UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

|  |  |
|---|---|
| TRANSCANADA POWER MARKETING LTD. ) | |
| ) Plaintiff, ) | |
| ) v. ) | C.A. No. _____ |
| ) | $05 - 40076$ |
| NARRAGANSETT ELECTRIC COMPANY ) | RECEIPT # 40457 |
| ) Defendant, ) | AMOUNT $ 260.00 |
| ) | SUMMONS ISSUED ✓ |
| _____ ) | LOCAL RULE 4.1 ✓ |
| | WAIVER FORM ✓ |
| | MCF ISSUED ✓ |
| | BY DPTY. CLK. _____ |
| | DATE 5/17/05 |

## COMPLAINT

Plaintiff TransCanada Power Marketing, Ltd. ("TransCanada") brings this action against

Narragansett Electric Company ("Narragansett") for breach of contract, contractual indemnity,

breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment.

## PARTIES

1.    Plaintiff TransCanada is a Delaware corporation with a principal place of business

at 11 Turnpike Road, Westborough, Massachusetts. TransCanada is a power marketing

company that purchases electricity from generation sources, such as power plants, and resells

that electricity to retail electric distribution companies and other customers throughout the

northeastern United States.

2.    Defendant Narragansett is a Rhode Island corporation with a principal place of

business at 280 Melrose Street, Providence, Rhode Island. Narragansett is a retail electric

distribution company engaged in the transmission and distribution of electricity to retail end-

customers in Rhode Island. Narragansett's predecessors include two retail electric distribution

companies in Rhode Island formerly known as Blackstone Valley Electric Company

("Blackstone") and Newport Electric Company ("Newport"), both of which merged into

Narragansett in 2000.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. § 1332, as the amount in controversy

exceeds $75,000.  Venue is proper in this Court under 28 U.S.C. § 1391(a)(1), (2) and (3).

## FACTS
### Industry Background: The URA

4.      In 1996, Rhode Island passed a Utility Restructuring Act (the "URA").  The

general objective of the URA was to deregulate electric power supply and develop a competitive

retail market for electricity in Rhode Island.  During the same time period, a similar electricity

deregulation process was ongoing in Massachusetts.

5.      The URA required that electric distribution companies in Rhode Island divest

ownership of their electricity generation facilities, and offer so-called "Retail Access" to Rhode

Island retail customers.  R.I.G.L. 39-1-27.3 (1997).  As envisioned by the URA, Retail Access

required each retail electric distribution company to allow its customers to purchase electricity

from non-affiliated retail suppliers, and further required each retail distribution company to

transport that purchased electricity over the retail distribution company's own lines from the

alternative supplier to the customer.

6.      The URA also required that, during the transition to Retail Access, the retail

distribution companies provide a standard power supply (a "Standard Offer Service") to Rhode

Island retail customers through 2009, at a set of regulated prices.  R.I.G.L. 39-1-27.3(d) (1997).

The purpose of the Standard Offer Service was to provide Rhode Island retail customers a stable,

2

competitively-priced source of electricity during the transition period to a competitive Retail

Access market, for those customers that had not yet obtained an alternative electricity supplier.

7.      Under the URA, the Standard Offer Service was to be priced to account for

increases in the consumer price index, and also for other factors reasonably beyond the control of

power suppliers such as "extraordinary fuel costs." R.I.G.L. 39-1-27.3(d) (1997). The URA

required the retail distribution companies to file tariffs with the Rhode Island Public Utilities

Commission ("PUC") to implement Standard Offer Service through 2009, for the benefit of both

wholesale and retail customers and their suppliers. R.I.G.L. 39-1-27(a) (1997).

Implementation of the URA

8.      Blackstone and Newport were retail electric distribution companies in Rhode

Island at the time of enactment of the URA, and were wholly-owned subsidiaries of Eastern

Utilities Associates ("EUA"), a public utility holding company.  EUA also owned a retail

electric company in Massachusetts, Eastern Edison Company ("Eastern," and, collectively with

Blackstone and Newport, the EUA retail "Companies").

9      At the time of enactment of the URA, the EUA Companies purchased their

electricity, which they then supplied to their retail customers, from an affiliated wholesale

electricity supplier, Montaup Electric Company ("Montaup").  To comply with the URA (and a

Massachusetts counterpart), the Companies were required to terminate their wholesale supply

contracts with Montaup, and allow their retail customers to have Retail Access to alternative

suppliers; Montaup was also required to divest its generation facilities.

10.     On October 17, 1997, in order to implement the URA, Blackstone, Newport, and

Montaup entered into a Stipulation and Agreement with the PUC, as well as the Rhode Island

Division of Public Utilities and Carriers ("Division") (hereinafter, the "RI Settlement

Agreement"). The RI Settlement Agreement was approved by the Federal Energy Regulatory Commission ("FERC"). A similar Stipulation and Agreement was executed in Massachusetts and also approved by FERC (the "MA Settlement Agreement," and, collectively with the RI Settlement Agreement, the "Settlement Agreements").

11.    In order to ensure a steady supply of Standard Offer Service, Montaup was required under the RI Settlement Agreement to provide Blackstone and Newport with a guaranteed, "Backstop" supply of Standard Offer Service through the required term of Standard Offer Service in Rhode Island (through 2009).[1] Blackstone and Newport were in turn required to seek alternative wholesale suppliers for Standard Offer Service during that term, and Montaup was to be released from its Backstop obligation to the extent Blackstone and Newport were able to obtain replacement contracts. In order to ensure a Standard Offer Service to Rhode Island retail customers through 2009, however, Montaup's Backstop obligation required it to provide Standard Offer Service to Blackstone and Newport through 2009 to the extent those companies did not obtain alternative wholesale Standard Offer Service supply contracts.

12.    The RI Settlement Agreement required that Montaup assign to the purchaser of any divested Montaup generation asset a commensurate share of Montaup's Backstop obligation. Thus, any purchaser of Montaup's generation assets was required to assume a share of Montaup's Backstop Standard Offer Service obligations to Blackstone and Newport.

13.    Consistent with the pricing scheme for Standard Offer Service set forth in the URA, the RI Settlement Agreement provided that Montaup and its successors and assigns were to provide Standard Offer Service to Blackstone and Newport in exchange for a stipulated set of base prices rising over time, subject to a "fuel index" to account for future extraordinary fuel

---

[1] Massachusetts required electric distribution companies to provide standard offer service only through 2004, and hence the MA Settlement Agreement imposed upon Montaup a Backstop obligation in Massachusetts only through 2004.

4

costs, through 2009. The purpose of the fuel index, as envisioned by the URA and Settlement

Agreements, was to ensure that wholesale Standard Offer Service suppliers would be protected

against the downside risk of future extraordinary increases in fuel costs, so that they would be

able to agree to the desired long-term Standard Offer Service supply contracts for the benefit of

Rhode Island retail customers.

TransCanada's WSOS Agreement

14.    On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase

Agreement whereby TransCanada purchased certain electricity generation assets of Montaup (the

"Asset Purchase Agreement"). TransCanada was thereby also required by the RI and MA

Settlement Agreements to assume a percentage share of Montaup's Backstop obligation to

provide Standard Offer Service to Blackstone, Newport and Eastern.

15.    TransCanada and Blackstone, Newport and Eastern (collectively, the EUA

"Companies") therefore entered into a Wholesale Standard Offer Service Agreement dated

April 7, 1998 (the "WSOS Agreement," or "Agreement," attached hereto as Exhibit A), which is

governed by Massachusetts law. In the WSOS Agreement, TransCanada agreed to assume a

percentage share of Montaup's Standard Offer Service obligations under the Settlement

Agreements, to Blackstone and Newport through 2009 (the term of the Standard Offer Service in

Rhode Island); and to Eastern through 2004 (the term of the Standard Offer Service in

Massachusetts). (*See* Agreement, § 3 & App. A.)

16.    Under the WSOS Agreement, and as specified in the Settlement Agreements and

the URA, TransCanada was to receive a price for delivering Standard Offer Service consisting of

the stipulated set of base prices rising over time (the "Standard Offer Wholesale Price"), plus a

fuel index (the "Fuel Adjustment Factor") to account for future extraordinary fuel costs. Under

5

the WSOS Agreement, the Fuel Adjustment Factor was to be calculated based upon the tariffs

that Blackstone and Newport were required to file in accordance with the URA and Settlement

Agreements. Specifically, Agreement Article Five provides that:

> For each kilowatt-hour of Delivered Energy that Supplier [TransCanada] provides in each month…, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:
>
> Price = Standard Offer Wholesale Price + Fuel Adjustment Factor
>
> Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and
>
> Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collection, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service Tariffs. … The Retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent the Companies are allowed to collect such revenues from the retail customers taking Standard Offer Service.

17.    The Agreement imposed upon Blackstone and Newport a good faith obligation to

make the required Standard Offer Service Tariff filings, and to use reasonable efforts to obtain

regulatory approval for a Fuel Adjustment Factor to be paid to TransCanada over the 2009 term

of the Agreement.

18.    The Agreement provided TransCanada with indemnity and termination rights in

the event that any government or regulatory agency amended the Standard Offer Service in a

manner which materially increased TransCanada's obligations or costs to provide Standard Offer

Service under the Agreement. Specifically, Article 8.3 of the Agreement provides:

> In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases the Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse the Supplier for any costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. … In the

6

event that the Parties are not able to agree on ... the amount to be reimbursed, ... either Party may terminate this Agreement on sixty (60) days written notice ....

19.     The Agreement also provided TransCanada with termination rights, and damages rights, in the event that the Companies failed to perform any of their obligations under the Agreement.  Specifically, the Agreement provides that, upon an uncured default by any of the Companies, TransCanada has the right to recover direct damages resulting from the default; to pursue all other remedies and damages provided for by law; and to terminate the Agreement upon sixty (60) days notice.  (Agreement, § 7(1), (2).)  Finally, the Agreement provides that TransCanada is entitled to recover interest on any improperly withheld payments.  (*Id.* § 6.)

The Narragansett Merger

20.     From the signing of the Agreement in April 1998 through early 2000, Blackstone and Newport filed the required Standard Offer Service Tariffs with the PUC on a periodic basis. Blackstone and Newport thereby obtained approval of the Standard Offer Wholesale Prices and a Fuel Adjustment Factor for 1999 and 2000, as required by the Agreement.

21.     In 2000, Blackstone and Newport merged into Narragansett, another retail electric distribution company in Rhode Island.  At the same time, Eastern merged into Massachusetts Electric Company ("Mass. Electric"), another retail distribution company in Massachusetts.

22.     Narragansett and Mass. Electric were at the time (and still are, upon information and belief) wholly-owned subsidiaries of National Grid USA ("National Grid").  Through the comprehensive merger, all of EUA's former retail distribution companies in Rhode Island and Massachusetts, consisting of Blackstone, Newport, and Eastern, merged into the corresponding Rhode Island and Massachusetts retail distribution companies of National Grid, consisting of Narragansett and Mass. Electric.

7

23.    By way of the Rhode Island portion of the merger, Narragansett became the retail

electric distribution company both for the previous retail customers of Blackstone and Newport

in Rhode Island (hereinafter the former "EUA Zone"), as well as its own previous retail

customers in its former area (hereinafter the old "Narragansett Zone").

24.    The PUC approved the Narragansett merger in March, 2000. At the request of

Narragansett, the PUC cancelled the former Blackstone and Newport Standard Offer Service

Tariffs and ruled that Narragansett could continue to obtain payment for Standard Offer Service

in both its new EUA Zone and in its old Narragansett Zone through Narragansett's own and

future Standard Offer Service Tariffs and related filings.[2]

Narragansett's Wrongful Conduct

25.    On April 18, 2000, Narragansett sent a letter to TransCanada giving notice of the

merger, and stating that Narragansett would succeed to and assume the obligations of Blackstone

and Newport under the WSOS Agreement. The letter further assured TransCanada, as required

for valid assignment of the Agreement in the case of a merger, that the obligations of the parties

"are not affected by the merger and assignments." Narragansett's letter further stated that

Narragansett would continue to make Fuel Adjustment payments to TransCanada "after 1999,"

according to the mechanism previously established in the RI Settlement Agreement and in the

Blackstone and Newport Standard Offer Service Tariffs.

26.    Unbeknownst to TransCanada, however, Narragansett began planning even at the

time of the merger to deny TransCanada the Fuel Adjustment Factor it had bargained for in the

---

[2] Narragansett, like Blackstone and Newport, had entered into its own Settlement Agreement with the PUC in 1997, which also required Retail Access and divestiture of generation assets. Narragansett's Settlement Agreement required Narragansett to provide Standard Offer Service at the same set of stipulated prices and fuel adjustment triggers as in Blackstone's and Newport's RI Settlement Agreement. Like Blackstone and Newport, Narragansett also subsequently entered into Standard Offer Service supply contracts with a number of wholesale Standard Offer Service suppliers. Narragansett was required, like Blackstone and Newport, to file tariffs under the URA to implement the Standard Offer Service for the benefit of its customers and suppliers.

8

WSOS Agreement. It was to Narragansett's benefit not to pay a Fuel Adjustment Factor, particularly in times of rising fuel prices, in order to reduce its overall expenses and costs. Fuel prices began rising at the time of Narragansett's merger, and the Fuel Adjustment Factors in Narragansett's and Blackstone's and Newport's wholesale Standard Offer Service supply contracts had been triggered.

27.    Nevertheless, Narragansett thereafter and through the end of 2004 continued to pay TransCanada for Standard Offer Service as required under the Agreement, including both the base Wholesale Standard Offer Price and a Fuel Adjustment Factor. Fuel prices continued to rise, however, and Fuel Adjustment Factor payments to TransCanada and other wholesale Standard Offer Service suppliers became a regular component of the price paid by Narragansett to its suppliers for Wholesale Standard Offer Services.

28.    In May, 2003, unbeknownst to TransCanada, Narragansett began to argue affirmatively before the PUC that its suppliers in the former EUA Zone should not be paid a Fuel Adjustment Factor after 2004. The PUC expressed concern about Narragansett's position, and Narragansett stated to the PUC both that it had discussed its intended position with all of its EUA Zone suppliers and that, while the suppliers had not affirmatively agreed with Narragansett's position, none of those suppliers had raised objection. These were blatant misrepresentations, as Narragansett neither notified nor discussed with TransCanada at any time Narragansett's intention not to provide Fuel Adjustment Factor payments under the Agreement after 2004.

29.    In July 2004, Narragansett again told the PUC that it should make no provision for a Fuel Adjustment Factor in the former EUA Zone after 2004. The PUC again expressed concern, both about the merit of Narragansett's position and about whether Narragansett's EUA Zone suppliers had been notified and agreed with Narragansett's position. In response,

9

Narragansett argued against TransCanada's right to a Fuel Adjustment Factor, and again misrepresented both that it had discussed the matter with all of its EUA Zone suppliers and that none of those suppliers had affirmatively disputed Narragansett's position. Narragansett also falsely assured the PUC that, in the event a dispute developed, TransCanada had no ability to terminate the WSOS Agreement in the event that it failed to receive Fuel Adjustment Factor payments after 2004.

30.     In December, 2004, Narragansett filed with the PUC its proposed Standard Offer Service Tariffs and rates for 2005. Narragansett specified that no Fuel Adjustment Factor should be granted to TransCanada (or any other EUA Zone suppliers) in 2005. As a result of that filing, and Narragansett's arguments and previous misstatements to the PUC, the PUC approved Standard Offer Service Tariffs and rates for 2005 that provide no allocation for a Fuel Adjustment Factor for TransCanada.[3] At the same time, Narragansett continued to request and obtain approval for a Fuel Adjustment Factor in 2005 for its suppliers in the old Narragansett Zone. TransCanada was never made aware of any of Narragansett's filings or arguments at the PUC in 2003 and 2004.

31.     In February, 2005, TransCanada learned for the first time that Narragansett did not plan to pay TransCanada any Fuel Adjustment Factor after 2004, or indeed for the last five years of the WSOS Agreement. TransCanada discovered this position only after receiving Narragansett's calculation of the amount payable for Standard Offer Service delivered in January, 2005, which noticeably omitted any payment for a Fuel Adjustment Factor. The expected amount of that unpaid Fuel Adjustment Factor, just for January, 2005, totaled over

---

[3] When asked in December 2004 whether it had had further discussions with its EUA Zone suppliers since its previous statements, Narragansett admitted in a half-truth at that point that it had not had *recent* discussions with all of its suppliers.

3925077v1

$320,000.00. The Fuel Adjustment Factor each subsequent month has been similar, and is expected to remain substantial in future months.

32.    On March 1, 2005, TransCanada provided written notice of default under the WSOS Agreement. Narragansett has thereafter refused to cure or change its position, or to indemnify or reimburse TransCanada under Article 8(3) of the Agreement for loss of the Fuel Adjustment Factor.

33.    Narragansett also continues to dispute TransCanada's right to terminate the WSOS Agreement. Narragansett has further threatened that its National Grid affiliates will withhold payments owed to TransCanada under the Asset Purchase Agreement if TransCanada proceeds to terminate the WSOS Agreement.

34.    Narragansett's breaches of its obligations under the WSOS Agreement have deprived TransCanada of its contractual rights to payment of a Fuel Adjustment Factor under the Agreement. These breaches have caused and are continuing to cause TransCanada substantial and ongoing damages.

Count I
(Breach of Contract)

35.    TransCanada repeats and incorporates by reference paragraphs 1 through 34 above.

36.    Narragansett has breached the WSOS Agreement through the acts described above, including (a) its failure to file for or make a reasonable effort to obtain regulatory approval of a Fuel Adjustment Factor after 2004, (b) its failure to pay a Fuel Adjustment Factor to TransCanada as required under the Agreement; and (c) its failure to indemnify or reimburse TransCanada as required by Article 8(3) of the Agreement for regulatory loss of the Fuel Adjustment Factor.

11

37.    As a result of these breaches, TransCanada has suffered and will continue to suffer monetary damages.  TransCanada is entitled to terminate the Agreement, and to an award of its damages and interest.

Count II
(Contractual Indemnification)

38.    TransCanada repeats and incorporates by reference paragraphs 1 though 37 above.

39.    The PUC's abolishment of the Blackstone and Newport tariffs, and its subsequent approval of Standard Offer Service Tariffs for 2005 that do not include a Fuel Adjustment Factor in the EUA Zone, have amended the Standard Offer Service in a manner that has materially increased TransCanada's costs and obligations to provide Standard Offer Service under the Agreement.  These regulatory changes were made by the PUC at the express request of Narragansett.

40.    Under Article 8(3) of the WSOS Agreement, Narragansett is obligated to indemnify or otherwise reimburse TransCanada for loss of the expected Fuel Adjustment Factor.

Count III
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

41.    TransCanada repeats and incorporates by reference paragraphs 1 through 40 above.

42.    The Agreement contains an implied covenant of good faith and fair dealing.

43.    Narragansett has breached the covenant of good faith and fair dealing implied in the Agreement through its conduct described above, including but not limited to its various contractual breaches, its misleading behavior with TransCanada and the PUC, its concealment of

3925077v1

its planned breach of the Agreement, and its expropriation to its own benefit of TransCanada's rights under the Agreement.

44.    As a result of these breaches, TransCanada has suffered and will continue to suffer substantial monetary damages. TransCanada is entitled to terminate the Agreement, and to an award of damages and interest.

Count IV
(Declaratory Relief under G.L. c 231A:  Right to Terminate)

45.    TransCanada repeats and incorporates by reference paragraphs 1 through 44 above.

46.    An actual controversy exists as to whether Narragansett has breached the WSOS Agreement, and whether TransCanada has the right to terminate the Agreement, including under its Articles 7(2) and/or 8(3).

47.    TransCanada requests a declaratory judgment that Narragansett has breached the terms of the WSOS Agreement; that Narragansett has failed to cure the breach; and that TransCanada has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement immediately.

3925077v1

WHEREFORE, TransCanada requests the following relief:

1.     Judgment in its favor on all counts.

2.     An award of damages, including interest, in an amount to be determined at trial.

3.     A declaratory judgment that Narragansett has breached the terms of the WSOS Agreement; that Narragansett has failed to cure the breach; and that TransCanada has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement immediately.

4.     An award of its costs, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

TRANSCANADA POWER MARKETING

By its attorneys,

Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
**CHOATE, HALL & STEWART LLP**
Exchange Place
53 State Street
Boston, MA  02109
Telephone No. (617) 248-5000
Fax No. (617) 248-4000

14

Wholesale Standard Offer
Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

# TABLE OF CONTENTS

Page

ARTICLE 1.  Definitions.................................................................................................. 2

ARTICLE 2.  Term  .........................................................................................................3

ARTICLE 3.  Supplier Responsibilities ......................................................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO ...........................4

ARTICLE 5.  Price  ........................................................................................................5

ARTICLE 6.  Billing and Payments ............................................................................... 6

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies .................. 6

ARTICLE 8.  Termination/Reimbursement ....................................................................8

ARTICLE 9.  Force Majeure ........................................................................................... 8

ARTICLE 10. Assignment ............................................................................................... 9

ARTICLE 11. Successors and Assigns............................................................................ 10

ARTICLE 12. Resolution of Disputes.............................................................................10

ARTICLE 13. Interpretation ........................................................................................... 11

ARTICLE 14. Severability of Provisions ....................................................................... 11

ARTICLE 15. Accounts and Records.............................................................................. 11

ARTICLE 16. Limitations on Liability and Indemnification .......................................... 12

ARTICLE 17. Regulation ................................................................................................ 12

ARTICLE 18. Notices ..................................................................................................... 12

ARTICLE 19. Miscellaneous .......................................................................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

## WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this seventh day of April, 1998          , between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

1

ARTICLE 1.  Definitions:

　　　　Whenever used in this Agreement, the following terms shall have the following meanings:

　　　　"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

　　　　"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

　　　　"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

　　　　"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

　　　　"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

　　　　"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

　　　　"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

　　　　"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

　　　　"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

　　　　"NEPOOL" shall mean the New England Power Pool or its successor.

　　　　"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

　　　　"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

　　　　"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5.  The Companies or their Standard Offer customers shall not be obligated

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.


ARTICLE 2.   Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.


ARTICLE 3.   Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.   Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

$$Price = Standard\ Offer\ Wholesale\ Price$$
$$+\ Fuel\ Adjustment\ Factor$$

Where:    Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

5

regulatory approval and only to the extent that the
Companies are allowed to collect such revenues from
their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be
paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or
which may be assessed or imposed in the future by any governmental authority with jurisdiction
governing the sale of electricity covered by this Agreement.

## ARTICLE 6.  Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of
Suppliers, computations by the Companies of the charges for the purposes of billings hereunder
shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the
Price as determined in accordance with Article 5.  The Companies shall calculate the amount
payable to Supplier for a given month on or before the twentieth (20th) day of the following
month. The calculation shall be provided to Supplier and shall show the total amount due and
payable for the previous month. Each bill shall be subject to adjustment for any errors in
arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of
Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due
and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date").
Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in
effect at the main office of BankBoston, or such other lending institution as agreed to by
Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis
for its dispute in a written notice to Companies within fifteen days after the Due Date.  Billing
and payment disputes shall be handled in accordance with the provisions of Article 12 of this
Agreement.  Upon final resolution of the dispute, payment of any amount due to a Party under
the terms of the resolution shall be made within thirty (30) days of the date thereof, together with
interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one
year from the date of the original billing in order to reflect differences in charges resulting from
receipt of more accurate data.  Supplier may dispute such adjustment in writing within thirty (30)
days of receipt of the proposed adjustment.

## ARTICLE 7.  Events of Default, Liability, Relationship of the Companies:

(1)    Unless excused by a Force Majeure as described in Article 9, each of the
following events shall be deemed to be an Event of Default hereunder:

6

    (a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

    (b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

    (2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

    (3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

    "Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

    The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

    (4)    As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement. The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

ARTICLE 8.   Termination/Reimbursement:

(1)     In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

      a.   Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

      b.   The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

      c.   Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)     In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice. In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3)     In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materially of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.   Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

8

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)     The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)     The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)     The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)     The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 11. <u>Successors and Assigns</u>:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. <u>Resolution of Disputes</u>:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value <u>provided, however,</u> that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 16. <u>Limitations on Liability and Indemnification</u>:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. <u>Regulation</u>:

(a)     This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided, however,</u> that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)     This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. <u>Notices</u>:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.


ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by  the portion of its monthly

Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:    TransCanada Power Marketing Ltd.

By: _____

On Behalf of the Companies:

Blackstone:    BLACKSTONE VALLEY ELECTRIC COMPANY

By: _____

Eastern:    EASTERN EDISON COMPANY

By: _____

Newport:    NEWPORT ELECTRIC CORPORATION

By: _____

15

APPENDIX A

## SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
## AND
## STANDARD OFFER WHOLESALE PRICE

TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service -In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

\* Standard Offer Service for Eastern Edison terminates
  at 12:00 midnight on December 31, 2004.

# 05-40076

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)   TransCanada Power Marketing Ltd. v.
   Narragansett Electric Company

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   [ ]    I.     160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   [ ]    II.    195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
                 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

   [X]    III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                 380, 385, 450, 891.

   [ ]    IV.    220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
                 690, 810, 861-865, 870, 871, 875, 900.

   [ ]    V.     150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                                        YES [ ]     NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
                                                                        YES [ ]     NO [X]
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                                        YES [ ]     NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                                        YES [ ]     NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                                        YES [ ]     NO [X]

   A.    If yes, in which division do all of the non-governmental parties reside?

         Eastern Division [ ]        Central Division [ ]        Western Division [ ]

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

         Eastern Division [ ]        Central Division [X]        Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
                                                                        YES [ ]     NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME     Daniel C. Winston
ADDRESS   Choate, Hall & Stewart LLP, Exchange Pl., 53 State St., Boston, MA
                                                                                              02109
TELEPHONE NO.     (617) 248-4049

(CategoryForm.wpd - 5/2/05)

05-40076

%JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| TransCanada Power Marketing Ltd. | Narragansett Electric Company |

| | | |
|---|---|---|
| **(b)** County of Residence of First Listed Plaintiff USA | County of Residence of First Listed Defendant USA | |
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) | |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. | |
| **(c)** Daniel C. Winston  (617) 248-4049 CHOATE, HALL & STEWART LLP Exchange Place 53 State Street Boston, MA 02109 | Attorneys (If Known) | |

| II.  BASIS OF JURISDICTION (Place an "X" in One Box Only) | III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|

(For Diversity Cases Only)

| II. BASIS | | III. CITIZENSHIP | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question (U.S. Government Not a Party) | Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V.  ORIGIN (Place an "X" in One Box Only)

| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|

| VI.  CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. Section 1332 |
|---|---|
| | Brief description of cause:  Suit for breach of contract and breach of the implied covenant of good faith and fair dealing. |

| VII.  REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND:  ☐ Yes  ☒ No |
|---|---|---|---|

| VIII.  RELATED CASE(S) IF ANY | (See instructions): | JUDGE | DOCKET NUMBER |
|---|---|---|---|

| DATE 5/17/05 | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____