UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-40076FDS |
| ) | |
| NARRAGANSETT ELECTRIC COMPANY, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF TRANSCANDA POWER MARKETING LTD.'S MEMORANDUM IN
SUPPORT OF ITS MOTION TO ENJOIN DEFENDANT NARRAGANSETT
ELECTRIC COMPANY FROM PROSECUTING A
DUPLICATIVE SECOND-FILED ACTION IN RHODE ISLAND**

Plaintiff TransCanada Power Marketing Ltd. ("TransCanada") respectfully requests this

Court enjoin Defendant Narragansett Electric Company ("Narragansett") from prosecuting Civil

Action No. 05-234 in the United States District Court for the District of Rhode Island (the

"Rhode Island Action"), because Narragansett's claims in the Rhode Island Action are literally

identical to Narragansett's counterclaims in this case. Narragansett brought its identical claims

in Rhode Island approximately ten days after TransCanada filed this case.

It is readily apparent that Narragansett filed the Rhode Island Action to forum shop, and

avoid litigating its breaches of contract before this Court. The Rhode Island Action is a word-

for-word copy of the counterclaim that Narragansett has already asserted in this case, and

consequently the underlying facts and legal issues are identical. Maintenance of both actions

would clearly lead to duplicative discovery, the inefficient use of judicial resources, and the

threat of inconsistent decisions. This Court should enjoin Narragansett from pursuing the Rhode

1

Island Action, or enjoin the Rhode Island Action itself from going forward, pending final disposition of this case.

### BACKGROUND

#### Parties

TransCanada is a power marketing company with a principal place of business in Westborough, Worcester County, Massachusetts. TransCanada purchases electricity from generation sources, such as power plants, and resells the electricity to retail electric distribution companies and other customers. (MA Comp./Ans. ¶ 1, MA Count./RI Compl. ¶¶ 2, 5.)[1]

Narragansett is a retail electric distribution company with a principal place of business in Providence, Rhode Island. (MA Count./RI Compl. ¶ 1.) Narragansett's predecessors include two retail electric distribution companies in Rhode Island formerly known as Blackstone Valley Electric Company ("Blackstone") and Newport Electric Company ("Newport"), both of which merged into Narragansett in 2000. (Id. ¶ 13.)

#### TransCanada's Massachusetts Complaint

On May 17, 2005, TransCanada filed a Complaint against Narragansett in this Court claiming that Narragansett breached its obligations under a so-called "Wholesale Standard Offer Service Agreement" dated April 7, 1998 (the "WSOS Agreement"). (A copy of the WSOS Agreement is attached as Exhibit A to the MA Complaint.) TransCanada served its MA Complaint on Narragansett on May 19, 2005. (See Return of Service filed on May 24, 2005.)

The original parties to the WSOS Agreement were TransCanada, on the one hand, and Blackstone, Newport and their affiliated Massachusetts retail electric company, Eastern Edison

---

[1] TransCanada cites particular paragraphs of its Massachusetts Complaint, and Narragansett's corresponding responses in its Massachusetts Answer, collectively by use of the following joint citation: "MA Compl./Ans. ¶ __." Similarly, TransCanada cites to particular portions of Narragansett's Massachusetts Counterclaim, and Narragansett's identical Rhode Island Complaint (attached to the Declaration of Wendy S. Plotkin filed herewith as Exhibit 1) jointly as the "MA Counter./RI Compl. ¶ __."

2

Company ("Eastern"), on the other hand. (MA Compl./Ans. ¶¶ 8, 15, MA Counter./RI Compl. ¶¶ 6, 8.) Blackstone, Newport and Eastern were all wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), a Massachusetts public utility holding company. (Id., Taylor Aff. ¶6.) The WSOS Agreement was part of a larger Asset Purchase Agreement between TransCanada and Montaup Electric Company ("Montaup"), another Massachusetts-based subsidiary of EUA. (Id.; Taylor Aff. ¶ 7.)

Under the WSOS Agreement, TransCanada agreed to provide to Blackstone, Newport and Eastern (the "EUA Companies") a specific share of the necessary electric service ("Wholesale Standard Offer Service" or "WSOS") to supply the standard offer service needs of the EUA Companies' retail customers. Under the WSOS Agreement, TransCanada was to provide WSOS to Blackstone and Newport in Rhode Island through 2009, and to Eastern in Massachusetts through 2004. (MA Compl./Ans. ¶ 15, MA Count./RI Compl. ¶ 8.) TransCanada was to receive for providing this Wholesale Standard Offer Service a price consisting of a stipulated set of base prices rising over time (the "Standard Offer Wholesale Price"), plus a fuel index to account for future extraordinary fuel costs (the "Fuel Adjustment Factor," or "FAF"). The Fuel Adjustment Factor was to be calculated based upon tariffs filed by Blackstone and Newport with the Rhode Island Public Utilities Commission ("RI-PUC"), and by Eastern with the Massachusetts regulatory authorities. (MA Compl./Ans. ¶ 16, MA Count./RI Compl. ¶¶ 9-11.) In 2000, Blackstone and Newport merged into Narragansett, a wholly owned subsidiary of National Grid USA, and Narragansett succeeded to the WSOS Agreement. (MA Compl./Ans. ¶¶ 21-24, MA Count./RI Compl. ¶¶ 13-15.)

The gravamen of TransCanada's Complaint in this action is that Narragansett breached the WSOS Agreement by (i) failing to file tariffs for a Fuel Adjustment Factor in Rhode Island

3

after 2004, and (ii) failing pay a Fuel Adjustment Factor to TransCanada after 2004. (MA Compl. ¶ 25-44.) Specifically, the counts in the MA Complaint are for: breach of contract (Count I), contractual indemnity (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and for a declaratory judgment (Count IV). (MA Compl. ¶¶ 35-47.)

### Narragansett's Answer and Counterclaim

Narragansett filed its Answer and Counterclaim in the this action on June 7, 2005. Narragansett's Counterclaim essentially asserts *defenses* to TransCanada's claims, as follows: alleged breach of contract based on TransCanada's "demand[s]" for payment of a Fuel Adjustment Factor and "threatened" termination of the WSOS Agreement (Count I); declaratory judgment that TransCanada is not entitled to FAF payments and has no right to terminate the WSOS Agreement (Count II); and alleged breach of good faith based on TransCanada's assertion of its claims (Count III). (MA Counterclaim ¶¶ 35-40.)

### The Current State of This Massachusetts Action

TransCanada served its automatic disclosures, as well as document requests and interrogatories to Narragansett on August 26, 2005. Narragansett's discovery responses are due on September 25, 2005. The parties filed a joint statement and proposed schedule on September 14, 2005, and the Court has set a scheduling conference for October 3, 2005.

### The Second-Filed Rhode Island Action

On May 26, 2005, fully aware that TransCanada had initiated this Massachusetts suit, Narragansett filed a complaint in the United States District Court for the District of Rhode Island. The RI Complaint is literally identical, word-for-word and from start to finish, to Narragansett's defensive and compulsory Counterclaim in this action. (Compare RI Complaint with MA Counterclaim.) On June 16, 2005, TransCanada filed a Motion to Dismiss, or,

4

Alternatively, to Stay the Action or Transfer Venue to the Central District of Massachusetts ("Motion to Dismiss"). On September 9, 2005, a hearing was held in the Rhode Island Action on TransCanada's Motion to Dismiss. The Motion to Dismiss is currently pending before the Rhode Island Court.[2]

TransCanada has not yet answered the Rhode Island Complaint, and no scheduling discussions or discovery has been initiated in the Rhode Island Action. The sole events in the Rhode Island Action have been the filing of the Rhode Island Complaint and the filing of TransCanada's Motion to Dismiss and related papers.

### Additional Facts Underlying TransCanada's Complaint and Choice of Forum

TransCanada's primary office is in Westborough, Worcester County, Massachusetts. It has no offices or employees in Rhode Island, except that it obtains certain accounting services from Rhode Island. (See Affidavit of William Taylor ("Taylor Aff.") ¶ 3, attached as Exhibit 2 to Plotkin Declaration.) Narragansett, although based in Rhode Island, maintains its customer service office in Northborough, Worcester County, Massachusetts. In addition, Narragansett operates through a service agent, National Grid USA Services Company ("National Grid SC"), which is located in Northborough, Massachusetts. (See Taylor Aff. ¶¶ 4-5.)

The principal witnesses at TransCanada involved with the negotiation and subsequent performance of the WSOS Agreement were William Taylor and Michael Hachey, both of whom have at all relevant times worked at TransCanada's office in Westborough and live in

---

[2] TransCanada did not previously file a Motion to Enjoin the Rhode Island Action in this Court, because Narragansett did not contest jurisdiction in this case and instead chose to let this action proceed. Moreover, as set forth in Section IB below, it is well settled that the Court of the first-filed action (here Massachusetts) is to be the Court which decides the issue of which of two actions should proceed. *See* Section IB, *supra*. Nevertheless, at the September 9 hearing on TransCanada's Motion to Dismiss the Rhode Island Action, the Rhode Island Court indicated that this rule (mandating that the first-filed court should decide the forum question) might apply only if a motion concerning the forum issue was pending before the first-filed court. While TransCanada disagrees with the Rhode Island court's assessment of the law on this issue, and believes it is clear that the Rhode Island Court must defer the forum decision to this Massachusetts Court regardless of whether a motion is pending here, TransCanada now files this motion to moot that subject and to bring the forum issue squarely before this Court.

Westborough, Massachusetts. (Taylor Aff. ¶¶ 1, 8, 9.) TransCanada's documents concerning the negotiation and performance of the WSOS Agreement are also currently located in TransCanada's offices in Westborough, Massachusetts. (Taylor Aff. ¶ 10.)

TransCanada and the EUA Companies negotiated the WSOS Agreement in and from Massachusetts, with the EUA companies negotiating through their affiliated service agent, the EUA Service Corporation ("EUA SC"), located in West Bridgewater, Massachusetts. Most of these former EUA SC representatives, upon information and belief, still work in Massachusetts. (Taylor Aff. ¶ 11.)

The Agreement expressly states that it is governed by Massachusetts law, and notices to the EUA Companies under the Agreement were to be sent to EUA SC in West Bridgewater, Massachusetts. (Agreement, §§ 13, 18; Taylor Aff. ¶ 12.)

After execution of the WSOS Agreement on April 7, 1998, substantially all communications concerning the Agreement were made between representatives of TransCanada in Westborough, Massachusetts and representatives of EUA SC in West Bridgewater, Massachusetts. (Taylor Aff. ¶ 13.)

Since Blackstone and Newport merged into Narragansett in 2000, TransCanada has communicated with Narragansett through Narragansett's service agent, National Grid SC, at its Northborough, Massachusetts offices. National Grid SC, in Massachusetts, is also Narragansett's designee for notices under the WSOS Agreement. (Taylor Aff. ¶ 14.) Narragansett's public testimony before the RI-PUC, as referenced in paragraphs 18-21 of the MA Counterclaim/RI Complaint, and in paragraphs 28-29 of the Massachusetts Complaint, was provided by representatives of National Grid SC working and living in Massachusetts. (Taylor Aff. ¶ 15.) Upon information and belief, many of the relevant decisions made by Narragansett

6

concerning the WSOS Agreement were made by representatives of National Grid SC in Massachusetts. Copies of all Narragansett's relevant documents concerning the WSOS Agreement are at National Grid's offices in Northborough, Massachusetts. (Taylor Aff. ¶ 16.)

Since the dispute came to a head in 2005, substantially all business communications concerning the dispute have occurred between TransCanada and Narragansett's service agent in Northborough, Massachusetts. (Taylor Aff. ¶¶ 17-19.) For example, the TransCanada letter, upon which Narragansett appears to base the specific counts in its Rhode Island Complaint/Massachusetts Counterclaim, was sent from TransCanada in Westborough to Narragansett's service agent in Northborough, Massachusetts. (See RI Comp./MA Count. at ¶¶ 27-30, 32, 35-40; Taylor Aff. ¶ 18.)

In sum, substantially all interactions between TransCanada and representatives of Narragansett or its predecessors, related to the negotiation and performance of the WSOS Agreement, occurred in and from Massachusetts. Similarly, substantially all relevant witnesses and documents are located in Massachusetts. Narragansett negotiated a contract with a Massachusetts company and made promises in Massachusetts to take certain actions. Narragansett has no right now to insist that TransCanada obtain relief, when Narragansett breaks those promises, only by chasing Narragansett into its home forum of Rhode Island despite a prior-filed action in Massachusetts.

## ARGUMENT

I.    Pursuant to the First-Filed Doctrine this Court Should Enjoin Narragansett From Prosecuting the Rhode Island Action

### A.    The First Filed Doctrine.

It is a well settled principle in this Circuit, and elsewhere, that when two parallel proceedings are brought in different federal courts, only one action should proceed and the first-

7

filed action generally receives priority. *See Cianbro Corp. v. Curran Lavoie, Inc.*, 814 F.2d 7, 11

(1st Cir. 1987); *United Fruit Co. v. Standard Fruit and Steamship Co.*, 282 F. Supp. 338, 339

(D.Mass. 1968) (applying "general rule that party filing later in time should be enjoined from

further prosecution of his suit"), citing *Martin v. Graybar Electric Company*, 266 F.2d 202, 204

(7th Cir. 1959). The first-filed rule "seeks to advance judicial economy, protect the plaintiff's

choice of forum and avoid duplicative litigation." *Kidd v. Andrews*, 340 F. Supp.2d 333, 335

(W.D.N.Y. 2004).

> In *Graybar,* the court noted:

> A party who first brings an issue into a court of competent jurisdiction should be free
> from the vexation of concurrent litigation over the same subject matter, and an injunction
> should issue enjoining the prosecution of the second suit ...

*Graybar*, 266 F.2d at 204.

Thus, where two actions concerning the same parties and embracing the same issues are

filed in separate federal district courts, the court in the first-filed action not only has the power to

enjoin the parties from proceeding in the second action, but "indeed should do so absent a

showing of special circumstances that would give priority to the second action." *Toy Biz v.

Centuri Corp.*, 990 F. Supp. 328, 332 (S.D.N.Y. 1998). *See also Small v. Wageman*, 291 F.2d

734, 736 (1st Cir. 1961).

**B.    This Court Determines Which Case Should Proceed Under the First-Filed
Doctrine.**

It also is well settled that the Court of the first-filed action (here, this Court in

Massachusetts) should be the Court to make the determination of whether the first or second-

filed case should proceed. *See National Equipment Rental, Ltd. v. Fowler*, 287 F.3d 43, 46 (2d

Cir. 1961); *Citigroup, Inc. v. Citi Holding Co.*, 97 F. Supp.2d 549, 556-557 (S.D.N.Y. 2000);

*Ontel Products, Inc. v. Project Strategies Corp.*, 889 F. Supp. 1144, 1150 (S.D.N.Y. 1995);

8

*Donaldson, Lufkin & Jenrette, Inc. v. Los Angeles County*, 542 F. Supp. 1317, 1321 (S.D.N.Y. 1982). As stated in *Ontel*, "case law indicates that the court in which the first-filed case was brought decided the question of whether or not the first-filed rule, or alternatively, an exception to the first-filed rule, applies." *Ontel*, 889 F. Supp. at 1150, n.9. Thus, the court addressing the second-filed case, when faced with a motion to determine which of the parallel cases should proceed, should dismiss or stay the second-filed action, or stay the pending motion, unless and until the first-filed court has either declined jurisdiction or ruled on the issue. *Cruz v. Hartford Casualty Insurance Co.*, 2005 WL 1231965, *3 (D.R.I. 2005). *See also, Donaldson, Lufkin & Jenrette, Inc.*, 542 F. Supp. at 1321 (dismissing the second-filed case without prejudice unless and until the court hearing the first-filed case declined jurisdiction); *Ultronic Sys. Corp. v. Ultronix, Inc.*, 217 F. Supp. 89, 92-93 (D. Del. 1963) (staying second-filed case unless and until first-filed case declined jurisdiction). The second-filed court should also defer to the first-filed court even when no motion is pending before the first-filed court. *See Ultronic Sys. Corp.* 217 F. Supp. at 92-93. In fact, the first-filed Court should ultimately determine the issue even where the second-filed court has gone ahead, erroneously, to decide the issue in favor of its own forum. *See National Equipment Rental*, 287 F.3d at 46, *Citigroup, Inc.* 97 F. Supp. 2d at 556-557 (enjoining second-filed action after second-filed court denied first-filed plaintiff's motion to dismiss or transfer venue based on first-filed rule).

Thus, this Court should enjoin the Rhode Island Action, regardless of the status of TransCanada's pending Motion to Dismiss in Rhode Island.

## C.     The Principles of Comity and Efficiency Compel Injunction of the Duplicative Rhode Island Action

The Rhode Island Action involves the exact same parties, claims, and legal and factual issues as this Massachusetts action. The RI Complaint is identical, literally word-for-word, to

9

the counterclaim Narragansett has asserted in the Massachusetts Action. Fed. R. Civ. P. 13(a).

*See also Fowler*, 287 F.2d at 45 (affirming first-filed court's enjoining of second-filed action

where second-filed claims were identical to (compulsory) counterclaims asserted in first-filed

suit). Because the issues and parties in both actions are the same, both actions will necessarily

involve identical witnesses and documentary evidence. To avoid a waste of judicial resources

and the possibility of multiple outcomes, Narragansett should be enjoined from prosecuting the

Rhode Island Action.

**D.     No Factors Exist to Warrant Deviation From First Filed Rule.**

While the preference for the first-filed action is not a per se rule, a strong presumption of

priority attaches to the first-filed action. *See, e.g., GSI Lumonics, Inc. v. Biodiscovery, Inc.*, 112

F. Supp. 2d 99, 104-105 (D.Mass. 2000); *Biogen, Inc. v. Schering AG*, 954 F. Supp. 391, 398

(D.Mass. 1996). To overcome this presumption, the defendant in the first-filed action – here

Narragansett – has the affirmative burden to show either that (1) the balance of convenience

weighs substantially in favor of the later-filed action; or (2) "special circumstances" justify

giving priority to the second action. *Veryfine Products, Inc. v. Phlo Corp.*, 124 F. Supp. 2d 16,

22-25 (D.Mass. 2000), *Holmes Group, Inc. v. Hamilton Beach/Proctor Silex*, 249 F. Supp. 2d 12,

16 (D.Mass. 2002). "Special circumstances" warranting divergence from the first-filed rule

include forum shopping, or "filing of suit for the sole purpose of winning the race to the

courthouse to secure a preferred forum." *See Holmes Group*, 249 F. Supp. 2d 12 at 16, *Toy Biz*,

990 F. Supp. at 332. Narragansett cannot make such a showing.

10

1.    The Balance of Convenience Does Not Favor the Second-Filed Action.

In weighing the balance of convenience, courts typically consider several factors including: (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses and location of documents; (4) any connection between the forum and the issues; (5) the law to be applied; and (6) the state or public interest at stake. *Holmes Group*, 249 F. Supp. 2d at 17.

Applying these factors, Narragansett cannot come close to showing that litigating this dispute in Rhode Island would be substantially more convenient than litigating this dispute in Massachusetts.

        a.    *The Plaintiff's Choice of Forum*

This Circuit has recognized that there is a "strong presumption in favor of a plaintiff's forum choice, [against which] the defendant must bear the burden of proving that considerations of convenience and judicial efficiency strongly favor litigation the claim in the alternative forum." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 719 (1st Cir. 1996).

TransCanada elected to bring this suit in Massachusetts, where its principle place of business is located and the contract at issue was negotiated and signed.    A plaintiff should not be deprived of the advantages of its own choice of jurisdiction except where there is clear factual showing (by Narragansett) which either "establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiffs convenience, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative or legal problems." *Nowak*, 94 F. 3d at 720, quoting *Koster v. Lumbermans Mut. Cas Co.*, 330 U.S. 518, 524 (1974). As this court has recognized, "where a plaintiff chooses his home forum, such a choice usually represents consideration of convenience, rather than harassment of the

11

defendant." *Holmes Group*, 249 F.Supp.2d at 17. Moreover, where, as here, the plaintiff is the "natural plaintiff," courts will not disturb the "natural plaintiff's" choice of forum absent a strong showing of inconvenience. *See Old Town Canoe Co. v Confluence Holdings*, 2005 WL 552005, at *2 (D. Or. 2005), *BASF Corp. v. Symington*, 50 F.3d 555, 559 (9th Cir. 1995). *See also* Section 2 below.

Narragansett cannot establish that trying this case in Massachusetts is either oppressive or inappropriate. First, litigating this case in Massachusetts would clearly not be oppressive or vexatious to Narragansett since it has an significant place of business here and several, if not most, of its witnesses either work or live in Massachusetts. *See* Taylor Aff. ¶¶1, 8, 9, 11. Moreover, it administers the WSOS Agreement from Massachusetts and has negotiated the dispute from Massachusetts. *See* Taylor Aff. ¶¶17-19. Further, there is no reason why it would be inappropriate (and in fact it is most appropriate) for this Court to decide issues involving a contract that was negotiated and signed in Massachusetts and that is expressly governed by Massachusetts law. Narragansett chose to come to Massachusetts and make promises to a Massachusetts company to perform under the WSOS Agreement, and consequently the issue of whether it has breached its promises can and should be litigated here.

      b.    *The Convenience Of The Parties*

Litigating the instant action in Massachusetts would also be more convenient than litigating in Rhode Island.

TransCanada maintains its principle place of business in Westborough, Massachusetts. Narragansett is based in Rhode Island, but has a customer service office in Northborough, Massachusetts. Narragansett's service agent is also located in Northborough, Massachusetts. (Taylor Aff. ¶¶ 3-5.) Substantially all business communications between the parties concerning

12

this dispute, and concerning performance of the WSOS Agreement, have occurred in and from Massachusetts. (Taylor Aff. ¶¶ 11, 13-14, 17-19.) Both parties' Massachusetts offices are just minutes from the Worcester Federal Courthouse. (Id. ¶ 20.)

Given Narragansett's business ties to Massachusetts with respect to the WSOS Agreement, and its clear ability (and indeed apparent preference) to communicate with TransCanada concerning this dispute through its service agent in and from Massachusetts (Taylor Aff. ¶¶ 17-19), it is patently obvious that litigating this dispute in Massachusetts would be more no burdensome than litigating in Rhode Island. *See Veryfine Prods.*, 124 F. Supp. at 26 (a corporation that sent employees to Massachusetts to contract with a Massachusetts corporation could not later claim that litigating the contracts in Massachusetts was an unreasonable burden). Thus, the convenience of the parties actually favors a Massachusetts forum.

      c.     *The Convenience Of The Witnesses And The Location Of The Documents*

The key witnesses relevant to this dispute, including third-party witnesses, are primarily located in Massachusetts. (Taylor Aff. ¶¶ 1, 8-9, 11, 14-18.) TransCanada's relevant documents are in Westborough, Massachusetts, minutes from the Massachusetts Courthouse. (Id. ¶¶ 10, 20.) Narragansett's documents are believed to be in a similarly convenient location at its agent's offices in neighboring Northborough, Massachusetts. (Taylor Aff. ¶ 16.) Thus, litigating this dispute in Massachusetts is most convenient for the witnesses and for document production. Although some witnesses may ultimately be located in places other than Massachusetts, there is no added convenience for these witnesses if they travel to Rhode Island as opposed to Massachusetts. *See Veryfine*, 124 F. Supp. 2d at 26; *Cianbro*, 814 F.2d at 11.

Thus, this factor also favors a Massachusetts forum.

      d.     *The Connection Between The Forum And The Issues*

13

Massachusetts bears a strong connection to the facts and issues in this dispute. The dispute involves an Agreement negotiated in Massachusetts, between a plaintiff based in Massachusetts and a defendant with a Massachusetts office that manages the Agreement through its service agent in Massachusetts. (Taylor Aff. ¶¶ 3-4, 10.) The WSOS Agreement is expressly governed by Massachusetts law. (WSOS Agreement ¶ 13.) Substantially all communications between the parties concerning performance of the WSOS Agreement, and giving rise to this dispute, have taken place in and from Massachusetts. (Taylor Aff. ¶¶ 11, 13-14, 17-19.) For example, the letter upon which Narragansett appears to base its specific claims in the Rhode Island Complaint was sent and received in Massachusetts. (Id. ¶ 18.) *See also Schmidt v. Am. Inst. of Physics*, 322 F. Supp. 2d 28, 33 (D.D.C. 2004) (finding that Maryland bore a strong connection to a breach of contract action where the decisions giving rise to the plaintiff's complaint were made in Maryland and communicated to the plaintiff in Maryland).

While Rhode Island clearly also has a connection to this dispute, because the dispute involves conduct before the RI-PUC and electricity delivered in Rhode Island, the contractual obligations between the parties arise from and are governed by a Massachusetts contract. This factor thus favors a Massachusetts forum or is at least even.

e.      *The Law To Be Applied*

The WSOS Agreement is expressly governed by Massachusetts law. (WSOS Agreement § 13.) Thus, this factor weighs squarely in favor of the Massachusetts Action. *R.W. Granger & Sons, Inc. v. Rojac Co.*, 885 F. Supp. 319, 324 (D.Mass. 1995) (noting that Massachusetts has an interest in hearing a case involving a contract governed by Massachusetts law).

14

f.    *The State Or Public Interest At Stake*

Massachusetts has a strong interest in resolving this dispute: the plaintiff is a

Massachusetts company, the WSOS Agreement was negotiated in Massachusetts, the Agreement

is governed by Massachusetts law, and the parties communicated with each other regarding the

Agreement almost exclusively in Massachusetts. While this dispute also involves conduct before

the RI-PUC, and electricity delivery in Rhode Island, the parties' obligations are governed by a

Massachusetts contract and Massachusetts law. A federal court sitting in Massachusetts may be

presumed to have greater familiarity with Massachusetts law than a federal court sitting in a

different district. *See R.W. Granger*, 885 F. Supp. at 324. Thus, even though portions of the

WSOS Agreement were carried out in Rhode Island, the public interest also weighs in favor of

allowing this dispute to be resolved in Massachusetts. *Schmidt* 322 F. Supp. 2d at 35 ("the

public interest is 'best served by having a case decided by the federal court in the state whose

laws govern the interests at stake.'") (quoting *Trout Unlimited v. Dep't of Agric.*, 944 F. Supp.

13, 19 (D.D.C. 1996)).

Further, to the extent Narragansett contends that resolution of this dispute would affect

retail electricity rates in Rhode Island, and hence the Rhode Island taxpaying "public," this

"public interest" must be balanced against the threat of judge and jury bias and TransCanada's

right to a fair and impartial process. In Rhode Island, this case would be heard by a judge and

jury composed of Narragansett rate payers. Therefore, there is a significant risk of bias to

TransCanada if this case were tried in Rhode Island. *See Long Island Lighting Co. v. New

England Petroleum Co.*, 362 N.Y.S.2d 350, 355 (N.Y. Sup. Ct. 1974) (holding that a dispute

concerning an energy contract should be transferred to a different county, as the judge and jury

were all rate payers and could be biased). Thus, there is a strong "public" interest in ensuring

15

3981712v1

unbiased consideration of the merits of TransCanada's claims. This factor, on balance, is therefore roughly even or favors Massachusetts.

In sum, all of the balance of convenience factors either weigh in favor of the first-filed Massachusetts Action or are equal. Thus, this action clearly must be litigated in Massachusetts.[3]

2.    No Special Circumstances Exist to Overcome the First-Filed Presumption

TransCanada has engaged in neither forum shopping nor a race to the courthouse in filing this litigation in Massachusetts. First, TransCanada has filed suit in the forum in which its home office is located, and the forum where the contract at issue was negotiated and signed. Forum shopping is found, in contrast, where the chosen forum only has a "slight connection" to the complaint. *Toy Biz*, 990 F. Supp. at 332.

TransCanada also did not engage in a "race to the courthouse." As stated in *Veryfine*, "[t]hese circumstances are usually found in situations in which one party has won a race to the courthouse by jumping the gun and filing a declaratory judgment action in a forum that has little relation to the dispute." *Veryfine*, 124 F. Supp. 2d at 22. Here, TransCanada is the "natural plaintiff" asserting affirmative claims for damages for breach of contract under Massachusetts law. A plaintiff is presumptively entitled to sue in the forum of its choice. (See MA Complaint and MA Counterclaim and RI Compl.) *See Amsouth Bank v. Dale*, 386 F.3d 763, 788 (6th Cir. 2004).

Narragansett, on the other hand, is the natural defendant: Narragansett's Massachusetts "Counterclaim" and identical Rhode Island "Complaint" constitute no more than defenses to

---

[3] Indeed, courts routinely give preference to first-filed actions in cases in which the balance of convenience factors are far more neutral than in the present case. *See, e.g., J. Lyons & Co. Ltd. v. The Republic of Tea, Inc.*, 892 F. Supp. 486, 492 (S.D.N.Y 1995) (dismissing action in favor of prior suits because the balance of convenience did not weigh sufficiently in favor of the second filed action); *Leesona Corp. v. Duplan Corp.*, 317 F. Supp. 290, 299-02 (D.R.I. 1970) (transferring second-filed action in favor of first filed action where factors were mixed); *S.W. Indus. v. Aetna Cas. & Sur. Co.*, 653 F. Supp. 631, 639 (D.R.I. 1987) (staying the second-filed proceeding where the balance of convenience factors were roughly even); *Cianbro*, 814 F. 2d at 11 (upholding transfer of second-filed action to venue of the first filed action where convenience of the parties and witnesses was inconclusive).

16

3981712v1

TransCanada's breach of contract claims. (MA Compl. ¶¶ 32-47; MA Counter., ¶¶ 35-40; RI Compl., ¶¶ 35-40.) As the "natural plaintiff," TransCanada is entitled to a strong presumption in favor of its choice of forum.  *See BASF Corp. v. Symington*, 50 F.3d 555, 559 (9th Cir. 1995) ("actions founded exclusively on a defense to a state law claim should be dismissed as a tactical maneuver calculated to deny potential plaintiffs of their traditional right to choose the forum and time of suit"). Thus, the "race to the courthouse" doctrine simply has no application here, where TransCanada is the natural plaintiff. Although a belated attempt, Narragansett's defensive claims and filing in the Rhode Island Action would be the action more properly characterized as an improper filing designed solely to gain a forum advantage

WHEREFORE, TransCanada respectfully requests that this court issue an Order enjoining Narragansett from further prosecuting Civil Action No. 05-234 in the United Stated District Court for the District of Rhode Island.

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD.,

By its attorneys,

/s/ Wendy S. Plotkin
Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
Dara Y. Zelnick (BBO #660256)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Telephone No.: (617) 248-5000
Fax No.: (617) 248-4000

September 16, 2005

17

3981712v1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

|  |  |  |
|---|---|---|
| TRANSCANADA POWER  MARKETING LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 05-40076FDS |
| NARRAGANSETT ELECTRIC COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

### DECLARATION OF WENDY S. PLOTKIN IN SUPPORT OF TRANSCANADA POWER MARKETING LTD.'S MOTION TO ENJOIN

Wendy S. Plotkin deposes and states as follows:

1.      I am an attorney in the law firm of Choate, Hall & Stewart, and a member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts.  I am counsel to the above-named plaintiff and make this declaration in support of TransCanada Power Marketing Ltd.'s Motion to Enjoin Defendant Narragansett Electric Company From Prosecuting a Duplicative Second-Filed Action in Rhode Island.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Complaint filed by Narragansett Electric Company in Civil Action No. 05-234 in the United States District Court for the District of Rhode Island (the "Rhode Island Action").

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Affidavit of William Taylor, filed by TransCanada Power Marketing Ltd. in the Rhode Island Action.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct to the best of my knowledge and belief.

/s/ Wendy S. Plotkin

Dated:  September 16, 2005

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE NARRAGANSETT ELECTRIC
COMPANY,                                    :

              Plaintiff,                    :

                                            :

v.                                          :                C.A. No. 05-

                                            :

TRANSCANADA POWER MARKETING :
LTD.,                                       :

                                            :

              Defendant.                    :

## COMPLAINT

Plaintiff, The Narragansett Electric Company, brings this action against

Defendant, TransCanada Power Marketing Ltd., for breach of contract and declaratory

judgment.

## PARTIES AND JURISDICTION

1.    Plaintiff, The Narragansett Electric Company ("Narragansett"), is a Rhode

Island corporation with its principal place of business at 280 Melrose Street, Providence,

Rhode Island.

2.    Defendant, TransCanada Power Marketing Ltd. ("TransCanada"), is a

Delaware corporation with its principal place of business at 110 Turnpike Road,

Westborough, Massachusetts.

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332

as the amount in controversy exceeds $75,000, exclusive of interest and costs, and

Narragansett and TransCanada are citizens of different states.

<u>FACTS COMMON TO ALL COUNTS</u>

4.    Narragansett is a retail electric distribution company that supplies and
delivers electricity to 465,000 retail end-use customers in 38 communities in Rhode
Island.  Narragansett provides such service pursuant to retail tariffs, and at rates and
under terms and conditions that the Rhode Island Public Utilities Commission (the
"Rhode Island Commission") approves and regulates.

5.    TransCanada is a power marketing company that sells electricity at
wholesale to Narragansett.

6.    Blackstone Valley Electric Company ("Blackstone") and Newport Electric
Corporation ("Newport") were retail electric supply and distribution companies in Rhode
Island, and were wholly-owned subsidiaries of the Eastern Utilities Associates ("EUA"),
a public utility holding company.  EUA also owned Eastern Edison Company
("Eastern"), a retail electric supply and distribution company in Massachusetts, and
Montaup Electric Company ("Montaup"), an affiliate of, and wholesale electricity
supplier to, Blackstone, Newport and Eastern.

7.    The Rhode Island Commission and the Rhode Island Division of Public
Utilities and Carriers possess the exclusive power and authority to supervise, regulate,
and issue orders governing the conduct of companies that provide energy to the public.
They safeguard the public against improper and unreasonable rates and charges by
providing full, fair, and adequate administrative procedures and remedies, and by
securing a judicial review to any party aggrieved by such an administrative proceeding or
ruling.  R.I. Gen. Laws § 39-1-1(c).

8.      On April 7, 1998, TransCanada and Montaup entered into an Asset

Purchase Agreement.  Pursuant to the Asset Purchase Agreement, TransCanada bought

certain electricity generation assets of Montaup, namely, a power purchase agreement

("PPA") between Montaup and the Ocean State Power generation station located in

Burrillville, Rhode Island.  The purchase was effectuated through a PPA Transfer

Agreement.  Also under the Asset Purchase Agreement, TransCanada agreed to provide

to Blackstone, Newport and Eastern a specific percentage share of electric service that

they needed to satisfy their electric supply obligations to their retail standard offer service

customers.  The supply obligation was effectuated through a Wholesale Standard Offer

Service Agreement ("WSOS Agreement") with Blackstone, Newport, and Eastern.

9.      Under the WSOS Agreement, Blackstone, Newport and Eastern are to pay

to TransCanada a "Standard Offer Wholesale Price," which is defined as "the stipulated

stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard

Offer Service for Delivered Energy" as set forth in an appendix to the WSOS Agreement.

WSOS Agreement, Art. 1, at 3; Appendix A, at 16.  The schedule of prices rises over

time and more than doubles during the ten-year term of the WSOS Agreement.

10.     The WSOS Agreement also provides for the payment of a Fuel

Adjustment Factor ("FAF") upon the occurrence and satisfaction of a specific condition

precedent.  The FAF is defined as:

> "… a cents per kilowatt-hour adder based on the
> incremental revenues collected, if any, attributed to the
> operation of the retail Rate Fuel Adjustment mechanism in
> the Companies' Standard Offer Service tariffs.  The
> incremental revenues attributed to the retail Fuel
> Adjustment will be fully allocated to Suppliers in
> proportion to the Standard Offer Service energy provided
> by each Supplier for the applicable billing month through

3

the Fuel Adjustment Factor. *The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.*"

WSOS Agreement, Art. 5, at 5-6 (emphasis added).

11.     The WSOS Agreement clearly spells out, in the FAF clause, that the FAF is only payable to TransCanada upon the occurrence of the Rhode Island Commission issuing a very specific approval for Blackstone's and Newport's retail tariffs which govern the rates, terms and conditions of service to their standard offer service customers; namely, the inclusion of a Fuel Adjustment in the retail rates which allows Blackstone and Newport to collect an FAF payment from their retail customers who take service pursuant to the standard offer service tariff.

12.     Blackstone's and Newport's Rhode Island Commission-approved retail standard offer service tariffs did not contain a Fuel Adjustment for 1998 and 1999 and did contain a Fuel Adjustment for each year from 2000 through 2004.

13.     Effective May 1, 2000, Blackstone and Newport merged with and into Narragansett, and Eastern merged with and into Massachusetts Electric Company ("Massachusetts Electric"), a retail electric distribution company in Massachusetts. Narragansett and Massachusetts Electric are wholly owned by National Grid USA ("National Grid"), a public utility holding company.

14.     Pursuant to the terms of the WSOS Agreement, TransCanada's and Massachusetts Electric's (as successor to Eastern) obligations that relate to service to Massachusetts Electric expired as of December 31, 2004.  Accordingly, the only issues in

4

controversy are those that arise in relation to service in Rhode Island and retail rates as approved by the Rhode Island Commission.

15.     The Rhode Island Commission approved the Narragansett-Blackstone and Newport merger (as well as the merger of their affiliates) in March of 2000 along with a rate settlement for the newly-merged entity and its customers.  Order No. 16200, approving Third Amended Stipulation and Settlement, March 24, 2000, Docket 2930.  As a result, Narragansett became the retail electric supplier and distribution company for Blackstone's and Newport's previous customers, in addition to its own existing customers.

16.     On February 8, 2000, Narragansett's power supply manager informed TransCanada via letter of the merger, explained the manner in which the WSOS Agreement would be administered after the merger, and stated that the WSOS Agreement was not being modified in any way.  The letter further stated that Narragansett would make FAF payments to TransCanada consistent with the Blackstone and Newport tariffs that the Rhode Island Commission had approved prior to the merger, and Eastern's approved tariffs in Massachusetts.  It attached a Fuel Adjustment schedule consistent with that set forth in Blackstone's and Newport's retail standard offer service tariffs; that is, for each year from 2000 through 2004.  Narragansett sent this letter to TransCanada in draft form and asked that TransCanada review it.

17.     TransCanada and Narragansett's representative discussed the letter.  After receiving no objection from TransCanada, on April 18, 2000, Narragansett's representative put the draft letter in final form and sent it to TransCanada.

18.     In June of 2000, in a public proceeding before the Rhode Island Commission concerning Narragansett's proposed retail standard offer service rates, Narragansett stated, on the record, that the FAF for the former Blackstone and Newport wholesale standard offer service agreements ("EUA Zone wholesale standard offer service agreements") would end after 2004. Docket No. 3138. These agreements included the WSOS Agreement.

19.     On May 28, 2003, in a public hearing before the Rhode Island Commission regarding Narragansett's retail standard offer service rates, Narragansett told the Rhode Island Commission that it was not obligated to make FAF payments under the EUA Zone wholesale standard offer service agreements (which included the WSOS Agreement) after 2004. Docket No. 3508.

20.     In November of 2003, Narragansett made a filing with the Rhode Island Commission which included a forecast that reflected zero FAF payments under the EUA Zone wholesale standard offer service agreements after 2004. Docket No. 3571.

21.     On July 1, 2004, Narragansett filed an application with the Rhode Island Commission to set its standard offer service rates effective as of October 1, 2004 based upon Narragansett's actual costs incurred through May 2004 and its estimated costs from June 1, 2004 through December 31, 2005. Consistent with the retail standard offer service tariffs that the Rhode Island Commission had approved for Blackstone and Newport, the FAF payments that Narragansett informed TransCanada it would continue to make upon the merger, and Narragansett's public statements to the Rhode Island Commission, this filing showed that Narragansett's proposed retail standard offer service rates did not include an amount for an FAF to be paid under the EUA Zone wholesale

standard offer service agreements (which include TransCanada under the WSOS Agreement).

22.    The Rhode Island Commission approved Narragansett's standard offer service rates effective August 1, 2004 pursuant to an Open Meeting decision on July 26, 2004 and a written Order dated August 26, 2004.  Order No. 17972, Docket No. 3571. The approved rates did not include an amount for an FAF to be paid under the EUA Zone wholesale standard offer service agreements beyond December 31, 2004.

23.    Likewise, on November 10, 2004, Narragansett made another filing relating to retail standard offer service.  This filing was also publicly noticed.  A Bench Decision at a public hearing on December 13, 2004, which was confirmed by a written Order issued February 17, 2005, approved Narragansett's filing which was based on no FAF payments in relation to the EUA Zone wholesale standard offer service agreements (which include the WSOS Agreement).

24.    Consistent with the foregoing, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

25.    Narragansett at all times provided public notice of its filings and hearing dates in accordance with the rules and regulations of the Rhode Island Commission.  All members of the public, including suppliers, are invited to participate through the public comment process at the Commission.  Orders of the Rhode Island Commission are publicly available.  In recent years, all of Narragansett's rate filings are posted on the Rhode Island Commission's website prior to the hearings, as are all Rhode Island Commission orders shortly after their issuance.

26. On information and belief, TransCanada monitors these proceedings closely, but has never filed testimony or otherwise commented to the Rhode Island Commission or Narragansett (or its affiliates) as to whether Narragansett should request the Commission to approve an FAF after 2004.

27. On March 1, 2005, TransCanada sent a letter to Narragansett (a) claiming that Narragansett was in default of the WSOS Agreement by not providing for an FAF in its calculations; (b) asserting that Narragansett was in breach by its "[refusal] to comply with its obligations under Article V before the Rhode Island Public Utilities Commission with respect to its Standard Offer Service tariffs"; and (c) threatening to terminate the WSOS Agreement.

28. TransCanada's reference to Narragansett's lack of inclusion of an FAF in its calculations apparently refers to the calculations Narragansett performs prior to issuing payment. Narragansett's calculation was accurate because TransCanada was not entitled to a payment for an FAF: the retail standard offer service rates did not include a Fuel Adjustment in relation to the WSOS Agreement.

29. TransCanada's assertion regarding obligations under Article V (sic) appears to imply that Narragansett had an affirmative obligation to take an action before the Rhode Island Commission; however, the WSOS Agreement contains no such obligation.

30. TransCanada's threat to terminate the WSOS Agreement is without cause and would itself constitute a breach of the WSOS Agreement.

31. At no point prior to March 1, 2005 did TransCanada provide Narragansett with a written notice of a dispute as required by the WSOS Agreement. The WSOS

Agreement states: "If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date." WSOS Agreement, Art. 6, at 6.

32.    TransCanada's purported notice of default was and is baseless and was accompanied by threats to terminate the Agreement. Its action was a pretext to enable TransCanada to avoid performing a contract that was no longer economically advantageous to TransCanada, whether or not fuel payments were made.

33.    A termination by TransCanada of the WSOS Agreement would not be justified, and would constitute a material breach; however, in order to preserve the benefit of the WSOS Agreement for its customers, and to deny TransCanada its pretextual argument for termination, Narragansett has paid to TransCanada, under protest, and with a full reservation of rights, a total of $921,827.46. The payments were based upon a calculation using the FAF that had been approved by the Rhode Island Commission for recovery in rates through, but not after, December 31, 2004. The payments relate to the period of January 1 through March 31, 2005.

34.    TransCanada had knowledge and notice of Narragansett's intention not to seek Commission approval for recovery of FAF payments from its customers after 2004, and it never objected at any point in time prior to early 2005. TransCanada's subsequent threat to terminate the WSOS Agreement constitutes an attempt to extort payments from Narragansett that are not due under the WSOS Agreement.

COUNT I
(BREACH OF CONTRACT)

35.    Narragansett repeats and realleges paragraphs 1 through 34 as stated above.

9

36.    TransCanada has demanded FAF payments from Narragansett to which it is not entitled under the WSOS Agreement, and has threatened to terminate the WSOS Agreement without cause, in order to avoid performing an agreement that is no longer economically advantageous to TransCanada, with or without FAF payments.

### COUNT II
### (DECLARATORY JUDGMENT)

37.    Narragansett repeats and realleges paragraphs 1 through 36 as stated above.

38.    TransCanada has threatened to terminate the WSOS Agreement even though TransCanada has no right to do so and no right to an FAF after 2004. Therefore, an actual controversy exists as to whether TransCanada has a right to terminate the WSOS Agreement.

### COUNT III
### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

39.    Narragansett repeats and realleges paragraphs 1 through 38 as stated above.

40.    TransCanada  has breached its obligation of good faith and fair dealing by: (a) failing to object at any point in time prior to March of 2005 to Narragansett's stated intention to not provide in rates for collection of FAF payments from customers after 2004; (b) notifying Narragansett for the first time in early 2005 of TransCanada's expectation that Narragansett had an obligation to take an action before the Rhode Island Commission and its expectation that Narragansett was required to make such payments even absent approval to collect such costs in rates; and (c) threatening to terminate the

10

WSOS Agreement as a pretext in order to avoid a contract that had become economically disadvantageous to TransCanada even with fuel payments.

REQUESTS FOR RELIEF

WHEREFORE, Plaintiff The Narragansett Electric Company seeks judgment as follows:

    1.     Compensatory damages for all damages caused by TransCanada's breach of contract, plus interest and costs;

    2.     A declaration that TransCanada has breached its obligation of good faith and fair dealing;

    3.     A declaration, pursuant to R.I. Gen. Laws § 9-30-2, that TransCanada does not have a right to terminate the WSOS Agreement; and

    5.     Such other relief as the Court deems just and proper under the circumstances.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

NARRAGANSETT ELECTRIC
COMPANY

By its Attorney,

Gerald J. Petros, Esq. (#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (FAX)

DATED: May 26, 2005.

11

# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>TRANSCANADA POWER MARKETING LTD.,<br><br>    Defendant. | )<br>)<br>)<br>)  C.A. No. 05-234<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>AFFIDAVIT OF WILLIAM TAYLOR</u>

I, William Taylor, herby depose and state as follows:

1.  I am Vice President of TransCanada Power Marketing Ltd. ("TransCanada"),
located at 110 Turnpike Road, Westborough, Worcester County, Massachusetts. I have held that
position since early 1998. I currently reside in Westborough, Massachusetts. I have reviewed
Narragansett's Complaint in this action (the "RI Complaint"), and am also familiar with
TransCanada's earlier Complaint filed in the District Court of Massachusetts (the "MA
Complaint").

2.  TransCanada is a power marketing company with a principal place of business in
Westborough, Worcester County, Massachusetts. TransCanada purchases electricity from
generation sources, such as power plants, and resells the electricity to retail electric distribution
companies and other customers.

3.  TransCanada's primary office is in Westborough, Worcester County,
Massachusetts. Several TransCanada officers are also located in Calgary, Alberta. TransCanada

has no offices or employees in Rhode Island, although certain of TransCanada's accounting functions are performed at an administrative facility at the Ocean State Power (OSP) generation site in Burrillville, Rhode Island. The administrative facility and OSP site are owned by, and perform functions for, a number of TransCanada's affiliates.

4.      Although Narragansett's principal office is in Providence, Rhode Island, its customer service office is in Northborough, Worcester County, Massachusetts. Narragansett's customer service office in Northborough, Massachusetts is indicated on Narragansett's website at http://www.nationalgridus.com/narragansett/contact_mail.asp, under "contact by mail." (See Ex. 1 hereto).

5.      Narragansett's service agent (which Narragansett calls its "power supply manager" or "representative" in paragraphs 16-17 of its RI Complaint) is the National Grid USA Service Company ("National Grid SC"), which is also located in Northborough, Massachusetts. It is my understanding that Narragansett is owned by National Grid USA, a Massachusetts-based public utility holding company with primary offices in Westborough, Massachusetts.

6.      On April 7, 1998, TransCanada entered into a Wholesale Standard Offer Services Agreement (the "WSOS Agreement") with Blackstone Valley Electric Company ("Blackstone"), Newport Electric Company ("Newport") and Eastern Edison Company ("Eastern"). Upon information and belief, Blackstone, Newport and Eastern (collectively, the "EUA Companies") were at the time all wholly-owned subsidiaries of EUA Utilities Associates ("EUA"), a Massachusetts-based public utility holding company.

7.      The WSOS Agreement was part of a larger Asset Purchase Agreement between TransCanada and Montaup Electric Company ("Montaup"), another EUA affiliate located in Massachusetts.

-2-

3939579v2

8.      I was directly involved for TransCanada with negotiation of the WSOS Agreement and the related Asset Purchase Agreement with the EUA Companies. I worked out of TransCanada's office in Westborough, Massachusetts at that time.

9.      The principal TransCanada personnel in charge of performance of the WSOS Agreement, since its execution, have been myself and Michael Hachey. Mr. Hachey has also at all relevant times worked out of TransCanada's office in Westborough, and lives in Westborough, Massachusetts.

10.     Copies of all or substantially all of TransCanada's documents concerning the negotiation and performance of the WSOS Agreement are currently located in TransCanada's offices in Westborough, Massachusetts, or at its counsel's offices in Boston, Massachusetts.

11.     TransCanada negotiated the terms of the WSOS Agreement with representatives of the EUA Service Corporation ("EUA SC"), which was the affiliated service agent for the EUA Companies. EUA SC's offices were in West Bridgewater, Massachusetts. These EUA SC representatives included Michael Hirsh, Lawrence Boisvert, Robert Clarke and Kevin Kirby, all of whom negotiated the WSOS Agreement from EUA SC's offices in West Bridgewater, Massachusetts. Some or all of these EUA SC representatives were also, upon information and belief, officers of Narragansett or Montaup, although my contacts with them for purposes of negotiating the WSOS Agreement, which included phone calls, mail, faxes and in-person meetings, all occurred primarily in Massachusetts. It is my understanding that most of these former EUA representatives still work in Massachusetts.

12.     The Agreement expressly states that it is governed by Massachusetts law, and that notices to the EUA Companies under the WSOS Agreement are to be sent to EUA SC in West Bridgewater, Massachusetts. (Agreement, §§ 13, 18.)

-3-

13.    After execution of the WSOS Agreement on April 7, 1998, substantially all of TransCanada's communications with the EUA Companies concerning the WSOS Agreement, whether by phone, mail, fax or in person, were with representatives of EUA SC in West Bridgewater, Massachusetts.

14.    Since Blackstone and Newport merged into Narragansett in 2000, TransCanada has communicated with Narragansett through Narragansett's service agent, National Grid SC, at its offices in Northborough, Massachusetts. National Grid SC, at its Northborough address, is also Narragansett's stated designee for notices under article 18 of the WSOS Agreement.

15.    Review of the public testimony given by Narragansett before the Rhode Island Public Utilities Commission ("RI-PUC"), as referenced in paragraphs 18-21 of the RI Complaint and paragraphs 28-29 of the Massachusetts Complaint, indicates that Narragansett's testimony was provided by representatives of National Grid SC. (See example attached as Exhibit 2.) This testimony was given by Michael Hager, the Vice President Energy Supply New England of National Grid SC. I am familiar with Mr. Hager, and he works at National Grid SC's offices in Northborough, Massachusetts and lives in the area of Northborough, Massachusetts.

16.    Based upon my interaction with National Grid SC as agent for Narragansett over a period of years, it is my experience that contract management decisions concerning the WSOS Agreement are made in large part by representatives of National Grid SC in Northborough, Massachusetts. Similarly, it is my understanding that National Grid SC generally maintains copies of Narragansett's documents concerning the WSOS Agreement, and concerning the calculation of payments thereunder, at its offices in Northborough.

17.    Since the dispute set forth in the MA and RI Complaints came to a head in 2005, communications between TransCanada and Narragansett concerning the dispute, including the

-4-

various default and payment notices exchanged (and excepting communications between counsel), have been primarily between TransCanada's offices in Westborough and Narragansett's service agent's offices in Northborough, Massachusetts.

18.     For example, the March 1, 2005 letter which Narragansett references in paragraphs 27-30 and 32 of its RI Complaint, and upon which Narragansett appears to base all the counts in its RI Complaint (see its paras. 36, 38, 40), was sent by Michael Hachey from TransCanada's offices in Westborough, Massachusetts to Michael Hager at the offices of Narragansett's service agent in Northborough, Massachusetts.  (See copy of letter attached as Exhibit 3.)

19.     Similarly, later in March, 2005, Mike Hachey met with Narragansett through its service agent representatives, including Michael Hager, at National Grid SC's offices in Northborough, Massachusetts to discuss the dispute.

16.     The Massachusetts District Court in Worcester, Massachusetts, which I understand is the forum for TransCanada's Massachusetts action, is only a ten or fifteen minute drive from both Northborough and Westborough, Massachusetts.

Signed under the pains and penalties of perjury this _15th_ day of June, 2005.

William Taylor

6/15/05

RICHARD P. SCHULER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 7, 2006

3939579v2

# Exhibit 1



## Contact Us

Before you email us, please visit our FAQ section or check to see if your question could be answered by the links below:

- What payment programs do you have?
- What is DirectPay?
- What is the Budget Plan?

**View FAQs by Topic**

Select Topic

| By Email | By Telephone | By Mail | Business Services Office |

Narragansett Electric Company
Customer Service Center
PO Box 960
Northborough MA 01532-0960

Privacy Policy
© 2005 National Grid

# Exhibit 2

1   STATE OF RHODE ISLAND

2   AND PROVIDENCE PLANTATIONS

3   PUBLIC UTILITIES COMMISSION

4

5   HEARING IN RE:

6   NARRAGANSETT ELECTRIC COMPANY
    STANDARD OFFER RATE TARIFF FILING
7

8   DOCKET NO. 3508

9   - - - - - - - - - - - - - /

10                          MAY 28, 2003
                            10:00 A.M.
11

12                          89 JEFFERSON BOULEVARD
                            WARWICK, RHODE ISLAND
13

14

15  BEFORE THE COMMISSION:

16      ELIA GERMANI, CHAIRMAN
        KATE F. RACINE, COMMISSIONER
        ROBERT HOLBROOK, COMMISSIONER
17
        CYNTHIA WILSON, LEGAL COUNSEL
18      ALAN NAULT, RATE ANALYST

19  APPEARANCES:

20

21  FOR THE COMPANY:        TERRY SCHWENNESEN, ESQ.

22  FOR THE DIVISION:       PAUL ROBERTI,
                            ASSISTANT ATTORNEY GENERAL
23
    FOR THE DEPT.
24  OF THE NAVY:            AUDREY VAN DYKE, ESQ.

A-1 COURT REPORTERS, INC.
(401) 333-3381



2

```
 1                     I-N-D-E-X

 2                                              PAGE NO.

 3

      HENRY SHELTON
 4
      Statement                                   10
 5

 6

 7    JEANNE A. LLOYD     MICHAEL J. HAGER

 8    Direct Examination by Ms. Schwennesen       24
      Cross-Examination by Mr. Roberti            37
 9    Examination by Ms. Wilson                   37
      Examination by Mr. Nault                    83
10    Further Examination by Ms. Wilson           91

11

12    DR. JOHN STUTZ

13    Direct Examination by Mr. Roberti           98
      Examination by Ms. Wilson                  101
14    Examination by Commissioner Racine         118
      Examination by Commissioner Holbrook       121

15

16

17

18

19

20

21

22

23

24
```

28

1    is on Page 4, Line 16.  5.6 cents becomes 5.5.

2    On Page 5, Line 4, 4.89 becomes 4.37 or

3    approximately eight percent instead of nine

4    percent.  On Page 12, Line 18, 5.6 becomes 5.5.

5    On Page 13, Line 4, 72.6 becomes 66.1.  Line 7,

6    same change; 72.6 becomes 66.1.  Line 8, 37.6

7    becomes 31.1.  Line 11, .9 becomes .8, and Line

8    13, 5.6 becomes 5.5.  On Page 14, Line 4, 72.6

9    becomes 66.1.  Line 7, 6.5 becomes 6.4.  And Page

10   17, Line 1, 4.89 becomes 4.37.  59.50 becomes

11   58.98, .98 and nine percent becomes eight

12   percent.

13          MS. SCHWENNESEN:  Thank you, Ms. Lloyd.

14   With those corrections is your testimony and your

15   exhibits true than an accurate to the best of

16   your knowledge?

17          MS. LLOYD:  Yes, they are.

18          MS. SCHWENNESEN:  Mr. Hager, I hand you

19   an exhibit marked as Narragansett Exhibit 1C.

20   First I'm going to identify you for the record.

21   Thank you so much, sir.  Could you please

22   identify yourself?

23          MR. HAGER:  I'm Michael Hager, Vice

24   President, Energy Supply New England, National

1    Grid USA Service Company, 55 Barefoot Road,

2    Northboro, Massachusetts.

3         MS. SCHWENNESEN:  Would you state your

4    title for the record?

5         MR. HAGER:  I did.  Vice President

6    Energy Supply New England.

7         MS. SCHWENNESEN:  Okay.  Sir, would you

8    please describe Exhibit 1C?  Is that your

9    testimony prepared by you or under your

10   supervision?

11        MR. HAGER:  Exhibit 1A includes direct

12   testimony prepared by myself and a series of

13   exhibits.

14        MS. SCHWENNESEN:  Is that marked as 1C?

15        MR. HAGER:  1C.  I'm sorry.  Yes.

16        MS. SCHWENNESEN:  Are those testimony

17   and exhibits true and accurate to the best of

18   your knowledge?

19        MR. HAGER:  Yes, they are.

20        MS. SCHWENNESEN:  Thank you.

21        MS. WILSON:  Mr. Hager, do you adopt

22   the respective testimony as your testimony here

23   today?

24        MR. HAGER:  I do.

1    high in the summer, so my sense of the usage, the

2    maximum usage I have is July and August.

3              MS. LLOYD:  I understand.  So for a

4    customer whose usage varies by month going into

5    the season, what the effect would be?

6              THE CHAIRMAN:  Yes.

7              MR. NAULT:  I would also be interested

8    in non-residential impacts.  I would imagine most

9    of those are probably fairly stable rates

10   throughout the year.

11             MS. LLOYD:  Probably for the most part.

12   Some would vary.  Of the same analysis or are you

13   talking about the three scenarios now?

14             MR. NAULT:  The three scenarios.

15             MS. LLOYD:  All right.  I'll provide

16   yours for every rate class.

17             MR. NAULT:  Thank you.  Narragansett

18   has standard offer contracts out to 2009 and

19   there are fuel adjustment clauses attached to

20   those contracts.  But for the record, are those

21   fuel adjustment contracts -- fuel adjustments

22   attachments to the contracts on all territories

23   through 2009?

24             MR. HAGER:  The standard offer

1   contracts come in two basic varieties.  Contracts

2   associated with what we call the Narragansett

3   zone, that's the Narragansett service territory

4   prior to its merger with EUA, and the contracts

5   in that zone have the fuel adjustment clauses

6   hard wired into those contracts as attachments in

7   part of the pricing provisions.  The other form

8   of contract is in what we call the EUA zone, the

9   service territory of Blackstone Valley Electric

10  Company, Newport Electric Company prior to the

11  merger into Narragansett.  Those forms of

12  contracts, the price sections specify the fixed

13  price components which is identical to the fixed

14  price components in the Narragansett zone

15  contracts.  Rather than have the standard offer

16  fuel adjustment provision as an integral

17  component of the contract there's a reference in

18  the pricing section to the standard offer

19  adjustment provisions that were contained in the

20  former EUA retail company tariffs and the

21  supplier would get the revenues that were

22  collected pursuant to those tariffs.  In May of

23  2000 when we completed the merger the EUA company

24  tariffs ceased to exist and as Narragansett

1    assumed the responsibilities under those

2    contracts we notified those suppliers that we

3    would continue to make the fuel adjustment

4    payments pursuant to the terms that were

5    contained in the tariff at the time. So we're

6    making those payments by reference to a tariff as

7    opposed to being part of our attachment to the

8    contract.

9         MR. NAULT: And that will extend

10   through 2009?

11        MR. HAGER: It's Narragansett's opinion

12   that the -- it is a fact that the tariffs at the

13   time of the EUA merger only included fuel

14   adjustment trigger amounts and payments through

15   2004. It's Narragansett's opinion that those

16   suppliers are only entitled to fuel adjustment

17   payments through 2004 and that they cease to

18   those entitlements on January 1, 2005, whereas in

19   the Narragansett zone contracts, those do include

20   trigger payments through 2009.

21        MR. NAULT: So could I very simply say

22   that the fuel adjustment clause component in the

23   EUA zone will cease to exist after 2004?

24        MR. HAGER: That's the position that

1          the company is taking with its suppliers, yes.

2                MR. NAULT:  And if the company's

3          position proves correct, will that mean that the

4          potential amount of fuel adjustment charges,

5          expenses that the company would incur would be

6          reduced, everything else being equal, between --

7          from 2004 to 2005?

8                MR. HAGER:  As of April, 2003 roughly

9          73 percent of our standard offer load was served

10         under Narragansett zone contracts and the other

11         27 percent was served under former EUA contracts.

12         Our hope is that by the time we get out to 2005

13         the trigger levels under which payments will be

14         made, they increase annually, that they are

15         finally at a level that even though we get these

16         extraordinary increases in gas and oil prices

17         that we didn't trigger the payments under the

18         contracts and there are no payments under each

19         form.  However, if we do exceed that trigger

20         amount, we will only be paying fuel amounts on

21         the roughly 73 percent as of today that's covered

22         under the Narragansett contracts and we wouldn't

23         be paying any amounts under the EUA contracts and

24         thus customers will be seeing less fuel expenses

1    and they will see lower expenses than they are in

2    today's environment.

3              MR. NAULT:  Okay.  And in a lot of what

4    you just said you said in Narragansett's opinion

5    and the company's opinion.  What about the

6    suppliers' opinion?

7              MR. HAGER:  We've informed them that

8    that's what it is.  We wait to see if they accept

9    our belief or whether they wish to pursue the

10   issue in some manner.

11             MR. NAULT:  But that's still out to

12   debate between Narragansett and the suppliers?

13             MR. HAGER:  I'm not aware of any

14   supplier who disputes that, but I think suppliers

15   are hoping that there's a continuation and it's

16   our opinion that the record should be clear that

17   those payments cease in 2004 and there was no

18   expectation, should have been no expectation on

19   their part at the time that amounts would

20   continue.

21             MR. NAULT:  Okay.  Thank you.  Thank

22   you, both.

23             MS. WILSON:  May I have a follow-up?

24             THE CHAIRMAN:  Sure

1    FURTHER EXAMINATION BY MS. WILSON

2         MS. WILSON:  When did you notify

3    suppliers of this interpretation of the EUA

4    contracts?

5         MR. HAGER:  We have not made formal

6    notification to suppliers.  There has just

7    been -- during the normal course of discussions

8    in business we have made reference to -- in

9    discussing various fuel trigger payments that

10   we've just brought it up in conversations that

11   that condition exists.

12        MS. WILSON:  Just for the record, my

13   concern as Commission counsel is that the

14   Commission has and the Division as well has

15   plenty of clear warning if this is going to

16   become a contested issue and that it not become a

17   short -- a decision that the Commission is being

18   asked to make sometime in the future but in a

19   short period of time.  In other words, if there's

20   a dispute and it results in some sort of

21   agreement that the Commission needs to look at

22   it, I request that the Commission be given

23   sufficient enough time to be able to look at it

24   and the Division be able to fully look at those

1       issues.

2               MR. HAGER:  Should there be a dispute

3       of those issues, we will promptly inform the

4       Commission and Division of such issues.

5               MS. WILSON:  I did want to go back to

6       one issue.  It was Mr. Shelton's issue.  The --

7       Narragansett still has an A-60 rate for low

8       income customers, correct?

9               MS. LLOYD:  That's right.

10              MS. WILSON:  And in looking at JAL-5,

11      Revised Page 4 of 23 it looks like the average

12      A-60 customers without a credit for a water

13      heater uses 380 kilowatt hours per month.

14              MS. LLOYD:  Yes, 380.

15              MS. WILSON:  And it looks like they're

16      starting out with a bill -- an average bill of

17      $33.88 and that with the proposed rate of

18      five-and-a-half cents per kilowatt hour their

19      bill would go up to $37.20 per month as opposed

20      to an A-16 customer which is an average

21      residential customer not on -- not falling into

22      those low income guidelines.

23              MS. LLOYD:  Well, this is based on 380

24      kilowatt hours.

# Exhibit 3



**Trans**Canada

*In business to deliver* ™

March 1, 2005

Mr. Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
55 Bearfoot Road
Northboro, MA  01532

Re:     Wholesale Standard Offer Service Agreement between Blackstone Valley Electric
        Company ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric
        Company ("Newport") and TransCanada Power Marketing Ltd. ("TCPM") dated
        April 7, 1998 (the "Agreement")

Dear Mr. Hager:

I am writing to provide notice of default under Article 7(1)(b) of the above-referenced
Agreement, based upon The Narragansett Electric Company's ("Narragansett's") failure to
comply with Article V of the Agreement.  Specifically, Narragansett has refused to include the
required Fuel Adjustment Factor in its price calculations, and to comply with its obligations
under Article V before the Rhode Island Public Utilities Commission with respect to its Standard
Offer Service tariffs.

As you know, Narragansett's failure to cure or rectify a noticed default within thirty (30)
days shall be deemed an Event of Default under Agreement Article 7.

Sincerely,

Michael Hachey

MH/DCW/slw:3837458

```
*********************
***    TX REPORT    ***
*********************


TRANSMISSION OK

TX/RX NO              3240
CONNECTION TEL                    15084217335
CONNECTION ID
ST. TIME             03/01 16:04
USAGE T              00'27
PGS. SENT               2
RESULT               OK
```

**fax**

date          3/1/05
attention     Michael Hager
company       NEPSCO
fax no.       508-421-7335
cc

from          Mike Hickey
phone         508-871-1852
fax
email
no. of pages      2      (including this page)

**Trans**Canada
*In business to deliver*

TransCanada Power Marketing Ltd
110 Turnpike Road - Suite 203
Westborough, MA 01581

**tel** 508-871-1850
**fax** 508-898-0433
**web** www.transcanada.com