UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| TRANSCANADA POWER MARKETING LTD., | : | |
| | : | C.A. No. 05-40076-FDS |
| Plaintiff, | : | |
| | : | (Michael P. Angelini, #019340) |
| v. | : | (Vincent F. O'Rourke, Jr., #380335) |
| | : | (Kimberly A. Stone, # 630952) |
| NARRAGANSETT ELECTRIC COMPANY, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO ENJOIN DEFENDANT NARRAGANSETT ELECTRIC COMPANY FROM PROSECUTING AN ACTION IN RHODE ISLAND

### I.  INTRODUCTION

Defendant, The Narragansett Electric Company ("Narragansett"), submits this Memorandum in

Opposition to the Motion of Defendant, TransCanada Power Marketing Ltd. ("TransCanada") to

Enjoin an identical action pending before Judge Smith in the United States District Court in Rhode

Island, which was filed on May 26, 2005, even though (a) TransCanada asked the Rhode Island

Federal Court to dismiss or stay that action on June 16, 2005 in favor of this action, (b) the parties

argued the Motion to Judge Smith on September 9, 2005, and (c) Judge Smith is currently considering

the matter.  TransCanada's Motion to Enjoin Narragansett from pursuing its action before Judge Smith

and, inferentially, from continuing to defend the pending motion in Rhode Island, should be denied for

several reasons.

First, TransCanada already brought essentially the same motion in Rhode Island in June

dressed in slightly different verbiage and that motion has already been briefed and argued.  Since

TransCanada has asked Judge Smith to dismiss the Rhode Island proceeding, and since Judge Smith

has devoted, and continues to devote, considerable attention to the subject, it is highly inappropriate for TransCanada to try to make the same arguments before a different judge.

Second, as Narragansett has already told Judge Smith in Rhode Island, TransCanada is not entitled to the benefits of "first-filed" status in this dispute. Although TransCanada "beat" Narragansett to the courthouse, TransCanada created a false start by racing to the courthouse steps in the middle of substantive settlement negotiations with Narragansett. Federal courts do not reward litigants for such questionable maneuvers. Moreover, TransCanada is not the natural Plaintiff in this dispute. From the beginning, Narragansett has made, under protest and with full reservation of rights, all of the payments that TransCanada claimed were due and owing under its illegitimate interpretation of the Wholesale Standard Offer Service Agreement (the "WSOS Agreement") that is at the heart of this dispute. Narragansett continues to make these payments even today, and did not sue to recover them in Rhode Island until TransCanada abruptly filed its Massachusetts action in the middle of settlement negotiations.

Third, as Narragansett has shown to Judge Smith in Rhode Island, most of the state of Rhode Island's electric customers, plus the government of Rhode Island – notably the Rhode Island Public Utilities Commission ("RIPUC"), which sets the prices that Narragansett can charge its customers, and the Rhode Island Division of Public Utilities and Carriers (the "Rhode Island Division") which also oversees rates – have a strong interest in the outcome of this dispute. TransCanada, a wholesale electric power supplier of Narragansett under a long term contract, seeks to require Narragansett to pay more under the contract and/or to terminate the contract. The contract is currently uneconomic for TransCanada, and its termination would force Narragansett to buy more expensive power at current market prices. If TransCanada succeeds, over 475,000 Rhode Island consumers served by Narragansett – including individual residents, businesses, hospitals, educational and charitable

2

institutions, and federal, state, and municipal entities – would have to pay more money for their electricity.

By contrast, the government and citizens of Massachusetts have virtually no interest in the resolution of this conflict, which involves solely a contract to supply power to a Rhode Island electric distribution company for the benefit of its Rhode Island retail customers.  In light of this overwhelming Rhode Island interest, this matter should proceed before the Rhode Island Court.

For all of these reasons, explained more fully below, the Court should deny TransCanada's motion.

## II.  FACTS

All of the facts below were presented to, and are currently under consideration by, the Rhode Island Federal Court.

### A.    The Parties

Narragansett is a specially chartered Rhode Island public utility corporation with its principal place of business in Rhode Island.  It is an electric distribution company whose charter permits it to deliver electricity over its wires to retail customers in thirty-eight Rhode Island cities and towns, with a population of over 1 million people.  Affidavit of Michael J. Hager Aff. ¶ 5[1].  Narragansett is the largest such electric utility in Rhode Island, serving most of that State's customers.  Id.  It presently delivers electricity to approximately 480,000 customers, of which over 475,000 receive standard offer service.  Id.  Narragansett has the exclusive right to own and operate distribution equipment for delivery of electricity at retail in these cities and towns.  Id.  Unlike non-utility companies, Narragansett does not set the prices at which it provides these services.  Rather, it sells and delivers

---

[1]  The Affidavit of Michael Hager was previously filed in the Rhode Island action in opposition to TransCanada's Motion to Dismiss or Stay filed in that action on June 16, 2005.  It is attached as Exhibit E to the Affidavit of Vincent F. O'Rourke, Jr. ("O'Rourke Aff.") being filed with this Opposition.

3

electricity pursuant to retail tariffs that the RIPUC has approved.  Narragansett is wholly owned by National Grid USA ("National Grid"), a public utility holding company.  Id. at ¶ 4.

TransCanada, a Delaware corporation, is a power marketing company that sells electricity at wholesale to Narragansett.  Its eastern operations – conducted from an office – are headquartered in Massachusetts.  Id. at ¶ 23.  Its other operations are in Calgary, Alberta, Canada and Toronto, Ontario, Canada.  Id.

Narragansett's predecessor companies, Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") also were retail electric distribution companies in Rhode Island.  Like Narragansett, Blackstone and Newport provided their services pursuant to retail tariffs approved by the RIPUC.  Eastern Utilities Associates ("EUA"), a public utility holding company, had owned Blackstone, Newport, and Montaup Electric Company ("Montaup"), the wholesale electricity supplier to Blackstone and Newport.  On May 1, 2000, Blackstone and Newport merged with and into Narragansett.  At the same time, National Grid acquired EUA, and Montaup merged with and into New England Power Company, another subsidiary of National Grid USA.  Consequently, Narragansett became the retail electric supplier and distribution company for Blackstone and Newport's customers, in addition to its already existing customers.

**B.     The WSOS Agreement**

On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement.  Under the Asset Purchase Agreement, TransCanada (1) purchased rights and obligations under a power purchase agreement between Montaup and the Ocean State Power ("OSP") generation station in Burrillville, Rhode Island; (2) entered into a PPA Transfer Agreement to effectuate the OSP purchase power obligations; and (3) agreed to supply a specific percentage share of electricity required by Blackstone and Newport to serve their Rhode Island customers.  In connection with its supply

4

obligation, TransCanada entered into a Wholesale Standard Offer Service Agreement ("WSOS Agreement") with Blackstone and Newport.[2]

At the heart of this dispute is the WSOS Agreement's fuel adjustment clause. Pursuant to this clause, Blackstone and Newport (now Narragansett) were obligated to pay a Fuel Adjustment Factor ("FAF") to TransCanada, as that FAF was to be reflected in their retail tariffs. The WSOS Agreement made clear that Blackstone and Newport's obligation to make payments under the FAF was conditioned upon the RIPUC approving the FAF in their tariffs.

Shortly after the WSOS Agreement was executed, Blackstone and Newport filed identical retail tariffs that contained the FAF. By its terms, the FAF commenced in the year 2000 and expired after 2004.[3] There were no provisions in the tariffs that provided for extending the FAF beyond 2004. These retail tariffs were approved by the RIPUC by order issued July 10, 1998. See July 10, 1998 Order, attached hereto as Exhibit A. The FAF remained in the Blackstone and Newport tariffs, unchanged, through the date that Blackstone and Newport merged into Narragansett.

In anticipation of the pending merger of Narragansett, Blackstone and Newport, by letter dated February 8, 2000, Narragansett informed TransCanada that it would pay an FAF consistent with Blackstone and Newport's RIPUC-approved retail tariffs. Accordingly, Narragansett attached to the correspondence a schedule containing a fuel adjustment for each year from 2000 through 2004. Narragansett sent this letter to TransCanada in draft form and asked TransCanada to review it. Representatives from TransCanada and Narragansett communicated regarding the letter, and

---

[2]  The Agreement also required TransCanada to supply electricity to Eastern Edison, a Massachusetts retail distribution company and subsidiary of EUA. However, the term of that supply obligation ended in 2004. As a result, TransCanada's remaining supply obligations relate solely to the former EUA companies in Rhode Island, Newport and Blackstone, which subsequently merged into Narragansett.

[3]  While the filing was made on April 15, 1998, the standard offer service tariff containing an FAF expiring after 2004 was virtually identical to a proposed standard offer service tariff that had been filed at the RIPUC in November of 1997. At that time, however, the RIPUC delayed approval. Instead, the RIPUC put interim tariffs into effect and required Blackstone and Newport to put the standard offer out to bid before approving any standard offer tariffs. Once the bidding process was completed, Blackstone and Newport refiled on April 15, 1998. The discussion of this filing history also is contained in the RIPUC's order issued July 10, 1998. See July 10, 1998 Order, attached as Exhibit A to this Memorandum.

TransCanada voiced no objections to the contents of the same.  Thus, on April 18, 2000, Narragansett put the draft letter in final form and sent it to TransCanada.

**C.    Proceedings Before the RIPUC**

Subsequent to the merger, Narragansett administered the WSOS Agreement  consistent with its understanding that the FAF would expire after 2004.  In fact, at several proceedings before the RIPUC, Narragansett expressed this understanding to the RIPUC.  These proceedings were noticed and open to the public.  Furthermore, in recent years, the RIPUC has made its orders and notices available on the web.  Examples of the several public proceedings before RIPUC include:  in June of 2000, Narragansett explained to the RIPUC that payment of an FAF for the wholesale standard offer service agreements for the former EUA companies Blackstone and Newport (the "EUA Zone WSOS Agreements") would end after 2004.  On May 28, 2003, in another public hearing before the RIPUC, Narragansett explained its understanding of the WSOS Agreement that it was not obligated to make FAF payments under the EUA Zone wholesale standard offer service agreements after 2004.  Consistent with its understanding of the WSOS Agreement, Narragansett filed with the RIPUC proposed standard offer rates that were based on a forecast of power costs that assumed no FAF payments would be made under the EUA Zone wholesale standard offer service agreements after 2004.  Additionally, on July 1, 2004, Narragansett filed an application with the RIPUC to set its rates effective as of October 1, 2004.  Again, the filing proposed rates based on a forecast of costs that assumed no FAF payments being made to TransCanada after 2004.

The RIPUC approved Narragansett's rates effective August 1, 2004 pursuant to an open meeting decision on July 26, 2004 and an order dated August 26, 2004.

Likewise, on November 10, 2004, Narragansett made another publicly-noticed filing with the RIPUC relative to retail standard offer service.  This filing proposed rates based on a forecast that no FAF payments would be made with regard to the EUA Zone wholesale standard offer service

agreements.  A bench decision delivered at a public hearing on December 13, 2004, and confirmed by a written order issued February 17, 2005, approved Narragansett's filing.

TransCanada failed to participate in these hearings.  As the RIPUC acknowledged in a letter to Michael Hachey of TransCanada,

> TransCanada has chosen not to participate in those publicly noticed hearings.  As I am sure you are aware, all members of the public, including suppliers, are invited to participate through the public comment process at the Commission.  Additionally, all Narragansett rate filings are posted on the Commission's website prior to the hearings as are all Commission Orders shortly after their issuance.

See Apr. 6, 2005 Letter, attached hereto as Exhibit B.

Consistent with its understanding of the WSOS Agreement, the terms of the retail tariff that had been initially approved by the RIPUC in 1998, the April 18, 2000 letter that had been sent to TransCanada at the time of the merger, and its filings with the RIPUC, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

**D.    Negotiations**

After Narragansett did not make any FAF payments for the month of January 2005, TransCanada complained to Narragansett.  Michael J. Hager Aff. ¶ 7.  In February of 2005, Narragansett and TransCanada initiated discussions concerning their respective understandings of the FAF clause.  Id.  On February 18, 2005, TransCanada invoked the dispute resolution clause of the WSOS Agreement, calling for senior representatives of TransCanada and Narragansett to meet.  Id. at ¶ 8.  At a meeting on March 7, 2005, the parties broached the subject of an amicable resolution.  Id. at ¶ 9.  At that same meeting, TransCanada expressed a strong interest in an expedited resolution, and the parties discussed a fast-track arbitration.  Id.[4]

---

[4]  The parties agreed that this meeting was subject to Federal Rule of Evidence 408 and similar state laws.  The meeting is described here not "to prove liability," but to explain the context of TransCanada's rush to the courthouse.

On March 1, 2005, TransCanada sent a letter to Narragansett (1) claiming that Narragansett was in default of the WSOS Agreement by not providing for an FAF in its price calculations; (2) asserting that Narragansett had breached the WSOS Agreement by refusing "to comply with its obligations under Article V before the … [RIPUC] with respect to its Standard Offer Service tariffs"; and (3) asserting that "Narragansett's failure to cure or rectify a notice default …shall be deemed an Event of Default…." <u>See</u> attached <u>Exhibit C.</u>

At the end of March, Narragansett began making payments to TransCanada, under protest (including retroactive protest payments for the period beginning in January), to allow the parties to negotiate a potential settlement, and to avoid giving TransCanada a pretext to terminate the WSOS Agreement, which, based on current market prices, is no longer economically advantageous to TransCanada.  Michael J. Hager Aff. ¶ 11.

Confidential settlement negotiations continued and on April 1, 2005, TransCanada and Narragansett also began negotiating an agreement for a fast-track arbitration.  <u>Id.</u> at ¶ 12.  The agreement for a fast-track arbitration was heavily negotiated.  <u>Id.</u> at ¶ 13.  It was nearly complete when TransCanada and Narragansett had made substantial progress towards a settlement agreement in principle of a large portion of the dispute.  <u>Id.</u>  At that time, on April 25, 2005, TransCanada's legal counsel sent an electronic mail message to Gloria Kavanah, National Grid's Assistant General Counsel, indicating TransCanada's willingness to hold off on finalizing the arbitration agreement due to the progress being made in settlement negotiations.  <u>Id.</u> at ¶ 14.

TransCanada and Narragansett were actually exchanging drafts of the partial settlement agreement when TransCanada filed suit in the United States District Court for the District of Massachusetts on May 17, 2005.  <u>Id.</u> at ¶ 15.  Nine days later, on May 26, 2005, Narragansett filed its action in the United States District Court for the District of Rhode Island.

8

At no time did TransCanada indicate that it no longer intended to arbitrate the dispute (or in the event of a settlement of a portion of the dispute, the remaining portion of the dispute.) Id. at ¶ 16. Moreover, TransCanada at all times indicated its strong interest in an expedited resolution. Id. at ¶ 17. Accordingly, Narragansett persisted in its belief that TransCanada continued to desire a fast-track arbitration. Id. Finally, Narragansett had no reason to believe that TransCanada would file suit since TransCanada was receiving all of the disputed FAF payments at that time. Id. at ¶ 18.

**E.    Other Facts Bearing on the Balance of Convenience**

**1.    The Rhode Island Regulatory Agencies' Involvement in this Dispute**

As regulatory agencies, the RIPUC and the Rhode Island Division have an integral and essential role in this dispute. The RIPUC and the Rhode Island Division possess "the exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering to the public in intrastate commerce energy … for the purpose of protecting … the public against improper and unreasonable rates, tolls and charges." R.I. Gen. Laws § 39-1-1(c). Furthermore, an electric distribution company may not terminate an existing standard offer wholesale supply agreement absent the Division's written consent. R.I. Gen. Laws § 39-1-27.3(b).

TransCanada acknowledges the role of the RIPUC in this dispute. On or about March 29, 2005, Michael Hachey of TransCanada contacted counsel for the RIPUC and requested a meeting with the regulators regarding this dispute. Michael J. Hager Aff. ¶ 10. In a letter to the RIPUC dated April 4, 2005, Hachey acknowledged the possibility of termination of the WSOS Agreement and the implications of the dispute for Rhode Island customers. See April 4, 2005 Letter, attached hereto as Exhibit D. The RIPUC responded to Hachey, noting that "any rate impact of any changes to a Standard Offer Service … Contract would be subject to Commission approval." See April 6, 2005 Letter, attached as Exhibit B.

2.    **Location of the Parties, Witnesses, and Evidence**

Narragansett's principal place of business is 280 Melrose Street, Providence, Rhode Island. Narragansett's business lead for the WSOS Agreement, Michael J. Hager, an employee of National Grid USA Service Company, lives equidistant between Worcester and Providence. Michael J. Hager Aff. ¶ 2, 3, and 6.

Narragansett employs over 470 persons in Rhode Island. Id. at ¶ 22. Upon information and belief, TransCanada has 8 to 10 employees in an office in Westborough, Massachusetts. Id. Furthermore, although TransCanada's Eastern division operations are located in Massachusetts, TransCanada also does business in Calgary, Alberta, Canada and Toronto, Ontario, Canada.[5] Id. at ¶ 23. TransCanada's employees in Burrillville, Rhode Island performed TransCanada's accounting services for the WSOS Agreement and the PPA Transfer Agreement since 1998 up until two days before TransCanada filed its motion with the Rhode Island Court to dismiss, stay, or transfer. Id. at ¶ 26.

The PPA Transfer Agreement for output from the OSP generation station is intertwined with the WSOS Agreement. Both the PPA Transfer Agreement and the WSOS Agreement have cross-default provisions. See PPA Transfer Agreement, Article 13, O'Rourke Aff. Ex. M; WSOS Agreement, Article 8(2), O'Rourke Aff. Ex. L. Accordingly, the PPA Transfer Agreement may be implicated in this litigation.

Much of the documentary evidence that Narragansett will introduce at trial is available in electronic form. Michael J. Hager Aff. ¶ 19. Furthermore, negotiations prior to TransCanada's filing of suit in Massachusetts took place in both Rhode Island and Massachusetts. Id. at ¶ 20. All hearings before the RIPUC, at which the retail fuel adjustment relative to the EUA Wholesale Standard Offer

---

[5]  On information and belief, Michael Hachey, one of TransCanada's business leads, owns a residence in Rhode Island and spends almost every weekend there. Id. at ¶ 25.

Service Agreements were discussed, took place in Rhode Island.  Id. at ¶ 21.

**F.     The Rhode Island Litigation**

On May 26, 2005, Narragansett filed its Complaint in the United States District Court for the

District of Rhode Island seeking to recover its damages arising from TransCanada's breach of the

WSOS Agreement and a declaration that TransCanada does not have a right to terminate the WSOS

Agreement and had breached its obligation of good faith and fair dealing.  On June 16, 2005,

TransCanada filed a Motion to Dismiss or in the Alternative Stay Narragansett's Rhode Island action

in favor of this action.  That Motion was briefed over the course of the summer and argued to Judge

William E. Smith on September 9, 2005.  It is currently pending decision.  The docket in the Rhode

Island action and the parties' memoranda, affidavits and the transcript of the argument on that motion

are attached to the O'Rourke Affidavit as Exhibits A to K.[6]

### III.  ARGUMENT

**A.     TransCanada's Decision to Present this Issue First to the US District Court of Rhode Island, the Interests of Judicial Economy, and the Need to Avoid Potential Disharmony Between Different Districts of the US District Court, Require that the US District Court for Rhode Island Should Resolve the Choice of Forum.**

As noted *supra,* TransCanada has already, and voluntarily, asked the US District Court for the

District of Rhode Island to decide whether this controversy should be decided in Massachusetts or

Rhode Island federal court.  The issues presented in both cases are identical.  The forum question was

extensively briefed and argued.  See O'Rourke Aff., Exhibits B-K.  TransCanada's belated efforts to

ask this court to enjoin the Rhode Island proceeding came only after Judge Smith addressed to

TransCanada's election not to file such a motion during the hearing on September 9, 2005.  (O'Rourke

Aff., Ex. I, Transcript pp. 46-51.)

---

[6]  The voluminous exhibits to the parties' affidavits are not attached to the O'Rourke Affidavit.

By asking a federal judge in Rhode Island to decide the forum issue first, and then asking this Court to decide the same issue later, before the Rhode Island federal judge has completed his review, TransCanada is attempting to disrupt and confuse the orderly process of adjudication, and waste judicial time and resources. Such tactics present "an opportunity for unseemly conflict between coordinate federal courts and causes wasteful delay in judicial administration." See National Equipment Rental, LTD v. Fowler, 287 F2d. 43, 47 (2d Cir. 1961) (Lumbard, C.J. concurring in part and dissenting in part). See also Hoffman v. Blaski, 363 U.S. 335, 345-358 (1960) (Frankfurter, Harlan and Brennan, dissenting).

There is no reason for this Court to accept TransCanada's invitation to jump into this self-created briar patch. The proper and orderly course is to allow the District of Rhode Island to finish resolving the process that TransCanada already started. That Court's decision will fully resolve the underlying motion before this Court.

**B.    The Court Should Deny TransCanada's Motion to Enjoin.**

In any event, even if TransCanada had not asked the Rhode Island Court to stay or dismiss the case that Narragansett filed, TransCanada's motion to this Court to enjoin the Rhode Island action should be denied on its merits. TransCanada's motion before this Court, as did its motion before the Rhode Island Court, relies exclusively on the first-filed rule. That reliance is misplaced because TransCanada lulled Narragansett into believing that settlement discussions were continuing and viable, when instead it was preparing to file suit in Massachusetts, and because (unlike Massachusetts) the State of Rhode Island, its utility regulators, and Rhode Island's electric customers, including individuals, businesses, colleges, hospitals, and governmental institutions, have a deep interest in the outcome of this proceeding.

The first-filed rule "is not a per se rule, but rather a policy governed by equitable considerations." Feinstein v. Brown, 304 F.Supp.2d 279, 283 (D.R.I. 2004); SW Industries, Inc. v.

Aetna Casualty & Surety Co., 653 F. Supp. 631, 634 (D.R.I. 1987).  Accordingly, courts refuse to

apply the first-filed rule mechanically and recognize various exceptions to the rule.  17 Moore's

Federal Practice § 111.13[1][o][B] (Matthew Bender 3d ed.).  See also Glades Pharmaceuticals v. Call,

Inc., No. Civ. A. 04-4259, 2005 WL 563726, at *8 (E.D. Pa. Mar. 9, 2005) (stating that "the first-filed

rule is not a rigid or inflexible rule to be mechanically applied"); Affinity Memory & Micro v. K & Q

Enter., 20 F. Supp. 2d 948, 954 (E.D. Va. 1998) (noting that "the first-filed rule is not to be applied

mechanically" and that the court should perform "a thorough transfer analysis … to determine if the

balance of convenience favors transfer"); 800-Flowers v. Intercontinental Florist, 860 F. Supp. 128,

133 (S.D.N.Y. 1994) (stating that "[i]t is well established that district courts need not slavishly adhere

to the first filed rule").  Furthermore, "courts generally give less weight to the first-filed rule when [as

here] the competing actions were filed within a short time of each other."  17 Moore's Federal Practice

§ 111.13[1][o][B] (Matthew Bender 3d ed.).[7]

Two well-settled exceptions to the first-filed rule apply where (1) special circumstances justify

giving priority to the second filed suit or (2) the balance of convenience favors the second suit.

Feinstein, 304 F.Supp.2d at 283.  Both of those exceptions apply here.

1.    **The Court Should Deny TransCanada's Motion to Enjoin Because the First-Filed Rule Does Not Apply Here.**

Where the first-filed action results from "a preemptive race to the courthouse," or is filed "for

the sole purpose of winning the race to the courthouse to secure a preferred forum," special

circumstances exist, and the first-filed rule does not apply.  Feinstein, 304 F.Supp.2d at 283; Holmes

Group, Inc. v. Hamilton Beach/Proctor Silex, Inc., 249 F.Supp.2d 12, 16 (D. Mass. 2002).

Furthermore, where one party reasonably holds off from filing suit because he or she believes the

parties are still negotiating, special circumstances exist that preclude application of the first-filed rule.

---

[7]  TransCanada's Complaint in this action was filed on May 17, 2005.  Narragansett's Complaint in Rhode Island was filed nine days later.

Nortek, Inc. v. Molnar, 36 F.Supp.2d 63, 70 (D.R.I. 1999).  See also Holmes Group, Inc., 249

F.Supp.2d at 16 (stating that the first-filed rule does not apply where "a plaintiff … misleads the

defendant into foregoing litigation in order to negotiate a settlement and then files suit").  A court "will

not reward conduct that undermines the sound policy of promoting settlements and negotiations

outside the courthouse." Nortek, Inc., 36 F.Supp.2d at 70.

Additionally, in the case of concurrent actions proceeding in different federal courts, courts

often note which of the parties constitutes the "natural plaintiff."  "The natural plaintiff's choice of

forum … will be disturbed only in exceptional circumstances." AmSouth Bank v. Dale, 386 F.3d 763,

788 (6th Cir. 2004).  See also Old Town Canoe Co. v. Confluence Holdings Corp., No. Civ. 04-1660-

AS, 2005 WL 552005, at *2 (D. Or. 2005) (noting that the natural plaintiff's choice of forum should

not be disturbed in the absence of a strong showing of inconvenience).

"[T]he circumstances under which an exception to the first-to-file rule typically will be made

include bad faith … anticipatory suit and forum shopping." Alltrade, Inc. v.

Uniweld Prods., Inc., 946 F.2d 622, 628 ( 9th Cir. 1991).  TransCanada is not entitled to the benefits of

the first-filed rule for at least two reasons.  First, TransCanada engaged in "conduct that undermines

the sound policy of promoting settlements and negotiations outside the courthouse." Nortek, Inc., 36

F.Supp.2d at 70.  Narragansett and TransCanada were engaged in negotiations for upwards of two

months when TransCanada unexpectedly filed its Massachusetts action.  TransCanada lured

Narragansett into a false sense of security by engaging in the dispute resolution process of the WSOS

Agreement and insisting on fast-track arbitration.  Furthermore, TransCanada's counsel told

Narragansett to hold off on finalizing the arbitration agreement due to the progress being made in

settlement negotiations.  Because negotiations had proven fruitful, as evidenced by the partial

settlement and TransCanada's counsel's statement, and Narragansett continued to pay under protest,

Narragansett had every reason to believe that the parties would resolve their dispute without a court

14

action.  TransCanada took advantage of the false sense of security it provided Narragansett and

ambushed Narragansett to secure its preferred forum of Massachusetts.

Second, TransCanada's actions are even more pernicious because Narragansett, not

TransCanada, was the only party suffering any actual harm at the time that TransCanada filed its

lawsuit.  While the parties attempted to resolve this dispute, Narragansett made payments under protest

to TransCanada for each month, beginning with the month that TransCanada sent Narragansett the

notice of dispute.  Therefore, when it filed suit, TransCanada already possessed all of the money it

claimed was due in connection with the dispute.  Narragansett, on the other hand, was out more than

$1,000,000, having made payments to allow the parties to negotiate and to avoid termination of a

power supply contract that is advantageous for Rhode Island customers.  To this day, Narragansett

continues to make these payments.  Michael J. Hager Aff. ¶ 11.  Thus Narragansett, not TransCanada,

was the party suffering damages at the time that TransCanada filed its lawsuit.  Narragansett, not

TransCanada, is the natural plaintiff.

2.     **The Court Should Deny the Motion to Enjoin Because the Government and Residents of Rhode Island have an Enormous Interest in the Resolution of this Dispute.**

The RIPUC and the Rhode Island Division extensively regulate the electric industry in Rhode

Island.  The RIPUC possesses "the exclusive power and authority to supervise, regulate, and make

orders governing the conduct of companies offering to the public in intrastate commerce energy … for

the purpose of protecting … the public against improper and unreasonable rates, tolls and charges."

R.I. Gen. Laws § 39-1-1(c).  Accordingly, a retail electric distribution company charges its customers

rates under public tariffs that are reviewed and approved by the RIPUC.  R.I. Gen. Laws §§ 39-1-3(a);

39-1-27(a).  Furthermore, an electric distribution company may not terminate an existing standard

offer wholesale supply agreement absent the Division's written consent.  R.I. Gen. Laws § 39-1-

27.3(b).

15

This case should be litigated in Rhode Island because the contract dispute at issue is inextricably intertwined with the RIPUC's regulation of the rates that Narragansett can charge its customers and because Rhode Island residents, businesses, and other electric consumers have a strong interest in the outcome of this dispute.  TransCanada seeks:  (1) to terminate its power supply contract, and (2) to obtain FAF payments for as long as the contract remains in effect.  Narragansett does not believe that TransCanada is entitled to any relief in this proceeding.  Nevertheless, either prong of the relief requested by TransCanada would increase the rates for hundreds of thousands of Rhode Island businesses and residents.

Under Rhode Island law, Narragansett is entitled to recover its costs under standard offer service agreements from approximately 54,832 businesses and 420,759 residents that receive standard offer service.  See R.I. Gen. Laws § 39-1-27.3(b) (stating that "[t]he electric distribution company will be entitled to recover its costs incurred from providing the standard offer arising out of … wholesale standard offer supply agreements … in effect prior to January 1, 2002").  If Narragansett is required to pay more to TransCanada under the WSOS Agreement, Narragansett will be forced to recover those increased costs from its customers.  If TransCanada is allowed to terminate the WSOS Agreement, then Narragansett will be forced to purchase more expensive market power, the costs of which, under Rhode Island law are recoverable.  See R.I. Gen Laws § 39-1-27.3(b) (stating that "[t]he electric distribution company will be entitled to recover its costs incurred from providing the standard offer arising out of … power supply related arrangements prudently made after January 1, 2002, to provide standard offer supply or to mitigate standard offer supply costs").  Therefore, if this Court accepts TransCanada's contract arguments – which it should not – Rhode Island residents, businesses, governmental, educational and charitable institutions will face higher energy costs.

The Rhode Island public interest demands resolution of this dispute in Rhode Island.  "When an action involves an incident occurring in a particular locale, there is a public interest in having the

16

controversy adjudicated in that locale ….."  17 Moore's Federal Practice § 111.13[1][l] (Matthew Bender 3d ed.).  See also In re Eastern Dist. Repetitive Stress Injury Litigation, 850 F.Supp. 188, 195 (E.D.N.Y. 1994) (stating that "[w]hen an action involves injuries sustained in a particular locale, the public interest supports adjudication of the controversy in that locale, where it may be a matter of local attention….")

This case involves events occurring exclusively in Rhode Island; specifically, the purchase of electricity in Rhode Island, on behalf of Rhode Island electric consumers, at rates set by Rhode Island regulatory authorities.  The more than 475,000 customers of the power supplied by TransCanada are located exclusively in Rhode Island.  Narragansett and its predecessors, Blackstone and Newport, are Rhode Island corporations.  By statute, Narragansett has the exclusive authority to distribute electricity to customers in its franchised territory in Rhode Island.  Michael J. Hager Aff. ¶ 5.  It has no other authority and engages in no other business.  Finally, this case involves relevant proceedings that took place before the RIPUC.

In short, this case is important to the residents of Rhode Island and it directly concerns the State's intensive regulation of the supply and sale of electricity.  The residents and government of Massachusetts have no interest in this dispute.  For this reason, this dispute should be determined in Rhode Island.

3. **The Balance of Convenience Favors Narragansett's Rhode Island Based Suit.**

In addition to the preemptive race to the courthouse, a balance of convenience favoring the venue of a later-filed action precludes application of the first-filed rule.  Feinstein, 304 F.Supp.2d at 283.  In analyzing the balance of convenience, courts weigh the following factors:  (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of witnesses and the location of documents; (4) any connection between the forum and the issues; (5) the law to be applied; and (6)

17

the state or public interest at stake.  Holmes Group, Inc., 249 F.Supp.2d at 17.   An analysis of these factors demonstrate that factors 1, 2, and 3 are essentially of little weight and that items 4, 5 and 6 favor resolution of this dispute in Rhode Island because of the strong interest of that forum in the outcome of this case which will, in part, turn upon an analysis of the Rhode Island statutory scheme governing public utilities.

### a.    The Plaintiff's Choice of Forum

In general, "[u]nder both the doctrine of forum non conveniens and the statutory provision for transfer of venue, the plaintiff's forum choice is generally preferred."  SW Industries, Inc., 653 F.Supp. at 637.  This preference for the plaintiff's choice of forum is especially strong where the plaintiff has filed suit in its home forum.  Kleinerman, 107 F.Supp.2d at 125.  Since both Narragansett and TransCanada filed in their home jurisdiction the facts appear to be neutral.

### b.    The Convenience of the Parties

Narragansett is a Rhode Island corporation with its principal place of business, and all of its equipment and customers, in Rhode Island.  TransCanada is a Delaware corporation with its small headquarters office in Massachusetts, and other operations in Canada.  TransCanada sells electricity to Narragansett, which Narragansett provides to Rhode Island consumers.  Given the proximity of Rhode Island to Massachusetts, this factor is also neutral.

### c.    Connections Between the Forum and the Issues

Both Narragansett's Rhode Island lawsuit and TransCanada's Massachusetts lawsuit arise from the delivery of electricity to Narragansett for consumption by Rhode Island consumers.  Rhode Island has a strong interest in the potential termination of the WSOS Agreement, since the increased costs from any payments to TransCanada and/or termination will be passed on to Rhode Island customers by operation of R.I. Gen. Laws § 39-1-27.3(b), discussed *infra*.  Consequently, the direct connection between Rhode Island and the issues central to this dispute is undeniable.

18

**d.      The Law To Be Applied**

Of the balance of convenience factors, the law to be applied "seems not to have been given great weight, particularly when the applicable state law appears clear." SW Industries, Inc., 653 F.Supp. at 638-39 (citing Wright, Miller & Cooper, Federal Practice and Procedure:  Jurisdiction 2d § 3854).  The WSOS Agreement provides for the application of Massachusetts law.  As Massachusetts law concerning the interpretation of contracts is fairly clear, this factor bears little weight.  Although Massachusetts law governs the WSOS Agreement, the Rhode Island statute regarding Standard Offer Service and proceedings, orders, rules, and regulations of the RIPUC is at the heart of this dispute, since the same contract prohibited TransCanada from collecting an FAF unless and to the extent that the RIPUC permitted Narragansett to recover such costs in its retail tariffs.  Thus, the Rhode Island legal issues appear to be more complex and favor resolution of this matter by a Rhode Island Court.

## IV.  CONCLUSION

As (1) TransCanada's request that the Court in Rhode Island determine the appropriate forum for this suit has already been fully briefed and argued and is now pending decision by Judge Smith, (2) special circumstances apply and (3) the balance of convenience favors Rhode Island as the appropriate venue for this action, the first-filed rule does not apply and the Court should deny TransCanada's motion to enjoin Narragansett from pursuing its action in Rhode Island.

THE NARRAGANSETT ELECTRIC
COMPANY
By its Attorneys,


/s/ Vincent F. O'Rourke, Jr.
Michael P. Angelini (BBO #019340)
Vincent F. O'Rourke, Jr. (BBO #380335)
Kimberly A. Stone (BBO #630952)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
Tel. No.: 508/791-3511

Dated:  September 29, 2005

20

# EXHIBIT A

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PUBLIC UTILITIES COMMISSION

IN RE:        BLACKSTONE VALLEY ELECTRIC COMPANY

NEWPORT ELECTRIC CORPORATION

STANDARD OFFER SERVICE                    DOCKET NO. 2716

<u>REPORT AND ORDER</u>

On April 15, 1998, the Blackstone Valley Electric Company ("BVE") and

Newport Electric Corporation ("Newport") (together, the "Companies") filed rate

changes with the Public Utilities Commission ("Commission") pursuant to R.I.G.L. §39-

3-10, to become effective June 1, 1998. This was the second filing made to satisfy the

Companies' obligations under the terms of a settlement agreement dated October 17,

1997 amongst the Companies, Montaup Electric Company ("Montaup"), the Division of

Public Utilities and Carriers ("Division") and the Commission ("Settlement Agreement")

that was filed with, and approved by the Federal Energy Regulatory Commission ("

FERC"). The Settlement Agreement provides, in relevant part, for the implementation of

Rhode Island's Utility Restructuring Act of 1996, as amended ("URA"). The general

objective of the URA is to deregulate electric power supplies and allow the development

of a competitive market for the purchase of electricity.

The Companies are wholly owned subsidiaries of Eastern Utilities Associates

("EUA"), an integrated public utility holding company. The Companies are engaged

primarily in the distribution of electricity to customers located in Rhode Island. The

Companies purchase all their energy requirements from Montaup, EUA's wholesale

generating and transmission subsidiary. The power has been purchased under the terms

1

of a long-term all-requirements contract, the terms and prices of which have been regulated by the FERC.

A public hearing was held on May 12, 1998. The following appearances were entered in this proceeding:

| | |
|---|---|
| FOR THE COMPANIES | David A. Fazzone, Esq.<br>McDermott, Will & Emery |
| FOR TEC-RI | Andrew Newman, Esq.<br>Rubin and Rudman, LLP |
| FOR THE DIVISION | Paul J. Roberti<br>Chief, Public Utilities Regulatory Unit<br>Office of the Attorney General |
| FOR THE COMMISSION | Adrienne G. Southgate<br>General Counsel |
| | Lindsay Johnson<br>Special Counsel |

## I. INTRODUCTION

On November 7 and 17, 1997, the Companies filed proposed Standard Offer rates and Last Resort Service rates which were designed to implement open access and bring competition to the Companies' ratepayers.[1] The rates mandated retail access to alternative suppliers of electricity. Simply put, the rates required the Companies to allow their customers to purchase electricity from other suppliers of electricity and required the Companies to transport any such purchases on their lines from the supplier to the customer.

---

[1] The Commission approved the filed rates with some changes on December 17, 1997. See Order No. 15521 dated July 10, 1998.

In its decision, the Commission found that the proposed rates did not qualify as
Standard Offer rates under the URA because the wholesale power supply had not been
awarded by public competitive bidding.[2]  Accordingly, while it approved the rates, the
Commission ordered the Companies to designate such rates "Interim Power Rates".
These rates are based upon the wholesale charge of 3.2¢ per kilowatt hour (kWh") to the
Companies for wholesale standard offer service.[3]  The 3.2¢ wholesale charge reduced
purchased power costs by 30% for BE and 14% for Newport.[4]  In order to provide a
reduction to all customers, the Companies reduced purchased power costs by 30% for BE
and 14% for Newport.[5]  The rate structures for each rate class (whether reflecting energy,
demand, or time-of-use-charges) have been maintained.

Since that decision, the Companies have put their power supply out to bid in an
effort to satisfy the requirements of both the Settlement Agreement and the URA.[6]  The
Companies now contend that the proposed rates are in compliance with R.I.G.L. §39-1-
27.3(d) and they have designated the rates as Standard Offer Service.  In addition, the
Companies have filed a Standard Offer Cost Adjustment provision ("SOCA") designed to
replace the Interim Generation Service Revenue Reconciliation Adjustment.  The purpose
of the SOCA is to allow the Companies to adjust rates to collect or refund the amount of
any over- or under-collection of Standard Offer Rates.[7]

---

[2] R.I.G.L. §39-1-27.3(d), as amended.
[3] Ex. EUA-1.
[4] Id.
[5] Id.
[6] Ex. EUA-A, pp. 14-27. All page references in this exhibit are to the page numbers of the volume which are shown on the bottom right of each page.
[7] Ibid., p. 36.

3

## II.  POSITIONS OF THE PARTIES

The Companies, the Division and TEC-RI presented witnesses who testified on the

filed rates.

### A.  THE COMPANIES

The Companies presented the testimony of three witnesses in support of its filing.

Mr. Michael J. Hirsh, Vice President of EUA Service Corporation ("EUASC"), BVE,

Newport and Eastern Edison Company,[8] testified that the purpose of the Companies'

filing was:

1. to present the Companies' proposed retail Delivery Standard Offer Service
   tariffs offered to comply with R.I.G.L. §39-1-27.3(d);

2. to describe the results of the Companies' Standard Offer Service and Last
   Resort Service competitive procurement processes; and

3. to address the reasonableness of the Companies' proposal to continue Last
   Resort Service under the same terms that have been in place since January 1,
   1998.[9]

Mr. Lawrence R. Boisvert, Supervisor of Power Supply Administration for

EUASC, testified on the competitive bidding procedures and the results of the Standard

Offer Service and the Last Resort /Default Service Requests for Proposals ("RFP") that

the Companies issued.[10]

Mr. Boisvert testified that under the Settlement Agreement, the Companies

entered into an agreement entitled Purchase of Electric Service for Resale, Amendment to

Service Agreement with Montaup[11] ("ASA").  Under the terms of the ASA, Montaup is

committed to provide the Standard Offer power supply to the Companies at fixed

---

[8] Ibid., p. 3
[9] Ibid., pp. 4-5.
[10] Ibid., p. 15.

4

Standard Offer prices, subject to a fuel index,[12] over the term that the Standard Offer will

be available in Rhode Island.[13]  In the event that the Companies reduce their purchases

from Montaup by purchasing wholesale standard offer power supply from another

supplier, Montaup has no further obligation to supply that portion of the Companies'

Standard Offer Load.[14]

Mr. Boisvert testified that the Companies issued the Standard Offer RFP to

comply with the requirements of the Settlement Agreement and with the provisions of the

URA.[15]  Suppliers were required to bid for a percentage of the Companies' load and to

bid a percentage discount off the wholesale standard offer rates stipulated in the ASA.[16]

Mr. Boisvert testified that the Companies received no qualifying bids for wholesale

standard offer Service and that, consistent with the Settlement Agreement, the Companies

will continue to receive service under their contracts with Montaup until such time that a

qualifying bid may be received in a future RFP.[17]  He indicated that the Companies intend

to issue another RFP in the fourth quarter of this year.[18]

Mr. Boisvert testified that the Companies also put Last Resort Service out to bid

as required by the URA.[19]  The URA provides:

> [E]ach distribution electric distribution company shall . . . arrange for a Last
> Resort power supply for customers who are no longer eligible to receive
> service under the Standard Offer and not adequately supplied by the market

---

[11] EUA-3, Attachment 1B.
[12] Ibid., p, 12.
[13] Ex. EUA-A, p. 18.
[14] Id.
[15] Ibid., p. 15.
[16] Ibid., p. 17.
[17] Ibid., p. 20.
[18] Tr. 5/12/98, pp. 107-108.
[19] R.I.G.L. §39-1-27.3(f).

because they are unable to obtain or retain electric service from non-regulated power producers.[20]

Mr. Boisvert indicated that the Companies issued an RFP for Last Resort Service.[21] While the Company received two qualifying bids, it did not accept the bids because each bid required a fixed payment that would have made the cost of Last Resort Service "much higher than the wholesale standard offer price."[22] Alternatively, the Companies propose to offer Last Resort Service at the same price as Standard Offer Service until a competitive procurement of Last Resort Service can be successfully implemented.[23]

Finally, Mr. James J. Bonner, Jr., Supervisor of Rate Design for EUASC, testified in support of the Companies' proposed Standard Offer Service and Last Resort Service tariffs.[24] He testified that the Standard Offer tariffs and the Last Resort Service tariffs were nearly identical to the tariffs currently in effect.[25] The only difference in the Standard Offer Service tariff is a SOCA that would operate on a prospective basis.[26]

B. THE DIVISION

The Division presented the testimony of Dr. John K. Stutz, Vice President of Tellus Institute. Dr. Stutz's testimony included a number of recommendations that were incorporated in the Companies' filed testimony.[27] In addition, Dr. Stutz recommended that the SOCA should be based on actual experienced cost data rather than estimates as

---

[20] Id.
[21] Ex. EUA-A, p. 21.
[22] Ibid., p. 24.
[23] Ibid., p. 25.
[24] Ibid., pp. 28-44.
[25] Ibid., p. 34.
[26] Ibid., p. 35.
[27] For example, Dr. Stutz recommended that the pricing of Standard Offer Service to "new" and "old" customers should be the same. Division Ex.-A. In addition, consistent with the eligibility provision of the Last Resort Service tariff, he recommended that customers who are not eligible for Standard Offer Service

proposed by the Companies.  During the hearings, to address this concern, the Companies

filed a modified SOCA that required the use of actual cost data.[28]

      C. <u>TEC-RI</u>

      Mr. Roger L. Buck, Executive Director of the Energy Council of Rhode Island

("TEC-RI"), testified on behalf of a consortium of about 95 major energy users in Rhode

Island.[29]  Mr. Buck testified in support of two rate design principles.  First, he testified

that TEC-RI supported the "designed standard offer pricing mechanism" which was

employed to design the presently effective rates.[30]  TEC-RI opposes the uniform pricing

method, which would price each kWh of usage at the flat rate that the Companies pay to

their wholesale supplier.[31]  He testified that the uniform method would cause customers

with high load factors to experience "a much smaller decrease in their rates".[32]  Mr. Buck

also recommended a provision in the tariffs that would fix the amount of future rate

increases needed to pay for the increase in the wholesale standard offer rates stipulated in

the Settlement Agreement.[33]

---

and who are not able to retain service from non-regulated power producers, due to cost, should be eligible
to receive Last Resort Service. <u>Ibid</u>., p. 4.
[28] Ex. EUA-B.
[29] Ex. TEC-RI-A.
[30] <u>Id</u>.
[31] <u>Id</u>.
[32] <u>Id</u>.
[33] <u>Id</u>.

III.  FINDINGS

    A.  <u>STANDARD OFFER</u>

      1.  <u>Competitive Bidding Requirements</u>

The URA provides:

> The power supply contract required for the standard offer shall be awarded by
> public competitive bidding to the lowest priced power supplier.[34]

The Companies' power supply acquisition procedures are also stipulated by the

Settlement Agreement.  First, the Settlement Agreement includes the provisions of the

ASA.[35]  Second, the Settlement Agreement required the Companies to issue an RFP.[36]  To

qualify, a proposal was required to produce cost savings to the Companies.  Any

qualifying bidder, in turn, would be required to enter into a Standard Offer Service

Agreement ("SOSA").  If the RFP did not solicit enough qualifying bids to meet the

Companies' load requirements, the Settlement Agreement requires Montaup to supply the

difference.

    The Companies did receive one bid in response to the RFP solicitation.[37]  This

proposal, however, did not conform to the requirements of the RFP because it was for

pre-scheduled capacity and energy delivered to the NEPOOL transmission system.[38]  The

proposal was rejected.  Consequently, the Companies continue to receive their power

supply requirements from Montaup under the terms of the ASA.

---

[34] R.I.G.L. §39-1-27.3(d), as amended. The FERC Settlement Agreement also requires the Company to put
its power supply out for competitive bid.
[35] Ex. EUA-A, pp. 17-18.
[36] <u>Id</u>.
[37] <u>Ibid</u>., p. 19.
[38] <u>Id</u>.

The Commission finds that the Companies have satisfied the competitive bidding requirements of the URA. This finding is based on the fact that the terms of the ASA and the SOSA are substantially the same. In addition, while there was some difference in the timing of the bids, all parties were bidding to provide all or some portion of the same load. The result was that unless the ASA produced the lowest cost to the Companies, the power would be provided by other suppliers. This procedure is consistent with the competitive bidding requirement of the URA.

2. Standard Offer Supply Contract

The URA also requires each distribution company to acquire a power supply adequate to provide service to "customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers".[39] As originally enacted, the URA provided:

> [E]ach electric distribution company shall arrange with its wholesale power supplier for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers.[40]

On July 7, 1997 the URA was amended to require that the Standard Offer power supply be competitively bid. This provision of the URA, as amended, now reads:

> [E]ach electric distribution company shall arrange for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers. The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier.[41]

---

[39] R.I.G.L. §39-1-27.3(d), as amended.
[40] Id
[41] R.I.G.L. §39-1-27.3(d), as originally enacted by P.L. 1996, ch 316, §1.

9

The statute requires that the distribution companies enter into a power supply arrangement that is adequate to provide power "to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers".[42] The Companies, however, took the position that the ASA required Montaup to provide service to only those customers who were on the system as of January 1, 1998.[43] For this reason, Mr. Hirsh testified that it was "likely that the Companies would need to solicit supply to meet the requirements of customers that take service after January 1, 1998."[44] The Division, on the other hand, took the position that the ASA required Montaup to provide service to customers that take service after January 1, 1998.[45]

The ASA provides:

> The Company shall provide "Standard Offer Service" to Customer commencing on the Contract Termination Date and continuing for the period through December 31, 2009 (the "Standard Offer Period"). Standard Offer Service shall consist of the wholesale supply of power sufficient to meet the requirements of retail customers served by the Customer's distribution system that purchase Standard Offer retail service from the Customer.[46]

The Companies argued that the ASA must be interpreted in light of all the facts surrounding the execution of the Agreement.[47] The essence of this argument appears to be that Montaup would not have agreed to a literal interpretation of this provision because a literal interpretation of the provision would place a hardship on Montaup.[48] Mr. Hirsh

---

[42] Id.
[43] Ex. NEC-A, p. 10.
[44] Id.
[45] RIPUC 1-1 (Division Response to Commission Data Request dated May 7, 1998).
[46] Ex. EUA-3, Attachment 1B, Purchase of Electric Service For Resale, Amendment to Service Agreement (ASA), Section 10, pp. 7-8. In the ASA, Montaup is referred to as the Company and the Companies are referred to as the Customer.
[47] Ex. EUA-C, Comm-1-3.
[48] Id.

referenced other sections of the ASA that in his opinion indicated that Montaup is not responsible for providing power to the Companies' new customers.[49]

The Commission is not convinced by the Companies' arguments. The Commission finds that, consistent with the requirements of the URA, Section 10 of the ASA requires Montaup to provide service to **all** customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers. Accordingly, the Commission finds that as of June 1, 1998, the Companies have acquired the power supply required by the URA.

It follows from the Commission's finding that the Companies need not incur costs in excess of the ASA wholesale standard offer rates to supply service to the new customers. Accordingly, if the Companies incur additional costs by purchasing such power from a different supplier, such costs will not be recoverable under the SOCA unless the Companies satisfy the considerable burden of establishing that the costs were prudently incurred.

### 3. Price Cap

The URA also places a cap on the price of the Standard Offer rates. The URA provides that:

> The Standard Offer shall be priced such that the average revenue per kilowatt-hour received from the customer for such power together with approved distribution, transmission and transition charges shall equal the price that would have been paid under rates in effect during the twelve (12) month period ending September 30, 1996 adjusted annually for eighty percent (80%) of the change in the consumer price index for the immediately preceding twelve (12) month period, and also for other factors reasonably beyond the control the electric distribution company and its former wholesale power supplier including but not limited to changes in federal, state or local

---

[49] Tr. 12/12/98, pp. 47-54.

taxes or extraordinary fuel costs; provided, however, that adjustments to the standard offer for factors other than inflation must be approved by the commission. The standard offer is to be a price cap and may, after notice to the commission, be less than the maximum allowed at anytime for the generation component of the standard offer.[50]

The difficulty with this provision is that it is not clear how the cap should be applied. The cap is placed on "the average revenue per kWh received from the customer".[51] It is not clear whether this test applies to each customer, each customer class or to total annual customer revenues.

Assuming the price cap applies to total annual customer revenues, the Commission finds that the Standard Offer rates do not produce average revenues in excess the URA price cap.[52] If the cap applies to the average revenues from each customer class, the Commission finds that the Standard Offer rates for each customer class do not exceed the URA cap.[53] There is nothing in the record to indicate how many customers would pay average revenues in excess of the price cap.

The Commission will allow the filed rates to go into effect so as not to delay implementation of the URA. However, the Commission will continue to pursue the interpretation of the legislative intent embodied in the Standard Offer price cap provision of the URA. This effort will include seeking a declaratory judgment from the courts. It must be emphasized that the Commission is not making any determination of how the

---

[50] R.I.G.L. §39-1-27.3(f).
[51] Id.
[52] Ex. EUA-1, Attachment 4.
[53] Ex. NEV-3.

12

price cap should be applied in any future proceeding and shall require the Company to

address this issue in any future rate proceeding[54].

### B. STANDARD OFFER SERVICE TARIFFS

#### 1. Standard Offer Cost Adjustment

The Companies have filed a Standard Offer Cost Adjustment.[55]  Under the terms

of the SOCA, the Commission would be required to refund any over- or under-collection

of Standard Offer power costs "on a uniform cents per kilowatthour basis to the bills of

all customers taking Retail Delivery Service from the Companies".[56]  In other words, the

under- or over-recovery would be applied to the bills of customers who are not taking

Standard Offer Service and are purchasing from nonregulated power suppliers, as well as

to Standard Offer customers.

The Division contends that this approach is required to prevent the Standard Offer

price signal from becoming blurred.[57]  The argument is that the adjustment should be

spread over all customers to minimize any incremental charge to the Standard Offer Rate.

The objective is to keep prices as close to the Standard Offer Rates as possible, so that

ratepayers get a clear price signal that allows them to shop for power.[58]

This argument would have more appeal if it were known that the Standard Offer

Service would be offered at Standard Offer rates.  There is no assurance that this will

---

[54] The Company has expressed its intent to modify its rates to impose a flat uniform rate when the Residual
Value Credit is realized upon the sale of Narragansett's and NEP's non-nuclear generating assets.  Ex.
NEC-1, pp. 20-22.  At that time, it is also possible that another party may propose the continuation of the
existing rate design.  In either event, the Commission will require the Company or any other party to
demonstrate that any proposed change in rates is in actual compliance with the URA.
[55] Ex. EUA-B.
[56] Id.
[57] Brief of the Division filed May 27, 1998, p. 2.

occur, because the Companies intend to put their entire supply requirements out to bid in the fourth quarter of 1998. Until the source and cost of the Companies' power supplies become known, the price of Standard Offer Service is unknown, and there can be no clear price signals.

The record simply does not support the position taken by either the Companies or the Division on this issue. It is possible, however, that future developments could justify their position on the matter. Accordingly, the SOCA filed by Companies is approved with the following modifications:

> The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

> By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.[59]

> At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowathour surcharge or credit factor to be

---

[58] Id.
[59] The Commission also finds that, as a matter of policy, the adjustment tariffs of the electric utilities in the State should be reasonably uniform where circumstances warrant. Accordingly, the revised language is very similar to the language from the Narragansett Electric Standard Offer Adjustment Provision. See Order No. 15639, issued on July 10, 1998.

applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service Costs and revenues that exist.[60]

### 2. Standard Offer Calendar Year Multiplier Table

The Standard Offer Service tariff proposed by the Companies stipulates that the retail rate shown in the tariff shall be multiplied times the Standard Offer Calendar Year Multiplier Table to obtain the retail rate for any given year. The purpose of the table is to escalate the retail rates to reflect scheduled increases in the wholesale standard offer rates.

The Commission finds that the adoption of the multiplier table is not warranted because the Companies intend to put their entire supply requirements out to bid in the fourth quarter of 1998. Until the source and cost of the Companies' power supplies become known, the price of Standard Offer Service is unknown and an accurate price multiplier can not be established. The Commission finds that the Companies have failed to establish the factual basis for the proposed multiplier table, and orders the Companies to remove the tables and any references to them from their Standard Offer Service tariffs.

### C. LAST RESORT SERVICE

The URA requires that distribution companies act as suppliers of last resort to those customers who otherwise may be unable to obtain service in a competitive market.[61] Specifically, the URA requires each distribution company to:

> [A]rrange for a last resort power supply for customers who are no longer eligible to receive service under standard offer and are not adequately supplied by the market because they are unable to obtain or retain electric service from nonregulated power producers. The electric distribution company shall periodically solicit bids from nonregulated power producers for such service at market prices plus a fixed contribution from

---

[60] Ex. EUA-B.
[61] R.I.G.L. §39-1-27.3(f).

the electric distribution company. . . . . All fixed contributions and any reasonable costs incurred by the electric distribution company in arranging this service shall be included in the distribution rates charged to all other customers.[62]

The Companies issued an RFP for Last Resort Service power supply as required by the URA.[63]  Two proposals were received.[64]  In each case, however, the proposals included fixed fees that produced per kWh prices in excess of the Standard Offer Rates.[65] Accordingly, the Companies "propose to continue serving Last Resort Service at the same price as Standard Offer Service until a competitive procurement of Last Resort Service can be successfully implemented".[66]  Because the Companies' proposal results in lower Last Resort Service rates, the Commission finds the Companies' proposal to be reasonable and approves it provided, however, that the Companies shall continue to periodically issue RFPS for Last Resort Service power supply as required by the statute.

(15640) ORDERED:

1. That the Standard Offer prices filed by the Companies are approved for consumption on and after June 1, 1998.

2. That the Standard Offer tariffs shall be modified in accordance with the findings and instructions contained in this Report and Order.

3. That the Standard Offer Cost Adjustment provision shall be modified in accordance with the findings and instructions contained in this Report and Order.

---

[62] Id.
[63] Ex. EUA-A, p. 23.
[64] Id.
[65] Ibid., pp. 23-24.
[66] Ibid., p. 25.

4. That the Last Resort Service tariff is approved as filed for consumption on and after June 1, 1998.

5. That the Companies shall file tariffs modified in accordance with the findings and instructions contained in this Report and Order.

6. That the Companies shall act in accordance with all other findings and instructions contained with this Report and Order.

EFFECTIVE AT PROVIDENCE, RHODE ISLAND PURSUANT TO OPEN MEETING DECISIONS ON MAY 29 AND JULY 9, 1998.  WRITTEN ORDER ISSUED JULY 10, 1998.

PUBLIC UTILITIES COMMISSION

James J. Malachowski, Chairman

Kate F. Racine, Commissioner

Brenda K. Gaynor, Commissioner

# EXHIBIT B



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PUBLIC UTILITIES COMMISSION                    Chairman Elia Germani
89 Jefferson Blvd.                             Commissioner Robert B. Holbrook
Warwick RI  02888
(401) 941-4500

April 6, 2005

Mr. Michael E. Hachey
Director, Power Marketing
TransCanada Power Marketing Ltd.
110 Turnpike Road – Suite 203
Westborough, MA 01591-2863

Re: TransCanada Power Marketing Ltd.'s Request for Informal Meeting with the
Commissioners

Dear Mr. Hachey:

In response to your letter of April 4, 2005, my understanding was that you had
requested, through me, an informal, off-the-record meeting with the Commissioners
of the Public Utilities Commission (Commission).    After speaking with the
Commissioners, I left you a voicemail indicating their discomfort with such a
discussion in light of the fact that any rate impact of any changes to a Standard Offer
Service (SOS) Contract would be subject to Commission approval.    All such
discussions should be on the record.

The second paragraph of your letter states that TransCanada has not been a party
to previous hearings at the Commission regarding SOS and that you were unaware of
Narragansett Electric Company's (Narragansett) interpretation of its SOS contracts.
TransCanada has chosen not to participate in those publicly noticed hearings.  As I
am sure you are aware, all members of the public, including suppliers, are invited to
participate through the public comment process at the Commission.  Additionally, all
Narragansett rate filings are posted on the Commission's website prior to the hearings
as are all Commission Orders shortly after their issuance.  At the very minimum, the
issue of the interpretation of the fuel index adjustment provision in the Standard Offer
contracts has been a matter of public record for just under two years (23 months).
TransCanada has had ample opportunity to share its interpretation in a public forum
in the same manner as Narragansett, namely, through testimony provided on the
record.

You indicated you were not seeking Commission action, but simply wanted to share the ramifications of Narragansett's interpretation of the contract and the impact on ratepayers, including a scenario where you threaten to terminate your contractual obligations to serve Narragansett's SOS contracts. However, any dispute resolution or other action taken pursuant to the terms of the contracts which would later require Commission action regarding rate recovery should be on the record from the beginning, as it has been with Narragansett.

Just as we have treated Narragansett, if you wish to have a meeting with the Commission regarding this matter, you may seek to have an on-the-record discussion at any time.

Sincerely,

Cynthia G. Wilson
Senior Legal Counsel

cc: Division of Public Utilities and Carriers

# EXHIBIT C



**Trans**Canada
*In business to deliver* ™

March 1, 2005

Mr. Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
55 Bearfoot Road
Northboro, MA  01532

> Re:  Wholesale Standard Offer Service Agreement between Blackstone Valley Electric
> Company ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric
> Company ("Newport") and TransCanada Power Marketing Ltd. ("TCPM") dated
> April 7, 1998 (the "Agreement")

Dear Mr. Hager:

I am writing to provide notice of default under Article 7(1)(b) of the above-referenced
Agreement, based upon The Narragansett Electric Company's ("Narragansett's") failure to
comply with Article V of the Agreement.  Specifically, Narragansett has refused to include the
required Fuel Adjustment Factor in its price calculations, and to comply with its obligations
under Article V before the Rhode Island Public Utilities Commission with respect to its Standard
Offer Service tariffs.

As you know, Narragansett's failure to cure or rectify a noticed default within thirty (30)
days shall be deemed an Event of Default under Agreement Article 7.

Sincerely,

Michael Hachey

MH/DCW/slw:3837458

# EXHIBIT D

)))

**Trans**Canada

*In business to deliver* ™

TransCanada Power Marketing Ltd.
110 Turnpike Road - Suite 208
Westborough, MA 01581-2863

tel   (508) 871-1852
fax   (508) 898-0423
e-mail  mike_hachey@transcanada.com

RECEIVED
2005 APR -5 PM 12: 38
PUBLIC UTILITIES COMMISSION

April 4, 2005

Ms. Cynthia Wilson
Senior Legal Counsel
Rhode Island Public Utilities Commission
89 Jefferson Boulevard
Warwick, Rhode Island 02888

RE: TransCanada Power Marketing Ltd.'s Wholesale Standard Offer Service Agreement
    with Narragansett Electric Company

Dear Ms. Wilson,

I received your telephone message, and am disappointed that neither the Commission nor its staff has elected to meet with TransCanada concerning the fuel adjustment provision of TransCanada's Wholesale Standard Offer Service Agreement with Narragansett Electric Company.

As you know, TransCanada has not been party to the previous hearings at the PUC at which Narragansett has testified about that subject. In fact, we were completely unaware of Narragansett's intent to terminate the fuel adjustment until payment for the month of January, 2005 was due. We had wanted to inform you of our position, advise you as to possible outcomes and alert you to potential impacts on rate payers. Included in these possible outcomes is the scenario where we terminate our contract with National Grid. We believed this discussion would have provided useful background, as we were seeking no formal action by the Commission.

Please let me know if you have any questions on this matter in the future.

Sincerely,

Michael E. Hachey
Director, Power Marketing