UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

TRANSCANADA POWER MARKETING :
LTD.,                        :
                             :     C.A. No. 05-40076-FDS
            Plaintiff,       :
                             :     (Michael P. Angelini, #019340)
v.                           :     (Vincent F. O'Rourke, Jr., #380335)
                             :     (Kimberly A. Stone, # 630952)
NARRAGANSETT ELECTRIC        :
COMPANY,                     :
                             :
            Defendant.       :

AFFIDAVIT OF VINCENT F. O'ROURKE, JR.

I, Vincent F. O'Rourke, Jr., being sworn under oath depose and state as follows:

1.      I am an attorney admitted to practice in the Commonwealth of Massachusetts and

the United States District Court for the District of Massachusetts and I represent the Defendant in

this matter.

2.      The materials listed below and attached to this Affidavit pertain to the matter of

The Narranansett Electric Company v. TransCanada Power Marketing Ltd., Civil Action No.:

05-234S and to the Motion of TransCanada Power Marketing Ltd. to Dismiss, or in the

Alternative Stay or Transfer that matter which is now pending before Judge William E. Smith of

the United States District Court for the District of Rhode Island.

3.      Attached hereto as Exhibit A is a true and accurate copy of the Civil Docket Sheet

for Case #1:05-cv-00234-S.

4.      Attached hereto as Exhibit B is a true and accurate copy of Defendant

TransCanada Power Marketing Ltd.'s Memorandum in Support of Motion to Dismiss or, in the

Alternative, To Stay the Action or Transfer Venue to the District of Massachusetts (without exhibits) dated June 16, 2005.

5.    Attached hereto as <u>Exhibit C</u> is a true and accurate copy of the Affidavit of William Taylor (without exhibits) dated June 15, 2005.

6.    Attached hereto as <u>Exhibit D</u> is a true and accurate copy of Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, Stay, or Transfer (without exhibits) dated July 8, 2005.

7.    Attached hereto as <u>Exhibit E</u> is a true and accurate copy of the Affidavit of Michael J. Hager (without exhibits) dated July 8, 2005.

8.    Attached hereto as <u>Exhibit F</u> is a true and accurate copy of Defendant TransCanada Power Marketing Ltd.'s Reply to "Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, Stay, or Transfer" dated July 23, 2005.

9.    Attached hereto as <u>Exhibit G</u> is a true and accurate copy of Plaintiff's Motion for Leave to File a Supplemental Affidavit and Plaintiff's Memorandum of Law in Support of its Motion for Leave to File a Supplemental Affidavit (without exhibits) dated September 6, 2005.

10.    Attached hereto as <u>Exhibit H</u> is a true and accurate copy of the Supplemental Affidavit of Michael J. Hager (without exhibits) dated September 2, 2005.

11.    Attached hereto as <u>Exhibit I</u> is a true and accurate copy of the transcript from the September 9, 2005 Hearing on the Motion to Dismiss, Stay or Transfer Venue heard before the Honorable William E. Smith.

12.    Attached hereto as <u>Exhibit J</u> is a true and accurate copy of the Affidavit of Daniel C. Winston dated September 23, 2005.

13.     Attached hereto as <u>Exhibit K</u> is a true and accurate copy of the Affidavit of Michael Hachey (without exhibits) dated September 23, 2005.

14.     Attached hereto as <u>Exhibit L</u> is a true and accurate copy of the Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and TransCanada Power Marketing Ltd. dated April 7, 1998.

15.     Attached hereto as <u>Exhibit M</u> is a true and accurate copy of the PPA Transfer Agreement between TransCanada Power Marketing Ltd. and Montaup Electric Company dated April 7, 1998.

Signed to and sworn under the pains and penalties of perjury this 29th day of September, 2005.

_____
Vincent F. O'Rourke, Jr.

# EXHIBIT A

# U.S. District Court
## District of Rhode Island (Providence)
## CIVIL DOCKET FOR CASE #: 1:05-cv-00234-S

Narragansett Electrc v. Transcanada Power
Assigned to: Judge William E. Smith
Demand: $0
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 05/26/2005
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**The Narragansett Electric Company**     represented by   **Gerald J. Petros**
Hinckley, Allen & Snyder
1500 Fleet Center
Providence, RI 02903
274-2000
Fax: 277-9600
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Transcanada Power Marketing, Ltd.**     represented by   **Daniel Winston**
Choate Hall & Stewart LLP
Two International Place
Boston, MA 02110
617-248-5000
Fax: 617-248-4000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin E. Rodgers**
Blish & Cavanagh
30 Exchange Terrace
Providence, RI 02903
751-7542
Fax: 490-7640
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Plotkin**
Choate Hall & Stewart LLP
Two International Place
Boston, MA 02110
617-248-5000
Fax: 617-248-4000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/26/2005 | 1 | COMPLAINT filed; FILING FEE $ 250.00 RECEIPT # 60328 (McCabe, F) (Entered: 05/26/2005) |
| 05/26/2005 | | CASE assigned to Judge William E. Smith . Assigned to Magistrate Judge Almond (McCabe, F) (Entered: 05/26/2005) |
| 05/26/2005 | | SUMMONS(ES) issued (McCabe, F) Modified on 05/26/2005 (Entered: 05/26/2005) |
| 06/01/2005 | 2 | Rule 7.1 Disclosure Statement by The Narragansett Electric Company. (Baldinelli, Doreen) (Entered: 06/02/2005) |
| 06/01/2005 | 3 | SUMMONS Returned Executed as to Transcanada Power Marketing, Ltd. served on 5/27/2005, answer due 6/16/2005. (Baldinelli, Doreen) Additional attachment(s) added on 8/25/2005 (Baldinelli, Doreen). (Entered: 06/02/2005) |
| 06/16/2005 | 4 | Corporate Disclosure Statement of Defendant Transcanada Power Marketing, Ltd.. (Baldinelli, Doreen) (Entered: 06/17/2005) |
| 06/16/2005 | 5 | ENTRY of Appearance by Kristin E. Rodgers on behalf of Transcanada Power Marketing, Ltd. (Baldinelli, Doreen) (Entered: 06/17/2005) |
| 06/16/2005 | 6 | AFFIDAVIT of William Taylor re 4 Corporate Disclosure Statement. (Baldinelli, Doreen) (Entered: 06/17/2005) |
| 06/16/2005 | 7 | MOTION and MEMORANDUM to Dismiss or in the Alternative, to Stay the Action or Transfer Venue to the District of Massachusetts by Transcanada Power Marketing, Ltd.. Responses due by 7/5/2005 (Baldinelli, Doreen) (Entered: 06/17/2005) |
| 06/17/2005 | 8 | MOTION for Leave to File Exhibits in Excess of Page Limitation of approximately 70 pages. by Transcanada Power Marketing, Ltd.. (Baldinelli, Doreen) (Entered: 06/17/2005) |
| 06/17/2005 | | 8 MOTION for Leave to File Excess Pages REFERRED to Judge Smith. (Mercurio, Alba-Sue) (Entered: 06/17/2005) |
| 06/23/2005 | 9 | ORDER granting 8 Motion for Leave to File Excess Pages . Signed by Judge William E Smith on June 22, 2005. (Mercurio, Alba-Sue) (Entered: 06/23/2005) |
| 06/23/2005 | 14 | Appendix in Support of Defendant Transcanada Power Marketing LTD's Motion to Dismiss or, in the Alternative, To Stay the Action or Transfer Venue to the District of Massachusetts (Attachments: # 1 # 2 # 3 # 4) (Baldinelli, Doreen) (Entered: 07/11/2005) |
| 06/23/2005 | 15 | APPENDIX by Transcanada Power Marketing, Ltd. in support of 6 Affidavit. (Attachments: # 1 # 2 # 3)(Baldinelli, Doreen) (Entered: 07/11/2005) |
| 07/05/2005 | | Set Deadlines/Hearings: Status Conference set for 7/14/2005 10:00 AM before William E Smith. (Mercurio, Alba-Sue) (Entered: 07/05/2005) |
| 07/08/2005 | 10 | STIPULATION AND ORDER Extending time in which plaintiff shall file response to motion to dismiss. Signed by Judge William E Smith on 7/8/05. (Farrell Pletcher, Paula) (Entered: 07/08/2005) |
| 07/08/2005 | | Set/Reset Deadlines: Response to motion to dismiss due by 7/8/2005 (Farrell Pletcher, Paula) (Entered: 07/08/2005) |

| 07/08/2005 | 11 | UNOPPOSED MOTION for Leave to file excess pages for filing of exhibits in support of its opposition to Defendants' Motion to Dismiss, stay, or transfer. The Exhibits total 28 pages. by The Narragansett Electric Company. (Baldinelli, Doreen) (Entered: 07/11/2005) |
| --- | --- | --- |
| 07/08/2005 | 12 | RESPONSE in Opposition and Memorandum re 7 MOTION to Dismiss, Stay, or Transfer filed by The Narragansett Electric Company. (Baldinelli, Doreen) (Entered: 07/11/2005) |
| 07/08/2005 | 13 | AFFIDAVIT of Michael J. Hager re 12 Response in Opposition to Motion to Dismiss, Stay, or Transfer. (Attachments: # 1)(Baldinelli, Doreen) (Entered: 07/11/2005) |
| 07/11/2005 | | 7 MOTION to Dismiss REFERRED to Judge Smith. (Mercurio, Alba-Sue) (Entered: 07/11/2005) |
| 07/11/2005 | 16 | ORDER granting 11 Motion for Leave to File Excess Pages . Signed by Judge William E Smith on 7/11/05. (Mercurio, Alba-Sue) (Entered: 07/12/2005) |
| 07/12/2005 | | Set Deadlines/Hearings: re 7 MOTION to Dismiss filed by Transcanada Power Marketing, Ltd., Motion Hearing set for 8/26/2005 09:30 AM before William E Smith. (Mercurio, Alba-Sue) (Entered: 07/12/2005) |
| 07/12/2005 | 17 | APPENDEX by The Narragansett Electric Company in support of 12 Response in Opposition to Motion. (Attachments: # 1 # 2 # 3 # 4)(Baldinelli, Doreen) (Entered: 07/12/2005) |
| 07/21/2005 | 18 | MOTION for Leave to File a reply to Plaintiff's opposition to Transcanada's Motion to Dismiss or, in the alternative, to Stay the action or Transfer Venue of an excess of twelve (12) pages. by Transcanada Power Marketing, Ltd.. (Baldinelli, Doreen) (Entered: 07/22/2005) |
| 07/22/2005 | 19 | ORDER granting 18 Motion for Leave to File Excess Pages . Signed by Judge William E Smith on 7/22/05. (Mercurio, Alba-Sue) (Entered: 07/22/2005) |
| 07/25/2005 | 20 | REPLY by Transcanada Power Marketing, Ltd. re 12 RESPONSE in Opposition and Memorandum re 7 MOTION to Dismiss, Stay, or Transfer filed by The Narragansett Electric Company. (Baldinelli, Doreen) (Entered: 07/25/2005) |
| 08/11/2005 | | Reset Hearings: re 7 MOTION to Dismiss filed by Transcanada Power Marketing, Ltd., Motion Hearing set for 9/9/2005 10:30 AM before William E Smith. (Mercurio, Alba-Sue) (Entered: 08/11/2005) |
| 09/02/2005 | 21 | MOTION for Leave to File a Supplemental Affidavit in Support of its opposition to the pending Motion to Dismiss which is scheduled for hearing on September 9, 2005 in Excess Pages of approximately ten (10) pages. by The Narragansett Electric Company. (Baldinelli, Doreen) (Entered: 09/02/2005) |
| 09/06/2005 | | 21 MOTION for Leave to File Excess Pages REFERRED to MJ Almond. (Mercurio, Alba-Sue) (Entered: 09/06/2005) |
| 09/06/2005 | 22 | ORDER granting 21 Motion for Leave to File Excess Pages . Signed by Judge William E Smith on 9/2/05. (faxed to counsel of record) (Mercurio, Alba-Sue) (Entered: 09/06/2005) |
| 09/06/2005 | 23 | MOTION for Wendy Plotkin, Esquire to Appear Pro Hac Vice by Transcanada Power Marketing, Ltd.. (Baldinelli, Doreen) Additional attachment(s) added on 9/6/2005 (Baldinelli, Doreen). (Entered: 09/06/2005) |

| 09/06/2005 | 24 | MOTION for Daniel Winston, Esquire to Appear Pro Hac Vice by Transcanada Power Marketing, Ltd.. (Baldinelli, Doreen) (Entered: 09/06/2005) |
| 09/06/2005 | 25 | MOTION for Leave to File a Supplemental Affidavit WITH ATTACHED MEMO by The Narragansett Electric Company. Responses due by 9/20/2005 (Attachments: # 1 Exhibit 1# 2 Exhibit A# 3 Exhibit b# 4 Exh C# 5 Exh D# 6 Exh E# 7 Exh F) (Baldinelli, Doreen) (Entered: 09/08/2005) |
| 09/08/2005 | 26 | ORDER granting 24 Motion to Appear Pro Hac Vice of Daniel Winston . Signed by Judge William E Smith on 9/7/05. (faxed to counsel of record) (Mercurio, Alba-Sue) (Entered: 09/08/2005) |
| 09/08/2005 | 27 | ORDER granting 23 Motion to Appear Pro Hac Vice of Wendy Plotkin . Signed by Judge William E Smith on 9/7/05. (faxed to counsel of record)(Mercurio, Alba-Sue) (Entered: 09/08/2005) |
| 09/08/2005 | 28 | ORDER granting 25 Motion for Leave to File . Signed by Judge William E Smith on 9/8/05. (faxed to counsel of record) (Mercurio, Alba-Sue) (Entered: 09/09/2005) |
| 09/09/2005 | 29 | Minute Entry for proceedings held before Judge William E Smith : Motion Hearing held on 9/9/2005 re 7 MOTION to Dismiss filed by Transcanada Power Marketing, Ltd., - Gerald Petros for Plaintiff; Daniel Winston, Kristin Rodgers for Defendant; Arguments heard; Parties to file a stipulation within two (2) weeks to the Court (Court Reporter Anne Clayton.) (Baldinelli, Doreen) (Entered: 09/09/2005) |
| 09/20/2005 | 30 | MOTION for Leave to file Supplement Record with copy of Motion to Enjoin in Related Massachusetts Action and, MOTION to Exceed Page Limit set forth in Amended General Order #2002-01 WITH ATTACHED MEMO by Transcanada Power Marketing, Ltd.. Responses due by 10/4/2005 (Baldinelli, Doreen) Additional attachment(s) added on 9/21/2005 (Baldinelli, Doreen). (Entered: 09/20/2005) |
| 09/21/2005 |  | 30 MOTION for Leave to File Excess Pages MOTION for Leave to File MOTION for Leave to File REFERRED to Judge Smith. (Mercurio, Alba-Sue) (Entered: 09/21/2005) |
| 09/23/2005 | 31 | ORDER granting 30 Motion for Leave to File Excess Pages, granting 30 Motion for Leave to File . Signed by Judge William E Smith on 9/22/05. (faxed to counsel of record)(Mercurio, Alba-Sue) (Entered: 09/23/2005) |
| 09/23/2005 | 32 | TRANSCRIPT of Proceedings held on September 9, 2005 before Judge William E. Smith. Court Reporter: Anne Clayton.. (Baldinelli, Doreen) (Entered: 09/23/2005) |
| 09/23/2005 | 33 | MOTION for Leave to File Affidavit and exhibits in response to Plaintiff's Supplemental Affidavit of Michael J. Hager in Excess Pages set forth in Amended General Order #2002-01 by Transcanada Power Marketing, Ltd.. (Baldinelli, Doreen) Modified on 9/27/2005 (Baldinelli, Doreen). (Entered: 09/27/2005) |
| 09/23/2005 | 34 | MOTION for Leave to File Affidavit and Objections in Suppor of its Motion to Dismiss, Stay or Transfer Venue in Excess Pages of approximately 45 pages. WITH ATTACHED MEMO by Transcanada Power Marketing, Ltd.. (Baldinelli, Doreen) (Entered: 09/27/2005) |
| 09/23/2005 | 39 | AFFIDAVIT IN SUPPORT of 34 MOTION for Leave to File Excess Pages. (Baldinelli, Doreen) (Entered: 09/27/2005) |
| 09/26/2005 | 35 | ORDER granting 34 Motion for Leave to File Excess Pages . Signed by Judge William E Smith on September 26, 2005. (Baldinelli, Doreen) (Entered: 09/27/2005) |

| 09/26/2005 | 38 | ORDER granting 33 Motion for Leave to File Excess Pages . Signed by Judge William E Smith on September 26, 2005. (Baldinelli, Doreen) (Entered: 09/27/2005) |
| 09/27/2005 | 36 | AFFIDAVIT by Michael Hachey re 13 Affidavit. (Farrell Pletcher, Paula) (Entered: 09/27/2005) |
| 09/27/2005 | 37 | AFFIDAVIT of Daniel C. Winston re 13 Affidavit. (Farrell Pletcher, Paula) (Entered: 09/27/2005) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/29/2005 08:35:41 | | |
| **PACER Login:** | bd0159 | **Client Code:** | 304810.0001 |
| **Description:** | Docket Report | **Search Criteria:** | 1:05-cv-00234-S |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE NARRAGANSETT ELECTRIC            :
COMPANY                               :
                    Plaintiff,        :
                                      :
v.                                    :        C.A. No. 05-234-S
                                      :
TRANSCANADA POWER                     :
MARKETING LTD.                        :
                    Defendant.        :

## DEFENDANT TRANSCANADA POWER MARKETING LTD.'S
## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, TO STAY THE ACTION OR
## TRANSFER VENUE TO THE DISTRICT OF MASSACHUSETTS

Defendant TransCanada Power Marketing Ltd. ("TransCanada") submits the within

memorandum of law in support of its motion to dismiss the instant action brought by Plaintiff

Narragansett Electric Company ("Narragansett") or, in the alternative, to stay the action or

transfer it pursuant to 28 U.S.C. § 1404(a) to the District of Massachusetts, where a previously

filed and identical action (the "Massachusetts Action") is already pending.[1]

Narragansett's Complaint in Rhode Island ("RI Complaint") represents nothing more

than baseless forum-shopping. Narragansett filed its RI Complaint only seven days after

receiving TransCanada's Massachusetts Complaint ("MA Complaint"), and the RI Complaint is

literally a word-for-word copy of the counterclaim that Narragansett has already asserted in the

Massachusetts Action ("MA Answer/Counterclaim"). (Copies of the MA Complaint and MA

Answer/Counterclaim are attached as Exhibits 1 and 2.)

---

[1] In further support of its motion, TransCanada files herewith the Affidavit of William Taylor ("Taylor Aff.").

The First Circuit and District Courts of Rhode Island have made clear that such forum-shopping is not permitted. Thus, in the absence of an affirmative showing by Narragansett that a Rhode Island forum is clearly preferable, this second-filed action should be dismissed.

Narragansett has no justifiable basis to have brought this second-filed action here in Rhode Island. As set forth herein, this Court should summarily dismiss this action because: (1) the instant matter is identical to the earlier filed Massachusetts Action; (2) the balance of convenience actually favors resolution of this action in the District of Massachusetts; and (3) no "special circumstances" exist that would justify disregarding the strong presumption favoring the first-filed Massachusetts Action. In the alternative, this Court should transfer this action to the District of Massachusetts, or stay this action, on the same grounds.

## RELEVANT FACTS[2]

TransCanada is a power marketing company with a principal place of business in Westborough, Worcester County, Massachusetts. TransCanada purchases electricity from generation sources, such as power plants, and resells the electricity to retail electric distribution companies and other customers. (RI Compl. ¶¶ 2, 5; MA Compl./Ans. ¶ 1[3].)

Narragansett is a retail electric distribution company with a principal place of business in Providence, Rhode Island. (RI Compl. ¶ 1.) Narragansett's predecessors include two retail electric distribution companies in Rhode Island formerly known as Blackstone Valley Electric Company ("Blackstone") and Newport Electric Company ("Newport"), both of which merged into Narragansett in 2000. (Id. ¶ 13.)

---

[2] This Court may properly accept and consider evidence outside the pleadings on this motion to dismiss, stay or transfer for improper venue. See Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1137 (9th Cir. 2004). See also Computer Assistance, Inc. v. Morris, 564 F. Supp. 1054, 1057 (D. Conn. 1983); Car-Freshner Corp. v. Auto Aid Mfg. Corp., 438 F. Supp. 82, 85 (N.D.N.Y. 1977).

[3] TransCanada cites particular paragraphs of its Massachusetts Complaint, and Narragansett's corresponding responses in its Massachusetts Answer, collectively by use of the following joint citation: "MA Compl./Ans. ¶ __."

## TransCanada's First-Filed Massachusetts Action

On May 17, 2005, TransCanada filed a Complaint against Narragansett in the District of Massachusetts, Central Division of Worcester, claiming that Narragansett breached its obligations under a so-called "Wholesale Standard Offer Service Agreement" dated April 7, 1998 (the "WSOS Agreement"). (A copy of the WSOS Agreement is attached as Exhibit A to the MA Complaint (see Ex. 1.A)). The Massachusetts Action is entitled TransCanada Power Marketing Ltd. v. Narragansett Electric Company, C.A. No. 05-40076FDS. TransCanada served its MA Complaint on Narragansett on May 19, 2005. (See Return of Service attached as Exhibit 3.)

The original parties to the WSOS Agreement were TransCanada, on the one hand, and Blackstone, Newport and their affiliated Massachusetts retail electric company, Eastern Edison Company ("Eastern"), on the other hand. (RI Compl. ¶¶ 6, 8; MA Compl./Ans. ¶¶ 8, 15.) Blackstone, Newport and Eastern were all wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), a public utility holding company. (Id.) The WSOS Agreement was part of a larger Asset Purchase Agreement between TransCanada and Montaup Electric Company ("Montaup"), another Massachusetts-based subsidiary of EUA. (Id.; Taylor Aff. ¶ 7.)

Under the WSOS Agreement, TransCanada agreed to provide to Blackstone, Newport and Eastern (the "EUA Companies") a specific share of the necessary electric service ("Wholesale Standard Offer Service" or "WSOS") to supply the standard offer service needs of the EUA Companies' retail customers. Under the Agreement, TransCanada was to provide WSOS to Blackstone and Newport in Rhode Island through 2009, and to Eastern in Massachusetts through 2004. (RI Compl. ¶ 8; MA Compl./Ans. ¶ 15.) TransCanada was to receive for providing this Wholesale Standard Offer Service a price consisting of a stipulated set

of base prices rising over time (the "Standard Offer Wholesale Price"), plus a fuel index to account for future extraordinary fuel costs (the "Fuel Adjustment Factor," or "FAF"). The Fuel Adjustment Factor was to be calculated based upon tariffs filed by Blackstone and Newport with the Rhode Island Public Utilities Commission ("RI-PUC"). (RI Compl. ¶¶ 9-11; MA Compl./Ans. ¶ 16.) In 2000, Blackstone and Newport merged into Narragansett, a wholly owned subsidiary of National Grid USA, and Narragansett succeeded to the WSOS Agreement. (RI Compl. ¶¶ 13-15; MA Compl./Ans. ¶¶ 21-24.)

The gravamen of TransCanada's Massachusetts Complaint is that Narragansett breached the WSOS Agreement by (i) failing to file tariffs for a Fuel Adjustment Factor in Rhode Island after 2004, and (ii) failing pay a Fuel Adjustment Factor to TransCanada after 2004. In addition, TransCanada seeks a declaratory judgment establishing its right to terminate the WSOS Agreement as a result of Narragansett's breaches. (MA Compl. ¶¶ 25-47.) Specifically, the counts in the MA Complaint are for: breach of contract (Count I), contractual indemnity (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and for a declaratory judgment (Count IV). (MA Compl. ¶¶ 35-47.)

Narragansett filed its Answer and Counterclaim in the Massachusetts Action on June 7, 2005. (Ex. 2.) Narragansett's Counterclaim essentially asserts *defenses* to TransCanada's claims in the Massachusetts Action, as follows: alleged breach of contract based on TransCanada's "demand[s]" for payment of a Fuel Adjustment Factor and "threatened" termination of the WSOS Agreement (Count I); declaratory judgment that TransCanada is not entitled to FAF payments and has no right to terminate the WSOS Agreement (Count II); and alleged breach of good faith based on TransCanada's assertion of its claims (Count III). (MA Counterclaim ¶¶ 35-40.) The Massachusetts Action remains pending.

### Narragansett's (Forum-Shopping) Complaint

On May 26, 2005, fully aware that TransCanada had initiated the Massachusetts Action, Narragansett brought its instant Rhode Island Complaint. The RI Complaint is literally identical, word-for-word and from start to finish, to Narragansett's defensive and compulsory Counterclaim in the Massachusetts Action. (Compare RI Complaint with MA Counterclaim.) Narragansett has offered no justification for this second-filed and identical action.

## ADDITIONAL FACTS RELEVANT
## TO THE BALANCE OF CONVENIENCE

TransCanada's primary office is in Westborough, Worcester County, Massachusetts. It has no offices or employees in Rhode Island, except that it obtains certain accounting services from Rhode Island. (Taylor Aff. ¶ 3.) Narragansett, although based in Rhode Island, maintains its customer service office in Northborough, Worcester County, Massachusetts. In addition, Narragansett operates through a service agent, National Grid USA Services Company ("National Grid SC"), which is located in Northborough, Massachusetts. (See Taylor Aff. ¶¶ 4-5.)

The principal witnesses at TransCanada involved with the negotiation and subsequent performance of the WSOS Agreement were William Taylor and Michael Hachey, both of whom have at all relevant times worked at TransCanada's office in Westborough and live in Westborough, Massachusetts. (Taylor Aff. ¶¶ 1, 8, 9.) TransCanada's documents concerning the negotiation and performance of the WSOS Agreement are also currently located in TransCanada's offices in Westborough, Massachusetts. (Taylor Aff. ¶ 10.)

TransCanada and the EUA Companies negotiated the WSOS Agreement in Massachusetts, with the EUA companies negotiating through their affiliated service agent, the EUA Service Corporation ("EUA SC"), located in West Bridgewater, Massachusetts. Most of

these former EUA SC representatives, upon information and belief, still work in Massachusetts. (Taylor Aff. ¶ 11.)

The Agreement expressly states that it is governed by Massachusetts law, and that notices to the EUA Companies under the Agreement were to be sent to EUA SC in West Bridgewater, Massachusetts. (Agreement, §§ 13, 18; Taylor Aff. ¶ 12.)

After execution of the WSOS Agreement on April 7, 1998, substantially all communications concerning the Agreement were made between representatives of TransCanada in Westborough, Massachusetts and representatives of EUA SC in West Bridgewater, Massachusetts. (Taylor Aff. ¶ 13.)

Since Blackstone and Newport merged into Narragansett in 2000, TransCanada has communicated with Narragansett through Narragansett's service agent, National Grid SC, at its Northborough, Massachusetts offices. National Grid SC is also Narragansett's designee for notices under the WSOS Agreement. (Taylor Aff. ¶ 14.) Narragansett's public testimony before the RI-PUC, as referenced in paragraphs 18-21 of the RI Complaint and paragraphs 28-29 of the Massachusetts Complaint, was provided by representatives of National Grid SC working in, and living in and around, Northborough, Massachusetts. (Taylor Aff. ¶ 15.) Upon information and belief, many of the relevant decisions made by Narragansett concerning the WSOS Agreement were made by representatives of National Grid SC in Northborough, Massachusetts, and copies of all Narragansett's relevant documents concerning the WSOS Agreement are at National Grid's offices in Northborough, Massachusetts. (Taylor Aff. ¶ 16.)

Since the dispute came to a head in 2005, substantially all business communications concerning the dispute have occurred between TransCanada and Narragansett through Narragansett's service agent in Northborough, Massachusetts. (Taylor Aff. ¶¶ 17-19.) For

example, the TransCanada letter upon which Narragansett appears to base the specific counts in

its Rhode Island complaint was sent from TransCanada in Westborough to Narragansett's service

agent in Northborough, Massachusetts. (See RI Complaint ¶¶ 27-30, 32, 35-40; Taylor Aff.

¶ 18.)

In sum, substantially all interactions between TransCanada and representatives of

Narragansett or its predecessors, related to the negotiation and performance of the WSOS

Agreement, occurred in and from Massachusetts. Similarly, substantially all relevant witnesses

and documents are located in Massachusetts.

### **Argument**

It is well established that, "where two suits involve the same issues, and prosecution of

both would entail duplicative litigation and a waste of judicial resources, the first-filed suit is

generally preferred." SW Indus., Inc. v. Aetna Cas. & Sur. Co., 653 F. Supp. 631, 634 (D.R.I.

1987). As this Court has recognized, the forum where an action is first filed is given priority

over subsequent actions unless there is a showing of (1) balance of convenience in favor of the

second action or (2) there are special circumstances which justify giving priority to the second.

Id. (internal quotations and citations omitted). The burden is upon the defendant in the second-

filed action -- here Narragansett -- to make the necessary showing to preserve jurisdiction in this

action. See id.

Because the instant action is duplicative of the first-filed Massachusetts Action, and

Narragansett cannot meet its burden of showing either that the balance of convenience weighs in

favor of litigating this case in Rhode Island or that special circumstances exist, this Court should

dismiss the instant action, or, alternatively, transfer it to the District of Massachusetts, or stay the

action.

-7-

I.    **The Instant Action Is Identical To The Earlier Filed Massachusetts Action.**

The instant action is clearly "duplicative" of the first-filed Massachusetts Action. The RI

Complaint asserts what would be defenses (or compulsory counterclaims) to the MA Complaint.

Fed. R. Civ. P. 13(a). The Rhode Island Complaint is in fact identical, literally word-for-word,

to the counterclaim Narragansett has already asserted in the Massachusetts Action. The parties

in the two cases are also identical, and the exact same witnesses and evidence will obviously be

at issue in both cases as the exact same dispute, Agreement, and facts are involved in both cases.

II.    **The Balance Of Convenience Does Not Weigh In Favor Of Adjudicating The
Dispute Between Narragansett And TransCanada In This Forum.**

While the preference for the first-filed action is not a <u>per se</u> rule, a strong presumption of

priority attaches to the first-filed action. <u>Feinstein v. Brown</u>, 304 F. Supp. 2d 279, 283 (D.R.I.

2004). To overcome this strong presumption, the defendant in the first-filed action – here

Narragansett – must show either that (1) the balance of convenience weighs in favor of the later-

filed action; or (2) special circumstances justify giving priority to the second action. <u>See id.</u>

In weighing the balance of convenience, courts typically consider several factors

including: (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the

convenience of the witnesses and location of documents; (4) any connection between the forum

and the issues; (5) the law to be applied; and (6) the state or public interest at stake. <u>Feinstein</u>,

304 F. Supp. 2d at 283 (citing <u>The Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc.</u>,

249 F. Supp. 2d 12, 17 (D. Mass. 2002)).

Narragansett cannot show that litigating this dispute in Rhode Island would clearly be

more convenient than litigating this dispute in Massachusetts. Thus, Narragansett cannot

overcome the strong presumption in favor of allowing the first-filed Massachusetts Action to

take priority over this second-filed action.

### A.    The Plaintiff's Choice Of Forum

Narragansett's choice of forum in this later-filed case should not take precedence over TransCanada's choice of forum in the first-filed case.  While a plaintiff's choice of forum is generally accorded great weight by courts, "this preference is inoperative in a later-filed action, where the plaintiff's claims would constitute compulsory counterclaims in the defendant's earlier-filed action." SW Indus., 653 F. Supp. at 637 (citing Leesona Corp. v. Duplan Corp., 317 F. Supp. 290, 299 (D.R.I. 1970)).  The First Circuit has particularly discounted a plaintiff's choice of forum in a later-filed action where the plaintiff's choice of forum and timing of suit appear to be nothing more than a "quick response . . . to [the first-filed suit,] designed to get home-court advantage." Cianbro Corp. v. Curran-Lavoie, Inc., 814 F.2d 7, 11 (1st Cir. 1987) (upholding a district court's decision to transfer an action filed in New Hampshire where the later-filed New Hampshire action was duplicative of the first-filed Maine action and was filed only a short time after the Maine action).

As stated above, Narragansett's claims in the instant action would clearly be compulsory counterclaims in the first-filed Massachusetts Action, as they are essentially no more than defenses to TransCanada's claims in the Massachusetts Action.  See Fed. R. Civ. P. 13(a). Additionally, Narragansett's decision to bring the instant action in Rhode Island just seven days after receiving service of the Massachusetts Complaint, regarding the exact same Agreement and dispute, is nothing more than a flagrant example of forum-shopping aimed at achieving "home-court advantage."  Thus, Narragansett's choice of forum in the instant action should not be afforded any weight.

### B.    The Convenience Of The Parties

Litigating the instant action in Rhode Island would actually be *less* convenient for the parties than litigating in Massachusetts.

TransCanada maintains its principle place of business in Westborough, Massachusetts. Narragansett is based in Rhode Island, but has a customer service office in Northborough, Massachusetts.  Narragansett's service agent is also located in Northborough, Massachusetts. (Taylor Aff. ¶¶ 3-5.)  Substantially all business communications between the parties concerning this dispute, and concerning performance of the WSOS Agreement, have occurred in and from Massachusetts.  (Taylor Aff. ¶¶ 11, 13-14, 17-19.)  Both parties' Massachusetts offices are both just minutes from the Federal Courthouse that will hear the Massachusetts Action.  (Id. ¶ 20.)

Given Narragansett's business ties to Massachusetts with respect to the WSOS Agreement, and its clear ability (and indeed apparent preference) to communicate with TransCanada concerning this dispute through its service agent in and from Massachusetts (Taylor Aff. ¶¶ 17-19), Narragansett cannot now seriously argue that litigating this dispute in Massachusetts would be more burdensome than litigating in Rhode Island.  See Veryfine Prods., Inc. v. Phlo Corp, 124 F. Supp. 2d 16, 26 (a corporation that sent employees to Massachusetts to contract with a Massachusetts corporation could not later claim that litigating the contracts in Massachusetts was an unreasonable burden).  Thus, the convenience of the parties favors a Massachusetts forum.

## C.    The Convenience Of The Witnesses And The Location Of The Documents

The key witnesses relevant to this dispute, including third-party witnesses, are primarily located in Massachusetts.  (Taylor Aff. ¶¶ 1, 8-9, 11, 14-18.)  TransCanada's relevant documents are in Westborough, Massachusetts, minutes from the Federal Courthouse in Worcester, Massachusetts.  (Id. ¶¶ 10, 20.)  Narragansett's documents are believed to be in a similarly convenient location at its or its agent's offices in neighboring Northborough, Massachusetts. (Taylor Aff. ¶ 16.)  Thus, litigating this dispute in Rhode Island, rather than in Massachusetts, would actually be *less* convenient for the witnesses and for document production.  Although

some witnesses may ultimately be located in places other than Massachusetts, there is no added convenience for these witnesses if they travel to Rhode Island as opposed to Massachusetts. See Veryfine, 124 F. Supp. 2d at 26; Cianbro, 814 F.2d at 11.

Thus, this factor also favors a Massachusetts forum.

## D.    The Connection Between The Forum And The Issues

Massachusetts bears a strong connection to the facts and issues in this dispute.  The dispute involves an Agreement negotiated in Massachusetts, between a company based in Massachusetts and a company with a Massachusetts office that manages the Agreement through its service agent in Massachusetts. (Taylor Aff. ¶¶ 3-4, 10.)  The WSOS Agreement is expressly governed by Massachusetts law. (WSOS Agreement ¶ 13.)  Substantially all communications between the parties concerning performance of the WSOS Agreement, and giving rise to this dispute, have taken place in and from Massachusetts. (Taylor Aff. ¶¶ 11, 13-14, 17-19.)  For example, the letter upon which Narragansett appears to base its specific claims in the Rhode Island Complaint was sent and received in Massachusetts. (Id. ¶ 18.)  See also Schmidt v. Am. Inst. of Physics, 322 F. Supp. 2d 28, 33 (D.D.C. 2004) (finding that Maryland bore a strong connection to a breach of contract action where the decisions giving rise to the plaintiff's complaint were made in Maryland and communicated to the plaintiff in Maryland).

While Rhode Island clearly also has a connection to this dispute, because the dispute involves conduct before the RI-PUC and electricity delivered in Rhode Island, the contractual obligations between the parties arise from and are governed by a Massachusetts contract. Thus, this factor is even or favors a Massachusetts forum.

## E.    The Law To Be Applied

The WSOS Agreement is expressly governed by Massachusetts law. (WSOS Agreement § 13.) Thus, this factor weighs squarely in favor of the Massachusetts Action. Paradis v.

Dooley, 774 F. Supp. 79, 83 (D.R.I. 1991) (noting that it is advantageous to have a lawsuit

adjudicated by the federal district court that is most familiar with the law governing the dispute).

F.    **The State Or Public Interest At Stake**

Massachusetts has a strong interest in resolving this dispute:  the WSOS Agreement was

negotiated in Massachusetts, it is governed by Massachusetts law, and the parties communicated

with each other regarding the Agreement in Massachusetts.[4]  While this dispute also involves

conduct before the RI-PUC and electricity delivery in Rhode Island, the parties' obligations are

governed by a Massachusetts contract and Massachusetts law.  A federal court sitting in

Massachusetts may be presumed to have greater familiarity with Massachusetts law than a

federal court sitting in a different district.  See Paradis, 774 F. Supp. at 83.  Thus, even though

portions of the WSOS Agreement were carried out in Rhode Island, the public interest also

weighs in favor of allowing this dispute to be resolved in Massachusetts.  Schmidt 322 F. Supp.

2d at 35 ("the public interest is 'best served by having a case decided by the federal court in the

state whose laws govern the interests at stake.'") (quoting Trout Unlimited v. Dep't of Agric.,

944 F. Supp. 13, 19 (D.D.C. 1996)).

This factor is therefore roughly even or favors Massachusetts, which as a procedural

matter weighs in favor of allowing the first-filed Massachusetts Action to take priority over the

instant action.

G.    **Summary of Convenience Factors**

In sum, all of the balance of convenience factors are either equal or weigh in favor of the

first-filed Massachusetts Action.  This action thus clearly should be litigated in Massachusetts.

Indeed, courts routinely give preference to first-filed actions in cases in which the balance of

---

[4] Narragansett could have, but did not, bargain for a forum selection clause in the WSOS Agreement.  See Jumara v. State Farm Ins. Co., 55 F.3d 873, 880 (3rd Cir. 1995).

convenience factors are far more neutral than in the present case. See, e.g., J. Lyons & Co. Ltd. v. The Republic of Tea, Inc., 892 F. Supp. 486, 492 (S.D.N.Y 1995) (dismissing action in favor of prior suits because the balance of convenience did not weigh sufficiently in favor of the second filed action); Leesona Corp., 317 F. Supp. at 299-02 (transfering second-filed action in favor of first filed action where factors were mixed); S.W. Indus., 653 F. Supp. at 639 (staying the second-filed proceeding where the balance of convenience factors were roughly even); Cianbro, 814 F. 2d at 11 (upholding transfer of second-filed action to venue of the first filed action where convenience of the parties and witnesses was inconclusive).

## III.    No Special Circumstances Exist Which Overcome The Strong Presumption In Favor Of The First-Filed Massachusetts Action.

Courts have recognized a second exception to the first-filed rule where "special circumstances" exist which justify giving priority to the second-filed suit instead of to the first. However, as the court noted in Veryfine, "[t]hese circumstances are usually found in situations in which one party has won a race to the courthouse by jumping the gun and filing a declaratory judgment action in a forum that has little relation to the dispute." Veryfine, 124 F. Supp. 2d at 22.   These cases bear no similarities to the Massachusetts Action filed by TransCanada.

## CONCLUSION

For the foregoing reasons, TransCanada respectfully requests that this Court dismiss the instant action.  In the alternative, TransCanada requests that this Court transfer this action to the District of Massachusetts (Central Division) for consolidation with C.A. No. 05-40076FDS, or stay this Action pending final resolution of C.A. No. 05-40076FDS.

Respectfully submitted,

TRANSCANADA POWER MARKETING, LTD.

By its Attorneys,

_Kristin E. Rodgers_

Kristin E. Rodgers #4842
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
(401) 751-7542 (fax)

Dated:  June 16, 2005

*Pro Hac Vice Pending*

Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 248-5000
(617) 248 4000 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2005 a copy of Defendant's Motion to Dismiss or, in the Alternative, to Transfer Proceedings to the District of Massachusetts, was duly served upon the following counsel of record for plaintiff, by hand:

Gerald J. Petros, Esq. (BBO#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island  02903
Telephone No. (401) 274-2000
Fax No. (401) 274-9600

_Cynthia Dragon_

-14-

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 05-234 |
| v. | ) ) ) | |
| TRANSCANADA POWER MARKETING LTD., | ) ) ) | |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF WILLIAM TAYLOR

I, William Taylor, herby depose and state as follows:

1.      I am Vice President of TransCanada Power Marketing Ltd. ("TransCanada"), located at 110 Turnpike Road, Westborough, Worcester County, Massachusetts. I have held that position since early 1998. I currently reside in Westborough, Massachusetts. I have reviewed Narragansett's Complaint in this action (the "RI Complaint"), and am also familiar with TransCanada's earlier Complaint filed in the District Court of Massachusetts (the "MA Complaint").

2.      TransCanada is a power marketing company with a principal place of business in Westborough, Worcester County, Massachusetts. TransCanada purchases electricity from generation sources, such as power plants, and resells the electricity to retail electric distribution companies and other customers.

3.      TransCanada's primary office is in Westborough, Worcester County, Massachusetts. Several TransCanada officers are also located in Calgary, Alberta. TransCanada

has no offices or employees in Rhode Island, although certain of TransCanada's accounting functions are performed at an administrative facility at the Ocean State Power (OSP) generation site in Burrillville, Rhode Island. The administrative facility and OSP site are owned by, and perform functions for, a number of TransCanada's affiliates.

4.      Although Narragansett's principal office is in Providence, Rhode Island, its customer service office is in Northborough, Worcester County, Massachusetts. Narragansett's customer service office in Northborough, Massachusetts is indicated on Narragansett's website at http://www.nationalgridus.com/narragansett/contact_mail.asp, under "contact by mail." (See Ex. I hereto).

5.      Narragansett's service agent (which Narragansett calls its "power supply manager" or "representative" in paragraphs 16-17 of its RI Complaint) is the National Grid USA Service Company ("National Grid SC"), which is also located in Northborough, Massachusetts. It is my understanding that Narragansett is owned by National Grid USA, a Massachusetts-based public utility holding company with primary offices in Westborough, Massachusetts.

6.      On April 7, 1998, TransCanada entered into a Wholesale Standard Offer Services Agreement (the "WSOS Agreement") with Blackstone Valley Electric Company ("Blackstone"), Newport Electric Company ("Newport") and Eastern Edison Company ("Eastern"). Upon information and belief, Blackstone, Newport and Eastern (collectively, the "EUA Companies") were at the time all wholly-owned subsidiaries of EUA Utilities Associates ("EUA"), a Massachusetts-based public utility holding company.

7.      The WSOS Agreement was part of a larger Asset Purchase Agreement between TransCanada and Montaup Electric Company ("Montaup"), another EUA affiliate located in Massachusetts.

8.     I was directly involved for TransCanada with negotiation of the WSOS Agreement and the related Asset Purchase Agreement with the EUA Companies. I worked out of TransCanada's office in Westborough, Massachusetts at that time.

9.     The principal TransCanada personnel in charge of performance of the WSOS Agreement, since its execution, have been myself and Michael Hachey. Mr. Hachey has also at all relevant times worked out of TransCanada's office in Westborough, and lives in Westborough, Massachusetts.

10.     Copies of all or substantially all of TransCanada's documents concerning the negotiation and performance of the WSOS Agreement are currently located in TransCanada's offices in Westborough, Massachusetts, or at its counsel's offices in Boston, Massachusetts.

11.     TransCanada negotiated the terms of the WSOS Agreement with representatives of the EUA Service Corporation ("EUA SC"), which was the affiliated service agent for the EUA Companies. EUA SC's offices were in West Bridgewater, Massachusetts. These EUA SC representatives included Michael Hirsh, Lawrence Boisvert, Robert Clarke and Kevin Kirby, all of whom negotiated the WSOS Agreement from EUA SC's offices in West Bridgewater, Massachusetts. Some or all of these EUA SC representatives were also, upon information and belief, officers of Narragansett or Montaup, although my contacts with them for purposes of negotiating the WSOS Agreement, which included phone calls, mail, faxes and in-person meetings, all occurred primarily in Massachusetts. It is my understanding that most of these former EUA representatives still work in Massachusetts.

12.     The Agreement expressly states that it is governed by Massachusetts law, and that notices to the EUA Companies under the WSOS Agreement are to be sent to EUA SC in West Bridgewater, Massachusetts. (Agreement, §§ 13, 18.)

3939579v2

13.    After execution of the WSOS Agreement on April 7, 1998, substantially all of TransCanada's communications with the EUA Companies concerning the WSOS Agreement, whether by phone, mail, fax or in person, were with representatives of EUA SC in West Bridgewater, Massachusetts.

14.    Since Blackstone and Newport merged into Narragansett in 2000, TransCanada has communicated with Narragansett through Narragansett's service agent, National Grid SC, at its offices in Northborough, Massachusetts.  National Grid SC, at its Northborough address, is also Narragansett's stated designee for notices under article 18 of the WSOS Agreement.

15.    Review of the public testimony given by Narragansett before the Rhode Island Public Utilities Commission ("RI-PUC"), as referenced in paragraphs 18-21 of the RI Complaint and paragraphs 28-29 of the Massachusetts Complaint, indicates that Narragansett's testimony was provided by representatives of National Grid SC.  (See example attached as Exhibit 2.)  This testimony was given by Michael Hager, the Vice President Energy Supply New England of National Grid SC.  I am familiar with Mr. Hager, and he works at National Grid SC's offices in Northborough, Massachusetts and lives in the area of Northborough, Massachusetts.

16.    Based upon my interaction with National Grid SC as agent for Narragansett over a period of years, it is my experience that contract management decisions concerning the WSOS Agreement are made in large part by representatives of National Grid SC in Northborough, Massachusetts.  Similarly, it is my understanding that National Grid SC generally maintains copies of Narragansett's documents concerning the WSOS Agreement, and concerning the calculation of payments thereunder, at its offices in Northborough.

17.    Since the dispute set forth in the MA and RI Complaints came to a head in 2005, communications between TransCanada and Narragansett concerning the dispute, including the

various default and payment notices exchanged (and excepting communications between counsel), have been primarily between TransCanada's offices in Westborough and Narragansett's service agent's offices in Northborough, Massachusetts.

18.     For example, the March 1, 2005 letter which Narragansett references in paragraphs 27-30 and 32 of its RI Complaint, and upon which Narragansett appears to base all the counts in its RI Complaint (see its paras. 36, 38, 40), was sent by Michael Hachey from TransCanada's offices in Westborough, Massachusetts to Michael Hager at the offices of Narragansett's service agent in Northborough, Massachusetts.  (See copy of letter attached as Exhibit 3.)

19.     Similarly, later in March, 2005, Mike Hachey met with Narragansett through its service agent representatives, including Michael Hager, at National Grid SC's offices in Northborough, Massachusetts to discuss the dispute.

16.     The Massachusetts District Court in Worcester, Massachusetts, which I understand is the forum for TransCanada's Massachusetts action, is only a ten or fifteen minute drive from both Northborough and Westborough, Massachusetts.

Signed under the pains and penalties of perjury this *15th* day of June, 2005.

_____
William Taylor

*Richard P. Schuler*          6/15/05

RICHARD P. SCHULER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 7, 2006

3939579v2

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| TRANSCANADA POWER MARKETING LTD., | : |
| | : |
| Defendant. | : |

C.A. No. 05-234S

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, STAY, OR TRANSFER

### I. INTRODUCTION

Plaintiff, The Narragansett Electric Company ("Narragansett"), submits this memorandum in opposition to the motion of Defendant, TransCanada Power Marketing Ltd. ("TransCanada"). TransCanada filed a parallel action about one week earlier in federal court in Massachusetts. This Court should deny TransCanada's motion to dismiss, stay, or transfer this action for several reasons.

First, most of the state's electric customers, plus the government of Rhode Island – notably the Rhode Island Public Utilities Commission ("RIPUC"), which sets the prices that Narragansett can charge its customers – have a powerful interest in the outcome of this dispute. TransCanada, a wholesale electric power supplier of Narragansett under a long term contract, seeks to require Narragansett to pay more under the contract and/or to terminate the contract. The contract is currently uneconomic for TransCanada, and its termination would force Narragansett to buy more expensive power at current market prices. If TransCanada succeeds, over 475,000 Rhode Island consumers served by

1

Narragansett – including individual residents, businesses, hospitals, educational and charitable institutions, and federal, state, and municipal entities – would have to pay more money for their electricity.

By contrast, the government and citizens of Massachusetts have virtually no interest in the resolution of this conflict, which involves solely a contract to supply power to a Rhode Island electric distribution company for the benefit of its Rhode Island retail customers. In light of this overwhelming Rhode Island interest, this matter should proceed before this Court.

Second, TransCanada is not entitled to the benefits of "first-filed" status in this dispute. Although TransCanada "beat" Narragansett to the courthouse, TransCanada's "methods" in so doing divest it of first-filed status. In particular, TransCanada created a false start by racing to the courthouse steps in the middle of substantive settlement negotiations with Narragansett. Federal courts do not reward litigants for such questionable maneuvers. Moreover, TransCanada is not the natural plaintiff in this dispute. From the beginning, Narragansett has made, under protest and with full reservation of rights, all of the payments that TransCanada claimed were due and owing under its illegitimate interpretation of the WSOS Agreement. Narragansett continues to make these payments even today, and did not sue to recover them until TransCanada abruptly filed its Massachusetts action in the middle of settlement negotiations. Finally, the balance of convenience weighs in favor of Rhode Island, particularly with the likely involvement of the RIPUC and the Rhode Island Division of Public Utilities and Carriers ("Rhode Island Division") as witnesses.

For all of these reasons, explained more fully below, the Court should deny

TransCanada's motion to dismiss, stay, or transfer, and should proceed to determine this

dispute that so directly affects the government and businesses and residents of this state.

## II. FACTS

### A.    The Parties

Narragansett is a specially chartered Rhode Island public utility corporation with

its principal place of business in Rhode Island.  It is an electric distribution company

whose charter permits it to deliver electricity over its wires to retail customers in thirty-

eight Rhode Island cities and towns, with a population of over 1 million people.  Michael

J. Hager Aff. ¶ 5.  Narragansett is the largest such electric utility in Rhode Island, serving

most of that State's customers.  Id.  It presently delivers electricity to approximately

480,000 customers, of which over 475,000 receive standard offer service.  Id.

Narragansett has the exclusive right to own and operate distribution equipment for

delivery of electricity at retail in these cities and towns.  Id.  Unlike non-utility

companies, Narragansett does not set the prices at which it provides these services.

Rather, it sells and delivers electricity pursuant to retail tariffs that the RIPUC has

approved.  Narragansett is wholly owned by National Grid USA ("National Grid"), a

public utility holding company.  Id. at ¶ 4.

TransCanada, a Delaware corporation, is a power marketing company that sells

electricity at wholesale to Narragansett.  Its eastern operations – conducted from an office

– are headquartered in Massachusetts.  Id. at ¶ 23.  Its other operations are in Calgary,

Alberta, Canada and Toronto, Ontario, Canada.  Id.

3

Narragansett's predecessor companies, Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") also were retail electric distribution companies in Rhode Island. Like Narragansett, Blackstone and Newport provided their services pursuant to retail tariffs approved by the RIPUC. Eastern Utilities Associates ("EUA"), a public utility holding company, had owned Blackstone, Newport, and Montaup Electric Company ("Montaup"), the wholesale electricity supplier to Blackstone and Newport. On May 1, 2000, Blackstone and Newport merged with and into Narragansett. At the same time, National Grid acquired EUA, and Montaup merged with and into New England Power Company, another subsidiary of National Grid USA. Consequently, Narragansett became the retail electric supplier and distribution company for Blackstone and Newport's customers, in addition to its already existing customers.

## B.     The WSOS Agreement

On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement. Under the Asset Purchase Agreement, TransCanada (1) purchased rights and obligations under a power purchase agreement between Montaup and the Ocean State Power ("OSP") generation station in Burrillville, Rhode Island; (2) entered into a PPA Transfer Agreement to effectuate the OSP purchase power obligations; and (3) agreed to supply a specific percentage share of electricity required by Blackstone and Newport to serve their Rhode Island customers. In connection with its supply obligation, TransCanada entered into a Wholesale Standard Offer Service Agreement ("WSOS Agreement") with Blackstone and Newport.[1]

---

[1] The Agreement also required TransCanada to supply electricity to Eastern Edison, a Massachusetts retail distribution company subsidiary of EUA. However, the term of that supply obligation ended in 2004. As a result, TransCanada's remaining supply obligations relate solely to the former EUA companies in Rhode Island, Newport and Blackstone, which subsequently merged into Narragansett.

4

At the heart of this dispute is the WSOS Agreement's fuel adjustment clause. Pursuant to this clause, Blackstone and Newport (now Narragansett) were obligated to pay a Fuel Adjustment Factor ("FAF") to TransCanada, as that FAF was to be reflected in their retail tariffs. The WSOS Agreement made clear that Blackstone and Newport's obligations to make payments under the FAF was conditioned upon the RIPUC approving the FAF in their tariffs.

Shortly after the WSOS Agreement was executed, Blackstone and Newport filed identical retail tariffs that contained the FAF. By its terms, the FAF commenced in the year 2000 and expired after 2004.[2] There were no provisions in the tariffs that provided for extending the FAF beyond 2004. These retail tariffs were approved by the RIPUC by order issued July 10, 1998. See July 10, 1998 Order, attached as Exhibit A. The FAF remained in the Blackstone and Newport tariffs, unchanged, through the date that Blackstone and Newport merged into Narragansett.

In anticipation of the pending merger of Narragansett, Blackstone and Newport, by letter dated February 8, 2000, Narragansett informed TransCanada that it would pay an FAF consistent with Blackstone and Newport's RIPUC-approved retail tariffs. Accordingly, Narragansett attached to the correspondence a schedule containing a fuel adjustment for each year from 2000 through 2004. Narragansett sent this letter to TransCanada in draft form and asked TransCanada to review it. Representatives from TransCanada and Narragansett communicated regarding the letter, and TransCanada

---

[2] While the filing was made on April 15, 1998, the standard offer service tariff containing an FAF expiring after 2004 was virtually identical to a proposed standard offer service tariff that had been filed at the RIPUC in November of 1997. At that time, however, the RIPUC delayed approval. Instead, the RIPUC put interim tariffs into effect and required Blackstone and Newport to put the standard offer out to bid before approving any standard offer tariffs. Once the bidding process was completed, Blackstone and Newport refiled on April 15, 1998. The discussion of this filing history also is contained in the RIPUC's order issued July 10, 1998.

voiced no objections to the contents of the same. Thus, on April 18, 2000, Narragansett

put the draft letter in final form and sent it to TransCanada.

**C.     Proceedings Before the RIPUC**

Subsequent to the merger, Narragansett administered the WSOS Agreement

consistent with its understanding that the FAF would expire after 2004. In fact, at several

proceedings before the RIPUC, Narragansett expressed this understanding to the RIPUC.

These proceedings were noticed and open to the public. Furthermore, in recent years, the

RIPUC has made its orders and notices available on the web. Examples of the several

public proceedings before RIPUC include: in June of 2000, Narragansett explained to the

RIPUC that payment of an FAF for the wholesale standard offer service agreements for

the former EUA companies Blackstone and Newport (the "EUA Zone WSOS

Agreements") would end after 2004. On May 28, 2003, in another public hearing before

the RIPUC, Narragansett explained its understanding of the WSOS Agreement that it was

not obligated to make FAF payments under the EUA Zone wholesale standard offer

service agreements after 2004. Consistent with its understanding of the WSOS

Agreement, Narragansett filed with the RIPUC proposed standard offer rates that were

based on a forecast of power costs that assumed no FAF payments would be made under

the EUA Zone wholesale standard offer service agreements after 2004. Additionally, on

July 1, 2004, Narragansett filed an application with the RIPUC to set its rates effective as

of October 1, 2004. Again, the filing proposed rates based on a forecast of costs that

assumed no FAF payments being made to TransCanada after 2004.

The RIPUC approved Narragansett's rates effective August 1, 2004 pursuant to an

open meeting decision on July 26, 2004 and an order dated August 26, 2004.

Likewise, on November 10, 2004, Narragansett made another publicly-noticed filing with the RIPUC relative to retail standard offer service. This filing proposed rates based on a forecast that no FAF payments would be made with regard to the EUA Zone wholesale standard offer service agreements. A bench decision delivered at a public hearing on December 13, 2004, and confirmed by a written order issued February 17, 2005, approved Narragansett's filing.

TransCanada failed to participate in these hearings. As the RIPUC acknowledged in a letter to Michael Hachey of TransCanada,

> TransCanada has chosen not to participate in those publicly noticed hearings. As I am sure you are aware, all members of the public, including suppliers, are invited to participate through the public comment process at the Commission. Additionally, all Narragansett rate filings are posted on the Commission's website prior to the hearings as are all Commission Orders shortly after their issuance.

See Apr. 6, 2005 Letter, attached as Exhibit B.

Consistent with its understanding of the WSOS Agreement, the terms of the retail tariff that had been initially approved by the RIPUC in 1998, the April 18, 2000 letter that had been sent to TransCanada at the time of the merger, and its filings with the RIPUC, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

## D.    Negotiations

After Narragansett did not make any FAF payments for the month of January 2005, TransCanada complained to Narragansett. Michael J. Hager Aff. ¶ 7. In February of 2005, Narragansett and TransCanada initiated discussions concerning their respective understandings of the FAF clause. Id. On February 18, 2005, TransCanada invoked the

dispute resolution clause of the WSOS Agreement, calling for senior representatives of

TransCanada and Narragansett to meet. Id. at ¶ 8. At a meeting on March 7, 2005, the

parties broached the subject of an amicable resolution. Id. at ¶ 9. At that same meeting,

TransCanada expressed a strong interest in an expedited resolution, and the parties

discussed a fast-track arbitration. Id.[3]

On March 1, 2005, TransCanada sent a letter to Narragansett (1) claiming that

Narragansett was in default of the WSOS Agreement by not providing for an FAF in its

price calculations; (2) asserting that Narragansett had breached the WSOS Agreement by

refusing "to comply with its obligations under Article V before the … [RIPUC] with

respect to its Standard Offer Service tariffs"; and (3) asserting that "Narragansett's failure

to cure or rectify a notice default …shall be deemed an Event of Default…." See Mar. 1,

2005 Letter, attached as Exhibit 3 to Def.'s App. in Supp. of Aff. of William Taylor.

At the end of March, Narragansett began making payments to TransCanada,

under protest (including retroactive protest payments for the period beginning in

January), to allow the parties to negotiate a potential settlement, and avoid giving

TransCanada a pretext to terminate the WSOS Agreement, which, based on current

market prices, is no longer economically advantageous to TransCanada. Michael J.

Hager Aff. ¶ 11.

Confidential settlement negotiations continued and on April 1, 2005,

TransCanada and Narragansett also began negotiating an agreement for a fast-track

arbitration. Id. at ¶ 12. The agreement for a fast-track arbitration was heavily negotiated.

Id. at ¶ 13. It was nearly complete when TransCanada and Narragansett had made

---

[3] The parties agreed that this meeting was subject to Federal Rule of Evidence 408 and similar state laws. The meeting is described here not "to prove liability," but to explain the context of TransCanada's rush to the courthouse.

substantial progress towards a settlement agreement in principle of a large portion of the

dispute.  Id.  At that time, on April 25, 2005, TransCanada's legal counsel sent an

electronic mail message to Gloria Kavanah, National Grid's Assistant General Counsel,

indicating TransCanada's willingness to hold off on finalizing the arbitration agreement

due to the progress being made in settlement negotiations.  Id. at ¶ 14.

TransCanada and Narragansett were actually exchanging drafts of the partial

settlement agreement when TransCanada filed suit in the United States District Court for

the District of Massachusetts on May 17, 2005.  Id. at ¶ 15.  Nine days later, on May 26,

2005, Narragansett filed this action in the United States District Court for the District of

Rhode Island.

At no time did TransCanada indicate that it no longer intended to arbitrate the

dispute (or in the event of a settlement of a portion of the dispute, the remaining portion

of the dispute.)  Id. at ¶ 16.  Moreover, TransCanada at all times indicated its strong

interest in an expedited resolution.  Id. at ¶ 17.  Accordingly, Narragansett persisted in its

belief that TransCanada continued to desire a fast-track arbitration.  Id.  Finally,

Narragansett had no reason to believe that TransCanada would file suit since

TransCanada was receiving all of the disputed FAF payments at that time.  Id. at ¶ 18.

**E.      Other Facts Bearing on the Balance of Convenience**

**1.      <u>The Rhode Island Regulatory Agencies' Involvement in this Dispute</u>**

As regulatory agencies, the RIPUC and the Rhode Island Division have an

integral and essential role in this dispute.  The RIPUC and the Rhode Island Division

possess "the exclusive power and authority to supervise, regulate, and make orders

governing the conduct of companies offering to the public in intrastate commerce energy

9

… for the purpose of protecting … the public against improper and unreasonable rates, tolls and charges." R.I. Gen. Laws § 39-1-1(c). Furthermore, an electric distribution company may not terminate an existing standard offer wholesale supply agreement absent the Division's written consent. R.I. Gen. Laws § 39-1-27.3(b).

TransCanada acknowledges the role of the RIPUC in this dispute. On or about March 29, 2005, Michael Hachey of TransCanada contacted counsel for the RIPUC and requested a meeting with the regulators regarding this dispute. Michael J. Hager Aff. ¶ 10. In a letter to the RIPUC dated April 4, 2005, Hachey acknowledged the possibility of termination of the WSOS Agreement and the implications of the dispute for Rhode Island customers. See April 4, 2005 Letter, attached as Exhibit C. The RIPUC responded to Hachey, noting that "any rate impact of any changes to a Standard Offer Service … Contract would be subject to Commission approval." See April 6, 2005 Letter, attached as Exhibit B.

## 2.    Location of the Parties, Witnesses, and Evidence

Narragansett's principal place of business is 280 Melrose Street, Providence, Rhode Island. Narragansett's business lead for the WSOS Agreement, Michael J. Hager, an employee of National Grid USA Service Company, lives equidistant between Worcester and Providence. Michael J. Hager Aff. ¶ 2, 3, and 6.

Narragansett employs over 470 persons in Rhode Island. Id. at ¶ 22. Upon information and belief, TransCanada has 8 to 10 employees in an office in Westborough, Massachusetts. Id. Furthermore, although TransCanada's Eastern division operations are located in Massachusetts, TransCanada also does business in Calgary, Alberta, Canada

and Toronto, Ontario, Canada.[4] Id. at ¶ 23.  TransCanada's employees in Burrillville,

Rhode Island performed TransCanada's accounting services for the WSOS Agreement

and the PPA Transfer Agreement since 1998 up until two days before TransCanada filed

its motion to dismiss, stay, or transfer. Id. at ¶ 26.

The PPA Transfer Agreement for output from the OSP generation station is

intertwined with the WSOS Agreement.  Both the PPA Transfer Agreement and the

WSOS Agreement have cross-default provisions.  See PPA Transfer Agreement, Article

13, attached as Exhibit D; WSOS Agreement, Article 8(2), attached as Exhibit 1(A) to

Def.'s Mem. In Support of its Mot. to Dismiss, Stay, or Transfer.  Accordingly, the PPA

Transfer Agreement may be implicated in this litigation.

Much of the documentary evidence that Narragansett will introduce at trial is

available in electronic form.  Michael J. Hager Aff. ¶ 19.  Furthermore, negotiations prior

to TransCanada's filing of suit in Massachusetts took place in both Rhode Island and

Massachusetts. Id. at ¶ 20.  All hearings before the RIPUC, at which the retail fuel

adjustment relative to the EUA Wholesale Standard Offer Service Agreements were

discussed, took place in Rhode Island. Id. at ¶ 21.

### III.  ARGUMENT

**A.**     **The Court Should Deny TransCanada's Motion to Dismiss**

TransCanada's motion to dismiss, stay, or transfer relies exclusively on the first-

filed rule.  That reliance is misplaced.  The first-filed rule "is not a per se rule, but rather

a policy governed by equitable considerations."  Feinstein v. Brown, 304 F.Supp.2d 279,

283 (D.R.I. 2004); SW Industries, Inc. v. Aetna Casualty & Surety Co., 653 F. Supp. 631,

---

[4] On information and belief, Michael Hachey, one of TransCanada's business leads, owns a residence in
Rhode Island and spends almost every weekend there. Id. at ¶ 25.

634 (D.R.I. 1987). Accordingly, courts refuse to apply the first-filed rule mechanically

and recognize various exceptions to the rule. 17 Moore's Federal Practice §

111.13[1][o][B] (Matthew Bender 3d ed.). See also Glades Pharmaceuticals v. Call, Inc.,

No. Civ. A. 04-4259, 2005 WL 563726, at *8 (E.D. Pa. Mar. 9, 2005) (stating that "the

first-filed rule is not a rigid or inflexible rule to be mechanically applied"); Affinity

Memory & Micro v. K & Q Enter., 20 F. Supp. 2d 948, 954 (E.D. Va. 1998) (noting that

"the first-filed rule is not to be applied mechanically" and that the court should perform

"a thorough transfer analysis ... to determine if the balance of convenience favors

transfer"); 800-Flowers v. Intercontinental Florist, 860 F. Supp. 128, 133 (S.D.N.Y.

1994) (stating that "[i]t is well established that district courts need not slavishly adhere to

the first filed rule"). Furthermore, "courts generally give less weight to the first-filed rule

when the competing actions were filed within a short time of each other." 17 Moore's

Federal Practice § 111.13[1][o][B] (Matthew Bender 3d ed.).

Two well-settled exceptions to the first-filed rule apply where (1) special

circumstances justify giving priority to the second filed suit or (2) the balance of

convenience favors the second suit. Feinstein, 304 F.Supp.2d at 283. Both of those

exceptions apply here.

**1.    The Court Should Deny the Motion to Dismiss Because the Government and Residents of Rhode Island have an Enormous Interest in the Resolution of this Dispute.**

The RIPUC and the Rhode Island Division extensively regulate the electric

industry in Rhode Island. The RIPUC possesses "the exclusive power and authority to

supervise, regulate, and make orders governing the conduct of companies offering to the

public in intrastate commerce energy ... for the purpose of protecting ... the public

against improper and unreasonable rates, tolls and charges." R.I. Gen. Laws § 39-1-1(c).

Accordingly, a retail electric distribution company charges its customers rates under

public tariffs that are reviewed and approved by the RIPUC. R.I. Gen. Laws §§ 39-1-

3(a); 39-1-27(a). Furthermore, an electric distribution company may not terminate an

existing standard offer wholesale supply agreement absent the Division's written consent.

R.I. Gen. Laws § 39-1-27.3(b).

This case should be litigated in Rhode Island because the contract dispute at issue

is inextricably intertwined with the RIPUC's regulation of the rates that Narragansett can

charge its customers and because Rhode Island residents, businesses, and other electric

consumers have a strong interest in the outcome of this dispute. TransCanada seeks: (1)

to terminate its power supply contract, and (2) to obtain FAF payments for as long as the

contract remains in effect. Narragansett does not believe that TransCanada is entitled to

any relief in this proceeding. Nevertheless, either prong of the relief requested by

TransCanada would increase the rates for hundreds of thousands of Rhode Island

businesses and residents.

Under Rhode Island law, Narragansett is entitled to recover its costs under

standard offer service agreements from approximately 54,832 businesses and 420,759

residents that receive standard offer service. See R.I. Gen. Laws § 39-1-27.3(b) (stating

that "[t]he electric distribution company will be entitled to recover its costs incurred from

providing the standard offer arising out of ... wholesale standard offer supply agreements

... in effect prior to January 1, 2002"). If Narragansett is required to pay more to

TransCanada under the WSOS Agreement, Narragansett will be forced to recover those

increased costs from its customers. If TransCanada is allowed to terminate the WSOS

13

Agreement, then Narragansett will be forced to purchase more expensive market power, the costs of which, under Rhode Island law are recoverable. See R.I. Gen Laws § 39-1-27.3(b) (stating that "[t]he electric distribution company will be entitled to recover its costs incurred from providing the standard offer arising out of ... power supply related arrangements prudently made after January 1, 2002, to provide standard offer supply or to mitigate standard offer supply costs"). Therefore, if this Court accepts TransCanada's contract arguments – which it should not – Rhode Island residents, businesses, governmental, educational and charitable institutions will face higher energy costs.

The Rhode Island public's interest demands resolution of this dispute in Rhode Island. "When an action involves an incident occurring in a particular locale, there is a public interest in having the controversy adjudicated in that locale, rather than in a remote forum." 17 Moore's Federal Practice § 111.13[1][l] (Matthew Bender 3d ed.). See also In re Eastern Dist. Repetitive Stress Injury Litigation, 850 F.Supp. 188, 195 (E.D.N.Y. 1994) (stating that "[w]hen an action involves injuries sustained in a particular locale, the public interest supports adjudication of the controversy in that locale, where it may be a matter of local attention, rather than in a remote location where it will be learned of only by report").

This case involves events occurring exclusively in Rhode Island; specifically, the purchase of electricity in Rhode Island, on behalf of Rhode Island electric consumers, at rates set by Rhode Island regulatory authorities. The more than 475,000 customers of the power supplied by TransCanada are located exclusively in Rhode Island. Narragansett and its predecessors, Blackstone and Newport, are Rhode Island corporations. By statute, Narragansett has the exclusive authority to distribute electricity to customers in its

14

franchised territory in Rhode Island.  Michael J. Hager Aff. ¶ 5.  It has no other authority

and engages in no other business.  Finally, this case involves relevant proceedings that

took place before the RIPUC.

In short, this case is important to the residents of Rhode Island and it directly

concerns the State's intensive regulation of the supply and sale of electricity.  The

residents and government of Massachusetts have no interest in this dispute.  For this

reason, this dispute should be determined in Rhode Island by this Court.

### 2.    The Court Should Deny TransCanada's Motion to Dismiss Because the First-Filed Rule Does Not Apply Here.

Where the first-filed action results from "a preemptive race to the courthouse," or

is filed "for the sole purpose of winning the race to the courthouse to secure a preferred

forum," special circumstances exist, and the first-filed rule does not apply.  Feinstein, 304

F.Supp.2d at 283; Holmes Group, Inc. v. Hamilton Beach/Proctor Silex, Inc., 249

F.Supp.2d 12, 16 (D. Mass. 2002).  Furthermore, where one party reasonably holds off

from filing suit because he or she believes the parties are still negotiating, special

circumstances exist that preclude application of the first-filed rule.  Nortek, Inc. v.

Molnar, 36 F.Supp.2d 63, 70 (D.R.I. 1999).  See also Holmes Group, Inc., 249 F.Supp.2d

at 16 (stating that the first-filed rule does not apply where "a plaintiff … misleads the

defendant into foregoing litigation in order to negotiate a settlement and then files suit").

A court "will not reward conduct that undermines the sound policy of promoting

settlements and negotiations outside the courthouse." Nortek, Inc., 36 F.Supp.2d at 70.

Additionally, in the case of concurrent actions proceeding in different federal

courts, courts often note which of the parties constitutes the "natural plaintiff." "The

natural plaintiff's choice of forum … will be disturbed only in exceptional

circumstances." AmSouth Bank v. Dale, 386 F.3d 763, 788 (6th Cir. 2004). See also

Old Town Canoe Co. v. Confluence Holdings Corp., No. Civ. 04-1660-AS, 2005 WL

552005, at *2 (D. Or. 2005) (noting that the natural plaintiff's choice of forum should not

be disturbed in the absence of a strong showing of inconvenience).

TransCanada is not entitled to the benefits of the first-filed rule for at least two

reasons. First, TransCanada engaged in "conduct that undermines the sound policy of

promoting settlements and negotiations outside the courthouse." Narragansett and

TransCanada were engaged in negotiations for upwards of two months when

TransCanada unexpectedly filed its Massachusetts action. TransCanada lured

Narragansett into a false sense of security by invoking the dispute resolution clause of the

WSOS Agreement and insisting on fast-track arbitration. Furthermore, TransCanada's

counsel told Narragansett to hold off on finalizing the arbitration agreement due to the

progress being made in settlement negotiations. Because negotiations had proven

fruitful, as evidenced by the partial settlement and TransCanada's counsel's statement,

and Narragansett continued to pay under protest, Narragansett had every reason to

believe that the parties would resolve their dispute without a court action. TransCanada

took advantage of the false sense of security it provided Narragansett and ambushed

Narragansett to secure its preferred forum of Massachusetts.

Second, TransCanada's actions are even more pernicious because Narragansett,

not TransCanada, was the only party suffering any actual harm at the time that

TransCanada filed its lawsuit. While the parties attempted to resolve this dispute,

Narragansett made payments under protest to TransCanada for each month, beginning in

January of 2005. Therefore, when it filed suit, TransCanada already possessed all of the

money it claimed was due in connection with the dispute.  Narragansett, on the other

hand, was out more than $1,000,000, having made payments to allow the parties to

negotiate and to avoid termination of a power supply that is advantageous for Rhode

Island customers.  To this day, Narragansett continues to make these payments.  Michael

J. Hager Aff. ¶ 11.  Thus Narragansett, not TransCanada, was the party suffering

damages at the time that TransCanada filed its lawsuit.  Narragansett, not TransCanada, is

the natural plaintiff.

### 3.    The Balance of Convenience Favors Narragansett's Rhode Island Based Suit.

In addition to the preemptive race to the courthouse, a balance of convenience

favoring the venue of a later-filed action precludes application of the first-filed rule.

Feinstein, 304 F.Supp.2d at 283.  The party seeking transfer must demonstrate that the

plaintiff's choice of forum is substantially more inconvenient than proceeding in its

choice of forum.  Id. at 284.  See also Kleinerman v. Luxtron Corp., 107 F.Supp.2d 122,

125 (D. Mass. 2000) (stating that "[t]he party seeking to demonstrate that one forum is

more convenient than another ... must show that the plaintiff's choice of forum is

substantially more inconvenient than the alternative proposed by it").  TransCanada has

not met this burden, and, in fact, inaccurately attempts to place the burden of proof upon

Narragansett.  See Def.'s Mem. in Support of its Mot. to Dismiss, Stay, or Transfer at 2

(stating that "in the absence of an affirmative showing by Narragansett that a Rhode

Island forum is clearly preferable, this second-filed action should be dismissed").

In analyzing the balance of convenience, courts weigh the following factors:  (1)

the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of

witnesses and the location of documents; (4) any connection between the forum and the

issues; (5) the law to be applied; and (6) the state or public interest at stake. Holmes

Group, Inc., 249 F.Supp.2d at 17.

### a.    The Plaintiff's Choice of Forum

In general, "[u]nder both the doctrine of forum non conveniens and the statutory

provision for transfer of venue, the plaintiff's forum choice is generally preferred." SW

Industries, Inc., 653 F.Supp. at 637.  This preference for the plaintiff's choice of forum is

especially strong where the plaintiff has filed suit in its home forum. Kleinerman, 107

F.Supp.2d at 125.  "When a plaintiff chooses his home forum, the choice more likely

represents considerations of convenience rather than vexation or harassment to the

defendant, thus elevating the hurdle the defendant is required to clear to warrant

transfer."  Id.  As Narragansett has filed suit in Rhode Island, where it maintains its

principal place of business, this factor favors a Rhode Island venue for this dispute.

### b.    The Convenience of the Parties

Narragansett is a Rhode Island corporation with its principal place of business,

and all of its equipment and customers, in Rhode Island.  TransCanada is a Delaware

corporation with its small headquarters office in Massachusetts, and other operations in

Canada.  TransCanada sells electricity to Narragansett, which Narragansett provides to

Rhode Island consumers.  As Narragansett and TransCanada have their principal places

of business in different states, this factor is neutral.

### c.    Connections Between the Forum and the Issues

Both Narragansett's Rhode Island lawsuit and TransCanada's Massachusetts

lawsuit arise from the delivery of electricity to Narragansett for consumption by Rhode

Island consumers.  Rhode Island has a strong interest in the potential termination of the

WSOS Agreement, since the increased costs from any payments to TransCanada and/or

termination will be passed on to Rhode Island customers by operation of R.I. Gen. Laws

§ 39-1-27.3(b), discussed *infra*. Consequently, the direct connection between Rhode

Island and the issues central to this dispute is undeniable.

### d.     The Law To Be Applied

Of the balance of convenience factors, the law to be applied "seems not to have

been given great weight, particularly when the applicable state law appears clear." SW

Industries, Inc., 653 F.Supp. at 638-39 (citing Wright, Miller & Cooper, Federal Practice

and Procedure:  Jurisdiction 2d § 3854).  See also Paradis v. Dooley, 774 F. Supp. 79, 82

(D.R.I. 1991) (stating that "[c]hoice of law is not a controlling factor in deciding this

motion [for transfer of venue] because a transferee court would apply the same state law

that the transferor court would have applied").

The WSOS Agreement provides for the application of Massachusetts law.  As

Massachusetts law concerning the interpretation of contracts is fairly clear, this factor

bears little weight.  Although Massachusetts law governs the WSOS Agreement, the

Rhode Island statute regarding Standard Offer Service and proceedings, orders, rules, and

regulations of the RIPUC is at the heart of this dispute, since the same contract prohibited

TransCanada from collecting a FAF unless and to the extent that the RIPUC permitted

Narragansett to recover such costs in its retail tariffs.  Moreover, the WSOS Agreement

initially covered supply to three EUA companies, Eastern Edison, Newport, and

Blackstone.  Eastern Edison, which served customers in Massachusetts, was the largest of

the three EUA companies.  Michael J. Hager Aff. ¶ 27.  TransCanada's obligations to

supply Eastern Edison expired in 2004.  Thus whether the application of Massachusetts

law would have had a bearing on venue in the past, it no longer is entitled to such consideration.

## IV. CONCLUSION

As special circumstances apply and the balance of convenience favors Rhode Island as the appropriate venue for this action, the first-filed rule does not apply and the Court should deny TransCanada's motion to dismiss, stay, or transfer Narragansett's lawsuit to Massachusetts.

THE NARRAGANSETT ELECTRIC
COMPANY
By its Attorney,

Gerald J. Petros, Esq. (#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (FAX)

DATED: July 8 , 2005.

## CERTIFICATION

To:

Kristin E. Rodgers
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

I certify that I mailed a true and accurate copy of this Memorandum in Opposition to Defendant's Motion to Dismiss, Stay, or Transfer to counsel of record, as stated above, on July 8th, 2005.

665645v4

20

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE NARRAGANSETT ELECTRIC          :
COMPANY,                           :
                                   :
       Plaintiff,               :
                                   :
v.                                 :          C.A. No. 05-234S
                                   :
TRANSCANADA POWER MARKETING :
LTD.,                              :
                                   :
       Defendant.               :

### <u>AFFIDAVIT OF MICHAEL J. HAGER</u>

I, Michael J. Hager, upon oath, depose and state that:

1.     Unless otherwise stated, I have personal knowledge of the facts stated herein and am competent to testify to such facts.

2.     I live at 36 Ridge Way in Sturbridge, MA 01566.

3.     I am the Vice President for Energy Supply New England, National Grid USA Service Company, Inc., an affiliate of The Narragansett Electric Company ("Narragansett").

4.     Narragansett and National Grid USA Service Company, Inc., are wholly-owned subsidiaries of National Grid USA ("National Grid"), a public utility holding company.

5.     Narragansett is the successor by merger in 2000 to Newport Electric Company and Blackstone Valley Electric Company, both subsidiaries of Eastern Utilities Associates ("EUA"), a public utility holding company. Narragansett delivers electricity to customers in thirty-eight Rhode Island cities and towns, with a population of over 1,000,000. A map of Narragansett's service territory is attached as <u>Exhibit 1</u>. Narragansett has the exclusive right

to deliver electricity to customers in those communities. Narragansett is the largest utility in Rhode Island, and serves approximately 480,000 customers. Of those customers, over 475,000 receive standard offer service.

6.     I was Narragansett's business lead for the WSOS Agreement since the merger in 2000.

7.     In February of 2005, Narragansett and TransCanada initiated discussions concerning their respective understandings of the FAF clause, after TransCanada complained that it was entitled to FAF payments after 2004, which Narragansett had not paid.

8.     On February 18, 2005, TransCanada invoked the dispute resolution clause of the WSOS Agreement, calling for senior representatives of TransCanada and Narragansett to meet.

9.     At a meeting on March 7, 2005, which the parties agreed was subject to Federal Rule of Evidence 408 and similar state laws, TransCanada and Narragansett broached the subject of an amicable resolution. At that same meeting, TransCanada expressed a strong interest in an expedited resolution, and the parties discussed a fast-track arbitration.

10.     On or about March 29, 2005, Michael Hachey of TransCanada contacted counsel for the Rhode Island Public Utilities Commission ("RIPUC"), requesting a meeting with the regulators regarding the dispute.

11.     At the end of March of 2005, Narragansett began making payments to TransCanada, under protest, to allow the parties to negotiate a potential settlement and to avoid giving TransCanada a pretext to terminate the WSOS Agreement, which, based on current market prices, is no longer economically advantageous to TransCanada. These payments included retroactive protest payments for the period beginning in January of 2005.

12.     On or about April 1, 2005, TransCanada and Narragansett also began negotiating an agreement for a fast-track arbitration.

13.     The agreement for a fast-track arbitration was heavily negotiated and was nearly complete when TransCanada and Narragansett had made substantial progress towards a settlement agreement in principle of a large portion of the dispute.

14.     On April 25, 2005, TransCanada's legal counsel sent an electronic mail message to Gloria Kavanah, National Grid's Assistant General Counsel, indicating TransCanada's willingness to hold off on finalizing the arbitration agreement due to the progress being made in settlement negotiations.

15.     TransCanada and Narragansett were exchanging drafts of the partial settlement agreement when TransCanada filed suit in the United States District Court for the District of Massachusetts on May 17, 2005.

16.     At no time did TransCanada indicate that it no longer intended to arbitrate the dispute or the remaining portion of the dispute, in the event of a settlement of a portion of the dispute.

17.     TransCanada at all times indicated its strong interest in an expedited resolution; therefore, Narragansett persisted in its belief that TransCanada continued to desire a fast-track arbitration.

18.     Narragansett had no reason to believe that TransCanada would file suit since TransCanada was receiving all of the disputed FAF payments at that time.

19.     Most, if not all, of the documents that are relevant to this dispute are available, or can be made available, in electronic form.

20.     Negotiations prior to TransCanada's filing suit in Massachusetts took place in both Rhode Island and Massachusetts.

21.     All hearings before the RIPUC, at which the FAF or the retail fuel adjustment relative to the EUA wholesale standard offer service agreements were discussed, took place in Rhode Island.

22.     Narragansett employs over 470 persons in Rhode Island. Upon information and belief, TransCanada employs 8 to 10 employees in an office in Westborough, Massachusetts.

23.     Although TransCanada's Eastern Division operations are located in Massachusetts, TransCanada also does business in Calgary, Alberta, Canada and Toronto, Ontario, Canada.

24.     TransCanada's affiliate owns the Ocean State Power plant in Rhode Island.

25.     Upon information and belief, Michael Hachey, one of TransCanada's business leads, owns a residence in Rhode Island and spends almost every weekend there.

26.     TransCanada's employees in Burrillville, Rhode Island performed TransCanada's accounting services for the WSOS Agreement and the PPA Transfer Agreement since 1998, up until two days before TransCanada filed its motion to dismiss, stay, or transfer.

27.     Eastern Edison, which served customers in Massachusetts, was the largest of the three EUA companies.

_____

Michael J. Hager

SUBSCRIBED AND SWORN to before me this _____ day of July, 2005.

_____
NOTARY PUBLIC

My Commission Expires: _4-4-08_

664694v4

## **CERTIFICATION**

To:

Kristin E. Rodgers
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

    I certify that I mailed a true and accurate copy of the Affidavit of Michael J. Hager to counsel of record, as stated above, on July _8_, 2005.

*Cynthia Lomas*

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | CA No. 05-234 |
| v. | ) ) | |
| TRANSCANADA POWER MARKETING LTD., | ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT TRANSCANADA POWER MARKETING LTD.'S
REPLY TO "PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS, STAY, OR TRANSFER"**

Defendant TransCanada Power Marketing Ltd. ("TransCanada") hereby replies to

"Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, Stay, or Transfer"

(Plaintiff's "Opposition Memorandum").

Plaintiff Narragansett Electric Company ("Narragansett") does not dispute the

fundamental grounds for TransCanada's Motion to Dismiss, Stay, or Transfer based upon the

previously pending Massachusetts Action. Nevertheless, Narragansett argues that this Court

should retain jurisdiction (apparently at the same time that the Massachusetts Court does so also,

since Narragansett has not actively contested venue there) on grounds that: (i) TransCanada

allegedly bears the burden of proof to establish the priority of its first-filed Massachusetts Action

(an incorrect legal premise); (ii) TransCanada is not the "natural plaintiff" and allegedly "rushed

to the courthouse" (both of which are demonstrably false); and (iii) one of the six primary

"balance of convenience" factors – the public interest – allegedly overcomes on its own all other

relevant factors pointing to Massachusetts as well as the strong presumption in favor of the first-filed Massachusetts Action. None of Narragansett's arguments has merit. Moreover, even if this Court were inclined to consider retaining jurisdiction, it should in any event dismiss or stay this action unless or until the Massachusetts court declines jurisdiction.

## **ARGUMENT**

I.    **AS THE SECOND-FILING PARTY, NARRAGANSETT BEARS A HEAVY BURDEN TO JUSTIFY RETENTION OF THIS CASE IN RHODE ISLAND.**

Contrary to Narragansett's assertion (see Opp. Mem. at 17), it is well-established that the first-filed Massachusetts Action is entitled to presumptive priority, and that Narragansett, as the second-filing party, bears the burden of demonstrating that there are either special circumstances or sufficient inconvenience to warrant overcoming the strong presumption in favor of the Massachusetts Action. See Cruz v. Hartford Cas. Ins. Co., 2005 WL 1231965, at *2 (D.R.I. 2005); SW Indus. v. Aetna Cas. & Sur. Co., 653 F. Supp. 631, 634, 637, 639 (D.R.I. 1987); 800-Flowers v. Intercontinental Florist Inc., 860 F. Supp. 128, 131-136 (S.D.N.Y. 1994); J.P. Sercel Assocs. v. New Wave Research, 2003 WL 22299014, at *2 (D.N.H. 2003); Cent. States v. Paramount Liquor Co., 34 F. Supp. 2d, 1092, 1095 (N.D.Ill. 1999). All of these cited cases addressed the precise procedural situation here -- a motion to dismiss, stay or transfer by the defendant in the second-filed action -- and each imposed upon the plaintiff in the second-filed action the burden to justify retention of jurisdiction in the second-filed action. Id.[1]

The two cases cited by Narragansett do not support imposing any burden on TransCanada as the first-filing party. See Feinstein v. Brown, 304 F. Supp. 2d 279, 283-84 (D.R.I. 2004) (holding that there is a strong presumption favoring the first-filed action and imposing the burden

---

[1] TransCanada is also clearly the "natural plaintiff" in this case (see Section II infra), and thus is also entitled to a strong presumption in favor of the Massachusetts Action on that ground. Old Town Canoe Co. v. Confluence Holdings, 2005 WL 552005, at *2 (D. Or. 2005); BASF Corp. v. Symington, 50 F.3d 555, 559 (9th Cir. 1995).

of proof upon the party seeking to dismiss the *first-filed* action); Kleinerman v. Luxtron Corp.,

107 F. Supp. 2d 122, 124-25 (D. Mass. 2000) (holding that the second-filing party generally

bears the burden of proof, but that under a special rule applicable to patent actions the first-filing

party was not entitled to the presumption in that case).[2]

## II.    TRANSCANADA IS THE "NATURAL PLAINTIFF" AND DID NOT "RACE TO THE COURTHOUSE"

Narragansett alleges two "special circumstances" why this Court should override the

presumption in favor of the first-filed action: TransCanada is not the "natural plaintiff," and

TransCanada allegedly "raced to the courthouse." Both of these assertions are false.

First, it is abundantly clear from a simple reading of the Massachusetts Complaint, and

Narragansett's identical Massachusetts Counterclaim and Rhode Island Complaint, that

TransCanada is the "natural plaintiff" in these cases. (See MA Complaint and MA Counterclaim

(TransCanada Exs. A, B) and RI Compl.) TransCanada sent a default notice to Narragansett, and

asserts in its MA Complaint affirmative claims for damages for breach of contract under

Massachusetts law. Narragansett's Massachusetts "Counterclaim," and its identical Rhode

Island "Complaint," constitute no more than defenses to TransCanada's Massachusetts breach of

contract claims. (MA Compl. ¶¶ 32-47; MA Counterclaim, ¶¶ 35-40; RI Compl., ¶¶ 35-40.) See

also TransCanada Motion to Dismiss, at 4-5; BASF Corp., 50 F.3d at 558 ("actions founded

exclusively on a defense to a state law claim should be dismissed as a tactical maneuver

calculated to deny potential plaintiffs of their traditional right to choose the forum and time of

---

[2] The cases Narragansett cites for the general proposition that the first-filed rule is not to be mechanically applied are also unhelpful to its cause. (Opp. Mem. at 11-12.) In fact, these cases either support dismissal of Narragansett's second-filed action, see SW Industries, 653 F. Supp. at 634-39 (staying second-filed action); Feinstein, 304 F. Supp. at 281-84 (denying a motion to dismiss the first-filed action); 800-Flowers, 860 F. Supp. at 131-136 (dismissing the second-filed action), or are inapplicable, see Glades Pharms. v. Call, Inc., 2005 WL 563726, at *8-9 (E.D. Pa. 2005) (declining to exercise first-filed rule only because the second-filed action had actually been filed first but was dismissed on grounds of forum non conveniens); Affinity Memory & Micro, Inc. v. K&Q Enters, 20 F. Supp. 2d 948, 950-55 (E.D. Va. 1998) (declining to exercise first-filed rule because the first-filed court had no jurisdiction over the plaintiff in the second-filed action, among other reasons also not applicable here).

suit"). Narragansett's assertion that its 3 months of "payments" to TransCanada preceding the

Massachusetts Action – admittedly made as a settlement strategy, under protest and with

reservation of rights, and with no promise to pay a fuel adjustment to TransCanada for the

remaining 57 months of the Agreement (see Opp. Mem. at 8) – is silly, and clearly does not turn

Narragansett into a "plaintiff."[3]

Second, Narragansett's conclusory "factual" allegations that TransCanada "raced to the

courthouse" are simply baseless, and indeed, even if taken as true (which they are not), would

not warrant overriding the strong preference in favor of the first-filed Massachusetts action.

TransCanada really does not want to get into the details of these settlement negotiations between

counsel, since even under Narragansett's version of those negotiations Narragansett does not

meet its burden (see infra), but TransCanada feels it must do so to correct the record.

Narragansett notably describes the negotiations between counsel by way of the conclusory

allegations of a witness, Mr. Hager (see Hager Aff. ¶¶ 12-18), who was not directly involved in

any of those negotiations. These referenced negotiations were conducted almost exclusively

between respective counsel to TransCanada and Narragansett, Daniel C. Winston, Esq. and

Gloria Kavanah, Esq. In short, here is what happened:[4]

---

[3] Narragansett's assertion that it believes it is the "plaintiff" is also markedly disingenuous: In the very arbitration negotiations referenced by Narragansett in its Opposition Memorandum, and included in the last written arbitration proposal sent by Narragansett to TransCanada on April 18, 2005, Narragansett proposed that TransCanada initiate any arbitration by submitting a "written statement of the dispute," to which Narragansett would submit "an answer."

[4] Like Narragansett, TransCanada submits information concerning settlement and arbitration discussions in full recognition of their protection under Federal Rule of Evidence 408, and not to prove liability but rather to address the relevant procedural background. TransCanada has not provided copies of the referenced communications and documents exchanged between counsel in view of Rule 408, but makes the representations herein consistent with the obligations of truthfulness under Fed. R. Civ. P. 11. To the extent the Court deems it necessary to delve further into the negotiations, TransCanada's counsel is fully willing to do so but suggests that the Court undertake such a review based only upon the representations of counsel who were actually involved in the negotiations, supported by the actual documentary exchanges. TransCanada doubts, however, that Narragansett's counsel involved in the negotiations would seriously dispute any of the assertions made herein. If necessary, TransCanada will also move to strike paragraphs 12-18 of Mr. Hager's Affidavit on grounds of lack of personal knowledge. In any event, TransCanada believes, as set forth herein, that the Court can avoid this whole factual issue since, even under the incorrect factual rendition of counsel's negotiations provided by Mr. Hager, Narragansett has not shown a "race to

- On March 1, 2005, TransCanada provided notice of default to Narragansett. The parties thereafter met to attempt to resolve the dispute.

- From April 1, 2005 through April 19, 2005, counsel negotiated terms for a possible expedited arbitration and exchanged drafts of a proposed arbitration agreement. TransCanada at all times insisted that arbitration was an option only if it could be accomplished on an expedited basis with a hearing proposed to occur in Summer 2005, and only if all other arbitration terms could be agreed upon.

- On April 19, 2005, TransCanada sent a draft arbitration proposal to Narragansett which still contained substantial points of disagreement, most notably regarding the scheduling. TransCanada insisted on a July 2005 hearing and an immediate start to the arbitration process, while Narragansett insisted on a slower, less defined arbitration schedule.

- On April 20, 2005, TransCanada sent an e-mail to Narragansett's counsel asking for a response. Narragansett's counsel responded by stating that Narragansett was reconsidering arbitration entirely, and at that point was not willing to respond to TransCanada's arbitration proposal. Narragansett instead suggested settlement talks. TransCanada therefore agreed to defer further negotiation of the arbitration agreement only until Tuesday, April 25, 2005, pending settlement meetings on Friday, April 22, 2005, and Monday, April 24, 2005.

- On Tuesday, April 25, 2005, to allow for a few more days of settlement discussions, TransCanada's counsel sent an e-mail to Narragansett's counsel stating that it would be "willing to hold off further negotiation on the Arbitration Agreement *through the end of this week*" (i.e., until Friday, April 28, 2005). (Emphasis added.) Those settlement discussions were unsuccessful, and no draft proposals regarding those discussions were ever exchanged following the April 24, 2005 meeting.

- From April 19 to May 17, 2005, Narragansett declined to respond to TransCanada's time-sensitive April 19 arbitration proposal, and never expressed further willingness to negotiate an arbitration. The parties were at a standstill.

- On May 17, 2005, TransCanada filed its Massachusetts Complaint.

- On May 26, 2005, Narragansett filed its Rhode Island Complaint.

- On May 27, 2005, Narragansett's counsel raised with TransCanada's counsel for the first time an entirely new proposed "partial settlement," this time involving replacement of TransCanada by another specific wholesale supplier. This "partial settlement" proposal was never raised until after TransCanada filed its Massachusetts Complaint on May 17, 2005, and the very first draft of that "partial

---

the courthouse" sufficient to overcome the presumption in favor of the first-filed Massachusetts Action. See discussion infra.

settlement" proposal was sent by Narragansett's counsel to TransCanada's counsel on May 27, 2005. These new negotiations continued until early July, when this "partial settlement" proposal also fell through.

These circumstances clearly do not describe a "race to the courthouse" solely to obtain to preferred forum. Indeed, as this Court stated in Feinstein:

> [TransCanada] neither misled [Narragansett] into foreclosing litigation in order to negotiate a settlement and then filed suit, nor reacted to [Narragansett's] notice of imminent filing by "literally sprinting to the courthouse the same day." . . . [TransCanada] was not obligated to continue what, in [its] view, was a fruitless negotiation before coming to court.

304 F. Supp. 2d at 283 (internal citation omitted).

Fortunately, however, this Court need not delve into the details of the negotiations because, even assuming Narragansett's conclusory and incorrect rendition of the facts, those alleged facts do not establish an improper "race to the courthouse" either solely to obtain a preferred forum or otherwise sufficient to overcome the preference in favor of the first-filed Massachusetts Action. At most, Narragansett conclusorily alleges that suit was filed by TransCanada, the natural plaintiff, in its home forum which has substantial connections to the dispute, during prolonged and unsuccessful settlement discussions. (See Hager Aff. ¶¶ 12-18.) These facts do not come close to meeting Narragansett's burden even under the very case law cited by Narragansett. See Feinstein, 304 F. Supp. 2d at 281-83 (finding on facts similar to those alleged by Mr. Hager that a party filing during dispute resolution discussions had not improperly rushed to the courthouse, and ruling in favor of the first-filed action); Holmes Group v. Hamilton Beach/Procter Silex, 249 F. Supp. 2d 12, 14, 16-17 (D. Mass. 2002) (finding on similar facts that even a natural defendant filing during dispute-related correspondence did not improperly "react to notice of imminent filing by literally sprinting to the courthouse", and ruling in favor of the first-filed action); see also GT Plus Ltd. v. Ja-Ru, Inc., 41 F. Supp.2d 421, 423-24, 425-27

(S.D.N.Y. 1998) (party filing in the midst of settlement dialogue and even upon threats of

litigation did not improperly race to the courthouse, and hence its first-filed action was proper).

The remaining case cited by Narragansett, Nortek, Inc. v. Molnar, 36 F. Supp. 2d 63

(D.R.I. 1999), is markedly distinguishable since in that case, the first-filing party (the putative

defendant) affirmatively misled the second-filing party (the putative plaintiff) into waiting for an

imminent response before rushing to the courthouse the very next day to file a declaratory

judgment action. See id. at 65-66. Notably, the party that "rushed to the courthouse" in Nortek

was not the natural plaintiff, but rather was the natural defendant filing a defensive, declaratory

judgment action solely to obtain its preferred forum. Id. That is not the case here.

Here, TransCanada is the natural plaintiff with a presumptive right to file in its own

forum, AmSouth Bank v. Dale, 386 F.3d at 763, 788 (6th Cir. 2004), which is heavily connected

to the dispute. See GT Plus, 41 F. Supp.2d at 425-26. TransCanada originally sent a default

notice under the Agreement, and (even based on Mr. Hager's allegations) did no more than file

in its own forum after several months of unsuccessful settlement discussions. Narragansett

makes no allegation of affirmatively misleading statements by TransCanada, or that

TransCanada "reacted to notice of imminent filing" by rushing to the courthouse the next day.

See Feinstein, 304 F. Supp. 2d at 283; Holmes Group, 249 F. Supp. 2d at 16-17; GT Plus, 41 F.

Supp.2d at 425-27. Accordingly, even assuming the accuracy and sufficiency of Narragansett's

conclusory submission, Narragansett has not overcome the strong presumption in favor of the

first-filed Massachusetts Action on grounds of an alleged "race to the courthouse."[5]

---

[5] Moreover, as it is Narragansett's burden to establish facts supporting a race to the courthouse as a "special circumstance" (see Section I supra), the conclusory allegations submitted by Mr. Hager do not meet that burden under the circumstances set forth herein in the absence of more specific and documentary corroboration. Thus, if this Court were to find that Narragansett's conclusory submission (if true) would create a genuine issue as to whether there was a sufficient showing of a "race to the courthouse" to warrant overriding the first-filed rule, TransCanada asks that the Court consider the factual representations of counsel herein and require more detailed submissions by Narragansett's counsel actually involved in the relevant settlement discussions.

III.  NARRAGANSETT HAS NOT SHOWN THAT THE PUBLIC INTEREST OR OTHER
CONVENIENCE FACTORS WARRANT OVERRIDING THE PRESUMPTION IN
FAVOR OF THE MASSACHUSETTS ACTION.

Again, it is *Narragansett's* burden as the plaintiff in this second-filed action to show that

the balance of convenience sufficiently weighs in favor of a Rhode Island forum to warrant

overriding the strong presumption in favor of the first-filed Massachusetts Action. (See Section I

supra.)  Narragansett attempts to make this showing in two respects: First, Narragansett attempts

to elevate one of the six convenience factors – the public interest – to a stand-alone argument

that this Court should assert jurisdiction based solely upon the alleged interests of Rhode Island

regulatory authorities and the Rhode Island public. (See Opp. Mem. at 9-10, 12-15.)  Second,

Narragansett alleges that a number of mostly irrelevant factual connections between Narragansett

and Rhode Island support overriding the first-filed rule.  Neither of these arguments has merit.[6]

First, Narragansett cites no legal authority for the proposition that the indirect interests of

Rhode Island regulatory authorities and rate payers alone justifies retention of jurisdiction in

Rhode Island.  Narragansett's heavy reliance upon the alleged interests of the Rhode Island

government agencies and public is also misleading, and clearly does not outweigh all the other

---

[6] Narragansett also makes two misstatements of law that need to be corrected. First, Narragansett is incorrect that,
as the plaintiff in this first Rhode Island Action, its forum choice is preferred. As established in the very case cited by
Narragansett, SW Indus. (Opp. Mem. at 18), the general preference for a plaintiff's choice of forum "is inoperative
in a later-filed action], where the plaintiff's claims [as here] would constitute compulsory counterclaims in the
defendant's earlier-filed action." 653 F. Supp. at 637.  See also TransCanada Motion to Dismiss, at 9.

Second, Narragansett is also incorrect that the parties' choice of Massachusetts law to govern the WSOS Agreement
does not favor a Massachusetts forum. (Opp. Mem. at 19.) Again, as stated in the very case cited by Narragansett,
Paradis v. Dooley, 774 F. Supp. 79, 83 (D.R.I. 1991), "[i]t is advantageous to have the lawsuit adjudicated by a
federal district court . . . that is more familiar with [the applicable state] law" (citing Van Dusen v. Barrack, 376 U.S.
612, 645 (1964)); cf. SW Indus., 653 F. Supp. at 639 (familiarity with state law was not a significant factor only
because the parties had not specified the applicable law and several foreign laws might apply in either jurisdiction).
Finally, Narragansett's argument that the application of Massachusetts law is inconsequential because
"Massachusetts law concerning the interpretation of contracts is fairly clear" (Opp. Mem. at 19) is belied by the fact
that Narragansett appears to dispute aspects of Massachusetts law central to this case, such as its obligation under
the WSOS Agreement and Massachusetts contract law to make reasonable efforts to obtain regulatory approval for a
fuel adjustment factor for TransCanada over the full term of the Agreement. (See MA Compl. ¶ 17; MA Answer
¶ 17.) A Massachusetts court should decide this central issue of Massachusetts law. See also TransCanada Motion
to Dismiss, at 11, 12.

factors pointing to Massachusetts and the presumptive priority of the first-filed Massachusetts

Action. This case addresses a breach of contract dispute between two contracting parties, under

an Agreement that the parties expressly stated was to be governed by Massachusetts law.

TransCanada asserts that Narragansett breached express and implied contractual obligations in

that Agreement under Massachusetts law. The terms of the WSOS Agreement were negotiated,

agreed upon and executed between TransCanada and Narragansett (its predecessor) in

Massachusetts. Both parties administered the Agreement from Massachusetts. (Taylor Aff.

¶¶ 5-19; Hager Aff. ¶¶ 2-4, 6.) Neither parties' claims seek to regulate or set rates in Rhode

Island, and neither the Rhode Island regulatory authorities nor the Rhode Island rate-paying

public are parties to the WSOS Agreement or these MA or RI Actions.

　　　Thus, the Rhode Island regulatory authorities' "exclusive power" to set electricity rates in

Rhode Island is irrelevant to this contract dispute. TransCanada is not asking for any particular

rate to be charged to Rhode Island rate payers, nor for that matter would the Rhode Island

District Court have any greater jurisdiction to decide that issue than a Massachusetts District

Court. Similarly, whether and to what extent Narragansett chooses to seek reimbursement from

Rhode Island rate payers or is ultimately able to recover from Rhode Island rate payers, the

amounts of any damages awarded to TransCanada is not an issue before this Court, nor has that

issue been raised by either TransCanada or Narragansett in the Massachusetts or Rhode Island

pleadings. That is presumably an issue between Narragansett and the Rhode Island regulatory

authorities, proceedings to which TransCanada has never been a party.

　　　Narragansett also misleadingly refers to a statutory prohibition against termination of a

wholesale supply agreement by "an electric distribution company" – here Narragansett. (See

Opp. Mem. at 13.) Narragansett is not attempting to terminate the WSOS Agreement, and

Narragansett (correctly) does not assert that TransCanada needs regulatory approval to terminate the Agreement.

Notably, Narragansett is not able to cite a single case that supports this Court's retention of jurisdiction in Rhode Island based solely upon the alleged interests of Rhode Island regulators and rate payers. The only case Narragansett is able to cite, In re E. Dist. Repetitive Stress Injury Litig., 850 F. Supp. 188 (E.D.N.Y. 1994), is simply off point. That case does not even address multiple filings in alternate forums; it arises from class action tort litigation; and the Court transferred the cased out of New York simply because New York bore absolutely no connection to the cases. See id.

Narragansett also raises a number of additional connections between Narragansett and Rhode Island – notably by way of the affidavit of its *Massachusetts*-based "business lead" for the WSOS Agreement, who is also a *Massachusetts* resident (see Hager Aff. ¶¶ 2, 6; Taylor Affidavit ¶¶ 14-19) – but the majority of these Rhode Island "connections" are irrelevant. For example: Narragansett touts its 470 employees in Rhode Island, but does not assert that a single one will be a witness or have involvement in this case; Narragansett asserts that TransCanada's accounting services are performed by employees (actually an affiliate's employees) in Rhode Island, but does not assert that these accounting services or employees are at all relevant to this case; Narragansett mentions cross-default provisions in the related PPA Transfer Agreement (Narragansett Ex. D), but fails to mention that this PPA Transfer Agreement was between TransCanada and *a Massachusetts* affiliate of Narragansett, the Montaup Electric Company (see Narragansett Ex. D, at 1); and Narragansett points out that the RIPUC hearings are in Rhode Island, but omits mentioning the fact that the relevant RIPUC testimony on Narragansett's behalf was provided by Narragansett representatives from Massachusetts (see Taylor Affidavit, ¶¶ 11,

15; and Narragansett Exhibit A, at 4-6 (July 10, 1998 RIPUC Decision, citing testimony of

Massachusetts employees of EUA Service Corporation on behalf of Narragansett)).

Accordingly, the additional Rhode Island "connections" asserted by Narragansett are irrelevant

to this dispute, or actually support a Massachusetts rather than Rhode Island forum.

Finally, Narragansett's claims about the "exclusive" relationship between this dispute and

Rhode Island, and the alleged need to have all contractual issues under the WSOS Agreement

determined in Rhode Island, are also belied by Narragansett's own actions.  If it was so

important that all matters relating to electricity delivery in Rhode Island be determined only in

Rhode Island, Narragansett (and its predecessors) would not have:  specified that the WSOS

Agreement is to be governed by Massachusetts law; would not have negotiated and administered

the WSOS Agreement from Massachusetts; would not have testified at the RIPUC concerning

the WSOS Agreement exclusively through Massachusetts employees of Narragansett's

Massachusetts affiliates; and would not have located Narragansett's customer service center in

Massachusetts.  (See Taylor Aff. at ¶¶ 4-7, 11-19.)

## IV.    EVEN TO THE EXTENT THIS COURT WERE TO CONSIDER RETAINING JURISDICTION, IT MUST DEFER TO THE MASSACHUSETTS COURT.

Finally, even to the extent this Court were to consider retaining jurisdiction of this

Action, it must refrain from doing so unless and until the Massachusetts District Court chooses to

divest itself of jurisdiction.

As this Court stated in Cruz, the court addressing a second-filed action should, as a

matter of comity, defer to the decision of the court addressing the first-filed action where related

proceedings are filed in two jurisdictions.  Cruz, 2005 WL 1231965, at *3.  See also, Donaldson,

Lufkin & Jenrette, Inc. v. Los Angeles County, 542 F. Supp. 1317, 1321 (S.D.N.Y. 1982)

(dismissing the second-filed case without prejudice unless and until the court hearing the first-

filed case declined jurisdiction); <u>Ultronic Sys. Corp. v. Ultronix, Inc.</u>, 217 F. Supp. 89, 92-93 (D.

Del. 1963) (staying second-filed case unless and until first-filed case declined jurisdiction).

Here, Narragansett has not filed any motion contesting jurisdiction in Massachusetts, but

rather has answered the Massachusetts Complaint and the parties are awaiting a scheduling

conference anticipated for early September 2005.  Based upon the relative merits of

Narragansett's weak arguments for a Rhode Island forum, this Court should dismiss this case.

If, on the other hand, this Court does feel that Narragansett has raised genuine issues with

respect to the more appropriate forum – which TransCanada respectfully suggests it has not –

then this Court, as stated in <u>Cruz</u>, should in any event still dismiss this Action without prejudice

or stay this Action (and defer any determination of TransCanada's Motion to Dismiss) unless

and until the Massachusetts Court, upon motion by Narragansett in the MA Action, chooses to

defer to this Rhode Island Action.

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD.,

By its attorneys,

*Mary C. Dunn*

Kristin E. Rodgers #4842
Mary Cavanagh Dunn #6712
Blish & Cavanagh, LLP
30 Exchange Terrace
Providence, RI 02903
(401) 831-8900
(401) 751-7542 (fax)

Pro Hac Vice Pending


Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
Dara Y. Zelnick (BBO #660256)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, MA  02109
Telephone No.:  (617) 248-5000
Fax No.:  (617) 248-4000

July 23, 2005

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 25th day of July, 2005, I caused a true copy of Defendant Transcanada Power Marketing Ltd.'s Reply to Plaintiff's Memorandum In Opposition To Defendant's Motion To Dismiss Stay, or Transfer to be sent via hand delivery, to Gerald J. Petros, Esq., Hinckley, Allen & Snyder LLP, 1500 Fleet Center, Providence, RI 02903

-13-

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-234S |
| TRANSCANADA POWER MARKETING LTD., | : | **Special Attention Requested** |
| | : | **D.R.I. Loc. R. 11(c)** |
| Defendant. | : | |

## PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL AFFIDAVIT

Plaintiff, The Narragansett Electric Company ("Narragansett"), hereby moves for leave to file a supplemental affidavit in support of its opposition to the motion to dismiss, stay, or transfer of Defendant, TransCanada Power Marketing Ltd. Specifically, Narragansett moves to file the Supplemental Affidavit of Michael J. Hager. In support of its motion, Narragansett relies on the memorandum of law and exhibit submitted herewith.

THE NARRAGANSETT ELECTRIC COMPANY

By its Attorney,

Gerald J. Petros, Esq. (#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (FAX)

DATED: September 6, 2005.

## **CERTIFICATION**

To:

Kristin E. Rodgers
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

I hereby certify that I mailed a copy of Plaintiff's Motion for Leave to File a Supplemental Affidavit to counsel listed above on this *6th* day of September, 2005.

*Cynthia Lomas*

673366v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE NARRAGANSETT ELECTRIC     :
COMPANY,                               :
                                         :
          Plaintiff,               :
                                         :
v.                                  :     C.A. No. 05-234S
                                       :
TRANSCANADA POWER MARKETING :     **Special Attention Requested**
LTD.,                         :     **D.R.I. Loc. R. 11(c)**
                                       :
          Defendant.             :

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE A SUPPLEMENTAL AFFIDAVIT

Plaintiff, The Narragansett Electric Company ("Narragansett"), moves for leave to file a supplemental affidavit in support of its opposition to the motion to dismiss, stay, or transfer of Defendant, TransCanada Power Marketing Ltd. ("TransCanada"). Specifically, Narragansett moves to file the Supplemental Affidavit of Michael J. Hager, which is attached as Exhibit 1.

In support of this motion, Narragansett states that on May 26, 2005, it filed this lawsuit against TransCanada. About a week before Narragansett filed this lawsuit, TransCanada filed a parallel action in federal court in Massachusetts. On June 16, 2005, TransCanada filed a motion to dismiss, stay, or transfer this lawsuit to Massachusetts. Narragansett filed an opposition to TransCanada's motion on July 8, 2005, arguing, inter alia, that the first-filed rule does not apply to TransCanada's Massachusetts lawsuit because TransCanada raced to the courthouse amidst productive and ongoing settlement negotiations with Narragansett and in spite of the nearly-complete detailed arbitration agreement negotiated between the parties. On July 25, 2005, TransCanada filed a reply

memorandum in which it contends that settlement negotiations and the finalization of the arbitration agreement both had failed when it filed suit against Narragansett. TransCanada's contentions are factually inaccurate and are not supported by an affidavit or other affirmative evidence.

Narragansett seeks leave to file its Supplemental Affidavit so this Court has before it a proper and accurate understanding of the facts and circumstances: one that is based upon a sworn statement of the facts and supported by affirmative evidence. The Supplemental Affidavit confirms that the parties indeed were in the final stages of negotiating an arbitration agreement and were in the midst of productive settlement negotiations when TransCanada filed the Massachusetts action to secure its preferred venue. For this reason, Narragansett respectfully requests that this Court grant its Motion for Leave to File a Supplemental Affidavit.

THE NARRAGANSETT ELECTRIC
COMPANY

By its Attorney,

Gerald J. Petros, Esq. (#2931)
HINCKLEY, ALLEN & SNYDER LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (FAX)

DATED: September 6, 2005.

2

## CERTIFICATION

To:

Kristin E. Rodgers
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

I hereby certify that I mailed a copy of Plaintiff's Memorandum of Law in Support of its Motion for Leave to File a Supplemental Affidavit to counsel listed above on this _6th_ day of September, 2005.

_Cynthia Lomas_

673315v3

3

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE NARRAGANSETT ELECTRIC      :
COMPANY,      :
     :
     Plaintiff,      :
     :
v.      :      C.A. No. 05-234S
     :
TRANSCANADA POWER MARKETING    :
LTD.,      :
     :
     Defendant.      :

## <u>SUPPLEMENTAL AFFIDAVIT OF MICHAEL J. HAGER</u>

I, Michael J. Hager, upon oath, depose and state that:

1.     Unless otherwise stated, I have personal knowledge of the facts stated herein and am competent to testify to such facts.

2.     At all times relevant hereto, I was present during negotiations and discussions and/or privy to documents concerning the negotiations and discussions between The Narragansett Electric Company ("Narragansett") and TransCanada Power Marketing Ltd. ("TransCanada") relative to the Fuel Adjustment Factor (the "FAF") dispute under the Wholesale Standard Offer Service Agreement (the "WSOS Agreement").

3.     Contrary to the allegations in "Defendant TransCanada Power Marketing Ltd.'s Reply to 'Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss, Stay or Transfer'" ("Reply"), at all relevant times, Narragansett desired and pursued both a negotiated settlement governing a significant time period at issue in the

FAF dispute, and an arbitration agreement to govern the period of the dispute that would not be governed by the settlement.

4.    After Narragansett began paying to TransCanada under protest a FAF, Daniel C. Winston, counsel for TransCanada, indicated that these payments alleviated the pressure to reach an expedited resolution to the dispute.  Notwithstanding Winston's comment, Narragansett continued to desire and pursue both an expedited arbitration process and a resolution of a large portion of the dispute.

5.    Contrary to Defendant's allegations in its Reply, Narragansett did not insist on a slower, less-defined arbitration schedule than that proposed by TransCanada.  Rather, Narragansett's and TransCanada's proposed dates for arbitration differed on account of personal scheduling conflicts between Narragansett's and TransCanada's key counsel and witnesses.  Furthermore, Narragansett suggested that the parties hold off on finalizing dates only until the parties selected an arbitrator and could coordinate with his or her availability.

6.    On April 19, 2005, Winston sent Narragansett via electronic mail ("e-mail") revisions to the arbitration agreement the parties were negotiating, stating, "Here is a proposed final or hopefully close."

7.    Contrary to Defendant's allegations in its Reply: TransCanada did not send an e-mail to Narragansett on April 20 asking for a response, nor did it orally or in writing ask for a response to the redraft arbitration proposal, nor did Narragansett's counsel indicate that Narragansett was reconsidering arbitration entirely, nor did Narragansett express in any way that it was not willing to respond to TransCanada's arbitration proposal.

8.     What did occur on April 20, 2005 was, Gloria Kavanah, Assistant General Counsel to National Grid USA, called Winston and proposed exploring settlement at a meeting on April 22, 2005. Kavanah further suggested that the parties meet on April 25, 2005 with the Rhode Island Public Utilities Commission ("Rhode Island PUC") and the Rhode Island Division of Public Utilities and Carriers ("Rhode Island Division") to discuss settlement.

9.     Following this conversation and also on April 20, 2005, Winston e-mailed Kavanah, confirming the April 22 meeting and his and Michael Hachey's availability for the April 25 meeting. See Apr. 20, 2005 Winston E-mail, attached as Exhibit A.

10.     As set forth in an e-mail from Kavanah memorializing her conversation with Winston on April 20, 2005: "TransCanada is on board with our proposal. Dan Winston said if things are not moving forward productively by mid-week next week, they want to move forward with the arbitration agreement." See Apr. 20, 2005 Kavanah E-mail, attached as Exhibit B.

11.     Contrary to Defendant's allegations in its Reply, representatives from Narragansett and TransCanada did not meet on April 24, 2005.

12.     On April 22, 2005, the parties met to discuss, and did discuss, settlement.

13.     Next, on April 25, 2005, the parties met with the Rhode Island PUC and the Rhode Island Division. At this meeting, Thomas Robinson, Deputy General Counsel for National Grid, distributed a "Term Sheet for Proposed Resolution" for the parties to consider. The Term Sheet has not been attached to my affidavit as it constitutes confidential settlement materials.

14.     Subsequent to this meeting, Winston sent Kavanah an e-mail stating "[b]ased on our discussions down at the PUC today, which I assume you have been debriefed on, TransCanada would be willing to hold off further negotiation on the arbitration agreement through the end of this week to see how things progress.  Assuming you are agreeable to that extension, let's revisit on Monday." See Apr. 25, 2005 E-mail, attached as Exhibit C.

15.     On April 27, 2005, Michael Hachey of TransCanada called me and Robinson and responded to the Term Sheet.  Robinson and I, in turn, suggested an adjustment to a term proposed by Hachey, and Hachey said he would get back to me and Robinson later that day.  See April 27, 2005 E-mail, as Exhibit D.

16.     On April 29, 2005, Robinson and I spoke with Hachey regarding the settlement terms, and Hachey agreed to the terms of the settlement.  The parties decided that Narragansett would draft the settlement and then TransCanada and Narragansett would present it to the Rhode Island Division, the Attorney General and Rhode Island PUC together.  See Apr. 29, 2005 E-mail, attached as Exhibit E.

17.     On May 3, 2005, Steve Scialabba from the Rhode Island Division e-mailed Hachey proposed modifications to the terms to which Narragansett and TransCanada had agreed on April 29, 2005.  Scialabba copied Rhode Island Assistant Attorney General Paul Roberti; Laura Olton, Narragansett's General Counsel; and Robinson.  See May 3, 2005 E-mail, attached as Exhibit F.

18.     On May 11, 2005, I called Michael Hachey of TransCanada and asked him if TransCanada was willing to agree to the Rhode Island Division's proposed modifications.  Hachey informed me that TransCanada was still talking internally about

4

the Rhode Island Division's proposed modifications and that he would get back to Narragansett shortly.

19.   On May 16, 2005, I again called Hachey. Hachey informed me that his boss, Bill Taylor (a Vice President) had been out so they did not yet have a response. I told Hachey that we wanted to know from TransCanada what about the Rhode Island Division's proposal worked and what did not work. Hachey and I discussed options to adjust some of the terms of the settlement. Hachey said that he would get back to me.

20.   TransCanada was well aware that during this time, Narragansett was drafting a set of complex documents and a regulatory filing that would be necessary to effectuate the settlement.

21.   On May 17, 2005, Kavanah received a voicemail from Winston, stating that TransCanada had filed suit in Federal Court in Worcester "for reasons regarding the forum." Winston instructed Kavanah to not "take it as an intent to increase the animus ... it was just a forum thing." Winston reiterated that TransCanada wanted to continue to pursue the course we were on, which I and Kavanah interpreted to mean the settlement path. See May 17, 2005 E-mail, attached as Exhibit G.

22.   On knowledge, information and belief, from April 19, 2005 to May 17, 2005, TransCanada and Narragansett did not orally or in writing mention the draft arbitration agreement, the possibility of not using arbitration to resolve the part of the dispute that would not be resolved to settlement, or time-sensitivity. Our discussions centered on the proposed settlement.

23.   Contrary to Defendant's allegations in its Reply that "settlement discussions were unsuccessful," on June 7, 2005, TransCanada and Narragansett

executed a settlement agreement and filed it with the Rhode Island PUC. The settlement was effective upon its execution; however, the parties' obligations under certain provisions were subject to receipt of approvals from the Rhode Island PUC and the Rhode Island Division.

24.     At all times relevant hereto, and contrary to Defendant's allegations in its Reply, the settlement being discussed by the parties would only resolve the dispute for the period after both the WSOS Agreement and a separate wholesale standard offer service contract between Narragansett and TransCanada were terminated in accordance with the settlement. At no time did the settlement terms under discussion concern a resolution for the period from January 1, 2005 through the termination date (in accordance with the settlement terms) of the two aforementioned agreements.

25.     Given TransCanada's statement that the FAF payments being made under protest alleviated the urgency of a resolution, TransCanada's silence as to executing the arbitration agreement, and the fact that the arbitration agreement was near final, Narragansett had no reason to believe that the parties would resolve the remaining portion of the FAF dispute through any means other than arbitration.


Michael J. Hager

SUBSCRIBED AND SWORN to before me this _2 n 2_ day of September, 2005.


NOTARY PUBLIC

My Commission Expires: _8/11/06_

673376v1

6

# EXHIBIT I
## (Pages 1-25)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND



```
* * * * * * * * * * *  CIVIL ACTION
NARRAGANSETT ELECTRIC *  NO. 05-234S
COMPANY               *
                      *
VS.                   *  SEPTEMBER 9, 2005
                      *
TRANSCANADA POWER     *
MARKETING LTD.        *  PROVIDENCE, RI
* * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(MOTION TO DISMISS, STAY OR TRANSFER VENUE)

<u>APPEARANCES</u>:

FOR THE PLAINTIFF:     GERALD J. PETROS, ESQ.
                       Hinckley, Allen & Snyder, LLP
                       1500 Fleet Center
                       Providence, RI  02903
                       (401) 274-2000

FOR THE DEFENDANT:     DANIEL WINSTON, ESQ.
                       Choate, Hall & Stewart, LLP
                       53 State Street
                       Boston, MA  02109

                       KRISTIN RODGERS, ATTY.
                       Blish & Cavanagh
                       30 Exchange Terrace
                       Providence, RI  02903
                       (401) 831-8900

Court Reporter:        Anne M. Clayton, RPR
                       One Exchange Terrace
                       Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

1    THE COURT:  Good morning.  We're here this

2  morning on Narragansett Electric Company versus

3  TransCanada Power Marketing, LTD.

4    Let's begin by having counsel identify

5  themselves for the record, please.

6    MR. PETROS:  Your Honor, Jerry Petros on

7  behalf of the plaintiff.  And with me is Gloria

8  Kavanah, who is the client lawyer.

9    MS. RODGERS:  Good morning, your Honor.

10  Kristin Rodgers on behalf of the defendant, and

11  with me today is Daniel Winston who will be

12  arguing and which you admitted pro hac vice.

13    MR. PETROS:  Your Honor, one preliminary

14  matter.  I was not aware until this morning that

15  Mr. Winston would be arguing.  I have no objection

16  to Mr. Winston's pro hac, and I told Kristin that

17  when she asked me last week.  I have no objection

18  to him being counsel in this case if it proceeds

19  in Rhode Island, as we'll find out at some point.

20  But I'm a little concerned about him arguing this

21  motion because if the Court's had a chance, and I

22  know it has, to read some of the papers, there are

23  some factual issues that have arisen.  And from my

24  understanding of the papers, Mr. Winston is in the

25  middle of some of those factual issues.  And I'm

1    concerned about a situation where an attorney is

2    standing up essentially saying I said this, I did

3    that, here's what happened.

4           I'll rely on the Court's judgment, but I

5    have that concern about just this morning's

6    hearing, not about any future proceedings.

7           THE COURT:  Well, it brings up an issue

8    that I was going to inquire of you both about.

9    But what do you all have to say about that?

10          MR. WINSTON:  Your Honor, if I could

11    respond to that.  Well, one, I think this also

12    brings up the supplemental filing that was filed

13    two days ago, which we would like to respond to in

14    the ordinary course, meaning by end of next week

15    or something of that nature.

16           I'd add that all of the facts that were in

17    there were known at the time that we filed our

18    reply on July 25th, yet for some reason were filed

19    two days before this hearing.  Reach your own

20    conclusions.  So we will be filing something.

21          To the extent there's factual disputes, I

22    think legally they're irrelevant on the point of

23    the race to the courthouse, and I could address

24    why.

25          Even if you assume everything they say in

4

1    their affidavits, they don't have a case on the

2    law on the race to the courthouse.

3          Second, we will likely file an affidavit.

4    It will be filed by Mr. Hachey.  It will not be

5    filed by me.  I won't be testifying under oath in

6    this proceeding.  I'm not going to make factual

7    representations today.

8          THE COURT:  Well, why don't we leave it

9    this way.  I mean, I think the concern that

10   Mr. Petros raises is valid in the sense that it

11   should be raised up front.  And to essentially

12   prevent any problems that might occur, I think the

13   way to prevent those problems is to keep this

14   argument limited to the law and the record that is

15   before me.

16         I don't expect to hear from Mr. Winston in

17   any testimonial fashion at all, and I wouldn't

18   accept anything said as testimony.  Counsel

19   speaking from the lectern here is not testifying.

20   You're not under oath.  It's just not testimony.

21   And so to the extent that one were to get into

22   that at all, it would be irrelevant, I think.

23   It's not part of a record.

24         So he's admitted pro hac vice.  I'm going

25   to allow him to argue the case.  But it does bring

1    up a point which I need to have counsel discuss in

2    argument.

3             So let's get started, Mr. Petros.  Well,

4    actually, it's TransCanada's motion.  So go ahead.

5             MR. WINSTON:  Thank you, your Honor.

6             THE COURT:  Come on up to the lectern

7    here.

8             MR. WINSTON:  Your Honor, you have our

9    papers, which should consist of our motion to

10   dismiss, stay or transfer as well as our reply.  I

11   won't repeat what's in those papers.  But to put

12   it succinctly up front, there are three reasons

13   why this case ought not to be here.  For one, the

14   same case is pending in Rhode Island.  There's

15   been no motion -- I'm sorry.  In Massachusetts.

16            THE COURT:  What's the status of that

17   case?

18            MR. WINSTON:  The status of that is

19   answers have been filed, discovery has started.

20   We've had a 26(f).  For reasons that appear to me

21   to relate to the judge's vacation schedule in late

22   August, a scheduling conference has not been set.

23   We were told it would be set in early September.

24   We put some calls in, but the judge has nothing on

25   the docket in this first week.  So I suspect we

6

1    will get a scheduling order shortly, but discovery

2    is started.  We've had our 26(f) conference.

3             There's been no motion filed to contest

4    jurisdiction in Massachusetts.  It's going

5    forward.  If your Honor compares the complaints,

6    they're literally word-for-word -- I mean, it's a

7    copy, photocopy.

8             So the cases in Massachusetts, this is in

9    duplicative identical actions filed subsequently.

10   So that's the first reason.  This case is already

11   being resolved in Massachusetts, and it's going

12   forward.  Number two --

13            THE COURT:  There's no contest that this

14   is the second filed action.  That's not really

15   disputed.  The Rhode Island action is the second

16   filed action.  I think the thing that really

17   drives this from Narragansett's point of view is

18   considerations of what they would argue are unique

19   considerations associated with the type of case

20   that this is, that it involves a high level of

21   public interest.  It involves potentially 480,000

22   people, all of whom are in the State of Rhode

23   Island who are rate payers of Narragansett

24   Electric.  It involves the PUC, the Division of

25   Public Utilities, both of which were engaged in

1    the process and have an interest in this.  So this

2    is sort of not your garden variety contractual

3    dispute.  That's their point.  So I think you

4    really need to zero in on that contention.

5              MR. WINSTON:  Okay.  Yeah, that is their

6    argument.  It's the argument I would make if I

7    were them.  The problem they have is that that

8    isn't what the law is that decides what the forum

9    is.  There's a strong presumption we're in

10   Massachusetts.  And I ought to point out at the

11   front that, you know, even were this Court

12   inclined to entertain their arguments, which I

13   will suggest you should not, as this Court held in

14   Cruz, the first case that had it, the first court

15   that had it really ought to be the one that

16   decides these arguments.  And they haven't even

17   brought a motion there.

18             So this Court really, based on the logic

19   used in Cruz, which I think was appropriate, ought

20   to just dismiss this case unless and until they

21   feel like bringing it up in front of the court

22   that ought to address the arguments.

23             But moving to the argument itself, the

24   courts have set forth a number of factors.  They

25   have to show special circumstances or a sufficient

1  overwhelming balance of convenience that, you
2  know, justifies overriding strong presumption that
3  Massachusetts forum states because it was the
4  first-filed action.  There's a number of factors.
5  One of them is the public interest.  There is no
6  case that I'm aware of, and they certainly don't
7  cite one, in which the public interest quite
8  frankly is viewed as a particularly important
9  factor or justifies overriding all the other
10  factors.
11      There are a lot of cases out there in
12  which, you know, people are indirectly affected.
13  There's all kinds of energy contracts and public
14  contracts that affect the public.  They haven't
15  been able to find a case that supports that.
16      So I would argue that Massachusetts also
17  has an interest in this contract.  But even if you
18  give them the public interest, that there's a
19  public interest here, it's one of six factors.
20  And they haven't cited any case in which, you
21  know, the others have been ignored.
22      It's also a little disingenuous because if
23  this really was so important that everything needs
24  to be resolved in Rhode Island, okay, they
25  wouldn't have signed a contract for energy supply

1    with a Massachusetts supplier to be governed by

2    Massachusetts law, negotiated and signed in

3    Massachusetts by employees of Massachusetts

4    companies.  They're service corporations which are

5    all run out of Massachusetts.  They wouldn't have

6    run the contract out of Massachusetts.  All the

7    testimony in front of the PUC wouldn't have been

8    given by Massachusetts employees of Narragansett

9    and it's affiliates.

10            THE COURT:  Don't these agreements

11    pre-date the -- I may have this wrong, but I

12    thought these agreements pre-dated the

13    acquisition, a couple of acquisitions that

14    resulted in National Grid.

15            MR. WINSTON:  Sure.  This agreement was

16    previously with Blackstone and Newport, which

17    merged into Narragansett in 2000.  Blackstone and

18    Newport were owned by a Massachusetts utility

19    called the EUA.  Like Narragansett, which runs its

20    contracts administratively out of a facility of

21    National Grid Service Corporation in

22    Massachusetts --

23            THE COURT:  Let me interrupt you for a

24    minute.  Maybe you can fill me in on this.

25    Blackstone Valley Electric and Newport Electric

10

1    obviously weren't always owned by Eastern

2    Utilities.  They were previously their own sort of

3    stand-alone utility companies.  And I forget the

4    date of the acquisition by Eastern Utilities, but

5    it was in the '90's, I think, and I just don't

6    remember the date.

7              MR. WINSTON:  It was surely before this

8    contract was signed because --

9              THE COURT:  The acquisition was before

10   this contract was signed.  That's my question.

11             MR. WINSTON:  Yes.  In fact, I was

12   unaware that they were not owned by -- I don't

13   know when EUA -- the bid came out as an EUA bid.

14             THE COURT:  I think that's right.  I may

15   have that wrong, but I believe they were

16   independent and then combined.

17             MR. WINSTON:  I honestly can't say.  But

18   the contract was signed -- it was signed among the

19   required divestiture.  EUA was a holding company

20   that held generation assets which was Montaup

21   Electric Company in Massachusetts, actually, and

22   Blackstone and Newport.  And they were required to

23   split up as part of the Rhode Island

24   restructuring.  And this contract came out of the

25   requirement that EUA redivest possibly Blackstone

1    and Newport.

2          So it's very clear that they -- you know,

3    and this was part of an agreement with other EUA

4    affiliates.  So the people who signed this on

5    behalf of Blackstone and Newport worked for EUA in

6    Bridgewater, Massachusetts, which is where -- and

7    the contract was signed in and around

8    Massachusetts.  This is set forth in Mr. Taylor's

9    affidavit.

10          These are also the individuals for EUA

11   that would go down and testify in the 1998, 1999

12   time period when EUA was testifying before the

13   Rhode Island public authorities, at the time of

14   the contract and deregulation, all that testimony

15   came from employees of EUA up in Massachusetts.

16          Mr. Hager, who has filed the affidavits in

17   this case on behalf of Narragansett, works in

18   Massachusetts.  Notably both of the affidavits

19   filed in this case are by Massachusetts employees,

20   and there's going to be a third one coming in.

21   And that's where TransCanada and Narragansett have

22   administered the contract from.

23          So what happened is EUA was previously

24   running the contracts out of Bridgewater after the

25   merger instead of EUA running EUA and its service

1    corporation running it out of Bridgewater,

2    National Grid and affiliates started running the

3    contract out of Westborough or Northborough.  I

4    mix them up.  Which is right around the Worcester

5    courthouse.

6            So this is a contract that was negotiated

7    in Massachusetts, signed in Massachusetts,

8    governed by Massachusetts law, administered in

9    Massachusetts.  All the decision making is done in

10   Massachusetts by Narragansett.  All the meetings

11   and correspondence disputing this have been in and

12   around Massachusetts.  And they have a customer

13   service center, if you go on the Rhode Island

14   website, there's a customer service center for

15   Narragansett rate payers in Westborough,

16   Massachusetts or Northborough.  I can't remember

17   which.

18           So it's a little disingenuous for them to

19   come in here now and say, gee, oh, this has got to

20   be resolved in Rhode Island.  This has nothing to

21   do with Massachusetts.  It's all got to be done in

22   Rhode Island.  It's disingenuous.

23           But here's the fact.  I mean, there are

24   lots of things that affect the public.  I mean,

25   there's oil and gas refinery disputes that raise

1    the pump level.  That doesn't mean -- you know,

2    there's lots of things that affect the public, but

3    the fact of the matter is, you know, Massachusetts

4    residents also have an interest in resolving

5    issues of Massachusetts law in Massachusetts.

6          I mean, this was negotiated and signed in

7    Massachusetts.  The parties decided Massachusetts

8    law should govern it.  And so there's an interest

9    here of Massachusetts, but let's leave aside the

10   interest.  I can't deny that Rhode Island has an

11   interest.  And frankly, I'm not sure what the

12   impact on the rate payers will be.

13         If you look in front of the PUC, there's

14   public proceedings going in which it's not clear

15   that the PUC agrees that Narragansett can pass on

16   damages if they lose this case to the rate payers.

17   I don't know how that turns out.  That's not our

18   business.  We have a contract in which we're to be

19   paid a certain amount, paid to us in

20   Massachusetts, and either we're entitled to it or

21   we're not.

22         But the other factors here, and I don't

23   want to lose them, because there are six factors.

24   You know, public interest is a thing to wave

25   around to argue, oh, the public interest.    But

1    one is the plaintiff's forum.  Plaintiff gets a

2    choice of forum.  However, there's an exception

3    where the second filed action is -- where the

4    plaintiff who filed this action is the second

5    filed plaintiff.  It's a compulsory parent claim.

6    It is.  So that actually points towards us as our

7    preference.

8         Convenience of the parties, they both have

9    offices within ten minutes of Westborough.  All

10   the relevant people signing and filing affidavits

11   work within ten minutes of Worcester.

12        So all the witnesses are in Massachusetts.

13   The documents are in Massachusetts.  So that's

14   factor number two.  Convenience of the third party

15   witnesses.  All the third-party witnesses --

16        THE COURT:  You know, I have to tell you

17   that I'm basically unpersuaded by both of your

18   arguments when it comes to convenience to

19   witnesses and parties.

20        I mean, as if it's a big deal whether a

21   witness is going to come to the Rhode Island,

22   Providence courthouse or the Worcester courthouse.

23   It's just a non-issue.  This is a joke.  People

24   drive -- where I grew up, you know, you drive

25   eight hours from one federal courthouse to another

15

1    federal courthouse.  The Worcester courthouse is

2    45 minutes away.  We move cases there all the

3    time.  I'm just not interested in that argument.

4            MR. WINSTON:  Okay.  And that's perfectly

5    fine.  And the problem that Narragansett has is

6    the presumption is that we win.  So if those

7    aren't relevant factors, then it stays in

8    Massachusetts.

9            THE COURT:  Well, they're neutral factors

10   basically.  And that's not necessarily the case.

11   The presumption is that you have a choice of

12   forum.  But the issue of whether -- what the

13   connection between the forum and the issues in

14   play, and that's really the public interest

15   question, does not necessarily favor and doesn't

16   favor, it seems to me, your client.

17           MR. WINSTON:  You know, we obviously see

18   it differently, your Honor.  I mean, the way we

19   see it, we've got a contract that was negotiated

20   in Massachusetts.  It's governed by Massachusetts

21   law.

22           THE COURT:  But we apply Massachusetts law

23   to contracts here all the time, this court does.

24   And there is case law that says, I forget which

25   case it is now, I can find it, that that's just

1    not a big factor in this analysis.  Isn't that

2    true?

3                MR. WINSTON:  I'm not sure that that's

4    clear, your Honor, where there are disputed issues

5    of law.  I would agree this Court is quite capable

6    of ruling on issues of Massachusetts law.  Here's

7    the situation, your Honor, then.  You look at a

8    bunch of relatively neutral factors.  You see

9    purported, yes, true public interest indirectly

10   rate payers although the parties haven't treated

11   it as though everything's got to happen in Rhode

12   Island, but you've got a strong presumption that

13   the first-filed action goes forward.

14                If your Honor is going to rule that that

15   presumption gets overruled and take it from a

16   Massachusetts court, which by the way hasn't even

17   -- to my knowledge, is not aware of this action --

18                THE COURT:  But that's sort of the point.

19   That's sort of the point.  I mean, what

20   Narragansett is saying essentially in this case is

21   that, look, this is a big deal to the people of

22   Rhode Island.  And it really ought to be in a

23   Rhode Island court, because a Rhode Island court

24   is going to recognize immediately that there's a

25   significant public impact and public interest in

17

1    this.  And whatever the outcome of it is, the

2    Rhode Island court is going to be a lot more

3    attuned to that.  Whereas the district court in

4    Massachusetts will look at this and say, you know,

5    this is a Rhode Island utility issue.  You know,

6    what do I really care about that.  It's going to

7    go on the back burner.

8            So that's really -- I think that's really

9    what they're getting at.  Now, there may be

10   problems with that, but that's the point.

11           MR. WINSTON:  I mean, I guess I could ask

12   is it relevant, is it relevant at all.  I'm sure

13   they'd love to have a jury full of rate payers in

14   Rhode Island.  You know, that's why plaintiffs are

15   allowed to choose their forum.

16           THE COURT:  I think that may be a big

17   problem.  And that's something I'm going to ask

18   Mr. Petros about.

19           MR. WINSTON:  Yeah.  I mean, so we move to

20   sever and carry the trial out of here, because

21   they can't find anybody to sit on the jury.  I

22   mean, I'm sure they -- it's not relevant.  And so

23   there's a huge chance that, in fact, the public

24   having this in Rhode Island -- and frankly this is

25   one of the reasons we filed in Massachusetts,

1  because the public interest and indirect affect on

2  rate payers isn't relevant.  It's highly

3  prejudicial to us.  And, you know, you've got a

4  highly qualified judge in Massachusetts who I

5  think is going to rule on the law and recognize

6  the relevant factors.

7        And so, you know, I don't think what the

8  law is, and they certainly haven't defined a case

9  stating that, is that whenever a public utility is

10 involved in a dispute with a supplier of any kind

11 of power that eventually is going to be passed on

12 to rate payers, they automatically get it in their

13 own forum even if they filed second.  That would

14 be what this Court would be saying, because that's

15 the only thing they've got going.  That's what

16 that's saying.  That's what that ruling does.  It

17 says you are automatically entitled per se as a

18 retail company to resolve every dispute in your

19 own state even if the other guys file first

20 because there's a public interest.  I don't think

21 that's the law, and they haven't found that that's

22 the law.

23        THE COURT:  One thing they say, and I

24 think you should address this before you sit down,

25 is that the factor that favors you, which is your

1    choice of forum, really should be discounted

2    because you raced to the courthouse.  And this

3    gets into this factual dispute about what the

4    status of your negotiations was and what the --

5    who said what to whom and so forth.

6         MR. WINSTON:  Sure.  And I can avoid all

7    that by let's assume everything they say is true,

8    every single thing.  And I'll include their

9    supplemental affidavit, because I've read it.

10   Frankly, there's nothing much we dispute.  I mean,

11   there's some conversations.  But here's the facts.

12   The notion, first of all, that they're the natural

13   plaintiff is just not true.  The fact of the

14   matter is that they failed to file tariffs as they

15   were required to do under the contract under our

16   view in breach of the contract, and then they

17   failed to pay us.

18        We have a breach of contract action for

19   failure to file the necessary tariff and for

20   failure to pay us.  Their defense to that and

21   asserted in affirmative claims here is that we're

22   wrong, and they didn't breach.  Okay.

23        They have raised protest payments as a

24   possible way to argue they're really the

25   plaintiff.  We're going to get these back.  Well,

1    they're paid under protest.  There's no tariff in

2    effect so they're paying them kind of in this

3    settlement void.  We've got four more years of --

4    so they paid, you know, two percent of what they

5    might owe us under protest over the next five

6    years.

7         So the notion that they're the natural

8    plaintiff is kind of silly, and these race to the

9    courthouse cases, they're flipping it around.

10   What those are for is when the declaratory -- when

11   the defensive plaintiff jumps in first, says, you

12   know what, don't sue me yet, let me consider your

13   claim, don't sue, and than they run and sue, this

14   is the reverse.

15        I mean, essentially, they're trying to

16   argue that we tricked them out of filing

17   defensively first.  I mean, that's not -- there is

18   no cases that holds that.  That's not what these

19   cases are for, number one.

20        Number two, even if you assume everything

21   is true in all of their submissions, there was a

22   dispute, we sent a default notice, and we sued.

23   We engaged in some settlement talks.  We're not

24   required to do that.  There's no allegation in any

25   of their papers that they ever threatened to sue

21

1    in Rhode Island, that we responded to the threat

2    of the suit, that we told them don't file in Rhode

3    Island.  I mean, we simply sued.  We talked

4    settlement, and we sued.  And there's nothing in

5    their papers that suggests anything misleading

6    other than we were talking settlement and sued and

7    chose to sue in a forum of our choice.

8            So it's not clear to me on what ground --

9    these are -- we held them off from suing when they

10   wanted to.  They told us we're going to sue, and

11   we said don't.  That's the only kind of case --

12   and it's the reverse.  It's where the defendant is

13   the one tricking.  We could have sued on day one.

14   And the notion that we're hurt by engaging in

15   settlement talks for two months is strange to me.

16           I mean, we could have sued on day one, and

17   we chose to talk to them for a while.  It didn't

18   get resolved, and we sued.

19           So I guess that's where I am on this is

20   all of this race to the courthouse, first of all,

21   they're switching the framework.  It doesn't apply

22   in this case.  And second , there's no allegations

23   that they've made that would meet the standard.

24   That's my response to that.  We're going to put in

25   an affidavit just so you have, you know,

1      affidavits from both sides.  They're going to

2      match up to a large extent except for a

3      conversation or two.

4                  THE COURT:  Okay.  Very good.

5                  MR. WINSTON:  Thank you, your Honor.

6                  THE COURT:  Thank you.  Mr. Petros?

7                  MR. PETROS:  Thank you, your Honor.  Good

8      morning, your Honor.  I think the Court has

9      correctly identified the principal prong in our

10     argument this morning, which is that not just the

11     citizens of Rhode Island, but actually the

12     Government, the regulatory bodies of Rhode Island

13     have a significant interest in this dispute.

14                 THE COURT:  But they're not parties to the

15     dispute so how do I factor that in?

16                 MR. PETROS:  Judge, I think that the law

17     both in one of your decisions and the other

18     decision says that one of the factors that is

19     appropriate to consider is the local interest, the

20     forum's interest in the dispute that is pending

21     before the Court.

22                 There's no requirement in the law that

23     I've seen that indicates that the forum has to be

24     a party, that the citizens who are interested and

25     whether Government officials who are interested

23

1    need to be parties before the Court recognizes

2    that interest.  I think the law was pretty clear

3    on that.

4            And it's actually, I think, a principal

5    that is fairly firmly rooted in our jurisprudence

6    going back two hundred plus years.  And you look

7    at our whole judicial system, it is really set up

8    on the notion that disputes should be tried in the

9    locale in which they occur, whether you're on the

10   criminal side or the civil side.

11           And I think that that sixth factor that's

12   been talked about this morning is simply an

13   outgrowth of that fundamental principle, that our

14   court system tries disputes in the open,

15   accessible to the public in the area where the

16   dispute occurred, where the people care about it.

17           THE COURT:  Well, it's interesting you

18   raise that point, because really one of the main

19   ideas behind the Federal Court system is that when

20   you have an action where the people of the state

21   have a -- might have some bias or a real interest,

22   you could have a court system where you could get

23   the case into a forum where you'd be freed up from

24   that bias.  And that would allow you to bring it

25   in the Federal Court, allow you to bring it in

1          another state.

2                    And it seems to me that this case has just

3          those kinds of problems.  How do you get a jury in

4          this case that isn't conflicted, that isn't from

5          the rate paying class?  How do I rule on this

6          case?  I have a conflict, don't I?  I'm a rate

7          payer of Narragansett Electric.  So if I rule in

8          favor of the defendants in this case, or in the

9          favor of the plaintiffs and your client, I'm

10         effectively keeping my own rates down.  Because if

11         I rule against you, you're going to go to the PUC,

12         and you're going to try to pass that through to me

13         and to every other rate payer.  So don't I have an

14         absolute, direct conflict of interest, and doesn't

15         the jury have the same conflict of interest?

16                    MR. PETROS:  You don't, Judge.  Let me

17         start with your first question and try to work

18         through all of them.  I agree that to some extent

19         the federal system was set up to allow for an

20         avenue to provide some additional fairness and

21         neutrality in disputes.  But certainly the federal

22         system that is set up in terms of diversity

23         jurisdiction does not in any way take a case and

24         move it out of the locale where the dispute arose.

25                    When a case comes over here to state

1    court, it doesn't go to Worcester.  It goes right

2    here to Providence.  And in fact, I think your

3    colleague, Judge Lisi, recently moved -- took the

4    very unusual step of moving a criminal case from

5    Providence to Massachusetts, but I think if you

6    look at the law that was discussed, and you may

7    have already, those are really extraordinary

8    circumstances when you take a dispute like that

9    and move it out of the locale where it really

10    belongs.

11    So while the federal system happily puts

12    federal judges like yourself here to deal with

13    certain types of diversity disputes involving

14    diverse parties, it certainly does not in any way

15    detract from the principle that disputes in this

16    country should be determined by courts in the

17    locale where they arose so that interested parties

18    have access to that process, have input to it and

19    can see it so that it's all transparent.

20    THE COURT:  In this case, there's a

21    tension there because where the dispute arose or

22    the state which has the interest depends on how

23    you're looking at this case.  If you're looking at

24    it from the standpoint of impact on rate payers

25    and the utility commission process, then it's

# EXHIBIT I
## (Pages 26-45)

1    Rhode Island.  But if you're looking at it from

2    the standpoint of a pure contractual matter, then

3    it's arguably Massachusetts for the reasons that

4    Mr. Winston outlined.

5            MR. PETROS:  There are two sides to that,

6    Judge, I agree.  But in terms of where the

7    performance of this contract was to take place, it

8    is, after all, a contract for the supply of power

9    in electrical distribution system.  They supply

10   the power.  We distribute that power to 475,000

11   Rhode Island citizens.

12          So certainly, the performance of that

13   contract concerns Rhode Island citizens.  It

14   doesn't concern in any way Massachusetts citizens

15   or any interest outside of Rhode Island.  Those

16   are the citizens who are affected by the

17   performance of that contract.

18          Let me get to the conflict question you

19   raised.  Your Honor I suspect has seen some of the

20   newspaper stories about the disqualification

21   motion pending in the case I'm involved in in

22   state court.  That was not a motion that my

23   clients filed or supported, and we so stated on

24   the record.  But having seen that law intensely

25   now because of that proceeding, I can state, and I

1    suspect your Honor knows this already, that there

2    is no conflict either for a judge or for jurors

3    hearing a case where the case involves an interest

4    or a benefit that is common to the public in

5    general.

6         And the classic definition, the example

7    that is often used to make that point and the case

8    law on that topic are matters just like this,

9    utility rates.  Every judge is paying somebody for

10   electricity or for water or for natural gas.

11   Every juror has presumably gas or electricity or

12   some utility service to them.  Those jurors are

13   not disqualified in Rhode Island or New York or

14   any other jurisdiction for either having that

15   interest or potentially in benefiting from the

16   result of a decision that might have some impact

17   on their rates, whether it means their rates go up

18   or their rates go down.

19         THE COURT:  Does Judge Silverstein

20   summarize all that law in his decision?

21         MR. PETROS:  He touches on it, your Honor,

22   but I would be happy to supply the Court with the

23   briefs that do discuss that in more detail.

24         THE COURT:  Because, I mean, I am somewhat

25   familiar with this and Judge Silverstein cited I

1    think as part of his reasoning there that the

2    matter that we handled jointly in the Blue Cross

3    -- the class action suit against Blue Cross.  And

4    in that case, where we were both members of the

5    class, different classes, we were able to -- and

6    again, most citizens of the state were members of

7    the class.  We were able to ensure that there was

8    no conflict by removing ourselves, affirmatively

9    removing ourselves from the class by letter to

10   Blue Cross that said, you know, take us out so

11   that if there was any benefit accruing to the

12   members of the class, we could not receive it.

13        But I don't see any way of doing that in

14   this case.  So that means that that option or that

15   extra protection is gone.  So I would have to rely

16   on that authority that you cite that says what you

17   say it says.  And if that's the case, maybe that

18   would alleviate my concern.

19        MR. PETROS:  I'd be happy to provide that,

20   Judge.  Just a point of example, the regulatory

21   process in Rhode Island provides that appeals from

22   the PUC go typically to the Rhode Island Supreme

23   Court.  Every time they rule on those appeals, you

24   can bet that those Supreme Court justices are

25   getting electricity or getting gas.  In fact,

1    Judge Flaherty in the Judge Silverstein motion

2    pointed out very quickly, "I live in a home that

3    was built before 1978.  Am I disqualified?  Are my

4    colleagues disqualified?"

5         And I think that the law is pretty

6    well-settled where you have common issues of that

7    type, those are not issues of qualification.  It's

8    where a judge has a particular specific interest

9    such as you own IBM stock, and this is an IBM case

10   that could affect the stock price that those

11   problems really become more serious.

12        Your Honor, in many respects it's possible

13   you could look at the Rhode Island residents as we

14   talked about as having a very significant interest

15   in this dispute.  But it doesn't end there.  I

16   think even the materials filed on both sides in

17   this case demonstrates that the Rhode Island

18   regulatory authorities have an overwhelming

19   interest and an overwhelming role in this dispute

20   a number of ways.

21        None of us dispute that during the

22   settlement negotiations that took place at the

23   time this lawsuit was filed in Massachusetts, both

24   parties were meeting with and talking to the Rhode

25   Island Division of Public Utilities.  Because any

1    settlement in this case necessarily requires not

2    only their approval but a role for the Division,

3    because it would ultimately have to go in front of

4    the Public Utility Commission.

5        All of these contracts are creatures of

6    regulation and fairly intensive and sophisticated

7    regulation.  None of these contracts get done

8    outside the purview, the view and the management

9    of the Division of Public Utilities and the Public

10   Utilities Commission.  None of these contracts can

11   be terminated without that review and approval.

12   Rates can't be changed.

13       THE COURT:  Let me ask you this, though.

14   The interest of the Division of Public Utilities

15   and the PUC would be -- is clear in the context of

16   a settlement of this dispute, but what is it in

17   the context of a question of the breach of

18   contract.  I mean, I don't see how they are

19   witnesses or otherwise involved in the question of

20   whether the contract was breached.

21       MR. PETROS:  Let me explain how, because I

22   think they are potentially witnesses, and

23   potentially I wouldn't say parties but they may

24   have a role that goes beyond a witness.

25       First of all, TransCanada themselves --

1    and not much has happened yet in Massachusetts,

2    your Honor.  We've got a preliminary discovery

3    schedule, but no depositions have taken place.  I

4    don't think any written discovery has been

5    answered at this point in time.  As Mr. Winston

6    correctly said, we're waiting for a schedule

7    conference.

8           But TransCanada has already indicated that

9    they expect that the Division or PUC employees

10   will be witnesses in this case.  At least they're

11   on their deposition list as potential witnesses in

12   this case.

13          So what's their role?  You already

14   understand their role potentially in any

15   settlement that comes out of this case, and I

16   won't go into that again.  That's in the

17   affidavits.

18          But in terms of as a witness, the way the

19   contract is written, I think both sides would

20   acknowledge that even if you accept the argument

21   put forth by TransCanada, and we dispute it, but

22   TransCanada says, Narragansett, you had an

23   obligation to ask the PUC to approve a fuel

24   adjustment factor for 2005 and for the four years

25   beginning at 2005, and you didn't do that.  But

1   the contract clearly states that even if we had

2   such an obligation, TransCanada could not collect

3   that fuel adjustment factor unless the PUC

4   approved such a factor in the rates.  And if they

5   did not, then those rates, that fuel adjustment

6   factor could not be collected from TransCanada.  I

7   don't think there's any dispute about that.

8           Now, I have been thinking about, and I

9   don't know that I've come to a conclusion yet,

10  about what that means, but there are certainly

11  several alternatives that jump out.

12          One is testimony of witnesses on the

13  approvability of such a factor, and the position

14  that the Division would have taken in recommending

15  or not recommending such a factor, and the

16  position the Commission might have taken in ruling

17  on such a question.

18          I could see a scenario where a judge

19  determined that maybe there should be an adjunct

20  proceeding that takes place.  Rather than having

21  us do this in a discovery context, perhaps with

22  the parties' consent and agreement we should go in

23  front of the PUC and ask them and see what happens

24  as opposed to predicting what they would have

25  done.

33

1    As I've said, Judge, I have not thought

2    that through.  I have not researched it.  I don't

3    know what the appropriate course is, but there's

4    no question that that issue will be a significant

5    issue in this litigation and no question that the

6    Division and the PUC will play a significant role

7    in that issue.  And I think that again argues for

8    this case being determined in Rhode Island as

9    opposed to Massachusetts.

10    So their role is at least that of a

11    witness and potentially more than that.

12    Your Honor, I couldn't agree more with

13    what you said earlier, that notwithstanding the

14    parties' strong efforts to talk about the other

15    factors, they're a wash.

16    In fact, I had written that in my outline,

17    and I was prepared to cite the footnote in your

18    Feinstein case, which essentially points that out.

19    And Judge Lagueux did the same thing in the Nortek

20    case.  He said, Look it.  You've got -- and you

21    said it.  You've got two sophisticated companies

22    or parties.  You know, we're talking about

23    Massachusetts and Rhode Island.  Everybody is

24    within 50 miles.  You can put your witnesses

25    wherever you decide to put them.  You can move

1    your documents electronically.

2            The fact of the matter is that neither

3    party in that sense will be inconvenienced whether

4    this takes place in Worcester 45 minutes away or

5    in Providence.  Those factors, I agree, are not

6    factors that really weigh one way or the other in

7    this dispute.

8            Your Honor, that brings me back to the

9    first-filed rule, because I think what TransCanada

10   relies upon in this whole dispute is the

11   first-filed rule.  They say we filed first, it

12   goes in Massachusetts.  Now, we're fortunate in

13   this case that for a change we have lots of Rhode

14   Island law.  You've written the Feinstein

15   decision; Judge Pettine decided the SW Industries

16   decision, which I had the pleasure of arguing

17   before him when I was a young associate long ago;

18   and Judge Lagueux decided the Nortek decision not

19   too long ago.  And I think those decisions are

20   very much in sync and lay out some of the

21   principles that defined the application and

22   rationale for the first-filed rule.

23            One of those principles is that this is an

24   equitable decision.  It's not a per se rule, the

25   first filed wins.  It's an equitable decision

1    where courts retain significant discretion.

2        In fact, the First Circuit has a quote

3    that Judge Lagueux recited in the <u>Nortek</u> case,

4    which I think is telling and that is as follows:

5    "While the first-filed rule may ordinarily be a

6    prudent one, it is so only because it is sometimes

7    more important that there be a rule than that the

8    rule be particularly sound."  And I think that is

9    certainly a reflection of the fact that courts

10   realize this is an equitable decision, it's not a

11   per se rule.

12       There are two exceptions to the

13   first-filed rule that courts recognized and your

14   Honor recognized in the <u>Feinstein</u> decision and so

15   did Judge Pettine and Judge Lagueux in their

16   decisions.  Convenience and specials

17   circumstances.  The public interest argument falls

18   under the convenience heading.  And we've talked

19   about that already.  What we haven't talked about

20   yet are the special circumstance exception.

21       The two special circumstances that are

22   most often talked about I think are described in

23   the decisions from this jurisdiction, and

24   certainly in the <u>Nortek</u> decision where Judge

25   Lagueux described them as, first, where forum

1    shopping motivates the first-filed action; and

2    second, where giving an advantage to the

3    first-filed action is contrary to the sound policy

4    of promoting extrajudicial dispute resolution.

5           We believe that if you look at the facts

6    here, your Honor, both of those special

7    circumstances are in play.  And let me be

8    specific.

9           This dispute arises at the beginning of

10   2004 -- 2005, excuse me.  TransCanada sends us

11   notice, invokes dispute resolution.  The parties

12   talk, but it doesn't stop there.  The parties

13   meet.  They talk about settlement.  The parties

14   put a term sheet together.  The parties go to the

15   Division of Public Utilities and involve them in

16   the discussions and ask them if they will

17   participate and approve of the settlement the

18   parties now have in concept.

19          The parties get feedback from the Division

20   of Public Utilities.  The parties are discussing

21   that feedback and going back and forth.  And the

22   settlement concept in play is not particularly

23   complicated, Judge.  What they proposed to do was

24   there were two TransCanada contracts.  The concept

25   was that those contracts would be taken over by a

1    third party and TransCanada would be excused from

2    performance.  One of those contracts was perhaps

3    economically lucrative; one was not.

4            The parties are at the point where they

5    have agreed in concept on a settlement.  They

6    presented it to the Division.  The Division sends

7    back comments, and we're waiting, Narragansett is

8    talking to TransCanada about those comments and

9    Mr. Hachey is, I think, honestly and candidly

10   telling us that he's still talking to his

11   superiors about it, and he needs to get back to

12   us.  That is the field of play, the state of play

13   on the day that they filed this lawsuit.

14           THE COURT:  So let me interrupt you there.

15   I've read all the e-mails, and I've read your

16   supplemental filing.  And what the issue strikes

17   me is this.  In these -- you start with the

18   premise that the plaintiff has the right to choose

19   its forum.  It has a right to file suit.  It has a

20   right to choose to file suit in Massachusetts

21   versus Rhode Island.  So there's nothing

22   presumptively wrong or inappropriate or improper

23   about filing this action in Massachusetts.

24           MR. PETROS:  I agree.

25           THE COURT:  There has to be something that

1  implies that this -- that overcomes the
2  presumption that the first-filed action prevails.
3      On the face of it, it looks as if they
4  simply made a tactical judgment to file in
5  Massachusetts at the time that seemed appropriate
6  to them.
7      Now, you're suggesting, implying, I think,
8  that there was -- because there's nothing overt
9  here.  There's nothing like what you see in some
10 of these cases, like don't file suit, let's talk
11 about this for a while, see if we can work it out
12 and then they go and file, a party goes and files
13 preemptively, which seems to be what the cases
14 suggest.  There you have a pretty clear exception
15 for the first-filed rule.
16     You don't have that here.  You don't have
17 any smoking gun of bad faith.  Now, you seem to be
18 implying that something that was going on in this
19 settlement discussion back and forth was really
20 designed to sort of create that opportunity to
21 file.  And I just -- and I have two questions.
22 It's a long build up, but I have two questions.
23     One is I don't quite understand the
24 reasoning behind that, because it seems to me that
25 they could have filed it at any time.  And they

1    just simply -- it seems they made the decision

2    when it appeared it wasn't going to work out,

3    which is when you usually file suit.

4         And secondly, if you say there is some

5    smoking gun underneath all of this activity, how

6    do I figure that out without turning this into a

7    mini-trial?  You've given me all this material,

8    e-mails and affidavits, and you're really asking

9    me to conduct almost a mini-trial to figure out

10   whether this was a bad faith preemptive strike

11   versus just plaintiff's decision to file suit.  So

12   I'd like you to get in on that.

13        MR. PETROS:  Let me do both, Judge.  We

14   are not here this morning suggesting that there's

15   more behind the scenes than what we report in our

16   affidavit.  And in fact, your Honor, what we are

17   suggesting is just this.  We had two parties

18   engaged in settlement negotiations, fairly intense

19   settlement negotiations, complicated.  They were

20   both moving forward, I presume, in good faith.

21        One of those parties, TransCanada decided

22   not that the negotiations weren't working because

23   they continued after the lawsuit was filed, and,

24   in fact, resulted in a tentative settlement which

25   the Division rejected.  They decided in the middle

1    of those good faith negotiations that they wanted

2    to secure a Massachusetts forum, because it was

3    certainly possible based on those negotiations

4    that while they would resolve most of the dispute

5    going forward, they might not resolve the payments

6    that had already been made and that might have to

7    be litigated.

8            The facts clearly indicate that they made

9    a tactical decision to go ahead and file and then

10   call us up and almost apologize about filing and

11   tell us they had to do it because of that forum

12   thing.

13           Now, I don't suggest for a moment, your

14   Honor, that TransCanada did anything that was in

15   some moral way wrong or that would be sanctionable

16   or that would be bad faith.  But think about the

17   issue that brings us here.  They are now here

18   saying to you we win, it goes in Massachusetts

19   because we filed first.  And that's exactly why in

20   the middle of settlement negotiations where there

21   was no impasse, where parties didn't say, you know

22   what, this isn't working, and then parties go

23   ahead and exercise their rights as they please to

24   do.  Nothing like that was happening.  They

25   decided to secure this tactical advantage.

1    You now will decide today or soon whether

2    or not they're entitled to receive the benefits of

3    the first-filed rule where two commercial entities

4    engaged in not only good faith, ongoing productive

5    negotiations, but also with an arbitration

6    agreement almost fully negotiated on the table as

7    well between them, whether when one of those

8    parties decides for reasons that are clearly

9    tactical forum shopping to go ahead and file,

10   whether they're going to be entitled or should be

11   entitled to that benefit.  And we submit, your

12   Honor, that they should not be.

13          THE COURT:  You say that the exception to

14   the first-filed rule for the race to the

15   courthouse exception, so to speak, is brought into

16   play merely when a party makes the tactical

17   decision to file without any other indication of

18   deceit or bad faith or any kind of trickery.  It's

19   just a tactical decision is enough.

20          MR. PETROS:  No, it's not, Judge.  What

21   I'm saying is -- let me use the Nortek case.  In

22   the Nortek case that Judge Lagueux decided, it is

23   admitted in that case, Judge Lagueux so stated

24   that the company, Nortek, never told the employee

25   Molnar that they weren't going to file suit.

1    The facts in that case are the company

2    lawyer called up the employees' attorney.  They

3    had a couple of preliminary discussions.  The

4    company attorney said why don't you send me a

5    letter outlining why you think New York law

6    applies.  The employees' attorney is working on

7    that.  While he's working on that, the company

8    files suit in Rhode Island.

9        Now, what Judge Lagueux said was he

10   dismissed the hyperbole in that case, and he so

11   says it in his decision, but he says it's clear

12   that what Nortek was doing was while these

13   discussions are going on, they decided to secure

14   the forum of their choice.  That's what they were

15   doing.  There was no time sensitivity.  There was

16   nothing driving Nortek to file then.  There was no

17   statute problem.  There was nothing happening in

18   the business that was forcing it.  They just

19   decided to go ahead and file to secure a forum.

20       And Judge Lagueux found in that case that

21   he was not going to reward forum shopping at the

22   expense of negotiations by giving them the

23   advantage of the first-filed rule.  He didn't

24   punish them, but he said when you first file under

25   those circumstances, I'm going to look at the

1    landscape and say where does this suit really

2    belong, and that's where I'm going to put it.

3        And that's the argument that we make to

4    you this morning, that what happened here wasn't a

5    crime, it was a violation of some ethical or moral

6    obligation, but TransCanada made a decision to

7    file in Massachusetts not because there was an

8    impasse where the parties had gone their own way

9    or not because an arbitration agreement couldn't

10   be negotiated, but because of this very moment.

11   Because when they were here, they wanted to be

12   able to say we filed first.  And what I'm urging

13   the Court to do is to say under those

14   circumstances I'm not going to give you the

15   benefit of first-filed rule.  I think it's

16   appropriate for the Court to look at the landscape

17   and say from judicial concerns where does this

18   case best belong.  Where should it be litigated

19   with no advantage to either party.

20       And the principle I would cite, Judge, is

21   that I think what Judge Lagueux was saying was I

22   don't want to encourage people to shoot first and

23   talk later.  I think the Court should encourage

24   circumstances where when parties are engaged in

25   productive settlement negotiations they stay

44

```
 1        engaged.  If they want to break off those
 2        negotiations and then file suit, they can do that,
 3        but they shouldn't in the middle of productive
 4        negotiations where both sides think things are
 5        going okay --because we thought about these
 6        things, too, Narragansett.  And we decided it
 7        didn't make sense to file because the parties were
 8        making progress.
 9             When that situation happens, I think Judge
10        Lagueux made a jurisprudential decision not to
11        reward that kind of behavior.  Not to punish it.
12        Doesn't violate any rule, but not to reward it
13        with first-filed status.
14             So that's a long way of saying, Judge,
15        we're not suggesting there's some other e-mail out
16        there or some other nefarious person on the part
17        of TransCanada.  They made a litigation decision.
18             THE COURT:  Get to my second question.
19        You've given me some pretty strong evidence that
20        indicates that that's exactly what was going on
21        here.  It was a tactical decision, a tactical
22        litigation decision was made to make the filing in
23        order to secure the forum of choice.  The problem
24        is that it's way outside the pleadings.  Some of
25        it is in e-mails that amount to about triple
```

1    hearsay, maybe more.  How do I factor that in to

2    the equation?

3         MR. PETROS:  My suggestion, your Honor,

4    I've heard Mr. Winston today say that they would

5    like to file an affidavit.  What I would suggest

6    to the Court is that it might be useful for myself

7    and Mr. Winston and Kristin Rodgers, who I know

8    well, to sit down and see if we can agree on

9    documents and facts to present to the Court and

10   see if there are really issues.  Because I'm not

11   so sure, and I think I heard Mr. Winston say it,

12   that there really are a lot of issues when you

13   boil it down.

14        I think there are some things in the reply

15   memo that are a little bit out there, but I

16   suspect that when we sit down and pool together

17   the e-mails and look at what's in the documents

18   we'll be able to agree on most of those facts.

19        And I don't know your Honor has the

20   patience to let us do that or whether the Court

21   wants to rule today.  But I would think a first

22   step in that process would be to ask the attorneys

23   to sit down and agree on as much as we can agree

24   on on the underlying facts.  And then if there is

25   a fact issue which appears to be material, then I

# EXHIBIT I
## (Pages 46-61)

1    think the attorneys ought to suggest whether we

2    need a deposition or two depositions to work that

3    out if indeed it's a material fact.  And I'm not

4    sure when we sit down with not just us but our

5    parties and talk about our clients and talk about

6    those facts that there'll be much dispute, because

7    I think it's pretty clear.

8         That's my suggestion this morning, your

9    Honor, on how to deal with that, because I

10    recognize that a factual dispute did arise in the

11    exchange of the papers, which is why we felt

12    compelled to file the supplemental affidavit.

13         THE COURT:  I think I'd be agreeable to a

14    procedure of that type.  I wasn't sure whether I'd

15    be ruling from the bench today or not.  That's why

16    I like to hear argument first before I make that

17    decision, but I'm more inclined to let you engage

18    in that process and see what it results in before

19    I make a decision.  But there's another issue that

20    you need to address.  And you cited my _Feinstein_

21    decision and Judge Lagueux's _Nortek_ decision, but

22    I also wrote a decision in this matter called

23    _Cruz_.

24         MR. PETROS:  Right.

25         THE COURT:  And Judge Pettine has written

1        an opinion which talks about the same issue, and

2        that is, as you know, that the Court in which the

3        first-filed action is pending should be the one to

4        decide the question.  So why doesn't this fit

5        right within Cruz?

6                   MR. PETROS:  Here's why, your Honor.  In

7        Cruz, as well as in the other case, which I can't

8        recall -- I think it was Donaldson and maybe Ultra

9        Ultronic, the other two cases that have been

10       cited.  Those are situations, your Honor, where

11       you have motions pending in two forums which

12       potentially could result in inconsistent rulings.

13       And I think in that situation, it is appropriate

14       for one court to defer to the other so that we

15       don't have, you know, Worcester saying send it to

16       Providence, and Providence saying send it to

17       Worcester.

18                   In this case, we don't have that

19       situation.  TransCanada could have filed a motion,

20       as I've seen it done many times, in Massachusetts

21       to enjoin or stay -- enjoin us from prosecuting

22       this action down here.  They made a decision

23       before we filed anything to move to dismiss this

24       action.  They placed this issue before your Honor

25       for decision.  We decided it would not be

1    appropriate, and we saw no reason to raise the

2    same issue up in Massachusetts to get into the

3    competing judge problem.  We were content to let

4    this issue go forward before your Honor and be

5    decided and be bound by that decision up or down,

6    whatever it came out to.  We opted not to create

7    the conflict situation.  And I think it's that

8    conflict situation where one court has to say,

9    okay, who is going to decide it either with a

10    written decision or to a phone call up to a

11    colleague, how ever that's done.

12          But I think this case is different, Judge,

13    for those reasons.  TransCanada has come down and

14    asked you to decide this issue.  And then at the

15    end in their reply memo they say but if you're

16    going to decide it against us, don't decide it.

17    Let us go up to Massachusetts.  I don't think

18    that's appropriate.  And I don't think that's the

19    way these issues should be decided.  If they

20    wanted it determined by the Massachusetts court,

21    they could have filed the appropriate motion up

22    there.  They didn't.  We didn't want to create the

23    conflict situation, and I think the parties have

24    now placed this decision before your Honor to

25    decide, and I think the Court should go forward

49

1      and decide it.

2              THE COURT:  Okay.

3              MR. PETROS:  Thank you, your Honor.

4              THE COURT:  Thank you.  Which side of that

5      issue were you on in Judge Pettine's decision in

6      Southwest Industries.

7              MR. PETROS:  We were actually moving to

8      dismiss a stay in that action.  Our client was

9      Lumbermens.  And there was another action pending

10     in Ohio at the same time.  It was a fun case.

11             MR. WINSTON:  Your Honor, could I just

12     reply very briefly?

13             THE COURT:  Yeah.  Absolutely.

14             MR. WINSTON:  Really just on two points.

15     First, I think this case is exactly like the Cruz

16     case.  And the notion that they're somehow better

17     off by not contesting it in Massachusetts is an

18     odd one to me.  I think it's fact dead on.  It's

19     exactly what happened in Cruz.  The second filed

20     -- the defendant in the second filed action, who

21     was the plaintiff from the first filed, filed a

22     motion, and your Honor deferred and said resolve

23     it in Massachusetts.  So I think it's exactly the

24     same.

25             THE COURT:  But it is different in the

1    respect that there was pending in the Texas court

2    in Cruz a motion.  That's a correct statement.

3              MR. WINSTON:  Yes, by the plaintiff in the

4    second filed action.  And I guess my point is that

5    it shouldn't be that they're in a better position

6    by not raising it in front of the Massachusetts

7    judge.

8              THE COURT:  Why not?

9              MR. WINSTON:  Because they've allowed it

10   to go forward.  We're in discovery up there.  I

11   mean, the case is going forward there.

12             THE COURT:  You haven't even had a

13   pretrial conference.  You haven't had a Rule 16

14   conference yet.

15             MR. WINSTON:  We haven't.  Narragansett

16   has not been in a rush to move things up there.  I

17   mean, we had a month vacation that went on.  So

18   you're right.  But discovery is out.  I just

19   suggest, your Honor, you wrote Cruz, but I suggest

20   to you that it seems odd to me that by not filing

21   the motion up there, they're in a better stead.

22             I think that the point of your Cruz

23   case --

24             THE COURT:  Well, there's a certain --

25             MR. WINSTON:  -- was that the first-filed

1    action ought to have the deference to decide.

2         THE COURT:  Wait a second.  There's a

3    certain a certain irony in you arguing that their

4    litigation tactical decision not to file a motion

5    in the Massachusetts action is inappropriate when

6    this whole problem is generated by a tactical

7    litigation decision that you made to file the

8    Massachusetts action.  I mean, isn't what's, you

9    know, fair for the goose, fair for the gander?

10        MR. WINSTON:  I honestly don't know what

11   their tactical decision is.  I mean, honestly --

12        THE COURT:  Mr. Petros just explained what

13   it was.

14        MR. WINSTON:  Yeah.  You know, until today

15   I actually was unclear except that I thought that

16   they thought it would end up in Massachusetts and

17   didn't want to cloud the issue in front of the

18   Massachusetts judge.  Didn't want to send a

19   message we don't want you to hear it only to end

20   up there.  That was my thought.  But I don't know

21   why they did what they did.

22        THE COURT:  They wanted to make it less

23   like Cruz.  I mean, I think that's basically what

24   he's saying.  It's as simple as that.

25        MR. WINSTON:  I guess our view would be

1    that the notion is the same, that, you know, I

2    can't speak for your Honor.  You wrote Cruz.  It

3    appeared to me that your logic was that the

4    second-filed case ought to show deference to the

5    first-filed case to decide it.  And if they don't

6    wish to file it and give the first-filed case the

7    opportunity and respect to decide the issue for

8    itself, they ought to concede down here.  I think

9    that your Honor ought to either dismiss it or stay

10    and say if you really want to contest it in

11    Massachusetts, file a motion, take it up, and I'd

12    hold off until they do.  And that's what I thought

13    your Honor said in Cruz.  It's hard for me to

14    argue Cruz with you, your Honor, because you wrote

15    it.  So I can only tell you what my impression

16    was.

17        The other point I think I wanted to

18    address was the first-filed aspect, the notion

19    that we should be encouraged that the point of it

20    is that don't shoot first, talk first.  That's

21    what we did.  We talked and decided it wasn't

22    going our way and decided to file.

23        I think that it would be productive for

24    your Honor to hear the other side, because one of

25    the things is the settlement talks.  And this will

1    be Mr. Hachey, but the settlement talks were not

2    quite as productive as is led on.  Basically, the

3    PUC torched it.  I mean, we don't care if the PUC

4    agrees to our settlement.  Narragansett's position

5    is that they can't settle without approval of the

6    PUC.  So we agreed.  And the PUC basically said or

7    the Division said -- responded and basically gave

8    us a proposition that was completely unacceptable,

9    and that's why we filed.  And then only after that

10   did a new settlement talk start.

11          So the truth is, and it will be revealed,

12   in our view settlement talks were dead.

13          THE COURT:  Well, the key here is not so

14   much whether -- how close the parties were to

15   settlement but whether there was a productive,

16   good faith settlement negotiation that was ongoing

17   and in process.  And maybe you disagree about

18   that.

19          MR. WINSTON:  I think what you'll find is

20   that we disagree that it was still ongoing at that

21   point.  But it resumed --

22          THE COURT:  All right.  This is important,

23   because Judge Lagueux's reasoning in Nortek as

24   described by Mr. Petros is really an equitable

25   consideration that factors in here fairly heavily.

1      And that is, you know, it's sort of the balance

2      between litigation tactics and promoting good

3      faith, not just good faith but promoting

4      settlement.  And I think what Judge Lagueux is

5      getting at, and I'm in agreement with the general

6      principle, is that parties ought to be able to

7      make their litigation choices.  That's what

8      lawyers get paid to do is make tactical decisions.

9      And there's nothing inherently wrong about that.

10     It's a good thing, not a bad thing.  On the other

11     hand, we also want to promote settlement.

12          So there's this balance between letting

13     the parties and the lawyers protect their

14     interests using what tactics are appropriate, but

15     not going so far as to reward or create a

16     disincentive to negotiating as fully and

17     effectively as you can to resolve disputes.

18          MR. WINSTON:  I understand.  I think

19     there's two possible scenarios.  You know, one

20     is -- actually, I think that technically the

21     first-filed rule still applies in either one.  But

22     one is that settlement discussions were ongoing.

23     And to kind of help ourselves in settlement talks,

24     we went off and secured the Massachusetts forum.

25     I actually think we're completely entitled to do

1    that.

2         One difference in <u>Nortek</u>, by the way, is

3    that it was the defendant that went and filed, not

4    the plaintiff.  And it's a very big difference.

5         In the other cases, your <u>Feinstein</u> case,

6    <u>G.T. Plus</u>, <u>Holmes</u>, all of those cases are cases

7    where settlement talks were ongoing and the

8    plaintiff got sick of it and filed because they

9    weren't getting enough attention.

10        The other scenario is that settlement

11   talks were ongoing.  They had kind of come to a

12   dead letter, and it needed to get resolved so we

13   filed.  And in truth, as a tactical matter having

14   decided to file, we, of course, filed in

15   Massachusetts because we wanted a court forum and

16   in Massachusetts and that's why we filed there.

17   So it was a forum thing, filing in Massachusetts.

18   There's two different scenarios.  I think we'd win

19   under either one.

20        But, you know, my suggestion on the

21   affidavits is as follows.  We don't have an

22   affidavit on the record.  My suggestion is that we

23   put in an affidavit of Mr. Hachey.  I think your

24   Honor will find that there isn't very much in

25   dispute.  And that based on the law on this, the

1     positions of the parties, who is the plaintiff,

2     who is the defendant, the lack of any threat of

3     the Rhode Island suit that we misled, I think your

4     Honor will find that any factual disputes are

5     minor and are irrelevant and it's not going to be

6     necessary.

7          So I think our preference, although we're

8     willing to do it either way, would be to put an

9     affidavit in, and let your Honor look at it and

10    decide whether -- our view is we've spent a lot of

11    time on this issue already.  And we'd rather just

12    put in an affidavit and let it decide.  But if

13    your Honor feels a dialogue is better, I think

14    what would probably what would result in that is

15    that we'd agree on most and agree that we have

16    different memories of conversations, but I think

17    they're relevant.

18         THE COURT:  Well, it would be easier for

19    me if you could tell me which facts you agree on

20    and submit them in some form of stipulation and

21    then tell me what facts you don't agree on,

22    because I do have to --

23         MR. WINSTON:  That makes sense.

24         THE COURT:  -- make a determination here

25    based on a record.  And if it's a record that you

1    can agree to, then I'll feel more comfortable

2    about it.  If you deny, for example, that this

3    phone call ever took place from your -- I forget

4    the name of the person that's memorialized in an

5    e-mail, that we had to do it, it's a forum thing,

6    words to that effect.  If you say that never

7    happened, well, I want to know that.

8            MR. WINSTON:  I think what happened is we

9    filed, and we filed in Massachusetts because we

10    thought that was the better forum.  I think that's

11    what was said, which is totally appropriate.

12            THE COURT:  I'm not saying it's

13    inappropriate.  I'm just saying that, you know,

14    I'd like to know whether there's agreement that

15    that did happen or not.  I just use that as one

16    example.  And as to the timing of the different

17    events and so forth --

18            MR. WINSTON:  The problem with this whole

19    fact thing is we've got privileged communications

20    coming in here, selective waiver of the privilege.

21    There's a lot going on in here.  And I think that

22    in the end it's not relevant based on the

23    undisputed facts.  That's why I'm encouraging your

24    Honor, because if there were discovery, we'd like

25    to see all the e-mails, the writing among their

1    counsel.  I mean, so that's why I think your Honor

2    can avoid it, but if it's productive to put in a

3    stipulation in that, that's perfectly fine.

4              THE COURT:  I think it would be.  All

5    right.  Why don't I give you -- how long do you

6    want to do that?

7              MR. PETROS:  Your Honor, we should be able

8    to I would think meet and get this done in the

9    next two weeks.  Is that reasonable?

10             MR. WINSTON:  Yeah.  I think that's a fair

11    period to do it without --

12             THE COURT:  Two weeks?

13             MR. WINSTON:  -- cramping ourselves.  Two

14    weeks.

15             MR. PETROS:  I might suggest, your Honor,

16    if the Court has time perhaps in two weeks we

17    ought to meet briefly with your Honor if you can

18    hear us.  We can tell you where we are and see if

19    additional one-party filings need to be made or

20    whether we can work it all out in an agreed

21    statement.

22             THE COURT:  You think we need to meet?

23             MR. PETROS:  We may not, your Honor.

24    We'll know how far we can go in the agreed

25    statement.  I don't know whether or not

1    TransCanada is still going to want to file an

2    affidavit beyond the agreed statement.

3            THE COURT:  Why don't you --

4            MR. WINSTON:  Why don't we --

5            THE COURT:  Please.  You've got to let me

6    talk once in a while.  Just try to get it into a

7    stipulation if you can.  If you feel the need to

8    file an affidavit, TransCanada feels a need to

9    file an affidavit in addition to a stipulation,

10   then they have my leave to do that.  They can

11   certainly do that.  And after you do all that, if

12   you feel there's a need for a conference, then

13   request it.  We'll try to set it up.

14           I may not -- it's going to be a little

15   tight to find the time but maybe we could do it.

16   I mean two to three weeks out, because I have some

17   back-to-back jury trials three weeks straight.

18   But if we need to do it, I'll find some time, and

19   I'll fit it in.  But it may be there's no need for

20   that.  Then once you file that, then I think

21   hopefully I'll be in a position to just make a

22   decision at that point.

23           MR. PETROS:  Very well, your Honor.

24           THE COURT:  Okay.

25           MR. PETROS:  Thank you for your time this

1          morning.

2                    MR. WINSTON:  Thank you, your Honor.

3                    THE COURT:  Thank you.

4                    (Court concluded at 11:45 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby
certify that the foregoing pages are a true and
accurate transcription of my stenographic notes in
the above-entitled case.

_____

Anne M. Clayton, RPR

_____
Date

# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CA No. 05-234 |
| TRANSCANADA POWER MARKETING LTD., | ) ) ) | |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF DANIEL C. WINSTON

I, Daniel C. Winston, hereby depose and state as follows:

1.     I am an attorney and partner with the law firm of Choate, Hall & Stewart. Choate, Hall & Stewart represents TransCanada Power Marketing Ltd. in this matter.  I make this affidavit to describe certain events leading up to this litigation that I have personal knowledge of.

2.     In early April, 2005, inside counsel for Narragansett, Gloria Kavanah, and myself attempted to negotiate terms for an expedited arbitration, including its schedule.  During those discussions, Ms. Kavanah suggested that the protest payments should relieve some of the urgency in TransCanada's proposed arbitration schedule.  In response, I indicated that, while the protest payments alleviated some of the pressure, the protest payments remained in dispute and were not guaranteed in the future. I insisted then, and at all times (and as set forth in our email correspondence), that arbitration was an option only if it could be accomplished on an expedited basis and only if all arbitration terms could be agreed upon.

3.    On April 20, 2005, Ms. Kavanah called shortly after I sent her an email inquiring about the last arbitration proposal. During this phone call, she stated that the matter had now gone to the highest levels at National Grid; that Narragansett was no longer sure it wanted to arbitrate at all; and that at that point Narragansett wanted to talk settlement and was not willing to respond to TransCanada's last arbitration proposal. She instead proposed settlement meetings on April 22 and on April 25, 2005, the second meeting to include the Rhode Island Division. We agreed to these meetings and to defer further discussion about the proposed arbitration agreement and Narragansett's objections only until Tuesday, April 26, 2005.

4.    On May 17, 2005 I left a voice message for Kavanah stating that I was calling as a courtesy to let her know that TransCanada had filed suit in Worcester Federal Court; that Narragansett would be served in Rhode Island in the next few days; that TransCanada had filed suit because at that point it wanted the matter resolved by a Court; and that, having chosen to file suit, it decided to file the suit in Massachusetts as its preferred forum. I also stated that our previous negotiations had been cordial; that the filing of the suit did not reflect an intent to increase the animus; and that I hoped that the parties could continue the pleasant tone of their previous conversations. I then reiterated certain parts of my message in roughly the same words. I did not mention settlement or continuing settlement talks. Kavanah then called back and asked for a copy of the Complaint, and I emailed her a copy.

5.     On May 26, 2005, Kavanah called me.  She stated "right back at 'atcha'," and that

Narragansett had filed suit in Rhode Island.  She said that Narragansett's filing of the Rhode

Island Complaint did not mean that Narragansett did not want to settle, but that Narragansett just

"wanted to preserve their rights" in Rhode Island.


Signed under the pains and penalties of perjury this 23$^{d}$ day of September, 2005.

Daniel C. Winston

Commission Expires on
May 29, 2009

# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 05-234-S |
| v. | ) ) | |
| TRANSCANADA POWER MARKETING LTD., | ) ) ) | |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF MICHAEL HACHEY

I, Michael Hachey, hereby depose and state as follows:

1.     I am currently the Director, Eastern Commercial for TransCanada Power Marketing, Ltd ("TransCanada"). I have worked for TransCanada for 7 years. I make this affidavit in further support of TransCanada's Motion to Dismiss, Stay or Transfer Venue. I was personally involved in the negotiations leading up to this litigation and make this affidavit on personal knowledge.

2.     On March 1, 2005, TransCanada provided notice of default to Narragansett, arising from Narragansett's Standard Offer Service ("SOS") tariff filings and nonpayment of a Fuel Adjustment Factor ("FAF") under a Wholesale Standard Offer Service Agreement dated April 7, 1998 (the "WSOS Agreement"). [*See* 3/1/05 Hachey Letter attached as Ex. 1.]

3.     At a meeting on March 7, 2005, TransCanada and Narragansett met to discuss their respective positions. They disagreed on the merits. TransCanada discussed terminating the Agreement or initiating a Court action following the 30 day cure period, to which Narragansett

1

objected. Narragansett maintained that the parties had agreed to mandatory arbitration, but

TransCanada pointed out that the Agreement provided for discretionary arbitration. Narragansett

suggested TransCanada consider expedited resolution through fast-track arbitration or a

declaratory judgment action, and TransCanada expressed willingness to discuss expedited

resolution.

    4.       On March 31, 2005, Narragansett began making payments to TransCanada, under

protest and with reservation of rights. [*See* Hager 3/31/05 Letter, attached as Ex. 2.] No change

was made to Narragansett's SOS tariff filing for 2005, which omitted an FAF for TransCanada,

and TransCanada received no promise of continued or future FAF payments.

    5.       From April 1, 2005 through April 19, 2005, counsel to the parties negotiated the

terms for a proposed expedited arbitration and exchanged drafts of a proposed arbitration

agreement. During those discussions in early April, Narragansett's counsel suggested that the

protest payments should relieve some of the urgency in TransCanada's proposed arbitration

schedule. In response, TransCanada's counsel indicated that, while the protest payments

alleviated some of the pressure, the protest payments remained in dispute and were not

guaranteed in the future, and TransCanada still required that any arbitration be completed on an

expedited schedule. TransCanada then and at all times insisted that arbitration was an option

only if it could be accomplished on an expedited basis and only if all arbitration terms could be

agreed upon. TransCanada consistently thought and indicated that Narragansett's proposals were

on too slow a schedule. [*See* emails between Winston and Kavanah dated 4/1/05; 4/6/05; 4/8/05;

4/12/05; 4/13/05(9:32 am, with embedded); 4/13/05(1:27 pm); 4/14/05(6:33 pm); 4/18/05(1:32

pm); and 4/19/05, attached as Exs. 4-12; Affidavit of Dan Winston ("Winston Aff."), attached as

Ex. 3, ¶2.]

6.      On April 19, 2005, TransCanada sent Narragansett proposed revisions to the

arbitration proposal.  TransCanada's proposal required initiation of the arbitration upon

execution in order to meet TransCanada's proposed schedule. [*See* Winston 4/19/05 e-mail and

proposal (Ex. 12).]  The parties had also agreed that the arbitration was to be initiated with the

filing by TransCanada of a Statement of the Dispute (within 3 business days of execution and as

early as April 26, 2005), to which Narragansett would file an Answer within 6 or 10 business

days.  [*See* 4/18/05 email and proposal (Ex. 11); 4/19/05 email and proposal (Ex. 12).]  In

TransCanada's view, the last arbitration proposals still contained substantial points of

disagreement, including the schedule, the confidentiality terms, and the treatment of protest

payments.

7.      On April 20, 2005, at 3:14 p.m., TransCanada sent an e-mail to Narragansett's

counsel inquiring about the proposed arbitration agreement.  [*See* 4/20/05 Winston email,

attached as Ex. 13.]  Narragansett's counsel then called TransCanada's counsel that same

afternoon.  During this April 20, 2005 phone call, Narragansett's counsel stated that the matter

had now gone to the highest levels at National Grid; that Narragansett was no longer sure it

wanted to arbitrate at all; and that at that point Narragansett wanted to talk settlement and was

not willing to respond to TransCanada's arbitration proposal. [*See* Winston Aff., ¶3.]

8.      Kavanah suggested during the April 20, 2005 phone call that the parties explore

settlement at a meeting on Friday, April 22, 2005.  Kavanah further suggested that the parties

meet on Monday, April 25, 2005 with the Rhode Island Division of Public Utilities and Carriers

("Rhode Island Division") to discuss settlement, subject to confirming the availability of

Division representatives.  TransCanada agreed to meet on April 22, 2005 and agreed to defer

further discussion about the proposed arbitration agreement and Narragansett's objections only until Tuesday, April 26, 2005. [*See* 4/40/05 email exchange, attached as Exhibit 14; Winston, Aff. ¶3.]

9.    The parties met on April 22, 2005 to discuss settlement. No constructive proposal came out of that meeting, but the parties agreed to still meet with the Division on April 25, 2005.

10.    On April 25, 2005, the parties met with the Rhode Island Division. At this meeting, attended by Dan Winston and myself for TransCanada; Thomas Robinson, Laura Olton, Ron Gerwatowski and Michael Hager of Narragansett; and Steve Scialabba and Assistant Attorney General Paul Roberti for the Division, TransCanada stated and argued its legal position for benefit of the Division. TransCanada stated during this conversation that it had the right to initiate, and might initiate, a Court action to resolve the dispute.

11.    Later during the same April 25, 2005 meeting, Thomas Robinson, Deputy General Counsel for National Grid, distributed a one-page handwritten "Tentative Term Sheet for Proposed Resolution" for the parties and Division to consider. This particular proposal had not previously been presented to TransCanada. The proposal anticipated that Narragansett would pay TransCanada its requested FAF for the duration of the WSOS Agreement. Narragansett could initiate public bids for a replacement supplier for the WSOS Agreement (and another SOS Agreement which, like the WSOS Agreement, also required TransCanada to supply electricity at below current market prices), on September 1, 2005 and then again on September 1, 2006. If a replacement supplier was accepted by Narragansett in either bid, TransCanada would be released from the WSOS Agreement and would receive FAF payments up to that point. The proposal also expressly required approval by the Rhode Island Public Utilities Commission ("PUC"). [*See* Tentative Term Sheet, attached as Ex. 15.] TransCanada, the Division and Narragansett

4

discussed Narragansett's proposal, and TransCanada and the Division agreed to consider Narragansett's proposal further.

12.      After the meeting and also on April 25, 2005, Winston sent Kavanah an e-mail stating "[b]ased on our discussions down at the PUC today, which I assume you have been debriefed on, TransCanada would be willing to hold off further negotiation on the arbitration agreement through the end of this week to see how things progress.  Assuming you are agreeable to that extension, let's revisit on Monday." [*See* Winston 4/25/05 email, attached as Ex. 16.]

13.      On Friday, April 29, 2005, I told Robinson that the April 25 proposal was okay subject to moving the secondary bid date back to June 1, 2006.  Narragansett agreed to that change, and the parties further agreed that Narragansett would draft a revised settlement proposal to present to the Division and PUC.

14.      On Monday and Tuesday, May 2 and 3, 2005, the parties heard from the Division before submitting the revised April 29 proposal.  On May 3, 2005, Steve Scialabba from the Division also e-mailed the parties.  Mr. Scialabba's email rejected the original terms which Narragansett had proposed on April 25, 2005, and required significantly different terms for further settlement discussions.  In essence, the Division required a settlement framework under which TransCanada would be paid only half the FAF, up until a public bid by Narragansett.  If Narragansett accepted a replacement bid, which would require Division and PUC approval, TransCanada would then be released from the WSOS Agreement (and a second Supply Agreement).  If Narragansett did not accept a replacement bid, TransCanada would receive no further FAF payments after that point and would retain only rights to litigate.  The Division stated that it would be willing to listen to proposals concerning modification to the timing of the

5

bids and release dates, if its revised settlement framework was acceptable. [*See* Scialabba 5/3/05 email, attached as Ex. 17.]

15.     In TransCanada's view, the Division's required settlement framework was entirely unworkable from a settlement standpoint, and could not form the basis for settlement discussions: the Division needed to approve any settlement, and its framework required TransCanada (i) to permanently waive half of the FAF payments up until any public bid by Narragansett, (ii) to receive *no* further FAF payments thereafter, as well as no guarantee that TransCanada would be released from the WSOS Agreement. The April 25 and 29 proposals, in contrast, guaranteed TransCanada full payment of an FAF throughout the duration of the WSOS Agreement, and provided the possibility of full release from the WSOS Agreement with FAF payments up to that date.

16.     I also had a telephone conversation with Mr. Scialabba on or around May 3, 2005, in which Mr. Scialabba confirmed that the Division's position was firm and had been discussed and approved personally by the administrator of the Division.

17.     TransCanada did not initiate any further conversations regarding settlement after May 3, 2005.

18.     Hager called me a few times in early May, 2005.  Hager asked on each occasion whether I had any further ideas to move forward with a settlement.  Hager offered no ideas of his own, and I offered none either.  I expressed to Hager my disappointment at the Division's response,  and let him know the Division's framework could not work to resolve the dispute. Hager did not disagree.  In my opinion, it was clearly understood between Hager and I that the settlement talks were at a standstill barring some entirely new approach or change of heart by the Division, since the Division had to approve any settlement and its current position was

6

unworkable. I also told Hager that my boss, Bill Taylor, was out of the office due to a death in the family so I had not been able to speak with him. I told Hager that I would give him a call if I came up with any additional settlement ideas. I did not tell Hager that TransCanada was considering accepting the Division's proposed revisions, and I did not discuss with Hager options to adjust the Division's proposed terms.

19.     After Narragansett indicated it no longer wished to negotiate an arbitration agreement on April 20, 2005, Narragansett declined to ever respond to TransCanada's April 19, 2005 arbitration proposal, and never expressed further desire or willingness to arbitrate. Other than Winston's April 25 email to Kavanagh, TransCanada and Narragansett did not thereafter orally or in writing mention the draft arbitration agreement or the possibility of arbitration.

20.     On May 17, 2005, TransCanada filed its Massachusetts Complaint. TransCanada filed its Complaint because settlement talks had proved fruitless in view of the Division's position, arbitration talks had broken down, and at that point TransCanada wanted the dispute resolved by a Court. Having decided to file suit, TransCanada decided to file its Complaint in Massachusetts because the WSOS Agreement is governed by Massachusetts law, TransCanada is a Massachusetts company, and TransCanada felt that the dispute was most appropriately and fairly resolved in a Massachusetts Court.

21.     Also on May 17, 2005, I called Robinson to inform him that a Complaint had been filed. Winston also called Kavanah and left a telephone message for the same purpose. Winston left a message for Kavanah stating that he was calling as a courtesy to let Kavanah know that TransCanada had filed suit in Worcester Federal Court; that Narragansett would be served in Rhode Island in the next few days; that TransCanada had filed suit because at that point it wanted the matter resolved by a Court; and that, having chosen to file suit, it decided to file the

suit in Massachusetts as its preferred forum.  Winston also stated that his and Kavanah's

previous negotiations had been cordial; that the filing of the suit did not reflect an intent to

increase the animus; and that he hoped he and Kavanah could continue the pleasant tone of their

previous conversations.  Winston then reiterated certain parts of his message in roughly the same

words.  He did not mention settlement or continuing settlement talks.  Kavanah then called back

and asked for a copy of the Complaint, and Winston emailed her a copy.  [*See* Winston Aff. ¶4.]

22.    On May 25, eight days after TransCanada's Massachusetts Complaint was filed,

Hager called me to propose a new approach to settlement.  Hager claimed that he had a particular

replacement supplier that was ready to pick up TransCanada's WSOS contracts immediately,

which would release TransCanada from the WSOS Agreement in a matter of months.  This was

an attractive proposal to TransCanada, and had never been mentioned before.  Hager did not say

who the replacement supplier was.

23.    On May 26, 2005, Narragansett filed its Rhode Island Complaint.

24.    Also on May 26, Kavanah called Winston.  Kavanah stated "right back at

'atcha'," and that Narragansett had filed suit in Rhode Island.  She said that Narragansett's filing

of the Rhode Island Complaint did not mean that Narragansett did not want to settle, but that

Narragansett just "wanted to preserve their rights" in Rhode Island.  [*See* Winston Aff. ¶5.]

25.    On May 27, 2005, Narragansett's counsel sent TransCanada's counsel a draft

agreement reflecting the settlement structure first mentioned by Hager on May 26.  This

proposed settlement involved replacement of TransCanada by another specific wholesale

supplier.  Narragansett insisted that this settlement had to be completed by June 1.  TransCanada

sent a preliminary response the same day.  [*See* Kavanah and Winston emails dated 5/27/05,

attached as Exs. 18-19.]  The parties thereafter exchanged multiple drafts of the proposed

8

agreement over the next 10 days, to attempt to complete the proposed settlement on the expedited basis required by Narragansett.

26.    On June 7, 2005, TransCanada, Narragansett and the third-party replacement supplier executed various settlement-related agreement and related documents, consisting of several volumes, and filed them with the Rhode Island PUC. This overall settlement was expressly contingent on receipt of approval from the Rhode Island PUC and the Rhode Island Division. [*See* June 7 Filing Letter, attached as Ex. 20.]

27.    The Division rejected the proposed settlement by letter dated June 29, 2003.

28.    The parties discussed and pursued a proposed arbitration agreement only between on or around April 1, 2005 and April 19, 2005. The parties productively discussed settlement only between April 22, 2005 and May 2, 2005, and again between May 25, 2005 and June 29, 2005; the latter May-June discussions were based upon different terms than in earlier discussions and began only after the filing of TransCanada's Massachusetts Complaint and a day before Narragansett filed its subsequent Rhode Island Complaint. Throughout these negotiation periods, TransCanada maintained its right to pursue a court action if the arbitration could not be started expeditiously and on agreed terms or if an acceptable settlement proposal could not be agreed upon.

29.    Narragansett answered TransCanada's Massachusetts Complaint on June 23, 2005. On July 1, 2005, TransCanada requested a Rule 26(f) conference with Narragansett's Massachusetts counsel. The Rule 26(f) conference finally occurred on August 26, 2005. Also on August 26, 2005, TransCanada served its automatic disclosures, as well as document requests

on September 14, 2005. A scheduling conference is set in the Massachusetts action for October

3, 2005.

Signed under the pains and penalties of perjury this 23rd day of September, 2005.

_____
Michael Hachey

RICHARD P. SCHULER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 7, 2006

9/23/05

10

3985809v1

# EXHIBIT L

Wholesale Standard Offer
Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

# TABLE OF CONTENTS

Page

ARTICLE 1.  Definitions................................................................................... 2

ARTICLE 2.  Term  .........................................................................................3

ARTICLE 3.  Supplier Responsibilities ........................................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO ................4

ARTICLE 5.  Price  ...........................................................................................5

ARTICLE 6.  Billing and Payments................................................................. 6

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies .......... 6

ARTICLE 8.  Termination/Reimbursement .....................................................8

ARTICLE 9.  Force Majeure ............................................................................ 8

ARTICLE 10. Assignment ............................................................................... 9

ARTICLE 11. Successors and Assigns........................................................... 10

ARTICLE 12. Resolution of Disputes..............................................................10

ARTICLE 13. Interpretation .......................................................................... 11

ARTICLE 14. Severability of Provisions......................................................... 11

ARTICLE 15. Accounts and Records.............................................................. 11

ARTICLE 16. Limitations on Liability and Indemnification ........................... 12

ARTICLE 17. Regulation ............................................................................... 12

ARTICLE 18. Notices .................................................................................... 12

ARTICLE 19. Miscellaneous ......................................................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

i

## WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this seventh day of April, 1998          , between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

1

ARTICLE I.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5.  The Companies or their Standard Offer customers shall not be obligated

2

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5.  The Companies or their Standard Offer customers shall not be obligated

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.  Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.

ARTICLE 3.  Supplier Responsibilities

3

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

Price = Standard Offer Wholesale Price
+ Fuel Adjustment Factor

Where:        Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

regulatory approval and only to the extent that the
Companies are allowed to collect such revenues from
their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be
paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or
which may be assessed or imposed in the future by any governmental authority with jurisdiction
governing the sale of electricity covered by this Agreement.

## ARTICLE 6.  Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of
Suppliers, computations by the Companies of the charges for the purposes of billings hereunder
shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the
Price as determined in accordance with Article 5.  The Companies shall calculate the amount
payable to Supplier for a given month on or before the twentieth (20th) day of the following
month.  The calculation shall be provided to Supplier and shall show the total amount due and
payable for the previous month. Each bill shall be subject to adjustment for any errors in
arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of
Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due
and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date").
Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in
effect at the main office of BankBoston, or such other lending institution as agreed to by
Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis
for its dispute in a written notice to Companies within fifteen days after the Due Date.  Billing
and payment disputes shall be handled in accordance with the provisions of Article 12 of this
Agreement.  Upon final resolution of the dispute, payment of any amount due to a Party under
the terms of the resolution shall be made within thirty (30) days of the date thereof, together with
interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one
year from the date of the original billing in order to reflect differences in charges resulting from
receipt of more accurate data.  Supplier may dispute such adjustment in writing within thirty (30)
days of receipt of the proposed adjustment.

## ARTICLE 7.  Events of Default, Liability, Relationship of the Companies:

(1)    Unless excused by a Force Majeure as described in Article 9, each of the
following events shall be deemed to be an Event of Default hereunder:

6

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default.  In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint.  Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages.  In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement.  The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

7

ARTICLE 8.  Termination/Reimbursement:

(1)    In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

a.  Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

b.  The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

c.  Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice.  In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes.  In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier.  In the event that the Parties are not able to agree on the materiality of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.  Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure.  A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)     The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)     The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)     The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)     The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party.  With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.


ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 11. Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. Resolution of Disputes:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

10

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

11

ARTICLE 16. <u>Limitations on Liability and Indemnification</u>:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. <u>Regulation</u>:

(a)     This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided, however,</u> that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)     This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. <u>Notices</u>:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by  the portion of its monthly

13

Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:   TransCanada Power Marketing Ltd.

By:

On Behalf of the Companies:

Blackstone:   BLACKSTONE VALLEY ELECTRIC COMPANY

By:

Eastern:   EASTERN EDISON COMPANY

By:

Newport:   NEWPORT ELECTRIC CORPORATION

By:

15

## APPENDIX A

### SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
### AND
### STANDARD OFFER WHOLESALE PRICE

### TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service -In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

* Standard Offer Service for Eastern Edison terminates
at 12:00 midnight on December 31, 2004.

# EXHIBIT M

## PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of April 7, 1998 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller"), to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of April 7, 1998 (the "APA"), by and between Seller and Asset Purchaser.

1.      The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power   (Montaup) |
| 9/28/88 | Ocean State Power II (Montaup) |
| 5/14/86 | Ocean State Power   (Montaup) |
| 7/12/88 | Ocean State Power II (Montaup) |

A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.      This Agreement shall become effective on the Effective Date (as defined in Section 12) and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List, and Seller has made payment to Asset Purchaser of amounts owned pursuant to Section 8 below, for the last month in which such a payment is due.

3.      Commencing as of the Effective Date, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

4.  (a)  Commencing as of the month following the Effective Date, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below.  In turn, each month, Seller shall timely pay the Power Seller an amount equal to all amounts properly due to the Power Seller for the preceding month under each Commitment.  For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month.  Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

(b) Upon the Effective Date, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or, at the termination of this Agreement pay to Asset Purchaser, any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the Effective Date which relate to billing errors or reconciliations of pre-Effective Date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the Effective Date that are attributable to a period prior to the Effective Date.

5.  (a)  Effective as of the Effective Date, Seller hereby irrevocably and unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment.  Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments.  Seller shall not unreasonably withold such consent.

(b) Seller shall not agree to any amendment to or waiver of rights under a

Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of this Section 5.

6.    Each party shall be entitled to indemnification under this Agreement to the extent and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.    (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation.

(b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, as a condition of any Novation, the Asset Purchaser will require Seller to provide,either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or, if Seller and Buyer do not mutually agree to payment of a lump sum,(ii) a security interest to the Asset Purchaser in a portion of the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is acceptable to the Asset Purchaser acting reasonably.

8.    (a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed , and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

(b) Commencing as of the month following the Effective Date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth is Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c)) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b)) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month

(d) To the extent that a Novation is executed with respect to a Commitment , pursuant to Section 7 and Asset Purchaser and Seller agree to a lump-sum payment, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller  to reduce the amount of Seller's retained obligation set forth in Section 8(b).  Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by Asset Purchaser and Seller.  It is the intention of the parties that the lump-sum payment shall be based on the net present value of the amounts set out in Schedule "A" calculated using a discount rate acceptable to Asset Purchaser and Seller acting reasonably and which is reasonable given the remaining term of the amounts payable by the Seller to the Asset Purchaser as set out in Schedule "A", prevailing interest rates for similar financings done at the time of payment of the lump sum and the creditworthiness of Seller at the time of payment of the lump sum.

9.    This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10.    This Agreement, the APA and any other agreement entered into by the parties pursuant to the
APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence.  This Agreement may be amended only a written agreement signed by the parties.  Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder.  Notwithstanding the foregoing,

(i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned

subsidiary (direct or indirect) of TransCanada Pipelines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to Asset Purchaser shall thereafter by deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refiancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof, provided, however, the no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyances, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby otherwise altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11.   All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such such payment.

12.   This Agreement shall be of no force and effect until the Effective Date. If the APA shall have

been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA. As used in this Agreement, "Effective Date" shall mean the Effective Date (as defined in the APA).

13.   In the event that TransCanada Power Marketing, Ltd. or successor is in default of the Wholesale Standard Offer Agreement between TransCanada Power Marketing, Ltd. and

Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric
Corporation and, having been given notice has failed to cure such default within the time
specified in the Wholesale Standard Offer Agreement, Seller's obligation to make support
payments under Section 8(a) will be suspended until such default is fully cured.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _Kevin A Kirby_
    Name: Kevin A. Kirby
    Title: V. P.

TRANSCANADA POWER MARKETING LTD.

By: _____
    Name: Alex Pourbaix
    Title: V. P.

By: _____
    Name: Russ Girling
    Title: S/V P

## MONTHLY SUPPORT PAYMENTS

For each month, beginning with the Effective Day (prorated in accordance with Section 8(a) of the PPTA), if applicable, the Monthly Support Payment shall be as set out below:

| Calendar Year | Monthly Support Payment |
|---|---|
| 1999 | $ 1,665,000 |
| 2000 | $1,665,000 |
| 2001 | $1,542,000 |
| 2002 | $1,542,000 |
| 2003 | $ 870,000 |
| 2004 | $ 870,000 |
| 2005 | $ 870,000 |
| 2006 | $ 870,000 |
| 2007 | $ 870,000 |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS