UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

|  |  |  |
|---|---|---|
| TRANSCANADA POWER  MARKETING LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-40076FDS |
| | ) | |
| | ) | |
| NARRAGANSETT ELECTRIC COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF WENDY S. PLOTKIN IN SUPPORT OF TRANSCANADA POWER MARKETING LTD.'S REPLY IN SUPPORT OF MOTION TO ENJOIN

Wendy S. Plotkin deposes and states as follows:

1.      I am an attorney in the law firm of Choate, Hall & Stewart, and a member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts.  I am counsel to the above-named plaintiff and make this declaration in support of TransCanada Power Marketing Ltd.'s Reply in Support of its Motion to Enjoin.

2.      Attached hereto as Exhibit A is a true and correction copy of the Affidavit of Michael Hachey filed in Civil Action No. 05-234 in the United States District Court for the District of Rhode Island and Exhibits 1-20 thereto.

3.      Attached hereto as B is a true and correct copy of the Decision and Order dated October 5, 2005 of Judge William E. Smith of the United States District Court for the District of Rhode Island in Civil Action No. 05-234.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

/s/ Wendy S. Plotkin

Dated:  October 7, 2005

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | ) ) ) |  |
| Plaintiff, | ) ) ) | C.A. No. 05-234-S |
| v. | ) ) |  |
| TRANSCANADA POWER MARKETING LTD., | ) ) ) |  |
| Defendant. | ) ) ) |  |

## AFFIDAVIT OF MICHAEL HACHEY

I, Michael Hachey, hereby depose and state as follows:

1.     I am currently the Director, Eastern Commercial for TransCanada Power Marketing, Ltd ("TransCanada"). I have worked for TransCanada for 7 years. I make this affidavit in further support of TransCanada's Motion to Dismiss, Stay or Transfer Venue. I was personally involved in the negotiations leading up to this litigation and make this affidavit on personal knowledge.

2.     On March 1, 2005, TransCanada provided notice of default to Narragansett, arising from Narragansett's Standard Offer Service ("SOS") tariff filings and nonpayment of a Fuel Adjustment Factor ("FAF") under a Wholesale Standard Offer Service Agreement dated April 7, 1998 (the "WSOS Agreement"). [*See* 3/1/05 Hachey Letter attached as Ex. 1.]

3.     At a meeting on March 7, 2005, TransCanada and Narragansett met to discuss their respective positions. They disagreed on the merits. TransCanada discussed terminating the Agreement or initiating a Court action following the 30 day cure period, to which Narragansett

1

objected. Narragansett maintained that the parties had agreed to mandatory arbitration, but TransCanada pointed out that the Agreement provided for discretionary arbitration. Narragansett suggested TransCanada consider expedited resolution through fast-track arbitration or a declaratory judgment action, and TransCanada expressed willingness to discuss expedited resolution.

4.    On March 31, 2005, Narragansett began making payments to TransCanada, under protest and with reservation of rights. [*See* Hager 3/31/05 Letter, attached as Ex. 2.] No change was made to Narragansett's SOS tariff filing for 2005, which omitted an FAF for TransCanada, and TransCanada received no promise of continued or future FAF payments.

5.    From April 1, 2005 through April 19, 2005, counsel to the parties negotiated the terms for a proposed expedited arbitration and exchanged drafts of a proposed arbitration agreement. During those discussions in early April, Narragansett's counsel suggested that the protest payments should relieve some of the urgency in TransCanada's proposed arbitration schedule. In response, TransCanada's counsel indicated that, while the protest payments alleviated some of the pressure, the protest payments remained in dispute and were not guaranteed in the future, and TransCanada still required that any arbitration be completed on an expedited schedule. TransCanada then and at all times insisted that arbitration was an option only if it could be accomplished on an expedited basis and only if all arbitration terms could be agreed upon. TransCanada consistently thought and indicated that Narragansett's proposals were on too slow a schedule. [*See* emails between Winston and Kavanah dated 4/1/05; 4/6/05; 4/8/05; 4/12/05; 4/13/05(9:32 am, with embedded); 4/13/05(1:27 pm); 4/14/05(6:33 pm); 4/18/05(1:32 pm); and 4/19/05, attached as Exs. 4-12; Affidavit of Dan Winston ("Winston Aff."), attached as Ex. 3, ¶2.]

2

6.      On April 19, 2005, TransCanada sent Narragansett proposed revisions to the arbitration proposal. TransCanada's proposal required initiation of the arbitration upon execution in order to meet TransCanada's proposed schedule. [*See* Winston 4/19/05 e-mail and proposal (Ex. 12).] The parties had also agreed that the arbitration was to be initiated with the filing by TransCanada of a Statement of the Dispute (within 3 business days of execution and as early as April 26, 2005), to which Narragansett would file an Answer within 6 or 10 business days. [*See* 4/18/05 email and proposal (Ex. 11); 4/19/05 email and proposal (Ex. 12).] In TransCanada's view, the last arbitration proposals still contained substantial points of disagreement, including the schedule, the confidentiality terms, and the treatment of protest payments.

7.      On April 20, 2005, at 3:14 p.m., TransCanada sent an e-mail to Narragansett's counsel inquiring about the proposed arbitration agreement. [*See* 4/20/05 Winston email, attached as Ex. 13.] Narragansett's counsel then called TransCanada's counsel that same afternoon. During this April 20, 2005 phone call, Narragansett's counsel stated that the matter had now gone to the highest levels at National Grid; that Narragansett was no longer sure it wanted to arbitrate at all; and that at that point Narragansett wanted to talk settlement and was not willing to respond to TransCanada's arbitration proposal. [*See* Winston Aff., ¶3.]

8.      Kavanah suggested during the April 20, 2005 phone call that the parties explore settlement at a meeting on Friday, April 22, 2005. Kavanah further suggested that the parties meet on Monday, April 25, 2005 with the Rhode Island Division of Public Utilities and Carriers ("Rhode Island Division") to discuss settlement, subject to confirming the availability of Division representatives. TransCanada agreed to meet on April 22, 2005 and agreed to defer

3

further discussion about the proposed arbitration agreement and Narragansett's objections only until Tuesday, April 26, 2005. [*See* 4/40/05 email exchange, attached as Exhibit 14; Winston, Aff. ¶3.]

9.      The parties met on April 22, 2005 to discuss settlement. No constructive proposal came out of that meeting, but the parties agreed to still meet with the Division on April 25, 2005.

10.      On April 25, 2005, the parties met with the Rhode Island Division. At this meeting, attended by Dan Winston and myself for TransCanada; Thomas Robinson, Laura Olton, Ron Gerwatowski and Michael Hager of Narragansett; and Steve Scialabba and Assistant Attorney General Paul Roberti for the Division, TransCanada stated and argued its legal position for benefit of the Division. TransCanada stated during this conversation that it had the right to initiate, and might initiate, a Court action to resolve the dispute.

11.      Later during the same April 25, 2005 meeting, Thomas Robinson, Deputy General Counsel for National Grid, distributed a one-page handwritten "Tentative Term Sheet for Proposed Resolution" for the parties and Division to consider. This particular proposal had not previously been presented to TransCanada. The proposal anticipated that Narragansett would pay TransCanada its requested FAF for the duration of the WSOS Agreement. Narragansett could initiate public bids for a replacement supplier for the WSOS Agreement (and another SOS Agreement which, like the WSOS Agreement, also required TransCanada to supply electricity at below current market prices), on September 1, 2005 and then again on September 1, 2006. If a replacement supplier was accepted by Narragansett in either bid, TransCanada would be released from the WSOS Agreement and would receive FAF payments up to that point. The proposal also expressly required approval by the Rhode Island Public Utilities Commission ("PUC"). [*See* Tentative Term Sheet, attached as Ex. 15.] TransCanada, the Division and Narragansett

4

discussed Narragansett's proposal, and TransCanada and the Division agreed to consider Narragansett's proposal further.

12.    After the meeting and also on April 25, 2005, Winston sent Kavanah an e-mail stating "[b]ased on our discussions down at the PUC today, which I assume you have been debriefed on, TransCanada would be willing to hold off further negotiation on the arbitration agreement through the end of this week to see how things progress. Assuming you are agreeable to that extension, let's revisit on Monday." [See Winston 4/25/05 email, attached as Ex. 16.]

13.    On Friday, April 29, 2005, I told Robinson that the April 25 proposal was okay subject to moving the secondary bid date back to June 1, 2006. Narragansett agreed to that change, and the parties further agreed that Narragansett would draft a revised settlement proposal to present to the Division and PUC.

14.    On Monday and Tuesday, May 2 and 3, 2005, the parties heard from the Division before submitting the revised April 29 proposal. On May 3, 2005, Steve Scialabba from the Division also e-mailed the parties. Mr. Scialabba's email rejected the original terms which Narragansett had proposed on April 25, 2005, and required significantly different terms for further settlement discussions. In essence, the Division required a settlement framework under which TransCanada would be paid only half the FAF, up until a public bid by Narragansett. If Narragansett accepted a replacement bid, which would require Division and PUC approval, TransCanada would then be released from the WSOS Agreement (and a second Supply Agreement). If Narragansett did not accept a replacement bid, TransCanada would receive no further FAF payments after that point and would retain only rights to litigate. The Division stated that it would be willing to listen to proposals concerning modification to the timing of the

5

bids and release dates, if its revised settlement framework was acceptable. [*See* Scialabba 5/3/05 email, attached as Ex. 17.]

15.    In TransCanada's view, the Division's required settlement framework was entirely unworkable from a settlement standpoint, and could not form the basis for settlement discussions: the Division needed to approve any settlement, and its framework required TransCanada (i) to permanently waive half of the FAF payments up until any public bid by Narragansett, (ii) to receive *no* further FAF payments thereafter, as well as no guarantee that TransCanada would be released from the WSOS Agreement. The April 25 and 29 proposals, in contrast, guaranteed TransCanada full payment of an FAF throughout the duration of the WSOS Agreement, and provided the possibility of full release from the WSOS Agreement with FAF payments up to that date.

16.    I also had a telephone conversation with Mr. Scialabba on or around May 3, 2005, in which Mr. Scialabba confirmed that the Division's position was firm and had been discussed and approved personally by the administrator of the Division.

17.    TransCanada did not initiate any further conversations regarding settlement after May 3, 2005.

18.    Hager called me a few times in early May, 2005.  Hager asked on each occasion whether I had any further ideas to move forward with a settlement. Hager offered no ideas of his own, and I offered none either. I expressed to Hager my disappointment at the Division's response,  and let him know the Division's framework could not work to resolve the dispute. Hager did not disagree. In my opinion, it was clearly understood between Hager and I that the settlement talks were at a standstill barring some entirely new approach or change of heart by the Division, since the Division had to approve any settlement and its current position was

6

unworkable. I also told Hager that my boss, Bill Taylor, was out of the office due to a death in the family so I had not been able to speak with him. I told Hager that I would give him a call if I came up with any additional settlement ideas. I did not tell Hager that TransCanada was considering accepting the Division's proposed revisions, and I did not discuss with Hager options to adjust the Division's proposed terms.

19.     After Narragansett indicated it no longer wished to negotiate an arbitration agreement on April 20, 2005, Narragansett declined to ever respond to TransCanada's April 19, 2005 arbitration proposal, and never expressed further desire or willingness to arbitrate. Other than Winston's April 25 email to Kavanagh, TransCanada and Narragansett did not thereafter orally or in writing mention the draft arbitration agreement or the possibility of arbitration.

20.     On May 17, 2005, TransCanada filed its Massachusetts Complaint. TransCanada filed its Complaint because settlement talks had proved fruitless in view of the Division's position, arbitration talks had broken down, and at that point TransCanada wanted the dispute resolved by a Court. Having decided to file suit, TransCanada decided to file its Complaint in Massachusetts because the WSOS Agreement is governed by Massachusetts law, TransCanada is a Massachusetts company, and TransCanada felt that the dispute was most appropriately and fairly resolved in a Massachusetts Court.

21.     Also on May 17, 2005, I called Robinson to inform him that a Complaint had been filed. Winston also called Kavanah and left a telephone message for the same purpose. Winston left a message for Kavanah stating that he was calling as a courtesy to let Kavanah know that TransCanada had filed suit in Worcester Federal Court; that Narragansett would be served in Rhode Island in the next few days; that TransCanada had filed suit because at that point it wanted the matter resolved by a Court; and that, having chosen to file suit, it decided to file the

7

suit in Massachusetts as its preferred forum. Winston also stated that his and Kavanah's previous negotiations had been cordial; that the filing of the suit did not reflect an intent to increase the animus; and that he hoped he and Kavanah could continue the pleasant tone of their previous conversations. Winston then reiterated certain parts of his message in roughly the same words. He did not mention settlement or continuing settlement talks. Kavanah then called back and asked for a copy of the Complaint, and Winston emailed her a copy. [*See* Winston Aff. ¶4.]

22.    On May 25, eight days after TransCanada's Massachusetts Complaint was filed, Hager called me to propose a new approach to settlement. Hager claimed that he had a particular replacement supplier that was ready to pick up TransCanada's WSOS contracts immediately, which would release TransCanada from the WSOS Agreement in a matter of months. This was an attractive proposal to TransCanada, and had never been mentioned before. Hager did not say who the replacement supplier was.

23.    On May 26, 2005, Narragansett filed its Rhode Island Complaint.

24.    Also on May 26, Kavanah called Winston. Kavanah stated "right back at 'atcha'," and that Narragansett had filed suit in Rhode Island. She said that Narragansett's filing of the Rhode Island Complaint did not mean that Narragansett did not want to settle, but that Narragansett just "wanted to preserve their rights" in Rhode Island. [*See* Winston Aff. ¶5.]

25.    On May 27, 2005, Narragansett's counsel sent TransCanada's counsel a draft agreement reflecting the settlement structure first mentioned by Hager on May 26. This proposed settlement involved replacement of TransCanada by another specific wholesale supplier. Narragansett insisted that this settlement had to be completed by June 1. TransCanada sent a preliminary response the same day. [*See* Kavanah and Winston emails dated 5/27/05, attached as Exs. 18-19.] The parties thereafter exchanged multiple drafts of the proposed

8

3985809v1

agreement over the next 10 days, to attempt to complete the proposed settlement on the expedited basis required by Narragansett.

26.     On June 7, 2005, TransCanada, Narragansett and the third-party replacement supplier executed various settlement-related agreement and related documents, consisting of several volumes, and filed them with the Rhode Island PUC. This overall settlement was expressly contingent on receipt of approval from the Rhode Island PUC and the Rhode Island Division. [*See* June 7 Filing Letter, attached as Ex. 20.]

27.     The Division rejected the proposed settlement by letter dated June 29, 2003.

28.     The parties discussed and pursued a proposed arbitration agreement only between on or around April 1, 2005 and April 19, 2005. The parties productively discussed settlement only between April 22, 2005 and May 2, 2005, and again between May 25, 2005 and June 29, 2005; the latter May-June discussions were based upon different terms than in earlier discussions and began only after the filing of TransCanada's Massachusetts Complaint and a day before Narragansett filed its subsequent Rhode Island Complaint. Throughout these negotiation periods, TransCanada maintained its right to pursue a court action if the arbitration could not be started expeditiously and on agreed terms or if an acceptable settlement proposal could not be agreed upon.

29.     Narragansett answered TransCanada's Massachusetts Complaint on June 23, 2005. On July 1, 2005, TransCanada requested a Rule 26(f) conference with Narragansett's Massachusetts counsel. The Rule 26(f) conference finally occurred on August 26, 2005. Also on August 26, 2005, TransCanada served its automatic disclosures, as well as document requests

9

on September 14, 2005. A scheduling conference is set in the Massachusetts action for October

3, 2005.

    Signed under the pains and penalties of perjury this 23rd day of September, 2005.

              Michael Hachey

9/23/05

RICHARD P. SCHULER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 7, 2006

10

# Exhibit 1



**Trans**Canada

*In business to deliver* ™

March 1, 2005

Mr. Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
55 Bearfoot Road
Northboro, MA  01532

Re:     Wholesale Standard Offer Service Agreement between Blackstone Valley Electric
        Company ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric
        Company ("Newport") and TransCanada Power Marketing Ltd. ("TCPM") dated
        April 7, 1998 (the "Agreement")

Dear Mr. Hager:

        I am writing to provide notice of default under Article 7(1)(b) of the above-referenced
Agreement, based upon The Narragansett Electric Company's ("Narragansett's") failure to
comply with Article V of the Agreement.  Specifically, Narragansett has refused to include the
required Fuel Adjustment Factor in its price calculations, and to comply with its obligations
under Article V before the Rhode Island Public Utilities Commission with respect to its Standard
Offer Service tariffs.

        As you know, Narragansett's failure to cure or rectify a noticed default within thirty (30)
days shall be deemed an Event of Default under Agreement Article 7.

                                        Sincerely,

                                        Michael Hachey

MH/DCW/slw:3837458

```
                    ************************
                    ***   TX REPORT   ***
                    ************************


    TRANSMISSION OK

    TX/RX NO              3240
    CONNECTION TEL                    15084217335
    CONNECTION ID
    ST. TIME              03/01 16:04
    USAGE T               00'27
    PGS. SENT                2
    RESULT               OK
```

( ) **Trans**Canada

*In business to deliver*

**fax**

date _3/1/05_

attention _Michael Hager_

company _NEPSCo_

fax no. _508-421-7335_

cc _____

from _Mike Hickey_

phone _508-871-1852_

fax _____

email _____

no. of pages _2_  (including this page)

TransCanada Power Marketing Ltd
110 Turnpike Road · Suite 203
Westborough, MA 01581

**tel** 508-871-1850
**fax** 508-898-0433
**web** www.transcanada.com

# Exhibit 2



National Grid USA Service Company, Inc.

Michael J. Hager
Vice President, Energy Supply – New England

March 31, 2005

VIA FACSIMILE and OVERNIGHT DELIVERY

TransCanada Power Marketing Ltd.
3400, 237-4th Avenue S.W.
Calgary, Alberta T2P5A4

RE:    Wholesale Standard Offer Service Agreement

Dear Sir/Madam:

The Narragansett Electric Company ("Narragansett") is issuing via wire transfer today to
TransCanada Power Marketing Ltd. ("TCPM's") account # 40760055 funds in the amount of
$602,214.39 (the "Funds"). Narragansett is paying the Funds to TCPM under protest, without
prejudice, and with a full reservation of all rights, claims (including for interest), counterclaims and
defenses under or in relation to the Wholesale Standard Offer Service Agreement between
Narragansett, as the successor in interest to the Blackstone Valley Electric Company and Newport
Electric Corporation, and TCPM dated April 7, 1998 (the "WSOS Agreement"), or in law or equity.
The payment of the Funds shall not be construed to be an admission, assent or acquiescence to any
allegation or assertion by TCPM whether or not in writing, or to alter, waive, invalidate, impair or
forfeit any of the terms or conditions of the WSOS Agreement or Narragansett's rights in relation
thereto in law or equity, or TCPM's obligations.

With reference to TCPM's letter dated March 1, 2005, TCPM alleges that Narragansett is in default
under the WSOS Agreement. As TCPM is aware, Narragansett vehemently denies and protests that
assertion. While Narragansett believes that TCPM would be in breach if TCPM served a notice of
termination, Narragansett is seeking to mitigate damages for TCPM's potential breaches.
Accordingly, the transferred Funds are based upon a calculation of the portion of the payments that
would have been due for the months of January and February 2005 under the WSOS Agreement if a
Fuel Adjustment Factor ("FAF") for the WSOS Agreement had been in existence and in effect in
Narragansett's tariffs, and which permitted Narragansett to recover the FAF amount from customers.
As noted above, Narragansett's position is that no such FAF was in existence or in effect.

The Funds should be placed by TCPM in a bankruptcy-remote escrow account for the benefit of the
party that prevails in a resolution of the dispute.

Very truly yours,

Michael Hager    MP

Michael J. Hager

cc:    Michael E. Hachey
       Daniel C. Winston, Esq.

55 Bearfoot Road
Northborough, MA 01532
508.421.7350    Fax: 508.421.7335

# Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br><br>        Plaintiff,<br><br>v.<br><br>TRANSCANADA POWER MARKETING LTD.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)    CA No. 05-234<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **AFFIDAVIT OF DANIEL C. WINSTON**

I, Daniel C. Winston, hereby depose and state as follows:

1.     I am an attorney and partner with the law firm of Choate, Hall & Stewart.

Choate, Hall & Stewart represents TransCanada Power Marketing Ltd. in this matter. I make

this affidavit to describe certain events leading up to this litigation that I have personal

knowledge of.

2.     In early April, 2005, inside counsel for Narragansett, Gloria Kavanah, and myself

attempted to negotiate terms for an expedited arbitration, including its schedule. During those

discussions, Ms. Kavanah suggested that the protest payments should relieve some of the

urgency in TransCanada's proposed arbitration schedule. In response, I indicated that, while the

protest payments alleviated some of the pressure, the protest payments remained in dispute and

were not guaranteed in the future. I insisted then, and at all times (and as set forth in our email

correspondence), that arbitration was an option only if it could be accomplished on an expedited

basis and only if all arbitration terms could be agreed upon.

3985812v1

3.    On April 20, 2005, Ms. Kavanah called shortly after I sent her an email inquiring about the last arbitration proposal. During this phone call, she stated that the matter had now gone to the highest levels at National Grid; that Narragansett was no longer sure it wanted to arbitrate at all; and that at that point Narragansett wanted to talk settlement and was not willing to respond to TransCanada's last arbitration proposal. She instead proposed settlement meetings on April 22 and on April 25, 2005, the second meeting to include the Rhode Island Division. We agreed to these meetings and to defer further discussion about the proposed arbitration agreement and Narragansett's objections only until Tuesday, April 26, 2005.

4.    On May 17, 2005 I left a voice message for Kavanah stating that I was calling as a courtesy to let her know that TransCanada had filed suit in Worcester Federal Court; that Narragansett would be served in Rhode Island in the next few days; that TransCanada had filed suit because at that point it wanted the matter resolved by a Court; and that, having chosen to file suit, it decided to file the suit in Massachusetts as its preferred forum. I also stated that our previous negotiations had been cordial; that the filing of the suit did not reflect an intent to increase the animus; and that I hoped that the parties could continue the pleasant tone of their previous conversations. I then reiterated certain parts of my message in roughly the same words. I did not mention settlement or continuing settlement talks. Kavanah then called back and asked for a copy of the Complaint, and I emailed her a copy.

5.     On May 26, 2005, Kavanah called me. She stated "right back at 'atcha'," and that Narragansett had filed suit in Rhode Island. She said that Narragansett's filing of the Rhode Island Complaint did not mean that Narragansett did not want to settle, but that Narragansett just "wanted to preserve their rights" in Rhode Island.

Signed under the pains and penalties of perjury this 22 day of September, 2005.

Daniel C. Winston

# Exhibit 4

## Thibodeau, Michelle L.

| | |
|---|---|
| **From:** | Winston, Daniel C. |
| **Sent:** | Friday, April 01, 2005 2:28 PM |
| **To:** | 'Gloria Kavanah Esq. (gloria.kavanah@us.ngrid.com)'; 'Gloria Kavanah Esq. (gloria.kavanah@us.ngrid.com)' |
| **Subject:** | TC/Grid: Fuel Adjustment |
| **Contacts:** | Gloria Kavanah Esq. |

Gloria,

As mentioned in my voicemail, the following are proposed terms for an arbitration. These terms would be signed by both parties (or their counsel) and would replace paragraphs 2 and 3 of Article 12 of the EUA SOS Agreement. I have tried to track Article 12, except where we felt it should be changed. We would like to finalize and submit the matter to the AAA next week, so we would appreciate your response to these terms by the end of Monday April 4 or no later than Tuesday, April 5. Please also feel free to call me on Monday to discuss the terms, as that may expedite reaching final terms if you have any disagreement.

- The arbitration shall be conducted before a single neutral arbitrator, appointed through the process outlined in the Commercial Arbitration Rules of the American Arbitration Association (AAA), except that the parties must make their selections under Rule R-11(b) within 7 (rather than 15) days. The arbitrator is to be appointed by the AAA from its National Energy Program panel (see http://www.adr.org/Energy), and shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration of any affiliate of such Party. The arbitration shall be conducted in Boston, Massachusetts
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.and its Procedures for Large, Complex Commercial Disputes.
- The arbitration and arbitrator selection process shall be initiated with the filing of a written submission(s) under Rule R-5, on or by April 8, 2005. The parties shall jointly share the initial filing fee.
- Discovery shall include an exchange of documents in response to written requests, and the parties shall exchange a preliminary list of witnesses five (5) days before the preliminary hearing. Depositions shall be permitted, subject to objections based on relevance or excessiveness.
- The parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator, at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- The arbitrator shall render a decision with 90 days of his or her appointment and shall notify the Parties in writing of such decision and the reasons therefore, and shall make an award apportioning the payment of the costs and expenses of arbitration, including arbitrator costs, among the Parties, provided, however, that except as authorized immediately below each party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants.
- The scope of the arbitration and arbitrator's authority will be to resolve all rights and claims arising from non-payment of the fuel adjustment factor in Article 5 of the EUA SOS Agreement, including all related common law and statutory claims. The arbitrator will be authorized to award

all relief available under the contract or any asserted claims, including but not limited to monetary damages, interest, termination, and, if warranted by a statutory claim, multiple damages or attorneys' fees and costs.

- The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

# Exhibit 5

## Thibodeau, Michelle L.

**From:** Kavanah, Gloria [Gloria Kavanah@us ngrid com]
**Sent:** Wednesday, April 06, 2005 1:14 PM
**To:** Winston, Daniel C ; Winston, Daniel C.
**Subject:** RE: TC/Grid: Fuel Adjustment

PRIVILEGED AND CONFIDENTIAL UNDER FRE 408 AND SIMILAR STATE LAWS

Dan-

Thanks for TCPM's arbitration proposal   Narragansett proposes some modifications to your proposal, which are marked on the attached word document  A clean copy is also attached  (Note that any redlining which doesn't accurately mark changes to TCPM's terms is unintentional and merely my typographical redlining glitch )

I'm available to discuss the proposal further  Also, let me know if you have questions

Thanks
Gloria

*Gloria Kavanah*
*National Grid USA*
*1125 Broadway*
*Albany, New York 12204-2505*

*518.433.5221 (phone)*
*518.433.5220 (fax)*
*gloria.kavanah@us.ngrid.com*


-----Original Message-----
**From:** Winston, Daniel C. [mailto:DWinston@choate.com]
**Sent:** Friday, April 01, 2005 2:28 PM
**To:** Kavanah, Gloria
**Subject:** TC/Grid: Fuel Adjustment

Gloria,

     As mentioned in my voicemail, the following are proposed terms for an arbitration.  These terms would be signed by both parties (or their counsel) and would replace paragraphs 2 and 3 of Article 12 of the EUA SOS Agreement.  I have tried to track Article 12, except where we felt it should be changed.  We would like to finalize and submit the matter to the AAA next week, so we would appreciate your response to these terms by the end of Monday April 4 or no later than Tuesday, April 5.  Please also feel free to call me on Monday to discuss the terms, as that may expedite reaching final terms if you have any disagreement.

- The arbitration shall be conducted before a single neutral arbitrator, appointed through the process outlined in the Commercial Arbitration Rules of the American Arbitration Association (AAA), except that  the parties must make their selections under Rule R-11(b) within 7 (rather than 15) days.  The arbitrator is to be appointed by the AAA from its National Energy Program

panel (see http://www.adr.org/Energy), and shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration of any affiliate of such Party. The arbitration shall be conducted in Boston, Massachusetts

- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA and its Procedures for Large, Complex Commercial Disputes.
- The arbitration and arbitrator selection process shall be initiated with the filing of a written submission(s) under Rule R-5, on or by April 8, 2005. The parties shall jointly share the initial filing fee.
- Discovery shall include an exchange of documents in response to written requests, and the parties shall exchange a preliminary list of witnesses five (5) days before the preliminary hearing. Depositions shall be permitted, subject to objections based on relevance or excessiveness.
- The parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator, at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- The arbitrator shall render a decision with 90 days of his or her appointment and shall notify the Parties in writing of such decision and the reasons therefore, and shall make an award apportioning the payment of the costs and expenses of arbitration, including arbitrator costs, among the Parties, provided, however, that except as authorized immediately below each party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants.
- The scope of the arbitration and arbitrator's authority will be to resolve all rights and claims arising from non-payment of the fuel adjustment factor in Article 5 of the EUA SOS Agreement, including all related common law and statutory claims. The arbitrator will be authorized to award all relief available under the contract or any asserted claims, including but not limited to monetary damages, interest, termination, and, if warranted by a statutory claim, multiple damages or attorneys' fees and costs.
- The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

---

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

---

This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

9/14/2005

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator.  The parties shall endeavor to agree upon a mutually acceptable arbitrator within twelve (12) business days, appointed through the following process:  Within three (3) business days, the Parties shall identify a pool of at least [seven (7)] potential arbitrators mutually acceptable to them (the "Pool").  If the Parties are unable to reach agreement on a Pool, the process shall cease.  The Pool shall consist of persons who (i) are an experienced arbitrator, (ii) are either a former judge or highly regarded seasoned attorney, (iii) are knowledgeable in contract law, (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration of any affiliate of such Party  Within five (5) business days after the date of identification of the Pool, each Party shall separately rank each of the candidates in the Pool.  Next, the Parties shall simultaneously exchange the rankings of the candidates.  The Parties' rank ascribed to each candidate shall be added (such total, the "Score").  The candidate with the lowest Score shall be invited to serve.  In the event the candidate is unwilling or unable to serve, the Parties shall invite the candidate with the next lowest Score, and so on, until an arbitrator is selected or the Pool is exhausted.  If the Pool is exhausted, the Parties may identify another Pool, and, if so, the above process will be repeated.  In the event that the lowest Score (of those candidates then in the Pool) is received by more than one candidate ("Tied" Candidates"), the Parties shall endeavor to agree on which of the Tied Candidates to invite to serve.  If the Parties are unable to agree on which of the Tied Candidates shall be invited to serve, the Parties shall submit the Pool to a Court and ask that the Court select a candidate from the Pool.  The Parties acknowledge and agree that either Party may discontinue the process upon notice to the other Party.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the [[under discussion: CPR Institute for Dispute Resolution Non-Administered Arbitrations or the Commercial Arbitration Rules of the AAA, and its Procedures for Large, Complex Commercial Disputes ]]
- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process.  If by close of business on [short date to be discussed] the Parties are unable to agree to a joint written submission, the arbitration shall be initiated with the filing by each Party of a written submission on or by [to be determined, e.g., 3 business days after date stated earlier in this clause].  The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.
- Discovery shall include an exchange of documents in response to written requests, and the Parties shall exchange a preliminary list of witnesses.

| Deleted: outlined in the Commercial Arbitration Rules of the American Arbitration Association (AAA), except that  the parties |

| Deleted: must make their selections under Rule R-11(b) within 7 (rather than 15) days. |

| Deleted: is to be appointed by the AAA from its National Energy Program panel (see http://www.adr.org/Energy), and shall be |

| Deleted: electric utility matters, including electricity transmission and bulk power issues |

| Deleted: and |

| Deleted: shall |

| Deleted: The arbitration shall be conducted in Boston, Massachusetts |

| Deleted: . |

| Deleted: and arbitrator selection process |

| Deleted: (s) under Rule R-5, |

| Deleted: April 8, 2005 |

| Deleted: p |

| Deleted: p |

| Deleted: five (5) days before the preliminary hearing  Depositions shall be permitted, subject to objections based on relevance or excessiveness |

| Formatted: Right:  0 25", Position: Horizontal:  7.13", Relative to: Page, Vertical:  0 07", Relative to: Paragraph |

| Formatted: Right:  0.25" |

- The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their presentations at any hearing before the arbitrator, at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- Unless otherwise agreed, the arbitrator shall render a decision within 90 days of his or her appointment and shall notify the Parties in writing of such decision and the reasons therefore.
- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights and obligations regarding the fuel adjustment factor, of the EUA SOS Agreement, including, without limitation, the right to terminate the EUA SOS Agreement based upon a default (if any) related to the fuel adjustment factor and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract, including but not limited to monetary damages, interest, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.
- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.
- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the FAF during the pendency of the arbitration and until the arbitrator issues his/her decision.
- TCPM specifically agrees that during the pendency of the arbitration and until the arbitrator issues his/her decision, Narragansett shall have no obligation to tender to TCPM a payment in relation to the Fuel Adjustment Factor; provided however, each Party reserves all rights, claims, defenses or the like in relation to matters and issues related to the FAF for the period from and after January 1, 2005; provided further, neither party shall use a Party's forbearance as provided in this clause as evidence of that Party's agreement or acquiescence to a position or action, and such forbearance shall not impair any right, claim, defense or the like in relation to the FAF or for related interest that may be applicable.
- The Parties' agreement to arbitrate the issues and matters related to the FAF, the submission to and existence of the arbitration and the arbitrator's decision, and anything in relation to the foregoing (the "Confidential Information"), shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party, or any of its affiliates, may provide copies or information regarding the Confidential Information to (1) any regulatory agency requesting and/or requiring such Confidential Information, provided that any such disclosure must include a request for confidential treatment of the Confidential Information from the copies of or references to the Confidential Information which are placed in the public record, (2) (i) any former employee of a Party if such person is contemplated as a witness in the arbitration and (ii) an affiliate if related to the Party's performance of the WSOSA or the arbitration, provided that in the case of (i) and (ii) any such person or affiliate agrees (x) to treat the

---

Deleted: p

Deleted: direct

Deleted: T

Deleted: . and shall make an award apportioning the payment of the costs and expenses of arbitration, including arbitrator costs, among the Parties provided, however, that except as authorized immediately below each party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants.

Deleted: will

Deleted: claims arising from non-payment of

Deleted: in Article 5

Deleted: claims

Deleted: or any asserted claims

Deleted: warranted

Deleted: a

Deleted: ory claim

Deleted: (s)

Deleted: award

Deleted: (s)

Formatted: Bullets and Numbering

Formatted: Right: 0.25", Position: Horizontal: 7.13", Relative to: Page, Vertical: 0.07", Relative to: Paragraph

Formatted: Right: 0.25"

Confidential Information as confidential in accordance with this clause and (y) that any Confidential Information shall be used only in relation to this arbitration.

**Formatted:** Indent: Left: 0.25"

**Formatted:** Right: 0.25", Position: Horizontal: 7.13", Relative to: Page, Vertical: 0.07", Relative to: Paragraph

**Formatted:** Right: 0.25"

PRIVILEGED AND CONFIDENTIAL UNDER FRE 408                3

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator. The parties shall endeavor to agree upon a mutually acceptable arbitrator within twelve (12) business days, appointed through the following process: Within three (3) business days, the Parties shall identify a pool of at least [seven (7)] potential arbitrators mutually acceptable to them (the "Pool"). If the Parties are unable to reach agreement on a Pool, the process shall cease. The Pool shall consist of persons who (i) are an experienced arbitrator, (ii) are either a former judge or highly regarded seasoned attorney, (iii) are knowledgeable in contract law, (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration of any affiliate of such Party. Within five (5) business days after the date of identification of the Pool, each Party shall separately rank each of the candidates in the Pool. Next, the Parties shall simultaneously exchange the rankings of the candidates. The Parties' rank ascribed to each candidate shall be added (such total, the "Score"). The candidate with the lowest Score shall be invited to serve. In the event the candidate is unwilling or unable to serve, the Parties shall invite the candidate with the next lowest Score, and so on, until an arbitrator is selected or the Pool is exhausted. If the Pool is exhausted, the Parties may identify another Pool, and, if so, the above process will be repeated. In the event that the lowest Score (of those candidates then in the Pool) is received by more than one candidate ("Tied" Candidates"), the Parties shall endeavor to agree on which of the Tied Candidates to invite to serve. If the Parties are unable to agree on which of the Tied Candidates shall be invited to serve, the Parties shall submit the Pool to a Court and ask that the Court select a candidate from the Pool. The Parties acknowledge and agree that either Party may discontinue the process upon notice to the other Party.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the [[under discussion: CPR Institute for Dispute Resolution Non-Administered Arbitrations or the Commercial Arbitration Rules of the AAA and its Procedures for Large, Complex Commercial Disputes.]]
- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process. If by close of business on [short date to be discussed] the Parties are unable to agree to a joint written submission, the arbitration shall be initiated with the filing by each Party of a written submission on or by [to be determined, e.g., 3 business days after date stated earlier in this clause]. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.
- Discovery shall include an exchange of documents in response to written requests, and the Parties shall exchange a preliminary list of witnesses.

- The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their presentations at any hearing before the arbitrator, at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- Unless otherwise agreed, the arbitrator shall render a decision within 90 days of his or her appointment and shall notify the Parties in writing of such decision and the reasons therefore.
- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights and obligations regarding the fuel adjustment factor of the EUA SOS Agreement, including, without limitation, the right to terminate the EUA SOS Agreement based upon a default (if any) related to the fuel adjustment factor and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract, including but not limited to monetary damages, interest, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.
- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.
- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the FAF during the pendency of the arbitration and until the arbitrator issues his/her decision.
- TCPM specifically agrees that during the pendency of the arbitration and until the arbitrator issues his/her decision, Narragansett shall have no obligation to tender to TCPM a payment in relation to the Fuel Adjustment Factor; provided however, each Party reserves all rights, claims, defenses or the like in relation to matters and issues related to the FAF for the period from and after January 1, 2005; provided further, neither party shall use a Party's forbearance as provided in this clause as evidence of that Party's agreement or acquiescence to a position or action, and such forbearance shall not impair any right, claim, defense or the like in relation to the FAF or for related interest that may be applicable.
- The Parties' agreement to arbitrate the issues and matters related to the FAF, the submission to and existence of the arbitration and the arbitrator's decision, and anything in relation to the foregoing (the "Confidential Information"), shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party, or any of its affiliates, may provide copies or information regarding the Confidential Information to (1) any regulatory agency requesting and/or requiring such Confidential Information, provided that any such disclosure must include a request for confidential treatment of the Confidential Information from the copies of or references to the Confidential Information which are placed in the public record, (2) (i) any former employee of a Party if such person is contemplated to be a witness in the arbitration and (ii) an affiliate if related to the Party's performance of the WSOSA or the arbitration, provided that in the case of (i) and (ii) any such person or affiliate agrees (x) to treat the

Confidential Information as confidential in accordance with this clause and (y) that any Confidential Information shall be used only in relation to this arbitration.

# Exhibit 6

## Thibodeau, Michelle L.

**From:** Winston, Daniel C

**Sent:** Friday, April 08, 2005 6:02 PM

**To:** Gloria Kavanah Esq (gloria kavanah@us ngrid com); 'Gloria Kavanah Esq (gloria kavanah@us ngrid com)'

**Subject:** TransCanada/Grid: Fuel Adjustment: Privileged and Confidential Settlement Exchange

Gloria,

Here are our requested revisions to your last draft, both clean and redlined against your draft. As we discussed, at this point we should just talk it over on the phone on Monday and try to hammer out the agreement rather than continue to exchange drafts. I am available all day Monday including early morning, and it might be good if we spoke promptly so I can explain our reasoning.

I will give more explanation over the phone, but a couple comments now. Some of the terms are still negotiable, and so for example we may be willing to limit the depositions (to, for example, a presumption against depositions unless good cause can be shown, as in the AAA Rules) provided that you will agree to the modified AAA selection process we have suggested. That AAA selection process is important to us for reasons I can explain. Some of the deadlines are based upon a conversation I had with the AAA about what is feasible in terms of timing. We also feel it is important that the hearing occur by mid-June or late July, or vacations will become a problem, and so some of the deadlines may depend on how quickly we can get this worked out and started. (Hence suggesting 75 rather than 90 days for the decision may apply if we don't get started in time.)

With no control over fuel prices, we cannot agree not to terminate in the absence of fuel adjustment payments during the arbitration. Obviously if you continue to make the payments during the pendency of the arbitration we would not terminate.

# Exhibit 7

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator. ~~The parties shall endeavor to agree upon a mutually acceptable arbitrator within twelve (12) business days, appointed through the following process: Within three (3) business days, the Parties shall identify a pool of at least [seven (7)] potential arbitrators mutually acceptable to them (the "Pool"). If the Parties are unable to reach agreement on a Pool, the process shall cease. The Pool shall consist of persons~~ The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA). The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex civil cases, (ii) are either a former judge or ~~highly regarded seasoned attorney~~ have more than twenty (20) years of complex civil litigation experience, (iii) are knowledgeable in contract law~~,~~ as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration ~~of any affiliate of such Party. Within~~ or any affiliate or predecessor of such Party. The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts. The parties shall file at the time of their initial submission(s), for conflicts purposes, a list of all affiliates, predecessors and known potential witnesses. As soon as possible and no later than five (5) business days after ~~the date of identification of the Pool, each Party shall separately rank each of the candidates in the Pool. Next, the Parties shall simultaneously exchange the rankings of the candidates. The Parties' rank ascribed to each candidate shall be added (such total, the "Score"). The candidate with the lowest Score shall be invited to serve. In the event the candidate is unwilling or unable to serve, the Parties shall invite the candidate with the next lowest Score, and so on, until an arbitrator is selected or the Pool is exhausted. If the Pool is exhausted, the Parties may identify another Pool, and, if so, the above process will be repeated. In the event that the lowest Score (of those candidates then in the Pool) is received by more than one candidate ("Tied" Candidates"), the Parties shall endeavor to agree on which of the Tied Candidates to invite to serve. If the Parties are unable to agree on which of the Tied Candidates shall be invited to serve, the Parties shall submit the Pool to a Court and ask that the Court select a candidate from the Pool. The Parties acknowledge and agree that either Party may discontinue the process upon notice to the other Party~~ receiving the initial filing by the parties, the AAA shall send to the parties the list of potential arbitrators. The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the parties' lists.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the ~~[[under discussion: CPR Institute for Dispute Resolution Non-~~

PRIVILEGED AND CONFIDENTIAL UNDER FRE 408                1

~~Administered Arbitrations or the~~ Commercial Arbitration Rules of the AAA and its Procedures for Large, Complex Commercial Disputes.~~]]~~

- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process, waiving any answer. If by close of business on [~~short date to be discussed~~3 business days after signing of this agreement] the Parties are unable to agree ~~to~~and submit a joint written submission, the arbitration shall be initiated with the filing by each Party of a written submission on or by [~~to be determined. e.g., 3~~2 business days after date stated earlier in this clause], waiving any answer. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

- Discovery shall include an exchange of documents in response to written requests, and the Parties shall exchange a preliminary list of witnesses.~~—~~ at the preliminary hearing. Depositions shall be permitted, subject to objections based on relevance or excessiveness.

- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any hearing before the arbitrator, at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.

- Unless otherwise agreed, the primary evidentiary hearing shall occur by no later than [July 15, 2005], and the arbitrator shall render a decision within 90 [75?] days of his or her appointment and shall notify the Parties in writing of such decision and the reasons therefore.

- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor (FAF) of the EUA SOS Agreement ("WSOSA"), including, without limitation, the right to terminate the ~~EUA SOS Agreement~~WSOSA based upon ~~a~~any WSOSA provision or any default (if any) related to the ~~fuel adjustment factor~~FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any claim asserted related to the FAF, including but not limited to monetary damages, interest, specific performance, rescission ,reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

- ~~The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the FAF during the pendency of the arbitration and until the arbitrator issues his/her decision.~~

PRIVILEGED AND CONFIDENTIAL UNDER FRE 408                                    2

- ~~TCPM specifically agrees that during the pendency of the arbitration and until the arbitrator issues his/her decision, Narragansett shall have no obligation to tender to TCPM a payment in relation to the Fuel Adjustment Factor; provided however, each Party reserves all rights, claims, defenses or the like in relation to matters and issues related to the FAF for the period from and after January 1, 2005; provided further, neither party shall use a Party's forbearance as provided in this clause as evidence of that Party's agreement or acquiescence to a position or action, and such forbearance shall not impair any right, claim, defense or the like in relation to the FAF or for related interest that may be applicable.~~

- The Parties' ~~agreement to  arbitrate the issues and matters related to the FAF, the submission to and existence of the arbitration and the arbitrator's decision, and anything in relation to the foregoing~~submissions to the arbitrator, AAA, and each other as part of the arbitration (the "Confidential Information")~~,~~ shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party~~,~~ or any of its affiliates~~,~~ may provide ~~copies or information regarding the~~Confidential Information to (1) any regulatory agency ~~requesting and/or requiring such Confidential Information~~, provided that any such disclosure must include a request for confidential treatment of the Confidential Information ~~from~~and the copies of or references to the Confidential Information which are placed in the public record, (2) ~~(i) any former employee of a Party if such person is contemplated to be a~~any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, under pledge of confidentiality; (5) any person contemplated to be an actual or potential witness in the arbitration~~and (ii) an affiliate if~~, but only (i) to the extent reasonably necessary to discover or develop such testimony, and (ii) provided that the person is informed of the confidential nature of the Confidential Materials, and (6) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, ~~provided that in the case of (i) and (ii) any such person or affiliate agrees (x) to treat the Confidential Information as confidential in accordance with this clause and (y) that any Confidential Information shall be used only in relation to this arbitration.~~and only under pledge of confidentiality.  Nothing herein, however, shall prevent either Party from continuing to use and disclose its own documents and information.

Document comparison done by DeltaView on Friday, April 08, 2005 5:29:53 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://exchdms/Exchange/3910013/1 |
| Document 2 | iManageDeskSite://exchdms/Exchange/3910013/2 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 30 |
| Deletions | 27 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 59 |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator. The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA). The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex civil cases, (ii) are either a former judge or have more than twenty (20) years of complex civil litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party. The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts. The parties shall file at the time of their initial submission(s), for conflicts purposes, a list of all affiliates, predecessors and known potential witnesses. As soon as possible and no later than five (5) business days after receiving the initial filing by the parties, the AAA shall send to the parties the list of potential arbitrators. The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the parties' lists.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA and its Procedures for Large, Complex Commercial Disputes.
- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process, waiving any answer. If by close of business on [3 business days after signing of this agreement] the Parties are unable to agree and submit a joint written submission, the arbitration shall be initiated with the filing by each Party of a written submission on or by [2 business days after date stated earlier in this clause], waiving any answer. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.
- Discovery shall include an exchange of documents in response to written requests, and the Parties shall exchange a preliminary list of witnesses at the preliminary hearing. Depositions shall be permitted, subject to objections based on relevance or excessiveness.
- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any hearing before the arbitrator, at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- Unless otherwise agreed, the primary evidentiary hearing shall occur by no later than [July 15, 2005], and the arbitrator shall render a decision within 90 [75?]

days of his or her appointment and shall notify the Parties in writing of such decision and the reasons therefore.

- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor (FAF) of the EUA SOS Agreement ("WSOSA"), including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any claim asserted related to the FAF, including but not limited to monetary damages, interest, specific performance, rescission ,reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

- The Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration (the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the public record, (2) any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, under pledge of confidentiality; (5) any person contemplated to be an actual or potential witness in the arbitration, but only (i) to the extent reasonably necessary to discover or develop such testimony, and (ii) provided that the person is informed of the confidential nature of the Confidential Materials, and (6) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality. Nothing herein, however, shall prevent either Party from continuing to use and disclose its own documents and information.

PRIVILEGED AND CONFIDENTIAL UNDER FRE 408

# Exhibit 8

## Thibodeau, Michelle L.

| | |
|---|---|
| **From:** | Winston, Daniel C |
| **Sent:** | Tuesday, April 12, 2005 11:23 AM |
| **To:** | Gloria Kavanah Esq  (gloria.kavanah@us.ngrid.com); 'Gloria Kavanah Esq. (gloria kavanah@us ngrid com)' |
| **Subject:** | TransCanada/Grid |

Gloria:

When can we expect to hear back from you?

**Thibodeau, Michelle L.**

| | |
|---|---|
| **From:** | Winston, Daniel C |
| **Sent:** | Wednesday, April 13, 2005 9:32 AM |
| **To:** | 'gloria.kavanah@us ngrid com'; 'gloria.kavanah@us.ngrid com' |
| **Subject:** | Re: [Maybe Spam] TransCanada/Grid |

That would be good.  We need to keep this moving.  I will also be able to work on this
with you from DC but would like to get started before I leave.  I am in the office until
about 3:30, which is when I need to leave.
------------------------
Dan Winston
Choate, Hall & Stewart
Exchange Place
Boston, MA 02109
(617) 248-4049 (direct dial)


-----Original Message-----
From: Kavanah, Gloria <Gloria.Kavanah@us ngrid.com>
To: Winston, Daniel C. <DWinston@choate.com>
Sent: Wed Apr 13 09:23:01 2005
Subject: RE: [Maybe Spam] TransCanada/Grid

Dan-

Keeping in mind you're out for the next two days, I'm  trying for mid-day today to call
you and get you a mark up so that we can advance the ball.

G
----Original Message-----
From: Winston, Daniel C. [mailto:DWinston@choate.com]
Sent: Tuesday, April 12, 2005 11:23 AM
To: Kavanah, Gloria
Subject: [Maybe Spam] TransCanada/Grid


Gloria:

    When can we expect to hear back from you?


    _____

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The
substance of this message, along with any attachments, may be confidential and legally
privileged.  If you are not the designated recipient of this message, please destroy it
and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at
<http://www.choate.com> www.choate.com


    _____


This e-mail and any files transmitted with it, are confidential to National Grid and are
intended solely for the use of the individual or entity to whom they are addressed. If you
have received this e-mail in error, please reply to this message and let the sender know.

1

# Exhibit 9

## Thibodeau, Michelle L.

**From:** Kavanah, Gloria [Gloria.Kavanah@us.ngrid.com]

**Sent:** Wednesday, April 13, 2005 1:27 PM

**To:** Winston, Daniel C ; Winston, Daniel C.

PRIVILEGED AND CONFIDENTIAL: SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

Dan-
Attached is a redline of the draft arbitration agreement marked to show changes to the version you sent of April
8  Let's plan to talk so that we can finalize the agreement

Gloria

*Gloria Kavanah*
*National Grid USA*
*1125 Broadway*
*Albany, New York 12204-2505*

*518.433.5221 (phone)*
*518.433.5220 (fax)*
*gloria.kavanah@us.ngrid.com*

This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

9/14/2005

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator. The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA)  The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party.  The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.)  The Parties shall file at the time of their initial submission(s), for conflicts purposes, a list of all affiliates and predecessors.  As soon as possible and no later than five (5) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators.  The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated.  The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b).  The Parties further agree that at any time during the selection process either Party may discontinue the selection process upon written notice to the other Party
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.
- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process, waiving any answer.  If by close of business on 3 business days after signing of this agreement (the "Arbitration Agreement Date") the Parties are unable to agree and submit a joint written submission, the arbitration shall be initiated with the filing by each Party of a written submission (i) in a form and format to be determined by the Parties within 2 business days after the Arbitration Agreement Date, (ii) on or by [15 business days after the Arbitration Agreement Date, and (iii) waiving any answer.  The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants

| Deleted: civil |
| Deleted: civil |
| Deleted: p |
| Deleted: , |
| Deleted: and known potential witnesses |
| Deleted: p |
| Deleted: p |
| Deleted: p |
| Deleted: and its Procedures for Large, Complex Commercial Disputes |
| Deleted: [ |
| Deleted: ] |
| Deleted: 2 |
| Deleted: d |
| Deleted: stated earlier in this clause] |
| Deleted: |
| Deleted: p |

- Discovery shall be limited to an exchange of documents in response to written requests, and the Parties shall exchange a preliminary list of witnesses after consultation with the arbitrator. There shall be no depositions.

  > **Deleted:** include
  > **Deleted:** at the preliminary hearing

- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any hearing before the arbitrator (any other witnesses or exhibits subject to the approval of the arbitrator), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing

  > **Deleted:** D
  > **Deleted:** shall be permitted, subject to objections based on relevance or excessiveness

- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the EUA SOS Agreement ("WSOSA") for reason of any alleged default in relation to the FAF from and after the Arbitration Agreement Date and through the date arbitrator issues his/her decision (the "Arbitration Period"); provided that during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like) an amount equal to the product of the calculation using the methodology set forth in Attachment 2 to the April 18, 2000 notice from the National Grid companies (by Michael Hager) to TCPM (Sean McMaster) (the "2000 Notice"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the 2000 notice) and (iii) defining the Fuel Trigger Point as $8.48/MMbtu (and not as set forth in the 2000 Notice) (such payments collectively, the "Protest Payment"); provided however; TCPM shall place such Protest Payment in a bankruptcy-remote escrow account and, provided further, neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim, and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest that may be applicable.

  > **Formatted:** Bullets and Numbering

- Unless otherwise agreed, the primary evidentiary hearing shall occur by no later than [August 10, 2005], and the arbitrator shall render a decision within [45] days after the submission of post-hearing briefs, which briefs shall be provided within thirty (30) days of the conclusion of the hearing, and shall notify the Parties in writing of such decision and the reasons therefore.

  > **Deleted:** July 15
  > **Deleted:**
  > **Deleted:** 90
  > **Deleted:** 75?
  > **Deleted:** his or her appointment

- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA, including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any claim asserted related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

  > **Deleted:**
  > **Deleted:** EUA SOS Agreement ("
  > **Deleted:** ")
  > **Deleted:**

- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having

jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M G L c 251 s 1 et seq.

- The Parties' agreement to arbitrate, the existence of the arbitration, the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, the decision of the arbitrator, and anything in relation to the foregoing (the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the public record, (2) any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, and any person contemplated in good faith to be an actual or potential witness in the arbitration (any of the foregoing in this clause (4) a "Person"), but only (i) to the extent reasonably necessary to discover or develop the Person's testimony, and (ii) provided that the Person is informed of the confidential nature of the Confidential Information and agrees to treat, keep and maintain it as confidential, and (iii) provided that the Person agrees that the Confidential Information shall be used only in relation to this arbitration, and (5) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality. A Party's use and disclosure of Confidential Information possessed or developed by it shall be subject to this clause.

| Deleted: under pledge of confidentiality; (5) |
| Deleted: such |
| Deleted: p |
| Deleted: Materials |
| Deleted: 6 |
| Deleted: Nothing herein, however, shall prevent either |
| Deleted: from continuing to |
| Deleted: its own documents and information |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator. The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA). The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party. The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.) The Parties shall file at the time of their initial submission(s), for conflicts purposes, a list of all affiliates and predecessors. As soon as possible and no later than five (5) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators. The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated. The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b). The Parties further agree that at any time during the selection process either Party may discontinue the selection process upon written notice to the other Party.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.
- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process, waiving any answer. If by close of business on 3 business days after signing of this agreement (the "Arbitration Agreement Date") the Parties are unable to agree and submit a joint written submission, the arbitration shall be initiated with the filing by each Party of a written submission (i) in a form and format to be determined by the Parties within 2 business days after the Arbitration Agreement Date, (ii) on or by [15 business days after the Arbitration Agreement Date, and (iii) waiving any answer. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

- Discovery shall be limited to an exchange of documents in response to written requests, and the Parties shall exchange a preliminary list of witnesses after consultation with the arbitrator. There shall be no depositions.
- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any hearing before the arbitrator (any other witnesses or exhibits subject to the approval of the arbitrator), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the EUA SOS Agreement ("WSOSA") for reason of any alleged default in relation to the FAF from and after the Arbitration Agreement Date and through the date arbitrator issues his/her decision (the "Arbitration Period"); provided that during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like) an amount equal to the product of the calculation using the methodology set forth in Attachment 2 to the April 18, 2000 notice from the National Grid companies (by Michael Hager) to TCPM (Sean McMaster) (the "2000 Notice"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the 2000 notice) and (iii) defining the Fuel Trigger Point as $8.48/MMbtu (and not as set forth in the 2000 Notice) (such payments collectively, the "Protest Payment"); provided however; TCPM shall place such Protest Payment in a bankruptcy-remote escrow account and, provided further, neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim, and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest that may be applicable.
- Unless otherwise agreed, the primary evidentiary hearing shall occur by no later than [August 10, 2005], and the arbitrator shall render a decision within [45] days after the submission of post-hearing briefs, which briefs shall be provided within thirty (30) days of the conclusion of the hearing, and shall notify the Parties in writing of such decision and the reasons therefore.
- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA, including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any claim asserted related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.
- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having

jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

- The Parties' agreement to arbitrate, the existence of the arbitration, the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, the decision of the arbitrator, and anything in relation to the foregoing (the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the public record, (2) any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, and any person contemplated in good faith to be an actual or potential witness in the arbitration (any of the foregoing in this clause (4) a "Person"), but only (i) to the extent reasonably necessary to discover or develop the Person's testimony, and (ii) provided that the Person is informed of the confidential nature of the Confidential Information and agrees to treat, keep and maintain it as confidential, and (iii) provided that the Person agrees that the Confidential Information shall be used only in relation to this arbitration, and (5) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality. A Party's use and disclosure of Confidential Information possessed or developed by it shall be subject to this clause.

# Exhibit 10

**Thibodeau, Michelle L.**

| | |
|---|---|
| **From:** | Winston, Daniel C |
| **Sent:** | Thursday, April 14, 2005 6:33 PM |
| **To:** | Gloria Kavanah Esq. (gloria.kavanah@us.ngrid.com); Gloria Kavanah Esq (gloria kavanah@us ngrid com) |
| **Subject:** | TC/Grid:  Arbitration Agreement |


14.DOC (41 KB)


Redline.rtf (50 KB)

Gloria:

     I thought it would be best if I sent you our suggested revisions, so that you would have them in hand when we discuss them. We are at an endpoint on some of these. I can make myself available tomorrow morning before noon, if that works.  Please email back with a good time to talk tomorrow morning (9, 10, 11) or call me to tomorrow morning on my cell at 617-872-1307.

Dan

1

<u>PRIVILEGED AND CONFIDENTIAL</u>
<u>SUBJECT TO FRE 408 AND SIMILAR STATE LAWS</u>

- The arbitration shall be conducted before a single neutral arbitrator. The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA). The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party. The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.) The Parties shall file at the time of their initial submission(s), for conflicts purposes, a list of all affiliates and predecessors, **predecessors and potential witnesses; these initial conflict disclosures shall be filed with AAA only and shall not be shared with the opposing party.** As soon as possible and no later than five (5) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators. The Parties **may strike no more than five (5) candidates from any list of potential arbitrators provided by the AAA, the Parties** must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that **it is unable to appoint an arbitrator from the initial list of candidates through the process in R-11(b) (i.e., if under R-11(b) "**the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists**")**, the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated. The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b). ~~The Parties further agree that at any time during the selection process either Party may discontinue the selection process upon written notice to the other Party.~~**If an arbitrator cannot be appointed by the AAA from the second list, this Arbitration Agreement shall be null and void.**
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.
- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process, waiving any answer. If by close of business on 3 business days after signing of this agreement (the "Arbitration Agreement Date") the Parties are unable to agree and submit a joint written submission, the arbitration shall be initiated with the filing by each Party of a **separate** written submission ~~(i)~~

~~in a form and format to be determined by the Parties~~ within ~~2~~5 business days ~~after the Arbitration Agreement Date, (ii) on or by [15 business days~~**[subject to scheduling conflicts to be addressed before signing]** after the Arbitration Agreement Date, ~~and (iii)~~**each of no more than 5 pages double-spaced (not counting copies of the EUA SOS Agreement ("WSOSA") and this Arbitration Agreement), and** waiving any answer. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

- ~~Discovery~~**Except as otherwise ordered by the arbitrator, discovery** shall be limited to an exchange of documents in response to written requests, **exchanges of interrogatory answers in response to no more than 10 interrogatories total (which may be served in two separate sets),** and the ~~Parties shall~~ exchange ~~a preliminary list of witnesses after consultation with the arbitrator~~**at the preliminary hearing of lists of witnesses who in good faith are intended at that point to be called to testify at the evidentiary hearing. Written document requests and interrogatories may be served upon appointment of the arbitrator, and responses shall be due within 15 days**. There shall be no depositions**, except in the arbitrator's discretion and only upon a showing that a Party has failed adequately to answer interrogatories and the information cannot be otherwise obtained**.

- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any **evidentiary** hearing before the arbitrator (any ~~other~~**newly identified** witnesses or exhibits subject to the approval of the arbitrator), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.

- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the ~~EUA SOS Agreement ("WSOSA")~~ for reason of any alleged default in relation to the **Fuel Adjustment Factor ("FAF"),** from and after the Arbitration Agreement Date and through the date **the** arbitrator issues his/her decision (the "Arbitration Period"); provided that **(A)** during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like **except as set forth herein**) an amount equal to **(i)** the product of the ~~calculation using the methodology set forth in Attachment 2 to the April 18, 2000 notice from the National Grid companies (by Michael Hager) to TCPM (Sean McMaster) (the "2000 Notice~~**fuel index calculation set forth in former Blackstone Wholesale Standard Offer Service Tariff RIPUC_____ [the tariff that was applicable January 1, 2000] (the "Former Blackstone Tariff**"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the ~~2000 notice~~**Former Blackstone Tariff**) and (iii) defining the **2005** Fuel Trigger Point as $8.48/MMbtu ~~(and not as set forth in the 2000 Notice~~) (such payments collectively, the "Protest Payment"); ~~provided however;~~**and (B) in the event the arbitrator determines that TCPM had the right to terminate the WSOSA related to the FAF during the Arbitration Period, TCPM shall have**

**the right to receive and retain all FAF payments and Protest Payments made or due for the period up to the date of the arbitrator's decision. Provided however; that except as provided herein or in the arbitrator decision:** TCPM shall place such Protest Payment in ~~a bankruptcy-remote~~**an** escrow account ~~and, provided further~~, neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim, and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest that may be applicable **(including that TCPM's failure to terminate shall not be used by Narragansett to argue for, and may not be grounds for any finding that, TCPM has failed to mitigate its damages)**.

- Unless otherwise agreed, ~~the primary~~**a preliminary hearing shall be scheduled and occur as soon as reasonably practicable after appointment of the arbitrator, the** evidentiary hearing shall ~~occur by~~**be completed** no later than ~~[August 10, 2005],~~**July 22, 2005,** and the arbitrator shall render a decision ~~within [45] days after the submission of post-hearing briefs, which briefs shall be provided within thirty (30) days of the conclusion of the hearing, and shall notify~~**no later than August 26, 2005 notifying** the Parties in writing of such decision and the reasons ~~therefore~~**therefor. Post-hearing briefs shall be submitted on a schedule determined by the arbitrator, in consideration of the schedules of the arbitrators and Parties**.

- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA, including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any claim asserted related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

- The Parties' agreement to arbitrate, the existence of the arbitration, the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, **and** the decision of the arbitrator~~, and anything in relation to the foregoing~~ (the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the public record, (2) any Court, for

PRIVILEGED AND CONFIDENTIAL UNDER FRE 408                3
3912358v~~1~~2

purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, and any person contemplated in good faith to be an actual or potential witness in the arbitration (any of the foregoing in this clause (4) a "Person"), but only (i) to the extent reasonably necessary to discover or develop the Person's testimony, and (ii) provided that the Person is informed of the confidential nature of the Confidential Information and ~~agrees to treat, keep and maintain it as confidential, and (iii) provided that the Person agrees that the Confidential Information shall be used only in relation to this arbitration,~~**requested to maintain its confidentiality;** and (5) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality.  A Party's use and disclosure of Confidential Information possessed or developed by it shall be subject to this clause**, except that documents created or received by the Parties in the ordinary course of business shall not be considered Confidential Information merely on the basis of their submission as evidence during the course of the arbitration**.

Document comparison done by DeltaView on Thursday, April 14, 2005 6:24:56 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://exchdms/Exchange/3912358/1 |
| Document 2 | iManageDeskSite://exchdms/Exchange/3912358/2 |
| Rendering set | CHS Standard B&W |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved-deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 36 |
| Deletions | 26 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 62 |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator. The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA). The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party. The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.) The Parties shall file at the time of their initial submission(s), for conflicts purposes, a list of all affiliates, predecessors and potential witnesses; these initial conflict disclosures shall be filed with AAA only and shall not be shared with the opposing party. As soon as possible and no later than five (5) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators. The Parties may strike no more than five (5) candidates from any list of potential arbitrators provided by the AAA, the Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that it is unable to appoint an arbitrator from the initial list of candidates through the process in R-11(b) (i.e., if under R-11(b) "the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists"), the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated. The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b). If an arbitrator cannot be appointed by the AAA from the second list, this Arbitration Agreement shall be null and void.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.
- The Parties shall endeavor to develop a joint written submission to initiate the arbitration process, waiving any answer. If by close of business on 3 business days after signing of this agreement (the "Arbitration Agreement Date") the Parties are unable to agree and submit a joint written submission, the arbitration shall be initiated with the filing by each Party of a separate written submission within 5 business days [subject to scheduling conflicts to be addressed before signing], after the Arbitration Agreement Date, each of no more than 5 pages double-spaced (not counting copies of the EUA SOS Agreement ("WSOSA") and

this Arbitration Agreement), and waiving any answer  The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

- Except as otherwise ordered by the arbitrator, discovery shall be limited to an exchange of documents in response to written requests, exchanges of interrogatory answers in response to no more than 10 interrogatories total (which may be served in two separate sets), and the exchange at the preliminary hearing of lists of witnesses who in good faith are intended at that point to be called to testify at the evidentiary hearing.  Written document requests and interrogatories may be served upon appointment of the arbitrator, and responses shall be due within 15 days  There shall be no depositions, except in the arbitrator's discretion and only upon a showing that a Party has failed adequately to answer interrogatories and the information cannot be otherwise obtained.

- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any evidentiary hearing before the arbitrator (any newly identified witnesses or exhibits subject to the approval of the arbitrator), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.

- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the Fuel Adjustment Factor ("FAF"), from and after the Arbitration Agreement Date and through the date the arbitrator issues his/her decision (the "Arbitration Period"); provided that (A) during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like except as set forth herein) an amount equal to (i) the product of the fuel index calculation set forth in former Blackstone Wholesale Standard Offer Service Tariff RIPUC _____ [the tariff that was applicable January 1, 2000] (the "Former Blackstone Tariff"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the Former Blackstone Tariff) and (iii) defining the 2005 Fuel Trigger Point as $8.48/MMbtu) (such payments collectively, the "Protest Payment"); and (B) in the event the arbitrator determines that TCPM had the right to terminate the WSOSA related to the FAF during the Arbitration Period, TCPM shall have the right to receive and retain all FAF payments and Protest Payments made or due for the period up to the date of the arbitrator's decision.  Provided however; that except as provided herein or in the arbitrator's decision:  TCPM shall place such Protest Payment in an escrow account, neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim, and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest that may be applicable (including that TCPM's failure to terminate shall not be used by Narragansett to argue for, and may not be grounds for any finding that, TCPM failed to mitigate its damages)

- Unless otherwise agreed, a preliminary hearing shall be scheduled and occur as soon as reasonably practicable after appointment of the arbitrator, the evidentiary hearing shall be completed no later than July 22, 2005, and the arbitrator shall render a decision no later than August 26, 2005 notifying the Parties in writing of such decision and the reasons therefor. Post-hearing briefs shall be submitted on a schedule determined by the arbitrator, in consideration of the schedules of the arbitrators and Parties.
- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA, including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any claim asserted related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.
- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.
- The Parties' agreement to arbitrate, the existence of the arbitration, the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, and the decision of the arbitrator (the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the public record, (2) any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, and any person contemplated in good faith to be an actual or potential witness in the arbitration (any of the foregoing in this clause (4) a "Person"), but only (i) to the extent reasonably necessary to discover or develop the Person's testimony, and (ii) provided that the Person is informed of the confidential nature of the Confidential Information and requested to maintain its confidentiality; and (5) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality. A Party's use and disclosure of Confidential Information possessed or developed by it shall be subject to this clause, except that documents created or received by the Parties in the ordinary course of business shall not be considered Confidential Information merely on the basis of their submission as evidence during the course of the arbitration

# Exhibit 11

## Thibodeau, Michelle L.

| | |
|---|---|
| **From:** | Kavanah, Gloria [Gloria Kavanah@us ngrid com] |
| **Sent:** | Monday, April 18, 2005 1:52 PM |
| **To:** | Winston, Daniel C ; Winston, Daniel C. |
| **Subject:** | TCPM-Narr Arb Agreement |

Dan-
Attached is a redline of the arbitration agreement.

I also wanted to confirm our understanding regarding the ten interrogatories  An integrated, full rounded question would count as one interrogatory.  For example, if a question were asked if a conversation took place, and the question also asked for the date, time, place and names, that would count as one interrogatory.  However, questions with subparts would not count as a single interrogatory

I'm available to work through any questions or comments you may have.

Gloria

**<<TCPM Arb 4-18-05.DOC>> <<TCPM Arb 4-18-05 redline.DOC>>**
*Gloria Kavanah*
*National Grid USA*
*1125 Broadway*
*Albany, New York 12204-2505*

*518.433.5221 (phone)*
*518.433.5220 (fax)*
*gloria.kavanah@us.ngrid.com*

This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator  The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA).  The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party   The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.)  The Parties shall file at the time of their submission to AAA as provided below, for conflicts purposes only, a list of all affiliates, predecessors and potential conflict witnesses; these initial conflict disclosures shall be filed with AAA only and shall not be shared with the opposing party  As soon as possible and no later than five (5) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators.  As soon as possible and no later than two (2) business days after receiving the list from AAA, the Parties shall notify each other of (i) any candidate on the list that has a conflict of interest and (ii) the basis for the conflict.  Of the candidates from the list of potential arbitrators provided by AAA for whom a conflict has not been identified by the Parties, the Parties may strike no more than five (5) candidates.  The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that it is unable to appoint an arbitrator from the initial list of candidates through the process in R-11(b) (i e , if under R-11(b) "the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists"), the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated   The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b).  If an arbitrator cannot be appointed by the AAA from the second list, this Arbitration Agreement shall be null and void.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.
- The arbitration shall be initiated upon execution of this Arbitration Agreement. TCPM shall serve on Narragansett a written statement of the dispute within three (3) business days of the execution of this Arbitration Agreement (excluding the day of the execution) and no more than six (6) pages in length (inclusive of a

| Deleted: initial |
| Deleted: (s) |

| Deleted: T |
| Deleted: |
| Deleted: from any list of potential arbitrators provided by the AAA, |
| Deleted: t |

| Deleted: Parties shall endeavor to develop a joint written submission to initiate the arbitration process, waiving any answer  If by close of business on 3 business days after signing of this agreement (the "Arbitration Agreement Date") the Parties are unable to agree and submit a joint written submission, the |
| Deleted: with the filing by each Party of a separate written submission |
| Deleted: 5 |
| Formatted: Font: 9 pt |

description of the Parties and the EUA SIS Agreement ("WSOSA")). All submissions under this clause shall be double-spaced. Narragansett shall serve on TCPM within ten (10) business days of receipt of TCPM's statement of the dispute (excluding the day of receipt) an answer to TCPM's statement which answer shall be no more than eight (8) pages in length. TCPM shall serve on Narragansett within three (3) business days of receipt of Narragansett's answer a reply which reply shall be no more than three (3) pages in length. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

- Service of any documents or notices under this Arbitration Agreement shall be sent via reputable overnight delivery service or in-hand. Service upon Narragansett shall be sent to [    ] and [    ]. Service upon TCPM shall be sent to [    ] and [    ].
- On the next business day following TCPM's service of its reply, the Parties shall submit to AAA this Arbitration Agreement, the AAA required fee, the conflicts information described in the first paragraph above, and the statement, answer and reply described in the immediately preceding paragraph.
- Discovery shall be limited to an exchange of documents in response to written requests, exchanges of interrogatory answers in response to no more than ten (10) interrogatories total by each Party (which may be served in two separate sets). At the preliminary hearing, the Parties shall exchange a list of witnesses who in good faith are intended at that point to be called to testify at the evidentiary hearing. Such written document requests and interrogatories may be served at any time after twenty (20) business days following the appointment of the arbitrator, and responses shall be due within twenty-five (25) business days. There shall be no depositions.
- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any evidentiary hearing before the arbitrator (any other witnesses or exhibits subject to the approval of the arbitrator upon good cause shown), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the Fuel Adjustment Factor ("FAF"), from and after the Arbitration Agreement Date and through the date the arbitrator issues his/her decision (the "Arbitration Period"); provided that (A) during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like except as set forth herein) an amount equal to (i) the product of the fuel index calculation set forth in the former Blackstone Wholesale Standard Offer Service Tariff RIPUC _____ [the tariff that was applicable January 1, 2000] (the "Former Blackstone Tariff"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the Former Blackstone Tariff) and (iii) defining the 2005

Fuel Trigger Point as $8.48/MMbtu) (such payments collectively, the "Protest Payment"); and (B) in the event the arbitrator determines that TCPM is entitled to damages, TCPM shall have the right to net the Protest Payments from any award for damages. Provided however, that except as may be provided in the arbitrator decision: TCPM shall place such Protest Payment in an escrow account, neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim, and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest (including on the Protest Payment)that may be applicable (including that TCPM's failure to terminate after February 1, 2005 shall not be used by Narragansett to argue for, and may not be grounds for any finding that, TCPM has failed to mitigate its damages).

- Unless otherwise agreed, a preliminary hearing shall be scheduled and occur as soon as reasonably practicable after appointment of the arbitrator, the evidentiary hearing shall be completed no later than August 23, 2005. The form and length of post-hearing briefs and the dates for submission shall be established by the arbitrator after consultation with the Parties and consideration of the schedules of the arbitrator and the Parties. The arbitrator shall render a decision no later than thirty (30) days after receipt of the briefs and shall notify the Parties in writing of such decision and the reasons therefor.

- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA, including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any asserted claim related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

- The Parties' agreement to arbitrate, the existence of the arbitration (subject to the proviso below), the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, the decision of the arbitrator and the substance of any of the foregoing (in any form or medium, including conversations and other communications regarding the foregoing, the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the

**Deleted:** had the right to terminate the WSOSA related to the FAF

**Deleted:** during the Arbitration Period

**Deleted:** receive and retain all FAF payments and

**Deleted:** made or due for the period up to the date of the arbitrator's decision

**Deleted:** herein or

**Deleted:** July 22

**Deleted:** , and t

**Deleted:** August 26, 2005

**Deleted:** ing

**Deleted:** Post-hearing briefs shall be submitted on a schedule determined by the arbitrator, in consideration of the schedules of the arbitrators and Parties.

**Deleted:** asserted

**Deleted:** and

**Deleted:**

**Formatted:** Font: 9 pt

public record, (2) any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality or who may testify in connection with the arbitration, and any person contemplated in good faith to be an actual or potential witness in the arbitration (any of the foregoing in this clause (4) a "Person"), but only (i) to the extent reasonably necessary to discover or develop the Person's testimony, (ii) provided that the Person is informed of the confidential nature of the Confidential Information and agrees to treat, keep and maintain it as confidential; and (iii) provided that the Person agrees that the Confidential Information shall be used only in relation to this arbitration provided, however, that if a Party has interviewed the Person and the Party has concluded that the Party intends to call the Person to testify as a witness at the evidentiary hearing, a Party may disclose to a Person the existence of the arbitration subject to the Party requesting that the Person treat, keep and maintain the existence of the arbitration as confidential; and (5) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality  A Party's use and disclosure of Confidential Information possessed or developed by it shall be subject to this clause, except that documents created or received by the Parties in the ordinary course of business shall not be considered Confidential Information merely on the basis of their submission as evidence during the course of the arbitration.

| Deleted: and |

| Deleted: requested to maintain its confidentiality; |

| Formatted: Font: 9 pt |

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

- The arbitration shall be conducted before a single neutral arbitrator  The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA).  The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party   The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.)  The Parties shall file at the time of their submission to AAA as provided below, for conflicts purposes only, a list of all affiliates, predecessors and potential witnesses; these initial conflict disclosures shall be filed with AAA only and shall not be shared with the opposing party   As soon as possible and no later than five (5) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators   As soon as possible and no later than two (2) business days after receiving the list from AAA, the Parties shall notify each other of (i) any candidate on the list that has a conflict of interest and (ii) the basis for the conflict.  Of the candidates from the list of potential arbitrators provided by AAA for whom a conflict has not been identified by the Parties, the Parties may strike no more than five (5) candidates   The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that it is unable to appoint an arbitrator from the initial list of candidates through the process in R-11(b) (i.e , if under R-11(b) "the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists"), the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated.  The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b)   If an arbitrator cannot be appointed by the AAA from the second list, this Arbitration Agreement shall be null and void.
- Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.
- The arbitration shall be initiated upon execution of this Arbitration Agreement  TCPM shall serve on Narragansett a written statement of the dispute within three (3) business days of the execution of this Arbitration Agreement (excluding the day of the execution) and no more than six (6) pages in length (inclusive of a

| Deleted: 3912358v2 |
| Formatted: Font: 9 pt |
| Deleted: 3912358v2 |
| Formatted: Font: 9 pt |
| Inserted: 3912358v2 |

description of the Parties and the EUA SIS Agreement ("WSOSA")). All submissions under this clause shall be double-spaced. Narragansett shall serve on TCPM within ten (10) business days of receipt of TCPM's statement of the dispute (excluding the day of receipt) an answer to TCPM's statement which answer shall be no more than eight (8) pages in length. TCPM shall serve on Narragansett within three (3) business days of receipt of Narragansett's answer a reply which reply shall be no more than three (3) pages in length. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

- Service of any documents or notices under this Arbitration Agreement shall be sent via reputable overnight delivery service or in-hand. Service upon Narragansett shall be sent to[   ] and [   ]. Service upon TCPM shall be sent to [   ] and [   ].
- On the next business day following TCPM's service of its reply, the Parties shall submit to AAA this Arbitration Agreement, the conflicts information described in the first paragraph above, and the statement, answer and reply described in the immediately preceding paragraph.
- Discovery shall be limited to an exchange of documents in response to written requests, exchanges of interrogatory answers in response to no more than ten (10) interrogatories total by each Party (which may be served in two separate sets). At the preliminary hearing, the Parties shall exchange a list of witnesses who in good faith are intended at that point to be called to testify at the evidentiary hearing. Such written document requests and interrogatories may be served at any time after twenty (20) business days following the appointment of the arbitrator, and responses shall be due within twenty-five (25) business days. There shall be no depositions.
- The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any evidentiary hearing before the arbitrator (any other witnesses or exhibits subject to the approval of the arbitrator upon good cause shown), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.
- The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the Fuel Adjustment Factor ("FAF"), from and after the Arbitration Agreement Date and through the date the arbitrator issues his/her decision (the "Arbitration Period"); provided that (A) during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like except as set forth herein) an amount equal to (i) the product of the fuel index calculation set forth in the former Blackstone Wholesale Standard Offer Service Tariff RIPUC _____ [the tariff that was applicable January 1, 2000] (the "Former Blackstone Tariff"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the Former Blackstone Tariff) and (iii) defining the 2005

| Deleted: 3912358v2 |
| Formatted: Font: 9 pt |
| Deleted: 3912358v2 |
| Formatted: Font: 9 pt |
| Inserted: 3912358v2 |

Fuel Trigger Point as $8.48/MMbtu) (such payments collectively, the "Protest Payment"); and (B) in the event the arbitrator determines that TCPM is entitled to damages, TCPM shall have the right to net the Protest Payments from any award for damages. Provided however, that except as may be provided in the arbitrator decision: TCPM shall place such Protest Payment in an escrow account, neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim, and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest (including on the Protest Payment)that may be applicable (including that TCPM's failure to terminate after February 1, 2005 shall not be used by Narragansett to argue for, and may not be grounds for any finding that, TCPM has failed to mitigate its damages).

- Unless otherwise agreed, a preliminary hearing shall be scheduled and occur as soon as reasonably practicable after appointment of the arbitrator, the evidentiary hearing shall be completed no later than August 23, 2005. The form and length of post-hearing briefs and the dates for submission shall be established by the arbitrator after consultation with the Parties and consideration of the schedules of the arbitrator and the Parties. The arbitrator shall render a decision no later than thirty (30) days after receipt of the briefs and shall notify the Parties in writing of such decision and the reasons therefor.

- The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA, including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any asserted claim related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

- The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq.

- The Parties' agreement to arbitrate, the existence of the arbitration (subject to the proviso below), the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, the decision of the arbitrator and the substance of any of the foregoing (in any form or medium, including conversations and other communications regarding the foregoing, the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the

| Deleted: 3912358v2 |
| Formatted: Font: 9 pt |
| Deleted: 3912358v2 |
| Formatted: Font: 9 pt |
| Inserted: 3912358v2 |

# Exhibit 12

**Thibodeau, Michelle L.**

| | |
|---|---|
| **From:** | Winston, Daniel C. |
| **Sent:** | Tuesday, April 19, 2005 10:44 AM |
| **To:** | Gloria Kavanah Esq (gloria kavanah@us ngrid com); Gloria Kavanah Esq (gloria kavanah@us ngrid com) |
| **Subject:** | Arbitration Agreement |



19 proposal.DOC
(50 KB)



Redline.rtf (74 KB)

       loria: Here is a proposed final or hopefully close.  The dates reflect an effort to work backward from the late July hearing and the preceding exchange of final exhibits and witnesses, and don't have much room for movement in my view to hit the late July hearing.  We believe that a July hearing is necessary because the next alternative is a hearing in September, which we believe is a delay that is in neither of our interests.  The later decision date (9/17) recognizes that we need time for post-hearing briefs and we will have trouble getting an arbitrator if we say the decision must be completed in August.  I have hard-wired an initial filing date of April 26 for TransCanada's initial 6-page statement, because at this point preparation and filing of the initial statement conflicts with Friday's hearing in the congestion cost matter.

The protest payment clause is now designed to give us the assurance of having the funds in escrow, and give you the assurance of no termination, but to make sure neither party is waiving any other rights.

1

PRIVILEGED AND CONFIDENTIAL ARBITRATION AGREEMENT

SUBJECT TO FRE 408 AND SIMILAR STATE LAWS

_____ This arbitration agreement is made and entered into this _____ day of April, 2005, by and between The Narragansett Electric Company ("Narragansett") and TransCanada Power Marketing Ltd., a Delaware Corporation ("TransCanada"), to resolve the dispute defined herein arising under the Wholesale Standard Offer Service Agreement dated April 7, 1998 (herein the "WSOSA") between TransCanada, on the one hand, and Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation (collectively, Narragansett), on the other hand.

1.      •The arbitration shall be conducted before a single neutral arbitrator. The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA). The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party. The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.) The Parties shall file at the time of their submission to AAA as provided below, for conflicts purposes only, a list of all affiliates, predecessors and potential witnesses; these initial conflict disclosures shall be filed with AAA only and shall not be shared with the opposing party. As soon as possible and no later than fivefour (54) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators. As soon as possible and no later than two (2) business days after receiving the list from AAA, the Parties shall notify each other of (i) any candidate on the list that has a conflict of interest and (ii) the basis for the conflict. Of the candidates from the list of potential arbitrators provided by AAA for whom a conflict has not been identified by the Parties, the Parties may strike no more than five (5) candidates. The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days after receiving the list from the AAA, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that it is unable to appoint an arbitrator from the initial list of candidates through the process in R-11(b) (i.e., if under R-11(b) "the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists"), the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated. The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b). If an arbitrator cannot be appointed by the AAA from the second list, this Arbitration Agreement shall be null and void.

2.    •Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.

3.    •The arbitration shall be initiated upon execution of this Arbitration Agreement.  ~~TCPM~~TransCanada shall serve on Narragansett a written statement of the dispute within three (3) business days of the execution of this Arbitration Agreement ~~(excluding the day of the execution~~ (and no earlier than April 26, 2005) and no more than six (6) pages in length (inclusive of a description of the Parties and the ~~EUA SIS Agreement ("WSOSA")).~~WSOSA, which may be attached).  All submissions under this clause shall be double-spaced.  Narragansett shall serve on ~~TCPM~~TransCanada within ~~ten~~six (~~10~~6) business days of receipt of ~~TCPM~~TransCanada's statement of ~~the~~ dispute (excluding the day of receipt) an answer to ~~TCPM~~TransCanada's statement which answer shall be no more than eight (8) pages in length.  ~~TCPM~~TransCanada shall serve on Narragansett and file with the AAA within three (3) business days of receipt of Narragansett's answer a reply which reply shall be no more than three (3) pages in length. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

4.    •Service of any documents or notices under this Arbitration Agreement shall be sent via reputable overnight delivery service or in-hand.  Service upon Narragansett shall be sent to [  ] and [  ].  Service upon ~~TCPM shall be sent to [        ] and [~~ ~~].~~TransCanada shall be sent to Daniel C. Winston, Esq., Choate, Hall & Stewart LLP, Exchange Place, 53 State Street, Boston, MA  02109-2804, and Michael Hachey, TransCanada Power Marketing Ltd., TransCanada Power Marketing Ltd., 110 Turnpike Road, Westborough, MA  01581.

5.    •On the next business day following ~~TCPM~~Narragansett's service of its ~~reply~~answer, the Parties shall submit to AAA :  this Arbitration Agreement;, the AAA required fee;, the conflicts information described in the first paragraph above. ~~and;~~ the statement;, and answer ~~and reply~~ described in the immediately preceding paragraph; and a request that the AAA immediately begin the selection process described in the first paragraph above.

6.    •Discovery shall be limited to an exchange of documents in response to written requests, exchanges of interrogatory answers in response to no more than ten (10) interrogatories total by each Party (each of which may be served in two separate sets).  ~~At~~The arbitrator shall resolve any disputes regarding the sufficiency of the responses.  The arbitrator shall also resolve any dispute as to the number of interrogatories served by applying the principles of Local Rule 26.1 of the United States District Court for the District of Massachusetts.  Such written document requests and interrogatories may be served upon appointment of the arbitrator or on May 24, 2005, whichever comes first, and responses shall be due within fifteen (15) days.  There shall be no depositions.  Two (2) business days before the preliminary hearing, the Parties shall exchange a list of witnesses who in good faith are intended at that point to be called to testify at the

evidentiary hearing. ~~Such written document requests and interrogatories may be served at any time after twenty (20) business days following the appointment of the arbitrator, and responses shall be due within twenty-five (25) business days. There shall be no depositions.~~ <u>To the extent a Party determines that it is reasonably likely to call any additional witness(es) to testify at the hearing, that Party shall immediately supplement and notify the other Party of the additional potential witness(es).</u>

<u>7.</u>   •The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any evidentiary hearing before the arbitrator (any other witnesses or exhibits subject to the approval of the arbitrator upon good cause shown), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.

<u>8.</u>   •The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the Fuel Adjustment Factor ("FAF"), from and after the Arbitration Agreement Date and through the date the arbitrator issues his/her decision (the "Arbitration Period"); provided that ~~(A)~~ during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like except as set forth herein) an amount equal to (i) the product of the fuel index calculation set forth <u>at pages 2-3</u> in the former Blackstone Wholesale Standard Offer Service Tariff RIPUC ~~————~~[<u>1200 (</u>the tariff that was applicable January 1, 2000~~]~~) (the "Former Blackstone Tariff"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the Former Blackstone Tariff) and (iii) defining the 2005 Fuel Trigger Point as $8.48/MMbtu) (such payments collectively, the "Protest Payment"). <u>Provided however</u>; ~~and (B) in the event the arbitrator determines that TCPM is entitled to damages, TCPM shall have the right to net the Protest Payments from any award for damages. Provided however; that~~<u>that (A) neither the Protest Payments nor the Parties' participation in this arbitration shall be deemed to cure or extend the cure period under Article 7(1)(b) of the WSOSA, or to delay or prevent the occurrence of any alleged breach or Event of Default in accordance with Article 7 of the WSOSA during the Arbitration Period, arising from or related to nonpayment of the FAF or alleged non-compliance with Article 8(3) of the WSOSA; (B) this arbitration shall not be deemed to occur under Article 12 of the WSOSA, and TransCanada's agreement to participation in this arbitration shall not impair TransCanada's ability to claim under Article 8(3) of the WSOSA that no resolution was obtained in accordance with Article 12; and (C)</u> except as may be provided in the arbitrator decision: ~~TCPM~~<u>TransCanada</u> shall place such Protest Payment in an ~~escrow~~<u>interest bearing</u> account~~,~~; neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim~~,~~; and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest (including on the Protest Payment) that may be applicable (including that ~~TCPM~~<u>TransCanada</u>'s failure to terminate after February 1, 2005 shall not be used by Narragansett to argue for, and may not be grounds for any finding that, ~~TCPM~~<u>TransCanada</u> has failed to mitigate its damages).

9.    • Unless otherwise agreed, a preliminary hearing shall be scheduled and occur as soon as reasonably practicable after appointment of the arbitrator, and the evidentiary hearing shall be completed no later than ~~August 23,~~ July 21, 2005. The form and length of post-hearing briefs and the dates for submission shall be established by the arbitrator after consultation with the Parties and consideration of the schedules of the arbitrator and the Parties. The arbitrator shall render a decision no later than ~~thirty (30) days after receipt of the briefs~~ September 17, 2005 and shall notify the Parties in writing of such decision and the reasons therefor.

10.    • The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA, including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any asserted claim related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

11.    • The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq. and/or the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

12.    • The Parties' agreement to arbitrate, the existence of the arbitration (subject to the proviso below), the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, the decision of the arbitrator and the substance of any of the foregoing (in any form or medium, including conversations and other communications regarding the foregoing, the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the public record, (2) any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, and any person contemplated in good faith to be an actual or potential witness in the arbitration (any of the foregoing in this clause (4) a "Person"), but only (i) to the extent reasonably necessary to discover or develop the Person's testimony or arrange for possible attendance at the arbitration, (ii) provided that the Person is informed of the confidential nature of the Confidential Information and ~~agrees to treat, keep and maintain it as confidential; and (iii) provided that the Person agrees that the Confidential Information shall be used~~ requested to maintain its confidentiality and to use the information only in relation to this arbitration ~~provided,~~

~~however, that if a Party has interviewed the Person and the Party has concluded that the Party intends to call the Person to testify as a witness at the evidentiary hearing, a Party may disclose to a Person,~~ and (iii) provided that the Parties agree that it is not necessary to disclose the existence of the arbitration ~~subject to the Party requesting that the Person treat, keep and maintain the existence of the arbitration as confidential~~proceeding (as opposed the relevant documents and information that may be introduced as evidence at the hearing, for the purpose of developing testimony) unless a party determines in good faith that it may wish to call the Person to testify and then only to the extent necessary to arrange for the possible testimony at the hearing; and (5) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality.  A Party's use and disclosure of Confidential Information possessed or developed by it shall be subject to this clause, except that documents created or received by the Parties in the ordinary course of business shall not be considered Confidential Information merely on the basis of their submission as evidence during the course of the arbitration.

TRANSCANADA POWER                                                    [Narragansett Block]
MARKETING, LTD.


By its attorneys,



Daniel C. Winston, Esq. (BBO # 562209)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, MA  02109-2804
Tel.:  (617) 248-5000
Fax:  (617) 248-4000

Document comparison done by DeltaView on Tuesday, April 19, 2005 10:37:20 AM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://exchdms/Exchange/3913701/1 |
| Document 2 | iManageDeskSite://exchdms/Exchange/3913701/2 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 62 |
| Deletions | 56 |
| Moved from | 7 |
| Moved to | 7 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 132 |

<u>ARBITRATION AGREEMENT</u>

This arbitration agreement is made and entered into this __ day of April, 2005, by and between The Narragansett Electric Company ("Narragansett") and TransCanada Power Marketing Ltd., a Delaware Corporation ("TransCanada"), to resolve the dispute defined herein arising under the Wholesale Standard Offer Service Agreement dated April 7, 1998 (herein the "WSOSA") between TransCanada, on the one hand, and Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation (collectively, Narragansett), on the other hand.

1.    The arbitration shall be conducted before a single neutral arbitrator. The arbitrator shall be appointed under the Commercial Arbitration Rules of the American Arbitration Association (AAA). The AAA shall propose for appointment only those arbitrators who (i) are an experienced arbitrator in complex contract cases, (ii) are either a former judge at the state or federal level or have more than twenty (20) years of complex commercial litigation experience, (iii) are knowledgeable in contract law as well as in electric utility and transmission matters, and (iv) do not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate or predecessor of such Party. The arbitrator need not be from the Boston or New England area, although the arbitration shall be conducted in Boston, Massachusetts (subject to the clause below.) The Parties shall file at the time of their submission to AAA as provided below, for conflicts purposes only, a list of all affiliates, predecessors and potential witnesses; these initial conflict disclosures shall be filed with AAA only and shall not be shared with the opposing party. As soon as possible and no later than four (4) business days after receiving the initial filing by the Parties, the AAA shall send to the Parties the list of potential arbitrators. As soon as possible and no later than two (2) business days after receiving the list from AAA, the Parties shall notify each other of (i) any candidate on the list that has a conflict of interest and (ii) the basis for the conflict. Of the candidates from the list of potential arbitrators provided by AAA for whom a conflict has not been identified by the Parties, the Parties may strike no more than five (5) candidates. The Parties must return their lists to the AAA under Rule R-11(b) within three (3) business days after receiving the list from the AAA, and the AAA shall thereafter make the appointment as soon as possible and no later than three (3) business days after receiving the Parties' lists; provided however, the Parties agree that if the AAA determines that it is unable to appoint an arbitrator from the initial list of candidates through the process in R-11(b) (i.e., if under R-11(b) "the Parties' failed to agree on any of the candidates named on the initial list, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists"), the AAA shall propose a second list of ten (10) candidates and the foregoing procedure shall be repeated. The Parties agree that the AAA shall not have the power to make the appointment from among other members of the National Roster as described in R-11(b). If an arbitrator cannot be appointed by the AAA from the second list, this Arbitration Agreement shall be null and void.

2.    Except as otherwise provided herein or as the Parties otherwise agree in writing, the arbitrator shall conduct the arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the AAA.

3.    The arbitration shall be initiated upon execution of this Arbitration Agreement. TransCanada shall serve on Narragansett a written statement of the dispute within three (3) business days of the execution of this Arbitration Agreement excluding the day of the execution (and no earlier than April 26, 2005) and no more than six (6) pages in length (inclusive of a description of the Parties and the WSOSA, which may be attached). All submissions under this clause shall be double-spaced. Narragansett shall serve on TransCanada within six (6) business days of receipt of TransCanada's statement of dispute (excluding the day of receipt) an answer to TransCanada's statement which answer shall be no more than eight (8) pages in length. TransCanada shall serve on Narragansett and file with the AAA within three (3) business days of receipt of Narragansett's answer a reply which reply shall be no more than three (3) pages in length. The Parties shall jointly share the initial filing fee and all other costs and expenses of arbitration, including arbitrator costs; provided, however, each Party shall bear its own costs including the costs and expenses of its own attorneys, expert witnesses and consultants.

4.    Service of any documents or notices under this Arbitration Agreement shall be sent via reputable overnight delivery service or in-hand. Service upon Narragansett shall be sent to [    ] and [    ]. Service upon TransCanada shall be sent to Daniel C. Winston, Esq., Choate, Hall & Stewart LLP, Exchange Place, 53 State Street, Boston, MA 02109-2804, and Michael Hachey, TransCanada Power Marketing Ltd., TransCanada Power Marketing Ltd., 110 Turnpike Road, Westborough, MA 01581.

5.    On the next business day following Narragansett's service of its answer, the Parties shall submit to AAA: this Arbitration Agreement; the AAA required fee; the conflicts information described in the first paragraph above; the statement and answer described in the immediately preceding paragraph; and a request that the AAA immediately begin the selection process described in the first paragraph above.

6.    Discovery shall be limited to an exchange of documents in response to written requests, exchanges of interrogatory answers in response to no more than ten (10) interrogatories total by each Party (each of which may be served in two separate sets). The arbitrator shall resolve any disputes regarding the sufficiency of the responses. The arbitrator shall also resolve any dispute as to the number of interrogatories served by applying the principles of Local Rule 26.1 of the United States District Court for the District of Massachusetts. Such written document requests and interrogatories may be served upon appointment of the arbitrator or on May 24, 2005, whichever comes first, and responses shall be due within fifteen (15) days. There shall be no depositions. Two (2) business days before the preliminary hearing, the Parties shall exchange a list of witnesses who in good faith are intended at that point to be called to testify at the evidentiary hearing. To the extent a Party determines that it is reasonably likely to call any additional witness(es) to testify at the hearing, that Party shall immediately supplement and notify the other Party of the additional potential witness(es).

7.    The Parties shall exchange final witness lists and copies of any exhibits that they intend to utilize in their presentations at any evidentiary hearing before the arbitrator (any other witnesses or exhibits subject to the approval of the arbitrator upon good cause shown), at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator prior to the hearing.

8.    The Parties each agree that neither Party shall serve a notice of termination or otherwise seek to terminate the WSOSA for reason of any alleged default in relation to the Fuel Adjustment Factor ("FAF"), from and after the Arbitration Agreement Date and through the date the arbitrator issues his/her decision (the "Arbitration Period"); provided that during the Arbitration Period Narragansett shall pay (under protest and with full reservations of rights, claims, defenses and the like except as set forth herein) an amount equal to (i) the product of the fuel index calculation set forth at pages 2-3 in the former Blackstone Wholesale Standard Offer Service Tariff RIPUC 1200 (the tariff that was applicable January 1, 2000) (the "Former Blackstone Tariff"), (ii) defining The Stipulated Price as the amount for the calendar year set forth on Appendix A of the WSOSA (and not as set forth in the Former Blackstone Tariff) and (iii) defining the 2005 Fuel Trigger Point as $8.48/MMbtu) (such payments collectively, the "Protest Payment"). Provided however; that (A) neither the Protest Payments nor the Parties' participation in this arbitration shall be deemed to cure or extend the cure period under Article 7(1)(b) of the WSOSA, or to delay or prevent the occurrence of any alleged breach or Event of Default in accordance with Article 7 of the WSOSA during the Arbitration Period, arising from or related to nonpayment of the FAF or alleged non-compliance with Article 8(3) of the WSOSA; (B) this arbitration shall not be deemed to occur under Article 12 of the WSOSA, and TransCanada's agreement to participation in this arbitration shall not impair TransCanada's ability to claim under Article 8(3) of the WSOSA that no resolution was obtained in accordance with Article 12; and (C) except as may be provided in the arbitrator decision: TransCanada shall place such Protest Payment in an interest bearing account; neither party shall use a Party's action or forbearance under or as provided in this clause as evidence of that Party's agreement or acquiescence to a position, allegation or claim; and such forbearance or action shall not impair any right, claim, defense or the like in relation to the FAF or for related interest (including on the Protest Payment) that may be applicable (including that TransCanada's failure to terminate after February 1, 2005 shall not be used by Narragansett to argue for, and may not be grounds for any finding that, TransCanada has failed to mitigate its damages).

9.    Unless otherwise agreed, a preliminary hearing shall be scheduled and occur as soon as reasonably practicable after appointment of the arbitrator, and the evidentiary hearing shall be completed no later than July 21, 2005. The form and length of post-hearing briefs and the dates for submission shall be established by the arbitrator after consultation with the Parties and consideration of the schedules of the arbitrator and the Parties. The arbitrator shall render a decision no later than September 17, 2005 and shall notify the Parties in writing of such decision and the reasons therefor.

10.    The scope of the arbitration and arbitrator's authority shall be to resolve all matters, issues, rights, claims (including, if appropriate, tort or G.L. c. 93A claims) and obligations regarding or arising from the fuel adjustment factor ("FAF") of the WSOSA,

including, without limitation, the right to terminate the WSOSA based upon any WSOSA provision or any default (if any) related to the FAF, and all related common law and statutory matters and issues. The arbitrator will be authorized to award all relief available under the contract or any asserted claim related to the FAF (provided such relief is not limited by the terms of the WSOSA), including but not limited to monetary damages, interest, specific performance, rescission, reformation, termination, and, if authorized or provided by statute, multiple damages or attorneys' fees and costs.

11.    The decision of the arbitrator shall be final and binding upon the Parties, and judgment on the decision of the arbitrator may be entered in any court having jurisdiction. The decision of the arbitrator may be appealed solely on the grounds provided under M.G.L. c. 251 s. 1 et seq. and/or the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

12.    The Parties' agreement to arbitrate, the existence of the arbitration (subject to the proviso below), the Parties' submissions to the arbitrator, AAA, and each other as part of the arbitration, the decision of the arbitrator and the substance of any of the foregoing (in any form or medium, including conversations and other communications regarding the foregoing, the "Confidential Information") shall be treated, kept and maintained as confidential and shall not be disclosed or revealed to any third party without the prior written consent of the other Party; provided, however, that either Party or any of its affiliates may provide Confidential Information to (1) any regulatory agency, provided that any such disclosure must include a request for confidential treatment of the Confidential Information and the copies of or references to the Confidential Information which are placed in the public record, (2) any Court, for purposes of enforcing this arbitration agreement or the arbitrator's decision, (3) lenders, affiliates, auditors and insurers as necessary, under pledge of confidentiality, (4) experts consulted or who may testify in connection with the arbitration, and any person contemplated in good faith to be an actual or potential witness in the arbitration (any of the foregoing in this clause (4) a "Person"), but only (i) to the extent reasonably necessary to discover or develop the Person's testimony or arrange for possible attendance at the arbitration, (ii) provided that the Person is informed of the confidential nature of the Confidential Information and requested to maintain its confidentiality and to use the information only in relation to this arbitration, and (iii) provided that the Parties agree that it is not necessary to disclose the existence of the arbitration proceeding (as opposed the relevant documents and information that may be introduced as evidence at the hearing, for the purpose of developing testimony) unless a party determines in good faith that it may wish to call the Person to testify and then only to the extent necessary to arrange for the possible testimony at the hearing; and (5) agents or affiliates of a Party, but only to the extent necessary and related to the Party's performance of the WSOSA or the arbitration, and only under pledge of confidentiality. A Party's use and disclosure of Confidential Information possessed or developed by it shall be subject to this clause, except that documents created or received by the Parties in the ordinary course of business shall not be considered Confidential Information merely on the basis of their submission as evidence during the course of the arbitration.

TRANSCANADA POWER                              [Narragansett Block]

PRIVILEGED AND CONFIDENTIAL UNDER FRE 408                     4
3913701v2

MARKETING, LTD.

By its attorneys,

_____
Daniel C. Winston, Esq. (BBO # 562209)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, MA  02109-2804
Tel.:  (617) 248-5000
Fax:  (617) 248-4000

# Exhibit 13

## Thibodeau, Michelle L.

**From:** Winston, Daniel C

**Sent:** Wednesday, April 20, 2005 3:44 PM

**To:** Gloria Kavanah Esq  (gloria kavanah@us ngrid com); 'Gloria Kavanah Esq (gloria kavanah@us ngrid com)'

**Subject:** Arbitration Agreement

How is it going over there?

# Exhibit 14

## Thibodeau, Michelle L.

**From:** Kavanah, Gloria [Gloria Kavanah@us ngrid com]
**Sent:** Wednesday, April 20, 2005 5:40 PM
**To:** Winston, Daniel C ; Winston, Daniel C
**Subject:** RE: Meetings

Dan -
Confirmed for Friday

I will let you know as soon as Laura Olton confirms with RI for Monday morning

Regards,
Gloria
-----Original Message-----
**From:** Winston, Daniel C. [mailto:DWinston@choate.com]
**Sent:** Wednesday, April 20, 2005 5:08 PM
**To:** Kavanah, Gloria
**Subject:** Meetings

Gloria:

This will confirm a meeting here at Choate at 10:00 am (building across street from Wilmer Hale). You have to go to the visitor desk and give my name and they will send you up. I put you, Mike Hager, and Tom Robinson on the guest list. Let me know if those names change.

Mike and I are both free Monday morning to meet in Rhode Island. Let me know.

Dan Winston
Choate, Hall & Stewart LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 248-4049 (direct dial)
(617) 248-4000 (fax)

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

9/14/2005

# Exhibit 15

Tentative

Term Sheet for Proposed Resolution

1. Both contracts between Narragansett and EUA are subject to the following terms.

2. We have the right to release both contracts by September 1 following a bid. Narragansett would continue to pay the SOSFA during the interim.

3. If we procure interim supply, Trans-Canada releases both contracts

4. If we don't take the bid, we pay SOSFA, but have right to repeat the process by September 1, 2006
   — TransCanada may offer payment to induce Narragansett to take bid.

5. The settlement is subject to the approval of the Rhode Island Commission, as is the replacement contract.

# Exhibit 16

**Thibodeau, Michelle L.**

| | |
|---|---|
| **From:** | Winston, Daniel C |
| **Sent:** | Monday, April 25, 2005 6:04 PM |
| **To:** | Gloria Kavanah Esq  (gloria kavanah@us ngrid com); Gloria Kavanah Esq (gloria kavanah@us ngrid com) |
| **Subject:** | TC/Grid: SOSFA |

Gloria:

   Based on our discussions down at the PUC today, which I assume you have been debriefed on, TransCanada would be willing to hold off further negotiation on the arbitration agreement through the end of this week to see how things progress.  Assuming you are agreeable to that extension, let's revisit on Monday.

Dan.

# Exhibit 17

**Plotkin, Wendy**

| | |
|---|---|
| **From:** | Mike Hachey [mike_hachey@transcanada com] |
| **Sent:** | Monday, September 19, 2005 3:07 PM |
| **To:** | Winston, Daniel C ; Plotkin, Wendy |
| **Subject:** | FW: Standard Offer contracts |

-----Original Message-----
From: steve scialabba [mailto:sscialabba@ripuc.state.ri.us]
Sent: Tuesday, May 03, 2005 12:10 PM
To: Mike Hachey
Cc: proberti@riag.state.ri.us; laura.olton@us.ngrid.com;
tom.robinson@us.ngrid.com
Subject: Standard Offer contracts

Mike,

As I mentioned in my earlier voicemail, in order for the Division to
participate in a settled resolution to the standard offer contractual
dispute between TransCanada Power and National Grid, modifications to
the proposal outlined by Tom Robinson from NGrid would need to be made.
Under the proposal made on 4/25, the two TransCanada contracts would be
subject to release by Narragansett, following a bid process.  As drafted
on 4/25, TransCanada would receive fuel payments on the disputed
contract from Narragansett effective 1/05, until released by
Narragansett.  As modified by the Division here,  the Division would
agree to support fuel payments on the disputed contract equivalent to
50% of the amount calculated utilizing the fuel provision of the
undisputed contract.

If Narragansett does not find any bids acceptable, the fuel payments at
the 50% level would cease (a specific date could be determined), and
parties would then be free to pursue their claims under the manner
stated in the contract.

Under this proposal, Transcanada would receive half the disputed fuel
payments until such time as Narragansett bids out the load of the two
contracts and makes a decision on the bids.  If Narragansett accepts a
bid, TransCanada is released and receives half the disputed fuel
payments without having to litigate.  If Narragansett does not accept a
bid, fuel payments cease and TransCanada is then, from that point
forward,  free to pursue its rights under the contract and seek the
relief and remedy it deems appropriate.  Narragansett is also then free
to do the same.

Regarding the timing of the bid(s) and release date(s), we would be
willing to listen to proposals from TransCanada and Narragansett if you
find the approach discussed above acceptable.

Steve Scialabba
Division of Public Utilities and Carriers

This electronic message and any attached documents are intended
only for the named addressee(s). This communication from
TransCanada may contain information that is privileged, confidential
or otherwise protected from disclosure and it must not be disclosed,
copied, forwarded or distributed without authorization. If you have
received this message in error, please notify the sender immediately

and delete the original message. Thank you.

# Exhibit 18

**Thibodeau, Michelle L.**

| | |
|---|---|
| **From:** | Kavanah, Gloria [Gloria Kavanah@us ngrid com] |
| **Sent:** | Friday, May 27, 2005 10:14 AM |
| **To:** | Winston, Daniel C.; mike_hachey@transcanada com; Winston, Daniel C.; mike_hachey@transcanada com |
| **Cc:** | Hager, Michael; Hager, Michael |
| **Subject:** | WSOS - Draft Settlement/Termination Agreement |
| **Importance:** | High |

CONFIDENTIAL SETTLEMENT COMMUNICATION
GOVERNED BY APPLICABLE FEDERAL AND STATE LAWS AND RULES GOVERNING SETTLEMENT
COMMUNICATIONS

Dan and Mike:

Further to the conversations between our companies, attached is a draft agreement  This agreement is subject to further internal review. As Mike Hager mentioned to Mike Hachey, we will need to finalize this agreement by Tuesday so that we can meet a regulatory filing deadline  Please let me or Mike Hager know if you have any questions.

Gloria <<TCPM Amend Rlease 5-26.doc>>

*Gloria Kavanah*
*Assistant General Counsel*
*National Grid USA*
*1125 Broadway*
*Albany, New York 12204-2505*

*518.433.5221 (phone)*
*518.433.5220 (fax)*
*gloria.kavanah@us.ngrid.com*

This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

9/14/2005

## WSOS AMENDMENT AND SETTLEMENT AGREEMENT

WHEREAS, THE NARRANGANSETT ELECTRIC COMPANY, INC., a Rhode Island Corporation, including as successor in interest to Blackstone Valley Electric Company and Newport Electric Corporation, ("Narragansett") and MASSACHUSETTS ELECTRIC COMPANY, INC., a Massachusetts corporation, including as successor in interest to Eastern Edison Company, ("Mass. Electric") (Mass. Electric and Narragansett collectively, the "Companies") and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("TransCanada") (Mass. Electric, Narragansett and TransCanada each individually, a "Party" and collectively, the "Parties") are Parties to a Wholesale Standard Offer Service Agreement dated as of April 7, 1998 (the "Blackstone WSOSA"), and Narragansett and TransCanada are Parties to an Amended and Restated Wholesale Standard Offer Service Agreement II amended as of September 1, 1998 (the "Narragansett WSOSA") (the Narragansett WSOSA and the Blackstone WSOSA, collectively, the "Two WSOSAs");

WHEREAS, pursuant to the Two WSOSAs, and as specified therein, TransCanada supplies and Narragansett purchases wholesale standard offer service;

WHEREAS, pursuant to the Blackstone WSOSA, and as specified therein, TransCanada had supplied and Mass. Electric had purchased wholesale standard offer service through December 31, 2004 at which time the wholesale supply obligations ceased in relation to Mass. Electric's standard offer service customers in accordance with the terms of the Blackstone WSOSA, although certain obligations in relation thereto survive;

WHEREAS, a dispute has arisen between the Parties under the Blackstone WSOSA;

WHEREAS, each of the Parties wish to limit the dispute by limiting the term of the contract and thereby the magnitude of the potential dispute;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties intending to be legally bound hereby agree as follows:

1.      **End of Term.**

(a)  Subject to the occurrence of the Effective Date (as defined in Article 13 of this WSOS Amendment and Settlement Agreement ("A&S Agreement")) and the Regulatory Approval Date (as defined in Article 4 of this A&S Agreement), the Two WSOSAs shall be terminated effective as of the Hour Ending 2400 Eastern prevailing time on August 31, 2005 (the "Termination Date") without any further notice by one Party to the other Party under this the "A&S Agreement or either of the Two WSOSAs and:

(i)    Article 2 of the Blackstone WSOSA shall be amended by deleting the existing clause and substituting the following clause:

> The term of this Agreement shall begin on the Commencement Date of Service and end at Hour Ending 2400 Eastern prevailing time on August 31, 2005.

(ii) Section 3.1 of the Narragansett WSOSA shall be amended by deleting the existing clause and substituting the following clause:

> The term of this Agreement shall begin at 12:01 a.m. on the Closing Date and shall end at Hour Ending 2400 Eastern prevailing time on August 31, 2005.

(b)    Upon the occurrence of the Regulatory Approval Date, each Party shall undertake any actions, including executing documentation, at the RTO-New England or Independent System Operator-New England that may be necessary to have the load obligations under the Two WSOSAs reassigned to Narragansett as of the Termination Date. TransCanada shall also undertake any action at the Federal Energy Regulatory Commission that may be necessary to terminate its Rate Schedules in relation to the Two WSOSAs, and the Companies shall cooperate as may be necessary in relation to any such filing.

**2.    Interim Payment.**

(a)    For any month beginning as of January 1, 2005 and prior to the earlier of (i) the Termination Date and (ii) the date a full and unconditional approval of a Regulatory Filing (as defined in Article 4) is denied, Narragansett shall pay to TransCanada an amount equal to the product of the calculation pursuant to Attachment A to this A&S Agreement using the kilowatt-hours of Delivered Energy under the Blackstone WSOSA ("Delivered Energy" as defined in the Blackstone WSOSA; such payments individually and collectively, the "Interim Payment"). The Interim Payment shall be made on the same date that payments are made pursuant to Article 6 of the Blackstone WSOSA.

(b)    In the event the Rhode Island Public Utilities Commission or the Division of Public Utilities and Carriers issues a ruling that does not fully and unconditionally approve a Regulatory Filing, as of and after such ruling, Narragansett's obligation to make Interim Payments shall cease.

(c)    TransCanada acknowledges and agrees that Narragansett is paying the Interim Payment to TCPM under protest and without prejudice. Each Party fully reserves all rights, claims (including for interest), counterclaims and defenses under or in relation to the Blackstone WSOSA, or in law or equity, in relation to the Fuel Adjustment Factor in Article 5 of the Blackstone WSOSA (i) in the event of the occurrence of a Regulatory Approval Date, such reservation shall apply to the Interim Period only and (ii) in the

2

event that full and unconditional approval of a Regulatory Filing is denied, such reservation shall be without limitation of period.

**3.    Limited Waiver of Dispute Resolution and Termination Rights.**

(a)    From and after the Effective Date until the earlier of (i) the Termination Date and (ii) the date of the issuance of a ruling does not fully and unconditionally approve a Regulatory Filing (such period, the "Interim Period") each Party waives any right that it may have to terminate or seek to terminate either of the Two WSOSAs for any reason or event of default arising from or related to the Fuel Adjustment Factor in Article 5 or Section 8(3) of the Blackstone WSOSA; provided however, it shall not be a violation of this clause, and nothing herein shall impair, the Parties' prosecution and defense of, The Narragansett Electric Company v. TransCanada Power Marketing Ltd. (U.S. District Court for the District of Rhode Island, C.A. No. 05234S or TransCanada Power Marketing Ltd. v. Narragansett Electric Company (U.S. District Court for the District of Massachusetts, Central Division, C.A. No. 05-40076).

*[Note to TransCanada: An alternate provision is to agree to stay the litigation until the earlier of Regulatory Approval Date or a denial of a Regulatory Approval ]*

(b)    In the event that a ruling does not fully and unconditionally approve a Regulatory Filing, the Parties shall no longer be bound by this waiver.

**4.    Regulatory Approvals.**

Within [  ] business days of the Effective Date, Narragansett shall file with the Rhode Island Public Utilities Commission and the Division of Public Utilities and Carriers (a) a petition requesting approval of this A&S Agreement including authorization to terminate the Two WSOSAs in accordance with the terms of this A&S Agreement, (b) a proposal to replace the supply obligations presently provided pursuant to the Two WSOSAs, and (c) any request it deems necessary or desirable regarding rate or related treatment or a request for any other authorization ((a), (b) and (c), individually, a "Regulatory Filing", collectively, the "Regulatory Filings").

If full and unconditional approval of a Regulatory Filing is denied, the Parties rights and obligations under Article 1, Section 2(a), and Section 3(a) shall cease.

The date that all Regulatory Filings are approved shall be the "Regulatory Approval Date."

**5.    Retained Rights and Obligations; Releases.**

Except as expressly set forth in this A&S Agreement, from and after a Termination Date (if any):

(a) The Parties shall have no further rights or obligations between themselves arising under or relating in any way whatsoever to the Two WSOSAs on or after the Termination Date except (i) to the extent necessary to provide for the satisfaction of any obligations under the Two WSOSAs arising or accruing on or before the Termination Date, (ii) in relation to an Interim Payment and in relation to the Fuel Adjustment Factor in Article 5 of the Blackstone WSOSA for the Interim Period, and including the rights reserved under Section 2(c), and (iii) as may arise under this A&S Agreement. The Parties' rights and obligations arising prior to the Termination Date expressly preserved by this clause include, and are without prejudice to the Parties' rights, claims and defenses under National Grid USA v. TransCanada Power Marketing Ltd., Suffolk Superior Court, C.A. No. 03-1362B and related arbitration decisions, and the Parties' dispute regarding responsibility for ISO-NE costs and charges as set forth in their correspondence.

(b)    TransCanada for itself and its successors and assigns and past, present and future insurers, attorneys, representatives, officers, directors, employees, agents and servants, its alleged or in fact predecessor corporations, parent corporations, present or former subsidiary corporations (whether or not wholly or directly owned), related corporations or entities, affiliates, divisions, acquired corporations, and any other person or entity who could assert a claim on its behalf (individually and collectively referred to as "TransCanada's Releasors") expressly release, remise, acquit and forever discharge the Companies, and any and all of their respective successors and assigns and all of their respective past, present and future insurers, attorneys, representatives, officers, directors, shareholders, agents, servants, volunteers, and employees, and all their heirs, executors, administrators, successors and assigns, parent corporations, present or former subsidiary corporations (whether or not wholly or directly owned), related corporations or entities, the Companies' Releasees from any and all claims (latent or patent), controversies, rights, disputes and causes of action, whether statutory or common law actions, whether in contract, equity, warranty, tort (including negligence, gross negligence, and strict liability), unfair or deceptive trade practices, bad faith, promissory estoppel, negligent misrepresentation of whatsoever kind for actual, direct, indirect, consequential or punitive damages or any economic loss, or otherwise, based upon facts, matters, occurrences, allegations, demands, claims or counterclaims arising out of, relating in any way whatsoever or with respect to the Two WSOSAs whether known or unknown, foreseen or unforeseen, asserted or unasserted, contingent or absolute, now or in the future or otherwise, that TransCanada's Releasors or any of them may have had or may now or in the future have against the Companies' Releasees or any of them, in respect of the Two WSOSAs; provided, however, that TransCanada shall retain the ability to enforce this A&S Agreement and such rights and obligations as may survive under Section (a) of this Article 5.

( c )    Each of the Companies, for itself and their respective successors and assigns and past, present and future insurers, attorneys, representatives, officers, directors, employees, agents and servants, its alleged or in fact predecessor corporations, parent corporations, present or former subsidiary corporations (whether or not wholly or directly owned), related corporations or entities, affiliates, divisions, acquired corporations, and any other person or entity who could assert a claim on its behalf (individually and collectively

referred to as the "Companies' Releasors") expressly release, remise, acquit and forever discharge TransCanada, and any and all of its successors and assigns and all of its past, present and future insurers, attorneys, representatives, officers, directors, shareholders, agents, servants, volunteers, and employees, and all their heirs, executors, administrators, successors and assigns, parent corporations, present or former subsidiary corporations (whether or not wholly or directly owned), related corporations or entities, (individually and collectively referred to as the "TransCanada Releasees") from any and all claims (latent or patent), controversies, rights, disputes and causes of action, whether statutory or common law actions, whether in contract, equity, warranty, tort (including negligence, gross negligence, and strict liability), unfair or deceptive trade practices, bad faith, promissory estoppel, negligent misrepresentation of whatsoever kind for actual, direct, indirect, consequential or punitive damages or any economic loss, or otherwise, based upon facts, matters, occurrences, allegations, demands, claims or counterclaims arising out of, relating in any way whatsoever or with respect to the Two WSOSAs whether known or unknown, foreseen or unforeseen, asserted or unasserted, contingent or absolute, now or in the future or otherwise, that the Companies' Releasors or any of them may have had or may now or in the future have against the TransCanada Releasees or any of them, in respect of the Two WSOSAs; provided, however, that the Companies shall retain the ability to enforce this A&S Agreement and such rights and obligations as may survive under Section (a) of this Article 5.

6.    **No Admission.**

Nothing herein is intended as, or shall be construed or treated as, an admission or evidence of liability of any kind by any Party. The Parties each agree that neither this A&S Agreement nor the Regulatory Filings shall be cited by any Party as evidence of a Party's admission or acquiescence to a position or assertion of a Party regarding the obligations under the Two WSOSAs.

7.    **Notices.**

Service of any documents or notices under the Two WSOSAs or this A&S Agreement shall be sent via reputable overnight delivery service or in-hand:

(a)    Service upon the Companies shall be sent to Mr. Michael J. Hager, Vice President, Energy Supply – New England, National Grid USA Service Company, Inc., 55 Bearfoot Road, Northborough, MA 01532 and General Counsel, National Grid USA Service Company, Inc., 25 Research Drive, Westborough, MA 01582.

(b)    Service upon TransCanada shall be sent to Michael E. Hachey, Director – Power Marketing, TransCanada Power Marketing Ltd., 110 Turnpike Road, Westborough, MA 01581 and Daniel C. Winston, Esq., Choate, Hall & Stewart LLP, Exchange Place, 53 State Street, Boston, MA 02109-2804.

8.    **Representations, Warranties and Covenants.**

Each Party represents, warrants and covenants to the other Parties, as follows:

(a) It is duly organized in the form of business entity set forth in the first paragraph of this A&S Agreement, validly existing and in good standing under the laws of its state of its organization and has all requisite power and authority to carry on its business as is now being conducted, including (with the exception of Narragansett as to the Regulatory Filings), all regulatory authorizations as necessary for it to legally perform its obligations hereunder.

(b) It has full power and authority to execute and deliver this A&S Agreement and to consummate and perform the transactions contemplated hereby. This A&S Agreement has been duly and validly executed and delivered by it, and, assuming that this A&S Agreement constitutes a valid and binding agreement of the other Parties, constitutes its valid and binding agreement, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c) Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, or the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which it is bound, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets.

**9.      Counterparts and Facsimile Signatures.**

This A&S Agreement may be executed in counterparts, including counterparts bearing facsimile signatures, and each such counterpart shall have the same force and effect as an original and, upon becoming effective in accordance with Article 13, shall constitute a legal, valid, binding and enforceable agreement on the part of each of the Parties.

**10.      Confidentiality.**

The Parties agree that neither they nor their attorneys, agents, servants or employees, nor any other person or persons acting on their behalf, may or shall in any manner disclose, publish or publicize the terms of this A&S Agreement or any portion hereof, except (a) to the extent necessary to enforce this A&S Agreement, (b) to the extent such disclosure is required by law or by a regulatory agency with jurisdiction over one or more of the Parties or is necessary to obtain approval of a Regulatory Filing and (c) to the extent disclosure is required to be made to one or more of the Parties' accountants, tax preparers or auditors; provided however, if disclosure is necessary or required as contemplated in (a), (b) or (c), the Parties shall request confidential or similar treatment for any copy of this A&S Agreement, any discussion of its terms, or any reference to the substance of it which is placed in the public record; provided further, however, Narragansett may disclose the existence of this A&S Agreement in the Regulatory Filings without seeking confidential treatment.

**11.    Construction.**

This A&S Agreement shall not be construed for or against any Party because the Party's legal representative drafted it or any part hereof. This A&S Agreement shall be governed by, interpreted under, and performed in accordance with, the Commonwealth of Massachusetts without giving effect to its conflict of laws principles.

**12.    Entire Agreement.**

This A&S Agreement, including its Attachment A, embodies the entire agreement and understanding of the Parties in respect of the transactions contemplated hereby. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein. It is expressly acknowledged and agreed that there are no restrictions, promises, representations, warranties, covenants or undertakings contained in any material provided or otherwise made available by any Party to the other Parties. This Agreement supersedes all prior agreements and understandings between and among the Parties with respect to the transactions contemplated hereby.

**13.    Effectiveness of this A&S Agreement.**

This A&S Agreement shall become effective against all Parties when and only upon its execution by all Parties (such dated of full execution, the "Effective Date"). Once effective, this A&S Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of each Party.

**14.    Amendments and Modifications.**

This A&S Agreement may be modified, amended or supplemented only in a written instrument which specifically references this A&S Agreement and which is executed by all Parties.

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this WSOS Amendment and Settlement Agreement on their behalf.

TRANSCANADA POWER MARKETING LTD.

By:_____

Name:_____

Title:_____

Date:_____

7

THE NARRAGANSETT ELECTRIC COMPANY

By:_____

Name:_____

Title:_____

Date:_____


MASSACHUSETTS ELECTRIC COMPANY

By:_____

Name:_____

Title:_____

Date:_____

APPENDIX A

Interim Payments due, if any, under Article 2 shall be calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Index Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---------------|-------------------------|
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Subject to Article 2, TransCanada will be paid the difference between the Stipulated Price as adjusted in accordance with this Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recently available six months, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in "The Wall Street Journal," expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent available twelve months (six months for Standard Offer load in the EUA Zone), where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, Narragansett shall file alternate indices with the RIPUC.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|------|------|
| 2005 | $8.48/MMBtu |
| 2006 | $9.22 |
| 2007 | $9.95 |
| 2008 | $10.69 |
| 2009 | $11.42 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2005 the Market Gas Price and Market Oil Price total $9.50 ($5.50/MMBtu plus $4.00/MMBtu respectively), the Fuel Trigger Point of 8.48 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$5.50 + \$.60/\text{MMBtu}) + (\$4.00 + \$.04/\text{MMBtu})}{\$8.48 + \$.60 + \$.04/\text{MMBtu}} = 1.1118$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 6.149¢/kWh (5.5 x 1.1118).

This calculation shall be performed each month.

# Exhibit 19

## Thibodeau, Michelle L.

**From:** Winston, Daniel C.
**Sent:** Friday, May 27, 2005 3:01 PM
**To:** 'Kavanah, Gloria'; 'Kavanah, Gloria'
**Subject:** RE: WSOS - Draft Settlement/Termination Agreement

Gloria:

The fundamental form of the proposal is workable, but we would need a couple major changes to this proposal in order to consider it further. We also have other comments, but unless these major ones can be addressed it does not seem worth wordsmithing this further. These are:

- The Termination Date should be June 30 (or July 1), as the Mike Hachey discussed with Mike Hager.
- We would like the to see the contractual commitment of the replacement supplier(s) as a condition of the Agreement. This will obviously need to be supplied to the PUC, and we would like to see the proposed filing with the PUC in its entirety as part of this Agreement. Clause 4 would similarly be amended to attach the proposed PUC filing in entirety.
- The agreed-upon reservation of rights as to Interim Payments would need to begin as of the Effective Date.

We are interested in continuing settlement talks but we don't think it is worth going further without these subjects being addressed. I am around this afternoon if you want to discuss, but wanted to give you a chance to see our major comments first in print.

-----Original Message-----
**From:** Kavanah, Gloria [mailto:Gloria.Kavanah@us.ngrid.com]
**Sent:** Friday, May 27, 2005 10:14 AM
**To:** Winston, Daniel C.; mike_hachey@transcanada.com
**Cc:** Hager, Michael
**Subject:** WSOS - Draft Settlement/Termination Agreement
**Importance:** High

CONFIDENTIAL SETTLEMENT COMMUNICATION
GOVERNED BY APPLICABLE FEDERAL AND STATE LAWS AND RULES GOVERNING SETTLEMENT COMMUNICATIONS

Dan and Mike:

Further to the conversations between our companies, attached is a draft agreement. This agreement is subject to further internal review. As Mike Hager mentioned to Mike Hachey, we will need to finalize this agreement by Tuesday so that we can meet a regulatory filing deadline. Please let me or Mike Hager know if you have any questions.

Gloria <<TCPM Amend Rlease 5-26.doc>>

*Gloria Kavanah*
*Assistant General Counsel*
*National Grid USA*

9/14/2005

*1125 Broadway*
*Albany, New York 12204-2505*

*518.433.5221 (phone)*
*518.433.5220 (fax)*
*gloria.kavanah@us.ngrid.com*

This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

9/14/2005

# Exhibit 20



Narragansett Electric
A **National Grid** Company

Thomas G. Robinson
Laura S. Olton

June 7, 2005

**VIA HAND DELIVERY & ELECTRONIC MAIL**

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
89 Jefferson Boulevard
Warwick, RI  02888

> RE: <u>**The Narragansett Electric Company, Petition for Approval of Settlement
> Agreement and Related Transactions Pertaining to Certain Standard Offer
> Wholesale Supply Agreements**</u>

Dear Ms. Massaro:

Enclosed please find an original and nine (9) copies of this filing, requesting approval of a
WSOS Amendment and Settlement Agreement ("Settlement Agreement") entered into between
The Narragansett Electric Company ("Narragansett" or the "Company") and TransCanada Power
Marketing Ltd. ("TransCanada"), as well as other related transactions.

The Settlement Agreement terminates TransCanada's obligations under two wholesale
standard offer service agreements.  In turn, as of the termination date, another power supplier,
Constellation Energy Commodities Group, Inc. (f/k/a Constellation Power Source, Inc.)
("Constellation"), entered into agreements to provide the supply presently provided under both of
those TransCanada agreements.   These transactions also are subject to effectuating other
amended and restated agreements, as will be described below.   The Settlement Agreement is
provided as Attachment 1.  These transactions limit the scope of the on-going litigation between
Narragansett and TransCanada and replace the existing agreements with agreements with the
same terms and without the dispute, all of which is to the benefit of Narragansett's customers.

<u>Dispute Giving Rise to Filing</u>

As you may be aware, a dispute has developed between TransCanada and Narragansett
regarding the Wholesale Standard Offer Service Agreement dated April 7, 1998 between
TransCanada and the former EUA Companies (Blackstone Valley Electric Company, Newport
Electric Corporation, and Eastern Edison Company), which has been assumed by Narragansett

280 Melrose Street
Providence, RI  02907
401-784-7667  Fax: 401-784-4321
laura.olton@us.ngrid.com

Luly E. Massaro, Commission Clerk
June 7, 2005
Page 2 of 4

("EUA WSOS Agreement"). On May 17, 2005, TransCanada served Narragansett with a complaint in U.S. District Court in Massachusetts with regard to the EUA WSOS Agreement for breach of contract, among other claims. Narragansett filed a complaint in the U.S. District Court in Rhode Island, alleging breach of contract of the EUA WSOS Agreement, among other claims. Copies of each of the complaints also are included with this filing as Attachments 2 and 3, respectively.

The Settlement Agreement, if approved by the Commission and consented to by the Division, resolves the dispute on a prospective basis by having Constellation enter into agreements to provide the supply presently provided under both of TransCanada's Wholesale Standard Offer Service Agreements, including the EUA WSOS Agreement that is the subject of the dispute. However, litigation would still proceed between TransCanada and Narragansett to determine whether TransCanada, under the terms of the contract as disputed by Narragansett and TransCanada, would be entitled to retain the fuel payments that have been and will be made under protest by Narragansett for wholesale standard offer supply provided by TransCanada from January to the termination date. Even though litigation will continue, this partial settlement of the dispute substantially reduces the amount at stake in the litigation for all concerned.

## Description of Constellation Transactions

Constellation has four existing wholesale standard offer supply agreements with Narragansett. Two of the Constellation agreements have fuel index provisions in effect, while the other two do not. TransCanada has two agreements. One contains a fuel index that is in effect, while the other is the subject of the dispute – Narragansett contends that fuel index ended after 2004, and TransCanada disagrees. In this proposed transaction, Constellation will enter into one new agreement, and amend an existing agreement, to provide the supply presently provided under both of TransCanada's agreements, and the new agreement to supply the EUA WSOS load will not contain a fuel index provision. Modifications to Constellation's existing agreements will be described below.

Constellation was interested in providing the supply presently provided by TransCanada to the extent it could split its pre-existing contracts and new obligations to the Company that contain a fuel index provision (i.e., those for the Narragansett Zone) into two sets of independent transactions, such that the Company's obligations to make fuel index payments are separated from the obligations to purchase power at the stipulated fixed price streams. As such, the fuel index payment provisions in the two Constellation agreements containing fuel index payments would be terminated, resulting in two amended power supply agreements with no fuel index ("Amended WSOS Agreements"). In addition, one new power supply agreement (with no fuel index) and an amendment to an existing Constellation WSOS agreement (with the fuel index being separated out) would be executed, through which Constellation would provide the supply presently provided by TransCanada in the EUA Zone and in the Narragansett Zone. In recognition of the termination of the obligation to make fuel index payments, a second set of new agreements ("Fuel Adjustment Payment Agreements") between Narragansett and Constellation would be executed for the purpose of making the fuel index payments. Each of the new Fuel

Luly E. Massaro, Commission Clerk
June 7, 2005
Page 3 of 4

Adjustment Payment Agreements would obligate Narragansett to make the fuel index payments as such payments would have been made under the terms of the pre-existing agreements, as applicable.

For the sake of simplicity, Attachment 4 provides a list of the pre-existing agreements, with a summary of the proposed actions that affect each of them. Attachment 5 provides a list of the new agreements with Constellation with a brief summary of the intent of each. The attachments, read together, provide a simplified description of the proposed transactions as set forth above.

## Assignment of Fuel Adjustment Payment Agreements

On or after the date the Fuel Adjustment Payment Agreements take effect, it is Constellation's intention to manage the Amended WSOS Agreements and the Fuel Adjustment Payment Agreements separately, which may include the sale or assignment of the Fuel Adjustment Payment Agreements, which contain assignment clauses. As a part of the approval process, Constellation desires assurance that, once an assignment right is properly exercised under the terms of the agreement, the agreement can be assigned without the need for Narragansett to return to the Commission for approval.

## Division Consent

It is important to note that, in addition to the transactions being conditioned upon Commission approval, they also are conditioned upon the Division's expressed written consent to terminate the TransCanada agreements, as required by the last sentence of Section 39-1-27.3(b) of the Rhode Island General Laws. The Company is separately requesting the Division to grant the consent on the condition that Commission grants the approvals requested in this docket.

## Need for Approval by June 30

One of the conditions to the transactions is that the Company obtain a final, non-appealable order from the Commission by June 30, 2005. Given the seven-day statutory appeal period, this would require the Commission to issue a written order by no later than the close of business on June 23. While the Company regrets that this puts this docket on an expedited basis, there was no other way that this creative solution could be consummated. For that reason, we respectfully request the Commission hold hearings in June and issue a written order approving the transactions such that the Commission order will be final and non-appealable by June 30.

The documents listed in Attachment 5 have been executed by Constellation and Narragansett and redacted versions of the agreements are attached as Attachments 6A-6H. Because the agreements with Constellation involve commercially-sensitive negotiated terms between Narragansett and Constellation, the Company requests that the redacted portion of the agreements be given confidential treatment. However, it is understood that the mechanics of the transactions themselves are not confidential and can be discussed at the hearing. The unredacted versions are being filed with the Commission in a sealed envelope marked "Contains Privileged Information – Do Not Release" in accordance with Commission Rule 1.2(g).

Luly E. Massaro, Commission Clerk
June 7, 2005
Page 4 of 4

        Accordingly, the Company respectfully requests the Commission approve the Settlement
Agreement provided in Attachment 1, and the new and amended agreements that are listed in
Attachment 5 and provided as Attachments 6A-6H, as described above.

        Thank you for your attention to this filing.  If you have any questions, please feel free to
call me at 508-389-2877 or Laura Olton at 784-7667.


                                                Very truly yours,


                                                Thomas G. Robinson
                                                Laura S. Olton


Enclosures

cc:       Service List

# Exhibit B

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| The Narragansett Electric Company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 05-234S |
| Transcanada Power Marketing, Ltd., | ) ) ) | |
| Defendant. | ) ) | |

DECISION AND ORDER

WILLIAM E. SMITH, United States District Judge.

Before the Court is Defendant's Motion to Dismiss or, in the Alternative, to Stay or Transfer Venue to the District of Massachusetts. For the reasons that follow, Defendant's motion is granted to the extent it requests this action be stayed pending adjudication in the District of Massachusetts.

I.  Background

This case involves a contractual dispute between The Narragansett Electric Company ("Narragansett") and Transcanada Power Marketing Ltd. ("Transcanada"). Narragansett is the largest electric distribution company in Rhode Island, providing electricity to approximately 480,000 Rhode Island customers. Narragansett purchases electricity for its customer base from Transcanada, a power distribution company, pursuant to the terms

and conditions of their Wholesale Standard Offer Service Agreement ("WSOS Agreement"). At the heart of their dispute is a provision in the WSOS Agreement providing that Transcanada shall receive a price for its electricity which includes: (1) the standard offer wholesale price; and (2) a fuel adjustment factor, to be approved by the Rhode Island Public Utilities Commission. The parties differing contractual interpretations focus on whether, beginning in January of 2005, Narragansett should still be required to pay the fuel adjustment factor as part of the price for electricity.[1]

Upon realizing they did not see eye-to-eye, the parties entered into settlement negotiations. Before reaching a resolution, however, Transcanada filed suit on May 17, 2005, in the District of Massachusetts, Worcester Division. See TransCanada Power Mktg. Ltd. v. Narragansett Elec. Co., C.A. No. 05-cv-40076-FDS (D. Mass.). After filing an answer and counterclaim in the Massachusetts action, Narragansett filed this lawsuit against Transcanada on May 26, 2005.[2] Not wanting to relinquish its home-field advantage, Transcanada has now filed in this Court a Motion to Dismiss or, in the Alternative, to Stay or Transfer Venue to the District of Massachusetts. On September 9, 2005, this Court heard

---

[1] Thus far in 2005, Narragansett has continued to pay the fuel adjustment factor under protest.

[2] The parties do not dispute that the Complaint filed by Narragansett is identical to Narragansett's counterclaim filed in the Massachusetts action.

2

arguments on Transcanada's motion, and requested that the parties
file a joint stipulation concerning their negotiations up until the
time Transcanada filed suit. Thereafter, Transcanada notified the
Court that it had filed in the Massachusetts action a Motion to
Enjoin Narragansett from prosecuting this case in Rhode Island,[3]
and that the parties were unable to reach agreement on a joint
stipulation regarding negotiations.

II.  Discussion

As this writer recently discussed in Cruz v. Hartford Casualty
Ins. Co., No. C.A. 005-38S, 2005 WL 1231965, *2 (D.R.I. May 20,
2005), the discretionary decision to transfer a case to a different
forum must take into account the presumption that the first-filed
action should prevail. "The 'first-filed rule' is an equitable
doctrine of venue selection followed universally: '[w]here
identical actions are proceeding concurrently in two federal courts
. . . the first filed action is generally preferred in a choice-of-
venue decision." Feinstein v. Brown, 304 F. Supp. 2d 279, 280-81
(D.R.I. 2004)(quoting Cianbro Corp. v. Curran-Lavoie, Inc., 814
F.2d 7, 11 (1st Cir. 1987)).

---

[3] According to the docket sheet, the Massachusetts court
issued a scheduling order and heard arguments on Transcanada's
Motion to Enjoin on October 4, 2005. See TransCanada Power Mktg.
Ltd. v. Narragansett Elec. Co., C.A. No. 05-cv-40076-FDS,
Electronic Clerk's Notes and Doc. #17 (D. Mass.) (last accessed
October 5, 2005).

There are, of course, ways in which the first-filed presumption may be overcome, one of which occurs when the balance of convenience favors the second-filed action. Factors to be weighed under this exception include: (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of witnesses and location of documents; (4) any connection between the forum and the issues; (5) the law to be applied; and (6) the state or public interest at stake. The presumption may also be overcome "[w]hen the first-filed action is the result of a preemptive 'race to the courthouse.'" Id. at 283. Concerns regarding pre-emptive filings are especially implicated when the race to the courthouse occurs in the midst of productive settlement negotiations. See Nortek, Inc. v. Molnar, 36 F. Supp. 2d 63, 70 (D.R.I. 1999)(courts should not "reward conduct that undermines the sound policy of promoting settlements and negotiations outside the courthouse").

Here, it is undisputed that the instant action and the litigation in the District of Massachusetts are identical. Also undisputed is that the Massachusetts action is the first-filed case -- Transcanada filed its Complaint in Massachusetts court nine days before Narragansett filed its Complaint here. What is disputed is whether Transcanada should benefit from the presumption in favor of the first-filed action and whether this case should proceed during adjudication by the District of Massachusetts court.

4

Transcanada argues that transfer is appropriate because the balance of convenience favors Massachusetts as a forum. Narragansett counters by urging this Court to ignore the first-filed rule because the balance of convenience actually favors Rhode Island, in that the resolution of this litigation could impact approximately 480,000 Rhode Island customers, and involves conduct before the Rhode Island Public Utilities Commission.[4] Additionally, Narragansett believes that Transcanada should not benefit from the first-filed rule because Transcanada's Massachusetts Complaint should be considered an improper anticipatory filing in the midst of ongoing settlement negotiations. To hold otherwise, Narragansett argues, would be to undermine the sound policy of encouraging settlements and negotiations outside the courthouse.

Narragansett's points are well-founded -- the potential impact upon a large number of Rhode Island residents and the rates they

---

[4] Much ado is also made about whether the convenience of parties, potential witnesses, and location of documents support Massachusetts or Rhode Island as a forum. The Worcester courthouse is approximately 40 miles from Providence, a distance that could prove challenging for pro se individuals. The Court is hard-pressed, however, to believe this distance inconveniences sophisticated litigants such as Narragansett and Transcanada, even at a time when gasoline prices hover around $3.00 per gallon. Moreover, it should be noted that another Judge of this Court recently transferred venue of a high profile criminal matter to Worcester from Providence. The Judge, her staff, and the attorneys all managed the daily commute with no reported injuries or inconvenience.

pay for electricity, as well as the potential involvement of Rhode Island regulatory agencies make for a compelling connection between this case and Rhode Island.[5] Moreover, the concerns discussed in <u>Nortek</u> merit further consideration of whether Transcanada should benefit from the first-filed rule.

Despite the willingness to litigate this dispute in Rhode Island, however, this Court must also be mindful of the doctrine of federal comity, "which requires the federal district courts to refrain from interfering with each other's affairs." <u>Gemco Latinoamerica, Inc. v. Seiko Time Corp.</u>, 623 F. Supp. 912, 916 (D.P.R. 1985). Otherwise, "there would exist the possibility of conflicting judicial resolutions as well as a duplication of judicial efforts." <u>Id.</u> These concerns have resulted in the understanding that "the district court hearing the first-filed action should determine whether special circumstances [or the balance of convenience] dictate that the first action be dismissed

---

[5] This writer pauses to note that his status as a Narragansett rate payer would not present a disqualifying conflict of interest. As correctly discussed by Plaintiff at the September 9, 2005 hearing, an interest shared by a judge in common with the public (as is often the case in public utility litigation) does not by itself mandate recusal. <u>See, e.g., In re New Mexico Natural Gas Antitrust Litig.</u>, 620 F.2d 794, 796-97 (10th Cir. 1980) (reversing a district judge who had recused himself because the possible beneficial effect on future utility bills was not a "financial interest" or "other interest" that was "substantially affected"). Simply stated, the mere possibility that electrical rates may increase does not alter this Court's ability to preside over this proceeding free from bias and with complete impartiality.

6

in favor of a later-filed action." Id. (internal quotations and citation omitted); see also Cruz, 2005 WL 1231965 at *3.

Application of these principles leads to the conclusion that the Massachusetts court should have the opportunity to determine the applicability of the first-filed rule. Whether Transcanada has a pending motion to enjoin prosecution is immaterial to this determination, because the courts are simply better equipped than the litigants to handle cases with an eye toward efficiency. See West Gulf Maritime Ass'n v. ILA Deep Sea Local 24, 751 F.2d 721, 732 (5th Cir. 1985) ("it seems clearly better for parties to rely on the discretion of the court in the second-filed action to prevent duplicative litigation, rather than to require them to seek an injunction in another court to prevent such duplicative litigation"). Thus, this Court will defer the ultimate decision on whether the first-filed rule should govern venue in this case to the court sitting in Worcester, Massachusetts.

III. Conclusion

In light of the foregoing, Transcanada's Motion to Dismiss or, in the Alternative, to Stay or Transfer Venue to the District of Massachusetts is GRANTED to the extent that this action shall be stayed pending adjudication of TransCanada Power Mktg. Ltd. v.

Narragansett Elec. Co., C.A. No. 05-cv-40076-FDS (D. Mass.). The
Clerk shall transmit a copy of this Order to the Judge presiding
over the case in the District of Massachusetts.


IT IS SO ORDERED.


_____
William E. Smith
United States District Judge
Date: 10/5/05

8



# *Facsimile Cover Page*

## United States District Court
### District of Rhode Island
### One Exchange Terrace
### Providence, RI 02903

**From:**

Sender: Doreen Baldwell

Phone: 752-724

Fax: 752-7247

Sent: _____

**To:**

~~Attn:~~ Organization: Attorney Daniel Winston

Phone: _____

Fax: 617-248-4000

☞ **Please Deliver To:** Daniel Winston

✏ **Message:** _____