UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| TRANSCANADA POWER MARKETING | : | |
| LTD., | : | |
| | : | C.A. No. 05-40076-FDS |
| Plaintiff, | : | |
| | : | (Michael P. Angelini, #019340) |
| v. | : | (Vincent F. O'Rourke, Jr., #380335) |
| | : | (Kimberly A. Stone, # 630952) |
| NARRAGANSETT ELECTRIC | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S SURREPLY TO PLAINTIFF'S
## MOTION TO ENJOIN RHODE ISLAND ACTION

Much of the substance of the reply memorandum filed by Plaintiff TransCanada Power

Marketing Ltd. ("TransCanada") is simply a restatement of its previous arguments seeking a

presumptive application of the first-filed rule in this matter. The Narragansett Electric Company

("Narragansett") does not restate its arguments on this issue herein.  Instead, Narragansett relies

upon its arguments in its previously filed "Memorandum in Opposition to Plaintiff's Motion to

Enjoin Defendant Narragansett from Prosecuting an Action in Rhode Island" and its oral

argument before this Court on October 4, 2005, demonstrating that the first-filed rule should not

be applied categorically in this instance since (1) TransCanada lulled Narragansett into an

erroneous belief that both parties were focused upon settlement, when instead TransCanada

rushed to file this action first, in Massachusetts and (2) Narragansett, not TransCanada, is the

"natural plaintiff" in this matter[1].

---

[1] TransCanada seeks to strike portions of the Supplemental Affidavit of Michael J. Hager. While
Narragansett does not credit this argument as contributing to a substantive analysis of the application of the first-
filed rule, Narragansett hereby submits the Affidavit of Gloria Kavanah in support of this Surreply and in further
support of its "Memorandum in Opposition to Plaintiff's Motion to Enjoin Defendant Narragansett from Prosecuting
an Action in Rhode Island." Narragansett's "race to the courthouse" facts are now amply supported by multiple

Narragansett responds herein to TransCanada's suggestion that the interests (TransCanada suggests that it is a "bias") of Rhode Island rate payers preclude a Rhode Island forum due to an alleged "countervailing public interest in obtaining a non-interested jury pool and an objective forum for resolution of this dispute."    (TransCanada's Reply at p.8).   This suggestion is not only contrary to Judge Smith's representation and demeaning to Rhode Island rate payers, judges and potential jury members alike, but it is also unsupported by law or fact. While Rhode Island, unlike Massachusetts, has an undeniable and inextricably intertwined public interest in the substance of this dispute in that its utility rate structures and communications with its regulators are implicated and the provision of electrical service to its population is at the heart of this dispute, none of these undeniable forum-based public policy connections mean that individual Rhode Island jurors or judges are personally "biased" in favor of or against one litigant in this proceeding.

### Judge Smith expressly rejected the argument that this matter would not receive a proper forum in Rhode Island.

As an initial matter, the Honorable William E. Smith, United States District Judge for the District of Rhode Island, has already partially considered and rejected this "potential bias" argument in his  Decision and Order ("Decision") which analyzed and deferred to this Court resolution of the parties' dispute concerning application of the first-filed rule.  Not only did Judge Smith recognize the "compelling connection" between this case and the State of Rhode Island and that Narragansett's arguments to that effect are "well-founded," and further recognize that the factors mitigating against a strict application of the first-filed rule "merit further consideration of whether TransCanada should benefit from the first-filed rule," but Judge Smith

---

affidavits from individuals with personal involvement in the discussions and negotiations between Narragansett and TransCanada and with contemporaneously created documents within the discussions and negotiations.

expressly indicated his "willingness to litigate this dispute in Rhode Island." (Decision, at pp. 5-6). Even more, Judge Smith expressly considered the "potential bias" argument and noted that "his status as a Narragansett rate payer would not present a disqualifying conflict of interest" which would preclude him from presiding over this matter. (Decision at p.6, at n.5). Judge Smith concurred with Narragansett that a mere "interest shared by a judge in common with the public (as is often the case in public utility litigation) does not by itself mandate recusal" and properly recognized that "the mere possibility that electrical rates may increase does not alter this Court's ability to preside over this proceeding free from bias and with complete impartiality." (Decision at p.6, at n.5).

In light of Judge Smith's assurance that he could and would provide a proper forum for this dispute and preside "free from bias and with complete impartiality," TransCanada's current suggestion to this Court that it cannot have an "objective forum" in Rhode Island is, at best, unfounded and, at worst, dismissive of Judge Smith's efforts to assure the parties and this Court otherwise.

### The majority of jurisdictions reject TransCanada's preferred approach of a *per se* disqualification of residents and rate payers from juror service, in favor of appropriate pre-trial mechanisms such as voir dire.

Judge Smith's points are as applicable to a potential jury pool as to the presiding judge. The majority of jurisdictions, including state and federal courts, have rejected the kind of *per se* disqualification of residents and rate payers as potential jury members that TransCanada suggests. See e.g., City of Cleveland v. Cleveland Elec. Illuminating Co., 538 F.Supp. 1240 (N.D. Ohio, 1980); Bell v. City of Bay St. Louis, 467 S.2d 657 (Miss.Sup.Ct. 1985); In re: Passaic County Grand Jury, 220 N.J.Super. 470 (1986); County of Nassau v. Southside Hosp., 393 N.Y.S.2d 512 (1977); Pennsylvania Power & Light Co. v. Gulf Oil Corp., 270 Pa.Super. 514

(1979).  In fact, it is widely recognized that the <u>only</u> states that recognize such an automatic disqualification of residents, taxpayers or utility customers are New York and Iowa.  <u>In re: Passaic</u>, 220 N.J.Super. at 481.  "In fact, the automatic disqualification rule has not been adopted by any state in the last 30 years."  <u>Id.</u> at 482.

It is therefore not surprising that TransCanada provided this Court with only one citation to support its assertion of potential jury bias which it argues would preclude this matter from being resolved in Rhode Island, <u>Long Island Lighting Co. v. New England Petroleum Corp.</u>, 362 N.Y.S.2d 350 (1974), a thirty year old case representing the minority view from the State of New York, which has not even been followed consistently in New York.  See, <u>County of Nassau v. Southside Hosp.</u>, 393 N.Y.S.2d at 514 (refusing to apply <u>Long Island Lighting</u> to a municipal corporation, and distinguishing it on facts pertaining to extensive media coverage).  (Reply, p. 9).

The trend among the majority of courts examining this issue is to abandon any *per se* disqualification of residents or taxpayers without a further finding of *actual* bias by *actual* jurors. <u>In re: Passaic</u>, 220 N.J.Super. at 481.  See also, <u>U.S. v. Brown</u>, 5402d 364 (8 Cir.1976); <u>City of Cleveland v. Cleveland Elec. Illuminating Co.</u>, 538 F.Supp. 1240; <u>Royal Indemnity Company v. City of Erie</u>, 372 F.Supp 1137 (W.D.Pa.1974).  Courts have recognized that an appropriate explanation to the jury pool of the possibility that they may or may not benefit (or, conversely, be injured) from the outcome and a carefully crafted set of voir dire questions can satisfactorily ensure a fair and impartial jury in matters involving public utilities.  See, e.g., <u>County of Nassau v. Southside Hosp.</u>, 393 N.Y.S.2d at 514 ("Essentially, the basic integrity and sense of justice which most men possess must be trusted so far as to believe that they will not be improperly influenced by an interest of the kind which they have in common with the whole community"); <u>Pennsylvania Power & Light Co.</u>, 270 Pa.Super. at 537 ("we do not find it realistic to assume

4

that every public utility customer assumes that a recovery by a utility in a civil suit will inure to the benefit of the utility's customers"). The <u>City of Cleveland</u> Court set forth this approach:

> [S]hould it become apparent during the voir dire examination that a prospective juror's pecuniary or other interest in the litigation, real or perceived, will preclude said individual from serving in an entirely fair and impartial manner, the Court will not hesitate to excuse the juror in question. However, the plaintiff's current attempt to indiscriminately exclude from the venire all [rate payers], which attempt is unaccompanied by the slightest effort to raise the instant contention of bias 'from the realm of speculation to the realm of fact' … finds no support from the governing authorities.

<u>City of Cleveland v. Cleveland Elec. Illuminating Co.</u>, 538 F.Supp. at 1253.

### There is no evidence that the pecuniary interest of individual<br>Rhode Island rate payers in this litigation is either actual or substantial.

Moreover, even the cases from New York and Iowa which represent the minority view on the issue of "potential jury bias" depend upon facts which are not present at bar. First, and critically, these cases dealt with residents and taxpayers as potential jurors who would have been subject to gain certain refunds or pay higher taxes depending upon the returned verdict. <u>Long Island Lighting Co.</u>, 362 N.Y.S.2d 350; <u>In re: Passaic</u>, 220 N.J.Super. at 481. The pecuniary interest of the residents and taxpayers was both *actual* and *substantial*. <u>Id</u>.

In contrast, in the case at bar, the possibility that any <u>individual</u> Rhode Island rate payer would be substantially impacted by the outcome of this litigation is remote. As TransCanada itself admits, neither the jury nor the Court which eventually hears the substance of this contract dispute has the power to alter the rates which are paid by Rhode Island residents for their electricity. (Reply, at p. 9). Only the Rhode Island Public Utility Commission ("RIPUC") has the authority and the ability to set rates in Rhode Island. As Judge Smith appropriately

recognized in his Decision, we are looking at a "mere possibility" that rates could increase at some point in the future.  (Decision at p.6, at n.5)

This kind of effect to rate payers as a community was appropriately addressed by voir dire in <u>Pennsylvania Power & Light Co.</u>, 270 Pa.Super. at 538, where that Court noted that "[b]y combining questioning with a full explanation, [a court] should be able to remove any preconception of a large benefit and replace it with knowledge that an individual's expectation of receiving anything is rather slight. Such knowledge should not in our view bar a juror from deciding the case impartially, just as a juror's knowledge that he is a taxpayer should not bar him from sitting in a case involving the taxing entity."

Moreover, while the impact to the <u>community</u> of Rhode Island rate payers may be substantial should TransCanada prevail in its arguments, the impact on any particular, individual rate payer would be insubstantial.  While fuel prices are highly volatile and hard to predict, it is currently estimated that the impact would be merely $5 to $12 per year, per residential account. It is not credible to suggest that any juror's analysis of this dispute would be influenced by such an insubstantial increase, even assuming that he or she is the one who actually pays the electric bill (and there are many potential jurors – e.g., students, family members, tenants -- who do not). The risk of an incrementally increased rate to the community of Rhode Island rate payers should TransCanada prevail is insufficient to require a *per se* disqualification of all Rhode Island rate payers as potential jurors or to deny Narragansett's pending Motion to Transfer this matter to Rhode Island.

<u>**The speculative risk of a tainted jury pool due to excessive media coverage can be adequately addressed by appropriate pre-trial orders**</u>.

Second, media coverage which is not at issue is a major factor in the one minority view case cited by TransCanada.   In <u>Long Island Lighting</u>, the New York State Trial Court found that

the jury pool could be "subliminally biased" since certain information regarding refunds to rate payers based upon a certain outcome of the litigation was leaked to the media.  <u>Long Island Lighting Co.</u>, 362 N.Y.S.2d 350.  Major news organizations such as the New York Times, Wall Street Journal and Newsday, widely reported that, if damages were recovered, then rate payers would receive a rebate, which the <u>Long Island Lighting</u> Court worried could influence potential jurors.  <u>Id</u>. at 353.  Many of the subsequent courts which analyzed <u>Long Island Lighting</u> in the context of addressing this issue have distinguished it as being applicable only to such high-profile, intense media scrutiny cases where there has been such a leak of erroneous information.  See e.g., <u>City of Cleveland v. Cleveland Elec. Illuminating Co.</u>, 538 F.Supp. at 1253; <u>County of Nassau v. Southside Hosp.</u>, 393 N.Y.S.2d at 514; <u>Pennsylvania Power & Light Co.</u>, 270 Pa.Super. at 537.  In contrast, as far as Narragansett is aware, there has been no media coverage of this dispute.  Moreover, even if this issue arose as a concern during the litigation in Rhode Island, Judge Smith could address it relatively simply via appropriate jury instructions and the entry of appropriate court orders, such as a "gag order" which prevented either party from discussing the substance of this dispute with the media.

## <u>CONCLUSION</u>

TransCanada has not met its burden of establishing that any partiality or bias exists in the pool of potential jurors in Rhode Island.  It has not established there is any *actual* bias by any *actual* jurors in this matter.   It has not established that any risk of such partiality or bias could not be effectively and adequately addressed through voir dire.  It has not established that the pecuniary interests of individual Rhode Island residents and rate payers in this litigation would be either *actual* or *substantial*.  Finally, it has not established any factual basis such as extensive

media coverage which should lead this Court to resort to the antiquated, minority *per se* disqualification rule.

TransCanada's Motion to Enjoin should be <u>denied</u> for these reasons, and for the reasons set forth in Narragansett's previously filed "Memorandum in Opposition to Plaintiff's Motion to Enjoin Defendant Narragansett from Prosecuting an Action in Rhode Island."

THE NARRAGANSETT ELECTRIC
COMPANY
By its Attorneys,


/s/ Vincent F. O'Rourke, Jr.
Michael P. Angelini (BBO #019340)
Vincent F. O'Rourke, Jr. (BBO #380335)
Kimberly A. Stone (BBO #630952)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
Tel. No.: 508/791-3511

Dated:  October 12, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| TRANSCANADA POWER MARKETING LTD., | : | |
| | : | C.A. No. 05-40076-FDS |
| Plaintiff, | : | |
| | : | (Michael P. Angelini, #019340) |
| v. | : | (Vincent F. O'Rourke, Jr., #380335) |
| | : | (Kimberly A. Stone, # 630952) |
| NARRAGANSETT ELECTRIC COMPANY, | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF GLORIA KAVANAH

I, Gloria Kavanah, upon oath, depose and state that:

1.    Unless otherwise stated, I have personal knowledge of the facts stated herein and am competent to testify to such facts.

2.    At all times relevant hereto, I was present during negotiations and discussions and/or privy to documents concerning the negotiations and discussions between The Narragansett Electric Company ("Narragansett") and TransCanada Power Marketing, Ltd. ("TransCanada") relative to the Fuel Adjustment Factor (the "FAF") dispute under the Wholesale Standard Offer Service Agreement (the "WSOS Agreement"). I am an attorney and, along with Michael J. Hager, was the lead point of contact on behalf of Narragansett for the Narragansett and TransCanada negotiations and discussions.

3.    My primary business contact within Narragansett pertaining to the negotiations and discussions between Narragansett and TransCanada was Michael J. Hager. He was present and/or privy to all of the negotiations and/or discussions and all of the documents concerning the negotiations and discussions between Narragansett and TransCanada in this matter.

4.      Contrary to the allegations in "Plaintiff TransCanada Power Marketing Ltd.'s Reply to 'Defendant's Memorandum in Opposition to Plaintiff's Motion to Enjoin Defendant Narragansett Electric Company from Prosecuting an Action in Rhode Island'" ("Reply"), at all relevant times, Narragansett desired and pursued both a negotiated settlement governing a significant time period at issue in the FAF dispute, and an arbitration agreement to govern the period of the dispute that would not be governed by the settlement.

5.      After Narragansett began paying TransCanada under protest a FAF, Daniel C. Winston, counsel for TransCanada ("Winston"), indicted to me that these payments alleviated the pressure to reach an expedited resolution to the dispute.  Notwithstanding Winston's comment, Narragansett continued to desire and pursue both an expedited arbitration process and a resolution of a large portion of the dispute.

6.      Narragansett did not insist on a slower, less-defined arbitration schedule than that proposed by TransCanada.  Rather, Narragansett's and TransCanada's proposed dates for arbitration differed due to personal scheduling conflicts between Narragansett's and TransCanada's key counsel and witnesses.  Furthermore, Narragansett suggested that the parties hold off on finalizing dates only until the parties selected an arbitrator and could coordinate with his or her availability.

7.      On April 19, 2005, Winston sent Narragansett via electronic mail ("e-mail") revisions to the arbitration agreement the parties were negotiating, stating, "Here is a proposed final or hopefully close."

8.      Narragansett did not receive an e-mail from TransCanada on April 20 asking for a response, nor did it orally or in writing ask for a response to the redraft arbitration proposal, nor

did I indicate that Narragansett was reconsidering arbitration entirely, nor did Narragansett express in any way that it was not willing to respond to TransCanada's arbitration proposal.

9.    On April 20, 2005, I called Winston and proposed exploring settlement at a meeting on April 22, 2005.  I further suggested that the parties meet on April 25, 2005 with the Rhode Island Public Utilities Commission ("Rhode Island PUC") and the Rhode Island Division of Public Utilities and Carriers ("Rhode Island Division") to discuss settlement.

10.    Later on April 20, 2005, following the conversation, Winston e-mailed me, confirming the April 22 meeting and his and Michael Hachey's availability for the April 25th meeting.  See Apr. 20, 2005 Winston E-Mail, attached as Exhibit A.

11.    As I set forth in an e-mail, contemporaneously memorializing my conversation with Winston, on April 20, 2005: "TransCanada is on board with our proposal.  Dan Winston said if things are not moving forward productively by mid-week next week, they want to move forward with the arbitration agreement." See Apr. 20, 2005 Kavanah E-Mail, attached as Exhibit B.

12.    On April 22, 2005, the parties met to discuss, and did discuss, settlement.

13.    It is my understanding that representatives of Narragansett and TransCanada met with the Rhode Island PUC and the Rhode Island Division on April 25, 2005.  It is my understanding that Thomas Robinson, Deputy General Counsel for National Grid, distributed at this meeting a "Term Sheet for Proposed Resolution" for the parties to consider.

14.    Subsequent to this meeting, Winston sent me an e-mail stating as follows: "[b]ased on our discussions down at the PUC today, which I assume you have been debriefed on, TransCanada would be willing to hold off further negotiation on the arbitration agreement

through the end of this week to see how things progress.  Assuming you are agreeable to that extension, let's revisit on Monday." <u>See</u> Apr. 25, 2005 E-mail attached as <u>Exhibit C</u>.

15.    It is my understanding that between April 27, 2005 and May 16, 2005, Michael Hager and Michael Hachey of TransCanada conducted repeated and continuing discussions pertaining to the Term Sheet and terms of settlement.

16.    It is my further understanding that Steve Scialabba from the Rhode Island Division participated in some of these discussions and proposed modifications to the settlement terms.

17.    During the time period between April 27, 2005 and May 16, 2005, as a result of my understanding that Michael Hager and Michael Hachey were continuing settlement discussions, I participated in the drafting, review and revision of a set of complex documents and a regulatory filing that would be necessary to effectuate the settlement which they were negotiating.

18.    On May 17, 2005, I received a voicemail from Winston, stating that TransCanada had filed suit in Federal Court in Worcester "for reasons regarding the forum".  In his message, Winston instructed me to not "take it as an intent to increase the animus…it was just a forum thing."  In his message, Winston reiterated that TransCanada wanted to continue to pursue the course we were on, which I interpreted to mean the settlement path.  <u>See</u> May 17, 2005 <u>Exhibit D</u>.

19.    On June 7, 2005, TransCanada and Narragansett executed a settlement agreement and filed it with the Rhode Island PUC.  The settlement was effective upon its execution; however, the parties' obligations under certain provisions were subject to receipts of approvals from the Rhode Island PUC and the Rhode Island Division.

20.    Given TransCanada's statement that the FAF payments being made under protest alleviated the urgency of a resolution, TransCanada's silence as to executing the arbitration agreement, and the fact that the arbitration agreement was near final, Narragansett had no reason to believe that the parties would resolve the remaining portion of the FAF dispute through any means other than arbitration.

Signed to and sworn under the pains and penalties of perjury this 12th day of October, 2005.

_Gloria Kavanah_

Gloria Kavanah, Assistant General Counsel
National Grid USA Service Company, Inc.

{J:\CLIENTS\lit\304810\0001\00597747.DOC;1}

# EXHIBIT A

## Kavanah, Gloria

**From:**     Winston, Daniel C. [DWinston@choate.com]
**Sent:**     Wednesday, April 20, 2005 5:08 PM
**To:**       Kavanah, Gloria
**Subject:**  Meetings

Gloria:

This will confirm a meeting here at Choate at 10:00 am (building across street from Wilmer Hale). You have to go to the visitor desk and give my name and they will send you up. I put you, Mike Hager, and Tom Robinson on the guest list. Let me know if those names change.

Mike and I are both free Monday morning to meet in Rhode Island. Let me know.

Dan Winston
Choate, Hall & Stewart LLP
Exchange Place
53 State Street
Boston, MA 02109
(617) 248-4049 (direct dial)
(617) 248-4000 (fax)

---

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

---

08/05/2005

# EXHIBIT B

**Kavanah, Gloria**

| | |
|---|---|
| **From:** | Kavanah, Gloria |
| **Sent:** | Wednesday, April 20, 2005 5:38 PM |
| **To:** | Robinson, Thomas G.; Gerwatowski, Ronald T.; Gavilondo, Carlos; Reilly, Lawrence J.; LaFleur, Cheryl A.; Hager, Michael; Olton, Laura; Sherman, John F. |
| **Cc:** | Tervo, Judith A. |
| **Subject:** | TransCanada On Board |

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATION

TransCanada is on board with our proposal. Dan Winston said if things are not moving forward productively by mid-week next week, they want to move forward with the arbitration agreement.

For a pre-meeting, they want a limited number of folks to meet this Friday morning at 10:00 a.m. in Boston before our Court hearing. For TransCanada, it will be just Winston and Mike Hachey. After discussion with Tom Robinson, we worked out the group of Tom, Mike Hager and me. If you propose otherwise, let us know

I told him that on Thursday Laura will confirm the Division and AG's availability for Monday morning.

1

# EXHIBIT C

Message

## Kavanah, Gloria

**From:** Winston, Daniel C. [DWinston@choate.com]
**Sent:** Monday, April 25, 2005 6:04 PM
**To:** Kavanah, Gloria
**Subject:** TC/Grid: SOSFA

Gloria:

    Based on our discussions down at the PUC today, which I assume you have been debriefed on, TransCanada would be willing to hold off further negotiation on the arbitration agreement through the end of this week to see how things progress.  Assuming you are agreeable to that extension, let's revisit on Monday.

Dan.

---

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The substance of this message, along with any attachments, may be confidential and legally privileged.  If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

For more information about Choate, Hall & Stewart LLP, please visit us at www.choate.com

---

# EXHIBIT D

**Kavanah, Gloria**

| | |
|---|---|
| **From:** | Kavanah, Gloria |
| **Sent:** | Tuesday, May 17, 2005 5:31 PM |
| **To:** | Sherman, John F.; Robinson, Thomas G.; Gerwatowski, Ronald T.; Hager, Michael; McLaren, Robert H.; Larry Reilly-home (ljreilly@att.net); Tervo, Judith A.; Reilly, Lawrence J.; Olton, Laura |
| **Subject:** | RE: TCPM |

TCPM's counsel, Dan Winston left me a voice mail stating:

- They filed suit in Federal Court in Worcester.

- They filed the suit "for reasons regarding the forum."

- "Don't take it as an intent to increase the animus... it was just a forum thing."

- Reiterating that they still wanted to continue to pursue the course were on.  Presumably, he means settlement negotiations.

I left him a responsive v-mail requesting a copy of the complaint (which he they will probably serve Narragansett on Wednesday.)

1