UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TRANSCANADA POWER MARKETING, LTD., | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 05-40076-FDS |
| v. | ) ) ) | |
| THE NARRAGANSETT ELECTRIC COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION TO ENJOIN PROSECUTION AND
DEFENDANT'S MOTION TO TRANSFER VENUE AND TO STAY

**SAYLOR, J.**

This is a contract dispute between a marketer of wholesale electric power based in Massachusetts and a retail distributor of electric power based in Rhode Island. The subject matter of the lawsuit is whether the retailer should be required to pay a fuel adjustment factor under the contract as part of the price of the electricity. The resolution of that issue is likely to affect the electric bills of a substantial number of electric ratepayers in Rhode Island.

The present motions involve the forum in which the lawsuit is to be litigated. Plaintiff TransCanada Power Marketing, Ltd. ("TransCanada") filed this suit in the District of Massachusetts on May 17, 2005. Defendant The Narragansett Electric Co. ("Narragansett") filed a similar suit in the District of Rhode Island on May 26, 2005. The two lawsuits are conceded to be essentially identical, and it is obvious that only one of them should proceed. For the reasons set forth below, this Court concludes that the matter should proceed in the District of

Massachusetts.

**I.     Background**[1]

Narragansett is the largest electric distribution company in Rhode Island, providing electricity to approximately 480,000 Rhode Island customers.[2] Narragansett purchases electricity for its customer base from TransCanada, a power distribution company, pursuant to the terms and conditions of their Wholesale Standard Offer Service Agreement ("WSOS Agreement"). At the heart of this dispute is a provision in the WSOS Agreement stating that the price TransCanada will receive for its electricity includes (1) the standard offer wholesale price; and (2) a fuel adjustment factor ("FAF"), to be approved by the Rhode Island Public Utilities Commission. The parties' differing contractual interpretations focus on whether, beginning in January 2005, Narragansett should still be required to pay the fuel adjustment factor as part of the price for electricity.

At some point in early 2005, the parties entered into settlement negotiations. The negotiations proceeded along two tracks: the parties negotiated towards a settlement of the substantive dispute, and they also negotiated towards an arbitration agreement to resolve whatever aspects of the dispute they could not settle themselves. During the negotiations, Narragansett paid the monthly FAF under protest, reserving its rights to dispute those charges. It apparently continues to make those payments. In an April 25 meeting between the parties and Rhode Island regulators, Narragansett offered proposed settlement terms. After the meeting,

---

[1] Portions of this section are taken directly from the opinion of Judge Smith in *The Narragansett Electric Co. v. TransCanada Power Marketing, Ltd.*, Civil Action No. 05-234S (D.R.I. Oct. 5, 2005).

[2] Most of those customers (approximately 475,000) would be likely to be affected by a change in utility rates as a result of any pass-through of the disputed contract amount.

TransCanada indicated to Narragansett its willingness to hold off on negotiating the arbitration agreement for a short time while settlement negotiations proceeded.  By April 29, the parties had agreed to a settlement along the lines of the April 25 proposal, with some modifications.  They intended to submit this agreement to regulators for approval.  Before they did so, however, the Division of Public Utilities and Carriers (the "Division"), a regulatory body within the Rhode Island Public Utilities Commission, informed the parties that its April 25 agreement was insufficient and proposed what TransCanada viewed as significant changes.  According to TransCanada executive Michael Hachey, the Division indicated in a May 3 telephone conversation that its proposals were essentially requirements.  The parties communicated a few more times regarding the status of the negotiations.[3]

Before reaching a resolution, however, TransCanada filed this lawsuit on May 17, 2005. After filing an answer and counterclaim in this action, Narragansett filed a separate lawsuit against TransCanada on May 26, 2005, in the District of Rhode Island.  *See The Narragansett Electric Co. v. TransCanada Power Marketing, Ltd.*, Civil Action No. 05-234S (D.R.I.).[4]  On June 16, 2005, TransCanada filed in the Rhode Island action a Motion to Dismiss, or in the Alternative, to Stay or Transfer Venue to the District of Massachusetts.[5]  Before the Rhode Island court had ruled on that motion, TransCanada filed in this action a Motion to Enjoin Narragansett from prosecuting this case in Rhode Island.

---

[3] As will be discussed below, the parties sharply dispute the nature and content of those discussions.

[4] The parties do not dispute that the complaint filed by Narragansett is identical to Narragansett's counterclaim filed in the Massachusetts action.

[5] On September 9, 2005, the Rhode Island court requested that the parties file a joint stipulation concerning their negotiations up until the time TransCanada filed suit.  The parties were unable to reach agreement on such a stipulation.

On October 5, 2005, Judge Smith of the District of Rhode Island issued a decision and order providing that the Rhode Island action should be stayed, pending a decision by this Court as to whether the matter should proceed in Massachusetts or Rhode Island.

## II.     Analysis

The resolution of this dispute turns on the application of the "first-filed" rule, which generally gives precedence to the first of two duplicative actions proceeding in different federal courts. "Where identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred in a choice-of-venue decision." *Cianbro Corp. v. Curran-Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir. 1987); *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (the "plaintiff's choice of forum should rarely be disturbed").

There are at least two exceptions to the first-filed rule. The first is where there are "special circumstances" justifying a transfer, such as where the party bringing the first-filed action engaged in misleading conduct in order to prevail in a pre-emptive "race to the courthouse." The second is where the balance of convenience substantially favors the second-filed action. *See Feinstein v. Brown*, 304 F. Supp. 2d 279, 283 (D.R.I. 2004); *Holmes Group, Inc. v. Hamilton Beach/Proctor Silex*, 249 F. Supp. 2d 12, 16 (D. Mass. 2002); *Veryfine Products, Inc. v. Phlo Corp.*, 124 F. Supp. 2d 16, 22-25 (D. Mass. 2000).

There is no dispute here that the Massachusetts action was filed nine days before the Rhode Island action. The Court will therefore consider whether the Rhode Island action should be given priority based on either of the two exceptions to the general rule.

4

A.  **Special Circumstances**

The first-filed presumption may be overcome when "special circumstances" are present. *See, e.g.*, *Holmes Group*, 249 F. Supp. 2d at 16; *Nortek, Inc. v. Molnar*, 36 F. Supp. 2d 63, 69-70 (D.R.I. 1999). Special circumstances have been found to exist "where a party has won the race to the courthouse by misleading his opponent into staying his hand in anticipation of negotiation[,] or by reacting to notice of imminent filing by literally sprinting to the courthouse the same day." *Veryfine*, 124 F. Supp. 2d at 22; *see also Holmes Group*, 249 F. Supp 2d at 16. Some courts have framed the issue, at least in part, in terms of a public policy favoring the promotion of settlements. *See Nortek*, 36 F. Supp. 2d at 70 ("Where this Court has discretion, it will not reward conduct that undermines the sound policy of promoting settlements and negotiations outside the courthouse."); *see also Davox Corp. v. Digital Systems Int'l, Inc.*, 846 F. Supp. 144, 148 (D. Mass. 1993).

As an initial matter, this case does not present a literal "race to the courthouse." Narragansett has provided no evidence that it ever intended to sue TransCanada before TransCanada commenced this action; for example, it never gave a notice of default alleging breach of contract.[6] As the Fourth Circuit aptly noted, "there can be no race to the courthouse when only one party is running." *Learning Network, Inc. v. Discovery Communications, Inc.*, 11 Fed. App'x 297, 301 (4th Cir. 2001).

Nor, for that matter, does this case present an instance of blatantly improper forum-shopping. Either of the two parties could have legitimately initiated a claim in either of the two

---

[6] In contrast, TransCanada sent its default notice to Narragansett on March 1, and, according to its supporting affidavits, twice thereafter discussed initiating a lawsuit—once in a March 7 meeting with Narragansett, and again in the April 25 meeting with Narragansett and Rhode Island regulators.

5

forums. TransCanada can hardly be faulted for filing in Massachusetts; that is the state where it does business, and the dispute involves a contract that was negotiated primarily in Massachusetts, signed in Massachusetts, and governed expressly by Massachusetts law. *See, e.g.*, *Holmes Group*, 249 F. Supp. 2d at 17 ("Where a plaintiff chooses his home forum, such a choice usually represents considerations of convenience.").[7]

Whether this case presents "special circumstances" therefore turns on whether TransCanada engaged in improper or misleading conduct. Narragansett contends that TransCanada "lured [it] into a false sense of security by engaging in" settlement negotiations and then "rac[ed] to the courthouse steps." Narragansett points to no affirmative misrepresentations by TransCanada, nor does it contend TransCanada negotiated in bad faith simply to buy time in order to secure a more favorable forum.[8] Instead, it asks the Court to ignore the first-filed rule because Narragansett "reasonably [held] off from filing suit" based on its belief that the parties were still negotiating a potential settlement.

In other words, Narragansett asks the Court to find an exception to the first-filed rule based on the "the sound policy of promoting settlements and negotiations outside the courthouse." *Nortek*, 36 F. Supp. 2d at 70. The implication, of course, is that by declining jurisdiction and transferring this case to Rhode Island, this Court would promote out-of-court

---

[7] Despite both parties' lengthy arguments to the contrary, there does not appear to be a so-called "natural" plaintiff in this case. Each party has a distinct interpretation of the contract, and under each interpretation, one party suffers significant and continuing damages. When applying the first-filed rule in such circumstances, it matters little whether the plaintiff seeks declaratory relief rather than money damages. *Cf. GSI Luminonics, Inc. v. Biodiscovery, Inc.*, 112 F. Supp 2d 99, 105 (D. Mass. 2000) ("The fact that [plaintiff's] action is for declaratory relief does not bar the application of the first-filed presumption.").

[8] Such an accusation would seem out of place where the parties in fact agreed to settlement terms on two separate occasions—once before TransCanada filed suit, and once after. Neither agreement earned the approval of Rhode Island regulators, and thus neither settlement was executed.

settlements and discourage improper forum-shopping. On the facts of this case, however, precisely the opposite is true; such a result would create an incentive for aggrieved parties to sue first and negotiate later.

TransCanada contends that the alleged breach occurred in early 2005. At that point, it had at least three choices: it could file suit in Massachusetts, file suit in Rhode Island, or engage in settlement negotiations. TransCanada was under no obligation to discuss settlement at all; it would have been well within its rights to bring suit immediately. Instead, it discussed the matter with Narragansett, and negotiated in apparent good faith, for more than two months. In fact, the parties reached the first of two settlement agreements—both of which failed to receive regulatory approval—before TransCanada commenced this action.

According to Narragansett, the mere fact that negotiations were ongoing is a "special circumstance" justifying an exception to the first-filed rule. It alleges that because negotiations were (in its view) productive, it "had every reason to believe that the parties would resolve their dispute without a court action," and TransCanada "took advantage of [this] false sense of security." But this implies that once a party begins negotiations, it must see them through to impasse or settlement—or otherwise its lawsuit may be adjudged an "ambush," and it will be denied the benefit of the first-filed rule. Consider, for example, what would have happened if on May 17, Narragansett (and not TransCanada) had filed first. Applying Narragansett's reasoning, TransCanada would have been able to block application of the first-filed rule. Thus neither plaintiff could have secured a home forum until the parties had reached an impasse—an impasse which, in all probability, would have triggered a race to the courthouse.[9]

---

[9] Complicating matters further, the parties' positions during settlement negotiations are usually deliberately opaque, making it difficult to ascertain whether the parties are in fact at an impasse. In addition, it is

7

But TransCanada was under no obligation to continue negotiating with Narragansett. Like any party, it could have simply determined that negotiations were no longer in its best interests and withdrawn. *See, e.g.*, *Feinstein*, 304 F. Supp. at 283 (noting that plaintiffs "were not obligated to continue what, in their view, was a fruitless negotiation before coming to court"). Of course, TransCanada also could have given Narragansett formal or explicit notice that the negotiations were at an impasse and that it intended to resolve the dispute in court. In that case, Narragansett would no longer possess a "false sense of security" that TransCanada would forestall litigation. But again, once TransCanada did so, Narragansett would have been unable to secure first-filed status by racing to the courthouse in Providence.

More generally, where two sophisticated parties are negotiating at arm's length, in the absence of any proof of misrepresentation or bad faith, the Court finds it inappropriate to deny the plaintiff the benefit of the first-filed rule. *See Veryfine*, 124 F. Supp. 2d at 23 ("When the negotiations are long-term and ongoing and there is no false implication that a party will refrain from litigation during those negotiations, the first-filed presumption may remain intact."); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931 (Fed. Cir. 1993) ("[T]here must . . . be sound reason that would make it unjust or inefficient to continue the first-filed action.").[10]

In its supporting memoranda, Narragansett refers to only one specific representation by TransCanada—a statement by its attorney that TransCanada would be willing to hold off on

---

easy for the parties to misperceive their opponents' position in settlement negotiations, either by unduly discounting it ("They're just posturing, they'll come back to the table.") or exaggerating it ("They're not going to budge an inch.").

[10] Significantly, the *Nortek* case, upon which Narragansett builds its theory of special circumstances, involved substantial evidence (though no actual findings) of both bad faith and misrepresentation. Similarly, in *Davox*, a case upon which *Nortek* relies, the court would not allow the first-filing plaintiff to "take advantage of the fact that [defendant] responsibly deferred filing potentially protracted and expensive litigation" where the plaintiff "perhaps misled [defendant] into believing it would not be prejudiced by doing so." 846 F. Supp. at 148.

arbitration negotiations, given the progress being made in settlement talks. At the time that statement was made, the parties had just met with Rhode Island regulators and had circulated proposed settlement terms. Thus, the statement does not appear misleading under the circumstances. Accordingly, Narragansett's reliance on this statement in deciding not to commence litigation is not a special circumstance justifying an exception to the first-filed rule.[11]

The parties also disagree on a number of issues regarding conduct of the negotiations, including: (1) who initiated the idea of holding off on arbitration negotiations; (2) the nature of the conversations that took place between May 3 and May 16;[12] (3) the nature of the regulators' assessment of the first proposed settlement agreement; and (4) whether the second settlement agreement was an offshoot of the first agreement. All of these issues are potentially relevant to the determining of whether TransCanada implicitly "lulled" Narragansett into foregoing litigation. None of them would be simple to resolve. Without any specific allegations of bad faith or affirmative misrepresentations, the Court faces the daunting task of sorting through the back-and-

---

[11] Subsequently, the Rhode Island regulators (whose approval of the settlement was required) made what Narragansett calls "proposed modifications" to the settlement. In TransCanada's view, however, those proposals constituted significantly different terms that were "entirely unworkable from a settlement standpoint, and could not form the basis for settlement discussions." Moreover, TransCanada contends, based on a follow-up phone conversation with the regulators, that the proposals were actually firm requirements. Apparently, neither party discussed reviving arbitration talks after that point. Particularly in light of this history, Narragansett's reliance on counsel's statement, if any, seems to be little more than a mistaken assessment of the status of the negotiations.

[12] Narragansett's Michael Hagar states in his affidavit that he had two telephone conversations with TransCanada's Michael Hachey that occurred between May 3 and May 16, the day before TransCanada filed suit. According to Hagar, Hachey informed him that the proposals of the Division were being discussed internally, and that Hachey would "get back to Narragansett shortly." Hachey disputes this account and states in an affidavit that he "let [Hagar] know that the Division's framework would not work to resolve the dispute" and that it was "clearly understood between Hagar and [Hachey] that the settlement talks were at a standstill barring some new approach." Hachey says he told Hagar "that [he] would give [Hagar] a call if [he] came up with any additional settlement ideas" but did not tell him that TransCanada was considering accepting Division's proposals. These could easily be honest, but dissimilar, interpretations of the events. Even if Hagar's interpretation is correct—while it would certainly give the Court pause—it would not necessarily, under all the circumstances, justify a finding of "special circumstances."

forth statements (and posturing) that is a regular part of ongoing settlement negotiations—made worse by the fact that each party has an interest in concealing information from the other during negotiations, including its own assessment of the status of the negotiations. Nothing short of a mini-trial could resolve these issues.[13] Even that might not bring the desired clarity, as many of the disagreements appear to be rooted in honest but differing subjective assessments of the status of the negotiations.

In any case, such a mini-trial is not necessary here. Having considered the record at length and the various equitable factors cited by the parties, the Court concludes that neither TransCanada's conduct, nor Narragansett's reliance on it, conclusively constitutes a "special circumstance" that would justify an exception to the first-filed rule. The Court will therefore turn to the second exception.

### B. The Balance of Convenience

The second exception to the first-filed presumption is where "the defendant [can] show that its choice of forum is substantially more convenient than that chosen by the plaintiff." *Holmes Group*, 249 F. Supp. at 17. "The burden of proof rests with the party seeking transfer; there is a strong presumption in favor of the plaintiff's choice of forum." *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000). That issue is to be determined on an individualized, case-by-case basis, in the sound discretion of the court. *See Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).[14]

---

[13] It seems beyond question that the marginal convenience of litigating in one forum over the other has been more than offset by the considerable time the parties (as well as the two district courts involved) have collectively invested in determining who should decide this case.

[14] In determining the relative convenience of the two options, the Court may look to cases arising under the common-law doctrine of *forum non conveniens* or the statutory provision for transfer of venue, 28 U.S.C. §

Here, the parties have both cited five factors that bear on the issue of the relative convenience of the two forums: (1) the relative convenience of the parties; (2) the convenience of the witnesses and location of documents; (3) any connection between the forum and the issues; (4) the law to be applied; and (5) the state or public interest at stake. *See Holmes Group*, 249 F. Supp. 2d at 17 (citing factors). The Court will consider each factor in turn.[15]

### 1. Convenience of the Parties

Both parties to this dispute are substantial entities fully capable of litigating this matter in either Massachusetts or Rhode Island. Massachusetts is a marginally more convenient forum for TransCanada, which maintains a place of business here; Rhode Island is a marginally more convenient forum for Narragansett, which maintains its principal place of business in Rhode Island (along with an office in Northborough, Massachusetts). Door-to-door, the two federal courthouses are less than 40 miles apart. Thus, this factor is essentially neutral and will not weigh significantly the balancing of convenience factors. *See, e.g.*, *Leesona Corp. v. Duplan Corp*. 317 F. Supp. 290, 299-300 (D.R.I. 1970) ( 200-mile distance between New York and Providence "insignificant in terms of additional expense, cost or time"); 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD COOPER, FEDERAL PRACTICE AND PROCEDURE § 3854 n.32 (2d ed. 1986) (collecting cases).

### 2. Convenience of the Witnesses and the Location of Documents

---

1404(a). *See, e.g.*, *SW Industries v. Aetna Cas. & Sur. Co*, 653 F. Supp. 631, 637 (D.R.I. 1987); *see also* 17 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 111.13 (3d ed. 1997) (citing factors under § 1404(a) and noting that those factors "are generally the same" as those considered under *forum non conveniens* doctrine).

[15] The parties both cite a sixth factor as well: plaintiff's choice of forum. In the present case, the Court must determine whether the alternative forum is substantially more convenient than the one chosen by the plaintiff. It strikes the Court as somewhat circular to consider plaintiff's choice of forum in determining whether the balance of convenience outweighs plaintiff's choice of forum. Accordingly, the Court will not consider that factor in making its determination.

Neither party has provided the Court with a list of witnesses, but it appears likely that most of the witnesses will be employees of the two parties. Narragansett states that much of its documentary evidence is in electronic form; TransCanada's documents are located in Westborough, Massachusetts. Again, given the close proximity of the two companies and the courthouses, this factor is essentially neutral.

### 3.     Connection Between the Forum and the Issues

The connection between Massachusetts and the issues presented in this case is substantial. TransCanada has a place of business in the Commonwealth; the contract was largely negotiated here; the contract was signed here; and its terms are governed by Massachusetts law. Moreover, defendant also has an office in Massachusetts, and a significant portion of the settlement negotiations occurred in Massachusetts. The connection, however, between Rhode Island and the issue presented is also substantial: Narragansett is a state-regulated Rhode Island company distributing electricity in Rhode Island to Rhode Island customers. This factor is therefore essentially neutral.

### 4.     Law to Be Applied

The parties agree that the contract is governed expressly by Massachusetts law. In a diversity case, it is "advantageous to have the lawsuit adjudicated by a federal district court . . . that is more familiar" with the particular state law to be applied. *Paradis v. Dooley*, 774 F. Supp 79, 83 (D.R.I. 1991); *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) ("There is an appropriateness . . . in having the trial of a diversity case in a forum that is at home with the state law that must govern the case."). Accordingly, this factor favors litigating the dispute in Massachusetts. But because this is a contract dispute where the legal issues appear to be

relatively simple, and Massachusetts contract law is relatively straightforward, this factor does not carry substantial weight in the overall balancing of convenience. *See* 15 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3854 at 466-67 and cases cited therein; *see also Scheidt v. Klein*, 956 F.2d 963, 966 (10th Cir. 1992) (applicability of foreign law "not a significant concern in light of the relative simplicity" of fraud and contract claims). *But see Kreisner v. Hilton Hotel Corp.*, 468 F. Supp. 176, 179 (E.D.N.Y. 1979) ("While there may not be novel or complex issues of State law to be resolved, construction of State law is best left to courts most familiar with it."). This factor therefore weighs slightly in favor of Massachusetts.

### 5. State or Public Interest at Stake

The parties raise two analytically distinct concepts within this factor; the interest of state itself in the litigation, and the interest of its citizens. Neither party has provided the Court with any authority defining a state's "interest" in litigation to which it is not a party, except in the most general terms, or describing how this factor differs from the forum's connection to the dispute. In the context of assessing personal jurisdiction, it is well-established that a state "has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)); *see also Pritzker v. Yari*, 42 F. 3d 53, 64 (1st Cir. 1994) (noting a state has "few interests greater than . . . forum-based litigation."). To the extent such a definition is relevant here, it would seem to apply equally to Massachusetts and Rhode Island, each of which has an interest in seeing that a company doing business within its borders has access to a convenient forum.

Narragansett also argues that the citizens of Rhode Island have a significant interest in the

litigation, as a judgment for TransCanada could result in rate increases for some 475,000 electric customers.  "In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only."  *Gulf Oil*, 330 U.S. at 509.  Thus, "[t]here is a local interest in having localized controversies decided at home."  *Id.*

Although advances in technology and transportation since 1947—the year *Gulf Oil* was decided—have dramatically changed the meaning of what is within the public's "view and reach," the basic principle still resonates to some extent today.  *See, e.g.*, *In re Eastern Dist. Repetitive Stress Injury Litigation*, 850 F. Supp. 188, 195 (E.D.N.Y. 1994) (where injury is sustained in particular locale, adjudication in that locale "may be a matter of greater local attention, rather than in a remote location where if will be learned of only by report."); *see also Nez Perce Tribe v. National Oceanic and Atmospheric Admin. Fisheries*, No. CV 04-60-RE, 2004 WL 1179333 at *2-3 (D. Or. May 27, 2004)*; Southern Utah Wilderness Alliance v. Norton*, 315 F. Supp 2d 82, 88 (D.D.C. 2004); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 26-27 (D.D.C. 2002); *Hawksbill Sea Turtle v. Federal Emergency Management Agency*, 939 F. Supp.  1, 3 n.5 (D.D.C. 1996) (noting "the importance of allowing local citizens to attend and observe the proceedings of this case" favored trial in the Virgin Islands rather than the District of Columbia).  That policy concern is largely allayed in the present case, however, where the two venues are less than 40 miles apart.  The marginal inconvenience of attending a trial in Worcester as opposed to Providence is slight, and the distance does not pose a significant barrier to attendance by Rhode Island residents or the Rhode Island news media, should either group be inclined to follow the

proceedings.[16]

Moreover, the potential rate increases that could result from this litigation would, by Narragansett's estimates, be in the range of $5 to $12 per year per customer and would run at most through 2009, when the contract expires. Thus, the potential impact on the average Rhode Island resident is relatively limited in both dollar amount and duration.

It should also be noted that the potential rate increases are not merely a source of local interest; they are also a source of potential jury bias.[17] This Court has no reason to doubt that a fair and impartial trial could be conducted in the District of Rhode Island. However, the issue under consideration is not whether an unbiased trial *can* be held, but whether it is *more convenient* to do so in one state rather than another. In Rhode Island there is an issue of potential jury bias; in Massachusetts, there is not. Defendant correctly suggests that additional jury screening and appropriate pretrial orders, including a "gag order" on party discussions with news media, could ensure an impartial jury. But such measures certainly do not contribute to the convenience of litigating the matter in Rhode Island.

Thus, while Rhode Island's interest in this dispute is greater than that of Massachusetts,

---

[16] It is true that the assessment of the public interest merits greater weight when the outcome of the litigation has a direct, substantial impact on local interests. For example, this factor has played a significant role in controversies involving land-use and environmental regulations. *See, e.g.*, *Southern Utah Wilderness Alliance*, 315 F. Supp at 88 ("Land is a localized interest because its management directly touches local citizens."); *Nez Perce Tribe*, 2004 WL 1179333 at *2 (collecting cases where venue was transferred from District of Columbia to district where the disputed federal action had direct impact on local interests). Here, however, the interest of Rhode Island customers is more attenuated because the parties are not directly disputing utility rates. This is a contract dispute between a wholesaler and a retailer, and the relief TransCanada seeks may or may not entail a rate increase for customers. Indeed, it is beyond the power of this Court—or the federal court in Providence—to order or approve rate increases.

[17] The Court recognizes that the potential for jury bias is essentially a separate factor from the public interest. It is, however, a relevant concern in the equitable balancing of conveniences. *See, e.g.*, *Gulf Oil*, 330 U.S. at 508 (legitimate considerations include all "practical problems that make trial of a case easy, expeditious and inexpensive"); *Chrysler Credit Corp v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir 1991) (same).

this factor cuts both ways; on balance, however, it weighs slightly in favor of a transfer to Rhode Island.

\*     \*     \*

In summary, of the five relevant factors, three are essentially neutral, one weighs slightly in favor of Massachusetts, and one weighs slightly in favor of Rhode Island. The defendant has therefore failed to show that its choice of forum is "substantially more convenient" than that chosen by the plaintiff. *See Holmes Group*, 249 F. Supp. at 17.

### III.    Conclusion

Whatever the stakes may be in the underlying contract dispute, the immediate stakes are very small indeed: whether this dispute should be resolved in this courthouse or one less than 40 miles away. In the absence of compelling circumstances dictating a contrary result, the dispute should proceed in the first-filed forum.

For the foregoing reasons, defendant's Motion to Transfer Venue to District of Rhode Island and to Stay this Action Pending Resolution of this Motion is DENIED, and plaintiff's Motion to Enjoin Defendant Narragansett Electric Company from Prosecuting a Duplicative Second-Filed Action in Rhode Island is DENIED as moot.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: November 18, 2005