UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-40076FDS |
| ) | |
| NARRAGANSETT ELECTRIC COMPANY, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF TRANSCANADA POWER MARKETING LTD.'S**
**MEMORANDUM IN SUPPORT OF**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Plaintiff TransCanada Power Marketing Ltd. ("TransCanada") hereby submits this

Memorandum in support its Motion for an Order compelling the production of documents

responsive to TransCanada's First Set of Document Requests, served upon Narragansett Electric

Company ("Narragansett") on August 26, 2005.   Narragansett should be ordered to produce (1)

documents in its possession and control concerning the Standard Offer Service retail tariffs and

pricing in the *EUA Zone generally*, not just limited to those documents specifically referencing

the Wholesale Standard Offer Service Agreement ("WSOS Agreement") between TransCanada

and Narragansett; (2) documents in its possession and control concerning pricing for the

Standard Offer Service "backstop" obligation assigned to TransCanada by way of the WSOS

Agreement; (3) documents concerning Narragansett's general use of fuel adjustment provisions

in supply contracts and retail tariffs; (4) other relevant documents that Narragansett is obligated

1

to and/or has agreed to produce but simply has not produced; and (5) its privilege log for the documents it has withheld.

The requested documents contain information directly relevant to the meaning of the disputed terms of the WSOS Agreement and the intent of the parties when they entered into the WSOS Agreement, as well as to TransCanada's claim for breach of the implied covenant of good faith and fair dealing, and Narragansett's counterclaims and defenses.  Despite the fundamental relevance of these materials, and TransCanada's repeated attempts to obtain their voluntary production over the last four months, Narragansett has either (i) refused wholesale to produce entire categories of clearly relevant documents; or (ii) simply delayed without justification from producing the  remaining documents that are responsive to TransCanada's requests and that they have agreed to produce.  To date, more than five months after service of TransCanada's document request and with expert deadlines approaching, Narragansett has produced no more than publicly available regulatory documents and a small handful of other documents.

## **BACKGROUND**

A.      The WSOS Agreement and referenced SOS Tariffs in the EUA Zone

This action arises out of Narragansett's alleged breach of the pricing terms in Article V of the WSOS Agreement, executed on April 7, 1998.  The original parties to the WSOS Agreement were TransCanada, on the one hand, and Blackstone Valley Electric Company ("Blackstone"), Newport Electric Company ("Newport"), and Eastern Edison Company ("Eastern"), on the other hand.  (Comp. ¶¶ 8, 15.) (A copy of the Complaint (with the WSOS Agreement attached) is attached hereto for the Court's convenience as Exhibit A)[1].  At the time of the WSOS Agreement,  Blackstone and Newport were retail electric distribution companies in Rhode Island, and were wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), a Massachusetts

---

[1] All exhibits referred to in the Memorandum are attached to the Declaration of Wendy S. Plotkin filed herewith.

public utility holding company (EUA also owned Eastern).  (Comp. ¶ 8.)  Blackstone and

Newport (the "EUA Companies") provided retail electricity to consumers in a portion of Rhode

Island called the "EUA Zone."  (Comp. ¶ 23.)[2] The WSOS Agreement provided that

TransCanada would supply Standard Offer Service energy to the EUA Companies through 2009,

the time period for which the EUA Companies were required to provide Standard Offer Service

to Rhode Island retail consumers.  (Comp. ¶ 15.)[3]

Article V of the WSOS Agreement sets forth the pricing mechanism for the energy

supplied by TransCanada to the EUA Companies.  Pursuant to Article V, TransCanada is to

receive a price consisting of a stipulated set of base prices rising over time, plus a fuel index to

account for future extraordinary fuel costs (the "Fuel Adjustment Factor").  Under Article V, the

Fuel Adjustment Factor is to be calculated based upon the "retail Rate Fuel Adjustment

mechanism in the [EUA] Companies' Standard Offer Service Tariffs" ("SOS Tariffs") filed

periodically with the Rhode Island Public Utilities Commission ("PUC").  (Comp. ¶¶ 7, 16, 20;

WSOS Agreement, Art. V.)  The referenced EUA Company SOS Tariffs apply to and cover the

entire EUA Zone to which the EUA Companies provided power.  (Comp. ¶ 23.)  In 2000, the

EUA Companies merged into Narragansett (the "Merger"), another retail electric distribution

company supplying power to the remaining portion of Rhode Island (the "Old Narragansett

Zone"). (Comp. ¶¶ 21, 23.)

This dispute arose as a result of Narragansett's: (a) failure to file or attempt to obtain

PUC approval of EUA Zone SOS Tariffs containing a Fuel Adjustment Factor after 2004, and

---

[2] The "EUA Zone" is defined in both the Complaint (¶ 23) and the Requests.   The definition in the Requests
provides:  the term "EUA Zone" shall mean the area of Rhode Island in which Blackstone and Newport provided
electricity prior to [the merger of Narragansett, Blackstone and Newport].
[3] Blackstone and Newport were required to provide Standard Offer Service through 2009 pursuant to (a) the Utility
Restructuring Act of 1996 (R.I.G.L. 39-1-27.3(d)) (the "URA"); and (b) the Stipulation Agreement entered into
between Blackstone, Newport and another EUA affiliate, Montaup Electric Company ("Montaup"), with Rhode
Island Regulatory authorities, to implement the URA (the "RI Settlement Agreement").  (Comp. ¶¶ 6, 11.)

(b) resulting failure to pay to TransCanada a Fuel Adjustment Factor after 2004.  It is TransCanada's position that, at the time the parties entered into the WSOS Agreement, it was the understanding and intent of EUA and TransCanada that EUA (and its successors) would file and seek to obtain approval of SOS Tariffs covering the EUA Zone with a fuel adjustment through 2009.  Further, TransCanada contends that Massachusetts law and relevant provisions of the URA incorporated under Massachusetts law required EUA to make such filings requesting a fuel adjustment through 2009.  (Comp. ¶¶ 7, 15-17.)  It is Narragansett's position that the parties at the time of contracting intended for EUA/Narragansett to file SOS Tariffs for the EUA Zone requesting a fuel adjustment only through 2004, rather than through the entire 2009 terms of the WSOS Agreement and Standard Offer Service in Rhode Island.  (Narragansett's Counterclaim, attached as Exhibit B,  ¶¶ 10-12).

B.     The  EUA "Backstop" Obligation Assumed by TransCanada

Also relevant to EUA/Narragansett's obligations under Article V of the WSOS Agreement was the assignment to TransCanada under the Agreement of certain "Backstop" obligations of the EUA Companies to supply Standard Offer Service.  (Comp. ¶¶ 8-15.)

Under the URA and RI Settlement Agreement, Montaup was obligated to supply Blackstone and Newport with a guaranteed "backstop" supply of Standard Offer Service in the EUA Zone through 2009.  (Comp. ¶ 11.)  Pursuant to the WSOS Agreement (which in earlier drafts was called the "Backstop" Agreement), TransCanada assumed a percentage share (14.45%) of this "backstop" obligation.  (Comp. ¶¶ 8-9, 14-15; WSOS Agreement, Appendix A.)[4]  TransCanada alleges that the price the EUA Companies were to receive for this "backstop"

---

[4] For example, the WSOS Agreement provides: "Whereas, the Supplier [TransCanada] will purchase certain electric resources from Montaup Electric Company… and as a condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service Under this Agreement; and … Whereas, this Agreement provides for the transfer, from the Companies to the Supplier, of the responsibility for providing [Standard Offer

obligation, which TransCanada assumed under the WSOS agreement, included a fuel adjustment factor through 2009.  (Comp. ¶¶ 7, 13.)

     C.    <u>TransCanada' Outstanding Document Requests</u>

TransCanada served its Requests on August 26, 2005.  *See* Exhibit C.  On October 18, 2005, Narragansett served its responses.  *See* Exhibit D.   On November 1, 2005, TransCanada expressed it concerns related to Narragansett's responses.  *See* Exhibit E.  In an effort to avoid a lengthy discovery dispute, TransCanada set forth its positions on the relevance of the documents requested, and narrowed several requests.  *Id.*  The parties then attempted to resolve TransCanada's concerns through discussions on November 29 and 30th, 2005.  Although these conversations appeared to resolve several issues, it confirmed that the parties disagreed on the relevance of several major categories of documents requested by TransCanada.   TransCanada again wrote to Narragansett on December 21, 2005 in an effort to avoid motion practice on those issues, and concerning Narragansett's general non-production of documents it had agreed to produce.  *See* Exhibit F.  Despite these efforts, Narragansett has failed to respond to TransCanada's reasonable requests.   Therefore, TransCanada brings this Motion to Compel.

<u>**ARGUMENT**</u>

Fed. R. Civ. P. 26(b)(1) states that a party may obtain discovery regarding any matter "which is relevant to the subject matter involved in the pending action…"  This rule is liberally construed to permit "wide-ranging discovery to the fullest extent possible."  *Knoloski v. Mahlab*, 156 F.3d 255, 267 (1st Cir. 1998).  The word "relevant" encompasses "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case…" *Id.* at 267 (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).)

---

Service] including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service."  (Comp. Ex. 1, at 1.)

Further, "discovery itself is designed to help define and clarify the issues." *Id.*  One treatise stated, "it is not too strong to say that a request for discovery should be considered relevant if there is *any possibility* that the information sought may be relevant to the subject matter of the action."  Wright & Miller, *Federal Practice and Procedure* § 2008 (2005).  Here, there is no question that the documents sought by TransCanada fall well within the boundaries set by Rule 26 and are indeed directly relevant to the issues in dispute.

The parties' current, substantive dispute with respect to the production of documents arises primarily from Narragansett's objections to TransCanada's reasonable requests for two major categories of materials.  They are (a) documents concerning EUA/Narragansett's SOS Tariff and fuel adjustment pricing in the EUA Zone (as opposed only to its public filings and internal documents specifically referencing the WSOS Agreement); and (b) documents concerning the pricing and fuel adjustments applicable to EUA's "backstop" SOS obligation assigned to TransCanada by way of the WSOS Agreement.  Incredibly, Narragansett has declared that the two categories above are irrelevant to this dispute.  In addition, Narragansett has refused to produce documents concerning its general business practices with respect to including fuel adjustment provisions in its long term supply contracts and retail rate tariff filings.  Finally, TransCanada, moves to compel numerous categories of documents that Narragansett has not objected to producing yet has thus far, after over five months to gather the documents, simply failed to produce.  TransCanada respectfully requests that Narragansett be compelled to produce the outstanding documents within fourteen (14) days of the Court's Order.

A.    **Documents concerning EUA/Narragansett's SOS Tariffs and fuel adjustment pricing in the EUA Zone**

Document Request Nos. 4, 5-7, 12, 13, 15-22, 27, 32-34 (and others) seek information concerning EUA/Narragansett's SOS Tariffs and fuel adjustment pricing in the EUA Zone.  As

6

set forth above, the WSOS Agreement's pricing term (Article V) specifically references and depends upon such EUA Zone SOS tariffs. (Comp. ¶¶ 16-17, 23-24, WSOS Agreement, Article V.) TransCanada also alleges Narragansett breached the covenant of good faith and fair dealing by (i) making affirmative efforts in its EUA Zone tariff filings and testimony from 1998 to the present to deny TransCanada a fuel adjustment after 2004; and (ii) affirmatively misrepresenting to the PUC its communications with EUA Zone suppliers. (Comp. ¶¶ 23-24, 26-31.) Narragansett disputes that it ever intended or agreed to file a fuel adjustment for the EUA Zone after 2004, and bases its defenses and counterclaims directly upon its EUA Zone SOS Tariff and fuel adjustment filings and testimony from 1998 through 2004. (Counterclaim ¶¶ 10-12, 16, 18-24.)

> 1.    Documents Concerning EUA/Narragansett's SOS Tariff and Fuel Adjustment Filings in the EUA Zone

The three requests set forth below are examples of TransCanada's requests concerning EUA/Narragansett's SOS Tariff and fuel adjustment pricing for the "EUA Zone":

**Request No. 19**

All documents concerning communications with FERC, RIPUC, the Division, or any person regarding fuel adjustments in the EUA Zone.

**Request No. 22**

All documents concerning the preparation and filing of Standard Offer Service or retail tariffs or Standard Offer Service pricing in the EUA and [Old Narragansett] Zones, including copies of all tariff filings, drafts and related memoranda and correspondence.[5]

**Request No. 27**

All documents concerning Standard Offer Service or its pricing and any fuel adjustments or triggers applicable in the EUA Zone, including public announcements and communications

---

[5]TransCanada has limited this request to (i) documents regarding EUA/Narragansett's SOS Tariff filings in the *EUA Zone*, and (ii) prior retail rate filings reflecting the presence or absence of a fuel adjustment from 1980 to 1999. EUA/Narragansett's pre-WSOS Agreement retail rate filings are relevant to show its general practices with respect to the presence or absence of fuel adjustment provisions in its retail tariffs. See also Part C, *infra*.

with the Old Narragansett, FERC, RIPUC, the Division, potential Standard Offer Service suppliers or any other person.

In response to these specific requests (*see also* Requests 4, 5, 7, 12, 13, 15-18, 20, 21, and 32-34), Narragansett has stated that it will not produce any documents concerning SOS Tariffs, fuel adjustments or SOS pricing in the "EUA Zone" generally, except as such documents specifically reference the WSOS Agreement.

The requested documents concerning EUA/Narragansett's SOS Tariff and fuel adjustment filings for the EUA Zone – the very tariff filings specifically incorporated into Article V of the WSOS Agreements – are obviously of central relevance. The WSOS Agreement does not place a time limitation on Narragansett's obligation to file fuel adjustments in its SOS Tariffs for the EUA Zone, yet Narragansett contends based on its EUA Zone SOS Tariff filings that it never had any obligation to file fuel adjustments in its EUA Zone SOS Tariffs after 2004. (*See e.g.*, Narragansett Counterclaim, at ¶¶ 10-12, 16, 18-24.)

Thus, even beside Narragansett's obligation to produce documents concerning its own Counterclaim allegations, the following types of requested documents are clearly relevant: (i) EUA/Narragansett's plans, analysis and preparation of its EUA Zone SOS Tariffs, both before and after the WSOS Agreement, (ii) EUA/Narragansett's past practices concerning the inclusion of fuel adjustments in its SOS and other retails tariffs, (iii) EUA/Narragansett's financial projections concerning its SOS Tariffs, pricing and fuel adjustments in the EUA Zone, and (iv) EUA/Narragansett's internal and external communications, and other internal documents, regarding these and related subjects. *See, e.g.., USM Corp. v. Arthur D. Little Sys.,* 28 Mass. App. Ct. 108, 116 (1989) ("extrinsic evidence bearing upon the background and purpose of the parties, as well as their understanding of the meaning of particular language used in the contract, may be considered both in the construction of ambiguous contract language and in resolving

8

uncertainties in applying the terms of the written contract to the subject matter"); *American Home Assurance Co. v. Fore River Dock & Dredge, Inc.*, 321 F. Supp.2d 209, 216 (D. Mass. 2004) (same). Narragansett filed EUA Zone SOS tariffs to cover the EUA Zone generally, and did not split up them up by supplier. (Comp. ¶¶ 28-29; Counterclaim ¶¶ 18-23.) Thus, documents reflecting on Narragansett's past and future practices, and intent, with regard to its SOS Tariff filings and fuel adjustments in the EUA Zone generally (not just specifically referencing the WSOS Agreement), are directly relevant.

2.    Documents Concerning Other Suppliers in the EUA Zone

TransCanada has also requested relevant documents concerning the fuel adjustment pricing for parallel contracts between Narragansett and other SOS suppliers in the EUA Zone, which rely upon the exact same EUA Zone SOS Tariffs and fuel adjustment filings. (Comp. ¶¶ 28-29; Counterclaim, at ¶¶ 18-23.) Examples of such requests are below:

**Request No. 13**

All documents concerning any Request for Qualifications to Bid, Requests for Proposals, or any other formal or informal offers or solicitations related to divestiture of assets, Standard Offer Service, or other implementation of the URA or Settlement Agreements by the EUA Companies, including all correspondence with potential or actual bidders or interested parties.

**Request No. 15**

All documents concerning the drafting, negotiation and terms of any Standard Offer Service contracts for the EUA Zone with suppliers other than TransCanada, and any amendments thereto, including the Agreements themselves.

**Request No. 17**

All RFQs, RFPs or other bids or solicitations involving in any way Standard Offer Service or replacement Standard Offer Service from 1996 to the present, including but not limited to any RFQs, RFPs or other bids or solicitations arising from the inability of NRG Energy, Inc. to supply Standard Offer service electricity in Massachusetts or Rhode Island.

4032166v1

**Request No. 18**

All documents concerning communications between Narragansett (again, including all predecessors) and any Standard Offer Service supplier in the EUA Zone regarding pricing for Standard Offer Service and/or any fuel adjustment.[6]

Narragansett has refused to produce any documents concerning any EUA Zone supplier other than TransCanada, even though Narragansett admits that these other EUA Zone contracts (Narragansett calls them the "EUA Zone wholesale standard offer service agreements," Counterclaim ¶ 18) reference and rely upon the exact same general EUA Zone SOS tariffs and fuel adjustment pricing. (Counterclaim, ¶¶ 18-23, Comp. ¶¶ 28-29.)

Narragansett's treatment of its pricing and SOS Tariff obligations in these parallel contracts is unquestionably relevant to its intent and understanding of its obligations under the WSOS Agreement. *See McNally Tunneling Corp. v. City of Evanston, Ill.*, Case No. 00 C 6979, 2001 WL 1414437 * 3 (N.D. Ill. Nov. 13, 2001) (defendant's interpretation of an identical provision in other contracts is relevant to the reasonableness of its interpretation of that provision in the contract that is the subject matter of the dispute with plaintiff); *Lexington Ins. Co. v. Commonwealth Ins. Co.,* Case No. C98-3477,1999 WL 33292943 *6 (N.D. Cal. Sept. 17, 1999) (evidence of parties' prior course of dealing with respect to provisions in similar contracts was discoverable as it may provide evidence relevant to the analysis of a contract provision in dispute.) Similarly, statements made by EUA/Narragansett in bid documents and or other communications with potential EUA Zone SOS suppliers concerning such issues are relevant. *Id.*

---

[6] TransCanada limited these Requests to documents regarding drafting, negotiation or interpretation of contract provisions similar to Article V of the WSOSA; regarding how long any fuel adjustment factor would be paid; regarding filing of SOS retail tariffs and fuel triggers in the EUA Zone; and regarding EUA's analysis of whether to solicit wholesale SOS contractors through 2009 or through a lesser term (e.g., 2004). *See* Exhibit E.

Finally, TransCanada's good faith and fair dealing claim expressly alleges that Narragansett, misrepresented its communications with other EUA Zone suppliers. (Comp. ¶¶ 28-29.) Thus, the requested documents concerning other EUA Zone suppliers are directly and highly relevant.

3.    Documents concerning the EUA/Narragansett Merger and Treatment of the EUA Zone SOS Tariffs

TransCanada also seeks documents relating to the Merger between Blackstone, Newport and Narragansett as they relate to SOS filings in the EUA Zone:

**Request No. 5**

All documents concerning the anticipated and actual Merger, including but not limited to concerning Standard Offer Service and rate filing obligations anticipated or implemented after or relating to the Merger.

**Request No. 21**

All documents concerning analyses performed related to the Merger regarding Standard Offer Service or retail tariffs in the EUA or Old Narragansett Zone and the treatment of said tariffs post-Merger, including, but not limited to, applicability of a Fuel Adjustment Factor after 2004 in the EUA Zone. [*TransCanada has agreed to limit requests 5 and 21 to documents concerning SOS Tariffs and fuel adjustments in the EUA Zone*].

Narragansett responded to these requests by stating it would only produce documents specifically related to the WSOS Agreement.

Documents relating to Narragansett's understanding of its predecessor EUA's SOS Tariff-filing obligations at the time of the Merger, and of Narragansett's related obligations going forward after the Merger, are of central relevance to this dispute. TransCanada has asserted that Narragansett breached the covenant of good faith and fair dealing by, inter alia, deciding at the time of merging with EUA to cancel and replace the EUA Zone tariffs, and then not file SOS Tariffs for TransCanada and its other EUA Zone suppliers containing a fuel adjustment after 2004 (while still filing such tariffs for its Old Narragansett Zone suppliers

containing a fuel adjustment through 2009).(Comp. ¶¶ 23-30.)  Thus, Narragansett's analysis and understanding of its predecessor EUA's obligations under the WSOS Agreement, at the time of and after the Merger, is directly relevant to TransCanada's claims.  Moreover, such analysis from Narragansett is likely to reflect upon and lead to information concerning EUA's original intent.

In sum, Narragansett's objections to the production of the above categories of documents related to the EUA Zone is absurd.  As this court has acknowledged, it "practically goes without saying that [a party] ought not be empowered to decide what may or may not be relevant for [another party's] purposes, particularly when…[the documents requested are] directly relevant to the subject matter of the pending action. "  *Atchison Casting Corp. v. Marsh, Inc.*, 216 F.R.D. 225, 227 (D. Mass. 2003).  Narragansett may not unilaterally decide what is relevant or what is not relevant to this dispute.  The broad scope of discovery mandated by Rule 26 provides that information is discoverable if there is *any* probability that it *might* be relevant to the subject matter of the action.  *See e.g. Knoloski*, 156 F.3d at 255.  Here, the requested documents concerning EUA Zone are *directly* relevant, and thus it is unquestionable that must be produced. Accordingly, Narragansett should be compelled to produce all responsive documents relating to the EUA Zone and that are responsive to Requests Nos. 4, 5-7, 12, 13, 15-22, 27, 32-34 or any other requests.

**B.     Documents Concerning The Pricing of EUA's "Backstop" SOS Obligation Assigned To TransCanada in the WSOS Agreement.**

TransCanada also seeks (such as in Document Requests 4, 6-7, 12, 16**,** 20, 28 and 32) documents concerning the pricing and fuel adjustments applicable to EUA's "backstop" SOS obligation assigned to TransCanada by way of the WSOS Agreement.  Set forth below is an example of such requests:

<u>**Request No. 12**</u>

All documents concerning so called "backstop" Standard Offer Service obligations (and the pricing of the same) in the RI Settlement Agreement and the [Narragansett Settlement Agreement][7], including but not limited to financial projections, internal analyses, memoranda, emails and correspondence.

In response to requests 4, 6-7, 12, 16**,** 20, 28 and 32 (and others), Narragansett has taken the position that documents concerning the pricing for EUA's "backstop" obligation have no relevance this dispute.   Specifically, Narragansett has stated that, because TransCanada (and the other EUA Zone suppliers) ultimately assumed EUA's entire "backstop" obligation, EUA's "backstop" obligation no longer "exists" and thus cannot be relevant to any dispute concerning the WSOS Agreement.  Narragansett's position completely ignores the relationship of the "backstop" obligation to the WSOS Agreement.

As previously stated, TransCanada alleges that the EUA Companies had a "backstop" obligation to provide SOS in Rhode Island through 2009.  EUA's "backstop" obligation was priced to include a fuel adjustment.  EUA assigned a portion of this "backstop" obligation (14.45%) to TransCanada by way of the WSOS Agreement.  (Comp. ¶¶ 11-15.)  The intended pricing applicable to EUA's "backstop" obligation, which was assigned to TransCanada, is directly relevant in a number of respects:  (i) the time period of the fuel adjustment applicable to EUA's "backstop" obligation assigned to TransCanada, (ii) how EUA planned to effectuate the fuel adjustment for this "backstop" obligation assigned to TransCanada; and (iii) whether EUA intended when it executed the WSOS Agreement to file EUA Zone SOS Tariffs to obtain the fuel adjustment for its remaining "backstop" obligation (85.55%) through 2009.  This clearly relevant information must be produced.

**C.    Narragansett's Customary Practices With Respect to Fuel Adjustments In Supply Contracts and Retail Tariffs**

---

[7] Through correspondence and communications with Narragansett's counsel, TransCanada has limited this request to the RI Settlement Agreement.

TransCanada also requests documents concerning Narragansett's general analysis and use of fuel adjustment provisions in energy supply contracts such as the WSOS Agreement:

**Request No. 36**

All documents concerning analysis of or use of fuel adjustments generally in electrical supply contracts. [*TransCanada has agreed to limit this request to Narragansett's internal analysis of or use of fuel adjustments in electrical supply contracts.*]

Similarly, TransCanada Request No. 22 (as limited by TransCanada) seeks documents evidencing EUA/Narragansett's general practice of placing fuel adjustments in its retail tariffs. *See* Section A.1, and footnote 5 *supra*. Narragansett states that it will produce no documents responsive to these requests.

Documents reflecting on EUA/Narragansett's general use and understanding of the need for fuel adjustments in similar energy supply contracts, and in retail rate tariff filings, is relevant to its intended understanding of its obligations under the fuel adjustment provision of the WSOS Agreement. (S*ee, e.g.*, Comp. ¶¶ 7, 13.) *See Lexington Ins. Co.,* 1999 WL 33292943 *6.

**D.    Other Documents That Have Not Been Produced By Narragansett**

The final "category" of documents TransCanada seeks to compel are the many documents that TransCanada has requested and that Narragansett has either agreed to produce or not objected to, yet has delayed over four months in producing.

TransCanada served its Requests five months ago, on August 26, 2005. On October 18, 2005, in its responses to TransCanada's Requests, Narragansett stated that "Narragansett is endeavoring in good faith to produce to TransCanada" responsive documents and that "Narragansett currently expects that this process will be completed within approximately *two* months [thus, by December 16, 2005], but that batches of documents will be produced as they become available during this period." *See* Exhibit D. TransCanada expressed concern, and

14

requested that the document production be completed by no later than December 18, 2005.  *See*

Exhibit E.  When Narragansett only produced publicly available regulatory documents by that

date, TransCanada demanded that all responsive documents be produced by January 13, 2006.

See Exhibit F.  Now, as of February 1, 2006, more than five months after TransCanada served its

Requests, Narragansett still has not produced any of the most relevant documents.  Moreover,

discovery deadlines in this case approach - pursuant to the Scheduling Order entered by the

Court, expert disclosures must be made by the end of March.

Narragansett still has not produced the following critically relevant documents it has

agreed to produce:

- Documents concerning negotiation of the WSOS Agreement (Requests 24, 28, 37.);
- Drafts of the WSOS Agreement (id.)
- Document reflecting internal analyses or discussions concerning the WSOS Agreement (e.g., Requests 24, 28);
- Communications concerning the WSOS Agreement (Requests 29 & 37);
- Documents concerning the drafting or negotiation of the RI Settlement Agreement (limited by TransCanada to the specific provisions of the RI Settlement Agreement relevant to SOS pricing and fuel adjustments) (Requests 8-11; *see also* Exhibit E)
- Documents concerning Narragansett's drafts, interpretation or consideration  of the URA provisions requiring the filing of SOS tariffs and fuel adjustments for suppliers (Request 3; *see also* Exhibit E)
- Documents concerning Narragansett's analyses of the WSOS Agreement at the time it merged with Blackstone and Newport (Requests 5, 21);
- Organizational charts for Narragansett (Requests 38, 39);
- Document retention policies for Narragansett or EUA (Requests 40-41).

To date, Narragansett has produced documents only in the following three categories (1)

publicly available regulatory documents concerning the RIPUC or FERC; (2) SEC documents

concerning the merger of Blackstone and Newport into Narragansett; and (3) a small volume of

other documents consisting of communications with TransCanada following the WSOS

Agreement, a few Requests for Bid for Standard Offer Service (but no responses to those bids),

15

and two to three documents that appear to be internal analyses of Standard Offer Service or individual notes concerning Standard Offer Service. While this production may constitute a large "page volume" of public documents, it omits the documents most central to this dispute.

In its responses, served on October 18, 2005, Narragansett complained that TransCanada's Requests would require it to search "hundreds of thousands of documents dating back more than eight years." *See* Exhibit D. The fact that Narragansett must search large volumes of documents to respond to TransCanada's requests is not an excuse from fulfilling its discovery obligations, particularly in light of the complicated issues and large amount of money in dispute.[8] *See, e.g., Schapp v. Executive Indus.,* 130 F.R.D. 384, 388 (N.D. Ill. 1990) ("The mere fact that [the defendant] will be required to expend a considerable amount of time, effort, or expensing in answering the [discovery requests] is not a sufficient reason to preclude discovery.") Through phone conversations and correspondence, TransCanada has in good faith attempted to narrow its requests. It is now Narragansett's turn to respond to the Requests. Narragansett should be compelled to produce forthwith the remaining documents that are responsive to TransCanada's Requests.

### C.     Privilege Log

On November 1, 2005, in light of Narragansett's objections to many of TransCanada's Requests on the grounds that they sought information protected by the attorney-client privilege, TransCanada requested that Narragansett produce its privilege log in mid-December, the time period that Narragansett had represented that it would produce documents by. Narragansett has

---

[8] In a recent public filing, Narragansett estimated that the disputed fuel adjustment amount under the WSOS Agreement just *for the first two years* of the 2005-2009 time period in dispute may amount to over $22 million. *See* Narragansett's October 2005 Standard Offer Service Rate Filing with the PUC. (*See* http://www.ripuc.org/eventsactions/docket/3706-NEC(10-31-05).pdf).

yet to produce its privilege log.  Narragansett should be compelled to produce its privilege log immediately.

**Conclusion**

For the reasons set forth above, Plaintiff TransCanada respectfully requests that this Court grant the accompanying Motion to Compel and order Narragansett to produce all requested documents and information set forth in Memorandum within fourteen (14) days of the Court's Order.  TransCanada further requests an Order granting its attorneys' fees and costs related to this Motion.

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD.,

By its attorneys,


/s/ Wendy S. Plotkin
Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
Dara Y. Zelnick (BBO #660256)
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA  02110
Telephone No.:  (617) 248-5000
Dated: February 1, 2006                Fax No.:  (617) 248-4000

4032166v1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-40076FDS |
| ) | |
| NARRAGANSETT ELECTRIC COMPANY, ) | |
| ) | |
| Defendant. ) | |

**DECLARATION OF WENDY S. PLOTKIN IN SUPPORT OF TRANSCANADA
POWER MARKETING LTD.'S MOTION TO ENJOIN**

Wendy S. Plotkin deposes and states as follows:

1.      I am an attorney in the law firm of Choate, Hall & Stewart, and a member of the

bar of the Supreme Judicial Court of the Commonwealth of Massachusetts and the United States

District Court for the District of Massachusetts.  I am counsel to the above-named plaintiff and

make this declaration in support of TransCanada Power Marketing Ltd.'s Motion to Compel

Production of Documents.

2.      Attached hereto as Exhibit A is a true and correct copy of the Complaint filed in

this Action.

3.      Attached hereto as Exhibit B is a true and correct copy of Defendant the

Narragansett Electric Company's Answer and Counterclaim filed in this Action.

4.      Attached hereto as Exhibit C is a true and correct copy of TransCanada Power

Marketing Ltd's First Set of Document Requests.

4039259v1

5.      Attached hereto as Exhibit D is a true and correct copy of Defendant the Narragansett Electric Company's Responses to TransCanada Power Marketing Ltd's First Set of Document Requests.

6.      Attached hereto as Exhibit E is a true and correct copy of correspondence dated November 1, 2005 from Wendy S. Plotkin to Kimberly A. Stone.

7.      Attached hereto as Exhibit F is a true and correct copy of correspondence dated December 21, 2005 from Wendy S. Plotkin to Kimberly A. Stone.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

/s/ Wendy S. Plotkin


Dated:  February 1, 2006

4039259v1

# Exhibit A



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

```
                                        )
TRANSCANADA POWER  MARKETING LTD.       )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )       C.A. No. _____
                                        )
                                        )
NARRAGANSETT ELECTRIC COMPANY           )
                                        )
            Defendant,                  )
                                        )
                                        )
```

## COMPLAINT

Plaintiff TransCanada Power Marketing, Ltd. ("TransCanada") brings this action against

Narragansett Electric Company ("Narragansett") for breach of contract, contractual indemnity,

breach of the implied covenant of good faith and fair dealing, and for a declaratory judgment.

### PARTIES

1.      Plaintiff TransCanada is a Delaware corporation with a principal place of business

at 11 Turnpike Road, Westborough, Massachusetts.  TransCanada is a power marketing

company that purchases electricity from generation sources, such as power plants, and resells

that electricity to retail electric distribution companies and other customers throughout the

northeastern United States.

2.      Defendant Narragansett is a Rhode Island corporation with a principal place of

business at 280 Melrose Street, Providence, Rhode Island.  Narragansett is a retail electric

distribution company engaged in the transmission and distribution of electricity to retail end-

customers in Rhode Island.  Narragansett's predecessors include two retail electric distribution

companies in Rhode Island formerly known as Blackstone Valley Electric Company

("Blackstone") and Newport Electric Company ("Newport"), both of which merged into

Narragansett in 2000.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction under 28 U.S.C. § 1332, as the amount in controversy

exceeds $75,000.  Venue is proper in this Court under 28 U.S.C. § 1391(a)(1), (2) and (3).

## FACTS
### Industry Background: The URA

4.     In 1996, Rhode Island passed a Utility Restructuring Act (the "URA").  The

general objective of the URA was to deregulate electric power supply and develop a competitive

retail market for electricity in Rhode Island.  During the same time period, a similar electricity

deregulation process was ongoing in Massachusetts.

5.     The URA required that electric distribution companies in Rhode Island divest

ownership of their electricity generation facilities, and offer so-called "Retail Access" to Rhode

Island retail customers.  R.I.G.L. 39-1-27.3 (1997).  As envisioned by the URA, Retail Access

required each retail electric distribution company to allow its customers to purchase electricity

from non-affiliated retail suppliers, and further required each retail distribution company to

transport that purchased electricity over the retail distribution company's own lines from the

alternative supplier to the customer.

6.     The URA also required that, during the transition to Retail Access, the retail

distribution companies provide a standard power supply (a "Standard Offer Service") to Rhode

Island retail customers through 2009, at a set of regulated prices.  R.I.G.L. 39-1-27.3(d) (1997).

The purpose of the Standard Offer Service was to provide Rhode Island retail customers a stable,

2

competitively-priced source of electricity during the transition period to a competitive Retail

Access market, for those customers that had not yet obtained an alternative electricity supplier.

     7.    Under the URA, the Standard Offer Service was to be priced to account for

increases in the consumer price index, and also for other factors reasonably beyond the control of

power suppliers such as "extraordinary fuel costs." R.I.G.L. 39-1-27.3(d) (1997). The URA

required the retail distribution companies to file tariffs with the Rhode Island Public Utilities

Commission ("PUC") to implement Standard Offer Service through 2009, for the benefit of both

wholesale and retail customers and their suppliers. R.I.G.L. 39-1-27(a) (1997).

Implementation of the URA

     8.    Blackstone and Newport were retail electric distribution companies in Rhode

Island at the time of enactment of the URA, and were wholly-owned subsidiaries of Eastern

Utilities Associates ("EUA"), a public utility holding company.  EUA also owned a retail

electric company in Massachusetts, Eastern Edison Company ("Eastern," and, collectively with

Blackstone and Newport, the EUA retail "Companies").

     9    At the time of enactment of the URA, the EUA Companies purchased their

electricity, which they then supplied to their retail customers, from an affiliated wholesale

electricity supplier, Montaup Electric Company ("Montaup"). To comply with the URA (and a

Massachusetts counterpart), the Companies were required to terminate their wholesale supply

contracts with Montaup, and allow their retail customers to have Retail Access to alternative

suppliers; Montaup was also required to divest its generation facilities.

     10.    On October 17, 1997, in order to implement the URA, Blackstone, Newport, and

Montaup entered into a Stipulation and Agreement with the PUC, as well as the Rhode Island

Division of Public Utilities and Carriers ("Division") (hereinafter, the "RI Settlement

3

Agreement"). The RI Settlement Agreement was approved by the Federal Energy Regulatory Commission ("FERC"). A similar Stipulation and Agreement was executed in Massachusetts and also approved by FERC (the "MA Settlement Agreement," and, collectively with the RI Settlement Agreement, the "Settlement Agreements").

11.     In order to ensure a steady supply of Standard Offer Service, Montaup was required under the RI Settlement Agreement to provide Blackstone and Newport with a guaranteed, "Backstop" supply of Standard Offer Service through the required term of Standard Offer Service in Rhode Island (through 2009).[1] Blackstone and Newport were in turn required to seek alternative wholesale suppliers for Standard Offer Service during that term, and Montaup was to be released from its Backstop obligation to the extent Blackstone and Newport were able to obtain replacement contracts. In order to ensure a Standard Offer Service to Rhode Island retail customers through 2009, however, Montaup's Backstop obligation required it to provide Standard Offer Service to Blackstone and Newport through 2009 to the extent those companies did not obtain alternative wholesale Standard Offer Service supply contracts.

12.     The RI Settlement Agreement required that Montaup assign to the purchaser of any divested Montaup generation asset a commensurate share of Montaup's Backstop obligation. Thus, any purchaser of Montaup's generation assets was required to assume a share of Montaup's Backstop Standard Offer Service obligations to Blackstone and Newport.

13.     Consistent with the pricing scheme for Standard Offer Service set forth in the URA, the RI Settlement Agreement provided that Montaup and its successors and assigns were to provide Standard Offer Service to Blackstone and Newport in exchange for a stipulated set of base prices rising over time, subject to a "fuel index" to account for future extraordinary fuel

---

[1] Massachusetts required electric distribution companies to provide standard offer service only through 2004, and hence the MA Settlement Agreement imposed upon Montaup a Backstop obligation in Massachusetts only through 2004.

costs, through 2009. The purpose of the fuel index, as envisioned by the URA and Settlement Agreements, was to ensure that wholesale Standard Offer Service suppliers would be protected against the downside risk of future extraordinary increases in fuel costs, so that they would be able to agree to the desired long-term Standard Offer Service supply contracts for the benefit of Rhode Island retail customers.

TransCanada's WSOS Agreement

14.    On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement whereby TransCanada purchased certain electricity generation assets of Montaup (the "Asset Purchase Agreement"). TransCanada was thereby also required by the RI and MA Settlement Agreements to assume a percentage share of Montaup's Backstop obligation to provide Standard Offer Service to Blackstone, Newport and Eastern.

15.    TransCanada and Blackstone, Newport and Eastern (collectively, the EUA "Companies") therefore entered into a Wholesale Standard Offer Service Agreement dated April 7, 1998 (the "WSOS Agreement," or "Agreement," attached hereto as Exhibit A), which is governed by Massachusetts law. In the WSOS Agreement, TransCanada agreed to assume a percentage share of Montaup's Standard Offer Service obligations under the Settlement Agreements, to Blackstone and Newport through 2009 (the term of the Standard Offer Service in Rhode Island); and to Eastern through 2004 (the term of the Standard Offer Service in Massachusetts). (*See* Agreement, § 3 & App. A.)

16.    Under the WSOS Agreement, and as specified in the Settlement Agreements and the URA, TransCanada was to receive a price for delivering Standard Offer Service consisting of the stipulated set of base prices rising over time (the "Standard Offer Wholesale Price"), plus a fuel index (the "Fuel Adjustment Factor") to account for future extraordinary fuel costs. Under

5

the WSOS Agreement, the Fuel Adjustment Factor was to be calculated based upon the tariffs
that Blackstone and Newport were required to file in accordance with the URA and Settlement
Agreements. Specifically, Agreement Article Five provides that:

> For each kilowatt-hour of Delivered Energy that Supplier [TransCanada] provides
> in each month..., the Companies shall pay Supplier the applicable Price for the
> month in cents per kilowatt hour calculated as follows:
>
> Price = Standard Offer Wholesale Price + Fuel Adjustment Factor
>
> Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in
> Article 1 and shown in Appendix A, and
>
> Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the
> incremental revenues collection, if any, attributed to the operation of the retail
> Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service
> Tariffs. ... The Retail Fuel Adjustment, and the resulting Fuel Adjustment
> Factor to be paid to Supplier, will be made subject to regulatory approval and
> only to the extent the Companies are allowed to collect such revenues from the
> retail customers taking Standard Offer Service.

17.    The Agreement imposed upon Blackstone and Newport a good faith obligation to
make the required Standard Offer Service Tariff filings, and to use reasonable efforts to obtain
regulatory approval for a Fuel Adjustment Factor to be paid to TransCanada over the 2009 term
of the Agreement.

18.    The Agreement provided TransCanada with indemnity and termination rights in
the event that any government or regulatory agency amended the Standard Offer Service in a
manner which materially increased TransCanada's obligations or costs to provide Standard Offer
Service under the Agreement. Specifically, Article 8.3 of the Agreement provides:

> In the event that the Standard Offer Service or the Terms and Conditions for
> Suppliers are terminated, amended or replaced by any governmental or regulatory
> agency having jurisdiction over the provision of Standard Offer Service in a
> manner which materially increases the Supplier's costs or obligations to provide
> Standard Offer Service, the Companies shall promptly reimburse the Supplier for
> any costs or increased obligations or otherwise provide relief reasonably
> acceptable to supplier to or indemnify the Supplier from such changes. ... In the

6

> event that the Parties are not able to agree on ... the amount to be reimbursed, ...
> either Party may terminate this Agreement on sixty (60) days written notice ....

19.    The Agreement also provided TransCanada with termination rights, and damages

rights, in the event that the Companies failed to perform any of their obligations under the

Agreement.  Specifically, the Agreement provides that, upon an uncured default by any of the

Companies, TransCanada has the right to recover direct damages resulting from the default; to

pursue all other remedies and damages provided for by law; and to terminate the Agreement

upon sixty (60) days notice.  (Agreement, § 7(1), (2).)  Finally, the Agreement provides that

TransCanada is entitled to recover interest on any improperly withheld payments.  (*Id.* § 6.)

### The Narragansett Merger

20.    From the signing of the Agreement in April 1998 through early 2000, Blackstone

and Newport filed the required Standard Offer Service Tariffs with the PUC on a periodic basis.

Blackstone and Newport thereby obtained approval of the Standard Offer Wholesale Prices and a

Fuel Adjustment Factor for 1999 and 2000, as required by the Agreement.

21.    In 2000, Blackstone and Newport merged into Narragansett, another retail electric

distribution company in Rhode Island.  At the same time, Eastern merged into Massachusetts

Electric Company ("Mass. Electric"), another retail distribution company in Massachusetts.

22.    Narragansett and Mass. Electric were at the time (and still are, upon information

and belief) wholly-owned subsidiaries of National Grid USA ("National Grid").  Through the

comprehensive merger, all of EUA's former retail distribution companies in Rhode Island and

Massachusetts, consisting of Blackstone, Newport, and Eastern, merged into the corresponding

Rhode Island and Massachusetts retail distribution companies of National Grid, consisting of

Narragansett and Mass. Electric.

7

23.    By way of the Rhode Island portion of the merger, Narragansett became the retail electric distribution company both for the previous retail customers of Blackstone and Newport in Rhode Island (hereinafter the former "EUA Zone"), as well as its own previous retail customers in its former area (hereinafter the old "Narragansett Zone").

24.    The PUC approved the Narragansett merger in March, 2000. At the request of Narragansett, the PUC cancelled the former Blackstone and Newport Standard Offer Service Tariffs and ruled that Narragansett could continue to obtain payment for Standard Offer Service in both its new EUA Zone and in its old Narragansett Zone through Narragansett's own and future Standard Offer Service Tariffs and related filings.[2]

### Narragansett's Wrongful Conduct

25.    On April 18, 2000, Narragansett sent a letter to TransCanada giving notice of the merger, and stating that Narragansett would succeed to and assume the obligations of Blackstone and Newport under the WSOS Agreement. The letter further assured TransCanada, as required for valid assignment of the Agreement in the case of a merger, that the obligations of the parties "are not affected by the merger and assignments." Narragansett's letter further stated that Narragansett would continue to make Fuel Adjustment payments to TransCanada "after 1999," according to the mechanism previously established in the RI Settlement Agreement and in the Blackstone and Newport Standard Offer Service Tariffs.

26.    Unbeknownst to TransCanada, however, Narragansett began planning even at the time of the merger to deny TransCanada the Fuel Adjustment Factor it had bargained for in the

---

[2] Narragansett, like Blackstone and Newport, had entered into its own Settlement Agreement with the PUC in 1997, which also required Retail Access and divestiture of generation assets. Narragansett's Settlement Agreement required Narragansett to provide Standard Offer Service at the same set of stipulated prices and fuel adjustment triggers as in Blackstone's and Newport's RI Settlement Agreement. Like Blackstone and Newport, Narragansett also subsequently entered into Standard Offer Service supply contracts with a number of wholesale Standard Offer Service suppliers. Narragansett was required, like Blackstone and Newport, to file tariffs under the URA to implement the Standard Offer Service for the benefit of its customers and suppliers.

8

WSOS Agreement. It was to Narragansett's benefit not to pay a Fuel Adjustment Factor, particularly in times of rising fuel prices, in order to reduce its overall expenses and costs. Fuel prices began rising at the time of Narragansett's merger, and the Fuel Adjustment Factors in Narragansett's and Blackstone's and Newport's wholesale Standard Offer Service supply contracts had been triggered.

27. Nevertheless, Narragansett thereafter and through the end of 2004 continued to pay TransCanada for Standard Offer Service as required under the Agreement, including both the base Wholesale Standard Offer Price and a Fuel Adjustment Factor. Fuel prices continued to rise, however, and Fuel Adjustment Factor payments to TransCanada and other wholesale Standard Offer Service suppliers became a regular component of the price paid by Narragansett to its suppliers for Wholesale Standard Offer Services.

28. In May, 2003, unbeknownst to TransCanada, Narragansett began to argue affirmatively before the PUC that its suppliers in the former EUA Zone should not be paid a Fuel Adjustment Factor after 2004. The PUC expressed concern about Narragansett's position, and Narragansett stated to the PUC both that it had discussed its intended position with all of its EUA Zone suppliers and that, while the suppliers had not affirmatively agreed with Narragansett's position, none of those suppliers had raised objection. These were blatant misrepresentations, as Narragansett neither notified nor discussed with TransCanada at any time Narragansett's intention not to provide Fuel Adjustment Factor payments under the Agreement after 2004.

29. In July 2004, Narragansett again told the PUC that it should make no provision for a Fuel Adjustment Factor in the former EUA Zone after 2004. The PUC again expressed concern, both about the merit of Narragansett's position and about whether Narragansett's EUA Zone suppliers had been notified and agreed with Narragansett's position. In response,

9

Narragansett argued against TransCanada's right to a Fuel Adjustment Factor, and again

misrepresented both that it had discussed the matter with all of its EUA Zone suppliers and that

none of those suppliers had affirmatively disputed Narragansett's position. Narragansett also

falsely assured the PUC that, in the event a dispute developed, TransCanada had no ability to

terminate the WSOS Agreement in the event that it failed to receive Fuel Adjustment Factor

payments after 2004.

      30.    In December, 2004, Narragansett filed with the PUC its proposed Standard Offer

Service Tariffs and rates for 2005. Narragansett specified that no Fuel Adjustment Factor should

be granted to TransCanada (or any other EUA Zone suppliers) in 2005. As a result of that filing,

and Narragansett's arguments and previous misstatements to the PUC, the PUC approved

Standard Offer Service Tariffs and rates for 2005 that provide no allocation for a Fuel

Adjustment Factor for TransCanada.[3] At the same time, Narragansett continued to request and

obtain approval for a Fuel Adjustment Factor in 2005 for its suppliers in the old Narragansett

Zone. TransCanada was never made aware of any of Narragansett's filings or arguments at the

PUC in 2003 and 2004.

      31.    In February, 2005, TransCanada learned for the first time that Narragansett did

not plan to pay TransCanada any Fuel Adjustment Factor after 2004, or indeed for the last five

years of the WSOS Agreement. TransCanada discovered this position only after receiving

Narragansett's calculation of the amount payable for Standard Offer Service delivered in

January, 2005, which noticeably omitted any payment for a Fuel Adjustment Factor. The

expected amount of that unpaid Fuel Adjustment Factor, just for January, 2005, totaled over

---

[3] When asked in December 2004 whether it had had further discussions with its EUA Zone suppliers since its
previous statements, Narragansett admitted in a half-truth at that point that it had not had *recent* discussions with all
of its suppliers.

3925077v1

$320,000.00. The Fuel Adjustment Factor each subsequent month has been similar, and is expected to remain substantial in future months.

32.    On March 1, 2005, TransCanada provided written notice of default under the WSOS Agreement. Narragansett has thereafter refused to cure or change its position, or to indemnify or reimburse TransCanada under Article 8(3) of the Agreement for loss of the Fuel Adjustment Factor.

33.    Narragansett also continues to dispute TransCanada's right to terminate the WSOS Agreement. Narragansett has further threatened that its National Grid affiliates will withhold payments owed to TransCanada under the Asset Purchase Agreement if TransCanada proceeds to terminate the WSOS Agreement.

34.    Narragansett's breaches of its obligations under the WSOS Agreement have deprived TransCanada of its contractual rights to payment of a Fuel Adjustment Factor under the Agreement. These breaches have caused and are continuing to cause TransCanada substantial and ongoing damages.

<u>Count I</u>
(Breach of Contract)

35.    TransCanada repeats and incorporates by reference paragraphs 1 through 34 above.

36.    Narragansett has breached the WSOS Agreement through the acts described above, including (a) its failure to file for or make a reasonable effort to obtain regulatory approval of a Fuel Adjustment Factor after 2004, (b) its failure to pay a Fuel Adjustment Factor to TransCanada as required under the Agreement; and (c) its failure to indemnify or reimburse TransCanada as required by Article 8(3) of the Agreement for regulatory loss of the Fuel Adjustment Factor.

11

3925077v1

37.    As a result of these breaches, TransCanada has suffered and will continue to suffer monetary damages. TransCanada is entitled to terminate the Agreement, and to an award of its damages and interest.

Count II
(Contractual Indemnification)

38.    TransCanada repeats and incorporates by reference paragraphs 1 though 37 above.

39.    The PUC's abolishment of the Blackstone and Newport tariffs, and its subsequent approval of Standard Offer Service Tariffs for 2005 that do not include a Fuel Adjustment Factor in the EUA Zone, have amended the Standard Offer Service in a manner that has materially increased TransCanada's costs and obligations to provide Standard Offer Service under the Agreement. These regulatory changes were made by the PUC at the express request of Narragansett.

40.    Under Article 8(3) of the WSOS Agreement, Narragansett is obligated to indemnify or otherwise reimburse TransCanada for loss of the expected Fuel Adjustment Factor.

Count III
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

41.    TransCanada repeats and incorporates by reference paragraphs 1 through 40 above.

42.    The Agreement contains an implied covenant of good faith and fair dealing.

43.    Narragansett has breached the covenant of good faith and fair dealing implied in the Agreement through its conduct described above, including but not limited to its various contractual breaches, its misleading behavior with TransCanada and the PUC, its concealment of

12

its planned breach of the Agreement, and its expropriation to its own benefit of TransCanada's rights under the Agreement.

44.    As a result of these breaches, TransCanada has suffered and will continue to suffer substantial monetary damages.  TransCanada is entitled to terminate the Agreement, and to an award of damages and interest.

Count IV
(Declaratory Relief under G.L. c 231A:  Right to Terminate)

45.    TransCanada repeats and incorporates by reference paragraphs 1 through 44 above.

46.    An actual controversy exists as to whether Narragansett has breached the WSOS Agreement, and whether TransCanada has the right to terminate the Agreement, including under its Articles 7(2) and/or 8(3).

47.    TransCanada requests a declaratory judgment that Narragansett has breached the terms of the WSOS Agreement; that Narragansett has failed to cure the breach; and that TransCanada has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement immediately.

13

WHEREFORE, TransCanada requests the following relief:

1.    Judgment in its favor on all counts.

2.    An award of damages, including interest, in an amount to be determined at trial.

3.    A declaratory judgment that Narragansett has breached the terms of the WSOS Agreement; that Narragansett has failed to cure the breach; and that TransCanada has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement immediately.

4.    An award of its costs, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

TRANSCANADA POWER MARKETING

By its attorneys,

Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
**CHOATE, HALL & STEWART LLP**
Exchange Place
53 State Street
Boston, MA  02109
Telephone No. (617) 248-5000
Fax No. (617) 248-4000

3925077v1

# Exhibit A

Wholesale Standard Offer
Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

# TABLE OF CONTENTS

Page

ARTICLE 1.  Definitions ................................................................................... 2

ARTICLE 2.  Term   .......................................................................................... 3

ARTICLE 3.  Supplier Responsibilities ........................................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO ........... 4

ARTICLE 5.  Price   .......................................................................................... 5

ARTICLE 6.  Billing and Payments ................................................................. 6

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies ... 6

ARTICLE 8.  Termination/Reimbursement ...................................................... 8

ARTICLE 9.  Force Majeure ............................................................................. 8

ARTICLE 10. Assignment ................................................................................. 9

ARTICLE 11. Successors and Assigns .............................................................. 10

ARTICLE 12. Resolution of Disputes ............................................................... 10

ARTICLE 13. Interpretation .............................................................................. 11

ARTICLE 14. Severability of Provisions .......................................................... 11

ARTICLE 15. Accounts and Records ................................................................ 11

ARTICLE 16. Limitations on Liability and Indemnification ........................... 12

ARTICLE 17. Regulation ................................................................................... 12

ARTICLE 18. Notices ........................................................................................ 12

ARTICLE 19. Miscellaneous ............................................................................. 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

i

# WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this seventh day of April, 1998_____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer customers shall not be obligated

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.   Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.

ARTICLE 3.   Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.


ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

$$Price = Standard\ Offer\ Wholesale\ Price + Fuel\ Adjustment\ Factor$$

Where:  Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

regulatory approval and only to the extent that the
Companies are allowed to collect such revenues from
their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be
paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or
which may be assessed or imposed in the future by any governmental authority with jurisdiction
governing the sale of electricity covered by this Agreement.

## ARTICLE 6.   Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of
Suppliers, computations by the Companies of the charges for the purposes of billings hereunder
shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the
Price as determined in accordance with Article 5. The Companies shall calculate the amount
payable to Supplier for a given month on or before the twentieth (20th) day of the following
month. The calculation shall be provided to Supplier and shall show the total amount due and
payable for the previous month. Each bill shall be subject to adjustment for any errors in
arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of
Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due
and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date").
Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in
effect at the main office of BankBoston, or such other lending institution as agreed to by
Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis
for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing
and payment disputes shall be handled in accordance with the provisions of Article 12 of this
Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under
the terms of the resolution shall be made within thirty (30) days of the date thereof, together with
interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one
year from the date of the original billing in order to reflect differences in charges resulting from
receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30)
days of receipt of the proposed adjustment.

## ARTICLE 7.   Events of Default, Liability, Relationship of the Companies:

(1)    Unless excused by a Force Majeure as described in Article 9, each of the
following events shall be deemed to be an Event of Default hereunder:

6

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement. The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

ARTICLE 8.   Termination/Reimbursement:

(1)    In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

a.   Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

b.   The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

c.   Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice. In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materiality of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.   Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)     The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)     The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)     The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)     The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party.  With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

## ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 11. <u>Successors and Assigns</u>:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. <u>Resolution of Disputes</u>:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value <u>provided, however</u>, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 16. Limitations on Liability and Indemnification:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. Regulation:

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.


ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by  the portion of its monthly

Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:          TransCanada Power Marketing Ltd.

By:

On Behalf of the Companies:

Blackstone:         BLACKSTONE VALLEY ELECTRIC COMPANY

By:

Eastern:         EASTERN EDISON COMPANY

By:

Newport:        NEWPORT ELECTRIC CORPORATION

By:

15

# APPENDIX A

## SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
## AND
## STANDARD OFFER WHOLESALE PRICE

### TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

\* Standard Offer Service for Eastern Edison terminates
at 12:00 midnight on December 31, 2004.

16

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| **(a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| TransCanada Power Marketing Ltd. | Narragansett Electric Company |
| USA | USA |
| **(b)** County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant |
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
| **(c)** Daniel C. Winston  (617) 248-4049 CHOATE, HALL & STEWART LLP Exchange Place 53 State Street Boston, MA 02109 | Attorneys (If Known) |

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN  (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332

Brief description of cause:  Suit for breach of contract and breach of the implied covenant of good faith and fair dealing.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  5/17/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)    TransCanada Power Marketing Ltd. v.
                                                              Narragansett Electric Company

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local
    rule 40.1(a)(1)).

    [ ]   I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

    [ ]   II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.             for patent, trademark or copyright cases

    [X]   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

    [ ]   IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

    [ ]   V.    150, 152, 153.

3.  Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.

    _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                             YES  [ ]      NO  [X]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
    §2403)
                                                             YES  [ ]      NO  [X]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                             YES  [ ]      NO  [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                             YES  [ ]      NO  [X]

7.  Do all of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                             YES  [ ]      NO  [X]

    A.    If yes, in which division do all of the non-governmental parties reside?

          Eastern Division  [ ]        Central Division  [ ]        Western Division  [ ]

    B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
          residing in Massachusetts reside?

          Eastern Division  [ ]        Central Division  [X]        Western Division  [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
    submit a separate sheet identifying the motions)
                                                             YES  [ ]      NO  [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME    Daniel C. Winston

ADDRESS    Choate, Hall & Stewart LLP, Exchange Pl., 53 State St., Boston, MA
                                                                                    02109

TELEPHONE NO.    (617) 248-4049

(CategoryForm.wpd - 5/2/05)

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

Civil Action No. 05-40076FDS

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE NARRAGANSETT ELECTRIC COMPANY | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ANSWER AND COUNTERCLAIM OF THE NARRAGANSETT ELECTRIC
COMPANY TO COMPLAINT OF TRANSCANADA POWER MARKETING LTD.
DEMAND FOR JURY TRIAL**

Defendant, The Narragansett Electric Company ("Narragansett"), hereby responds to the

numbered paragraphs of the Complaint of TransCanada Power Marketing Ltd. ("TransCanada")

as follows:

PARTIES

1.    Narragansett admits that TransCanada is a Delaware corporation, but states that

TransCanada's principal place of business is located at 110 Turnpike Road, Westborough,

Massachusetts. Narragansett further admits that TransCanada is a power marketing company

that sells electricity to at least one retail electric distribution company but is without knowledge

or information concerning the sources from which TransCanada purchases electricity or the

scope of TransCanada's customer base.

2.    The allegations of paragraph 2 are admitted, except the name of "Newport" is "Newport Electric Corporation."

## JURISDICTION AND VENUE

3.    Narragansett admits that this Court has jurisdiction under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.  However, Narragansett denies that venue is proper in this Court.

## FACTS

### Industry Background:  The URA

4.    Narragansett admits that Rhode Island passed a Utility Restructuring Act in 1996. The URA speaks for itself and, therefore, the characterization of it is denied.  Narragansett further admits that an electricity deregulation process was ongoing in Massachusetts in or about 1996.

5.    The URA speaks for itself and, therefore, TransCanada's characterization of it is denied.

6.    The URA speaks for itself and, therefore, TransCanada's characterization of it is denied.

7.    The URA speaks for itself and, therefore, TransCanada's characterization of it is denied.

### Implementation of the URA

8.    The allegations of paragraph 8 are admitted.

9.    The allegations of the first sentence of paragraph 9 are admitted.  The remaining allegations of paragraph 9 are denied.

10.    The allegations of paragraph 10 are admitted.

11.    The RI Settlement Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

12.    The RI Settlement Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

13.    The URA and RI Settlement Agreements speak for themselves and, therefore, TransCanada's characterization of them is denied. Further answering, Narragansett specifically denies that the "fuel index" described in paragraph 13 was applicable through 2009.

<u>TransCanada's WSOS Agreement</u>

14.    Narragansett admits that TransCanada and Montaup entered into an Asset Purchase Agreement on April 7, 1998. The Asset Purchase Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

15.    Narragansett admits that TransCanada and Blackstone, Newport and Eastern (collectively, the "EUA Companies") entered into a Wholesale Standard Offer Service ("WSOS") Agreement dated April 7, 1998. The WSOS Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied.

16.    The WSOS Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied. Further answering, Narragansett specifically denies that it was obliged to file Fuel Adjustment Factor tariffs.

17.    The WSOS Agreement speaks for itself and, therefore, TransCanada's characterization of it is denied. Further answering, Narragansett specifically denies that it was required to make a filing or use efforts to obtain regulatory approval for a Fuel Adjustment Factor to be paid to TransCanada after 2004.

18.    The WSOS Agreement speaks for itself and TransCanada's characterization of that Agreement is denied.

19.    The WSOS Agreement speaks for itself and TransCanada's characterization of that Agreement is denied.

## The Narragansett Merger

20.    The allegations of paragraph 20 are admitted, except, Narragansett denies that a Fuel Adjustment Factor was approved for the year 1999.

21.    The allegations of paragraph 21 are admitted.

22.    The allegations of paragraph 22 are admitted.

23.    The allegations of paragraph 23 are admitted.

24.    Narragansett admits that the PUC approved the merger in March 2000.  The PUC's ruling speaks for itself and, therefore, the remaining allegations of paragraph 24 are denied.  Further answering, Narragansett admits that it had entered into a Settlement Agreement with the PUC in 1997.  Narragansett's Settlement Agreement with the PUC speaks for itself and, therefore, the characterizations of that Agreement in footnote 2 are denied.  Narragansett specifically denies that the Narragansett Settlement Agreement required Narragansett to provide Standard Offer Service at the same set of fuel adjustment triggers as Blackstone and Newport's RI Settlement Agreement.

## Narragansett's [Alleged] Wrongful Conduct

25.    Narragansett admits that it sent TransCanada a letter on April 18, 2000.  The letter speaks for itself and, therefore, TransCanada's characterization of it is denied.  Further answering, Narragansett states that the letter, including its attachments, makes it clear that Fuel Adjustments, where applicable, would only be available through 2004.

26.    The allegations of paragraph 26 are denied.

27.    The allegations of the first sentence of paragraph 27 are admitted.  Narragansett denies the remaining allegations of paragraph 27.

28.    The allegations of paragraph 28 are denied.

29.    The allegations of paragraph 29 are denied.

30.    The first sentence of paragraph 30 is admitted.  The remaining allegations of paragraph 30 are denied.

31.    The allegations of paragraph 31 are denied.

32.    The allegations of paragraph 32 are denied.  Further answering, Narragansett states that it has no obligation to cure, change its position, or indemnify or reimburse TransCanada and that no claim for reimbursement under Article 8(3) of the WSOS Agreement has ever been made by TransCanada.

33.    Narragansett admits that it disputes TransCanada's right to terminate the WSOS Agreement.  The remaining allegations of paragraph 33 are denied.

34.    The allegations of paragraph 34 are denied.

Count I

(Breach of Contract)

35.    Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 34 above.

36.    The allegations of paragraph 36 are denied.

37.    The allegations of paragraph 37 are denied.

Count II

(Contractual Indemnification)

38.    Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 37 above.

39.    The allegations of paragraph 39 are denied.

40.    The allegations of paragraph 40 are denied.

## Count III

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

41.    Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 40 above.

42.    The allegations of paragraph 42 are admitted.

43.    The allegations of paragraph 43 are denied.

44.    The allegations of paragraph 44 are denied.

## Count IV

(Declaratory Relief under G.L. c 231A: Right to Terminate)

45.    Narragansett repeats and incorporates by reference its responses to paragraphs 1 through 44 above.

46.    The allegations of paragraph 46 are admitted.

47.    Narragansett denies that TransCanada has a right to the declaratory judgment that it seeks.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Venue does not properly lie in the United States District Court for the District of Massachusetts.

### SECOND AFFIRMATIVE DEFENSE

The Complaint fails to state a claim for Breach of Contract, Contractual Indemnification or Breach of the Implied Covenant/Good Faith and Fair Dealing because the documents relied upon to support these claims do not establish an obligation to pay or seek approval of a Fuel Adjustment Factor after 2004, or to indemnify or reimburse TransCanada under Section 8(3).

## THIRD AFFIRMATIVE DEFENSE

TransCanada has waived its claim for damages arising from Narragansett's failure to pay a Fuel Adjustment Factor after 2004 by failing to contest Narragansett's 2004 filings before, or orders of, the Rhode Island Public Utility Commission regarding the Fuel Adjustment Factor, which did not include an amount to be paid for a Fuel Adjustment Factor.

## FOURTH AFFIRMATIVE DEFENSE

TransCanada's claims are barred in whole or in part by its own inequitable conduct and unclean hands and by its breaches of its obligations of good faith and fair dealing.

## FIFTH AFFIRMATIVE DEFENSE

TransCanada's claims are barred in whole or in part by its own breaches of its contractual obligations to Narragansett.

## COUNTERCLAIM OF THE NARRAGANSETT ELECTRIC COMPANY

## PARTIES AND JURISDICTION

1.     Plaintiff-in-Counterclaim, The Narragansett Electric Company ("Narragansett"), is a Rhode Island corporation with its principal place of business at 280 Melrose Street, Providence, Rhode Island.

2.     Defendant-in-Counterclaim, TransCanada Power Marketing Ltd. ("TransCanada"), is a Delaware corporation with its principal place of business at 110 Turnpike Road, Westborough, Massachusetts.

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, exclusive of interest and costs, and Narragansett and TransCanada are citizens of different states.

7

## FACTS COMMON TO ALL COUNTS

4.      Narragansett is a retail electric distribution company that supplies and delivers electricity to 465,000 retail end-use customers in 38 communities in Rhode Island.  Narragansett provides such service pursuant to retail tariffs, and at rates and under terms and conditions that the Rhode Island Public Utilities Commission (the "Rhode Island Commission") approves and regulates.

5.      TransCanada is a power marketing company that sells electricity at wholesale to Narragansett.

6.      Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") were retail electric supply and distribution companies in Rhode Island, and were wholly-owned subsidiaries of the Eastern Utilities Associates ("EUA"), a public utility holding company.  EUA also owned Eastern Edison Company ("Eastern"), a retail electric supply and distribution company in Massachusetts, and Montaup Electric Company ("Montaup"), an affiliate of, and wholesale electricity supplier to, Blackstone, Newport and Eastern.

7.      The Rhode Island Commission and the Rhode Island Division of Public Utilities and Carriers possess the exclusive power and authority to supervise, regulate, and issue orders governing the conduct of companies that provide energy to the public.  They safeguard the public against improper and unreasonable rates and charges by providing full, fair, and adequate administrative procedures and remedies, and by securing a judicial review to any party aggrieved by such an administrative proceeding or ruling.  R.I. Gen. Laws § 39-1-1(c).

8.      On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement.  Pursuant to the Asset Purchase Agreement, TransCanada bought certain electricity

generation assets of Montaup, namely, a power purchase agreement ("PPA") between Montaup

and the Ocean State Power generation station located in Burrillville, Rhode Island. The purchase

was effectuated through a PPA Transfer Agreement. Also under the Asset Purchase Agreement,

TransCanada agreed to provide to Blackstone, Newport and Eastern a specific percentage share

of electric service that they needed to satisfy their electric supply obligations to their retail

standard offer service customers. The supply obligation was effectuated through a Wholesale

Standard Offer Service Agreement ("WSOS Agreement") with Blackstone, Newport, and

Eastern.

      9.      Under the WSOS Agreement, Blackstone, Newport and Eastern are to pay to

TransCanada a "Standard Offer Wholesale Price," which is defined as "the stipulated stream of

prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for

Delivered Energy" as set forth in an appendix to the WSOS Agreement. WSOS Agreement, Art.

1, at 3; Appendix A, at 16. The schedule of prices rises over time and more than doubles during

the ten-year term of the WSOS Agreement.

      10.     The WSOS Agreement also provides for the payment of a Fuel Adjustment Factor

("FAF") upon the occurrence and satisfaction a specific condition precedent. The FAF is

defined as:

> "... a cents per kilowatt-hour adder based on the incremental
> revenues collected, if any, attributed to the operation of the retail
> Rate Fuel Adjustment mechanism in the Companies' Standard
> Offer Service tariffs. The incremental revenues attributed to the
> retail Fuel Adjustment will be fully allocated to Suppliers in
> proportion to the Standard Offer Service energy provided by each
> Supplier for the applicable billing month through the Fuel
> Adjustment Factor. *The retail Fuel Adjustment, and the resulting*
> *Fuel Adjustment Factor to be paid to Supplier, will be made*
> *subject to regulatory approval and only to the extent that the*
> *Companies are allowed to collect such revenues from their retail*
> *customers taking Standard Offer Service.*"

WSOS Agreement, Art. 5, at 5-6 (emphasis added).

11.    The WSOS Agreement clearly spells out in the FAF clause that the FAF is only payable to TransCanada upon the occurrence of the Rhode Island Commission issuing a very specific approval for Blackstone's and Newport's retail tariffs, which govern the rates, terms and conditions of service to their standard offer service customers; namely, the inclusion of a Fuel Adjustment in the retail rates which allows Blackstone and Newport to collect an FAF payment from their retail customers who take service pursuant to the standard offer service tariff.

12.    Blackstone's and Newport's Rhode Island Commission-approved retail standard offer service tariffs did not contain a Fuel Adjustment for 1998 and 1999 and did contain a Fuel Adjustment for each year from 2000 through 2004.

13.    Effective May 1, 2000, Blackstone and Newport merged with and into Narragansett, and Eastern Edison merged with and into Massachusetts Electric Company ("Massachusetts Electric"), a retail electric distribution company in Massachusetts. Narragansett and Massachusetts Electric are wholly owned by National Grid USA ("National Grid"), a public utility holding company.

14.    Pursuant to the terms of the WSOS Agreement, TransCanada's and Massachusetts Electric's (as successor to Eastern) obligations that relate to service to Massachusetts Electric expired as of December 31, 2004. Accordingly, the only issues in controversy are those that arise in relation to service in Rhode Island and retail rates as approved by the Rhode Island Commission.

15.    The Rhode Island Commission approved the Narragansett-Blackstone and Newport merger (as well as the merger of their affiliates) in March of 2000 along with a rate settlement for the newly-merged entity and its customers. Order No. 16200, approving Third

10

Amended Stipulation and Settlement, March 24, 2000, Docket 2930. As a result, Narragansett

became the retail electric supplier and distribution company for Blackstone and Newport's

previous customers, in addition to its own existing customers.

     16.     On February 8, 2000, Narragansett's power supply manager informed

TransCanada via letter of the merger, explained the manner in which the WSOS Agreement

would be administered after the merger and stated that the WSOS Agreement was not being

modified in any way. The letter further stated that Narragansett would make FAF payments to

TransCanada consistent with the Blackstone and Newport tariffs that the Rhode Island

Commission had approved prior to the merger, and Eastern's approved tariffs in Massachusetts.

It attached a Fuel Adjustment schedule consistent with that set forth in Blackstone's and

Newport's retail standard offer service tariffs; that is, for each year from 2000 through 2004.

Narragansett sent this letter to TransCanada in draft form and asked that TransCanada review it.

     17.     TransCanada and Narragansett's representative discussed the letter. After

receiving no objection from TransCanada, on April 18, 2000, Narragansett's representative put

the draft letter in final form and sent it to TransCanada.

     18.     In June 2000, in a public proceeding before the Rhode Island Commission

concerning Narragansett's proposed retail standard offer service rates, Narragansett stated, on the

record, that the FAF for the former Blackstone and Newport wholesale standard offer service

agreements ("EUA Zone wholesale standard offer service agreements") would end after 2004.

Docket No. 3138. These agreements included the WSOS Agreement.

     19.     On May 28, 2003, in a public hearing before the Rhode Island Commission

regarding Narragansett's retail standard offer service rates, Narragansett told the Rhode Island

Commission that it was not obligated to make FAF payments under the EUA Zone wholesale

standard offer service contracts (which included the WSOS Agreement) after 2004. Docket No. 3508.

20.    In November 2003, Narragansett made a filing with the Rhode Island Commission which included a forecast that reflected zero FAF payments under the EUA Zone wholesale standard offer service contracts after 2004. Docket No. 3571.

21.    On July 1, 2004, Narragansett filed an application with the Rhode Island Commission to set its standard offer service rates effective as of October 1, 2004 based upon Narragansett's actual costs incurred through May 2004 and its estimated costs from June 1, 2004 through December 31, 2005. Consistent with the retail standard offer service tariffs that the Rhode Island Commission had approved for Blackstone and Newport, the FAF payments that Narragansett informed TransCanada it would continue to make upon the merger, and Narragansett's public statements to the Rhode Island Commission, this filing showed that the Narragansett's proposed retail standard offer service rates did not include an amount for an FAF to be paid under the EUA Zone wholesale standard offer service agreements (which include TransCanada under the WSOS Agreement.)

22.    The Rhode Island Commission approved Narragansett's standard offer service rates effective August 1, 2004 pursuant to an Open Meeting decision on July 26, 2004 and a written Order dated August 26, 2004. Order No. 17972 in Docket No. 3571. The approved rates did not include an amount for an FAF to be paid under the EUA Zone wholesale standard offer service agreements beyond December 31, 2004. Accordingly, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

23.    Likewise, on November 10, 2004, Narragansett made another filing relating to retail standard offer service. This filing was also publicly noticed. A Bench Decision at public

hearings on December 13, 2004, which was confirmed by a written Order issued February 17, 2005, approved Narragansett's filing, which was based on no FAF payments in relation to the EUA Zone wholesale standard offer service agreements (which include the WSOS Agreement.)

24.     Consistent with the foregoing, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.

25.     Narragansett at all times provided public notice of its filings and hearing dates in accordance with the rules and regulations of the Rhode Island Commission. All members of the public, including suppliers, are invited to participate through the public comment process at the Commission. Orders of the Rhode Island Commission are publicly available. In recent years, all of Narragansett's rate filings are posted on the Rhode Island Commission's website prior to the hearings, as are all Rhode Island Commission orders shortly after their issuance.

26.     On information and belief, TransCanada monitors these proceedings closely, but has never filed testimony or otherwise commented to the Rhode Island Commission or Narragansett (or its affiliates) as to whether Narragansett should request the Commission to approve an FAF after 2004.

27.     On March 1, 2005, TransCanada sent a letter to Narragansett, (a) claiming that Narragansett was in default of the WSOS Agreement by not providing for an FAF in its calculations; (b) asserting that Narragansett was in breach by its "[refusal] to comply with its obligations under Article V before the Rhode Island Public Utilities Commission with respect to its Standard Offer Service tariffs"; and (c) threatening to terminate the WSOS Agreement.

28.     TransCanada's reference to Narragansett's lack of inclusion of an FAF in its calculations apparently refers to the calculations Narragansett performs prior to issuing payment. Narragansett's calculation was accurate because TransCanada was not entitled to a payment for

an FAF: the retail standard offer service rates did not include a Fuel Adjustment payment in relation to the WSOS Agreement.

29.    TransCanada's assertion regarding obligations under Article V (sic) appears to infer that Narragansett had an affirmative obligation to take an action before the Rhode Island Commission; however, the WSOS Agreement contains no such obligation.

30.    TransCanada's threat to terminate the WSOS Agreement is without cause and would itself constitute a breach of the WSOS Agreement.

31.    At no point prior to March 1, 2005 did TransCanada provide Narragansett with a written notice of a dispute as required by the WSOS Agreement. The WSOS Agreement states: "If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date." WSOS Agreement, Art. 6, at 6.

32.    TransCanada's purported notice of default was baseless, and was accompanied by threats to terminate the Agreement. Its action was a pretext to enable TransCanada to avoid performing a contract that  was no longer economically advantageous to TransCanada, whether or not fuel payments were made.

33.    A TransCanada termination of the WSOS Agreement would not be justified, and would constitute a material breach; however, in order to preserve the benefit of the WSOS Agreement for its customers, and to deny TransCanada its pretextual argument for termination, Narragansett has paid to TransCanada, under protest, and with a full reservation of rights, a total of $921,827.46. The payments were based upon a calculation using the FAF that had been approved by the Rhode Island Commission for recovery in rates through, but not after, December 31, 2004. The payments relate to the period of January 1 through March 31, 2005.

14

34.     TransCanada had knowledge and notice of Narragansett's intention not to seek

Commission approval for recovery of FAF payments from its customers after 2004, and it never

objected at any point in time prior to early 2005. TransCanada's subsequent threat to terminate

the WSOS Agreement constitutes an attempt to extort payments from Narragansett that are not

due under WSOS Agreement.

## COUNT I
## (BREACH OF CONTRACT)

35.     Narragansett repeats and realleges paragraphs 1 through 34 as stated above.

36.     TransCanada has demanded FAF payments from Narragansett that it is not

entitled to under the WSOS Agreement, and has threatened to terminate the WSOS Agreement

without cause, in order to avoid performing an agreement that is no longer economically

advantageous to TransCanada, with or without FAF payments.

## COUNT II
## (DECLARATORY JUDGMENT)

37.     Narragansett repeats and realleges paragraphs 1 through 36 as stated above.

38.     TransCanada has threatened to terminate the WSOS Agreement even though

TransCanada has no right to do so and no right to an FAF after 2004. Therefore, an actual

controversy exists as to whether TransCanada has a right to terminate the WSOS Agreement.

## COUNT III
## (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)

39.     Narragansett repeats and realleges paragraphs 1 through 38 as stated above.

40.     TransCanada has breached its obligation of good faith and fair dealing by: (a)

failing to object at any point in time prior to March 2005 to Narragansett's stated intention to not

provide in rates for collection of FAF payments from customers after 2004; (b) notifying

Narragansett for the first time in early 2005 of TransCanada's expectation that Narragansett had

an obligation to take an action before the Rhode Island Commission and its expectation that

Narragansett was required to make such payments even absent approval to collect such costs in

rates; and (c) threatening to terminate the WSOS Agreement as a pretext in order to avoid a

contract that had become economically disadvantageous to TransCanada even with fuel

payments.

REQUESTS FOR JUDGMENT

WHEREFORE, Defendant and Counterclaim Plaintiff Narragansett seeks judgment as

follows:

1.     Dismissing the claims of TransCanada in their entirety with prejudice;

2.     Awarding Narragansett compensatory damages for all damages caused by

TransCanada's breach of contract, plus interest and costs;

3.     Declaring that TransCanada has breached its obligation of good faith and fair

dealing;

4.     Declaring, pursuant to R.I. Gen. Laws § 9-30-2, that TransCanada does not have a

right to terminate the WSOS Agreement; and for

5.     Such other relief as the Court deems just and proper under the circumstances.

**NARRAGANSETT DEMANDS A TRIAL BY JURY ON ALL CLAIMS AND
COUNTERCLAIMS.**

THE NARRAGANSETT ELECTRIC COMPANY
By its Attorneys,

/s/ Vincent F. O'Rourke, Jr.
Michael P. Angelini (BBO#019340)
Vincent F. O'Rourke, Jr. (BBO#380335)
Bowditch & Dewey, LLP
311 Main Street. P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated:  June 7, 2005

{J:\CLIENTS\lit\304810\0001\00547646.DOC;1}

16

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| TRANSCANADA POWER  MARKETING LTD.<br><br>Plaintiff,<br><br>v.<br><br>NARRAGANSETT ELECTRIC COMPANY<br><br>Defendant, | )<br>)<br>)<br>)<br>)<br>)      C.A. No. 05-40076FDS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF TRANSCANADA POWER MARKETING LTD.'S
## FIRST SET OF DOCUMENT REQUESTS

Pursuant to Fed. R. Civ. P. 34, plaintiff TransCanada Power Marketing Ltd.

("TransCanada" or "plaintiff") submits these requests for documents and things to defendant

Narragansett Electric Company ("Narragansett").  Narragansett must produce the following

documents and things at the office of Choate, Hall & Stewart, Exchange Place, 53 State Street,

Boston, MA  02109, within 30 days of service of these requests.


## DEFINITIONS

1.      These document requests incorporate the definitions provided in Local Rule 26.5.

2.      The term "you," "your" or "Narragansett" means the defendant Narragansett

Electric Company, its predecessors (including Old Narragansett, Blackstone, and Newport as

defined below), successors in interest, affiliates, and divisions, and each of its and their officers,

directors, attorneys, agents (including but not limited to National Grid Service Corporation, EUA

1

Service Corporation and similar affiliates or agents), employees, and any other entity acting on its or their behalf.

      3.      The term "Blackstone" means Blackstone Valley Electric Company, its predecessors, affiliates, divisions, and each of its and their officers, directors, attorneys, agents (including but not limited to EUA Service Corporation and similar affiliates or agents), employees, and any other entity on its or their behalf.

      4.      The term "Newport" means Newport Electric Company, its predecessors, affiliates, divisions, and each of its and their officers, directors, attorneys, agents (including but not limited to EUA Service Corporation and similar affiliates or agents), employees, and any other entity on its or their behalf.

      5.      The term "Eastern" means Eastern Edison Company, its predecessors, divisions, and each of its and their officers, directors, attorneys, agents (including EUA Service Corporation and similar affiliates or agents), employees, and any other entity on its or their behalf.

      6.      The term "Montaup" means Montaup Electric Company, its predecessors, successors in interest, affiliates, and divisions, and each of its and their officers, directors, attorneys, agents (including EUA Service Corporation and similar affiliates or agents), employees, and any other entity on its or their behalf.

      7.      "EUA Service Corporation" means Eastern Utilities Service Corporation, its predecessors, divisions, and each of its and their officers, directors, attorneys, agents, employees, and any other entity on its or their behalf.

2

8.     "National Grid Service Corporation" means National Grid Service Corporation, its predecessors, successors in interest, affiliates, and divisions, and each of its and their officers, directors, attorneys, agents, employees and any other entity on its or their behalf.

9.     The term "EUA Companies" shall refer collectively to Blackstone, Newport, Eastern, Montaup, EUA Service Corporation, Eastern Utilities Associates and any affiliate entity.

10.    The term "NEES" shall refer to New England Electric System (NEES), a public utility holding company incorporated in Massachusetts, and its successors in interest.

11.    The term "Merger" shall refer to the event in 2000 where Blackstone and Newport merged, and their affiliates, into Narragansett Electric Company and its affiliates.

12.    The terms "Pre-Merger Narragansett" or "Old Narragansett" shall refer to the Narragansett corporate entity before it merged with Blackstone and Newport in 2000, and all predecessors and divisions, and each of its and their officers, directors, attorneys, agents, employees and any other entity on its or their behalf.

13.    The term "EUA Zone" shall mean the area of Rhode Island in which Blackstone and Newport provided electricity prior to the Merger.

14.    The term "Old Narragansett Zone" shall mean the area of Rhode Island in which Old Narragansett provided electricity prior to the Merger.

15.    The term "TransCanada" means the plaintiff TransCanada Power Marketing Ltd., its predecessors, successors in interest, corporate affiliates and divisions, and each of its and their officers, directors, attorneys, agents, employees, and any other entity acting on its or their behalf.

16.    The term "RIPUC" means the state of Rhode Island Public Utilities Commission.

3

17.    The term "Division" means the state of Rhode Island Attorney General's Office Division of Public Utilities and Carriers.

18.    The term "FERC" refers to the Federal Energy Regulatory Commission.

19.    The term "the RI Settlement Agreement" means the Stipulation and Agreement entered into by Montaup, Blackstone, Newport, the RIPUC, and the Division on or around October 17, 1997 and filed with FERC.

20.    The term "MA Settlement Agreement" means the Stipulation and Agreement entered into by Montaup, Eastern, and Massachusetts regulatory authorities on or around October 17, 1997 and filed with FERC.

21.    The term "Narragansett Settlement Agreement" means the Stipulation and Agreement entered into by Old Narragansett, the New England Power Company, the RIPUC and the Division on or around May 30, 1997 and filed with FERC.

22.    The term "Settlement Agreements" shall collectively refer to the RI Settlement Agreement, the MA Settlement Agreement and the Narragansett Settlement Agreement.

23.    The term "URA" means the Rhode Island Utility Restructuring Act, passed in 1996.

24.    The term "Standard Offer Service" refers to retail electric service that was required to be provided to Rhode Island consumers at regulated prices by the Rhode Island Utility Restructuring Act of 1996, by the Settlement Agreements, and by the RIPUC.

25.    The term "Asset Purchase Agreement" refers to the Asset Purchase Agreement entered into by TransCanada and Montaup on April 7, 1998.

26.    The term "WSOS Agreement" refers to the Wholesale Standard Offer Service Agreement entered into by TransCanada, Blackstone, Newport and Eastern on April 7, 1998.

4

27.    The "Fuel Adjustment Factor" refers to the fuel index that is set forth in Article V of the WSOS Agreement.

### Instructions

A.    Please note specifically that the recipient of these discovery requests, Narragansett, and the term "Narragansett," is defined herein to include Narragansett and all its predecessors and affiliates (e.g., EUA Companies and Old Narragansett).

B.    In construing any document request, the singular form of a word shall be interpreted as plural and the plural as singular as necessary to bring within the scope of the request any information or documents that might otherwise be construed to be outside its scope.

C.    In construing any document request, whenever appropriate, "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information that might otherwise be construed to be outside its scope; and "all" shall mean "any and all" unless the context requires otherwise.

D.    Each document request shall be construed independently and not with reference to any other request herein for purposes of limitation, unless a request so specifies.

E.    With respect to each document or thing that Narragansett is unwilling to produce for inspection and copying because the document or thing is asserted to be protected by an attorney-client privilege or work product immunity or otherwise not subject to production, state separately:

    1.    the date of the document or thing;
    2.    the names of the author or addressor of the document or thing;
    3.    the names of all recipients or addressees of the document or thing;
    4.    the name and address of each person having possession, custody or control of the document or thing;
    5.    a brief description of the nature and the subject matter of the document or thing; and
    6.    the grounds for non-production.

5

3945093v3

F.    TransCanada requests that Narragansett produce the responsive documents and things either as they are kept in the usual course of business, or organized and labeled to correspond to the categories in these requests. If there are no documents or things responsive to any particular request, Narragansett shall so state in writing in its response.

G.    Each request calls for production of each document and thing in its entirety, without abbreviation, redaction, expurgation, or modification.

H.    Each request seeks production of all documents and things described, along with any addenda, attachments, drafts, and nonidentical copies, as found or located in business files, together with a copy of the descriptive file folder or database category in its entirety.

I.    If Narragansett objects to any request made herein as unduly broad, Narragansett should identify the categories of documents within the scope of the request that it believes are properly discoverable, should produce all such documents, and should state, with particularity, its reason for asserting that the remainder of the request seeks documents that are beyond the scope of permissible discovery.

J.    This request for documents shall be deemed continuing so as to require prompt supplemental responses in accordance with Federal Rule of Civil Procedure 26(e) if, between the date hereof and time of hearing or trial, any additional documents responsive to this request come into Narragansett's possession, custody or control or the possession, custody or control of Narragansett's agents or representatives, including but not limited to any attorneys, accountants and advisors. Narragansett is requested to produce any such additional documents within five (5) days of their coming into Narragansett's possession, custody or control or the possession, custody or control of Narragansett's agents or representatives. If any such additional documents or any portion thereof are withheld from production upon a claim of privilege or for any other

6

reason, Narragansett is requested promptly to serve upon TransCanada a written identification of each such document or portion of a document, setting forth the information described in Instruction E hereof.

## REQUESTS FOR DOCUMENTS AND THINGS

1.    All documents identified in Narragansett's Initial Disclosures served pursuant to Fed. R. Civ. P. 26(a) (the "Disclosures") in this action.

2.    All documents identified in Narragansett's responses to TransCanada's First Set of Interrogatories or evidencing the answers thereto.

3.    All documents concerning the URA (including specifically as originally enacted and amended through 1998) and the legislative history of same, including but not limited to documents concerning the terms "standard offer pricing" and "extraordinary fuel costs."

4.    All documents concerning consideration, analyses or financial projections related to Narragansett's, NEES's, or the EUA Companies' Standard Offer Service obligations, related "backstop" obligations, or other obligations under the URA (as enacted or amended) or Settlement Agreements, as anticipated or as implemented.

5.    All documents concerning the anticipated and actual Merger, including but not limited to concerning Standard Offer Service and rate filing obligations anticipated or implemented after or relating to the Merger.

6.    All documents concerning communications between the EUA Companies and any of Old Narragansett/NEES, RIPUC, FERC, the Division or any other person (including public announcements) regarding the URA, the Settlement Agreements, Standard Offer Service or any related agreements or obligations prior to or after the Merger.

7

7.      All documents concerning communications before January 1, 1999 between Old Narragansett/NEES and any of the EUA Companies, RIPUC, FERC, the Division or any other person (including public announcements) regarding the URA, the Settlement Agreements, Standard Offer Service or any related agreements or obligations prior to or after the Merger.

8.      All documents concerning the Narragansett Settlement Agreement, and the drafting and negotiation of same, including all documents in the EUA Companies' possession regarding same.

9.      All documents concerning the RI Settlement Agreement, and the drafting and negotiation of same.

10.     All documents concerning the MA Settlement Agreement, and the drafting and negotiation of same.

11.     All documents concerning the Service Agreement between Montaup and Blackstone/Newport, preceding and as amended in the RI Settlement Agreement.

12.     All documents concerning so called "backstop" Standard Offer Service obligations (and the pricing of the same) in the RI Settlement Agreement and the Narragansett Settlement Agreement, including but not limited to financial projections, internal analyses, memoranda, emails and correspondence.

13.     All documents concerning any Request for Qualifications to Bid, Requests for Proposals, or any other formal or informal offers or solicitations related to divestiture of assets, Standard Offer Service, or other implementation of the URA or Settlement Agreements by the EUA Companies, including all correspondence with potential or actual bidders or interested parties.

8

14.     All documents concerning any Request for Qualifications to Bid, Requests for Proposals, or any other formal or informal offers or solicitations related to divestiture of assets, Standard Offer Service, or other implementation of the URA or Settlement Agreements by Old Narragansett, including all correspondence with potential or actual bidders or interested parties.

15.     All documents concerning the drafting, negotiation and terms of any Standard Offer Service contracts for the EUA Zone with suppliers other than TransCanada, and any amendments thereto, including the Agreements themselves.

16.     All documents and files of Lawrence Boisvert, John Carney, Robert Clarke, Peter Fuller, Michael Hirsh, Robert Powderly, Donald Ryan, Dennis St. Pierre and Kevin Kirby concerning: the negotiation of the WSOS Agreement; the administration of the WSOS Agreement; payment of the Fuel Adjustment Factor; Standard Offer Service rate filings and testimony with the RIPUC; the Settlement Agreements; the EUA Companies' implementation of the URA and Settlement Agreements with respect to Standard Offer Service; RFQs, RFPs or other bids or solicitations involving in any way Standard Offer Service; or that are otherwise responsive to those document requests, including all emails and personal notes.

17.     All RFQs, RFPs or other bids or solicitations involving in any way Standard Offer Service or replacement Standard Offer Service from 1996 to the present, including but not limited to any RFQs, RFPs or other bids or solicitations arising from the inability of NRG Energy, Inc. to supply Standard Offer service electricity in Massachusetts or Rhode Island.

18.     All documents concerning communications between Narragansett (again, including all predecessors) and any Standard Offer Service supplier in the EUA Zone regarding pricing for Standard Offer Service and/or any fuel adjustment.

3945093v3

19.    All documents concerning communications with FERC, RIPUC, the Division, or any person regarding fuel adjustments in the EUA Zone.

20.    All financial projections prepared at any time concerning divestiture of generation assets or Standard Offer Service in the EUA.

21.    All documents concerning analyses performed related to the Merger regarding Standard Offer Service or retail tariffs in the EUA or Old Narragansett Zone and the treatment of said tariffs post-Merger, including, but not limited to, applicability of a Fuel Adjustment Factor after 2004 in the EUA Zone.

22.    All documents concerning the preparation and filing of Standard Offer Service or retail tariffs or Standard Offer Service pricing in the EUA and Old Narragansett Zones, including copies of all tariff filings, drafts and related memoranda and correspondence.

23.    All wholesale or other electricity supply agreements, including drafts of such agreements,  by and between any of the EUA Companies and any other entity executed prior to January 1, 1999.

24.    All documents concerning the WSOS Agreement and Asset Purchase Agreement, including all documents concerning the negotiation, preparation, evaluation and review thereof.

25.    All documents concerning the negotiations, drafting, and terms of Standard Offer Service contracts with TransCanada in the Old Narragansett Zone.

26.    All documents concerning Standard Offer Service or its pricing and any fuel adjustments or triggers applicable in the Old Narragansett Zone, including public announcements and communications with the EUA Companies, FERC, RIPUC, the Division, potential Standard Offer Service suppliers or any other person, prior to January 1, 1999.

3945093v3

27.    All documents concerning Standard Offer Service or its pricing and any fuel adjustments or triggers applicable in the EUA Zone, including public announcements and communications with the Old Narragansett Zone, FERC, RIPUC, the Division, potential Standard Offer Service supplies or any other person.

28.    All documents concerning the original drafting and revision of the WSOS Agreement and all previous versions, including drafts of previous versions of that Agreement or portions thereof that appeared in the RI Settlement Agreement or in preceding RFQ's, RFP's or other proposals or requests for Standard Offer Service providers in the EUA Zone.

29.    All documents concerning communications by and between and any person, including but not limited to the RIPUC and the Division, concerning the WSOS Agreement and Asset Purchase Agreement.

30.    All documents concerning the administration of the WSOS Agreement and payment of a Fuel Adjustment Factor under the WSOS Agreement.

31.    All documents concerning the applicability (or non-applicability) of the Fuel Adjustment Factor after 2004.

32.    All documents and files of Michael Hager concerning:  the WSOS Agreement; TransCanada; Standard Offer Service; related rate filings before the RIPUC; fuel adjustments and Standard Offer Service pricing; and the Merger, or that are otherwise responsive to these document requests, including all emails and personal notes.

33.    All documents concerning written or oral testimony before the RIPUC concerning Standard Offer Service and retail rate filings and the preparation for same, including draft testimony, internal communications, memoranda, emails and notes.

11

34.    All documents concerning consideration of whether, and the decision not, to seek approval of a Fuel Adjustment Factor after 2004.

35.    All documents concerning the preparation, negotiation and drafting of the April 18, 2000 letter from Michael Hager to Sean McMaster.

36.    All documents concerning analysis of or use of fuel adjustments generally in electrical supply contracts.

37.    All documents concerning communications with TransCanada, including, without limitation, internal notes or memoranda, correspondence, e-mails, memoranda, presentations and proposals.

38.    All organization charts of Narragansett from 1996 to the present.

39.    All organization charts of each of the EUA Companies from 1996 to 2000.

40.    A complete copy of each document retention policy (for paper or electronic files) adopted or instituted by Narragansett, or in effect at Narragansett at any time from January 1, 1996 to the present.

3945093v3

41.    All documents concerning the documents or files of any of the EUA Companies, and retention of treatment of the same, including indexes, memoranda, communications, or policies or notes.

Respectfully submitted,

TRANSCANADA POWER MARKETING

By its attorneys,

Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
Dara Y. Zelnick (BBO# 660256)
**CHOATE, HALL & STEWART LLP**
2 International Place
Boston, MA  02110
Telephone No. (617) 248-5000
Fax No. (617) 248-4000

Dated:  August 26, 2005

13

3945093v3

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

Civil Action No. 05-40076FDS

|  |  |
|---|---|
| TRANSCANADA POWER MARKETING LTD. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE NARRAGANSETT ELECTRIC COMPANY | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT THE NARRAGANSETT ELECTRIC COMPANY'S
RESPONSES TO PLAINTIFF TRANSCANADA POWER MARKETING LTD.'S
FIRST SET OF DOCUMENT REQUESTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant The Narragansett

Electric Company ("Narragansett") responds to Plaintiff TransCanada Power Marketing Ltd.'s

("TransCanada") First Set of Document Requests as follows:

INTRODUCTION

This dispute centers upon construction of Narragansett's obligations under a written

contract for Narragansett's purchase of electricity from TransCanada for distribution to retail

consumers of electricity in Rhode Island.   Specifically, this dispute focuses upon the obligations

under the Fuel Adjustment Factor ("FAF") clause in the parties' Wholesale Standard Offer

Service Agreement ("WSOSA").  The dispute relates to the period from and after January 1,

2005.

The parties' contract, the WSOSA, is clear that Narragansett's obligation to pay to

TransCanada an FAF only applies if regulatory approval of a fuel adjustment factor to be paid to

TransCanada is received. That condition precedent has not been met. Further, it is clear that Narragansett had and has no obligation to request approval of an FAF from the Rhode Island Public Utility Commission ("RIPUC") for any time period beyond that which RIPUC initially approved. The documents concerning this contract, including its negotiation, administration, and the obligations under the FAF clause are relatively few.

In contrast, many of TransCanada's forty-one document requests, literally taken, would require Narragansett to search hundreds of thousands of documents dating back more than eight years in order to locate scores of documents concerning far-reaching topics such as entire statutory schemes, the entire merger between Narragansett and several Rhode Island predecessors, all asset divestitures, and other contracts with other providers including those in other states. Not only would it be impracticable, if not impossible, for Narragansett to answer some of these requests as written, but it would be prohibitively expensive and time consuming, while in the end leading to production- probably six months or more in the future- of tens of thousands documents which shed no light on whether or not Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period beyond 2004.

At the same time, Narragansett is mindful of its disclosure obligations and desires to be responsive and cooperative in the discovery process with TransCanada. It is for this reason that Narragansett endeavors within this response to set forth with particularity its objections and to narrow and identify those categories of documents which are appropriate within the scope of the dispute. Narragansett welcomes discussion with TransCanada regarding this response and the scope of the requests.

## GENERAL RESPONSES AND OBJECTIONS

1.    Narragansett is committed to the speedy production of all documents which are relevant to this dispute and responsive to TransCanada's request, subject only to the limitations of privilege, protection of confidential business information, and also to practicality, given the vast scope of the document requests propounded by TransCanada.   To that end, Narragansett makes the following general responses and objections.

2.    Without admitting that any of the documents requested are relevant to the subject matter of this action or that the production of said documents would be reasonably calculated to lead to the discovery of admissible evidence or that said documents exist or that said documents are within the custody or control of Narragansett, Narragansett will make appropriate documents available for inspection and copying at the office of Bowditch & Dewey, LLP in Worcester, Massachusetts at a mutually agreeable date and time.  Narragansett is endeavoring in good faith to produce to TransCanada all such documents in the most expeditious and efficient manner possible, and such documents are currently being identified and culled from literally hundreds of thousands of other documents covering an eight-year time period, then prepared by an outside vendor for electronic organization and storage.  Narragansett currently expects that this process will be completed within approximately two months, but that batches of documents will be produced as they become available during this period.

3.    Narragansett objects to any requests for documents which fall beyond the scope of permitted discovery as defined by Rule 26 of the Federal Rules of Civil Procedure.  More particularly, Narragansett will not produce documents which are privileged or which were prepared in anticipation of litigation or for trial by or for Narragansett or by or for any of its representatives. Additionally, Narragansett objects to TransCanada's requests to the extent that

they are irrelevant, unduly burdensome, vague and ambiguous, or purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure.

4.    Where Narragansett objects to TransCanada's requests on the basis that they are irrelevant, unduly burdensome, vague and ambiguous, and/or not reasonably calculated to lead to admissible evidence because, among other reasons, they seek information which is either (a) outside of Narragansett's knowledge, custody or control; (b) not limited in either time and/or scope; or (c) undefined and / or unclear, vague or ambiguous, Narragansett has endeavored in good faith to ascertain and state a construction of each such request in order to be able to provide a substantive response beyond objection, and to be able to provide TransCanada with responsive documents.

5.    Narragansett further objects to each request to the extent that it seeks confidential, proprietary business information of Narragansett. Even where a response may state that "responsive documents will be produced," such portion(s) of responsive documents which are confidential, proprietary business information of Narragansett will not be produced except upon the entry of an appropriate confidentiality order by the Court.

6.    Narragansett is also prepared to enter into an appropriate stipulation pertaining to the return and handling of privileged and/or confidential documents which may be inadvertently produced by either side. As such, Narragansett expressly reserves the right to retract any such documents and to request that any and all copies of such documents be destroyed. Such inadvertent production does not waive Narragansett's assertion of its claim to privilege or confidentiality.

7.    The following responses to specific requests hereby incorporate and are made subject to and without waiving these general responses and objections. The statement that

for inspection and copying as described herein to the extent they can be located, but is not an

acknowledgment or representation that such documents have been located.

DOCUMENTS REQUESTED

REQUEST 1:    All documents identified in Narragansett's Initial Disclosures served

pursuant to Fed. R. Civ. P. 26(a) (the "Disclosures") in this action.

RESPONSE 1:  Responsive documents will be produced.

REQUEST 2:  All documents identified in Narragansett's responses to TransCanada's

First Set of Interrogatories or evidencing the answers thereto.

RESPONSE 2:  Responsive documents will be produced.

REQUEST 3:  All documents concerning the URA (including specifically as originally

enacted and amended through 1998) and the legislative history of same, including but not limited

to documents concerning the terms "standard offer pricing" and "extraordinary fuel costs."

RESPONSE 3:  Narragansett objects to Request numbered 3 as it is overbroad, overly

burdensome, irrelevant, vague and ambiguous, and not calculated to lead to admissible evidence,

and seeks information which is outside of Narragansett's knowledge, custody or control and

which is equally available to TransCanada within the public domain.   By this request,

TransCanada seeks a copy of the Rhode Island Utility Restructuring Act ("URA"), a public

statute passed by the Rhode Island Legislature which is available to the general public by a

variety of databases, "all documents concerning the URA," together with an undefined and

unlimited "legislative history" of the URA. This request is well beyond the limits of reasonable

discovery requests, particularly given that such documents are either as readily available to

-5-

TransCanada as to Narragansett and/or are not relevant to this contract dispute. Narragansett is prepared to discuss this request with TransCanada, and urges TransCanada to reconsider this request. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request.

REQUEST 4: All documents concerning consideration, analyses or financial projections related to Narragansett's NEES's or the EUA Companies' Standard Offer Service obligations, related "backstop" obligations, or other obligations under the URA (as enacted or amended) or Settlement Agreements, as anticipated or as implemented.

RESPONSE 4: Narragansett objects to Request numbered 4 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks scores of documents pertaining to broad topics, most of which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In contrast, TransCanada's request, literally taken, would require Narragansett to search tens, if not hundreds, of thousands of documents dating back more than eight years to locate all documents concerning all analyses related to the broad topics of Standard Offer Service "or other obligations under the URA" or "Settlement Agreements," presumably including those in other states. Asking for all documents pertaining to all obligations under a statutory scheme is impracticable, if not impossible, to answer and would be prohibitively expensive and time consuming, while in the end leading to production- probably six months or more in the future- of

documents which shed no light on Narragansett's obligation to pay an FAF to TransCanada past 2004 or otherwise reimburse or indemnify TransCanada.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking any documents concerning analyses or financial projections by EUA or Narragansett concerning the WSOSA or the FAF thereunder.   As construed, responsive documents will be produced.

REQUEST 5:  All documents concerning the anticipated and actual Merger, including but not limited to concerning Standard Offer Service and rate filing obligations anticipated or implemented after or relating to the Merger.

RESPONSE 5:  Narragansett objects to Request numbered 5 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and as it in part seeks documents which are equally available to TransCanada within the public domain.

By this request, TransCanada seeks "all documents concerning the anticipated and actual Merger" in 2000 whereby Blackstone Valley Electric Company and Newport Electric Company, together with each of their affiliates, merged into Narragansett and its affiliates.  Simply put, if construed as written, this request would require production of literally tens of thousands, if not hundreds of thousands, of pages of documents, most of which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few.   In contrast, if this request were construed as written, it would require Narragansett to search hundreds of thousands of documents spread across nearly every office of National Grid (the parent company of Narragansett), including the files and work stations of nearly every employee of National Grid.  Such a search would be impracticable, if not impossible, and would be prohibitively expensive and time consuming, while in the end leading to production- probably six months or more in the future- of documents which shed no light on whether or not Narragansett has an obligation to pay an FAF even though it has not been approved by the regulators and even though there is no obligation in the FAF clause in the parties' WSOSA to request such approval.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking any documents from the Merger which concern the WSOSA, the FAF, and/or Narragansett's rate filing obligations concerning the FAF after the Merger.   As construed, responsive documents will be produced.

REQUEST 6:  All documents concerning communications between the EUA Companies and any of Old Narragansett/NEES, RIPUC, FERC, the Division or any other person (including public announcements) regarding the URA, the Settlement Agreements, Standard Offer Service or any related agreements or obligations prior to or after the Merger.

RESPONSE 6:  Narragansett objects to request numbered 6 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which

may be equally available to TransCanada within the public domain. Read literally, this request seeks all communications by anybody at any time, including with a number of public agencies, concerning an entire statutory scheme in Rhode Island (the URA), Standard Offer Service (anywhere), and an undefined universe of "agreements or obligations" from the beginning of time through the present. Not only is the universe of potential communications endless, it is also unknown and unknowable to Narragansett. Seeking all communications between anyone at anytime concerning undefined "agreements or obligations," expressly including communications by and between RIPUC, FERC and the Division, calls for documents which are outside of Narragansett's realm of knowledge, custody or control and which are not properly delineated by either scope or time parameters.

Moreover, to the extent this request seeks communications pertaining to the URA, Settlement Agreement and Standard Offer Service, in general, it is overbroad. The WSOSA is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In contrast, this request seeks documents pertaining to documents (and statutes) far outside the parameters of the parties' WSOSA and which do not reflect the parties' negotiations with respect to the WSOSA. They are irrelevant to this dispute.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all written communications or oral communications memorialized in writing between Narragansett and FERC, RIPUC, the Division or TransCanada concerning the administration of the WSOSA and the payment to TransCanada of an FAF after 2004. As construed, responsive documents will be produced.

REQUEST 7: All documents concerning communications before January 1, 1999 between Old Narragansett/NEES and any of the EUA Companies, RIPUC, FERC, the Division or any other person (including public announcements) regarding the URA, the Settlement Agreements, Standard Offer Service or any related agreements or obligations prior to or after the Merger.

RESPONSE 7: This request appears to be identical to request numbered 6 in all respects except for the date restriction to "before January 1, 1999." If there is a distinction, Narragansett welcomes clarification. Unless or until such clarification is received, Narragansett respectfully refers to and incorporates herein its response to request numbered 6.

REQUEST 8: All documents concerning the Narragansett Settlement Agreement, and the drafting and negotiation of same, including all documents in the EUA Companies' possession regarding same.

RESPONSE 8: Narragansett objects to Request numbered 8 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to agreements outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In contrast, this request would require Narragansett to search thousands of documents dating back to more than eight years to locate all documents concerning a Settlement Agreement which is not the subject of the dispute and which is, in large part, a public document. Accordingly, no

documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 9: All documents concerning the RI Settlement Agreement, and the drafting and negotiation of same.

RESPONSE 9: Narragansett objects to Request numbered 9 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to an agreement outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In contrast, this request would require Narragansett to search tens of thousands of documents dating back more than eight years to locate all documents concerning a Settlement Agreement which is not the subject of the dispute and which is, in large part, a public document. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 10: All documents concerning the MA Settlement Agreement, and the drafting and negotiation of same.

RESPONSE 10: Narragansett objects to Request numbered 10 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to agreements outside of the parties' contract, which would be completely irrelevant to the dispute

over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In contrast, this request would require Narragansett to search tens of thousands of documents to locate all documents concerning a Massachusetts Settlement Agreement which is not the subject of the dispute, which is, in large part, a public document, and which is not relevant to application of any FAF in the tariffs administered by the RIPUC, pursuant to RIPUC regulations and Rhode Island laws. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 11: All documents concerning the Service Agreement between Montaup and Blackstone/Newport, preceding and as amended in the RI Settlement Agreement.

RESPONSE 11: Narragansett objects to Request numbered 11 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to agreements outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the applicability of the FAF in this contract are relatively few. In contrast, this request would require Narragansett to search tens of thousands of documents dating back more than eight years, including Montaup, Blackstone and Newport, to locate all documents concerning a Service Agreement which is not the subject of the dispute and

which is, in large part, a public document. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 12: All documents concerning so called "backstop" Standard Offer Service obligations (and the pricing of the same) in the RI Settlement Agreement and the Narragansett Settlement Agreement, including but not limited to financial projections, internal analyses, memoranda, emails and correspondence.

RESPONSE 12: Narragansett objects to Request numbered 12 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to agreements outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In contrast, this request would require Narragansett to search thousands of documents dating back more than eight years to locate all documents concerning Settlement Agreements which are not the subject of the dispute and which are, in large part, public documents. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 13: All documents concerning any Request for Qualifications to Bid, Request for Proposals, or any other formal or informal offers or solicitations related to divestiture of assets, Standard Offer Service, or other implementation of the URA or Settlement

Agreements by the EUA Companies, including all correspondence with potential or actual bidders or interested parties.

RESPONSE 13:  Narragansett objects to Request numbered 13 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to agreements outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the applicability of the FAF in this contract are relatively few.  In contrast, this request would require Narragansett to locate and search many documents dating back more than eight years to locate all documents concerning RFPs which are not the subject of the dispute.   In fact, seeking "all documents concerning any Request for Qualifications to Bid, Request for Proposals, or any other formal or informal offers or solicitations related to ... implementation of the URA or Settlement Agreements by the EUA Companies," is an overbroad request, which implicates hundreds of thousands of pages of documents about the implementation of an entire statutory scheme by any of the EUA predecessors of Narragansett.

Furthermore, this request seeks documents concerning TransCanada's competitors and documents pertaining to Narragansett's communications with TransCanada's competitors, which contain highly sensitive confidential and proprietary business information. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all documents concerning TransCanada's own

bids and EUA's RFP concerning the divestiture of assets that were tied to the WSOSA, including all correspondence with TransCanada as a potential or actual bidder or interested party. As construed, responsive documents will be produced.

REQUEST 14: All documents concerning any Request for Qualifications to Bid, Request for Proposals, or any other formal or informal offers or solicitations related to divestiture of assets, Standard Offer Service, or other implementation of the URA or Settlement Agreements by Old Narragansett, including all correspondence with potential or actual bidders or interested parties.

RESPONSE 14: Narragansett objects to Request numbered 14 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to agreements outside of the parties' contract, are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause in this contract are relatively few. In contrast, this request would require Narragansett to locate and search all documents concerning RFPs which are not the subject of the dispute.

Furthermore, this request seeks documents concerning TransCanada's competitors and documents pertaining to Narragansett's communications with TransCanada's competitors, which contain highly sensitive confidential and proprietary business information. Further, this request seeks documents which pertain to Old Narragansett, which, at the time of negotiating and entering into the WSOSA, was a separate entity with distinct tariffs and rate setting mechanisms,

-15-

serving a distinct geographic territory, separate and apart from EUA and EUA's rate setting

mechanisms for a distinct geographic territory. Standard Offer Service agreements of Old

Narragansett are not probative of the instant dispute. Notwithstanding and without waiving this

objection, in order to provide a substantive and helpful response, Narragansett construes this

request as seeking all documents concerning TransCanada's own bid and EUA's RFP concerning

the divestiture of assets that was tied to the WSOSA, including all correspondence with

TransCanada as a potential or actual bidder or interested party. As construed, this request is

identical to request numbered 13 and responsive documents will be produced accordingly.

REQUEST 15: All documents concerning the drafting, negotiation and terms of any

Standard Offer Service contracts for the EUA Zone with suppliers other than TransCanada, and

any amendments thereto, including the Agreements themselves.

RESPONSE 15: Narragansett objects to Request numbered 15 to the extent that it is

overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to other

agreements with other suppliers, direct competitors of TransCanada, which are outside of the

parties' contract and which are not relevant to the dispute over whether Narragansett has an

obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period

after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its

negotiation and administration, and the obligations under the FAF clause are relatively few. In

contrast, this request would require Narragansett to search many documents dating back more

than eight years to locate and search all documents concerning agreements with other parties

which are not the subject of the dispute.

Furthermore, this request seeks documents concerning TransCanada's competitors, agreements with TransCanada's competitors, and documents pertaining to Narragansett's communications with TransCanada's competitors, all of which contain confidential and proprietary business information. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 16: All documents and files of Lawrence Boisvert, John Carney, Robert Clarke, Peter Fuller, Michael Hirsh, Robert Powderly, Donald Ryan, Dennis St. Pierre and Kevin Kirby concerning: the negotiation of the WSOS Agreement; the administration of the WSOS Agreement; payment of the Fuel Adjustment Factor; Standard Offer Service rate filings and testimony with the RIPUC; the Settlement Agreements; the EUA Companies' implementation of the URA and Settlement Agreements with respect to Standard Offer Service; RFQs, RFPs or other bids or solicitations involving in any way Standard Offer Service; or that are otherwise responsive to those document requests, including all emails and personal notes.

RESPONSE 16: Narragansett objects to request numbered 16 to the extent that it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control. This request seeks files from nine former employees of Narragansett and/or Narragansett's predecessors, on a far-reaching list of broad topics. The scope of the request is far too broad, for the substantive reasons as set forth herein as to other requests for this information. Seeking information pertaining to "Settlement Agreements" in general, "the EUA Companies' implementation of the URA and Settlement Agreements with respect to Standard Offer Service," or "RFQs, RFPs or other bids or solicitations involving in any way Standard

Offer Service" seeks voluminous (and in some instances, undefined) information which would are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking the following categories of documents from the files of the named nine former employees of Narragansett or one of Narragansett's predecessors: the negotiation and administration of the WSOSA; payment of the FAF to TransCanada before and after 2004, in particular; Standard Offer Service rate filings and testimony with the RIPUC before and after 2004 concerning the FAF. As construed, responsive documents will be produced.

REQUEST 17: All RFQs, RFPs or other bids or solicitations involving in any way Standard Offer Service or replacement Standard Offer Service from 1996 to the present, including but not limited to any RFQs, RFPs or other bids or solicitations arising from the inability of NRG Energy, Inc. to supply Standard Offer service electricity in Massachusetts or Rhode Island.

RESPONSE 17: Narragansett objects to Request numbered 17 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to other agreements with other suppliers, competitors of TransCanada, which are outside of the parties' contract and which would not be relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In contrast, this request would require Narragansett to search tens of thousands of documents dating back more than eight years to locate and search all documents concerning agreements with other parties which are not the subject of the dispute.

Furthermore, this request seeks documents concerning TransCanada's competitors and documents pertaining to Narragansett's communications with TransCanada's competitors, all of which contain highly sensitive confidential and proprietary business information. In fact, this request goes so far as to identify a direct competitor of TransCanada's, about which TransCanada makes characterizations and seeks sensitive pricing, bidding and other business information. This request is entirely inappropriate. Accordingly, no documents will be produced responsive to this request.

REQUEST 18: All documents concerning communications between Narragansett (again, including all predecessors) and any Standard Offer Service supplier in the EUA Zone regarding pricing for Standard Offer Service and/or any fuel adjustment.

RESPONSE 18: Narragansett objects to Request numbered 18 to the extent that it is overbroad, overly burdensome, and irrelevant, in that it seeks documents pertaining to other agreements with other suppliers, competitors of TransCanada, which are outside of the parties' contract and which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

The parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few. In

contrast, this request would require Narragansett to search many documents dating back more than eight years to locate and search all documents concerning agreements with other parties which are not the subject of the dispute.

Furthermore, this request seeks documents concerning Narragansett's communications with TransCanada's competitors, which contain highly sensitive confidential and proprietary business information. Accordingly, no documents will be produced responsive to this request.

REQUEST 19: All documents concerning communications with FERC, RIPUC, the Division, or any person regarding fuel adjustments in the EUA Zone.

RESPONSE 19: Narragansett objects to request numbered 19 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which may be equally available to TransCanada within the public domain. As an initial matter, the use of the term "fuel adjustments" without definition is vague and ambiguous. To the extent that this undefined term refers to the FAF, as defined, Narragansett can respond to this request to the extent of the further limitations described herein. To the extent that this undefined term refers to "fuel adjustments" other than the FAF, Narragansett is without sufficient information to fully respond to this request, except to object to their relevancy to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

Moreover, read literally as written, this request seeks all communications by anybody at any time with a number of public agencies "or any [other] person" concerning fuel adjustments in the EUA Zone. Not only is the universe of potential communications endless, it is also

unknown and unknowable to Narragansett. Seeking all communications between anyone at anytime concerning the undefined "fuel adjustments," expressly including communications by and between RIPUC, FERC and the Division, this request calls for documents which are outside of Narragansett's realm of knowledge, custody or control.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all written communications between Narragansett and FERC, RIPUC, the Division or TransCanada concerning the administration of the WSOSA and the payment or the obligations under the FAF clause in the WSOSA. As construed, responsive documents will be produced.

REQUEST 20: All financial projections prepared at any time concerning divestiture of generation assets or Standard Offer Service in the EUA.

RESPONSE 20: Narragansett objects to Request numbered 20 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain. By this request, TransCanada seeks "all financial projections prepared at any time concerning divestiture of generation assets or Standard Offer Service in the EUA," without limitation in scope, analyst or time. If construed as written, this request would require review of tens of thousands of pages of documents, most of which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004. Further, it seeks documents which are plainly outside of Narragansett's custody or control, in that many entities, including the legislatures and regulators in many states, presumably conducted

"financial projections" concerning the broad topic of "divestiture of generation assets" over a large span of time when many states, including Rhode Island, were considering, approaching and undergoing deregulation of the electric industry to restructure toward competitive markets. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 21: All documents concerning analyses performed related to the Merger regarding Standard Offer Service or retail tariffs in the EUA or Old Narragansett Zone and the treatment of said tariffs post-Merger, including, but not limited to, applicability of a Fuel Adjustment Factor after 2004 in the EUA Zone.

RESPONSE 21: Narragansett objects to request numbered 21 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain. As an initial matter, this request seeks "all ... analyses performed related to the Merger regarding Standard Offer Service or retail tariffs in the EUA or Old Narragansett Zone." This request is vastly overbroad. As set forth more fully herein at Narragansett's response to request numbered 20, if construed as written, this request would require review of tens of thousands, if not hundreds of thousands, of pages of documents, most of which would be irrelevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004. Further, it seeks documents which are plainly outside of Narragansett's custody or control, in that many entities, including the legislatures and regulators in several states, including Rhode Island, presumably conducted "financial projections" concerning the broad topics of "Standard Offer Service" and "retail tariffs" over a large span of time they were considering,

approaching and undergoing deregulation of the electric industry to restructure toward
competitive markets.

To the extent that this request concerns analyses of the obligation (or non-obligation) to
pay an FAF after 2004, it is appropriately focused in substance upon the actual subject matter of
the dispute over whether Narragansett has an obligation to request regulatory approval of a retail
FAF for the parties' WSOSA for the period after 2004. However, the scope of even this portion
of the request is overly broad and unlimited in that it seeks documents including those outside of
Narragansett's custody or control, including documents in TransCanada's own possession,
documents in possession of other electric suppliers in Rhode Island, and documents in the
possession of RIPUC, a public entity. Documents that are publicly available are equally
available to TransCanada and may or may not be in the custody or control of Narragansett
depending on who testified before RIPUC. (See response to request numbered 33, which
response is incorporated herein).

Notwithstanding and without waiving this objection, in order to provide a substantive and
helpful response, Narragansett construes this request as seeking all documents concerning
analyses of the payment of the FAF obligations under the FAF clause after 2004. As construed,
this request is duplicative of other requests, most notably requests numbered 19, 30 and 31. As
construed, responsive documents will be produced.

REQUEST 22: All documents concerning the preparation and filing of Standard Offer
Service or retail tariffs or Standard Offer Service pricing in the EUA and Old Narragansett
Zones, including copies of all tariff filings, drafts and related memoranda and correspondence.

RESPONSE 22:  Narragansett objects to request numbered 22 to the extent that it is not limited to any particular timeframe and to the extent that it is vague and ambiguous as to which entity's documents are being sought and also seeks public documents which are already available to TransCanada.   Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking documents concerning post-2000 merger Narragansett's, and EUA's, preparation and filing of Standard Offer Service tariffs or Standard Offer Service pricing in the EUA Zone if regarding the FAF or the WSOSA and for the period 1998 through present day.  As construed, responsive documents will be produced.

REQUEST 23:  All wholesale or other electricity supply agreements, including drafts of such agreements, by and between any of the EUA Companies and any other entity executed prior to January 1, 1999.

RESPONSE 23:    Narragansett objects to Request numbered 23 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain.  By this request, TransCanada seeks "all wholesale or other electricity supply agreements, including drafts of such agreements, by and between any of the EUA Companies and any other entity" from the beginning of time through 1999, without limitation in scope or time.   If construed as written, this request would require review of thousands of pages of documents, the vast majority of which would be irrelevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004. Further, it seeks documents which are completely outside of Narragansett's custody or control, in

that Narragansett does not have – or at the very least cannot know whether or not it has- each and every document from the beginning of time on behalf of each of the multitude of former EUA companies which merged into Narragansett.   Moreover, even where Narragansett may be able to locate responsive documents, those supply agreements – aside from being completely irrelevant to the dispute- may well contain confidential and proprietary business information relative to competitors of TransCanada.  Accordingly, no documents will be produced responsive to this request unless and until TransCanada further defines and/or limits this request as described herein.

REQUEST 24:  All documents concerning the WSOS Agreement and Asset Purchase Agreement, including all documents concerning the negotiation, preparation, evaluation and review thereof.

RESPONSE 24:  Responsive documents will be produced.

REQUEST 25:  All documents concerning the negotiations, drafting, and terms of Standard Offer Service contracts with TransCanada in the Old Narragansett Zone.

RESPONSE 25:  Narragansett objects to request numbered 25 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous.  To the extent that the undefined term "Standard Offer Service contracts" refers to the WSOSA, responsive documents will be produced in response to numerous requests herein.  To the extent that this undefined term refers to agreements other than the WSOSA, Narragansett objects to the relevancy to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

REQUEST 26: All documents concerning Standard Offer Service or its pricing and any fuel adjustments or triggers applicable in the Old Narragansett Zone, including public announcements and communications with the EUA Companies, FERC, RIPUC, the Division, potential Standard Offer Service suppliers or any other person, prior to January 1, 1999.

RESPONSE 26: Narragansett objects to request numbered 26 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain. As an initial matter, the use of the term "fuel adjustments or triggers" without definition is vague and ambiguous. To the extent that this undefined term refers to the FAF, as defined, Narragansett can respond to this request to the extent of the further limitations described herein. To the extent that this undefined term refers to "fuel adjustments or triggers" other than the FAF, Narragansett is without sufficient information to fully respond to this request, except to object to their relevancy to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

Moreover, by its terms, this request includes "public announcements and communications with ... RIPUC, the Division." Furthermore, it seeks "communications with FERC, RIPUC, the Division, potential Standard Offer Service suppliers or any other person" concerning Standard Offer Service. This request plainly seeks documents which are, first, publicly available and, second, over which Narragansett may not have custody or control. The inclusion of "any other person" in fact opens the inquiry to an unknown universe of people, extending to competitors, customers, and the general public.

Also, this request seeks "all documents concerning Standard Offer Service" in the Old Narragansett Zone, a very broad topic, when this dispute is simply about the FAF clause for the period after 2004 and which relates to a different Zone, the EUA Zone. Were Narragansett to undertake to respond to this request literally, every document concerning Standard Offer Service would constitute tens and tens of thousands of pages of paper, nearly all of which would be irrelevant to the dispute at bar.

In addition, this request seeks "all" documents concerning Standard Offer Service from the EUA companies, a cluster of companies which are the predecessors of Narragansett. As outlined more fully herein, it would be impossible for Narragansett to know whether it is in possession of "all" of the documents from each and every EUA company concerning any subject. Thus, it is impossible for Narragansett to respond to this request on this basis.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking documents which it has in its custody and control concerning the FAF. As construed, responsive documents will be produced.

REQUEST 27: All documents concerning Standard Offer Service or its pricing and any fuel adjustments or triggers applicable in the EUA Zone, including public announcements and communications with the Old Narragansett Zone, FERC, RIPUC, the Division, potential Standard Offer Service supplies or any other person.

RESPONSE 27: Narragansett objects to request numbered 27 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is

{J:\CLIENTS\lit\304810\0001\00579663 DOC;6}    -27-

equally available to TransCanada within the public domain. As an initial matter, the use of the term "fuel adjustments or triggers" without definition is vague and ambiguous. To the extent that this undefined term refers to the FAF, as defined, Narragansett can respond to this request to the extent of the further limitations described herein. To the extent that this undefined term refers to "fuel adjustments or triggers" other than the FAF, Narragansett is without sufficient information to fully respond to this request, except to object to their relevancy to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

Moreover, by its terms, this request includes "public announcements and communications with ... RIPUC, the Division." Furthermore, it seeks "communications with FERC, RIPUC, the Division, potential Standard Offer Service suppliers or any other person" concerning Standard Offer Service. This request plainly seeks documents which are, first, publicly available and, second, over which Narragansett may not have custody or control. The inclusion of "any other person" in fact opens the inquiry to an unknown universe of people, extending to competitors, all customers, and the general public.

Further, this request seeks "all documents concerning Standard Offer Service" in the EUA Zone, a broad topic, when this dispute is simply about the FAF clause for the period after 2004. Were Narragansett to undertake to respond to this request literally, every document concerning Standard Offer Service would constitute tens and tens of thousands of pages of paper, nearly all of which would be irrelevant to the dispute at bar.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking documents which it has in its custody and control concerning the FAF. As construed, responsive documents will be produced.

REQUEST 28: All documents concerning the original drafting and revision of the WSOS Agreement and all previous versions, including drafts of previous versions of that Agreement or portions thereof that appeared in the RI Settlement Agreement or in preceding RFQ's RFP's or other proposals or request for Standard Offer Service providers in the EUA Zone.

RESPONSE 28: Narragansett objects to request numbered 28 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, in that it seeks documents pertaining to language in other contracts and other agreements, proposals or requests outside of the parties' WSOSA which is the subject of the dispute. Whether or not language similar to the language which appears in the parties' WSOSA also appears in other agreements with other parties, previous RFPs or other venues is not probative to the actual contract between TransCanada and Narragansett (WSOSA) or to the interpretation of the FAF clause within that actual contract.

Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all documents concerning the negotiation of the WSOSA, including drafts, markups and communication. As construed, responsive documents will be produced.

REQUEST 29: All documents concerning communications by and between and any person, including but not limited to the RIPUC and the Division, concerning the WSOS Agreement and Asset Purchase Agreement.

RESPONSE 29: Narragansett objects to request numbered 29 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain. This request seeks "all ... communications by and between ... any person" concerning the WSOSA and APA. This dispute focuses upon whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

This request seeks all communications between anyone at anytime concerning the WSOSA, expressly including communications by and between RIPUC and the Division. This request calls for documents including those which are outside of Narragansett's realm of knowledge, custody or control. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all communications between Narragansett and TransCanada concerning the WSOSA or APA (which deems this request as duplicative of other requests such as requests numbered 24 and 37) and all communications between Narragansett and RIPUC concerning the WSOSA or APA (which deems this request as duplicative of other requests such as requests numbered 30 and 33). As construed, responsive documents will be produced in response to such other requests.

REQUEST 30: All documents concerning the administration of the WSOS Agreement and payment of a Fuel Adjustment Factor under the WSOS Agreement.

RESPONSE 30: Responsive documents will be produced.

REQUEST 31: All documents concerning the applicability (or non-applicability) of the Fuel Adjustment Factor after 2004.

RESPONSE 31:    Narragansett objects to request numbered 31 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain. This request seeks "all documents" concerning the applicability (or non-applicability) of the FAF after 2004. While this request is appropriately more focused in substance than other requests, upon the actual subject matter of the dispute - whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004 - the scope of this request is overly broad and unlimited in that it seeks documents which include documents outside of Narragansett's custody or control, including documents in TransCanada's own possession, and documents in the possession of (or constituting testimony before) RIPUC, a public entity. This latter category of documents are publicly available and are equally available to TransCanada and may or may not be in the custody or control of Narragansett depending on who testified before RIPUC.  (See response to request numbered 33, which response is incorporated herein.)  Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all documents in its possession concerning the administration of the WSOSA and the payment or obligation to pay the FAF after 2004. As construed, this request is duplicative of other requests, most notably requests numbered 19, 21 and 30. As construed, responsive documents will be produced in response to such other requests.

REQUEST 32:  All documents and files of Michael Hager concerning:  the WSOS Agreement; TransCanada; Standard Offer Service; related rate filings before the RIPUC; fuel

adjustments and Standard Offer Service pricing; and the Merger, or that are otherwise responsive to these document request, including all emails and personal notes.

RESPONSE 32: Narragansett objects to request numbered 32 as it is overbroad, overly burdensome, and irrelevant, and to the extent that it seeks confidential and proprietary business information pertaining to competitors of TransCanada and business dealings unrelated to this dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.    Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all documents and files of Michael Hager which concern the WSOSA with TransCanada, Wholesale Standard Offer Service provided by TransCanada, correspondence with TransCanada, Standard Offer Service rate filings with the RIPUC which concern the WSOSA, the FAF for the WSOSA and the merger, but only as they concern TransCanada and the FAF. As construed, responsive documents will be produced.

REQUEST 33: All documents concerning written or oral testimony before the RIPUC concerning Standard Offer Service and retail rate filings and the preparation for same, including draft testimony, internal communications, memoranda, emails and notes.

RESPONSE 33: Narragansett objects to request numbered 33 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain.  This request seeks all "written or oral testimony before the RIPUC," a public entity, and is not limited to any particular time period or person giving the testimony.   As an initial matter, these documents are publicly available and

are equally as available to TransCanada as to Narragansett. Moreover, many persons and entities other than Narragansett surely testified before RIPUC pertaining to "Standard Offer Service and retail rate filings" stated that generally, and Narragansett cannot be and may not be in possession of all such testimony or documents "concerning" such testimony. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking documents pertaining to Narragansett's own testimony before RIPUC concerning Standard Offer Service filings that relate to the FAF under the WSOSA after 2004. As construed, responsive documents will be produced.

REQUEST 34: All documents concerning consideration of whether, and the decision not, to seek approval of a Fuel Adjustment Factor after 2004.

RESPONSE 34: Narragansett objects to Request numbered 34 as it is irrelevant, vague and ambiguous and to the extent that it improperly characterizes Narragansett's actions or "decisions" concerning the applicability of the FAF for the parties' WSOSA after 2004. The parties' contract, the WSOSA, is clear that the FAF only applies if certain conditions precedent are met, and they have not been met. It is also clear that Narragansett has and had no affirmative obligation to petition the RIPUC for approval of an FAF beyond 2004. Accordingly, any characterization to the contrary is inaccurate and any request seeking documents about a "decision not" to do something that Narragansett had no obligation to do in the first place is vague, ambiguous, misleading and impossible to answer. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all documents concerning the administration of the WSOSA and the payment of an FAF or obligations under the FAF clause after 2004. As construed, this request is

duplicative of several other requests, most notably requests numbered 30 and 31. As construed, responsive documents will be produced in response to such other requests.

REQUEST 35: All documents concerning the preparation, negotiation and drafting of the April 18, 2000 letter from Michael Hager to Sean McMaster.

RESPONSE 35: Responsive documents will be produced.

REQUEST 36: All documents concerning analysis of or use of fuel adjustments generally in electrical supply contracts.

RESPONSE 36: Narragansett objects to Request numbered 36 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public (or private) domain. By this request, TransCanada seeks "all documents concerning analysis of or use of fuel adjustments generally in electrical supply contracts," without limitation in scope, analyst or time. This request appears to ask Narragansett to conduct research into the standards, norms and opinions of the electrical supply industry as a whole. If construed as written, this request would require review of tens of thousands, if not hundreds of thousands, of pages of documents, the vast majority of which would be irrelevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004. Further, it seeks documents which are plainly outside of Narragansett's custody or control, in that many persons and entities, including legislatures, regulators, think tanks, financial analysts, other electric suppliers, other electric marketers, and other electric distribution companies may well have performed "analysis of the use of fuel adjustments generally in electrical supply contracts,"

and such information would be entirely outside of Narragansett's custody, knowledge and / or control. Accordingly, no documents will be produced responsive to this request unless and until TransCanada can further define and/or limit this request as described herein.

REQUEST 37: All documents concerning communications with TransCanada, including, without limitation, internal notes or memoranda, correspondence, e-mails, memoranda, presentations and proposals.

RESPONSE 37: Narragansett objects to request numbered 37 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, seeks information which is outside of Narragansett's knowledge, custody or control, and appears to seek documents protected by the attorney client privilege and/or confidential and/or proprietary business information.  Read literally, this request seeks all communications with TransCanada with any party, at any time.  It would be impossible for Narragansett to comply with this request as written.  Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking all communications between Narragansett and TransCanada, limited to the time period 1997 to the present and concerning Wholesale Standard Offer Service.  As construed, responsive documents will be produced.

REQUEST 38: All organization charts of Narragansett from 1996 to the present.

RESPONSE 38: Narragansett objects to request numbered 38 as it is overbroad, overly burdensome, and irrelevant.  Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking

{J:\CLIENTS\lit\304810\0001\00579663.DOC;6}

-35-

Narragansett's post-merger organization chart. As construed, responsive documents will be produced.

REQUEST 39: All organization charts of each of the EUA Companies from 1996 to 2000.

REQUEST 39: Narragansett objects to request numbered 39 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking a copy of any organizational chart which existed at any of the EUA companies at the time of the Merger. As construed, responsive documents will be produced.

REQUEST 40: A complete copy of each document retention policy (for paper or electronic files) adopted or instituted by Narragansett, or in effect at Narragansett at any time from January 1, 1996 to the present.

RESPONSE 40: Narragansett objects to request numbered 40 to the extent that it seeks Narragansett's document retention policies prior to the policies in place as of Narragansett's notice of this dispute, in February of 2005. A request for any earlier policies it is overbroad, overly burdensome, and irrelevant. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking a complete copy of any document retention policy which was in effect at Narragansett as of February 2005 or after. As construed, responsive documents will be produced.

REQUEST 41: All documents concerning the documents or files of any of the EUA Companies, and retention of treatment of the same, including indexes, memoranda, communications, or policies or notes.

RESPONSE 41: Narragansett objects to request numbered 41 as it is overbroad, overly burdensome, irrelevant, vague and ambiguous, not calculated to lead to admissible evidence, and seeks information which is outside of Narragansett's knowledge, custody or control. Read literally, this request seeks "all documents concerning the documents or files of any of the EUA Companies," as well as all information pertaining to the retention of same. In other words, this request seeks every piece of paper, regardless of topic, from every company which comprised EUA, Narragansett's predecessor, from the beginning of time through the Merger. There is no limitation on subject matter, location, or time period in this request. This is perhaps the most egregious instance where response to this request, as written, would require production of literally hundreds of thousands of pages of documents, nearly all of which would be irrelevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004. It would be impossible for Narragansett to comply with this request as written. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this request as seeking a complete copy of any document retention policy which was in effect at any of the EUA companies at the time of the Merger. As construed, responsive documents will be produced.

THE NARRAGANSETT ELECTRIC COMPANY
By its Attorneys,

Michael P. Angelini (BBO#019340)
Vincent F. O'Rourke, Jr. (BBO#380335)
Kimberly A. Stone (BBO#630952)
Bowditch & Dewey, LLP
311 Main Street. P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated:  October 18, 2005

## CERTIFICATE OF SERVICE

I, Kimberly A. Stone, hereby certify that I have served a copy of the foregoing on the following by mailing same postage prepaid this 18th day of October, 2005 to:

Daniel C. Winston
Wendy S. Plotkin
Dara Y. Zelnick
Choate, Hall & Stewart LLP
2 International Place
Boston, MA  02110

Kimberly A. Stone

{J:\CLIENTS\lit\304810\0001\00579663.DOC;6}

-38-

# Exhibit E

# CHOATE

CHOATE HALL & STEWART LLP

**FILE COPY**

Wendy S. Plotkin
(617) 248-5047
wplotkin@choate.com

November 1, 2005

**VIA FACSIMILE AND REGULAR MAIL**

Kimberly A. Stone, Esquire
Bowditch & Dewey
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156

RE:    *TransCanada Power Marketing Ltd.  v. Narragansett Electric Company*,
       Civil Action No. 05-40076FDS

Dear Attorney Stone:

I am writing with regard to Narragansett Electric Company's ("Narragansett") recent responses to TransCanada's First Set of Interrogatories and First Requests for the Production of Documents, and to address several significant deficiencies in those responses. I have set forth a detailed description of the deficiencies below. I appreciate your offer for a telephone call to discuss Narragansett's responses, but I thought it would be helpful first for TransCanada to set forth its positions briefly in this letter. We have agreed herein to limit the number of the requests for now for purposes of moving forward, although we reserve our rights to request further disclosure with respect to all requests and responses including those not mentioned herein.

With respect to the interrogatory answers and written document responses, please provide the requested supplementation or alterations to your responses, or indicate your continued opposition if and where appropriate, no later than Thursday, November 10, 2005. Or, please call me in advance of that date if you wish to discuss any requests in substance. To the extent we are unable to agree on fundamental points regarding the scope of discovery, we would like to have the disputed matters identified and resolved (by the Court if necessary) before going to far into discovery process.

With respect to the document production, we understand that review of the requested documents could take some time and we want to accommodate your schedules, but also need to keep this case moving. The Document Requests were served in August, and at a minimum the last of the requested documents must be produced by the end of the two-month time period you represented in your October 18, 2005 letter (i.e., all documents produced by December 18, 2005). As your letter promises, we also will expect to start receiving documents soon. On that

Kimberly A. Stone, Esquire
November, 1 2005
Page 2

schedule, Narragansett will have had four months to produce documents. That is certainly a
reasonable amount of time, especially considering the fact that Narragansett agreed to the
proposed case schedule that was submitted to the Court. I assume that Narragansett took into
account its November 7, 2005 trial, and its personnel needs, when it agreed to the proposed
dates for the completion of discovery, expert disclosures, etc.

Several of Narragansett's Objections to TransCanada's Document Request state that
the requests seek information protected from disclosure by the attorney-client or work product
privileges. Consequently, I assume Narragansett is in the process of producing a privilege log
for all documents or information withheld on grounds of privilege. Please let me know by
what date Narragansett will product its privilege log, which I assume will be produced no later
than with completion of document production by mid-December, 2005.

In addition, Narragansett also objects to many of TransCanada's request on the grounds
that they seek confidential information. Attached hereto is a draft Protective Order governing
the treatment of confidential information. Please let me know Narragansett's comments on the
draft Protective Order, if any, next week so that it may be presented to the Court for approval.

Finally, to the extent Narragansett's objections are based on lack of possession,
custody or control of the documents, TransCanada obviously only requests and expects
Narragansett to produce documents in its possession, custody or control.

**Interrogatory Responses**

Interrogatory Nos. 4 and 5 seek the identification of individuals with knowledge or
information concerning the drafting and/or negotiation of the Narragansett Settlement
Agreement and the drafting or filing of Standard Offer Service RIPUC filings, respectively.
The Interrogatories *also* ask for a description of each identified person's role and, with respect
to No. 5, the dates of their involvement. Please supplement Narragansett's responses to
Interrogatories Nos. 4 and 5 to include a brief description of each identified individual's role in
these projects and, with respect to No. 5, the dates of their involvement.

Interrogatory No. 6 seeks the identification and description of communications
between Narragansett and the RIPUC and/or the Division relating to the WSOS Agreement
and/or the Fuel Adjustment Factor, including the dates of those communications and the
individuals involved. Narragansett states that these communications are far too numerous but
that it will attempt to identify any "material" oral conversations that would be responsive to
this Interrogatory. Please supplement this response with the information currently available,
provide a date by which Narragansett will further supplement its response, and also
acknowledge that your response will include description of what you consider to be "non-
material" communications concerning the FAF.

3999740v1

Kimberly A. Stone, Esquire
November, 1 2005
Page 3

Interrogatory No. 7 seeks the identification of any efforts that Narragansett made to ensure approval an FAF applicable for the years 2004 to 2009. Narragansett answers by stating that Narragansett did not have the power to "ensure" that the FAF was approved by regulatory authorities. Fair enough, but the import and scope of the Interrogatory is clear. Please supplement Narragansett's response to Interrogatory No. 7 by providing information concerning any efforts made by Narragansett to seek approval of the FAF after 2005, or affirmatively state that Narragansett made no such efforts. This information surely must be known by Narragansett now.

Interrogatory No. 8 requests the identification and description of any communications between Narragansett and TransCanada concerning the applicability of the Fuel Adjustment Provision after 2004, including the dates of those communications and the individuals involved. Narragansett's "response" states only that it will "attempt to identify any material oral conversations which its representatives had with TransCanada which would be responsive to this request as discovery progresses and, if such communications are identified, will supplement this response." It is not credible that Narragansett cannot answer this Interrogatory now at least in part, since Michael Hager has been testifying before the RIPUC concerning such alleged communications for several years. Interrogatory 8 seeks information highly relevant to the subject matter of this dispute and must be answered fully. Please supplement this response to Interrogatory No. 8 by providing the information sought or affirmatively stating that Narragansett is unaware of any communications between Narragansett and TransCanada concerning the applicability of the FAF after 2004.

Interrogatory No. 9 seeks the identification of individuals who participated in any review or analysis of the applicability of the Fuel Adjustment Provision, including at the time of the Merger, in the EUA Zone after 2004, and a description of each person's involvement in any such review or analysis. Narragansett's responses only lists individuals, with no description of each individual's involvement. Please supplement Narragansett's responses to include a brief description of each identified individual's involvement in any such review or analysis. TransCanada is specifically looking for identification of and descriptions for individuals who were involved in any review or analysis at the time of the Merger, and then again in the period leading up to the end of 2004.

Interrogatory Nos. 10 and 11 simply seeks a description of the treatment, location and/or existence of any files of each of the EUA Companies, Narragansett's predecessors, that contain documents relevant to this dispute. In particular, what was the treatment of the EUA Companies' relevant records at the time of the Merger? Were the records transported to a Narragansett facility? Were they destroyed? Who was responsible for the records? This is a relevant, reasonable request. Please supplement your response to Interrogatories Nos. 10 and 11 by providing the requested information concerning the specific location, treatment and existence of the files of the former EUA Companies concerning Standard Offer Service, the WSOSA and the Fuel Adjustment Factor. In addition, please state affirmatively whether

3999740v1

Kimberly A. Stone, Esquire
November, 1 2005
Page 4

potentially relevant EUA files were destroyed or if you have no information concerning the
location or existence of any potentially relevant EUA files.

**Document Requests**

As an initial matter, it makes sense to outline several key points concerning the
relevancy of the documents requested by TransCanada.

First, Article V of the WSOSA specifically references and relies upon the Standard
Offer Service retail tariffs to be filed for the EUA Zone. Under Massachusetts law, EUA's
obligations under Article V are governed both by the language of Article V, the parties'
understandings, and EUA's intent with respect to SOS retail tariff filings in the EUA Zone.
Thus, documents reflecting on EUA's past and its future practices, and intent, with regard to
its SOS retail tariff filings and fuel adjustments in the EUA Zone generally (not just with
respect to the WSOSA or FAF), are directly relevant.

Second, as is set forth in Paragraphs 11-14 of TransCanada's Complaint, the RI
Settlement Agreement imposed an obligation on EUA to provide "backstop" Standard Offer
Service through the length of the Standard Offer period. This "backstop" obligation was to be
priced to include a fuel index for the Standard Offer period through 2009. By entering into the
Asset Purchase Agreement with Montaup, and the WSOSA Agreement with Newport and
Blackstone, TransCanada assumed EUA's "backstop" rights and obligations under the RI
Settlement Agreement. Under Massachusetts law, EUA's intent as to how it planned to
implemented the fuel index under its "backstop" obligation through its future filing of SOS
retail tariffs, is directly relevant.

Third, it is relevant whether and to what extent EUA, Narragansett, and TransCanada
discussed or anticipated, before or at the time the WSOSA was signed, a uniform scheme of
Standard Offer Service pricing and fuel triggers in both Rhode Island Zones. EUA would
have implemented any such uniform scheme through its SOS retail tariff filings and fuel
triggers therein. Under Massachusetts law, these understandings, discussions and expectations
are directly relevant to EUA's expected SOS retail filings in Rhode Island under the WSOSA
Agreement. Accordingly, documents concerning any discussions or understandings at EUA,
Narragansett, or TransCanada about uniform or comparative SOS pricing schemes for
stipulated prices or fuel triggers in the two Rhode Island Zones -- such as discussions during
EUA's and Old Narragansett's drafting of the related EUA and Old Narragansett Settlement
Agreements, during the negotiation and drafting of TransCanada's SOS contracts in Rhode
Island, or otherwise -- are clearly relevant.

Finally, TransCanada has asserted that Narragansett has breached the covenant of good
faith and fair dealing under Massachusetts law. In fact, it is successor Narragansett that
reviewed EUA's obligations under the WSOSA to file SOS retail tariffs, and that opted both to
replace EUA's SOS retail tariffs as of the Merger and then later not to request a fuel

Kimberly A. Stone, Esquire
November, 1 2005
Page 5

adjustment for TransCanada in the EUA Zone after 2004. Thus, Narragansett's understanding of EUA's obligations under the WSOSA Agreement, such as to file SOS retail tariffs, is also relevant.

With respect to the individual requests as to Request No. 3, Paragraph 7 of the Complaint alleges that "under the URA, the Standard Offer Service was to be priced to account for increases in the consumer price index, and also for other factors reasonably beyond the control of power suppliers such as "extraordinary fuel costs." R.I.G.L. 39-1-27.3(d) (1997). The URA required the retail distribution companies to file tariffs with the Rhode Island Public Utilities Commission ("PUC") to implement Standard Offer Service through 2009, for the benefit of both wholesale and retail customers and wholesale suppliers. R.I.G.L. 39-1-27(a) (1997)." EUA's understandings of its rights and obligations under these two statutory provisions, which were in place at the time the WSOSA was signed, are directly relevant to EUA's tariff filing obligations under the WSOSA Agreement. We are therefore entitled to documents at Narragansett concerning EUA's and Narragansett's drafting or interpretation of these two statutory provisions.

Request No. 5 seeks documents relating to the Merger, including documents related to Standard Offer Service and rate filing obligations. Narragansett responds to this request by stating that it will produce documents from the Merger which concern the "WSOSA, the FAF and/or Narragansett's rate filing obligations concerning the FAF after the Merger." Narragansett's limitation is acceptable for now provided that Narragansett *also* provide requested documents from the Merger "concerning Narragansett's SOS retail tariff filing obligations in the EUA Zone generally after the Merger."

Request Nos. 6 and 7 seek documents concerning communications between the EUA Companies and any Old Narragansett, RIPUC, FERC, the Division or others concerning the URA, the Settlement Agreements, Standard Offer Service, or any related agreements or obligations related to the Merger. Narragansett respond to this request by stating that it will produce "all written communications or oral communications memorialized in writing between Narragansett, and FERC, RIPUC, the Division or TransCanada concerning the administration of WSOSA and the payment of an FAF after 2004. Narragansett's limitation is acceptable provided Narragansett also produce documents regarding communications (which should include communications between the EUA Companies and Old Narragansett, which were then separate entities) "concerning Standard Offer Service pricing, fuel adjustments or fuel triggers in the EUA Zone or Rhode Island generally, concerning creation of the portions of the Settlement Agreements related to those subjects, and concerning any efforts to model or draft the EUA RI Settlement Agreement based upon the Narragansett Settlement Agreement or its terms."

Requests Nos. 8-10 seek documents concerning the Narragansett and RI Settlement Agreements. Narragansett responds to these requests by stating that they are overbroad and refusing to produce any documents responsive to the Requests. TransCanada will limit these

Kimberly A. Stone, Esquire
November, 1 2005
Page 6

requests to documents concerning (or necessary to place in context) drafting and negotiation of the specific portions of the Settlement Agreements that relate to Standard Offer Service pricing and the fuel index, specifically, for example, in the RI Settlement Agreement, Article 5 of the Stipulation and Agreement and Attachment 4 thereto, and §§10 and 14 of the Service Agreement Amendment; and concerning any efforts to model or draft the EUA RI Settlement Agreement based upon the Narragansett Settlement Agreement or its terms."

Request No. 11 seeks all documents concerning the Service Agreements between Montaup and Blackstone/Newport that were amended by the assignment and backstop obligations of the RI Settlement Agreement. Narragansett refused to produce any documents in response to this request. TransCanada is willing to limit Request No. 11 to the Service Agreements themselves, at least for now.

Request No. 12 seeks documents related to the EUA Companies' "backstop" obligation under the Settlement Agreements. As discussed above, TransCanada entered the WSOSA and assumed Montaup's "backstop" obligation under the Settlement Agreements. TransCanada is entitled to financial projections, analyses, memoranda, emails, correspondence or other documents relating to the pricing and fuel index for the "backstop" obligation.

Request Nos. 13, 15, 17, and 18 seek documents concerning: RFQs, RFPs, or any other formal or information solicitations or offers; contract negotiations and drafting; and communications with TransCanada or other wholesale suppliers, concerning Standard Offer Service. TransCanada will limit these requests to include documents therein regarding drafting, negotiation or interpretation of contract provisions similar to Article V of the WSOSA; regarding how long any fuel adjustment factor would be paid; regarding filing of SOS retail tariffs and fuel triggers in the EUA Zone; and regarding EUA's analysis of whether to solicit wholesale SOS contractors through 2009 or through a lesser term (e.g., 2004).

Request No. 16 seeks documents found in the files of several individuals named in the parties' Automatic Disclosures. Narragansett's limitations are acceptable, as long as Narragansett *also* produces documents concerning Standard Offer pricing and fuel adjustments or triggers in the EUA Zone or under the backstop obligation, or that are otherwise responsive to TransCanada's document requests.

Request No. 19 seeks all documents concerning communications with FERC, RIPUC, the Division or any other person regarding fuel adjustments in the EUA Zone. Narragansett's response to Request No. 19 is limited only to documents concerning the WSOSA. As set forth above, communications between Narragansett and its predecessors and FERC, RIPUC, the Division, and other third parties concerning fuel adjustments in the entire EUA Zone are relevant to this dispute and should be produced. Please supplement your response accordingly.

Kimberly A. Stone, Esquire
November, 1 2005
Page 7

Request No. 20 seeks documents concerning financial projections concerning divestiture of generation assets or Standard Offer Service in the EUA Zone. In an effort to narrow this request, TransCanada will limit this request to financial projections concerning or incorporating Standard Offer Service pricing or fuel adjustments in the EUA Zone.

Request No. 21 seeks documents concerning analyses performed related to the Merger regarding Standard Offer Service or retail tariffs. TransCanada specifically seeks documents concerning analyses performed related to the applicability, alteration or cancellation of retail tariffs in the EUA Zone, or to the applicability and treatment of fuel adjustments or triggers in the EUA Zone after the Merger.

Request No. 22 seeks documents concerning retail tariff formulation and filing for Standard Offer Service in the EUA and Narragansett Zones. Narraganset responds to this request by stating that it will produce documents concerning Narragansett's and EUA's post-2000 preparation and filing of Standard Offer Service tariffs or Standard Offer Service pricing in the UA zone *if* regarding the FAF or the WSOSA. In addition to the documents proposed by Narragansett, TransCanada seeks production of (i) all such documents "regarding fuel adjustments or indexes in the EUA Zone generally, from 1998 to present"; and (ii) copies of Narragansett's and its predecessors actual retail tariff filings from 1980 to the present.

Request No. 25 seeks documents concerning the negotiation and drafting of Standard Offer Service Contracts with TransCanada in the Old Narragansett Zone. Narragansett refuses to produce documents responsive to this request. Such documents specifically concerning Standard Offer Service fuel adjustments or indexes applicable in Rhode Island after 2004, or regarding uniformity of wholesale pricing in Rhode Island, are relevant and should be produced.

Request No. 27 seeks documents concerning Standard Offer Service and its pricing, including fuel adjustments and triggers in the EUA Zone. Narragansett improperly limits its response to Request No. 27 to documents concerning the FAF. The Request seeks all documents concerning Standard Offer Service Pricing, fuel adjustments and triggers in the EUA Zone as a whole, not just the FAF.

Request No. 28 seeks documents concerning the original drafting and revision of the WSOS Agreement and all previous versions, including drafts of earlier versions of the agreement that appeared in the RI Settlement Agreement. In response to this request Narragansett states that it will produce documents concerning the "negotiation of the WSOSA, including drafts, markups and communication." Pursuant to Request No. 28, TransCanada is entitled to documents concerning all earlier drafts of Article V of the WSOSA, including in earlier versions of the proposed Backstop Agreement that ultimately became the WSOSA.

Request No. 29 seeks documents concerning communications by and between Narragansett and any person concerning the WSOSA and the Asset Purchase Agreement.

Kimberly A. Stone, Esquire
November, 1 2005
Page 8

Narragansett inexplicably excludes from its response documents concerning communications between Narragansett and *the Division* concerning the APA or WSOSA. Please provide the requested documents.

Narragansett's response to Request No. 32 states that it will only produce documents in the files of Michael Hager related to the WSOSA and TransCanada. This is not sufficient, as any responsive documents in Mr. Hager's files must be produced. Please confirm that Narragansett will produce any documents in the files of Michael Hager that are responsive to any of TransCanada's document requests.

Request No. 33 seeks documents concerning written or oral testimony before the RIPUC concerning Standard Offer Service and retail rate filing and the preparation for same, including draft testimony, etc. Narragansett responds to this request by stating that it will produce documents pertaining to Narragansett's own testimony before the RIPUC concerning Standard Offer Service filings that relate to the FAF under the WSOSA after 2004. Narragansett's limitation is acceptable provided that Narragansett *also* provide all such documents relating to Standard Offer Service fuel adjustments or triggers in the EUA Zone.

Request No. 36 seeks all documents concerning analysis of or use of fuel adjustments generally in electrical supply contracts. Narragansett states that it will produce no documents responsive to this request. TransCanada seeks, and is entitled to, documents relevant to *Narragansett's* internal analysis or view of the use of fuel adjustment factors in electrical supply contracts.

Requests Nos. 38 and 39 simply seek the organizational charts for Narragansett and the EUA Companies from 1996 to the present, if they exist and can be located. These requests are routine and not unreasonably burdensome. Please let me know whether Narragansett will supplement its response to Requests Nos. 37 and 38 to include documents from 1996 to the present.

Again, in its response to Request No. 40, Narragansett unreasonably limits its response to the production of document retention policies from 2005 to the present. Potentially relevant documents in this dispute date back to 1996. Therefore, the document retention policies for Narragansett and its predecessors from 1996 to the present are relevant to this matter and must be produced.

Kimberly A. Stone, Esquire
November, 1 2005
Page 9


As stated above, and for all of the above document requests listed above, individually, please indicate by November 10, 2005 whether Narragansett will produce the documents as outlined above.


Sincerely,

Wendy S. Plotkin


cc:    Daniel C. Winston
       Dara Y. Zelnick

# Exhibit F

# CHOATE

CHOATE HALL & STEWART LLP

Wendy S. Plotkin
(617) 248-5047
wplotkin@choate.com

December 21, 2005

**VIA FACSIMILE AND REGULAR MAIL**

Kimberly A. Stone, Esquire
Bowditch & Dewey
311 Main Street
P.O. Box 15156
Worcester, MA 01615-0156

RE:     *TransCanada Power Marketing Ltd. v. Narragansett Electric Company,*
         Civil Action No. 05-40076FDS

Dear Attorney Stone:

I am writing in follow up on TransCanada's First Set of Interrogatories and First Set of Document Requests to Narragansett, and our most recent telephone conversations of November 29 and 30, 2005.

We originally served the discovery requests on August 26, 2005, with responses due on September 28, 2005. We granted reasonable extension requests. In a letter dated November 1, 2005, we set forth TransCanada's concerns with Narragansett's written responses and attached a proposed Protective Order. We have received no written response to that November 1 request for supplementation, nor any actual comments yet on the Protective Order. Our discussions on November 29 and 30, 2005 fleshed out each party's positions on various issues, but on many points the parties still appear to disagree. Moreover, even on the points on which we appear to agree, Narragansett has yet to provide any actual supplementation or even to confirm in writing that it will do so.

As of today, almost four months after service of the discovery, Narragansett has produced no documents other than publicly available records. It also has not meaningfully responded to the Interrogatories. The discovery and pretrial schedule is advancing, and so must this case. TransCanada therefore feels it must file a motion to compel in early January, 2006, to the extent Narragansett is unable to complete its document production and discovery responses by that time. With that in mind, and in a final effort to narrow the issues before filing that motion, below is what I believe to be Narragansett's positions based on Narragansett's October 18, 2005 written responses and our telephone conversations of November 28 and 29, 2005. I hope that we can present to the Court a narrowly tailored

Kimberly A. Stone, Esquire
December 21, 2005
Page 2

motion, but if Narragansett's intransigence persists we will be forced simply to ask the Court to order Narragansett to provide even the most basic discovery responses.

**Interrogatories**

With regard to Narragansett's responses to Interrogatories Nos. 4, 5, and 9, you agreed that Narragansett would supplement its responses to include a brief description of each identified individual's role in the project or subject matter of the interrogatories, which would implicitly include the dates of those individuals involvement. We plan to file a motion to compel if this is not done by January 6, 2005.

You also indicated that Narragansett would provide supplemental responses to Interrogatories Nos. 7, 10 and 11. Again, we plan to file a motion to compel if this is not done by January 6, 2005.

Interrogatories No. 6 and 8 seek information regarding communications between Narragansett and various regulatory authorities, and communications between Narragansett and TransCanada, concerning the subject matter of this suit. You stated that Narragansett was in the process of gathering information and would supplement its response at some unstated later date. These interrogatories seek information that is highly relevant to this litigation and Narragansett has had ample time to collect information necessary to meaningfully answer at least as of this point. As you know, Fed. R. Civ. P. 33(b)(1) and (3) provide that interrogatories must be answered "fully" and must be served within 30 days after receipt. We plan to file a motion to compel if this is not done by January 6, 2005.

**Document Requests**

Our conversations have revealed that the parties disagree on two underlying points that pertain to the majority of the disputed Document Requests. I will confirm the parties' positions on these two issues, and then will specifically discuss some additional requests. Also, to the extent Narragansett has indicated or indicates it does plan to produce documents, we will nevertheless be forced to move to compel to the extent the documents have not been physically produced to TransCanada by January 13, 2005. We also expect that, to the extent it intends to make production by January 13, 2005, Narragansett will evidence that intent by commencing a significant portion of any document production before that date.

Document Request Nos. 5, 13, 15-22, 27, 32 and 33 seek information concerning Standard Offer Service retail tariffs and fuel adjustments in the EUA Zone generally. The WSOS Agreement specifically references the EUA Zone's general SOS retail tariffs, and Narragansett's intent with respect to them is central to this dispute. Similarly, Narragansett's discussion with other suppliers regarding the tariffs is relevant to its intent. Nevertheless, Narragansett has indicated it will not produce any documents (i) concerning SOS retail tariffs, fuel adjustments or pricing in the "EUA Zone" generally, or (ii) concerning contracts between

Kimberly A. Stone, Esquire
December 21, 2005
Page 3

Narragansett and suppliers other than TransCanada in the EUA Zone, even if those contracts and negotiations reference Narragansett's intent with respect precisely the same general EUA Zone tariffs and pricing. Unless Narragansett indicates by January 6, 2005 it plans to produce these documents, and produces them by January 13, 2005, TransCanada will need to file a motion to compel.

The parties also disagree concerning the relevance of documents related to Narragansett's "backstop" obligations, as sought in Document Requests 12, 16, 20 and 28. TransCanada's complaint alleges that EUA (and its affiliates) had "backstop" obligations under the RI Settlement Agreement to provide SOS through its term in Rhode Island (i.e., through 2009), to the extent EUA could not assign its "backstop" obligations to suppliers such as TransCanada. EUA's "backstop" obligations were priced to include a fuel adjustment. The complaint alleges that EUA assigned its "backstop" obligation to TransCanada under the WSOS Agreement. Documents concerning EUA's "backstop" obligation are thus relevant in a number of respects: (i) the time period of the fuel adjustment for EUA's "backstop" obligation in the EUA Zone, (ii) how EUA planned to effectuate that fuel adjustment in the EUA Zone; and (iii) the pricing and fuel adjustment structure for the "backstop" obligation that EUA assigned to TransCanada, in the WSOS Agreement. Narragansett has taken the position that documents concerning its "backstop" obligation have no relevance this dispute. Unless Narragansett indicates by January 6, 2005 it plans to produce these documents, and produces them by January 13, 2005, TransCanada will need to file a motion to compel.

The following represents our discussion with respect to further specific requests:

With regard to Request No. 3, you stated that you would attempt to determine whether any documents responsive to this request exist. Specifically, TransCanada has identified as of particular relevance documents concerning any drafting, explanatory or lobbying efforts of Narragansett with regard to passage of the cited portions of the URA.

With regard to Requests No. 6 and 7, Narragansett agreed that it would produce documents concerning Standard Offer Service and fuel adjustment in the EUA Zone, and would not limit its response to only documents concerning "the administration of WSOSA and the payment of an FAF after 2004."

With regard to Requests No. 8-10, Narragansett agreed that it would produce documents responsive to TransCanada's narrowed request, if they exist.

With regard to Request No. 11, while you disputed its relevance, you stated that Narragansett would produce the Service Agreement "if it could be located."

With regard to Request No. 22, Narragansett refuses to produce documents concerning preparation of its Standard Offer Service Tariffs or pricing in the EUA Zone generally, or copies of Narragansett's and its predecessors' actual retail rate filings (or at least relevant

4025522v1

Kimberly A. Stone, Esquire
December 21, 2005
Page 4

portions thereof reflecting the presence of absence of a fuel adjustment) from 1980 to 1999.
These documents are relevant to Narragansett's normal practices with respect to the presence
of fuel adjustments in its retail tariffs. TransCanada will therefore file a motion to compel on
this request.

        With regard to Request No. 29, you confirmed that Narragansett inadvertently removed
documents concerning communications with the Division from its response, and will produce
such documents if they exist.

        With regard to Request No. 32, you stated that Narragansett's response would be
supplemented to include documents in the files of Michael Hager concerning Standard Offer
Service tariffs, but otherwise the production documents found in the files of Michael Hager
would be limited pursuant to your objection to files concerning other suppliers in the EUA
Zone, and documents concerning the EUA Zone generally.

        With regard to Request No. 36, despite TransCanada's narrowing of this request to
Narragansett's own internal analyses concerning fuel adjustment factors, you reasserted your
objection that this request was overly broad. TransCanada will file a motion to compel on this
request.

        With regard to Requests No. 38 and 39 you stated that Narragansett would produce
documents responsive to these requests. You informed me that Narragansett often updated its
organizational charts three to four times a week, and I confirmed that TransCanada did not
seek production of each updated organizational chart. We agreed that Narragansett would
produce a reasonably representative number of organizational charts.

        With regard to Request No. 40, you stated that Narragansett would produce the
document retention policies in its possession that are responsive to this request.

        With respect to each specific category of documents listed above, and with respect to
each additional category of documents that Narragansett has already agreed to produce in its
October 18, 2005 written responses, please (i) confirm by no later than January 6, 2005, in
writing, whether and to what extent Narragansett actually plans to produce the documents by
January 13, 2005, and (ii) physically produce them to TransCanada by January 13, 2005.

4025522v1

Kimberly A. Stone, Esquire
December 21, 2005
Page 5


To the extent production remains incomplete as of January 6, 2005 and January 13, 2005, as indicated above, TransCanada believes that at that point it will need to file a motion to compel. Please also consider this letter to be a final invitation to confer precedent to that filing.

Sincerely,

Wendy S. Plotkin


cc:    Daniel C. Winston
       Dara Y. Zelnick