UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD., <br><br> Plaintiff, <br><br> v. <br><br> NARRAGANSETT ELECTRIC COMPANY, <br><br> Defendant. | C.A. No. 05-40076-FDS <br><br> (Michael P. Angelini, #019340) <br> (Vincent F. O'Rourke, Jr., #380335) <br> (Kimberly A. Stone, # 630952) |

### DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

### INTRODUCTION

Defendant, The Narragansett Electric Company ("Narragansett"), submits this Memorandum in Opposition to the Motion of Defendant, TransCanada Power Marketing Ltd. ("TransCanada"), to compel production of several categories of irrelevant documents requested in discovery in this action. Contrary to what the voluminous file in this matter might suggest, the issue presented by this case is relatively straight forward. TransCanada claims that Narragansett breached a contract with TransCanada by failing to request that the State of Rhode Island approve a so-called "fuel adjustment factor" when it approved the rates which Narragansett could charge for its wholesale "standard offer" electricity service for the years subsequent to 2004. The fuel adjustment factor ("FAF") in the parties' Wholesale Standard Offer Service Agreement ("WSOS Agreement") was an additional amount to be paid to TransCanada, as the supplier of electricity, by Narragansett, as the purchaser of electricity, when certain market-place pricing triggers are met, in accordance with the terms of the clause in which it is referenced, and

during certain years, and when it was approved by the regulator for collection in Narragansett's retail rates. The parties dispute the time period during which an FAF was contemplated. Thus, the documents which are probative of this dispute are relatively few. To date, Narragansett has devoted hundreds of hours of employee and outside counsel time to search for and produce responsive documents, and has produced over twenty thousand pages of documents responsive to TransCanada's lengthy requests. Narragansett maintains that it has produced virtually all documents which it has in its possession which are responsive to appropriate requests, and that it will have produced all such documents by the time of any hearing on TransCanada's Motion.

With respect to the four categories of documents which TransCanada identified within its Motion to Compel, it would be impracticable, if not impossible, for Narragansett to answer some of TransCanada's forty-one document requests as written. By its Motion to Compel, TransCanada seeks to compel production of documents: (1) concerning Narragansett's entire standard offer electrical service in the EUA Zone (that is, the geographic area previously served by Blackstone and Newport prior to its merger with Narragansett), including contracts and correspondence with other electricity suppliers which were entered into subsequent to execution of the contract at issue; (2) concerning a predecessor's "backstop" supply obligations which were extinguished when TransCanada purchased its standard offer service obligations; (3) concerning fuel adjustment provisions "in general," in any context, contract or tariff, anywhere, at any time; and (4) concerning "other" topics, such as those concerning an unrelated Rhode Island Settlement Agreement and the legislative history of the Rhode Island Utility Restructuring Act. Not only would it be prohibitively expensive and time consuming to search for and produce these far-reaching categories of document, but it would in the end lead to production of tens of thousands of documents which shed no light on whether or not Narragansett has an obligation to

2

request regulatory approval of a retail FAF for the parties' WSOS Agreement for the period beyond 2004. Narragansett has acted in good faith in meeting its discovery obligations in this matter, and neither an order to produce further documents nor an award of attorneys' fees or costs to TransCanada is warranted.

## FACTUAL BACKGROUND

All of the facts below are taken from the Complaint, Answer and Counterclaim, and the Affidavits of Michael Hager and Kimberly A. Stone, filed in this matter.

### A.   The Parties

Narragansett is a specially chartered Rhode Island public utility corporation. It is an electric distribution company whose charter permits it to deliver electricity over its wires to retail customers in thirty-eight Rhode Island cities and towns, with a population of over 1 million people. Affidavit of Michael J. Hager Aff. ¶ 5[1]. Narragansett is the largest such electric utility in Rhode Island, serving most of that State's customers. Id. It presently delivers electricity to approximately 480,000 customers, of which over 475,000 receive standard offer service. Id. Narragansett has the exclusive right to own and operate distribution equipment for delivery of electricity at retail in these cities and towns. Id. Unlike non-utility companies, Narragansett does not set the prices at which it provides these services. Rather, it sells and delivers electricity pursuant to retail tariffs that the Rhode Island Public Utility Commission ("RIPUC") has approved.

TransCanada, a Delaware corporation, is a power marketing company that sells electricity at wholesale to Narragansett.

---

[1] The Affidavit of Michael Hager was previously submitted as Exhibit E to the Affidavit of Vincent F. O'Rourke, Jr., filed with Narragansett's Opposition to TransCanada's Motion to Enjoin the Rhode Island Action. The Hager Affidavit is being filed again with this Opposition, as Exhibit A to the Affidavit of Kimberly A. Stone ("Stone Aff.") for this Court's convenient reference.

3

Narragansett's predecessor companies, Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") also were retail electric distribution companies in Rhode Island. Like Narragansett, Blackstone and Newport provided their services pursuant to retail tariffs approved by the RIPUC. Eastern Utilities Associates ("EUA"), a public utility holding company, had owned Blackstone, Newport, and Montaup Electric Company ("Montaup"), the wholesale electricity supplier to Blackstone and Newport. On May 1, 2000, Blackstone and Newport merged with and into Narragansett. At the same time, National Grid acquired EUA, and Montaup merged with and into New England Power Company, another subsidiary of National Grid USA. Consequently, Narragansett became the retail electric supplier and distribution company for Blackstone and Newport's customers, in addition to its already existing customers.

**B.     The WSOS Agreement**

On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement. Under the Asset Purchase Agreement, TransCanada (1) purchased rights and obligations under a power purchase agreement between Montaup and the Ocean State Power ("OSP") generation station in Burrillville, Rhode Island; (2) entered into an agreement to effectuate the OSP purchase power obligations; and (3) agreed to supply a specific percentage share of electricity required by Blackstone and Newport to serve their Rhode Island customers. In connection with this supply obligation, TransCanada entered into the WSOS Agreement with Blackstone and Newport.

Montaup was required by the State of Rhode Island, as part of divestiture, to provide so-called "backstop service" to Narragansett for its Standard Offer Service customers, at a tariff rate, if it did not receive bids for supply of that service under Standard Offer Service.

TransCanada took on the responsibility to provide Standard Offer Service when it bid upon and won the rights and obligations under the power purchase agreement. It did not "assume" Montaup's backstop obligations.

At the heart of this dispute is the WSOS Agreement's fuel adjustment clause. Pursuant to this clause, Blackstone and Newport (now Narragansett) were obligated to pay an FAF to TransCanada if certain market-place triggers reached certain levels, to the extent to which that FAF was authorized by their state approved retail tariffs and Narragansett recovered it from its customers. The WSOS Agreement made clear that Blackstone and Newport's obligation to make payments under the FAF was conditioned upon regulatory approval by RIPUC of the FAF in their tariffs and collection.

Shortly after the WSOS Agreement was executed, Blackstone and Newport filed identical retail tariffs that contained the FAF. Consistent with the terms of the contract, the FAF provision in the filed tariff commenced in the year 2000 and expired after 2004. There were no provisions in the tariffs that provided for extending the FAF beyond 2004. These retail tariffs were approved by the RIPUC by order issued July 10, 1998. See July 10, 1998 Order, attached to the Stone Aff. as Exhibit B. The FAF remained in the Blackstone and Newport tariffs, unchanged, through the date that Blackstone and Newport merged into Narragansett.

On February 8, 2000, in anticipation of the pending merger of Narragansett, Blackstone and Newport, Narragansett informed TransCanada that it would pay an FAF consistent with Blackstone and Newport's RIPUC-approved retail tariffs. (Stone Aff. at Exhibit C). Accordingly, Narragansett attached to the correspondence a schedule containing the FAF for each year from 2000 through 2004. Narragansett sent this letter to TransCanada in draft form and asked TransCanada to review it. Representatives from TransCanada and Narragansett

communicated regarding the letter, and TransCanada voiced no objections to the contents of the letter. On April 18, 2000, Narragansett put the draft letter in final form and sent it to TransCanada. (Stone Aff. at Exhibit D). TransCanada again voiced no objections to the contents of this correspondence.

**C.     Proceedings Before the RIPUC**

Subsequent to the merger, Narragansett administered the WSOS Agreement consistent with its understanding that the FAF would expire after 2004. In fact, at several proceedings before the RIPUC, Narragansett expressed this understanding to the RIPUC. These proceedings were noticed and open to the public. Furthermore, in recent years, the RIPUC has made its orders and notices available on the web. Examples of the several public proceedings before RIPUC include: in June of 2000, Narragansett explained to the RIPUC that payment of an FAF for the wholesale standard offer service agreements for the former EUA companies Blackstone and Newport (the "EUA Zone WSOS Agreements") would end after 2004. On May 28, 2003, in another public hearing before the RIPUC, Narragansett explained its understanding of the WSOS Agreement that it was not obligated to make FAF payments under the EUA Zone wholesale standard offer service agreements after 2004. Consistent with its understanding of the WSOS Agreement, Narragansett filed with the RIPUC proposed standard offer rates that were based on a forecast of power costs that assumed no FAF payments would be made under the EUA Zone wholesale standard offer service agreements after 2004. Additionally, on July 1, 2004, Narragansett filed an application with the RIPUC to set its rates effective as of October 1, 2004. Again, the filing proposed rates based on a forecast of costs that assumed no FAF payments being made to TransCanada after 2004.

The RIPUC approved Narragansett's rates effective August 1, 2004 pursuant to an open meeting decision on July 26, 2004 and an order dated August 26, 2004.

Likewise, on November 10, 2004, Narragansett made another publicly-noticed filing with the RIPUC relative to retail standard offer service. This filing proposed rates based on a forecast that no FAF payments would be made with regard to the EUA Zone wholesale standard offer service agreements. A bench decision delivered at a public hearing on December 13, 2004, and confirmed by a written order issued February 17, 2005, approved Narragansett's filing.

By its own election, TransCanada failed to participate in these hearings. As the RIPUC itself acknowledged in a letter to Michael Hachey of TransCanada,

> TransCanada has chosen not to participate in those publicly noticed hearings. As I am sure you are aware, all members of the public, including suppliers, are invited to participate through the public comment process at the Commission. Additionally, all Narragansett rate filings are posted on the Commission's website prior to the hearings as are all Commission Orders shortly after their issuance.

See Apr. 6, 2005 Letter, attached to the Stone Aff. as Exhibit E.

Consistent with its understanding of the WSOS Agreement, the terms of the retail tariff that had been initially approved by the RIPUC in 1998, the April 18, 2000 letter that had been sent to TransCanada at the time of the merger, and its filings with the RIPUC, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005. TransCanada admits that it complained to Narragansett about this issue *for the first time* after Narragansett did not make any FAF payments for the month of January 2005. Hager Aff. ¶ 7. This litigation ensued shortly thereafter.

## DISCUSSION

I.  **TRANSCANADA'S FAR-REACHING DISCOVERY REQUESTS ARE INAPPROPRIATE FOR THIS RELATIVELY STRAIGHT-FORWARD CONTRACT DISPUTE.**

In order to analyze the parties' respective positions on the scope of warranted discovery in this matter, this Court must look to the scope and nature of their dispute. This dispute, while involving large sums of money and implicating thousands of Rhode Island ratepayers, is nothing more than a contract dispute. This contract dispute focuses upon the obligations under the FAF clause in the parties' WSOS Agreement and, more specifically, whether or not the FAF is required to, or was ever intended to, extend past 2004.

Thus, the documents which are probative of this dispute are relatively few- (1) the WSOS Agreement itself; (2) all documents about that contract-- negotiation (including drafts, markups, notes, memoranda, electronic mail correspondence, communications) and administration (including correspondence about the Fuel Adjustment Factor in this contract, testimony and merger documents about administration of this Fuel Adjustment Factor in this contract); (3) all other documents which pertain to the FAF in this contract (including testimony about the applicability of the FAF, TransCanada's bid for OSP, Standard Offer Service rate filings and testimony before RIPUC concerning the FAF in the EUA Zone during this contract and after 2004); (4) all correspondence between Narragansett and TransCanada; and (5) all correspondence between any EUA company and TransCanada pertaining to the contract and/or the FAF.

In stark contrast, many of TransCanada's forty-one document requests, literally taken, would require Narragansett to search hundreds of thousands of documents dating back more than eight years in order to locate scores of documents concerning far-reaching topics such as entire

{Client Files\LIT\304810\0001\00655631.DOC;4}

statutory schemes and legislative history, the entire merger between Narragansett and several Rhode Island predecessors, all asset divestitures, and other contracts with other providers including those in other states. Not only would it be impracticable, if not impossible, for Narragansett to answer some of these requests as written, but it would be prohibitively expensive and time consuming, while in the end leading to production- probably six months or more in the future- of tens of thousands documents which shed no light on whether or not Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period beyond 2004.

II.   NARRAGANSETT HAS ACTED WITH THE UTMOST GOOD FAITH AND ATTENTION TO DETAIL IN CARRYING OUT ITS DISCOVERY OBLIGATIONS IN THIS MATTER.

Narragansett took great care to respond to TransCanada's discovery requests in good faith, with detailed responses, careful and specific explanation of those portions of the voluminous requests which it found to be objectionable, reasonable alternative constructions of TransCanada's more far-reaching requests, and voluminous production of documents responsive to non-objectionable portions of TransCanada's requests. Narragansett's detailed written Response to TransCanada's First Request for Production of Documents ("Narragansett's Response") is attached to the Affidavit of Wendy S. Plotkin as Exhibit D filed with TransCanada's Motion to Compel.

Subsequent to Narragansett's Response, counsel for Narragansett participated in good faith in telephone conferences and exchange of email correspondence with counsel for TransCanada in order to eliminate or narrow areas of disagreement. (Stone Aff., at ¶2). To date, Narragansett has devoted hundreds of hours of employee time to search for responsive documents, and has produced over twenty thousand, eight hundred and fifty-eight (20,858) pages

9

of documents responsive to TransCanada's lengthy requests. (Stone Aff. at ¶3).[2] In fact, this voluminous amount of documents was produced in an electronic format to assist all parties in their document review, storage and organization. (Stone Aff. at ¶4). Moreover, as indicated within Narragansett's Response and as discussed with TransCanada's counsel from the very beginning of production in this matter, search for and production of responsive documents continues in good faith and is ongoing on a rolling basis. (Stone Aff. at ¶5). Finally, in recognition of any priority right TransCanada may believe it has in the discovery process due to its first service of discovery requests with its Complaint and in an effort to work cooperatively in this discovery process, Narragansett refrained to date from serving its own discovery requests until such time as the majority of documents responsive to TransCanada's discovery requests were produced.[3]

III.  **NARRAGANSETT HAS PRODUCED ALL OF THE MOST RELEVANT DOCUMENTS AND BY THE TIME OF HEARING WILL HAVE PRODUCED ALL DOCUMENTS WHICH IT HAS IN ITS POSSESSION WHICH ARE RESPONSIVE TO APPROPRIATE DOCUMENT REQUESTS, AND THE REMAINING REQUESTS SEEK ONLY IRRELEVANT AND UNNECESSARY DOCUMENTS, FAR AFIELD FROM DISPOSITION OF THE CONTRACT CLAIMS AT BAR.**

Narragansett maintains that, by the time of the hearing on this Motion, it will have produced all documents which it has in its possession which are responsive to appropriate

---

[2] TransCanada now argues to this Court that the enormous volume of documents produced thus far by Narragansett is not dispositive (even, apparently, of Narragansett's obvious good faith) since it alleges many of the documents produced by Narragansett are "no more than publicly available regulatory documents and a small handful of other documents." (TransCanada's Memorandum in Support of Motion to Compel Production of Documents ("TransCanada's Memorandum"), at p. 2). Frankly, Narragansett objected to production of "publicly available regulatory documents" on this very basis as they were equally available to TransCanada and, thus, a waste of resources and time to produce. However, the fact remains that TransCanada <u>requested</u> these documents and insisted on their production and it cannot now complain about <u>receiving</u> them or about the time absorbed in producing them. Similarly, as outlined herein, the reason that there are only a "handful of other documents" which are pertinent to this dispute should be clear from the discrete nature of this contract dispute and this fact certainly cannot form the basis of a determination of bad faith by, or an award of attorneys' fees against, Narragansett in this matter.

[3] As this has now been substantially accomplished, Narragansett's own discovery requests will be served forthwith.

requests.[4] TransCanada's statement that "Narragansett still has not produced any of the most relevant documents" (see TransCanada Memorandum at p. 15) is inaccurate and misleading. The "most relevant documents" to this contract dispute are (1) the contract; (2) documents about the contract such as negotiation documents, to the extent they exist; (3) any document illustrating either party's interpretation of the contract at any relevant time; and (4) all documents concerning the FAF in the contract. These documents, to the extent which they exist, have been produced by Narragansett to TransCanada. For example, the following "most relevant documents" have been produced: WSOS Agreement (produced at NARR 8936-8953); correspondence between the parties concerning the WSOS Agreement (see e.g., NARR 9050-9056, NARR 3119-3123, NARR 7932); bidding information for the WSOS Agreement SOS (NARR 7933-7936); mark-up of Asset Purchase Agreement (NARR 7938-8007); public testimony before and public filings with RIPUC as to the FAF expiring after 2004 (see e.g., NARR 2761-2802, NARR 7484 – 7491, NARR 516-593, NARR 4583 – 4584, NARR 1426 – 1601, NARR 4800-4885); and RIPUC decisions and orders approving Narragansett's rates with the FAF expiring after 2004 (see e.g., NARR 1412 – 1425, NARR 974 – 1024, NARR 1025 – 1043).

The simple fact that there are not reams of discoverable documents which go to the heart of this dispute is not through any fault or failing of Narragansett. In fact, Narragansett was very clear about this fact in its written discovery Response when it said, multiple times, that "[t]he parties' contract, the WSOSA, is clear and the documents concerning it, including its negotiation

---

[4] As contemplated by a "rolling production of documents," where responsive documents are sent for scanning and production as they are located internally to ensure a constant and fast turn-around of responsive documents, additional documents have been produced by Narragansett to TransCanada subsequent to TransCanada's filing of its Motion to Compel. More specifically, the privilege log to date (see TransCanada's Memorandum at pp. 16 – 17) and the organizational charts and document retention policies (see TransCanada's Memorandum at p. 15) will be produced forthwith. (Stone Aff. at ¶6).

{Client Files\LIT\304810\0001\00655631.DOC;4}

and administration, and the obligations under the FAF clause are relatively few." (See e.g., Narragansett's Response at p. 6). This was not mere superfluous verbiage. Narragansett was aware that the documents surrounding the negotiation of the WSOS Agreement and, more particularly, the operation of the FAF, were very limited. As the parties had been in negotiations about this dispute for some months prior to the filing of this litigation, a preliminary search for and review of any directly relevant documents had been done. As a result, Narragansett was speaking from a position of knowledge in its written discovery Response. It appears that if there were any direct discussions about the FAF in the WSOS Agreement prior to its execution, which Narragansett doubts, then those discussions were likely oral as they are not evidenced by any documents than that which have been produced.

With respect to the four categories of documents which TransCanada identified within its Motion to Compel, Narragansett maintains that they are inappropriate to this dispute and discusses each of these categories in the same order which TransCanada addresses them in its Memorandum, as follows:

    A.    <u>Documents pertaining to Narragansett's entire Standard Offer Service in the entire EUA Zone, including concerning other suppliers.</u>

Many of TransCanada's requests (TransCanada lists these as Requests 4, 5-7, 12-13, 15-22, 27 and 32-34; Narragansett sees the most directly relevant Requests on this topic to be numbered 13-15, 17, 18, and 22-23) seek documents about Narragansett's Standard Offer Service ("SOS") in the entire EUA Zone, expressly including documents concerning <u>other</u> agreements Narragansett has or had with <u>other</u> suppliers. This request is probably where there is the most fundamental difference of opinion between Narragansett and TransCanada on the scope

12

of discovery in this matter. Narragansett has objected to this category of requests on several bases.

First, these requests seek agreements outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOS Agreement for the period after 2004. This is a contract dispute, and thus should be decided by the language of the parties' contract or, if this Court were to determine that the contract is ambiguous on any point, by the intent of <u>these parties</u> in effectuating <u>this contract</u>, through negotiation documents, if any. The parties' intent cannot be construed through documents pertaining to <u>other</u> contracts with <u>other</u> parties, with terms which were unknown to TransCanada, especially where those agreements were entered into at times <u>after</u> the WSOS Agreement at issue.

Second, these requests seek proprietary and confidential information concerning business arrangements which Narragansett has with other suppliers. Since these agreements and documents cannot shed light on the parties' expectations or dealings with respect to the WSOS Agreement for the reasons described above, TransCanada can only seek them in order to gain an inappropriate business advantage over its direct competitors. This kind of competitive advantage should not be gained via the discovery process in an unrelated case involving a relatively straight-forward contract dispute.

Third, TransCanada's argument pertaining to good faith and fair dealing with respect to other suppliers is misplaced. Narragansett's obligations to TransCanada are defined by the WSOS Agreement, which was negotiated and then executed by these two parties. The terms governing any payment of an FAF to TransCanada are in this contract. Narragansett was free to

contract differently with other suppliers, and those terms would not govern Narragansett's relationship with TransCanada. Even if Narragansett had contracts or discussions with other suppliers which provided for or contemplated payment of an FAF past 2004, those contract terms or discussions would not govern or even be relevant to Narragansett's contract with TransCanada.

That principal is sound and Narragansett maintains its objections on those grounds. Nevertheless, in this case it may be a distinction without a difference. In order to alleviate any remaining concerns which TransCanada or this Court may have pertaining to any "unequal treatment" between TransCanada and other suppliers in the EUA Zone as to operation of the FAF after 2004, Narragansett is prepared to enter into an appropriate stipulation and/or provide an affidavit which certifies that <u>no other Narragansett SOS supplier in the EUA Zone has an agreement which provided for payment of an FAF subsequent to 2004</u>. In other words, the FAF clauses and discussions with other suppliers in the EUA Zone- TransCanada's direct competitors- also provide for payment of an FAF only through 2004 and no other supplier has been paid an FAF after 2004.

    B.       <u>Documents pertaining to EUA's "backstop" Standard Offer Service obligations</u>.

Those requests which seek documents about EUA's "backstop" SOS obligations (TransCanada lists these as Requests 4, 6-7, 12, 16, 20, 28 and 32; Narragansett sees the most specific request on this topic to be numbered 12) are objectionable and inappropriate for several reasons.

First, as set forth earlier, this request seeks documents concerning an agreement outside of the parties' contract, which is not relevant to the dispute over whether Narragansett has an

14

obligation to request regulatory approval of a retail FAF for the parties' WSOS Agreement for the period after 2004. The parties' intent cannot be construed through documents pertaining to another contract, between completely different parties.

Second, TransCanada's repeated assertion that it "assumed" EUA's backstop obligations via the WSOS Agreement is simply incorrect. Montaup's backstop obligation was required by the State of Rhode Island as part of divestiture, whereby Montaup would have been required to supply electricity to Narragansett for Narragansett's Standard Offer Service customers pursuant to a FERC-filed tariff, if it did not receive bids for supply of wholesale Standard Offer Service. TransCanada bid upon and won the right to provide wholesale Standard Offer Service- it did not "assume" Montaup's backstop obligations. Montaup did not have to provide this backstop service, and thus its backstop obligations were extinguished, because TransCanada and other suppliers took on the entire SOS obligation through various purchases and bids. Thus, documents pertaining to Montaup's backstop obligation are completely and wholly irrelevant to TransCanada's SOS obligation.

C. <u>Documents pertaining to Narragansett's fuel adjustment provisions in general, in any energy supply contract or retail tariff</u>.

Requests numbered 22 and 36 seek documents pertaining to Narragansett's fuel adjustment provisions in general, in <u>any</u> energy supply contract or retail tariff. These requests are plainly objectionable.

First, like the other categories of objectionable requests, these requests seek documents concerning agreements outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the

15

parties' WSOS Agreement for the period after 2004. This is a contract dispute, and thus should be decided by the language of the parties' contract or through negotiation documents, if any.

Second, to the extent that these requests seek documents pertaining to any electric supply contract in general, outside of the FAF in this dispute, then these requests are vastly overbroad. "Any electric supply contract" is an even broader category of contracts than merely Standard Offer Service contracts. Further, "any electrical supply contract" encompasses a universe of terms, both wholesale and retail. Also, the terms and negotiation of the terms have nothing whatsoever to do with the application of any FAF or contract clause containing an FAF or any entity's obligation to request same. Provisions in these distinct supply contracts, and Narragansett's discussions and negotiations with other suppliers, have absolutely nothing to do with whether or not TransCanada is entitled to receive payment of an FAF under the WSOS Agreement after 2004. Thus, these requests are overbroad as written. Further, it appears to ask Narragansett to conduct research into the standards, norms and opinions of the electrical supply industry as a whole.

Third, TransCanada seeks "all documents concerning analysis of or use of fuel adjustments generally in electrical supply contracts," without limitation in scope, analyst or time. This request is overbroad. For instance, there have been separate rate hearings solely addressing the topic of which Rhode Island ratepayers are properly included in the Standard Offer Service pool. There are literally dozens of examples just like this. If construed as written, this request would require review of tens of thousands, if not hundreds of thousands, of pages of documents, the vast majority of which would be irrelevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004.

To the extent that these requests seek (or are narrowed to seek) documents created by Narragansett on the amorphous issue of "when Narragansett uses fuel adjustment factors" as in the nature of a philosophical analysis detached from the WSOS Agreement, Narragansett can state that no such documents exist.

D.     "Other" documents, such as concerning the Rhode Island Settlement Agreement and Narragansett's understanding of the Rhode Island Utility Restructuring Act.

Finally, TransCanada lists nine bulleted categories of documents which it alleges have not been produced by Narragansett in this matter. (TransCanada Memorandum at p. 15). Narragansett addresses these, in turn:[5]

1.     Bullets 1 through 4 and 7: Documents concerning the WSOS Agreement.

As set forth herein at pp. 10-12, to the best of Narragansett's knowledge at this time, all of the most relevant documents concerning the WSOS Agreement, the contract in dispute in this action, have been produced to TransCanada. Moreover, by the time of the hearing on this Motion, all documents concerning the WSOS Agreement will have been produced.

2.     Bullet 5: Documents concerning the drafting and negotiation of the Rhode Island Settlement Agreement entered into as part of divestiture.

As an initial matter, TransCanada misrepresents that counsel for Narragansett "agreed" to produce this category of document. First, Narragansett plainly objected to producing any of these documents in its written Response. (see Narragansett's Response to Request no. 9, at p. 11). Second, during one of the telephone conference calls seeking to narrow or eliminate

---

[5] Narragansett does not herein address bulleted points 8 or 9, as they address documents (organizational charts and document retention policies) which have since been produced to TransCanada as part of Narragansett's rolling production process.

17

dispute over discovery, Narragansett's counsel maintained its objections to the appropriateness of this request but agreed to produce the Rhode Island Settlement Agreement <u>itself</u>- <u>not</u> any documents concerning the "drafting or negotiation" of same. (Stone Aff. at ¶7).

Moreover, Narragansett's objections are well-founded. Request numbered 9 is overbroad, overly burdensome, and seeks irrelevant documents pertaining to an agreement outside of the parties' contract, which are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOS Agreement for the period after 2004. The Rhode Island Settlement Agreement is a document which Narragansett negotiated and entered into with parties and which was approved by the Rhode Island Public Utilities Commission in the context of divestiture. Even Standard Offer Service is but a small portion of the subject matter. The Rhode Island Settlement Agreement is not the subject of this dispute and the documents evidencing or constituting it are completely and wholly irrelevant.

3. <u>Bullet 6: Documents concerning Narragansett's interpretation of the Rhode Island Utility Restructuring Act, a public statute passed by the Rhode Island Legislature.</u>

Request numbered 3 seeks documents concerning the Rhode Island Utility Restructuring Act ("URA"). Narragansett objected to this request as overbroad, overly burdensome, irrelevant, vague and ambiguous, and not calculated to lead to admissible evidence, and seeking information which is outside of Narragansett's knowledge, custody or control and which is equally available to TransCanada within the public domain. First, TransCanada sought a copy of the URA, a public statute passed by the Rhode Island Legislature which is available to the general public by a variety of databases, "all documents concerning the URA," together with an undefined and unlimited "legislative history" of the URA. This request is well beyond the limits

of reasonable discovery requests, particularly given that such documents are either as readily available to TransCanada as to Narragansett and/or are not relevant to this contract dispute.

Second, even to the extent that TransCanada limited this request to seek only documents pertaining to Narragansett's interpretations of the URA, this request remains objectionable. Even if Narragansett maintained files of its own interpretations of various state statutory schemes, such files would be privileged as they would likely have been created by counsel and they would be completely irrelevant to this contract dispute. Narragansett's "understanding" of the URA has nothing to do with its contractual obligation to pay an FAF as negotiated and executed in its WSOS Agreement with TransCanada.

Third, as indicated to counsel for TransCanada during conference calls seeking to narrow or eliminate discovery dispute, this discussion appears to be futile as Narragansett does not have any documents generally interpreting its "obligations" under the URA.

## CONCLUSION

For the foregoing reasons, Narragansett requests that TransCanada's Motion to Compel be <u>denied</u> in its entirety and that Narragansett be <u>awarded</u> its reasonable costs and attorneys' fees for having to defend against a baseless motion.

THE NARRAGANSETT ELECTRIC
COMPANY
By its Attorneys,


/s/ Vincent F. O'Rourke, Jr.
Michael P. Angelini (BBO #019340)
Vincent F. O'Rourke, Jr. (BBO #380335)
Kimberly A. Stone (BBO #630952)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
Tel. No.: 508/791-3511

Dated: February 15, 2006

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 15, 2006.

/s/ Vincent F. O'Rourke, Jr.