UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 05-40076FDS |
| ) | |
| NARRAGANSETT ELECTRIC COMPANY, ) | |
| ) | |
| Defendant. ) | |

## REPLY BRIEF IN SUPPORT OF MOTION TO COMPEL [MOTION FOR LEAVE GRANTED 3/1/06]

Plaintiff TransCanada Power Marketing Ltd. ("TransCanada") hereby replies to

"Defendant's Memorandum in Opposition to Plaintiff's Motion Compel" ("Opposition").

In its Opposition, Defendant Narragansett Electric Company ("Narragansett") offers no

viable legal arguments to support its failure to provide discovery.  Instead, Narragansett

completely ignores the requirements of Rule 26 and argues the merits of the case.  Essentially,

Narragansett argues that, under *its view of the dispute and its theory of the case*, TransCanada is

not entitled to discovery.  Narragansett notably cites not a single legal authority to support this

novel discovery rule, or to refute the case law cited by TransCanada which clearly establishes the

relevance of the specific categories of documents TransCanada seeks based on its well-pled

allegations and claims.   Moreover, in its misplaced attempt to rebut TransCanada's allegations,

Narragansett misrepresents the subject matters on which TransCanada seeks discovery.

TransCanada's Motion to Compel should be granted in its entirety.

1

4048614v1

# **ARGUMENT**

I.    Under Rule 26, TransCanada is Entitled to Broad Discovery to Investigate Its
      Theories of the Case

Narragansett's entire Opposition is based on the faulty legal premise that this Court should,

in evaluating whether TransCanada is entitled to discovery: (i) deem TransCanada's allegations

in its Complaint to be false; and (ii) adopt Narragansett's theory of the case.  That is not the way

discovery works.

Rule 26 contemplates wide-ranging discovery to the fullest possible extent.  *See Klonoski v.*

*Mahlab*, 156 F.3d 255, 267 (1st Cir. 1998).  As the First Circuit in *Klonoski* instructed:

> The word relevant encompasses any matter that bears on, or that reasonable could lead to
> other matters that could bear on, any issue that is or may be in the case . . . [D]iscovery is not
> limited to issues raised by the pleadings, for discovery itself is designed to help define and
> clarify the issues.  Nor is discovery limited to the merits of the case, for a variety of fact-
> oriented issues may arise during litigation that are not related to the merits.

*Id.*  The underlying purpose of discovery is to allow the parties to access information that will

assist them in developing their theories and positions in the case.  *See id.*  A motion to compel is

not like a motion for a preliminary injunction, which asks – what is the likelihood of success on

the merits of a case?  Instead, a motion to compel simply focuses on whether the material

requested falls under the broad scope of relevancy and discovery permitted by Rule 26.

TransCanada is entitled to discovery to develop *TransCanada's* claims and theories in this

case.  Under Rule 26, the documents sought by TransCanada are both relevant and discoverable,

and Narragansett should be compelled produce all responsive documents immediately.

4048614v1

II.     The Categories of Documents Sought by TransCanada are Relevant to this Dispute

   A.     **Documents Relating to Fuel Triggers in the EUA Zone Generally and Contracts with Other Suppliers in the EUA Zone.**

Narragansett offers no credible argument in opposition to TransCanada's requests for specific documents concerning the EUA Zone.

First, Narragansett fails even to address TransCanada's cited authority holding that (i) documents concerning Narragansett's past and future practices, and intent, with respect to its EUA Zone SOS Tariff filings, are relevant and discoverable (Motion to Compel, at 8-9); and (ii) documents concerning Narragansett's treatment of the disputed clause in similar contracts is also relevant and discoverable.  (*Id.* at 10.)   Based and this uncontroverted case law alone, TransCanada's Motion as to these documents should be granted.

Narragansett's only defense to production of documents regarding the EUA Zone is to dispute the merits of TransCanada's claims.  (*See* Opposition, at 5-7.)  Specifically, Narragansett appears to imply that, because the RIPUC approved an EUA Zone SOS Tariff in mid-1998 which in Narragansett's view did not include a fuel adjustment past 2004, TransCanada is entitled to no further discovery on EUA/Narragansett's intent with respect to the applicability of a fuel adjustment through 2009.  (Opp. at 5.)

Narragansett, however, cannot choose to rely upon and produce only the evidence that it feels supports its case or that it deems relevant.  Moreover, a few simple examples show that EUA/Narragansett's intent with respect to its EUA Zone Tariff filings contradicts Narragansett's arguments:

First, at the time the WSOS Agreement was signed on April 7, 1998, no EUA Zone SOS Tariff was *even in place, or was pending for approval*.  Instead, an "Interim Generation Service

3

Tariff" was in effect, which expressly stated it was to be replaced by an unspecified future Standard Offer Service Tariff. *See* Tariff 1135, at 1, attached as Ex. A.[1] *See also* Ex. B. to Affidavit of Kimberly A. Stone filed with Opposition, at 2-3.

Second, the EUA Zone SOS tariff which Narragansett relies upon (Opp. at 5) was submitted and approved in July, 1998, *after* the WSOS Agreement was executed on April 7, 1998. That same July, 1998 Tariff also provided the Stipulated Base Price only through *1998* and obviously was to be updated, and Narragansett notably does not argue that TransCanada is entitled to the Stipulated Base Price only through *1998*. In fact, Narragansett replaced its July, 1998 EUA Zone SOS Tariff on numerous occasions after 1998 and on at least a yearly basis, including with subsequent SOS Tariff filings indicating that a fuel adjustment factor *would* be applicable in the EUA Zone *after 2004 and through 2009*. *See, e.g.* Ex. B. (Pre-filed testimony of Michael Hager filed with the RIPUC in November, 2001, at 5-6, and Exhibit MJH-1 to testimony, at 2.) Thus, while Narragansett may argue (weakly) that its alleged July, 1998 SOS Tariff is tangentially relevant to an alleged earlier intent not to file a fuel adjustment after 2004 (or perhaps that this Tariff established a *breach* of the WSOS Agreement as early as July, 1998), further discovery is obviously necessary as to EUA/Narragansett's intent.

Similarly, Narragansett's reliance on the letter it sent to TransCanada in 2000, in anticipation of the merger, is mistaken for numerous reasons. (*See* Opp. at 5-6). First, the letter is again dated *after* the WSOS Agreement was executed. Second, the Attachment to the letter specifically says in its preamble that it covers increases in fuel prices "after 1999," with no end date. *See* Ex. D to Stone Aff. The Attachment lists both fuel adjustments *and* Stipulated Prices only through 2004; the figures appear subject to updating after 2004 and, again, Narragansett notably does not argue that TransCanada is entitled to a Stipulated Price only through 2004.

---

[1] All exhibits cited herein are attached to the Declaration of Wendy S. Plotkin filed with this Reply.

Finally, as stated above, Narragansett in fact made subsequent SOS Tariff filings even after sending its 2000 letter indicating that a fuel adjustment factor would apply in the EUA Zone through 2009.  *See* Ex. B, MJH-1 at 1-2.

To return to the main point, however, this back and forth on the merits of the case is irrelevant and does not support a viable opposition to TransCanada's Motion to Compel.  As TransCanada has alleged (and as the documents cited by TransCanada above also confirm), Narragansett's intent and obligation to file EUA Zone SOS Tariffs with a fuel adjustment after 2004 is disputed and needs to be explored through discovery.  TransCanada is therefore entitled to discover the requested information concerning Narragansett's SOS Tariff filings in the EUA Zone generally.

*(i) Documents concerning contracts with other EUA Zone Suppliers*

Narragansett's further arguments to avoid producing the requested documents concerning other EUA Zone suppliers are meritless.  First, Narragansett does not even address TransCanada's actual case law which clearly holds that the requested documents regarding other EUA Zone suppliers are relevant and discoverable.  Second, in arguing that the documents contain "proprietary and confidential information," Narragansett conveniently neglects to mention that this Court has entered a protective order.   Narragansett cannot avoid production of relevant documents by asserting an empty accusation that TransCanada will improperly use the information it requested.  Third, Narragansett curiously states that, in lieu of documents concerning other EUA Zone suppliers, it will instead provide TransCanada with an affidavit that no other supplier in the EUA Zone has an agreement which provides for payment of a fuel adjustment factor after 2004.  This offer is laughable and clearly self–interested.  First, TransCanada is unaware of any discovery rule which allows a party to offer an affidavit in the

place of relevant documents.  Second, Narragansett also contends that it has no contract with

TransCanada which provides for payment of a fuel adjustment factor after 2004.  These are not

valid objections to production.

### B.     Documents Concerning the Assigned Backstop Obligation

Narragansett argues that documents related to the "backstop obligation," which

TransCanada alleges it assumed by way of the WSOS Agreement when it purchased Montaup's

generation assets, are not relevant because they relate to an agreement "outside of the parties'

contract."  (Opp. at 14.)    Narragansett further argues simply that TransCanada "did not assume

Montaup's backstop obligations," and therefore that TransCanada is not entitled to the requested

discovery.  (Opp. at 5, 14-15.)

Again, Narragansett misses the fact that whether the "backstop obligation" was assumed

is a matter of contention between the parties.  TransCanada is entitled to discovery on this issue,

regardless of Narragansett's merit-based arguments.

It also bears mention that Narragansett's statements regarding Montaup's "backstop

obligation" are rife with inaccuracies.  As TransCanada has alleged, TransCanada acquired

certain of Montaup's generation assets, and under the terms of the RI Settlement Agreement was

required to assume the correlating "backstop" Standard Offer Service.  (Comp. ¶¶ 11-14.)

Excerpts from the RIPUC testimony of an EUA representative, Michael Hirsch[2], illustrate

EUA/Narragansett's understanding of this backstop assignment:

> MR. HIRSH: . . . Montaup is now responsible for backstopping its agreed to share of
> Blackstone and Newport's standard offer load.  As part of the [RI] settlement
> [agreement], what we've also agreed to is that Montaup will assign this backstop
> obligation, along with any [generation] units that are divested. . . .
>
> MR. ROBERTI:  And the response to Commission Data Request 1-14 discusses  . . . your
> current negotiations with the sale of certain [generation] assets  . . . And in those

---

[2] Mr. Hirsch is also the EUA representative that *signed* the WSOS Agreement.  *See* Ex. A to Complaint.

> negotiations is . . . something . . . you are negotiating . . . how much these contracts will cover backstop obligations?
>
> MR. HIRSH: What we have announced is that we have completed an agreement for our ESP-1 and 2 entitlements which will be assumed by TransCanada.

*See* Hirsh Testimony, at 33-34 Ex. C. Mr. Hirsh also further describes:

> . . . presuming there's some [backstop SOS] obligation on Montaup's part left, then we assign portions of that obligation to the buyer's of Montaup's [generation] units so those buyers then execute an agreement with the retail companies to provide that standard offer service for the term and we are done.

*See* Hirsh Testimony, at 128-29    Ex. C. Further evidence, *inter alia,* that the backstop

obligation was assigned under the WSOS Agreement is found in Ex. A, cited above, a letter from

EUA to TransCanada referencing EUA's mark-up of the "Backstop Agreement" (which was

later renamed the WSOS Agreement). *See also* Motion to Compel at 4-5, 12-13.

Thus, Narragansett is not only trying to avoid its discovery obligations by improperly

arguing the merits of the dispute, but stands on a precarious limb with respect to its

representations. Narragansett should be compelled to produce responsive documents relating to

the "backstop obligation" immediately.

### C.    Documents concerning EUA/Narragansett's Use of Fuel Adjustment Provisions in General

TransCanada's Request Nos. 22 and 36, as narrowed, simply seek any documents

concerning *Narragansett's* analysis or use of fuel adjustments in its electrical supply contracts

or retail tariffs. (Motion to Compel, at 7 & n.5, 14.) Narragansett's chief mode of opposition to

these requests appears to be to misrepresent their scope. (*See* Opp. at 17-18. ) For example,

Narragansett makes the silly suggestion that TransCanada expects Narragansett to "conduct

research into the standard, norms and opinions of the electrical supply industry as a whole."

(Opp. at 16.) As is clear from TransCanada's Motion, however, TransCanada is merely seeking

documents that already exist and that are in Narragansett's possession on this topic. Indeed, an example of the type of document TransCanada is seeking was recently filed by Narragansett with the RIPUC (and obtained by TransCanada on its own), yet Narragansett has declined to produce that same document or similar documents to TransCanada in discovery. *See* Ex. D, "1997 Forecast" prepared by LaCapra Associates. Similarly, Narragansett obviously has copies of its retail rate filings and can produce them. (Mot. to Compel, at 7 n.5)

Similarly, Narragansett fails even to rebut the case law cited by TransCanada holding that the requested information concerning Narragansett's usage of fuel adjustments is relevant and discoverable. (*See* Mot. to Compel, p. 14.)

### D.    Other Documents:  Narragansett's Production is Not Sufficient

Finally, Narragansett also argues that TransCanada's Motion should be denied because Narragansett has met its discovery obligations and has produced over twenty-thousand pages of in response to TransCanada's requests. (Opp. at 2.) Narragansett has produced thousands of pages of documents, but the vast majority of that production consists of RIPUC and SEC regulatory filings.

The contract at issue was entered into in the midst of massive restructuring of the electrical utility industry in New England, was for a term of twelve years, and relates to the provision of electricity to a significant portion of Rhode Island consumers. The same transaction included the sale of significant electricity generation assets to TransCanada. Yet Narragansett, by its own admission, has produced a sum total of only 105 pages of bates-stamped documents (Opp. at 11) allegedly relating to all of the drafting, negotiation, administration, and analysis of the WSOS Agreement or the APA (other than public rate filings before the RIPUC, or filings with the SEC.) Included in this 105-page production are the lengthy contract itself, correspondence between the

parties *after* the agreement was entered into, and *one prior draft* of the agreement.  While TransCanada does not question the credibility of the representations of Narragansett's counsel, this sum total of documents in the organization's possession concerning an ongoing multi-million dollar 12-year contract, and the divestiture of signification generation assets, seems incredible.   Narragansett representatives should be ordered to gather and produce the documents in full, and in view of the incredible dearth of documents to further supplement their answers to TransCanada's Interrogatory No. 10 with a full answer as to what happened to the former EUA documents responsive to each of TransCanada's document requests.  *See* Ex. E (Narragansett's Supplemental Response to Interrogatory No. 10).

Finally, TransCanada's requests cover documents concerning the Asset Purchase Agreement ("APA") as well as the WSOS.  Narragansett does not even allege to have produced documents concerning the APA, although it agreed to do so.  *See, e.g.*  Request No. 24 (attached as Ex. C to Motion to Compel).  In addition, with regard to the RI Settlement Agreement, on November 1, 2005 TransCanada expressly limited its requests to documents concerning the specific portions of the RI Settlement Agreement that relate to Standard Offer Service pricing and fuel adjustments.  (*See* Mot. to Compel at 15-6 and Ex. E to Mot. to Compel at 5-6.)    With regard to the URA, TransCanada on November 1, 2005 similarly identified and limited its requests to documents concerning the relevant portions of the statute, such as the provisions relating to fuel adjustments for "extraordinary fuel costs" and Narragansett's obligations to file tariffs for the benefit of its suppliers.  (*See Id*. at 15 and Ex. E at 5.)  TransCanada's Motion to Compel is similarly limited.  (*See* Mot. to Compel at 15.)  The URA and the RI Settlement Agreement established the framework for Standard Offer Service and its pricing, and the parties'

understandings and interpretations of these pricing provisions are relevant and discoverable.  If

the requested documents are privileged, they must appear on Narragansett's privilege log.

### Conclusion

For the reasons set forth above, TransCanada's Motion to Compel should be granted in

its entirety.

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD.,

By its attorneys,


/s/ Wendy S. Plotkin
Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
Dara Y. Zelnick (BBO #660256)
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA  02110
Telephone No.:  (617) 248-5000
Dated: March 1, 2006                    Fax No.:  (617) 248-4000

4048614v1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

|  |  |  |
|---|---|---|
| TRANSCANADA POWER  MARKETING LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-40076FDS |
| | ) | |
| | ) | |
| NARRAGANSETT ELECTRIC COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF WENDY S. PLOTKIN IN SUPPORT OF TRANSCANADA
POWER MARKETING LTD.'S REPLY IN SUPPORT OF MOTION TO COMPEL**

Wendy S. Plotkin deposes and states as follows:

1.      I am an attorney in the law firm of Choate, Hall & Stewart, and a member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts.  I am counsel to the above-named plaintiff and make this declaration in support of TransCanada Power Marketing Ltd.'s Reply in Support of its Motion to Compel Production of Documents.

2.      Attached hereto as Exhibit A is a true and correct copy a letter from Donald Ryan, Manager of Power Resources for Eastern Utilities, to Alexander J. Pourbaix, Vice President, Power and Projects of TransCanada Energy Ltd., dated January 19, 1998, with an excerpted portion of the encloses,  Tariff No. 1135 attached.

3.      Attached hereto as Exhibit B are excerpts of the Pre-Filed Testimony of Michael J. Hager, submitted to the Rhode Island Public Utilities Commission (RIPUC) in November 2001.

4.    Attached hereto as Exhibit C are of excerpts of the transcript of the testimony of Michael Hirsh before the RIPUC on May 12, 1998.

5.    Attached hereto as Exhibit D is a true and correct copy of correspondence from National Grid to the RIPUC on December 21, 2005.

6.    Attached hereto as Exhibit E is a true and correct copy of Narragansett's Supplemental Response to TransCanada's Interrogatory No. 10.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

/s/ Wendy S. Plotkin


Dated:  March 1, 2006

4050102v1

# Exhibit A



**Eastern Utilities**
**Blackstone Valley Electric**
**Eastern Edison**
**EUA Service Corporation**
**Montaup Electric**
**Newport Electric**



January 19, 1998

Alexander J. Pourbaix
Vice President, Power and Projects
TransCanada Energy Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Dear Mr. Pourbaix:

As requested in your mark-up of the Backstop Agreement, enclosed are:

1. Blackstone's Interim Generation Service Tariff R.I.P.U.C. No. 1135;

2. Newport's Interim Generation Service Tariff R.I.P.U.C. No. 1360;

3. Eastern's Standard Offer Service Tariff [draft, filing planned for mid-February];

4. Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers R.I.P.U.C. No. 1363; and

5. Eastern Edison Company Terms and Conditions for Competitive Suppliers M.D.T.E. No. 359.

Please call if you have any questions or if I can be of further assistance.

Sincerely,

Donald C. Ryan
Manager, Power Resources

cc:  Michael J. Hirsh

R.I.P.U.C. NO. 1135

## BLACKSTONE VALLEY ELECTRIC COMPANY
## INTERIM GENERATION SERVICE

AVAILABILITY:

This Rate Schedule for Interim Generation Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, and who have provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and take Interim Generation Service hereunder. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule. Service under this tariff will terminate coincident with the approval by the Rhode Island Public Utility Commission of a Standard Offer Service Tariff.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:            $0.03051      per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:            $0.03051      per kWh

Residential Space Heating Retail Delivery Service Rate R-3

    Energy Charge:            $0.03158      per kWh

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after January 1, 1998 per Open Meeting Decision on December 17, 1997 in Docket 2651.

\\Alfred\ratedgn\CurrentDocs\Tariffs\BVE\igs1135.doc

12/22/97 2:54 PM

R.I.P.U.C. NO. 1135

-2-

## Large Residential Retail Delivery Service Rate R-4

Energy Charge
Peak Hours:                     $0.15384          per kWh
Off-Peak Hours:                 $0.00570          per kWh

## Small Secondary Voltage General Retail Delivery Service Rate G-1

Energy Charge:                  $0.03589          per kWh

## Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option:

Demand Charge:                  $5.81             per kW

Energy Charge:                  $0.01403          per kWh

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option:

Demand Charge:                  $6.11             per kW

Energy Charge
Peak Hours:                     $0.02978          per kWh
Off-Peak Hours:                 $0.00877          per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

## Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option:

Demand Charge:                  $5.29             per kW

Energy Charge:                  $0.01610          per kWh

The Billing Demand in kilowatts for each month will be the maximum
metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option:

Demand Charge:                  $5.48             per kW

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

R.I.P.U.C. NO. 1135

-3-

Energy Charge
    Peak Hours:                $0.03241      per kWh
    Off-Peak Hours:           $0.01054      per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

## Large Secondary Voltage General Retail Delivery Service Rate T-4

Demand Charge:              $5.88      per kW
Energy Charge
    Peak Hours:                $0.03919      per kWh
    Off-Peak Hours:           $0.01027      per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

## Large Primary Voltage General Retail Delivery Service Rate T-6

Demand Charge:              $5.37      per kW

Energy Charge
    Peak Hours:                $0.03914      per kWh
    Off-Peak Hours:           $0.01239      per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

## Large Secondary Voltage Auxiliary
## General Retail Delivery Service Rate A-4

Demand Charge:              $3.70      per kW

Energy Charge
    Peak Hours:                $0.03919      per kWh
    Off-Peak Hours:           $0.01027      per kWh

The Supplementary Interim Generation Service Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of

Date Filed, December 23, 1997        Date Effective, January 1, 1998
                                       For consumption on or after
                                       January 1, 1998 per Open
                                       Meeting Decision on December
                                       17, 1997 in Docket 2651.

R.I.P.U.C. NO. 1135

-4-

Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Interim Generation Service Demand Charge and the Backup Usage Demand
Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in <u>Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4</u>.

Maintenance Power:

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
|     Peak Hours: | $0.03914 | per kWh |
|     Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Interim Generation Service Demand Charge shall be
the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

R.I.P.U.C. NO. 1135

-5-

The Billing Demand Charge shall be the sum of the Supplementary
Interim Generation Service Demand Charge and the Backup Usage Demand
Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6.

Maintenance Power:

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

Energy Charge:              $0.03308      per kWh

General Heating Retail Delivery Service Rate H-2

Energy Charge:              $0.03339      per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

Energy Charge:              $0.03509      per kWh

Lighting Retail Delivery Service Rate S-1

Energy Charge:              $0.03408      per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours
        Monday through Friday excluding holidays defined below
        April through September,    11:00 a.m. to  4:00 p.m.
        October through March,      8:00 a.m. to 12:00 noon, and
                                    4:00 p.m. to  7:00 p.m.
Off-Peak Hours
        All other hours.

Date Filed, December 23, 1997           Date Effective, January 1, 1998
                                        For consumption on or after
                                        January 1, 1998 per Open
                                        Meeting Decision on December
                                        17, 1997 in Docket 2651.

R.I.P.U.C. NO. 1135

-6-

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

## Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

## INTERIM GENERATION SERVICE REVENUE RECONCILIATION ADJUSTMENT:

The Company shall reconcile the revenues billed to Customers taking Interim Generation Service against payments to Suppliers of Interim Generation Service and recover or refund any under- or overcollection in accordance with the following:

Any revenues billed by the Company for Interim Generation Service in excess of payments to Suppliers of that service shall be accumulated in an account and credited with interest. In the event that the revenues billed by the Company do not recover the Company's payments to Suppliers in any calendar year, the Company shall also be authorized to accumulate the deficiencies in this account together with interest into the next calendar year, except when the accumulated balance is expected to be a credit at the end of a calendar year, the Company will petition the Commission to refund that balance to all of the Company's Retail Delivery Service customers through a uniform cents per kilowatt-hour factor in the following year. The Company will periodically notify the Division of the status of the account, and a filing, if necessary, will be made by December 1 based on 10 months actual and 2 months estimated, for a factor to be effective January 1 through December 31, of the following year. Upon approval of a Standard Offer Service tariff, the account balances will be assumed by the Standard Offer Revenue Reconciliation Adjustment.

## BILLING:

The Billing Amount for electric service supplied under this Rate

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

R.I.P.U.C. NO. 1135

-7-

Schedule shall consist of the sum of the Demand Charge and the Energy
Charges and applicable Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Customer may terminate service on five (5) days notice. Phase I
customers who choose to remain with a Nonregulated Power Provider
after December 31, 1997 and those customers that are eligible on
January 1, 1998 and choose to go to a Nonregulated Power Provider will
have additional opportunities to return to the Interim Generation
Service until the Standard Offer Service is approved by the Commission
and is in place.  To exercise this option, customers must provide the
Companies with 30 days written notice and they must return on the
first day of the month (i.e. February 1, March 1, etc.) not their
scheduled billing cycle read date.

TERMS AND CONDITIONS:

The Company's various Terms and Conditions in effect from time to
time, where not inconsistent with the specific provisions hereof, are
a part of this Rate Schedule.

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

# Exhibit B

The Narragansett Electric Company

Rate Changes for January 1, 2002

Testimony and Exhibits
of
Jeanne A. Lloyd,
Michael J. Hager, and
Anne M. Rodrigues

November 2001

Submitted to:
Rhode Island Public Utilities Commission
R.I.P.U.C. Docket No. _____

Submitted by:

**Narragansett Electric**
A **National Grid** Company 

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Witness: Hager

# DIRECT TESTIMONY

## OF

## MICHAEL J. HAGER

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 1 of 12

1    **I.    Introduction**

2    Q.    Please state your name and business address.

3    A.    Michael J. Hager, 55 Bearfoot Road, Northborough, Massachusetts 01532.

4

5    Q.    Please state your position.

6    A.    I am the Manager, Distribution Energy Services for National Grid USA Service

7          Company.  I am responsible for all power procurement and related activities for the

8          distribution companies of National Grid USA (formerly the New England Electric

9          System) including The Narragansett Electric Company ("Narragansett" or "Company").

10         These activities include the procurement of power for Standard Offer Service and Last

11         Resort Service.

12

13   Q.    Will you describe your educational background and training?

14   A.    In 1982, I graduated from the University of Hartford with a Bachelor of Science degree in

15         Mechanical Engineering.  In 1986, I received a Master of Science degree in Mechanical

16         Engineering from Northeastern University.  I am a Licensed Professional Engineer in the

17         Commonwealth of Massachusetts.

18

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 5 of 12

1    over before proposing any plan regarding the disposition of this credit. This will allow

2    the Company and the Division to assess the direction of fuel prices that could impact

3    Standard Offer costs in the future.

4

5    Q.    Please describe the costs that Narragansett incurs under the Standard Offer supply

6        contracts.

7    A.    The Standard Offer supply contracts contain two price components – a base price and a

8        fuel index adjustment provision.

9

10    Q.    What are the base prices for the period January 2002 through December 2004?

11    A.    The base prices are 4.2 ¢/kWh, 4.7 ¢/kWh and 5.1 ¢/kWh for calendar years 2002, 2003

12        and 2004, respectively.

13

14    Q.    Can you describe the fuel index adjustment provision that is contained in the Standard

15        Offer contracts?

16    A.    Yes. The Company's contracts with its Standard Offer suppliers contain a fuel index

17        adjustment provision that provides additional payments to those suppliers in the event of

18        substantial increases in the market price of No. 6 residual fuel oil (1% sulphur) and

19        natural gas. In short, the provision compares the sum of the six-month and twelve-month

1    rolling average of oil and gas prices to a preset trigger point. (The six-month rolling

2    average is used for Standard Offer load in the EUA Zone while the twelve-month rolling

3    average is used for Standard Offer load in the Narragansett Zone.) If the sum of the fuel

4    index values exceeds the trigger point in a given month then the Company makes

5    additional payments to the suppliers in that month. If the sum of the fuel index values is

6    less than or equal to the trigger point in a given month, no additional payments are made

7    in that month. Comparisons are made each month and thus payments may be made in

8    some months and not in others. The text of the fuel index adjustment provision that is

9    applicable to each of the Standard Offer contracts is provided as Exhibit MJH-1.

10

11   **IV.** **Fuel Index Estimate for the Period January 2002 through December 2004**

12   Q.   Has the Company conducted an estimate of expected costs under the fuel index

13        adjustment provisions for the period January 2002 through December 2004?

14   A.   Yes. The Company has estimated its expected costs under the fuel index adjustment

15        provisions in the same manner as its September 2000, December 2000, March 2001 and

16        August 2001 estimates but used average gas and crude oil prices as reported in The Wall

17        Street Journal on 13-Nov-01, 14-Nov-01 and 15-Nov-01.

18

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 1 of 3

### Standard Offer Fuel Index Adjustment Provision

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, NECO will pay additional amounts to Seller in accordance with this Standard Offer Fuel Index Adjustment Provision, which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Index Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---------------|-------------------------|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Seller will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent available twelve months (six months for Standard Offer load in the EUA Zone), where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 2 of 3

month of delivery trades as reported in the "Wall Street Journal",
expressed in dollars per MMBtu. NYMEX Contract shall mean
the New York Mercantile Exchange Natural Gas Futures Con-
tract as approved by the Commodity Futures Trading Commis-
sion for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent
available twelve months (six months for Standard Offer load in the EUA Zone), where:

Oil Index is the average for the month of the daily low quotations
for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into
New York harbor, as reported in "Platt's Oilgram U.S.
Marketscan" in dollars per barrel and converted to dollars per
MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, NECO
shall file alternate indices with the RIPUC.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu,
applicable for all months in the specified calendar year:

| Year | Amount |
|------|--------|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 | $8.48 |
| 2006 | $9.22 |
| 2007 | $9.95 |
| 2008 | $10.69 |
| 2009 | $11.42 |

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 3 of 3

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

# Exhibit C

STATE OF RHODE ISLAND

AND PROVIDENCE PLANTATIONS

PUBLIC UTILITIES COMMISSION



**HEARING IN RE:**          DOCKET NO. 2716

PROPOSED STANDARD OFFER SERVICE
AND LAST RESORT POWER SERVICE FILED
BY THE BLACKSTONE VALLEY ELECTRIC
COMPANY AND NEWPORT ELECTRIC CORPORATION


-------------/

                              MAY 12, 1998
                              9:30 A. M.

                              100 ORANGE STREET
                              PROVIDENCE, RI


**BEFORE:**

        JAMES J. MALACHOWSKI, CHAIRMAN
        KATE F. RACINE, COMMISSIONER, PRESIDING
        BRENDA GAYNOR, COMMISSIONER
        LINDSAY JOHNSON, LEGAL COUNSEL
        ADRIENNE SOUTHGATE, LEGAL COUNSEL


**APPEARANCES:**

FOR THE COMPANIES:    DAVID A. FAZZONE, P. C.
                  and McDERMOTT, WILL & EMERY
                      LAURA S. OLTON, ESQ.


FOR THE DIVISION:    ELIZABETH KELLEHER,
        SPECIAL ASSISTANT ATTORNEY GENERAL


## ORIGINAL

A-1 COURT REPORTERS, INC.
(401) 231-8860

```
1                          I-N-D-E-X

2                                           PAGE NO.

3

4                       ANDREW GALLI

       Statement                                    17
5

6                  MICHAEL J. HIRSH
               LAWRENCE R. BOISVERT
7                JAMES J. BONNER

8
       Direct Examination by Mr. Fazzone          20
9      Cross-Examination by Mr. Roberti            26
       Examination by Mr. Johnson                  43
10     Examination by Ms. Southgate                90
       Examination by the Chairman                 91
11     Examination by Commissioner Gaynor         119
       Further Examination by Mr. Johnson         136
12     Examination by Commissioner Racine         138

13
                    JOHN STUTZ, PhD
14
       Examination by the Chairman                161
15     Examination by Mr. Johnson                 181
       Examination by Commissioner Gaynor         186
16

17

18

19

20

21

22

23

24
```

E-X-H-I-B-I-T-S

EXHIBIT NO.                                    PAGE NO.


PUBLIC COMMENT

1    Statement of CCJ offered by
     Andrew Galli                                  19


FOR BVE/NEC

A    Standard offer and last resort
     service filing                                 9

B    SOCA tariff amendments                         9

C    Responses to Commission data
     requests                                        9


FOR THE DIVISION

A    Prefiled testimony of John Stutz,
     PhD                                           160

1          MR. BOISVERT:  Newport's losses are

2     different.  I don't know what the exact figure

3     is for Newport.

4          MR. ROBERTI:  Mr. Hirsh, on Page 9

5     of your testimony down on Lines 16 and 17 you

6     testify about the remaining amount of

7     Montaup's standard offer obligations for the

8     term 1999 to 2004 and I think you meant 2012.

9          MR. HIRSH:  I meant 2009 I think.

10         MR. ROBERTI:  2009.  I'm sorry.

11         MR. HIRSH:  Right.  That is

12    correct.

13         MR. ROBERTI:  And could you describe

14    for me what you meant by remaining amount,

15    that term or that phrase?

16         MR. HIRSH:  Sure.  As of this

17    auction with no bidders Montaup is now

18    responsible for backstopping its agreed to

19    share of Blackstone and Newport's standard

20    offer load.  As part of the settlement, what

21    we've also agreed to is that Montaup will

22    assign this backstop obligation, along with

23    any units that are divested, and as you are

24    well aware, Montaup is in the midst of the

1    divestiture process.  On top of this any

2    customers that go to the competitive market

3    are no longer part of the standard offer

4    load.  So when we get to this auction in the

5    fall, the standard offer obligation will be

6    pegged to Montaup's obligation under --

7    Montaup's remaining standard offer obligation

8    in the settlement as defined by those two

9    factors.

10           MR. ROBERTI:  And the response to

11    Commission Data Request 1-14 discusses I guess

12    your current negotiations with the sale of

13    certain assets.

14           MR. HIRSH:  That's correct.

15           MR. ROBERTI:  And in those

16    negotiations is that something now that you

17    are negotiating on what level or how much

18    these contracts will cover backstop

19    obligations?

20           MR. HIRSH:  What we have announced

21    is we have completed an agreement for our

22    ESP-1 and 2 entitlements which will be assumed

23    by Transcanada.  That's the extent of

24    transactions so far and as part of that

1    pipeline.  Millstone is expected to come back

2    on service.  Once there is new capacity

3    available so that these bidders can put

4    together a power supply that they can manage

5    to serve this load, they will be much more

6    willing to buy it and there may be bidders who

7    are willing to take lower margins or even

8    negative margins in the earlier years with the

9    prospect of realizing higher margins in the

10   out years that take this seven-year

11   commitment.  In fact, once Millstone is back

12   and new capacity begins to come on line, it's

13   likely that bidders are going to be able to

14   successfully bid all of these years.

15         COMMISSIONER GAYNOR:  Why is this

16   fall a particularly good time if -- I mean,

17   it's possible Millstone may be back in, but

18   are you proposing to just wait and see or are

19   you really definitely going to go with the bid

20   this fall?

21         MR. HIRSH:  This fall isn't

22   necessarily the best time.  What we are doing

23   is we are linking this term bid of Montaup's

24   obligation to the divestiture process.  The

1    sequence of events as initially envisioned in

2    this settlement was that -- just going back to

3    what I referred to in Attachment 4 of the

4    settlement, the time lines the parties

5    envisioned is that we would get these units

6    under agreement and as part of that agreement

7    the buyers of the units would agree that we

8    were going to go to market for this standard

9    offer obligation for the 12-year term and

10   whatever the market didn't take they were

11   going to accept in proportion to the units

12   they bought; whatever the units they bought

13   are contributing to the power requirements of

14   the retail companies.  So we get the units

15   under agreement then we go out to bid for

16   standard offer.  We get the results of that

17   standard offer bid and presuming there's some

18   obligation on Montaup's part left, then we

19   assign portions of that obligation to the

20   buyers of Montaup's units so those buyers then

21   execute an agreement with the retail companies

22   to provide that standard offer service for the

23   term and we are done.

24        COMMISSIONER GAYNOR:  Are the prices

# Exhibit D

# national**grid**

Thomas G. Robinson
Deputy General Counsel
National Grid

December 21, 2005

**VIA HAND DELIVERY & ELECTRONIC MAIL**

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
89 Jefferson Boulevard
Warwick, RI  02888

> **RE:     Docket 3706 – October '05 Standard Offer Adjustment**
> **Responses to Division's Data Requests – Set 2 (Part III)**

Dear Ms. Massaro:

Enclosed please find ten (10) copies of The Narragansett Electric Company's d/b/a National Grid ("Company") response to Division Data Request 2-10.  This filing completes the Company's responses to the Division's Data Requests issued in the above-captioned proceeding.

Thank you for your attention to this filing.  If you have any questions, please feel free to contact me (508) 389-2877.

Very truly yours,

Thomas G. Robinson

Enclosures

cc:     Docket 3706 Service List

280 Melrose Street, Westborough, MA  01582
T: 508-389-2877  ◼  F: 508-389-2463  ◼  thomas.robinson@us.ngrid.com  ◼  www.nationalgrid.com

THE NARRAGANSETT ELECTRIC COMPANY d/b/a NATIONAL GRID
R.I.P.U.C. Docket No. 3706
October 2005 Standard Offer Adjustment Filing
Responses to Division's 2nd Set of Data Requests
Issued on November 23, 2005

Division Data Request 2-10

Request:

How did NEC determine that the fuel surcharge benchmarks were reasonable?  Provide all workpapers supporting this conclusion, if such a conclusion were reached.  Did NEC determine that the fuel surcharge benchmarks were reasonable?  If not, why not?

Response:

The Fuel Trigger Points implied a base price of oil and natural gas which exceeded a commonly accepted range of forecasts for oil and natural gas prices being debated at the time industry restructuring was being considered.  For example, attached is a January 1997 forecast sponsored by La Capra Associates, showing a range of forecasts for natural gas.

Based on these fuel forecast expectations, among other information at the time, the Company believed that the Fuel Trigger Points were reasonable, given the purpose for which they were being used.

In the limited amount of time available, we have not performed a complete search of our archives for other workpapes, if any exist, that might be responsive to this request.

Prepared by or under the supervision of:  Ronald T. Gerwatowski



1997 Forecast
(La Capra Associates)

Firm Gas Delivered Prices

Attachment 3(b)

FUEL.WK4 01/02/97

La Capra Associates

### Certificate of Service

I hereby certify that a copy of the cover letter and accompanying material(s) have been hand-delivered or sent via U.S. mail to the parties listed below.

Joanne M. Scanlon
National Grid

December 21, 2005
Date

**Narragansett Electric Co. – Standard Offer Rate Filing – Docket No. 3706**
Service list as 11/03/05

| Name/Address | E-mail Distribution | Phone/FAX |
|---|---|---|
| Laura S. Olton, Esq.<br>Narragansett Electric Co.<br>280 Melrose St.<br>PO Box 1438<br>Providence, RI 02901-1438 | Laura.olton@us.ngrid.com<br>Thomas.robinson@us.ngrid.com<br>Ronald.Gerwatowski@us.ngrid.com<br><br>Joanne.scanlon@us.ngrid.com | 401-784-7667<br>401-784-4321 |
| Paul Roberti, Esq.<br>Dept. of Attorney General<br>150 South Main St.<br>Providence, RI 02903 | Proberti@riag.ri.gov<br>Steve.scialabba@ripuc.state.ri.us<br>RDiMeglio@riag.ri.gov<br>David.stearns@ripuc.state.ri.us | 401-222-2424<br>401-222-3016 |
| William Lueker, Esq.<br>Dept. of Attorney General<br>150 South Main St.<br>Providence, RI 02903 | Wlueker@riag.ri.gov | 401-222-2424<br>401-222-3016 |
| John Stutz<br>Tellus Institute<br>11 Arlington St.<br>Boston MA 02116-3411 | Jstutz@tellus.org | |
| **Original & nine (9) copies file w/:**<br>Luly E. Massaro, Commission Clerk<br>Public Utilities Commission<br>89 Jefferson Blvd.<br>Warwick RI 02889 | Lmassaro@puc.state.ri.us<br>Cwilson@puc.state.ri.us<br>Anault@puc.state.ri.us | 401-941-4500<br>401-941-1691 |
| W. Mark Russo, Esq. | mrusso@frlawri.com | |
| Jean Rosiello, Esq. | jeanrosiello@cox.net | |
| John Farley, Esq. | jfarley316@hotmail.com | |

# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

Civil Action No. 05-40076FDS

|  |  |
|---|---|
| TRANSCANADA POWER MARKETING LTD. ) | |
| ) | (Michael P. Angelini, #019340) |
| Plaintiff, ) | (Vincent F. O'Rourke, Jr., #380335) |
| ) | (Kimberly A. Stone, # 630952) |
| v. ) | |
| ) | |
| THE NARRAGANSETT ELECTRIC COMPANY ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT THE NARRAGANSETT ELECTRIC COMPANY'S FIRST SUPPLEMENTAL ANSWERS TO PLAINTIFF TRANSCANADA POWER MARKETING LTD.'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant The

Narragansett Electric Company ("Narragansett") hereby supplements its responses to Plaintiff

TransCanada Power Marketing Ltd.'s ("TransCanada") First Set of Interrogatories as follows:

## GENERAL OBJECTIONS

1.      Defendant objects to each and every interrogatory to the extent that it seeks

information protected by the attorney-client privilege and/or the work product doctrine.

2.      Defendant objects to each and every interrogatory to the extent that it purports to

establish a continuing duty to supplement, or seeks to impose a duty beyond those imposed by

the Federal Rules of Civil Procedure.

3.      Each of the General Objections shall be deemed to apply to each of Plaintiff's

separate interrogatories.

10. Paul Roberti - regulator;

11. Thomas Robinson - legal;

12. Steven Sciallaba - regulator;

13. John Sherman – legal;

14. Cynthia Wilson - regulator; and

15. Peter Zschokke - rate analysis.

Narragansett further states that these are the individuals whom it has identified as being responsive to this request through a search to date, in the early stages of this litigation. As discovery progresses, more individuals may be identified.

INTERROGATORY 10: Please describe any and all actions taken concerning the files of each EUA Companies that are or would be responsive to TransCanada's First Set of Document Requests, including but not limited to files concerning Standard Offer Service, the Fuel Adjustment Factor, the URA, the Settlement Agreements, and rate filings with the PUC before the Merger and after. Please include information concerning:

a.    identification of all individuals involved;

b.    whether and which specific files were destroyed;

c.    transfers of both electronic and paper files;

d.    retention of both electronic and paper files;

e.    current locations of all files.

13

ANSWER 10: Narragansett objects to Interrogatory numbered 10 to the extent that it is overbroad, overly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence insofar as it requires Narragansett to speculate on matters outside of its knowledge. For instance, Narragansett cannot and does not know "any and all actions taken" by its predecessors. Further, this request does not attempt to limit the universe of "the files of each [of the] EUA Companies" about which it seeks information. Moreover, it would be next to impossible, if not actually impossible, for Narragansett to undertake to list in narrative fashion the information which is sought in this request, including the "current locations of all files" of each of the former EUA Companies, Narragansett's predecessors. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this interrogatory as requesting the current document retention policy of Narragansett and the last identifiable document retention policies of any of the EUA Companies to the extent that Narragansett has knowledge of same.

To the extent that this request, as construed, seeks information contained within written documents, Narragansett refers to the documents which will be made available for inspection and copying in response to Plaintiff's Request for Production of Documents, as these documents contain the information responsive to this request. Further answering, Narragansett states that upon notification of the dispute between Narragansett and TransCanada concerning the applicability of the Fuel Adjustment Factor in the EUA Zone after 2004, Narragansett directed its employees that may have had material involvement in matters related to the dispute or responsibility associated with maintaining files that may contain material information related to the dispute, to suspend the ordinary course of timed document destruction to the extent that any document concerned the applicability of the Fuel Adjustment Factor in the EUA Zone after

14

2004 and/or the negotiation and administration of the WSOS Agreement. Finally, with respect to the locations of files, Narragansett states that its files, and some of the files of its EUA predecessors, are located in various locations in facilities operated by National Grid.

SUPPLEMENTAL RESPONSE 10: Narragansett objects to Interrogatory numbered 10 to the extent that it is overbroad, overly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence insofar as it requires Narragansett to speculate on matters outside of its knowledge. For instance, Narragansett cannot and does not know "any and all actions taken" by its predecessors. Further, this request does not attempt to limit the universe of "the files of each [of the] EUA Companies" about which it seeks information. Moreover, it would be next to impossible, if not actually impossible, for Narragansett to undertake to list in narrative fashion the information which is sought in this request, including the "current locations of all files" of each of the former EUA Companies, Narragansett's predecessors. Notwithstanding and without waiving this objection, in order to provide a substantive and helpful response, Narragansett construes this interrogatory as requesting the current document retention policy of Narragansett and the last identifiable document retention policies of any of the EUA Companies to the extent that Narragansett has knowledge of same.

To the extent that this request, as construed, seeks information contained within written documents, Narragansett refers to the documents which will be made available for inspection and copying in response to Plaintiff's Request for Production of Documents, as these documents contain the information responsive to this request. Further answering, Narragansett states that upon notification of the dispute between Narragansett and TransCanada concerning the applicability of the Fuel Adjustment Factor in the EUA Zone after 2004, Narragansett directed its employees that may have had material involvement in matters related to the dispute or

15

responsibility associated with maintaining files that may contain material information related to the dispute, to suspend the ordinary course of timed document destruction to the extent that any document concerned the applicability of the Fuel Adjustment Factor in the EUA Zone after 2004 and/or the negotiation and administration of the WSOS Agreement.

Finally, with respect to the locations of files, Narragansett states that, to date, its files, and some of the files of its EUA predecessors, have been located in Narragansett's facilities including, but not limited to the following facilities: 55 Bearfoot Road, Northborough, Massachusetts; 25 Research Drive, Westborough, Massachusetts; St. Martin Drive, Marlborough, Massachusetts; Ruppert Place, Brockton, Massachusetts; 280 Melrose Street, Providence, Rhode Island; and 640 Washington Highway, Lincoln, Rhode Island. Narragansett also retrieved its documents from its document storage contractor, Iron Mountain, from its facilities in Franklin and Northborough, Massachusetts.

INTERROGATORY 11: Please describe Narragansett's (and its predecessors') policies and protocols concerning the retention of electronic files, including the people involved in the retention of electronic files, the type of software and electronic systems involved, policies concerning the backup of emails and drafts of any such policies.

ANSWER 11: Narragansett objects to Interrogatory numbered 11 to the extent that it is overbroad, overly burdensome, and is not reasonably calculated to lead to the discovery of admissible evidence insofar as it requires Narragansett to speculate on matters outside of its knowledge. As an initial matter, this request does not attempt to focus the inquiry to any specific time period and instead purports to seek information from the beginning of time through present

16

substantive and helpful response, Narragansett construes this Interrogatory as requesting the current electronic document retention policy of Narragansett, if any, and the last identifiable electronic document retention policies, if any, of any of the EUA Companies to the extent that Narragansett has knowledge of same.

To the extent that this request, as construed, seeks information contained within written documents, Narragansett refers to the documents which will be made available for inspection and copying in response to Plaintiff's Request for Production of Documents, as these documents contain the information responsive to this request.

Finally, with respect to the locations of files, Narragansett states that, to date, its files, and some of the files of its EUA predecessors, have been located in Narragansett's facilities including, but not limited to the following facilities: 55 Bearfoot Road, Northborough, Massachusetts; 25 Research Drive, Westborough, Massachusetts; St. Martin Drive, Marlborough, Massachusetts; Ruppert Place, Brockton, Massachusetts; 280 Melrose Street, Providence, Rhode Island; and 640 Washington Highway, Lincoln, Rhode Island. Narragansett also retrieved its documents from its document storage contractor, Iron Mountain, from its facilities in Franklin and Northborough, Massachusetts.

Signed under the pains and penalties of perjury this *12th* day of January, 2006.

_____
**Michael Hager, Vice President Energy Supply**
**National Grid**

{Client Files\LIT\304810\0001\00630524.DOC;1}

THE NARRAGANSETT ELECTRIC COMPANY
By its Attorneys,


Michael P. Angelini (BBO#019340)
Vincent F. O'Rourke, Jr. (BBO#380335)
Kimberly A. Stone (BBO #630952)
Bowditch & Dewey, LLP
311 Main Street. P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated: January 12, 2006

## CERTIFICATE OF SERVICE

I, Kimberly A. Stone, hereby certify that I have served a copy of the foregoing on the following by mailing same postage prepaid this 17th day of January, 2006 to:

Daniel C. Winston
Wendy S. Plotkin
Dara Y. Zelnick
Choate, Hall & Stewart LLP
2 International Place
Boston, MA  02110


Kimberly A. Stone

19