UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                       )
TRANSCANADA POWER MARKETING, LTD.      )
                                       )
              Plaintiff,               )
                                       )
       v.                              )        05-CV-40076 FDS
                                       )
NARRAGANSETT ELECTRIC COMPANY,         )
                                       )
              Defendant.               )
_____ )


**HILLMAN, M.J.**

## OPINION AND ORDER
### August 17, 2006


## INTRODUCTION

By Order of Reference dated March 7, 2006 pursuant to 28 U.S.C. § 636 (b)(1)(A), the

Plaintiff's Motion to Compel Production of Documents (Docket #26) was referred to me for

disposition. For the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in

part.

## NATURE OF THE CASE

This is a contract dispute between a marketer of wholesale electric power based in

Massachusetts, and a retail distributor of electric power based in Rhode Island. The subject

matter of the lawsuit is whether the retailer is required to pay a fuel adjustment factor under the

contract as part of the wholesale price of electricity. The plaintiff wholesaler, TransCanada

1

Power Marketing, LTD ("TransCanada"),  has made claims against the defendant retailer

Narragansett Electric Company ("Narragansett"), seeking monetary damages for breach of

contract and breach of the implied warranty of good faith and fair dealing.  TransCanada also

seeks contractual indemnification from Narragansett for loss of the expected fuel adjustment

factor, and seeks declaratory relief as to whether it may terminate its obligations under the

underlying agreement.

Narragansett counterclaims, asserting that TransCanada has violated the implied covenant

of good faith and fair dealing by threatening to terminate the underlying agreement in order to

avoid performing on a contract that is no longer economically advantageous.  Narragansett also

seeks declaratory relief in the form of an order that TransCanada has no right to terminate the

underlying agreement.


## BACKGROUND

**1.    Parties to the dispute**

TransCanada is a power marketing company that purchases electricity from generation

sources, such as power plants, and resells that electricity to retail electric distribution companies

and other customers throughout the northeastern United States.  (Complaint ¶1).  Narragansett is

a retail electric distribution company engaged in the transmission and distribution of electricity to

retail end-customers in Rhode Island.  In 2000 two retail electricity providers, Blackstone Valley

Electric Company and Newport Electric Company, merged into Narragansett.  (Id. ¶2).[1]

---

[1]  Blackstone and Newport were wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), which also owned a retail electric company in Massachusetts named Eastern Edison Company.  Also affiliated with EUA was Montaup Electricity Company, a wholesale electricity supplier.

**2.      Electricity deregulation in Rhode Island under the Utility Restructuring Act[2]**

In 1996, Rhode Island passed the Utility Restructuring Act ("URA"), intended to

deregulate electric power supply and develop a competitive retail market for electricity in Rhode

Island.  (Complaint ¶4).  As part of deregulation, electric distribution companies were obligated to

divest ownership of electricity generation facilities and provide retail access service to Rhode

Island retail customers.  This would permit customers to purchase electricity from non-affiliated

retail suppliers.  (Id. ¶5).

During the transition period before Retail Access service was to be fully implemented (i.e.,

before 2010) retail distribution companies were obligated to provide a standard power supply,

called "Standard Offer Service" ("SOS") to Rhode Island retail customers at regulated prices.

(Id. ¶6).  The URA also called for divestiture; and thus Blackstone and Newport were obligated

to terminate their wholesale supply contracts with Montaup Electric Company, a wholesale

electricity supplier (with generation facilities) that was affiliated with their parent company,

Eastern Utilities Associates ("EUA", a public utility holding company).  (Id. ¶9).

Apparently as part of a stipulation implementing the URA, Blackstone, Newport and

Montaup entered into a Stipulation and Agreement with the Rhode Island Public Utilities

Commission ("RIPUC") and the Rhode Island Division of Public Utilities and Carriers (this

Stipulation and Agreement is also referred to as the "Settlement Agreement").  This Settlement

Agreement, entered into as of October 17, 1997, was approved by the Federal Energy Regulatory

Commission.  Under the Settlement Agreement, Blackstone and Newport were required to seek

---

[2]  The following factual narrative is designed to provide context to the underlying dispute.  It is largely drawn from the Plaintiff's characterizations as found in its Complaint.  It is not meant to, and does not, constitute findings of fact that are binding on the parties in any manner.

alternative wholesale suppliers for SOS through 2009. Montaup was required to provide a guaranteed "backstop" supply of SOS through 2009, (id. ¶11), to the extent Blackstone and Narragansett did not obtain alternative wholesale SOS supply contracts.

Also under the Stipulation and Agreement, Montaup and its successors and assigns were to provide SOS to Blackstone and Newport "in exchange for a stipulated set of base prices, subject to a 'fuel index' to account for future extraordinary fuel costs, through 2009." (Id. ¶13).

### 3.    TransCanada's Wholesale Standard Offer Service Agreement

On April 7, 1998, TransCanada, Blackstone, Newport and Eastern entered into a Wholesale Standard Offer Service Agreement ("WSOS Agreement"). (Complaint ¶15).[3] According to TransCanada, "[u]nder the WSOS Agreement, and as specified in the [Stipulation and Agreement] and the URA, TransCanada was to receive a price for delivering Standard Offer Service consisting of the stipulated set of base prices rising over time (the "Standard Offer Wholesale Price"), plus a fuel index (the "Fuel Adjustment Factor") to account for future extraordinary fuel costs." (Id. ¶16).

The Fuel Adjustment Factor ("FAF") forms the basis of the dispute between the parties. Under the WSOS Agreement, the FAF:

> is a cents per kilowatt-hour adder based on the incremental revenues collection, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service Tariffs. . . . The Retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to the Supplier, will be made subject to

---

[3]Also on that date, TransCanada and Montaup entered into an Asset Purchase Agreement whereby TransCanada purchased certain electricity generation assets of Montaup, and an associated obligation to assume a percentage share of Montaup's backstop obligation to provide SOS to Blackstone and Newport.

regulatory approval and only to the extent the Companies are allowed to collect such revenues from the retail customers taking Standard Offer Service.

(Complaint Exhibit A (WSOS Agreement) at Article 5, pp. 5-6). TransCanada alleges the WSOS

Agreement imposed on Blackstone and Newport "a good faith obligation to make the required

Standard Offer Service Tariff filings, and to use reasonable efforts to obtain regulatory approval

for a Fuel Adjustment Factor to be paid to TransCanada over the 2009 term of the Agreement."

(Complaint ¶17).

**4.    Blackstone and Newport merge into Narragansett in 2000**

In 2000, Blackstone and Newport merged into the defendant Narragansett, another retail

electric distribution company in Rhode Island. (Complaint ¶21). Narragansett has been, at all

relevant times, a wholly-owned subsidiary of National Grid USA. (Id.). As a result of the

merger, Narragansett became the retail electric distribution company both for the previous retail

customers of Blackstone and Newport in Rhode Island (in an area denominated by TransCanada

as the former "EUA Zone"), as well as its own previous retail customers (in an area denominated

by TransCanada as the "Old Narragansett Zone"). (Id. ¶23). In connection with the merger,

Narragansett set a letter to TransCanada dated April 18, 2000 in which, according to

TransCanada, it stated it would succeed to and assume the obligations of Blackstone and

Newport under the WSOS Agreement. Narragansett further assured TransCanada that the

obligations of the parties "are not affected by the merger and [associated] assignments."

Narragansett's letter further stated that it "would continue to make Fuel Adjustment payments to

TransCanada 'after 1999,' according to the mechanism previously established in the RI Settlement

5

Agreement and in the Blackstone and Newport Standard Offer Service Tariffs." (Id. ¶25). The letter also contained an attachment concerning Standard Offer Fuel Adjustment Provisions, which identified fuel trigger points through 2004, above which fuel adjustment factors would be calculated in connection with the WSOS Agreement. (Docket #29, Ex. D).

**5.     The conduct giving rise to the lawsuit**

In December 2004, Narragansett filed with the RIPUC its proposed SOS Tariffs and rates for 2005. (Complaint ¶30). Unlike prior years, Narragansett's filings for 2005 contained no allocations for a FAF for TransCanada. However, Narragansett "continued to request and obtain approval for a Fuel Adjustment Factor in 2005 for its suppliers in the Old Narragansett Zone." (Id.). On March 1, 2005, TransCanada provided written notice of default under the WSOS Agreement. Narragansett refused to cure or change its position. Narragansett also disputed TransCanada's right to terminate the WSOS Agreement, and has allegedly "threatened that its National Grid USA affiliates will withhold payments owed to TransCanada under [the related Asset Purchase Agreement] if TransCanada proceeds to terminate the WSOS Agreement." (Id. ¶¶32-33).

TransCanada alleges that Narragansett has breached the WSOS Agreement by failing to file for or make a reasonable effort to obtain regulatory approval of a FAF after 2004, failing to pay a FAF to TransCanada as required under the WSOS Agreement, and failing to indemnify or reimburse TransCanada as required by Article 8(3) of the WSOS Agreement for the regulatory loss of the FAF. (Id. ¶36). TransCanada also alleges that Narragansett has breached the covenant of good faith and fair dealing with respect to its conduct in connection with the FAF and

the WSOS Agreement.  (Id. ¶43).  It seeks contractual indemnification under Article 8(3) of the

WSOS Agreement, (id. ¶40), and declaratory judgment that it is entitled to terminate its

obligations under the WSOS Agreement as a result of Narragansett's breach.  (Id. ¶47).

Narragansett counterclaims against TransCanada, asserting that it was under no obligation

to obtain a FAF after 2004.  Instead, claims Narragansett, TransCanada is attempting to "avoid

performing an agreement that is no longer economically advantageous to TransCanada."  (Answer

and Counterclaim, Docket #4, at ¶36).  Narragansett also seeks declaratory judgment that

TransCanada has no right to terminate the WSOS Agreement, (id. p. 16), as well as damages

arising from TransCanada's alleged breach of its obligation of good faith and fair dealing.  (Id.).

**6,      The Discovery Requests, Responses, and the instant motion**

On August 26, 2005, TransCanada served its First Set of Document Requests on

Narragansett, pursuant to Federal Rule of Civil Procedure Rule 34 (the "Request for Production"

or "RFP").  (Docket #27-6).  The Request for Production contained 40 requests, running the

gamut from the general (e.g., request no 36, seeking "[a]ll documents concerning analysis of or

use of fuel adjustments generally in electrical supply contracts") to the very specific (e.g., request

no. 16, seeking all documents and files of Lawrence Boisvert, John Carney, Robert Clarke, Peter

Fuller, Michael Hirsh, Robert Powderly, Donald Ryan, Dennis St. Pierre and Kevin Kirby

concerning various aspects of the WSOS Agreement, the FAF, filings with RIPUC, and the EUA

Companies' implementation of the URA and Rhode Island Settlement Agreement with respect to

SOS).

Summarized generally and relevant to the instant motion, the RFP sought production of documents relating to (1) Narragansett's SOS tariffs and fuel adjustment pricing within the "EUA Zone" (defined by TransCanada as the area of Rhode Island in which Blackstone and Newport provided electricity prior to their 2000 merger into Narragansett); (2) pricing and fuel adjustments applicable to "backstop" SOS obligations under the Settlement Agreement in the EUA Companies (defined as Blackstone, Newport, Montaup, Eastern Electric Co., EUA Service Corporation, Eastern Utilities Associates and any affiliated entity); and (3) Narragansett's use of fuel adjustment provisions in energy supply contracts and retail tariffs generally.

Narragansett's 37-page responsive pleading, captioned <u>Defendant The Narragansett Electric Company's Responses to Plaintiff TransCanada Power Marketing LTD.'s First Set of Document Requests</u>, was served on October 18, 2005. (Docket #27-6). Narragansett responded generally by arguing that "[t]he parties' contract, the WSOSA, is clear and the documents concerning it . . . are relatively few", and that many requests "are not relevant to the dispute over whether Narragansett has an obligation to request regulatory approval of a retail FAF for the parties' WSOSA for the period after 2004." Narragansett also complained that the requests, as phrased, would oblige it to review hundreds of thousands of pages of documents.

By 9-page letter dated November 1, 2005, TransCanada objected to Narragansett's response, (Docket #27-7), setting forth a detailed description of the perceived deficiencies in Narragansett's discovery responses. Conversations ensued, followed by another 5-page letter dated December 21, 2005. (Docket #27-8). The results were evidently less-than-satisfactory, and this motion followed.

In its motion, TransCanada seeks an Order compelling the production of four categories of documents:

(1)    Documents concerning Narragansett's Standard Offer Service ("SOS") tariffs and fuel adjustment pricing in the EUA Zone, including concerning other EUA Zone suppliers, such as those responsive to Requests 4, 5-7, 12-13, 15-22, 27, and 32-34 of TransCanada's First Set of Document Requests;

(2)    Documents concerning the pricing and fuel adjustments applicable to EUA's "backstop" SOS obligation, including those responsive to Requests 4, 6-7, 12, 16, 20, 28, and 32;

(3)    Documents concerning Narragansett's general use of fuel adjustment provisions in energy supply contracts and retail tariffs, including those responsive to Requests 22 and 36;

(4)    Other documents that Narragansett is obligated and has agreed to produce, but has simply not produced, including those responsive to Requests 3-11, 13-22, 24, 26-30, 32-33, 35, and 37-40; and

(5)    Its privilege log for the documents it has withheld.

(Docket #26).

## ANALYSIS

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party[. . . .]  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).

The scope of discovery is wide ranging.  As the Supreme Court has stated, the word "relevant" encompasses:

> any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case . . ..  [D]iscovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the

9

issues.  Nor is discovery limited to the merits of a case, for a variety of fact-oriented
issues may arise during litigation that are not related to the merits.

Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) (citing Hickman v. Taylor, 329

U.S. 495, 501 (1947) (purpose of discovery rules is to permit "the parties to obtain the fullest

possible knowledge of the issues and facts before trial")).  See also United States v. Procter &

Gamble Co., 356 U.S. 677, 682 (1958) ("Modern instruments of discovery serve a useful

purpose. . . .  They together with pretrial procedures make a trial less a game of blindman's bluff

and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.

Only strong public policies weigh against disclosure.").

    The trial court's power to control discovery is broad.  City of Waltham v. U.S. Postal

Service, 11 F.3d 235, 243 (1st Cir. 1993), Santiago v. Fenton, 891 F.2d 373, 379 (1st Cir. 1989).

This power is exercised by weighing discovery burdens against the likelihood of finding relevant

material.  Id. (citing Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 186-87 (1st Cir.

1989)).  In this case, the Plaintiff's two arguments appear to be that (1) the WSOS Agreement is

ambiguous as to Narragansett's continuing obligations to seek fuel pricing adjustments within its

RIPUC tariff submissions, and discovery with respect to other wholesalers is needed to determine

Narragansett's understanding of its obligations; and (2) Narragansett's handling of fuel pricing

adjustments with respect to other wholesale suppliers is necessary to prosecute its claim of breach

of the implied covenant of good faith and fair dealing.  Narragansett's response can be

summarized as (1) the dispute is – and therefore discovery should be – limited to the language of

the WSOS Agreement and its implementation; and (2) many of the responsive documents

comprise confidential trade secret information that TransCanada might use for improper purposes.

Of TransCanada's five requests for relief in its motion, the final two are easily dispatched. With respect to a privilege log, the Defendant advances no cogent argument opposing the same. The privilege log has been described as "'the universally accepted means' of asserting privilege claims in federal court."  In re Grand Jury Subpoena, 274 F.3d 563, 576 (1st Cir. 2001) (citing Avery Dennison Corp. v. Four Pillars, 190 F.R.D. 1 (D.D.C. 1999)); see also Fed. R. Civ. P. 26(b)(5).  Accordingly, TransCanada's motion insofar as it requests an Order requiring a privilege log to be submitted for documents for which privilege is asserted is GRANTED.  The Privilege Log shall be produced within 30 days of the date of this Order, and seasonably supplemented as additional materials are identified.  With respect to the documents described by TransCanada as ones which "Narragansett is obligated and has agreed to produce, but has simply not produced," Motion p. 2, the motion is GRANTED.  Such materials shall be produced within 30 days of the date of this Order.

While this clears some of the underbrush, adjudication of the Motion to Compel insofar as Request nos. 4-7, 12-13, 15-22, 27-28, 32-34, and 36 remains.  The Court has carefully studied the memoranda submitted in connection with the Motion, as well as each of those requests and the objections lodged thereto.[4]  Following are the rulings with respect to each request:

---

[4]  The Court's analysis of the motion has not been particularly well assisted by the format of the parties' filings.  Local Rule 37.1(b), adopted in 1992, obligates a moving party in a discovery dispute to file:

[a] memorandum [which] shall state with particularity the following:
*       *       *       *       *
(4)       Each interrogatory, deposition question, request for production, request for admission or other discovery matter raising an issue to be decided by the court, and the response thereto; and
(5)       A statement of the moving party's position as to each contested issue, with supporting legal authority, which statement shall be set forth separately immediately following each contested item.

LR 37.1(b)(4)-(5).  See also Massachusetts Superior Court Rule 30A (providing that "[a]ll motions arising out of . .

**REQUEST NO. 4**    *All documents concerning consideration, analyses or financial projections related to Narragansett's, NEES's, or the EUA Companies' Standard Offer Service obligations, related "backstop" obligations, or other obligations under the URA (as enacted or amended) or Settlement Agreements, as anticipated or implemented.*

As with the majority of the requests, Narragansett objects that the WSOS Agreement "is clear and the documents concerning it, including its negotiation and administration, and the obligations under the FAF clause are relatively few.  In contrast, TransCanada's request, literally taken, would require Narragansett to research tens, if not hundreds, of thousands of documents."

Initially, Narragansett's position that the WSOS Agreement "is clear" is rejected. TransCanada contends the contractual language is ambiguous.  Absent a judicial ruling that the contractual language is unambiguous, TransCanada is entitled to explore the circumstances surrounding negotiation of the Agreement, its execution, and its implementation; including Narragansett's understanding of its obligations thereunder.  Narragansett's parade of horribles lacks any evidentiary basis and is likely exaggerated.  See e.g., Docket #27-6 (Narragansett's response to Plaintiff's First Set of Document Requests) at p. 8, claiming it would have to search "hundreds of thousands of documents spread across nearly every office of National Grid . . .

---

. a party's response to, or asserted failure to comply with, a request for production of documents shall be accompanied by a brief.  With respect to each . . . request at issue, the brief shall set forth separately and in the following order (1) the text of the interrogatory or request, (2) the opponent's response, and (3) an argument." Mass. Sup. Ct. Rule 30A.

Instead of such a submission, the parties submitted copies of the discovery requests and responses, but with memoranda which provided general and thematic arguments which cut across several of the requests and the responses thereto, and which did not provide specific arguments tuned to the specific requests for which production was sought to be compelled.  While following the Local Rules may be a time-consuming exercise for the practitioner, it enables the Court to evaluate each request specifically, cogently, and quickly; rather than forcing the Court to speculate as to the parties' positions vis-a-vis each request.  Cf. Massachusetts Electric Co. v. Travelers Casualty & Surety Co., 14 Mass. L. Rptr. 86, 2001 WL 1763448 at *2 (Mass. Super. Sept. 27, 2001) (Fecteau, J.).

including the files and work stations of nearly every employee of National Grid."). This dispute centers around the Rhode Island URA; the location of discoverable information should easily be determinable.

TransCanada argues that RI General Law 39-1-27.3(d) (1997) allows SOS to be priced to account for increases in the CPI and other factors such as "extraordinary fuel costs." The EUA Companies understandings of their rights and obligations under the statutory scheme are relevant to EUA's tariff filings under the WSOS Agreement. Although the range of documents may be potentially large, the dispute involves the parties' understanding of SOS price adjustments relative to fuel prices. The material may both be relevant or reasonably calculated to lead to the discovery of admissible evidence. The motion is GRANTED as to Request No. 4.

**REQUEST NO. 5**    *All documents concerning the anticipated and actual Merger, including but not limited to concerning Standard Offer Service and rate filing obligations anticipated or implemented after or relating to the Merger.*

Narragansett's objections about the scope and burden of production are again considered and rejected for the reasons described in response to Request No. 4, particularly in light of TransCanada's narrowing the request as stated in its November 1, 2005 letter. The case concerns FAF under the RI URA, and TransCanada makes no compelling argument as to how evidence unrelated to Rhode Island may lead to the discovery of admissible evidence. However, limitation of the request to the EUA Zone, defined by TransCanada as "the area of Rhode Island in which Blackstone and Newport provided electricity prior to the merger in which Blackstone and Newport merged into Narragansett Electric Company" forms an appropriate limitation to the request. Accordingly, the Motion is GRANTED as to Request No. 5 as narrowed to "any

13

documents concerning the Merger and its impact on the WSOS Agreement, the FAF, and/or

Narragansett's SOS retail tariff filing obligations in the EUA Zone (defined here and hereinafter as

'the area of Rhode Island in which Blackstone and Newport provided electricity prior to the

merger in which Blackstone and Newport merged into Narragansett Electric Company') after the

Merger."


**REQUEST NO. 6**    *All documents concerning communications between the EUA Companies and any of Old Narragansett/NEES, RIPUC, FERC, the Division or any other person (including public announcements) regarding the URA, the Settlement Agreements, Standard Offer Service or any related agreements or obligations prior to or after the Merger*

For the reasons described above in response to Request nos. 4 and 5, the Motion is

GRANTED as to Request No. 6, narrowed to "all documents concerning communications

(whether written or oral communications memorialized in writing) in Narragansett's possession,

custody , or control – regardless of author – between or among any of the following parties:

Narragansett, Old Narragansett, the EUA Companies, NEES, RIPUC, FERC, and the Division;

concerning SOS pricing, fuel adjustments or fuel triggers (or any other mechanism by which retail

or wholesale pricing is contingent / dependent on fuel supply and/or prices) in the EUA Zone or

Rhode Island generally; including documents pertaining to portions of the Settlement Agreements

related to those subjects, and concerning any efforts to model or draft the EUA RI Settlement

Agreement based upon the Narragansett Settlement Agreement or its terms."

To the extent such production includes pricing information from other wholesale

suppliers, Narragansett may redact the numeric price per kilowatt hour information from all

competitors' bids or designate the information "confidential" pursuant to the Stipulated Protective

Order entered by the Court (Docket #25).

**REQUEST NO. 7**    *All documents concerning communications before January 1, 1999
between Old Narragansett/NEES and any of the EUA Companies, RIPUC,
FERC, the Division or any other person (including public announcements)
regarding the URA, the Settlement Agreements, Standard Offer Service or
any related agreements or obligations prior to or after the Merger.*

TransCanada does not explain how this request is intended to differ from Request No. 6

except as to time frame. As the Rhode Island URA was passed in 1996, documents prior to the

date of its passage are not relevant except to the extent they concern the impact of the URA.

Accordingly, TransCanada's motion with respect to Request no. 7 is GRANTED as narrowed to

"all documents concerning communications (whether written or oral communications

memorialized in writing) in Narragansett's possession, custody , or control – regardless of author

– between or among any of the following parties: Narragansett, Old Narragansett, the EUA

Companies, NEES, RIPUC, FERC, and the Division; concerning SOS pricing, fuel adjustments or

fuel triggers (or any other mechanism by which retail or wholesale pricing is contingent /

dependent on fuel supply and/or prices) in the EUA Zone or Rhode Island generally; including

documents pertaining to portions of the Settlement Agreements related to those subjects, and

concerning any efforts to model or draft the EUA RI Settlement Agreement based upon the

Narragansett Settlement Agreement or its terms."

To the extent such production includes pricing information from other wholesale

suppliers, Narragansett may redact the numeric price per kilowatt hour information from all

competitors' bids or designate the information "confidential" pursuant to the Stipulated Protective Order.  Narragansett need produce no documents dated prior to 1996.


**REQUEST NO. 12**    *All documents concerning so called "backstop" Standard Offer Service obligations (and the pricing of the same) in the RI Settlement Agreement and the Narragansett Settlement Agreement, including but not limited to financial projections, internal analyses, memoranda, emails and correspondence.*

As TransCanada alleges that it assumed Montaup's "backstop" obligations under the WSOS Agreement, it is entitled to documents concerning the scope of those obligations. Narragansett's objection, that it cannot produce responsive documents "unless and until TransCanada can further define and/or limit this request as described herein" (Docket #27-6 at p. 13) is not persuasive; Narragansett provides no explanation as to (a) what is confusing or ambiguous about the Request, (b) what it seeks to be defined or limited, or (c) any reason for declining production that has not been previously considered and rejected.

The Motion is GRANTED as to request 12 as narrowed:  "Narragansett shall produce all documents in its possession, custody, or control concerning any of the EUA Companies, Narragansett, or Old Narragansett obligations arising in connection with the called "backstop" Standard Offer Service obligations (and the pricing of the same) in the RI Settlement Agreement and the Narragansett Settlement Agreement, including but not limited to financial projections, internal analyses, memoranda, emails and correspondence."

16

**REQUEST NO. 13**   *All documents concerning any Request for Qualifications to Bid, Requests for Proposals, or any other formal or informal offers or solicitations related to divestiture of assets, Standard Offer Service, or other implementation of the URA or Settlement Agreements by the EUA Companies, including all correspondence with potential or actual bidders or interested parties.*

TransCanada offers no particularized argument as to how this request would lead to the discovery of potentially admissible evidence in this dispute.  To the extent TransCanada seeks documents relative to proposals concerning (a) the EUA Companies' divestiture compelled by the Rhode Island URA, or (b) the EUA Companies' implementation of the URA unrelated to SOS, TransCanada has not provided the Court with any argument for their relevance.  Likewise, TransCanada has not explained precisely how proposals for Standard Offer Service submitted by other parties (including competitors) – including proposals that were not accepted by Narragansett, for whatever reasons – might lead to the discovery of admissible evidence as pertains to *this* dispute.  The motion is DENIED as to Request No. 13.

**REQUEST NO. 15**   *All documents concerning the drafting, negotiation and terms of any Standard Offer Service contracts for the EUA Zone with suppliers other than TransCanada, and any amendments thereto, including the Agreements themselves.*

Unlike Request No. 13, this Request appears to pertain to actual agreements entered into by Narragansett.  The handling of wholesaler pricing adjustments relative to fuel price is relevant to the underlying dispute, and TransCanada has narrowed its Request to the drafting, negotiation, or interpretation of contract provisions similar to Article 5 of the WSOS Agreement.  Accordingly, the motion is GRANTED as to Request No. 15 as limited: "Narragansett shall produce all documents in its possession, custody or control regarding drafting, negotiation or

17

interpretation of Standard Offer Service contract provisions similar to Article 5 of the WSOS

Agreement, how long any FAF would be paid, filing of SOS Retail Tariffs, fuel triggers in the

EUA Zone (as defined above), or any contractual agreement providing for changes in retail or

wholesale pricing contingent on or dependent on the cost and/or availability of fuel; and any

analysis performed by Narragansett or the EUA Companies of whether to solicit wholesale SOS

contractors through 2009 or through a lesser term."  Narragansett may redact the numeric price

per kilowatt hour information from all materials not authored or received by TransCanada, or

designate the information "confidential" pursuant to the Stipulated Protective Order.

**REQUEST NO. 16**    *All documents and files of Lawrence Boisvert, John Carney, Robert Clarke, Peter Fuller, Michael Hirsh, Robert Powderly, Donald Ryan, Dennis St. Pierre and Kevin Kirby concerning: the negotiation of the WSOS Agreement; the administration of the WSOS Agreement; payment of the Fuel Adjustment Factor; Standard Offer Service rate filings and testimony with the RIPUC; the Settlement agreements; the EUA Companies' implementation of the URA and Settlement Agreements with respect to Standard Offer Service; RFQs, RFPs or other bids or solicitations involving in any way Standard Offer Service; or that are otherwise responsive to those document requests, including all emails and personal notes.*

Narragansett construed this request as seeking documents from the named individuals

pertaining to "the negotiation and administration of the WSOSA; payment of the FAF to

TransCanada before and after 2004, in particular; Standard Offer Service rate filings and

testimony with the RIPUC before and after 2004 concerning the FAF."  TransCanada additionally

sought documents in those individuals' files concerning "Standard Offer pricing and fuel

adjustments or triggers in the EUA Zone or under the backstop obligation, or that are otherwise

responsive to TransCanada's document requests."

18

The motion is GRANTED with respect to Request No. 16 as to documents and files of the named individuals pertaining to "the negotiation and administration of the WSOSA; Payment of the FAF to TransCanada before and after 2004; SOS rate filings and testimony with the RIPIC before and after 2004, and Standard Offer pricing and fuel adjustments or triggers in the EUA Zone or under the backstop obligation." Narragansett may redact the numeric price per kilowatt hour information from all materials not authored or received by TransCanada, or designate the information "confidential" pursuant to the Stipulated Protective Order.

**REQUEST NO. 17**   *All RFQs, RFPs or other bids or solicitations involving in any way Standard Offer Service or replacement Standard Offer Service from 1996 to the present, including but not limited to any RFQs, RFPs or other bids or solicitations arising from the inability of NRG Energy, Inc. to supply Standard Offer service electricity in Massachusetts or Rhode Island.*

The Motion is DENIED as to Request No. 17 for reasons similar to those articulated in connection with Request No. 13.

**REQUEST NO. 18**   *All documents concerning communications between Narragansett (again, including all predecessors) and any Standard Offer Service supplier in the EUA Zone regarding pricing for Standard Offer Service and/or any fuel adjustment.*

In its November letter, TransCanada limited this request to documents regarding drafting, negotiation or interpretation of contract provisions similar to Article 5 of the WOIS Agreement, how long any FAF would be paid, filing of SOS Retail Tariffs and fuel triggers in the EUA Zone, and the EUA Companies' analysis of whether to solicit wholesale SOS contractors through 2009

or through a lesser term.  (Docket #27-6 at p. 7).  As limited by TransCanada, the Motion is

GRANTED as to Request No. 18.  Narragansett may redact the numeric price per kilowatt hour

information from all materials not authored or received by TransCanada, or designate the

information "confidential" pursuant to the Stipulated Protective Order.


**REQUEST NO. 19**     *All documents concerning communications with FERC, RIPUC, the
                       Division, or any person regarding fuel adjustments in the EUA Zone.*

        In response to this request, Narragansett professed an inability to comprehend the term

"fuel adjustments" without further definition.  In light of the nature of this dispute, the response

strains credibility; the meaning and scope of this term clearly involves any changes in retail or

wholesale pricing contingent or dependent on the cost and/or availability of fuel.  Likewise,

Narragansett's objection that the "universe of potential communications [is] endless [and] also

unknown and unknowable" is not well taken.  Narragansett is (or should be) well aware of those

individuals who had analytical or decision-making authority with respect to fuel adjustments in the

EUA Zone.  The Motion is GRANTED as to Request No. 19.


**REQUEST NO. 20**     *All financial projections prepared at any time concerning divestiture of
                       generation assets or Standard Offer Service in the EUA.*

        TransCanada limited this Request to financial projections concerning Standard Offer

Service pricing or fuel adjustments in the EUA Zone.  So limited, the Motion is GRANTED as to

Request No. 20.

**REQUEST NO. 21**    *All documents concerning analyses performed related to the Merger regarding Standard Offer Service or retail tariffs in the EUA or Old Narragansett Zone and the treatment of said tariffs post-Merger, including, but not limited to, applicability of a Fuel Adjustment Factor after 2004 in the EUA Zone.*

TransCanada seeks documents concerning analyses performed relating to the applicability, alteration or cancellation of retail tariffs in the EUA Zone, or to the applicability and treatment of fuel adjustments or triggers in the EUA Zone after the 2000 Merger.  The Request appears calculated to lead to admissible evidence pertaining to the Plaintiff's claim for breach of covenants of good faith and fair dealing.  Accordingly, as limited by TransCanada, the Motion is GRANTED as to Request No. 21.

**REQUEST NO. 22**    *All documents concerning the preparation and filing of Standard Offer Service or retail tariffs or Standard Offer Service pricing in the EUA and Old Narragansett Zones, including copies of all tariff filings, drafts and related memoranda and correspondence.*

Narragansett agreed to produce documents concerning post-2000 merger Narragansett's, and EUA's preparation and filing of SOS tariffs or SOS pricing in the EUA Zone if regarding FAF or the WSOS Agreement, and for the period 1998 through the present day.  TransCanada sought all such documents regarding fuel adjustments or indexes in the EUA Zone generally, from 1998 to the present, and copies of Narragansett's and its predecessors' actual retail tariff filings from 1980 to the present.  Documents concerning filings in the EUA Zone are clearly relevant to the dispute.  Copies of the actual retail tariff filings prior to 1996 are not relevant, however, and those actual retail tariff filings are equally as available to TransCanada as to Narragansett.

Accordingly, the Motion is GRANTED as to Request No. 22 as limited: "Narragansett shall produce all documents in its possession, custody or control concerning the preparation and filing of Standard Offer Service or retail tariffs in the EUA and Old Narragansett Zones, including fuel adjustments or indexes, in the EUA Zone generally from 1998 to the present."

**REQUEST NO. 27**   *All documents concerning Standard Offer Service or its pricing and any fuel adjustments or triggers applicable in the EUA Zone, including public announcements and communications with the Old Narragansett Zone, FERC, RIPUC, the Division, potential Standard Offer Service supplies [sic] or any other person.*

The Motion is DENIED as to Request 27, as it is duplicative of other requests dealt with by this Court.

**REQUEST NO. 28**   *All documents concerning the original drafting and revision of the WSOS Agreement and all previous versions, including drafts of previous versions of that Agreement or portions thereof that appeared in the RI Settlement Agreement or in preceding RFQ's, RFP's or other proposals or requests for Standard Offer Service providers in the EUA Zone.*

Narragansett construed this request as "seeking all documents concerning the negotiation of the WSOSA, including drafts, markups and communications." TransCanada claims that it is "entitled to documents concerning all earlier drafts of Article V of the WSOSA, including in [sic] earlier versions of the proposed Backstop Agreement that ultimately became the WSOSA." (Docket #27-7 at p. 7). The documents claimed by TransCanada, presumably any earlier versions of the proposed Backstop Agreement as they appear in the WSOS Agreement, appear to be included in those agreed to be produced by Narragansett. As such, the Motion is GRANTED as

to "all documents concerning the negotiation of the WSOSA, including drafts, markups and communications."

**REQUEST NO. 32**    *All documents and files of Michael Hager concerning: the WSOS Agreement; TransCanada' Standard Offer Service; related rate filings before the RIPUC; fuel adjustments and Standard Offer Service pricing; and the Merger, or that are otherwise responsive to these document requests, including all emails and personal notes.*

The principal difference between the parties appears to be that Narragansett seeks to limit the production of documents and files of Michael Hager to those concerning the WSOS Agreement, while TransCanada seeks documents in his files that are responsive to any of TransCanada's document requests.  (Docket #27-7 at p. 8).  Hager is a central figure in the dispute, and his understanding of and actions with respect to fuel pricing adjustments in the EUA Zone and with the EUA Companies generally, are reasonably calculated to lead to the discovery of admissible evidence, particularly as to TransCanada's claim that Narragansett breached its implied covenant of good faith and fair dealing.

Accordingly, with respect to Request No. 32, the Motion is GRANTED as modified to production of "all documents and files of Michael Hager concerning the SOS Agreement, TransCanada's Standard Offer Service; related rate filings before the RIPUC; fuel adjustments and Standard Offer Service pricing, the FAF, and fuel pricing adjustments in the EUA Zone and/or with EUA Companies."

**REQUEST NO. 33**  *All documents concerning written or oral testimony before the RIPUC concerning Standard Offer Service and retail rate filings and the preparation for same, including draft testimony, internal communications, memoranda, emails and notes.*

Notwithstanding an array of objections, Narragansett construed this request as "seeking documents pertaining to Narragansett's own testimony before RIPUC concerning Standard Offer Service filings that relate to the FAF under the WSOSA after 2004." (Docket #27-6 at pp.32-33). In addition to those documents, TransCanada also sought any such documents relating to SOS fuel adjustments or triggers in the EUA Zone. As described above, the request (as limited by TransCanada) is both relevant and seemingly reasonably calculated to lead to the discovery of admissible evidence. Accordingly, the Motion with respect to Request no. 33 is GRANTED as limited: "Narragansett shall produce all documents in its possession, custody or control concerning Narragansett's own testimony before RIPUC concerning (a) Standard Offer Service filings that relate to the FAF under the WSOSA; and (b) SOS fuel adjustments or triggers within the EUA Zone; for the period of time from 1998 through the present date."

**REQUEST NO. 34**  *All documents concerning consideration of whether, and the decision not, to seek approval of a Fuel Adjustment Factor after 2004.*

Notwithstanding Narragansett's self-serving response,[5] the import of the Request is clear. It is a "catch-all" to encompass any other FAF-related documents not covered by prior specific requests. Still, that status does not render it unenforceable. Narragansett accurately construed

---

[5] "It is also clear that Narragansett has and had no affirmative obligation to petition the RIPUC for approval of an FAF beyond 2004. Accordingly, any characterization to the contrary is inaccurate and any request seeking documents about a 'decision not' to do something that Narragansett had no obligation to do in the first place is vague, ambiguous, misleading and impossible to answer." (Docket #27-6 at p. 33).

this request as seeking "all documents concerning the administration of the WSOSA and the payment of an FAF or obligations under the FAF clause after 2004." (Docket #27-6 at p. 33). While the Court hopes and expects that Narragansett has complied with its obligations under the Rules of Civil Procedure in turning over all documents relative to the FAF, the motion will be GRANTED as to Request No. 34 to avoid any possible confusion as to the issue.

**REQUEST NO. 36**    *All documents concerning analysis of or use of fuel adjustments generally in electrical supply contracts.*

In refusing to produce any responsive documents, Narragansett chose to construe the request as asking it to "conduct research into the standards, norms and opinions of the electrical supply industry as a whole [including] legislatures, regulators, think tanks, financial analysts, other electric suppliers, [and] other electric marketers, and other electric distribution companies [that have] performed 'analysis of the use of fuel adjustments generally in electrical supply contracts.'" (Docket #27-6 at pp. 34-35) (emphasis in original). TransCanada appropriately contends that it is entitled to documents "relevant to Narragansett's internal analysis or view of the use of fuel adjustment factors in electrical supply contracts." (Docket #27-7 at p. 8). Accordingly, the motion with respect to Request No. 36 is GRANTED as limited to documents within Narragansett's possession, custody or control concerning its internal analysis or view of the use of fuel adjustment factors in electrical supply contracts.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion to Compel Production of Documents (Docket #26) is GRANTED in part and DENIED in part. Within thirty (30) days of the date of

25

this Order, Narragansett shall produce to TransCanada within thirty (30) days of the date of this

Order:

1.      A privilege log of all materials for which privilege is asserted, together with seasonable supplementation of the same as additional materials are identified;

2.      Such materials as it is obligated and has agreed to produce, but has simply not produced, as identified in Prayer 4 of its Motion;

3.      Documents responsive to Requests no. 4-7, 12, 15-16, 18-22, 28, 32-34, and 36; as those Requests have been narrowed by this Opinion.

IT IS SO ORDERED.


 /s/ Timothy S. Hillman
Timothy S. Hillman
United States Magistrate Judge