UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                        )
TRANSCANADA POWER  MARKETING LTD.       )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        C.A. No. 05-40076FDS
                                        )
                                        )
NARRAGANSETT ELECTRIC COMPANY           )
                                        )
        Defendant,                      )
                                        )
_____)

**AMENDED COMPLAINT**
**LEAVE TO FILE GRANTED ON MARCH 7, 2007**

        Plaintiff TransCanada Power Marketing Ltd. ("TransCanada") brings this action against

Narragansett Electric Company ("Narragansett") for breach of contract, contractual indemnity,

breach of the implied covenant of good faith and fair dealing, reformation or rescission of

contract, a declaratory judgment, and for violation of M.G.L. ch. 93A.

PARTIES

        1.      Plaintiff TransCanada is a Delaware corporation with a principal place of business

at  11 Turnpike Road, Westborough, Massachusetts.  TransCanada is a power marketing

company that purchases electricity from generation sources, such as power plants, and resells

that electricity to retail electric distribution companies and other customers throughout the

northeastern United States.

        2.      Defendant Narragansett is a Rhode Island corporation with a principal place of

business at 280 Melrose Street, Providence, Rhode Island and a business office in Northborough,

Massachusetts.  Narragansett is a retail electric distribution company engaged in the transmission and distribution of electricity to retail end-customers in Rhode Island.  Narragansett's predecessors include two retail electric distribution companies in Rhode Island the formerly known as Blackstone Valley Electric Company ("Blackstone") and Newport Electric Company ("Newport"), both of which merged into Narragansett in 2000.  Narragansett and its predecessors Blackstone and Newport have, at all relevant times and for all relevant purposes, acted through, and been managed and operated by, representatives at affiliated service companies (National Grid USA Service Company and EUA Service Corporation) based in Northborough and Bridgewater, Massachusetts, respectively.

<u>JURISDICTION AND VENUE</u>

3.    This Court has jurisdiction under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.  Venue is proper in this Court under 28 U.S.C. § 1391(a)(1), (2) and (3).

<u>FACTS</u>
<u>Industry Background: The URA</u>

4.    In 1996, Rhode Island passed a Utility Restructuring Act (the "URA").  The general objective of the URA was to deregulate electric power supply and develop a competitive retail market for electricity in Rhode Island.  During the same time period, a similar electricity deregulation process was ongoing in Massachusetts.

5.    The URA required that electric distribution companies in Rhode Island divest ownership of their electricity generation facilities, and offer so-called "Retail Access" to Rhode Island retail customers.  R.I.G.L. 39-1-27.3 (1997).  As envisioned by the URA, Retail Access required each retail electric distribution company to allow its customers to purchase electricity from non-affiliated retail suppliers, and further required each retail distribution company to

2

transport that purchased electricity over the retail distribution company's own lines from the alternative supplier to the customer.

6.     The URA also required that, during the transition to Retail Access, the retail distribution companies provide a standard power supply (a "Standard Offer Service") to Rhode Island retail customers through 2009, at a set of regulated prices.  R.I.G.L. 39-1-27.3(d) (1997). The purpose of the Standard Offer Service was to provide Rhode Island retail customers a stable, competitively-priced source of electricity during the transition period to a competitive Retail Access market, for those customers that had not yet obtained an alternative electricity supplier.

7.     Under the URA, the Standard Offer Service was to be priced to account for increases in the consumer price index, and also for other factors reasonably beyond the control of power suppliers such as "extraordinary fuel costs."  R.I.G.L. 39-1-27.3(d) (1997).  The URA required the retail distribution companies to file tariffs with the Rhode Island Public Utilities Commission ("PUC") to implement Standard Offer Service through 2009, for the benefit of both wholesale and retail customers and their suppliers.  R.I.G.L. 39-1-27(a) (1997).

## Implementation of the URA

8.     Blackstone and Newport were retail electric distribution companies in Rhode Island at the time of enactment of the URA, and were wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), a Massachusetts-based public utility holding company.   EUA also owned a retail electric company in Massachusetts, Eastern Edison Company ("Eastern," and, collectively with Blackstone and Newport, the EUA retail "Companies").

9      At the time of enactment of the URA and its Massachusetts counterpart, the EUA Companies purchased their electricity, which they then supplied to their retail customers, from an affiliated wholesale electricity supplier in Massachusetts, Montaup Electric Company

("Montaup").  To comply with the URA (and a Massachusetts counterpart), the Companies were required to terminate their wholesale supply contracts with Montaup, and allow their retail customers to have Retail Access to alternative suppliers; Montaup was also required to divest its generation facilities.

10.      On October 17, 1997, in order to implement the URA, Blackstone, Newport, and Montaup entered into a Stipulation and Agreement with the PUC, as well as the Rhode Island Division of Public Utilities and Carriers ("Division") (hereinafter, the "RI Settlement Agreement").  The RI Settlement Agreement was approved by the Federal Energy Regulatory Commission ("FERC").  A similar Stipulation and Agreement was executed in Massachusetts and also approved by FERC (the "MA Settlement Agreement," and, collectively with the RI Settlement Agreement, the "Settlement Agreements").

11.      In order to ensure a steady supply of Standard Offer Service, Montaup was required under the RI Settlement Agreement to provide Blackstone and Newport with a guaranteed, "Backstop" supply of Standard Offer Service through the required term of Standard Offer Service in Rhode Island (through 2009).[1]  Blackstone and Newport were in turn required to seek alternative wholesale suppliers for Standard Offer Service during that term, and Montaup was to be released from its Backstop obligation to the extent Blackstone and Newport were able to obtain replacement contracts.  In order to ensure a Standard Offer Service to Rhode Island retail customers through 2009, however, Montaup's Backstop obligation required it to provide Standard Offer Service to Blackstone and Newport through 2009 to the extent those companies did not obtain alternative wholesale Standard Offer Service supply contracts.

---

[1] Massachusetts required electric distribution companies to provide standard offer service only through 2004, and hence the MA Settlement Agreement imposed upon Montaup a Backstop obligation in Massachusetts only through 2004.

12.    The RI Settlement Agreement required that Montaup assign to the purchaser of any divested Montaup generation asset a commensurate share of Montaup's Backstop obligation. Thus, any purchaser of Montaup's generation assets was required to assume a share of Montaup's Backstop Standard Offer Service obligations to Blackstone and Newport.

13.    Consistent with the pricing scheme for Standard Offer Service set forth in the URA, the RI Settlement Agreement provided that Montaup and its successors and assigns were to provide Standard Offer Service to Blackstone and Newport in exchange for a stipulated set of base prices rising over time, subject to a "fuel index" to account for future extraordinary fuel costs, through 2009. The purpose of the fuel index, as envisioned by the URA and Settlement Agreements, was to ensure that wholesale Standard Offer Service suppliers would be protected against the downside risk of future extraordinary increases in fuel costs, so that they would be able to agree to the desired long-term Standard Offer Service supply contracts for the benefit of Rhode Island retail customers.

TransCanada's WSOS Agreement

14.    On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement whereby TransCanada purchased certain electricity generation assets of Montaup (the "Asset Purchase Agreement"). TransCanada was thereby also required by the RI and MA Settlement Agreements to assume a percentage share of Montaup's Backstop obligation to provide Standard Offer Service to Blackstone, Newport and Eastern.

15.    TransCanada and Blackstone, Newport and Eastern (collectively, the EUA "Companies") therefore entered into a Wholesale Standard Offer Service Agreement dated April 7, 1998 (the "WSOS Agreement," or "Agreement," attached hereto as Exhibit A), which is governed by Massachusetts law. In the WSOS Agreement, TransCanada agreed to assume a

5

percentage share of Montaup's Standard Offer Service obligations under the Settlement

Agreements, to Blackstone and Newport through 2009 (the term of the Standard Offer Service in

Rhode Island); and to Eastern through 2004 (the term of the Standard Offer Service in

Massachusetts). (*See* Agreement, § 3 & App. A.) The parties negotiated, signed, and

subsequently administered the WSOSA in and from their respective offices in Massachusetts.

16.     Under the WSOS Agreement, and as specified in the Settlement Agreements and

the URA, TransCanada was to receive a price for delivering Standard Offer Service consisting of

the stipulated set of base prices rising over time (the "Standard Offer Wholesale Price"), plus a

fuel index (the "Fuel Adjustment Factor") to account for future extraordinary fuel costs. Under

the WSOS Agreement, the Fuel Adjustment Factor was to be calculated based upon the tariffs

that Blackstone and Newport were required to file in accordance with the URA and Settlement

Agreements. Specifically, Agreement Article Five provides that:

> For each kilowatt-hour of Delivered Energy that Supplier [TransCanada] provides
> in each month…, the Companies shall pay Supplier the applicable Price for the
> month in cents per kilowatt hour calculated as follows:
>
> Price = Standard Offer Wholesale Price + Fuel Adjustment Factor
>
> Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in
> Article 1 and shown in Appendix A, and
>
> Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the
> incremental revenues collection, if any, attributed to the operation of the retail
> Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service
> Tariffs. … The Retail Fuel Adjustment, and the resulting Fuel Adjustment
> Factor to be paid to Supplier, will be made subject to regulatory approval and
> only to the extent the Companies are allowed to collect such revenues from the
> retail customers taking Standard Offer Service.

17.     The Agreement imposed upon Blackstone and Newport a good faith obligation to

make the required Standard Offer Service Tariff filings, and to use reasonable efforts to obtain

regulatory approval for a Fuel Adjustment Factor to be paid to TransCanada over the 2009 term of the Agreement.

18.     The Agreement provided TransCanada with indemnity and termination rights in the event that any government or regulatory agency amended the Standard Offer Service in a manner which materially increased TransCanada's obligations or costs to provide Standard Offer Service under the Agreement.  Specifically, Article 8.3 of the Agreement provides:

> In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases the Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse the Supplier for any costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes.  In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier.  In the event that the Parties are not able to agree on the materiality of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter … and failing resolution … either Party may terminate this Agreement on sixty (60) days written notice ….

19.     The Agreement also provided TransCanada with termination rights, and damages rights, in the event that the Companies failed to perform any of their obligations under the Agreement.  Specifically, the Agreement provides that, upon an uncured default by any of the Companies, TransCanada has the right to recover direct damages resulting from the default; to pursue all other remedies and damages provided for by law; and to terminate the Agreement upon sixty (60) days notice.  (Agreement, § 7(1), (2).)  Finally, the Agreement provides that TransCanada is entitled to recover interest on any improperly withheld payments.  (*Id.* § 6.)

<u>The Narragansett Merger</u>

20.     From the signing of the Agreement in April 1998 through early 2000, Blackstone and Newport filed the required Standard Offer Service Tariffs with the PUC on a periodic basis. Blackstone and Newport thereby obtained approval of the Standard Offer Wholesale Prices and a

7

Fuel Adjustment Factor for 1999 and 2000, as required by the Agreement. Blackstone and Newport's representatives planned and prepared the tariff filings in EUA's offices in Massachusetts.

21.     In 2000, Blackstone and Newport merged into Narragansett, another retail electric distribution company in Rhode Island. At the same time, Eastern merged into Massachusetts Electric Company ("Mass. Electric"), another retail distribution company in Massachusetts.

22.     Narragansett and Mass. Electric were at the time (and still are, upon information and belief) wholly-owned subsidiaries of National Grid USA ("National Grid"), a Massachusetts-based public utility holding company. Through the comprehensive merger, all of EUA's former retail distribution companies in Rhode Island and Massachusetts, consisting of Blackstone, Newport, and Eastern, merged into the corresponding Rhode Island and Massachusetts retail distribution companies of National Grid, consisting of Narragansett and Mass. Electric.

23.     By way of the Rhode Island portion of the merger, Narragansett became the retail electric distribution company both for the previous retail customers of Blackstone and Newport in Rhode Island (hereinafter the former "EUA Zone"), as well as its own previous retail customers in its former area (hereinafter the old "Narragansett Zone").

24.     The PUC approved the Narragansett merger in March, 2000. At the request of Narragansett, the PUC cancelled the former Blackstone and Newport Standard Offer Service Tariffs and ruled that Narragansett could continue to obtain payment for Standard Offer Service in both its new EUA Zone and in its old Narragansett Zone through Narragansett's own and future Standard Offer Service Tariffs and related filings.[2]

---

[2] Narragansett, like Blackstone and Newport, had entered into its own Settlement Agreement with the PUC in 1997, which also required Retail Access and divestiture of generation assets. Narragansett's Settlement Agreement

Narragansett's Wrongful Conduct

25.    On April 18, 2000, Narragansett sent a letter to TransCanada giving notice of the merger, and stating that Narragansett would succeed to and assume the obligations of Blackstone and Newport under the WSOS Agreement.  The letter further assured TransCanada, as required for valid assignment of the Agreement in the case of a merger, that the obligations of the parties "are not affected by the merger and assignments."  Narragansett's letter further stated that Narragansett would continue to make Fuel Adjustment payments to TransCanada "after 1999," according to the mechanism previously established in the RI Settlement Agreement and in the Blackstone and Newport Standard Offer Service Tariffs.

26.    Unbeknownst to TransCanada, however, Narragansett, through its service company representatives in Massachusetts, began planning even at the time of the merger to deny TransCanada the Fuel Adjustment Factor it had bargained for in the WSOS Agreement.  It was to Narragansett's benefit not to pay a Fuel Adjustment Factor, particularly in times of rising fuel prices, in order to reduce its overall expenses and costs.  Fuel prices began rising at the time of Narragansett's merger, and the Fuel Adjustment Factors in Narragansett's and Blackstone's and Newport's wholesale Standard Offer Service supply contracts had been triggered.

27.    Nevertheless, Narragansett thereafter and through the end of 2004 continued to pay TransCanada for Standard Offer Service as required under the Agreement, including both the base Wholesale Standard Offer Price and a Fuel Adjustment Factor.  Fuel prices continued to rise, however, and Fuel Adjustment Factor payments to TransCanada and other wholesale

---

required Narragansett to provide Standard Offer Service at the same set of stipulated prices and fuel adjustment triggers as in Blackstone's and Newport's RI Settlement Agreement.  Like Blackstone and Newport, Narragansett also subsequently entered into Standard Offer Service supply contracts with a number of wholesale Standard Offer Service suppliers.  Narragansett was required, like Blackstone and Newport, to file tariffs under the URA to implement the Standard Offer Service for the benefit of its customers and suppliers.

9

Standard Offer Service suppliers became a regular component of the price paid by Narragansett to its suppliers for Wholesale Standard Offer Services.

28.    In May, 2003, unbeknownst to TransCanada, Narragansett's Massachusetts representatives began to argue affirmatively before the PUC, based on filings planned and prepared in Massachusetts, that its suppliers in the former EUA Zone should not be paid a Fuel Adjustment Factor after 2004.   The PUC expressed concern about Narragansett's position, and Narragansett stated to the PUC both that it had discussed its intended position with all of its EUA Zone suppliers and that, while the suppliers had not affirmatively agreed with Narragansett's position, none of those suppliers had raised objection.  These were blatant misrepresentations, as Narragansett neither notified nor discussed with TransCanada at any time Narragansett's intention not to provide Fuel Adjustment Factor payments under the Agreement after 2004.

29.    In July 2004, Narragansett again told the PUC that it should make no provision for a Fuel Adjustment Factor in the former EUA Zone after 2004.  The PUC again expressed concern, both about the merit of Narragansett's position and about whether Narragansett's EUA Zone suppliers had been notified and agreed with Narragansett's position.  In response, Narragansett argued against TransCanada's right to a Fuel Adjustment Factor, and again misrepresented both that it had discussed the matter with all of its EUA Zone suppliers and that none of those suppliers had affirmatively disputed Narragansett's position.  Narragansett also falsely assured the PUC that, in the event a dispute developed, TransCanada had no ability to terminate the WSOS Agreement in the event that it failed to receive Fuel Adjustment Factor payments after 2004.

30.    In December, 2004, Narragansett filed with the PUC its proposed Standard Offer Service Tariffs and rates for 2005.  Narragansett specified that no Fuel Adjustment Factor should

be granted to TransCanada (or any other EUA Zone suppliers) in 2005. As a result of that filing, and Narragansett's arguments and previous misstatements to the PUC, the PUC approved Standard Offer Service Tariffs and rates for 2005 that provide no allocation for a Fuel Adjustment Factor for TransCanada.[3] At the same time, Narragansett continued to request and obtain approval for a Fuel Adjustment Factor in 2005 for its suppliers in the old Narragansett Zone. TransCanada was never made aware of any of Narragansett's filings or arguments at the PUC in 2003 and 2004.

31.    In February, 2005, TransCanada learned for the first time that Narragansett did not plan to pay TransCanada any Fuel Adjustment Factor after 2004, or indeed for the last five years of the WSOS Agreement. TransCanada discovered this position only after receiving Narragansett's calculation of the amount payable for Standard Offer Service delivered in January, 2005, which noticeably omitted any payment for a Fuel Adjustment Factor. The expected amount of that unpaid Fuel Adjustment Factor, just for January, 2005, totaled over $320,000.00. The Fuel Adjustment Factor each subsequent month has been similar, and is expected to remain substantial in future months.

32.    On March 1, 2005, TransCanada provided written notice of default under the WSOS Agreement. Narragansett has thereafter refused to cure or change its position, or to indemnify or reimburse TransCanada under Article 8(3) of the Agreement for loss of the Fuel Adjustment Factor.

33.    Narragansett also continues to dispute TransCanada's right to terminate the WSOS Agreement. Narragansett has further threatened during communications and meetings in Massachusetts that its National Grid affiliates will withhold payments owed to TransCanada

---

[3] When asked in December 2004 whether it had had further discussions with its EUA Zone suppliers since its previous statements, Narragansett admitted in a half-truth at that point that it had not had *recent* discussions with all of its suppliers.

4173083v2

under the Asset Purchase Agreement if TransCanada proceeds to terminate the WSOS Agreement.

34.     Narragansett's breaches of its obligations under the WSOS Agreement have deprived TransCanada of its contractual rights to payment of a Fuel Adjustment Factor under the Agreement. These breaches have caused and are continuing to cause TransCanada substantial and ongoing damages.

Count I
(Breach of Contract)

35.     TransCanada repeats and incorporates by reference paragraphs 1 through 34 above.

36.     Narragansett has breached the WSOS Agreement through the acts described above, including (a) its failure to file for or make a reasonable effort to obtain regulatory approval of a Fuel Adjustment Factor after 2004, (b) its failure to pay a Fuel Adjustment Factor to TransCanada as required under the Agreement; and (c) its failure to notify TransCanada and negotiate in good faith at the time it identified the issue and to indemnify or reimburse TransCanada as required by Article 8(3) of the Agreement for regulatory loss of the Fuel Adjustment Factor.

37.     As a result of these breaches, TransCanada has suffered and will continue to suffer monetary damages. TransCanada was and is entitled to terminate the Agreement, and to an award of its damages and interest.

Count II
(Contractual Indemnification)

38.     TransCanada repeats and incorporates by reference paragraphs 1 though 37 above.

12

39.     The PUC's abolishment of the Blackstone and Newport tariffs, and its subsequent approval of Standard Offer Service Tariffs for 2005 that do not include a Fuel Adjustment Factor in the EUA Zone, have amended the Standard Offer Service in a manner that has materially increased TransCanada's costs and obligations to provide Standard Offer Service under the Agreement.  These regulatory changes were made by the PUC at the express request of Narragansett.

40.     Under Article 8(3) of the WSOS Agreement, Narragansett was obligated at the time it identified the issue to notify and meet with TransCanada in good faith concerning the anticipated loss of the expected Fuel Adjustment Factor, to indemnify or otherwise reimburse TransCanada, and to permit TransCanada to account for or contest the change or choose to exercise its right to terminate the WSOS Agreement at that time.  As a result of its failure to do so, TransCanada has been prejudiced and has suffered and is continuing to suffer damages.

<u>Count III</u>
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

41.     TransCanada repeats and incorporates by reference paragraphs 1 through 40 above.

42.     The Agreement contains an implied covenant of good faith and fair dealing.

43.     Narragansett has breached the covenant of good faith and fair dealing implied in the Agreement through its conduct described above, including but not limited to its various contractual breaches, its misleading behavior with TransCanada and the PUC, its concealment of its planned breach of the Agreement, and its expropriation to its own benefit of TransCanada's rights under the Agreement.

13

44.     As a result of these breaches, TransCanada has suffered and will continue to suffer substantial monetary damages.  TransCanada was and is entitled to terminate the Agreement, and to an award of damages and interest.

<u>Count IV</u><br>(Rescission or Reformation of Contract)

45.     TransCanada repeats and incorporates by reference paragraphs 1 through 44 above.

46.     Narragansett has breached the WSOS Agreement and its covenant of implied good faith and fair dealing through the acts described above.

47.     As a result of these material breaches, TransCanada is entitled to rescind the WSOS Agreement and to be restored to the *status quo ante*.

48.     In the alternative, Narragansett misled TransCanada at the time of contracting into believing that it would continue to obtain regulatory approval of a Fuel Adjustment Factor throughout the term of the WSOS Agreement, and would continue to pay a Fuel Adjustment Factor to TransCanada for the entire term of the WSOS Agreement.

49.     Through its acts and omissions, Narragansett caused TransCanada to believe and was aware or should have been aware that TransCanada believed, that Narragansett would continue to file for and obtain regulatory approval of a Fuel Adjustment Factor throughout the term of the WSOS Agreement and would continue to pay a Fuel Adjustment Factor to TransCanada for the entire term of the WSOS Agreement.  Had TransCanada been aware of Narragansett's (or certain of its representatives') contrary plans or intent not to file an FAF for the entire term of the WSOSA, TransCanada would not have signed the WSOSA.

50.     This unilateral or mutual mistake as to the Fuel Adjustment Factor in Article V of the WSOS Agreement was material and essential to the Contract.

14

51.     As a result of this unilateral or mutual mistake, TransCanada was and is entitled to rescind the WSOS Agreement, or to reform the WSOS Agreement to conform with the understanding at the time the WSOS Agreement was signed.  The WSOS Agreement should be rescinded or reformed so that, in keeping with the understanding at the time the WSOS Agreement was executed, Narragansett is required:  (1) to file for or make reasonable efforts to obtain a Fuel Adjustment Factor throughout the term of the WSOS Agreement; and (2) to pay a Fuel Adjustment Factor to TransCanada for the entire term of the WSOS Agreement.

Count V
(Declaratory Relief under G.L. c 231A:  Right to Terminate)

52.     TransCanada repeats and incorporates by reference paragraphs 1 through 51 above.

53.     An actual controversy exists as to whether Narragansett breached the WSOS Agreement, and whether TransCanada has the right to terminate the Agreement, including under its Articles 7(2) and/or 8(3).

54.     TransCanada requests a declaratory judgment that Narragansett breached the terms of the WSOS Agreement; that Narragansett failed to cure the breach (to the extent cure was applicable); that TransCanada had the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement upon the breach; and that TransCanada's is entitled to damages.

Count VI
(Unfair and Deceptive Acts and Practices in Violation of M.G.L. ch. 93A §11)

55.     TransCanada repeats and incorporates by reference paragraphs 1 through 54 above.

15

56.    TransCanada and Narragansett are "persons" engaged in the conduct of trade or commerce within the meaning of M.G.L. ch. 93A §§ 1 and 11.

57.    Section 11 of the Massachusetts Consumer Protection and Unfair Trade Practices Act, M.G.L. ch. 93A, § 1 et seq., makes it unlawful for "any person who engages in the conduct of any trade or commerce . . . [to engage in] . . . an unfair method of competition or an unfair or deceptive act or practice . . ." Section 11 further provides that any person who engages in trade or commerce and who suffers any loss of money or property as a result of such conduct is entitled to multiple damages, attorneys' fees, costs and equitable relief.

58.    In order to accomplish and hide its breaches, and help secure undeserved benefits under the Agreement, Narragansett engaged in a scheme to deceive TransCanada into believing that it would perform a certain way under the WSOS Agreement, all the while acting in bad faith and in knowing violation of the WSOS Agreement. These actions, and others described herein, constitute unfair and deceptive business practices under M.G.L. ch. 93A § 11.

59.    Narragansett's actions are willful and knowing violations of M.G.L. ch. 93A § 11.

60.    Narragansett's unfair and deceptive acts and practices have occurred primarily and substantially within the Commonwealth of Massachusetts. The WSOSA was negotiated and signed in Massachusetts; it is governed by Massachusetts law; Narragansett administered and managed the WSOS Agreement from its offices in Massachusetts; the relevant tariff filings were planned, prepared and promoted by Narragansett representatives in and from Narragansett's offices in Massachusetts; and all relevant communications, misrepresentations and misleading statements made to TransCanada were planned and made by Narragansett representatives in and from Massachusetts.

61.     As a consequence of Narragansett's unfair and deceptive acts and practices, TransCanada has incurred damages.

62.     As a direct and proximate result of the foregoing knowing, willful and unfair deceptive acts and practices of Narragansett, Plaintiff is entitled to treble damages in an amount to be determined, as well as recovery of its reasonable attorney's fees and costs.

WHEREFORE, TransCanada requests the following relief:

1.     Judgment in its favor on all counts.

2.     An award of specific performance and/or damages, including interest, in an amount to be determined at trial.

3.     A declaratory judgment that Narragansett has breached the terms of the WSOS Agreement; that Narragansett has failed to cure the breach; and that TransCanada had the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOS Agreement immediately.

4.     An order rescinding the WSOS Agreement as of the date of contracting or thereafter and restoring the *status quo ante*, including, but not limited to, an award of damages including interest, in an amount to be determined at trial.  Or, in the alternative, an award reforming the WSOS Agreement to reflect the intent under which the WSOS Agreement was signed, that EUA and its successors would (a) file for and make a reasonable effort to obtain regulatory approval of a Fuel Adjustment Factor throughout the full term of the WSOS Agreement; and (b) pay a Fuel Adjustment Factor to TransCanada throughout the full term of the WSOS Agreement.

5.     An award of treble damages in an amount to be determined at trial, as well as recovery of TransCanada's reasonable attorney fees and costs, pursuant to M.G.L. ch. 93A.

6.    An award of costs, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD

By its attorneys,


/s/  Daniel C. Winston
Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
Dara Z. Kesselheim (BBO#660256)
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA  02110
Tel. (617) 248-5000
Fax (617) 248-4000

18