UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | | |
|---|---|---|
| TRANSCANADA POWER MARKETING LTD., | ) ) ) | C. A. No. 05-40076-FDS |
| | ) | (Michael P. Angelini, #019340) |
| Plaintiff, | ) | (Vincent F. O'Rourke, Jr., #380335) |
| | ) | (Daniel P. Flynn, #655180) |
| v. | ) ) | |
| NARRAGANSETT ELECTRIC COMPANY, | ) ) ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT ON COUNT II OF TRANSCANADA POWER
MARKETING LTD.'S AMENDED COMPLAINT**

**INTRODUCTION**

Defendant, The Narragansett Electric Company ("Narragansett"), submits this Memorandum in Support of its Motion for Partial Summary Judgment on Count II of TransCanada Power Marketing Ltd.'s ("TransCanada") Amended Complaint. TransCanada supplies Narragansett with electric power for distribution to Narragansett's Rhode Island customers pursuant to the Wholesale Standard Offer Services Agreement ("WSOSA") at issue in this case. In this action, TransCanada complains because Narragansett did not seek a fuel adjustment provision in connection with tariffs filed by Narragansett with the Rhode Island Public Utility Commission ("RIPUC") to implement the WSOSA for the years after 2004.

In Count II of its Amended Complaint, TransCanada relies on Article 8(3) of the WSOSA, which provides for indemnification of TransCanada by Narragansett in the event of action by a "governmental or regulatory agency … which materially increases [TransCanada's] costs or obligations to provide Standard Offer Service…" in providing electric power to

Narragansett. TransCanada is not entitled to the indemnification it seeks under the plain language of Article 8(3) and summary judgment dismissing Count II should be granted. The lack of a fuel adjustment provision in tariffs approved by RIPUC in 2005 and thereafter in no way "increases TransCanada's costs or obligations" – it simply decreases the revenue received by TransCanada pursuant to the WSOSA and thus Article 8(3) is inapposite.

## FACTUAL BACKGROUND

### A. The Parties

Narragansett is a specially chartered Rhode Island public utility corporation with its principal place of business in Rhode Island. It is an electric distribution company whose charter permits it to deliver electricity over its wires to retail customers in thirty-eight Rhode Island cities and towns, with a population of over 1 million people. Affidavit of Michael J. Hager, ¶ 5[1]. Narragansett is the largest such electric utility in Rhode Island, serving most of that State's customers. Id. It presently delivers electricity to approximately 480,000 customers, of which over 475,000 receive standard offer service. Id. Narragansett has the exclusive right to own and operate distribution equipment for delivery of electricity at retail in these cities and towns. Id. Unlike non-utility companies, Narragansett does not set the prices at which it provides these services. Rather, it sells and delivers electricity pursuant to retail tariffs that the RIPUC has approved. Narragansett is wholly owned by National Grid USA ("National Grid"), a public utility holding company. Id. at ¶ 4.

---

[1] The Affidavit of Michael Hager was previously filed in Opposition to TransCanada's Motion to Enjoin Narragansett from prosecuting an action in Rhode Island. It is attached as Exhibit A to the Affidavit of Daniel Flynn, ("Flynn Aff.") being filed with this Opposition. The Further Affidavit of Michael Hager in Support of Defendant's Motion for Summary Judgment is also being filed in support of this Motion and is referenced herein as "Further Hager Aff."

2

TransCanada, a Delaware corporation, is a power marketing company that sells electricity at wholesale to Narragansett. Its eastern operations are headquartered in Massachusetts. Id. at ¶ 23.

Narragansett's predecessor companies, Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") also were retail electric distribution companies in Rhode Island. Like Narragansett, Blackstone and Newport provided their services pursuant to retail tariffs approved by the RIPUC. Eastern Utilities Associates ("EUA"), a public utility holding company, had owned Blackstone, Newport, and Montaup Electric Company ("Montaup"), the wholesale electricity supplier to Blackstone and Newport. On May 1, 2000, Blackstone and Newport merged with and into Narragansett. At the same time, National Grid acquired EUA, and Montaup merged with and into New England Power Company, another subsidiary of National Grid USA. Consequently, Narragansett became the retail electric supplier and distribution company for Blackstone and Newport's customers, in addition to its already existing customers. Further Hager Aff., ¶¶ 1-2.

### B. The WSOSA

On April 7, 1998, TransCanada and Montaup entered into an Asset Purchase Agreement. Under the Asset Purchase Agreement, TransCanada (1) purchased rights and obligations under a power purchase agreement between Montaup and the Ocean State Power ("OSP") generation station in Burrillville, Rhode Island; (2) entered into a Transfer Agreement to effectuate the OSP purchase power obligations; and (3) agreed to supply a specific percentage share of electricity

3

required by Blackstone and Newport to serve their Rhode Island customers. In connection with its supply obligation, TransCanada entered into the "WSOSA" with Blackstone and Newport[2].

At the heart of this dispute is the WSOSA's fuel adjustment clause. Pursuant to this clause, Blackstone and Newport (now Narragansett) were obligated to pay a Fuel Adjustment Factor ("FAF") to TransCanada, as that FAF was to be reflected in their retail tariffs. The FAF is an added charge paid by ratepayers which TransCanada would receive if fuel costs exceeded certain levels. The WSOSA made clear that Blackstone and Newport's obligation to make payments under the FAF was conditioned upon the RIPUC approving the FAF in their tariffs. WSOSA, ¶5.

Shortly after the WSOSA was executed, Blackstone and Newport filed identical retail tariffs that contained the FAF. By its terms, the FAF in those tariffs commenced in the year 2000 and expired after 2004. Flynn Aff., Exhibit D. There were no provisions in the tariffs that provided for extending the FAF beyond 2004. These retail tariffs were approved by the RIPUC by order issued July 10, 1998. The FAF remained in the Blackstone and Newport tariffs, unchanged, through the date that Blackstone and Newport merged into Narragansett.[3]

In anticipation of the pending merger of Narragansett, Blackstone and Newport, by letter dated February 8, 2000, Narragansett informed TransCanada that it would pay an FAF consistent

---

[2] The Asset Purchase Agreement is attached to the Flynn Affidavit as Exhibit B and the WSOSA Agreement is attached to the Flynn Affidavit as Exhibit C. The WSOSA Agreement also required TransCanada to supply electricity to Eastern Edison, a Massachusetts retail distribution company and subsidiary of EUA. However, the term of that supply obligation ended in 2004. As a result, TransCanada's remaining supply obligations relate solely to the former EUA companies in Rhode Island, Newport and Blackstone, which subsequently merged into Narragansett.

[3] While the filing was made on April 15, 1998 (Flynn Aff., Exhibit D), the standard offer service tariff containing an FAF expiring after 2004 was virtually identical to a proposed standard offer service tariff that had been filed at the RIPUC in November of 1997. At that time, however, the RIPUC delayed approval. Instead, the RIPUC put interim tariffs into effect and required Blackstone and Newport to put the standard offer out to bid before approving any standard offer tariffs. Once the bidding process was completed, Blackstone and Newport refiled on April 15, 1998. The discussion of this filing history also is contained in the RIPUC's order issued July 10, 1998. See July 10, 1998 Order (Ex. 72), attached as Exhibit E to the Flynn Affidavit.

4

with Blackstone and Newport's RIPUC-approved retail tariffs.  Flynn Aff., Exhibit F. Accordingly, Narragansett attached to the correspondence a schedule containing a fuel adjustment for each year from 2000 through 2004.  Narragansett sent this letter to TransCanada in draft form and asked TransCanada to review it.  Id.  Representatives from TransCanada and Narragansett communicated regarding the letter, and TransCanada voiced no objections to the contents of the letter.  Flynn Aff., Exhibit G (Deposition of Hager), pp. 114-116.  Thus, on April 18, 2000, Narragansett put the draft letter in final form and sent it to TransCanada.  Flynn Aff., Exhibit H.

Consistent with its understanding of the WSOSA, the terms of the retail tariff that had been initially approved by the RIPUC in 1998, the April 18, 2000 letter that had been sent to TransCanada at the time of the merger, and its filings with the RIPUC, Narragansett did not make an FAF payment to TransCanada for the period beginning January 1, 2005.  After negotiations between the parties in the spring of 2005, TransCanada filed the Complaint in this matter on May 17, 2005.  The parties have completed fact and expert discovery and are filing these motions for summary judgment pursuant to the Court's scheduling order.  Trial is scheduled for January 22, 2008.

I. **NARRAGANSETT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF THE AMENDED COMPLAINT BECAUSE NO ACTIONS OF ANY GOVERNMENTAL OR REGULATORY AGENCY INCREASED TRANSCANADA'S COSTS OR OBLIGATIONS TO PROVIDE STANDARD OFFER SERVICE AS REQUIRED TO TRIGGER ITS RIGHT TO INDEMNIFICATION UNDER ARTICLE 8(3) OF THE WSOSA.**

Count II of TransCanada's Amended Complaint seeks contractual indemnification for lost revenues pursuant to Article 8(3) of the WSOSA.  The plain language of Article 8(3) and the testimony concerning the intent of the parties shows that, at best, Article 8(3) provided indemnification to TransCanada only for material increases in costs or obligations to provide

standard offer services. Because there have been no such increases to TransCanada's costs or obligations, Count II of the Amended Complaint should be dismissed.

### A. The Plain Language of Article 8(3) of the WSOSA Shows That TransCanada Is Not Entitled to Indemnification for Lost Revenues.

TransCanada seeks indemnification for its revenues lost as a result of the failure of RIPUC to approve a fuel adjustment for 2005, 2006 and 2007. See Amended Complaint ¶¶ 39-40. Article 8(3) of the WSOSA provides as follows:

> In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materially [sic] of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

Article 8(3) is quite clear. TransCanada is entitled to indemnification pursuant to this Article only if "the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended, or replaced by any governmental or regulatory agency . . . in a manner which <u>materially increases [its] costs or obligations to provide standard offer service</u>." (<u>Emphasis added</u>.) The FAF is not a cost or obligation. Black's Law Dictionary defines a "cost" as "the amount paid or charged for something; price or expenditure" and defines "obligation" as "a legal or moral duty to do or not do something." *Black's Law Dictionary* (1996). A change in the amount or availability of an FAF does not materially increase any costs or obligations to TransCanada, as the FAF does not affect the price TransCanada pays for fuel or its expenses in providing fuel to customers. Instead, the FAF is a revenue provision which entitles TransCanada

6

to increased payments when fuel costs exceed stipulated levels. It does not affect costs or obligations to provide Standard Offer Service. Further Hager Aff., ¶¶ 4, 9.

Massachusetts law is clear that there is no need to reach the business context surrounding an agreement if the contract is by its terms unambiguous. See Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992) (citing Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516 (1970)). Absent fraud or mistake, an agreement is presumed to express the intent of the parties. See id. (citing Hess Oil & Chemical Corp. v. Ristuccia, 3 Mass. App. 772 (1975)). Nor can evidence of prior or contemporaneous oral agreements be considered to vary or modify the terms of an unambiguous written contract. See id., citing New England Financial Resources, Inc. v. Coulouras, 30 Mass. App. 140 (1991). Here, there is no dispute that there has been no increase in "costs or obligations to provide standard offer service" and summary judgment on Count II of TransCanada's Amended Complaint should therefore be granted.

> **B.    TransCanada's Interpretation of Article 8(3) of the WSOSA to Include Indemnification for Lost Revenue Is Contradicted by Article 8(1) of the WSOSA.**

Article 8(3) of the WSOSA makes no provision for instances where actions by a governmental or regulatory agency decrease the revenues payable to TransCanada. This absence is in stark contrast to Article 8(1)b where the parties agreed that the WSOSA could be terminated by Narragansett's predecessors if they were "prevented by any government agency of competent jurisdiction from recovering from customers taking standard offer service the cost of electricity provided by [TransCanada]." See Flynn Aff., Exhibit C, p. 8. Unlike Article 8(1)b, Article 8(3) does not address collecting remuneration for costs as does Article 8(1)b. Article 8(3) simply addresses the right to indemnification when unrecovered costs or obligations to provide standard offer service increase. The parties clearly knew how to address actions by governmental agencies which impacted the ability to recover revenue to compensate for costs incurred and did

7

not do so in Article 8(3).  Where, as here, the parties knew how to properly express the pertinent language, and choose to use different language in other sections of the agreement, their decision must be controlling.  See Fried v. Fried, 5 Mass.App.Ct. 660, 663-64 and n. 3 (1977) (When parties intended a particular result, they said so:  "The construction of words in a carefully drawn document may be affected by the varied use of words in another part of the document.")  Cf. Allstate Ins. Co. v. Bearce, 412 Mass. 442, 447 (1992) (It may "reasonably be inferred that if the parties intended to include subjects to which no reference is made in the instrument they would have done so by the addition of appropriate words."  (Internal citations and quotations omitted.)

      C.     **TransCanada Drafted Article 8(3) of the WSOSA.**

That TransCanada knew precisely how to include language in Article 8(3) concerning its ability to recover revenue, but did not do so, is even more persuasive in this instance where Article 8(3) was in fact required by and drafted by TransCanada's representatives and its counsel.  See Flynn Aff., Exhibit I (Deposition of Pourbaix, p. 194) and Exhibit J (Deposition of McMaster, pp. 59-60.)  A review of that drafting history is instructive.  TransCanada's senior bargaining representative, Alexander Pourbaix, initially proposed that a provision be added providing that, "In the event that the Price increases as a result of the decision of any regulatory body having jurisdiction over Standard Offer Service, such increase shall be paid to Supplier [TransCanada] by the Companies."  See Flynn Aff., Exhibit I, Pourbaix Dep. p. 194 and Dep. Exhibit 54 (Bates Number: TCPM 07195).  This focus on money to be paid to TransCanada changed in subsequent drafts to the ultimate language which was designed to address increases only in costs or obligations.  As Mr. Pourbaix testified, "It was drafted very broadly to ensure that if anything changed . . . we would be held harmless for it in the future. . . . [I]f there was a subsequent change in the fixed price of power under the standard offer service agreement, we did

8

not want to be held responsible for that, and hence the insertion of the 8(3) language." See Flynn Aff., Exhibit I, Pourbaix Dep. at p. 197.  (Emphasis added.) [4]

When a party and its counsel draft a provision, that party must be charged with accepting the language it crafted, and any uncertainty in the meaning of the document's terms is construed against the drafter.  See Merrimack Valley Nat'l Bank v. Baird, 372 Mass. 721, 724 (1977); Massachusetts Turnpike Auth. v. Perini Corp., 349 Mass. 448, 454 (1965); New Bedford Gas and Edison Light Company v. Maritime Terminal, Inc., 380 Mass. 734, 735 (1980); 4 S. Williston, Contracts § 621, at 760-762 (3d ed. 1961).  Indeed, the drafter of an ambiguous term is generally held to any reasonable interpretation attributed to it by the non-drafting party.  See Merrimack Valley Nat'l Bank, 372 Mass. at 724; ER Holdings, Inc. v. Norton Co., 735 F. Supp. 1094, 1100 (D.Mass. 1990); see also Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63 (1995) ("Respondents drafted an ambiguous document, and they cannot now claim the benefit of the doubt. The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result."); Restatement (Second) of Contracts § 206. TransCanada could have addressed a decrease in receipts, as was done in Article 8(1)b.  It did not do so and thus its claims under Article 8(3) are baseless.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted, dismissing Count II of TransCanada's Amended Complaint with prejudice.

---

[4] See also Flynn Aff., Exhibit K (Deposition of William Taylor, pp. 71-72, 165): "[Article 8(3) addresses] regulatory change that is . . . economically harmful to us as a supplier that would materially increase our cost to supply standard offer service under this agreement . . ..We were worried about a whole host of things, inclusion of other services, the migration issue . . . where customers . . . could be allowed to come back as to standard offer. . . . There were a number of things that we were just generally concerned could be implemented at the hand of the regulators that we want to be reimbursed for if it had a material financial impact on us."

{Client Files\lit\304810\0001\PLD\F0417472.DOC;4}

NARRAGANSETT ELECTRIC COMPANY,

By its attorneys,

/s/ Vincent F. O'Rourke, Jr.
Michael P. Angelini (BBO #019340)
Vincent F. O'Rourke, Jr. (BBO #380335)
Daniel P. Flynn (BBO# 655180)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15156
Worcester, MA  01615-0156
Tel: (508) 926-3511
Fax: (508) 929-3035
vorourke@bowditch.com

CERTIFICATE OF SERVICE

I, Vincent F. O'Rourke, Jr., hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on the 15th day of August, 2007.

/s/ Vincent F. O'Rourke, Jr.
Vincent F. O'Rourke, Jr.

{Client Files\lit\304810\0001\PLD\F0417472.DOC;4}