UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

Civil Action No. 05-40076FDS

|  |  |
|---|---|
| TRANSCANADA POWER MARKETING LTD. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE NARRAGANSETT ELECTRIC COMPANY | ) |
| | ) |
| Defendant. | ) |

## AFFIDAVIT OF DANIEL P. FLYNN, ESQUIRE IN SUPPORT OF NARRAGANSETT ELECTRIC COMPANY'S MOTION FOR SUMMARY JUDGMENT

I, Daniel P. Flynn, being sworn under oath depose and state as follows:

1.      I am an attorney admitted to practice in the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts and I represent the Defendant in this matter.

2.      Attached hereto as Exhibit A is a true and accurate copy of the Affidavit of Michael Hager, which was previously filed in support of Defendant's Opposition to Plaintiff's Motion to Enjoin Defendant from prosecuting an action in Rhode Island.

3.      Attached hereto as Exhibit B is a true and accurate copy of the April 7, 1998 Asset Purchase Agreement between Montaup Electric Company and TransCanada Power Marketing Ltd. ("TransCanada").

4.      Attached hereto as Exhibit C is a true and accurate copy of the April 7, 1998 Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company

("Blackstone"), Eastern Edison Company, Newport Electric Corporation ("Newport"), and TransCanada.

5.      Attached hereto as <u>Exhibit D</u> is a true and accurate copy of the Standard Offer Service and Last Resort Service tariffs filed by Blackstone and Newport on April 15, 1998.

6.      Attached hereto as <u>Exhibit E</u> is a true and accurate copy of the Rhode Island Public Utility Commission's July 10, 1998 Order.

7.      Attached hereto as <u>Exhibit F</u> is a true and accurate copy of the February 8, 2000 letter from Narragansett Electric Company ("Narragansett" or "Defendant") to TransCanada.

8.      Attached hereto as <u>Exhibit G</u> is a true and accurate copy of excerpts from the transcript of the deposition of Michael J. Hager held on March 23, 2007.

9.      Attached hereto as <u>Exhibit H</u> is a true and accurate copy of the April 18, 200 correspondence from Narragansett to TransCanada.

10.     Attached hereto as <u>Exhibit I</u> is a true and accurate copy of excerpts and Deposition Exhibit No. 54 (Bates Number: TCPM 007194-007196) from the transcript of the deposition of Alex Pourbaix held on April 17, 2007.

11.     Attached hereto as <u>Exhibit J</u> is a true and accurate copy of excerpts from the transcript of the deposition of Sean McMaster held on April 11, 2007.

12.     Attached hereto as <u>Exhibit K</u> is a true and accurate copy of excerpts from the transcript of the deposition of William C. Taylor held on March 12, 2007.

{Client Files\lit\304810\0001\PLD\00970285.DOC;1}

Signed to and sworn under the pains and penalties of perjury this 15th day of August,

2007.


/s/ Daniel P. Flynn
Daniel P. Flynn

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 05-234S |
| | : | |
| TRANSCANADA POWER MARKETING LTD., | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF MICHAEL J. HAGER

I, Michael J. Hager, upon oath, depose and state that:

1.      Unless otherwise stated, I have personal knowledge of the facts stated herein and am competent to testify to such facts.

2.      I live at 36 Ridge Way in Sturbridge, MA 01566.

3.      I am the Vice President for Energy Supply New England, National Grid USA Service Company, Inc., an affiliate of The Narragansett Electric Company ("Narragansett").

4.      Narragansett and National Grid USA Service Company, Inc., are wholly-owned subsidiaries of National Grid USA ("National Grid"), a public utility holding company.

5.      Narragansett is the successor by merger in 2000 to Newport Electric Company and Blackstone Valley Electric Company, both subsidiaries of Eastern Utilities Associates ("EUA"), a public utility holding company. Narragansett delivers electricity to customers in thirty-eight Rhode Island cities and towns, with a population of over 1,000,000. A map of Narragansett's service territory is attached as Exhibit 1. Narragansett has the exclusive right

to deliver electricity to customers in those communities. Narragansett is the largest utility in Rhode Island, and serves approximately 480,000 customers. Of those customers, over 475,000 receive standard offer service.

6.     I was Narragansett's business lead for the WSOS Agreement since the merger in 2000.

7.     In February of 2005, Narragansett and TransCanada initiated discussions concerning their respective understandings of the FAF clause, after TransCanada complained that it was entitled to FAF payments after 2004, which Narragansett had not paid.

8.     On February 18, 2005, TransCanada invoked the dispute resolution clause of the WSOS Agreement, calling for senior representatives of TransCanada and Narragansett to meet.

9.     At a meeting on March 7, 2005, which the parties agreed was subject to Federal Rule of Evidence 408 and similar state laws, TransCanada and Narragansett broached the subject of an amicable resolution. At that same meeting, TransCanada expressed a strong interest in an expedited resolution, and the parties discussed a fast-track arbitration.

10.     On or about March 29, 2005, Michael Hachey of TransCanada contacted counsel for the Rhode Island Public Utilities Commission ("RIPUC"), requesting a meeting with the regulators regarding the dispute.

11.     At the end of March of 2005, Narragansett began making payments to TransCanada, under protest, to allow the parties to negotiate a potential settlement and to avoid giving TransCanada a pretext to terminate the WSOS Agreement, which, based on current market prices, is no longer economically advantageous to TransCanada. These payments included retroactive protest payments for the period beginning in January of 2005.

Case 1:05-cv-00234-S   Document 61-2   Filed 08/15/2007   Page 4 of 8

12.     On or about April 1, 2005, TransCanada and Narragansett also began negotiating an agreement for a fast-track arbitration.

13.     The agreement for a fast-track arbitration was heavily negotiated and was nearly complete when TransCanada and Narragansett had made substantial progress towards a settlement agreement in principle of a large portion of the dispute.

14.     On April 25, 2005, TransCanada's legal counsel sent an electronic mail message to Gloria Kavanah, National Grid's Assistant General Counsel, indicating TransCanada's willingness to hold off on finalizing the arbitration agreement due to the progress being made in settlement negotiations.

15.     TransCanada and Narragansett were exchanging drafts of the partial settlement agreement when TransCanada filed suit in the United States District Court for the District of Massachusetts on May 17, 2005.

16.     At no time did TransCanada indicate that it no longer intended to arbitrate the dispute or the remaining portion of the dispute, in the event of a settlement of a portion of the dispute.

17.     TransCanada at all times indicated its strong interest in an expedited resolution; therefore, Narragansett persisted in its belief that TransCanada continued to desire a fast-track arbitration.

18.     Narragansett had no reason to believe that TransCanada would file suit since TransCanada was receiving all of the disputed FAF payments at that time.

19.     Most, if not all, of the documents that are relevant to this dispute are available, or can be made available, in electronic form.

20.    Negotiations prior to TransCanada's filing suit in Massachusetts took place in both Rhode Island and Massachusetts.

21.    All hearings before the RIPUC, at which the FAF or the retail fuel adjustment relative to the EUA wholesale standard offer service agreements were discussed, took place in Rhode Island.

22.    Narragansett employs over 470 persons in Rhode Island.  Upon information and belief, TransCanada employs 8 to 10 employees in an office in Westborough, Massachusetts.

23.    Although TransCanada's Eastern Division operations are located in Massachusetts, TransCanada also does business in Calgary, Alberta, Canada and Toronto, Ontario, Canada.

24.    TransCanada's affiliate owns the Ocean State Power plant in Rhode Island.

25.    Upon information and belief, Michael Hachey, one of TransCanada's business leads, owns a residence in Rhode Island and spends almost every weekend there.

26.    TransCanada's employees in Burrillville, Rhode Island performed TransCanada's accounting services for the WSOS Agreement and the PPA Transfer Agreement since 1998, up until two days before TransCanada filed its motion to dismiss, stay, or transfer.

27.    Eastern Edison, which served customers in Massachusetts, was the largest of the three EUA companies.

Michael J. Hager

SUBSCRIBED AND SWORN to before me this ____7____ day of July, 2005.

NOTARY PUBLIC

My Commission Expires: ___4-4-08___

664694v4

# Narragansett Electric
### A **National Grid** Company





**Operating Division**

⚠ Narragansett Electric Headquarters, and Operating Division Headquarters

▨ Ocean State

● Operating Centers

NECO ST Map © 2003 National Grid

## CERTIFICATION

To:

Kristin E. Rodgers
Blish & Cavanagh LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903

I certify that I mailed a true and accurate copy of the Affidavit of Michael J. Hager to counsel of record, as stated above, on July _8_, 2005.

Cynthia Srnas

# Exhibit B

ASSET PURCHASE AGREEMENT

BY AND AMONG

MONTAUP ELECTRIC COMPANY

AND

TRANSCANADA POWER MARKETING LTD.

*April 7*, 1998

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          1



NARR 08008

EASTERN UTILITIES ASSOCIATES
GENERATION BUSINESS DIVESTITURE

|  |  |  | Tab |
|---|---|---|---|
| Asset Purchase Agreement |  |  | 1 |
| Exhibits to Asset Purchase Agreement |  |  |  |
|  | A | Form of Wholesale Standard Offer Agreement | 2 |
|  | B | Form of Instrument of Assignment and Assumption | 3 |
|  | C | Form of Interconnection Agreement | 4 |
|  | D | Form of PPA Transfer Agreement | 5 |
| Guaranty |  |  | 6 |
| Schedules to the Asset Purchase Agreement |  |  | 7 |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08009

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| 1.1. | Definitions | 1 |
| | | |
| ARTICLE II | PURCHASE AND SALE | 5 |
| 2.1. | The Sale | 5 |
| | | |
| ARTICLE III | PURCHASE PRICE | 5 |
| 3.1. | Purchase Price | 5 |
| | | |
| ARTICLE IV | THE CLOSING | 5 |
| 4.1. | Time and Place of Closing | 5 |
| 4.2. | Payment of Purchase Price | 5 |
| 4.3. | Deliveries by Seller | 5 |
| 4.4. | Deliveries by the Buyer | 6 |
| 4.5. | Wholesale Standard Offer Agreement | 6 |
| | | |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF THE SELLER | 7 |
| 5.1. | Organization; Qualification | 7 |
| 5.2. | Authority Relative to this Agreement | 7 |
| 5.3. | Consents and Approvals; No Violation | 7 |
| 5.4. | Title and Related Matters | 8 |
| 5.5. | The PPA | 8 |
| | | |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF THE BUYER | 9 |
| 6.1. | Organization | 9 |
| 6.2. | Authority Relative to this Agreement | 9 |
| 6.3. | Consents and Approvals; No Violation | 9 |
| 6.4. | Regulation as a Utility | 10 |
| | | |
| ARTICLE VII | COVENANTS OF THE PARTIES | 10 |
| 7.1. | Conduct of Business of the Company | 10 |
| 7.2. | Access to Information | 10 |
| 7.3. | Expenses | 11 |
| 7.4. | Further Assurances | 11 |
| 7.5. | Public Statements | 11 |
| 7.6. | Consents and Approvals | 11 |
| 7.7. | Fees and Commissions | 12 |
| 7.8. | Tax Matters | 12 |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08010

ARTICLE VIII    PURCHASED ASSETS CLOSING CONDITIONS ................................. 13
   8.1.    Conditions to Each Party's Obligations to Effect the Purchase
          Transactions.................................................................................... 13
   8.2.    Conditions to Obligations of the Buyer ............................ 13
   8.3.    Conditions to Obligations of the Seller............................ 15

ARTICLE IX    INDEMNIFICATION................................................................ 17
   9.1.    Indemnification .................................................................. 17
   9.2.    Defense of Claims ............................................................. 18

ARTICLE X    TERMINATION AND ABANDONMENT .................................. 19
   10.1.   Termination ....................................................................... 19
   10.2.   Procedure and Effect of Termination................................ 20

ARTICLE XI    MISCELLANEOUS PROVISIONS ........................................ 21
   11.1.   Amendment and Modification ........................................... 21
   11.2.   Waiver of Compliance; Consents...................................... 21
   11.3.   No Survival........................................................................ 21
   11.4.   Notices .............................................................................. 21
   11.5.   Assignment ....................................................................... 22
   11.6.   Governing Law .................................................................. 23
   11.7.   Counterparts ..................................................................... 23
   11.8.   Interpretation .................................................................... 23
   11.9.   Schedules and Exhibits..................................................... 23
   11.10.  Entire Agreement.............................................................. 23

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

<u>ASSET PURCHASE AGREEMENT</u>

ASSET PURCHASE AGREEMENT, dated as of April 7 1998, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "*Seller*"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "*Buyer*").

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell, the Purchased Assets upon the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1 *Definitions*. (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

(1)    "*Affiliate*" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(2)    "*Ancillary Agreements*" mean the Wholesale Standard OfferAgreement, the Instrument of Assignment and Assumption and the PPA Transfer Agreement.

(3)    " *Wholesale Standard Offer Agreement*" means the Wholesale Standard Offer Agreement between the Retail Companies and the Buyer, substantially in the form of Exhibit A hereto, relating to Standard Offer Service.

(4)    "*Business Day*" means any day other than Saturday, Sunday and any day which is a legal holiday or a day on which banking institutions in Boston, Massachusetts are authorized by law or other governmental action to close.

(5)    "*Buyer Representatives*" means the Buyer's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

(6)    "*Code*" means the Internal Revenue Code of 1986, as amended.

NARR 08012

(7)    *"Confidentiality Agreement"* means the Confidentiality Agreement, among the Seller, Blackstone Valley Electric Company, Newport Electric Corporation, Eastern Utilities Associates and TransCanada Energy Ltd.

(8)    *"Encumbrances"* means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

(9)    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

(10)    *"Federal Power Act"* means the Federal Power Act of 1935, as amended.

(11)    *"FERC"* means the Federal Energy Regulatory Commission.

(12)    *"Holding Company Act"* means the Public Utility Holding Company Act of 1935, as amended.

(13)    *"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(14)    *"Indenture"* means the Brockton Edison Company Indenture of First Mortgage and Deed of Trust dated as of September 1, 1948, as supplemented and modified.

(15)    *"Instrument of Assignment and Assumption"* means the Instrument of Assignment and Assumption attached as Exhibit B hereto relating to the assignment by the Seller and the assumption by the Buyer of all of the rights, title, interests, liabilities and obligations of the Seller, in, to and under the PPA.

(16)    *"Material Adverse Effect"* means any change in or effect on the Purchased Assets after the date of this Agreement that is materially adverse to the Purchased Assets, taken as a whole, other than (i) any change or effect resulting from changes in the international, national, regional or local wholesale or retail markets for electric power, (ii) any change or effect resulting from changes in the international, national, regional or local markets for any fuel utilized in connection with the Purchased Assets, (iii) any change or effect resulting from changes in the North American, national, regional or local electric transmission systems and (iv) any materially adverse change in or effect on the Purchased Assets which is cured (including by the payment of money) by the Seller before the Termination Date.

(17)    *"MDTE"* means the Massachusetts Department of Telecommunications and Energy (formerly the Department of Public Utilities.)

(18)    *"Permitted Encumbrances"* means (i) any Encumbrances not created by the Seller or resulting from actions by or against the Seller; (ii) all exceptions, restrictions,

NARR 08013

easements, charges, rights of way and monetary and non-monetary encumbrances which are matters of record or are set forth in an applicable FERC project license, except for such encumbrances which secure indebtedness; (iii) with respect to any date before the Closing Date, Encumbrances created by the Indenture; (iv) statutory liens for current taxes or assessments not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (v) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Seller or the validity of which are being contested in good faith by appropriate proceedings; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations by governmental authorities; and (vii) such other liens, imperfections in or failure of title, charges, easements, restrictions and encumbrances which do not, in any material respect, affect the Buyer's rights under the Purchased Assets.

(19)     *"Person"* means any individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization and a governmental entity or any department or agency thereof.

(20)     *"PPA"* means the agreement, or, if more than one agreement, means collectively, the agreements listed on Schedule 1.1(a) hereto.

(21)     *"PPA Transfer Agreement"* means the PPA Transfer Agreement, between the Seller and the Buyer, attached as Exhibit C hereto.

(22)     *"Purchased Assets"* means all right, title and interests of the Seller in and to and all liabilities and obligations of the Seller under the PPA.

(23)     *"Retail Companies"* means, as applicable, each, any or all of Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation.

(24)     *"RIPUC"* means the Rhode Island Public Utilities Commission.

(25)     *"SEC"* means the Securities and Exchange Commission.

(26)     *"Securities Act"* means the Securities Act of 1933, as amended.

(27)     *"Standard Offer Service"* means the electric service, if any, required to be provided by one or more of the Retail Companies to its retail customers who do not elect to purchase electricity from an alternative supplier in the market.

(28)     *"Taxes"* means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll,

NARR 08014

withholding, social security or other taxes, including any interest, penalties or additions attributable thereto.

(b)    Each of the following terms has the meaning specified in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Buyer | Recitals |
| Buyer Required Regulatory Approvals | 6.3(b) |
| Closing | 4.1 |
| Closing Conditions | 4.1 |
| Closing Date | 4.1 |
| Direct Claim | 9.2(c) |
| Effective Date | 4.1 |
| Final Order | 8.1(c) |
| Indemnifiable Loss | 9.1(a) |
| Indemnifying Party | 9.1(d) |
| Indemnitee | 9.1(c) |
| Permits | 5.18 |
| Purchase Price | 3.1 |
| Seller | Recitals |
| Seller Required Regulatory Approvals | 5.3(b) |
| Termination Date | 10.1(5) |
| Third Party Claim | 9.2(a) |

NARR 08015

## ARTICLE II

## PURCHASE AND SALE

2.1 *The Sale*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), the Purchased Assets.

## ARTICLE III

## PURCHASE PRICE

3.1 *Purchase Price*. The purchase price for the Purchased Assets shall be one dollar and other good and valuable consideration (the "Purchase Price").

## ARTICLE IV

## THE CLOSING

4.1 *Time and Place of Closing*. Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement (the "*Closing Conditions*"), the closing of the sale of the Purchased Assets contemplated by this Agreement (the "*Closing*") will take place at the offices of McDermott, Will & Emery, 75 State Street, Suite 1700, Boston, MA 02109-1807 at 10:00 A.M. (local time) on such date as the parties may agree, which date is as soon as practicable, but no later than fifteen (15) Business Days, following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the parties may agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "*Closing Date*.." The Ancillary Agreements will become effective at midnight on the last day of the month in which the Closing Date occurs (the "Effective Date"), but in no event earlier than midnight on December 31, 1998.

4.2 *Payment of Purchase Price*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Purchased Assets, the Buyer will pay or cause to be paid to the Seller at the Closing the Purchase Price.

4.3 *Deliveries by Seller*. At the Closing, the Seller will deliver to the Buyer the following items:

J:\DATA\CLR\84\31584\064\ASSPURCH.OS          6

NARR 08016

(a) The Instrument of Assignment and Assumption, duly executed by the Seller;

(b) All consents, waivers or approvals obtained by the Seller with respect to the Purchased Assets or the consummation of the transactions connected to the sale of the Purchased Assets, as the case may be, contemplated by this Agreement, to the extent specifically required hereunder;

(c) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Seller;

(d) An opinion of counsel and certificates (as contemplated by Section 8.2) with respect to the Purchased Assets; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Buyer and its counsel, in connection herewith.

4.4 *Deliveries by the Buyer*. At the Closing, the Buyer will deliver to the Seller the following items:

(a) The Purchase Price by wire transfer of immediately available funds or such other means as are agreed upon by the Seller and the Buyer;

(b) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Buyer;

(c) An opinion of counsel and certificates (as contemplated by Section 8.3) with respect to the Purchased Assets;

(d) The Instrument of Assignment and Assumption, duly executed by the Buyer; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Seller and its counsel, in connection herewith.

4.5 *Wholesale Standard Offer Agreement*. In the event Unsubscribed Standard Offer Service (as defined in the Wholesale Standard OfferAgreement) shall be zero on the Closing Date, neither the Seller nor the Buyer shall be required to execute and deliver the Wholesale Standard Offer Agreement at the Closing.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          7

NARR 08017

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows:

5.1. *Organization; Qualification*. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller is duly qualified or licensed to do business as foreign corporation and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The Seller has heretofore delivered to the Buyer complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents as currently in effect).

5.2. *Authority Relative to this Agreement*. The Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby. This Agreement and the Ancillary Agreements have been duly and validly executed and delivered by the Seller, and assuming that this Agreement and the Ancillary Agreements constitute valid and binding agreements of the Buyer, subject to the receipt of the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, constitute valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

5.3. *Consents and Approvals; No Violation*. (a) Except for such notices or approvals set forth on Schedule 5.3(a), and other than obtaining the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, neither the execution and delivery of this Agreement and the Ancillary Agreements by the Seller nor the sale by the Seller of the Purchased Assets pursuant to this Agreement and the Ancillary Agreements will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Seller, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except (x) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not in any material respect affect the Buyer's rights under the Purchased Assets or (y) for those requirements which become applicable to the Seller as a result of the

NARR 08018

specific regulatory status of the Buyer (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which the Buyer (or any of its Affiliates) is or proposes to be engaged; (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller, or any of the Purchased Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which, in the aggregate, would in any material respect affect the Buyer's rights under the Purchased Assets, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation would in any material respect affect the Buyer's rights under the Purchased Assets.

(b)  Except for such notices or approvals set forth on Schedule 5.3(b) (the *"Seller Required Regulatory Approvals "*), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Seller of the transactions contemplated hereby, other than such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, will not, in the aggregate, in any material respect affect the Buyer's rights under the Purchased Assets.

5.4.  *Title and Related Matters*.  Except as set forth in Schedule 5.4 and except for Permitted Encumbrances, the Seller has good and valid title to the Purchased Assets, free and clear of all Encumbrances.

5.5.  *The PPA*.  (a)  Except as disclosed in Schedule 5.5(a), the PPA (i) constitutes a valid and binding obligation of the Seller and to the best knowledge of the Seller constitutes a valid and binding obligation of the other parties thereto, (ii) is in full force and effect, and (iii) may be transferred to the Buyer pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder.

(b)  Except as set forth in Schedule 5.5(b), there is not, under the PPA, any default or event which, with notice or lapse of time or both, would constitute a default on the part of the Seller.

5.6.  *Litigation*.  There are no claims, actions or proceedings pending  or to the knowledge of Seller, threatened, against the Seller or its Affiliates relating to the Purchased Assets or any such claims, actions or proceedings, the subject matter of which is the Purchased Assets.

NARR 08019

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

6.1. *Organization*. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted. The Buyer has heretofore delivered to the Seller complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents), as currently in effect.

6.2. *Authority Relative to this Agreement*. The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Seller, subject to the receipt of the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

6.3. *Consents and Approvals; No Violation*. (a) Except as set forth in Schedule 6.3(a), and other than obtaining the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets pursuant to this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except for the failure of which to obtain or make would not materially affect the Buyer's ability to perform its obligations under this Agreement, or (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer or any of its subsidiaries is a party or by which any of their respective assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not materially affect the Buyer's ability to perform its obligations under this Agreement.

NARR 08020

(b) Except as set forth in Schedule 6.3(b) (the filings and approvals referred to in Schedule 6.3(b) are collectively referred to as the *"Buyer Required Regulatory Approvals"*), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Buyer of the transactions contemplated hereby.

6.4. *Regulation as a Utility*. The Buyer is a public utility holding company, exempt from registration, under the Holding Company Act.

## ARTICLE VII

## COVENANTS OF THE PARTIES

7.1. *Conduct of Business of the Company*. During the period from the date of this Agreement to the Closing Date, the Seller will conduct its business with respect to the Purchased Assets according to its ordinary and usual course of business consistent with good industry practice and will not amend (or waive any rights under) the PPA without the Buyer's prior written consent or take any action or fail to take any action that would result in a material breach of the Seller's obligations under the PPA.

7.2. *Access to Information*. (a) Between the date of this Agreement and the Closing Date, the Seller will, during ordinary business hours and upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books and records of the Seller relating to the Purchased Assets; (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request; and (iii) furnish the Buyer, at the Buyer's expense, with such financial and operating data and other information with respect to the Purchased Assets in the Seller's possession as the Buyer may from time to time reasonably request; provided, however, that (A) the Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (B) the Seller need not supply the Buyer with any information which the Seller is under a legal obligation not to supply.

(b) All information furnished to or obtained by the Buyer and the Buyer Representatives pursuant to this Section 7.2 shall be subject to the provisions of the Confidentiality Agreement.

7.3. *Expenses*. Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

7.4. *Further Assurances*. (a) Subject to the terms and conditions of this Agreement, each of the parties hereto will use its reasonable commercial efforts to take, or cause

NARR 08021

to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets pursuant to this Agreement.

(b) Subject to the PPA Transfer Agreement, to the extent that the Seller's rights, title, interests, liabilities and obligations under the PPA may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Seller, at its expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. The Seller and the Buyer agree that if any consent to an assignment of the PPA shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights and obligations under the PPA so that the Buyer would not in effect acquire the benefit of all such rights and obligations, the Seller, to the maximum extent permitted by law and the PPA, shall at the Closing and pursuant to the PPA Transfer Agreement, appoint the Buyer to be the Seller's agent with respect to the PPA, and the Seller shall, to the maximum extent permitted by law and the PPA, enter into such reasonable arrangements with the Buyer as are necessary to provide the Buyer with the benefits and obligations of the PPA. The Seller and the Buyer shall cooperate and shall each use their commercially reasonable efforts after the Closing to obtain an assignment of the PPA to the Buyer.

7.5. *Public Statements*. The parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law and except that the parties may make public announcements, statements or other disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of "Proprietary Information" (as defined in the Confidentiality Agreement).

7.6. *Consents and Approvals*. (a) The Seller and the Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice the notifications, if any, required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The parties shall consult with each other as to the appropriate time of filing such notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by either of such agencies, and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after each date of filing.

(b) The Seller and the Buyer shall cooperate with each other and (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, necessary or advisable to consummate the transactions contemplated by this Agreement

NARR 08022

(including, without limitation, the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which the Seller or the Buyer is a party or by which any of them is bound. The Seller shall have the right to review and approve (in its reasonable discretion) in advance all characterizations of the information relating to Purchased Assets, and each of the Seller and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with the transactions contemplated hereby.

7.7. *Fees and Commissions*. The Seller and the Buyer each represent and warrant to the other on its own behalf that no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transaction contemplated hereby by reason of any action taken by the party making such representation. The Seller and the Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees (including the fees described above) incurred by reason of any action taken by such party.

7.8. *Tax Matters*. All transfer and sales taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Buyer, and the Buyer, at its own expense, will file, to the extent required by applicable law, all necessary tax returns and other documentation with respect to all such transfer or sales taxes, and, if required by applicable law, the Seller will join in the execution of any such tax returns or other documentation. Prior to the Closing Date, the Buyer will provide to the Seller, to the extent possible, an appropriate certificate of no tax due from any applicable taxing authorities.

# ARTICLE VIII

# PURCHASED ASSETS CLOSING CONDITIONS

8.1. *Conditions to Each Party's Obligations to Effect the Purchase Transactions*. The respective obligations of each party to effect the sale of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) If applicable, the waiting period under the HSR Act applicable to the consummation of the sale of the Purchased Assets contemplated hereby shall have expired or been terminated;

(b) No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of the Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable best efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          13

NARR 08023

have been enacted by any state or federal government or governmental agency in the United States which prohibits the consummation of the sale of the Purchased Assets;

(c) All material federal, state and local government consents and approvals required for the consummation of the sale of the Purchased Assets, including, without limitation, the Seller Required Regulatory Approvals applicable to the sale of the Purchased Assets and the Buyer Required Regulatory Approvals applicable to the sale of the Purchased Assets, shall have been obtained and become Final Orders (a "*Final Order*" means a final order after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending)) with such terms and conditions as shall have been imposed by the governmental entity issuing such Final Order; and

(d) All consents and approvals for the consummation of the sale of the Purchased Assets contemplated hereby required under the terms of any note, bond, mortgage, indenture, contract or other agreement to which the Seller or the Buyer, or any of their subsidiaries, are a party shall have been obtained, other than those (i) which if not obtained, would not, in the aggregate, have a Material Adverse Effect, or (ii) which are governed by the PPA Transfer Agreement.

8.2. *Conditions to Obligations of the Buyer*. The obligation of the Buyer to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) There shall not have occurred and be continuing a Material Adverse Effect;

(b) The Seller shall have performed and complied with in all material respects the covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed and complied with by the Seller on or prior to the Closing Date, and the representations and warranties of the Seller which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) There shall be no Encumbrances on the Purchased Assets by virtue of the Indenture or otherwise, except for Permitted Encumbrances;

(d) The Buyer shall have received certificates from authorized officers of the Seller, dated the Closing Date, to the effect that, to the best of such officers' knowledge, the conditions set forth in Sections 8.2(a), (b) and (c) have been satisfied;

(e) The Buyer shall have received an opinion from McDermott, Will & Emery, counsel for the Seller, dated the Closing Date and satisfactory in form and substance to the Buyer and its counsel, substantially to the effect that:

NARR 08024

(1)  the Seller is a corporation organized, existing and in good standing under the laws of its state of incorporation and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Seller;

(2)  this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Seller and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals are obtained) are valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3)  the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller will not constitute a violation of the Certificates of Incorporation or Bylaws (or similar governing documents), as in effect on the Closing Date, of the Seller;

(4)  the Bill of Sale and other documents described in Section 4.3 are in proper form to transfer to the Buyer title to the Purchased Assets; and

(5)  no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Seller of the Closing other than (i) the Seller Required Regulatory Approvals, all of such Seller Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority, and (ii) such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, would not, in the aggregate have a Material Adverse Effect.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States or the laws of Massachusetts, such counsel may rely upon opinions of counsel admitted in such other jurisdictions.  Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel.  Such opinion may expressly rely as to matters of fact upon certificates furnished by the Seller and appropriate officers and directors of the Seller and by public officials.

8.3.  *Conditions to Obligations of the Seller*.  The obligation of the Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

NARR 08025

(a) The Buyer shall have performed in all material respects its covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed on or prior to the Closing Date;

(b) The representations and warranties of the Buyer which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) The Seller shall have received a certificate from an authorized officer of the Buyer, dated the Closing Date, to the effect that, to the best of such officer's knowledge, the conditions set forth in Sections 8.3(a) and (b) have been satisfied;

(d) The FERC shall have approved the Stipulations and Agreements filed in FERC Docket No. ER97-3127-000 by and between the Office of the Attorney General of Massachusetts, the Division of Energy Resources, Eastern Edison Company and the Seller, dated October 29, 1997; Docket No. ER97-2800-000 by and between the RIPUC, the Rhode Island Division of Public Utilities and Carriers, Blackstone Electric Company, the Seller and Newport Electric Corporation; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Pascoag Fire District of Rhode Island; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Gas and Electric Department of the Town of Middleborough; and Docket No. ER97-2338-000 between the Seller and the Taunton Municipal Lighting Plant, Pascoag Fire District of Rhode Island and the Gas and Electric Department of the Town of Middleborough; and said Stipulations and Agreements shall be and shall continue to be in full force and effect; Stipulations and Agreements shall be and shall continue to be in full force and effect; and

(e) The Seller shall have received an opinion from Shearman & Sterling, counsel for the Buyer (or other counsel reasonably satisfactory to Seller), dated the Closing Date and satisfactory in form and substance to the Seller and its counsel, substantially to the effect that:

(1) the Buyer is a corporation organized, existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Buyer;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Buyer and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approval are obtained) are valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their terms,

NARR 08026

except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Buyer will not constitute a violation of the Certificate of Incorporation or Bylaws on the Closing Date (or other similar governing documents), as in effect, of the Buyer;

(4) the Instrument of Assignment and Assumption and other instruments described in Section 4.4 are in proper form for the Buyer to assume the Assumed Liabilities; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Buyer of the Closing other than the Buyer Required Regulatory Approvals, all of such Buyer Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States and the laws of New York, such counsel may rely upon opinions of counsel admitted to practices in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of facts upon certificates furnished by appropriate officers and directors of the Buyer and its subsidiaries and by public officials.

## ARTICLE IX

## INDEMNIFICATION

9.1. *Indemnification*. (a) The Seller will indemnify, defend and hold harmless the Buyer from and against any and all claims, demands or suits (by any Person), losses, liabilities, damages (including consequential or special damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance that is actually recovered (each, an *"Indemnifiable Loss"*), asserted against or suffered by the Buyer relating to, resulting from or arising out of (i) any breach by the Seller of any representation, warranty, covenant or agreement of the Seller contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(b) The Buyer will indemnify, defend and hold harmless the Seller from and against any and all Indemnifiable Losses asserted against or suffered by the Seller relating to,

J:\DATA\CLI\84\31584\064\ASSPURCH.OS         17

NARR 08027

resulting from or arising out of (i) any breach by the Buyer of any representation, warranty, covenant or agreement of the Buyer contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(c)  Any Person entitled to receive indemnification under this Agreement (an "*Indemnitee*") having a claim under these indemnification provisions shall make a good faith effort to recover all losses, damages, costs and expenses from insurers of such Indemnitee under applicable insurance policies so as to reduce the amount of any Indemnifiable Loss hereunder. The amount of any Indemnifiable Loss shall be reduced (i) to the extent that Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss (after taking into account the costs incurred in collecting such insurance and any reasonable likely increase in premiums resulting from such claim) and (ii) to take into account any net Tax benefit actually recognized by the Indemnitee arising from the recognition of the Indemnifiable Loss and any payment actually received with respect to an Indemnifiable Loss.

(d)  The expiration, termination or extinguishment of any covenant or agreement shall not affect the parties' obligations under this Section 9.1 if the Indemnitee provided the Person required to provide indemnification under this Agreement (the "*Indemnifying Party*") with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

(e)  Except in the case of fraud and intentional breaches of this Agreement, the rights and remedies of the Seller and the Buyer under this Article IX are exclusive and in lieu of any and all other rights and remedies which the Seller and the Buyer may have under this Agreement or otherwise for monetary relief with respect to (i) any breach or failure to perform any covenant or agreement set forth in this Agreement or (ii) any relationship resulting from the PPA Transfer Agreement.

9.2.  *Defense of Claims*.  (a)  If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any Person who is not a party to this Agreement or any Affiliate of a party to this Agreement (a "*Third Party Claim*") with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than twenty (20) calendar days after the Indemnitee's receipt of notice of such Third Party Claim.  Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee.  The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, and the Indemnitee will cooperate in good faith in such defense at such Indemnitee's own expense.

(b)  If within ten (10) calendar days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claim the Indemnitee receives written notice from the

NARR 08028

Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in the last sentence of Section 9.2(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable expenses thereof. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) calendar days after its receipt of such notice, the Indemnitee may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will be the amount of such settlement offer, plus reasonable costs and expenses paid or incurred by the Indemnitee up to the date of such notice.

(c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a *"Direct Claim"*) will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event not later than twenty (20) calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party will have a period of thirty (30) calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such thirty (30) calendar day period, the Indemnifying Party will be deemed to have accepted such claim. If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its rights to indemnification under this Agreement.

(d) If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the prime rate then in effect of the Bank of Boston, N.A.), will promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any indemnity payment, the Indemnifying Party will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided, however, that (i) the Indemnifying Party will then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying

NARR 08029

Party against any such third party on account of said indemnity payment is hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party. Without limiting the generality or effect of any other provision hereof, each such Indemnitee and Indemnifying Party will duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights. Nothing in this Section 9.2(d) shall be construed to require any party hereto to obtain or maintain any insurance coverage.

(e) A failure to give timely notice as provided in this Section 9.2 will not affect the rights or obligations of any party hereunder except if, and only to the extent that, as a result of such failure, the party which was entitled to receive such notice was actually prejudiced as a result of such failure.

## ARTICLE X

## TERMINATION AND ABANDONMENT

10.1. *Termination*. (a) This Agreement may be terminated at any time prior to the Closing Date by mutual written consent of the Seller and the Buyer.

(b) This Agreement may be terminated by the Seller or the Buyer if the Closing has not occurred on or before the first anniversary of the date of this Agreement (the *"Termination Date"*); provided that the right to terminate this Agreement under this Section 10.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date; and provided, further, that if on the first anniversary of the date of this Agreement the conditions to the Closing set forth in Section 8.1(c) shall not have been fulfilled but all other conditions to the Closing shall be fulfilled or shall be capable of being fulfilled, then the Termination Date shall be the day which is twenty-four (24) months from the date of this Agreement.

(c) This Agreement may be terminated by either the Seller or the Buyer if (i) any governmental or regulatory body, the consent of which is a condition to the obligations of the Seller or the Buyer to consummate the Closing shall have determined not to grant its or their consent and all appeals of such determination shall have been taken and have been unsuccessful, (ii) one or more courts of competent jurisdiction in the United States or any State shall have issued an order, judgment or decree permanently restraining, enjoining or otherwise prohibiting the Closing, and such order, judgment or decree shall have become final and nonappealable or (iii) any statute, rule or regulation shall have been enacted by any State or federal government or governmental agency in the United States which prohibits the consummation of the Closing.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          20

NARR 08030

(d) This Agreement may be terminated by the Buyer, if there has been a material violation or breach by the Seller of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Buyer to effect the Closing impossible and such violation or breach has not been waived by the Buyer.

(e) This Agreement may be terminated by the Seller, if there has been a material violation or breach by the Buyer of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Seller to effect the Closing impossible and such violation or breach has not been waived by the Seller.

10.2. *Procedure and Effect of Termination*. In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 10.1, written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein:

(a) said termination shall be the sole remedy of the parties hereto with respect to breaches of any agreement, representation or warranty contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except in each case as stated in this Section 10.2 and in Sections 7.2(b), 7.3 and 7.7; provided, however, nothing in this Section 10.2 shall relieve any party for willful breaches of any representations, warranties, covenants or agreements contained herein; and

(b) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1. *Amendment and Modification*. Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of the Seller and the Buyer.

11.2. *Waiver of Compliance; Consents*. Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon

NARR 08031

strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

11.3.  *No Survival*.  Subject to the provisions of Section 10.2, each and every representation, warranty and covenant contained in this Agreement (other than the covenants contained in Sections 7.2(b), 7.3, 7.4, 7.7, 7.8 and in Articles IX and X (which covenants shall expire in accordance with their terms), and the provisions of Article IX with respect to any relationship resulting from the PPA Transfer Agreement and this Article XI which shall survive indefinitely) shall expire with, and be terminated and extinguished by, the consummation of the sale of the Purchased Assets, provided, however, that representations and warranties contained herein shall survive for a period of twenty-four (24) months following closing. None of the Seller, the Buyer or Affiliate of any of them shall be under any liability whatsoever with respect to any such representation, warranty or covenant after such period expires.

11.4.  *Notices*.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, telexed or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

(a)  If to the Seller, to:

c/o EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
Facsimile: (508) 559-8932
Attention:            Donald C. Ryan
                           Manager-Power Resources

with a copy to:

McDermott, Will & Emery
75 State Street
Suite 1700
Boston, MA  62109-1807
Facsimile: (617) 345-5077
Attention:            Arthur I. Anderson, P.C.

NARR 08032

(b)  if to the Buyer, to:

> c/o TransCanada Energy Ltd.
> 3400, 237 - 4th Avenue S.W.
> Calgary, Alberta, Canada
> T2P 5A4
> Facsimile: (403) 213-3550
> Attention:            Sean D. McMaster

with a copy to:

> Sherman & Sterling
> 555 California Street
> San Francisco, CA 94104
> Facsimile: (415) 616-1199
> Attention:            Christopher D. Dillon

11.5. *Assignment*. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, other than to an Affiliate, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.6. *Governing Law*. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

11.7. *Counterparts*. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.8. *Interpretation*. The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

11.9. *Schedules and Exhibits*. All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS            23

NARR 08033

11.10. *Entire Agreement*. This Agreement, the Confidentiality Agreement and the Ancillary Agreements including the Exhibits, Schedules documents, certificates and instruments referred to herein or therein, embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein. It is expressly acknowledged and agreed that there are no restrictions, promises, representations, warranties, covenants or undertakings contained in any material made available to the Buyer pursuant to the terms of the Confidentiality Agreement (including the Information Memorandum, dated July, 1997). This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions other than the Confidentiality Agreement.

IN WITNESS WHEREOF, the Seller and the Buyer have caused this agreement to be signed by their respective duly authorized officers as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____
Name: Kevin A. Kirby
Title: Vice President

TRANSCANADA POWER MARKETING LTD.

By: _____
Name: Alex Pourbaiy
Title: U. P

By: _____
Name: Ross Grace
Title: SVP

NARR 08034

SCHEDULE 1.1(a)

PPA Description

"PPA" means, collectively, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated May 14, 1986, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated September 28, 1988, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Newport Electric Corporation, dated May 14, 1986, by and between Ocean State Power and Newport Electric Corporation and the Unit Power Agreement For the Sale of Second Unit Capacity and Energy from Ocean State Power Project to Newport Electric Corporation, dated July 12, 1988, by and between Ocean State Power and Newport Electric Corporation, in each case as amended, modified or supplemented.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08035

## SCHEDULE 5.3(a)

<u>Seller Notices and Approvals</u>

<u>PPA</u>

Approvals as may be required under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08036

## SCHEDULE 5.3(b)

### Seller Required Regulatory Approvals

(i)  Any required approvals under the Federal Power Act, (ii) (A) notice by the Seller to, and an order by, the  MDTE approving the transactions contemplated by this Agreement, (B) the approval by the RIPUC of the market valuation "implementation methodology" filed in RIPUC Docket 25-92, pursuant to section 39-1-27.4(g) of the Rhode Island General Laws, (C) the approval by the RIPUC of the "Transfer Plan" filed in RIPUC Docket 25-14, pursuant to section 39-1-27(a) of the Rhode Island General Laws, (D) the approval, if required, of the Rhode Island Division of Public Utilities and Carriers, (E) the approval, if required, of the Rhode Island Energy Facilities Sitting Board, (iii) the approval, if required, of the SEC pursuant to the Holding Company Act, (iv) the filings, if required by the Seller and the Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act, and (v) the approval, if required, of the Nuclear Regulatory Commission (the *"NRC"*).

NARR 08037

SCHEDULE 5.4

Exceptions to Seller's Title to the PPA

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08038

## SCHEDULE 5.5(a)

### Exceptions to the Full Force and Effect of and the Transferability of the PPA

Transferability may be subject to the approval of the counterparties to the PPA and lenders thereto.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

SCHEDULE 5.5(b)

Defaults under the PPA

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08040

SCHEDULE 6.3(a)

Buyer Notices and Approvals

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08041

SCHEDULE 6.3(b)

<u>Buyer Required Regulatory Approvals</u>

Any approvals required under the Federal Power Act.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08042

## SCHEDULE 6.4

### Buyer Regulation as a Utility

The Buyer is a public utility holding company exempt from registration under the Holding Company Act.

NARR 08043

APPENDIX A to the ASSET PURCHASE AGREEMENT

NARR 08044

Wholesale Standard Offer
Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

NARR 08045

## TABLE OF CONTENTS

Page

ARTICLE 1.   Definitions........................................................................................... 2

ARTICLE 2.   Term   ................................................................................................3

ARTICLE 3.   Supplier Responsibilities ................................................................. 3

ARTICLE 4.   Estimation of Hourly Loads and Reporting to the ISO .........................................4

ARTICLE 5.   Price   ................................................................................................5

ARTICLE 6.   Billing and Payments ....................................................................... 6

ARTICLE 7.   Events of Default, Liability, Relationship of the Companies ................................. 6

ARTICLE 8.   Termination/Reimbursement ...................................................................8

ARTICLE 9.   Force Majeure ................................................................................... 8

ARTICLE 10. Assignment ......................................................................................... 9

ARTICLE 11. Successors and Assigns...............................................................;..... 10

ARTICLE 12. Resolution of Disputes......................................................................10

ARTICLE 13. Interpretation.................................................................................... 11

ARTICLE 14. Severability of Provisions .................................................................. 11

ARTICLE 15. Accounts and Records....................................................................... 11

ARTICLE 16. Limitations on Liability and Indemnification ..................................... 12

ARTICLE 17. Regulation......................................................................................... 12

ARTICLE 18. Notices ............................................................................................. 12

ARTICLE 19. Miscellaneous ................................................................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

i

NARR 08046

## WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this seventh day of _April, 1998_____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

1

NARR 08047

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5.  The Companies or their Standard Offer customers shall not be obligated

NARR 08048

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.   Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.

ARTICLE 3.   Supplier Responsibilities

3

NARR 08049

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

4

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

> Price = Standard Offer Wholesale Price
>       + Fuel Adjustment Factor

Where:  Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

5

NARR 08051

regulatory approval and only to the extent that the
Companies are allowed to collect such revenues from
their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be
paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or
which may be assessed or imposed in the future by any governmental authority with jurisdiction
governing the sale of electricity covered by this Agreement.

ARTICLE 6.   Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of
Suppliers, computations by the Companies of the charges for the purposes of billings hereunder
shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the
Price as determined in accordance with Article 5. The Companies shall calculate the amount
payable to Supplier for a given month on or before the twentieth (20th) day of the following
month. The calculation shall be provided to Supplier and shall show the total amount due and
payable for the previous month. Each bill shall be subject to adjustment for any errors in
arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of
Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due
and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date").
Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in
effect at the main office of BankBoston, or such other lending institution as agreed to by
Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis
for its dispute in a written notice to Companies within fifteen days after the Due Date.  Billing
and payment disputes shall be handled in accordance with the provisions of Article 12 of this
Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under
the terms of the resolution shall be made within thirty (30) days of the date thereof, together with
interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one
year from the date of the original billing in order to reflect differences in charges resulting from
receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30)
days of receipt of the proposed adjustment.

ARTICLE 7.   Events of Default, Liability, Relationship of the Companies:

(1)     Unless excused by a Force Majeure as described in Article 9, each of the
following events shall be deemed to be an Event of Default hereunder:

6

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement. The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

7

ARTICLE 8.  Termination/Reimbursement:

(1)    In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

    a.  Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

    b.  The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

    c.  Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice.  In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes.  In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier.  In the event that the Parties are not able to agree on the materially of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.  Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure.  A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

8

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)     The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)     The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)     The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)     The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party.  With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

NARR 08055

ARTICLE 11. Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. Resolution of Disputes:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

NARR 08056

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

11

NARR 08057

ARTICLE 16. <u>Limitations on Liability and Indemnification:</u>

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. <u>Regulation:</u>

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided, however,</u> that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. <u>Notices:</u>

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

12

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.


ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly

13

NARR 08059

Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

NARR 08060

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:              TransCanada Power Marketing Ltd.


                       By:_____


On Behalf of the Companies:


Blackstone:            BLACKSTONE VALLEY ELECTRIC COMPANY


                       By:_____


Eastern:               EASTERN EDISON COMPANY


                       By:_____


Newport:               NEWPORT ELECTRIC CORPORATION


                       By:_____


15

NARR 08061

APPENDIX A

## SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
### AND
### STANDARD OFFER WHOLESALE PRICE

### TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

*  Standard Offer Service for Eastern Edison terminates
   at 12:00 midnight on December 31, 2004.

16

NARR 08062

TO ASSET PURCHASE AGREEMENT

FORM OF INSTRUMENT OF
ASSIGNMENT AND ASSUMPTION

Instrument of Assignment and Assumption (this "Agreement") made, executed and delivered on this day of _____, by and between TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "Buyer") and MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "Seller").

WITNESSETH:

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of _____, 199 8 (as amended, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), by and between the Seller and the Buyer, the Seller is concurrently herewith selling, assigning, conveying, transferring and delivering to the Buyer the Purchased Assets (as defined in the Asset Purchase Agreement); and

WHEREAS, the Asset Purchase Agreement requires that the Seller assign all of its right, title and interest in, and that the Buyer assume all liabilities and obligations of the Seller under, the PPA (as defined in the Asset Purchase Agreement);

NOW THEREFORE, in good consideration of these premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Seller and the Buyer agree as follows:

1. Capitalized terms which are used in this Agreement but are not defined in this Agreement shall have the meaning ascribed to such terms in the Asset Purchase Agreement.

2. The Seller hereby assigns, transfers and sets over to the Buyer all of the Seller's rights, title and interest in and to the PPA. The assignment effected pursuant to this Section 2 shall be without recourse to and without representation or warranty by the Seller except as specifically provided in the Asset Purchase Agreement.

3. The Buyer hereby assumes and agrees to pay, perform or discharge in accordance with their terms, to the extent not heretofore paid, performed or discharged, all liabilities and obligations of the Seller under the PPA.

NARR 08063

4.      It is understood and agreed that nothing in this Agreement shall constitute a waiver or release of any claims arising out of the contractual relationships between the Seller and the Buyer.

5.      This Agreement shall inure to the benefit and be enforceable against the respective successors and assigns of the Seller and the Buyer.

6.      This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws).

7.      This Agreement is delivered pursuant to and is subject to the Asset Purchase Agreement. In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall prevail.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the respective duly authorized officers of the Seller and the Buyer as of the date first above written.

TRANSCANADA POWER MARKETING LTD.

By_____
    Name:
    Title:

By_____
    Name:
    Title:

MONTAUP ELECTRIC COMPANY

By_____
    Name:
    Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

NARR 08064

EXHIBIT C
TO ASSET PURCHASE AGREEMENT

PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of _____, 1998 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller"), to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of _____, 1998 (the "APA"), by and between Seller and Asset Purchaser.

1.     The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power    (Montaup) |
| 9/28/88 | Ocean State Power II (Montaup) |
| 5/14/86 | Ocean State Power    (Montaup) |
| 7/12/88 | Ocean State Power II (Montaup) |

A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.     This Agreement shall become effective on the Effective Date (as defined in Section 12) and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List, and Seller has made payment to Asset Purchaser of amounts owned pursuant to Section 8 below, for the last month in which such a payment is due.

3.     Commencing as of the Effective Date, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy.

J:\DATA\CLJ\84\31584\064\ASSPURCH.OS

4.        (a)   Commencing as of the month following the Effective Date, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below.  In turn, each month, Seller shall timely pay the Power Seller an amount equal to all amounts properly due to the Power Seller for the preceding month under each Commitment.  For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month.  Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

(b) Upon the Effective Date, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or, at the termination of this Agreement pay to Asset Purchaser, any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the Effective Date which relate to billing errors or reconciliations of pre-Effective Date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the Effective Date that are attributable to a period prior to the Effective Date.

5.        (a)   Effective as of the Effective Date, Seller hereby irrevocably and unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment.  Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments.   Seller shall not unreasonably withold such consent.

(b) Seller shall not agree to any amendment to or waiver of rights under a Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of this Section 5.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS                    2

6.    Each party shall be entitled to indemnification under this Agreement to the extent and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.        (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation.

        (b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, as a condition of any Novation , the Asset Purchaser will require Seller to provide, either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or, if Seller and Buyer do not mutually agree to payment of a lump sum,(ii) a security interest in a portion to the Asset Purchaser in a portion of the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is  acceptable to the Asset Purchaser acting reasonably.

8.        (a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed , and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

        (b) Commencing as of the month following the Effective Date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment,

NARR 08067

and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth is Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c)) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b)) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month

(d) To the extent that a Novation is executed with respect to a Commitment , pursuant to Section 7 and Asset Purchaser and Seller agree to a lump-sum payment, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller to reduce the amount of Seller's retained obligation set forth in Section 8(b). Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by Asset Purchaser and Seller. It is the intention of the parties that the lump-sum payment shall be based on the net present value of the amounts set out in Schedule "A" calculated using a discount rate acceptable to Asset Purchaser and Seller acting reasonably and which is reasonable given the remaining term of the amounts payable by the Seller to the Asset Purchaser as set out in Schedule "A", prevailing interest rates for similar financings done at the time of payment of the lump sum and the creditworthiness of Seller at the time of payment of the lump sum.

9.   This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10.   This Agreement, the APA and any other agreement entered into by the parties pursuant to the APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only a written agreement signed by the parties. Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing, (i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned subsidiary (direct or indirect) of TransCanada Pipelines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to Asset Purchaser shall thereafter by

NARR 08068

deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refiancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof, provided, however, the no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyances, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby otherwise altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11.    All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such such payment.

12.    This Agreement shall be of no force and effect until the Effective Date. If the APA shall have been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA. As used in this Agreement, "Effective Date" shall mean the Effective Date (as defined in the APA).

13.    In the event that TransCanada Power Marketing, Ltd. or successor is in default of the Wholesale Standard Offer Agreement between TransCanada Power Marketing, Ltd. and Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation and, having been given notice has failed to cure such default within the time specified in the Wholesale Standard Offer Agreement, Seller's obligation to make support payments under Section 8(a) will be suspended until such default is fully cured.

NARR 08069

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By:_____

    Name:

    Title:

TRANSCANADA POWER MARKETING LTD.

By:_____

    Name:

    Title:

By:_____

    Name:

    Title:

NARR 08070

SCHEDULE "A"

MONTHLY SUPPORT PAYMENTS

For each month, beginning with the Effective Day (prorated in accordance with Section 8(a) of the PPTA), if applicable, the Monthly Support Payment shall be as set out below:

| Calendar Year | Monthly Support Payment |
|---------------|-------------------------|
| 1999 | $ 1,665,000 |
| 2000 | $1,665,000 |
| 2001 | $1,542,000 |
| 2002 | $1,542,000 |
| 2003 | $  870,000 |
| 2004 | $  870.000 |
| 2005 | $  870,000 |
| 2006 | $  870,000 |
| 2007 | $  870,000 |

NARR 08071

# Exhibit C



EXHIBIT

1

Wholesale Standard Offer
Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

TCPM 000065

## TABLE OF CONTENTS

Page

ARTICLE 1.  Definitions........................................................................................................... 2

ARTICLE 2.  Term  ...................................................................................................3

ARTICLE 3.  Supplier Responsibilities ........................................................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO ..........................................4

ARTICLE 5.  Price  ...................................................................................................5

ARTICLE 6.  Billing and Payments ........................................................................... 6

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies ................................... 6

ARTICLE 8.  Termination/Reimbursement ................................................................................8

ARTICLE 9.  Force Majeure ................................................................................. 8

ARTICLE 10. Assignment ................................................................................................. 9

ARTICLE 11. Successors and Assigns........................................................................... 10

ARTICLE 12. Resolution of Disputes........................................................................10

ARTICLE 13. Interpretation.......................................................................................... 11

ARTICLE 14. Severability of Provisions ....................................................................... 11

ARTICLE 15. Accounts and Records........................................................................... 11

ARTICLE 16. Limitations on Liability and Indemnification ....................................... 12

ARTICLE 17. Regulation ............................................................................................ 12

ARTICLE 18. Notices .............................................................................................. 12

ARTICLE 19. Miscellaneous ................................................................................. 13


Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

i

TCPM 000066

## WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this seventh day of April, 1998_____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

1

TCPM 000067

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer customers shall not be obligated

2

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.


ARTICLE 2.  Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.


ARTICLE 3.  Supplier Responsibilities

3

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

4

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

$$Price = \text{Standard Offer Wholesale Price} + \text{Fuel Adjustment Factor}$$

Where:       Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

5

regulatory approval and only to the extent that the
Companies are allowed to collect such revenues from
their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be
paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or
which may be assessed or imposed in the future by any governmental authority with jurisdiction
governing the sale of electricity covered by this Agreement.

ARTICLE 6.    Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of
Suppliers, computations by the Companies of the charges for the purposes of billings hereunder
shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the
Price as determined in accordance with Article 5.  The Companies shall calculate the amount
payable to Supplier for a given month on or before the twentieth (20th) day of the following
month. The calculation shall be provided to Supplier and shall show the total amount due and
payable for the previous month. Each bill shall be subject to adjustment for any errors in
arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of
Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due
and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date").
Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in
effect at the main office of BankBoston, or such other lending institution as agreed to by
Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis
for its dispute in a written notice to Companies within fifteen days after the Due Date.  Billing
and payment disputes shall be handled in accordance with the provisions of Article 12 of this
Agreement.  Upon final resolution of the dispute, payment of any amount due to a Party under
the terms of the resolution shall be made within thirty (30) days of the date thereof, together with
interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one
year from the date of the original billing in order to reflect differences in charges resulting from
receipt of more accurate data.  Supplier may dispute such adjustment in writing within thirty (30)
days of receipt of the proposed adjustment.

ARTICLE 7.    Events of Default, Liability, Relationship of the Companies:

(1)    Unless excused by a Force Majeure as described in Article 9, each of the
following events shall be deemed to be an Event of Default hereunder:

6

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement. The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

7

ARTICLE 8.  Termination/Reimbursement:

(1)  In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

> a.  Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

> b.  The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

> c.  Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)  In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice. In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3)  In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materially of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.  Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

8

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)     The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)     The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)     The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)     The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.


ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

9

TCPM 000075

ARTICLE 11. <u>Successors and Assigns</u>:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. <u>Resolution of Disputes</u>:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value <u>provided</u>, <u>however</u>, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration. except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

10

TCPM 000076

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

TCPM 000077

ARTICLE 16. <u>Limitations on Liability and Indemnification</u>:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. <u>Regulation</u>:

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided, however,</u> that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. <u>Notices</u>:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

12

TCPM 000078

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a)     Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)     Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)     Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)     This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)     Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)     Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)     Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)     Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by  the portion of its monthly

13

TCPM 000079

Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

TCPM 000080

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:              TransCanada Power Marketing Ltd.

                       By: _____

On Behalf of the Companies:

Blackstone:            BLACKSTONE VALLEY ELECTRIC COMPANY

                       By: _____

Eastern:               EASTERN EDISON COMPANY

                       By: _____

Newport:               NEWPORT ELECTRIC CORPORATION

                       By: _____

15

TCPM 000081

APPENDIX A

## SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
## AND
## STANDARD OFFER WHOLESALE PRICE

TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

\*  Standard Offer Service for Eastern Edison terminates
   at 12:00 midnight on December 31, 2004.

16

TCPM 000082

# PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of April 7, 1998 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller"), to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of April 7, 1998 (the "APA"), by and between Seller and Asset Purchaser.

1.    The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power    (Montaup) |
| 9/28/88 | Ocean State Power II (Montaup) |
| 5/14/86 | Ocean State Power    (Montaup) |
| 7/12/88 | Ocean State Power II (Montaup) |

A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.    This Agreement shall become effective on the Effective Date (as defined in Section 12) and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List, and Seller has made payment to Asset Purchaser of amounts owned pursuant to Section 8 below, for the last month in which such a payment is due.

3.    Commencing as of the Effective Date, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

4.        (a)    Commencing as of the month following the Effective Date, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below.  In turn, each month, Seller shall timely pay the Power Seller an amount equal to all amounts properly due to the Power Seller for the preceding month under each Commitment.  For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month.  Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

          (b) Upon the Effective Date, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or, at the termination of this Agreement pay to Asset Purchaser, any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the Effective Date which relate to billing errors or reconciliations of pre-Effective Date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the Effective Date that are attributable to a period prior to the Effective Date.

5.        (a)    Effective as of the Effective Date, Seller hereby irrevocably and unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment.  Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments.  Seller shall not unreasonably withold such consent.

          (b)  Seller shall not agree to any amendment to or waiver of rights under a

TCPM 000084

Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of this Section 5.

6.    Each party shall be entitled to indemnification under this Agreement to the extent and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.    (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation.

(b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, as a condition of any Novation , the Asset Purchaser will require Seller to provide,either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or, if Seller and Buyer do not mutually agree to payment of a lump sum,(ii) a security interest to the Asset Purchaser in a portion of the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is acceptable to the Asset Purchaser acting reasonably.

8.    (a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed , and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

TCPM 000085

(b) Commencing as of the month following the Effective Date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth is Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c)) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b)) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month

(d) To the extent that a Novation is executed with respect to a Commitment , pursuant to Section 7 and Asset Purchaser and Seller agree to a lump-sum payment, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller to reduce the amount of Seller's retained obligation set forth in Section 8(b). Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by Asset Purchaser and Seller. It is the intention of the parties that the lump-sum payment shall be based on the net present value of the amounts set out in Schedule "A" calculated using a discount rate acceptable to Asset Purchaser and Seller acting reasonably and which is reasonable given the remaining term of the amounts payable by the Seller to the Asset Purchaser as set out in Schedule "A", prevailing interest rates for similar financings done at the time of payment of the lump sum and the creditworthiness of Seller at the time of payment of the lump sum.

9. This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10. This Agreement, the APA and any other agreement entered into by the parties pursuant to the
APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only a written agreement signed by the parties. Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing.

TCPM 000086

(i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned

subsidiary (direct or indirect) of TransCanada Pipelines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to Asset Purchaser shall thereafter by deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refiancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof, provided, however, the no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyances, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby otherwise altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11.    All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such such payment.

12.    This Agreement shall be of no force and effect until the Effective Date. If the APA shall have

been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA. As used in this Agreement, "Effective Date" shall mean the Effective Date (as defined in the APA).

13.    In the event that TransCanada Power Marketing, Ltd. or successor is in default of the Wholesale Standard Offer Agreement between TransCanada Power Marketing, Ltd. and

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          5

TCPM 000087

Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation and, having been given notice has failed to cure such default within the time specified in the Wholesale Standard Offer Agreement, Seller's obligation to make support payments under Section 8(a) will be suspended until such default is fully cured.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          6

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _Kevin A. Kirby_

Name: Kevin A. Kirby

Title: V. P.

TRANSCANADA POWER MARKETING LTD.

By: _____

Name: Alex Porroai

Title: V. P.

By: _____

Name: Russ Gielow

Title: B VP

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          7

TCPM 000089

# Exhibit D

# Standard Offer and Last Resort Service
# Docket No. 2716

April 1998

State of Rhode Island and Providence Plantations
Public Utilities Commission



*Eastern Utilities*
*Blackstone Valley Electric*
*Newport Electric*

Case 4:05-cv-40076-FDS     Document 61-13     Filed 08/15/2007     Page 3 of 8

02/18/2005 16:43 FAX 5088980433     TRANSCANADA PWR MKTG LTD → Kristine Delkus     ☒004
=B 15 2005  2:02 PM FR NATIONAL GRID     5084217335 TO 915088980433     P.03/30



**Eastern Utilities**

*Blackstone Valley Electric*
*Eastern Edison*
*EUA Service Corporation*
*Montaup Electric*
*Newport Electric*

April 15, 1998

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

Re: Blackstone Valley Electric Company and
    Newport Electric Corporation
    R. I. P. U. C. Docket No. 2716 Standard Offer Service and Last Resort Service

Dear Ms. Massaro:

Enclosed herewith for filing are Standard Offer Service and Last Resort Service tariffs and revised Retail Delivery Rate Schedules for Blackstone Valley Electric Company ("Blackstone"), R.I.P.U.C. Nos. 1154-1170, and for Newport Electric Corporation ("Newport"), R.I.P.U.C. Nos. 1379-1395. The Standard Offer Service, Last Resort Service and revised Retail Delivery Rate Schedules replace the currently effective Tariffs, R.I.P.U.C. Nos. 1135, 1136 and 1139-1153 for Blackstone and R.I.P.U.C. Nos. 1360, 1361 and 1364-1378 for Newport.

Blackstone and Newport have included with this filing:

• redlined copies of the proposed Standard Offer Service and Last Resort Service tariffs marked to show all changes between the proposed tariffs and the current Interim Generation Service and Last Resort Service tariffs and

■ as a sample to serve for all of the Retail Delivery Rate Schedules, redline copies of Blackstone's and Newport's Rate R1 Retail Delivery Rate Schedules marked to show the changes between the revised tariffs and current tariffs.

*750 West Center Street   P.O. Box 543, West Bridgewater, MA 02379   508-559-2000  FAX: 508-559-8932*

02/18/2005 16:43 FAX 5088980433                TRANSCANADA PWR MKTG LTD → Kristine Delkus        Ø005
:B 15 2005   2:03 PM FR NATIONAL GRID         5084217335 TO 915088980433              P.04/30

Ms. Luly Massaro                        - 2 -                          April 15, 1998

    The inclusion of the reference to the Standard Offer Cost Adjustment ("SOCA")
Clause is the only revision to Blackstone's and Newport's current Retail Delivery Rate
Schedules.

    Blackstone and Newport request that the Standard Offer Service and Last Resort
Service tariffs as well as the revised Retail Delivery tariffs and associated Standard Offer
Cost Adjustment Factors be made effective June 1, 1998.

    If you have any questions or if you need more information, please call me at
508/559-2000 ext. 3700.

                Very truly yours,

                Dennis St. Pierre
                Vice President of Rates

Enc.
Service List

q:\mark\stdoffer\lilelo~1.doc

02/18/2005 16:43 FAX 5088980433        TRANSCANADA PWR MKTG LTD → Kristine Delkus        ☒006
EB 15 2005   2:03 PM FR NATIONAL GRID        5084217335 TO 915088980433        P.05/30

April 15, 1998

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
R.I.P.U.C. Docket No. 2716

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Alan Shoer, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

Sam DeFrawi
Navy Rate Intervention
901 M Street S.E., Building 212
Washington, DC 20374-5018

NAVY\RIPUC-1\2716LIST.WPD

02/18/2005 16:43 FAX 5088980433    TRANSCANADA PWR MKTG LTD → Kristine Delkus    ☑007
B 15 2005  2:03 PM FR NATIONAL GRID    5084217335 TO 915088980433    P.06/30

# Standard Offer and Last Resort Service
# Docket No. 2716

April 1998

State of Rhode Island and Providence Plantations
Public Utilities Commission



**Eastern Utilities**
Blackstone Valley Electric
Newport Electric

02/18/2005 16:43 FAX 5088980433    TRANSCANADA PWR MKTG LTD → Kristine Delkus    ⓘ008
FEB 15 2005  2:03 PM FR NATIONAL GRID    5084217335 TO 915088980433    P.07/30

Case 4:05-cv-40076-FDS    Document 61-13    Filed 08/15/2007    Page 7 of 8

# BLACKSTONE VALLEY ELECTRIC COMPANY
## and
# NEWPORT ELECTRIC CORPORTION
## DOCKET NO. 2716

## TABLE OF CONTENTS

**PAGE**

Section I:

Direct Testimony of Michael J. Hirsh ........... 1

Section II:

Direct Testimony of Lawrence R. Boisvert ........... 12

Section III:

Direct Testimony of James J. Bonner, Jr. ........... 28

1.  Standard Offer Service Tariffs
    - Proposed ........... 45
    - Redlined ........... 65

2.  Last Resort Service Tariffs
    - Proposed ........... 85
    - Redlined ........... 90

3.  Rate R-1 Tariffs - Redlined ........... 94

4.  Standard Offer Cost Adjustment ("SOCA") ........... 99

5.  URA 80% Cap Calculation ........... 126

6.  Sample Bills and Typical Bill Calculations ........... 129

7.  Proposed Retail Delivery Tariffs
    - Blackstone Valley Electric ........... 134

    - Newport Electric Corporation ........... 175

02/18/2005 16:43 FAX 5088980433          TRANSCANADA PWR MKTG LTD → Kristine Delkus    @009
FB 15 2005  2:03 PM FR NATIONAL GRID       5094217335 TO 915088980433        P.08/30

# SECTION III.1

## STANDARD OFFER SERVICE TARIFFS

## PROPOSED AND REDLINED

02/18/2005 16:43 FAX 5088980433          TRANSCANADA PWR MKTG LTD → Kristine Delkus          @010
B 15 2005  2:03 PM FR NATIONAL GRID      5084217335 TO 915088980433          P.09/30

R.I.P.U.C. NO. 1154
CANCELS NO. 1135

## BLACKSTONE VALLEY ELECTRIC COMPANY
### STANDARD OFFER SERVICE

### AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

### APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

### RATE:

The Rate for each Rate Class shall consist of the following charges:

#### Residential Retail Delivery Service Rate R-1

    Energy Charge:        $0.03051      per kWh

#### Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:        $0.03051      per kWh

#### Residential Space Heating Retail Delivery Service Rate R-3

    Energy Charge:        $0.03158      per kWh

#### Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:        $0.15384      per kWh
        Off-Peak Hours:      $0.00570      per kWh

Date Filed, April 15, 1998

Date Effective, June 1, 1998

\\Alfred\ratedgn\BVE\RIPUC2716\SO_BVE4-15.doc

04/13/98 12:51 PM

02/18/2005 16:44 FAX 5088980433    TRANSCANADA PWR MKTG LTD → Kristine Delkus    ☒011
02/18/20 2005 2:05 PM FR NATIONAL GRID    5084217935 TO 915088980433    P.10/30

R.I.P.U.C. NO. 1154

-2-

Small Secondary Voltage General Retail Delivery Service Rate G-1

Energy Charge:                     $0.03589         per kWh

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

Demand Charge:                     $5.81            per kW

Energy Charge:                     $0.01403         per kWh

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

Demand Charge:                     $6.11            per kW

Energy Charge
Peak Hours:                        $0.02978         per kWh
Off-Peak Hours:                    $0.00877         per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

Demand Charge:                     $5.29            per kW

Energy Charge:                     $0.01610         per kWh

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

Demand Charge:                     $5.48            per kW

Energy Charge
Peak Hours:                        $0.03241         per kWh
Off-Peak Hours:                    $0.01054         per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, April 15, 1998

Date Effective, June 1, 1998

02/18/2005 16:44 FAX 5088980433        TRANSCANADA PWR MKTG LTD → Kristine Delkus        ☒012
B 15 2005  2:04 PM FR NATIONAL GRID      5084217335 TO 915088980433        P.11/30

R.I.P.U.C. NO. 1154

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

|  |  |  |
|---|---|---|
| Demand Charge: | $5.88 | per kW |
| Energy Charge |  |  |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

|  |  |  |
|---|---|---|
| Demand Charge: | $5.37 | per kW |
| Energy Charge |  |  |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

|  |  |  |
|---|---|---|
| Demand Charge: | $3.70 | per kW |
| Energy Charge |  |  |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, April 15, 1998

Date Effective, June 1, 1998

48

02/18/2005 16:44 FAX 5084980433    TRANSCANADA PWR MKTG LTD → Kristine Delkus    ☑013

02/18 2005  2:04 PM FR NATIONAL GRID    5084217335 TO 915088980433    P.12/38

R.I.P.U.C. NO. 1154

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.</u>

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary</u>
<u>General Retail Delivery Service Rate A-6</u>

Demand Charge:                        $3.37             per kW

Energy Charge
    Peak Hours:                       $0.03914          per kWh
    Off-Peak Hours:                   $0.01239          per kWh

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.</u>

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the

Date Filed, April 15, 1998

Date Effective, June 1, 1998

02/18/2005 18:44 FAX 5088980433    EASTERN NATIONAL GRID    TRANSCANADA PWR MKTG LTD → Kristine Delkus    @014
5084217335 TO 915088980433    P.13/30

R.I.P.U.C. NO. 1154

-5-

customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:

                $0.03308      per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:

                $0.03339      per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:

                $0.03509      per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:

                $0.03408      per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

  Peak Hours
    Monday through Friday excluding holidays defined below
    April through September,   11:00 a.m. to  4:00 p.m.
    October through March,    8:00 a.m. to 12:00 noon, and
                        4:00 p.m. to  7:00 p.m.

  Off-Peak Hours
    All other hours.

    Holidays are defined as:

        New Year's Day
        President's Day        Columbus Day
        Memorial Day         Veteran's Day
        Independence Day    Thanksgiving Day
        Labor Day           Christmas Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power

Date Filed, April 15, 1998

Date Effective, June 1, 1998

02/18/2005 16:44 FAX 5088980433    TRANSCANADA PWR MKTG LTD → Kristine Delkus    ☒015
02/18/2005 2:04 PM FR NATIONAL GRID    5084217335 TO 915088980433    P.14/30

R.I.P.U.C. NO. 1154

—6—

Factor Adjustment (PFA) to their Demand Charge based on the following
method, except that the Demand Charge shall not be less than 95% nor
more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted effective January 1 of each
calendar year beginning in the year 1998 and ending in the year 2009
by multiplying the Rates by the appropriate Cumulative Multiplier
shown in the Standard Offer Calendar Year Multiplier Table below.  The
foregoing Rates shall also be adjusted from time to time in accordance
with provisions of the Standard Offer Fuel Index and the Standard
Offer Revenue Reconciliation Adjustment described below:

STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:

| Year | Cumulative Multiplier |
|------|----------------------|
| 1998 | 1.00000 |
| 1999 | 1.09375 |
| 2000 | 1.18750 |
| 2001 | 1.18750 |
| 2002 | 1.31250 |
| 2003 | 1.46875 |
| 2004 | 1.59375 |
| 2005 | 1.71875 |
| 2006 | 1.84375 |
| 2007 | 1.96875 |
| 2008 | 2.09375 |
| 2009 | 2.21875 |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied
by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas
Price plus Market Oil Price for the billing month exceeds the Fuel
Trigger Point then in effect, where:

   Market Gas Price is the average of the values of Gas Index for
the most recent six months through and including the billing
month, where:

      Gas Index is the average of the daily settlement prices for
the last three days that the NYMEX Contract (as defined
below) for the month of delivery trades as reported in the
Wall Street Journal, expressed in dollars per MMBTU.  NYMEX
Contract shall mean the New York Mercantile Exchange Natural
Gas Futures Contract as approved by the Commodity Futures
Trading Commission for the purchase and sale of natural gas
at Henry Hub;

Date Filed, April 15, 1998

51

Date Effective, June 1, 1998

R.I.P.U.C. NO. 1154

--7--

Market Oil Price is the average of the values of Oil Index for
the most recent six months through and including the billing
month, where:

Oil Index is the average for the month of the daily low
quotations for cargo delivery of 1.0% sulfur No. 6 residual
fuel oil into New York harbor, as reported in Platt's
Oilgram U.S. Marketscan in dollars per barrel and converted
to dollars per MMBTU by dividing by 6.3; and if the indices
referred to above should become obsolete or no longer
suitable, the distribution company shall file alternate
indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars
per MMBTU, applicable for all months in the specified calendar
year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU   |
| 2001 | $5.35  per MMBTU   |
| 2002 | $6.09  per MMBTU   |
| 2003 | $7.01  per MMBTU   |
| 2004 | $7.74  per MMBTU   |

In the event that the Fuel Trigger Point is exceeded, the Fuel
Adjustment value for the billing month is determined based according
to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point
are as defined above. The values of $0.60 and $0.04/MMBTU
represent for gas and oil respectively, estimated basis
differentials or market costs of transportation from the point
where the index is calculated to a proxy power plant in the New
England market.

Incremental revenues received by the Company from the application of
the Fuel Adjustment shall be fully allocated to Standard Offer
Suppliers in proportion to the Standard Offer energy provided by a
Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the
differences between the cost of Standard Offer Service paid by the
Company to wholesale suppliers thereof and the revenues billed by the
Company to Customers taking Standard Offer Service under this Rate
Schedule. As used herein "Standard Offer Service costs" shall be
those costs incurred by the Company in providing Standard Offer

Date Filed, April 15, 1998

Date Effective, June 1, 1998

02/18/2005 16:45 FAX 5088980433          TRANSCANADA PWR MKTG LTD → Kristine Delkus       017
EB 15 2005  2:04 PM FR NATIONAL GRID       5084217335 TO 915088980433        P.16/30

R.I.P.U.C. NO. 1154

-8-

Service under this Rate Schedule including wholesale rate discounts
arising from the competitive procurement process and any or all other
costs determined by the Public Utilities Commission to be includable
therewith, excluding all costs recoverable through the Standard Offer
Fuel Index provision.

The Company shall refund any overcollection or recover any
undercollection of monies attributable to the foregoing differences
through a Standard Offer Cost Adjustment ("SOCA") factor applied on a
uniform cents per kilowatthour basis to the bills of all Customers
taking Retail Delivery Service from the Company.  The SOCA shall be
estimated for each year in advance and shall be effective for bills
rendered to Customers commencing on January 1 and ending on December
31 of each year, except for calendar year 1998 where the SOCA shall
commence on June 1.

The SOCA shall be determined for each year as follows:

     (1)   The Standard Offer Service costs shall be reconciled with
the Standard Offer Service revenues billed to Customers taking
Standard Offer Service for the prior year. If actual costs and
revenues are not available for any month for the prior year
reconciliation, they shall be estimated, subject to further
adjustment, for purposes of the foregoing calculations;

     (2)   The difference between Standard Offer Service costs and the
Standard Offer Service revenues to be billed to Customers taking
Standard Offer Service shall be estimated for the year;

     (3)   The sum of (1) and (2) above shall be divided by the
estimated total kilowatthour sales for Retail Delivery Service
for the year to yield the SOCA for the year.

At the conclusion of the Standard Offer Service period on December 31,
2009, the Company will apply to the Public Utilities Commission for
approval of a temporary per kilowatthour surcharge or credit factor to
be applied to the distribution component of the Retail Delivery Rates
for such a duration as necessary to provide for full recovery or
return of any outstanding balance of Standard Offer Service costs and
revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer Calendar Year
Multiplier and the Standard Offer Fuel Index, and Rhode Island Gross
Receipts Tax.

Date Filed, April 15, 1998

Date Effective, June 1, 1998

02/18/2005 16:45 FAX 5088980433        TRANSCANADA PWR MKTG LTD → Kristine Delkus    ☑018
ED 18 2005  2:05 PM FR NATIONAL GRID      5084217335 TO 915088980433      P.17/30

R.I.P.U.C. NO. 1154

~9~

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
beginning on the date service is first taken and ending on the earlier
of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, April 15, 1998

Date Effective, June 1, 1998

# Exhibit E

RI

EXHIBIT

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PUBLIC UTILITIES COMMISSION

IN RE:     BLACKSTONE VALLEY ELECTRIC COMPANY
           NEWPORT ELECTRIC CORPORATION

STANDARD OFFER SERVICE                    DOCKET NO. 2716

## REPORT AND ORDER

On April 15, 1998, the Blackstone Valley Electric Company ("BVE") and

Newport Electric Corporation ("Newport") (together, the "Companies") filed rate

changes with the Public Utilities Commission ("Commission") pursuant to R.I.G.L. §39-

3-10, to become effective June 1, 1998. This was the second filing made to satisfy the

Companies' obligations under the terms of a settlement agreement dated October 17,

1997 amongst the Companies, Montaup Electric Company ("Montaup"), the Division of

Public Utilities and Carriers ("Division") and the Commission ("Settlement Agreement")

that was filed with, and approved by the Federal Energy Regulatory Commission ("

FERC"). The Settlement Agreement provides, in relevant part, for the implementation of

Rhode Island's Utility Restructuring Act of 1996, as amended ("URA"). The general

objective of the URA is to deregulate electric power supplies and allow the development

of a competitive market for the purchase of electricity.

The Companies are wholly owned subsidiaries of Eastern Utilities Associates

("EUA"), an integrated public utility holding company. The Companies are engaged

primarily in the distribution of electricity to customers located in Rhode Island. The

Companies purchase all their energy requirements from Montaup, EUA's wholesale

generating and transmission subsidiary. The power has been purchased under the terms

1

of a long-term all-requirements contract, the terms and prices of which have been
regulated by the FERC.

A public hearing was held on May 12, 1998. The following appearances were
entered in this proceeding:

| | |
|---|---|
| FOR THE COMPANIES | David A. Fazzone, Esq.<br>McDermott, Will & Emery |
| FOR TEC-RI | Andrew Newman, Esq.<br>Rubin and Rudman, LLP |
| FOR THE DIVISION | Paul J. Roberti<br>Chief, Public Utilities Regulatory Unit<br>Office of the Attorney General |
| FOR THE COMMISSION | Adrienne G. Southgate<br>General Counsel |
| | Lindsay Johnson<br>Special Counsel |

## I. INTRODUCTION

On November 7 and 17, 1997, the Companies filed proposed Standard Offer rates
and Last Resort Service rates which were designed to implement open access and bring
competition to the Companies' ratepayers.[1] The rates mandated retail access to
alternative suppliers of electricity. Simply put, the rates required the Companies to allow
their customers to purchase electricity from other suppliers of electricity and required the
Companies to transport any such purchases on their lines from the supplier to the
customer.

---

[1] The Commission approved the filed rates with some changes on December 17, 1997. See Order No.
15521 dated July 10, 1998.

2

NARR 07314

In its decision, the Commission found that the proposed rates did not qualify as Standard Offer rates under the URA because the wholesale power supply had not been awarded by public competitive bidding.[2] Accordingly, while it approved the rates, the Commission ordered the Companies to designate such rates "Interim Power Rates". These rates are based upon the wholesale charge of 3.2¢ per kilowatt hour (kWh") to the Companies for wholesale standard offer service.[3] The 3.2¢ wholesale charge reduced purchased power costs by 30% for BE and 14% for Newport.[4] In order to provide a reduction to all customers, the Companies reduced purchased power costs by 30% for BE and 14% for Newport.[5] The rate structures for each rate class (whether reflecting energy, demand, or time-of-use-charges) have been maintained.

Since that decision, the Companies have put their power supply out to bid in an effort to satisfy the requirements of both the Settlement Agreement and the URA.[6] The Companies now contend that the proposed rates are in compliance with R.I.G.L. §39-1-27.3(d) and they have designated the rates as Standard Offer Service. In addition, the Companies have filed a Standard Offer Cost Adjustment provision ("SOCA") designed to replace the Interim Generation Service Revenue Reconciliation Adjustment. The purpose of the SOCA is to allow the Companies to adjust rates to collect or refund the amount of any over- or under-collection of Standard Offer Rates.[7]

---

[2] R.I.G.L. §39-1-27.3(d), as amended.

[3] Ex. EUA-1.

[4] Id.

[5] Id.

[6] Ex. EUA-A, pp. 14-27. All page references in this exhibit are to the page numbers of the volume which are shown on the bottom right of each page.

[7] Ibid., p. 36.

3

II. POSITIONS OF THE PARTIES

The Companies, the Division and TEC-RI presented witnesses who testified on the

filed rates.

### A. THE COMPANIES

The Companies presented the testimony of three witnesses in support of its filing.

Mr. Michael J. Hirsh, Vice President of EUA Service Corporation ("EUASC"), BVE,

Newport and Eastern Edison Company,[8] testified that the purpose of the Companies'

filing was:

1. to present the Companies' proposed retail Delivery Standard Offer Service tariffs offered to comply with R.I.G.L. §39-1-27.3(d);

2. to describe the results of the Companies' Standard Offer Service and Last Resort Service competitive procurement processes; and

3. to address the reasonableness of the Companies' proposal to continue Last Resort Service under the same terms that have been in place since January 1, 1998.[9]

Mr. Lawrence R. Boisvert, Supervisor of Power Supply Administration for

EUASC, testified on the competitive bidding procedures and the results of the Standard

Offer Service and the Last Resort /Default Service Requests for Proposals ("RFP") that

the Companies issued.[10]

Mr. Boisvert testified that under the Settlement Agreement, the Companies

entered into an agreement entitled Purchase of Electric Service for Resale, Amendment to

Service Agreement with Montaup[11] ("ASA").  Under the terms of the ASA, Montaup is

committed to provide the Standard Offer power supply to the Companies at fixed

---

[8] Ibid., p. 3
[9] Ibid., pp. 4-5.
[10] Ibid., p. 15.

4

NARR 07316

Standard Offer prices, subject to a fuel index,[12] over the term that the Standard Offer will be available in Rhode Island.[13]  In the event that the Companies reduce their purchases from Montaup by purchasing wholesale standard offer power supply from another supplier, Montaup has no further obligation to supply that portion of the Companies' Standard Offer Load.[14]

Mr. Boisvert testified that the Companies issued the Standard Offer RFP to comply with the requirements of the Settlement Agreement and with the provisions of the URA.[15]  Suppliers were required to bid for a percentage of the Companies' load and to bid a percentage discount off the wholesale standard offer rates stipulated in the ASA.[16] Mr. Boisvert testified that the Companies received no qualifying bids for wholesale standard offer Service and that, consistent with the Settlement Agreement, the Companies will continue to receive service under their contracts with Montaup until such time that a qualifying bid may be received in a future RFP.[17]  He indicated that the Companies intend to issue another RFP in the fourth quarter of this year.[18]

Mr. Boisvert testified that the Companies also put Last Resort Service out to bid as required by the URA. [19]  The URA provides:

[E]ach distribution electric distribution company shall . . . arrange for a Last Resort power supply for customers who are no longer eligible to receive service under the Standard Offer and not adequately supplied by the market

---

[11]  EUA-3, Attachment 1B.
[12]  Ibid., p, 12.
[13]  Ex. EUA-A, p. 18.
[14]  Id.
[15]  Ibid., p. 15.
[16]  Ibid., p. 17.
[17]  Ibid., p. 20.
[18]  Tr. 5/12/98, pp. 107-108.
[19]  R.I.G.L. §39-1-27.3(f).

5

NARR 07317

because they are unable to obtain or retain electric service from non-regulated power producers.[20]

Mr. Boisvert indicated that the Companies issued an RFP for Last Resort Service. [21] While the Company received two qualifying bids, it did not accept the bids because each bid required a fixed payment that would have made the cost of Last Resort Service "much higher than the wholesale standard offer price."[22] Alternatively, the Companies propose to offer Last Resort Service at the same price as Standard Offer Service until a competitive procurement of Last Resort Service can be successfully implemented.[23]

Finally, Mr. James J. Bonner, Jr., Supervisor of Rate Design for EUASC, testified in support of the Companies' proposed Standard Offer Service and Last Resort Service tariffs.[24] He testified that the Standard Offer tariffs and the Last Resort Service tariffs were nearly identical to the tariffs currently in effect.[25] The only difference in the Standard Offer Service tariff is a SOCA that would operate on a prospective basis.[26]

## B. THE DIVISION

The Division presented the testimony of Dr. John K. Stutz, Vice President of Tellus Institute. Dr. Stutz's testimony included a number of recommendations that were incorporated in the Companies' filed testimony.[27] In addition, Dr. Stutz recommended that the SOCA should be based on actual experienced cost data rather than estimates as

---

[20] Id.
[21] Ex. EUA-A, p. 21.
[22] Ibid., p. 24.
[23] Ibid., p. 25.
[24] Ibid., pp. 28-44.
[25] Ibid., p. 34.
[26] Ibid., p. 35.
[27] For example, Dr. Stutz recommended that the pricing of Standard Offer Service to "new" and "old" customers should be the same. Division Ex.-A. In addition, consistent with the eligibility provision of the Last Resort Service tariff, he recommended that customers who are not eligible for Standard Offer Service

6

proposed by the Companies. During the hearings, to address this concern, the Companies filed a modified SOCA that required the use of actual cost data.[28]

## C. TEC-RI

Mr. Roger L. Buck, Executive Director of the Energy Council of Rhode Island ("TEC-RI"), testified on behalf of a consortium of about 95 major energy users in Rhode Island.[29] Mr. Buck testified in support of two rate design principles. First, he testified that TEC-RI supported the "designed standard offer pricing mechanism" which was employed to design the presently effective rates.[30] TEC-RI opposes the uniform pricing method, which would price each kWh of usage at the flat rate that the Companies pay to their wholesale supplier.[31] He testified that the uniform method would cause customers with high load factors to experience "a much smaller decrease in their rates".[32] Mr. Buck also recommended a provision in the tariffs that would fix the amount of future rate increases needed to pay for the increase in the wholesale standard offer rates stipulated in the Settlement Agreement.[33]

---

and who are not able to retain service from non-regulated power producers, due to cost, should be eligible to receive Last Resort Service. Ibid., p. 4.

[28] Ex. EUA-B.

[29] Ex. TEC-RI-A.

[30] Id.

[31] Id.

[32] Id.

[33] Id.

7

NARR 07319

III. FINDINGS

### A. STANDARD OFFER

#### 1. Competitive Bidding Requirements

The URA provides:

> The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier.[34]

The Companies' power supply acquisition procedures are also stipulated by the Settlement Agreement. First, the Settlement Agreement includes the provisions of the ASA.[35] Second, the Settlement Agreement required the Companies to issue an RFP.[36] To qualify, a proposal was required to produce cost savings to the Companies. Any qualifying bidder, in turn, would be required to enter into a Standard Offer Service Agreement ("SOSA"). If the RFP did not solicit enough qualifying bids to meet the Companies' load requirements, the Settlement Agreement requires Montaup to supply the difference.

The Companies did receive one bid in response to the RFP solicitation.[37] This proposal, however, did not conform to the requirements of the RFP because it was for pre-scheduled capacity and energy delivered to the NEPOOL transmission system.[38] The proposal was rejected. Consequently, the Companies continue to receive their power supply requirements from Montaup under the terms of the ASA.

---

[34] R.I.G.L. §39-1-27.3(d), as amended. The FERC Settlement Agreement also requires the Company to put its power supply out for competitive bid.
[35] Ex. EUA-A, pp. 17-18.
[36] Id.
[37] Ibid., p. 19.
[38] Id.

8

NARR 07320

The Commission finds that the Companies have satisfied the competitive bidding requirements of the URA. This finding is based on the fact that the terms of the ASA and the SOSA are substantially the same. In addition, while there was some difference in the timing of the bids, all parties were bidding to provide all or some portion of the same load. The result was that unless the ASA produced the lowest cost to the Companies, the power would be provided by other suppliers. This procedure is consistent with the competitive bidding requirement of the URA.

2. Standard Offer Supply Contract

The URA also requires each distribution company to acquire a power supply adequate to provide service to "customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers".[39] As originally enacted, the URA provided:

> [E]ach electric distribution company shall arrange with its wholesale power supplier for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers.[40]

On July 7, 1997 the URA was amended to require that the Standard Offer power supply be competitively bid. This provision of the URA, as amended, now reads:

> [E]ach electric distribution company shall arrange for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers. The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier.[41]

---

[39] R.I.G.L. §39-1-27.3(d), as amended.
[40] Id
[41] R.I.G.L. §39-1-27.3(d), as originally enacted by P.L. 1996, ch 316, §1.

9

NARR 07321

The statute requires that the distribution companies enter into a power supply arrangement that is adequate to provide power "to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers".[42] The Companies, however, took the position that the ASA required Montaup to provide service to only those customers who were on the system as of January 1, 1998.[43] For this reason, Mr. Hirsh testified that it was "likely that the Companies would need to solicit supply to meet the requirements of customers that take service after January 1, 1998."[44] The Division, on the other hand, took the position that the ASA required Montaup to provide service to customers that take service after January 1, 1998.[45]

The ASA provides:

> The Company shall provide "Standard Offer Service" to Customer commencing on the Contract Termination Date and continuing for the period through December 31, 2009 (the "Standard Offer Period"). Standard Offer Service shall consist of the wholesale supply of power sufficient to meet the requirements of retail customers served by the Customer's distribution system that purchase Standard Offer retail service from the Customer.[46]

The Companies argued that the ASA must be interpreted in light of all the facts surrounding the execution of the Agreement.[47] The essence of this argument appears to be that Montaup would not have agreed to a literal interpretation of this provision because a literal interpretation of the provision would place a hardship on Montaup.[48] Mr. Hirsh

---

[42] Id.

[43] Ex. NEC-A, p. 10.

[44] Id.

[45] RIPUC 1-1 (Division Response to Commission Data Request dated May 7, 1998).

[46] Ex. EUA-3, Attachment 1B, Purchase of Electric Service For Resale, Amendment to Service Agreement (ASA), Section 10, pp. 7-8. In the ASA, Montaup is referred to as the Company and the Companies are referred to as the Customer.

[47] Ex. EUA-C, Comm-1-3.

[48] Id.

NARR 07322

referenced other sections of the ASA that in his opinion indicated that Montaup is not responsible for providing power to the Companies' new customers.[49]

The Commission is not convinced by the Companies' arguments. The Commission finds that, consistent with the requirements of the URA, Section 10 of the ASA requires Montaup to provide service to **all** customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers. Accordingly, the Commission finds that as of June 1, 1998, the Companies have acquired the power supply required by the URA.

It follows from the Commission's finding that the Companies need not incur costs in excess of the ASA wholesale standard offer rates to supply service to the new customers. Accordingly, if the Companies incur additional costs by purchasing such power from a different supplier, such costs will not be recoverable under the SOCA unless the Companies satisfy the considerable burden of establishing that the costs were prudently incurred.

3. Price Cap

The URA also places a cap on the price of the Standard Offer rates. The URA provides that:

> The Standard Offer shall be priced such that the average revenue per kilowatt-hour received from the customer for such power together with approved distribution, transmission and transition charges shall equal the price that would have been paid under rates in effect during the twelve (12) month period ending September 30, 1996 adjusted annually for eighty percent (80%) of the change in the consumer price index for the immediately preceding twelve (12) month period, and also for other factors reasonably beyond the control the electric distribution company and its former wholesale power supplier including but not limited to changes in federal, state or local

---

[49] Tr. 12/12/98, pp. 47-54.

11

NARR 07323

taxes or extraordinary fuel costs; provided, however, that adjustments to the standard offer for factors other than inflation must be approved by the commission. The standard offer is to be a price cap and may, after notice to the commission, be less than the maximum allowed at anytime for the generation component of the standard offer.[50]

The difficulty with this provision is that it is not clear how the cap should be applied. The cap is placed on "the average revenue per kWh received from the customer".[51] It is not clear whether this test applies to each customer, each customer class or to total annual customer revenues.

Assuming the price cap applies to total annual customer revenues, the Commission finds that the Standard Offer rates do not produce average revenues in excess the URA price cap.[52] If the cap applies to the average revenues from each customer class, the Commission finds that the Standard Offer rates for each customer class do not exceed the URA cap.[53] There is nothing in the record to indicate how many customers would pay average revenues in excess of the price cap.

The Commission will allow the filed rates to go into effect so as not to delay implementation of the URA. However, the Commission will continue to pursue the interpretation of the legislative intent embodied in the Standard Offer price cap provision of the URA. This effort will include seeking a declaratory judgment from the courts. It must be emphasized that the Commission is not making any determination of how the

---

[50] R.I.G.L. §39-1-27.3(f).
[51] Id.
[52] Ex. EUA-1, Attachment 4.
[53] Ex. NEV-3.

12

NARR 07324

price cap should be applied in any future proceeding and shall require the Company to
address this issue in any future rate proceeding[54].

## B. STANDARD OFFER SERVICE TARIFFS

### 1. Standard Offer Cost Adjustment

The Companies have filed a Standard Offer Cost Adjustment.[55]  Under the terms
of the SOCA, the Commission would be required to refund any over- or under-collection
of Standard Offer power costs "on a uniform cents per kilowatthour basis to the bills of
all customers taking Retail Delivery Service from the Companies".[56]  In other words, the
under- or over-recovery would be applied to the bills of customers who are not taking
Standard Offer Service and are purchasing from nonregulated power suppliers, as well as
to Standard Offer customers.

The Division contends that this approach is required to prevent the Standard Offer
price signal from becoming blurred.[57]  The argument is that the adjustment should be
spread over all customers to minimize any incremental charge to the Standard Offer Rate.
The objective is to keep prices as close to the Standard Offer Rates as possible, so that
ratepayers get a clear price signal that allows them to shop for power.[58]

This argument would have more appeal if it were known that the Standard Offer
Service would be offered at Standard Offer rates.  There is no assurance that this will

---

[54] The Company has expressed its intent to modify its rates to impose a flat uniform rate when the Residual
Value Credit is realized upon the sale of Narragansett's and NEP's non-nuclear generating assets. Ex.
NEC-1, pp. 20-22.  At that time, it is also possible that another party may propose the continuation of the
existing rate design.  In either event, the Commission will require the Company or any other party to
demonstrate that any proposed change in rates is in actual compliance with the URA.
[55] Ex. EUA-B.
[56] Id.
[57] Brief of the Division filed May 27, 1998, p. 2.



13

occur, because the Companies intend to put their entire supply requirements out to bid in

the fourth quarter of 1998. Until the source and cost of the Companies' power supplies

become known, the price of Standard Offer Service is unknown, and there can be no clear

price signals.

The record simply does not support the position taken by either the Companies or

the Division on this issue. It is possible, however, that future developments could justify

their position on the matter. Accordingly, the SOCA filed by Companies is approved with

the following modifications:

> The following Standard Offer Cost Adjustment shall reflect the
> difference between the cost of Standard Offer Service paid by the Company
> to wholesale suppliers thereof and the revenues billed by the Company to
> Customers taking Standard Offer Service under this Rate Schedule. As used
> herein "Standard Offer Service costs" shall be those costs incurred by the
> Company in providing Standard Offer Service under this Rate Schedule
> including wholesale rate discounts arising from the competitive procurement
> process and any or all other costs determined by the Public Utilities
> Commission to be includable therewith, excluding all costs recoverable
> through the Standard Offer Fuel Index provision.

> By March 1 of each year, the Company shall determine the amount of
> any over- or under-collection for the prior calendar year and make a filing
> with the Commission. The Company will propose at that time a rate
> recovery/refund methodology to recover or refund the balance, as
> appropriate, over the twelve-month period commencing April 1. The
> Commission may order the Company to collect or refund the balance over
> any reasonable time period from (i) all customers, (ii) only Standard Offer
> customers, or (iii) through any other reasonable method.[59]

> At the conclusion of the Standard Offer Service period on December 31,
> 2009, the Company will apply to the Public Utilities Commission for
> approval of a temporary per kilowathour surcharge or credit factor to be

---

[58] Id.

[59] The Commission also finds that, as a matter of policy, the adjustment tariffs of the electric utilities in the
State should be reasonably uniform where circumstances warrant. Accordingly, the revised language is
very similar to the language from the Narragansett Electric Standard Offer Adjustment Provision. See
Order No. 15639, issued on July 10, 1998.

14

NARR 07326

applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service Costs and revenues that exist.[60]

### 2. Standard Offer Calendar Year Multiplier Table

The Standard Offer Service tariff proposed by the Companies stipulates that the retail rate shown in the tariff shall be multiplied times the Standard Offer Calendar Year Multiplier Table to obtain the retail rate for any given year. The purpose of the table is to escalate the retail rates to reflect scheduled increases in the wholesale standard offer rates.

The Commission finds that the adoption of the multiplier table is not warranted because the Companies intend to put their entire supply requirements out to bid in the fourth quarter of 1998. Until the source and cost of the Companies' power supplies become known, the price of Standard Offer Service is unknown and an accurate price multiplier can not be established. The Commission finds that the Companies have failed to establish the factual basis for the proposed multiplier table, and orders the Companies to remove the tables and any references to them from their Standard Offer Service tariffs.

### C. LAST RESORT SERVICE

The URA requires that distribution companies act as suppliers of last resort to those customers who otherwise may be unable to obtain service in a competitive market.[61] Specifically, the URA requires each distribution company to:

> [A]rrange for a last resort power supply for customers who are no longer eligible to receive service under standard offer and are not adequately supplied by the market because they are unable to obtain or retain electric service from nonregulated power producers. The electric distribution company shall periodically solicit bids from nonregulated power producers for such service at market prices plus a fixed contribution from

---

[60] Ex. EUA-B.
[61] R.I.G.L. §39-1-27.3(f).

15

NARR 07327

the electric distribution company. . . . . All fixed contributions and any
reasonable costs incurred by the electric distribution company in arranging
this service shall be included in the distribution rates charged to all other
customers.[62]

The Companies issued an RFP for Last Resort Service power supply as required

by the URA.[63] Two proposals were received.[64] In each case, however, the proposals

included fixed fees that produced per kWh prices in excess of the Standard Offer Rates.[65]

Accordingly, the Companies "propose to continue serving Last Resort Service at the

same price as Standard Offer Service until a competitive procurement of Last Resort

Service can be successfully implemented".[66] Because the Companies' proposal results in

lower Last Resort Service rates, the Commission finds the Companies' proposal to be

reasonable and approves it provided, however, that the Companies shall continue to

periodically issue RFPS for Last Resort Service power supply as required by the statute.

(15640) ORDERED:

1. That the Standard Offer prices filed by the Companies are approved for
   consumption on and after June 1, 1998.

2. That the Standard Offer tariffs shall be modified in accordance with the
   findings and instructions contained in this Report and Order.

3. That the Standard Offer Cost Adjustment provision shall be modified in
   accordance with the findings and instructions contained in this Report and
   Order.

---

[62] Id.
[63] Ex. EUA-A, p. 23.
[64] Id.
[65] Ibid., pp. 23-24.
[66] Ibid., p. 25.

16

NARR 07328

4. That the Last Resort Service tariff is approved as filed for consumption on and after June 1, 1998.

5. That the Companies shall file tariffs modified in accordance with the findings and instructions contained in this Report and Order.

6. That the Companies shall act in accordance with all other findings and instructions contained with this Report and Order.

EFFECTIVE AT PROVIDENCE, RHODE ISLAND PURSUANT TO OPEN MEETING DECISIONS ON MAY 29 AND JULY 9, 1998. WRITTEN ORDER ISSUED JULY 10, 1998.

PUBLIC UTILITIES COMMISSION

James J. Malachowski, Chairman

Kate F. Racine, Commissioner

Brenda K. Gaynor, Commissioner

17

NARR 07329

# Exhibit F



EXHIBIT

New England Power Service
*A NEES company*

FAX

To: MIKE HACHEY

Phone: 871-1852                    Date: FEB 8, 2000

Fax: 898-0433                      From: Michael J. Hager

Subject: Merger w/ EVA             Pages: 7, incl. cover sheet

---

Please review The enclosed draft letter and
call me so we can work Through The
administrative tasks needed to make
The cutover

                  Mike

3/14/... - to Michael Shaker
3/14/... (Michael ...(s?)(...))

*This is a confidential business document, and the property of NEES companies.*
*If you do not receive all pages or if there are problems with this transmission, please call.*

Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
25 Research Drive
Westboro, MA 01582
Tel: (508) 389-3056
Fax: (508) 389-~~2469~~ 2929
hager@neesnet.com

<<logo>>

<<date>>

Mr. Sean D. McMaster
TransCanada Power Marketing, Ltd.
3400, 237-4th Avenue S.W.
Calgary, Alberta T2P 5A4

Subject:        Wholesale Standard Offer Service Agreement between Blackstone Valley Electric
                Company ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric
                Company ("Newport") and TransCanada Power Marketing Ltd ("TCPM") dated
                April 7, 1998 (the "Agreement")

Dear Mr. McMaster:

        The subsidiaries of Eastern Utilities Associates ("EUA") will merge with and into various
subsidiaries of the New England Electric System ("NEES")[1] in the next few months. The actual
date of the merger is referred to herein as the "Merger Date". As a result of the merger, the
NEES subsidiaries will assume the obligations of the former EUA subsidiaries pursuant to
Article 10 of the Agreement.

        The obligations of the parties or their successors and the terms of the Agreement are not
affected by the merger and assignments. The following actions will be taken in order to continue
to facilitate the administration of the Agreement. These actions are not intended and in no way
constitute nor should be deemed to constitute a modification of the terms of the Agreement.

        **1. Designation of Load Served.** Currently, Load Asset 983 is used within the
        NEPOOL Market System to represent the loads covered by the Agreement.
        Effective hour 1 of the Merger Date, Load Asset 983 will no longer be used and
        its associated NEPOOL Market System contracts 66609 and 66610 will be
        terminated. The following Load Assets will be used within the NEPOOL Market
        System to represent the loads covered by the Agreement:

---

[1] Specifically, as it relates to the Agreement, Eastern will merge into Massachusetts
Electric Company ("Mass. Electric"), Blackstone and Newport will merge into The Narragansett
Electric Company ("Narragansett") and Montaup Electric Company will merge into New
England Power Company.

Mr. Sean D. McMaster
<<date>>
page 2 of 6

| Load Asset | Load Description |
|---|---|
| <s>aaaa</s> 1252 | Standard Offer load in the former Eastern Service Territory. |
| <s>bbbb</s> 1250 | Standard Offer load in the former Blackstone and Newport Service Territories. |

Mass. Electric will replace Eastern and Narragansett will replace Blackstone and Newport and, as Sellers within the NEPOOL Market System, Mass. Electric and Narragansett will be responsible for inputting Load Asset Contracts for each of the above Load Assets and assigning to TCPM, as Buyer within the NEPOOL Market System, 14.4550% of each Load Asset. Attachment 1 provides a list of the NEPOOL Market System Contracts that will be entered. Kindly submit the required Load Asset Contract Acknowledgment ("LACA") forms for each contract shown to ISO-NE by hour 1 of the Merger Date and forward copies of each LACA to me as well.

**2. Application of the Fuel Adjustment Factor.** Article 5 of the Agreement entitles TCPM to receive additional monies based on revenues collected from retail customers pursuant to Fuel Adjustment mechanisms contained in Eastern's, Blackstone's and Newport's Standard Offer Service tariffs. Mass. Electric and Narragansett will continue to make such Fuel Adjustment payments, if applicable, according to Attachment 2. Attachment 2 replaces the retail fuel adjustment mechanisms contained in the EUA Companies' respective Standard Offer Service tariffs. Said payments will be made by Mass. Electric or Narragansett in the month immediately following service.

**3. Supplier Information to be Provided.** In addition to any specific data or information required to be provided under the terms of the Agreement, Mass. Electric and Narragansett will provide TCPM with (i) customer "add" and "drop" notices and (ii) monthly customer enrollment counts by rate class. The add and drop notices will be sent electronically using the Advantis Value Added Network ("VAN"). To receive these notices TCPM must establish an account on the VAN and be responsible for paying any charges incurred in using the VAN. The customer counts will be compiled and e-mailed by our Standard Offer Portfolio Manager.

**4. Change of Notice Recipient.** The recipient of notices for the Companies, as designated in Article 18 of the Agreement, should be changed to the following:

Mr. Sean D. McMaster
<<date>>
page 3 of 6

    Mr. Michael J. Hager
    Standard Offer Portfolio Manager
    New England Power Service Company
    25 Research Drive
    Westboro, MA 01582
    (508) 389-3056
    (508) 389-2929 (facsimile)

  Should you have any questions regarding the above implementation plans please do not
hesitate to contact me.

        Very truly yours,


        <<name>>
        <<title>>

cc: M. E. Hachey

NG/TC 026585

Mr. Sean D. McMaster
<<date>>
page 4 of 6

*TCPM*

## ATTACHMENT 1

### NEPOOL MARKET SYSTEM CONTRACTS

| Market System Contract # | Load Asset | Product | Term |
|---|---|---|---|
| <<tbd>> 113,915 | ~~aaaa~~ 1252 | Energy | <<date>> @ he 0100, to 31-Dec-2004 @ he 2400 |
| <<tbd>> 113,916 | ~~aaaa~~ 1252 | ICAP | <<date>> @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113,927 <<tbd>> 113,927 | ~~bbbb~~ 1250 | Energy | <<date>> @ he 0100, to 31-Dec-2009 @ he 2400 |
| 113,928 <<tbd>> 113,928 | ~~bbbb~~ 1250 | ICAP | <<date>> @ he 0100, to 31-Dec-2009 @ he 2400 |

14.455 %

Mr. Sean D. McMaster
<<date>>
page 5 of 6

## ATTACHMENT 2

### STANDARD OFFER FUEL ADJUSTMENT PROVISION

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, Mass. Electric and Narragansett will pay additional amounts to Supplier in accordance with this Standard Offer Fuel Adjustment Provision which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 2000 | 3.4 cents (MA) 3.8 cents (RI) |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Supplier will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York

Mr. Sean D. McMaster
<<date>>
page 6 of 6

harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per
barrel and converted to dollars per MMBtu by dividing by 6.3; and

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all
months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing
month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined
above. The values of $.60 and $.04/MMBtu represent for gas and oil
respectively, estimated basis differentials or market costs of
transportation from the point where the index is calculated to a proxy
power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50
($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In
this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming
4.4548¢/kWh (4.2 x 1.0609).

The additional amount paid to each supplier, on a per-kilowatt-hour basis, would be 0.2548
¢/kWh (4.4548 - 4.2).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment
determined.

NG/TC 026588

# Exhibit G

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

------------------------------------x

TRANSCANADA POWER MARKETING,

LTD.,

      Plaintiff,    Case No. 05-40076 FDS

  v.

NARRAGANSETT ELECTRIC CO.,

      Defendant.

------------------------------------x

Volume I               1 - 222


     VIDEOTAPED DEPOSITION of MICHAEL J. HAGER,

a witness called for examination by the

Plaintiff, taken pursuant to the Applicable

Provisions of the Federal Rules of Civil

Procedure, before Laurie K. Langer, Registered

Professional Reporter and Notary Public in and

for the Commonwealth of Massachusetts, at the

offices of Choate Hall & Stewart, Two

International Place, Boston, Massachusetts, on

Friday, March 23, 2007, commencing at 9:15 a.m.

Page 114

1    said in his deposition?
2    A.  I can't recall being told what Kirby said,
3        specifics of what Kirby said or anything in
4        general as to what Kirby said.
5    Q.  Okay.  The tariff that you've attached to your
6        letter in exhibit --
7    A.  136.
8    Q.  Yeah, that one.  136.  Beyond, I mean, we can
9        all look at it and see that this tariff has fuel
10       trigger numbers only through 2004.  Beyond the
11       fact that there was a piece of paper which is a
12       tariff which only had the fuel triggers through
13       2004, what conversations if any did you have
14       with Kevin Kirby about plans with respect to the
15       tariffs that would be filed in 2005 through 2009
16       when that time period came?
17          MR. LODEMORE:  Objection.
18   A.  I'm struggling with, you know, the limitation to
19       conversations specifically in general with
20       Kirby.  Again, through many conversations I had
21       at the time it's my understanding that these
22       provisions were being -- they were what they
23       were.  There was no intent to go back and
24       reopen, renegotiate, relook at, that these

Page 115

1    things were being put out there and they were
2    what they were for the remainder of the term and
3    just simply handed over for administration
4    purposes.
5    Q.  And those are, and that's your summarization of
6        conversations with Mr. Boisvert and Mr. Kirby?
7    A.  That would be my summarizations of conversations
8        with everyone.  Your earlier question is, you
9        know, I'll identify Boisvert and Kirby as the
10       ones that I probably spoke the most with with
11       regard to administration of these arrangements,
12       but, again, all that was coming over was in my
13       understanding of all of the obligations and
14       things were coming over were based on the many
15       conversations with that entire crowd of the EUA
16       folks.
17   Q.  The -- did you ever speak before May 1, 2000 to
18       any of the, anyone from the State Regulatory
19       Agency about the fuel adjustment mechanism and
20       the EUA tariffs?
21   A.  I may have, but I can't recall any
22       conversations, whether specific or general.
23   Q.  What did you do to announce to contractors to
24       transfer the contracts?

Page 116

1    A.  By contractors do you mean wholesale standard
2        offer suppliers that we had contracts with?
3    Q.  Yes.
4    A.  Each one of those received a letter, a draft
5        letter very similar to the April 18, 2000 letter
6        contained in Exhibit 136.  They all received it
7        on or about the same time.
8    Q.  Okay.  Who was involved in drafting those
9        letters?
10   A.  I would have had --
11   Q.  Let me take it.
12   A.  I would have had, you know, internal counsel
13       review it.  You know, EUA, the Kirbys and the
14       Boisverts and others would have looked at it,
15       perhaps their internal counsel.  We may have
16       had -- I don't know, whoever I was reporting to
17       at the time.  I may have sent a copy to them.
18       Counsel and/or other parties leading the
19       integration effort would probably, we may have
20       sent a copy to them and to the extent they
21       wanted to see what was going out.
22   Q.  Okay.  Who from EUA do you recall being involved
23       in the drafting of, for example, Exhibit 77?
24       Which is an earlier version of the letter to

Page 117

1    TransCanada dated February 8, 2000.
2    A.  At this stage of the game Larry Boisvert would
3        have been my primary contact.  I can't recall
4        who he would have shared it with on the other
5        end.
6    Q.  Do you recall discussing this letter with
7        anybody else at EUA other than Mr. Boisvert?
8          MR. LODEMORE:  Just the draft?  This
9        letter, Exhibit 77, or the final document or
10       both?
11          MR. WINSTON:  Both.
12   A.  I don't have a recollection of who other than
13       Larry I would have talked to.
14   Q.  Okay.  So you don't have any recollection as you
15       sit here today of talking to anyone other than
16       Larry about this form of letter?
17   A.  No, I don't.
18   Q.  Okay.  What do you recall about discussing this
19       form of letter with Larry Boisvert?
20   A.  Making sure that we got the -- we would have
21       discussed making sure that we got the
22       designation of the loads correct.  That we
23       were -- certainly there was -- we anticipated a
24       concern from suppliers, we anticipated a

30  (Pages 114 to 117)

# Exhibit H

 National Grid

Michael Hager
Standard Offer Portfolio Manager

April 18, 2000

Mr. Sean D. McMaster
TransCanada Power Marketing, Ltd.
3400, 237-4th Avenue S.W.
Calgary, Alberta T2P 5A4

Subject:        Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company
                ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric Company ("Newport")
                and TransCanada Power Marketing Ltd ("TCPM") dated April 7, 1998 (the "Agreement")

Dear Mr. McMaster:

Effective May 1, 2000 ("Merger Date") the subsidiaries of Eastern Utilities Associates ("EUA") will merge
with and into various subsidiaries of National Grid - USA (formerly New England Electric System)[1]. As a result of
the merger, the National Grid - USA subsidiaries will assume the obligations of the former EUA subsidiaries
pursuant to Article 11 of the Agreements.

The obligations of the parties or their successors and the terms of the Agreement are not affected by the
merger and assignments. The following actions will be taken in order to continue to facilitate the administration of
the Agreement. These actions are not intended and in no way constitute nor should be deemed to constitute a
modification of the terms of the Agreement.

1. Designation of Load Served. Currently, Load Asset 983 is used within the NEPOOL Market
System to represent the loads covered by the Agreement. Effective hour 1 of the Merger Date,
Load Asset 983 will no longer be used and its associated NEPOOL Market System contracts
66609 and 66610 will be terminated. The following Load Assets will be used within the
NEPOOL Market System to represent the loads covered by the Agreement:

| Load Asset | Load Description |
| --- | --- |
| 1252 | Standard Offer load in the former Eastern Service Territory. |
| 1250 | Standard Offer load in the former Blackstone and Newport Service Territories. |



EXHIBIT
Lloyd 90
3-6-07

[1] Specifically, as it relates to the Agreements, Eastern will merge into Massachusetts Electric
Company ("Mass. Electric"), Blackstone and Newport will merge into The Narragansett Electric Company
("Narragansett") and Montaup Electric Company will merge into New England Power Company.

55 Bearfoot Road
Northboro, MA 01532
Tel: 508.421.7350 Fax: 508.421.7335
michael.hager@us.ngrid.com

NARR 22621

Mr. Sean D. McMaster
April 18, 2000
page 2 of 5

Mass. Electric will replace Eastern and Narragansett will replace Blackstone and Newport and, as Sellers within the NEPOOL Market System, Mass. Electric and Narragansett will be responsible for inputting Load Asset Contracts for each of the above Load Assets and assigning to TCPM, as Buyer within the NEPOOL Market System, 14.4550% of each Load Asset. Attachment 1 provides a list of the NEPOOL Market System Contracts that will be entered. Kindly submit the required Load Asset Contract Acknowledgment ("LACA") forms for each contract shown to ISO-NE by hour 1 of the Merger Date and forward copies of each LACA to me as well.

2. Application of the Fuel Adjustment Factor. Article 5 of the Agreement entitles TCPM to receive additional monies based on revenues collected from retail customers pursuant to Fuel Adjustment mechanisms contained in Eastern's, Blackstone's and Newport's Standard Offer Service tariffs. Mass. Electric and Narragansett will continue to make such Fuel Adjustment payments, if applicable, according to Attachment 2. Attachment 2 replaces the retail fuel adjustment mechanisms contained in the EUA Companies' respective Standard Offer Service tariffs. Said payments will be made by Mass. Electric or Narragansett in the month immediately following service.

3. Supplier Information to be Provided. In addition to any specific data or information required to be provided under the terms of the Agreement, Mass. Electric and Narragansett will provide TCPM with (i) customer "add" and "drop" notices and (ii) monthly customer enrollment counts by rate class. The add and drop notices will be sent electronically using the Advantis Value Added Network ("VAN"). To receive these notices TCPM must establish an account on the VAN and be responsible for paying any charges incurred in using the VAN. The customer counts will be compiled and e-mailed by our Standard Offer Portfolio Manager.

4. Change of Notice Recipient. The recipient of notices for the Companies, as designated in Article 18 of the Agreement, should be changed to the following:

Mr. Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
55 Bearfoot Road
Northboro, MA 01532
(508) 421-7350
(508) 421-7335 (facsimile)

Should you have any questions regarding the above implementation plans please do not hesitate to contact me.

Very truly yours,

cc: M. E. Hachey

Mr. Sean D. McMaster
April 18, 2000
page 3 of 5

ATTACHMENT 1

NEPOOL MARKET SYSTEM CONTRACTS

| Market System Contract # | Seller ID # | Load Asset | Product | Term |
|---|---|---|---|---|
| 113,915 | 50075 | 1252 | Energy | 01-May-2000 @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113,916 | 50075 | 1252 | ICAP | 01-May-2000 @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113,927 | 156 | 1250 | Energy | 01-May-2000 @ he 0100, to 31-Dec-2009 @ he 2400 |
| 113,928 | 156 | 1250 | ICAP | 01-May-2000 @ he 0100, to 31-Dec-2009 @ he 2400 |

NARR 22623

Mr. Sean D. McMaster
April 18, 2000
page 4 of 5

ATTACHMENT 2

STANDARD OFFER FUEL ADJUSTMENT PROVISION

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, Mass. Electric and Narragansett will pay additional amounts to Supplier in accordance with this Standard Offer Fuel Adjustment Provision which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 2000 | 3.4 cents (MA) 3.8 cents (RI) |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Supplier will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

NARR 22624

Mr. Sean D. McMaster
April 18, 2000
page 5 of 5

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{\text{(Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

The additional amount paid to each supplier, on a per-kilowatt-hour basis, would be 0.2548 ¢/kWh (4.4548 - 4.2).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

NARR 22625

# Exhibit I

Page 1

```
 1                              Vol. 1, Pgs. 1-280

 2                              Exhibits 194-219

 3

 4            UNITED STATES DISTRICT COURT

 5             DISTRICT OF MASSACHUSETTS

 6

 7     - - - - - - - - - - - - - - - - - - -

 8   TRANSCANADA POWER MARKETING, LTD.

 9              Plaintiff

10   v.                          CA No. 05-40076 FDS

11   NARRAGANSETT ELECTRIC CO.,

12              Defendant

13     - - - - - - - - - - - - - - - - - ORIGINAL

14

15

16

17            DEPOSITION of ALEX POURBAIX

18       Tuesday, April 17, 2007 - 9:17 a.m.

19              Bowditch & Dewey, LLP

20             One International Place

21             Boston, Massachusetts

22

23       Reporter:  Jill K. Ruggieri, RMR/CRR

24
```

Page 194

```
 1    Q    I show you what's been marked Exhibit 54.

 2              And is that a letter that you

 3         prepared?

 4    A    That is a letter that is under my signature,

 5         but the specific comments with respect to

 6         the legal language would have been prepared

 7         by Mr. McMaster.

 8    Q    Okay.

 9              You've testified a few times that

10         there was a provision 8.3 that was added in

11         connection with your concerns with regard to

12         the tariffs?

13    A    Yes.

14    Q    Is this Rider 1 the language that was

15         proposed in that respect?

16    A    Rider 1, I believe, was the first iteration

17         of what eventually became Section 8.3.

18    Q    Did Rider 1 address your concerns?

19    A    I think -- sorry.

20              My recollection was that this was our

21         first cut at it.  And over time, we expanded

22         that language in order to better protect

23         ourselves.

24    Q    Isn't Rider 1 as written a tautology?
```

| 1  | A | In what regard? |
| 2  | Q | The price increases -- the price increases |
| 3  |   | and you get it? |
| 4  | A | No, I think its meaning is clear. |
| 5  | Q | And what would that be? |
| 6  | A | That -- well, sorry.  Let me think about |
| 7  |   | that.   The -- I think this -- this is my |
| 8  |   | explanation about how this clause evolved. |
| 9  |   | I think this was a first cut at it, |
| 10 |   | and further cuts at it which ultimately |
| 11 |   | resulted in 8.3 gave us better protection. |
| 12 |   | I see your point by referring to |
| 13 |   | capital P, price, in Rider 1. |
| 14 | Q | Did you have any discussions with Mr. Hirsh |
| 15 |   | regarding Rider 1 at that point? |
| 16 | A | In meetings with Mr. Hirsh, Mr. Taylor |
| 17 |   | typically led the discussion on -- either |
| 18 |   | call it Rider 1 or call it Section 8.3, so I |
| 19 |   | was there, but I would not have been leading |
| 20 |   | that. |
| 21 |   | This was very much Mr. Taylor's -- |
| 22 | Q | Do you recall any discussions concerning |
| 23 |   | this provision as proposed in this Exhibit |
| 24 |   | 54? |

```
 1    A    You're talking about the specific Rider 1
 2         provision?
 3    Q    Right.
 4    A    I don't recall the exact discussion.
 5    Q    What generally were the discussions
 6         Mr. Taylor had with -- and you'll have to
 7         tell me who he has them with -- concerning
 8         8.3?
 9    A    So I -- I would have been present when he
10         would have had those discussions with
11         Mr. Hirsh.  And he may have had those
12         discussions at other times not in my
13         presence.
14              But the gist of his concern was that
15         we were being asked to execute this
16         agreement, which would obligate us to
17         provide standard offer service to customers
18         of EUA; and it would be almost impossible
19         for us to be part of and follow every future
20         regulatory hearing regarding -- regarding
21         standard offer service.
22              Or, in fact, we may not even be
23         allowed to be part of the discussions.
24              And Bill requested the insertion of
```

1      language which ultimately ended up as

2      Section 8.3 in order to protect us from some

3      subsequent action by regulators that

4      could -- regulators, politicians.

5           It was drafted very broadly to ensure

6      that if anything changed, we would not -- we

7      would be held harmless for it in the future.

8           And I'll give you something -- I

9      mean, one of the concerns at the time was

10     this concern over the ability of people to

11     leave and come back on to standard offer

12     service.

13          I think the concerns of TransCanada

14     went even beyond that, though.  I mean, for

15     example, if -- if there was a subsequent

16     change in the actual fixed price of power

17     under the standard offer service agreement,

18     we did not want to be held responsible for

19     that, and hence the insertion of the 8.3

20     language.

21   Q  If I could show you what's been marked

22     Exhibit 56, and I refer you to page 007312.

23          Do you recall receiving this

24     document?

Rider 1
to Art 5

**TransCanada**

TransCanada Energy Ltd.

3400, 237 - 4th Avenue S.W.
Calgary, Alberta, Canada T2P 5A4
Telephone: (403) 213-3100
Fax: (403) 213-3111

EXHIBIT

S34

March 24, 1998                                    "Via Fax: (508)559-6125"

Eastern Utilities Associates
750 West Centre Street
West Bridgewater, MA
USA 02379

Attention:    Mr. Michael Hirsh
              Vice President

Dear Michael:

Re:    Acquisition by TransCanada Power Marketing Ltd. ("TransCanada") of
       Montaup Electric Company's ("Montaup's") Power Purchase Agreement ("PPA")
       with Ocean State Power ("OSP")

I have attached a marked-up version of the most recent set of sale documents which were
recently provided to us. For the most part the comments are relatively minor. I would like to
direct your attention to the following material comments:

**Asset Purchase Agreement:**

1.    Page 4, Section 1.1(19) -          In the definition of "Permitted Encumbrances", the
                                         first phrase "any Encumbrances not created by the
                                         Seller" should be deleted.   TransCanada is not
                                         willing to accept the risk of Encumbrances of this
                                         nature.  I believe that this was agreed to in our
                                         original discussions.

2.    Page 9, Section 5.6 -             The litigation representation and warranty needs to
                                        be expanded to include the Purchased Assets. At
                                        this time, the representation only refers to the Seller
                                        and there could be a suit with respect to the
                                        Purchased Assets that is not against the Seller.

**Backstop Agreement:**

1.    Article 5, Page 6 -               We have added Rider 1 which provides that any
                                        increase in the Price which arises as a result of a
                                        regulatory decision will be passed on to
                                        TransCanada. Although this concept has not been
                                        discussed previously, I believe it is similar to the

TCPM007194

- 2 -

"Favored Nations" clause we have discussed previously. In the event that Eastern Utilities Associates ("EUA") receives approval from the regulators for increased Standard Offer Service prices, I believe it is appropriate that any such increment be passed on to TransCanada.

Rider 1 is as follows:

"In the event that the Price increases as a result of the decision of any regulatory body having jurisdiction over Standard Offer Service, such increase shall be paid to Supplier by the Companies."

2.    Article 7, Page 7 –

I have deleted the reference to the one cent per kWh penalty in the "Failure to Deliver" provision. TransCanada will reimburse EUA for its actual costs of supplying replacement power.

3.    Article 8, Page 8 -

TransCanada PipeLines Limited's ("TCPL's") counsel are currently reviewing the Guarantee. We have also made a couple of changes to Article 8 to provide TransCanada with the time required to rectify default as well as to delete references to indirect consequential and incidental damages in order to make the provision reciprocal to TransCanada's obligations.

4.    Appendix A -

I have deleted the Option to Reduce Suppliers Share, as I believe this was agreed to previously.

### PPA Transfer Agreement:

1.    Section 7(b) -

I found there was potential confusion between the provisions of Section 7(b) and 8(d). We have made some proposed amendments which I hope have the effect of cleaning up any potential confusion.

2.    Section 8(d) -

I have suggested certain amendments in this paragraph as the original language could have been construed to mean that a lump sum would have to be "equitable" amount rather than the discounted present value of the agreed upon monthly support payment. I believe that the only issue we should leave open for discussion is the actual discount rate attributable to the support payments.

- 3 -

Finally in respect to your letter of March 9, 1998, we agree with the changes in your Paragraph 2 of the draft letter. I have attached a revised copy of the equity letter for your review. When you have had an opportunity to review the foregoing, please give me a call so that we can discuss the proposed amendments.

Yours truly,

TRANSCANADA ENERGY LTD.

Alexander J. Pourbaix
Vice President, Power and Projects

Enclosures

AJP/tc/ajp051

cc:    Mr. Sean McMaster

# Exhibit J

Page 1

1                                      Vol. 1, Pgs. 1-68

2                                      Exhibits 192-193

3

4            UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6

7     - - - - - - - - - - - - - - - -

8   TRANSCANADA POWER MARKETING, LTD.

9              Plaintiff

10  v.                                  CA No. 05-40076 FDS

11  NARRAGANSETT ELECTRIC CO.,

12             Defendant

13  - - - - - - - - - - - - - - -  ORIGINAL

14

15         DEPOSITION of SEAN McMASTER

16    Wednesday, April 11, 2007 - 10:09 a.m.

17           Bowditch & Dewey, LLP

18          One International Place

19           Boston, Massachusetts

20

21

22

23     Reporter:  Jill K. Ruggieri, RMR/CRR

24

1   A   They were not mine.

2   Q   I misunderstood then.

3   A   Just the TCPM notation at the top.

4   Q   And that did not end up in the final

5       version?

6   A   That's correct.

7   Q   Thank you.

8           I show you what's been marked

9       Exhibit 58.  This provision 58 is language

10      that you drafted --

11          I'm sorry, the typewritten language

12      on page TCPM7325 is language that you

13      drafted?

14          MR. WINSTON:  Objection.  Do not

15      answer.

16  Q   Well, did you draft the cover sheet to this

17      document?

18  A   Yes.

19  Q   And if I look at page TCPM7324, it says,

20      "Attached is the provision regarding changes

21      to standard offer service which Alex has

22      discussed with you.  Alex has not yet seen

23      this."

24          Am I reading that correctly?

Page 60

```
 1   A    Yes.

 2             MR. WINSTON:  I think you can ask him

 3        who he worked with with respect to what's

 4        attached, if he did.

 5             MR. O'ROURKE:  Okay.  I mean, I think

 6        I can ask him whether anyone other than you

 7        drafted --

 8             MR. WINSTON:  Or participated in

 9        drafting, perhaps.

10   A    My recollection is that Bill Taylor and I

11        would have participated in drafting this, a

12        joint effort.

13   Q    Okay.

14             And am I correct that this provision

15        eventually became provision 8.3 of the

16        standard offer service contract?

17             (Witness read document.)

18             MR. WINSTON:  Are you asking word for

19        word or in sum or substance?

20             MR. O'ROURKE:  We can start with sum

21        or substance, but I think it is word for

22        word.

23             MR. WINSTON:  Okay.  It may be.  I'm

24        just...
```

# Exhibit K

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3             (Central Division)

4    - - - - - - - - - - - - - - - - - - - - - - -

5    TRANSCANADA POWER MARKETING, LTD.,

6          Plaintiff,

7

8          vs                    C.A. No. 05-40076FDS

9

10   NARRAGANSETT ELECTRIC COMPANY,

11         Defendant.          **ORIGINAL**

12   - - - - - - - - - - - - - - - - - - - - - - -

13        DEPOSITION OF WILLIAM C. TAYLOR, called as a

14   witness by counsel for the Defendant, pursuant to

15   the provisions of Massachusetts Rules of Civil

16   Procedure, before Victoria S. Reade, Professional

17   Court Reporter and Notary Public, in and for the

18   Commonwealth of Massachusetts, taken at Bowditch &

19   Dewey, 311 Main Street, Worcester, Massachusetts, on

20   Monday, March 12, 2007, commencing at 9:30 a.m.

21

22

23

24

1      A.    As well as the words standard-offer

2            service, which, again, I've gone over this

3            with you before, it refers back to --

4      Q.    Company standard-offer service tariffs?

5                  MR. WINSTON:   Objection.

6      A.    Again, unless you want to keep going over

7            the same ground, I think I have answered

8            the question.

9      Q.    As best you can?

10     A.    Yes.

11     Q.    Did you think the word tariffs was

12           surplusage in that sentence?

13     A.    I didn't think about it in the context of

14           sur -- whatever word you just used.

15     Q.    Did you think it was excess baggage,

16           unneeded verbiage?

17     A.    Again, I will reiterate that I was

18           specifically concerned about the tariffs.

19           This led to the inclusion specifically in

20           Clause 8.3, which, if you have read that,

21           states that to the extent that there is a

22           regulatory change that is, I forget the

23           exact words, but essentially economically

24           harmful to us as a supplier that would

1           materially increase our cost to supply

2           standard-offer service under this

3           agreement, then we had certain remedies

4           that we could avail ourselves under the

5           contract.

6                       So was I concerned about the use

7           of the word tariffs in here, yes.  I was

8           concerned about it for two reasons but

9           mostly because they were being, as I said

10          earlier, either unclear or elusive, I

11          wasn't sure which, about making these

12          tariffs clear to us so we needed to find a

13          solution to the fact that they were unable

14          or unwilling to put these tariffs forward

15          to us and that solution was embodied in

16          the change you see to the definition of

17          standard-offer service and the inclusion

18          of Clause 8.3.

19      Q.  Well, you recognize that any tariff that

20          they submitted had to be approved,

21          correct?

22      A.  I presume so, yes.

23      Q.  That's what included 8.3 you have just

24          said?

Page 165

```
 1                        We were worried about a whole
 2           host of things, inclusion of other
 3           services, the migration issue that I
 4           referred to earlier where customers maybe
 5           could be allowed to come back on to
 6           standard-offer, that was something we were
 7           thinking about.  There was a number of
 8           things that we were just generally
 9           concerned could be implemented at the hand
10           of the regulator that we want to be
11           reimbursed for if it had a material
12           financial impact on us.
13      Q.   Have customers been allowed to come back
14           on to the standard-offer?
15      A.   Not to my knowledge.
16      Q.   Pardon me if I've asked this, but your
17           counsel will object if I have, why did it
18           have to be signed on April 7th if there
19           was such uncertainty as to what the
20           tariffs were going to be?
21      A.   Well, it wasn't clear that the tariffs
22           were become clear any time soon.  We
23           certainly weren't getting that message
24           from Mr. Hirsh.
```