UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

———————————————————————

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 05-40076FDS |
| | ) |
| NARRAGANSETT ELECTRIC COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

———————————————————————

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**
**(Leave to File Brief in Excess of 20 pages granted on August 14, 2007)**

Plaintiff TransCanada Power Marketing Ltd. ("TransCanada") hereby submits this memorandum in support of its motion for summary judgment on Counts I, III, and V (or in the alternative Count IV) of the Amended Complaint, and all Counts of the Amended Counterclaim.

## INTRODUCTION

This is an action by TransCanada, a wholesale electricity supplier, against Narragansett Electric Company ("Narragansett"), a retail electric distribution company in Rhode Island. TransCanada alleges, *inter alia*, breach of contract, breach of the covenant of good faith and fair dealing, and in the alternative rescission or reformation of contract for unilateral mistake. TransCanada's claims arise out of a Wholesale Standard Offer Service Agreement (the "Agreement") between TransCanada and Narragansett's predecessors -- Blackstone Valley Electric Company ("Blackstone") and Newport Electric Company ("Newport"). The Agreement was entered into on April 7, 1998 and expires on December 31, 2009.[1] The Agreement arose out

---

[1] The Agreement also required TransCanada to provide electricity to Narragansett's Massachusetts affiliate, Massachusetts Electric, as successor to Eastern Electric Company ("Eastern"). The Massachusetts portion of the Agreement ended in 2004.

of the restructuring of the electricity industry in Rhode Island and Massachusetts in the late 1990s. Pursuant to the Agreement, TransCanada supplies electric power to Narragansett. Narragansett then delivers the electricity to Rhode Island electric consumers. The Agreement sets forth a two part pricing system for TransCanada's supply of electricity to Narragansett – (i) a fixed price component, and (ii) a fuel adjustment mechanism to account for extraordinary fuel costs. Narragansett obtains the funds to pay these two price components to TransCanada from the retail end-consumers of the electricity, through the filing of Standard Officer Service retail tariffs. These tariffs are filed periodically with state utilities commissions and include reimbursement provisions for both the fixed price and the fuel adjustment components.

Starting in 2005 (the middle of the Agreement's term), Narragansett elected not to include in its retail tariff, or pay to TransCanada, the "fuel adjustment" component of the price for delivered power. In other words, Narragansett seeks to require TransCanada to continue to deliver power for the Agreement's remaining 2005-2009 term, but to pay TransCanada only one of the two stated price components under the Agreement. Summary judgment should be granted to TransCanada declaring that, *inter alia*, Narragansett is obligated to file for, and pay to TransCanada, a fuel adjustment through the Agreement's full term, including the years 2005-2009.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Background:  The URA and Restructuring of the Electric Industry in Rhode Island and Massachusetts

Prior to 1996, New England utility companies were generally vertically integrated monopolies. One utility company controlled (through its "affiliate" subsidiaries) the electricity generation, transmission and distribution functions for its given area.[2] (Declaration of Michael

---

[2] Electricity "generation" means the creation of the electricity in a plant or facility through, for example, the burning of fossil fuels (oil, gas, coal). "Transmission" means the transfer of power from the generation plant or facility across high-voltage power lines to local distribution areas.  "Distribution" means the local delivery of the electricity to individual residences and businesses over local power lines and poles.  Hachey Decl. ¶ 2.

Hachey ("Hachey Decl."), ¶ 1; Clarke Dep. at 45).[3] In the 1996 timeframe, only two large vertically integrated utilities operated in Rhode Island -- Eastern Utilities Associates ("EUA") and New England Electric System ("NEES"). (Hachey Decl. ¶ 4). EUA's generation affiliate was Montaup Electric Company ("Montaup"), and its retail distribution company affiliates were Blackstone and Newport in Rhode Island and Eastern in Massachusetts. (Amend. Compl. 9/Amend. Ans. 9). NEES's generation affiliate was New England Power Company ("NEP"), and NEES's retail distribution affiliate was Narragansett in Rhode Island and Massachusetts Electric in Massachusetts. (Hachey Decl. ¶ 5; *see also Arbitration Between TransCanada and National Grid USA*, November 5, 2002, (Testimony of Michael J. Hager, Tab 1 at 35, 37). A chart of these companies is as follows:



The utilities' generation affiliates (*e.g.*, Montaup, NEP) were regulated by the Federal Energy Regulatory Commission ("FERC"). Their distribution companies (*e.g.*, Blackstone, Newport, Narragansett) were regulated by state public utility commissions (in Rhode Island, the Public Utilities Commission (the "Commission" or "RIPUC")). (Hachey Decl. ¶ 6). NEES provided power to approximately 70-80% of the state of Rhode Island, with EUA providing most of the remaining 20-30%. (Hirsh Dep. at 265-266; Hamal Dep. at 16-17).

---

[3] All cited deposition transcript excerpts and documents are filed herewith, organized by tabs in the Appendix to this Memorandum. Deposition excerpts are marked alphabetically by name and documents are marked by numbered tabs.

The cost of fuel is a significant component of the cost of generating power. (Hager Dep. at 37; Clarke Dep. at 51; Hachey Decl. ¶ 8). The power generation affiliates (Montaup and NEP), under their contracts with the retail distribution companies, were reimbursed for their fuel costs by the distribution companies. (Hirsh Dep. at 33, 151-153; St. Pierre Dep. at 26-28; Hager Dep. at 36-37). In turn, the retail distribution companies (Blackstone, Newport and Narragansett) included fuel adjustment clauses in the retail tariffs they filed with the Commission to obtain the funds to reimburse the generation companies for their fuel costs. (St. Pierre Dep. at 28-32; Hirsh Dep. at 153-155; Hager Dep. at 36-37; *see e.g.* 1993 Blackstone Fuel Adjustment Clause, Tab 2).[4]

In 1996, Rhode Island passed the Utility Restructuring Act (the "URA"), and Massachusetts a similar counterpart. (Amend. Compl. 4/Amend. Ans. 4). The URA was enacted to restructure the vertical utilities in an effort to create a competitive market for power supply and ultimately to lower prices to consumers.[5] (Hachey Decl. ¶ 9; Clarke Dep. at 52-53; Powderly Dep. at 37-38). The URA and its Massachusetts counterpart also mandated a transition supply of electricity to customers called Standard Offer Service ("SOS"). Standard Offer Service was to be a guaranteed electricity supply to consumers that did not or had not yet elected to obtain their power supply from a competitive marketer. (R.I. Gen. Laws § 39-1-27.3(d) (1997), Tab 3 at p. 34; Hirsh Dep. at 24-25; Clarke Dep. at 54-55). The URA required the retail distribution companies (Blackstone, Newport, Narragansett) to provide Standard Offer Service power to retail customers through the year 2009. (Tab 3 at p. 34; Clarke Dep. at 55). The URA set forth a pricing scheme for Standard Offer Service that included (i) a rising stipulated price, plus (ii) an adjustment for

---

[4] "Tariffs" are documents filed by the retail distribution companies with state regulatory authorities, which identify the terms, conditions and charges under which the retail electric distribution companies provide the electricity to retail customers. (Hachey Decl. ¶ 7).

[5] The new competitive market was to be structured such that the retail distribution companies would still deliver the electricity to end-consumers over their local utility poles and lines, and manage billing and customer service issues. But the vertical utilities would no longer generate and supply the power. Instead, it was hoped that competitive power supply providers would step in and market power supply directly to consumers to be delivered by the distribution companies. (Hachey Decl. ¶ 9).

factors out of the utility's control such as extraordinary fuel costs, through 2009.  (St. Pierre Dep.

at 53, 62-63, 124-25).  The statute provided:

> … extending through the year 2009, each electric distribution company shall arrange for a standard power supply offer ("standard offer") …
>
> The standard offer shall be priced such that the average revenue per kilowatt-hour received from the customer for such power together with approved distribution, transmission and transition charges shall equal the price that would have been paid under rates in effect during the twelve (12) month period ending September 30, 1996 *adjusted annually* for eighty percent (80%) of the change in the consumer price index for the immediately preceding twelve (12) month period, *and also for other factors reasonably beyond the control of the electric distribution company and its former wholesale power supplier including but not limited to changes in federal, state or local taxes or extraordinary fuel costs*; provided however that adjustments to the standard offer for factors other than inflation must be approved by the Commission.

 (Tab 3 at p. 34-35).  The retail companies were required to secure wholesale suppliers for

Standard Offer Service through a public bidding process.  (*Id*).  In addition, they were to file retail

Standard Offer Service tariffs to effect the Standard Offer Service schedule and pricing "for the

benefit of both wholesale and retail customers and their suppliers."    (Tab 3 at p. 27).

Massachusetts had a similar structure, but Standard Offer Service was required only through 2004

instead of 2009.  (St. Pierre Dep. at 57).[6]

     In 1997, to comply with the URA, the utility holding companies (NEES and EUA)

negotiated "Settlement Agreements" with state and federal authorities (the "Settlements").  The

Settlements described public bid (or "auction") processes that the retail companies would use

initially to solicit wholesale suppliers for their Standard Offer Service needs.[7]  The Settlements

---

[6] The Massachusetts Standard Offer Service is relevant to this case because the Agreement required delivery of Standard Offer Service to both Blackstone and Newport in Rhode Island and Eastern in Massachusetts.  The dispute concerns only the fuel adjustment in Rhode Island from 2005-09, however.

[7] The EUA Settlement and related bid solicitation documents described a bidding process pursuant to which Blackstone, Newport and Eastern would solicit contracts to supply Standard Offer Service in both Rhode Island and Massachusetts in a multi-state supply contract, through 2004 -- the shorter term of the Massachusetts Standard Offer

also described Standard Offer Service and the two-part price structure generally prescribed by the URA:  (i) a set of stipulated prices rising on a yearly basis; and (ii) a fuel adjustment provision, using a formula based on market gas and oil prices and a set of rising "trigger" values.  (EUA Settlement  Agreement,  Tab 4  at  NARR 23316,  NARR  23337-38,  NARR 23520-522;  NEES Settlement  Agreement,  Tab 5  at  NARR 61692-61693,  NARR 61838-40)[8].    Both Settlements described a fuel adjustment mechanism applicable to the full term of the Standard Offer Contracts put out for auction, and neither Blackstone/Newport nor Narragansett has ever interpreted the EUA Settlement to prohibit the filing of a fuel adjustment after 2004.  (Tab 5 at NARR 61834-40; Tab 4 at NARR 23517-22; St. Pierre Dep. at 70-73, 143-45; Hager Dep. at 526, 544-47; Hirsh Dep. at 136-137, 150-151, 157-159, 192-193, 206, 377).

## B.    The Agreement

In November 1997, EUA sent a proposed asset purchase agreement, and an attached form "backstop" Agreement,[9] to TransCanada and other potential bidders for EUA's generation assets.  (Memorandum re: EUA Divestiture, Tab  7 at NARR 09096).  The proposed backstop Agreement

---

Service.  (Tab 4 at NARR 23317-18, NARR 23515-22; EUA Request for Qualifications, Tab 6 at NEC 79523-79524; Hirsh Dep. at 173).  In EUA's RFQ, issued to TransCanada and others around the same time as its Settlement, EUA stated that it planned to arrange for the remaining Rhode Island Standard Offer Service period (2005-09) at a later date.  (Tab 6 at NEC 079524).

[8] As described in EUA's bid solicitation and settlements, the fuel adjustment formula operated using current market values of oil and gas as indicated by published market indices, and a set of "Trigger Points" rising yearly.  If market values of oil and gas reached a sufficiently high level in comparison to the trigger values in a given year, the fuel adjustment would come into play or "kick in" and provide a fuel adjustment to be included in the tariff and ultimately paid to the wholesale supplier.  (Tab 6 at NEC 079541-44).

[9] The Agreement was first entitled by EUA as the "Backstop Agreement." (Tab 7 at NARR 09096).  To ensure supply for Standard Offer Service, the EUA Settlement required Montaup to provide a guaranteed "backstop" supply of Standard Offer Service to Blackstone and Newport through 2009 to the extent they were unable to obtain Standard Offer supply from wholesale suppliers.  (Tab 4 at NARR 23316-18, 23337-38).  The Settlement further required Montaup to assign to the purchasers of its generation assets a proportional share of its backstop obligations which EUA did by way of an attached "backstop agreement" to be executed by any purchaser of EUA generation assets.  (*Id.* at NARR 23318; Tab 7; Amend. Compl./Amend. Ans. 10; Hirsh Dep. at 57, 115-116; St. Pierre Dep. at 23).  This is how TransCanada obtained its obligation to supply Standard Offer Service:  when it purchased certain Montaup/EUA generation assets (which provided roughly 14.45% of EUA's load in Rhode Island and Massachusetts), it thereby also assumed Montaup's backstop obligation under the Agreement to supply a proportionate share (14.45%) of Blackstone/Newport's Standard Offer Service requirements in Rhode Island and Massachusetts.  (Pourbaix Dep. at 27-28; Hirsh Dep. at 158-159, 346; Tab 7 at NARR 09116; The Agreement, Tab 14 at TCPM 000067, TCPM 000082).

governed the supply of Standard Offer Service to EUA's retail distribution companies through 2004. (Tab 7 at NARR 09101-02). By this time, TransCanada had entered into a similar backstop Standard Offer Service Agreement with Narragansett (the "NECO Agreement"), under which TransCanada would supply Rhode Island Standard Offer Service to Narragansett through 2009. (NECO Agreement, Tab 8 at NARR 35222; (TransCanada/NEP Consent Agreement, Tab 9 at NARR 31964-78; Hachey Decl. at ¶ 10). In the NECO Agreement, which TransCanada entered on October 24, 1997, both the stipulated prices and the specific fuel adjustment triggers were explicitly set forth in the contract through 2009. (Tab 8 at NARR 35224; 35239-41).[10]

EUA's form backstop Agreement was different from that used by Narragansett. Article 5 of EUA's proposed backstop Agreement set forth the two standard price components for supplying Standard Offer Service by reference to a tariff:

> Price = Standard Offer Wholesale Price + *Fuel Adjustment Factor*
>
> Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and
>
> *Fuel Adjustment Factor* is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of *the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs*. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

---

[10] TransCanada became a signatory to the NECO Agreement through assignment from U.S. Generation Company. (Tab 9 at NARR 31964-31978; Hachey Decl. ¶ 10).

(Tab 7 at NARR 09103-04). Appendix A to the Agreement listed the stipulated prices through the Agreement's 2004 term. (*Id.* at NARR 09115). Article 5 referenced the Fuel Adjustment Factor by way of the "Companies' Standard Offer Service tariffs." Blackstone and Newport did not have a Standard Offer Service tariff filed and approved with the Commission at the time of their negotiations with TransCanada, nor did they provide a draft Standard Offer Service tariff to TransCanada before the Agreement was executed. (Tab 7; Pourbaix Dep. at 119-121; Hirsh Dep. at 285-86; Hager Dep. at 506). TransCanada requested copies of the referenced Standard Offer Service tariffs, but the tariffs were not ready and EUA provided only copies of the approved "Interim" Generation Service tariffs, which expressly anticipated the filing of future Standard Offer Service tariffs. (Letter from Ryan to Pourbaix, Tab 10 at TCPM 7142-43).

For purposes of identifying the trigger numbers to be placed in the tariffs through the 2004 term of the Agreement, TransCanada received from EUA its Standard Offer Service public bid documents. (Taylor Dep. at 55-56; Tab 6 at NEC 079524, NEC 079543; EUA March 1998 RFP, Tab 12 at TCPM 007433, TCPM 007456). These EUA bid documents offered a Standard Offer Service contract through 2004, consistent with EUA's Settlement. The EUA documents set forth the same prices and fuel triggers for Rhode Island as did TransCanada's NECO Agreement with Narragansett. (*Id.*; Tab 8 at NARR 35224, NARR 35240). During their negotiations, EUA and TransCanada specifically referenced TransCanada's agreements with NEES (*e.g.*, the NECO Agreement), and EUA never indicated any intent to employ different Standard Offer Service pricing from NEES. (Pourbaix Dep. at 82, 85-86, 114-115; TC Offer to Acquire Assets, Tab 11 at TCMP 0000361; Hirsh Dep. at 206, 266).

From November 1997 through April 1998, EUA and TransCanada negotiated the backstop Agreement with a term through 2004. (Tab 7; Pourbaix Dep. at 334). During this period, all of the pricing documents that EUA shared with TransCanada described a pricing structure (i) which

extended the fuel adjustment "after 1999" for the full term of the contract then being offered by EUA; and (ii) matched the NEES pricing. (Tab 6 at NEC 079522, 079542-44; Tab 12).

Less than one week prior to the signing of the Agreement, Michael Hirsh, the lead negotiator for EUA and the signatory to the Agreement, told TransCanada for the first time that EUA needed to extend the proposed Agreement's term from 2004 to 2009. (Pourbaix Dep. at 84; Hirsh Dep. at 334-35; April 3, 1998 Draft of Agreement, Tab 13 at TCPM 000458, 000463). This proposed extension would bring the Agreement in line with both the full 2009 statutory term of Standard Offer Service in Rhode Island, and with TransCanada's NECO Agreement with Narragansett covering the other half of Rhode Island.

EUA proposed no change to Article 5 of the Agreement which continued to refer to a two-part price structure without time limitation when it proposed the extension to 2009. (Tab 13 at TCPM 000465-66). EUA added a specific notation indicating that Standard Offer Service in Massachusetts ended in 2004. (Tab 13 at TCPM 000475; Tab 14 at TCPM 000082). When the extension was first proposed, Alex Pourbaix, lead negotiator for TransCanada, asked Mr. Hirsh to confirm what the "pricing" would be for the additional five years of the contract. (Pourbaix Dep. at 82-86, 114-115). Mr. Hirsh (who was familiar with the NECO Agreement TransCanada had executed with NEES (Hirsh Dep. at 266; Tab 11)) responded that the pricing would be "identical to the Narragansett" contract. (Pourbaix Dep. at 82, 85-88; 114-15; Hirsh Dep. at 303-04).[11]

---

[11] In his deposition, Mr. Hirsh stated unequivocally that he did not remember "one way or the other" whether he made this statement to Mr. Pourbaix. (Hirsh Dep. at 303-304). On the second day he was deposed (several weeks later), Mr. Hirsh again did not deny that he made the statement, but speculated that if the subject was discussed he would have "couched it" as subject to approval of the Commission. (*Id.* (day two) at 337-38). This is insufficient to create a disputed fact as to Mr. Pourbaix's precise testimony for summary judgment purposes that Mr. Hirsh informed Mr. Pourbaix that the Agreement's pricing would be identical to the Narragansett contract, although (perhaps) subject to the Commission approval. TransCanada does not dispute that any tariff filing would be subject to approval, so whether Mr. Hirsh added that caveat is irrelevant. Moreover, it is well-established that such speculative testimony about past statements does not create a genuine issue of fact sufficient to create a disputed fact or defeat summary judgment. *Lexington Ins. Co. v. Western Penn. Hosp.*, 423 F.3d 318, 332-333 (3d Cir. 2005); *Terault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 465 n.10 (1997); *McCoy v. City of Florence*, 949 So.2d 69, 79 (Miss. Ct. App. 2006).

No one from EUA (or elsewhere) told TransCanada that EUA had any intent to end the fuel adjustment in 2004, halfway through the term of the Agreement. Nor did anyone from EUA mention to TransCanada that EUA had any intent to depart from the NEES pricing, or from the URA's prescription that Standard Offer Service would include a fuel adjustment through 2009. (Pourbaix Dep. at 71-72, 117-119; *e.g.* Hirsh Dep. at 295, 298-299; Clarke Dep. at 188-189; Kirby Dep. at 83; St. Pierre Dep. at 15-16, 194). Further, all of the relevant EUA decision-makers and contract negotiators (the Director of Rates; the supervisor of EUA rate design; the Vice President and liaison in charge of coordinating EUA's restructuring (and the signatory to the Agreement); the head of EUA's Power Supply group; and the secondary negotiator of the Agreement) testified that they never even discussed or decided internally not to include a fuel adjustment in EUA's retail tariffs after 2004. (Hirsh Dep. at 13-16, 134-137, 160, 209, 260-261, 269, 315-16, 377; St. Pierre Dep. at 35-37, 61, 64-65, 186-187; Clarke Dep. at 180-189; Kirby Dep. at 75-77; Bonner Dep. at 12-13, 118-19, 155; Hager (30(b)(6)) Dep. at 528).[12] These same key EUA officials, as well as Narragansett's Rule 30(b)(6) witness, also testified that they were not aware of any statutory or regulatory or other prohibition on filing a tariff applicable to the Agreement that includes a fuel adjustment after 2004 and through 2009. (St. Pierre Dep. at 52-53, 61-63, 143-145; Hager Dep. at 544-547, 555; Hirsh Dep. at 157-162, 377).

---

[12] One EUA witness not directly involved in the Agreement negotiations and with no decision-making authority, Larry Boisvert (who incidentally now holds a sales position in which he competes for contracts with Narragansett), testified contrary to all eight other EUA witnesses that he believes he told TransCanada "many times" and that there were "many" internal EUA discussions that the FAF cut off in 2004. Yet he could not recall any specific conversations, who they were with, or when they occurred; he is just "sure" they occurred. For example, on page 49 of his deposition, Mr. Boisvert was asked whether he was aware of any discussions between EUA and TransCanada informing TransCanada that EUA would not seek a fuel adjustment for the post 2004 time period. Mr. Boisvert responded: "I don't remember any of those discussions." (Boisvert Dep. at 49-52). Later in the deposition (p. 70) he was asked whether he recalled ever telling any supplier or potential bidder for wholesale Standard Offer Service that EUA did not intend to apply for a fuel adjustment after 2004. Mr. Boisvert responded: "I'm sure I did." When asked to say what he remembered about those conversations, however, Mr. Boisvert responded: "I don't remember." (Boisvert Dep. at 69-73). When asked to clarify his recollection of any conversations in which he informed a wholesale Standard Offer Service supplier that EUA did not intend to apply for a fuel adjustment after 2004, Mr. Boisvert was unable to offer *any* information about these alleged conversations. He responded: "I'm sure we had those discussions. I just don't recall ever talking about it." (*Id.; See also* Boisvert Dep. at 169-173, 191-193, 207-225). Mr. Boisvert's testimony is insufficient to create a disputed material fact as matter of law. *See Lexington*, 423 F.3d at 332-333; *Terault*, 425 Mass. at 465 n.10; *McCoy*, 949 So.2d at 79.

TransCanada signed the Agreement with the understanding that EUA would file tariffs that would include both the stipulated price and a fuel adjustment through 2009. TransCanada based this understanding on: the parties' negotiations; the documents that consistently showed a fuel adjustment to the end of the proposed Agreement; statewide Standard Offer pricing consistent with NEES; EUA's statements and silence at the time of the proposed extension; and the URA's requirement that Blackstone and Newport file retail tariffs that included an adjustment for extraordinary fuel costs through 2009. (Pourbaix Dep. at 71-72, 82, 85-86, 114-115, 184, 239; Taylor Dep. at 32-43). EUA's signatory to the Agreement, Mr. Hirsh, testified that he similarly understood that TransCanada was relying on it to file the retail tariffs to collect the amounts due under the fuel adjustment provision. (Hirsh Dep. at 48-51, 208, 311-313). Still, recognizing that Standard Offer Service and Blackstone/Newport's filings were subject to regulatory oversight, the parties agreed to add Article 8(3) to the Agreement. Article 8(3) required Blackstone/Newport to negotiate with and indemnify TransCanada for any regulatory changes to Standard Offer Service, subject to a right of termination by TransCanada. (Tab 14 at TCPM 000074).

Following execution of the Agreement and through 2000, Blackstone and Newport filed and obtained approval of Standard Offer Service tariffs containing the applicable fuel trigger for the year 2000.[13] (Amend. Compl. 20/Amend. Ans. 20). Pursuant to an Order of the Commission, these tariffs were to address and contain the future Standard Offer Service pricing only for the upcoming year. (Report and Order Dockets 2651, 2657, 2514, Tab 15 at 12). Thus, for example, the 2001 pricing would generally be set by a tariff filed in late 2000, the 2002 pricing by a tariff filed in late 2001, and so on. (*See id;* January 2000 Blackstone Standard Offer of Service Tariff, Tab 34 at NARR 43040-43; Bonner Dep. at 125-26, 130-132).

---

[13] Blackstone and Newport did not file for a fuel adjustment in the year 1999, as it was expected and clear in all the Standard Offer Service Settlements and bid documents throughout Rhode Island that the fuel adjustment began in 2000. (Tab 5 at NARR 61839; Tab 4 at NARR 23521; Tab 6 at NEC 079543; Tab 12 at TCPM 7456; Tab 8 at NARR 35240).

C.     **The Merger**

In early 2000, Blackstone and Newport merged into Narragansett. (Amend. Compl./Amend. Ans. 21).[14] Narragansett's territory now includes customers from both the former Blackstone and Newport zones (the old "EUA Zone"), and its former zone (the "Old Narragansett Zone"). (Amend. Compl. 23/Amend. Ans. 23). In a joint rate consolidation filing in 1999 seeking approval for the merger -- and which was designed to identify differences between the merging companies' rates – Narragansett and Blackstone/Newport noted no differences in their respective SOS pricing or fuel adjustment provisions. (Rate Plan Filing in Support of Merger, Tab 17 at NEC 092255-58; St. Pierre Dep. at 201-202; Bonner Dep. at 138-147; Hager Dep. at 557-570).

In April 2000, Narragansett sent TransCanada a letter informing TransCanada of the merger. (Tab 16). Narragansett stated that it had assumed the obligations of Blackstone and Newport under the Agreement, and that the parties' obligations under the Agreement were not affected by the merger. (Amend. Compl. 25/Amend. Ans. 25, Tab 16 at NARR 22621). The letter further stated that, although the former EUA retail tariffs would be canceled, Narragansett as its successor would continue to pay TransCanada's fuel adjustment as required under the Agreement. (Tab 16 at NARR 22622). Thus, pursuant to the merger, Narragansett, which was already administering its former NECO Agreement with TransCanada, would now also be assuming and administering TransCanada's Agreement with Blackstone and Newport. *Id.*

The letter attached a document addressing Narragansett's (and Mass. Electric's) obligations in both Rhode Island and Massachusetts. It stated that a fuel adjustment applied "after 1999," and listed the prices and triggers applicable in both Massachusetts and Rhode Island through the Massachusetts Standard Offer Service term of 2004. (*Id.* at NARR 22624; Hager Dep. at 129-130, 140-141). Mr. Hager (the Narragansett officer in charge of administering

---

[14] At the same time, Eastern merged into Mass. Electric. (Tab 16).

Narragansett's Standard Offer Service contracts) and Mr. Hachey (the TransCanada officer in charge of the Agreement and the NECO Agreement) discussed the letter. Mr. Hager did not mention any intent to end the Rhode Island fuel adjustment in either the Agreement or the NECO Agreement in 2004, or to treat the fuel adjustment in these two Narragansett Standard Offer contracts any differently from one another. (Fax from Hager to Hachey re Merger w/EUA (Tab 18); Hachey Decl. ¶ 12; Hager Dep. at 119-122, 140-141).

D.    **Narragansett's Improper and Misleading Conduct**

In June, 2000, Narragansett (through Mr. Hager and Narragansett's counsel Ron Gerwatowski) stated in testimony before the Commission, for the first time, that Narragansett had formed an "initial opinion" that the fuel adjustment for the former EUA contracts would end in 2004. (June 20, 2000 Hearing Transcript, Tab 19 at 31-33). Mr. Hager stated he was unaware of any particular reason to limit the fuel adjustment to 2004, and that Narragansett had based this "initial opinion" simply on the fact that the last EUA tariff on file before the merger (which was applicable only for roughly a one-year period for the year 2000) contained no fuel triggers after 2004. *Id.* Mr. Hager testified that before taking this "initial position" before the Commission, he never inquired of EUA as to what tariff provisions it had planned to file for the 2005-2009 period had it not merged into NEES. (Hager Dep. 138-139, 163-164). He also said he did not ask TransCanada for its understanding of the Agreement or the length of its fuel adjustment. (*Id.* at 379-383; Hirsh Dep. at 314-315, 368-369; St. Pierre Dep. at 17, 201-203, 205; Hachey Decl. ¶ 13). Mr. Hager also said that he "assumed" that the former EUA contractors would take a different position and thus expect payment of a fuel adjustment through 2009. *Id.* Narragansett did not inform TransCanada of this "initial opinion" that it might end the fuel adjustment in 2004, or send it the hearing transcript, although Narragansett knew suppliers generally do not attend such standard rate filing hearings and that none, including TransCanada, were present. (Hager Dep. at 169, 174; Hachey Decl. ¶ 13).

In August and November, 2001, Narragansett submitted new Standard Offer Service tariff filings to the Commission. These filings expressly indicated that Narragansett's former EUA zone contracts (including the Agreement) *actually were entitled to the same fuel adjustment through 2009 as were its Old Narragansett Zone contracts (e.g. TransCanada's NECO Agreement)*. (Narragansett Rate Change October 1, 2001, Tab 20 at NG/TC 8597-8598; Narragansett Rate Change January 1, 2002, Tab 21 at NG/TC 10760-10761, NG/TC 10769; November 2001 Pre-Filed Testimony, Tab 22 at 137, MJH-1 p. 2 of 3). These rate filings were approved by the Commission. (*See* 2001 WL 1823618 (Oct. 2, 2001)).

In 2002, Narragansett sent these rate filings to TransCanada. (Hachey Decl. ¶ 14). TransCanada noted these filings, which were consistent with its understanding it would be paid a fuel adjustment under the Agreement through 2009 as under its NECO Agreement. (Hachey Dep. at 30-32).[15] Narragansett also described the Agreement and TransCanada's NECO Agreement in live arbitration testimony in Boston before TransCanada in early November 2002. (Tab 1 at 35-38). Using the NECO Agreement as an example, Mr. Hager explained that the fuel adjustment mechanisms in Narragansett's Standard Offer Service contracts went through 2009. (Tab 1 at 37-38). He stated that the fuel adjustments were included in the Standard Offer Service contracts so that suppliers would agree to such long-term SOS contracts. (*Id.*).

Immediately after this arbitration testimony, and unbeknownst to TransCanada, Narragansett again changed course before the Commission. In late November, 2002, Narragansett amended its previous rate filings (which, again, it had just sent to TransCanada and which indicated a fuel adjustment applied to the Agreement through 2009) with an asterisk indicating

---

[15] Narragansett sent these rate filings to TransCanada in response to discovery requests in an arbitration proceeding between the parties concerning other issues related to the Agreement and NECO Agreement. (Hachey Decl. ¶ 14. TransCanada had actually requested the production of *all* Commission filings and transcripts concerning Standard Offer Service, but Narragansett produced only the rate filings showing that a fuel adjustment applied to the Agreement through 2009. Narragansett did not produce the earlier June 2000 transcript indicating an "initial position" that it might not apply for a fuel adjustment after 2004. (Hachey Decl. ¶ 14; TransCanada's Arbitration Discovery Requests, Tab 25; National Grid's Responses at Tab 26).

that the fuel adjustment in the EUA Zone ended in 2004. (Narragansett January 2003 Retail Rate Filing, Tab 23 at MJH-1).[16]

In May, 2003, Narragansett then testified, falsely, that TransCanada had been told about Narragansett's intent to cut off of the fuel adjustment after 2004. (Hachey Decl. ¶¶ 13-16; May 28, 2003 Transcript, Tab 33 at pp. 86-92). Narragansett continued such testimony in the Commission hearings in 2004, reconfirming and maintaining its earlier position in response to questioning (and even skepticism) from the Commission. (July 26, 2004 Transcript, Tab 25 at pp. 20-27, 30-35, 53-55, 69-70; Dec. 13, 2004 Transcript, Tab 24 at pp. 87-88, 117-118). TransCanada was unaware of the substance of these proceedings. Although Narragansett and TransCanada communicated on a regular basis from 2000 to 2005 on matters related to the Agreement, not once did Narragansett raise the issue of the fuel adjustment with TransCanada. (Hachey Decl. ¶¶ 13-16; Hager Dep. 324-325).

In February 2005, Narragansett did not pay a fuel adjustment for January 2005 to TransCanada under the Agreement. (Tab 28). TransCanada immediately expressed its objection by email (Tab 28), and thereafter sent a default notice to Narragansett under Section 7 of the Agreement. (Tab 29; Hachey Decl. ¶ 17). Executives of TransCanada and Narragansett met to try to resolve the matter. (Id. ¶ 18). Narragansett then threatened to withhold payments under certain cross-default rights in other contracts if TransCanada sent a final termination notice under the Agreement. (Id.; Hager Dep. at 429-435). TransCanada thereafter did not send a termination notice. (Hachey Decl. ¶ 18).

In April 2005, Narragansett began making so-called "protest payments" to TransCanada subject to a claimed right of recovery. Narragansett stated that the payments were based upon a

---

[16] Narragansett first placed the asterisk in its SOS rate filings made in late November 2002, just days after the live arbitration testimony stating its fuel adjustments went through 2009. (Tab 23 at MJH-1 p. 2). Narragansett did not produce this supplementary, amended rate filing to TransCanada, either in the arbitration or otherwise. (Hachey Decl. ¶ 14-15).

calculation "of the portion of the payments that would have been due under the  . . . Agreement if a Fuel Adjustment Factor ("FAF") had been in existence and in effect in Narragansett's tariffs." (Tab 30; Hachey Decl. ¶ 19; Hager Dep. at 435-436).  Narragansett's protest payments have since been included in the approved rates charged by Narragansett to consumers, subject to refund if Narragansett prevails in this litigation.  (RIPUC Report and Order September 29, 2005, Tab. 31 at NARR 46303-31).

## ARGUMENT

Summary judgment should be granted "where there is no material fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also* Fed. R. Civ. P. 56(c).

**A.    TRANSCANADA IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT AND DECLARATORY JUDGMENT CLAIMS (COUNTS I, V) AND ON ALL COUNTERCLAIMS (I-III)**

**1.    The Parties Agreed That A Fuel Adjustment Factor Would Be Filed Through The End Of The Agreement.**

Article 5 states that TransCanada is to receive two price components in exchange for delivery of Standard Offer Service through 2009 under the Agreement:  (1) a stipulated Standard Offer Wholesale Price; and (2) a Fuel Adjustment Factor.  The Fuel Adjustment Factor is to be the revenues collected from "*the* retail rate Fuel Adjustment mechanism *in* the Companies' Standard Offer Service tariffs."   (Tab 14 at TCPM 000071 (emphasis added)).   Under the URA, (1) Blackstone and Newport (the EUA retail companies) were required to file Standard Offer Service tariffs through 2009, and (2) Standard Offer Service was to be priced to include both a rising base price and an adjustment for extraordinary fuel costs.

There is no dispute that Narragansett was obligated to (and did) pay TransCanada a Fuel Adjustment Factor through 2004.  The question is whether Narragansett is obligated to file for and pay TransCanada a Fuel Adjustment Factor from 2005-09.  Essentially, Narragansett would have

it that TransCanada is required to deliver power through 2009 under the Agreement, but Narragansett is only required to pay TransCanada one of the two stated price components under the Agreement.  In other words, it is Narragansett's position that, when EUA and TransCanada extended the Agreement's term from 2004 to 2009, TransCanada agreed to supply power for the additional five years, but EUA did not in turn agree to pay the fuel adjustment component of the stated price for the additional five years.  Narragansett's position is contrary to Massachusetts law (which governs the Agreement) and the undisputed facts,[17] and constitutes a breach of contract.

For over five months and until the final days before execution of the Agreement, TransCanada and EUA were negotiating an Agreement whose whole term ended in 2004.  All the documents EUA presented to TransCanada indicated that a fuel adjustment applied from 2000 through the end of the Agreement's term.  (Tab 6 at NEC 079540, NEC 079543; Standard Offer Service Presentation, Tab 32 at TCPM 000956-57; Tab 12 at TCPM 007416, TCPM 007432-33).  These documents indicated consistent, statewide Standard Offer Service pricing and fuel triggers identical to those in TransCanada's earlier NECO Agreement with Narragansett.  (*See Id.*; Tab 8 at NARR 35239-40).  This was no surprise, since all of Rhode Island Standard Offer Service was established by the same enabling legislation, the URA.  The URA explicitly required EUA and Narragansett to file tariffs establishing Standard Offer Service through 2009, priced to include an annual adjustment for extraordinary fuel.  (Tab 3 at p. 27, 34-35).

Just five days before the Agreement was signed, EUA proposed for the first time that the term of the Agreement (and hence TransCanada's obligation to supply power) be extended from 2004 to 2009.  (Hirsh Dep. at 334-35; Pourbaix Dep. at 84).  EUA proposed no change to the pricing language of Article 5, which continued to refer to two price components without a time

---

[17] The Agreement is governed by Massachusetts law.  (Tab 14 at TCPM 000077).  Under Massachusetts law, where the language of a contract is unclear or ambiguous (here the dispute regards the terms of a retail tariff not yet filed at time of contract execution), parole evidence is admissible to define the meaning of the terms of the contract as the parties used them.  *See, e.g.*, *Rizzo v. Cunningham*, 303 Mass. 16, 21 (1939); *SMS Fin. V, LLC v. Conti*, 68 Mass. App. Ct. 738, 749 (2007).

limitation. Similarly, EUA did not inform TransCanada that it intended to pay TransCanada only one part of the two-part pricing structure for the additional five years of power it now requested. In contrast, EUA did amend the Agreement to clarify that the Massachusetts Standard Offer Service ended in 2004. (Tab 13 at TCPM 000475; Tab 14 at TCPM 000082).

EUA's lead negotiator and signatory to the Agreement, Michael Hirsh, testified that he understood that EUA was obligated to file the referenced Standard Offer Service tariffs with the fuel adjustment mechanism, and that TransCanada was relying on EUA to do so. (Hirsh Dep. at 48-51, 208, 312-313). Yet neither he nor anyone else ever indicated to TransCanada any intent not to include a fuel adjustment in EUA's Standard Offer Service tariffs for the full term of the extended Agreement or of Standard Offer Service. (Pourbaix Dep. at 71-72, 117-119; Hirsh Dep. at 295, 298-99; Clarke Dep. at 188-189; Kirby Dep. at 83; St. Pierre Dep. at 15-16, 194). And, when TransCanada specifically asked to confirm what the "pricing" would be for the additional 2005-09 term, EUA's lead negotiator, Mr. Hirsh, confirmed that it would be the same as Narragansett's pricing (as it had been through 2004). (Pourbaix Dep. at 82-88, 114-115; Hirsh Dep. at 303-304).[18]

The language in the Agreement reflects this understanding. The term of the Agreement was from 1999 through 2009 (Article 2). The plain language of Article 5 states that there will be two price components for Standard Offer Service delivered under the Agreement: (1) a stipulated

---

[18] The EUA Settlement likewise does not indicate that a fuel adjustment would not be paid to TransCanada in 2005-09. Nowhere does the Settlement affirmatively limit the fuel adjustment to 2004, and its public auction attachment includes a fuel adjustment extending to the end of the 2004 contract described. Moreover, neither EUA nor Narragansett have ever regarded the EUA Settlement to prevent EUA from filing a tariff including a fuel adjustment for the 2005-2009 time period. (St. Pierre Dep. at 143-45; Hager Dep. at 544-47; Hirsh Dep. at 377). At worst, the EUA Settlement is ambiguous, and that ambiguity must be resolved against EUA since TransCanada had no role in drafting or negotiating the EUA Settlement. *See, e.g.*, *Merrimack Valley Nat. Bank v. Baird*, 372 Mass. 721, 724 (1977) (contract ambiguities should be construed against the drafter). Although this doctrine is to be used sparingly, it is applicable even among two sophisticated parties in circumstances such as these. *See, e.g.*, *Bay State Smelting Co. v. Ferric Indus.*, 292 F.2d 96, 99 (1st Cir. 1961); *Johnson Controls, Inc. v. City of Cedar Rapids*, 713 F.2d 370, 375 (8th Cir. 1983); *Zero Stage Capital v. Harvard Clinical Technology*, 2002 WL 1489645, *10 (Mass. Super. 2002). Here, EUA drafted the relevant provision of the Settlement Agreement and Article 5 of the Agreement, and the filing of tariffs was solely within EUA's control.

Standard Offer Wholesale Price; and (2) a Fuel Adjustment Factor.  The Fuel Adjustment Factor is defined in Article 5 as:

> "… a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of *the* retail Rate Fuel Adjustment mechanism *in* the Companies' Standard Offer Service Tariffs …."

(Tab 14 at TCPM 000071 (emphasis added)).  No EUA retail tariff was on file at the time the Agreement was executed.  The URA required EUA to file retail tariffs to establish Standard Offer Service through 2009 with pricing to include a fuel adjustment.

Moreover, it is well established that where a contractual payment depends on one party's application for government approval of funding for the payment, that party has an obligation to make the necessary filings or applications in a good faith effort to obtain the required approval.  *See, e.g.*, *Sechrest v. Safiol*, 383 Mass. 568, 569-72, n.4 (1981); *Stabile v. McCarthy*, 336 Mass. 399, 404 (1957); *Tufankjian v. Rockland Trust Co.*, 57 Mass. App. Ct. 173, 178-79 (2003); *Seaward Constr. Co., Inc. v. City of Rochester*, 118 N.H. 128, 130 (1978); *Killian v. McCulloch*, 850 F. Supp. 1239, 1250-51 (E.D. Pa. 1994); *Public Market Co. v. Portland*, 138 P.2d 916, 919 (Or. 1943).  For example, in *Seaward Construction*, the court addressed a contract in which the city's payments to a plumber depended on the city obtaining funds from HUD to pay the plumber.  118 N.H. at 128.  The court found that the city had an implied obligation by law to make a good faith effort to apply for and obtain the funds from HUD.  118 N.H. at 130; s*ee also Sechrest* 383 Mass. at 571 n.4; *Tufankjian*, 57 Mass. App. Ct. at 177-78; *Killian*, 850 F. Supp. at 1250-51; *Public Market Co.*, 138 P.2d at 919.

Here, the Agreement provides that EUA/Narragansett will pay TransCanada two price components for the delivery of Standard Offer Service under the Agreement.  The Agreement's reference to the fuel adjustment is without time limitation.  There was no tariff on file at the time, and under Massachusetts law EUA was obligated to file and seek approval of a tariff to enable its

payment obligations under the Agreement.  EUA/Narragansett was therefore obligated to make a good faith effort to file and obtain approval of tariff filings with a fuel adjustment through 2009, to secure the promised fuel adjustment for TransCanada for the 2005-09 term of the Agreement.

> **2.    The URA, As Incorporated Into The Agreement, Required Narragansett To Seek A Fuel Adjustment Factor Unless The Parties Agreed Otherwise.**

It is also well established under Massachusetts contract law that relevant statutes in existence at the time an agreement is executed become part of the agreement.  *See, e.g.*, *Mayor of Salem v. Warner Amex Cable Commc'ns.*, 392 Mass. 663, 666 (1984) (rate filing laws existing at time were incorporated as part of the agreement); *Feakes v. Bozyczko*, 373 Mass. 633, 636 (1977) (citing multiple cases).   In other words, TransCanada was entitled to assume that EUA/Narragansett would comply with the laws governing tariff filings under the Agreement.  *Id.*

The URA required EUA to file tariffs to accomplish the statutory Standard Offer Service schedule and pricing through 2009, for "the benefit of both wholesale and retail customers and their suppliers."  (Tab 3 at p. 27).  The URA specified pricing to include both a set price rising over time, plus a fuel adjustment in the event of extraordinary fuel costs.  Section 39-1-27(a) of the URA provided in pertinent part:

> Consistent with the schedule for implementing retail access . . . electric distribution companies *shall file tariffs* with the commission . . . The tariffs *shall* (1) conform to the standards, policies, and requirements of the federal energy regulatory commission or the commission . . . (2) fulfill such standards with respect to both transmission and distribution services *for the benefit of both wholesale and retail customers and their suppliers*, and (3) *provide retail access in accordance with the schedule set forth in § 39-1-27.3*.  (Emphasis added.)

Section 39-1-27.3(d) provided in pertinent part:

> … extending through the year 2009, each electric distribution company shall arrange for a standard power supply offer ("standard offer") ….  *The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier.*  The Standard Offer *shall* be priced such that

the average revenue per kilowatt-hour received from the customer for such power together with approved distribution, transmission and transition charges *shall* equal the price that would have been paid under rates in effect during the twelve (12) month period ending September 30, 1996 *adjusted annually* for eighty percent (80%) of the change in the consumer price index for the immediately preceding twelve (12) month period, and *also for other factors reasonably beyond the control of the electric distribution company and its former wholesale power supplier* including but not limited to changes in federal, state or local taxes or *extraordinary fuel costs*; provided, however, that adjustments to the standard offer for factors other than inflation must be approved by the commission.

(Tab 3 at 27, 34-35 (emphasis added)).

It is well established in Rhode Island (and Massachusetts) that statutory use of the term "shall" indicates mandatory rather than discretionary action.  *Connelly v. City of Providence Ret. Bd.*, 601 A.2d 498, 500 (R.I. 1992); *Conrad v. State of Rhode Island Med. Ctr.*, 592 A.2d 858, 860 (R.I. 1991); *Lemoine v. Martineau*, 115 R.I. 233, 241 (R.I. 1975); *see also McCarty v. Boyden*, 275 Mass. 91, 93 (1931); *Johnson v. District Attorney for the Northern Dist.,* 342 Mass. 212, 215 (1961).  Indeed, the mandatory nature of the word "shall" in the URA and in Standard Offer Service Section 39-1-27.3(d) in particular, has been endorsed by the Commission.  (*See* RIPUC Report and Order, July 10, 1998, 1998 WL 716622, Tab 15 at p.7-8) (finding that the language in section 39-1-27.3(d) stating "the power supply contract required for the standard offer *shall* be awarded by public competitive bidding . . ." *required* that the power supply contract for the provision of Standard Offer Service be put out to a public bid) (emphasis added).

Given this well-established interpretation of the word "shall" in Rhode Island statutes and particularly in Section 39-1-27.3, it is indisputable that under Sections 39-1-27(a) and 39-1-27.3(d) of the URA – *and under the Agreement into which these provisions were incorporated as a matter of Massachusetts contract law* -- EUA/Narragansett was *required* to file Standard Offer Service tariffs which included an adjustment for extraordinary fuel costs through 2009.  At minimum, these statutory provisions were sufficient to create a reasonable expectation on

TransCanada's part, as a matter of contract law, that EUA/Narragansett would do so. *Mayor of Salem*, 392 Mass. at 666-67. Based on this language (and in the absence of an agreement to the contrary, which there was not), Narragansett was required under the Agreement (as well as under the URA itself) to file tariffs with a fuel adjustment mechanism for extraordinary fuel costs for the duration of the 2009 Agreement and Standard Offer Service period in Rhode Island.[19]

In sum, under several overlapping principles of Massachusetts law, Article 5, the incorporated language of the URA, and the undisputed facts, affirmatively establish that EUA/Narragansett is required to file tariffs with a fuel adjustment through 2009.

**B.    TRANSCANADA IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III (AND ALL COUNTERCLAIM COUNTS) BECAUSE NO GENUINE ISSUE OF MATERIAL FACT EXISTS ON TRANSCANADA'S GOOD FAITH AND FAIR DEALING CLAIM**

**1.    Legal Standard.**

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. The covenant requires the parties to exercise discretion under the contract in good faith, and requires both parties to do nothing that will "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*, 367 F. Supp.2d 122, 132 (D. Mass. 2005) (*quoting Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-72 (1991)). In determining whether a party has breached the covenant of good faith and fair dealing, "[t]he essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the

---

[19] Certainly, under Section 39-1-27.3(d) of the URA, the fuel adjustment filed by Narragansett had to be approved by the Commission. However, this required approval in no way absolved Narragansett of the responsibility of filing tariffs with a fuel adjustment mechanism in the first place. Additionally, in the event that Narragansett had filed a tariff with a fuel adjustment mechanism, the Commission would not have been permitted to arbitrarily or capriciously deny the request for an adjustment in the event of extraordinary fuel costs. Rhode Island courts have found that decisions and orders issued by the Commission must be "lawful and reasonable," and that the Commission findings must be "fairly and substantially supported by legal evidence and sufficiently specific to enable [a court] to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *See, e.g.*, *Blackstone Valley Chamber of Commerce v. Pub. Utils. Comm'n.*, 121 R.I. 122, 128 (1979); *Roberts II v. New England Tel. and Tel. Co.*, 487 A.2d 136, 138 (1985).

overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." *Speakman*, 367 F. Supp. 2d at 132; *Tufankjian v. Rockland Trust Co.*, 47 Mass. App. Ct. 173, 177-78 (2003).

A party breaches the covenant of good faith and fair dealing if the party takes deliberate actions that make it impossible or nearly impossible for the plaintiff to enjoy the fruits of its bargain. *See id.* at 133-138; *see also Eastern Massachusetts St. Ry. Co. v. Union St. Ry. Co.*, 269 Mass. 329, 334 (1929). In addition, it constitutes a breach of the duty of good faith and fair dealing when a party ceases to do something part way through the contract term that it was contemplated to do for the entire contract. *Id.*; *Diamond Alkali Co. v. P.C. Thomson*, 35 F.2d 117, 119-20 (3rd Cir. 1929); *see also Larson v. Larson*, 37 Mass. App. Ct. 106, 109-110 (1994); *Krapf v. Krapf*, 439 Mass. 97, 106 (2003).

> **2.      Narragansett Breached Its Obligation Of Good Faith And Fair Dealing By Exercising Any Discretion In Bad Faith, By Affirmatively Convincing The Commission To Deny A Fuel Adjustment Factor, And By Affirmatively Misleading TransCanada And The Commission.**

To the extent EUA (or Narragansett) maintained discretion under the Agreement as to whether to file a fuel adjustment in its Standard Offer Service tariffs through 2009, it was obligated to exercise that discretion consistent with the expectations of the contracting parties.

As set forth above, TransCanada's fair expectation was that Blackstone and Newport would include a fuel adjustment in their tariffs for the full term of the Standard Offer Service. No document or agreement prevented EUA/Narragansett from seeking recovery of extraordinary fuel costs after 2004. (St. Pierre Dep. at 52-53, 61-63, 143-145; Hager Dep. at 544-47; Hirsh Dep. at 157-162, 377). In fact, Narragansett and Blackstone/Newport obtained approval for their merger based upon a rate consolidation filing indicating that their respective Standard Offer Service rates were exactly the same, and identifying no differences in their fuel adjustment provisions. (Ex. 78 at NEC 092258). As a result of the merger, Narragansett was then administering both its previous

NECO Agreement with TransCanada (in the "Old Narragansett Zone"), and the former EUA contracts such as the Agreement (in the "EUA Zone").  Yet after the merger was approved, Narragansett began to act under the EUA legacy contracts in bad faith.

In April 2000, Narragansett sent a letter to TransCanada stating that the terms of the Agreement were unaffected by the merger and that it would assume Blackstone and Newport's obligations.  (Tab 16 at NARR 22621).  Yet shortly thereafter, Narragansett testified before the Commission that it had formed an "initial opinion" that its former EUA Zone suppliers were *not* entitled to a fuel adjustment after 2004.  (Tab 19 at 31-33).  Narragansett's witness, Mr. Hager, admitted taking this position based merely upon the language of an EUA tariff filed for the year 2000 (which had to be refiled every year with updated pricing), although he said he knew of no reason why the EUA fuel adjustment would stop in 2004.  Moreover, before testifying to this "initial position," Mr. Hager performed no investigation as to EUA's actual intent concerning its retail tariffs after 2004 had EUA remained in existence.  (Hager Dep. at 138-39, 163-164).  Mr. Hager also said he "assumed" the former EUA suppliers would disagree with his position, but never asked or informed TransCanada that Narragansett might not seek a fuel adjustment for its EUA legacy Agreement after 2004.  (Tab 19 at pp. 31-33; Hager Dep. at 379-383).

Thereafter, in 2001 and 2002, Narragansett filed and actually sent to TransCanada *two* separate Standard Offer Service rate filings *stating that the fuel adjustment applicable to the Agreement did in fact extend to 2009*.  (Hachey Decl. ¶ 14).  TransCanada received and relied upon these representations, which simply confirmed TransCanada's original understanding and the representation made to it by EUA that the pricing for the additional 2005-2009 term would be the same as the NECO Agreement.  (Hachey Dep. at 98-105).

Yet, immediately thereafter, and unbeknownst to TransCanada, Narragansett amended these same Standard Offer Service filings in late November, 2002 to indicate that the EUA Zone fuel adjustment ended in 2004.  (Tab 23 at MJH-1).  Narragansett thereafter reconfirmed its

position, in response to questions from the Commission, that TransCanada's Agreement was not subject to a fuel adjustment after 2004. Narragansett did this in part by misrepresenting to the Commission that TransCanada had been informed of Narragansett's intent. (Hachey Decl. ¶ 15; Hager Dep. 324-25). Narragansett then chose not to apply for a fuel adjustment for its EUA Zone contract following 2004. (Tab 28).

Narragansett's actions exposed TransCanada to uncapped risk in the case of extraordinary fuel prices. Narragansett had numerous opportunities to ask or inform TransCanada of its questions or "positions" regarding the fuel adjustment, but instead made the calculated decision to stay silent and to mislead TransCanada. In failing to apply for a fuel adjustment midway through the Agreement's term, and actually going out of its way to mislead and prevent approval of a fuel adjustment for TransCanada, Narragansett thereby took "unilateral, voluntary action that advanced its own self-interest and prevented or hindered [TransCanada] from reaping substantial benefits of the contract." *Speakman*, 367 F.Supp.2d at 134; *Tufankjian*, 57 Mass. App. Ct. at 177-78. These actions unquestionably violated Narragansett's duty of good faith and fair dealing. Accordingly, TransCanada is entitled to summary judgment on Count III of its Amended Complaint and on all Counts of the Counterclaim

## C. THE AGREEMENT SHOULD BE REFORMED OR RESCINDED BASED ON THE DOCTRINE OF UNILATERAL MISTAKE (COUNT IV)

In the alternative, and at minimum, TransCanada is entitled to summary judgment on Count IV of the Amended Complaint (and all Counts of the Counterclaim) on grounds of unilateral mistake. Here, the undisputed material facts clearly establish that, at minimum, Narragansett caused TransCanada to make a unilateral mistake that warrants rescission or reformation of the Agreement on summary judgment. *See Polaroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 757 (1993) (reforming a contract for mistake on summary judgment); *Shea v.*

*Eisenberg*, 2004 WL 2550450 at *4-5 (Mass. Super. Ct. 2004) (reforming a contract for mistake on summary judgment).

### 1.    Legal Standard.

Reformation or rescission of a contract is within this Court's equitable powers.  *See Shea*, 2004 WL 2550450 at *4; *Mickelson v. Barnet*, 390 Mass. 786, 791 (1984).  While relief for unilateral mistake is not as common as for mutual mistake, "there is practically universal agreement that, if the material mistake of one party was caused by the other, either purposefully or innocently, or was known by the other or was of such character and accompanied by such circumstances that the other had reason to know of it, the mistaken party has the power to avoid the contract."  To grant the relief of reformation or rescission of the Agreement, this court must find (1) that TransCanada made a mistake as to the "basic assumption of the contract," (2) that had material effect on the agreed exchange of performances, and (3) that the effect of the mistake is such that enforcement of the contract would be unconscionable or the other party had reason to know of the mistake or his fault caused the mistake.  *See Restatement (Second) of Contracts, §153* (2006); s*ee also Shea,* 2004 WL 2550450 at *4; *Les Construction Beauce Atlas, Inc. v. T.R. White Co.*, No. 95354, 2006 Mass. Super. LEXIS 455 at *7 (Mass. Super. Ct. Aug. 28, 2006); *Torrao v. Cox*, 26 Mass. App. Ct. 247, 250-51 (1988).

Further, when a party asks for reformation of a contract, it is not asking the court to interpret the contract but rather to change it to conform to the parties' intent.  Accordingly, the usual restrictions on contract interpretation, such as the parole evidence rule, do not apply to the court's inquiry into the parties' intent.  *See Berezin v. Regency Sav. Bank*, 234 F.3d 69. 72 (1st Cir. 2000); *Polaroid Corp.*, 414 Mass. at 756.

## 2.    The Undisputed Material Facts Clearly Meet The Elements Of Unilateral Mistake.

As set forth above, the Agreement between TransCanada and EUA was negotiated for five months with a term through 2004.  As explained above, during these five months of negotiations, all materials provided to or available to TransCanada described a pricing structure that had two basic price components -- a rising stipulated price, plus a fuel adjustment.  Both of these components extended to the end of the offered term of the Agreement.  These prices and fuel triggers were identical to those in TransCanada's NECO Agreement with Narragansett, in the other roughly 80% of Rhode Island.  EUA was aware that TransCanada had already entered into the NECO Agreement.  The Agreement was extended to cover the same exact 2009 term as the NECO Agreement, which contained the fuel triggers for the 2005-09 time period and in every other respect matched the pricing in the Agreement.  The URA, which governed the tariffs referenced in Article 5 of the Agreement, specified that EUA had to file tariffs for the benefit of both customers and wholesale suppliers.  The URA further specified that Standard Offer Service was to be priced to include an adjustment for extraordinary fuel costs.

Only days before the Agreement was executed, EUA proposed for the first time that the term of the contract be extended to 2009.  EUA did not inform TransCanada that it intended to extend only one-half of the two-part pricing structure for the additional term.  Further, EUA did not add any language to Article 5 of the Agreement (which EUA drafted) that would indicate the fuel adjustment would cut off any time prior to the end of the term, although it explicitly added language indicating that the Massachusetts component of Standard Offer Service ended entirely in 2004.  Perhaps most dispositively, EUA's lead negotiator told TransCanada when he proposed that the Agreement be extended to 2009 that the pricing terms of the Agreement for the extended 2005-09 term were intended to be the same as in the NECO Agreement.

Based on EUA's actions and TransCanada's understanding of the URA, TransCanada justifiably concluded that when the term of the Agreement was extended through 2009 the entire pricing structure described in Article 5 would continue to apply to the end of the entire Agreement term.  (Taylor Dep. at 38-44; Pourbaix Dep. at 239).  EUA's actions in requesting a last minute extension without stating any limitation to the fuel adjustment caused TransCanada to reach this conclusion, and EUA failed to correct TransCanada's mistake.   Indeed, EUA had notice of TransCanada's mistaken assumption regarding the fuel adjustment (if indeed it was mistaken) when TransCanada asked EUA whether the pricing of the Agreement was the same as the NECO Agreement.  Not only did EUA not correct that assumption, it corroborated its validity.  Finally, it is clear that the fuel adjustment mechanism, which constitutes one half of a two part pricing scheme, is a central and material term of the contract.

### 3.    Courts In Massachusetts And Other Jurisdictions Have Granted Rescission/Reformation For Unilateral Mistake in Similar Circumstances.

Courts in both Massachusetts and other jurisdictions, addressing similar situations, have granted rescission or reformation on grounds of unilateral mistake.  For example, in *Zero Stage Capital, Inc. v. Harvard Clinical Technology, Inc.*, 2002 WL 148945 (Mass. Super. Ct. May 16, 2002), the court applied the theory of unilateral mistake to a complex venture capital transaction between sophisticated business entities.  The Court found that the defendant, Harvard Clinical Technology, a technology firm focused on the development of novel medical devices, mistakenly concluded that a "detachable warrant" that it issued to Zero Stage Capital in exchange for an advance could not be exercised independent of the closing of the deal.  *Zero Stage Capital*, 2002 WL 1489645 at *1-4, 8-11.  Zero Stage Capital argued that the meaning of the term "detachable warrant" was self-evident and that the detachable warrant should be enforced.   The court disagreed, holding that Harvard Clinical's understanding of the detachable warrant was "objectively reasonable" based on the ambiguous language in the agreement, the fact that the

defendant drafted this ambiguous language, the lack of communications between the parties on the subject during negotiations, and the defendants' failure to clearly identify their reading of the term in the contract.  *Id.  See also Torrao,* 26 Mass. App. Ct. at 251 (granting choice of rescission or reformation of real estate contract where plaintiff had mistaken belief concerning the parcel he was conveying and purchasers had actual knowledge of that mistake).   Courts in other jurisdictions have also recognized that equitable relief is warranted when there has been a unilateral mistake.  *See Shurgard Storage Centers v. Lipton-UCity, LLC*, 394 F.3d 1041, 1046-47 (8th Cir. 2005) (court upheld rescission of lease agreement between two sophisticated parties based on misunderstanding of price calculation provision in contract); *In re Jay's Trucking Co.,* 26 B.R. 73, 76 (Bankr. E.D. Va. 1982) (court reformed contract based on unilateral mistaken when plaintiff mistakenly agreed to perform contract at half the reasonable price for such work and defendant clearly knew or should have known of plaintiff's mistake and failed to correct it); *Home Savers, Inc. v. United Security Co.*, 103 Nev. 357, 359 (1987) (court granted rescission of contract by where defendant caused plaintiff's mistake relating to purchase of property by giving misleading information about the property upon which plaintiff relied).

As in *Zero Stage Capital* and other cases, this case involves a complex transaction between sophisticated business entities.  The Court in *Zero Stage Capital* did not hesitate in correcting Harvard Clinical's mistaken understanding of a common business term, because the actions of Zero Stage Capital had caused that mistake.  Similarly here, EUA's actions caused TransCanada's mistaken belief that the fuel adjustment ran through the term of the contract.  This Court should rescind or reform the Agreement in TransCanada's favor, requiring Narragansett to apply a fuel adjustment for the 2005-2009 period.

## CONCLUSION

For the foregoing reasons, TransCanada should be granted summary judgment on Counts I, III, and V, or in the alternative Count IV, of the Amended Complaint, and on all Counts (I through

III) of the Amended Counterclaim.  Accordingly, TransCanada respectfully requests a ruling that

it was and is entitled to rescind or terminate the Agreement, and to a fuel adjustment based on the

established fuel adjustment triggers for the remainder of Rhode Island (*i.e.*, the Old Narragansett

Zone triggers) until the Agreement terminates.

<div style="margin-left: 40%;">

TRANSCANADA POWER MARKETING LTD.

By its attorneys,


/s/  Wendy S. Plotkin Esq._____
Daniel C. Winston (BBO #562209)
Wendy S. Plotkin (BBO #647716)
Dara Z. Kesselheim (BBO #660256)
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA  02110
Tel. (617) 248-5000
Fax (617) 248-4000

</div>

Dated:  August 15, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD.,<br><br>Plaintiff,<br><br>v.<br><br>NARRAGANSETT ELECTRIC COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)    C.A. No. 05-40076FDS<br>)<br>)<br>)<br>)<br>)<br>) |

## **AFFIDAVIT OF MICHAEL HACHEY**

I, Michael Hachey, hereby depose and state as follows:

1.      I am currently the Director, Eastern Commercial for TransCanada Power Marketing, Ltd ("TransCanada"). I have worked for TransCanada for 9 years. Prior to working for TransCanada I worked in the Generation Marketing department of New England Power Company, a New England Electric System ("NEES") subsidiary. I have worked in the electric/power supply industry for nearly 30 years.   I make this affidavit in further support of TransCanada's Motion For Summary Judgment.

2.      Prior to 1996, New England electric utility companies were generally vertically integrated monopolies, where one utility company controlled (through "affiliate" companies) all of the generation, transmission and distribution functions of electric service to consumers for a given geographic area.

3.      Electricity "generation" means the creation of the electricity in a plant or facility through, for example, the burning of fossil fuels (oil, gas, coal). "Transmission" means the transfer of power from the generation plant or facility across high-voltage power lines to local

1

distribution areas. "Distribution" means the local delivery of the electricity to individual residences and businesses over local power lines and poles.

4.    In the 1996 time frame, only two large vertical utilities operated in Rhode Island – Eastern Utilities Associates ("EUA") and New England Electric System ("NEES").

5.    EUA's generation affiliate was Montaup Electric Company ("Montaup"), and EUA's retail distribution company affiliates were Blackstone and Newport in Rhode Island and Eastern in Massachusetts. NEES's generation affiliate was New England Power Company ("NEP") and NEES's retail distribution affiliate was Narragansett Electric Company ("Narragansett") in Rhode Island and Massachusetts Electric Company in Massachusetts.

6.    In the 1996 time frame, the generation affiliates (e.g. Montaup, NEP) were regulated by the Federal Energy Regulatory Commission ("FERC"), and the distribution companies (e.g. Blackstone, Newport, Narragansett) by state public utility commissions (in Rhode Island the Public Utilities Commission "RIPUC").

7.    "Tariffs" are documents filed by the retail distribution companies with state regulatory authorities, which identify the terms, conditions and charges under which the retail distribution companies provide the electricity to retail customers.

8.    The cost of fuel is a significant component of the cost of generating power, if not the most significant cost. In New England, about 50% of electricity is produced by burning volatile, high cost fuels such as natural gas and oil, to generate power.

9.    In 1996, Rhode Island passed the Utility Restructuring Act ("URA"). The URA was enacted to restructure the vertical utilities in an effort to create a competitive market for power supply and ultimately to lower consumer prices. The new competitive market was to be structured such that the retail distribution companies would still deliver the electricity to end-

2

consumers over their local utility poles and lines, and manage billing and customer service issues. But the vertical utilities would no longer generate and supply the power. Instead, it was hoped that competitive power supply providers would step in and market power supply directly to consumers to be delivered by the distribution companies.

10.     In October, 1997, TransCanada purchased certain NEES generation assets – a power purchase agreement and NEES's share in the Ocean State Power plant. TransCanada purchased these assets from U.S. Generating Company, who had purchased all of NEES's generation assets earlier in 1997. As part of the transaction, TransCanada was assigned the Standard Offer Service Agreement between U.S. Generating and Narragansett (the "NECO Agreement").

11.     Shortly before the merger of NEES and EUA, I left NEES and took a position with TransCanada. At that time, I became responsible for the oversight of TransCanada's Standard Offer Service Agreements with NEES and EUA.

12.     In February, 2000, Michael Hager of NEES sent me a draft letter which concerned the merger of EUA and NEES and the future administration of the Wholesale Standard Offer Service Agreement between Blackstone, Newport, Eastern and TransCanada (the "Agreement"). This letter stated that the parties' obligations under the Agreement would not be affected by the merger. Further, the letter informed TransCanada that EUA's retail tariff would be cancelled, but that Narragansett would pay TransCanada the fuel adjustment under the Agreement. Mr. Hager and I discussed the letter, and Mr. Hager did not mention that Narragansett did not intend to seek approval of or pay TransCanada a fuel adjustment under either the EUA or NECO Agreement after 2004, or to treat the fuel adjustment in TransCanada's two Standard Offer contracts differently from one another.

3

13.    Mr. Hager and I talked from time to time concerning the administration of TransCanada's Wholesale Standard Offer Service Agreement with Narragansett in the 2001 – 2005 time period.  In addition I saw Mr. Hager periodically at industry meetings in the 2001-2005 time period.  Not once during this time did Mr. Hager inform me that Narragansett took the position that the fuel adjustment in the legacy EUA contracts ended in 2004.  Mr. Hager also never asked me what TransCanada's understanding was concerning the length of the fuel adjustment in the EUA Agreement.  Further, Mr. Hager never sent me transcripts of hearings before the RIPUC concerning standard offer service, even though it was generally not the practice of wholesale suppliers to attend routine rate proceedings and TransCanada did not attend the relevant rate proceedings in this matter.

14.    In 2002, TransCanada and Narragansett participated in an arbitration proceeding concerning other aspects of the Wholesale Standard Offer Service agreements between the parties.  As part of this arbitration, TransCanada issued discovery requests to Narragansett seeking the production of all filings and testimony with the RIPUC concerning Standard Offer Service.  Narragansett refused to produce any hearing transcripts.  Narragansett did produce, however, 2001 rate filings which clearly indicated that the NEES and EUA fuel adjustments were the same and had trigger numbers through 2009.  Narragansett did not produce any documents that indicated that it did not intend to seek approval of a fuel adjustment for the legacy EUA contracts after 2004.

15.    Following the arbitration, Narragansett did not send to TransCanada any testimony or transcripts from RIPUC proceedings that indicated that in their view the fuel adjustment ended in 2004.

4

16.    At no point prior to February 2005 did Narragansett inform TransCanada that the fuel adjustment for the EUA contract ended in 2004.

17.    In February, 2005 TransCanada discovered that Narragansett did not pay it a fuel adjustment for January 2005.  TransCanada sent an email to Narragansett inquiring about the lack of a fuel adjustment payment and Narragansett stated that the fuel adjustment for the legacy EUA contracts ended on December 31, 2004.  Upon this discovery, TransCanada sent a default notice to Narragansett under Section 7 of the Agreement.

18.    After TransCanada sent the default notice, representatives of TransCanada and Narragansett met to discuss the fuel adjustment and to try to resolve the dispute.  I was present at this meeting.  During these discussions, Narragansett threatened to withhold payments under certain cross-default rights in other contracts if TransCanada sent a final termination notice under the Agreement.  As a result of this threat, TransCanada did not send a termination notice.

19.    In March 2005, Narragansett began making so-called "protest payments" of the fuel adjustment to TransCanada subject to a claimed right of recovery.  Narragansett stated that these payments were based on the calculations "of a Fuel Adjustment Factor ("FAF") if the FAF had been in existence and in effect in Narragansett's tariffs."


Signed under the pains and penalties of perjury this 15th day of August, 2007.


_____
Michael Hachey


5