UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
)
TRANSCANADA POWER MARKETING LTD.,        )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )        C.A. No. 05-40076FDS
                                          )
NARRAGANSETT ELECTRIC COMPANY,            )
                                          )
            Defendant.                    )
                                          )
_____)

**DEPOSITION TRANSCRIPT APPENDIX**

4242627v1

# Boisvert

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2

 3
     ---------------------------x
 4

     TRANSCANADA POWER MARKETING,
 5   LTD.,

 6
            Plaintiff,
 7

     v.                      CASE NO.: 05-40076
 8

     NARRAGANSETT ELECTRIC COMPANY,
 9

            Defendant.
10
     ---------------------------x
11

12

13   Job No. 8924              Pages 1 - 227

14

15

16            DEPOSITION OF LAWRENCE R. BOISVERT, a

17   witness called by counsel for the Plaintiff,

18   taken pursuant to the applicable Rules of Civil

19   Procedure before Dena M. O'Brien, CSR, and

20   Notary Public in and for the State of Rhode

21   Island, at the law office of Blish & Kavanaugh,

22   30 Exchange Terrace, Providence, Rhode Island,

23

24   on March 1, 2007, commencing at 9:30 a.m.
```

Page 2

1 APPEARANCES:
2
3
   CHOATE HALL & STEWART, LLP
4 BY: DANIEL C. WINSTON, ESQUIRE
   BY: WENDY S. PLOTKIN, ESQUIRE
5 Two International Plaza
   Boston, MA 02100
6 617-248-5000
   dwinston@choate.com
7 wplotkin@choate.com
8    Counsel for Plaintiff
9
10 BOWDITCH & DEWEY, LLP
   BY: VINCENT F. O'ROURKE, JR., ESQUIRE
11 311 Main Street
   Worcester, MA 01608
12 508-926-3424
   vorourke@bowditch.com
13
      Counsel for Defendant
14
15
   FPL ENERGY IN-HOUSE COUNSEL
16 BY: RACHEL BUDKE, ESQUIRE
   700 Universe Blvd.
17 Juno Beach, FL 33408
   561-304-5209
18
      Counsel for FPL ENERGY
19
20
21
22
23
24

Page 3

1        INDEX
2 WITNESS:
   LAWRENCE R. BOISVERT              PAGE
3
   Examination by Mr. Winston.............  04
4
   Examination by Mr. O'Rourke...........  208
5
   Examination by Mr. Winston...........  208
6
   Examination by Mr. O'Rourke...........  225
7
   Certificate of Oath...................  227
8
9
10
11
        EXHIBITS
12
   NO.   DESCRIPTION              PAGE
13
   Plaintiff's Exhibit No. 81.............  53
14
   Plaintiff's Exhibit No. 82.............  56
15
   Plaintiff's Exhibit No. 83.............  59
16
   Plaintiff's Exhibit No. 84.............  62
17
   Plaintiff's Exhibit No. 85.............  184
18
   Plaintiff's Exhibit No. 86.............  186
19
   Plaintiff's Exhibit No. 87.............  195
20
21   (The above-referenced exhibits were retained
     by counsel and are not attached to the
22   transcript.)
23
24

Page 4

1        PROCEEDINGS
2        LAWRENCE R. BOISVERT,
3 a witness in the above-entitled matter, having
4 been first duly sworn, was examined and
5 testified as follows:
6        EXAMINATION
7 BY MR. WINSTON:
8    Q.    Good morning, Mr. Boisvert. Can you
9 spell your name for the record, please?
10   A.    Boisvert, B-o-i-s-v-e-r-t.
11   Q.    And it's Larry Boisvert, right?
12   A.    Lawrence. You can call me Larry.
13        MR. WINSTON: Okay. Vin, do you want
14 to do the standard motions to strike until
15 trial, objections except as to form until trial,
16 waive notarization?
17        Mr. Boisvert, you have a right to
18 read and sign your deposition, check it for
19 accuracy within 30 days. I don't know if Rachel
20 talked to you about that. Is that something
21 you'd like to do? I guess that's a question to
22 you, Rachel.
23        MS. BUDKE: Yes. Can we make that
24 decision after the depo?

Page 5

1        MR. WINSTON: Sure.
2        MS. BUDKE: Okay. Thanks.
3        MR. WINSTON: Let's see -- well, okay.
4 Let's do this then: Let's just say you've
5 preserved the right to read and sign, and
6 obviously, he'll get the transcript, and he can
7 change it or do what he wants with it, and he'll
8 have 30 days.
9        MS. BUDKE: Thank you.
10 BY MR. WINSTON:
11   Q.    Where do you live, Mr. Boisvert?
12   A.    I live at 16 Greenwood Lane in
13 Lincoln, Rhode Island.
14   Q.    Have you been deposed before?
15   A.    Yes, I have.
16   Q.    Okay. You understand that I'll be
17 asking you a series of questions. It's
18 important that you wait until I get my question
19 out before you start answering, just so we have
20 a clear record. It's also important that you
21 remember that she can only transcribe sounds.
22 So nodding and um she can't take. So you've got
23 to just say yes or no.
24        Your counsel can object to questions

2 (Pages 2 to 5)

Esquire Deposition Services
1-866-619-3925

1 that I ask for the record or Mr. O'Rourke may
2 object for the record.  As a general matter,
3 it's as to form, and we argue later about it,
4 and you can go ahead and answer.  The one area
5 that I don't want to know about is conversations
6 you've had with your counsel.  You are
7 represented here by who?
8        MS. BUDKE:  Rachel Budke.
9 BY MR. WINSTON:
10   Q.   Okay.  You are not represented here by
11 Mr. O'Rourke?
12   A.   No.
13   Q.   Okay.  So what I don't want to know is
14 conversations you've had with Rachel or any
15 other counsel at FPL.  So I don't want to know
16 about them, and that's the one area if I ask
17 about them, which I won't, Rachel can instruct
18 you not to answer, and please don't answer.
19        If you need a break, let me know.  If
20 you don't understand a question, let me know.
21 I'll rephrase it.  And beyond that, I'll try to
22 make this as quick and painless as I can.
23        Okay.  Can you just tell me briefly
24 about your education just quickly, where you

1 went to high school, when you graduated college,
2 etc.?
3   A.   Sure.  I went to Blackstone Valley
4 Regional Vocational Technical High School in
5 Upton, Massachusetts.  I graduated in 1978.  I
6 went to Worcester Polytechnical Institute,
7 which is in Worcester.  I graduated
8 electrical -- with an engineering degree in the
9 area of electrical, and that was in 1982.  I
10 have a master's of business administration also
11 from Worcester Polytech, and I have a master's
12 of engineering from Rensselaer Polytech.
13   Q.   And since high school, just briefly
14 run for me the same way, the jobs that you've
15 held roughly when you started and left each of
16 those jobs.
17   A.   Since high school?
18   Q.   Let's not count college.  When you had
19 a real job.
20   A.   When I had a real job.  After I got
21 out of college, I worked for a company called
22 Yankee Atomic Electric, and that was from 1982
23 until summer of -- it was the summer of '85, in
24 which time I went to graduate school at RPI.

1 Then after graduate school from RPI, I worked
2 for a company called Eastern Utilities EUA, and
3 that was I think it was in the summer of '86
4 that I started that position -- a position with
5 them.
6   Q.   What was the title of that position?
7   A.   I worked in the resource planning
8 department.
9   Q.   What does that mean, resource
10 planning?
11   A.   Resource planning at that point in
12 time we were running -- running long-term load
13 forecasts, long-term generation studies looking
14 to determine what the mix of generation assets
15 we should either build, buy to meet the
16 long-term load requirements.
17   Q.   Okay.  And then just carry through
18 until you left EUA just what your positions were
19 and rough timing?
20   A.   I worked in that area for a couple of
21 years.  Then I was also responsible for QF
22 procurement.  I ran several QF RFP's, and then
23 for a few years I worked in the conservation
24 load management area, and in the last few years

1 I worked as the I don't know whether it was the
2 manager or the supervisor of the power
3 marketing group.
4   Q.   QF procurement is what?
5   A.   Those are qualifying facilities.
6 Those are code generation plants -- small code
7 generation plants.  In Massachusetts we had --
8 there were regulations that required tant each
9 utility go out and issue an RFP and procure so
10 much generation from these independent small
11 power plants.
12   Q.   Okay.  And roughly how long were you
13 doing that, I mean, just give or take a year?
14   A.   A couple of years.
15   Q.   Late '80s, early '90s?
16   A.   That would have been the late '80s.
17   Q.   And then conservation and load
18 management, what did that involve and what time
19 frame?
20   A.   That was the early '90s.
21   Q.   Okay.  And at what point did you
22 become, to the best you can recall, manager in
23 the power supply group?
24   A.   It would have been -- I'm not sure

3 (Pages 6 to 9)

Page 10

1 what the actual -- what the date was, but it
2 was somewhere around '9 -- '95, '96.
3 **Q. Do you recall the restructuring -- you**
4 **recall the URA, Utility Restructuring Act in**
5 **Rhode Island passed in '96?**
6 A. (Witness nods head.)
7 **Q. Were you in that position before that**
8 **act was passed?**
9 A. Yes.
10 **Q. Okay. So prior to the restructuring**
11 **dealings, you were already in that position?**
12 A. I might not have been a supervisor or
13 manager at that time, but I was in the power
14 marketing group.
15 **Q. Okay. And you had been there for**
16 **approximately a year or so before that?**
17 A. I don't know. I don't remember
18 whether it was a year or two years.
19 **Q. Okay. So what were your positions in**
20 **the power marketing group up until you left just**
21 **near as you can recall?**
22 A. Basically, back then I was -- it's a
23 long time ago. Our group was responsible for
24 the day-to-day dispatch and fuel procurement

Page 11

1 for the plants that we had. Basically
2 dispatching the units with NEPOOL ISO to meet
3 the load requirements that we had and try to
4 optimize that. Also responsible for the
5 billing with the power purchase agreements that
6 we had.
7 **Q. Power purchase agreements were**
8 **agreements that Montaup had with other power**
9 **suppliers?**
10 A. That's correct.
11 **Q. Okay. And who else -- so from say the**
12 **'96 time period -- well, let me ask you this:**
13 **When did you leave EUA?**
14 A. I left EUA -- EUA was bought out by
15 New England Electric, and so when I -- when
16 that merger happened, I left shortly after the
17 merger. I think it was like a week after the
18 merger.
19 **Q. Okay. After the merger was final?**
20 A. Yes.
21 **Q. So mid 2000; does that sound right?**
22 A. That would have been either late May
23 or early June 2000. So I started with FPL.
24 **Q. You went directly to FPL?**

Page 12

1 A. Yes.
2 **Q. What was your position coming in to**
3 **FPL and what do you do now?**
4 A. I am in the origination group.
5 **Q. What does that mean?**
6 A. It's power marketing. We sell or look
7 to sell the APL between the power plants that
8 we have here in New England to third parties,
9 utilities, other power marketers.
10 **Q. Okay. Are you -- do you know what**
11 **TransCanada Power Marketing does?**
12 A. I know who they are or --
13 **Q. I mean, do you do something similar to**
14 **what they do in terms of your placement in the**
15 **market?**
16 A. I'm not sure exactly. I don't know
17 what they do. I mean, I think there are some
18 similarities, but I don't know for sure.
19 **Q. Okay. Who else -- so between the time**
20 **period of '96 through 2000, who else worked with**
21 **you in the power marketing group? How was that**
22 **structured?**
23 A. Bob Clark was the head of the group,
24 and he reported to I think it was Kevin Kirby.

Page 13

1 Under Bob Clark I was responsible for the
2 day-to-day power marketing activities, and Don
3 Ryan was -- he was responsible for something,
4 but I don't remember what it was.
5 **Q. Okay. So you were responsible for**
6 **day-to-day power marketing activities. What**
7 **else was -- I assume other people were doing**
8 **other things. What were they doing? I'm just**
9 **trying to get a sense of what the power supply**
10 **group did.**
11 A. I think Don was responsible for maybe
12 contract administration type of issues. Pete
13 Fuller was in our group, and he used to do some
14 analytical work studies.
15 **Q. Okay. Did anybody report to you**
16 **during that time period?**
17 A. Yes. I had four people reporting to
18 me.
19 **Q. Who were they?**
20 A. Paul Lopes, Joe Rosignoli, Cathy -- I
21 don't remember what her last name was -- and
22 then there was another lady, but I don't
23 remember what her name was either.
24 **Q. In your role at FPL, do you have**

4 (Pages 10 to 13)

1 ongoing business relations with National Grid?
2 I mean, are you dealing with them, making
3 contracts and doing things?
4    A.    We participate in the various RFP's
5 that they have.
6    Q.    Okay. So since you've left EUA, who
7 are the people that you've dealt with at
8 National Grid just in a business context?
9    A.    Well, through the RFP process the
10 person that typically runs those solicitations
11 would be John Warshaw.
12    Q.    So your role with FPL now -- FPL is in
13 the position of selling power to grid and
14 bidding on grid RFP's?
15    A.    That's correct.
16    Q.    Do you have any business dealings
17 ongoing with TransCanada at all?
18    A.    Not to my knowledge.
19    Q.    Okay. Do you know if you've been
20 involved in any business dealings with them
21 since you left EUA?
22    A.    Yes, I have.
23    Q.    What was that?
24    A.    I think we -- this goes back a few

1 years ago. I don't remember whether we sold
2 them maybe some renewable energy credits or
3 some energy in an energy capacity.
4    Q.    Were you involved in that deal?
5    A.    Yes.
6    Q.    Who did you deal with at TransCanada?
7    A.    It's a lady there. I can't think of
8 her name. Sorry.
9    Q.    That's all right. So other than the
10 business dealings relating to the supply of
11 power to National Grid, have you been involved
12 in any other business dealings with National
13 Grid since you left EUA?
14    A.    I'm not sure what you mean.
15    Q.    I'm just trying to get a context. I
16 understand that you in your capacity as an
17 employee of FPL dealing with grid in context of
18 responding to solicitations they make to supply
19 power to them?
20    A.    Uh-huh.
21    Q.    You need to say yes.
22    A.    Yes.
23    Q.    Is there any other business context in
24 which you interact with them?

1    A.    No.
2    Q.    At the time that you were at EUA, were
3 you involved in -- well, let me ask you this:
4 Are you familiar with what this dispute is
5 about?
6    A.    Yes.
7    Q.    What do you understand as you sit here
8 today about what the dispute that leads you to
9 sit in this room is?
10    A.    My understanding there is a dispute
11 regarding the standard offer agreement between
12 TransCanada and Narragansett Electric.
13    Q.    I mean, just tell me what you know
14 about what that dispute involves or what terms;
15 do you know?
16    A.    No, I do not.
17    Q.    Okay. Have you spoken to anyone other
18 than your attorneys at FPL about the dispute of
19 your testimony here today?
20    A.    We did have a meeting this past summer
21 with the folks from Narragansett Electric.
22    Q.    Okay. Who was in that meeting?
23    A.    Mike Hager, and I don't remember the
24 attorneys that were involved.

1    Q.    Okay. Was this fine gentleman here
2 there?
3    A.    I think so.
4        MS. BUDKE: Hey, Dan, I'm having a
5 hard time hearing Larry.
6        THE WITNESS: I will speak up.
7        MS. BUDKE: I hear you loud and clear.
8        MR. WINSTON: Yes, let me turn it, so
9 that it's kind of in the middle of us. Let us
10 know if that doesn't work.
11        MS. BUDKE: Thank you.
12 BY MR. WINSTON:
13    Q.    Who else was there -- just tell me who
14 you recall being at the meeting?
15    A.    I remember Mike Hager being there. I
16 remember one or two attorneys. I don't recall
17 who they were. There might have been someone
18 on the phone, but --
19    Q.    And tell me what you remember about
20 that discussion.
21    A.    They asked me some questions regarding
22 the standard offer contract.
23    Q.    Just tell me what you remember about
24 what were the questions concerning?

5 (Pages 14 to 17)

Page 46

1 about the fuel adjustment not extending for that
2 full period of 2009?
3 A. Yes.
4 Q. And your answer is?
5 A. I thought it was in the agreement.
6 Q. And why did you think that?
7 A. I just recall that the fuel adjustment
8 provision did not run for the full term of the
9 agreement.
10 Q. Okay. To the best of your memory as
11 you sit there, what is that recollection based
12 upon?
13 A. That was based on discussions and work
14 that we had done when I was at EUA.
15 Q. Who were they with?
16 A. Bob Clark, Kevin Kirby, Mike Hirsch.
17 Q. Tell me everything you remember about
18 those discussions.
19 A. I remember -- not a lot. I remember
20 that the fuel adjustment provision was supposed
21 to be -- terminate before 2009.
22 Q. Do you remember the reasons for that?
23 A. No, I don't.
24 Q. Do you think you would have given me

Page 47

1 the same answer before you met with Narragansett
2 last summer?
3 A. Yes.
4 Q. So your recollection is there were
5 discussions about it ending. You don't remember
6 any reasons why EUA would have done that?
7 A. No.
8 Q. Any other recollection as to the basis
9 for that -- for those discussions?
10 A. It might have been in the Rhode Island
11 settlement. I don't know for sure.
12 Q. Is it your understanding that the URA
13 permitted a fuel adjustment through 2009?
14 A. I don't recall what the URA permitted.
15 Q. Well, you've got it in front of you.
16 If you turn to page 34 that we looked at, which
17 is Section D, which is the provision you read,
18 you can see it mentions standard offer through
19 2009 and then to be adjusted annually for
20 factors, including extraordinary fuel cost.
21     Do you see anything in that provision
22 that limits the fuel adjustment to shorter than
23 2009?
24 A. No.

Page 48

1    MR. O'ROURKE: Objection.
2 BY MR. WINSTON:
3 Q. Were you aware of any law or
4 regulatory decision that prevented EUA from
5 seeking a fuel adjustment after 2004?
6 A. I don't remember.
7 Q. Do you have a sense of how much energy
8 FPL sells to National Grid on a yearly basis?
9 A. It varies a year.
10 Q. Roughly?
11 A. I don't know. I'd have to calculate
12 it.
13 Q. Can you give me a ball park, 100,000,
14 100 million, 100 billion?
15 A. Probably a couple of million megawatt
16 hours annually.
17 Q. How much is that in terms of dollars?
18 A. Total dollars?
19 Q. Sure.
20 A. If it's two million megawatt hours
21 at -- it would be 180 million.
22 Q. Is that for last year?
23 A. I said it varies. It depends upon
24 what contracts we have.

Page 49

1 Q. You're estimating that over the last
2 couple of years on average FPL has sold about
3 somewhere in the range of 180 million in energy
4 per year to National Grid?
5 A. No, I came up with an estimate of two
6 million megawatt hours.
7 Q. Okay. And what's your best
8 understanding of what the dollar value has been
9 on average over the last five years?
10 A. I don't remember.
11 Q. More than 100 million per year?
12 A. I don't know. I'd have to go back and
13 look at my records.
14 Q. Okay. How often does FPL respond to
15 solicitations from National Grid?
16 A. National Grid issues four RFP's a
17 year, and we respond typically to two of them.
18 Q. Do you know why if there were
19 discussions at EUA -- well, are you aware of any
20 discussions between EUA and TransCanada
21 informing TransCanada that EUA wouldn't seek a
22 fuel adjustment for the post 2004 time period?
23 A. I don't remember any of those
24 discussions.

13 (Pages 46 to 49)

Page 50

1   Q.   Do you recall whether the discussions
2 -- the discussions that you recall with others
3 at the EUA about the length of the fuel
4 adjustment, were those before or after the
5 contract was signed with TransCanada?
6   A.   I'm sure they were both.
7   Q.   Do you know why if a decision was made
8 not to have a fuel adjustment after 2004, it
9 wouldn't have been put in the wholesale standard
10 offer service contract?
11  A.   No.
12  Q.   Is that something that normally would
13 be put in a contract?
14      MR. O'ROURKE:  Objection.
15      MS. BUDKE:  Object to the form.
16      THE WITNESS:  It might be.
17 BY MR. WINSTON:
18  Q.   Is the answer yes?
19      MR. O'ROURKE:  Objection.
20      THE WITNESS:  Yes or no.  I don't
21 know.
22 BY MR. WINSTON:
23  Q.   Well, if you're a business person
24 signing a wholesale standard offer service

Page 52

1   Q.   As a business person looking at this,
2 would you expect if the fuel adjustment ended
3 halfway through the term to see it set forth in
4 the contract?
5       MR. O'ROURKE:  Objection.
6       MS. BUDKE:  Object to the form.
7       THE WITNESS:  One might think that
8 that would be -- be in there.
9 BY MR. WINSTON:
10  Q.   And you don't have a recollection as
11 to why at the time that wasn't put in the
12 contract?
13  A.   It might have been covered in one of
14 the tariffs that would have been referenced to
15 the contract.
16  Q.   Do you recall that in 2002 or '03, FPL
17 signed a wholesale standard offer service
18 contract with Narragansett?
19  A.   I'm sorry.  What was the question
20 again?
21  Q.   Make it easy.  I'll show you the
22 contract.  Let me show you a new exhibit.
23      MS. PLOTKIN:  81.
24      MR. WINSTON:  81.

Page 51

1 contract that references -- I mean, let's look
2 at Article 5, which is on page 5, and you see it
3 says "Price equals standard offer wholesale
4 price plus fuel adjustment factor," and then
5 below it says the fuel adjustment factor is
6 based on the retail rate fuel adjustment
7 mechanism in the company's standard offer
8 service tariffs.
9       MR. O'ROURKE:  Objection.  You missed
10 some critical words there.
11 BY MR. WINSTON:
12  Q.   You signed -- you in your business
13 capacity signed standard offer service and other
14 supply contracts, correct?
15  A.   No, I did not sign contracts.
16  Q.   You do not sign contracts?
17  A.   (Witness shaking head.)
18  Q.   Do you negotiate them?
19  A.   Yes.
20  Q.   Would you expect that if -- and you
21 see the term in this contract is 2009?
22  A.   Yes.
23  Q.   Exhibit 1?
24  A.   It's through 2009.

Page 53

1   (Plaintiff's Exhibit No. 81 was marked.)
2 BY MR. WINSTON:
3   Q.   I'll show you what has now been marked
4 as Exhibit 81, and ask you if that looks
5 familiar to you?
6   A.   Yes, it does.
7   Q.   What do you recall about the contract?
8   A.   I remember discussing this contract
9 with Mike Hager.
10  Q.   What do you recall about the
11 negotiation of this contract?
12  A.   Can you be more specific?
13  Q.   Well, who did you talk to at National
14 Grid, if anyone, other than Mike Hager?
15  A.   Maybe John Warshaw.
16  Q.   What were the -- what was FPL's
17 interest in entering into this contract?
18  A.   Low calling type of deals such as this
19 is part of our normal course of business.
20  Q.   And what are the -- are you familiar
21 with the basic pricing terms of this contract?
22  A.   I'm familiar with it, yes.
23  Q.   How does the pricing work in this
24 contract?

14 (Pages 50 to 53)

Page 66

1  Q.  Okay.  Do you know why that difference
2 existed?
3  A.  No.
4  Q.  Do you recall any other differences in
5 the pricing terms?
6  A.  No.
7  Q.  Do you recall any difference in the
8 pricing -- in the stipulated price streams
9 through 2009 between NEES and the EUA?
10  A.  I think they were very similar.
11  Q.  You don't remember any differences?
12  A.  I don't remember any differences.
13  Q.  Do you remember any difference in the
14 trigger numbers between NEES and EUA on the fuel
15 adjustment?
16      MR. O'ROURKE: Objection.
17      THE WITNESS: No.
18 BY MR. WINSTON:
19  Q.  Do you recall being aware of any
20 differences in the length that the fuel
21 adjustment would be offered in Rhode Island
22 between NEES and EUA?
23  A.  Yes.
24  Q.  Other than what you've told me before

Page 67

1 about discussions internally with Bob Clark,
2 Kevin Kirby, and Mike Hirsch, do you have any
3 other recollection as to why that was?
4  A.  No.
5  Q.  What was the difference that you
6 understood there to be?
7  A.  My understanding is that the
8 Narragansett contract, the fuel adjustment
9 provision goes full term, and under the EUA
10 contracts, we terminated on December 31, 2004.
11  Q.  As you sit here today, can you think
12 of any reason why EUA would terminate its fuel
13 adjustment short of the full term of the
14 standard offer service?
15      MR. O'ROURKE: Objection.
16      THE WITNESS: It could have been
17 something that we discussed with the PUC.
18 BY MR. WINSTON:
19  Q.  You're surmising, but do you have any
20 basis to say that?
21  A.  I have no basis to say that.  I don't
22 recall.
23  Q.  Wouldn't cutting off the fuel
24 adjustment in 2004 affect your ability to bid

Page 68

1 off the standard offer service contracts?
2      MR. O'ROURKE: Objection.
3      THE WITNESS: No.
4 BY MR. WINSTON:
5  Q.  Why not?
6  A.  It would just -- I'm not sure what
7 you're getting at.
8  Q.  Well, I think you told me before that
9 you wanted a fuel adjustment so that you could
10 provide some security to bidders for wholesale
11 standard offer service they'd be protected
12 against fuel price rises, correct?
13  A.  That's correct.
14  Q.  And so -- well, what was your memory
15 as to the length that you were offering
16 wholesale standard offer service contracts in
17 Rhode Island?
18  A.  For the full 2009 period.
19  Q.  And wouldn't a bidding contractor for
20 those contractors desire a fuel adjustment in
21 the last four years of the contract?
22  A.  Sure, yes.
23  Q.  And so what would be the advantage to
24 EUA of not offering that, if any?

Page 69

1      MS. BUDKE: Object to the form.
2      THE WITNESS: That would be a risk
3 that EUA would then have in the future because
4 if prices were high, then EUA's utility would
5 then have to either bear that cost or have to go
6 back to the PUC and collect that money.
7 BY MR. WINSTON:
8  Q.  Well, it is it your understanding that
9 it was -- EUA was -- was EUA offering wholesale
10 standard offer service contracts that provided
11 fuel protection through 2009 to its wholesale
12 standard offer service providers?
13      MR. O'ROURKE: Objection.
14      THE WITNESS: No.
15 BY MR. WINSTON:
16  Q.  So who -- isn't it then the provider
17 that's bearing the risk of the fuel?
18  A.  Yes.
19  Q.  And wouldn't that affect the sale
20 price for those contracts?
21  A.  Not necessarily.
22  Q.  Do you recall any discussions with any
23 bidder for wholesale standard offer service
24 about the fuel adjustment ending in 2004?

18 (Pages 66 to 69)

1   A.   I don't recall any specific
2 discussions with any of the suppliers.
3   Q.   Do you recall ever selling any
4 supplier or potential bidder for wholesale
5 standard offer service that EUA did not intend
6 to apply for a fuel adjustment after 2004?
7   A.   I'm sure I did.
8   Q.   Tell me what you remember.
9   A.   I don't remember.
10   Q.   So your answer is you don't have any
11 recollection as you sit here today of ever
12 telling any actual wholesale standard offer
13 service supplier or bidder that EUA did not
14 intend to apply for a fuel adjustment after
15 2004?
16       MR. O'ROURKE: Objection.
17       MS. BUDKE: Object.
18       THE WITNESS: I'm sure we had those
19 discussions. I just don't recall ever talking
20 about it.
21 BY MR. WINSTON:
22   Q.   Why are you sure you had them?
23   A.   Because that provision, as well as
24 several other provisions in the contract, were

1   A.   I don't remember.
2   Q.   Do you recall how NEES did it?
3   A.   No.
4   Q.   Do you recall knowing at the time that
5 you solicited the bids what term NEES was
6 offering the wholesale standard offer service
7 contracts for?
8   A.   Could you ask that again?
9   Q.   Would you have been familiar at the
10 time you were bidding the wholesale standard
11 offer service contracts for EUA what the terms
12 that NEES was offering for its wholesale
13 standard offer service contracts?
14       MR. O'ROURKE: Objection.
15       THE WITNESS: I was probably aware.
16 BY MR. WINSTON:
17   Q.   Okay. Were you aware that NEES was
18 offering wholesale standard offer service
19 contracts with a fuel adjustment through 2009?
20   A.   Yes.
21   Q.   And your memory as you sit here today
22 is that EUA was offering wholesale standard
23 offer service contracts with a fuel adjustment
24 only through 2004?

1 very important.
2   Q.   You'd agree that it would be important
3 to disclose to a wholesale standard offer
4 supplier that it would not be getting a fuel
5 adjustment for the last four years of the
6 contract?
7       MR. O'ROURKE: Objection.
8       THE WITNESS: Yes.
9 BY MR. WINSTON:
10   Q.   That would be an important term to
11 anybody negotiating a wholesale standard service
12 offer contract with EUA?
13       MR. O'ROURKE: Objection.
14       THE WITNESS: Yes.
15 BY MR. WINSTON:
16   Q.   Do you recall whether EUA ever bid out
17 the wholesale standard offer service contracts
18 for less than the full term?
19   A.   We might have.
20   Q.   Do you know why that was?
21   A.   I don't remember.
22   Q.   Do you recall whether the bid was done
23 independently for Massachusetts and Rhode Island
24 or jointly?

1   A.   That's correct.
2   Q.   Do you recall any supplier ever
3 expressing concern about the absence of a fuel
4 adjustment after 2004?
5   A.   No.
6   Q.   Do you recall that fact ever coming up
7 in any conversation with an actual potential
8 wholesale standard offer service supplier?
9   A.   No.
10   Q.   Let me show you what has been marked
11 as Exhibit 17.
12   A.   Would you like me to read this?
13       MR. WINSTON: No. This is why we
14 premark exhibits because we carry around
15 phonebooks. Actually, do you want to take just
16 a five-minute break?
17       THE WITNESS: Yes, please.
18       (Recess.)
19 BY MR. WINSTON:
20   Q.   So I'm showing you what's been marked
21 as Exhibit 17, which I will represent to you is
22 a settlement agreement with FERC for Rhode
23 Island filed by NEES. Is this something that --
24 do you recall reviewing settlement agreements

19 (Pages 70 to 73)

1 responses to this RFP.

2 **Q.   Bids were due it says so on the front**
3 **April 1, 1998?**

4 A.   I think so, yes.

5 **Q.   RFP issued March 2, '98. Proposal due**
6 **April 1, 1998?**

7 A.   Yes.

8 **Q.   And then if you turn back to your**
9 **testimony at Exhibit 73, if you turn to -- your**
10 **testimony is at page -- take a look at page 18**
11 **of your testimony -- no, it's page 18 of the**
12 **document.**

13 A.   Yes.

14 **Q.   And then you see there's a question,**
15 **please describe the RFP issued in March, and**
16 **there you refer it contains the seven-year term?**

17 A.   Yes.

18 **Q.   And then your testimony a month later,**
19 **May 12, '98, which is Exhibit 32, is we're on**
20 **page 28, you reference the RFP and the**
21 **oversight?**

22 A.   Yes.

23 **Q.   And just to complete the circle of**
24 **creating a timeline, then if you turn to page**

1 **50, at Exhibit 50, which is the RFP, that you're**
2 **submitting several days after this. You are**
3 **submitting the RFP that you've referenced?**

4 A.   Yes.

5 **Q.   And do you recall when, at what point**
6 **before your testimony on May 12th you discovered**
7 **that it was an oversight?**

8 A.   I don't know. I don't remember.

9 **Q.   I presume it was sometime after you**
10 **submitted your April 15th testimony referencing**
11 **the bid through 2007?**

12 A.   I don't know.

13 **Q.   Looking at your testimony again on**
14 **page 28 -- well, actually, turning to Exhibit 50**
15 **you see that -- which is the PUC submission on**
16 **the 15th that included the RFP.**

17 A.   Okay.

18 **Q.   You see that there's also -- the first**
19 **answer -- question and answer there a few pages**
20 **in, RR11 says "Provide a copy of the wholesale**
21 **standard offer service agreement."**

22 A.   Yes.

23 **Q.   And agreement attached to that -- it's**
24 **actually the next page. Attached to that you**

1 **will see that there is a wholesale standard**
2 **offer service agreement with TransCanada?**

3 A.   Yes.

4 **Q.   And that's dated April 7, '98?**

5 A.   Yes.

6 **Q.   Okay. And just the same as Exhibit 1**
7 **we looked at?**

8 A.   Yes.

9 **Q.   Do you recall that the term of the**
10 **wholesale standard offer service contract with**
11 **TransCanada was changed from 2004 to 2005 just**
12 **before signing?**

13      MR. O'ROURKE:  Objection.

14      THE WITNESS:  What was the question?

15 BY MR. WINSTON:

16 **Q.   Do you recall that the wholesale**
17 **standard offer service agreement with**
18 **TransCanada was negotiated as a 2004 agreement**
19 **for some time?**

20 A.   You've got to ask me again. I'm
21 sorry.

22 **Q.   Do you recall that the wholesale**
23 **standard offer service agreement -- TransCanada**
24 **signed an asset purchase agreement for OSP,**

1 **correct?**

2 A.   Yes.

3 **Q.   And with that a backstop obligation**
4 **for wholesale standard offer service?**

5      MR. O'ROURKE:  Objection.

6      THE WITNESS:  Correct.

7 BY MR. WINSTON:

8 **Q.   And that's what I've shown you as**
9 **Exhibit 1?**

10 A.   Yes.

11 **Q.   Did you have any conversations with**
12 **anyone at TransCanada about the oversight that**
13 **was in the RFP that was issued in early 1998?**

14 A.   I don't recall.

15 **Q.   It's your testimony -- is it -- do you**
16 **recall any discussions with TransCanada at any**
17 **time about the fuel adjustment provision?**

18 A.   I'm sure I had conversations with
19 them, but I don't recall what those
20 conversations were.

21 **Q.   Did you ever have any conversations**
22 **with them about the length of the fuel**
23 **adjustment provision in their contract?**

24 A.   I don't know.

43 (Pages 166 to 169)

Page 170

1   Q.   At the time of the -- you've seen that
2 there was a bunch of testimony in the
3 TransCanada contract all signed in the April,
4 May 1998 time frame?
5   A.   What?
6   Q.   I'm just getting a point of reference
7 on time.  We've looked at some testimony before
8 the PUC and a TransCanada contract dated in
9 April or May 1998, correct?
10  A.   Yes.
11  Q.   Are you aware of what the status of --
12 or do you recall what the status of EUA's
13 standard offer tariffs was at that time?
14  A.   No.
15  Q.   Do you recall that there were at some
16 point interim -- something called interim
17 generation service tariffs that were filed?
18  A.   There could have been.
19  Q.   Let me show you what's been marked as
20 Exhibit 33.  You'll see it's a PUC order dated
21 in November '97.  If you look at the orders, you
22 can see rejects tariffs based on failure to
23 comply with the bid, and then at the top of page
24 3 orders interim service rates to be put in

Page 171

1 effect.
2   A.   Okay.
3   Q.   I mean, do you recall the tariffs
4 being rejected at some point?  I think you
5 testified to that before.
6   A.   I might have.  I don't remember.
7   Q.   Did you ever have any conversations
8 with anyone at TransCanada about the content of
9 EUA's proposed standard offer service tariffs?
10  A.   I don't remember.
11  Q.   Let me show you what's been marked as
12 Exhibit 51, which is a January 19th letter to
13 TransCanada.  You can see this is a letter from
14 Don Ryan to Alex Pourbaix of TransCanada
15 enclosing tariffs.
16  A.   Yes.
17  Q.   Is this a letter you would have
18 reviewed?
19      MR. O'ROURKE:  Object to the form.
20      THE WITNESS:  Probably not.  Probably
21 would have gotten a copy from Don.
22 BY MR. WINSTON:
23  Q.   Okay.  Do you recall any discussions
24 with anyone at TransCanada about the interim

Page 172

1 generation service tariffs of EUA?
2   A.   I don't recall.
3   Q.   You don't recall one way or the other?
4   A.   I don't know one way or the other.
5   Q.   Let me show you what's been marked as
6 Exhibit 57, which is a fax from you to Bill
7 Taylor dated 4/2/98.  You can see what's
8 enclosed here is the Eastern Edison Company
9 tariff.
10  A.   Yes.
11  Q.   And you'll see that that now has, as
12 you referenced, a 2005 price.
13  A.   Yes.
14  Q.   And your recollection as to why it was
15 extended in 2005 is what?
16  A.   Because retail competition, the
17 approvals in Massachusetts didn't happen until
18 I think -- it started in -- it didn't happen
19 until like February.  So retail competition
20 didn't actually start until I think it was
21 March.  So we had to extend it two months into
22 '05.
23  Q.   Do you recall any conversations with
24 Bill Taylor about this tariff?

Page 173

1   A.   No.
2   Q.   Do you know why you were sending him
3 this Massachusetts tariff?
4   A.   Bill probably called me looking for
5 it.  So I sent it.
6   Q.   Do you know if he ever called you
7 looking for the Rhode Island standard offer
8 service tariffs?
9   A.   I don't know.
10  Q.   Do you recall ever sending any of
11 Rhode Island's tariffs to Mr. Taylor or anyone
12 at TransCanada?
13  A.   I don't remember.
14  Q.   When you put out the RFP in early '98
15 that we've looked at, were you aware of what
16 NEES was doing with its wholesale standard offer
17 service solicitation?
18      MR. O'ROURKE:  Objection.  You mean
19 the March '98 RFP?
20      MR. WINSTON:  March '98 RFP.
21      THE WITNESS:  I'm sure at that time I
22 had some knowledge of what was going on.
23 BY MR. WINSTON:
24  Q.   I'll show you what's been marked as

44 (Pages 170 to 173)

1 NRG at which the length of the fuel adjustment
2 was discussed?
3   A.   I don't.  I don't recall.
4   Q.   As to Constellation, do you recall any
5 conversations as to whether the length of the
6 fuel adjustment on their contracts was
7 discussed?
8   A.   I don't recall any specific
9 conversations.
10   Q.   It looks like a lot, but it's the end
11 of the box.  It will go fast.  We'll get done
12 today.
13   A.   Only what, 20 more documents?
14   Q.   Actually, probably not.  Let me show
15 you a document that's been marked as Exhibit 77.
16 At this time, so this is early February 2000 --
17   A.   Yes.
18   Q.   -- what were you doing at that time
19 period at EUA?
20   A.   I was administering the standard offer
21 contracts, our other agreements that we had.
22   Q.   What does administering them mean?
23   A.   Making sure that the wholesale bills
24 went out.  Actually, I'm sorry, February of

1 2000?  Actually, we were at that point in time
2 transitioning -- looking to transition out of
3 EUA because the merger was just about ready to
4 happen.  So at that point in time, we were -- I
5 had a group still administering standard offer
6 contracts, and what that meant was that we were
7 collecting the loan information from the rate
8 department and invoicing the wholesale
9 suppliers and making sure they were; paid.
10   Q.   Okay.  Were you involved in -- were
11 you -- was TransCanada one of the suppliers you
12 were dealing with?
13   A.   TransCanada, NRG, and I think
14 Constellation at this point in time.
15   Q.   Who did you deal with at TransCanada?
16   A.   Probably Mike Hachey.
17   Q.   How often were you interacting with
18 these people?
19   A.   On a regular basis.
20   Q.   Okay.  And what were the subjects that
21 it concerned?
22   A.   It was always, you know, questions
23 about load, questions about billing, questions
24 about, you know, lots of stuff.

1   Q.   Okay.  And before you left EUA, I
2 mean, do you recall having any conversations
3 with TransCanada about the length of the fuel
4 adjustment provision in the contract?
5   A.   No.
6   Q.   This letter, as you can see, appears
7 to be a transfer letter regarding the merger
8 with respect to the wholesale standard offer
9 service contracts?
10   A.   Okay.
11   Q.   Well, take a look at it, and tell me
12 what you understand this to be.
13   A.   This is regarding the merger.
14   Q.   I mean, my question really is is this
15 a letter you would have been involved in
16 preparing or have seen?
17   A.   I think Mike Hager did all of these.
18   Q.   At some point did somebody at Grid
19 take over your responsibilities as the
20 administrator of the wholesale standard offer
21 service contracts?
22        MR. O'ROURKE:  Objection.
23        THE WITNESS:  Yes.
24

1 BY MR. WINSTON:
2   Q.   Who was that?
3   A.   Mike Hager.
4   Q.   When did he take over that
5 responsibility?
6   A.   When the merger occurred.
7   Q.   And to the best of your memory that
8 was in April or May of 2000?
9   A.   I think it was the end -- close to the
10 end of May of 2000.
11   Q.   Okay.  My question really has to do
12 with -- I'm trying to figure out what your role
13 as opposed to Mike Hager's is here in early 2000
14 as to the administration of these contracts just
15 before the merger.  You're still there.  He's
16 coming on.
17   A.   Well, I think our roles actually were
18 probably very similar.  He was administering
19 his wholesale contracts.  I was doing the same
20 thing on our end.  And what I -- you know, we
21 were doing was working with each other to
22 prepare the transition where EUA would be
23 merged with New England Electric.
24   Q.   Let me also show you what I'll mark as

49 (Pages 190 to 193)

1  A.  No.

2  Q.  How about Mike Hirsch?

3  A.  No.

4  Q.  Did you talk to -- when you -- have

5  you me with Mr. O'Rourke prior to our deposition

6  here at all?

7  A.  Were you part of the team? I don't

8  know.

9  Q.  I don't think he can testify.

10  A.  I think he was there this past summer.

11  Q.  My guess is yes, but --

12  A.  As I mentioned, I know Mike Hager was

13  there. I know there were a couple of attorneys

14  that were there.

15  Q.  If it becomes a big deal, I'll send

16  him a deposition notice.

17      MR. O'ROURKE:  A bunch of suits.

18      THE WITNESS:  It was in August

19  sometime and --

20  BY MR. WINSTON:

21  Q.  Were there any former EUA employees at

22  that meeting?

23  A.  No.

24  Q.  Do you recall Bob Powderly

1  (phonetically) being there?

2  A.  No.

3  Q.  Did you talk to Mike Hachey before or

4  after that meeting?

5  A.  Well before.

6  Q.  You said you recall telling Mike

7  Hachey that you weren't sure about the length of

8  the fuel adjustment without checking the

9  contract?

10      MR. O'ROURKE:  Objection.

11      THE WITNESS:  I remember -- again,

12  this goes back a while ago, but I remember

13  telling Mike that -- because Mike was -- he had

14  called up asking about the fuel adjustment

15  provision asking me whether it went out to 2009,

16  and I told him absolutely it did not. I said I

17  wasn't sure when it was ending, but I was

18  definitely, definitely sure it wasn't going

19  through 2009.

20      I don't remember whether it was 2 --

21  February of 2005 because that's when the

22  standard offer in Massachusetts ran out, or

23  whether it was December 31, 2004, but it was --

24  I told him it was in and around that time frame.

1  BY MR. WINSTON:

2  Q.  And did he ask you why that was?

3  A.  I'm sure he did.

4  Q.  What did you tell him?

5  A.  I don't remember.

6      MR. WINSTON:  I'm done.

7      MR. O'ROURKE:  Just to put a cap on it

8  and at least make sure we have a good dispute

9  here.

10      EXAMINATION

11  BY MR. O'ROURKE:

12  Q.  Did you ever tell anybody from

13  TransCanada that the fuel trader would run

14  through 2009, that is the end of the contract?

15  A.  Absolutely not.

16      MR. O'ROURKE:  I don't have any

17  further questions.

18      EXAMINATION

19  BY MR. WINSTON:

20  Q.  Did you ever tell anybody at

21  TransCanada it was going to cut off before 2009?

22  A.  Yes.

23  Q.  When did you do that?

24  A.  I know I had that conversation with

1  Mike Hachey. Like I said, I don't know whether

2  it was a year ago June or a year and a half,

3  but it was -- he called me a couple of times.

4  Q.  Other than that conversation, which

5  we're going to have to have testimony about, I

6  guess --

7  A.  Sure.

8  Q.  -- did you have any other

9  conversations with TransCanada in which you told

10  them that the fuel adjustment did not run

11  through 2009?

12  A.  I don't remember. I don't recall.

13  Q.  So your recollection is the only

14  conversation that you had with TransCanada in

15  which you discussed the possibility of the fuel

16  adjustment ending before 2009 is your

17  conversation with Mike Hachey?

18  A.  That's the one I'm definitely sure on,

19  yes.

20  Q.  You don't recall any other

21  conversations with anyone from TransCanada?

22  A.  As I mentioned before, I'm sure that,

23  you know, during our discussions and the

24  meetings I had with Bill and Mike back when the

53 (Pages 206 to 209)

Page 210

1 contract was being negotiated back when I'm
2 sure we had discussions.
3    **Q.    You actually haven't said that until**
4 **now.**
5    A.    Oh.
6    **Q.    Your recollection now, Mr. Boisvert,**
7 **is that you did talk to TransCanada about the**
8 **fuel adjustment ending before 2009?**
9    A.    I'm sure -- as I said before, I'm sure
10 we talked about that, as well as other parts of
11 the contract, but I can't point to a specific
12 meeting or a specific phone call or a specific
13 date.
14    **Q.    Who?  Name a person at TransCanada you**
15 **said -- I want your every memory who and what**
16 **date and where you told someone from TransCanada**
17 **there would be no fuel adjustment after 2004.**
18    A.    I just said -- other than the specific
19 phone call that Mike Hachey called me looking
20 for information on that -- on that -- on the
21 fuel provision, which was, as I said, it was
22 spring a year or two ago -- June I think it
23 was -- I told him specifically at that point in
24 time that there's no way.  It did not go back

Page 211

1 to 2009 --
2    **Q.    I understand.  Let's leave off -- I**
3 **understand that you've got testimony about what**
4 **you talked about with Mike Hachey a year ago.**
5    A.    Sure.
6    **Q.    Okay.  Take that off the table.  I'm**
7 **talking about back when you worked at EUA and**
8 **I'm asking you under oath do you recall a**
9 **conversation with someone at TransCanada in**
10 **which you discussed the length of the fuel**
11 **trader?**
12    A.    I'm sure we talked about it.  I can't
13 recall a specific meeting or a specific time,
14 no.
15    **Q.    Are you aware you were negotiating a**
16 **2004 deal with TransCanada until the days before**
17 **the deal was signed?**
18    A.    Yes.
19    **Q.    Oh, you are aware of that?**
20    A.    We were negotiating the contract all
21 during that time period, yes.
22    **Q.    Okay.  You recall changing the term**
23 **from 2004 to '09 in the last days before**
24 **signing?**

Page 212

1    A.    I did not make that change, no.  I was
2 not the person who was negotiating.  I'm aware
3 that the company was negotiating the contract.
4    **Q.    Are you aware that the company made a**
5 **change at the last minute on the term of the**
6 **TransCanada contract from 2004 to 2009?**
7        MR. O'ROURKE:  Objection.
8        MS. BUDKE:  Object to the form.
9        THE WITNESS:  I'm aware that the
10 standard offer changed because of delays in the
11 start-up of the restructure.
12 BY MR. WINSTON:
13    **Q.    In what state?**
14    A.    In Massachusetts.
15    **Q.    Okay.  Are you aware that TransCanada**
16 **was negotiating a 2004 contract in Rhode Island**
17 **up until the days before it signed the deal?**
18        MS. BUDKE:  Object to the form.
19        MR. O'ROURKE:  Objection.
20        THE WITNESS:  I'm confused what you're
21 saying.  You're saying they were negotiating a
22 2004 contract.  What do you mean by that?
23 BY MR. WINSTON:
24    **Q.    Are you aware that -- Exhibit 1 is a**

Page 213

1 2009 contract, correct?
2    A.    Where is it?  Yes, it was 2009.
3    **Q.    Okay.  Are you aware that up until**
4 **April 1, 1998, six days before that that the**
5 **term of that contract was through 2004 that was**
6 **being negotiated?**
7        MR. O'ROURKE:  Objection.
8        THE WITNESS:  No, I'm not aware of
9 that.
10 BY MR. WINSTON:
11    **Q.    Do you know you would have been**
12 **discussing with TransCanada the length of a fuel**
13 **adjustment after 2004 if they were negotiating**
14 **only a 2004 contract up to the last minute**
15 **before the deal was signed?**
16    A.    Ask that question again, please.
17    **Q.    Is it -- you were bidding a 2004**
18 **wholesale standard offer service contract in**
19 **March of 1998 --**
20    A.    Yes.
21        MS. BUDKE:  Object to the form.
22 BY MR. WINSTON:
23    **Q.    -- through 2004, correct?**
24        MR. O'ROURKE:  Objection.

54 (Pages 210 to 213)

1 THE WITNESS: We had an RFP that was
2 out on the street that we had the incorrect date
3 on, yes.
4 BY MR. WINSTON:
5 Q. Correct. And what I'm asking you
6 is -- and you saw that there was an oversight
7 and that the wholesale standard offer service
8 bid documents subsequent to April or May of '98
9 were changed to 2009, correct?
10 A. Yes.
11 Q. And you see that the TransCanada
12 contract is dated April 7, 1998?
13 A. Yes.
14 Q. Are you aware that TransCanada prior
15 to the date that contract was signed, the term
16 in that contract was changed from 2004 to 2009?
17 A. No, I'm not aware of that.
18 Q. And were you discussing with them
19 specifically their contract with EUA?
20 A. I'm sure they were talking about it.
21 I wasn't the primary negotiator on this, no.
22 Q. I'm trying to understand why were you
23 discussing with TransCanada fuel adjustments
24 after 2004 when you were putting on a bid for a

1 2004 RFP during that time period?
2 MR. O'ROURKE: Objection.
3 MS. BUDKE: Object to the form.
4 THE WITNESS: The intent was not to go
5 out to 2004. The intent was to go out to 2009,
6 and we made a mistake.
7 BY MR. WINSTON:
8 Q. So your testimony is that you recall a
9 discussion with which individuals of TransCanada
10 about a fuel adjustment -- the fuel adjustment
11 in their -- you discussed the fuel adjustment in
12 their contract?
13 MS. BUDKE: Object to the form.
14 MR. O'ROURKE: Objection.
15 THE WITNESS: What time period are
16 you --
17 BY MR. WINSTON:
18 Q. Before the contract was signed?
19 A. Before the contract was signed, I
20 don't remember.
21 Q. So before -- do you recall any
22 conversation before that contract was signed
23 with TransCanada in which you informed them that
24 EUA had any intent to file a fuel trigger for

1 less than the full term?
2 A. I don't remember.
3 Q. Before you talked to Mike Hachey a
4 year ago, do you recall any conversation with
5 anybody from TransCanada in which you informed
6 them that the fuel trigger would run for any
7 term less than 2009?
8 A. As I mentioned before, we had a series
9 of meetings with TransCanada about the
10 contract, about all -- several other points,
11 and I'm sure this was brought up.
12 Q. Okay. So your testimony is that
13 subsequent to the contract being signed, you're
14 sure it was brought up at some point?
15 A. Absolutely.
16 Q. You're not sure whether it was brought
17 up before the contract was signed?
18 A. I think it was.
19 Q. What's your best memory?
20 A. My best memory it was.
21 Q. With who?
22 MS. BUDKE: Object to the form.
23 THE WITNESS: I don't remember.
24

1 BY MR. WINSTON:
2 Q. Who are all of the individuals you
3 talked to at TransCanada?
4 MS. BUDKE: Object to the form.
5 MR. O'ROURKE: Objection.
6 THE WITNESS: We met on a regular
7 basis and talked with Bill Taylor and Mike
8 Hachey.
9 BY MR. WINSTON:
10 Q. Do you know that Mike didn't work at
11 TransCanada until 1999?
12 A. Yes.
13 Q. I mean, Mr. Boisvert, what's your
14 basis for asserting that you talked to anybody
15 at TransCanada before the date of the contract?
16 I mean, what's your reference point for thinking
17 that?
18 MS. BUDKE: Object to the form.
19 MR. O'ROURKE: Objection.
20 THE WITNESS: It's quite simple. I
21 was in the department that was responsible for
22 these contracts. We had meetings with these
23 people. The contracts didn't just mysteriously
24 rise out and show up on the table. We had a

55 (Pages 214 to 217)

1 series of meetings with people. I don't
2 remember where the meetings were or with who they
3 were. I know we had meetings and talked about
4 specifics of the contract.
5 BY MR. WINSTON:
6   Q.   Who at EUA was in those meetings?
7   A.   It would have been Mike Hirsch, Peter
8 Fuller, and Bob Clark.
9   Q.   Your memory is that Mike Hirsch, Peter
10 Fuller, and Bob Clark attended meetings at which
11 the fuel adjustment for EUA was cut off before
12 2004 was discussed with TransCanada?
13       MR. O'ROURKE:  Objection.
14       THE WITNESS:  I don't know if it was
15 that -- we talked about that specific thing, but
16 we had meetings with TransCanada on several
17 occasions.
18 BY MR. WINSTON:
19   Q.   And the best of your memory is that
20 those meetings at which the fuel trigger cutting
21 off before 2009 were discussed were attended by
22 individuals, including Mike Hirsh, Peter Fuller,
23 and Bob Clark?
24       MR. O'ROURKE:  Objection.

1       MS. BUDKE:  Object.
2       THE WITNESS:  I don't know if all four
3 of them were there or one of them was there, but
4 those were the people that regularly attended
5 the meetings when we met with the various
6 counterparties that we were talking to.
7       MR. WINSTON:  I may need another two
8 minutes to think about this for a little bit.
9 It's totally different than everything he's
10 testified to today.
11      MR. O'ROURKE:  I wouldn't agree with
12 that. I mean, I'll give you the two minutes but
13 not with your characterization.
14      (Recess.)
15 BY MR. WINSTON:
16   Q.   Let me show you what's been marked as
17 Exhibit 54, and you're going to have to bear
18 with me because it's the only copy I have.
19   A.   Sure.
20   Q.   But you'll see it's a letter from --
21 it's a letter to --
22   A.   Mike Hirsh.
23   Q.   -- Mike Hirsch from Alex Pourbaix of
24 TransCanada enclosing a draft asset purchase

1 agreement and wholesale standard offer service
2 agreement.  You can see the date of the letter
3 is March 24, '98.  You'll see you've got the
4 backstop agreement there.
5   A.   Yes.
6   Q.   And you'll see that if you turn to
7 Article 2 of the attached agreement, it has a
8 term through 2004.
9   A.   Okay.
10   Q.   And if you turn to Appendix A, it's
11 got pricing through 2004.
12   A.   All right.
13   Q.   Is this a draft you would have seen?
14       MR. O'ROURKE:  Objection.
15       MS. BUDKE:  Objection.
16 BY MR. WINSTON:
17   Q.   Do you recall seeing it?
18   A.   I don't recall seeing it.
19   Q.   Okay.  Is it something you necessarily
20 would have seen?
21       MR. O'ROURKE:  Objection.
22       MS. BUDKE:  Objection.
23       THE WITNESS:  I might have been asked
24 to review it.

1 BY MR. WINSTON:
2   Q.   You don't know one way or the other?
3   A.   I don't know.
4   Q.   Let me show you what's been marked as
5 Exhibit 56, which is a fax to Alex Poorbaix and
6 Sean McMaster from Mike Hirsh dated 4/1/98,
7 which it says "Common backstop agreement renamed
8 whole standard offer service agreement."
9   A.   Okay.
10   Q.   You may recall 4/1/98 was when the
11 bids were due on the RFP?
12       MR. O'ROURKE:  Objection.
13       THE WITNESS:  Okay.
14 BY MR. WINSTON:
15   Q.   Do you know why it was being named
16 wholesale standard offer agreement instead of
17 backstop?
18   A.   No.
19   Q.   And if you look at the term here on
20 the attached agreement, you see agreements
21 through 2004?
22   A.   Yes.
23   Q.   Okay.  And you recall that as of --
24 well, I can even show you.  4/3 draft -- and by

56 (Pages 218 to 221)

Page 222

1 the way, are these drafts you think you saw?

2  A.  I don't know.

3  Q.  Do you recall attending any meetings

4 with TransCanada in the days leading up to the

5 signing of this agreement?

6  A.  I don't remember.

7  Q.  It's Exhibit 59 faxed from Mike Hirsch

8 to Sean McMaster subject line "Agreements

9 4/3/98," and you see here the term has been

10 changed to 2009?

11  A.  Okay.

12  Q.  Okay. And the pricing is through

13 2009?

14  A.  Yes.

15  Q.  Do you recall any discussions -- I

16 mean, does this refresh your recollection at all

17 as to TransCanada negotiating a 2004 contract up

18 until the final days before it was signed?

19  A.  No.

20  Q.  These discussions -- let me show you

21 one other document. It's entitled document --

22 do you recall ever sitting down with TransCanada

23 and actually discussing with them the actual

24 terms written in their standard offer service

Page 223

1 agreement?

2  A.  I don't think I was -- not, any

3 negotiate -- are you asking about a specific

4 negotiation session?

5  Q.  Yes.

6  A.  No, I was not involved in any specific

7 negotiation sessions.

8  Q.  Do you recall ever on the phone

9 talking with them while you were looking at

10 specific provisions of the wholesale standard

11 offer service agreement and discussing them?

12  A.  No, I don't recall that.

13  Q.  Okay. Do you recall discussing with

14 them the wholesale standard offer service in

15 terms of the bid process that was separately

16 going on?

17      MR. O'ROURKE:  Objection.

18      THE WITNESS:  I don't recall.

19 BY MR. WINSTON:

20  Q.  I'm showing you Exhibit 58, which is

21 an April 2, '98 fax to Mike Hirsch from Sean

22 McMaster, and you see it attaches multiple

23 copies of the same fax sheet. The last page

24 says "Attached is the provision regarding

Page 224

1 changes to standard offer service which Alex has

2 discussed with you."

3      Just take a look at this provision.

4 Do you recall ever discussing this provision

5 with TransCanada or anybody at EUA?

6      MR. O'ROURKE:  For the record, it's

7 the last page of the exhibit that you're

8 pointing him to?

9      MR. WINSTON:  It's TCPM 7325.

10      THE WITNESS:  I don't recall ever

11 seeing this.

12 BY MR. WINSTON:

13  Q.  Okay. With reference to the dates

14 we've seen as to the dates of the TransCanada

15 contract, which you can see that there's a draft

16 on April 1 with a 2004 term, and then you can

17 see the signed version is April 7, '98 with a

18 2009 term.

19  A.  Yes.

20  Q.  Conversations that you recall having

21 with TransCanada about the length of the

22 standard offer of the fuel adjustment for

23 standard offer service, with reference to those

24 dates, what's your best recollection as to when

Page 225

1 those conversations might have occurred?

2  A.  It would have to have occurred during

3 that time period.

4  Q.  So your best memory is that between

5 April 1, '98 and April 7, '98, you believe you

6 had conversations with TransCanada about the

7 length of the fuel adjustment?

8  A.  Or it could have been after that. I

9 don't recall the specific dates.

10  Q.  Do you recall one way or the other

11 whether you had conversations with TransCanada

12 before their contract was signed as to whether

13 the fuel adjustment would be cut off prior to

14 2009?

15  A.  I -- I don't remember.

16      MR. WINSTON:  I think I'm going to

17 stop.

18      EXAMINATION

19 BY MR. O'ROURKE:

20  Q.  But we started this with your

21 testimony, am I not correct, that you never told

22 them that it would extend until 2009?

23  A.  Absolutely; that is correct.

24  Q.  Ever?

57 (Pages 222 to 225)

# Bonner

1        UNITED STATES DISTRICT COURT

2         DISTRICT OF MASSACHUSETTS

3            (Central Division)

4    ------------------------------------x

5    TRANSCANADA POWER MARKETING,

6    LTD.,

7            Plaintiff,    Case No. 05-40076 FDS

8        v.

9    NARRAGANSETT ELECTRIC CO.,

10           Defendant.

11   ------------------------------------x

12   Volume I                    1 - 161

13

14       DEPOSITION of JAMES J. BONNER, a witness

15   called for examination by the Plaintiff, taken

16   pursuant to the Applicable Provisions of the

17   Federal Rules of Civil Procedure, before Laurie

18   K. Langer, Registered Professional Reporter and

19   Notary Public in and for the Commonwealth of

20   Massachusetts, at the offices of Choate Hall &

21   Stewart, Two International Place, Boston,

22   Massachusetts, on Wednesday, March 7, 2007,

23   commencing at 9:30 a.m.

24

Page 2

1 APPEARANCES
2
3 CHOATE HALL & STEWART LLP
4 By Daniel C. Winston, Esq.
5 Two International Place
6 Boston, Massachusetts 02110
7 (617) 248-5000
8 For the Plaintiff
9
10 NATIONAL GRID
11 By David C. Lodemore, Esq.
12 25 Research Drive
13 Westboro, Massachusetts 01582
14 (508) 389-2989
15 For the Defendant
16
17
18
19
20
21
22
23
24

Page 3

1        INDEX
2 ATTORNEY    EXAMINATION CROSS    REDIRECT
3 Mr. Winston      4
4
5 EXHIBIT                    PAGE
6 101 Restructuring Outline Dated 12/3/96   79
7 102 Exhibit B in the EUA April 15, 1998
8 Tariff Filing                111
9
10 (Exhibits retained by counsel.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         P R O C E E D I N G S
2
3         JAMES J. BONNER,
4 having been satisfactorily identified by the
5 production of his driver's license, and duly
6 sworn by the Notary Public, was examined and
7 testified as follows:
8
9         EXAMINATION
10
11 BY MR. WINSTON:
12 Q.  Good morning, Mr. Bonner.
13 A.  Good morning.
14     MR. WINSTON:  David, we've been doing the
15 standard set of stipulations, motions to strike,
16 objections except as to form reserved until
17 trial.  Waiving notarization.
18     MR. LODEMORE:  I'm happy with those.  I
19 anticipate that Jim will read his deposition and
20 will sign it and he'll return it to me and I'll
21 get it to you.
22 Q.  Okay.  Could you please state and spell your
23 name for the record.
24 A.  My name is James J. Bonner, Junior.  Last name

Page 5

1 is B-o-n-n-e-r.
2 Q.  Okay.  Have you been deposed before?
3 A.  No.
4 Q.  Okay.  You understand I'll be asking you a
5 series of questions, your answers are under
6 oath.  It's important that to create a clear
7 record for the court reporter and to make her
8 day less than miserable you wait until I get my
9 question out even if you know how it's going to
10 end and then answer.  Your attorney has probably
11 told you the same.
12     If you don't understand a question ask me,
13 I'll repeat it.  Your attorney may object to
14 questions as a matter of form, it has to do with
15 admissibility of testimony, we'll fight about
16 that later.  You can go ahead and answer.  The
17 one exception is, I don't want to know about
18 your conversations with your counsel, so I'm not
19 going to ask about it, but if I did he can
20 instruct you not to answer and rightfully so.
21     It's not a prison, if you want to take a
22 break, go to the bathroom, all I would ask is if
23 we're on a subject we can either finish that
24 subject or finish the question posed.

2 (Pages 2 to 5)

Page 6

1 Could you briefly just set forth your
2 education as far as when you graduated from high
3 school and what post high school education
4 you've had.
5 A. I graduated from high school in 1971.
6 Q. Uh-huh.
7 A. And I attended Northeastern University here in
8 the City of Boston. And graduated in 1976.
9 Q. Where did you go to college, if you did?
10 A. Northeastern University.
11 Q. Oh. They say you're supposed to listen to the
12 answers of the witness, I'm doing a great job so
13 far, aren't I.
14 Any other education post college?
15 A. No.
16 Q. Now, if you could just run for me through your
17 history, let's say post college, as far as just
18 where you worked and dates of starting and
19 stopping to the best of your memory.
20 A. Sure. From college I was hired in 1976 as a
21 plant engineer for the Belcher Malleable
22 Iron -- Belcher Malleable Iron Company in
23 Easton, Massachusetts. In 1983 I came back to,
24 well, I'm sorry, let me back up a second.

Page 7

1 During the period 1972 to 1976 I was a student
2 engineer at an Eastern Utilities affiliate
3 called Brockton Edison Company.
4 Q. Uh-huh.
5 A. But I -- my first full-time job was the one at
6 Belcher Malleable. I returned to Eastern
7 Utilities in 1983 as what's called a consumer
8 services engineer.
9 Q. Uh-huh.
10 A. And then in 1985 I joined the rate department
11 for Eastern Utilities and I worked there until
12 the merger with National Grid in the year 2000.
13 And in 2000 I joined National Grid as a
14 principal analyst for the distribution financial
15 analysis department.
16 Q. Okay. Actually, let's jump forward. So in,
17 when did you leave Eastern Utilities?
18 A. When Eastern -- on March 27th, the year 2000.
19 Q. March 27, 2000?
20 A. Yes.
21 Q. Okay. Where have you physically been working
22 since then?
23 A. My current assignment since May of 2002 is
24 manager of electric pricing for the New York

Page 8

1 division, the former Niagara-Mohawk Power
2 Company based in Syracuse, New York.
3 Q. In between March of 2000 and that move to
4 Syracuse?
5 A. I was -- shortly after I came aboard National
6 Grid in late March of 2000 I, I was brought onto
7 what's called the merger, merger team. I was in
8 the due diligence process beginning in July of
9 that year for what eventually was to become the
10 Niagara-Mohawk acquisition.
11 Q. Okay. Due diligence for the Niagara-Mohawk
12 acquisition?
13 A. Yes. And September of 2000 when they announced
14 the merger, which I recall was Labor Day, I
15 about a week or so later I was put on what was
16 called the merger regulatory team. I've been
17 doing almost exclusively New York work since
18 about July of 2000.
19 Q. Okay. Did you -- so between March of 2000 and
20 July of 2000, were you still working at all in
21 relation to goings on in New England?
22 A. Very little, actually. I had a temporary
23 assignment that occupied the bulk of it
24 beginning the 1st of May of 2000. I was sent to

Page 9

1 the United Kingdom.
2 Q. Okay.
3 A. And I worked on a joint strategy project for
4 group strategy. That lasted eight weeks and I
5 returned in late June. I was only back a couple
6 of weeks before I was put on the Niagara-Mohawk
7 matter.
8 Q. So since March of 2000 have you been involved in
9 any rate filing proceedings in Rhode Island or
10 Massachusetts?
11 A. I did some Rhode Island work. I don't recall if
12 I was involved in any regulatory proceedings; if
13 I were it was very minor.
14 Q. Did you do any rate -- did you do any work
15 relating to standard offer service tariff
16 filings in New England after March of 2000?
17 A. No.
18 Q. Okay. That confirms what I was hoping, which
19 will make it more likely we'll be out of here at
20 two thirty.
21 MR. LODEMORE: That's what I thought.
22 MR. WINSTON: Because I didn't prepare for
23 it. So, good.
24 Q. Okay. And after March 2000 have you had

3 (Pages 6 to 9)

Page 10

1    discussions with anyone else at National Grid
2    other than your lawyer -- let me say this.
3       When did you learn that there was a case up
4    here about the wholesale standard offer service
5    contracts?
6  A.  When I was contacted by my lawyer.
7  Q.  Okay.  And when approximately was that?
8  A.  That was about a year ago.  Or during the
9    discovery process.
10  Q.  Okay.  Before that, before you learned there was
11    a case here, --
12  A.  Uh-huh.
13  Q.  -- had you had any discussions between when you
14    left in March of 2000 and that point about
15    standard offer service obligations or tariff
16    filings in New England?
17  A.  Not that I recall.
18  Q.  Okay.  Okay.  Likewise, do you recall any
19    discussions about the fuel adjustment provisions
20    in the standard offer service tariff filings in
21    Rhode Island that you had between March of 2000
22    and the date that you learned about this
23    lawsuit?
24  A.  None that I recall.

Page 11

1  Q.  Okay.  Have you had any discussions with -- and
2    for the, if you're -- I can ask you whether or
3    not you've had the discussions, if your counsel
4    was present I won't ask you what was said if he
5    was present.  But have you had discussions with
6    any of your former EUA colleagues since you left
7    EUA in March of 2000 about standard offer
8    service tariff filings in Rhode Island?
9  A.  None that I can recall.
10  Q.  Okay.  Have you reviewed any documents in
11    preparation for your deposition here today?
12  A.  Only with my lawyer.
13  Q.  Okay.  And other than with your lawyer, have you
14    met with any employee, other employees at
15    National Grid about this dispute?
16  A.  I did have dinner with Mike Hager who is the
17    manager, or, sorry, vice president of energy
18    supply last week on Tuesday night.  And we did,
19    I did note, we did come up and I told him I was
20    being deposed, which was originally supposed to
21    be last Friday.
22  Q.  Okay.  Did you have any discussions with
23    Mr. Hager about the fuel adjustment mechanism in
24    the standard offer retail tariffs?

Page 12

1  A.  No.  We would just simply remark that I was
2    going to be participating in the case.
3  Q.  And since you left National Grid in 2000 -- no.
4    Since you left Eastern Utilities in 2000 have
5    you seen any of the standard offer service
6    tariff filings?
7  A.  No.
8  Q.  Have you reviewed any of the FERC settlement
9    agreements?
10  A.  No.
11  Q.  Have you read any of the deposition transcripts
12    in this case?
13  A.  No.
14  Q.  Okay.  So taking you back now, do you recall
15    that at some point in Massachusetts and Rhode
16    Island Restructuring Acts were passed?
17  A.  Yes.
18  Q.  What do you recall about approximately when that
19    was?
20  A.  They varied by the jurisdiction.  It was in the
21    time frame of, oh, let's say somewhere around
22    '97 to '98.
23  Q.  Okay.  In 1996 to the best of your memory what
24    were you, what was your role at Eastern

Page 13

1    Utilities?
2  A.  I was supervisor of rate design.
3  Q.  Okay.  And what does that -- what were your
4    responsibilities and obligations?
5  A.  Sure.  I was responsible for the study, design,
6    analysis for the retail distribution, service
7    rates for Eastern Edison Company, Blackstone
8    Valley Electric, Newport Electric Corporation.
9    I had a small staff that I directed.
10  Q.  Who was on your staff?
11  A.  A number of people.  Jeanne Lloyd was my lead
12    analyst.  Liz Beth O'Donnell, Edward Atchison, I
13    think were the members that were at that time.
14  Q.  And who did you report to?
15  A.  Robert G. Erickson, Junior.
16  Q.  What was Dennis St. Pierre's role at that point?
17  A.  Dennis St. Pierre was at the time either
18    director or vice president of rates, he was
19    Mr. Erickson's boss.
20  Q.  Did Mr. Erickson supervise anyone other than
21    you?
22  A.  Yes, he did.  He, I don't -- I'm trying to
23    remember.  Yes, I believe Deborah Sorgman worked
24    for Mr. Erickson at the time.

4 (Pages 10 to 13)

Page 118

1  Q.  Do you see that they're offering -- again, this
2      is a bid for the 1999 to 2004 time period?
3  A.  That's what it states.
4  Q.  Okay.  And is that -- again, would you
5      have -- do you recall being aware that the bid
6      again in the spring was through 2004?
7  A.  Yes.  At the time this was filed I would have
8      had a copy of the document, so, yes, the thing
9      went to 2004.
10 Q.  Okay.  You would have been aware at the time
11     that the bid went through 2004?
12 A.  Yes.
13 Q.  Okay.  And again, do you recall any discussions
14     at the time about what UAE planned to do for
15     that subsequent standard offer service period?
16 A.  No, I don't.
17 Q.  And did you have any understanding at this time
18     in May of 1998 one way or the other as to
19     whether -- well, did you have an understanding
20     one way or the other as to what EUA intended
21     with respect to the operation of the, of any
22     fuel mechanism after 2004?
23 A.  No, I did not.
24 Q.  And you don't recall any discussions on that

Page 119

1      subject at that time?
2  A.  None that I recall.
3  Q.  Okay.  Let me take that back.
4  A.  (Indicating.)
5  Q.  If you look at Exhibit 73, turn to page 8 of
6      that.
7  A.  I'm there.
8  Q.  Okay.  And you see he says, Mr. Hirsh, this is
9      his testimony at the bottom, "as in your
10     testimony the company's proposed standard offer
11     service are almost identical to those proposed
12     in 2651"?
13 A.  Yes, that's what it says.
14 Q.  On the sentence that carries over, you can read
15     it to yourself, I think it says that these
16     prices will remain in effect pending another
17     competitive procurement?
18 A.  Yes, that's Mr. Hirsh's testimony.
19 Q.  Did you ever have discussions after the date of
20     this about any changes to the standard offer
21     service tariffs based upon the subsequent
22     procurement?
23 A.  No, I did not.
24 Q.  And again -- oh, you don't remember any

Page 120

1      conversations at the time about actions to be
2      taken related to extending the bid from 2004 to
3      2009?
4  A.  No, I don't.
5  Q.  I'll take that back from you.
6  A.  (Indicating.)
7  Q.  Okay.  Do you have a recollection as you sit
8      here today of what PUC's response was to this
9      April tariff filing?
10 A.  As I recall I believe they approved this one.
11 Q.  Do you recall that there was a rejection of the
12     multiplier table?
13 A.  I might have to look at the order, but I
14     wouldn't be surprised if it was approved with
15     changes.
16 Q.  Okay.  I show you what's been marked as Exhibit
17     74, it is a July 17, 1998 tariff filing.
18 A.  We're moving up in time.
19 Q.  Right.  We are getting there.  And you'll see
20     that this is a filing in the same docket and
21     refers to, in the second sentence, "these
22     tariffs are filed in compliance with an order
23     dated July 10, 1998"?
24 A.  Yes.

Page 121

1  Q.  Okay.  And let me show you while we're at it
2      Exhibit 72, which is an order dated July 10,
3      1998.  In fact, you might want to read the order
4      which is actually consistent with the answer
5      that you just gave.
6  A.  (Witness reviewing.)  Yes, it's the order
7      referenced in the first paragraph.  I was
8      checking the order number.
9  Q.  Yep.  Okay.  And you see it refers to some
10     attached tariffs and it says that also they're
11     attaching Redline tariffs?
12 A.  Yes.
13 Q.  Okay.  What, do you recall -- this is a letter
14     from Mr. St. Pierre, what do you recall about
15     the preparation of this filing?
16 A.  This filing was probably prepared by myself and
17     my staff under the supervision of
18     Mr. St. Pierre.
19 Q.  Is it likely you prepared the letter?  Or would
20     he have drafted it?  To the best of your memory.
21 A.  I don't recall specifically.  It could have been
22     either one of us.
23 Q.  Okay.  If you look at the -- go down to what's
24     been Bates stamped 7353 in the lower right.

Page 122

1   A.  7353.
2   Q.  Let me give you back Exhibit 102.
3       MR. LODEMORE:  My exhibit goes up to 7329.
4   I'll look over your shoulder.
5       MR. WINSTON:  I think you have the wrong
6   one.
7       MR. LODEMORE:  This is 72 -- oh, it's 74,
8   that's why.
9   Q.  You can see that, I think what -- am I right
10      that what starts at 7353 is a Redline of the,
11      this new proposed tariff as of July 1998 against
12      the previously proposed tariff of April of '98?
13  A.  There seems to be at least one more document in
14      between.  The cancellation numbers refer to an
15      1172 in the upper left-hand corner.  So there
16      may be one more version that's in between this.
17  Q.  Okay.  Is it, is the common way -- how would you
18      have created, would you have just simply -- I
19      assume you've got some electronic copy of this
20      tariff on your system; correct?
21  A.  We did at the time.
22  Q.  Right.
23  A.  I don't physically possess the files anymore,
24      but, yes, these things were done.  I'm trying to

Page 123

1       remember the word, processing program.  I
2       believe these were done in Microsoft Word at
3       this juncture.
4   Q.  Am I right that what you would have done to
5       create the subsequent versions is either changed
6       it in the document or copied it over and made
7       whatever changes you had to make?
8   A.  Yes.
9   Q.  Okay.  And when you're updating the tariffs from
10      filing to filing how do you know what changes to
11      make to the tariffs?
12  A.  It depends on what the requirements, usually in
13      a compliance filing it depends on the directives
14      in the order directing me to make a compliance
15      filing.
16  Q.  And as to the standard offer fuel index here
17      which is at 7358, the Redline version, --
18  A.  Yes.
19  Q.  -- do you recall any conversations or
20      instructions as to any changes to be made to
21      that?
22  A.  Yes.  As I think we just discussed there was a
23      requirement in the order to make a change to it.
24      I would have to go back and review the order.

Page 124

1   Q.  You mean to make a change to the tariff itself?
2   A.  Yes.
3   Q.  The multiplier table?
4   A.  Yes.
5   Q.  Okay.  But other than as you were ordered to
6       make changes you would have just kept the terms
7       the same as in the previous one; is that?
8   A.  Yes.
9   Q.  All right.  And this tariff now, which is
10      the -- so if you turn -- let's go to the clean
11      version of this, which I think is -- there's
12      probably one right after this.  Yeah, I think
13      it's probably 7335.
14  A.  Yes, I'm there.
15  Q.  Okay.  Now, at this point is it, is it your
16      understanding that this is the tariff, that this
17      went into effect?
18  A.  I would need to see the Commission's order
19      either accepting the tariff filing, but to the
20      best of my recollection this seems to be the one
21      that went into effect.
22  Q.  Is it -- taking a look at it you see it only
23      has, it only has prices for the present time
24      period.

Page 125

1   A.  Yes, that is correct.
2   Q.  Okay.  And what was the plan for further
3       standard offer service tariff filings at this
4       point?
5   A.  I just need to refresh my memory with the
6       orders, but as I recall we were supposed to
7       refile with new prices as they became, as they
8       became effective.
9   Q.  Okay.  So as the 1999 price came into effect you
10      would file prices, new rates as they, as
11      appropriate?
12  A.  Right.  Instead of having the more complicated
13      arrangement of a base price multiplied times a
14      multiplier the tariff pages would be replaced
15      with the express price to be charged.
16  Q.  Okay.  And so any tariff you were filing at a
17      particular time would only be applicable for
18      that price in the year in question presumably?
19  A.  Not necessarily.  Actually, officially under the
20      way these things are put in they're in effect
21      until actually supersede.
22  Q.  But the expectation you have is that you will
23      file a superseding tariff when the price, the
24      stipulated price goes up?

Page 126

1  A.  Yes.
2  Q.  And that stipulated set of prices is what was,
3     is what's set forth in your settlement documents
4     or where do you -- what do you refer back to?
5  A.  What I don't recall now, because I don't have
6     the papers in front of me or I would have to
7     examine this, is where the individual prices for
8     each of the service classes.  I need to see the
9     work papers or the exhibits in which they were
10    derived.
11 Q.  Yep.  Okay.  Hold onto that for a second, if you
12    want to refer back.  Let me show you what's been
13    marked as Exhibit 4, which is a rate filing
14    dated October 30, '98 and ask if you would take
15    a look at that.  This is still by
16    Mr. St. Pierre.  Although, if you look at the
17    signature page in the lower left there is a JJB.
18 A.  Yes.  We were, we're a small company, I actually
19    did the typing.
20 Q.  Okay.  Do you recall typing this letter?
21 A.  Off the top of my head, no.  But obviously my
22    initials indicate that I did.
23 Q.  Okay.
24 A.  These are fairly conventional, so I did a lot of

Page 127

1     such letters over the years.
2  Q.  Okay.  Just looking at the letter, do you have
3     an understanding of what the cause for this
4     subsequent tariff filing is?
5  A.  Yes, they're to replace the standard offer
6     prices.
7  Q.  Okay.  Okay.  Where you are -- right.  This is
8     because the standard offer price, stipulated
9     price goes up in 1999?
10 A.  Yes.
11 Q.  This is for a compliance filing starting January
12    1, '99 to reflect the higher prices?
13 A.  Yes.
14 Q.  If you turn to page 59 of the filing.
15 A.  (Indicating.)  I'm there.
16 Q.  Is this -- what I'm trying to figure out is
17    where you're getting the prices to put in there.
18    Are you pulling them off -- how does the pricing
19    work in this tariff?  How are you -- where do --
20 A.  The derivation of the individual tariff prices
21    is in Section 5 of that filing which is page 60
22    of the filing or the Bates stamp 06296.  If you
23    turn to the following page there's a schedule,
24    it shows the derivation of the multiplier and a

Page 128

1     multiplication of the present rate which is
2     shown in Column 1, times the multiplier in
3     Column 2, wield the proposed price in Column 3
4     for each of the service rate classes.
5  Q.  So what you've got at the top of page 61 is the
6     1998 standard offer service rate of .032?
7  A.  Yes.
8  Q.  And the 1999 rate of .035?
9  A.  Yes.
10 Q.  And you're calculating the multiplier and
11    applying it?
12 A.  Yes.  An equal percentage increase in the
13    previously approved prices.
14 Q.  Okay.  And if you turn two pages back Attachment
15    4 looks to me to be the prices that you are,
16    those are in fact, the that's on the right-hand
17    proposed maximum standard offer?
18 A.  Yes.
19 Q.  That is where you're getting the stipulated
20    prices to apply?
21 A.  Yes.
22 Q.  If I refer you back to Exhibit 31 which is
23    your -- if you look at page 42478.
24 A.  I'm there.

Page 129

1  Q.  Okay.  And you see that's Attachment 4.  And
2     turn the page.
3  A.  Yes.
4  Q.  Okay.  And in fact, I think if you look at the
5     document number in the lower left, it's pretty
6     close.  Okay, do you -- who would have created
7     this Attachment 4?
8  A.  An analyst who worked for me by the name of Liz
9     Beth O'Donnell.
10 Q.  And is what she's doing taking this original set
11    of stipulated prices that was in the November
12    filing and she's essentially copying it over
13    into a new document for subsequent filings?
14 A.  The documents are different in terms of the URA
15    standard offer.  But the proposed maximum
16    standard offer coincidentally turns out to be
17    the same number.
18 Q.  And that's what you're applying in your price
19    schedules?
20 A.  Yes.
21 Q.  Where did -- so back to Exhibit 31 which is the
22    first tariff filing you made, the November '97
23    tariff filing.
24 A.  Yes.

33 (Pages 126 to 129)

Page 138

1    rapidly as possible, so. And not to make the
2    assumption you're starting from a blank sheet of
3    paper and redesigning the new organization.
4    Q.  And is the idea here the organization is
5    basically going to become the, what is already
6    the NEES organization?
7    A.  New England Electric was very much larger --
8    Q.  Okay.
9    A.  -- than Eastern Utilities.
10   Q.  Okay. Let me show you a document that's been
11   marked as Exhibit 78. And ask you if
12   you -- well, it's Volume II, but ask you if you
13   know what this is?
14   A.  This is the filing for the rate, the rate plan
15   filing in support of the merger in Rhode Island
16   for Narragansett Electric and Blackstone Valley
17   Electric and Newport Electric Corporation.
18   Q.  Okay. And if you look at page 192 of that
19   filing. Okay. Do you see there's testimony of
20   yourself?
21   A.  Yes.
22   Q.  And, I mean, feel free, you describe sort of
23   what the filing's about there, so if you want to
24   look at it and refresh your recollection that's

Page 139

1    fine. What's the purpose of this filing?
2    A.  The purpose of this filing is to present what's
3    known as the rate plan. Part of it would have
4    been to address the consolidation of Blackstone
5    Valley Electric rates, Newport Electric
6    Corporations rates into Narragansett.
7    Q.  Okay. And does that include -- okay. Does that
8    include incorporating adjustment provisions like
9    fuel adjustments?
10   A.  It would include all retail rate provisions. So
11   that answer is yes.
12   Q.  Okay. And at this point I'm looking at page,
13   the first page of your testimony which is page
14   193, you introduce yourself as manager of retail
15   pricing?
16   A.  Yes.
17   Q.  Okay. Are you still reporting to Dennis
18   St. Pierre at this point?
19   A.  At this point I'm directly reporting to Dennis
20   St. Pierre. I was promoted on January 1, 1999
21   to manager of retail pricing and rate
22   administration.
23   Q.  And again, before that you had been reporting
24   to?

Page 140

1    A.  To Mr. Erickson, who by this time now had
2    retired on a medical retirement.
3    Q.  Okay. Do you remember when he retired?
4    A.  It was somewhere during 1998, toward the fall is
5    my recollection.
6    Q.  Okay. I'm asking because frankly I've never
7    heard his name before. What did he do?
8    A.  Well, actually -- maybe I can enlighten you just
9    a little bit. Mr. Erickson suffered from severe
10   vision problems. He was blind in one eye, he
11   had the lens in the other eye removed. So he
12   had an artificial lens in there. And he had
13   partially detached retinas. Starting somewhere,
14   I believe it was in '97 or early '98, he started
15   to experience bleeding and blindness in that
16   eye. This went on and off for several months.
17   The bottom line, the punch line of the story is
18   that he subsequently had to retire early. The
19   good news was that that did stabilize his sight
20   and he can still see to this day. So it was the
21   right thing to do.
22   Q.  That's great. Essentially he was there but he
23   was not an active participant?
24   A.  No. In terms of restructuring, because again

Page 141

1    that was the single largest project being
2    tackled by the company at that time, I was, I
3    was reporting to Mr. St. Pierre in that capacity
4    rather than Mr. Erickson.
5    Q.  Okay. Okay. And who is Mr. Malloy?
6    A.  Mr. Malloy worked for New England Electric. He
7    was a senior analyst. And worked for
8    Miss Schwennesen.
9    Q.  At the time of this rate filing in June of '99
10   is Miss Schwennesen still director of rates?
11   A.  I would have to check it. You could be right on
12   the same where Mr. Carlton is actually in charge
13   of the department. This is June -- I would have
14   to go back and check actual dates when the
15   change took place.
16   Q.  Okay.
17   A.  To the best of my recollection I think she was
18   still in charge at that point.
19   Q.  And who else from EUA, if anyone, helped you
20   prepare this filing?
21   A.  Oh, members of my staff, principally Jeanne
22   Lloyd, but also Mr. Atchison and Miss O'Donnell
23   would have assisted me.
24   Q.  And if you look at page 195. Do you see it says

36 (Pages 138 to 141)

Page 142

1    "purpose of testimony" and it says, "that the
2    purpose is to support the mapping of the
3    Blackstone Newport rates to Narragansett's
4    rates"?
5  A.  Uh-huh.
6  Q.  And then Mr. Malloy makes use of those. Okay,
7    so was the idea here to identify all the rates
8    and adjustments for the two companies and
9    integrate them?
10  A.  That's the basic objective, yes.
11  Q.  And that included the standard offer service
12    tariff?
13  A.  Most of what I'm seeing right here, and I would
14    have to review in detail, is focused on what we
15    call the base rates. But somewhere along the
16    line the standard offer provisions would have to
17    be reconciled, yes.
18  Q.  Okay. So if you turn to page 198 of your
19    testimony, you see there's a question, "please
20    describe Blackstone and Newport's schedule of
21    rates"?
22  A.  Uh-huh.
23  Q.  And then you say, "in addition to these
24    reference rates which are an attachment" and you

Page 143

1    have a list of them, and the following page it
2    says, "standard offer service tariff."
3  A.  Yes. And last resort service and transition
4    cost adjustment.
5  Q.  Right. And then below there's another question
6    and then it talks about the, right at the bottom
7    of page 199, "tariff for standard offer service
8    tariff"?
9  A.  Yes, that would be a Narragansett Electric.
10  Q.  Okay. And so now if we turn to Mr. Malloy's
11    testimony. I assume you would have reviewed
12    Mr. Malloy's testimony as well when this was
13    filed?
14  A.  Yes.
15  Q.  Okay. If you look at page 11 on the bottom
16    right. There's Mr. Malloy. Is it your
17    understanding he prepared his testimony here and
18    you would have prepared your testimony?
19  A.  Yes.
20  Q.  But you would have reviewed each other's
21    testimony and integrated them?
22  A.  Yes. The final integration was done at New
23    England Electric and so the actual process was
24    me sort of preparing my stuff, passing it over

Page 144

1    to New England Electric. Then I would see the,
2    I would be involved in the total document, what
3    really was more under the direction and control
4    of New England Electric than it was under
5    Eastern Utilities.
6  Q.  Okay. Your role was to supply information about
7    the EUA company's rates?
8  A.  Yes. And also to the other major role that we
9    undertook was because he understood how our
10    customers were put together, to get them to move
11    each individual customer to their proper service
12    classification in Narragansett.
13  Q.  Okay. Then there's a question at the bottom of
14    page 11, "how would the customers of Blackstone
15    and Newport be transferred." It talks about
16    mapping of rates. And then if you turn to page
17    20 do you see there's a section on standard
18    offer service rates?
19  A.  Yes, I see that.
20  Q.  Are you aware of any, of ever identifying in any
21    of the rate proceedings any difference in the
22    operation of the fuel trigger and its length
23    between NEES and EUA?
24  A.  Not that I recall.

Page 145

1  Q.  Are you -- do you recall any discussions with
2    anybody at NEES or National Grid about any
3    length difference between the NEES and the EUA
4    fuel adjustment mechanism?
5  A.  No.
6  Q.  Do you ever recall ever discussing with anyone
7    from NEES or National Grid the length of the
8    term of the fuel adjustment in EUA standard
9    offer service tariffs?
10  A.  No.
11  Q.  Was the idea of this document to disclose any
12    differences in the rates that needed to be dealt
13    with?
14  A.  Insofar as they impacted the retail customers,
15    yes.
16  Q.  Okay. So would it be your understanding that if
17    there was a difference in the rates here and
18    length between NEES and the EUA that would have
19    been something that this filing was designed to
20    address?
21  A.  I'm not sure. There certainly is no express
22    provision here that, so far that I've seen that
23    discusses that.
24  Q.  Okay. Well, as you say, when you filed this

37 (Pages 142 to 145)

Page 146

1     document were you aware of any difference in the
2     length of the fuel adjustment mechanisms between
3     NEES and EUA?
4  A.  Are you referring to the standard, the fuel
5     index, no.
6  Q.  Did you ever have any discussion with anybody
7     from NEES or Grid that they intended to apply
8     the fuel adjustment mechanism differently in the
9     2005 to 9 period with respect to the previous
10    Narragansett zone and the previous EUA company
11    zones?
12 A.  No.
13 Q.  Okay, I'll take that back.
14 A.  (Indicating.)
15 Q.  Was -- which company, NEES or EUA, made the
16    final decision as to the content of this filing?
17 A.  New England Electric.
18 Q.  Do you know whether you made any changes to your
19    portion of the filing based on comments of New
20    England Electric?
21 A.  Oh, I'm sure that I did when I probably passed
22    through an initial draft of testimony, it was
23    probably edited and we came to an agreement as
24    to what its final content actually was.

Page 147

1  Q.  So NEES reviewed and commented on your portion
2     of the filing?
3  A.  Absolutely.
4  Q.  Okay.  Who at NEES?
5  A.  That would have been Mr. Malloy and
6     Miss Schwennesen, whoever else may have been
7     involved.
8  Q.  Let me show you a filing, it is Exhibit 88.
9     That is an October 29, '99 filing --
10 A.  Uh-huh.
11 Q.  -- by Mr. Sorgman.  Now, I know you're not
12    copied on this, do you know why that would be?
13 A.  No, actually I don't.  I'm going to assume that
14    was an oversight and I probably later received a
15    copy.
16 Q.  This is a copy -- in your job at the time this
17    would have been something that you would have --
18 A.  Yes, October 29, 1999 Mr. Sorgman worked for me.
19 Q.  In fact, you, as one of your duties, would be
20    responsible to review such filings; correct?
21 A.  Yes.
22 Q.  And just reading this, is what this -- am I
23    correct that this filing is simply doing the
24    same thing as the October 1998 filing which is

Page 148

1     refilling the tariffs to reflect the higher
2     2000?
3  A.  Yes, the standard offer was to go from three and
4     a half cents to 3.8 cents.
5  Q.  Okay.  So this is a tariff designed to address
6     the 2000 stipulated price?
7  A.  Yes.
8  Q.  Okay.  With the expectation that in probably
9     late 2000 another tariff will be filed to
10    address the 2001 price?
11 A.  No.  I don't think that would have been the case
12    at this late stage.  We would have expected the
13    consummation of the merger to take place prior
14    to the next filing and that actually occurred,
15    as I recall, somewhere in March of 2000.
16 Q.  Okay.  Had you not merged your expectation would
17    have been that a subsequent filing would have
18    been made to address --
19 A.  Yes.
20 Q.  -- 2001?  Okay.  And did you have an
21    understanding at this time as to what was going
22    to happen to EUA's standard offer service
23    tariffs?
24 A.  Well, once, assuming the commission approved the

Page 149

1     merger and the rate plan and the consolidation
2     of Blackstone, Valley Electric and Newport
3     Electrica Corporation's rates into Narragansett
4     Electric that the currently effective Blackstone
5     Valley Electric and Newport Electrical tariffs
6     would simply cease and the Narragansett tariffs
7     would apply.
8  Q.  Fair enough.  I'll take that back.  I show you
9     what's been marked as Exhibit 75.  This is
10    December 6, '99 testimony.  If you were to look
11    at Exhibit 88 you'll see this is testimony in
12    the same proceeding?
13 A.  Sure.  3022.
14 Q.  So this is testimony in the same rate proceeding
15    as this October 1999 filing?
16 A.  Yes.
17 Q.  And if you turn to page 32.
18 A.  Who is the witness in this case?
19 Q.  Well, it's interesting because the front page
20    says Mr. Malloy, but if you look at page 32 --
21 A.  I'm getting there.
22 Q.  -- it's very clear they're asking a question of
23    a Mr. Sorgman at the bottom.
24 A.  Yes.

Esquire Deposition Services
1-866-619-3925

Page 154

1  Q.  Okay.  And you keep reading along there it talks
2      about subsequent years.  And there's a question
3      in the middle of line 10, "so the trigger kicks
4      in no matter what" and he explains it relates to
5      oil and gas prices?
6  A.  Uh-huh.
7  Q.  You have to --
8  A.  Yes.  I'm sorry.
9  Q.  And then the last question is, "and you're under
10     contract for most of it anyway?"  And the answer
11     is "standard offer is under contract for the
12     entire period of standard offer."  Okay.  So at
13     that time period you would have no -- you didn't
14     know whether or not the contracts that -- well,
15     do you know what he's referring to when he says
16     that?
17 A.  I believe that Mr. Sorgman is testifying as to
18     the contents of the tariff.
19 Q.  Okay.  Is it your understanding that -- well,
20     the tariff, what's in the tariff as far as the
21     fuel trigger at this point?
22 A.  Well, at some of the earlier documents that you
23     were showing me, the standard offer service
24     toward the back end of that tariff, do we get

Page 155

1      through the whole schedule of prices, that is
2      where the standard offer fuel index was stated.
3  Q.  Yep.  Okay.
4  A.  And laid out.
5  Q.  I see.  So when you left EUA essentially you did
6      not know what EUA's plans were one way or the
7      other with respect to what they were going to
8      file from 2005 to 9 on the fuel adjustment?
9          MR. LODEMORE:  Objection.
10 A.  That's correct.  That's correct.
11 Q.  Okay.  And you don't recall any discussions on
12     that subject with anyone at the EUA while you
13     were there?
14 A.  Not that I recall.
15 Q.  Let me ask you this, do you recall any
16     discussions with anyone at anytime anywhere,
17     person, man or child, on that subject?
18 A.  No, I do not.
19 Q.  You are not aware of any decision made by EUA at
20     anytime never to seek a fuel adjustment during
21     that time period?
22 A.  I'm not aware of any decision by EUA in either
23     direction, whether to seek it in the future or
24     not to do it.

Page 156

1  Q.  Let me show you what's been marked as Exhibit 77
2      and you'll see this is a letter from Mr. Hager
3      to Mr. Hachey of TransCanada.
4  A.  Uh-huh.
5  Q.  Do you know who Mike Hachey is?
6  A.  Yes, actually.  He was a classmate of mine at
7      Northeastern University.  Among other things.
8      But he also worked for New England Power.
9  Q.  You knew him when you worked at New England
10     Power?
11 A.  Actually, I didn't.  I knew him in college.  I
12     haven't seen Mr. Hachey since 1976.
13 Q.  Okay.  Well, Mr. Hachey is involved in this
14     litigation in case you didn't know.
15 A.  I had heard that.
16 Q.  Yep.  The -- did you -- did you have occasions
17     to talk to Mike Hager during, during your time
18     at EUA?
19 A.  I don't remember.  My first recollections of
20     meeting and discussing things with Mike Hager is
21     after I came on board National Grid in 2000.
22 Q.  Okay.  And this is when you were not dealing
23     with the New England region?
24 A.  That's correct.  Or I was just starting off in

Page 157

1      distribution, financial analysis.
2  Q.  Okay.  Do you know what Larry Boisvert was doing
3      during the time period of the merger, like what
4      he was doing in the final months?
5  A.  Well, he would have been attending to the
6      day-to-day course of business, because that
7      would have been required.  That was always part
8      of our job.  But beyond that I don't remember
9      what his role was in any of the integration
10     teams or I don't recall that he had any role in
11     the regulatory process.
12 Q.  Do you recall any discussions with Mr. Boisvert
13     about the fuel trigger mechanism at all?
14 A.  Nothing comes to mind.
15 Q.  This letter is, you see this letter is
16     essential, it's talking about the transfer of
17     contracts.  It's announcing a merger.  Would you
18     have been involved in any of the letters that
19     were sent by EUA to its former wholesale service
20     suppliers?
21 A.  No.
22 Q.  Okay.  This isn't a letter that you would have
23     reviewed at the time?
24 A.  No, this is the first time I've seen this

40 (Pages 154 to 157)

# Clarke

Vol. 1, Pgs. 1-205

Exhibits 125-129


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING, LTD.

      Plaintiff

v.                CA No. 05-40076 FDS

NARRAGANSETT ELECTRIC CO.,

      Defendant

- - - - - - - - - - - - - - - - -


DEPOSITION of ROBERT CLARKE

Thursday, March 15, 2007 - 10:09 a.m.

Choate Hall & Stewart LLP

Two International Place

Boston, Massachusetts


Reporter:  Jill K. Ruggieri, RMR/CRR

ffc610a2-1a8e-4572-84a3-bd8fbe66c167

Page 2

```
 1   APPEARANCES:
 2
 3   Choate Hall & Stewart LLP
 4       Wendy S. Plotkin, Esq.
 5       Two International Place
 6       Boston, Massachusetts 02110
 7       (617) 248-5000  Fax:  (617) 248-4000
 8       on behalf of the plaintiff
 9
10   Bowditch & Dewey, LLP
11       Vincent F. O'Rourke, Jr., Esq.
12       311 Main Street
13       Worcester, Massachusetts 01615
14       (508) 926-3424  Fax:  (508) 929-3035
15       on behalf of the Defendant
16
17   NSTAR Electric & Gas Corporation
18       Timothy N. Cronin, Esq.
19       800 Boylston Street, P-1700
20       Boston, Massachusetts 02199
21       (617) 424-2104  Fax:  (617) 424-2733
22       on behalf of the deponent
23
24   Also present:  Michael Hachey, TransCanada
```

Page 3

```
 1        S T I P U L A T I O N S
 2           It was stipulated and agreed by and
 3   between counsel for the respective parties
 4   that the witness will read and sign the
 5   deposition under the pains and penalties of
 6   perjury within 30 days of receipt of the
 7   transcript.
 8           It was further stipulated and agreed
 9   that all objections, except as to the form
10   of the question, including motions to
11   strike, shall be reserved until the time of
12   trial.
13
14           ROBERT P. CLARKE, a witness having
15   been duly sworn, on oath deposes and says as
16   follows:
17              EXAMINATION
18   BY MS. PLOTKIN:
19   Q   Could you state your name for the record.
20   A   Robert Clarke, C-L-A-R-K-E.
21   Q   And could you tell me your home address?
22   A   8 Gold Star Drive, Cumberland, Rhode Island
23       02864.
24   Q   Okay.
```

Page 4

```
 1           Have you been deposed before?
 2   A   Yes.
 3   Q   Okay.
 4           So you know the drill, so to speak?
 5   A   You can walk me through it.  It's been a
 6       long time.
 7   Q   I'll be asking you a series of questions
 8       that will be taken down by the court
 9       reporter, so it will be important that you
10       answer verbally.  She can't take down nods
11       of the head or "uh-huhs."
12           Also, since we're building a record
13       here, it's important that even if you know
14       where I'm going with a question that you let
15       me finish it and then answer, and I'll do
16       the same for you.  I'm not going to
17       interrupt you.
18   A   Okay.
19   Q   Mr. O'Rourke here or Mr. Cronin may object
20       to my questions.  Most of these objections
21       are just to the form of the question.  You
22       can go ahead and answer.
23           But certain areas I'm not interested
24       in receiving information on, and that's any
```

Page 5

```
 1   conversations between you and your counsel,
 2   Mr. Cronin.
 3           So if Mr. Cronin objects and
 4   instructs you not to answer based on the
 5   attorney-client privilege, then don't
 6   answer, and I'm not trying to get to that
 7   information anyway.
 8           This isn't a jail.  If you need to
 9   take a break, let me know.  If you need to
10   get water, coffee, let me know.
11           If a question is pending and you want
12   to take a break, I'll probably just ask you
13   to answer it.  But otherwise, feel free to
14   take a break whenever you need.  Okay?
15           Does that sound okay?
16   A   That sounds good.
17   Q   Okay.
18       (Pause.)
19   Q   Could you describe for me your education
20       from high school forward?
21   A   I graduated in 1981 from Columbia University
22       with a bachelor's of science degree in
23       electrical engineering; and also in 1981 I
24       received a bachelor's of math degree from
```

Esquire Deposition Services
1-866-619-3925

ffc610a2-1a8e-4572-84a3-bd8fbe66c167

Page 10

1    been referring to what's call the power
2    supply department.
3         Is that the same as power management?
4    A  Yes, yes.
5    Q  Okay.
6         So you were director of power --
7    A  The title may have changed to director of
8    power supply at some time.
9    Q  Okay.
10        Was there -- is there a difference
11   between power management and power supply?
12   A  No.
13   Q  Okay.
14        Just what different people call it?
15   A  Yes.
16   Q  So from 1996 to May 2000, you were director
17   of power management.
18        Then what did you do?
19   A  I left Eastern Utilities and became director
20   of NEPOOL coordination at NSTAR in June of
21   2000.
22   Q  Why did you leave EUA?
23   A  EUA merged with National Grid.  It was New
24   England Electric at that time, and then they

Page 11

1    became National Grid.
2    Q  Okay.
3         And you decided you didn't want to
4    work for the merged entity; is that correct?
5    A  That's correct.
6    Q  Okay.
7         And have you changed positions since
8    you've been at NSTAR?
9    A  The title has changed, yes.  I'm director of
10   transmission business strategy now.
11   Q  Okay.
12        And what are the responsibilities of
13   that position?
14   A  Primarily I'm responsible for all
15   transmission contracts and also our FERC,
16   Federal Energy Regulatory Commission filings
17   associated with transmission.
18   Q  Okay.
19        What were the -- back to EUA, what
20   were the responsibilities of the power
21   management or the power supply department?
22   A  As I said, it was power supply contracting
23   primarily.
24        We were also responsible for

Page 12

1    transmission contracting at -- for a period
2    of time, and then that was split off.
3    Q  Okay.
4         And where did it -- when it was split
5    off, where did it go?
6    A  It -- when you say where did it go, it
7    stayed at EUA, but it was -- it was still
8    under Kevin Kirby, who I had reported to,
9    and we -- he was the point of contact where
10   both transmission contracts and power supply
11   contracts came together.
12   Q  Okay.
13   A  So I think that was in '96.
14   Q  Okay.
15        As the director of power management,
16   you said you reported to Kevin Kirby; is
17   that correct?
18   A  Yes.
19   Q  And what was his position?  Do you recall
20   what his title was?
21   A  I don't recall the exact title.
22   Q  Okay.
23        And he oversaw other departments as
24   well?

Page 13

1    A  Yes.
2    Q  Transmission contracts is one?
3    A  That's correct.
4    Q  Anything else?
5    A  I don't believe so.
6    Q  Okay.
7         And then from the 1996 to 2000 time
8    period, who did you supervise in the power
9    supply group?
10   A  Larry Boisvert, Fernando DaSilva, Don Ryan,
11   Joe Rossignoli.  I had 14 folks at one time.
12   Q  Okay.
13   A  You want me to try to remember all the
14   names?
15   Q  No, it's okay.
16        How about Peter Fuller?
17   A  Peter Fuller, yes.
18   Q  What was Mr. Boisvert's position?  What were
19   his responsibilities?
20   A  Larry was responsible primarily for billing
21   and contract administration of the power
22   supply contracts.
23   Q  Did he negotiate any of the contracts?  Was
24   he involved in that part of the --

4  (Pages 10 to 13)



Esquire Deposition Services
1-866-619-3925

ffc610a2-1a8e-4572-84a3-bd8fbe66c167



Page 14

1    MR. O'ROURKE: Objection.
2    MR. CRONIN: You can answer, Bob.
3    THE WITNESS: Oh.
4  A  Yes.
5  Q  He was involved in the negotiation of power
6    contracts?
7  A  Short-term contracts, I believe.
8  Q  Okay.
9  A  He didn't negotiate a lot of contracts. His
10   primary responsibility was administration,
11   so I think I need to correct myself. I
12   don't think he really negotiated any power
13   supply contracts.
14     He -- the folks that worked for
15   him -- well, reported to him did the
16   short-term power supply deals.
17 Q  Okay.
18     But he didn't negotiate long --
19 A  He did the primary -- I don't think Larry
20   was involved in long-term negotiations.
21 Q  Okay.
22     And when you say contract
23   administration, what does that entail?
24 A  Billing for the power supply contracts, you

Page 15

1    know, how much we owe for power supply
2    contracts, paying those bills and sending
3    out our bills for the contracts in which
4    we're providing power.
5  Q  Okay.
6     What about Don Ryan, what were his
7    responsibilities?
8  A  Well, Don has changed over time. He was
9    primarily responsible for load forecasting
10   initially.
11     And as we moved into divestiture, Don
12   became responsible for really overseeing the
13   process to divest of our owned generation --
14   the generation that we owned.
15 Q  Okay.
16     So over the restructuring period, he
17   was overseeing the divestiture of your
18   generation assets, EUA's?
19 A  He was involved in the divestiture of
20   generation assets, yes.
21 Q  Okay.
22     Was he involved at all in standard
23   offer service supply contracts?
24 A  No.

Page 16

1  Q  And what were Peter Fuller's
2    responsibilities, if you recall?
3  A  Peter -- I don't recall precisely.
4  Q  Okay.
5     And you said that Larry Boisvert
6    didn't really negotiate long-term contracts.
7     Was that your responsibility?
8  A  I was responsible -- I'm trying to -- things
9    change over time, but I was responsible
10   primarily for the negotiation of the power
11   purchase arrangements as we were divesting
12   of those power purchase arrangements at the
13   end of EUA's corporate life.
14 Q  So negotiating the sale of those power --
15 A  Right.
16 Q  -- the power purchase agreements that you
17   already had?
18 A  That's right.
19 Q  Okay.
20     What about standard offer service
21   contracts? Were you involved in negotiating
22   those?
23 A  Yes, but not primarily.
24 Q  When you say "not primarily," do you mean

Page 17

1    someone else was the primary person
2    responsible for those?
3  A  Well, there wasn't a lot of negotiation with
4    standard offer contracts. We developed the
5    standard offer contract, and that's it. It
6    was pretty much a standard contract.
7  Q  So no terms would change from the standard
8    contract you developed when you were trying
9    to market the contracts to competitive
10   suppliers?
11 A  I'm sure there was some change in terms. I
12   don't recall.
13 Q  Okay.
14     But you were involved in marketing
15   the standard offer service contracts to
16   competitive suppliers?
17     MR. O'ROURKE: Objection.
18     MR. CRONIN: Do you understand the
19   question, Bob?
20 A  Well, I think I need more information,
21   because we developed the standard offer
22   contract, and my recollection is the real
23   negotiations of standard offer contracts are
24   the --

5  (Pages 14 to 17)

Page 6

1    Providence College; and in 1989, I received
2    an MBA from the University of Rhode Island.
3  Q  1989?
4  A  '89, yes.
5  Q  And what did you do in between your BS and
6    your MBA?
7  A  I went to school at nights for my MBA, and I
8    was employed by Eastern Utilities Associates
9    in July of 1981.
10 Q  Okay.
11   In July of 1981?
12 A  1981, yes.
13 Q  Okay.
14   And what was your first job at EUA?
15 A  I was an associate engineer.
16 Q  Okay.
17   And how long did you hold that
18   position?
19 A  Two years.
20 Q  And what were the responsibilities of that
21   position?
22 A  I was responsible for, you know, a wide
23   variety of substation engineering projects.
24 Q  And what was the position after that?

Page 7

1  A  I believe it was supervisor of power
2    management.
3  Q  Okay.
4    And what were the job
5    responsibilities of that position?
6  A  Power contracting, primarily.
7  Q  What kind of power contracting?
8  A  Daily, weekly, monthly power contracts.
9    Probably up to about a year.
10 Q  Okay.
11   These were --
12 A  I was involved with.
13 Q  -- contracts that Montaup would provide
14   power for --
15 A  Provide or buy power.
16 Q  Okay.
17   And where was that position based?
18 A  Lincoln, Rhode Island.
19 Q  And those were short-term contracts, you
20   said?
21 A  Primarily short-term contracts.
22 Q  And how long were you in that position?
23 A  I think it was about two years.
24 Q  Okay.

Page 8

1    And what was the next position you --
2  A  Manager of power management.
3  Q  And how did your job responsibilities
4    change?
5  A  Well, I was -- I was responsible for
6    longer-term power and transmission contracts
7    in addition to the short-term contracts.
8  Q  And those, again, were contracts both for
9    Montaup to provide power and Montaup to buy
10   power; is that correct?
11 A  That's correct.
12 Q  And when you say "long-term," what do you
13   mean by that?
14 A  Well, it could be up to 20 years.
15 Q  Okay.
16   And how long were you manager of
17   power management?
18 A  I think that was about two years, and then I
19   became director of power management.
20 Q  And what year was that?
21 A  I want to say that was 1996.
22 Q  Okay.
23   And so in between that -- during this
24   period, you went to night school and you got

Page 9

1    your MBA?
2  A  That's correct.
3  Q  Okay.
4    And that was in 1989?
5  A  Well, between '81 and '89.
6  Q  Okay.
7    And when you got your MBA, did you
8    get some sort of promotion or did you stay
9    on and then --
10 A  I think I became a senior engineer at that
11   time.
12 Q  Okay.
13 A  So there was a couple of in-between steps.
14 Q  Okay.
15   So in 1996, you were director of
16   you're calling it power management?
17 A  Power management, yes.
18 Q  Okay.
19   And how long did you hold that
20   position?
21 A  Until May of 2000.
22 Q  Okay.
23   Just for my own clarification, all
24   throughout these depositions, people have

3  (Pages 6 to 9)

Page 42

1   A   I don't recall.
2   Q   You don't recall.
3           Were you trying to get rid -- were
4   you trying to get suppliers to sign on to
5   provide standard offer service?
6   A   We packaged the standard offer with the
7   generation, so they would look at the
8   generation assets and the amount of standard
9   offer supply and take into account both
10  contracts and bid on them.
11  Q   So if the -- if the supplier thought that
12  the standard offer service obligation was a
13  bad deal, would the -- would that affect the
14  price they offered for the generation
15  assets?
16          MR. O'ROURKE:  Objection.
17  A   Yes.  And if they thought it was a good
18  deal, it would affect the price also.
19  Q   So you were trying to maximize -- were you
20  trying -- was EUA trying to maximize the
21  sale price of the generation assets?
22  A   Is that the -- is that the whole question?
23  Q   Yes.
24  A   By doing what?

Page 43

1   Q   Were you -- not by doing anything.
2           Was the goal of selling the assets to
3   get a high price?
4   A   Selling the assets and the load obligation.
5   Get the highest price for selling the assets
6   along with the load obligation that would be
7   attached to that asset.
8   Q   So is that a yes?  I'm sorry.
9   A   We wanted to get the highest price we could
10  but not retain ongoing obligations or have
11  resources without -- without a load
12  obligation.
13  Q   Okay.
14          But you were trying to maximize --
15  A   That package.
16  Q   Correct.  Okay.
17          Both the -- you were trying to
18  maximize the price you got for both assets
19  and the standard offer load application?
20  A   Which --
21  Q   I think we're on the same page, I'm just
22  trying to --
23  A   That's right.
24          But the point is, without ending up

Page 44

1   with some load and no assets or some assets
2   and no load.
3   Q   So you wanted to get rid of everything; is
4   that correct?
5   A   That's correct.
6   Q   And you wanted to get the best price you
7   could for everything?
8   A   For that package, yes.
9   Q   Okay.
10          And you said before that you didn't
11  recall whether the fuel adjustment went
12  through the full term of the contract; is
13  that correct?
14  A   That's correct.
15  Q   Okay.
16          Do you recall any conversations with
17  anyone at TransCanada at the time that this
18  contract was negotiated about the fuel
19  adjustment clause?
20  A   I don't recall.
21  Q   You don't recall.
22          You don't recall either way?
23          MR. O'ROURKE:  Objection.
24  Q   Yes or no or you --

Page 45

1           You don't recall whether you had any
2   conversations about the fuel adjustment; is
3   that correct?
4   A   That's correct.
5   Q   Okay.
6           Are you -- do you recall any internal
7   discussions at EUA concerning the fuel
8   adjustment as it related to this standard
9   offer service contract?
10  A   I don't recall.
11  Q   You don't recall.  Okay.
12          Prior to restructuring, EUA owned
13  both retail and generation companies; is
14  that correct?
15  A   Yes.
16  Q   Okay.
17          And we discussed this before, but
18  Montaup was the generation -- is "affiliate"
19  the right word or should I use subsidiary?
20  A   Either.
21  Q   Either.  Okay.
22          So was Montaup the generation
23  affiliate of EUA?
24  A   Generation and transmission.

12  (Pages 42 to 45)

ffc610a2-1a8e-4572-84a3-bd8fbe66c167

Page 50

1  Q   And was there a fuel adjustment or something
2      like that?
3         How was that achieved?
4         MR. O'ROURKE:  Objection.
5  A   I believe it was a fuel adjustment clause.
6      We -- Montaup received its costs of fuel, is
7      my recollection.
8  Q   And that was -- when you say there was a
9      fuel adjustment clause, would that have been
10     in the tariff?
11 A   I -- you know, I don't recall.
12 Q   Okay.
13        And do you recall whether the
14     consumers would be charged for those fuel
15     costs through Blackstone or Newport's
16     tariffs?
17 A   I believe so.
18 Q   You believe so.  Okay.
19        And you said that you don't recall
20     any real changes to the FERC tariff for
21     Montaup during the time that you were there;
22     is that correct?
23        MR. O'ROURKE:  Objection.
24 A   That's correct.

Page 51

1  Q   And you also testified -- I'm just trying to
2      confirm this -- that Montaup was, for the
3      time that you were at EUA, always reimbursed
4      for its fuel costs pursuant to the
5      all-requirements contracts?
6         MR. O'ROURKE:  Objection.
7  A   That's my recollection.
8  Q   Okay.
9         Can you tell me why?
10        MR. O'ROURKE:  Objection, vague.
11        MR. CRONIN:  Do you understand the
12     question?
13 A   Yes, I -- I --
14        Could you clarify what you mean by
15     that?
16 Q   Why was Montaup reimbursed for its fuel?
17        Was it important to its -- to its
18     business to be reimbursed for its fuel
19     costs?
20 A   Yes, it was important to receive its -- its
21     cost of service.
22 Q   Is fuel a significant part of the cost of
23     generating that power?
24 A   Yes.

Page 52

1  Q   And was it at the time pre-restructuring an
2      industrywide practice for wholesale
3      suppliers to be reimbursed for their fuel
4      costs?
5         MR. O'ROURKE:  Objection.
6  A   I'm not sure if it was industrywide.
7  Q   But was it Montaup's practice?
8  A   Yes.
9  Q   Okay.
10        Do you recall in 1996 there was an
11     act passed in Rhode Island called the
12     Utility Restructuring Act?
13 A   Yes.
14 Q   Do you recall what the purpose of that act
15     was?
16 A   To the best of my recollection, it was to
17     bring competition to the utility industry.
18 Q   Okay.
19        And did the URA require EUA to divest
20     its generation assets?
21 A   Yes.
22 Q   Okay.
23        And that was to -- was that to serve
24     the purpose of creating a competitive

Page 53

1      market, as you said, for electricity?
2  A   That was my understanding.
3  Q   Okay.
4         And why?  Would the creation of a
5      competitive market for electricity lower
6      consumers' electricity prices?
7         Is that what the goal of the act was?
8  A   I believe that was the goal.
9  Q   Okay.
10        And was a similar piece of
11     legislation enacted in Massachusetts?
12 A   Yes.
13 Q   Okay.
14        Do you know when that was?
15 A   I don't recall the date.
16 Q   Do you recall whether at the time they were
17     passed, you would have reviewed the URA?
18 A   I believe I -- yes.
19 Q   So you believe you would have reviewed it?
20 A   Yes.
21 Q   Okay.
22        Do you believe you did review it?
23 A   Yes.
24 Q   Okay.

14  (Pages 50 to 53)

Page 54

1    I'm going to show you what's been
2    marked as Exhibit 2.
3        (Witness read document.)
4  Q  Sorry, there's another little piece to that,
5    if you could clip that on the back.
6        MS. PLOTKIN: Here you go.
7        MR. CRONIN: Thanks, Wendy.
8  BY MS. PLOTKIN:
9  Q  Do you recognize this document?
10 A  Yes.
11 Q  Can you tell me what it is?
12 A  I believe this is the restructuring act from
13   the Public Utilities Commission.
14 Q  Okay.
15      So this would be Rhode Island, do you
16   think?
17 A  Yes.
18 Q  Do you recall that the URA provided for
19   something called standard offer service?
20 A  Yes.
21 Q  And can you tell me what standard offer
22   service was?
23 A  Standard offer service was the service
24   that -- for customers that did not elect a

Page 55

1    competitive supplier.
2  Q  So customers who were already customers of
3    Blackstone Valley and Newport?
4  A  Yes.
5  Q  And this was service that was to be provided
6    to them if they didn't find a competitive or
7    choose a competitive supplier; is that
8    correct?
9  A  That's correct.
10 Q  Okay.
11     Who was obligated to provide standard
12   offer service?
13 A  The retail companies, retail distribution
14   companies.
15 Q  Do you recall what the term of standard
16   offer service was for Rhode Island?
17 A  I believe it was through December 2009.
18 Q  What about do you recall if Massachusetts
19   also had something called standard offer
20   service?
21 A  Yes.
22 Q  And what was the term of that standard offer
23   service?
24 A  Initially, December 31, 2004.

Page 56

1  Q  And you said initially. Did that change?
2  A  Yes.
3  Q  What did it change to?
4  A  My recollection is it was February 2005.
5  Q  Do you recall why it changed to
6    February 2005?
7  A  I don't recall.
8  Q  Okay.
9        Do you recall whether the URA set
10   forth a pricing scheme for standard offer
11   service?
12 A  My recollection is it did.
13 Q  And do you recall what it was?
14 A  I don't recall.
15 Q  If you could look to -- this is two little
16   packets -- the second packet, the bottom of
17   the page, this is Exhibit 2, it says
18   39-127.3.
19       Do you see that?
20 A  I do.
21 Q  Okay.
22       And if you could turn the page and
23   look to subsection (d). I think your copy
24   is --

Page 57

1  A  Where it's highlighted?
2  Q  -- is highlighted, which is some sort of
3    error.
4        MS. PLOTKIN: Apologize for that,
5    Vin.
6        MR. O'ROURKE: Makes him easier to
7    find what you want him to read.
8  Q  So if you could just read subsection (d) to
9    yourself. Not the whole thing. If you
10   could go just about a third of the way down
11   to the next page, that would be great.
12       (Witness read document.)
13 A  Okay.
14 Q  Does this refresh your recollection at all
15   about the pricing scheme set forth in the
16   URA concerning standard offer service?
17 A  Somewhat.
18 Q  Somewhat?
19       Can you describe for me your
20   understanding of what the pricing scheme set
21   forth in the URA is?
22       (Witness read document.)
23 A  It appears that it was a price that was set
24   and then adjusted for a number of factors.

15  (Pages 54 to 57)

Page 178

1  A  I don't recall.
2  Q  Okay.
3      And do you recall, again, when this
4    change occurred?
5  A  I don't.
6  Q  I'm going to show you an Exhibit I'm going
7    to mark as 127.
8      (Exhibit No. 127 marked for
9    identification.)
10  BY MS. PLOTKIN:
11  Q  Do you recognize this document?
12  A  I do.
13  Q  What is this?
14  A  This document outlined the standard offer
15    backstop percentages that we assigned to
16    each of our assets.
17  Q  Okay.
18      And do you recall why you were
19    sending this to Bill Taylor on April 2,
20    1998?
21  A  Not specifically, no.
22  Q  Do you recall any discussions with
23    Mr. Taylor about percentages of standard
24    offer load during this time period?

Page 179

1  A  I don't recall the details of those
2    discussions.
3  Q  And what is the standard offer load for the
4    OSP -- what is the percentage of backstop
5    assignment for OSP?
6  A  14.455 percent.
7  Q  Okay.
8      And that coincides with your previous
9    recollection?
10  A  That's correct.
11  Q  Good job.
12      Let me show you what I'm going to
13    mark as Exhibit 128.
14      (Exhibit No. 128 marked for
15    identification.)
16  BY MS. PLOTKIN:
17  Q  Do you recognize this document?
18      (Witness read document.)
19  A  I do not.
20  Q  Does this refresh your recollection at all
21    about any conversations you had with Bill
22    Taylor concerning standard offer service
23    percentages?
24  A  I don't recall.

Page 180

1  Q  Okay.
2      Do you recall discussing standard
3    offer service pricing terms with anyone at
4    TransCanada after April 1, 1998?
5  A  I don't recall any details, and I'm not sure
6    about the timing.
7  Q  Okay.
8      And do you recall ever discussing the
9    fuel adjustment provision with anyone at
10    TransCanada after April 1, 1998?
11  A  I don't recall.
12  Q  And do you recall any changes in the
13    purchase price offered by TransCanada for
14    the assets between April 1 and April 7,
15    1998?
16  A  I don't recall.
17  Q  Okay.
18      I'm going to show you what's been
19    marked as Exhibit 58. If I could turn your
20    attention to TCPM7325.
21      Do you recall having any
22    discussions -- you can take a minute to
23    review this -- with anyone at TransCanada
24    concerning this provision?

Page 181

1      (Witness read document.)
2  A  I don't recall discussions concerning the
3    provision.
4  Q  Okay.
5      Do you recognize this language at
6    all?
7  A  Looks familiar.
8  Q  Do you recall whether it ever made it into
9    the -- whether it ever made it into the
10    contract between TransCanada and
11    Narragansett?
12  A  I don't recall.
13  Q  I'm sorry, and EUA? You don't recall?
14  A  No.
15  Q  Okay.
16      And you don't recall any discussions
17    with anyone at TransCanada about that
18    provision?
19  A  Not specifically, no.
20  Q  Do you recall any discussions with anyone at
21    EUA about that provision?
22  A  I do not.
23  Q  Okay.
24      MS. PLOTKIN: I'm going to mark this

46 (Pages 178 to 181)

**Page 182**

1  as 129.
2  (Exhibit No. 129 marked for
3  identification.)
4  BY MS. PLOTKIN:
5  Q  Do you recognize this document?
6  A  Yes.
7  Q  What is it?
8  A  Asset purchase agreement by and among
9  Montaup Electric and TransCanada.
10  Q  And do you see -- it's a little difficult on
11  the first page, but if you flip three, do
12  you see the fax line at the top?
13  A  Yes.
14  Q  Do you see what the date of that is?
15  It's actually clearer as you go
16  farther back in the document, for some
17  reason.
18  A  April 5, 1998.
19  Q  If you turn a little bit farther back, I
20  think it looks more like April 3rd, but
21  I'll --
22  A  Okay.
23  Q  Do you recall having any discussions with
24  TransCanada around the period of April 3,

**Page 183**

1  1998, concerning the standard offer service
2  agreement or the asset purchase agreement?
3  A  I don't recall.
4  Q  If you turn back to 7506, and you can flip
5  through a few pages, this appears to be a
6  markup of the wholesale standard offer
7  service agreement between TransCanada and
8  Narragansett -- I'm sorry, and EUA.
9  Have you ever seen this particular
10  markup before?
11  A  Not that I recall.
12  Q  And do you recognize the handwriting?
13  A  I do not.
14  Q  Okay.
15  Turning to 7510, do you see the
16  handwriting above the term standard offer
17  service, "Settlement agreements means ...
18  Bob to provide"?
19  A  Yes.
20  Q  Do you recall if that is referring to you?
21  A  I do not.
22  Q  Do you know of any other Bob that was
23  involved in the negotiations between
24  TransCanada and EUA concerning this

**Page 184**

1  agreement?
2  A  No.
3  Q  You're not aware of any other Bob?
4  A  Well, the only other Bob I'm aware of is Bob
5  Powderly.
6  Q  Okay.
7  Do you think he was involved in
8  negotiations with TransCanada concerning
9  this agreement?
10  A  I don't think he was involved in
11  negotiations, and I don't know what other
12  Bob this might be, but I don't recall --
13  Q  Do you recall at the time being asked to
14  provide any language for this agreement?
15  A  No, I do not.
16  And I -- it doesn't look like
17  something I would be asked to provide, so...
18  Q  Do you think it's something that Bob
19  Powderly would be asked to provide?
20  A  No.
21  Q  Okay.
22  So it's just kind of -- you're not
23  sure?
24  A  I -- I can't think of who it is --

**Page 185**

1  Q  Okay.
2  A  -- referring to.
3  Q  But you do not think this is you that this
4  is referring to?
5  (Witness read document.)
6  A  I don't recall.
7  Q  Okay.
8  And reading that description of
9  standard offer service, were you familiar
10  with this description?
11  A  Yes.
12  Q  And this refers to the company's standard
13  offer service tariffs; is that correct?
14  A  That's correct.
15  Q  Okay.
16  And does this refer in any way to
17  standard offer service price, or is this
18  referring to something else?
19  A  This is referring to the service.
20  Q  And how is that -- what does that mean?
21  A  That means all the responsibilities that
22  are -- that must be met to provide
23  all-requirements service for standard offer
24  service.

47 (Pages 182 to 185)

Page 186

1  Q  Is that energy, installed capability,
2     operable capability, reserves --
3  A  That's correct.
4  Q  Associated losses? That's what that's
5     referring to?
6  A  Yes.
7  Q  Okay.
8        And do you recall any draft --
9     drafting any language that described
10    settlement agreements?
11 A  I do not.
12 Q  And do you recall any conversations with
13    TransCanada concerning adding the phrase
14    "settlement agreements" here?
15 A  I do not.
16 Q  Do you recall any internal conversations
17    with anyone at EUA concerning adding the
18    phrase or the words "settlement agreements"
19    at this point in the agreement?
20 A  I do not.
21 Q  And if you look down the page to Article 2,
22    Term, it appears the term is now through
23    2009?
24 A  (Witness nods.)

Page 187

1  Q  Again, do you recall when the term of the
2     agreement with TransCanada changed from 2004
3     to 2009?
4  A  I do not.
5  Q  And do you recall when the term of the
6     agreement with TransCanada changed from 2004
7     to 2009 anything changed with regard to the
8     price for standard offer service?
9  A  For the period prior?
10 Q  For the contract.
11       Was there a change in the price term
12    of the contract?
13 A  I don't recall.
14 Q  You had previously stated that the price
15    included the stipulated price plus a fuel
16    adjustment --
17 A  That's correct.
18 Q  -- through the term of the contract; is that
19    correct?
20       MR. O'ROURKE:  Objection.
21 A  Through 2004, yes.
22 Q  Okay.
23       Do you recall that there was any
24    change in that term, that price term, for

Page 188

1     the years -- for through 2009?
2  A  I do not recall.
3  Q  Do you recall whether the price included the
4     stipulated price plus the fuel adjustment
5     for the period through 2009?
6  A  I don't recall.
7  Q  You don't recall either way?
8  A  That's correct.
9  Q  Do you recall any discussions with
10    TransCanada about any changes in the price
11    term of the standard offer service contract?
12 A  I do not.
13 Q  And do you have any -- do you recall any
14    discussions concerning the fuel adjustment
15    provision in the years 2005 through 2009
16    with TransCanada?
17 A  I do not.
18 Q  And do you recall any discussions at EUA
19    internally concerning the fuel adjustment
20    factor in the TransCanada wholesale standard
21    offer service contract --
22 A  I do not.
23 Q  -- for the years 2005 through 2009?
24 A  I do not.

Page 189

1  Q  Thank you.
2        Now, if you can turn to Article 5,
3     which is at 7512.
4        The price is described the same way
5     as the contract that we viewed before where
6     the term was through 2004; is that correct?
7  A  That's correct.
8  Q  Okay.
9        And did you have any discussions with
10    TransCanada that the fuel adjustment would
11    not be for the full term of the contract?
12 A  Not to my recollection.
13 Q  You don't recall any internal communications
14    at EUA concerning extending the term of the
15    TransCanada contract from 2004 to 2009; is
16    that correct?
17 A  I don't recall specific discussions, no.
18 Q  And you don't recall when that decision was
19    made?
20 A  I don't.
21 Q  Okay.
22       And you don't recall any discussions
23    with TransCanada specifically about the
24    extension of the term of the contract

48 (Pages 186 to 189)

ffc610a2-1a8e-4572-84a3-bd8fbe66c167

# Hachey

                    UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

                      (Central Division)

- - - - - - - - - - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING, LTD.,

          Plaintiff,


          vs                    C.A. No. 05-40076FDS


NARRAGANSETT ELECTRIC COMPANY,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - -

     DEPOSITION OF MICHAEL HACHEY, called as a

witness by counsel for the Defendant, pursuant to

the provisions of Massachusetts Rules of Civil

Procedure, before Victoria S. Reade, Professional

Court Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, taken at Bowditch &

Dewey, 311 Main Street, Worcester, Massachusetts, on

Tuesday, March 13, 2007, commencing at 10:14 a.m.

0783e97e-b283-4f1f-a712-9b4cd03c706d

Page 2

1  APPEARANCES:
2  CHOAT HALL & STEWART
3  BY: Mr. Daniel C. Winston, Esq.
4  Two International Place
5  Boston, Massachusetts 02110
6  617-248-4049
7  dwinston@choate.com
8  Counsel for the Plaintiff
9
10  TRANSCANADA PIPELINES LIMITED
11  BY: Ms. Jody D.M. Johnson, Esq.
12  450 1ST Street S.W.
13  Calgery, Alberta, Canada T2P 5H1
14  403-920-2706
15
16  BOWDITCH & DEWEY
17  BY: Mr. Vincent F. O'Rourke, Esq.
18  311 Main Street
19  Worcester, Massachusetts 01615
20  508-926-3424
21  vorourke@bowditch.com
22  Counsel for the Defendant
23
24

Page 3

1          I N D E X
2
3  Testimony of:  Direct Cross Redirect Recross
4  Michael Hachey
5  by Mr. O'Rourke  4
6
7          E X H I B I T S
8  Exhibit No.                    Page
9   115   Deposition Notice        13
10
11   116   Interrogatories          90
12
13   117   Arbitration Testimony   116
14
15   118   Correspondence          129
16
17   119   Correspondence          130
18
19   120   Correspondence          134
20
21   121   Correspondence          136
22
23      EXHIBITS RETAINED BY ATTORNEY O'ROURKE
24

Page 4

1          P R O C E E D I N G S
2          MICHAEL HACHEY, having first
3  been satisfactorily identified by the
4  production of his driver's license, was
5  duly sworn by the Notary Public, examined
6  and testified as follows:
7  DIRECT EXAMINATION BY MR. O'ROURKE:
8  Q.  Mr. Hachey, could you please state your
9      full name for the record, please.
10  A.  My name is Michael E. Hachey.
11  Q.  And your residence address?
12  A.  It's 56 Belknap, that's B-e-l-k-n-a-p,
13      Street in Westborough, Massachusetts.
14  Q.  And you've been deposed before?
15  A.  Yes.
16  Q.  How many times do you think?
17  A.  Too many. Two that I can immediately
18      think of, but there may be more.
19  Q.  Well, just for the drill before we start.
20      MR. O'ROURKE: The usual
21      stipulations? All objections except as to
22      form, all motions to strike reserved until
23      trial? Read and sign?
24      MR. WINSTON: Waive

Page 5

1  notarization. Yes.
2      MR. O'ROURKE: Thank you.
3  BY MR. O'ROURKE:
4  Q.  You have done it before. I'm going to be
5      asking you some questions about the matter
6      of TransCanada versus Narragansett. If
7      you don't understand my questions, just
8      let me know and I'll rephrase them.
9          If you need a break, that's fine. I
10      just ask that you not take a break while a
11      question is pending.
12  A.  Yes.
13  Q.  Okay?
14  A.  Thank you.
15  Q.  Could you please state your educational
16      background.
17  A.  I received a Bachelor of Science in
18      Electrical Engineering from Northeastern
19      University. I received a Masters in
20      Electric Power Engineering from Rensselaer
21      Polytechnic Institute, and I've had other
22      miscellaneous training including a Public
23      Utility Executive Program from the
24      University of Michigan.

2 (Pages 2 to 5)

Page 6

1  Q.  When did you receive your BS?
2  A.  '76.
3  Q.  Could you state your employment background
4      and including in that, if you could recall
5      them all, your co-ops at Northeastern.
6  A.  Well, I worked for various subsidiaries of
7      the New England Electric System as a co-op
8      at Northeastern, Narragansett, New England
9      Power, and New England Power Service
10     Company.
11         In 1977 I went to work on a full-time
12     basis for New England Electric System in
13     a -- on a training basis, and I pursued a
14     number of assignments throughout the
15     system, ultimately, coming back to the
16     Generation Planning and Power Supply
17     Department in about the time of 1978 or
18     '79.
19         I worked there for several years, and
20     in about 1981, or '80, '80 or '81, I
21     became a staff assistant to the president
22     of New England Power Company.
23         Thereafter, I worked as the manager
24     of technical services within New England

Page 7

1      Power Company. Subsequent to that, I
2      became the manager of the Alternate Energy
3      Department at New England Power, I'm
4      sorry. That would have been for New
5      England Power Service Company.
6          After that I took on an expanded
7      role while I continued having the
8      responsibilities of the ultimate energy
9      area. But I ultimately became the
10     Vice-President of Generation Marketing for
11     New England Power Company. I believe it
12     may have been the Service Company, I don't
13     know, one of the two companies, either the
14     service or the power company.
15         You want me to continue now, past
16     that point?
17  Q.  Actually, was that the conclusion of your
18     New England Power?
19  A.  Yes.
20  Q.  I just -- do you have any sense of the
21     time frame of the manager of Alternative
22     Energy, when you assumed that role?
23  A.  Oh, I'm sorry. I completely missed a
24     piece here.

Page 8

1          In the 1985 to the 1988 time frame I
2      was at Breakpoint Station as the assistant
3      plant manager. So I would have taken on
4      the Alternate Energy role in about the '88
5      time frame.
6  Q.  What did that role involve, the Alternate
7      Energy?
8  A.  I was responsible for the role of -- well,
9      I'm sorry, was responsible for the various
10     activities relating to procurement of
11     power and administration of contracts with
12     the non-utility generators.
13  Q.  And what year did you become the
14     Vice-President of Generation Marketing?
15  A.  That may have been on the order of 1996 or
16     something.
17  Q.  And what did your responsibilities entail
18     in that role?
19  A.  I continued to have oversight over the
20     Alternate Energy area, but I also was
21     responsible for power purchases and sales
22     from the New England Power portfolio.
23  Q.  And did those purchases include purchases
24     from entities like TransCanada?

Page 9

1  A.  I don't think it involved any purchases
2      from TransCanada.
3  Q.  But similar types of purchases from
4      suppliers?
5  A.  Well, the Alternate Energy role really
6      dealt with non-utility, non-traditional
7      utility suppliers.
8          When adding on to the generation
9      marketing, I would have included the role
10     of the traditional utility purchases and
11     sales.
12  Q.  So that would be companies like EUA or
13     TransCanada or the more traditional
14     suppliers?
15  A.  Well, TransCanada wasn't an active player
16     in the area, but for there participation
17     in the Ocean State Power Plant.
18         So it would have typically involved
19     entities like Boston Edison, a number of
20     municipalities that we had agreements
21     with.
22  Q.  And when did you leave New England Power
23     entities for the general company?
24  A.  August 31, 1998.

3 (Pages 6 to 9)

0783e97e-b283-4f1f-a712-9b4cd03c706d

Page 30

1    what the company is stating, with respect
2    to this case. And -- and what was the
3    question again?
4    BY MR. O'ROURKE:
5    Q.  I'm going to have the same problem you're
6         having remembering my question.
7              I think my question was: Your
8         base -- your conclusion -- are you basing
9         your position that a fuel adjustment
10        factor is required for every year of the
11        contract based upon your reading of
12        Paragraph 5 of the contract?
13   A.  And that would be one item that I would
14        refer to.
15   Q.  The second item that you mentioned was
16        your understanding of the requirement
17        under the Uniform of Restructuring Act?
18   A.  Correct.
19   Q.  Are there any other things that you
20        personally based that understanding on?
21   A.  Well, because I've seen a number of
22        documents in this case, I, you know,
23        understand that EUA made a number of
24        representations in their documents as to

Page 31

1    how this mechanism was to work.
2              And, you know, I've seen other,
3         obviously, we had the tariffs that
4         Narragansett sent to us in the congestion
5         case that indicated that their
6         understanding was consistent with our own.
7    Q.  Did you see any tariffs in the congestion
8         case which indicated that Narragansett
9         was -- considered that the fuel adder
10        applied through 2009 with respect to this
11        agreement, Exhibit 1?
12   A.  Yes.
13   Q.  What year were those tariffs?
14   A.  About 2001, as I recall.
15   Q.  And that was a tariff?
16   A.  Those were fuel clause filings that
17        Narragansett made.
18   Q.  Did you see them at the 2001 time frame?
19   A.  That was in the 2001 time frame.
20   Q.  But did you see them at that time?
21   A.  I saw them in the course of the review of
22        materials for the congestion clause case.
23   Q.  And when did you undertake that reading?
24   A.  That would have been in the 2002 time

Page 32

1    frame.
2    Q.  Were you aware in 2004 that the fuel adder
3         provision, in existence at that time, had
4         an end point?
5              MR. WINSTON: Objection.
6    A.  We're talking about the EUA contract?
7    Q.  Yes.
8    A.  Well, I would've -- was I aware in 2004
9         that the fuel had an end point, yes. 2009
10        was my understanding.
11   Q.  Did you understand that the tariff in
12        existence as of 2004 had an expiration
13        date?
14              MR. WINSTON: Objection.
15   A.  No, I did not.
16   Q.  Did you recognize that the numerical value
17        of the fuel adder that would be payable in
18        2005, were there a fuel adder, did you
19        think would be the same number that was
20        being paid in 2004?
21              MR. WINSTON: Objection.
22   A.  I thought that it would be the same as the
23        value paid by the, what we'll call the old
24        Narragansett, but for the action of the

Page 33

1    six month rolling versus 12 month rolling
2         mechanism.
3    Q.  The old Narragansett being the pre-merger
4         Narragansett; is that what you're
5         referring to as old Narragansett?
6    A.  Yes.
7    Q.  And so you believe that the number for
8         2005 would be the same number that was in
9         Narragansett's tariffs with other
10        companies?
11              MR. WINSTON: Objection.
12   A.  You said same number as Narragansett's
13        tariffs with other companies?
14   Q.  Applicable to either contracts.
15              MR. WINSTON: Objection.
16   A.  You wouldn't get the same number in 2004
17        as in 2005.
18   Q.  Right.
19   A.  So my understanding was that the there was
20        uniformity of the determination of the
21        fuel adjustment between Narragansett and
22        EUA, but for the fact that one of them was
23        a six month rolling fuel index, and the
24        other was a 12 month rolling fuel index.

9 (Pages 30 to 33)

0783e97e-b283-4f1f-a712-9b4cd03c706d

Page 98

1  Q.  Your counsel is not as forward.
2       Okay.  Thank you.
3       And you also indicated that there
4   were fuel clause filings in 2001 which you think were
5   Narragansett which you think were
6   deceptive in some respect?
7       MR. WINSTON:  Objection.
8  A.  I don't believe -- well, no.  I don't
9   believe that was my testimony.  I think
10  that I indicated that there fuel clause
11  filings in 2001 that were provided to
12  TransCanada.
13      And if it was provided while
14  Narragansett believed that something
15  completely different than what was in
16  those filings, then as they appear they
17  do, then that was deceptive.
18  Q.  And they were provided to you in
19  connection with another -- a different
20  piece of litigation?
21  A.  Yes.
22  Q.  They weren't provided to you in response
23  for a request for an explanation of their
24  belief concerning standard-offer, or fuel

Page 99

1   adjustment provisions, or any other
2   discussion that's journeyed into this
3   transaction?
4  A.  We asked them for any materials that
5   provide the basis for their view, and no,
6   those weren't provided at the time.
7  Q.  I'm sorry, for their view of what?
8  A.  This is post February of 2005.  We asked
9   for documents that supported their view
10  that the fuel clause -- fuel adjustment in
11  the EUA contract didn't extend past 2004.
12      And my point was that, no, they were
13  not provided at that time.  They were
14  provided as part of the -- they were
15  provided prior to that as part of the
16  Congestion Arbitration.
17  Q.  And what was deceptive about they are
18  being provided as part of the Congestion
19  Arbitration?
20      MR. WINSTON:  Objection.
21  A.  Well, I think what I said was if their
22  view at the time was that they weren't
23  going to pay the fuel adjustment past 2004
24  while they were providing us those

Page 100

1   documents, then that was deceptive.
2  Q.  When did they provide you with those
3   documents?
4  A.  2002.
5  Q.  Okay.
6  A.  Thereabouts.
7  Q.  But they were in response to a request
8   concerning the standard-offer and fuel
9   adjustment, weren't they?
10  A.  Well, it very much had to do with the
11  Standard-Offer Contract.
12  Q.  Right.  Did it have anything to do with
13  the length of the fuel adjustment
14  provisions?
15  A.  The Congestion Arbitration did not pertain
16  to the length of the fuel arbitration.
17  Q.  So the documents that were provided to you
18  were in connection with an entirely
19  different piece of litigation?
20      MR. WINSTON:  Objection.
21  A.  Well, they were provided entirely with
22  respect to the Standard-Offer Contract.
23  It was a different issue that was being
24  litigated.  It was the Standard-Offer

Page 101

1   Contracts.
2  Q.  That's true.  But it was not as if this
3   was a representation that was germane to
4   the request that you had made for
5   information?
6       MR. WINSTON:  Objection.
7  A.  I don't know how to answer that.  We sent
8   along a document request, this is what we
9   got back.  I'd have to go back and review
10  the document requests.  But we asked for,
11  as you might imagine, all documents
12  associated with the Standard-Offer
13  Contracts.
14  Q.  I have no doubt.
15      Is this -- I'm handing you Exhibit
16  92.  Is that the document you're referring
17  to?
18      MR. WINSTON:  I'll object to the
19  use of the singular term document.
20  A.  This is one of the documents, yes.
21  Q.  If you don't mind, I'm going to come
22  around just because I was saving a tree,
23  or at least a leaf.
24      What in that document do you consider

26  (Pages 98 to 101)

| Page 102 | | Page 104 | |
|---|---|---|---|
| 1 | it to be deceptive with respect to the to | 1 | Q. And did you rely on them at the time for |
| 2 | fuel adjustment provision and | 2 | that proposition? Did you take note of |
| 3 | Narragansett's beliefs with respect to it? | 3 | that proposition? |
| 4 | A. Well, again, it wasn't just related to | 4 | A. I reviewed 11 boxes of documents in |
| 5 | this document. It was the idea that if | 5 | conjunction with the Congestion Cost |
| 6 | they were of the belief in 2002 that the | 6 | Arbitration, extensively. I did, and two |
| 7 | adjustment in the EUA zone was not going | 7 | of our attorneys did, and it was |
| 8 | to be paid after 2004, that by delivering | 8 | consistent with my understanding. |
| 9 | this to us, which clearly indicated that | 9 | So to that extent you know when |
| 10 | the fuel -- EUA fuel adjustment would | 10 | you say take note, it was, went through |
| 11 | continue through 2009. | 11 | it, it was the matter at hand involved |
| 12 | In fact, as I understood it, | 12 | congestion. |
| 13 | that there was no material difference | 13 | But I certainly was interested in any |
| 14 | between the old Narragansett and the EUA | 14 | other concerns that might arise with our |
| 15 | fuel adjustments. | 15 | contracts, and that document and at least |
| 16 | Yet, if at the same time they had | 16 | one other document simply gave me comfort |
| 17 | quite a different belief, then that whole | 17 | that those two were consistent. |
| 18 | package would have been deceptive. | 18 | So, no, in answer to the direct |
| 19 | Q. Where do you see that in here? I haven't | 19 | question, there was no specific note |
| 20 | had a chance to read it yet, I've just | 20 | because it was consistent with what I |
| 21 | been trying to find out what document | 21 | always understood. |
| 22 | you've been referring to. | 22 | Q. But it was inconsistent with the letter |
| 23 | If you could just point that out | 23 | that you received from Mr. Hager back |
| 24 | to me in Exhibit 92 where you see that | 24 | January of 2000? |

| Page 103 | | Page 105 | |
|---|---|---|---|
| 1 | representation. | 1 | MR. WINSTON: Objection. |
| 2 | A. Where do I see the -- | 2 | A. That wasn't my testimony. |
| 3 | Q. The representation that it would run | 3 | Q. The charts certainly are different? |
| 4 | through 2009. | 4 | A. I guess the difference in my mind was |
| 5 | A. That the two -- that the old Narragansett | 5 | being presented with something that looked |
| 6 | and the new Narragansett fuel adjustments | 6 | like it was intended to get the |
| 7 | were similar in all material respects. | 7 | administration straight, and in this case |
| 8 | It's in the testimony, embedded | 8 | is filed testimony, which in my experience |
| 9 | in the testimony, as well as in the | 9 | typically would have involved review by |
| 10 | Exhibit 1. | 10 | attorneys. |
| 11 | This is the Exhibit MJH1. And the | 11 | And, you know, looking back on the |
| 12 | only difference noted between the EUA and | 12 | 2000 letter today, it appears that it was |
| 13 | the Narragansett or old -- at this point | 13 | a little sloppy in that it didn't |
| 14 | it's old Narragansett and new | 14 | distinguish at all between the old |
| 15 | Narragansett, relates to the 12 month or 6 | 15 | Narragansett and the new Narragansett, |
| 16 | month rolling averages for market gas, and | 16 | which is the way I understood it at the |
| 17 | then market oil. | 17 | time. |
| 18 | Q. Were there other documents that were | 18 | So as to the charts themselves, these |
| 19 | provided to you in connection with that | 19 | charts extend through 2009, those charts |
| 20 | congestion -- | 20 | extended through 2004, however, the |
| 21 | A. Yes. | 21 | stipulated pricing only showed through |
| 22 | Q. -- transaction that had similar | 22 | 2004. So I really can't say that they're |
| 23 | statements in them? | 23 | inconsistent, it's just different. |
| 24 | A. Yes. | 24 | Q. Did you ever have any discussions with |

27 (Pages 102 to 105)

# Hager

Page 1

1      UNITED STATES DISTRICT COURT

2        DISTRICT OF MASSACHUSETTS

3         (Central Division)

4  ------------------------------------x

5  TRANSCANADA POWER MARKETING,

6  LTD.,

7        Plaintiff,    Case No. 05-40076 FDS

8     v.

9  NARRAGANSETT ELECTRIC CO.,

10         Defendant.

11  ------------------------------------x

12  Volume I                    1 - 222

13

14      VIDEOTAPED DEPOSITION of MICHAEL J. HAGER,

15  a witness called for examination by the

16  Plaintiff, taken pursuant to the Applicable

17  Provisions of the Federal Rules of Civil

18  Procedure, before Laurie K. Langer, Registered

19  Professional Reporter and Notary Public in and

20  for the Commonwealth of Massachusetts, at the

21  offices of Choate Hall & Stewart, Two

22  International Place, Boston, Massachusetts, on

23  Friday, March 23, 2007, commencing at 9:15 a.m.

24

**Page 2**

```
 1  APPEARANCES
 2
 3     CHOATE HALL & STEWART LLP
 4     By Daniel C. Winston, Esq.
 5     Wendy S. Plotkin, Esq.
 6     Two International Place
 7     Boston, Massachusetts 02110
 8     (617) 248-5000
 9     For the Plaintiff
10
11     NATIONAL GRID
12     By David C. Lodemore, Esq.
13     25 Research Drive
14     Westboro, Massachusetts 01582
15     (508) 389-2989
16     For the Defendant
17
18     ALSO PRESENT
19     Kristen Zarnetske, videographer
20
21
22
23
24
```

**Page 4**

```
 1  (Index continued)
 2  EXHIBIT                          PAGE
 3  146  Filing                      198
 4  147  Filing                      200
 5
 6
 7  (Exhibits retained by counsel.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1          INDEX
 2  ATTORNEY    EXAMINATION CROSS   REDIRECT
 3  Mr. Winston      6
 4
 5  EXHIBIT                         PAGE
 6  132  Narragansett Presentation,
 7  October 10, 1995                 39
 8  133  Not Identified              48
 9  134  Narragansett Data Response Number 7,
10  Docket 3496                      50
11  135  Narragansett May 11, 1998 PUC
12  Testimony                        70
13  136  Letter from Mike Hager to Rich
14  Schueler dated February 9, 2005   98
15  137  April 13th Letter           124
16  138  Not Identified             125
17  139  May 26, 2000 Filing Letter  144
18  140  PUC Testimony dated June 20, 2000  153
19  141  PUC Testimony dated December 13,
20  2000                            179
21  142  August 27, 2001 PUC Filing  182
22  143  PUC Filing Dated November 2001  189
23  144  August 12, 2002 Document Request  192
24  145  Response to Discovery Requests  193
```

**Page 5**

```
 1          PROCEEDINGS
 2
 3      VIDEOGRAPHER:  This is tape number one of
 4  the videotaped deposition of Mr. Michael Hager
 5  taken by the Plaintiff in the matter of
 6  TransCanada Power Marketing, LTD, Plaintiff,
 7  versus Narragansett Electric Company, Defendant.
 8  In the United States District Court, District of
 9  Massachusetts, Central Division.  Case Number
10  05-40076 FDS.  The deposition is being held on
11  March 23, 2007 at approximately nine seventeen
12  a.m.  My name is Kristin Zarnetske, I'm a legal
13  videographer representing Esquire Deposition
14  Services.  The court reporter also in
15  association with Esquire is Laurie Langer.  This
16  deposition is being held at the law firm of
17  Choate Hall and Stewart at Two International
18  Place, Boston, Massachusetts.
19      Will counsel present please introduce
20  themselves for the record.
21      MR. WINSTON:  Dan Winston and Wendy Plotkin
22  for the Plaintiff TransCanada.
23      MR. LODEMORE:  David Lodemore for the
24  Deponent Mike Hager.
```

2 (Pages 2 to 5)

Page 6

1    VIDEOGRAPHER: Thank you. Would the court
2  reporter please swear in the witness.
3
4        MICHAEL J. HAGER,
5  having been satisfactorily identified by the
6  production of his driver's license, and duly
7  sworn by the Notary Public, was examined and
8  testified as follows:
9
10      MR. WINSTON: Just a couple of formalities,
11  David. Do you want to do the standard motions
12  to strike except as to form, reserved, and
13  objections except as to form reserved until
14  trial, waive notarization? Would you like the
15  witness to read and sign?
16      MR. LODEMORE: I would. And the
17  stipulations are fine.
18      MR. WINSTON: Okay.
19
20          EXAMINATION
21
22  BY MR. WINSTON:
23 Q.  Could you please state your name for the record
24  and spell it.

Page 7

1 A.  Michael Hager. M-i-c-h-a-e-l H-a-g-e-r.
2 Q.  Where do you live?
3 A.  I live in Sturbridge, Massachusetts.
4 Q.  Have you been deposed before?
5 A.  Yes, I have.
6 Q.  How many times?
7 A.  I'm aware of once.
8 Q.  Okay. What was the nature of that dispute?
9 A.  A contract dispute involving U.S. Gen.
10 Q.  Okay. Okay. So you understand that I'm going
11  to be asking you a series of questions, it's
12  important that you wait until I finish my
13  question -- it's important that we not talk over
14  each other so we have a clear record. If you
15  don't understand a question let me know and I'll
16  be happy to rephrase it. If you want to take a
17  break for any reason feel free to do so. I'd
18  just ask if you'd answer the question that's
19  pending. That's basically it.
20      MR. WINSTON: I think that -- so Mr. Hager
21  is here both on the 30 (b)(6) and individually?
22      MR. LODEMORE: That's correct.
23      MR. WINSTON: So I think -- let me start
24  with kind of the personal deposition and then,

Page 8

1  except where noted, because I think it's
2  important what he knew at different times.
3      MR. LODEMORE: Yeah.
4      MR. WINSTON: So -- well, let's just start
5  with the individual and then I'll move into the
6  30 (b)(6) either at different small times or at
7  the end.
8      MR. LODEMORE: I agree. That's I think the
9  easiest way and clearest way to do it.
10      MR. WINSTON: Okay.
11 Q.  So for now this is just you, Mike Hager
12  individually.
13      Could you please tell me starting with the
14  year you graduated from high school and just run
15  through your post high school education.
16 A.  I graduated high school in 1977. I attended the
17  University of Hartford in West Hartford,
18  Connecticut. Obtained a Bachelor's degree in
19  mechanical engineering. I also attended
20  Northeastern University.
21 Q.  Okay. When did you graduate from Northeastern
22  University?
23 A.  I believe that was June of 1986.
24 Q.  What was your degree in?

Page 9

1 A.  It was a Master's degree in mechanical
2  engineering.
3 Q.  I'm sorry. Okay. And then could you give
4  me -- what did you do in between high school and
5  college? It sounds like there's some years in
6  there.
7 A.  There was no break. I graduated high school,
8  immediately attended the University of Hartford,
9  graduated there in February of 1982. I attended
10  Northeastern in the evening.
11 Q.  Oh, okay. And I understand. What was your job
12  while you attended Northeastern in the evening?
13 A.  I was employed by New England Power Service
14  Company.
15 Q.  Okay. And what did you do for New England Power
16  Service Company?
17 A.  I worked in their central mechanical engineering
18  group providing engineering support to various
19  power plants.
20 Q.  Okay. Is New England, is that any -- is that --
21  was that a subsidiary of NEES?
22 A.  Yes, it was.
23 Q.  Okay. So maybe you could just quickly run
24  through from the time you graduated from, got

3 (Pages 6 to 9)

Page 10

1  your Master's; just generally what your job and
2  titles have been since that time.
3 A.  Since that time there were various titles in the
4  engineering function. Most likely senior
5  engineer. Engineer, senior engineer. Several
6  years after I attained my Master's I then went
7  to work in the alternate energy department. I
8  believe my title in that group was senior
9  engineer. Yes, it was senior engineer. Several
10  years after I joined that department it merged
11  with our power supply group. I worked in there
12  for several years as a senior engineer,
13  ultimately obtaining the title of principal
14  engineer.
15      Following the divestiture of NEES's
16  generating assets I took on the position of
17  standard offer portfolio manager and the roles
18  and responsibilities from there have increased
19  over time. The titles have gone from standard
20  offer portfolio manager, there was probably a,
21  it may have gone to manager standard offer
22  portfolio, I'm not sure, ultimately to a
23  director title and I'm currently a vice
24  president.

Page 11

1 Q.  Okay. When you were the -- when did you join
2  the alternate energy department? Give or take a
3  year.
4 A.  Approximately 1992.
5 Q.  Okay. And what did you do in that department?
6 A.  That department was responsible for managing the
7  relationships with non-affiliated independent
8  power producers who were selling power under
9  contract to New England Power Company. We also
10  conducted various solicitations in order to
11  obtain additional power supply resources from
12  IPPs.
13 Q.  Okay. Were you an engineer in that department
14  or were you more of a business person or both?
15 A.  My title as senior engineer was more of a
16   · business role than an engineering technical
17  role.
18 Q.  Okay. What were your personal responsibilities
19  in the alternate energy department before it
20  merged with Power Supply?
21 A.  Conducting solicitations, evaluating bids, both
22  the price terms, commercial terms, negotiating
23  contracts with winning bidders, administering
24  contractual provisions of existing contracts.

Page 12

1 Q.  Okay. Were these contracts of -- were you
2  employed by New England Power at that time?
3 A.  While I was in the alternate energy department I
4  was employed by New England Power Service
5  Company.
6 Q.  Okay. Did New England Power Service Company do
7  any work for Narragansett at that time or Mass.
8  Electric?
9 A.  I'm not aware of any direct work that we
10  performed, no.
11 Q.  Okay. Then when did the alternate energy
12  department merge with the power supply group?
13 A.  Approximately 1994, plus or minus a year or so.
14 Q.  Was power supply part of New England Power as
15  well?
16 A.  Initially that department was part of the
17  service company.
18 Q.  Okay. How did your role change after the merger
19  of those two groups?
20 A.  Similar-type activities, contractual in nature,
21  but rather than just buying power from
22  independent power producers we would be selling
23  excess power or optimizing our overall portfolio
24  of assets to various purchases and sales with

Page 13

1  entities that went beyond independent power
2  producers.
3 Q.  Okay. And up until NEES sold its -- when you
4  say, "sold its generating assets" you're talking
5  about the U.S. Gen transaction?
6 A.  Yes.
7 Q.  When was that -- when did that close?
8 A.  September 1, 1998.
9 Q.  Okay. And up until September 1, 1998 what were
10  you doing in the 1997 to 1998 time frame?
11 A.  I believe in April -- I believe beginning in
12  June of 1997 I took on the role of standard
13  offer portfolio manager. Prior to that I was
14  still in the power supply group.
15 Q.  Okay. And as standard offer portfolio manager
16  what were your responsibilities?
17 A.  To, basically to administer the standard offer
18  contracts on behalf of the various distribution
19  companies. It also included establishing the
20  auction processes and conducting the auction
21  processes to obtain suppliers who would have an
22  opportunity to replace the backstop providers
23  under which we had supply contracts with.
24 Q.  Okay. The -- when did -- when did Narragansett

4 (Pages 10 to 13)

Page 34

1 Q. Okay. Anybody else draft your pre-filed as a
2     matter of course, pre-filed testimony?
3 A.  I may ask a staff member to fill in, you know,
4     certain sections of it if they perform a
5     calculation on my behalf. Various other parties
6     reviewing the, the proposed testimony may, and
7     filings, may offer some suggestions for
8     additions and deletions and so forth.
9 Q.  In the 2000, 2001, 2002 time frame who commonly
10     reviewed your standard offer filing?
11 A.  Again, in general it would be whoever the rate
12     witness was for the particular case. Most
13     likely the head of our rate and regulatory
14     group. Certainly our counsel representing us in
15     Rhode Island and one or more members of
16     management who had an interest in the filing or
17     may need to be made aware of the filing.
18 Q.  Okay. Your pre-file testimony, is that
19     submitted under oath?
20 A.  Yes, it is.
21 Q.  Did you ever have discussions with either
22     the -- let me -- I'm going to use the division,
23     that term to refer to the Rhode Island division
24     of -- what are the regulatory entities in Rhode

Page 35

1     Island?
2 A.  The Commission which is the Rhode Island Public
3     Utilities Commission, three members who
4     ultimately decide the fate of the case.
5 Q.  Yep.
6 A.  And the Division of Rhode Island Public
7     Utilities and Carriers who, staff is not the
8     right word, let's say they are the rate payer
9     advocate or the entity that's reviewing the
10     filings on behalf and representing the interest
11     of rate payers.
12 Q.  Okay. And are, when preparing rate filings, and
13     this is in the post-merger days, are there
14     discussions outside of the context of a public
15     hearing between Narragansett and the division
16     about those filings?
17 A.  Occasionally.
18 Q.  Okay. Who would Narragansett commonly talk to
19     at the division?
20 A.  The typical contact, although not the only
21     contact, necessarily, would be Steve Scialabba
22     and Paul Roberti.
23 Q.  Okay. And were they, in the context of filing
24     the standard offer rate filings, were there ever

Page 36

1     occasions where there would be conversations
2     with either the Commissioners or their lawyers
3     or other staff members outside the context of a
4     public hearing?
5 A.  When we don't have cases pending we would
6     occasionally talk with Commissioners and/or
7     their counsel on various matters.
8 Q.  Okay. Okay. Pre-restructuring, this is, again,
9     this is not EUA, this is NEES. Was, was
10     Montaup -- was NEP, I'll call it NEP, N-E-P, as
11     the court reporter will know. How is NEP
12     compensated for fuel costs?
13 A.  Through a series of -- there may have been an
14     element included in a demand-type charge. There
15     may have been an element included in a per
16     megawatt hour, fixed per megawatt hour fee that
17     was charged to Narragansett and some costs were
18     included in a fuel clause mechanism.
19 Q.  Okay. Well, let me ask it more simply. Was
20     pre-restructuring, was NEP compensated for its
21     cost of fuel in providing power to Narragansett?
22 A.  Yes.
23 Q.  And did Narragansett have in its retail tariffs
24     pre-restructuring, a fuel adjustment clause?

Page 37

1 A.  Yes.
2 Q.  Are you aware of any tariffs filed by
3     Narragansett pre-restructuring that did not have
4     a fuel clause in them?
5 A.  Pre-restructuring I did not spend a significant
6     amount of my time involved with Narragansett's
7     retail rate structures, so I don't know the full
8     scope and extent of their rates at any point in
9     time nor over time.
10 Q.  Okay. With that clarification I take it your
11     answer is no?
12 A.  Can I hear the question again?
13 Q.  Are you aware of any retail tariffs filed by
14     Narragansett pre-restructuring that did not have
15     a fuel clause in them?
16 A.  Subject to the prior clarification, no.
17 Q.  Did you have an understanding back at that time
18     period as to what percentage of the cost of
19     providing electricity was due to fuel costs?
20 A.  In the pre-restructuring time frame?
21 Q.  Yes.
22 A.  It would be subject to check, but a third to a
23     half is coming to my mind.
24 Q.  Okay. Was it -- at the time of the

10 (Pages 34 to 37)

Page 118

1 potential concern as suppliers would say, "since
2 my contract only gives me payments under the
3 tariff, if the tariff were to disappear or
4 otherwise become non-effective do my payments go
5 away" that we wanted to make sure that we
6 included the provision that we would continue to
7 make that payment under the tariff language
8 regardless of what happened to that tariff. And
9 just making sure that, you know, you know, at
10 the time in April these were EUA suppliers and
11 Larry was the counter-party, so just making sure
12 that he knew what, what messages we were
13 communicating to the suppliers in case they
14 called him rather than calling us.
15 Q. Okay. Let me show you what's been marked as
16 Exhibit 87, which is a very similar looking fax
17 to NRG. Is it your memory that Constellation
18 received the February 8th letter as well?
19 A. They received a very similar letter, I'll, you
20 know, assume the date was February 8th. I
21 probably shouldn't assume that; I don't know the
22 date, but I received a similar letter, I would
23 expect it to be issued at the same time.
24 Q. Okay. The reason I'm asking is just because it,

Page 119

1 it wasn't produced and I just want, your memory
2 is that Constellation did receive a first draft
3 of this around the same time?
4 A. Yes.
5 Q. Okay. It worked the same way with respect to
6 Constellation as the other two?
7 A. Yes.
8     MR. LODEMORE: When you get to a convenient
9 stop, Dan, if we can just take a couple minute
10 break.
11 Q. Okay, let me just finish with these letters.
12 Okay. And what discussions did you have
13 with -- let me show you what's been marked as
14 Exhibit 90 and I ask if that appears to, is that
15 what you understand to be the final letter to
16 TransCanada?
17 A. Yes.
18 Q. Okay. What discussions did you have with
19 TransCanada -- did you -- well, let me ask this.
20     Before this February 8, 2000 fax to Mike
21 Hachey had you had any discussions with
22 TransCanada about the wholesale standard offer
23 service contracts that you can recall?
24 A. Not that I can recall.

Page 120

1 Q. Okay. What discussions after you sent the
2 February 8, 2000 letter do you recall having
3 with anyone from TransCanada?
4 A. Very few discussions. I most likely called each
5 one of these folks to let them know that the
6 letter was coming. According to articles,
7 excuse me, Exhibit 77, I followed up almost
8 about a week later to Mike. As I recall he said
9 he hadn't really looked at it and he handed it
10 over to Richard Schueler to make sure that the
11 ISO administration part was right. And it looks
12 like the next day Richard got back and said
13 you're all set. Other than that not a, not a
14 lot of discussion.
15 Q. Okay. Did you have any discussion with either
16 Mike Hachey or Richard Schueler about the fuel
17 adjustment provision?
18 A. That was the discussion I think we in our
19 initial calls, again, "here's what we're doing
20 and by the way, to the extent this tariff,"
21 again, I don't know what the proper word,
22 whether it was -- the tariff was no longer
23 effective, we were having Narragansett tariffs
24 versus Blackstone tariffs, so rather than say to

Page 121

1 our suppliers, "hey, too bad for you, the tariff
2 went away and your contract referred to a tariff
3 that doesn't exist, you're not getting paid."
4 We wanted to make sure, since that would
5 probably be the most critical issue for
6 suppliers that we assured them that we would
7 continue to pay under the index provisions that
8 were in the tariff at the time.
9 Q. And who did you have that conversation with?
10 A. That would have been with Mike.
11 Q. Mike Hachey?
12 A. Yes.
13 Q. Okay. And you recall having a telephone
14 conversation with him to that effect?
15 A. I can recall that, yes.
16 Q. Any other -- anything else that you can recall
17 about that conversation?
18 A. No, neither than we'll take a look at it and
19 we'll get back to you.
20 Q. The -- did you have any other discussions with
21 TransCanada about the fuel adjustment before
22 sending the final letter which is Exhibit 90?
23 A. I can't recall any at all.
24 Q. Okay. Did you say anything to Mike on the

31 (Pages 118 to 121)

Page 122

1  telephone call about the applicability of the
2  fuel adjustment after 2004?
3 A.  I can't recall that I did.
4 Q.  Okay.  The -- did you have any discussions with
5  anyone from Constellation with respect to its
6  letter about the fuel adjustment provision?
7 A.  I don't believe I had any.  Other than the
8  initial, you know, like we did with all of them.
9  Here's what we're doing and that's what that is
10  attempting to continue to make those payments
11  to.
12 Q.  Okay.  Did you make any statement to
13  Constellation about the applicability of a fuel
14  adjustment between 2004 and 2009?
15 A.  Not that I recall.
16 Q.  All right.  Do you recall any conversations with
17  NRG about the fuel adjustment mechanism?
18 A.  Yes.
19 Q.  Okay.  And what do you recall about those
20  conversations?
21 A.  That after reviewing the letter they came back
22  and indicated that they, they would like to
23  discuss extending the fuel mechanism through
24  2009 and not 2004.  After hearing their request

Page 123

1  and discussing it, again, with the EUA and
2  others our position was that that was not the
3  deal that, that was not the EUA deal and no, we
4  were not going to enter into any discussions
5  regarding extending it beyond 2004.
6 Q.  Okay, who did you talk to?
7 A.  I would have to look at the NRG letter.  The
8  name Jim Bertrand comes to mind.  But I would
9  have to look at the letter that, the draft to
10  see exactly who I sent it to.
11 Q.  Okay.  Your memory is -- what did he say to you,
12  did he tell you that he thought that the fuel
13  adjustment ran through 2009?
14 A.  I believe it was he -- no.  That he would like
15  to see it extend beyond the 2004, not that he
16  thought he had one that ran the whole time, but
17  he would like to see it extend beyond that
18  period.
19 Q.  Did he tell you that he understood the deal to
20  be that the fuel adjustment ended in 2004?
21 A.  I recall it being a rather, you know, polite
22  conversation, non-confrontational, as we pushed
23  back and said no, it was only through '04 and
24  not beyond that.  And that we didn't spend a lot

Page 124

1  of time arguing and debating it.  That's what I
2  recall the nature of the conversation.
3 Q.  Let me show you what we'll mark as -- okay.
4  Your best -- your testimony is that NRG
5  requested that the, that the fuel adjustment be
6  extended?
7 A.  That's how I would characterize it, yep.
8 Q.  I'll show you what we'll mark as Exhibit 137.
9  (Deposition Exhibit 137 marked for
10  identification.)
11 A.  (Witness reviewing.)
12 Q.  Why did you send him the tariff?
13 A.  Again, to show that the, the language that we
14  included in our April letter as to how we would
15  make those payments was consistent with the
16  tariff language that for all intents and
17  purposes was going away.
18 Q.  And what was his response to your April 13th
19  letter as you can recall?  Mr. Bertrand.
20 A.  Again, I recall the conversation, he was seeking
21  facts and, again, in a, you know,
22  non-confrontational, non-hostile discussions
23  that, you know, that EUA deal was for 2004 and
24  we were not using this as an opportunity to

Page 125

1  renegotiate the terms of the contract.
2 Q.  I show you what's been marked as exhibit -- what
3  we'll mark as Exhibit 138.
4  (Deposition Exhibit 138 marked for
5  identification.)
6 Q.  Now, is that -- turning to the second page you
7  see there's a scribble there, "National Grid
8  does not believe that"?  Is that Mr. Bertrand's
9  writing?
10 A.  I don't know if it's Mr. Bertrand's writing, but
11  it is writing from NRG showing markups that they
12  like to see in the letter.
13 Q.  And the comments on the right with the arrows,
14  those are your comments?
15 A.  Yes.
16 Q.  Okay.  And what was the -- did you discuss these
17  comments?
18 A.  With who?
19 Q.  With somebody from NRG.
20 A.  Yes, I would have called Mr. Bertrand and
21  explained how we were responding to his markups.
22 Q.  Okay.  And what do you recall discussing about
23  the markup "National Grid does not believe
24  that"?

32 (Pages 122 to 125)

Page 126

1 A. I can't recall a specific discussion, but in
2    general it's wishy-washy language. I mean,
3    we're looking for the emphatic, the obligations
4    don't change just as a result of the merger, you
5    just have a new counter-party.
6 Q. Well, do you agree -- do you know why he wanted
7    the language "National Grid does not believe
8    that the obligations were not affected," do you
9    know why he wanted that?
10 A. I don't recall discussing with him why he wanted
11    that.
12 Q. And turn to page 3. And you see there's a, he
13    writes, somebody writes at the bottom, "if
14    necessary to fulfill the provisions of Article 5
15    of the agreement this Attachment 2 shall be
16    extended for the time or term of the agreement."
17    And then you write in large letters, "no." What
18    was the discussion about that suggestion?
19 A. We're looking at Bates page 43064?
20 Q. Yep.
21 A. Again, the discussion being that the EUA
22    transaction had always been a, associated with
23    -- the EUA transaction and their plan only
24    encompassed a fuel index through 2004, not their

Page 127

1    intent to do anything beyond 2004. And we were
2    not, again, using this merger as a, as an
3    opportunity to renegotiate the terms that had
4    previously been agreed to.
5 Q. That's what you told him; right?
6 A. Uh-huh.
7 Q. Okay. He writes, "if necessary to fulfill the
8    provision of Article 5 of the agreement it shall
9    be extended." Did he tell you that in his view
10    Article 5 required extending the fuel adjustment
11    for the entire term?
12 A. I don't recall that, no.
13 Q. Okay. What do you recall him telling you about
14    this clause?
15 A. I recall it being a conversation that they, they
16    were looking to keep the door open, at least
17    have an opportunity to keep it open and, you
18    know, we were saying the deal has always been
19    only through '04.
20 Q. Okay. And how did you leave it with him?
21 A. That I would make whatever adjustments to the
22    letter we said were okay and we would, you know,
23    we sent him the final letter. Was that a prior
24    exhibit? We sent him a finalized letter. We

Page 128

1    worked with them to complete the ISO transfer
2    and have never received a phone call nor
3    correspondence of any nature indicating
4    disagreement about that provision.
5 Q. Well, the NRG contract was canceled in 2002;
6    wasn't it?
7 A. I forget the exact date, but it sounds like the
8    2002, 3 time frame.
9 Q. Right. So the NRG contract wasn't applicable
10    when the 2005 fuel adjustment payment came
11    around, was it?
12 A. No, nor did they send me a letter at the time we
13    had the discussion as to whether it applies in
14    '05 or not saying that they disagree with the,
15    the position we had stated.
16 Q. Well, they didn't send you anything other than
17    what I just showed you?
18 A. Correct.
19 Q. In your mind at the time had NRG -- was it an
20    open issue with NRG or had they agreed to no
21    fuel trigger after 2004?
22 A. Again, it was a very amicable conversation and I
23    was of the opinion that they, they agreed and we
24    were all set moving forward.

Page 129

1 Q. Your understanding at that time was that NRG as
2    one of your suppliers had agreed there was no
3    fuel trigger after 2004?
4 A. Yes.
5 Q. Okay. If you want to, let's take a break now.
6       VIDEOGRAPHER: The time is one fifty-nine
7    p.m. on March 23, 2007, this is the end of tape
8    number three of the videotaped deposition of
9    Mr. Michael Hager.
10       (Short break taken.)
11       VIDEOGRAPHER: The time is two O eight p.m.
12    on March 23, 2007 this is tape number four of
13    the videotaped deposition of Mr. Michael Hager.
14 Q. Okay. Let me show you the final TransCanada
15    letter. That's my copy. Exhibit 90.
16       Okay. What was the -- now, what was the
17    purpose of this letter?
18 A. We were informing TransCanada that the merger
19    was taking place effective May 1, that
20    Narragansett, or that the EUA companies were
21    merging with and into the NEES, National Grid
22    companies at the time. And that those companies
23    would be the counter-party and taking over the
24    obligations, the rights and obligations of the

33 (Pages 126 to 129)

Page 130

1  EUA companies. We were designating how we will
2  designate these loads within the ISO settlement
3  system and informing them that despite the
4  tariff, again, whatever the term is, no longer
5  becoming applicable, that we will continue to
6  make the fuel index payments that were in that
7  former EUA tariff. And, and informing them of
8  information. Paragraph 3 here lets them know
9  about some information that we will be making
10  available to suppliers. I can't recall whether
11  EUA did that or did not do that, but, again, we
12  were, you know, letting him know how we were
13  making additional information available to them
14  to better help them manage their obligations and
15  providing a formal change of notice under the
16  contract.
17 Q.  Okay. The -- where did you get, looking at
18      Attachment 2 here, where did you get this
19      language? Did you draft this language?
20 A.  I believe it came from the EUA tariff.
21 Q.  The EUA tariff at the time?
22 A.  That should be tariffs, plural. Again, we have,
23      EUA had three tariffs, an Eastern tariff, a
24      Blackstone Tariff, a Newport tariff, what we did

Page 131

1  was take the language from those tariffs and
2  combine them into a single attachment for
3  purposes of communicating the language.
4 Q.  Okay. Let me show you what's been marked as
5      Exhibit 137 again. Do you see this is your fax
6      to Jim Bertrand to NRG?
7 A.  Yes.
8 Q.  And there you attach tariffs. You say the
9      tariffs in effect as of January 1st. Can you
10     show me where you took the language out of those
11     tariffs?
12 A.  Starting on page, Bates page 43041, the heading
13     there, Standard Offer Fuel Index.
14 Q.  Okay. There's a paragraph in your Attachment 2,
15     first paragraph, which starts with the line "in
16     the event of substantial increases in the market
17     prices of fuel and natural gas after '99." Why
18     did you put that paragraph in there? And where
19     did it come from?
20 A.  I'm not sure where it came from; why we added
21     this at the beginning of this.
22 Q.  Who is "we"?
23 A.  Myself and anyone else who would have worked on
24     this attachment.

Page 132

1 Q.  Do you remember drafting this attachment with
2      anybody else's help?
3 A.  I don't know specifically who would have worked
4      on it, but again this whole letter and these
5      attachments would have been subject to the
6      review of the EUA folks and others at NEES at
7      the time.
8 Q.  Okay. So EUA guys would have reviewed that
9      first paragraph that referred to substantial
10     increases in the market prices of fuel after
11     '99?
12 A.  I'm sure they would have.
13 Q.  Okay. And you don't have any recollection as to
14     why you stuck that paragraph in there?
15 A.  Other than as you look at the, the mechanism in
16     the tariff here, you know, it really needed a
17     starting point for establishing the base prices
18     for which that index would apply.
19 Q.  Where does it say in here that there's no fuel
20     index after 2004? Or is that indicated?
21 A.  This attachment only includes a fuel index
22     provision through the end of 2004. It's silent
23     on, on the issue of it ending in '05 or
24     otherwise extending beyond '05.

Page 133

1 Q.  So your understanding is this letter doesn't
2      address the fuel index after the year 2004?
3         MR. LODEMORE: Objection.
4 A.  This attachment stipulates the fuel index that
5      we see applicable to the contract which ends in
6      2004.
7 Q.  Let me show you the -- let me show what you
8      we've marked as Exhibit 87 which is the letter
9      sent to NRG in February.
10 A.  Hold on, you're connected.
11         (Pause.)
12 Q.  Was Attachment 2 to all, to the letters to all
13     three contractors the same?
14 A.  It should have been, yes.
15 Q.  Okay. So the NRG letter the -- isn't it true
16     that in Massachusetts there was a fuel
17     adjustment applicable into 2005?
18 A.  In these contracts I believe the answer is no.
19     No, these contracts ended in 2004.
20 Q.  Well, take --
21 A.  Massachusetts. In the EUA one I believe there
22     was an EUA tariff that did include a 2005 index.
23 Q.  Take a look at your Attachment 1 to your NRG
24     letter which is Exhibit 87. Do you see that

34 (Pages 130 to 133)

Page 138

1  was signed before there was a merger planned; am
2  I right?
3 A.  I believe that's correct, yes.
4 Q.  Okay.  And --
5 A.  I believe the TransCanada deal was signed in
6  April of 1998, I don't know when the plan for
7  the merger took place, all I know is I believe
8  that the public announcement of the merger took
9  place after April of 1998.
10 Q.  Well, your understanding is that Narragansett
11  succeeded to EUA's rights and obligations under
12  the TransCanada contract; correct?
13 A.  I'm going to have to answer that yes from a
14  business perspective.  To the extent there's a
15  legal implication there I'm going to have to
16  rely on counsel.
17 Q.  Was it your understanding that because the
18  merged entity wasn't going to file another EUA
19  tariff, EUA no longer had an obligation to
20  update its tariffs as it would have had to do if
21  it existed as a freestanding entity?
22     MR. LODEMORE:  Objection.
23 A.  What I was saying is that if EUA were to remain
24  a freestanding entity then I believe they would

Page 139

1  be going in there at some point in time to file
2  another rate, perhaps a year from now.  I don't
3  know whether at a year from then they would have
4  filed a rate that included the fixed prices for
5  the entire term or had they been a freestanding
6  entity with now a merger happening moments after
7  they made this filing in December, they
8  otherwise would have as an independent
9  freestanding entity filed the rates similar to
10  the Massachusetts plan in Rhode Island in
11  December of 1999.
12 Q.  Is what you're saying you don't know what EUA
13  would have filed as far as its standard offer
14  service tariffs had it remained a freestanding
15  entity?
16 A.  Yes.
17 Q.  Had you discussed that with anyone from EUA?
18 A.  I can't recall.
19 Q.  Did you discuss any of the contents that EUA
20  planned to file in its tariffs had it remained a
21  freestanding entity?
22 A.  I don't recall any conversations on that topic.
23 Q.  Looking at the Blackstone tariff again, there's
24  also a line, do you see, on Bates stamp 43041 at

Page 140

1  the very bottom of the page:  "And if the
2  indices referred to above should become obsolete
3  or no longer suitable the distribution company
4  shall file alternate indices with the
5  department."  Can you find that in your
6  Attachment 2?
7 A.  No, I can't.
8 Q.  Do you know why you took that language out?
9 A.  No, I don't.
10 Q.  The word "department" in that line that was in
11  the Rhode Island tariff, do you know what that
12  refers to?  Is that an error referring to the
13  Department of Public Utilities in Massachusetts?
14 A.  I don't know whether it's an error or not.  But
15  typically the Rhode Island Commission is
16  referred to as Rhode Island PUC Commission,
17  something other than department, and generally
18  the Massachusetts regulator is referred to as
19  department.
20 Q.  Okay.  You don't have a recollection as to why
21  you took that line out?
22 A.  I do not.
23 Q.  Was your intent in Attachment 2 to inform
24  suppliers with the fuel adjustment were cut off

Page 141

1  in 2004?
2 A.  No.  It was our understanding that the EUA
3  transaction only went through 2004, our intent
4  was to inform them that the, they had a contract
5  that said they got paid pursuant to the monies
6  collected pursuant to a tariff, the tariff would
7  no longer be operable and that we were not going
8  to say, "well, because the tariff is inoperable
9  we're not going to pay you."  That we will
10  continue to pay pursuant to the terms of what
11  was otherwise contained in that tariff before it
12  became inoperable.  Again, I don't know if
13  "inoperable" is the correct term but that's the
14  term that I would use.
15 Q.  And your testimony is that NRG didn't express
16  any disagreement with your interpretation of, of
17  EUA's obligations in the 2004 -- I'm sorry.
18     Is your testimony that NRG did not express
19  any disagreement with your view of the original
20  contract intent with respect to the fuel
21  adjustment from 2005 to 2009?
22 A.  Yes, my recollection is that they saw this as an
23  opportunity to negotiate the little sweetener in
24  the back end, that through our discussions of

36 (Pages 138 to 141)

Page 162

1 Did you have any concern at this time as to
2 whether or not your April letter that included
3 this as an attachment might have been misleading
4 or confusing to your suppliers?
5 A. No.
6 Q. The, then again he asks on page 30, "is this any
7 different from the language that was in the
8 tariff, I believe this is the language in the
9 tariff." Why didn't you submit a redline copy
10 to them that indicated all of the changes that
11 you made?
12 A. I'm not sure why we didn't do that.
13 Q. Okay. Did you ever disclose to them the fact
14 that you had put in prices through 2004 when in
15 fact the EUA tariff was only filed for a
16 one-year period?
17 A. Again, we're putting in the fuel trigger
18 mechanism and not the, not the standard offer
19 rate mechanism.
20 Q. Right. Well, you say this is the language in
21 the tariff, and my question for you is did you
22 ever disclose to the Commission at all that
23 EUA's tariff differed from your attachment by
24 means of the fact that that tariff did not

Page 163

1 reflect any stipulated prices except for the
2 given year 2000?
3 A. I don't recall making such disclosure.
4 Q. Okay. And then again on page 31 there's
5 another question asking for any other
6 differences. And you disclose another
7 difference, not that one, but you mention there
8 is the fuel adjustment triggers that only go
9 through 2004. And you say, "the only reason I
10 have, is that when EUA developed their
11 settlement agreement in its initial set of
12 tariffs they only, for whatever business reason,
13 they only included fuel trigger points for the
14 period through 2004." And that's accurate, that
15 at this point you, you didn't have any knowledge
16 as to what the reason might have been for that?
17 A. As I said previously we knew what, what their
18 mechanism included, how long it included for,
19 but we, we never inquired or otherwise
20 understood why they had ended in '04.
21 Q. So you, you adopted a limited 2004 trigger
22 without inquiring as to why it was that way in
23 the tariff?
24 A. Yes. Or if I didn't inquire I don't recall the

Page 164

1 reason being.
2 Q. Okay. And here there's a question at the bottom
3 of page 32. "And do you have any sense of what
4 would happen in the year 2005?" And you say,
5 "my initial interpretation is since there are no
6 fuel trigger appointments beyond that there are
7 no fuel trigger payments applicable after 2004."
8 Had -- had you made a final decision at this
9 point or was this just an initial
10 interpretation?
11 A. I was very certain that it ended in 2004.
12 Q. And why did you use the term "initial
13 interpretation" before the PUC under oath?
14 A. When we get into contract interpretations and we
15 were being grilled on the interpretation, we
16 only speak about hours as opposed to suppliers.
17 We've had instances over the years where we
18 believe it's very clear by the language in the
19 contract what the contract means and we would
20 represent to a Commission, you know, the
21 contract says this, therefore, we expect no
22 other charges; they get a level of comfort in
23 that. All of a sudden you get a supplier out of
24 the blue comes up with a different view. So I

Page 165

1 find it very, I make it a practice not to
2 represent how suppliers would otherwise
3 interpret contracts or for a supplier who agrees
4 with you today that it means one thing and then
5 has, changes their mind down the future that we
6 got it locked in stone, so it's being cautious.
7 Q. So is it your policy in your tariff filings
8 never to mention what a contractor says to you
9 about their interpretation of a contract?
10 A. To the extent I know what my contractor says
11 about their contractor I can pass that along.
12 But to the extent that, you know, I don't
13 specifically know, nor have had a specific
14 conversation, I probably would not pass that
15 along.
16 Q. Okay. And your next sentence says, "I assume a
17 supplier may have a different opinion."
18 A. Uh-huh.
19 Q. What was that assumption based on?
20 A. Again, I'm just leaving the door open that if a
21 supplier wanted in the future to take a
22 different point of view that, you know, I wasn't
23 locking into a guarantee that we would not have
24 the issue, that the issue would not arise in the

42 (Pages 162 to 165)

Page 166

1   future.

2 Q.  Well, why, why would a supplier take a different

3       opinion?  Why would you make a statement that

4       you assume that a supplier would have a

5       different opinion?

6 A.  I guess it's --

7       MR. LODEMORE:  Objection.  It says "may

8   have a different opinion" not will have a

9   different opinion.

10 Q.  Why would you assume that?

11 A.  I don't know that it was necessary to make any

12      assumption.  Perhaps I could have used a

13      different choice of words in the heated moment

14      within the filing there.  In the proceeding

15      there.

16         I had no reason at the time to assume

17      somebody would.  Again, I'm trying to convey to

18      the Commission that while I wanted to tell you

19      the contract says A, we've had instances in the

20      past where suppliers say, "well, no, now we

21      think it means B or something changes and I want

22      to think it means B now," so we're trying to

23      avoid a, making rock solid representations that

24      are beyond our control.

Page 167

1 Q.  If you know that the NRG folks agreed with your

2       interpretation why didn't you disclose that

3       here?

4 A.  Again, I'm just going with the flow of the

5       questions as they come and responding as best I

6       can with information that I feel is relevant at

7       the time.

8 Q.  Is it because in fact they disagreed with you,

9       Mr. Hager?

10 A.  Absolutely not.

11 Q.  The -- turn to page 55, if you would.  And

12      there's a question here by Mr. Johnson, and who

13      is he again?

14 A.  Commission counsel.

15 Q.  And he says, "I've been thinking about what you

16      told me and as I understood what you told me you

17      said this is a document that was sent out to

18      suppliers."  And you said, "yes."  And he asks,

19      "is this a change in the contract?"  And you

20      say, "we sent notices to the suppliers."  You're

21      referring there to the April notices?

22 A.  Yep.

23 Q.  And then Mr. Johnson says at the bottom of page

24      56 and 57 to Mr. Gerwatowski, "in other words,

Page 168

1   Ron, I assume you have a new contract if this is

2   a contract amendment."

3       MR. LODEMORE:  I'm sorry, Dan, is there a

4   question?

5 Q.  Yeah.  And then at the bottom of 57 Ron

6       Gerwatowski says, "whether you want to

7       technically call it an amendment I guess I would

8       disagree, I think reasonable minds could

9       differ."  He says, "we didn't want to play some

10      games with the suppliers, we tried to work with

11      the suppliers."  What did you do to try to work

12      with the suppliers concerning the fuel

13      adjustment provision up to that point.

14 A.  Again, the testimony on pages 56 and 57 talk

15      about, you know, you have a contract that says

16      you get paid your pro rata share of the revenues

17      that we collect pursuant to a BVE Newport

18      tariff.  A merger comes along, that tariff goes

19      away, therefore, there are no revenues coming in

20      pursuant to that tariff by the language in that

21      contract, therefore, no revenues in, no pro

22      rata, or you get your pro rata share of zero

23      which is zero.  We did not want to take that

24      position with those suppliers because we're

Page 169

1   making those tariffs go away.  So we worked with

2   them by sending them notices and upfront in

3   those notices saying, "we will continue to pay

4   you pursuant to the terms of those tariff

5   language even though the tariffs go away."  Gave

6   them the text of how we will operate that

7   provision going forward to keep them whole

8   pursuant to the terms of that tariff that had

9   gone away.

10 Q.  In the middle of page 57 he says, "I think Mike

11      might have had a conversation with the

12      suppliers."  Do you have an understanding of

13      what he's referring to there?

14 A.  In my communications with the suppliers in April

15      and the follow-up communications from that,

16      those draft letters.

17 Q.  Okay.  After this hearing did you, did you make

18      any contacts with any of the three suppliers

19      about the subject matter of the fuel index in

20      2005 to 9?

21 A.  I can't recall any.

22 Q.  Did you do anything to inform any of them about

23      the discussion that you had with the Commission?

24 A.  I don't recall any.

43 (Pages 166 to 169)

Page 174

1  Mr. Michael Hager.
2 Q.  The PUC hearings like the one that we were just
3     talking about, who usually attends those
4     hearings?
5 A.  Well, they're open hearings that are publicly
6     posted and noticed throughout the state.
7     Members of the general public who wish to
8     comment on our rate proposals, you know,
9     competitive suppliers can attend, wholesale
10    suppliers can attend, but generally it's members
11    of the general public.
12 Q. Okay.  I mean, are your wholesale suppliers
13    generally in attendance at those?
14 A. Generally, no.
15 Q. Do you -- your pre-filing -- your pre-filed
16    testimony, who do you send that to?
17 A. I don't personally send it to anyone.  But our
18    counsel would file that with the Clerk of the
19    Commission, to the extent that there's a service
20    list established they may or may not send copies
21    to folks that are on the service list.  I
22    believe all of the filings are posted on the
23    Commission's website.
24 Q. Okay.  Do you know what date and time

Page 175

1     Narragansett began to post its filings on its
2     website?
3 A.  I don't know if Narragansett posts its filings
4     on its website.  I know the Commission posts the
5     filings on its website.  I don't know when that
6     began.
7 Q.  Okay.  Are you aware that the Commission does
8     not post transcripts on its website?
9 A.  I'm not aware of that.
10 Q. The -- in what circumstances do you inform your,
11    as a general matter, your suppliers about the
12    subject matter of a particular hearing?
13 A. Our hearings involve the rates that we were
14    setting, resulting from things that occur, costs
15    incurred under our contract.  We generally don't
16    provide notice to our suppliers of our filings
17    other than public notices that are made.  Some
18    such as TransCanada, you know, follow
19    proceedings on their own, others, perhaps, don't
20    follow them as closely.
21 Q. When you say "TransCanada follows proceedings,"
22    on what do you base that comment?
23 A. Conversations with Mike Hachey.
24 Q. When were those conversations?

Page 176

1 A.  At various times throughout the course of the
2     years.
3 Q.  What were the sum and substance of those
4     conversations?
5 A.  You know, part of a phone call on another, if I
6     were to call on him about a particular matter,
7     or if I saw him at a NEPO meeting or something
8     he would generally say hey; you know, he's
9     running a retail business, competitive retail
10    operation, he generally would comment that he
11    saw a filing in a particular state and, you
12    know, was seeing what, what rates we were
13    charging and so forth.
14 Q. Did he ever talk to you about, mention that he
15    had seen any standard offer service retail
16    tariff filings before 2005 in Rhode Island?
17 A. You know, those are general conversations that
18    I've had over time.  So, yeah, I can't give you
19    a specific date but I wouldn't, I would believe
20    they would be prior to '05 as well as beyond
21    '05.
22 Q. You believe.  Do you recall Mike Hachey ever
23    discussing with you any standard offer retail
24    filing made by TransCanada in which he said he

Page 177

1     had seen it prior to 2005?
2        MR. LODEMORE:  Could I get that back one
3     second.
4 Q.  I'll ask it again.  It's a mess.
5        Do you recall Mr. Hachey ever indicating to
6     you that he had independently obtained and
7     reviewed a Narragansett standard offer retail
8     filing before 2005?
9 A.  I'm sure I had those conversations before 2005.
10    You know, they were not in-depth conversations
11    so I don't know to the extent at which he gained
12    materials regarding the filings.  It was my
13    understanding that he followed what we were
14    setting for rates in the various states.
15 Q. Were you aware that he obtained his information
16    from e-mail notices sent by Narragansett?
17 A. I don't know the particular sources of his
18    information.
19 Q. Okay.  Do you have any reason to believe that he
20    was aware prior to 2005 of your retail tariff
21    filing specifically related to the fuel
22    adjustment applicability after 2005?
23 A. I'm losing the question, but I believe my answer
24    is going to be I don't know what Mike Hachey

45 (Pages 174 to 177)

# Hager (Day 2)

Page 223

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

- - - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING     :

LTD,                            :

      Plaintiff,          :     CASE NO.

VS.                             :     05-40076 FDS

NARRAGANSETT ELECTRIC CO.,      :

      Defendant.          :

- - - - - - - - - - - - - - - -


  VIDEOTAPED CONTINUED 30(B)(6) DEPOSITION OF

NARRAGANSETT ELECTRIC COMPANY by MICHAEL J.

HAGER, a witness called by and on behalf of the

Plaintiff, taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Sandra L. Bray, Registered

Diplomate Reporter, CSR Number 103593, and

Notary Public in and for Commonwealth of

Massachusetts, at the offices of Choate Hall &

Stewart LLP, Two International Place, Boston,

Massachusetts, on Tuesday, April 3, 2007,

commencing at 9:42 a.m.

195d170d-300f-4951-b1f1-8406267f2e1d

Page 324

1    markets in New England. We referred to that as
2    the implementation of standard market design.
3    As a result, we needed to figure out a way to,
4    again, administer the contracts within the
5    wholesale marketplace, to put responsibility
6    into TransCanada's account, and to pay them for
7    that load that they served. So this letter is
8    some initial discussions between Mike Hachey and
9    myself as to how we would attempt to register
10   the loads and handle the administration,
11   starting at that point in time.
12   Q.  Okay. You previously mentioned that you had a
13       short conversation with Mike Hachey about the
14       letter that you had sent in early 2000, correct?
15   A.  Yes.
16   Q.  Between -- and you've further had conversations
17       with Mike Hachey on or about February of 2005
18       concerning the fuel adjustment, correct?
19   A.  Yes.
20   Q.  Did you have any discussions with Mike Hachey
21       between -- well, any other discussions -- other
22       than the discussion that you've testified to in
23       early 2000 concerning the letter, did you have
24       any other discussions with Mike Hachey

Page 325

1    concerning the applicability of a fuel
2    adjustment in the EUA zone between 2005 and
3    2009?
4    A.  I can't recall any.
5    Q.  Okay. Did you have any discussions with anybody
6        else at TransCanada on that subject?
7    A.  I can't recall any.
8    Q.  To your knowledge, did anyone at Narragansett
9        have any discussions with TransCanada prior to
10       February 2005 on the subject -- well, scratch
11       that.
12           Between January 1 -- so leaving aside
13       the EUA transaction, post the EUA -- after the
14       EUA-NEES merger, are you aware of any
15       discussions between anybody at Narragansett and
16       anybody at TransCanada concerning the
17       applicability of a fuel adjustment between 2005
18       to '9 before February of 2005?
19   A.  I can't recall any. I'm not aware of any.
20   Q.  Okay. All right. I'll take that back. Let me
21       show you what I'll mark as Exhibit 168, which is
22       PUC testimony dated May 2003.
23           (PUC Testimony, dated May 2003 was
24           marked Exhibit Number 168 for

Page 326

1        identification.)
2    Q.  If you turn to the bottom of Page 87, there's a
3        sentence -- feel free to read the surrounding,
4        but the bottom of Page 87, there's a sentence
5        that begins, "In May of 2000, when we completed
6        the merger." Are you with me?
7    A.  I'm with you.
8    Q.  And then it goes on to say, the last sentence of
9        the answer on the top of Page 88, "So we're
10       making those payments by reference to a tariff
11       as opposed to being part of our attachment to
12       the contract." What is that referring to?
13   A.  Which part?
14   Q.  The bottom -- the last sentence on Page 88. I'm
15       just trying to understand what you're referring
16       to as the --
17   A.  The sentence is, "So we're making those payments
18       by reference to a tariff as opposed to making
19       them part of our attachment"?
20   Q.  Yes.
21   A.  Again, this goes back to the NEES contracts had
22       a fuel index as a hard-wired part of the
23       contract as opposed to the EUA contracts that
24       say, "You get what we were able to collect under

Page 327

1    a tariff."
2    Q.  You're describing the different manners in which
3        the fuel adjustment had been referenced in those
4        two contracts?
5    A.  Yes.
6    Q.  And if you look at the bottom of Page 88,
7        Mr. Nault, he is the -- you told me last time --
8        the rate analyst for the Commission?
9    A.  Yes.
10   Q.  He asks a question about whether the fuel
11       adjustment component ceases to exist after 2004
12       in the EUA zone. You say, "That's the position
13       the company is taking with its suppliers, yes."
14           At this point, in what form has
15       Narragansett informed TransCanada of that
16       position?
17   A.  Certainly we had our February and April 2000
18       letters. I can't recall any conversations
19       beyond that.
20   Q.  Okay. At the top of Page 90, Mr. Nault says,
21       "Okay. A lot of what you just said is in
22       Narragansett's opinion. What about the
23       suppliers' opinion?" And you said, "We've
24       informed them that's what it is. We wait to see

27  (Pages 324 to 327)

195d170d-300f-4951-b1f1-8406267f2e1d

Page 380

1  anyone indicate to you any statements that had
2  been made to TransCanada or by TransCanada
3  before they signed the EUA contract about the
4  applicability of a fuel adjustment from 2005 to
5  '9?
6  A.  No.
7  Q.  And on Page 35, when Mr. Nault asked, "Does
8  Narragansett have any thoughts, plans or
9  considerations about offering a financial
10  incentive," you answer, "No, I don't see why I
11  need to. The contract is pretty clear. It was
12  a bargain struck at the time." That statement
13  is based on the conversations -- upon the
14  testimony you've stated to date at the time of
15  the merger?
16        MR. LODEMORE: Objection.
17  A.  Not necessarily.
18  Q.  What's the basis for the statement that that was
19  a bargain struck at the time?
20  A.  Every one of these contracts at the time go back
21  to, you know, what the deal was, who was
22  expecting what, who negotiated what terms under
23  the agreement at the time. So it would be
24  relative to each individual contract.

Page 381

1  Q.  But you didn't make any investigation at the
2  time you made the decision to cut off the fuel
3  trigger as to the specific negotiations between
4  TransCanada and EUA, did you?
5        MR. LODEMORE: Objection.
6  A.  Whatever was negotiated was reflected in the
7  terms of that contract. We paid the fuel
8  trigger in accordance with the terms of that
9  arrangement.
10  Q.  Did you make any investigation before taking the
11  position you did as to the fuel adjustment for
12  the TransCanada contract into the negotiations
13  that TransCanada and EUA had at the time?
14  A.  It was my understanding that the EUA transaction
15  did not involve fuel triggers beyond 2004. I
16  don't recall details of conversations regarding
17  specific negotiations with specific suppliers
18  that they had at the time.
19  Q.  Did you make any effort before taking the
20  position you did as to the inapplicability --
21  let me start over. You took a position in early
22  2000 that the TransCanada contract did not
23  entitle TransCanada to fuel adjustment payments
24  after 2004, correct?

Page 382

1  A.  I took the position in early 2000 that the EUA
2  contracts, including TransCanada, entitled those
3  suppliers to get paid under the terms of the
4  tariff. The tariff had consistently only
5  included fuel mechanisms through 2004.
6  Q.  And before taking that position, did you make
7  any investigation into the particular
8  negotiations that went on between TransCanada
9  and EUA as far as what was said between the two
10  entities?
11        MR. LODEMORE: Objection. It's the
12  term "particular negotiations" that I think is a
13  bit...
14  A.  And also what was said. Not as to what was
15  said, but what the nature of the transaction was
16  is what was conveyed to me.
17  Q.  Meaning you discussed the filings that were made
18  by EUA?
19  A.  In the contract itself and the various contract
20  provisions and how they were different in some
21  cases from ours and what they were intending by
22  those provisions in our contracts.
23  Q.  But you didn't make any effort to investigate,
24  other than the contract itself, the negotiations

Page 383

1  and the back and forth between TransCanada and
2  EUA concerning that contract?
3  A.  I don't recall any discussions relative to that.
4  Q.  Okay. At the bottom of Page 40 and on the top
5  of 41, you explain -- you basically describe
6  waiting -- well, actually, rather than looking
7  at your testimony, the EUA -- the customers in
8  the EUA zone and old Narragansett zone pay the
9  same standard offer service rate, correct?
10  A.  Each contract has its unique pricing provisions.
11  We blend all the contract rates and provide a
12  uniform retail rate to customers.
13  Q.  So had EUA and NEES remained separate, standard
14  offer service rate to EUA zone would be lower,
15  am I right, because there would be no fuel
16  adjustment?
17  A.  Yes.
18  Q.  Okay. And as a result of the blending of the
19  rates, effectively, the EUA zone customers pay a
20  slightly higher rate than they would have had a
21  merger not occurred?
22  A.  Relative to --
23        MR. LODEMORE: Objection.
24  A.  Relative to their standard offer service, yes.

41 (Pages 380 to 383)

195d170d-300f-4951-b1f1-8406267f2e1d

Page 428

1       MR. LODEMORE:  Thanks.
2   Q.  And what led you to send these earlier EUA
3       tariffs to Mr. Hachey?
4   A.  I'm assuming he's asking for additional
5       background information to understand what the
6       nature of the contract was and the tariffs that
7       were applicable at the time.
8   Q.  At this point, has the Division or Commission
9       been alerted that TransCanada has an issue with
10      Narragansett's position as to the fuel
11      adjustment provision?
12  A.  I can't recall.
13  Q.  Let me show you what we'll mark as Exhibit 185,
14      which is some e-mail exchange between Hager and
15      Hachey, dated February 18, 2005, and they refer
16      to a meeting.
17          (Copy of E-mail String was marked
18          Exhibit Number 185 for identification.)
19  Q.  What was the purpose of this meeting or how
20      did -- let me ask it this way:  How did this
21      meeting come about?
22  A.  I'm assuming that between, you know, discussions
23      I was having with Mike relative to this issue,
24      he and/or I suggested a face-to-face meeting to

Page 429

1       discuss it further.  I don't know if at this
2       point we received a formal written notice from
3       Hachey invoking some -- again, I go back to the
4       applicability of the dispute resolution process,
5       whether I at this point received a formal
6       dispute notice from him and potentially invoking
7       a senior management discussion on a disputed
8       issue or if this is a friendly meeting to better
9       understand the issues and background or not.
10  Q.  Okay.  Do you recall having a meeting with Mike
11      Hachey following these e-mails?
12  A.  I can recall a meeting with him.  I can't recall
13      exactly what took place off the top of my head
14      on February -- March 2nd or whenever we met, but
15      I recall a meeting with him on it.
16  Q.  And do you recall discussions with Mike Hachey
17      about the applicability of the cross-default
18      provisions under the PPAs?
19  A.  I recall discussions along those lines, yes.
20  Q.  Okay.  What do you recall about those
21      discussions?
22  A.  I believe the issue is -- was that to the extent
23      Mike chose to -- chose or otherwise was in
24      default of the standard offer -- EUA standard

Page 430

1       offer contract for whatever reason, that the
2       provisions of the PPA transfer agreement between
3       us and TransCanada involving Ocean State Power,
4       then provisions were if they were in default
5       under the standard offer agreement, we did not
6       have to make the NPO payments under the PPA
7       transfer agreement.
8   Q.  And was that discussed with Mike Hachey during
9       the meeting?
10  A.  I remember discussing it with him.  I can't
11      remember exactly what meeting or meetings that
12      discussion took place.
13  Q.  Was the gist of the conversations that if
14      TransCanada exercised its termination provisions
15      under the contract that Narragansett would
16      assert the cross-default provisions?
17  A.  I don't recall that discussion.  That doesn't
18      seem consistent with what I think how that
19      provision works.
20  Q.  Well, what did you explain to him as to how it
21      works?
22  A.  Again, I'm going to have to review the exact
23      language in the contract, but I think it was a
24      default provision, not if he had a right to

Page 431

1       terminate this contract, and the contract
2       terminated, we withheld NPOs, but if he were in
3       default of the contract, then the NPO payments
4       were to be withheld by us.
5   Q.  Well, what default -- what default did you think
6       TransCanada was in danger of making that would
7       cause you to exercise the cross-default
8       provisions?
9   A.  Failure to perform.
10  Q.  Okay.  In other words, if they -- leaving aside
11      how a termination is exercised, the discussion
12      was to the effect that if TransCanada stopped
13      providing power to the contracts, the cross-
14      default provisions would be exercised?
15  A.  Again, to the extent that they were applicable,
16      they could be exercised.
17  Q.  Well, was Narragansett's intent to exercise the
18      cross-default provisions if TransCanada stopped
19      providing power under the wholesale standard
20      offer service agreement?
21  A.  If the conditions in the asset -- in the PPA
22      transfer agreement that allowed me to withhold
23      those payments bore out, then, yes, I believe we
24      intended to withhold those NPO payments.

53  (Pages 428 to 431)

195d170d-300f-4951-b1f1-8406267f2e1d

Page 432

1 Q. Okay. And did you inform Mike Hachey that were
2    TransCanada to stop providing power that the
3    cross-default provisions would apply?
4 A. I think I recall discussion that, you know,
5    those provisions were there and we both had to
6    review their applicability related to those.
7    I'm not sure -- as much as I like to think it's
8    black and white, every time we get into one of
9    these discussions, what's clear to us is not --
10   is clear to you means something different, not
11   you personally but the counter-party, and you
12   get into these issues of this is an element in
13   play here and we both need to be wary of actions
14   we take here.
15 Q. Your meeting with Mike Hachey, did you meet with
16   him in person?
17 A. I can envision a meeting with Mike in our office
18   in Northborough. I can visualize you there
19   tearing your jacket that day. I can't recall
20   whether that was relative to this issue or the
21   long saga on the congestion case or yet some
22   other issue, but I remember that particular
23   meeting. I can't recall a specific one relative
24   to -- was it March 2nd or March 3rd or whatever

Page 433

1    else.
2 Q. Okay. Did you discuss these cross-default
3    provisions with Mike over the telephone as well?
4 A. I may have. I can't recall.
5 Q. Okay. Your -- the discussions that you've had
6    with Mike Hachey are from your offices in
7    Massachusetts, correct?
8 A. Most likely, yes, but on any given day, I could
9    be working out of another location. I may have
10   had a conversation with him someplace other than
11   my Massachusetts office.
12 Q. Okay. And -- okay. Let me show you what's been
13   marked as Exhibit 118, which is a notice of
14   default, dated March 1, '05. Do you recall
15   receiving this notice?
16 A. Yes.
17 Q. And was your meeting with Mike Hachey after you
18   received this notice of default?
19 A. Most likely yes.
20 Q. And were the cross-default discussions with
21   regard to this notice of default?
22 A. I recall that they -- all discussions we had
23   after that were as a result of this letter and
24   the alleged actions, so yes.

Page 434

1 Q. Did you inform the Division or the PUC following
2    this notice of default that you received it?
3 A. Given both the Division and Commission's desire
4    to know as soon as we get any dispute on any
5    contract, I'm sure we made a verbal notification
6    in some form to them. Exactly when or in what
7    form that was relative to this issue, I don't
8    have any recollection.
9 Q. Okay. Let me just show you one more, which
10   we'll mark Exhibit 186.
11       (Fax to Mr. Hachey, et al. from
12       Mr. Hager, dated March 15, 2005 was
13       marked Exhibit Number 186 for
14       identification.)
15 Q. It's a fax from Hager to Hachey and others,
16   dated 3-15-05. And, again, do you recall why
17   you're continuing to send Mr. Hachey additional
18   EUA tariff filings?
19 A. Other than I assume he's looking for additional
20   background information back at that point in
21   time as to -- I assume that's the reason why I'm
22   sending it to him. And I see your name on here
23   and the two sides, so I would assume whatever
24   meeting I had in early March, you were a

Page 435

1    participant in as well.
2 Q. Okay. At some point, Narragansett made what
3    have been termed protest payments to
4    TransCanada, correct?
5 A. Correct.
6 Q. And how did that come about?
7 A. That's part of the give and take in the
8    not-so-black-and-white issues related to these
9    contract provisions. I recall TransCanada
10   alleging that we're in default for not making
11   the payments. Therefore, they were defaulting
12   us and terminating the contract. We did not
13   wish to have the contract terminated nor us to
14   be considered in default. So rather than run
15   the risk of not making the payment and giving
16   TransCanada a basis for which to assert that
17   default and a basis for a termination, we
18   elected to make the payments under protest.
19 Q. Did you have discussions with TransCanada before
20   making those protest payments about the subject
21   of protest payments?
22 A. I believe we did. I can't recall a particular
23   conversation, but -- let me just say I can't
24   recall.

54 (Pages 432 to 435)

195d170d-300f-4951-b1f1-8406267f2e1d

Page 436

1  Q. Do you recall any conversations with TransCanada
2     about the --
3  A. I recall conversations regarding the protest
4     payments. Certainly, we would have sent one.
5     We would have sent the letter of notice with it.
6     Whether we had conversation prior to making the
7     payment and sent the notice or whether we sent
8     the payment and notice and what we intended by
9     that after that, I'm uncertain.
10 Q. Before you sent the letter and protest payment,
11    you're not aware of any discussions you had with
12    TransCanada about the subject of the protest
13    payment?
14 A. I can't recall whether we did or did not have
15    any conversations.
16 Q. Okay. Did you have any discussions with the
17    Division or the Commission before making the
18    protest payments?
19 A. I can't recall.
20     MR. WINSTON: Let me show you what
21    we'll mark as Exhibit 187, March 31, 2005 letter
22    from Mike Hager.
23     (Letter to TransCanada from Mr. Hachey,
24     dated March 31, 2005 was marked Exhibit

Page 437

1     Number 187 for identification.)
2  Q. And ask you if you recognize that as, in fact,
3     the first protest payment letter.
4  A. Yes.
5  Q. Okay. How did Narragansett determine the
6     calculation for the protest payment?
7  A. I believe we continued the six-month rolling
8     average mechanism that had been in place under
9     the EUA tariff or -- the mechanism under which
10    we were paying under the EUA contracts and then
11    applied the Narragansett zone trigger points to
12    that calculation.
13 Q. Okay. So you used the 6 -- you used the
14    mechanism that had been set forth in the
15    standard offer service tariffs of EUA, the
16    six-month rolling average?
17 A. Yes.
18 Q. And you added the trigger points for 2005, which
19    had been set forth in the NEES filings?
20 A. I assume the 2000 trigger -- the 2005 trigger
21    point that had been used for calculation of
22    these protest payments under the EUA contract
23    would be the same trigger point in my
24    Narragansett sum contract for 2005.

Page 438

1  Q. And why did you make that assumption?
2  A. Seemed reasonable at the time.
3  Q. Did you have any discussions with anyone else
4     before you made that calculation?
5  A. I'm sure we discussed it internally. I'm not
6     sure whether we discussed it with TransCanada or
7     not.
8  Q. Did you have any discussions with the Division
9     or the Commission before calculating the fuel
10    adjustment payment in that manner?
11 A. I can't recall whether we did or did not.
12 Q. Did you have any understanding as to whether the
13    PUC would reimburse Narragansett for the protest
14    payments at the time you sent this letter?
15 A. I think at the time we sent this letter, it was
16    uncertain as to whether we would get cost
17    recovery. I think we didn't seek cost recovery
18    immediately upon making these payments. That
19    came later.
20     (Letter to Mr. Hachey, et al, from
21     Ms. Kavanagh, dated July 1, 2005 was
22     marked Exhibit Number 188 for
23     identification.)
24 Q. Okay. Let me show you what we'll mark as

Page 439

1     Exhibit 188, which is a letter from the Division
2     to Mike Hachey and another regarding standard
3     offer service.
4  A. I --
5  Q. The other is myself.
6  A. You said this is a letter from the Division. I
7     believe it's a letter from my counsel.
8  Q. Oh, I'm sorry. Gloria Kavanagh. You're right.
9     Am I right this is a letter in which
10    Narragansett is informing TransCanada that the
11    Division has denied consent for a settlement
12    that had been made between the parties in or
13    around June of 2005?
14 A. Yes.
15 Q. Okay. Did you have an understanding of why the
16    Division rejected the settlement?
17 A. The settlement included termination of the
18    TransCanada obligations, both EUA and
19    Narragansett, Constellation taking over those
20    obligations, the separation, as we talked about
21    many times today, of the fuel index piece from
22    the underlying fixed price part of the contract,
23    and the resulting Constellation agreements. My
24    understanding at the time that this was filed

Esquire Deposition Services
1-866-619-3925

195d170d-300f-4951-b1f1-8406267f2e1d

# Hager (Day 3)

Page 443

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

- - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING    :

LTD,                           :

       Plaintiff,          :    CASE NO.

VS.                            :    05-40076 FDS

NARRAGANSETT ELECTRIC CO.,     :

       Defendant.          :

- - - - - - - - - - - - - -


  VIDEOTAPED CONTINUED 30(B)(6) DEPOSITION OF

NARRAGANSETT ELECTRIC COMPANY by MICHAEL J.

HAGER, a witness called by and on behalf of the

Plaintiff, taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Sandra L. Bray, Registered

Diplomate Reporter, CSR Number 103593, and

Notary Public in and for Commonwealth of

Massachusetts, at the offices of Choate Hall &

Stewart LLP, Two International Place, Boston,

Massachusetts, on Wednesday, April 4, 2007,

commencing at 11:15 a.m.

38853558-cc6c-4b41-b683-964c4852fde5

Page 504

1    documents related to a certain topic.
2        MR. WINSTON: Okay. Your objection is
3    on the record. I guess the other thing I would
4    note is that Narragansett has submitted
5    interrogatory answers in this case to questions
6    such as the following and provided that
7    supplementation would be given, which has not
8    been forthcoming. So to the extent that
9    Mr. Hager omits anything, I would expect that it
10   would be provided in a supplementary
11   interrogatory answer forthwith. I might also
12   add, you're obligated to supplement your
13   interrogatory answers regardless.
14       MR. LODEMORE: Right. No, I
15   understand we have an obligation to supplement
16   under the rules, and that will be -- understand
17   that will be done. I'm not sure what our timing
18   obligations are under that. So I'll accept your
19   representation. I'll reserve my answer until a
20   later date.
21  Q. Okay. To the best of your human ability, what
22   documents are you aware of that were given to
23   TransCanada by EUA that indicated that no fuel
24   adjustment would be sought after 2004?

Page 505

1   A. Any documents that we have available to us that
2    are responsive have been provided through these
3    requests and are here --
4   Q. Actually, let me clarify my question. What I'm
5    asking you is what documents were given to
6    TransCanada, as you understand it, by EUA prior
7    to April 7, 1998, the date the contract was
8    executed, which indicated that EUA did not have
9    an intent to seek a fuel adjustment after 2004?
10  A. We provided a bunch of documents that would
11   indicate, as you review each one of those, which
12   ones were transmitted or not. I'm having a
13   difficult time pinpointing an exact document,
14   given this volume, which ones were given to them
15   and which ones specifically address your
16   question.
17  Q. Has Narragansett been able to determine whether
18   or not any of the draft or proposed standard
19   offer service tariffs for Rhode Island were ever
20   physically given to TransCanada before it signed
21   the WSOS agreement?
22  A. I'm aware -- I recall a fax from someone at EUA
23   to Bill Taylor, March, April '98 time frame,
24   containing copies of some tariffs. Again, I --

Page 506

1    to the extent that there were other transmittals
2    prior or subsequent to that, I can't recall at
3    this time.
4   Q. Would Exhibit 57 be what you're referring to?
5   A. Yes.
6   Q. Okay. And you can see that includes a
7    Massachusetts approved tariff?
8   A. Yes.
9   Q. Are you aware of any -- are you -- has
10   Narragansett been able to determine whether EUA
11   ever presented to TransCanada prior to April 7,
12   1998 an actual copy of a proposed or other
13   standard offer service tariff for Rhode Island?
14  A. I have not seen a document indicating that one
15   was transmitted.
16  Q. Okay. What regulatory filings by EUA prior to
17   the signing date of the contract is Narragansett
18   aware of that indicated EUA's intent not to seek
19   a fuel adjustment after 2004?
20  A. I recall a version of a FERC filing that
21   included '05 through '09 fuel trigger points
22   with question marks in them that were later
23   removed.
24  Q. Okay. Are you aware of a document with question

Page 507

1    marks that was actually distributed outside of
2    EUA?
3   A. I'm going to have to look at that document to
4    see whether it was filed at FERC or --
5   Q. Are the documents you're referring to --
6   A. I believe it was a FERC filing.
7   Q. Are the documents you're referring to deposition
8    exhibits in this case?
9   A. Yes, I believe it is.
10  Q. Okay. Other than what's set forth in the
11   documents that you've seen, do you have any
12   information that indicates to you whether or not
13   those documents with question marks were ever
14   transmitted outside EUA other than looking at
15   the documents?
16  A. No.
17  Q. Did EUA, to your knowledge, ever provide any
18   written statement to TransCanada indicating that
19   it affirmatively did not intend to seek a fuel
20   adjustment after 2004?
21  A. I'm not aware of any such written communication.
22  Q. Are you aware of any verbal statements made by
23   EUA to TransCanada to the effect that it did not
24   intend to seek a fuel adjustment after 2004?

17 (Pages 504 to 507)

38853558-cc6c-4b41-b683-964c4852fde5

Page 528

1    triggers after 2004 in the EUA zone?
2  A.  I'm aware of a document produced by
3    Mr. Kremzier. I'm not aware of any
4    conversations that Mr. Kremzier would have had.
5  Q.  What internal discussions at EUA do you
6    understand to have occurred regarding the
7    applicability of a fuel adjustment after 2004?
8  A.  I don't have any knowledge of any particular
9    internal discussions at EUA.
10  Q.  Okay. These questions are to you also as a
11    30(b)(6), right, just to clarify?
12  A.  Uh-huh.
13  Q.  You have to say yes or no, not uh-huh.
14  A.  Yes.
15  Q.  Let me show you what has been previously marked
16    as Exhibit 31 in this case, which is a tariff
17    filing by EUA, dated November '97, and if you
18    turn to what is Bates-stamped Number 42485 at
19    the lower right, you see there's a request for
20    qualifications?
21  A.  Yes.
22  Q.  And then if you turn to 42490, there's a section
23    entitled Rhode Island, and there's a paragraph
24    in the middle of the page which states that --

Page 529

1    in sum or substance that there's an auction
2    process through 2005 and that Blackstone and
3    Newport will arrange at a later date for power
4    supplies for standard offer service for 2005
5    through 2009.
6        What was the reasoning behind EUA's
7    decision to split the standard offer service
8    period into two parts as set forth in that
9    paragraph?
10  A.  I can't recall anyone informing me as to why
11    they chose to go that route.
12  Q.  Well, do you -- as a 30(b)(6) witness and having
13    reviewed the deposition transcripts in this
14    case, do you have an understanding or does
15    Narragansett have an understanding as to why EUA
16    split the standard offer service period into two
17    time periods as set forth in that paragraph?
18      MR. LODEMORE: Objection.
19  A.  I have an opinion as to why such an approach was
20    proposed here. I don't have any -- I can't base
21    that on any discussions I've had with EUA
22    representatives or any documents that I've
23    viewed to date.
24  Q.  What is your opinion?

Page 530

1  A.  That the intent here is to line up the Rhode
2    Island and the Massachusetts auctions, hold them
3    simultaneously. They have contracts that apply
4    to both locations, that they were going to deal
5    with the seven-year term. And at this stage of
6    the game, folks were looking at the long-term
7    piece in Rhode Island, especially those fixed
8    price amounts that were in the contract, and
9    there are some initial discussions as to whether
10    we should lock up prices at this point in time
11    in the marketplace for the high-priced out years
12    or wait a while for the market to develop and
13    lock them in at a later time at even lower
14    prices than we are today.
15  Q.  Is that opinion based on any discussion and/or
16    testimony of EUA representatives?
17  A.  No.
18      MR. LODEMORE: Dan, just before you go
19    on, I don't want to give you the wrong
20    impression. The witness has reviewed some EUA
21    deposition testimony. There's been a lot of
22    deposition testimony. It's the same way as this
23    one. A lot of documents. And I just want to --
24    I don't want you to have the impression that

Page 531

1    he's reviewed all the deposition testimony in
2    the case thus far.
3  Q.  What deposition testimony have you reviewed in
4    this case thus far?
5  A.  I know I haven't spent any time looking at mine.
6    Boisvert, Hachey, Taylor. I did not have an
7    opportunity to review Hirsh. I don't recall
8    reviewing -- only very limited parts of
9    St. Pierre. Who else? Maybe part of Kirby's
10    and Lloyd.
11  Q.  Are you aware of any discussions with regulatory
12    authorities in Rhode Island about EUA's plan for
13    standard offer service in the 2005 to '9 time
14    frame?
15  A.  In relation to this auction process?
16  Q.  Yes.
17  A.  No.
18  Q.  Did EUA ever form a plan as to how it would
19    ultimately deal with the 2005 to '9 time period
20    before it merged with NEES?
21  A.  I'm not aware of any.
22  Q.  With respect to EUA's -- the obligation -- okay.
23    TransCanada took on an obligation under its
24    standard offer service contract to provide

23  (Pages 528 to 531)

38853558-cc6c-4b41-b683-964c4852fde5

Page 544

1  had ever intended to propose one in the future.
2  Q. And they made a decision at the time -- had EUA
3     made a decision at the time of Exhibit 6 that
4     they would not seek a fuel adjustment after 2004
5     in the EUA zone?
6  A. I don't know if that decision was reached at
7     this time or later.
8  Q. Do you have any information that indicates to
9     you that such a decision was reached before the
10    TransCanada contract was signed?
11 A. Not that I recall.
12 Q. Is there anything in Narragansett's view that
13    would have barred EUA from seeking a fuel
14    adjustment on its backstop after 2004 had it
15    wished to do so?
16 A. No.
17 Q. Are you aware of anything that would bar
18    Narragansett from requesting a fuel adjustment
19    in the EUA zone after 2004 now?
20 A. No.
21 Q. Are you aware of any agreement with Rhode Island
22    regulatory authorities that would prevent
23    Narragansett from seeking a fuel adjustment in
24    the EUA zone after 2004 now?

Page 545

1  A. No, and, in fact, I recall that that was one of
2     the options we considered back in early 2005,
3     when TransCanada raised this issue.
4  Q. Okay. What was that consideration?
5  A. That if there was a belief that we had an
6     obligation to take a particular action, we could
7     have worked on an appropriate filing and taken
8     it down to Rhode Island.
9  Q. And who was involved in those discussions?
10 A. Certainly Mr. Hachey. I believe you were his
11    legal representative at the time as well.
12 Q. Oh, okay. So your understanding is that -- I
13    mean Narragansett, if it wished to do so, does
14    not see any regulatory impediment to requesting
15    a fuel adjustment after 2004 in the EUA zone?
16    MR. LODEMORE: Objection.
17 A. I don't see any reason why we can't go down,
18    make a filing in Rhode Island for a fuel index
19    that is applicable in the EUA zone. The issue
20    whether we've got a basis and are able to get
21    the Commission to agree to that is maybe an
22    impediment, but there's nothing to prevent us
23    from making a filing that I'm aware of and
24    seeking such a fuel clause treatment.

Page 546

1  Q. Is there anything that leads you to believe that
2     the PUC would not grant such a request?
3     MR. LODEMORE: Incidentally, I think
4     we're well out of the 30(b)(6) range at this
5     point. Of course, if you'd like to -- just to
6     save time, if you'd like the same reservation we
7     had before.
8     MR. WINSTON: Fine.
9  A. I'm just thinking off the top of my head here of
10    such a filing. I think the hurdle, as in any
11    filing, is what's the basis on which we're
12    seeking this approval, what's the basis on which
13    Rhode Island can approve such a change. I think
14    we would have to show why this is not just a
15    let's go in and take more money from customers,
16    why it's something that should be in effect. If
17    there was an expectation or understanding that
18    we can demonstrate to the Commission and get
19    them to agree existed, that would certainly be a
20    very helpful thing in getting their approval, if
21    there was a statutory basis on which such an
22    amount was to be expected and so forth. It
23    would be up to us to make the case that there
24    was a basis for them to approve this other than

Page 547

1  here's a way to take more money from customers.
2  That would be the hurdle that we would need to
3  work through to make sure that we put together
4  our best case for such a request. There may be
5  other considerations that others after giving it
6  thought may be able to recommend as well.
7  Q. Okay. So what I understand you to be saying,
8     there's no impediment that you see for
9     Narragansett making an application for a fuel
10    adjustment after 2004 in the EUA zone, correct?
11 A. I'm not aware of any. I'm not aware our legal
12    counsel has given it full consideration, but I'm
13    not aware that there's any impediments.
14 Q. And I take it what you're saying is that one way
15    Narragansett might substantiate such a request
16    is to say, for example, "Upon review of the
17    matter, we've determined that the deal with
18    TransCanada did encompass a fuel adjustment
19    after 2004." That would be an example of a
20    substantiation that might be presented to the
21    PUC?
22 A. Yes.
23 Q. Do you have any reason to believe that if that
24    substantiation was provided that the PUC would

27  (Pages 544 to 547)

Page 552

1  overall restructuring, higher fixed prices,
2  other ways of restructuring those agreements.
3  I'm pretty sure I mentioned yesterday that in
4  the context of the FP&L contract in which I
5  needed to get the Division's consent to
6  terminate the NRG one, that we would have
7  presented the FP&L contract with the hard-wired
8  fuel index that only went to 2004 and had a
9  discussion as part of that one. Hopefully, you
10 recall those discussions.
11 Q.  Did you ever have a discussion with
12     Mr. Scialabba about the applicability of a fuel
13     adjustment after 2004 to the TransCanada or
14     Constellation contracts?
15 A.  I think I've just, again, summarized the extent
16     of the discussions to which I am -- I can
17     recall, and whether they go specifically to
18     all -- those discussions would apply equally to
19     all contracts.
20 Q.  Did you ever have any conversations with Steve
21     Scialabba prior to 2005 in which he expressed an
22     opinion about the applicability of the fuel
23     adjustment factor after 2004 in the EUA zone?
24 A.  I cannot point to a particular conversation

Page 553

1  where he expressed his opinion. I'll leave it
2  at the summary of discussions that I've
3  explained and that my view of the result of
4  those is at least an understanding that he was
5  in agreement with our view of that provision.
6  of that provision. How that was expressed and
7  what his exact opinion and words were, I am
8  unable to recall.
9  Q.  Are you aware of any entity other than
10     Narragansett ever expressing in the PUC
11     proceedings an opinion that a fuel adjustment
12     was not applicable in the EUA zone after 2004?
13 A.  Well, certainly in one of the exhibits you
14     showed me yesterday towards the end of 2004,
15     there were some comments made by Mr. Roberti. I
16     can't recall at this time whether they were
17     opinion or other, and I guess we'll just rely on
18     the transcripts of those various proceedings to
19     tell us whether or not others have opined on the
20     matter.
21 Q.  Okay. Are you aware of any negotiations between
22     EUA and Constellation about the applicability of
23     a fuel adjustment after 2004 to the
24     Constellation wholesale standard offer service

Page 554

1  contracts?
2  A.  No, other than, you know, Constellation telling
3  me that it was their understanding that it was
4  not applicable.
5  Q.  I'm trying to figure out if that was a no --
6  whether your qualification was gratuitous or
7  whether or not you were qualifying that you do
8  know. Are you aware of any negotiations between
9  EUA and Constellation -- leave aside any
10 opinions that you believe were expressed to you
11 by anybody at Constellation. Are you aware of
12 any statements made by EUA to Constellation
13 concerning the applicability of a fuel
14 adjustment after 2004?
15 A.  No.
16 Q.  Are you aware of any statements made by EUA to
17 NRG about the applicability of a fuel adjustment
18 after 2004?
19 A.  No.
20         MR. LODEMORE:  Just for clarification,
21 we're talking verbal statements?  The documents
22 say what the documents say.
23         MR. WINSTON:  Correct.
24         MR. LODEMORE:  Verbal statements.

Page 555

1  Q.  Are you aware of any objection ever expressed by
2  the Rhode Island Division or the Rhode Island
3  PUC prior to 2005 to Narragansett seeking a fuel
4  adjustment in the EUA zone after 2004?
5  A.  What do you mean by objection?
6  Q.  Any opposition.
7  A.  Having expressed any opposition to our
8  consideration of making a filing or seeking such
9  a provision?
10 Q.  Yes.
11 A.  No.
12 Q.  Are you aware of any objection or opposition
13 being expressed by the PUC after 2005 to
14 Narragansett seeking a fuel adjustment in the
15 EUA zone after 2004?
16 A.  No.
17 Q.  Are you aware of any objection or opposition
18 being expressed by the Rhode Island Division to
19 Narragansett seeking a fuel adjustment after
20 2004 in the EUA zone?
21 A.  No.
22 Q.  Are you aware of EUA -- and when I say EUA, I
23 mean EUA or its representatives.
24         MR. LODEMORE:  Correct.

29  (Pages 552 to 555)

Page 556

1  Q.  You can agree I can make that qualification to
2      all the questions I've asked?  When I've said
3      EUA, you understand I've meant EUA and all its
4      representatives, correct?
5          MR. LODEMORE:  Please say yes.
6  A.  Yes.
7  Q.  Are you aware of EUA ever making statements to
8      any bidders, successful or otherwise, for assets
9      or wholesale standard offer service contracts
10     concerning the applicability of a fuel
11     adjustment after 2004, limiting it to verbal
12     representations?
13 A.  Other than those expressed by Mr. Boisvert?
14 Q.  Yes.
15 A.  No.
16         MR. WINSTON:  Getting close.
17         MR. LODEMORE:  Getting close to the
18     five hours too.
19         MR. WINSTON:  Oh, c'mon.  There was
20     lunchtime in there.
21         THE WITNESS:  We were back in ten
22     minutes.  Where were you?
23         MR. WINSTON:  I was sitting in here,
24     waiting for you.  I have one very short topic,

Page 557

1      and then I probably want to consult with Wendy
2      Plotkin here.
3          (Discussion off the record)
4  Q.  Let me show you what's been marked as Exhibit
5      78.  Again, I apologize.  Is that a document
6      you've seen before?
7  A.  I've seen it.  I can't say that I have
8      extensively reviewed it.
9  Q.  Were you involved in its preparation at all?
10 A.  Not that I recall.
11 Q.  You are aware you have been put forth as the
12     30(b)(6) witness for Narragansett on
13     Narragansett's evaluation and treatment of the
14     EUA Companies' standard offer service retail
15     tariffs and fuel adjustment factor for purposes
16     of the merger --
17 A.  Okay, yes.
18 Q.  -- and related rate consolidation filings.  What
19     was the process by which -- is this the rate
20     consolidation filing or a portion of it?
21 A.  Yes.
22 Q.  What was the process by which this was put
23     together?
24 A.  Would have involved -- it would have been an

Page 558

1      internal team of NEES and EUA folks reviewing
2      the various rates and attempting to derive a
3      plan that would transfer all the EUA customers
4      onto Narragansett rates following the merger.
5  Q.  Were the standard offer service rates and
6      tariffs part of this rate consolidation
7      proceeding?
8  A.  Yes.
9  Q.  What was the process by which the standard offer
10     rates and tariffs were consolidated?
11 A.  That the customers would move onto the
12     Narragansett standard offer service tariff.
13 Q.  Was the idea that if there were any differences
14     in the standard offer service tariffs that it
15     was to be identified in the rate consolidation
16     filings?  No, I'm actually asking the purpose
17     and intent, not what's in the document.
18         THE WITNESS:  May I hear the question
19     one more time, please?
20         MR. WINSTON:  Read it back.
21         (Reporter read back the last question.)
22 A.  I think to the extent that there were any
23     material differences that needed to be
24     identified, they would have been included in

Page 559

1      that filing.
2  Q.  What was the standard for determining whether a
3      difference needed to be identified?
4  A.  I don't know.
5  Q.  Who would know that information?
6  A.  Perhaps someone on the rate side, perhaps
7      counsel representing us, if it needed to be
8      identified at all.
9  Q.  Well, Mr. Malloy made this filing.  Would that
10     be something he'd be responsible for
11     determining?
12 A.  I think he'd have knowledge whether they had to
13     identify it or not, yes.
14 Q.  Was the idea to identify -- do you have any
15     understanding what the standard was for
16     determining the differences that needed to be
17     identified?
18 A.  Certainly rate impacts would be the primary
19     driver.
20 Q.  Okay.  What do you mean by rate impacts?
21 A.  Well, if we were moving folks off of an E-way
22     standard offer tariff that has a rate -- I'm
23     just grabbing a number -- 4 cents per kilowatt
24     hour and putting them on Narragansett's standard

30  (Pages 556 to 559)

| Page 560 | Page 562 |
|---|---|
| 1   offer tariff that has them paying a rate higher | 1   related to whether or not fuel trigger |
| 2   than 4 cents, you would need to identify that | 2   provisions would kick in or not. |
| 3   rate impact as part of this proceeding and why | 3   Q.  Well, you said at the beginning of this that you |
| 4   customers should pay that higher amount and why | 4   weren't aware of how the rate consolidation |
| 5   some other form of adjustment may or may not be | 5   worked.  What's the source of your knowledge as |
| 6   applicable to affected customers. | 6   to the comparison -- as to any analysis that was |
| 7   Q.  Would you agree with me that that would apply to | 7   set forth -- that was done concerning whether to |
| 8   both present and future rate impacts? | 8   identify differences in the standard offer |
| 9   A.  Yes, but as this filing indicates, at least in | 9   service tariffs with regard to a fuel |
| 10   relation to the fixed prices, the EUA and NEES | 10   adjustment? |
| 11   plans were identical. | 11   A.  I have none. |
| 12   Q.  Well, was the idea to identify rate impacts both | 12   Q.  Are you aware that anyone involved with the rate |
| 13   short-term and long-term on different customers? | 13   consolidation effort identified any differences |
| 14   A.  I think with respect to distribution rates, | 14   in the fuel adjustment in the 2005 to '09 time |
| 15   which were going to be in effect for long terms, | 15   frame between the EUA and Narragansett zones? |
| 16   that was where the brunt of the analysis was. | 16   A.  I'm not aware of any. |
| 17   As far as the other rates that were subject to | 17   THE WITNESS:  Let me hear the question |
| 18   reconciliation adjustment provisions, I don't | 18   again. |
| 19   recall that that was part of the -- | 19   (Reporter read back the last question.) |
| 20   Q.  Did you have an understanding that long-term | 20   A.  I'm not aware of anyone's knowledge on the rate |
| 21   distribution rates were to be identified in the | 21   plan.  I know that we knew working on the |
| 22   rate consolidation filing? | 22   contract side that those tariffs were going -- |
| 23   A.  We were establishing as part of this a new set | 23   that the EUA tariffs -- customers were moving |
| 24   of long-term distribution rates.  So as | 24   off of EUA tariffs, going onto the Narragansett |

| Page 561 | Page 563 |
|---|---|
| 1   customers were going from one set of rates to | 1   tariffs.  The Narragansett tariffs no longer |
| 2   another, they were identifying the impacts of | 2   had -- never contained the fuel index provision |
| 3   those changes, but the other rate provisions | 3   under that contract, that we were making |
| 4   were being consolidated and averaged and blended | 4   those -- we were going to make that commitment |
| 5   together. | 5   to the suppliers to continue to make those |
| 6   Q.  And did you have any understanding that | 6   payments, even though there was no longer an |
| 7   long-term rate differences for other components | 7   applicable tariff.  I'm sure that was |
| 8   of the end rate to be paid by a customer were to | 8   communicated to the rate team as an issue that |
| 9   be identified as well? | 9   we took care of on our end.  I don't recall -- |
| 10   A.  Not my understanding. | 10   have any knowledge of any particular decisions |
| 11   Q.  Why would it not be relevant to note differences | 11   as to whether that was needed to be explained -- |
| 12   between the rates that might be charged to EUA | 12   that aspect of it needed to be explained in this |
| 13   customers after 2005 and the rates that might be | 13   proceeding and why or why not that was the case. |
| 14   charged to NEES customers after 2005 for | 14   Q.  Are you aware of anyone -- who was -- the folks |
| 15   standard offer service? | 15   that were in charge of this reconsolidation |
| 16   A.  This plan was providing for an overall uniform | 16   filing would have been the rate departments of |
| 17   standard offer rate across the state of Rhode | 17   EUA and NEES, respectively, correct? |
| 18   Island.  Those rates were being driven by the | 18   A.  Yes. |
| 19   various applicable contractual provisions coming | 19   Q.  Are you aware of anyone in the rate departments |
| 20   together and blending.  So at that point, which | 20   of NEES and EUA during the process of this |
| 21   customers were paying more or less given that | 21   reconsolidation filing identifying any |
| 22   the base rates under those contracts were | 22   difference between the NEES and EUA zones |
| 23   identical, not viewed as an impact, and there | 23   regarding the applicability of a fuel adjustment |
| 24   was not being performed any specific analysis | 24   factor between 2005 and 2009? |

31  (Pages 560 to 563)

Page 564

1   A.  No.
2   Q.  At EUA, was the rate department in charge of
3       filing and drafting the standard offer service
4       tariffs?
5   A.  Yes.
6   Q.  At EUA, was it the rate department that was in
7       charge of the content of the standard offer
8       service retail tariffs?
9           MR. LODEMORE:  Objection.
10  A.  Yes, to the extent that they were responsible
11      for the tariff and, thus, by definition, all of
12      its contents.  However, I believe their rate
13      folks have indicated that at least with respect
14      to the fuel trigger mechanism, that they relied
15      on stuff from the power supply group and the
16      other wholesale related documents to incorporate
17      the language from those settlements and so forth
18      into their tariff.
19  Q.  What was EUA's and NEES's understanding of the
20      manner in which its rate consolidation filing
21      would be used by the PUC?
22  A.  Used by the PUC to establish rates and
23      applicable tariffs following the merger of NEES
24      and EUA.

Page 565

1   Q.  It was NEES and EUA's understanding that the PUC
2       would rely on the representations made in the
3       rate consolidation filings as to differences
4       between the EUA and NEES tariffs, correct?
5   A.  You're going beyond my range on that question.
6       I'm afraid I'm unable to answer.
7           THE VIDEOGRAPHER:  Five minutes.  Five
8       minutes.
9           MR. WINSTON:  Got you.  I've probably
10      got ten or fifteen minutes, probably max, but
11      you want to just switch it.
12          THE VIDEOGRAPHER:  The time is
13      3:38 p.m.  This is the end of Tape Number 3.
14          (Recess)
15          THE VIDEOGRAPHER:  The time is
16      3:46 p.m.  This is the beginning of Tape
17      Number 4.
18  Q.  Mr. Hager, what is the standard offer service
19      rate in Rhode Island today?
20  A.  I don't know at this time.
21  Q.  Let me show you what's been marked as Exhibit
22      99, and you'll see that what it employs is
23      it's -- have you seen this document before?
24  A.  Yes.

Page 566

1   Q.  Okay.  Am I right it's a commission data request
2       response that provides calculations of the
3       standard offer service price both including the
4       TransCanada protest payments and not including
5       them, correct?
6   A.  Yes.
7   Q.  So you'll see "Attachment 2" in the middle of
8       the page of the response, "Attachment 2
9       replicates the calculation rates for both
10      periods, this time eliminating disputed fuel
11      index payments."
12  A.  Yes.
13  Q.  So that would be a calculation based on paying
14      no fuel adjustments to any of the EUA
15      contractors but a fuel adjustment to the old
16      Narragansett's own contractors, correct?
17  A.  Correct.
18  Q.  And if we look at Attachment 2, for the period
19      of October to December 2005, am I right that the
20      current base standard offer charge is the .05543
21      cents per kilowatt hour?
22  A.  Yes.
23  Q.  In Column B?
24  A.  Correct.

Page 567

1   Q.  Okay.  And that reflects an original stipulated
2       price of .055 plus the .00043 adder based on the
3       congestion costs resolution with Constellation,
4       correct?
5   A.  Correct.
6   Q.  And the .083 cents per kilowatt hour number
7       represents the figure including the fuel
8       adjustment that would be charged throughout
9       Rhode Island, correct?
10  A.  Correct.
11  Q.  Okay.  Now, had EUA and NEES not merged, am I
12      right that the EUA customers would be paying
13      .055 or thereabouts cents per kilowatt hour?
14  A.  Yes.
15  Q.  And the old Narragansett zone end customers in
16      the absence of a merger would be paying .083
17      cents per kilowatt hour or a higher number?
18          MR. LODEMORE:  Objection.
19  A.  Certainly the costs under my contract would be
20      higher by the -- higher than the .0543 cents by
21      the amount of my fuel index payments.  So it
22      would most likely result in a higher number than
23      .083.
24  Q.  Okay.  Likewise, had NEES and EUA not merged,

32 (Pages 564 to 567)

Page 568

1    for the calculation for 2006 on Attachment 2,
2    the EUA customers would be paying approximately
3    .059 cents per kilowatt hour, correct?
4  A.  Correct.
5  Q.  And the old Narragansett zone --
6  A.  Or thereabouts.
7  Q.  Or thereabouts. And the "or thereabouts,"
8    you're referring -- what are you leaving off the
9    settlement amount?
10  A.  The settlement probably will be a little
11    different when you spread it over just the EUA
12    contracts versus all the contracts.
13  Q.  But approximately .0543 cents per kilowatt hours
14    is what the EUA zone customers would be paying
15    in 2006 according to Attachment 2 in the absence
16    of a merger?
17      MR. LODEMORE:  Objection.
18  Q.  You can answer.
19  A.  Yes.
20  Q.  And in the absence of a merger --
21  A.  Well, let me just state -- put a qualifier that
22    goes back to one of the answers. Assuming that
23    rates are set in accordance with the same
24    provision here, that the retail rate reflects

Page 569

1    the cost under the various purchase power
2    agreements in those zones.
3  Q.  Well, also assuming that no fuel adjustment was
4    paid in the EUA zone?
5  A.  Correct.
6      MR. LODEMORE:  Also for clarification,
7    we're assuming there's no distribution charge or
8    transmission charge or anything like that?
9      MR. WINSTON:  We're just focusing on
10    the standard offer service charge.
11      MR. LODEMORE:  Right.
12  Q.  And in the absence of a merger, the standard
13    offer service charge that would be applied to
14    the old Narragansett zone customers in which a
15    fuel adjustment is included would be higher than
16    .1 cents per kilowatt hour?
17  A.  That's what I would expect, yes.
18  Q.  Okay. So in the absence of a merger, at least
19    based on these projections in 2006, the old
20    Narragansett zone customers would be paying a
21    standard offer price almost double what the EUA
22    zone customers be paying?
23      MR. LODEMORE:  Objection.
24  A.  Yes.

Page 570

1  Q.  Is that the type of rate impact and difference
2    that the rate consolidation proceedings were
3    designed to identify?
4  A.  Those rate impact differences are as a result of
5    a fuel index provision kicking in in the
6    Narragansett zone. If that was not kicking in,
7    there would be no rate difference, and at the
8    time, there was no attempt to forecast or
9    anticipate what, if any, fuel trigger amounts
10    were being paid. Especially back in -- we go
11    back to this filing being in June 1999. We were
12    still at this point not anticipating that we
13    would initiate any payments beginning in January
14    of 2000. So the calculation of what to expect
15    under those fuel trigger amounts, if any, was
16    not something anyone was focusing on nor was
17    anyone focusing on -- to the extent it got to
18    these levels, I would doubt anybody would
19    anticipate in any of their calculations we ever
20    would perform that calculation.
21  Q.  And you're stating that based on what? Your
22    assumption or is that based on any conversations
23    you've had with anybody involved in the rate
24    consolidation filing?

Page 571

1  A.  Based on many discussions that I've been a part
2    of and aware of on the rate side. When they've
3    done these rate analyses, they've always
4    excluded the fuel trigger, and the impacts, at
5    this point in time, they always excluded any
6    impact from the fuel trigger provisions, if any.
7  Q.  Let me show you one final exhibit, 191.
8      (Rate Settlement Plan in Docket 2930 was
9      marked Exhibit Number 191 for
10      identification.)
11      THE WITNESS:  Could you underline the
12    word "final"?
13  Q.  I think it is rate settlement plan in Docket
14    2930. Is that a document you've seen before?
15  A.  Yes.
16  Q.  What is that document?
17  A.  It's a summary of events related to the rate
18    settlement discussions of actions that would be
19    taken over time.
20  Q.  Who prepared it?
21  A.  Either our counsel in the proceeding or a member
22    of the rate team.
23  Q.  Was this filed with the Public Utilities
24    Commission?

33  (Pages 568 to 571)

38853558-cc6c-4b41-b683-964c4852fde5

# Hirsh

Page 1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                  (Central Division)

4      - - - - - - - - - - - - - - -

5    TRANSCANADA POWER MARKETING    :

6    LTD,                           :

7              Plaintiff,           :   CASE NO.

8    VS.                            :   05-40076 FDS

9    NARRAGANSETT ELECTRIC CO.,     :

10              Defendant.          :

11     - - - - - - - - - - - - - - -

12

13    VIDEOTAPED DEPOSITION OF MICHAEL J. HIRSH, a

14    witness called by and on behalf of the

15    Plaintiff, taken pursuant to the applicable

16    provisions of the Federal Rules of Civil

17    Procedure, before Sandra L. Bray, Registered

18    Diplomate Reporter, CSR Number 103593, and

19    Notary Public in and for Commonwealth of

20    Massachusetts, at the offices of Choate Hall &

21    Stewart LLP, Two International Place, Boston,

22    Massachusetts, on Saturday, January 27, 2007,

23    commencing at 9:01 a.m.

24

ESQUIRE DEPOSITIONS SERVICES

Page 2

1  APPEARANCES:
2    Representing the Plaintiff:
3      CHOATE HALL & STEWART LLP
4      Two International Place
5      Boston, Massachusetts  02110
6      BY:  DANIEL C. WINSTON, ESQUIRE
7         WENDY S. PLOTKIN, ESQUIRE
8
9    Representing the Defendant:
10     BOWDITCH & DEWEY, LLP
11     311 Main Street
12     Worcester, Massachusetts  01615-0156
13     BY:  VINCENT F. O'ROURKE, JR., ESQUIRE
14
15  ALSO PRESENT:
16    Michael Hachey, TransCanada
17    Jody Johnson, TransCanada
18    Douglas I.D. McLean, TransCanada
19    David Woodford, Videographer
20
21
22
23
24

Page 4

1
2        E X H I B I T S, Continued
     NO.     DESCRIPTION          PAGE NO.
3
4    12   Notes of 2-25-97 Meeting at EUA  82
5    13   Response to Division Data
6         Request, dated 3-28-97        82
     14   Draft Stipulation and
7         Agreement, dated 3-20-97      87
8    15   NEES Draft Settlement,
          May 16, 1997               88
9    16   NEES May 28, 1997
          Massachusetts Settlement      99
10
11   17   NEES May 28, 1997 Rhode Island
          Settlement                  99
12   18   FERC November 26, 1997 Order   99
13   19   EUA Massachusetts Settlement,
          October 29, 1997              99
14
     20   EUA Rhode Island Settlement,
15        October 29, 1997              99
16   21   June 5, 1997 Project Time Line  112
17
     22   Letter to Mr. Scialabba, dated
18        7-27-97, and Enclosures       117
19   23   Letter to Division, dated
          8-1-97, and Enclosure        121
20
     24   Response to FERC Requests,
21        dated 8-7-97               124
22   25   Letter                      162
23   26   Letter to Mr. Scialabba, dated
          8-21-97, and Other Documents   164
24

Page 3

1          I N D E X
2    WITNESS:                PAGE NO.
3    MICHAEL J. HIRSH
4    BY MR. WINSTON             10
5
6
7
8          E X H I B I T S
9    NO.    DESCRIPTION        PAGE NO.
     1   Wholesale Standard Offer
10       Service Agreement        17
11   2   Sections of URA Enacted in 1996  27
12   3   Retail Choice and Standard
         Offer Outline            29
13
     4   Letter to Ms. Massaro at PUC
14       from Mr. St. Pierre, dated
         10-4-98                37
15
     5   May 11 Filing in Docket 2716   38
16
     6   Response to Enron's Request
17       For Information, December 1997  42
18   7   Letter to PUC, dated January 3,
         and Enclosure            59
19
     8   January 23, 1997 Rhode Island
20       Outline                59
21   9   Memorandum of Understanding,
         dated 2-8-97             59
22
23
     10  Offer of Settlement Book 2 of 5  59
24   11  EUA Proposed FERC Filing
         Package, dated 1-30-97       59

Page 5

1         E X H I B I T S, Continued
2    NO.    DESCRIPTION        PAGE NO.
3    27  Draft of Stipulation Agreement   177
4    28  Request for Qualifications,
         dated 8-14-97            179
5
     29  Document                211
6
     30  Request for Qualifications,
7        dated 9-18-97            215
8    31  November 7, 1997 Standard
         Offer Service Tariff Filing   220
9
     32  Transcript of Hearing Testimony
10       In Docket Number 2716      173
11   33  Order of PUC, dated 11-7-97   227
12   34  Compliance Filing, 12-23-97    228
13   35  Letter                  232
14   36  Letter from TransCanada,
         dated 9-9-97             233
15
     37  October 24, 1997 Bid Conference
16       Slide Presentation         234
17   38  Memorandum from Mr. Drumm,
         dated 11-12-97           237
18
     39  Letter to Salomon Brothers
19       from TransCanada dated 12-11-97  242
20   40  Fax to Mr. Pourbaix from
         Mr. Hirsh                245
21
     41  Memorandum from Mr. Ryan,
22       dated 1-13-98             246
23   42  Fax to Mr. Hirsh from
         Mr. Taylor               248
24

2 (Pages 2 to 5)

ESQUIRE DEPOSITIONS SERVICES

Page 6

| | | |
|---|---|---|
| | E X H I B I T S, Continued | |
| NO. | DESCRIPTION | PAGE NO. |
| 43 | Net Present Value Calculation, 1-9-98 | 251 |
| 44 | Reed Letter, dated 1-7-98 | 254 |
| 45 | Marketing Meeting List, dated February 4, 1998 | 255 |
| 46 | Reed Information Memorandum | 258 |
| 47 | NEP November 19, 1997 PUC Response | 264 |
| 48 | Second November 19, 1997 NEP Data Response | 266 |
| 49 | January 9, 1998 NEES Bid Document | 270 |
| 50 | May 15, 1998 PUC Submission | 275 |
| 51 | Letter to Mr. Pourbaix from Mr. Ryan, dated 1-19-98 | 277 |
| 52 | Standard Offer Service Filing, dated 1-15-98 | 282 |
| 53 | Letter to Mr. Pourbaix from Mr. Hirsh, dated 1-9-98 | 286 |
| 54 | Letter to Mr. Hirsh from Mr. Pourbaix, dated 3-24-98 | 288 |
| 55 | Fax to Mr. Hirsh, dated 3-30-98 | 294 |
| 56 | Fax to Messrs. McMaster and Pourbaix from Mr. Hirsh, dated 4-1-98 | 295 |
| 57 | Fax to Mr. Taylor from Mr. Boisvert | 299 |

Page 7

| | | |
|---|---|---|
| | E X H I B I T S, Continued | |
| NO. | DESCRIPTION | PAGE NO. |
| 58 | Fax to Mr. Hirsh from Mr. Boisvert | 300 |
| 59 | Fax to Mr. McMaster from Mr. Hirsh and 4-3-98 Draft of Wholesale Standard Offer Service Agreement | 301 |
| 60 | Document | 304 |
| 61 | Document | 306 |

(EXHIBITS RETAINED BY COUNSEL.)

Page 8

1      P R O C E E D I N G S
2      (The Massachusetts driver's license
3      number as identification of the deponent
4      was noted for the record.)
5           THE VIDEOGRAPHER: Good morning. Here
6      begins Tape Number 1 of the videotaped
7      deposition of Mr. Michael Hirsh, taken by the
8      Plaintiff in the matter of TransCanada,
9      Plaintiff, versus Narragansett Electric,
10     Defendant, in the United States District Court,
11     District of Massachusetts, Central District.
12     Case number is 05-40076 FDS. This deposition is
13     being held at the offices of Choate Hall &
14     Stewart at Two International Place, 30th floor,
15     Boston, Massachusetts.
16          The time now is 9:01 a.m. on
17     January 27th, 2007. My name is David Woodford.
18     I'm a legal videographer from Esquire Deposition
19     Services. The court reporter today is Sandra
20     Bray, also in association with Esquire
21     Deposition Services.
22          Would the counsel present please
23     introduce themselves for the record?
24          MR. WINSTON: My name is Dan Winston

Page 9

1      of Choate Hall & Stewart, for TransCanada.
2           MR. O'ROURKE: My name is Vincent
3      O'Rourke of Bowditch & Dewey. I'm here for
4      Narragansett Electric Company and for the
5      witness, Mr. Hirsh.
6           THE VIDEOGRAPHER: Thank you. Will
7      the court reporter please swear in the witness
8      at this time?
9           MICHAEL J. HIRSH, having duly sworn or
10     affirmed that his testimony would be the truth,
11     the whole truth, and nothing but the truth,
12     testified as follows:
13               *  *  *
14          MR. WINSTON: I think we've stipulated
15     that motions to strike and objections, except as
16     to form, are reserved until trial.
17          MR. O'ROURKE: Correct.
18          MR. WINSTON: We'll waive
19     notarization. Mr. Hirsh, you have the right to
20     read and sign a transcript of your deposition
21     within 30 days after this. Would you like to
22     have the opportunity to do that?
23          THE WITNESS: Yes, I would.
24               *  *  *

3 (Pages 6 to 9)

Page 10

1    EXAMINATION BY MR. WINSTON:
2  Q.  Please state your name for the record and spell
3      it.
4  A.  My name is Michael Hirsh, H I R S H.
5  Q.  Where do you live?
6  A.  I live at 3 South Stone Mill Drive in Dedham,
7      Massachusetts.
8  Q.  Have you been deposed before, Mr. Hirsh?
9  A.  Yes.
10  Q.  You understand I'll be asking you a series of
11      questions, your answers are under oath?
12  A.  Yes.
13  Q.  One thing I need to emphasize is that because
14      we're taking a written transcript, you need to
15      answer verbally yes or no. Nodding, she can't
16      get.
17  A.  Right.
18  Q.  Or uh-huh is unclear. So please answer
19      verbally. If I -- it's also important that even
20      if you think you know where my question is going
21      to end, you wait until I get it out so that the
22      court reporter can have question, answer,
23      question, answer. If you don't understand a
24      question, just tell me and I'll rephrase it.

Page 11

1      Your counsel may object to certain
2      questions as a matter of form. That's for us to
3      argue about later. You can go ahead and ask
4      (sic) the question. The one area I do not want
5      to get testimony from you is about your
6      conversations from counsel, and in that respect,
7      he can instruct you not to answer. I don't
8      intend to ask you about those conversations.
9      If you need a break to go to the
10      bathroom or something, let us know that you want
11      a break. I would ask you answer the question
12      that's pending. We've got -- as you know, this
13      relates to matters a long time ago, and there's
14      a lot of ground to cover; and you're also the
15      first witness in this case. So I'll try to go
16      as quickly as I can, and I appreciate your
17      coming in on a Saturday.
18      Could you just briefly tell me where
19      you went to high school and just what your
20      education is?
21  A.  I went to Natick High School, Natick,
22      Massachusetts. Undergraduate, attended Carnegie
23      Mellon University, got a bachelor's degree in
24      electrical engineering and public policy. After

Page 12

1      I started work, I got a master's degree in
2      electrical engineering from Northeastern in
3      1983, an M.B.A. from Northeastern in 1986, and I
4      received my M.S. in teaching and physics at
5      Northeastern in 2003.
6  Q.  Okay. You are well educated. Good work.
7  A.  Thanks.
8  Q.  And could you tell me, not high school jobs, but
9      just your work history and dates of those jobs?
10  A.  I basically started with Eastern Utilities at
11      the Brockton Edison division in 1977 and worked
12      at EUA through April of 2000 in various jobs.
13  Q.  So you started at EUA right out of college?
14  A.  Correct.
15  Q.  Right out of Carnegie Mellon. And can you
16      briefly tell me -- and to the extent you can
17      give me dates and years, that would be
18      helpful -- the jobs you held at EUA from 1977
19      through 2000?
20  A.  Through about 1977 through about 1980, I was in
21      the engineering department in various divisions.
22      In 1980, I joined a department called resource
23      planning that was responsible for planning
24      transmission and generation facilities for the

Page 13

1      system. I was in that department, rising up
2      from engineer to director of the department from
3      1980 to 1988 or so. About then, I became
4      director of engineering. Was director of
5      engineering for two years, until 1990.
6      1990, I became president of Blackstone
7      Valley Electric, which was the operating
8      division, Rhode Island. In 1994 or so, the
9      company reorganized, and I became vice president
10      of technical services in charge of engineering,
11      operations, substations and facilities, and then
12      somewhere around 1997, 1998, my responsibilities
13      changed to focus on coordinating the activities
14      to deal with restructuring the electric utility
15      business.
16  Q.  Okay. And what was your -- so your position in,
17      say, 1996 was VP of technical services?
18  A.  Right.
19  Q.  And what organization were you VP of?
20  A.  Right. So when the reorganization occurred, I
21      became vice president of -- with EUA Service
22      Corporation.
23  Q.  What was EUA?
24  A.  Service Corporation consisted of two operating

4 (Pages 10 to 13)

ESQUIRE DEPOSITIONS SERVICES

Page 14

1    units, which was Eastern Massachusetts and
2    Blackstone, which was Rhode Island. A little
3    later in the history of the organization, we
4    picked up Newport Electric, so we had three
5    operating divisions, plus Montaup, which was our
6    generating facility, and the Service Corporation
7    was to provide services to those three
8    companies, to engineering, rates, customers
9    services, and finance and administration.
10   Q. Okay. Where was your office as VP of technical
11      services?
12   A. West Bridgewater.
13   Q. Massachusetts?
14   A. Massachusetts.
15   Q. And then, when the restructuring came about,
16      what did your position become or did your actual
17      formal position change?
18   A. Yeah, actual formal position changed. They
19      changed that responsibility I had as vice
20      president of technical services, and other
21      people took it over. I basically had a staff of
22      two, and my job was to coordinate the activities
23      of all the other departments that would have to
24      change function or be looking to the effect of

Page 15

1    restructuring on those departments. It was also
2    to make sure the company understood and was
3    dealing with all the various aspects of the
4    Electric Utility Restructuring Acts of Mass. and
5    Rhode Island.
6    Q. You said you had a staff of two. Who were those
7       people?
8    A. Those people were Ed Kremzier and Peter Fuller.
9    Q. What was your -- did you work in that capacity
10      until you left?
11   A. No. It died down quite a lot in the last year
12      or so. At some point, probably around 1999, I
13      also took on responsibility for the business
14      services function, and as we were working on the
15      closing of our merger with NEES -- New England
16      Electrical System, I took on a responsibility of
17      coordinating the due diligence and data requests
18      and supporting the various filings in that
19      transaction.
20   Q. Okay. What was your formal title in, say, 1999?
21   A. Well, that's a good question. It was certainly
22      vice president of EUA Service Corp. I don't
23      recall that it was ever anything like vice
24      president of restructuring, so I don't think the

Page 16

1    formal title took on any new name to reflect my
2    responsibilities. It wasn't technical services
3    anymore, but it was just generic vice president.
4    Q. When did -- okay. You said you left EUA in
5       approximately April of 2000?
6    A. Yes.
7    Q. What did you do then?
8    A. Then I -- after a few -- in September of that
9       year, I began school at Northeastern, working on
10      the master's arts in teaching and physics.
11   Q. What do you do now?
12   A. Now, I'm a teacher at Needham High School.
13   Q. What subjects do you teach?
14   A. I teach physics, astronomy, and meteorology.
15   Q. Why did you leave EUA in April 2000?
16   A. Well, there was a change in control, and I was
17      offered a new position under the change of
18      control. There were conditions under which I
19      could decide to accept or refuse the position
20      based on -- but anyway, I decided to turn down
21      that position, and teaching was something I'd
22      wanted to do.
23   Q. Do you still have any type of working
24      relationship with the subsequent entity?

Page 17

1    A. No.
2    Q. What's the name of the subsequent entity?
3    A. National Grid.
4    Q. Do you have ongoing relations with anybody at
5       National Grid?
6    A. Do you mean socially or businesswise?
7    Q. Businesswise first.
8    A. No.
9    Q. How about socially?
10   A. There are a few people I still see and keep in
11      touch with from Eastern Utilities.
12   Q. Are you aware of what the subject of this
13      lawsuit is?
14   A. Yes, I am. At least I think I am.
15   Q. Okay. What do you understand the subject of
16      this lawsuit to be?
17   A. I understand the subject of this lawsuit to be a
18      dispute over the standard offer agreement
19      between TransCanada and National Grid or whoever
20      the current entity is.
21   Q. I'm going to be showing you a series of
22      exhibits.
23          (Wholesale Standard Offer Service
24          Agreement was marked Exhibit Number 1

5 (Pages 14 to 17)

ESQUIRE DEPOSITIONS SERVICES

Page 22

1   Q.   Okay.  What are the names of the people that you
2        met with from National Grid to talk about the
3        dispute, attorneys or nonattorneys?
4   A.   Well, I didn't meet anybody to talk about the
5        dispute, per se.
6   Q.   Okay.  Have you talked to anybody other than
7        Mr. O'Rourke?
8   A.   In terms -- about the fact that I'm being
9        deposed, is that what you're asking me?
10  Q.   Yes.
11  A.   So the names would be a gentleman named --
12       you're asking me discussions with --
13  Q.   I'm just trying --
14  A.   But with who exactly?
15  Q.   My question to you is, who, if anyone, other
16       than Mr. O'Rourke have you talked about either
17       your testimony here today or the subject of the
18       testimony?
19  A.   Anybody I've spoken to about it?
20  Q.   No, at National Grid or an attorney at National
21       Grid.
22  A.   So currently at National Grid?
23  Q.   Yes.
24  A.   Probably Tom McBride.  Of people at National

Page 23

1        Grid, he's the only one I can recall.
2   Q.   Okay.  Who's Tom McBride?
3   A.   He's -- he is in charge of their ethics
4        compliance, and he was a former head of audit
5        for Eastern Utilities.
6   Q.   Was counsel present for that conversation?
7   A.   No.  That was a social conversation.
8   Q.   Okay.  And are you -- have you been in contact
9        with any of your former working associates,
10       Kevin Kirby, Dennis Powderly -- not Dennis
11       Powderly, Bob Powderly or others?
12  A.   Yes.
13  Q.   Which of those individuals have you discussed
14       this dispute with?
15            MR. O'ROURKE:  Objection.
16  Q.   You can answer.
17  A.   Okay.  I haven't discussed the dispute with any
18       of them, but if you're asking if it came up at
19       all, the fact that, jeez, I'm being disposed --
20       deposed and I can't believe they think I
21       remember anything about this, that conversation
22       was held with -- well, a gentleman named Don
23       Sena, who was previously in the finance
24       department, and Bob Powderly might have been

Page 24

1        present for some of that conversation.
2   Q.   Okay.  Okay.  Do you recall what the -- do you
3        recall there was an act passed in Rhode Island
4        called the Utility Restructuring Act?
5   A.   I vaguely recall that, yes.
6   Q.   Do you recall when that was enacted?
7   A.   Not exactly.  Must have been '96, '97.
8   Q.   Okay.  Do you -- and do you recall that that
9        provided for standard offer service?
10  A.   Yes, I do.
11  Q.   Okay.  What do you recall about the terms of
12       standard offer service generally?
13  A.   Well, you know, I haven't thought about this
14       stuff in ten years.  I'm sure I was an expert on
15       it once.  I mean I can recall that standard
16       offer service, the word "backstop" was often
17       applied to it.  Its purpose was to ensure that
18       wholesale power would be available to
19       customers -- retail customers in Rhode Island in
20       the event that a competitive market to supply
21       that service did not develop under the
22       restructuring or in the event that customers
23       just didn't take action to take advantage of
24       that wholesale market.

Page 25

1   Q.   Okay.  What I'm going to be doing is showing you
2        a series of documents to try to refresh your
3        recollection because I understand it's a long
4        time ago.  Do you recall the term of the
5        standard offer service in Rhode Island?
6   A.   No, not exactly.
7   Q.   Okay.  Do you recall that the implementation of
8        the act required the divestiture of EUA's
9        generation assets?
10  A.   Yes, I do.
11  Q.   And you recall it was held at some point that a
12       public bid of standard offer service was also
13       required?
14  A.   Yes, I do.
15  Q.   Okay.  And so you recall there was a public bid
16       for standard offer service contracts as well as
17       a separate bid for the asset -- generation asset
18       of Montaup?
19  A.   Yes.
20  Q.   Do you also recall that there was an obligation
21       that buyers of the generation assets of Montaup
22       had to take a backstop obligation to provide
23       standard offer service?
24  A.   Yes.

ESQUIRE DEPOSITIONS SERVICES

Page 30

1    Outline was marked Exhibit Number 3 for
2    identification.)
3  Q.  I'll represent to you this is an outline that
4    was produced by Narragansett Electric or
5    National Grid in this litigation, which is what
6    is denoted by the Bates stamp NARR at the
7    bottom. Do you recall various analyses and
8    outlines prepared at EUA about the
9    implementation required by the URA?
10 A.  I guess I'm trying to understand the question.
11    What -- do you have --
12 Q.  What did -- the URA was passed in 1996.
13 A.  Okay.
14 Q.  What happened at EUA in response to URA?
15 A.  Well, when a law like that was passed, we would
16    understand the implications of the law and
17    various departments, rate department, power
18    supply, customer service, would go about
19    determining what the impact of that law is on
20    their operation, what we would have had to do to
21    comply with the law.
22 Q.  What I'm asking you, does this look like the
23    type of outline that would have been prepared at
24    EUA? Were outlines like this prepared for the

Page 31

1    purpose of such analyses?
2    MR. O'ROURKE: Objection.
3  A.  I don't recall seeing an outline like this, per
4    se.
5  Q.  Okay.
6  A.  And notice this one says "draft" on it. Is
7    there a final outline?
8  Q.  There are a number -- I mean I'm showing you
9    what I've got.
10 A.  I mean if you had outlines that were prepared
11    for EUA that got through discovery, I could look
12    at them, but I don't specifically recall
13    anything.
14 Q.  Let me direct you down towards the bottom of
15    here. Fourth paragraph up from the bottom,
16    "Electric distribution companies to provide
17    standard offer service to customers that do not
18    choose other suppliers within three months after
19    retail access is available to 40 percent of New
20    England kilowatt-hour sales extending through
21    2009." Just page through. You can read the
22    next paragraph to yourself.
23 A.  All right. I understand.
24 Q.  I mean, do you have a recollection of the URA

Page 32

1    requiring standard offer service to 2009?
2  A.  Yes.
3  Q.  Do you have a recollection that it included a
4    stipulated price schedule and an adjustment for
5    fuel?
6    MR. O'ROURKE: Objection.
7  A.  I recall those provisions were part of the --
8    and I see the words here.
9  Q.  Okay.
10 A.  So I don't dispute that.
11 Q.  Okay. But do you have an independent
12    recollection that the URA envisioned, as you
13    understood it at EUA, the stipulated set of
14    prices related to the CPI?
15 A.  Yes.
16 Q.  And also a fuel adjustment?
17    MR. O'ROURKE: Objection.
18 A.  Yes, in certain words.
19 Q.  Do you recall a fuel adjustment being part of
20    the discussions about the implementation of the
21    URA?
22 A.  Discussions between?
23 Q.  Do you know -- what do you understand a fuel
24    adjustment to be?

Page 33

1  A.  I understand the fuel adjustment to be an adder
2    to the stipulated price -- a provision that
3    would allow the price to be different than --
4    higher than the stipulated price.
5  Q.  Did Montaup -- how did Montaup -- how was
6    Montaup compensated prior to restructuring for
7    the power it provided?
8  A.  There was a rate clause. I'm not an expert on
9    it in recollection, but Montaup would file a
10    rate for recovery of its costs from the retail
11    companies, and the retail would file a rate at
12    that level for recovery of their expenses to
13    Montaup.
14 Q.  Okay. Was Montaup compensated for fuel?
15 A.  Yes.
16 Q.  How did that work, to your memory?
17 A.  I recall that there was something called a fuel
18    price adjustment clause or something like that.
19    I don't recall its actual workings.
20 Q.  Okay. Did Montaup provide all of its power
21    to -- okay -- I'll call them the retail
22    companies, Blackstone and at some point Newport?
23 A.  Yes.
24 Q.  Was Montaup -- to the extent it provided power

9 (Pages 30 to 33)

Page 46

1   me -- even if I was taking a question like this,
2   I'm going to the power supply department to give
3   me the answer.
4   Q.  Okay.  Is this the type of question that would
5       have -- that you would have been involved in
6       answering?
7           MR. O'ROURKE:  Objection.
8   A.  Not necessarily.
9   Q.  Okay.  It says, "The companies have not been
10      tracking the relevant market oil indices for oil
11      and gas to establish their current levels, and
12      so we're unable to estimate the rates of growth
13      that would cause the fuel index to be triggered
14      in 2000 and thereafter.  The fuel index does not
15      apply in 1998 or 1999."
16          Do you recall that the fuel index
17      worked on a set of fuel triggers?
18  A.  Yes.
19  Q.  What do you recall about that mechanism?
20  A.  That it worked on a set of fuel triggers.
21  Q.  Do you know how those triggers were developed?
22  A.  No, I don't.
23  Q.  Down at the bottom, it says, "During the course
24      of settlement negotiations in November and

Page 47

1       December 1996, EUA systems staff analyzed the
2       fuel index to understand its operation.  No
3       record of this analysis was retained."  Do you
4       recall an analysis done at EUA about the fuel
5       index?
6   A.  No, I don't.
7   Q.  Okay.  Do you know whether you were involved in
8       that analysis?
9   A.  I was unlikely to have been involved in the
10      analysis.
11  Q.  Okay.  Who was likely to have been involved in
12      that analysis?
13  A.  That would have been people in Kevin Kirby's
14      department.
15  Q.  And who worked with Kevin Kirby?
16  A.  Robert Clarke, Don Ryan.
17  Q.  What, to your understanding, was the purpose of
18      the fuel index?
19  A.  My recollection of it is vague.  I'm sure it's
20      spelled out pretty clearly in the settlement
21      documents, but my recollection is that if some
22      price index went above a certain level, that the
23      companies would file for an adjustment of the
24      standard offer price based on the cost of fuel.

Page 48

1   Q.  Okay.  Well, do you have -- did you have an
2       understanding at the time as to what the public
3       policy purpose for the fuel adjustment was?
4   A.  I'm still trying to understand the question.  By
5       public policy, you mean?
6   Q.  Did you have an understanding at the time as to
7       why people put fuel adjustments into contracts?
8           MR. O'ROURKE:  Objection.
9   A.  Well, the reason we put the fuel adjustment
10      clause into that contract was to provide
11      suppliers some way of providing -- reducing
12      risks they had in matters over which they might
13      not have control in the future.
14  Q.  Okay.  Do you have an understanding as to why
15      Montaup had a fuel adjustment in its tariffs
16      prior to restructuring?
17  A.  Well, the purpose of the fuel adjustment was for
18      Montaup to match its recoveries to the cost of
19      fuel.  I mean the way that tariff was designed,
20      Montaup did not either benefit or lose from
21      fluctuations in the cost of fuel.
22  Q.  You mentioned that the purpose of the fuel
23      adjustment in the standard offer service was so
24      suppliers would have a lower risk of fuel.  Why

Page 49

1       was that desirable?
2   A.  Well --
3           MR. O'ROURKE:  I'm going to object to
4       that question.
5   Q.  You can answer.
6   A.  Our goal was to get -- well, we wanted to get
7       these suppliers to bid these contracts at a
8       reasonable price, and if suppliers had to build
9       into their price large uncertainties in the
10      price of fuel that they had no way of mitigating
11      other than through the price they were bidding
12      to us, then it would be in the customer's
13      benefit to instead allow them a recovery.
14  Q.  Is it a fair statement that when Montaup was
15      selling its generation assets, one of its goals
16      was to maximize sale price?
17  A.  Yes.
18  Q.  Part of the sale was an obligation -- part of
19      the sale structure was that the buyer of the
20      Montaup asset would need to take a backstop
21      obligation, correct?
22  A.  Yes.
23  Q.  That was a backstop obligation to supply
24      standard service?

13 (Pages 46 to 49)

ESQUIRE DEPOSITIONS SERVICES

Page 50

1 A. Right.
2 Q. So is what you're saying that the fuel
3    adjustment was desirable so that the fuel risk
4    would not lower the sale price for the Montaup
5    assets?
6 A. I can't say what the buyers were specifically
7    thinking of, and I think that's going too far.
8    I guess I'm saying that the purpose of it was to
9    provide some buffer there so that the buyers
10    would know that they had some level of backstop
11    or control, they weren't taking on the full
12    risks of changes in fuel that were beyond their
13    control.
14 Q. Okay. So it's fair to say it was your
15    understanding at the time that a fuel adjustment
16    was a desirable feature in a contract for a
17    supplier of electricity?
18 A. Sure.
19 Q. Is it -- was it your perception at the time that
20    a long-term supply contract without a fuel
21    adjustment for the whole term would have been
22    attractive to a supplier of electricity?
23    MR. O'ROURKE: Objection.
24 A. I don't know what would be attractive to -- I

Page 51

1    mean -- ask the question again, please.
2 Q. Well, part of your responsibilities were
3    facilitating the sale of the Montaup assets,
4    correct?
5 A. Yes.
6 Q. One of your objectives in doing so was to
7    maximize the sale price of those assets,
8    correct?
9 A. Yes.
10 Q. Another responsibility you had was to facilitate
11    the bidding of the wholesale standard offer
12    service on their own, correct?
13 A. I was coordinating all of these activities. I
14    don't know --
15 Q. An activity at EUA in which you were involved
16    was attempting to obtain bidders for the
17    standard wholesale service contracts?
18 A. It was the responsibility of the power supply
19    department to do the auction for the -- what are
20    we talking about now? I'm sorry. I got a
21    little lost. Are we talking about the --
22 Q. I'm actually now talking about the bidders for
23    the wholesale standard offer service contracts
24    themselves, not the assets.

Page 52

1 A. The wholesale standard offer service bidding was
2    conducted by the power supply department
3    and maybe involvement -- probably the power
4    supply department.
5 Q. Let me show you -- if you look at what's been
6    marked as Exhibit 5.
7 A. Yes. Which is...
8 Q. And you turn in about four pages or five pages.
9    MR. O'ROURKE: It's this one.
10 Q. No. I think you're on this exhibit -- oops. My
11    fault. What do you have, the thick --
12    (Documents handed to counsel.)
13    MR. O'ROURKE: Looks like you gave him
14    a different 5 than you gave me, Dan, or without
15    the full pages. I have the one you may be
16    looking for with all the extra pages. If that's
17    the last time it happens, you're doing really
18    well.
19 Q. Okay. Turn a couple pages in on that exhibit.
20    You'll see it's Commission Request 1-3. Keep
21    turning until you get to that one.
22 A. Yes.
23 Q. And turn the page. You see at the bottom,
24    "Witness responsible"?

Page 53

1 A. Yes.
2 Q. And that's you?
3 A. Uh-huh.
4 Q. And you see it refers to some of your testimony,
5    and if you just read -- why don't you just read
6    through this for a minute. Just read to the end
7    of the first paragraph on the second page.
8    Okay. You see at the top of the second page --
9 A. Yes.
10 Q. -- it says, "Clearly Montaup could not have
11    agreed to a set of terms that would leave it
12    with no generating resources and a twelve-year
13    commitment to provide unspecified future load
14    requirements at a guaranteed price. Similarly,
15    buyers of generating assets contracting to
16    provide standard offer service under the
17    scheduled prices could not be expected to accept
18    such terms."
19 A. Right.
20 Q. Do you recall -- do you recall this response at
21    all as you sit here today?
22 A. Not specifically.
23 Q. Okay. When you filed things with the PUC, were
24    they accurate?

14 (Pages 50 to 53)

ESQUIRE DEPOSITIONS SERVICES

Page 54

1  A.  To the best of our ability.
2  Q.  Okay. As you sit here today, does that sound
3      like a statement that you would have made at the
4      time?
5  A.  Yes.
6  Q.  Okay. You'd agree with me that for Montaup or
7      any buyer to take on a stipulated set of prices
8      for a twelve-year term would be an undesirable
9      feature in a contract, correct?
10 A.  I can agree with that for Montaup, yeah.
11 Q.  Okay. Referring you to the second sentence,
12     would you also agree that that would be an
13     undesirable feature for any buyer of standard
14     offer service -- supplier of standard offer
15     service?
16 A.  Under what terms are we talking about?
17 Q.  A stipulated set of prices.
18 A.  I really have to say for Montaup, Montaup had no
19     resources, very little control over what it
20     procured, and it had no upside. All it could do
21     was pass through costs. So there was never, to
22     my knowledge, a set of prices under which
23     Montaup was taking upside and downside, had the
24     ability to hedge and do things that some

Page 55

1      suppliers might be able to do.
2          Suppliers in the marketplace had a
3      completely different source of resources, so I
4      really can't tell -- and I wasn't really that
5      familiar with what suppliers had available.
6      That would be the power supply department, so I
7      really can't tell you under what circumstances
8      suppliers would find a commitment desirable. As
9      far as I know, some suppliers could see a
10     twelve-year commitment under a set set of prices
11     as desirable if they felt they had the ability
12     to control their prices.
13 Q.  The second sentence says, "Similarly, buyers of
14     generating assets contracting to provide
15     standard offer service under the schedule prices
16     could not be expected to accept such terms."
17 A.  Yes, I see that.
18 Q.  Was that an accurate statement when you made it?
19 A.  I must have felt it was an accurate assessment,
20     yeah.
21 Q.  Okay. You disagree with that now?
22 A.  Well, you know, I don't know -- this says such
23     terms. I mean I assume we're talking about --
24     what specific terms were we talking about?

Page 56

1  Q.  I don't know. You wrote the sentence,
2      Mr. Hirsh.
3  A.  Yeah, it was a long time ago.
4  Q.  Do you feel particular loyalty to the company
5      today, Mr. Hirsh?
6  A.  Loyalty to National Grid?
7  Q.  Yes.
8  A.  Not really.
9  Q.  Do you have a view as to -- you're here to
10     testify truthfully; aren't you?
11 A.  Yes.
12 Q.  Okay. You feel -- do you feel a particular need
13     to testify in favor of the company today as you
14     sit here?
15         MR. O'ROURKE:  Objection.
16 A.  I'm just trying to answer your questions as best
17     I can really.
18 Q.  Okay. Then that's all I'm asking you to do.
19         MR. O'ROURKE:  And that's all he's
20     doing.
21 Q.  And you see the next sentence here, "One of the
22     concepts driving the proportional assignment of
23     Montaup's standard offer service load with the
24     divested units was the linkage of load

Page 57

1      responsibility to load-serving capability of the
2      existing generation assets."
3  A.  Yes.
4  Q.  You recall that the buyer of a generating asset
5      was required to provide a backstop commensurate
6      with the load that had been supplied by the
7      asset they bought?
8  A.  I remember that.
9  Q.  And what you're referring to here is the fact
10     that a buyer who takes on an asset, the
11     understanding was they would provide the
12     standard offer service load from that asset?
13 A.  The way it worked was their responsibility was
14     commensurate with that asset's proportion to our
15     entire load. So where they provided the
16     standard offer service from would not
17     necessarily -- would be from any asset they
18     wanted.
19 Q.  Okay, okay. Do you recall the length of the
20     standard offer service in Massachusetts?
21 A.  Well, I recall seeing it in documents I saw here
22     today that it ran through December 31st, 2004.
23 Q.  Do you have a memory as you sit here today that
24     there was a different standard offer service

15 (Pages 54 to 57)

ESQUIRE DEPOSITIONS SERVICES

Page 102

1  Q.  There's a line in the middle of that paragraph
2      that says, "The terms for the bid shall be as
3      set forth in Attachment 4"?
4  A.  I see it.
5  Q.  So we've got a reference there to Attachment 4
6      to describe the bid, and on the previous page,
7      you can see we've got a reference to
8      Attachment 4 as also describing the fuel index.
9      Now, if you turn to what's Bates-stamped 49094.
10 A.  Okay.
11 Q.  Okay. We've got, again, the standard offer
12     auction proposed design document, Attachment 4?
13 A.  Yep.
14 Q.  And if you turn to the second page of
15     Attachment 4, you see there's the seven-year
16     discount offer for Massachusetts?
17 A.  Right.
18 Q.  And then you go down to Page 6 of 7 of
19     Attachment 4?
20 A.  Yes.
21 Q.  There's our fuel trigger mechanism?
22 A.  Right.
23 Q.  You can see they've changed the market gas price
24     index to 12 months?

Page 103

1  A.  Yes.
2  Q.  As we saw in the red line. And then down below,
3      there's fuel trigger points through 2004?
4  A.  Yep.
5  Q.  And then above that, there's a line for the
6      filing of alternative indices with the
7      department?
8  A.  Right.
9  Q.  Okay. And so I'll represent to you this is the
10     final settlement agreement filed in
11     Massachusetts by NEES. Now, if you'll look
12     at -- I'll give you a chance to clip that.
13         If you then look at Exhibit 17. To
14     keep your counsel happy, this one did have the
15     cover letter on the produced copy. So you'll
16     see it's a May 30 letter, two days later, and
17     you see in the first sentence -- first sentence
18     of the cover page, "A signed original and
19     fourteen copies of the stipulation agreement,"
20     and it references the Rhode Island Public
21     Utilities Commission.
22 A.  Right.
23 Q.  So this is the -- this is the -- as you said
24     before, there was -- these settlement

Page 104

1      agreements, there was one filed by each utility
2      in Massachusetts and then one filed in Rhode
3      Island?
4  A.  Right.
5  Q.  If we turn then to what's Bates-stamped 61692 in
6      the lower right.
7  A.  Okay.
8  Q.  You see there's our 5.1 standard offer service?
9  A.  Right.
10 Q.  This time, we've got from the period of the
11     contract termination date through December 31,
12     2009?
13 A.  Right.
14 Q.  NEP shall provide Narragansett with standard
15     offer service?
16 A.  Yes.
17 Q.  And there's our footnote of the potential
18     shortening of the term to 2004?
19 A.  Uh-huh.
20 Q.  You just need to say yes or no.
21 A.  Yes, yes.
22 Q.  And then you see it says, "Standard offer
23     service shall be provided at the prices set
24     below adjusted for the fuel price index set

Page 105

1      forth in Attachment 5"?
2  A.  I'm sure it does. Where is that?
3  Q.  I'm sorry. It's the second sentence of Section
4      5.1.
5  A.  Right.
6  Q.  And then again, if you look at the following
7      page, there's a Section 5.2.
8  A.  Yes.
9  Q.  Narragansett Right to Bid the Standard Offer?
10 A.  Yes.
11 Q.  And in the sentence that carries over, it talks
12     about the bid attachment in Attachment 5?
13 A.  Yes.
14 Q.  And then if we turn to what has been
15     Bates-stamped at the bottom 61833?
16 A.  Yes.
17 Q.  See it says Attachment 5?
18 A.  It does.
19 Q.  And the next pages are again Standard Offer
20     Auction Proposed Design?
21 A.  Right.
22 Q.  If you turn to the second page of that document,
23     you'll see that it refers to in Section 2A a
24     twelve-year flat discount auction?

27 (Pages 102 to 105)

ESQUIRE DEPOSITIONS SERVICES

Page 106

1   A.   Right.
2   Q.   You understand that to refer to the twelve-year
3        2009 term of Rhode Island?
4   A.   Yes.
5   Q.   And if you then turn to what's Bates-stamped
6        61839 at the bottom right?
7   A.   Yes.
8   Q.   You see there's the second half of our fuel
9        trigger provision?
10  A.   Right.
11  Q.   And you see -- again, if you look at the top,
12       there's -- again, they, NEES, appears to have
13       changed market gas and oil price indexes to
14       12 months?
15  A.   Yes.
16  Q.   And they have now substituted for the line that
17       mentions the updating of the indices "Rhode
18       Island Commission" halfway down the page?
19  A.   Yes, I see it.
20  Q.   And that's consistent with your understanding of
21       any updates to the pricing in Rhode Island would
22       have to be filed with the Rhode Island
23       Commission?
24  A.   That's right.

Page 107

1   Q.   Not the Department in Massachusetts? You've
2        just got to say --
3   A.   Yes.
4   Q.   And then you'll see there's fuel trigger point,
5        and it lists four numbers.
6   A.   Right.
7   Q.   And it says, "Narragansett shall file fuel
8        trigger points for the years following 2004 with
9        the Rhode Island Commission prior to the date of
10       the auction"?
11  A.   Right.
12  Q.   So what this is is a twelve-year auction in
13       Rhode Island and it appears NEES has not yet
14       filed the triggers for 2005 to '0 9?
15            MR. O'ROURKE: Objection.
16  A.   It says they'll file the trigger points from
17       2005 and beyond.
18  Q.   Okay. As you sit here today, do you have a
19       recollection of there being these documents
20       filed without the trigger numbers yet for 2005
21       to '09?
22  A.   No specific recollection.
23  Q.   Let me show you what's been marked as
24       Exhibit 18. It's the small document. You

Page 108

1        probably clipped it at the back of one of the
2        other two.
3   A.   Probably did.
4            MR. O'ROURKE: You're going to have to
5        leave if you keep that up.
6            MR. WINSTON: You know what? I'm not
7        going to do much with this exhibit, so you're
8        not going to miss anything. Let's just mark a
9        new exhibit for him.
10  A.   Oh, I found it. So I can stay, right?
11  Q.   I would have let you stay anyway.
12  A.   Okay.
13  Q.   Okay. I'm mainly referring -- you'll notice
14       it's dated November 26, '97?
15  A.   I do.
16  Q.   Okay. Do you have a recollection that these
17       agreements filed by both NEES and FERC had to be
18       approved by FERC?
19  A.   Say that again.
20  Q.   These settlement agreements were awaiting
21       approval by FERC?
22  A.   The settlement agreement between?
23  Q.   Do you have a recollection that part of the
24       process here was that the settlement agreements

Page 109

1        were filed and went through a process by which
2        FERC would approve or disapprove the
3        settlements?
4   A.   FERC approved settlements that had to do with
5        wholesale rates. So to the extent that there
6        was a wholesale rate involved, FERC had to
7        approve that. So they didn't approve the retail
8        settlement agreements, but there were settlement
9        agreements -- aspects that FERC had to approve.
10  Q.   But referring you back, for example, to
11       Exhibit 17, three pages down, when it says Offer
12       of Settlement --
13  A.   Yes.
14  Q.   -- the purpose of filing these is to obtain FERC
15       approval of the portions of the settlement that
16       require FERC approval, correct?
17  A.   Right, to the extent that Montaup is a party to
18       the settlement, their rates are subject to FERC
19       jurisdiction.
20  Q.   And do you recall that ultimately for both NEES
21       and EUA, the provisions for the restructuring
22       relating to Montaup and NEP were approved by
23       FERC?
24  A.   Yes.

28 (Pages 106 to 109)

ESQUIRE DEPOSITIONS SERVICES

Page 114

1    obligation contract"?
2  A.  So that would be the standard offer backstop
3       obligation.
4  Q.  And it says, "Contact: Fuller." Do you know
5       who was responsible at EUA for drafting the
6       backstop contracts at least at this time?
7  A.  No, I don't.
8  Q.  Okay. Let me see here. Then if we turn to Page
9       3 of this spreadsheet, it says Offering Process.
10  A.  Right.
11  Q.  There's a list of items. "Mail teaser and CA."
12       Do you know what that refers to?
13  A.  No.
14  Q.  You'll see these dates are --
15          MR. O'ROURKE:  That's M A I L, for the
16       record.
17          MR. WINSTON:  M A I L, yes.  Did I say
18       something -- fair enough.
19          THE VIDEOGRAPHER:  Ten minutes.
20  Q.  Then if you turn to Page 6 at the bottom.
21  A.  Yes.
22  Q.  It says Standard Offer Auction?
23  A.  Yes.
24  Q.  Now, this refers to the separate auction for the

Page 115

1       standard offer contracts?
2  A.  Yes.
3  Q.  And, again, just to clarify, so one auction
4       process is to sell the generation assets of
5       Montaup?
6  A.  Uh-huh.
7  Q.  And that's being worked with the Salomon
8       Brothers?
9  A.  Right.
10  Q.  The other auction that's being conducted is a
11       standard offer auction to sell the standard
12       offer service contracts to bidders?
13  A.  Right.
14  Q.  And the backstop obligation refers to an
15       obligation to supply the wholesale standard
16       offer service formally served by the assets that
17       are purchased by a bidder?  Let me ask you. How
18       does it work?  What is your memory of how the
19       backstop worked?
20  A.  I don't recall the terms specifically.  I can
21       recall the idea was we went out to bid for
22       standard offer service with the expectation that
23       competitive bidders would take away all
24       responsibility for the standard offer

Page 116

1       business -- standard offer supply. To the
2       extent that didn't happen or maybe perhaps as a
3       reaction to the fact that didn't happen, at the
4       time -- as the units were sold, they were sold
5       with a proportional share of the standard offer
6       obligation that had not either left the system
7       or been taken by other suppliers.  And by
8       proportional share, I mean a specific proportion
9       was assigned to each asset.  My recollection is
10       that was developed in some relationship to the
11       proportion that asset was of our total power
12       supply.
13  Q.  Okay.  And so am I right if I say that the
14       backstop means that the asset buyer is required
15       to supply that power only if it is not otherwise
16       supplied through the wholesale standard offer
17       service auction?
18  A.  That's my recollection.
19  Q.  Okay.  And this mentions that the contacts for
20       the standard offer service auction are Clarke
21       and Fuller?
22  A.  Right.
23  Q.  Who to your memory worked on those offer
24       packages?

Page 117

1  A.  Well, I think I previously testified today that
2       I thought Larry Boisvert was responsible for the
3       standard offer contract.  This says something
4       different, so I'd have to assume based on what's
5       here -- well, Bob Clarke was the head of power
6       supply, and Peter Fuller, depending on the date,
7       was either working for me or in the power supply
8       department.
9  Q.  It says -- okay.
10          MR. WINSTON:  I am about,
11       Mr. Videographer, to go into kind of a new area.
12       You probably have five minutes left.  It might
13       make sense to just change it and we'll premark a
14       couple exhibits and maybe take a five-minute
15       break.
16          THE VIDEOGRAPHER:  The time is
17       11:40 a.m.  This is the end of Tape Number 2.
18          (Recess)
19          (Letter to Mr. Scialabba, dated July 27,
20          1997, and Enclosures were marked Exhibit
21          Number 22 for identification.)
22          THE VIDEOGRAPHER:  The time is
23       11:50 a.m.  This is the beginning of Tape Number
24       3.

30 (Pages 114 to 117)

Page 134

1         MR. O'ROURKE: Objection.
2   A.  Well, I mean I'd have to say no. We try to
3       answer the intent of the question the best of
4       our ability. You know, I know, for example, our
5       CTC pricing was different than NEP. See, I
6       don't see that listed here, for example. So
7       I've got to say all differences in pricing
8       aren't listed here. So I mean to be responsive,
9       we'd have to get into the intent of the
10      question. So I can't tell you.
11  Q.  Okay. If you look at what's been Bates-stamped
12      as 2125 --
13         MR. O'ROURKE: 2125?
14         MR. WINSTON: Yes. I'm sorry. We're
15      in Exhibit 24, Bates Stamp 2125.
16         MR. O'ROURKE: My 24 starts with 2191.
17  A.  So does mine, yet I have a 2125.
18         MR. WINSTON: Okay. Let the record
19      reflect the Bates stamp is out of sequence here.
20         MR. O'ROURKE: Okay. Okay. I'm
21      sorry. Now I'm with you maybe. There's a
22      chance anyway. There we go. Thank you.
23  Q.  Let me ask you a question. At this time, do you
24      recall discussion being had at EUA at this time

Page 135

1       about not having a fuel index for the part of
2       the standard offer service in Rhode Island?
3   A.  No.
4   Q.  Okay. And -- okay. If you look at what's
5       Bates-stamped 2125 at the bottom --
6   A.  Yep.
7   Q.  -- do you see that there's a paragraph -- this
8       says red line from NEES May 30 filing?
9   A.  Right.
10  Q.  And actually, if you turn to the first page of
11      this document, which is 2110 --
12  A.  Okay.
13  Q.  -- do you see that it's been switched out New
14      England Power Company to Montaup?
15  A.  Right.
16  Q.  So what this appears to be is the Montaup
17      current draft of stipulation agreement red lined
18      against the NEES May 30 filing, which is
19      Exhibit 17?
20  A.  Right.
21  Q.  Do you recall making these kind of red lines
22      against the NEES agreement?
23  A.  No. I'm kind of surprised to see we were this
24      diligent about it.

Page 136

1   Q.  Okay. Fair enough. I mean, do you recall
2       making line-by-line comparisons between the two
3       settlements?
4   A.  I don't.
5   Q.  You see in what's Bates-stamped 2125?
6   A.  Yes.
7   Q.  You see it says Article 5.0, Standard Offer
8       Service. This is the article we've looked at.
9       And you see it's red lined, and it refers, like
10      in the NEES agreement, to "Standard offer
11      service shall be provided at the prices below,
12      adjusted for the fuel index set forth in
13      Attachment 5?
14  A.  Right.
15  Q.  And there's a footnote we looked at?
16  A.  Yes.
17  Q.  Do you have a recollection of EUA copying the
18      NEES May 30 settlement over to create this
19      document so that it's got the same language?
20  A.  No, I can't say I have a recollection of us
21      copying it over.
22  Q.  Okay. I mean -- well, as you said, it was your
23      practice that you would have taken the NEES
24      agreement as a starting point.

Page 137

1   A.  Yes, we wouldn't reinvent that.
2   Q.  Right. And then you would start with that
3       language and you would make the changes?
4   A.  Right.
5   Q.  And that's what we're seeing reflected here?
6   A.  Right.
7   Q.  So your memory of what the process EUA did was
8       it would start with the NEES agreement and then
9       make changes necessitated by its own business?
10  A.  Right.
11  Q.  And you don't recall any discussion at the time
12      about cutting off the fuel adjustment earlier
13      than the 2009 term referenced in the NEP
14      agreement?
15  A.  No, I don't.
16  Q.  Okay. And you see it references this
17      Attachment 5.
18  A.  Right.
19  Q.  I'll represent to you there's no attachment to
20      this document here.
21  A.  Okay.
22  Q.  I'll also represent to you that nor was it in
23      what we copied this from, so we're not tricking
24      you.

35 (Pages 134 to 137)

ESQUIRE DEPOSITIONS SERVICES

Page 150

1  Q.  This is Exhibit 6.
2  A.  Okay.
3  Q.  If you turn there to what's Bates-stamped as
4      5246?
5  A.  Yep.
6  Q.  And you can see there's a question, "Will
7      Montaup Electric provide backstop service to
8      both BVE and Newport? For what time period will
9      Montaup provide backstop"?
10 A.  Right.
11 Q.  And you can see they're referring to the
12     settlement we just looked at?
13 A.  Uh-huh.
14 Q.  And you can see Article 5, which is what we're
15     looking at, provides that Montaup shall provide
16     Blackstone and Newport with standard offer
17     service through the year 2009?
18 A.  Right.
19 Q.  And so it was your understanding that in these
20     settlement agreements, if Montaup was still
21     providing standard offer service through 2009,
22     it would be compensated for its fuel?
23 A.  That's correct.
24 Q.  And Montaup received its funds for -- so it

Page 151

1      would be paid for that fuel by which entity?
2  A.  Oh, by the retail companies.
3  Q.  Okay. That's Blackstone and Newport?
4  A.  Whoever -- right, whoever was -- correct.
5  Q.  Maybe you can just describe to me how the -- so
6      you said there were -- maybe you can describe
7      for me how the pay structure works? There's a
8      tariff to the retail customer, how the money
9      flows to pay Montaup for its electricity?
10 A.  You have much better witnesses on this than me.
11 Q.  You'll probably do pretty well.
12 A.  But my vague understanding -- my recollection is
13     that Montaup had a set of rates approved by FERC
14     that it charged the retail companies based on
15     demand and energy use at the retail level.
16     There was, as I recall, something for purchase
17     power, something for fuel, and something for its
18     fixed costs, fixed costs being for hard assets.
19     The fixed cost -- and then the retail companies
20     had price mechanisms by which they collected the
21     costs associated with the costs they incurred
22     for buying power from Montaup from their retail
23     companies, and there were various sets of
24     adjustment clause s that may or may not have

Page 152

1      exactly matched the Montaup clauses.
2          The fixed portion was regulated
3      through periodic rate filings. When the
4      collection of funds got out of whack with
5      Montaup's actual cost structure -- each year,
6      could go two or three years -- then there was a
7      rate filing with FERC to bring that back in
8      line.
9          The purchase power and fuel were what
10     we call pass-throughs. They were adjusted on a
11     regular basis. I remember there were certain
12     clauses that were adjusted quarterly. There
13     were certain clauses that were adjusted less
14     than quarterly, but they were -- the objectives
15     would be to look at actual costs compared to
16     collections and then adjust the clause to make
17     up any over or undercollection from the previous
18     period and try to match collections to the next
19     period to our best forecasts of what the costs
20     would be.
21 Q.  Okay. So Montaup is paid for the fuel it
22     delivers to the retail companies by the retail
23     companies?
24 A.  Right.

Page 153

1  Q.  Okay. And those payments include a variety of
2      costs, including fuel?
3  A.  Correct.
4  Q.  Okay. Where does -- where do the retail
5      companies get the money that they then use to
6      pay Montaup?
7  A.  Then there is an adjustment clause that's in
8      retail rates that reflects the costs the retail
9      companies incur from their purchases from
10     Montaup.
11 Q.  Okay. And those retail rates are set how?
12 A.  There, to my recollection, was something like a
13     fuel price adjustment clause that was part of
14     the retail rate, so it would be, as at the
15     federal level, a periodic and I think it
16     probably was quarterly filing, worked the same
17     way. It would reconcile any over or
18     undercollections from the previous period and
19     try to match the costs that would be the
20     prediction of costs for the future period.
21 Q.  And when you say the retail rates, what are
22     those defined in?
23 A.  Rates paid by retail customers to Blackstone,
24     Newport, and Eastern Edison.

39 (Pages 150 to 153)

ESQUIRE DEPOSITIONS SERVICES

Page 154

1  Q.  And are those defined in retail tariffs?
2  A.  Yes.
3  Q.  So, in other words, the retail companies file
4      retail tariffs --
5  A.  Right.
6  Q.  -- with the PUC?
7  A.  Right.
8  Q.  Those contain a fuel adjustment clause?
9          MR. O'ROURKE:  Objection.
10 A.  Right, or some form of it.
11 Q.  And so they are collecting -- those tariffs,
12     which we're getting a copy of one of them just
13     to make your life easier, but those retail
14     tariffs contain various costs of distribution,
15     like running the lines and things, by the retail
16     companies?
17 A.  Correct.
18 Q.  They also include all the costs that the retail
19     companies are then -- they include, essentially,
20     Montaup's costs that the retail companies will
21     then pay over to Montaup?
22 A.  I'd say they incur -- the retail company's
23     obligations to pay Montaup under the FERC
24     tariffs.

Page 155

1  Q.  Right.  So the retail companies have an
2      obligation to pay Montaup for its costs and fuel
3      in providing the electricity?
4  A.  That's the basis of the tariffs, yeah.
5  Q.  So yes?  I'm just trying to walk it through
6      because if it's complicated to you, it's very
7      complicated to the rest of us.
8          MR. O'ROURKE:  Could you put a time
9      frame on this?
10         MR. WINSTON:  Yes, it's pre-
11     restructuring retail tariffs.
12 Q.  So in order for the retail companies to have the
13     costs -- in order to compensate Montaup for its
14     costs, they, in turn, charge the customers in
15     the retail tariffs for those Montaup costs?
16 A.  That's correct.
17 Q.  Okay.  And so the fuel adjustment that is in the
18     retail tariffs filed by the retail companies
19     corresponds to the fuel that is going to be paid
20     to Montaup?
21 A.  As best we can, yeah.
22 Q.  Okay.  And so the way in which Montaup recovers
23     its fuel from the retail companies is through
24     the retail companies filing retail tariffs?

Page 156

1  A.  No, the way the retail companies recovered their
2      costs that they pay to Montaup is through the
3      retail companies filing retail tariffs.  Montaup
4      recovers its costs through wholesale tariffs
5      that it charges the retail companies.
6  Q.  Right.  So you've said your expectation then in
7      this settlement agreement was Montaup, to the
8      extent it -- Montaup to the extent that it
9      maintained a standard offer service obligation
10     through 2009 would be compensated for its fuel?
11 A.  Yeah.  Montaup -- we were all, essentially,
12     prerestructuring a cost-plus business.  So the
13     plus was a return on equity set in agreement
14     with either the FERC or the local company, and
15     everything else was a cost pass-through.
16 Q.  Okay.  So -- but as we've said, EUA had an
17     understanding, as its responses show to the PUC,
18     that it had a backstop obligation for standard
19     offer service through 2009?
20         MR. O'ROURKE:  Objection.
21 A.  Say the question again.
22 Q.  Montaup's backstop service obligation extended
23     through 2009?
24 A.  If I'm going to testify to that, I just want to

Page 157

1      refresh my memory.  Can I refer to something?
2  Q.  I was referring to -- you can reach your own
3      conclusion.  If you refer to Exhibit 20.  This
4      is Section 5, which starts at 23316.
5  A.  Yep.
6  Q.  And you see at the top, it says, "For the period
7      from the contract termination date through
8      December 31, 2009, Montaup shall provide
9      Blackstone and Newport with standard offer
10     service"?
11 A.  I agree that's what it says, yes.
12 Q.  And there was a provision by which Montaup could
13     bid away and sell away that standard offer
14     service, correct?
15 A.  Correct.
16 Q.  But your understanding at the time was that
17     Montaup was agreeing here to supply standard
18     offer service through 2009?
19 A.  To supply what was ever not taken away through
20     the divestiture or the standard offer auction.
21 Q.  Right.  And that would -- and it says, "Standard
22     offer service shall be provided at the prices
23     shown below adjusted for a fuel index"?
24 A.  Correct.

40 (Pages 154 to 157)

Page 158

1  Q.  So when you signed this, your understanding is
2      EUA is being paid a stipulated set of prices
3      plus a fuel index through 2009?
4  A.  Yeah. I mean our expectation was we'd be long
5      out of it by 2009, but that's what the contract
6      says.
7  Q.  And is the way in which Montaup would have been
8      compensated for its fuel through 2009 was
9      through the filing by retail companies of
10     standard offer service tariffs?
11 A.  That was our expectation, yes.
12 Q.  So as you are filing this document in October
13     '97, your expectation is that the retail
14     companies will file standard offer service with
15     stipulated prices and a fuel index through 2009?
16         MR. O'ROURKE:  Objection.
17 A.  Our expectation is we're long out of it by 2009,
18     but to the extent that Montaup is still
19     responsible, that's what we'd understand, yeah.
20 Q.  Did you have an understanding that in the
21     assignment with the assets, it was the backstop
22     obligation of Montaup that was being assigned to
23     the asset buyers?
24 A.  That's my recollection. I mean I'm sure it's

Page 159

1      clearly spelled out in the document.
2  Q.  Okay. Was there an understanding at the time
3      that if Montaup sold off the assets, it would
4      suddenly stop seeking the fuel adjustment?
5  A.  I don't know what you mean.
6  Q.  I mean -- what I'm saying is, the expectation
7      when you file this document is that the standard
8      offer service tariffs will contain a stipulated
9      set of prices and a fuel index through 2009;
10     isn't that correct?
11         MR. O'ROURKE:  Objection.
12 A.  That's what this seems to say here.
13 Q.  And do you have any different recollection as
14     you sit here today?
15 A.  I have no other recollection.
16 Q.  Okay. And so your best memory and understanding
17     is that at the time that EUA filed this FERC
18     document in October 1997, it intended that the
19     retail companies would file standard offer
20     service tariffs with a stipulated price and a
21     fuel index provision through 2009?
22         MR. O'ROURKE:  Objection.
23 A.  I'm not sure I can say what the retail companies
24     intended to do through 2009. I don't recall a

Page 160

1      specific intent to be filing these through 2009.
2  Q.  Well, you as Michael Hirsh --
3  A.  Yes.
4  Q.  -- were in charge of coordinating restructuring,
5      correct?
6  A.  Right.
7  Q.  And you had various discussions with others at
8      EUA and the retail companies about the
9      restructuring?
10         (The witness nodded.)
11 Q.  I mean someone is acting on behalf of the retail
12     companies to sign these documents. In these
13     discussions that you have in which you're
14     creating the FERC document, who's acting on
15     behalf of the retail companies? I mean, who are
16     the officers of the retail companies during
17     these conversations? Who's signing these
18     documents?
19 A.  Officers of the retail companies are Kevin,
20     Dennis, me. I'm signing a lot of these
21     documents. Kevin is signing some of the
22     documents. Dennis may have signed some of the
23     documents.
24 Q.  Were you an officer of Blackstone and Newport?

Page 161

1  A.  Yes, I was.
2  Q.  So your intention as an officer of Blackstone
3      and Newport at the time -- I'm not asking about
4      what the company had done; I'm asking what you,
5      Michael Hirsh, thought -- your understanding of
6      Montaup's intent at the time they filed this
7      document is that the standard offer service
8      tariffs to be filed through 2009 would contain a
9      stipulated set of prices plus a fuel index?
10         MR. O'ROURKE:  Objection.
11 A.  Well, you already asked me were there
12     discussions about cutting off the fuel index in
13     2004, and I said I don't recall. So I can't
14     tell you what we intended to do beyond 2004
15     because there might have been discussions. I
16     just can't say. There might have been
17     discussions where we said, "This is going to
18     look different after 2004." I really don't
19     know.
20 Q.  I'm not asking what you don't know. I'm just
21     asking what you do know.
22 A.  So I can't say I know what we expected. You
23     just asked me would it be standard offer plus
24     fuel index beyond 2004, and, you know, if I

41 (Pages 158 to 161)

ESQUIRE DEPOSITIONS SERVICES

Page 162

1  could give you the answer to that, we'd probably
2  have the answer to this whole case, but I really
3  don't.
4  Q.  Looking at the document in October 1997, if
5  someone had said to you how is Montaup going to
6  obtain its fuel adjustment through 2009, what
7  would you have answered?
8        MR. O'ROURKE:  Objection.
9  A.  Yeah, I don't know.
10 Q.  Well, it would have been through a standard
11 offer service tariff; would it not?
12       MR. O'ROURKE:  Objection.
13 A.  As I said, I don't know.  If I was doing
14 business the way I usually did and I got that
15 question and I said, "Hmmm, jeez, that's a good
16 question," then Dennis and Kevin and I would
17 have sat down and said, "What are we really
18 thinking that's going on through 2009?"
19 Q.  That's all right.  I have more documents I'll
20 show you.  Let me do this.  Boy, this is getting
21 to be a mess.
22       (Letter was marked Exhibit Number 25 for
23       identification.)
24 Q.  Okay.  Let's do this.  Let me show you what's

Page 163

1  been marked as Exhibit 25.  And you see this is
2  a letter to various Rhode Island regulatory
3  folks?
4  A.  Yeah.
5  Q.  And it references draft of current settlement
6  documents formatted to show changes from the
7  agreements with NEES?
8  A.  Uh-huh.
9  Q.  And drawing you back to what we looked at, which
10 is Exhibit 24, we've looked at that.  That's the
11 FERC answer comparing the settlement agreements?
12 A.  Yep.
13 Q.  Okay.  I'm not asking if you remember, but would
14 it be your understanding that that's the type of
15 comparison that is being referenced in the
16 August 21, 1997 letter?  It's not a trick
17 question.  It refers to a set of -- there were
18 documents showing -- formatted to show changes
19 between the EUA proposal and the NEES
20 settlement.  These documents plus the list of
21 differences between the draft Montaup agreement
22 and these were provided to FERC staff in
23 response to a second round of data requests, and
24 you can see that Exhibit 24 is, in fact --

Page 164

1  A.  Right.  That's what I'm getting at, why you
2  asked me it was similar.  It seems to me it's
3  referring to the same document.
4  Q.  It is.  I'm just trying to get on the record.
5  So it is your understanding -- as you sit here
6  today, it would be your understanding this
7  August 21 letter is referring to the NEES set of
8  letters?
9  A.  That would be my understanding, yes.
10 Q.  And do you know why the PUC would have been
11 asking about your FERC filings or why you would
12 be sending them?
13 A.  Well, I don't remember exactly in this case.
14 Clearly the PUC would have a very strong
15 interest in the FERC filing because it's, first
16 of all, required in order to implement the
17 retail filing, and it has a pretty huge effect
18 on the retail filing.
19 Q.  Let me show you a second letter, dated
20 August 21, which I'll mark as Exhibit 26.
21       (Letter to Mr. Scialabba, dated
22       August 21, 1997 and Other Documents were
23       marked Exhibit Number 26 for
24       identification.)

Page 165

1  Q.  This is a letter to Steve Scialabba.
2        MR. WINSTON:  That is
3        S C I A L A B B A.
4  Q.  Dated August 21, 1997.
5  A.  Okay.
6  Q.  And you'll see there's another letter from
7  Dennis St. Pierre, including the settlement
8  list, various other things, and a standard offer
9  service tariff as Item 6.
10 A.  Okay.
11 Q.  Okay.  And first, you see -- if you turn to the
12 second page, it says, "Attachment 1 has been
13 annotated to reflect the Rhode Island parties'
14 August 6th, 1997 proposals.  In addition, I have
15 indicated on the settlement terms list where the
16 parties are in agreement and where issues are
17 still under negotiation."
18 A.  Right.
19 Q.  Again, this is -- would you have been involved
20 in the drafting of a document like this?
21 A.  Unless I was away on vacation or something,
22 yeah.
23 Q.  I mean, this is a significant document; is it
24 not?

42 (Pages 162 to 165)

Page 170

1    tariff, the reference to a Department would be
2    in error, right?
3  A. Correct.
4  Q. And if you'll look at the bottom of the next
5    page, 2490 --
6  A. Yep.
7  Q. -- you see the term of contract is for seven
8    years?
9  A. Right.
10 Q. But there's prices through 2009 up front?
11 A. Right.
12 Q. Does that appear to be an error to you?
13        MR. O'ROURKE: Objection.
14 A. I don't know.
15 Q. Who would have -- okay. I mean, do you know
16    whether EUA was essentially waiting for NEES to
17    come up with the triggers for 2005 to '09 before
18    they added the actual numbers?
19 A. No, I don't.
20 Q. Who would have had those discussions --
21        MR. O'ROURKE: Objection.
22 Q. -- within EUA?
23        MR. O'ROURKE: Objection.
24 A. Discussions as to what?

Page 171

1  Q. Well, the preparing of this tariff. Who would
2    have created this attached tariff here?
3  A. The tariff would be created by the rate
4    department.
5  Q. Okay. And so -- I guess this is a letter from
6    Dennis St. Pierre saying they've copied in the
7    price schedule from NEP. So is it your
8    understanding -- so this is a rate department
9    creation?
10 A. Correct.
11        MR. WINSTON: I think we should break.
12    It's 1. You know, on the assumption that
13    everybody would like to not be into the evening,
14    if we can eat quickly. We have food ordered in.
15        MS. PLOTNICK: For everyone.
16        MR. WINSTON: So if we can keep it to
17    half an hour.
18        THE WITNESS: Okay.
19        MR. WINSTON: That would be good.
20        THE VIDEOGRAPHER: The time is
21    1 o'clock p.m. This is the end of Tape
22    Number 3.
23        (Luncheon recess)
24        THE VIDEOGRAPHER: The time is now

Page 172

1    1:41 p.m., and this is the beginning of Tape
2    Number 4.
3  Q. Do you recall that we had talked before about
4    your memory regarding the length of the bid?
5  A. Yes.
6  Q. And I just want to show you something that might
7    help to refresh your recollection. If you look
8    back at Exhibit 17, which is the EUA Rhode
9    Island settlement agreement. Oh, I'm sorry.
10    20. Okay. If you look at Exhibit 20, which is
11    EUA's Rhode Island settlement agreement, and you
12    look at where it's tabbed at 23316.
13 A. Okay.
14 Q. And you see it refers -- we're back to the
15    Article 5.0, Transition Service?
16 A. Right.
17 Q. And that's the provision we've talked about
18    before. And it refers to fuel index set forth
19    in Attachment 5?
20 A. Right.
21 Q. If you turn to the next page, which is Section
22    5.2 -- we'll come back to this, but it refers to
23    the term for the bid as set forth in Attachment
24    4.

Page 173

1  A. Okay.
2  Q. If we look at Attachment 4 to this document,
3    which is 23515, you see Attachment 4, standard
4    offer option proposed design. And this is what
5    describes the bid for the standard offer
6    service, correct? You can see it also includes
7    the fuel index, although it was labeled
8    Attachment 5.
9  A. Right.
10 Q. Okay. You recall Attachment 5 was the fuel
11    index description in the Narragansett agreement?
12 A. Right.
13 Q. You'll see -- it says on Page 2 of that
14    attachment, it says, "Seven-Year flat discount
15    auction"?
16 A. Right.
17 Q. And that's for the 2004 Massachusetts term?
18    This is the Rhode Island -- okay. The
19    seven-year term of 2004 corresponds to a
20    Massachusetts standard offer service term?
21 A. Right.
22        (Transcript of Hearing Testimony in
23        Docket Number 2716 was marked Exhibit
24        Number 32 for identification.)

44 (Pages 170 to 173)

Page 190

1    a fuel index is the NEES agreement?
2  A.  Right.
3  Q.  So if you look back at Exhibit 20?
4  A.  Yeah. Where are we?
5  Q.  We're at 23316.
6  A.  Yep.
7  Q.  Okay. And we're back to, again -- it's
8      referring to Montaup's obligation to provide
9      standard offer service through 2009 and then
10     refers to the fuel service index.
11 A.  Right.
12 Q.  And leaving aside that this Attachment 4 -- if
13     you turn to Attachment 4 here, this is -- go to
14     23516.
15 A.  Yep.
16 Q.  Just hold your finger on that for a minute, if
17     you would.
18 A.  Sure.
19 Q.  And go back to 23317?
20 A.  Yep.
21 Q.  And you see Right to Bid the Standard Offer?
22 A.  Right.
23 Q.  "Blackstone and Newport shall offer alternative
24     suppliers the opportunity to bid on the

Page 191

1      provision of standard offer service." Second
2      sentence refers to how that bid is in
3      coordination with Eastern?
4  A.  Uh-huh.
5  Q.  And then it refers to Attachment 4 to describe
6      the bid.
7  A.  Okay.
8  Q.  So here's the bid in Attachment 4, and you see
9      if you turn to 23517 --
10 A.  Right.
11 Q.  -- we've got a seven-year auction?
12 A.  Right.
13 Q.  We've got on 23518 --
14 A.  Yes.
15 Q.  -- we've got prices -- stipulated prices only
16     through 2004?
17 A.  Yes.
18 Q.  And a fuel trigger number with prices only
19     through 2004?
20 A.  Yeah.
21 Q.  So what this Attachment 4 describes, you'd agree
22     with me, is a bid through 2004 for Massachusetts
23     and Rhode Island jointly with numbers only
24     through 2004?

Page 192

1  A.  Right.
2  Q.  And you'll see at the top of Page 6 of that
3      attachment, in fact, it refers to the filing of
4      alternate indices with the Department?
5  A.  Yes.
6  Q.  Okay. And that wouldn't be correct with respect
7      to Rhode Island; would it?
8  A.  Correct.
9  Q.  Does that -- you can think about it and look at
10     it. Does that refresh your recollection that
11     Montaup was governed by the same standard offer
12     service tariff as buyers of standard offer
13     service?
14 A.  Yes.
15 Q.  Okay. So -- and if you compare -- if you come
16     back to Exhibit 28, which is the RFQ, you see
17     that describes a fuel index provision which --
18     you can take the liberty of comparing -- which
19     is essentially the same fuel index provision in
20     the settlements.
21 A.  Okay.
22 Q.  You'd agree with me then that these fuel trigger
23     points are describing the fuel trigger points
24     that will apply both to Montaup's backstop

Page 193

1      obligation and bidders of standard offer
2      service?
3  A.  Yes.
4  Q.  And you've told me that Montaup -- it was
5      understood by you and consistent with your
6      discussions at EUA that Montaup would have a
7      fuel adjustment with triggers through 2009?
8  A.  It was my understanding that Montaup was going
9      to divest all of its standard offer obligation
10     one way or another, so if it didn't go through
11     this auction, we were already divesting all of
12     our generating resources, and at some price,
13     those generating resources were going to sell;
14     and with it would go all of our backstop
15     obligation. So if you ask what our expectation
16     was in 2005, our full expectation was that
17     Montaup would have no backstop obligation. It
18     would be gone long before 2005 in the
19     divestiture.
20 Q.  Let me show you what's been marked as Exhibit 6,
21     which is the one I think you couldn't find. You
22     found it eventually. It's a thin one. It looks
23     like this, but I need to show you it.
24 A.  Well, I remember it.

49 (Pages 190 to 193)

Page 206

1    mechanism. And then something happened beyond
2    2005, and this doesn't say what it is.
3  Q. Right. There's question marks?
4  A. Right.
5  Q. And we've seen that -- before this, I'm correct
6     when I state that EUA had taken the triggers and
7     other numbers from the earlier NEES settlements?
8  A. Right.
9  Q. And the only earlier NEES settlement that
10    contained the triggers from 2005 to '09 at this
11    time said the triggers weren't yet in the
12    document, said they're coming?
13 A. Right, right.
14 Q. So EUA doesn't have the numbers to put into this
15    document, correct?
16 A. Correct.
17 Q. And you would agree with me that from a sales
18    standpoint when attempting to attract bidders,
19    you would want to have a fuel adjustment in the
20    2005 to 2009 time period; would you not?
21        MR. O'ROURKE: Objection.
22 A. If that were true, I don't know why we didn't
23    wait until we had that information available or
24    say in here, just like NEES apparently did, that

Page 207

1    the fuel triggers were coming at some point. We
2    did neither. Why that happened, I really can't
3    tell you. You're kind of asking me to testify
4    as to what our thought process was and what
5    effect it had on the market. I really don't
6    know. You know, somebody might have been
7    thinking about this. They might not have. I'm
8    not sure.
9  Q. I'm asking what you, Mike Hirsh, were thinking.
10 A. I wasn't thinking about it.
11 Q. Okay. Who was setting -- who was responsible
12    for getting bidders to bid on the wholesale
13    standard offer service?
14 A. I think we saw the RFQ was under the
15    responsibility of Bob Clarke and Peter Fuller.
16 Q. And their responsibility was to make this an
17    attractive bidding package; was it not?
18 A. Within the scope of what had been agreed to.
19    For example, they had to discount off the
20    standard offer price. Clearly, there's all
21    kinds of things we could have done to make this
22    more attractive to bidders, but there was a set
23    of terms that had to be met that we agreed were
24    in the best interests of all parties in order to

Page 208

1    accept a standard offer bid.
2  Q. You've seen that Narragansett in its settlement
3     agreement had indicated that they would offer
4     fuel triggers through 2009? I mean it provides
5     that we are going to supply fuel triggers?
6  A. Right.
7  Q. And you've agreed with me that a bidder if
8     offered the same contract with a fuel index -- a
9     fuel adjustment 2005 to '09, compared to the
10    same contract without it, the contract with the
11    fuel index is a lot more attractive?
12 A. I'd guess I'd have to say I'd rather have a fuel
13    adjustment than not have a fuel adjustment,
14    yeah.
15 Q. So I'm saying, are you aware of a business
16    reason back in this time period that EUA would
17    have chosen to offer -- to bid a standard offer
18    service contract at the same time as
19    Narragansett but not offer a fuel index in the
20    latter four years?
21 A. Well, I mean I can think of business reasons --
22    business reasons -- I can think of reasons that
23    the parties to the settlement would have had an
24    interest in holding parties responsible for

Page 209

1    fluctuations in the price of fuel beyond 2005.
2    I mean one the goals of the parties is to
3    minimize customer costs. So suppose at some
4    point the Rhode Island Division or other
5    entities decided, you know, these companies have
6    long enough to develop hedges or protect
7    themselves against real price fluctuations out
8    between 2005, let's see if we can hold them
9    accountable for that and see what happens. I
10    don't know.
11 Q. Okay. Are you aware of any such discussion?
12 A. I'm not aware of any such discussions.
13 Q. And as you said -- okay. So you're not aware of
14    any discussion that EUA would not offer a fuel
15    adjustment --
16 A. No, I'm not.
17 Q. -- from 2005 to '09?
18 A. No.
19 Q. What you're telling me is you're not sure what
20    these question marks mean in this document?
21 A. Correct.
22 Q. They might mean that someone is waiting for the
23    numbers?
24        (The witness nodded.)

53 (Pages 206 to 209)

ESQUIRE DEPOSITIONS SERVICES

Page 226

1    MR. O'ROURKE: Objection.
2  A.  Okay. Whatever it says.
3  Q.  You don't have a specific recollection today of
4     thinking there was a difference in the term for
5     which NEES and EUA were going to offer a fuel
6     trigger?
7    MR. O'ROURKE: Objection.
8  A.  I'd say I have no recollection of comparing the
9     two.
10 Q.  Okay. Fair enough. Okay. If you look at
11    42518, this is the price term.
12 A.  Yes.
13 Q.  So now we've got bid price plus fuel adjustment
14    factor.
15 A.  Right.
16 Q.  And fuel adjustment factor is no longer
17    referenced by an appendix but by that paragraph
18    there?
19 A.  Yes.
20 Q.  Okay. Do you have any memory of that paragraph
21    or how it got added --
22 A.  No.
23 Q.  -- or who added it?
24 A.  No.

Page 227

1  Q.  Okay. Let me show you what's been marked as
2     Exhibit --
3    MS. PLOTNICK: 33.
4  Q.  -- 33.
5    MS. PLOTNICK: Since we already did
6     32.
7    (Order of PUC, dated 11-7-97 was marked
8     Exhibit Number 33 for identification.)
9  Q.  And you see that's an order of the PUC?
10 A.  Yes, I do.
11 Q.  Okay. November 7, '97. Okay. And if you turn
12    to the second page, you see Item Number 1 refers
13    to an open meeting decision held December 17,
14    '97?
15 A.  Yes.
16 Q.  Okay. And then it says -- Number 1 says -- I'll
17    just paraphrase to save the court reporter, but
18    it says the standard offer service application
19    was rejected because it was not subject to
20    public bid?
21 A.  Correct.
22 Q.  Do you recall that?
23 A.  No.
24 Q.  Do you recall having to rebid the standard offer

Page 228

1     service?
2  A.  I have some vague recollection of that, but I
3     don't recall any of the specifics of it.
4  Q.  And then the next paragraph -- the next page,
5     "Company's filings shall be considered interim
6     service rates."
7  A.  I see it.
8  Q.  Do you recollect the filing of interim service
9     rates?
10 A.  No.
11    (Compliance Filing, December 23, 1997
12     was marked Exhibit Number 34 for
13     identification.)
14 Q.  Let me show you what's been marked as Exhibit
15    34. These meetings before the PUC that result
16    in orders like this, how does the process
17    usually work with a tariff filing or how did it
18    work at that time period?
19 A.  Tariff filings were generally fairly routine. I
20    didn't get involved with them. They would be --
21    a filing would be made. The company would
22    present a witness to support it. There'd be
23    some cross-examination, and the commission would
24    issue an order.

Page 229

1  Q.  Did you commonly go to the tariff filing
2     proceedings?
3  A.  No, not unless it was something --
4  Q.  Who generally went from EUA?
5  A.  The rate department generally supported tariff
6     filings. In the case of something like a fuel
7     clause adjustment or fuel purchase adjustment,
8     there may have been someone from power supply.
9  Q.  Power supply department within EUA?
10 A.  Right.
11 Q.  Did the retail companies back before
12    restructurings ever have -- did they get any
13    power from anyone other than Montaup?
14 A.  No.
15 Q.  Okay. If you look at Exhibit 34 --
16    THE VIDEOGRAPHER: Five minutes.
17    MR. WINSTON: Perfect. We'll be at a
18    break point in four minutes, maybe two.
19 Q.  This is entitled Compliance Filing. Let's call
20    it December 23, 1997 Tariff Filing. If you look
21    at the letter that's behind the cover sheet, it
22    refers to -- it says it's been made pursuant to
23    an open meeting decision, December 17th?
24 A.  Yes.

58 (Pages 226 to 229)

Page 258

1  Q.  And it says down below, "Asset boundaries, John
2      Llodra"?
3  A.  Yeah.
4  Q.  Who is that?
5  A.  Good question.  I don't know.
6  Q.  Do you know whether TransCanada was also using
7      Reed to evaluate the purchased assets?
8  A.  No, I don't.
9  Q.  Okay.
10         (Reed Information Memorandum was marked
11         Exhibit Number 46 for identification.)
12  Q.  Let me show you what's been marked as Exhibit
13      46, which is entitled Reed Information
14      Memorandum.  If you can tell me, what do you
15      recognize this to be?
16  A.  This appears to be the piece that Reed would
17      have sent out to potential bidders to solicit
18      interest in our generating assets.
19  Q.  Okay.  And is this a document you would have --
20      EUA would have reviewed before it was sent out
21      to bidders?
22  A.  Yes.
23  Q.  Is this a document you would have likely
24      reviewed?

Page 259

1  A.  Yes.
2  Q.  And if you turn to 652 at the bottom.  You see
3      Description of New England Power Market?
4  A.  Yes.
5  Q.  And then the second bullet there is, "Analysis
6      of the New England energy market suggests
7      gas-fired generation will be on the margin" --
8  A.  Yes.
9  Q.  -- "leading to increased volatility of energy
10      prices and greater value for coal-fired
11      resources"?
12  A.  Yes.
13  Q.  And then if you turn down to 657?
14  A.  Yes.
15  Q.  You see under Fuel Markets?
16  A.  Uh-huh.
17  Q.  "Natural gas is anticipated to be the fuel of
18      choice for most New England electric generation
19      projects in New England over the next several
20      years.  Therefore, New England natural gas
21      markets will likely have significant influence
22      in the region's power market."
23  A.  Yes.
24  Q.  Is that -- do you have a recollection of having

Page 260

1      that view of the New England power markets at
2      the time?
3  A.  Yeah.
4  Q.  Okay.  Are those accurate statements in that
5      time frame, based on your understanding and
6      memory?
7  A.  They're consistent with my understanding of the
8      power market at the time.
9  Q.  Okay.  And do you recall discussions with Reed
10      about the function of a fuel adjustment in order
11      to ameliorate fuel risks in view of the fuel
12      market condition and predictions at the time?
13  A.  I don't recall any discussions.
14  Q.  Do you recall ever discussing with Reed the
15      impact -- do you ever recall discussing with
16      Reed the prospect of EUA offering long-term
17      wholesale standard offer service supply
18      contracts without a fuel adjustment in them?
19  A.  No, I don't.
20  Q.  Do you ever recall discussing with anyone the
21      possibility of offering wholesale standard offer
22      service contracts without a fuel adjustment for
23      part of the term?
24  A.  No, I don't.

Page 261

1  Q.  Do you ever recall discussing with anyone,
2      discussing the fuel index stopping in year 2004
3      for the wholesale standard offer service supply
4      contracts?
5  A.  No.
6  Q.  Let me show you what's been marked as Exhibit
7      4 -- actually, let's go back to exhibit -- I'm
8      not going to keep going back much more.  I think
9      that is over, so we can move more quickly.
10         Okay.  If you can pull out Exhibit 40.
11      By the way, had EUA considered cutting the fuel
12      adjustment off halfway through the power supply
13      contracts at that time period, do you think
14      that's something that would have been discussed
15      in EUA?
16         MR. O'ROURKE:  Objection.
17  A.  Yeah.
18  Q.  I mean, that would have been -- that would have
19      been a factor -- to cut off the fuel adjustment
20      in the middle of the offered wholesale service
21      supply contracts would have been a relevant
22      term -- a significant term in the contracts;
23      would it not?
24         MR. O'ROURKE:  Objection.

66 (Pages 258 to 261)

Page 262

1   A.   I would concede that if a decision was made to
2        cut off the fuel halfway through that there
3        would have been a discussion about it at some
4        point.
5   Q.   Okay.  Would you also agree that had a decision
6        been made to cut off the fuel adjustment halfway
7        through, you would have been involved in those
8        discussions?
9   A.   Not necessarily.
10  Q.   Okay.  Who would -- well, if a decision had been
11       made to cut off a fuel adjustment halfway
12       through a supply contract in which you were in
13       charge or in which you were involved in
14       negotiating --
15            MR. O'ROURKE:  Objection.
16  Q.   -- do you think you would have been involved in
17       that discussion?
18            MR. O'ROURKE:  Objection.
19  A.   Only if it was a term that was already at issue
20       in the negotiation.  Okay?  So I imagine if
21       there was a sense it would affect our
22       negotiation, I would be involved, but there were
23       plenty of these discussions going on that I
24       wasn't party to.

Page 263

1   Q.   Is it likely that if a decision has been made to
2        cut off the fuel adjustment halfway through the
3        standard offer service term, you would have been
4        informed of that decision?
5            MR. O'ROURKE:  Objection.
6   A.   Not necessarily.  There was a lot of things
7        going on.  Sometimes the communications weren't
8        perfect.  I'd also say it's possible I was
9        informed and I just don't remember.
10  Q.   Okay.  Turning back to Exhibit 40, you'll see
11       that it refers to the monthly support payments?
12  A.   Yes.
13  Q.   Okay.  And it notes that support payments are
14       significantly higher than in the assignment of
15       the NEP purchase power contract to U.S.
16       Generating Company and subsequently acquired by
17       TransCanada?
18  A.   Yes.
19  Q.   And if you turn to the next page -- this is a
20       letter you wrote to Mr. Pourbaix?
21  A.   Yes.
22  Q.   What contract are you referring to there?
23  A.   In?
24  Q.   In that paragraph.

Page 264

1   A.   In the paragraph, "Monthly support payments"?
2   Q.   Yes.  It refers to NEP purchase power contract
3        to U.S. Generating and subsequently acquired by
4        TransCanada.
5   A.   My best recollection is that U.S. Generating
6        Company purchased substantially all of NEP's
7        generating assets in a single transaction,
8        including purchase power agreements and then,
9        according to this, resold at least the Ocean
10       State Power to TransCanada.
11  Q.   And so when you wrote this letter -- well, this
12       indicates you knew what the support payments
13       were in order to make the comparisons that were
14       in this TransCanada contract?
15  A.   Well, they would have had to make a filing for
16       CTC recovery, whichh showed what they were
17       recovering through the divestiture.
18            (NEP November 19, 1997 PUC Response was
19            marked Exhibit Number 47 for
20            identification.)
21  Q.   Now, let me show you what's been marked as
22       Exhibit 47.  Call it NEP, N E P, November 19,
23       1997 PUC response.  Okay.  And if you turn to
24       the third page of this document, you see this is

Page 265

1        a request to Narragansett Electric?
2   A.   Yes.
3   Q.   And I won't read it, but it asks for a copy of
4        the U.S. Gen contract?
5   A.   Right.
6   Q.   And you see -- turn the page -- that the date is
7        October 29, 1997?
8   A.   I see that.
9   Q.   And then if you turn to Page 35206?
10  A.   Yep.
11  Q.   You see there's the fuel trigger points put in
12       through 2009 in this contract?
13  A.   Right.
14  Q.   And as you said, your understanding was U.S. Gen
15       took all the load on the Narragansett side?
16  A.   Yes.
17  Q.   What percentage of Rhode Island was that?
18  A.   Oh, probably somewhere between two-thirds and
19       80 percent.
20            MR. O'ROURKE:  Excuse me.  When you
21       say what percentage of Rhode Island, what
22       percentage of the load was Rhode Island's?
23            MR. WINSTON:  What percentage of Rhode
24       Island's total electric load was served by

Page 266

1  Narragansett Electric.
2  A.  Yes, my understanding is somewhere in the order
3       of 70 to 80 percent.
4  Q.  And your understanding was through contracts
5       with U.S. Gen -- this appears to be a
6       contract -- there was an assignment of all of
7       that load to U.S. Gen?
8  A.  It should be clearly in here one way or another.
9  Q.  Is that your memory?
10 A.  Yeah.
11 Q.  I think that's what you said.  And do you recall
12      reviewing these contracts on -- the U.S. Gen
13      contracts?
14 A.  I'm sure I read the contracts.  I don't
15      specifically recall it.
16 Q.  Do you recall knowing what the fuel triggers
17      were on the Narragansett side through 2009?
18 A.  I don't recall it.
19 Q.  You don't recall one way or the other?
20 A.  Right.
21         (Second November 19, 1997 NEP Data
22          Response was marked Exhibit Number 48
23          for identification.)
24 Q.  Let me show you what's been marked as Exhibit

Page 267

1       48, entitled Second November 19, 1997 NEP Data
2       Response.  Okay.
3  A.  Okay.
4  Q.  You see this is a similar question that was
5       asked of EUA, which is what average annual
6       percentage increase in the price of residual oil
7       and gas would trigger the fuel adjustment in
8       1999, 2000, and 2010?
9  A.  I see that.
10 Q.  And you see they lay out the fuel triggers all
11      the way through 2009?
12 A.  Right.
13 Q.  Are these filings that NEES makes, would these
14      have been reviewed at this time by folks at EUA?
15 A.  I don't know that they'd necessarily be
16      reviewed.  They'd certainly be available.
17 Q.  Okay.  If you'd turn back to Exhibit 6 --
18 A.  Yep.
19 Q.  -- which I put in your pile.  It's near the
20      bottom.
21 A.  Yep.
22 Q.  And you turn to that same answer, it's 5253.
23      Okay.  You see it's the same question put to --
24 A.  Yep.

Page 268

1  Q.  And as you sit here today, do you have any idea
2       who prepared this response that is Exhibit 6?
3  A.  No.
4  Q.  Do you think that -- I mean, as you've said, it
5       was EUA's practice, you know, to review NEES
6       filings if they were made beforehand for
7       purposes of preparing their own?
8  A.  Yes, yes.
9  Q.  Okay.  Is it likely -- again, I'm asking you to
10      speculate somewhat here.  Is it likely that
11      people in the rate department that filed this
12      would have reviewed the NEES filings prior to
13      answering questions like this?
14 A.  I think if they were answering this question
15      that they would have been aware that NEES had
16      filed the response you're showing me in Exhibit
17      48.
18 Q.  Okay.  And -- okay.  I mean, do you have a sense
19      that if they had intended the fuel index not to
20      apply in the years 2005 to '09, that would have
21      been stated there when they're stating it
22      doesn't apply in two other specific years?
23         MR. O'ROURKE:  Objection.
24 A.  I don't know.  It seems to me, in the

Page 269

1       alternative, if they intended for these to be
2       the numbers, I don't know why they didn't just
3       put them in here.
4  Q.  It's a good question.  We've seen the tariffs
5       have been filed with triggers through 2004.
6  A.  Right.
7  Q.  So you don't have a specific recollection as you
8       sit here today of knowing what the trigger
9       numbers are NEES had used in its contracts from
10      2005 to '09?
11 A.  Correct.
12 Q.  Okay.  Do you recall ever knowing -- do you
13      recall knowing -- whether you knew at the time
14      that they had determined what the triggers were
15      at that point?
16 A.  I don't have a specific recollection of it.
17      It's unlikely that we were unaware that these
18      numbers existed.
19 Q.  Right.  And were you aware of any discussions at
20      EUA about using different prices or trigger
21      numbers than NEES was using for the other half
22      of Rhode Island?
23 A.  No, I'm not aware of.
24 Q.  Are you aware -- do you recall any discussions

68 (Pages 266 to 269)

ESQUIRE DEPOSITIONS SERVICES

Page 282

1  document in there. Let's mark this as Exhibit
2  52.
3         (Standard Offer Service Filing, dated
4         April 15, 1998 was marked Exhibit Number
5         52 for identification.)
6  Q.  Showing you a standard offer service filing
7      dated April 15, 1998. Okay. And let's actually
8      pull out what's Exhibit 1.
9         THE WITNESS: How did you find that so
10     fast?
11        MR. WINSTON: I did mine in reverse
12     chronological order so it was on the bottom.
13        MR. O'ROURKE: Did you happen to grab
14     that when you grabbed the ones you were going to
15     use?
16        MR. WINSTON: I think this is it.
17 Q.  Okay. And you see that the wholesale standard
18     offer service we saw was signed by you and
19     TransCanada?
20 A.  Yes.
21 Q.  And you see that's dated April 7, 1998?
22 A.  Right.
23 Q.  Okay. So this is the standard offer service
24     tariff filing signed after the signed contract?

Page 283

1  A.  It's dated after the contract is.
2  Q.  Right. And if you look at the first page of
3      that cover letter of the April 15th filing?
4  A.  Yep.
5  Q.  It says, "Enclosed herewith for filing are
6      standard offer service and last resort service
7      tariffs"?
8  A.  Right.
9  Q.  And then at the bottom of the first paragraph,
10     "To replace the currently effective tariffs
11     R.I.P.U.C. Number 1135"?
12 A.  Right.
13 Q.  You can see 1135 corresponds to the Blackstone
14     interim generation service tariff?
15 A.  I'm sure I can. Yes.
16 Q.  Okay. And the bottom there, the bullets, "Red-
17     lined copies of the proposed standard offer
18     service tariffs marked show changes against the
19     current interim generation service tariffs"?
20 A.  Yes.
21 Q.  Do you have a recollection of in April at some
22     point filing the actual standard offer service
23     tariffs?
24 A.  No.

Page 284

1  Q.  Okay. Do you have a recollection of that -- as
2      you sit here today, whether that was done before
3      or after you signed the TransCanada contract?
4  A.  No.
5  Q.  You'd agree with me that looking at this
6      correspondence here, it indicates that, in fact,
7      EUA filed those standard offer service tariffs
8      after signing the TransCanada contract?
9  A.  I see a date of April 15th on the filing and
10     April 7th on the cover of the agreement.
11 Q.  Okay. Do you recall conversations with
12     TransCanada about the interim generation service
13     tariff?
14 A.  No.
15 Q.  Do you recall conversations about what was going
16     to be contained in the standard offer service
17     tariff that would be filed?
18 A.  No.
19 Q.  Do you recall telling them what was going to be
20     in the standard offer service tariff?
21 A.  No, I don't.
22 Q.  Okay. Do you recall having an understanding --
23     well, obviously, the agreement that's signed
24     April 7th is based on what's in some standard

Page 285

1  offer service tariffs, correct?
2  A.  Correct. Do we have -- I see the front of it's
3      dated April 7th. Do we have a date that the
4      signatures were actually executed?
5  Q.  You can -- well, we don't. I'll get there.
6      You'll see the documents leading right up to the
7      very minute it's signed.
8  A.  Okay.
9         THE VIDEOGRAPHER: Ten minutes.
10        MR. WINSTON: Okay.
11 Q.  You'd agree with me what these documents seem to
12     show --
13 A.  Yeah.
14 Q.  -- is that at the time that TransCanada signed
15     this contract, in fact, the standard offer
16     service tariffs referenced in it are not yet
17     filed?
18        MR. O'ROURKE: Objection.
19 A.  The date of the filing is April 15th. The date
20     on the contracts is April 7th. I can't believe
21     TransCanada wasn't aware of what was in these,
22     but I agree the date of this document is after
23     the date of the contract.
24 Q.  Okay. Do you -- right. Well, you don't have a

72 (Pages 282 to 285)

Page 286

1  memory one way or another what you told them
2  about what was in the tariffs, right?
3  A.  Correct, correct.
4  Q.  It's a fair guess that considering it references
5    a price based on the standard offer service
6    tariffs, there was some discussion about what
7    would be in those tariffs, right?
8  A.  Correct.
9  Q.  You don't remember the substance of those
10    conversations?
11  A.  No.
12      (Letter to Mr. Pourbaix from Mr. Hirsh,
13      dated March 9, 1998 was marked Exhibit
14      Number 53 for identification.)
15  Q.  Let me show you what's been marked as Exhibit
16    53, which is a March 9 letter from Michael Hirsh
17    to Alex Pourbaix.  Who do you recall being
18    involved in the actual discussions between
19    TransCanada and EUA concerning the standard
20    offer service contract?
21  A.  Well, from our side, it would have been me, Don
22    Ryan, Bob Clarke or other people in power
23    supply.  Who I recall talking to from
24    TransCanada would be Bill Taylor and Sean

Page 287

1  McMaster.
2  Q.  And Alex Pourbaix?
3  A.  I don't recall ever meeting with Alex Pourbaix
4    directly, but I do recall correspondence and
5    some telephone conversations.
6  Q.  You don't recall meeting with Alex Pourbaix on
7    several occasions?
8  A.  I did?  Well, there must be a record of it.  I
9    don't recall it.
10  Q.  You don't recall it.  Okay.  Do you recall
11    in-person meetings with folks from TransCanada
12    on more than one occasion?
13  A.  Yes, I do.
14  Q.  Do you remember telephone conversations with
15    folks from TransCanada?
16  A.  I remember there were telephone conversations,
17    yes.
18  Q.  And the people you were talking to from
19    TransCanada other than yourself were Bob Clarke,
20    you listed Don Ryan?
21  A.  I'm going to say I don't specifically recall --
22    I've seen correspondence between Don Ryan and
23    TransCanada.  So we'll say we know he talked to
24    them.

Page 288

1  Q.  You're going off the documents?
2  A.  I can't specifically recall Bob Clarke did, but
3    he's the type that would have been involved.
4      (Letter to Mr. Hirsh from Mr. Pourbaix,
5      dated March 24, 1998 was marked Exhibit
6      Number 54 for identification.)
7  Q.  I'll show you what's going to be marked as
8    Exhibit 54, which is a letter from Pourbaix to
9    Hirsh, dated March 24, 1998.
10  A.  Okay.
11  Q.  Okay.  You see this March 9 letter?
12  A.  Yes.
13  Q.  It says, "Attached is a revised set of
14    agreements which reflects our discussions to
15    date"?
16  A.  Right.
17  Q.  "Areas that have been changed are noted by a
18    mark in the margin"?
19  A.  You're saying it says that?
20  Q.  Second sentence of the March 9 letter.
21  A.  I'm looking at something dated March 24th.
22  Q.  Oh, I'm sorry.  It's 53.  This one.  I'm back to
23    that one.
24  A.  Yes.

Page 289

1  Q.  Okay.  And take it on faith.  There's nothing
2    attached to this Exhibit 53.
3  A.  Okay.
4  Q.  Nor if you were to look at Exhibit 7194, which
5    is the page following this essential exhibit,
6    which is why I'm going to show you what's been
7    marked as Exhibit 54.
8  A.  Okay.
9  Q.  And this says, "Dear Michael, I've attached a
10    marked-up version of the most recent set of
11    sales documents which were recently provided to
12    us"?
13  A.  Right.
14  Q.  And if you turn a couple pages in -- let's
15    actually skip all the way to Exhibit -- 7221.
16  A.  All right.
17  Q.  You see this is dated 2-3-98, draft?
18  A.  Right.
19  Q.  And if you turn a couple pages in to the
20    first -- to 7223?
21  A.  Right.
22  Q.  Okay.  You see it's got backstop agreement.
23    It's got some lines on the right?
24  A.  Yes.

73 (Pages 286 to 289)

ESQUIRE DEPOSITIONS SERVICES

Page 294

1  A.  Right.
2       THE VIDEOGRAPHER:  I have to call
3  time.
4       MR. WINSTON:  Excuse me?
5       THE VIDEOGRAPHER:  That's time.
6       MR. WINSTON:  Sure.
7       THE VIDEOGRAPHER:  The time is
8  4:41 p.m.  This is the end of Tape Number 5.
9       (Recess)
10      (Fax to Mr. Hirsh, dated March 30, 1998
11      was marked Exhibit Number 55 for
12      identification.)
13      THE VIDEOGRAPHER:  The time is
14  4:56 p.m., and this is the beginning of Tape
15  Number 6.
16  Q.  Okay.  Thirty-four minutes and counting.  If I
17  finish this unit before then, we can break.  All
18  right.  Let me show you what's been marked as
19  Exhibit 56 -- 55.  It is a fax -- March 30, 1998
20  fax to Mike Hirsh, and you see this attaches,
21  again, the Rider 1 that we looked at?
22  A.  Right.
23  Q.  And at the bottom of -- unfortunately, I don't
24  have the sender here, but at the bottom, it

Page 295

1  says, "As requested"?
2  A.  Right.
3  Q.  You don't recall conversations with anyone at
4  TransCanada about tariffs and regulatory
5  decisions in the future regarding standard offer
6  service?
7  A.  No.
8       (Fax to Messrs. McMaster and Pourbaix
9       from Mr. Hirsh, dated April 1, 1998 was
10      marked Exhibit Number 56 for
11      identification.)
12  Q.  I show you what's been marked as Exhibit 56.
13  And this is a fax from you to Sean McMaster and
14  Alex Pourbaix, dated April 1, 1998?
15  A.  Yes.
16  Q.  And is that your writing there?
17  A.  Unfortunately, it is.
18  Q.  "Backstop agreement renamed wholesale standard
19  offer service agreement"?
20  A.  Yes.
21  Q.  And then turn to 7303.
22  A.  Yep.
23  Q.  And you see it's now called Wholesale Standard
24  Offer Service Agreement?

Page 296

1  A.  Yep.
2  Q.  Do you know why that name was changed?
3  A.  No.
4  Q.  Do you recall we looked at a bid document where
5  bids were due April 1st, '98?
6  A.  No.
7  Q.  Okay.  Do you recall the second -- the result of
8  the second wholesale standard offer service bid
9  by EUA?
10  A.  This was the one in the spring of 1998?
11  Q.  Yeah.
12  A.  Not specifically.  I presume nobody bid, though.
13  Q.  Okay.  And do you recall that the name was
14  changed because it was, in fact, no longer a
15  backstop but it was your obligation?
16  A.  Oh, no, I don't.
17  Q.  Okay.  Then if you turn, you see you've got --
18  this is changes and it's got the lines?
19  A.  I see that.
20  Q.  Now, we've got -- in the third paragraph of the
21  whereas clauses --
22  A.  Right.
23  Q.  -- you see it lists specific tariff numbers?
24  A.  Yes.

Page 297

1  Q.  And it says, "As amended from time to time"?
2  A.  Right.
3  Q.  Do you recall whether or not you provided those
4  tariffs -- copies of those tariffs to
5  TransCanada?
6  A.  No, not specifically.  I can't imagine they
7  would have wanted to see copies of those
8  tariffs.
9  Q.  You recall them asking you for them?
10  A.  No, not specifically.
11  Q.  Do you recall telling them they weren't prepared
12  yet?
13  A.  No.
14  Q.  Do you see down in the Article 2, Term, on the
15  next page?
16  A.  Yes.
17  Q.  You see the term there is still December 2004?
18  A.  Yes, I do.
19  Q.  Okay.  And then if you turn to the very last
20  page of this document, the second -- well, it's
21  actually three pages in from the back.  It's
22  7320.
23  A.  Right.
24  Q.  And do you see that now the price schedule has

75 (Pages 294 to 297)

ESQUIRE DEPOSITIONS SERVICES

Page 298

1    been extended to 2009?
2  A.  Yes, I do.
3  Q.  Okay.  Do you recall making that change to this
4      contract?
5  A.  No.
6  Q.  Do you recall changing the term of the
7      TransCanada contract in the days before signing
8      from 2004 to 2009?
9  A.  No.
10 Q.  Do you recall who put in these actual numbers
11     here?
12 A.  No, I don't.
13 Q.  Okay.  And you see it says, "Standard offer
14     service for Eastern terminates December 31,
15     2004"?
16 A.  Right.
17 Q.  Do you think if the fuel adjustment terminated
18     in those extra five years that were added to the
19     contract, that's something that you would have
20     told TransCanada about?
21 A.  I don't know.
22     MR. O'ROURKE:  Objection.
23 Q.  Do you remember ever telling TransCanada that
24     there would be no fuel adjustment in the added

Page 299

1      2005 to 2009 years?
2  A.  I don't recall any conversation with TransCanada
3      about the fuel adjustment.
4  Q.  Okay.  Let me turn you to what I'll mark as
5      Exhibit 57.
6      (Fax to Mr. Taylor from Mr. Boisvert was
7       marked Exhibit Number 57 for
8       identification.)
9  Q.  You see this is a fax -- this is from Larry
10     Boisvert to Bill Taylor?
11 A.  Yes.
12 Q.  Now, this refers to a tariff 364?
13 A.  Yes.
14 Q.  If you look back at the 4-1 draft we just looked
15     at, it's 56?
16 A.  Yes.
17 Q.  And you turn to where it's Bates-stamped 7305?
18 A.  Yep.
19 Q.  You see that the MDE Mass. tariff there is
20     listed as 340?
21 A.  Right.
22 Q.  So you see the tariff number changed?
23 A.  Yes.
24 Q.  Is that common for new tariffs -- replacement

Page 300

1      tariffs were filed, the numbers changed?
2  A.  I don't know.
3  Q.  And if you turn to what is 997 on Exhibit 57?
4  A.  Yes.
5  Q.  You see that the fuel price has now been
6      extended to 2005?
7  A.  Yes.
8  Q.  If you turn the page, there's an added fuel
9      trigger?
10 A.  Yes.
11 Q.  For 2005?
12 A.  Yes.
13 Q.  Do you recall why that was?
14 A.  No.
15 Q.  Okay.  Do you recall discussing that with
16     TransCanada?
17 A.  No.
18 Q.  Okay.  Now, I'll show you what we'll mark as
19     Exhibit 58.
20     (Fax to Mr. Hirsh from Mr. Boisvert was
21      marked Exhibit Number 58 for
22      identification.)
23 Q.  I gave you my copy.  No.  Did I give you my
24     copy?  You have my copy.

Page 301

1      And you see here this is a fax from
2      Sean McMaster to Mike Hirsh?
3  A.  I do.
4  Q.  Attached is the provision regarding changes to
5      standard offer service which Alex has discussed
6      with you?
7  A.  Yes.
8  Q.  And then if you look three pages down, read that
9      provision to yourself in small type.
10 A.  I'll try.
11     Okay.
12 Q.  Do you recall discussing that with Alex
13     Pourbaix?
14 A.  I don't.
15 Q.  Do you recall anything about the intent of that
16     provision?
17 A.  Not beyond what's on the page.
18 Q.  Okay.  Look at the next document that we'll
19     number Exhibit 59.
20     (Fax to Mr. McMaster from Mr. Hirsh and
21      April 3, 1998 Draft of Wholesale
22      Standard Offer Service Agreement was
23      marked Exhibit Number 59 for
24      identification.)

76 (Pages 298 to 301)

ESQUIRE DEPOSITIONS SERVICES

Page 302

```
1   Q.  Let's call it 4-3-98 draft, wholesale standard
2       offer service agreement.  You can see this is a
3       fax from you to Sean McMaster?
4   A.  Yes.
5   Q.  And it says, "Incorporates our discussions
6       yesterday"?
7   A.  Okay.
8   Q.  It refers to, "Please write of TPPL to terminate
9       Article 8."  And then at the bottom, "Please
10      make sure that Alex finds a copy"?
11  A.  Right.
12  Q.  If you turn to Page 459?
13  A.  Which page?
14  Q.  459 in the bottom right.
15          MR. McLEAN:  These are out of order.
16  A.  It may be out of order.
17  A.  Got it.
18  Q.  Actually, turn to 458.  There's that page again.
19  A.  Yep.
20  Q.  There's the fax cover page.  I think there were
21      three parts of this.  Okay.  Then you turn to
22      the next page.  You've got now an April 3 draft
23      of the wholesale standard offer service
24      agreement?
```

Page 303

```
1   A.  Right.
2   Q.  And now, if you turn to 463 --
3   A.  Yep.
4   Q.  In term, it is now changed to December 2009?
5   A.  Yes.
6   Q.  And if you look at Page 468 --
7   A.  Yep.
8   Q.  -- you see that Clause 3 there is the clause you
9       just read that was attached to that fax?
10  A.  Yes.
11  Q.  Okay.  And you can see in the fax you reference
12      adding it.  You don't recall other discussions
13      about that provision?
14  A.  No.
15  Q.  Okay.  Do you recall discussing at the time that
16      you changed it to 2009 the pricing that was in
17      TransCanada's wholesale standard offer service
18      contract with NEES?
19  A.  Say that again.
20  Q.  Do you remember discussing them -- do you
21      remember discussing with TransCanada, meaning
22      Alex Pourbaix or Sean McMaster or Bill Taylor,
23      around the time that you changed the term to
24      2009 the pricing terms of their 2009 standard
```

Page 304

```
1       offer service contract with Narragansett?
2   A.  No, I don't.
3   Q.  Okay.  You don't recall one way or the other?
4   A.  No.
5   Q.  You don't recall one way or the other whether
6       you discussed the pricing numbers in that
7       contract for the outlying years of the contract?
8           MR. O'ROURKE:  Objection.
9   A.  No, I don't recall.
10  Q.  Can you say one way or the other whether or not
11      you told Alex Pourbaix that the numbers in the
12      latter years of the contract were the same as in
13      the NEES contract from 2005 to '09?
14  A.  I cannot.
15  Q.  You can't say one way or the other?
16  A.  No, I can't.
17  Q.  If you turn to Page 4729.
18          MS. PLOTNICK:  Is that a new exhibit,
19  Tim?
20          MR. WINSTON:  What?
21          MS. PLOTNICK:  Is that a new exhibit?
22          MR. WINSTON:  Oh, sorry.
23          (Document was marked Exhibit Number 60
24          for identification.)
```

Page 305

```
1   Q.  Let's go to Exhibit 60.  Use this one.  Okay.
2       If you turn to Page 4729.
3   A.  Yep.
4   Q.  You see where it defines the tariff numbers
5       there?
6   A.  Yes, I do.
7   Q.  And it's got these numbers for the Blackstone
8       and Newport tariffs?
9   A.  Yep.
10  Q.  And it says, "Which are materially the same,"
11      and refers to the interim generation service
12      tariffs?
13  A.  Yep.
14  Q.  Do you recall discussing why that clause was put
15      in there?
16          MR. O'ROURKE:  Excuse me.  What clause
17      are you talking about?
18          MR. WINSTON:  It's down in the middle
19  of the definition of standard offer service
20  tariff.
21          MR. O'ROURKE:  Thanks.
22  A.  No, I don't.
23  Q.  Do you recall that that was because you were
24      unable to provide the standard offer service
```

77 (Pages 302 to 305)

ESQUIRE DEPOSITIONS SERVICES

Page 310

1   Q.   If you look at Page 1670?
2   A.   Yep.
3   Q.   You see it references the order that says, "The
4        standard offer services found not to comply"?
5   A.   Yes.
6   Q.   And then the following page again refers to the
7        interim service rates?
8   A.   Right.
9   Q.   Okay. And let's see here. You've seen a
10       document that I've shown you that shows EUA
11       filing the standard offer service tariffs on
12       April 15th?
13  A.   Yes.
14  Q.   Okay. Of '98?
15  A.   Yes.
16  Q.   Okay. Do you have reason to disagree that
17       that's the date that those were filed?
18  A.   No reason to disagree.
19  Q.   And do you recall what you said one way or the
20       other to TransCanada about that standard offer
21       service tariff filing?
22  A.   No.
23  Q.   The -- okay. And you've seen that the signed
24       copy that we have is dated April 7th, 1998?

Page 311

1   A.   Yeah.
2   Q.   Okay. Do you have any reason to think that's
3        not the date it was signed?
4   A.   I have no way to know what date it was signed.
5        I see on the cover it says April 7th.
6   Q.   Okay. So looking at Exhibit 1 --
7   A.   Yep.
8   Q.   -- and turning to page Bates-stamped 71 at the
9        bottom?
10  A.   Yep.
11  Q.   And you see that there's two price components,
12       standard offer service wholesale price and fuel
13       adjustment factor?
14  A.   Yep.
15  Q.   And you see this is a 2009 agreement?
16  A.   Right.
17  Q.   And you don't recall any conversations with
18       TransCanada concerning one-half of that price
19       component ending halfway through the contract;
20       do you?
21  A.   I don't recall any conversations with
22       TransCanada about the price adjustment.
23  Q.   Okay. And you see, "The price adjustment is
24       based on the filing of standard offer service

Page 312

1        tariffs. Fuel adjustment factors is cents per
2        kilowatt hour based on the revenues collected,
3        if any, attributed to the operation of the
4        retail fuel rate adjustment mechanism and the
5        standard offer service tariffs"?
6   A.   Yes, that sounds right. Where is that?
7   Q.   That's at the top of the fat paragraph, the
8        bottom of Page 5.
9   A.   Right.
10  Q.   And those standard offer service tariffs are to
11       be filed -- your understanding of this agreement
12       when you signed it was that those tariffs were
13       to be filed by Blackstone and Newport?
14            MR. O'ROURKE: Objection.
15  A.   Blackstone and Newport would file standard offer
16       service tariffs, correct.
17  Q.   Right. So these are tariffs they would file?
18  A.   Yes.
19  Q.   And did you have an understanding that -- based
20       upon this clause, that Blackstone and Newport
21       would, in fact, include a fuel adjustment in
22       their retail rate standard tariffs?
23  A.   That's what this says, yeah.
24  Q.   Would you agree with me that if the tariff that

Page 313

1        was filed the next week did not contain any fuel
2        adjustment provision in it, that would be
3        inconsistent with your understanding of this
4        agreement?
5   A.   I'm just trying to read the words here. The
6        words here imply there's a fuel adjustment
7        factor that's part of the standard offer service
8        tariff. So I don't recall what I understood
9        then, but that seems to be what this says, yeah.
10  Q.   Did you understand when you signed this that
11       TransCanada was relying on the retail companies
12       to file these tariffs?
13  A.   Yeah.
14  Q.   Okay. And you understood when you signed this
15       that TransCanada was relying on the UA companies
16       to file standard offer service tariffs that
17       contained a rate fuel adjustment mechanism?
18  A.   I don't know exactly what they were relying on,
19       but they were relying on the existence of a
20       standard offer service tariff. That's what this
21       represents, that there will be one.
22  Q.   Right. And assume with me that based on the
23       documents you've seen that there was no standard
24       offer service tariff that was on file at the

79 (Pages 310 to 313)

ESQUIRE DEPOSITIONS SERVICES

Page 314

1  time this was signed. You would agree with me
2  that EUA was obligating itself under this
3  contract to actually then file the standard
4  offer service tariff?
5  A. Yeah. It's kind of -- I just can't understand
6  how a contract would be executed without the
7  standard offer service tariffs in everybody's
8  hand. You know, I know I wouldn't sign the
9  standard offer service without the tariff in my
10 hand to look at.
11 Q. Well, you agree that you would want to have some
12 assurances from the other party they would make
13 the necessary filings?
14      MR. O'ROURKE: Objection.
15 A. I'd actually want to see it.
16 Q. Did you ever tell TransCanada that -- well, let
17 me put it this way: You didn't end up -- you're
18 not involved -- you were not -- is it fair to
19 say you were not involved in the decision by
20 National Grid to decide in 2004 to stop paying a
21 fuel tariff, right, a fuel trigger?
22 A. Correct.
23 Q. Were you consulted before that decision was
24 made?

Page 315

1  A. No, I wasn't.
2  Q. Did anyone at National Grid ask you what you
3  thought about the fuel tariff?
4  A. No.
5  Q. So you didn't put yourself here?
6  A. Right.
7  Q. Did you know when you signed this that
8  TransCanada was relying on a fuel adjustment
9  factor?
10 A. I can't say I knew what TransCanada was relying
11 on.
12 Q. Okay. Do you know whether -- do you recall one
13 way or the other whether it was discussed
14 whether the fuel adjustment factor was important
15 to them?
16 A. I don't recall any discussion.
17 Q. Okay. Would you agree with me that -- do you
18 recall ever thinking before you signed this
19 contract that the fuel adjustment factor was not
20 going to go through the full term of the
21 contract?
22      MR. O'ROURKE: Objection.
23 A. I can't recall thinking about the fuel
24 adjustment clause at all when I went through

Page 316

1  this.
2  Q. The answer is no, you have no memory of any
3  discussion anywhere at EUA about the fuel
4  adjustment related to this contract ending
5  before 2009?
6  A. That's correct.
7        MR. WINSTON: Okay. Why don't we do
8  this? Let's stop. I think we'll have to
9  reconvene in some afternoon.
10       THE WITNESS: Okay.
11       MR. O'ROURKE: Okay.
12       MR. WINSTON: Thanks for coming in.
13 Sorry we couldn't finish.
14       THE VIDEOGRAPHER: Anything else for
15 the record? The time is 5:27 p.m. This will be
16 the end of Tape Number 6.
17       MR. WINSTON: So we're going to agree
18 to continue this subject to the limits. We'll
19 get the tally of what the totals are. We'll
20 hold to our 10-hour limit. Can't get worse than
21 that. Can't go more than two hours or whatever
22 is left. And so we'll agree to reconvene on a
23 mutually agreeable afternoon that's convenient
24 for everyone involved here. Our discovery

Page 317

1  closes at the end of March, so what I'd like to
2  do is get it in -- I'd just assume get it in the
3  next couple of weeks if we can do that.
4        MR. O'ROURKE: Okay.
5        MR. WINSTON: We don't need to do it
6  now, but we'll call you Monday or something.
7        THE WITNESS: Sure.
8        MR. WINSTON: I think that's it.
9        THE VIDEOGRAPHER: 7 hours 38 minutes.
10 (Deposition suspended at 5:31 p.m.)

80 (Pages 314 to 317)

# Hirsh

# (Day Two)

Page 320

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3                  (Central Division)

 4  - - - - - - - - - - - - - -

 5 TRANSCANADA POWER MARKETING    :

 6 LTD,                           :

 7          Plaintiff,            :   CASE NO.

 8 VS.                            :   05-40076 FDS

 9 NARRAGANSETT ELECTRIC CO.,     :

10          Defendant.            :

11  - - - - - - - - - - - - - -

12

13    VIDEOTAPED CONTINUED DEPOSITION OF MICHAEL J.

14 HIRSH, a witness called by and on behalf of the

15 Plaintiff, taken pursuant to the applicable

16 provisions of the Federal Rules of Civil

17 Procedure, before Sandra L. Bray, Registered

18 Diplomate Reporter, CSR Number 103593, and

19 Notary Public in and for Commonwealth of

20 Massachusetts, at the offices of Choate Hall &

21 Stewart LLP, Two International Place, Boston,

22 Massachusetts, on Thursday, February 15, 2007,

23 commencing at 4:03 p.m.

24
```

Page 333

1  back. Let me show you a document which has been
2  marked as Exhibit 54. And you'll see that's one
3  of the drafts that we talked about last time of
4  the backstop agreement being negotiated between
5  TransCanada and EUA? Take your time -- take a
6  minute to look at it.
7         MR. O'ROURKE: I guess I'd object to
8  your question as being inaccurate.
9         MR. WINSTON: How so?
10        MR. O'ROURKE: Because it's a lot more
11 than the backstop agreement.
12        MR. WINSTON: It's what?
13        MR. O'ROURKE: It's a lot more than
14 the backstop agreement.
15        MR. WINSTON: That's fine. It
16 includes the backstop agreement being
17 negotiated.
18 A. Okay.
19 Q. If you turn to Page 7221.
20 A. Yep.
21 Q. And you see there's a draft backstop, and if you
22 turn to 7226, you see there's a term at the top,
23 2004?
24 A. Right.

Page 334

1 Q. And then if you turn down to Article 5, 7227,
2  you see standard offer wholesale price and fuel
3  adjustment factor?
4 A. Yes.
5 Q. And you'd agree with me at the time you're
6  negotiating this contract in March, the
7  understanding is that that wholesale price and
8  fuel adjustment factor applies for the whole
9  contract term?
10 A. Through 2004, which is the contract term, I
11 agree.
12 Q. Okay. Do you recall asking in the days before
13 signing that the term be extended to 2009?
14 A. I don't recall the specifics of asking it, but
15 clearly it was changed from 2004 to 2009 at some
16 point.
17 Q. Okay. Do you recall that was done at EUA's
18 request?
19 A. Yes.
20 Q. Do you recall why that was?
21 A. That was done because the Rhode Island
22 commission required us to provide standard offer
23 service through 2009.
24 Q. Okay. Why had the contract previously been only

Page 335

1  through 2004?
2 A. I believe what we saw before is that Larry
3  Boisvert admitted that that was an oversight on
4  the part of EUA only going out to 2004.
5 Q. Okay. Did you tell TransCanada that the fact
6  that it'd only gone through 2004 was an
7  oversight and you needed it to go through 2009?
8 A. I'm sure we did.
9 Q. When you extended the term from 2004 to '09,
10 what elements of the basic terms did you tell
11 them had changed for the added term?
12        MR. O'ROURKE: Objection.
13 Q. If any?
14 A. I believe the only thing we would have discussed
15 is that the term now goes through 2009 and
16 provided to them what schedules of price we had.
17 Q. Okay. Did you mention to them -- and your
18 testimony is that when you extended the term to
19 2009, you weren't sure whether the second
20 component of the price term was going to apply
21 for that term?
22 A. Well, that's true, because we had no settlement
23 or no agreement with the PUC regarding the
24 existence or the level of the trigger for the

Page 336

1  fuel beyond 2004. As you showed me, it was
2  question marks --
3 Q. What was your understanding when you extended
4  the term from 2004 to 2009 as to whether you
5  were going to seek from the PUC a fuel
6  adjustment for the time period after 2004?
7 A. I don't recall having a specific expectation. I
8  think I've already testified had that question
9  come up, before I made a commitment to that, I
10 would have discussed it with the rate department
11 and the power supply department.
12 Q. Well, you'd been negotiating contracts with
13 price terms, A plus B equals price, through the
14 term of the contract up until the days before
15 contract signing; isn't that correct?
16        MR. O'ROURKE: Objection.
17 A. We were negotiating them through -- said through
18 2004, up until the day we signed the contract.
19 Then it was extended to 2009, for which we
20 had -- I'm agreeing we had a price, and that was
21 also in our settlement with Rhode Island for the
22 wholesale standard service, but we did not have
23 a fuel trigger beyond that point.
24 Q. And was it your intent when you extended the

5 (Pages 333 to 336)

Page 337

1  term and asked TransCanada to extend it at your
2  request that you intended not to seek from them
3  one-half of the price component that had been
4  part of the previous contract price?
5 A.  Well, it's not one-half of the price. It's one
6     component of the price, but it wasn't one-half
7     of the price.
8 Q.  So what was your understanding when you extended
9     the term as to whether or not you intended to
10    try to get a fuel adjustment for TransCanada for
11    the added four years that you asked them to add
12    to the contract?
13 A. I don't really recall whether there were
14    discussions about it or not. I wouldn't -- you
15    know, the way things went with the PUC and with
16    the complications of this, the interactions
17    between the various agreements, the existence of
18    the wholesale standard -- the wholesale
19    settlement, the retail settlements. I wouldn't
20    have presumed anything. If someone had sat down
21    and said, "What is going on with this fuel
22    adjustment beyond 2005," I would have said, "You
23    know, I really need to find out what the fuel
24    supply people and the rate supply people are

Page 338

1     thinking, and we're going to have to talk about
2     this." I don't -- I didn't intend to presume
3     anything if it wasn't down in writing.
4 Q.  Did you tell them that the same terms applied
5     for the added four years in the contract?
6 A.  No.
7 Q.  You didn't say that?
8 A.  Well, I don't recall any specific discussions,
9     but I wouldn't have said that.
10 Q. Did you tell them the added four years were the
11    same numbers as the NEES contract that run
12    through 2009?
13 A. I couldn't have possibly said that because -- I
14    mean it's just not the way I did business. It's
15    still subject to PUC approval, and they had no
16    obligation to approve the NEES contract. They
17    change numbers -- well, they were known to
18    change numbers. There's no guarantee because
19    they agreed on a set of NEES numbers that they
20    were going to agree on that same set of numbers
21    for us. So had the subject come up, I would
22    have couched it that way. I would have said,
23    "Anything is subject to PUC approval."
24 Q. Do you think when you're negotiating a contract

Page 339

1     that has two price components and that you
2     extend the term for an added four years, you
3     have some obligation to tell them you think that
4     one of the two price components might not extend
5     for the added four years?
6       MR. O'ROURKE: Objection.
7 A.  I think they have the obligation to ask. The
8     information was all out there. It's their job
9     to look out for their interests. We didn't -- I
10    wouldn't have deliberately tried to mask it from
11    them. I wouldn't have made a point of not
12    saying it. If it didn't come up, it's possible
13    it just didn't come up. It may not have been on
14    anybody's radar screen.
15 Q. My question is, do you think you had some
16    obligation to raise with them the fact that half
17    the price component might not apply for the
18    added four years you requested be added to the
19    contract?
20      MR. O'ROURKE: Objection.
21 A. I think I had an obligation to provide them the
22    information they asked for. You know, I can't
23    think of what's important to them. They've got
24    to really represent their interests. We didn't

Page 340

1     try to hide anything, but the information was
2     all out there. The fact that there was no --
3     there was a standard offer wholesale price
4     beyond 2005 but no fuel index beyond 2005, it
5     was question marks in the agreement, and no
6     filing had been made, I really think it's up to
7     them to look out for their interests, but if
8     they had asked me the question, I would have
9     answered it as honestly and as completely as I
10    could.
11 Q. Your understanding when you signed the
12    contract -- start over. Your understanding when
13    you extended the term to 2009 was that you might
14    not apply for a fuel adjustment for the last
15    four years but you decided not to tell them?
16      MR. O'ROURKE: Objection.
17 A. I'm saying it wasn't on the radar screen and
18    they didn't ask.
19 Q. Can you think of a reason why EUA wouldn't have
20    applied for a fuel adjustment for the last four
21    years of the contract?
22      MR. O'ROURKE: Objection.
23 A. You know, I don't know of any specific reasons.
24    I can think of reasons possibly why. There may

6 (Pages 337 to 340)

Page 365

1 A. Page 11 -- this is Exhibit 1?
2 Q. Exhibit 1.
3 A. Okay.
4 Q. Article 13.
5 A. Okay. I see it.
6 Q. So your understanding -- when you signed this
7    contract, your understanding was that EUA's
8    obligations with respect to the filing of
9    tariffs were whatever was dictated by the law
10   governing this contract?
11 A. I would say so.
12 Q. Okay. Beyond that, you didn't have an
13   understanding specifically as to what EUA's
14   obligations were with respect to filing a fuel
15   adjustment from 2005 to '09?
16      MR. O'ROURKE: Objection.
17 A. The obligations are whatever were in here.
18 Q. As dictated by the applicable law?
19 A. Sure.
20 Q. What I'm saying is beyond the language and the
21   law, you have a specific understanding as
22   to what your obligations were for filing a fuel
23   index from 2005 to '09 beyond what the law
24   provided?

Page 366

1      MR. O'ROURKE: Objection.
2 A. If I can rephrase this, I think you're asking me
3    did I sign this with the intent that EUA was
4    obligating itself or whoever was administering
5    this contract was obligated to file a fuel index
6    in 2005 and beyond?
7 Q. No, I'm not asking you that.
8 A. Okay. What are you asking? I'm not
9    understanding.
10 Q. I'm simply asking you that other than -- I've
11   asked you what you thought your obligation was
12   with respect to filing a fuel index from 2005 to
13   '09. I think what you've told me is you didn't
14   know other than what was the -- the language in
15   the contract and what was required by law.
16 A. That's right.
17 Q. Okay. And what I'm saying is so you didn't --
18   beyond the language of the contract and the
19   applicable law, you didn't have a specific
20   understanding beyond that as to what you had
21   agreed to do with respect to the fuel index from
22   2005 to '09?
23      MR. O'ROURKE: Objection.
24 A. I don't recall particularly thinking about it,

Page 367

1    but the way contracts were administered, the
2    obligations of the parties are expressed in the
3    contract. So if TransCanada was seeking to
4    ensure that we had that responsibility, those
5    words would have gone into the contract.
6 Q. I'm not asking what you think about what law
7    requires. I'm asking you --
8 A. Yeah.
9 Q. The question is, beyond the language of the
10   contract and your understanding of whatever that
11   meant in the law, did you have a specific
12   understanding as to what EUA was required to do
13   with respect to the fuel index from 2005 to '09?
14 A. I'm actually having a little trouble
15   understanding this question.
16 Q. I think you've answered it. I'm just trying to
17   get you to put it --
18      MR. O'ROURKE: In the way he wants you
19   to put it.
20      MR. WINSTON: No.
21 Q. Well, in a way that's clear. Is it true that
22   what you're saying is your understanding as to
23   EUA's obligations to file a fuel index from 2005
24   to '09 are defined simply by the language of the

Page 368

1    contract and the applicable law?
2 A. Yes.
3 Q. Okay. The -- were you involved -- where was
4    your office when you negotiated this contract?
5 A. West Bridgewater.
6 Q. Did you have an office anywhere else?
7 A. No.
8 Q. Was there an EUA office in Boston?
9 A. EUA had an office in Boston, yes.
10 Q. Okay. By the way, I think you've testified that
11   you don't recall discussing with anyone from
12   Grid after you left whether or not the fuel
13   index ran -- before this dispute arose, it is
14   still accurate, is it not, that you don't recall
15   any discussions after you left EUA as to the
16   length of the fuel index in the EUA zone?
17 A. I can do better than that. There were no
18   discussions. I can be confident there were no
19   discussions with National Grid.
20 Q. So -- well, let's -- so while you were at EUA
21   and after you left EUA, including during the
22   merger, there were no discussions with National
23   Grid or any of its representatives at any time
24   as to the length of the fuel index in the EUA

13 (Pages 365 to 368)

Esquire Deposition Services
1-866-619-3925

Page 369

1   zone?
2 A.  Correct.
3 Q.  Is it fair to say, consistent with your
4     testimony today, that had you been asked, you
5     would have said, "I don't know"?
6 A.  Yes, it is.
7 Q.  Is your testimony today, in fact, as to the
8     question of whether Narragansett as successor to
9     EUA has an obligation to file a fuel index after
10    2005 in the EUA zone "I don't know"?
11 A.  Ask that again, please.
12 Q.  Do you know -- I understand you're not a lawyer.
13    Do you know whether or not Narragansett as EUA's
14    predecessor has an obligation to file for a fuel
15    index in the EUA zone after 2005 under this
16    contract?
17        MR. O'ROURKE:  Objection.
18 A.  Do you mean predecessor?  You said predecessor.
19 Q.  It's no longer EUA.  You understand Narragansett
20    stepped into EUA's shoes.  So I'm switching the
21    names.
22 A.  Okay.  I would testify that I do not know what
23    National -- what Narragansett's obligation is
24    under this contract.

Page 370

1 Q.  Okay.  With respect to filing a fuel index from
2     2005 to '09?
3 A.  With respect to filing a fuel index from 2005
4     and beyond.
5 Q.  When you negotiated this contract with
6     TransCanada, where were your meetings with them?
7 A.  They were usually -- the ones I recall were in
8     our Boston office.
9 Q.  Did you meet with them anywhere outside of
10    Massachusetts?
11 A.  No.
12 Q.  Did you do any negotiating of this contract in
13    Rhode Island?
14 A.  I don't recall any face-to-face meetings in
15    Rhode Island.
16 Q.  Did you have an office in Rhode Island?
17 A.  No, I didn't personally have an office in Rhode
18    Island.
19 Q.  Did you ever do business in Rhode Island?
20 A.  I did.  It was unlikely I did any business on
21    this in Rhode Island, with the exception of any
22    PUC hearings on it.
23 Q.  PUC hearings would have been in Rhode Island,
24    obviously?

Page 371

1 A.  Right.
2 Q.  Who drafted the company's standard offer service
3     tariffs when you were there?
4 A.  I don't know.
5 Q.  Is it Dennis St. Pierre and Bonner?
6 A.  Well, I doubt he personally drafted them, but --
7     you know, it could have either been someone in
8     his department or someone in the -- no, I would
9     say someone in Dennis St. Pierre's office
10    drafted the tariffs, to the best of my
11    knowledge.  I could be wrong about it.
12 Q.  Where did the rate department do its -- where
13    was their office?
14 A.  The rate department's office was in West
15    Bridgewater.
16 Q.  To your knowledge, where did they do the work in
17    preparing the rate filings?
18 A.  West Bridgewater, best of my knowledge.
19 Q.  Would they have also drafted the rate filings
20    for Rhode Island in their offices in
21    Massachusetts?
22 A.  Yes, they would.
23 Q.  What was your role in the -- you mentioned
24    before you weren't involved subsequent to

Page 372

1     TransCanada in negotiating with the wholesale
2     standard offer service contracts with
3     Constellation and NRG?
4 A.  Correct.
5 Q.  Do you know why that was?  Or why was that?
6 A.  Apparently there was no need for me to be
7     involved in it.  I don't remember anything
8     beyond that.
9 Q.  Okay.  What did you do -- after you signed the
10    TransCanada contract, did your role change?
11 A.  My role changed at some point.  You know, I was
12    never the definitive expert on power supply
13    contracts.  So to the extent I was involved, I
14    was involved as the person coordinating the
15    restructuring effort.  I think once the
16    restructuring effort was matured, I was on to
17    other things.  My role did change at some point.
18    I can't recall exactly when.
19 Q.  Did you -- what was your role during the merger?
20 A.  During the merger, I was focused on supporting
21    the development of the merger agreement and
22    supporting the various state and federal
23    approvals.
24 Q.  Did you participate in the rate consolidation

14 (Pages 369 to 372)

Page 377

1  from 2005 to '09?
2 A.  That's correct.
3 Q.  And your understanding is that because to that
4     point the bid had been focused to the 2009 time
5     period?
6        MR. O'ROURKE:  Objection.
7 Q.  Or why did you understand that to be?
8 A.  Because it had not come up as a topic of
9     discussion with the regulators. Obviously, we
10    hadn't discussed it in the settlement, and I
11    wasn't aware of any discussion on that
12    particular topic beyond that.
13 Q.  You weren't aware of an agreement that EUA
14    wouldn't get a fuel index?
15 A.  I wasn't aware of any discussion one way or the
16    other.
17 Q.  Either with the regulators or internally at EUA?
18 A.  That's correct.
19 Q.  And you weren't aware of any filing with any
20    regulators that would have precluded EUA from
21    asking for a fuel index after 2004?
22 A.  I was not aware of anything that precluded our
23    asking for that.
24       MR. WINSTON:  I'm done.

Page 378

1        MR. O'ROURKE:  Okay.  So are we.
2        MR. WINSTON:  Mr. Hirsh, thanks for
3     coming in.
4        THE VIDEOGRAPHER:  The time is
5     5:35 p.m. This is the end of Tape Number 2.
6     This will conclude the videotaped deposition of
7     Mr. Michael Hirsh.
8        (Deposition concluded at 5:35 p.m.)

Page 379

1        C E R T I F I C A T E
2     I, MICHAEL J. HIRSH, do hereby certify that I
3  have read the foregoing transcript of my
4  testimony, given on February 15, 2007, and I
5  further certify that said transcript is a true
6  and accurate record of said testimony (with the
7  exception of the corrections listed below):
8  Page    Line      Correction
9
10
11
12
13
14
15
16
17  Dated at        , this
18  day of           , 2007.
19
        MICHAEL J. HIRSH
20
    SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY
21
22
23
    slb
24

Page 380

1        CERTIFICATE
2
3  COMMONWEALTH OF MASSACHUSETTS
4  SUFFOLK, SS
5     I, Sandra L. Bray, Registered Diplomate
6  Reporter and Notary Public in and for the
7  Commonwealth of Massachusetts, do hereby
8  certify:
9     That MICHAEL J. HIRSH, the witness whose
10 deposition is hereinbefore set forth, was duly
11 sworn by me and that such deposition is a true
12 record of my stenotype notes taken in the
13 foregoing matter, to the best of my knowledge,
14 skill and ability.
15    IN WITNESS WHEREOF, I have hereunto set
16 my hand this 21st day of February, 2007.
17
18 _____
       Sandra L. Bray, RDR
19     Registered Diplomate Reporter
20
21
22
23
24

16 (Pages 377 to 380)

# Kirby

Page 1

Vol. 1, Pgs. 1-128

Exhibits 130-131

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING, LTD.

       Plaintiff

v.                      CA No. 05-40076 FDS

NARRAGANSETT ELECTRIC CO.,

       Defendant

- - - - - - - - - - - - - - - - -

DEPOSITION of KEVIN KIRBY

Tuesday, March 20, 2007 - 10:01 a.m.

Bowditch & Dewey, LLP

311 Main Street

Worcester, Massachusetts

Reporter:  Jill K. Ruggieri, RMR/CRR

0637db2c-d000-4332-9577-e39964b5dd5a

| Page 2 |
|---|
| 1  APPEARANCES: |
| 2 |
| 3  Choate Hall & Stewart LLP |
| 4       Daniel C. Winston, Esq. |
| 5       Two International Place |
| 6       Boston, Massachusetts 02110 |
| 7       (617) 248-5000  Fax: (617) 248-4000 |
| 8       on behalf of the plaintiff |
| 9 |
| 10  Bowditch & Dewey, LLP |
| 11       Vincent F. O'Rourke, Jr., Esq. |
| 12       311 Main Street |
| 13       Worcester, Massachusetts 01615 |
| 14       (508) 926-3424  Fax: (508) 929-3035 |
| 15       on behalf of the Defendant |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 4 |
|---|
| 1       MR. WINSTON:  Motions to strike and |
| 2   objections except as to form both reserved |
| 3   until trial, waive notarization. |
| 4       Does Mr. Kirby wish to read and sign? |
| 5   I don't know. |
| 6       MR. O'ROURKE:  Do you think you'll |
| 7   want to take a look at this to see if |
| 8   there's any errors or inaccuracies? |
| 9       THE WITNESS:  I don't care about |
| 10  that. |
| 11      MR. O'ROURKE:  He'll reserve the |
| 12  right. |
| 13      THE WITNESS:  I'll reserve the right. |
| 14      MR. WINSTON:  Okay, that's fine. |
| 15  BY MR. WINSTON: |
| 16  Q   Mr. Kirby, where do you live? |
| 17  A   I live in Palmer, Massachusetts. |
| 18  Q   Have you been deposed before? |
| 19  A   I've been deposed one other time. |
| 20  Q   Okay. |
| 21      So you know I'll be asking you a |
| 22  series of questions. |
| 23      For the ease of the court reporter, |
| 24  and just so there's a clear record, it's |

| Page 3 |
|---|
| 1        S T I P U L A T I O N S |
| 2       It was stipulated and agreed by and |
| 3   between counsel for the respective parties |
| 4   that the witness will read and sign the |
| 5   deposition under the pains and penalties of |
| 6   perjury within 30 days of receipt of the |
| 7   transcript. |
| 8       It was further stipulated and agreed |
| 9   that all objections, except as to the form |
| 10  of the question, including motions to |
| 11  strike, shall be reserved until the time of |
| 12  trial. |
| 13 |
| 14      KEVIN KIRBY, a witness having been |
| 15  duly sworn, on oath deposes and says as |
| 16  follows: |
| 17 |
| 18       EXAMINATION |
| 19  BY MR. WINSTON: |
| 20  Q   Good morning. |
| 21      Could you -- well, could you state |
| 22  your name for the record and just spell it. |
| 23  A   Kevin Kirby, K-E-V-I-N, K-I-R-B-Y. |
| 24  Q   Okay. |

| Page 5 |
|---|
| 1   important that we try not to talk over each |
| 2   other, so I'll finish my question, you can |
| 3   answer. |
| 4       If you don't understand a question, |
| 5   let me know; I'll rephrase it. |
| 6       Is Mr. O'Rourke representing you here |
| 7   today? |
| 8   A   Yes. |
| 9   Q   Okay. |
| 10      If Mr. O'Rourke objects, for the most |
| 11  part, his objections are as to the form of |
| 12  the question.  Those would be baseless, |
| 13  because my questions are all perfect, but |
| 14  he's allowed to put them on the record. |
| 15      (Laughter.) |
| 16  Q   You can go ahead and answer. |
| 17      The one area which I don't want to |
| 18  know about is your conversations with |
| 19  Mr. O'Rourke. |
| 20  A   Okay. |
| 21  Q   And if I erroneously ask about something |
| 22  like that, he'll rightfully instruct you not |
| 23  to answer. |
| 24      If you want to take a break, let me |

2 (Pages 2 to 5)

0637db2c-d000-4332-9577-e39964b5dd5a

Page 6

1  know.
2        Could you just briefly run through
3  your education maybe starting with the year
4  you graduated from high school forward?
5  A  Okay.
6        I graduated from Dedham High School
7  in 1968, and I graduated from Northeastern
8  University in 1973, bachelor's in electrical
9  engineering, power systems.
10  Q  Any other education?
11  A  No.
12  Q  And briefly, unless you worked in the energy
13  profession in college, in which case you can
14  give me those, your jobs post college.
15  A  Okay.
16        Post college, I started with Stone &
17  Webster, actually did some co-op work with
18  them before graduating. I worked at Stone &
19  Webster in nuclear plant design until
20  approximately 1979, 1980.
21        Then I went to work for United
22  Engineers, again working in power plant
23  design.
24        I was there one year, then was

Page 7

1  recruited to an engineering firm to do -- to
2  start up an electrical group for them. That
3  was Fern Engineering, F-E-R-N, Engineering,
4  and I was there for four years in project
5  work for independent power production,
6  municipal electric type work.
7        And then I did consulting on my own
8  for two years following that, so that would
9  be until about 1986, at which time I took a
10  position at Eastern Utilities Associates,
11  and I worked there until approximately --
12  well, until 2000.
13  Q  Okay.
14  A  And then after Eastern Utilities, I went to
15  work for ISO New England, and that's my
16  current employment.
17  Q  Okay.
18        What do you do at ISO New England?
19  A  I am the vice president of market
20  operations.
21  Q  Just briefly, what does that mean, what are
22  your duties?
23  A  The departments that report to me, we have
24  market administration, which -- which

Page 8

1  administers the day-ahead market, the
2  financial transmission rate market in the
3  transmission area, verify real-time pricing
4  and spot market.
5        Another group does all of the market
6  settlements for both -- for all of the
7  markets of the, you know, day-ahead,
8  real-time, monthly, reserves, capacity
9  markets, et cetera.
10  Q  Okay.
11  A  I have another group that does market
12  training and contracts for reliability
13  purposes.
14        And then I have another group that
15  does the market support system, so that's
16  the call center, if people have issues,
17  registration and some of the outreach
18  programs, basically you call the technical
19  support for the participants that are in the
20  marketplace.
21  Q  Okay.
22        You said you consulted for two years.
23  What was the nature of that consulting?
24  A  Primarily, it was industrial distribution

Page 9

1  systems, you know, some on-site generation
2  work --
3  Q  Okay.
4  A  -- primarily into the -- with oil companies.
5  Hess Oil was the major client, and I also
6  did some consulting work for developers who
7  were interested in doing independent power
8  work.
9  Q  Okay.
10        And in your job since leaving EUA, do
11  you have business interactions with anybody
12  from TransCanada at all?
13  A  Well, TransCanada is a market participant so
14  they'll have interactions with the company.
15        Generally speaking -- I can't recall
16  specific interaction with me personally, but
17  certainly with -- I'm sure they've had some
18  cases of support questions or they may have
19  some people do the training.
20  Q  Okay.
21  A  Any transactions that would go would be
22  cleared through our settlement system.
23  Q  And focusing just on you personally, because
24  for National Grid, I know they have

3 (Pages 6 to 9)

0637db2c-d000-4332-9577-e39964b5dd5a

Page 74

1    outside of certain boundaries.
2  Q   Okay.
3        Were you involved in the discussions
4    at the time that this filing was made in
5    November as to what EUA intended with
6    respect to the standard offer service
7    pricing for the 2005 to 2009 period?
8  A   No, I don't recall -- I -- any discussions
9    along -- for this particular solicitation.
10 Q   Okay.
11       Are you aware of whether EUA had a
12   plan at that time as to what the pricing
13   would be for the standard offer service for
14   the 2005 to 2009 time period?
15 A   No.
16 Q   If EUA had such a plan, who from your
17   understanding would have been involved with
18   discussing and developing that?
19 A   For the retail pricing?  It would have gone
20   through the -- it would have been
21   coordinated through the rate department.
22 Q   What individuals in the rate department?
23 A   Dennis St. Pierre -- it would have been
24   under his general direction.  He would have

Page 75

1    assigned it to people within his group,
2    but...
3  Q   Was Mike Hirsh involved in setting the terms
4    for the standard offer service bids?
5  A   I don't know.  You'd have to ask Mike.
6  Q   Okay.
7        You stated that -- well, following a
8    solicitation, do you recall there ever being
9    discussions at EUA about the pricing
10   structure that EUA planned, including for a
11   fuel index, for the 2005 to 2009 time
12   period?
13       MR. O'ROURKE:  Objection.
14 A   No.
15 Q   Were you aware of any affirmative decisions
16   at EUA one way or the other as to what fuel
17   index, if any, would apply for the 2005 to
18   2009 time period, when that time came?
19 A   For -- for Montaup?  No, I don't think we --
20   no.
21 Q   Were you aware of any decision at EUA at
22   that time back in 1997-98 never to seek a
23   fuel adjustment after 2005, regardless of
24   market prices?

Page 76

1  A   No, I mean, '98 we had divested, so we had
2    gotten rid of -- by the end of '98.
3        '97 our objective was still to divest
4    and divest of the obligation, and we had --
5    the end of '98.
6  Q   Right.
7        But in -- but -- well, so let's take
8    it in pieces.
9        Before the divestiture was completed,
10   meaning --
11       You recall that by the end of 1998,
12   Montaup had sold off its generation assets?
13 A   Right.
14       At the end of 1998, we had sold off
15   our generation assets and they came with the
16   backstop obligation.
17 Q   Okay.
18       Prior to the completion of that asset
19   divestiture, are you aware of any decisions
20   having been made at EUA never to seek a fuel
21   adjustment after 2004?
22 A   I don't recall if the conversation came up.
23 Q   Do you recall any discussions with anyone
24   internal to EUA about never seeking a fuel

Page 77

1    adjustment after 2004?
2  A   No, I don't recall any conversation like
3    that.
4  Q   I also assume after the asset divestitures
5    were completed there were no discussions
6    whether to seek a fuel adjustment after
7    2004?
8  A   Montaup didn't have, you know, any reason
9    to.  Montaup had no obligations left.
10   Just -- we didn't have any prices to adjust.
11 Q   Okay.
12       So after Montaup divested its assets,
13   there was no interest at EUA to seek a fuel
14   adjustment either way after 2005?
15 A   We had -- all the contracts were done.
16 Q   Were there any discussions about what
17   Montaup would have done with respect to the
18   fuel adjustment had it been unable to divest
19   the assets?
20 A   No.
21 Q   Did you have an understanding at the time as
22   to what Montaup would have done for the fuel
23   adjustment after 2005 had it been unable to
24   divest the assets?

20  (Pages 74 to 77)

0637db2c-d000-4332-9577-e39964b5dd5a

Page 82

1   same way that it had through 2004?
2  A   Could have sought that.
3  Q   Okay.
4      In other words, that decision was
5   undetermined as of mid 1998?
6  A   That's correct. We couldn't -- couldn't
7   make that determination until we knew
8   what -- how -- what we needed to manage
9   against.
10  Q   Okay.
11      And it's fair to say that after the
12   asset divestitures were completed in 1998,
13   EUA decided -- well, at that point decided
14   that it didn't need a fuel adjustment?
15      What did it decide?
16  A   It wouldn't have needed to make a decision.
17   It would have been kind of a nondecision.
18   The asset divestiture, as I mentioned, is we
19   provided -- here's your price obligations
20   for the purchase -- you know, the standard
21   offer obligation.
22      They've already -- the bidders have
23   already made their risk adjustments to that
24   schedule in their offer prices to us for the

Page 83

1   assets of the purchased power contracts.
2  Q   Mm-hmm.
3  A   So you've had both -- you know, the --
4   you've -- you know, presumably have resolved
5   that amongst the parties by either, you
6   know, the -- you know, they've either --
7   they've adjusted what they're willing to pay
8   for the assets based on their view of the
9   forward market and that obligation.
10  Q   Okay.
11  A   So...
12  Q   Do you know -- well, okay.
13      Do you have any information as to
14   what TransCanada understood its deal was
15   with EUA as to the fuel adjustment?
16  A   I had no discussions with TransCanada on
17   that, so I don't know what they were
18   thinking.
19  Q   Okay.
20      And do you have any knowledge as to
21   what anybody from EUA said to TransCanada as
22   to the applicability of a fuel adjustment
23   from 2005 to 2009?
24  A   I was not in those conversations, no.

Page 84

1  Q   Is -- prior to restructuring, Montaup had a
2   fuel adjustment in its FERC tariff, correct?
3  A   FERC tariff going to -- right, the
4   wholesale -- wholesale, retail, to our
5   affiliate companies, yes.
6  Q   Okay.
7      And did Montaup also have power
8   purchase contracts with other generators?
9  A   With other generators and other utilities,
10   yes.
11  Q   Okay.
12      Were there fuel adjustments in those
13   contracts commonly?
14  A   Those were cost-of-service-based contracts,
15   generally speaking, except for the QF
16   facilities.
17      The traditional cost-of-service were
18   the seller had to file the rate at FERC, you
19   know, if we were the purchaser; and
20   generally speaking, those were -- if they
21   were utility-based contracts, they were
22   cost-of-service so they could have a rate of
23   return on their investment and a
24   pass-through on their fuel.

Page 85

1      So they neither took losses nor made
2   profits.
3      In the purchased power agreements we
4   made with qualifying facilities, those
5   typically would be fixed price schedules.
6      There would be no fuel adjustment
7   clauses in those. Those were, you know,
8   things that we bought -- you know, purchases
9   we made from independent power producers or
10   qualifying facilities.
11      Some -- you know, you could negotiate
12   those either way. Some of them had a
13   ratchet clause in them that would actually
14   ratchet down or up based on conditions, but
15   not necessarily tied to fuel.
16  Q   Okay.
17      Was the -- was the provision of --
18   okay.
19      Was the issue of whether -- okay.
20      So there are different types of fuel
21   adjustments. Some are cost of service on
22   the fuel --
23      When I talk about a fuel adjustment,
24   I'm talking about including all of those,

22  (Pages 82 to 85)

0637db2c-d000-4332-9577-e39964b5dd5a

# Pourbaix

Page 1

```
 1                                    Vol. 1, Pgs. 1-280

 2                                    Exhibits 194-219

 3

 4            UNITED STATES DISTRICT COURT

 5            DISTRICT OF MASSACHUSETTS

 6

 7 - - - - - - - - - - - - - - - - - - -

 8 TRANSCANADA POWER MARKETING, LTD.

 9            Plaintiff

10 v.                                  CA No. 05-40076 FDS

11 NARRAGANSETT ELECTRIC CO.,

12            Defendant

13 - - - - - - - - - - - - - - - - - - -

14

15

16

17        DEPOSITION of ALEX POURBAIX

18     Tuesday, April 17, 2007 - 9:17 a.m.

19          Bowditch & Dewey, LLP

20          One International Place

21          Boston, Massachusetts

22

23     Reporter:  Jill K. Ruggieri, RMR/CRR

24
```

Page 2

1 APPEARANCES:
2
3 Choate Hall & Stewart LLP
4     Daniel C. Winston, Esq.
5     Two International Place
6     Boston, Massachusetts 02110
7     (617) 248-5000 Fax: (617) 248-4000
8     on behalf of the plaintiff
9
10 Bowditch & Dewey, LLP
11     Vincent F. O'Rourke, Jr., Esq.
12     311 Main Street
13     Worcester, Massachusetts 01615
14     (508) 926-3424 Fax: (508) 929-3035
15     on behalf of the Defendant
16
17 Also present: Jody D. M. Johnson, Esq.
18         TransCanada Power Marketing, Ltd.
19
20
21
22
23
24

Page 3

1         PROCEEDINGS
2
3         ALEX POURBAIX, a witness having been
4     duly sworn, on oath deposes and says as
5     follows:
6         EXAMINATION
7 BY MR. O'ROURKE:
8 Q   Mr. Pourbaix, could you please state your
9     full name and spell it for the reporter.
10 A   Sure. It's Alexander John Pourbaix,
11     A-L-E-X-A-N-D-E-R, J-O-H-N, P-O-U-R-B-A-I-X.
12 Q   And we met on the way in, but my name is Vin
13     O'Rourke, and I represent Narragansett in
14     this litigation.
15         Have you been deposed before?
16 A   Years and years ago.
17 Q   Briefly, I'm going to ask you a series of
18     questions about this litigation that
19     TransCanada has brought against
20     Narragansett.
21         If you have any questions or don't
22     understand my questions, feel free to stop
23     me, and I'll rephrase them.
24         If you have a problem with a

Page 4

1     question, you have a right to talk to your
2     lawyer, but I request that you not stop to
3     talk to your lawyer in the middle of a
4     question.
5         MR. O'ROURKE:  We're going to reserve
6     all objections except objections as to form
7     and motions to strike until the time of
8     trial?
9         MR. WINSTON:  Yes.
10        MR. O'ROURKE:  Thank you.
11        MR. WINSTON:  Waive notarization, and
12     we'll read and sign.
13        MR. O'ROURKE:  That's great.
14 BY MR. O'ROURKE:
15 Q   How old are you, sir?
16 A   Forty-one.
17 Q   And could you please describe your education
18     since high school?
19 A   Sure.
20        I graduated with a bachelor's of
21     economics in -- I'm going to say that was
22     1986.
23        In 1989, I graduated with an LLB,
24     which is a Canadian law degree.

Page 5

1         Both those degrees were at the
2     University of Alberta in Edmonton, Alberta.
3         Sorry, that was my education.
4 Q   Okay.  That's fine.
5 A   Okay.
6 Q   Could you tell me where you presently
7     reside?
8 A   In Calgary, Alberta.
9 Q   And how long have you resided there?
10 A   Since 1991.
11 Q   What year did you get your LLB?
12 A   1989.
13 Q   And could you please give me your employment
14     background?
15 A   Sure.
16        I practiced -- when I graduated from
17     law school, I practiced corporate commercial
18     law in Edmonton for a firm called Bryan &
19     Company, B-R-Y-A-N, & Company.
20        In 1991, I was offered a job with a
21     company called Northridge Canada, Inc.
22     Northridge Canada, Inc., was an energy
23     trading and marketing company, and I worked
24     with them as a lawyer until 1995, at which

2 (Pages 2 to 5)

Page 6

1  time we sold the company to TransCanada
2  PipeLines at the time.
3      And at that time I became associate
4  general counsel of TransCanada, and I
5  remained in that position for a relatively
6  short time, I'm going to say it was about
7  eight months, after which time I moved over
8  into a commercial role in the power group,
9  in the energy segment of TransCanada, and I
10  was in charge of business development.
11      And I would have -- that job
12  continued. I -- from 1996 until I'm going
13  to say 2001, I just maintained positions of
14  increasing responsibility in the power group
15  in TransCanada.
16      In around 2001, I was made the head
17  of the power group and also became an
18  executive vice president of TransCanada
19  Corporation.
20      That remained the same until June of
21  last year, at which time I became president
22  of all of the unregulated businesses of
23  TransCanada.
24 Q  What do those entail?

Page 7

1 A  The power business, which would be power
2  generation, power marketing, power trading,
3  construction of power plants, operation of
4  power plants, gas storage, gas trading and
5  marketing, to the extent that we do that.
6      That's a relatively small component
7  of our business.
8      And then there's a number of much
9  smaller businesses, what I would call just
10  sort of orphan businesses in TransCanada
11  which I'm responsible for, none of which
12  really amount materially in terms of income
13  or cash flow.
14 Q  You say this was the unregulated business.
15      What is the regulated TransCanada?
16 A  TransCanada is split into two businesses.
17  The pipeline business, which is run by a
18  fellow named Russ Girling, who is the
19  president of the pipeline business, and then
20  I run the other half of the company, which
21  is the unregulated energy business, and I'm
22  the president of energy.
23 Q  What are the overall assets of TransCanada
24  Power if you put the two businesses

Page 8

1      together?
2 A  TransCanada, the entire corporation?
3 Q  Yes.
4 A  Sorry.
5      I would -- I would -- I think we
6  have a total value probably in the range of
7  $30 billion, and that would be split
8  probably in the range of 20 billion for the
9  pipeline business and 10 billion for the
10  energy business.
11 Q  When you say the energy business, is that
12  the --
13 A  The business I'm responsible for, yes.
14 Q  And how many employees does TransCanada
15  have?
16 A  Probably about I'm going to say in the range
17  of 32 to 3500.
18 Q  If I could bring you back to 1997, how many
19  employees did TransCanada have?
20 A  The entire entity?
21 Q  Yes.
22 A  It was actually a much bigger company at
23  that time in terms of employees.
24      It probably would have been in the

Page 9

1  range of 4 or 5,000.
2      Subsequent to 1997, we did a
3  significant divestiture. We sold our
4  international business, and that business --
5  that business had many hundreds of employees
6  but also assets around the globe, and we
7  sold that business and refocused on the
8  North American market, and that's our bigger
9  company, smaller number of employees today.
10 Q  What were your assets in 1997?
11 A  I'm going to say probably around 15 billion.
12 Q  And how did they break down between the
13  unregulated --
14 A  Oh, it was overwhelmingly pipeline assets.
15 Q  What were the assets of the unregulated
16  business at that time?
17 A  At that time we had a 40 percent interest in
18  Ocean State Power. We were in -- I can't
19  remember the exact date, but it -- at the
20  time of this issue that we're going to talk
21  about today, we were very close to acquiring
22  New England Electric's interest in Ocean
23  State Power, but, you know, depending on
24  when your time horizon is.

3 (Pages 6 to 9)

**Page 26**

1 that typically --
2 Generators -- when they're running,
3 they're running at a certain fixed level,
4 but the load is constantly varying.
5 And spinning reserve is an ability of
6 a unit, in my understanding, to respond to
7 those relatively small variations. And that
8 is a --
9 Once again, that's an available
10 product to the system operator, to respond
11 to the varying load.
12 Q It's a flexibility factor?
13 A Yes, yes.
14 Q Thank you.
15 Do you know if you still have the
16 record of this analysis that you made in
17 connection with making this bid?
18 A I saw in one of the -- I saw a summary of
19 the financial model is one of the documents
20 in this matter, and I don't know if beyond
21 that the actual financial model exists other
22 than in that summary form that was provided.
23 Q In connection with standard offer service,
24 part of what you had to do in connection

**Page 27**

1 with this bid at this point in time was
2 provide standard offer service, and what is
3 your understanding of what standard offer
4 service was?
5 A Under the Utility Restructuring Act, the
6 utilities had a backstop obligation to
7 supply power to those customers that did not
8 choose to go to a third-party supplier.
9 And the only way that the utilities
10 had of supplying that power was through
11 their assets, which typically -- typically
12 which they were divesting.
13 So they had this backstop obligation,
14 which then as they divested their
15 assets, they would then ask the party that
16 acquired those assets to assume some pro
17 rata share of that backstop obligation that
18 they had to the customers that remained on
19 their system.
20 Q And were you going to be required to assume
21 a portion of standard offer service in
22 connection with your bid on the EUA-OSP
23 contract?
24 A Subject to the success of EUA in their RFPs

**Page 28**

1 that they were -- they were out seeking
2 suppliers for that backstop obligation.
3 And to the extent that third-party
4 suppliers accepted that, we would have a
5 lower obligation.
6 Q You're speaking now in terms of what your
7 thinking was in September of 1997, is
8 that --
9 A In -- meaning at the exact time that --
10 Q Yes.
11 A I may not have been aware of that. I think
12 if I go back to the last page and I say, "If
13 TransCanada will be required to assume a
14 portion of EUA's standard offer obligations,
15 enter into short-term transitional power
16 contracts," blah, blah, blah, "we will
17 require due-diligence review on those
18 items."
19 So I think at this time, I was not --
20 we were aware of the standard offer service
21 obligation. We weren't exactly aware of how
22 EUA was intending to deal with it.
23 So that is why we had that section in
24 there. We wanted to sit down with them to

**Page 29**

1 understand.
2 Q I see.
3 Eventually, though, it became clear
4 EUA was looking for you to assume a standard
5 offer obligation?
6 A Yes.
7 Q In connection with that, did you perform an
8 analysis of the impact of the standard offer
9 service in connection with costs and your
10 bid?
11 A Yes.
12 Q And was that an analysis that was performed
13 by Reed for you?
14 A I think -- yes, I think that is part of what
15 the work Reed was doing for us.
16 Q If I could show you --
17 A Would you like this one back?
18 Q We probably ought to pile it up here. See
19 if we can keep our filing in better order
20 than usual.
21 (Discussion off the record.)
22 BY MR. O'ROURKE:
23 Q In connection with evaluating standard offer
24 service, you evaluated how many customers

8 (Pages 26 to 29)

Page 70

1 above all we delivered on the availability
2 and other requirements under the contract.
3        If we owned all the PPAs, then it
4 would allow us to be far more flexible in
5 terms --
6        With third parties that we might be
7 liable to, it would be foolish for us to
8 take an operational risk by significantly
9 reducing O&M because the penalties we may
10 end up paying if there was a bad outcome
11 would far outweigh any benefit we may have
12 achieved in terms of operating cost
13 reductions.
14        So this was very much focused on us
15 consolidating the -- consolidating OSP.
16 Q    Okay.
17        Now, the case we're here for today,
18 **TransCanada versus Narragansett, involves**
19 **prices paid between 2005 and 2009 and**
20 **whether they should be adjusted for a fuel**
21 **adder or fuel changes.**
22        **Was that an important issue you**
23 **considered in signing the contract in 1998?**
24 A    Yes.

Page 71

1 Q    **What did you do to evaluate the issue of**
2 **fuel cost changes in connection with your**
3 **analysis of this contract?**
4 A    During the -- almost the entire balance of
5 the negotiation process, it was absolutely
6 clear that -- it was only in the last two or
7 three days before the contract was signed
8 that this concept of the '05 to '09 was
9 added.
10        During the entire duration of the
11 negotiations prior to that, it was quite
12 explicit that the -- we were dealing with
13 the contract to 2004 and that the fuel
14 adjustment provision very explicitly related
15 to that.
16        So until the very end days of the
17 negotiation, this was not an issue at all.
18 Q    **And I guess my question was, what -- did it**
19 **do anything to evaluate the fuel cost**
20 **charges for the period 2005 to 2009?**
21 A    I don't know that there was a need to.
22        We had the enabling legislation, the
23 Utility Restructuring Act --
24 Q    **Yes.**

Page 72

1 A    -- that very explicitly stated that the
2 tariffs were to include fuel adjustment
3 provisions for significant fuel changes.
4        Our entire discussions throughout the
5 course of our discussion with EUA with every
6 document that EUA shared with us never put
7 at issue this -- the thought that the fuel
8 adjustment provision would end at some
9 interim period prior to the end of the
10 contract.
11        So it just was not something that
12 anybody put a lot of thought to, I think EUA
13 included.
14 Q    **I have other things we can talk to about**
15 **that, but the -- the materials that you saw**
16 **that dealt with the tariff through 2004 had**
17 **graduated payments for the fuel adder; isn't**
18 **that right?**
19        MR. WINSTON: Objection. You can
20 answer.
21 A    Graduated payments?
22 Q    **You would -- you would get a fuel -- I**
23 **should do it with documents rather than in**
24 **the abstract. I'll ask you that.**

Page 73

1 A    Okay.
2 Q    **The issue is, though, that you knew what the**
3 **fuel adder would be and when it would**
4 **trigger through 2004, correct?**
5        MR. WINSTON: Objection.
6 A    Are you talking about during the negotiation
7 period --
8 Q    **Yes, yes.**
9 A    -- or are you talking about the final
10 document that was signed?
11 Q    **During the negotiation period.**
12 A    The fuel adder was a formula rather than a
13 specific number. It depended on the future
14 price of oil and gas.
15 Q    **And it only triggered at certain prices,**
16 **correct?**
17 A    At certain prices of oil and gas.
18 Q    **And so during a certain portion, during a**
19 **period of time between the triggering**
20 **amounts, you would be at risk?**
21 A    Sir, I don't know that I follow your
22 question.
23 Q    **I think I'll have to do it with a document,**
24 **and I'll get to that later.**

19 (Pages 70 to 73)

Page 82

1 Q   Through 2004?

2 A   Which would have -- during that time period,

3      that was the time we were dealing with, yes.

4 Q   And your testimony is you don't recall

5      whether you had one for the period of 2005

6      to 2009, an analysis concerning the impact

7      of the fuel adder on the EUA contract with

8      TransCanada?

9          MR. WINSTON:  Objection.

10 A  It would have been that -- given that the

11     term and the trigger points were identical,

12     it -- I mean, I -- it is possible I had

13     regard to the NEES contract, but I do not

14     have an independent recollection of

15     commissioning specific analysis for the

16     addition of the '05 to '09 period.

17 Q  What do you base your assumption that the

18     NEES trigger points would have been

19     identical with EUA trigger points for that

20     period?

21 A  Mike Hirsh told me in our negotiations that

22     the deals were identical in terms of

23     pricing.

24 Q  When did Hirsh tell you that?

Page 83

1 A   In one of our last meetings before the

2      agreement was executed.

3 Q   Let's step back while we're on that.

4          What led to that discussion?

5 A   That's a very broad question.

6          (Laughter.)

7 Q   How did it come up that Mr. Hirsh told you

8      at that point that the NEES contract and the

9      EUA contract would be identical?

10 A  In the --

11         MR. WINSTON:  Objection.  You can

12     answer.

13         THE WITNESS:  Okay.

14 A  In the week prior to the execution of the

15     standard offer service agreement, there -- I

16     had travelled to Boston, and we were trying

17     to clear off a number of loose ends in order

18     for us to execute the agreement.

19         At one of our later meetings -- and

20     I'm not sure it would have been -- I think

21     the document -- was it executed --

22         I'm sorry, can I ask, was it executed

23     on a Tuesday?

24         MR. WINSTON:  I can't answer any

Page 84

1      questions.

2 A   Maybe you could refer me to --

3 Q   I can only refer you to a date of April 7,

4      1998.

5 A   And you don't know what day of the week that

6      was?

7 Q   Not as I sit here.

8 A   I'll give you my recollection.

9          In the week before -- my recollection

10     is that that date that the document was

11     executed was sometime around a Tuesday.

12         The week prior to that, I had

13     traveled to Boston to meet with Mike to

14     resolve -- the goal of which was to resolve

15     the outstanding issues to allow us to

16     execute the agreement.

17         At -- and I'm going to say it was

18     probably -- possibly as late as the Thursday

19     or Friday prior to the weekend, Hachey came

20     to me and for the first time mentioned that

21     they were going to need to extend the

22     standard offer service from 2004 to 2009.

23 Q  Okay.

24         And in connection with that, did you

Page 85

1      have any discussions concerning any aspects

2      of how the agreement would be interpreted in

3      the years 2004 to 2009?

4 A   Yes.

5 Q   And what were those discussions?

6 A   Well, obviously this was a pretty

7      significant change coming at this very late

8      date; and my recollection is that in my

9      discussion with Mike, I said "Why?" first.

10     "What is the rational for this change?"

11         He just -- my recollection is he

12     described it to me that they had gone out

13     for the RFP for alternate suppliers.  They

14     had received none.

15         And as a result, they were getting

16     concerned about their obligation, so they

17     wanted to extend it over the entire term.

18 Q  And did you have any discussions with him

19     concerning the fuel adder for the period

20     2004 to 2009?

21 A  I had discussions with him on the price we

22     were to be paid, and I said, How are we --

23     you know, what -- what is the pricing for

24     this period?

22 (Pages 82 to 85)

Page 86

1    And he said it is -- he was very
2 familiar with our deal we had done with
3 NEES, particularly with Narragansett in
4 Rhode Island; and he described it to me as
5 being identical in pricing terms to that of
6 the Narragansett deal, which we had
7 recently -- we were recently part of with
8 NEES.
9 Q    You say he was familiar with the
10 Narragansett deal.
11    How do you know he was familiar with
12 that deal?
13 A    Because he used it -- he referred to that
14 agreement on multiple occasions and the
15 similarities between our agreements.
16 Q    In those conversations, did Mr. Hirsh ever
17 say there will be a fuel adder through 2009?
18 A    My recollection is my question was more --
19 it was focused on pricing, not the two
20 components of pricing.
21    I said, "What is the pricing going to
22 be?" He said, "Exactly as it was in
23 Narragansett."
24 Q    So the answer to my question is that you do

Page 87

1 not recall that he ever specifically said
2 there will be a fuel adder for the period
3 2005 to 2009?
4 A    Correct.
5 Q    You had previously been -- I guess your
6 previous contract, was that a contract that
7 you had with Narragansett, that TransCanada
8 had with Narragansett?
9 A    It was a contract that I believe it was
10 USGen entered into and was generally
11 assigned to us when we acquired their
12 interests in Ocean State.
13 Q    When had that contract been assigned to you?
14 A    I can't recall the exact date.
15 Q    Was it prior to April 7, 199 --
16 A    The negotiations had been concluded.
17    I can't state explicitly if the
18 formal assignment date had occurred, but our
19 deal was done with New England or with USGen
20 at the time.
21 Q    Where did you have the meeting with Mike
22 Hirsh when he discussed the Narragansett
23 contract with you and said that the pricing
24 would be the same as the Narragansett

Page 88

1 contract?
2 A    My recollection was that it was at their
3 Boston office.
4    But I had a series of meetings with
5 Mike, at least one of which was in their
6 Boston office and at least one of which was
7 at their -- their office I think in West
8 Bridgeport [sic], and I --
9    My recollection is Boston, but I
10 could be wrong on that.
11 Q    And now I'm speaking about the meeting when
12 you and he discussed the extension from 2004
13 to 2009 --
14 A    Mm-hmm.
15 Q    -- and when he spoke to you concerning the
16 Narragansett deal, just so that we have a --
17 know what we're talking about.
18    Who else was present?
19 A    At the time, I think it was just he and I.
20 His -- he had a -- a right-hand man, Bob
21 Clarke, who might have been -- sometimes he
22 was there. Sometimes he was not there.
23 Q    And no one was present from your side?
24 A    I think our counsel was in Calgary at the

Page 89

1 time. I think he didn't make the trip. He
2 was just participating by phone.
3 Q    He was on -- your counsel was on the line at
4 the time of this?
5 A    Sorry, he -- when he participated in this
6 period, he was participating by phone. I
7 cannot recall if he was on the phone at that
8 time.
9 Q    Who was your counsel?
10 A    Sean McMaster.
11 Q    Do you recall what day of the week this was?
12 A    I want to say it was -- like it was towards
13 the end of week. I mean, as I said, I -- I
14 am -- my recollection is the agreement was
15 signed -- the 7th was a Tuesday, and this
16 was as late as Thursday or Friday, is my
17 recollection, that Mike came up with this
18 change.
19    It could have been Wednesday, but it
20 was -- it was the latter half of the week.
21 Q    When he came up with this change, did he
22 discuss it before he included it in the
23 draft or did he just give you a draft with
24 it or how did it come up?

23 (Pages 86 to 89)

Page 114

1  concept.
2      MR. O'ROURKE: Why don't we do it
3  now. This is fine.
4      (Discussion off the record.)
5      (Luncheon recess.)
6 BY MR. O'ROURKE:
7 Q  I just want to take you back to the
8      conversation you had with Mike Hirsh
9      sometime in the last few days before the
10      signing of the standard offer agreement.
11 A  Mm-hmm.
12 Q  As I understand it, your testimony is that
13      Mr. Hirsh told you that the EUA standard
14      offer agreement would be -- would model the
15      Narragansett-USGen agreement?
16 A  Mm-hmm.
17 Q  Did he specifically speak in terms of the
18      fuel adder?
19 A  No, no.
20      We were talking about the -- the only
21  issue I had was the pricing, because all the
22  other provisions were --
23      I mean, you were just extending the
24  contract. The issue was what was the

Page 115

1  pricing, and I took that as the entire
2  pricing clause, and that's --
3      I said, "What is the pricing?" He
4  said, "Identical to the Narragansett."
5 Q  Did you write any memo to the file after
6      having that discussion?
7 A  No, but I would have made that clear in my
8  discussions.
9 Q  Your discussions with who?
10 A  Just subsequently from that point. It was a
11  statement that was given to me, and it was a
12  statement that we were relying on.
13 Q  Did you ever advise Mr. Taylor of that
14      conversation?
15 A  I believe I did.
16 Q  At the time you advised him of that?
17 A  Yes.
18 Q  Did you ever tell Mr. Hachey about that
19      conversation?
20 A  I didn't have any discussions with
21  Mr. Hachey at that time.
22 Q  How about subsequently, other than in the
23      presence of counsel, have you ever told
24      Mr. Hachey about that conversation?

Page 116

1 A  No.
2      My discussions on the commercial
3  matters were primarily with counsel and with
4  Bill.
5 Q  Did you consider writing any confirmatory
6      letter with respect to that discussion that
7      you had with Mr. Hirsh?
8 A  Well, it -- to be honest, it seemed to be
9  the only sensible thing. We already had a
10  standard offer in Rhode Island that was
11  approved by the Rhode Island PUC in
12  Narragansett.
13      It seemed that that was the entirely
14  logical outcome, for the pricing to follow
15  that. So I didn't think it was a
16  contentious issue in any way.
17 Q  But the approved rates that you speak of
18      that RIPUC had approved had been for
19      Narragansett, correct?
20 A  Yes, but it was a standard offer, standard
21  to Rhode Island. It was intended -- I -- it
22  seemed it would be nonsensical to assume
23  that they would propose a different standard
24  offer for the same statement with the same

Page 117

1  ratepayers.
2 Q  Aren't those rates, particularly the fuel
3      adders, also tied to the costs of the
4      suppliers.
5 A  The fuel adder? The fuel adder was based on
6  the prices of natural gas and oil, not to
7  the type of generation that I'm aware of.
8 Q  And in terms of RIPUC's approving tariffs,
9      isn't there actions in approving tariffs
10      generally focused on the --
11      (Telephone interruption.)
12 A  That's not me -- oh, it is me. I apologize.
13      (Discussion off the record.)
14 BY MR. O'ROURKE:
15 Q  The point I was making -- and maybe it's not
16      one you agree with -- is isn't it true that
17      in approving a tariff, RIPUC makes its
18      decision based upon the company that's
19      submitting the tariff to it?
20      MR. WINSTON: Objection.
21 A  The -- I can't speak for how RIPUC arrives
22  at that decision. The enabling statute
23  makes it quite clear that the term of the
24  standard offer -- and it makes it clear that

30 (Pages 114 to 117)

Page 118

1   extraordinary fuel is to be provided for in
2   the tariff.
3       So I had no -- I mean, it -- it was
4   beyond my comprehension that there would be
5   a scenario where we -- the -- half the
6   pricing, the fixed price stays for the term
7   and then just for some inexplicable reason
8   the fuel adder just ceased to apply at some
9   time in the middle of that term.
10 Q   **At the time of this conversation, did you**
11   **and Mr. Taylor have that kind of discussion**
12   **that you just described to me in terms of**
13   **your reasoning?**
14 A   We were very concerned that we understood
15   what the pricing was, and I was comfortable
16   that the pricing was going to be
17   representative of the NEES pricing in Rhode
18   Island, and that corresponded with my
19   understanding.
20       I did not pursue it beyond that.
21 Q   **Did you give any thought to having it --**
22   **that confirmation specifically included in**
23   **the contract?**
24 A   I saw absolutely -- I mean, I couldn't -- I

Page 119

1   really didn't think there was an outcome
2   that could be different than that.
3       It wasn't front and center on my mind
4   that I would have that documented anywhere.
5 Q   **Isn't it true that prior to this discussion**
6   **with Mr. Hirsh, Mr. Taylor had been making**
7   **repeated efforts to find out what the tariff**
8   **would be?**
9 A   Yes.
10 Q   **And Mr. Taylor has testified that he was**
11   **frustrated that he couldn't do that?**
12 A   Mm-hmm.
13 Q   **And in light of that, wouldn't it have made**
14   **sense to tie it down more completely?**
15 A   Well, my recollection at the time was it was
16   not us who were anxious to get this deal
17   concluded. It was EUA who was anxious to
18   get this deal concluded.
19       And from my perspective, your
20   statement of Bill's concern is very correct.
21   He was exceedingly concerned about EUA's
22   ability to provide us with executed,
23   approved tariffs.
24       And that was why over time you saw

Page 120

1   the change in that section in the agreement,
2   that it moved to reference the settlement
3   agreements and then subsequently moved to
4   reference the infamous Section 8.3.
5       That was our -- those changes were
6   made in order to accommodate EUA, because
7   they weren't able to deliver to us executed,
8   approved tariffs.
9 Q   **But Mr. Taylor's concern was that he -- as I**
10   **understood it was you didn't know what**
11   **tariff EUA would be requesting?**
12       MR. WINSTON: Objection. You can
13   answer.
14 A   Sorry, we didn't know what tariff they would
15   be --
16 Q   **What tariff rates they would be seeking.**
17 A   No, that is not -- I --
18       I wasn't there when you were
19   obviously deposing Mr. Taylor.
20       From my perspective, we were very
21   anxious to see the tariffs. They had
22   provided us with interim tariffs, which were
23   less than any use whatsoever, because they
24   didn't even reference the standard offer;

Page 121

1   and we had repeated assurances from EUA that
2   they were preparing the filings.
3       They were going to file them, but
4   they weren't approved; and, hence, they
5   could not provide them to us.
6       But I don't -- I mean, are you
7   suggesting that Bill was saying we thought,
8   for example, the --
9       I don't know what you're suggesting.
10 Q   **What was your concern that led you to or led**
11   **Mr. Taylor to continually seek to see the**
12   **tariffs?**
13 A   Well, obviously the tariffs were what were
14   going to memorialize the standard offer
15   rates.
16 Q   **And as of the date of April 7, 1998, there**
17   **was no tariff, correct?**
18 A   Yes.
19 Q   **And so my question is, why, then, did you**
20   **not memorialize the tariff that you expected**
21   **EUA to file --**
22 A   Because --
23 Q   **-- as of that date?**
24 A   I don't even think they were sure what they

31 (Pages 118 to 121)

Page 182

1    standard offer service, so I don't know why
2    the trigger points would go beyond that.
3  Q   But, in fact, that's what it's going
4    through, is through 2004?
5  A   It appears to be, yes.
6  Q   Did you or anyone at TransCanada ever see a
7    document that had been prepared by EUA prior
8    to April of 1998 which had fuel triggers
9    going beyond 2004?
10 A   You're asking me now on behalf of
11   TransCanada?
12 Q   Both ways, you or anyone at TransCanada.
13   I'm trying to --
14 A   Mm-hmm.
15       Well, I, once again, go back to the
16   enabling legislation, the URA, which --
17 Q   I understand --
18 A   Yes.
19 Q   But just my question, did you or anyone see
20   a document in which EUA sought approval of a
21   fuel trigger or listed a fuel trigger amount
22   for any period of time after 2004?
23 A   Yes.
24 Q   And when was that?

Page 183

1  A   One of the -- I believe that was the
2    Eastern -- Eastern Edison standard offer
3    service tariff went -- was extended into
4    2005, as were the fuel triggers.
5  Q   For two months?
6  A   Into -- your question was beyond 2004?
7  Q   Correct.
8  A   Yes.
9  Q   And that's -- I'm just clarifying, for two
10   months in 2005?
11 A   Yes.
12 Q   And that was in the state of Massachusetts?
13 A   Mm-hmm.
14 Q   And did you ever see EUA submit a proposal
15   with a fuel adder after 2004 in the State of
16   Rhode Island prior to entering into a
17   contract with TransCanada?
18 A   That only could have occurred in the period
19   from approximately April 2nd or 3rd to
20   April 7th, because until April 2nd or 3rd,
21   we were only ever negotiating a deal that
22   went to 2004.
23       So that is a very compressed time for
24   anybody to see those kind of tariffs, so my

Page 184

1    answer is I don't recall.
2  Q   Well, the question is not just in connection
3    with your transaction, but do you have any
4    awareness that EUA had ever sought or
5    proposed to have a fuel adder after 2004 in
6    any document that it produced prior to
7    January -- excuse me, prior to April of
8    1998?
9  A   No, I -- once again, I go back to that was
10   much more Bill's area, and I was not
11   perusing EUA's filings before the Rhode
12   Island PUC during that time period.
13 Q   Was anyone from TransCanada doing so?
14 A   The entire sort of fabric that our deal was
15   premised on was always premised on fuel
16   triggers for the term of the standard offer
17   service.
18       When we changed -- when EUA was
19   unable to deliver to us filed, approved
20   tariffs for the standard offer service and
21   we defaulted to the settlement agreement
22   language, at that point we insisted on the
23   insertion of Section 8.3 in the settlement
24   language.

Page 185

1        And from our perspective at that
2    point in time, there was no further need to
3    be haunting the halls of the PUC, if you
4    will, because we believed we had the
5    protection and we had the certainty that
6    that pricing term was continuing until the
7    end of 2009.
8  Q   So to summarize, the answer is no, prior to
9    April of 1998, no one from TransCanada had
10   ever --
11 A   To my knowledge.
12 Q   -- sought to determine what fuel adjustment
13   factor EUA was submitting to the Rhode
14   Island Public Utility Commission in
15   connection with its fuel tariffs?
16 A   Sorry, could you read that back to me?
17       MR. WINSTON: Objection.
18 Q   I'll just rephrase it; it's probably easier.
19 A   Sure.
20       MR. O'ROURKE: Actually, probably if
21   you ask the question before last, it's the
22   question that I'm asking.
23 Q   But the question is, did you or anyone at
24   TransCanada make any effort to determine

47 (Pages 182 to 185)

Page 238

1 Q  Well, is there anything else you think
2    encompasses the agreement between
3    TransCanada and Blackstone, Eastern Edison
4    and Newport Electric with respect to their
5    provision of wholesale standard offer
6    service?
7        MR. WINSTON: Objection.
8 A  We certainly had an anticipation that the
9    tariff filed would include price adjustment
10   triggers, fuel adjustment triggers until the
11   term the contract ended in 2009.
12 Q  And are there any other items that don't
13   appear in this agreement that you think are
14   a part and parcel of the agreement?
15 A  That is the predominant one that comes to
16   mind.
17 Q  Just kind of a summary question.
18       Are you aware of actions by EUA or
19   Narragansett that you believe violated the
20   standard offer contract?
21 A  We had an understanding that our standard
22   offer supply agreement with EUA or their
23   affiliates entitled us to the protection of
24   the fuel adjustment clause through the term

Page 239

1    2009.
2        So that -- I think I already answered
3    that. That would be -- that would be
4    where -- if -- the violation would be that.
5 Q  And that understanding came from what?
6 A  It came from -- there are a whole series of
7    things that came from. I think, as I've
8    said to you before, it came from the
9    enacting or the enabling legislation.
10       I think the price clause itself was
11   quite explicit that it contained two parts.
12   There was -- if it was intended that the
13   fuel adder provision were to end at a time
14   otherwise, I think it would have been
15   absolute common sense to have stated that,
16   that it was ending at a time other than the
17   end of the standard offer service
18   obligation.
19       I think on top of that, I have -- or
20   I had the word of Hirsh that the
21   agreement -- the tariffs that we were going
22   to get in the deal we had was going to be
23   identical in pricing terms to Narragansett,
24   which did include pricing triggers out to

Page 240

1    the end.
2        So I put all that together, and I
3    believe we had an entitlement to pricing
4    triggers to the end of the term.
5 Q  Are there any other actions that you believe
6    constituted a violation of this Exhibit 1 by
7    EUA or Narragansett?
8 A  Are you talking about a violation of the
9    explicit provisions of the contract?
10 Q  Yes.
11       MR. WINSTON: Objection. You can
12   answer.
13       THE WITNESS: Sorry, objection I can
14   answer?
15       MR. WINSTON: Objection, you can
16   answer. Lucky you.
17       (Laughter.)
18 A  That is what -- at this point, the one that
19   comes to mind is the refusal to honor the
20   fuel price adjustment out to 2009.
21 Q  Are you aware of any conduct by EUA that you
22   consider deceptive?
23 A  I was not present, but subsequent -- it is
24   my understanding that shortly after the

Page 241

1    execution of this agreement, a presentation
2    was made by EUA to TransCanada setting out
3    the obligations of the standard offer
4    service, which presentation --
5        I've had an opportunity to review
6    that presentation; and that presentation, in
7    my mind, quite clearly stated that the fuel
8    price adjustment was to continue for the
9    term.
10       And if they are subsequently
11   suggesting that that was never their
12   intention, then I would suggest that their
13   delivering that presentation to us and
14   making those representations was deceptive.
15 Q  Do you recall who made that presentation?
16 A  I just saw a copy of the presentation, and
17   I -- I was able to review the testimony of
18   Mike Hachey and Bill Taylor in that regard.
19 Q  Do you remember who, if anyone, from
20   TransCanada attended that presentation?
21 A  No.
22 Q  Do you know who would know who had attended
23   that presentation?
24 A  I would imagine either Hachey or Taylor

61 (Pages 238 to 241)

# Powderly

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3              (Central Division)

4     - - - - - - - - - - - - - - - -

5   TRANSCANADA POWER MARKETING      :

6   LTD,                             :

7          Plaintiff,               :   CASE NO.

8   VS.                              :   05-40076 FDS

9   NARRAGANSETT ELECTRIC CO.,       :

10          Defendant.               :

11    - - - - - - - - - - - - - - - -

12

13     DEPOSITION OF ROBERT G. POWDERLY, a witness

14   called by and on behalf of the Plaintiff, taken

15   pursuant to the applicable provisions of the

16   Federal Rules of Civil Procedure, before

17   Sandra L. Bray, Registered Diplomate Reporter,

18   CSR Number 103593, and Notary Public in and for

19   Commonwealth of Massachusetts, at the offices of

20   Choate Hall & Stewart LLP, Two International

21   Place, Boston, Massachusetts, on Wednesday,

22   February 14, 2007, commencing at 9:59 a.m.

23

24

Page 2

1  APPEARANCES:
2   Representing the Plaintiff:
3     CHOATE HALL & STEWART LLP
4     Two International Place
5     Boston, Massachusetts 02110
6     BY: WENDY S. PLOTKIN, ESQUIRE
7
8   Representing the Defendant:
9     BOWDITCH & DEWEY, LLP
10    311 Main Street
11    Worcester, Massachusetts 01615-0156
12    BY: VINCENT F. O'ROURKE, JR., ESQUIRE
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1         I N D E X
2  WITNESS:                PAGE NO.
3  ROBERT G. POWDERLY
4  BY MS. PLOTKIN              4
5
6
7
         E X H I B I T S
8
   NO.   DESCRIPTION        PAGE NO.
9
   79   Group of Documents      80
10
   80   Rollout of NEES/EUA Merger
11        Agreement           135
12
13    (EXHIBITS RETAINED BY COUNSEL.)
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         (The Massachusetts driver's license
2    number as identification of the deponent
3    was noted for the record.)
4         ROBERT G. POWDERLY, having duly sworn
5    or affirmed that his testimony would be the
6    truth, the whole truth, and nothing but the
7    truth, testified as follows:
8              *  *  *
9         MS. PLOTKIN: Just for the usual
10   stipulations, reserve motions to strike until
11   trial; objections, except as to form, until
12   trial.
13        MR. O'ROURKE: Okay.
14        MS. PLOTKIN: Waive notarization.
15        MR. O'ROURKE: Good.
16        MS. PLOTKIN: And Mr. Powderly has 30
17   days to read and sign.
18        THE WITNESS: I have 30 days to?
19        MS. PLOTKIN: Read and sign. Correct
20   any errors.
21        MR. O'ROURKE: You'd like to read it?
22        THE WITNESS: Yes.
23   EXAMINATION BY MS. PLOTKIN:
24   Q. Have you ever been deposed before?

Page 5

1   A.  Yes.
2   Q.  So before we start, even though you've been
3       deposed before, I'll just set forth a few ground
4       rules. I'll be asking a series of questions,
5       and my questions and your answers will be
6       transcribed by the court reporter, so it's
7       important to answer verbally instead of nodding
8       or saying uh-huh. It's important, even if you
9       know where my question is going, to let me
10      finish, and I'll do the same with your answers.
11      I will not interrupt you so we can get a clear
12      transcript.
13          If you need to take a break, take a
14      break. You know, let us know, but if there is a
15      question pending, I'll ask that you finish
16      answering it before we take a break. Okay?
17  A.  Yes.
18  Q.  Sound okay?
19  A.  Yes.
20  Q.  And as for objections, most objections that your
21      attorney will make, you can go ahead and answer
22      the question. One area I'm not trying to get to
23      here is any conversations you might have had
24      with Mr. O'Rourke or any other attorney that

2 (Pages 2 to 5)

Page 6

1  you've had in your position at EUA. So if he
2  instructs you not to answer those kind of
3  questions, don't answer, but other questions, if
4  he objects, you can just go ahead and answer.
5  He's just objecting to the form of my question.
6  Okay?
7  A. Yes.
8  Q. Okay. Could you state your name and your home
9  address for the record?
10 A. My name is Robert Powderly, and my home address
11 is 42 Wayside Lane, Ashland, Massachusetts.
12 Q. And could you describe for me your -- briefly
13 your education background starting with high
14 school forward?
15 A. I graduated from College of the Holy Cross in
16 1969 with a bachelor of arts in mathematics. I
17 spent the next five years in the U.S. Navy, and
18 then after the Navy, I went to graduate school
19 at Northeastern, received a master's of science
20 in accounting degree. After that, I went to
21 work for Ernst & Young for four years. After
22 that, I went to work for Eastern Utilities, and
23 I worked for Eastern Utilities all the way up
24 until 2000. Then I worked for National Grid,

Page 7

1  which had acquired Eastern Utilities, and I had
2  retired in 2002.
3  Q. Okay. Now, if we could go back and just go
4  through that in a little bit more detail. After
5  you graduated from Northeastern, you went to
6  Ernst & Young, correct?
7  A. Yes. Then --
8  Q. And -- go ahead.
9  A. Then it was known as Ernst & Ernst and Ernst &
10 Whinney.
11 Q. And what year was that?
12 A. 1975 through 1978, I worked for Ernst & Young.
13 Q. And what was your position?
14 A. Senior auditor.
15 Q. And then after that, you said you worked for
16 EUA, correct?
17 A. That's correct.
18 Q. So what was the first position you started with
19 at EUA?
20 A. My position at Eastern Utilities was audit
21 supervisor.
22 Q. And that would have been in 1980?
23 A. 1978 through early 1980.
24 Q. Okay. And you were an auditor. Did you work

Page 8

1  with a particular department of EUA or
2  subsidiary?
3  A. Was the audit department. EUA -- its long name
4  is Eastern Utilities Associates -- was a holding
5  company, and they had several subsidiaries; and
6  I worked for the subsidiary called EUA Service
7  Corporation. And the purpose of EUA Service
8  Corporation was to provide services to the other
9  affiliates within the Eastern Utilities
10 Associates system.
11 Q. And what were the other affiliates in the EUA
12 system?
13 A. There was Blackstone Valley Electric Company,
14 Fall River Electric Light Company, Brockton
15 Edison, Montaup Electric Company, EUA Service
16 Corporation, and those are the companies they
17 had when I started.
18 Q. Okay. And we'll get into a little bit of that
19 later. What was your next position within EUA?
20 A. Next position was manager of revenue
21 requirements.
22 Q. And what is that position? What are the
23 responsibilities?
24 A. Eastern Utilities Associates' subsidiaries had

Page 9

1  rates established through tariffs, which they
2  billed retail customers, and from time to time,
3  we would go before the regulatory commissions to
4  ask for a change in rates; and we would go
5  before the Rhode Island Public Utilities
6  Commission, the Massachusetts -- then it was
7  called Department of Public Utilities. And we
8  would go before the Federal Regulatory Energy
9  Commission. My job as manager of revenue
10 requirements was to, basically, manage and put
11 together our rate case filings at those
12 regulatory bodies.
13 Q. Okay. Was that in the rate department, that
14 position?
15 A. No, it was not.
16 Q. And did you work with the rate department to put
17 together those filings?
18 A. I would work with the rate department, yes.
19 Q. Were you supervising the rate department?
20 A. No, I was not, not at that point in time.
21 Q. Okay. And then what was your next position?
22 A. Next position was assistant vice president.
23 Q. And what year did you become assistant vice
24 president, if you recall?

3 (Pages 6 to 9)

Page 10

1    A.  Mid-'80s sometime.
2    Q.  And what were your responsibilities as assistant
3        vice president?
4    A.  I worked directly for the chief financial
5        officer and would work on special projects and
6        other assigned duties as they came along.
7    Q.  What kind of special projects, if you recall,
8        did you work on?
9    A.  Well, I could give you an example.  At one point
10       in time, we were looking at selling our
11       receivables, factoring our receivables.  So I
12       would do an analysis of the impact of factoring
13       receivables, what's the cost of factoring
14       receivables versus going out and getting loans
15       in the short-term debt market.  That would be an
16       example of the types of things that I would have
17       done.
18   Q.  So high-level financial projects for the
19       company?
20   A.  If we agree what "high" means.  I mean I
21       reported to the chief financial officer.  So if
22       that helps clarify what my responsibilities
23       were, that's what they were.
24   Q.  Okay.  And you weren't at the time working on

Page 11

1        rate filings in matters like that?
2    A.  No, not during that period.
3    Q.  Okay.  And then what was your next position
4        within EUA?
5    A.  Next position was vice president.
6    Q.  And what year, if you recall?
7    A.  Maybe 1987.
8    Q.  Okay.  What were your responsibilities as vice
9        president?
10   A.  Responsibilities at that point in time included
11       customer service and rates.
12   Q.  Okay.  And turning to the rates part of that,
13       you were the executive managing the rate
14       department?  Is that a fair description?
15   A.  Well, at that point in time, I think Dennis
16       St. Pierre was director, and Dennis reported to
17       me.
18   Q.  So how involved at that period of time would you
19       have been in the day-to-day management of the
20       rate department?
21   A.  I would know generally what was going on.  At
22       times during that period, I would actually be a
23       witness in rate cases, and I was fairly familiar
24       with -- from my prior experience as manager of

Page 12

1        revenue requirements, what the information had
2        to be in a particular case and how we would
3        present our positions to the regulatory bodies,
4        but I would be one of several witnesses in the
5        rate case.
6    Q.  Okay.  Would there be a particular type of
7        subject matter you would be testifying to in
8        these rate cases?
9    A.  I testified on a variety of subject matters, but
10       one that I spent the most time with was EUA
11       Service Corporation's contribution to the
12       financial needs of the company as reflected in
13       the subsidiary's filing.  For example, EUA
14       Service Corporation would provide services to
15       the retail companies, and it made sense from an
16       EUA parent company perspective to centralize
17       those services.  So, for example, we would have
18       one purchasing department which would provide
19       services to Blackstone, Eastern Edison, which
20       was the successor to Fall River Electric Light
21       and Brockton Edison, and Montaup Electric
22       Company.  And so I would present in the rate
23       case the data that related to EUA Service
24       Corporation in their cost of service analysis.

Page 13

1    Q.  And when -- you say that they provided services
2        to the subsidiaries or affiliates, and you
3        mentioned purchasing.  What kind of services?
4        They purchased all their office supplies?
5        What --
6    A.  Well, purchasing would be an example.  Other
7        examples would be one customer service center, a
8        call center for all our affiliates.  We would
9        have one treasury department for all our
10       affiliates.  We would have one engineering
11       department for all our affiliates.
12   Q.  Did you have one rate department?
13   A.  We would have one rate department for all our
14       affiliates.  We would have one corporate
15       communication department for all our retail
16       affiliates.
17   Q.  Okay.  And so you became vice president, you
18       said, in 1987?
19   A.  Or thereabouts.
20   Q.  And was that your last position at EUA?
21   A.  No.
22   Q.  And what was the next position?
23   A.  In 1990, I became president of Newport Electric
24       Company.

4 (Pages 10 to 13)

Page 14

1  Q.  And did your duties change significantly then?
2  A.  Yes, they did.
3  Q.  What were your duties as president of Newport?
4  A.  In 1990, EUA acquired Newport Electric Company.
5      So I became president of Newport Electric
6      Company, and I operated out of the Newport
7      Electric Company facility in Middletown, Rhode
8      Island; and my principal responsibility was to
9      integrate the Newport Electric Company
10     operations into the EUA system operations.
11 Q.  Okay.  And how long did you hold that position?
12 A.  I held that position for two years.
13 Q.  Okay.  And then what did you do next?
14 A.  Then I became executive vice president.
15 Q.  And what departments were under your supervision
16     as executive vice president?
17 A.  Corporate communications, information
18     technology, customer service, consumer service
19     which is the department that dealt with our
20     commercial industrial customers, facilities,
21     human resources, and rates.
22 Q.  So as executive vice president, were you
23     involved much in the day-to-day management of
24     the rate department?

Page 15

1  A.  Day-to-day management of the rate department,
2      no.
3  Q.  What about daily activities, rate filings?  Were
4      you copied on rate filings, for example?
5  A.  Yes, I would be copied on rate filings.
6  Q.  Would you be copied on them before they were
7      filed, draft rate filings?
8  A.  In some cases, yes.
9  Q.  And did you have much input onto (sic) how the
10     rate department operated?
11         MR. O'ROURKE:  He'd like to think so.
12 A.  I'm just seeing -- trying to determine the way
13     you asked the question when you said "much
14     input."  Naturally, I would be involved in the
15     rate department as how they conformed to our
16     personnel policies and procedures, but not in
17     the day-to-day operation, but I would -- you
18     know, if we were involved in a rate filing in
19     any one of the jurisdictions, I would generally
20     be familiar with the rate filing.  I reported to
21     John Stevens, who was the chief operating
22     officer, so I would keep John Stevens informed
23     as to what are the major subject matters in the
24     rate filing, what issues there could be and what

Page 16

1      our approach to the issues were, and I would
2      deal with our rate counsel in addressing, you
3      know, those issues.
4  Q.  Okay.  Do you recall at the time who -- I think
5      we're in the late '90s now; is that correct?
6  A.  From 1992 on.
7  Q.  Okay.  Do you recall who the rate counsel was?
8  A.  David A. Fazzone, F A Z Z O N E.
9  Q.  He was outside counsel, correct?
10 A.  He was outside counsel, that's correct.
11 Q.  With the firm McDermott, Will & Emery, I
12     believe?
13 A.  That's correct.
14 Q.  I've seen his name before.
15 A.  He worked with us as rate counsel, and his last
16     firm was McDermott, Will & Emery.  He worked
17     with other firms but still was our rate counsel
18     prior to that time.
19 Q.  So you were the executive vice president.  And
20     that was up until the merger with NEES; is that
21     correct?
22 A.  That's correct.
23 Q.  And what position did you take with NEES?
24 A.  I became president of New England Power Service

Page 17

1      Company.
2  Q.  Okay.  And what was the New England Power
3      Service Company?
4  A.  The New England Power Service Company was the
5      NEES equivalent of the EUA Service Corporation,
6      provided centralized services.
7  Q.  What were your responsibilities in that
8      position?
9  A.  My responsibilities were facilities, information
10     technology, and generation investments.
11 Q.  Now, did you take that position immediately upon
12     the merger?
13 A.  Yes.
14 Q.  Okay.  And was part of your job responsibilities
15     to facilitate the transition and merging of the
16     two companies?
17 A.  Yes.  We had a transition team prior to the
18     merger, and I was the principal EUA
19     representative on that transition team.
20 Q.  And when NEES merged with National Grid, I
21     assume you also had the same position as
22     president of NEP Service Corp.?
23 A.  As I recall, although I could be wrong, I think
24     NEES was acquired by National Grid before EUA

5 (Pages 14 to 17)

Page 34

1    geographic area that Blackstone covered, if you
2    can generally describe that?
3    A.  Northern Rhode Island.
4    Q.  Northern Rhode Island.  And what about Newport?
5    A.  Aquidneck Island.
6    Q.  And Eastern?
7    A.  Southeastern Massachusetts.
8    Q.  So Fall River and Brockton?
9    A.  Yes.
10   Q.  Okay.  And in Rhode Island, was there another
11   utility operating at the same time that EUA was?
12   A.  There were more than one.  Narragansett Electric
13   had retail service territory in Rhode Island.
14   Newport Electric did, and there was Block Island
15   something or other; and then there was Pascoag
16   Fire District.
17   Q.  And Narragansett Electric, they were owned by a
18   company called New England Electric System; is
19   that correct?
20   A.  They were a downstream subsidiary of New England
21   Electric System.  I'm not sure if there was any
22   intervening companies on the organization chart.
23   Q.  But they were owned by -- they were a subsidiary
24   in the East --

Page 35

1    A.  As far as I know, yes.
2    Q.  And what about Block Island and Pascoag Fire?
3    Were they independent?
4    A.  Pascoag was a municipal fire district, and Block
5    Island, I just don't recall who owned Block
6    Island.  It might have been a separate company.
7    Q.  And Newport was eventually acquired by EUA?
8    A.  Newport was acquired by EUA in 1990.
9    Q.  Okay.  And just generally, what was the portion
10   of Rhode Island that the EUA companies operated
11   in?
12         MR. O'ROURKE:  Objection.  You mean
13   geographically?
14   Q.  A percentage of the geographic --
15   A.  A percentage of the geographic square miles to
16   square miles?  I don't know.
17   Q.  What about volume of customers?  Do you have any
18   idea how the volume of customers would compare
19   to Narragansett?
20   A.  25 percent of the state might be Blackstone's
21   customers.  That would be my best guess.
22   Q.  What about in Massachusetts?  There was Eastern
23   operating for the EUA companies.  What other
24   retail distributors were operating in

Page 36

1    Massachusetts, if you recall?
2    A.  Boston Edison, Massachusetts Electric,
3    Commonwealth Electric, Fitchburg Electric
4    Light & Gas, Western Massachusetts, and there's
5    many municipalities that operate in
6    Massachusetts as well.
7    Q.  Okay.  And NEES was a parent company of Mass.
8    Electric; is that correct?
9    A.  Similar to the relationship to Narragansett
10   Electric, as I understand it.
11   Q.  And just to compare the size of the companies,
12   EUA and NEES, was NEES significantly larger than
13   EUA?
14   A.  Yes.
15   Q.  Did EUA have any retail distributors in any
16   other states besides Massachusetts and Rhode
17   Island?
18   A.  For sales of electricity?
19   Q.  Uh-huh.
20   A.  No.
21   Q.  What about NEES?  Do you know if they did?
22   A.  They had a subsidiary in New Hampshire, Granite
23   State Electric.
24   Q.  Okay.  At the time, was NEES considered a

Page 37

1    competitor of EUA?
2    A.  At the time, what time?
3    Q.  1994 to 1998, until restructuring really.
4    A.  I wouldn't term them a competitor, no.
5    Q.  Okay.  Do you recall back in 1996 that there was
6    a piece of legislation in Rhode Island called
7    the Utility Restructuring Act?
8    A.  I do recall that.
9    Q.  Do you recall what the purpose of that
10   legislation was?
11   A.  I think -- well, the purpose was to restructure
12   the electric industry in Rhode Island.
13   Q.  And when you say restructure, what does that
14   mean?
15   A.  Well, it is one of the first steps and maybe an
16   entire step -- I'm not sure -- to kind of
17   separate the wholesale business from the retail
18   business.  By the wholesale, I mean the power
19   generation, acquisition, and supply.
20   Q.  Why was it -- why did they want to separate
21   those two parts of the business?
22   A.  Well, it was a legislative act, and I think
23   there was a thought on the part of the
24   legislators that they could reduce the price of

10 (Pages 34 to 37)

Page 38

```
 1     electricity to the ultimate customers if they
 2     restructured, but you really would have to ask
 3     them as to what their reasoning was.
 4  Q.  So was the -- would it be fair to say that your
 5     understanding is that part of the purpose was to
 6     create a competitive market on the generation
 7     side of the business?
 8  A.  Yes.
 9  Q.  And by competitive, I mean other suppliers
10     besides Montaup or NEP or other companies like
11     that.  Is that correct?
12  A.  Yes.
13  Q.  Do you recall whether a similar piece of
14     legislation was passed in Massachusetts?
15  A.  Yes, I do.
16  Q.  And was it around the same time, before or
17     after?
18  A.  It was after.
19  Q.  So Rhode Island was first?
20  A.  Between Massachusetts and Rhode Island, Rhode
21     Island occurred first.
22  Q.  And nationwide, do you recall whether Rhode
23     Island occurred first in restructuring?
24  A.  Well, there are a lot of components to the
```

Page 39

```
 1     Restructuring Act, and some of the components
 2     might have been instituted in other states.  I
 3     don't know if you're referring to the whole
 4     package or each element in the Restructuring
 5     Act.  I guess my answer to your question would
 6     be I don't know.
 7  Q.  Okay.  Was EUA ever consulted by any legislators
 8     for input on the Restructuring Act?
 9  A.  Yes.
10  Q.  And do you recall what time period that was?
11  A.  Prior to the passing of the Utility
12     Restructuring Act.
13  Q.  And did you participate in any conversations
14     with legislators on that subject matter?
15  A.  Yes, I did.
16  Q.  And do you recall what EUA's position was on
17     restructuring?
18        MR. O'ROURKE:  Objection.  It's a
19     pretty broad question.
20  A.  We, obviously, had to comply with the
21     Restructuring Act, and...
22  Q.  Do you recall any specific portions of the
23     Restructuring Act?  I'll give you an example,
24     standard offer service.  Do you recall giving
```

Page 40

```
 1     any input to the legislators on how standard
 2     offer service should be structured?
 3  A.  I don't.
 4  Q.  Would you have reviewed the Rhode Island act at
 5     the time it was passed?
 6  A.  Yes, I would have.
 7  Q.  Would you have been pretty familiar with it?
 8  A.  Yes, I would have been.
 9  Q.  Do you recall at the time if there were any
10     significant differences between the
11     Massachusetts Restructuring Act and the Rhode
12     Island Restructuring Act?
13  A.  In general, I don't.
14  Q.  Okay.  We already talked about standard offer
15     service, but do you recall that the Rhode Island
16     act required something called standard offer
17     service?
18  A.  Yes, I do.
19  Q.  And can you describe for me what standard offer
20     service is?
21  A.  It represented a power supply component that was
22     to be used for those customers who didn't want
23     to go into the marketplace to buy electricity
24     and had been -- and had stayed customers of the
```

Page 41

```
 1     retail company since the act took effect.
 2  Q.  So the customer had to have already been a
 3     Blackstone customer in 1996?
 4  A.  To the best of my recollection.  There were
 5     wrinkles as to whether you moved from one
 6     portion in the service territory to another
 7     portion in the service territory, but in
 8     general, I think that was the case.
 9  Q.  Okay.  And do you know who was obligated to
10     provide the power for standard offer service?
11  A.  When Eastern Utilities divested of its
12     generation portfolio, part of the purchaser's
13     obligation was to provide standard offer service
14     to Eastern and Blackstone as represented by that
15     portion of the portfolio that they acquired to
16     the standard -- to the total amount of standard
17     offer provided.
18  Q.  Okay.  So let's just try to break that down a
19     little bit.  Blackstone and Newport and Eastern
20     Edison, they were required to provide standard
21     offer service option --
22  A.  Yes.
23  Q.  -- to the consumers; is that correct?
24  A.  Yes.
```

11 (Pages 38 to 41)

# St. Pierre

Page 1

1              VOL. I, PAGES 1 - 211

2              U.S. DISTRICT COURT

3           DISTRICT OF MASSACHUSETTS

4              (Cental Division)

5

6  Civil Action No. 05-400076 FDS

7

8  TRANSCANADA POWER MARKETING, LTD

9                    Plaintiff

10  V.

11  NARRAGANSETT ELECTRIC COMPANY

12                    Defendant

13

14         - - - - - - - -

15   VIDEOTAPED DEPOSITION OF DENNIS ST. PIERRE

16          Tuesday, January 30, 2007

17               9:01 a.m.

18          Choate Hall & Stewart

19          Two International Place

20          Boston, Massachusetts

21         - - - - - - - -

22      Reporter:  Deborah Roth, RPR/CSR

23

24

|  | Page 2 |
|---|---|
| 1 PRESENT: | |
| 2 | |
| 3 Daniel C. Winston, Esq. | |
| 4 Wendy S. Plotkin, Esq. | |
| 5 Dara Z. Kesselheim, Esq. | |
| 6 Choate Hall & Stewart | |
| 7 Two International Place | |
| 8 Boston, Massachusetts 02110 | |
| 9 617 248 5000 | |
| 10 For the Plaintiff | |
| 11 | |
| 12 Vincent F. O'Rourke, Jr., Esq. | |
| 13 Bowditch & Dewey, LLP | |
| 14 311 Main Street, P.O. Box 15156 | |
| 15 Worcester, Massachusetts 01615 | |
| 16 508 926 3424 | |
| 17 For the Defendant and the Deponent | |
| 18 | |
| 19 ALSO PRESENT:    Jody D. M. Johnson, Esq., | |
| 20          TransCanada | |
| 21          Shawn Budd, Videographer | |
| 22 | |
| 23 | |
| 24 | |

|  |  | Page 4 |
|---|---|---|
| 1 EXHIBITS | PAGE | 10:14:41 |
| 2 | | 10:14:41 |
| 3 70 Testimony dated December 4, 1997 | 83 | 11:02:22 |
| 4 71 Order of the Public Utilities | | 13:30:58 |
| 5    Commission | 167 | 13:30:58 |
| 6 72 Filing made April 15th, 1998 | 170 | 13:33:59 |
| 7 73 April 1998 Filing | 174 | 13:41:04 |
| 8 74 Filing | 175 | 13:41:04 |
| 9 75 Testimony | 187 | 13:41:04 |
| 10 76 Transition List | 194 | 14:13:14 |
| 11 77 Notice Letter | 203 | 14:22:12 |
| 12 78 Rate Plan Filing | 204 | 14:23:42 |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 Original exhibits retained by Mr. Winston | | |
| 23 | | |
| 24 | | |

|  |  | Page 3 |
|---|---|---|
| 1 INDEX | | |
| 2 WITNESS: Dennis St. Pierre | | |
| 3 EXAMINATION    DIRECT    CROSS | | |
| 4 By Mr. Winston    6, 207 | | |
| 5 By Mr. O'Rourke          206 | | |
| 6 | | |
| 7 EXHIBITS | PAGE | |
| 8 62 Montaup's Tariff | 30 | 10:21:04 |
| 9 63 Rate Tariff of Blackstone Valley | | 10:21:56 |
| 10   Electric Company Newport Electric | | 10:21:59 |
| 11   Corporation | 30 | 10:22:02 |
| 12 64 Outline on URA Rate on Bundling | 33 | 10:26:22 |
| 13 65 Differences Outline | 34 | 10:26:22 |
| 14 66 Rhode Island Regulatory Strategy | | 10:28:01 |
| 15   Outline | 34 | 10:28:03 |
| 16 67 Document | 38 | 10:28:03 |
| 17 68 Document | 38 | 10:28:03 |
| 18 69 Testimony before PUC | 55 | 10:14:41 |
| 19 | | 10:14:41 |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

|  | Page 5 |
|---|---|
| 1        P-R-O-C-E-E-D-I-N-G-S | |
| 2        THE VIDEOGRAPHER: Stand by. Okay. | 09:51:06 |
| 3 We are on the record. | 09:51:15 |
| 4        This is the video operator speaking, | 09:51:16 |
| 5 Sean Budd, of Esquire Deposition Services, | 09:51:19 |
| 6 Boston, Massachusetts. Today's date is | 09:51:22 |
| 7 January 30, 2007, and the time is one minute | 09:51:25 |
| 8 after 9:00. | 09:51:29 |
| 9        We are here at the offices of Choate | 09:51:30 |
| 10 Hall & Stewart, located in Boston, | 09:51:34 |
| 11 Massachusetts, to take the videotaped | 09:51:37 |
| 12 deposition of Dennis St. Pierre, in the matter | 09:51:38 |
| 13 of TransCanada Power Marketing Limited versus | 09:51:42 |
| 14 Narragansett Electric Company in U.S. District | 09:51:46 |
| 15 Court, District of Massachusetts, Central | 09:51:49 |
| 16 Division. | 09:51:52 |
| 17        Counsel, please introduce | 09:51:53 |
| 18 themselves. | 09:51:54 |
| 19        MR. WINSTON: I am Dan Winston for | 09:51:55 |
| 20 TransCanada. | 09:51:57 |
| 21        MR. O'ROURKE: I am Vincent | 09:51:58 |
| 22 O'Rourke for Narragansett and for the witness, | 09:52:01 |
| 23 Dennis St. Pierre. | 09:52:03 |
| 24        MR. WINSTON: Again, you want to go | 09:52:09 |

2 (Pages 2 to 5)

Page 6

1  with the same stipulations: Motions to strike    09:52:10
2  reserved until trial, all objections except as    09:52:11
3  to form reserved until trial, waive the    09:52:14
4  notarization.    09:52:16
5       Have you explained reading and    09:52:17
6  signing to Mr. St. Pierre?    09:52:18
7       MR. O'ROURKE:  I haven't.    09:52:20
8       You have the right to read and sign    09:52:20
9  this.  I suggest you do that.    09:52:22
10      THE WITNESS:  Yes.    09:52:24
11      MR. O'ROURKE:  We have 30 days.    09:52:24
12      THE WITNESS:  Okay.    09:52:27
13          DENNIS ST. PIERRE,
14      having been satisfactorily
15 identified by the production of his
16 Massachusetts driver's license, and duly sworn
17 by the Notary Public, was examined and
18 testified as follows:
19      DIRECT EXAMINATION
20 BY MR. WINSTON:
21 Q.  What is your name?    09:52:29
22 A.  Dennis St. Pierre.    09:52:42
23 Q.  Where do you live?    09:52:43
24 A.  I live in Somerset, Massachusetts.  My    09:52:44

Page 7

1  address is 128 Wellesley Drive.    09:52:48
2  Q.  You also have a home in Florida?    09:52:51
3  A.  Yes, I do have a home in Florida.  1999    09:52:53
4  Anniston Drive, Lady Lake, Florida.    09:52:56
5  Q.  Mr. St. Pierre, have you been deposed    09:53:00
6  before?    09:53:02
7  A.  I have not been deposed, no.    09:53:02
8  Q.  Okay.  I will be asking you a series of    09:53:03
9  questions.    09:53:05
10      A couple of just ground rules.  You    09:53:09
11 need to respond verbally.  If you nod, she    09:53:13
12 can't take that, and, "uhn-uhn," also, won't    09:53:18
13 pick up; and it is important that, to get a    09:53:22
14 clear record, that you wait until I finish my    09:53:24
15 question.  You may know what the last words    09:53:26
16 are going to be before the question mark, and    09:53:29
17 -- but just wait until I finish the question.    09:53:32
18 If you don't understand a question, just tell    09:53:35
19 me, and I will rephrase it.    09:53:37
20      Your counsel may object to certain    09:53:39
21 questions, as a matter of form, we argue    09:53:40
22 about that later, but you can go ahead and    09:53:42
23 answer.    09:53:44
24      The one area that I don't want to    09:53:44

Page 8

1  know about, and he can rightfully instruct you    09:53:47
2  not to answer about, is your communication    09:53:49
3  with counsel.    09:53:51
4  A.  Yes.    09:53:53
5  Q.  If you need a break, let me know, it's    09:53:56
6  not a prison, there's a bathroom, water.  I    09:54:00
7  just ask that you answer the question pending.    09:54:02
8       I know you have got to leave on a    09:54:04
9  flight at 2:30.  It's possible I can finish by    09:54:06
10 then.  I will do what I can.    09:54:09
11      Okay.  Can you just briefly run    09:54:12
12 through for me your -- very quickly -- your    09:54:15
13 educational background, just where you went to    09:54:19
14 high school, where you went to college?    09:54:22
15 A.  Yes.  I went to high school in Swansea,    09:54:24
16 Massachusetts, Joseph Case High School.    09:54:26
17      I also have graduate degrees.  I    09:54:31
18 have a bachelor of science degree in    09:54:34
19 electromechanical technology from Roger    09:54:39
20 Williams University.  I have a master of    09:54:42
21 business administration degree from UMass    09:54:45
22 Dartmouth, and I have attended many other    09:54:49
23 programs related to the electric utility    09:54:55
24 industry and also electric utility rates and    09:54:58

Page 9

1  regulatory seminars as well.    09:55:00
2  Q.  Okay.  And, briefly, if you could just    09:55:04
3  describe for me your work history, not    09:55:07
4  counting high-school jobs.    09:55:10
5  A.  I started with the Fall River Electric    09:55:13
6  Light Company in 1967, which is one of its    09:55:20
7  predecessor companies of Eastern Edison    09:55:24
8  Company.    09:55:26
9       I worked various jobs.  Of course    09:55:28
10 when you first start, you start at the bottom.    09:55:32
11 It was a union organization, and I was happy    09:55:34
12 to read meters, that was one of the    09:55:37
13 lower-level jobs, and I worked my way up    09:55:40
14 through that organization, going to school    09:55:42
15 most of my -- as a matter of fact, all of my    09:55:44
16 degrees were on the continuing education level    09:55:49
17 at night.  I spent 13 and a half years at    09:55:51
18 night school to get my degrees, and progressed    09:55:54
19 through various jobs through the company.    09:55:58
20      I held positions of executive    09:56:00
21 assistant to the president of Eastern Edison    09:56:02
22 Company, executive assistant to the president    09:56:05
23 and vice president of EUA.  I was manager of    09:56:06
24 rates during the 1980s, was promoted to    09:56:13

3 (Pages 6 to 9)

| | Page 10 | | | Page 12 |
|---|---|---|---|---|
| 1 director of rates, and, finally, to vice | 09:56:17 | | 1 matter of our dispute here today? | 09:58:59 |
| 2 president of rates, that was the position I | 09:56:22 | | 2  A.  Yes, I am. | 09:59:00 |
| 3 last held with EUA. | 09:56:24 | | 3  Q.  What do you understand about the | 09:59:02 |
| 4  Q.  When did you become a director of | 09:56:27 | | 4 subject matter of our dispute? | 09:59:03 |
| 5 rates? | 09:56:28 | | 5  A.  What I understand is that TransCanada | 09:59:05 |
| 6  A.  Not exactly -- I could review some of | 09:56:33 | | 6 has a dispute with the company involving one | 09:59:08 |
| 7 my older testimony to get the exact dates -- | 09:56:36 | | 7 particular issue, and that is the issue of a | 09:59:12 |
| 8 but it had to be the early 1980s. | 09:56:38 | | 8 fuel trigger as it applies to the retail | 09:59:16 |
| 9  Q.  How about vice president of rates? | 09:56:41 | | 9 companies and also the wholesale company. | 09:59:24 |
| 10  A.  My recollection is that that was in the | 09:56:45 | | 10  Q.  Okay.  And have you, other than your | 09:59:27 |
| 11 1998 time frame. | 09:56:50 | | 11 counsel, have you talked with anybody at | 09:59:31 |
| 12  Q.  Okay. | 09:56:53 | | 12 National Grid about this dispute since leaving | 09:59:35 |
| 13  A.  '98, '99. | 09:56:54 | | 13 the company in May 2000? | 09:59:38 |
| 14  Q.  And in the 1998 time frame, who worked | 09:56:55 | | 14  A.  Prior to an earlier deposition date, I | 09:59:44 |
| 15 with you in the rate department? | 09:56:58 | | 15 did have a meeting with Vincent O'Rourke at | 09:59:47 |
| 16  A.  I had a group of professionals working | 09:57:02 | | 16 Westborough, and several people were in and | 09:59:51 |
| 17 with me.  I had three supervisors.  I had a | 09:57:06 | | 17 out of the room.  I would have to look at my | 09:59:54 |
| 18 supervisor of rates, that was James Bonner.  I | 09:57:12 | | 18 notes to -- | 09:59:59 |
| 19 had a manager of rates, that was Robert | 09:57:17 | | 19  Q.  Do you -- without knowing what was | 10:00:00 |
| 20 Erickson.  I had a supervisor of load | 09:57:20 | | 20 said, do you recollect anyone else, just some | 10:00:05 |
| 21 research, and that was Mark Sorgman. | 09:57:25 | | 21 of the folks who were there? | 10:00:05 |
| 22  Q.  Okay.  When did you leave EUA? | 09:57:32 | | 22  A.  I recognized Mike Hager.  He stopped in | 10:00:06 |
| 23  A.  I left EUA in May of 2000. | 09:57:39 | | 23 to say "Hello."  I recall Mike from some of | 10:00:11 |
| 24  Q.  What were the circumstances of your | 09:57:44 | | 24 our prior meetings, but... | 10:00:13 |

| | Page 11 | | | Page 13 |
|---|---|---|---|---|
| 1 departure? | 09:57:46 | | 1  Q.  Any other former employees that you are | 10:00:17 |
| 2  A.  The circumstances of the departure were | 09:57:46 | | 2 aware of that were there? | 10:00:23 |
| 3 that they were in the middle of the -- | 09:57:50 | | 3  A.  I don't believe so. | 10:00:24 |
| 4 finalizing the merger between the EUA | 09:57:52 | | 4  Q.  Any other meeting -- and that was -- | 10:00:25 |
| 5 companies, the New England Electric companies | 09:57:56 | | 5 approximately when was that meeting? | 10:00:31 |
| 6 and National Grid, and I was offered a | 09:57:59 | | 6  A.  That was in mid-June. | 10:00:32 |
| 7 position that I evaluated was not equivalent | 09:58:03 | | 7  Q.  Of this year? | 10:00:34 |
| 8 to the position I held within EUA and decided | 09:58:09 | | 8  A.  Of 2006. | 10:00:37 |
| 9 to leave the company. | 09:58:12 | | 9  Q.  I presume you have met with | 10:00:38 |
| 10  Q.  Okay.  What did you do after May 2000? | 09:58:14 | | 10 Mr. O'Rourke in preparation for your | 10:00:46 |
| 11  A.  Retired. | 09:58:18 | | 11 deposition today? | 10:00:47 |
| 12  Q.  Okay.  Do you still have any ongoing | 09:58:20 | | 12  A.  I met with him yesterday -- | 10:00:48 |
| 13 business relationship with the merged entity? | 09:58:24 | | 13  Q.  Okay. | 10:00:49 |
| 14  A.  No, I do not. | 09:58:27 | | 14  A.  -- afternoon. | 10:00:50 |
| 15  Q.  Do you receive a pension from the | 09:58:28 | | 15  Q.  Have you met with him on other | 10:00:50 |
| 16 merged entity? | 09:58:29 | | 16 occasions? | 10:00:53 |
| 17  A.  Yes, I do. | 09:58:30 | | 17  A.  Other than the 16th of June at | 10:00:53 |
| 18  Q.  Is it from the company, or is it | 09:58:32 | | 18 Westborough, no. | 10:00:58 |
| 19 separately funded? | 09:58:34 | | 19  Q.  Approximately how long did you meet | 10:00:59 |
| 20  A.  There are several pieces to my pension. | 09:58:38 | | 20 with Mr. O'Rourke yesterday? | 10:01:01 |
| 21 One I believe is a John Hancock Insurance type | 09:58:42 | | 21  A.  We met around noontime, and we parted | 10:01:01 |
| 22 of a -- and the other is the National Grid | 09:58:45 | | 22 around 5:30. | 10:01:12 |
| 23 pension. | 09:58:51 | | 23  Q.  Okay.  Have you reviewed documents in | 10:01:15 |
| 24  Q.  Okay.  Are you aware of the subject | 09:58:52 | | 24 preparation for your deposition today? | 10:01:17 |

4 (Pages 10 to 13)

Page 14

| | |
|---|---|
| 1   A. I reviewed some documents. | 10:01:19 |
| 2   Q. Have you talked with anyone else who | 10:01:23 |
| 3 was employed with you at EUA before you left, | 10:01:27 |
| 4 about this dispute? | 10:01:30 |
| 5       MR. O'ROURKE:  Other than in the | 10:01:35 |
| 6 presence in the counsel? | 10:01:36 |
| 7   Q. Other than in the presence of counsel? | 10:01:37 |
| 8   A. No, I have not. | 10:01:39 |
| 9   Q. Well, let me ask it that way. | 10:01:40 |
| 10      Have you talked with anyone else | 10:01:42 |
| 11 who was formerly employed with EUA in the | 10:01:43 |
| 12 presence of counsel, generally concerning the | 10:01:46 |
| 13 subject matter of this dispute? | 10:01:50 |
| 14   A. No, I have not. | 10:01:51 |
| 15   Q. What was your involvement in the -- | 10:01:54 |
| 16 okay.  You so understand this concerns the | 10:01:57 |
| 17 wholesale standard offer service agreement | 10:02:00 |
| 18 between TransCanada and EUA? | 10:02:03 |
| 19   A. I understand that that is a related | 10:02:04 |
| 20 matter. | 10:02:11 |
| 21      My focus, in looking at what the | 10:02:16 |
| 22 deposition is all about, kind of concentrated | 10:02:21 |
| 23 on rate tariffs, which is where my level of | 10:02:25 |
| 24 understanding is with respect to everything | 10:02:29 |

Page 15

| | |
|---|---|
| 1 that took place. | 10:02:30 |
| 2   Q. Okay.  Have you ever -- let me ask | 10:02:31 |
| 3 this:  When you were at EUA, were you aware | 10:02:36 |
| 4 that TransCanada had signed a wholesale | 10:02:38 |
| 5 standard offer agreement with EUA?  When I say | 10:02:40 |
| 6 "EUA," I mean some the companies of EUA. | 10:02:44 |
| 7   A. I probably was aware at some point in | 10:02:49 |
| 8 time. | 10:02:52 |
| 9   Q. Were you involved at all in the | 10:02:53 |
| 10 negotiation of that contract? | 10:02:54 |
| 11   A. No, I was not. | 10:02:55 |
| 12   Q. Did you ever speak with anybody at | 10:02:57 |
| 13 TransCanada? | 10:02:59 |
| 14   A. I spoke to someone on the phone a year | 10:03:07 |
| 15 or so ago, but I think it was a lawyer for | 10:03:12 |
| 16 TransCanada. | 10:03:14 |
| 17   Q. I think it was me.  It was a nice | 10:03:14 |
| 18 fellow. | 10:03:17 |
| 19   A. A very nice fellow. | 10:03:17 |
| 20   Q. It was a nice fellow.  It was probably | 10:03:18 |
| 21 me. | 10:03:20 |
| 22      Okay.  So while you were at EUA, | 10:03:21 |
| 23 you never spoke with anyone at TransCanada, to | 10:03:24 |
| 24 your knowledge? | 10:03:27 |

Page 16

| | |
|---|---|
| 1   A. I have never spoken to anyone from | 10:03:27 |
| 2 TransCanada. | 10:03:29 |
| 3   Q. And did you ever speak with anybody at | 10:03:30 |
| 4 EUA, to your memory, about the subject of the | 10:03:33 |
| 5 contract negotiations with TransCanada? | 10:03:36 |
| 6   A. Not the subject matter of the contract | 10:03:45 |
| 7 negotiations; but at various staff meetings or | 10:03:49 |
| 8 update meetings, progress reports are usually | 10:03:56 |
| 9 given as to what the status of certain | 10:04:00 |
| 10 activities are relative to what our goals and | 10:04:03 |
| 11 objectives are. | 10:04:08 |
| 12   Q. Okay.  And do you recall that at that | 10:04:09 |
| 13 time period there were -- okay. | 10:04:12 |
| 14      So, there was an asset divestiture | 10:04:15 |
| 15 going on during the late 1990s? | 10:04:17 |
| 16   A. Yes, there was. | 10:04:19 |
| 17   Q. And there was also another bid process | 10:04:20 |
| 18 for the wholesale standard offer service | 10:04:23 |
| 19 contracts? | 10:04:28 |
| 20   A. Yes.  There was a bid process ongoing, | 10:04:28 |
| 21 yes. | 10:04:30 |
| 22   Q. Okay.  I presume you would go to staff | 10:04:30 |
| 23 meetings where people would update you on the | 10:04:32 |
| 24 status of those various divestitures and bid | 10:04:35 |

Page 17

| | |
|---|---|
| 1 processes? | 10:04:38 |
| 2   A. Yes.  Generally, yes. | 10:04:38 |
| 3   Q. Who would generally updated you during | 10:04:41 |
| 4 those meetings about the status of the asset | 10:04:44 |
| 5 divestitures and wholesale standard offer | 10:04:46 |
| 6 service agreements? | 10:04:51 |
| 7   A. The asset divestiture part was kept | 10:04:52 |
| 8 fairly confidential, and I don't recall a lot | 10:04:57 |
| 9 of discussion on the specifics of the asset | 10:05:03 |
| 10 divestiture at these staff meetings. | 10:05:07 |
| 11      These staff meetings were more along | 10:05:09 |
| 12 the lines of regulatory type activities: | 10:05:11 |
| 13 What's going on in the regulatory front? | 10:05:13 |
| 14 Where are we with this negotiation or that | 10:05:17 |
| 15 negotiation?  But not really a lot of details | 10:05:22 |
| 16 on asset divestitures, that was kept pretty | 10:05:25 |
| 17 close to upper management. | 10:05:29 |
| 18   Q. Okay.  After you left EUA, did anyone | 10:05:30 |
| 19 from National Grid ever contact you to ask you | 10:05:32 |
| 20 about your view of the length of the fuel | 10:05:35 |
| 21 triggers in the tariffs? | 10:05:40 |
| 22   A. No.  No one from National Grid | 10:05:45 |
| 23 contacted me. | 10:05:49 |
| 24   Q. Were you involved -- or what was your | 10:05:54 |

5 (Pages 14 to 17)

| | Page 22 |
|---|---|
| 1 companies? | 10:10:58 |
| 2  A.  It was my understanding that if Montaup | 10:10:58 |
| 3 was unsuccessful in selling its assets, and as | 10:11:02 |
| 4 part of the sale of those assets or power | 10:11:07 |
| 5 contracts, there would have been an obligation | 10:11:10 |
| 6 from the purchaser to provide standard offer | 10:11:12 |
| 7 service, that if that that was unsuccessful, | 10:11:15 |
| 8 Montaup agreed to continue providing standard | 10:11:21 |
| 9 offer service with its generating assets and | 10:11:24 |
| 10 purchase power contracts, if that's what you | 10:11:26 |
| 11 mean by "backstop." | 10:11:28 |
| 12  Q.  Yes.  Yes.  So your understanding -- do | 10:11:29 |
| 13 you recall the term of the standard offer | 10:11:31 |
| 14 service in Rhode Island? | 10:11:33 |
| 15  A.  I recall the term extended out through | 10:11:34 |
| 16 2009. | 10:11:43 |
| 17  Q.  Okay.  Was it your understanding that | 10:11:44 |
| 18 Montaup had an obligation, to the extent it | 10:11:46 |
| 19 kept its assets, to provide standard offer | 10:11:48 |
| 20 service up to 2009? | 10:11:50 |
| 21  A.  Yes. | 10:11:54 |
| 22  Q.  And to the extent that a purchaser bid | 10:11:56 |
| 23 in for the wholesale standard offer service | 10:11:59 |
| 24 contract, that removed that portion the | 10:12:02 |

| | Page 23 |
|---|---|
| 1 standard offer service obligation? | 10:12:05 |
| 2  A.  It would have removed a proportional | 10:12:06 |
| 3 share, yes. | 10:12:13 |
| 4  Q.  To the extent somebody, likewise, were | 10:12:13 |
| 5 to buy the assets, they would take on a | 10:12:16 |
| 6 proportional share of the standard offer | 10:12:20 |
| 7 service load with those assets? | 10:12:22 |
| 8  A.  Yes. | 10:12:23 |
| 9  Q.  Okay.  And that would similarly relieve | 10:12:24 |
| 10 Montaup of the obligation for the wholesale | 10:12:26 |
| 11 standard offer service? | 10:12:29 |
| 12  A.  Yes. | 10:12:30 |
| 13  Q.  Do you recall settlement agreements | 10:12:33 |
| 14 being filed with the state and federal | 10:12:36 |
| 15 regulators? | 10:12:39 |
| 16  A.  Yes, I do. | 10:12:40 |
| 17  Q.  Were you involved in the drafting of | 10:12:47 |
| 18 those? | 10:12:49 |
| 19  A.  I was involved in drafting portions of | 10:12:51 |
| 20 the settlements. | 10:12:57 |
| 21  Q.  Do you recall which portions? | 10:12:57 |
| 22  A.  Certainly anything to do with rates. | 10:13:01 |
| 23  Q.  That would -- | 10:13:06 |
| 24  A.  Rates and tariffs, and to some extent, | 10:13:08 |

| | Page 24 |
|---|---|
| 1 pricing, yes. | 10:13:12 |
| 2  Q.  What was your role in -- well, how did | 10:13:12 |
| 3 your department develop the tariffs that it | 10:13:18 |
| 4 followed for rates? | 10:13:21 |
| 5  A.  First of all, there was a requirement | 10:13:23 |
| 6 that the rates be unbundled; and in unbundling | 10:13:26 |
| 7 the rates, we had to break out | 10:13:36 |
| 8 responsibilities for generation, transmission, | 10:13:39 |
| 9 distribution -- and I think there was one | 10:13:43 |
| 10 other component -- and tried to develop | 10:13:49 |
| 11 pricing within the unbundled rate structure to | 10:14:02 |
| 12 reflect cost recovery of the revenue | 10:14:03 |
| 13 responsibility for each one of those areas, | 10:14:03 |
| 14 that was the start of the deregulation | 10:14:05 |
| 15 process, which was to unbundle rates, and this | 10:14:09 |
| 16 kind of goes back even earlier to the Public | 10:14:13 |
| 17 Utility Regulatory Policies Act, which was in | 10:14:20 |
| 18 place that required companies to develop fully | 10:14:21 |
| 19 allocated cost of service studies which formed | 10:14:26 |
| 20 the foundation for the unbundling of rates | 10:14:29 |
| 21 eventually. | 10:14:33 |
| 22  Q.  Okay. | 10:14:33 |
| 23  A.  It's a long process. | 10:14:35 |
| 24  Q.  No, I understand. | 10:14:37 |

| | Page 25 |
|---|---|
| 1      So when the standard offer service | 10:14:38 |
| 2 terms were drafted, who in your department | 10:14:40 |
| 3 actually drafted them, to your recollection? | 10:14:42 |
| 4  A.  The people in the rate department that | 10:14:44 |
| 5 are responsible for preparing rate tariffs are | 10:14:54 |
| 6 under the supervision of James Bonner.  So it | 10:14:59 |
| 7 would have been his staff, under my direction, | 10:15:04 |
| 8 that would have developed draft tariffs. | 10:15:08 |
| 9  Q.  Okay.  So your role would have been to | 10:15:12 |
| 10 review and comment, as necessary, on the | 10:15:16 |
| 11 tariff drafts? | 10:15:18 |
| 12  A.  Yes. | 10:15:19 |
| 13  Q.  Okay.  How did the -- prior to | 10:15:20 |
| 14 restructuring, how were -- let me understand. | 10:15:24 |
| 15      My understanding is Montaup | 10:15:31 |
| 16 provided fuel -- fuel -- provided electricity | 10:15:32 |
| 17 to the retail companies. | 10:15:35 |
| 18  A.  Montaup provided all requirement | 10:15:39 |
| 19 service, which means that the retail companies | 10:15:41 |
| 20 could not go out and acquire power because | 10:15:44 |
| 21 that would be a violation of their agreement | 10:15:49 |
| 22 with Montaup.  Montaup would be providing them | 10:15:51 |
| 23 their full requirement service. | 10:15:54 |
| 24  Q.  So, there was an agreement -- there was | 10:15:55 |

7 (Pages 22 to 25)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 26

1 a power supply between Montaup and the retail | 10:15:58
2 companies? | 10:16:01
3  A.  Yes.  That was -- that is -- was in | 10:16:02
4 effect at the Federal Energy Regulatory | 10:16:03
5 Commission. | 10:16:06
6  Q.  Okay.  And Montaup billed the retail | 10:16:06
7 companies for its costs, supply? | 10:16:10
8  A.  Montaup billed companies under rates | 10:16:12
9 that were reviewed and approved by the Federal | 10:16:15
10 Energy Regulatory Commission. | 10:16:21
11  Q.  What were the components of the rates | 10:16:21
12 that Montaup received for providing the power? | 10:16:24
13  A.  The components of Montaup's rates | 10:16:25
14 consisted of a base charge, a purchase | 10:16:26
15 capacity adjustment clause charge and a fuel | 10:16:31
16 charge; and at several times, there were other | 10:16:34
17 provisions like an oil conservation adjustment | 10:16:37
18 that was in place for a period of time which | 10:16:41
19 was designed to provide monies for the | 10:16:42
20 conversion of units from oil-fired to | 10:16:44
21 coal-fired generation. | 10:16:50
22      So over time there were components | 10:16:52
23 of rates that existed and then went away as | 10:16:53
24 times changed, but basically Montaup has a | 10:16:58

Page 27

1 demand charge that consisted of a base demand | 10:17:02
2 charge and a purchase capacity charge and an | 10:17:06
3 energy charge.  That's how it billed the | 10:17:09
4 company.  The energy charge was primarily just | 10:17:11
5 fuel. | 10:17:13
6  Q.  Okay.  How did the fuel provision work? | 10:17:13
7  A.  Montaup had a provision that was | 10:17:16
8 captioned "fuel adjustment clause," but in | 10:17:20
9 essence what Montaup did was bill its actual | 10:17:22
10 cost out to the retail companies on a monthly | 10:17:26
11 basis with a true-up adjustment for estimates | 10:17:28
12 that it would have had to use in order to | 10:17:33
13 generate the bills for the month-ending. | 10:17:36
14      In other words, it might not have | 10:17:39
15 had all of its cost components within that | 10:17:40
16 month, and it would estimate some of those | 10:17:44
17 costs, and then true-up those estimates the | 10:17:45
18 next month, but it pretty much billed actual | 10:17:48
19 cost. | 10:17:50
20  Q.  Okay.  Did Montaup assume any fuel | 10:17:51
21 risk? | 10:17:54
22  A.  Did Montaup -- | 10:17:59
23      MR. O'ROURKE:  Objection. | 10:18:01
24  A.  There was always a risk associated with | 10:18:02

Page 28

1 the Federal Energy Regulatory Commission's | 10:18:13
2 review of Montaup's activities.  There were | 10:18:15
3 audits periodically. | 10:18:18
4      So if you are asking me whether | 10:18:19
5 Montaup faced some risk associated with fuel, | 10:18:22
6 yes, it did. | 10:18:25
7  Q.  Okay.  The principle though was in | 10:18:27
8 Montaup's tariff it was compensated for its | 10:18:31
9 fuel costs? | 10:18:34
10  A.  It was fully compensated for its fuel | 10:18:34
11 costs, but also faced the risk that at some | 10:18:37
12 point in time if FERC did audit the books and | 10:18:39
13 found something it didn't like that it could | 10:18:41
14 be denied the ability to keep that revenue, | 10:18:43
15 and it would have to flow it back somehow. | 10:18:47
16  Q.  Okay.  And FERC's review was to review | 10:18:50
17 the reasonableness of the costs, I presume? | 10:18:53
18  A.  I can't specifically answer that, | 10:18:56
19 because I don't know what FERC's charge was | 10:19:00
20 when it came in to review the books and | 10:19:04
21 records of the company. | 10:19:07
22  Q.  How were the fuel costs at Montaup | 10:19:08
23 passed onto the end consumer? | 10:19:11
24  A.  The retail companies also had unbundled | 10:19:13

Page 29

1 rates, and in particular, the retail companies | 10:19:17
2 had fuel adjustment clause mechanisms. | 10:19:22
3      These mechanisms were designed to | 10:19:26
4 operate on a periodic basis, meaning, I think | 10:19:28
5 in Massachusetts, they were on a quarterly | 10:19:32
6 basis, and in Rhode Island, I think we moved | 10:19:35
7 to a six-month basis, where we would file to | 10:19:37
8 put in place a factor, a fuel charge factor, | 10:19:39
9 that would be allowed to be billed for six | 10:19:43
10 months; and at the end of the six months, | 10:19:46
11 revenues and expenses would be trued up and | 10:19:48
12 flow through to the next period in terms of | 10:19:52
13 the true-up adjustment for differences between | 10:19:55
14 revenues and expenses. | 10:19:58
15      In Rhode Island, in particular, that | 10:19:59
16 was all done on a forecast basis.  You had | 10:20:03
17 maybe two or three months of actual data and a | 10:20:05
18 couple of months of forecast data.  So you put | 10:20:08
19 your charge in place; and when you had the | 10:20:11
20 remaining months of actual data, you would | 10:20:15
21 true up that period and flow that adjustment | 10:20:17
22 into the next period. | 10:20:19
23      It was an ongoing -- but it pretty | 10:20:20
24 much was designed to recover dollar for dollar | 10:20:23

8 (Pages 26 to 29)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

| | Page 30 |
|---|---|
| 1 whatever was billed by Montaup to the retail | 10:20:26 |
| 2 companies. | 10:20:30 |
| 3     MR. WINSTON: Let me show what we | 10:20:30 |
| 4 will mark as Exhibit 62 and 63. | 10:20:33 |
| 5     EXHIBITS NOS. 62 AND 63 MARKED | 10:20:36 |
| 6  Q. Let me show you what has been marked as | 10:20:53 |
| 7 Exhibit 3. | 10:20:57 |
| 8     MR. O'ROURKE: 62? | 10:20:58 |
| 9  Q. 62. Is that a copy of Montaup's | 10:21:00 |
| 10 tariff? | 10:21:06 |
| 11  A. Yes, it is. | 10:21:08 |
| 12  Q. Showing you what has been marked as | 10:21:33 |
| 13 Exhibit 63, Montaup, what is Exhibit 63? | 10:21:35 |
| 14  A. 63? 63 is a rate tariff of Blackstone | 10:21:52 |
| 15 Valley Electric Company, Newport Electric | 10:21:58 |
| 16 Corporation. | 10:22:02 |
| 17  Q. It looks like some earlier drafts? | 10:22:14 |
| 18  A. And some earlier drafts, yes. | 10:22:16 |
| 19  Q. To your knowledge, did the retail | 10:22:18 |
| 20 companies always have a fuel adjustment clause | 10:22:21 |
| 21 in their retail tariffs? | 10:22:24 |
| 22  A. To my knowledge -- I can't say with 100 | 10:22:27 |
| 23 percent surety, because I don't recall going | 10:22:41 |
| 24 back to the beginning of when these companies | 10:22:44 |

| | Page 31 |
|---|---|
| 1 became -- first became electric utilities, | 10:22:53 |
| 2 whether or not the rates had fuel adjustments | 10:22:55 |
| 3 way back then. | 10:22:59 |
| 4  Q. Right. Is it fair to say that during | 10:22:59 |
| 5 your tenure there, since the early 1980s, the | 10:23:00 |
| 6 retail tariffs always had a fuel adjustment? | 10:23:10 |
| 7  A. Yes. Extending back that far, fuel | 10:23:13 |
| 8 adjustment clauses were in place, yes. | 10:23:16 |
| 9  Q. Okay. And are you aware of any tariffs | 10:23:18 |
| 10 filed by the retail companies that did not | 10:23:21 |
| 11 have a fuel adjustment, as you sit here today? | 10:23:23 |
| 12  A. Well, there are tariffs, other tariffs | 10:23:37 |
| 13 that were in place at other certain points in | 10:23:41 |
| 14 time that were other types of tariffs. | 10:23:43 |
| 15     So I would have to qualify that to | 10:23:46 |
| 16 say rate tariffs that were billed to | 10:23:48 |
| 17 customers, those kinds of tariffs did have | 10:23:53 |
| 18 fuel adjustment mechanisms. | 10:23:55 |
| 19  Q. Right. So the retail tariffs billed to | 10:23:58 |
| 20 customers, to your knowledge, you were not | 10:24:00 |
| 21 aware of any of those tariffs that did not -- | 10:24:02 |
| 22 let me start over. | 10:24:04 |
| 23     You were not aware of any retail | 10:24:05 |
| 24 tariffs to bill end customers that did not | 10:24:06 |

| | Page 32 |
|---|---|
| 1 have a fuel adjustment? | 10:24:10 |
| 2  A. Yes, I will agree to that. | 10:24:12 |
| 3  Q. Okay. Is that -- in your knowledge, is | 10:24:16 |
| 4 that -- outside of the utilities in Rhode | 10:24:18 |
| 5 Island, is that an industry-wide practice, to | 10:24:23 |
| 6 have fuel adjustments in the retail tariffs? | 10:24:23 |
| 7  A. I am aware that there are states that | 10:24:26 |
| 8 do allow fuel adjustments in their rate | 10:24:33 |
| 9 structures. | 10:24:36 |
| 10     I recall that because we used to | 10:24:37 |
| 11 submit calculations of typical bills to the | 10:24:41 |
| 12 Edison Electric Institute, and we would | 10:24:45 |
| 13 receive the summary of all of the states and | 10:24:47 |
| 14 what the bills were like and how they | 10:24:50 |
| 15 compared; and from looking at that | 10:24:52 |
| 16 information, there were certainly a lot of | 10:24:54 |
| 17 other states that did allow fuel clauses. | 10:24:56 |
| 18  Q. Okay. To your knowledge, were other | 10:24:58 |
| 19 generators, such as Montaup, nationwide, also | 10:25:03 |
| 20 compensated for fuel? | 10:25:06 |
| 21  A. To my knowledge, there were other | 10:25:10 |
| 22 wholesale rates that did contain fuel clause | 10:25:13 |
| 23 adjustments or fuel clause mechanisms that | 10:25:18 |
| 24 were approved by the federal commission. | 10:25:21 |

| | Page 33 |
|---|---|
| 1  Q. Do you recall the URA being enacted in | 10:25:23 |
| 2 1996 or thereabouts? | 10:25:26 |
| 3  A. Thereabouts, yes. | 10:25:28 |
| 4  Q. Okay. Do you recall reviewing that | 10:25:30 |
| 5 statute? | 10:25:31 |
| 6  A. I have to say I recall reviewing it, | 10:25:32 |
| 7 yes. Do I remember it? That's another story. | 10:25:38 |
| 8  Q. Let me show you a couple exhibits. | 10:25:43 |
| 9 This is Exhibit 2, which has been premarked, | 10:25:51 |
| 10 which is a copy of the URA. | 10:25:53 |
| 11     I am going to show you a bunch of | 10:25:59 |
| 12 exhibits here. | 10:26:01 |
| 13     MR. WINSTON: This will be marked | 10:26:16 |
| 14 as Exhibit 64. | 10:26:17 |
| 15     EXHIBIT NO. 64 MARKED | 10:26:19 |
| 16     MR. WINSTON: Let's call Exhibit 64 | 10:26:21 |
| 17 "Outline on URA Rate on Bundling." | 10:26:22 |
| 18  Q. Looking at Exhibit 64, you see there is | 10:26:27 |
| 19 a name down there in the disk drive, | 10:26:27 |
| 20 "StPierre/charts"? | 10:26:35 |
| 21  A. That's what it says. | 10:26:37 |
| 22  Q. Okay. Do you recall -- not necessarily | 10:26:38 |
| 23 this document -- but preparing outlines like | 10:26:40 |
| 24 this to evaluate the URA? | 10:26:42 |

9 (Pages 30 to 33)

**Page 34**

| | |
|---|---|
| 1  A. I'm sure I prepared documents like | 10:26:44 |
| 2 this. | 10:26:54 |
| 3      EXHIBIT NO. 65 MARKED | 10:26:59 |
| 4      MR. WINSTON: Let me show you what | 10:26:55 |
| 5 has been marked as Exhibit 65. This is -- | 10:26:56 |
| 6 call it "Differences Outline." | 10:27:18 |
| 7  Q. And that has a "DSP" on the end. | 10:27:31 |
| 8  A. Uh-huh. | 10:27:31 |
| 9  Q. Is it fair to say that is likely your | 10:27:36 |
| 10 document if it has your name on the bottom? | 10:27:37 |
| 11  A. More than likely it is my document, | 10:27:39 |
| 12 yes. | 10:27:55 |
| 13      EXHIBIT NO. 66 MARKED | 10:28:00 |
| 14  Q. Let me show you what has been marked as | 10:28:00 |
| 15 Exhibit 66, Rhode Island regulatory strategy | 10:27:59 |
| 16 outline. | 10:28:03 |
| 17      Who else might have prepared | 10:28:15 |
| 18 outlines? | 10:28:16 |
| 19      Well, I will ask you this question: | 10:28:17 |
| 20 I assume you don't recognize this particular | 10:28:19 |
| 21 outline? | 10:28:21 |
| 22  A. I don't recognize this one | 10:28:22 |
| 23 (indicating). | 10:28:24 |
| 24  Q. Okay. Who else would prepare outlines | 10:28:25 |

**Page 35**

| | |
|---|---|
| 1 like this at that time period? | 10:28:28 |
| 2  A. Based upon the caption, "Rhode Island | 10:28:32 |
| 3 regulatory strategy," in Exhibit 66, it had to | 10:28:41 |
| 4 be someone that had overall responsibility for | 10:28:45 |
| 5 coordinating the regulatory strategy. | 10:28:52 |
| 6  Q. So who might that person have been? | 10:28:57 |
| 7  A. Well, the person that was ultimately | 10:29:06 |
| 8 responsible for the coordination was Mike | 10:29:11 |
| 9 Hirsh. | 10:29:16 |
| 10  Q. What was Mike Hirsh's job in all of | 10:29:16 |
| 11 this? | 10:29:21 |
| 12  A. He was designated by the management of | 10:29:21 |
| 13 EUA to be the point person, the person to | 10:29:25 |
| 14 coordinate all of the activities related to | 10:29:31 |
| 15 restructuring. | 10:29:33 |
| 16  Q. So he was generally kept apprised of | 10:29:36 |
| 17 everything happening in the rate department? | 10:29:38 |
| 18      MR. O'ROURKE: Objection. | 10:29:40 |
| 19  A. He would have been apprised of issues | 10:29:42 |
| 20 that were consistent with our regulatory | 10:30:01 |
| 21 strategy from the rate department. | 10:30:07 |
| 22  Q. Is it fair to say that -- | 10:30:11 |
| 23  A. It's fair to say, too, that there were | 10:30:12 |
| 24 times where Mr. Hirsh would not have been in | 10:30:14 |

**Page 36**

| | |
|---|---|
| 1 direct communications based on the level of | 10:30:25 |
| 2 activity going on. | 10:30:31 |
| 3      In other words, you don't -- you | 10:30:32 |
| 4 don't go to the top one and bug the heck out | 10:30:35 |
| 5 of him every day to tell him the little | 10:30:40 |
| 6 details of what is going on. | 10:30:43 |
| 7  Q. So is it fair to say he would have been | 10:30:44 |
| 8 informed of the overall pricing for standard | 10:30:46 |
| 9 offer service in the rate department? | 10:30:49 |
| 10  A. At points in time, yes, uh-huh. | 10:30:53 |
| 11  Q. Was he generally pretty knowledgeable | 10:30:56 |
| 12 about the electrical industry? | 10:30:59 |
| 13      MR. O'ROURKE: Objection. | 10:31:01 |
| 14  A. It's said hard for me to say. | 10:31:17 |
| 15      I mean, I worked with Mike side by | 10:31:19 |
| 16 side on a lot of different activities, never | 10:31:20 |
| 17 really got into his overall knowledge about | 10:31:27 |
| 18 the electric utility industry. | 10:31:31 |
| 19  Q. Did he strike you as a capable guy? | 10:31:32 |
| 20      MR. O'ROURKE: Objection. | 10:31:36 |
| 21  A. I viewed Mike as a very intelligent | 10:31:41 |
| 22 individual. | 10:31:51 |
| 23  Q. Did he seem to have a pretty good grasp | 10:31:52 |
| 24 on the restructuring concepts? | 10:31:55 |

**Page 37**

| | |
|---|---|
| 1      MR. O'ROURKE: Objection. | 10:31:57 |
| 2  A. I will just say, in my, view Mike was | 10:32:20 |
| 3 more knowledgeable than a lot of other people | 10:32:26 |
| 4 in our organization on overall restructuring. | 10:32:28 |
| 5  Q. Okay. Was he somebody you'd rely on as | 10:32:33 |
| 6 far as what the company was doing with respect | 10:32:37 |
| 7 to the restructuring company-wide? | 10:32:40 |
| 8  A. He was our point person. I mean, he | 10:32:45 |
| 9 was the coordinator, so we had to go through | 10:32:50 |
| 10 him. | 10:32:53 |
| 11  Q. Okay. | 10:32:54 |
| 12  A. And if something -- if it were | 10:32:55 |
| 13 something that he didn't feel comfortable | 10:32:59 |
| 14 with, then I'm sure he went to another level | 10:33:01 |
| 15 to get a clarification or a direction. | 10:33:05 |
| 16  Q. Let me show you one more outline, | 10:33:13 |
| 17 Exhibit 3, which has been premarked. | 10:33:39 |
| 18      I am going to ask you if that | 10:33:44 |
| 19 outline looks familiar. | 10:33:46 |
| 20  A. I'm sure -- I recall reading outlines | 10:34:01 |
| 21 like this. | 10:34:03 |
| 22  Q. Might you have prepared an outline like | 10:34:06 |
| 23 that? | 10:34:08 |
| 24  A. I might have. | 10:34:09 |

10 (Pages 34 to 37)

Page 50

| | | |
|---|---|---|
| 1 | firm to make an assessment of how big the coal | 10:05:49 |
| 2 | pile was at that point in time and adjustments | 10:05:54 |
| 3 | were filed to reflect whether the books didn't | 10:05:58 |
| 4 | reflect the accuracy of what was in the coal | 10:06:05 |
| 5 | pile, called the coal pile adjustment, and we | 10:06:08 |
| 6 | went before the Rhode Island regulator to pass | 10:06:11 |
| 7 | through the coal pile adjustment as part of | 10:06:15 |
| 8 | the fuel cost, and it was denied by the Rhode | 10:06:18 |
| 9 | Island Commission. | 10:06:21 |
| 10 | So when you are saying that it's an | 10:06:22 |
| 11 | automatic pass-through because the mechanism | 10:06:25 |
| 12 | is in place, that's not true. The Rhode | 10:06:30 |
| 13 | Island Commission can review the procurement | 10:06:34 |
| 14 | practices of the company; and if it deems that | 10:06:36 |
| 15 | the company is not conducting its business | 10:06:38 |
| 16 | appropriately in terms of -- it can make | 10:06:41 |
| 17 | adjustments to rates. | 10:06:44 |
| 18 | Q. No, I understand the fuel adjustment | 10:06:45 |
| 19 | clauses are subject to regulatory review. | 10:06:48 |
| 20 | A. Right. But it also doesn't guarantee | 10:06:50 |
| 21 | that Montaup gets a hundred percent cost | 10:06:54 |
| 22 | recovery. | 10:06:56 |
| 23 | Q. I understand. Did you -- okay. | 10:06:57 |
| 24 | So, did you understand the standard | 10:07:09 |

Page 51

| | | |
|---|---|---|
| 1 | offer -- do you recall that the standard offer | 10:07:12 |
| 2 | had a set of rising prices through the term, | 10:07:16 |
| 3 | 2009? | 10:07:19 |
| 4 | A. What are we talking now? We are | 10:07:20 |
| 5 | looking at the URA? | 10:07:29 |
| 6 | Q. Yes. | 10:07:30 |
| 7 | A. The URA doesn't have a set of prices. | 10:07:33 |
| 8 | It has a formula. | 10:07:35 |
| 9 | Q. Right. And the formula is referring to | 10:07:36 |
| 10 | the CPI. | 10:07:37 |
| 11 | What do you understand that to | 10:07:41 |
| 12 | mean, or what did you understand at the time? | 10:07:42 |
| 13 | A. What I understand this to mean is that | 10:07:48 |
| 14 | there is a calculation built into the URA that | 10:07:50 |
| 15 | says when you add in the distribution, | 10:07:55 |
| 16 | transmission and transition charges, and the | 10:07:58 |
| 17 | standard offer can be up to 80 percent of the | 10:08:03 |
| 18 | value of the CPI times the 1996 number. | 10:08:09 |
| 19 | So that says the standard offer is a | 10:08:13 |
| 20 | variable, that it can be an offer up to, but | 10:08:16 |
| 21 | not exceeding this calculation. | 10:08:24 |
| 22 | Q. Did you at the time of when you | 10:08:25 |
| 23 | evaluated the URA understand that it allowed | 10:08:27 |
| 24 | for the possibility of adjustments for fuel | 10:08:31 |

Page 52

| | | |
|---|---|---|
| 1 | costs through the full term of the standard | 10:08:37 |
| 2 | offer service? | 10:08:42 |
| 3 | A. Rephrase that. | 10:08:42 |
| 4 | Q. Did you understand the URA to permit | 10:08:44 |
| 5 | application for adjustments in extraordinary | 10:08:50 |
| 6 | fuel costs throughout the entire 2009 term of | 10:08:54 |
| 7 | the standard offer service in Rhode Island? | 10:08:57 |
| 8 | MR. O'ROURKE: Objection. | 10:09:11 |
| 9 | A. I am not sure I came to that | 10:09:12 |
| 10 | understanding, but I -- in looking at the | 10:09:21 |
| 11 | verbiage in front of me, it says specifically | 10:09:23 |
| 12 | that changes in federal or local taxes or | 10:09:28 |
| 13 | extraordinary fuel costs. | 10:09:32 |
| 14 | Q. Did you ever understand the URA to | 10:09:39 |
| 15 | limit the ability to obtain extraordinary fuel | 10:09:43 |
| 16 | costs to some earlier time period than to the | 10:09:47 |
| 17 | end of standard offer service? | 10:09:51 |
| 18 | A. What I assume this to be is that there | 10:09:52 |
| 19 | is a requirement in here that if something | 10:09:57 |
| 20 | changes -- the federal, state or something | 10:10:00 |
| 21 | happens with fuel -- then something has to be | 10:10:03 |
| 22 | brought before the utility commission for a | 10:10:06 |
| 23 | determination as to whether or not they feel | 10:10:12 |
| 24 | these events should be recovered in rates | 10:10:14 |

Page 53

| | | |
|---|---|---|
| 1 | somehow. | 10:10:21 |
| 2 | Q. Right. You understood the URA to allow | 10:10:21 |
| 3 | the retail companies to apply for a fuel | 10:10:24 |
| 4 | adjustment at any year up to 2009? | 10:10:26 |
| 5 | A. The way I read this, it doesn't exclude | 10:10:40 |
| 6 | that. | 10:10:43 |
| 7 | If an event occurred, it would be an | 10:10:44 |
| 8 | obligation of the retail company to provide | 10:10:48 |
| 9 | evidence to the Commission that it incurred | 10:10:51 |
| 10 | extraordinary fuel costs in providing for | 10:10:54 |
| 11 | standard offer service and demonstrate whether | 10:10:57 |
| 12 | or not they took reasonable action and still | 10:11:00 |
| 13 | incurred those costs. | 10:11:06 |
| 14 | Q. Right. And I think the answer to my | 10:11:07 |
| 15 | question is "yes." | 10:11:09 |
| 16 | Your understanding of the URA was | 10:11:10 |
| 17 | that it permitted the retail companies to make | 10:11:13 |
| 18 | application for extraordinary fuel costs | 10:11:16 |
| 19 | throughout the full 2009 term of the standard | 10:11:18 |
| 20 | offer service in Rhode Island? | 10:11:21 |
| 21 | MR. O'ROURKE: Objection. | 10:11:28 |
| 22 | A. It is what it says. | 10:11:29 |
| 23 | Q. Is that what you understood? | 10:11:31 |
| 24 | A. What I -- I am trying to recall what I | 10:11:38 |

14 (Pages 50 to 53)

**Page 54**

| | |
|---|---|
| 1 understood back at that time, but I remember | 10:11:43 |
| 2 the changes in federal and state taxes being | 10:11:46 |
| 3 discussed, but I don't recall the | 10:11:50 |
| 4 extraordinary fuel costs provision, until you | 10:11:56 |
| 5 just showed it to me. | 10:12:02 |
| 6   Q. Let see. Let me show what has been | 10:12:04 |
| 7 premarked as Exhibit 8. Okay. | 10:12:07 |
| 8      Do you see it's an outline?  It | 10:12:28 |
| 9 looks like it is prepared by a JBB, at the | 10:12:29 |
| 10 bottom. | 10:12:31 |
| 11   A. Yes. | 10:12:31 |
| 12   Q. Who is that? | 10:12:32 |
| 13   A. James B. Bonner, the supervisor of | 10:12:33 |
| 14 rates. | 10:12:36 |
| 15   Q. Okay. Is this the type of outline that | 10:12:37 |
| 16 you would have reviewed? | 10:12:40 |
| 17   A. Yes. | 10:12:41 |
| 18   Q. And you see it says at the bottom of | 10:12:44 |
| 19 the first bullet, "The standard offer will be | 10:12:47 |
| 20 subject to upward adjustments and substantial | 10:12:52 |
| 21 increases in market fuel after 1999 by the | 10:12:54 |
| 22 operation of the standard fuel index." | 10:12:56 |
| 23   A. Yes. I read that. | 10:13:00 |
| 24   Q. Okay. It refers to triggers. | 10:13:04 |

**Page 55**

| | |
|---|---|
| 1      What do you recall about the | 10:13:07 |
| 2 triggers for the standard offer fuel index? | 10:13:08 |
| 3   A. I recall the construct, that there were | 10:13:20 |
| 4 trigger levels established. I don't recall | 10:13:29 |
| 5 precisely what they are, but -- | 10:13:33 |
| 6   Q. Do you recall discussing the trigger | 10:13:35 |
| 7 mechanism with Rick Sergel of NEES? | 10:13:37 |
| 8   A. I recall being at a meeting, but I | 10:13:42 |
| 9 don't recall that I had a direct discussion | 10:13:53 |
| 10 with him. | 10:13:58 |
| 11      MR. WINSTON: We will mark a new | 10:14:13 |
| 12 exhibit as No. 69? | 10:14:13 |
| 13      EXHIBIT NO. 69 MARKED | 10:14:18 |
| 14   Q. Let me show you Exhibit 69. | 10:14:27 |
| 15      You see that's testimony | 10:14:38 |
| 16 before the Public Utilities Commission? | 10:14:41 |
| 17   A. Yes. | 10:14:43 |
| 18   Q. You are smiling. You probably remember | 10:14:44 |
| 19 many of these meetings. | 10:14:47 |
| 20   A. Well, there is a name there I would | 10:14:47 |
| 21 like to forget. | 10:14:50 |
| 22   Q. You know what, I will leave it alone. | 10:14:52 |
| 23   A. Okay. | 10:14:55 |
| 24   Q. You see -- if you turn to Page 3 -- | 10:15:04 |

**Page 56**

| | |
|---|---|
| 1   A. Yes. | 10:15:08 |
| 2   Q. -- you see there there's your name | 10:15:13 |
| 3 listed and James Bonner listed? | 10:15:16 |
| 4   A. Yes. | 10:15:18 |
| 5   Q. Were you under oath at these | 10:15:18 |
| 6 proceedings? | 10:15:20 |
| 7   A. Yes. | 10:15:21 |
| 8      MR. O'ROURKE: Could you excuse me | 10:15:27 |
| 9 one moment -- I don't -- okay. There it is. | 10:15:30 |
| 10 Okay. | 10:15:34 |
| 11   Q. If you turn to Page 214 of your | 10:15:35 |
| 12 testimony, upper right-hand corner -- | 10:15:56 |
| 13   A. Yes. | 10:16:09 |
| 14   Q. -- you see there is a question of | 10:16:09 |
| 15 chairman about, asking about your | 10:16:11 |
| 16 interpretation of the law and the price cap | 10:16:15 |
| 17 for the standard offer, at the top the page. | 10:16:17 |
| 18   A. I see the chairman ask the question, | 10:16:23 |
| 19 yes. | 10:16:25 |
| 20   Q. Right. If you would just read to | 10:16:26 |
| 21 yourself your answer. | 10:16:29 |
| 22      Do you see you're discussing the | 10:16:53 |
| 23 URA, and the 12-year period corresponds to | 10:16:56 |
| 24 2009, correct? | 10:17:01 |

**Page 57**

| | |
|---|---|
| 1   A. Without looking at the exhibit, I | 10:17:03 |
| 2 assume it's a 12-year period. | 10:17:16 |
| 3   Q. Do you recall there was a 12-year | 10:17:18 |
| 4 standard offer service period in Rhode Island | 10:17:20 |
| 5 through 2009? | 10:17:22 |
| 6   A. There it is, yes. | 10:17:23 |
| 7   Q. And a seven-year standard offer service | 10:17:24 |
| 8 period through 2004 in Massachusetts? | 10:17:26 |
| 9   A. Right. I recall that. | 10:17:28 |
| 10   Q. Then if you turn to Page 99 -- | 10:17:30 |
| 11   A. Okay. | 10:17:50 |
| 12   Q. -- you see Mr. Benka ask a question. | 10:17:52 |
| 13      Who is Mr. Benka, do you recall? | 10:17:55 |
| 14   A. Not without -- | 10:18:01 |
| 15   Q. Since you're looking at the front -- | 10:18:02 |
| 16   A. Unless I look at something to refresh | 10:18:05 |
| 17 my memory. | 10:18:07 |
| 18   Q. Fair enough. If you look at your | 10:18:08 |
| 19 answer that spans from 99 to 100, there is a | 10:18:10 |
| 20 question about the standard offer service, | 10:18:14 |
| 21 and you see your answer. Read it to yourself. | 10:18:16 |
| 22      At the bottom of your statement it | 10:18:39 |
| 23 says, "The standard offer price is going to be | 10:18:41 |
| 24 fixed for this entire period subject only to | 10:18:43 |

15 (Pages 54 to 57)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 58

| | |
|---|---|
| 1 the fuel adjustment mechanism kicking in if it | 10:18:46 |
| 2 does kick in. | 10:18:49 |
| 3   A. Uh-huh. | 10:18:50 |
| 4   Q. Okay. "If it does kick in" is the | 10:18:51 |
| 5 regulatory approval? | 10:18:53 |
| 6   A. Right. | 10:18:54 |
| 7   Q. Let me also show you what has been | 10:18:58 |
| 8 marked as Exhibit 4. If you would look at | 10:19:08 |
| 9 that, that is a letter to the Public Utilities | 10:19:20 |
| 10 Commission. | 10:19:22 |
| 11       If you just look at Page 4, that's | 10:19:27 |
| 12 what you write in that letter. | 10:19:34 |
| 13   A. Yes. | 10:19:35 |
| 14   Q. If you see on the second page -- who | 10:19:35 |
| 15 generally wrote these letters? Did you write | 10:19:40 |
| 16 them? | 10:19:42 |
| 17       MR. O'ROURKE: Objection. | 10:19:44 |
| 18   A. A combination of things would happen. | 10:19:46 |
| 19 Any time we are filing a tariff advice, we | 10:20:02 |
| 20 also work with legal counsel. | 10:20:06 |
| 21       So whether this was drafted by me or | 10:20:10 |
| 22 drafted by legal counsel, or vice versa, we | 10:20:15 |
| 23 always go through that process before anything | 10:20:18 |
| 24 goes to the utility commission, on a | 10:20:21 |

Page 59

| | |
|---|---|
| 1 regulatory basis, like a tariff advice filing, | 10:20:24 |
| 2 is reviewed by counsel. | 10:20:26 |
| 3   Q. Okay. You would have reviewed this | 10:20:27 |
| 4 letter before you signed it? | 10:20:32 |
| 5   A. Yes, uh-huh. | 10:20:33 |
| 6   Q. And you would have made sure it was | 10:20:34 |
| 7 accurate? | 10:20:35 |
| 8   A. Yes. | 10:20:36 |
| 9   Q. And if you look at the second page, it | 10:20:36 |
| 10 refers to an order of the PUC dated July 10, | 10:20:43 |
| 11 1998, at the very top. | 10:20:47 |
| 12   A. Yes. | 10:20:49 |
| 13   Q. And then you note in the order that the | 10:20:49 |
| 14 Commission noted, and the first sentence, it | 10:20:51 |
| 15 refers to the settlement agreement which -- or | 10:20:55 |
| 16 the -- it refers to something called the ASA, | 10:20:59 |
| 17 a service agreement with Montaup. | 10:21:02 |
| 18   A. Right. | 10:21:04 |
| 19   Q. And then it says, "Under the terms of | 10:21:05 |
| 20 the ASA, Montaup Electric Company is committed | 10:21:08 |
| 21 to provide this standard offer power supply to | 10:21:11 |
| 22 the companies at fixed standard offer price | 10:21:12 |
| 23 subject to fuel index over term that this | 10:21:15 |
| 24 standard offer service will be available in | 10:21:17 |

Page 60

| | |
|---|---|
| 1 Rhode Island." | 10:21:19 |
| 2   A. Yes, I read that. | 10:21:20 |
| 3   Q. This was an accurate letter when you | 10:21:27 |
| 4 wrote it? | 10:21:30 |
| 5       MR. O'ROURKE: Objection. Are you | 10:21:30 |
| 6 implying that he wrote those words? | 10:21:36 |
| 7       MR. WINSTON: I am implying he sent | 10:21:38 |
| 8 the letter. | 10:21:40 |
| 9       MR. O'ROURKE: Okay. | 10:21:40 |
| 10   A. I guess in reading that sentence, it | 10:21:41 |
| 11 could be interpreted several ways. | 10:21:59 |
| 12   Q. Mr. St. Pierre, when you were at EUA, | 10:22:02 |
| 13 did you ever discuss with anybody the | 10:22:06 |
| 14 possibility of the fuel adjustment ending | 10:22:08 |
| 15 prior to the end of 2009? | 10:22:10 |
| 16   A. Not ending prior to, but I recall | 10:22:12 |
| 17 discussions way late in the game, where we | 10:22:21 |
| 18 were made aware that Narragansett Electric and | 10:22:25 |
| 19 the New England electric systems were | 10:22:31 |
| 20 proposing to extend the fuel index mechanism | 10:22:33 |
| 21 out to 2009. | 10:22:37 |
| 22   Q. Okay. When was that? | 10:22:44 |
| 23   A. It surely had to be within this late | 10:22:47 |
| 24 1998 time frame, and I don't recall | 10:22:53 |

Page 61

| | |
|---|---|
| 1 specifically the dates. | 10:22:59 |
| 2   Q. Did you ever have any discussions at | 10:23:00 |
| 3 EUA about a decision of EUA not to have a fuel | 10:23:02 |
| 4 adjustment for the standard offer service | 10:23:06 |
| 5 through 2009? | 10:23:10 |
| 6   A. The way you phrased the question, I | 10:23:33 |
| 7 would have to say no. | 10:23:39 |
| 8   Q. Okay. And the standard offer service | 10:23:41 |
| 9 was priced by the filing of tariffs by your | 10:23:44 |
| 10 department, was it not? | 10:23:45 |
| 11   A. Yes, it was. | 10:23:47 |
| 12   Q. You were director of that department? | 10:23:49 |
| 13   A. Yes. | 10:23:50 |
| 14   Q. And as the director of that department, | 10:23:54 |
| 15 you were unaware of any decision or plan by | 10:23:56 |
| 16 EUA to stop the fuel adjustment prior to 2009; | 10:24:01 |
| 17 isn't that correct? | 10:24:08 |
| 18   A. Could you restate that? | 10:24:08 |
| 19   Q. Were you aware of any plan or decision | 10:24:12 |
| 20 by any of the EUA companies to stop applying | 10:24:17 |
| 21 for a fuel adjustment before 2009? | 10:24:21 |
| 22   A. No. But I would have to qualify that | 10:24:30 |
| 23 answer, because I don't recall any discussion | 10:24:33 |
| 24 of the fuel adjustment extending out to 2009 | |

16 (Pages 58 to 61)

Page 62

```
10:24:37   1 in our original settlement negotiations.
10:24:43   2       The construct that I recall was that
10:24:46   3 the fuel adjustment mechanism was going to be
10:24:48   4 in place in Mass. and Rhode Island only
10:24:50   5 through 2004.
10:24:53   6  Q. Did you intend to comply with the URA
10:24:57   7 requirement that the standard offer service be
10:24:58   8 provided in Rhode Island through 2009?
10:25:00   9       MR. O'ROURKE: Objection.
10:25:00  10  A. Yes.
10:25:01  11  Q. Did you understand that you made some
10:25:04  12 agreement with the regulators that was
10:25:05  13 inconsistent with the statute?
10:25:07  14  A. No.
10:25:14  15  Q. Okay.
10:25:16  16  A. And I say that, because if the statute
10:25:21  17 is the law, and the law says that at some
10:25:24  18 point in time the companies have the ability
10:25:27  19 to petition the Commission for an adjustment
10:25:32  20 to standard offer, that language doesn't have
10:25:34  21 to be in a tariff to be in effect, that
10:25:38  22 legislation is the law.
10:25:40  23       So that carries with it the ability
10:25:43  24 of the companies to seek permission to recover
```

Page 63

```
10:25:46   1 in rates extraordinary fuel costs if in fact
10:25:49   2 they incur them.
10:25:51   3  Q. Through 2009, correct?
10:25:53   4  A. Right.
10:25:54   5  Q. Or if their suppliers incur them
10:25:57   6 through 2009, correct?
10:26:03   7  A. I am not sure I can agree to that, if
10:26:05   8 their suppliers.
10:26:06   9  Q. Well, the retail companies incur fuel
10:26:09  10 costs.
10:26:10  11  A. The retail companies would have been
10:26:13  12 billed under the wholesale -- amended service
10:26:16  13 agreement at those stipulated prices, if we
10:26:21  14 are still in that time frame.
10:26:25  15       What I am saying to you is that the
10:26:32  16 law as written provides that there be an
10:26:38  17 opportunity to recover extraordinary fuel
10:26:41  18 costs as well as increases in federal and
10:26:43  19 state taxes, if and when those events happen.
10:26:47  20  Q. Through 2009?
10:26:48  21  A. Through 2009.
10:26:52  22       THE VIDEOGRAPHER: We need to
10:26:54  23 change tapes.
10:26:54  24       MR. WINSTON: Okay.
```

Page 64

```
10:26:54   1       THE VIDEOGRAPHER: This is the end
10:26:55   2 of tape number one. The time is 10:24. We
10:27:00   3 are off the record.
10:35:27   4       (A recess was taken.)
10:35:27   5       THE VIDEOGRAPHER: We are back on
10:35:28   6 the record. The time is 10:32.
10:35:43   7  BY MR. WINSTON:
10:35:44   8  Q. Okay. Mr. St. Pierre, you mentioned
10:35:49   9 that there was discussion about stopping the
10:35:53  10 Rhode Island standard offer service at 2004.
10:35:55  11 What did you mean by that?
10:35:56  12  A. My recall goes back to our federal
10:36:04  13 filing, and that's the filing where we
10:36:07  14 submitted to the federal commission the
10:36:09  15 settlement agreements for Mass. and Rhode
10:36:12  16 Island, and the construct that I recall for
10:36:15  17 those settlements was that the fuel trigger
10:36:22  18 mechanism for both states only extended
10:36:25  19 through 2004.
10:36:29  20  Q. Okay. Did you ever have any
10:36:46  21 discussions with regulators about the retail
10:37:00  22 companies not being able to file for
10:37:01  23 extraordinary fuel cost through the full term
10:37:05  24 of the standard offer service?
```

Page 65

```
10:37:06   1  A. No, I did not.
10:37:07   2  Q. Are you aware of any such discussions
10:37:10   3 with regulators?
10:37:12   4  A. I am not.
10:37:13   5  Q. What did EUA -- what was the process
10:37:17   6 that EUA went through to implement the URA?
10:37:20   7  A. First we had to understand what impact
10:37:37   8 the URA had on our company, which is why you
10:37:40   9 see some of those summaries of the URA.
10:37:45  10       Then we had to formulate a business
10:37:49  11 plan and add and allocate the appropriate
10:37:52  12 resources to implement whatever the URA called
10:37:59  13 for, and the rate department made a full
10:38:06  14 commitment, power management made a full
10:38:09  15 commitment, and it was just mind-boggling with
10:38:12  16 everything that was going on, how a small
10:38:14  17 company could allocate resources and come out
10:38:18  18 at the end of this process with something that
10:38:20  19 looked like we made it, but it definitely was
10:38:24  20 a trying experience, and I remember some of my
10:38:28  21 people, it was not unusual to work 80, 90 hour
10:38:33  22 weeks.
10:38:39  23  Q. For what time period was that?
10:38:40  24  A. Almost two years.
```

17 (Pages 62 to 65)

**Page 70**

| | |
|---|---|
| 1 to the public? | 10:43:50 |
| 2   A.  In what context are you -- | 10:43:57 |
| 3   Q.  Well, was there encouragement to have, | 10:43:58 |
| 4 for example, the pricing uniform to end | 10:44:01 |
| 5 consumers? | 10:44:05 |
| 6   A.  There was an encouragement to have the | 10:44:06 |
| 7 pricing uniform, yes. | 10:44:09 |
| 8   Q.  Do you recall how EUA developed the | 10:44:14 |
| 9 pricing in its settlement agreement? | 10:44:19 |
| 10   A.  I am sure that that information in | 10:44:31 |
| 11 terms of the pricing structure was provided to | 10:44:35 |
| 12 us, either directly or indirectly, from NEES, | 10:44:39 |
| 13 and, again, they were months ahead of us in | 10:44:46 |
| 14 negotiations. | 10:44:49 |
| 15       MR. WINSTON: Let me show you what | 10:45:05 |
| 16 I will mark as Exhibit 70. | 10:45:07 |
| 17       MR. O'ROURKE: Are you through with | 10:45:22 |
| 18 these? | 10:45:23 |
| 19       MR. WINSTON: I think so. Thanks. | 10:45:24 |
| 20   Q.  While you're searching for that, let | 10:46:17 |
| 21 me show you what has been marked as Exhibit 9. | 10:46:19 |
| 22       You see this is a letter dated | 10:46:56 |
| 23 February 28 enclosing a memorandum of | 10:46:58 |
| 24 understanding? | 10:47:01 |

**Page 71**

| | |
|---|---|
| 1   A.  Yes. | 10:47:02 |
| 2   Q.  Okay. If you turn down to what as the | 10:47:03 |
| 3 number 61662 on the lower right? | 10:47:10 |
| 4   A.  Yes. | 10:47:13 |
| 5   Q.  "Settlement terms," and there's your | 10:47:13 |
| 6 initials, "DSP," at the bottom? | 10:47:15 |
| 7   A.  Yes. | 10:47:17 |
| 8   Q.  Do you recall drafting these settlement | 10:47:18 |
| 9 terms? | 10:47:20 |
| 10   A.  I don't recall specifically, but I am | 10:47:27 |
| 11 there. | 10:47:30 |
| 12   Q.  Okay. Do you know how -- had EUA | 10:47:31 |
| 13 previously prepared settlement terms with the | 10:47:39 |
| 14 State of Massachusetts? | 10:47:41 |
| 15   A.  I believe we were -- Massachusetts, we | 10:47:49 |
| 16 were ahead of Rhode Island, yes. I believe we | 10:47:54 |
| 17 were ahead. We would have done this -- | 10:47:57 |
| 18   Q.  Right. Let me just help you out here a | 10:48:02 |
| 19 little bit. Let me show you what has been | 10:48:04 |
| 20 marked as Exhibit 7. | 10:48:08 |
| 21   A.  Right. I see that. | 10:48:12 |
| 22       So, yes, we were ahead in terms of | 10:48:14 |
| 23 settlement discussions in Massachusetts. | 10:48:21 |
| 24   Q.  Okay. And looking at -- if you look at | 10:48:23 |

**Page 72**

| | |
|---|---|
| 1 the memorandum of understanding, the Rhode | 10:48:39 |
| 2 Island one -- | 10:48:42 |
| 3   A.  Uh-huh. | 10:48:43 |
| 4   Q.  -- if you turn down to number 61664 -- | 10:48:44 |
| 5   A.  Yes. | 10:48:52 |
| 6   Q.  -- you see there's that paragraph we | 10:48:53 |
| 7 saw before in the draft, "The standard offer | 10:48:56 |
| 8 will be subject to upward adjustments in the | 10:48:58 |
| 9 event of substantial fuel increases," and then | 10:49:00 |
| 10 it refers to trigger levels, triggers again? | 10:49:04 |
| 11   A.  Okay. Let me read this. | 10:49:08 |
| 12   Q.  Sure. | 10:49:10 |
| 13   A.  I see that, yes. | 10:49:18 |
| 14   Q.  Okay. Where did EUA get the trigger | 10:49:20 |
| 15 levels? | 10:49:28 |
| 16   A.  I am pretty sure the framework came | 10:49:31 |
| 17 from something that was supplied to us | 10:49:34 |
| 18 directly or indirectly from NEES. | 10:49:36 |
| 19   Q.  Okay. Do you recall getting the | 10:49:39 |
| 20 trigger numbers from NEES? | 10:49:43 |
| 21   A.  I don't recall. | 10:49:45 |
| 22   Q.  Do you recall developing them on -- do | 10:49:46 |
| 23 you recall that EUA developed them on their | 10:49:50 |
| 24 own? | 10:49:53 |

**Page 73**

| | |
|---|---|
| 1   A.  I don't believe we developed them on | 10:49:53 |
| 2 our own. | 10:49:55 |
| 3   Q.  Okay. Let me show you what has been | 10:49:55 |
| 4 marked as Exhibit 10. This is a -- I will | 10:50:12 |
| 5 tell what it is. You can verify, but it is | 10:50:34 |
| 6 a draft NEES settlement for Massachusetts | 10:50:36 |
| 7 dated October '96. | 10:50:39 |
| 8   A.  Okay. | 10:50:41 |
| 9   Q.  And if you look at the third page here, | 10:50:44 |
| 10 you can see it says "New England Power | 10:50:50 |
| 11 Company." | 10:50:53 |
| 12   A.  Yep, I see. | 10:50:53 |
| 13   Q.  And "Attorney General of Massachusetts" | 10:50:54 |
| 14 is in the second line. | 10:50:56 |
| 15   A.  Yes. | 10:51:00 |
| 16   Q.  Okay. I am just familiarizing you. | 10:51:05 |
| 17       And then you see, if you turn down | 10:51:09 |
| 18 to Page 46734 -- | 10:51:11 |
| 19   A.  Not that far -- okay. | 10:51:23 |
| 20   Q.  Then you see there's a paragraph there, | 10:51:26 |
| 21 5.1, Standard Offer Service. | 10:51:29 |
| 22   A.  Yes. | 10:51:31 |
| 23   Q.  Refers to an Attachment 4, and the next | 10:51:32 |
| 24 page has the prices through 2004. | 10:51:35 |

19 (Pages 70 to 73)

Page 122

1  A. Yes.  11:53:58
2  Q. And if you turn the page to 56523 --  11:54:01
3  A. Okay.  11:54:16
4  Q. -- there is the question, "What average  11:54:16
5  annual increases in the price of residual oil  11:54:17
6  and gas would trigger the fuel adjustment  11:54:19
7  mechanism in 1999, 2000 and 2010?"  11:54:21
8  A. Yes. I see the question.  11:54:25
9  Q. And then there is an answer that refers  11:54:26
10 to, "Unable to estimate rates of growth that  11:54:30
11 would cause the fuel index to be triggered in  11:54:32
12 2000 and thereafter. The fuel index does not  11:54:37
13 apply in 1998 or 1999."  11:54:40
14 A. I see that.  11:54:43
15 Q. Did EUA feel an obligation to be honest  11:54:44
16 in its responses to requests from parties such  11:54:56
17 as Enron?  11:54:56
18 A. Yes.  11:54:56
19 Q. Do you think this is a fair disclosure,  11:54:56
20 if there was no fuel index intended at all  11:54:58
21 from 2005 to '9?  11:55:01
22 A. Well, I don't read that. It says: The  11:55:04
23 fuel index to be triggered in 2000 and  11:55:07
24 thereafter. I don't know what "thereafter"  11:55:10

Page 123

1  means. "Thereafter" could be mean 2004.  11:55:11
2    It says we are unable to do --  11:55:18
3  Q. Let me show --  11:55:20
4  A. -- to prepare the answer, and  11:55:21
5  "thereafter" to me means -- it could be any  11:55:26
6  time, "thereafter."  11:55:29
7  Q. Would Montaup agree to a worse deal  11:55:30
8  than NEES on its backstop obligation?  11:55:35
9  A. I can't comment on that, because I  11:55:38
10 don't know what you are saying.  11:55:46
11    Why would I even have an  11:55:48
12 understanding that the NEES deal was better  11:55:51
13 than the EUA deal?  11:55:52
14 Q. If you're --  11:55:53
15 A. You are asking me something that I  11:55:54
16 can't. I am not an expert there.  11:55:56
17 Q. Do you think it's preferable for  11:55:58
18 Montaup to have a fuel index from 2005 to '9  11:56:00
19 or to not have a fuel index on a stipulated  11:56:03
20 set of prices?  11:56:06
21 A. I can't envision what Montaup's  11:56:07
22 circumstances would be.  11:56:15
23    It's not -- I am not part of that  11:56:16
24 business. I don't know what risks Montaup  11:56:18

Page 124

1  would face if it was putting itself in that  11:56:22
2  position; or if it did or did not have a fuel  11:56:27
3  index. It's just not my bailiwick.  11:56:29
4  Q. Before this dispute arose, did you ever  11:56:40
5  have any discussions at EUA about the FERC  11:56:47
6  agreement limiting the fuel adjustment to  11:56:50
7  2004?  11:56:53
8  A. I'm sure there were discussions amongst  11:56:53
9  our team.  11:57:06
10 Q. Do you recall any, Mr. St. Pierre?  11:57:07
11 A. The discussions I recall were the fact  11:57:09
12 that we wanted uniformity in Rhode Island and  11:57:16
13 Massachusetts with respect to our companies.  11:57:18
14 Q. Well, then why did you -- then why did  11:57:20
15 you do stipulated prices in Rhode Island after  11:57:27
16 2004 in Rhode Island?  11:57:29
17 A. Because the period extended through  11:57:31
18 2009. It was either agree to a set of  11:57:34
19 stipulated prices or follow what the URA is  11:57:37
20 telling us to do beyond 2004.  11:57:43
21 Q. Doesn't the URA provide for  11:57:46
22 extraordinary fuel prices, all the way through  11:57:48
23 the term, Mr. St. Pierre?  11:57:51
24 A. The way I read it, yes, there is a  11:57:52

Page 125

1  provision that if extraordinary fuel costs are  11:57:57
2  incurred -- and I would have to go back and  11:58:02
3  make sure that's defined as the supplier  11:58:05
4  incurred the extraordinary fuel costs, because  11:58:08
5  you could read that that if the retail company  11:58:12
6  went out for competitive bid for a  11:58:16
7  solicitation, and the prices came in way out  11:58:20
8  of whack, but there was no other choice but to  11:58:24
9  accept them, then the Commission would be  11:58:27
10 allowed, or the Commission would allow the  11:58:29
11 company to recover those extraordinary costs.  11:58:31
12    THE VIDEOGRAPHER: We have to go  11:58:36
13 off the record and change the tapes.  11:58:37
14    MR. WINSTON: Okay.  11:58:39
15    THE VIDEOGRAPHER: This is the end  11:58:40
16 of tape number two. The time is 11:55. We  11:58:41
17 are off the record.  11:58:46
18    (A lunch recess was taken from  11:58:46
19    11:55 a.m. to 12:32 p.m.)  11:58:46
20
21
22
23
24

32 (Pages 122 to 125)

Page 142

| | |
|---|---|
| 1 with legislative mandates and other factors. | 12:57:27 |
| 2     So, I mean, there are differences in | 12:57:31 |
| 3 Rhode Island and Mass. with respect to the | 12:57:33 |
| 4 Utility Restructuring Acts. You can't have | 12:57:35 |
| 5 the same ball of wax in both jurisdictions | 12:57:37 |
| 6 when there is different legislative bodies. | 12:57:41 |
| 7   Q. The period after Massachusetts ends in | 12:57:43 |
| 8 2004, you have Rhode Island going on for four | 12:57:45 |
| 9 more years, correct? | 12:57:48 |
| 10   A. That's right. | 12:57:49 |
| 11   Q. What discussions do you remember about | 12:57:50 |
| 12 the fuel index after 2004 in Rhode Island | 12:57:53 |
| 13 concerning this settlement agreement, if any? | 12:57:58 |
| 14   A. None. I don't recall any discussions, | 12:58:01 |
| 15 other than when we made our Rhode Island and | 12:58:04 |
| 16 Mass. filings as uniformed as possible with | 12:58:09 |
| 17 respect to standard offer in fuel index, | 12:58:12 |
| 18 because Rhode Island was going out through | 12:58:15 |
| 19 2009, we felt that the URA language provided a | 12:58:18 |
| 20 guideline beyond the 2004 period, as indicated | 12:58:23 |
| 21 in the document that was noted as Paragraph C. | 12:58:26 |
| 22   Q. And you have told me what you think is | 12:58:31 |
| 23 what the URA provided is that the retail | 12:58:33 |
| 24 companies were permitted to apply for | 12:58:37 |

Page 143

| | |
|---|---|
| 1 extraordinary fuel costs through 2009? | 12:58:39 |
| 2   A. Right. Because they were also required | 12:58:42 |
| 3 to do competitive solicitation for standard | 12:58:44 |
| 4 offer service; and if that meant that the | 12:58:49 |
| 5 prices that they incurred for standard offer | 12:58:52 |
| 6 service were deemed by the commission to be | 12:58:57 |
| 7 excessive, they would limit recovery and | 12:58:59 |
| 8 retail rates and defer recovery of dollars to | 12:59:01 |
| 9 later periods. | 12:59:05 |
| 10   Q. You didn't view this settlement | 12:59:06 |
| 11 agreement as prohibiting the retail companies | 12:59:07 |
| 12 from filing for a fuel adjustment in Rhode | 12:59:11 |
| 13 Island after 2005 under the EUA, did you? | 12:59:17 |
| 14     MR. O'ROURKE: What settlement? | 12:59:19 |
| 15     MR. WINSTON: This EUA settlement. | 12:59:21 |
| 16   A. The federal commission? It certainly | 12:59:22 |
| 17 didn't prohibit, but it didn't require either. | 12:59:26 |
| 18   Q. But you did not view this settlement | 12:59:30 |
| 19 agreement with FERC in Rhode Island in October | 12:59:33 |
| 20 '97 as prohibiting the retail companies from | 12:59:39 |
| 21 filing for a fuel index in Rhode Island for | 12:59:42 |
| 22 the period 2005 to 2009? | 12:59:44 |
| 23   A. It didn't prohibit, but when you look | 12:59:47 |
| 24 at the fact that this was a settlement | 12:59:50 |

Page 144

| | |
|---|---|
| 1 agreement amongst many parties; if you wanted | 12:59:53 |
| 2 to take something beyond the terms of this | 12:59:57 |
| 3 settlement agreement and file it with the | 13:00:00 |
| 4 appropriate regulators, say, a fuel index | 13:00:02 |
| 5 mechanism, then you would have all of the | 13:00:06 |
| 6 other interveners petition to oppose that. | 13:00:10 |
| 7   Q. Well, let's not speculate on what would | 13:00:16 |
| 8 have happened. | 13:00:16 |
| 9     I am simply asking the question: | 13:00:17 |
| 10 Did you view the retail companies to have | 13:00:17 |
| 11 retained the ability to file for a fuel index | 13:00:20 |
| 12 for the period 2005 to 2009 in their standard | 13:00:22 |
| 13 offer service retail tariffs? | 13:00:26 |
| 14     MR. O'ROURKE: Objection. | 13:00:29 |
| 15   A. I am giving you an answer, and I am | 13:00:30 |
| 16 qualifying that answer. | 13:00:32 |
| 17     No, it didn't prohibit it; but in | 13:00:33 |
| 18 terms of the facts, the retail regulators | 13:00:36 |
| 19 would suggest that if a company on its own | 13:00:39 |
| 20 wanted to file something beyond the terms of a | 13:00:44 |
| 21 settlement agreement, the other parties would | 13:00:47 |
| 22 have the right to come in and object. | 13:00:49 |
| 23     Why would they have the right? | 13:00:52 |
| 24 Because that would lead to higher costs to | 13:00:53 |

Page 145

| | |
|---|---|
| 1 consumers, and the Attorney General's office | 13:00:55 |
| 2 and the Division do not want higher rates. | 13:00:58 |
| 3   Q. My question -- just focus on my | 13:01:00 |
| 4 question -- my question is, in your view, | 13:01:03 |
| 5 after this FERC settlement in October of '97, | 13:01:07 |
| 6 the retail companies retained the ability to | 13:01:13 |
| 7 file for a fuel index in their standard offer | 13:01:13 |
| 8 service tariffs for the period 2004 to 2009; | 13:01:18 |
| 9 yes or no? | 13:01:22 |
| 10     MR. O'ROURKE: Objection. | 13:01:22 |
| 11   A. They were not prohibited from doing so. | 13:01:23 |
| 12   Q. Does that mean they were permitted to | 13:01:25 |
| 13 do so? | 13:01:28 |
| 14   A. The companies can file anything they | 13:01:30 |
| 15 want. Whether it goes through the regulatory | 13:01:33 |
| 16 process with some success, that is a risk. | 13:01:36 |
| 17   Q. Sure. It's always a risk, right? | 13:01:38 |
| 18   A. Of course. | 13:01:40 |
| 19   Q. As you told us, Montaup's filings | 13:01:41 |
| 20 weren't even approved all of the time for fuel | 13:01:43 |
| 21 indexes? | 13:01:46 |
| 22   A. Right. Exactly. | 13:01:47 |
| 23   Q. Now, you also mentioned that -- let's | 13:01:56 |
| 24 do this: Were you involved in any discussions | 13:02:12 |

37 (Pages 142 to 145)

| | Page 146 | |
|---|---|---|
| 1 | as to whether a fuel index was a desirable | 13:02:22 |
| 2 | feature for the asset or wholesale standard | 13:02:29 |
| 3 | offer service bidding? | 13:02:32 |
| 4 | A. I was not directly, because it's not my | 13:02:34 |
| 5 | area of expertise. | 13:02:39 |
| 6 | Q. What do you know about it? | 13:02:41 |
| 7 | A. I don't know much at all about the | 13:02:42 |
| 8 | bidding process, other than some general | 13:02:56 |
| 9 | concepts. | 13:02:58 |
| 10 | Q. Okay. Well, with respect to a fuel | 13:03:00 |
| 11 | index, do you have any general context of what | 13:03:01 |
| 12 | a fuel index means to a supplier -- a fuel | 13:03:06 |
| 13 | adjustment means to a supplier in a long-term | 13:03:08 |
| 14 | supply contract? | 13:03:12 |
| 15 | A. Yes. It means some reduced risk -- | 13:03:12 |
| 16 | Q. Okay. | 13:03:16 |
| 17 | A. -- of high prices. | 13:03:17 |
| 18 | Q. And if you are trying to bid a standard | 13:03:20 |
| 19 | offer service contract, that is a desirable | 13:03:23 |
| 20 | feature for a supplier who might bid on the | 13:03:25 |
| 21 | contracts, correct? | 13:03:28 |
| 22 | A. It's one of many desirable features. | 13:03:29 |
| 23 | Q. Was the discussion about the fact that | 13:03:33 |
| 24 | the wholesale standard offer service bid had | 13:03:38 |

| | Page 147 | |
|---|---|---|
| 1 | to include a fuel adjustment through the term | 13:03:43 |
| 2 | in order to have suppliers bid? | 13:03:45 |
| 3 | A. I am not aware of that. | 13:03:47 |
| 4 | Q. Let me show you what has been marked as | 13:03:51 |
| 5 | Exhibit No. 5. Rumor has it, you have No. 5 | 13:04:07 |
| 6 | in your pile. | 13:04:18 |
| 7 | Do you see this is a May 11th -- | 13:04:36 |
| 8 | the cover sheet says, "May 11." | 13:04:38 |
| 9 | A. Okay. | 13:04:40 |
| 10 | Q. It is in response to a Commission data | 13:04:41 |
| 11 | request dated October 30, '97. | 13:04:43 |
| 12 | A. Okay. | 13:04:47 |
| 13 | Q. Then you see this is -- this is Michael | 13:04:48 |
| 14 | Hirsh's response. | 13:04:53 |
| 15 | A. All right. | 13:04:54 |
| 16 | Q. Okay. Then you see at the top -- | 13:04:55 |
| 17 | well, you see it says, "Reply: The commitment | 13:05:01 |
| 18 | from Montaup to provide standard offer service | 13:05:03 |
| 19 | at a specified price must be taken in the | 13:05:05 |
| 20 | context of the complete settlement offer." | 13:05:08 |
| 21 | A. Which page are you on? | 13:05:10 |
| 22 | Q. It's Commission 1.3. | 13:05:11 |
| 23 | A. I got it. | 13:05:18 |
| 24 | Q. Okay. The first sentence in the reply | 13:05:19 |

| | Page 148 | |
|---|---|---|
| 1 | is what I just read, and Item No. 1 is, "Serve | 13:05:20 |
| 2 | the standard offer requirements of Blackstone, | 13:05:24 |
| 3 | Newport and Eastern -- I won't read the whole | 13:05:26 |
| 4 | thing -- "at a price, plus a fuel index." | 13:05:30 |
| 5 | A. Uh-huh. | 13:05:31 |
| 6 | Q. If you would read the next few | 13:05:32 |
| 7 | sentences at the to top of the next page. | 13:05:34 |
| 8 | A. Okay. | 13:05:58 |
| 9 | Q. Do you recall discussions at EUA about | 13:05:59 |
| 10 | the absolute need to have a fuel index in the | 13:06:03 |
| 11 | standard offer service in order to have any | 13:06:09 |
| 12 | suppliers bid for those contracts? | 13:06:10 |
| 13 | A. I don't recall. | 13:06:11 |
| 14 | Q. Do you have any reason to disagree with | 13:06:17 |
| 15 | the views expressed by Mr. Hirsh in that | 13:06:20 |
| 16 | paragraph? | 13:06:23 |
| 17 | A. I am not sure I understand what views | 13:06:54 |
| 18 | you are talking about. | 13:07:00 |
| 19 | Q. Well, the views expressed at the top of | 13:07:01 |
| 20 | the page that neither Montaup nor any | 13:07:04 |
| 21 | suppliers could be expected to provide a | 13:07:09 |
| 22 | 12-year long-term commitment at a fixed price. | 13:07:11 |
| 23 | A. It says, "Clearly Montaup could not | 13:07:15 |
| 24 | agree to a set of terms that would leave it | 13:07:16 |

| | Page 149 | |
|---|---|---|
| 1 | with no generating resources and a 12-year | 13:07:19 |
| 2 | commitment to provide an unspecified load | 13:07:23 |
| 3 | requirement." | 13:07:25 |
| 4 | Q. Then on the next page -- | 13:07:26 |
| 5 | A. If Montaup has no assets, it's not | 13:07:27 |
| 6 | going to be in business anymore. | 13:07:29 |
| 7 | Q. What's the next sentence? | 13:07:30 |
| 8 | A. "Similarly, buyers of generating assets | 13:07:31 |
| 9 | contracted to provide standard offer service | 13:07:33 |
| 10 | under the scheduled prices could not be | 13:07:34 |
| 11 | expected to accept such terms." | 13:07:36 |
| 12 | In other words, you want to buy an | 13:07:38 |
| 13 | asset, but you want to buy a stream of | 13:07:41 |
| 14 | revenues that goes with it -- an obligation -- | 13:07:44 |
| 15 | that there is a revenue stream to go along | 13:07:48 |
| 16 | with the asset. | 13:07:51 |
| 17 | You don't want to the buy an asset | 13:07:52 |
| 18 | with no possible revenues coming in, and | 13:07:54 |
| 19 | that's the situation Montaup would have been | 13:07:56 |
| 20 | in. You take the asset and you leave me with | 13:07:59 |
| 21 | the obligation to provide the service. | 13:08:00 |
| 22 | Q. Well, isn't he referring to the buyers | 13:08:00 |
| 23 | of the generating assets? | 13:08:02 |
| 24 | A. Well, it's referring to Montaup as | 13:08:03 |

38 (Pages 146 to 149)

| | Page 186 | |
|---|---|---|
| 1 | applies to this one entity, then it uniformly | 14:01:47 |
| 2 | applies to all entities. | 14:01:50 |
| 3 | Q. Understood. | 14:01:51 |
| 4 | A. Anything in a tariff becomes a | 14:01:52 |
| 5 | contract, become the force of law, and you | 14:01:54 |
| 6 | have to be very careful what you put in a rate | 14:01:58 |
| 7 | tariff. | 14:02:01 |
| 8 | Q. Right. But weren't you -- wasn't what | 14:02:02 |
| 9 | EUA was doing here was reserving its rights as | 14:02:03 |
| 10 | to whether it was going to file -- as to what | 14:02:06 |
| 11 | it was going to file for the period 2005 to | 14:02:09 |
| 12 | '9? | 14:02:13 |
| 13 | MR. O'ROURKE: Objection. | 14:02:13 |
| 14 | A. The company was going to do what it | 14:02:13 |
| 15 | felt it was going to do at that particular | 14:02:17 |
| 16 | point in time for whatever the circumstances | 14:02:20 |
| 17 | were that presented -- that were presented to | 14:02:22 |
| 18 | it, and I can't postulate as to what that | 14:02:26 |
| 19 | would be. | 14:02:29 |
| 20 | Q. Right. Did anyone ever tell you, or | 14:02:30 |
| 21 | were you aware of any discussion to the effect | 14:02:37 |
| 22 | that BUA was never going to file fuel triggers | 14:02:40 |
| 23 | after 2004 in Rhode Island? | 14:02:43 |
| 24 | A. It was never brought up in discussion. | 14:02:45 |

| | Page 187 | |
|---|---|---|
| 1 | Q. Okay. Or that any corporate decision | 14:02:48 |
| 2 | had been made not file fuel triggers in Rhode | 14:02:56 |
| 3 | Island after 2004? | 14:02:59 |
| 4 | A. It was never brought up for discussion. | 14:03:00 |
| 5 | So there was no decision one way or other that | 14:03:03 |
| 6 | I'm aware of. | 14:03:05 |
| 7 | Q. And let me show you what's -- a new | 14:03:06 |
| 8 | exhibit. This is all I have left, which in | 14:03:22 |
| 9 | some circumstances might seem like a lot, but | 14:03:31 |
| 10 | in our circumstance, is not very much. | 14:03:33 |
| 11 | Similarly, were there any | 14:03:58 |
| 12 | conversations with any regulators promising | 14:03:59 |
| 13 | not file fuel adjustments after 2004 in Rhode | 14:04:01 |
| 14 | Island? | 14:04:07 |
| 15 | A. I am not aware of any conversations | 14:04:07 |
| 16 | that existed one way or the other with | 14:04:09 |
| 17 | regulators regarding that mechanism. | 14:04:12 |
| 18 | EXHIBIT NO. 75 MARKED | 14:04:35 |
| 19 | Q. This is Exhibit 75. Who is -- see this | 14:04:35 |
| 20 | is testimony -- this is late '99. | 14:04:53 |
| 21 | So what is common in your tariff | 14:05:01 |
| 22 | filings is that until a decision is made to | 14:05:03 |
| 23 | change the tariffs or the PUC tells you to, | 14:05:06 |
| 24 | you just copy the old tariffs over, changing | 14:05:09 |

| | Page 188 | |
|---|---|---|
| 1 | the price, but you would not normally change | 14:05:16 |
| 2 | any of the provisions in there, unless you had | 14:05:19 |
| 3 | cause to do so. | 14:05:21 |
| 4 | A. That's true. | 14:05:22 |
| 5 | Q. Would it surprise you if the tariff | 14:05:24 |
| 6 | that was filed in 1999 had "the Department" | 14:05:26 |
| 7 | written where the indices should be filed? | 14:05:30 |
| 8 | MR. O'ROURKE: Objection. | 14:05:33 |
| 9 | A. No. It wouldn't surprise me. | 14:05:33 |
| 10 | Q. If you look at -- is testimony by | 14:05:36 |
| 11 | -- well, on the first page it says by a Mark | 14:05:42 |
| 12 | Maloy. | 14:05:44 |
| 13 | A. Okay. | 14:05:50 |
| 14 | Q. Do you know who that is? | 14:05:51 |
| 15 | A. I have no idea. | 14:05:52 |
| 16 | Q. Now if you turn to Page 32, towards the | 14:05:53 |
| 17 | bottom, Line 17, they ask, they are asking | 14:05:59 |
| 18 | something of a Mr. Sorgman. | 14:06:03 |
| 19 | A. Yes. | 14:06:05 |
| 20 | Q. Who was Mr. Sorgman? | 14:06:05 |
| 21 | A. Mr. Sorgman was a supervisor that | 14:06:08 |
| 22 | reported directly to me. | 14:06:11 |
| 23 | Q. What was he responsible for? | 14:06:12 |
| 24 | A. He was responsible for the revenue | 14:06:15 |

| | Page 189 | |
|---|---|---|
| 1 | requirements function and for preparing | 14:06:23 |
| 2 | allocated cost-of-service studies that were | 14:06:26 |
| 3 | the basis for some of our rate design studies. | 14:06:29 |
| 4 | Q. Were you aware of generally the supply | 14:06:33 |
| 5 | contracts that had been signed with suppliers | 14:06:37 |
| 6 | in the 1999 -- '98-'99 time period? | 14:06:43 |
| 7 | A. Not specifically, no. | 14:06:47 |
| 8 | Q. Did you know who had taken -- did you | 14:06:49 |
| 9 | have an understanding that as of some point in | 14:06:52 |
| 10 | 1998 or '99 all the standard offer service | 14:06:54 |
| 11 | load had been transferred away from Montaup? | 14:06:58 |
| 12 | A. Yes. But I don't recall specifically | 14:07:01 |
| 13 | who the entities were. | 14:07:05 |
| 14 | Q. Do you recall that one of them was | 14:07:07 |
| 15 | TransCanada? | 14:07:09 |
| 16 | A. Yes. | 14:07:09 |
| 17 | Q. How about Constellation? | 14:07:10 |
| 18 | A. Not specifically. | 14:07:12 |
| 19 | Q. Or NRG? | 14:07:14 |
| 20 | A. Not specifically. I know the names, | 14:07:16 |
| 21 | but I don't know. | 14:07:18 |
| 22 | Q. Okay. Would you have been familiar | 14:07:21 |
| 23 | with those, the terms of those contracts at | 14:07:23 |
| 24 | the time? | 14:07:27 |

48 (Pages 186 to 189)

Page 194

| | 14:12:02 |
|---|---|
1 exercise.

2  Q. Did you ever talk to anybody from Reed?   14:12:04

3  A. No.   14:12:06

4  Q. Let me show you what has been marked as   14:12:07

5 Exhibit 4. This is an information memorandum   14:12:11

6 prepared by Reed for the asset divestiture.   14:12:16

7      Is that a document you have would   14:12:20

8 have seen?   14:12:22

9  A. No.   14:12:22

10  Q. Okay. By the way, did anyone ever tell   14:12:25

11 you that any of the suppliers for standard   14:12:33

12 offer service had agreed to a fuel index term   14:12:35

13 less than the full term of the standard offer,   14:12:38

14 before this dispute arose?   14:12:42

15  A. I never talked to anybody about that   14:12:45

16 issue.   14:12:50

17  Q. Okay. So the answer is "no"?   14:12:51

18  A. Right.   14:12:53

19      EXHIBIT NO. 76 MARKED   14:12:59

20  Q. Let me show you what's been marked as   14:12:54

21 Exhibit 76.   14:12:57

22      Okay. This appears to be a   14:13:11

23 transition list related to the merger.   14:13:14

24  A. Right.   14:13:16

Page 195

1  Q. And you'll see, in fact, that there's a   14:13:17

2 big, huge task list attached to this.   14:13:19

3  A. Uh-huh.   14:13:22

4  Q. When did the merger first come up as a   14:13:23

5 possible event?   14:13:28

6  A. Well, it certainly had to be before   14:13:29

7 March of 1999, which is the date on the top of   14:13:33

8 this.   14:13:36

9  Q. What was your involvement in --   14:13:37

10  A. Actually, not -- I will let you finish   14:13:45

11 the question.   14:13:47

12  Q. I'm sorry. What was your involvement   14:13:47

13 in the merger transition with NEES?   14:13:50

14  A. My initial responsibility was to   14:13:53

15 provide information, because this was a merger   14:14:02

16 between NEES and EUA.   14:14:05

17      The larger merger with National Grid   14:14:10

18 was something that was handled by the New   14:14:15

19 England Electric people. We EUA people were   14:14:19

20 not really actively involved.   14:14:22

21  Q. You were doing the merger between   14:14:24

22 Narragansett --   14:14:26

23  A. Right. We were absorbed in that one   14:14:27

24 and all of a sudden --   14:14:29

Page 196

1  Q. Okay. You were doing the retail   14:14:32

2 company merger?   14:14:33

3  A. Right. Right.   14:14:35

4  Q. You see at the bottom, it says,   14:14:35

5 "Overview of transition, teams will gain   14:14:37

6 understanding of how both companies work."   14:14:40

7  A. Uh-huh.   14:14:41

8  Q. And then under "Role of task teams and   14:14:42

9 leaders," "be realistic" -- blah, blah,   14:14:47

10 blah -- "will differ from existing NEES model   14:14:50

11 by exception."   14:14:53

12  A. Okay.   14:14:54

13  Q. What was the -- was that -- what was   14:14:55

14 the goal in the -- was that a goal to sort of   14:14:58

15 -- what does that mean? What does that refer   14:15:04

16 to?   14:15:06

17  A. I really don't know.   14:15:06

18  Q. Okay. If you turn the page to the   14:15:08

19 transition team, you see on the first page of   14:15:10

20 the spreadsheet, there's you and an individual   14:15:17

21 named T. Schwennessen.   14:15:19

22  A. Yes.   14:15:21

23  Q. Who is T. Schwennessen?   14:15:21

24  A. Terry Schwennessen at the time was a   14:15:23

Page 197

1 person in the rate department at New England   14:15:26

2 Electric System.   14:15:30

3  Q. Okay. And --   14:15:30

4  A. She wasn't the department head at the   14:15:32

5 time, but she was --   14:15:34

6  Q. She was working in rates?   14:15:35

7  A. She was working in the rate area, yes.   14:15:38

8  Q. Was she equivalent to, say, Mr. Bonner?   14:15:39

9  A. Yes. I am not sure the titles were,   14:15:43

10 because titles at that point in time didn't   14:15:48

11 mean much to anybody because of the transition   14:15:50

12 we were going through, but...   14:15:53

13  Q. And it says, "Review required rates   14:15:55

14 standard offer contracts."   14:15:59

15      What were you responsible for as   14:16:00

16 far as the merger?   14:16:03

17  A. Pretty much providing Terry   14:16:04

18 Schwennessen with anything she wanted to   14:16:07

19 review.   14:16:08

20  Q. I mean, what was the method for the --   14:16:18

21 there was a rate consolidation, was there not?   14:16:24

22  A. I'm sure the rate consolidation was one   14:16:24

23 of the objectives of consolidating the   14:16:27

24 companies, yes. At some point in time you   14:16:32

50 (Pages 194 to 197)

Page 198

| | |
|---|---|
| 1 want one uniformed set of rates for each | 14:16:34 |
| 2 particular state. | 14:16:37 |
| 3   Q.  Okay.  And how was that accomplished? | 14:16:38 |
| 4 I mean, how did you go about consolidating the | 14:16:42 |
| 5 rates? | 14:16:45 |
| 6   A.  Well, first of all, you have to | 14:16:45 |
| 7 identify your customer characteristics by rate | 14:16:47 |
| 8 class, accumulate all of the data points, | 14:16:50 |
| 9 meaning all of the billing determinants for | 14:16:52 |
| 10 the entire 12-month period, and then you have | 14:16:54 |
| 11 to take all of that information, and, say, | 14:16:56 |
| 12 okay, what would these customers have paid | 14:16:58 |
| 13 under EUA rates, and what are going to be | 14:17:00 |
| 14 paying under the Narragansett rates, and | 14:17:04 |
| 15 determine whether or not certain customers | 14:17:06 |
| 16 were getting increases or decreases, and if | 14:17:08 |
| 17 so, of what magnitude, because one the goals | 14:17:11 |
| 18 is you can't just consolidate customers on a | 14:17:13 |
| 19 rate schedule and have some customers get | 14:17:16 |
| 20 increases and some customers get decreases, | 14:17:19 |
| 21 that voids one of the provisions of the | 14:17:19 |
| 22 settlement or the merger to provide discounts | 14:17:23 |
| 23 to all customers or provide rate reductions to | 14:17:24 |
| 24 all customers. | 14:17:25 |

Page 199

| | |
|---|---|
| 1        So now once you've identified what | 14:17:26 |
| 2 your trouble areas are, you have to put a | 14:17:28 |
| 3 transition plan in place, a phase-in plan over | 14:17:29 |
| 4 a period of time to move customers to rates | 14:17:32 |
| 5 and mitigate the impacts.  So it is a very | 14:17:37 |
| 6 detailed process. | 14:17:40 |
| 7   Q.  So is part of that identifying various | 14:17:43 |
| 8 rates charged by both companies? | 14:17:46 |
| 9   A.  Uh-huh. | 14:17:47 |
| 10   Q.  Identifying differences in those rates? | 14:17:48 |
| 11   A.  Right. | 14:17:50 |
| 12   Q.  That includes adjustment provisions, I | 14:17:50 |
| 13 presume? | 14:17:53 |
| 14   A.  Everything. | 14:17:53 |
| 15   Q.  Okay.  Part of it would be to identify | 14:17:55 |
| 16 differences in fuel index provisions? | 14:17:59 |
| 17   A.  That be would one of your | 14:18:02 |
| 18 responsibilities, yes, anything in one set of | 14:18:08 |
| 19 rates that is different than the other set of | 14:18:12 |
| 20 rates. | 14:18:14 |
| 21   Q.  Why is that important? | 14:18:16 |
| 22   A.  Again, when you are trying to reach a | 14:18:17 |
| 23 goal of one set of rates for the entire rate | 14:18:23 |
| 24 population within a state -- in this | 14:18:26 |

Page 200

| | |
|---|---|
| 1 particular state, you're talking three | 14:18:30 |
| 2 companies you are trying to move to one | 14:18:32 |
| 3 uniform set of rates -- it becomes a very | 14:18:34 |
| 4 ticklish issue. | 14:18:37 |
| 5   Q.  Okay.  What were you required to file | 14:18:41 |
| 6 with the Rhode Island entities?  As far as the | 14:18:46 |
| 7 rate consolidation, what were you required to | 14:18:48 |
| 8 file? | 14:18:50 |
| 9   A.  Well, the New England system was | 14:18:50 |
| 10 required to file a rate plan that showed how | 14:18:52 |
| 11 they were going to move customers to one set | 14:18:56 |
| 12 of rates over time, demonstrate impacts, all | 14:18:59 |
| 13 of that good stuff, and put together a plan | 14:19:02 |
| 14 for review and approval by the Comission. | 14:19:04 |
| 15   Q.  Did you identify similarities and | 14:19:06 |
| 16 differences in these filings between the rates | 14:19:09 |
| 17 of the differing companies? | 14:19:11 |
| 18   A.  We were more interested in customer | 14:19:14 |
| 19 impacts. | 14:19:14 |
| 20   Q.  Okay. | 14:19:15 |
| 21   A.  We weren't really too concerned about | 14:19:16 |
| 22 applicability clauses and those kinds of | 14:19:19 |
| 23 things, because they are pretty much standard | 14:19:22 |
| 24 across utility rate structures. | 14:19:24 |

Page 201

| | |
|---|---|
| 1   Q.  Okay.  Do you recall any discussions at | 14:19:26 |
| 2 the time of the merger about the fuel index | 14:19:29 |
| 3 provisions of the two various companies? | 14:19:31 |
| 4   A.  None. | 14:19:33 |
| 5   Q.  Do you recall any identification of any | 14:19:34 |
| 6 difference in the fuel index provisions? | 14:19:36 |
| 7   A.  No. | 14:19:38 |
| 8   Q.  Do you recall any difference identified | 14:19:40 |
| 9 between the terms of the fuel index provisions | 14:19:43 |
| 10 of the two companies? | 14:19:45 |
| 11   A.  No.  Again, my role was to provide the | 14:19:46 |
| 12 information.  Terry Schwennessen would have | 14:19:54 |
| 13 been the person responsible for providing that | 14:19:56 |
| 14 summary information to -- | 14:19:59 |
| 15   Q.  The PUC? | 14:20:03 |
| 16   A.  No.  To her higher levels.  It looks | 14:20:04 |
| 17 like Tom Rogers and Bob Powderly. | 14:20:07 |
| 18        So they would prepare periodic | 14:20:11 |
| 19 reports on the progress, what they identified: | 14:20:14 |
| 20 problems or resolutions. | 14:20:17 |
| 21   Q.  Did you ever hear anybody from the | 14:20:17 |
| 22 Narragansett or National Grid side identify | 14:20:20 |
| 23 any differences in the fuel index provisions | 14:20:23 |
| 24 between the companies? | 14:20:25 |

51 (Pages 198 to 201)

**Page 202**

1　A. Not to my knowledge.　14:20:27

2　Q. Or did you ever hear them identify any　14:20:28

3　differences in the length of the fuel index　14:20:30

4　provision in Rhode Island between the two　14:20:33

5　companies?　14:20:34

6　A. Not to my knowledge.　14:20:34

7　Q. Did you ever see any documents that　14:20:36

8　they produced at the time of the merger that　14:20:38

9　indicated that they felt there was any　14:20:40

10　difference between the fuel index provisions　14:20:42

11　of the two companies?　14:20:44

12　A. No.　14:20:46

13　Q. Or that indicated that there was a　14:20:47

14　difference between the length of the fuel　14:20:49

15　index provisions of the two companies?　14:20:51

16　A. No.　14:20:52

17　Q. When I say "the two companies," I mean　14:20:53

18　Narragansett, on the one hand, and BVE and　14:20:55

19　Newport, correct?　14:20:57

20　A. Yes, I understand.　14:20:58

21　Q. And you never identified any difference　14:21:01

22　in the length of the fuel index provision to　14:21:06

23　anyone at National Grid, did you?　14:21:07

24　　MR. O'ROURKE: Objection.　14:21:08

**Page 203**

1　A. I did not.　14:21:09

2　Q. Were you involved in any of the notice　14:21:11

3　letters to contractors at the time of the　14:21:18

4　merger?　14:21:20

5　A. What type of notice letters?　14:21:26

6　Q. I will show you one.　14:21:28

7　　MR. WINSTON: We will mark this as　14:21:31

8　an exhibit.　14:21:32

9　　EXHIBIT NO. 77 MARKED　14:21:32

10　Q. Exhibit No. 77. It's a draft. So it's　14:21:33

11　got some scribbles on the front, but if you　14:22:07

12　look at the next page, you see that's a notice　14:22:09

13　letter saying: Hello, we are merging.　14:22:12

14　A. Okay.　14:22:16

15　Q. Are these the types of letters -- would　14:22:17

16　you have been consulted about any of these　14:22:18

17　types of letters?　14:22:20

18　A. No, I would not.　14:22:21

19　Q. Were you involved in -- how would --　14:22:23

20　when there were rate plans -- were there rate　14:22:27

21　plans filed with the PUC to let them know how　14:22:30

22　the rate consolidation was going forward?　14:22:35

23　A. There might have been.　14:22:38

24　Q. Were you involved with those?　14:22:40

**Page 204**

1　A. No, I was not.　14:22:42

2　Q. So the way it worked is you provided　14:22:44

3　information about your rates and schedules to　14:22:47

4　Terry Schwennessen, and then they made the　14:22:50

5　filings?　14:22:52

6　A. Right. Terry Schwennessen and Jim　14:22:54

7　Bonner were the expert witnesses that appeared　14:22:58

8　before the Comission on rate consolidation　14:23:01

9　plan --　14:23:03

10　Q. Okay.　14:23:05

11　A. -- that was filed.　14:23:05

12　Q. Who were the two?　14:23:06

13　A. Terry Schwennessen and James Bonner.　14:23:06

14　Q. Is that because James Bonner had then　14:23:11

15　moved over to the other company?　14:23:13

16　A. I don't know specifically the time of　14:23:14

17　that, but...　14:23:19

18　Q. Right. Okay.　14:23:21

19　　MR. WINSTON: If I show you what we　14:23:22

20　will mark as Exhibit 78.　14:23:25

21　　EXHIBIT NO. 78 MARKED　14:23:26

22　Q. So that is a rate plan filing in　14:23:30

23　support of the merger?　14:23:43

24　A. Yes, it is.　14:23:44

**Page 205**

1　Q. Is that something you would have　14:23:45

2　reviewed?　14:23:46

3　A. I would have been looking at it, and I　14:23:46

4　would have been communicating with Mr. Bonner　14:24:06

5　on how he was progressing with all of the rate　14:24:09

6　analysis work that was being done, but all of　14:24:13

7　this information was being sent up to Terry　14:24:15

8　Schwennessen to put together this filing plan,　14:24:21

9　rate filing plan.　14:24:26

10　Q. After you left EUA -- I may have asked　14:24:31

11　this -- did anyone from National Grid or　14:24:41

12　Narragansett ever call you to ask you about　14:24:45

13　the application of the fuel index in the EUA　14:24:52

14　zone after 2004?　14:24:58

15　A. No one ever called me, for anything.　14:24:59

16　Q. That must have been very flattering.　14:25:06

17　　Give me two minutes.　14:25:13

18　A. Sure.　14:25:15

19　　THE VIDEOGRAPHER: The time is　14:25:19

20　2:22. We are off the record.　14:25:22

21　　(A discussion was held off the record.)　14:28:00

22　　THE VIDEOGRAPHER: Stand by.　14:28:00

23　Okay. We are back on the record. The time is　14:28:08

24　2:25.　14:28:11

52 (Pages 202 to 205)

# Taylor

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3             (Central Division)

4  - - - - - - - - - - - - - - - - - - - - - - - - - -

5  TRANSCANADA POWER MARKETING, LTD.,

6          Plaintiff,

7

8          vs                    C.A. No. 05-40076FDS

9

10 NARRAGANSETT ELECTRIC COMPANY,

11         Defendant.

12 - - - - - - - - - - - - - - - - - - - - - - - - - -

13      DEPOSITION OF WILLIAM C. TAYLOR, called as a

14 witness by counsel for the Defendant, pursuant to

15 the provisions of Massachusetts Rules of Civil

16 Procedure, before Victoria S. Reade, Professional

17 Court Reporter and Notary Public, in and for the

18 Commonwealth of Massachusetts, taken at Bowditch &

19 Dewey, 311 Main Street, Worcester, Massachusetts, on

20 Monday, March 12, 2007, commencing at 9:30 a.m.

21

22

23

24

Page 2

1    APPEARANCES:
2    CHOAT HALL & STEWART
3    BY: Mr. Daniel C. Winston, Esq.
4    Two International Place
5    Boston, Massachusetts 02110
6    617-248-4049
7    dwinston@choate.com
8    Counsel for the Plaintiff
9
10   TRANSCANADA PIPELINES LIMITED
11   BY: Ms. Jody D.M. Johnson, Esq.
12   450 1ST Street S.W.
13   Calgery, Alberta, Canada T2P 5H1
14   403-920-2706
15
16   BOWDITCH & DEWEY
17   BY: Mr. Vincent O'Rourke, Esq.
18   311 Main Street
19   Worcester, Massachusetts 01615
20   508-926-3424
21   vorourke@bowditch.com
22   Counsel for the Defendant
23
24

Page 4

1    110    News Release              140
2
3    111    Correspondence            153
4
5    112    Chart                     158
6
7    113    Handwritten Notes of W. Taylor    160
8
9    114    PUC2 Correspondence       175
10
11          EXHIBITS RETAINED BY ATTORNEY O'ROURKE
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2
3    Testimony of:  Direct  Cross  Redirect  Recross
4    William C. Taylor
5    by Mr. O'Rourke  5
6
7
8              E X H I B I T S
9
10   Exhibit No.                    Page

11   103    Correspondence            59
12
13   104    Handwritten Notes of W. Taylor    78
14
15   105    Analysis                  88
16
17   106    Arbitration Hearing Transcript    102
18
19   107    Invoice                   103
20
21   108    Analysis                  106
22
23   109    Handwritten Notes of W. Taylor    111
24

Page 5

1              P R O C E E D I N G S
2              WILLIAM CHARLES TAYLOR, having
3    first been satisfactorily identified by
4    the production of his driver's license,
5    was duly sworn by the Notary Public and
6    testified as follows:
7    DIRECT EXAMINATION BY MR. O'ROURKE:
8    Q.    Mr. Taylor, could you please state your
9          full name for the record, please.
10   A.    William Charles Taylor.
11   Q.    And if other than shaking your hand I
12         didn't introducing myself, my name is Vin
13         O'Rourke.  I represent Narragansett
14         TransCanada in this matter.
15              Have you been deposed before,
16   sir?
17   A.    Yes.
18   Q.    How many times?
19   A.    Couple of times.
20   Q.    You probably know the drill but I'll give
21         you a little bit of it.
22              MR. O'ROURKE:  Before we do
23   that, stand stipulates, all objections
24   except as to form, all motions to strike

2 (Pages 2 to 5)

Page 6

1  reserved until trial. Is the witness
2  going to read and sign?
3          MR. WINSTON: Yes, we'll read
4  and sign, waive notarization.
5          MR. O'ROURKE: Any other
6  standard stips?
7          MR. WINSTON: That's it.
8  BY MR. O'ROURKE;
9  Q.  If you have been deposed before, you know
10  I am going to be asking you questions
11  regarding the matter of TransCanada versus
12  Narragansett.
13          If you don't understand any of
14  my questions, feel free to say so and I
15  will rephrase them for you. You have to
16  answer yes or no verbally so the court
17  reporter can take it down and from time to
18  time I will remind you of that if I
19  remember to.
20          If you need a break at any time,
21  that's fine, we'll be taking breaks and if
22  you need to break to talk to your counsel,
23  that's fine too, but I'd appreciate it if
24  you'd not do so while a question is

Page 7

1  pending, okay.
2  A.  Sure.
3  Q.  I don't think I had him spell his name for
4  you, why don't I do that?
5  A.  W-i-l-l-i-a-m  C-h-a-r-l-e-s T-a-y-l-o-r.
6  Q.  And, sir, how old are you?
7  A.  42.
8  Q.  Where do you live?
9  A.  In live in Westboro, Mass.
10  Q.  Your address?
11  A.  7 Katie Drive, Westboro, 01581.
12  Q.  And where are you employed?
13  A.  I am employed with TransCanada Power
14  Marketing in Westboro.
15  Q.  And what is the address?
16  A.  110 Turnpike Road, Suite 203.
17  Q.  Could you summarize for me your
18  educational background since high school.
19  A.  Sure. I attended University of Waterloo
20  which is located it Waterloo Ontario. I
21  have a bachelor of applied science in
22  civil engineering.
23          I graduated in 1988 and then I
24  also have a power technology certificate

Page 8

1  from Southern Alberta Institute of
2  Technology and I have attended an advanced
3  management program at Harvard University
4  Q.  When did you attend the power technology
5  certificate?
6  A.  I believe that was 1987.
7  Q.  During the course of your studies at
8  Waterloo?
9  A.  Yes, my studies at Waterloo were a coop
10  program so I was working in the energy
11  industry and obtain the power technology
12  certificate while I was on work term.
13  Q.  What does the power technology certificate
14  entail?
15  A.  It's basically power operations so steam
16  plant operations, power plant operations,
17  gas plant operations, that kind of thing.
18  Q.  And when did you obtain the advanced
19  management degree from Harvard?
20  A.  About 18 months ago.
21  Q.  How long is that course of study?
22  A.  It's nine or ten weeks on campus.
23  Q.  And what did you study in connection with
24  that?

Page 9

1  A.  It's basically a condensed -- it's sort
2  of -- I hate to use this term, but it's
3  kind of like an MBA in a can, you know.
4  It's kind of like a condensed version of
5  an MBA.
6  Q.  I am sure Harvard hates for you to use
7  that term also.
8  A.  Yes. It's actually a very good program.
9  Q.  Could you give me your employment
10  background, I guess beginning with college
11  given that it was a coop program.
12  A.  Sure. Through college I worked. I worked
13  at a few traditional civil engineering
14  roles during college, but than I started
15  in the energy industry in 1985 through the
16  college work programs.
17          I worked for Imperial Oil
18  through 1992, I believe. Imperial Oil is
19  the Canadian affiliate of Exxon and then
20  following that I worked for a company
21  called PanCanadian Petroleum and during
22  that time when I left Imperial Oil and
23  PanCanadian I began working in the
24  commercial area national gas marketing and

3 (Pages 6 to 9)

Page 10

1  I worked at PanCanadian in the natural gas
2  marketing group basically selling their
3  production to customers throughout Canada
4  and the U.S.
5      I left PanCanadian to work a
6  U.S. based company called Tenaska and
7  they're based out of Omaha, Nebraska.
8      They were a natural gas, natural
9  gas marketing and power generation
10  development company so that is how I sort
11  of made the transition over to the
12  electric power electric period, that was
13  around 1990, that would be around the
14  1995, 1996 time at Tenaska and then I
15  started with TransCanada in say mid 1996
16  and I have been with TransCanada since
17  that time.
18  Q.  Let me just step back.  In terms of your
19      experience while you were in college, what
20      companies did you work for there?
21  A.  First couple of terms while in college I
22      worked for Parks Canada doing civil
23      engineering work on some of their
24      facilities and then I started with

Page 11

1  Imperial in '85.
2  Q.  So from '85 from '92 you were with
3      Imperial?
4  A.  Yeah, some of that time I was a student,
5      but, yeah.
6  Q.  And what were your duties there?
7  A.  I started in my full-time career with them
8      in the drilling department doing drilling
9      work, then I did field work on pipelines
10      installation of pipelines at facilities,
11      again, doing sort of traditional civil
12      engineering work geotechnical and then
13      from there I moved into the natural gas
14      marketing and business areas just towards
15      the tail end of my career with Imperial.
16  Q.  So you began at PanCanadian in 1992 and
17      how long did you work there?
18  A.  Until '95.
19  Q.  And what were your duties there?
20  A.  I was in the natural gas marketing.
21  Q.  So that's that and then from '95 to '96
22      you were at Tanaska?
23  A.  Just a year at Tanaska, yeah.
24  Q.  And at Tanaska your obligations were?

Page 12

1  A.  I managed our started-up and managed our
2      Canadian natural gas marketing office.  As
3      I said, they were based in Ontario, so I
4      got their operations started in Canada and
5      from there I moved over to TransCanada in
6      the power group.
7  Q.  And initially what were your obligations
8      at TransCanada and where were you located?
9  A.  I was located in Calgary, which is where
10      TransCanada's head office is, and my
11      responsibilities were primarily around
12      business development for our power group
13      in the areas of -- well, geographically I
14      worked primarily in Ontario, however, I
15      did have some responsibilities for a
16      project that involved an oil pipeline
17      called the Express Oil Pipeline and we
18      were needing to power the pumps on that
19      line with power so there was a lot of
20      power work associated exercise so I worked
21      on that which kind of went down through
22      the western part of the U.S. and across to
23      Illinois and so I worked on that as well.
24      Then it was 1998 I'd say

Page 13

1  actually late '97, early 1998 that I began
2  to work on the northeast U.S. area.  I was
3  asked by the company in early part of '98
4  to consider moving down to New England
5  which I did and I started up our operation
6  in Westboro, Massachusetts at that time.
7  Q.  Do you recall exactly when you moved to
8      open up your Westboro operations?
9  A.  I moved to the U.S., I believe in May of
10      1998, if I am recalling correctly.  Our
11      office in Westboro wasn't opened  until a
12      little laterr that year because when I
13      first came down I operated out of our
14      Ocean State Power Plant.
15      We had a pretty substantial
16      office, administrative office down at the
17      plant and it took a while to get our
18      office space sorted out in Westboro so we
19      started out down there.
20  Q.  And that would have been in May 1998?
21  A.  Well, I physically started living in the
22      U.S. in May 1998 but I worked out of the
23      plant at Ocean State for a number of
24      months then we started up the Westboro

Esquire Deposition Services
1-866-619-3925

Page 30

1  negotiated.
2  Q.  And as you sit here today, are you aware
3      of any actions or inactions by
4      Narragansett or EUA that you believe
5      violated this contract?
6  A.  Well, you've asked me as I heard it kind
7      of a compound question because you asked
8      about Narrangansett in that we have
9      another contact with Narragansett.
10 Q.  Okay.  Then at some point some in time
11     Narragansett became responsible for
12     fulfilling EUA's obligations under this
13     Exhibit 1; is that right?
14 A.  Well, the NEES companies, as I understand
15     it, at one point the NEES companies bought
16     the assets and obligations of EUA and this
17     contract wasn't changed as a result of
18     that transaction, and as I said, we had a
19     separate contract with Narragansett so
20     this contract is with Blackstone, Eastern
21     and Newport so that's the distinction I am
22     making.
23 Q.  Is it your position in the lawsuit that
24     Narragansett has violated its obligations

Page 31

1      to you under this contract, Exhibit 1?
2          MR. WINSTON:  Objection.  You
3      can answer based on your understanding.
4  A.  My understanding is that we entered into
5      an agreement, we being TransCanada Power
6      Marketing, entered into an agreement with
7      Blackstone, Eastern and Newport, and
8      that's this document that you put in front
9      of me.
10 Q.  Right.
11 A.  The obligations that arise under this
12     agreement were assumed by the NEES
13     companies when they purchased the assets
14     and obligations of EUA.
15         And, yes, there has been a
16     default in the obligations that these
17     companies owe TransCanada under the
18     contract and that's what this dispute is
19     all about.
20 Q.  And could you tell me how the NEES
21     companies, or why don't we say
22     Narragansett since that's the defendant
23     here, have violated their obligations or
24     its obligations under this contract.

Page 32

1  A.  Sure.  In around, as recall it, January or
2      early February of 2005 we were surprised
3      to learn that payment that was due to us
4      as a supplier was significantly less than
5      we thought it was going to be for power
6      that was delivered in January.
7          So the dispute arose as a result
8      of their apparent position that the fuel
9      adder was no longer to be included in the
10     price, so that was the start of the
11     dispute.
12 Q.  And in terms of this agreement, is it your
13     position that Article 5 of the agreement
14     on Page 5 establishes an obligation to
15     provide a fuel adder?
16 A.  In part it does.
17 Q.  What other source is there of that
18     obligation?
19 A.  Well, I'd say that the obligation is
20     resident in the contract in total.  I
21     mean, I am not an attorney, I am not going
22     to opine on a legal opinion on the
23     contract, that's what the dispute is
24     about, but I can tell you that certainly

Page 33

1      Article 5 discusses the fuel adjustment
2      factor but there is also other references
3      to the definition of standard-offer
4      service as an example which is
5      standard-offer service is defined as
6      referencing back to the settlement
7      agreements as an example and the fuel
8      adder is discussed in the settlement
9      agreements as well.
10 Q.  Could you tell me where in this document
11     it requires that you receive a fuel adder
12     after January of 2005.
13 A.  Well, under Article 5, which you just
14     referred me to, it states that the fuel
15     adder is part of the price.  Price
16     applies, of course, for the entire term of
17     the contract which goes to 2009.
18 Q.  Am I correct that the fuel adjustment
19     factor, that's what you're referring to as
20     the adder?
21 A.  Yes, the standard-offer wholesale price
22     plus the fuel adjustment factor.
23 Q.  And the fuel adjustment factor is cents
24     per kilowatt hour based on incremental

9 (Pages 30 to 33)

Page 34

```
 1        revenues collected, if any, attributed to
 2        the operation of their retail rate fuel
 3        adjustment mechanism in the company's
 4        standard-offer service tariffs.
 5              Have I correctly read the
 6        definition of the fuel adder or fuel
 7        adjustment factors?
 8              MR. WINSTON: Objection.
 9    A.  Well, you have read it in part.
10    Q.  What else do you think is necessary for an
11        understanding of the term?
12    A.  Which term?
13    Q.  Fuel adder or fuel adjustment factor.
14    A.  Well, there is more words there on the
15        contract which refers to standard-offer
16        service tariffs and then it goes on to say
17        the incremental revenues and so forth
18        until the end of that section.
19              And as I said a moment ago, it
20        refers to standard-offer service which is
21        a defined term under the contact so this
22        definition links you to the standard-offer
23        service definition which I referred you to
24        a moment ago.
```

Page 35

```
 1    Q.  Is it your position in this case that a
 2        fuel adder was required to be included in
 3        all tariffs submitted by Narragansett?
 4    A.  Yes, absolutely.
 5    Q.  Through what period of time?
 6    A.  Through the term of the contract.
 7    Q.  And what do you base that on?
 8    A.  Well, I think I have already answered that
 9        question.
10    Q.  I am sorry, I missed it.
11              MR. WINSTON: Objection.
12    A.  You started off asking me a question
13        about --
14              MR. WINSTON: Just answer his
15        question. If he doesn't like your answer,
16        that's okay.
17    Q.  Could you tell me what portion of what you
18        just told me you thought answers that
19        question.
20    A.  Well, the price is, as I said a moment
21        ago, comprised of two parts:
22        Standard-offer wholesale price and a fuel
23        adjustment factor and the price applies
24        for the entire term of the contract,
```

Page 36

```
 1        which, if you look under the term section
 2        ends on December 31, 2009, so the fuel
 3        adjustment factor is part of the price
 4        through 2009.
 5    Q.  On April 7, 1998 do you know if there was
 6        any --
 7    A.  April 7, 1998 okay.
 8    Q.  Is that the date this was signed?
 9    A.  It appears that is the case, yes.
10    Q.  Do you know if there was any fuel
11        adjustment factor in a tariff that was
12        applicable to this contract?
13    A.  Well, that's a good question because one
14        of the challenges that I recall as the
15        contract was being negotiated was the fact
16        that EUA representatives that we were
17        dealing with had not provided us with full
18        and complete copies of the tariffs, the
19        retail tariffs.
20              This was a concern to the
21        company and you may know that earlier
22        drafts of the contact, in fact, very much
23        approximate to this date, I believe a day
24        or two before, still contained references
```

Page 37

```
 1        to retail tariffs that we were
 2        uncomfortable with because we weren't
 3        gaining visibility from EUA on these.
 4              We were asking them for them
 5        and they weren't providing them, they
 6        weren't ready. A lot of, as I recall it,
 7        a lot of concern on their part that these
 8        things were not complete and so forth, we
 9        were, therefore, uncomfortable with that
10        and, therefore, referenced in this final
11        draft of the contract under standard-offer
12        service referenced the standard-offer
13        service to the settlement agreements
14        rather than referencing to the retail
15        tariffs.
16    Q.  And by the settlement agreements do you
17        mean EUA's agreements with the State of
18        Massachusetts and the State of Rhode
19        Island?
20    A.  Yes, that's correct. That's also a
21        defined term in the agreement, actually
22        just above the definition of
23        standard-offer service.
24              EUA had represented the nature
```

10 (Pages 34 to 37)

Page 38

1  of their settlement agreement throughout
2  these discussions, not only these
3  discussions with is us, but they were
4  involved in a number of activities some of
5  which were public, if you will, in that
6  they were issuing RFP's for supply and
7  doing other things that were very much
8  arising as a result of their settlement
9  agreements.
10      So these were documents and
11  concepts around the settlement which were
12  being talked about quite openly and quite
13  often around this time.
14  Q.  When you say they represented the nature
15      of the settlement agreement, what are you
16      referring to?
17  A.  I just recall that they were having
18      sessions with potential suppliers and
19      interested parties.
20      The other exhibit that you
21  referred me to, 36, they had engaged
22  Solomon Brothers to help them with some of
23  their asset sales; they were having
24  information sessions with interested

Page 39

1  bidders, this sort of thing, as I recall
2  it.
3      There was a number of sessions
4  like that where they were providing
5  information about settlement.
6  Q.  Did attend those sessions?
7  A.  I attended some, yes.
8  Q.  And what representations were made about
9      the fuel adjustment factors at those
10      sessions?
11  A.  I recall that it was described as part of
12      the price that would be provided to
13      suppliers of standard-offer, that this was
14      for extraordinary fuel price movements, it
15      was protection for the suppliers in the
16      event of extraordinary moves in price.
17      That's what I recall.
18  Q.  Do you recall who it was that made those
19      representations?
20  A.  I recall some discussions with Larry
21      Boisvert making presentations to us or
22      about one that he made to us directly, us
23      being TransCanada, but I also recall some
24      other sessions that they had.

Page 40

1      I remember one that they had at
2  a hotel somewhere that was a general open
3  session for potential suppliers where they
4  made a presentation.
5  Q.  Do you recall who made that presentation?
6  A.  I don't recall who made it, but it was
7      some at EUA.
8  Q.  Did Larry Boisvert ever tell you that the
9      fuel adder would be included in all
10      tariffs through the year 2009?
11  A.  I recall him, Larry Boisvert, stating that
12      the fuel adder was part of the price.  As
13      to whether it was it would be included in
14      tariffs, I don't recall that specifically.
15  Q.  How about at the open session for
16      suppliers, was it specifically said that
17      there would be a fuel adder provided
18      through 2009?
19  A.  I recall them describing that there was
20      this protection as I mentioned earlier,
21      that suppliers would be afforded this fuel
22      adder in the event of extraordinary moves
23      in fuel, that what it was there for.
24      And they were securing or

Page 41

1  attempting to attract suppliers so they
2  were describing this as an important
3  feature or an important risk protection or
4  mitigant for suppliers.  That's as I
5  recall it.
6  Q.  Do you recall any specific representations
7      as the time period to which that
8      protection would apply?
9  A.  I think I have already answered it.  They
10      were trying to secure supply for a term
11      and that represented that supply would be
12      priced in a certain way which included a
13      base price, I don't know if they used that
14      term, but a base price or a starting price
15      and then a fuel adder.
16      So, yeah, I think they did
17      represent it to the extent that they were
18      trying to buy supply for that term and
19      they represented the price as being
20      comprised of those two components.
21  Q.  When the representation was made to you
22      that you recall being made to you at the
23      hotel, do you know what term was being
24      sought to be filled or how long the

11 (Pages 38 to 41)

Page 42

1    contract that was being offered was for?
2    A.   I recall initially that EUA was focused on
3         the period through '04, so that's as I
4         recall it.
5    Q.   So to the extent that any representation
6         was made to you at that session, it was a
7         representation that there would be a fuel
8         adder through 2004?
9              MR. WINSTON:  Objection.
10   A.   As I mentioned earlier, there was
11        references made to the settlement
12        agreements both in Massachusetts and in
13        Rhode Island, and it was, as I recall it,
14        it represented that this was a feature,
15        that this protection was a feature of the
16        price.
17             There was no specific exclusion
18        or addition associated with any time
19        frame.  It's like we are being supply for
20        a term and with that supply we'll have
21        this protection.  That's as I remember it.
22   Q.   So your memory in terms of the meeting,
23        the session at the hotel, it was your
24        understanding that there would be a fuel

Page 43

1    adder for whatever term was being
2    presented for purchasers at the hotel?
3    A.   I recall seeing some documents later to
4         that where there was -- I don't recall
5         exactly how this arose, but there was some
6         question as to when the obligation started
7         like it related to this notion of the
8         retail access date which was an important
9         date like the date upon which customers
10        obtained retail access and I recall seeing
11        at least one other document where that
12        actually pushed the obligation out into
13        '05 or something and there was a fuel
14        adder shown going through '05 which would
15        be latter than the '04 date.
16             So I go back to what I said
17        earlier, it was suggested that this was a
18        feature of the price.
19   Q.   The document you saw that related to 2005,
20        that related to Massachusetts, didn't it?
21   A.   I don't recall.
22   Q.   In connection with your involvement with
23        this matter, are you aware of any actions
24        that were taken by EUA or Narragansett

Page 44

1    with respect to the fuel adjustments that
2    you consider were deceptive?
3              MR. WINSTON:  Objection.
4              THE WITNESS:  Does that mean I
5    don't have to answer?
6              MR. WINSTON:  You can answer,
7    can and should.
8    A.   Sir, your question again, sir?
9    Q.   With respect to the contract and your
10        claims here, are you aware of any actions
11        that either EUA or Narragansett -- let's
12        start with EUA, that EUA took that were
13        deceptive with respect to TransCanada?
14   A.   Yes.
15   Q.   And what actions do you consider
16        deceptive?
17   A.   Well, with the caveat that I am not
18        answering this question as an attorney --
19   Q.   Sure.
20   A.   -- I am answering it as a senior business
21        man.  As we have been working through this
22        case and uncovering documents, we have or
23        I have become aware that there were
24        representation made by the EUA companies

Page 45

1    or their successors in front of the
2    regulator as late as 2001 or 2002 where
3    they were representing to the regulator
4    that the fuel adder under all their
5    contracts including this contract was
6    applicable through 2009, and, of course,
7    as the crux of this dispute is they're now
8    taking a contrary position to that and
9    given what we believe to be their
10   obligations under this contract I would
11   view that as deceptive.
12   Q.   Do you have any knowledge of any deceptive
13        statements or representations that were
14        made to TransCanada in connection with the
15        length of time to which the fuel adder
16        would apply?
17             MR. WINSTON:  Objection.
18   A.   Yes.
19   Q.   And what do you have in mind?
20   A.   Well, some of what you have already asked
21        me about.  When we were considering this
22        transaction in the beginning there were
23        statements made that I referred to earlier
24        in a number of presentations that describe

12 (Pages 42 to 45)

1  Q.  Could you turn to Page 5, if you're not
2      there. I am just going to read what I
3      consider the definition of the fuel
4      adjustment factor.
5          It says, "The fuel adjustment
6      factor is a sense per kilowatt hour adder
7      based on the incremental revenues
8      collected, if any, attributed to the
9      operation of the retail rate fuel
10     adjustment mechanisms in the company's
11     standard-offer service tariffs".
12         Did you read that correctly?
13 A.  Yes.
14 Q.  Wouldn't you say that the fuel adjustment
15     factor is tied to the company's tariffs?
16 A.  No.
17 Q.  And can I just ask, why not?
18 A.  Because I think it's tied to the provision
19     of standard-offer service which is a
20     defined term under this contract.
21 Q.  So that's how you understand that
22     provision?
23 A.  Yes.
24 Q.  You understood that provision as being

1      unrelated to the tariffs that the company
2      files?
3  A.  It may be related but it's reference to
4      standard-offer service.
5  Q.  How do you determine what amount the fuel
6      adjustment factor adder will be?
7  A.  Well, the fuel adjustment factors had been
8      previously reviewed by the Rhode Island
9      regulator in respect of Narragansett's
10     standard-offer service, so we understood
11     that these were established at by and
12     with the agreement of the regulator in
13     that proceeding.
14         Those numbers were sort and
15     known and knowable from that perspective,
16     again, referring back to the settlement.
17 Q.  And that was proceeding was a proceeding
18     that approved a tariff, wasn't it?
19     MR. WINSTON: Objection.
20 A.  No, I am referring to the settlement,
21     actually.
22 Q.  What dollar values did you think would be
23     included for the fuel adjustment factor in
24     this contract?

1  A.  The same dollar values that were resident
2      in the Narragansett contract that we had
3      with NEES.
4  Q.  Why did you think that?
5  A.  Because those dollar values matched the
6      same numbers that we were provided in
7      various documents that EUA had provided
8      us, and, again, they were referred to in
9      the settlement agreement, the notion of a
10     fuel adder was referenced in the
11     settlement agreement, so this is what we
12     understood to be the regulatory deal, if
13     you will, it that it was establishing
14     these fuel adders in that way.
15 Q.  In 1997 or 1998 you were dealing EUA,
16     weren't you?
17 A.  We were, but we had completed a
18     transaction with NEES just prior to that
19     time.
20 Q.  Right, but EUA was not part of NEES at
21     that time, correct?
22 A.  No, but they were very much following the
23     same regulatory path under the settlement
24     agreement and with respect to the

1      disposition of their assets, they had the
2      same regulator.
3          They represented to us, in fact,
4      that they were following the same path our
5      consult suggested, our consultant being
6      Mr. Reed's firm.
7  Q.  Did anyone from EUA specifically tell you
8      that they were going to seek a fuel adder,
9      approval for a fuel adder through 2009?
10     MR. WINSTON: Objection.
11 A.  Again, I would refer you to back to my
12     previous answer.
13 Q.  No, no just answer my question.
14     MR. WINSTON: Just let him
15     answer the question.
16     MR. O'ROURKE: No. I want him
17     to answer my question, then he can answer
18     his question.
19 Q.  Did anyone specifically tell you we will
20     seek a fuel adder through 2009?
21     MR. WINSTON: With quotations
22     being those exact words, meaning those
23     exact words?
24     MR. O'ROURKE: Yeah.

15 (Pages 54 to 57)

# Hamal

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                  (Central Division)

4     - - - - - - - - - - - - - - - -

5    TRANSCANADA POWER MARKETING     :

6    LTD,                            :

7              Plaintiff,            :   CASE NO.

8    VS.                             :   05-40076 FDS

9    NARRAGANSETT ELECTRIC CO.,      :

10              Defendant.           :

11   - - - - - - - - - - - - - - - -

12

13      DEPOSITION OF CLIFF W. HAMAL, a witness

14   called by and on behalf of the Plaintiff, taken

15   pursuant to the applicable provisions of the

16   Federal Rules of Civil Procedure, before

17   Sandra L. Bray, Registered Diplomate Reporter,

18   CSR Number 103593, and Notary Public in and for

19   Commonwealth of Massachusetts, at the offices of

20   Choate Hall & Stewart LLP, Two International

21   Place, Boston, Massachusetts, on Tuesday,

22   July 10, 2007, commencing at 9:11 a.m.

23

24

Page 2

```
1   APPEARANCES:
2   Representing the Plaintiff:
3       CHOATE HALL & STEWART LLP
4       Two International Place
5       Boston, Massachusetts 02110
6       BY: DANIEL C. WINSTON, ESQUIRE
7   -and-
8       TRANSCANADA PIPELINES LIMITED
9       450 - 1st Street S.W.
10      Calgary, Alberta, Canada T2P 5H1
11      BY: JODY D. M. JOHNSON, ESQUIRE
12          DOUGLAS I.D. McLEAN, ESQUIRE
13
14  Representing Narragansett Electric Co.:
15      NATIONAL GRID
16      25 Research Drive
17      Westborough, Massachusetts 01582
18      BY: DAVID C. LODEMORE, ESQUIRE
19
20  ALSO PRESENT:
21  Mike Hachey
22  Brenda Carr, National Grid
23
24
```

Page 3

```
1               INDEX
2   WITNESS:                PAGE NO.
3   CLIFF W. HAMAL
4   BY MR. WINSTON              4
5
                EXHIBITS
6
    NO.   DESCRIPTION         PAGE NO.
7
    D   Expert Report of Cliff W.
8       Hamal                      4
9   E   Rebuttal Expert Report of
        Cliff W. Hamal             4
10
    F   Taylor Deposition Testimony
11      Excerpts                  77
12  G   Work Paper 3.1, Electricity
        Price Forecast Data (1998-2009)  101
13
    H   Wholesale Standard Offer
14      Service Agreement         175
15  I   Power Supply Agreement    183
16  J   Service Agreement Filing  200
17
18
        (EXHIBITS RETAINED BY COUNSEL.)
19
20
21
22
23
24
```

Page 4

```
1           P R O C E E D I N G S
2   (The Virginia driver's license number as
3   identification of the deponent was noted
4   for the record.)
5   (Expert Report of Cliff W. Hamal was
6   marked Exhibit D for identification.)
7   (Rebuttal Expert Report of Cliff W.
8   Hamal was marked Exhibit E for
9   identification.)
10      CLIFF W. HAMAL, having duly sworn or
11  affirmed that his testimony would be the truth,
12  the whole truth, and nothing but the truth,
13  testified as follows:
14              *   *   *
15      MR. WINSTON: You want to go with the
16  stipulations we've put on the record in the
17  other depositions?
18      MR. LODEMORE: Absolutely.
19  EXAMINATION BY MR. WINSTON:
20  Q.  Could you please state your name for the record?
21  A.  My name is Cliff William Hamal.
22      MR. WINSTON: You have the spelling of
23  his name?
24      THE STENOGRAPHER: Yes.
```

Page 5

```
1   Q.  Have you been deposed before?
2   A.  Yes, I have.
3   Q.  So you understand your counsel will be objecting
4       to certain questions. Except to the extent I'm
5       asking for privilege, you should go ahead and
6       answer.
7           I'm showing you what's been marked as
8       Exhibits D and E. Are those your report and
9       rebuttal report issued in this proceeding?
10  A.  Yes, they appear to be.
11  Q.  Okay. What is your expertise?
12  A.  I'm an expert in economic issues related to the
13      electric power industry and business practices
14      in the electric power industry generally, and I
15      detail my expertise based on my experience and
16      education in my C.V.
17  Q.  What is your education relevant to your
18      expertise?
19  A.  My undergraduate degree is a bachelor of science
20      degree in marine engineering and marine
21      transportation. Marine engineering is very much
22      a power systems degree. So my education at the
23      bachelor's level is very focused on,
24      essentially, power generation, power plants and
```

2 (Pages 2 to 5)

Page 6

1   how they work.
2        My education after that included a
3   nondegree program working with General Electric
4   and Westinghouse at different points, taking
5   extensive full-time training programs in
6   operations of other power generation facilities
7   which relates to my understanding of the
8   industry.  In addition to that, I have a
9   master's of science in industrial administration
10  from Carnegie Mellon.  This degree is similar to
11  a master's in business administration, and, in
12  fact, the program has been renamed to match an
13  M.B.A. program; and that education experience
14  emphasized economics and business issues
15  generally.
16  Q.  Okay.  Your undergraduate degree was a bachelor
17      of science?
18  A.  That's right.
19  Q.  Okay.  Is that primarily a technical degree?
20  A.  Yes.
21  Q.  Do you have any degrees in economics?
22  A.  I do not have degrees with economics in their
23      title.  I do not.  I hope that was clear.
24  Q.  In what job capacities have you negotiated power

Page 7

1       contracts?
2            THE WITNESS:  Could you repeat the
3       question?
4            (Reporter read back the last question.)
5   A.  My work related to negotiation of power
6       contracts has been as a consultant.
7   Q.  Is it fair to say you've never negotiated an
8       electricity power contract?
9   A.  No.
10  Q.  What are the contexts in which you've negotiated
11      a power contract?
12  A.  I've worked with a utility looking to
13      restructure its power contracts and was engaged
14      in negotiations in that process.
15  Q.  Is that one occasion?
16  A.  I'm thinking of one occasion.
17  Q.  Are there others?
18  A.  Yes.
19  Q.  What are those?
20  A.  I have worked on restructuring a power system,
21      which involved an agreement that related to the
22      delivery of power during the transition period
23      on the way to competition from a generator --
24      power that would be delivered from a generator.

Page 8

1   Q.  How many other than those two times have you
2       consulted on the negotiation of power contracts?
3   A.  I don't know.
4   Q.  Can you think of any as you sit here today?
5   A.  I worked talking to companies looking to acquire
6       power generation facilities, and that involves
7       in some cases power purchase agreements on how
8       that energy might be sold back to the utility
9       that sold the power plant.
10  Q.  You've never been the actual negotiator on a
11      power contract; is that correct?
12           MR. LODEMORE:  Objection.
13  A.  No.
14  Q.  You've consulted on two occasions concerning the
15      negotiation of power contracts, correct?
16  A.  Yes, I have consulted.
17  Q.  On two occasions?
18  A.  Not to be limited to two, but yes, on two
19      occasions, I have consulted.
20  Q.  On some other occasions, you've done consulting
21      work which has involved the evaluation of power
22      purchase agreements, correct?
23  A.  Yes.
24  Q.  Okay.  Other than that, any other experience

Page 9

1       with negotiating power purchase contracts?
2   A.  I'm not sure what you mean by "other than that."
3   Q.  Other than what you've just named.
4   A.  I first want to include the work I did on behalf
5       of purchasing power generation facilities and
6       negotiations leading to the sale of energy back
7       to the original owners of those facilities,
8       which I talked about earlier but I wasn't sure
9       whether that was included by your "that" or not.
10      I have worked in occasions attempting to sell
11      power purchase agreements and dealing with the
12      marketplace and the sale of those agreements.  I
13      have consulted on -- let me pause here.
14           Can you repeat the question again?
15           (Reporter read back the record as
16           requested.)
17  A.  I've been involved with transactions looking to
18      purchase power plant ownership interests that
19      involve power purchase agreements.
20  Q.  Let me rephrase the question.  Other than as an
21      outside consultant, have you ever been involved
22      in the negotiation of power contracts?
23  A.  I'm not sure what you mean by an outside
24      consultant.

3 (Pages 6 to 9)

Page 10

1   Q.  Have you ever worked for a company that was
2       actually negotiating a power purchase contract?
3            MR. LODEMORE:  Directly employed?
4            MR. WINSTON:  Yes.
5   A.  I'm thinking of an occasion.  It becomes a
6       semantic issue whether it's included in what
7       you're talking about.  I have worked as a
8       consultant, as I've said, in this activity.  On
9       some occasions, work I have done would have
10      involved taking an interest in the output of the
11      power plant and taking an interest in the
12      proceeds from the power sale agreement.  So it
13      becomes a semantic issue whether we're dealing
14      with that on behalf of the company I'm with.
15      Other than that, I have not -- well, I haven't
16      under that circumstance.
17  Q.  Have you ever worked for a utility?
18           MR. LODEMORE:  Again, directly?
19           MR. WINSTON:  As an employee.
20  A.  No.
21  Q.  Have you worked --
22  A.  Excuse me.  As a regulated, vertically
23      integrated utility?
24  Q.  Yes.

Page 11

1   A.  No.
2   Q.  Have you ever worked for an independent power
3       generator as an employee?
4   A.  No.
5   Q.  Have you ever worked for any agency or
6       governmental body in charge of electricity
7       rates?
8   A.  As an employee?
9   Q.  Yes.
10  A.  No.
11  Q.  Where geographically have you done your work?
12  A.  What do you mean by where?
13  Q.  New England region, California?
14  A.  Where was I located or what markets was I
15      dealing with?
16  Q.  What markets were you dealing with.
17  A.  I've done work in South Africa, Eastern Europe,
18      Peru, some work in China, a tiny amount in New
19      Zealand and Australia.  I've done work in the
20      U.S., the NERC regions in the U.S.  I'd have to
21      think about it further.
22  Q.  Would you describe your United States practice
23      as general or focused on any particular regions?
24  A.  I would define it as focused on all the regions.

Page 12

1   Q.  Okay.  Have you done previous work as a
2       consultant in any capacity with National Grid or
3       its predecessors?
4   A.  Yes.
5   Q.  Can you describe that work?
6   A.  Yes.  I've done work with them on antitrust
7       issues, prudency hearings, and issues related to
8       power purchase agreements and issues related to
9       market roles and market design.
10  Q.  Okay.  On how many -- how many different
11      engagements would you say you've had with
12      National Grid or its predecessors over the
13      years?
14  A.  I'm not sure.
15  Q.  More than ten?
16  A.  No, I don't -- I don't think so, no.
17  Q.  Five to ten?
18  A.  Probably.
19  Q.  Have you done past work with TransCanada?
20  A.  Yes.
21  Q.  On what occasion?
22  A.  I worked with TransCanada in the regulatory
23      approval process for their acquisition of
24      interest in Ocean State Power dealing with

Page 13

1       antitrust issues.
2   Q.  Who did you work with at TransCanada?
3   A.  I worked with outside law firms in general.
4   Q.  Looking at what's been marked as Exhibit D, you
5       have an attachment which includes Speeches and
6       Papers?
7   A.  Yes.
8   Q.  On Page 8 of that, there's an article entitled
9       Risk and Risk Management in Electricity Markets?
10  A.  Yes.
11  Q.  Do you still have that paper?
12  A.  No -- yes, in my office.
13  Q.  Yes, you do have that paper?
14  A.  Yes.  I don't have it with me at the moment, but
15      I have it in my office.
16  Q.  Are you aware of its content?
17  A.  Generally.
18  Q.  Okay.  When's the last time you looked at it?
19  A.  I looked at it last week, I believe.
20  Q.  Does it discuss fuel adjustments?
21  A.  What do you mean by fuel adjustments?
22  Q.  I mean adjustment mechanisms by which power
23      contracts or tariffs include some adjustment for
24      the price of fuel.

4 (Pages 10 to 13)

Page 14

1   A. I don't think so.
2   Q. Is the word "fuel" contained in the document?
3   A. I think so.
4   Q. In what context?
5   A. I believe the document speaks to fuel in the
6      context of uncertainty over fuel prices.
7   Q. What does it say in that context?
8   A. I'm not certain. My recollection is that it
9      talks about signing fixed price contracts and
10     having to manage fuel price risk.
11  Q. Does it discuss ways to manage fuel price risk?
12  A. I believe it deals with that issue some.
13  Q. Okay. What are the options that it presents as
14     to how to manage fuel price risk?
15  A. I'm not sure what exactly it talks about. My
16     memory is that it mentions the potential to
17     engage in hedging strategies to lay that risk
18     off on other people or to accept that risk as
19     part of your business practice.
20  Q. Okay. I presume we'd have to look at the actual
21     article to see exactly what it says on the
22     subject?
23  A. Right.
24  Q. If you turn to Page 4 of what's been marked as

Page 15

1      Exhibit D, which I will henceforth call your
2      report instead of Exhibit D, at the top line,
3      you say, "EUA was a modest-sized electricity
4      entity." What is EUA as you define it there?
5   A. I don't define it there, but I do define it on
6      Page 2. We talked about the three electric
7      utilities served in Rhode Island or these three
8      electric companies, that being Newport, Eastern,
9      and Blackstone Valley along with Montaup
10     consists of EUA.
11  Q. So EUA as you refer to it in your report is the
12     three distribution companies and Montaup?
13  A. And the parent.
14  Q. And the parent. When you say it's a modest-
15     sized utility, what's that based on?
16  A. It's based on my knowledge of their size in both
17     generation, number of customers, amount of load
18     that they serve relative to the utility
19     industry.
20  Q. Who served more load than EUA in Rhode Island?
21  A. Narragansett.
22  Q. Any other utility serve more load in Rhode
23     Island than EUA?
24  A. Not to my knowledge.

Page 16

1   Q. Who in Massachusetts served more load than EUA?
2   A. I don't know for certain. I could speculate. I
3      mean I don't know the numbers for certain. I
4      haven't looked at those. I could offer an
5      estimate based on my general knowledge.
6   Q. Who were the biggest four utilities in
7      Massachusetts in 1998 prior to divestiture?
8   A. I would assume it's New England Power and
9      Massachusetts Electric, Boston Edison. EUA is
10     probably on that list, and I feel like I'm
11     missing other one between them in size.
12  Q. So EUA was one of the top three or four biggest
13     utilities in Massachusetts in 1998, correct?
14  A. I've said I haven't looked at those numbers
15     recently. I don't know for certain. They may
16     have been one of among the top four.
17  Q. And they were one of only two utilities serving
18     load in Rhode Island, correct?
19  A. I don't know that to be true.
20  Q. They were the second biggest utility in Rhode
21     Island?
22  A. I think that's right.
23  Q. What percentage of the load did they bear in
24     Rhode Island?

Page 17

1   A. I believe it's approximately 25 percent, maybe a
2      little more.
3   Q. Other than EUA, was there any other company more
4      familiar with rate filings and the rate
5      structure in Rhode Island in 1998?
6          MR. LODEMORE: Objection.
7   A. I haven't done a study of that.
8   Q. Are you aware of any companies that would have
9      known more than EUA about the rate filing
10     structure in Rhode Island in 1998?
11         MR. LODEMORE: Objection.
12  A. Well, I believe that Narragansett, New England
13     Power would have been very familiar with that.
14     I believe that Tellus Institute, which Rosen was
15     very focused on, would have been very
16     involved in rates in that area. There may have
17     been other participants that followed Rhode
18     Island restructuring. I don't know.
19  Q. Tellus Institute was what?
20  A. A consulting firm.
21  Q. Who did they consult for?
22  A. I know they had a -- well, I believe that they
23     consulted for the consumer advocate in Rhode
24     Island. They may have done consulting work for