UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                    )
TRANSCANADA POWER MARKETING LTD.,                   )
                                                    )
            Plaintiff,                              )
                                                    )
            v.                                      )        C.A. No. 05-40076FDS
                                                    )
NARRAGANSETT ELECTRIC COMPANY,                      )
                                                    )
            Defendant.                              )
                                                    )
_____)

**<u>DOCUMENT APPENDIX</u>**

4242622v1

# Tab 1



EXHIBIT
146
3-23-07

1

1        VOLUME 1

2        PAGES  1 - 255

3

4   ----------------------------------

5   In the Matter of the Arbitration )

6   between                          )

7   TransCanada Power Marketing Ltd. )

8        - and -                     )

9   National Grid USA                )

10  ----------------------------------

11

12

13

14            ARBITRATION HEARING

15          Tuesday, November 5, 2002

16            McDermott Will & Emery

17         28 State Street - 34th Floor

18            Boston, Massachusetts

19

20

21  ----------  J. EDWARD VARALLO, RMR, CRR  -----------

22              COURT REPORTER

23    FARMER ARSENAULT BROCK LLC, BOSTON, MASS.

24              617.728.4404

NARR 08725

30

1   of the meters where the standard-offer service
2   customers are located.
3         MR. AVERY: Could you give me the page
4   references for that sentence in the three
5   agreements?
6         MR. WISEMAN: That sentence in Exhibit 1
7   would be at page 9; and in Exhibit 2 the sentence is
8   also at page 9. In the agreement between Blackstone
9   Valley, Eastern Edison Company, Newport Electric
10  Company and TransCanada, that's Exhibit 4, and the
11  relevant sentence is at page 4.
12        MR. AVERY: Thank you.
13        MR. WISEMAN: Again, we believe that
14  National Grid's interpretation of that provision
15  requires a rewriting of the sentence to give it a
16  meaning that it just doesn't have.
17        So TransCanada will present evidence today
18  from a number of witnesses whose testimony will
19  strongly support our view and interpretation of
20  these contracts. But, again, I would emphasize that
21  we don't believe we need to get to the extrinsic
22  evidence. We believe that the contracts are clear
23  and unambiguous on their face and they should be
24  decided in favor of TransCanada. Thank you.

31

1         MR. PORTER: Mr. Ngau, in the spirit of
2   rebuttal/surrebuttal and so forth, did you have any
3   comments, mindful that Mr. Wiseman may have comments
4   with respect to yours?
5         MR. NGAU: I'm afraid that I think any
6   comments I might have at this point will shed more
7   heat than light.
8         MR. PORTER: That's fine. Thank you.
9         Mr. Ngau, are you calling the first
10  witness?
11        MR. NGAU: I am. Mr. Hager?
12              MICHAEL J. HAGER,
13        having been first duly sworn on oath,
14        was examined and testified as follows:
15              DIRECT EXAMINATION
16  BY MR. NGAU:
17        Q.   Mr. Hager, I think you identified yourself
18  earlier. But now that you're in the witness chair,
19  would you please state your full name and address?
20        A.   Yes. Michael Hager. I'm the director -
21  energy supply New England for National Grid USA
22  Service Company, 55 Bearfoot Road, Northborough,
23  Massachusetts 01532.
24        Q.   You have given us your current position.

32

1   Can you just briefly tell us what your
2   responsibilities are in that position?
3         A.   Yes. I'm responsible for all the
4   generation-related activities for the National Grid
5   USA operating companies, for the distribution
6   companies Massachusetts Electric, Narragansett
7   Electric, Granite State Electric, Nantucket
8   Electric. I'm responsible for procuring standard-
9   offer and default service that as the provider of
10  last-resort services we're obligated to provide the
11  customers, as well as coordinating NEPOOL
12  representation on market issues for New England
13  Power Company. I'm responsible for managing the
14  completion of the divestiture of our generating
15  assets.
16        Q.   Now, you have mentioned a number of
17  entities that we'll be covering in the next day.
18  Just so we have a clear sense of who they are, let's
19  go through them. I think you mentioned
20  Massachusetts Electric Company?
21        A.   Yes.
22        Q.   Could you identify what that is, what they
23  do?
24        A.   Massachusetts Electric Company is a

33

1   subsidiary of National Grid USA, who is the
2   successor to New England Electric System.
3   Mass. Electric is a local distribution company
4   operating in the state of Massachusetts that
5   provides distribution delivery services of
6   electricity to its retail customers.
7         Q.   What about Nantucket Electric Company?
8         A.   Nantucket is a similar subsidiary of
9   Mass. Electric. It serves the island of Nantucket.
10        Q.   And the Narragansett Electric Company?
11        A.   Again, is a subsidiary of National Grid
12  USA, which provides electric distribution service to
13  the customers in the state of Rhode Island.
14        Q.   And you've mentioned now National Grid USA
15  several times. What is that?
16        A.   National Grid USA is the holding company
17  of the operating companies of National Grid here in
18  the United States, which include Mass. Electric,
19  Nantucket, Narragansett, several other subsidiaries,
20  including New England Power Company and Niagara
21  Mohawk.
22        Q.   And I think there are several other
23  entities that will probably get mentioned in the
24  next day or so. New England Electric System, can

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

10 (Pages 34 to 37)

**34**

1  you identify what that is?
2    A.   That is the predecessor of National Grid
3  USA.
4    Q.   New England Power Company?
5    A.   Like Mass. Electric and Narragansett, that
6  is a subsidiary of National Grid USA who formerly
7  was the wholesale generation and transmission
8  subsidiary that owned and operated transmission and
9  generation assets. As a result of restructuring, we
10  have divested the generation assets and now it is
11  our transmission subsidiary which owns and operates
12  transmission systems in New England.
13    Q.   Another entity that I think may get
14  mentioned is Blackstone Valley Electric Company.
15  What is that?
16    A.   Blackstone Valley was a former operating
17  company of Eastern Utilities Associates. In May of
18  2000 New England Electric System, National Grid USA
19  at that time, purchased Eastern Utilities Associates
20  and Blackstone Valley Electric Company was merged
21  with and into Narragansett Electric Company.
22    Q.   And where is its service territory?
23    A.   In Rhode Island.
24    Q.   And Eastern Edison Company, what is that?

**35**

1    A.   Eastern Edison Company was a subsidiary of
2  Eastern Utilities Associates. It was the operating
3  company in Massachusetts. As a result of the NEES-
4  Grid-EUA merger, it merged with and into
5  Massachusetts Electric Company.
6    Q.   And Newport Electric Corporation?
7    A.   Again, an operating subsidiary of EUA that
8  was merged which operates in Rhode Island. It was
9  merged with and into Narragansett Electric Company.
10    Q.   You mentioned a couple of times there EUA
11  or Eastern Utilities Associates. What was that?
12    A.   A holding company similar to New England
13  Electric System that owned the operating companies
14  of Eastern Edison, Blackstone Valley, and Newport.
15    Q.   And just a couple other entities before we
16  move on. We'll hear a lot of mention of something
17  called NEPOOL. Could you tell us what that is?
18    A.   New England Power Pool is an organization
19  of entities that were involved in the wholesale
20  power and transmission business who organized to
21  establish rules under which the bulk transmission
22  and generation systems will be operated.
23    Q.   And lastly, ISO New England. What is
24  that?

**36**

1    A.   ISO New England is an independent entity
2  that is charged with administering and operating the
3  rules established by NEPOOL.
4    Q.   Now, you've mentioned in your testimony a
5  restructuring that took place at New England
6  Electric System. Correct?
7    A.   Correct.
8    Q.   What responsibilities did you have in
9  connection with that restructuring?
10    A.   As the restructuring was being negotiated,
11  I was responsible to make sure that the power
12  purchase agreements for providing standard offer
13  were consistent with the obligations that the retail
14  companies, Mass. Electric and Narragansett Electric,
15  were committing to with their state regulators.
16    Q.   And when you say the power purchase
17  agreements, does that include the agreements with
18  TransCanada?
19    A.   Yes.
20    Q.   And just so we're clear, you have some
21  exhibit binders up there. Take a look, if you
22  would, at Exhibit 22 and tell me if those are the
23  agreements to which you were referencing.
24    A.   Yes.

**37**

1    Q.   Now, could you just summarize or tell us
2  briefly what took place in connection with the
3  restructuring of NEES to which you've referred?
4    A.   Prior to the implementation of
5  restructuring, NEES was a vertically integrated
6  utility who owned and operated generation and
7  transmission systems as well as the distribution
8  systems to deliver power to retail customers. With
9  restructuring, NEES was obligated to divest itself
10  of the generation business and focus on being
11  strictly a wires or a delivery company providing
12  transmission and distribution services.
13        And so in going through restructuring,
14  NEES went through a process of divesting its
15  generation assets and also committed to ensure a
16  supply of power to customers. So before competitive
17  suppliers were allowed to enter the marketplace and
18  serve generation services to those customers, we
19  provided a service which is called standard-offer
20  service, which was a transitional service until
21  customers elected to go to the competitive
22  marketplace.
23    Q.   And how was this standard-offer service
24  priced?

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

38

1    A.   In order to meet the retail rate
2  obligations that were required in the restructuring
3  agreements, the standard-offer service was priced
4  with a fixed-price component that would escalate on
5  an annual basis. It was fixed prices that were
6  established, different rates each year. And to
7  provide wholesale suppliers with protections against
8  extraordinary increases in fuel prices over the term
9  of the agreements, there was a fuel price adjustment
10  mechanism that was included as well.
11    Q.   Where did the distribution companies
12  obtain the power to supply the standard-offer
13  service?
14    A.   Prior to restructuring, the distribution
15  companies received the power that they provided to
16  retail customers from New England Power Company, its
17  wholesale affiliate who owned and operated the
18  generating units under an all-requirements tariff.
19  As part of the restructuring, not only did the
20  distribution companies have to agree to provide
21  competition and allow competition there, but New
22  England Power Company had to agree to be released as
23  the wholesale supplier. And as part of that
24  restructuring, distribution companies had received

39

1  from New England Power Company a commitment to
2  provide the standard-offer service at the exact
3  rates that the distribution companies had committed
4  to provide the service to their retail customers.
5    Q.   And how did the distribution companies go
6  about obtaining this service to supply standard-
7  offer service?
8    A.   Initially it negotiated with New England
9  Power Company, its wholesale supplier. It also
10  understood that the power company was obligated to
11  divest its generating assets, and therefore there
12  was an obligation on the purchaser of those assets
13  to assume NEP's responsibilities once they purchased
14  those assets to provide the standard offer at the
15  rates that were agreed to between NEP and the
16  distribution companies.
17    In addition, there was a lot of concern
18  that while we were trying to open up competition in
19  the wholesale marketplace, that allowing a sole-
20  source negotiated deal for a single supplier may not
21  be in the true spirit of competition. So both the
22  distribution companies and NEP had agreed that they
23  would go through a procurement process and offer the
24  ability to displace NEP or the ultimate purchaser of

40

1  the assets, should we find another supplier who
2  wanted to take on the service at or below the rates
3  that were negotiated.
4    Q.   In connection with NEES's restructuring,
5  were there any provisions that addressed the issue
6  of stranded costs?
7    A.   Yes. New England Power Company was
8  concerned that it had substantial investments that
9  were unrecovered in the generating assets that it
10  was now told it could no longer sell to the
11  distribution companies and may not recover those
12  investments through the sale of the assets. So the
13  restructuring agreements allowed the power company
14  to receive its unrecovered investments through
15  charges back to the distribution companies and
16  ultimately to retail customers so it would receive
17  the recovery of its investments there; and
18  customers, upon the sale of the assets, would be
19  credited with the proceeds from the sale to reduce
20  their obligations towards those unrecovered
21  investments.
22    Q.   How did this restructuring of NEES affect
23  the role of the distribution companies?
24    A.   Prior to the divestiture, the distribution

41

1  companies were delivery companies providing power it
2  had purchased from its wholesale affiliate to its
3  customers. After restructuring, the distribution
4  companies again continued to be the delivery entity
5  providing the distribution service to customers. It
6  just purchased the power from NEP and ultimately its
7  successor wholesale suppliers under a different
8  contract at different rates than prior.
9    Q.   Now, I want to ask you some more questions
10  about the process by which the distribution
11  companies obtain supplies to supply the standard-
12  offer service.
13    MR. NGAU: And I think it may be helpful
14  to everyone if we use an exhibit that has some dates
15  on it which will give everyone a reference as to
16  when various events took place, so I have provided a
17  copy to Mr. Wiseman previously and I will supply
18  copies to the panel now.
19    MR. AVERY: Mr. Ngau, if you're going to
20  cover it in the course of your examination you don't
21  need to jump to it now, but I was just wondering, as
22  I was listening, how things eventually evolved in a
23  couple of respects: one, how much retail
24  competition evolved; or is the standard-offer

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

12 (Pages 42 to 45)

---

**42**

1  service now basically what's being used to serve
2  most of the retail load. I would just like a little
3  better understanding, not a lot of detail, but a
4  little better understanding on that.
5      MR. NGAU: Okay.
6      MR. AVERY: And as I say, if you're going
7  to get to that anyway, you don't have to jump to it.
8  And then I just was curious to have a little more
9  detail on how much the stranded costs were reduced
10  roughly and how much was left after you credited
11  what you got from the generation. Just to have a
12  little fuller picture.
13      MR. NGAU: Well, let's take those two
14  issues up.
15  BY MR. NGAU:
16      Q. Can you explain the extent to which retail
17  competition has developed in the service areas of
18  the National Grid distribution companies?
19      A. Sure. Retail competition effectively
20  began in 1998, early 1998, and was for the most part
21  slow to evolve. It has not evolved as quickly as
22  the marketplace and others had anticipated. Today
23  in Massachusetts over 20 percent of our total load
24  is being served in the competitive marketplace. The

---

**43**

1  remaining 80 percent is divided between standard-
2  offer service, which is customers who were taking
3  the service as of the retail access date, the date
4  customers could go to the competitive marketplace
5  and have not yet gone there, and default service,
6  which is for new customers who have come on since
7  that date, which was March 1 of '98 in
8  Massachusetts, new customers who have come on and
9  customers who have not gone to the competitive
10  marketplace and are not currently being supplied by
11  a competitive supplier.
12      In Rhode Island I believe there are
13  similar results. However, on the default service
14  aspect in Rhode Island, new customers are allowed to
15  take standard-offer service. So we have a separate
16  standard-offer supplier for customers who have come
17  on after the retail access date, which was January
18  1st of '98 in Rhode Island. So we have a smaller
19  number of customers on default service but --
20  BY MR. AVERY:
21      Q. But it's about an 80/20 split in Rhode
22  Island, are you saying?
23      A. If the detail is important, I'm
24  comfortable in Massachusetts, but it's no more than

---

**44**

1  20 percent in Rhode Island.
2      Q. That's fine. Just roughly.
3      A. And in general where the activity seems to
4  be is in the large customer classes. Small
5  residential customers in general are not going into
6  the competitive marketplace, but the large
7  commercial/industrial customers are the ones that
8  are for the most part going in that direction.
9      MR. REED: Just for my edification, the
10  default service contracts are not a subject of this
11  arbitration. Is that correct?
12      MR. NGAU: Correct.
13      MR. REED: So we're only dealing with the
14  SOS contracts?
15      MR. NGAU: Correct.
16  BY MR. NGAU:
17      Q. And the other issue that Mr. Avery raised
18  was the extent of the stranded-cost reduction. Can
19  you tell us, to the extent you know, the amount of
20  stranded costs on the books and the amount of
21  reduction from the sale of generating assets?
22      A. I know we received approximately 1.6
23  billion, 1.7 billion dollars for the sale of the
24  generating assets. I know that that was a large

---

**45**

1  reduction in the stranded costs. However, I cannot
2  put my finger on the exact total stranded-cost
3  number and how much is remaining at this time.
4      MR. NGAU: Let's turn to this document I
5  handed you, and it might be easier if we mark it as
6  an exhibit. I think the next exhibit number is 53.
7      MR. WISEMAN: I'm sorry. Tim, are you
8  referring to the document that is titled Key Events?
9      MR. NGAU: Yes.
10      (Exhibit 53 marked for identification.)
11      MR. AVERY: Excuse me.
12      (Pause)
13      MR. PORTER: We were furnished with
14  approximately fifty exhibits, I think, last evening.
15  How is it you're going to deal with the exhibits?
16  Are they all joint? Are you going to offer them?
17  What's their status?
18      MR. NGAU: My understanding, Ken, is that
19  they were joint exhibits.
20      MR. WISEMAN: Yes.
21      MR. NGAU: I mean, we can offer them
22  formally, but in any event they're agreed.
23      MR. PORTER: In order to protect our
24  record, if you would, I believe they should be

---

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

13 (Pages 46 to 49)

**46**

1  offered at some point. And we would like to know
2  how you're going to do that.
3      MR. NGAU: No time like the present.
4      MR. WISEMAN: Do you want to just move
5  them in en masse?
6      MR. PORTER: That's fine.
7      MR. NGAU: Sure. We provided the panel
8  members yesterday evening a set of exhibit binders
9  containing documents marked as Exhibits 1 through
10 52, and I think at the front of it there is an index
11 entitled Combined Exhibit List. At this time I
12 would offer into the record Exhibits 1 through 52.
13     MR. WISEMAN: Is there any objection?
14     MR. WISEMAN: No objection.
15     MR. PORTER: Then they are received.
16     MR. AVERY: By the way, could I ask a
17 question while we're at this point. When I was
18 looking at the binder, Exhibit 51 was on the list as
19 a map but it wasn't there. I assume at some time
20 we're going to get it. Is that right?
21     MR. WISEMAN: Exhibit 51 is this large map
22 which we were unsuccessful in trying to reduce, but
23 I understand that Mr. Ngau was again creative and
24 has taken a photograph of it.

**47**

1      MR. NGAU: Yes. I won't vouch for the
2  quality, but this is a roughly three-by-four-foot
3  exhibit. I hung it on my wall and took a picture of
4  it with my digital camera, and I'll hand out the
5  8-1/2 by 11 version of it. It doesn't have an
6  exhibit number but it is a copy of what's been
7  identified as Exhibit 51.
8      MR. PORTER: We will mark the digital
9  camera product as Exhibit 51.
10     MR. NGAU:
11 Q.  Let's turn back to the process by which
12 the distribution companies obtained power to meet
13 their standard-offer service obligation. I have
14 handed you a document which I have asked to be
15 marked as Exhibit 53 entitled Key Events, and let's
16 start with the first event, April '97. Can you
17 explain what took place there?
18 A.  Okay. I'm going to start one step prior
19 to that. Before these events transpired, the
20 distribution company had obtained agreement from its
21 affiliate New England Power Company to provide
22 standard-offer service at the fixed price, so they
23 already had a supplier of power from their affiliate
24 and former all-requirements supplier to provide the

**48**

1  power.
2      We then had an obligation to go down two
3  paths. One is for New England Power Company, who
4  had the commitment to provide that, to divest its
5  assets as well its obligation to continue to
6  provide that supply to a purchaser of the assets;
7  and the distribution companies had an obligation to
8  perform a competitive solicitation to offer that
9  service to anyone else in the marketplace who wanted
10 to step forward.
11     So the first event, dated April 1997, on
12 this list talks about that second process, which is
13 where NEES or Mass. Electric and Narragansett
14 Electric had gone out to the marketplace with a
15 competitive solicitation or request for
16 qualifications to see if anyone who wasn't part of
17 the asset purchase process or its affiliate wanted
18 to step up and take all or a portion of that supply
19 and bid into that process.
20 Q.  Could someone who was interested in
21 bidding on the asset sale also participate in this
22 process?
23 A.  Yes, we allowed that to happen. And that
24 would offer the asset purchaser who had some value

**49**

1  and wanted to continue to provide that service, that
2  it wasn't a process where it was just taken away
3  from them and they were left with the remains there;
4  that they were able to participate in that process.
5  They had to bid a discount to the existing prices
6  that they were already going to inherit as part of
7  the asset sale. But they were able to participate
8  to protect their interests if they wanted to
9  continue to serve that load.
10     MR. NGAU: And before we move on to the
11 next event, I will just note that Exhibits 14 and 47
12 relate to this item on the line April of '97.
13     MR. PORTER: The exhibit numbers again,
14 please?
15     MR. NGAU: 14 and 47.
16     MR. PORTER: Thank you.
17     MR. REED: Mr. Hager referred to some
18 dates prior to April of '97. Can you just fill out
19 the date, whatever happened, and under what
20 agreements, so I have a complete time line here? If
21 that's what you're intending. You can have the
22 witness do that.
23     BY MR. NGAU:
24 Q.  Can you give us the dates, I guess it

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

14 (Pages 50 to 53)

**50**

1  would be the dates on which the distribution
2  companies agreed to have NEP supply them with
3  wholesale standard-offer service?
4      A.   Just quickly looking at the list of
5  exhibits, I don't know that that agreement was in
6  there.  But if I could take that as a request and
7  get back to you later in the proceeding with that
8  date?
9      Q.   All right.
10     For now let's move on.  There's an event
11  which occurred in May 1997.  Can you tell us what
12  that is?  What happened there?
13     A.   Yes.  That was a parallel path to the
14  April '97 activities in which New England Power
15  Company had issued a request for proposals to sell
16  its non-nuclear generating asset.
17     MR. NGAU:  I will just note for the
18  panel's benefit that that request for proposals is
19  Exhibit 7.
20  BY MR. NGAU:
21     Q.   And what about the event that is listed as
22  July 18, 1997?
23     A.   That is the date that New England Power
24  Company had received bids from interested asset

**51**

1  purchasers for the generating assets.
2      MR. NGAU:  And USGen's bid is Exhibit
3  Number 8.
4  BY MR. NGAU:
5      Q.   What about the August 5, 1997 event?
6      A.   That is the date upon which NEES and USGen
7  had signed agreements.  USGen, after receiving the
8  bids on July 18, was determined to be the entity
9  that NEP would sell its generating assets to.  And
10  between July 18 and August 5, there was a review of
11  the bids and negotiations on some outstanding issues
12  and the purchase and sale for that occurred on
13  August 5, 1997.
14     MR. NGAU:  And again the versions of the
15  agreements signed on that date are Exhibits 11 and
16  12.
17  BY MR. NGAU:
18     Q.   What about the event listed as October 29,
19  1997?  What happened there?
20     A.   Two of the agreements entered into on
21  August 5 were wholesale standard-offer service
22  agreements.  One was between Mass. Electric,
23  Nantucket and USGen.  The second was between
24  Narragansett and USGen, under which USGen would

**52**

1  provide a hundred percent of the standard-offer
2  service that was less whatever was served by
3  suppliers in the distribution company RFP process.
4      On October 29, after August 5, we
5  understood that USGen had agreed to sell to
6  TransCanada one of the assets that USGen was
7  purchasing.  That's the Ocean State power plant.
8  And as part of that transaction between USGen and
9  TransCanada, that TransCanada would be taking on a
10  portion of the USGen's WSOS obligations.  And so on
11  October 29 we amended the agreements with USGen to
12  provide for two agreements.  One was for roughly 90
13  percent of the load; one was for the other 10
14  percent of the load.  And that 10 percent would be
15  assigned to TransCanada upon the completion of the
16  transaction between USGen and TransCanada.
17     MR. NGAU:  And those documents are Exhibit
18  16.
19  BY MR. NGAU:
20     Q.   Let's go down to the April 7, 1998 event.
21     A.   That's the date that Blackstone — That
22  would be the date that all the EUA operating
23  companies, Blackstone Valley, Newport and Eastern
24  Edison, entered into a wholesale standard offer

**53**

1  agreement with TransCanada in which TransCanada
2  would provide roughly 15 percent of EUA's standard-
3  offer obligations.
4      Q.   And just so the record is clear, what
5  involvement if any did you have in the negotiation
6  of that agreement?
7      A.   No one from NEES had any involvement in
8  that.  They were separate companies at the time.
9      MR. NGAU:  And that agreement is Exhibit
10  4.
11  BY MR. NGAU:
12     Q.   We'll go down to September 1, 1998.  What
13  happened there?
14     A.   That is the date that the sale of the
15  assets to USGen was completed.  We had also at that
16  time made some amendments to WSOS agreements,
17  principally to account for some dispatchable load
18  credits that were included in the prior agreements.
19  And that's the date that both USGen and TransCanada
20  began their supply of wholesale standard-offer
21  service to Narragansett and Mass. Electric.
22     Q.   Do any of the amendments that were made on
23  that date affect the provisions that we have
24  discussed here this morning?

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

15 (Pages 54 to 57)

54

1  A.  No, they do not.
2  Q.  Then the event in March of 2000?
3  A.  That's the date that New England Electric
4  System merged with National Grid and became National
5  Grid USA.
6  Q.  And the event in May of 2000?
7  A.  That's the date that National Grid USA
8  completed the merger with Eastern Utilities
9  Associates and the date on which Blackstone and
10  Newport merged with and into Narragansett and
11  Eastern Edison merged with and into Narragansett.
12  The old Montaup, which was the wholesale entity of
13  EUA, also merged with and into the power company.
14  Q.  Just to sort of complete this column, we
15  began at the top with a request for qualifications
16  to supply standard-offer service. Can you tell us
17  what happened with that solicitation process?
18  A.  Yes. We received quite a number of
19  interested parties who participated in that. And as
20  we went through the process of ultimately selecting
21  bids from those, we did not receive any bids that
22  were better than what we had already obtained from
23  NEP and USGen, and therefore did not select any
24  bids.

55

1  Q.  Before we leave this exhibit, can you just
2  briefly go through the items over in the column
3  under NEPOOL? Just tell us what happened there.
4  A.  Certainly. On October 31st of 1997 -- Let
5  me step back before that. As these activities were
6  taking place in 1997, the NEPOOL members were coming
7  up with a plan for restructuring the wholesale
8  markets to make them more competitive in light of
9  the divestiture and other changes in the marketplace
10  that were going on.
11  On October 31st of 1997 NEPOOL had filed
12  an amendment to the agreement that governs how it
13  operates, and that amendment had allocated
14  congestion charges to regional network service and
15  had indicated that those charges would be effective
16  to that service effective January 1 of 1998. And at
17  that time it was viewed as an interim temporary
18  solution which would be effective through January of
19  2000 and then beyond that, it was anticipated that
20  congestion charges would no longer be socialized as
21  a transmission expense to transmission customers but
22  would somehow be borne by suppliers of load in the
23  area where congestion occurred.
24  MR. NGAU:  Before you move on, that item

56

1  refers to Exhibits 22 and 23.
2  BY MR. NGAU:
3  Q.  Let's go down to June 2000.
4  A.  The interim proposal of October of '97 was
5  still being debated at NEPOOL. There were several
6  extensions of that interim allocation period; and in
7  June of 2000 FERC had extended that temporary
8  allocation to transmission customers for an
9  indefinite period of time while NEPOOL continued to
10  work through some ongoing restructuring of the
11  marketplace to implement this congestion management
12  system that was being proposed.
13  MR. NGAU:  And Exhibits 27 through 29 bear
14  on that.
15  BY MR. NGAU:
16  Q.  What about the item under July 2002?
17  A.  That's the date that NEPOOL finally filed
18  its standard market design rules that incorporated
19  the congestion management system.
20  MR. NGAU:  And Exhibits 30 and 33 refer to
21  that.
22  BY MR. NGAU:
23  Q.  What about the last item, September 20,
24  2002?

57

1  A.  Getting closer to the end and FERC has
2  finally approved that detailed set of market rules
3  with a couple of changes, but we finally have
4  approval to start moving forward with this market
5  design.
6  MR. NGAU:  And that order is Exhibit 32.
7  BY MR. NGAU:
8  Q.  Now let's go back a bit and just tell us
9  again, why exactly did the distribution companies
10  enter into wholesale standard-offer service
11  agreements in the first place?
12  A.  At the time we were coming up with
13  restructuring, there was an expectation that
14  competitive suppliers would take over the supply of
15  generation service to all the distribution
16  companies. However, there was a concern that some
17  customers for whatever reason may not be able to
18  choose or obtain a competitive supplier. And so the
19  restructuring agreements obligated the distribution
20  companies to provide a transitional service, which
21  was called standard-offer service, for a period of
22  time that would accomplish two goals.
23  One, it would ensure that until customers
24  had an opportunity to understand the restructuring

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

16 (Pages 58 to 61)

**58**

1   marketplace and make informed choices and find a
2   competitive supplier that they would go to, that
3   they would have a supply of power and they weren't
4   left in the dark with no lights on.
5          The second part of it was restructuring
6   was also supposed to leave customers with some
7   benefits here. And part of the retail restructuring
8   agreements included long-term rate plans with fixed
9   rates for distribution service as well as this
10  generation service so that we can assure customers
11  of a level of savings while they remained on
12  standard-offer until they chose their competitive
13  supplier to achieve greater savings in the
14  marketplace.
15     Q.   Where were the customers receiving
16  standard-offer service from the distribution
17  companies located? Maybe you can move those boards
18  and use the map to show us.
19     A.   Well, certainly as of the retail access
20  date in each state, they were all one million
21  customers that we were supplying -- And I'll
22  incorporate the EUA customers as well. It was for
23  all intents and purposes the entire state of Rhode
24  Island, with the exception of Pascoag Fire District

**59**

1   up in the northwest corner there.
2          MR. PORTER: Excuse me a moment. What is
3   the question again? What is your question,
4   Mr. Ngau, to the witness?
5          MR. NGAU: Where were and are the
6   customers receiving standard-offer service located.
7          MR. PORTER: All right.
8     A.   So we have customers in the entire state
9   of Rhode Island. We have customers in
10  Mass. Electric's service territory in Massachusetts,
11  which in general is North Shore of Massachusetts,
12  Merrimack Valley region of Massachusetts, several
13  communities in central Massachusetts, and several
14  communities out in western Massachusetts. There are
15  gaps in that service territory; it's not a
16  contiguous service territory here. There's about
17  forty municipalities with power supply; Boston
18  Edison and Cambridge and Commonwealth have some on
19  the eastern side; and Western Mass. Electric, who
20  we're not affiliated with, have parts in the western
21  territory.
22     Q.   And what about in southeastern
23  Massachusetts?
24     A.   There is in southeast Massachusetts, in

**60**

1   the form of EUA's service territory we picked up;
2   and Nantucket serves the island of Nantucket.
3     Q.   Let's turn to the issue of congestion
4   costs are. Tell me, first of all, just what
5   congestion costs are as you understand it?
6     A.   The NEPOOL rules which are implemented and
7   administered by ISO New England provide for a
8   least-cost dispatch of generating units. So all the
9   generating units throughout New England provide bids
10  into the system operator, ISO New England, and the
11  ISO dispatches those based on lowest cost to get the
12  lowest-cost dispatch to meet the electric needs of
13  the entire New England region.
14         There are times when there are
15  transmission limitations that prevent power moving
16  from one generating location to an area where load
17  is located. If, for example, we just split
18  Massachusetts into two areas, the western part and
19  then the Boston area, if the dispatch says the next-
20  least-expensive generating unit is located in
21  western Massachusetts but by turning it on we can't
22  serve load in downtown Boston because we don't have
23  enough transmission capacity to wheel that power,
24  then the ISO in order to maintain reliability of the

**61**

1   system will skip over that least-cost unit and take
2   a higher-cost generating unit located in Boston or
3   the area that could be dispatched to meet those load
4   needs and pay a slightly higher price for that
5   dispatch than the economic order would allow for.
6   And that out-of-merit generation is flagged and the
7   costs above the economic dispatch are classified as
8   congestion costs.
9     Q.   How are those congestion costs assigned
10  today? Who pays them, in other words?
11     A.   On the agreement that first started back
12  in October of '97 and even though it was an interim
13  agreement it continues today, they are allocated to
14  customers who are taking transmission service under
15  the NEPOOL transmission agreement. That is
16  effectively Mass. Electric and Narragansett
17  Electric, because they take transmission service
18  from NEPOOL and other transmission providers as part
19  of the wires business that they provide.
20     Q.   And do the distribution companies charge
21  their retail customers for this transmission?
22     A.   Yes, the retail restructuring agreements
23  allow the distribution companies who are taking
24  transmission service on behalf of the retail

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

17 (Pages 62 to 65)

**62**

1  customers to fully collect all transmission costs it
2  incurs
3      Q.   Including congestion charges as they're
4  now assigned?
5      A.   Since the congestion charge is a charge
6  and a cost that is incurred as part of that
7  transmission service that they're taking, we are
8  allowed to recover those costs.
9      Q.   Now, under the system that you discussed
10  earlier that NEPOOL filed in July 2002 and that FERC
11  approved with some conditions in September 2002,
12  will there be any changes in the treatment of
13  congestion costs?
14      A.   Yes. Suppliers of load will be
15  responsible for those congestion costs.
16      Q.   And how will that occur?
17      A.   Under the current dispatch, even though
18  the ISO may dispatch a higher-cost unit, let's
19  assume it's a $100 generator in Boston as opposed to
20  a $50 generator that otherwise would have dispatched
21  in western Massachusetts. The clearing price or the
22  wholesale market price for power remains at $50
23  throughout New England today and the extra 50
24  dollars above that that's paid to the generator is

**63**

1  what is socialized to transmission customers. Under
2  the CMS proposal that will be forthcoming, that
3  difference in price will set different wholesale
4  market-clearing prices depending on where your load
5  and your generator is located, so that suppliers
6  serving load and generators providing power in
7  Boston will see a $100 market price whereas
8  suppliers and generators in western Massachusetts
9  will see the $50 price. And the difference in those
10  prices is representative of congestion cost.
11      Q.   Does NEPOOL permit parties to reallocate
12  by agreement any congestion costs that NEPOOL
13  assesses?
14      A.   Yes, and parties have bilateral
15  arrangements amongst themselves in which to settle
16  up those arrangements as to who's responsible for
17  which costs. There's no prohibition on doing that.
18      Q.   Now, were congestion costs an issue back
19  in '97 when the distribution companies were first
20  entering into wholesale standard-offer service
21  agreements?
22      A.   Yes. We understood that there was
23  congestion predominantly in the Boston area. I'm
24  not sure that we spent a lot of time trying to

**64**

1  quantify exactly how much that was, but we certainly
2  knew that there were areas that did experience
3  congestion at the time. And it was an area that was
4  going to be resolved as to who was to pay that,
5  because the concept of congestion and how those
6  costs would be allocated were included in the early
7  restructuring arrangements at NEPOOL.
8      Q.   On behalf of NEES or on behalf of the
9  distribution companies back in '97, what were your
10  objectives with respect to the responsibility for
11  congestion costs?
12      MR. AVERY: Your, do you mean him
13  personally or do you mean his company? I'm not sure
14  what you're asking.
15      MR. NGAU: That's why I said on behalf of
16  NEES.
17      MR. AVERY: Oh, on behalf of NEES, okay.
18      A.   Again, NEES was coming up with wholesale
19  standard-offer agreements so that it could obtain
20  the supply of that power as a perfect hedge against
21  its obligations to provide standard-offer service to
22  its customers. So the responsibility was to make
23  sure that these wholesale standard-offer agreements,
24  whether they were with the asset purchaser or with

**65**

1  suppliers who placed winning bids in the
2  solicitation by the distribution companies, that
3  those agreements including who was responsible for
4  the congestion costs were consistent with the supply
5  and the commitments that the distribution companies
6  had made under the restructuring agreements.
7      Q.   And in what way would --
8      MR. PORTER: Mr. Ngau, would this be a
9  good time to take a break?
10      MR. NGAU: Certainly.
11      MR. PORTER: Fifteen minutes, if that's
12  okay with everyone.
13      MR. NGAU: That's fine.
14      (In recess 10:30 a.m. to 10:50 a.m.)
15      MR. PORTER: Back on the record, please.
16      I think there's some question as to
17  whether or not Exhibit 53 was admitted. And the
18  record should show that it should be admitted. It
19  is accepted.
20      Go ahead, Mr. Ngau.
21      MR. NGAU: Thank you.
22  BY MR. NGAU:
23      Q.   I may have asked you this this morning but
24  I may have overlooked it, so let me be sure. What

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

18 (Pages 66 to 69)

66

1   responsibilities did you have in connection with the
2   drafting of the Massachusetts Electric and Nantucket
3   Electric wholesale standard-offer service
4   agreements?
5       A.   I was responsible for reviewing those
6   agreements and making sure that they were consistent
7   with the services that Mass. Electric and
8   Narragansett would be providing to their customers
9   and ensuring that the risks, in particular that the
10  service that we were buying enabled us to provide
11  those services to retail customers as a complete
12  perfect hedge there.
13      Q.   And did you actually participate in the
14  negotiation with USGen of those agreements?
15      A.   I participated in the internal NEES
16  discussions relative to the comments and terms that
17  were being negotiated. I did not participate in the
18  discussions directly with USGen.
19      Q.   Now, you said you wanted to make sure that
20  the supply you were getting was consistent with the
21  retail obligations that the distribution companies
22  had. How did that objective relate to the issue of
23  congestion costs?
24      A.   Again, we ensured in at least two places

67

1   in those WSOS agreements that to the extent those
2   were supplier-related costs, that our wholesale
3   supplier would be responsible for those congestion
4   costs and we would just be paying the fixed price
5   and the fuel trigger payments to obtain that supply.
6       Q.   Can you show us where in the agreements
7   you believe you accomplished that objective?
8       A.   I'll point to two locations in the
9   agreement. The first one here is the WSOS agreement
10  between Mass. Electric and Narragansett with USGen
11  and in article Definitions, we have this definition
12  of what the wholesale standard-offer service is that
13  USGen and TransCanada will be providing to us:
14  Generation and delivery of the electric capacity and
15  energy to meet the needs of MECo's ultimate
16  customers taking standard-offer service through, and
17  the definition says that the supplier will be
18  responsible for all present or future requirements
19  and associated costs for a number of market-related
20  products. And after that, the list of products and
21  obligations, it includes losses and any congestion
22  charges associated with seller's supply of wholesale
23  standard-offer service, along with other
24  requirements imposed by the ISO.

68

1       MR. PORTER: Mr. Ngau, would you identify,
2   please, what exhibit we're dealing with?
3       MR. NGAU: That is a blowup of Exhibit 1,
4   page 4.
5       A.   Also in that same agreement --
6   BY MR. AVERY:
7       Q.   Could you tell me again which words you
8   just pointed to, Mr. Hager? I'm sorry.
9       A.   Would it be permissible to mark the
10  agreement?
11      MR. AVERY: By the way, are you going to
12  have page-size copies of those excerpts or shall we
13  just rely on the agreement?
14      MR. NGAU: I think you need to rely on the
15  agreement. I did not bring my camera to the
16  hearing.
17      A.   Seller will be responsible for a list of
18  products and any congestion charges associated with
19  seller's supply of wholesale standard-offer service.
20  BY MR. NGAU:
21      Q.   There's another blowup there; this is
22  Exhibit 1, pages 8 and 9.
23      A.   Which is another section within the
24  agreement where we again discuss the responsibility

69

1   for congestion costs. And under Section 6.1 we
2   talked about the ability, the flexibility to deliver
3   to any location on the system, but it clearly says
4   "If the NEPOOL control area experiences congestion,
5   seller will be responsible for any congestion costs
6   incurred in delivering power across the PTF system
7   to MECo to the extent such costs are imposed by
8   NEPOOL or the ISO on suppliers." So once again we
9   have identified the responsibility for the
10  congestion costs to be with our supplier to the
11  extent we don't receive those costs as a
12  transmission expense.
13      Q.   The two blowups we just looked at were
14  excerpts from the Massachusetts Electric agreement.
15  Are there any differences between that agreement and
16  the agreement with Narragansett Electric in these
17  particular provisions?
18      A.   No, there is not.
19      MR. AVERY: That's Exhibit 2, is it?
20      MR. NGAU: The Narragansett Electric
21  agreement is Exhibit 2, that's correct.
22  BY MR. NGAU:
23      Q.   Now, looking back at the definition of
24  wholesale standard-offer service, is there any

**70**

1 limitation there on the seller's responsibility for
2 congestion costs to costs incurred up to the
3 delivery point?
4    A.   Absolutely not.
5    Q.   And 6.1?
6    A.   Again, there is absolutely no limitation.
7 It's just to the delivery point.
8    Q.   Looking at 6.1 in the sentence you have
9 highlighted there, there is a phrase "across the PTF
10 system." Do you see that?
11    A.   Yes.
12    Q.   Let me back up a step. That entire
13 sentence you've highlighted there, what was the source of
14 that sentence in the agreement?
15.    A.   That was included in our original draft.
16    Q.   And when you say "our," you mean?
17.    A.   New England Electric System's draft.
18    Q.   Focusing on the language "across the PTF
19 system," what was the purpose of that language?
20    A.   WSOS is the sale of service to our
21 customers. As part of the earlier sentence, we
22 allowed suppliers the flexibility, to manage their
23 resources to best perform under these contracts, to
24 have delivery point flexibility anywhere in the PTF.

**71**

1 It also was consistent with the transmission tariffs
2 for delivery at any point in the PTF. We could then
3 transmit from there to the location of our
4 customers.
5        So what we're suggesting is to the extent
6 we have customers in Boston that you're serving
7 under that supplier arrangement and you elect to
8 deliver power in western Massachusetts because
9 there's an economic advantage to you or for whatever
10 other reason, that we weren't going to get stuck
11 with the cost of congestion-related costs when it
12 was delivered to where our customers were located.
13 So what we're saying is if you want to put it in
14 there and we need to get that power across the PTF
15 to where our customers are located in Boston, you,
16 the supplier, will be responsible for that cost.
17    Q.   Now, you mentioned a sentence that talks
18 about the delivery points. That's a sentence in
19 6.1?
20    A.   That's the first sentence in Section 6.1,
21 yes.
22    Q.   And again who put that sentence in the
23 agreement?
24    A.   That was included in the original NEES

**72**

1 draft agreement.
2    Q.   And when you reviewed that sentence, what
3 did you think you were accomplishing there?
4    A.   Again, we were accomplishing two things.
5 The transmission tariffs as they were operable at
6 the time allowed that once a generation supply was
7 put on PTF -- which I should define as pool
8 transmission facilities, transmission facilities
9 greater than 69 kv in voltage. And I always
10 visualize it as just a big transmission ring that
11 runs all around New England connecting all of New
12 England with the high-voltage transmission level.
13 That any generation source that was delivered up to
14 that PTF system would then flow around that system
15 and could be taken off at other locations to serve
16 customers there.
17        So what we're saying with that sentence
18 is, the transmission tariffs allow you to put it
19 wherever you want and we can transmit it at no
20 additional cost, whether it's in Maine, Connecticut,
21 Rhode Island, wherever. In addition, this is a
22 system power arrangement where we weren't hardwiring
23 purchases from specific generating units; we were
24 allowing the supplier to pick and choose the

**73**

1 resources that they best wanted to use to meet their
2 obligations here. So it also allowed them the
3 flexibility of choosing the resource that they
4 wanted to use to meet their ultimate obligations.
5    Q.   Now, why didn't you require your
6 suppliers, instead of delivering power anywhere on
7 the NEPOOL PTF, to deliver it in the location where
8 your customers were located?
9    A.   Again, the transmission tariffs allowed
10 the flexibility, so there's no additional
11 transmission cost to us depending on where they
12 located it. Secondly, we were giving them the
13 flexibility to pick and choose their resources, and
14 we were comfortable doing that because we had this
15 other sentence that said to the extent you want to
16 deliver that power in western Massachusetts and I
17 have customers in Boston, I'm not handing a blank
18 check to my supplier that I can't recover from
19 customers if there are congestion-related costs. We
20 said you can put it anywhere you want. But if there
21 happens to be congestion from where you put it to
22 where I need it, in this other sentence, you're
23 responsible for that; make sure you factor that into
24 your economic decision to put it in western

74

1 Massachusetts instead of using a Boston resource.
2 BY MR. AVERY:
3    Q.   I'm a little confused on the whole Boston
4 thing.  Boston is served by Boston Edison.  Right?
5 Well, let me just complete my thought.  I have it in
6 my head that Boston is served by Boston Edison,
7 which is not part of NEES, was not part of NEES, and
8 I hear you talking about your concern with Boston
9 customers.  And I am just not clear in my own mind
10 how that all works.
11    A.   Certainly, you are absolutely correct that
12 Boston is served by Boston Edison, which is not now
13 or to my knowledge in the future to be part of our
14 National Grid here.  What I was just referring to
15 was specific locations.  In fact, Boston is in this
16 zone which we call the northeast Mass., or NEMA,
17 which incorporates Boston and some of the
18 northeastern parts of Boston; and we do happen to
19 have customers north of the Boston service territory
20 that we serve.  So as a part of that NEMA area, I
21 just used Boston.
22    Q.   So when you use that parlance, you're
23 referring to your own customers in that area?
24    A.   Yes.

75

1 BY MR. NGAU:
2    Q.   There's another sentence in Section 6.1
3 there that has been the subject of some discussion
4 here.  It's the second sentence that begins "Title
5 shall pass...."  Do you see that?
6    A.   Yes, I do.
7    Q.   How did that sentence get included in the
8 agreement?
9    A.   That was not included in the original
10 draft agreements that we sent out to suppliers, not
11 only those bidding in the auction process but the
12 asset purchasers.  That was one of the few markups
13 that USGen had given us in their response, in their
14 bid to purchase the generating assets, that they
15 wanted that sentence included there.
16 BY MR. AVERY:
17    Q.   You're waving your hand and pointing to a
18 sentence, and I'm not sure --
19    A.   Excuse me.  This sentence, "Title shall
20 pass to MECo at the delivery point and seller shall
21 incur no expense or risk beyond the delivery point."
22 BY MR. NGAU:
23    Q.   Were you ever told why USGen proposed
24 adding such a sentence?

76

1    A.   No, I was not.
2    Q.   Why did you agree to add it?
3    A.   As we sat and evaluated what that meant,
4 we had determined that it did not negate in any way
5 the congestion cost responsibility that we had and
6 therefore the delivery point flexibility.  And as we
7 understood it, it had to do with a concern that
8 USGen had about being a retail supplier.
9        The earlier drafts, if you read them, sort
10 of would lead you to believe that as a supplier you
11 were supplying this power directly to retail
12 customers, right to their meters.  USGen as a
13 requirement of their asset purchase needed to obtain
14 EWG status, exempt wholesale generator status, and
15 they were very concerned that that would adversely
16 affect their ability to obtain EWG status.  We
17 interpreted that as a boundary point that we were
18 making it clear that at some point the ownership of
19 the electrons would change from USGen and
20 TransCanada to New England Electric System.  But the
21 other cost responsibility for congestion beyond that
22 was not affected by that change in ownership of the
23 electrons.
24 BY MR. AVERY:

77

1    Q.   You've used "we" two or three times in
2 that answer and I'm not clear on who "we" is.
3    A.   When I say "we," Mass. Electric,
4 Narragansett Electric:  the NEES subsidiaries who
5 were entering these agreements.
6 BY MR. NGAU:
7    Q.   Let's clarify that here.  You talked about
8 your role in the drafting of these agreements.  Were
9 there others involved at NEES at the time?
10    A.   Yes.
11    Q.   And what was your role relative to the
12 other people who were involved in the drafting
13 process?
14    A.   Reviewing the proposed changes that came
15 into these agreements.  My role was to review the
16 proposed changes to the agreements to make sure they
17 were consistent with what we were intending to
18 purchase in order for us to provide the standard-
19 offer service at no basis differential, at no cost
20 differential between what our commitments were to
21 retail customers under restructuring agreements
22 versus what we were purchasing our supply at.
23    Q.   If you reviewed something and determined
24 there was a problem with it or you had an objection

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

21 (Pages 78 to 81)

**78**

1  to it, what was the process within NEES to deal with
2  that?
3     A.   Certainly we would raise it to the team of
4  lawyers who was negotiating with USGen, that this is
5  a significant and -- For example, if this title
6  passes language were to pass additional costs on to
7  us or some other proposed language were to pass
8  additional costs onto us other than the fixed-price
9  and the fuel trigger mechanism, then it was a simple
10 process of flagging that as being different than
11 what we had committed to sell to retail customers,
12 that we were going to incur more costs than we
13 otherwise would collect.  And we would have to
14 evaluate whether we wanted to do that or find a way
15 to go back and see if we could restructure the
16 retail arrangements to incorporate that change to
17 the extent it brought value to our customers and we
18 could demonstrate that.
19    Q.   Did you have any --
20       MR. PORTER:  Excuse me.
21       MR. NGAU:  Please.
22 BY MR. PORTER:
23    Q.   What did you do?  Did you raise questions
24 about this or not?  I mean, I'm not quite clear what

**79**

1  you're saying.
2     A.   When I saw this language I talked with the
3  attorney who was representing us with USGen, and I
4  others who were reviewing these agreements, and I
5  said "I don't believe that that's passing costs to
6  anyone else.  Can someone see any reason why this is
7  shifting any risks or obligations to us?"  None of
8  us who were on the team that was evaluating that
9  believed it was.  We all believed it just had to do
10 with a line of demarcation as to who owned the
11 electrons so we wouldn't impinge on this EWG issue
12 that was of concern to USGen.
13 BY MR. AVERY:
14    Q.   And you're telling Mr. Porter that you
15 communicated that thought to the negotiating team?
16    A.   Yes.
17    Q.   Or did you just think it and not say it?
18 That's what I'm trying to understand.
19    A.   No, I communicated that thought.
20       MR. PORTER:  Thank you.
21 BY MR. NGAU:
22    Q.   And before these agreements were finally
23 executed by an officer of NEES, did you make any
24 recommendations in connection with signing or not

**80**

1  signing the agreements?
2     A.   I had indicated that I didn't see that any
3  of these changes had altered the risks or
4  obligations of the parties under the agreement; they
5  were all clarifications to better define
6  responsibilities; and that this agreement was
7  consistent with the draft that we had sent out.
8     Q.   Now, in the sentence that begins "If the
9  NEPOOL control area experiences congestion" in
10 Section 6.1, there's a phrase at the end "to the
11 extent such costs are imposed by NEPOOL or the ISO
12 on suppliers."  Do you see that?
13    A.   Yes, I do.
14    Q.   Was that part of the original draft that
15 NEES provided to bidders?
16    A.   I believe it was, if I could just check.
17       MR. AVERY:  If you're checking in an
18 exhibit, would you tell us what exhibit and what
19 page when you find it.
20    A.   Yes, it is.  And I'm referring to Exhibit
21 8 and the Bates number would be 801 in the lower
22 right-hand corner.
23 BY MR. NGAU:
24    Q.   What was NEES's reason for including that

**81**

1  particular phrase?
2     A.   As part of the restructuring, NEES was
3  taking on responsibility for transmission and
4  distribution of electricity and we were looking to
5  purchase the generation or the commodity supply from
6  a wholesale supplier.  So we were dealing with a
7  series of costs that were being debated at the time.
8        We were setting up a set of market rules
9  in here, and there was a clear distinction that to
10 the extent that costs are allocated as a
11 transmission expense, which is a service that the
12 distribution companies were taking and passing on to
13 its customers, that those would be costs that were
14 on our ticket and that were our responsibility and
15 not the responsibility of the wholesale supplier.
16 And to the extent that there were costs that were
17 allocated through the market system and settlements
18 and so forth as a result of the supplier taking on
19 the supply of the standard-offer load, then that
20 would be the responsibility of the wholesale
21 supplier.
22    Q.   Let's turn to the EUA agreement, which is
23 Exhibit 4.  And I think you told us this.  Were any
24 personnel from NEES involved in the negotiation of

FARMER ARSENAULT BROCK LLC

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

22 (Pages 82 to 85)

**82**

1 that agreement?
2     A. No.
3     Q. Are there any personnel at National Grid
4 today who were involved in the negotiation of that
5 agreement?
6     A. No.
7     Q. Are you responsible for administering that
8 agreement today?
9     A. Yes, I am.
10     Q. In connection with administering that
11 agreement, have you determined whether there are any
12 provisions in that agreement that address congestion
13 cost responsibility?
14     A. Yes, I have.
15     Q. Could you just walk us through those? And
16 before you begin, that blowup is from Exhibit 4 and
17 we're looking at Article 3; and the heading is on
18 page 3 and the text is on page 4.
19     A. The first place it appears in those
20 agreements is in Article 3 under Supplier
21 Responsibilities, which lists all the
22 responsibilities of TransCanada under this
23 agreement. And in the paragraph down below it
24 indicates that the now National Grid companies are

**83**

1 responsible for the transmission service, regional
2 network service, and any local network service
3 that's required for the transmission. And that's
4 something that they will recover in their regulated
5 charges. And it specifically says that supplier is
6 responsible for any transmission wheeling costs and
7 so forth and that "if the NEPOOL control area
8 experiences congestion, supplier will be responsible
9 for any congestion costs incurred in delivering
10 power across the PTF system to the companies."
11     Q. One question I know I overlooked this
12 morning, to go way back. You told us your current
13 position with National Grid.
14     A. Yes.
15     Q. Would you just briefly review your
16 employment history and your education background?
17     A. Sure. I started with New England Power
18 Service Company, which is the predecessor to
19 National Grid USA Service Company, back in February
20 of 1982 as an engineer, assistant engineer at the
21 time. For approximately ten years I held various
22 engineering positions where I provided technical
23 engineering support to various power plants, doing
24 studies and various plant betterment projects.

**84**

1       Following that, I worked for approximately
2 five years within NEES doing various power marketing
3 roles, working in the alternate power supply
4 department where we were doing contracting from
5 various IPPs. That department eventually got merged
6 in with the power supply group to form the
7 generation marketing group, where we bought and sold
8 wholesale power to meet our supply obligations and
9 to sell excess power to other entities, investor-
10 owned utilities, government agencies, marketers and
11 so forth.
12       Around June of 1997 I became the standard-
13 offer portfolio manager, where I was responsible
14 initially for the standard-offer-related
15 arrangements and contracts. I have been performing
16 that role with expanding duties for the last five
17 years. The role went from standard-offer portfolio
18 manager to manager of the distribution energy
19 services group because the role became more than
20 just standard-offer; it was default service and
21 other generation stuff. And now I'm director of
22 energy supply, with the added responsibility for
23 finalizing the divestiture of the power company
24 assets.

**85**

1     MR. NGAU: Thank you, Mr. Hager. Nothing
2 further.
3     MR. PORTER: Mr. Wiseman.
4     MR. WISEMAN: Thank you. Could we take a
5 moment so I can get documents I need?
6     MR. PORTER: Absolutely. Would you like
7 to take a break, Mr. Wiseman?
8     MR. WISEMAN: Maybe just a couple of
9 minutes, if we could.
10     MR. PORTER: Sure. We'll take a
11 five-minute break.
12     (In recess 11:18 a.m. to 11:25 a.m.)
13     MR. PORTER: Mr. Wiseman, we're back on
14 the record. Please proceed.
15     MR. WISEMAN: Thank you, Mr. Porter.
16       CROSS-EXAMINATION
17 BY MR. WISEMAN:
18     Q. Mr. Hager, let's start off, can you refer
19 to Exhibit 6. Now, this is a letter you sent to
20 TransCanada explaining National Grid's position on
21 the question of the allocation of responsibility for
22 congestion costs. Is that correct?
23     A. Yes.
24     Q. Can you refer to the third paragraph on

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

23 (Pages 86 to 89)

**86**

1  page 1, the paragraph that starts "As I understand
2  your letter...." Do you see that?
3      A.  Yes, I do.
4      Q.  And then you see the sentence that is a
5  little bit more than halfway down which begins
6  "Reading these sentences together...." Do you see
7  that sentence?
8      A.  Yes, I do.
9      Q.  Can you read that sentence out loud?
10     A.  "Reading these sentences together,
11 TransCanada thus can deliver power to any delivery
12 point it chooses. But if TransCanada chooses to
13 deliver the power at a delivery point that requires
14 transmission to National Grid when there is
15 congestion, TransCanada is responsible for the
16 congestion costs."
17     Q.  And does that set forth a fair summary of
18 National Grid's position in this case?
19     A.  Yes.
20     Q.  Now let's refer to the map, the large map
21 that's up here which has been marked as Exhibit
22 Number 51. First of all, would you agree with me
23 that National Grid provided that map to TransCanada
24 in discovery in this case?

**87**

1      A.  Yes.
2      Q.  Could you describe generally the kind of
3  information that is shown on that map?
4      A.  It shows in general the New England
5  transmission system facilities that are 69 kv and
6  above and it also shows the major generating plants
7  that may be connected to those facilities.
8      Q.  Would you agree that for the most part the
9  transmission lines that are shown on that map are
10 part of the NEPOOL PTF system?
11     A.  In general, yes.
12     Q.  Now, if you could refer to Exhibit 52,
13 please. Do you have that?
14     A.  Yes, I do.
15     Q.  Can you describe the information that is
16 shown on this map?
17     A.  It appears to be a map of New England
18 showing various transmission facilities, probably
19 similar to, not necessarily identical to that on the
20 large map provided to my left. It also has a series
21 of heavy dark lines breaking out seven, looks like
22 eight distinct geographic areas which would
23 represent, I believe, the various zones that will be
24 used by the ISO for settlement purposes under the

**88**

1  standard market design rules.
2      Q.  So when you say the zones that will be
3  used by the ISO for settlement purposes, would you
4  be referring to the zones in which zonal margin
5  prices will be determined?
6      A.  Yes.
7      Q.  By reference to these two maps, I would
8  like to explore with you how National Grid's
9  interpretation of these contracts was going to work
10 in practice. Let's look first at the map that is
11 Exhibit 51, the large map. You see a line that
12 starts right over here at Rotterdam? Do you see
13 that?
14     A.  Yes, I do.
15     Q.  Now, is that line at Rotterdam part of the
16 PTF system?
17     A.  I'm assuming by the designation on this
18 map that all of the lines shown are part of the PTF
19 system.
20     Q.  Now, that line happens to be owned by
21 National Grid. Is that right?
22     A.  I'm not familiar with the ownership of
23 individual lines.
24     Q.  Could you look at the legend on the map

**89**

1  just over here where it indicates lines owned by
2  National Grid and lines owned by other companies.
3  Do you see that?
4      A.  Yes, I do.
5      Q.  Now again, having referred to that legend,
6  can you tell me whether that line appears to be
7  owned by National Grid?
8      A.  The legend shows various solid colored
9  lines, one of those colors being green, and the line
10 at Rotterdam, at least the New England side of that
11 line, is a solid green line which according to that
12 legend would suggest it's owned by National Grid.
13     Q.  Thank you.
14     Now, assume that TransCanada delivered one
15 hundred percent of the power that is subject to the
16 MECo, NECo and the EUA agreements at Northfield. Do
17 you see where that point is on that green line and
18 can you point it out?
19     A.  It's over here in the western part of....
20 Okay, here it is.
21     Q.  First, is Northfield a location on the PTF
22 where TransCanada can choose to deliver power under
23 the three agreements?
24     A.  This map indicates that it is.

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

24 (Pages 90 to 93)

90

1    Q.   And so would you agree then that
2    Northfield qualifies as a delivery point under all
3    three of the agreements?
4    A.   Yes.
5    Q.   Assuming again that TransCanada delivers
6    all the power it is obligated to provide under all
7    three agreements to Northfield, show me where on map
8    Exhibit 51 -- and you can refer to the map that's
9    been marked as Exhibit 52 as well -- show me where
10   on those maps you would refer for purposes of
11   determining congestion cost responsibility under
12   National Grid's interpretation of the contracts.
13       MR. PORTER:  Read the question back,
14   please.
15       (The reporter read the last question.)
16   A.   Let me just focus on Narragansett,
17   although you can draw similar conclusions from
18   Mass. Electric; and I will refer to the NECo
19   agreement which is in Exhibit 2. My interpretation
20   of how this contract will be implemented goes to
21   Section 6.3 of the agreement, the Bates number would
22   be 26522.
23   Q.   Could you do this first?  And you're
24   welcome to refer to Exhibit 2, but could you first

91

1    just point to the places on the map where you would
2    have to look to determine TransCanada's
3    responsibility for congestion costs. And then if
4    you want to explain the basis for how you get there,
5    that's fine, but just show me first on the map where
6    you would look.
7    A.   Sticking with Narragansett for the time
8    being, you're indicating that TransCanada would be
9    delivering a hundred percent of the Narragansett
10   requirements at Northfield, which is up in north
11   central Massachusetts here, and Narragansett is
12   serving customers down in the state of Rhode Island
13   over here.
14   Q.   So that for purposes of determining
15   TransCanada's responsibility for congestion costs
16   under National Grid's interpretation of the
17   contract, if TransCanada delivers power here at
18   Northfield, you would refer down to this area in
19   Rhode Island to determine TransCanada's
20   responsibility for congestion costs associated with
21   the Narragansett contract. Is that right?
22   A.   What I'm saying is that under the
23   Narragansett contract, TransCanada is serving load
24   for Rhode Island customers who are located here in

92

1    Rhode Island and it is delivering power here at
2    Northfield.
3    Q.   In other words, let's use Exhibit 52. And
4    if you could do it so that the arbitrators can see,
5    can you point to the specific zone that you're
6    referring to on Exhibit 52?
7    A.   Certainly. I'll just do this over here.
8    Rhode Island is the middle dark area on the bottom
9    (indicating) and Northfield would be located up here
10   in what we call the western central Massachusetts
11   zone somewhere where that yellow line is designated.
12   Q.   Good enough. Now, recall my question
13   asked you to show me where you would deliver power
14   under all three agreements under this assumption
15   that all the power has been delivered to Northfield.
16   Show me where you would look for purposes of
17   determining congestion cost responsibility under the
18   Mass. Electric and the EUA agreements.
19   A.   Under the Mass. Electric agreement, which
20   includes Nantucket Electric Company, you certainly
21   have the island of Nantucket. I'm always confused
22   as to which one it is. It's the farther one out
23   there. So Nantucket Electric Company's customers
24   are located on the island of Nantucket.

93

1    Massachusetts Electric Company has customers, as I
2    believe I said earlier, in three locations. One is
3    the northeast Massachusetts area, which is north of
4    the Boston location, and west of there as well
5    through the Merrimack Valley. We have customers in
6    the central part of the state of Massachusetts and
7    we have customers located in the western part of the
8    state.
9    Q.   So then by reference to Exhibit 52 --
10   A.   We also have the EUA contract, which is
11   all the state of Rhode Island for Blackstone and
12   Newport, and the Edison customers are located in
13   southeast Massachusetts south of Boston.
14   Q.   If we could refer now to Exhibit 52, for
15   purposes of determining TransCanada's responsibility
16   for congestion costs under National Grid's
17   interpretation of these contracts, am I correct that
18   we would have to look at the zones, first of all,
19   the western and central Massachusetts, the WC Mass.
20   zone on this page, the one that says NEMA -- I
21   believe it's northeast Massachusetts -- and Boston,
22   that zone, the southeast Massachusetts zone and the
23   Rhode Island zone. Is that correct?
24   A.   Yes, it is.

FARMER  ARSENAULT  BROCK  LLC

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

25 (Pages 94 to 97)

94

1    Q.  Can you show me where in the contracts
2  there is language that says that TransCanada has an
3  obligation to deliver power to those zones?
4    A.  I can show you that.  The contract,
5  meaning Section 6.1 for the WSOS agreements, says
6  that all electricity shall be delivered to MECo at
7  any location on the NEPOOL PTF system or on MECo's
8  system.
9    Q.  So you would agree with me, would you not,
10  that TransCanada has no responsibility to deliver
11  power to the zones that you just referred to.  Is
12  that correct?
13    A.  That's correct.
14    Q.  Now, tell me, in my hypothetical where
15  TransCanada delivers a hundred percent of its power
16  to Northfield, and this is a hundred percent of the
17  power under all three agreements, how would you
18  allocate the amounts to go to the various zones?
19        MR. AVERY:  I'm not sure I understood that
20  question.  The amounts of what?
21  BY MR. WISEMAN:
22    Q.  Let's just say that TransCanada's total
23  obligation under the three agreements for a given
24  hour is 300 megawatts.  All right?

95

1    A.  Mm-hmm.
2    Q.  How would you allocate how much of that
3  300 megawatts goes to serve the customers in the
4  Rhode Island zone versus the NEMA zone versus the
5  southeast Massachusetts zone?  Tell me how you would
6  figure out how that allocation works.
7    A.  That allocation is accomplished through
8  the NEPOOL market settlement system where these
9  contracts are settled out amongst us.  And that is
10  accomplished under the terms of Article 6.3 in the
11  National Grid contracts.
12    Q.  Show me the language that specifically
13  provides an allocation methodology for determining
14  congestion cost responsibility in the various zones
15  that you just referred to.
16    A.  Well, Section 6.3 in paragraph (a) —
17    Q.  I'm sorry.  Which agreement are you in
18  now?
19    A.  Again, Exhibit 2 is what I have open and
20  let me use the Bates number; it would be 26522.
21  Section 6.3 deals with how we're going to implement
22  these and it starts in paragraph (a) there to say
23  that to meet its NEPOOL obligations, TransCanada
24  must have a settlement agreement and then NECo will

96

1  estimate its total hourly standard-offer service
2  load using a load estimation process that we've
3  agreed upon.  And towards the end of that paragraph
4  (a) it says NECo will report to NEPOOL on behalf of
5  TransCanada TransCanada's standard-offer service
6  load, which is their portion of what they're
7  supplying under this agreement.
8        Paragraph (b) then says that we will
9  report that by 1:00 p.m. of the second following
10  business day.  So loads that TransCanada was serving
11  on Monday will be reported by 1:00 p.m. on Wednesday
12  to the ISO and to TransCanada.
13        And it also says that that load should be
14  added by NEPOOL to all the other loads that
15  TransCanada is providing.
16    Q.  You would agree with me, would you not,
17  that Section 6.3 has to do with determination of
18  volumes essentially.  Is that right?
19    A.  It accomplishes two things.  It
20  accomplishes how we are going to determine the
21  volumes, but it also clearly establishes who has
22  settlement responsibility in the ISO market system
23  for these loads and which defines who has generation
24  settlement responsibility obligations and who has

97

1  transmission cost responsibility.
2    Q.  Do you see the words congestion cost
3  responsibility or congestion cost anywhere in
4  Section 6.3?
5    A.  No.
6    Q.  What is the one section that you see in
7  this agreement — What are the two sections that
8  refer to congestion cost responsibility?
9    A.  As I indicated earlier, the first very
10  clear section is the definition of the wholesale
11  standard-offer service that TransCanada is providing
12  to us and the sentence that says that seller will be
13  responsible for any congestion charges associated
14  with their supply of standard-offer service.
15  Without qualification, they're responsible for any
16  congestion costs associated with their supply of
17  that service.  And we have Section 6.1 which again
18  establishes that if the NEPOOL control area
19  experiences congestion, TransCanada will be
20  responsible for any congestion costs incurred in
21  delivering power across the PTF system to MECo to
22  the extent such costs are imposed on suppliers.
23    Q.  In either Section 6.1 or in the definition
24  of wholesale standard-offer service where the word

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

26 (Pages 98 to 101)

98

1  congestion is used, do you see any language in there
2  that describes the allocation methodology you just
3  described?
4      A.    It establishes who's responsible for those
5  costs.
6      Q.    Do you see any description of the
7  allocation methodology that you just described?
8      A.    Not in those two sections.
9      Q.    Thank you.
10         Let's just go through one more
11  hypothetical and see how this works. Assume that
12  TransCanada delivered one hundred percent of its
13  power under all three agreements down here at
14  Millstone in Connecticut. Do you see that?
15      A.    Yes, I do.
16      Q.    There's some very small writing on there.
17  But can you see that although there's one dotted
18  line the map indicates that there are actually four
19  transmission lines coming out of Millstone?
20      A.    I see four numerical designations which I
21  believe are designations for individual transmission
22  lines.
23      Q.    And are those transmission lines part of
24  the PTF system?

99

1      A.    This map indicates that they are.
2      Q.    Can TransCanada deliver its power under
3  the contracts to those transmission lines at the
4  outlet side of the Millstone plant?
5      A.    If that is PTF, they can.
6      Q.    And that would qualify as legitimate
7  delivery points under the contracts. Is that right?
8      A.    Yes.
9      Q.    Now, just so we're clear, in this instance
10  those transmission wires are not owned by National
11  Grid companies. Is that right?
12      A.    That is correct.
13      Q.    To maybe shortcut this a little bit, would
14  I be correct in assuming that if TransCanada
15  delivered one hundred percent of its power to those
16  transmission lines just downstream of the Millstone
17  plant and designated that as the delivery point, for
18  purposes of determining TransCanada's responsibility
19  for congestion costs under your interpretation of
20  the contracts, again we would have to look to Rhode
21  Island and to I think it's three or four zones
22  within Massachusetts. Is that correct?
23      A.    Yes.
24         MR. WISEMAN: I would like to have marked

100

1  for identification as the next exhibits in order
2  first a wholesale standard-offer service agreement
3  between Narragansett Electric Company and a company
4  as yet to be named, dated June 3, 1997. I believe
5  this will be Exhibit Number 54.
6         (Exhibit 54 marked for identification.)
7         MR. WISEMAN: And then could we mark as
8  Exhibit Number 55 the wholesale standard-offer
9  service agreement among Massachusetts Electric
10  Company, Nantucket Electric Company and again an
11  as-yet-unidentified party. And this draft is also
12  dated June 3, 1997.
13         (Exhibit 55 marked for identification.)
14  BY MR. WISEMAN:
15      Q.    Mr. Hager, have you had an opportunity to
16  review those documents?
17      A.    I just briefly glanced at them, given it's
18  the first time I've had them.
19      Q.    Certainly. Now, you testified earlier
20  that in connection with the process of reaching
21  agreement as to the final forms of executed
22  wholesale standard-offer service agreements that you
23  reviewed the drafts. Correct?
24      A.    Yes, I did.

101

1      Q.    So would you agree that Exhibits 54 and 55
2  are drafts of wholesale standard-offer service
3  agreements that were drafted by NEES or on NEES's
4  behalf?
5      A.    They appear to be.
6      Q.    And you would agree, would you not, that
7  TransCanada and USGen did not have anything to do
8  with these drafts. Is that correct? Anything to do
9  with writing these drafts.
10      A.    Yes.
11      Q.    Can you refer to page 8 -- I believe it's
12  page 8 in both agreements -- and specifically to
13  Section 6.1. First of all, are those two sections
14  identical to each other with the only difference
15  being that one refers to MECo and one refers to
16  NECo?
17      A.    Yes.
18      Q.    Now, can you refer to Exhibit 1 and
19  Exhibit 2, the September 1, 1998 agreements, and
20  specifically to Section 6.1 in each of those
21  agreements. Maybe again to shortcut this a little
22  bit, you would agree that Section 6.1 in the MECo
23  agreement which is Exhibit 1 is identical to Section
24  6.1 in the NECo agreement which is Exhibit 2. Is

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

102

1   that correct?
2       A.   Yes.
3   .   Q.   Let's just use Exhibit 1 for ease of
4   reference.  Can you read out loud the second
5   sentence in Section 6.1?
6       A   In Exhibit 1?
7       Q   In Exhibit 1, yes.
8       A.   "Title shall pass to MECo at the delivery
9   point and seller shall incur no expense or risk
10  beyond the delivery point other than those described
11  in Section 6.2."
12      Q.   Now, going back to the June 3 drafts that
13  have been marked as Exhibits 54 and 55, would you
14  agree that the sentence you just read is not in
15  those earlier drafts?
16      A.   Yes, I would.
17      MR. WISEMAN:  Thank you.  And I would move
18  the admission of Exhibits 54 and 55.
19      MR. PORTER:  Any objection?
20      MR. NGAU:  No.
21      MR. PORTER:  They will be admitted.
22      MR. WISEMAN:  I next ask to have marked
23  for identification as Exhibit 56 a memorandum dated
24  July 25, 1997, to the NEES team from Mike Frankel.

103

1          (Exhibit 56 marked for identification.)
2   BY MR. WISEMAN:
3       Q.   Mr. Hager, this document was produced by
4   National Grid to TransCanada in discovery in this
5   case.  Is that correct?
6       A.   I believe it has been, yes.
7       Q.   Can you tell me who Mike Frankel is?
8       A.   No, I cannot.
9       Q.   Would it refresh your recollection if I
10  were to tell you that he was an attorney with the
11  law firm Skadden Arps Slate Meagher & Flom?
12      A.   Did not work with that firm directly.  But
13  if you indicate that that's who he is, I have no
14  reason to disagree.
15      MR. WISEMAN:  Could I ask counsel to
16  stipulate to that?
17      MR. NGAU:  Yes, I will stipulate to that.
18  BY MR. WISEMAN:
19      Q.   Now, you are familiar with the firm
20  Skadden Arps.  Is that correct?
21      A.   Yes.
22      Q.   Am I correct that Skadden Arps represented
23  NEES in connection with the divestiture of its non-
24  nuclear electric generating plants to USGen?

104

1       A.   Yes.
2       Q.   Could you read just to yourself the first
3   sentence in this memorandum, please.  And would you
4   agree that this memorandum summarizes open issues
5   from a meeting that took place with USGen on July
6   24, 1997?
7       A.   According to the subject line, the meeting
8   was July 25, 1997.
9       Q.   Well, if you go back to the sentence,
10  you'll see that the memo is dated July 25.  I'm not
11  sure that it's important, but it refers to a meeting
12  that took place yesterday.
13      A.   The subject says summary of open items
14  from 7/25/1997 meeting with USGen.  The first
15  sentence says conclusions I noted during our meeting
16  yesterday.
17      Q.   I don't think it's critical one way or
18  another whether the meeting took place on the 24th
19  or the 25th.  You agree, though, that it is
20  summarizing the discussions from a meeting with
21  USGen.  Right?
22      A.   That's what the sentence indicates.
23      Q.   Now would you refer to page 4 of the
24  document, and specifically let me refer you to

105

1   paragraph II.G.2, a little bit more than two-thirds
2   of the way down the page.  Do you see that?
3       A.   Roman numeral 2?  Yes.
4       Q.   II.G.2.
5       A.   Yes.
6       Q.   Would you agree that this memorandum
7   indicates that an open issue that came out of either
8   the July 24 or July 25 meeting with USGen was
9   whether title would pass at the delivery point and
10  whether USGen incurs no expense or risk beyond the
11  delivery point other than losses?  Do you agree with
12  that?
13      A.   Yes.
14      MR. WISEMAN:  This is frankly somewhat
15  complicated potentially now, since National Grid is
16  presenting different witnesses or fewer witnesses
17  than I had originally anticipated.
18      MR. PORTER:  Just take your time,
19  Mr. Wiseman.
20      MR. WISEMAN:  Thank you.
21  BY MR. WISEMAN:
22      Q.   Do you recall that TransCanada asked in
23  discovery who attended the meeting on behalf of
24  National Grid?  Do you recall that interrogatory?

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

28 (Pages 106 to 109)

106

1    A.   Yes, I do.
2    Q.   And am I correct that National Grid's
3  response indicated that Michael Jesanis, Marjorie
4  Katz, Thomas Rogers and Michael Frankel attended as
5  representatives of NEES. Is that correct? If you
6  need me to refer you to a document, if you would
7  like to review the discovery response, I'd be happy
8  to show it to you.
9    A.   That sounds correct.
10    Q.   And I think the interrogatory response
11  also indicated that Thomas Widener from Merrill
12  Lynch might have attended. Correct?
13    A.   Again, that sounds correct.
14    Q.   And what was Merrill Lynch's relationship
15  to this transaction?
16    A.   I think Merrill Lynch was the entity that
17  NEES hired to conduct the asset purchase process,
18  asset sale process.
19    Q.   It was the financial adviser for NEES. Is
20  that fair to say?
21    A.   Yes.
22    Q.   Now, do you recall that in discovery
23  TransCanada also asked National Grid to produce
24  copies of the notes of all NEES personnel including

107

1  outside attorneys and consultants who attended this
2  meeting?
3    A.   I remember that interrogatory.
4      So I'm clear, the document you handed me,
5  July 25, has that been numbered?
6    Q.   That is now Exhibit Number 56.
7    A.   Okay.
8      MR. WISEMAN: And before I forget, if I
9  could move for admission of Exhibit 56.
10      MR. PORTER: Any objection?
11      MR. NGAU: No objection.
12      MR. PORTER: It will be admitted.
13      MR. WISEMAN: I would next like to have
14  marked for identification as Exhibit Number 57
15  National Grid's response to TransCanada's request
16  number 2-6.
17      (Exhibit 57 marked for identification.)
18  BY MR. WISEMAN:
19    Q.   If you could, please, take a minute to
20  review that. In particular, I would like you to
21  review the last paragraph.
22    A.   (Pause) All right.
23    Q.   First of all, do you recognize this
24  document as an interrogatory response that National

108

1  Grid provided to TransCanada in this case?
2    A.   It appears that it is, yes.
3      MR. WISEMAN: Could I move for admission
4  of Exhibit Number 57, please.
5      MR. NGAU: No objection.
6      MR. PORTER: It shall be admitted.
7  BY MR. WISEMAN:
8    Q.   Now, you are identified as one of several
9  persons prepared to testify about this response. Is
10  that right?
11    A.   Yes.
12    Q.   Would you agree with me that what this
13  response shows in part is that at the July 24 or
14  July 25, 1997 meeting, Ms. Katz and Mr. Rogers, who
15  attended, customarily took notes at meetings related
16  to generation divestiture and retained their notes.
17  Is that right?
18    A.   That's what the response indicates.
19    Q.   And it also indicates that neither
20  Ms. Katz nor Mr. Rogers had any notes from the July
21  24 or July 25 meeting with USGen or, for that
22  matter, any other meeting concerning wholesale
23  standard-offer service agreements between USGen,
24  NECo and MECo. Is that right?

109

1    A.   Correct.
2    Q.   And would you agree that this response
3  also shows that Mr. Hale, who attended the meeting,
4  normally took notes in meetings with USGen and
5  retained those notes. Is that right?
6    A.   That's correct.
7      MR. PORTER: May I ask a question? You
8  keep referring to a meeting. What I have says took
9  notes at meetings. What meeting do you have
10  reference to?
11      MR. WISEMAN: I'm referring to the July --
12      MR. PORTER: That's all right. Thank you.
13      MR. WISEMAN: You're welcome.
14  BY MR. WISEMAN:
15    Q.   And, I'm sorry, let me start over. I'm
16  not sure where I broke off.
17      MR. PORTER: I apologize. Go ahead.
18      MR. WISEMAN: That's fine.
19  BY MR. WISEMAN:
20    Q.   You agree that this response indicates
21  that Mr. Hale normally took notes in meetings with
22  USGen and retained them. Correct?
23    A.   Correct.
24    Q.   The response also indicates that Mr. Hale

FARMER ARSENAULT BROCK LLC

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

29 (Pages 110 to 113)

**110**

1 couldn't find any notes from the meeting on July 24
2 or 25, 1997, with USGen. Right?
3    A.   Correct.
4    Q.   Mr. Hale had at least some responsibility
5 for the open issues. Is that right?
6    A.   Yes.
7    Q.   Would you agree that neither Mr. Hale nor
8 anyone at National Grid could recall the position
9 taken by either NEES or USGen at the meeting that
10 took place on July 24 or 25, 1997, on the issue of
11 whether title passes at the delivery point and
12 seller shall incur no expense or risk beyond the
13 delivery point other than losses?
14    A.   Will you repeat the question again,
15 please?
16    Q.   Sure. Would you agree that in discovery
17 responses in this case that National Grid advised
18 TransCanada that no one at National Grid can recall
19 the positions that either USGen took or that
20 National Grid took at the July 24 or 25, 1997
21 meeting concerning the issue of whether title passes
22 at the delivery point and seller shall incur no
23 expense or risk beyond the delivery point?
24    A.   I would have to refer to a specific

**111**

1 interrogatory there.
2    Q.   Fair enough.
3       MR. WISEMAN: Why don't we do this. Why
4 don't we mark this as the next exhibit in order,
5 Number 58, National Grid's response to TransCanada
6 request number 2-22.
7       (Exhibit 58 marked for identification.)
8       MR. AVERY: Mr. Wiseman, I'm having
9 trouble remembering here today. I remember you
10 asked a question about an interrogatory answer, and
11 did that reveal -- this was a few minutes ago -- that
12 that reveal that Mr. Hale was at the July meeting?
13       MR. WISEMAN: Yes, it did. And I think
14 Mr. Hager testified to that.
15       MR. AVERY: Okay. I just was a little
16 hazy on that for a moment. Okay, thanks.
17 BY MR. WISEMAN:
18    Q.   First of all, Mr. Hager, does Exhibit
19 Number 58 appear to be National Grid's response to
20 an interrogatory that TransCanada asked in this
21 proceeding?
22    A.   Yes.
23    Q.   Why don't you just read out loud the
24 response.

**112**

1    A.   "After reasonable investigation, National
2 Grid is unable to determine at this time what
3 positions, if any, National Grid and PG&E took at
4 the meeting referenced in NG/TC002132 concerning the
5 issues identified in paragraph II.G.2 of that
6 document."
7       MR. WISEMAN: I would move for the
8 admission of Exhibit Number 58
9       MR. PORTER: Any objection?
10       MR. NGAU: No objections.
11       MR. PORTER: It will be admitted.
12 BY MR. WISEMAN:
13    Q.   Earlier when you were answering questions
14 for Mr. Ngau on your direct examination you were
15 discussing ideas that you had personally about what
16 the meaning of this sentence was about title passing
17 at the delivery point and seller shall incur no
18 expense or risk beyond the delivery point. Do you
19 recall that?
20    A.   Yes.
21    Q.   So you would agree that you don't know
22 whether your interpretation was ever discussed at
23 the July 24 or 25, 1997 meeting with USGen.
24 Correct?

**113**

1    A.   I do not know what was discussed at that
2 meeting.
3    Q.   You would agree with me, would you not,
4 that at some time after the July 24 or 25 meeting
5 this sentence was added into the agreements? "This
6 sentence" meaning the sentence that said title shall
7 pass at the delivery point and seller shall incur no
8 expense or risk beyond the delivery point other than
9 for losses. Correct?
10    A.   Correct.
11       MR. WISEMAN: If I could have marked for
12 identification as the next exhibit in order, this is
13 National Grid's response to TransCanada request
14 number 2-18.
15       (Exhibit 59 marked for identification.)
16 BY MR. WISEMAN:
17    Q.   Have you reviewed that, Mr. Hager?
18    A.   Yes, I have.
19    Q.   First, do you recognize that as an
20 interrogatory response that National Grid provided
21 to TransCanada in this case?
22    A.   Yes.
23    Q.   And would you agree that this response
24 describes the general process for proposed language

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

30 (Pages 114 to 117)

114

1  to be incorporated into drafts of the MECo and NECo
2  wholesale standard-offer service agreements?
3      A.  Yes.
4      Q.  And you would agree that the response also
5  shows how National Grid can't provide any details
6  explaining how or why the sentence, the specific
7  sentence that we've been referring to, was added
8  into the agreement.  Correct?
9      A.  Correct.
10         MR. WISEMAN:  Thank you.  I would move for
11  the admission of Exhibit Number 59.
12         MR. PORTER:  Any objection?
13         MR. NGAU:  No objection.
14         MR. PORTER:  It shall be admitted.
15         Where are you at this point, counsel?
16         MR. WISEMAN:  Actually, if it's time, this
17  would be a good place to break.
18         MR. PORTER:  All right, until 1:15.  Is
19  that satisfactory?  Give you enough time?
20         MR. NGAU:  That's fine.
21         MR. WISEMAN:  That's fine, yes.
22         MR. PORTER:  We are adjourned until 1:15.
23         (Luncheon recess at 12:14 p.m.)
24

115

1  _____
2         AFTERNOON SESSION
3             1:25 p.m.
4  _____
5         MR. PORTER:  Back on the record.
6      Mr. Wiseman, if you want to continue,
7  please.
8         MR. WISEMAN:  Thank you, Mr. Porter.
9      I would like to have marked for
10  identification as the next exhibit in order --
11  I think Number 60 we're up to.
12         MR. PORTER:  Yes.
13         MR. WISEMAN:  -- a draft of a wholesale
14  standard-offer service agreement among Massachusetts
15  Electric Company, Nantucket Electric Company and an
16  as-yet-unnamed party.  And this is dated July 25,
17  1997.
18         (Exhibit 60 marked for identification.)
19         MR. WISEMAN:  And if we could have marked
20  as Exhibit Number 61, this is also a July 25, 1997
21  draft wholesale standard-offer service agreement, in
22  this case between the Narragansett Electric Company
23  and again an as-yet-unnamed company.
24         (Exhibit 61 marked for identification.)

116

1  BY MR. WISEMAN:
2      Q.  Mr. Hager, can you take a moment and just
3  review those documents, please.  Tell me when you're
4  ready.  And my questions, just to shortcut this,
5  will relate mostly to Section 6.1.
6      A.  I'm ready.
7      Q.  Okay.  First of all, can you identify the
8  documents that have been marked for identification
9  as Exhibits 60 and 61?
10     A.  They appear to be draft wholesale
11  standard-offer service agreements prepared by NEES
12  as part of its divestiture of generating assets.
13     Q.  And what was the date on these agreements?
14     A.  They are marked July 25, 1997.
15     Q.  So that would be the same date as the July
16  25, 1997 memorandum that we discussed a little bit
17  earlier.  Is that correct?
18     A.  Yes.
19     Q.  And you said that these were NEES's
20  drafts.  Do you see the legend, I believe it's on
21  every page, which has a series of numbers and then
22  it says New York server 7A.  Do you see that?
23     A.  Yes, I do.
24     Q.  Does that indicate to you that this

117

1  document was drafted by Skadden Arps?
2      A.  The document may not have been drafted by
3  Skadden Arps, but it is my understanding that
4  Skadden Arps was managing all the document revisions
5  associated with the asset sale.
6      Q.  Now, refer to paragraph 6.1 in each of
7  these agreements, please.  And again to shortcut it,
8  is the Section 6.1 in each agreement, are they
9  identical?
10     A.  Without reading every word, the two
11  agreements are supposed to be identical in that
12  section.
13     Q.  Would you agree that these drafts do not
14  yet include the sentence that says title shall pass
15  to the buyer at the delivery point and seller shall
16  incur no expense or risk beyond the delivery point
17  other than for losses?
18     A.  Yes.
19         MR. WISEMAN:  If I could move the
20  admission of Exhibits 60 and 61.
21         MR. PORTER:  Any objection?
22         MR. NGAU:  No objection.
23         MR. PORTER:  They will be admitted.
24         MR. WISEMAN:  If we could now mark for

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

31 (Pages 118 to 121)

118

1  identification as Exhibit 62, this is a draft
2  wholesale standard-offer service agreement between
3  the Narragansett Electric Company and an as-yet-
4  unnamed party, dated August 1, 1997.
5          (Exhibit 62 marked for identification.)
6          MR. WISEMAN:  And if we could mark for
7  identification as Exhibit 63 a draft wholesale
8  standard-offer service agreement dated August 3,
9  1997, among Massachusetts Electric Company,
10  Nantucket Electric Company, and an as-yet-unnamed
11  third party.
12          (Exhibit 63 marked for identification.)
13  BY MR. WISEMAN:
14      Q.  Mr. Hager, can you identify those
15  documents that have been marked for identification
16  as Exhibits 62 and 63?
17      A.  They appear to be drafts of the wholesale
18  standard-offer service agreement dated as of -- One
19  of them, Exhibit 62, appears to be dated as of
20  August 1, 1997; Exhibit 63 appears to be dated
21  August 3, 1997.
22      Q.  And would you agree that Section 6.1 in
23  each of the agreements are identical?
24      A.  Without reading the specific language,

119

1  both of those sections are supposed to be identical.
2      Q.  And would you agree that each of these
3  agreements does include the sentence that we've
4  referred to earlier that says that seller shall
5  incur no expense or risk beyond the delivery point
6  other than for losses?
7      A.  It says other than those described in
8  Section 6.2, which is losses, yes.
9      Q.  And that sentence that appears in these
10  drafts is identical to the sentence that was
11  included in the final versions of the documents that
12  were executed on August 5, 1997. Is that your
13  understanding? And you may refer to the exhibit,
14  and if you could identify it, please.
15      A.  I'm referring to -- If I compare Exhibit
16  62, Section 6.1, the title passes sentence, to
17  Exhibit 2, Section 6.1, the title passes sentence,
18  they're identical, as is Exhibit 63 in Exhibit 1.
19      Q.  And just so the record is clear, you were
20  referring to the September 1, 1998 agreements just
21  now when you referred to Exhibit 1. The sentence
22  that we've been discussing that appears in Exhibits
23  62 and 63, is it identical to the sentence that
24  appeared in Section 6.1 in the August 5, 1997

120

1  documents that were actually executed by the
2  parties?
3      A.  Yes.
4          MR. WISEMAN:  I move the admission of
5  Exhibits 62 and 63.
6          MR. PORTER:  Any objection?
7          MR. NGAU:  No objection.
8          MR. PORTER:  They're admitted.
9  BY MR. WISEMAN:
10      Q.  Now, could you refer to Exhibit 1, please,
11  and specifically to Section 6.2 in that exhibit.
12  Excuse me.  If you could refer to Section 6.2 in
13  Exhibit 1, to be clear.  Do you have that?
14      A.  Yes, I do.
15      Q.  And would you agree that Section 6.2 in
16  the MECo agreement, which is Exhibit 1, is identical
17  to Section 6.2 in the NECo agreement, which is
18  Exhibit 2?
19      A.  Please repeat that again.
20      Q.  Yes.  Is Section 6.2 in the MECo
21  agreement, the Mass. Electric agreement, identical
22  to Section 6.2 in the Narragansett agreement, which
23  is Exhibit Number 2?
24      A.  Again, without reading the language, they

121

1  are supposed to be identical.
2      Q.  And are those Sections 6.2 also supposed
3  to be identical to the Sections 6.2 in the August 5,
4  1997 versions of these documents?
5      A.  Yes.  One moment, please.
6      Q.  Certainly.
7          MR. AVERY:  Which is the exhibit number of
8  the August 5 version?
9          MR. WISEMAN:  Exhibit Numbers 11 and 12.
10      A.  (Pause)  Yes.
11      Q.  I think the question you're answering is
12  that Section 6.2 in the August 5, 1997 agreements is
13  identical to Section 6.2 in the September 1, 1998
14  agreements.  Is that correct?
15      A.  That's correct.
16      Q.  Thank you.
17          Now, focusing on Exhibit 1 and Section 6.2
18  in Exhibit 1, you would agree that that says that
19  seller will be responsible for losses to the meters
20  of ultimate customers of MECo or NECo, as the case
21  may be, receiving retail standard-offer service.  Is
22  that correct?
23      A.  Correct.
24      Q.  And would you agree with me that Section

FARMER ARSENAULT BROCK LLC

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

32 (Pages 122 to 125)

122

1    6.1 does not contain comparable language that
2    expressly says that seller is responsible for
3    congestion costs to the meters of ultimate customers
4    of MECo or NECo receiving retail standard-offer
5    service?
6        A.   Section 6.1 says that if there's
7    congestion, seller is responsible for costs incurred
8    delivering power across the PTF to MECo.
9        Q.   And, again, do you agree that Section 6.1
10   does not contain language that is comparable to the
11   language that's in 6.2 which would say that seller
12   is responsible for congestion costs, quote, "to the
13   meters of ultimate customers of MECo or NECo
14   receiving standard-offer service"?
15       A.   Section 6.1 does not specifically identify
16   the specific language that it's to the meters of the
17   customers.
18       MR. WISEMAN:  Now if we could mark for
19   identification as Exhibit Number 64, this is a power
20   supply agreement between Massachusetts Electric
21   Company, Nantucket Electric Company, and
22   Constellation Power Source, Inc.
23       (Exhibit 64 marked for identification.)
24       MR. WISEMAN:  And if we could mark for

123

1    identification as Exhibit Number 65 a power supply
2    agreement between Narragansett Electric Company and
3    Constellation Power Source, Inc.
4        (Exhibit 65 marked for identification.)
5    BY MR. WISEMAN:
6        Q.   Mr. Hager, are you familiar with the
7    documents that have been marked for identification
8    as Exhibits 64 and 65?
9        A.   Yes, I am.
10       Q.   These are agreements that Mass. Electric
11   and Narragansett recently entered into with
12   Constellation Power Source. Is that correct?
13       A.   Yes, they are.
14       Q.   And would you agree that the agreements
15   are identical, other than referencing Narragansett
16   in one instance and Mass. Electric in the other?
17       A.   Yes.
18       Q.   Now, can you refer --
19       A.   There might be some other minor
20   differences in terms of the quantities of load that
21   are served, but substantially identical, yes.
22       Q.   Fair enough.
23       Let's make reference then to Exhibit 64,
24   which is the first one, involving Mass. Electric,

124

1    and refer to page 2 of that document, please, which
2    bears the Bates stamp number 028121. Do you have
3    that?
4        A.   Yes, I do.
5        Q.   And can you refer to the definition of
6    delivery point. Do you see that?
7        A.   Yes, I do.
8        Q.   Would you agree that this agreement has
9    different definitions of delivery point depending
10   upon whether the time period involved is before or
11   after implementation of the locational marginal
12   pricing in NEPOOL?
13       A.   Yes.
14       Q.   Now, after the implementation of
15   locational marginal pricing, the delivery point
16   would be the nodes or zones representing the actual
17   locations of the meters of MECo's retail standard-
18   offer service customers. Is that correct?
19       A.   That's correct.
20       Q.   Please refer to page 11 of the document,
21   which bears the Bates stamp numbers 028130. Do you
22   have that?
23       A.   Yes, I do.
24       Q.   And if you could focus on paragraph (c),

125

1    it says there if the NEPOOL control area experiences
2    congestion, seller will be responsible for any
3    congestion costs incurred in delivering power across
4    the PTF system to the companies. Do you see that?
5        A.   Yes, I do.
6        Q.   Now, after the implementation of
7    locational marginal pricing, where under this
8    agreement would Constellation deliver power to MECo,
9    Nantucket and Narragansett?
10       A.   According to the definition of delivery
11   point it would be the nodes, if any, and if not, the
12   zones representing the actual locations of the
13   meters of the customers taking service.
14       Q.   So under this agreement after the
15   implementation of locational marginal pricing, which
16   party is responsible for congestion costs at the
17   locations of the meters of MECo's standard-offer
18   service customers?
19       A.   As with all the other agreements we've
20   been talking about, it would be the wholesale power
21   supplier, unless those costs are allocated as a
22   transmission expense. And during the period of time
23   of SMD, it would be the wholesale supplier.
24       Q.   So under this agreement, I just want to

FARMER ARSENAULT BROCK LLC

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

33 (Pages 126 to 129)

126

1   make sure this is clear and there's no
2   misunderstanding, after the implementation of
3   locational marginal pricing, Constellation Power
4   Source will be responsible for congestion costs at
5   the meters of MECo's retail standard-offer service
6   customers. Is that right?
7       A.   Constellation will be responsible for
8   congestion costs during that period of time to the
9   extent it is not allocated as a transmission
10  expense.
11      Q.   Let me try this again, because I'm not
12  sure why I can't get a simple yes to my question.
13      MR. PORTER: Just ask your question.
14  BY MR. WISEMAN:
15      Q.   After the implementation of locational
16  marginal pricing, will Constellation Power Source be
17  responsible for congestion costs at the locations of
18  the meters of MECo's retail standard-offer service
19  customers?
20      A.   Yes, under paragraph (c) on page 11, if
21  the NEPOOL control area experiences congestion,
22  whether that congestion occurs prior to the
23  implementation of SMD or after the implementation,
24  Constellation will be responsible for any congestion

127

1   costs of moving power across the PTF to us, provided
2   that we are responsible, we the companies, for any
3   congestion costs allocated on the basis of network
4   load.
5       Q.   Did I hear a yes in your answer to my last
6   question?
7       A.   That word was contained in my answer, yes,
8   it was.
9       Q.   All right, thank you very much.
10      Now let's talk about before the
11  implementation of locational marginal pricing.
12  Under this agreement, which party is responsible for
13  congestion costs at the meters of MECo's retail
14  standard-offer service customers?
15      A.   And again both prior to and after the
16  implementation of SMD, in accordance with paragraph
17  (c) on page 11, if NEPOOL experiences congestion,
18  Constellation is responsible for any congestion
19  costs incurred delivering power across the PTF
20  system to the companies, provided that we the
21  companies are responsible for any congestion costs
22  which happen to be allocated on the basis of network
23  load under the NEPOOL open-access transmission
24  tariff.

128

1       Q.   So it is your testimony that prior to the
2   implementation of locational marginal pricing,
3   Constellation Power Source is responsible for
4   congestion costs at the meters of MECo's retail
5   standard-offer service customers. Is that correct?
6       A.   Those costs are not allocated on the basis
7   of network load under the open-access transmission
8   tariff. Yes, Constellation would be responsible for
9   those congestion costs under the terms of this
10  agreement.
11      Q.   But would you agree with me that the
12  definition of delivery point in these agreements,
13  which are agreements Exhibits 64 and 65, I think,
14  that that definition is different than the
15  definition of delivery point under the three
16  agreements that are the subject of this arbitration?
17      A.   Yes, in some respects.
18      Q.   Now, I think you testified about this
19  earlier. You would agree that to date National Grid
20  has borne responsibility for congestion costs in the
21  provision of standard-offer service. Is that right?
22      A.   To date congestion costs have been
23  allocated on the basis of network load, which is an
24  allocator to customers taking transmission service

129

1   under the NEPOOL open-access transmission tariff,
2   and we have borne those costs to date.
3       Q.   And today have the Massachusetts
4   Department of Telecommunications and Energy and the
5   Rhode Island Public Utilities Commission authorized
6   recovery by MECo and NECo of those congestion costs?
7       A.   The restructuring settlement agreements
8   allow both those companies to fully recover all
9   transmission-related expenses that it incurs. And
10  since the congestion costs are allocated as a
11  transmission expense, we have been able to recover
12  those costs pursuant to the terms of those
13  settlement agreements.
14      Q.   Has National Grid, MECo or NECo or any
15  other entity or person on behalf of those companies
16  sought authorization from the Massachusetts DTE or
17  the Rhode Island Public Utilities Commission to
18  recover from retail ratepayers congestion costs that
19  will arise after the implementation of locational
20  marginal pricing in NEPOOL?
21      A.   No.
22      Q.   Has National Grid, MECo or NECo or anyone
23  on their behalf sought a request for declaratory
24  order asking that those companies be authorized to

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1,  11/5/2002

34 (Pages 130 to 133)

**130**

1  recover congestion costs that will arise after the
2  implementation of locational marginal pricing in
3  NEPOOL?
4      A.  No.
5      Q.  In addition to paying congestion costs
6  currently -- Well, let me back up for a second. The
7  congestion costs that ratepayers currently pay are
8  over and above the amounts that they pay for
9  standard-offer service under the fixed rates. Isn't
10  that right?
11      A.  Yes, currently.
12      Q.  Aren't there also electrical-load-related ·
13  costs that National Grid incurs and collects from
14  retail ratepayers?
15      A.    National Grid currently has a dispute with
16  a supplier in which it is currently paying some
17  electrical-load-based costs it believes it is not
18  responsible to be paying. And in one jurisdiction
19  it has been allowed to recover those costs while it
20  pursues a proceeding to have this supplier refund
21  those costs.
22      Q.  Are those electrical-load-related costs
23  energy-related or transmission-related costs?
24      A.  Energy-related costs.

**131**

1      Q.  And those are costs that are over and
2  above the rates for fixed standard-offer service.
3  Is that correct?
4      A.  Yes. Those are costs that the National
5  Grid Company believed its supplier was responsible
6  for under the definition of wholesale standard-
7  offer service and for which it is withholding
8  additional amounts in dispute until that dispute can
9  be resolved.
10      MR. WISEMAN: And I think I forgot to do
11  this earlier. I would like to move the admission of
12  Exhibits I believe it's 64 and 65.
13      MR. PORTER: Any objection?
14      MR. NGAU: No objection.
15      MR. PORTER: They shall be admitted.
16      A.  To be clear, those costs are being
17  incurred in only one jurisdiction.
18      Q.  Which jurisdiction is that?
19      A.  Massachusetts.
20      Q.  I would like to focus for a minute on
21  certain events that occurred in 1999. Do you recall
22  that a dispute arose in 1999 between National Grid
23  and USGen about which party should bear
24  responsibility for congestion costs downstream of

**132**

1  the delivery points?
2      A.  I know the issue has arisen as to how they
3  would be implemented downstream at that point.
4  Whether it's classified as a dispute or not is
5  subject to interpretation.
6      Q.  But the issue arose. Correct?
7      A.  Yes.
8      Q.  And would you agree that in a meeting in
9  October 1999, USGen's representatives told you that
10  their interpretation of the contracts was that they
11  had no responsibility for congestion costs
12  downstream of the contractual delivery points. Is
13  that correct?
14      A.  I believe they indicated that they may be
15  able to make that argument.
16      Q.  Did they say that that was their
17  interpretation?
18      A.  That the contracts may possibly be
19  interpreted in that way, yes.
20      Q.  I'm probably going to have to skip around
21  a little bit now since we don't have the witnesses
22  who had previously been identified. Let me ask you
23  this: Who has responsibility for serving retail
24  load? Is that TransCanada or MECo and NECo?

**133**

1      A.  MECo and NECo are the entities that are
2  making the ultimate sale to the retail customers.
3  TransCanada's role is to provide that wholesale
4  power and take on settlement responsibilities at the
5  ISO for that load responsibility.
6      Q.  MECo and NECo didn't transfer their load
7  responsibility to TransCanada. Is that correct?
8      A.  Let's be clear on this. MECo and NECo is
9  the party that is making the retail sale and has the
10  direct relationship with the retail end-use
11  customers. What it transferred to TransCanada and
12  transfers to all of its wholesale suppliers is
13  settlement responsibility for those loads in the
14  wholesale power markets.
15      Q.  But it did not transfer its retail load
16  obligation. Is that correct?
17      A.  The wholesale agreements do not create a
18  direct relationship between the wholesale suppliers
19  and the retail customers.
20      Q.  So is the answer to my question a yes?
21      A.  Would you repeat the question again so
22  it's clear?
23      Q.  Let's go back to the original question I
24  asked you. Who has the responsibility for serving

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

35 (Pages 134 to 137)

**134**

1  retail load?
2      A.   MECo and NECo are the entities that are
3  making the retail sale to the retail end-use
4  customer.
5      Q.   And MECo and NECo have the responsibility
6  for serving the retail load. Is that correct?
7      A.   At the retail level, yes.
8      Q.   Now, you would agree with me, I believe,
9  that the agreements between USGen and MECo and NECo
10  were part of a larger transaction in which USGen
11  agreed to acquire NEES's non-nuclear generating
12  plants. Is that correct?
13      A.   Correct.
14      Q.   And would you agree with me that the
15  amount that USGen agreed to pay was $1.59 billion
16  for plants plus $140 million to cover various
17  employee-related expenses and the value of
18  inventories?
19      A.   Yes.
20          MR. WISEMAN:  I would like to have now
21  marked for identification as Exhibit Number 66
22  National Grid's response to TransCanada request
23  number 5-4.
24          (Exhibit 66 marked for identification.)

**135**

1  BY MR. WISEMAN:
2      Q.   Mr. Hager, do you recognize this document
3  as an interrogatory response that National Grid
4  provided to TransCanada in this case?
5      A.   Yes.
6      Q.   And just looking at the numbers that are
7  set forth on that page, would you agree that USGen's
8  bid for the plants was approximately $330 million or
9  approximately 25 percent higher than the next
10  highest bid?
11      A.   Yes.
12      Q.   And would you agree that USGen's bid for
13  the plants was approximately $520 million or almost
14  50 percent higher than the next highest bid?
15      A.   Yes.
16          MR. WISEMAN:  I move the admission of
17  Exhibit Number 66.
18          MR. NGAU:  No objection.
19          MR. PORTER:  It will be admitted.
20          MR. WISEMAN:  If I could now have marked
21  for identification as Exhibit Number 67, this is
22  National Grid's response to TransCanada request
23  number 5-9.
24          (Exhibit 67 marked for identification.)

**136**

1  BY MR. WISEMAN:
2      Q.   Mr. Hager, again, does this appear to be
3  an interrogatory response that National Grid
4  provided to TransCanada in this case?
5      A.   Yes.
6      Q.   And would you agree that this response
7  shows that USGen paid an amount for the plants that
8  exceeded NEES's net book value by $490 million?
9      A.   Yes.
10          MR. WISEMAN:  Thank you. I move the
11  admission of Exhibit Number 67.
12          MR. NGAU:  No objection.
13          MR. PORTER:  It shall be admitted.
14          MR. WISEMAN:  I next want to have marked
15  for identification as Exhibit Number 68 a
16  presentation to the board of directors of the New
17  England Electric System dated July 28, 1997.
18          (Exhibit 68 marked for identification.)
19  BY MR. WISEMAN:
20      Q.   Mr. Hager, is this a document that
21  National Grid produced to TransCanada in discovery
22  in this case?
23      A.   While I have not seen this before, given
24  the Bates numbers in the lower right-hand corner, I

**137**

1  would say yes.
2      Q.   All right. And, again, I think you said
3  earlier Merrill Lynch was NEES's financial adviser
4  in connection with divestiture of NEES's non-nuclear
5  generating plants. Correct?
6      A.   Correct.
7      Q.   Could you turn to page 8 of this document?
8  It bears the Bates stamp number 28690. Do you have
9  that?
10      A.   Yes, I do.
11      Q.   Look at the second major bullet point
12  that's right in the middle of the page. And you see
13  there that Merrill Lynch calculated a value range
14  for NEES's non-nuclear plants of $1.12 billion to
15  $1.26 billion. Do you see that?
16      A.   Yes.
17      Q.   And you would agree with me that USGen's
18  payment for the plants exceeded Merrill Lynch's
19  high-range estimated value by approximately
20  $327 million. Is that right?
21      A.   Well, looking at these documents, that
22  appears correct, yes.
23          MR. WISEMAN:  Thank you.
24          Let me first move the admission of Exhibit

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1,  11/5/2002

36 (Pages 138 to 141)

138

```
 1  Number 68.
 2      MR. PORTER:  Any objection?
 3      MR. NGAU:  No objection.
 4      MR. PORTER:  It shall be admitted.
 5      MR. WISEMAN:  I would like to have marked
 6  for identification as Exhibit 69, this is National
 7  Grid's response to TransCanada request number 3-20.
 8      (Exhibit 69 marked for identification.)
 9  BY MR. WISEMAN:
10   Q.  Mr. Hager, does this appear to be an
11  interrogatory response which National Grid provided
12  to TransCanada in this case?
13   A.  Yes.
14   Q.  Now, since Mr. Hale isn't here, why don't
15  you just read -- First of all, do you agree that in
16  this request TransCanada asked National Grid to
17  produce all bid evaluation documents from NEES's
18  divestiture of its generation business as well as
19  documents that analyze or discuss markups to the
20  various contractual agreements including the
21  wholesale standard-offer service agreements?  Is
22  that what is asked?
23   A.  Yes.
24   Q.  Can you just read the first sentence of
```

139

```
 1  the National Grid response out loud, please?
 2   A.  "As best National Grid is able to
 3  determine at this time, there are no responsive
 4  documents."
 5   Q.  I'm sorry.  I meant to have you read the
 6  second sentence.  I apologize.  Can you read that
 7  one too?
 8   A.  I'll read that one as well.  "Given the
 9  disparity between the bid received from USGen and
10  the bid of the next highest bidder for the NEES
11  generation assets, there was no apparent need to
12  undertake a detailed analysis of the respective
13  bids."
14      MR. WISEMAN:  Thank you.  I would move the
15  admission of Exhibit Number 69.
16      MR. PORTER:  Any objection?
17      MR. NGAU:  No objection.
18      MR. PORTER:  It will be admitted.
19  BY MR. WISEMAN:
20   Q.  Mr. Hager, do you recall when Mr. Ngau was
21  asking you some questions this morning you were
22  talking about stranded-cost recovery?
23   A.  Yes.
24   Q.  Tell me, what would pose less risk to
```

140

```
 1  NEES:  a one-time recovery of a substantial amount
 2  of dollars that represented the value of NEES's non-
 3  nuclear generating plants, or recovering the value
 4  of those plants over an extended time period through
 5  a stranded-cost surcharge recovery mechanism?
 6   A.  The one-time reduction.
 7   Q.  Are some questions for Mr. Kirby, who
 8  had been identified as a former -- First of all,
 9  Mr. Kirby was identified as a former employee of
10  Eastern Utilities.  Is that correct?
11   A.  That's correct.
12   Q.  Can you tell me, in the 1997 to 1999 time
13  frame, would you agree that Eastern Utilities
14  entered into multiple agreements for wholesale
15  standard-offer service with various suppliers?  Is
16  that correct?
17   A.  That's correct.
18   Q.  Are you aware of what Eastern Utilities'
19  policy was concerning assignment of responsibility
20  for congestion costs under its agreements to supply
21  wholesale standard-offer service?
22   A.  EUA's approach was consistent with that of
23  NEES in that they were bound by similar retail rate
24  settlement agreements that limited the price for the
```

141

```
 1  standard-offer service and therefore was outsourcing
 2  their wholesale supply, again, to provide a perfect
 3  hedge between their obligations to provide the
 4  service to customers and the price that they would
 5  pay their suppliers for that service.
 6   Q.  Did Eastern Utilities apply that policy
 7  consistently during the 1997-1999 time frame?
 8   A.  I would have to go back to specific
 9  agreements.  I believe it was consistent.  But I
10  would have to look in individual agreements to
11  verify that.
12   Q.  Let me ask you this.  Did you have any
13  discussions with Mr. Kirby concerning the specific
14  negotiations between TransCanada and Eastern
15  Utilities which resulted in the April 7, 1998
16  agreement?
17   A.  No.
18   Q.  I believe, when I ask this question, I
19  think you testified about this, although it's
20  possible that I heard it in Mr. Ngau's opening
21  statement.  Did you testify that under the rules
22  that will be imposed in NEPOOL in the early part of
23  2003, that suppliers will be responsible for
24  congestion costs?
```

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

37 (Pages 142 to 145)

142

1    A.  Yes.
2    Q.  So it is your testimony that the rules
3  impose congestion costs on suppliers effective with
4  the implementation of the new congestion management
5  system that will shortly be implemented.  Is that
6  right?
7    A.  Yes.
8    Q.  You would agree with me, would you not,
9  that if the rules don't impose congestion costs on
10  suppliers, that under the MECo and NECo agreements,
11  which are Exhibits 1 and 2, then TransCanada would
12  not be responsible for congestion costs under those
13  agreements.  Is that correct?
14    A.  The language in Section 6.1 of those
15  agreements says that TransCanada is responsible to
16  the extent that those are allocated to suppliers.
17    Q.  So to answer my question, if the rules do
18  not impose those costs on suppliers, then
19  TransCanada is not responsible for those congestion
20  costs under the MECo and NECo agreements.  Is that
21  right?
22    A.  That's possible.
23    Q.  Is it correct?
24    A.  Yes.

143

1    Q.  Now, could you refer to Exhibit 34.
2  First, can you describe what this document is?
3    MR. WISEMAN:  Before we get to that,
4  I just wonder if I've moved admission of whatever
5  the last document was, which I think was Exhibit 69.
6    MR. PORTER:  You had moved the admission
7  of 69.  That's the last one that I have.
8    MR. WISEMAN:  Thank you.
9  BY MR. WISEMAN:
10    Q.  I'm sorry, Mr. Hager.  Can you just
11  describe generally what this document is that has
12  been marked as Exhibit Number 34?
13    A.  Yes.  It is entitled NEPOOL Manual for
14  Market Rule 1 Accounting, Manual M-28.  This is a
15  draft as of October 11, 2002.
16    Q.  And would you agree that this draft that
17  was adopted was approved at a NEPOOL meeting which
18  took place last Friday?
19    A.  I believe this document with several
20  modifications may have been one that was approved
21  last Friday.
22    Q.  Let's talk about certain provisions in it
23  and see if those were approved with or without
24  modifications.  First of all, would you refer to

144

1  page INT-3, which is the ninth page in in the
2  document.  Do you have that?
3    A.  Yes, I do.
4    Q.  Do you see where it says Target Users and
5  then identifies four types of entities underneath
6  that?  You see that?
7    A.  Yes.
8    Q.  Was that provision modified?
9    A.  I will be unable to give you specific
10  section-by-section analysis of which ones were
11  modified.  I did not compare the final draft that
12  was reviewed to this one to be able to give you
13  specific answers section by section.
14    Q.  All right, let's try it this way.  Let's
15  just go forward and see where this goes.  You see
16  the term NEPOOL participants there?
17    A.  Yes, I do.
18    Q.  Can you tell me what that term means?  Let
19  me strike that and ask you a different question.
20  What kinds of entities are included within the
21  definition of NEPOOL participants?
22    A.  NEPOOL participants are those entities who
23  have signed a New England Power Pool agreement.
24  They include end-use customers, suppliers whether

145

1  they be competitive retail suppliers or wholesale
2  market suppliers, generating companies,
3  transmission-owning entities and so forth.
4    Q.  I'm sorry, your use of the words "and so
5  forth."  Does it include distribution companies as
6  well?
7    A.  Yes.
8    Q.  Now, can you turn to Section 6, which
9  starts at page 6-1.
10    MR. AVERY:  Before we go on to that, I'm
11  sitting here listening and I'm not sure I have a
12  clear enough understanding of the relationship
13  between NEPOOL and the ISO.
14    [LAUGHTER]
15    MR. AVERY:  Does anybody have one?
16    THE WITNESS:  Let me take a shot at that.
17    I always define NEPOOL as a chamber of
18  commerce, an organization where folks get together
19  who are participants that have an interest in this,
20  and it's kind of like a chamber of commerce where we
21  have single entities agreeing to get together and
22  form a set of market rules under which we all agree
23  that we are going to participate going forward.  The
24  ISO is a separate entity, a separate corporation

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

38 (Pages 146 to 149)

---

**146**

1  whose task is to take the rules and agreements that
2  all those chamber of commerce entities have agreed
3  that that's how we will operate this system as an
4  organization and the ISO is the independent entity
5  that says I will take your rules and now I will make
6  sure that everyone abides by those rules and we will
7  implement the markets in accordance with the rules
8  you've agreed to.
9      Q.   Well, let's see. I had an arbitration out
10  in California which gave me some familiarity with
11  CALISO. And there, if I'm remembering correctly,
12  basically they operated the transmission system
13  there in California, if I'm remembering right.
14  There was actually some agreement between the
15  transmission owners and the ISO and the system, if
16  I'm remembering correctly, was actually operated by
17  the ISO entity and I'm not clear. Is that the way
18  NEPOOL and the New England ISO operate?
19      A.   That's consistent with New England in that
20  NEPOOL participants are folks like New England Power
21  Company who own transmission assets, folks like
22  TransCanada who own generating assets and may be
23  suppliers of wholesale and retail load, and we as an
24  entity in both setting rules and agreeing to abide

---

**147**

1  by those also turn over the dispatch and operational
2  control of those facilities. So maybe a TransCanada
3  employee is running the power plant but at the
4  direction of the ISO in accordance with the rules
5  that we have agreed to abide by.
6      Q.   So there's like an ISO control center and
7  so on that is dispatching the system --
8      A.   Yes.
9      Q.   -- that is operated through the facilities
10  which consist of NEPOOL?
11      A.   Yes. The ISO and the dispatch center is
12  calling TransCanada and USGen and saying we want you
13  to run this plant at this level, also calling New
14  England Power Company and other transmission owners
15  as to how transmission assets should be operated and
16  switched and so forth.
17      MR. AVERY: Okay, thank you. I'm sorry to
18  interrupt, but I just realized I wasn't quite clear
19  on how all that worked.
20      MR. WISEMAN: I think many people are not
21  quite clear on how all that works.
22  BY MR. WISEMAN:
23      Q.   Mr. Hager, are you at page 6-1?
24      A.   Yes, I am.

---

**148**

1      Q.   And do you see at the top of that page it
2  says Section 6, Transmission Congestion Accounting.
3  Do you see that?
4      A.   Yes.
5      Q.   And then would you agree that under the
6  first sort of bullet point it says that this section
7  contains a general description of how charges and
8  credits are calculated when the transmission system
9  is scheduled or operated under constraining
10  conditions. Do you see that?
11      A.   Yes, I do.
12      Q.   Now, do you see the title that says
13  Transmission Congestion Accounting Overview? Do you
14  see that?
15      A.   Yes.
16      Q.   In the first paragraph under that, do you
17  see the last sentence in that paragraph which starts
18  with "Every participant"?
19      A.   Yes.
20      Q.   Can you read that sentence out loud,
21  please?
22      A.   "Every participant and transmission
23  customer is charged or credited for congestion on
24  the NEPOOL transmission system based on the

---

**149**

1  calculations previously described under Section 3 of
2  this manual."
3      MR. WISEMAN: Thank you. I have no
4  further questions. Thank you, Mr. Hager.
5      MR. PORTER: Mr. Ngau? Do you want to
6  take a break?
7      MR. NGAU: It might go more efficiently if
8  we take a break.
9      MR. PORTER: Yes, it might. How much time
10  do you want? Ten minutes?
11      MR. NGAU: That's fine.
12      MR. PORTER: All right, we'll take a
13  ten-minute break.
14      (In recess 2:20 p.m. to 2:33 p.m.)
15      MR. PORTER: You may proceed.
16      MR. NGAU: Thank you.
17      REDIRECT EXAMINATION
18  BY MR. NGAU:
19      Q.   Mr. Hager, during cross-examination one
20  topic that was touched upon was the recovery of
21  costs by the distribution companies. Do you recall
22  that general line of examination?
23      A.   Yes, I do.
24      Q.   And in connection with that, you answered

---

FARMER ARSENAULT BROCK LLC

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

39 (Pages 150 to 153)

150

1 some questions about a dispute with another
2 supplier. Correct?
3    A.   Correct.
4    Q.   Are the costs in dispute with that
5 supplier congestion costs?
6    A.   No, they are not.
7    Q.   So they're a different kind of cost?
8    A.   Yes.
9    Q.   What kind of cost are they, in general?
10    A.   They are other forms of uplift and they
11 are ISO expenses. They are costs which are
12 allocated by the ISO under the market rules to an
13 allocator called electrical load.
14    Q.   Did you make any attempt to seek recovery
15 of those costs pending your attempts to resolve that
16 dispute with your supplier?
17    A.   Yes, we did.
18    Q.   In what jurisdictions did you seek such
19 recovery?
20    A.   Massachusetts and Rhode Island.
21    Q.   Let's start with Rhode Island. Can you
22 tell me what happened there?
23    A.   Yes. The Rhode Island regulators did not
24 believe that those costs should be borne by us under

151

1 those contracts and directed us to proceed to
2 arbitrate the matter before they allowed us to
3 recover those costs from our customers.
4    Q.   And can you tell me what happened in
5 Massachusetts?
6    A.   In Massachusetts we identified the
7 disputed costs as part of our rate recovery, and
8 Massachusetts based on a commitment that we had made
9 that once we were successful in that arbitration and
10 we recover the funds from our supplier, we would
11 credit those moneys back to the retail customers at
12 a future time, that they will allow us to continue
13 to recover those costs now, with the stipulation
14 that they will be returned to customers once we are
15 successful.
16    Q.   Let me switch subjects. You were shown an
17 exhibit during cross-examination, actually two
18 exhibits, Exhibits 64 and 65. These are agreements
19 between the distribution companies and Constellation
20 Power. Do you have those?
21    A.   Yes, I do.
22    Q.   What is the date of these agreements?
23    A.   August 23, 2002.
24    Q.   Is that before or after the current

152

1 dispute with TransCanada arose?
2    A.   After.
3    Q.   And I think you were asked some questions
4 about whether the provisions dealing with delivery
5 point and congestion cost in these agreements were
6 different from the agreements at issue in this case.
7 Do you recall that?
8    A.   Yes, I do.
9    Q.   And can you explain why the provisions in
10 Exhibits 64 and 65 are different from the provisions
11 in Exhibits 1 and 2 with respect to delivery point
12 and congestion costs?
13    A.   Yes: as a direct result of the
14 arbitration we're going through right now, in that
15 Constellation, who's taking on part of USGen's
16 standard-offer service under terms with USGen that
17 were consistent with the other forms of agreement
18 we've been looking at this morning, was going to
19 serve us directly versus serve the load with USGen.
20 And just to make sure that things were clear as to
21 what the responsibilities were when we contracted
22 directly and because this dispute arose and we're
23 four or five years later in the process and we know
24 what the specific congestion allocation rules are

153

1 now, we agreed that this language was consistent
2 with the intent that was in the previous versions of
3 the contracts but that we would use current language
4 to make sure that we're both clear in today's
5 terminology as to what those responsibilities are.
6    Q.   And switching subjects one more time, you
7 were asked some questions about Exhibit 34, the
8 NEPOOL Manual for Market Rule 1 Accounting.
9    A.   Yes.
10    Q.   One of the questions appeared to try to
11 relate this document back to the words of Exhibits 1
12 and 2. Do you recall that?
13    A.   Yes.
14    Q.   Now, do you have the language in Section
15 6.1 of Exhibits 1 and 2 up there with you?
16    A.   Yes.
17    Q.   I'll just use Exhibit 1 for convenience.
18 Over on page 9 of Exhibit 1 in Section 6.1 it says
19 seller will be responsible for any congestion costs
20 incurred in delivering power across the PTF system
21 to MECo to the extent such costs are imposed by
22 NEPOOL or the ISO on suppliers. Can you please tell
23 us what you understood the term suppliers to mean in
24 that sentence?

TransCanada Power Marketing Ltd. and National Grid USA
Volume 1, 11/5/2002

40 (Pages 154 to 157)

154

1    A.   Yes: the entity that was taking on
2  settlement responsibility at NEPOOL for these loads
3  under the terms of the agreement.  At the time we
4  had customers who were -- We were splitting apart
5  the integrated systems and there were wires-related
6  charges and folks who had responsibility for
7  transmission-related expenses, and there were
8  suppliers responsible for the energy market and
9  other generation-related expenses and supply of
10  those services.  And the difference is, to the
11  extent they're allocated to the supplier who is
12  taking on those settlement responsibilities for
13  providing all the various products needed to serve
14  this load, that would be the responsibility of our
15  wholesale supplier.
16    Q.   And what provisions of the agreement
17  impose that responsibility on the supplier?
18    A.   Impose which responsibility?
19    Q.   Let me strike that and let me ask a
20  different question.  How does that definition of
21  supplier relate to Exhibit 34?
22    A.   Under the terms of Exhibit 1, the
23  wholesale contracts here, TransCanada will be the
24  supplier of energy and all the other related

155

1  products needed to provide this wholesale standard-
2  offer service.  They will under Exhibit 34 and those
3  rules be a provider of energy and a supplier of
4  energy and receive an allocation of costs through
5  the locational marginal price that also includes a
6  congestion component in it.
7        MR. NGAU:  Thank you.  Nothing further.
8        MR. PORTER:  Any recross?
9        MR. WISEMAN:  Just a couple of questions.
10  Thank you.
11        RECROSS-EXAMINATION
12  BY MR. WISEMAN:
13    Q.   First, when you were talking about the
14  recovery from retail ratepayers of electrical-
15  related costs currently going on in Massachusetts,
16  what occurs in the arbitration if National Grid
17  loses that arbitration?
18    A.   We would disclose the results of that
19  arbitration to the Massachusetts regulators; and I'm
20  sure the issue, to the extent that we lose that and
21  we've collected the moneys, will then be a matter
22  for a regulatory proceeding as to whether we can
23  continue to receive those or whether we're obligated
24  to refund the money out of our own pocket.

156

1    Q.   Currently you're recovering those costs
2  from ratepayers in Massachusetts?
3    A.   Again, in Massachusetts the agreement we
4  had was that we could -- There's a significant
5  amount of money at stake in that, and the issue
6  before us was:  Do we go ahead and properly
7  arbitrate this thing and continue to incur these
8  costs?  Or do we do a quick arbitration, maybe not
9  do our best, and see what the outcome is?  And all
10  parties agreed it's best for us to vigorously pursue
11  these and not worry about looming costs that we
12  continue to pay and not receive recovery for in the
13  meantime.
14        So the agreement was that we will promptly
15  pursue this arbitration, hopefully to a very
16  successful end for our customers, and we will refund
17  moneys we collect back to our customers.
18    Q.   But in the meantime you're recovering
19  those costs from your customers.  Correct?
20    A.   We are collecting those funds on the
21  understanding that they will be refunded upon the
22  successful conclusion of the arbitration.
23    Q.   If you are successful?
24    A.   That's correct.

157

1    Q.   Just this last area of redirect.  Would
2  you agree with me that the term supplier is not a
3  defined term in Exhibit 1 or Exhibit 2, the
4  September 1, 1998 agreements?
5    A.   In Article 6.1 where we've been
6  discussing, it is not a capitalized term; therefore
7  it is not specifically defined.
8        MR. WISEMAN:  Thank you.  I have no
9  further questions.
10        MR. PORTER:  Any other questions?
11        MR. NGAU:  No.
12        MR. PORTER:  Thank you very much, sir.
13  You're excused.
14        (Witness excused)
15        MR. PORTER:  Next witness.
16        MR. NGAU:  Steve Garwood.
17        STEVEN S. GARWOOD,
18      having been first duly sworn on oath,
19      was examined and testified as follows:
20        DIRECT EXAMINATION
21  BY MR. NGAU:
22    Q.   Would you please state your full name for
23  the record?
24    A.   Steven Garwood.

# Tab 2

R.I.P.U.C. No. 918
Cancels R.I.P.U.C. No. 728

<u>BLACKSTONE VALLEY ELECTRIC COMPANY</u>

<u>FUEL ADJUSTMENT CLAUSE</u>



The following provisions will apply to reflect fluctuations in the cost
of fuel charged by the Company's wholesale suppliers of power.

The charges made by the Company for sales subject to this clause shall
be adjusted by an Average Fuel Adjustment Factor, as and when approved
by the Commission, to reflect the estimated current cost of fuel. The
Average Fuel Adjustment Factor per kilowatthour applicable to any
period will be the amount, positive or negative, by which the estimated
average fuel cost per kilowatthour for such period varies from the
amount of $.017906, said base having been adjusted for Rhode Island
Gross Receipts Tax.

The Average Fuel Adjustment Factor, as determined for any period
consisting of six successive billing months, shall be applied to
increase or decrease the price of each kilowatthour of electricity
billed in the same period under rates subject to this clause.

The estimated average fuel cost, as used above, is the estimated
aggregate cost of fuel chargeable to Account 555 of the Uniform System
of Accounts, included in charges from wholesale suppliers of power,
divided by the estimated total kilowatthour sales for the period. In
determining the estimated average fuel cost for any period, any
differentials for the preceding eight months between actual fuel costs
incurred and attributable to consumption under rates subject to this
clause and cost recovered under the clause (after allowance for Gross
Receipts Tax), including interest, shall be added to or subtracted from
the subsequent estimate of fuel costs. If such actual costs, revenues
and interest are not available for any month, they shall be estimated
for purposes of the above calculation.

In the event that conditions affecting the cost of fuel, which are
actually experienced or reasonably to be anticipated during the period
when an Average Fuel Adjustment Factor is in effect, indicate that the
total charges on account of the cost of fuel incurred and to be
incurred by the Company during said period will vary by five percent
(5%) or more above or below fuel revenues collected and to be
collected, the Company may apply to the Rhode Island Public Utilities
Commission for approval and authorization of an appropriate interim
increase or decrease in the Average Fuel Adjustment Factor, to be
applied during the remainder of said period.

Date Filed, May 28, 1993                    Date Effecitve, July 1, 1993

R.I.P.U.C. No. 917
Cancels R.I.P.U.C. No. 745

<u>BLACKSTONE VALLEY ELECTRIC COMPANY</u>

<u>PURCHASED POWER COST ADJUSTMENT CLAUSE</u>

The following provisions will apply to reflect fluctuations in the cost of purchased power charged the Company by its wholesale suppliers of power. As used herein "purchased power costs" shall be those costs chargeable to Account 555 of the Uniform System of Accounts, excluding any fuel portion of this account which is recoverable through the Fuel Adjustment Charge.

The charges made by the Company under rates subject to this clause shall be adjusted by a Purchased Power Cost Adjustment Factor ("PPCA"), as and when approved by the Rhode Island Public Utility Commission ("Commission"), to reflect the estimated current purchased power costs. The PPCA applicable to any period shall be the amount, positive or negative, adjusted for the Rhode Island Gross Receipts Tax, by which the estimated purchased power costs per kilowatthour for such period vary from the currently approved base amount.

The PPCA shall be determined by dividing the estimated aggregate purchased power costs for the period by the estimated total kilowatthour sales for the period. When applicable, such figures shall be adjusted by the addition or subtraction, as the case may be, of any differentials from the preceding eight month period between actual purchased power costs incurred and attributable to consumption under rates subject to this clause and actual costs recovered under this clause (after allowance for Gross Receipts Tax), including interest. Unless otherwise ordered by the Commission, such adjustments shall include wholesale suppliers' refunds and adjustments pertaining to such costs and received during such periods. If actual costs, revenues and interest are not available for any month, they shall be estimated, subject to further adjustment, for purposes of the foregoing calculations.

Unless otherwise ordered by the Commission, the PPCA shall be forecast for successive periods consisting of six months. However, in the event conditions are actually experienced or reasonably anticipated, that will cause the purchased power costs to vary during any period by more than five percent (5%) above or below the purchased power revenues estimated to be collected under the clause during such period, the Company may apply to the Commission for approval of an appropriate decrease or increase in the PPCA to be applicable during the remainder of such period.

Date filed, May 28, 1993                    Date Effective, July 1, 1993

R.I.P.U.C. No. 1084
Cancels R.I.P.U.C. No. 100-I (Revised)

NEWPORT ELECTRIC CORPORATION

STANDARD FUEL ADJUSTMENT CLAUSE

The following provisions will apply to reflect fluctuations in the cost of fuel for all sources of the Company power supply.

The charges made by the Company for sales subject to this clause shall be adjusted by an Average Fuel Adjustment Factor, as and when approved by the Commission, to reflect the estimated current cost of fuel. The Average Fuel Adjustment Factor per kilowatthour applicable to any period will be the amount, positive or negative, by which the estimated average fuel cost per kilowatthour for such period varies from the amount of $.02929 adjusted to reflect the Rhode Island Gross Receipts Tax.

The estimated fuel cost is the estimated aggregate cost of fuel from all sources except for power exchanged with the New England Power Pool. The net cost of exchange power shall be added or deducted from the fuel costs from all other sources. These total costs shall be divided by the estimated total kilowatthour sales for the six month period to determine the estimated average fuel cost, as used above. In determining the estimated average fuel cost for any six month period, any differentials, for the preceding eight month period between reasonable fuel costs incurred and attributable to consumption under rates subject to this clause and fuel revenues under the clause (after allowance for the Gross Receipts Tax), including interest, shall be added to or subtracted from the subsequent estimate of fuel costs. If such actual costs, revenues and interest are not available for any month, they shall be estimated for purposes of the above calculation.

In the event that conditions affecting the price and/or supply of fuel, which are actually experienced or reasonably to be anticipate during the period when an Average Fuel Adjustment Factor is in effect, indicate that the total charges on account of cost of fuel incurred and to be incurred during said period will vary by five percent (5%) or more above or below fuel revenues collected and to be collected, the Company may apply to the Rhode Island Public Utilities Commission for approval and authorization of an appropriate interim increase or decrease in the Average Fuel Adjustment Factor, to be applicable during the remainder of said period.

If at any time changes or revisions in the fuel adjustment clause applicable to any wholesale supplier's Primary Service for Resale Rate become effective in accordance with law, the Company will propose appropriate changes or revisions in this Standard Fuel Adjustment Clause, to the extent they may be necessary, and submit them to the Rhode Island Utilities Commission for approval.

Date Filed, May 28, 1993                    Date Effective, July 1, 1993

R.I.P.U.C. No. 1083
Cancels R.I.P.U.C. No. 92.3

Page 1 of 2

## NEWPORT ELECTRIC CORPORATION

### PURCHASED POWER COST ADJUSTMENT CLAUSE

The prices contained in the applicable rates of the Company are subject to adjustment for changes in the wholesale cost of purchased power. The cost of purchased power referred to herein is the cost of purchased power from various wholesale suppliers, as designed by the Rhode Island Public Utilities Commission exclusive of any adjustment for cost of fuel applicable thereto.

The charges made by the Company for sales subject to this clause shall be adjusted by an Average Purchased Power Cost Adjustment Factor, as and when approved by the Commission, on a periodic basis, to reflect the estimated current cost of purchased power. The Average Purchased Power Cost Adjustment Factor per kilowatthour applicable to any period will be the amount, positive or negative, by which the estimated average cost of purchased power per kilowatthour of estimated sales, adjusted for Rhode Island Gross Receipts Tax, varies from the amount of $.016275.

The estimated cost of purchased power is the estimated aggregate capacity and transmission costs from all sources of purchased power consisting of six successive billing months. These total costs shall be divided by the estimated total kilowatthour sales for the six month period to determine the estimated average purchased power cost, as used above. In determining the estimated average purchased power cost for any period, any differentials for the preceding eight month period between reasonable purchased power costs incurred and attributable to consumption under rates subject to this clause and purchased power revenues under the clause (after allowance for the Gross Receipts Tax), including interest, shall be added to or subtracted from the subsequent estimate of purchased power costs. If such actual costs, revenues and interest are not available for any month, they shall be estimated for purposes of the above calculation.

In the event that conditions affecting the price and/or supply of purchased power, which are actually experienced or reasonably to be anticipated during the period when and Average Purchased Power Cost Adjustment Factor is in effect, indicate that the total charges on account of cost of purchased power incurred and to be incurred by the Company during said period will vary by five percent (5%) or more above or below purchased power revenues collected and to be collected, the Company may apply to the Rhode Island Public Utilities Commission for approval and authorization of an appropriate interim increase or decrease in the Average Purchased Power Cost Adjustment Factor, to be applicable during the remainder of said period.

If at any time changes or revisions in the terms or conditions applicable to any wholesale supplier's Primary Service for Resale Rate become effective in accordance with law, the Company will propose appropriate changes or revisions in the Purchased Power Cost Adjustment Clause, to the extent they may be necessary, and submit them to the Rhode Island Public Utilities Commission for approval.

If the Company receives any refunds from its wholesale suppliers representing an amount collected in excess of the amount which would have been collected under the rates subsequently approved by the Federal Energy Regulatory Commission, the Company will make an equitable adjustment with its customers on those rates affected by the Company's Purchased Power Cost Adjustment. The amount of such adjustment by the Company shall not be greater than any applicable excess amount collected by the Company from its customers. Any such adjustment shall be applied by customers' bills commencing within a reasonable period of time after the date of refund unless otherwise extended by the Rhode Island Public Utilities Commission, and shall continue until the amount to be refunded has been consumed.

The operation of this Purchased Power Cost Adjustment Clause is subject to all powers of suspension, investigation and other regulatory authority of the Rhode Island Public Utilities Commission.

These provisions shall be applicable to all rates for electric service.

Date Filed, May 28, 1993                    Date Effective, July 1, 1993

R.I.P.U.C. NO. ~~760~~ 728
CANCELS NO. 562

## BLACKSTONE VALLEY ELECTRIC COMPANY

### FUEL ADJUSTMENT CLAUSE

The following provisions will apply to reflect fluctuations in the cost of fuel charged by the Company's wholesale suppliers of power.

The charges made by the Company for sales subject to this clause shall be adjusted by an Average Fuel Adjustment Factor, as and when approved by the Commission, to reflect the estimated current cost of fuel. The Average Fuel Adjustment Factor per kilowatthour applicable to any period will be the amount, positive or negative, by which the estimated average fuel cost per kilowatthour for such period varies from the amount of $.017906 said base having been adjusted for Rhode Island Gross Receipts Tax.

The Average Fuel Adjustment Factor, as determined for any period consisting of ~~four~~ *eight* successive billing months, shall be applied to increase or decrease the price of each kilowatthour of electricity billed in the same period under rates subject to this clause.

The estimated average fuel cost, as used above, is the estimated aggregate cost of fuel chargeable to account 555 of the Uniform System of Accounts included in charges from wholesale suppliers of power, divided by the estimated total kilowatthour sales for the period, in determining the estimated average fuel cost for any period, any differentials for the preceding *(four* months between actual fuel costs incurred and attributable to consumption under rates subject to this clause and costs recovered under the clause shall be added to or subtracted from the subsequent estimate of fuel costs. If such actual costs and revenues *(other than allowance for Rhode Island Gross Receipts Tax), including* are not available *interest,* for any month, they shall be estimated for purposes of the above *and interest* calculation.

In the event that conditions affecting the cost of fuel, which are actually experienced or reasonably to be anticipated during the period when an Average Fuel Adjustment Factor is in effect, indicate that the total charges on account of the cost of fuel incurred and to be incurred by the Company during said period will vary by ~~ten~~ *5%* percent (~~10%~~) or more above or below fuel revenues collected and to be collected, the Company ~~shall~~ *may* apply to the Rhode Island Public Utilities Commission for approval and authorization of an appropriate interim increase or decrease in the Average Fuel Adjustment Factor, to be applied during the remainder of said period.

Date Filed: ~~October 10, 1995~~          Date Effective, ~~November 1, 1986~~
*May 28, 1993*                            ~~per Order 11850 of November 1, 1995~~
                                         ~~in Docket 1541~~
                                         *July 1, 1993*

-29-

R.I.P.U.C. NO. 748 — 917
CANCELS NO. 708 — 745

# BLACKSTONE VALLEY ELECTRIC COMPANY

## PURCHASED POWER COST ADJUSTMENT CLAUSE

The following provisions will apply to reflect fluctuations in the cost of purchased power charged the Company by its wholesale suppliers of power. As used herein "purchased power costs" shall be those costs chargeable to Account 555 of the Uniform System of Accounts, excluding any fuel portion of this account which is recoverable through the Fuel Adjustment Charge.

The charges made by the Company under rates subject to this clause shall be adjusted by a Purchased Power Cost Adjustment Factor ("PPCA"), as and when approved by the Rhode Island Public Utility Commission ("Commission"), to reflect the estimated current purchased power costs. The PPCA applicable to any period shall be the amount, positive or negative, adjusted for the Rhode Island gross receipts tax, by which the estimated purchased power costs per kilowatthour for such period vary from the currently approved base amount.

The PPCA shall be determined by dividing the estimated aggregate purchased power costs for the period by the estimated total kilowatthour sales for the period. When applicable, such figures shall be adjusted by the addition or subtraction, as the case may be, of any differentials from the prior two periods [*eight-month*] between actual purchased power costs incurred and attributable to consumption under rates subject to this clause and actual costs recovered under this clause. Unless otherwise ordered by the Commission, such adjustments shall include wholesale suppliers' refunds and adjustments pertaining to such costs [*and interest*] and received during such periods. If actual costs and revenues are not available for any month, they shall be estimated, subject to further adjustment, for purposes of the foregoing calculations.

Unless otherwise ordered by the Commission, the PPCA shall be forecast for successive periods [*consisting of successive billing months*] consisting of four [*five*] months. However, in the event conditions are actually experienced or reasonably anticipated that will cause the purchased power costs to vary during any period by more than Ten percent (10%) [*5%*] above or below the purchased power revenues estimated to be collected under the clause during such period, the Company shall [*may*] apply to the Commission for approval of an appropriate decrease or increase in the PPCA to be applicable during the remainder of such period.

Date Filed, July 15, 1986

Date Effective, December 31, 1986
Per Order 12274 of March 10, 1987
In Docket 1856

*(handwritten annotations: "after allowance for (Gross Receipts Tax)) including interest"; "July 1, 1993"; "May 28, 1993")*



Cancels ——— Cancelling ——— R.I.P.U.C. No. 100-I (Revised) ——— 1084
R.I.P.U.C. No. 100-H                                          100-I (Reissued)

## NEWPORT ELECTRIC CORPORATION

### STANDARD FUEL ADJUSTMENT CLAUSE

The following provisions will apply to reflect fluctuations in the cost of fuel for all sources of the Company's power supply.

The charges made by the Company for sales subject to this clause shall be adjusted by an Average Fuel Adjustment Factor, as and when approved by the Commission, to reflect the estimated current cost of fuel. The Average Fuel Adjustment Factor per kilowatthour applicable to any period will be the amount, positive or negative, by which the estimated average fuel cost per kilowatthour for such period varies from the amount of $.02929 adjusted to reflect the Rhode Island Gross Receipts Tax.

The estimated fuel cost is the estimated aggregate cost of fuel from all sources except for power exchanged with the New England Power Pool. The total cost of exchange power shall be deducted from the fuel costs from all other sources. These total costs shall be divided by the estimated total kilowatthour sales for the period to determine the estimated average fuel cost, as used above. In determining the estimated average fuel cost for any period, any differentials for the preceding period between reasonable fuel costs incurred and attributable to consumption under rates subject to this clause and fuel revenues under the clause (after allowance for the Gross Receipts Tax) shall be added to or subtracted from the subsequent estimate of fuel costs. If such actual costs and revenues are not available for any month, they shall be estimated for purposes of the above calculation.

In the event that conditions affecting the price and/or supply of fuel, which are actually experienced or reasonably to be anticipated during the period when an Average Fuel Adjustment Factor is in effect, indicate that the total charges on account of cost of fuel incurred and to be incurred during said period will vary by ten percent (10%) or more above or below fuel revenues collected and to be collected, the Company may apply to the Rhode Island Public Utilities Commission for approval and authorization of an appropriate interim increase or decrease in the Average Fuel Adjustment Factor, to be applicable during the remainder of said period.

If at any time changes or revisions in the fuel adjustment clause applicable to any wholesale supplier's Primary Service for Resale Rate become effective in accordance with law, the Company will propose appropriate changes or revisions in this Standard Fuel Adjustment Clause, to the extent they may be necessary, and submit them to the Rhode Island Public Utilities Commission for approval.

Approval Issued, March 7, 1986.        Effective, March 1, 1986.

Date Filed, May 28, 1993              Date Effective, July 1, 1993

*[handwritten margin annotations: "underline", "any month", "including interest", "fix", "provisions of any successor billing month", "eight month", "5%"]*



Cancels

R.I.P.C. No. ~~92.3~~ 1083
Superseding R.I.P.C. No. ~~92.2~~ 92.3

Page 1 of 1

# NEWPORT ELECTRIC CORPORATION
## PURCHASED POWER ADJUSTMENT PROVISIONS

### COST *of* CLAUSE

The prices contained in the applicable rates of the Company are subject to adjustment for changes in the wholesale cost of purchased power. The cost of purchased power referred to herein is the cost of purchased power from various wholesale suppliers, as designed by the Public Utilities Commission, exclusive of any adjustment for cost of fuel applicable thereto.

(1) The charges made by the Company for sales subject to this clause shall be adjusted by an Average Purchased Power Cost Adjustment Factor, as and when approved by the Commission, on a periodic basis, to reflect the estimated current cost of purchased power. The Average Purchased Power Cost Adjustment Factor per kilowatthour applicable to any period will be the amount, positive or negative, by which the estimated average cost of purchased power per kilowatthour of estimated sales, adjusted for Rhode Island Gross Receipts Tax, varies from the amount of $.016275.

(2) The estimated cost of purchased power is the estimated aggregate capacity and transmission costs from all sources of purchased power. These total costs shall be divided by the estimated total kilowatthour sales for the period to determine the estimated average purchased power costs, as used above. In determining the estimated average purchased power cost for any period, any differentials for preceding periods between reasonable purchased power costs incurred and attributable to consumption under rates subject to this clause and purchased power revenues under the clause (after allowance for the Gross Receipts Tax) shall be added to or subtracted from the subsequent estimate of purchased power costs. If such actual costs and revenues are not available for any months, they shall be estimated for purposes of the above calculation.

(3) In the event that conditions affecting the price and/or supply of purchased power, which are actually experienced or reasonably to be anticipated during the period when an Average Purchased Power Cost Adjustment Factor is in effect, indicate that the total charges on account of cost of purchased power incurred and to be incurred by the Company during said period will vary by more than five percent (5%) from that above or below the purchased power revenues to be collected, the Company may apply to the Rhode Island Public Utilities Commission for approval and authorization of an appropriate interim increase or decrease in the Average Purchased Power Cost Adjustment Factor, to be applicable during the remainder of said period.

(4) If at any time changes or revisions in the terms or conditions applicable to any wholesale supplier's Primary Service for Resale Rate become effective in accordance with law, the Company will propose appropriate changes or revisions in this Purchased Power Cost Adjustment Clause, to the extent they may be necessary, and submit them to the Rhode Island Public Utilities Commission for approval.

*(handwritten margin annotations: "Rhode Island", "underline", "the", "one month", "eight month", "including interest", "and interest", "five", "5%", "consisting of the succeeding billing month")*

-32-

R.I.P.U.C. No. 923 — 1083

Page 2 of 2

(5.) If the Company receives any refunds from its wholesale suppliers represent an amount collected in excess of the amount which would have been collected under the rates subsequently approved by the Federal Energy Regulatory Commission, the Company will make an equitable adjustment with its customers on those rates affected by the Company's Purchased Power Cost Adjustment. The amount of such adjustment by the Company shall not be greater than any applicable excess amount collected by the Company from its customers. Any such adjustment shall be applied to customers' bills commencing within a reasonable period of time after the date of refund unless otherwise extended by the Public Utilities Commission, and shall continue until the amount to be refunded has been consumed. ——— Rhode Island

(6.) The operation of this Purchased Power Cost Adjustment Clause is subject to all powers of suspension, investigation and other regulatory authority of the Public Utilities Commission.

Rhode Island

(7.) These provisions shall be applicable to all rates for electric service.

Date Wed, May 26, 1993
Approval Issued  March 7, 1986

Date Effective, July 1, 1993
Effective  March 7, 1986

—33—

# Tab 3


EXHIBIT
2

**History of Section.**
P.L. 1969, ch. 240, § 1; P.L. 1973, ch. 199, § 1; P.L. 1980, ch. 73, § 1; P.L. 1981, ch. 259, § 1; P.L. 1984, ch. 210, § 1; P.L. 1987, ch. 22, § 1; P.L. 1991, ch. 44, art. 76, § 6; P.L. 1993, ch. 138, art. 55, § 1; P.L. 1995, ch. 316, § 1; P.L. 1995, ch. 330, § 1; P.L. 1996, ch. 316, § 1.

**39-1-27. Electric distribution companies required to file restructuring plans. —** (a) Each electric distribution company shall file with the commission a plan for transferring ownership of generation facilities into a separate affiliate of the electric distribution company. The transmission facilities owned by the electric distribution company also may be transferred to an affiliated electric transmission company at a price that shall equal the book value of the transmission facilities on the electric distribution company's accounts net of depreciation and deferred taxes as the date of transfer, but such a transfer is not required. The generation plant, equipment, and facilities owned by an electric distribution company shall be transferred to an affiliate that is a nonregulated power producer at a price that shall equal the book value of the generation plant, equipment, and facilities on the electric distribution company's accounts net of depreciation and deferred taxes as of the date of the transfer. Consistent with the schedule for implementing retail access in § 39-1-27.3, each electric transmission company shall file tariffs with the federal energy regulatory commission (FERC) and electric distribution companies shall file tariffs with the commission. The tariffs will provide the terms, conditions and rates for nondiscriminatory access to transmission and distribution facilities to wholesale and retail customers and to nonregulated power producers. The tariffs shall (1) conform to the standards, policies, and requirements of the federal energy regulatory commission or the commission as appropriate with respect to nondiscriminatory access to transmission and distribution services, (2) fulfill such standards with respect to both transmission and distribution services for the benefit of both wholesale and retail customers and their suppliers, and (3) provide retail access in accordance with the schedule set forth in § 39-1-27.3. For purposes of this section, nondiscriminatory access shall mean access to transmission and distribution services on rates, terms and conditions found to be reasonable by the FERC or the commission as appropriate and applied consistently to all customers in a rate class regardless of their supplier. When establishing terms and conditions for distribution service, the commission shall implement standards, policies, and requirements consistent with those established by the federal energy regulatory commission for transmission service unless it determines that alternative terms and conditions are in the public interest.

(b) The commission shall review the plan within six (6) months of filing and if the plan is in compliance with chapter 3 of this title, shall authorize the property transfers, securities issuances, and affiliate transactions pursuant to this title and shall grant all necessary regulatory approvals. All existing state and local rights, authoriza-

tions, and approvals, including but not limited to, permits, licenses, locations, indentures, leases, orders, or similar rights associated with the ownership and operation of plant and equipment, shall be deemed transferred with the associated plant and equipment upon the commission's authorization of the transfer effective as of the date of transfer. Notwithstanding any provisions of this section, if the electric distribution company's wholesale power supplier chooses to transfer its generation assets to a nonaffiliate of the electric distribution company for purposes of carrying out the market valuation required by § 39-1-27.4(g), and such transfer to a nonaffiliate is specified in the electric distribution company's restructuring plan filed with the commission pursuant to subsection (a) above, the transfer of the electric distribution company's interest in the generation facilities may be made directly to the nonaffiliate. In the case of such a transfer directly to a nonaffiliate, all of the state and local rights, authorizations and approvals, including those enumerated above, shall be deemed transferred with the associated plant and equipment upon the commission's authorization of the transfer effective as of the date of the transfer.

(c) The electric distribution company shall implement the corporate reorganizations and property transfers specified in such restructuring plan, terminate its all requirements contract with its wholesale power supplier on the terms set forth in § 39-1-27.4 and provide retail access for all customers in Rhode Island with a standard offer as set forth in § 39-1-27.3 no later than three (3) months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England. The commission may extend this time if it determines that additional time is necessary to implement the transactions on reasonable terms and in accordance with a reasonable schedule; provided however, that nothing in this section shall be construed to limit the effect of § 39-1-27.3 or permit the commission to unduly discriminate in providing retail access among or within rate classes.

(d) Following the complete implementation of the restructuring plans, electric distribution companies shall be prohibited from selling electricity at retail and from owning, operating, or controlling generating facilities, although such facilities may be owned by affiliates of electric distribution companies. For purposes of this paragraph providing the standard offer service and last resort power supply in accordance with subsections (d) and (f) of § 39-1-27.3 shall not be construed as selling electricity at retail.

(e) Following the termination of the electric distribution company's contracts with its wholesale power supplier, the wholesale power supplier shall become a nonregulated power producer, and shall be free, subject to the requirements of the standard offer set forth in § 39-1-27.3(e) and retail electric licensing commission plan requirements pursuant to § 39-1-27.1 to sell electricity generated from each of its facilities on either the wholesale or retail markets at market

28

), mits, licenses,
;hts associated with
|uipment, shall be
nd equipment upon
ective as of the date
this section, if the
supplier chooses to
f the electric distri-
ie market valuation
to a nonaffiliate is
restructuring plan
:tion (a) above, the
iterest in the gener-
filiate. In the case of
the state and local
; those enumerated
issociated plant and
ion of the transfer

nplement the corpo-
ified in such restruc-
tract with its whole-
;9-1-27.4 and provide
with a standard offer
)) months after retail
∋ he kilowatt-hour
ixtend this time if it
y to implement the
dance with a reason-
1 this section shall be
ırmit the commission
ess among or within

of the restructuring
rohibited from selling
g, or controlling gen-
be owned by affiliates
ies of this paragraph
esort power supply in
;9-1-27.3 shall not be

c distribution compa-
r, the wholesale power
iroducer, and shall be
lard offer set forth in
imission plan require-
y generated from each
iil markets at market

prices, either directly or through an affiliate, which shall also become a nonregulated power producer. The former wholesale power supplier and its affiliates shall be free to apply to become exempt wholesale generators pursuant to section 32 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79z-5a, and other federal law, rules and regulations, and each and every generating facility of the former wholesale power supplier shall become an eligible facility pursuant to that statute. Accordingly, the legislature hereby finds and declares that the division has sufficient regulatory authority, resources, access to books and records to exercise its duties; and that the full participation of former wholesale power suppliers and affiliated nonregulated power producers in the market and the designation of each of the former wholesale power supplier's facilities as eligible facilities will benefit consumers, is consistent with state law, will not provide any unfair competitive advantage by virtue of their status as a former wholesale power supplier or as affiliates of electric distribution companies, and is in the public interest.

(f) Although reducing air emissions from power plants is a goal of electricity industry restructuring, power plants in Rhode Island already have low emissions relative to their counterparts in other states. For this reason, it is unnecessary for the restructuring plans required by this section to address in-state air emission reductions. However, to the extent a wholesale power supplier receiving contract termination fees pursuant to § 39-1-27.4(b)(4) owns and operates as of December 31, 1995 fossil fired generation in another state which does not meet air emission standards applicable as of that date to new electric generating facilities in that state, such wholesale power suppliers shall cooperate with the appropriate environmental offi-cials in the state or states where such generating facilities are located to develop a plan for reducing the emissions of nitrogen oxides, sulfur dioxide, and particulate matter from such plants on an overall basis through retirements, replacements, controls or offsets or any combi-nation of the above toward the air emissions standards applicable to new electric generating facilities in effect in the state or states where the plants are located as of January 1, 1996. Such plans shall be implemented in connection with electric industry restructuring in the state or states where the generating facilities are located.

(g) An electric distribution company, whether public, quasi-munic-ipal or investor owned, that as of January 1, 1996 did not purchase power at wholesale from a wholesale power supplier under an all requirements contract shall include proposals for recovering transi-tion costs consistent with the elements which would be comparable in nature to the elements included in termination fees pursuant to § 39-1-27.4(b) through (g) and for providing a standard offer consis-tent with requirements of § 39-1-27.3(d) in its plan filed with the commission pursuant to this section. The filing by an electric distri-bution company that is a quasi-municipal corporation shall also address any unique circumstances affecting the electric distribution

company including special contract requirements or charter restrictions and the conditions that the quasi-municipal corporation must satisfy in order to participate in retail competition. In reviewing the filing and determining the appropriate level of transition cost recovery, the commission shall apply standards consistent with those contained in § 39-1-27.4(b) through (g) and with this subsection. The commission shall be authorized to take any action or to grant any approval necessary to maintain hydro-electric power purchases from the Niagara and St. Lawrence power projects by quasi-municipal corporations. Notwithstanding any other provision of this section, quasi-municipal electric distribution companies that purchase hydro-electric power from the Niagara and St. Lawrence power projects shall be authorized to continue to resell such power to residential customers within their service territories. After notice and public hearing, the commission may exempt electric distribution companies subject to this paragraph from (1) the requirement to transfer ownership of generation and transmission facilities to affiliated companies pursuant to subsection (a), and (2) the prohibition against selling electricity at retail pursuant to subsection (d) with respect to sales within the service territory of such electric distribution company, if it determines that such exemptions are in the public interest.

(h) With the exception of the requirements of the standard offer set forth in § 39-1-27.3(e) and (f) and retail electric licensing commission plan requirements pursuant to § 39-1-27.1, nothing in this section shall be construed or interpreted to constrain the application of anti-trust laws to nonregulated power producers, whether affiliated or not with an electric distribution company.

**History of Section.**
P.L. 1996, ch. 316, § 1; P.L. 1997, ch. 357, § 1.

**Compiler's Notes.** This section as it appears above has been edited by the compiler to incorporate the changes made by the 1997 reenactment of title 39 by P.L. 1997, ch. 326, which were not included in the 1997 amendment.

In 1997, the compiler substituted "subsection" for "paragraph" in subsections (b) and (d), and substituted "39-1-27.3(e) and (f)" for "39-1-27.3(e) and (h)" in subsection (h).

**Repealed Sections.** Former § 39-1-27 (P.L. 1912, ch. 795, § 4; P.L. 1920, ch. 1944, § 1; P.L. 1922, ch. 2188, § 1; G.L. 1923, ch. 253, § 4; P.L. 1929, ch. 1416, § 1; P.L. 1935, ch. 2250, § 149; G.L. 1938, ch. 122, § 4; G.L. 1956, § 39-1-5; P.L. 1969, ch. 240, § 1; P.L. 1973, ch. 199, § 1; P.L. 1978, ch. 13, § 1) concerning appropriations and disbursements, was repealed by P.L. 1996, ch. 316, § 1, effective August 7, 1996, and that act enacted the above section.

**39-1-27.1. Retail electric licensing commission plan requirements and nonregulated power producer registration requirements.** — (a) The retail electric licensing commission shall by January 1, 1997 submit a plan to the legislature which shall include, but not be limited to, the following:

(1) A recommendation for taxing and/or assessing electric distribution companies, electric transmission companies and nonregulated power producers;

32

d⌒of organiza-
iti. , partnership
gal organization;
.d directors, part-

er service contact

itory contact per-

nt for service of

ig conducted; and
y bonds, a recent
d by the division.
), shall be served
. companies. Up-
i of any change to
ation, as filed or
pursuant to sub-
er filing with the
ay period. If the
shall specify the
entify alternative
nity of a hearing,
)ducer's registra-
by ~uthorized to
m. ffective and

s. Former § 39-1-27.1
3; P.L. 1991, ch. 44, art.
1. 370, art. 40, § 116)
rogram for studies and
i by P.L. 1996, ch. 316,
7, 1996, and that act
tion.

nission estab-
electric licensing
ers, all of whom
jinted as follows:

i as follows:
f the division of
ies commission;
e department of

:;

---

33      PUBLIC UTILITIES COMMISSION      39-1-27.3

(ii) The senate majority leader shall appoint three (3) members as follows:

(A) One of whom shall be selected from nominations received from the operators of electric utility companies conducting business in Rhode Island;

(B) One of whom shall be a member of the senate; and

(C) One of whom shall be a member of the public;

(iii) The speaker of the house of representatives shall appoint three (3) members as follows:

(A) One of whom shall be selected from nominations received from the operators of electric utility companies conducting business in Rhode Island.

(B) One of whom shall be a member of the house of representatives; and

(C) One of whom shall be a member of the public.

(b) Forthwith upon appointment of its members, the commission shall meet at the call of the speaker of the house of representatives and organize and select from among its members a chairperson. Vacancies in the commission shall be filled in like manner as the original appointment.

(c) Members of the commission shall not be compensated, but shall be reimbursed for all reasonable and necessary expenses incurred in the carrying out of their official duties by the department of business regulation.

(d) All departments and agencies of the state shall furnish such advice and information, documentary and otherwise, to the commission and its agents as is deemed necessary or desirable by the commission to facilitate the purposes of this act.

(e) The speaker of the house of representatives is hereby authorized and directed to provide administrative support, including suitable quarters for the commission and clerical support, as deemed necessary by the commission to facilitate the purposes of this chapter.

(f) The commission shall prepare a plan pursuant to the provisions of § 39-1-27.1, and shall submit that plan to the general assembly not later than January 1, 1997. In addition, the commission shall consider such other matters related to the implementation of the Utility Restructuring Act of 1996 as it so deems, providing advice and recommendations thereon, and the commission shall expire on April 30, 1997.

**History of Section.**
P.L. 1996, ch. 315, § 1.
**Reenactments.** The 1997 Reenactment (P.L. 1997, ch. 326, § 1) redesignated the subdivisions in subsection (a), substituted "this chapter" for "this act" in subsection (e), and substituted "August 7, 1996" for "the effective date of this act" in subsection (a)(1), which substitution was first made by the compiler in 1996.

**39-1-27.3. Electric distribution companies required to provide retail access and standard offer.** — (a) To promote eco-

Case 4:05-cv-40076-FDS     Document 65-4     Filed 08/15/2007     Page 18 of 20

nomic development and the creation and preservation of employment opportunities within the state, on July 1, 1997, each electric distribution company shall offer retail access from nonregulated power producers to: ·

(1) All new commercial and industrial customers, including new manufacturing customers, commencing service on or after July 1, 1997, with an anticipated average annual demand of two hundred (200) kilowatts or greater;

(2) All existing manufacturing customer with an average annual demand of fifteen hundred (1500) kilowatts or greater; and

(3) All accounts in the name of the state, provided, however, no electric distribution company shall be required to release more than ten percent (10%) of its total kilowatt-hour sales to retail access pursuant to this subsection.

(b) On January 1, 1998, all electric distribution companies shall expand their offer of retail access to include existing manufacturing customers with an average annual demand of two hundred (200) kilowatts or greater and all accounts in the name of the cities and towns in Rhode Island, provided, however, no electric distribution company shall be required to release a total of more than twenty percent (20%) of its total kilowatt-hour sales to retail access pursuant to subsections (a) and (b).

(c) Retail access shall be implemented for all customers in Rhode Island within three (3) months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England including the total kilowatt-hour sales in Rhode Island; provided however, that if such retail access in New England has not occurred by July 1, 1998, then each electric distribution company shall expand its offer of retail access to all of the electric distribution company's remaining customers. The commission may extend this deadline for up to six (6) months for some or all customers if it determines that additional time is necessary to ensure that retail access can be extended to all customers on reasonable terms. Each electric distribution company shall notify all customers in its service territory of the options available to them to procure electric service at lease ninety (90) days before such customers become eligible for retail access. Upon request from any nonregulated power producer, an electric distribution company shall make available a list of the names and addresses of its customers that are, or within sixty (60) days are expected to become, eligible for retail access; provided, however, such lists shall not include customers that have submitted written requests to the electric distribution company that they be excluded from such lists.

(d) Within three (3) months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England and extending through year 2009, each electric distribution company shall arrange for a standard power supply offer ("standard offer") to customers that have not elected to enter into power supply arrange-

. 34

or  of employment
id.  lectric distri-
nregulated power

rs, including new
 or after July 1,
d of two hundred

n average annual
iter; and
ded, however, no
elease more than
; to retail access

. companies shall
ng manufacturing
o hundred (200)
of the cities and
ctric distribution
iore than twenty
l access pursuant

itomers in Rhode
available to forty
in New England
Island; provided
h    iot occurred
any shall expand
iution company's
this deadline for
determines that
il access can be
ch electric distri-
rvice territory of
service at lease
ligible for retail
'er producer, an
list of the names
xty (60) days are
d, however, such
tted written re-
hey be excluded

ivailable to forty
ew England and
bution company
andard offer") to
supply arrange-

ments with other nonregulated power suppliers. The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier. The standard offer shall be priced such that the average revenue per kilowatt-hour received from the customer for such power together with approved distribution, transmission and transition charges shall equal the price that would have been paid under rates in effect during the twelve (12) month period ending September 30, 1996 adjusted annually for eighty percent (80%) of the change in the consumer price index for the immediately preceding twelve (12) month period, and also for other factors reasonably beyond the control of the electric distribution company and its former wholesale power supplier including but not limited to changes in federal, state or local taxes or extraordinary fuel costs; provided, however, that adjustments to the standard offer for factors other than inflation must be approved by the commission. The standard offer is to be a price cap and may, after notice to the commission, be less than the maximum allowed at anytime for the generation component of the standard offer. Once a customer has elected to enter into a power supply arrangement with a nonregulated power producer, the electric distribution company shall not be required to arrange for the standard offer to such customer. No customer who initially elects the standard offer and then chooses an alternative supplier shall be required to pay any withdrawal fee or penalty to the provider of the standard offer unless such a penalty or withdrawal fee was agreed to as part of a contract; however, no residential customer shall be required to pay a penalty or withdrawal fee for choosing an alternative supplier. Nothing in this subsection shall be construed to restrict the right of any nonregulated power producer to offer to sell power to customers at a price comparable to that of the standard offer specified pursuant to this subsection.

(e) On or before January 1, 1997, each retail distribution company shall file with the commission unbundled rates which separately identify charges for use of transmission and distribution facilities and provide for retail access in accordance with the schedule set forth in this section. Such unbundled rates shall also include transition charges calculated in accordance with § 39-1-27.4 and shall become effective on July 1, 1997. Such unbundled rates shall also include just and reasonable terms, conditions, and procedures for interconnection with small scale generating units located on the distribution system. If the federal energy regulatory commission (FERC) also requires such filings, then the retail distribution or transmission company may submit to the commission the same filing as provided to FERC to meet the intent of this subsection.

(f) In recognition that electricity is an essential service, each electric distribution company shall, within three (3) months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England, arrange for a last resort power

supply for customers who are no longer eligible to receive service under the standard offer and not adequately supplied by the market because they are unable to obtain or retain electric service from nonregulated power producers. The electric distribution company shall periodically solicit bids from nonregulated power producers for such service at market prices plus a fixed contribution from the electric distribution company. Acceptance of bids by the electric distribution company and the terms and conditions for such last resort service shall be subject to approval by the commission. The bids requiring the lowest fixed contribution from the electric distribution company shall be accepted. Nothing in this section shall be construed to prohibit an electric distribution company or nonregulated power producer from terminating service provided hereunder in accordance with commission rules and regulations in the event of nonpayment of such service. All fixed contributions and any reasonable costs incurred by the electric distribution company in arranging this service shall be included in the distribution rates charged to all other customers. The commission may promulgate regulations to implement this section.

**History of Section.**
P.L. 1996, ch. 316, § 1; P.L. 1997, ch. 326, § 103; P.L. 1997, ch. 357, § 1.

**Reenactments.** The 1997 Reenactment (P.L. 1997, ch. 326, § 1) redesignated the subdivisions in subsection (a).

**Compiler's Notes.** This section was amended by two Acts (P.L. 1997, ch. 326, § 103; P.L. 1997, ch. 357, § 1) passed by the 1997 General Assembly. Inasmuch as the two

Acts do not appear to be in conflict with each other, the section as set forth above incorporates the amendments by both Acts.

This section as it appears above has been edited by the compiler to incorporate the changes made by the 1997 reenactment of title 39 by P.L. 1997, ch. 326, which were not included in the 1997 amendment. For the extent of the reenactment changes, see the reenactment note above.

**39-1-27.4. Transition charges authorized. —** (a) An electric distribution company that purchases power at wholesale from a wholesale power supplier under an all requirements contract shall be authorized to execute an agreement terminating, in whole or in part, such all requirements contracts on terms that require payment of a contract termination fee complying with the requirements in subsection (b) and notwithstanding any other provisions of this title, shall be allowed to recover such payment through a nonbypassable transition charge paid by all customers of the electric distribution company. Any nonregulated power producer may pay all or a part of its customers' transition charges.

(b) The contract termination fee paid by the electric distribution company to its wholesale power supplier shall include the electric distribution company's share of its wholesale supplier's costs associated with the following:

(1) Regulatory assets related to the generation business which include costs for which recovery has been deferred to the future in accordance with prior rate cases or settlements approved by regulators, or consistent with regulatory precedent; regulatory assets of

# Tab 4

# (1 of 8)

ORIGIN
EXHIBIT
20

**WINTHROP, STIMSON, PUTNAM & ROBERTS**

ONE BATTERY PARK PLAZA
NEW YORK, NY 10004-1490
TELEPHONE: 212-858-1000
TELEFAX: 212-858-1800

695 EAST MAIN STREET
STAMFORD, CT 06904-6760
TELEPHONE: 203-348-2300
TELEFAX: 203-965-8226

125 WORTH AVENUE
PALM BEACH, FL 33480
TELEPHONE: 407-655-7297
TELEFAX: 407-833-6725

ISAAC D. BENKIN
202-775-9880

1133 CONNECTICUT AVENUE, N.W.
WASHINGTON, DC 20036

TELEPHONE: 202-775-9800
TELEFAX: 202-833-8491
TELEX: 316229 WINSTIM DC

FILED BY THE SECRETARY
97 OCT 29 AM 11: 11
FEDERAL ENERGY
REGULATORY
COMMISSION

2 THROGMORTON AVENUE
LONDON EC2N 2DL ENGLAND
TELEPHONE: 011-44(71)-628-4031
TELEFAX: 011-44(71)-638-0443

RUE DU TACITURNE 42
B-1040 BRUSSELS, BELGIUM
TELEPHONE: 011-322-230-1392
TELEFAX: 011-322-230-9288

6-7, ATAGO I-CHOME
MINATO-KU, TOKYO 105, JAPAN
TELEPHONE: 011-813-3437-9740
TELEFAX: 011-813-3437-9261

2805 ASIA PACIFIC FINANCE TOWER
CITIBANK PLAZA
3 GARDEN ROAD, CENTRAL, HONG KONG
TELEPHONE: 011-852-2530-3400
TELEFAX: 011-852-2530-3355

October 29, 1997

Hon. Lois D. Cashell, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

      Re:  Montaup Electric Company, Docket
           Nos. ER97-2800-000, ER97-3127-000
           and ER97-2338-000 (Consolidated) --
           <u>Offers of Settlement</u>

Dear Ms. Cashell:

      Pursuant to Rule 602 of the Commission's Rules of
Practice and Procedure, 18 C.F.R. § 385.602, Montaup Electric
Company (Montaup) is herewith filing an original and fourteen
copies of a package of Offers of Settlement in Docket Nos.
ER97-2800-000, ER97-3200-000 and ER97-2338-000 together with
a single Explanatory Statement covering all such settlements.

      The settlement offers consist of: (1) A Stipulation and
Agreement by and between The Office of the Attorney General
of Massachusetts, the Division of Energy Resources, Edison
Electric Company and Montaup in Docket No. ER97-3127-000; (2)
A Stipulation and Agreement by and between the Rhode Island
Public Utilities Commission, the Rhode Island Division of
Public Utilities and Carriers, Blackstone Valley Electric
Company, Montaup and Newport Electric Corporation in Docket
No. ER97-2800-000; (3) A Stipulation and Agreement between
Montaup and the Pascoag Fire District of Rhode Island
(Pascoag) in Docket Nos. ER97-3127-000 and ER97-2800-000,
settling issues pertaining to the restructuring of their
current contract for Contract Demand Service; (4) A
Stipulation and Agreement between Montaup and the Gas and
Electric Department of the Town of Middleborough,
Massachusetts (Middleborough) in Docket Nos. ER97-3127-000
and ER97-2800-000, settling issues pertaining to the
restructuring of their current contract for Contract Demand
Service; (5)  A series of agreements between Montaup, on

POOR QUALITY ORIGINAL

POOR QUALITY ORIGINAL

FERC - DOCKETED

97 1031 - 0085 -1

OCT 2 9 1997

Hon. Lois D. Cashell        -2-            October 29, 1997

one hand, and the Taunton Municipal Lighting Plant, Pascoag and Middleborough, on the other, in Docket No. ER97-2338-000, settling issues pertaining to the provision of Transmission Service by Montaup to those three municipal customers.

The settlement offers are unanimously supported by all active parties to this consolidated proceeding.

If accepted and approved by the Commission, these Offers of Settlement would resolve all issues which have been set for hearing before Presiding Administrative Law Judge Lawrence Brenner.

In accordance with Rule 602(d), Montaup states that (i) copies of this filing are being served upon all participants in this proceeding and upon all other persons on whom the service agreements in the captioned dockets were served, and (ii) initial comments on the Offers of Settlement are due on or before November 18, 1997 and reply comments are due no later than November 28, 1997.

The Stipulations and Agreements that make up the Offers of Settlement tendered herewith are intended to enable Montaup's retail affiliates to implement the provisions of retail open access programs in Massachusetts and Rhode Island. On January 1, 1998, the Massachusetts retail open access program is scheduled to commence and the Rhode Island program is scheduled to undergo a significant expansion. In addition, the Stipulations and Agreements with Montaup's unaffiliated customers, Pascoag First District in Rhode Island and the Town of Middleborough, Massachusetts, are designed to restructure their power supply arrangements with Montaup, and it is important to place their new agreements into effect on January 1, 1998 also. For this reason, Montaup wishes to call to the Commission's attention the importance of acting on these settlement proposals in time to allow them to be placed into effect on January 1, 1998.

We are providing two courtesy copies of this filing to Presiding Judge Brenner.

We are also transmitting two additional copies of this filing and ask that your office date-stamp them to indicate

#60103201.1

Hon. Lois D. Cashell          -3-          October 29, 1997

their receipt and return them to us in the envelope provided
for that purpose.    Finally, we request that you call us
immediately if you have any questions about this filing.

                              Sincerely,

                              *Isaac D. Benkin*

                              Isaac D. Benkin
                              Counsel for Montaup
                                 Electric Co.

Atch.

cc: Judge Brenner
    All persons required to
        be served under Rule 602(d)

#60103201.1

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Montaup Electric Company )   Docket Nos. ER97-2800-000
) ER97-2338-000 and
) ER97-3127-000

EXPLANATORY STATEMENT TO ACCOMPANY
STIPULATIONS AND AGREEMENTS

Montaup Electric Company ("Montaup"), pursuant to Rule

602(c)(ii) of the Commission's Rules of Practice and Procedure,

18 C.F.R. § 385.602(c)(ii), submits this Explanatory Statement in

connection with four packages of settlement proposals intended to

dispose of all issues pending before the Commission in this

consolidated proceeding.

The four packages are as follows:

(1) A Stipulation and Agreement filed in Docket No.
ER97-2800-000 (referred to hereinafter as the "RI
Agreement") by and among the Rhode Island Public Utilities
Commission, the Rhode Island Division of Public Utilities
and Carriers, Montaup's affiliated customers in Rhode
Island, Blackstone Valley Electric Company ("Blackstone"),
Newport Electric Corporation ("Newport"), and Montaup.

(2) A Stipulation and Agreement in Docket No. ER97-
3127-000 (referred to hereafter as the "MA Agreement"), by
and among the Massachusetts Office of the Attorney General,
the Massachusetts Division of Energy Resources, Montaup's
affiliated customer in Massachusetts, Eastern Edison Company
("Eastern Edison"), and Montaup. 1/

---

1/   The MA Agreement is also jurisdictional to the Massachusetts
Department of Public Utilities ("DPU") and will be filed
with the DPU at a later date.  Montaup anticipates that the
original May 16, 1997 MA Agreement, as modified by a
compliance filing on October 10, 1997, will be acted upon by
the Massachusetts Department of Public Utilities ("DPU") on
or before November 9, 1997.  As discussed in the attached
press release issued by Montaup's parent, Eastern Utilities
Associates, the modified agreement reflects certain
technical changes which EUA expects will fully resolve the
(continued...)

NARR 23291

(3) Stipulations and Agreements between Montaup and its non-affiliated sales customers, the Pascoag, Rhode Island, Fire District ("Pascoag") and the Town of Middleborough, Massachusetts ("Middleborough") in Docket Nos. ER97-2800-000 and ER97-3127-000, incorporating by reference Agreements between Montaup and each of those customers (hereinafter referred to as the "Pascoag-Middleborough Transition Sales Agreements").  Those Agreements will replace Montaup's existing contracts for Contract Demand service ("CD contracts") to Pascoag and Middleborough with more flexible service arrangements and provide for Montaup's recovery of contract termination charges to compensate it for the loss of contract demand service to the non-affiliated customers.

(4) Stipulations and Agreements between Montaup and its three non-affiliated transmission customers, Pascoag, Middleborough and the City of Taunton's Municipal Lighting Plant ("Taunton") in Docket No. ER97-2338-000, providing for a transmission tariff service agreement for network transmission service and a network operating agreement between Montaup and each of those customers, under which Montaup will provide each of those customers with Network Integration Transmission Service (referred to hereinafter as the "NIS Agreements").

If accepted and approved by the Commission, the RI and MA Agreements would specify the terms and conditions for the termination of the wholesale electric requirements contracts between Montaup and Blackstone and Newport, Montaup's retail affiliates doing business in the State of Rhode Island (Docket No. ER97-2800-000), and between Montaup and Eastern Edison, Montaup's retail affiliate doing business in the Commonwealth of Massachusetts (Docket No. ER97-3127-000).

Montaup presently supplies all of its Affiliates' requirements for electricity.  Prior to the institution of this consolidated proceeding, all of the Affiliates were subject to a

---

1/ (...continued)
        outstanding issues in connection with the introduction of
        retail open access in Massachusetts.

#60102880.5                    -2-

NARR 23292

three-year notice provision in order to terminate their all-requirements contracts. To permit the Affiliates to participate in the phase-in of retail open access in Rhode Island and full retail access in Massachusetts, the Agreements provide for the modification of the three-year notice provision.

The RI Agreement implements the requirements of a Rhode Island statute, the Utility Restructuring Act of 1996, under which the first step of a three-step process introducing retail open access in that state commenced on July 1, 1997. The MA Agreement responds to an initiative of the Massachusetts Department of Public Utilities which has promulgated Model Rules establishing guidelines for restructuring utilities so that they can, and will, provide unbundled retail open access service. In addition, the Agreements reflect the Commission's policies under its Order No. 888, favoring wholesale competition. Hence, the Agreements present a unique circumstance: the Commission must approve the voluntary termination of wholesale requirements service in order to enable state-mandated or -sponsored retail competition programs to go forward. Therefore, the Agreements implicate important state interests and are consistent with the Commission's policy of "cooperative federalism," under which it strives to strike an appropriate balance between federal and state interests.

### The RI and MA Agreements

The significant features of the RI and MA Agreements are as follows:

#60102880.5                    -3-

NARR 23293

1. **Termination of Wholesale Service Agreements.**  The
signatories to the RI and MA Agreements agree that it is just and
reasonable and in the public interest to terminate the respective
obligations of Montaup, Newport, Blackstone and Eastern Edison
under their FERC Tariff First Revised Volume No. 1 ("Tariff No.
1") wholesale requirements service agreements in accordance with
the provisions of amendments to those service agreements which
are being submitted as part of this settlement (the
"Amendments").  Major provisions of the Amendments are as
follows:

     a.    The Amendments permit Newport and Blackstone to
reduce purchases of their wholesale requirements
from Montaup as of July 1, 1997, and for all the
Affiliates to terminate their purchases of
wholesale requirements service on or after January
1, 1998, upon 90 days' advance notice (or less
upon mutual consent of the parties) rather than
the three-years' notice provided for in the pre-
existing contracts.

     b.    The Amendments require each of the Affiliates to
pay Montaup Contract Termination Charges ("CTC")
commencing with the termination of its wholesale
requirements purchase obligation.  The CTC
payments will enable Montaup to recover an
allocable share of the costs it has incurred to
provide requirements service to each of these
Tariff No. 1 customers.  As detailed in a formula
included as part of each of the Amendments, these
costs include, for example, the costs associated
with Montaup's investments in generating assets,
Montaup's contractual commitments for purchased
power and fuel transportation, deferred costs and
other regulatory assets, nuclear post-shutdown
costs including decommissioning costs and employee
severance and retraining costs, together with a
return on unrecovered costs.  The Agreements
include a mechanism for resolving disputes that
may arise in the implementation of the CTC
formula.

     c.    Each of the Amendments requires Montaup to credit
against the respective Affiliate's responsibility
for CTC a proportionate share of the full market

#60102880.5                              -4-

NARR 23294

value of Montaup's generating business. Montaup has committed to divest itself of its generating assets and purchased power contracts. The allocable share of the net proceeds of the divestitures will be applied to reduce the responsibility of each of the Affiliates for CTC, rather than being retained by Montaup or its shareholders.

d.  The Amendments require Montaup to offer wholesale "Standard Offer Service" to the Affiliates after the termination of their Tariff No. 1 purchase obligations, at a fixed schedule of prices (subject to adjustment for a fuel index only) to enable the Affiliates to meet their obligations to provide continued service to their retail customers who choose not to avail themselves of the opportunity to acquire their retail power supplies from alternate suppliers. Although Montaup is obligated to supply wholesale Standard Offer Service to the Affiliates, the Affiliates are not obligated to purchase wholesale power from Montaup after the Contract Termination Date, as such date is defined in the Amendments applicable to the Affiliates. The Agreements and the Amendments reflect the fact that each of the Affiliates may choose to afford other suppliers the opportunity to bid to supply the power it needs to meet its obligations to retail customers after retail open access commences. This will provide greater opportunities for wholesale competition to develop in conjunction with the introduction of retail competition. Montaup's obligation to supply wholesale power at a preset rate will, moreover, afford a high level of assurance that all retail customers of the Affiliates will have an opportunity to benefit from the introduction of competition at the wholesale and retail levels.

e.  Base rates for the wholesale requirements service of Blackstone and Newport are frozen until the Contract Termination Date, as such date is defined in their Amendments. With respect to Eastern Edison, its base rates for wholesale requirements service are frozen until the earlier of December 31, 2000 or the Contract Termination Date, as such date is defined in the Amendment pertaining to Eastern Edison.

f.  Montaup commits to provide unbundled Network Integration Transmission Service to each of the Affiliates from and after the Contract Termination

NARR 23295

Date, as such date is defined in the Amendment applicable to that Affiliate.

2. **Divestiture of Generation Assets.** Montaup agrees to divest its generation assets and to attempt to divest its contractual entitlements to purchase power from third parties and its minority interests in nuclear power facilities. A proportionate share of the net proceeds received by Montaup through the divestiture will be credited against each of the Affiliates' respective obligation to pay CTC. Montaup's divestiture is subject to a final Commission order approving the method of sale and the reasonableness of the proceeds. Principal aspects of the divestiture are as follows:

a. In the event that Montaup retains the obligation to pay post-shutdown, decommissioning or site restoration costs with respect to its interests in nuclear generating facilities as part of the disposition of those interests, Montaup will be entitled to recover a proportionate share of those costs from the Affiliates through the CTC. In the event Montaup is unable to dispose of its interests in nuclear generating facilities, it will be entitled to recover 80 percent of the reasonable going-forward costs of operating the facilities through the CTC and will credit 80 percent of the revenues from the kilowatt-hour sales from its interests in the facilities in the calculation of the CTC. Montaup also agrees to present a proposed performance standard applicable to its nuclear facility interests and to support adoption at those facilities of a detailed procedure to be implemented in the event the decision is made to shut down any of those plants prematurely.

b. Montaup may recover in CTC paid by each of its Affiliates a proportionate share of the payments to power suppliers and other costs associated with buying out or buying down purchased power contracts. In the event Montaup is unable to dispose of its rights under those contracts, Montaup is expected to resell the power purchased under those contracts. The CTC will reflect both contract payments and revenues received from the

#60102880.5                    -6-

sale of power into the market. The Agreements also provide that Montaup may use its rights under those contracts to fulfill its backstop obligations to supply wholesale Standard Offer Service to the Affiliates.

3. **Emission Reductions.** Montaup agrees to reduce emissions of $NO_x$ and $SO_2$ from certain generating units by the amounts and on the schedule specified in an attachment to the MA Agreement. This requirement will also apply to the party or parties that might acquire the generating units upon their divestiture by Montaup.

4. **Other Matters.** The Agreements also reflect agreement on the following matters:

a. The signatories agree that market pricing is appropriate for sales from Montaup's generation.

b. The signatories agree to the appropriateness of the designation of Montaup's generating units as eligible facilities under section 32 of the Public Utility Holding Company Act.

c. The signatories agree that all of the facilities of Montaup and the Affiliates used for the delivery of electricity to retail customers (with the exception of a few specified facilities) are properly classified as distribution facilities subject to the ratemaking jurisdiction of the Rhode Island or Massachusetts state regulatory bodies, as appropriate. Nevertheless, the Agreements expressly provide that the Commission's acceptance or approval of the signatories' resolution of the above matters is not a condition of the Commission's acceptance and approval of the Agreements.

5. **Need for Assurances.** The Agreements recognize that Montaup is making substantial and irreversible commitments, including the divestiture of its generating business and the assignment of the Affiliates' share of the residual value of Montaup's generating assets for the benefit of the Affiliates and

#60102880.5                              -7-

their customers, primarily in consideration for an entitlement to the recovery of CTC from the Affiliates, determined in accordance with the particular Amendment applicable to each such Affiliate, over an extended period of time. To give effect to Montaup's reliance on the bargain reflected in the Agreements and the Amendments, the signatories to the RI and MA Agreements seek the Commission's assurance that it will, to the fullest extent permissible under the Federal Power Act, give permanent effect to Montaup's right to charge and recover the allocable amount of CTC from the Affiliates in accordance with the particular Amendment applicable to each such Affiliate. The Agreements specifically preclude application to the Commission for changes to the CTC formula, under either section 205 or section 206 of the Federal Power Act, absent Montaup's agreement (section 3.6) and call upon the Commission to refrain from revisiting the issue of the justness and reasonableness of the CTC or from limiting Montaup's right to recover in full the CTC contemplated by the Agreements (section 6.1).

Montaup recognizes that the Commission's responsibility to order changes in jurisdictional rates that are contrary to the public interest cannot be precluded by a settlement agreement. See El Paso Electric Co., 43 FERC ¶ 61,201 (1988). Nevertheless, the parties have concluded that, taken as a whole, the provisions of the Agreements, including Montaup's recovery of the CTC in full, are just, reasonable and consistent with the public interest. Significantly, the signatories reaching that conclusion with respect to the MA Agreement include the Attorney

#60102880.5                    -8-

General, who is authorized by Massachusetts law to represent the interests of Eastern Edison's retail customers in proceedings before this Commission. See Mass. Gen. Laws, c. 12, sec. 11E. With respect to the RI Agreement, the signatories include the Rhode Island Public Utilities Commission as well as the Rhode Island Division of Public Utilities and Carriers, acting through the Rhode Island Attorney General who is authorized to act on its behalf. These institutions are authorized under Rhode Island law to represent the interests of the retail customers of Blackstone and Newport in this proceeding. See R.I. Gen. Laws § 39-1-27.1 (Rhode Island Public Utilities Commission), § R.I. Gen Laws § 39-1-29 (Rhode Island Division of Public Utilities and Carriers).

The parties to the RI and MA Agreements have also recognized that the Agreements go well beyond the resolution of a single wholesale rate proceeding. Indeed, they provide the framework for the fundamental restructuring of the contractual relationships between Montaup and its Affiliates, committing Montaup to divestiture of its generating business in the process. In light of the gravity and the irreversible nature of the mutual commitments reflected in the Agreements, the parties seek to assure the continued vitality of those commitments to the greatest extent possible, consistent with the Commission's exercise of its statutory authority. As other regulatory agencies have done when they have approved similarly long-lived settlements, see Pacific Gas & Electric Co., 99 P.U.R. 4th 141 (Cal. Publ. Util. Com'n 1988), the Commission should indicate that it recognizes the unusual nature of the commitments in the

#60102880.5                     -9-

NARR 23299

Agreements, and will not disturb them absent an unequivocal showing that the public interest cannot be served in any other way.

### The Pascoag-Middleborough Transition Sales Agreements

Pascoag and Middleborough had protested Montaup's original filings in Docket Nos. ER97-2800-000 and ER97-3127-000 as adversely affecting their existing CD contracts with Montaup, pursuant to which these customers had purchased contract demand service. In its August 1, 1997 order accepting Montaup's filing in Docket No. ER97-3127-000 and consolidating it for hearing with Docket No. ER97-2800-000, the Commission ruled that the issues raised by Pascoag and Middleborough "are best pursued at the hearing we have ordered on Montaup's filing."

Montaup, on the one hand, and Pascoag and Middleborough, on the other, now wish to settle those issues in Docket Nos. ER97-2800-000 and ER97-3127-000 (as consolidated with Docket No. ER97-2338-000) regarding the impact of the filings on these customers' CD contracts by entering into new power supply agreements, restructuring their existing obligations to take and pay for contract demand electric service under the CD contracts. Under the new agreements, Montaup will receive certain compensation in connection with the termination of contract demand service under the pre-existing contracts. Copies of the new agreements are attached to and incorporated in the Stipulations and Agreements between Montaup and Pascoag and between Montaup and Middleborough (Attachment 1). They form an integral part of the settlement which we are now submitting to the Commission. In addition,

#60102880.5                          -10-

there are attached to the Stipulations and Agreements, as
Attachment 2, spreadsheets which the parties had before them
while negotiating the new agreements, demonstrating that, for
each of the customers, the new agreements produce cost savings
when compared with the rates they would have paid under their CD
contracts, which had previously been deemed just and reasonable
by the Commission.  It should be noted that the new agreements
produce rate decreases even when the customers' obligations to
make Contract Termination Charge payments are taken into account.

The Agreements between Montaup and Middleborough and between
Montaup and Pascoag provide for those customers to receive from
Montaup sales services tailored to the needs of the specific
customer in lieu of its old CD contract service.  Each of the
customers is given the right to reduce or terminate the amount of
its service upon 90 days' notice to Montaup.  Hence, the non-
affiliated customers will have the flexibility to continue to
receive service from Montaup or to purchase their electricity
needs from the evolving competitive bulk power market.

### The NIS Agreements

The transmission settlements are between Montaup, on the one
hand, and Middleborough, Taunton and Pascoag (collectively
"Municipals") on the other.  They consist of a transmission
tariff service agreement for network transmission service and a
network operating agreement between Montaup and each Municipal, a
letter agreement with Municipal stating the terms of the
settlement and an attachment to the letter stating the conditions
of the settlement.  The terms of the settlement --

NARR 23301

- Require Montaup and each Municipal to renegotiate their network operating agreement if NEPOOL and the ISO should cease to exist.

- Municipals have the right to terminate service on one year's notice.

- Include in the agreement for network service to Taunton a provision with respect to credit for the reactive power contribution of Taunton's generation in case NEPOOL no longer exists.

- Provide that 115 kV radial support provisions in the CD contract between Montaup and Middleborough shall remain in effect following the termination of contract demand service under that agreement, and that contracts pertaining to the E-1/115 kV radial and breaker are intended to be life-of-facilities agreements.

- Provide for use of current-month coincident demands in determining load ratio shares of Montaup's revenue requirement.

- Provide for revenue credits against each Municipal's load ratio share of Montaup's transmission revenue requirement for any revenues from retail transmission service which Montaup provides to customers within that Municipal's service area.

- Provide that Montaup shall not charge a Municipal customer for any ancillary services provided by NEPOOL for Montaup's load or such services billed directly by NEPOOL to them.

- Provide that Montaup shall not bypass a Municipal customer's distribution facilities and interconnect directly with a retail customer unless required to do so by order of the FERC or such state regulatory authority as may have jurisdiction.

- Provide that the network operating agreements and service agreements shall be revised to include any changes required as a result of FERC proceedings on transmission filings made by NEPOOL.

- Provide that Montaup will correct service agreements between Montaup and its affiliates to eliminate delivery points below 115 kV.

- Provide that Montaup will amend its tariff to make it clear that Pascoag will not be charged twice for the costs of 13.8 kV facilities used to serve Pascoag.

#60102880.5                    -12-

NARR 23302

- Provide that provisions for subtransmission service in the CD contract between Montaup and Pascoag shall remain in effect following the termination of contract demand service under that agreement, and that this subtransmission service shall apply to, and be available for, requests for transmission service to retail customers within Pascoag's service territory.

The negotiation of this package of agreements has involved a delicate balancing of many interests and a great deal of give and take among the parties.  We urge the Commission to act promptly and favorably upon this settlement and to allow the several agreements that make up the settlement to become effective on January 1, 1998 to enable Montaup and its customers to participate on schedule in the initiation of retail access in Massachusetts and the expansion of retail access in Rhode Island.

Respectfully submitted,
MONTAUP ELECTRIC COMPANY

Isaac D. Benkin
Marvin T. Griff
Winthrop, Stimson, Putnam & Roberts
1133 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 775-9800

Its Attorneys

Atch.

Dated: October 29, 1997

#60102880.5                    -13-

NARR 23303

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, D.C. this
29th day of October, 1997.

Isaac D. Benkin
Winthrop, Stimson, Putnam & Roberts
1133 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 775-9800

#60102880.5                              -14-

NARR 23304

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

|  |  |  |
|---|---|---|
| Montaup Electric Company | ) ) ) | Docket No.. ER97-2800-000 |

## STIPULATION AND AGREEMENT

ARTICLE 1.0
BACKGROUND

1.1    Parties.

This Stipulation and Agreement ("Agreement") is entered into by and among the Rhode Island Public Utilities Commission ("RIPUC"), the Rhode Island Division of Public Utilities and Carriers ("RI Division"), Montaup Electric Company (" Montaup"), Blackstone Valley Electric Company (" Blackstone") and Newport Electric Corporation ("Newport"). The foregoing entities are referred to as the Signatories.

Montaup is now obligated to sell electric energy at wholesale to meet the service area requirements of both Blackstone and Newport pursuant to its FERC Electric Tariff, First Revised Volume No. 1 ("Tariff 1"). The RIPUC and RI Division are authorized under the Rhode Island General Laws to participate in all proceedings before the Federal Energy Regulatory Commission (" FERC") with respect to the modification and/or termination of the wholesale Tariff 1.

A:\STIP&A~1.CLN

1.2    Introduction.

This Agreement is designed to implement a resolution of the issues presented by the restructuring of the contract relationship between Montaup and Blackstone and between Montaup and Newport arising out of the passage by the Rhode Island Legislature of the Utility Restructuring Act of 1996 ("URA").

Under Tariff 1, Montaup is obligated to sell to Blackstone and Newport, and Blackstone and Newport are obligated to purchase from Montaup, the requirements of their retail service territories, and they may only terminate those mutual obligations upon three years' notice. The Signatories to this Agreement desire to terminate those obligations earlier in order that retail choice in Rhode Island can proceed as set forth in the URA and in order to provide additional benefits to all electric consumers in Rhode Island.

The URA extends competition in power supply markets to retail customers through the provision of retail access directly to Blackstone's and Newport's customers. Termination of Tariff 1 and the provision of unbundled transmission service by Montaup to Blackstone and Newport under Montaup's open access tariff are both necessary to implement retail access in a manner consistent with the URA. In addition, the provisions of this Agreement provide additional assurance, beyond those reflected in the URA, that consumers will benefit from expanded competition in wholesale and retail power supply markets and that competition will take place on an open and non-discriminatory basis.

This Agreement, all provisions of which are interdependent, except where expressly stated otherwise, is intended upon its acceptance by FERC to provide a final and binding

A:\STIP&A-1.CLN                          - 2 -

resolution of all issues associated with the liquidation of the mutual sale and purchase

obligations under Tariff 1 and Blackstone's and Newport's Service Agreements with

Montaup. Nothing in the language of this Agreement shall be construed to permit Montaup,

Blackstone or Newport to recover more than once any of the charges authorized hereunder.

ARTICLE 2.0<br>AMENDMENT OF SERVICE AGREEMENT AND WHOLESALE RATE FREEZE

2.1     Amendment of Service Agreement.

The Service Agreements between Montaup and Blackstone and between Montaup

and Newport shall be amended in accordance with the Amendment to the Service Agreement

included in Attachments 1B and 1N ("Amendment"). The Signatories agree that the

Amendment sets forth rates and other terms for the termination of the reciprocal sale and

purchase rights and obligations of Montaup, Blackstone and Newport, including, without

limitation, provisions for the payment and collection of Contract Termination Charges, that

are just, reasonable and in the public interest.

2.2     Wholesale Rate Freeze

Blackstone and Newport are now served by Montaup under Montaup's wholesale

rate M-14 approved by FERC in Docket ER94-1062-000. As set forth in the Amendment,

the M-14 base rates in effect as of January 1, 1997 shall remain in effect for Montaup's

A:\STIP&A~1.CLN                                - 3 -

NARR 23307

service to Blackstone and Newport through the Contract Termination Date defined in Section
3.1 below. Nothing in this Agreement or the Amendment shall preclude Montaup from
petitioning FERC for modification of Montaup's fuel or purchase power clauses.

ARTICLE 3.0
CONTRACT TERMINATION

3.1     Contract Termination Date Defined .

        As specified in the Amendment, Montaup's obligations to provide requirements
service to Blackstone and Newport shall cease on the Contract Termination Date. The
Contract Termination Date shall occur on the earlier of the Retail Access Date or the
Wholesale Access Date, defined as follows:

        3.1.1  The Retail Access Date shall be the later of January 1, 1998 or the date
of a final, nonappealable order of the RIPUC approving the implementation methodology
for the disposition of Montaup's non-nuclear generating facilities, provided, however, the
Retail Access Date shall occur no later than three months after retail access is made available
to forty percent (40%) or more of the kilowatt-hour sales in New England, including the total
kilowatt-hour sales in Rhode Island, and in any event, not later than July 1, 1998.

        3.1.2  The Wholesale Access Date shall be the earlier of the Retail Access
Date or the date on which Blackstone or Newport in its sole discretion decides to terminate
purchases under Tariff 1 and its Service Agreement with Montaup by providing FERC and

A:\STIP&A~1.CLN                          - 4 -

the Signatories with 90 days advance notice in writing, or less with the mutual consent of the
parties, said date not to be earlier than January 1, 1998.

3.2    Contract Termination Charges .

Commencing on the Contract Termination Date, Blackstone and Newport shall pay
Montaup the Contract Termination Charges pursuant to the terms of the Amendment.  If this
Agreement is approved by FERC, the Amendment shall be deemed to be a just and
reasonable rate for wholesale electric service pursuant to the Federal Power Act and  FERC's
regulations.  The Contract Termination Charges under the Amendment shall apply to all
kilowatthours delivered by  Blackstone or Newport or their successors or assigns in
Blackstone's or Newport's Service Areas.   Service Areas  are defined to include the area
served by  Blackstone and Newport on December 1, 1996.  Kilowatthours delivered are
defined to include all kilowatthours delivered to electricity consumers in  Blackstone's or
Newport's Service Areas, whether or not they are present customers of Blackstone or
Newport.  The Base Contract Termination Charges shall equal the cents per kilowatthour
amounts shown on Schedule 1 of the Amendment.

The Base Contract Termination Charges shall recover  Blackstone's and Newport's
proportionate share of  Montaup's total contract termination costs shown in Schedule 1 to the
Amendment, which respective shares equal 29.13 percent and 11.85 percent of the total.
The Base Contract Termination Charges shall be subject to adjustments for a Residual Value
Credit described in Section 3.3 and a Reconciliation Account described in Section 3.4.

A:\STIP&A~1.CLN                              - 5 -

3.3     Residual Value Credit.

As set forth under Section 6.1 below,  Montaup has agreed to a divestiture of  its generation business within six months after the later of (1) the Retail Access Date as defined in  Montaup's settlement with  Eastern Edison Company ("Eastern") in Docket ER97-3127-000, or (2) the receipt of all governmental approvals necessary for such divestiture.  Within three months after the sale of any or all of Montaup's generating facilities or any other property subject to divestiture,  Montaup shall implement a Residual Value Credit as a direct offset to the Base Contract Termination Charges authorized under this Agreement.  The Residual Value Credit shall be deemed to be fully implemented upon completion of the initial divestiture process for  Montaup's non-nuclear generating facilities. The Residual Value Credit shall be calculated as set forth in  the Amendment.

3.4     Reconciliation Account.

The Base Contract Termination Charges shall be adjusted through a Reconciliation Account in which differences, whether positive or negative, between the estimates for costs and revenues included in the Base Contract Termination Charges and actual costs and revenues are added to or subtracted from the Base Contract Termination Charges from Montaup to Blackstone and Newport.  The Reconciliation Account shall be calculated as set forth in the Amendment.

3.5     Resolution of Disputes Associated with the Implementation of the Contract Termination Charge.

It is intended that disputes about the calculation of the Residual Value Credit, other than disputes about the method of sale or reasonableness of the proceeds and adjustments to

A:\STIP&A~1.CLN                         - 6 -

the Contract Termination Charges to Blackstone and Newport made by Montaup pursuant to sections 3.3 and 3.4, and the calculation of the purchased power mitigation incentive are, to the extent possible, to be resolved informally and, accordingly, such disputes may not be submitted to FERC until a good faith effort to achieve a consensual resolution has first been made by following the procedures prescribed herein, provided, however, nothing shall preclude FERC from examining any such adjustment including, without limitation, any capital addition made by Montaup after December 31, 1995, by opening its own investigation. Within 30 days after it has modified Blackstone's and Newport's Contract Termination Charges to reflect the Residual Value Credit or a Reconciliation Adjustment, Montaup shall submit to the Signatories, and to any person or entity that is to receive, under FERC's regulations, notice of Montaup rate filings affecting Blackstone and Newport, including, but not limited to the RIPUC and RI Division, an explanation of the adjustment including supporting workpapers. If a recipient desires to challenge any portion of the adjustment, it shall advise Montaup in writing identifying the basis for its dispute. Montaup shall, within 30 days, respond in writing. If the recipient is not satisfied with Montaup's further explanation it shall, within 15 days, notify Montaup in writing of any remaining disagreements and may request that Montaup convene a conference which is to be held within 30 days of such request. The Signatories are to receive from Montaup written notice of, and may participate at, any such conference and are to be provided all written communications relevant to the dispute. At such conference the participants are to make a good faith effort to resolve outstanding disputes. If, following exhaustion of the foregoing

A:\STIP&A~1.CLN                           - 7 -

procedure, a participant still disputes any portion of Montaup's adjustment, it may petition

FERC for appropriate relief.  A copy of such petition shall be served on the Signatories.

If, either as a result of the informal dispute resolution procedure or of FERC action,

it is determined that Montaup's calculation of the Residual Value Credit or Reconciliation

Account balances for Blackstone's and Newport's Contract Termination Charges were

inappropriate, the credit or charges shall nevertheless remain in effect for the balance of the

calendar year but Montaup shall adjust the Reconciliation Account for any such overcharge,

together with a return equal to that specified in Section 1.1.2 of Appendix 1 to the

Amendment, and shall reflect that adjustment in Blackstone's and Newport's Contract

Termination Charges effective January 1 of the following calendar year.


3.6    Formula For Contract Termination Charges Not Subject to Change.

The Contract Termination Charges reflected in this Agreement and in the Amendment

shall not be subject to change and shall remain in effect until Montaup has collected all

amounts subject to collection thereunder. Neither the formulae as set forth in Appendix 1 and

Schedules 1 and 2 to the Amendment nor the Contract Termination Charges recoverable

under this Agreement and the Amendment shall be subject to change through application to

FERC pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act,

absent the agreement of Montaup or its successors or assigns.


A:\STIP&A~1.CLN                    - 8 -

NARR 23312

3.7    Hold Harmless Deferral

Effective on July 1, 1997, Montaup shall institute a Hold Harmless Deferral

("HHD"), in accordance with Article 6 of the Amendment, to defer a portion of the M-Rate

Billings to Blackstone and Newport to ensure Blackstone and Newport are held harmless as a

result of the phase in of retail access in Rhode Island.

ARTICLE 4.0
TRANSMISSION

4.1    Montaup to Provide  Network Integration Transmission Service.

Effective on the Contract Termination Date, Montaup shall provide  Blackstone and

Newport Network Integration Transmission Service under Montaup's open access

transmission tariffs as filed and allowed to become effective from time to time, and on the

terms set forth in the Service Agreement for Network Integration Transmission Service

included as Attachments  2B and 2N to this Agreement.  The Network Integration

Transmission Service provided under the Service Agreement shall include transmission

service necessary for  Blackstone and Newport to provide transmission and distribution

access to retail customers.  The Signatories to this Agreement support the approval by

FERC of Attachments  2B and 2N as filed as part of this Agreement.  However, with the

exception of the commitments in the following paragraph, approval of Attachments  2B and

2N without change is not a condition of this Agreement.  Rather, with respect to

transmission access and pricing,  Montaup, Blackstone and  Newport will modify the

Transmission Service Agreement in a manner that is necessary to accommodate  FERC's

policy.

NARR 23313

In addition to the charges for Network Integration Transmission Service, in the event Blackstone or Newport is denied the ability to recover in its transition charges established for the provision of local distribution service the full amount of the Contract Termination Charges billed to them, Montaup or its successors and assigns shall be entitled to collect the unrecovered balance of the Contract Termination Charges as a surcharge on any rate paid for the transmission in interstate commerce of electric energy to Blackstone and Newport or to every consumer located in their Service Area that takes delivery of electric energy from the transmission facilities of Montaup and the distribution facilities of Blackstone and Newport. The amount of any such surcharge shall be submitted to the Federal Energy Regulatory Commission for review by a filing under section 205 of the Federal Power Act. Approval of this provision is a condition of this Agreement.

4.2    Separation of Transmission and Distribution Facilities.

In Order 888, FERC set forth a seven-factor test for determining whether facilities used to provide access to ultimate customers are subject to the ratemaking jurisdiction of FERC or of the RIPUC under state law. Blackstone and Newport have completed such an analysis for the jurisdictional separation of their facilities. The analysis was approved by the RIPUC on June 4, 1997 in Docket 2514, and is included as Attachment 3 to this Agreement. Based on that analysis, the Signatories agree that all of Blackstone's and Newport's facilities meet FERC's seven-factor test for designation as distribution facilities

A:\STIP&A~1.CLN                      - 10 -

subject to the RIPUC's jurisdiction with two exceptions. The first exception consists of the facilities that are paid for by Montaup pursuant to FERC Rate Schedules No. 19, No. 21 and No. 6. The Signatories agree that those facilities are transmission facilities subject to FERC's exclusive jurisdiction. The second exception consists of certain facilities that have in the past been classified as distribution plant and that are proposed to be retained by Blackstone and Newport as distribution although they could be classified as transmission under FERC's seven-factor test. The Signatories agree that since these instances of distribution plant that could also be classified as transmission are few in number and have a de minimis impact on the costs of either distribution or transmission service, and because classification of the facilities as transmission would be burdensome to Blackstone, Newport and Montaup, their historical classification as distribution plant should be retained. The Signatories to this Agreement therefore support the approval by FERC of the jurisdictional separation of facilities set forth in Attachment 3. However, approval of the jurisdictional separation of facilities without change is not a condition of this Agreement.

4.3    Sale of Assets.

If, within twelve years from the date of this Agreement, Montaup sells or spins off all or part of its transmission business to an entity that is not a regulated public utility or does not become a regulated public utility immediately following the acquisition, then Montaup will credit any net proceeds in excess of book value to the Reconciliation Account.

A:\STIP&A~1.CLN                    - 11 -

ARTICLE 5.0
TRANSITIONAL SERVICE

5.1    Standard Offer Service.

Standard Offer Service shall consist of the wholesale supply of power sufficient to meet the requirements of retail customers served by Blackstone's and Newport's distribution facilities that purchase Standard Offer retail service from Blackstone and Newport. For the period from the Contract Termination Date through December 31, 2009, Montaup shall provide Blackstone and Newport with Standard Offer Service.[1]  Standard Offer Service shall be provided at the prices shown below, adjusted for the fuel index set forth in Attachment 5 to this Agreement:

| Calendar Year | Price per kilowatthour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

The prices shown above shall be for electricity delivered to the meter of Blackstone's and Newport's ultimate customers, not including the charges for Blackstone's and Newport's

---

[1] Montaup, Blackstone and Newport shall have the right in their sole discretion to shorten the period of Standard Offer Service to December 31, 2004, if Blackstone and Newport no longer have the obligation under the Rhode Island URA to extend Standard Offer Service through 2009.

NARR 23316

distribution services or for Montaup's Network Integration Transmission Service, but including any and all transmission charges to reach Montaup's system that are not recovered in Blackstone's and Newport's transmission cost adjustment provisions. Standard Offer Service shall be available to Blackstone and Newport after the Wholesale Access Date or to their ultimate customers after the Retail Access Date. After those dates, Blackstone and Newport are free to reduce their purchases under the Standard Offer by pursuing other opportunities in the wholesale market, and their ultimate customers may terminate Standard Offer Service at any time to purchase from a non-regulated power producer as defined in Section 39-1-2(7.1) of the Rhode Island General Laws. Once Blackstone and Newport have reduced their wholesale purchases for those ultimate customers who have terminated Standard Offer Service, they may only elect to increase their purchase for any of Blackstone's and Newport's residential or small general service customers who have taken service from a non-regulated power producer within the first year after the Retail Access Date and such residential or small general service customer elects to return to Standard Offer Service within 120 days of taking service from such non-regulated power producer.

5.2    Right to Bid the Standard Offer.

Blackstone and Newport shall offer alternative suppliers the opportunity to bid on the provision of Standard Offer Service. Blackstone and Newport shall have the ability to defer the bid for standard offer service to coordinate with the Standard Offer Service auction of their affiliate, Eastern. The terms for the bid shall be as set forth in Attachment 4. Montaup shall be free to bid in such auction at prices less than those set forth in Section 5.1,

A:\STIP&A~1.CLN                        - 13 -

NARR 23317

provided, however, that, if suppliers do not bid to supply any part of the Standard Offer, Montaup, its successors or assignees shall guarantee to provide the unsubscribed portion of such service to Blackstone and Newport at the prices set forth in Section 5.1.

5.3    Assignment by Montaup of Unsubscribed Standard Offer Obligation through Divestiture

As Montaup has agreed to divest its generating business, as set forth in Article 6.0, it will assign the obligation to provide a share of the unsubscribed portion of Standard Offer service with each unit divested in proportion to that unit's contribution to providing Blackstone's and Newport's energy requirements. Montaup will have no further obligation for Standard Offer backstop service so assigned. Any Standard Offer service obligation remaining with Montaup after completion of the divestiture will be supplied first from Montaup's remaining power contracts then from Montaup's remaining nuclear units at the prices set forth in Section 5.1. Montaup will purchase capacity and energy to meet any obligatory Standard Offer Service at the prices set forth in Section 5.1 that cannot be served from Montaup's remaining purchase power and nuclear units.

5.4    Montaup's Obligation to Install Additional Generation Terminated.

Effective on the Contract Termination Date, Montaup shall have no further obligation to meet the electricity demands of Blackstone or Newport, and nothing in this Agreement shall be deemed to require Montaup to make any plan, investment, purchase, or commitment to maintain sufficient generating capacity to provide adequate, continuous, or reliable electricity supplies to Blackstone or Newport except as required to fulfill

A:\STIP&A~1.CLN                           - 14 -

# Tab 4

# (2 of 8)

Montaup's obligation under this Agreement to provide Standard Offer Service or as is expressly set forth in a separate power purchase contract between Montaup and Blackstone or between Montaup and Newport.

ARTICLE 6.0
DIVESTITURE AND MARKET PRICING OF MONTAUP'S GENERATION

6.1    Divestiture of Montaup's Generating Business.

6.1.1  Montaup agrees, subject to the receipt of all required governmental approvals, to lease, sell, spin off, or otherwise transfer ownership of its generating business to a nonaffiliated entity or entities, other than properties, assets, and entitlements classified to the transmission function. The parties intend that the properties to be divested shall also include: properties currently held in FERC Account 105 Land Held for Future Use - (Production) and FERC Account 121 Nonutility Property.   Montaup has developed and, on July 1, 1997 filed with FERC in Docket Nos. ER97-2800-000 and ER97-3127-000, a plan to implement divestiture.  This plan includes in particularized detail the generating business to be divested and all properties, assets, and entitlements to be included in the divestiture.  The divestiture shall be completed by six months after the later of the Retail Access Date as defined under the filing in Docket No. ER97-3127-000, or the receipt of all governmental approvals necessary for the transfer, and shall be updated with an informational filing 90 days before the date of divestiture.  FERC shall review the plan and shall issue a final order on the method of sale and the reasonableness of the proceeds as part of its plan approval.

NARR 23319

6.1.2   As part of the divestiture,  Montaup will endeavor to sell, lease, assign, or otherwise dispose of its minority shares of nuclear units or entitlements on terms that will assign ongoing operating costs and responsibility to a nonaffiliated third party, but may require  Montaup to retain the obligation for post-shutdown, decommissioning, and site restoration for these units or entitlements.  Montaup shall recover these post-shutdown, decommissioning, and site restoration costs from  Blackstone and Newport through the Contract Termination Charge, and shall credit any net positive value or recover any payments associated with such transaction in the Reconciliation Account of the Contract Termination Charge or the Residual Value Credit.  The  Signatories agree that this approach is reasonable and  Montaup is authorized to include it in its divestiture plan.  The transfer of nuclear entitlements will be subject to the approval of the Nuclear Regulatory Commission ("NRC") to the extent required by NRC regulations.  In the event that  Montaup is unable to sell, lease, assign, or otherwise dispose of its nuclear units or entitlements, Montaup shall include 80 percent of the reasonable going forward costs of operating the units and entitlements, including variable costs and capital additions on a cost of service basis,[2] and 80 percent of the revenues from kilowatthour sales from the units and entitlements, in the Reconciliation Account.  Within six months prior to implementing the Performance Based Rate set forth in the prior sentence, Montaup will consult with the Signatories on a performance standard for nuclear safety indicators and will file such performance standard

---

[2]In the event that the nuclear unit is retired before the end of its license life, the capital addition shall be amortized with a return over the remainder of the license or in accordance with its depreciation schedule, whichever is shorter.

NARR 23320

with a maximum potential credit for nonperformance of $250,000. Montaup shall also encourage and support a procedure for maintaining a detailed early shutdown plan at each nuclear unit in which it has an entitlement that can be updated easily and that can form the basis to expedite the preparation of a NRC Post-Shutdown Decommissioning Activities Report ("PSDAR") under 10 C.F.R. 50.82 in the event of early shutdown. Montaup's sales, if any, from its nuclear units shall not be made directly to retail customers of Blackstone and Newport, however these units may be used by Montaup to fulfill its backstop obligations under the Standard Offer.

6.1.3   As part of the divestiture, Montaup will endeavor to sell, assign or otherwise dispose of its power contracts on terms that will assign ongoing contract payments to a nonaffiliated third party. In that event, changes to the above-market payments to power suppliers and any buyout or buydown costs shall be reflected in the Reconciliation Account. In the event that such contracts cannot be sold, assigned, or otherwise disposed of, the power purchased from those contracts shall be sold and the contract payments and market value associated with the sale shall be reflected in the Reconciliation Account . Such sales, if any, shall not be made directly to retail customers of Blackstone and Newport, however, the contracts, including that with Hydro Quebec, may be used by Montaup to fulfill its backstop obligations under the Standard Offer. Nothing in this Settlement shall affect the rights of suppliers or Montaup under purchased power contracts.

6.1.4   The non-utility Signatories have expressed the goals of attaining a market valuation of utility stranded costs, creating a competitive market for supplying electricity to

A:\STIP&A~1.CLN                          - 17 -

consumers, and separating generating assets from the transmission system to assure comparability of transmission service.  They have expressed a preference for voluntary divestiture of utility generation as a means of achieving these goals.  Montaup, Blackstone and  Newport have agreed, as part of this Agreement, voluntarily to undertake such divestiture.  In exchange, and as consideration for this voluntary divestiture, the Signatories and  FERC by its approval of this Agreement, agree that  Montaup's Contract Termination Charges to Blackstone and Newport and, in the circumstances described in the second paragraph of section 4.1, to every consumer located in their Service Areas as set forth in the Amendment for the period contemplated by this Agreement are just and reasonable.  Accordingly, and to give effect to the reliance placed by the Signatories on the foregoing, FERC shall treat the finding that such Contract Termination Charges are just and reasonable as a final determination made after public notice and a full investigation of the merits, and, in any future proceeding brought by any person or party, or by  FERC on its own motion, shall accord such finding the full benefit of policies of repose including, without limitation, the application of the doctrines of res judicata, laches, collateral estoppel, the filed rate doctrine, the prohibition against retroactive ratemaking, and the finality of contracts, it being the express intention of the Signatories to prevent, as a matter of law and policy,  FERC or any other authority from: (1) revisiting the issue of the justness and reasonableness of the Contract Termination Charges; (2) reducing, other than as set forth in the Amendment, the amount of the Contract Termination Charges either directly or indirectly; and (3) or otherwise limiting the right of Montaup, its successors or assigns, to charge and recover the

A:\STIP&A – 1.CLN                                   - 18 -

NARR 23322

Contract Termination Charges set forth in this Agreement for any reason prior to their
recovery in full as contemplated by this Agreement.

6.2    Market Pricing of Montaup's Generation.

To facilitate the divestiture and valuation of Montaup's units, the Signatories agree
that it is in the public interest for Montaup or its successors or assigns to be authorized to
price its wholesale electricity sales subject to the FERC's jurisdiction at market prices. The
Signatories to this Agreement support the approval by FERC of market pricing for
Montaup's or its successors' or assigns' wholesale electricity sales after the Contract
Termination Date as part of its approval of this Agreement. However, such approval is not a
condition of this Agreement.

6.3    Exempt Wholesale Generator Status.

Effective upon appropriate findings by the two states in which Montaup provides
wholesale service to affiliate distribution companies, Montaup shall be authorized to apply
for status as an exempt wholesale generator under Section 32 of the Public Utility Holding
Company Act of 1935, and its entitlements in generating units shall become eligible facilities
under that statute. The Signatories agree that these designations as an Exempt Wholesale
Generator and eligible facilities will meet the statutory and regulatory standards for such
designation and are appropriate to increase the number of potential purchasers for the
market valuation of Montaup's assets. The receipt of Exempt Wholesale Generator Status is
not a condition to this Agreement.

NARR 23323

6.4     Re-entry into Business.

Nothing in this Agreement shall prevent Montaup or an affiliate from re-entering the generation business following the completion of divestiture, and nothing in this Agreement shall prevent Montaup or an affiliate from marketing electricity, other energy sources, or energy services to customers within or outside Blackstone's or Newport's Service Areas.

6.5     Environmental Commitments at Montaup's Facilities.

Subject to the DPU approving Eastern's Restructuring Settlement, Montaup or its successors in interest shall reduce the emissions of $NO_x$ and $SO_2$ from its Somerset Station and its share of Canal No. 2 by the amounts and on the schedule and terms set forth in Eastern's Restructuring Settlement.


ARTICLE 7.0
SUCCESSORS AND ASSIGNS

The rights conferred and obligations imposed on any Signatory by this Agreement shall be binding on or inure to the benefit of its successors in interest or assignees as if such successor or assignee was itself a Signatory hereto.


ARTICLE 8.0
ADDITIONAL PROVISIONS

8.1     This Agreement is the product of settlement negotiations. The content of those negotiations shall be privileged and all offers of settlement shall be without prejudice to the position of any party or participant presenting such offer.

A:\STIP&A~1.CLN                               - 20 -

8.2    The Signatories to this Agreement recognize and fully understand that their mutual promises in this Agreement evidence the consideration they have extended to each other in their efforts to settle the issues associated with the termination of the rights and obligations of Montaup, Blackstone and Newport to each other under Tariff 1, in connection with the introduction of wholesale and retail competition for electricity supplies in Blackstone's and Newport's Service Areas . The willingness and ability of Montaup, Blackstone and Newport to commit to and fulfill any and all of their obligations under this Agreement are predicated and conditioned upon FERC's approval of Montaup's Contract Termination Charges to Blackstone and Newport and the commitments by the other Signatories to this Agreement to such recovery.

8.3    Acceptance of this Agreement and the Amendment by FERC shall not be deemed to restrain FERC's exercise of its authority to promulgate future orders, regulations or rules which resolve similar matters affecting other parties in different fashion.

8.4    FERC's approval of this Stipulation and Agreement shall endure so long as is necessary to fulfill this Agreement's objectives. In the event of future regulatory or legislative actions which may render any part of this Agreement ineffective, Montaup shall nevertheless be held harmless and made whole for the payments it has agreed to accept as consideration for relinquishing its existing rights under Montaup's Tariff 1.

8.5    Except as expressly set forth above, this Agreement is submitted on the condition that it be approved in full by FERC and on the further condition that if FERC does not approve

A:\STIP&A-1.CLN                            - 21 -

NARR 23325

the Agreement in its entirety, the Agreement shall be deemed withdrawn and shall not

constitute a part of the record in any proceeding or used for any purpose.

IN WITNESS WHEREOF, each of the Signatories has executed Agreement, intending

to be bound by its terms.

A:\STIP&A – 1.CLN                                    - 22 -

NARR 23326

Montaup Electric Company                          FERC Docket No. ER97-2800-000
Settlement Agreement


Alan Shoer
Special Assistant Attorney General
Counsel for Rhode Island
Division of Public Utilities and Carriers

Office of the Attorney General
150 So. Main Street
Providence, RI 02903


October 9, 1997

Montaup Electric Company                    FERC Docket No. ER97-2800-000
Settlement Agreement


Robert G. Powderly
Executive Vice President


John D. Carney
President
Blackstone Valley Electric Company
Newport Electric Corporation


October 17, 1997


Q:\SETTLMNT\POWCAR.SIG

NARR 23328

Montaup Electric Company                    FERC Docket No.  ER97-2800-000
Settlement Agreement


Harvey L. Reiter
Counsel for Rhode Island
Public Utilities Commission

McCarthy, Sweeney & Harkaway, P.C.
1750 Pennsylvania Avenue, N.W.
Washington, DC  20006


October 17, 1997

NARR 23329

**ATTACHMENT 1B**

**PURCHASE OF ELECTRIC SERVICE FOR RESALE**
**AMENDMENT TO SERVICE AGREEMENT**

NARR 23330

MONTAUP ELECTRIC COMPANY

Purchase of Electric Service for Resale

AMENDMENT TO SERVICE AGREEMENT

Dated: October      , 1997

Parties:      MONTAUP ELECTRIC COMPANY
a Massachusetts corporation (the "Company")

and

BLACKSTONE VALLEY ELECTRIC COMPANY,
a Rhode Island corporation (the "Customer"),

WHEREAS, the Customer is currently an all-requirements electric customer of the

Company under the Company's FERC Tariff, First Revised Volume No. 1 (the "Tariff"),

and a Service Agreement as amended (the "Service Agreement"); and

WHEREAS, under the Service Agreement, the Customer purchases from the

Company for resale all of the electric requirements of the ultimate customers in the

Customer's service territory; and

WHEREAS, the Rhode Island  Legislature passed into law the Rhode Island Utility

Restructuring Act of 1996 ("URA"), which extends wholesale competition in power supply

markets to retail customers through the provision of retail access; and

WHEREAS, termination of all-requirements service under the Tariff and the provision

of unbundled transmission service by the Company to Customer under the Company's open

access tariff are necessary to implement retail access in a manner consistent with the URA;

and

WHEREAS, the Customer desires to comply with the URA which mandates a

reduction in the purchase of its energy requirements from the Company under the Tariff

before the term of the Service Agreement has expired and the Customer further desires to

retain the flexibility to terminate all purchase requirements under the Tariff on the Contract Termination Date, as defined in Section 3 of this Amendment; and

WHEREAS, the Customer desires to continue to receive transmission service over the transmission facilities owned or operated by the Company after the termination of its purchases under the Tariff; and

WHEREAS, the Customer desires to retain the option, but not the obligation, to purchase electricity from the Company after the termination of its purchases under the Tariff or the option for the ultimate customers in the Customer's service territory to do so; and

WHEREAS, the Company is willing to permit the Customer to terminate its purchase requirement before the Term has expired and to provide the options desired by the Customer, but only upon the terms and conditions set forth in this Amendment to Service Agreement ("Amendment"),

NOW, THEREFORE, the Company and the Customer, in consideration of their mutual commitments set forth herein, agree as follows:

1.    The Parties agree that, notwithstanding anything to the contrary in the Service Agreement or in the Tariff, the Customer's obligation to purchase energy under the Service Agreement and the Company's obligation to provide energy under the Service Agreement shall be reduced as of July 1, 1997, in accordance with the Retail Access Schedule (as defined in Section 2 of this Amendment) and shall terminate as of the Contract Termination Date, which shall be determined pursuant to Section 3 of this Amendment.  Except as provided in Section 10 below, or in a separate contract for power supply, the Company shall have no further obligation to meet the electricity demands of the ultimate customers in the service territory of the Customer on or after

2

Attachment 1B

the Contract Termination Date, or to make any plan, investment, purchase, or
commitment to maintain sufficient generating capacity to provide adequate,
continuous, or reliable electricity supplies to the Customer or its ultimate customers
on or after such date.

2.    Commencing on July 1, 1997, the Customer shall not be obligated to purchase, and
the Company shall not be obligated to supply, energy required by any distribution
service customer of the Customer, or its successor or assign, that is taking retail
access in accordance with the following schedule ("Retail Access Schedule"):

Phase 1:    On July 1, 1997, the following customers shall have retail access: (i)
all new commercial and industrial customers, including new
manufacturing customers, commencing service on or after July 1, 1997,
with an anticipated average annual demand of two hundred (200)
kilowatts or greater; (ii) all existing manufacturing customers with an
average annual demand of fifteen hundred (1500) kilowatts or greater;
and (iii) all accounts in the name of the State of Rhode Island,
provided, however, the Customer may limit retail access to no more
than ten percent (10%) of its total kilowatt-hour sales.

Phase 2:    On January 1, 1998, retail access shall be extended to the following
customers: all existing manufacturing customers with an average annual
demand of two hundred (200) kilowatts or greater and all accounts in
the name of the cities and towns in Rhode Island, provided, however,
the Customer may limit retail access to no more than twenty percent
(20%) of its total kilowatt-hour sales.

3

NARR 23333

Phase 3:    The remaining customers shall have retail access on the earliest to
            occur of: (i) July 1, 1998; (ii) within three months after retail access is
            available to forty percent (40%) or more of the kilowatt-hour sales in
            New England including the total kilowatt-hour sales in Rhode Island,
            provided, however, if the Rhode Island Public Utilities Commission
            ("RIPUC") extends the deadline beyond July 1, 1998, then the
            remaining customers shall have access on the extended date established
            by the RIPUC; or (iii) the Retail Access Date defined in Section 3(a).

3.    Montaup's obligations to provide requirements service shall cease on the Contract
Termination Date.  The Contract Termination Date shall occur on the earlier of the
Retail Access Date or the Wholesale Access Date, defined as follows:

(a) The Retail Access Date shall be the later of January 1, 1998 or the date of a final
nonappealable order of the RIPUC approving the implementation methodology for the
disposition of Montaup's non-nuclear generating facilities, provided, however that the
Retail Access Date shall occur no later than three months after retail access is made
available to forty percent (40%) or more of the kilowatt-hour sales in New England,
including the total kilowatt-hour sales in Rhode Island and, in any event, not later
than July 1, 1998.

(b) The Wholesale Access Date shall be the earlier of the Retail Access Date or the
date on which the Customer in its sole discretion decides to terminate purchases under
Tariff 1 and its Service Agreement with Montaup by providing FERC and the
Signatories with 90 days advance notice in writing, or less with the mutual consent of
the parties, said date not to be earlier than January 1, 1998.

4

4.    For service under the Tariff commencing July 1, 1997 and continuing to the Contract

Termination Date, the Company shall continue to charge and the Customer shall

continue to pay the Demand and Energy Charges shown on Sheet No. 4 as revised,

which sets forth the M-14 rates, and the Company shall defer a portion of the M-Rate

billings to the Customer to ensure that the Customer is held harmless as a result of

the phase-in of retail access in Rhode Island.

5.    The Customer agrees that its Billing Determinants for calculating Demand Charges

shall apply to all kilowatts recorded by the Customer in the Customer's service territory.

The Customer further agrees that its Billing Determinants for calculating Energy Charges

shall apply to all kilowatt-hours recorded by Customer less all kilowatt-hours recorded by

Customer as supplied by a Non-Regulated Power Producer ("NRPP") as that term is defined

in the URA.6. The Company agrees to defer a portion of the Demand Charges in

accordance with the following formula:

Hold Harmless Deferral (HHD) = $(amdr * kW_{retail\ access}) - (TC\ per\ kWh\ * kWh_{retail\ access}) - Trans_{Retail}$

Where:

a) average monthly demand rate:

$$amdr = \frac{Base \pm PCAC}{kW_{cp}}$$

b) Base - Base Rate Demand Charges (initial and tail block charges) as specified in the Company's effective rate under Section III and applied to the full requirements of the Customer.

c) PCAC - Purchased Capacity Adjustment Clause rate as provided for in the Company's effective rate under Section III B and applied to the initial block of the full requirements of the Customer.

d) $Trans_{Retail}$ - Represents Transmission billings, for all kWh gone to retail choice

e) $^{(1)}kW_{cp}$ - The Customer's coincident peak demand in kilowatts, including kW gone to

5

Attachment 1B

retail choice.

f) $^{(1)}kW_{retail\ access}$ & $kWh_{retail\ access}$ - kW demand and associated energy gone to retail choice.

g) TC - Transition Charge, initially set at $0.028 per kWh per the URA and revised from time-to-time as approved by the Commission.

(1) Adjusted for losses to the wholesale metering points.

7.   The Company shall record the HHD as a regulatory asset on its books as a receivable, and the Customer shall record on its books a corresponding payable, owed to the Company at the completion of the Company's divestiture of its non-nuclear generating facilities in accordance with Section 1.1.4(c)(ii) of Appendix 1. The Company shall mitigate the HHD upon the reconciliation of the 1997 Purchase Capacity Adjustment Clause by allocating that portion of the Sales Credit which can be attributed to the sales of capacity resulting from $kW_{retail\ access}$.

8.   Commencing on the Contract Termination Date, the Customer shall pay to the Company the Contract Termination Charges determined in accordance with Appendix 1 and Schedules 1 and 2 to this Amendment, which sets forth Base Contract Termination Charges and formulae for the adjustment of the Base Contract Termination Charges. The Contract Termination Charges shall apply to all kilowatt-hours delivered by the Customer, or its successor or assign, in the Customer's Service Area, whether or not such kilowatthours are sold by the Customer. The Customer's Service Area is defined to include the area served by the Customer on December 1, 1996. Kilowatt-hours delivered are defined to include all kilowatt-hours delivered to electricity consumers in the Customer's Service Area, whether or not they are present customers of the

6

NARR 23336

Customer. The Base Contract Termination Charges shall equal the cents per kilowatt-hour amounts shown on Schedule 1.

The Base Contract Termination Charges shall recover the Customer's proportionate share of the Company's total contract termination costs shown in Schedule 1, which share equals 29.13 percent of the Company's total contract termination costs. The Base Contract Termination Charges shall be subject to adjustments for a Residual Value Credit described in Appendix 1. The Base Contract Termination Charges shall be adjusted through a Reconciliation Account in which differences, whether positive or negative, between the estimates for costs and revenues included in the Base Contract Termination Charges and actual costs and revenues are subtracted from the Base Contract Termination Charges from the Company to the Customer.

9.  Notwithstanding anything to the contrary in the Tariff or the Service Agreement, the Contract Termination Charges specified in Appendix 1 and Schedules 1 and 2 to this Amendment shall remain in effect until the Company has collected all amounts subject to collection thereunder and neither the Customer's obligation to pay the Contract Termination Charges in full nor the formulae for the calculation of the Contract Termination Charges set forth in Appendix 1 and Schedules 1 and 2 to this Amendment shall be subject to change by the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act, absent the agreement of the Company or its successors or assigns.

10. The Company shall provide "Standard Offer Service" to the Customer commencing on the Contract Termination Date and continuing for the period through December 31, 2009 (the "Standard Offer Period"). Standard Offer Service, shall consist of the

7

wholesale supply of power sufficient to meet the requirements of retail customers served by the Customer's distribution system that purchase Standard Offer retail service from the Customer.

(a)    Standard Offer Service shall be made available at the prices set forth in the Stipulation and Agreement adjusted for a fuel index. The prices for Standard Offer Service shall be for electricity delivered to the meter of Customer's ultimate customers, not including the charges for Customer's distribution services or for the Company's Network Integration Transmission Service, but including any and all transmission charges to reach the Company's system that are not recovered in Customer's transmission cost recovery provisions.

(b)    Standard Offer Service shall be available to Customer after the Contract Termination Date. After that date, Customer, in its sole discretion, is free to reduce its purchases under the Standard Offer by pursuing other opportunities in the wholesale market, and Customer's ultimate customers may terminate Standard Offer Service at any time to purchase from a nonregulated power producer as defined in Section 39-1-2(7.1) of the Rhode Island General Laws. Once Customer has reduced its wholesale purchases for those ultimate customers who have terminated Standard Offer Service, it may only elect to increase its purchase for resale to any of Customer's residential or small general service customers who: (1) purchased power from Customer immediately prior to the Retail Access Date; (2) begin to purchase power from a nonregulated power producer on or within one year of the Retail Access Date; and (3) elect to return to Standard Offer Service within 120 days of taking service from such nonregulated power producer.

8

NARR 23338

(c)    In the event the Contract Termination Date is determined by the Wholesale

Access Date, the Customer shall be free, either in its notice pursuant to Section 3(b),

or thereafter by giving the Company at least 90 days advance written notice directed

to the first day of a calendar month, to terminate or reduce its purchases of Standard

Offer Service from the Company in order to obtain electricity from other suppliers in

the market.  Once the Customer has reduced or terminated its purchases of Standard

Offer Service from the Company, the Company shall have no obligation to supply

Standard Offer Service to the Customer with respect to the terminated or reduced

purchases, except as provided for in Section 10(b).

(d)    No less than 90 days before the Retail Access Date, the Customer shall notify

the Company in writing of its estimate of the capacity and energy it shall purchase

under Standard Offer Service for resale to ultimate customers in its service territory.

The Customer shall provide the Company with at least 30 days prior advance written

notice, directed to the first day of a calendar month, of reductions in the quantity of

energy so purchased due to decisions by Standard Offer Service customers to purchase

electricity from other nonregulated power producers after the Retail Access Date.

Nothing in this Amendment shall restrict the right of any ultimate customer to

purchase electricity from nonregulated power producers after the Retail Access Date,

provided that, except as set forth in Section 10(b) above, once any such ultimate

customer has purchased electricity from a nonregulated power producer, the Company

shall have no obligation to supply Standard Offer Service to the Customer for resale

to such ultimate customer.

(e)    The Company acknowledges that the Customer will offer alternative power

9

Attachment 1B

suppliers the opportunity in an auction to supply electricity to enable the Customer to provide Standard Offer Service to ultimate customers in its service territory after the Retail Access Date. The Company, its successors or assigns, shall be free to bid in the auction, provided that the Company's bid shall not exceed the prices set forth in the Stipulation and Agreement, adjusted for the fuel index set forth in that Agreement.

11. Commencing on the Contract Termination Date, the Company (including any successor or assign of the Company that succeeds to the Company's obligations with respect to the operation of its transmission facilities) shall, upon request of the Customer, provide network integration transmission service to the Customer in accordance with the Service Agreement for Network Integration Transmission Service between the Customer and the Company of even date, and with the terms and conditions of the tariff or successor tariff or tariffs for such service in accordance with the policy of the Federal Energy Regulatory Commission as in effect from time to time. Such service shall be provided to the Customer after the Wholesale Access Date to enable the Customer to integrate its loads and resources and shall be provided to the Customer after the Retail Access Date to enable the ultimate customers in the Customer's service territory to integrate their loads and resources.

12. This Amendment shall take effect as of the date it is permitted to become effective by FERC, which date shall be referred to as the "Effective Date." This Amendment, together with all provisions of the Tariff and the Service Agreement necessary to effectuate all provisions of this Amendment, shall remain in effect until all obligations of the parties under this Amendment, including, without limitation, the obligation of the Customer to pay to the Company the Contract Termination Charges, have been

10

discharged in full. Upon the discharge in full of all such obligations, this Amendment and the Service Agreement shall terminate.

13.    The provisions of this Amendment shall override any inconsistent provisions of the Service Agreement and, with respect to the Customer, all inconsistent provisions of the Tariff, but all provisions of the Tariff and the Service Agreement that are not inconsistent with this Amendment shall remain in full force and effect.

14.    The rights conferred and obligations imposed on the parties to this Amendment shall be binding on or inure to the benefit of their successors in interest or assignees as if such successor or assignee was itself a party hereto.

11

NARR 23341

Attachment 1B

IN WITNESS WHEREOF, the parties have executed this Amendment of Service
Agreement as of the date first written above.

MONTAUP ELECTRIC COMPANY

By _____
Robert G. Powderly

Title:   Executive Vice President

BLACKSTONE VALLEY ELECTRIC COMPANY

By _____
John D. Carney

Title:   President

12

NARR 23342

**APPENDIX 1**

FORMULA FOR CALCULATING CONTRACT TERMINATION
CHARGES

NARR 23343

Appendix 1

MONTAUP ELECTRIC COMPANY
AMENDMENT TO SERVICE AGREEMENT WITH
BLACKSTONE VALLEY ELECTRIC COMPANY UNDER
FERC ELECTRIC TARIFF, FIRST REVISED VOLUME NO. 1
FORMULA FOR CALCULATING CONTRACT
TERMINATION CHARGES

1.1    The Fixed Component of the Contract Termination Charge shall include Blackstone

Valley Electric Company's ("Blackstone") 29.13 percent allocated share of Montaup's costs

as shown on Schedule 1, Page 2, which shall include:

1.1.1   Revenues sufficient to amortize over a twelve year period commencing on

January 1, 1998 and continuing through December 31, 2009 the following plant

balances and regulatory assets:

(a)    Plant balances shall include unrecovered net book value as shown on Schedule

1, Page 4, Column (7), of the following Montaup generation-related

investments as of December 31, 1997,[1] excluding any capital additions made

after December 31, 1995:

(i)     Somerset Unit 6, Jet 1 and Jet 2 including general plant allocated to
generation;
(ii)    Montaup's ownership Share of Canal Unit 2, including capital
additions past December 31, 1995, but committed prior to that date;
(iii)   Montaup's and Newport's ownership share of Wyman Unit 4;
(iv)    Montaup's ownership share of Millstone Unit 3;
(v)     Montaup's ownership share of Seabrook Unit 1;
(vi)    Montaup's Entitlements in the Maine Yankee and Vermont Yankee
Units, including the balances for materials and supplies;

---

[1]The figures shown on Schedule 1, Page 4, Column (7) are estimates and will be updated for
actual balances as of December 31, 1997.  Changes, if any, shall be reconciled at the Divestiture
Date.

C:\FORMUL~1.RED                                     1

NARR 23344

Appendix 1

(vii)   Newport's generation related investment in the Diesel Units at Jepson and Eldred;

(viii)  Step-up transformers at Montaup generating units which are excluded from Montaup's transmission rates;

(ix)    Montaup's non-utility property; and

(x)     Generation-related property held for future use including net investment in Somerset Unit 5, through November 1, 1997, per settlement agreement in Docket ER94-1062-000.

(b)    Regulatory assets shall include the generation-related unrecovered net book

balances shown in Schedule 1, Page 5, Column (2), as of December 31,

1997[2/]:

(i)    FAS 109;

(ii)   Net pension liability/(asset) of Montaup and allocated to Montaup by affiliates to the extent that they exceed 5% of the greater of the total pension benefits obligation or the fair market value of plan assets.

(iii)  Unamortized deferred FAS 106 costs;

(iv)   Unamortized deferred dredging costs;

(v)    Unamortized ITC; and

(vi)   Montaup's share of unamortized debt expense recorded on the balance sheet of its parent, Eastern Edison Company.

1.1.2  Revenues sufficient to provide an overall pre-tax return of 11.34 percent based

on a combined state and federal income tax rate of 39.225 percent, and Montaup's

1995 year-end capital structure as shown in Schedule 1, Page 14, Column (8),

including a return on common equity of 9.2 percent for the period prior to the

completion of the initial divestiture process for  Montaup's non-nuclear generating

---

[2/]The figures shown on Schedule 1, Page 5, Column (2) are estimates and will be updated for actual balances as of December 31, 1997.   Changes, if any, shall be reconciled at the Divestiture Date.

C:\FORMUL~1.RED                         2

NARR 23345

Appendix 1

facilities ("Divestiture Date")[3], and sufficient to provide an overall pretax return of 13.09 percent including a return on common equity of 11.4 percent for the period after the Divestiture Date,[4] multiplied by the average of the beginning and ending balances in each calendar year beginning in 1998 of the sum of the following:

(a)     Unrecovered net book value of Montaup's generation investments as defined under 1.1.1(a) above, plus

(b)     Unrecovered net book value of generation-related Regulatory Assets as defined under 1.1.1(b) above, excluding the unamortized ITC under 1.1.1(b)(v), less

(c)     Deferred Taxes as shown in Schedule 1, Page 13, Column (9), equal to the combined state and federal income tax rate of 39.225 percent, which shall be adjusted for changes in tax laws, multiplied by the sum of:

(i)     the unrecovered net book value of Montaup's generation investment, plus

(ii)     the unrecovered net book value of generation-related regulatory assets, less

---

[3]If Montaup sells its non-nuclear generating facilities in more than one transaction, the rights and obligations associated with the divestiture shall be allocated among the transactions using appropriate allocators. In the case of return, the allocator shall be based on the net book value of the sold facility or facilities to total net book value of the non-nuclear generating facilities in Section 1.1.1(a). This percentage allocation shall be applied to the total of plant, regulatory asset balances, and deferred tax balances as set forth below.

[4]The difference between the 11.34 percent and 13.09 percent returns as applied to unamortized balances prior to the Divestiture Date shall be recovered, if divestiture occurs, through an offset to the Residual Value Credit, and the difference between the 11.34 percent and 13.09 percent returns that occurs after the Divestiture Date shall be included in the Reconciliation Account. The 11.34 percent and 13.09 percent returns shall be used as the return wherever a return is referenced throughout this Appendix. However, the 13.09 percent return after the Divestiture Date shall be adjusted in accordance with Section 1.1.4(d). Notwithstanding the above, an equity return of 9.2% will be applied to Montaup's equity investment in the Ocean States Power facility for purposes of estimating Contract Termination Charges under the Amendment.

C:\FORMUL~1.RED                                    3

NARR 23346

    (iii)   the unrecovered balance of generation investment for tax purposes, less

    (iv)   the unrecovered balance of generation-related regulatory assets for tax purposes.

1.1.3 Revenues sufficient to:  (i)  amortize over a twelve year period commencing on January 1, 1998 and continuing through December 31, 2009 the generation-related, unrecovered net book balances associated with the FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates[5]; and (ii) pay a return of 7.25 percent equal to the interest rate reflected in the actuarial analysis of the FAS 106 Transition Obligation of  Montaup and allocated to Montaup by affiliates multiplied by the outstanding balances remaining for the FAS 106 Transition Obligation of Montaup and allocated to Montaup by affiliates.  Following the Divestiture Date, these outstanding balances shall be subject to a one time adjustment as set forth in Section 1.1.4(b) below.  At the same time, the interest rate return for the period after the Divestiture Date shall be established using the most current actuarial analysis available at the time, which rate shall remain in place for the remainder of the fixed cost recovery period.

1.1.4 The Fixed Components shall be subject only to the following adjustments:

    (a)   For each month that the Contract Termination Date is delayed beyond January 1, 1998, Montaup shall adjust the Reconciliation Account in the Variable Component of the Contract Termination Charge by an

---

[5] Any FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates that is not allocated to generating facilities shall be deemed transmission related.

NARR 23347

amount equal to the difference between the depreciation and
amortization expense authorized under the M-14 rate and the
depreciation and amortization under Section 1.1.1, together with the
associated return computed in accordance with Section 1.1.2 of this
Appendix, multiplied by Blackstone's 29.13 percent allocated share.
An exhibit showing the difference between depreciation and
amortization under the M-14 rate and the Contract Termination Charge
is included in Schedule 2.

(b)     Following the Divestiture Date and at the time of implementing the
Residual Value Credit, Montaup shall reconcile the balances in
Sections 1.1.1 and 1.1.3 for Blackstone's 29.13 percent allocated share
of (i) the unrecognized transition obligation, prior service cost, and
unrecognized gains or losses associated with the FAS 106 obligation;
and (ii) the unrecognized transition obligation, prior service cost, and
unrecognized gains or losses associated with the FAS 87 obligation, but
the gains or losses associated with FAS 87 shall be recognized only to
the extent that they exceed five percent of the greater of total pension
benefits obligation or fair market value of plan assets. Montaup shall
fund the FAS 106 and FAS 87 obligations under this Section and
Section 1.2.2(f) as rapidly as permitted by the tax law up to the level of

NARR 23348

revenues collected for this purpose.[6] Any revenues associated with
these obligations that cannot be immediately funded shall be put into a
separate account on the books to be reserved with the return specified
in Section 1.1.3 until tax deductible funding becomes possible. The
one-time adjustment associated with FAS 106 and FAS 87, whether
positive or negative, shall be subtracted from or added to the schedules
for prospective recovery of FAS 106, as appropriate, and amortized
with the return specified in Section 1.1.3 over the period between the
sale and December 31, 2009. An exhibit showing the reconciliations is
included in Schedule 3, page 1. In addition, Montaup shall reconcile
the balances for Blackstone's 29.13 percent allocated share of (i) the
FAS 109 regulatory asset; and (ii) the general plant allocated to
generation, provided, however, that any general plant not allocated to
generation shall be functionalized to transmission. The one-time
adjustment associated with differences in the balances for FAS 109 and
general plant, whether positive or negative, shall be subtracted from or
added to the net proceeds reflected in the Residual Value Credit as
appropriate and shall be amortized, with the return specified in Section
1.1.2, over the period between the sale and December 31, 2009.

---

[6]Montaup's post-divestiture FAS 106 or FAS 87 gains or losses recognized on Montaup's books
shall be fully reflected in rates to customers and shall neither be retained nor borne by Montaup.
Montaup shall propose an allocation of these post-divestiture gains or losses between customers
paying Contract Termination Charges and transmission customers.

NARR 23349

# Tab 4

# (3 of 8)

(c)     Montaup has agreed to divest its generating business within six months

after the later of the Retail Access Date as defined in the Settlement

filed in Docket ER97-3127-000 or the receipt of all governmental

approvals and other consents necessary for the divestiture.  Within

three months after the completion of divestiture or the sale of any

property,[7] the cost of which is included in the Contract Termination

Charge, Montaup shall implement a Residual Value Credit as a direct

offset to the Contract Termination Charges authorized under this

Amendment.  The Residual Value Credit will be deemed to be fully

implemented upon completion of the initial divestiture process for

Montaup's non-nuclear generating facilities.  Proceeds from the

divestiture which are realized after the full implementation of the

Residual Value Credit will be reflected in the variable component of the

CTC as hereinafter described.  The Residual Value Credit to

Blackstone shall be calculated as follows:

(i)     Blackstone's 29.13 percent allocated share of Total Proceeds[8]

---

[7]Proceeds, if any, from Montaup's future leases of nuclear entitlements will also be flowed
through the Residual Value Credit if such proceeds can be definitively calculated at the time the
Residual Value Credit is determined.  The proceeds from leases determined after the Residual Value
Credit is set will be flowed through the Reconciliation Account as received.

[8]As part of the terms of the Divestiture, Montaup shall require the buyer of the facility to pay
Montaup the net book value for all inventories and materials and supplies associated with the
generating facility.  As a result, inventories and materials and supplies for Montaup's non-nuclear
facilities are excluded from the plant balances under Section 1.1.1, and shall be excluded from the
calculation of the Residual Value Credit.  In addition, the Buyer may assume other obligations that

C:\FORMUL~1.RED                          7

NARR 23350

Appendix 1

equal to the sale price and other consideration received by

Montaup excluding $15 million[2] which purchasers will be

required to pay into an account for employee benefits pursuant to

Section 1.2.2(f), less

(ii)    The revenues lost or gained by Montaup between July 1, 1997

and the Divestiture Date measured by the difference between the

revenues excluding revenues attributable to items included in the

Contract Termination Charge or in Montaup's transmission rates,

that Montaup would have collected under Rate M-14 had it

continued to make the sales to Blackstone under Tariff 1 and the

revenues, excluding transmission revenues and Contract

Termination Charge revenues, that it actually collected from sales

to Blackstone's customers during the period, together with a credit

for Blackstone's share of the revenue from sales at no less than

market prices made by Montaup to third parties during the period,

provided, however, the lost revenues so calculated shall not

exceed $0.008 per kilowatthour multiplied by the number of

---

are included in the variable component of the Contract Termination Charge. Montaup reserves its right to revise the variable cost estimates and the amortization of fixed cost components in Schedule 1 to reflect the assignment of obligations to the purchasers, if such revision is necessary to maintain a stable and declining pattern of Contract Termination Charges as offset by the Residual Value Credit.

[2]This figure consists of $11.8 million as shown on Schedule 5 and an estimated $3.2 million for Canal 2 based on Montaup's 25% share of employee costs for Canal Station. The parties agree to use a reasonable actual figure for Canal 2 when available from Canal Electric.

C:\FORMUL~1.RED                                    8

NARR 23351

Appendix 1

kilowatthours delivered[10] by Blackstone during the period

between July 1, 1997 and the Divestiture Date, less

(iii) Blackstone's 29.13 percent allocated share of capital investments

demonstrated to be prudently incurred after December 31, 1995,

excluded from the plant balances in Section 1.1.1 (a) above,[11]

less

(iv) Blackstone's 29.13 percent allocated share of reasonable

transaction costs associated with the divestiture including the cost

of necessary refinancings, repurchases, and retirements of

securities occurring after May 1, 1997.

The Net Proceeds from the divestiture including amortization and the pretax

return specified in Section 1.1.2 on the unreturned credit balance net of tax

impacts shall be credited to the Fixed Component in equal annual amounts

over the period commencing on the date the Residual Value Credit is

implemented through December 31, 2009. The Residual Value Credit shall be

implemented even if: (i) the Divestiture Date occurs before the Contract

---

[10] "Delivered", as used herein, refers to the kilowatt hours delivered by Newport other than of purchases from Montaup under Rate M-14.

[11] Montaup's capital investments shall include construction work in progress. The investments in non-nuclear generating facilities during the period January 1, 1996 through May 31, 1997 are shown in Schedule 4. These projects have been reviewed by the parties and are included as an offset to the Residual Value Credit subject only to a further review for the reasonableness of the amounts expended in the construction of the projects under Section 3.5 of the Agreement. Montaup may include additional projects, if any, at the time of the calculation of the Residual Value Credit, subject to the dispute resolution procedures under Section 3.5 of the Agreement.

C:\FORMUL~1.RED                    9

NARR 23352

Termination Date, or (ii) the Residual Value Credit exceeds the Contract

Termination Charge in any given year. If for any reason, generation assets

which were not sold at the Divestiture Date and therefore were not in the

Residual Value Credit but remained in the Contract Termination Charge, are

sold at a later date, the proceeds of such a sale will be amortized, with a

return as specified in Section 1.1.2, over the remaining fixed component

recovery period or over a five year period, whichever period is greater, and

credited to the Reconciliation Account as received.

(d)    Effective with refinancings, repurchases, and retirements of securities relating

to assets being recovered through Contract Termination Charge, Montaup shall

flow through the Reconciliation Account the annual effects associated with any

differences between the 13.09 percent overall pre-tax return and the actual pre-

tax return, calculated using an 11.4 percent return on common equity,

attributable to changes in the cost of long-term debt, preferred stock, capital

structure or income tax rates, provided that the overall pre-tax return shall not

exceed 13.09 percent so long as the yield on 10-year Treasury constant

maturities as reported in the Federal Reserve Statistical Release is 9 percent or

lower. In the event that the yield on Treasury maturities as so reported

exceeds 9 percent, the 13.09 percent overall pre-tax return shall be adjusted

to include Montaup's actual cost of long-term debt and preferred stock using

an 11.40 percent return on common equity. This reconciliation will apply to

NARR 23353

the period following the Divestiture Date   whether or not securitization has been implemented.  Notwithstanding the foregoing, nothing shall require a change in capital structure prior to any financing to take advantage of securitization.

Securitization will be implemented only if it would produce net savings to customers after taking into account all transaction costs including call provisions and prepayments, if applicable.  Notwithstanding the above, savings from securitization, (pursuant to the terms of a qualified rate order), will be reflected in the Contract Termination Charge.

Any and all financing savings associated with refinancing  related to divestiture and following the implementation of the Residual Value Credit, shall be allocated to the Contract Termination Charge through this paragraph, and shall not be reflected in  Montaup's capital structure used for transmission rates.  To the extent any financing savings are allocated to transmission rates by FERC, however, they shall not also be allocated to the Contract Termination Charge under this paragraph.

1.2     The Variable Component of the Contract Termination Charge shall include Blackstone's allocated share of the items specified in Section 1.2.2, below adjusted for the Reconciliation Account discussed in Section 1.2.1.

1.2.1  The Variable Component shall be adjusted through a Reconciliation Adjustment in which differences, whether positive or negative, between the estimates

C:\FORMUL~1.RED                           11

for Contract Termination Charge Payments by Blackstone and Blackstone's allocated share of the estimated variable costs listed in Section 1.2.2 below and actual Contract Termination Charge payments by Blackstone and its allocated share of the actual variable costs will be accumulated in a Reconciliation Account and added to or subtracted from the Contract Termination Charge from Montaup to Blackstone. The Reconciliation Account shall also include the adjustments under Sections 1.1.2, note 4, 1.1.4(a) and 1.1.4(d) above. A pretax return equal to that specified in Section 1.1.2 shall be included on any balance in the Reconciliation Account, whether positive or negative.

The Reconciliation Account shall accumulate through December 31, 2000, and shall be used to adjust Montaup's Base Contract Termination Charges to Blackstone on January 1, 2001. Thus, effective January 1, 2001, Montaup shall return or collect Blackstone's allocated share of any outstanding balance in the Reconciliation Account by implementing an adjustment to the Base Contract Termination Charges to Blackstone. Thereafter, the balance including the accumulated return in the Reconciliation Account at the end of a year shall be used to adjust Montaup's Base Contract Termination Charges for the following year. Reconciliation Account adjustments to the Contract Termination Charges shall not cause the Contract Termination Charges to exceed 2.8 cents per kilowatthour. Any deferrals caused by the limitation in the prior sentence shall be carried forward with a return into the next annual adjustment to the Base Contract Termination Charge. Any Reconciliation

C:\FORMUL~1.RED                    12

NARR 23355

Account adjustments occurring prior to January 1, 2001 that would otherwise cause the Contract Termination Charge to increase or decrease by more than 0.2 cent per kilowatthour shall be implemented up to 0.2 cents per kilowatthour.  The excess above 0.2 cents per kilowatthour shall be amortized with a return over the three years following January 1, 2001.

1.2.2  Blackstone's 29.13 percent allocated share of the specific cost items included in the Variable Component are set forth in Schedule 1 at page 3.  The difference between Blackstone's percent allocated share of the actual variable costs incurred by Montaup and the estimated variable costs in this section shall be included in the Reconciliation Account.  The costs included in the Variable Component shall include the following:

    (a)    <u>Nuclear Decommissioning and Other Post Shutdown Costs</u> shown on Schedule 1, Pages 6 and 7, shall include:  (i) all charges, excluding any net incremental decommissioning costs caused by operations after the Retail Access Date, for decommissioning and site restoration assessed to Montaup by the operators of each nuclear electric generating facility specified in Section 1.1.1(a) (iv), (v), and (vi) above, subject to the regulatory authority of the agencies having jurisdiction over the operation and collection of such funds; (ii) all other reasonable post shutdown costs associated with  Montaup's entitlements in the units listed in Section 1.1.1(a), (iv), (v), and (vi) above; and (iii) all

NARR 23356

Appendix 1

remaining reasonable costs, including decommissioning costs and
unrecovered capital costs, associated with Yankee Rowe and
Connecticut Yankee shown on Schedule 1, page 7. Funding for the
decommissioning costs will be placed in irrevocable trusts in
accordance with NRC regulations. If, upon the completion of
decommissioning for any of the above listed nuclear generating
facilities, it is determined that there has been an over collection of
funds, such over collection will be transferred to Montaup's
decommissioning fund for either Millstone 3 or Seabrook 1 pending
final disposition of their decommissioning. Once all decommissioning
is complete, any over collection will be refunded to Blackstone in the
Reconciliation Adjustment. Other post shutdown costs will also be
fully reconciled in the Reconciliation Adjustment.

Montaup's share of the Book Value of the Actual Nuclear Core at
Shutdown or time of sale, which Montaup has not previously recovered
through sales or lease proceeds and the Book Value of Materials and
Supply at Shutdown or time of sale, which have not been addressed by
other recovery mechanisms, will be recovered with a carrying charge in
equal amounts over three years at a pre-tax return provided for in
Section 1.1.2.

C:\FORMUL~1.RED                    14

NARR 23357

(b)     Above Market Payments to Power Suppliers will be (i) all payments by Montaup for Long-Term Power Supply Contracts less the market value realized from the resale of electricity purchased under the contracts into the wholesale market, plus (ii) Economic Buyout Payments associated with those contracts, less (iii) Credit for Unit Sales Contracts, plus (iv) the Power Contract Buyout Incentive realized.

(i)     Long-Term Power Supply Contracts will be the power supply contracts listed below which were in place as of December 31, 1995, between Montaup and a third party supplier, continuing to the termination date of each contract.  The Long-Term Supply Contracts include:

(1)  Ocean State Power I and II
(2)  Canal 1, including transmission wheeling, rental andsupport payments
(3)  Northeast Energy Associates, including transmission wheeling payments
(4)  Potter 2, including transmission wheeling payments
(5)  Cleary 9
(6)  McNeil, including transmission wheeling payments
(7)  Blackstone Hydro, Inc., including transmission wheeling payments
(8)  Hydro Quebec, including AC and DC facilities support payments
(9)  Pilgrim, including transmission wheeling, rental and support payments
(10)  Bear Swamp Hydro
(11)  Green Mountain Power Peakers, including transmission wheeling payments

C:\FORMUL~1.RED                    15

(ii)     Economic Buyout Payments will be all reasonable
payments agreed to by Montaup after May 1, 1997
associated with the sale, assignment, disposition or buy
down of the Long-Term Power Supply Contracts.
Economic Buyout Payments shall be recovered as
incurred to the extent that current recovery does not
increase rates to customers above the level that would
have been incurred absent the sale, assignment,
disposition, or buy down of the Long-Term Power
Supply Contract. The portion of the Economic Buyout
Payment that cannot be recovered currently under the
prior sentence shall be deferred and recovered with the
return specified in Section 1.1.2 as soon as such
recovery will not increase rates to customers above the
level that would have been incurred absent the sale,
assignment, disposition, or buy down of the Long-Term
Power Supply Contract.

For purposes of calculating above market payments in (b)(i)
and economic buyout payments in (b)(ii), associated with the
long term supply contracts with Ocean State Power I and II,

NARR 23359

Montaup's total obligation under the contracts will be based on a return on equity of 9.2%.

(iii)    Credit for Unit Sales Contracts will be all unit sales contracts entered into by Montaup as of December 31, 1995, for sales from (i) Canal Unit 2 if it is not otherwise subject to market valuation and (ii) Contract Demands to non-affiliates, less the market value of these contracts as shown in Schedule 1, Page 3, Columns (7) through (9).

(iv)    Power Contract Buyout Incentive will be the sum of: (a) the Power Contract Buyout Incentive Associated with Canal 2 Divestiture calculated in accordance with Schedule 3, pages 2 and 3; and (b) the Power Contract Buyout Incentive Independent of Divestiture which shall represent 10% of the savings realized by customers as the result of the sale, assignment, disposition or buy down of its power supply contracts occurring outside of the divestiture process. The Power Contract Buyout Incentive Independent of Divestiture shall be determined at the time of the sale, assignment, disposition or buy down. The Buyout Incentive for the Ocean State Power units will be calculated in accordance with Page 4 of Schedule 3. The Total Power Contract Buyout Incentive shall not exceed $3.9 million, stated on a present value

NARR 23360

basis upon the divestiture using a discount rate equal to the actual pre-tax return in place following completion of post divestiture refinancing as determined under Section 1.1.4(d). Montaup shall document the level of the Power Contract Buyout Incentive in a report, and the amount of the Power Contract Buyout Incentive shall be subject to the dispute resolution procedures set forth under Section 3.5 of the Stipulation and Agreement. The Power Contract Buyout Incentive Associated with Canal 2 Divestiture will be recovered in equal increments over the period from the divestiture through December 31, 2009, with appropriate adjustments for the time value of money, and the Power Contract Buyout Incentive Independent of Divestiture will be recovered in equal increments over the remaining term of the related purchased power contract, with appropriate adjustments for the time value of money.

(c)    Above Market Fuel Transportation as shown in Schedule 1, Page 15, Column 10 will be Montaup's continuing long-term payment obligations associated with Capacity Payments to Algonquin Natural Gas Pipeline for Canal 2 less the market value of that capacity.  The Market Value of Capacity Payments to Algonquin Natural Gas Pipelines will equal the actual proceeds associated with the sale or assignment or

C:\FORMUL~1.RED                          18

NARR 23361

termination of contractual obligations.  For the purposes of calculating

the Contract Termination Charges, prior to the date that  Montaup's

contractual entitlements to the pipeline capacity are assigned to a

nonaffiliate, the Market Value of Capacity Payments to Algonquin

Natural Gas Pipeline shall be deemed to equal the savings associated

with actual unit operation on natural gas compared to the unit's avoided

operation on oil at prevailing market prices.  For illustrative purposes,

the amounts shown on page 15 of Schedule 1 reflect a market value

which is 50 percent of the capacity payments.

(d)    Transmission wheeling, rental and support charges as shown in

Schedule 1, Page 3, associated with the transmission of electricity from

Montaup's entitlements in Seabrook Unit 1, Connecticut Yankee, Maine

Yankee, Millstone Unit 3, Wyman Unit 4, Canal Unit 2, Vermont

Yankee,  which units are located off of Montaup's transmission system.

These wheeling and support payments shall include only costs that are

excluded from recovery under  Montaup's and NEPOOL's open access

transmission tariffs or are not assigned to a purchaser of the unit.

(e)    Payments in Lieu of Property Taxes will include all reasonable costs

incurred by Montaup or its affiliates associated with payments in lieu of

property taxes to the cities and towns in which Montaup owns

generating facilities to mitigate the loss of tax revenues that those cities

C:\FORMUL-1.RED                                    19

and towns would otherwise incur in connection with restructuring. For
the purposes of calculating the Base Contract Termination Charges and
the estimate included in the Reconciling Account, the Payments in Lieu
of Property Taxes are assumed to be zero.

(f)     Employee Severance and Retraining Costs as shown in Schedule 1,
page 3, Column (13), will include all reasonable costs and expenses
incurred by Montaup or its affiliates associated with the adjustment of
their workforces in connection with the implementation of retail access,
divestiture, or the termination of Montaup's Tariff No 1, including, but
not limited to early retirement, severance, retraining and other
reasonable costs associated with the implementation of the benefits to
employees included in Schedule 5. Montaup shall require purchasers of
its generating assets to pay $15 million[12] for the costs under this
paragraph incurred by Montaup or its affiliates. In the event that the
actual costs incurred under this paragraph are less than $15 million,
excluding costs found by FERC to be recoverable in Montaup's
transmission rates, Montaup shall flow back the difference to customers
in the Reconciliation Account. The procedure established in this
paragraph shall be the exclusive method for recovering the costs under

---

[12] The parties agree that $11.8 million will be reserved for Montaup and EUASC employees and estimate that $3.2 million will be reserved for Canal 2 and paid by the buyer of Canal 2. The Canal 2 figure may be adjusted when actual figures are available from Canal Electric.

NARR 23363

this paragraph, and, except in the event of legislation changing required benefits, neither Montaup nor its affiliates shall be able to recover more than $15 million, subject to the Canal 2 adjustment, for these costs. Thus, for the purposes of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, the Employee Severance and Retraining Costs are assumed to be zero and, except in the event of legislation changing required benefits, these costs shall not result in an increase to the Reconciliation Account or to the Contract Termination Charge.

(g)  Damages, Costs, or Net Recoveries from claims by or against third parties shall include all damages, costs, or recoveries associated with Montaup's generating business which accrued prior to the date of divestiture and which were not:  (i) included in the reserves for generation related, uninsured claims other than claims associated with Environmental Response Costs as of May 21, 1994, plus annual additions to the reserves for uninsured claims in Montaup's M-14 rate, less actual payments out of the reserve for generation related claims during the period from May 21, 1994 through the Contract Termination Date; (ii) assigned to Montaup's successor in interest; (iii) recovered from Montaup's insurance carriers; or (iv) the result of gross negligence. For the purposes of calculating the Base Contract

C:\FORMUL—1.RED

21

NARR 23364

Termination Charges and the estimate included in the Reconciliation
Account, Damages, Costs, or Net Recoveries from claims are assumed
to be zero.

(h)    Performance Based Rate for Nuclear Units Remaining After Divestiture
shall credit value received that is not otherwise reflected in the Residual
Value Credit, or recover any payments or costs associated with the
sale, lease or disposal of Montaup's minority ownership share of the
Seabrook, Millstone #3, and Vermont Yankee Nuclear Units ("PBR
Nuclear Units") that are not otherwise reflected in the Residual Value
Credit. If Montaup is unable to sell, lease, assign, or otherwise
dispose of its PBR Nuclear Units on the terms set forth in the
Stipulation and Agreement prior to the Contract Termination Date, the
Performance Based Rate shall include 80 percent of the reasonable
going forward costs, including variable costs and post-1995 capital
additions on a cost of service basis,[13] associated with Montaup's
PBR Nuclear Units that are not otherwise recovered in contract
termination charges less 80 percent of the revenues from sales of
energy or capacity from such units or entitlements that are not
otherwise reflected in contract termination charges. The Performance

---

[13] In the event that the nuclear unit is retired before the end of its license life, the capital addition
shall be amortized with a return over the remainder of the license or in accordance with its
depreciation schedule, whichever is shorter.

C:\FORMUL~1.RED                           22

Based Rate shall apply for the period from the Contract Termination Date to the date that Montaup either sells, leases, assigns or otherwise disposes of the PBR Nuclear Units or to the date such units are shutdown. Within six months prior to implementing the Performance Based Rate, Montaup will consult with the Signatories on a performance standard for nuclear safety indicators and will file such performance standard with a maximum potential credit for nonperformance of $250,000. Such sales, if any, shall not be made directly to Blackstone's retail customers, however, Montaup shall retain the right to use its minority shares of the PBR Nuclear Units to fulfill its backstop obligations under the standard offer. For the purpose of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, the Performance Based Rate for Nuclear Units is assumed to be zero.

(i)    Environmental Response Costs defined as:

      (i)    Reasonable and prudently incurred costs associated with the investigation, testing, remediation, liabilities, damages, claims, settlements, or judgments attributable to or incurred by Montaup or Blackstone relating to deposits or waste from divested generating facilities off the site of properties sold, whether or not such material is regulated under the statutes and

NARR 23366

Appendix 1

authorities referenced in paragraph (iv), including material deposited before the Divestiture Date at disposal sites, sites to which material may have migrated from off-site disposal sites, or any off-site location at which generation related material may have been deposited before the Divestiture Date associated with the operation of generating facilities sold pursuant to the divestiture plan;

(ii)     Reasonable and prudently incurred costs associated with the investigation, testing, remediation, liabilities, damages, claims, settlements, or judgments attributable to or incurred by Montaup or Blackstone relating to deposits and wastes occurring prior to the Divestiture Date whether or not such material is regulated under the statutes and authorities referenced in paragraph (iv) from facilities located within the switchyards for which Montaup will retain a permanent easement on parcels that are otherwise being divested  if such costs are not recovered in transmission rates;

(iii)    Reasonable and prudently incurred costs associated with the purchase of property that is acquired as part of an overall mitigation and response plan associated with sites identified in paragraphs (i) and (ii);

C:\FORMUL~1.RED                                    24

(iv)    The statutes and authorities referenced in paragraphs (i) and (ii)

shall be the Comprehensive Environmental Response,

Compensation and Liability Act (CERCLA), Resource

Conservation and Recovery Act (RCRA), Massachusetts G.L. c.

21C and 21E, and Rhode Island General Laws 23-19.14, or any

other laws, regulations or orders by courts or governmental

authorities, or resulting from claims and contentions arising in

tort, breach of contract or violation of law;

(v)    Except for property acquired under paragraph (iii),

Environmental Response Costs shall not include costs associated

with the investigation, testing, remediation, or other liabilities

relating to property acquired after the Divestiture Date.

Environmental Response Costs recovered under paragraphs (i),

(ii), and (iii) shall also be offset by:    (i) proceeds from

insurance companies related to Environmental Response Costs;

(ii) proceeds from the sale of properties purchased under

paragraph (iii); and (iii) recoveries from third parties;

(vi)    Nothing herein is intended to limit, alter, or otherwise affect

any liability of Montaup to governmental authorities or third

parties other than the buyer or buyers of Montaup generating

facilities under any environmental law including those

C:\FORMUL~1.RED                        25

NARR 23368

Appendix I

referenced in paragraph (iv).

C:\FORMUL~1.RED

26

NARR 23369

*SCHEDULE 1*

SUMMARY OF  CONTRACT TERMINATION CHARGES

NARR 23370

Schedule 1
Page 1 of 15

## MONTAUP ELECTRIC COMPANY
## SUMMARY OF CONTRACT TERMINATION CHARGES TO BLACKSTONE VALLEY ELECTRIC

| YEAR (1) | EST. BVE MWH SALES (2) | SHARE OF FIXED COMPONENT $ IN 000 (3) | SHARE OF FIXED COMPONENT CENTS/KWH (4) | SHARE OF VAR. COMPONENT $ IN 000 (5) | SHARE OF VAR. COMPONENT CENTS/KWH (6) | SHARE OF TOT. TERM CHARGE $ IN 000 (7) | BASE CONTRACT TERM CHARG CENTS/KWH (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 1,293,212 | 14,900 | 1.15 | 23,897 | 1.85 | 38,796 | 3.00 |
| 1999 | 1,309,137 | 16,084 | 1.23 | 23,190 | 1.77 | 39,274 | 3.00 |
| 2000 | 1,329,905 | 16,899 | 1.27 | 22,998 | 1.73 | 39,897 | 3.00 |
| 2001 | 1,346,024 | 13,060 | 0.97 | 23,084 | 1.72 | 36,145 | 2.69 |
| 2002 | 1,360,074 | 15,070 | 1.11 | 19,955 | 1.47 | 35,025 | 2.58 |
| 2003 | 1,377,851 | 16,099 | 1.17 | 17,931 | 1.30 | 34,030 | 2.47 |
| 2004 | 1,399,848 | 16,895 | 1.21 | 16,262 | 1.16 | 33,157 | 2.37 |
| 2005 | 1,423,866 | 15,343 | 1.08 | 17,001 | 1.19 | 32,344 | 2.27 |
| 2006 | 1,452,574 | 15,967 | 1.10 | 15,677 | 1.08 | 31,644 | 2.18 |
| 2007 | 1,471,219 | 14,203 | 0.97 | 16,534 | 1.12 | 30,737 | 2.09 |
| 2008 | 1,493,432 | 15,041 | 1.01 | 14,882 | 1.00 | 29,923 | 2.00 |
| 2009 | 1,512,696 | 12,338 | 0.85 | 16,729 | 1.07 | 29,067 | 1.92 |
| 2010 | 1,534,836 | 0 | 0.00 | 13,437 | 0.88 | 13,437 | 0.88 |
| 2011 | 1,560,396 | 0 | 0.00 | 12,585 | 0.81 | 12,585 | 0.81 |
| 2012 | 1,566,958 | 0 | 0.00 | 7,517 | 0.48 | 7,517 | 0.48 |
| 2013 | 1,597,698 | 0 | 0.00 | 3,988 | 0.25 | 3,988 | 0.25 |
| 2014 | 1,624,096 | 0 | 0.00 | 4,126 | 0.25 | 4,126 | 0.25 |
| 2015 | 1,644,785 | 0 | 0.00 | 2,602 | 0.17 | 2,602 | 0.17 |
| 2016 | 1,671,116 | 0 | 0.00 | 2,758 | 0.17 | 2,758 | 0.17 |
| 2017 | 1,693,977 | 0 | 0.00 | 2,140 | 0.13 | 2,140 | 0.13 |
| 2018 | 1,713,946 | 0 | 0.00 | 1,999 | 0.12 | 1,999 | 0.12 |
| 2019 | 1,739,097 | 0 | 0.00 | 2,018 | 0.12 | 2,018 | 0.12 |
| 2020 | 1,762,428 | 0 | 0.00 | 2,084 | 0.12 | 2,084 | 0.12 |
| 2021 | 1,787,624 | 0 | 0.00 | 1,797 | 0.10 | 1,797 | 0.10 |
| 2022 | 1,811,988 | 0 | 0.00 | 614 | 0.03 | 614 | 0.03 |
| 2023 | 1,837,328 | 0 | 0.00 | 529 | 0.03 | 529 | 0.03 |
| 2024 | 1,863,048 | 0 | 0.00 | 545 | 0.03 | 545 | 0.03 |
| 2025 | 1,888,165 | 0 | 0.00 | 561 | 0.03 | 561 | 0.03 |
| 2026 | 1,915,656 | 0 | 0.00 | 201 | 0.01 | 201 | 0.01 |
| 2027 | 2,011,439 | 0 | 0.00 | 207 | 0.01 | 207 | 0.01 |
| 2028 | 2,112,011 | 0 | 0.00 | 214 | 0.01 | 214 | 0.01 |
| 2029 | 2,217,611 | 0 | 0.00 | 220 | 0.01 | 220 | 0.01 |

COLUMN NOTES:
(2) PER 1996 LONG RANGE ENERGY & DEMAND FORECAST.
(3) SCHEDULE 1, P2, COLUMN (9).
(4) COLUMN (3)/COLUMN (2).
(5) SEE SCHEDULE 1, P.3, COLUMN (18).
(6) COLUMN (5)/COLUMN (2).
(7) COLUMN (3) + COLUMN (5).
(8) COLUMN (7)/COLUMN (2).

BV30BAS2.WK4  10/23/97

Schedule 1
Page 2 of 15

SUMMARY OF CONTRACT TERMINATION CHARGES
BLACKSTONE VALLEY ELECTRIC COMPANY SHARE (29.13%)
FIXED COMPONENT
$ IN 000

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 109 TRANSITION OBLIGATION (4) | BASE TOTAL FIXED COMPONENT (6) | ADJ. FOR RESIDUAL VALUE CREDIT (7) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (8) |
|---|---|---|---|---|---|---|
| 1998 | 9,035 | 5,507 | 357 | 14,900 | 0 | 14,900 |
| 1999 | 8,517 | 7,225 | 343 | 16,084 | 0 | 16,084 |
| 2000 | 7,876 | 8,694 | 329 | 16,899 | 0 | 16,899 |
| 2001 | 7,304 | 5,441 | 315 | 13,060 | 0 | 13,060 |
| 2002 | 6,768 | 8,012 | 301 | 15,070 | 0 | 15,070 |
| 2003 | 6,047 | 9,766 | 287 | 16,099 | 0 | 16,099 |
| 2004 | 5,205 | 11,418 | 272 | 16,895 | 0 | 16,895 |
| 2005 | 4,325 | 10,769 | 258 | 15,343 | 0 | 15,343 |
| 2006 | 3,411 | 12,312 | 244 | 15,967 | 0 | 15,967 |
| 2007 | 2,469 | 11,504 | 230 | 14,203 | 0 | 14,203 |
| 2008 | 1,487 | 13,338 | 216 | 15,041 | 0 | 15,041 |
| 2009 | 481 | 12,154 | 202 | 12,836 | 0 | 12,836 |

COLUMN NOTES:
EACH COLUMN REPRESENTS 29.13% OF THE SAME COLUMN NUMBER ON P. 12.

BV30BAS2.WK4  10/23/97

NARR 23372



Schedule 1
Page 4 of 15

**MONTAUP ELECTRIC COMPANY**
**NET CAPABILITY & UNRECOVERED COSTS**
**AS OF DECEMBER 31, 1995**

| SOURCE (1) | LOCATION (2) | YEAR(S) PLACED IN SERVICE (3) | ENERGY SOURCE (4) | NET CAPABILITY MW (5) | $ IN 000 | | APPLICABLE ANNUAL DEPRECIATION FOR 1996 AND BEYOND (8) |
|---|---|---|---|---|---|---|---|
| | | | | | 1995 (6) | 1997 (7) | |
| FOSSIL FUEL UNITS | | | | | | | |
| SOMERSET 6 & JETS | SOMERSET, MA | 1959 | COAL/JET FUEL | 153.2 | 28,032 | 23,718 | 2,158 |
| CANAL 2 | SANDWICH, MA | 1976 | OIL | 233 | 41,041 | 35,207 | 2,917 |
| WYMAN 4 | YARMOUTH, ME | 1978 | OIL | 12.2 | 2,030 | 1,806 | 112 |
| NEWPORT DIESELS | JAMESTOWN/ PORTSMOUTH, RI/ YARMOUTH, ME | 1961 1978 1978 | DIESEL DIESEL OIL | 8.8 8.3 4.1 | 1,803 | 1,499 | 152 |
| NUCLEAR UNITS | | | | | | | |
| SEABROOK | SEABROOK, NH | 1990 | NUCLEAR | 33.5 | 170,705 | 160,949 | 4,878 |
| MILLSTONE 3 | WATERFORD, CT | 1986 | NUCLEAR | 45.9 | 137,749 | 128,279 | 4,735 |
| VERMONT YANKEE | BRATTLEBORO, VT | | NUCLEAR | 12.0 | 3,786 (a) | 3,092 | 347 |
| MAINE YANKEE | BRUNSWICK, ME | | NUCLEAR | 31.6 | 7,439 (a) | 6,105 | 667 |
| PLANT HELD FOR FUTURE USE - LAND IN SOMERSET, MA | | | | | 604 | 604 | |
| - NET INVESTMENT IN SOMERSET UNIT 5 | | | | | 5,880 | 6,449 | (b) |
| NONUTILITY PROPERTY (LAND IN PORTSMOUTH, RI & DIGHTON, MA) | | | | | 2,610 | 2,610 | |
| TOTAL | | | | 542.6 | 401,659 | 370,316 | 15,965 |

(a) PLANT IN SERVICE AS OF 12/31/95 INCLUDING MATERIALS AND SUPPLIES.
   PER M-14 FERC SETTLEMENT AGREEMENT, SOMERSET UNIT 5 IS EXCLUDED
   FROM PLANT IN SERVICE BUT IS ALLOWED A RETURN THROUGH 11/1/97.
(b) (321k IN 1996 AND 268k IN 1997).

BV3UBAS2.WK4  10/23/97

NARR 23374

**MONTAUP ELECTRIC COMPANY**
**REGULATORY ASSET BALANCE**
**$ IN 000**

| | BALANCE AS OF DECEMBER 31, 1995 (1) | BALANCE AS OF DECEMBER 31, 1997 (2) | APPLICABLE AMORTIZATION FOR 1996 AND BEYOND (3) | BASIS FOR DEFERRAL (4) |
|---|---|---|---|---|
| FAS 109 - ASSET | 39,916 | 37,466 | 1,225 | FERC RATEMAKING POLICY |
| - LIABILITY | (14,583) | (8,717) | (2,933) | FERC RATEMAKING POLICY |
| FAS 106 DEFERRAL | 1,313 | 538 | 387 (a) | FERC RATEMAKING POLICY |
| NET PENSION LIABILITY / (ASSET) | (485) | (415) | (35) | FAS 87 |
| UNAMORTIZED DEBT PREMIUMS | 13,879 | 10,665 | 1,607 | FERC RATEMAKING POLICY |
| UNAMORTIZED ITC | (12,523) | (11,367) | (578) | FERC RATEMAKING POLICY |
| DREDGING | 424 | 173 | 125 (b) | FERC RATEMAKING POLICY |
| TOTAL REG. ASSETS | 27,941 | 28,343 | (202) | |

(a) REMAINING AMORTIZATION SCHEDULE: 387 IN 1998, 151 IN 1999.
(b) REMAINING AMORTIZATION SCHEDULE: 125 IN 1998, 48 IN 1999.

BV30BAS2.WK4  10/23/97

**MONTAUP ELECTRIC COMPANY**
**FAS 106 TRANSITION OBLIGATION REGULATORY ASSET**
**$ IN 000**

UNRECOVERED BALANCE AS OF 12/31/95          9,091
AMORTIZATION AMOUNT (1996 & BEYOND)          534
DISCOUNT RATE                               7.25%

| | AMORTIZATION (1) | INTEREST (2) | TOTAL EXPENSE (3) | UNAMORTIZED BALANCE (4) |
|---|---|---|---|---|
| 1998 | 669 | 557 | 1,226 | 8,023 |
| 1999 | 669 | 509 | 1,178 | 7,354 |
| 2000 | 669 | 460 | 1,129 | 6,686 |
| 2001 | 669 | 412 | 1,081 | 6,017 |
| 2002 | 669 | 364 | 1,032 | 5,349 |
| 2003 | 669 | 315 | 984 | 4,680 |
| 2004 | 669 | 267 | 935 | 4,011 |
| 2005 | 669 | 218 | 887 | 3,343 |
| 2006 | 669 | 170 | 838 | 2,674 |
| 2007 | 669 | 121 | 790 | 2,006 |
| 2008 | 669 | 73 | 741 | 1,337 |
| 2009 | 669 | 24 | 693 | 669 |
| | | | | (0) |

COLUMN NOTES:
(1) 12/31/97 Balance straight lined over 12 years.
(2) (Prior Year Column (4) + Current Year Column (4) ) / 2  * 7.25%
(3) Column (1) + Column (2)
(4) Prior Year Column (4) - Current Year Column (1)

BV30BAS2.WK4  10/23/97

NARR 23376

Schedule 1
Page 6 of 15

MONTAUP ELECTRIC COMPANY
OTHER POST-SHUTDOWN NUCLEAR COSTS
$ IN 000



| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | VERMONT YK (4) | MAINE YK (5) | TOTAL (6) |
|---|---|---|---|---|---|
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 |
| 2011 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 |

BV30BAS2.WK4  10/23/97

NARR 23377

## MONTAUP ELECTRIC COMPANY
### TOTAL ANNUAL DECOMMISSIONING COST
### $ IN 000

| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | CONNECTICUT YANKEE (4) | VERMONT YANKEE (5) | MAINE YANKEE (6) | YANKEE ATOMIC (7) | TOTAL (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 602 | 319 | 3,868 | 317 | 599 | 2,306 | 8,011 |
| 1999 | 621 | 328 | 3,102 | 318 | 711 | 2,306 | 7,386 |
| 2000 | 639 | 339 | 3,058 | 407 | 713 | 1,206 | 6,362 |
| 2001 | 658 | 349 | 2,972 | 408 | 716 | 58 | 5,161 |
| 2002 | 679 | 359 | 2,908 | 409 | 718 | 58 | 5,131 |
| 2003 | 699 | 370 | 2,823 | 456 | 803 | 63 | 5,214 |
| 2004 | 721 | 382 | 2,742 | 457 | 983 | 65 | 5,350 |
| 2005 | 743 | 394 | 2,681 | 585 | 986 | 68 | 5,457 |
| 2006 | 766 | 405 | 2,587 | 587 | 990 | 70 | 5,405 |
| 2007 | 770 | 409 | 2,013 | 578 | 967 | 52 | 4,789 |
| 2008 | 759 | 406 | 0 | 546 | 510 | 0 | 2,221 |
| 2009 | 782 | 418 | 0 | 546 | 0 | 0 | 1,746 |
| 2010 | 806 | 431 | 0 | 710 | 0 | 0 | 1,947 |
| 2011 | 830 | 444 | 0 | 710 | 0 | 0 | 1,984 |
| 2012 | 855 | 457 | 0 | 177 | 0 | 0 | 1,489 |
| 2013 | 880 | 471 | 0 | 0 | 0 | 0 | 1,351 |
| 2014 | 907 | 485 | 0 | 0 | 0 | 0 | 1,392 |
| 2015 | 934 | 499 | 0 | 0 | 0 | 0 | 1,433 |
| 2016 | 962 | 514 | 0 | 0 | 0 | 0 | 1,476 |
| 2017 | 991 | 530 | 0 | 0 | 0 | 0 | 1,521 |
| 2018 | 1,021 | 546 | 0 | 0 | 0 | 0 | 1,567 |
| 2019 | 1,051 | 562 | 0 | 0 | 0 | 0 | 1,613 |
| 2020 | 1,083 | 579 | 0 | 0 | 0 | 0 | 1,662 |
| 2021 | 1,115 | 596 | 0 | 0 | 0 | 0 | 1,711 |
| 2022 | 1,149 | 614 | 0 | 0 | 0 | 0 | 1,763 |
| 2023 | 1,183 | 633 | 0 | 0 | 0 | 0 | 1,816 |
| 2024 | 1,219 | 652 | 0 | 0 | 0 | 0 | 1,871 |
| 2025 | 1,255 | 671 | 0 | 0 | 0 | 0 | 1,926 |
| 2026 | 0 | 691 | 0 | 0 | 0 | 0 | 691 |
| 2027 | 0 | 712 | 0 | 0 | 0 | 0 | 712 |
| 2028 | 0 | 733 | 0 | 0 | 0 | 0 | 733 |
| 2029 | 0 | 755 | 0 | 0 | 0 | 0 | 755 |

BV30BAS2.WK4  10/23/97

NARR 23378

Schedule 1
Page 6 of 16

Purchase Power Total $000

| | Pgrm | Canal 1 | Pelzer 2 | Cleary | Mothel | OSP 1 | OSP 2 | NEA | Blackstone Hydro | HQ | GMP | BSH | OSP @ 9.2% ROE | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 38,042 | 26,677 | 3,632 | 330 | 3,562 | 25,449 | 27,471 | 12,515 | 526 | 10,662 | 150 | 650 | (1,209) | 146,855 |
| 1999 | 35,710 | 27,181 | 3,675 | 338 | 3,558 | 26,638 | 27,015 | 12,518 | 528 | 10,770 | 0 | 0 | (1,146) | 146,086 |
| 2000 | 35,174 | 27,040 | 4,023 | 347 | 3,612 | 24,918 | 27,541 | 12,653 | 531 | 10,008 | 0 | 0 | (1,089) | 145,885 |
| 2001 | 35,184 | 26,548 | 6,078 | 361 | 3,710 | 25,595 | 27,014 | 8,003 | 532 | 6,935 | 0 | 0 | (1,064) | 139,288 |
| 2002 | 35,333 | 21,448 | 4,137 | 371 | 3,818 | 27,947 | 27,087 | 8,360 | 556 | 3,731 | 0 | 0 | (985) | 129,733 |
| 2003 | 35,743 | 0 | 4,199 | 391 | 3,935 | 25,332 | 28,939 | 8,670 | 539 | 3,612 | 0 | 0 | (946) | 132,465 |
| 2004 | 34,010 | 0 | 4,281 | 400 | 4,057 | 25,953 | 27,782 | 7,290 | 541 | 3,508 | 0 | 0 | (897) | 107,831 |
| 2005 | 35,689 | 0 | 4,337 | 418 | 4,152 | 26,533 | 27,453 | 7,907 | 544 | 3,357 | 0 | 0 | (887) | 107,831 |
| 2006 | 34,488 | 0 | 4,395 | 423 | 4,237 | 26,533 | 28,508 | 8,179 | 547 | 3,225 | 0 | 0 | (842) | 103,600 |
| 2007 | 35,141 | 0 | 4,465 | 440 | 4,335 | 26,001 | 28,383 | 8,515 | 550 | 3,168 | 0 | 0 | (800) | 100,219 |
| 2008 | 33,192 | 0 | 4,640 | 457 | 4,465 | 26,007 | 27,976 | 8,937 | 553 | 2,997 | 0 | 0 | (760) | 112,512 |
| 2009 | 35,999 | 0 | 4,618 | 476 | 4,643 | 30,870 | 28,591 | 9,404 | 557 | 2,909 | 0 | 0 | (722) | 114,222 |
| 2010 | 34,533 | 0 | 4,696 | 485 | 4,805 | 27,074 | 28,000 | 9,473 | 860 | 2,823 | 0 | 0 | (686) | 118,734 |
| 2011 | 40,427 | 0 | 4,779 | 514 | 4,949 | 24,388 | 27,329 | 10,560 | 587 | 2,740 | 0 | 0 | (652) | 114,500 |
| 2012 | 18,380 | 0 | 4,855 | 535 | 5,146 | 0 | 0 | 10,270 | 575 | 2,659 | 0 | 0 | (393) | 91,776 |
| 2013 | 0 | 0 | 4,953 | 595 | 5,331 | 0 | 0 | 10,413 | 571 | 2,581 | 0 | 0 | 0 | 43,603 |
| 2014 | 0 | 0 | 5,049 | 678 | 5,519 | 0 | 0 | 10,841 | 576 | 2,535 | 0 | 0 | 0 | 24,818 |
| 2015 | 0 | 0 | 5,148 | 802 | 5,717 | 0 | 0 | 11,453 | 578 | 2,432 | 0 | 0 | 0 | 25,299 |
| 2016 | 0 | 0 | 5,247 | 631 | 0 | 0 | 0 | 11,506 | 582 | 2,260 | 0 | 0 | 0 | 20,225 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,394 | 588 | 1,896 | 0 | 0 | 0 | 20,429 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,095 | 591 | 1,027 | 0 | 0 | 0 | 14,556 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,512 | 0 | 1,664 | 0 | 0 | 0 | 14,613 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,769 | 0 | 1,564 | 0 | 0 | 0 | 14,391 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,465 | 0 | 0 | 0 | 0 | 0 | 14,333 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,455 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

BV0636A52.WK4  02/25/97

**Tab 4**

**(4 of 8)**

Schedule 1
Page 8 of 15

Purchase Power MWh

| Year | Pilgrim | Canal 1 | Potter 2 | Cleary | Mobell | OSP 1 | OSP 2 | NEA | Braddone Hydro | HQ | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 328,992 | 2,781,183 |
| 1999 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 324,187 | 2,710,592 |
| 2000 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 283,092 | 2,740,313 |
| 2001 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 134,017 | 2,520,652 |
| 2002 | 553,418 | 441,228 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 2,510,145 |
| 2003 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,739,131 |
| 2004 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2005 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2006 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2007 | 497,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,788,131 |
| 2008 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2009 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,788,131 |
| 2010 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2011 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2012 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,289,698 |
| 2013 | 194,473 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 449,470 |
| 2014 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 264,997 |
| 2015 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 264,997 |
| 2016 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 247,577 |
| 2017 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 247,577 |
| 2018 | 0 | 0 | 36,979 | 10,234 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 200,364 |
| 2019 | 0 | 0 | 36,979 | 10,234 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 200,364 |
| 2020 | 0 | 0 | 0 | 10,234 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 200,364 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

BV00BA52.WK4  10/23/97

## UNIT CONTRACT & NON AFFILIATE REVENUE CREDIT
## $ IN 000

| YEAR END (1) | M-RATE SALES TO MIDDLEBORO (2) | M-RATE SALES TO PASCOAG (3) | CANAL UNIT SALES TO BRAINTREE (4) | TOTAL (5) |
|---|---|---|---|---|
| 1998 | 2,004 | 1,295 | 1,555 | 4,854 |
| 1999 | 1,663 | 1,234 | 1,555 | 4,452 |
| 2000 | 0 | 815 | 1,555 | 2,370 |
| 2001 | 0 | 0 | 1,555 | 1,555 |
| 2002 | 0 | 0 | 1,555 | 1,555 |
| 2003 | 0 | 0 | 1,555 | 1,555 |
| 2004 | 0 | 0 | 1,555 | 1,555 |
| 2005 | 0 | 0 | 1,555 | 1,555 |
| 2006 | 0 | 0 | 1,555 | 1,555 |
| 2007 | 0 | 0 | 1,555 | 1,555 |
| 2008 | 0 | 0 | 1,555 | 1,555 |
| 2009 | 0 | 0 | 1,555 | 1,555 |
| 2010 | 0 | 0 | 1,555 | 1,555 |
| 2011 | 0 | 0 | 1,555 | 1,555 |
| 2012 | 0 | 0 | 1,555 | 1,555 |
| 2013 | 0 | 0 | 1,555 | 1,555 |
| 2014 | 0 | 0 | 1,555 | 1,555 |
| 2015 | 0 | 0 | 1,555 | 1,555 |
| 2016 | 0 | 0 | 1,555 | 1,555 |
| 2017 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 |

BV30BAS2.WK4  10/23/97



NARR 23381

TRANSMISSION IN SUPPORT OF REMOTE GENERATING UNITS
DETAIL BY UNIT
$ IN 000

| (1) | SEABROOK (2) | MILLSTONE (3) | CANAL 2 (4) | WYMAN 4 (5) | MAINE YNK (6) | VERMONT YNK (7) | TOTAL (8) |
|------|------|------|------|------|------|------|------|
| 1998 | 297 | 138 | 527 | 91 | 214 | 55 | 1,322 |
| 1999 | 292 | 138 | 507 | 91 | 214 | 55 | 1,297 |
| 2000 | 286 | 138 | 488 | 91 | 214 | 55 | 1,272 |
| 2001 | 280 | 138 | 470 | 91 | 214 | 55 | 1,248 |
| 2002 | 275 | 138 | 452 | 91 | 238 | 61 | 1,225 |
| 2003 | 269 | 138 | 435 | 91 | 238 | 61 | 1,232 |
| 2004 | 264 | 138 | 418 | 91 | 238 | 61 | 1,210 |
| 2005 | 259 | 138 | 402 | 91 | 238 | 61 | 1,189 |
| 2006 | 254 | 138 | 386 | 91 | 238 | 61 | 1,168 |
| 2007 | 249 | 138 | 371 | 91 | 238 | 61 | 1,148 |
| 2008 | 245 | 138 | 357 | 91 | 238 | 61 | 1,130 |
| 2009 | 240 | 138 | 443 | 91 | 0 | 61 | 973 |

BV30BAS2.WK4  10/23/97

NARR 23382

## SUMMARY OF CONTRACT TERMINATION CHARGES
## MONTAUP ELECTRIC COMPANY (100%)
## FIXED COMPONENT
## $ IN 000

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 106 TRANSITION OBLIGATION (4) | BASE TOTAL FIXED COMPONENT (5) | ADJ. FOR RESIDUAL VALUE CREDIT (6) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (7) |
|---|---|---|---|---|---|---|
| 1998 | 31,016 | 18,907 | 1,226 | 51,148 | 0 | 51,148 |
| 1999 | 29,236 | 24,802 | 1,178 | 55,216 | 0 | 55,216 |
| 2000 | 27,038 | 29,844 | 1,129 | 58,011 | 0 | 58,011 |
| 2001 | 25,074 | 18,679 | 1,081 | 44,834 | 0 | 44,834 |
| 2002 | 23,200 | 27,503 | 1,032 | 51,735 | 0 | 51,735 |
| 2003 | 20,758 | 33,525 | 984 | 55,267 | 0 | 55,267 |
| 2004 | 17,868 | 39,196 | 935 | 57,999 | 0 | 57,999 |
| 2005 | 14,848 | 36,936 | 897 | 52,671 | 0 | 52,671 |
| 2006 | 11,711 | 42,265 | 838 | 54,814 | 0 | 54,814 |
| 2007 | 8,475 | 39,480 | 790 | 48,756 | 0 | 48,756 |
| 2008 | 5,105 | 45,788 | 741 | 51,635 | 0 | 51,635 |
| 2009 | 1,650 | 41,723 | 693 | 44,066 | 0 | 44,066 |

COLUMN NOTES:
(2) See Schedule 1, p. 14, Column (8).
(3) p. 1 Column (7) /.2913 - p. 12 Column (2)
    - p. 12 Column (4) - p. 12 Column (6) - p. 3 Column (17) /.2913.
(4) See p. 5a, Column (3).
(5) Sum of Columns (2) through (4).
(6) To be based on results of actual market valuation.
(7) Columns (5) + (6).

BV30BAS2.WK4 10/23/97

NARR 23383

Schedule 1
Page 13 of 15

**MONTAUP ELECTRIC COMPANY**
**SUMMARY OF CONTRACT TERMINATION CHARGES**
**DEFERRED TAXES ON FIXED COMPONENT**
**$ IN 000**

| YEAR END (1) | BALANCE NET BOOK VALUE OF GENERATION (2) | BOOK BASIS BALANCE GENERATION RELATED REG. ASSETS (3) | TOTAL NET BOOK BASIS (4) | BALANCE NET TAX VALUE OF GENERATION (5) | TAX BASIS BALANCE GENERATION RELATED REG. ASSETS (6) | TOTAL TAX BASIS (7) | EXCESS BOOK OVER TAX (8) | DEFERRED TAXES (9) |
|---|---|---|---|---|---|---|---|---|
| 1997 | 370,316 | 28,343 | 398,659 | 68,206 | 0 | 68,206 | 330,453 | 129,620 |
| 1998 | 352,754 | 26,999 | 379,752 | 64,971 | 0 | 64,971 | 314,781 | 123,473 |
| 1999 | 329,715 | 25,236 | 354,951 | 60,728 | 0 | 60,728 | 294,223 | 115,409 |
| 2000 | 301,993 | 23,114 | 325,106 | 55,622 | 0 | 55,622 | 269,484 | 105,705 |
| 2001 | 284,641 | 21,786 | 306,427 | 52,426 | 0 | 52,426 | 254,001 | 99,632 |
| 2002 | 259,093 | 19,830 | 278,924 | 47,721 | 0 | 47,721 | 231,203 | 90,689 |
| 2003 | 227,952 | 17,447 | 245,398 | 41,985 | 0 | 41,985 | 203,414 | 79,789 |
| 2004 | 191,543 | 14,660 | 206,203 | 35,279 | 0 | 35,279 | 170,924 | 67,045 |
| 2005 | 157,233 | 12,034 | 169,267 | 28,960 | 0 | 28,960 | 140,307 | 55,036 |
| 2006 | 117,972 | 9,029 | 127,001 | 21,728 | 0 | 21,728 | 105,273 | 41,253 |
| 2007 | 81,289 | 6,222 | 87,511 | 14,972 | 0 | 14,972 | 72,539 | 28,453 |
| 2008 | 38,757 | 2,966 | 41,723 | 7,138 | 0 | 7,138 | 34,585 | 13,566 |
| 2009 | (0) | (0) | (0) | (0) | 0 | (0) | (0) | (0) |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P. 4 COLUMN (7) FOR 1997 BALANCE.
(3) SEE SCHEDULE 1, P. 5 COLUMN (2) FOR 1997 BALANCE.
(4) COLUMN (2) + COLUMN (3).
(5) PER TAX RECORDS OF THE COMPANY.
(6) PER TAX RECORDS OF THE COMPANY.
(7) COLUMN (5) + COLUMN (6).
(8) COLUMN (4) - COLUMN (7).
(9) COLUMN (8) x TAX RATE .39225.

BV30BAS2.WK4  10/23/97

NARR 23384

Schedule 1
Page 14 of 16

SUMMARY OF CONTRACT TERMINATION CHARGES
MONTAUP ELECTRIC COMPANY
RETURN ON FIXED COMPONENT

| YEAR END (1) | BALANCE OF FIXED COMPONENT (2) | DEFERRED TAXES (3) | NET BALANCE (4) | AVG NET BALANCE (5) | SUBTOTAL ANNUAL RETURN ON UNAMORTIZED BALANCE USING BASE ROE (6) | PLUS: RETURN ON UNAMORT. ITC (7) | TOTAL ANNUAL RETURN (8) |
|---|---|---|---|---|---|---|---|
| 1997 | 398,659 | 129,620 | 269,039 | | | | |
| 1998 | 379,752 | 123,473 | 256,280 | 262,659 | 29,781 | 1,235 | 31,016 |
| 1999 | 354,951 | 115,409 | 239,542 | 247,911 | 28,109 | 1,128 | 29,236 |
| 2000 | 325,105 | 105,705 | 219,401 | 229,471 | 26,018 | 1,020 | 27,038 |
| 2001 | 306,427 | 99,632 | 206,795 | 213,098 | 24,161 | 913 | 25,074 |
| 2002 | 278,924 | 90,689 | 188,234 | 197,515 | 22,395 | 808 | 23,200 |
| 2003 | 246,398 | 79,789 | 166,609 | 176,922 | 20,060 | 698 | 20,758 |
| 2004 | 206,203 | 67,045 | 139,158 | 152,384 | 17,278 | 591 | 17,868 |
| 2005 | 169,267 | 55,036 | 114,231 | 126,695 | 14,365 | 483 | 14,848 |
| 2006 | 127,001 | 41,293 | 85,708 | 99,970 | 11,335 | 376 | 11,711 |
| 2007 | 87,511 | 28,453 | 59,058 | 72,383 | 8,207 | 269 | 8,475 |
| 2008 | 41,723 | 13,566 | 28,157 | 43,607 | 4,944 | 161 | 5,105 |
| 2009 | (0) | (0) | (0) | 14,078 | 1,596 | 54 | 1,650 |

EECo 12/31/95
CAPITAL STRUCTURE

| | | ATWACC | | BTWACC |
|---|---|---|---|---|
| COMMON | 48.45% | 9.20% (a) | 4.46% | 7.33% |
| PFD | 5.95% | 9.83% | 0.58% | 0.96% |
| LTD | 45.60% | 6.67% | 3.04% | 3.04% |
| | 100.00% | | 8.08% | 11.338% |
| TAX RATE | | | | 39.225% |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P 13 COLUMN (4).
(3) SEE SCHEDULE 1, P 13 COLUMN (9).
(4) COLUMN (2) - COLUMN (3).
(5) COLUMN (4) PRIOR YEAR+COLUMN (4)/2.
(6) COLUMN (5) * TOTAL RATE OF RETURN.
(7) AVERAGE UNAMORT. ITC (ASSUMING 12 YR SL AMORT OF P. 5, COLUMN (2) * BTWACC).
(8) COLUMN (6) + COLUMN (7).
(a) PER NEP RI FILING.

BV309AS2.WK4  10/23/97

NARR 23385

Schedule 1
Page 16 of 16

**NORTHUP ELECTRIC COMPANY**
**SUMMARY OF CONTRACT TERMINATION CHARGES**
**BLACKSTONE VALLEY ELECTRIC COMPANY SHARE (100%)**
**VARIABLE COMPONENT**



| YEAR END (1) | NUCLEAR DECOMMISSIONING AND OTHER POST SHUTDOWN COSTS (2) | TOTAL OBLIGATION (3) | POWER CONTRACTS ASSURED MARKET VALUE (4) | NET EXCESS OVER MARKET (5) | FUTURE POWER CONTRACT BUYOUTS (6) | TOTAL OBLIGATION (7) | ASSURED MARKET VALUE (8) | NET EXCESS OVER MARKET (9) | ABOVE MARKET FUEL TRANSPORT COSTS (10) | TRANSMISSION IN SUPPORT OF REMOTE GEN. UNITS (11) | PAYMENTS IN LIEU OF PROPERTY TAXES (12) | EMPLOYEE SEVERANCE AND RETRAINING COSTS (13) | DAMAGES, COSTS OR NET RECOVERIES FROM CLAIMS (14) | PMT FOR RMB UNITS REAL AFTER MKT. VALUATION (15) | BVME TOTAL VARIABLE COMPONENT (16) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(The table body consists of annual rows from 1998 through 2029 with numeric values; the majority of columns (6)–(15) contain zeros. Individual digit values are not legibly reproducible from this scan.)*

**Column Notes:**
(2) Schedule 1, p. 6 Column (9) + Schedule 1, p. 7 Column (9)
(3) Schedule 1, p. 9
(5) Column (3) - Column (4)
(6) Schedule 1, p. 10 Column (5)
(8) Column (7) - Column (4)
(9) Column (7) - Column (6)
(11) Schedule 1, p. 11 Column (4)
(16) Sum of Columns (2), (5), (6), (9), (10), (11), (12), (13), (14), and (15)

NARR 23386

**SCHEDULE 2**

**CALCULATION OF ADJUSTMENT FOR DEFERRAL
OF CONTRACT TERMINATION DATE**

NARR 23387

IMPACT OF CONTRACT TERMINATION DEFERRAL    Schedule 2
ON STARTING BALANCE OF SUNK COMMITMENTS    Page 1 of 3
MONTAUP ELECTRIC COMPANY
($ IN 000's)

**1998**

CONTINUATION OF CURRENT RECOVERY

| | | |
|---|---:|---:|
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 332 (b) | 28 |
| TOTAL | 16,298 | 1,359 |
| | | |
| AMORT PER CTC | | |
| TOTAL | 19,575 (c) | 1,631 |
| EXCESS AMORTIZATION | (3,277) | (273) |
| | | |
| CUMULATIVE EXCESS AMORT. | (3,277) | (273) |

**1999**

CONTINUATION OF CURRENT RECOVERY

| | | |
|---|---:|---:|
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 19 (b) | 2 |
| TOTAL | 15,985 | 1,332 |
| | | |
| AMORT PER CTC | | |
| TOTAL | 25,470 (c) | 2,123 |
| EXCESS AMORTIZATION | (9,485) | (790) |
| | | |
| CUMULATIVE EXCESS AMORT. | (12,763) | (1,064) |

**2000**

CONTINUATION OF CURRENT RECOVERY

| | | |
|---|---:|---:|
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | (180)(b) | (15) |
| TOTAL | 15,786 | 1,316 |
| | | |
| AMORT PER CTC | | |
| TOTAL | 30,513 (c) | 2,543 |
| EXCESS AMORTIZATION | (14,727) | (1,227) |
| | | |
| CUMULATIVE EXCESS AMORT. | (27,489) | (2,291) |

(a) Schedule 1, p. 4, Column (8)
(b) Schedule 1, p. 5, Column (3) + Schedule 1, p. 5a, Amortization Amount (1996 & Beyond)
(c) Schedule 1, p. 12, Column (3) + Schedule 1, p. 5a, Column (1)


BV30BAS2.WK4  10/23/97

NARR 23388

NARR 23389



RECONCILIATION ADJUSTMENT ILLUSTRATION CALCULATION
BLACKSTONE VALLEY ELECTRIC SHARE

Schedule 2
Page 3 of 3

COLUMN NOTES:
(2) ASSUMED TO BE ZERO.
(3) TO BE DETERMINED AT VALUATION.
(4) SEE SCHEDULE 2, PG. 2, COLUMN (23) X -1.
(5) COLUMN (2) x BLACKSTONE'S % OF SALES.
(6) COLUMN (3) x BLACKSTONE'S % OF SALES.
(7) SUM OF COLUMN (4) THROUGH (6).
(8) COLUMN (10) PRIOR YEAR x RETURN @ BTWACC.
(9) COLUMN (10) PRIOR YEAR + (-) COLUMN(8) CURRENT YEAR.
(10) PRIOR YEAR COLUMN (10) + CURRENT YEAR SUM COLUMN (7) THROUGH (9).

BVG02/M2JXM4  10/23/97

NARR 23390

**SCHEDULE 3**

RECONCILIATION OF FAS 106 AND FAS 87 UPON DIVESTITURE

NARR 23391

**Reconciliation of FAS 106 and 87**
**Upon Divestiture**

**$ in Thousands**

|  | Actual After Date of Divesture |
|---|---|
| ***One-Time Adjustments Upon Divesture:*** | |
| | |
| **[1] Post Retirement Health Care Benefits -** | |
| Unrecognized FAS 106 Gain or (Loss) | |
| | |
|     (a) **Unrecognized Net Gain/(Loss) associated with FAS 106** | |
|        MEC | . |
|        EUASC x 23.504% | : |
|        Total unrecognized Net Gain/(loss) allocated to MEC | . |
| | |
|     (b) **Generation Related Portion** | 93.08% |
|     (c) Total Unrecognized Net Gain/(Loss) allocated to Generation | . |
| | |
| | |
| **[2] Pensions -** | |
| Unrecognized FAS 87 Gain or (Loss) * | |
| | |
|     (d) **Unrecognized Net Gain/(Loss) associated with FAS 87** | |
|        MEC | . |
|        EUASC x 23.504% | : |
|        Total Unrecognized Net Gain/(Loss) allocated to MEC | . |
| | |
|     (e) **Less: Unrecognized Prior Service Costs associated with FAS 87** | |
|        MEC | . |
|        EUASC x 23.504% | : |
|        Total Unrecognized Prior Service Costs Allocated to MEC | . |
| | |
|     (f) **Less: FAS 87 Transition Liability** | |
|        MEC | . |
|        EUASC x 23.504% | : |
|        Total FAS 87 Transition Asset allocated to MEC | . |
| | |
|     (g) **Plus: FAS 87 Transition Asset** | |
|        MEC | . |
|        EUASC x 23.504% | : |
|        Total FAS 87 Transition Asset allocated to MEC | . |
| | |
|     (h) Net Unrecognized Gain/(Loss) Associated with Pension | . |
|     (i) Generation Related Portion | 93.08% |
|     (j) Net Unrecognized Gain/(Loss) allocated to Generation | . |

* For the purpose of this reconciliation the unrecognized FAS 87 gains or losses shall be the amount of the net unrecognized transition obligation, prior service cost, and unrecognized FAS 87 gains or losses only to the extent that such gains or losses exceed five percent of the greater of plan assets or liabilities.

Row Notes:
(a) Per actual accounting and actuarial records.
(b) = Generation allocator based upon salaries and wages.
(c) = (a) x (b)
(d), (e), (f), (g) Per actual accounting records.
    Specific Company balances for Union, Non-Union, and SERP plans will be allocated by multiplying the total
    EUA balance for these plans by the ratio of the Company liability to the total EUA liability, by plan.
(h) = (a) - (b) - (c) + (d)
(i) See (b) above.
(j) = (h) x (i)

NARR 23392

Schedule 3
Page 3 of 4

<u>Power Contract Buyout Incentive</u>
*Associated with Canal Divestiture*

**$ in Thousands**

*Market Price Assumptions* \*

<u>cents/kwh</u>

| | |
|---|---|
| 1998 | 2.48 |
| 1999 | 2.63 |
| 2000 | 2.65 |
| 2001 | 2.59 |
| 2002 | 2.87 |
| 2003 | 2.97 |
| 2004 | 3.07 |
| 2005 | 3.16 |
| 2006 | 3.25 |
| 2007 | 3.36 |
| 2008 | 3.49 |
| 2009 | 3.58 |
| 2010 | 3.71 |
| 2011 | 3.80 |
| 2012 | 3.95 |
| 2013 | 4.05 |
| 2014 | 4.14 |
| 2015 | 4.24 |
| 2016 | 4.39 |
| 2017 | 4.51 |
| 2018 | 4.62 |
| 2019 | 4.74 |
| 2020 | 4.85 |
| 2021 | 4.97 |
| 2022 | 5.09 |
| 2023 | 5.20 |
| 2024 | 5.32 |
| 2025 | 5.43 |
| 2026 | 5.55 |
| 2027 | 5.67 |
| 2028 | 5.79 |
| 2029 | 5.90 |

\* Note:    Market Price Assumptions are fixed for purposes of the calculation of
the Power Contract Buyout Incentive associated with the Canal divestiture.

NARR 23394

Schedule 3
Page 4 of 4

**Ocean State Power Buyout Incentive**
For Illustrative Purposes Only
$ in 000

| | | |
|---|---|---|
| 1 | NPV of OSP Costs in CTC | $335,759 |
| 2 | NPV for Incentive Purposes | 302,184 |
| 3 | NPV of Market Value | 188,977 |
| 4 | Above Market Cost for Incentive | 113,207 |
| 5 | NPV of Buyout Amount | 100,000 |
| 6 | Net Value Attributable to Buyout | 13,207 |
| 7 | 10% Buyout Incentive | 1,321 |
| 8 | Blackstone Valley Electric Share | 29.13% |
| 9 | Blackstone Share of Incentive | $385 |

1    NPV at time of divestiture, @ full cost-of-service, using a discount rate
     equal to the actual pre-tax return in place following completion of post-
     divestiture refinancing as determined under section 1.1.4(d). For this
     example, the discount rate used equals 13.092% under Section 1.1.2.
2    90% of Line 1.
3    NPV at time of divestiture of market value for remaining contract lives
     using a discount rate equal to the actual pre-tax return in place following
     completion of post-divestiture refinancing as determined in Section
     1.1.4 (d).   For this example, the discount rate used equals 13.092%.
4    Line 2 - Line 3.
5    NPV, at the time of divestiture, for stipulated term of buyout payments
     using a discount rate equal to the actual pre-tax return in place following
     completion of post-divestiture refinancing as determined in Section
     1.1.4 (d).   For this example, the discount rate used equals 13.092%.
6    Line 4 - Line 5.  Cannot be less than zero.
7    Line 6 * 10%.
8    Blackstone Valley Electric Company's share of MEC stranded costs.
9    Line 8 x Line 7.

NARR 23395

**SCHEDULE 4**

**MONTAUP ELECTRIC COMPANY**
**POST 1995 CAPITAL INVESTMENTS**

NARR 23396

NARR 23397

15-96/97   **Minor Imps/Rets – Canal #2 Common** - $83,105
X15-96/97   Perform miscellaneous minor improvements and retirements of Canal Unit #2 equipment, which is common to Canal Unit #1.

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Project:  To increase the operational and maintenance efficiency of the unit.

16-96/97   **Minor Imps/Rets – Wyman #4** - $6,565
X16-96/97   Perform miscellaneous minor improvements and retirements at Wyman Unit #4.

Charges and credits to plant will reflect Montaup's 1.9618% share of ownership.

Reason for Project:  To increase the operational and maintenance efficiency of the unit.

34   **1994 Miscellaneous Projects, Canal 2** - $708,661
X34   This requisition includes the following projects which began during 1994, and is net of $11,985,355 for gas conversion which is included in December 31, 1995 embedded plant amounts.

1. Miscellaneous Improvements under $25,000
2. Gas for Canal Unit #2
3. Generator Stator Refurbishment
4. Emission Monitoring, Common
5. NOx Ports and Register Assemblies
6. Replace Breaker Mufflers, Common
7. Replace ID Fan Inlet Box
8. Discharge Flume Repairs, Common
9. CO Reduction
10. Resin for Polishers
11. Refurbish Marine Building, Common
12. Ash Pit and Expansion Joint Work
13. Economizer Expansion Joints
14. Cold End Air Preheater B
15 Piping Restraint System
16. Maintenance Management System, Common
17. Electrostatic Precipitator Refurbishment
18. Condensate Polisher Refurbishment
19. Generator Rings & Stator Windings

Charges and credits to plant will reflect Montaup's 50% share of ownership

Reason for Projects:  To increase the operational and maintenance efficiency of the unit.

NARR 23398

35      **1995 Miscellaneous Projects, Canal 2** - $137,978
X35    This requisition includes the following projects which began during 1995:

        1.        Replace Turbine Room Roof
        2.        Training/Visitor Building
        3.        Waste Neutralizing Tank
        4.        Caustic & Acid Storage Area Repairs
        5.        Combustion Modifications & CO
        6.        Neutralizing Wash System
        7.        Reheat Controls Upgrade

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects:  To increase the operational and maintenance efficiency of the unit.

36      **1996 Miscellaneous Projects, Canal 2** - $2,698,884
X36    This requisition includes the following projects which began during 1996:

        1.        ID Fan Attenuators
        2.        NOx/CO Reduction

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects:  To increase the operational and maintenance efficiency of the unit.

37      **1997 Miscellaneous Projects, Canal 2** - $21,678
X37    This requisition includes the following projects which began during 1997:

        1.        Callon Regeneration Vessel Replacement
        2.        Rework Furnace Wall
        3.        Replace ID Fan Attenuators
        4.        Precipitator Roof Enclosure
        5.        Precipitator Inlet Flow Distribution

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

718     **Warehouse No. 2 Roof and Side Walls** - $57,740
X718   Install a new metal roof and metal siding on warehouse.  Retire existing roof and siding.

Reason for Project:  Existing roof and sidewalls are heavily corroded and leak excessively.

797     **Preservation of Unit 5** - $40,366
        Design, supply and maintain a dehumidification and sealing system to protect the generating equipment of
        Unit No. 5 from corrosion damage while the unit remains in a deactivated reserve status.  Several tasks
        must be performed by Engineering, plant personnel and outside contractors to prepare the unit for the
        acceptance of the dehumidification system.

Reason for Project:  As a result of Unit No. 5 being placed in a deactivated reserve status, procedures must be followed to preserve the mechanical and electrical components.  The preservation is to prevent moisture attack to the metal components and to maintain operational integrity of the Unit.

X806    **1995 Asbestos Abatement, LP Station - $738,326**
Remove asbestos insulating material from Units 1-4, low pressure station.  Reinsulate the equipment which is still in service.

Reason for Project:  Remove insulation, refractories, coatings and gasketing material from the equipment to allow dismantlement, reduce environmental liability and diminish ongoing maintenance and re-encapsulation costs.

X808    **Units 1, 2, 3 & 4 Salvage - ($100,132)**
To capture salvage value for reserve of physical plant equipment from Somerset Units 1, 2, 3 and 4, previously retired.  This work addresses salvage of unit generators 1, 2 and 4 as one effort.  A second effort addresses salvage of units 1, 2 and 4 main transformers and numerous other station service transformers.

Unit generators have a salvage value of $10,000 each for a total of $30,000.  The last of 15 transformers have a salvage value of $40,000.  Montaup labor will consist of electrical disconnects and isolation, and operation of overhead cranes.  Montaup labor is estimated at $10,000.

Reason for Project:  To obtain existing secondary market value of used equipment.

812
X812    **Abatement & Encapsulation, Stacks 1-4 - $29,682**
Complete abatement and encapsulation of stacks 1-4 at Montaup Electric's Somerset Station.  Air monitoring and proper disposal of all asbestos materials and debris included.

Reason for Project: The existing mastic coating is flaking off stacks 1-4.  In order to contain this mastic material is necessary to completely abate all four stacks.  In addition, once this coating is removed, stacks 1-4 must be sealed in order to preserve their weather integrity.

815
X815    **J2 Gas Turbine Exhaust Silencer - $105,095**
Purchase and install a new exhaust silencer for the J2 gas turbine.  Remove and retire the existing silencer.

Reason for Project:  The existing silencer is severely corroded.  Internal attenuating baffles are damaged beyond repair.  Installation of the new silencer will be performed during the annual overhaul of the unit.

816
X816    **J1 Gas Turbine Exhaust Silencer - $98,542**
Purchase and install a new exhaust silencer for the J1 gas turbine.  Remove and retire the existing silencer.

Reason for Project: The existing silencer is severely corroded. Internal attenuating baffles are damaged beyond repair. Installation of the silencer will be performed during the annual overhaul of the unit.

**818**
**X818**   **Air Preheater Basket Replacement - $244,066**
Replace air preheater heat exchange basket assemblies.

Reason for Project: This project will improve unit heat rate. In addition, it will increase combustion air temperature due to improved heat transfer from new baskets.

**822**
**X822**   **New Cond. Tubes - $491,620**
Install approximately 11,200 new 90-10 Cu-Ni, 7/8" OD, 18 BWG, 30' long tubes in Unit #6 steam condenser.

Reason for Project: The existing tubes will be in service for 30 years by 1997. The condition of these tubes was such that 5,500 tube end inserts had to be installed in 1990 to prevent further corrosion of tubes. Tube leaks will necessitate load reduction or unit outage, threaten the boiler water chemistry, and also lead to degradation of the heat rate of the unit. New condenser tubes will assure improved boiler water chemistry and better thermal performance for many years.

NARR 23401

**SCHEDULE 5**

DETAIL OF EARLY RETIREMENT, EMPLOYEE TERMINATION & RETRAINING COSTS RESULTING
FROM DIVESTITURE

**Schedule 5**
Detail of
Early Retirement, Employee Terminations & Retraining Costs
Resulting from Divestiture

$ in Thousands

| | Non-Union | Union | Total All |
|---|---|---|---|
| **I.  Accounting Costs:** | | | |
| **A.  Early Retirement** | | | |
| **- Additional Benefits:** | | | |
| (1)  Pension | $5,726.0 | $1,312.0 | |
| (2)  Severance | $134.0 | $189.0 | |
| (3)  Health | $1,643.0 | $266.0 | |
| (4)  Retraining | $108.0 | $51.0 | |
| **Subtotal Early Retirement (I.A)** | $7,611.0 | $1,828.0 | $9,439.0 |
| **B.  Terminations & Employee Retraining** | | | |
| **- Severance:** | | | |
| (1)  Payments | $830.7 | $938.8 | |
| (2)  Health | $146.8 | $248.4 | |
| (3)  Retraining | $81.0 | $138.0 | |
| **Subtotal Terminations & Retraining (I.B)** | $1,057.5 | $1,325.2 | $2,382.7 |
| **TOTAL PROGRAM COSTS (I.A, I.B)** | $8,668.5 | $3,153.2 | $11,821.7 |
| **II.  Position Reductions:** | | | |
| A.  # Employees Eligible for Early Retirement | 50 | 17 | 67 |
| B.  # Employees Accepting Early Retirement | 36 | 17 | 53 |
| C.  # Employees to be Severed | 27 | 46 | 73 |
| D.  Total Reductions (Early Retirement & Severance) | 63 | 63 | 126 |

Notes:
Assumes a 7.5% discount rate
Costs include those of Montaup Electric Company and EUA Service Corporation in support of generation function

NARR 23403

**ATTACHMENT 1N**

**PURCHASE OF ELECTRIC SERVICE FOR RESALE**
**AMENDMENT TO SERVICE AGREEMENT**

NARR 23404

MONTAUP ELECTRIC COMPANY

Purchase of Electric Service for Resale

AMENDMENT TO SERVICE AGREEMENT

Dated: October        , 1997

Parties:    MONTAUP ELECTRIC COMPANY
a Massachusetts corporation (the "Company")

and

NEWPORT ELECTRIC CORPORATION,
a Rhode Island corporation (the "Customer"),

WHEREAS, the Customer is currently an all-requirements electric customer of the

Company under the Company's FERC Tariff, First Revised Volume No. 1 (the "Tariff"),

and a Service Agreement as amended (the "Service Agreement"); and

WHEREAS, under the Service Agreement, the Customer purchases from the

Company for resale all of the electric requirements of the ultimate customers in the

Customer's service territory; and

WHEREAS, the Rhode Island  Legislature passed into law the Rhode Island Utility

Restructuring Act of 1996 ("URA"), which extends wholesale competition in power supply

markets to retail customers through the provision of retail access; and

WHEREAS, termination of all-requirements service under the Tariff and the provision

of unbundled transmission service by the Company to Customer under the Company's open

access tariff are necessary to implement retail access in a manner consistent with the URA;

and

WHEREAS, the Customer desires to comply with the URA which mandates a

reduction in the purchase of its energy requirements from the Company under the Tariff

before the term of the Service Agreement has expired and the Customer further desires to

NARR 23405

retain the flexibility to terminate all purchase requirements under the Tariff on the Contract

Termination Date, as defined in Section 3 of this Amendment; and

      WHEREAS, the Customer desires to continue to receive transmission service over the

transmission facilities owned or operated by the Company after the termination of its

purchases under the Tariff; and

      WHEREAS, the Customer desires to retain the option, but not the obligation, to

purchase electricity from the Company after the termination of its purchases under the Tariff

or the option for the ultimate customers in the Customer's service territory to do so; and

      WHEREAS, the Company is willing to permit the Customer to terminate its purchase

requirement before the Term has expired and to provide the options desired by the Customer,

but only upon the terms and conditions set forth in this Amendment to Service Agreement

("Amendment"),

      NOW, THEREFORE, the Company and the Customer, in consideration of their

mutual commitments set forth herein, agree as follows:

1.      The Parties agree that, notwithstanding anything to the contrary in the Service

      Agreement or in the Tariff, the Customer's obligation to purchase energy under the

      Service Agreement and the Company's obligation to provide energy under the Service

      Agreement shall be reduced as of July 1, 1997, in accordance with the Retail Access

      Schedule (as defined in Section 2 of this Amendment) and shall terminate as of the

      Contract Termination Date, which shall be determined pursuant to Section 3 of this

      Amendment. Except as provided in Section 10 below, or in a separate contract for

      power supply, the Company shall have no further obligation to meet the electricity

      demands of the ultimate customers in the service territory of the Customer on or after

2

Attachment 1N

the Contract Termination Date, or to make any plan, investment, purchase, or
commitment to maintain sufficient generating capacity to provide adequate,
continuous, or reliable electricity supplies to the Customer or its ultimate customers
on or after such date.

2.   Commencing on July 1, 1997, the Customer shall not be obligated to purchase, and
the Company shall not be obligated to supply, energy required by any distribution
service customer of the Customer, or its successor or assign, that is taking retail
access in accordance with the following schedule ("Retail Access Schedule"):

Phase 1:   On July 1, 1997, the following customers shall have retail access: (i)
all new commercial and industrial customers, including new
manufacturing customers, commencing service on or after July 1, 1997,
with an anticipated average annual demand of two hundred (200)
kilowatts or greater; (ii) all existing manufacturing customers with an
average annual demand of fifteen hundred (1500) kilowatts or greater;
and (iii) all accounts in the name of the State of Rhode Island,
provided, however, the Customer may limit retail access to no more
than ten percent (10%) of its total kilowatt-hour sales.

Phase 2:   On January 1, 1998, retail access shall be extended to the following
customers: all existing manufacturing customers with an average annual
demand of two hundred (200) kilowatts or greater and all accounts in
the name of the cities and towns in Rhode Island, provided, however,
the Customer may limit retail access to no more than twenty percent
(20%) of its total kilowatt-hour sales.

3

NARR 23407

Attachment 1N

Phase 3:      The remaining customers shall have retail access on the earliest to

occur of: (i) July 1, 1998; (ii) within three months after retail access is

available to forty percent (40%) or more of the kilowatt-hour sales in

New England including the total kilowatt-hour sales in Rhode Island,

provided, however, if the Rhode Island Public Utilities Commission

("RIPUC") extends the deadline beyond July 1, 1998, then the

remaining customers shall have access on the extended date established

by the RIPUC; or (iii) the Retail Access Date defined in Section 3(a).

3.    Montaup's obligations to provide requirements service shall cease on the Contract

Termination Date. The Contract Termination Date shall occur on the earlier of the

Retail Access Date or the Wholesale Access Date, defined as follows:

(a) The Retail Access Date shall be the later of January 1, 1998 or the date of a final

nonappealable order of the RIPUC approving the implementation methodology for the

disposition of Montaup's non-nuclear generating facilities, provided, however that the

Retail Access Date shall occur no later than three months after retail access is made

available to forty percent (40%) or more of the kilowatt-hour sales in New England,

including the total kilowatt-hour sales in Rhode Island and, in any event, not later

than July 1, 1998.

(b) The Wholesale Access Date shall be the earlier of the Retail Access Date or the

date on which the Customer in its sole discretion decides to terminate purchases under

Tariff 1 and its Service Agreement with Montaup by providing FERC and the

Signatories with 90 days advance notice in writing, or less with the mutual consent of

the parties, said date not to be earlier than January 1, 1998.

4

4.    For service under the Tariff commencing July 1, 1997 and continuing to the Contract
Termination Date, the Company shall continue to charge and the Customer shall
continue to pay the Demand and Energy Charges shown on Sheet No. 4 as revised,
which sets forth the M-14 rates, and the Company shall defer a portion of the M-Rate
billings to the Customer to ensure that the Customer is held harmless as a result of
the phase-in of retail access in Rhode Island.

5.    The Customer agrees that its Billing Determinants for calculating Demand Charges
shall apply to all kilowatts recorded by the Customer in the Customer's service territory.
The Customer further agrees that its Billing Determinants for calculating Energy Charges
shall apply to all kilowatt-hours recorded by Customer less all kilowatt-hours recorded by
Customer as supplied by a Non-Regulated Power Producer ("NRPP") as that term is defined
in the URA.6. The Company agrees to defer a portion of the Demand Charges in
accordance with the following formula:

Hold Harmless Deferral (HHD) = (amdr * $kW_{total\ access}$) - (TC per kWh * $kWh_{total\ access}$) -
$Trans_{Retail}$

Where:

a) average monthly demand rate:

$$amdr = \frac{Base \pm PCAC}{kW_{cp}}$$

b) Base - Base Rate Demand Charges (initial and tail block charges) as specified in
the Company's effective rate under Section III and applied to the full requirements
of the Customer.

c) PCAC - Purchased Capacity Adjustment Clause rate as provided for in the
Company's effective rate under Section III B and applied to the initial block of the
full requirements of the Customer.

d) $Trans_{Retail}$ - Represents Transmission billings, for all kWh gone to retail choice

e) $^{(1)}kW_{cp}$ - The Customer's coincident peak demand in kilowatts, including kW gone to

5

NARR 23409

retail choice.

f) $^{(1)}kW_{retail\ access}$ & $kWh_{retail\ access}$ - kW demand and associated energy gone to retail choice.

a) TC - Transition Charge, initially set at $0.028 per kWh per the URA and revised from time-to-time as approved by the Commission.

(1) Adjusted for losses to the wholesale metering points.

7.    The Company shall record the HHD as a regulatory asset on its books as a receivable, and the Customer shall record on its books a corresponding payable, owed to the Company at the completion of the Company's divestiture of its non-nuclear generating facilities in accordance with Section 1.1.4(c)(ii) of Appendix 1. The Company shall mitigate the HHD upon the reconciliation of the 1997 Purchase Capacity Adjustment Clause by allocating that portion of the Sales Credit which can be attributed to the sales of capacity resulting from $kW_{retail\ access}$.

8.    Commencing on the Contract Termination Date, the Customer shall pay to the Companythe Contract Termination Charges determined in accordance with Appendix 1 and Schedules 1 and 2 to this Amendment, which sets forth Base Contract Termination Charges and formulae for the adjustment of the Base Contract Termination Charges. The Contract Termination Charges shall apply to all kilowatt-hours delivered by the Customer, or its successor or assign, in the Customer's Service Area, whether or not such kilowatthours are sold by the Customer. The Customer's Service Area is defined to include the area served by the Customer on December 1, 1996. Kilowatt-hours delivered are defined to include all kilowatt-hours delivered to electricity consumers in the Customer's Service Area, whether or not they are present customers of the Customer. The Base Contract Termination Charges shall equal the

6

# Tab 4

# (5 of 8)

Attachment 1N

cents per kilowatt-hour amounts shown on Schedule 1.

The Base Contract Termination Charges shall recover the Customer's proportionate share of the Company's total contract termination costs shown in Schedule 1, which share equals 29.13 percent of the Company's total contract termination costs. The Base Contract Termination Charges shall be subject to adjustments for a Residual Value Credit described in Appendix 1. The Base Contract Termination Charges shall be adjusted through a Reconciliation Account in which differences, whether positive or negative, between the estimates for costs and revenues included in the Base Contract Termination Charges and actual costs and revenues are subtracted from the Base Contract Termination Charges from the Company to the Customer.

9.  Notwithstanding anything to the contrary in the Tariff or the Service Agreement, the Contract Termination Charges specified in Appendix 1 and Schedules 1 and 2 to this Amendment shall remain in effect until the Company has collected all amounts subject to collection thereunder and neither the Customer's obligation to pay the Contract Termination Charges in full nor the formulae for the calculation of the Contract Termination Charges set forth in Appendix 1 and Schedules 1 and 2 to this Amendment shall be subject to change by the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act, absent the agreement of the Company or its successors or assigns.

10.  The Company shall provide "Standard Offer Service" to the Customer commencing on the Contract Termination Date and continuing for the period through December 31, 2009 (the "Standard Offer Period"). Standard Offer Service, shall consist of the wholesale supply of power sufficient to meet the requirements of retail customers

7

served by the Customer's distribution system that purchase Standard Offer retail service from the Customer.

(a)    Standard Offer Service shall be made available at the prices set forth in the Stipulation and Agreement adjusted for a fuel index. The prices for Standard Offer Service shall be for electricity delivered to the meter of Customer's ultimate customers, not including the charges for Customer's distribution services or for the Company's Network Integration Transmission Service, but including any and all transmission charges to reach the Company's system that are not recovered in Customer's transmission cost recovery provisions.

(b)    Standard Offer Service shall be available to Customer after the Contract Termination Date. After that date, Customer, in its sole discretion, is free to reduce its purchases under the Standard Offer by pursuing other opportunities in the wholesale market, and Customer's ultimate customers may terminate Standard Offer Service at any time to purchase from a nonregulated power producer as defined in Section 39-1-2(7.1) of the Rhode Island General Laws. Once Customer has reduced its wholesale purchases for those ultimate customers who have terminated Standard Offer Service, it may only elect to increase its purchase for resale to any of Customer's residential or small general service customers who: (1) purchased power from Customer immediately prior to the Retail Access Date; (2) begin to purchase power from a nonregulated power producer on or within one year of the Retail Access Date; and (3) elect to return to Standard Offer Service within 120 days of taking service from such nonregulated power producer.

(c)    In the event the Contract Termination Date is determined by the Wholesale

8

Attachment 1N

Access Date, the Customer shall be free, either in its notice pursuant to Section 3(b),
or thereafter by giving the Company at least 90 days advance written notice directed
to the first day of a calendar month, to terminate or reduce its purchases of Standard
Offer Service from the Company in order to obtain electricity from other suppliers in
the market. Once the Customer has reduced or terminated its purchases of Standard
Offer Service from the Company, the Company shall have no obligation to supply
Standard Offer Service to the Customer with respect to the terminated or reduced
purchases, except as provided for in Section 10(b).

(d)    No less than 90 days before the Retail Access Date, the Customer shall notify
the Company in writing of its estimate of the capacity and energy it shall purchase
under Standard Offer Service for resale to ultimate customers in its service territory.
The Customer shall provide the Company with at least 30 days prior advance written
notice, directed to the first day of a calendar month, of reductions in the quantity of
energy so purchased due to decisions by Standard Offer Service customers to purchase
electricity from other nonregulated power producers after the Retail Access Date.
Nothing in this Amendment shall restrict the right of any ultimate customer to
purchase electricity from nonregulated power producers after the Retail Access Date,
provided that, except as set forth in Section 10(b) above, once any such ultimate
customer has purchased electricity from a nonregulated power producer, the Company
shall have no obligation to supply Standard Offer Service to the Customer for resale
to such ultimate customer.

(e)    The Company acknowledges that the Customer will offer alternative power
suppliers the opportunity in an auction to supply electricity to enable the Customer to

9

NARR 23413

provide Standard Offer Service to ultimate customers in its service territory after the

Retail Access Date. The Company, its successors or assigns, shall be free to bid in

the auction, provided that the Company's bid shall not exceed the prices set forth in

the Stipulation and Agreement, adjusted for the fuel index set forth in that Agreement.

11.     Commencing on the Contract Termination Date, the Company (including any

successor or assign of the Company that succeeds to the Company's obligations with

respect to the operation of its transmission facilities) shall, upon request of the

Customer, provide network integration transmission service to the Customer in

accordance with the Service Agreement for Network Integration Transmission Service

between the Customer and the Company of even date, and with the terms and

conditions of the tariff or successor tariff or tariffs for such service in accordance

with the policy of the Federal Energy Regulatory Commission as in effect from time

to time. Such service shall be provided to the Customer after the Wholesale Access

Date to enable the Customer to integrate its loads and resources and shall be provided

to the Customer after the Retail Access Date to enable the ultimate customers in the

Customer's service territory to integrate their loads and resources.

12.     This Amendment shall take effect as of the date it is permitted to become effective by

FERC, which date shall be referred to as the "Effective Date." This Amendment,

together with all provisions of the Tariff and the Service Agreement necessary to

effectuate all provisions of this Amendment, shall remain in effect until all obligations

of the parties under this Amendment, including, without limitation, the obligation of

the Customer to pay to the Company the Contract Termination Charges, have been

discharged in full. Upon the discharge in full of all such obligations, this Amendment

NARR 23414

Attachment 1N

and the Service Agreement shall terminate.

13.   The provisions of this Amendment shall override any inconsistent provisions of the
Service Agreement and, with respect to the Customer, all inconsistent provisions of
the Tariff, but all provisions of the Tariff and the Service Agreement that are not
inconsistent   with this Amendment shall remain in full force and effect.

14.   The rights conferred and obligations imposed on the parties to this Amendment shall
be binding on or inure to the benefit of their successors in interest or assignees as if
such successor or assignee was itself a party hereto.

11

NARR 23415

Attachment 1N

IN WITNESS WHEREOF, the parties have executed this Amendment of Service

Agreement as of the date first written above.

MONTAUP ELECTRIC COMPANY

By _____

Robert G. Powderly

Title:   Executive Vice President

NEWPORT ELECTRIC CORPORATION

By _____

John D. Carney

Title:   President

Q:\SETTL.MNT\ATTACH3.BVE\NECAMEND.WPD

12

NARR 23416

**APPENDIX 1**

**FORMULA FOR CALCULATING CONTRACT TERMINATION CHARGES**

NARR 23417

Appendix 1

## MONTAUP ELECTRIC COMPANY
## AMENDMENT TO SERVICE AGREEMENT WITH
## NEWPORT ELECTRIC CORPORATION UNDER
## FERC ELECTRIC TARIFF, FIRST REVISED VOLUME NO. 1
## FORMULA FOR CALCULATING CONTRACT
## TERMINATION CHARGES

1.1    The Fixed Component of the Contract Termination Charge shall include Newport

Electric Corporation's ("Newport") 11.85 percent allocated share of Montaup's costs as

shown on Schedule 1, Page 2, which shall include:

1.1.1 Revenues sufficient to amortize over a twelve year period commencing on

January 1, 1998 and continuing through December 31, 2009 the following plant

balances and regulatory assets:

(a)    Plant balances shall include unrecovered net book value as shown on Schedule

1, Page 4, Column (7), of the following Montaup generation-related

investments as of December 31, 1997,[1] excluding any capital additions made

after December 31, 1995:

(i)    Somerset Unit 6, Jet 1 and Jet 2 including general plant allocated to
generation;
(ii)   Montaup's ownership Share of Canal Unit 2, including capital additions
past December 31, 1995, but committed prior to that date;
(iii)  Montaup's and Newport's ownership share of Wyman Unit 4;
(iv)   Montaup's ownership share of Millstone Unit 3;
(v)    Montaup's ownership share of Seabrook Unit 1;
(vi)   Montaup's Entitlements in the Maine Yankee and Vermont Yankee
Units, including the balances for materials and supplies;

---

[1]The figures shown on Schedule 1, Page 4, Column (7) are estimates and will be updated for
actual balances as of December 31, 1997. Changes, if any, shall be reconciled at the Divestiture
Date.

A:\NECFORM1.WPD                                    1

NARR 23418

Appendix 1

(vii)   Newport's generation related investment in the Diesel Units at Jepson and Eldred;

(viii)  Step-up transformers at Montaup generating units which are excluded from Montaup's transmission rates;

(ix)   Montaup's non-utility property; and

(x)   Generation-related property held for future use including net investment in Somerset Unit 5, through November 1, 1997, per settlement agreement in Docket ER94-1062-000.

(b)   Regulatory assets shall include the generation-related unrecovered net book balances shown in Schedule 1, Page 5, Column (2), as of December 31, 1997[2]:

(i)   FAS 109;

(ii)   Net pension liability/(asset) of Montaup and allocated to Montaup by affiliates to the extent that they exceed 5% of the greater of the total pension benefits obligation or the fair market value of plan assets.

(iii)  Unamortized deferred FAS 106 costs;

(iv)  Unamortized deferred dredging costs;

(v)   Unamortized ITC; and

(vi)  Montaup's share of unamortized debt expense recorded on the balance sheet of its parent, Eastern Edison Company.

1.1.2 Revenues sufficient to provide an overall pre-tax return of 11.34 percent based on a combined state and federal income tax rate of 39.225 percent, and Montaup's 1995 year-end capital structure as shown in Schedule 1, Page 14, Column (8), including a return on common equity of 9.2 percent for the period prior to the completion of the initial divestiture process for Montaup's non-nuclear generating

---

[2] The figures shown on Schedule 1, Page 5, Column (2) are estimates and will be updated for actual balances as of December 31, 1997. Changes, if any, shall be reconciled at the Divestiture Date.

A:\NECFORM1.WPD          2

NARR 23419

Appendix 1

facilities ("Divestiture Date")[3], and sufficient to provide an overall pretax return of 13.09 percent including a return on common equity of 11.4 percent for the period after the Divestiture Date,[4] multiplied by the average of the beginning and ending balances in each calendar year beginning in 1998 of the sum of the following:

(a)     Unrecovered net book value of Montaup's generation investments as defined under 1.1.1(a) above, plus

(b)     Unrecovered net book value of generation-related Regulatory Assets as defined under 1.1.1(b) above, excluding the unamortized ITC under 1.1.1(b)(v), less

(c)     Deferred Taxes as shown in Schedule 1, Page 13, Column (9), equal to the combined state and federal income tax rate of 39.225 percent, which shall be adjusted for changes in tax laws, multiplied by the sum of:

    (i)     the unrecovered net book value of Montaup's generation investment, plus

    (ii)    the unrecovered net book value of generation-related regulatory assets, less

---

[3] If Montaup sells its non-nuclear generating facilities in more than one transaction, the rights and obligations associated with the divestiture shall be allocated among the transactions using appropriate allocators. In the case of return, the allocator shall be based on the net book value of the sold facility or facilities to total net book value of the non-nuclear generating facilities in Section 1.1.1(a). This percentage allocation shall be applied to the total of plant, regulatory asset balances, and deferred tax balances as set forth below.

[4] The difference between the 11.34 percent and 13.09 percent returns as applied to unamortized balances prior to the Divestiture Date shall be recovered, if divestiture occurs, through an offset to the Residual Value Credit, and the difference between the 11.34 percent and 13.09 percent returns that occurs after the Divestiture Date shall be included in the Reconciliation Account. The 11.34 percent and 13.09 percent returns shall be used as the return wherever a return is referenced throughout this Appendix. However, the 13.09 percent return after the Divestiture Date shall be adjusted in accordance with Section 1.1.4(d). Notwithstanding the above, an equity return of 9.2% will be applied to Montaup's equity investment in the Ocean States Power facility for purposes of estimating Contract Termination Charges under the Amendment.

A:\NECFORM1.WPD                                  3

Appendix 1

(iii)    the unrecovered balance of generation investment for tax purposes, less
(iv)    the unrecovered balance of generation-related regulatory assets for tax purposes.

1.1.3   Revenues sufficient to: (i) amortize over a twelve year period commencing on January 1, 1998 and continuing through December 31, 2009 the generation-related, unrecovered net book balances associated with the FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates[5/]; and (ii) pay a return of 7.25 percent equal to the interest rate reflected in the actuarial analysis of the FAS 106 Transition Obligation of Montaup and allocated to Montaup by affiliates multiplied by the outstanding balances remaining for the FAS 106 Transition Obligation of Montaup and allocated to Montaup by affiliates. Following the Divestiture Date, these outstanding balances shall be subject to a one time adjustment as set forth in Section 1.1.4(b) below. At the same time, the interest rate return for the period after the Divestiture Date shall be established using the most current actuarial analysis available at the time, which rate shall remain in place for the remainder of the fixed cost recovery period.

1.1.4   The Fixed Components shall be subject only to the following adjustments:

(a)    For each month that the Contract Termination Date is delayed beyond January 1, 1998, Montaup shall adjust the Reconciliation Account in

---

[5/]Any FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates that is not allocated to generating facilities shall be deemed transmission related.

A:\NECFORM1.WPD           4

NARR 23421

Appendix 1

the Variable Component of the Contract Termination Charge by an

amount equal to the difference between the depreciation and

amortization expense authorized under the M-14 rate and the

depreciation and amortization under Section 1.1.1, together with the

associated return computed in accordance with Section 1.1.2 of this

Appendix, multiplied by Newport's 11.85 percent allocated share. An

exhibit showing the difference between depreciation and amortization

under the M-14 rate and the Contract Termination Charge is included

in Schedule 2.

(b)     Following the Divestiture Date and at the time of implementing the

Residual Value Credit, Montaup shall reconcile the balances in

Sections 1.1.1 and 1.1.3 for Newport's 11.85 percent allocated share

of (i) the unrecognized transition obligation, prior service cost, and

unrecognized gains or losses associated with the FAS 106 obligation;

and (ii) the unrecognized transition obligation, prior service cost, and

unrecognized gains or losses associated with the FAS 87 obligation, but

the gains or losses associated with FAS 87 shall be recognized only to

the extent that they exceed five percent of the greater of total pension

benefits obligation or fair market value of plan assets. Montaup shall

fund the FAS 106 and FAS 87 obligations under this Section and

Section 1.2.2(f) as rapidly as permitted by the tax law up to the level of

A:\NECFORM1.WPD                         5

Appendix 1

revenues collected for this purpose.[6]  Any revenues associated with

these obligations that cannot be immediately funded shall be put into a

separate account on the books to be reserved with the return specified

in Section 1.1.3 until tax deductible funding becomes possible.  The

one-time adjustment associated with FAS 106 and FAS 87, whether

positive or negative, shall be subtracted from or added to the schedules

for prospective recovery of FAS 106, as appropriate, and amortized

with the return specified in Section 1.1.3 over the period between the

sale and December 31, 2009.  An exhibit showing the reconciliations is

included in Schedule 3, page 1.  In addition, Montaup shall reconcile

the balances for Newport's 11.85 percent allocated share of (i) the FAS

109 regulatory asset; and (ii) the general plant allocated to generation,

provided, however, that any general plant not allocated to generation

shall be functionalized to transmission.  The one-time adjustment

associated with differences in the balances for FAS 109 and general

plant, whether positive or negative, shall be subtracted from or added

to the net proceeds reflected in the Residual Value Credit as appropriate

and shall be amortized, with the return specified in Section 1.1.2, over

the period between the sale and December 31, 2009.

---

[6]Montaup's post-divestiture FAS 106 or FAS 87 gains or losses recognized on Montaup's books shall be fully reflected in rates to customers and shall neither be retained nor borne by Montaup. Montaup shall propose an allocation of these post-divestiture gains or losses between customers paying Contract Termination Charges and transmission customers.

A:\NECFORM1.WPD                    6

NARR 23423

Appendix 1

(c)    Montaup has agreed to divest its generating business within six months after the later of the Retail Access Date as defined in the Settlement filed in Docket ER97-3127-000 or the receipt of all governmental approvals and other consents necessary for the divestiture. Within three months after the completion of divestiture or the sale of any property,[2] the cost of which is included in the Contract Termination Charge, Montaup shall implement a Residual Value Credit as a direct offset to the Contract Termination Charges authorized under this Amendment. The Residual Value Credit will be deemed to be fully implemented upon completion of the initial divestiture process for Montaup's non-nuclear generating facilities. Proceeds from the divestiture which are realized after the full implementation of the Residual Value Credit will be reflected in the variable component of the CTC as hereinafter described. The Residual Value Credit to Newport shall be calculated as follows:

(i)    Newport's 11.85 percent allocated share of Total Proceeds[3]

---

[2]Proceeds, if any, from Montaup's future leases of nuclear entitlements will also be flowed through the Residual Value Credit if such proceeds can be definitively calculated at the time the Residual Value Credit is determined. The proceeds from leases determined after the Residual Value Credit is set will be flowed through the Reconciliation Account as received.

[3]As part of the terms of the Divestiture, Montaup shall require the buyer of the facility to pay Montaup the net book value for all inventories and materials and supplies associated with the generating facility. As a result, inventories and materials and supplies for Montaup's non-nuclear facilities are excluded from the plant balances under Section 1.1.1, and shall be excluded from the calculation of the Residual Value Credit. In addition, the Buyer may assume other obligations that

A:\NECFORM1.WPD                                    7

NARR 23424

Appendix 1

equal to the sale price and other consideration received by

Montaup excluding $15 million[9] which purchasers will be

required to pay into an account for employee benefits pursuant

to Section 1.2.2(f), less

(ii)     The revenues lost or gained by Montaup between July 1, 1997

and the Divestiture Date measured by the difference between the

revenues excluding revenues attributable to items included in the

Contract Termination Charge or in Montaup's transmission

rates, that Montaup would have collected under Rate M-14 had

it continued to make the sales to Newport under Tariff 1 and the

revenues, excluding transmission revenues and Contract

Termination Charge revenues, that it actually collected from

sales to Newport's customers during the period, together with a

credit for Newport's share of the revenue from sales at no less

than market prices made by Montaup to third parties during the

period, provided, however, the lost revenues so calculated shall

not exceed $0.008 per kilowatthour multiplied by the number of

---

are included in the variable component of the Contract Termination Charge. Montaup reserves its
right to revise the variable cost estimates and the amortization of fixed cost components in Schedule 1
to reflect the assignment of obligations to the purchasers, if such revision is necessary to maintain a
stable and declining pattern of Contract Termination Charges as offset by the Residual Value Credit.

[9]This figure consists of $11.8 million as shown on Schedule 5 and an estimated $3.2 million for
Canal 2 based on Montaup's 25% share of employee costs for Canal Station. The parties agree to use
a reasonable actual figure for Canal 2 when available from Canal Electric.

A:\NECFORM1.WPD                              8

Appendix 1

kilowatthours delivered by Newport during the period between

the July 1, 1997 and the Divestiture Date, less

(iii)  Newport's 11.85 percent allocated share of capital investments

demonstrated to be prudently incurred after December 31, 1995,

excluded from the plant balances in Section 1.1.1 (a) above,[10]

less

(iv)  Newport's 11.85 percent allocated share of reasonable transaction

costs associated with the divestiture including the cost of

necessary refinancings, repurchases, and retirements of securities

occurring after May 1, 1997.

The Net Proceeds from the divestiture including amortization and the pretax

return specified in Section 1.1.2 on the unreturned credit balance net of tax

impacts shall be credited to the Fixed Component in equal annual amounts

over the period commencing on the date the Residual Value Credit is

implemented through December 31, 2009. The Residual Value Credit shall be

implemented even if: (i) the Divestiture Date occurs before the Contract

Termination Date, or (ii) the Residual Value Credit exceeds the Contract

---

[10]Montaup's capital investments shall include construction work in progress. The investments in
non-nuclear generating facilities during the period January 1, 1996 through May 31, 1997 are shown
in Schedule 4. These projects have been reviewed by the parties and are included as an offset to the
Residual Value Credit subject only to a further review for the reasonableness of the amounts
expended in the construction of the projects under Section 3.5 of the Agreement. Montaup may
include additional projects, if any, at the time of the calculation of the Residual Value Credit, subject
to the dispute resolution procedures under Section 3.5 of the Agreement.

A:\NECFORM1.WPD                                        9

NARR 23426

Termination Charge in any given year.  If for any reason, generation assets which were not sold at the Divestiture Date and therefore were not in the Residual Value Credit but remained in the Contract Termination Charge, are sold at a later date, the proceeds of such a sale will be amortized, with a return as specified in Section 1.1.2, over the remaining fixed component recovery period or over a five year period, whichever period is greater, and credited to the Reconciliation Account as received.

(d)     Effective with refinancings, repurchases, and retirements of securities relating to assets being recovered through Contract Termination Charge,   Montaup shall  flow through the Reconciliation Account the annual effects associated with any differences between the 13.09 percent overall pre-tax return and the actual pre-tax return, calculated using an 11.4 percent return on common equity, attributable to changes in the cost of long-term debt, preferred stock, capital structure or income tax rates, provided that the overall pre-tax return shall not exceed 13.09 percent so long as the yield on 10-year Treasury constant maturities as reported in the Federal Reserve Statistical Release is 9 percent or lower.  In the event that the yield on Treasury maturities as so reported exceeds 9 percent, the  13.09 percent overall pre-tax return shall be adjusted to include Montaup's actual cost of long-term debt and preferred stock using an 11.40 percent return on common equity.  This reconciliation will apply to the period following the Divestiture Date whether or not

A:\NECFORM1.WPD                                    10

securitization has been implemented. Notwithstanding the foregoing, nothing shall require a change in capital structure prior to any financing to take advantage of securitization.

Securitization will be implemented only if it would produce net savings to customers after taking into account all transaction costs including call provisions and prepayments, if applicable. Notwithstanding the above, savings from securitization, (pursuant to the terms of a qualified rate order), will be reflected in the Contract Termination Charge.

Any and all financing savings associated with refinancing related to divestiture and following the implementation of the Residual Value Credit, shall be allocated to the Contract Termination Charge through this paragraph, and shall not be reflected in Montaup's capital structure used for transmission rates. To the extent any financing savings are allocated to transmission rates by FERC, however, they shall not also be allocated to the Contract Termination Charge under this paragraph.

1.2    The Variable Component of the Contract Termination Charge shall include Newport's allocated share of the items specified in Section 1.2.2, below adjusted for the Reconciliation Account discussed in Section 1.2.1.

    1.2.1 The Variable Component shall be adjusted through a Reconciliation Adjustment in which differences, whether positive or negative, between the estimates for Contract Termination Charge Payments by Newport and Newport's allocated

A:\NECFORM1.WPD                              11

Appendix 1

share of the estimated variable costs listed in Section 1.2.2 below and actual Contract

Termination Charge payments by Newport and its allocated share of the actual

variable costs will be accumulated in a Reconciliation Account and added to or

subtracted from the Contract Termination Charge from Montaup to Newport. The

Reconciliation Account shall also include the adjustments under Sections 1.1.2, note

4, 1.1.4(a) and 1.1.4(d) above. A pretax return equal to that specified in Section

1.1.2 shall be included on any balance in the Reconciliation Account, whether positive

or negative.

The Reconciliation Account shall accumulate through December 31, 2000, and

shall be used to adjust Montaup's Base Contract Termination Charges to Newport on

January 1, 2001. Thus, effective January 1, 2001, Montaup shall return or collect

Newport's allocated share of any outstanding balance in the Reconciliation Account by

implementing an adjustment to the Base Contract Termination Charges to Newport.

Thereafter, the balance including the accumulated return in the Reconciliation

Account at the end of a year shall be used to adjust Montaup's Base Contract

Termination Charges for the following year. Reconciliation Account adjustments to

the Contract Termination Charges shall not cause the Contract Termination Charges

to exceed 2.8 cents per kilowatthour. Any deferrals caused by the limitation in the

prior sentence shall be carried forward with a return into the next annual adjustment

to the Base Contract Termination Charge. Any Reconciliation Account adjustments

occurring prior to January 1, 2001 that would otherwise cause the Contract

A:\NECFORM1.WPD                               12

NARR 23429

Appendix 1

Termination Charge to increase or decrease by more than 0.2 cents per kilowatthour shall be implemented up to 0.2 cents per kilowatthour. The excess above 0.2 cents per kilowatthour shall be amortized with a return over the three years following January 1, 2001.

1.2.2  Newport's 11.85 percent allocated share of the specific cost items included in the Variable Component are set forth in Schedule 1 at page 3. The difference between Newport's percent allocated share of the actual variable costs incurred by Montaup and the estimated variable costs in this section shall be included in the Reconciliation Account. The costs included in the Variable Component shall include the following:

(a)     Nuclear Decommissioning and Other Post Shutdown Costs shown on Schedule 1, Pages 6 and 7, shall include: (i) all charges, excluding any net incremental decommissioning costs caused by operations after the Retail Access Date, for decommissioning and site restoration assessed to Montaup by the operators of each nuclear electric generating facility specified in Section 1.1.1(a) (iv), (v), and (vi) above, subject to the regulatory authority of the agencies having jurisdiction over the operation and collection of such funds; (ii) all other reasonable post shutdown costs associated with Montaup's entitlements in the units listed in Section 1.1.1(a), (iv), (v), and (vi) above; and (iii) all remaining reasonable costs, including decommissioning costs and

A:\NECFORM1.WPD                            13

NARR 23430

Appendix 1

unrecovered capital costs, associated with Yankee Rowe and
Connecticut Yankee shown on Schedule 1, page 7.  Funding for the
decommissioning costs will be placed in irrevocable trusts in
accordance with NRC regulations.  If, upon the completion of
decommissioning for any of the above listed nuclear generating
facilities, it is determined that there has been an over collection of
funds, such over collection will be transferred to Montaup's
decommissioning fund for either Millstone 3 or Seabrook 1 pending
final disposition of their decommissioning.  Once all decommissioning
is complete, any over collection will be refunded to Newport in the
Reconciliation Adjustment.  Other post shutdown costs will also be
fully reconciled in the Reconciliation Adjustment.

Montaup's share of the Book Value of the Actual Nuclear Core at
Shutdown or time of sale, which Montaup has not previously recovered
through sales or lease proceeds and the Book Value of Materials and
Supply at Shutdown or time of sale, which have not been addressed by
other recovery mechanisms, will be recovered with a carrying charge in
equal amounts over three years at a pre-tax return provided for in
Section 1.1.2.

(b)    Above Market Payments to Power Suppliers will be (i) all payments by
Montaup for Long-Term Power Supply Contracts less the market value

A:\NECFORM1.WPD                                  14

NARR 23431

Appendix 1

realized from the resale of electricity purchased under the contracts into

the wholesale market, plus (ii) Economic Buyout Payments associated

with those contracts, less (iii) Credit for Unit Sales Contracts, plus (iv)

the Power Contract Buyout Incentive realized.

(i)     Long-Term Power Supply Contracts will be the power supply

        contracts listed below which were in place as of December 31,

        1995, between Montaup and a third party supplier, continuing to

        the termination date of each contract.  The Long-Term Supply

        Contracts include:

                (1)  Ocean State Power I and II
                (2)  Canal 1, including transmission wheeling, rental and
                     support payments
                (3)  Northeast Energy Associates, including transmission
                     wheeling payments
                (4)  Potter 2, including transmission wheeling payments
                (5)  Cleary 9
                (6)  McNeil, including transmission wheeling payments
                (7)  Newport Hydro, Inc., including transmission
                     wheeling payments
                (8)  Hydro Quebec, including AC and DC facilities
                     support payments
                (9)  Pilgrim, including transmission wheeling, rental and
                     support payments
                (10) Bear Swamp Hydro
                (11) Green Mountain Power Peakers, including
                     transmission wheeling payments

(ii)    Economic Buyout Payments will be all reasonable

        payments agreed to by Montaup after May 1, 1997

        associated with the sale, assignment, disposition or buy

NARR 23432

Appendix 1

down of the Long-Term Power Supply Contracts.
Economic Buyout Payments shall be recovered as
incurred to the extent that current recovery does not
increase rates to customers above the level that would
have been incurred absent the sale, assignment,
disposition, or buy down of the Long-Term Power
Supply Contract. The portion of the Economic Buyout
Payment that cannot be recovered currently under the
prior sentence shall be deferred and recovered with the
return specified in Section 1.1.2 as soon as such
recovery will not increase rates to customers above the
level that would have been incurred absent the sale,
assignment, disposition, or buy down of the Long-Term
Power Supply Contract.

For purposes of calculating above market payments in
(b)(i)and economic buyout payments in (b)(ii), associated
with the long term supply contracts with Ocean State
Power I and II, Montaup's total obligation under the
contracts will be based on a return on equity of 9.2%.

(iii)    Credit for Unit Sales Contracts will be all unit sales
contracts entered into by Montaup as of December 31,

A:\NECFORM1.WPD                    16

NARR 23433

Appendix 1

1995, for sales from (i) Canal Unit 2 if it is not
otherwise subject to market valuation and (ii) Contract
Demands to non-affiliates, less the market value of these
contracts as shown in Schedule 1, Page 3, Columns (7)
through (9).

(iv)     Power Contract Buyout Incentive will be the sum of: (a)
the Power Contract Buyout Incentive Associated with
Canal 2 Divestiture calculated in accordance with
Schedule 3, pages 2 and 3; and (b) the Power Contract
Buyout Incentive Independent of Divestiture which shall
represent 10% of the savings realized by customers as
the result of the sale, assignment, disposition or buy
down of its power supply contracts occurring outside of
the divestiture process. The Power Contract Buyout
Incentive Independent of Divestiture shall be determined
at the time of the sale, assignment, disposition or buy
down. The Buyout Incentive for the Ocean State Power
units will be calculated in accordance with Page 4 of
Schedule 3. The Total Power Contract Buyout Incentive
shall not exceed $ 1.6 million, stated on a present value
basis upon the divestiture using a discount rate equal to

A:\NECFORM1.WPD

17

Appendix 1

the actual pre-tax return in place following completion of
post divestiture refinancing as determined under Section
1.1.4(d). Montaup shall document the level of the
Power Contract Buyout Incentive in a report, and the
amount of the Power Contract Buyout Incentive shall be
subject to the dispute resolution procedures set forth
under Section 3.5 of the Stipulation and Agreement. The
Power Contract Buyout Incentive Associated with Canal
2 Divestiture will be recovered in equal increments over
the period from the divestiture through December 31,
2009, with appropriate adjustments for the time value of
money, and the Power Contract Buyout Incentive
Independent of Divestiture will be recovered in equal
increments over the remaining term of the related
purchased power contract, with appropriate adjustments
for the time value of money.

(c)    Above Market Fuel Transportation as shown in Schedule 1, Page 15,
Column 10 will be Montaup's continuing long-term payment obligations
associated with Capacity Payments to Algonquin Natural Gas Pipeline
for Canal 2 less the market value of that capacity. The Market Value
of Capacity Payments to Algonquin Natural Gas Pipelines will equal

NARR 23435

Appendix 1

the actual proceeds associated with the sale or assignment or termination of contractual obligations. For the purposes of calculating the Contract Termination Charges, prior to the date that Montaup's contractual entitlements to the pipeline capacity are assigned to a nonaffiliate, the Market Value of Capacity Payments to Algonquin Natural Gas Pipeline shall be deemed to equal the savings associated with actual unit operation on natural gas compared to the unit's avoided operation on oil at prevailing market prices. For illustrative purposes, the amounts shown on page 15 of Schedule 1 reflect a market value which is 50 percent of the capacity payments.

(d)     Transmission wheeling, rental and support charges as shown in Schedule 1, Page 3, associated with the transmission of electricity from Montaup's entitlements in Seabrook Unit 1, Connecticut Yankee, Maine Yankee, Millstone Unit 3, Wyman Unit 4, Canal Unit 2, Vermont Yankee, which units are located off of Montaup's transmission system. These wheeling and support payments shall include only costs that are excluded from recovery under Montaup's and NEPOOL's open access transmission tariffs or are not assigned to a purchaser of the unit.

(e)     Payments in Lieu of Property Taxes will include all reasonable costs incurred by Montaup or its affiliates associated with payments in lieu of property taxes to the cities and towns in which Montaup owns

NARR 23436

Appendix 1

generating facilities to mitigate the loss of tax revenues that those cities
and towns would otherwise incur in connection with restructuring. For
the purposes of calculating the Base Contract Termination Charges and
the estimate included in the Reconciling Account, the Payments in Lieu
of Property Taxes are assumed to be zero.

(f)    Employee Severance and Retraining Costs as shown in Schedule 1,
page 3, Column (13), will include all reasonable costs and expenses
incurred by Montaup or its affiliates associated with the adjustment of
their workforces in connection with the implementation of retail access,
divestiture, or the termination of Montaup's Tariff No 1, including, but
not limited to early retirement, severance, retraining and other
reasonable costs associated with the implementation of the benefits to
employees included in Schedule 5. Montaup shall require purchasers of
its generating assets to pay \$15 million[11] for the costs under this
paragraph incurred by Montaup or its affiliates. In the event that the
actual costs incurred under this paragraph are less than \$15 million,
excluding costs found by FERC to be recoverable in Montaup's
transmission rates, Montaup shall flow back the difference to customers
in the Reconciliation Account. The procedure established in this

---

[11] The parties agree that \$11.8 million will be reserved for Montaup and EUASC employees and estimate that \$3.2 million will be
reserved for Canal 2 and paid by the buyer of Canal 2. The Canal 2 figure may be adjusted when actual figures are avilable from Canal
Electric.

A:\NECFORM1.WPD                                       20

NARR 23437

Appendix I

paragraph shall be the exclusive method for recovering the costs under this paragraph, and, except in the event of legislation changing required benefits, neither Montaup nor its affiliates shall be able to recover more than $15 million, subject to the Canal 2 adjustment, for these costs. Thus, for the purposes of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, the Employee Severance and Retraining Costs are assumed to be zero and, except in the event of legislation changing required benefits, these costs shall not result in an increase to the Reconciliation Account or to the Contract Termination Charge.

(g)  Damages, Costs, or Net Recoveries from claims by or against third parties shall include all damages, costs, or recoveries associated with Montaup's generating business which accrued prior to the date of divestiture and which were not: (i) included in the reserves for generation related, uninsured claims other than claims associated with Environmental Response Costs as of May 21, 1994, plus annual additions to the reserves for uninsured claims in Montaup's M-14 rate, less actual payments out of the reserve for generation related claims during the period from May 21, 1994 through the Contract Termination Date; (ii) assigned to Montaup's successor in interest; (iii) recovered from Montaup's insurance carriers; or (iv) the result of gross

A:\NECFORM1.WPD

21

NARR 23438

Appendix 1

negligence.  For the purposes of calculating the Base Contract

Termination Charges and the estimate included in the Reconciliation

Account, Damages, Costs, or Net Recoveries from claims are assumed

to be zero.

(h)    Performance Based Rate for Nuclear Units Remaining After Divestiture

shall credit value received that is not otherwise reflected in the Residual

Value Credit, or recover any payments or costs associated with the

sale, lease or disposal of Montaup's minority ownership share of the

Seabrook, Millstone #3, and Vermont Yankee Nuclear Units ("PBR

Nuclear Units")  that are not otherwise reflected in the Residual Value

Credit.  If  Montaup is unable to sell, lease, assign, or otherwise

dispose of its  PBR Nuclear Units on the terms set forth in the

Stipulation and Agreement prior to the Contract Termination Date, the

Performance Based Rate shall include 80 percent of the reasonable

going forward costs, including variable costs and post-1995 capital

additions on a cost of service basis,[12] associated with  Montaup's

PBR Nuclear Units that are not otherwise recovered in contract

termination charges less 80 percent of the revenues from sales of

energy or capacity from such units or entitlements that are not

---

[12]In the event that the nuclear unit is retired before the end of its license life, the capital addition shall be amortized with a return over the remainder of the license or in accordance with its depreciation schedule, whichever is shorter.

A:\NECFORM1.WPD                                  22

NARR 23439

Appendix 1

otherwise reflected in contract termination charges.  The Performance

Based Rate shall apply for the period from the Contract Termination

Date to the date that  Montaup either sells, leases, assigns or otherwise

disposes of the  PBR Nuclear Units or to the date such units are

shutdown.  Within six months prior to implementing the Performance

Based Rate,  Montaup will consult with the Signatories on a

performance standard for nuclear safety indicators and will file such

performance standard with a maximum potential credit for

nonperformance of $250,000.   Such sales,  if any,  shall  not be made

directly to Newport's retail customers,  however,   Montaup shall

retain the right to use its minority shares of the  PBR Nuclear Units to

fulfill its  backstop obligations under the standard offer.  For the

purpose of calculating the Base Contract Termination Charges and the

estimate included in the Reconciliation Account, the Performance Based

Rate for Nuclear Units is assumed to be zero.

(i)  Environmental Response Costs defined as:

    (i)  Reasonable and prudently incurred costs associated with the

        investigation, testing, remediation, liabilities, damages, claims,

        settlements, or judgments attributable to or incurred by

        Montaup or Newport relating to deposits or waste from divested

        generating facilities off the site of properties sold, whether or

23

# Tab 4

# (6 of 8)

Appendix 1

not such material is regulated under the statutes and authorities
referenced in paragraph (iv), including material deposited before
the Divestiture Date at disposal sites, sites to which material
may have migrated from off-site disposal sites, or any off-site
location at which generation related material may have been
deposited before the Divestiture Date associated with the
operation of generating facilities sold pursuant to the divestiture
plan;

(ii)     Reasonable and prudently incurred costs associated with the
investigation, testing, remediation, liabilities, damages, claims,
settlements, or judgments attributable to or incurred by Montaup
or Newport relating to deposits and wastes occurring prior to the
Divestiture Date whether or not such material is regulated under
the statutes and authorities referenced in paragraph (iv) from
facilities located within the switchyards for which  Montaup will
retain a permanent easement on parcels that are otherwise being
divested  if such costs are not recovered in transmission rates;

(iii)     Reasonable and prudently incurred costs associated with
the purchase of property that is acquired as part of an
overall mitigation and response plan associated with sites
identified in paragraphs (i) and (ii);

A:\NECFORM1.WPD                          24

NARR 23441

Appendix 1

(iv)      The statutes and authorities referenced in paragraphs (i) and (ii) shall be the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), Resource Conservation and Recovery Act (RCRA), Massachusetts G.L. c. 21C and 21E, and Rhode Island General Laws 23-19.14, or any other laws, regulations or orders by courts or governmental authorities, or resulting from claims and contentions arising in tort, breach of contract or violation of law;

(v)      Except for property acquired under paragraph (iii), Environmental Response Costs shall not include costs associated with the investigation, testing, remediation, or other liabilities relating to property acquired after the Divestiture Date. Environmental Response Costs recovered under paragraphs (i), (ii), and (iii) shall also be offset by: (i) proceeds from insurance companies related to Environmental Response Costs; (ii) proceeds from the sale of properties purchased under paragraph (iii); and (iii) recoveries from third parties;

(vi)      Nothing herein is intended to limit, alter, or otherwise affect any liability of Montaup to governmental

25

NARR 23442

Appendix 1

authorities or third parties other than the buyer or buyers

of Montaup generating facilities under any

environmental law including those referenced in

paragraph (iv).

NARR 23443

**SCHEDULE I**

**SUMMARY OF CONTRACT TERMINATION CHARGES**

NARR 23444

Schedule1
Page 1 of 15

**MONTAUP ELECTRIC COMPANY**
**SUMMARY OF CONTRACT TERMINATION CHARGES TO NEWPORT ELECTRIC COMPANY**

| YEAR (1) | EST. NEC MWH SALES (2) | SHARE OF FIXED COMPONENT $ IN 000 (3) | SHARE OF FIXED COMPONENT CENTS/KWH (4) | SHARE OF VAR. COMPONENT $ IN 000 (5) | SHARE OF VAR. COMPONENT CENTS/KWH (6) | SHARE OF TOT. TERM CHARGE $ IN 000 (7) | BASE CONTRACT TERM CHARG CENTS/KWH (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 530,595 | 6,195 | 1.17 | 9,721 | 1.83 | 15,916 | 3.00 |
| 1999 | 536,555 | 6,663 | 1.24 | 9,434 | 1.76 | 16,097 | 3.00 |
| 2000 | 544,130 | 6,968 | 1.28 | 9,356 | 1.72 | 16,324 | 3.00 |
| 2001 | 549,913 | 5,350 | 0.97 | 9,391 | 1.71 | 14,741 | 2.68 |
| 2002 | 555,906 | 6,156 | 1.11 | 8,118 | 1.46 | 14,274 | 2.57 |
| 2003 | 563,367 | 6,569 | 1.17 | 7,294 | 1.29 | 13,863 | 2.46 |
| 2004 | 571,358 | 6,853 | 1.20 | 6,615 | 1.16 | 13,468 | 2.36 |
| 2005 | 580,288 | 6,186 | 1.07 | 6,916 | 1.19 | 13,102 | 2.26 |
| 2006 | 589,460 | 6,372 | 1.08 | 6,377 | 1.08 | 12,749 | 2.16 |
| 2007 | 596,369 | 5,628 | 0.94 | 6,726 | 1.13 | 12,354 | 2.07 |
| 2008 | 603,135 | 5,914 | 0.98 | 6,054 | 1.00 | 11,968 | 1.98 |
| 2009 | 609,079 | 4,974 | 0.82 | 6,603 | 1.08 | 11,577 | 1.90 |
| 2010 | 616,061 | 0 | 0.00 | 5,466 | 0.89 | 5,466 | 0.89 |
| 2011 | 622,439 | 0 | 0.00 | 5,119 | 0.82 | 5,119 | 0.82 |
| 2012 | 627,545 | 0 | 0.00 | 3,058 | 0.49 | 3,058 | 0.49 |
| 2013 | 636,621 | 0 | 0.00 | 1,622 | 0.25 | 1,622 | 0.25 |
| 2014 | 643,741 | 0 | 0.00 | 1,678 | 0.26 | 1,678 | 0.26 |
| 2015 | 648,276 | 0 | 0.00 | 1,140 | 0.18 | 1,140 | 0.18 |
| 2016 | 654,269 | 0 | 0.00 | 1,122 | 0.17 | 1,122 | 0.17 |
| 2017 | 661,698 | 0 | 0.00 | 870 | 0.13 | 970 | 0.13 |
| 2018 | 667,717 | 0 | 0.00 | 813 | 0.12 | 813 | 0.12 |
| 2019 | 673,767 | 0 | 0.00 | 821 | 0.12 | 821 | 0.12 |
| 2020 | 680,723 | 0 | 0.00 | 848 | 0.12 | 848 | 0.12 |
| 2021 | 687,311 | 0 | 0.00 | 731 | 0.11 | 731 | 0.11 |
| 2022 | 694,002 | 0 | 0.00 | 209 | 0.03 | 209 | 0.03 |
| 2023 | 700,796 | 0 | 0.00 | 216 | 0.03 | 216 | 0.03 |
| 2024 | 707,697 | 0 | 0.00 | 222 | 0.03 | 222 | 0.03 |
| 2025 | 714,705 | 0 | 0.00 | 228 | 0.03 | 228 | 0.03 |
| 2026 | 721,821 | 0 | 0.00 | 82 | 0.01 | 82 | 0.01 |
| 2027 | 757,912 | 0 | 0.00 | 84 | 0.01 | 84 | 0.01 |
| 2028 | 795,808 | 0 | 0.00 | 87 | 0.01 | 87 | 0.01 |
| 2029 | 835,598 | 0 | 0.00 | 89 | 0.01 | 89 | 0.01 |

COLUMN NOTES:
(2) PER 1996 LONG RANGE ENERGY & DEMAND FORECAST.
(3) SCHEDULE 1, P2, COLUMN (9).
(4) COLUMN (3)/COLUMN (2).
(5) SEE SCHEDULE 1, P.3, COLUMN (18).
(6) COLUMN (5)/COLUMN (2).
(7) COLUMN (3) + COLUMN (5).
(8) COLUMN (7)/COLUMN (2).

NP30BAS2.WK4  10/23/97

SUMMARY OF CONTRACT TERMINATION CHARGES
NEWPORT ELECTRIC COMPANY SHARE (11.85%)
FIXED COMPONENT
$ IN 000

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 106 TRANSITION OBLIGATION (4) | BASE TOTAL FIXED COMPONENT (5) | ADJ. FOR RESIDUAL VALUE CREDIT (6) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (7) |
|---|---|---|---|---|---|---|
| 1998 | 3,670 | 2,381 | 145 | 6,196 | 0 | 6,196 |
| 1999 | 3,449 | 3,075 | 140 | 6,663 | 0 | 6,663 |
| 2000 | 3,178 | 3,696 | 134 | 6,968 | 0 | 6,968 |
| 2001 | 2,936 | 2,284 | 128 | 5,350 | 0 | 5,350 |
| 2002 | 2,711 | 3,323 | 122 | 6,156 | 0 | 6,156 |
| 2003 | 2,417 | 4,036 | 117 | 6,569 | 0 | 6,569 |
| 2004 | 2,071 | 4,671 | 111 | 6,853 | 0 | 6,853 |
| 2005 | 1,712 | 4,369 | 105 | 6,186 | 0 | 6,186 |
| 2006 | 1,344 | 4,928 | 99 | 6,372 | 0 | 6,372 |
| 2007 | 988 | 4,566 | 94 | 5,628 | 0 | 5,628 |
| 2008 | 580 | 5,247 | 88 | 5,914 | 0 | 5,914 |
| 2009 | 186 | 4,706 | 82 | 4,974 | 0 | 4,974 |

COLUMN NOTES:
EACH COLUMN REPRESENTS 11.85% OF THE SAME COLUMN NUMBER ON P. 12.

NP30BAS2.WK4 10/23/97

NARR 23446



NARR 23447

Schedule 1
Page 4 of 15

**MONTAUP ELECTRIC COMPANY**
**NET CAPABILITY & UNRECOVERED COSTS**
**AS OF DECEMBER 31, 1995**

| SOURCE (1) | LOCATION (2) | YEAR(S) PLACED IN SERVICE (3) | ENERGY SOURCE (4) | NET CAPABILITY MW (5) | 1995 (6) | 1997 (7) | APPLICABLE ANNUAL DEPRECIATION FOR 1998 AND BEYOND (8) |
|---|---|---|---|---|---|---|---|
| | | | | | \$ IN 000 | | |
| **FOSSIL FUEL UNITS** | | | | | | | |
| SOMERSET 6 & JETS | SOMERSET, MA | 1959 | COAL/JET FUEL | 153.2 | 28,032 | 23,716 | 2,158 |
| CANAL 2 | SANDWICH, MA | 1976 | OIL | 233 | 41,041 | 35,207 | 2,917 |
| WYMAN 4 | YARMOUTH, ME | 1978 | OIL | 12.2 | 2,030 | 1,806 | 112 |
| NEWPORT DIESELS | JAMESTOWN/ PORTSMOUTH, RI/ YARMOUTH, ME | 1961 1978 1978 | DIESEL DIESEL OIL | 8.6 8.3 4.1 | 1,803 | 1,499 | 152 |
| **NUCLEAR UNITS** | | | | | | | |
| SEABROOK | SEABROOK, NH | 1990 | NUCLEAR | 33.6 | 170,705 | 160,949 | 4,878 |
| MILLSTONE III | WATERFORD, CT | 1986 | NUCLEAR | 45.9 | 137,749 | 128,279 | 4,735 |
| VERMONT YANKEE | BRATTLEBORO, VT | 1972 | NUCLEAR | 12.0 | 3,786 (a) | 3,092 | 347 |
| MAINE YANKEE | BRUNSWICK, ME | | NUCLEAR | 31.6 | 7,439 (a) | 6,105 | 667 |
| PLANT HELD FOR FUTURE USE - LAND IN SOMERSET, MA | | | | | 604 | 604 | |
| - NET INVESTMENT IN SOMERSET UNIT 5 | | | | | 5,880 | 6,449 | (b) |
| NONUTILITY PROPERTY (LAND IN PORTSMOUTH, RI & DIGHTON, MA) | | | | | 2,610 | 2,610 | |
| TOTAL | | | | 542.6 | 401,659 | 370,316 | 15,986 |

(a) PLANT IN SERVICE AS OF 12/31/95 INCLUDING FUEL AND MATERIALS AND SUPPLIES.
(b) PER M-14 FERC SETTLEMENT AGREEMENT, SOMERSET UNIT 5 IS EXCLUDED FROM PLANT IN SERVICE BUT IS ALLOWED A RETURN THROUGH 11/1/97. (321K IN 1996 AND 268K IN 1997).

NP30BAS2.WK4 10/23/97

NARR 23448

MONTAUP ELECTRIC COMPANY
REGULATORY ASSET BALANCE
$ IN 000

| | BALANCE AS OF | | APPLICABLE AMORTIZATION FOR 1998 AND BEYOND | BASIS FOR DEFERRAL |
|---|---|---|---|---|
| | DECEMBER 31, 1995 (1) | DECEMBER 31, 1997 (2) | (3) | (4) |
| FAS 109 - ASSET | 39,916 | 37,466 | 1,226 | FERC RATEMAKING POLICY |
| - LIABILITY | (14,583) | (8,717) | (2,933) | FERC RATEMAKING POLICY |
| FAS 106 DEFERRAL | 1,313 | 538 | 387 (a) | FERC RATEMAKING POLICY |
| NET PENSION LIABILITY / (ASSET) | (485) | (415) | (35) | FAS 87 |
| UNAMORTIZED DEBT PREMIUMS | 13,879 | 10,665 | 1,607 | FERC RATEMAKING POLICY |
| UNAMORTIZED ITC | (12,623) | (11,367) | (578) | FERC RATEMAKING POLICY |
| DREDGING | 424 | 173 | 125 (b) | FERC RATEMAKING POLICY |
| TOTAL REG. ASSETS | 27,941 | 28,343 | (202) | |

(a) REMANING AMORTIZATION SCHEDULE: 416 IN 1998, 162 IN 1999.
(b) REMANING AMORTIZATION SCHEDULE: 125 IN 1998, 40 IN 1999.

NP30BAS2.WK4  10/23/97

NARR 23449

MONTAUP ELECTRIC COMPANY
FAS 106 TRANSITION OBLIGATION REGULATORY ASSET
$ IN 000

UNRECOVERED BALANCE AS OF 12/31/95         9,091
AMORTIZATION AMOUNT (1996 & BEYOND)          534
DISCOUNT RATE                               7.25%

| | AMORTIZATION (1) | INTEREST (2) | TOTAL EXPENSE (3) | UNAMORTIZED BALANCE (4) |
|---|---|---|---|---|
| 1998 | 669 | 557 | 1,226 | 8,023 |
| 1999 | 669 | 509 | 1,178 | 7,354 |
| 2000 | 669 | 460 | 1,129 | 6,686 |
| 2001 | 669 | 412 | 1,081 | 6,017 |
| 2002 | 669 | 364 | 1,032 | 5,349 |
| 2003 | 669 | 315 | 984 | 4,680 |
| 2004 | 669 | 267 | 935 | 4,011 |
| 2005 | 669 | 218 | 887 | 3,343 |
| 2006 | 669 | 170 | 838 | 2,674 |
| 2007 | 669 | 121 | 790 | 2,006 |
| 2008 | 669 | 73 | 741 | 1,337 |
| 2009 | 669 | 24 | 693 | 669 |
| | | | | (0) |

COLUMN NOTES:
(1) 12/31/97 Balance straight lined over 12 years.
(2) (Prior Year Column (4) + Current Year Column (4) ) / 2  * 7.25%
(3) Column (1) + Column (2)
(4) Prior Year Column (4) - Current Year Column (1)

NP30BAS2.WK4  10/23/97

NARR 23450



**Schedule 1**
**Page 6 of 15**

MONTAUP ELECTRIC COMPANY
OTHER POST-SHUTDOWN NUCLEAR COSTS
$ IN 000

| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | VERMONT YK (4) | MAINE YK (5) | TOTAL (6) |
|---|---|---|---|---|---|
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 |
| 2011 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 |

NP30BAS2.WK4  10/23/97

NARR 23451

MONTAUP ELECTRIC COMPANY
TOTAL ANNUAL DECOMMISSIONING COST
$ IN 000

| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | CONNECTICUT YANKEE (4) | VERMONT YANKEE (5) | MAINE YANKEE (6) | YANKEE ATOMIC (7) | TOTAL (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 602 | 319 | 3,868 | 317 | 599 | 2,306 | 8,011 |
| 1999 | 621 | 328 | 3,102 | 318 | 711 | 2,306 | 7,386 |
| 2000 | 639 | 339 | 3,056 | 407 | 713 | 1,206 | 6,362 |
| 2001 | 658 | 349 | 2,972 | 408 | 716 | 58 | 5,161 |
| 2002 | 679 | 359 | 2,908 | 409 | 718 | 60 | 5,131 |
| 2003 | 699 | 370 | 2,823 | 456 | 803 | 63 | 5,214 |
| 2004 | 721 | 382 | 2,742 | 457 | 983 | 65 | 5,350 |
| 2005 | 743 | 394 | 2,661 | 585 | 986 | 68 | 5,457 |
| 2006 | 766 | 405 | 2,587 | 587 | 980 | 70 | 5,405 |
| 2007 | 770 | 409 | 2,013 | 578 | 987 | 52 | 4,789 |
| 2008 | 759 | 406 | 0 | 546 | 510 | 0 | 2,221 |
| 2009 | 782 | 418 | 0 | 546 | 0 | 0 | 1,746 |
| 2010 | 806 | 431 | 0 | 710 | 0 | 0 | 1,947 |
| 2011 | 830 | 444 | 0 | 710 | 0 | 0 | 1,984 |
| 2012 | 855 | 457 | 0 | 177 | 0 | 0 | 1,489 |
| 2013 | 880 | 471 | 0 | 0 | 0 | 0 | 1,351 |
| 2014 | 907 | 485 | 0 | 0 | 0 | 0 | 1,392 |
| 2015 | 934 | 499 | 0 | 0 | 0 | 0 | 1,433 |
| 2016 | 962 | 514 | 0 | 0 | 0 | 0 | 1,476 |
| 2017 | 991 | 530 | 0 | 0 | 0 | 0 | 1,521 |
| 2018 | 1,021 | 546 | 0 | 0 | 0 | 0 | 1,567 |
| 2019 | 1,051 | 562 | 0 | 0 | 0 | 0 | 1,613 |
| 2020 | 1,083 | 579 | 0 | 0 | 0 | 0 | 1,652 |
| 2021 | 1,115 | 596 | 0 | 0 | 0 | 0 | 1,711 |
| 2022 | 1,149 | 614 | 0 | 0 | 0 | 0 | 1,763 |
| 2023 | 1,183 | 633 | 0 | 0 | 0 | 0 | 1,816 |
| 2024 | 1,219 | 652 | 0 | 0 | 0 | 0 | 1,871 |
| 2025 | 1,255 | 671 | 0 | 0 | 0 | 0 | 1,926 |
| 2026 | 0 | 691 | 0 | 0 | 0 | 0 | 691 |
| 2027 | 0 | 712 | 0 | 0 | 0 | 0 | 712 |
| 2028 | 0 | 733 | 0 | 0 | 0 | 0 | 733 |
| 2029 | 0 | 755 | 0 | 0 | 0 | 0 | 755 |

NP30BAS2.WK4  10/23/97

NARR 23452

Schedule 1
Page # of 18

Purchase Power Total $000

| Year | Pilgrm | Canal 1 | Porter 2 | Cleary | Modval | OSP 1 | OSP 2 | NEA | Blldstone Hydro | HQ | GMP | BSH | OSP @ 9.2% ROE | Total |
|------|--------|---------|----------|--------|--------|-------|-------|-----|-----------------|-----|-----|-----|-----------------|-------|
| 1998 | 36,042 | 22,977 | 3,522 | 330 | 3,502 | 25,446 | 27,471 | 12,513 | 528 | 10,882 | 150 | 650 | (1,206) | 146,955 |
| 1999 | 35,710 | 27,181 | 3,578 | 339 | 3,566 | 25,630 | 27,008 | 12,519 | 529 | 10,770 | | | (1,146) | 148,098 |
| 2000 | 36,174 | 27,300 | 4,023 | 347 | 3,612 | 24,578 | 27,541 | 12,632 | 531 | 10,098 | | | (1,069) | 155,986 |
| 2001 | 36,184 | 29,248 | 4,079 | 361 | 3,719 | 26,995 | 27,714 | 6,083 | 533 | 6,935 | | | (1,044) | 153,288 |
| 2002 | 35,333 | 21,448 | 4,137 | 376 | 3,819 | 25,847 | 27,097 | 6,380 | 536 | 3,731 | | | (939) | 129,723 |
| 2003 | 35,703 | | 4,198 | 391 | 3,933 | 25,332 | 28,639 | 6,970 | 538 | 3,612 | | | (943) | 130,945 |
| 2004 | 34,010 | | 4,261 | 406 | 4,057 | 25,553 | 27,782 | 7,200 | 541 | 3,508 | | | (940) | 107,831 |
| 2005 | 35,089 | | 4,327 | 423 | 4,192 | 26,533 | 27,433 | 7,697 | 544 | 3,397 | | | (897) | 108,600 |
| 2006 | 34,498 | | 4,395 | 440 | 4,285 | 28,001 | 28,500 | 8,170 | 547 | 3,225 | | | (842) | 105,318 |
| 2007 | 35,582 | | 4,466 | 457 | 4,403 | 28,907 | 28,303 | 8,615 | 550 | 3,038 | | | (800) | 112,612 |
| 2008 | 33,999 | | 4,540 | 476 | 4,643 | 30,070 | 27,976 | 8,837 | 553 | 2,997 | | | (760) | 112,832 |
| 2009 | 34,333 | | 4,616 | 496 | 4,605 | 32,561 | 27,674 | 9,404 | 557 | 2,903 | | | (722) | 115,334 |
| 2010 | 40,427 | | 4,695 | 514 | 4,069 | 29,000 | 27,328 | 5,478 | 560 | 2,823 | | | (698) | 114,703 |
| 2011 | 18,360 | | 4,779 | 535 | 5,140 | 28,396 | 0 | 10,660 | 563 | 2,740 | | | (693) | 91,776 |
| 2012 | 0 | | 4,865 | 559 | 5,331 | | | 10,270 | 567 | 2,869 | | | | 43,069 |
| 2013 | | | 4,955 | 579 | 5,519 | | | 10,413 | 571 | 2,581 | | | | 24,618 |
| 2014 | | | 5,048 | 602 | 5,777 | | | 10,841 | 575 | 2,505 | | | | 24,919 |
| 2015 | | | 5,147 | 628 | | | | 11,453 | 578 | 2,432 | | | | 25,209 |
| 2016 | | | 5,247 | 651 | | | | 11,568 | 582 | 2,360 | | | | 20,335 |
| 2017 | | | | | | | | 12,384 | 586 | 2,180 | | | | 20,426 |
| 2018 | | | | | | | | 12,096 | 591 | 1,968 | | | | 14,563 |
| 2019 | | | | | | | | 12,512 | 0 | 1,927 | | | | 14,613 |
| 2020 | | | | | | | | 12,789 | | 1,698 | | | | 14,361 |
| 2021 | | | | | | | | 13,495 | | 1,584 | | | | 14,383 |
| 2022 | | | | | | | | 0 | | 0 | | | | 13,455 |
| 2023 | | | | | | | | | | | | | | 0 |
| 2024 | | | | | | | | | | | | | | 0 |
| 2025 | | | | | | | | | | | | | | 0 |
| 2026 | | | | | | | | | | | | | | 0 |
| 2027 | | | | | | | | | | | | | | 0 |
| 2028 | | | | | | | | | | | | | | 0 |
| 2029 | | | | | | | | | | | | | | 0 |

NP30MSS2.WK4 10/23/97

NARR 23453



| | Pilgrim | Canal 1 | Potter 2 | Cleary | McNeil | OSP 1 | OSP 2 | NEA | Blackstone Hydro | HQ | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Purchase Power - MWhs | | | | | | |
| 1998 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 323,992 | 2,781,183 |
| 1999 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 324,157 | 2,710,592 |
| 2000 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 282,092 | 2,740,313 |
| 2001 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 134,017 | 2,520,452 |
| 2002 | 553,418 | 441,228 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 2,310,145 |
| 2003 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,788,131 |
| 2004 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,788,131 |
| 2005 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,888,917 |
| 2006 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,788,131 |
| 2007 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,888,917 |
| 2008 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,788,131 |
| 2009 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,888,917 |
| 2010 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,788,131 |
| 2011 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,888,917 |
| 2012 | 184,473 | 0 | 36,979 | 10,234 | 17,420 | 0 | 541,959 | 194,911 | 5,453 | 0 | 1,289,588 |
| 2013 | 0 | 0 | 0 | 10,234 | 17,420 | 0 | 541,959 | 194,911 | 5,453 | 0 | 449,470 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 254,997 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 254,997 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 247,577 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 247,577 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 200,364 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 200,364 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

NP30BAS2.WK4  10/23/97

NARR 23454

Schedule 1
Page 10 of 15

## UNIT CONTRACT & NON AFFILIATE REVENUE CREDIT
### $ IN 000

| YEAR END (1) | M-RATE SALES TO MIDDLEBORO (2) | M-RATE SALES TO PASCOAG (3) | CANAL UNIT SALES TO BRAINTREE (4) | TOTAL (5) |
|---|---|---|---|---|
| 1998 | 2,004 | 1,295 | 1,555 | 4,854 |
| 1999 | 1,663 | 1,234 | 1,555 | 4,452 |
| 2000 | 0 | 815 | 1,555 | 2,370 |
| 2001 | 0 | 0 | 1,555 | 1,555 |
| 2002 | 0 | 0 | 1,555 | 1,555 |
| 2003 | 0 | 0 | 1,555 | 1,555 |
| 2004 | 0 | 0 | 1,555 | 1,555 |
| 2005 | 0 | 0 | 1,555 | 1,555 |
| 2006 | 0 | 0 | 1,555 | 1,555 |
| 2007 | 0 | 0 | 1,555 | 1,555 |
| 2008 | 0 | 0 | 1,555 | 1,555 |
| 2009 | 0 | 0 | 1,555 | 1,555 |
| 2010 | 0 | 0 | 1,555 | 1,555 |
| 2011 | 0 | 0 | 1,555 | 1,555 |
| 2012 | 0 | 0 | 1,555 | 1,555 |
| 2013 | 0 | 0 | 1,555 | 1,555 |
| 2014 | 0 | 0 | 1,555 | 1,555 |
| 2015 | 0 | 0 | 1,555 | 1,555 |
| 2016 | 0 | 0 | 1,555 | 1,555 |
| 2017 | 0 | 0 | 1,555 | 1,555 |
| 2018 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 |

NP30BAS2.WK4  10/23/97

NARR 23455

TRANSMISSION IN SUPPORT OF REMOTE GENERATING UNITS
DETAIL BY UNIT
$ IN 000

| (1) | SEABROOK (2) | MILLSTONE (3) | CANAL 2 (4) | WYMAN 4 (5) | MAINE YNK (6) | VERMONT YNK (7) | TOTAL (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 297 | 138 | 527 | 91 | 214 | 55 | 1,322 |
| 1999 | 292 | 138 | 507 | 91 | 214 | 55 | 1,297 |
| 2000 | 286 | 138 | 488 | 91 | 214 | 55 | 1,272 |
| 2001 | 280 | 138 | 470 | 91 | 214 | 55 | 1,248 |
| 2002 | 275 | 138 | 452 | 91 | 214 | 55 | 1,225 |
| 2003 | 269 | 138 | 435 | 91 | 238 | 61 | 1,232 |
| 2004 | 264 | 138 | 418 | 91 | 238 | 61 | 1,210 |
| 2005 | 259 | 138 | 402 | 91 | 238 | 61 | 1,188 |
| 2006 | 254 | 138 | 386 | 91 | 238 | 61 | 1,168 |
| 2007 | 249 | 138 | 371 | 91 | 238 | 61 | 1,148 |
| 2008 | 245 | 138 | 357 | 91 | 238 | 61 | 1,130 |
| 2009 | 240 | 138 | 443 | 91 | 0 | 61 | 973 |

NP30BAS2.WK4  10/23/97

NARR 23456

## SUMMARY OF CONTRACT TERMINATION CHARGES
## MONTAUP ELECTRIC COMPANY (100%)
## FIXED COMPONENT
## $ IN 000

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 106 TRANSITION OBLIGATION (4) | BASE TOTAL FIXED COMPONENT (5) | ADJ. FOR RESIDUAL VALUE CREDIT (6) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (7) |
|---|---|---|---|---|---|---|
| 1998 | 30,970 | 20,094 | 1,226 | 52,290 | 0 | 52,290 |
| 1999 | 29,101 | 25,950 | 1,178 | 56,229 | 0 | 56,229 |
| 2000 | 26,821 | 30,854 | 1,129 | 58,803 | 0 | 58,803 |
| 2001 | 24,796 | 19,273 | 1,081 | 45,149 | 0 | 45,149 |
| 2002 | 22,878 | 28,040 | 1,032 | 51,950 | 0 | 51,950 |
| 2003 | 20,395 | 34,059 | 984 | 55,437 | 0 | 55,437 |
| 2004 | 17,477 | 39,416 | 935 | 57,828 | 0 | 57,828 |
| 2005 | 14,451 | 36,865 | 887 | 52,203 | 0 | 52,203 |
| 2006 | 11,342 | 41,588 | 838 | 53,768 | 0 | 53,768 |
| 2007 | 8,169 | 38,536 | 790 | 47,494 | 0 | 47,494 |
| 2008 | 4,894 | 44,274 | 741 | 49,909 | 0 | 49,909 |
| 2009 | 1,573 | 39,711 | 693 | 41,977 | 0 | 41,977 |

COLUMN NOTES:
(2) See Schedule 1, p. 14, Column (8).
(3) p. 1 Column (7) /.1185 - p. 15 Column (16) - p. 12 Column (2)
- p. 12 Column (4) - p. 12 Column (6) - p. 3 Column (17)/.1185.
(4) See p. 5a, Column (3).
(6) Sum of Columns (2) through (4).
(7) To be based on results of actual market valuation.
(8) Columns (5) + (6).

NP30BAS2.WK4  10/23/97

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES
DEFERRED TAXES ON FIXED COMPONENT
$ IN 000

| YEAR END (1) | BALANCE NET BOOK VALUE OF GENERATION (2) | BOOK BASIS BALANCE GENERATION RELATED REG. ASSETS (3) | TOTAL NET BOOK BASIS (4) | BALANCE NET TAX VALUE OF GENERATION (5) | TAX BASIS BALANCE GENERATION RELATED REG. ASSETS (6) | TOTAL TAX BASIS (7) | EXCESS BOOK OVER TAX (8) | DEFERRED TAXES (9) |
|---|---|---|---|---|---|---|---|---|
| 1997 | 370,316 | 28,343 | 398,659 | 68,206 | 0 | 68,206 | 330,453 | 129,620 |
| 1998 | 351,651 | 26,914 | 378,565 | 84,768 | 0 | 84,768 | 313,797 | 123,087 |
| 1999 | 327,546 | 25,069 | 352,615 | 60,328 | 0 | 60,328 | 292,287 | 114,649 |
| 2000 | 298,886 | 22,876 | 321,762 | 55,050 | 0 | 55,050 | 266,712 | 104,618 |
| 2001 | 280,983 | 21,506 | 302,489 | 51,752 | 0 | 51,752 | 250,736 | 98,351 |
| 2002 | 254,937 | 19,512 | 274,449 | 46,955 | 0 | 46,955 | 227,494 | 89,235 |
| 2003 | 223,300 | 17,091 | 240,391 | 41,128 | 0 | 41,128 | 199,263 | 78,161 |
| 2004 | 186,686 | 14,288 | 200,975 | 34,384 | 0 | 34,384 | 166,590 | 65,345 |
| 2005 | 162,442 | 11,667 | 184,109 | 28,077 | 0 | 28,077 | 156,032 | 53,359 |
| 2006 | 113,810 | 8,711 | 122,521 | 20,962 | 0 | 20,962 | 101,559 | 39,837 |
| 2007 | 78,015 | 5,971 | 83,986 | 14,369 | 0 | 14,369 | 69,617 | 27,307 |
| 2008 | 36,888 | 2,823 | 39,711 | 6,794 | 0 | 6,794 | 32,917 | 12,912 |
| 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P. 4 COLUMN (7) FOR 1997 BALANCE.
(3) SEE SCHEDULE 1, P. 5 COLUMN (2) FOR 1997 BALANCE.
(4) COLUMN (2) + COLUMN (3).
(5) PER TAX RECORDS OF THE COMPANY.
(6) PER TAX RECORDS OF THE COMPANY.
(7) COLUMN (5) + COLUMN (6).
(8) COLUMN (4) - COLUMN (7).
(9) COLUMN (8) x TAX RATE .39225.

NP30BAS2.WK4  10/23/97

NARR 23458

Schedule 1
Page 14 of 15

## SUMMARY OF CONTRACT TERMINATION CHARGES
## MONTAUP ELECTRIC COMPANY
## RETURN ON FIXED COMPONENT

| YEAR END (1) | BALANCE OF FIXED COMPONENT (2) | DEFERRED TAXES (3) | NET BALANCE (4) | AVG NET BALANCE (5) | SUBTOTAL ANNUAL RETURN ON UNAMORTIZED BALANCE USING BASE ROE (6) | PLUS: RETURN ON UNAMORT. ITC (7) | TOTAL ANNUAL RETURN (8) |
|---|---|---|---|---|---|---|---|
| 1997 | 398,659 | 129,620 | 269,039 | 262,258 | 28,735 | 1,235 | 30,970 |
| 1998 | 378,565 | 123,087 | 255,478 | 246,722 | 27,974 | 1,128 | 29,101 |
| 1999 | 352,615 | 114,649 | 237,966 | 227,555 | 25,801 | 1,020 | 26,821 |
| 2000 | 321,762 | 104,618 | 217,144 | 210,641 | 23,883 | 913 | 24,796 |
| 2001 | 302,488 | 98,351 | 204,137 | 194,676 | 22,073 | 806 | 22,876 |
| 2002 | 274,449 | 89,235 | 185,215 | 173,722 | 19,697 | 698 | 20,395 |
| 2003 | 240,391 | 78,161 | 162,230 | 148,930 | 16,888 | 591 | 17,477 |
| 2004 | 200,975 | 65,345 | 135,630 | 123,190 | 13,967 | 483 | 14,451 |
| 2005 | 164,109 | 53,359 | 110,751 | 96,718 | 10,966 | 376 | 11,342 |
| 2006 | 122,521 | 39,837 | 82,685 | 69,682 | 7,901 | 269 | 8,169 |
| 2007 | 83,986 | 27,307 | 56,678 | 41,739 | 4,732 | 161 | 4,894 |
| 2008 | 39,711 | 12,912 | 26,799 | 13,400 | 1,519 | 54 | 1,573 |
| 2009 | 0 | 0 | 0 | | | | |

EECo 12/31/95
CAPITAL STRUCTURE

| | | | ATWACC | BTWACC |
|---|---|---|---|---|
| COMMON | 48.45% | 9.20% (a) | 4.46% | 7.33% |
| PFD | 5.95% | 9.83% | 0.58% | 0.95% |
| LTD | 45.60% (a) | 6.67% | 3.04% | 3.04% |
| | 100.00% | | 8.08% | 11.338% |
| TAX RATE | | | | 39.225% |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P 13 COLUMN (4).
(3) SEE SCHEDULE 1, P 13 COLUMN (9).
(4) COLUMN (2) - COLUMN (3).
(5) COLUMN (4) PRIOR YEAR+COLUMN (4)/2.
(6) COLUMN (5) x TOTAL RATE OF RETURN.
(7) AVERAGE UNAMORT. ITC (ASSUMING 12 YR S/L AMORT. OF P. 5, COLUMN (2) * BTWACC).
(8) COLUMN (6) + COLUMN (7).
(a) PER NEP RI FILING

NF30BAS2.WK4  10/23/97



MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES
NEWPORT ELECTRIC COMPANY SHARE (100%)
VARIABLE COMPONENT

Schedule 1
Page 15 of 18

Column Notes:
(2) Schedule 1, p. 6, Column (9) + Schedule 1, p. 7 Column (8).
(3) Column 1, p. 6
(6) Column (3) – Column (4)
(7) Per Schedule 1, p. 9, 10 Column (6)
(8) Column (7) – Column (8)
(9) Column (7) – Column (8)
(16) Sum of Columns (2), (5), (9), (10), (11), (12), (13), (14), and (15).

N0R8DA62.WK4 /02/23/97

NARR 23460

**SCHEDULE 2**

**CALCULATION OF ADJUSTMENT FOR DEFERRAL
OF CONTRACT TERMINATION DATE**

NARR 23461

IMPACT OF CONTRACT TERMINATION DEFERRAL
ON STARTING BALANCE OF SUNK COMMITMENTS
MONTAUP ELECTRIC COMPANY
($ IN 000's)

Schedule 2
Page 1 of 3

**1998**

CONTINUATION OF CURRENT RECOVERY

| | | |
|---|---:|---:|
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 332 (b) | 28 |
| TOTAL | 16,298 | 1,358 |
| AMORT PER CTC | | |
| TOTAL | 20,763 (c) | 1,730 |
| EXCESS AMORTIZATION | (4,465) | (372) |
| CUMULATIVE EXCESS AMORT. | (4,465) | (372) |

**1999**

CONTINUATION OF CURRENT RECOVERY

| | | |
|---|---:|---:|
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 19 (b) | 2 |
| TOTAL | 15,985 | 1,332 |
| AMORT PER CTC | | |
| TOTAL | 26,618 (c) | 2,218 |
| EXCESS AMORTIZATION | (10,633) | (886) |
| CUMULATIVE EXCESS AMORT. | (15,098) | (1,258) |

**2000**

CONTINUATION OF CURRENT RECOVERY

| | | |
|---|---:|---:|
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | (180)(b) | (15) |
| TOTAL | 15,786 | 1,316 |
| AMORT PER CTC | | |
| TOTAL | 31,522 (c) | 2,627 |
| EXCESS AMORTIZATION | (15,736) | (1,311) |
| CUMULATIVE EXCESS AMORT. | (30,834) | (2,570) |

(a) Schedule 1, p. 4, Column (8)
(b) Schedule 1, p. 5, Column (3) + Schedule 1, p. 5a, Amortization Amount (1996 & Beyond)
(c) Schedule 1, p. 12, Column (3) + Schedule 1, p. 5a, Column (1)

NP30BAS2.WK4  10/23/97

NARR 23462



NARR 23463



RECONCILIATION ADJUSTMENT ILLUSTRATION CALCULATION
NEWPORT ELECTRIC COMPANY SHARE

Schedule 2
Page 3 of 3

COLUMN NOTES:
(2) ASSUMED TO BE ZERO.
(3) TO BE DETERMINED AT VALUATION.
(4) SEE SCHEDULE 2, PG. 2, COLUMN (23) X -1.
(5) COLUMN (2) x NEWPORT'S % OF SALES.
(6) COLUMN (3) x NEWPORT'S % OF SALES.
(7) SUM OF COLUMN (4) THROUGH (6).
(8) COLUMN (10) PRIOR YEAR x RETURN @ BTYWACC.
(9) COLUMN (10) PRIOR YEAR x -1- COLUMN (8) CURRENT YEAR.
(10) PRIOR YEAR COLUMN (10) + CURRENT YEAR SUM COLUMNS (7) THROUGH (9).

NPSUBAS2.WK4  10/23/97

NARR 23464

**SCHEDULE 3**

**RECONCILIATION OF FAS 106 AND FAS 87 UPON DIVESTITURE**

NARR 23465

**Reconciliation of FAS 106 and 87**
**Upon Divestiture**

**$ in Thousands**

|  | Actual After Date of Divestiture |
|---|---|

**_One-Time Adjustments Upon Divesture:_**

**(1) Post Retirement Health Care Benefits -**
Unrecognized FAS 106 Gain or (Loss)

    **(a) Unrecognized Net Gain/(Loss) associated with FAS 106**
        MEC — -
        EUASC x 23.504% — :
        Total unrecognized Net Gain/(loss) allocated to MEC — :

    **(b) Generation Related Portion** — 93.08%
    **(c) Total Unrecognized Net Gain/(Loss) allocated to Generation** — -

**(2) Pensions -**
Unrecognized FAS 87 Gain or (Loss) *

    **(d) Unrecognized Net Gain/(Loss) associated with FAS 87**
        MEC — -
        EUASC x 23.504% — :
        Total Unrecognized Net Gain/(Loss) allocated to MEC — :

    **(e) Less: Unrecognized Prior Service Costs associated with FAS 87**
        MEC — -
        EUASC x 23.504% — :
        Total Unrecognized Prior Service Costs Allocated to MEC — :

    **(f) Less: FAS 87 Transition Liability**
        MEC — -
        EUASC x 23.504% — :
        Total FAS 87 Transition Asset allocated to MEC — :

    **(g) Plus: FAS 87 Transition Asset**
        MEC — -
        EUASC x 23.504% — :
        Total FAS 87 Transition Asset allocated to MEC — :

    **(h) Net Unrecognized Gain/(Loss) Associated with Pension** — -
    **(i) Generation Related Portion** — 93.08%
    **(j) Net Unrecognized Gain/(Loss) allocated to Generation** — -

* For the purpose of this reconciliation the unrecognized FAS 87 gains or losses shall be the amount of
the net unrecognized transition obligation, prior service cost, and unrecognized FAS 87 gains or losses
only to the extent that such gains or losses exceed five percent of the greater of plan assets or liabilities.

Row Notes:
(a) Per actual accounting and actuarial records.
(b) = Generation allocator based upon salaries and wages.
(c) = (a) x (b)
(d), (e), (f), (g) Per actual accounting records.
    Specific Company balances for Union, Non-Union, and SERP plans will be allocated by multiplying the total
    EUA balance for these plans by the ratio of the Company liability to the total EUA liability, by plan.
(h) = (a) - (b) - (c) + (d)
(i) See (b) above.
(j) = (h) x (i)

**Power Contract Buyout Incentive**
**Associated with Canal Divesture**

**$ in Thousands**

| | Divestiture Transaction: | | Illustrative Example Only |
|---|---|---|---|
| (1) | Total MEC Proceeds from Canal 2 Divestiture | $0 | $35,207 |
| | MEC Power Contracts Assumptions: | | |
| (2) | Annual Buyout Payments | 0 | 4,889 |
| (3) | NPV of Annual Buyout Payments | 0 | 28,812 |
| (4) | Net Proceeds Realized for Assets | 0 | 6,396 |
| (5) | Proceeds Necessary to Realize 125% Net Book Value | 0 | 44,009 |
| (6) | Net Value Attributable to Power Contracts | 0 | (37,613) |
| (7) | NPV of Above-Market Power Contracts in CTC | 0 | (57,623) |
| (8) | Total Power Contracts Savings | 0 | (20,010) |
| (9) | 10% Buyout Incentive | 0.0 | 2,001 |
| (10) | Newport Electric Share | 11.85% | 11.85% |
| (11) | Newport Share of Incentive | $0.0 | $237.1 |

Line Notes:

(1)   Actual sale proceeds realized through Canal 2 divestiture.
(2)   Actual annual power contract buyout payments for Canal 1, Potter 2 and Cleary 9.
(3)   NPV, at the time of divestiture, of Line (2) for stipulated term of buyout
        payments using a discount rate equal to the actual pre-tax return in place
        following completion of post-divestiture refinancing as determined under
        Section 1.1.4 (d).   For this example, the discount rate used equals
        the pre-tax return of 13.092% pursuant to Section 1.1.2.
(4)   Line (1) - Line (3).
(5)   Actual net book value of Canal 2 generating unit upon divestiture x 125%.
(6)   Line (5) - Line (4).  The result cannot exceed zero.
(7)   NPV, at the time of divestiture, of Schedule 1, Page 15, Column (5),
        remaining years only, using a discount rate equal to the actual pre-tax return
        in place following completion of post-divestiture refinancing as determined under
        Section 1.1.4 (d) and the market prices shown in Page 3 of this Schedule, even if
        actual market prices are different.  For this example, the discount rate used equals
        the pre-tax return of 13.092% pursuant to Section 1.1.2.
(8)   Line (7) - Line (6).
(9)   Line (8) x -1 x 10%
(10)  Newport Electric Corporation's share of MEC stranded costs.
(11)  Line (9) x Line (10).

NARR 23467

Schedule 3
Page 3 of 4

**Power Contract Buyout Incentive**
**Associated with Canal Divestiture**

**$ in Thousands**

**Market Price Assumptions \***

cents/kwh

| | |
|------|------|
| 1998 | 2.48 |
| 1999 | 2.63 |
| 2000 | 2.55 |
| 2001 | 2.59 |
| 2002 | 2.87 |
| 2003 | 2.97 |
| 2004 | 3.07 |
| 2005 | 3.16 |
| 2006 | 3.25 |
| 2007 | 3.36 |
| 2008 | 3.49 |
| 2009 | 3.58 |
| 2010 | 3.71 |
| 2011 | 3.80 |
| 2012 | 3.95 |
| 2013 | 4.05 |
| 2014 | 4.14 |
| 2015 | 4.24 |
| 2016 | 4.39 |
| 2017 | 4.51 |
| 2018 | 4.62 |
| 2019 | 4.74 |
| 2020 | 4.85 |
| 2021 | 4.97 |
| 2022 | 5.09 |
| 2023 | 5.20 |
| 2024 | 5.32 |
| 2025 | 5.43 |
| 2026 | 5.55 |
| 2027 | 5.67 |
| 2028 | 5.79 |
| 2029 | 5.90 |

\* Note:  Market Price Assumptions are fixed for purposes of the calculation of
the Power Contract Buyout Incentive associated with the Canal divestiture.

NARR 23468

## Ocean State Power Buyout Incentive
### For Illustrative Purposes Only
### $ in 000

| | | |
|---|---|---|
| 1 | NPV of OSP Costs in CTC | $335,759 |
| 2 | NPV for Incentive Purposes | 302,184 |
| 3 | NPV of Market Value | 188,977 |
| 4 | Above Market Cost for Incentive | 113,207 |
| 5 | NPV of Buyout Amount | 100,000 |
| 6 | Net Value Attributable to Buyout | 13,207 |
| 7 | 10% Buyout Incentive | 1,321 |
| 8 | Newport Electric Share | 11.85% |
| 9 | Newport Share of Incentive | $156 |

1   NPV at time of divestiture, @ full cost-of-service, using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined under section 1.1.4(d). For this example, the discount rate used equals 13.092% under Section 1.1.2.

2   90% of Line 1.

3   NPV at time of divestiture of market value for remaining contract lives using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined in Section 1.1.4 (d).   For this example, the discount rate used equals 13.092%.

4   Line 2 - Line 3.

5   NPV, at the time of divestiture, for stipulated term of buyout payments using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined in Section 1.1.4 (d).   For this example, the discount rate used equals 13.092%.

6   Line 4 - Line 5. Cannot be less than zero.

7   Line 6 * 10%.

8   Newport Electric Corporation's share of MEC stranded costs.

9   Line 8 x Line 7.

NARR 23469

**SCHEDULE 4**

**MONTAUP ELECTRIC COMPANY**
**POST 1995 CAPITAL INVESTMENTS**

NARR 23470

# Tab 4

# (7 of 8)

Schedule 4
Page 1 of 5

## MONTAUP ELECTRIC COMPANY

### POST 1995 CAPITAL INVESTMENTS

#### Through May 1997

#### Project Descriptions

**Project No.**    **Title - Total Project Cash Through May 1997**

**7-96/97**    **Building Improvements/Retirements** - $4,502
**X7-96/97**    Perform routine minor building improvements and retirements.

The maximum single expenditure for any one project shall not exceed $25,000.

Reason for Project:  To improve various work facilities through improvement of system buildings and retirement of obsolete facilities.

**10-96/97**    **Furniture, Tools, Lab and Comm. Equipment** - $68,375
**X10-96/97**    Purchase and install furniture, tools, laboratory, garage and communications equipment.  Also remove or retire the aforementioned which are either replaced or abandoned.

The maximum single expenditure under this authorization shall not exceed $25,000.

Reason for Project:  To improve various work facilities through additions and replacements of furniture, tools and equipment.

**13-96/97**    **Miscellaneous Production Improvements/Retirements** - $345,944
**X13-96/97**    Perform routine production improvements and retirements.

Reason for Project:  To improve various work facilities through improvement of system buildings and retirements of obsolete facilities.

**14-96/97**    **Minor Imps/Rets - Canal #2** - $798,492
**X14-96/97**    Perform miscellaneous minor improvements and retirements of Canal Unit #2 equipment.

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Project:  To increase the operational and maintenance efficiency of the unit.

NARR 23471

**15-96/97**
**X15-96/97**
<u>Minor Imps/Rets - Canal #2 Common</u> - $83,105
Perform miscellaneous minor improvements and retirements of Canal Unit #2 equipment, which is common to Canal Unit #1.

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Project: To increase the operational and maintenance efficiency of the unit.

**16-96/97**
**X16-96/97**
<u>Minor Imps/Rets - Wyman #4</u> - $6,565
Perform miscellaneous minor improvements and retirements at Wyman Unit #4.

Charges and credits to plant will reflect Montaup's 1.9618% share of ownership.

Reason for Project: To increase the operational and maintenance efficiency of the unit.

**34**
**X34**
<u>1994 Miscellaneous Projects, Canal 2</u> - $708,661
This requisition includes the following projects which began during 1994, and is net of $11,985,355 for gas conversion which is included in December 31, 1995 embedded plant amounts.

1.  Miscellaneous Improvements under $25,000
2.  Gas for Canal Unit #2
3.  Generator Stator Refurbishment
4.  Emission Monitoring, Common
5.  NOx Ports and Register Assemblies
6.  Replace Breaker Mufflers, Common
7.  Replace ID Fan Inlet Box
8.  Discharge Flume Repairs, Common
9.  CO Reduction
10. Resin for Polishers
11. Refurbish Marine Building, Common
12. Ash Pit and Expansion Joint Work
13. Economizer Expansion Joints
14. Cold End Air Preheater B
15. Piping Restraint System
16. Maintenance Management System, Common
17. Electrostatic Precipitator Refurbishment
18. Condensate Polisher Refurbishment
19. Generator Rings & Stator Windings

Charges and credits to plant will reflect Montaup's 50% share of ownership

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

35
X35

**1995 Miscellaneous Projects, Canal 2 - $137,978**
This requisition includes the following projects which began during 1995:

1. Replace Turbine Room Roof
2. Training/Visitor Building
3. Waste Neutralizing Tank
4. Caustic & Acid Storage Area Repairs
5. Combustion Modifications & CO
6. Neutralizing Wash System
7. Reheat Controls Upgrade

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

36
X36

**1996 Miscellaneous Projects, Canal 2 - $2,698,884**
This requisition includes the following projects which began during 1996:

1. ID Fan Attenuators
2. NOx/CO Reduction

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

37
X37

**1997 Miscellaneous Projects, Canal 2 - $21,678**
This requisition includes the following projects which began during 1997:

1. Callon Regeneration Vessel Replacement
2. Rework Furnace Wall
3. Replace ID Fan Attenuators
4. Precipitator Roof Enclosure
5. Precipitator Inlet Flow Distribution

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

718
X718

**Warehouse No. 2 Roof and Side Walls - $57,740**
Install a new metal roof and metal siding on warehouse. Retire existing roof and siding.

Reason for Project: Existing roof and sidewalls are heavily corroded and leak excessively.

797

**Preservation of Unit 5 - $40,366**
Design, supply and maintain a dehumidification and sealing system to protect the generating equipment of Unit No. 5 from corrosion damage while the unit remains in a deactivated reserve status. Several tasks must be performed by Engineering, plant personnel and outside contractors to prepare the unit for the acceptance of the dehumidification system.

Reason for Project: As a result of Unit No. 5 being placed in a deactivated reserve status, procedures must be followed to preserve the mechanical and electrical components. The preservation is to prevent moisture attack to the metal components and to maintain operational integrity of the Unit.

**X806**      **1995 Asbestos Abatement, LP Station - $738,326**
Remove asbestos insulating material from Units 1-4, low pressure station. Reinsulate the equipment which is still in service.

Reason for Project: Remove insulation, refractories, coatings and gasketing material from the equipment to allow dismantlement, reduce environmental liability and diminish ongoing maintenance and re-encapsulation costs.

**X808**      **Units 1, 2, 3 & 4 Salvage - ($100,132)**
To capture salvage value for reserve of physical plant equipment from Somerset Units 1, 2, 3 and 4, previously retired. This work addresses salvage of unit generators 1, 2 and 4 as one effort. A second effort addresses salvage of units 1, 2 and 4 main transformers and numerous other station service transformers.

Unit generators have a salvage value of $10,000 each for a total of $30,000. The last of 15 transformers have a salvage value of $40,000. Montaup labor will consist of electrical disconnects and isolation, and operation of overhead cranes. Montaup labor is estimated at $10,000.

Reason for Project: To obtain existing secondary market value of used equipment.

**812**      **Abatement & Encapsulation, Stacks 1-4 - $29,682**
**X812**     Complete abatement and encapsulation of stacks 1-4 at Montaup Electric's Somerset Station. Air monitoring and proper disposal of all asbestos materials and debris included.

Reason for Project: The existing mastic coating is flaking off stacks 1-4. In order to contain this mastic material is necessary to completely abate all four stacks. In addition, once this coating is removed, stacks 1-4 must be sealed in order to preserve their weather integrity.

**815**      **J2 Gas Turbine Exhaust Silencer - $105,095**
**X815**     Purchase and install a new exhaust silencer for the J2 gas turbine. Remove and retire the existing silencer.

Reason for Project: The existing silencer is severely corroded. Internal attenuating baffles are damaged beyond repair. Installation of the new silencer will be performed during the annual overhaul of the unit.

**816**      **J1 Gas Turbine Exhaust Silencer - $98,342**
**X816**     Purchase and install a new exhaust silencer for the J1 gas turbine. Remove and retire the existing silencer.

Reason for Project:  The existing silencer is severely corroded.  Internal attenuating baffles are damaged beyond repair.  Installation of the silencer will be performed during the annual overhaul of the unit.

818
X818
**Air Preheater Basket Replacement** - $244,066
Replace air preheater heat exchange basket assemblies.

Reason for Project:  This project will improve unit heat rate.  In addition, it will increase combustion air temperature due to improved heat transfer from new baskets.

822
X822
**New Cond. Tubes** - $491,620
Install approximately 11,200 new 90-10 Cu-Ni, 7/8" OD, 18 BWG, 30' long tubes in Unit #6 steam condenser.

Reason for Project:  The existing tubes will be in service for 30 years by 1997.  The condition of these tubes was such that 5,500 tube end inserts had to be installed in 1990 to prevent further corrosion of tubes.  Tube leaks will necessitate load reduction or unit outage, threaten the boiler water chemistry, and also lead to degradation of the heat rate of the unit.  New condenser tubes will assure improved boiler water chemistry and better thermal performance for many years.

**SCHEDULE 5**

**DETAIL OF EARLY RETIREMENT, EMPLOYEE TERMINATION & RETRAINING COSTS RESULTING FROM DIVESTITURE**

**Schedule 5**
**Detail of**
Early Retirement, Employee Terminations & Retraining Costs
<u>Resulting from Divestiture</u>

$ in Thousands

| | Non-Union | Union | Total All |
|---|---|---|---|
| **I.  Accounting Costs:** | | | |
| **A.  Early Retirement** | | | |
|   _Additional Benefits:_ | | | |
|   (1)  Pension | $5,726.0 | $1,312.0 | |
|   (2)  Severance | $134.0 | $199.0 | |
|   (3)  Health | $1,643.0 | $208.0 | |
|   (4)  Retraining | $108.0 | $51.0 | |
| **Subtotal Early Retirement (I.A)** | $7,611.0 | $1,828.0 | $9,439.0 |
| **B.  Terminations & Employee Retraining** | | | |
|   _Severance:_ | | | |
|   (1)  Payments | $830.7 | $938.8 | |
|   (2)  Health | $145.8 | $248.4 | |
|   (3)  Retraining | $81.0 | $138.0 | |
| **Subtotal Terminations & Retraining (I.B)** | $1,057.5 | $1,325.2 | $2,382.7 |
| **TOTAL PROGRAM COSTS (I.A, I.B)** | $8,668.5 | $3,153.2 | $11,821.7 |
| **II.  Position Reductions:** | | | |
| A.  # Employees Eligible for Early Retirement | 50 | 17 | 67 |
| B.  # Employees Accepting Early Retirement | 36 | 17 | 53 |
| C.  # Employees to be Severed | 27 | 46 | 73 |
| D.  Total Reductions (Early Retirement & Severance) | 63 | 63 | 126 |

Notes:
Assumes a 7.5% discount rate
Costs include those of Montaup Electric Company and EUA Service Corporation in support of generation function

NARR 23477

**ATTACHMENT 2B**

SERVICE AGREEMENT FOR NETWORK INTEGRATION TRANSMISSION SERVICE

NARR 23478

Service Agreement For
Network Integration Transmission Service
Between Montaup Electric Company and
Blackstone Valley Electric Company,
Agent for Retail Transmission Customers

THIS AGREEMENT is made this 3rd day of June, 1997, by and between Montaup

Electric Company (hereinafter called "Transmission Provider"), and Blackstone Valley

Electric Company, acting as agent for certain retail electric customers (hereinafter called

"Transmission Customer").

In consideration of the mutual covenants and agreements herein contained, the

Parties hereto agree as follows:

1.    For purposes of transmission service under the Transmission Provider's

Tariff No. 7, the Transmission Customer is agent for its retail customers who are

eligible for retail choice but that do not obtain Network Integration Transmission

Service directly from the Transmission Provider ("Blackstone Retail Transmission

Customers").

2.    Customers who are eligible for retail choice are as follows:

a)    In the period beginning July 1, 1997:

(i)    All new commercial and industrial customers, including new

manufacturing customers, commencing service on or after

July 1, 1997, with an anticipated average annual demand of

two hundred (200) kilowatts or greater;

NARR 23479

- 2 -

      (ii)    All existing manufacturing customers with an average annual demand of fifteen hundred (1500) kilowatts or greater; and

      (iii)    All accounts in the name of the State of Rhode Island; subject to a limitation of no more than ten percent (10%) of the Transmission Customer's total kilowatt-hour sales.

    b)    In the period beginning January 1, 1998:

      (i)    The customers specified in section (a), above; and

      (ii)    Existing manufacturing customers with an average annual demand of two hundred (200) kilowatts or greater and all accounts in the name of cities and towns in Rhode Island; subject to a limitation of no more than 20% of the Transmission Customer's total kilowatt-hour sales.

    c)    In the period beginning July 1, 1998, all retail customers shall be eligible for retail choice.

3.    The aggregated transmission requirements of the Blackstone Retail Transmission Customers are the Transmission Customer's Network Load.

4.    The Transmission Provider agrees to furnish Network Transmission Service over the Transmission Provider's transmission system to the Transmission Customer, acting as agent for the Blackstone Retail Transmission Customers, commencing on July 1, 1997. The Transmission Customer agrees to serve as the billing agent for provision of such Network Transmission Service to the Network Retail Transmission Customers and for the provision to the Blackstone Retail

NARR 23480

- 3 -

Transmission Customers of Regional Transmission Service and Ancillary Services pursuant to the NEPOOL Open Access Tariff. The terms and conditions of service and the rates shall be as provided in FERC Transmission Tariff No. 7 of the Transmission Provider (the Tariff) and Schedule 13 of the Tariff.

5.      Service under this Agreement shall not be terminated before the date on which the Transmission Provider recovers all Contract Termination Charges established pursuant to the Amendment to the Service Agreement for Purchase of Electric Service for Resale dated May 1, 1997, as amended from time to time.

6.      In the event that the Transmission Customer is denied permission to recover, through its rates for local distribution service, access charges sufficient to collect the full amount of the Contract Termination Charges billed to the Transmission Customer, the Transmission Provider shall collect the unrecovered balance of the Contract Termination Charges as a surcharge to all retail customers taking delivery of electric energy over the transmission or distribution facilities of the Transmission Provider.

7.      Service under this Agreement shall be subject to the following charges:

      7.1     Transmission Charge: The charge set out in Schedule 13 of the Tariff.

      7.2     Ancillary Services Charges: Ancillary Services customarily will be provided by NEPOOL pursuant to the NEPOOL Open Access Tariff. The Transmission Provider will provide Ancillary Services only if they are not available from NEPOOL. The charges for any Ancillary

- 4 -

Services provided by the Transmission Provider are set out in Schedules 1 through 6 of the Tariff.

7.3    Losses:  The charges to the Transmission Customer for such losses shall be based on application of the Real Power Loss factor set out in Section 28.5 of the Tariff, as modified from time to time.

8.    Except as provided in paragraphs 5 through 7, above, which may be modified only by mutual consent of the parties, nothing contained herein shall be construed as affecting in any way the Transmission Provider's right to unilaterally make application to the Federal Energy Regulatory Commission, or other regulatory agency having jurisdiction, for any change in the Tariff or this Service Agreement under Section 205 of the Federal Power Act, or other applicable statute, and any rules and regulations promulgated thereunder; or the Transmission Customer's rights under the Federal Power Act and rules and regulations promulgated thereunder.

9.    The obligations under this Agreement may be assigned only with the express written consent of the other party, which consent shall not be unreasonably withheld; provided, however, that the Transmission Provider shall not be obligated to consent to any assignment that adversely affects the ability of the Transmission Provider to recover from the Transmission Customer the payments required to be made under the Tariff, this Service Agreement, including any Contract Termination Charges that may be billed to the Transmission Customer pursuant to this Agreement.

- 5 -

10.   This Service Agreement is subject to any present and future state and

federal laws, regulations, orders or other duly promulgated requirements.

IN WITNESS HEREOF, the Parties have caused this Service Agreement to be

executed by their respective authorized officials.

MONTAUP ELECTRIC COMPANY

Dated: _June 4, 1997_       BY: _Kevin A Kirby_

Title: _Vice President_

BLACKSTONE VALLEY ELECTRIC COMPANY, AGENT FOR BLACKSTONE
RETAIL TRANSMISSION CUSTOMERS

Dated: _June 4, 1997_       BY: _____

Title: _President_

NARR 23483

## Specifications for Network Integration Transmission Service
## To
## Blackstone Valley Electric Company

1.  Term of Service:

    Start Date:  July 1, 1997

    Termination Date:  Pursuant to mutual agreement of the Parties.

2.  List of Network Resources and Point(s) of Receipt:

    The system generating resources of Montaup Electric Company.

3.  a)  List of Point(s) of Delivery including and identifying Remote Delivery Point(s):

        See Attachment 1.

    b)  List of Metering Point(s) when they differ from Point(s) of Delivery:

        To be provided.

4.  List of non-Network Resource(s), to the extent known today:

        None.

5.  Ancillary Services Requested or Proof of Satisfactory Arrangements for Ancillary Services:

        All Ancillary Services will be provided pursuant to the NEPOOL Open Access Tariff or, if necessary, pursuant to Montaup's Open Access Tariff.

6.  Other Specified Provisions:

    A.  Billing will include any applicable charges in accordance with the rates, terms and conditions of the Tariff.

    B.  The Transmission Provider has agreed to terminate those requirements of its FERC Electric Tariff, Revised Volume No. 1 ("Tariff No. 1") that obligate the Transmission Customer to buy all of its electricity requirements under

NARR 23484

— 2 —

Tariff No. 1 and Transmission Customer has agreed to pay contract termination charges pursuant to the Amendment. Service under this Agreement is conditioned on the Commission's approval of the Amendment filed on May 1, 1997.

C.  In no event shall the Transmission Provider bypass the Transmission Customer's distribution facilities and interconnect directly with a retail customer.

NARR 23485

**Attachment 1**
**Montaup Delivery Points for Newport Electric Corporation**

| **Substation Delivery Point** | **Delivery Voltage (Nominal kV)** |
| --- | --- |
| Canonicus Street | 115 |

File Name: deliv

NARR 23486

NARR 23487

EUA SYSTEM COMPANIES

**BLACKSTONE VALLEY ELECTRIC COMPANY**
**EASTERN EDISON COMPANY**
**MONTAUP ELECTRIC COMPANY**
**NEWPORT ELECTRIC CORPORATION**

JURISDICTIONAL SEPARATION OF TRANSMISSION
AND DISTRIBUTION FACILITIES PURSUANT TO
FERC ORDER 888

NARR 23488

Table of Contents

| | | Page |
|---|---|---|
| I. | Executive Summary | 1 |

Analysis

| | | |
|---|---|---|
| II. | Federal and State Jurisdictional Requirements per FERC Order 888 | 3 |
| III. | Summary of EUA System Structure | 4 |
| IV. | Definition of EUA Retail Companies' Distribution Systems | 6 |
| V. | Definition of EUA Transmission System | 10 |
| VI. | Attachments | |

NARR 23489

## I.    Executive Summary

In its Order Number 888, the Federal Energy Regulatory Commission (FERC) proposed a seven-factor test to delineate the jurisdictional line between transmission facilities subject to FERC's jurisdiction and distribution facilities subject to state rate-making authority.  FERC has claimed exclusive authority over all transmission and distribution facilities used for wholesale wheeling and over the transmission component of unbundled interstate retail wheeling.  The seven-factor test is designed to identify the characteristics of local distribution systems that differentiate them from transmission systems.  The seven-part test proposed by FERC is flexible and based on the actual use of the distribution and transmission systems.  The application of the test depends on the facts of each case.

The corporate structure of the EUA System Companies generally separates transmission or distribution functions into different subsidiaries in a way that parallels FERC's seven-factor test.  The individual subsidiaries within the EUA System are segregated by function, and not vertically integrated, as is the standard organization of most electric utilities.  Wholesale services, comprising generation and transmission functions, are primarily under one subsidiary, Montaup Electric Company (Montaup).  Retail distribution functions are under separate retail subsidiaries, Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone),and Newport Electric Corporation (Newport).[1]  This unique structuring of the subsidiary utilities creates functional and jurisdictional separations that are consistent with FERC's definition of wholesale transmission and local distribution.

---

[1] Blackstone, Newport, and Eastern currently own transmission facilities. All of Blackstone's and Eastern's transmission facilities, and some of Newport's, are leased to and operated by Montaup under an agreement that is subject to FERC's jurisdiction. Thus, even while ownership is not completely consolidated by function, the system is functionally separated for rate jurisdiction purposes.

1

NARR 23490

Based on the analysis in this report, the EUA Companies conclude that their current usage and jurisdictional rate treatment of transmission and distribution facilities is appropriate and is consistent with FERC's definitions of transmission and local distribution facilities as expressed in the seven factor test, with the exception of Newport's transmission facilities. The facilities owned and/or operated by Montaup are properly classified as transmission, based on Montaup's customers and the voltage class and system configuration of the facilities. Where distribution facilities of the distribution companies are used for a wholesale wheeling purpose, appropriate support costs are allocated to Montaup and included in its FERC-jurisdictional rates. When the ownership and operation of transmission is further consolidated in a new transmission company, contemplated as part of a comprehensive corporate restructuring plan, all of the Newport transmission facilities will be transferred or leased, as appropriate, and made part of a FERC-jurisdictional transmission tariff.

The distribution facilities of the EUA retail subsidiaries which are subject to state rate-making jurisdiction today fit the seven-part test established by FERC for the definition of local distribution facilities used for retail access in a restructured industry.

2

NARR 23491

## II.   Overview of Federal and State Jurisdictional Requirements per FERC Order 888

In its Order Number 888, FERC addressed the issue of federal and state jurisdiction over retail transmission by defining what constitutes "local distribution". FERC claimed exclusive jurisdiction over transmission facilities and service used for retail wheeling up to the point of local distribution.[2] To determine the jurisdictional line, FERC proposed the seven-factor test of local distribution. This test of functional and technical characteristics of facilities defines local distribution facilities and thus demarcates the line between federal and state jurisdiction.

Under Order 888, FERC will defer jurisdiction over local distribution facilities to state commissions if the state commission applies the seven part criteria set forth in Order 888. Accordingly, this report is prepared for use before the state commissions in Massachusetts and Rhode Island, as well as FERC, when evaluating the jurisdictional separation between transmission and distribution facilities. A consistent separation for each state will prevent gaps or overlaps in rate making and will protect against cross subsidies among customers that could otherwise occur if the states adopted different dividing lines between transmission and distribution for ratemaking purposes.

---

[2] In addition, FERC claimed exclusive jurisdiction over all facilities, whether transmission or distribution, used for wholesale wheeling.

3

NARR 23492

### III.    Summary of EUA System Structure

The EUA System has a unique structure.  Most utilities are vertically integrated, and a single corporate entity owns the utility's generation, transmission, and distribution assets.  However, the EUA System is already organized along functional lines.  Montaup, a separate subsidiary of the EUA System, owns, operates and/or controls through integrated facilities arrangements, most of the System's generation and transmission assets[3] and has contracted for all of the System's power purchases and transmission support obligations.[4]  The EUA retail companies-Eastern, Blackstone, and Newport- obtain the power supplies they need to serve the retail customers in their service territories, as well as the transmission service to deliver that generation to their distribution systems, from Montaup under Montaup's FERC Electric Tariff, Revised Volume Number 1 (Tariff 1).  The EUA retail companies separately own all of the distribution facilities needed to serve retail customers in their individual service territories.[5]

Thus, within the EUA System, transmission and distribution are generally owned by separate corporations.  In those instances where ownership is not separated, control and rate-making authority over assets have been established through agreements between Montaup and the distribution companies.  Under these agreements, Blackstone, Eastern, and Newport receive support payments from Montaup to compensate them for the rental costs of their transmission and generation facilities.  Likewise, Montaup receives compensation from Eastern for its use of the Montaup-

---

[3]Blackstone owns and operates a small run-of-river hydro facility in Pawtucket, RI.  Newport has retained ownership and rate treatment of most of its 115kV and 69kV transmission facilities to date; these will be consolidated into the FERC-jurisdictional transmission function as part of a comprehensive corporate reorganization.

[4] This is true with the exception of certain Qualifying Facilities (QFs) with capacity less than 1 megawatt, the output of which is purchased directly by the EUA retail companies under PURPA guidelines in each of the respective states in which the EUA retail companies operate.

[5] Montaup owns a very limited number of distribution facilities in Eastern's service area.  These facilities are supported by Eastern under an agreement with Montaup.

4

NARR 23493

owned distribution facilities.

        Under the disaggregated structure of the EUA system, the costs of Montaup's wholesale power supply and transmission investments and commitments are reflected in Montaup's FERC-jurisdictional rates. Montaup's rates also recover the costs associated with distribution facilities used for wholesale services. Montaup compensates the retail affiliates for use of those distribution facilities. Thus, the rate recovery of investments and commitments for all wholesale wheeling is determined by FERC. Conversely, state commissions address directly the distribution costs and other costs associated exclusively with retail service.

5

NARR 23494

## IV.  Definition of EUA Retail Companies' Distribution Systems

Attachment 1 shows the geographic areas served by the EUA retail companies. The local distribution systems of the EUA Retail Companies are primarily 14kV voltage class systems. Some areas also have 4, 23, or 69kV voltage class systems. These systems are radial in nature, serving retail load in the vicinity of the local distribution facilities. The local distribution systems are typically supplied from the 115 kV transmission system owned or controlled by Montaup through one or more step-down transformers owned or controlled by the EUA retail companies. Metering that measures the total kilowatt hours flowing into each local distribution area of the EUA retail companies at each delivery point is typically on the low voltage side of the step-down transformers and compensated for transformer losses and adjusted to the high side. The line of demarcation between transmission facilities and distribution facilities is designated at the high side bushing of the step-down transformers.

Attachment 2 shows a typical distribution system for the EUA retail companies. This diagram indicates that the system is served from a transmission line, typically 115 kV, through one or more step-down transformers. Typically, several distribution feeders emanate radially from each distribution substation, with normally open switch points connecting to feeders from neighboring substations. Distribution systems are generally 14, 23 or 69 kV voltage class distribution systems which serve some customers directly through service transformers (Type I Facilities) and serve other customers through step-down transformers to distribution systems which have 4 or 23 kV voltage class distribution feeders (Type II Facilities).

As is shown on Attachment 2, the distribution system is radial in nature. Although power may be supplied from more than one transmission/distribution interface, power flow is always into the geographic area served by the distribution facilities. Distribution facilities are not used to transmit bulk power from one geographic area to another; the power is consumed within the distribution service area. The distribution circuit often terminates at an open switch to tie with an adjacent circuit for reliability and maintenance purposes; opening or closing tie points on the

6

distribution system has no affect on the integrity or reliability of the bulk transmission system. Switching of distribution tie points may be manual or automatic and is done to restore service to customers in the event of an outage or to perform maintenance on equipment.

Attachment 3 is a list of the EUA System transmission/distribution supply points. This attachment identifies each supply point by name, delivery voltage (kV), and the type of distribution system supplied from that location. The distribution systems of the EUA retail companies supplied by points listed in Attachment 3 meet the seven-part test for distribution systems as described below.

(1)    **Local distribution facilities are normally in close proximity to retail customers.**

The EUA retail companies' distribution facilities are in close proximity to retail customers, as these are the circuits that emanate from local distribution substations and serve customers in a limited geographical area as shown in Attachment 2. These circuits typically are installed along public roads and private rights-of-way and serve adjacent customers.

(2)    **Local distribution facilities are primarily radial in character.**

The distribution facilities of the EUA retail companies are primarily radial in character, and serve a limited area from one or more transmission supply points. These facilities typically benefit the local area, and do not affect the operation or integrity of the transmission system other than as local load delivery points (Reference Attachment 2).

7

NARR 23496

(3)  **Power flows into local distribution systems; it rarely, if ever, flows out.**

Power flow is into a local distribution system, and is metered at the transmission/distribution interface. More than one supply point may exist as previously described in item (2) above and shown in Attachment 4 page 1. Because these systems are radial in nature, the net power flow will be into the system to serve the local load. Pages 2 and 3 of Attachment 4 show the billing metering facilities at Staples and Washington Substations, respectively. Refer to Attachment 9 for a description of symbols and designations used on billing meter layouts.

If generation exists on the distribution system, separate billing metering facilities would be located at the local generation facility to segregate wholesale services from local distribution deliveries. In Attachment 5, the BFI generation facility in East Bridgewater resides on a 14 kV system in Massachusetts. Generation facilities interconnected to the distribution system are typically much smaller than the load being served by the local distribution facilities. The net power flow across the transmission/distribution interface will generally be reduced, but power will typically not flow from the distribution system to the transmission system.

(4)  **When power enters a local distribution system, it is not reconsigned or transported on to some other market.**

The EUA retail companies' distribution systems serve retail end-use customers. In cases where distribution facilities are also used to serve wholesale customers, an allocation of the cost of the system used for wholesale services would be assigned to the wholesale transaction. Separate metering is located at the wholesale customer to segregate wholesale deliveries from local distribution deliveries. Attachment 5 shows an example of the BFI generating facility interconnected to a 14 kV distribution line (#941) and the corresponding meter location. This line also serves retail end-use customers in East Bridgewater, Massachusetts. In this case a portion of the 941 line is allocated to the wholesale transaction and such portion is considered to be transmission. The remaining portion is considered to be a distribution facility.

8

(5)    **Power entering a local distribution system is consumed in a comparatively restricted geographical area.**

The EUA retail companies' distribution systems serve load in a comparatively restricted geographical area. The geographical area served by a local distribution system depends on the load density of the area. For example, several distribution circuits of the types shown in Attachment 2 may serve a city or a number of rural towns.

Attachment 6 shows the area map and electrical one-line diagram for distribution feeders which serve the town of Scituate, Massachusetts and portions of adjacent towns. This represents how a typical distribution system of the EUA retail companies serves a restricted geographic area.

(6)    **Meters are based at the transmission/distribution interface to measure flows into the local distribution system**

Metering to measure flows into the local distribution systems of the EUA retail companies is typically on the low voltage side of the step-down transformer and compensated for transformer losses and adjusted to the high side. Refer to Attachment 2 for a general overview. As an example, Attachment 7 shows a typical billing metering installation at the Valley Substation from the 115 kV transmission system.

(7)    **Local distribution system will be of reduced voltage.**

The local distribution voltages of the EUA retail companies are less than 115 kV. Typical voltage classes used are 4, 14, 23 and 69 kV. Attachment 8 shows the actual distribution voltages used by the EUA retail companies.

9

NARR 23498

## V.    Definition of EUA Transmission System

The function of transmission facilities is to integrate generation resources over large geographical areas and deliver the needed power to local distribution supply systems.  The EUA transmission system is used to transmit power from generation resources located on its system or on the transmission systems of other utilities to the loads served by the distribution system.  By definition, a transmission system is typically interconnected to the neighboring transmission systems of neighboring utilities. Transmission lines are rarely, if ever, directly connected to retail customers. The EUA Companies' transmission system is generally operated at voltages of 115kV and above.

10

NARR 23499

# Tab 4

# (8 of 8)



## TERRITORY OVERVIEW



NARR 23500



## BLACKSTONE VALLEY ELECTRIC COMPANY

| Operating District | Substation | Distribution Type | Delivery Voltage (Nominal KV) | Metering Point | Metering Voltage (Nominal KV) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|---|
| Lincoln | Center St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Central Falls | II | 13.8 | SDP | 4 | SDP | SL |
| | Cottage St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Crossman St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Daggett Ave. | II | 13.8 | SDP | 4 | SDP | SL |
| | East School St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Farnum | I | ·115 | SDP | 23 | SDP | SL |
| | Front St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Hyde Ave. | II | 13.8 | SDP | 4 | SDP | SL |
| | Lee St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Merry St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Nasonville | I | 115 | SDP | 13.8 | SDP | SL |
| | Pawtucket #1 | I | 115 | SDP | 13.8 | SDP | SL |
| | Pawtucket #2 | II | 13.8 | SDP* | 4 | SDP* | SL |
| | Riverside | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Southeast | II | 13.8 | SDP | 4 | SDP | SL |
| | Staples | I | 115 | SDP | 13.8 | SDP | SL |
| | Valley | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Washington | I | 115 | SDP | 13.8 | SDP | SL |
| | West Farnum | I | 115 | SDP | 13.8 | SDP | SL |
| | York Ave. | II | 13.8 | SDP | 4 | SDP | SL |

SDP = Standard Delivery Point
SL = Supply Line
SDP* = Hydro Generation Metered as leaving Generators

## EASTERN EDISON COMPANY

| Operating District | Substation | Distribution Type | Delivery Voltage (Nominal KV) | Metering Point | Metering Voltage (Nominal KV) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|---|
| Brockton | Ames | I | 115 | SDP | 13.8 | SDP | SL |
| | Ames St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Avon Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Belmont | I | 115 | SDP | 13.8 | SDP | SL |
| | Court St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Dupont | I | 115 | SDP | 13.8 | SDP | SL |
| | Easton | I | -115 | ..SDP | 13.8 | .SDP | SL |
| | East Bridgewater | I | 115 | SDP | 13.8 | SDP | SL |
| | Lincoln St. | II | 13.8 | SDP | 4 | SDP | SL |
| | North Abington | I | 115 | SDP | 13.8 | SDP | SL |
| | Parkview | I | 115 | SDP | 13.8 | SDP | SL |
| | Pond St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Plymouth | I | 115 | .SDP | 13.8 | SDP | SL |
| | Spring St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Stoughton | I | 115 | SDP | 13.8 | SDP | SL |
| | Temple St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | West Bridgewater Unit | II | 13.8 | SDP | 4 | SDP | SL |
| Fall River | Adamsville | II | 13.8 | SDP | 4 | SDP | SL |
| | Bates | I | 115 | SDP | 13.8 | SDP | SL |
| | Dighton | I | 115 | SDP | 13.8 | SDP | SL |
| | Hartwell | II | 23 | SDP | 4 | SDP | SL |
| | Hathaway | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Palmer | II | 23 | SDP | 4 | SDP | SL |
| | Riverside | II | 23 | SDP | 4 | SDP | SL |
| | Swansea | I | 115 | SDP | 13.8 | SDP | SL |
| | Sykes | I | 115 | SDP | 13.8 | SDP | SL |
| Hanover | Central St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | County Rd. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Division St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Hanover Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | King St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Mill St. | I | 115 | SDP | 13.8 | SDP | SL |
| | North Scituate Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Norwell | I | 115 | SDP | 13.8 | SDP | SL |
| | Rockland St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Scituate | I | 115 | SDP | 13.8 | SDP | SL |
| | Scituate Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Scituate St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Silver Lake | II | 13.8 | SDP | 4 | SDP | SL |
| | Sunnyside Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Water St. | I | 115 | SDP | 13.8 | SDP | SL |

SDP = Standard Delivery Point
SL = Supply Line

NARR 23503

## NEWPORT ELECTRIC CORPORATION

| Operating District | Substation | Distribution Type | Delivery Voltage (Nominal KV) | Metering Point | Metering Voltage (Nominal KV) | Metering Arrangements | Delivery Arrangements |
|---|---|---|---|---|---|---|---|
| Middletown | Bailey Brook | II | 23 | SDP | 4 | SDP | SL |
| | Clarke | II | 23 | SDP | 4 | SDP | SL |
| | Dexter | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Eldred | II | 23 | SDP** | 4 | SDP | SL |
| | Gate 2 | II | 69 | SDP | 23 | SDP | SL |
| | Harrison | II | 23 | SDP | 4 | SDP | SL |
| | Hospital | II | 23 | SDP | 4 | SDP | SL |
| | Jepson | I | 69 | SDP** | 13.8/23 | SDP | SL |
| | Kingston | II | 23 | SDP | 4 | SDP | SL |
| | Marion | II | 23 | SDP | 4 | SDP | SL |
| | North Aquidneck | II | 23 | SDP | 4 | SDP | SL |
| | South Aquidneck | II | 23 | SDP | 4 | SDP | SL |
| | Vernon | II | 23 | SDP | 4 | SDP | SI |
| | West Howard | II | 23 | SDP | 4 | SDP | SL |

SDP = Standard Delivery Point which is at Canonicus St. Transmission Substation
SL = Supply Line
SDP** = Standard Delivery Point with Generation Metering on Output of Local Generators

NARR 23504



STAPLES and WASHINGTON
SUBSTATION FEEDER TIE

Attachment
1 of 3



NARR 23506



WASHINGTON ONE-LINE

NARR 23507



BFGSI - E.BRIDGEWATER ONE-LINE
Independant Power Producer

Attachment 5

NARR 23508



## SCITUATE AREA



NARR 23509

Eastern Utilities



SCITUATE ONE-LINE

Attachment 7

# VALLEY ONE-LINE



NOMINAL SYSTEM VOLTAGE                    1 of 2

1.0   THIS STANDARD LISTS THOSE SYSTEM VOLTAGES PRESENTLY IN USE
      WITHIN EASTERN UTILITIES SERVICE TERRITORY

2.0   TRANSMISSION VOLTAGES

C            69,000 volts

             115,000 volts

             345,000 volts

3.0   PRIMARY DISTRIBUTION VOLTAGES
      3.1    THREE PHASE THREE WIRE

| Voltage | Bil (kV) | Notes | Operating Location |
|---------|----------|-------|--------------------|
| 2400 Delta | 75 | | BVE |
| 23,000Y | 125 | (2) | BVE |
| 23,000Y | 150 | (3) | EECo/Fall River |
| 23,000 Delta | 150 | | Newport Electric |
| 69,000Y | 230 | | Newport Electric |

(C for 23,000 Delta and 69,000Y rows)

      3.2    THREE PHASE FOUR WIRE

| Voltage | Bil (kV) | Notes | Operating Location |
|---------|----------|-------|--------------------|
| 4160Y/2400 | 75 | | BVE
EECo (All Divisions)
Newport Electric |
| 4160Y/2400 | 75 | (4) | EECo/Fall River |
| 12,470 GRDY/7200 | 95 | (1) | EECo/Fall River |
| 13,600 GRDY/7600 | 95 | (9) | EECo/Fall River |
| 13,800 GRDY/7970 | 95 | | BVE
EECo (All Divisions)
Newport Electric |

(C for 13,600 GRDY/7600 and 13,800 GRDY/7970 rows)

4.0 SECONDARY DISTRIBUTION VOLTAGES

| Eastern Utilities EUA Service CONSTRUCTION STANDARD | STANDARD NUMBER | ISSUE DATE |
|---|---|---|
| | 0105    1 of 2 | 6/92 |

NARR 23512

4.1  SINGLE PHASE                                                    2 of 2

    4.1.1  Single Phase Two Wire

        120 Volts (Note 5)

    4.1.2  SINGLE PHASE THREE WIRE

        120/240 volts

        120/208 volts (Note 6)

4.2  THREE PHASE

    4.2.1  THREE PHASE THREE WIRE

| Voltage | Notes |
|---------|-------|
| 240 | 7 & 8 |
| 480 | 7 & 8 |
| 600 | 7 & 8 |

    4.2.2  THREE PHASE FOUR WIRE

| Voltage | Notes |
|---------|-------|
| 208Y/120 | |
| 240/120 | 7 & 8 |
| 480Y/277 | |

NOTES

1. The Westport Harbor area is fed from the Narragansett Electric Company System.

2. Grounded at station - is a three-wire Y system.

3. Resistively grounded Wye transformer. No distribution customers on this voltage.

4. Unigrounded primary neutral system.

5. Usually used only for lighting purposes.

C 6. A three-wire system to provide single-phase service from a three-phase four-wire system. Only available from specific underground network systems.

7. Not available for new installations.

C 8. Special overload protection is required for motor circuits. Transformers are susceptible to burnouts on primary faults. Refer to EUA Construction Standard 1508; TRANSFORMER LOADING GUIDELINE FOR THREE - PHASE DELTA CONNECTED SECONDARY TRANSFORMER BANKS.

C 9. Maple Swamp Road, Dighton.

| Eastern Utilities EUA Service CONSTRUCTION STANDARD | STANDARD NUMBER | | ISSUE DATE |
|---|---|---|---|
| | 0105 | 2 of 2 | 6/92 |

NARR 23513

# TYPICAL SYMBOLS



PRIMARY/BILLING METERING

TRANSFORMER

GROUND

AIR BREAK - OPEN

AIR BREAK - CLOSED

DISCONNECT SWITCH

OPEN CIRCUIT BREAKER

CLOSED CIRCUIT BREAKER

FUSE

REGULATOR

N.O. - NORMALLY OPEN

NARR 23514

**ATTACHMENT 4**

**STANDARD OFFER AUCTION PROPOSED DESIGN
(INCLUDES FUEL INDEX)**

NARR 23515

**The Standard Offer Auction**
**Proposed Design**

**A.    Administrative Process and Time Line**

It is the parties' intent that the bidding process for securing standard offer service be as competitive as possible and proceed in a timely manner. Therefore, based on the parties' current understanding of the timeframe for the Retail Access Date and divestiture, the parties believe at this time that the Final RFP for Standard Offer Service should be issued no sooner than the execution of purchase and sale agreements for Montaup's interest in the Somerset Station and Canal 2 but, in any event, no later than six months after the Retail Access Date.

The principal steps and approximate timing of events will be as outlined below.  ·

> October 1997 - Preliminary RFP Issued
>> The Preliminary RFP will detail all of the major elements, requirements and commercial terms and conditions of the final RFP that will be issued in April, 1988.  Its purpose is to give potential bidders the necessary information to determine whether they intend to participate in the Auction.  Specific pre-bid qualifications will be established including an audited statement of financial qualifications and other relevant information to ascertain a bidder's ability to perform.  Neither the terms of the Preliminary RFP nor Final RFP shall require a bidder to hold title to the power needed to fulfill its obligations under its bid.
>>
>> Pre-bid applications including required bidder qualification information are due by (a date to be specified in the Preliminary RFP) along with a modest non-refundable administration fee of $1,000.

> February 1998 - List of Qualified Bidders Submitted to the PUC (for informational purposes)

> April 1998 - Final RFP Issued (including a standard contract)

> May 1998 - Bids Due
>> Bids would be accepted only from pre-qualified bidders and must include a deposit of $5,000/MW-year the bidder proposes to supply.  *For example, if a bidder proposed to supply 100 MW for seven years, its deposit would total $3,500,000 ($5,000/MW-year x 100 MW x 7 yrs).*  This deposit is refunded in the event that a bidder is not selected.  If successful, at the bidder's election, the deposit can either be refunded or applied toward the performance bond (described below).

June 1998 - <u>Winning Bidders Selected</u>

> Contracts are expected to be executed between bidders and the distribution companies and become effective upon the bidders (now considered "suppliers" in this description) establishing a "performance bond" in the amount of $50,000/MW-year to be supplied under the Standard Offer. The performance bond would be returned to the supplier upon completion of its contractual obligations.

Notwithstanding the above schedule, the timing of the standard offer bidding process will be coordinated with generation divestiture and the Retail Access Date as described in the introductory paragraph above.

**B.    Important Auction Rules and Conditions**

1. <u>Minimum Bid Elements.</u> In order to conduct a fair and effective Auction, all bids from pre-qualified bidders in each round must include a "Percentage Discount Off the Standard Offer" (the "Discount") and the "Peak Energy Delivery Rate" as described and applied below. These two elements will be the only criteria by which winning bidders are chosen in each auction. All bids from pre-qualified bidders will otherwise be considered to be equivalent.

2. <u>The Auction Procedures.</u> Blackstone and Newport shall implement the following auction procedures for determining the suppliers of Standard Offer Service:

   a. <u>Seven Year Flat Discount Auction.</u> This is a single, constant discount to be in effect for all seven years of the Standard Offer, expressed as a percentage greater than 0%, with larger discounts viewed more favorably. Winning bidders are to be paid based upon the <u>next highest Discount bid</u> whether determined by the Seven Year Flat Discount Auction or by the lowest discount bid in the next best Alternative Individual Auction Increment, discussed below (a second-price, or Vickery auction)[1]. The bids in this auction shall be sealed until the Alternative Individual Year Auction set forth below is completed.

   b. <u>Alternative Individual Year Auction ("Alternative Auction").</u> This Alternative Auction shall take place immediately following the Seven Year Flat Discount Auction. Bidders will be required to bid separately for each year, and unlike the Seven Year Flat Discount Auction, a bid for any single year may not be conditioned on success in any other year. Thus, the Alternative Auction shall allow bidders to specify different discounts in

---

[1] For example, if the best four winning bids (out of ten submitted) met the distribution company's expected demand at Discounts of 12.5%, 10%, 9%, and 7%, respectively, the first winning bidder would be paid based on a 10% Discount, the second based on a 9% Discount, the third 7%, and the fourth would be paid based on the Discount bid by the first losing bidder (e.g., 6.5%).

Page 3 of 7

different years. Bid amounts must be in annual increments of 25 megawatts, which will be delivered as specified below. Prices in the Alternative Auction shall be open to other bidders, but the identity of the bidders associated with the prices will not be identified. The Alternative Auction will continue for multiple rounds until the next bid fails to improve the discount offered in the prior bid by one percent.

Following the completion of the bidding, Blackstone and Newport shall rank the bids for each individual year, with larger discounts viewed more favorably, and shall identify the best bids in each year that would fill a 25 megawatt increment covering all seven years of the purchase period. Blackstone and Newport will then repeat the process for as many increments as possible until the bids no longer cover all seven years in the period.

c. <u>Selection of Suppliers from Both Auctions.</u> The increments from the Alternative Individual Year Auction will then be compared to the Seven Year Flat Discount Auction by assigning the Alternative Individual Auction Increment the lowest discount bid in any single year of the increment. In the event of ties, the earliest, highest discount shall have priority. Suppliers in the Alternative Individual Year Auction shall be held to their bids, unlike the second price or Vickery auction used in the Seven Year Flat Discount Auction.

Blackstone's and Newport's affiliated power supply company shall be allowed, but not required, to bid in both auctions.

3.   <u>Payment by Distribution Company.</u> The distribution company is responsible for paying suppliers at the following electric delivery rates, reduced by the applicable Discount, for all energy the supplier delivers (less losses) in the respective year. These rates are flat annual values and do not include a demand or capacity component and will not be adjusted for seasonal or time of day factors.

| Distribution Company Rates | |
|---|---|
| 1998 | 3.2 ¢/KWH |
| 1999 | 3.5 |
| 2000 | 3.8 |
| 2001 | 3.8 |
| 2002 | 4.2 |
| 2003 | 4.7 |
| 2004 | 5.1 |

*For example, if a supplier bid a Discount of 5.5% and delivered 500 GWH to ultimate customers in 1999, that supplier would receive $16,537,500 from the distribution company (3.5¢/kWh x (1-.055) x 500 GWH x 1,000,000 kWh/GWH x .01 $/¢).*

NARR 23518

A fuel index adjustment mechanism, applied to Customer Rates, may provide additional revenues to suppliers in the event that large, unexpected increases in market oil and gas prices occur. This adjustment is further described below.

4. <u>Peak Energy Delivery Rate ("Delivery Rate")</u> Bids shall specify a peak energy delivery rate, expressed in MWH per hour, that the bidder commits to supply to the distribution company in each year of the Standard Offer. This amount represents the nominal maximum amount of energy a supplier is responsible to provide to the distribution company in any given hour, as measured at the ultimate customer's meter. For purposes of determining the amount of the bid deposit and performance bond, the total megawatts to be supplied under the standard offer will be the Delivery Rate times the number of years the capacity will be provided. Suppliers are responsible for any necessary transmission arrangements and costs that are not recovered in Blackstone's and Newport's transmission cost adjustment provisions and all electric delivery losses.

5. <u>Right to Bid a Joint Supply</u> - Prequalified bidders will have the right, subject to any provision of law, to submit joint bids pursuant to which one supplier may provide less than the full amount of the bid's Delivery Rate in any or all hours as long as the other suppliers on the joint bid provide the remainder of the Delivery Rate obligation, and the total performance bond is posted and in effect for the term of the bid.

6. <u>Higher Discounts Ensure a Right to a Longer Term of Supply</u> - Customers have the right to leave the Standard Offer at any time to receive service in the competitive energy market (subject to minimal notice provisions). As such, the amount of capacity and energy required from suppliers under the Standard Offer may likely decline over time. Supplier(s) who are in the increment with the highest assigned discount will have the right to provide capacity and energy for the longest period of time. With declining customer load due to departures from Standard Offer service, lower discount suppliers whose Delivery Rate amount exceeds the distribution company's needs will have their Delivery Rate amounts reduced and Standard Offer supply contracts ultimately terminated.

7. <u>Load Responsibility and Allocation</u> - Suppliers are responsible for a percentage of the distribution company's Standard Offer real-time customer energy demand (minute by minute, hour by hour, day by day). This includes changes in customer demand for any reason, including but not limited to, seasonal factors, normal daily load patterns, increased usage, demand side management activities, extremes in weather, etc. The only exception is for the loss of Standard Offer customers as described in the section immediately above. Responsibility is allocated to a supplier based on its Delivery Rate bid divided by the estimated annual Standard Offer peak energy demand of the distribution company. The percentage

allocation shall be determined each year on an estimated forecast basis. Once the percentage is determined, the supplier is responsible for that percentage share of the distribution company's Standard Offer load, including variances from the forecast peak and load factor estimates.

8.    <u>Responsibility for Electric Delivery Losses</u> - Suppliers will provide all losses, in kilowatts and kilowatthours, from the supplier's generation sources to the customer meter.

### C.    Standard Offer Customer Rates and Customer Rights

At any time during the Standard Offer customers have the right to leave Standard Offer service and receive energy from another supplier in the marketplace. In addition, residential and G-1 customers have a limited right to return to standard offer service in the first year after the Retail Access Date.

Customer Rates are subject to upward adjustment in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, as described in the following section. If invoked, prices would change as a function of the amount by which market fuel prices exceed the predetermined price "trigger" levels. These triggers have been set to allow a large dead-band in which no increases to Customer Rates would apply.

### D.    Standard Offer Fuel Index

The Customer Rate in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

<u>Market Gas Price</u> is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

<u>Gas Index</u> is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

<u>Market Oil Price</u> is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> <u>Oil Index</u> is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

<u>Fuel Trigger Point</u> is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year.

|      |              |
|------|--------------|
| 2000 | $5.35/MMBtu  |
| 2001 | $5.35        |
| 2002 | $6.09        |
| 2003 | $7.01        |
| 2004 | $7.74        |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

> Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

*For example, if for a month in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50 + \$.60/MMBtu) + (\$3.00 + \$.04/MMBtu)}{\$6.09 + \$.60 + \$.04/MMBtu} = 1.0609$$

*The Customer Rate paid to the distribution company is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548 ¢/KWH (4.2 x 1.0609).*

NARR 23521

Page 7 of 7

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

Incremental revenues received by the distribution company as the result of a Fuel Adjustment would be fully allocated to Standard Offer suppliers in proportion to the Standard Offer energy provided by a supplier to the distribution company in the applicable billing month.

NARR 23522

**ATTACHMENT 5**

**MONTAUP ELECTRIC COMPANY**
**EMISSION REDUCTIONS FROM SOMERSET AND CANAL**

NARR 23523

EMISSION REDUCTION PROGRAM
EASTERN EDISON COMPANY's RESTRUCTURING PLAN
February 1997

### I. Purpose

The purpose of the emission reduction program detailed in this restructuring plan is to provide a vehicle whereby the new competitive industry structure can support and advance efforts to further reduce the environmental impacts of electricity generation. This will be accomplished by requiring older fossil-fuel fired electric generating facilities to reduce certain air emissions to a level that is roughly equivalent to new source standards. The program will not supersede any environmental agency's legal authority to regulate these units nor require the units to meet emission standards other than the most stringent standards required by law. It is a simple and straightforward program that can be applied to other older utility sources in Massachusetts, the region, and elsewhere in the country.

### II. Generic Components

1.    The program is designed to require all older fossil-fueled electric generating units throughout the U.S. to meet "old source performance standards" (OSPS) for $NO_x$ and $SO_2$ on January 1 of the year following the year a unit becomes 40 years old. The 40 year time period starts from the year a unit commenced commercial operation. For those units that are 40 years or older in the year the program becomes effective, they will be required to meet OSPS by January 1 of the following year. The end point for this program is the year 2010; therefore, all units will be assumed to be 40 years old on or before December 31, 2009.

2.    As of the date this program becomes effective, each existing operating unit will receive "allowances" for that unit's emissions of $NO_x$ and $SO_2$. Each allowance equals one ton of allowable emissions. Unit-specific allowances are aggregated to become a utility company-wide cap.

3.    New units or repowered units subject to new source permitting regulations will not receive allowances, and thus not be included in the program. Emissions from new or repowered units will not be included in determining a company's overall cap of $NO_x$ or $SO_2$.

1

4.    Unit-specific allowances are calculated as follows:

a.    For units 40 years old or older, or by the year 2010:

$$\text{Yearly Net Electric Generation (kWh)} \times \text{Heat Rate (Btu/kWh)} \times \text{Emission Rate (lbs/mmBtu)} \times \text{Conversion Factor } \frac{1}{2 \times 10^9} = \text{Tons/Year}$$

The elements of the formula are derived as follows:

i)    Yearly Net Electric Generation = average kWh of the highest eight (8) of ten (10) year period of 1986-1995, as reported on U.S. Department of Energy Form EIA-767, Schedule IV.

ii)   Heat Rate    = 10,000 Btu/kWh

iii)  Emission Rate = 0.30 lbs/mmBtu for $SO_2$
                    = 0.15 lbs/mmBtu for $NO_x$

PROVIDED, however, that if a unit's required emission rate is lower than the rates listed above, the lowest, most stringent emission rate applies.

iv)   Conversion Factor = factor required to convert differing measures used in formula to result in tons per year of emissions ( 1,000,000 Btu/mmBtu x 2,000 lbs/ton)

b.    For units less than 40 years old:

$NO_x$ --- Same formula as in 4.a. above, except that emission rate is set at the regulatory limit.

$SO_2$ --- Allowances as allocated under Acid Rain Program, Title IV of federal Clean Air Act.

5.    Each utility company may meet its allowance cap by any combination of control technologies, fuel switching, unit retirements, operational changes and/or retirements of purchased or surplus allowances. Selection of any one or a combination of more than one of these options to meet the company cap will be at the sole discretion of the utility company.

2

NARR 23525

6.    SO₂ allowances may be traded freely in the market as allowed under the Clean Air Act, Title IV Acid Rain Program regulations. Unused allowances may be banked and carried forward also as allowed under the Acid Rain Program regulations.

7.    It is anticipated that a NO$_x$ trading program will be established similar to the federal SO₂ program. Unused NO$_x$ allowances also may be banked, provided, however, that allowance withdrawals from the bank may be subject to a "flow control" mechanisms specified in the Ozone Transport Commission model rule.

8.    With respect to jointly-owned units, their participation in the program will be governed in the same manner as jointly-owned units are governed under the federal Acid Rain Program.

III.    Eastern Edison Company-Specific Requirements Under the Proposal

1.    The Eastern Edison Company("EECo")-specific emission reductions included in this proposal apply to the following fossil-fueled power plants:

Somerset Station, Somerset, MA
Unit Nos. 5 and 6

Canal Electric Co.'s Unit #2

Montaup Electric Company ("Montaup"), a subsidiary of EECo, is the owner and operator of the Somerset Station facility, and a 50% owner of Canal Unit #2. Montaup may meet its allowance caps by any combination of control technologies, fuel switching, unit retirements, operational changes, and/or retirements of purchased or surplus allowances.

2.    The program start date for Somerset Units 5 and 6, and Canal Unit 2 is January 1, 2000. OSPS will apply to Somerset Units 5 and 6 on that date. Unit 5 was placed in "deactivated reserve" in 1993, with no current plans to reactivate it[1]. Montaup's portion of Canal Unit 2 will be subject to OSPS on 1/1/2010.

3.    SO₂ Emissions. Somerset's Units 5 and 6 will comply with an annual emission rate of 0.30 lbs SO₂/mmBtu, using the formulas, factors, and other provisions in Section II, above.

_____

[1] The NO$_x$ and SO₂ emission totals indicated on the tables and graphs appended hereto will not include Unit 5's totals unless the unit is reactivated.

3

NARR 23526

4.   NO$_x$ Emissions.

a.   On 1/1/2000, Somerset Units 5 and 6 will comply with an effective NO$_x$ emission rate of 0.21 lbs NO$_x$/mmBtu for the seven months outside the ozone season ( October through April), and an effective rate of 0.15 lbs NO$_x$/mmBtu during the 5 month ozone season ( May through September).

Proposed MADEP regulations will institute a NO$_x$ "cap and trade" system (the Massachusetts NO$_x$ Allowance Program) that sets a total emissions cap for Units 5 and 6 during the 5-month ozone season. This 582 ton NO$_x$ emissions cap is based on an effective emission rate of 0.21 lbs NO$_x$/mmBtu during the 5 month ozone season, and 0.38 lbs NO$_x$/mmBtu during the other seven months, effective 5/1/99.

Montaup has agreed with MADEP that, if Unit 5 is reactivated, the unit will have to comply with Best Available Control Technology ("BACT") standards. Montaup hereby agrees that, if Unit 5 is reactivated, it will comply with the more stringent of: 1) BACT as determined by MADEP upon reactivation; or 2) the same emission rates agreed to herein for Unit 6 ( 0.15 lbs NO$_x$/mmBtu for the 5 month ozone season and 0.21 lbs NO$_x$/mmBtu for the other seven months). Montaup further agrees that, if Unit 5 is reactivated, it would comply with these limitations with no cost cap.

The compliance strategy for Unit 6 is to acquire NO$_x$ credits or allowances, with the cost capped at $405,000, based on an assumption that NO$_x$ allowances will cost $500/ton. If credits and allowances are not available at this market price, EECo will use the most effective combination of credits/allowances, urea injection, or other methods to achieve NO$_x$ reductions for Unit 6 at a cost not to exceed $405,000/year. This plan achieves significant reductions below the MADEP regulations all 12 months of the year, yet focuses the reductions when they are most needed.

UNIT 6 :
NO$_x$ emissions at 0.38 lbs NO$_x$/mmBtu, 80 % CF, 12 months: 1579  tons
NO$_x$ emissions at 0.15 lbs NO$_x$/mmBtu, 80 % CF,  5 months: -260 tons
NO$_x$ emissions at 0.21 lbs NO$_x$/mmBtu, 80 % CF,  7 months: -509 tons
     NO$_x$ ALLOWANCES/ CREDITS REQUIRED:          810 tons

TOTAL ANNUAL COST = 810 tons x $500/ton
                          = $405,000

4

b.    On 1/1/2003, Unit 5, if reactivated, will comply with the more stringent of: 1) BACT as determined by MADEP upon reactivation; or 0.15 lbs $NO_x$/mmBtu. Unit 6 will comply with an annual emission limit of 0.15 lbs $NO_x$/mmBtu.

c.    On 1/1/2010, Canal Electric's Unit 2 will comply with an $SO_2$ emission rate of 0.30 lbs/mmBtu, and a $NO_x$ emission rate of 0.15 lbs/mmBtu, on an annual basis, using the formulas, factors, and other provisions in Section II of this plan. Canal Unit 2 may meet its allowance caps using any combination of control technologies, fuel switching, operational changes, and/or the use of purchased or surplus allowances. This commitment can only be made for Montaup Electric's 50 % ownership share of Canal Unit 2.

5

NARR 23528



Eastern Edison Emission Reduction Program
Somerset Station Annual NOx Tonnage

2/13/97

NARR 23529

# Eastern Edison Emission Reduction Program
## Somerset Station Unit 6



**Somerset Station kWh Production**

| Year | Unit 6 |
|------|--------|
| 1995 | 665,991,646 |
| 1994 | 646,004,841 |
| 1993 | |
| 1992 | 694,610,132 |
| 1991 | 642,263,959 |
| 1990 | |
| 1989 | 774,449,000 |
| 1988 | 767,134,600 |
| 1987 | 790,635,600 |
| 1986 | 594,046,700 |
| Average | 685,685,768 |

**Somerset Station Unit 6 Emissions Calculations**

SO2

| Year | Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) |
|------|------|------|
| 1994 | 1.2 | 4,996 |
| 1995 | 1.2 | 4,996 |
| 1996 | 1.2 | 4,996 |
| 1997 | 1.2 | 4,996 |
| 1998 | 1.2 | 4,996 |
| 1999 | 1.2 | 4,996 |
| 2000 | 0.3 | 1,049 |
| 2001 | 0.3 | 1,049 |
| 2002 | 0.3 | 1,049 |
| 2003 | 0.3 | 1,049 |
| 2004 | 0.3 | 1,049 |
| 2005 | 0.3 | 1,049 |
| 2006 | 0.3 | 1,049 |
| 2007 | 0.3 | 1,049 |
| 2008 | 0.3 | 1,049 |
| 2009 | 0.3 | 1,049 |
| 2010 | 0.3 | 1,049 |

NOx

| Year | Non-Ozone Season Effective Emission Rate (lb/mmBtu) | Ozone Season Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) |
|------|------|------|------|
| 1994 | 0.50 | 0.50 | 2,493 |
| 1995 | 0.49 | 0.49 | 2,036 |
| 1996 | 0.38 | 0.38 | 1,570 |
| 1997 | 0.38 | 0.38 | 1,570 |
| 1998 | 0.38 | 0.38 | 1,570 |
| 1999 | 0.21 | 0.21 | 1,263 |
| 2000 | 0.15 | 0.15 | 847 |
| 2001 | 0.21 | 0.15 | 847 |
| 2002 | 0.21 | 0.15 | 847 |
| 2003 | 0.15 | 0.15 | 835 |
| 2004 | 0.15 | 0.15 | 835 |
| 2005 | 0.15 | 0.15 | 835 |
| 2006 | 0.15 | 0.15 | 835 |
| 2007 | 0.15 | 0.15 | 835 |
| 2008 | 0.15 | 0.15 | 835 |
| 2009 | 0.15 | 0.15 | 835 |
| 2010 | 0.15 | 0.15 | 835 |

2/13/07

NARR 23530



Eastern Edison Emission Reduction Program
Somerset Station Annual SO2 Tonnage

2/13/97

NARR 23531

# Eastern Edison Emission Reduction Program
## Somerset Station Unit 5

2/13/07



### Somerset Station Unit 5 Emissions Calculations

| | SO2 | | | NOx | |
| Year | Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) | Non-Ozone Season Effective Emission Rate (lb/mmBtu) | Ozone Season Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) |
|---|---|---|---|---|---|
| 1994 | 1.2 | 3293 | 0.60 | 0.60 | 1,547 |
| 1995 | 1.2 | 3293 | 0.49 | 0.49 | 1,345 |
| 1996 | 1.2 | 3293 | 0.38 | 0.38 | 1,043 |
| 1997 | 1.2 | 3293 | 0.38 | 0.38 | 1,043 |
| 1998 | 1.2 | 3293 | 0.38 | 0.38 | 1,043 |
| 1999 | 1.2 | 3293 | 0.38 | 0.38 | 1,043 |
| 2000 | 0.3 | 451 | 0.21 | 0.21 | 646 |
| 2001 | 0.3 | 451 | 0.21 | 0.21 | 276 |
| 2002 | 0.3 | 451 | 0.21 | 0.21 | 276 |
| 2003 | 0.3 | 451 | 0.15 | 0.15 | 276 |
| 2004 | 0.3 | 451 | 0.15 | 0.15 | 228 |
| 2005 | 0.3 | 451 | 0.15 | 0.15 | 228 |
| 2006 | 0.3 | 451 | 0.15 | 0.15 | 228 |
| 2007 | 0.3 | 451 | 0.15 | 0.15 | 228 |
| 2008 | 0.3 | 451 | 0.15 | 0.15 | 228 |
| 2009 | 0.3 | 451 | 0.15 | 0.15 | 228 |
| 2010 | 0.3 | 451 | 0.15 | 0.15 | 228 |

### Somerset Station
### kWh Production

| Year | Unit 5 |
|---|---|
| 1995 | |
| 1994 | |
| 1993 | 133,337,052 |
| 1992 | 230,850,101 |
| 1991 | 4,053,743 |
| 1990 | 366,513,699 |
| 1989 | 501,471,003 |
| 1988 | 384,634,600 |
| 1987 | 496,427,900 |
| 1986 | 287,419,900 |
| Average | 300,851,040 |

NARR 23532