UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                )
TRANSCANADA POWER MARKETING LTD.,               )
                                                )
            Plaintiff,                          )
                                                )
    v.                                          )      C.A. No. 05-40076FDS
                                                )
NARRAGANSETT ELECTRIC COMPANY,                  )
                                                )
            Defendant.                          )
                                                )
_____)

## DOCUMENT APPENDIX

### (PART 2)

# Tab 5

# (1 of 6)

*R.I. - FERC Offer*
*of Settlement - 5/30/97*

# SWIDLER
# &
# BERLIN
### CHARTERED

EDWARD BERLIN
ATTORNEY-AT-LAW

DIRECT DIAL
(202)424-7504

EXHIBIT
17

May 30, 1997

**VIA HAND DELIVERY**

Lois D. Cashell, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Room 1A
Washington, D.C. 20426

Re:   New England Power Company
      Docket No. ER97-680-000

Dear Secretary Cashell:

Enclosed for filing pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602, are a signed original and fourteen copies of a Stipulation and Agreement among New England Power Company ("NEP"), The Narragansett Electric Company, the Rhode Island Public Utilities Commission, and the Rhode Island Division of Public Utilities and Carriers, together with an Explanatory Statement. If accepted by the Commission, the enclosed Stipulation and Agreement would resolve all issues in Docket No. ER97-680-000, which has been consolidated for hearing with Docket No. ER97-678-000 before Presiding Administrative Law Judge William J. Cowan. NEP filed an offer of settlement in Docket No. ER97-678-000 on May 28, 1997.

Pursuant to Rule 602(d), copies of this letter and all attachments are being served upon all persons designated on the official service list in this proceeding and on all other persons on whom the service agreement amendment that is the subject of Docket No. ER97-680-000 was served. The recipients of this letter are advised, pursuant to Rules 602(d) and (f) that initial comments on the Offer of Settlement are due no later than June 19, 1997 and reply comments are due no later than June 30, 1997.

**Confidential**

**NARR 61667**

Lois D. Cashell, Secretary
May 30, 1997
Page 2

An additional copy of this filing is enclosed, to be marked with your filing stamp and returned to us.

Sincerely,

Edward Berlin
Counsel for New England Power Company

EB/dlh

cc:    Presiding Administrative Law Judge
       William J. Cowan
       All Parties and Others Required to be
       Served Under Rule 602(d)

3031327.1

**Confidential**

**NARR 61668**

# ELECTRIC UTILITY INDUSTRY RESTRUCTURING

## Offer of Settlement

May 30, 1997

Submitted to:
Federal Energy Regulatory Commission
FERC Dkt. ER97-680-000

Submitted by:

 New England Power
*A NEES company*

**Confidential**

NARR 61669

Explanatory
Statement

Confidential

NARR 61670

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

New England Power Company                    )                    Docket No. ER97-680-000

## EXPLANATORY STATEMENT

This Explanatory Statement is submitted in support of the Stipulation and Agreement ("Agreement") among the Rhode Island Public Utilities Commission ("Rhode Island Commission"), the Rhode Island Division of Public Utilities and Carriers ("Rhode Island Division"), The Narragansett Electric Company ("Narragansett"), and New England Power Company ("NEP") (each of the foregoing entities being referred to as a "Signatory" to the Agreement).

If accepted by the Commission, the Agreement would specify the conditions for the termination of the wholesale electric requirements contract between NEP and its affiliate, Narragansett. Currently, NEP supplies all of Narragansett's requirements for electricity to supply retail customers in Narragansett's service territory pursuant to a service agreement under NEP's Primary Service for Resale Tariff (NEP's FERC Electric Tariff, Original Volume No. 1, or "Tariff No. 1"). Under Tariff No. 1, either party must give seven years' advance notice before terminating service.

The Agreement provides for the termination of Narragansett's wholesale purchases under its Tariff No. 1 service agreement earlier, in order to accommodate the introduction of retail choice for customers of Narragansett and the introduction of expanded competition in wholesale

Confidential

- 2 -

electric supplies. The Agreement thus implements both the Rhode Island Utility Restructuring Act of 1996 ("Rhode Island URA") and the policies of this Commission, as articulated in Order No. 888 and 888-A, in favor of wholesale competition. The Agreement also marks an important milestone in the restructuring of the electric utility industry in New England; it is a critical step for the introduction of retail choice for electric service in Rhode Island. Because of the structure of the NEES system, of which NEP and Narragansett are subsidiaries, the Agreement presents a unique circumstance, under which the Commission must approve the voluntary termination of wholesale requirements service in order to enable a State-mandated retail competition program to go forward. As such, it implicates important State interests and is consistent with the Commission's policy of "cooperative federalism," under which it strikes an appropriate balance between Federal and State interests.

The principal components of the Agreement, all of which are interdependent, are as follows:

1.    The Signatories agree that it is just, reasonable, and consistent with the public interest to terminate the obligations of NEP and Narragansett under their Tariff No. 1 wholesale requirements service agreement in accordance with the provisions of an amendment to that service agreement ("Amendment") which is appended to the Agreement. Major provisions of the Amendment include the following:

(a)    The Amendment allows Narragansett to reduce its purchase of wholesale requirements service from NEP as of July 1, 1997 and terminate its purchase of wholesale requirements service on or after January 1, 1998 upon 90 days' notice to NEP, rather than seven years' notice.

**Confidential**

**NARR 61672**

- 3 -

(b)    The Amendment requires Narragansett to pay Contract Termination

Charges to NEP, commencing with the termination of its requirements

purchase obligation, to enable NEP to recover an allocable share of the

costs it has incurred to provide requirements service to Tariff No. 1

customers, including Narragansett. These costs, which are specified in a

formula included as part of the Amendment, include costs associated with

NEP's investments in generating assets, NEP's contractual commitments

for purchased power and fuel transportation, deferred costs and other

regulatory assets, nuclear post-shutdown costs including decommissioning

costs, and employee severance and retraining costs, together with a return

on unrecovered costs. The Agreement includes a mechanism for resolving

any disputes that may arise in the implementation of the Contract

Termination Charge formula.

(c)    The Amendment requires NEP to credit against Narragansett's

responsibility for Contract Termination Charges a proportionate share of

the remaining value of NEP's generating business. Under the Agreement,

NEP will be divesting its generating business. Through the residual value

credit and the proposed divestiture, Narragansett's allocable share of the

remaining value of NEP's generating assets, as determined by the market,

will be passed on to Narragansett, rather than being retained by NEP's

shareholders.

**Confidential**

- 4 -

(d)     The Amendment requires NEP to provide wholesale "Standard Offer

Service" to Narragansett after the termination of the Tariff No. 1 purchase

obligation, at a fixed schedule of prices (subject to adjustment only for a

fuel index) to enable Narragansett to meet its obligations to provide

continued service to its retail customers who do not immediately turn to

the market for retail power supplies.  Although NEP is obligated to supply

wholesale Standard Offer Service to Narragansett, Narragansett is not

obligated to purchase that wholesale power from NEP after the date when

retail customers in Massachusetts are allowed to choose their suppliers.

Rather, the Agreement and the Amendment recognize that Narragansett

will afford other suppliers the opportunity to bid to supply the power it

needs to meet its retail Standard Offer obligations after the Massachusetts

retail access date. In this manner, the Agreement provides enhanced

opportunities for wholesale competition in conjunction with the

introduction of retail competition and, through NEP's obligation to supply

wholesale power at a fixed stream of prices, provides a high level of

assurance that all Narragansett customers will have an opportunity to

benefit from the introduction of competition at wholesale and at retail.

(e)     Pending the termination of NEP's Tariff No. 1 wholesale requirements

service to Narragansett, current base rates for that service are frozen until

the Contract Termination Date.

**Confidential**                                                    **NARR 61674**

- 5 -

    (f)    NEP commits to provide unbundled network transmission service to

            Narragansett after the termination of bundled requirements service in

            accordance with the Amendment. ,

    2.    The Agreement also reflects NEP's agreement to divest its generation business.

NEP has committed to divest its fossil-fuel and hydroelectric generation units, as well as its

investments in oil and gas properties, its contractual entitlements to purchase power from third

parties and for natural gas pipeline capacity, and generating units owned by affiliates that are

controlled and paid for by NEP pursuant to the integrated facilities provisions of Tariff No. 1.

NEP has also agreed to attempt to divest its minority interests in certain nuclear generating units.

A proportionate share of the net proceeds received by NEP through the divestiture will be

credited against Narragansett's obligation to pay Contract Termination Charges.  NEP commits to

file a plan to implement divestiture with the Commission by October 1, 1997 and to complete

divestiture by six months after the later of the introduction of retail access in Massachusetts or

the receipt of all necessary governmental approvals.  The Commission's acceptance or approval

of the Agreement is not intended to constitute any approvals required for the divestiture under

section 203 or, with respect to NEP's hydroelectric facilities, Part I of the Federal Power Act.

Rather, the Agreement acknowledges that NEP will submit any necessary applications to the

Commission at a later date.

    (a)    The Agreement provides that if NEP retains the obligation to pay post-

            shutdown, decommissioning, or site restoration costs for its interests in

            nuclear generating plants as part of the disposition of those interests, NEP

            will be entitled to recover a proportionate share of those costs from

**Confidential**

- 6 -

Narragansett in the Contract Termination Charges. In the event NEP is unable to dispose of its interests in nuclear generating plants, NEP will be entitled to recover 80 percent of the reasonable going forward costs of operating the plants through the Contract Termination Charges and will credit 80 percent of the revenues from the kilowatthour sales from its interests in the plants to the calculation of the Contract Termination Charges. NEP also agrees to present a proposed performance standard applicable to its nuclear plant interests and to support adoption at those plants of a detailed procedure to be implemented in the event it is decided to shut down any of those plants prematurely.

(b)    The Agreement provides that NEP may recover in Contract Termination Charges to Narragansett a proportionate share of the payments to power suppliers and other costs associated with buying out of or buying down purchased power contracts. In the event NEP is unable to dispose of its rights under those contracts, the Agreement contemplates that NEP will sell the power purchased under those contracts. Both the contract payments and the revenues received from the sale of that power in the market will be reflected in the Contract Termination Charges. NEP may, however, use its rights under those contracts to fulfill its minimum obligations to supply wholesale Standard Offer Service to Narragansett.

3.    The Agreement requires NEP to reduce emissions of $NO_x$ and $SO_2$ from certain generating units by the amounts and on the schedule specified in an attachment to the

**Confidential**

**NARR 61676**

- 7 -

Agreement. This requirement will also apply to the party or parties that acquire those generating units upon NEP's divestiture of them.

4.    The Agreement also reflects the Signatories' agreement on the following issues:

(a)    The Signatories agree that market pricing is appropriate for sales at wholesale from NEP's generation.

(b)    The Signatories agree to the appropriateness of the designation of NEP's generating units as eligible facilities under section 32 of the Public Utility Holding Company Act.

(c)    The Signatories agree that all of the facilities of NEP and Narragansett used for the delivery of electricity to retail customers, except for those facilities that are financially supported by NEP pursuant to the integrated facilities provision of NEP's Tariff No. 1, are appropriately classified as distribution facilities subject to the ratemaking jurisdiction of the Rhode Island Commission.

The Agreement specifies that the Commission's acceptance or approval of the Signatories' agreements on the above issues is not a condition of the Commission's acceptance of the Agreement in resolution of this proceeding.

5.    The Agreement recognizes that NEP is making substantial and irreversible commitments, including the divestiture of its generating business and the assignment of Narragansett's share of the residual value of its generating assets for the benefit of Narragansett and its customers, primarily in consideration for an entitlement to the recovery of Contract Termination Charges from Narragansett, determined in accordance with the Amendment, over an

Confidential                                                    NARR 61677

- 8 -

extended period of time. To give effect to NEP's reliance on the bargain reflected in the

Agreement and the Amendment, the Signatories seek the Commission's assurance that it will, to

the fullest extent permissible under the Federal Power Act, give effect to NEP's right to charge

and recover Contract Termination Charges from Narragansett in accordance with the

Amendment. The Agreement specifically precludes application to the Commission for changes

to the Contract Termination Charge formula, under either section 205 or section 206 of the

Federal Power Act, absent NEP's agreement (section 3.6) and calls upon the Commission to

refrain from revisiting the issue of the justness and reasonableness of the Contract Termination

Charges or from limiting NEP's right to recover in full the Contract Termination Charges

contemplated by the Agreement (section 6.1.4).

NEP recognizes that the Commission's responsibility to order changes in jurisdictional

rates that are contrary to the public interest cannot be precluded by a settlement agreement. See

El Paso Electric Co., 43 FERC ¶ 61,201 (1988). The Signatories have concluded that, taken as

whole, the provisions of the Agreement, including NEP's recovery of the Contract Termination

Charges in full, are just, reasonable, and consistent with the public interest. The Signatories have

also recognized that the Agreement goes beyond the resolution of a single wholesale rate

proceeding. Rather, it provides the terms for the fundamental restructuring of the contractual

relationship between NEP and Narragansett and commits NEP to divest its generating business.

In light of the gravity and the irreversible nature of the mutual commitments reflected in the

Agreement, the Signatories seek to assure the continued vitality of those commitments to the

greatest extent possible consistent with the Commission's exercise of its statutory authority. As

other regulatory agencies have done when they have approved similarly long-lived settlements,

**Confidential**

- 9 -

see Pacific Gas & Electric Co., 99 P.U.R. 4th 141 (Cal. Publ. Util. Com'n 1988), the Commission should indicate that it .recognizes the unusual nature of the commitments in the Agreement and will not disturb them absent an unequivocal showing that the public interest cannot be served in any other way.

6.    The Agreement does not affect Tariff No. 1 customers other than Narragansett. The Amendment modifies the Tariff No. 1 service agreement between NEP and Narragansett, not Tariff No. 1 itself. Indeed, the Agreement modifies Tariff No. 1 only to add a statement to ensure that the termination of Narragansett's Tariff No. 1 service will not cause NEP's fuel charges to other Tariff No. 1 customers to increase. NEP will continue to provide wholesale requirements service under Tariff No. 1 to current customers who choose not to terminate that service.

Respectfully submitted,

Edward Berlin
Kenneth G. Jaffe
Richard P. Sparling
SWIDLER & BERLIN, CHARTERED
3000 K Street, N.W., Suite 300
Washington, D.C.  20007
(202) 424-7500

Thomas G. Robinson
NEW ENGLAND POWER SERVICE
    COMPANY
25 Research Drive
Westborough, MA  01582
(508) 389-2877

Counsel for New England Power
    Company

**Confidential**

**NARR 61679**

Stipulation and
Agreement

Confidential

NARR 61680

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| New England Power Company | ) ) ) | Dkt. ER97-680-000 |

## STIPULATION AND AGREEMENT

### ARTICLE 1.0
### BACKGROUND

1.1    Parties.

This Stipulation and Agreement ("Agreement") is entered into by and among the Rhode

Island Public Utilities Commission ("Rhode Island Commission"), the Rhode Island Division of

Public Utilities and Carriers ("Rhode Island Division"), The Narragansett Electric Company

("Narragansett"), and New England Power Company ("NEP"). The foregoing entities are

referred to as the Signatories.[1]

NEP is now obligated to sell electric energy at wholesale to meet the service area

requirements of both affiliated and unaffiliated customers pursuant to its Primary Service for

Resale Tariff, NEP's FERC Electric Tariff, Original Volume No. 1 (Tariff 1). Narragansett is

NEP's affiliate and is a customer under Tariff 1. The Rhode Island Commission and Rhode Island

Division are authorized to represent the interests of Narragansett's retail customers in

proceedings before the Federal Energy Regulatory Commission ("Commission") regarding the

rates and terms of Tariff 1. (See e.g., R.I. G.L. §§ 39-1-1(3)(c); 39-1-27.1(b); and 39-1-29).

---

[1] The Utility Workers Union of America, AFL-CIO, and Local 464, Utility Workers Union of
America, AFL-CIO, while not parties to the Agreement, do not oppose the Settlement. These parties have
otherwise worked out their differences with the Companies.

- 2 -

1.2    Introduction.

This Agreement is designed to implement a comprehensive resolution of the issues

presented by the restructuring of the contract relationship between NEP and Narragansett in the

context of the Rhode Island Utility Restructuring Act of 1996. (Rhode Island URA).

Under Tariff 1, NEP is obligated to sell to Narragansett, and Narragansett is obligated to

purchase from NEP, the requirements of its retail service territory, and they may only terminate

those mutual obligations upon seven years' notice. The parties to this Agreement desire to

terminate those obligations earlier, in order that Narragansett may accommodate the program of

retail choice set forth in the Rhode Island URA.

The Rhode Island URA would extend wholesale competition in power supply markets to

retail customers through the provision of retail access directly to Narragansett's customers.

Termination of Tariff 1 and the provision of unbundled transmission service by NEP to

Narragansett under NEP's open access tariff are both necessary to implement retail access in a

manner consistent with that statute.

This Agreement, all provisions of which are interdependent, except where expressly

stated otherwise, is intended upon its acceptance by the Commission to provide a final and

binding resolution of all issues associated with the liquidation of the mutual sale and purchase

obligations under Tariff 1 and Narragansett's Service Agreement with NEP.

Confidential

- 3 -

## ARTICLE 2.0
### AMENDMENT OF SERVICE AGREEMENT AND WHOLESALE RATE FREEZE

2.1    Amendment of Service Agreement.

The Service Agreement between NEP and Narragansett shall be amended in accordance

with the Amendment to the Service Agreement included in Attachment 1 ("Amendment"). The

Signatories agree that the Amendment sets forth rates and other terms for the termination of the

reciprocal sale and purchase rights and obligations of NEP and Narragansett, including, without

limitation, provisions for the payment and collection of Contract Termination Charges, that are

just, reasonable and in the public interest.

2.2    Narragansett is now served by NEP under NEP's wholesale rate W-95(S) approved by the

Commission in Docket ER95-267-000. As set forth in the Amendment, the W-95(S) base rates

shall remain in effect for NEP's service to Narragansett through the Contract Termination Date

defined in Section 3.1.2 below. Nothing in this Agreement or the Amendment shall preclude NEP

from petitioning the Commission for a waiver of the Commission's fuel clause regulations (18

C.F.R. § 35.14) or modification of NEP's fuel clause.

## ARTICLE 3.0
### CONTRACT TERMINATION

3.1    Termination of Purchase and Supply Obligations.

NEP's obligations to provide requirements service to Narragansett and Narragansett's

obligations to purchase requirements service shall cease on the Contract Termination Date as

defined in Section 3.1.2. Prior to the Contract Termination Date, Narragansett shall not be

**Confidential**                                                                      NARR 61683

- 4 -

obligated to purchase, and NEP shall not be obligated to supply, electricity required by any distribution service customer of Narragansett, or its successor or assign, that is taking retail access in accordance with the Retail Access Schedule set forth in Section 3.1.1.

3.1.1   Retail Access Schedule.

Phase 1:        On July 1, 1997, the following customers shall have retail access:  (i) all new commercial and industrial customers, including new manufacturing customers, commencing service on or after July 1, 1997, with an anticipated average annual demand of two hundred (200) kilowatts or greater; (ii) all existing manufacturing customers with an average annual demand of fifteen hundred (1500) kilowatts or greater; and (iii) all accounts in the name of the State of Rhode Island, provided, however,  Narragansett may limit retail access to no more than ten percent (10%) of its total kilowatt-hour sales.

Phase 2:        On January 1, 1998, retail access shall be extended to the following customers:  all existing manufacturing customers with an average annual demand of two hundred (200) kilowatts or greater and all accounts in the name of the cities and towns in Rhode Island, provided, however, Narragansett may limit retail access to no more than twenty percent (20%) of its total kilowatt-hour sales.

Phase 3:        The remaining customers shall have retail access on the earlier to occur of (i) the Retail Access Date defined in § 3.1.2(a) below, (ii) within three months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England including the total kilowatt-hour sales in Rhode Island, or (iii) July 1, 1998, provided, however, if the Rhode Island Commission extends the deadline beyond July 1, 1998, then the remaining customers shall have access on the extended date established by the Rhode Island Commission.

**Confidential**

- 5 -

3.1.2   <u>Contract Termination Date Defined</u>.

The Contract Termination Date shall occur on the earlier of the Retail Access Date or the Wholesale Access Date, defined as follows:

3.1.2(a)    The Retail Access Date shall be the later of January 1, 1998 or the date of a final, nonappealable order of the Rhode Island Commission approving the divestiture plan for the disposition of NEP's non-nuclear generating facilities.

3.1.2(b)    The Wholesale Access Date shall be the earlier of the Retail Access Date or the date on which Narragansett in its sole discretion decides to terminate purchases under Tariff 1 and its Service Agreement with NEP by providing the Commission and the Signatories with 90 days advance notice in writing, said date not to be earlier than January 1, 1998.

3.2   <u>Contract Termination Charges Commencing on the Contract Termination Date</u>.

Narragansett shall pay NEP the Contract Termination Charges pursuant to the terms of the Amendment included in Attachment 1 to this Agreement.  If this Agreement is approved by the Commission, the Amendment shall be deemed to be a just and reasonable rate for wholesale electric service pursuant to the Federal Power Act and the Commission's regulations.  The Contract Termination Charges under the Amendment shall apply to all kilowatthours delivered by Narragansett or its successors or assigns in Narragansett's Service Area, except that, prior to the Contract Termination Date, the Contract Termination Charges shall apply only to kilowatthours delivered but not sold by Narragansett or its successors or assigns in Narragansett's Service Area. Narragansett's Service Area is defined to include the area served by Narragansett on August 6, 1996.  Kilowatthours delivered are defined to include all kilowatthours delivered to electricity consumers in Narragansett's Service Area, whether or not they are present customers of

**Confidential**

**NARR 61685**

- 6 -

Narragansett. The Base Contract Termination Charges shall equal the cents per kilowatthour amounts shown on Schedule 1 of the Amendment.

The Base Contract Termination Charges shall recover Narragansett's proportionate share of NEP's total contract termination costs shown in Schedule 1 to the Amendment, which share equals 22.4 percent of the total. The Base Contract Termination Charges shall be subject to adjustments for a Residual Value Credit described in Section 3.3, and a Reconciliation Account described in Section 3.4.

3.3    Residual Value Credit.

As set forth under Section 6.1 below, NEP and its affiliates have agreed to a divestiture of the generation business within six months after the later of (1) the Retail Access Date as defined in NEP's settlement with Massachusetts Electric Company in Docket ER97-678-000, or (2) the receipt of all governmental approvals necessary for such divestiture. Within three months after the sale of any or all of NEP's generating facilities or any other property subject to divestiture, NEP shall implement a residual value credit as a direct offset to the Base Contract Termination Charges authorized under this Agreement. The residual value credit shall be calculated as set forth in Attachment 1 to this Agreement.

3.4    Reconciliation Account.

The Base Contract Termination Charges shall be adjusted through a Reconciliation Account in which differences, whether positive or negative, between the estimates for costs and revenues included in the Base Contract Termination Charges and actual costs and revenues are added to or subtracted from the Base Contract Termination Charges from NEP to Narragansett . The Reconciliation Account shall be calculated as set forth in Attachment 1 to this Agreement.

**Confidential**                                                    **NARR 61686**

- 7 -

3.5   Resolution of Disputes Associated with the Implementation of the Contract Termination Charge.

It is intended that disputes about the calculation of the residual value credit, other than disputes about the method of sale or reasonableness of the proceeds, adjustments to the Contract Termination Charges to Narragansett made by NEP pursuant to sections 3.3 and 3.4, and the calculation of the purchased power cost mitigation incentive are, to the extent possible, to be resolved informally and, accordingly, such disputes may not be submitted to the Commission until a good faith effort to achieve a consensual resolution has first been made by following the procedures prescribed herein, provided, however, nothing shall preclude the Commission from examining any such adjustment including, without limitation, any capital addition made by NEP after December 31, 1995, by opening its own investigation. Within 30 days after it has modified Narragansett's Contract Termination Charges to reflect the residual value credit or a Reconciliation Adjustment, NEP shall submit to the Signatories, and to any person or entity that is to receive, under the Commission's regulations, notice of NEP rate filings affecting Narragansett, including, but not limited to the Rhode Island Commission and Rhode Island Division, an explanation of the adjustment including supporting workpapers. If a recipient desires to challenge any portion of the adjustment, it shall advise NEP in writing identifying the basis for its dispute. NEP shall, within 30 days, respond in writing. If the recipient is not satisfied with NEP's further explanation it shall, within 15 days, notify NEP in writing of any remaining disagreements and may request that NEP convene a conference which is to be held within 30 days of such request. The Signatories are to receive from NEP written notice of, and may participate at, any such conference and are to be provided all written communications relevant to the dispute. At such

**Confidential**

- 8 -

conference the participants are to make a good faith effort to resolve outstanding disputes. If, following exhaustion of the foregoing procedure, a participant still disputes any portion of NEP's adjustment, it may petition the Commission for appropriate relief. A copy of such petition shall be served on the Signatories.

If, either as a result of the informal dispute resolution procedure or of Commission action, it is determined that NEP's calculation of the residual value credit or Reconciliation Account balances for Narragansett's Contract Termination Charges were inappropriate, the credit or charges shall nevertheless remain in effect for the balance of the calendar year but NEP shall adjust the Reconciliation Account for any such overcharge, together with a return equal to that specified in Section 1.1.2 of the Appendix to Attachment 1, and shall reflect that adjustment in Narragansett's Contract Termination Charges effective January 1 of the following calendar year.

3.6    Formula For Contract Termination Charges Not Subject to Change.

The Contract Termination Charges reflected in this Agreement and in the Amendment shall not be subject to change and shall remain in effect until NEP has collected all amounts subject to collection thereunder. Neither the formula as set forth in Appendix 1 and attached Schedules to the Amendment nor the Contract Termination Charges recoverable under this Agreement and the Amendment shall be subject to change through application to the Commission pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act, absent the agreement of NEP or its successors or assigns.

3.7    Provisions from Prior Rate Settlements

3.7.1    In its W-10 Wholesale Rate Settlement, Docket No. ER88-630-000, NEP agreed to pay or reimburse Narragansett for "Planning and Dispatchable Program Costs" that include

- 9 -

expenditures for (a) administration, research and development, and program evaluation and monitoring on the integrated New England Electric System, and (b) the program costs associated with dispatchable programs. Effective on the Contract Termination Date, NEP shall cease reimbursing Narragansett for these costs.

    3.7.2   In its W-95 Wholesale Rate Settlement, Docket No. ER95-267-000, NEP agreed to reimburse Narragansett for Narragansett's discounts to ultimate customers who agreed to provide notice to Narragansett before changing power supplies (Service Extension Discounts). Under Schedule III-D to Tariff 1, NEP is entitled to repayment for any payments by ultimate customers to buydown the notice period and must consent to any modification of the Service Extension Discount agreements. Effective on the date that Narragansett commences Standard Offer Service to its ultimate customers, NEP shall cease reimbursing Narragansett for Narragansett's Service Extension Discounts to ultimate customers. In addition, NEP waives its right to reimbursement of buydown payments made by Narragansett's ultimate customers, and waives its right to require consent prior to any change by Narragansett to the Service Extension Discount agreements.

3.8   <u>Amendment to Fuel Clause</u>

    Effective on the Contract Termination Date, NEP shall amend its fuel clause for remaining Tariff 1 customers as set forth in Attachment 2 to this Agreement to assure that the fuel charges to these customers do not increase as the result of the termination of NEP's all-requirements service to Narragansett under this Agreement.

**Confidential**

- 10 -

## ARTICLE 4.0
### TRANSMISSION

4.1    NEP to Provide Narragansett Network Integration Transmission Service.

In accordance with the Retail Access Schedule, NEP shall provide Narragansett Network

Integration Transmission Service under its open access transmission tariffs as filed and allowed to

become effective from time to time, and on the terms set forth in the Service Agreement for

Network Integration Transmission Service included as Attachment 3 to this Agreement.  The

Network Integration Transmission Service provided under the Service Agreement shall include

transmission service necessary for Narragansett to provide transmission and distribution access to

retail customers.  The Signatories to this Agreement support the approval by the Commission of

Attachment 3 as filed as part of this Agreement.  However, with the exception of the

commitments in the following paragraph, approval of Attachment 3 without change is not a

condition of this Agreement.  Rather, with respect to transmission access and pricing, NEP and

Narragansett will modify the Transmission Service Agreement in a manner that is necessary to

accommodate the Commission's policy.

In addition to the charges for Network Integration Transmission Service, in the event

Narragansett is denied the ability to recover in its access charges established for the provision of

local distribution service the full amount of the Contract Termination Charges billed to

Narragansett, NEP or its successors and assigns shall be entitled to collect the unrecovered

balance of the Contract Termination Charges as a surcharge on any rate paid for the transmission

in interstate commerce of electric energy to Narragansett or to every consumer located in

Narragansett's Service Area that takes delivery of electric energy from the transmission facilities

**Confidential**

- 11 -

of NEP or the distribution facilities of Narragansett. Approval of this provision is a condition of this Agreement.

4.2    Separation of Transmission and Distribution Facilities.

In Order 888, the Commission set forth a seven factor test for determining whether facilities used to provide access to ultimate customers are subject to the ratemaking jurisdiction of the Commission or state ratemaking authorities. Narragansett has completed such an analysis for the jurisdictional separation of its facilities. The analysis has been filed with the Rhode Island Commission in Docket 2515, and is included as Attachment 4 to this Agreement. Based on that analysis, the Signatories agree that all of Narragansett's facilities meet the Commission's seven factor test for designation as distribution facilities subject to the Rhode Island Commission's jurisdiction with two exceptions. The first exception consists of the Narragansett facilities that are paid for by NEP pursuant to the Integrated Facilities Schedule III-B of Tariff 1. The Signatories agree that those facilities are transmission facilities subject to the Commission's exclusive jurisdiction. The second exception consists of certain facilities that have in the past been classified as distribution plant and that are proposed to be retained by Narragansett as distribution although they could be classified as transmission under the Commission's seven-factor test. The Signatories agree that since these instances of distribution plant that could also be classified as transmission are few in number and have a de minimis impact on the costs of either distribution or transmission service, and because classification of the facilities as transmission would be burdensome to both Narragansett and NEP, their historical classification as distribution plant should be retained. The Signatories to this Agreement therefore support the approval by the Commission of the jurisdictional separation of facilities set forth in Attachment 4. However,

**Confidential**

**NARR 61691**

- 12 -

approval of the jurisdictional separation of facilities without change is not a condition of this

Agreement.

4.3    If, within twelve years from the date of this Agreement, NEP sells or spins off all or part

of its transmission business to an entity that is not a regulated public utility or does not become a

regulated public utility immediately following the acquisition, then NEP will credit any net

proceeds in excess of book value to the Reconciliation Account.


## ARTICLE 5.0
## TRANSITIONAL SERVICE

5.1    Standard Offer Service.

For the period from the Contract Termination Date through December 31, 2009, NEP

shall provide Narragansett with Standard Offer Service.[2/]  Standard Offer Service shall be

provided at the prices shown below, adjusted for the fuel index set forth in  Attachment 5 to this

Agreement:

| Calendar Year | Price per kilowatthour |
|---------------|------------------------|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |

---

[2/]NEP and Narragansett shall have the right in their sole discretion to shorten the period of standard
offer service to December 31, 2004, if Narragansett no longer has the obligation under the Rhode Island URA
to extend standard offer service through 2009.

- 13 -

| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

The prices shown above shall be for electricity delivered to the meter of Narragansett's ultimate customers, not including the charges for Narragansett's distribution services or for NEP's Network Integration Transmission Service, but including any and all transmission charges to reach NEP's system that are not recovered in Narragansett's transmission cost adjustment provisions. Standard Offer Service shall be available to Narragansett after the Wholesale Access Date or to Narragansett's ultimate customers after the Retail Access Date. After those dates, Narragansett is free to reduce its purchases under the Standard Offer by pursuing other opportunities in the wholesale market, and Narragansett's ultimate customers may terminate Standard Offer Service at any time to purchase from an alternative supplier in the market. Once Narragansett has reduced its wholesale purchases or the ultimate customer has purchased from an alternative supplier in the market, they may not return to Standard Offer service, provided, however, that Standard Offer Service shall be available to all of Narragansett's residential or C-2 Rate customers who have taken service from an alternative supplier for the first year after the Retail Access Date, if such residential or C-2 Rate customer elects to return to Standard Offer Service within 120 days of taking service from an alternative supplier.

5.2    Narragansett Right to Bid the Standard Offer.

Narragansett shall put the Standard Offer out for bid by alternative suppliers offering them the opportunity to provide Standard Offer Service to Narragansett after the Retail Access Date. Narragansett shall have the ability to defer the bid for standard offer service to coordinate with the standard offer service auction of its affiliate, Massachusetts Electric Company. The terms for the

- 14 -

bid shall be as set forth in Attachment 5. NEP shall be free to bid in such auction at prices less

than those set forth in Section 5.1, provided, however, that, if suppliers do not bid to supply any

part of the Standard Offer, NEP, its successors or assignees shall guarantee to provide the

unsubscribed portion of such service to Narragansett at the prices set forth in Section 5.1.

5.3     NEP's Obligation to Install Additional Generation Terminated.

Effective on the Contract Termination Date, NEP shall have no further obligation to meet

the electricity demands of Narragansett or its ultimate customers, and nothing in this Agreement

shall be deemed to require NEP to make any plan, investment, purchase, or commitment to

maintain sufficient generating capacity to provide adequate, continuous, or reliable electricity

supplies to Narragansett or its ultimate customers except as required to fulfill NEP's obligation

under this Agreement to provide Standard Offer Service or as is expressly set forth in a separate

power purchase contract between NEP and Narragansett.


ARTICLE 6.0
DIVESTITURE AND MARKET PRICING OF NEP'S GENERATION

6.1     Divestiture of NEP's Generating Business.

6.1.1    NEP agrees, subject to the receipt of all required governmental approvals, to sell,

spin off, or otherwise transfer ownership of its generating business to a nonaffiliated entity or

entities, other than properties, assets, and entitlements classified to the transmission function. The

parties intend that the properties to be divested shall also include: (1) properties owned by New

England Energy Inc. (NEEI), (2) the generating units of Nantucket Electric, to the extent they are

not classified to the transmission function, including any proceeds from the sale of emission

Confidential                                          NARR 61694

- 15 -

credits, (3) Narragansett's ownership interest in the Manchester Street Station, and (4)

Narragansett's and NEP's contractual entitlements to pipeline capacity for natural gas supply to

New England. NEP shall develop and file with the Commission by October 1, 1997, a plan to

implement divestiture. This plan shall include in particularized detail the generating business to be

divested and all properties, assets, and entitlements to be included in the divestiture. The

divestiture shall be completed by six months after the later of the Retail Access Date as defined

under the filing in Docket No. ER97-678-000, or the receipt of all governmental approvals

necessary for the transfer, and shall be updated with an informational filing 90 days before the

date of divestiture. The Commission shall review the plan and shall issue a final order on the

method of sale and the reasonableness of the proceeds as part of its plan approval.

   6.1.2   As part of the divestiture, NEP will endeavor to sell, lease, assign, or otherwise

dispose of its minority shares of nuclear units or entitlements on terms that will assign ongoing

operating costs and responsibility to a nonaffiliated third party, but may require NEP to retain the

obligation for post-shutdown, decommissioning, and site restoration for these units or

entitlements. NEP shall recover these post-shutdown, decommissioning, and site restoration costs

from Narragansett through the Contract Termination Charge, and shall credit any net positive

value or recover any payments associated with such transaction in the reconciliation account of

the Contract Termination Charge or the Residual Value Credit. The Parties agree that this

approach is reasonable and NEP is authorized to include it in its divestiture plan. The transfer of

nuclear entitlements will be subject to the approval of the Nuclear Regulatory Commission

("NRC") to the extent required by NRC regulations. In the event that NEP is unable to sell,

lease, assign, or otherwise dispose of its nuclear units or entitlements, NEP shall include 80

- 16 -

percent of the reasonable going forward costs of operating the units and entitlements, including

variable costs and capital additions on a cost of service basis,[3] and 80 percent of the revenues

from kilowatthour sales from the units and entitlements, in the reconciliation account. Within six

months prior to implementing the Performance Based Rate set forth in the prior sentence, NEP

will consult with the Signatories on a performance standard for nuclear safety indicators and will

file such performance standard with a maximum potential credit for nonperformance of $1 million.

NEP shall also encourage and support a procedure for maintaining a detailed early shutdown plan

at each nuclear unit in which it has an entitlement that can be updated easily and that can form the

basis to expedite the preparation of a NRC Post-Shutdown Decommissioning Activities Report

("PSDAR") under 10 C.F.R. 50.82 in the event of early shutdown. NEP's sales, if any, from its

nuclear units and entitlements shall only be made in the wholesale market to nonaffiliates,

provided that NEP shall retain the right to use its minority shares of the units or entitlements to

fulfill its minimum, zero bid obligations under the Standard Offer.

    6.1.3    As part of the divestiture, NEP will endeavor to sell, assign or otherwise dispose

of its power contracts on terms that will assign ongoing contract payments to a nonaffiliated third

party. In that event, changes to the above-market payments to power suppliers and any buyout or

buydown costs shall be reflected in the Reconciliation Account. In the event that such contracts

cannot be sold, assigned, or otherwise disposed of, the power purchased from those contracts

shall be sold and the contract payments and market value associated with the sale shall be

reflected in the reconciliation account. Such sales, if any, shall only be made in the wholesale

---

[3]In the event that the nuclear unit is retired before the end of its license life, the capital addition shall
be amortized with a return over the remainder of the license or in accordance with its depreciation schedule,
whichever is shorter.

Confidential

# Tab 5

# (2 of 6)

- 17 -

market to nonaffiliates, provided, however, that NEP shall retain the right to use the contracts, including that with Hydro Quebec, to fulfill its minimum, zero bid obligations under the Standard Offer. Nothing in this Settlement shall affect the rights of suppliers or NEP under purchased power contracts.

6.1.4' The non-utility Signatories have expressed the goals of attaining a market valuation of utility stranded costs, creating a competitive market for supplying electricity to consumers, and separating generating assets from the transmission system to assure comparability of transmission service. They have expressed a preference for voluntary divestiture of utility generation as a means of achieving these goals. NEP and Narragansett have agreed, as part of this Agreement, voluntarily to undertake such divestiture. In exchange, and as consideration for this voluntary divestiture, the Signatories and the Commission by its approval of this Agreement, agree that NEP's Contract Termination Charges to Narragansett and, in the circumstances described in the second paragraph of section 4.1, to every consumer located in Narragansett's Service Area as set forth in the Amendment for the period contemplated by this Agreement are just and reasonable. Accordingly, and to give effect to the reliance placed by the Signatories on the foregoing, the Commission shall treat the finding that such Contract Termination Charges are just and reasonable as a final determination made after public notice and a full investigation of the merits, and, in any future proceeding brought by any person or party, or by the Commission on its own motion, shall accord such finding the full benefit of policies of repose including, without limitation, the application of the doctrines of res judicata, laches, collateral estoppel, the filed rate doctrine, the prohibition against retroactive ratemaking, and the finality of contracts, it being the express intention of the Signatories to prevent, as a matter of law and policy, the Commission or

**Confidential**

**NARR 61697**

- 18 -

any other authority from: (1) revisiting the issue of the justness and reasonableness of the Contract Termination Charges; (2) reducing, other than as set forth in the Amendment, the amount of the Contract Termination Charges either directly or indirectly; and (3) or otherwise limiting the right of NEP, its successors or assigns, to charge and recover the Contract Termination Charges set forth in this Agreement for any reason prior to their recovery in full as contemplated by this Agreement.

6.2     Market Pricing of NEP's Generation.

To facilitate the divestiture and valuation of NEP's units, the Signatories agree that it is in the public interest for NEP or its successors or assigns to be authorized to price its wholesale electricity sales subject to the Commission's jurisdiction at market prices. The Signatories to this Agreement support the approval by the Commission of market pricing for NEP's or its successors' or assigns' wholesale electricity sales after the Contract Termination Date as part of its approval of this Agreement. However, such approval is not a condition of this Agreement.

6.3     Exempt Wholesale Generator Status.

Effective upon appropriate findings by the three states in which NEP provides wholesale service to affiliate distribution companies, NEP shall be authorized to apply for status as an exempt wholesale generator under Section 32 of the Public Utility Holding Company Act of 1935, and its entitlements in generating units shall become eligible facilities under that statute. The Signatories agree that these designations as an Exempt Wholesale Generator and eligible facilities will meet the statutory and regulatory standards for such designation and are appropriate to increase the number of potential purchasers for the market valuation or NEP's assets. The receipt of Exempt Wholesale Generator Status is not a condition to this Agreement.

Confidential

- 19 -

6.4    Re-entry into Business.

Nothing in this Agreement shall prevent an affiliate of Narragansett from re-entering the

generation business following the completion of divestiture, and nothing in this Agreement shall

prevent affiliates of Narragansett from marketing electricity, other energy sources, or energy

services to customers within or outside Narragansett's service territory.

6.5    Environmental Commitments at NEP's Facilities.

NEP or its successors in interest shall reduce the emissions of $NO_x$ and $SO_2$ from its Salem

Harbor Units 1, 2, 3, and 4, and its Brayton Point Units 1, 2, 3, and 4 by the amounts and on the

schedule and terms set forth in Attachment 6.

ARTICLE 7.0
SUCCESSORS AND ASSIGNS

The rights conferred and obligations imposed on any Signatory by this Agreement shall be

binding on or inure to the benefit of its successors in interest or assignees as if such successor or

assignee was itself a Signatory hereto.

ARTICLE 8.0
ADDITIONAL PROVISIONS

8.1    This Agreement is the product of settlement negotiations. The content of those

negotiations shall be privileged and all offers of settlement shall be without prejudice to the

position of any party or participant presenting such offer.

8.2    The Signatories to this Agreement recognize and fully understand that their mutual

promises in this Agreement evidence the consideration they have extended to each other in their

**Confidential**

- 20 -

efforts to settle the issues associated with the termination of the rights and obligations of NEP and Narragansett to each other under Tariff 1, in connection with the introduction of wholesale and retail competition for electricity supplies in Narragansett's service territory. The willingness and ability of NEP and Narragansett to commit to and fulfill any and all of their obligations under this Agreement are predicated and conditioned upon the Commission's approval of NEP's Contract Termination Charges to Narragansett and the commitments by the other Signatories to this Agreement to such recovery.

8.3    Acceptance of this Agreement and the Amendment by the Commission shall not be deemed to restrain the Commission's exercise of its authority to promulgate future orders, regulations or rules which resolve similar matters affecting other parties in different fashion.

8.4    The Commission's approval of this Stipulation and Agreement shall endure so long as is necessary to fulfill this Agreement's objectives. In the event of future regulatory or legislative actions which may render any part of this Agreement ineffective, NEP shall nevertheless be held harmless and made whole for the payments it has agreed to accept as consideration for relinquishing its existing rights under NEP's Tariff 1.

8.5    Except as expressly set forth above, this Agreement is submitted on the condition that it be approved in full by the Commission and on the further condition that if the Commission does not approve the Agreement in its entirety, the Agreement shall be deemed withdrawn and shall not constitute a part of the record in any proceeding or used for any purpose.

Respectfully submitted,

Confidential

NARR 61700

New England Power Company                    FERC Dkt. ER97-680-000
Settlement Agreement


Name:  Edward Berlin
Title:    Counsel for New England Power Company
<u>and</u> The Narragansett Electric Company
Address: Swidler & Berlin, Chtd
             3000 K Street, N.W.
             Washington, D.C. 20007


Dated:  May 30, 1997


**Confidential**                                      **NARR 61701**

New England Power Company
Settlement Agreement

FERC Dkt. ER97-680-000


Name:  Harvey L. Reiter
Title:  Counsel for the Public Utilities
Commission of the State of
Rhode Island and Providence
Plantations
Address:  1750 Pennsylvania Ave., N.W.
Washington, DC  20006

Dated:  May 30, 1997

Confidential

New England Power Company
Settlement Agreement

FERC Dkt. ER97-680-000

_[signature]_

Name: Alan Shoer
Title: Special Assistant Attorney General
Address: 150 South Main Street
Providence, Rhode Island   02903

on behalf of

Dated: May 29, 1997.

Rhode Island Division of Public
Utilities and Carriers

Confidential

NARR 61703

Attachment 1

Confidential

NARR 61704

## NEW ENGLAND POWER COMPANY

### Primary Service for Resale

### AMENDMENT TO SERVICE AGREEMENT

Dated as of:   February 1, 1997

Parties:       NEW ENGLAND POWER COMPANY,
               a Massachusetts corporation (the "Company" or "NEP")

and

THE NARRAGANSETT ELECTRIC COMPANY
a Rhode Island corporation (the "Customer" or "Narragansett"),

WHEREAS, the Customer is currently an all-requirements electric customer of the Company under the Company's FERC Tariff, Original Volume No. 1 (the "Tariff"), and a Service Agreement as amended (the "Service Agreement"); and

WHEREAS, under the Service Agreement, the Customer purchases from the Company for resale all of the electric requirements of the ultimate customers in the Customer's service territory; and

WHEREAS, the Rhode Island General Assembly passed into law the Rhode Island Utility Restructuring Act of 1996 ("URA"), which extends wholesale competition in power supply markets to retail customers through the provision of retail access directly to Narragansett's customers; and

WHEREAS, the termination of all-requirements service under the Tariff and the provision of unbundled transmission service by the Company to Narragansett under the Company's open access tariff are necessary to implement retail access in a manner consistent with the URA; and

Confidential                                                    NARR 61705

- 2 -

WHEREAS, the Customer desires to comply with the URA to terminate the requirement that it purchase all of the electric requirements of the customers in its service territory from the Company under the Tariff before the term of the Service Agreement has expired, and to retain the flexibility to terminate its purchase requirement entirely on the date when standard offer service is made available to all distribution customers of Rhode Island electric utilities pursuant to the terms of the URA; and

WHEREAS, the Customer desires to continue to receive transmission service over the transmission facilities owned or operated by the Company after the termination of its purchases under the Tariff; and

WHEREAS, the Customer desires to retain the option, but not the obligation, to purchase electricity from the Company after the termination of its purchases under the Tariff or the option for the ultimate customers in the Customer's service territory to do so; and

WHEREAS, the Company is willing to permit the Customer to terminate its purchase requirement before the Term has expired and to provide the options desired by the Customer, but only upon the terms and conditions set forth in this Amendment to Service Agreement ("Amendment");

NOW, THEREFORE, the Company and the Customer, in consideration of their mutual commitments set forth herein, agree as follows:

1.     The Parties agree that, notwithstanding anything to the contrary in the Service Agreement or in the Tariff, the Customer's obligation to purchase electricity under the Service Agreement and the Company's obligation to provide electricity under the Service Agreement shall be reduced as of July 1, 1997, in accordance with the Retail Access Schedule (as defined in

- 3 -

Section 2 of this Amendment), and shall terminate as of the Contract Termination Date, which shall be determined pursuant to Section 3 of this Amendment. Except as provided in Section 9 below, or in a separate contract for power supply, the Company shall have no further obligation to meet the electricity demands of the ultimate customers in the service territory of the Customer on or after the Contract Termination Date, or to make any plan, investment, purchase, or commitment to maintain sufficient generating capacity to provide adequate, continuous, or reliable electricity supplies to the Customer or its ultimate customers on or after such date.

2.      The Customer shall not be obligated to purchase, and the Company shall not be obligated to supply, electricity required by any distribution service customer of the Customer, or its successor or assign, that is taking retail access in accordance with the following schedule ("Retail Access Schedule"):

Phase 1:      On July 1, 1997, the following customers shall have retail access: (i) all new commercial and industrial customers, including new manufacturing customers, commencing service on or after July 1, 1997, with an anticipated average annual demand of two hundred (200) kilowatts or greater; (ii) all existing manufacturing customers with an average annual demand of fifteen hundred (1500) kilowatts or greater; and (iii) all accounts in the name of the State of Rhode Island, provided, however, the Customer may limit retail access to no more than ten percent (10%) of its total kilowatt-hour sales.

Phase 2:      On January 1, 1998, retail access shall be extended to the following customers: all existing manufacturing customers with an average annual demand of two hundred (200) kilowatts or greater and all accounts in the name of the cities and towns in

- 4 -

Rhode Island, provided, however, the Customer may limit retail access to no more than twenty percent (20%) of its total kilowatt-hour sales

Phase 3:   The remaining customers shall have retail access on the earlier to occur of (i) the Retail Access Date defined in Section 3, below, (ii) within three months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England including the total kilowatt-hour sales in Rhode Island, or (iii) July 1, 1998, provided, however, if the Rhode Island Public Utilities Commission ("Rhode Island Commission") extends the deadline beyond July 1, 1998, then the remaining customers shall have access on the extended date established by the Rhode Island Commission.

3.   The Contract Termination Date shall occur on the earlier of the Retail Access Date, determined in accordance with subparagraph (a) or the Wholesale Access Date, determined in accordance with subparagraph (b).

(a)   The Retail Access Date shall be the later of January 1, 1998, or the date of a final nonappealable order of the Rhode Island Commission approving the divestiture plan for the disposition of the Company's non-nuclear generating facilities, provided, however, that in any event, the Retail Access Date shall occur no later than three months after retail access is available to forty percent (40%) or more of the kilowatthour sales in New England, including the total kilowatthour sales in Rhode Island.

(b)   The Wholesale Access Date shall be the earlier of the Retail Access Date or the date on which the Customer in its sole discretion decides to terminate

Confidential

- 5 -

purchases under Tariff 1 and the Service Agreement, provided that such date shall not be earlier than January 1, 1998, and provided further that the Customer shall give the Company at least 90 days advance written notice of its declaration of the Wholesale Access Date.

4.    The Customer shall pay to the Company the Contract Termination Charges determined in accordance with Appendix 1 and the Schedules attached to this Amendment, which set forth Base Contract Termination Charges and formulae for the adjustment of the Base Contract Termination Charges. Between July 1, 1997 and the Contract Termination Date, the Contract Termination Charges shall apply to all kilowatthours delivered but not sold by the Customer, or its successor or assign, in the Customer's Service Area. After the Contract Termination Date, the Contract Termination Charges shall apply to all kilowatthours delivered by the Customer, or its successor or assign in the Customer's Service Area, whether or not such kilowatthours are sold by the Customer. The Customer's Service Area is defined to include the area served by the Customer on August 6, 1996. Kilowatthours delivered are defined to include all kilowatthours delivered to electricity consumers in the Customer's Service Area, whether or not they are present customers of the Customer.

5.    For the period between July 1, 1997 and the Contract Termination Date, the Company shall charge and the Customer shall pay the Demand and Energy Charges shown on Fifty-third Revised Page No. 1 of Schedule II-A, which sets forth the W-95(S) rates, for all kilowatts and kilowatthours purchased by the Customer from the Company for resale to retail customers, and such charges shall not be subject to change during such period for service to the Customer. For the same period, the Company shall charge and the Customer shall pay the

Confidential

- 6 -

Contract Termination Charges determined in accordance with Appendix 1 and the Schedules

attached to this Amendment for all kilowatthours delivered, but not sold, to retail customers in its

service territory, pursuant to the Retail Access Schedule. During this period the Company shall

reconcile recoveries under W-95(S) rates and the Contract Termination Charge pursuant to

procedure set forth in Section 1.1.4 of Appendix 1. After the Contract Termination Date, the

Company's service under the W-95(S) rates will cease, and the Company will charge and the

Customer will pay the Contract Termination Charges for all kilowatthours delivered to the

Customer's Service Area. In addition, the Company shall be obligated to provide the Customer

with standard offer service pursuant to Section 9, below.

6.       For the period between July 1, 1997 and the Contract Termination Date, the

Company will adjust non-fuel billings to the Customer to assure that the Customer's average

purchased power expense is not increased solely as a result of the phase-in of retail access in

Rhode Island. This adjustment is necessary because of the Company's marginal cost rate design.

The sales lost as the result of the Customer's retail load beginning to purchase electricity from

other power producers would have been billed by the Company at its lower-cost tail block rates.

Thus, a billing adjustment is necessary to prevent the average cost of power supply to the

Customer and its remaining retail load from increasing solely as a result of the phase-in of retail

access.

Base rate adjustments will be established using estimated and/or actual hourly loads

provided to the Company on a monthly basis for Tariff No. 1 billing. The hourly loads will be

summed to determine usage during On-Peak Hours and Off-Peak Hours. The Customer will

provide the average rate of delivery associated with retail customers in its service territory who

NARR 61710

- 7 -

purchased electricity from a power producer other than the Company during the sixty-minute

clock hour occurring at the time of the Company's peak load for the month. These amounts ("the

Retail Access Loads") need to be estimated because the wholesale meter reads at the Company's

interconnections with the Customer cannot distinguish between requirements loads under the

Company's Tariff No. 1 and Retail Access Loads.

The Company will adjust the Customer's base rate purchased power expense excluding

the Retail Access Loads to equal what the base rate purchased power expense would have been

if the Retail Access Loads had continued to purchase requirements service from the Customer.

Adjustments will be made for demand, on-peak energy and off-peak energy. The total adjustment

shall equal the sum of the: (1) Adjustment to Demand Related Expense, (2) Adjustment to On-

Peak Energy Expense, and (3) Adjustment to Off-Peak Energy Expense. Formulas for each of

these three adjustments are shown below.

```
ADJUSTMENT TO          ( Average Demand      Average Demand  )   Total kW
DEMAND RELATED   = (  Charge Including  -  Charge Excluding ) x  Purchases Excluding
EXPENSE                ( Retail Access Load   Retail Access Load)  Retail Access Load


ADJUSTMENT TO          ( Avg Peak Energy      Avg Peak Energy )   Total Peak kWh
ON-PEAK          = (  Charge Including  -  Charge Excluding ) x  Purchases Excluding
ENERGY EXPENSE     ·   ( Retail Access Load   Retail Access Load)  Retail Access Load


ADJUSTMENT TO          ( Avg Off-Pk Energy    Avg OffPk Energy )  Total Off-Pk kWh
OFF-PEAK         = (  Charge Including  -  Charge Excluding ) x  Purchases Excluding
ENERGY EXPENSE         ( Retail Access Load   Retail Access Load)  Retail Access Load
```

After the Contract Termination Date, the adjustments pursuant to this paragraph shall cease.

7.    Notwithstanding anything to the contrary in the Tariff or the Service Agreement,

the Contract Termination Charges specified in Appendix 1 and the attached Schedules to this

- 8 -

Amendment shall remain in effect until the Company has collected all amounts subject to collection thereunder and neither the Customer's obligation to pay the Contract Termination Charges in full nor the formulae for the calculation of the Contract Termination Charges set forth in Appendix 1 and the attached Schedules to this Amendment shall be subject to change through application to the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act, absent the agreement of the Company or its successors or assigns.

8.    Notwithstanding anything to the contrary in Schedule III-B of the Tariff, the Company will discontinue fixed credits to the Customer for generation and transmission effective on the date or dates that the Customer's integrated generation or transmission facilities are transferred to the Company, a separate affiliate, or an unaffiliated third party. During any period in which the Customer has transferred some, but less than all of its generation or transmission facilities, the amount of the applicable fixed credit, excluding municipal taxes and cost of removal expenses associated with the South Street Station, will be prorated to reflect the remaining facilities by multiplying the appropriate fixed credit for either generation or transmission by the ratio of gross plant investment remaining to the total gross plant. Nothing in this Amendment shall preclude the Company from otherwise petitioning the FERC to adjust the level of the fixed credits in accordance with the terms of the Tariff.

9.    For the period commencing on the Contract Termination Date and extending through December 31, 2009 (the "Standard Offer Period"),[1] the Company shall provide service to

---

[1]Company and Customer shall have the right in their sole discretion to shorten the period of standard offer service to December 31, 2004, if Customer no longer has the obligation under the Rhode Island URA to extend standard offer service through 2009.

**Confidential**

**NARR 61712**

- 9 -

the Customer in accordance with this section, such service being referred to as "Standard Offer Service."

(a) Standard Offer Service shall be made available at the prices set forth in the Stipulation and Agreement, adjusted for a fuel index. The prices for Standard Offer Service do not include charges for transmission services provided in accordance with section 10 of this Amendment, or charges for distribution services under the Customer's rates for distribution services, but otherwise reflect the price of electricity delivered to the meters of the ultimate customers of the Customer.

(b) Standard Offer Service shall be made available by the Company to the Customer after the Wholesale Access Date for the purposes set forth in paragraph D of Schedule I of the Tariff or to the Customer for resale to those ultimate customers in the Customer's service territory who elect to purchase Standard Offer Service after the Retail Access Date and have not terminated Standard Offer Service to purchase electricity from another supplier, provided that, neither the Customer nor the ultimate customers shall be required to purchase Standard Offer Service from the Company. For the first year after the Retail Access Date, the Company shall make Standard Offer Service available to all residential or Rate C-2 customers of the Customer, who have previously taken service from an alternative supplier, if such residential or Rate C-2 customer elects to return to Standard Offer Service within 120 days of taking service from the alternative supplier.

(c) In the event the Contract Termination Date is determined by the Wholesale Access Date, the Customer shall be free, either in its notice pursuant to section 3(b), or thereafter by giving the Company at least 90 days advance written notice directed to the

**NARR 61713**

- 10 -

first day of a calendar month, to terminate or reduce its purchases of Standard Offer

Service from the Company in order to obtain electricity from other suppliers in the market.

Once the Customer has reduced or terminated its purchases of Standard Offer Service

from the Company, the Company shall have no obligation to supply Standard Offer

Service to the Customer with respect to the terminated or reduced purchases.

(d)  No less than 90 days before the Retail Access Date, the Customer shall notify

the Company in writing of the quantity of energy it shall purchase under Standard Offer

Service for resale to ultimate customers in its service territory.  The Customer shall

provide the Company with at least 30 days prior advance written notice, directed to the

first day of a calendar month, of reductions in the quantity of energy so purchased due to

decisions by customers initially electing Standard Offer Service to purchase electricity

from other suppliers after the Retail Access Date.  Nothing in this Amendment shall

restrict the right of any ultimate customer to purchase electricity from other suppliers after

the Retail Access Date, provided that, except as set forth in section 9(b), above, once any

such ultimate customer has purchased electricity from another supplier, the Company shall

have no obligation to supply Standard Offer Service to the Customer for resale to such

ultimate customer.

(e)  The Company acknowledges that the Customer will offer alternative power

suppliers the opportunity in an auction to supply electricity to enable the Customer to

provide Standard Offer Service to ultimate customers in its service territory after the

Retail Access Date.  The Company shall be free to bid in the auction, provided that the

**Confidential**

- 11 - ·

Company's bid shall not exceed the prices set forth in the Stipulation and Agreement, adjusted for the fuel index set forth in that Agreement.

10.    In accordance with the Retail Access Schedule, the Company (including any successor or assign of the Company that succeeds to the Company's obligations with respect to the operation of its transmission facilities) shall, upon request of the Customer, provide network integration transmission service to the Customer in accordance with the Service Agreement for Network Integration Transmission Service between the Customer and the Company included in Attachment 3 to the Stipulation and Agreement, and with the terms and conditions of the tariff maintained in effect by the Company for such service, or in accordance with the policy of the Federal Energy Regulatory Commission as in effect from time to time. Such service shall be provided to the Customer after the Wholesale Access Date to enable the Customer to integrate its loads and resources and shall be provided to the Customer after the Retail Access Date to enable the ultimate customers in the Customer's service territory to integrate their loads and resources. From July 1, 1997 through the Contract Termination Date, the Network Integration Transmission Service shall only apply to kilowatthours delivered, but not sold, by the Customer in the Customer's Service Area, and the Company shall continue to provide transmission service to the Customer pursuant to the W-95(S) wholesale rate for the retail customers continuing to purchase power from the Customer. After the Contract Termination Date, the Network Transmission Service shall apply to all kilowatthours delivered in the Customer's Service Area.

11.    This Amendment shall take effect as of the date it is permitted to become effective by the Federal Energy Regulatory Commission, which date shall be referred to as the "Effective

Confidential

NARR 61715

- 12 -

Date." This Amendment, together with all provisions of the Tariff and the Service Agreement necessary to effectuate all provisions of this Amendment, shall remain in effect until all obligations of the parties under this Amendment, including, without limitation, the obligation of the Customer to pay to the Company the Contract Termination Charges, have been discharged in full. Upon the discharge in full of all such obligations, this Amendment and the Service Agreement shall terminate.

12.  The provisions of this Amendment shall override any inconsistent provisions of the Service Agreement and, with respect to the Customer, all inconsistent provisions of the Tariff, but all provisions of the Tariff and the Service Agreement that are not inconsistent with this Amendment shall remain in full force and effect.

13.    The rights conferred and obligations imposed on the Customer and Company under this Amendment shall be binding on or inure to the benefit of their successors in interest or assignees as if such successor or assignee was itself a signatory hereto.

IN WITNESS WHEREOF, the parties have executed this Amendment of Service Agreement as of the date first written above.

NEW ENGLAND POWER COMPANY

By _____
    Jeffrey D. Tranen

Its   PRESIDENT

**Confidential**

NARR 61716

- 13 -

THE NARRAGANSETT ELECTRIC COMPANY

By _Robert L. McCabe_
Robert L. McCabe

Its  President

C:\DOC\TGR\97-680\1SVCNARR.WPD

Confidential

NARR 61717

Appendix 1

Confidential

NARR 61718

NEW ENGLAND POWER COMPANY
AMENDMENT TO SERVICE AGREEMENT WITH
THE NARRAGANSETT ELECTRIC COMPANY UNDER
FERC ELECTRIC TARIFF, ORIGINAL VOLUME NO. 1
FORMULA FOR CALCULATING CONTRACT
TERMINATION CHARGES

1.1    The Fixed Component of the Contract Termination Charge shall include Narragansett's

22.4 percent allocated share of NEP's costs as shown on Schedule 1, Page 2, which shall include:

1.1.1    Revenues sufficient to amortize over a twelve and one-half year period

commencing on July 1, 1997 and continuing through December 31, 2009 the following

plant balances and regulatory assets:

(a)    Plant balances shall include unrecovered net book value as shown on Schedule 1,

Page 4, Column (7), of the following NEP generation-related investments as of

June 30, 1997,[1] excluding any capital additions made after December 31, 1995:

(i)    Brayton Point Units 1, 2, 3, 4, including the Brayton Point Diesels; Salem
Harbor Units 1, 2, 3, 4; Wyman Unit 4;

(ii)    Manchester Street Station, including NEP's reimbursement to Narragansett
for its ownership share of the Station at Narragansett's net book value,
prepaid property tax payments made in accordance with a tax treaty with
the City of Providence, and capital additions past December 31, 1995, but
committed prior to that date;

(iii)    NEP Hydro Units;

(iv)    Bear Swamp Pumped Storage Facility;

(v)    NEP's Entitlements in the Maine Yankee and Vermont Yankee Units;

(vi)    NEP's ownership share of Millstone Unit 3;

(vii)    NEP's ownership share of Seabrook Unit 1;

---

[1] The figures shown on Schedule 1, Page 4, Column (7) are estimates and will be updated for actual
balances as of June 30, 1997. Changes, if any, shall be reconciled at the Divestiture Date.

Confidential

NARR 61719

(viii)  Step-up transformers at NEP generating units which are excluded from
        NEP's transmission rates;
(ix)    General plant allocated to generation;
(x)     Generation-related property held for future use and nonutility property;
(xi)    Generation-related investment in the Nantucket Diesels; and
(xii)   Generation-related investment in the NEP Diesels at Gloucester and
        Newburyport.

The plant balances for NEP's entitlements and ownership shares in nuclear units

(items v, vi, and vii above) shall also include the balances for the final fuel cores

and materials and supplies; and

(b)     Regulatory assets shall include the generation-related unrecovered net book

balances shown in Schedule 1, Page 5, Column (2), as of June 30, 1997[2/]:

(i)     FAS 109;
(ii)    Unamortized losses on Reacquired Debt;
(iii)   Unamortized pipeline demand charges deferred prior to the commercial
        operation of Manchester Street;
(iv)    NEEI;
(v)     FAS 106 Deferral;
(vi)    Unamortized power contract buyout costs;
(vii)   Rate clauses;
(viii)  South Street Cost of Removal;
(ix)    Brayton Point Rotor;
(x)     Seabrook tax true-up;
(xi)    Decontamination and decommissioning costs;
(xii)   W-95 Settlement Adjustment Account to the extent not otherwise
        recovered; and
(xiii)  Unamortized ITC.

1.1.2   Revenues sufficient to provide an overall pre-tax return of 11.01 percent based on

a combined state and federal income tax rate of 39.225 percent, and NEP's 1995 year-end

---

[2/]The figures shown on Schedule 1, Page 5, Column (2) are estimates and will be updated for actual
balances as of June 30, 1997. In addition, the balance in the W-95 Settlement Adjustment Account will be
updated again at the Contract Termination Date. Changes, if any, shall be reconciled at the Divestiture Date.

Confidential

capital structure as shown in Schedule 1, Page 14, Column (8), including a return on

common equity of 9.2 percent for the period prior to the divestiture of NEP's non-nuclear

generating facilities ("Divestiture Date")[3], and sufficient to provide an overall pretax

return of 12.56 percent including a return on common equity of 11 percent for the period

after the Divestiture Date,[4] multiplied by the average of the beginning and ending balances

in each calendar year beginning in 1997 of the sum of the following:

(a)    Unrecovered net book value of NEP's generation investments as defined under

       1.1.1(a) above, plus

(b)    Unrecovered net book value of generation-related Regulatory Assets as defined

       under 1.1.1(b) above, excluding the rate clauses and unamortized ITC under

       1.1.1(b)(vii) and (xiii), less

---

[3] If NEP sells its non-nuclear generating facilities in more than one transaction, the rights and obligations associated with the divestiture shall be allocated among the transactions using appropriate allocators. In the case of return, the allocator shall be based on the net book value of the sold facility or facilities to total net book value of the non-nuclear generating facilities in Section 1.1.1(a). This percentage allocation shall be applied to the total of plant, regulatory asset balances, and deferred tax balances as set forth below.

[4] The difference between the 11.01 percent and 12.56 percent returns as applied to unamortized balances prior to the Divestiture Date shall be recovered, if divestiture occurs, through an offset to the Residual Value Credit, and the difference between the 11.01 and 12.56 percent returns that occurs after the Divestiture Date shall be included in the Reconciliation Account. The 11.01 percent and 12.56 percent returns shall be used as the return wherever a return is referenced throughout this Appendix. However, the 12.56 percent return after the Divestiture Date shall be adjusted in accordance with Section 1.1.4(e). Notwithstanding the above, an equity return of 9.4 percent will be applied to NEP's equity investment in the Ocean State Power facility for purposes of estimating Contract Termination Charges under the Agreement and such equity return shall increase to 11 percent following divestiture.

**NARR 61721**

(c)    Deferred Taxes as shown in Schedule 1, Page 13, Column (9), equal to the

combined state and federal income tax rate of 39.225 percent, which shall be

adjusted for changes in tax laws, multiplied by the sum of:

(i)     the unrecovered net book value of NEP's generation investment, plus
(ii)    the unrecovered net book value of generation-related regulatory assets,
         excluding rate clauses, less
(iii)   the unrecovered balance of generation investment for tax purposes, less
(iv)    the unrecovered balance of generation-related regulatory assets for tax
         purposes.

1.1.3   Revenues sufficient to:  (i)  amortize over a twelve and one-half year period

commencing on July 1, 1997 and continuing through December 31, 2009 the

generation-related, unrecovered net book balances associated with the FAS 106

Transition Obligation of NEP and allocated to NEP by its affiliates[5/]; and (ii) pay a

return of 7.25 percent equal to the interest rate reflected in the actuarial analysis of

the FAS 106 Transition Obligation of NEP and allocated to NEP by affiliates

multiplied by the outstanding balances remaining for the FAS 106 Transition

Obligation of NEP and allocated to NEP by affiliates.  Following the Divestiture

Date,[6/] these outstanding balances shall be subject to a one time adjustment as set

forth in Section 1.1.4(b) below.  At the same time, the interest rate return for the

period after the Divestiture Date shall be established using the most current

_____

[5/]Any FAS 106 Transition Obligation of NEP and allocated to NEP by its affiliates that is not
allocated to generating facilities shall be deemed transmission related.

[6/]If NEP sells its non-nuclear generating facilities in more than one transaction, the FAS 106
transition obligation and adjustments shall be allocated based on the ratio of direct payroll costs at each
generating facility sold to total direct payroll costs at all of NEP's non-fossil generating facilities.

**Confidential**

**NARR 61722**

actuarial analysis available at the time, which rate shall remain in place for the
remainder of the fixed cost recovery period.

1.1.4   The Fixed Components shall be subject only to the following adjustments:

(a)     For period between July 1, 1997 and the Contract Termination Date, NEP

shall adjust the Reconciliation Account in the Variable Component of the

Contract Termination Charge by an amount equal to the difference between

the depreciation and amortization expense authorized under the W-95(S)

rate and the depreciation and amortization under Section 1.1.1, together

with the associated return computed in accordance with Section 1.1.2 of

this Appendix, multiplied by Narragansett's 22.4 percent allocated share

and further multiplied by the percentage of kilowatthours delivered to

customers who continue to buy their electricity from Narragansett to the

total number of kilowatthours delivered by Narragansett to all customers in

Narragansett's Service Territory.  An exhibit showing the difference

between depreciation and amortization under W-95(S) rate and the

Contract Termination Charge is included in Schedule 2.

(b)     Following the Divestiture Date and at the time of implementing the

Residual Value Credit, NEP shall reconcile the balances in Sections 1.1.1

and 1.1.3 for Narragansett's 22.4 percent allocated share of (i) the

unrecognized transition obligation, prior service cost, and unrecognized

gains or losses associated with the FAS 106 obligation; and (ii) the

**Confidential**

**NARR 61723**

unrecognized transition obligation, prior service cost, and unrecognized

gains or losses associated with the FAS 87 obligation, but the gains or

losses associated with FAS 87 shall be recognized only to the extent that

they exceed five percent of the greater of plan assets or liabilities. NEP

shall fund the FAS 106 and FAS 87 obligations under this Section and

Section 1.2.2(f) as rapidly as permitted by the tax law up to the level of

revenues collected for this purpose.[2] Any revenues associated with these

obligations that cannot be immediately funded shall be put into a separate

account on the books to be reserved with the return specified in Section

1.1.3 until tax deductible funding becomes possible. The one-time

adjustment associated with FAS 106 and FAS 87, whether positive or

negative, shall be subtracted from or added to the schedules for prospective

recovery of FAS 106, as appropriate, and amortized with the return

specified in Section 1.1.3 over the period between the sale and December

31, 2009. An exhibit showing the reconciliations is included in Schedule 3,

page 1. In addition, NEP shall reconcile the balances for Narragansett's

22.4 percent allocated share of (iii) the FAS 109 regulatory asset; and (iv)

---

[2] The FAS 106 and FAS 87 costs recovered through the Contract Termination Charge shall be reflected as a credit to NEP's transmission rates. NEP's post-divestiture FAS 106 or FAS 87 gains or losses recognized on NEP's books shall be fully reflected in rates to customers and shall neither be retained nor borne by NEP. NEP shall propose an allocation of these post-divestiture gains or losses between customers paying contract termination charges and transmission customers to recognize the higher cash contributions of the customers paying the Contract Termination Charges in the filing implementing the Residual Value Credit.

NARR 61724

the general plant allocated to generation, provided, however, that any general plant not allocated to generation shall be functionalized to transmission. The one-time adjustment associated with differences in the balances for FAS 109 and general plant, whether positive or negative, shall be subtracted from or added to the net proceeds reflected in the residual value credit as appropriate and shall be amortized, with the return specified in Section 1.1.2, over the period between the sale and December 31, 2009.

(c)     Upon the sale of NEEI properties, NEP shall reconcile NEEI recovery to reflect the difference between the actual NEEI loss following the sale and the estimated NEEI loss reflected in the Contract Termination Charge. The reconciliation shall credit to Narragansett, Narragansett's 22.4 percent allocated share of the compounded return that NEP accrued on the NEEI unamortized balance through the Contract Termination Charge prior to the sale of the NEEI properties, and shall account for and reconcile all differences between: (i) actual amortization under NEP's Tariff No. 1 fuel clause as compared to the amortization estimates included in the Contract Termination Charge and Schedule 2; (ii) actual balances on NEEI's books at the sale as compared to balances used to calculate the Base Contract Termination Charge; and (iii) actual net proceeds after transaction costs realized from the sale as compared to those used to estimate market value when calculating the Base Contract Termination Charge. Following the

completion of the above reconciliations, Narragansett's 22.4 percent

allocated share of the differences in the balances, whether positive or

negative, shall be subtracted from or added to the Narragansett 22.4

percent allocated share of the balance for NEEI losses and the Schedule for

prospective recovery of NEEI costs shall be adjusted to amortize, with the

return specified in Section 1.1.2, the adjusted balance over the period

between the sale and December 31, 2009.  An exhibit showing the

methodology for the NEEI reconciliation is attached as Schedule 3, page 2.

If the Contract Termination Date has not yet occurred at the time the NEEI

properties are sold, the same schedule of recovery shall be applied to

NEP's Tariff No. 1 fuel clause to Narragansett so that NEP fully recovers

the revised NEEI recovery from Narragansett.

(d)     NEP has agreed to divest its generating business within six months after the

later of the Retail Access Date as defined in the Settlement filed in Docket

ER97-680-000 or the receipt of all governmental approvals and other

consents necessary for the divestiture.  Within three months after the

completion of divestiture or the sale of any property,[8/] the cost of which is

included in the Contract Termination Charge, NEP shall implement a

Residual Value Credit as a direct offset to the Contract Termination

---

[8/]Proceeds, if any, from NEP's future leases of nuclear entitlements will also be flowed through the
Residual Value Credit.

# Tab 5

# (3 of 6)

Charges authorized under this Amendment.  The Residual Value Credit to

Narragansett shall be calculated as follows:

(i)   Narragansett's 22.4 percent allocated share of Total Proceeds[9/] equal

to the sale price and other consideration received by NEP excluding

$85 million[10/] which purchasers will be required to pay into an

account for employee benefits pursuant to Section 1.2.2(f), less

(ii)  The revenues lost or gained by NEP between July 1, 1997 and the

Divestiture Date[11/] measured by the difference between the revenues,

excluding revenues attributable to items included in the Contract

Termination Charge or in NEP's transmission rates, that NEP would

have collected under Rate W-95(S) had it continued to make the

sales to Narragansett under Tariff 1 and the revenues, excluding

transmission revenues and Contract Termination Charge revenues,

---

[9/]As part of the terms of the Divestiture, NEP shall require the buyer of the facility to pay NEP the net book value for all inventories and materials and supplies associated with the generating facility.  As a result, inventories and materials and supplies for NEP's non-nuclear facilities are excluded from the plant balances under Section 1.1.1, and shall be excluded from the calculation of the Residual Value Credit.  In addition, the Buyer may assume other obligations that are included in the variable component of the Contract Termination Charge.  NEP reserves its right to revise the variable cost estimates and the amortization of fixed cost components in Schedule 1 to reflect the assignment of obligations to the purchasers, if such revision is necessary to maintain a stable and declining pattern of Contract Termination Charges as offset by the Residual Value Credit.

[10/]The $85 million represents total costs of $91 million less $6 million of FAS 106 transition obligation which is being recovered under Section 1.1.3.

[11/]If NEP sells its non-nuclear generating facilities in more than one transaction, the revenues lost shall be allocated based on the kilowatthours generated by the unit sold to total kilowatthours generated from NEP's non-nuclear generating facilities during the period from July 1, 1997 to the Divestiture Date.

that it actually collected from sales to Narragansett's customers

during the period, together with a credit for Narragansett's share of

the revenue from sales at no less than market prices made by NEP to

third parties during the period, provided, however, the lost revenues

so calculated shall not exceed $0.008 per kilowatthour multiplied by

the number of kilowatthours delivered by Narragansett during the

period between the July 1, 1997 and the Divestiture Date, less

(iii)  Narragansett's 22.4 percent allocated share of capital investments

demonstrated to be prudently incurred after December 31, 1995,

excluded from the plant balances in Section 1.1.1 (a) above,[12] less

(iv)  The difference between the overall pretax return of 11.01 percent that

NEP realized prior to the Divestiture Date pursuant to Section 1.1.2

and 12.56 percent as applied to Narragansett's 22.4 percent allocated

share of the outstanding balances for plant and regulatory assets, net

of deferred taxes, listed in Section 1.1.1 over the period from July 1,

1997 to the Divestiture Date, less

---

[12] NEP's capital investments shall include construction work in progress. The investments in non-nuclear generating facilities in 1996 are shown in Schedule 4. These projects have been reviewed by the parties and are included as an offset to the Residual Value Credit subject only to a further review for the reasonableness of the amounts expended in the construction of the projects under Section 3.5 of the Agreement. NEP may include additional projects, if any, at the time of the calculation of the Residual Value Credit, subject to the dispute resolution procedures under Section 3.5 of the Agreement.

(v)   Narragansett's 22.4 percent allocated share of reasonable transaction

costs associated with the divestiture including the cost of

refinancings, repurchases, and retirements of securities occurring

after March 20, 1997.

The Net Proceeds from the divestiture including amortization and the pretax return

specified in Section 1.1.2 on the unreturned credit balance net of tax impacts shall be

credited to the Fixed Component in equal annual amounts over the period commencing on

the date the Residual Value Credit is implemented through December 31, 2009.  The

Residual Value Credit shall be implemented even if:  (i)  the Divestiture Date occurs

before the Contract Termination Date, or (ii) the Residual Value Credit exceeds the

Contract Termination Charge in any given year.  If the sale of assets, whose costs have

been included in the Contract Termination Charge, occurs after December 31, 2009, NEP

shall implement a Residual Value Credit following that date to amortize the proceeds with

the return specified above, over no more than five years.

(e)   Effective with refinancings, repurchases, and retirements of securities on

and after March 20, 1997, NEP shall, for all purposes associated with the

implementation of the Contract Termination Charge or the Residual Value

Credit, flow through the Residual Value Credit the annual effects

associated with any differences between the 12.56 percent overall pre-tax

return and the actual pre-tax return, calculated using an 11 percent return

on common equity, attributable to changes in the cost of debt, preferred

**Confidential**

stock, capital structure or income tax rates, provided that the overall pre-tax return shall not exceed 12.56 percent so long as the yield on 10-year Treasury constant maturities as reported in the Federal Reserve Statistical Release is 9 percent or lower. In the event that the yield on Treasury maturities as so reported exceeds 9 percent, the 12.56 percent overall pre-tax return shall be adjusted to include NEP's actual cost of debt and preferred stock using a 11 percent return on common equity. This reconciliation will apply to the period following the Divestiture Date whether or not securitization has been implemented. Notwithstanding the foregoing, nothing shall require a change in capital structure prior to any financing to take advantage of securitization.

NEP shall not be required to implement securitization unless implementation would produce net savings after taking into account all transaction costs including call provisions and prepayments, if applicable.

Any and all financing savings associated with refinancing following divestiture or securitization shall be allocated to the Contract Termination Charge through this paragraph, and shall not be reflected in NEP's capital structure used for transmission rates. To the extent any financing savings are allocated to transmission rates by the Commission, however, they shall not also be allocated to the Contract Termination Charge under this paragraph.

**Confidential**

1.2    The Variable Component of the Contract Termination Charge shall include Narragansett's

allocated share of the items specified in Section 1.2.2, below adjusted for the Reconciliation

Account discussed in Section 1.2.1.

    1.2.1    The Variable Component shall be adjusted through a Reconciliation Adjustment in

    which differences, whether positive or negative, between the estimates for Contract

    Termination Charge Payments by Narragansett and Narragansett's allocated share of the

    estimated variable costs listed in Section 1.2.2 below and actual Contract Termination

    Charge payments by Narragansett and its allocated share of the actual variable costs will

    be accumulated in a Reconciliation Account and added to or subtracted from the Contract

    Termination Charge from NEP to Narragansett.  The Reconciliation Account shall also

    include the adjustments under Sections 1.1.2, note 4, and 1.1.4(a) above.  A pretax return

    equal to that specified in Section 1.1.2 shall be included on any balance in the

    Reconciliation Account, whether positive or negative.

        The Reconciliation Account shall accumulate through December 31, 2000, and

    shall be used to adjust NEP's Base Contract Termination Charges to Narragansett on

    January 1, 2001.  Thus, effective January 1, 2001, NEP shall return or collect

    Narragansett's allocated share of any outstanding balance in the Reconciliation Account

    by implementing an adjustment to the Base Contract Termination Charges to

    Narragansett.  Thereafter, the balance including the accumulated return in the

    Reconciliation Account at the end of a year shall be used to adjust NEP's Base Contract

    Termination Charges for the following year.  Reconciliation Account adjustments to the

**Confidential**

Contract Termination Charges shall not cause the Contract Termination Charges to exceed 2.8 cents per kilowatthour. Any deferrals caused by the limitation in the prior sentence shall be carried forward with a return into the next annual adjustment to the Base Contract Termination Charge. Any Reconciliation Account adjustments occurring prior to January 1, 2001 that would otherwise cause the Contract Termination Charge to increase or decrease by more than 0.2 cent per kilowatthour shall be amortized with a return over the three years following January 1, 2001.

1.2.2    Narragansett's 22.4 percent allocated share of the specific cost items included in the Variable Component are set forth in Schedule 1 at page 3. The difference between Narragansett's 22.4 percent allocated share of the actual variable costs incurred by NEP and the estimated variable costs in this section shall be included in the Reconciliation Account. The costs included in the Variable Component shall include the following:

(a)    Nuclear Decommissioning and Other Post Shutdown Costs shown on Schedule 1, Pages 6 and 7, shall include: (i) all charges, excluding any net incremental decommissioning costs caused by operations after the Retail Access Date, for decommissioning and site restoration assessed to NEP by the operators of each nuclear electric generating facility specified in Section 1.1.1(a) (v), (vi), and (vii) above, subject to the regulatory authority of the agencies having jurisdiction over the operation and collection of such funds; (ii) all other reasonable post shutdown costs associated with NEP's entitlements in the units listed in Section 1.1.1(a), (v), (vi), and (vii) above;

and (iii) all remaining reasonable costs, including decommissioning costs and unrecovered capital costs, associated with Yankee Rowe and Connecticut Yankee shown on Schedule 1, page 7. Funding for the decommissioning costs will be placed in irrevocable trusts in accordance with NRC regulations. If, upon the completion of decommissioning for any of the above listed nuclear generating facilities, it is determined that there has been an over collection of funds, such over collection will be transferred to NEP's decommissioning fund for either Millstone 3 or Seabrook 1 pending final disposition of their decommissioning. Once all decommissioning is complete, any over collection will be refunded to Narragansett in the Reconciliation Adjustment. Other post shutdown costs will also be fully reconciled in the Reconciliation Adjustment.

(b)    <u>Above Market Payments to Power Suppliers</u> will be (i) all payments by NEP for Long-Term Power Supply Contracts less the market value realized from the resale of electricity purchased under the contracts into the wholesale market, plus (ii) Economic Buyout Payments associated with those contracts, less (iii) Credit for Unit Sales Contracts, plus (iv) the Power Contract Buyout Incentive realized.

(i)    Long-Term Power Supply Contracts will be the power supply contracts listed below which were in place as of December 31, 1995,

between NEP and a third party supplier, continuing to the termination

date of each contract. The Long-Term Supply Contracts include:

(1)    Ocean State Power
(2)    Canal
(3)    NU Slice
(4)    Lawrence Hydro
(5)    Mascoma Hydro
(6)    Pontook Hydro
(7)    Northeast Landfill
(8)    Turnkey
(9)    Ogden Haverhill
(10)   RESCO Saugus
(11)   RESCO N. Andover
(12)   Signal - Millbury
(13)   Hydro MWRA
(14)   RFA Lawrence
(15)   ALTRESCO
(16)   Clark University
(17)   Milford Power
(18)   Pawtucket
(19)   Hydro Quebec

(ii)    Economic Buyout Payments will be all reasonable payments agreed

to by NEP after April 1, 1997 associated with the sale, assignment,

disposition or buy down of the Long-Term Power Supply

Contracts. Economic Buyout Payments shall be recovered as

incurred to the extent that current recovery does not increase rates

to customers above the level that would have been incurred absent

the sale, assignment, disposition, or buy down of the Long-Term

Power Supply Contract. The portion of the Economic Buyout

Payment that cannot be recovered currently under the prior sentence shall be deferred and recovered with the return specified in Section 1.1.2 as soon as such recovery will not increase rates to customers above the level that would have been incurred absent the sale, assignment, disposition, or buy down of the Long-Term Power Supply Contract. If the Contract Termination Date has not yet occurred at the time that an Economic Buyout Payment is made, the schedule of recovery set forth in the prior two sentences shall be applied to NEP's Tariff No. 1 fuel clause to Narragansett so that NEP fully recovers Narragansett's allocated share of the Economic Buyout Payment from Narragansett.

(iii)   Credit for Unit Sales Contracts will be all unit sales contracts entered into by NEP as of December 31, 1995, for sales from the following generating units if they are not otherwise subject to market valuation, less the market value of these contracts as shown in Schedule 1, Page 3, Columns (7) through (9). Units Sales Contracts include contracts for NEP's sale of power from the following units:

    (1)      Ocean State Power
    (2)      Maine Yankee
    (3)      Millstone 3
    (4)      Seabrook I

**Confidential**

(iv)  Power Contract Buyout Incentive will be the sum of:  (a) the Power

Contract Buyout Incentive Associated with Divestiture calculated in

accordance with Schedule 3, pages 3 and 4; and (b) the Power

Contract Buyout Incentive Independent of Divestiture which shall

represent 10% of the savings realized by customers as the result of

the sale, assignment, disposition or buy down of its power supply

contracts occurring outside of the divestiture process.  The Power

Contract Buyout Incentive Independent of Divestiture shall be

determined at the time of the sale, assignment, disposition or buy

down using the market prices shown on page 4 of Schedule 3.  The

Total Power Contract Buyout Incentive shall not exceed $13.2

million, stated on a present value basis upon the divestiture using a

discount rate equal to the actual pre-tax return in place following

completion of post divestiture refinancing as determined under

Section 1.1.4(e), and the market prices shown on page 4 of Schedule

3, notwithstanding the actual market prices for the power.  NEP shall

document the level of the Power Contract Buyout Incentive in a

report, and the amount of the Power Contract Buyout Incentive shall

be subject to the dispute resolution procedures set forth under

Section 3.5 of the Settlement Agreement. The Power Contract

Buyout Incentive associated with Divestiture will be recovered in

**Confidential**

equal increments over the period from the divestiture through

December 31, 2009, with appropriate adjustments for the time value

of money, and the Power Contract Buyout Incentive Independent of

Divestiture will be recovered in equal increments over the remaining

term of the related purchased power contract, with appropriate

adjustments for the time value of money.

(c) <u>Above Market Fuel Transportation</u> as shown in Schedule 1, Page 11, will

be the sum of NEP's continuing long-term payment obligations associated

with (i) Capacity Payments to Interstate Natural Gas Pipelines, less the

market value of that capacity, and (ii) coal ship obligations less the market

value associated with those obligations (see Schedule 1, page 11).

(i) Capacity Payments to Interstate Natural Gas Pipelines will be all

capacity payments for Interstate Pipeline Capacity Contracts in effect

as of December 31, 1995. They include:

| | |
|---|---|
| (1) | NOVA |
| (2) | TCPL |
| (3) | Iroquois |
| (4) | Tennessee |
| (5) | Algonquin |
| (6) | ANR |
| (7) | Columbia |
| (8) | Distrigas |
| (9) | Providence Gas |
| (10) | Brayton Point Lateral |

Confidential

The Market Value of Capacity Payments to Interstate Natural Gas

Pipelines will equal the actual proceeds associated with the sale or

assignment or termination of contractual obligations.  For the

purposes of calculating the Contract Termination Charges, prior to

the date that NEP's contractual entitlements to the pipeline capacity

are assigned to a nonaffiliate, the Market Value of Capacity Payments

to Interstate Natural Gas Pipelines shall be deemed to equal the

amounts shown on page 11 of Schedule 1, which are  50 percent of

such capacity payments.

(ii)   Coal Ship Obligations will be all payments by NEP under its charter

with the Energy Enterprise until the contract is otherwise terminated

or assigned.  The market value of these Coal Ship Obligations will

equal the actual proceeds associated with the assignment or

termination of the charter with the Energy Enterprise, and are

assumed to be zero for the purpose of calculating the Base Contract

Termination Charges and the estimate included in the Reconciliation

Account.  See Schedule 1, page 11.

(d)   Transmission wheeling charges as shown in Schedule 1, Page 3, associated

with the transmission of electricity from NEP's entitlements in Connecticut

Yankee, Maine Yankee, Millstone Unit 3, Wyman Unit 4, Vermont

Yankee, and NEP's purchase from a slice of Northeast Utilities system,

Confidential

NARR 61738

which units are located off of NEP's transmission system, together with

support payments to Central Maine Power and Connecticut Light and

Power which are necessary for the transmission of NEP's remote

generation. These wheeling and support payments shall include only costs

that are excluded from recovery under NEP's and NEPOOL's open access

transmission tariffs or are not assigned to a purchaser of the unit.

(e)    Payments in Lieu of Property Taxes will include all reasonable costs

incurred by NEP or its affiliates associated with payments in lieu of

property taxes to the cities and towns in which NEP owns generating

facilities to mitigate the loss of tax revenues that those cities and towns

would otherwise incur in connection with restructuring. For the purposes

of calculating the Base Contract Termination Charges and the estimate

included in the Reconciling Account, the Payments in Lieu of Property

Taxes are assumed to be zero.

(f)    Employee Severance and Retraining Costs as shown in Schedule 1, page 3,

Column (13), will include all reasonable costs and expenses incurred by

NEP or its affiliates associated with the adjustment of their workforces in

connection with the implementation of retail access, divestiture, or the

termination of NEP's Tariff No 1, including, but not limited to early

retirement, severance, retraining and other reasonable costs associated with

the implementation of the benefits to employees included in Schedule 5.

**Confidential**                                    **NARR 61739**

NEP shall require purchasers of its generating business to pay $85 million

for the costs under this paragraph incurred by NEP or its affiliates:  In the

event that the actual costs incurred under this paragraph are less than $85

million, excluding costs found by the Commission to be recoverable in

NEP's transmission rates, NEP shall flow back the difference to customers

in the Reconciliation Account.  The procedure established in this paragraph

shall be the exclusive method for recovering the costs under this paragraph,

and, except in the event of legislation changing required benefits, neither

NEP nor its affiliates shall be able to recover more than $85 million for

these costs.  Thus, for the purposes of calculating the Base Contract

Termination Charges and the estimate included in the Reconciliation

Account, the Employee Severance and Retraining Costs are assumed to be

zero and, except in the event of legislation changing required benefits,

these costs shall not result in an increase to the Reconciliation Account or

to the Contract Termination Charge.

(g)     Damages, Costs, or Net Recoveries from claims by or against third parties

shall include all damages, costs, or recoveries associated with NEP's

generating business which accrued prior to the date of divestiture and

which were not:  (i) included in the reserves for generation related,

uninsured claims other than claims associated with Environmental

Response Costs as of January 1, 1995, plus annual additions to the reserves

for uninsured claims in NEP's W-95(S) rate, less actual payments out of

the reserve for generation related claims during the period from January 1,

1995 through the Contract Termination Date; (ii) assigned to NEP's

successor in interest; (iii) recovered from NEP's insurance carriers; or (iv)

the result of gross negligence. For the purposes of calculating the Base

Contract Termination Charges and the estimate included in the

Reconciliation Account, Damages, Costs, or Net Recoveries from claims

were assumed to be zero.

(h)     Performance Based Rate for Nuclear Units Remaining After Divestiture

shall credit value received that is not otherwise reflected in the Residual

Value Credit, or recover any payments or costs associated with the sale,

lease or disposal of nuclear units or entitlements that are not otherwise

reflected in the Residual Value Credit. If NEP is unable to sell, lease,

assign, or otherwise dispose of its nuclear units or entitlements on the

terms set forth in the Agreement prior to the Contract Termination Date,

the Performance Based Rate shall include 80 percent of the reasonable

going forward costs, including variable costs and capital additions on a cost

of service basis,[13] associated with NEP's nuclear units or entitlements that

are not otherwise recovered in contract termination charges less 80 percent

---

[13] In the event that the nuclear unit is retired before the end of its license life, the capital addition shall be amortized with a return over the remainder of the license or in accordance with its depreciation schedule, whichever is shorter.

of the revenues from sales of energy or capacity from such units or

entitlements that are not otherwise reflected in contract termination

charges. The Performance Based Rate shall apply for the period from the

Contract Termination Date to the date that NEP either sells, leases, assigns

or otherwise disposes of the nuclear unit or entitlement of the nuclear unit

is shutdown. Within six months prior to implementing the Performance

Based Rate, NEP will consult with the Signatories on a performance

standard for nuclear safety indicators and will file such performance

standard with a maximum potential credit for nonperformance of $1

million. Such sales, if any, shall only be made in the wholesale market to

nonaffiliates, provided, however, that NEP shall retain the right to use its

minority shares of the units or entitlements to fulfill its minimum, zero bid

obligations under the standard offer. For the purpose of calculating the

Base Contract Termination Charges and the estimate included in the

Reconciliation Account, the Performance Based Rate for Nuclear Units is

assumed to be zero.

(i)     Environmental Response Costs defined as:

    (i)     Reasonable and prudently incurred costs associated with the

        investigation, testing, remediation, liabilities, damages, claims,

        settlements, or judgments attributable to or incurred by NEP or

        Narragansett relating to deposits or waste from divested generating

facilities off the site of properties sold, whether or not such material

is regulated under the statutes and authorities referenced in paragraph

(iv), including material deposited before the Divestiture Date at

disposal sites, sites to which material may have migrated from off-site

disposal sites, or any off-site location at which generation related

material may have been deposited before the Divestiture Date

associated with the operation of generating facilities sold pursuant to

the divestiture plan;

(ii)    Reasonable and prudently incurred costs associated with the

investigation, testing, remediation, liabilities, damages, claims,

settlements, or judgments attributable to or incurred by NEP or

Narragansett relating to deposits and wastes occurring prior to the

Divestiture Date whether or not such material is regulated under the

statutes and authorities referenced in paragraph (iv) from facilities

located either within the switchyards for which NEP will retain a

permanent easement on parcels that are otherwise being divested or

the Brayton Point step-up transformers if such costs are not

recovered in transmission rates;

(iii)    Reasonable and prudently incurred costs associated with the purchase

of property that is acquired as part of an overall mitigation and

Confidential

response plan associated with sites identified in paragraphs (i) and
(ii);

(iv)   The statutes and authorities referenced in paragraphs (i) and (ii) shall
be the Comprehensive Environmental Response, Compensation and
Liability Act (CERCLA), Resource Conservation and Recovery Act
(RCRA), Massachusetts G.L. c. 21C and 21E, and Rhode Island
General Laws 23-19.14, or any other laws, regulations or orders by
courts or governmental authorities, or resulting from claims and
contentions arising in tort, breach of contract or violation of law;

(v)   Except for property acquired under paragraph (iii), Environmental
Response Costs shall not include costs associated with the
investigation, testing, remediation, or other liabilities relating to
property acquired after the Divestiture Date.  Environmental
Response Costs recovered under paragraphs (i), (ii), and (iii) shall
also be offset by:  (i) reserves related to Environmental Response
Costs as of January 1, 1995, less actual payments out of the reserve
for Environmental Response Costs during the period from January 1,
1995 through the Contract Termination Date; (ii) proceeds from
insurance companies related to Environmental Response Costs; (iii)
proceeds from the sale of properties purchased under paragraph (iii);
and (iv) recoveries from third parties;

Confidential

(vi)  Nothing herein is intended to limit, alter, or otherwise affect any

liability of NEP to governmental authorities or third parties other than

the buyer or buyers of NEP generating facilities under any

environmental law including those referenced in paragraph (iv).

Confidential

Schedules 1-5

NARR 61746

05/28/07

Schedule 1
Page 1 of 15

**New England Power Company**
**Summary of Contract Termination Charges**
**to The Narragansett Electric Company**

| Line (1) | Year (1) | Estimated Narragansett Electric Company Gwh Delivered (2) | Portion of the Year for Retail Access (3) | Estimated Narragansett Electric Company Gwh Delivered for Portion of the Year (4) | Share of Fixed Component $ In Millions (5) | Share of Fixed Component cents/kwh (6) | Share of Variable Component $ In Millions (7) | Share of Variable Component cents/kwh (8) | Share of Total Termination Charge $ In Millions (9) | Base Contract Termination Charge cents/kwh (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1997 | 4,768 | 50% | 2,379 | $30 | 1.26 | $37 | 1.54 | $67 | 2.80 |
| 2 | 1998 | 4,879 | 100% | 4,879 | 66 | 1.35 | 71 | 1.45 | 137 | 2.80 |
| 3 | 1999 | 5,013 | 100% | 5,013 | 72 | 1.45 | 68 | 1.35 | 140 | 2.80 |
| 4 | 2000 | 5,165 | 100% | 5,165 | 78 | 1.52 | 67 | 1.28 | 145 | 2.80 |
| 5 | 2001 | 5,163 | 100% | 5,163 | 56 | 1.08 | 73 | 1.40 | 129 | 2.48 |
| 6 | 2002 | 5,232 | 100% | 5,232 | 63 | 1.22 | 69 | 1.32 | 122 | 2.33 |
| 7 | 2003 | 5,288 | 100% | 5,288 | 51 | 0.96 | 66 | 1.25 | 117 | 2.20 |
| 8 | 2004 | 5,356 | 100% | 5,356 | 49 | 0.90 | 65 | 1.21 | 113 | 2.11 |
| 9 | 2005 | 5,428 | 100% | 5,428 | 49 | 0.90 | 65 | 1.21 | 111 | 2.04 |
| 10 | 2006 | 5,496 | 100% | 5,496 | 43 | 0.78 | 64 | 1.17 | 107 | 1.95 |
| 11 | 2007 | 5,562 | 100% | 5,562 | 40 | 0.72 | 62 | 1.12 | 102 | 1.84 |
| 12 | 2008 | 5,628 | 100% | 5,628 | 37 | 0.67 | 61 | 1.09 | 99 | 1.76 |
| 13 | 2009 | 5,695 | 100% | 5,695 | 35 | 0.61 | 63 | 1.09 | 98 | 1.65 |
| 14 | 2010 | 5,783 | 100% | 5,783 | | | 49 | 0.83 | 49 | 0.84 |
| 15 | 2011 | 5,864 | 100% | 5,864 | | | 36 | 0.61 | 36 | 0.61 |
| 16 | 2012 | 5,946 | 100% | 5,946 | | | 30 | 0.50 | 30 | 0.50 |
| 17 | 2013 | 6,029 | 100% | 6,029 | | | 30 | 0.49 | 30 | 0.49 |
| 18 | 2014 | 6,114 | 100% | 6,114 | | | 28 | 0.46 | 28 | 0.46 |
| 19 | 2015 | 6,199 | 100% | 6,199 | | | 27 | 0.44 | 27 | 0.44 |
| 20 | 2016 | 6,286 | 100% | 6,286 | | | 23 | 0.37 | 23 | 0.38 |
| 21 | 2017 | 6,374 | 100% | 6,374 | | | 23 | 0.36 | 23 | 0.36 |
| 22 | 2018 | 6,463 | 100% | 6,463 | | | 17 | 0.26 | 17 | 0.26 |
| 23 | 2019 | 6,554 | 100% | 6,554 | | | 17 | 0.26 | 17 | 0.26 |
| 24 | 2020 | 6,646 | 100% | 6,646 | | | 17 | 0.26 | 17 | 0.26 |
| 25 | 2021 | 6,739 | 100% | 6,739 | | | 12 | 0.17 | 12 | 0.17 |
| 26 | 2022 | 6,833 | 100% | 6,833 | | | 12 | 0.17 | 12 | 0.17 |
| 27 | 2023 | 6,929 | 100% | 6,929 | | | 12 | 0.17 | 12 | 0.17 |
| 28 | 2024 | 7,026 | 100% | 7,026 | | | 12 | 0.17 | 12 | 0.17 |
| 29 | 2025 | 7,124 | 100% | 7,124 | | | 12 | 0.17 | 12 | 0.17 |
| 30 | 2026 | 7,224 | 100% | 7,224 | | | 7 | 0.10 | 7 | 0.10 |
| 31 | 2027 | 7,325 | 100% | 7,325 | | | 6 | 0.08 | 6.0 | 0.08 |
| 32 | 2028 | 7,427 | 100% | 7,427 | | | 6 | 0.08 | 6.0 | 0.08 |
| 33 | 2029 | 7,531 | 100% | 7,531 | | | 6 | 0.08 | 5.9 | 0.08 |

(2) Per June 9, 1998 Integrated Least Cost Plan Update. Includes Incremental DSM.
(3) Per Utility Restructuring Act of 1996, pages 24 and 25. Assumes 100% Retail Access as of 1/1/98.
(4) Column (2) x Column (3).
(5) See Page 2, Column (7).
(6) Column (5)/Column (4) x 100.
(7) See Page 3, Column (16).
(8) Column (7)/Column (4) x 100.
(9) Column (5) + Column (7).
(10) Column (9) / Column (4) x 100.

**Confidential**

Schedule 1
Page 2 of 15

05/23/97

# New England Power Company

## Summary of Contract Termination Charges
## The Narragansett Electric Company Share (22.4%)
## Fixed Component

$ In Millions

| Line (1) | Year (1) | Pre-Tax Return on Generation Related Investment and Regulatory Assets (2) | Amortization of Generation Related Investment and Regulatory Assets (3) | Generation Related FAS 106 Termination Obligation (4) | Base Total Fixed Component (5) | Adjustment For Residual Value Credit (6) | Net Fixed Component Including Adjustment For Residual Value Credit (7) |
|---|---|---|---|---|---|---|---|
| 1 | 1997 | $18 | $11 | $1 | $30 | $0 | $30 |
| 2 | 1998 | 34 | 30 | 2 | 66 | 0 | 66 |
| 3 | 1999 | 30 | 40 | 2 | 73 | 0 | 73 |
| 4 | 2000 | 27 | 50 | 2 | 78 | 0 | 78 |
| 5 | 2001 | 23 | 31 | 2 | 56 | 0 | 56 |
| 6 | 2002 | 21 | 31 | 2 | 53 | 0 | 53 |
| 7 | 2003 | 18 | 31 | 2 | 51 | 0 | 51 |
| 8 | 2004 | 16 | 31 | 2 | 48 | 0 | 48 |
| 9 | 2005 | 13 | 31 | 2 | 45 | 0 | 45 |
| 10 | 2006 | 11 | 31 | 1 | 43 | 0 | 43 |
| 11 | 2007 | 8 | 31 | 1 | 40 | 0 | 40 |
| 12 | 2008 | 6 | 31 | 1 | 37 | 0 | 37 |
| 13 | 2009 | 3 | 31 | 1 | 35 | 0 | 35 |
| 14 | 2010 | | | | | | |
| 15 | 2011 | | | | | | |
| 16 | 2012 | | | | | | |
| 17 | 2013 | | | | | | |
| 18 | 2014 | | | | | | |
| 19 | 2015 | | | | | | |
| 20 | 2016 | | | | | | |
| 21 | 2017 | | | | | | |
| 22 | 2018 | | | | | | |
| 23 | 2019 | | | | | | |
| 24 | 2020 | | | | | | |
| 25 | 2021 | | | | | | |
| 26 | 2022 | | | | | | |
| 27 | 2023 | | | | | | |
| 28 | 2024 | | | | | | |
| 29 | 2025 | | | | | | |

Column Notes:

Each Column represents 22.4% of the same Column number on Page 12.

Confidential

NARR 61748

06/23/07

**New England Power Company**
**Summary of Contract Termination Charges**
**The Narragansett Electric Company Share (22.4%)**
**Variable Component**

$ In Millions

| Line (1) | Year End (1) | Nuclear Decommissioning and Other Post-Shutdown Costs (2) | Power Contracts Power Total Obligation (3) | Power Contracts Assumed Market Value (4) | Power Contracts Net Excess Over Market (5) | Future Power Contract Buyouts (6) | Credit (or Unit Sales Contracts) Power Total Obligation (7) | Credit (or Unit Sales Contracts) Assumed Market Value (8) | Credit (or Unit Sales Contracts) Net Excess Over Market (9) | Above Market Fuel Transportation Costs (10) | Transmission in Support of Remote Generating Units (11) | Payments in Lieu of Property Taxes (12) | Employee Severance and Retraining Costs (13) | Damages, Costs, or Net Recoveries from Claims (14) | PBR for Nuclear Units Remaining After Market Valuation (15) | Base Total Variable Component (16) | Reconciliation Account (17) | Total Variable Component Including Reconciliation Account (18) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Column Notes:**

Column (2) through (16) represent 22.4% of the same Column number on Page 15.

(17) See Schedule 2, Page 3, Column (7) x -1
(18) Column (16) + Column (17).

**Confidential**

NARR 61749

New England Power Company's Generation Facilities
Net Capability and Unrecovered Costs
as of December 31, 1995

| Source | Location | Year(s) Placed In-Service | Energy Source | Net Capability (MW) | $ Millions 1995 | 06/30/97 | Applicable Annual Depreciation per W-95 ($) for the period: 1996 1997 | 1998 and Beyond | |
|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | |
| **Fossil Fuel Units** | | | | | | | | | |
| Brayton Point Station Units 1,2 & 3 Unit 4 | Somerset, Mass. | 1963-1969 1974 | Coal-Oil-Gas Oil-Gas | 1,130 446 1,576 | | | | | |
| Salem Harbor Station Units 1,2 & 3 Unit 4 | Salem, Mass. | 1952-1958 1972 | Coal-Oil Oil | 314 400 714 | | | | | |
| Other System Units | Me., Mass. | 1963-1978 | Oil | 101 | | | | | |
| Subtotal Brayton Point, Salem Harbor, and Other | | | | 2,391 | $435 | $384 | $34.0 | $34.0 | (c) |
| Manchester St. Station | Prov., R.I. | 1995 | Oil-Gas | 513 | 468 (a) | 441 (a) | 18.2 | 18.2 | (d) |
| **Hydroelectric Units** | | | | | | | | | |
| Conventional | Mass., N.H. & Vt. | 1909-1987 | Water | 577 | 170 | 165 | 3.3 | 3.3 | |
| Pumped Storage Bear Swamp | Rowe, Mass. | 1974 | Water | 589 | 73 | 71 | 1.4 | 1.4 | |
| **Nuclear Units** | | | | | | | | | |
| Yankees and Vt. | Maine & Vt. | 1968-1972 | Nuclear | 341 | 75 (b) | 68 (b) | 5.1 | 5.1 | (e) |
| Millstone 3 | Waterford, Conn. | 1986 | Nuclear | 140 | 391 (b) | 360 (b) | 30.0 | 44.9 | (f) |
| Seabrook 1 | Seabrook, N.H. | 1990 | Nuclear | 115 | 59 (b) | 42 (b) | 1.8 | 1.9 | |
| Step-Up Transformers at Generation Facilities (Not Included in Transmission Rates) | | | | | 8 | 8 | 0.3 | 0.3 | |
| General Plant Allocated to Generation | | | | | 10 | 9 | 0.6 | 0.6 | |
| Generation Related Property Held For Future Use and Non-Utility Property | | | | | 10 | 10 | 0.0 | 0.0 | |
| Nantucket Generating Units (Not Included in Transmission Rates) | | | | | 9 | 8 | 0.6 | 0.6 | |
| Total | | | | 4,566 | $1,709 | $1,566 | $95.3 | $110.2 | |

(a) Includes prepaid taxes in accordance with tax treaty.
(b) Includes balances for final fuel core and materials and supplies.
(c) Depreciation includes dismantlement expense of $5 M and $3 M for Brayton Point and Salem Harbor, respectively, through the year 2004.
(d) Includes $3.3 M of annual amortization of prepaid taxes which ends 2002.
(e) Depreciation based upon years remaining under license. Maine Yankee license expires 2008 and Vermont Yankee
     license expires 2012.
(f) Millstone 3 base amortization was adjusted for acceleration per W-95S in 1996 and 1997. Accelerated amortization for 1998
     is as noted in the table and an additional $1.2 M of amortization should be added each year thereafter until fully depreciated.

05/28/97

Confidential

**New England Power Company Generation Related**

**Regulatory Asset Balances**

$ in Millions

| | Balance as of | | Applicable Annual Depreciation per W-95 (S) for the period: | | Basis for Deferral |
|---|---|---|---|---|---|
| | December 31, 1996 | June 30, 1997 | 1997 | 1998 and Beyond | |
| | (1) | (2) | (3) | (4) | (5) |
| FAS 109 | $26 | $26 | $0.9 | $0.9 | FERC Ratemaking Policy |
| Unamortized Losses on Reacquired Debt | 26 | 23 | 1.8 | 1.8 | FERC Ratemaking Policy |
| Pipeline Demand Charges | 58 | 54 | 2.3 | 2.3 | Settlement Agreement (1) |
| NEEI | 226 | 158 | 18.0 | 21.2 | Settlement Agreement (2) |
| FAS 106 Deferral | 13 | 5 | 11.0 | 0.0 | FERC Ratemaking Policy |
| Power Contract Buyouts | 24 | 18 | 3.9 | 3.9 | Settlement Agreement (3) |
| Property Losses | 5 | 0 | 0.0 | 0.0 | Settlement Agreement (2) |
| Rate Clauses | 5 | 3 | 0.7 | 0.7 | Settlement Agreement (4) |
| South Street Cost of Removal | 8 | 2 | 3.9 | 0.0 | Settlement Agreement (3) |
| Brayton Point Rotor | 9 | 2 | 4.2 | 0.0 | Settlement Agreement (3) |
| Seabrook Tax True-Up | 2 | 2 | 0.0 | 0.0 | Settlement Agreement (2) |
| Decontamination & Decommissioning Costs | 2 | 2 | 0.2 | 0.2 | FERC Ratemaking Policy |
| W-95S Adjustment Account | 2.2 | (1.5) | 0.3 | 0.0 | Settlement Agreement (3) |
| Unamortized ITC | (47) | (45) | (1.2) | (1.2) | FERC Ratemaking Policy |
| Total Regulatory Assets | $360 | $250 | $46.0 | $29.9 | |

Settlement Agreement Notes:

    (1)  W-92 Settlement Agreement - FERC Docket Nos. ER91-565-000 and ER91-566-000
    (2)  W-9 Settlement Agreement - FERC Docket No. ER88-86-000
    (3)  W-95 Settlement Agreement - FERC Docket Nos. ER95-267-000
    (4)  Surcharge Compliance Filing Settlement, FERC Docket Nos. ER88-630-000 et al.
       (Rate W-10), ER89-582-000 et al. (Rate W-11), and ER90-525-000 et al. (Rate W-12)

Confidential

# New England Power Company

## FAS 106 Transition Obligation Regulatory Asset

$ in Millions

| | |
|---|---|
| Unrecovered Balance as of 6/30/97 | $67.9 |
| Actuarial Discount Rate | 7.25% |
| Amortization (straightline) | 12.5 years |

| | Amortization (1) | Interest (2) | Total Expense (3) | Unamortized Balance (4) |
|---|---|---|---|---|
| | | | | 67.9 |
| 1997 | 2.7 | 2.4 | 5.1 | 65.2 |
| 1998 | 5.4 | 4.5 | 10.0 | 59.7 |
| 1999 | 5.4 | 4.1 | 9.6 | 54.3 |
| 2000 | 5.4 | 3.7 | 9.2 | 48.9 |
| 2001 | 5.4 | 3.3 | 8.8 | 43.4 |
| 2002 | 5.4 | 3.0 | 8.4 | 38.0 |
| 2003 | 5.4 | 2.6 | 8.0 | 32.6 |
| 2004 | 5.4 | 2.2 | 7.6 | 27.2 |
| 2005 | 5.4 | 1.8 | 7.2 | 21.7 |
| 2006 | 5.4 | 1.4 | 6.8 | 16.3 |
| 2007 | 5.4 | 1.0 | 6.4 | 10.9 |
| 2008 | 5.4 | 0.6 | 6.0 | 5.4 |
| 2009 | 5.4 | 0.2 | 5.6 | (0.0) |
| | 67.9 | | | |

Column Notes:

(1) Column (4) 6/30/1997 balance/12.5.
(2) (Prior year Column (4) + Current year Column (4))/2 x .0725
(3) Column (1) + Column (2)
(4) Prior year Column (4) - Column (1)

Confidential

# New England Power Company Share of

## Total Nuclear Post-Shutdown Costs

### $ in Millions

| | Millstone 3 (1) | Seabrook 1 (2) | Vermont Yankee (3) | Maine Yankee (4) | Total (5) |
|---|---|---|---|---|---|
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 7 | 6 | 7 | 7 | 26 |
| 2002 | 7 | 6 | 7 | 7 | 26 |
| 2003 | 7 | 6 | 7 | 7 | 26 |
| 2004 | 7 | 6 | 7 | 7 | 26 |
| 2005 | 7 | 6 | 7 | 7 | 26 |
| 2006 | 7 | 6 | 7 | 7 | 26 |
| 2007 | 7 | 6 | 7 | 7 | 26 |
| 2008 | 7 | 6 | 7 | 7 | 26 |
| 2009 | 7 | 6 | 7 | 7 | 26 |
| 2010 | 7 | 6 | 7 | 7 | 26 |
| 2011 | 7 | 6 | 7 | 7 | 26 |
| 2012 | 7 | 6 | 7 | 7 | 26 |
| 2013 | 7 | 6 | 7 | 7 | 26 |
| 2014 | 7 | 6 | 7 | 7 | 26 |
| 2015 | 7 | 6 | 7 | 7 | 26 |
| 2016 | 7 | 6 | 7 | 7 | 26 |
| 2017 | 7 | 6 | 7 | 7 | 26 |
| 2018 | 7 | 6 | 7 | 7 | 26 |
| 2019 | 7 | 6 | 7 | 7 | 26 |
| 2020 | 7 | 6 | 7 | 7 | 26 |
| 2021 | 7 | 6 | 7 | 7 | 26 |
| 2022 | 7 | 6 | 7 | 7 | 26 |
| 2023 | 7 | 6 | 7 | 7 | 26 |
| 2024 | 7 | 6 | 7 | 7 | 26 |
| 2025 | 7 | 6 | 7 | 7 | 26 |
| 2026 | 7 | 6 | 7 | 7 | 26 |
| 2027 | 7 | 6 | 7 | 7 | 26 |
| 2028 | 7 | 6 | 7 | 7 | 26 |
| 2029 | 7 | 6 | 7 | 7 | 26 |

05/28/97

NARR 61753

Confidential

New England Power Company Share of

Total Annual Decommissioning Cost

$ In Millions

| | Millstone 3 (1) | Seabrook 1 (2) | Connecticut Yankee (3) | Vermont Yankee (4) | Maine Yankee (5) | Yankee Atomic (6) | Total Nuclear Decommissioning (7) |
|---|---|---|---|---|---|---|---|
| 1997 | 1 | 1 | 24 | 2 | 3 | 15 | 47 |
| 1998 | 1 | 1 | 24 | 2 | 3 | 14 | 46 |
| 1999 | 1 | 1 | 17 | 2 | 3 | 15 | 40 |
| 2000 | 2 | 2 | 16 | 3 | 3 | 8 | 34 |
| 2001 | 2 | 2 | 15 | 3 | 3 | 0 | 25 |
| 2002 | 2 | 2 | 13 | 3 | 3 | 0 | 24 |
| 2003 | 2 | 2 | 13 | 4 | 3 | 0 | 23 |
| 2004 | 2 | 2 | 13 | 4 | 4 | 0 | 24 |
| 2005 | 3 | 2 | 13 | 4 | 4 | 0 | 26 |
| 2006 | 3 | 2 | 13 | 4 | 4 | 0 | 26 |
| 2007 | 3 | 2 | 8 | 5 | 4 | 0 | 21 |
| 2008 | 3 | 2 | 0 | 5 | 3 | 0 | 13 |
| 2009 | 3 | 2 | 0 | 5 | 0 | 0 | 10 |
| 2010 | 4 | 3 | 0 | 5 | 0 | 0 | 12 |
| 2011 | 4 | 3 | 0 | 6 | 0 | 0 | 13 |
| 2012 | 4 | 3 | 0 | 2 | 0 | 0 | 8 |
| 2013 | 4 | 3 | 0 | 0 | 0 | 0 | 7 |
| 2014 | 4 | 3 | 0 | 0 | 0 | 0 | 7 |
| 2015 | 5 | 4 | 0 | 0 | 0 | 0 | 9 |
| 2016 | 5 | 4 | 0 | 0 | 0 | 0 | 9 |
| 2017 | 5 | 4 | 0 | 0 | 0 | 0 | 9 |
| 2018 | 5 | 4 | 0 | 0 | 0 | 0 | 9 |
| 2019 | 5 | 4 | 0 | 0 | 0 | 0 | 9 |
| 2020 | 7 | 6 | 0 | 0 | 0 | 0 | 13 |
| 2021 | 7 | 6 | 0 | 0 | 0 | 0 | 13 |
| 2022 | 7 | 6 | 0 | 0 | 0 | 0 | 13 |
| 2023 | 7 | 6 | 0 | 0 | 0 | 0 | 13 |
| 2024 | 7 | 6 | 0 | 0 | 0 | 0 | 13 |
| 2025 | 8 | 7 | 0 | 0 | 0 | 0 | 15 |
| 2026 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |

Confidential

edule 1
Page 8 of 15

05/28/97

## Power Contract Obligations
## Annual Obligations in Millions of Dollars

| Year | CSP | Canal | NU Slice | Lawrence Hydro | Mascoma Hydro | Pontook Hydro | Northeast Landfill | Turnkey Rochester NH | Ogden Haverhill | RESCO Saugus | RESCO N. Andover | Signal-Millbury | Wheelabrator Hydro MWRA | RFA Lawrence | Altresco | Clark University | Milford Power | Pawtucket | Hydro-Quebec DC Phase 1 & 2 | TOTAL |
|------|-----|-------|----------|----------------|---------------|---------------|--------------------|----------------------|-----------------|--------------|------------------|-----------------|-------------------------|--------------|----------|------------------|---------------|-----------|------------------------------|-------|
| 1997 | 98 | 30 | 8 | 5 | 0 | 5 | 6 | 1 | 28 | 19 | 5 | 29 | 1 | 0 | 53 | 0 | 33 | 34 | 17 | 372 |
| 1998 | 95 | 30 | 7 | 5 | 0 | 5 | 6 | 1 | 29 | 19 | 5 | 30 | 1 | 0 | 53 | 0 | 33 | 33 | 17 | 370 |
| 1999 | 96 | 31 | 0 | 5 | 0 | 5 | 7 | 1 | 29 | 19 | 6 | 30 | 1 | 0 | 54 | 0 | 36 | 34 | 16 | 371 |
| 2000 | 93 | 34 | 0 | 5 | 0 | 5 | 7 | 1 | 30 | 20 | 7 | 31 | 1 | 0 | 54 | 0 | 37 | 35 | 16 | 375 |
| 2001 | 95 | 30 | 0 | 5 | 0 | 5 | 7 | 1 | 31 | 21 | 9 | 33 | 1 | 0 | 53 | 0 | 41 | 35 | 16 | 382 |
| 2002 | 97 | 25 | 0 | 4 | 0 | 5 | 7 | 1 | 32 | 21 | 7 | 33 | 1 | 0 | 55 | 0 | 42 | 35 | 16 | 381 |
| 2003 | 96 | 0 | 0 | 4 | 0 | 4 | 7 | 2 | 32 | 22 | 8 | 34 | 1 | 0 | 56 | 0 | 43 | 36 | 15 | 368 |
| 2004 | 93 | 0 | 0 | 4 | 0 | 4 | 7 | 2 | 33 | 22 | 8 | 34 | 1 | 0 | 56 | 0 | 44 | 36 | 15 | 359 |
| 2005 | 95 | 0 | 0 | 4 | 0 | 4 | 7 | 2 | 33 | 22 | 3 | 35 | 1 | 0 | 56 | 0 | 45 | 37 | 15 | 359 |
| 2006 | 92 | 0 | 0 | 4 | 0 | 4 | 7 | 2 | 34 | 23 | 0 | 35 | 1 | 0 | 56 | 0 | 46 | 37 | 14 | 355 |
| 2007 | 94 | 0 | 0 | 4 | 0 | 4 | 8 | 2 | 34 | 23 | 0 | 36 | 1 | 0 | 58 | 0 | 47 | 38 | 13 | 361 |
| 2008 | 99 | 0 | 0 | 3 | 0 | 5 | 8 | 0 | 35 | 24 | 0 | 37 | 1 | 0 | 59 | 0 | 51 | 38 | 13 | 374 |
| 2009 | 99 | 0 | 0 | 3 | 0 | 5 | 1 | 0 | 36 | 24 | 0 | 38 | 1 | 0 | 60 | 0 | 2 | 39 | 13 | 327 |
| 2010 | 91 | 0 | 0 | 3 | 0 | 5 | 0 | 0 | 37 | 25 | 0 | 39 | 1 | 0 | 41 | 0 | 0 | 3 | 13 | 294 |
| 2011 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 38 | 25 | 0 | 39 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 217 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 38 | 26 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 122 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 39 | 26 | 0 | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 123 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 40 | 26 | 0 | 42 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 126 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 40 | 0 | 0 | 42 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 128 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 99 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 96 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 54 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 55 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 13 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 13 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 13 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 13 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 14 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 14 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Confidential

module 1
...9 of 15

05/28/97

**Power Contract Obligations**
**Annual Obligations in GWH**

| Year | CSE | Canal | NU Seba | Lawrence Hydro | Mascoma Hydro | Pontook Hydro | Northeast Landfill | Turnkey Rochester NH | Ogden Haverhill | RESCO Saugus | RESCO N. Andover | Signal-Millbury | Wachusett Hydro MWRA | RFA Lawrence | Altresco | Clark University | Milford Power | Pawtucket | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 1,879 | 850 | 94 | 70 | 4 | 64 | 100 | 24 | 306 | 226 | 210 | 321 | 13 | 0 | 800 | 0 | 444 | 453 | 5,857 |
| 1998 | 1,879 | 782 | 95 | 70 | 4 | 64 | 100 | 24 | 306 | 226 | 210 | 321 | 13 | 0 | 762 | 0 | 424 | 425 | 5,706 |
| 1999 | 1,879 | 774 |  | 70 | 4 | 64 | 100 | 24 | 306 | 226 | 210 | 321 | 13 | 0 | 790 | 0 | 464 | 453 | 5,699 |
| 2000 | 1,879 | 896 |  | 70 | 4 | 64 | 100 | 24 | 307 | 227 | 211 | 322 | 13 | 0 | 737 | 0 | 438 | 454 | 5,746 |
| 2001 | 1,879 | 736 |  | 70 | 4 | 64 | 100 | 24 | 317 | 242 | 240 | 333 | 13 | 0 | 716 | 0 | 531 | 497 | 5,766 |
| 2002 | 1,879 | 613 |  | 70 | 4 | 64 | 100 | 24 | 317 | 242 | 240 | 333 | 13 | 0 | 800 | 0 | 504 | 469 | 5,672 |
| 2003 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 317 | 242 | 241 | 334 | 13 | 0 | 800 | 0 | 538 | 497 | 5,121 |
| 2004 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 318 | 242 | 100 | 333 | 13 | 0 | 802 | 0 | 546 | 504 | 5,142 |
| 2005 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 317 | 242 |  | 333 | 13 | 0 | 744 | 0 | 558 | 509 | 4,956 |
| 2006 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 317 | 243 |  | 333 | 13 | 0 | 716 | 0 | 572 | 509 | 4,841 |
| 2007 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 318 | 242 |  | 333 | 13 | 0 | 800 | 0 | 545 | 475 | 4,866 |
| 2008 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 317 | 242 |  | 334 | 13 | 0 | 802 | 0 | 607 | 510 | 4,967 |
| 2009 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 317 | 242 |  | 333 | 13 |  | 800 | 0 | 25 | 509 | 4,359 |
| 2010 | 1,879 |  |  | 70 | 4 | 64 | 100 | 24 | 317 | 242 |  | 333 | 13 |  | 497 | 0 |  | 503 | 3,931 |
| 2011 | 1,879 |  |  | 70 | 4 | 5 | 8 | 4 | 317 | 243 |  | 334 | 10 |  |  | 0 |  | 42 | 2,964 |
| 2012 |  |  |  |  | 4 |  |  |  | 318 | 242 |  | 333 |  |  |  | 0 |  |  | 975 |
| 2013 |  |  |  |  | 4 |  |  |  | 317 | 242 |  | 333 |  |  |  | 0 |  |  | 973 |
| 2014 |  |  |  |  | 4 |  |  |  | 317 |  |  | 333 |  |  |  | 0 |  |  | 973 |
| 2015 |  |  |  |  | 4 |  |  |  | 317 |  |  | 333 |  |  |  | 0 |  |  | 969 |
| 2016 |  |  |  |  | 4 |  |  |  | 317 |  |  |  |  |  |  | 0 |  |  | 718 |
| 2017 |  |  |  |  | 4 |  |  |  | 317 |  |  |  |  |  |  | 0 |  |  | 659 |
| 2018 |  |  |  |  | 4 |  |  |  | 317 |  |  |  |  |  |  | 0 |  |  | 321 |
| 2019 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 321 |
| 2020 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2021 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2022 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2023 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2024 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2025 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2026 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2027 |  |  |  |  | 4 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 4 |
| 2028 |  |  |  |  | 0 |  |  |  |  |  |  |  |  |  |  | 0 |  |  | 0 |
| 2029 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |  |  |  |

Confidential

NARR 61756

05/28/97

Schedule 1
Page 10 of 15

# New England Power Company

## Annual Utility Unit Sales Power Contracts

$ in Millions

| | OSP (1) | Maine Yankee (2) | Millstone 3 (3) | Millstone3/ Seabrook 1 (4) | TOTAL (5) |
|---|---|---|---|---|---|
| 1997 | 5 | 0 | 7 | 5 | 12 |
| 1998 | 8 | 1 | 7 | 5 | 15 |
| 1999 | 8 | 0 | 7 | 6 | 15 |
| 2000 | 8 | 1 | 7 | 6 | 16 |
| 2001 | 8 | 1 | 7 | | 10 |
| 2002 | 8 | 1 | 7 | | 10 |
| 2003 | 8 | 1 | 7 | | 10 |
| 2004 | 8 | 1 | 7 | | 9 |
| 2005 | 8 | 1 | 7 | | 9 |
| 2006 | 8 | 1 | 7 | | 9 |
| 2007 | 8 | | | | 8 |
| 2008 | 8 | | | | 8 |
| 2009 | 8 | | | | 8 |
| 2010 | 7 | | | | 7 |

Confidential

NARR 61757

# Tab 5

# (4 of 6)

05/28/97

## New England Power Company
## Fixed Costs of Gas Transportation
## Contractual Commitments

### Annual Expenses

$ In Millions

| | Total Pipeline Demand Charge Obligation (1) | Assumed Market Value (2) | Excess Over Market (3) | Total Energy Enterprise Minimum Payments (4) | Assumed Market Value (5) | Excess Over Market (6) | Total Above Market Fuel Transportation Costs (7) |
|---|---|---|---|---|---|---|---|
| 1997 | $62 | $31 | $31 | $15 | $0 | $15 | $46 |
| 1998 | 61 | 31 | 31 | 13 | 0 | 13 | 44 |
| 1999 | 60 | 30 | 30 | 13 | 0 | 13 | 43 |
| 2000 | 60 | 30 | 30 | 13 | 0 | 13 | 43 |
| 2001 | 59 | 29 | 29 | 14 | 0 | 14 | 43 |
| 2002 | 58 | 29 | 29 | 14 | 0 | 14 | 43 |
| 2003 | 57 | 28 | 28 | 15 | 0 | 15 | 43 |
| 2004 | 56 | 28 | 28 | 13 | 0 | 13 | 41 |
| 2005 | 55 | 28 | 28 | 14 | 0 | 14 | 41 |
| 2006 | 55 | 27 | 27 | 14 | 0 | 14 | 41 |
| 2007 | 54 | 27 | 27 | 14 | 0 | 14 | 41 |
| 2008 | 41 | 20 | 20 | 15 | 0 | 15 | 35 |
| 2009 | 40 | 20 | 20 | 15 | 0 | 15 | 35 |
| 2010 | 35 | 18 | 18 | 15 | 0 | 15 | 33 |
| 2011 | 35 | 17 | 17 | 16 | 0 | 16 | 33 |
| 2012 | 34 | 17 | 17 | 1 | 0 | 1 | 18 |
| 2013 | 30 | 15 | 15 | 0 | 0 | 0 | 15 |
| 2014 | 29 | 15 | 15 | 0 | 0 | 0 | 15 |
| 2015 | 16 | 8 | 8 | 0 | 0 | 0 | 8 |

**Columns Notes:**

(2) Assumes 50% of obligation is recoverable through the market. Upon actual market valuation, this component will be adjusted for actual market value realized.

(3) Column (1) - Column (2).

(5) Assumes 0% of obligation is recoverable through the market. Upon actual market valuation, this component will be adjusted for actual market value realized.

(6) Column (4) - Column (5).

(7) Column (3) + Column (6).

**Confidential**

NARR 61758

05/28/97

## Summary of Contract Termination Charges

### New England Power Company (100%)
### Fixed Component

$ In Millions

| Line | Year (1) | Pre-Tax Return on Generation Related Investment and Regulatory Assets (2) | Amortization of Generation Related Investment and Regulatory Assets (3) | Generation Related FAS 106 Transition Obligation (4) | Base Total Fixed Component (5) | Adjustment For Residual Value Credit (6) | Net Fixed Component Including Adjustment For Residual Value Credit (7) |
|---|---|---|---|---|---|---|---|
| 1 | 1997 | $80 | $49 | $5 | $134 | $0 | $134 |
| 2 | 1998 | 150 | 135 | 10 | 295 | 0 | 295 |
| 3 | 1999 | 135 | 180 | 10 | 325 | 0 | 325 |
| 4 | 2000 | 118 | 222 | 9 | 349 | 0 | 349 |
| 5 | 2001 | 104 | 137 | 9 | 248 | 0 | 248 |
| 6 | 2002 | 92 | 137 | 8 | 237 | 0 | 237 |
| 7 | 2003 | 81 | 137 | 8 | 226 | 0 | 226 |
| 8 | 2004 | 70 | 137 | 7 | 214 | 0 | 214 |
| 9 | 2005 | 59 | 137 | 7 | 202 | 0 | 202 |
| 10 | 2006 | 47 | 137 | 6 | 181 | 0 | 181 |
| 11 | 2007 | 36 | 137 | 6 | 179 | 0 | 179 |
| 12 | 2008 | 25 | 137 | 6 | 167 | 0 | 167 |
| 13 | 2009 | 13 | 137 | 6 | 156 | 0 | 156 |
| 14 | 2010 | | | | | | |
| 15 | 2011 | | | | | | |
| 16 | 2012 | | | | | | |
| 17 | 2013 | | | | | | |
| 18 | 2014 | | | | | | |
| 19 | 2015 | | | | | | |
| 20 | 2016 | | | | | | |
| 21 | 2017 | | | | | | |
| 22 | 2018 | | | | | | |
| 23 | 2019 | | | | | | |
| 24 | 2020 | | | | | | |
| 25 | 2021 | | | | | | |
| 26 | 2022 | | | | | | |
| 27 | 2023 | | | | | | |
| 28 | 2024 | | | | | | |
| 29 | 2025 | | | | | | |

Column Notes:
(2) See Page 14, Column (9).
(3) For years 1997-2000 Column (3) = [Page 1, Column (10) x Page 1, Column (2), Column (4)]/100/.224 - Page 15, Column (16) - Page 13, Column (2) and (4).
For 2001, Column (3) = (Page 14, Column (2), Line 5)/9
For years 2002-2009, same as 2001.
(4) Page 5a, Column (3) x Page 1, Column (3).
(5) Sum of Column (2) through (4).
(6) To be based upon results of actual market valuation.
(7) Column (5) + Column (6).

Confidential

NARR 61759

## Summary of Contract Termination Charges
## New England Power Company (100%)

### Deferred Taxes on Fixed Component

$ In Millions

| Line | Year End (1) | Book Basis | | | Tax Basis | | | Excess Book Over Tax (8) | Deferred Taxes (9) |
|---|---|---|---|---|---|---|---|---|---|
| | | Balance Net Book Value of Generation (2) | Balance Generation Related Regulatory Assets (3) | Total Net Book Basis (4) | Balance Net Book Value of Generation (5) | Balance Generation Related Regulatory Assets (6) | Total Tax Basis (7) | | |
| 1 | 06/30/97 | $1,565 | $250 | $1,815 | $832 | $0 | $832 | $983 | $386 |
| 2 | 1997 | 1,523 | 243 | 1,766 | 785 | 0 | 785 | 981 | 385 |
| 3 | 1998 | 1,406 | 224 | 1,631 | 695 | 0 | 695 | 936 | 367 |
| 4 | 1999 | 1,251 | 200 | 1,451 | 611 | 0 | 611 | 840 | 329 |
| 5 | 2000 | 1,060 | 169 | 1,229 | 557 | 0 | 557 | 671 | 263 |
| 6 | 2001 | 942 | 150 | 1,092 | 509 | 0 | 509 | 584 | 229 |
| 7 | 2002 | 824 | 131 | 956 | 463 | 0 | 463 | 492 | 193 |
| 8 | 2003 | 706 | 113 | 819 | 435 | 0 | 435 | 384 | 151 |
| 9 | 2004 | 589 | 94 | 683 | 391 | 0 | 391 | 282 | 114 |
| 10 | 2005 | 471 | 75 | 546 | 348 | 0 | 348 | 198 | 78 |
| 11 | 2006 | 353 | 56 | 410 | 305 | 0 | 305 | 105 | 41 |
| 12 | 2007 | 235 | 38 | 273 | 262 | 0 | 262 | 11 | 4 |
| 13 | 2008 | 118 | 19 | 137 | 220 | 0 | 220 | (84) | (33) |
| 14 | 2009 | 0 | 0 | 0 | 184 | 0 | 184 | (184) | (72) |

Column Notes:
(2) See Page 4, Column (7) for 6/30/97 balance.  For year end 1997-2009, Column (2) prior year - (Page 12, Column (2) current year x (Column (2) Line1/Column (4) Line 1)
(3) See Page 5, Column (2) for 6/30/97 balance.  For year end 1997-2009, Column (3) prior year - (Page 12, Column (3) current year x (Column (3) Line1/Column (4) Line 1)
(4) Column (2) + Column (3).
(5) Per tax records of the Company.
(6) Per tax records of the Company.
(7) Column (5) + Column (6).
(8) Column (4) - Column (7).
(9) Column (8) x taxrate of .39225.

Confidential

**Summary of Contract Termination Charges**
**New England Power Company (100%)**

**Return on Fixed Component**

| Line | Year End (1) | Balance of Fixed Component (2) | Deferred Taxes (3) | Net Balance (4) | Average Net Balance (5) | Subtotal Annual Return on Unamortized Balance (6) | Less: Return on Rate Clauses (7) | Plus: Return on Unamortized ITC (8) | Total Annual Return on Unamortized Balance (9) |
|---|---|---|---|---|---|---|---|---|---|
| | | Base Return | | | | | | | |
| 1 | 06/30/97 | $1,815 | $368 | $1,429 | $1,465 | $77 | (90.1) | 2.4 | 880 |
| 2 | 1997 | 1,786 | 365 | 1,361 | 1,522 | 148 | (0.2) | 4.6 | 150 |
| 3 | 1998 | 1,651 | 367 | 1,284 | 1,192 | 151 | (0.2) | 4.2 | 155 |
| 4 | 1999 | 1,451 | 320 | 1,121 | 1,043 | 115 | (0.2) | 3.6 | 119 |
| 5 | 2000 | 1,229 | 283 | 965 | 914 | 89 | (0.2) | 3.1 | 104 |
| 6 | 2001 | 1,082 | 229 | 883 | 853 | 79 | (0.1) | 2.8 | 92 |
| 7 | 2002 | 956 | 183 | 789 | 715 | 66 | (0.1) | 2.4 | 81 |
| 8 | 2003 | 819 | 151 | 688 | 616 | 57 | (0.1) | 2.0 | 70 |
| 9 | 2004 | 683 | 114 | 568 | 516 | 48 | (0.1) | 1.7 | 59 |
| 10 | 2005 | 548 | 78 | 466 | 418 | 35 | (0.1) | 1.3 | 47 |
| 11 | 2006 | 410 | 41 | 368 | 319 | 24 | (0.0) | 0.9 | 35 |
| 12 | 2007 | 273 | 4 | 269 | 219 | 13 | (0.0) | 0.6 | 25 |
| 13 | 2008 | 137 | (33) | 169 | 121 | | (0.0) | 0.2 | 13 |
| 14 | 2009 | (0) | (72) | 72 | | | | | |

**Column Notes:**

(2) See Page 13, Column (4).
(3) See Page 13, Column (3).
(4) Column (2) - Column (3).
(5) Column (4)(Prior Year + Column (4))/2.
(6) Column (5) x Total Pre-Valuation Rate of Return of 11.01% x Page 1, Column (3).
(7) Column (5) x Total Pre-Valuation Balance of Rate Clauses - Deferred Taxes on Rate Clauses) x 11.18% x Page 1, Column (3).
(8) Average of Unamortized Balance of ITC x 11.18% x Page 1, Column (3).
(9) Column (6) + Column (7) + Column (8).

| Return Component | Pre-Divestiture Year End 1995 | Post-Divestiture Year End 1995 |
|---|---|---|
| Capital Structure: | | |
| LTD - Taxable | 44.07% | 44.07% |
| Preferred | 3.56% | 3.56% |
| Common Equity | 52.37% | 52.37% |
| | 100.00% | 100.00% |
| Cost Rates: | | |
| LTD - Taxable | 8.23% | 8.23% |
| Preferred | 5.60% | 5.60% |
| Common Equity | 9.20% | 11.00% |
| Total Weighted Cost Rate | 7.77% | 8.71% |
| Reimbursement for Taxes on Equity Component | 3.24% | 3.85% |
| Total Rate of Return | 11.01% | 12.56% |

Schedule 1
Page 15 of 15

05/25/97

**Summary of Contract Termination Charges**

**New England Power Company (100%)**
**Variable Component**

$ in Millions

| Line (1) | Year End (1) | Nuclear Decommissioning and Other Post-Shutdown Costs (2) | Power Contracts Total Obligation (3) | Power Contracts Assumed Market Value (4) | Excess Over Market (5) | Future Power Contract Buyouts (6) | Credit for Unit Sales Contracts Total Revenue (7) | Credit for Unit Sales Contracts Assumed Market Value (8) | Credit for Unit Sales Contracts Excess Over Market (9) | Above Market Fuel Transportation Costs (10) | Transmission in Support of Remote Generating Units (11) | Payments in Lieu of Property Taxes (12) | Employee Severance and Retraining Costs (13) | Damages, Costs, or Net Recoveries from Claims (14) | PBR for Nuclear Units Remaining After Market Valuation (15) | Base Total Variable Component (16) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1997 | $24 | $166 | $69 | $117 | $0 | ($6) | ($4) | ($2) | $23 | $2 | $0 | $0 | $0 | $0 | $164 |
| 2 | 1998 | 46 | 370 | 142 | 229 | 0 | (15) | (9) | (6) | 44 | 3 | 0 | 0 | 0 | 0 | 316 |
| 3 | 1999 | 49 | 371 | 150 | 221 | 0 | (15) | (9) | (6) | 43 | 3 | 0 | 0 | 0 | 0 | 302 |
| 4 | 2000 | 34 | 375 | 153 | 222 | 0 | (16) | (9) | (6) | 43 | 3 | 0 | 0 | 0 | 0 | 296 |
| 5 | 2001 | 51 | 382 | 150 | 232 | 0 | (16) | (9) | (6) | 43 | 1 | 0 | 0 | 0 | 0 | 305 |
| 6 | 2002 | 50 | 381 | 163 | 218 | 0 | (10) | (5) | (5) | 43 | 0 | 0 | 0 | 0 | 0 | 307 |
| 7 | 2003 | 50 | 358 | 158 | 200 | 0 | (10) | (5) | (5) | 42 | 0 | 0 | 0 | 0 | 0 | 297 |
| 8 | 2004 | 61 | 359 | 157 | 202 | 0 | (10) | (5) | (5) | 41 | 0 | 0 | 0 | 0 | 0 | 295 |
| 9 | 2005 | 52 | 359 | 162 | 197 | 0 | (8) | (5) | (4) | 41 | 0 | 0 | 0 | 0 | 0 | 281 |
| 10 | 2006 | 53 | 355 | 158 | 197 | 0 | (8) | (5) | (4) | 35 | 0 | 0 | 0 | 0 | 0 | 282 |
| 11 | 2007 | 48 | 361 | 184 | 177 | 0 | (8) | (5) | (4) | 35 | 0 | 0 | 0 | 0 | 0 | 278 |
| 12 | 2008 | 46 | 374 | 172 | 202 | 0 | (8) | (5) | (4) | 33 | 0 | 0 | 0 | 0 | 0 | 274 |
| 13 | 2009 | 36 | 327 | 156 | 170 | 0 | (8) | (5) | (3) | 33 | 0 | 0 | 0 | 0 | 0 | 231 |
| 14 | 2010 | 39 | 294 | 146 | 149 | 0 | (8) | (5) | (3) | 33 | 0 | 0 | 0 | 0 | 0 | 218 |
| 15 | 2011 | 39 | 217 | 113 | 104 | 0 | (7) | (4) | (3) | 18 | 0 | 0 | 0 | 0 | 0 | 161 |
| 16 | 2012 | 33 | 122 | 38 | 84 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 133 |
| 17 | 2013 | 33 | 123 | 39 | 83 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 122 |
| 18 | 2014 | 33 | 123 | 39 | 83 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 127 |
| 19 | 2015 | 33 | 128 | 41 | 86 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 122 |
| 20 | 2016 | 36 | 99 | 32 | 68 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 104 |
| 21 | 2017 | 36 | 96 | 30 | 66 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 102 |
| 22 | 2018 | 36 | 54 | 15 | 39 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 75 |
| 23 | 2019 | 38 | 55 | 15 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 78 |
| 24 | 2020 | 38 | 13 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 |
| 25 | 2021 | 39 | 13 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 52 |
| 26 | 2022 | 39 | 14 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 |
| 27 | 2023 | 39 | 14 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 |
| 28 | 2024 | 41 | 14 | 0.2 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 55 |
| 29 | 2025 | 32 | 0.2 | 0.2 | 0.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 |
| 30 | 2026 | 26 | 0.2 | 0.2 | 0.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| 31 | 2027 | 26 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| 32 | 2028 | 26 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| 33 | 2029 | 26 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |

Column Notes:
(All Sources based upon estimates of Variable Costs)
(2) Page 6, Column (5) + Page 7, Column (7)) x Page 1, Column (3)
(3) See Page 8 x Page 1, Column (3).
(4) Column (3) - Column (4).
(5) Page 10, Column (5) x Page 1, Column (3).
(7) Column (7) - Column (8).
(9) Column (8) - Column (8).
(10) Page 11, Column (7) x Page 1, Column (3).
(16) Sum of Columns (2), (5), (6), (9), (10), (11), (12), (13), (14), and (15).

**Confidential**

NARR 61762

**Impact of Contract Termination Deferral
on Starting Balance of Sunk Commitments**

New England Power Company
($ Millions)

| Continuation of W-95(S) | 1997 | |
|---|---|---|
| | Annual | Monthly |
| Depreciation of Generating Plant | $95.3 | $7.9 |
| Amortization of Regulatory Assets | 50.4 | 4.2 |
| Total | $145.7 | $12.1 |
| **Amortization per CTC** | | |
| Total | $103.4 | $8.6 |
| Excess Amortization in W-95(S) | $42.3 | $3.5 |
| Cumulative Excess Amortization in W-95(S) | $42.3 | $3.5 |

| Continuation of W-95(S) | 1998 | |
|---|---|---|
| | Annual | Monthly |
| Depreciation of Generating Plant | $110.2 | $9.2 |
| Amortization of Regulatory Assets | 34.2 | 2.9 |
| Total | $144.5 | $12.0 |
| **Amortization per CTC** | | |
| Total | $140.4 | $11.7 |
| Excess Amortization in W-95(S) | $4.0 | $0.3 |
| Cumulative Excess Amortization in W-95(S) | $46.3 | $0.3 |

| Continuation of W-95(S) | 1999 | |
|---|---|---|
| | Annual | Monthly |
| Depreciation of Generating Plant | $111.4 | $9.3 |
| Amortization of Regulatory Assets | 34.2 | 2.9 |
| Total | $145.7 | $12.1 |
| **Amortization per CTC** | | |
| Total | $185.4 | $15.5 |
| Excess Amortization in W-95(S) | ($39.8) | ($3.3) |
| Cumulative Excess Amortization in W-95(S) | $6.5 | ($3.0) |

| Continuation of W-95(S) | 2000 | |
|---|---|---|
| | Annual | Monthly |
| Depreciation of Generating Plant | $112.6 | $9.4 |
| Amortization of Regulatory Assets | 34.2 | 2.9 |
| Total | $146.9 | $12.2 |
| **Amortization per CTC** | | |
| Total | $227.4 | $19.0 |
| Excess Amortization in W-95(S) | ($80.6) | ($6.7) |
| Cumulative Excess Amortization in W-95(S) | ($74.0) | ($9.7) |

05/28/97

**Confidential**

**NARR 61763**

Reconciliation Adjustment - Illustrative Calculation

The Narragansett Electric Company Share

New England Power Company Variable Cost Adjustments

NARR 61764

05/28/97

Schedule 2
Page 3 of 3

## The Narragansett Electric Company

### Reconciliation Account - Illustrative Calculation

**The Narragansett Electric Company Account**

| Year (1) | Reconciliation Adjustment (2) | Adjustment for Difference Between 9.2% ROE Pre-Divestiture and 11% ROE Post-Divestiture (3) | Adjustment for Difference Between Amortization per VP9(5) and Amortization per CTC (4) | Annual Shortfall/ (Excess) (5) | Annual Pre-Tax Return on Balance (6) | Collection of Prior Year Balance Including Interest (7) | End of Year Account Balance (8) |
|---|---|---|---|---|---|---|---|
| 1997 | $0 | $0 | $0 | $0 | $0 | NA | $0 |
| 1998 | 0 | 0 | 0 | 0 | 0 | NA | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 | NA | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 | NA | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Column Notes:

(2) - See Schedule 2, Page 1, Column (23) x-1.
(3) Sum Columns (2) through (4).
(6) Column (8) prior year x return pursuant to Section 1.1.2.
(7) Column (8) prior year x -1 + Column (6) current year.
(8) Prior year Column (8) + current year Sum Column (5) through (7).

**Confidential**

NARR 61765

**Reconciliation of FAS 106 and 87**
**Upon Divestiture**

$ in Millions

| | Actual After Date of Divestiture |
|---|---|

_**One-Time Adjustments Upon Divestiture:**_

**(1) Post Retirement Health Care Benefits-**
Unrecognized FAS 106 Gain or (Loss)

(a) Unrecognized Net Gain/(Loss) associated with FAS 106
    NEP x 95%   —
    NARR x 15%   =
    NEPSCO x 50%   =
    Total Unrecognized Net Gain/(Loss) allocated to NEP   —

(b) Generation Related Portion   84.10%
(c) Total Unrecognized Net Gain/(Loss) allocated to Generation   —

**(2) Pensions –**
Unrecognized FAS 87 Gain or (Loss) *

(d) Unrecognized Net Gain/(Loss) associated with FAS 87
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEP x 95%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NARR x 15%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEPSCO x 50%   =
    Total Unrecognized Net Gain/(Loss) allocated to NEP   —

(e) Less: Unrecognized Prior Service Costs associated with FAS 87
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEP x 95%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NARR x 15%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEPSCO x 50%   =
    Total Unrecognized Prior Service Costs allocated to NEP   —

(f) Less: FAS 87 Transition Liability
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEP x 95%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NARR x 15%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEPSCO x 50%   =
    Total FAS 87 Transition Liability allocated to NEP   —

(g) Plus: FAS 87 Transition Asset
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEP x 95%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NARR x 15%   —
    (NEES Union x __%) + (NEES Non-Union x __%) + (SERP x __%) = NEPSCO x 50%   =
    Total FAS 87 Transition Asset allocated to NEP   —

(h) Net Unrecognized Gain/(Loss) Associated with Pension   —
(i) Generation Related Portion   84.10%
(j) Net Unrecognized Gain/(Loss) allocated to Generation   —

\*  For the purpose of this reconciliation the unrecognized FAS 87 gains or losses shall be the amount of
the net unrecognized transition obligation, prior service cost, and unrecognized FAS 87 gains or losses
only to the extent that such gains or losses exceed five percent of the greater of plan assets or liabilities.

Row Notes:
(a) Per actual accounting and actuarial records.
(b) = Generation allocator based upon salaries and wages.
(c) = (a) x (b)
(d), (e), (f), (g) Per actual accounting and actuarial records.
    Specific Company balances for Union, Non-Union, and SERP plans will be allocated by multiplying the total
    NEES balance for these plans by the ratio of the Company liability to the total NEES liability, by plan.
(h) = (a) – (b) – (c) + (d)
(i) See (b) above.
(j) = (h) x (i)

**Confidential**

**NARR 61766**

**Reconciliation of NEEI Stranded Costs
Upon Sale of NEEI Assets**

$ in Millions

| | 6/30/97 Estimate (A) | Actual (B) | Delta = NEEI Reconciliation (C) |
|---|---|---|---|
| **Regulatory Asset Calculation:** | | *To Be Determined Upon Sale* | |
| | | | |
| **(1) Market Value (After-Tax)** | | | |
| Pre-Divestiture:  Cost Center Ceiling | | | |
| Present Value of Reserves | $57.0 | | |
| Income Tax Adjustment | (4.2) | | |
| Cost Center Ceiling withTax Adj. | 52.7 | $0.0 | |
| or | | | |
| Post Divestiture: Actual Net Proceeds | | | |
| Actual Market Value Realized, after-tax | 0.0 | 52.7 | |
| | | | |
| Equals Market Value | 52.7 | 52.7 | $0.0 |
| | | | |
| **(2) Book Basis** | | | |
| Unamortized Balance | 181.8 | 181.8 | 0.0 |
| Less: Related Deferred Tax | 51.7 | 51.7 | 0.0 |
| Net Book Basis | 130.1 | 130.1 | 0.0 |
| | | | |
| **(3) Write-Off** | | | |
| Net of Taxes | 77.4 | 77.4 | 0.0 |
| Tax Adjustment | 48.5 | 48.5 | 0.0 |
| Write-Off Including Taxes | 125.9 | 125.9 | 0.0 |
| | | | |
| **(4) Estimated Unrecovered 1997 Loss** | 31.9 | 31.9 | 0.0 |
| | | | |
| **(5) Total Revenue Requirement** | $157.7 | $157.7 | $0.0 |

Row Notes:
(1) For estimated market value, use cost center ceiling test , after-tax.
     For actual market value, use actual after-tax proceeds.
(2) For estimate use 12/31/97 balances.  Update to actual upon sale.
(3) ((Row (1) - Row (2)) x -1)/(1-.39225)
(4) For estimate use 1997 estimated loss.  Update to actual upon sale.
(5) Row (3) + Row (4).

Column Notes:
(A) Estimated 12/31/97 balance.
(B) Actual components at time of sale of assets.  For illustrative purposes, actuals
     assumed to equal estimates.
(C) Column (A) - Column (B) = NEEI Reconciliation

Confidential

**Power Contract Buyout Incentive**
**Associated with Divestiture**

$ in Millions

| | | | *Illustrative Example Only* |
|---|---|---|---|
| | **Divestiture Transaction:** | | |
| (1) | Total NEP Proceeds from Divestiture | $0 | $1,100 |
| | **NEP Power Contracts Assumptions:** | | |
| (2) | Annual Buyout Payments | 0 | 144 |
| (3) | NPV of Annual Buyout Payments | 0 | 795 |
| (4) | Net Proceeds Realized for Assets | 0 | 305 |
| (5) | Proceeds Necessary to Realize 125% Net Book Value | 0 | 1,370 |
| (6) | Net Value Attributable to Power Contracts | 0 | (1,065) |
| (7) | NPV of Above-Market Power Contracts in CTC | 0 | (1,415) |
| (8) | Total Power Contracts Savings | 0 | (349) |
| (9) | 10% Buyout Incentive | 0.0 | 34.9 |
| (10) | Narragansett Share | 22.4% | 22.4% |
| (11) | Narragansett Share of Incentive | $0.0 | $7.8 |

Line Notes:

(1) Actual sale proceeds realized through divestiture.
(2) Actual annual power contract buyout payments.
(3) NPV, at the time of divestiture, of Line (2) for stipulated term of buyout payments using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined under Section 1.1.4 (e). For this example, the discount rate used equals the pre-tax return of 12.56% pursuant to Section 1.1.2.
(4) Line (1) - Line (3).
(5) Actual net book value of fossil and hydro units upon divestiture x 125%.
(6) Line (5) - Line (4).
(7) NPV, at the time of divestiture, of Schedule 1, Page 15, Column (5), remaining years only, using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined under Section 1.1.4 (e) and the market prices shown in Page 4 of this Schedule, even if actual market prices are different. For this example, the discount rate used equals the pre-tax return of 12.56% pursuant to Section 1.1.2.
(8) Line (7) - Line (6).
(9) Line (8) x -1 x 10%
(10) The Narragansett Electric Company's share of NEP stranded costs.
(11) Line (9) x Line (10).

Confidential

### Power Contract Buyout Incentive
**Associated with Divestiture**

**$ in Millions**

**Market Price Assumptions** *

cents/kwh

| Year | cents/kwh |
|------|-----------|
| 1997 | 2.24 |
| 1998 | 2.34 |
| 1999 | 2.46 |
| 2000 | 2.46 |
| 2001 | 2.60 |
| 2002 | 2.88 |
| 2003 | 2.97 |
| 2004 | 3.07 |
| 2005 | 3.16 |
| 2006 | 3.26 |
| 2007 | 3.36 |
| 2008 | 3.48 |
| 2009 | 3.59 |
| 2010 | 3.70 |
| 2011 | 3.82 |
| 2012 | 3.93 |
| 2013 | 4.05 |
| 2014 | 4.16 |
| 2015 | 4.28 |
| 2016 | 4.39 |
| 2017 | 4.51 |
| 2018 | 4.62 |
| 2019 | 4.74 |
| 2020 | 4.85 |
| 2021 | 4.97 |
| 2022 | 5.09 |
| 2023 | 5.20 |
| 2024 | 5.32 |
| 2025 | 5.43 |
| 2026 | 5.55 |
| 2027 | 5.67 |
| 2028 | 5.79 |
| 2029 | 5.90 |

* Note:   Market Price Assumptions are fixed for purposes of the calculation of
the Power Contract Buyout Incentive.  With respect to the Hydro-Quebec
contract, the market values assumed for 1997, 1998, 1999 and 2000 are
also fixed at $7 M, $8 M, $10 M and $12 M per year, respectively, for
purposes of the calculation of the Power Contract Buyout Incentive.

**Confidential**

## NEPCo - 1996 CWIP SPENDING
## FOR THERMAL and HYDRO PRODUCTION

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 12260 | Vernon | Vernon SPCC-Oil/Water Separator | 144,952.66 | United States Environmental Protection Agency Regulations 40 CFR 109 and 112 require the prevention of potential spills from reaching waterways. |
| 12354 | BP | BP 3 Turbine Water Induction | 165,451.51 | The installation of motor operators on the Braylon Point Unit 3 extraction line block valves was recommended as part of the overall turbine water induction protection program. The installation of the motor operators will further enhance the systems already in place which protect against turbine water induction. |
| 12413 | BP | BP Continuous Emissions Monitors | 230,481.39 | As mandated by the 1990 Clean Air Act Amendment, these units must be equipped with continuous emission monitoring systems in order to operate beyond December 31, 1994 |
| 12460 | BP | BP 3 Low NOx Burners | 1,022,227.55 | The 1990 Clean Air Act Amendment requires that Braylon Point Unit 3 be in compliance with NOx emissions regulations by May 31, 1995 |
| 12476 | BP | BP Equipment Retirement and Removal -1994 | 199,794.20 | To create space for future projects, to eliminate operation and maintenance and to prevent equipment from becoming a safety hazard |

Confidential

**NEPCo - 1996 CWIP SPENDING
FOR THERMAL and HYDRO PRODUCTION**

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 12661 | BP | BP 1 & 2 Control Replacements | 153,467.96 | The existing control systems have reached the end of their useful lives, and are now causing decreased unit availability, increased maintenance costs, and degradation of unit efficiency |
| 12726 | BP | BP Fire Protection/City Water | 175,618.47 | To upgrade the level of fire protection at Brayton Point Station in areas considered essential for power production and personnel safety. This project is part of the overall Thermal Stations Fire Protection improvement program which has been reviewed and received concurrence from both management and our insurance carrier |
| 12792 | SH | SH Equipment Removal/Retirement | 550,119.85 | The amount of previously retired and abandoned equipment has increased at Salem Harbor over the past years due to many improvements at the station. This equipment has been and will continue to deteriorate posing potential hazards while diminishing the overall appearance of the plant. Abandoned equipment affects normal station operations by impeding the plant operators who must work around this equipment and it unnecessarily adds to the complexity of plant systems |

Confidential

NEPCo - 1996 CWIP SPENDING
FOR THERMAL and HYDRO PRODUCTION

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 14741 | BP | BP 3 Old Precipitator Rebuild | 167,152.40 | The existing precipitator internals have been inspected and have been determined to be irreparable. With New England Power's intention to burn low sulfur coal to comply with Massachusetts Acid Rain Law, proper operation of precipitator internals will be necessary to ensure compliance with particulate emissions standards. |
| 15163 | BP | Ash Separation Handling | 1,462,516.88 | The ash separation and handling facility will allow processing flyash from the coal fired units. Flyash coming from the Unit 1-3 precipitators will be processed to remove a portion of the unburned carbon from the coal flyash. The processed ash product will be sold as cement additive. |
| 15200 | BP | BP Coal Conveyors | 187,208.27 | Use of compliance coal will overload the existing coal conveyor drives due to the increased coal volumes required. Replacement and upgrade of the coal conveyor motor control center and cable replacement for new coal conveyor drive systems (separate project.) |

Confidential

NARR 61772

NEPCo - 1996 CWIP SPENDING
FOR THERMAL and HYDRO PRODUCTION

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 15284 | BP | Bulldozer Maintenance Garage | 123,345.82 | Currently all bulldozer maintenance activities are required to be performed out of doors throughout the entire year either on the coal pile or on the coal pile runoff roadway. These activities include all oil changes, transmission PM's and blade maintenance. As the station uses 5 machines, these activities occur weekly and involve handling over 100 gallons of oil each time. By providing a building all these activities will occur in an enclosed environment, minimizing the potential for an oil release. In addition, the plant will be capable of performing maintenance work that requires the entire machine be sent offsite. |
| 15335 | BP | BP Cell 9 Removal | 331,719.05 | Massachusetts Department of Environmental Protection (MDEP) Permit requires installation of an approved closure cap |
| 15512 | Vernon | Vernon 9 & 10 Governor Replacement | 231,737.60 | This work is being performed as part of the Hydro Automation Program. The Vernon #9 and #10 governors are at the end of their useful service life. It is necessary to replace the governors now before the full station automation occurs, scheduled for late 1996 |
| 15552 | BP | BP Turbine Lube Oil Piping | 116,154.04 | The piping between the turbine lube oil storage tanks and the Unit 1,2,3 & 4 lube oil tanks is corroded and is no longer serviceable. |

**Confidential**

**NARR 61773**

## NEPCo - 1996 CWIP SPENDING
## FOR THERMAL and HYDRO PRODUCTION

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 15625 | Bellows | Bellows Rack Rake Replacement | 176,595.78 | The rack rake has reached the end of its' useful life with costly repairs in terms of repair hours and outside vendor expense. |
| 15875 | Wilder | Wilder Automation Project | 1,452,488.60 | The Wilder Automation Project is part of the overall Hydro Automation Program. The program will allow for a reduction in staffing and optimization of river operation. |
| 16090 | Hydro-Various | River Decision Support System | 372,855.69 | The River Decision Support System is part of the Hydro Automation Program. The system will improve efficiencies in dispatching reservoirs and power stations. The system will be used as a managing tool by river operations and also by the Relicensing Team for study purposes |
| 16310 | BP | BP Floor Drain Oil Water Separator | 217,359.52 | Installing an oil water separator will remove potential oil contamination prior to entering the Waste Water Treatment System. |

Confidential

## NEPCo - 1996 CWIP SPENDING
## FOR THERMAL and HYDRO PRODUCTION

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 16452 | BP | BP Process Drains Relocation | 157,399.09 | The Unit 1,2 & 3 turbine oil tanks currently vent lube oil mist onto the turbine hall roof. The lube oil mist that collects on the roof discharges with storm water into the condenser seal pits and into Mount Hope Bay. Installing a mist elimination on each unit will prevent lube oil mist from collecting on the turbine hall roof. The Unit 1,2 & 3 circulating water pump house and Unit 4 screen well pump house floor drain sump pumps have the potential for discharging oil directly into the Taunton River. Installing a skimmer device will solve the problem of removing a potential oil or grease discharge prior to discharging into the Taunton River or Unit 4 intake canal |
| 16717 | BP | Rough Terrain Crane | 120,136.08 | A crane is required for station maintenance. A variety of options were explored and the least cost option selected. This option has a 2-1/2 year break-even point as compared to the existing rental agreement. |
| 16974 | Gloucester | Gloucester Diesel Fire Detection | 102,113.73 | Install a new fire detection system within the diesel enclosures to permit monitoring for potential fire conditions. This work was conducted to enhance safety and reduce possible losses as requested and agreed to with Arkwright Insurance |

Confidential

## NEPCo - 1996 CWIP SPENDING
## FOR THERMAL and HYDRO PRODUCTION

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 15832 | Vernon | Vernon Trash Boom Replacement | 180,557.66 | Existing trash booms at Vernon are deteriorating to the condition that replacement is required |
| 12414 | SH | SH Continuous Emissions Monitors | 138,180.24 | As mandated by the 1990 Clean Air Act Amendment, these units must be equipped with continuous emission monitoring systems in order to operate beyond December 31 1995 |
| 12454 | SH | SH 4 Combustion Controls | 491,628.32 | The existing 1960s vintage combustion controls cannot maintain combustion conditions necessary to limit NOx and CO emissions as required by the Clean Air Act. The present controls cannot be modified due to a lack of component availability Future manufacturer support for the existing control system will not be available |
| 15691 | SH | SH Recycled Water System | 100,880.32 | The new pump and piping will allow waste water effluent to be reused for boiler washing, stack washing, bottom ash system makeup, fly ash system makeup, coal pile dust suppression, and general cleaning. The current arrangement does not have the flow requirements to allow for constant recycling of effluent, resulting in city water being used in its place  The new system will mkae recycling convenient and dependable, which will greatly reduce the cost of city water |

Confidential

NARR 61776

NEPCo - 1996 CWIP SPENDING
FOR THERMAL and HYDRO PRODUCTION

| Project # | Station | Project Title | 1996 Costs Capital & Removal | Spending Purpose |
|---|---|---|---|---|
| 16000 | Vernon | Vernon Transformers Replacement | 256,777.50 | Two of the 2.4/69kV transformers are 1909 vintage, water-cooled units beyond their life expectancy. Transformation from 2.4 to 13.8kV will eliminate 150 degree phase difference between the two 2.4kV buses, removing a potential source of costly operating errors and equipment damage The full output of the station will go through the two new 13.8/69kV transformers in the outdoor switch-yard. |

**Confidential**

NARR 61777

**Detail of
Early Retirement,
<u>Employee Severance and Retraining Costs</u>
Resulting From Divestiture \***

$ in Millions

<u>Assumptions:</u>
7.25% Discount rate, Updated Eligibility, Lump Sum Feature, Updated Acceptance Profile

| <u>Accounting Cost:</u> | 5 & 5 plus $750 | | |
|---|---|---|---|
| | <u>Non Union</u> | <u>Union</u> | <u>Total</u> |
| **Early Retirement** | | | |
| <u>Additional Benefits</u> | | | |
| Pension | $25.1 | $27.0 | $52.1 |
| Health | | 6.5 | 6.5 |
| | | | |
| <u>Curtailment effects</u> | | | |
| Pension | 0.2 | 0.3 | 0.5 |
| Health | <u>5.7</u> | <u>6.5</u> | <u>12.2</u> |
| **Subtotal Early Retirement** | 31.0 | 40.3 | 71.3 |
| | | | |
| **<u>Terminations & Employee retraining</u>** | | | |
| Payments | 7.0 | 2.0 | 9.0 |
| | | | |
| <u>Curtailment effects</u> | | | |
| Pension | (3.6) | | (3.6) |
| Health | <u>15.0</u> | | 15.0 |
| **Subtotal Terminations & Retraining** | 18.4 | 2.0 | 20.4 |
| | | | |
| **Total Program Costs** | <u>49.4</u> | <u>42.3</u> | 91.7 |
| | | | |
| Less Estimated amount included in Contract Termination | | | |
| Charge already (both early retirement & severance) | | | <u>(6.0)</u> |
| | | | |
| **Net Program Costs** | | | **$85.7** |
| | | | |
| <u>Position Reductions:</u> | | | |
| # of employees eligible | 295 | 583 | 878 |
| # of employees accepting | 187 | 432 | 619 |
| | | | |
| # of employees to be severed | <u>200</u> | <u>100</u> | <u>300</u> |
| Total Reductions | 387 | 532 | 919 |

\* Costs include those of New England Power Company, Massachusetts Electric Company,
The Narragansett Electric Company, and New England Power Service Company.
Reductions include positions in the generation, transmission, and distribution businesses.

**Confidential**                                                    **NARR 61778**

Attachment 2

Confidential

NARR 61779

**Agreement to Credit Tariff 1 Fuel Clause with Revenues Representing the**
**Fixed Cost Contribution from Departing Customers**

To ensure that Tariff No. 1 customers are held harmless from contract termination of any Tariff No. 1 customer, and to recognize the changing nature of NEP's sales due to the restructuring proposals contained in the Mass. Electric settlement, NEP agrees to credit the Fuel and Purchased Economic Power Adjustment Clause ("Fuel Clause") monthly, with the pro rata share that any departing customer would have contributed to the Fixed Costs included in the fuel clause. The Pro Rata share will be defined as the 1991-1995 base revenue contribution of any departing customers(s) taken as a percentage of NEP's total base revenues during that period.

Fixed Costs are defined to include:

1) NEEI Payments;
2) Pipeline Demand Charges net of any mitigation (including OSP pipeline charges);
3) Fixed Costs associated with purchases from alternate energy suppliers specified on Page 2 of this Attachment;
4) Fixed coal transportation charges;
5) DOE Decontamination and Decommissioning costs; and
6) Final Nuclear Fuel Core Amortization for Millstone and Seabrook.

Confidential

The definition of Fixed Costs included in NEP's Fuel Clause shall include the fixed costs associated with purchases from the following alternate energy suppliers:

Altresco Pittsfield
Pawtucket Power
NELP Johnston Landfill
Ogden Haverhill Landfill
RESCO Saugus
RESCO North Andover
Refuse Fuel Associates - Lawrence
Turnkey (Rochester) NH
Wheelabrator Millbury
Barre Landfill
Four Hills (Nashua) Landfill
Lawrence Hydro
Mascoma Hydro
MWRA - Cosgrove Wachusett Hydro
Pontook Hydro
Clark University

**Confidential**

Attachment 3

NARR 61782

Service Agreement For

Network Integration Transmission Service

1.0     This Service Agreement (Agreement), dated as of February 1, 1997, is entered into, by and between New England Power Company (the "Transmission Provider"), and The Narragansett Electric Company ("Transmission Customer") for the purpose of implementing wholesale competition or retail access for the Transmission Customer's retail customers pursuant to the Rhode Island Utility Restructuring Act of 1996 (URA).

2.0     The Transmission Customer has been determined by the Transmission Provider to have a valid request for Firm Transmission Service under the Transmission Provider's Open Access Transmission Tariff ("Tariff").

3.0     Service under this Agreement shall be provided in accordance with the Retail Access Schedule, which together with other capitalized terms in this paragraph are defined in the Stipulation and Agreement filed with the Commission in Docket ER97-680-000. For the period from July 1, 1997 through the Contract Termination Date, service under this agreement shall only apply to kilowatthours delivered, but not sold, by the Transmission Customer in the Transmission Customer's Service Area. After the Contract Termination Date, service under this agreement shall apply to all kilowatthours delivered in the Transmission Customer's Service Area. Service under this Agreement shall not be terminated before the date that the Contract Termination Charges set forth in the Stipulation and Agreement and the Amendment to the Service Agreement between the Transmission Customer and the Transmission Provider under the Transmission Provider's FERC Electric Tariff, Original Volume No. 1 (Amendment) are fully recovered from the Transmission Customer. Following that date service under this Agreement shall continue until modified or terminated upon the written consent of both parties or upon five years advance written notice by either party to the other.

4.0     The Transmission Provider agrees to provide and the Transmission Customer agrees to take and pay for Network Integration Transmission Service in accordance with the provisions of the Tariff, this Service Agreement and Exhibit 1 to this Service Agreement. In the event that Transmission Customer is denied recovery in its rates for local distribution service of access charges sufficient to collect the full amount of the Contract Termination Charges billed to Transmission Customer, its successors or assigns, by Transmission Provider, its successors or assigns, Transmission Provider, its successor or assigns, providing service over the transmission facilities covered by this Agreement shall collect the unrecovered balance of the Contract Termination Charges as a surcharge under this Agreement to the Transmission Customer or to any consumer taking delivery of electric energy over the transmission or distribution facilities of the Transmission Customer.

5.0     Any notice or request made to or by either Party regarding this Service Agreement shall be made to the representative of the other Party as indicated below.

**Confidential**

**NARR 61783**

Transmission Provider:

New England Power Company
Attention: Director, Transmission Marketing
25 Research Drive
Westborough, MA 01582

Transmission Customer:

The Narragansett Electric Company
25 Research Drive
Westborough, MA 01582

6.0    The Tariff, as amended, changed, modified or superseded by filings with the Federal
       Energy Regulatory Commission, is incorporated herein and made a part hereof.

7.0    The obligations under this Agreement may be assigned only with the express written
       consent of the other party, which consent shall not be unreasonably withheld, provided,
       however, that the Transmission Provider shall not be obligated to consent to any
       assignment that adversely affects the ability of Transmission Provider to recover from the
       Transmission Customer the payments required to be made under the Tariff, this Service
       Agreement, including any Contract Termination Charges that may be billed to
       Transmission Customer pursuant to Section 4.0 above, and Exhibit 1 to this Service
       Agreement.

IN WITNESS WHEREOF, the Parties have caused this Service Agreement to be executed by
their respective authorized officials.

Transmission Provider:

By: _Arnold H. Turner_____    _Vice President_____    _May 29, 1997_____
    Name Arnold H. Turner      Title                  Date


Transmission Customer:

By: _Robert L. McCabe_____    _President_____    _May 29, 1997_____
    Name Robert L. McCabe      Title              Date


C:\DOCITGR\97-440\ATT23A.WPD

**Confidential**                                                    **NARR 61784**

**Exhibit 1**
**Specifications for Network Integration Transmission Service**

1.    Term of Service: _____

    Start Date: Effective date of the Service Agreement.

    Termination Date: As specified in the Service Agreement.

2.    List of Network Resources and Point(s) of Receipt.

    To be supplied by the Customer upon effectiveness of this Service Agreement.

3.    a)    List of Point(s) of Delivery including and identifying Remote Delivery Point(s).

        See Attachment 1

    b)    List of Metering Point(s) when they differ from Point(s) of Delivery.

        To be provided.

4.    List of non-Network Resource(s), to the extent known today.

    To be supplied by the customer upon effectiveness of this Service Agreement.

5.    Ancillary Services Requested or Proof of Satisfactory Arrangements for Ancillary Services.

    To be supplied by the customer upon effectiveness of this Service Agreement.

6.    Identity of Designated Agent: See Attachment No. 2.

    a)    Authority of Designated Agent

    b)    Term of Designated Agent's authority

    c)    Division of responsibilities and obligations between Transmission Customer and Designated Agent

7.    Other specified provisions:

    A.    Billing will include any applicable charges in accordance with the rates, terms, and conditions of the Tariff.

    B.    The Transmission Provider has agreed to terminate those requirements of its FERC Electric Tariff, Original Volume No. 1 ("Tariff No. 1") that obligate the

C:\DOCSTORE\97-58\ATTBA.WPD

**Confidential**

Transmission Customer to buy all of its electricity requirements under Tariff No. 1 and Transmission customer has agreed to pay contract termination charges pursuant to the Stipulation and Agreement of even date and the Amendment. Service under this Agreement is conditioned on the Commission's approval of the Stipulation and Agreement and the Amendment filed on May 30, 1997.

C.    In no event shall the Transmission Provider bypass the Transmission Customer's distribution facilities and interconnect directly with a retail customer.

C:\DOCITGR\97-668\ATTI2A.CLN

Confidential

NARR 61786

Attachment 1

Points of Delivery

Admiral Street Substation
Bristol Substation
Clarkson Street Substation
Davisville Substation
Drumrock Substation
Farnum Pike Substation
Franklin Square Substation
Johnston Substation
Kent County Substation
Kenyon Substation
Lincoln Ave. Substation
Mink Street Substation
Old Baptist Road Substation
Phillipsdale Substation, Transformer #1 (Remote)*
Phillipsdale Substation, Transformer #2 *
Pontiac Substation
Sockanosset Substation
South Street Station
Tiverton Substation (Remote)
Wampanoag Substation
Warren Substation
West Cranston Substation
West Kingston Substation
Wolf Hill Substation
Wood River Substation

* Phillipsdale Substation is served off both the Company's transmission system and EUA's transmission system.

C:\DOC\NGRI97-480ATT23A.WPD

Attachment 2

**The Narragansett Electric Company**

1.    Identity of Designated Company

The Designated Agents may be either the suppliers to the Transmission Customer's retail customers provided that the suppliers are members of the New England Power Pool (NEPOOL) or the NEPOOL members with whom the supplier's have contracted to provide such supplies.  The identity of the Designated Agents may be modified to reflect changes in NEPOOL rules.

2.    Authority of the Designated Agent

The Transmission Customer assigns its rights under the Tariff to the Designated Agent(s) as follows: A Designated Agent(s) shall have full authority to designate network resources, delete network resources, and purchase resources other than network resources for delivery to that portion of the Network Load that is assigned to that Designated Agent.  A Designated Agent will be assigned all the Transmission Customer's firm allocated limited interface rights in proportion to its assigned ratio of Network Load, including the authority to schedule transactions over these limited interfaces.  A Designated Agent will also have the authority to integrate its assigned portion of the Transmission Customer's load and associated resources with the loads and resources of other transmission customers who have similarly designated rights to the same agent, for all NEPOOL purposes.

3.    Term of Designated Agent's Authority

The Transmission Customer may name another Designated Agent for purposes of this Tariff, to the extent that a portion of the Network Load changes suppliers.

4.    Division of responsibilities and obligations between Transmission Customer and Designated Agent

The Transmission Customer is responsible for payment, operating its distribution system and maintaining proper load power factors in accordance with the Tariff, and any other obligations relating to the Transmission Customer's physical distribution system or its interconnections with the Transmission Provider's transmission system, or other transmission systems.

The Designated Agent is responsible for designating network resources, delivering network resources to the Transmission Provider's Transmission System, scheduling purchases from non-network resources, arranging for required redispatch of network resources, and supplying ancillary services, for the portion of the Transmission Customer's load that it has been assigned.

C:\DOCS\TGRA97-490\ATT2EA.WPD

**Tab 5**

**(5 of 6)**

Attachment 4

Confidential

NARR 61789

# Evaluation of FERC's Seven Factor Test

Confidential

NARR 61790

## Table of Contents

I.    Federal and State Jurisdictional Requirements per FERC Order 888

II.   Summary of NEES System Structure

III.  Description of the NEES Retail Companies' Distribution Systems

IV.   Application of Seven Factors

V.    Description of the NEES Transmission System

VI.   Conclusion

VII.  Attachments

**Confidential**

NARR 61791

**I.  Overview of Federal and State Jurisdictional Requirements per FERC Order 888**

In its Order 888, the Federal Energy Regulatory Commission ("FERC") addressed the issue of Federal and State jurisdiction over retail transmission by defining what constitutes local distribution.   The Commission exercised exclusive jurisdiction over unbundled transmission in interstate commerce used by public utilities for retail wheeling up to the point of local distribution.[1] To determine the jurisdictional line for retail access purposes, FERC proposed a seven factor test of local distribution. This test of functional and technical characteristics of facilities would define local distribution facilities and thus would demarcate the line between federal and state jurisdiction.   (See FERC Stats & Regs. ¶ 31,036, pp. 31,770-85).  The seven factors are as follows:


(1)     Local distribution facilities are normally in close proximity to retail customers.

(2)     Local distribution facilities are primarily radial in character.

(3)     Power flows into local distribution systems; it rarely, if ever, flows out.

(4)     When power enters a local distribution system, it is not recognized or transported on to some other market.

(5)     Power entering a local distribution system is consumed in a comparatively restricted geographical area.

(6)     Meters are based at the transmission/local distribution interface to measure flows into

---

[1] In addition, the Commission exercised exclusive jurisdiction over all facilities, whether transmission or distribution, used for wholesale wheeling.

the local distribution.

(7)     Local distribution systems will be reduced voltage.

Under Order 888, FERC will defer jurisdiction over local distribution facilities to state commissions if the state commissions apply the seven criteria set forth in Order 888. Accordingly, this report is prepared for use by the Rhode Island Public Utilities Commission, as well as FERC, when evaluating the jurisdictional separation between transmission and distribution facilities in Rhode Island. In addition, the NEES Companies have prepared a similar report for use by other state commissions in Massachusetts and New Hampshire. A consistent separation for each state will prevent gaps or overlaps in rate making and will protect against cross subsidies among customers that could otherwise occur if the states adopted different dividing lines between transmission and distribution plant. This report is consistent with the report that has been filed in Massachusetts and accepted by the Massachusetts Attorney General and other parties to Massachusetts Electric's proposed restructuring settlement agreement.

## II. Summary of NEES System Structure

The NEES System has a unique structure. Most utilities are vertically integrated, and a single corporate entity owns the utility's generation, transmission, and distribution assets. However, the NEES system is organized differently along functional lines. New England Power Company (NEP), a separate subsidiary of the NEES system, owns or operates through an integrated facilities

Confidential

agreement, all of the system's generation and transmission assets and has contracted for all of the system's power purchases and transmission support obligations.[2]  Although Narragansett owns the transmission facilities in Rhode Island, they are operated by NEP under a generation and transmission agreement ("G&T Agreement") that is subject to FERC's jurisdiction. The NEES retail companies, Massachusetts Electric, Granite State Electric, and Narragansett Electric obtain the power supplies they need to serve the retail customers in their service territories, as well as the transmission service to deliver that generation to their distribution system, through NEP under NEP's FERC Electric Tariff, Original Volume Number 1 (Tariff 1).  The NEES retail companies separately own all of the distribution facilities needed to serve retail customers in their individual service territory.[3]

Thus, within NEES, transmission and distribution are generally operated by separate corporations. Outside of Rhode Island, transmission is separately owned by NEP. As stated above, in those instances where ownership is not separated, control and ratemaking authority over assets have been established through a FERC-jurisdictional integrated G&T Agreement between NEP and the distribution companies under Tariff 1. This G&T Agreement has been particularly significant for Narragansett Electric which owns all of the transmission assets and some generation assets in Rhode Island. In addition, the G&T Agreement has played a much smaller role for Massachusetts Electric

---

[2] This is true with the exception of certain Qualifying Facilities (QF's) with capacity less than 1 megawatt, the output of which are purchased directly by the NEES retail companies under PURPA guidelines in each of the respective states in which the NEES retail companies operate. There also are some small, limited borderline sales agreements between Narragansett and EUA affiliates to serve isolated customers.

[3] NEP owns a very limited number of distribution facilities in Massachusetts Electric's service area. These lines are supported by Mass. Electric under its integrated facilities agreement with NEP.

which owns a relatively small number of transmission assets in Massachusetts and for NEP which owns a very small portion of the distribution assets in Massachusetts. In all of these instances, the generation and transmission assets are controlled and operated by NEP, and the distribution assets are controlled and operated by Massachusetts Electric Company pursuant to the integrated facilities G&T Agreement between NEP and each of the retail affiliates. Narragansett and Massachusetts Electric receive credits against their purchased power bills from NEP to compensate them for the costs of their transmission and generation facilities. Likewise, NEP receives compensation through the integrated facilities agreement from Massachusetts Electric for its use of the NEP owned distribution facilities.

Under the disaggregated structure of the NEES system, the costs of NEP's wholesale power supply and transmission investments and commitments are reflected in NEP's rates. NEP's rates also typically recover the costs associated with distribution facilities used for wholesale services. When NEP uses specific distribution facilities over which wholesale services occur to municipal customers or generators selling at wholesale, NEP compensates the retail affiliate under the integrated facilities contract for the use of those distribution facilities. As part of the G&T Agreement, these facilities also are under FERC jurisdiction. Thus, the rate recovery of investments and commitments for all wholesale wheeling are determined by FERC. In contrast, state commissions address directly the distribution costs and other costs associated directly with retail service.

### III.  Description of the NEES Retail Companies' Distribution Systems

The local distribution systems of the NEES Retail Companies are typically 5, 15, 25 or 35 kV

voltage class systems.  These systems are primarily radial in nature, serving retail load in the vicinity

of the local distribution facilities.  The local distribution systems are typically supplied from the 115

or 69 kV transmission system through one or more step-down transformers owned or controlled by

NEP.  Metering that measures the total kilowatt hours flowing into each local distribution area of the

NEES retail companies is at the transmission/distribution interface, typically on the low voltage side

of the step-down transformers.

Attachment 1 shows two types of common distribution systems for the NEES retail

companies.  Both are served from a transmission line, typically 69 kV or higher, through one or more

step-down transformers.  Type I distribution systems usually are comprised of 5, 15 or 35 kV voltage

class feeders which serve retail customers directly through their service transformers.  Several

distribution feeders could emanate radially from each distribution substation.  Type II distribution

systems are generally 15, 25 or 35 kV voltage class distribution systems which serve some customers

directly through the customer's service transformer and serve other customers through step-down

transformers to a Type I distribution system which has 5 or 15 kV voltage class distribution feeders.

Both Type I and II distribution systems are primarily radial in nature.  Although power may

be supplied from more than one transmission/distribution interface, power flow is always into the

geographic area served by the distribution facilities.  Distribution facilities are not used to transmit

bulk power from one geographic area to another;  the power is consumed within the distribution

**Confidential**

service area.[4] The distribution circuit often terminates at an open switch to tie with an adjacent circuit for reliability and maintenance purposes; opening or closing tie points on the distribution system has no affect on the integrity or reliability of the bulk transmission system. Switching of distribution tie points may be manual or automatic and is done to restore service to customers in the event of an outage or to perform maintenance on equipment.

Attachment 2 is a list of Narragansett's transmission/distribution supply points. This attachment identifies each supply point by name, delivery pressure kV, and the type of distribution system supplied from that location.

## IV. Application of the Seven Factors

The Narragansett distribution system is analyzed below, applying the seven factors identified by FERC:

### (1) *Local distribution facilities are normally in close proximity to retail customers.*

Narragansett's distribution facilities are in close proximity to retail customers, as these are the circuits that emanate from local distribution substations and serve customers in a limited geographical area. These circuits typically are installed along public roads and private rights-of-way and serve adjacent customers.

---

[4] One minor exception relates to certain small, limited borderline sales agreements with EUA affiliates to serve islated customers.

Attachment 3 shows an example of a Type I distribution system which has four distribution feeders, 68F1, 68F2, 68F3 and 68F4, which serve customers in the towns of Charlestown, Richmond, South Kingstown, and Westerly. These four distribution feeders are tied to adjacent feeders 86F1, 41F1, 30F1, 59F3 and 59F1 via open switches. Type II distribution systems generally cover a larger area than Type I distribution systems, but are still local in nature. Attachment 4, page 1 of 2, shows an example of a Type II distribution system made up of the 85T1, 85T2 and 85T3 lines out of Wood River Substation. This distribution system serves customers either directly or via Type I distribution systems in the towns of Hopkinton, Richmond, Westerly, and Charlestown as shown in Attachment 4, page 2 of 2.

(2)  *Local distribution facilities are primarily radial in character.*

The distribution facilities of Narragansett are primarily radial in character, and serve a limited area from one or more transmission supply points. These facilities typically benefit the local area, and do not affect the operation or integrity of the transmission system other than as local load delivery points.

Type I distribution circuits are always radial, but may have normally open ties with similar circuits. Attachment 5 shows four radial distribution circuits, designated 68F1, 68F2, 68F3 and 68F4, which serve the towns of Charlestown, Richmond, South Kingstown, and ties to Westerly, R.I. These circuits are connected by normally open switches at several locations. These tie points are usually manually operated and may be used to restore service to customers in the event of an outage

or to perform maintenance on equipment.

Type II circuits are also radial, but may occasionally have more than one source into the distribution system. Attachment 6 (page 1 of 3) is an example where the distribution system is supplied from the transmission system at Kent County #22, Davisville #24 and West Kingston #62 substations. Power would always flow into this system from Kent County, Davisville, and West Kingston; opening the 34 kV circuit ties would have no impact on the transmission system.

(3) *Power flows into local distribution systems; it rarely, if ever, flows out.*

Power flow is into a local distribution system, and is metered at the transmission/distribution interface. More than one supply point may exist as previously described in item (2) above and shown in Attachment 6, page 1 of 3. Because these systems are radial in nature, the net power flow will be into the system to serve the local load. Pages 2 and 3 of Attachment 6 show the billing metering facilities at West Kingston and Kent County, respectively. Refer to Attachment 18 for a description of symbols and designations used on billing meter layouts.

If generation exists on the distribution system, separate billing metering facilities would be located at the local generation facility to segregate wholesale services from local distribution deliveries. Attachments 7 and 8 show examples where a wholesale transaction from generation resides on a 23 kV distribution facility which also provides service to retail customers. In Attachment 8, Pawtucket Power Associates generation facility resides on a 23 kV distribution facility in Rhode Island.

**Confidential**

*(4)    When power enters a local distribution system, it is not reconsigned or transported on to some other market.*

Narragansett's distribution system serves retail end-use customers. In cases where distribution facilities are also used to serve wholesale customers, that portion of the cost of those facilities used for wholesale services would be assigned to the wholesale transaction. Separate metering is located at the wholesale customer to segregate wholesale deliveries from local distribution deliveries. There are instances of such wholesale deliveries in the NEES system. However, there are no examples currently in Rhode Island. Attachment 9, page 1, shows an example in Massachusetts where the wholesale customer, Merrimac Municipal, is served from the 2377 line; a 23 kV distribution facility. The 2377 line also serves retail end-use customers in the Amesbury/Salisbury area. Metering facilities for Merrimac Municipal are shown in Attachment 9, page 2. The cost of the portion of those facilities used to serve Merrimac Municipal is assigned to the wholesale transaction. This would be the same in Rhode Island if Narragansett Electric had a wholesale customer.

Attachment 10, shows an example where one NEES retail company, Massachusetts Electric, is supplying Narragansett from 23 kV facilities. The Massachusetts Electric facilities are at Mink Street. Attachment 10 shows the metering on the 2267 circuit which serves Narragansett's Waterman Ave. Substation and provides back-up for Kent's Corner and East Providence distribution substations in Rhode Island. In this case, the cost of the portion of the facilities used for wholesale services to Narragansett is assigned to the wholesale transaction.

**Confidential**

(5) _Power entering a local distribution system is consumed in a comparatively restricted geographical area._

Narragansett's distribution system serves load in a comparatively restricted geographical area. The geographical area served by a local distribution system depends on the load density of the area. For example, several Type I or Type II distribution circuits as shown in Attachment 1 may serve a large city or a number of rural towns.

Attachment 11, shows the area map and Attachment 12 the electrical one line diagram for four distribution feeders which serve the towns of Tiverton and Little Compton. This represents how a typical Type I distribution system serves a restricted geographic area.

Attachment 4, page 1, shows the electrical one line diagram for the Type II distribution system served from the Wood River No. 85 Substation. The three distribution circuits 85T1, 85T2 and 85T3 serve the limited geographic area shown on Attachment 4, page 2.

Attachment 13 shows an example of where the distribution system is supplied from the transmission system at Drumrock Substation. In this example, both Type I and Type II distribution systems are being served from one transmission /distribution interface. The Type I distribution system is a 12.47 kV system serving a restricted geographic area. The Type II distribution system is a 23 kV system serving a completely separate geographic area than the Type I 12.47 kV system.

**Confidential**

*(6)* *Meters are based at the transmission/distribution interface to measure flows into the local distribution system.*

Metering to measure flows into Narragansett's distribution system is based at the transmission/distribution interface, typically on the low voltage side of the stepdown transformer.

Attachment 6, pages 2 and 3, show billing metering installations at West Kingston and Kent County substations from the 115 kV system. Attachment 14 shows similar billing metering at the West Cranston No. 21 substation on the 12.47 kV side of the 115/13.2 kV transformers supplied from the 115 kV transmission lines designated S171 and T172. Attachment 15 shows the billing metering at the Wood River No. 85 Substation for the distribution system shown schematically in Attachment 4, Page 1, on the 34.5 kV side of the 115/34.5 kV transformers supplied from the 115 kV transmission lines designated 1870S and 1870N.

*(7)* *Local distribution systems will be of reduced voltage.*

The local distribution voltages of the NEES retail companies are less than 69 kV. Typical voltage classes used are 5, 15, 25 and 35 kV. Attachment 16 shows the actual distribution voltages and the letter designations used by the NEES retail companies to identify Type I distribution. Type II distribution circuit voltages are 12.47, 23 or 34.5 kV. Narragansett has no distribution voltage above 34.5 kV.

**Confidential**

### V.  Description of the NEES Transmission System

The function of  transmission facilities is to integrate generation resources over large geographical areas and deliver the needed power to local distribution supply systems.  The NEES transmission system is used to transmit power from generation resources located on its system or on the transmission systems of other utilities to the loads served by the distribution system.  By definition, a transmission system is always interconnected to the neighboring transmission systems of neighboring utilities.  Transmission lines are rarely, if ever, directly connected to retail customers, and with few a exceptions, the NEES companies transmission system is a 69 kV or greater class system.

On Narragansett's transmission system in Rhode Island, there is no transmission below 115 kV.[5]  However, there are two instances outside of Rhode Island where the NEP transmission system is of lower voltage.  First,  if a lower voltage system is used to integrate generation resources and interconnected utilities, as it does at 34.5 kV in the Comerford/Moore area shown in Attachment 17, this is defined as transmission.  Second, if a low voltage system is used to interconnect two utilities as does the 34.5 kV system in the Comerford/Moore area and the 46 kV system in the Bellows Fall/Charlestown area (Attachment 18), this is also defined as transmission.

---

[5] Two limited exceptions relate to Narragansett ownership of two 23 kV transmission interconnections that allow Pawtucket Power and the Johnston Lanfill IPP projects to sell power from their facilities at wholesale.

Confidential

## VI.    Conclusion

Narragansett's facilities are unbundled on a functional basis between FERC jurisdictional transmission and state jurisdictional local distribution.  Based on the application of the seven factors identified by FERC, Narragansett and the NEES Companies conclude that they are structured according to FERC's definition of transmission and local distribution facilities.  The distribution facilities of Narragansett and the other NEES Companies subject to state rate making jurisdiction today fit the seven-part test established by FERC for the definition of local distribution facilities used for retail access in a restructured industry.   In addition, NEP, as the generation and transmission provider, fits the FERC definition of transmission based on its customers, voltage class, and system type.

**Confidential**

Exhibit A -- Page 14

## VII.  Attachments

| | |
|---|---|
| Attachment  1 | Diagram of Type I and Type II Distribution Systems |
| Attachment 2 | List of Narragansett's transmission/distribution supply points |
| Attachment 3 | Town Map of Charlestown, Richmond and, South Kingston showing distribution lines on streets |
| Attachment 4 (2 pages) | Wood River Substation one line diagram (PLND-3401-0) and geographic map |
| Attachment 5 | Feeder Tie Map of Kenyon for the towns Charlestown, Richmond, South Kingston, and Westerly |
| Attachment 6 Page 1 of 3 | Distribution System served from Kent County, Davisville, and West Kingston (PLND-3402-0) |
| Page 2 of 3 | West Kingston Billing Metering Layout (B533) |
| Page 3 of 3 | Kent County Billing Metering Layout (B534) |
| Attachment 7 | Admiral Street Billing Meter Layout (B539) |
| Attachment 8 | Pawtucket Power (B548) |
| Attachment 9 Page 1 of 2 | King Street #18 one line diagram (LND-2365-0) |
| Page 2 of 2 | Memman Municipal Billing Meter Layout (B410) |
| Attachment 10 | Mink Street Billing Meter Layout (B509) |
| Attachment 11 | Geographic map and feeder tie map for Tiverton area |
| Attachment 12 | Tiverton one line diagram |
| Attachment 13 | Drumrock Billing Meter Layout (B530) |
| Attachment 14 | West Cranston Billing Meter Layout (B535) |

Confidential

Exhibit A -- Page 15

Attachment 15     Wood River Billing Meter Layout (B544)

Attachment 16     Numbering Distribution - Feeder Std. 8151

Attachment 17     Comerford 34.5 kV Area

Attachment 18     Bellows Falls/Charlestown 46 kV Area

Attachment 19     Billing Metering Layout Symbols B1, B2

**Confidential**

**NARR 61806**

Attachment 1

## VOLTAGE CLASS: ~ 15, 25, 34.5 kV



Retail distribution feeder installed along town roads and city streets serving distributed customer loads. Circuit is radial, but may have open ties with other circuits.



A typical type II distribution system will emanate from a transmission supplied substation, will be built along right-of-way and streets, will provide distribution supply service to substations serving type I distribution systems and, often times, to larger commercial/industrial customers.

Confidential

NARR 61807

ATTACHMENT 2
Page 1

## THE NARRAGANSETT ELECTRIC COMPANY

| Name of District | Distribution System Type | Delivery Pressure KV (Nominal) | Metering Points | Metering Pressure KV (Nominal) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|
| Main District: | | | | | | |
| Admiral Street Substation (9) | II | 115 | SDP | 23 | SDP | SL |
| Bristol Substation (51) | I | 115 | SDP | 12.47 | SDP | SL |
| Clarkson Street Substation (13) | I | 115 | SDP | 12.47 | SDP | SL |
| Davisville Substation (84) | II | 115 | SDP | 34.5 | SDP | SL |
| Drumrock Substation (14) | I, II | 115 | SDP | 23/12.47 | SDP | SL |
| Farnum Pike Substation (23) | I | 115 | SDP | 12.47 | SDP | SL |
| Franklin Square Substation | I, II | 115 | SDP | 11.5 | SDP | SL |
| Johnston Landfill (Northeast) | Wholesale | 23 | SDP | 23 | SDP | SL |
| Johnston Substation (18) | I, II | 115 | SDP | 23/12.47 | SDP | SL |
| Kent County Substation (22) | II | 115 | SDP | 34.5 | SDP | SL |

SDP    Standard Delivery Point
SL     Supply Line

Confidential

NARR 61808

ATTACHMENT 2
Page 2

| Name of District | Distribution System Type | Delivery Pressure KV (Nominal) | Metering Points | Metering Pressure KV (Nominal) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|
| Kenyon Stustation (68) | I | 115 | SDP | 12.47 | SDP | SL |
| Lincoln Substation (72) | I | 115 | SDP | 12.47 | SDP | SL |
| Manchester Street Generation Station (Franklin Square Substation) | Wholesale | 11.5 | SDP | 11.5 | SL | SL |
| Mink Street Substation (7) | II | 23 | SDP | 23 | SDP | SDP |
| Old Baptist Road Substation (46) | I | 115 | SDP | 12.47 | SDP | SL |
| Pawtucket Power | Wholesale | 23 | Patucket/ Providence City Line | 23 | SDP | SL |
| Phillipsdale Substation (20) | II | 115 | SL | 115 | SL | SL |
| Pontiac Substation (27) | II | 115 | SDP | 12.47 | SDP | SL |
| Sockanosset Substation (24) | II | 115 | SDP | 23 | SDP | SL |
| South Street Station | I, II | 115 | SDP | 11.5 | SDP | SL |
| Warnpanoag | I | 115 | SDP | 12.47 | SDP | SL |

SDP  Standard Delivery Point
SL   Supply Line

**Confidential**

ATTACHMENT 2
Page 3

| Name of District | Distribution System Type | Delivery Pressure KV (Nominal) | Metering Points | Metering Pressure KV (Nominal) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|
| Warren Substation (5) | I, II | 115 | SDP | 23/12/47 | SDP | SL |
| West Cranston Substation (21) | I | 115 | SDP | 12.47 | SDP | SL |
| West Kingston Substation (62) | II | 115 | SDP | 34.5 | SDP | SL |
| Wolf Hill Substation (19) | II | 115 | SDP | 23 | SDP | SL |
| Wood River Substation (85) | I, II | 115 | SDP | 34.5 | SDP | SL |
| | | | | | | |
| **Tiverton District:** | | | | | | |
| Tiverton Substation (33) | I | 115 | SL | 12.47 | SL | SL |

SDP    Standard Delivery Point
SL      Supply Line



Kenyon #68 Area Map







NARR 61811

**Confidential**



Confidential



Attachment 4   Page 2 of 2

Confidential

NARR 61813





ONE LINE DIAGRAM

PLND-3402-0

NARRAGANSETT ELECTRIC COMPANY

34.5KV LINES: 84T1, 84T2, 3302, 3307, 3308, 3310, 3311, 3312.

THIS DWG. SUPERSEDES
SYS. DIA.- S5349, S5351 &
PART OF S5026

Confidential

NARR 61815



Attachment 6
Page 2 of 3

BILLING METER LAYOUT
## WEST KINGSTON
NEW ENGLAND POWER COMPANY

REFERENCE: SYSTEM PRINTS
S5329, 5351

10-30-92
B533

NARR 61816

Confidential



REFERENCE: SYSTEM PRINTS
S5347

BILLING METER LAYOUT
KENT COUNTY
NEW ENGLAND POWER COMPANY

10-30-92
B534
NARR 61817

**Confidential**



BILLING METER LAYOUT
ADMIRAL ST.

REFERENCE: SYSTEM PRINTS
S6201

Confidential

NARR 61818

# Tab 5

# (6 of 6)

Attachment 8



**QUANTITIES ARE COMPENSATED TO THE PAWTUCKET /PROVIDENCE TOWN LINE**

REFERENCE: SYSTEM PRINTS
SS200

BILLING METER LAYOUT
PAWT. POWER ASSOC. (COLFAX)

10-30-92
DF49

Confidential

NARR 61819



Confidential

NARR 61820

Attachment 9
Page 2 of 2



4J6KV.

45J1

3-200A.

POLE MOUNTED

WEST
AMESBURY
NO.45

3-500

IT

AMESBURY
2377

2377
OP.

2377

WEST
NEWBURY

2396

2395

2395

HILLSIDE

961

2396

MUN.

NO.1
1-2500

4J6KV.

4J6KV.

NO.2
1-2500

MERRIMAC
NO. 81
(MUNICIPAL)

3-1191
(1667)

13.8KV. 3-1191
(1667)

B0017776

3.125
KQH DEL

3.125

KWH DEL

7.2

TEL

ABCD
RAPR
15309

WESTBORO
COMPLEX

† COMPENSATED TO THE
MERRIMAC /AMESBURY
TOWN LINE

REFERENCE: SYSTEM PRINTS
N4264,N4269

BILLING METER LAYOUT
MERRIMAC (MUNICIPAL)
NEW ENGLAND POWER COMPANY



12-15-90

B410

NARR 61821

Confidential



BILLING METER LAYOUT
# MINK ST.

REFERENCE: SYSTEM PRINTS
CT153

Confidential

NARR 61822

Tiverton #2 Area Map
Tiverton and Little Compton





Confidential

NARR 61824



BILLING METER LAYOUT
**DRUMROCK**

REFERENCE: SYSTEM PRINTS
S6263

NARR 61825

Confidential





REFERENCE: SYSTEM PRINTS
S5388

BILLING METER LAYOUT
# WEST CRANSTON
NEW ENGLAND POWER COMPANY

10-30-92
# B535
NARR 61826

Confidential

Attachment 15



* BIDIRECTIONAL METER USED IN A
  UNIDIRECTIONAL APPLICATION

*WOOD RIVER NO. 85*

REFERENCE: SYSTEM PRINTS
S5328

BILLING METER LAYOUT
**WOOD RIVER**
NEW ENGLAND POWER COMPANY


10-30-92
**B544**

NARR 61827

**Confidential**



New England Electric

# NUMBERING  DISTRIBUTION  FEEDERS

STD 8151

D
Issue

and

## Street Light Circuits

1. APPLICATION – The distribution and Dispatching-Departments of each company shall assign numbers in accordance with this STANDARD.

Transmission and distribution supply lines are numbered by the System Dispatching Department.

2. ALL STATIONS & SUBSTATIONS are to be numbered consecutively – 1, 2, 3, etc.

3. CLASSIFICATION LETTERS for feeders and circuits are;

R – Series Street Lighting Circuits
DC – Direct Current Circuits
H – 2400 V Distribution Feeders
J – 4160 V      "          "
M – 4800 V      "          "
G – 8320 V      "          "
F – 12470 V      "          "
L – 13200 V      "          "
W – 13800 V      "          "
K – 24900 V      "          "
T – 34500 V      "          "

4. FEEDERS & CIRCUITS for each substation shall be numbered consecutively – 1, 2, 3, etc.

5. DISTRIBUTION FEEDER NUMBER combines the items of the above three paragraphs in sequence – thus, feeder #5H7 is the 7th 2400 V feeder extending from station #5.

6. STREET LIGHT CIRCUITS are numbered in the same manner as distribution feeders.

### Modification for circuits not originating in substations

Where a constant current transformer is not located in a substation, the series circuit will carry no prefix for the substation, and the suffix will be consecutive circuit numbers for the entire area – i.e., R1, R2, R3, etc.

Issue D – April 1978 – Parag. 3 – "T" Assigned to 34.5 kV

Confidential

Attachment 17



COMERFORD 34.5KV AREA

H3128

Confidential

NARR 61829

Attachment 18



✛  MOBILE SUB TAP

★  DEMARCATION LINE OF AUTHORITY

CLAREMONT
C.V.P.S.

CV.P.S.
MAPLE
AVE.

CV.P.S.
ELMENDORF

JOY MFG.
NO.2

N.H.ELECTRIC
13.2KV.

46KV.

CV.P.S.
SOUTH ST.

N.E.P.
LAST
POLE

CHARLESTOWN
NO.32

CHARLESTOWN

H3149

BELLOWS FALLS
PRINT H3145

N.E.P.
4402

EMERG.FEEDER

SPARE BANK

11-22-93

**Confidential**

**NARR 61830**



METERING OUTFIT

CURRENT TRANSFORMER

BUSHING CURRENT TRANSFORMER

VOLTAGE TRANSFORMER

LOSS COMPENSATOR

SURVEY

DOUBLE CIRCLE IS USED FOR
SURVEY METERING ONLY

ARROW INDICATES DIRECTION OF
FLOW OF ENERGY IN REFERENCE
TO CURRENT TRANSFORMERS:
BILLING WATTHOUR METER OR INSTRUMENT

SOLID - STATE ELECTRONIC METER

(25KWH PER CONTACT CLOSURE)
METERING CIRCUIT & TELEMETERING

TOTALIZER OR DIGITAL PULSE RECORDER,
MAGNETIC IMPULSE RECORDER OR RAPR
(REMOTE ACCESS PULSE RECORDER)

**B1**

## TYPICAL LETTERS & NUMBERS TO BE INSERTED IN SYMBOLS:

WH = WATTHOUR METER

WHD= WATTHOUR DEMAND METER

VARh= VOLT AMP REACTIVE HOUR METER

WHC= WATTHOUR METER WITH CONTACTS

WHL= WATTHOUR METER WITH LOSS COMPENSATOR

WHCL= WH METER, CONTACTS AND COMPENSATOR

XXH= VARHOUR METER

QHC= QHOUR METER WITH CONTACTS

$V^2$h= VOLT SQUARED HOUR METER

(2) AUXILIARY METERING DEVICE,
NUMBER INDICATES TYPE

1 = DC SUPPLY

2 = 3 TO 2 WIRE CONVERSION RELAY

3 = AUXILIARY RELAY

4 = POTENTIAL SELECTOR RELAY

5 = POLARIZED IMPULSE RELAY

6 = FREQUENCY RESPONSE RELAY

7 = 2 TO 3 WIRE CONVERSION RELAY

8 = PULSE VALUE MULTIPLIER

9 = 2 TO 3 WIRE CONVERSION RELAY FOR
TELEPHONE CARRIER CIRCUITS

### TYPES OF INSTRUMENTS

SST, DT, MD, CE, PE, WT = IMPULSE
                          TOTALIZING RELAY

FP, L&G, PD, DTR = IMPULSE TYPE PRINTING
                   DEMAND RECORDER

L&G, C14 = SYNCHRONOUS CONTACT CLOCK

TDX = THERMAL DEMAND TRANSMITTER

W456, D456 = COMPANY NUMBER OF METER
             OR DEVICE

DPR, BPR, WR, PDM, BTR = DIGITAL PULSE RECORDER

BR, L&N, DG, RA, RB, RL = GRAPHIC DEMAND RECORDER

| CTz | TRANSDUCER |

CTz = CURRENT TRANSDUCER

VTz = VOLTAGE TRANSDUCER

WTz = WATT TRANSDUCER

WhTz = WATTHOUR TRANSDUCER

VARhz = VARHOUR TRANSDUCER

W/WhTz = WATT/WATTHOUR TRANSDUCER

# B2

Confidential

NARR 61832

Attachment 5

Confidential

### The Standard Offer Auction
### Proposed Design

A.    **Administrative Process and Time Line**

The Standard Offer Auction (the "Auction") will be administered and conducted via a common process and time line for all distribution companies. Bids will be submitted and evaluated through a Request for Proposal process. The principal steps and approximate timing of the Auction are outlined below. Narragansett reserves its right to defer the auction or adjust the following schedule to coordinate with the Standard Offer Auction of its affiliate, Massachusetts Electric Company. Massachusetts Electric Company has issued a request for qualification on April 3, 1997 that provides additional details on the Standard Offer Auction. Both Massachusetts Electric Company and Narragansett reserve their right to modify the terms and the timing of the Standard Offer Auction.

March 1997 - <u>Preliminary RFP Issued</u>

    The Preliminary RFP will detail all of the major elements, requirements and commercial terms and conditions of the final RFP that will be issued in August. Its purpose is to give potential bidders the necessary information to determine whether they intend to participate in the Auction. Specific pre-bid qualifications will be established including an audited statement of financial qualifications and other relevant information to ascertain a bidder's ability to perform. Neither the terms of the Preliminary RFP nor Final RFP shall require a bidder to hold title to the power needed to fulfill its obligations under its bid.

    Pre-bid applications including required bidder qualification information are due by (a date to be specified in the Preliminary RFP) along with a modest non-refundable administration fee of $1,000.

July 1997 - <u>List of Qualified Bidders Submitted to the Rhode Island Commission</u> (for informational purposes)

August 1997 - <u>Final RFP Issued</u> (including a standard contract)

September 1997 - <u>Bids Due</u>

    Bids would be accepted only from pre-qualified bidders and must include a deposit of $1,000 for each GWH the bidder proposes to supply over the duration of the Standard Offer. *For example, if a bidder proposed to supply 500 GWH per year for twelve years, its deposit would total $6,000,000 ($1,000 x 500 GWH x 12 yrs).* This deposit is refunded in the event that a bidder is not selected. If

**Confidential**

**NARR 61834**

successful, at the bidder's election, the deposit can either be refunded or applied toward the performance bond (described below).

October 1997 - <u>Winning Bidders Selected</u>

Contracts are expected to be executed between bidders and the distribution companies and become effective upon the bidders (now considered "suppliers" in this description) establishing a "performance bond" in the amount of $10,000 per GWH to be supplied under the Standard Offer. The performance bond would be returned to the supplier upon completion of its contractual obligations.

**B.     Important Auction Rules and Conditions**

1.     <u>Minimum Bid Elements</u>. In order to conduct a fair and effective Auction, all bids from pre-qualified bidders must include a "Percentage Discount Off the Standard Offer" (the "Discount") and the "Amount of Energy to be Delivered" as described and applied below. These two elements will be the only criteria by which winning bidders are chosen. All bids from pre-qualified bidders will otherwise be considered to be equivalent.

2.     <u>The Auction Procedures</u>. Narragansett shall implement the following auction procedures for determining the suppliers of Standard Offer Service:

a.     <u>Twelve Year Flat Discount Auction</u>[1]. This is a single, constant discount to be in effect for all twelve years of the Standard Offer, expressed as a percentage greater than 0%, with larger discounts being viewed more favorably. Winning bidders are to be paid based upon the <u>next highest Discount bid</u> whether determined by the Twelve Year Flat Discount Auction or by the lowest discount bid in the next best Alternative Individual Auction Increment, discussed below (a second price or Vickery auction).[2] The bids in this auction shall be sealed until the Alternative Individual Year Auction set forth below is completed.

---

[1]NEP and Narragansett shall have the right in their sole discretion to shorten the period of standard offer service to December 31, 2004, if Narragansett no longer has the obligation under the Rhode Island URA to extend standard offer service through 2009.

[2]For example, if the best four winning bids (out of 10 submitted) met the distribution company's expected demand at Discounts of 12.5%, 10%, 9% and 7% respectively, the first winning bidder would receive a discount of 10%, the second winning bidder 9%, the third 7%, and the fourth would receive the Discount bid by the first losing bidder (who bid 6.5%).

**Confidential**

b.    Alternative Individual Year Auction ("Alternative Auction"). This Alternative Auction shall take place immediately following the Twelve Year Flat Discount Auction. Bidders will be required to bid separately for each year, and unlike the Twelve Year Flat Discount Auction, a bid for any single year may not be conditioned on success in any other year. Thus, the Alternative Auction shall allow bidders to specify different discounts in different years. Bid amounts must be in annual increments of 150 gigawatthours of energy, which will be delivered as specified below. Prices in the Alternative Auction shall be open to other bidders, but the identity of the bidders associated with the prices will not be identified. The Alternative Auction will continue for multiple rounds until the next bid fails to improve the discount offered in the prior bid by one percent.

Following completion of the bidding, Narragansett shall rank the bids for each individual year, with larger discounts viewed more favorably, and shall identify the best bids in each year that would fill a 150 gigawatthour increment covering all twelve years of the purchase period. Narragansett will then repeat the process for as many increments as possible until the bids no longer cover all twelve years in the period.

c.    Selection of Suppliers from Both Auctions. The increments from the Alternative Individual Year Auction will then be compared to the Twelve Year Flat Discount Auction by assigning the Alternative Individual Auction Increment with the lowest discount bid in any single year of the increment. In the event of ties, the earliest, highest discount shall have priority. Suppliers in the Alternative Individual Year Auction shall be held to their bids, unlike the second price or Vickery auction used in the Twelve Year Flat Discount Auction.

NEP shall be allowed, but not required, to bid in the Alternative Individual Year Auction.

3.    Payment by Distribution Company. The distribution company is responsible for paying suppliers at the following electric delivery rates, reduced by the applicable Discount, for all energy the supplier delivers (less losses) in the respective year. These rates are flat annual values and do not include a demand or capacity component and will not be adjusted for seasonal or time of day factors.

Distribution Company Rates

| | |
|---|---|
| 1998 | 3.2 ¢/KWH |
| 1999 | 3.5 |

| | | |
|------|-----|-----|
| 2000 | | 3.8 |
| 2001 | | 3.8 |
| 2002 | | 4.2 |
| 2003 | | 4.7 |
| 2004 | 5.1 | |
| 2005 | | 5.5 |
| 2006 | | 5.9 |
| 2007 | | 6.3 |
| 2008 | | 6.7 |
| 2009 | | 7.1 |

*For example, if a supplier bid a Discount of 5.5% and delivered 500 GWH to ultimate customers in 1999, that supplier would receive $16,537,500 from the distribution company (3.5¢/kwh x (1-.055) x 500 GWH x 1,000,000 kwh/GWH x .01 $/¢).*

A fuel index adjustment mechanism, applied to Customer Rates, may provide additional revenues to suppliers in the event that large, unexpected increases in market oil and gas prices occur. This adjustment is further described below.

4.  Amount of Energy to be Delivered ("Delivered Energy"). Bids shall specify a single, constant quantity of energy, expressed in GWH per year, that the bidder commits to supply to the distribution company in each year of the Standard Offer. This amount represents the maximum amount of energy a supplier is responsible to provide to the distribution company annually, as measured at the ultimate customer's meter. For purposes of determining the amount of the bid deposit and performance bond, the total energy to be supplied under the standard offer will be the Delivered Energy value times the number of years the energy will be provided. Suppliers are responsible for all electric delivery losses and any necessary transmission arrangements and costs.

5.  Right to Bid a Joint Supply - Prequalified bidders will have the right, subject to any provision of law, to submit joint bids pursuant to which one supplier may provide less than the full amount of Delivered Energy as long as the other suppliers on the joint bid provide the remainder of the Delivered Energy obligation, and the total performance bond is posted and in effect for the twelve years .

6.  Higher Discounts Ensure a Right to a Longer Term of Supply - Customers have the right to leave the Standard Offer at any time to receive service in the competitive energy market (subject to minimal notice provisions). As such, the amount of energy required from suppliers under the Standard Offer may likely

**Confidential**

decline over time. Supplier(s) who are in the increment with the highest Assigned Discount will have the right to provide energy for the longest period of time. With declining customer load due to departures from Standard Offer service, lower Discount suppliers whose Delivered Energy amount exceeds the distribution company's needs will have their Delivered Energy amounts reduced and Standard Offer supply contracts ultimately terminated.

7.   <u>Load Responsibility and Allocation</u> - Suppliers are responsible for a percentage of the distribution company's Standard Offer real-time customer energy demand (minute by minute, hour by hour, day by day). This includes changes in customer demand for any reason, including but not limited to, seasonal factors, normal daily load patterns, increased usage, demand side management activities, extremes in weather, etc. The only exception is for the loss of Standard Offer customers as described in the section immediately above. Responsibility is allocated to a supplier based on its Delivered Energy bid divided by the estimated total annual Standard Offer energy demand of the distribution company.

8.   <u>Responsibility for Electric Delivery Losses</u> - Suppliers will provide all losses, in kilowatts and kilowatthours, from the supplier's generation sources to the customer meter.

C.   **Standard Offer Customer Rates and Customer Rights**

Customers who elect Standard Offer service by choice or inaction will pay predetermined, flat rates ("Customer Rates") for energy consumed. At any time during the Standard Offer customers have the right to leave Standard Offer service and receive energy from another supplier in the marketplace. In addition, residential and C-2 customers have a limited right to return to standard offer service in the first year after the retail access date.

Customer Rates are subject to upward adjustment in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, as described in the following section. If invoked, prices would change as a function of the amount by which market fuel prices exceed the predetermined price "trigger" levels. These triggers have been set to allow a large dead-band in which no increases to Customer Rates would apply.

D.   **Standard Offer Fuel Index**

The Customer Rate in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the

"Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

Market Gas Price is the average of the values of "Gas Index" for the most recent available twelve months, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent available twelve months, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Rhode Island Commission.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| Year | Price |
|------|-------|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

Narragansett shall file Fuel Trigger Points for the years following 2004 with the Rhode Island Commission prior to the date of the Auction.

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

Fuel = (Market Gas Price + $.60/MMBtu) + (Market Oil Price + $.04/MMBtu)

Adjustment                Fuel Trigger Point + $.60 + $.04/MMBtu

Where:

    Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined
above. The values of $.60 and $.04/MMBtu represent for gas and oil
respectively, estimated basis differentials or market costs of transportation
from the point where the index is calculated to a proxy power plant in the
New England market.

*For example, if at a point in the year 2002 the Market Gas Price and Market Oil Price
total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of
6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50 + \$.60/MMBtu) + (\$3.00 + \$.04/MMBtu)}{\$6.09 + \$.60 + \$.04/MMBtu} = 1.0609$$

*The Customer Rate paid to the distribution company is increased by this Fuel Adjustment
factor for the billing month, becoming 4.4548¢/KWH (4.2 x 1.0609).*

In subsequent months the same comparisons are made and, if applicable, a Fuel
Adjustment determined.

Incremental revenues received by the distribution company as the result of a Fuel
Adjustment would be fully allocated to Standard Offer suppliers in proportion to the
Standard Offer energy provided by a supplier to the distribution company in the
applicable billing month.

**Confidential**

Attachment 6

Confidential

NARR 61841

Electric Utility Restructuring Plan
New England Electric System--Proposal for Environmental Component

I.    Purpose

       The purpose of the environmental component of an electric industry restructuring plan is
to provide a means such that a competitive industry structure supports and furthers the efforts of
environmental regulators to reduce the environmental impacts of electricity generation.  This
objective is to be achieved by establishing a program by which older fossil-fueled electric
generating facilities will be required to reduce certain air emissions to a level that is roughly
equivalent to new source standards.  As implemented, the program will not supersede any
environmental agency's legal authority to regulate the units nor require the units to meet emission
standards other than the most stringent applicable standards required by law.  The program is
intended to be simple and straight-forward,  one that is transferable to other older utility sources
in all regions of the country.

II.    Generic Components of Proposal

       1.      The program is designed to require all older fossil-fueled electric generating units
               throughout the U.S. to meet "old source performance standards" ("OSPS") for
               $NO_x$ and $SO_2$ on January 1 of the year following the year a unit becomes 40 years
               old.  The 40 year time period starts from the year a unit commenced commercial
               operation.  For those units that are 40 years or older in the year the program
               becomes effective, they will be required to meet OSPS by January 1 of the
               following year.  The end point for this program is the year 2010; therefore, all units
               will be assumed to be 40 years old on or before December 31, 2009.

       2.      As of the date the program becomes effective, each existing operating unit will
               receive "allowances" for that unit's emissions of $NO_x$ and $SO_2$.  Each allowance
               equals one ton of allowable emissions.  Unit-specific allowances are aggregated to
               become a utility company-wide cap.

       3.      New units or repowered units subject to new source permitting regulations and
               thus not be included under the program.  Emissions from new or repowered units
               will not be included in determining a company's overall cap of $NO_x$ or $SO_2$.

Confidential                                                        NARR 61842

2

4.  Unit-specific allowances are calculated as follows:

    a.  For units 40 years old or older, or by the year 2010:

$$\text{Yearly Net Electrical Generation (kWh)} \times \text{Heat Rate (Btu/kWh)} \times \text{Emission Rate (lbs./MMBtu)} \times \text{Conversion Factor } \frac{1}{2 \times 10^9} = \text{Tons/Year}$$

The elements of the formula are derived as follows:

    i)  Yearly Net Electrical Generation = average kWh of the highest eight (8) of ten (10) year period of 1986-1995, as reported on U.S. Department of Energy Form EIA- 767, Schedule IV.

    ii)  Heat Rate = 10,000 Btu/kWh

    iii)  Emission Rate = 0.30 lbs/MMBtu for $SO_2$
          0.15 lbs/MMBtu for $NO_x$

PROVIDED, however, that if a unit's required emission rate is lower than the rates listed above, the lowest, most stringent emission rate applies.

    iv)  Conversion Factor = factor required to convert differing measures used in formula to result in tons per year of emissions.

    b.  For units less than 40 years old:

      $NO_x$--- Same formula as in 4.a. above, except that emission rate is set at the regulatory limit.

      $SO_2$--- Allowances as allocated under Acid Rain Program, Title IV of federal Clean Air Act.

5.  Each utility company may meet its allowance cap by any combination of control technologies, fuel switching, unit retirements, operational changes and/or retirements of purchased or surplus allowances. Selection of any one or a combination of more than one of these options to meet the company cap will be at the sole discretion of the utility company.

6.  $SO_2$ allowances may be traded freely in the market as allowed under the Clean Air Act, Title IV Acid Rain Program regulations. Unused allowances may be banked and carried forward also as allowed under the Acid Rain Program regulations.

Confidential

3

7.    It is anticipated that a $NO_x$ trading program will be established similar to the federal $SO_2$ program. Unused $NO_x$ allowances also may be banked, provided, however, that allowance withdrawals from the bank may be subject to a "flow control" mechanism as specified in the Ozone Transport Commission model rule.

8.    With respect to jointly-owned units, their participation in the program will be governed in the same manner as jointly-owned units are governed under the federal Acid Rain Program.

9.    The final emission reductions applicable on January 1, 2010, will be subject to the following "trigger" mechanisms which assure that a substantive portion of the national emissions inventory is subject to this program:

    a.    If in calendar year 2005, the actual $NO_x$ emissions of the emissions inventory in the Ozone Transport Region ("OTR") and in the East Central Area Reliability Coordination Agreement ("ECAR") and the Mid-America Interconnected Network ("MAIN") of the North American Electric Reliability Council (hereinafter collectively referred to as "the Region") are reduced by no less than 50% from the calendar year 1996 actual $NO_x$ emissions of the emissions inventory in the Region, then implementation of the OSPS for $NO_x$ will be on January 1, 2010. If a reduction of $NO_x$ emissions of 50% or greater is not achieved in calendar year 2005, the actual emissions of the emissions inventory in the Region will be measured in each successive calendar year until such time as the prescribed level of reduction from the year 1996 baseline is actually achieved, and implementation of the OSPS $NO_x$ requirement will be five (5) years from the year the emission reduction of 50% or greater is actually achieved.

    b.    If the $SO_2$ allowances allocated under Title IV of the federal Clean Air Act to the emissions inventory in the Region in the year 2007 are 50% or less of the $SO_2$ allowance allocation made in the year 2000, then implementation of the OSPS for $SO_2$ will be on January 1, 2010. If a reduction of 50% or greater is not achieved in the year 2007, the $SO_2$ allocation will be reviewed in each successive year until such time as the prescribed level of reduction from the year 2000 baseline is actually achieved, and implementation of the OSPS $SO_2$ requirement will be three (3) years from the year the reduction in allowance allocation of 50% or greater from the year 2000 baseline is actually achieved.

The $NO_x$- and $SO_2$-specific triggers described above will be implemented independent of one another.

Confidential

NARR 61844

4

III.    NEES-Specific Requirements Under the Proposal

1.    The NEES-specific emission reductions included in this proposal apply to the following fossil-fueled power plants:

> Brayton Point Station, Somerset, MA
> Unit Nos. 1, 2, 3, and 4
>
> Salem Harbor Station, Salem MA
> Unit Nos., 1, 2, 3, and 4

New England Power Company ("NEP"), a subsidiary of NEES, is the owner and operator of the Brayton Point and Salem Harbor facilities. NEP may meet its allowance cap by any combination of control technologies, fuel switching, unit retirements, operational changes and/or retirements of purchased or surplus allowances.

2.    The program start date for NEP's Brayton Point and Salem Harbor units is 2000. The dates when the Brayton Point and Salem Harbor units will be subject to OSPS are as follows:

| Unit No. | Brayton Point | Salem Harbor |
|---|---|---|
| 1 | 2004 | 2000[1] |
| 2 | 2005 | 2000[1] |
| 3 | 2010 | 2000[1] |
| 4 | 2010[2] | 2000[2] |

([1] Although 40 year time period for these three units ends earlier than year indicated, each unit will be subject to OSPS by the year indicated.)

([2] Although 40 year time period for these two units ends later than years indicated, each unit will be subject to OSPS by the years indicated.)

3.    The emission reductions profile for all the NEP Brayton Point and Salem Harbor units, absent the NEP-specific triggers described in Section III.5. below, are illustrated in the attached graphs.

Confidential

5

4.    With respect to SO₂, the total annual cost that may be necessary to achieve the reductions included in this proposal is capped as follows:

| Year(s) | Annual Cost Cap |
|---------|-----------------|
| 2000-2003 | $1.9MM p/year |
| 2004 | $2.7MM p/year |
| 2005-2009 | $3.5MM p/year |
| 2010 and beyond | $6.0MM p/year |

provided, however, that the cost cap for the year 2010 and beyond will remain at $3.5MM p/year if the SO₂ trigger in Section II.9. is not met. Once the trigger is met, the cost cap will increase to $6.0MM p/year. Whether the annual tonnage cap of SO₂ is achieved in any given year is limited by the annual cost cap applicable in that year.

5.    With respect to NO$_x$, the following additional triggers apply to NEP:

a.    On January 1, 2003, Brayton Point Unit Nos. 1 and 2 will receive allowances calculated pursuant to Section II.4.a. of this proposal if in calendar year 2000 the actual NO$_x$ emissions of the emissions inventory in the Region is reduced by no less than 50% from the emissions of the emissions inventory in the Region in the baseline year of 1990. If a reduction of 50% or greater is not achieved in calendar year 2000, the actual emissions of the emissions inventory will be measured in each successive calendar year until such time as the prescribed level of reduction from the year 1990 baseline is actually achieved. Brayton Point Unit Nos. 1 and 2 will receive allowances pursuant to Section II.4.a. of this proposal in the third year after the prescribed reductions in the emissions inventory are actually achieved; provided, however, that in no event shall the date the units are subject to the OSPS requirements of Section II.4. go beyond January 1, 2004 for Brayton Point Unit No. 1 and January 1, 2005 for Brayton Point Unit No. 2.

b.    On January 1, 2007, Brayton Point Unit No. 3 will receive allowances calculated pursuant to Section II.4.a. of this proposal if in calendar year 2003 the actual NO$_x$ emissions of the emissions inventory in the Region is reduced by no less than 75% from the emissions of the emissions inventory in the Region in the baseline year of 1990. If a reduction of 75% or greater is not achieved in calendar year 2003, the actual emissions of the emissions inventory will be measured in each successive calendar year until such time as the prescribed level of reduction from the year 1990 baseline is actually achieved. Brayton Point Unit No. 3 will receive allowances pursuant to

Confidential

6

Section II.4.a. of this proposal in the fourth year the after prescribed reductions in the emissions inventory are actually achieved; provided, however, that allowances for Brayton Point Unit No. 3 will be calculated pursuant to Section II.4.a. of this proposal by no later than January 1, 2010 subject to the $NO_x$ trigger specified in Section II.9. of this proposal.

**Confidential**



NEPCo Proposal - Annual NOx Tonnage

08/23/96

Confidential

NARR 61848



Confidential

NARR 61849



Mass Steam Turbine Boiler - 40 Years

Confidential

NARR 61850

08/23/96

## Massachusetts Steam Turbine / Boiler Units

| UTILITY | UNIT | FUEL TYPE | WINTER NET CAPACITY (MW) | COMMISSIONING YEAR |
|---|---|---|---|---|
| BECO | NEW BOS 1 | OIL/GAS | 380 | 1965 |
| | NEW BOS 2 | OIL/GAS | 380 | 1967 |
| | MYSTIC 4 | OIL | 135 | 1957 |
| | MYSTIC 5 | OIL | 126 | 1959 |
| | MYSTIC 6 | OIL | 138 | 1961 |
| | MYSTIC 7 | OIL/GAS | 592 | 1975 |
| CES | BLACKSTONE 1 | OIL/GAS | 16 | 1930 |
| | CANAL 1 | OIL | 557 | 1968 |
| | CANAL 2 | OIL/GAS | 584 | 1976 |
| | KENDALL 1-3 | OIL/GAS | 64 | 1950 (EST) |
| EUA | SOMERSET 6 | COAL | 110 | 1959 |
| HOLYOKE | CABOT 6&8 | OIL/GAS | 14 | 1949 |
| NU | MOUNT TOM | COAL | 147 | 1960 |
| | W SPRINGFIELD 3 | OIL/GAS | 107 | 1957 |
| TMLP | CLEARY 8 | OIL | 26 | 1966 |
| NEPCO | BP1 | COAL | 255 | 1963 |
| | BP2 | COAL | 253 | 1964 |
| | BP3 | COAL | 622 | 1969 |
| | BP4 | OIL/GAS | 446 | 1974 |
| | SH1 | COAL | 84 | 1952 |
| | SH2 | COAL | 80 | 1952 |
| | SH3 | COAL | 150 | 1958 |
| | SH4 | OIL | 400 | 1972 |

**MASSACHUSETTS TOTAL STEAM TURBINE CAPACITY (MW)**        **5666**

08/23/96

NARR 61851

Confidential

# Tab 6
# (1 of 2)

 **Eastern Utilities**                    *Memorandum*

October 3, 1997

To:     All Interested Power Suppliers

From:   Robert P. Clarke, Director of Power Supply

Re:     Auction of Standard Offer Service

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are seeking, through the attached Request for Qualifications, qualified power suppliers to participate in an auction for the rights to provide Standard Offer Service in the Companies' service territories.

Massachusetts and Rhode Island are in the forefront of states moving to restructure the electric utility industry and provide a choice of power suppliers to all retail customers. An integral part of the restructuring is the Standard Offer Service that the Companies will offer to their retail customers that have not yet chosen an alternative supplier. It is the Companies' intent, through the auction process, to secure supply commitments for one hundred percent of the Standard Offer Service load electric requirements.

We welcome your questions or comments on the attached RFQ and the Standard Offer Service, and invite you to direct your written inquiries to the postal or e-mail address given on the cover of the RFQ. In addition, we will hold a pre-submittal conference at 10 a.m. on Friday, October 24, 1997 at our West Bridgewater, MA offices, to discuss the process and to respond to your questions and comments. We look forward to your interest and your participation in the auction.



EXHIBIT
126
Clarke
3/15/07

Confidential                                              NEC079518

# EASTERN EDISON COMPANY
## BLACKSTONE VALLEY ELECTRIC COMPANY
### NEWPORT ELECTRIC CORPORATION

## REQUEST FOR QUALIFICATIONS
## TO BID TO SUPPLY
## STANDARD OFFER SERVICE

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting electricity suppliers for their qualifications to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Qualifications ("RFQ") must be received at the address set forth below no later than 4:00 p.m. on Friday, November 14, 1997. Responses to the RFQ must adhere to the specifications herein. Interested parties must submit five (5) copies of their responses to:

Robert P. Clarke
Director, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379

Please submit any questions concerning interpretation of the RFQ in writing to:

Peter D. Fuller
Energy Strategy Advisor
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
pfuller@eua.com

*The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall vest in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to modification by certain state and federal regulatory agencies having jurisdiction of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any regulator or court having jurisdiction, or legislation may require the Companies to modify or withdraw their plans as described herein. The Companies expressly reserve the right to modify the schedule and any provision herein to accommodate the standard offer procurement process of one or more other utilities. Furthermore, the Companies, for their convenience and in their sole discretion, may change the timetable for the actions described herein.*

Confidential

NEC079519

Table of Contents

I.    Introduction

II.   General Description

    A.    Standard Offer Service

    B.    Market Procurement for Suppliers of Standard Offer Service

III.  Threshold Qualifications to Bid in Standard Offer Auction

    A.    Administrative Fee

    B.    Financial Qualifications

    C.    Bid Deposit

    D.    Performance Surety Commitment

    E.    NEPOOL Participation

    F.    State Registration

    G.    Proposed Changes to the Standard Offer Service Agreement

IV.   Auction Process

V.    Administrative Issues

    A.    Auction

    B.    Standard Offer Service


Appendix 1    Standard Offer Service Price Schedules

Appendix 2    Fuel Index

Appendix 3    Draft Standard Offer Service Agreement

Appendix 4    Calculation of Bid Deposit Amounts, Performance Surety Amounts, and Maximum Eligibility

Appendix 5    Form of Bid Deposit and Performance Surety Documents

Appendix 6    NEPOOL Membership Application Requirements

Confidential

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) are jointly seeking qualified parties to participate in their planned auction of Standard Offer Service obligations. Eastern, Blackstone, and Newport (collectively, "the Companies") are wholly-owned subsidiaries of Eastern Utilities Associates, a registered public utility holding company, and are cooperating on the design and implementation of a process for soliciting suppliers of Standard Offer Service. In 1996, the Companies had total retail billings of 4,420 GWh and an annual peak of approximately 835 MW.

During the transition to a competitive retail electricity marketplace, the Companies will be providing Standard Offer Service to their retail customers that have not yet chosen a competitive supplier. "Standard Offer Service" is defined as firm, all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs[1]. Standard Offer Service is a transitional service which is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace. Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. Suppliers who successfully bid in the auction will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply. Suppliers will be responsible for meeting their share of the Companies' Standard Offer Service load under the Restated NEPOOL Agreement and rules of ISO New England, Inc. or successor rules, and their responsibilities will include, without limitation the following: i) installed and operable capacity; ii) operating reserves; iii) transmission arrangements and expenses not recovered in the Companies' transmission cost adjustment provisions; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Forecasts of Standard Offer Service load are uncertain. Retail electric customers may terminate Standard Offer Service at any time to purchase electricity from an alternative supplier and, with few exceptions, may not return to Standard Offer Service. Rather than bidding to supply given quantities of capacity or energy, Qualified Bidders will bid in the auction for percentage shares of the Standard Offer Service load. At the conclusion of the auction, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time. The Companies will provide Suppliers with certain load information on a periodic basis, such as numbers of customers taking Standard Offer Service and representative load shapes for each customer class. It

---

[1] Eastern's Standard Offer Service Tariff, No. M.D.P.U 340, is currently pending before the Massachusetts Department of Public Utilities. Blackstone's and Newport's tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

1

Confidential

NEC079521

will be the Supplier's responsibility to forecast its capacity and energy requirements to meet its Standard Offer Service responsibilities.

Each Supplier will have complete responsibility for its fixed percentage share of the Companies' real-time Standard Offer Service load (minute by minute, hour by hour, day by day). Although the quantities of energy and capacity required (MWh and MW) will fluctuate with changes in customer demand resulting from factors including, but not limited to, seasonal factors, normal daily load patterns, increased usage by existing Standard Offer customers, demand side management activities, extremes in weather, *etc.*, the Supplier's percentage of Standard Offer Service load will not vary within a calendar year.

This document provides Prospective Bidders with an overview of the qualification and auction processes, as well as the specific information necessary for a Prospective Bidder to be qualified by the Companies to participate in the auction. Section II presents a general description and approximate schedule for the implementation of the qualification and auction processes. Section III spells out the specific content and form requirements of qualification submittals. Prospective Bidders must satisfy certain financial criteria and must be recognized by the appropriate regulatory agencies to be considered Qualified Bidders. Section IV presents the design of the auction. Section V presents logistical details of the auction process and the Companies' proposed methods for administering their Standard Offer Service Agreements with Suppliers.

Several appendices are attached, including the wholesale and retail price schedules for Standard Offer Service (Appendix 1), a Fuel Index which will produce additional revenues to Suppliers in the event of high oil and gas prices after 1999 (Appendix 2), and a draft Standard Offer Service Agreement (Appendix 3). In addition, Appendix 4 presents the Companies' methodology for calculating bid deposit amounts, performance surety amounts, and Qualified Bidders' eligibility to bid in the auction. Appendix 5 presents acceptable forms of bid deposit and performance surety documents. Appendix 6 contains information regarding NEPOOL membership.

2

NEC079522

## II. General Description

### A. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. The Companies will solicit the competitive market for Suppliers of this service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and resell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs. To the extent that the auction of Standard Offer Service does not procure sufficient supplies to meet the Companies' full Standard Offer Service load, the Companies' affiliated power supply company, Montaup Electric Company (Montaup), or its successors or assigns, will provide service at a fixed price cap ("backstop" service).

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for forecasting energy and demand requirements and maintaining sufficient capacity entitlements to meet their obligations under the rules of ISO New England, Inc. for the full requirements of their share of Standard Offer Service load. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customers' meters. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments to Suppliers for Standard Offer Service will be based on the annual average prices shown in Appendix 1, adjusted for discounts bid in the auction and for the operation of the Fuel Index (Appendix 2), with no adjustment for time of use, load factor, or any other characteristics of the load.

### Massachusetts

Under the terms of an agreement between Eastern, Montaup, the Massachusetts Attorney General, the Massachusetts Division of Energy Resources, and other parties (Massachusetts Settlement Agreement), Eastern has agreed to provide Standard Offer Service to those of its customers who have not yet entered into power supply arrangements with competitive power suppliers, at fixed cents-per-kWh prices.[2] Eastern's Standard Offer Service will be available beginning on the Massachusetts Retail Access Date and continuing through 2004. The Massachusetts Retail Access Date is defined as the later of January 1, 1998 or the date when retail access is made available to all customers of the investor-owned utilities in Massachusetts, provided, however, in the event that retail access is not available to all customers of investor-owned utilities in Massachusetts by January 1, 1998, Eastern in its sole discretion shall have the option to accelerate the Retail Access Date and implement retail access for its customers with 90

---

[2] During the first year after the Massachusetts Retail Access Date, residential and certain small commercial customers will have the ability to return to Standard Offer Service within 90 days of first taking service from an alternative supplier.

3

Confidential

NEC079523

days advance notice. The Massachusetts Settlement Agreement is currently pending before the Massachusetts Department of Public Utilities and the Federal Energy Regulatory Commission.

### Rhode Island

Under the Rhode Island Utility Restructuring Act of 1996, Blackstone and Newport are each required to "arrange . . . for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers." This service is expected to be offered beginning on the Rhode Island Retail Access Date, and must remain in place through 2009. Under a comprehensive agreement (Rhode Island Settlement Agreement) between Blackstone, Newport, Montaup, the Rhode Island Attorney General, and the Rhode Island Division of Public Utilities and Carriers, a schedule of price caps will be established for Standard Offer Service offered to retail customers of Blackstone and Newport who have not yet chosen a supplier in the competitive market. The Rhode Island Retail Access Date is defined as the later of January 1, 1998 or the date of the RIPUC's final approval of Montaup's generation divestiture methodology, provided, however, that in any event, the Rhode Island Retail Access Date shall occur no later than three months after retail access is made available to forty percent or more of the kilowatt-hour sales in New England. The Rhode Island Settlement Agreement is subject to approval by the appropriate regulatory authorities, and approval is anticipated prior to the auction.

The Companies will use the qualification and auction processes described here to procure power supplies to provide this service for the years 1998-2004. Blackstone and Newport will arrange at a later date for power supplies to provide Standard Offer Service in 2005-2009.

### B. Market Procurement for Suppliers of Standard Offer Service

In order to obtain the lowest-cost, reliable supplies of Standard Offer Service for their customers, the Companies will procure supplies for a seven-year term through a competitive auction process open to all qualified suppliers of power. The Companies will auction percentage shares of their Standard Offer Service load for each year of the seven-year term. Bids will be in the form of percentage discounts off the stipulated Supplier Rates shown in Appendix 1. Contracts to provide Standard Offer Service will be awarded to the Qualified Bidders who offer the greatest discounts.

### Procedural Schedule

Prospective Bidders who wish to be considered for certification to participate in the auction must submit their qualifications, pursuant to Section III, no later than November 14, 1997. A pre-submittal conference will be held at EUA's West Bridgewater offices on Friday, October 24, 1997, at 10 a.m., to provide Prospective Bidders with additional information on the qualification requirements, the auction process, and the administration of Standard Offer Service by the Companies. The Companies will review the submittals and will provide written notification to each Prospective Bidder of its certification to participate or its failure to qualify no later than December 5, 1997. Prospective Bidders

4

Confidential

NEC079524

who submit satisfactory documentation of their qualifications to supply Standard Offer Service will subsequently be referred to as Qualified Bidders.

Any proposed changes to the draft Standard Offer Service Agreement (Appendix 3) must be submitted in writing along with submittals for qualification, but the Companies are under no obligation to incorporate any proposed changes into the final Agreement, which will be distributed with the Final Auction Rules.

The Companies will issue the Final Auction Rules upon execution of purchase and sale agreements for two of Montaup's primary fossil generating assets, Somerset Station and Montaup's share of the Canal 2 Unit, anticipated to occur before the end of 1997. The Final Auction Rules will contain details on the date and procedures for participating in the auction, the final form of the Standard Offer Service Agreement, and an Auction Participation Agreement.

The auction will consist of an ascending-bid auction for shares of the Companies' Standard Offer Service load for the full seven-year term. The auction will continue for multiple rounds, subject to activity rules described in Section IV and more fully specified in the Final Auction Rules. In the event that less than one hundred percent (100%) of the Standard Offer Service load is taken in the full-term auction, the Companies will conduct a supplemental, single-year auction for the remaining shares. The results of the full-term auction will not be affected by the single-year auction in any way; a winning bid in the full-term auction will not be displaced by any combination of bids in the supplemental single-year auction.

The auction is anticipated to take place approximately 30 days after the issuance of the Final Auction Rules. Standard Offer Service Agreements will be executed with winning bidders within ten (10) business days after completion of the auction. The Companies will begin taking deliveries from Suppliers under the Standard Offer Service Agreements on the later of i) the later of the Massachusetts or Rhode Island Retail Access Date, or ii) the effective date of the contracts. The Retail Access Date in both states may occur as early as January 1, 1998.

5

Confidential

NEC079525

### III. Threshold Qualifications to Bid in Standard Offer Auction

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the auction must meet the Companies' minimum eligibility requirements as outlined below. Documentation of compliance with each item must be provided. The Companies will have final authority to determine if a respondent meets or does not meet these requirements.

#### A. Administrative Fee

Each Prospective Bidder who wishes to participate in the standard offer auction must submit a complete package documenting its qualifications, plus a non-refundable administrative fee of $1,000, to the address above no later than 4:00 p.m. on November 14, 1997. The Companies reserve the right to accept submittals after this date but are under no obligation to do so.

#### B. Financial Strength

Each Prospective Bidder wishing to participate in the auction must submit the following information to be considered for certification:

##### 1. General Information

- The full legal name of Prospective Bidder and any Guarantor(s).

- The name and title of the authorized contact person(s), with a street address, mailing address, telephone number, facsimile number and e-mail address for each.

- A legal description of the Prospective Bidder and any Guarantor(s) (*e.g.*, corporation, joint venture, limited partnership, partnership or sole proprietorship) and state of organization or residency for each. If the Prospective Bidder or any Guarantor(s) is a corporation, include the names and titles of all officers and directors of the corporation and the names of all stockholders possessing five percent (5%) or more of the stock of the corporation. If a partnership, include the names of all general and limited partners for each.

- The date of founding and the corporate history of Prospective Bidder and any Guarantor(s).

- A description of any corporate affiliations or joint venture partnerships.

##### 2. Financial Information

- Audited or certified financial statements, including balance sheet and statement of income and cash flow for Prospective Bidder and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.

- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.

6

NEC079526

- A description of any corporate affiliations or joint venture partnerships.

### 3. References

- The name, title, address, and telephone number for five (5) references knowledgeable of Prospective Bidder's or any Guarantor's business practices, organization and finances.

### 4. Defaults, Litigation and Penalties

- For each Prospective Bidder and any Guarantor(s) or any affiliate of each which in the past five years has been determined in writing by an arbitration panel or a court to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.

- A detailed description of any situation within the past five (5) years in which the Prospective Bidder or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations.

- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the Prospective Bidder or its Guarantor(s), or their respective officers or directors.

- A detailed description of any penalties, judgments, consent decrees, or other sanctions within the past five (5) years in any venue involving the Prospective Bidder or its Guarantor(s).

### 5. Other Adverse Matters

- A detailed description of any present or anticipated facts known to the Prospective Bidder or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

### 6. Authority

Prospective Bidder and its Guarantor(s) must provide a statement:

- that it has or will obtain all necessary regulatory authorizations for it to perform lawfully its obligations under each Standard Offer Service Agreement that it may enter into with the Companies;

- that the execution, delivery and performance of each Standard Offer Service Agreement will be within its lawful powers;

- that each Standard Offer Service Agreement will be duly authorized by all necessary corporate action and will not violate any of the terms and conditions in its governing documents, any contract or other agreement to which it is a party, or any law applicable to it; and

7

NEC079527

- that each Standard Offer Service Agreement when entered into will constitute its legally valid and binding obligation enforceable in accordance with its terms.

The Companies agree that all information they receive from the Prospective Bidders and any Guarantor(s) shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the Prospective Bidder's and/or Guarantors' qualifications to bid in the auction described herein.

## C. Bid Deposit

To ensure that all bidding in the auction is the legitimate action of a serious bidder, the Companies will require a bid deposit, calculated in accordance with Appendix 4, from each Qualified Bidder prior to the auction. The amount of the bid deposit or the face amount of the Qualified Bidder's performance surety commitment, whichever is more restrictive, will establish a limit on the Qualified Bidder's eligibility to participate in the auction. A Qualified Bidder who successfully bids in the auction and fails to provide a performance surety and execute a Standard Offer Service Agreement within the terms of the Auction Participation Agreement will forfeit its entire bid deposit amount.

As part of its submittal of qualifications, a Prospective Bidder and any Guarantor(s) must provide a statement that they understand the bid deposit mechanism and that they are prepared to supply a bid deposit, in a form acceptable to the Companies, prior to execution of an Auction Participation Agreement.

## D. Performance Surety Commitment

Each Prospective Bidder or any Guarantor(s) of each Prospective Bidder must provide one of the following:

(a) A commitment letter to the Companies from a bank or banks stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the bank(s) will arrange for the issuance of performance letters of credit collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each bank proposing to issue letters of credit on behalf of a Prospective Bidder or its Guarantor(s) maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. The bank(s) shall specify the face amount of letters of credit each can arrange and the periods in which they can be outstanding. The bank(s) shall affirm that, upon completion of the auction, they will be prepared to issue such letter(s) of credit to the Companies within ten (10) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

8

Confidential

NEC079528

(b) A commitment letter to the Companies from a surety company or companies stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the surety company or companies will arrange for the issuance of performance bonds collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each surety company proposing to issue performance bonds on behalf of said Prospective Bidder or its Guarantor(s) maintain a rating of "B+" or better from A.M. Best Company. The surety company or companies shall specify the face amount of performance bonds each can arrange and the periods in which they can be outstanding. The surety company or companies shall affirm that, upon completion of the auction, they will be prepared to issue such performance bonds to the Companies within ten (10) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

(c) Such other financial assurances as the Companies, in their sole discretion, deem appropriate to secure all of a Prospective Bidder's or its Guarantor(s)' obligations to the Companies, including those arising from participation in the auction and those contained in the Standard Offer Service Agreement.

All performance letters of credit or performance bonds shall be issued in substantially the forms given in Appendix 5.

The face amount of the performance letters of credit or performance bonds specified in such a commitment letter or the value of such other acceptable financial assurances provided will be used, as will the required bid deposits, to determine the Prospective Bidder's maximum eligibility to bid in the auction as described in Appendix 4.

## E. NEPOOL Participation

To participate in the Standard Offer Service auction, a Prospective Bidder must be a member in good standing of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England, Inc. billing system. As an alternative to being a member, the Prospective Bidder may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the Prospective Bidder's proposed commitment to provide Standard Offer Service or for such period until the Prospective Bidder becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the Prospective Bidder in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the Prospective Bidder's submittal of qualifications.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement.

9

Confidential

The requirements for becoming a NEPOOL participant are included in Appendix 6. For new members, it is recommended that the NEPOOL Membership Committee be contacted as early as possible because the application process, including Federal Energy Regulatory Commission (FERC) approval, may take several months.

### F. State Registration

To participate in the auction, each Prospective Bidder must provide documentation that it is registered with the Rhode Island Division of Public Utilities and Carriers as a Non-Regulated Power Producer and must provide documentation that it has complied with the Massachusetts Department of Public Utilities' registration requirements for competitive suppliers then in effect, if any.

### G. Proposed Modifications of the Draft Standard Offer Service Requirements Agreement

At the completion of the auction, each successful bidder will be required to sign the Companies' Standard Offer Service Agreement, without modification, within ten (10) business days. To accommodate this schedule, Prospective Bidders are requested to review the draft Agreement attached as Appendix 3 and to provide any comments, exceptions, or proposed changes as part of their submittal of qualifications.

The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement. The final Standard Offer Service Agreement will be provided to all Qualified Bidders with the Final Auction Rules and the Auction Participation Agreement. By executing the Auction Participation Agreement, Qualified Bidders will agree to the terms in the final Standard Offer Service Agreement and to execute the Agreement, without modification, if they are successful in the auction.

Confidential

NEC079530

## IV. Auction Process

To be auctioned are 100 shares of the Standard Offer Service load for each year. Each share represents one percent of the Companies' aggregated Standard Offer Service load. These shares will be sold in an ascending-clock auction. In each round, Qualified Bidders will bid the number of shares they desire at the discount specified on the auction "clock". If more than 100 shares are bid, then the discount is increased by a clock increment and Qualified Bidders indicate the number of shares they desire at the new, higher discount. The auction ends when fewer than 100 shares are bid at the specified discount. Before the auction, Qualified Bidders will provide a bid deposit, which, along with the face amount of the Qualified Bidder's performance surety commitment, will determine the maximum number of shares they are eligible to bid on.

The auction may actually consist of two auctions conducted in sequence. First, a full-term auction will be held. Bids in the full-term auction will be for a specified number of shares of Standard Offer Service load across all seven years, 1998 through 2004. At the conclusion of the full-term auction, if there are remaining shares that did not sell, a single-year auction will be held. In the single-year auction, bids are for shares in a specified year. Each Qualified Bidder's initial eligibility in the single-year auction will be its initial eligibility in the full-term auction less its winnings in the full-term auction.

The rules for the full-term and the single-year auctions are nearly identical. We begin with a description of the full-term auction and then point out the differences in the single-year auction.

### A. The Full-Term Auction

In the initial round, each Qualified Bidder submits a bid indicating the number of shares it desires at a discount of 0% off the stipulated Supplier Rates (see Appendix 1). If the total shares bid is less than or equal to 100, then the auction ends with each bidder winning the number of shares it bid at the 0% discount. If the total shares bid exceeds 100, then the discount is raised by one clock increment and a new round begins. In each round, each Qualified Bidder bids the number of shares it desires at the specified discount. If the total shares bid is greater than 100, then the discount is increased by another clock increment and the process repeats. If the total shares bid is less than or equal to 100, then each bidder wins the shares bid at the specified discount. If the total shares bid is less than 100, then the Rationing Rule is invoked to assign the remaining shares.

*Rationing Rule*: Any remaining shares not awarded at the highest clock discount are awarded to the Qualified Bidders that reduced their bids in the final round. The Qualified Bidder that reduced its shares bid by the smallest amount (in percentage terms) is awarded additional shares, at the previous round's clock discount, up to the total amount of its reduction from the previous round. If needed, additional shares will be awarded to other Qualified Bidders in ascending order of their percentage reductions from the previous rounds. In the event of two or more Qualified Bidders with identical percentage reductions, the smaller absolute reduction will be favored. This rationing mechanism

11

NEC079531

ensures that shares not bid at the highest clock discount are awarded at the next highest discount.

*Activity Rule*: The shares bid in any round cannot exceed the bidder's eligibility. Eligibility is initially determined by the bidder's bid deposit and its available performance surety. If a bidder bids less than its full eligibility in any round, its eligibility is permanently reduced to the shares bid. Hence, a bidder can only hold its shares bid at a constant level or decrease the number as the discount increases.

Each bid is binding and remains in force until it is accepted or rejected by the Companies at the conclusion of the auction. Each successful Qualified Bidder is required to execute a Standard Offer Service Agreement. Upon execution of Standard Offer Service Agreements for 100 shares, the remaining bids are rejected.

*The table below gives an example of an ascending-clock auction. At a discount of 0%, 200 shares are bid. Hence, the "clock" increases by one increment to 1%. The total shares bid drops to 160 at a 1% discount. The process continues until the total shares bid is less than 100 (round 7). At this point, the auction ends. Ninety-seven shares are awarded to Qualified Bidders at a 4.5% discount. The remaining three shares are awarded, at a 4% discount, to the Qualified Bidders that reduced their bids in round 7 by the smallest percentage relative to their bids in round 6.*

| Round | Discount | Total Shares Bid |
|-------|----------|------------------|
| 1 | 0% | 200 |
| 2 | 1% | 160 |
| 3 | 2% | 135 |
| 4 | 3% | 115 |
| 5 | 3.5% | 108 |
| 6 | 4% | 101 |
| 7 | 4.5% | 97 |

*The Rationing Rule would operate as shown in the table below for this example. Qualified Bidder A would be awarded two shares at a 4% discount, and Qualified Bidder B would be awarded one.*

| Bidder | Round 6 Shares Bid | Round 7 Shares Bid | % Decrease | Absolute Decrease | Shares Awarded |
|--------|--------------------|--------------------|-----------|-------------------|----------------|
| A | 20 | 18 | 10% | 2 | 2 |
| B | 10 | 8 | 20% | 2 | 1 |
| C | 50 | 50 | - | - | - |
| D | 21 | 21 | - | - | - |
|   | 101 | 97 | | | |

Confidential

NEC079532

*The total shares awarded would be as shown in the following table.*

| Bidder | Shares | Discount |
|--------|--------|----------|
| A | 18 | 4.5% |
|   | 2 | 4.0% |
| B | 8 | 4.5% |
|   | 1 | 4.0% |
| C | 50 | 4.5% |
| D | 21 | 4.5% |
|   | 100 | |

### B.  The Single-Year Auction

If Standard Offer Service Agreements for less than 100 shares are executed after the full-term auction, the remaining shares will be sold in a single-year auction. Rather than having a single discount across all years, as in the full-term auction, there is a separate discount or "clock" for each of the seven years. Also, since the bid deposit and performance surety amounts required to be eligible to bid vary over the seven years, eligibility in the single-year auction is expressed in dollars rather than in percent shares.

Qualified Bidders may bid on any one or more years, and may bid for different shares and at different discounts in each year. The shares bid in any round cannot exceed the Qualified Bidder's eligibility. A Qualified Bidder's initial eligibility in the single-year auction reflects its initial eligibility in the full-term auction less any shares won in the full-term auction. The activity rule in the single-year auction permits Qualified Bidders to increase the shares bid during the first four rounds.

*Activity Rule*: A Qualified Bidder must submit bids totaling at least 25% of its initial eligibility in the first round of the single-year auction, 50% in the second round, 75% in the third round, and 100% in the fourth round. Failure to meet or exceed these activity levels will result in a corresponding reduction in eligibility. *For example, if a Qualified Bidder has eligibility equivalent to $900,000 of bid deposit, but only bids on the equivalent of $180,000 of shares in the first round, then its eligibility is reduced by $55,000 ($900,000 x 25% = $225,000; $225,000 - $180,000 = $55,000).* After the fourth round, if a bidder bids less than its eligibility, then in all subsequent rounds its eligibility is limited to the shares bid in the prior round. Hence, a bidder can increase its shares bid only in the first four rounds.

### C.  Initial Discounts and Clock Increments

The initial discount is 0%. In subsequent rounds, the discount is increased by the clock increment. The clock increment will likely change as the auction progresses and will be stated before each round of bidding. In the single-year auction, different years may have different clock increments. Typically, the increments decrease later in the auction.

13

Confidential

NEC079533

## V. Administrative Issues

### A. Auction

1.  Auction Participation Agreement

Participation in the auction will be governed by an Auction Participation Agreement and the terms of the Final Auction Rules. Qualified Bidders will be required to execute an Auction Participation Agreement, affirming their commitment to i) abide by the rules of the auction as stated in the Final Auction Rules, ii) abide by any decisions of the auctioneer[3], and iii) if successful in the auction, provide the requisite performance surety documents and execute a Standard Offer Service Agreement within ten (10) business days after the conclusion of the auction.

2.  Bid Deposit

At least ten (10) business days prior to the commencement of the auction, each Qualified Bidder or its Guarantor(s) shall deliver to the Companies a bid deposit proportional to the percentage share of Standard Offer Service load that the Qualified Bidder proposes to bid on. The bid deposit will be determined in accordance with a formula generally as provided in Appendix 4. The bid deposit shall be provided in one of the following forms:

*   Qualified Bidder's or its Guarantor's certified check payable to the Companies;

*   a bank check drawn on a financial institution acceptable to the Companies;

*   funds electronically transferred to the account of the Companies in accordance with the following instructions:

                    Fleet Bank
                    ABA # 011-000-206
                    For Credit to:  Eastern Edison Company
                                    Blackstone Valley Electric Company
                                    Newport Electric Corporation
                    A/C # xxxxxxxxxxxxx
                    Ref: (Bidder/Guarantor Name) Bid Deposit; or

*   a performance letter of credit or performance bond issued by a bank or surety company which satisfies the rating criteria established in Section III.B(a) and (b), respectively. Each performance letter of credit or bond will be required to be in substantially the form given in Appendix 5.

As a condition of the auction, the Companies will not accept any bid for which the Qualified Bidder or its Guarantor(s) has not previously provided the required amount of

---

[3] The Companies may act as auctioneer, or may hire an independent entity with particular auction expertise.

14

NEC079534

bid deposit.

### 3. Maximum Eligibility

A Qualified Bidder's maximum eligibility to bid in the auction will be based on whichever of the following two measures results in the lower eligibility:

i)  the face amount of a performance bond or equivalent surety for which the Qualified Bidder provides a commitment letter, as outlined in Section III.D; or
ii) the amount of the bid deposit.

Eligibility, in terms of shares of Standard Offer Service load, will be governed by the relationships presented in Appendix 4. At least five (5) business days prior to the start of the full-term auction, the Companies will certify in writing each Qualified Bidder's maximum eligibility to bid in the full-term auction.

### 4. Bid Deposit Refunds/Credits:

Bid deposits will be refunded in accordance with the Prospective Bidder's or Guarantor's direction in one of the following manners:

- For bids selected by the Companies:

  Cash deposits will be fully refundable, with interest, one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor; or

  Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor.

- For bids which are not selected by the Companies:

  Cash deposits will be fully refundable, with interest, one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid; or

  Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid.

If a successful Qualified Bidder or its Guarantor(s) fails to honor its bid by providing the required performance surety and executing a Standard Offer Service Agreement within ten (10) business days of completion of the auction, the entire bid deposit amount will be forfeited. The next bidder(s) whose aggregate shares would bring the total shares to exactly 100 will then be considered winning bidders and will be

Confidential

NEC079535

required to provide performance sureties and to execute Standard Offer Service Agreement within ten (10) business days of notification.

Cash deposits will be eligible for earnings at a rate of three percent (3%) per annum commencing with the business day that said funds become fully available to the Companies and continuing through the business day that the Companies issue a refund. All refunds will be in the form of a Company check payable to the Qualified Bidder or its Guarantor(s) with accrued interest.

### B.  Standard Offer Service

1.  Performance Surety

Within ten (10) business days of the completion of the auction, and as a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Bidder will be required to deliver to the Companies a performance surety securing the Qualified Bidder's full responsibility for Standard Offer Service load over the seven-year term.

Acceptable forms of surety include a performance letter of credit or a performance bond, in substantially the form as provided in Appendix 5.  Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service.  Each surety company or companies issuing a performance bond must maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Agreement.  Performance letters of credit or bonds, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and shall be renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

Failure to provide the performance surety within ten (10) business days after the completion of the auction will disqualify the Qualified Bidder and will result in forfeiture of its entire bid deposit.  Failure to maintain such surety in good standing after execution of the Standard Offer Service Agreement will be considered an event of default and the Companies will exercise their rights under the Agreement accordingly.

2.  Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England, Inc. each Supplier's hourly share of the aggregated load requirements of those customers taking Standard Offer Service.  The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a

16

NEC079536

proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the MDPU and RIPUC, summarized as follows:

-Energy and demand for each retail account will be estimated for each hour using a combination of inputs including weather and load data from the EUA Supervisory Control and Data Acquisition (SCADA) system, sample meter data, historical load shapes, and individual customer usage ratios.

-The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.

-The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.

-Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.

-The hourly Standard Offer loads, including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.

-The daily load information will be transferred to ISO New England, Inc. for inclusion in each Supplier's own-load dispatch (or such other settlement process developed by NEPOOL or ISO New England, Inc.).

The Terms and Conditions for Suppliers may be revised, amended, supplemented, or supplanted in whole or in part from time to time by state regulatory agencies or by law.

3. Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

Suppliers will receive daily reports of their estimated hourly Standard Offer Service loads, and monthly reports of the number of customers in each rate class taking Standard Offer Service along with representative customer load shapes for each rate class. The Companies will also provide, on an annual basis, estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for the prior twelve months and a forecast of Standard Offer Service peak and energy demands for the upcoming twelve months, assuming no incremental migration of customers to competitive suppliers.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies receive customer notifications of

17

NEC079537

significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts.  Suppliers are advised to rely on their own projections of load and market dynamics.

4.  Minimum Load Obligations

Over time, it is expected that Standard Offer Service load will decline, and thus the actual energy and demand  responsibilities (in MW and MWh) associated with a given percentage of the load will decline as well.  The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater.  If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

5.  Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement.  The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, etc.

18

NEC079538

**APPENDIX 1**
**STANDARD OFFER SERVICE PRICE SCHEDULES**

Confidential

NEC079539

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction will be based on the following predetermined schedules of prices for energy consumed, as described in the applicable retail Standard Offer Service tariffs. The rate for customers of Eastern is subject to adjustment only for the operation of the Fuel Index. Rates charged to customers of Blackstone and Newport [will be determined].

| Calendar Year | Price per Kilowatt hour | |
| --- | --- | --- |
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | |
| 1999 | 3.1 cents | TO BE |
| 2000 | 3.4 cents | DETERMINED |
| 2001 | 3.8 cents | |
| 2002 | 4.2 cents | |
| 2003 | 4.7 cents | |
| 2004 | 5.1 cents | |

The Supplier Rate defines the price cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement. Prices apply to energy as measured at the retail customers' meters.

| Calendar Year | Price per Kilowatt hour |
| --- | --- |
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Supplier Rates, reduced by the applicable Discounts offered in the Companies' auction. Additional revenues to Suppliers may be realized through the operation of the Fuel Index.

Confidential

NEC079540

**APPENDIX 2**

**FUEL INDEX**

Confidential

NEC079541

The Companies will incorporate a Fuel Adjustment mechanism in their respective retail Standard Offer Service tariffs which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulfur) and natural gas after 1999. This fuel adjustment mechanism is subject to continued regulatory supervision and approval which allows the Companies to collect such revenues from their retail customers taking Standard Offer Service. The formula and indices used for calculating such revenues are also subject to regulatory change.

Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels. The Companies' retail Standard Offer Service tariffs are not yet finalized, and will likely differ between Massachusetts and Rhode Island. The actual Fuel Adjustment mechanism will vary in accordance with the differing retail terms in the two states, but will operate substantially in the manner described below:

The retail Standard Offer rate in effect for a given month is multiplied by a "Fuel Adjustment Multiplier" that is set equal to 1.0 and thus has no impact unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The benchmark rates for retail Standard Offer Service are based on the following predetermined average annual flat rates for energy consumed:

| Calendar Year | Annual Company Average Price per Kilowatt hour | |
| --- | --- | --- |
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | |
| 1999 | 3.1 cents | TO BE |
| 2000 | 3.4 cents | DETERMINED |
| 2001 | 3.8 cents | |
| 2002 | 4.2 cents | |
| 2003 | 4.7 cents | |
| 2004 | 5.1 cents | |

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in *The Wall Street Journal*, expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

2 -1

Confidential

NEC079542

<u>Market Oil Price</u> is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> <u>Oil Index</u> is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No.6 oil into New York harbor, as reported in *Platt's Oilgram U.S. Marketscan* in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies for approval. Upon regulatory approval, such indices will be used for calculating Fuel Adjustment revenues in accordance with the order(s) and shall be incorporated into the terms of the retail Standard Offer Service tariffs.

<u>Fuel Trigger Point</u> is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

|  |  |
|------|-------------|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment Multiplier for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment Multiplier} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{ Market Oil Price} + \$0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where:   Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment Multiplier would be:*

$$\frac{(\$3.50 + \$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate is increased by this Fuel Adjustment Multiplier for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

The incremental revenues attributable to the Customer Rate Fuel Adjustment mechanism will be allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier in the applicable billing month, pursuant to Article 5 of the Standard Offer Service Agreement.

2-2

Confidential

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment Multiplier determined.

2 -3

Confidential

NEC079544

**APPENDIX 3**

**DRAFT STANDARD OFFER**
**SERVICE AGREEMENT**

Confidential

NEC079545

Appendix 3   Standard Offer Service Agreement

DRAFT

Standard Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

_____

Dated _____

10/2/97 Draft

Confidential

NEC079546

# TABLE OF CONTENTS

Page

ARTICLE 1.    Definitions . . . . . . . . . . . . . . . . .    1

ARTICLE 2.    Term . . . . . . . . . . . . . . . . . . . . .    3

ARTICLE 3.    Supplier Responsibilities . . . . . . . . . .    3

ARTICLE 4.    Estimation of Hourly Loads and Reporting to
              the ISO . . . . . . . . . . . . . . . . . . .    4

ARTICLE 5.    Price . . . . . . . . . . . . . . . . . . . .    5

ARTICLE 6.    Billing and Payments . . . . . . . . . . . .    6

ARTICLE 7.    Security Provisions . . . . . . . . . . . . .    6

ARTICLE 8.    Events of Default, Liability, Relationship of
              the Companies . . . . . . . . . . . . . . . .    7

ARTICLE 9.    Termination . . . . . . . . . . . . . . . . .    8

ARTICLE 10.   Force Majeure . . . . . . . . . . . . . . . .    9

ARTICLE 11.   Assignment . . . . . . . . . . . . . . . . .    10

ARTICLE 12.   Successors and Assigns . . . . . . . . . . .    10

ARTICLE 13.   Resolution of Disputes . . . . . . . . . . .    10

ARTICLE 14.   Interpretation . . . . . . . . . . . . . . .    12

ARTICLE 15.   Severability of Provisions . . . . . . . . .    12

ARTICLE 16.   Accounts and Records . . . . . . . . . . . .    12

ARTICLE 17.   Limitations on Liability and Indemnification .   12

ARTICLE 18.   Regulation . . . . . . . . . . . . . . . . .    13

ARTICLE 19.   Notices . . . . . . . . . . . . . . . . . . .    14

ARTICLE 20.   Miscellaneous . . . . . . . . . . . . . . . .    14

Appendix A  Schedule of Supplier's Share of Offer Service and
Delivered Energy Price

I

Confidential

NEC079547

## STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this _____ day of _____ _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and

_____
_____
_____
_____ ,("Supplier"), on the other hand.

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any action by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1.    Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Bid Price" shall mean the Standard Offer Wholesale Price in each calendar year multiplied by the Supplier's Discount in the same calendar year as shown in Appendix A.

"Commencement Date of Service" shall mean 12:01 A.M. on _____ .

1

Confidential

NEC079548

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"Discount" shall mean the percentage discount off the Standard Offer Wholesale Price of electricity, which discount is offered by Supplier for a given Contract Year as determined through the Company's Standard Offer auction.

"D.P.U." shall mean the Massachusetts Department of Public Utilities.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NYMEX Contract" shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B.  The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

2

NEC079549

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.P.U., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.P.U. or as otherwise provided by law.

ARTICLE 2.    Term:

The term of this Agreement shall begin on the Commencement Date of Service and end on 12:00 a.m. _____, unless terminated in accordance with Article 8 or 9.

ARTICLE 3.    Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power

3

Confidential

NEC079550

# Tab 6
# (2 of 2)

support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

ARTICLE 4.4.    Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.U., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer

4

NEC079551

Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.    Price:

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price + Fuel Adjustment Factor

where:    Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which is required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

5

ARTICLE 6.    <u>Billing and Payments</u>:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5.  The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 13 of this Agreement.  Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data.  Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment.

ARTICLE 7.    <u>Security Provisions</u>:

As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n) = SF \times STDL(n-1) \times \{ \; (PSTD(n) \times TD(n)) \\ + (PSTD(n+1) \times TD(n+1)) \\ + (PSTD(n+2) \times TD(n+2)) \; + \ldots \ldots + \\ + (PSTD(2004) \times TD(2004)) \; \}$$

Confidential

NEC079553

Where:

SD(n)    is the Security Deposit in Contract Year (n)

SF    is the Security Fee equal to $10.00/MWh

STDL(n-1)    is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year (n-1), expressed in MWh.  In 1997, STDL shall be 4,500,000 MWh.

PSTD(n)    is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n)

TD(n)    is the Transition Discount in Contract Year (n), calculated as follows:

$$TD(n) = 1.00$$
$$TD(n+1) = (7-1)/7 = 0.857$$
$$TD(n+2) = (7-2)/7 = 0.714$$
$$TD(n+3) = (7-3)/7 = 0.571$$
$$TD(n+4) = (7-4)/7 = 0.429$$
$$TD(n+5) = (7-5)/7 = 0.286$$
$$TD(n+6) = (7-6)/7 = 0.143$$

To secure the above amounts, Supplier shall provide a letter of credit or performance bond in a form acceptable to Company. The bank issuing such letter of credit on behalf of a Supplier must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. If a performance bond is provided it is required that each surety company issuing such performance bond on behalf of a Supplier must maintain a rating of "B" or better from A.M. Best Company.

The Performance Letter of Credit or Bond, if not issued for the full term of the Supplier's Standard Offer Service obligation, shall be renewed on an annual basis or replaced and superseded by a like kind of surety at least thirty (30) days prior to the expiration of such prior surety on a continuing basis to the termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial security may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 for the remaining term of this Agreement.

ARTICLE 8:    Events of Default, Liability, Relationship of the Companies:

(1)  With the exception of Force Majeure described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

7

Confidential

NEC079554

(a)  Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)  Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c)  Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days after notice thereof from the Companies.

(2)  Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default.  In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3)  Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security amounts calculated pursuant to Article 7 and regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the financial surety used to secure such amounts. The Parties expressly agree that the amounts set forth in the financial surety documentation do not constitute liquidated damages.  In addition to the financial surety amounts, the Supplier shall be liable to the Companies for any direct damages resulting from an Event of Default, including replacement power costs incremental to the Bid Price. The Companies may pursue any remedies or other damages provided for under law, including indirect, consequential, reliance and incidental damages, and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9.    Termination:

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

8

Confidential

NEC079555

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier.

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide financial surety to the Companies pursuant to Article 7 shall be terminated.

ARTICLE 10.     Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event directly and adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating any generating facility, or and event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b)  The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

Confidential

NEC079556

(c)  The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d)  The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 11.    Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (I) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 12.    Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 13.    Resolution of Disputes:

Subject to Section 4 of Article 8, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith.  The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks.  In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such

10

NEC079557

other period as the Companies and the Supplier may jointly agree
upon, such dispute may be submitted to arbitration and resolved
in accordance with the arbitration procedure set forth herein if
the Companies and Supplier jointly agree to submit it to
arbitration. Nothing in this Article 13 shall prevent the
Companies from issuing, pursuant to Sections 1(a) and ® of
Article 8, notice of failure to comply with, observe or perform
this Agreement or to maintain any of the security requirements
under Article 7 to Supplier, and upon failure to cure or rectify
by Supplier, exercise their rights under the financial surety.
Supplier, however, may dispute the exercise by the Companies of
their rights under the financial surety, under this Article 13,
after such exercise.

The arbitration shall be conducted before a single neutral
arbitrator or arbitrator panel appointed by the Parties. If the
Parties agree upon a single arbitrator within ten (10) days of
the referral of the dispute to arbitration, that arbitrator shall
serve, otherwise the Companies and Supplier shall each choose one
arbitrator, who shall serve on a three member arbitration panel.
The two arbitrators so chosen shall within twenty (20) days
select a third arbitrator to act as chairman of the arbitration
panel. If the two arbitrators are unable to select a third
arbitrator, each arbitrator shall select three candidates. A
list of the six candidates, along with their resumes, shall be
provided in alphabetical order, with no indication of the
arbitrator who selected such candidate or the Party who selected
the arbitrator who selected such candidate, to the American
Arbitration Association ("AAA"), who will select one candidate.
If that candidate is unable or unwilling to serve, AAA shall
select another candidate. This process will be repeated until a
third arbitrator is selected or the list of candidates is
exhausted. If the list of candidates is exhausted, the
arbitrators shall submit a new list of candidates and the process
set forth above shall be repeated a second time. In all cases,
the arbitrator(s) shall be knowledgeable in electric utility
matters, including electricity transmission and bulk power
issues, and shall not have any current or past substantial
business or financial relationships with any Party to the
arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s),
shall generally conduct the arbitration in accordance with the
Commercial Arbitration Rules of the American Arbitration
Association. There shall be no formal discovery conducted in
connection with the arbitration, except as specifically
authorized by a vote of the panel. The Parties shall exchange
witness lists and copies of any exhibits that they intend to
utilize in their direct presentations at any hearing before the
arbitrator(s) at least ten (10) days prior to such hearing, along
with any other information or documents specifically requested by
the arbitrator(s) prior to the hearing. Unless otherwise agreed,
the arbitrator(s) shall render a decision within ninety (90) days
of his, her, or their appointment and shall notify the Parties in
writing of such decision and the reasons therefor, and shall make
an award apportioning the payment of the costs and expenses of
arbitration, including panel costs, among the Parties, provided,
however, that each Party shall bear the costs and expenses of its

11

own attorneys, expert witnesses and consultants.  The
arbitrator(s) shall be authorized only to interpret and apply the
provisions of this Agreement and shall have no power to amend or
modify this Agreement in any manner.  The decision of the
arbitrator(s) shall be final and binding upon the Parties, and
judgment on the award may be entered in any court having
jurisdiction.  The decision of the arbitrator(s) may be appealed
solely on the grounds that the conduct of the arbitrator(s), or
the decision itself, violated the standards required under the
Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The
Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c.
251, § 1 et seq.).

ARTICLE 14.    Interpretation:

    The interpretation and performance of this Agreement shall
be in accordance with and shall be controlled by the laws of the
Commonwealth of Massachusetts, without regard to Massachusetts
conflict of law principles.

ARTICLE 15.    Severability of Provisions:

    Subject to the provisions of Article 14 above, a holding by
any court having jurisdiction that any provision of this
Agreement is invalid or unenforceable shall not result in
invalidation or unenforceability of the entire Agreement but all
remaining terms shall remain in full force and effect.

ARTICLE 16.    Accounts and Records:

    The Companies and Supplier shall keep complete and accurate
records of their operations hereunder and shall maintain such
data for a period of at least two (2) years after final billing.
The Companies and Supplier shall have the right, during normal
business hours, to examine and inspect all such records insofar
as may be necessary for the purpose of ascertaining the
reasonableness and accuracy of all relevant data, estimates or
statement of charges associated with service hereunder.

ARTICLE 17.    Limitations on Liability and Indemnification:

    Each Party agrees to indemnify, defend, and hold the other
Party (including the other Party's affiliated companies,
trustees, directors, board members, officers, employees, and
agents) harmless from and against any and all third party
damages, costs, claims, liabilities, actions or proceedings
arising from or claimed to have arisen from the negligent acts or
omissions of the indemnifying Party's employees or agents.

    The Parties hereby waive and release the other Party as well
as the other Party's affiliated companies, trustees, directors,
officers, employees, and agents from any liability, claim, or
action arising from damage to its property due to the performance
of this Agreement.

12

Confidential

NEC079559

ARTICLE 18.    <u>Regulation</u>:

(a)  This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided</u>, <u>however</u>, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)  This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules").  If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule.  If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 17, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 19.    <u>Notices</u>:

Any notice, demand or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

<u>To Companies</u>:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

<u>To Supplier</u>:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

13

NEC079560

ARTICLE 20.    <u>Miscellaneous</u>:

(a)  Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)  Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)  Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)  This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)  Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)  Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:                Supplier's NAME

                         By:_____

On Behalf of the Companies:

Blackstone:    BLACKSTONE VALLEY ELECTRIC COMPANY

               By:_____

Eastern:       EASTERN EDISON COMPANY

               By:_____

Newport:       NEWPORT ELECTRIC CORPORATION

               By:_____

14

Confidential                                    NEC079561

## APPENDIX A

### SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY
### AND
### PRICE



| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 cents/kWh | | |
| 1999 | | 3.5 cents/kWh | | |
| 2000 | | 3.8 cents/kWh | | |
| 2001 | | 3.8 cents/kWh | | |
| 2002 | | 4.2 cents/kWh | | |
| 2003 | | 4.7 cents/kWh | | |
| 2004 | | 5.1 cents/kWh | | |

Confidential

NEC079562

APPENDIX 4

CALCULATION OF BID DEPOSIT AMOUNTS,
PERFORMANCE SURETY AMOUNTS,
AND MAXIMUM ELIGIBILITY

Confidential

NEC079563

Eligibility of Qualified Bidders to bid in the auction is governed by the amount of the bid deposit provided or by the amount of the performance surety commitment provided by the Qualified Bidder to qualify, whichever results in the lower eligibility.

**Bid Deposit Amounts**
Qualified Bidders will be required to submit a lump-sum bid deposit proportional to their intended participation in the auction, based on the amounts shown below.

Full-Term Auction
Qualified Bidders who intend to bid in the full-term auction should submit a bid deposit amount of $180,000 for each percentage share of the Companies' aggregated Standard Offer Service load that they intend to bid on. A Qualified Bidder who submits a bid deposit of $18.0 million ($180,000 x 100 percent) will be eligible to submit bids for 100 percent of the Companies' Standard Offer Service load (assuming the Qualified Bidder also provides the requisite commitment letter(s) for a performance surety to secure their performance for the entire load). No Qualified Bidder will be required to submit a bid deposit in excess of $18.0 million.

Single-Year Auction
Qualified Bidders who intend to bid only in the single-year auction should multiply the annual deposit amounts in the table below by the percentage shares they intend to bid in each year to arrive at a lump sum bid deposit amount.

Single-Year Auction
Annual Bid Deposit Amounts, $/%

| Year | Amount |
|------|--------|
| 1998 | $45,000 |
| 1999 | $39,000 |
| 2000 | $32,000 |
| 2001 | $26,000 |
| 2002 | $19,000 |
| 2003 | $13,000 |
| 2004 | $6,000 |
|      | $180,000 |

*For example, a Qualified Bidder intending to bid on a ten percent share in each of years 1, 2, and 7 would submit a bid deposit amount of $900,000.*

| | | |
|---|---|---|
| *10% year 1* | *10 x $45,000 =* | *$450,000* |
| *10% year 2* | *10 x $39,000 =* | *$390,000* |
| *10% year 7* | *10 x  $6,000 =* | *$60,000* |
| | | *$900,000* |

*The Qualified Bidder would not be bound to bid for those amounts in those years, however, and could deploy its bids in the full-term auction or in different years of the single-year auction, subject to its eligibility as determined below.*

Confidential                                                    NEC079564

**Performance Surety Amounts**

In order to qualify to participate in the auction. Prospective Bidders must provide commitment letter(s) from banks or surety companies demonstrating their commitment to provide performance surety instruments to secure the Prospective Bidder's obligations under a Standard Offer Service Agreement with the Companies, or such other financial assurances as the Companies, in their sole discretion, deem acceptable. The amount of performance surety required for execution of the Agreement and for ongoing performance under the Agreement will be governed by Article 7 of the Agreement. For purposes of establishing a Prospective Bidder's qualifications and eligibility to bid, the following amounts will apply.

<u>Full-Term Auction</u>

The amount of the performance surety commitment required to bid in the full-term auction is $1.8 million per one percentage share of Standard Offer Service load that the Prospective Bidder proposes to bid on. A Prospective Bidder who wishes to bid on one hundred percent of the Companies' Standard Offer Service load in the full-term auction must provide commitment letter(s) for an aggregate performance surety amount of $180 million. No Prospective Bidder will be required to provide commitment letter(s) for performance surety in excess of $180 million.

<u>Single-Year Auction</u>

Prospective Bidders intending to participate in the single-year auction must provide commitment letter(s) for an aggregate performance surety amount equal to the percentage share in each of the seven years that the Prospective Bidder proposes to bid on multiplied by the annual performance surety amounts shown in the table below. A Prospective Bidder who wishes to bid on one hundred percent of the Companies' Standard Offer Service load in each of the seven years of the single-year auction must provide performance surety commitments for an aggregate amount of $180 million.

Single-Year Auction
Annual Performance Surety Amounts, $/%

| | |
|------|------------|
| 1998 | $ 450,000 |
| 1999 | $ 390,000 |
| 2000 | $ 320,000 |
| 2001 | $ 260,000 |
| 2002 | $ 190,000 |
| 2003 | $ 130,000 |
| 2004 | $   60,000 |
| | $1,800,000 |

**Initial Eligibility**

Upon execution of an Auction Participation Agreement with a Qualified Bidder, the Companies will determine, based on the bid deposit provided and the performance surety commitments previously provided, the Qualified Bidder's initial eligibility to bid in the full-term auction. The Companies will provide written notification of eligibility to each Qualified Bidder no less than five (5) business days prior to the commencement of the full-term auction.

4 -2

Confidential

NEC079565

Full-Term Auction

Each Qualified Bidder's initial eligibility to bid in the full-term auction is determined by the lesser of the following two quotients, provided however, that the maximum eligibility can never exceed 100:

i) Deposit eligibility, in percent $= \dfrac{\text{bid deposit, in dollars}}{\$180,000}$

or

ii) Surety eligibility, in percent $= \dfrac{\text{aggregate surety commitments, in dollars}}{\$1,800,000}$

A Qualified Bidder may bid up to its initial eligibility in the first round of the full-term auction. However, if a Qualified Bidder bids less than its full eligibility in the first round, its eligibility in subsequent rounds is permanently reduced. A Qualified Bidder can not increase its number of shares bid from one round to the next; the number can only stay constant or decrease.

Single-Year Auction

If the Companies' full Standard Offer Service load is not subscribed in the full-term auction, a subsequent single-year auction will be held and the Companies will promptly notify in writing all Qualified Bidders of their initial eligibility to participate in the single-year auction. In the single-year auction, each Qualified Bidder's eligibility to bid is expressed in terms of the remaining dollar amount of its bid deposit or performance surety commitments, whichever is lower.

i) Deposit eligibility, in dollars = bid deposit - (Full-Term Shares Won x $180,000)

or

ii) Surety eligibility, in dollars = aggregate surety commitments -
(Full-Term Shares Won x $1,800,000)

where: "Full-Term Shares Won" means the percentage share of the Companies' Standard Offer Service load for which the Qualified Bidder is responsible for a seven-year term under the terms of an executed Standard Offer Service Agreement.

In each of the first four rounds of the single-year auction, each Qualified Bidder must comply with a minimum activity rule, expressed as a percentage of its initial eligibility. In the first round, each Qualified Bidder must submit bids with an aggregate bid deposit or performance surety value, based on the annual bid deposit amounts and annual performance surety amounts shown in the tables above, equal to at least twenty-five percent (25%) of its initial eligibility. Failure to meet this activity rule will permanently reduce the Qualified Bidder's eligibility in subsequent rounds. In the second, third, and fourth rounds, the activity rules require each Qualified Bidder to submit or maintain active bids worth at least 50%, 75%, and 100%, respectively, of its initial eligibility.

Confidential

NEC079566

Bids will be accepted only up to the limits of the Qualified Bidder's initial eligibility. If a Qualified Bidder's entire eligibility is used up prior to the completion of the fourth round of the single-year auction, any subsequent bids for additional shares submitted by that Qualified Bidder will not be accepted.

4 -4

Confidential

NEC079567

## APPENDIX 5

### FORM OF BID DEPOSIT AND
### PERFORMANCE SURETY DOCUMENTS

Confidential

NEC079568

Form of Bid Deposit Letter of Credit

Bid Deposits in the form of letters credit must be in substantially the form given below.

```
Irrevocable Standby Letter of Credit    Date:                )

BENEFICIARY                         Credit Number:           )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

     BY ORDER OF:
                         (Bidder name and address)

                         or (Guarantor name and address)
```

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of (the Bidder) [(the Guarantor) on behalf of (the Bidder)]for a sum or sums not exceeding a total of US DOLLARS $xx,xxx.xx (written dollar amount AND xx/100 U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES effective (date) and expiring on (date).

Draft(s) must be accompanied by:

1.  Your written letter requesting payment under this Letter of Credit signed by a representative of Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the EUA Companies"). Such letter from the EUA Companies shall include a statement indicating (the Bidder/ Guarantor) has forfeited their Bid Deposit due to their failure to execute the Standard Offer Service Agreement and/or deliver the required performance surety in connection with said Agreement in accordance with the terms of an Auction Participation Agreement between (the Bidder) and the EUA Companies dated (          ).

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. (          ) dated (          ) of the (Bank)."

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before (FILL IN EXPIRATION DATE.

5-1

Confidential                                    NEC079569

Except so far as otherwise expressly stated herein, this
letter of credit is subject to the "Uniform Customs and
Practice for Documentary Credits (1993 Revision),
International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of
credit to the attention of our (Bank credit operations name
and, attention (Bank credit operations contact), mentioning
our reference number as it appears above.   Telephone
inquires can be made to(Bank credit operations contact).

Confidential

NEC079570

Form of Bid Deposit Performance Bond

Bid Deposits provided in the form of performance bonds must be in substantially the
form given below.

PERFORMANCE BOND     NO. [           ]

KNOW ALL MEN BY THESE PRESENTS, that ( Prospective Bidder
or Guarantor(s) name(s)) as Principal, and ( Surety Company
name ) as Surety, are held firmly bound unto Eastern Edison
Company, Blackstone Valley Electric Company, and Newport
Electric Corporation as Obligees in the sum of [dollars]
lawful money of the United States of America, to be paid to
the Obligees, for which payment, well and truly to be made,
we bind ourselves, our respective heirs, executors,
administrators, successors and assigns, jointly and
severally, firmly by these presents.

WHEREAS, Principal has entered a written Auction
Participation Agreement dated (                    ) (the
"Agreement") with the Obligees affirming Principal's
commitment 1) to abide by the rules of the Auction as stated
or referenced in the Agreement, 2) to abide by any decisions
of the Auctioneer, and 3) to provide the requisite security
documents and execute a Standard Offer Service Agreement
within ten (10) business days upon notification of their
status as a Successful Bidder.

NOW THEREFORE, the condition of this obligation is such
that, if the Principal shall promptly and faithfully
perform the undertakings, covenants, terms and conditions
of the Agreement, then this obligation shall become null and
void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to,
or for the use or benefit of anyone other than the named
Obligees.

Whenever the Principal shall be declared by the Obligees to
be in default in relation to the Principal's failure to
abide by the undertakings, covenants, terms and conditions
of the Agreement, the Surety shall:

1. Immediately upon the presentation by the Obligees to the
Surety of a Notice of Claim stating that the Principal is in
default of Principal's obligations under the Agreement, pay
to the Obligees such dollar amount representing the
Principal's Bid Deposit due to the Obligees under the
Agreement.

5-3

Confidential

NEC079571

In witness whereof we hereunto set our hands and seals this
(    ) day of (                ), A.D. 19(   ).

(                            (                            )
        (Principal)                  (Surety)
by: (                ) (seal,  by: (                ; 'seal)

5-4

Confidential

NEC079572

Form of Performance Surety Letter of Credit

Performance surety provided in the form of a letter of credit must be in substantially the form given below.

Irrevocable Standby Letter of Credit    Date:              ;

BENEFICIARY                      Credit Number: (          )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

      BY ORDER OF:

                  (Bidder name and address)

                  or (Guarantor name and address)


      We hereby open in your favor our Irrevocable Standby
Letter of Credit for the account of (the Bidder)[(the
Guarantor) on behalf of (the Bidder)]for a sum or sums
not exceeding a total of US DOLLARS $xx,xxx.xx(written
dollar amount AND xx/100 U.S. DOLLARS) available by your
draft(s) at SIGHT on OURSELVES effective(date)and
expiring on (date).

Draft(s) must be accompanied by:

1.    Your written letter requesting payment under this
      Letter of Credit signed by a representative of
      Eastern Edison Company, Blackstone Valley Electric
      Company, and Newport Electric Corporation ("the EUA
      Companies").  Such letter from the EUA Companies
      shall include a statement of the dollar amount due
      to the EUA Companies, pursuant to the obligations of
      (Bidder/Guarantor)as set forth in the Standard Offer
      Service Agreement by and between (Bidder/Guarantor)
      and the EUA Companies.

Partial drawings are permitted under this Letter of
Credit.

Each draft must bear upon its face the clause "Drawn under
Letter of Credit No. (        ) dated (            ) of the
(Bank)."

We agree to renew this Letter of Credit automatically for a
period of one (1) year from the initial expiration and each
subsequent expiry date unless the beneficiary has received
by registered or certified mail, return receipt requested,

5-5

Confidential

NEC079573

written notification of our intention not to renew, post marked no less than thirty 30) days prior to the expiration of any term.

If this Letter of Credit shall not be extended and the obligation of (Bidder/Guarantor)under the Standard Offer Service Agreement, as secured by this Letter of Credit, remains outstanding, and (Bidder/Guarantor)has failed to provide an amended or substitute Letter of Credit in accordance with your terms and conditions, you may draw upon us forthwith for the full amount of this Letter of Credit by means of your sight draft together with the following document:

Your signed statement certifying that (Bidder/Guarantor)has failed to provide you with a substitute Letter of Credit within fifteen (15) days from the date of your receipt of our notice not to renew.

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before (FILL IN EXPIRATION DATE), or any subsequent expiration date.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name) and, attention (Bank credit operations contact), mentioning our reference number as it appears above.  Telephone inquires can be made to(Bank credit operations contact).

5-6

Confidential

Form of Performance Surety Performance Bond

Performance surety provided in the form of a performance bond  must be in substantially the form given below.

PERFORMANCE BOND    NO. [         :

KNOW ALL MEN BY THESE PRESENTS,  that ( Prospective Bidder or Guarantor(s) name(s)) as Principal, and ( Surety Company name ) as Surety, are held firmly bound unto Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation as Obligees in the sum of [dollars] lawful money of the United States of America, to be paid to the Obligees, for which payment, well and truly to be made, we bind ourselves, our respective heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS,  Principal has entered a written Standard Offer Service Agreement dated (            ) (the "Agreement") with the Obligees for the delivery of requirements electric service (the "Standard Offer Service").

NOW THEREFORE,  the condition of this obligation is such that, if the Principal shall promptly and faithfully perform delivery of the Standard Offer Service pursuant to the undertakings, covenants,  terms and conditions of the Agreement, then this obligation shall become null and void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to, or for the use or benefit of anyone other than the named Obligees.

Whenever the Principal shall be declared by the Obligees to be in default in relation to the Principal's obligations under the Agreement, the Surety shall:

1. Immediately upon the presentation by the Obligees to the Surety of a Notice of Claim stating that the Principal is in default of Principal's obligations under the Agreement, pay to the Obligees such dollar amount due to the Obligees under the Agreement.

In witness whereof we hereunto set our hands and seals this
(    ) day of (          ), A.D. 19( ).
(                         )
     (Principal)
by: (                     ) (seal)
(                         )
        (Surety)
by: (                     ) (seal)

5-7

Confidential

NEC079575

# APPENDIX 6

## NEPOOL Membership Application Requirements

Confidential

In accordance with Sections 1.18 and 3.0 of the Restated NEPOOL Agreement, membership is open to any Entity, which is defined as:

"any person or organization in the electric power business (the generation and/or transmission and/or distribution of electricity for the consumption by the public, or the purchase, as a principal or broker, of Installed Capability, Operable Capability, Energy, Operating Reserves, and/or AGC for resale at wholesale or retail), whether the United States of America or Canada or a state or province or a political subdivision thereof or a duly established agency of any of them, a private corporation recognized in law as capable of owning property with respect thereto.

No person or organization shall be deemed to be an Entity if the generation, transmission, or distribution of electricity by such person or organization is primarily conducted to provide electricity for consumption by such person or organization or a Related Person."

To become a NEPOOL Participant, a letter requesting membership must be sent to the Secretary of the NEPOOL Management Committee with the following documents:

1. A completed NEPOOL Membership Application Questionnaire

2. An executed counterpart of the Restated NEPOOL Agreement, as amended

3. Evidence of a certified vote of the applicant's board of directors, or such other body or bodies as may be appropriate, duly authorizing execution and performance of the Restated NEPOOL Agreement

4. A check for $500, payable to the New England Power Pool.

Once the above documents are received, the application will be forwarded to the NEPOOL Membership Subcommittee to review conditions on memberships and to consider if any waivers of obligations are applicable. Such issues are based on the nature of the electric business that will be conducted in New England identified in the NEPOOL Membership Application Questionnaire. Also note that per Section 3.5 of the Restated NEPOOL Agreement, the NEPOOL Management Committee may prescribe that the applicant provide and maintain in effect an unconditional and irrevocable letter of credit to meet the applicant's responsibilities and obligations under the agreement to protect other Participants against the risk of the applicant's non-payment of its obligations.

In addition to the initial application of $500, NEPOOL Members must also pay an annual fee of $500 and a monthly variable charge based on business activity. This monthly fee will be determined using an approved formula that weights load responsibility, market activity and other matters.

Once membership has been approved, NEPOOL must file with the Federal Energy Regulatory Agency (FERC). The filing is reviewed by FERC and a public notice of the filing is published. If there are no problems with the filing, FERC sends NEPOOL a

Confidential

NEC079577

letter accepting the filing within two months after its been made. Typically the process, from initial application with NEPOOL to the final approval by FERC, will take approximately six months to complete. Applicants are encouraged to submit all requested information as completely as possible in order to expedite the application process.

Attachment 1     NEPOOL Membership Application Questionnaire

Attachment 2     Executable Counterpart of the Restated NEPOOL Agreement

Attachment 3     Form of Corporate Resolution

6 -2

Confidential

NEC079578

NEPOOL Membership Applicant Questionnaire

I.     Applicant:     _____

        Applicant is (please check appropriate category):
        ____ A corporation created under the laws of _____
        ____ A political subdivision of the US or Canada, or an agency thereof
        ____ A partnership                    ____ An electric cooperative
        ____ An individual
        ____ Other (please describe) _____

        Applicant operates as (please check all categories that apply):
        ____ Vertically Integrated Utility        ____ Municipal
        ____ Qualifying Facility                  ____ Cogenerator
        ____ Independent Power Producer           ____ Exempt Wholesale Generator
        ____ Cooperative                          ____ Transmitter
        ____ Load Aggregator (purchases at wholesale to sell at retail)
        ____ Power Marketer (purchases and sells at wholesale)
        ____ Broker (arranges power transactions without taking title)

II.    **What is the nature of your electric business in New England?**
        (Please answer all of the following)

        a.     Do you own, operate, or hold assignable entitlements in generating capability
               located in New England? _____

        b.     Do you own, operate, or hold assignable rights to transmission facilities rated
               69 kV or above located in New England? _____

        c.     Do you distribute electricity directly to end-users in New England, or to end-
               users whose loads you intend to transfer to New England? _____

        d.     Are you engaged, as principal or broker, in the purchase or ownership of
               electric energy and/or capacity for resale at wholesale? _____

        e.     Describe the activities you have conducted (or will conduct pending appropriate
               approvals) in New England? _____
               _____
               _____

        f.     If you answered yes to a, b, or c above, is any of your generation, transmission,
               or distribution of electricity conducted to provide energy for your own
               consumption? _____

               If yes, please describe the nature of your own consumption. _____
               _____
               _____

Confidential                                                        NEC079579

g.    i.    Do you have a direct or indirect ownership interest in any entity engaged in the electric business or are you owned directly or indirectly by any entity engaged in the electric business? _____

     ii.    If yes, please identify and describe all related entities engaged in the electric business and the nature of your relationship with them. _____

     iii.    If you answered yes to a, b, or c above, is any of your generation, transmission, or distribution of electricity conducted to provide energy for consumption by any of the organizations identified in ii. above? ____

       If yes, please describe the nature of such entities' consumption. _____

h.    If the primary answers to a, b, c, and d above are all negative, what is your interest in becoming a member of NEPOOL? _____

**III.    Who are your contact individuals?**

Applicant Contact(s):     _____

Address:     _____

Phone(s):     _____

Fax:     _____

We anticipate that you may have a number of questions in considering membership in NEPOOL. To avoid any confusion or misinformation that could result from differing interpretations of questions and/or answers, please direct any questions concerning NEPOOL membership to:

E. Kenneth Nielsen
Director, NEPOOL Billing

Phone: (413) 535-4075
New England Power Pool
One Sullivan Road
Holyoke, MA 01040-2841

ILARTO1-129369-1
46357-10180
May 8, 1997 10:59 am

Confidential

NEC079580

COUNTERPART SIGNATURE PAGE
NEW ENGLAND POWER POOL AGREEMENT

The NEPOOL Agreement, being dated as of September 1, 1971, as amended.

_____

(Applicant)

By:_____

Name:
Title:
Address:

HART01-1292203-1
66☐☐7-101120
May 8, 1997 10:59 am

Confidential

NEC079581

<u>RESOLUTION FOR ADOPTION BY NEPOOL APPLICANTS</u>

## CERTIFIED RESOLUTION OF THE BOARD OF DIRECTORS

The undersigned, being the Secretary of the [Company], a [State] corporation, certifies that on a meeting of the Board of Directors of the [Company] held on [Date] in accordance with the provisions of the duly-adopted by-laws of the [Company], the following resolution was adopted and the same remains in full force and effect as of the date hereof.

RESOLVED, that the [Company] shall apply to become a Participant in the New England Power Pool under the New England Power Pool Agreement dated as of September 1, 1971, as amended, (the "Agreement") and the [officers] are severally authorized to execute a counterpart of the Agreement on behalf of the [Company] and to cause the [Company] to perform its obligations under the Agreement upon the effectiveness of its membership.

Dated: _____

_____
By [Name of Secretary]
Its Secretary

HART01-111673-1
66227-00012
May 6, 1997 10:59 am

Confidential

NEC079582

# Tab 7
# (1 of 3)

PENGAD 800-631-6989

EXHIBIT

38

## McDermott, Will & Emery
New York, New York

## MEMORANDUM

**FROM:**   Gerard T. Drumm

**DATE:**   November, 12, 1997

**RE:**   Eastern Utilities Associates Divestiture

At the request of Salomon Brothers, Inc., enclosed are two (2) copies of an Asset Purchase Agreement for your review.

As indicated in Salomon Brother's letter of October 31, 1997, a mark-up of the Asset Purchase Agreement should be submitted with your definitive proposal.

cc:   Donald C. Ryan
      Allan L. Platt

\315849064\MEM1112.001

NARR 09064

EASTERN UTILITIES ASSOCIATES
GENERATION BUSINESS DIVESTITURE

|  |  |  | Tab |
|---|---|---|---|
| Asset Purchase Agreement |  |  | 1 |
| Exhibits to Asset Purchase Agreement |  |  |  |
|  | A | Form of Backstop Agreement | 2 |
|  | B | Form of Instrument of Assignment and Assumption | 3 |
|  | C | Form of Interconnection Agreement | 4 |
|  | D | Form of PPA Transfer Agreement | 5* |
| Guaranty |  |  | 6* |
| Schedules to the Asset Purchase Agreement |  |  | 7 |

---

\* To be provided at a later date, as an addition to this volume.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09065

1

NARR 09066

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## MONTAUP ELECTRIC COMPANY

## AND

## [THE BUYER]

_____, 1997

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09067

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| 1.1. | Definitions | 1 |
| | | |
| ARTICLE II | PURCHASE AND SALE | 5 |
| 2.1. | The Sale | 5 |
| | | |
| ARTICLE III | PURCHASE PRICE | 5 |
| 3.1. | Purchase Price | 5 |
| | | |
| ARTICLE IV | THE CLOSING | 5 |
| 4.1. | Time and Place of Closing | 5 |
| 4.2. | Payment of Purchase Price | 5 |
| 4.3. | Deliveries by Seller | 5 |
| 4.4. | Deliveries by the Buyer | 6 |
| 4.5. | Backstop Agreement | 6 |
| | | |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF THE SELLER | 7 |
| 5.1. | Organization; Qualification | 7 |
| 5.2. | Authority Relative to this Agreement | 7 |
| 5.3. | Consents and Approvals; No Violation | 7 |
| 5.4. | Title and Related Matters | 8 |
| 5.5. | The PPA | 8 |
| | | |
| ARTICLE VI | REPRESENTATIONS AND WARRANTIES OF THE BUYER | 8 |
| 6.1. | Organization | 9 |
| 6.2. | Authority Relative to this Agreement | 9 |
| 6.3. | Consents and Approvals; No Violation | 9 |
| 6.4. | Regulation as a Utility | 10 |
| | | |
| ARTICLE VII | COVENANTS OF THE PARTIES | 10 |
| 7.1. | Conduct of Business of the Company | 10 |
| 7.2. | Access to Information | 10 |
| 7.3. | Expenses | 11 |
| 7.4. | Further Assurances | 11 |
| 7.5. | Public Statements | 11 |
| 7.6. | Consents and Approvals | 11 |
| 7.7. | Fees and Commissions | 12 |
| 7.8. | Tax Matters | 12 |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

i

NARR 09068

ARTICLE VIII   PURCHASED ASSETS CLOSING CONDITIONS . . . . . . . . . . . . . .   13
  8.1.   Conditions to Each Party's Obligations to Effect the Purchase
       Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
  8.2.   Conditions to Obligations of the Buyer  . . . . . . . . . . . . . . . . . . . . .   13
  8.3.   Conditions to Obligations of the Seller . . . . . . . . . . . . . . . . . . . . . .   14

ARTICLE IX     INDEMNIFICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
  9.1.   Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
  9.2.   Defense of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

ARTICLE X      TERMINATION AND ABANDONMENT . . . . . . . . . . . . . . . . . . .   19
  10.1.  Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
  10.2.  Procedure and Effect of Termination  . . . . . . . . . . . . . . . . . . . . . . .   20

ARTICLE XI     MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . .   20
  11.1.  Amendment and Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
  11.2.  Waiver of Compliance; Consents . . . . . . . . . . . . . . . . . . . . . . . . . .   20
  11.3.  No Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20
  11.4.  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
  11.5.  Assignment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
  11.6.  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
  11.7.  Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
  11.8.  Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
  11.9.  Schedules and Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
  11.10. Entire Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

NARR 09069

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of _____, 1997, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "*Seller*"), and _____, a _____ corporation (the "*Buyer*").

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell, the Purchased Assets upon the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

1.1. *Definitions*. (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

(1)    "*Affiliate*" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(2)    "*Ancillary Agreements*" mean the Backstop Agreement, the Interconnection Agreement, the Instrument of Assignment and Assumption and the PPA Transfer Agreement.

(3)    "*Back Stop Agreement*" means the Backstop Agreement between the Retail Companies and the Buyer, substantially in the form of Exhibit A hereto, relating to Standard Offer Service.

(4)    "*Business Day*" means any day other than Saturday, Sunday and any day which is a legal holiday or a day on which banking institutions in Boston, Massachusetts are authorized by law or other governmental action to close.

(5)    "*Buyer Representatives*" means the Buyer's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

(6)    "*Code*" means the Internal Revenue Code of 1986, as amended.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

**NARR 09070**

(7)    *"Confidentiality Agreement"* means the Confidentiality Agreement, among the Seller, Blackstone Valley Electric Company, Newport Electric Corporation, Eastern Utilities Associates and the Buyer.

(8)    *"Encumbrances"* means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

(9)    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

(10)    *"Federal Power Act"* means the Federal Power Act of 1935, as amended.

(11)    *"FERC"* means the Federal Energy Regulatory Commission.

(12)    *"Holding Company Act"* means the Public Utility Holding Company Act of 1935, as amended.

(13)    *"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(14)    *"Indenture"* means the Brockton Edison Company Indenture of First Mortgage and Deed of Trust dated as of September 1, 1948, as supplemented and modified.

(15)    *"Instrument of Assignment and Assumption"* means the Instrument of Assignment and Assumption substantially in the form of Exhibit B hereto relating to the assignment by the Seller and the assumption by the Buyer of all of the rights, title, interests, liabilities and obligations of the Seller, in, to and under the PPA.

(16)    *"Interconnection Agreement"* means the Interconnection Agreement between [EUA Transco] and the Buyer, substantially in the form of Exhibit C hereto.

(17)    *"Material Adverse Effect"* means any change in or effect on the Purchased Assets after the date of this Agreement that is materially adverse to the Purchased Assets, taken as a whole, other than (i) any change or effect resulting from changes in the international, national, regional or local wholesale or retail markets for electric power, (ii) any change or effect resulting from changes in the international, national, regional or local markets for any fuel utilized in connection with the Purchased Assets, (iii) any change or effect resulting from changes in the North American, national, regional or local electric transmission systems and (iv) any materially adverse change in or effect on the Purchased Assets which is cured (including by the payment of money) by the Seller before the Termination Date.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

2

NARR 09071

(18)    *"MDPU"* means the Massachusetts Department of Public Utilities.

(19)    *"NHPUC"* means the New Hampshire Public Utility Commission.

(20)    *"Permitted Encumbrances"* means (i) any Encumbrances not created by the Seller; (ii) all exceptions, restrictions, easements, charges, rights of way and monetary and non-monetary encumbrances which are matters of record or are set forth in an applicable FERC project license, except for such encumbrances which secure indebtedness; (iii) with respect to any date before the Closing Date, Encumbrances created by the Indenture; (iv) statutory liens for current taxes or assessments not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (v) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Seller or the validity of which are being contested in good faith by appropriate proceedings; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations by governmental authorities; and (vii) such other liens, imperfections in or failure of title, charges, easements, restrictions and encumbrances which do not, in the aggregate, have a Material Adverse Effect.

(21)    *"Person"* means any individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization and a governmental entity or any department or agency thereof.

(22)    *"PPA"* means the agreement, or, if more than one agreement, means collectively, the agreements listed on Schedule 1.1(a) hereto.

(23)    *"PPA Transfer Agreement"* means the PPA Transfer Agreement, between the Seller and the Buyer, substantially in the form of Exhibit D hereto.

(24)    *"Purchased Assets"* means all right, title and interests of the Seller in and to and all liabilities and obligations of the Seller under the PPA.

(25)    *"Retail Companies"* means, as applicable, each, any or all of Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation.

(26)    *"RIPUC"* means the Rhode Island Public Utilities Commission.

(27)    *"SEC"* means the Securities and Exchange Commission.

(28)    *"Securities Act"* means the Securities Act of 1933, as amended.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

3

NARR 09072

(29)  *"Standard Offer Service"* means the electric service, if any, required to be provided by one or more of the Retail Companies to its retail customers who do not elect to purchase electricity from an alternative supplier in the market.

(30)  *"Taxes"* means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions attributable thereto.

(31)  *"VTPSB"* means the Vermont Public Service Board.

(b)  Each of the following terms has the meaning specified in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Buyer | Recitals |
| Buyer Required Regulatory Approvals | 6.3(b) |
| Closing | 4.1 |
| Closing Conditions | 4.1 |
| Closing Date | 4.1 |
| Direct Claim | 9.2(c) |
| Final Order | 8.1(c) |
| Indemnifiable Loss | 9.1(a) |
| Indemnifying Party | 9.1(d) |
| Indemnitee | 9.1(c) |
| Permits | 5.18 |
| Purchase Price | 3.1 |
| Seller | Recitals |
| Seller Required Regulatory Approvals | 5.3(b) |
| Termination Date | 10.1(b) |
| Third Party Claim | 9.2(a) |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

4

NARR 09073

## ARTICLE II

### PURCHASE AND SALE

2.1. *The Sale*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), the Purchased Assets.

## ARTICLE III

### PURCHASE PRICE

3.1. *Purchase Price*. The purchase price for the Purchased Assets shall be $_____ (the "Purchase Price").

## ARTICLE IV

### THE CLOSING

4.1. *Time and Place of Closing*. Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement (the "*Closing Conditions*"), the closing of the sale of the Purchased Assets contemplated by this Agreement (the "*Closing*") will take place at the offices of McDermott, Will & Emery, 75 State Street, Suite 1700, Boston, MA  02109-1807 at 10:00 A.M. (local time) on such date as the parties may agree, which date is as soon as practicable, but no later than fifteen (15) Business Days, following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the parties may agree.  The date and time at which the Closing actually occurs is hereinafter referred to as the "*Closing Date*."

4.2. *Payment of Purchase Price*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Purchased Assets, the Buyer will pay or cause to be paid to the Seller at the Closing the Purchase Price.

4.3. *Deliveries by Seller*. At the Closing, the Seller will deliver to the Buyer the following items:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09074

(a)     The Instrument of Assignment and Assumption, duly executed by the Seller;

(b)     All consents, waivers or approvals obtained by the Seller with respect to the Purchased Assets or the consummation of the transactions connected to the sale of the Purchased Assets, as the case may be, contemplated by this Agreement, to the extent specifically required hereunder;

(c)     Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Seller;

(d)     An opinion of counsel and certificate (as contemplated by Section 8.2) with respect to the Purchased Assets; and

(e)     Such other agreements, documents, instruments and writings as are required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Buyer and its counsel, in connection herewith.

4.4. *__Deliveries by the Buyer__*.  At the Closing, the Buyer will deliver to the Seller the following items:

(a)     The Purchase Price by wire transfer of immediately available funds or such other means as are agreed upon by the Seller and the Buyer;

(b)     Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Buyer;

(c)     An opinion of counsel and certificate (as contemplated by Section 8.3) with respect to the Purchased Assets;

(d)     The Instrument of Assignment and Assumption, duly executed by the Buyer; and

(e)     Such other agreements, documents, instruments and writings as are required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Seller and its counsel, in connection herewith.

4.5. *__Backstop Agreement__*.  In the event Unsubscribed Standard Offer Service (as defined in the Backstop Agreement) shall be zero on the Closing Date, neither the Seller nor the Buyer shall be required to execute and deliver the Backstop Agreement at the Closing.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

6

NARR 09075

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows (all such representations and warranties, except those regarding the Seller, being made to the best knowledge of the Seller).

5.1. *Organization; Qualification.* The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller is duly qualified or licensed to do business as foreign corporation and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The Seller has heretofore delivered to the Buyer complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents as currently in effect.

5.2. *Authority Relative to this Agreement.* The Seller has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Seller, and assuming that this Agreement constitutes a valid and binding agreement of the Buyer, subject to the receipt of the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, constitutes a valid and binding agreement of the Seller, enforceable against the Seller in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

5.3. *Consents and Approvals; No Violation.* (a) Except for such notices or approvals set forth on Schedule 5.3(a), and other than obtaining the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, neither the execution and delivery of this Agreement by the Seller nor the sale by the Seller of the Purchased Assets pursuant to this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Seller, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except (x) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification,

NARR 09076

would not have a Material Adverse Effect or (y) for those requirements which become applicable to the Seller as a result of the specific regulatory status of the Buyer (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which the Buyer (or any of its Affiliates) is or proposes to be engaged; (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller, or any of the Purchased Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which, in the aggregate, would not have a Material Adverse Effect; or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation would have a Material Adverse Effect.

(b)   Except for such notices or approvals set forth on Schedule 5.3(b) (the *"Seller Required Regulatory Approvals"*), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Seller of the transactions contemplated hereby, other than such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, will not, in the aggregate, have a Material Adverse Effect.

5.4.   *Title and Related Matters*.  Except as set forth in Schedule 5.4 and except for Permitted Encumbrances, the Seller has good and valid title to the Purchased Assets, free and clear of all Encumbrances.

5.5.   *The PPA*.  (a)  Except as disclosed in Schedule 5.5(a), the PPA (i) constitutes a valid and binding obligation of the Seller and to the best knowledge of the Seller constitutes a valid and binding obligation of the other parties thereto, (ii) is in full force and effect, and (iii) may be transferred to the Buyer pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder.

(b)   Except as set forth in Schedule 5.5(b), there is not, under the PPA, any default or event which, with notice or lapse of time or both, would constitute a default on the part of the Seller.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

8

NARR 09077

6.1. ***Organization***.  The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of _____ and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted.  The Buyer has heretofore delivered to the Seller complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents), as currently in effect.

6.2. ***Authority Relative to this Agreement***.  The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Seller, subject to the receipt of the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

6.3. ***Consents and Approvals; No Violation***.  (a)  Except as set forth in Schedule 6.3(a), and other than obtaining the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets pursuant to this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer or any of its subsidiaries is a party or by which any of their respective assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained.



(b)  Except as set forth in Schedule 6.3(b) and except for (i) _____ _____ [1]/ and (  ) the filings, if any, by the Buyer and the Seller required by the HSR Act (the filings and approvals referred to in clauses (i) through (  ) are collectively referred to as the "***Buyer Required Regulatory***

---

1      Bidders - Disclose all required regulatory approvals.

NARR 09078

*Approvals*"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Buyer of the transactions contemplated hereby.

6.4.  ***Regulation as a Utility***.  [Except as set forth in Schedule 6.4,] [the Buyer is not subject to regulation as a public utility or public service company (or similar designation) by the United States, any State of the United States, any foreign country or any municipality or any political subdivision of the foregoing.] [The Buyer is a public utility holding company [exempt from registration] under the Holding Company Act.][2/]

ARTICLE VII

COVENANTS OF THE PARTIES

7.1.  ***Conduct of Business of the Company***.  During the period from the date of this Agreement to the Closing Date, the Seller will conduct its business with respect to the Purchased Assets according to its ordinary and usual course of business consistent with good industry practice and will not amend the PPA other than in the ordinary and usual course of business or with the Buyer's prior written consent.

7.2.  ***Access to Information***.  (a)  Between the date of this Agreement and the Closing Date, the Seller will, during ordinary business hours and upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books and records of the Seller relating to the Purchased Assets to which the Buyer is permitted access by law; (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request; (iii) furnish the Buyer, at the Buyer's expense, with such financial and operating data and other information with respect to the Purchased Assets in the Seller's possession as the Buyer may from time to time reasonably request; provided, however, that (A) the Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (B) the Seller need not supply the Buyer with any information which the Seller is under a legal obligation not to supply.

(b)  All information furnished to or obtained by the Buyer and the Buyer Representatives pursuant to this Section 7.2 shall be subject to the provisions of the Confidentiality Agreement and shall be treated as "Proprietary Information" (as defined in the Confidentiality Agreement).

---

2       Bidders - Strike bracketed language as appropriate.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

10

NARR 09079

7.3. *Expenses*. Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

7.4. *Further Assurances*. (a) Subject to the terms and conditions of this Agreement, each of the parties hereto will use its best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets pursuant to this Agreement.

(b) Subject to the PPA Transfer Agreement, to the extent that the Seller's rights, title, interests, liabilities and obligations under the PPA may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Seller, at its expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. The Seller and the Buyer agree that if any consent to an assignment of the PPA shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights and obligations under the PPA so that the Buyer would not in effect acquire the benefit of all such rights and obligations, the Seller, to the maximum extent permitted by law and the PPA, shall at the Closing and pursuant to the PPA Transfer Agreement, appoint the Buyer to be the Seller's agent with respect to the PPA, and the Seller shall, to the maximum extent permitted by law and the PPA, enter into such reasonable arrangements with the Buyer as are necessary to provide the Buyer with the benefits and obligations of the PPA. The Seller and the Buyer shall cooperate and shall each use their commercially reasonable efforts after the Closing to obtain an assignment of the PPA to the Buyer.

7.5. *Public Statements*. The parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law and except that the parties may make public announcements, statements or other disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of "Proprietary Information" (as defined in the Confidentiality Agreement).

7.6. *Consents and Approvals*. (a) The Seller and the Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice the notifications, if any, required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The parties shall consult with each other as to the appropriate time of filing such notifications and

NARR 09080

shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by either of such agencies, and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after each date of filing.

(b) The Seller and the Buyer shall cooperate with each other and (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, necessary or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which the Seller or the Buyer is a party or by which any of them is bound. The Seller shall have the right to review and approve in advance all characterizations of the information relating to Purchased Assets, and each of the Seller and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with the transactions contemplated hereby.

7.7. *Fees and Commissions*. The Seller and the Buyer each represent and warrant to the other that, except for Salomon Brothers Inc, which is acting for and at the expense of the Seller, and _____, which is acting for and at the expense of the Buyer, no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transaction contemplated hereby by reason of any action taken by the party making such representation. The Seller and the Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees (other than as described above) incurred by reason of any action taken by such party.

7.8. *Tax Matters*. All transfer and sales taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Buyer, and the Buyer, at its own expense, will file, to the extent required by applicable law, all necessary tax returns and other documentation with respect to all such transfer or sales taxes, and, if required by applicable law, the Seller will join in the execution of any such tax returns or other documentation. Prior to the Closing Date, the Buyer will provide to the Seller, to the extent possible, an appropriate certificate of no tax due from any applicable taxing authorities.

NARR 09081

ARTICLE VIII

PURCHASED ASSETS CLOSING CONDITIONS

8.1. ***Conditions to Each Party's Obligations to Effect the Purchase Transactions***. The respective obligations of each party to effect the sale of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) If applicable, the waiting period under the HSR Act applicable to the consummation of the sale of the Purchased Assets contemplated hereby shall have expired or been terminated;

(b) No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of the Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable best efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any state or federal government or governmental agency in the United States which prohibits the consummation of the sale of the Purchased Assets;

(c) All federal, state and local government consents and approvals required for the consummation of the sale of the Purchased Assets, including, without limitation, the Seller Required Regulatory Approvals applicable to the sale of the Purchased Assets and the Buyer Required Regulatory Approvals applicable to the sale of the Purchased Assets, shall have been obtained or become Final Orders (a "***Final Order***" means a final order after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending)) with such terms and conditions as shall have been imposed by the governmental entity issuing such Final Order unless the failure to obtain such consent or approval would not result in a Material Adverse Effect; and

(d) All consents and approvals for the consummation of the sale of the Purchased Assets contemplated hereby required under the terms of any note, bond, mortgage, indenture, contract or other agreement to which the Seller or the Buyer, or any of their subsidiaries, are a party shall have been obtained, other than those (i) which if not obtained, would not, in the aggregate, have a Material Adverse Effect, or (ii) which are governed by the PPA Transfer Agreement.

8.2. ***Conditions to Obligations of the Buyer***. The obligation of the Buyer to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) There shall not have occurred and be continuing a Material Adverse Effect;

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

13

NARR 09082

(b)   The Seller shall have performed and complied with in all material respects the covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed and complied with by the Seller on or prior to the Closing Date, and the representations and warranties of the Seller which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c)   There shall be no Encumbrances on the Purchased Assets by virtue of the Indenture;

(d)   The Buyer shall have received certificates from authorized officers of the Seller, dated the Closing Date, to the effect that, to the best of such officers' knowledge, the conditions set forth in Sections 8.2(a), (b) and (c) have been satisfied;

(e)   The Buyer shall have received an opinion from McDermott, Will & Emery, counsel for the Seller, dated the Closing Date and satisfactory in form and substance to the Buyer and its counsel, substantially to the effect that:

(1)   the Seller is a corporation organized, existing and in good standing under the laws of its state of incorporation and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Seller;

(2)   this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Seller and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals are obtained) are valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3)   the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller will not constitute a violation of the Certificates of Incorporation or Bylaws (or similar governing documents), as in effect on the Closing Date, of the Seller;

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09083

(4)  the Bill of Sale and other documents described in Section 4.3 are in proper form to transfer to the Buyer title to the Purchased Assets; and

(5)  no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Seller of the Closing other than (i) the Seller Required Regulatory Approvals, all of such Seller Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority, and (ii) such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, would not, in the aggregate have a Material Adverse Effect.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States or the laws of Massachusetts, such counsel may rely upon opinions of counsel admitted in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of fact upon certificates furnished by the Seller and appropriate officers and directors of the Seller and by public officials.

8.3. *Conditions to Obligations of the Seller*. The obligation of the Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a)  The Buyer shall have performed in all material respects its covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed on or prior to the Closing Date;

(b)  The representations and warranties of the Buyer which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c)  The Seller shall have received a certificate from an authorized officer of the Buyer, dated the Closing Date, to the effect that, to the best of such officer's knowledge, the conditions set forth in Sections 8.3(a) and (b) have been satisfied;

(d)  The FERC shall have approved the Stipulations and Agreements filed in FERC Docket No. ER97-3127-000 by and between the Office of the Attorney General of Massachusetts, the Division of Energy Resources, Edison Electric Company and the Seller, dated October 29, 1997; Docket No. ER97-2800-000 by and between the RIPUC, the Rhode Island Division of Public Utilities and Carriers, Blackstone Electric Company, the Seller and Newport Electric Corporation; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Pascoag Fire District of Rhode Island; Docket No. ER97-3127-000 and ER97-

NARR 09084

2800-000 between the Seller and the Gas and Electric Department of the Town of Middleborough; and Docket No. ER97-2338-000 between the Seller and the Taunton Municipal Lighting Plant, Pascoag Fire District of Rhode Island and the Gas and Electric Department of the Town of Middleborough; and said Stipulations and Agreements shall be and shall continue to be in full force and effect; Stipulations and Agreements shall be and shall continue to be in full force and effect; and

(e)  The Seller shall have received an opinion from _____, counsel for the Buyer, dated the Closing Date and satisfactory in form and substance to the Seller and its counsel, substantially to the effect that:

(1)  the Buyer is a corporation organized, existing and in good standing under the laws of the State of _____ and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Buyer;

(2)  this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Buyer and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approval are obtained) are valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3)  the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Buyer will not constitute a violation of the Certificate of Incorporation or Bylaws on the Closing Date (or other similar governing documents), as in effect, of the Buyer;

(4)  the Instrument of Assignment and Assumption and other instruments described in Section 4.4 are in proper form for the Buyer to assume the Assumed Liabilities; and

(5)  no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Buyer of the Closing other than the Buyer Required Regulatory Approvals, all of such Buyer Required Regulatory Approvals which are applicable to the sale of the Purchased Assets

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

16

NARR 09085

hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States and the laws of _____, such counsel may rely upon opinions of counsel admitted to practices in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of facts upon certificates furnished by appropriate officers and directors of the Buyer and its subsidiaries and by public officials.

## ARTICLE IX

## INDEMNIFICATION

9.1. *Indemnification*. (a) The Seller will indemnify, defend and hold harmless the Buyer from and against any and all claims, demands or suits (by any Person), losses, liabilities, damages (including consequential or special damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance (each, an *"Indemnifiable Loss"*), asserted against or suffered by the Buyer relating to, resulting from or arising out of (i) any breach by the Seller of any covenant or agreement of the Seller contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(b) The Buyer will indemnify, defend and hold harmless the Seller from and against any and all Indemnifiable Losses asserted against or suffered by the Seller relating to, resulting from or arising out of (i) any breach by the Buyer of any covenant or agreement of the Buyer contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(c) Any Person entitled to receive indemnification under this Agreement (an *"Indemnitee"*) having a claim under these indemnification provisions shall make a good faith effort to recover all losses, damages, costs and expenses from insurers of such Indemnitee under applicable insurance policies so as to reduce the amount of any Indemnifiable Loss hereunder. The amount of any Indemnifiable Loss shall be reduced (i) to the extent that Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss and (ii) to take into account any net Tax benefit recognized by the Indemnitee arising from the recognition of the Indemnifiable Loss and any payment actually received with respect to an Indemnifiable Loss.

NARR 09086

(d) The expiration, termination or extinguishment of any covenant or agreement shall not affect the parties' obligations under this Section 9.1 if the Indemnitee provided the Person required to provide indemnification under this Agreement (the "*Indemnifying Party*") with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

(e) The rights and remedies of the Seller and the Buyer under this Article IX are exclusive and in lieu of any and all other rights and remedies which the Seller and the Buyer may have under this Agreement or otherwise for monetary relief with respect to (i) any breach or failure to perform any covenant or agreement set forth in this Agreement or (ii) any relationship resulting from the PPA Transfer Agreement.

9.2. *Defense of Claims*. (a) If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any Person who is not a party to this Agreement or any Affiliate of a party to this Agreement (a "*Third Party Claim*") with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than ten (10) calendar days after the Indemnitee's receipt of notice of such Third Party Claim. Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, and the Indemnitee will cooperate in good faith in such defense at such Indemnitee's own expense.

(b) If within ten (10) calendar days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claim the Indemnitee receives written notice from the Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in the last sentence of Section 9.2(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable expenses thereof. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give

NARR 09087

written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) calendar days after its receipt of such notice, the Indemnitee may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will be the amount of such settlement offer, plus reasonable costs and expenses paid or incurred by the Indemnitee up to the date of such notice.

(c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a "*Direct Claim*") will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event not later than ten (10) calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party will have a period of thirty (30) calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such thirty (30) calendar day period, the Indemnifying Party will be deemed to have accepted such claim. If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its rights to indemnification under this Agreement.

(d) If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the prime rate then in effect of the [Bank of Boston, N.A.]), will promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any indemnity payment, the Indemnifying Party will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided, however, that (i) the Indemnifying Party will then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said indemnity payment is hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party. Without limiting the generality or effect of any other provision hereof, each such Indemnitee and Indemnifying Party will duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights. Nothing in this Section 9.2(d) shall be construed to require any party hereto to obtain or maintain any insurance coverage.

(e) A failure to give timely notice as provided in this Section 9.2 will not affect the rights or obligations of any party hereunder except if, and only to the extent that, as a result of such failure, the party which was entitled to receive such notice was actually prejudiced as a result of such failure.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

19

NARR 09088

## ARTICLE X

TERMINATION AND ABANDONMENT

10.1. *Termination.* (a) This Agreement may be terminated at any time prior to the Closing Date by mutual written consent of the Seller and the Buyer.

(b) This Agreement may be terminated by the Seller or the Buyer if the Closing has not occurred on or before the first anniversary of the date of this Agreement (the "*Termination Date*"); provided that the right to terminate this Agreement under this Section 10.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date; and provided, further, that if on the first anniversary of the date of this Agreement the conditions to the Closing set forth in Section 8.1(c) shall not have been fulfilled but all other conditions to the Closing shall be fulfilled or shall be capable of being fulfilled, then the Termination Date shall be the day which is twenty-four (24) months from the date of this Agreement.

(c) This Agreement may be terminated by either the Seller or the Buyer if (i) any governmental or regulatory body, the consent of which is a condition to the obligations of the Seller or the Buyer to consummate the Closing shall have determined not to grant its or their consent and all appeals of such determination shall have been taken and have been unsuccessful, (ii) one or more courts of competent jurisdiction in the United States or any State shall have issued an order, judgment or decree permanently restraining, enjoining or otherwise prohibiting the Closing, and such order, judgment or decree shall have become final and nonappealable or (iii) any statute, rule or regulation shall have been enacted by any State or federal government or governmental agency in the United States which prohibits the consummation of the Closing.

(d) This Agreement may be terminated by the Buyer, if there has been a material violation or breach by the Seller of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Buyer to effect the Closing impossible and such violation or breach has not been waived by the Buyer.

(e) This Agreement may be terminated by the Seller, if there has been a material violation or breach by the Buyer of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Seller to effect the Closing impossible and such violation or breach has not been waived by the Seller.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

20

NARR 09089

10.2. *__Procedure and Effect of Termination__.*  In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 10.1, written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein:

(a)  said termination shall be the sole remedy of the parties hereto with respect to breaches of any agreement, representation or warranty contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except in each case as stated in this Section 10.2 and in Sections 7.2(b), 7.3 and 7.7; and

(b)  all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1. *__Amendment and Modification__.*  Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of the Seller and the Buyer.

11.2. *__Waiver of Compliance; Consents__.*  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

11.3. *__No Survival__.*  Subject to the provisions of Section 10.2, each and every representation, warranty and covenant contained in this Agreement (other than the covenants contained in Sections 7.2(b), 7.3, 7.4, 7.7, 7.8 and in Articles IX and X (which covenants shall expire in accordance with their terms), and the provisions of Article IX with respect to any relationship resulting from the PPA Transfer Agreement and this Article XI which shall survive indefinitely) shall expire with, and be terminated and extinguished by, the consummation of the sale of the Purchased Assets and such representations, warranties and

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

21

NARR 09090

covenants shall not survive the Closing Date; and none of the Seller, the Buyer or any officer, director, trustee or Affiliate of any of them shall be under any liability whatsoever with respect to any such representation, warranty or covenant.

11.4. *Notices*. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, telexed or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

    (a)  If to the Seller, to:

        c/o EUA Service Corporation
        750 West Center Street
        West Bridgewater, MA 02379
        Facsimile: (508) 559-8932
        Attention:    Donald C. Ryan
                    Manager-Power Resources

        with a copy to:

        McDermott, Will & Emery
        75 State Street
        Suite 1700
        Boston, MA  62109-1807
        Facsimile: (617) 345-5077
        Attention:  Arthur I. Anderson, P.C.

    (b)  if to the Buyer, to:

        Facsimile:
        Attention:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

22

NARR 09091

with a copy to:

Facsimile:
Attention:

11.5. *Assignment*.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.6. *Governing Law*.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

11.7. *Counterparts*.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.8. *Interpretation*.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

11.9. *Schedules and Exhibits*.  All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

11.10. *Entire Agreement*.  This Agreement, the Confidentiality Agreement and the Ancillary Agreements including the Exhibits, Schedules, documents, certificates and instruments referred to herein or therein, embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein.  It is expressly acknowledged and agreed that there are no restrictions, promises, representations, warranties, covenants or undertakings contained in any material made available to the Buyer pursuant to the terms of the Confidentiality Agreement (including the Information Memorandum, dated July, 1997.  This

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09092

Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions other than the Confidentiality Agreement.

**NARR 09093**

IN WITNESS WHEREOF, the Seller and the Buyer have caused this agreement to be signed by their respective duly authorized officers as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____
     Name:
     Title:

[THE BUYER]

By: _____
     Name:
     Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

25

NARR 09094

2

NARR 09095

<u>EXHIBIT A</u>

Backstop Agreement

## DRAFT

Backstop Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

_____

Dated _____

10/22/97

**NARR 09096**

# TABLE OF CONTENTS

Page

ARTICLE 1.    Definitions ................................    1

ARTICLE 2.    Term .....................................    3

ARTICLE 3.    Supplier Responsibilities ..........................    3

ARTICLE 4.    Estimation of Hourly Loads and Reporting to
the ISO ..................................    4

ARTICLE 5.    Price .....................................    5

ARTICLE 6.    Billing and Payments ............................    6

ARTICLE 7.    Security Provisions ............................    6

ARTICLE 8.    Events of Default, Liability, Relationship of
the Companies ..............................    7

ARTICLE 9.    Termination ...............................    8

ARTICLE 10.    Force Majeure ..............................    9

ARTICLE 11.    Assignment ................................    10

ARTICLE 12.    Successors and Assigns ..........................    10

ARTICLE 13.    Resolution of Disputes ..........................    10

ARTICLE 14.    Interpretation ..............................    12

ARTICLE 15.    Severability of Provisions ........................    12

ARTICLE 16.    Accounts and Records ..........................    12

ARTICLE 17.    Limitations on Liability and Indemnification ............    12

ARTICLE 18.    Regulation ................................    13

J:\DATA\CLI\84\31584\064\APAHYDR2.001

i

NARR 09097

ARTICLE 19.       Notices ................................... 14

ARTICLE 20.       Miscellaneous ............................. 14

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

**NARR 09098**

# Tab 7
# (2 of 3)

## BACKSTOP AGREEMENT

This Backstop Agreement ("Agreement"), is made and entered into this _____ day of _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and _____

_____

,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric generation resources from Montaup Electric Corporation, under an asset purchase agreement, dated _____; and

as condition of such purchase and sale Supplier is required to assume a share of any unsubscribed Standard Offer Service under this Backstop Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. ____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. ____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' unsubscribed portion of the aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

J:\DATA\CLI\84\31584\064\APAHYDR2.001

NARR 09099

ARTICLE 1. Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the closing date and time that the generation resources transfers to Supplier.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.P.U." shall mean the Massachusetts Department of Public Utilities.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B. The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

NARR 09100

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

_____ "Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. ___, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. ___, as amended from time to time. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.P.U., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.P.U. or as otherwise provided by law.

"Unsubscribed Standard Offer Service" shall mean the amount of Standard Offer Service, if any, that the Companies did not award to an alternate supplier under the Companies' Standard Offer Service auction. Prior to retail access, Unsubscribed Standard Offer Service shall mean one hundred (100%) percent of Montaup Electric Company's wholesale power requirements.

ARTICLE 2. Term:

NARR 09101

The term of this Agreement shall begin on the Commencement Date of Service and end at 11:59 p.m. on December 31, 2004, unless terminated sooner in accordance with Article 8 or 9.

## ARTICLE 3.  Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission

NARR 09102

systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the _____ ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.P.U., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer

Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.  Price:

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Standard Offer Wholesale Price
+ Fuel Adjustment Factor

where:      Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

NARR 09103

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6.  Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime

NARR 09104

Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 13 of this Agreement.   Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data.   Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment.

ARTICLE 7.  Security Provisions:

As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n) = SF \times STDL(n-1) \times \{ (PSTD(n) \times TD(n))$$
$$+ (PSTD(n+1) \times TD(n+1))$$
$$+ (PSTD(n+2) \times TD(n+2)) + \ldots + $$
$$+ (PSTD(2004) \times TD(2004)) \}$$

Where:

$SD(n)$  is the Security Deposit in Contract Year $(n)$

$SF$        is the Security Fee equal to \$10.00/MWh

$STDL(n-1)$    is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year $(n-1)$, expressed in MWh.  In 1997, STDL shall be 4,500,000 MWh.

J:\DATA\CLI\84\3\584\064\APAHYDR2.001

7

NARR 09105

PSTD(n)    is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n) as shown in Appendix A, which shall be equal to the percentage of Unsubscribed Standard Offer Service load multiplied by the sum of the backstop assignment percentages for those units that Supplier has purchased as shown in Table 2 of Appendix A.

TD(n) is the Transition Discount in Contract Year (n), calculated as follows:

$$
\begin{aligned}
TD(n) &= 1.00 \\
TD(n+1) &= (7-1)/7 = 0.857 \\
TD(n+2) &= (7-2)/7 = 0.714 \\
TD(n+3) &= (7-3)/7 = 0.571 \\
TD(n+4) &= (7-4)/7 = 0.429 \\
TD(n+5) &= (7-5)/7 = 0.286 \\
TD(n+6) &= (7-6)/7 = 0.143
\end{aligned}
$$

To secure the above amounts, Supplier shall provide a letter of credit or performance bond in a form acceptable to Company. The bank issuing such letter of credit on behalf of a Supplier must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. If a performance bond is provided it is required that each surety company issuing such performance bond on behalf of a Supplier must maintain a rating of "B+" or better from A.M. Best Company.

The Performance Letter of Credit or Bond, if not issued for the full term of the Supplier's Standard Offer Service obligation, shall be renewed on an annual basis or replaced and superseded by a like kind of surety at least thirty (30) days prior to the expiration of such prior surety on a continuing basis to the termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial security may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 for the remaining term of this Agreement.

ARTICLE 8.  <u>Events of Default, Liability, Relationship of the                    Companies:</u>

()    Unless excused by a Force Majeure as described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

NARR 09106

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c)    Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days after notice thereof from the Companies.

()    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

()    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security amounts calculated pursuant to Article 7 and regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the financial surety used to secure such amounts. The Parties expressly agree that the amounts set forth in the financial surety documentation do not constitute liquidated damages. In addition to the financial surety amounts, the Supplier shall be liable to the Companies for any direct damages resulting from an Event of Default, including replacement power costs incremental to the Bid Price. The Companies may pursue any remedies or other damages provided for under law, including indirect, consequential, reliance and incidental damages, and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9. Termination:

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

J:\DATA\CLI\84\31584\064\APAHYDR2.001

9

NARR 09107

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier.

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide financial surety to the Companies pursuant to Article 7 shall be terminated.

ARTICLE 10.    Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event directly and adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating an generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)    The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

J:\DATA\CLI\84\31584\064\APAHYDR2.001

10

NARR 09108

(b)     The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

(c) The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d)     The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party.  With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.


ARTICLE 11.     Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (I) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.


ARTICLE 12.     Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.


ARTICLE 13.     Resolution of Disputes:

Subject to Section 3 of Article 8, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable.  The Parties agree

J:\DATA\CLI\84\31584\064\APAHYDR2.001

11

NARR 09109

that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 13 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (c)of Article 8, notice of failure to comply with, observe or perform this Agreement or to maintain any of the security requirements under Article 7 to Supplier, and upon failure to cure or rectify by Supplier, exercise their rights under the financial surety. Supplier, however, may dispute the exercise by the Companies of their rights under the financial surety, under this Article 13, after such exercise.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall be provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the

J:\DATA\CLI\84\31584\064\APAHYDR2.001

12

NARR 09110

arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 14.     Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 15.     Severability of Provisions:

Subject to the provisions of Article 14 above, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 16.     Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 17.     Limitations on Liability and Indemnification:

NARR 09111

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all third party damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the negligent acts or omissions of the indemnifying Party's employees or agents.

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

## ARTICLE 18.     Regulation:

(a)     This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)     This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

## ARTICLE 19.     Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply

J:\DATA\CLI\84\315\84\064\APAHYDR2.001

14

NARR 09112

EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 20.    Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as                creating any relationship between the Parties other than        that of independent contractor for the sale and purchase of        electricity.

J:\DATA\CLI\84\31584\064\APAHYDR2.001

15

NARR 09113

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies, Total Standard Offer Service requirement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:                              Supplier's NAME


                                       By:_____


On Behalf of the Companies:

Blackstone:                            BLACKSTONE VALLEY ELECTRIC COMPANY


                                       By:_____


Eastern:                               EASTERN EDISON COMPANY


                                       By:_____


Newport:                               NEWPORT ELECTRIC CORPORATION


                                       By:_____

16

NARR 09114

APPENDIX A

SCHEDULE OF SUPPLIER'S SHARE of STANDARD OFFER SERVICE
AND
STANDARD OFFER WHOLESALE PRICE

TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent (PSTD) | Standard Offer Wholesale Price |
|---|---|---|
| 1998 | | 3.2 cents/kWh |
| 1999 | | 3.5 cents/kWh |
| 2000 | | 3.8 cents/kWh |
| 2001 | | 3.8 cents/kWh |
| 2002 | | 4.2 cents/kWh |
| 2003 | | 4.7 cents/kWh |
| 2004 | | 5.1 cents/kWh |

Option To Reduce Suppliers Share

With 30 days written notice, the Companies may reduce Supplier's percentage share of Standard Offer Service shown above; provided however, that once the Companies have elected to reduce Suppliers share of Standard Offer Service, such percentage share cannot be increased. The Companies may exercise this option to reduce Suppliers percentage share of Standard Offer Service as frequently as it deems necessary.

J:\DATA\CLR\84\31584\064\APAHYDR2.001

17

**NARR 09115**

## Appendix A
## Table 2
**Standard Offer Backstop Assignment Percentages**

Q2

Rev. draft 12/2/97

| Divestiture Asset Group | 1 NCC | % Total | SUMMER NCC | % Total | Minimum NCC | Backstop Assignment % |
|---|---|---|---|---|---|---|
| Somerset Unit 6 | 111.00 | | 111 00 | | | |
| Somerset J1 | 22.50 | | 18.30 | | | |
| Somerset J2 | 23.00 | | 18.50 | | | |
| Total | 156.50 | 16.01% | 147 80 | 14.84% | 147.8 | 15.7648% |
| | | | | | | |
| Canal 1 | 140.25 | | 141.50 | | | |
| Canal 2 | 265.50 | | 275.69 | | | |
| Potter | 40.00 | | 40 00 | | | |
| Cleary 9 | 15.00 | | 14.31 | | | |
| Less: Canal 2 Sale | (35.00) | | (35.00) | | | |
| Total | 425 75 | 43 56% | 436.50 | 43 84% | 425 75 | 45.4119% |
| Wyman 4 | 16.30 | 1.67% | 16 15 | 1.62% | 16 15 | 1.7226% |
| NEA | 28 74 | 2.94% | 23.35 | 2.34% | 23.35 | 2.4906% |
| Hydro Quebec | 25.57 | 2.62% | 73.05 | 7 34% | 25 57 | 2.7274% |
| OSP 1 | 80.36 | | 67 76 | | | |
| OSP 2 | 78.68 | | 67.76 | | | |
| Total | 159 04 | 16.27% | 135.52 | 13 61% | 135.52 | 14.4550% |
| Millstone | 45.93 | 4.70% | 44 88 | 4.51% | 44.88 | 4.7870% |
| Seabrook | 33 70 | 3 45% | 33.70 | 3.38% | 33 70 | 3.5946% |
| Vermont Yankee | 11 95 | 1.22% | 11.26 | 1.13% | 11.26 | 1.2010% |
| Pilgrm | 73.82 | 7.55% | 73 55 | 7 39% | 73 55 | 7.8451% |
| TOTAL | 977.30 | 100.00% | 995.76 | 100.00% | 937 53 | 100.0000% |

NOTES:  1) The NCC (Normal Claimed Capability) is based on the NEPEX Net Claimed Capabilities report which
is a compilation of NX-12 reports   ( *x -/- 97 )

2) The Diesels, Pawtucket No2 Hydro, Blackstone Hydro, and McNeil have no backstop assignments due to
their small size and operating characteristics which do not support any standard offer load obligation.

3) The supplier is responsible for a percentage share of standard offer service load in contract year (n)
[PSTD(n)] equal to the percentage of unsubscribed standard offer load multiplied by the sum of the backstop
assignment percentages for these units that the supplier has purchased.

OPTION TO TERMINATE AGREEMENT
If the percentage share of standard offer service for any supplier becomes less than or equal to 1% of peak load
responsibility or less than 1mW, the companies have the right to terminate the backstop agreement and
re-allocate the backstop obligation to the remaining suppliers of backstop service.

NARR 09116

3

NARR 09117

EXHIBIT B

TO ASSET PURCHASE AGREEMENT

FORM OF INSTRUMENT OF
ASSIGNMENT AND ASSUMPTION

Instrument of Assignment and Assumption (this "Agreement") made, executed and delivered on this day of _____, by and between _____, a _____ corporation (the "Buyer") and MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "Seller").

W I T N E S S E T H :

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of _____, 1997 (as amended, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), by and between the Seller and the Buyer, the Seller is concurrently herewith selling, assigning, conveying, transferring and delivering to the Buyer the Purchased Assets (as defined in the Asset Purchase Agreement); and

WHEREAS, the Asset Purchase Agreement requires that the Seller assign all of its right, title and interest in, and that the Buyer assume all liabilities and obligations of the Seller under, the PPA (as defined in the Asset Purchase Agreement);

NOW THEREFORE, in good consideration of these premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Seller and the Buyer agree as follows:

1.     Capitalized terms which are used in this Agreement but are not defined in this Agreement shall have the meaning ascribed to such terms in the Asset Purchase Agreement.

2.     The Seller hereby assigns, transfers and sets over to the Buyer all of Seller's rights, title and interest in and to the PPA.  The assignment effected pursuant to this Section 2 shall be without recourse to and without representation or warranty by the Seller except as specifically provided in the Asset Purchase Agreement.

3.     The Buyer hereby assumes and agrees to pay, perform or discharge in accordance with their terms, to the extent not heretofore paid, performed or discharged, all liabilities and obligations of the Seller under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

4.    It is understood and agreed that nothing in this Agreement shall constitute a waiver or release of any claims arising out of the contractual relationships between the Seller and the Buyer.

5.    This Agreement shall inure to the benefit and be enforceable against the respective successors and assigns of the Seller and the Buyer.

6.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws).

7.    This Agreement is delivered pursuant to and is subject to the Asset Purchase Agreement.  In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall prevail.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the respective duly authorized officers of the Seller and the Buyer as of the date first above written.

[THE BUYER]

By_____
   Name:
   Title:

MONTAUP ELECTRIC COMPANY

By_____
   Name:
   Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

4

NARR 09120

INTERCONNECTION AGREEMENT

BETWEEN

MONTAUP ELECTRIC COMPANY

AND

THE GENERATION BUYER OF SOMERSET STATION

G:\DATA\CLR\84\31584\064\sommer.001

NARR 09121

## TABLE OF CONTENTS

Page

ARTICLE 1      Operation of the Interconnection Facilities . . . . . . . . . . . . . . . . . . . 2

ARTICLE 2      Metering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARTICLE 3      Delivery and Measurement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE 4      Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

ARTICLE 5      Billing and Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 6      Procedures Governing Shutdown and

               Resumption of Delivery of Generation . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 7      Maintenance of Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE 8      Responsibility for Protective Relays . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 9      Responsibility to Protect Each Party's

               System from Other Party's System . . . . . . . . . . . . . . . . . . . . . .  8

ARTICLE 10     Power Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

ARTICLE 11     Term of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

ARTICLE 12     Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

ARTICLE 13     Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 14     Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

ARTICLE 15     Future Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

ARTICLE 16     Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

ARTICLE 17     Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE 18     Need for Additional Interconnection Facilities . . . . . . . . . . . . . . . .12

ARTICLE 19     No Dedication of Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE 20     Safety Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

ARTICLE 21     Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

ARTICLE 22     Notices and Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

APPENDIX A     Interconnection Facilities and Associated Equipment

APPENDIX B     Procedures for Calculating Monthly Expenses

**NARR 09122**

INTERCONNECTION AGREEMENT BETWEEN

MONTAUP ELECTRIC COMPANY

AND

THE GENERATION BUYER


This Agreement, entered into as of the _____ day of _____, 1997, between Montaup Electric Company, a Massachusetts corporation (hereinafter "the Company") a subsidiary of Eastern Utility Associates ("EUA") and _____
(hereinafter "the Generator").


WITNESSETH:


WHEREAS, the Company and the Generator have entered into an Asset Purchase Agreement for the sale of certain Company generating assets; and

WHEREAS, the Generator plans to own and operate or cause to be operated, the purchased Company generating assets located on property situated at Somerset Station in Somerset, MA (the "Facility"); and

WHEREAS, the Company and/or its Affiliates intend to continue to operate their transmission and distribution business from their present locations; and

WHEREAS, this Interconnection Agreement is to establish the requirements, terms and conditions for the interconnection of the Generator's Facilities with the transmission system of the Company; and

WHEREAS, the Interconnection Facilities are intended to enable the Generator to operate in parallel with the Company's electrical system; and

WHEREAS, the Company and the Generator desire to interconnect the Facility with the Company's transmission facilities, on terms mutually beneficial to the Parties.

NARR 09123

NOW THEREFORE, in consideration of the premises and the mutual promises and agreements of the Company and the Generator (hereinafter referred to collectively as the "Parties" and individually as a "Party"), intending to be legally bound, hereby agree to the following:

## ARTICLE 1

### OPERATION OF THE INTERCONNECTION FACILITIES

1.1 Operation of Interconnection Facilities. The Company shall operate its Interconnection Facilities, through use of its personnel or its designees under the supervision of Company personnel, in accordance with good utility practice. Interconnection Facilities means the facilities or portions of facilities that are identified as Interconnection Facilities and Associated Equipment in Appendix A. The Company may, in accordance with good utility practice, curtail or interrupt interconnected operation of the Interconnection Facilities, at any time that such curtailment or interruption or delay is necessary under good utility practice, in order for the Company to inspect, repair, or replace equipment associated with the Company's electric system, or to aid in the restoration of service on the Company's system or on the systems with which it is directly or indirectly interconnected, provided any such interruption, reduction or refusal shall continue only for so long as it is necessary under good utility practice.

1.2 Company Access to Interconnection facilities. The Generator shall provide and grant to the Company such access to the Generator's Facility, as necessary or appropriate, to inspect, test, operate and maintain the Company's Interconnection Facilities.

## ARTICLE 2

### METERING

2.1 Metering Requirements. The point of metering shall be at the high side of the step-up transformer at the site. The meters are currently installed, and will be tested and maintained

**NARR 09124**

by the Company or its designee at the sole expense of the Generator. Equipment necessary for remote metering and indication of the Interconnection Facilities is currently installed. The Generator shall be responsible for the cost for regular routine testing of the meters and associated equipment in accordance with the standards set forth by the Company.

2.1.1 The installation by the Company or its designee, of additional metering equipment shall be at the Generator's sole expense. The Company shall furnish and install the necessary meter sockets and wiring in accordance with accepted electrical standards and state and local codes. The Company shall furnish, install, read, and maintain the metering equipment.

2.1.2 A separately executed agreement between the Parties shall provide for the responsibilities and costs associated with reading the meters and reporting pertinent data to the Independent System Operator for New England ("ISO-NE") and/or the New England Power Pool ("NEPOOL").

2.1.3 The Company shall also conduct testing, other than routine maintenance testing, upon the reasonable request, and in the presence of, a representative of the Generator. The Company shall maintain an accurate log or record of all such meter testing. If the metering equipment is found in any such test to be inaccurate, it shall be made accurate, and if it is found to be inaccurate by more than two percent (2%) up or down, the meter readings for the period of inaccuracy shall be adjusted to correct such inaccuracies as far as the same can be reasonably ascertained and such adjusted readings shall be reported to the Generator by the Company for the purpose of billing. If the period of inaccuracy cannot be ascertained such period will be deemed to have encompassed one-half of the time period since the last test of the meter. The cost of any testing performed in accordance with this paragraph shall be borne by the Generator, if the results of the tests conducted by the Company prove the metering equipment to be inaccurate by less than two percent (2%) up or down, and otherwise by the Company.

NARR 09125

## ARTICLE 3

### DELIVERY AND MEASUREMENT

All electricity shall be delivered at the Interconnection Point in the form of three-phase sixty-hertz alternating current at a voltage of _____. The Interconnection Point means the point where the Company's system connects with the Generator's facility on the high voltage side of the generator step-up transformer as identified in Appendix A.

## ARTICLE 4

### FORCE MAJEURE

The Company shall not be considered to be in default of any obligation hereunder as a result of all or any part of the Interconnection Facilities being destroyed, damaged, or otherwise rendered inoperable or unavailable as a result of or caused by storm, flood, lightning, earthquake, fire, explosion, equipment failure, civil disturbance, labor dispute, regulatory lag, Act of God or the public enemy, or any cause beyond the control of the Company. Nor shall the unavailability of all or any part of the Interconnection Facilities for any such cause relive the Generator of any obligations to make any payment under Article 5 of this Agreement as long as the Company shall use good utility practice to restore the availability of the Interconnection Facilities so rendered inoperable or unavailable at the cessation of the event causing or resulting in such inoperability or unavailability.

The Company shall not be responsible in tort, contract or strict liability to the Generator for damages of any description whatsoever which may result from any unavailability of the Interconnection Facilities unless such availability is the result of willful default, deliberate misconduct or gross negligence by the Company.

NARR 09126

## ARTICLE 5

### BILLING AND PAYMENT

Bills shall be rendered by the Company to the Generator during the first part of the succeeding month, and payment shall be due within ten (10) days of receipt of bill ("Due Date"). Such bills shall be delivered via first class mail postage pre-paid, or by facsimile.

Billing for the expenses and overheads for on-going operations and maintenance shall be as specified in Appendix B.

If the transmittal of payment is not postmarked by the Due Date, an interest charge shall be paid on the unpaid balance computed daily from the Due Date at an annual rate equal to two percent (2%) more than the then current Prime Interest rate charged by the Bank of Boston. In the event the bill is disputed, interest shall accrue only on the unpaid amount finally determined to be due and payable.

Notwithstanding the above, if any bill remains unpaid for more than sixty (60) days from the Due Date, except amounts in dispute, the Company may suspend operation of the Interconnection Facilities hereunder until full payment has been made.

## ARTICLE 6

### PROCEDURES GOVERNING SHUTDOWN AND RESUMPTION
### OF DELIVERY OF GENERATION

The following procedures govern the shutdown and resumption of delivery of generation. Such procedures shall be subject to change as mutually agreeable:

6.1 Unscheduled Facility Outage. In the event of an unscheduled shutdown by the Generator, it shall notify the Company as promptly as is possible by telephone notice given directly to the Company's System Operator, as to the circumstances believed to have caused the shutdown, and subsequently shall confirm to the Company in writing its formal determination as to the reason for the interruption.

NARR 09127

6.2 <u>Emergency Relating to Facility Power</u>. If a curtailment or interruption of the acceptance by the Company of electric power generated in accordance with Article 1.1 is occasioned by emergency circumstances which do not permit advance notice, the Company shall notify the Generator by telephone, as promptly after the event as is reasonably possible under the circumstances, of the reasons for the shutdown and its expected duration.

6.3 <u>Failure of SCADA</u>. In the event of a failure of the SCADA terminal to transmit data to the Company or its affiliate's SCADA system, at a time when the continuing inflow of the Generator's energy into the Company's electrical system would unreasonably impair or threaten to impair the safe and reliable operation of the Company's system, the Company shall have the right to require the Generator to shut down its Facility for the duration of such period. The Company shall be subject to no liability in the event of such shutdown unless such failure is a result of gross negligence, or willful default of the Company. The Parties agree to take all reasonable actions to prevent, mitigate or correct any such failures and to cooperate to that end.

6.4 <u>Shutdown, Reduction, Curtailment or Delay of Operation of Interconnection Facilities</u>. In the event that the Company reduces, curtails or delays the operation of the Interconnection Facilities in accordance with Article 1.1, the Company shall be subject to no liability for such interruption. In the case when shutdown can be scheduled, the Company shall notify the Generator by telephone, at the earliest practical time, but not later than at least fifteen minutes prior to the scheduled shutdown, of reasons for the shutdown, the time scheduled for it to take place, and its expected duration. The Company shall resume interconnected operation of the facility as quickly as possible in accordance with Article 1.1.

6.5 <u>Procedures for Resumption of Facility Operation</u>. On occasions when interconnected operation has been interrupted by the Generator and the Generator wishes to resume such interconnected operation, it shall give telephone notice to the Company or its affiliate's System Operator at least fifteen minutes in advance as to the time which resumption of operation is desired; provided, however, that such advance notice to Company may be waived by the Company" said System Operator and the Generator may institute a manual

NARR 09128

interconnection more quickly in any instance in which the Company's said System Operator shall deem appropriate. In the event that the Generator's interconnection shall have been previously disconnected or locked out by the Company, the Company shall reconnect and/or reset the permissive relay so as to allow the Generator to resume interconnected operation at the time scheduled in the Company's telephone notice. However, if technical conditions existing on the Company's system are such that it is not feasible in accordance with this Article for the Company to allow interconnection with the Generator at the time proposed for the resumption of generation, the Company may deny interconnected operation at that time, but shall thereafter notify the Generator by telephone as to the earliest time that it is able to accept generation from the Generator and shall cooperate diligently to resume interconnected operation with the Generator at that time.

6.6 <u>Right to Open Disconnects</u>. The Generator shall afford to the Company reasonable access at all times to the disconnects associated with the Interconnection Facilities, and the Company shall have the right to open said disconnects whenever it is appropriate to do so pursuant to Article 1.1.

### ARTICLE 7

### MAINTENANCE OF EQUIPMENT

The Generator shall be responsible for maintaining its designated equipment and its associated telephone lines in good operational order. Upon request by the Generator, the Company agrees to carry out required maintenance upon the said equipment and associated lines, from time to time, as the Company reasonably deems necessary or appropriate, with the understanding that the Generator will reimburse it promptly against invoices duly submitted for such costs and expenses, including overheads, so incurred. So far as feasible, the Company shall notify the Generator in advance of undertaking such maintenance as to the work expected to be done and its expected cost; provided, however that an inadvertent failure by the Company to give such notice shall not excuse the Generator from its obligation to reimburse the Company for its costs and expenses, including overheads, so incurred.

**NARR 09129**

## ARTICLE 8

## RESPONSIBILITY FOR PROTECTIVE RELAYS

The Interconnection Facilities are designed and constructed with mutually beneficial protective relay schemes, serving functions and meeting tolerances which have been agreed upon between the Parties. The Generator shall own and be responsible for maintaining the said mutual relay schemes in good operational order and condition, and shall cause said mutual relay scheme to operate within prescribed tolerances. The Generator shall be responsible for adhering to reasonable testing procedures and schedules for such testing for such equipment and the reporting thereof as well as for any reasonable periodic maintenance or replacement, as determined by the Company.

## ARTICLE 9

## RESPONSIBILITY TO PROTECT EACH PARTY'S SYSTEM
## FROM THE OTHER PARTY'S SYSTEM

Except as may be set forth in this Agreement to the contrary, each Party shall be responsible for protecting its facilities from possible damage by reason of electrical disturbances or faults caused by the operation, faulty operation, or non-operation of the other Party's facilities, as well as for electrical systems interconnected to the Company's electrical system and unless due to wanton, willful or grossly negligent conduct, such other Party shall not be liable for any damages so caused.

## ARTICLE 10

## POWER FACTOR

Unless otherwise requested by the Company or its designee, the Generator will operate the Facility at unity power factor at the metering point and within tolerance of the power factor controller. In no case however, will the Generator be required to operate outside the volt-ampere

G:\DATA\CLJ\84\01584\064\commer.001                 8

NARR 09130

range ("VAR") of the Facility's capability as determined from the equipment manufacturer's recommendations.

## ARTICLE 11
## TERM OF AGREEMENT

This Agreement shall become effective on the date first written above and the term of this Agreement shall continue for a period of twenty-five (25) years from such date. The Company shall file this Agreement with the Federal Energy Regulatory Commission ("FERC") as a Rate Schedule within the meaning of 18 C.F.R. Part 35. The Generator agrees to support such filing and cooperate with the Company and provide any information reasonably required by the Company to comply with applicable filing requirements.

## ARTICLE 12
## ASSIGNMENT

This Agreement shall be binding upon and shall inure to the benefit of, and may be performed by, the successor and assigns of the Parties, except that no assignment, pledge or other transfer of this Agreement by any party shall operate to release the assignor, pledgor or transferor of any of its obligations hereunder unless: (1) consent to the assignment is given in writing by the other Party, such consent not to be unreasonably withheld; (2) such assignment, in whole or in part, is to financial institutions or entities for the purpose of financing construction and/or providing permanent debt financing of the Facility or modification thereof; or (3) Company assigns its interest in this Agreement to an affiliate of the Company or to a transferee of all of the assets of the Company.

## ARTICLE 13
## APPLICABLE LAWS

This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

G:\DATA\CLI\5403\15B4\064\sommer 001                          9

**NARR 09131**

## ARTICLE 14
## REGULATION

This Agreement is subject to all applicable state and federal laws and to all duly promulgated orders and other authorized action of governmental authority having jurisdiction.

## ARTICLE 15
## FUTURE OPERATIONS

The Generator covenants and agrees that with the Company, it will at all times operate and maintain its portion of the Interconnection Facilities in compliance with all applicable provisions of any Federal, State, or local laws, as may be supplemental or amended from time to time, and with all other applicable regulations and requirements of the MDPU and with all applicable provisions hereof.

## ARTICLE 16
## LIABILITY

Neither party hereto, nor its respective parents, subsidiaries, affiliates, agents, officers, directors, employees, successors, assigns, shall be liable, directly or indirectly, to the other or its respective parents, subsidiaries, affiliates, agents, officers, directors, employees, successors, assigns or customers for claims for special incidental, indirect or consequential damages, whether based on breach of warranty (express or implied), contract, tort or otherwise, connected with or resulting from, directly or indirectly, performance or the failure to perform by either party of any of its obligations under this Agreement.

NARR 09132

# Tab 7
# (3 of 3)

## ARTICLE 17

## INSURANCE

17.1 Responsibility. The Generator covenants and agrees with the Company to maintain in full force and effect throughout the term of this Agreement the types and minimum dollar amounts of insurance coverage set forth in 17.2.

17.2 Coverages. The Generator agrees to maintain at all times the following insurance:

> (1) Workmen's compensation insurance as prescribed or permitted by law.

> (2) Employer's liability insurance with limits of not less than one hundred thousand dollars ($100,000) per occurrence.

> (3) Comprehensive general liability and property damage insurance with limits not less than five hundred thousand dollars ($500,000) per person and one million dollars ($1,000,000) per accident for property damage.

> (4) Automobile liability coverage with limits not less than five hundred thousand dollars ($500,000) per person and one million dollars ($1,000,000) per accident for bodily injury (including death) and one million dollars ($1,000,000) aggregate for property damage.

> (5) Umbrella liability insurance in a minimum amount of eight million dollars ($8,000,000).

> (6) All risk property and boiler and machinery insurance against damage to owned, leased or operated property, that is part of the Facility, on a replacement cost basis, with self-insurance of not more than five hundred thousand dollars ($500,000); and business interruption insurance, of the types which a prudent developer, owner and operator of a similar project would provide, or as may be required by a lender. The Generator shall provide a

NARR 09133

copy of all state and/or insurance company inspection reports to the Company within thirty (30) days of issuance.

(7) The minimum liability and amounts specified above shall be adjusted at least as often as at three-year intervals by the ratio of the value of the Consumer Price Index, all categories, for the Greater Boston area as of January, 1988, to the most recent January value of such index at the time of adjustment.

17.3 <u>Insured</u>.  The insurance policy or policies entered into pursuant to this Article of the Interconnection Agreement shall be endorsed naming the Company or, at the option of the Company, a Company affiliate as an additional insured, except to the extent of Company's negligence or willful misconduct, with respect to any and all third party bodily injury and/or property damage claims arising from the performance of this Agreement and shall require thirty (30) days written notice to be given to the Company of cancellation and or material change in the policy(s).  The insurance coverage described herein shall be primary to any other coverage available to the Company and shall not be deemed to limit the Generator's liability under this Agreement.

17.4 <u>Certificate of Insurance</u>.  The Generator shall provide the Company with certificates of insurance as evidence of coverage.  Such certificates shall include a statement that coverage will not be reduced or cancelled by the carrier without first providing the Company at least thirty (30) days' prior written notice.


### ARTICLE 18

### NEED FOR ADDITIONAL INTERCONNECTION FACILITIES

The Parties agree that should the need arise for the construction of additional Interconnection Facilities, the Parties will negotiate mutually acceptable terms, conditions and costs for such additional Interconnection Facilities in a separate agreement.

NARR 09134

## ARTICLE 19

### NO DEDICATION OF FACILITIES

No undertaking by the Company or the Generator shall be deemed to constitute a dedication of its system, or any portion thereof, to the public or the requirements of the other Party, and all undertakings of each Party hereunder with respect to the other shall cease upon the termination of this Agreement.

## ARTICLE 20

### SAFETY STATEMENT

It is the Generator's responsibility to assure that all work performed under this Agreement by other than the Company's personnel or personnel under the Company's supervision, reasonably complies with Company safety rules in addition to all applicable municipal, state, OSHA, and other federal regulations.  The Company shall furnish its safety rules to the Generator.

## ARTICLE 21

### ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the Parties regarding the Interconnection Facilities and supersedes all previous agreements, discussions, communications and correspondence regarding such Interconnection Facilities.

## ARTICLE 22

### NOTICES AND BILLS

All notices hereunder, in which the manner of delivery is not otherwise specified, shall be sent by U.S. mail postage prepaid or shall be hand delivered.  Notices and other communications by the Company to the Generator shall be addressed to:

G:\DATA\CLT\84\31584\064\sommer.001                    13

NARR 09135

Notices and other communications by the Generator to the Company shall be addressed

to:

> Manager of Transmission Services
>
> EUA Service Corporation
>
> 750 West Center Street
>
> West Bridgewater, MA  02379

All payments to the Company shall be sent to:

> EUA Service Corporation
>
> Accounts Receivable Department
>
> 750 West Center Street
>
> West Bridgewater, MA  02379

Either party may change the address to which bills or notices are to be sent by written notice to the other party.

NARR 09136

Witness the name of the Parties hereto affixed by their respective officers as of the date first written above. Executed in duplicate.

MONTAUP ELECTRIC COMPANY

By: _____    Date: _____

Title: _____    Witness: _____

GENERATOR

By: _____    Date: _____

Title: _____    Witness: _____

NARR 09137

# Appendix A

### Interconnection Facilities and Associated Equipment Description

I.     Customer:        (Buyer)

      Unit Location:      Somerset Station, Unit 5, Unit 6 and Jets 1 and 2

      Nameplate Rating:*

| | Summer: | | Winter: | |
|---|---|---|---|---|
| | 111.00 MW (Unit 6) | | | 111.00 MW (Unit 6) |
| | 18.23 MW (Jet 1) | | | 22.50 MW (Jet 1) |
| | 18.50 MW (Jet 2) | | | 23.00 MW (Jet 2) |
| | 0.00 MW (Unit 5)** | | | 0.00 MW (Unit 5)** |

        *Normal Claimed Capability
        **Deactivated

      Interconnection Point:

          Interconnection of customer's OCB 078 with EUA 115kV bus (Jets),
          Interconnection of customer's generator leads with EUA's OCB's 062 and 068
          (Unit 6), and OCB's 058 and TL56 (Unit 5) located in Somerset Station 115kV
          switchyard.

      Point(s) of Delivery:

          EUA PTF (115kV bus at Somerset Station switchyard).

II.     Interconnection Facilities and Associated Equipment:

      Three (3) 70.95/123Y - 14.52kV transformers, OCB 078 and associated investment between
      ownership point of demarcation and EUA PTF.

III.     Additional Facilities and/or Associated Equipment:

IV.     Special Conditions:

      1.   In the event Montaup adds equipment to this location in the future in accordance with
          good utility practice, and such investment is not deemed PTF, it may be directly
          assignable to the Customer.

NARR 09138

## MONTAUP ELECTRIC COMPANY
### PROCEDURE FOR CALCULATING MONTHLY EXPENSES

The Generator shall be responsible for paying all on-going operation and maintenance expenses, including overheads, and real estate and personal property taxes associated with the Interconnection Facilities as follows:

I.    OPERATION AND MAINTENANCE EXPENSES

Operation and Maintenance ("O&M") expenses shall be the labor cost, material cost, equipment cost and overheads related to the Interconnection Facilities. The Company will maintain a record of the charges, for all work, or its books under an internal class code for the Interconnection facilities (designated internal class code _____).

O&M expenses shall be determined in accordance with the following formula:

Total O&M Cost = Total Labor Cost + Total Material Cost + Equipment Costs (Note 1) + Outside Services (Note 2)

Total Labor Cost = A + A (B/E + C/E + D/E)

Total Material Cost = F + (F x G/H)

Where:

A = Direct Labor

B = Unproductive Labor Expense (Note 3)

C = Administrative & General Expense (Note 4)

D = Total Payroll Taxes (Note 5)

E = Company Total Wages & Salaries (Note 6)

F = Direct Material Cost as invoiced for materials for the Interconnection Facilities

G = Stores Expense (Note 7)

H = Total Stock Issues (Note 8)

G:\DATA\CLI\584\31584\064\APPENDB 001

NARR 09139

NOTES:    1.    Equipment Costs.  Equipment purchased directly for the Interconnection
Facilities at invoiced cost.

2.    Outside Services.  Those services performed by other than Company
personnel which are directly provided for the Interconnection Facilities.

3.    Unproductive Labor.  Unproductive Labor Expenses include Vacations,
Holidays, Sick days, Occupational Accident, Jury Duty, etc.
Unproductive
Expenses are not included in Administrative Expenses.

4.    Administrative & General Expenses.  A&G Expenses includes salaries
associated with Administrative and General Operations, Worker's
Compensation, Injuries & Damages, and Pension Benefits.  (Blackstone
FERC Form 1, page 323, line 168b).  This item does not include stores
related expenses.

5.    Total Payroll Taxes.  Total Payroll Taxes include employer FICA and
Federal & State Unemployment Taxes.  (Blackstone FERC Form 1, page
262).  Payroll taxes are not included in Administrative & General
Expenses.

6.    Company Total Wages & Salaries.  References Blackstone's FERC Form
1,
page 355, line 96b.

7.    Direct Materials Cost.  Stores Expense meaning material handling and
warehousing costs, includes the costs of supervision, labor and expenses in
the operation of general storerooms including purchasing, storage,
handling and distribution of materials and supplies.  Warehousing costs
shall be limited to those costs associated with items issues in the calendar
year.  These expenses are not included in Administrative & General
Expenses.

8.    Total Stock Issues.  Total Stock Issues include the cost of all transmission
and distribution inventory issued, not including handling or warehousing
expenses.

NARR 09140

II    REAL ESTATE AND PERSONAL PROPERTY TAXES

Taxes = X (Y/Z)

Where:

X = Real Estate and Personal Property Taxes (Note 1)

Y = Interconnection Facilities Investment (Note 2)

Z = Total Electric Plant in Service (Note 3)

NOTES:    1.    Real Estate and Personal Property Taxes. Real Estate and Personal
Property Taxes are shown on pages 262-263 of Blackstone's FERC Form

1.

2.    Interconnection Facilities Investment. The average of the beginning and
end of year balances for the Interconnection Facilities.

3.    Total Electric Plant in Service. FERC Accounts 301-399, and 102-103
comprise Total Electric Plant in Service. The beginning and end of year
figures are shown on pages 204-207 of Blackstone's FERC Form 1. The
Interconnection Facilities investment will be added to the Total Electric
Plant in Service.

G:\DATA\CLR\84\31584\064\APPENDB.001

NARR 09141

SUBTRANSMISSION SERVICE AGREEMENT

<u>Terms and Conditions</u>

1. This Agreement shall become effective when the Interconnection Facilities are energized and shall remain in effect: (a) for as long as necessary to provide subtransmission service or (b) the date this Agreement is terminated for other cause stated herein.

2. As of the effective date of the Agreement provided above, Montaup shall provide Subtransmission Service to the Subtransmission Customer over the distribution system of Montaup's retail affiliate. Montaup's Open Access Transmission Tariff requires Montaup's retail affiliates to rent distribution facilities used for the service to Montaup and requires Montaup to provide Subtransmission Service over the rented facilities under that Tariff.

3. The Subtransmission Customer agrees to pay Montaup a monthly charge for Subtransmission Service beginning on the effective date of the Agreement, such charge to be the same as the retail affiliates' rental charge to Montaup as shown in Appendices A and B hereto.

4. Montaup shall have the right at any time to amend the Appendices A and B hereto by serving an appropriate statement of such amendment upon the Subtransmission Customer and filing the same with the FERC (or such other regulatory agency as may have jurisdiction in the premises) in accordance with the applicable laws and any rules and regulations thereunder, and the amendment shall thereupon become effective on the date specified therein, subject to any modification and/or suspension order duly authorized by such agency.

5. Montaup from time to time may require additional distribution facilities in Massachusetts to effectively provide subtransmission service to the Subtransmission Customer. The Subtransmission Customer agrees to pay Subtransmission Service charges on such facilities in accordance with Appendices A and B, hereto.

6. Whenever the provision of subtransmission service requires the installation of Direct Assignment Facilities, Montaup shall initially seek agreement with the Subtransmission

NARR 09142

Customer on the need for and cost associated with these proposed facilities. Direct Assignment Facilities are facilities or portions of facilities that are constructed by Montaup or its EUA Affiliates for the sole use/benefit of the Subtransmission Customer. If the Subtransmission Customer does not agree that Direct Assignment Facilities are needed or that the costs are just and reasonable, or for any other reason, Montaup shall have the right to file for cost recovery of such facilities with the FERC and the Subtransmission Customer shall have the right to challenge such filing at the FERC.

7. Bills for each month shall be rendered as soon as practicable after the end of the calendar month and shall be due within twenty (20) days of receipt.

8. This Agreement shall be binding upon and shall insure to the benefit of and may be performed by, the successors and assigns of the parties, except that no assignment, pledge or other transfer of this Agreement by either party shall operate to release the assignor, pledgor or transferor of any of its obligations under this Agreement unless consent to the release is given in writing by the other party, or if either party has therefore assigned, pledged or otherwise transferred its interest in this Agreement, by either party's assignee, pledgee or transferee, such consent not to be unreasonably withheld.

9. This Agreement and all rights, obligations, and performance of the parties hereunder, are subject to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction in the premises.

NARR 09143

IN WITNESS WHEREOF, Montaup and the Subtransmission Customer have caused this Agreement to be executed by duly authorized respective corporate officers as of the day and year first above written.

MONTAUP ELECTRIC COMPANY

By: _____

Title: _____

SUBTRANSMISSION CUSTOMER

By: _____

Title _____

NARR 09144

Basis for Montaup Subtransmission Service Charges

1.    Somerset Station Unit 6

- Somerset Unit 6 will not be subject to any subtransmission service charge or local point-to-point charge for transmission service. The new NEPOOL definition of half-breakers as PTF facilities will make Unit 6 directly connected to the NEPOOL Grid.

2.    Eldred and Jepson

- The Eldred and Jepson units utilize Newport Electric Company's distribution system in order to get to Montaup's transmission system. Therefore the owner of Eldred and Jepson will have to pay for subtransmission service for the use of these facilities. The percentage of distribution facilities required to provide for the transfer of generation from Eldred and Jepson to Montaup's transmission system is calculated by dividing the peak MW rating of the units by the peak MW rating of the units plus the loads on each appropriate distribution facility at Newport's peak.

- The load ratio share of each facility is then multiplied by the distribution cost for each appropriate distribution facility. The sum of the total allocated cost divided by the selected rate base distribution plant cost provides the Distribution Plant Factor.

- Newport's Distribution Facilities Revenue Requirement is multiplied by the Distribution Plant Factor to calculate the annual rental charge to Montaup for use of this segment of Newport's distribution system. Montaup then passes this cost on to the generator as the charge for subtransmission service.

- The diesels are connected to PTF transmission facilities at the Jepson Substation, therefore the generator would not have to pay Montaup for local point-to-point service in addition to subtransmission service.

3.    Hydro Units

- The Hydro Units would be charged for subtransmission service on a similar basis to Eldred and Jepson. A load ratio share of a traced path from the units to Montaup transmission facilities would be the methodology used to calculate the

NARR 09145

subtransmission charge. The only difference in the calculation is that the Blackstone Valley Electric distribution facilities used in the traced path for the Hydro Units cannot be cost itemized the way the Newport facilities are. Instead of cost itemization for specific facilities a fractional share of the distribution system based on circuit miles is used in the calculation.

- The fractional share of the distribution facilities is then multiplied by the load ratio share of the Hydro Units over the traced path. This factor is then multiplied by Blackstone's Distribution Facilities Revenue Requirement to calculate the annual rental charge to Montaup. Montaup then passes this cost on to the generator as the charge for subtransmission service.

- Both Hydro Units are connected to PTF transmission facilities. Blackstone Hydro connects to Riverside Substation and #2 Hydro connects to #1 Station. Therefore, the generator would not also have to pay Montaup for local point-to-point service.

NARR 09146

October 9, 1997

This letter agreement is made and entered into as of _____ between EUA Service Corporation ("EUASC"), a Massachusetts corporation, and _____.

## NEPOOL Billing Data

EUASC will retrieve and store all of the hourly load data in the Supervisory Control and Data Acquisition (SCADA) - Archival Data Storage and Retrieval (ADSR) system at Lincoln, RI. This data will be retrieved and kept up-to-date on the SCADA Daily Load record at Lincoln. This same data will be retrieved and stored on the Daily Load Record at West Bridgewater, MA.

The NEPOOL billing data will consist of 24 hourly readings plus a total mWh reading for each day. Each hour's load will be validated to insure that it has been properly accounted for by the system. This data will be transferred to the NEPOOL Automated Billing System (NABS) once a day via the NEPOOL Daily Load record transfer line. NEPOOL Billing is located in Weathersfield, CT.

## Automatic Generation Control (AGC) & Desired Generation

EUASC will provide the transfer of AGC pulse control from NEPEX to the generating unit. NEPEX will send all of EUA's SCADA signals over the planned Inter-Control Center Communications Protocol (ICCP) datalink to EUA's SCADA center in Lincoln, RI and then through the SCADA system to the pulse outputs in the Remote Terminal Unit (RTU) installed at the plant site.

## Monthly Support Charges

The monthly support charge for this service will be _____ per month as detailed in the attached Appendix A. As yearly labor and communications costs increase, there will be yearly adjustments to these monthly charges for which 60 days advance notice will be given.

This agreement shall become effective on _____ and shall remain in effect unless canceled by either party by giving thirty (30) days written notice, except for final billing adjustments.

G:\DATA\CLI\84\31584\064\data 001

**NARR 09147**

Billing

Billing shall be rendered during the first part of the succeeding month and shall be due within twenty (20) days of receipt of the bill.

If the transmittal of payment is not postmarked by the due date, an interest charge shall be paid on the unpaid balance computed daily from the invoice date at an annual rate equal to two percent (2%) more than the prime rate of interest charged by The First National Bank of Boston. The daily rate will be determined by dividing the annual rate by the number of days in the current calendar year.

EUASC shall use its best effort to give advanced notice of the amount of any bill which will reflect adjustments to charges for future years.

This Agreement shall be binding upon and shall inure to the benefit of and may be performed by the successors of the parties. No assignment of this Agreement, other than to a successor to all or substantially all of the electric business and property of a party, shall operate to relieve the assignor of its obligations under this Agreement without written consent of the remaining party hereto.

If this Letter of Agreement accurately reflects our understanding, please sign both copies and return both copies to me. I will return one fully executed copy for your records.

EUA SERVICE CORPORATION

Date: _____        By: _____


CORPORATION NAME

Date: _____        By: _____


G:\DATA\CLB84\31584\064\data.001

**NARR 09148**

5

NARR 09149

EXHIBIT D
TO ASSET PURCHASE AGREEMENT

PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of _____, 1997 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and _____, a _____ corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller") to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of _____, 1997 (the "APA"), by and between Seller and Asset Purchaser.

1.      The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power |
| 9/28/88 | Ocean State Power II |

1.      A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.      This Agreement shall become effective on the date of its execution and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List.

3.      Commencing as of the effective date of this Agreement, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09150

4.  Commencing as of the month following the effective date of this Agreement, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below. For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month. Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

5.  Effective as of the effective date of this Agreement, Seller hereby appoints Asset Purchaser as its agent for purposes of administering each Commitment. Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller , except that Seller's prior written consent shall be required for (i) actions that materially affect the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments. Seller shall not unreasonably withhold such consent.

6.  Each party shall be entitled to indemnification under this Agreement to the extent and in the manner set forth in Article 10 of the APA which is hereby incorporated herein by reference.

7.  Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller. Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchasers while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment. Seller and Asset Purchaser agree to execute all agreements and documents

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09151

reasonably requested by the other in connection with such Commitment amendment and assignment.

8.     (a) In the month during which this Agreement is executed, Seller shall retain the obligation to pay the Power Seller an aggregate amount equal to (i) $_____ dollars ($_____), multiplied by (ii) a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed of this Agreement, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

     (b)     Commencing as of the month following the effective date of this Agreement and continuing for each succeeding month through and including _____, Seller shall retain the obligation to pay to the Power Seller each month an aggregate amount equal to_____ dollars ($_____), and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

     (c)     In the event that the amount of Seller's retained obligation set forth in Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its retained obligation in the next month (in addition to its obligation set forth in Section 8(b)) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month.

     (d)     To the extent that an amendment and assignment pursuant to Section 7 is reasonably expected to result in Asset Purchaser's aggregate monthly payment obligations under Section 4 being less than $_____ on a continuing basis, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller to settle such difference and to reduce the amount of Seller's retained obligation set forth in Section 8(b). Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by such parties. If a Commitment is amended and assigned pursuant to Section 7 above and as part of such amendment and assignment Seller agrees to make a lump-sum payment to Asset Purchaser or the Power Seller, Seller and Asset Purchaser agree to amend this agreement to equitably reduce the amount of Seller's retained obligation set forth in Section 8(b) by an amount to be negotiated in good faith by such parties.

9.     This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09152

10. This Agreement, the APA and any other agreement entered into by the parties pursuant to the APA constitute the entire agreement between the parties and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only by a written agreement signed by the parties. No party shall assign, pledge or otherwise transfer this Agreement or any right or obligation under this Agreement without first obtaining the other party's written consent, which consent shall not be unreasonably withheld. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11. All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such payment.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____
    Name:
    Title:

(ASSET PURCHASER)

By: _____
    Name:
    Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

4

6

NARR 09154

**GUARANTY**

NARR 09155

# GUARANTY

1. Reference is made to the Asset Purchase Agreement, dated as of _____ 1997 (the "Purchase Agreement"), by and among [Name of Applicable Seller(s)] ([together], the "Seller") and _____, a _____ corporation (the "Buyer"). For good and valuable consideration received, _____, a _____ corporation (the "Guarantor"), hereby irrevocably and unconditionally guarantees to the Seller and its successors and assigns that the Buyer shall perform all of its obligations under the Purchase Agreement and each of the Ancillary Agreements (as defined in the Purchase Agreement), including, but not limited to, the due and punctual: (i) payment of all amounts required to be paid by the Buyer pursuant to (a) the Purchase Agreement and (b) each Ancillary Agreement; and (ii) performance and observance of and compliance with all other obligations, covenants, and undertakings and representations and warranties of the Buyer contained in the Purchase Agreement and any other agreement or instrument relating thereto, including the Ancillary Agreements (such payments and other obligations referred to in clauses (i) and (ii), collectively, the "Obligations"), at the times and in the manner provided therein. This Guaranty shall be an absolute, unconditional, present and continuing guaranty of payment and performance (not merely of collection or collectibility) which shall remain in full force and effect until each and all of the Obligations guaranteed hereunder shall have been fully and satisfactorily discharged in accordance with the terms and provisions of the Purchase Agreement, the Ancillary Agreements and any other agreement or instrument relating thereto, and that its undertakings hereunder are not contingent upon the bringing of any action against the Buyer or any other person or entity or resorting to any security or making of any effort to obtain payment or performance by the Buyer or any other person or entity or exercise or assertion of any other right or remedy against the Buyer or any other person or entity, and Guarantor hereby expressly waives any claim that its undertakings hereunder are so contingent.

2. The liability of the Guarantor under this Guaranty shall be absolute, unconditional and irrevocable, irrespective of:

   (a) any lack of validity or enforceability of the Purchase Agreement, the Ancillary Agreements or any other agreement or instrument relating thereto;

   (b) any change in time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of, or any consent to departure from, the Purchase Agreement, the Ancillary Agreements or any other agreement or instrument relating thereto;

J:\DATA\CLI\84\31584\064\GUARANTY.001

NARR 09156

(c)     any change in ownership of the Guarantor or the Buyer;

(d)     any bankruptcy, insolvency or reorganization of, or other similar proceedings involving the Guarantor or the Buyer; or

(e)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Buyer in respect of the Obligations or a legal or equitable discharge of the Buyer in respect thereof.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by the Seller upon the insolvency, bankruptcy or reorganization of the Buyer or otherwise, all as though such payment had not been made.

3.      The Guarantor hereby irrevocably, unconditionally and expressly waives, to the fullest extent permitted by applicable law, promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Seller protect, secure or perfect any security interest or exhaust any right or first proceed against the Buyer or any other person or entity.

4.      This Guaranty constitutes a primary obligation of the Guarantor and is a continuing guaranty and shall (a) be binding upon the Guarantor and its successors and assigns and (b) inure to the benefit of and be enforceable by the Seller and its successors and assigns.

[GUARANTOR]

By:_____
Name:
Title:

J:\DATA\CLI\84\31584\064\GUARANTY.001

7

NARR 09158

**SCHEDULE 1.1(a)**

<u>PPA Description</u>

"PPA" means, collectively, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated May 14, 1986, by and between Ocean State Power and Montaup Electric Company and the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power II to Montaup Electric Company, dated September 28, 1988, by and between Ocean State Power II and Montaup Electric Company, in each case as amended, modified or supplemented.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

**NARR 09159**

## SCHEDULE 5.3(a)

### Seller Notices and Approvals

Indenture

Approvals as may be required under the Indenture.

PPA

Approvals as may be required under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

## SCHEDULE 5.3(b)

### Seller Required Regulatory Approvals

(i) Any required approvals under the Federal Power Act, (ii) (A) notice by the Seller to, and an order by, the MDPU approving the transactions contemplated by this Agreement, (B) the approval by the RIPUC of the market valuation "implementation methodology" filed in RIPUC Docket 25-92, pursuant to section 39-1-27.4(g) of the Rhode Island General Laws, (C) the approval by the RIPUC of the "Transfer Plan" filed in RIPUC Docket 25-14, pursuant to section 39-1-27(a) of the Rhode Island General Laws, (D) the approval, if required, of the Rhode Island Division of Public Utilities and Carriers, (E) the approval, if required, of the Rhode Island Energy Facilities Sitting Board, (F) if required, notice by the Seller to, and an order by, each of the NHPUC, the VTPSB, the Maine Public Utilities Commission and the Connecticut Department of Public Utility Control approving the sale of the Purchased Assets, (iii) the approval, if required, of the SEC pursuant to the Holding Company Act, (iv) the filings, if required by the Seller and the Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act, and (v) the approval, if required, of the Nuclear Regulatory Commission (the *"NRC"*).

**NARR 09161**

## SCHEDULE 5.4

<u>Exceptions to Seller's Title to the PPA</u>

Nothing to disclose.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09162

**SCHEDULE 5.5(a)**

<u>Exceptions to the Full Force and Effect of and the Transferability of the PPA</u>

Transferability may be subject to the approval of the counterparties to the PPA and lenders thereto.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

**NARR 09163**

**SCHEDULE 5.5(b)**

Defaults under the PPA

Nothing to disclose.

NARR 09164

**SCHEDULE 6.3(a)**

<u>Buyer Notices and Approvals</u>

[To be completed by the Buyer.]

NARR 09165

## SCHEDULE 6.3(b)

### Buyer Required Regulatory Approvals

[To be completed by the Buyer.]

J:\DATA\CLI\84\31584\064\ASSPURCH.OS2

NARR 09166

**SCHEDULE 6.4**

<u>Buyer Regulation as a Utility</u>

[To be completed by the Buyer.]

NARR 09167

# Tab 8

# NECO WHOLESALE STANDARD OFFER
# SERVICE AGREEMENT II

WHOLESALE STANDARD OFFER
SERVICE AGREEMENT

between

THE NARRAGANSETT ELECTRIC COMPANY

and

USGEN NEW ENGLAND, INC.

Dated as of October 29, 1997

0139967.02-01S7a

Confidential



NARR 35216

# Table of Contents

ARTICLE 1.   BASIC UNDERSTANDINGS ............................... 1

ARTICLE 2.   DEFINITIONS ........................................ 2

ARTICLE 3.   TERM AND REGULATORY APPROVAL .................... 4
   3.1   Term ..................................................... 4
   3.2   Obtaining and Maintaining Required Permits ...................... 5

ARTICLE 4.   SALE AND PURCHASE ................................. 5

ARTICLE 5.   PRICE AND BILLING ................................. 6
   5.1   Price ..................................................... 6
   5.2   Payment .................................................. 7
   5.3   Taxes, Fees and Levies ...................................... 8

ARTICLE 6.   DELIVERY, LOSSES, AND DETERMINATION AND
           REPORTING OF HOURLY LOADS ................... 8
   6.1   Delivery .................................................. 8
   6.2   Losses ................................................... 8
   6.3   Determination and Reporting of Hourly Loads ................... 9

ARTICLE 7.   DEFAULT AND TERMINATION ........................ 10
   7.1   Material Breach and Termination ............................. 10

ARTICLE 8.   NOTICES, REPRESENTATIVES OF THE PARTIES .......... 11
   8.1   Notices .................................................. 11
   8.2   Authority of Representative ................................. 12

ARTICLE 9.   LIABILITY, INDEMNIFICATION, AND
           RELATIONSHIP OF PARTIES .................... 12
   9.1   Limitation on Consequential, Incidental and Indirect Damages .......... 12
   9.2   Recovery of Direct Damages Permitted ........................ 12
   9.3   Indemnification .......................................... 13
   9.4   Independent Contractor Status ............................... 14

ARTICLE 10.   ASSIGNMENT ...................................... 14
   10.1   Assignment .............................................. 14

ARTICLE 11.   SUCCESSORS AND ASSIGNS ......................... 15

Confidential

NARR 35217

ARTICLE 12.  FORCE MAJEURE ......................................... 15
    12.1  Force Majeure Standard ...................................... 15
    12.2  Force Majeure Definition .................................... 15
    12.3  Obligation to Diligently Cure Force Majeure ................. 16

ARTICLE 13.  WAIVERS ................................................ 16

ARTICLE 14.  REGULATION ............................................. 17
    14.1  Laws and Regulations ....................................... 17
    14.2  NEPOOL Requirements ........................................ 17

ARTICLE 15.  INTERPRETATION, DISPUTE RESOLUTION ..................... 17
    15.1  Interpretation ............................................. 17
    15.2  Dispute Resolution ......................................... 17

ARTICLE 16.  SEVERABILITY ........................................... 18

ARTICLE 17.  MODIFICATIONS .......................................... 18

ARTICLE 18.  SUPERSESSION ........................................... 18

ARTICLE 19.  COUNTERPARTS ........................................... 18

ARTICLE 20.  HEADINGS ............................................... 18

Appendix A.  Incremental Revenues ................................... A-1

Appendix B.  Estimation of Supplier Hourly Loads .................... B-1

Appendix C.  Arbitration Agreement .................................. C-1

0139967.02-0157a

ii

NARR 35218

# NECO WHOLESALE STANDARD OFFER SERVICE AGREEMENT II

This **NECO WHOLESALE STANDARD OFFER SERVICE AGREEMENT II** ("Agreement") is dated as of October 29, 1997 and is by and between THE NARRAGANSETT ELECTRIC COMPANY, a Rhode Island corporation ("NECO"), and USGen New England, Inc. (formerly named USGen Acquisition Corporation), a Delaware corporation ("Seller"). This Agreement provides for the purchase by NECO and the sale by Seller of Wholesale Standard Offer Service, as defined in this Agreement.

## ARTICLE 1.   BASIC UNDERSTANDINGS

NECO purchases all of its requirements of electricity for resale to its retail electric customers from its affiliate, New England Power Company ("NEP").

NEP, NECO and other parties have entered into an agreement in settlement of regulatory proceedings before the Federal Energy Regulatory Commission (the "Rhode Island Restructuring Agreement") that, among other things, implements certain requirements of the Rhode Island Utility Restructuring Act of 1996 (the "Act"), permits NECO to terminate wholesale purchases from NEP, permits current retail customers of NECO to purchase electricity from other suppliers on and after a date defined therein as the "Retail Access Date," or, for a limited time, to purchase Standard Offer Service from NECO, obligates NEP to supply NECO with power sufficient to meet the latter's obligations to supply Standard Offer Service, and obligates NEP to transfer its interests in the electric generating business to another party or parties.

NEP, NECO, and Seller have entered an agreement under which Seller will acquire certain NEP and NECO generating assets.

NEP and Seller desire that Seller shall supply electric capacity and energy to NECO to fulfill a portion of NEP's power supply obligations under the Rhode Island Restructuring Agreement.

Under the Rhode Island Restructuring Agreement, NECO is obligated to afford wholesale power suppliers other than NEP the opportunity to commit to supply NECO with power sufficient to meet NECO's obligation to supply retail Standard Offer Service after the Retail Access Date.

This Agreement sets forth the terms under which Seller will supply Wholesale Standard Offer Service to NECO, for a period beginning on the Closing Date, to enable NECO to meet the needs of its retail customers for electricity, including all or a portion of the needs of customers receiving retail Standard Offer Service after the Retail Access Date.

0139967.02-01S7a

Confidential

NARR 35219

## ARTICLE 2.   DEFINITIONS

The following words and terms shall be understood to have the following meanings when used in this Agreement, or in any associated documents entered into in conjunction with this Agreement.  In addition, except as otherwise expressly provided, where terms used in this Agreement are defined in the NEPOOL Agreement and not otherwise defined herein, such definitions are expressly incorporated into this Agreement by reference.

**Affiliate of NECO** - Any company that is a subsidiary of New England Electric System and its successors.

**Closing Date** - The date upon which the Seller acquires ownership of generating assets it purchases from NEP.

**Commission or FERC** - The Federal Energy Regulatory Commission or such successor federal regulatory agency as may have jurisdiction over this Agreement.

**Contract Termination Date** - The date established by the Rhode Island Restructuring Agreement when the respective obligations of NEP and NECO under NEP's FERC Electric Tariff, Original Volume No. 1, to sell and purchase wholesale electric requirements service shall cease.  The Contract Termination Date shall occur on the earlier of the Retail Access Date or the Wholesale Access Date.

**GWh** - Gigawatt hour.

**ISO** - The Independent System Operator to be established in accordance with the NEPOOL Agreement and the Interim Independent System Operator Agreement as amended, superseded or restated from time to time.

**kWh** - Kilowatt- hour.

**MECO** - Massachusetts Electric Company.

**MECO Wholesale Standard Offer Service Agreement** - The Wholesale Standard Offer Service Agreement of even date herewith between MECO and the Seller.

**NECO's Service Territory** - The geographic area in which NECO provided electric service to retail customers on August 6, 1996.

**NECO's System** - The electrical system of NECO and/or the electrical system of any Affiliate of NECO.

**MMBtu** - Million British thermal units.

Confidential

NARR 35220

<u>NEP</u> - New England Power Company, an Affiliate of NECO.

<u>NEPEX</u> - The New England Power Exchange.

<u>NEPOOL</u> - The New England Power Pool.

<u>NEPOOL Agreement</u> - The New England Power Pool Agreement dated as of September 1, 1971, as amended and as may be amended or restated from time to time.

<u>Price</u> - The price set forth in SECTION 5.1, below.

<u>Prime Rate</u> - The prime (or comparable) rate announced from time to time as its prime rate by the Bank of Boston or its successor, which rate may differ from the rate offered to its more substantial and creditworthy customers.

<u>PTF</u> - Facilities categorized as Pool Transmission Facilities under the NEPOOL Agreement.

<u>Retail Access Date</u> - The date so defined under the Rhode Island Restructuring Agreement, as the later of January 1, 1998, or the date of a final, nonappealable order of the RIPUC approving the divestiture plan for the disposition of NEP's non-nuclear generating facilities provided, however, that in any event the Retail Access Date shall occur no later than three (3) months after retail access is available to forty percent (40%) or more of the kilowatt hour sales in New England including the total kilowatt hour sales in Rhode Island.

<u>Rhode Island Restructuring Agreement</u> - The Offer of Settlement dated May 30, 1997, entered into by and among the RIPUC, the Rhode Island Division of Public Utilities and Carriers, NECO, and NEP, as amended and accepted or approved by the FERC.

<u>RIPUC</u> - The Rhode Island Public Utilities Commission.

<u>Standard Offer Auction</u> - The solicitation by NECO of offers from wholesale power suppliers, including, at their option, NEP and Seller, of electric energy and associated capacity and ancillary services necessary to meet the needs of ultimate customers of NECO eligible for and accepting retail Standard Offer Service on or after the Retail Access Date, and any wholesale electric supply contracts resulting from that solicitation. The solicitation and any contract(s) entered into as a result thereof shall not be on terms that are materially different from those described by MECO in the Massachusetts Restructuring Agreement (as defined in the MECO Wholesale Standard Offer Service Agreement), the RFQ dated April 3, 1997, and the letter to potential asset purchasers dated June 16, 1997, or result in a material adverse impact on Seller. NECO shall not, without Seller's consent, conduct the Standard Offer Auction more than once or more than six (6) months prior to the Retail Access Date, which date shall be as reasonably determined by NECO.

Confidential                                                    NARR 35221

**Standard Offer Service** - The electric service provided by NECO pursuant to the Rhode Island Restructuring Agreement: (i) to retail customers in NECO's Service Territory during the period, if any, during the term of this Agreement preceding the Retail Access Date; and (ii) to NECO's retail customers on the Retail Access Date that do not elect to obtain their electric supply from an alternative supplier on or after the Retail Access Date through December 31, 2009.

**Wholesale Access Date** - The date so defined under the Rhode Island Restructuring Agreement, as the date on which NECO in its sole discretion decides to terminate its purchase from NEP of wholesale requirements service pursuant to NEP's FERC Electric Tariff, Original Volume No. 1, by providing the Commission and the Signatories to the Rhode Island Restructuring Agreement with 90 days advance notice in writing, said date not to be earlier than January 1, 1998.

**Wholesale Standard Offer Service** - The generation and delivery, to any location on the NEPOOL PTF system or NECO's system, of the portion of the electric capacity, energy and ancillary services required by NECO to meet the needs of NECO's ultimate customers taking Standard Offer Service, excluding, after the Retail Access Date, any portion of such requirements that NECO has contracted to obtain through the Standard Offer Auction, determined in accordance with ARTICLE 4. Seller, as the supplier of Wholesale Standard Offer Service capacity and energy, will be responsible for all present, or future requirements and associated costs for installed capability, operable capability, energy, operating reserves, and automatic generation control, including tie benefit payments, losses and any congestion charges associated with Seller's supply of Wholesale Standard Offer Service and any other requirements imposed by NEPOOL or the ISO, as they may be in effect from time to time. To the extent that any NEPOOL, ISO or any successor entity expenses or uplift costs are allocated to wholesale suppliers, the portion of such costs associated with Seller's supply of Standard Offer Service will also be the responsibility of Seller. To the extent any costs contemplated by this paragraph are applicable to NECO and recoverable by NECO from its customers, NECO shall be responsible for such costs.

## ARTICLE 3.   TERM AND REGULATORY APPROVAL

### 3.1   Term

The term of this Agreement shall begin at 12:01 am on the Closing Date and continue until the earlier of: (a) 11:59 pm on December 31, 2009; or (b) the first date that NECO has no requirements for electric capacity and energy to supply Standard Offer Service that are not satisfied by contracts resulting from the Standard Offer Auction

Confidential                                                    NARR 35222

3.2  Obtaining and Maintaining Required Permits

(a)    Performance under this Agreement is conditioned upon both Parties securing and maintaining such federal, state or local approvals, grants or permits as may be necessary for the sale and purchase of Wholesale Standard Offer Service, which shall not include any approvals, grants, or permits necessary for the operation of any particular generating facility. Each Party shall use reasonable efforts to acquire and maintain such approvals, grants or permits. If the acquisition or maintenance of a particular approval, grant, or permit requires a modification to this Agreement, then the Parties agree to negotiate in good-faith to reach a mutually agreeable modification of the Agreement. The Parties are not required to reach such a mutually acceptable modification.

(b)    Seller will file this Agreement with FERC (and any other regulatory agency as may have jurisdiction over the Agreement) in accordance with the provisions of applicable laws, rules and regulations. Seller will be responsible for any filing fees for filing this Agreement with FERC (and any other regulatory agency as may have jurisdiction over the Agreement) and for any regulatory assessments associated with sales under this Agreement. FERC approval of this Agreement shall be a condition to the obligations of the Parties hereunder.

## ARTICLE 4.  SALE AND PURCHASE

Seller shall sell and deliver to the Delivery Points, as defined in ARTICLE 6, SECTION 6.1 and NECO shall purchase 9.22% of NECO's requirements for Wholesale Standard Offer Service. NECO's requirements for Wholesale Standard Offer Service shall be determined on the basis of ARTICLE 6, SECTION 6.3, below, and the price for such sale and purchase shall be as set forth in ARTICLE 5, SECTION 5.1, below.

Confidential

NARR 35223

## ARTICLE 5.  PRICE AND BILLING

5.1  Price

For each kilowatt hour of Wholesale Standard Offer Service that Seller delivers to the Delivery Points, in accordance with ARTICLE 6, SECTION 6.3, below, NECO shall pay Seller a price equal to the following amounts for each period during the term of this Agreement:

| Period | Price in Cents per kWh |
|--------|------------------------|
| 1998 | 3.2 Cents |
| 1999 | 3.5 Cents |
| 2000 | 3.8 Cents |
| 2001 | 3.8 Cents |
| 2002 | 4.2 Cents |
| 2003 | 4.7 Cents |
| 2004 | 5.1 Cents |
| 2005 | 5.5 Cents |
| 2006 | 5.9 Cents |
| 2007 | 6.3 Cents |
| 2008 | 6.7 Cents |
| 2009 | 7.1 Cents |

In addition, in the event of increases in the market price of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999 as described in Appendix A, NECO shall pay Seller a percentage of any incremental revenues received by NECO as a result of NECO's Customer Rate Fuel Adjustment, described in Appendix A, attached and incorporated herein by reference.  Such percentage, with respect to the billing month, shall equal the percentage of NECO's total Standard Offer Service requirements during the month that Seller delivers under this Agreement.

Confidential                                                    NARR 35224

## 5.2  Payment

(a)     On or before the tenth (10th) day of each month during the term of this Agreement, NECO shall: (i) calculate the amount due and payable to Seller pursuant to this ARTICLE 5 with respect to the preceding month; and (ii) advise Seller of the schedule upon which it shall pay the amount so calculated, which schedule shall comply with paragraph (b), below.  The amount payable shall be calculated by multiplying the Price specified in the first paragraph of ARTICLE 5, SECTION 5.1, above, for the applicable Contract Period by the quantity of Wholesale Standard Offer Service delivered by Seller to the Delivery Points for NECO's Standard Offer Service customers in the month, as determined in accordance with ARTICLE 6, SECTION 6.3, below.  Because quantities determined under SECTION 6.3 are estimated, subject to a reconciliation process described in SECTION 6.3(d), quantities used in calculations under this paragraph (a) shall be subject to adjustment, whether positive or negative, in subsequent months' calculations, to reflect that reconciliation process, and any adjusted quantities shall be applied to the Price applicable during the month of the calculation being adjusted.  Seller's percentage of any Customer Rate Fuel Adjustment incremental revenue shall be added to such amount.

(b)     NECO shall pay Seller any amounts due and payable on or before the twenty-fifth (25th) day after the date a calculation is made pursuant to paragraph (a), provided that, if and to the extent NECO pays Seller any portion of the amount due and payable before the twenty-fifth (25th) day after a calculation is made, it shall be entitled, without interest or penalty, to defer payment of an equal portion of the amount due and payable for that month by the lesser of: (i) the same number of days that the early payment preceded the twenty-fifth day after the calculation; and (ii) twenty-five (25) days.  If all or any part of any amount due and payable pursuant to paragraph (a) shall remain unpaid thereafter, interest shall thereafter accrue and be payable to Seller on such unpaid amount at a rate per annum equal to two percent (2%) above the Prime Rate in effect on the date of such bill; provided, however, if the amount due and payable is disputed, interest shall accrue and be payable to Seller on the unpaid amount finally determined to be due and payable at a rate per annum equal to the Prime Rate in effect on the date of the calculation pursuant to paragraph (a); and provided, further, no interest shall accrue in favor of Seller or NECO on amounts that are added to or credited against a calculation due to the adjustment of estimated quantities in accordance with paragraph (a) and ARTICLE 6, SECTION 6.3.

(c)     With respect to reconciliation adjustments pursuant to SECTION 6.3(d) or any error in a calculation (whether the amount is paid or not), any overpayment, underpayment, or reconciliation adjustment will be refunded or paid up, as appropriate.  Interest shall accrue from the date of the error or adjustment on the unpaid or overpaid amount finally determined to be due and shall be calculated pursuant to Section 35.19a of the Commission regulations.

Confidential

NARR 35225

5.3  Taxes, Fees and Levies

Seller shall be obligated to pay all present and future taxes, fees and levies which may be assessed upon Seller by any entity upon the purchase or sale of electricity covered by the Agreement. To the extent such taxes, fees, and levies are allowed to be, and are actually, recoverable by NECO from its customers, NECO shall reimburse Seller for such taxes, fees, and levies paid by Seller. It is expressly agreed that Seller shall not be responsible for, and shall be held harmless from, the Rhode Island Tax on gross receipts or earnings (Public Service Corporation Tax, Chapter 44-13 of the Rhode Island General Laws, as amended or superseded).

## ARTICLE 6.  DELIVERY, LOSSES, AND DETERMINATION AND REPORTING OF HOURLY LOADS

6.1  Delivery

All electricity shall be delivered to NECO in the form of three-phase sixty-hertz alternating current at any location on the NEPOOL PTF system or NECO's System ("Delivery Points"). Title shall pass to NECO at the Delivery Point and Seller shall incur no expense or risk beyond the Delivery Point other than those described in SECTION 6.2. If the NEPOOL control area experiences congestion, Seller will be responsible for any congestion costs incurred in delivering power across the PTF system to NECO to the extent such costs are imposed by NEPOOL or the ISO on suppliers. Seller shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point to point charges and distribution charges needed to deliver the power to the NEPOOL PTF.

6.2  Losses

Seller shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement to the meters of ultimate customers of NECO receiving retail Standard Offer Service, provided, however, that losses do not include service to unmetered facilities for which estimates of kWh use are available and provided, further, that Seller shall not be responsible for unmetered use or consumption of electricity by NECO's Affiliates. Seller shall provide NECO at the Delivery Points with additional quantities of electricity and ancillary services to cover such losses, but Seller shall not be entitled to payment under ARTICLE 5 of this Agreement for such additional quantity. The quantities required for this purpose in each hour of a billing period shall be determined in accordance with NEPOOL's, NEP's and NECO's filed procedures for loss determination.

Confidential

6.3  Determination and Reporting of Hourly Loads

(a)    To meet its NEPOOL obligations, Seller, or a NEPOOL member having an own-load dispatch or settlement account with the NEPOOL billing system with whom Seller has a load inclusion agreement, must report to NEPOOL or the ISO the Standard Offer Service load for which Seller is providing Wholesale Standard Offer Service pursuant to this Agreement, including losses. To accomplish this, NECO will estimate its total hourly Standard Offer Service load based upon average load profiles developed for each NECO customer class and NECO's actual total hourly load. Appendix B, attached and incorporated herein by reference, provides a general description of the estimation process that NECO will initially employ (the "Estimation Process"). NECO reserves the right, subject to the approval of appropriate regulatory authorities having jurisdiction to modify the Estimation Process in the future, provided that any such modification be designed to improve the accuracy of its results, and provided further that NECO shall consult with Seller and other similarly situated sellers to the maximum extent permitted by any applicable standards of conduct. NECO will report to NEPOOL, on behalf of Seller or such other NEPOOL member, Seller's hourly Standard Offer Service load, which shall equal the portion of NECO's estimated total Standard Offer Service hourly load for which Seller is responsible for supplying Wholesale Standard Offer Service under this Agreement.

(b)    NECO will report to NEPOOL or the ISO Seller's hourly adjusted Standard Offer Service loads by 12:00 noon of the second following business day. This adjusted load should be added by NEPOOL or the ISO to the other NEPOOL load of Seller or such other NEPOOL member.

(c)    At the end of each month, NECO shall aggregate Seller's hourly loads for the month as determined by the Estimation Process. For purposes of SECTION 5.1, above, the result of the Estimation Process, less losses to the Standard Offer Service customers' meters determined as specified in ARTICLE 6 SECTION 6.2, above, will be deemed to be the quantity of Wholesale Standard Offer Service delivered by Seller to the Delivery Points in a month.

(d)    To refine the estimates of Seller's monthly Standard Offer Service load developed by the Estimation Process, a monthly calculation will be performed to reconcile the original estimate of Seller's Standard Offer Service loads to actual customer usage based on meter reads. NECO will apply any resulting billing adjustment (debit or credit) to Seller's account no later than the last day of the third month following the billing month. Appendix B, attached and incorporated herein by reference, also provides a general description of this reconciliation process.

Confidential                                                             NARR 35227

## ARTICLE 7.  DEFAULT AND TERMINATION

7.1  Material Breach and Termination

(a)  (i)  If NECO fails in any material respect to comply with, observe or perform any covenant, warranty or obligation under this Agreement (except due to causes excused by force majeure or attributable to Seller's wrongful act or wrongful failure to act); and

(ii)  After receipt of written notice from Seller such failure continues for the Cure Period (as defined below), or, if such failure cannot be reasonably cured within the Cure Period, such further period as shall reasonably be required to effect such cure (except in the case of a payment default), provided that NECO commences within the Cure Period to effect such cure and at all times thereafter proceeds diligently to complete such cure as quickly as possible; then

(iii)  Seller shall have the right to terminate this Agreement, subject to paragraph (c) below.  For purposes of this Section 7.1(a), the Cure Period shall mean five days in the case of a failure by NECO to fulfill its payment obligations pursuant to Section 5.2 and forty-five (45) days in the case of a failure by NECO to comply with, observe or perform any other covenant, warranty or obligation under this Agreement.  If an unexcused failure to pay continues for fifteen (15) days, Seller shall have the right to suspend service until payment is made in full and appropriate security is posted for future payments or to terminate this Agreement.

(b)  (i)  If Seller fails in any material respect to comply with, observe, or perform any covenant, warranty or obligation under this Agreement (except due to causes excused by force majeure or attributable to NECO's wrongful act or wrongful failure to act); and

(ii)  After receipt of written notice from NECO such failure continues for a period of forty-five (45) days, or, if such failure cannot be reasonably cured within such forty-five (45) day period, such further period as shall reasonably be required to effect such cure, provided that Seller commences within such forty-five (45) day period to effect such cure and at all times thereafter proceeds diligently to complete such cure as quickly as possible; then

(iii)  NECO shall have the right to terminate this Agreement, subject to paragraph (c) below.

Confidential                                    NARR 35228

(c)     Any termination arising out of the exercise of the termination rights specified in paragraphs (a) or (b) above (with the exception of termination for a payment default) may not take effect unless and until an arbitrator (pursuant to ARTICLE 15, SECTION 15.2 of this Agreement) has made a ruling that the exercise of such termination right was valid. The fact that one party alleged to be in material breach of this Agreement ("Alleged Breaching Party") complies with the request of the other to cure an alleged material breach shall not be considered by the arbitrator as an admission against the Alleged Breaching Party or evidence that such party was or was not in material breach.

(d)     Nothing in this SECTION 7.1 shall be construed to limit the right of any party to seek any remedies for damages, as limited by ARTICLE 9 of this Agreement, even if a cure of an alleged breach is made within the periods of time specified for curing any such breach stated above. The provisions of this SECTION 7.1 are intended only to provide the exclusive process through which one party may exercise and effectuate its right to terminate this Agreement as a result of a material breach of this Agreement.

## ARTICLE 8.   NOTICES, REPRESENTATIVES OF THE PARTIES

8.1   Notices

Any notice, demand, or request required or authorized by this Agreement to be given by one party to another party shall be in writing. It shall either be sent by facsimile (confirmed by telephone), overnight courier, personally delivered and acknowledged in writing or by registered or certified mail, (return receipt requested) postage prepaid, to the representative of the other party designated in this ARTICLE 8. Any such notice, demand, or request shall be deemed to be given (i) when sent by facsimile confirmed by telephone, (ii) when actually received if delivered by courier or personal deliver or (iii) three (3) days after deposit in the United States mail, if sent by first class mail.

Notices and other communications by Seller to NECO shall be addressed to:

The Narragansett Electric Company
c/o New England Power Service Company
25 Research Drive
Westborough, MA 01582
Attention: Michael J. Hager
Fax: (508) 389-3001

Confidential

NARR 35229

Notices and other communications by NECO to Seller shall be addressed to:

> USGen New England, Inc.
> 7500 Old Georgetown Road, 13th Floor
> Bethesda, MD 20814
> Attention: Stephen A. Herman
> Fax: (301) 718-6913

Any party may change its representative by written notice to the others.

8.2   Authority of Representative

The parties' representatives designated in ARTICLE 8, SECTION 8.1 shall have full authority to act for their respective principals in all technical matters relating to the performance of this Agreement. They shall not, however, have the authority to amend, modify, or waive any provision of this Agreement unless they are authorized officers of their respective entities.

### ARTICLE 9.   LIABILITY, INDEMNIFICATION, AND RELATIONSHIP OF PARTIES

9.1   Limitation on Consequential, Incidental and Indirect Damages

To the fullest extent permissible by law, neither NECO nor Seller, nor their respective officers, directors, agents, employees, parent or affiliates, successor or assigns, or their respective officers, directors, agents, or employees, successors, or assigns, shall be liable to the other party or its parent, subsidiaries, affiliates, officers, directors, agents, employees, successors or assigns, for claims, suits, actions or causes of action for incidental, indirect, special, punitive, multiple or consequential damages (including attorney's fees or litigation costs) connected with or resulting from performance or non-performance of this Agreement, or any actions undertaken in connection with or related to this Agreement, including without limitation any such damages which are based upon causes of action for breach of contract, tort (including negligence and misrepresentation), breach of warranty, strict liability, Rhode Island Gen. Laws Title 6, c. 13.1, statute, operation of law, or any other theory of recovery. The provisions of this SECTION 9.1 shall apply regardless of fault and shall survive termination, cancellation, suspension, completion or expiration of this Agreement.

9.2   Recovery of Direct Damages Permitted

Notwithstanding the provisions of ARTICLE 9, SECTION 9.1, subject to the duty to mitigate damages as provided under common law of damages recovery, both NECO and Seller shall be entitled to recover their actual, direct damages (i) incurred as a result of the other party's breach of this Agreement or (ii) incurred as a result of any other claim arising out of any action undertaken in connection with or related to this Agreement. For purposes of

Confidential                                                    NARR 35230

avoiding any disputes about the difference between direct damages and consequential damages, the parties agree as follows:

(a) (1) To the extent that NECO is found to be in breach of this Agreement or liable under another cause of action; and

(2) as a result of such breach or event giving rise to the cause of action, Seller suffers loss of profits that Seller reasonably expected to have received from NECO under this Agreement had NECO performed under this Agreement; then

(3) Seller shall be entitled to recover any lost profits that Seller can demonstrate it lost or will lose as a result of NECO's breach, subject to the duty to mitigate.

(b) (1) To the extent that Seller fails to provide NECO Wholesale Standard Offer Service Power under the terms of this Agreement; and

(2) as a result, Seller is found to be in material breach of this Agreement or liable under another cause of action; and

(3) subject to the duty to mitigate, NECO purchases (as a result of Seller's failure) power from a third party at a price that is higher than what NECO would have paid under the terms of this Agreement, NECO may recover the difference between the price NECO paid to such third party and the price it would have paid had Seller performed; provided, however, Seller shall not be liable to NECO for lost profits associated with any expected revenue streams from the sale of power to third parties or lost profits from any other contracts or sales.

(c) Except as provided in paragraphs (a) and (b) above, neither NECO nor Seller shall be liable to the other for lost profits arising out of performance, or non-performance of this Agreement, whether such lost profits may be categorized as direct, incidental, indirect, or consequential damages and irrespective of whether such claims are based upon warranty, tort, strict liability, contract, statute (including R.I. G.L. Title 6, c. 13.1), operation of law or otherwise.

9.3 Indemnification

(a) Seller agrees to defend, indemnify and save NECO, its officers, directors, employees, agents, successors, assigns, and Affiliates and their officers, directors, employees, and agents harmless from and against any and all claims, suits, actions or causes of action for damage by reason of bodily injury, death, or damage to property caused by Seller, its officers, directors, employees, agents or affiliates or caused by or sustained on its facilities, except to

Confidential

NARR 35231

the extent caused by an act of negligence or willful misconduct by an officer, director, agent, employee or Affiliate of NECO or their successors or assigns.

(b)    NECO agrees to defend, indemnify and save Seller, its officers, directors, employees, agents, successors, assigns, and affiliates and their officers, directors, employees, and agents harmless from and against any and all claims, suits, actions or causes of action for damage by reason of bodily injury, death, or damage to property caused by NECO, its officers, directors, employees, agents or affiliates or caused by or sustained on its facilities, except to the extent caused by an act of negligence or willful misconduct by an officer, director, agent, employee or Affiliate of Seller or their successors or assigns.

(c)    If any party intends to seek indemnification under this ARTICLE from the other party with respect to any action or claim, the party seeking indemnification shall give the other party notice of such claim or action within fifteen (15) days of the commencement of, or actual knowledge of, such claim or action. Such party seeking indemnification shall have the right, at its sole cost and expense, to participate in the defense of any such claim or action. The party seeking indemnification shall not compromise or settle any such claim or action without the prior consent of the other party, which consent shall not be unreasonably withheld.

9.4    Independent Contractor Status

Nothing in this Agreement shall be construed as creating any relationship between NECO and Seller other than that of independent contractors for the sale and purchase of electricity provided as Wholesale Standard Offer Service.

## ARTICLE 10.    ASSIGNMENT

10.1    Assignment

This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing, (i) NECO may, without Seller's prior written consent, (A) assign all or a portion of its rights and obligations under this Agreement to any Affiliate of NECO or (B) assign its rights and obligations hereunder, or transfer such rights and obligations by operation of law, to any corporation or other entity with which or into which NECO shall merge or consolidate or to which NECO shall transfer all or substantially all of its assets, provided that such Affiliate or other entity agrees to be bound by the terms thereof; provided, in either case, that the assignee or transferor shall have senior securities rated investment grade or better; (ii) the Seller may assign all of its rights and obligations hereunder to any wholly owned Subsidiary (direct or

Confidential

NARR 35232

indirect) of PG&E Corporation and upon NECO's receipt of notice from Seller of any such assignment, the Seller will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to "Seller" shall thereafter be deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Buyer from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Buyer's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge PG&E Corporation from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by PG&E Corporation, and (iii) the Seller or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purposes of financing or refinancing the Purchased Assets, including upon or pursuant to the exercise of remedies under such financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof; provided, however, that no such assignment or disposition shall relieve or in any way discharge the Seller or such assignee from the performance of its duties and obligations under this Agreement. NECO agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyance, pledge or disposition of rights hereunder so long as NECO's rights under this Agreement are not thereby altered, amended, diminished or otherwise impaired.

## ARTICLE 11.  SUCCESSORS AND ASSIGNS

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective permitted successors and assigns.

## ARTICLE 12.  FORCE MAJEURE

### 12.1  Force Majeure Standard

The parties shall be excused from performing their respective obligations hereunder and shall not be liable in damages or otherwise, if and only to the extent that they are unable to so perform or are prevented from performing by an event of force majeure.

### 12.2  Force Majeure Definition

An event of force majeure includes, without limitation, storm, flood, lightning, drought, earthquake, fire, explosion, equipment failure, civil disturbance, labor dispute, act of God or the public enemy, action of a court or public authority, or any other cause beyond a party's control, but only if and to the extent that the event directly affects the availability of the transmission or distribution facilities of NEPOOL, NECO or an Affiliate necessary to

0139967.02-01S7a                                    15

Confidential

NARR 35233

deliver Wholesale Standard Offer Service to NECO's customers.   Events affecting the availability or cost of operating any generating facility shall not be events of <u>force majeure</u>.

12.3   <u>Obligation to Diligently Cure Force Majeure</u>

If any party shall rely on the occurrence of an event or condition described in ARTICLE 12, SECTION 12.2, above, as a basis for being excused from performance of its obligations under this Agreement, then the party relying on the event or condition shall:

      a.    provide written notice to the other parties promptly but in no event later than 5 days of the occurrence of the event or condition giving an estimation of its expected duration and the probable impact on the performance of its obligations hereunder;

      b.    exercise all reasonable efforts to continue to perform its obligations hereunder;

      c.    expeditiously take reasonable action to correct or cure the event or condition excusing performance; <u>provided</u> that settlement of strikes or other labor disputes will be completely within the sole discretion of the party affected by such strike or labor dispute;

      d.    exercise all reasonable efforts to mitigate or limit damages to the other parties to the extent such action will not adversely affect its own interests; and

      e.    provide prompt notice to the other parties of the cessation of the event or condition giving rise to its excuse from performance.

## ARTICLE 13.   WAIVERS

The failure of either party to insist in any one or more instance upon strict performance of any of the provisions of this Agreement or to take advantage of any of its rights under this Agreement shall not be construed as a general waiver of any such provision or the relinquishment of any such right, but the same shall continue and remain in full force and effect, except with respect to the particular instance or instances.

Confidential

## ARTICLE 14.   REGULATION

14.1   Laws and Regulations

This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all duly promulgated orders and other duly authorized action of governmental authority having jurisdiction.

14.2   NEPOOL Requirements

This Agreement must comply with all NEPOOL Criteria, Rules, and Standard Operating Procedures ("Rules"). If, during the term of this Agreement, the NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL, the parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate a replacement Rule ("Replacement Rule"). The intent of the parties is that any such Replacement Rule reflect, as closely as possible, the intent and substance of the Rule being replaced as such Rule was in effect prior to such termination or amendment of the NEPOOL Agreement or elimination or alteration of the Rule. If the parties are unable to reach agreement on such an amendment, the parties agree to submit the matter to arbitration under the terms of Appendix C, attached and incorporated herein by reference, and to seek a resolution of the matter consistent with the above stated intent.

## ARTICLE 15.   INTERPRETATION, DISPUTE RESOLUTION

15.1   Interpretation

The interpretation and performance of this Agreement shall be in accordance with and controlled by the laws of The State of Rhode Island.

15.2   Dispute Resolution

All disputes between NECO and Seller arising out of or relating to this Agreement which are defined as "Arbitrable Claims" in SECTION 2 of Appendix C, attached and incorporated herein by reference, shall be resolved by binding arbitration and be governed by the terms of such Arbitration Agreement. Any arbitration of an Arbitrable Claim that is substantially related to an arbitrable claim under a Wholesale Standard Offer Service Agreement among Seller, Massachusetts Electric Company, and Nantucket Electric Company shall be conducted jointly with the arbitration of the latter claim, before the same panel of arbitrators, with NECO, Massachusetts Electric Company, and Nantucket Electric Company jointly exercising their rights regarding the selection of arbitrators. Any decisions of the arbitrators shall be final and binding upon the parties.

Confidential                                           NARR 35235

## ARTICLE 16.   SEVERABILITY

If any provision or provisions of this Agreement shall be held invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

## ARTICLE 17.   MODIFICATIONS

No modification to this Agreement will be binding on any party unless it is in writing and signed by all parties.

## ARTICLE 18.   SUPERSESSION

This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and its execution supersedes any other agreements, written or oral, between the parties concerning such subject matter.

## ARTICLE 19.   COUNTERPARTS

This Agreement may be executed in any number of counterparts, and each executed counterpart shall have the same force and effect as an original instrument.

## ARTICLE 20.   HEADINGS

Article and Section headings used throughout this Agreement are for the convenience of the parties only and are not to be construed as part of this Agreement.

Confidential

NARR 35236

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

THE NARRAGANSETT ELECTRIC COMPANY

BY:_____

Its_____

USGEN ACQUISITION CORPORATION

BY:_____
M. Richard Smith

Its____Vice President_____

Confidential                                              NARR 35237

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

THE NARRAGANSETT ELECTRIC
COMPANY

BY: _John S Cochran_
      John G. Cochran

Its  _Assistant Treasurer_


USGEN NEW ENGLAND, INC.

BY: _____

Its _____

Confidential

NARR 35238

## Appendix A.  Incremental Revenues
## From NECO Customer Rate Fuel Adjustment

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, incremental revenues received by NECO as a result of NECO's Customer Rate Fuel Adjustment, described below, will be fully allocated among suppliers of Wholesale Standard Offer Service Power in proportion to the percentage of NECO's total Standard Offer Service requirements during the month that such supplier delivers under its respective agreement with NECO.

NECO's Customer Rate in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on the Customer Rate unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The NECO Customer rate for retail customers who elect Standard Offer Service by choice or inaction is the following predetermined, flat rate for energy consumed:

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Market Gas Price is the average of the values of "Gas Index" for the most recent available twelve months, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu.  NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

0139967.02-01S7a

A-1

Confidential

NARR 35239

Market Oil Price is the average of the values of "Oil Index" for the most recent available twelve months, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, NECO shall file alternate indices with the RIPUC.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 | $8.48 |
| 2006 | $9.22 |
| 2007 | $9.95 |
| 2008 | $10.69 |
| 2009 | $11.42 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

> Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:

Confidential                    NARR 35240

$$\frac{(\$3.50+\$.60/MMBtu)+(\$3.00+\$.04/MMBtu)}{\$6.09+\$.60+\$.04/MMBtu} = 1.0609$$

The Customer Rate paid to NECO is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

Confidential                                        NARR 35241

### Appendix B.  Estimation of Supplier Hourly Loads

**Overview**

Generating units operated by suppliers are dispatched by the power pool to meet the region's electrical requirements reliably, and at the lowest possible cost.  As a result, a supplier's electricity production may not match the demand of its customers.  In each hour some suppliers with low cost production units are net sellers of electricity to the pool, while other suppliers are purchasing power from the pool to meet the demand of their customers.  To determine the extent to which suppliers are net buyers or sellers on an hourly basis, it is necessary to estimate the hourly aggregate demand for all of the customers served by each supplier ("own-load").  NECO will estimate Seller's Wholesale Standard Offer Service "own-load" within NECO's service territory and report the hourly results to NEPOOL or the ISO on a daily basis.

The estimation process is a cost effective approach to producing results that are reliable, unbiased and reasonably accurate.  The hourly load estimates will be based on rate class load profiles which will be developed from statistically designed samples.  Each day, the class load shapes will be scaled to the population of customers served by each supplier contracting with NECO as a result of the Standard Offer Auction ("Standard Offer Auction Supplier"), Seller, and any other entity providing Wholesale Standard Offer Service.  In cases where telemetered data on individual customers are available, they will be used in place of the estimated shapes.  On a monthly basis, the estimates will be refined by incorporating actual usage data obtained from meter readings.  In both processes, the sum of all suppliers' estimated Standard Offer Service loads will match the total load delivered into the distribution system.  A description of the estimation process follows.

**Daily Estimation of Suppliers' Own Load**

The daily process estimates the hourly load for each Standard Offer Auction Supplier, Seller, and any other entity providing Wholesale Standard Offer Service, for the previous day.  There are four components in this process:

- Select a proxy date from the previous year with characteristics which best match the day for which the hourly demand estimates are being produced.  Extract class load shapes for the selected proxy date from the load research data base.

- Scale the class load shapes appropriately for each individual customer based on the usage level of the customer relative to the class average usage level.

- Calculate a factor for each customer which reflects their relative usage level and includes an adjustment for losses ("load adjustment factor").  Aggregate the load adjustment factors across the customers served by each supplier in each class.

Confidential                                                    NARR 35242

- Produce a preliminary estimate of each supplier's hourly loads by combining the proxy day class load shapes with the supplier's total load adjustment factors. Aggregate the loads across the classes for each supplier.

- Adjust the preliminary hourly supplier estimates so that their sum is equal to NECO's actual hourly metered loads (as metered at the point of delivery to the distribution system) by allocating any differences to suppliers in proportion to their estimated load.

**Monthly Reconciliation Process**

The monthly process will improve the estimates of Standard Offer Service supplier loads by incorporating the most recent customer usage information, which will be available after the monthly meter readings are processed. A comparison will be made between customers' estimated and actual usage, by billing cycle, then summed across billing cycles for each supplier. The ratio between the actual kWh and the estimated kWh reflects the kWh amount for which the supplier may have been overcharged or undercharged by NEPOOL or the ISO during the month. This ratio will be used to develop a kWh adjustment amount for each supplier for the calendar month. The sum of the adjustments will be zero because the total kWh will still be constrained to equal NECO's actual hourly metered Standard Offer Service loads during the month.

Confidential

Appendix C.  Arbitration Agreement

ARBITRATION AGREEMENT

This Arbitration Agreement, dated as of _____ (date of Whole-
sale Standard Offer Service Agreement), is entered into between The Narragansett Electric
Company, a Rhode Island corporation ("NECO") and _____, a
_____ (describe entity) ("Seller").  Reference is made to that certain
Wholesale Standard Offer Service Agreement dated as of _____, 199__ (the
"Service Agreement") between NECO and Seller.  Unless otherwise specified or apparent
from the context of this Arbitration Agreement, the term "Party" shall mean either NECO or
Seller, or both of them.

WHEREAS, NECO and Seller wish to avoid the burden, time, and expense of court
proceedings with respect to any disputes that may arise from or relate to the Service Agree-
ment, and to submit such disputes to mandatory binding arbitration if they cannot first be
resolved through negotiation and mediation.

NOW, THEREFORE, NECO and SELLER AGREE AS FOLLOWS:

1.    **Mediation**

Before resorting to mediation or arbitration under this Arbitration Agreement, the
Parties will try to resolve promptly through negotiation any Arbitrable Claim, as defined
below.  If the Arbitrable Claim has not been resolved through negotiation within ten (10) days
after the existence of the Arbitrable Claim has been brought to the attention of the other Party
in a writing, any Party may request in writing to resolve the Arbitrable Claim through
mediation conducted by a mediator selected by agreement of the Parties.  The mediation
procedure shall be determined by the Parties in consultation with the mediator.  Any medica-
tion pursuant hereto shall be kept confidential.  The fees and expenses of the mediator shall
be borne equally by the Parties. If the Parties are unable to agree upon the identity of a
mediator or a mediation procedure within ten (10) days after a Party has requested mediation
in writing or if the Arbitrable Claim has not been resolved to the satisfaction of either NECO
or Seller within forty (40) days after the Parties have selected a mediator and agreed upon a
mediation procedure, either Party may invoke arbitration pursuant to the following sections by
notifying the other Party of such selection in writing consistent with Section 3(c), below.

2.    **Mandatory Arbitration**

(a)    Except as provided in paragraph (b) of this Section 2 and in Section 8, below,
any case, controversy or claim arising out of or relating to the Service Agreement, its breach,
or any other disputes arising out of the business relationship created by the Service Agree-
ment, of whatever nature, including but not limited to any claim based in contract, in law, in
equity, any statute, regulation, or theory of law now in existence or which may come into

Confidential                                                           NARR 35244

existence in the future, whether known or unknown, including without limitation, claims based upon deceit, fraudulent inducement, misrepresentation, 18 U.S.C §§1962 and 1964 (RICO), and R.I. G.L. Title 6, c. 13.1, the federal and state antitrust laws (collectively, the "Arbitrable Claims"), which cannot be resolved by negotiation or mediation, as provided in Section 1 above, shall be submitted to mandatory, binding, and final arbitration in accordance with procedures set forth in this Agreement, which shall constitute the exclusive remedy for any and all Arbitrable Claims.

(b)     Notwithstanding paragraph (a) above, physical accidents or events giving rise to negligence or intentional tort claims for the recovery of property damages and/or damages for personal injury and failure to make payments due under Section 5.2 of the Service Agreement shall not be considered "Arbitrable Claims." However disputes regarding the interpretation or scope of any indemnification clauses in the Service Agreement shall be subject to arbitration, even if the dispute relates to whether one Party must indemnify the other for property damages and/or damages for personal injury, the recovery of which was or will be determined in a court of law.

(c)     Each Party agrees that it will not attempt to circumvent this Arbitration Agreement by coordinating or cooperating with their respective parent companies or affiliates or guarantors in the filing of a legal action in the name of any of the parent companies or affiliates or guarantors of the Parties to this Arbitration Agreement regarding claims that otherwise are subject to this Arbitration Agreement. Any Party failing to comply with this provision shall indemnify the other Party against, and hold the other harmless from, the costs (including reasonable litigation costs) incurred by the other in defending any and all claims brought by a parent company or affiliate or guarantor of the other in a court of law regarding claims that otherwise would be Arbitrable Claims under this Arbitration Agreement.

3.     **Selection and Qualification of Arbitrators**

(a)     Any arbitration shall be conducted by a panel of three neutral arbitrators, consisting of (i) a practicing lawyer admitted to practice in the Commonwealth of Massachusetts; (ii) a person with professional experience in and substantial knowledge of the power generation industry in any one or more of the New England States, who may be, but need not be a lawyer, and (iii) a person with professional experience in and substantial knowledge of power markets in any one or more of the New England States, who may, but need not be, a lawyer (collectively, the "Arbitration Panel"). For purposes of this Arbitration Agreement, an arbitrator or candidate shall be considered "neutral" only if the arbitrator or candidate has not previously served as an arbitrator for a Party or one of its affiliates or guarantors and is not a present or former lawyer, employee or consultant of a Party or any of its affiliates or guarantors.

(b)     Any Party entitled to commence arbitration hereunder shall do so by serving a written Notice of Arbitration briefly describing the Arbitrable Claims and the Agreements under which they are brought. Service of such Notice of Arbitration shall be complete upon receipt by the person designated for each party at the addresses specified in Section 12 below.

0139967.02-01S7a                          C-2

(c)    Within twenty (20) days after service of a Notice of Arbitration, each Party shall serve upon the other Party a list of seven neutral candidates for each of the three panel members described in subparagraph (a) above.

(d)    Within twenty (20) days after service of the lists referred to in subparagraph (c), NECO and Seller shall then strike from the other's lists any two candidates from each of the lists, for any reason whatsoever. For the remaining candidates each Party shall rank each candidate on its three lists from one to five and shall do the same for the other Party's lists.

(e)    The candidates in each of the three categories with the lowest total score shall be invited to serve as panel members. In the event that the candidate in any of the three categories with the lowest total score is unable or unwilling to serve, or has a potential conflict of interest not consented to by each Party, then the candidate with the next lowest score in that category shall be invited to serve, subject to full disclosure by each candidate of, and consent by each Party to any potential conflicts of interests. This process shall be repeated until a full arbitration Panel is selected or the list of candidates for that category is exhausted. If the list of candidates for a category is exhausted the Parties shall exchange a new list of candidates for that category and the procedures set forth above shall be repeated a second time.

(f)    If the parties cannot select a full Arbitration Panel in accordance with these procedures than any Party may request that a court of competent jurisdiction appoint the remaining members subject to their qualifications, willingness and ability to serve as provided above.

(g)    The American Arbitration Association shall be appointed to facilitate and administer the parties' compliance with the procedures set forth above.

4.    **Time Schedule**

The Arbitration shall be conducted as expeditiously as possible. The Arbitration Panel shall schedule a pre-hearing conference and hearings as it deems advisable and shall use its best efforts to schedule consecutive days of hearings. Hearings shall be limited to a total of ten (10) days. The Arbitration Panel shall issue its final decision and award within thirty (30) days of the close of the hearings, which shall be accompanied by a written, reasoned opinion.

5.    **Remedies**

(a)    The Arbitration Panel shall not award punitive or multiple damages or any other damages not measured by the prevailing Party's actual damages - except that the Arbitration Panel, in its sole discretion, may shift all or a portion of the costs of the Arbitration to any Party.

Confidential

(b)  Any award of damages by the Arbitration Panel shall be determined, limited and controlled by the damages limitation clauses of the Service Agreement applicable to the dispute before the Arbitration Panel.

(c)  The Arbitration Panel may, in its discretion, award pre-award and post-award interest on any damages award; provided, however, that the rate of pre-award or post-award interest shall not exceed a rate equal to the rate provided for post-judgment interest by 28 U.S.C.§ 1961 as published from time to time by the Administrative Office of the United States Courts based on the equivalent coupon issue yield for auctions of 52-week Treasury bills.

6.    **Confidentiality**

The existence,  contents, or results of any mediation or arbitration hereunder may not be disclosed without the prior written consent of both Parties; provided, however, either Party may make disclosures as may be necessary to fulfill regulatory obligations to any regulatory bodies having jurisdiction, and may inform their lenders, affiliates, auditors and insurers, as necessary, under pledge of confidentiality and can consult with experts as required in connection with the arbitration under pledge of confidentiality. If any Party seeks preliminary injunctive relief from any court to preserve the status quo or avoid irreparable harm pending mediation or arbitration, the Parties agree to use best efforts to keep the court proceedings confidential, to the maximum extent permitted by law.

7.    **FERC Jurisdiction over Certain Disputes**

(a)  Nothing in this Arbitration Agreement shall preclude, or be construed to preclude, any Party from filing a petition or complaint with the Federal Energy Regulatory Commission ("FERC") with respect to any Arbitrable Claim. In such case, the other Party may request FERC to reject or to waive jurisdiction. If the FERC rejects or waives jurisdiction, with respect to all or a portion of the claim, the portion of the claim not so accepted by FERC shall be resolved through arbitration, as provided in this Arbitration Agreement. To the extent that FERC asserts or accepts jurisdiction over the claim, the decision, finding of fact, or order of FERC shall be final and binding, and any arbitration proceedings that may have commenced prior to the assertion or acceptance of jurisdiction by FERC shall be stayed, pending the outcome of the FERC proceedings.

(b)  The Arbitration Panel shall have no authority to modify, and shall be conclusively bound by, any decision, finding of fact, or order of FERC. However, to the extent that a decision finding of fact, or order of FERC does not provide a final or complete remedy to the Party seeking relief, such Party may proceed to arbitration under this Arbitration Agreement to secure such remedy, subject to the FERC decision, finding or order.

0139967.02-0157a                          C-4

Confidential                                          NARR 35247

8.    **Preliminary Injunctive Relief**

Nothing in this Arbitration Agreement shall preclude, or be construed to preclude, the resort by either Party to a court of competent jurisdiction solely for the purposes of securing a temporary or preliminary injunction to preserve the status quo or avoid irreparable harm pending mediation or arbitration pursuant to this Arbitration Agreement.

9.    **Governing Law**

This Arbitration Agreement shall be construed, enforced in accordance with, and governed by, the laws of the State of Rhode Island.

10.   **Location of Arbitration**

Any arbitration hereunder shall be conducted in Boston, Massachusetts.

11.   **Severability**

If any section, subsection, sentence, or clause of this Arbitration Agreement is adjudged illegal, invalid, or unenforceable, such illegality, invalidity, or enforceability shall not affect the legality, validity, or enforceability of the Arbitration Agreement as a whole or of any section, subsection, sentence or clause hereof not so adjudged.

12.   **Notices**

Any notices required to be given pursuant to this Arbitration Agreement shall be in writing and sent to the receiving party by (i) certified mail, return receipt requested, (ii) overnight delivery service, or (iii) facsimile transmission (confirmed by telephone), addressed to the receiving party at the address shown below or such other address as a party may subsequently designate in writing. Any such notice shall be deemed to be given (i) three days after deposit in the United States mail, if sent by mail, (ii) when actually received if sent by overnight delivery service, or (iii) when sent, if sent by facsimile and confirmed by telephone.

> If to NECO:    The Narragansett Electric Company
> 25 Research Drive
> Westborough, Massachusetts  01582
> Attention:  General Counsel
> Facsimile:  (508) 389-2463
>
> If to Seller    _____
> _____
> _____
> Attention:  _____
> Facsimile:  ( )    .  _____

0139967.02-01S7a                          C-5

In addition, the parties shall send copies of any notices required by the terms of any of the Agreements, in accordance with the terms of each Agreement.

**IN WITNESS WHEREOF,** Each Party has caused its duly authorized officers to execute this Arbitration Agreement on the dates set forth below.

THE NARRAGANSETT ELECTRIC COMPANY

BY:_____

Its_____


USGEN NEW ENGLAND, INC.

BY:_____

Its_____

Confidential

# Tab 9

## CONSENT AGREEMENT

This Consent Agreement ("Agreement") is made and effective as of the 29th day of October 1997, by and among New England Power Company, a Massachusetts corporation ("NEP"), USGen New England, Inc. (formerly named USGen Acquisition Corporation), a Delaware corporation ("USGen"), TransCanada OSP Holdings Ltd., a Delaware Corporation ("TransCanada Holdings"), TransCanada Power Marketing Ltd., a Delaware corporation ("TransCanada Power", and together with TransCanada Holdings the "TransCanada Parties"), Narragansett Electric Company, a Rhode Island corporation ("NECO"), Massachusetts Electric Company, a Massachusetts corporation, Nantucket Electric Company, a Massachusetts corporation (these two parties collectively being referred to as "MECO") and Granite State Electric Company, a New Hampshire corporation ("GSEC").

## W I T N E S S E T H

WHEREAS, pursuant to the Asset Purchase Agreement, dated as of August 5, 1997, as amended by Amendment No.1 thereto dated as of September 25, 1997 and Amendment No. 2 thereto dated as of October 29, 1997 (as so amended, the "APA"), by and among NEP, NECO and USGen, NEP and NECO have agreed to deliver to USGen certain assets which include 100% of the issued and outstanding shares of common stock of Narragansett Energy Resources Company, a Rhode Island corporation ("NERC Stock");

WHEREAS, USGen desires to sell and assign the NERC Stock and assign the benefits and obligations related thereto under the APA to TransCanada Holdings and TransCanada Holdings desires to purchase the NERC Stock and accept such benefits and obligations;

WHEREAS, pursuant to the OSP PPA Transfer Agreement, dated as of the date hereof (the "OSP PPA Transfer Agreement"), by and between NEP and USGen, NEP has agreed to transfer and USGen has agreed to assume benefits and obligations related to certain power purchase agreements;

0220118.21-01S1a

Confidential

WHEREAS, USGen desires to transfer the benefits and obligations related to the OSP PPA Transfer Agreement to TransCanada Power and TransCanada Power desires to accept such benefits and obligations;

WHEREAS, pursuant to the PSA Performance Support Agreement, dated as of August 5, 1997 relating to a certain Power Sales Agreement between NEP and Unitil Power Corp., dated July 30, 1992 as amended relating to the Ocean State Power and Ocean State Power II facilities (the "Unitil PSA"), by and between NEP and USGen, NEP has agreed to transfer and USGen has agreed to assume benefits and obligations related to such power sales agreements;

WHEREAS, USGen desires to transfer the benefits and obligations related to the Unitil PSA to TransCanada Power and TransCanada Power desires to accept such benefits and obligations;

WHEREAS, pursuant to the MECO Wholesale Standard Offer Service Agreement II, dated as of the date hereof, by and between MECO and USGen (the "MECO II Agreement") and the NECO Wholesale Standard Offer Service Agreement II, dated as of the date hereof, by and between NECO and USGen (the "NECO II Agreement"), USGen has agreed to sell and MECO and NECO have agreed to purchase Wholesale Standard Offer Service as defined in the MECO II and NECO II Agreements;

WHEREAS, USGen desires to assign the benefits and obligations related to the MECO II and NECO II Agreements to TransCanada Power and TransCanada Power desires to accept such benefits and obligations;

WHEREAS, pursuant to Section 7.15 of the APA, on or prior to the Effective Date, USGen and GSEC may, at the request of GSEC, enter into a Wholesale Standard Offer Service Agreement ("GSEC Agreement") in substantially the same form as the MECO II Agreement, under which USGen will agree to sell and GSEC will agree to purchase Wholesale Standard Offer Service as defined in the GSEC Agreement;

WHEREAS, USGen desires to transfer 9.22% of the benefits and obligations related to the GSEC Agreement to

0220115.21-0151a                           2

Confidential                                    NARR 31965

TransCanada Power and TransCanada Power desires to accept such benefits and obligations;

NOW, THEREFORE, in consideration of the promises, covenants and other agreements hereinafter set forth, the parties hereto, intending to be bound hereby, agree as follows:

SECTION ONE
ASSIGNMENT OF NERC STOCK

1.1  Assignment of NERC Stock and Related Benefits.  Pursuant to a Stock Purchase and Assumption Agreement dated as of October 29, 1997 (the "Stock Purchase and Assumption Agreement") USGen agreed to assign to TransCanada Holdings, as of the Effective Date (as defined below), all of its right, title and interest in and to the NERC Stock pursuant to the APA.  Pursuant to Section 12.5 of the APA, NEP and NECO hereby consent to the foregoing assignment and agree to assign the NERC Stock, and deliver the certificates representing the NERC Stock, directly to TransCanada Holdings at the Effective Date if so requested by USGen.

SECTION TWO
ASSUMPTION AND RELEASE OF
LIABILITIES AND OBLIGATIONS

2.1  Assumption of Liabilities and Obligations by TransCanada Holdings.  Pursuant to the Stock Purchase and Assumption Agreement, TransCanada Holdings has undertaken, assumed and agreed to perform, pay or discharge, and NEP hereby consents to the assignment by USGen and the assumption by TransCanada Holdings of, as of the Effective Date, all obligations of USGen with respect to the NERC Stock under the APA in accordance with its terms, including but not limited to (a) obligations of USGen under Section 7.4 whether accrued or unaccrued, or fixed or contingent to the extent that they relate to the NERC Stock, (b) obligations of USGen under Section 7.8(d) and any other obligations of USGen under Section 7.8 whether accrued or unaccrued, or fixed or contingent to the extent that they relate to the NERC Stock and (c) obligations of USGen under Section 10.1(b) whether accrued or unaccrued, or fixed or contingent to indemnify NEP for any and all Indemnifiable Losses asserted against

0220118.21-01S1a                           3

Confidential                                        NARR 31966

or suffered by NEP relating to, resulting from or arising out of (i) any breach of the covenants or agreements of USGen contained in Sections 7.4 and 7.8 of the APA to the extent that they relate to the NERC Stock or (ii) any Assumed Obligations whether accrued or unaccrued, or fixed or contingent to the extent that they relate to the NERC Stock; provided, however, that all such obligations, including indemnification obligations, shall terminate, and all such representations, warranties, covenants and agreements shall survive, in accordance with the terms of the APA.

2.2   Assignment of Rights and Benefits by USGen; Consent to Assignment by NEP.  Pursuant to the Stock Purchase and Assumption Agreement, USGen has assigned to TransCanada Holdings, and NEP hereby consents to the assignment by USGen, as of the Effective Date, of all the rights and benefits of USGen with respect to the NERC Stock under the APA in accordance with its terms, including but not limited to (a) obligations of NEP under Section 7.4 whether accrued or unaccrued, or fixed or contingent to the extent that they relate to the NERC Stock, (b) obligations of NEP under Section 7.8(d) and any other obligations of NEP under Section 7.8 whether accrued or unaccrued, or fixed or contingent to the extent that they relate to the NERC Stock and (c) obligations of NEP under Section 10.1(a) whether accrued or unaccrued, or fixed or contingent to indemnify USGen for any and all Indemnifiable Losses asserted against or suffered by USGen relating to, or resulting from or arising out of (i) any breach of the covenants or agreements of NEP contained in Sections 7.4 and 7.8 of the APA to the extent that such covenant or agreement relates to the NERC Stock, (ii) any Excluded Liabilities whether accrued or unaccrued, or fixed or contingent to the extent that they relate to the NERC Stock or (iii) any breach by NEP of any of the representations or warranties contained in Sections 5.1, 5.2 or 5.3 to the extent that they relate to the NERC Stock; provided, however, that all such obligations, including indemnification obligations, shall terminate, and such representations, warranties, covenants and agreements shall survive, in accordance with the terms of the APA; provided, however, that any obligations which, by the terms of the APA, terminate at or do not survive the Closing, shall create no rights in TransCanada Holdings.

0220118.21-01S1a                        4

Confidential

2.3  Assumption of PPA and PSA Liabilities and Obligations by TransCanada Power.  Pursuant to the Stock Purchase and Assumption Agreement, TransCanada Power has undertaken, assumed and agreed to perform, pay or discharge, and NEP hereby consents to the assignment by USGen and the assumption by TransCanada Power of, as of the Effective Date, all obligations of USGen whether accrued or unaccrued, or fixed or contingent under (i) the OSP PPA Transfer Agreement, by and between NEP and USGen, and (ii) the Unitil PSA, by and between NEP and USGen, each in accordance with their respective terms.

2.4  Assignment of Benefits Under the OSP PPA Transfer Agreement and the Unitil PSA.  Pursuant to the Stock Purchase and Assumption Agreement, USGen has assigned to TransCanada Power and NEP hereby consents to the assignment by USGen, as of the Effective Date, of all the benefits under the OSP PPA Transfer Agreement and the Unitil PSA.

2.5  Assumption of MECO II and NECO II Liabilities and Obligations by TransCanada Power.  Pursuant to the Stock Purchase and Assumption Agreement, TransCanada Power has undertaken, assumed and agreed to perform, pay or discharge, and NEP hereby consents to the assignment by USGen and the assumption by TransCanada Power of, as of the Effective Date, all obligations of USGen, whether accrued or unaccrued, fixed or contingent, under the MECO II and NECO II Agreements.

2.6  Assignment of Benefits Under the MECO II and NECO II Agreements.  Pursuant to the Stock Purchase and Assumption Agreement, USGen has assigned to TransCanada Power, and NEP, MECO and NECO hereby consent to the assignment by USGen, as of the Effective Date, of all the benefits under the MECO II and NECO II Agreements.

2.7  Assumption of GSEC Agreement Liabilities and Obligations by TransCanada Power.  In the event that USGen and GSEC enter into the GSEC Agreement, TransCanada Power will undertake, assume and agree to perform, pay or discharge, and NEP hereby consents to the assignment by USGen and the assumption by TransCanada Power of, as of the Effective Date, 9.22% of the obligations of USGen, whether accrued or unaccrued, fixed or contingent, under the GSEC Agreement; and in such case, liabilities and

0220118.21-0JSta                         5

Confidential                        NARR 31968

obligations assumed shall be deemed "Assignee Assumed OSP Ancillary Agreement Obligations" for all purposes of the Stock Purchase and Assumption Agreement and the OSP Ancillary Agreement Instrument of Assumption and Assignment delivered thereunder.

2.8  <u>Assignment of Benefits Under the GSEC Agreement</u>.  In the event that USGen and GSEC enter into the GSEC Agreement, USGen hereby agrees to assign to TransCanada Power, and NEP and GSEC hereby agree to consent to the assignment by USGen, as of the Effective Date, of 9.22% of the benefits under the GSEC Agreement, if such GSEC Agreement is executed; and in such case, the benefits as assigned shall be deemed "Seller Assigned OSP Ancillary Agreement Rights and Benefits" for all purposes of the Stock Purchase and Assumption Agreement and the OSP Ancillary Agreement Instrument of Assumption and Assignment delivered thereunder.

2.9  <u>Release of USGen</u>.  NEP, MECO and NECO hereby release USGen, as of the Effective Date, from any and all obligations of USGen that have been assumed by the TransCanada Parties as contemplated by Sections 2.1, 2.3, 2.5 and 2.7 hereof.

2.10  <u>Release of NEP, MECO and NECO</u>.  USGen hereby releases (a) NEP, as of the Effective Date, from any and all obligations with respect to (i) the NERC Stock, under the APA, (ii) the OSP PPA Transfer Agreement and (iii) the Unitil PSA, (b) NEP, MECO and NECO, as of the Effective Date, from any and all obligations with respect to the MECO II and NECO II Agreements, which have been assigned under Sections 2.2, 2.4 and 2.6 of this Agreement, respectively, by USGen to the TransCanada Parties, and (c) NEP and GSEC, as of the Effective Date, from any and all obligations with respect to the GSEC Agreement, which may be assigned under Section 2.8 of this Agreement by USGen to TransCanada Power.  The USGen release of NEP, MECO and NECO pursuant to this Section 2.10 in no way limits any rights the TransCanada Parties may have as a result of the assignments contemplated by this Agreement.

SECTION THREE
TERMINATION

Confidential

NARR 31969

3.1  Termination.  a.  This Agreement will automatically terminate upon the earlier of the termination of the APA pursuant to Article XI of the APA, or the termination of the Stock Purchase and Assumption Agreement, without any further action by any party hereto.

b.  This Agreement may be terminated by NEP, USGen, MECO, NECO or the TransCanada Parties if (i) any governmental or regulatory body, the consent of which is a condition to the obligations of USGen, NEP, MECO, NECO or the TransCanada Parties to consummate the transactions contemplated hereby shall have determined not to grant its or their consent and all appeals of such determination shall have been taken and have been unsuccessful, (ii) one or more courts of competent jurisdiction in the United States or any State shall have issued an order, judgment or decree permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby, and such order, judgment or decree shall have become final and nonappealable or (iii) any statute, rule or regulation shall have been enacted by any State or Federal government or governmental agency in the United States which prohibits the consummation of the transactions contemplated hereby.

3.2  Procedure and Effect of Termination.  In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by any of the parties pursuant to this Section Three, written notice thereof shall forthwith be given by the terminating party to the other parties and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein:

(i)  said termination shall be the sole remedy of the parties hereto with respect to breaches of any agreement contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other parties or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except in each case as stated in this Section Three; and

0120118.21-01St2                           7

Confidential

(ii)  all filings, applications and other sub-missions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made.

## SECTION FOUR
## MISCELLANEOUS

4.1  *Indemnification for Waiver of Conditions by USGen.*  USGen will defend and hold harmless NEP, NECO, MECO, and GSEC (together the "Indemnified Parties" or "Indemnitee") from and against any and all Indemnifiable Losses (as defined in the APA), asserted against or suffered by the Indemnified Parties relating to, result-ing from or arising out of the waiver by USGen of any closing condition contained in Article VIII of the Stock Purchase and Assumption Agreement.  The procedures for the assertion and payment of claims under this Section 4.1 shall be governed by the terms of Sections 10.1 and 10.2 of the APA.

4.2  *Continuing Effectiveness of Confidentiali-ty Agreement.*  The TransCanada Parties hereby expressly acknowledge that they are Representatives of TCPL Power Corporation under the terms of the Confidentiality Agree-ment executed by TCPL Power Corporation and New England Electric System on January 3, 1997 (the "Confidentiality Agreement").  All information furnished to or obtained by the TransCanada and the TransCanada Parties representa-tives pursuant to or in connection with this Agreement, the Stock Purchase and Assumption Agreement or the trans-actions contemplated thereby, shall be subject to the provisions of the Confidentiality Agreement and shall be treated as "Proprietary Information" (as defined in the Confidentiality Agreement).

4.3  *Terms of OSP PPA Transfer Agreement.*  NEP and the TransCanada Parties hereby agree that upon and as of the Effective Date, and upon the assignment of the OSP PPA Transfer Agreement to TransCanada Power pursuant to the Stock Purchase and Assumption Agreement and this Agreement, the OSP PPA Transfer Agreement shall hereby be modified by the following terms:

a.  for any Commitment for which there has been a Novation at the Effective Date or

**Confidential**

NARR 31971

within thirty (30) days thereafter, the
Applicable Discount Rate to be applied
under Section 8(d)(3) shall be 6.5%, and
TransCanada Power hereby consents under
Section 8(d) to the resulting Trigger
Payment; provided, that if such a Novation
occurs not later than the earlier of thir-
ty (30) days after the Effective Date or
the last business day of the calendar year
in which the Effective Date occurs, NEP
waives its right under Section 8(d)(5) to
defer the resulting Trigger Payment;

b.    for any Commitment for which there has not
been a Novation at the Effective Date or
within thirty (30) days thereafter, the
Monthly Payment Obligation associated
therewith shall be reduced by 1%.

4.4  PG&E Corporation References in the OSP
Ancillary Agreements.    NEP and the TransCanada Parties
hereby agree that upon and as of the Effective Date, and
upon the assignment of the OSP Ancillary Agreements (as
that term is defined in the Stock Purchase and Assumption
Agreement) pursuant to the Stock Purchase and Assumption
Agreement and this Agreement, all references in the OSP
Ancillary Agreements (as that term is defined in the
Stock Purchase and Assumption Agreement) to "PG&E Corpo-
ration" shall be deemed to be references to TransCanada
PipeLines Limited;

4.5  Amendment and Modification.    Subject to
applicable law, this Agreement may be amended, modified
or supplemented only by written agreement of NEP, MECO,
NECO, USGen and the TransCanada Parties.

4.6  Notices.    All notices and other communica-
tions hereunder shall be in writing and shall be deemed
given if delivered personally or by facsimile transmis-
sion, telexed or mailed by overnight courier or regis-
tered or certified mail (return receipt requested),
postage prepaid, to the parties at the following address-
es (or at such other address for a party as shall be
specified by like notice; provided that notices of a

0220118.21-0151a                              9

Confidential                              NARR 31972

change of address shall be effective only upon receipt thereof):

    a.   If to NEP, NECO, MECO or GSEC to:

        New England Power Company
        The Narragansett Electric Company
        c/o New England Power Service Company
        25 Research Drive
        Westborough, MA  01582
        Facsimile: (508) 389-5498
        Attention: Mr. Michael E. Jesanis

        with a copy to:

        Skadden, Arps, Slate, Meagher & Flom LLP
        919 Third Avenue
        New York, NY  10022
        Facsimile:   (212) 735-2000
        Attention:   Sheldon S. Adler, Esq.

    b.   if to USGen, to:

        USGen New England, Inc.
        7500 Old Georgetown Road, 13th Floor
        Bethesda, MD  20814
        Facsimile: (301) 718-6913
        Attention:   Stephen A. Herman, Esq.
                    General Counsel

        with a copy to:

        Weil, Gotshal & Manges LLP
        700 Louisiana, Suite 1600
        Houston, TX  77024
        Facsimile:   (713) 224-9511
        Attention:   Alan Gover, Esq.

    c.   if to the TransCanada Parties, to:

        TransCanada Power Ltd.
        c/o TransCanada Energy Ltd.
        3400, 237-4th Ave., S.W.
        Calgary, Alberta T2P5A4
        Facsimile:   (403) 213-3550
        Attention:   Sean D. McMaster

0220118.21-01$1a                    10

**Confidential**

with a copy to:

Shearman & Sterling
555 California Street
San Francisco, CA 94104
Facsimile:        (415) 616-1199
Attention:        Christopher D. Dillon, Esq.

    4.7  _Assignment_.  This Agreement and all of the
provisions hereof shall be binding upon and inure to the
benefit of the parties hereto and their respective suc-
cessors and permitted assigns, but neither this Agreement
nor any of the rights, interests or obligations hereunder
shall be assigned by any party hereto, including by
operation of law without the prior written consent of the
other parties, nor is this Agreement intended to confer
upon any other Person except the parties hereto any
rights or remedies hereunder.  Notwithstanding the fore-
going, (i) TransCanada Holdings or TransCanada Power may
assign all of its rights and obligations hereunder to any
wholly owned Subsidiary (direct or indirect) of
TransCanada PipeLines Limited and upon NEP, MECO and
NECO's receipt of notice from TransCanada Holdings or
TransCanada Power of any such assignment of their respec-
tive agreements, TransCanada Holdings or TransCanada
Power will be released from all liabilities and obliga-
tions hereunder, accrued and unaccrued, such assignee
will be deemed to have assumed, ratified, agreed to be
bound by and perform all such liabilities and obliga-
tions, and all references herein to "TransCanada" shall
thereafter be deemed references to such assignee, in each
case without the necessity for further act or evidence by
the parties hereto or such assignee; provided, however,
that no such assignment and assumption shall release
TransCanada Holdings or TransCanada Power from its lia-
bilities and obligations hereunder unless the assignee
shall have acquired all or substantially all of
TransCanada's assets; provided, further, however, that no
such assignment and assumption shall relieve or in any
way discharge TransCanada PipeLines Limited from the per-
formance of its duties and obligations under the Guaranty
dated as of the date of this Agreement executed by
TransCanada PipeLines Limited, and (ii) TransCanada Hold-
ings or TransCanada Power or its permitted assignee may
assign, transfer, pledge or otherwise dispose of its
rights and interests hereunder to a trustee or lending
institution(s) for the purposes of financing or refinanc-

0220118.21-01S1a                    11

**Confidential**

ing the NERC Stock, including upon or pursuant to the
exercise of remedies under such financing or refinancing,
or by way of assignments, transfers, conveyances or
dispositions in lieu thereof; provided, however, that no
such assignment or disposition shall relieve or in any
way discharge TransCanada Holdings or TransCanada Power
as the case may be, or such assignee from the performance
of its duties and obligations under this Agreement. NEP,
MECO and NECO agree to execute and deliver such documents
as may be reasonably necessary to accomplish any such as-
signment, transfer, conveyance, pledge or disposition of
rights hereunder so long as the NEP's, MECO's and NECO's
rights under this Agreement are not thereby altered,
amended, diminished or otherwise impaired.

4.8  _Counterparts_.  This Agreement may be exe-
cuted in two or more counterparts, each of which shall be
deemed an original, but all of which together shall
constitute one and the same instrument.

4.9  _Interpretation_.  The section headings
contained in this Agreement are solely for the purpose of
reference, are not part of the agreement of the parties
and shall not in any way affect the meaning or inter-
pretation of this Agreement.

4.10  _Entire Agreement_.  This Agreement, the
OSP PPA Transfer Agreement, the MECO II Agreement, the
NECO II Agreement, the Unitil PSA, and the APA including
the Exhibits, Schedules, documents, certificates and in-
struments referred to herein or therein, embody the
entire agreement and understanding of the parties hereto
in respect of the transactions contemplated by this
Agreement.  There are no restrictions, promises, repre- ,
sentations, warranties, covenants or undertakings, other
than those expressly set forth or referred to herein or
therein.

4.11  _Binding Clause_.  This Agreement shall inure
to the benefit of and be binding upon NEP, MECO, NECO,
USGen, the TransCanada Parties and their respective suc-
cessors and assigns.

4.12  _Governing Law_.  This Agreement shall be
governed by and construed in accordance with the laws of
the Commonwealth of Massachusetts (regardless of the laws
that might otherwise govern under applicable Massachu-

Confidential

NARR 31975

setts principles of conflicts of law) as to all matters, including but not limited to matters of validity, effect, performance and remedies.

4.13 <u>Defined Terms</u>.  Unless otherwise defined herein all capitalized terms shall have the meaning set forth in the APA, OSP PPA Transfer Agreement, MECO II Agreement, or NECO II Agreement.  Where any conflict may arise between the aforementioned agreements, the defined terms in the APA shall govern.

4.14 <u>Effective Date</u>.  This Agreement shall be of no force and effect until the Effective Date.  As used in this Agreement, "Effective Date" shall mean the Closing Date (as defined in the Stock Purchase and Assumption Agreement).  If the APA shall have been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA.

Confidential

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be signed by their respective authorized representatives as of the date indicated above.

NEW ENGLAND POWER COMPANY

By: _____
    Name:   Michael E. Jesanis
    Title:   Treasurer

NARRAGANSETT ELECTRIC COMPANY

By: _____
    Name:   John G. Cochrane
    Title:   Assistant Treasurer

MASSACHUSETTS ELECTRIC COMPANY

By: _____
    Name:   Michael E. Jesanis
    Title:   Treasurer

NANTUCKET ELECTRIC COMPANY

By: _____
    Name:   John G. Cochrane
    Title:   Treasurer

GRANITE STATE ELECTRIC COMPANY

By: _____
    Name:   John G. Cochrane
    Title:   Assistant Treasurer

**Confidential**

USGEN NEW ENGLAND, INC.

By: _____
Name:   M. Richard Smith
Title:  Vice President

TRANSCANDA OSP HOLDINGS LTD.

By: _____
Name:   Alexander Pourbaix          Sean D. McMaster
Title:  Vice President              Assistant Secretary

TRANSCANADA POWER MARKETING LTD.

By: _____
Name:   Alexander Pourbaix          Sean D. McMaster
Title:  Vice President              Assistant Secretary

Confidential