UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                    )
TRANSCANADA POWER MARKETING LTD.,                   )
                                                    )
        Plaintiff,                                   )
                                                    )
        v.                                           )     C.A. No. 05-40076FDS
                                                    )
NARRAGANSETT ELECTRIC COMPANY,                      )
                                                    )
        Defendant.                                   )
                                                    )
_____)

**<u>DOCUMENT APPENDIX</u>**

**(PART 3)**

# Tab 10
# (1 of 2)



REDACTED

# **Eastern Utilities**
**Blackstone Valley Electric**
**Eastern Edison**
**EUA Service Corporation**
**Montaup Electric**
**Newport Electric**

January 19, 1998

Alexander J. Pourbaix
Vice President, Power and Projects
TransCanada Energy Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Dear Mr. Pourbaix:

As requested in your mark-up of the Backstop Agreement, enclosed are:

1. Blackstone's Interim Generation Service Tariff R.I.P.U.C. No. 1135;

2. Newport's Interim Generation Service Tariff R.I.P.U.C. No. 1360;

3. Eastern's Standard Offer Service Tariff [draft, filing planned for mid-February];

4. Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers R.I.P.U.C. No. 1363; and

5. Eastern Edison Company Terms and Conditions for Competitive Suppliers M.D.T.E. No. 359.

Please call if you have any questions or if I can be of further assistance.

Sincerely,

*Donald C Ryan*

Donald C. Ryan
Manager, Power Resources

cc: Michael J. Hirsh

TCPM007142

R.I.P.U.C. NO. 1135

## BLACKSTONE VALLEY ELECTRIC COMPANY
## INTERIM GENERATION SERVICE

AVAILABILITY:

This Rate Schedule for Interim Generation Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, and who have provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and take Interim Generation Service hereunder. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule. Service under this tariff will terminate coincident with the approval by the Rhode Island Public Utility Commission of a Standard Offer Service Tariff.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:        $0.03051      per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:        $0.03051      per kWh

Residential Space Heating Retail Delivery Service Rate R-3

    Energy Charge:        $0.03158      per kWh

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

\\Alfred\ratedgn\CurrentDocs\Tariffs\BVE\igs1135.doc

*12/22/97 2:54 PM*

TCPM007143

R.I.P.U.C. NO. 1135

-2-

## Large Residential Retail Delivery Service Rate R-4

Energy Charge
Peak Hours:               $0.15384        per kWh
Off-Peak Hours:           $0.00570        per kWh

## Small Secondary Voltage General Retail Delivery Service Rate G-1

Energy Charge:              $0.03589        per kWh

## Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option:

Demand Charge:              $5.81          per kW

Energy Charge:              $0.01403        per kWh

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option:

Demand Charge:              $6.11          per kW

Energy Charge
Peak Hours:               $0.02978        per kWh
Off-Peak Hours:           $0.00877        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

## Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option:

Demand Charge:              $5.29          per kW

Energy Charge:              $0.01610        per kWh

The Billing Demand in kilowatts for each month will be the maximum
metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option:

Demand Charge:              $5.48          per kW

Date Filed, December 23, 1997                Date Effective, January 1, 1998
                                             For consumption on or after
                                             January 1, 1998 per Open
                                             Meeting Decision on December
                                             17, 1997 in Docket 2651.

TCPM007144

R.I.P.U.C. NO. 1135

-3-

Energy Charge
    Peak Hours:                    $0.03241        per kWh
    Off-Peak Hours:                $0.01054        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

Large Secondary Voltage General Retail Delivery Service Rate T-4

    Demand Charge:                 $5.88           per kW
    Energy Charge
        Peak Hours:                $0.03919        per kWh
        Off-Peak Hours:            $0.01027        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

    Demand Charge:                 $5.37           per kW

    Energy Charge
        Peak Hours:                $0.03914        per kWh
        Off-Peak Hours:            $0.01239        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

    Demand Charge:                 $3.70           per kW

    Energy Charge
        Peak Hours:                $0.03919        per kWh
        Off-Peak Hours:            $0.01027        per kWh

The Supplementary Interim Generation Service Demand Charge shall be
the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of

Date Filed, December 23, 1997          Date Effective, January 1, 1998
                                       For consumption on or after
                                       January 1, 1998 per Open
                                       Meeting Decision on December
                                       17, 1997 in Docket 2651.

**TCPM007145**

R.I.P.U.C. NO. 1135

-4-

Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Interim Generation Service Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4</u>.

Maintenance Power:

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Interim Generation Service Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

Date Filed, December 23, 1997

Date Effective, January 1, 1998 For consumption on or after January 1, 1998 per Open Meeting Decision on December 17, 1997 in Docket 2651.

TCPM007146

R.I.P.U.C. NO. 1135

-5-

The Billing Demand Charge shall be the sum of the Supplementary
Interim Generation Service Demand Charge and the Backup Usage Demand
Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6.

Maintenance Power:

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

        Energy Charge:                  $0.03308          per kWh

General Heating Retail Delivery Service Rate H-2

        Energy Charge:                  $0.03339          per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

        Energy Charge:                  $0.03509          per kWh

Lighting Retail Delivery Service Rate S-1

        Energy Charge:                  $0.03408          per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

        Peak Hours
            Monday through Friday excluding holidays defined below
            April through September,   11:00 a.m. to  4:00 p.m.
            October through March,      8:00 a.m. to 12:00 noon, and
                                        4:00 p.m. to  7:00 p.m.
        Off-Peak Hours
            All other hours.

Date Filed, December 23, 1997              Date Effective, January 1, 1998
                                           For consumption on or after
                                           January 1, 1998 per Open
                                           Meeting Decision on December
                                           17, 1997 in Docket 2651.

TCPM007147

R.I.P.U.C. NO. 1135

-6-

Holidays are defined as:

New Year's Day          Columbus Day
President's Day          Veteran's Day
Memorial Day             Thanksgiving Day
Independence Day         Christmas Day
Labor Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

INTERIM GENERATION SERVICE REVENUE RECONCILIATION ADJUSTMENT:

The Company shall reconcile the revenues billed to Customers taking Interim Generation Service against payments to Suppliers of Interim Generation Service and recover or refund any under- or overcollection in accordance with the following:

Any revenues billed by the Company for Interim Generation Service in excess of payments to Suppliers of that service shall be accumulated in an account and credited with interest. In the event that the revenues billed by the Company do not recover the Company's payments to Suppliers in any calendar year, the Company shall also be authorized to accumulate the deficiencies in this account together with interest into the next calendar year, except when the accumulated balance is expected to be a credit at the end of a calendar year, the Company will petition the Commission to refund that balance to all of the Company's Retail Delivery Service customers through a uniform cents per kilowatt-hour factor in the following year. The Company will periodically notify the Division of the status of the account, and a filing, if necessary, will be made by December 1 based on 10 months actual and 2 months estimated, for a factor to be effective January 1 through December 31, of the following year. Upon approval of a Standard Offer Service tariff, the account balances will be assumed by the Standard Offer Revenue Reconciliation Adjustment.

BILLING:

The Billing Amount for electric service supplied under this Rate

Date Filed, December 23, 1997                Date Effective, January 1, 1998
                                             For consumption on or after
                                             January 1, 1998 per Open
                                             Meeting Decision on December
                                             17, 1997 in Docket 2651.

TCPM007148

R.I.P.U.C. NO. 1135

-7-

Schedule shall consist of the sum of the Demand Charge and the Energy
Charges and applicable Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Customer may terminate service on five (5) days notice. Phase I
customers who choose to remain with a Nonregulated Power Provider
after December 31, 1997 and those customers that are eligible on
January 1, 1998 and choose to go to a Nonregulated Power Provider will
have additional opportunities to return to the Interim Generation
Service until the Standard Offer Service is approved by the Commission
and is in place.  To exercise this option, customers must provide the
Companies with 30 days written notice and they must return on the
first day of the month (i.e. February 1, March 1, etc.) not their
scheduled billing cycle read date.

TERMS AND CONDITIONS:

The Company's various Terms and Conditions in effect from time to
time, where not inconsistent with the specific provisions hereof, are
a part of this Rate Schedule.

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

TCPM007149

R.I.P.U.C. NO. 1135

## BLACKSTONE VALLEY ELECTRIC COMPANY
## INTERIM GENERATION SERVICE

### AVAILABILITY:

This Rate Schedule for Interim Generation Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, and who have provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and take Interim Generation Service hereunder. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule. Service under this tariff will terminate coincident with the approval by the Rhode Island Public Utility Commission of a Standard Offer Service Tariff.

### APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

### RATE:

The Rate for each Rate Class shall consist of the following charges:

#### Residential Retail Delivery Service Rate R-1

| Energy Charge: | $0.03051 | per kWh |
|---|---|---|

#### Residential SSI Retail Delivery Service Rate R-2

| Energy Charge: | $0.03051 | per kWh |
|---|---|---|

#### Residential Space Heating Retail Delivery Service Rate R-3

| Energy Charge: | $0.03158 | per kWh |
|---|---|---|

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

\\Alfred\ratedgn\CurrentDocs\Tariffs\BVE\igs1135.doc

12/22/97 2:54 PM

TCPM007143

R.I.P.U.C. NO. 1135

-2-

Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:             $0.15384        per kWh
        Off-Peak Hours:       $0.00570        per kWh

Small Secondary Voltage General Retail Delivery Service Rate G-1

    Energy Charge:             $0.03589        per kWh

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option:

    Demand Charge:             $5.81           per kW

    Energy Charge:             $0.01403        per kWh

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option:

    Demand Charge:             $6.11           per kW

    Energy Charge
        Peak Hours:              $0.02978        per kWh
        Off-Peak Hours:       $0.00877        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option:

    Demand Charge:             $5.29           per kW

    Energy Charge:             $0.01610        per kWh

The Billing Demand in kilowatts for each month will be the maximum
metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option:

    Demand Charge:             $5.48           per kW

Date Filed, December 23, 1997        Date Effective, January 1, 1998
                                    For consumption on or after
                                    January 1, 1998 per Open
                                    Meeting Decision on December
                                    17, 1997 in Docket 2651.

TCPM007144

R.I.P.U.C. NO. 1135

-3-

Energy Charge
    Peak Hours:               $0.03241        per kWh
    Off-Peak Hours:         $0.01054        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

## Large Secondary Voltage General Retail Delivery Service Rate T-4

Demand Charge:             $5.88            per kW
Energy Charge
    Peak Hours:               $0.03919        per kWh
    Off-Peak Hours:         $0.01027        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

## Large Primary Voltage General Retail Delivery Service Rate T-6

Demand Charge:             $5.37            per kW

Energy Charge
    Peak Hours:               $0.03914        per kWh
    Off-Peak Hours:         $0.01239        per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

## Large Secondary Voltage Auxiliary
## General Retail Delivery Service Rate A-4

Demand Charge:             $3.70            per kW

Energy Charge
    Peak Hours:               $0.03919        per kWh
    Off-Peak Hours:         $0.01027        per kWh

The Supplementary Interim Generation Service Demand Charge shall be
the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period. The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of

Date Filed, December 23, 1997        Date Effective, January 1, 1998
                                    For consumption on or after
                                    January 1, 1998 per Open
                                    Meeting Decision on December
                                    17, 1997 in Docket 2651.

R.I.P.U.C. NO. 1135

-4-

Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Interim Generation Service Demand Charge and the Backup Usage Demand
Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in <u>Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4</u>.

Maintenance Power:

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Interim Generation Service Demand Charge shall be
the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

Date Filed, December 23, 1997                Date Effective, January 1, 1998
                                             For consumption on or after
                                             January 1, 1998 per Open
                                             Meeting Decision on December
                                             17, 1997 in Docket 2651.

TCPM007146

R.I.P.U.C. NO. 1135

-5-

The Billing Demand Charge shall be the sum of the Supplementary Interim Generation Service Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

Maintenance Power:

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:                $0.03308      per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:                $0.03339      per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:                $0.03509      per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:                $0.03408      per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

    Peak Hours
        Monday through Friday excluding holidays defined below
        April through September,   11:00 a.m. to  4:00 p.m.
        October through March,    8:00 a.m. to 12:00 noon, and
                               4:00 p.m. to  7:00 p.m.

    Off-Peak Hours
        All other hours.

Date Filed, December 23, 1997             Date Effective, January 1, 1998
                                 For consumption on or after
                                 January 1, 1998 per Open
                                 Meeting Decision on December
                                 17, 1997 in Docket 2651.

TCPM007147

R.I.P.U.C. NO. 1135

-6-

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

### Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

$$PFA = ((0.80 / \text{Power Factor}) - 1) \times (\text{Unadjusted Demand Charge} / 3)$$

### INTERIM GENERATION SERVICE REVENUE RECONCILIATION ADJUSTMENT:

The Company shall reconcile the revenues billed to Customers taking Interim Generation Service against payments to Suppliers of Interim Generation Service and recover or refund any under- or overcollection in accordance with the following:

Any revenues billed by the Company for Interim Generation Service in excess of payments to Suppliers of that service shall be accumulated in an account and credited with interest. In the event that the revenues billed by the Company do not recover the Company's payments to Suppliers in any calendar year, the Company shall also be authorized to accumulate the deficiencies in this account together with interest into the next calendar year, except when the accumulated balance is expected to be a credit at the end of a calendar year, the Company will petition the Commission to refund that balance to all of the Company's Retail Delivery Service customers through a uniform cents per kilowatt-hour factor in the following year. The Company will periodically notify the Division of the status of the account, and a filing, if necessary, will be made by December 1 based on 10 months actual and 2 months estimated, for a factor to be effective January 1 through December 31, of the following year. Upon approval of a Standard Offer Service tariff, the account balances will be assumed by the Standard Offer Revenue Reconciliation Adjustment.

### BILLING:

The Billing Amount for electric service supplied under this Rate

Date Filed, December 23, 1997

Date Effective, January 1, 1998 For consumption on or after January 1, 1998 per Open Meeting Decision on December 17, 1997 in Docket 2651.

TCPM007148

R.I.P.U.C. NO. 1135

-7-

Schedule shall consist of the sum of the Demand Charge and the Energy Charges and applicable Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Customer may terminate service on five (5) days notice. Phase I customers who choose to remain with a Nonregulated Power Provider after December 31, 1997 and those customers that are eligible on January 1, 1998 and choose to go to a Nonregulated Power Provider will have additional opportunities to return to the Interim Generation Service until the Standard Offer Service is approved by the Commission and is in place.  To exercise this option, customers must provide the Companies with 30 days written notice and they must return on the first day of the month (i.e. February 1, March 1, etc.) not their scheduled billing cycle read date.

TERMS AND CONDITIONS:

The Company's various Terms and Conditions in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, December 23, 1997

Date Effective, January 1, 1998
For consumption on or after
January 1, 1998 per Open
Meeting Decision on December
17, 1997 in Docket 2651.

TCPM007149

M.D.P.U. NO. 340

EASTERN EDISON COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before the Retail
Access Date, and who have not elected to receive electric power
service from a Supplier other than the Company on or after the Retail
Access Date. Said Customers shall have the right to relocate to a
different service location within the Company's service area and
continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

| Year | Charge | |
|------|--------|------|
| 1998 | $0.02800 | per kWh |
| 1999 | $0.03100 | per kWh |
| 2000 | $0.03400 | per kWh |
| 2001 | $0.03800 | per kWh |
| 2002 | $0.04200 | per kWh |
| 2003 | $0.04700 | per kWh |
| 2004 | $0.05100 | per kWh |

The foregoing Rate shall be adjusted in accordance with the provisions
of the Standard Offer Fuel Index and the Standard Offer Revenue
Reconciliation Adjustments described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied
by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas
Price plus Market Oil Price for the billing month exceeds the Fuel
Trigger Point then in effect:

    Market Gas Price is the average of the values of Gas Index for
    the most recent six months through and including the billing
    month, where:

        Gas Index is the average of the daily settlement prices for
        the last three days that the NYMEX Contract (as defined
        below) for the month of delivery trades as reported in the

Date Filed, October 10, 1997                Date Effective, Retail Access Date
S:\ELECTRAXIT\AMENDED\STANDTFR.REV

8

TCPM007158

ATTACHMENT 2          M.D.P.U. NO. 340

Wall Street Journal, expressed in dollars per MMBTU. NYMEX
Contract shall mean the New York Mercantile Exchange Natural
Gas Futures Contract as approved by the Commodity Futures
Trading Commission for the purchase and sale of natural gas
at Henry Hub;

Market Oil Price is the average of the values of Oil Index for
the most recent six months through and including the billing
month, where:

Oil Index is the average for the month of the daily low
quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel
oil into New York harbor, as reported in Platt's Oilgram U.S.
Marketscan in dollars per barrel and converted to dollars per
MMBTU by dividing by 6.3; and if the indices referred to above
should become obsolete or no longer suitable, the distribution
company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars
per MMBTU, applicable for all months in the specified calendar
year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel
Adjustment value for the billing month is determined according to the
following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point
are as defined above. The values of $0.60 and $0.04/MMBTU
represent for gas and oil respectively, estimated basis
differentials or market costs of transportation from the point
where the index is calculated to a proxy power plant in the New
England market.

Incremental revenues received by the Company from the application of
the Fuel Adjustment shall be fully allocated to Standard Offer
Suppliers in proportion to the Standard Offer energy provided by a
Supplier to the Company in the applicable billing month.

Date Filed, May 16, 1997          Date Effective, Retail Access Date

9

**210**

TCPM007159

M.D.P.U. NO. 340

STANDARD OFFER REVENUE RECONCILIATION ADJUSTMENTS:

The Company shall reconcile the revenues billed to Customers taking
Standard Offer Service against payments to Suppliers of Standard Offer
Service and recover or refund any under- or overcollection in
accordance with the following terms:

1.  Any revenues billed by the Company for Standard Offer
    Service in excess of payments to Suppliers of that service
    shall be accumulated in an account and credited with
    interest calculated using the methodology for calculating
    interest on customer deposits specified in the Company's
    terms and conditions.  The accumulated balance at the end of
    each calendar year shall be credited to all of the Company's
    Retail Delivery Service customers through a uniform cents
    per kilowatt-hour factor in the following year.

2.  In the event that the revenues billed by the Company do not
    recover the Company's payments to Suppliers or the Company
    defers expenses to meet the Inflation Cap, the Company shall
    be authorized to accumulate the deficiencies in the account
    together with interest calculated as above and recover those
    amounts by implementing a uniform cents per kilowatt-hour
    surcharge on the rates for Standard Offer Service, if and to
    the extent that the access charges billed by the Company to
    its Retail Delivery Service customers are for any reason
    below the Unadjusted Contract Termination Charges.  Under-
    recoveries, if any, that remain after the standard offer
    transition period ends on December 31, 2004 shall be
    recovered from all Retail Delivery Service customers by a
    uniform surcharge not exceeding $0.004 per kilowatt-hour
    commencing on January 1, 2010.

TERM OF CONTRACT

The Term of Contract for Standard Offer Service shall be for a period
of not more than seven (7) years beginning on the date service is
first taken and ending on the earlier of December 31, 2004, or the
date the Customer terminates service.  The Customer may terminate
service on five (5) days notice.  The Customer shall be ineligible to
receive Standard Offer Service thereafter.  The foregoing provision
shall not apply to Customers who receive service under any of the
Company's residential Retail Delivery Service Rates or under Small
General Retail Delivery Service Rate G-1.   Said Customers may elect
to take electric power service from another Supplier during the period
beginning on the Retail Access Date, and ending one year thereafter,
and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

Date Filed, October 10, 1997          Date Effective, Retail Access Date
s:\RECTARIF\AMENDED\STANOFFR.REV

10

**TCPM007160**

ATTACHMENT 2          M.D.P.U. NO. 340

TERMS AND CONDITIONS:

"Restructuring Settlement Agreement" shall mean the agreement entitled Restructuring Settlement Agreement, dated May 16, 1997, by and between Eastern Edison Company, Montaup Electric Company, the Office of the Attorney General, and the Department of Energy Resources.

"Inflation Cap" shall mean the inflation cap established in Section I.B.9 of the Restructuring Settlement Agreement.

"Unadjusted Contract Termination Charges" shall mean the unadjusted contract termination charges listed in Attachment 3 of the Restructuring Settlement Agreement.

The Company's various Terms and Conditions in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, May 16, 1997                    Date Effective, Retail Access Date

I1                    212

TCPM007161

M.D.T.E. NO. 359

EASTERN EDISON COMPANY

TERMS AND CONDITIONS
FOR COMPETITIVE SUPPLIERS

Date Filed, January 16, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

Date Effective, March 1, 1998

TCPM007162

M.D.T.E. NO. 359

EASTERN EDISON COMPANY
TERMS AND CONDITIONS
FOR COMPETITIVE SUPPLIERS

CONTENTS

1.    APPLICABILITY.................................................... 1

2.    DEFINITIONS..................................................... 1

3.    OBLIGATIONS OF PARTIES.......................................... 2

      3A. CUSTOMER.................................................... 2

      3B. DISTRIBUTION COMPANY........................................ 3

      3C. COMPETITIVE SUPPLIER........................................ 4

4.    CUSTOMER USAGE INFORMATION TO BE MADE AVAILABLE TO
      COMPETITIVE SUPPLIERS........................................... 5

5.    INITIATION AND TERMINATION OF GENERATION SERVICE............ 5

      5A. INITIATION OF GENERATION SERVICE........................ 5

      5B. TERMINATION OF GENERATION SERVICE....................... 6

      5C. CUSTOMER MOVES.......................................... 6

      5D. OTHER PROVISIONS ....................................... 7

      5E. FEES................................................... 7

6.    DISTRIBUTION SERVICE INTERRUPTION........................... 7

      6A. PLANNED OUTAGES........................................ 7

      6B. UNPLANNED OUTAGES...................................... 7

      6C. DISCONNECTION OF SERVICE............................... 8

7.    METERING................................................... 8

      7A. METER READING......................................... 8

      7B. OWNERSHIP OF METERING EQUIPMENT....................... 8

Date Filed, January 16, 1998                 Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007163

M.D.T.E. NC. 359

8.      BILLING................................................  8

        8A. STANDARD PASSTHROUGH BILLING SERVICE.................  9

        8B. STANDARD COMPLETE BILLING SERVICE....................  9

            1. BILLING PROCEDURE.................................  9

            2. CHANGES TO RATE CLASSES...........................  9

            3. OPTIONAL CUSTOMER SERVICES........................ 10

            4. SUMMARY BILLING................................... 10

            5. EXISTING FEES..................................... 10

        8C. DEFINITION OF STANDARD UNITS OF SERVICE.............. 10

            1. BILLING DEMAND................................... 10

            2. ON-PEAK/OFF-PEAK PERIOD DEFINITIONS.............. 10

        8D. FEES............................................... 11

9.      DETERMINATION OF HOURLY LOADS.............................. 11

10.     LIABILITY AND INDEMNIFICATION............................ 12

Date Filed, January 16, 1998
per Order in D.P.U./D.T.E. 97-65          Date Effective, March 1, 1998
dated December 31, 1997

TCPM007164

M.D.T.E. NO. 359

## EASTERN EDISON COMPANY
### TERMS AND CONDITIONS FOR COMPETITIVE SUPPLIERS

1.   Applicability

    1A.   The following Terms and Conditions shall apply to every registered Competitive Supplier authorized to do business within the Commonwealth of Massachusetts, and to every Customer and Distribution Company doing business with said Competitive Suppliers.

    1B.   These Terms and Conditions may be revised, amended, supplemented or supplanted in whole or in part from time to time according to the procedures provided in MDTE regulations and Massachusetts law.  In case of conflict between these Terms and Conditions and any orders or regulations of the MDTE, said orders or regulations shall govern.

    1C.   No agent or employee of the Company is authorized to modify any provision contained in these Terms and Conditions or to bind the Company to perform in any manner contrary thereto.  Any such modification to these Terms and Conditions or any such promise contrary thereto shall be in writing, duly executed by an authorized officer of the Company, and subject in all cases to applicable statutes and to the orders and regulations of the MDTE, and available for public inspection during normal business hours at the business offices of the Company and at the offices of the MDTE.

2.   Definitions

"Competitive Supplier" shall mean any entity licensed by the MDTE to sell electricity to retail Customers in Massachusetts, with the following exceptions:  (1) a Distribution Company providing Standard Offer Service and Default Service to its distribution Customers, and (2) a municipal light department that is acting as a Distribution Company.

"Customer" shall mean any person, partnership, corporation, or any other entity, whether public or private, who obtains Distribution Service at a Customer Delivery Point and who is a Customer of record of the Company.

"Customer Delivery Point" shall mean the Company's meter or a point designated by the Company located on the Customer's premises.

"Default Service" shall mean the service provided by the Distribution Company to a Customer who is not receiving either Generation Service from a Competitive Supplier or Standard Offer Service, in accordance with the provisions set forth in the Company's Default Service tariff, on file with the MDTE.

"Distribution Company" or "Company" shall mean Eastern Edison Company.

Date Filed, January 16, 1998            Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007165

"Distribution Service" shall mean the delivery of electricity to Customers by the Distribution Company.

"EBT Working Group Report" or "Report" shall mean the most recently revised version of the report initially submitted by the Electronic Business Transaction Working Group on October 9, 1997.  The Report shall be on file at the MDTE.

"Enrollment period" shall mean, for a particular Customer, the period of time during which a Competitive Supplier may submit an enrollment transaction to a Distribution Company for initiation of Generation Service concurrent with the start of the Customer's next billing cycle.

"Generation Service" shall mean the sale of electricity, including ancillary services such as the provision of reserves, to a Customer by a Competitive Supplier.

"ISO-NE" shall mean the Independent System Operator of the New England bulk power system.

"MDTE" shall mean the Massachusetts Department of Telecommunications and Energy.

"NEPOOL" shall mean the New England Power Pool and its successors.

"NEPOOL PTF" shall mean pool transmission facilities included in the NEPOOL Open Access Transmission Tariff on file with the Federal Energy Regulatory Commission.

"Own-Load Calculation" shall mean the settlement method utilized by NEPOOL for its members, as set forth in the NEPOOL Agreement, as amended from time to time, on file as a tariff with the Federal Energy Regulatory Commission.

"Standard Offer Service" shall mean the service provided by the Distribution Company for a term of seven years after the Retail Access Date, unless otherwise determined by the MDTE.  The rates for this service shall be set at levels that achieve the overall Customer rate reductions required by G.L. c. 164, § 1B.  Availability for this service shall be in accordance with the with the provisions set forth in the Company's Standard Offer Service tariff, on file with the MDTE.

"Terms and Conditions" shall mean these Terms and Conditions for Competitive Suppliers.

3.    Obligations of Parties

    3A.    Customer

    A Customer shall select one Competitive Supplier for each account at any given time, or authorize an agent to make the selection for the Customer, for the purposes of the Distribution Company

Date Filed, January 16, 1998                 Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007166

(1) reporting the Customer's hourly electric consumption to the ISO-NE, and (2) providing billing services. The Customer must provide the selected Competitive Supplier with the information necessary to allow the Competitive Supplier to initiate Generation Service, in accordance with Section 6A, below. A Customer may choose only a Competitive Supplier that is licensed by the MDTE.

Nothing in these Terms and Conditions shall prohibit a Customer from entering into arrangements with multiple suppliers, provided that a single Competitive Supplier is designated for the purposes described above.

3B.  Distribution Company

The Company shall:

(1)   Arrange for or provide (i) regional network transmission service over NEPOOL PTF and (ii) local network transmission service from NEPOOL PTF to the Company's Distribution System for each Customer, unless the Customer or its Competitive Supplier otherwise arranges for such service;

(2)   Deliver power over distribution facilities to each Customer Delivery Point;

(3)   Provide customer service and support for Distribution Service and, if contracted by the Competitive Supplier, for Generation Service in accordance with Section 8B.3 below;

(4)   Respond to service interruptions or power quality problems;

(5)   Handle connections and terminations;

(6)   Read meters;

(7)   Submit bills to Customers for Distribution Service and, if contracted by the Competitive Supplier, for Generation Service in accordance with Section 8B below;

(8)   Address billing inquiries for Distribution Service and, if contracted by the Competitive Supplier, for Generation Service in accordance with Section 8B.3 below;

(9)   Answer general questions about Distribution Service;

(10)  Report Competitive Suppliers' estimated and metered loads, including local network transmission and distribution losses, to the ISO-NE, in accordance with Section 9 below;

(11)  Process the electronic business transactions submitted by Competitive Suppliers, and send the necessary electronic business transactions to Competitive Suppliers, in

Date Filed, January 16, 1998                    Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007167

# Tab 10
# (2 of 2)

accordance with Section 5, below, and the rules and
procedures set forth in the EBT Working Group Report;

(12) Provide information regarding, at a minimum, rate tariffs,
billing cycles, and load profiles, on its Internet website
or by alternate electronic means;

(13) Provide Standard Offer Service to Customers in accordance
with the Company's tariff; and

(14) Provide Default Service to Customers in accordance with the
Company's tariff.

3C.   Competitive Supplier

1.    Each Competitive Supplier must meet the registration and
licensing requirements established by law or regulation and
either (i) be a member of NEPOOL subject to an Own-Load
Calculation or (ii) have an agreement in place with a NEPOOL
member whereby the NEPOOL member agrees to include the load to be
served by the Competitive Supplier in such NEPOOL member's Own-
Load Calculation.

2.    A Competitive Supplier shall be responsible for providing
all-requirements service to meet each of its Customers' needs and
to deliver the associated capacity and energy to a point or
points on NEPOOL PTF.

3.    A Competitive Supplier providing Generation Service to
Customers will be responsible for any and all losses incurred on
(i) local network transmission systems and distribution systems,
as determined by the Company; (ii) NEPOOL PTF, as determined by
the ISO-NE; and (iii) facilities linking generation to NEPOOL
PTF.  A Competitive Supplier shall also be responsible for all
transmission wheeling charges necessary to reach NEPOOL PTF.

4.    A Competitive Supplier shall be required to complete testing
of the transactions included in the EBT Working Group Report
prior to the initiation of Generation Service to any Customer in
the Company's service territory.  Such testing shall be in
accordance with the rules and procedures set forth in the Report.

5.    Each Competitive Supplier shall be required to enter into a
service contract with the Distribution Company that resolves
issues associated with, among other things, information exchange,
problem resolution, and revenue liability.  This contract must be
entered prior to the initiation of Generation Service to any
Customer in the Company's service territory.

6.    A Competitive Supplier shall be responsible for obtaining
the necessary authorization from each Customer prior to
initiating Generation Service to the Customer.  Such
authorization shall be in accordance with St. 1997, c. 164, § 193
(G.L. c. 164, § 1F(8)(a)) and 220 C.M.R. § 11.05.

Date Filed, January 16, 1998                Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007168

7.    A Competitive Supplier not affiliated with the Company shall
be responsible for obtaining the necessary authorization from
each Customer prior to requesting the Company to release the
Company's historic usage information specific to that Customer to
such Competitive Supplier.  Such authorization shall consist of
(i) letter of authorization; (ii) third-party verification; or
(iii) a customer-initiated call to an independent third-party,
consistent with 220 C.M.R. § 11.05.  A Competitive Supplier
affiliated with the Company must obtain a Customer's written
authorization prior to requesting the release of the Company's
historic usage information specific to that Customer consistent
with St. 1997, c. 164, § 193 (G.L. c.164, § 1C(v)) and 220 C.M.R.
§ 12.00 et seq.,

4.    Customer Usage Information to be Made Available to Competitive
      Suppliers

The Company shall be required to provide twelve months' of a
Customer's historic usage data to a Competitive Supplier, provided
that the Competitive Supplier has received the appropriate
authorization, in accordance with the provisions established in
Section 3C.7, above.  This information shall be provided in electronic
form.

The Company shall print twelve months' of historic usage data on
customers' bills, in addition to the usage data for the current
billing period.

The Company shall be required to provide customers who, since
January 1, 1995, have been billed in part on a demand basis, with
twelve months of usage data, upon the customer's written request.
These data shall be provided pursuant to the requirements set forth in
St. 1997, c.164, § 193 (G.L. c. 164, § 1F(9)).

5.    Initiation and Termination of Generation Service

      5A.    Initiation of Generation Service

To initiate Generation Service to a Customer, the Competitive
Supplier shall submit an "enroll customer" transaction to the
Company, in accordance with the rules and procedures set forth in
the EBT Working Group Report.  The Competitive Supplier shall
hold the "enroll customer" transaction until any applicable right
of rescission has lapsed.

If the information on the enrollment transaction is correct, the
Distribution Company shall send the Competitive Supplier a
"successful enrollment" transaction, in accordance with the rules
and procedures set forth in the EBT Working Group Report.
Generation Service shall commence on the date of the Customer's
next scheduled meter read, provided that the Supplier has

Date Filed, January 16, 1998                    Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007169

submitted the enrollment transaction to the Distribution Company no fewer than two business days prior to the meter read date. If the Supplier has not submitted the enrollment transaction at least two days before the meter read date, Generation Service shall commence on the date of the Customer's subsequent scheduled meter read.

If more than one Competitive Supplier submits an enrollment transaction for a given Customer during the same enrollment period, the first transaction that is received by the Distribution Company shall be accepted. All other transactions shall be rejected. Rejected transactions may be resubmitted during the customer's next enrollment period.

5B.   Termination of Generation Service

To terminate Generation Service with a Customer, a Competitive Supplier shall submit a "supplier drops customer" transaction, in accordance with the rules and procedures set forth in the EBT Working Group Report. Generation Service shall be terminated on the date of the customer's next scheduled meter read, provided that the Competitive Supplier has submitted this transaction to the Distribution Company no fewer than two business days prior to the meter read date. If the Competitive Supplier has not submitted this transaction at least two days before the meter read date, Generation Service shall be terminated on the date of the Customer's subsequent scheduled meter read. The Distribution Company shall send a "confirm drop date" transaction to the Competitive Supplier, in accordance with the rules and procedures set forth in the EBT Working Group Report.

To terminate Generation Service with a Competitive Supplier, a Customer shall so inform the Distribution Company or Competitive Supplier. Generation Service shall be terminated within two business days for residential customers; for other customers, Generation Service shall be terminated on the date of the Customer's next scheduled meter read. The Distribution Company shall send a "customer drops supplier" transaction to the Competitive Supplier, in accordance with the rules and procedures set forth in the EBT Working Group Report.

In those instances when a Customer who is receiving Generation Service from an existing Competitive Supplier initiates such service with a new Competitive Supplier, the Distribution Company shall send the existing Competitive Supplier a "customer drops supplier" transaction, in accordance with the rules and procedures set forth in the EBT Working Group Report.

5C.   Customer Moves

A Customer that moves within a Distribution Company's service territory shall have the opportunity to notify the Distribution

Date Filed, January 16, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

Date Effective, March 1, 1998

TCPM007170

Company that he/she seeks to continue Generation Service with his/her existing Competitive Supplier. Upon such notification, the Distribution Company shall send a "customer move" transaction to the Competitive Suppliers, in accordance with the rules and procedures set forth in the EBT Working Group Report.

In those instances when a Customer moves into a Distribution Company's service territory, the Customer's existing Competitive Supplier must submit an "enroll customer" transaction to the new Distribution Company in order to initiate Generation Service. Otherwise, the Customer shall receive Standard Offer Service or Default Service, in accordance with the Company's respective tariffs.

5D.   Other Provisions

Distribution Companies and Suppliers shall send "change enrollment detail" transactions to change any information included on the "enroll customer" transactions, in accordance with the rules and procedures set forth in the EBT Working Group Report.

If any of the transactions described above are rejected by the Distribution Company, the Distribution Company shall send an "error" transaction to the Competitive Supplier identifying the reason for the rejection, in accordance with the rules and procedures set forth in the EBT Working Group Report.

5E.   Fees

The Company may charge fees to Competitive Supplier for processing the transactions described above, as approved by the MDTE.  These fees are included in Appendix A.

6.   Distribution Service Interruption

6A.   Planned Outages

In the event that the loading of the Distribution System, or a portion thereof, must be reduced for safe and reliable operation, such reduction in loading shall be proportionately allocated among all Customers whose load contributes to the need for the reduction, when such proportional curtailments can be accommodated within good utility practices.

6B.   Unplanned Outages

In the event of unplanned outages, service will be restored in accordance with good utility practice.  When appropriate, service restoration shall be accomplished in accordance with the Company System Storm Emergency Plan on file with the MDTE.

Date Filed, January 16, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997                    Date Effective, March 1, 1998

TCPM007171

6C.  Underline: Disconnection of Service

The Distribution Company may discontinue Distribution Service to
a Customer in accordance with the provisions set forth in the
Terms and Conditions for Distribution Service.  The Company shall
provide electronic notification to the Customer's Competitive
Supplier of record upon physical disconnection.  Once
disconnection occurs, the provision of Generation Service to the
Customer is no longer the obligation of the Competitive Supplier.
The Company shall not be liable for any revenue losses to the
Competitive Supplier as a result of any such disconnection.

7.  Underline: Metering

7A.  Underline: Meter Reading

The Company shall meter each Customer in accordance with tariff
provisions.  Upon request by a Competitive Supplier, the Company
shall schedule meter reads on a monthly cycle.

Each Customer shall be metered or estimated such that the loads
can be reported to the ISO-NE for inclusion in the Competitive
Supplier's, or the Competitive Supplier's wholesale provider's,
Own-Load Calculation.

7B.  Underline: Ownership of Metering Equipment

Should a Customer or Competitive Supplier a request a new meter
or that a communication device be attached to the existing meter,
the Company shall provide, install, test, and maintain the
requested metering or communication device.  The requested meter
or communication device must meet the Company's requirements.
The Customer or Competitive Supplier shall bear the cost of
providing and installing the meter or communication device.  Upon
installation, the meter or communication device shall become the
property of the Company and will be maintained by the Company.
The Company shall complete installation of the meter or
communication device, if reasonably possible, within thirty (30)
days of receiving a written request from the Customer or
Competitive Supplier.  The Company shall bill the Customer or
Competitive Supplier upon installation.

8.  Underline: Billing

The Company shall provide a single bill, reflecting unbundled
charges for electric service, to Customers who receive Standard
Offer Service or Default Service.

The Company shall offer two billing service options to Customers
receiving Generation Service from Competitive Suppliers:
(1) Standard Complete Billing Service; and (2) Standard
Passthrough Billing Service.  The Competitive Supplier shall

TCPM007172

inform the Distribution Company of the selected billing option, in accordance with the rules and procedures set forth in the EBT Working Group Report.

**8A.    Standard Passthrough Billing Service**
The Company shall issue a bill for Distribution Service to each Customer. The Competitive Supplier shall be responsible billing Customers for the cost of Generation Service provided by the Competitive Supplier and for the collection of amounts due to the Competitive Supplier from the Customer.

The Company shall send a "customer usage information" transaction to the Competitive Supplier, in accordance with the rules and procedures set forth in the EBT Working Group Report.

**8B.    Standard Complete Billing Service**

**1.    Billing Procedure**

The Company shall issue a single bill for electric service to each Customer.

The Company shall use the rates supplied by the Competitive Supplier to calculate the Competitive Supplier portion of Customer bills, and integrate this billing with its own billing in a single mailing to the Customer. The Company shall send a "customer usage and billing information" transaction to the Competitive Supplier, in accordance with the rules and procedures set forth in the EBT Working Group Report.

Upon receipt of Customer payments, the Company shall send a "payment/adjustment" transaction to the Competitive Supplier, in accordance with the rules and procedures set forth in the EBT Working Group Report. Customer revenue due the Competitive Supplier shall be transferred to the Competitive Supplier in accordance with the service contract entered into by the Competitive Supplier and the Company.

If a Customer pays the Company less than the full amount billed, the Company shall apply the payment first to Distribution Service and, if any payment remains, it shall be applied to Generation Service.

**2.    Changes to Rate Classes**

If a Competitive Supplier requests different customer classes or rate structures than are offered by the Company, the Company shall accommodate changes to the billing system, if reasonably possible, at the Competitive Supplier's

Date Filed, January 16, 1998                    Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007173

expense.  The costs of making the designated changes shall
be quoted by the Company to the Competitive Supplier prior
to the start of programming.

### 3.  Optional Customer Services

Upon request by a Competitive Supplier, the Company may
offer optional customer services to those Competitive
Suppliers who receive Standard Complete Billing Service.
Pricing for these optional services shall be customized to
the Competitive Supplier's needs, and shall be dependent on
the specific customer services required by the Competitive
Supplier, the volume of Customer calls, requested coverage
hours, and/or the specific number of customer service
representatives requested.

### 4.  Summary Billing

The Company may offer a Summary Billing option for
Competitive Suppliers who have qualified Customers with
multiple electric service accounts.  Designed to consolidate
multiple individual billings on a single bill format, this
optional service allows Customers to pay multiple accounts
with one check.

### 5.  Existing Fees

Existing Company service fees, such as interest charges for
unpaid balances and bad check charges, shall remain in
effect and shall be assessed, as applicable, according to
the Company's Terms and Conditions for Distribution Service,
applicable to all Customers.

## 8C.  Definition of Standard Units of Service

### 1.  Billing Demand

Units of billing demand shall be as defined in the Company's
applicable tariffs on file with the MDTE.

### 2.  On-Peak/Off-Peak Period Definitions

The on-peak and off-peak periods shall be as defined in the
Company's applicable tariffs on file with the MDTE.

Competitive Suppliers may define on-peak and off-peak periods
differently from those above; however, they will be required to
make special metering arrangements with the Company to reflect
different on-peak and off-peak definitions.  Any costs incurred
to provide the special metering arrangements shall be assigned to
the Competitive Supplier.

Date Filed, January 16, 1998
per Order in D.P.U./D.T.E. 97-65          Date Effective, March 1, 1998
dated December 31, 1997

TCPM007174

8D.  <u>Fees</u>

The Company may charge fees to Competitive Suppliers for
providing the services described in this section of the Terms and
Conditions, as approved by the MDTE.  These fees are included in
Appendix A.

9.  <u>Determination of Hourly Loads</u>

9A.  For each Competitive Supplier, hourly loads for each day
shall be estimated or telemetered and reported daily to the
ISO-NE for inclusion in the Competitive Supplier's Own-Load
Calculation.  Hourly load estimates for non-telemetered customers
will be based upon load profiles developed for each customer
class or Customer of the Company.  The total hourly loads will be
determined in accordance with the appropriate hourly load for the
Company.

9B.  The Company shall normally report previous days' hourly
loads to the ISO-NE by a specified time.  These loads shall be
included in the Competitive Supplier's Own Load Calculation.

9C.  To refine the estimates of the Competitive Suppliers' loads
that result from the estimated hourly loads, a monthly
calculation shall be performed to incorporate the most recent
customer usage information, which is available after the monthly
meter readings are processed.

9D.  The hourly loads shall be determined consistent with the
following steps:

  (1)  The Company shall identify or develop a load profile
       for each customer class or each Customer for use in
       each day's daily determination of hourly load.

  (2)  The Company shall calculate a usage factor for each
       Customer that reflects the Customer's relative usage
       level.

  (3)  The Company shall develop estimates of hourly load
       profiles for the previous day for each Competitive
       Supplier such that the sum of the Competitive
       Suppliers' loads equals the hourly metered loads
       collected each day.  Distribution losses, which are
       included in the hourly metered Company loads, shall be
       fully allocated into Competitive Supplier loads.

  (4)  Transmission losses from local network facilities
       shall be approximated and added to the Competitive
       Supplier's hourly loads.

9E.  The process of Competitive Supplier load estimation involves
statistical samples and estimating error.  The Distribution

Date Filed, January 16, 1998                Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007175

Company shall not be responsible for any estimating errors and shall not be liable to the Competitive Supplier for any costs that are associated with such estimating errors.

10.  <u>Liability and Indemnification</u>

The liability of the Competitive Supplier to the Customer shall be as set forth in the specific Customer/Competitive Supplier Contract.

Except as provided in § 9E of the Model Terms and Conditions, the Company and the Competitive Supplier shall indemnify and hold the other and their respective affiliates, and the directors, officers, employees, and agents of each of them (collectively, "Affiliates") harmless from and against any and all damages, costs (including attorneys' fees), fines, penalties, and liabilities, in tort, contract, or otherwise (collectively, "Liabilities"), resulting from claims of third parties arising, or claimed to have arisen, from the acts or omissions of such party in connection with the performance of its obligations under these Terms and Conditions. The Company and the Competitive Supplier shall waive recourse against the other party and its Affiliates for or arising from the non-negligent performance by such other party in connection with the performance of its obligations under these Terms and Conditions.

Date Filed, January 16, 1998            Date Effective, March 1, 1998
per Order in D.P.U./D.T.E. 97-65
dated December 31, 1997

TCPM007176

ATTACHMENT 3

EASTERN EDISON COMPANY
SUMMARY OF LOAD ESTIMATION PROCESS

TCPM007177

Load Estimation Process

Eastern Edison has had an aggressive Load Research program since the dawn of PURPA in the late 1970s. Eastern Edison continually utilizes the latest technology, statistical techniques, and software available in the industry. The role of Load Research has been expanded to include modeling suppliers' load profiles and reporting the loads to the ISO-NE.

## DAILY MODEL

The supplier load modeling system is a new application of the historical rate class load curves. Rate Class load curves, which include distribution losses, are developed monthly and reconciled to company loads. The daily model develops the hourly load for each Supplier for the previous day. There are five components in this process:

### Select Proxy Day
Select a proxy day from the previous eighteen months which most closely matches the characteristics, load shape and load magnitude of the day for which the hourly demands are being modeled. Extract load data for the selected proxy date from the historical data base for each sampled rate class and for individual customers of fully monitored rate classes.

### Reconcile to Metered Load at Company Busses
Allocate the delta between the proxy day loads and the metered loads at company busses for the previous day to the extracted load data.

### Calculate Supplier Weights
Calculate a usage factor for each customer which reflects their relative usage level; aggregate by supplier within each rate class; then unitize factor totals to calculate supplier weights within rate classes.

### Develop Hourly Loads for Suppliers
Multiply supplier weights by the corresponding rate class loads to segregate rate class loads by supplier. Sum each suppliers' sampled rates, individual customer proxy loads, and telemetered loads.

### Incorporate Transmission Losses
Approximate transmission losses and add to the results of the previous steps.

## MONTHLY RECONCILIATION PROCESS

The monthly process improves the estimates of Supplier loads by incorporating the most recent customer usage information, which is available after the monthly meter readings are processed. Calendar month usage is re-estimated for each customer with a demand or energy meter and calculated for each customer with a recorder, then summed by supplier. Actual transmission losses are allocated to all suppliers. The difference between the monthly reconciliation and the sum of the daily loads is reported to the ISO-NE.

*EUA*

*01/14/98*

TCPM007178

R.I.P.U.C. NO. 1363

# BLACKSTONE VALLEY ELECTRIC COMPANY

# NEWPORT ELECTRIC CORPORATION

## TERMS AND CONDITIONS FOR ELECTRIC POWER SUPPLIERS

Date Filed, May 29, 1997

Date Effective, July 1, 1997 per
Order No. 15383, dated September
4, 1997, in Docket No. 2514.

TCPM007179

-1-                    R.I.P.U.C. NO. 1363

## BLACKSTONE VALLEY ELECTRIC COMPANY

## NEWPORT ELECTRIC CORPORATION

## TERMS AND CONDITIONS FOR ELECTRIC POWER SUPPLIERS

## 1. Applicability

1.1 The following Terms and Conditions for Electric Power Suppliers shall apply to every registered electric power Supplier doing business as such, or authorized to do so, within the State of Rhode Island and Providence Plantations, and to every customer doing business with said Suppliers.

1.2 These Terms & Conditions may be revised, amended, supplemented or supplanted in whole or in part from time to time according to the procedures provided in RIPUC and RIDPUC regulations and Rhode Island law. In case of conflict between these Terms & Conditions and any orders or regulations of the RIPUC or RIDPUC, said orders or regulations shall govern.

1.3 No agent or employee of the Company is authorized to orally modify any provision contained in these Terms & Conditions or to bind the Company to any promise or representation contrary thereto. Any such modification to these Terms & Conditions or any such promise contrary thereto shall be in writing, duly executed by an authorized officer of the Company, and subject in all cases to applicable statutes and to the orders and regulations of the RIPUC and RIDPUC.

## 2. Definitions

"Aggregator" shall mean a person or persons who are authorized by Customers to arrange for supply of electricity on the Customer's behalf.

"Customer" shall mean all persons, partnerships, corporations, or others taking electric service at a single point of delivery or meter location that are Customers of Record for the Company.

"Customer Delivery Point" shall mean the terminus of the Company's incoming service conductors located on the Customer's premises.

"Distribution Company" or "Company" shall mean Blackstone Valley Electric (BVE) or Newport Electric Corporation (NEC).

"Montaup" shall mean Montaup Electric Company.

Date Filed, May 29, 1997                    Date Effective, July 1, 1997 per
                                            Order No. 15383, dated September
                                            4, 1997, in Docket No. 2514.

TCPM007180

"NEPOOL" shall mean New England Power Pool and its successors.

"NEPOOL PTF Facilities" shall mean pool transmission facilities noted 69kV or above owned by NEPOOL Participants and required to allow energy from significant power sources to move freely on the New England Transmission Network.

"Own-Load-Dispatch" shall mean the determination of the output level required of a NEPOOL Participant's generating entitlements in order to meet that Participant's stand-alone energy needs in the most economical manner.

"RIDPUC" shall mean the Rhode Island Division of Public Utilities and Carriers.

"RIPUC" shall mean the Rhode Island Public Utilities Commission.

"Supplier" shall mean an electric power supplier registered with the RIDPUC.

"Terms & Conditions" shall mean these Terms and Conditions for Electric Power Suppliers.

"Transmission Delivery Point" shall mean a location on Montaup's transmission system where the Supplier delivers capacity and energy for a Customer, or a location where Montaup's transmission system and the Company's distribution system interconnect.

## 3. Obligations of Parties

### 3.1 Customer
A Customer will select one Supplier at any given time, or authorize an Aggregator (hereinafter, Supplier) to make the selection for them if aggregation becomes an available opportunity. Customers must provide the selected Supplier with their applicable Company account number(s).

### 3.2 Distribution Company
The Company is responsible for providing local distribution services from the Transmission Delivery Point(s) to the Customer Delivery Point(s).

The Company will:

- arrange for or provide network transmission service on behalf of each Supplier to each Transmission Delivery Point;

- deliver power over distribution facilities to each Customer Delivery Point;

Date Filed, May 29, 1997                    Date Effective, July 1, 1997 per
                                            Order No. 15383, dated September
                                            4, 1997, in Docket No. 2514.

- provide customer service and support;

- respond to service interruptions or power quality problems;

- handle connections and terminations;

- read meters;

- submit bills to Customers for distribution services and, unless the Customer chooses separate bills, for generation services;

- address billing inquiries for the retail delivery services bill portion and, if contracted by Supplier, the generation services portion;

- answer general questions about retail delivery service; and

- report Suppliers' loads, including losses to NEPOOL.

- The Company will also provide last resort power supply for Customers that are not on standard offer service and do not have a Supplier.

### 3.3 Supplier

The Supplier shall be responsible for providing firm, all-requirements service to meet Customers' needs and to deliver the associated capacity and energy to a point or points on Montaup's transmission system, as well as provide any and all necessary installed and operating reserves required to serve each Customer's load.

Each Supplier must meet the registration requirements established by law, be a member of NEPOOL and have an Own-Load Dispatch established within the NEPOOL billing system[1] or have an agreement in place with a NEPOOL member whereby the NEPOOL member agrees to include the load to be served by the Supplier in its Own-Load Dispatch.

---

[1]Membership in NEPOOL is open to any person or organization engaged in the electric utility business (the generation and/or transmission and/or distribution of electricity for consumption by the public, or the purchase, as principal or broker, of electric energy and/or capacity for resale at wholesale), whether in the United States of America or Canada or a state or province or a political subdivision thereof or a duly established agency of any of them; a private corporation, a partnership, an individual, an electric cooperative or any other person or organization recognized in law as capable of owning property and contracting with respect thereto. No person or organization shall be deemed to be eligible for membership if the generation, transmission, or distribution of electricity by such person or organization is primarily conducted to provide electricity for consumption by such person or organization or an affiliated person or organization.

Date Filed, May 29, 1997

Date Effective, July 1, 1997 per Order No. 15383, dated September 4, 1997, in Docket No. 2514.

TCPM007182

-4-                          R.I.P.U.C. NO. 1363

Suppliers providing generation service to Customers from outside of NEPOOL will be responsible for any and all losses incurred on other transmission systems, which may also include losses on facilities linking generation to NEPOOL PTF Facilities.

The Supplier must provide the Company with information electronically, in the Company's predetermined format, at least five (5) work days prior to the commencement or termination of service by the Supplier. The following items are representative of the type of data required:

- The Customer's account number(s);

- The identification number of the Supplier, or the Supplier's NEPOOL sponsor;

- Customer billing option, and;

- The start or stop date of service (The Company can pro-rate the Customer's usage based on normal cycle readings).

The Supplier will send this data using FTP (File Transfer Protocol ) via the Internet to a predetermined area on the Company's server.

Suppliers will be charged an administration fee specified in Appendix A, Section 1, *Administration Fees*, for every transaction.

Suppliers requesting the enrollment of a new customer, or a customer that is switching to them, will be presumed to have obtained the authorization of the customer by an approved method. A request by the supplier, to the Company, that contains the Customer's account number will be deemed as confirmation that the customer has consented to the enrollment or switch.

## 4. Service Standards

### 4.1 Distribution Service Interruption

The Company shall provide retail delivery service to each Customer. In the event that the loading of the distribution system, or portion thereof, must be reduced for safe and reliable operation, such reduction will be made in accordance with standard business practices and in compliance with NEPOOL directives.

In the event of unplanned outages, service will be restored in accordance with standard business practices. When appropriate, service restoration will be done in accordance with the *EUA System*

Date Filed, May 29, 1997                    Date Effective, July 1, 1997 per
                                            Order No. 15363, dated September
                                            4, 1997, in Docket No. 2514.

TCPM007183

*Storm Emergency Plan* on file with the Rhode Island Public Utilities Commission and the Rhode Island Division of Public Utilities and Carriers.

The discontinuance of electric service to Customers is solely controlled by the Company in accordance with the Company's *Terms and Conditions for Electric Service* and the billing and termination regulations of the RIPUC and the RIDPUC.

### 4.2 Authorization to Release Customer Information

Customer authorization is required for the release of any of the Company's Customer specific data, including, but not limited to, Customer name, address, account number(s), load and usage data. The Company shall provide this information to the Customer or the Supplier, as requested by the Customer."

### 4.3 Metering

The Company shall meter each Customer. Should a change in metering be required at a Customer location for the Supplier's billing or the determination of the Supplier's Own-Load-Dispatch, the Company will provide, install, test and maintain the required metering. The Supplier shall bear the cost of providing and installing the meter. Upon installation, the meter shall become the property of the Company and will be maintained by the Company. The Company will complete installation of the meter, if it is available, within 30 days of receiving a written request from the Supplier. The Company shall bill the Supplier upon installation.

## 5. Billings

The Company will provide complete billing and customer services for Customers who receive the standard offer or last resort power supply. The Company offers either Standard Complete Billing or Standard Passthru Billing and also Optional Customer Services, described below, to competitive Suppliers for their Customers.

The Customer will have the right to choose separate bills. The cost of the customer selection of separate bills will be borne by the Customer or the Supplier.

The Company will put all of the electronic files needed by the Suppliers on an in-house file server. Once there, the Supplier can retrieve the files at their convenience, using FTP (File Transfer Protocol) via the internet. Security measures will be implemented to allow each Supplier permission to only retrieve their data.

Information exchange, problem resolution and revenue liability issues require that a service contract exist between a Supplier and the Company before these services start. Since each of

TCPM007184

-6-

R.I.P.U.C. NO. 1363

these service contracts will be different, they should be developed on a company by company basis.

### 5.1 Standard Passthru Billing Service

The Customer elects the option to receive a separate bill for generation from the Supplier. The Company will issue a bill for retail delivery service to each Customer. The Supplier will be responsible for billing Customers for the cost of generation service provided by the Supplier and for the collection of amounts due to the Supplier from the Customer.

The Company schedules meters to be read on a monthly cycle. The Company will provide for the Supplier, an electronic file containing the applicable billing determinants for each customer.

### 5.2  Standard Complete Billing Service

This is the default billing service.

### 5.2.1 Billing Service

The Company schedules meters to be read on a monthly cycle. The Company will use the Supplier's rates to calculate the Supplier portion of Customer bills, and integrate this billing with its own billing in a single mailing to the Customer. The Company will provide an electronic file for the Supplier that will, in addition to the usage being billed, contain the calculated billing amounts for the current bill cycle.

The Company offers this billing service for set fees, identified in Appendix A, Section 2, *"Charges for Service,"* provided the Supplier adheres to the customer classes and rate pricing structure as specified in the current retail delivery tariffs on file with the RIPUC.

If a Supplier requests different customer classes or rate structures, the Company will consider accommodating changes to the billing system at the Supplier's expense. The costs of making the designated changes will be quoted by the Company to the Supplier prior to the start of programming.

Upon receipt of Customer payments, the Company will provide a file for the Supplier summarizing all revenue from Supplier sales which have been received and recorded that day. Payments to a Supplier will be made in a lump sum for all Customer revenue due the Supplier for a given day. These lump sum Supplier payments will be made via an Automated Clearing House (ACH) credit to a predetermined Supplier bank account. The electronic file containing detail records supporting this transaction will be available to Suppliers. This money transfer will

Date Filed, May 29, 1997

Date Effective, July 1, 1997 per Order No. 15383, dated September 4, 1997, in Docket No. 2514.

TCPM007185

take place on the 2nd day following the payment receipt, when the money has become available to the Company.

Existing Company service fees, such as interest charges for unpaid balances, returned check charges, etc., shall remain in effect and shall be assessed, as applicable, according to the Company's *Terms and Conditions for Electric Service*, applicable to all Customers. The cash posting sequence for Customer payments is detailed in Appendix B, *"Company Cash Posting Sequence"*.

### 5.2.2 Optional Customer Services

The Company will offer optional Customer Services to Suppliers who elect the complete billing service.

These services include, but are not limited to, providing customer service representatives to answer phone calls from a Supplier's Customers. The Company can provide a Supplier contracting for optional customer service with a unique toll free phone number which would be printed on the Supplier portion of the Customer's bill. Telephone calls can be answered using the appropriate Supplier's name and operators can respond to a wide variety of call types.

Pricing for this optional service will be customized to the Supplier's needs, and is dependent on several factors such as the specific customer services required by the Supplier, the volume of Customer calls, requested coverage hours and/or the specific number of customer service representatives requested.

## 6. Generation Requirements

### 6.1 Delivery Points

The Supplier shall be obligated to deliver the capacity and energy used by the Customer plus losses to a Transmission Delivery Point. The Supplier shall be obligated to arrange for and pay all costs associated with delivery of its capacity and energy to the Transmission Delivery Point(s).

Montaup will transmit the power received at the Transmission Delivery Point to the Company and deliver it to the interconnection point(s) between Montaup's system and the Company's system. This service will be provided by Montaup.

The Company will provide local distribution service to deliver the power from the interconnection point to the Customer Delivery Point.

Date Filed, May 29, 1997

Date Effective, July 1, 1997 per Order No. 15383, dated September 4, 1997, in Docket No. 2514.

TCPM007186

-8-                    R.I.P.U.C. NO. 1363

### 6.2 Back-up Supply

Since the load for each Customer will be included in the Supplier's Own-Load Dispatch at
NEPOOL, the Supplier will be responsible for obtaining any back-up supply that it may need.
This supply can be obtained from other supply sources or through service offered by NEPOOL to
cover energy and/or capacity deficiencies.

### 6.3 Losses

The Supplier shall be responsible for supplying all transmission and distribution system losses
required to meet the load requirements of each Customer.  To compensate for system losses, the
Company requires a Supplier to provide an excess quantity of electricity and associated ancillary
services.  The percentages above the quantities actually delivered to said Supplier's retail
Customer in each hour of the billing period shall be determined in the estimation of the suppliers
hourly loads as specified in Section 7 *"Determination of Hourly Loads"*.

### 6.4 Own-load Dispatch

The Supplier, or host NEPOOL member, shall be required to include the load for each Customer
it serves, including losses, in its Own-Load Dispatch.

Each day the Company shall normally report the previous day's adjusted hourly loads for each
Supplier to NEPOOL.  This is the load which the Supplier will be obligated to include in its
Own-Load Dispatch at NEPOOL and is the amount it was required to have delivered to the
Transmission Delivery Point(s).

## 7. Determination of Hourly Loads

### 7.1 Overview

On a daily basis the Company will determine and report each Supplier's previous day hourly
loads to NEPOOL for inclusion in the Supplier's Own-Load Dispatch. NEPOOL determines if a
Supplier is a net buyer or seller from these hourly load profiles.

The Supplier's hourly loads will be based on individual Customers' loads and on load profiles
for each Company rate class which are developed from rate class populations and statistically
designed samples using ratio estimation methodology that meet the RIPUC sampling criteria for
load research.

Date Filed, May 29, 1997                Date Effective, July 1, 1997 per
                                        Order No. 15383, dated September
                                        4, 1997, in Docket No. 2514.

TCPM007187

R.I.P.U.C. NO. 1363

On a monthly basis the estimates of each Supplier's energy are updated to calendar month values for: Customers' metered energy, rate class load profiles, and, where available, customer load profiles. The difference between the monthly sum of the daily Supplier's energy estimates and the monthly energy estimates for each Supplier is reported to NEPOOL. Also, each Supplier's non-coincident peak demand is reported to NEPOOL monthly.

### 7.2 Daily Estimation of Suppliers' Own Load Dispatch

In the daily estimation process, each Supplier's hourly loads will be determined by weighting the Company's statistically developed historical generator-level (inclusive of losses) load profiles for each rate class and summing by Supplier the weighted rate class hourly loads and, where available, individual Customer load profiles. The sum of all the Suppliers' hourly load profiles shall equal the Company's load profile of the previous day.

### 7.2.1 Company Hourly Load Profile for Previous Day

The previous day Company hourly loads are known from hourly interval data collected daily at the point of delivery between transmission and distribution.

### 7.2.2 Historical Day

The Company will identify the proxy date from historical Company load shapes which best fits the Company's previous day's characteristics such as day type, load, load shape, and weather. The criteria used to select the best proxy day minimizes the statistical distance between the Company's previous day and the proxy Company day. Rate class hourly loads and, when necessary, Customer's hourly loads for the selected proxy date are then used as the primary inputs for the determination of the daily Supplier hourly load profiles.

### 7.2.3 Customer Energy Usage Ratio for Weighting Factor

An Energy Usage Ratio will be calculated for each Customer from their current metered energy. Each Customer is identified by Supplier and rate class to calculate the Supplier's percentage weight of each rate class, which is equal to the sum of the individual Customers' Energy Usage Ratios by Supplier and rate class, divided by the sum of the individual Customers' Energy Usage Ratios by the rate class. The Supplier's weighting factor for each rate class accounts for the proportion of the Supplier's Customers' loads within a rate class relative to the total rate class.

Date Filed, May 29, 1997                    Date Effective, July 1, 1997 per
                                            Order No. 15383, dated September
                                            4, 1997, in Docket No. 2514.

TCPM007188

-10-                                    R.I.P.U.C. NO. 1363

### 7.2.4 Determine Daily Supplier Load Profile

Each Supplier's hourly loads are determined by multiplying the rate class load profiles (7.2.2) for each hour by a corresponding Supplier's rate class weighting factor (7.2.3) and then summing the weighted rate class hourly loads, and, where available , individual Customer loads for each Supplier inclusive of losses. The sum of all the Suppliers' load profiles shall equal the Company's hourly metered loads for the previous day. The Company will report each Supplier's previous day hourly loads to NEPOOL for inclusion in the Supplier's Own-Load Dispatch.

### 7.3  Monthly Supplier kWh  Reconciliation

After all actual hourly load data is collected for the calendar month, approximately 45 days after the month end. The Suppliers' energy estimates will be recalculated to calendar month values for: Customers' metered energy, hourly generator-level rate class load profiles and, where available, individual Customers' load profiles.

### 7.3.1 Customer Energy Usage Ratio for Weighting Factor

A current Energy Usage Ratio will be calculated for each Customer from the metered energy used in the calendar month. Each Customer is identified by Supplier and rate class to calculate the Supplier's percentage weight of each rate class, which is equal to the sum of the individual Customers' Current Energy Usage Ratios by Supplier and rate class, divided by the sum of the individual Customers' Current Energy Usage Ratios by the rate class. The Supplier's weighting factor for each rate class accounts for the proportion of the Supplier's Customers' loads within a rate class relative to the total rate class.

### 7.3.2 Determine Calendar Month Supplier Hourly Load Profiles

The Supplier estimated hourly loads are recalculated using the updated Supplier's weighting factor for each rate class (7.3.1), which are applied to actual hourly loads collected for the calendar month, by day. Each Supplier's hourly profiles are summed over the days to yield the Supplier's total calendar month hourly load profile inclusive of losses. The sum of all the Supplier's load profiles shall equal the Company's hourly loads for the actual calendar month. The resulting total monthly energy estimate for each Supplier is then compared to the monthly sum of the daily energy estimates (7.2.4), to calculate the energy adjustment for each Supplier.

Date Filed, May 29, 1997                   Date Effective, July 1, 1997 per
                                           Order No. 15383, dated September
                                           4, 1997, in Docket No. 2514.

**TCPM007189**

-11-                          R.I.P.U.C. NO. 1363

### 7.4 NEPOOL Reporting

Based on NEPOOL daily and monthly reporting requirements , the Company will report each Supplier's previous day hourly loads (7.2.4) to NEPOOL for inclusion in the Supplier's Own-Load Dispatch. Monthly energy adjustments (7.3.2) will be provided to NEPOOL to determine the adjustments to the Supplier payments that had been calculated daily. In addition, the Company will provide each Supplier's non-coincident hourly demand for the previous month. The Company will calculate this peak hourly demand for each Supplier from the Supplier's monthly load profile (7.3.2).

## 8. Liability and Indemnification

The Company shall not be liable for any direct, special, indirect or consequential damages whatsoever under any theory of Law that is now or may in the future be in effect, including without limitation: act of God, contract, tort, strict liability or negligence, caused by interruption, abnormal voltage, discontinuance or reversal of energy delivered, circumstances beyond its immediate control, including but not limited to accidents, labor difficulties, actions of transmission services provider(s), Suppliers, public authorities, the failure to receive electricity from any Supplier(s), implementation of an emergency load reduction program, or the inability for any other reason to maintain uninterrupted and continuous deliveries.

Date Filed, May 29, 1997

Date Effective, July 1, 1997 per Order No. 15383, dated September 4, 1997, in Docket No. 2514.

TCPM007190

-12-                    R.I.P.U.C. NO. 1363

# APPENDIX A

*1. Administration Fees $TBD*

*2 Charges for Service*

The following standard and optional monthly charges will apply to Suppliers:

A.  **Charges for Billing of Supplier Use:**

| Rate Class | Billing Fee (per Account Record, per Month) |
|---|---|
| | (See Notes) |
| R-1, R-2, R-3, W-1, S-1, | |
| Non-Metered | $TBD |
| R-4 | $TBD |
| G-1, H-1, H-2 | $TBD |
| G-2 | $TBD |
| T-2, T4, T5, T6, G-5 | $TBD |

Notes:

1)         These fees will be charged to all Suppliers who elect the Standard Complete Billing Service.  All costs above are per Customer account per month.

2)         Any Supplier choosing the Standard Complete Billing Service will receive a monthly minimum charge.

Date Filed, May 29, 1997

Date Effective, July 1, 1997 per Order No. 15383, dated September 4, 1997, in Docket No. 2514.

TCPM007191

-13-                    R.I.P.U.C. NO. 1363

## APPENDIX B

### *Company Cash Posting Sequence*

For those Suppliers electing the Standard Complete Billing Service, the following Account cash posting sequence will be in effect upon receipt of Customer payments:

**A. Cash Posting:**

    1)    Electric Arrears, 90 days and Greater
    2)    Other Arrears, 90 Days and Greater
    3)    Electric Arrears, 60 Days
    4)    Other Arrears, 60 Days
    5)    Electric Arrears, 30 Days
    6)    Other Arrears, 30 Days
    7)    Net Current Balance
    8)    Miscellaneous Arrears
    9)    Miscellaneous Current
    10)    Charge Off Transfer Balance

**Note:**    Following the Cash Posting sequence as outlined above, remaining dollars will be credited to the Supplier as follows:

**B. Supplier Cash Posting:**

    1)    Arrears, 90 Days and Greater
    2)    Arrears, 60 Days
    3)    Arrears, 30 Days
    4)    Net Current Balance

**Note:**    Following the Supplier Cash Posting sequence as outlined above, any remaining dollars, i.e., credit balance will be held and applied to the Company Net Current Balance.

Date Filed, May 29, 1997

Date Effective, July 1, 1997 per Order No. 15383, dated September 4, 1997, in Docket No. 2514.

TCPM007192

# Tab 11

JAN. -19' 98(MON) 12:45    EASTERN UTILITIES         TEL:508-55^ 6125              P. 001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-559-6125



EXHIBIT
40

To:       Alexander J. Pourbaix        Date:        Jan. 19, 1998

Fax #:    403-213-3538                 Pages:       6 , including this cover
                                                    sheet.

From:     Michael J. Hirsh

Subject:  TransCanada Power Marketing Ltd.

COMMENTS:

_____

_____

_____

_____

ANY PROBLEMS OR QUESTIONS, PLEASE CALL ____Mike Hirsh_____

at (508) 559-2000, Ext. 3101 .

TCPM 000361



**Blackstone Valley Electric**
**Eastern Edison**
**EUA Service Corporation**
**Montaup Electric**
**Newport Electric**

January 19, 1998

Mr. Alexander J. Pourbaix
Vice President, Power and Projects
TransCanada Energy Ltd.
3400, 237 - 4th Avenue, S.W.
Calgary, Alberta T2P 5A4

RE:    TransCanada Power Marketing Ltd.
       ("TransCanada") Offer to Acquire Certain Assets of Eastern Utilities Associates ("EUA")

Dear Sir:

This letter and attachment is to respond to the issues and mark-up of the agreements included in
TransCanada's offer dated December 21, 1997 and a follow-up to our telephone conversation on
Friday, January 16. This material is intended to provide a basis for our discussion Wednesday.
In the meantime, if you have any questions, please do not hesitate to call me or Allen Platt.

1. Monthly Support Payments:

EUA notes that, the support payments proposed are significantly higher than in the assignment of
the NEP purchase power contract to U.S. Generating Company and subsequently acquired by
TransCanada. We need to be able to convince ourselves and the regulators who must approve
this transfer that this proposal is fair to our ratepayers. To this end, the differential must be
closed, or appropriately explained. We are prepared to elaborate on our analysis and our
concerns.

2. Lump Sum Payment Provision:

Rather than agreeing on a discount rate, at this time, we have accepted TransCanada's proposal
to reinsert subsection 8(d) of the PPATA as originally drafted.

3. Mark-up of Agreement:

As attached.

TCPM 000362

#### 4. Montaup Credit Issues:

Montaup's payment to TransCanada would be funded through collection of a contract
termination charge from Montaup's retail affiliates pursuant to an order from the Federal Energy
Regulatory Commission ("FERC"). We propose that this provides the financial assurance that
TransCanada requires. We would like to discuss with you how the CTC can provide such
assurance.

We are pleased to have the opportunity to discuss these issues and look forward to a successful
conclusion.

Very truly yours,

Michael J. Hirsh

Attachment

cc: A. Platt, Salomon Smith Barney
    G. Drumm, Esq., McDermott, Will & Emery

TCPM 000363

## EUA Response to TransCanada Proposed Revisions to Asset Purchase Agreement

| Contract Page/Provision | EUA Response |
|---|---|
| Page 1 Revisions | Accepted. |
| Article I, 1.1, (7) | Accepted. |
| Article I, 1.1, (16) | Accepted. |
| Article I, 1.1, (17) | Not Accepted. |
| Article I, 1.1, (20) | 1st Sentence - Accepted.<br>Last Sentence - insert proposed language on page 8 - "in any material respect affect the Buyer's rights..." |
| Article I, 1.1, (23) | Accepted. |
| Page 5 Revisions | Accepted. |
| Page 6 Revisions | Accepted. |
| Page 7 Revisions | Accepted. |
| Article V, 5.3 | Accepted. |
| Article V, 5.6 | Accepted, with addition of "against the seller" following "pending" and "threatened". |
| Article VI, 6.1 | Accepted. |
| Article VI, 6.3 | Accepted. |
| Page 10 Revisions | Accepted. |
| Article VII, 7.4 (a) | Accepted. |
| Article VII, 7.4 (b) | Not Accepted. |
| Page 12 | Accepted. |
| Article VIII, 8.1 | Accepted. |
| Article VIII, 8.2 (a) | Not Accepted. |
| Article VIII, 8.2 (c) | Accepted. |
| Page 16 | Accepted. |
| Page 17 | Accepted. |
| Article IX, 9.1 | Accepted. |
| Article IX, 9.2 (a) | 1st Revision - Accepted.<br>Last Sentence - Not Accepted. |
| Article IX, 9.2 (c) | Accepted. |
| Article X, 10.2 (a) | Accepted. |
| Article XI, 11.3 | Not Accepted. |
| Article XI, 11.5 | Accepted. |

TCPM 000364

## EUA Response to TransCanada Proposed Revisions to Backstop Agreement

| Contract Page/Provision | EUA Response |
|---|---|
| Page 1 Revisions | Accepted. |
| Page 2 Revisions | Accepted. |
| Page 3 Request | Accepted. |
| Page 5 Revision | Accepted. |
| Article 7 | Reference Cover Letter. |
| Article 8 | Reference Cover Letter. |
| Article 9 | Reference Cover Letter. |
| Article 10 | First Paragraph - Not Accepted. Remaining Revisions Accepted. |
| Article 11 | Accepted. |
| Article 13 | Not Accepted. |
| Article 17 | Not Accepted. |

## EUA Response to TransCanada Proposed Revisions to Instrument of Assignment

| Contract Page/Provision | EUA Response |
|---|---|
| Point 3, Page 1 | Not Accepted. |

## EUA Response to TransCanada Proposed Revisions to PPA Transfer Agreement

| Contract Page/Provision | EUA Response |
|---|---|
| Page 1 Revisions | Accepted. |
| Paragraphs 4, 5, 6, and 7 | Accepted; with addition of "in accordance with the terms of such commitment" following "subject of a commitment" at the |
| Inserts 1 and 2 | |
| Paragraph 8 (a) (b) and © | Accepted. |
| Paragraph 8 (d) | Accept TransCanada offer to eliminate Insert 3 and leave 8(d) as drafted. |
| Insert 4 | Accepted. |
| Paragraph 10 | Maintain first 2 sentences as drafted and replace 3rd sentence with Insert 4. |

TCPM 000365

## EUA Response to TransCanada Proposed Revisions to Guaranty

| Contract Page/Provision | EUA Response |
|---|---|
| Paragraph 1 | Accepted, with the exception of insert at beginning of (ii) and deletion beginning with "or making of any....". |
| Insert Rider 1 | Accepted. |
| Paragraph 2 (e) | Not Accepted. |
| Paragraph 2 (d) | Not Accepted. |
| Paragraph 2 (e) | Accepted, with the addition of "except payment in full of all Obligations owing to the Seller" after "in respect thereof". |
| Insert Rider 2, Paragraph 5 | Accepted. |
| Insert Rider 2, Paragraph 6 | Not Accepted. |
| Insert Rider 2, Paragraph 7 | Accepted. |
| Schedule 1.1(a) | Accepted. |
| Schedule 5.4 | Accepted. |
| Schedule 5.5(b) | Accepted. |
| Schedule 6.3(a) | Accepted. |
| Schedule 6.3(b) | Accepted. |
| Schedule 6.4 | Accepted. |

TCPM 000366

# Tab 12
# (1 of 2)

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION

## REQUEST FOR PROPOSALS
## TO SUPPLY
## STANDARD OFFER SERVICE

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting suppliers for proposals to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Proposals ("RFP") must be received at the address set forth below no later than 4:00 p.m. on Wednesday, April 1, 1998. Responses to the RFP must adhere to the specifications herein. Questions and responses to this RFP should be submitted to:

Lawrence R. Boisvert
Supervisor, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
Lboisvert@eua.com

The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall vest in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to modification by certain state and federal regulatory agencies having jurisdiction of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any regulator or court having jurisdiction, or legislation may require the Companies to modify or withdraw their plans as described herein. Furthermore, the Companies, for their convenience and in their sole discretion, may change the timetable for the actions described herein.

TCPM007401

Table of Contents

I.    Introduction

II.    Standard Offer Service
    A.    Customer Eligibility - Massachusetts
    B.    Customer Eligibility - Rhode Island

III.    Supplier Eligibility
    A.    General Requirements
        1.    NEPOOL Membership
        2.    Regulatory Authorizations
    B.    Additional Requirements for Option 2 Suppliers
        1.    Modifications to Standard Offer Agreement
        2.    Financial Information
        3.    Default, Litigation and Penalties
        4.    Performance Surety

IV.    Administration of Standard Offer Service
    A.    Hourly Load Estimation and Loss Allocation
    B.    Load Information
    C.    Minimum Load Obligation
    D.    Supplier Defaults

V.    Proposal Terms and Evaluation

VI.    RFP Schedule


Appendix 1    Standard Offer Price Schedule

Appendix 2    Standard Offer Fuel Index

Appendix 3    Five-Year Load Forecast

Appendix 4    Proposal Bid Forms

Appendix 5    Draft Standard Offer Service Agreement

Appendix 6    Form of Performance Surety Documents

i

TCPM007402

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) (collectively, the "Companies") are jointly seeking qualified parties to submit proposals to provide wholesale power supply to fulfill the Companies' Standard Offer Service obligations. Eastern, Blackstone, and Newport are wholly-owned retail subsidiaries of Eastern Utilities Associates, a registered public utility holding company, and are cooperating on the design and implementation of a process for soliciting suppliers of this service. In 1997, the Companies had total retail billings of 4,455 GWh and an annual peak of approximately 904 MW.

During the transition to a competitive retail electricity marketplace, the Companies are required to arrange for Standard Offer Service to their retail customers that have not yet chosen a competitive supplier. "Standard Offer Service" is defined as firm, all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs.[1] Standard Offer Service is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace. Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. The Companies are providing two options for submitting proposals. Prospective Suppliers can submit bids for either one or both options. The solicitation options are as follows:

Option 1: 1998 Standard Offer     Bids are to be provided for a fixed percentage of the Companies' Standard Offer Load for the period June 1, 1998 through December 31, 1998.

Option 2: 1999-2004 Standard Offer     Bids are to be provided for a fixed percentage of the Companies' Standard Offer Load for the period January 1, 1999 through December 31, 2004.

Suppliers who successfully bid will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply as described in Section II. At the conclusion of the evaluation of the bids provided in response to this solicitation, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time. The Companies will make available to Suppliers certain load information, as described in Section IV. However, it will be the Suppliers' ultimate responsibility for estimating and meeting its Standard Offer Service responsibilities.

---

[1] Eastern's Standard Offer Service Tariff is currently pending before the Massachusetts Department of Telecommunications and Energy. Blackstone's and Newport's tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

TCPM007403

The Suppliers will also be required to provide power plant emissions and labor information in appropriate form to enable Eastern Edison to comply with the Massachusetts Department of Telecommunications and Energy's Uniform Label Disclosure requirements.

2

TCPM007404

## II. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. Eastern, Blackstone, and Newport are required to solicit through the competitive market for Suppliers of Standard Offer Service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and resell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs.

Initially, the Companies expect that many of its existing customers will continue to take Standard Offer Service for the remainder of 1998. However, long-term forecasts of Standard Offer Service load are uncertain. As the electricity market matures, retail electric customers are expected to terminate Standard Offer Service to purchase electricity from an alternative supplier and, with the few exceptions described below, may not return to Standard Offer Service after 1998.

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for meeting their share of the Companies' Standard Offer Service load under the Restated NEPOOL Agreement and rules of ISO New England, Inc. or successor rules, and their responsibilities will include, without limiting the scope of such responsibilities, the following: i) installed and operable capacity; ii) operating reserves and automatic generator control; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customers' meters. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments to Suppliers for Standard Offer Service will be based on the discounts to the annual average prices shown in Appendix 1 determined through this solicitation as adjusted for the Fuel Index (Appendix 2), if applicable. No adjustments will be made for time of use, load factor, or any other characteristics of the load.

A five-year forecast of monthly energy billings and requirements of the Companies' aggregated Standard Offer Service load, assuming no migration of customers from Standard Offer Service to competitive suppliers, is shown in Appendix 3. Additional load information, consisting of "percent of annual peak" customer class load shapes, can be obtained from the EUA System's Internet website at www.eua.com, under "Supplier/EBT Information."

3

## A. Customer Eligibility - Massachusetts

Standard Offer Service shall be available to each customer who was a customer of record as of March 1, 1998 and who has not received generation service from a competitive supplier since March 1, 1998, subject to the following conditions:

1. A customer receiving Standard Offer Service shall be allowed to retain such service upon moving within Eastern Edison's service territory.

2. A customer who previously received generation service from a competitive supplier is no longer eligible to receive Standard Offer Service, except that a low-income customer may return to Standard Offer Service at any time, regardless of whether the customer has previously received generation service from a competitive supplier.

3. Residential or small commercial or industrial customers taking retail delivery service under Eastern Edison's residential rates or Small General Service Retail Delivery Rate G-1 who have received generation service from a competitive supplier since March 1, 1998 are eligible to receive Standard Offer Service by so notifying Eastern Edison within one-hundred-twenty (120) days of the date when the customer first began to receive generation service from a competitive supplier, provided that such notification occurs prior to March 1, 1999.

4. A customer who moves into Eastern Edison's service territory after March 1, 1998 is not eligible to receive Standard Offer Service, except that a low-income customer who moves into Eastern Edison's service territory after March 1, 1998 shall be eligible for Standard Offer Service.

5. A customer who has received generation service pursuant to an agreement with a municipal aggregator is eligible to receive Standard Offer Service by so notifying Eastern Edison with one-hundred-eighty (180) days of the date when the customer first began to receive generation service through such agreement.

## B. Customer Eligibility - Rhode Island

Standard Offer Service shall be available to all customers taking electric service from Blackstone or Newport before January 1, 1998 and customers moving into the Blackstone or Newport service territories on or after January 1, 1998, subject to the following conditions:

1. Such customers shall have the right to relocate to a different service location within Blackstone's or Newport's service territory and continue to receive Standard Offer Service.

2. Customers shall be ineligible to receive Standard Offer Service after terminating such service, except that customers who receive service under any of Blackstone's or Newport's residential retail delivery service rates or under the Small General Retail Delivery Service Rate G-1 may elect to take electric power service from another supplier during the period beginning January 1, 1998 and ending December 31, 1998; and elect to return to Standard Offer Service within one-hundred-twenty (120) days of commencing service from that supplier.

4

TCPM007406

### III. Supplier Eligibility

#### A. General Requirements

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the solicitation must meet the Companies' minimum eligibility requirements as outlined below. Prospective Suppliers submitting proposals under Option 2 are required to submit additional information about their qualifications, due to the extended term of the service and the correspondingly larger commitment on behalf of the Companies' retail customers. Documentation of compliance with each applicable requirement must be provided as part of the proposal. The Companies will have the final authority to determine, in their sole discretion, whether a respondent meets or does not meet these requirements.

##### 1. NEPOOL Membership

To participate in this Standard Offer Service RFP, a prospective Supplier must be a member in good standing of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England, Inc. billing system. As an alternative to being a member, the prospective Supplier may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the prospective Supplier's proposed commitment to provide Standard Offer Service or for such period until the prospective Supplier becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the prospective Supplier in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the prospective Supplier's proposal.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement.

##### 2. Regulatory Authorizations

Each proposal must include a positive declaration that the prospective Supplier has obtained or will obtain in a timely manner all applicable state and federal regulatory authorizations necessary for the Supplier to lawfully perform its obligations under any Standard Offer Service Agreement that it may enter into with the Companies.

#### B. Additional Requirements for Option 2 Suppliers

##### 1. Modifications to the Standard Offer Agreement

At the completion of the evaluation process, each successful Supplier for Option 2 will be required to sign a Standard Offer Service Agreement substantially in the form provided in Appendix 5. Alternatively, the Companies will consider using a Supplier's existing FERC wholesale tariff, provided the tariff's terms and conditions are acceptable.

TCPM007407

Prospective Suppliers wishing to utilize their existing tariff must include it with their proposal package. Prospective Suppliers who do not provide a tariff for the Companies' consideration are requested to review the draft Agreement and to provide any comments, exceptions, or proposed changes as part of their proposal. The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement.

## 2. Financial Information

- Audited or certified financial statements, including balance sheet and statement of income and cash flow for prospective Supplier and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.
- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.
- A description of any corporate affiliations or joint venture partnerships.

## 3. Defaults, Litigation, and Penalties

- For each prospective Supplier and any Guarantor(s) or any affiliate of each which in the past five years has been determined by an arbitrator, regulator, or court, having jurisdiction of the matter, to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.
- A detailed description of any situation within the past five (5) years in which the prospective Supplier or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations by an arbitrator, regulator, or court having jurisdiction of the matter.
- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the prospective Supplier or its Guarantor(s), or their respective officers or directors.
- A detailed description of any penalties, judgments, consent decrees, or other sanctions within the past five (5) years in any venue involving the prospective Supplier or its Guarantor(s).
- A detailed description of any present or anticipated facts known to the prospective Supplier or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

## 4. Performance Surety

As a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Supplier under Option 2 will be required to deliver to the Companies a performance surety securing the Qualified Supplier's full responsibility for Standard Offer Service load over the six-year term.

6

Acceptable forms of surety include a performance letter of credit, a performance bond, or a parent guaranty, in substantially the form as provided in Appendix 3. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. Each surety company or companies issuing a performance bond must maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Agreement. Performance letters of credit or bonds, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and shall be renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

7

TCPM007409

IV.  Administration of Standard Offer Service

A.  Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England, Inc. each Supplier's hourly share of the aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the Massachusetts Department of Telecommunications and Energy and Rhode Island Public Utilities Commission, summarized as follows:

- Energy and demand for each retail account will be estimated for each hour using a combination of inputs, including weather and load data from the EUA Supervisory Control and Data Acquisition ("SCADA") system, sample meter data, historical load shapes, and individual customer usage ratios.

- The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.

- The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.

- Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.

- The hourly Standard Offer loads, including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.

- The daily load information will be transferred to ISO New England, Inc. for inclusion in each Supplier's own-load dispatch (or such other settlement process developed by NEPOOL or ISO New England, Inc.).

The Terms and Conditions for Suppliers may be revised, amended, supplemented, or supplanted in whole or in part from time to time by state regulatory agencies or by law.

B.  Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

The Companies will make available information to enable Suppliers to track their actual Standard Offer Service loads and to forecast their future obligations. Such information will include daily reports of estimated hourly Standard Offer Service loads,

8

numbers of customers in each rate class taking Standard Offer Service, and representative customer load shapes for each rate class. The Companies may also make available estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for prior monthly or annual periods, as appropriate.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies receive customer notifications of significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts. Suppliers are advised to rely on their own projections of load and market dynamics.

### C.  Minimum Load Obligations

- Over time, it is expected that Standard Offer Service load will decline, and thus the actual energy and demand responsibilities (in MWh and MW) associated with a given percentage of the load will decline as well. The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater. If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

### D.  Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement. The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, and other factors the Companies deem appropriate.

9

V. Proposal Terms and Evaluation

## A. Proposal Requirements

The Companies in this Request for Proposals are providing prospective Suppliers with two options for providing bids. Prospective Suppliers may respond to this solicitation by bidding on the Single Year (Option 1) Standard Offer which is for the period June 1, 1998 through December 31, 1998 and/or for the full remaining term of Standard Offer (Option 2) which is for the period January 1, 1999 through February 28, 2005.

The Companies require that Suppliers of Standard Offer Service take on a fixed percentage share of the Companies' load obligations for the term of such Suppliers' obligations, and that prospective Suppliers' bids, exclusive of the Fuel Index revenues, not exceed the fixed annual cents-per-kilowatt-hour prices for energy delivered to retail customer meters given in Appendix 1. Consequently, for either Option, bids must contain two elements: i) a percentage share of the Companies' aggregate Standard Offer Service Load that the prospective Supplier wishes to serve (the "Share"); and ii) a percentage discount off of the wholesale rate caps shown in Appendix 1 at which the prospective Supplier would serve Standard Offer Service Load (the "Discount"). The Share should be stated as an integer-valued percentage, no smaller than 1% and no larger than 100%. The Discount must be stated as a non-negative percentage. Under Option 2, the Share and the Discount must remain constant year-to-year. The Discount must be stated as a fixed value, and must not be indexed in any way.

Proposals should be submitted on the appropriate Proposal Forms included in Appendix 4. Proposals must also conform in all material respects to the appropriate Standard Offer Service Agreement included in Appendix 5. Alternatively, the Companies will consider using a Supplier's existing FERC wholesale tariff, provided the tariff's terms and conditions are acceptable. Prospective Suppliers wishing to utilize their existing tariff must include it with their proposal package.

The Companies agree that all information they receive from the prospective Suppliers shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the prospective Supplier's qualifications and proposals. To the extent that such information is required to be disclosed to a third person in any proceeding, the Companies will produce it under a confidentiality agreement or protective order of the tribunal or agency having jurisdiction of the matter.

## B. Proposal Evaluation

For each of the two Options, proposals which offer the largest Discounts to the wholesale rate cap will be selected first until 100% of the Companies' Standard Offer Service Load has been subscribed. In the event that two or more prospective Suppliers offer the same discount and the aggregate of such bids represent more than 100% of the Standard Offer Load, the Companies will pro-rate each of those bids, such that the sum of all bids selected equals 100%.

10

The Companies shall have the exclusive right to accept or reject any or all of the proposals submitted at any time, for any reason. All submissions shall constitute an offer to sell Standard Offer Service and such offer shall be deemed to be held open until May 31, 1998. Pricing contained in such proposal may not be changed or withdrawn during this period.

11

TCPM007413

## VI.    RFP Schedule

| | |
|---|---|
| RFP Issued | March 2, 1998 |
| Proposals Due | April 1, 1998 |

### Option 1: 1998 Standard Offer

| | |
|---|---|
| Proposal Evaluations Complete | April 7, 1998 |
| Sign Standard Offer Service Agreements | April 10, 1998 |
| File Agreements for Regulatory Approval | April 15, 1998 |
| Begin Standard Offer Service | June 1, 1998 |

### Option 2: 1999-2004 Standard Offer

| | |
|---|---|
| Proposal Evaluations Complete | May 1, 1998 |
| Sign Standard Offer Service Agreements | May 29, 1998 |
| File Agreements for Regulatory Approval | June 12, 1998 |
| Begin Standard Offer Service | January 1, 1998 |

TCPM007414

# APPENDIX 1

## STANDARD OFFER SERVICE PRICE SCHEDULE

TCPM007415

The rate for retail customers who receive Standard Offer Service will be based on the applicable retail Standard Offer Service tariffs on file with the applicable regulatory agencies. The Standard Offer Wholesale rate cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement is as follows:

| Calendar Year | Price per Kilowatt-hour |
|---------------|-------------------------|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Standard Offer Wholesale rates, reduced by the applicable Discounts offered by Suppliers in the Companies' solicitation. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers are responsible for all losses between their sources of supply and the customers' meters, as well as all responsibility for meeting their share of the following: i) installed and operable capacity; ii) operating reserves; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Additional revenues to Suppliers may be realized through the operation of the Fuel Index (Appendix 2).

TCPM007416

# APPENDIX 2

## FIVE-YEAR LOAD FORECAST

TCPM007417

EASTERN UTILITIES ASSOCIATES

STANDARD OFFER LOAD INFORMATION

HISTORICAL AND FORECAST MONTHLY PEAK AND ENERGY DETAIL

1997 - 2002

Load Forecasting and Profiling
Power Supply Department
February 26, 1998

TCPM007418

EUA SYSTEM
1997 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1997 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Mon | Tue | Thu | Wed | Mon | Thu | Thu | Fri | Wed | Tue | Tue | Tue | |
| Date | 01/20/97 | 02/11/97 | 03/13/97 | 04/02/97 | 05/19/97 | 06/26/97 | 07/17/97 | 08/01/97 | 09/03/97 | 10/28/97 | 11/26/97 | 12/15/97 | |
| Hour | 6 PM | 7 PM | 7 PM | 8 PM | 12 PM | 2 PM | 3 PM | 2 PM | 3 PM | 6 PM | 6 PM | 6 PM | |
| Temperature | 28 | 28 | 28 | 41 | 54 | 86 | 93 | 66 | 82 | 40 | 33 | 31 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 444,400 | 427,800 | 414,000 | 395,900 | 366,500 | 512,800 | 540,600 | 473,900 | 450,800 | 413,000 | 441,500 | 465,400 | 445,717 |
| Blackstone | 203,500 | 196,300 | 190,700 | 179,200 | 186,100 | 258,800 | 265,300 | 227,040 | 201,630 | 170,120 | 180,500 | 185,700 | 202,914 |
| Newport | 89,400 | 85,400 | 81,200 | 76,000 | 70,100 | 82,800 | 97,900 | 87,300 | 87,400 | 82,500 | 89,000 | 90,800 | 85,650 |
| Total | 737,300 | 709,500 | 685,900 | 651,100 | 622,700 | 854,400 | 903,800 | 788,240 | 739,830 | 665,620 | 711,000 | 741,900 | 734,281 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 4,400 | 6,100 | 6,100 | 6,000 | 7,800 | 5,400 | 7,300 | 6,100 | 6,600 | 3,000 | 9,000 | 5,400 | 6,100 |
| NEPOOL External | -2,500 | -2,520 | 3,010 | 1,900 | 2,750 | 7,310 | 8,520 | -1,570 | -100 | 760 | 520 | -3,100 | 1,252 |
| Total | 1,900 | 3,580 | 9,110 | 7,900 | 10,550 | 12,710 | 15,820 | 4,530 | 6,500 | 3,760 | 9,520 | 2,300 | 7,352 |
| **TOTAL STANDARD OFFER DEMAND** | 739,200 | 713,080 | 695,010 | 659,040 | 633,250 | 867,110 | 919,620 | 792,770 | 746,330 | 669,380 | 720,520 | 744,200 | 741,633 |

-1-

TCPM007419

EUA SYSTEM
1996 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1996 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 476,100 | 448,800 | 431,300 | 396,740 | 412,984 | 488,216 | 538,810 | 514,394 | 462,221 | 397,325 | 431,357 | 478,035 | 456,358 |
| Blackstone | 202,900 | 192,400 | 186,400 | 179,900 | 200,400 | 231,300 | 256,100 | 239,300 | 223,100 | 182,100 | 191,300 | 207,300 | 207,542 |
| Newport | 99,000 | 91,500 | 84,200 | 78,900 | 74,600 | 85,500 | 98,700 | 90,400 | 84,600 | 78,600 | 85,300 | 97,400 | 87,558 |
| Total | 778,000 | 732,700 | 701,900 | 655,549 | 687,984 | 805,016 | 893,610 | 844,094 | 769,921 | 658,025 | 707,957 | 782,735 | 751,458 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,500 | 3,300 | 4,900 | 3,800 | 5,400 | 3,800 | 9,600 | 9,800 | 5,000 | 4,300 | 6,800 | 4,900 | 4,592 |
| NEPOOL External | 0 | 470 | 1,670 | 1,620 | 1,130 | 1,180 | 3,270 | 4,060 | 1,720 | 2,200 | 2,520 | 210 | 1,671 |
| Total | 2,500 | 3,770 | 6,570 | 5,420 | 6,530 | 4,980 | 7,870 | 9,860 | 6,720 | 6,500 | 9,320 | 5,110 | 6,263 |
| **TOTAL STANDARD OFFER DEMAND** | 780,500 | 736,470 | 708,470 | 660,969 | 694,514 | 809,996 | 901,480 | 853,954 | 776,641 | 664,525 | 717,277 | 787,845 | 757,720 |

-2-

TCPM007420

EUA SYSTEM
1999 STANDARD OFFER OFFER/PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 12 | 42 | 70 | 86 | 89 | 89 | 82 | 40 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 470,216 | 442,635 | 423,602 | 391,643 | 409,081 | 484,139 | 537,321 | 515,256 | 463,330 | 400,356 | 436,308 | 485,035 | 454,910 |
| Blackstone | 204,200 | 193,700 | 185,600 | 179,600 | 202,000 | 233,400 | 258,400 | 241,500 | 225,200 | 183,900 | 193,000 | 209,100 | 209,242 |
| Newport | 100,300 | 92,700 | 87,400 | 81,000 | 75,200 | 85,900 | 99,300 | 90,900 | 85,000 | 79,000 | 85,800 | 98,000 | 88,292 |
| Total | 774,716 | 729,035 | 696,602 | 652,643 | 686,281 | 803,439 | 895,021 | 847,656 | 773,530 | 663,156 | 715,108 | 792,135 | 732,444 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,300 | 5,000 | 3,800 | 5,500 | 3,800 | 4,600 | 5,900 | 5,000 | 4,400 | 6,800 | 5,000 | 4,642 |
| NEPOOL External | 0 | 470 | 1,690 | 1,640 | 1,160 | 1,190 | 3,310 | 4,110 | 1,740 | 2,230 | 2,520 | 210 | 1,688 |
| Total | 2,600 | 3,770 | 6,690 | 5,440 | 6,660 | 4,990 | 7,910 | 10,010 | 6,740 | 6,630 | 9,320 | 5,210 | 6,329 |
| TOTAL STANDARD OFFER DEMAND | 777,316 | 732,805 | 703,292 | 658,083 | 692,921 | 808,429 | 902,931 | 857,666 | 780,270 | 669,786 | 724,428 | 797,345 | 758,773 |

-3-

TCPM007421

**EUA SYSTEM**
**2000 STANDARD OFFER PEAK DEMANDS**
**(KW)**

MONTHLY LOADS.

| | January | February | March | April | May | June | July | August | September | October | November | December | 2000 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 477,116 | 449,135 | 429,802 | 397,443 | 413,981 | 489,339 | 563,021 | 520,756 | 468,230 | 404,656 | 440,908 | 490,135 | 460,377 |
| Blackstone | 206,200 | 195,500 | 187,900 | 182,700 | 203,400 | 234,600 | 259,800 | 242,600 | 226,300 | 184,700 | 195,900 | 210,200 | 210,600 |
| Newport | 100,900 | 93,300 | 87,300 | 80,400 | 75,400 | 86,200 | 79,500 | 91,200 | 85,200 | 79,200 | 86,000 | 98,200 | 88,617 |
| Total | 784,216 | 737,935 | 705,002 | 660,543 | 692,781 | 810,139 | 902,321 | 854,556 | 779,730 | 668,556 | 720,808 | 798,535 | 759,594 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,300 | 5,000 | 3,800 | 5,500 | 3,800 | 4,600 | 5,900 | 5,000 | 4,400 | 6,800 | 5,000 | 4,642 |
| NEPOOL External | 0 | 470 | 1,690 | 1,640 | 1,140 | 1,190 | 3,310 | 4,100 | 1,730 | 2,220 | 2,530 | 210 | 1,686 |
| Total | 2,600 | 3,770 | 6,690 | 5,440 | 6,640 | 4,990 | 7,910 | 10,000 | 6,730 | 6,620 | 9,330 | 5,210 | 6,328 |
| **TOTAL STANDARD OFFER DEMAND** | 786,816 | 741,705 | 711,692 | 665,983 | 699,421 | 815,129 | 910,231 | 864,556 | 786,460 | 675,176 | 730,138 | 803,745 | 765,921 |

-4-

TCPM007422

EUA SYSTEM
2001 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 482,216 | 453,935 | 434,402 | 401,643 | 419,281 | 496,039 | 550,421 | 527,056 | 474,730 | 410,156 | 447,008 | 496,035 | 466,210 |
| Blackstone | 207,100 | 195,400 | 189,200 | 183,600 | 205,000 | 236,900 | 262,300 | 245,600 | 228,500 | 186,500 | 195,600 | 212,200 | 212,292 |
| Newport | 101,100 | 93,500 | 88,100 | 80,600 | 75,800 | 86,200 | 100,200 | 91,000 | 85,800 | 79,700 | 86,600 | 98,900 | 89,067 |
| Total | 790,416 | 743,835 | 710,702 | 665,843 | 700,081 | 819,639 | 912,921 | 864,656 | 789,030 | 676,356 | 729,408 | 807,935 | 767,569 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,300 | 5,000 | 3,800 | 5,500 | 3,800 | 4,700 | 5,900 | 5,000 | 2,400 | 5,900 | 5,000 | 4,658 |
| NEPOOL External | 0 | 480 | 1,690 | 1,650 | 1,150 | 1,200 | 3,530 | 4,130 | 1,750 | 2,240 | 2,560 | 210 | 1,699 |
| Total | 2,600 | 3,780 | 6,690 | 5,450 | 6,650 | 5,000 | 8,030 | 10,030 | 6,750 | 6,640 | 9,460 | 5,210 | 6,358 |
| **TOTAL STANDARD OFFER DEMAND** | 793,016 | 747,615 | 717,392 | 671,293 | 706,731 | 824,639 | 920,951 | 874,686 | 795,780 | 682,996 | 738,860 | 813,145 | 773,926 |

-5-

TCPM007423

EUA SYSTEM
2002 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 488,616 | 460,135 | 440,402 | 407,243 | 423,881 | 500,939 | 555,921 | 533,956 | 479,430 | 414,256 | 451,308 | 501,635 | 471,419 |
| Blackstone | 209,100 | 198,300 | 190,100 | 185,400 | 206,700 | 238,700 | 265,300 | 246,000 | 230,300 | 108,000 | 197,300 | 213,500 | 207,483 |
| Newport | 101,000 | 94,100 | 88,700 | 81,100 | 76,200 | 87,100 | 100,500 | 92,100 | 86,100 | 80,000 | 86,900 | 99,500 | 89,092 |
| Total | 799,716 | 752,535 | 719,202 | 673,743 | 706,781 | 826,739 | 920,721 | 872,056 | 795,830 | 602,256 | 735,508 | 814,635 | 774,994 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,400 | 5,100 | 3,900 | 5,500 | 3,900 | 4,700 | 6,000 | 5,100 | 4,400 | 6,900 | 5,100 | 4,717 |
| NEPOOL External | 0 | 480 | 1,710 | 1,670 | 1,160 | 1,210 | 3,360 | 4,170 | 1,760 | 2,250 | 2,580 | 220 | 1,714 |
| Total | 2,600 | 3,880 | 6,810 | 5,570 | 6,660 | 5,110 | 8,060 | 10,170 | 6,860 | 6,650 | 9,480 | 5,320 | 6,431 |
| TOTAL STANDARD OFFER DEMAND | 802,316 | 756,415 | 726,012 | 679,313 | 713,441 | 831,849 | 928,781 | 882,226 | 802,690 | 608,906 | 744,988 | 820,155 | 781,424 |

-6-

TCPM007424

EVA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1997 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1997 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 109,987,752 | 108,232,456 | 99,351,331 | 100,731,075 | 94,020,806 | 90,714,411 | 111,251,173 | 115,223,123 | 101,320,747 | 80,364,608 | 89,711,530 | 99,431,567 | 1,210,347,140 |
| Company Use | 335,232 | 282,672 | 304,632 | 372,232 | 543,832 | 173,152 | 252,592 | 172,182 | 735,232 | 8,308,572 | 361,752 | 374,152 | 5,438,434 |
| Losses and Unbilled | 5,439,086 | -7,669,384 | 9,844,318 | -848,397 | 5,897,744 | 13,713,390 | 10,010,792 | -1,396,985 | -3,720,650 | 6,315,136 | 3,009,719 | 274,936 | 42,008,103 |
| Requirements | 115,765,070 | 100,945,744 | 108,700,000 | 100,256,010 | 101,462,482 | 112,601,040 | 122,213,397 | 117,040,571 | 117,335,370 | 94,989,316 | 93,082,801 | 100,404,667 | 1,264,734,447 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 237,300,173 | 230,414,145 | 208,536,112 | 211,377,336 | 199,546,686 | 204,502,122 | 235,012,414 | 237,997,504 | 227,449,722 | 207,510,207 | 207,611,724 | 239,943,535 | 2,646,187,372 |
| Company Use | 14,595,701 | -10,348,264 | 275,065 | 266,166 | 211,186 | 156,661 | 186,696 | 331,389 | 131,389 | 157,011 | 266,010 | 242,262 | 2,721,280 |
| Losses and Unbilled | -140,546 | -5,546,088 | 24,135,857 | -1,512,165 | 7,401,644 | 27,211,450 | 16,762,434 | 7,138,631 | -7,538,405 | 12,463,574 | 17,278,894 | 16,022,913 | 113,192,863 |
| Requirements | 251,835,088 | 214,936,405 | 232,951,632 | 210,253,331 | 207,187,530 | 239,888,341 | 256,788,644 | 264,409,425 | 220,262,394 | 220,237,501 | 225,097,446 | 225,148,744 | 2,742,971,523 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 46,189,530 | 44,353,704 | 42,813,638 | 42,562,180 | 31,722,065 | 41,308,070 | 46,419,499 | 46,373,318 | 46,725,711 | 41,449,375 | 42,426,375 | 47,400,551 | 534,097,074 |
| Company Use | 24,718 | 531,167 | 422,503 | 115,563 | 65,116 | 62,271 | 34,387 | 36,467 | 385,081 | 38,285 | 78,600 | 192,782 | 1,971,744 |
| Losses and Unbilled | 4,898,092 | -5,717,931 | 5,462,999 | 637,397 | 2,087,264 | 6,067,119 | 5,774,244 | 2,156,375 | -800,252 | 3,407,938 | 3,748,901 | 3,782,167 | 31,822,782 |
| Requirements | 53,112,340 | 45,356,420 | 48,739,140 | 43,315,100 | 42,475,470 | 45,437,470 | 52,228,100 | 50,572,160 | 45,672,540 | 45,221,620 | 46,475,106 | 51,264,460 | 569,344,820 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 395,555,455 | 387,401,205 | 350,691,001 | 354,672,591 | 354,199,615 | 363,525,022 | 394,104,260 | 401,205,395 | 375,716,502 | 337,475,912 | 339,447,247 | 379,675,655 | 4,374,551,416 |
| Company Use | 14,757,657 | -27,282,285 | 1,872,376 | 756,933 | 821,123 | 381,746 | 468,835 | 559,748 | 354,742 | 561,908 | 561,011 | 740,174 | 9,056,454 |
| Losses and Unbilled | 24,396,984 | -27,726,221 | 1,497,393 | -1,497,391 | 11,194,552 | 45,010,965 | 36,555,660 | 8,197,929 | -12,135,343 | 24,274,932 | 24,857,281 | 21,057,012 | 195,106,528 |
| Requirements | 420,713,298 | 361,931,791 | 390,393,441 | 353,822,441 | 350,125,290 | 386,926,551 | 427,210,741 | 409,828,155 | 351,276,817 | 342,468,737 | 364,554,227 | 401,035,703 | 4,577,730,790 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | 2,190,760 | 2,106,700 | 5,018,872 | 513,844 | 4,085,373 | -356,466 | 4,581,552 | 2,414,650 | 204,061 | -554,689 | 1,402,623 | 1,003,621 | 23,376,212 |
| External | -43,650 | 206,420 | 412,773 | 946,120 | 373,580 | -579,399 | -746,050 | 124,443 | 456,200 | 556,100 | 468,801 | 1,074,420 | 2,675,577 |
| Total | 2,147,110 | 2,313,120 | 5,431,642 | 1,497,964 | 4,458,873 | -1,204,866 | 3,067,972 | 2,540,207 | 443,151 | 591,411 | 2,070,033 | 2,075,994 | 26,051,791 |
| **TOTAL STANDARD OFFER** | 422,842,405 | 363,232,697 | 396,025,303 | 354,159,405 | 355,356,163 | 387,711,745 | 435,556,643 | 412,344,342 | 344,457,160 | 342,959,160 | 366,724,260 | 403,946,397 | 4,625,782,491 |

-7-

TCPM007425

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1998 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1998 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 106,434,255 | 104,540,150 | 10,572,333 | 15,033,240 | 92,591,855 | 94,437,570 | 103,077,146 | 115,389,974 | 104,421,494 | 93,934,470 | 95,116,744 | 102,356,465 | 1,210,052,266 |
| Company Use | 314,281 | -4,325,331 | 344,691 | 291,461 | 254,328 | 236,182 | 207,256 | 232,897 | 232,897 | 250,491 | 281,767 | 150,486 | 2,306,175 |
| Losses and Unbilled | 3,515,117 | 5,503,553 | 5,503,553 | -836,747 | 5,519,371 | 15,275,527 | 13,445,237 | 2,043,434 | -5,436,185 | 7,079,788 | 5,811,418 | 5,185,315 | 46,561,859 |
| Requirements | 110,477,665 | 99,747,205 | 104,976,677 | 15,303,942 | 97,653,554 | 107,207,201 | 117,525,957 | 117,034,430 | 104,746,360 | 101,155,587 | 104,591,429 | 107,691,840 | 1,260,460,101 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 243,575,051 | 230,476,800 | 224,411,146 | 213,368,321 | 201,593,044 | 207,866,863 | 228,697,035 | 243,776,042 | 220,377,124 | 195,103,695 | 197,255,250 | 222,770,451 | 2,437,235,423 |
| Company Use | 361,263 | 372,126 | 301,190 | 246,968 | 187,164 | 152,964 | 155,273 | 196,275 | -10,501,204 | 17,135,767 | 11,208,744 | 118,783 | 2,0454,482 |
| Losses and Unbilled | 8,961,768 | -9,561,434 | 19,200,236 | -533,414 | 12,373,492 | 22,530,040 | 30,107,528 | 5,364,943 | 5,364,943 | 17,135,847 | 11,298,783 | 124,382,966 | 112,669,816 |
| Requirements | 252,090,082 | 221,400,416 | 239,986,382 | 213,065,782 | 214,116,349 | 239,555,169 | 259,961,204 | 249,515,613 | 209,694,421 | 210,511,117 | 209,139,061 | 235,351,255 | 2,755,144,910 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,025,535 | 44,229,218 | 46,007,603 | 43,417,022 | 40,494,594 | 42,540,117 | 46,973,148 | 49,147,430 | 44,456,168 | 40,725,037 | 40,641,490 | 40,223,474 | 543,140,356 |
| Company Use | 155,130 | 352,052 | 521,017 | 154,083 | 18,477 | 148,397 | 55,140 | 71,812 | -1,431,381 | 44,981 | 91,253 | 141,374 | 1,664,725 |
| Losses and Unbilled | 2,437,314 | -1,109,756 | 3,037,207 | 674,438 | 5,253,774 | 5,850,069 | 6,752,714 | 1,885,565 | 1,431,381 | 4,350,386 | 5,156,925 | 3,599,554 | 32,396,163 |
| Requirements | 52,615,031 | 46,392,514 | 50,366,417 | 44,361,311 | 43,446,925 | 47,976,303 | 52,124,522 | 51,104,827 | 45,096,131 | 45,125,754 | 43,000,744 | 51,734,422 | 577,201,240 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 400,220,705 | 392,446,064 | 371,451,094 | 352,671,397 | 335,756,250 | 347,111,010 | 370,550,917 | 408,472,444 | 373,626,044 | 326,943,932 | 333,453,484 | 373,359,869 | 4,391,706,263 |
| Company Use | 12,608 | 482,221 | 352,335,096 | 705,382 | 515,613 | 410,463 | 424,227 | 406,232 | 461,415 | 462,415 | 557,505 | 382,505 | 2,0454,264 |
| Losses and Unbilled | 15,016,177 | -15,715,365 | 22,533,006 | -436,223 | 20,158,763 | 384,144,460 | 86,425,635 | 7,206,332 | -10,374,371 | 29,555,911 | 20,001,510 | 20,457,835 | 191,585,532 |
| Requirements | 416,101,564 | 377,040,295 | 394,711,654 | 352,717,055 | 355,210,720 | 305,738,705 | 429,400,765 | 410,655,070 | 355,711,920 | 356,752,456 | 555,057,234 | 394,816,749 | 4,593,220,360 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -263,402 | 1,795,810 | 2,452,611 | 1,497,433 | 3,791,446 | 604,557 | 1,373,996 | 2,655,722 | 1,378,726 | 1,301,425 | 2,085,350 | 2,425,520 | 21,666,470 |
| External | 12,686 | 482,221 | 440,169 | 701,427 | 497,851 | 232,141 | 497,774 | 601,289 | 501,289 | 1,004,013 | 1,089,288 | 392,236 | 4,656,905 |
| Total | -250,716 | 2,278,031 | 2,698,780 | 2,351,860 | 4,201,317 | 916,436 | 1,871,670 | 3,257,042 | 1,872,015 | 2,305,430 | 3,175,400 | 3,317,766 | 26,325,477 |
| **TOTAL STANDARD OFFER** | 415,950,859 | 380,110,326 | 397,610,416 | 355,106,115 | 351,510,045 | 384,955,431 | 431,200,455 | 421,512,112 | 357,585,935 | 359,097,896 | 354,000,042 | 398,134,505 | 4,619,351,745 |

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1999 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 107,720,386 | 105,517,716 | 99,387,731 | 95,704,116 | 92,331,701 | 97,381,707 | 105,120,275 | 116,420,460 | 107,477,383 | 93,945,563 | 95,122,845 | 103,561,580 | 1,223,690,935 |
| Company Use | 356,728 | 395,829 | 395,891 | 279,116 | 235,686 | 234,410 | 240,067 | 240,747 | 235,282 | 250,801 | 255,371 | 331,336 | 5,315,537 |
| Losses and Unbilled | 3,546,577 | -5,425,351 | 5,551,414 | -607,634 | 5,386,555 | 10,574,655 | 13,576,431 | 2,285,147 | -6,238,837 | 7,949,388 | 6,061,188 | 5,161,765 | 46,924,169 |
| Requirements | 111,403,682 | 100,860,274 | 105,244,464 | 96,156,336 | 98,522,672 | 107,979,852 | 118,916,863 | 118,914,562 | 101,474,528 | 102,145,710 | 101,398,023 | 109,007,445 | 1,272,503,461 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 230,155,119 | 235,390,705 | 221,952,555 | 209,922,761 | 198,791,246 | 205,581,142 | 227,174,613 | 243,752,051 | 221,315,742 | 194,237,603 | 199,395,947 | 224,013,917 | 2,419,326,205 |
| Company Use | 381,366 | 370,778 | 357,327 | 347,297 | 351,307 | 356,263 | 356,005 | 370,136 | 195,404 | 168,708 | 11,207,512 | 517,544 | 2,456,004 |
| Losses and Unbilled | 6,871,846 | -7,906,430 | 13,271,833 | -700,391 | 12,423,247 | 22,549,283 | 30,185,965 | 5,388,611 | -11,258,868 | 17,365,145 | 11,017,581 | 12,511,759 | 112,853,213 |
| Requirements | 247,408,491 | 226,414,133 | 236,622,017 | 201,371,667 | 211,571,625 | 228,586,646 | 257,695,887 | 247,201,370 | 210,242,350 | 211,839,463 | 211,325,492 | 236,859,200 | 2,735,027,158 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,319,901 | 41,495,707 | 46,741,737 | 43,727,201 | 40,352,604 | 42,776,491 | 46,343,101 | 49,653,077 | 44,235,731 | 40,793,209 | 40,849,613 | 48,490,400 | 549,200,134 |
| Company Use | 157,064 | 386,565 | 525,815 | 156,703 | 91,705 | 69,249 | 58,501 | 72,535 | 76,170 | 72,304 | 72,398 | 143,135 | 31,667,500 |
| Losses and Unbilled | 2,641,158 | -1,251,645 | 3,560,663 | 685,690 | 5,283,301 | 5,388,169 | 6,853,616 | 1,804,363 | -1,461,455 | 4,346,140 | 3,165,315 | 3,379,727 | 322,652,500 |
| Requirements | 53,117,123 | 40,442,632 | 50,414,418 | 44,567,973 | 45,445,412 | 48,235,909 | 53,235,576 | 51,410,705 | 46,364,284 | 45,373,604 | 44,110,316 | 52,013,834 | 580,331,792 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 316,194,406 | 386,942,286 | 387,172,353 | 350,254,077 | 332,315,053 | 346,617,420 | 378,650,203 | 409,027,196 | 378,530,855 | 329,191,172 | 334,088,507 | 377,076,145 | 4,587,595,324 |
| Company Use | 15,813,726 | 1,113,172 | 935,440 | 704,164 | 512,471 | 461,969 | 422,503 | 4,222,503 | 499,160 | 491,106 | 20,153,508 | 601,013 | 7,864,527 |
| Losses and Unbilled | 15,865,175 | -14,613,417 | 22,372,100 | -665,026 | 21,555,105 | 38,510,107 | 50,165,597 | 9,291,721 | -18,758,664 | 29,457,191 | 20,153,508 | 20,881,013 | 179,233,590 |
| Requirements | 412,129,746 | 373,725,657 | 390,482,101 | 350,096,116 | 355,566,129 | 384,731,429 | 430,649,219 | 419,606,725 | 357,685,140 | 359,360,641 | 356,842,625 | 391,551,201 | 4,507,471,411 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -266,012 | 1,617,503 | 2,486,624 | 1,715,665 | 3,838,914 | 650,777 | 1,301,735 | 2,591,051 | 1,273,682 | 1,276,895 | 2,110,921 | 2,763,603 | 21,321,740 |
| External | 1,423 | 485,491 | 445,784 | 717,565 | 564,830 | 255,354 | 502,772 | 598,603 | 591,457 | 1,035,899 | 1,100,750 | 392,916 | 4,713,814 |
| Total | -285,301 | 2,103,060 | 2,932,404 | 2,417,015 | 4,343,356 | 924,132 | 1,872,707 | 3,237,654 | 1,873,139 | 2,531,604 | 3,210,771 | 3,356,521 | 28,443,774 |
| **TOTAL STANDARD OFFER** | 411,074,515 | 374,228,691 | 393,415,305 | 552,512,011 | 357,929,485 | 385,715,561 | 431,961,805 | 422,904,377 | 359,186,271 | 361,677,465 | 360,053,600 | 402,377,722 | 4,616,315,185 |

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2000 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2000 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 106,517,973 | 104,172,940 | 100,106,114 | 97,632,302 | 93,491,313 | 90,150,360 | 106,062,682 | 117,511,516 | 106,634,322 | 94,619,056 | 94,651,326 | 104,211,752 | 1,251,653,634 |
| Company Use | 3,335,125 | 3,191,275 | 3,595,453 | 302,217 | 5,836,915 | 1,406,608 | 1,203,976 | 2,041,432 | 4,255,672 | 250,437 | 250,437 | 591,734 | 4,314,465 |
| Losses and Unbilled | 3,819,739 | -5,916,739 | 5,594,941 | -885,067 | 5,606,986 | 10,664,269 | 13,725,068 | 2,861,303 | -4,105,835 | 6,012,360 | 5,852,027 | 5,230,417 | 47,345,030 |
| Requirements | 112,433,551 | 101,656,465 | 106,906,508 | 97,044,445 | 97,139,214 | 100,051,237 | 117,987,726 | 119,813,251 | 102,563,924 | 102,074,151 | 102,176,324 | 109,772,105 | 1,202,813,129 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 261,357,591 | 237,116,504 | 224,691,707 | 212,789,532 | 201,613,013 | 206,597,513 | 239,320,760 | 247,006,427 | 226,538,728 | 196,941,615 | 201,953,406 | 220,890,171 | 2,655,082,103 |
| Company Use | 6,972,632 | 371,367 | 1,300,028 | 249,304 | 1,103,422 | 156,044 | 165,329 | 125,414 | 159,728 | 168,205 | 201,445 | 319,052 | 2,085,820 |
| Losses and Unbilled | 18,142,552 | -14,066,542 | 13,436,180 | -722,271 | 12,580,790 | 25,046,375 | 30,705,678 | 5,401,557 | -11,406,888 | 17,564,663 | 11,961,969 | 122,482,481 | 114,107,994 |
| Requirements | 250,472,773 | 227,421,329 | 237,035,715 | 212,317,164 | 214,377,225 | 231,802,365 | 261,451,776 | 252,670,076 | 215,093,420 | 214,694,561 | 214,115,929 | 241,442,504 | 2,772,123,977 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,411,211 | 47,911,975 | 46,914,217 | 43,956,532 | 40,500,723 | 42,904,489 | 46,595,235 | 49,740,155 | 46,919,190 | 41,155,975 | 41,047,740 | 40,782,594 | 547,591,282 |
| Company Use | 156,105 | 370,857 | 329,633 | 150,611 | 100,672 | 70,760 | 51,267 | 73,374 | 70,199 | 76,335 | 91,480 | 164,812 | 1,707,251 |
| Losses and Unbilled | 2,845,842 | -1,246,258 | 3,540,535 | 673,465 | 3,273,175 | 5,413,898 | 6,871,606 | 1,683,446 | -1,400,840 | 4,365,700 | 3,174,221 | 3,581,956 | 32,514,784 |
| Requirements | 53,414,162 | 46,893,574 | 50,804,465 | 44,730,610 | 43,882,776 | 48,476,597 | 53,524,391 | 51,497,177 | 45,576,349 | 45,607,079 | 44,395,457 | 52,287,364 | 581,381,215 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 418,407,981 | 393,956,511 | 371,226,118 | 354,380,366 | 355,631,055 | 364,742,374 | 392,907,685 | 414,338,098 | 374,721,240 | 332,719,463 | 359,680,432 | 381,884,719 | 4,435,095,017 |
| Company Use | 10,678,577 | 4,105,499 | 943,111 | 412,735 | 311,197 | 453,261 | 426,612 | 491,223 | 464,211 | 464,217 | 606,294 | 964,599 | 8,867,764 |
| Losses and Unbilled | 15,108,955 | -14,353,630 | 22,552,454 | -414,473 | 21,255,940 | 36,526,463 | 51,552,122 | 9,544,008 | -10,919,553 | 20,379,035 | 21,062,854 | 193,947,770 | 193,947,770 |
| Requirements | 416,535,514 | 377,781,380 | 394,031,180 | 354,174,425 | 357,591,313 | 380,132,011 | 434,346,061 | 424,181,326 | 361,235,903 | 353,175,291 | 361,424,801 | 403,721,971 | 4,537,710,341 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -273,442 | 1,837,466 | 2,516,064 | 1,727,467 | 3,082,919 | 697,428 | 1,406,200 | 2,628,974 | 1,306,167 | 1,510,446 | 2,132,263 | 2,971,507 | 22,171,129 |
| External | 4,356 | 489,011 | 447,695 | 716,401 | 509,405 | 235,140 | 507,720 | 704,587 | 605,204 | 1,045,272 | 1,118,259 | 393,156 | 6,770,204 |
| Total | -269,500 | 2,326,477 | 2,963,864 | 2,445,910 | 4,392,324 | 932,508 | 1,911,920 | 3,333,501 | 1,912,171 | 2,555,718 | 6,264,502 | 5,390,743 | 28,941,333 |
| **TOTAL STANDARD OFFER** | 416,244,801 | 380,107,865 | 397,775,557 | 356,618,385 | 361,791,537 | 390,064,607 | 436,066,429 | 427,814,707 | 363,168,074 | 355,551,009 | 365,864,303 | 407,112,714 | 4,564,459,474 |

-10-

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2001 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 191,233,337 | 107,998,441 | 109,744,412 | 16,228,907 | 74,121,065 | 90,815,437 | 106,740,818 | 116,371,715 | 109,294,440 | 155,147,510 | 77,282,103 | 104,877,214 | 1,240,264,027 |
| Company Use | 335,456 | -291,460 | 235,782 | 380,558 | 235,180 | 234,941 | 201,312 | 240,491 | 235,731 | 242,403 | 242,403 | 340,111 | 3,318,936 |
| Losses and Unbilled | 5,587,384 | -5,147,123 | 5,434,874 | 888,129 | 5,541,981 | 10,552,061 | 13,859,137 | 2,057,203 | -6,174,521 | 8,071,824 | 5,286,755 | 5,252,520 | 47,539,594 |
| Requirements | 115,156,177 | 124,328,170 | 115,007,066 | 17,641,512 | 79,806,214 | 101,482,419 | 120,800,447 | 120,673,469 | 103,355,670 | 103,467,569 | 102,831,261 | 115,469,845 | 1,291,107,047 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 244,695,102 | 231,726,523 | 224,598,638 | 215,252,867 | 203,702,901 | 219,901,152 | 232,917,733 | 249,050,786 | 226,828,747 | 199,055,497 | 205,791,064 | 231,032,357 | 2,404,100,022 |
| Company Use | 1,955,691 | -291,706 | 591,473 | 250,261 | 183,486 | 156,723 | 164,569 | 164,569 | 191,148 | 115,228 | 207,140 | 212,528,313 | 2,837,131 |
| Losses and Unbilled | | -10,331,759 | 13,573,799 | -748,922 | 12,710,189 | 23,300,865 | 31,279,400 | 5,461,152 | -11,562,139 | 17,167,572 | 12,042,431 | 12,558,872 | 115,282,542 |
| Requirements | 253,443,978 | 221,102,660 | 240,401,603 | 214,714,206 | 216,794,856 | 234,440,370 | 244,365,732 | 255,477,574 | 215,426,597 | 216,911,647 | 216,272,283 | 243,911,042 | 2,002,219,723 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,852,843 | 41,972,791 | 47,208,716 | 44,150,973 | 44,441,905 | 43,153,532 | 44,701,266 | 49,946,073 | 47,128,859 | 41,304,920 | 41,195,239 | 40,715,002 | 551,323,619 |
| Company Use | 187,856 | 374,750 | 335,271 | 160,563 | 191,905 | 70,833 | 54,121 | 74,184 | 177,232 | 94,479 | 94,479 | 144,411 | 1,726,100 |
| Losses and Unbilled | 2,469,507 | -1,286,606 | 3,569,973 | 445,712 | 3,280,083 | 5,435,935 | 6,401,502 | 1,000,237 | -1,564,794 | 5,377,268 | 3,176,461 | 3,394,424 | 32,563,168 |
| Requirements | 53,442,226 | 41,010,935 | 51,105,180 | 44,765,074 | 46,045,173 | 48,486,300 | 51,742,601 | 51,911,454 | 46,735,874 | 46,749,104 | 44,466,251 | 52,456,117 | 585,594,967 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 444,688,597 | 394,015,155 | 374,745,558 | 357,500,747 | 330,691,951 | 353,030,071 | 386,461,037 | 416,181,342 | 383,332,086 | 385,587,385 | 542,477,205 | 384,424,155 | 4,475,501,568 |
| Company Use | 871,234 | 1,223,355 | 747,525 | 711,551 | 220,833 | 469,497 | 531,377 | 490,563 | 465,483 | 474,973 | 566,050 | 806,025 | 1,011,925 |
| Losses and Unbilled | 15,294,752 | -16,681,406 | 22,776,547 | -713,391 | 21,632,253 | 31,284,521 | 52,427,802 | 9,386,812 | -19,251,428 | 30,215,642 | 20,527,647 | 21,205,944 | 195,326,736 |
| Requirements | 420,242,416 | 381,329,601 | 396,471,151 | 351,316,594 | 364,645,043 | 372,761,009 | 430,700,800 | 426,058,497 | 364,514,143 | 364,222,350 | 363,571,703 | 406,837,022 | 4,176,722,557 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -277,591 | 1,854,504 | 2,541,227 | 1,764,200 | 3,120,931 | 702,091 | 1,415,975 | 2,654,935 | 1,517,270 | 1,821,858 | 2,150,446 | 3,927,058 | 22,375,207 |
| External | 4,311 | 439,631 | 445,106 | 719,461 | 512,963 | 236,166 | 511,377 | 788,622 | 609,270 | 1,101,842 | 1,120,890 | 590,336 | 6,007,160 |
| Total | -273,278 | 2,294,135 | 2,116,333 | 2,485,641 | 4,435,894 | 939,257 | 1,927,355 | 5,363,555 | 1,927,940 | 2,374,700 | 3,271,495 | 5,417,394 | 29,182,347 |
| **TOTAL STANDARD OFFER** | 411,961,335 | 385,475,951 | 401,441,184 | 351,784,255 | 365,078,157 | 355,719,356 | 440,834,261 | 451,422,252 | 364,443,185 | 366,573,050 | 364,843,278 | 410,254,416 | 4,706,604,904 |

-11-

TCPM007429

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2002 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 101,929,916 | 107,795,110 | 101,714,724 | 78,831,691 | 94,860,285 | 91,710,697 | 107,552,751 | 119,459,514 | 110,101,957 | 94,911,895 | 96,062,954 | 105,725,455 | 1,259,155,240 |
| Company Use | 335,016 | 327,958 | 394,083 | 381,029 | 561,229 | 541,835 | 591,510 | 665,927 | 656,530 | 590,456 | 562,461 | 540,485 | 6,121,296 |
| Losses and Unbilled | 3,401,471 | -5,202,336 | 5,474,315 | -986,985 | 5,958,547 | 19,235,160 | 13,556,723 | 2,080,937 | -233,140 | 6,141,197 | 5,355,146 | 5,291,960 | 47,601,635 |
| Requirements | 113,063,403 | 102,911,842 | 107,491,122 | 98,226,735 | 101,580,051 | 110,475,043 | 121,706,984 | 121,784,252 | 104,195,471 | 104,405,636 | 103,840,764 | 111,435,141 | 1,301,356,200 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 244,951,675 | 241,002,707 | 228,635,057 | 217,233,655 | 205,806,312 | 213,098,028 | 235,276,653 | 252,415,207 | 225,225,554 | 201,221,646 | 294,285,071 | 235,530,150 | 2,710,740,053 |
| Company Use | 383,398 | 372,335 | 309,207 | 296,994 | 402,920 | 356,182 | 31,806,108 | 175,093 | 160,177 | 160,750 | 210,224 | 320,785 | 2,660,093 |
| Losses and Unbilled | 9,115,651 | -10,335,337 | 13,604,551 | -770,531 | 12,026,112 | 38,522,159 | 31,084,155 | 5,453,490 | -11,196,281 | 17,944,370 | 121,961,402 | 12,402,835 | 116,242,327 |
| Requirements | 255,550,724 | 231,047,843 | 242,631,092 | 216,705,597 | 216,035,142 | 236,784,119 | 267,031,597 | 256,044,790 | 217,609,452 | 219,354,774 | 216,457,527 | 244,555,736 | 2,829,807,279 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,110,223 | 50,139,493 | 47,341,003 | 44,270,756 | 60,790,082 | 43,515,437 | 46,901,813 | 50,102,092 | 47,407,630 | 41,515,677 | 41,415,535 | 49,177,435 | 855,744,427 |
| Company Use | 182,333 | 2,385,861 | 336,767 | 152,002 | 103,049 | 21,572 | 60,556 | 74,950 | 72,551 | 78,063 | 95,495 | 81,447,739 | 1,748,403 |
| Losses and Unbilled | 2,442,881 | -1,289,861 | 3,575,669 | 985,163 | -3,284,640 | 5,602,532 | 6,929,401 | 1,962,576 | -1,529,912 | 4,393,591 | 18,190,221 | 5,409,510 | 32,606,542 |
| Requirements | 53,001,496 | 41,226,519 | 51,253,439 | 45,407,755 | 44,107,771 | 48,039,541 | 53,971,760 | 52,139,626 | 45,950,219 | 45,907,413 | 44,732,954 | 54,756,682 | 507,914,722 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 406,170,864 | 397,937,520 | 377,473,416 | 340,336,102 | 361,355,197 | 364,212,352 | 391,025,817 | 422,051,813 | 384,031,111 | 336,740,410 | 345,935,161 | 300,505,257 | 4,514,425,790 |
| Company Use | 981,761 | 1,128,304 | 951,775 | 713,465 | 522,376 | 465,571 | 425,844 | 915,060 | 466,267 | 493,267 | 859,107 | 879,107 | 11,726,390 |
| Losses and Unbilled | 15,371,519 | -16,817,245 | 22,536,475 | -1,029,713 | 21,512,207 | 39,420,651 | 52,466,279 | 9,442,089 | -19,482,639 | 30,479,166 | 26,706,822 | 21,391,198 | 174,726,305 |
| Requirements | 423,225,423 | 364,900,157 | 401,501,846 | 361,019,801 | 363,639,706 | 396,298,601 | 442,710,161 | 432,010,606 | 367,035,142 | 359,725,823 | 387,204,053 | 410,765,551 | 4,719,405,401 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -282,414 | 1,018,880 | 2,542,420 | 1,746,226 | 3,956,376 | 707,087 | 1,427,743 | 2,670,751 | 1,329,503 | 1,333,577 | 2,170,759 | 3,054,520 | 22,551,943 |
| External | 63 | 452,422 | -544,941 | 713,465 | 376,926 | 526,368 | 515,586 | 714,153 | 194,555 | 1,562,160 | 1,131,730 | 595,240 | 6,053,537 |
| Total | -282,351 | -2,361,072 | 3,012,469 | 2,463,735 | 6,471,747 | 944,390 | 1,943,287 | 3,393,064 | 1,944,044 | 2,394,577 | 3,302,400 | 3,449,746 | 35,429,400 |
| **TOTAL STANDARD OFFER** | 422,941,272 | 386,401,931 | 404,514,257 | 362,503,426 | 386,111,531 | 397,243,087 | 444,653,428 | 435,403,750 | 367,779,206 | 372,122,402 | 370,822,041 | 414,235,323 | 4,740,504,081 |

-12-

# APPENDIX 3

## STANDARD OFFER FUEL INDEX

TCPM007431

The Companies have a Fuel Adjustment mechanism in their respective retail Standard Offer Service tariffs which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulfur) and natural gas after 1999. This fuel adjustment mechanism is subject to continued regulatory supervision and approval which allows the Companies to collect such revenues from their retail customers taking Standard Offer Service. The formula and indices used for calculating such revenues are also subject to regulatory change.

Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels.

The retail Standard Offer rate in effect for a given month is multiplied by a "Fuel Adjustment Multiplier" that is set equal to 1.0 and thus has no impact unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in *The Wall Street Journal*, expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No.6 oil into New York harbor, as reported in *Platt's Oilgram U.S. Marketscan* in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies for approval. Upon regulatory approval, such indices will be used for calculating Fuel Adjustment revenues in accordance with the order(s) and shall be incorporated into the terms of the retail Standard Offer Service tariffs.

TCPM007432

# Tab 12
# (2 of 2)

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment Multiplier for the billing month is determined according to the following formula:

Fuel
Adjustment = $\dfrac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + 0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$
Multiplier

where:   Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment Multiplier would be:*

$$\frac{(\$3.50 + \$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate is increased by this Fuel Adjustment Multiplier for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

The incremental revenues attributable to the Customer Rate Fuel Adjustment mechanism will be allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier in the applicable billing month, pursuant to Article 5 of the Standard Offer Service Agreement.

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment Multiplier determined.

# APPENDIX 4

## PROPOSAL BID FORMS

TCPM007434

Appendix 1

### Standard Offer Service
### Project Proposal Bid Form

Bidder Name: _____

Authorized Contact Person: _____

Mailing Address: _____

_____

City/State/Zip: _____

_____

Telephone Number: _____

Facsimile Number: _____

E-Mail Address: _____

Legal Description of Bidder: _____

_____

_____

Description of Affiliations: _____

_____

_____

_____

Is Bidder a NEPOOL Member: _____ _____

Yes    No

If No, please identify the NEPOOL Member that the Bidder has a contract with that will include the Standard Offer Load in their Own-load dispatch.

Entity Name: _____

Contact Person: _____

Telephone Number: _____

Facsimile Number: _____

Is Bidder Registered as a Non-Regulated Power Supplier in Rhode Island?

_____ _____
Yes    No

Is Bidder Registered as a Non-Regulated Power Supplier in Massachusetts?

Yes    No

Does the Bidder have changes to the Standard Offer Service Agreement?

_____

_____

_____

_____

( attach additional sheets as required)

02/27/98

TCPM007435

# Appendix 1

## Standard Offer Service
## Project Proposal Bid Form

| | Calendar Year | (a) Standard Offer Wholesale Rate ($/kwh) | (b) % Discount | (c) Bid Rate (a) x (b) ($/kwh) | (d) % Standard Offer Load |
|---|---|---|---|---|---|
| Option 1 | 1998 | | | | |
| | | | | | |
| Option 2 | 1999 | | | | |
| | 2000 | | | | |
| | 2001 | | | | |
| | 2002 | | | | |
| | 2003 | | | | |
| | 2004 | | | | |

Note:

The Standard Offer Wholesale rate and resulting Bid Rate will be paid based on actual energy delivered to the meters of those customers taking Standard Offer Service under the Companies Standard Offer tarriffs.

The Calendar Year for Option 1 is from June 1, 1998 through December 31, 1998.

02/27/98

TCPM007436

# APPENDIX 5

## DRAFT STANDARD OFFER
## SERVICE AGREEMENT

TCPM007437

Appendix 5   Standard Offer Service Agreement

Standard Offer Service Agreement

between

# Blackstone Valley Electric Company

# Eastern Edison Company

# Newport Electric Corporation
# and

_____

Dated _____

3/2/98

TCPM007438

# TABLE OF CONTENTS

Page

ARTICLE 1.    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 2.    Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 3.    Supplier Responsibilities . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 4.    Estimation of Hourly Loads and Reporting to
              the ISO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARTICLE 5.    Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 6.    Billing and Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE 7.    Security Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE 8.    Events of Default, Liability, Relationship of
              the Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 9.    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 10.   Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 11.   Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE 12.   Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE 13.   Resolution of Disputes . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE 14.   Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE 15.   Severability of Provisions . . . . . . . . . . . . . . . . . . . . 13

ARTICLE 16.   Accounts and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE 17.   Limitations on Liability and Indemnification . . . 13

ARTICLE 18.   Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE 19.   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE 20.   Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Appendix A Schedule of Supplier's Share of Offer Service and Delivered Energy Price

TCPM007439

## STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this _____ day of _____ _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and _____

_____
_____
_____, ("Supplier"), on the other hand.

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1.    Definitions.

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Bid Price" shall mean the Standard Offer Wholesale Price multiplied by one minus the Supplier's Discount for each of the calendar years as shown in Appendix A.

- 1 -

TCPM007440

"Commencement Date of Service" shall mean 12:01 A.M. on

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"Discount" shall mean the percentage discount off the Standard Offer Wholesale Price of electricity, which discount is offered by Supplier for a given Contract Year as determined through the Company's Standard Offer auction.

"D.T.E." shall mean the Massachusetts Department of Energy and Telecommunications, formerly the Department of Public Utilities.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B. The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

TCPM007441

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.    Term.

The term of this Agreement shall begin on the Commencement Date of Service and end at 11:59 p.m. on December 31, 2004, unless terminated sooner in accordance with Article 8 or 9.

ARTICLE 3. Supplier Responsibilities.

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

-3-

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

ARTICLE 4. <u>Estimation of Hourly Loads and Reporting to the ISO</u>.

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

TCPM007443

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

At the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, less losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.    <u>Price.</u>

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price + Fuel Adjustment Factor

where:    Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

TCPM007444

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6.    Billing and Payments.

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5.  The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 13 of this Agreement.  Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data.  Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment.

TCPM007445

ARTICLE 7.    <u>Security Provisions.</u>

*(Applicable to Option 2 Full Term Standard Offer)*

As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n) = SF \times STDL(n-1) \times \{ \; (PSTD(n) \times TD(n)) \\ + (PSTD(n+1) \times TD(n+1)) \\ + (PSTD(n+2) \times TD(n+2)) + \ldots + \\ + (PSTD(2004) \times TD(2004)) \; \}$$

Where:

$SD(n)$     is the Security Deposit in Contract Year (n)

$SF$     is the Security Fee equal to $10.00/MWh

$STDL(n-1)$ is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year (n-1), expressed in MWh. In 1997, STDL shall be 4,500,000 MWh.

$PSTD(n)$     is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n)

$TD(n)$     is the Transition Discount in Contract Year (n), calculated as follows:

$TD(n)$     $= 1.00$
$TD(n+1)$   $= (7-1)/7 = 0.857$
$TD(n+2)$   $= (7-2)/7 = 0.714$
$TD(n+3)$   $= (7-3)/7 = 0.571$
$TD(n+4)$   $= (7-4)/7 = 0.429$
$TD(n+5)$   $= (7-5)/7 = 0.286$
$TD(n+6)$   $= (7-6)/7 = 0.143$

To secure the above amounts, Supplier shall provide a letter of credit, performance bond, or a parent guarantee in a form acceptable to Company. The bank issuing such letter of credit on behalf of a Supplier must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. If a performance bond is provided it is required that each surety company issuing such performance bond on behalf of a Supplier must maintain a rating of "B+" or better from A.M. Best Company. If a parent guarantee is provided the parent company must maintain investment grade long-term bond ratings of at least BBB- by Standard and Poor's Rating Service or Baa3 by Moody's Investors Service.

TCPM007446

The Performance Letter of Credit or Bond, if not issued for the full term of the Supplier's Standard Offer Service obligation, shall be renewed on an annual basis or replaced and superseded by a like kind of surety at least thirty (30) days prior to the expiration of such prior surety on a continuing basis to the termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial security may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 for the remaining term of this Agreement.

ARTICLE 8.    Events of Default, Liability, Relationship of the Companies.

(1)  Unless excused by a Force Majeure as described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

(a)  Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)  Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c)  Failure of Supplier to maintain any of the security requirements outlined in Article 7 and such failure is not cured or rectified within five (5) days after notice thereof from the Companies.

(2)  Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default.  In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint.  Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

TCPM007447

(3)   Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security amounts calculated pursuant to Article 7 and regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the financial surety used to secure such amounts. The Parties expressly agree that the amounts set forth in the financial surety documentation do not constitute liquidated damages.  In addition to the financial surety amounts, the Supplier shall be liable to the Companies for any direct damages resulting from an Event of Default, including replacement power costs incremental to the Bid Price. The Companies may pursue any remedies or other damages provided for under law, including indirect, consequential, reliance and incidental damages, and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9.    Termination.

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier.

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide financial surety to the Companies pursuant to Article 7 shall be terminated.

ARTICLE 10.    Force Majeure.

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure.  A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having

- 9 -

TCPM007448

jurisdiction thereof, but only if and to the extent that the event directly and adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating any generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)   The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b)   The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

(c)   The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d)   The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.


ARTICLE 11.   Assignment.

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (I) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can

- 10 -

TCPM007449

meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 12.    Successors and Assigns.

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 13.    Resolution of Disputes.

Subject to Section 3 of Article 8, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 13 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (c) of Article 8, notice of failure to comply with, observe or perform this Agreement or to maintain any of the security requirements under Article 7 to Supplier, and upon failure to cure or rectify by Supplier, exercise their rights under the financial surety. Supplier, however, may dispute the exercise by the Companies of their rights under the financial surety, under this Article 13, after such exercise.

TCPM007450

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall be provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

TCPM007451

ARTICLE 14.     Interpretation.

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 15.     Severability of Provisions.

Subject to the provisions of Article 14 above, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 16.     Accounts and Records.

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 17.     Limitations on Liability and Indemnification.

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all third party damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the negligent acts or omissions of the indemnifying Party's employees or agents.

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

- 13 -

TCPM007452

ARTICLE 18.    <u>Regulation.</u>

(a)  This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided</u>, <u>however</u>, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)  This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules").  If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule.  If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 19.    <u>Notices.</u>

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

<u>To Companies</u>:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

<u>To Supplier</u>:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

TCPM007453

ARTICLE 20.    <u>Miscellaneous.</u>

(a)  Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)  Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)  Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)  This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)  Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)  Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)  Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

TCPM007454

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:          Supplier's NAME

By:_____

On Behalf of the Companies:

Blackstone:        BLACKSTONE VALLEY ELECTRIC COMPANY

By:_____

Eastern:           EASTERN EDISON COMPANY

By:_____

Newport:           NEWPORT ELECTRIC CORPORATION

By:_____

TCPM007455

APPENDIX A

SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY
AND
PRICE

| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 cents/kWh | | |
| 1999 | | 3.5 cents/kWh | | |
| 2000 | | 3.8 cents/kWh | | |
| 2001 | | 3.8 cents/kWh | | |
| 2002 | | 4.2 cents/kWh | | |
| 2003 | | 4.7 cents/kWh | | |
| 2004 | | 5.1 cents/kWh | | |

TCPM007456

# APPENDIX 6

## FORM OF PERFORMANCE SURETY DOCUMENTS

TCPM007457

Form of Performance Surety Letter of Credit

Performance surety provided in the form of a letter of credit must be in substantially the form given below.

Irrevocable Standby Letter of Credit    Date:(         )

BENEFICIARY                    Credit Number: (      )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

    BY ORDER OF:
                    (Supplier name and address)

                    or (Guarantor name and address)

    We hereby open in your favor our Irrevocable Standby Letter
of Credit for the account of (the Supplier)[(the Guarantor) on
behalf of (the Supplier)]for a sum or sums not exceeding a
total of US DOLLARS $xx,xxx.xx(written dollar amount AND xx/100
U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES
effective(date)and expiring on (date).

Draft(s) must be accompanied by:

    1.  Your written letter requesting payment under this
        Letter of Credit signed by a representative of Eastern
        Edison Company, Blackstone Valley Electric Company, and
        Newport Electric Corporation ("the EUA Companies").
        Such letter from the EUA Companies shall include a
        statement of the dollar amount due to the EUA
        Companies, pursuant to the obligations of
        (Supplier/Guarantor)as set forth in the Standard Offer
        Service Agreement by and between (Supplier/Guarantor)
        and the EUA Companies.

Partial drawings are permitted under this Letter of Credit.

Each draft must bear upon its face the clause "Drawn under
Letter of Credit No. (    .    ) dated (         ) of the
(Bank)."

We agree to renew this Letter of Credit automatically for a
period of one (1) year from the initial expiration and each
subsequent expiry date unless the beneficiary has received
by registered or certified mail, return receipt requested,
written notification of our intention not to renew, post
marked no less than thirty (30) days prior to the expiration
of any term.

If this Letter of Credit shall not be extended and the obligation of (Supplier/Guarantor) under the Standard Offer Service Agreement, as secured by this Letter of Credit, remains outstanding, and (Supplier/Guarantor) has failed to provide an amended or substitute Letter of Credit in accordance with your terms and conditions, you may draw upon us forthwith for the full amount of this Letter of Credit by means of your sight draft together with the following document:

Your signed statement certifying that (Supplier/Guarantor) has failed to provide you with a substitute Letter of Credit within fifteen (15) days from the date of your receipt of our notice not to renew.

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before (FILL IN EXPIRATION DATE), or any subsequent expiration date.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name) and, attention (Bank credit operations contact), mentioning our reference number as it appears above. Telephone inquires can be made to (Bank credit operations contact).

Form of Performance Surety Performance Bond

Performance surety provided in the form of a performance bond must be in substantially the form given below.

PERFORMANCE BOND    NO. [        ].

KNOW ALL MEN BY THESE PRESENTS, that ( Prospective Supplier or Guarantor(s) name(s)) as Principal, and ( Surety Company name ) as Surety, are held firmly bound unto Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation as Obligees in the sum of [dollars] lawful money of the United States of America, to be paid to the Obligees, for which payment, well and truly to be made, we bind ourselves, our respective heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has entered a written Standard Offer Service Agreement dated (        ) (the "Agreement") with the Obligees for the delivery of requirements electric service (the "Standard Offer Service").

NOW THEREFORE, the condition of this obligation is such that, if the Principal shall promptly and faithfully perform delivery of the Standard Offer Service pursuant to the undertakings, covenants, terms and conditions of the Agreement, then this obligation shall become null and void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to, or for the use or benefit of anyone other than the named Obligees.

Whenever the Principal shall be declared by the Obligees to be in default in relation to the Principal's obligations under the Agreement, the Surety shall:

1. Immediately upon the presentation by the Obligees to the Surety of a Notice of Claim stating that the Principal is in default of Principal's obligations under the Agreement, pay to the Obligees such dollar amount due to the Obligees under the Agreement.

In witness whereof we hereunto set our hands and seals this ( ) day of (        ), A.D. 19( ).
(                    )
    (Principal)

```
            by: (                    ) (seal)
               (                    )
                      (Surety)
            by: (                    ) (seal)
```

TCPM007461

## GUARANTY

1.(a)    Reference is made to the Standard Offer Service Agreement dated as of
_____ 1998 (the "Agreement") between Blackstone Valley
Electric Company, Newport Electric Corporation, and Eastern Edison Company
(collectively the "Companies") on the one hand, and _____
(the "Supplier"), on the other hand. For good and valuable consideration received,
_____, (the "Guarantors") hereby
irrevocably and unconditionally jointly and severally guarantee to the Companies and
their successors and assigns that the Supplier shall perform all of its obligations under the
Agreement, including, but not limited to, the delivery of electric service and the due and
punctual payment of all amounts required to be paid by the Supplier pursuant to Article 7
of the Agreement; and insofar as the Guarantors are able, performance and observance of
and compliance with all other obligations, covenants, and undertakings of the Supplier
contained in the Agreement and any other agreement or instrument relating thereto
(collectively, the "Obligations"), at the times and in the manner provided therein. This
Guaranty shall be an absolute, unconditional, present and continuing guaranty of payment
and performance (not of collection or collectibility) which shall remain in full force and
effect until each and all of the Obligations guaranteed hereunder shall have been fully and
satisfactorily discharged in accordance with the terms and provisions of the Agreement
and any other agreement or instrument relating thereto, and that its undertakings
hereunder are not contingent upon the bringing of any action against the Supplier or any
other person or entity or resorting to any security or exercise or assertion of any other
right or remedy against the Supplier or any other person or entity, and Guarantor hereby
expressly waives any claim that its undertakings hereunder are so contingent.

1.(b)    Notwithstanding Section 1(a) or any other paragraph hereof:

     i) the Guarantors' liability hereunder shall be and is specifically limited to
payments or performance expressly required by the Supplier in accordance with
the Obligations (even if such payments are deemed to be damages) and except to
the extent specifically provided in the Agreement and any other agreement or
instrument relating thereto, in no event shall the Guarantors be subject hereunder
to consequential, exemplary, equitable, loss of profits, punitive, tort, or any other
damages, costs, or attorney's fees.

2.    The liability of the Guarantor under this Guaranty shall be absolute, unconditional
and irrevocable, irrespective of:

    (a)    any change in time, manner or place of payment of, or in any other term
of, all or any of the Obligations or any other amendment or waiver of, or
any consent to departure from, the Agreement or any other agreement or
instrument relating thereto;

    (b)    any change in ownership of the Guarantor or the Supplier; or

(c)    any bankruptcy, insolvency or reorganization of, or other similar proceedings involving the Supplier.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by the Companies upon the insolvency, bankruptcy or reorganization of the Supplier or otherwise, all as though such payment had not been made.

3.    The Guarantor hereby irrevocably, unconditionally and expressly waives, to the fullest extent permitted by applicable law, promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Companies protect, secure or perfect any security interest or exhaust any right or first proceed against the Supplier or any other person or entity.

4.    This Guaranty constitutes a primary obligation of the Guarantor and is a continuing guaranty and shall (a) be binding upon the Guarantor and its successors and assigns and (b) inure to the benefit of and be enforceable by the Companies and their successors and assigns.

5.    Upon payment of all Obligations owing to the Companies, the Guarantors shall be subrogated to the rights of the Companies against the Supplier.

6.    This Guarantee may be terminated upon the later of February 28, 2005, or such time as all Obligations incurred prior to such termination have been satisfied.

7.    This Guarantee shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and the Guarantors hereto submit to the non-exclusive jurisdiction of the courts of the Commonwealth of Massachusetts or of the federal courts located in Boston, Massachusetts, exclusively, without request for arbitration. Process shall be made by certified mail.

[GUARANTOR]


By:
Name:
Title:


G:\STDOFFER\RFP\GUARANTY.DOC

TCPM007464

# Tab 13
# (1 of 2)

APR. -03' 98 (FRI) 17:43    EASTERN UTILITIES                    TEL:508-559-6125              P. 001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-559-6125



EXHIBIT
59

To: S. McMaster          Date: 4/3

Fax #: _____     Pages: 22
                          (including cover page)

From: M. Hirsh

Subject: Redline Agreements

COMMENTS: Incorporates our discussions yesterday. We are OK with all ~~the~~ in concept — may want to tweak the words a bit. We have placed right of TCPL to terminate in Article 8 of Standard Offer Agreement. We agree to accept this but seek a comparable right to terminate our obligation

ANY PROBLEMS OR QUESTIONS, PLEASE CALL _____

AT (508) 559-2000, EXT. _____

to sell equity if TCPL is in default of either PPA Transfer of Standard offer, prior to equity closing.

This document is coming to you in three parts. Please make sure that Alex finds a copy.

TCPM 000476

APR. -03' 98(FRI) 17:43    EASTERN UTILITIES         TEL.508-559-6125         P. 002

ASSET PURCHASE AGREEMENT

BY AND AMONG

MONTAUP ELECTRIC COMPANY

AND

TRANSCANADA POWER MARKETING LTD.

————, 1998

————————————

TCPM 000477

### ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of ____, 1998, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the *"Seller"*), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the *"Buyer"*).

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell, the Purchased Assets upon the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

1.1 *Definitions.* (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

(1)    *"Affiliate"* has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(2)    *"Ancillary Agreements"* mean the Wholesale Standard Offer Agreement, the Instrument of Assignment and Assumption and the PPA Transfer Agreement.

(3)    *" Wholesale Standard Offer Agreement"* means the Wholesale Standard Offer Agreement between the Retail Companies and the Buyer, substantially in the form of Exhibit A hereto, relating to Standard Offer Service.

(4)    *"Business Day"* means any day other than Saturday, Sunday and any day which is a legal holiday or a day on which banking institutions in Boston, Massachusetts are authorized by law or other governmental action to close.

(5)    *"Buyer Representatives"* means the Buyer's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

(6)    *"Code"* means the Internal Revenue Code of 1986, as amended.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          2

TCPM 000478

(7)    *"Confidentiality Agreement"* means the Confidentiality Agreement, among the Seller, Blackstone Valley Electric Company, Newport Electric Corporation, Eastern Utilities Associates and TransCanada Energy Ltd.

(8)    *"Encumbrances"* means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

(9)    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

(10)    *"Federal Power Act"* means the Federal Power Act of 1935, as amended.

(11)    *"FERC"* means the Federal Energy Regulatory Commission.

(12)    *"Holding Company Act"* means the Public Utility Holding Company Act of 1935, as amended.

(13)    *"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(14)    *"Indenture"* means the Brockton Edison Company Indenture of First Mortgage and Deed of Trust dated as of September 1, 1948, as supplemented and modified.

(15)    *"Instrument of Assignment and Assumption"* means the Instrument of Assignment and Assumption  attached as of Exhibit B hereto relating to the assignment by the Seller and the assumption by the Buyer of all of the rights, title, interests, liabilities and obligations of the Seller, in, to and under the PPA.

(16)    *"Material Adverse Effect"* means any change in or effect on the Purchased Assets after the date of this Agreement that is materially adverse to the Purchased Assets, taken as a whole, other than (i) any change or effect resulting from changes in the international, national, regional or local wholesale or retail markets for electric power, (ii) any change or effect resulting from changes in the international, national, regional or local markets for any fuel utilized in connection with the Purchased Assets, (iii) any change or effect resulting from changes in the North American, national, regional or local electric transmission systems and (iv) any materially adverse change in or effect on the Purchased Assets which is cured (including by the payment of money) by the Seller before the Termination Date.

(17)    *"MDTE"* means the Massachusetts Department of Telecommunications and Energy (formerly the Department of Public Utilities.)

(18)    *"NHPUC"* means the New Hampshire Public Utility Commission.

TCPM 000479

(19)   *"Permitted Encumbrances"* means (i) any Encumbrances not created by the Seller or resulting from actions by or against the Seller; (ii) all exceptions, restrictions, easements, charges, rights of way and monetary and non-monetary encumbrances which are matters of record or are set forth in an applicable FERC project license, except for such encumbrances which secure indebtedness; (iii) with respect to any date before the Closing Date, Encumbrances created by the Indenture; (iv) statutory liens for current taxes or assessments not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (v) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Seller or the validity of which are being contested in good faith by appropriate proceedings; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations by governmental authorities; and (vii) such other liens, imperfections in or failure of title, charges, easements, restrictions and encumbrances which do not, in any material respect, affect the Buyer's rights under the Purchased Assets.

(20)   *"Person"* means any individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization and a governmental entity or any department or agency thereof.

(21)   *"PPA"* means the agreement, or, if more than one agreement, means collectively, the agreements listed on Schedule 1.1(a) hereto.

(22)   *"PPA Transfer Agreement"* means the PPA Transfer Agreement, between the Seller and the Buyer, attached as Exhibit C hereto.

(23)   *"Purchased Assets"* means all right, title and interests of the Seller in and to and all liabilities and obligations of the Seller under the PPA.

(24)   *"Retail Companies"* means, as applicable, each, any or all of Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation.

(25)   *"RIPUC"* means the Rhode Island Public Utilities Commission.

(26)   *"SEC"* means the Securities and Exchange Commission.

(27)   *"Securities Act"* means the Securities Act of 1933, as amended.

(28)   *"Standard Offer Service"* means the electric service, if any, required to be provided by one or more of the Retail Companies to its retail customers who do not elect to purchase electricity from an alternative supplier in the market.

(29)   *"Taxes"* means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority,

TCPM 000480

including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions attributable thereto.

       (30)   *"VTPSB"* means the Vermont Public Service Board.

       (b)   Each of the following terms has the meaning specified in the Section set forth opposite such term:

| <u>Term</u> | <u>Section</u> |
| --- | --- |
| Buyer | Recitals |
| Buyer Required Regulatory Approvals | 6.3(b) |
| Closing | 4.1 |
| Closing Conditions | 4.1 |
| Closing Date | 4.1 |
| Direct Claim | 9.2(c) |
| Effective Date | 4.1 |
| Final Order | 8.1(c) |
| Indemnifiable Loss | 9.1(a) |
| Indemnifying Party | 9.1(d) |
| Indemnitee | 9.1(c) |
| Permits | 5.18 |
| Purchase Price | 3.1 |
| Seller | Recitals |
| Seller Required Regulatory Approvals | 5.3(b) |
| Termination Date | 10.1(b) |
| Third Party Claim | 9.2(a) |

TCPM 000481

## ARTICLE II

### PURCHASE AND SALE

2.1 *The Sale*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), the Purchased Assets.

## ARTICLE III

### PURCHASE PRICE

3.1 *Purchase Price*. The purchase price for the Purchased Assets shall be one dollar and other good and valuable consideration (the "Purchase Price").

## ARTICLE IV

### THE CLOSING

4.1 *Time and Place of Closing*. Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement (the "*Closing Conditions*"), the closing of the sale of the Purchased Assets contemplated by this Agreement (the "*Closing*") will take place at the offices of McDermott, Will & Emery, 75 State Street, Suite 1700, Boston, MA 02109-1807 at 10:00 A.M. (local time) on such date as the parties may agree, which date is as soon as practicable, but no later than fifteen (15) Business Days, following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the parties may agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "*Closing Date.*." The Ancillary Agreements will become effective at midnight on the last day of the month following the eClosing dDate (the "Effective Date"), but in no event earlier than midnight on December 31, 1998.

4.2 *Payment of Purchase Price*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Purchased Assets, the Buyer will pay or cause to be paid to the Seller at the Closing the Purchase Price.

4.3 *Deliveries by Seller*. At the Closing, the Seller will deliver to the Buyer the following items:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS                6

TCPM 000482

(a) The Instrument of Assignment and Assumption, duly executed by the Seller;

(b) All consents, waivers or approvals obtained by the Seller with respect to the Purchased Assets or the consummation of the transactions connected to the sale of the Purchased Assets, as the case may be, contemplated by this Agreement, to the extent specifically required hereunder;

(c) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Seller;

(d) An opinion of counsel and certificates (as contemplated by Section 8.2) with respect to the Purchased Assets; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Buyer and its counsel, in connection herewith.

4.4 *Deliveries by the Buyer*. At the Closing, the Buyer will deliver to the Seller the following items:

(a) The Purchase Price by wire transfer of immediately available funds or such other means as are agreed upon by the Seller and the Buyer;

(b) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Buyer;

(c) An opinion of counsel and certificates (as contemplated by Section 8.3) with respect to the Purchased Assets;

(d) The Instrument of Assignment and Assumption, duly executed by the Buyer; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Seller and its counsel, in connection herewith.

4.5 *Wholesale Standard Offer Agreement*. In the event Unsubscribed Standard Offer Service (as defined in the Wholesale Standard Offer Agreement) shall be zero on the Closing Date, neither the Seller nor the Buyer shall be required to execute and deliver the Wholesale Standard Offer Agreement at the Closing.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          7

TCPM 000483

APR. -03'98(FRI) 17:46   EASTERN UTILITIES      TEL:508-559-6125        P. 009

ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows:

5.1. *Organization; Qualification.* The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller is duly qualified or licensed to do business as foreign corporation and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The Seller has heretofore delivered to the Buyer complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents as currently in effect).

5.2. *Authority Relative to this Agreement.* The Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby. This Agreement and the Ancillary Agreements have been duly and validly executed and delivered by the Seller, and assuming that this Agreement and the Ancillary Agreements constitute valid and binding agreements of the Buyer, subject to the receipt of the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, constitute valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

5.3. *Consents and Approvals; No Violation.* (a) Except for such notices or approvals set forth on Schedule 5.3(a), and other than obtaining the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, neither the execution and delivery of this Agreement and the Ancillary Agreements by the Seller nor the sale by the Seller of the Purchased Assets pursuant to this Agreement and the Ancillary Agreements will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Seller, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except (x) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not in any material respect affect the Buyer's rights under the Purchased Assets or (y) for those requirements which become applicable to the Seller as a result of the

TCPM 000484

specific regulatory status of the Buyer (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which the Buyer (or any of its Affiliates) is or proposes to be engaged; (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller, or any of the Purchased Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which, in the aggregate, would in any material respect affect the Buyer's rights under the Purchased Assets, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation would in any material respect affect the Buyer's rights under the Purchased Assets.

(b)  Except for such notices or approvals set forth on Schedule 5.3(b) (the *"Seller Required Regulatory Approvals"*), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Seller of the transactions contemplated hereby, other than such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, will not, in the aggregate, in any material respect affect the Buyer's rights under the Purchased Assets.

5.4.  *Title and Related Matters*.  Except as set forth in Schedule 5.4 and except for Permitted Encumbrances, the Seller has good and valid title to the Purchased Assets, free and clear of all Encumbrances.

5.5.  *The PPA*.  (a) Except as disclosed in Schedule 5.5(a), the PPA (i) constitutes a valid and binding obligation of the Seller and to the best knowledge of the Seller constitutes a valid and binding obligation of the other parties thereto, (ii) is in full force and effect, and (iii) may be transferred to the Buyer pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder.

(b)  Except as set forth in Schedule 5.5(b), there is not, under the PPA, any default or event which, with notice or lapse of time or both, would constitute a default on the part of the Seller.

5.6. *Litigation*.  There are no claims, actions, or proceedings pending or to the knowledge of Seller, threatened, against the Seller or its Affiliates relating to the Purchased Assets or any such claims, actions or proceedings, the subject matter of which is the Purchased Assets.

TCPM 000485

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

6.1. *Organization*. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted. The Buyer has heretofore delivered to the Seller complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents), as currently in effect.

6.2. *Authority Relative to this Agreement*. The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Seller, subject to the receipt of the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

6.3. *Consents and Approvals; No Violation*. (a) Except as set forth in Schedule 6.3(a), and other than obtaining the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets pursuant to this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except for the failure of which to obtain or make would not materially affect the Buyer's ability to perform its obligations under this Agreement, or (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer or any of its subsidiaries is a party or by which any of their respective assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not materially affect the Buyer's ability to perform its obligations under this Agreement.

TCPM 000486

(b) Except as set forth in Schedule 6.3(b) (the filings and approvals referred to in Schedule 6.3(b) are collectively referred to as the "*Buyer Required Regulatory Approvals*"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Buyer of the transactions contemplated hereby.

6.4. *Regulation as a Utility*. The Buyer is a public utility holding company, exempt from registration, under the Holding Company Act.

## ARTICLE VII

## COVENANTS OF THE PARTIES

7.1. *Conduct of Business of the Company*. During the period from the date of this Agreement to the Closing Date, the Seller will conduct its business with respect to the Purchased Assets according to its ordinary and usual course of business consistent with good industry practice and will not amend (or waive any rights under) the PPA without the Buyer's prior written consent or take any action or fail to take any action that would result in a material breach of the Seller's obligations under the PPA.

7.2. *Access to Information*. (a) Between the date of this Agreement and the Closing Date, the Seller will, during ordinary business hours and upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books and records of the Seller relating to the Purchased Assets; (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request; and (iii) furnish the Buyer, at the Buyer's expense, with such financial and operating data and other information with respect to the Purchased Assets in the Seller's possession as the Buyer may from time to time reasonably request; provided, however, that (A) the Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (B) the Seller need not supply the Buyer with any information which the Seller is under a legal obligation not to supply.

(b) All information furnished to or obtained by the Buyer and the Buyer Representatives pursuant to this Section 7.2 shall be subject to the provisions of the Confidentiality Agreement.

7.3. *Expenses*. Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

7.4. *Further Assurances* (a) Subject to the terms and conditions of this Agreement, each of the parties hereto will use its reasonable commercial efforts to take, or cause

TCPM 000487

to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets pursuant to this Agreement.

(b) Subject to the PPA Transfer Agreement, to the extent that the Seller's rights, title, interests, liabilities and obligations under the PPA may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Seller, at its expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. The Seller and the Buyer agree that if any consent to an assignment of the PPA shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights and obligations under the PPA so that the Buyer would not in effect acquire the benefit of all such rights and obligations, the Seller, to the maximum extent permitted by law and the PPA, shall at the Closing and pursuant to the PPA Transfer Agreement, appoint the Buyer to be the Seller's agent with respect to the PPA, and the Seller shall, to the maximum extent permitted by law and the PPA, enter into such reasonable arrangements with the Buyer as are necessary to provide the Buyer with the benefits and obligations of the PPA. The Seller and the Buyer shall cooperate and shall each use their commercially reasonable efforts after the Closing to obtain an assignment of the PPA to the Buyer.

7.5  *Public Statements*. The parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law and except that the parties may make public announcements, statements or other disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of "Proprietary Information" (as defined in the Confidentiality Agreement).

7.6.  *Consents and Approvals*. (a) The Seller and the Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice the notifications, if any, required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The parties shall consult with each other as to the appropriate time of filing such notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by either of such agencies, and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after each date of filing.

(b) The Seller and the Buyer shall cooperate with each other and (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, necessary or advisable to consummate the transactions contemplated by this Agreement

TCPM 000488

(including, without limitation, the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which the Seller or the Buyer is a party or by which any of them is bound. The Seller shall have the right to review and approve (in its reasonable discretion) in advance all characterizations of the information relating to Purchased Assets, and each of the Seller and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with the transactions contemplated hereby.

7.7. *Fees and Commissions*. The Seller and the Buyer each represent and warrant to the other on its own behalf that no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transaction contemplated hereby by reason of any action taken by the party making such representation. The Seller and the Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees (including the fees described above) incurred by reason of any action taken by such party.

7.8. *Tax Matters*. All transfer and sales taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Buyer, and the Buyer, at its own expense, will file, to the extent required by applicable law. all necessary tax returns and other documentation with respect to all such transfer or sales taxes, and, if required by applicable law, the Seller will join in the execution of any such tax returns or other documentation. Prior to the Closing Date, the Buyer will provide to the Seller, to the extent possible, an appropriate certificate of no tax due from any applicable taxing authorities.

## ARTICLE VIII

## PURCHASED ASSETS CLOSING CONDITIONS

8.1. *Conditions to Each Party's Obligations to Effect the Purchase Transactions*. The respective obligations of each party to effect the sale of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) If applicable, the waiting period under the HSR Act applicable to the consummation of the sale of the Purchased Assets contemplated hereby shall have expired or been terminated;

(b) No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of the Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable best efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall

TCPM 000489

have been enacted by any state or federal government or governmental agency in the United States which prohibits the consummation of the sale of the Purchased Assets;

(c) All material federal, state and local government consents and approvals required for the consummation of the sale of the Purchased Assets, including, without limitation, the Seller Required Regulatory Approvals applicable to the sale of the Purchased Assets and the Buyer Required Regulatory Approvals applicable to the sale of the Purchased Assets, shall have been obtained and become Final Orders (a *"Final Order"* means a final order after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending)) with such terms and conditions as shall have been imposed by the governmental entity issuing such Final Order; and

(d) All consents and approvals for the consummation of the sale of the Purchased Assets contemplated hereby required under the terms of any note, bond, mortgage, indenture, contract or other agreement to which the Seller or the Buyer, or any of their subsidiaries, are a party shall have been obtained, other than those (i) which if not obtained, would not, in the aggregate, have a Material Adverse Effect, or (ii) which are governed by the PPA Transfer Agreement.

8.2. *Conditions to Obligations of the Buyer*. The obligation of the Buyer to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) There shall not have occurred and be continuing a Material Adverse Effect;

(b) The Seller shall have performed and complied with in all material respects the covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed and complied with by the Seller on or prior to the Closing Date, and the representations and warranties of the Seller which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) There shall be no Encumbrances on the Purchased Assets by virtue of the Indenture or otherwise, except for Permitted Encumbrances;

(d) The Buyer shall have received certificates from authorized officers of the Seller, dated the Closing Date, to the effect that, to the best of such officers' knowledge, the conditions set forth in Sections 8.2(a), (b) and (c) have been satisfied;

(e) The Buyer shall have received an opinion from McDermott, Will & Emery, counsel for the Seller, dated the Closing Date and satisfactory in form and substance to the Buyer and its counsel, substantially to the effect that:

TCPM 000490

(1) the Seller is a corporation organized, existing and in good standing under the laws of its state of incorporation and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Seller;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Seller and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals are obtained) are valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller will not constitute a violation of the Certificates of Incorporation or Bylaws (or similar governing documents), as in effect on the Closing Date, of the Seller;

(4) the Bill of Sale and other documents described in Section 4.3 are in proper form to transfer to the Buyer title to the Purchased Assets; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Seller of the Closing other than (i) the Seller Required Regulatory Approvals, all of such Seller Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority, and (ii) such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, would not, in the aggregate have a Material Adverse Effect.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States or the laws of Massachusetts, such counsel may rely upon opinions of counsel admitted in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of fact upon certificates furnished by the Seller and appropriate officers and directors of the Seller and by public officials.

8.3. *Conditions to Obligations of the Seller*. The obligation of the Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          15

(a) The Buyer shall have performed in all material respects its covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed on or prior to the Closing Date;

(b) The representations and warranties of the Buyer which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) The Seller shall have received a certificate from an authorized officer of the Buyer, dated the Closing Date, to the effect that, to the best of such officer's knowledge, the conditions set forth in Sections 8.3(a) and (b) have been satisfied;

(d) The FERC shall have approved the Stipulations and Agreements filed in FERC Docket No. ER97-3127-000 by and between the Office of the Attorney General of Massachusetts, the Division of Energy Resources, Eastern Edison Electric Company and the Seller, dated October 29, 1997; Docket No. ER97-2800-000 by and between the RIPUC, the Rhode Island Division of Public Utilities and Carriers, Blackstone Electric Company, the Seller and Newport Electric Corporation; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Pascoag Fire District of Rhode Island; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Gas and Electric Department of the Town of Middleborough; and Docket No. ER97-2338-000 between the Seller and the Taunton Municipal Lighting Plant, Pascoag Fire District of Rhode Island and the Gas and Electric Department of the Town of Middleborough; and said Stipulations and Agreements shall be and shall continue to be in full force and effect; Stipulations and Agreements shall be and shall continue to be in full force and effect; and

(e) The Seller shall have received an opinion from Shearman & Sterling, counsel for the Buyer (or other counsel reasonably satisfactory to Seller), dated the Closing Date and satisfactory in form and substance to the Seller and its counsel, substantially to the effect that:

(1) the Buyer is a corporation organized, existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Buyer;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Buyer and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approval are obtained) are valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their terms,

TCPM 000492

except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Buyer will not constitute a violation of the Certificate of Incorporation or Bylaws on the Closing Date (or other similar governing documents), as in effect, of the Buyer;

(4) the Instrument of Assignment and Assumption and other instruments described in Section 4.4 are in proper form for the Buyer to assume the Assumed Liabilities; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Buyer of the Closing other than the Buyer Required Regulatory Approvals, all of such Buyer Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States and the laws of New York, such counsel may rely upon opinions of counsel admitted to practices in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of facts upon certificates furnished by appropriate officers and directors of the Buyer and its subsidiaries and by public officials.

ARTICLE IX

INDEMNIFICATION

9.1. *Indemnification*. (a) The Seller will indemnify, defend and hold harmless the Buyer from and against any and all claims, demands or suits (by any Person), losses, liabilities, damages (including consequential or special damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance that is actually recovered (each, an *"Indemnifiable Loss"*), asserted against or suffered by the Buyer relating to, resulting from or arising out of (i) any breach by the Seller of any representation, warranty, covenant or agreement of the Seller contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(b) The Buyer will indemnify, defend and hold harmless the Seller from and against any and all Indemnifiable Losses asserted against or suffered by the Seller relating to,

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          17

TCPM 000493

resulting from or arising out of (i) any breach by the Buyer of any representation, warranty, covenant or agreement of the Buyer contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

      (c)  Any Person entitled to receive indemnification under this Agreement (an *"Indemnitee"*) having a claim under these indemnification provisions shall make a good faith effort to recover all losses, damages, costs and expenses from insurers of such Indemnitee under applicable insurance policies so as to reduce the amount of any Indemnifiable Loss  hereunder. The amount of any Indemnifiable Loss shall be reduced (i) to the extent that Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss (after taking into account the costs incurred in collecting such insurance and any reasonable likely increase in premiums resulting from such claim) and (ii) to take into account any net Tax benefit actually recognized by the Indemnitee arising from the recognition of the Indemnifiable Loss and any payment actually received with respect to an Indemnifiable Loss.

      (d)  The expiration, termination or extinguishment of any covenant or agreement shall not affect the parties' obligations under this Section 9.1 if the Indemnitee provided the Person required to provide indemnification under this Agreement (the *"Indemnifying Party"*) with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

      (e) Except in the case of fraud and intentional breaches of this Agreement, the rights and remedies of the Seller and the Buyer under this Article IX are exclusive and in lieu of any and all other rights and remedies which the Seller and the Buyer may have under this Agreement or otherwise for monetary relief with respect to (i) any breach or failure to perform any covenant or agreement set forth in this Agreement or (ii) any relationship resulting from the PPA Transfer Agreement.

      9.2.  *Defense of Claims*.  (a)  If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any Person who is not a party to this Agreement or any Affiliate of a party to this Agreement (a *"Third Party Claim"*) with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than twenty (20) calendar days after the Indemnitee's receipt of notice of such Third Party Claim.  Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee.  The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, and the Indemnitee will cooperate in good faith in such defense at such Indemnitee's own expense.

      (b) If within ten (10) calendar days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claim the Indemnitee receives written notice from the

TCPM 000494

Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in the last sentence of Section 9.2(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable expenses thereof. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) calendar days after its receipt of such notice, the Indemnitee may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will be the amount of such settlement offer, plus reasonable costs and expenses paid or incurred by the Indemnitee up to the date of such notice.

    (c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a "*Direct Claim*") will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event not later than twenty (20) calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party will have a period of thirty (30) calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such thirty (30) calendar day period, the Indemnifying Party will be deemed to have accepted such claim. If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its rights to indemnification under this Agreement.

    (d) If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the prime rate then in effect of the {Bank of Boston, N.A.}), will promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any indemnity payment, the Indemnifying Party will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided, however, that (i) the Indemnifying Party will then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying

TCPM 000495

04/03/98  16:56  FAX 403 213 3550        TCEM LAW DEPT                          ☒001

```
**************************
***  ACTIVITY REPORT  ***
**************************

TRANSMISSION OK

TX/RX NO.              5029
TTI                   TCEM LAW DEPT
CONNECTION TEL                    3538
CONNECTION ID         EXECUTIVE POWER
START TIME            04/03 16:44
USAGE TIME            12'03
PAGES                   43
RESULT                OK
```

APR. -03' 98(FRI) 17:56   EASTERN UTILITIES          TEL:508-559-6125          P. 001

# FAX TRANSMISSION

**EUA SERVICE CORPORATION**
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
Fax: 508-559-6125

*ALEX POURBAIX*

To: S. McMaster            Date: 4/3

                                      P + 11 - 25 pgs

Fax #: _____     Pages: ~~25~~ (including cover page)

From: M. Irish

Subject: Redline Agreements

COMMENTS: Incorporates our discussions yesterday. We are OK with all in concept - may want to tweak the words a bit. We have placed right of TCPL to terminate in Article 8 of Standard Offer Agreement. We agree to accept this but seek a comparable right to terminate our obligation

TCPM 000432

APR.-03'98(FRI) 17:56    EASTERN UTILITIES                  TEL:508-559-6125                  P.001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-559-6125

To: S. McMaster                      Date: 4/3

                                      P + 11 - 25 pages

Fax #: _____               Pages: ~~25~~
                                      (including cover page)

From: M. (rish)

Subject: Redline Agreements

COMMENTS:
Incorporates our discussions yesterday. We are
OK with all ~~are~~ in concept — may want to tweak
the words a bit. We have placed right of TCPL
to terminate in Article 8 of Standard Offer
Agreement. We agree to accept this but seek a
comparable right to terminate our obligation

ANY PROBLEMS OR QUESTIONS, PLEASE CALL _____

AT (508) 559-2000, ext. _____

to sell equity if TCPL is in default
of either PPA Transfer of Standard offer
prior to equity closing.

This document is coming to you in
three parts. Please make sure that
alex finds a copy.

TCPM 000433

strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

      11.3.  *No Survival*.  Subject to the provisions of Section 10.2, each and every representation, warranty and covenant contained in this Agreement (other than the covenants contained in Sections 7.2(b), 7.3, 7.4, 7.7, 7.8 and in Articles IX and X (which covenants shall expire in accordance with their terms), and the provisions of Article IX with respect to any relationship resulting from the PPA Transfer Agreement and this Article XI which shall survive indefinitely) shall expire with, and be terminated and extinguished by, the consummation of the sale of the Purchased Assets, provided, however, that representations and warranties contained herein shall survive for a period of twenty-four (24) months following closing. None of the Seller, the Buyer or Affiliate of any of them shall be under any liability whatsoever with respect to any such representation, warranty or covenant after such period expires.

      11.4.  *Notices*.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, telexed or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

      (a)  If to the Seller, to:

          c/o EUA Service Corporation
          750 West Center Street
          West Bridgewater, MA 02379
          Facsimile: (508) 559-8932
          Attention:       Donald C. Ryan
                     Manager-Power Resources

          with a copy to:

          McDermott, Will & Emery
          75 State Street
          Suite 1700
          Boston, MA  62109-1807
          Facsimile: (617) 345-5077
          Attention:       Arthur I. Anderson, P.C.

TCPM 000434

(b)  if to the Buyer, to:

        c/o TransCanada Energy Ltd.
        3400, 237 - 4th Avenue S.W.
        Calgary, Alberta, Canada
        T2P 5A4
        Facsimile: (403) 213-3550
        Attention.         Sean D. McMaster

with a copy to:

        Sherman & Sterling
        555 California Street
        San Francisco, CA. 94104
        Facsimile: (415) 616-1199
        Attention:        Christopher D. Dillon

11.5.  *Assignment*.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, other than to an Affiliate, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.6.  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

11.7.  *Counterparts*.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.8.  *Interpretation*.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

11.9.  *Schedules and Exhibits*.  All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

TCPM 000435

11.10. *Entire Agreement*. This Agreement, the Confidentiality Agreement and
the Ancillary Agreements including the Exhibits, Schedules documents, certificates and
instruments referred to herein or therein, embody the entire agreement and understanding of the
parties hereto in respect of the transactions contemplated by this Agreement. There are no
restrictions, promises, representations, warranties, covenants or undertakings, other than those
expressly set forth or referred to herein or therein. It is expressly acknowledged and agreed that
there are no restrictions, promises, representations, warranties, covenants or undertakings
contained in any material made available to the Buyer pursuant to the terms of the Confidentiality
Agreement (including the Information Memorandum, dated July, 1997). This Agreement
supersedes all prior agreements and understandings between the parties with respect to such
transactions other than the Confidentiality Agreement.

IN WITNESS WHEREOF, the Seller and the Buyer have caused this agreement to
be signed by their respective duly authorized officers as of the date first above written.


MONTAUP ELECTRIC COMPANY


By: _____
      Name:
      Title:


TRANSCANADA POWER MARKETING LTD.


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

TCPM 000436

## SCHEDULE 1.1(a)

### PPA Description

"PPA" means, collectively, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated May 14, 1986, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated September 28, 1988, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Newport Electric Corporation, dated May 14, 1986, by and between Ocean State Power and Newport Electric Corporation and the Unit Power Agreement For the Sale of Second Unit Capacity and Energy from Ocean State Power Project to Newport Electric Corporation, dated July 12, 1988, by and between Ocean State Power and Newport Electric Corporation, in each case as amended, modified or supplemented.

TCPM 000437

## SCHEDULE 5.3(a)

### Seller Notices and Approvals

~~Indenture~~

~~Approvals as may be required under the Indenture.~~

PPA

Approvals as may be required under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000438

## SCHEDULE 5.3(b)

### Seller Required Regulatory Approvals

      (i) Any required approvals under the Federal Power Act, (ii) (A) notice by the Seller to, and an order by, the MDTE approving the transactions contemplated by this Agreement, (B) the approval by the RIPUC of the market valuation "implementation methodology" filed in RIPUC Docket 25-92, pursuant to section 39-1-27.4(g) of the Rhode Island General Laws, (C) the approval by the RIPUC of the "Transfer Plan" filed in RIPUC Docket 25-14, pursuant to section 39-1-27(a) of the Rhode Island General Laws, (D) the approval, if required, of the Rhode Island Division of Public Utilities and Carriers, (E) the approval, if required, of the Rhode Island Energy Facilities Sitting Board, ~~(F) if required, notice by the Seller to, and an order by, each of the NHPUC, the VTPSB, the Maine Public Utilities Commission and the Connecticut Department of Public Utility Control approving the sale of the Purchased Assets,~~ (iii) the approval, if required, of the SEC pursuant to the Holding Company Act, (iv) the filings, if required by the Seller and the Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act, and (v) the approval, if required, of the Nuclear Regulatory Commission (the *"NRC"*).

TCPM 000439

## SCHEDULE 5.4

### Exceptions to Seller's Title to the PPA

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000440

APR. -03' 98(FRI) 17:59   EASTERN UTILITIES          TEL:508-559-6125          P. 009

## SCHEDULE 5.5(a)

### Exceptions to the Full Force and Effect of and the Transferability of the PPA

Transferability may be subject to the approval of the counterparties to the PPA and lenders thereto.

TCPM 000441

## SCHEDULE 5.5(b)

### Defaults under the PPA

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000442

# Tab 13
# (2 of 2)

## SCHEDULE 6.3(a)

Buyer Notices and Approvals

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

**TCPM 000443**

## SCHEDULE 6.3(b)

### Buyer Required Regulatory Approvals

Any approvals required under the Federal Power Act.

TCPM 000444

## SCHEDULE 6.4

### Buyer Regulation as a Utility

The Buyer is a public utility holding company exempt
from registration under the Holding Company Act.

TCPM 000445

EXHIBIT B

TO ASSET PURCHASE AGREEMENT

FORM OF INSTRUMENT OF
ASSIGNMENT AND ASSUMPTION

Instrument of Assignment and Assumption (this "Agreement") made, executed and delivered on this day of _____, by and between TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "Buyer") and MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "Seller").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of _____, 199 8 (as amended, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), by and between the Seller and the Buyer, the Seller is concurrently herewith selling, assigning, conveying, transferring and delivering to the Buyer the Purchased Assets (as defined in the Asset Purchase Agreement); and

WHEREAS, the Asset Purchase Agreement requires that the Seller assign all of its right, title and interest in, and that the Buyer assume all liabilities and obligations of the Seller under, the PPA (as defined in the Asset Purchase Agreement);

NOW THEREFORE, in good consideration of these premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Seller and the Buyer agree as follows:

1.    Capitalized terms which are used in this Agreement but are not defined in this Agreement shall have the meaning ascribed to such terms in the Asset Purchase Agreement.

2.    The Seller hereby assigns, transfers and sets over to the Buyer all of the Seller's rights, title and interest in and to the PPA. The assignment effected pursuant to this Section 2 shall be without recourse to and without representation or warranty by the Seller except as specifically provided in the Asset Purchase Agreement.

3.    The Buyer hereby assumes and agrees to pay, perform or discharge in accordance with their terms, to the extent not heretofore paid, performed or discharged, all liabilities and obligations of the Seller under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000446

4.    It is understood and agreed that nothing in this Agreement shall constitute a waiver or release of any claims arising out of the contractual relationships between the Seller and the Buyer.

5.    This Agreement shall inure to the benefit and be enforceable against the respective successors and assigns of the Seller and the Buyer.

6.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws).

7.    This Agreement is delivered pursuant to and is subject to the Asset Purchase Agreement. In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall prevail.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the respective duly authorized officers of the Seller and the Buyer as of the date first above written.

TRANSCANADA POWER MARKETING LTD.


By_____
   Name:
   Title:


By_____
   Name:
   Title:


MONTAUP ELECTRIC COMPANY


By_____
   Name:
   Title:


J:\DATA\CLT\84\31584\064\ASSPURCH.OS

TCPM 000447

EXHIBIT C
TO ASSET PURCHASE AGREEMENT

. PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of _____, 1998 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller"), to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of _____, 1998 (the "APA"), by and between Seller and Asset Purchaser.

1.      The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power   (Montaup) |
| 9/28/88 | Ocean State Power II (Montaup) |
| 5/14/86 | Ocean State Power    (Montaup) |
| 7/12/88 | Ocean State Power II (Montaup) |

1.      A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.      This Agreement shall become effective on the Effective dDate (as defined in Section 12) and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List, and Seller has made payment to Asset Purchaser of amounts owned pursuant to Section 8 below, for the last month in which such a payment is due.

3.      Commencing as of the eEffective dDate of this Agreement, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

4.          (a)  Commencing as of the month following the eEffective dDate of this Agreement, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below. In turn, each month, Seller shall timely pay the Power Seller an amount equal to all amounts properly due to the Power Seller for the preceding month under each Commitment.  For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month.  Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

          (b) Upon the eEffective dDate of this Agreement, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or, at the termination of this Agreement pay to Asset Purchaser, any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the effective date which relate to billing errors or reconciliations of pre-effective date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the eEffective dDate that are attributable to a period prior to the eEffective dDate.

5.          (a)  Effective as of the eEffective dDate of this Agreement, Seller hereby irrevocably and
unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment. Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments.   Seller shall not unreasonably witholdout such consent.

          (b) Seller shall not agree to any amendment to or waiver of rights under a Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of this Section 5.

TCPM 000449

6.      Each party shall be entitled to indemnification under this Agreement to the extendt and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.          (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation.

          (b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, as a condition of any Novation , the Asset Purchaser will require Seller to provide, either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or, if Seller and Buyer do not mutually agree to payment of a lump sum, (ii) a security interest to the Asset Purchaser in a portion to the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is  acceptable to the Asset Purchaser acting reasonably.

8.          (a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed of this Agreement, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

          (b) Commencing as of the month following the effective date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment,

TCPM 000450

and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth is Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c)) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month

(d) To the extent that a Novation is executed with respect to a Commitment , pursuant to Section 7 and Asset Purchaser and Seller agree to a lump-sum payment, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller  to reduce the amount of Seller's retained obligation set forth in Section 8(b). Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by Asset Purchaser and Seller. It is the intention of the parties that the lump-sum payment shall be based on the net present value of the amounts set out in Schedule "A" at a discount rate agreeable to Asset Purchaser and Seller calculated using a discount rate acceptable to Asset Purchaser and Seller acting reasonably and which is reasonable given the remaining term of the amounts payable by the Seller to the Asset Purchaser as set out in Schedule "A", prevailing interest rates for similar financings done at the time of payment of the lump sum and the creditworthiness of Seller at the time of payment of the lump sum.

9.    This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10.    This Agreement, the APA and any other agreement entered into by the parties pursuant to the APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only a written agreement signed by the parties. Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing, (i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned subsidiary (direct or indirect) of TransCanada Pipelines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to Asset Purchaser shall thereafter by

TCPM 000451

deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refiancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof, provided, however, the no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyances, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby otherwise altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11.    All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such such payment.

12.    This Agreement shall be of no force and effect until the Effective Date. If the APA shall have been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA. As used in this Agreement, "Effective Date" shall mean the Effective Date (as defined in the APA).

TCPM 000452

APR. -03' 98 (FRI) 18:04    EASTERN UTILITIES                TEL:508-559-6125                P. 021

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By:_____
   Name:
   Title:

TRANSCANADA POWER MARKETING LTD.

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS                6

TCPM 000453

TABLE OF CONTENTS

ARTICLE I    DEFINITIONS ................................................................... 1
   1.1.    Definitions ...................................................................... 1

ARTICLE II    PURCHASE AND SALE ............................................... 5
   2.1.    The Sale............................................................................ 5

ARTICLE III    PURCHASE PRICE ...................................................... 5
   3.1.    Purchase Price.................................................................. 5

ARTICLE IV    THE CLOSING................................................................ 5
   4.1.    Time and Place of Closing.............................................. 5
   4.2.    Payment of Purchase Price.............................................. 5
   4.3.    Deliveries by Seller.......................................................... 5
   4.4.    Deliveries by the Buyer .................................................. 6
   4.5.    Wholesale Standard Offer Agreement.......................... 6

ARTICLE V    REPRESENTATIONS AND WARRANTIES OF THE SELLER.................. 7
   5.1.    Organization; Qualification............................................ 7
   5.2.    Authority Relative to this Agreement ........................... 7
   5.3.    Consents and Approvals; No Violation........................ 7
   5.4.    Title and Related Matters ...... ....................................... 8
   5.5.    The PPA .......................................................................... 8

ARTICLE VI    REPRESENTATIONS AND WARRANTIES OF THE BUYER.................... 9
   6.1.    Organization .................................................................. 9
   6.2.    Authority Relative to this Agreement ........................... 9
   6.3.    Consents and Approvals; No Violation........................ 9
   6.4.    Regulation as a Utility.................................................... 10

ARTICLE VII    COVENANTS OF THE PARTIES................................. 10
   7.1.    Conduct of Business of the Company........................... 10
   7.2.    Access to Information .................................................... 10
   7.3.    Expenses.......................................................................... 11
   7.4.    Further Assurances......................................................... 11
   7.5.    Public Statements........................................................... 11
   7.6.    Consents and Approvals................................................ 11
   7.7.    Fees and Commissions .................................................. 12
   7.8.    Tax Matters . ... ............................................................... 12

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000454

ARTICLE VIII   PURCHASED ASSETS CLOSING CONDITIONS ...................................... 13
    8.1.   Conditions to Each Party's Obligations to Effect the Purchase
          Transactions.................................................................................... 13
    8.2.   Conditions to Obligations of the Buyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    8.3.   Conditions to Obligations of the Seller. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE IX    INDEMNIFICATION......................................................................... .......... 17
    9.1.   Indemnification ............................................................................... 17
    9.2.   Defense of Claims .................................................................. ................ 18

ARTICLE X     TERMINATION AND ABANDONMENT ................................................ 19
    10.1.  Termination ....................................................................................... 19
    10.2.  Procedure and Effect of Termination ............................................... 20

ARTICLE XI    MISCELLANEOUS PROVISIONS ....................................................... 21
    11.1.  Amendment and Modification ................................ ............................. 21
    11.2.  Waiver of Compliance, Consents...................................................... 21
    11.3.  No Survival........................................................................................ 21
    11.4.  Notices .............................................................................................. 21
    11.5.  Assignment ....................................................................................... 22
    11.6.  Governing Law .................................................................................. 23
    11.7.  Counterparts ...................................................................................... 23
    11.8.  Interpretation ..................................................................................... 23
    11.9.  Schedules and Exhibits. ..................................................................... 23
    11.10. Entire Agreement............................................................................... 23

J:\DATA\CLT\84\31584\064\ASSPURCH.OS

TCPM 000455

## EASTERN UTILITIES ASSOCIATES
## GENERATION BUSINESS DIVESTITURE

|                                                          | Tab |
|----------------------------------------------------------|-----|
| Asset Purchase Agreement                                 | 1   |
| Exhibits to Asset Purchase Agreement                     |     |
| A   Form of Wholesale Standard Offer Agreement | 2 |
| B   Form of Instrument of Assignment and Assumption | 3 |
| C   Form of Interconnection Agreement     | 4   |
| D   Form of PPA Transfer Agreement        | 5   |
| Guaranty                                                 | 6*  |
| Schedules to the Asset Purchase Agreement                | 7   |

---

\* To be provided at a later date, as an addition to this volume.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

**TCPM 000456**

SCHEDULE "A"

### MONTHLY SUPPORT PAYMENTS

For each month, beginning with the Effective Day (prorated in accordance with Section 8(a) of the PPTA), if applicable, the Monthly Support Payment shall be as set out below:

| Calendar Year | Monthly Support Payment |
|---|---|
| 1999 | $ 1,6650,000 |
| 2000 | $1,6650,000 |
| 2001 | $1,542,000 |
| 2002 | $1,542,000 |
| 2003 | $ 870,000 |
| 2004 | $ 870,000 |
| 2005 | $ 870,000 |
| 2006 | $ 870,000 |
| 2007 | $ 870,000 |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000457

APR. -03' 98 (FRI) 18:22    EASTERN UTILITIES                TEL:508-559-6125                P. 001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-559-6125

**To:** S. McMaster

**Date:** 4/3

~~Pt II - 25~~ pgs

**Fax #:** _____

**Pages:** ~~25~~ Pt III - 17 pages
(including cover page)

**From:** M. Irish

**Subject:** Redline Agreements

**COMMENTS:**
Incorporates our discussions yesterday. We are
OK with all ~~~~ in concept — may want to tweak
the words a bit. We have placed right of TCPL
to terminate in Article 8 of Standard Offer
Agreement. We agree to accept this but seek a
comparable right to terminate our obligation

ANY PROBLEMS OR QUESTIONS, PLEASE CALL _____

AT (508) 559-2000, ext. _____

to sell equity if TCPL is in default
of either PPA Transfer of Standard offer,
prior to equity closing.

This document is coming to you in
three parts. Please make sure that
alex finds a copy.

TCPM 000458

Wholesale Standard
Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 3, 1998

TCPM 000459

## TABLE OF CONTENTS

Page

ARTICLE 1. Definitions .......................................................................... 2

ARTICLE 2. Term ........................................................................... 3

ARTICLE 3. Supplier Responsibilities ................................................. 3

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO ............... 4

ARTICLE 5. Price ........................................................................... 5

ARTICLE 6. Billing and Payments ....................................................... 6

ARTICLE 7. Events of Default, Liability, Relationship of the Companies ......... 6

ARTICLE 8. Termination .................................................................. 8

ARTICLE 9. Force Majeure ............................................................... 8

ARTICLE 10. Assignment .................................................................. 9

ARTICLE 11. Successors and Assigns .................................................. 10

ARTICLE 12. Resolution of Disputes .................................................... 10

ARTICLE 13. Interpretation .............................................................. 11

ARTICLE 14. Severability of Provisions ................................................ 11

ARTICLE 15. Accounts and Records .................................................... 11

ARTICLE 16. Limitations on Liability and Indemnification ........................ 11

ARTICLE 17. Regulation .................................................................. 12

ARTICLE 18. Notices ...................................................................... 12

ARTICLE 19. Miscellaneous ............................................................. 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

TCPM 000460

## STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this _____ day of _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated _____; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Standard Offer Service Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 364, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' of the aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

TCPM 000461

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 364, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended from time to time. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.


ARTICLE 2.  Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.


ARTICLE 3.  Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

TCPM 000463

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

TCPM 000464

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

Price = Standard Offer Wholesale Price
        + Fuel Adjustment Factor

Where:      Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein

includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6.  Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date.  Billing and payment disputes shall be handled in accordance with the provisions of Article 12 of this Agreement.  Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data.  Supplier may dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies:

(1)     Unless excused by a Force Majeure as described in Article 9, each of the following events shall be deemed to be an Event of Default hereunder:

(a)     Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)     Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such

TCPM 000466

failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the company resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable. Any contract entered into by the Companies will be deemed commercially reasonable unless Supplier can demonstrate that the Companies paid materially more than the market price for contracts for comparable services and lengths entered into during the same time period.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to reasonable, additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this agreement. The Companies accept the Guarantee attached hereto as reasonable financial surety.

**ARTICLE 8.   Termination/Reimbursement:**

(1)    In addition to the termination rights provided for an Event of Default as provided in Article 7, the Companies may terminate this Agreement, if:

a.  Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

b.  The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; and

c.  Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup Electric Company under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Supplier are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service, in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief to the Supplier. If Supplier determines, acting reasonably, that its costs or obligations have materially increased, and so demonstrates to the Companies, acting reasonably, then the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materiality of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

**ARTICLE 9.   Force Majeure:**

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

TCPM 000468

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)    The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)    The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)    The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)    The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

TCPM 000469

ARTICLE 11. Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. Resolution of Disputes:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

TCPM 000470

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 16. Limitations on Liability and Indemnification:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful

TCPM 000471

misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. Regulation:

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

> To Companies:
> Director, Power Supply
> EUA Service Corporation
> P. O. Box 543
> 750 West Center Street
> West Bridgewater, MA 02379
>
> To Supplier:
> TransCanada Power Marketing Ltd.
> 3400, 237 - 4th Avenue S.W.
> Calgary, Alberta T2P 5A4

TCPM 000472

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

TCPM 000473

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:            TransCanada Power Marketing Ltd.


                     By:_____


On Behalf of the Companies:


Blackstone:          BLACKSTONE VALLEY ELECTRIC COMPANY


                     By:_____


Eastern:             EASTERN EDISON COMPANY


                     By:_____


Newport:             NEWPORT ELECTRIC CORPORATION


                     By:_____


TCPM 000474

## APPENDIX A

### SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
### AND
### STANDARD OFFER WHOLESALE PRICE

### TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

* Standard Offer Service for Eastern Edison terminates
  at 12:00 midnight on December 31, 2004.

Option To Reduce Suppliers Share

With 30 days written notice, the Companies may reduce Supplier's percentage share of Standard Offer Service shown above; provided however, that once the Companies have elected to reduce Supplier's share of Standard Offer Service, such percentage share cannot be increased. The Companies may exercise this option to reduce Supplier's percentage share of Standard Offer Service as frequently as it deems necessary.

TCPM 000475

# Tab 14



Wholesale Standard Offer
Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

TCPM 000065

## TABLE OF CONTENTS

Page

ARTICLE 1.  Definitions.................................................................................... 2

ARTICLE 2.  Term  ........................................................................................3

ARTICLE 3.  Supplier Responsibilities .......................................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO  ............................4

ARTICLE 5.  Price  ........................................................................................5

ARTICLE 6.  Billing and Payments ................................................................ 6

ARTICLE 7.  Events of Default. Liability, Relationship of the Companies .............................. 6

ARTICLE 8.  Termination/Reimbursement ..........................................................8

ARTICLE 9.  Force Majeure ........................................................................... 8

ARTICLE 10. Assignment ............................................................................... 9

ARTICLE 11. Successors and Assigns............................................................... 10

ARTICLE 12. Resolution of Disputes.................................................................10

ARTICLE 13. Interpretation............................................................................. 11

ARTICLE 14. Severability of Provisions............................................................ 11

ARTICLE 15. Accounts and Records................................................................. 11

ARTICLE 16. Limitations on Liability and Indemnification ....................................... 12

ARTICLE 17. Regulation................................................................................ 12

ARTICLE 18. Notices .................................................................................... 12

ARTICLE 19. Miscellaneous .......................................................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

i

TCPM 000066

<u>WHOLESALE STANDARD OFFER SERVICE AGREEMENT</u>

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this <u>seventh</u> day of <u>April, 1998</u>, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

TCPM 000067

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer customers shall not be obligated

2

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.


ARTICLE 2.   Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.


ARTICLE 3.   Supplier Responsibilities

3

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

4

TCPM 000070

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

$$Price = Standard\ Offer\ Wholesale\ Price$$
$$+\ Fuel\ Adjustment\ Factor$$

Where:    Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

5

TCPM 000071

regulatory approval and only to the extent that the
Companies are allowed to collect such revenues from
their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be
paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or
which may be assessed or imposed in the future by any governmental authority with jurisdiction
governing the sale of electricity covered by this Agreement.

ARTICLE 6.  Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of
Suppliers, computations by the Companies of the charges for the purposes of billings hereunder
shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the
Price as determined in accordance with Article 5. The Companies shall calculate the amount
payable to Supplier for a given month on or before the twentieth (20th) day of the following
month. The calculation shall be provided to Supplier and shall show the total amount due and
payable for the previous month. Each bill shall be subject to adjustment for any errors in
arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of
Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due
and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date").
Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in
effect at the main office of BankBoston, or such other lending institution as agreed to by
Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis
for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing
and payment disputes shall be handled in accordance with the provisions of Article 12 of this
Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under
the terms of the resolution shall be made within thirty (30) days of the date thereof, together with
interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one
year from the date of the original billing in order to reflect differences in charges resulting from
receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30)
days of receipt of the proposed adjustment.

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies:

(1)  Unless excused by a Force Majeure as described in Article 9, each of the
following events shall be deemed to be an Event of Default hereunder:

6

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement. The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

7

TCPM 000073

ARTICLE 8.   Termination/Reimbursement:

(1)    In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

      a.  Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

      b.  The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

      c.  Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice.  In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes.  In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier.  In the event that the Parties are not able to agree on the materiality of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.   Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure.  A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

8

TCPM 000074

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)     The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)   . The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)     The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)     The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.


ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

TCPM 000075

ARTICLE 11. Successors and Assigns:

　　　　This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. Resolution of Disputes:

　　　　Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

　　　　The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

　　　　Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration. except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

TCPM 000076

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

TCPM 000077

ARTICLE 16. <u>Limitations on Liability and Indemnification</u>:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. <u>Regulation</u>:

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided, however</u>, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. <u>Notices</u>:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

12

TCPM 000078

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly

13

TCPM 000079

Standard Offer Service energy requirements represented as a percentage of the
Companies' total Standard Offer Service requirement.

TCPM 000080

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:          TransCanada Power Marketing Ltd.

By:

On Behalf of the Companies:

Blackstone:          BLACKSTONE VALLEY ELECTRIC COMPANY

By:

Eastern:          EASTERN EDISON COMPANY

By:

Newport:          NEWPORT ELECTRIC CORPORATION

By:

15

TCPM 000081

APPENDIX A

SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
AND
STANDARD OFFER WHOLESALE PRICE

TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

\* Standard Offer Service for Eastern Edison terminates
  at 12:00 midnight on December 31, 2004.

16

TCPM 000082

PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of Qpr·1 7, 1998 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller"), to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of Qpr·1 7, 1998 (the "APA"), by and between Seller and Asset Purchaser.

1.   The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power    (Montaup) |
| 9/28/88 | Ocean State Power II (Montaup) |
| 5/14/86 | Ocean State Power    (Montaup) |
| 7/12/88 | Ocean State Power II (Montaup) |

A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.   This Agreement shall become effective on the Effective Date (as defined in Section 12) and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List, and Seller has made payment to Asset Purchaser of amounts owned pursuant to Section 8 below, for the last month in which such a payment is due.

3.   Commencing as of the Effective Date, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000083

4.　　　　(a)  Commencing as of the month following the Effective Date, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below.  In turn, each month, Seller shall timely pay the Power Seller an amount equal to all amounts properly due to the Power Seller for the preceding month under each Commitment.  For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month.  Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

　　　　(b)  Upon the Effective Date, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or, at the termination of this Agreement pay to Asset Purchaser, any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the Effective Date which relate to billing errors or reconciliations of pre-Effective Date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the Effective Date that are attributable to a period prior to the Effective Date.

5.　　　　(a)  Effective as of the Effective Date, Seller hereby irrevocably and unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment.  Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments.  Seller shall not unreasonably withold such consent.

　　　　(b)  Seller shall not agree to any amendment to or waiver of rights under a

TCPM 000084

Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of this Section 5.

6.    Each party shall be entitled to indemnification under this Agreement to the extent and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.    (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation.

(b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, as a condition of any Novation , the Asset Purchaser will require Seller to provide,either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or, if Seller and Buyer do not mutually agree to payment of a lump sum,(ii) a security interest to the Asset Purchaser in a portion of the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is acceptable to the Asset Purchaser acting reasonably.

8.    (a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed , and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

TCPM 000085

(b) Commencing as of the month following the Effective Date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth is Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c)) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b)) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month

(d) To the extent that a Novation is executed with respect to a Commitment , pursuant to Section 7 and Asset Purchaser and Seller agree to a lump-sum payment, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller to reduce the amount of Seller's retained obligation set forth in Section 8(b). Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by Asset Purchaser and Seller. It is the intention of the parties that the lump-sum payment shall be based on the net present value of the amounts set out in Schedule "A" calculated using a discount rate acceptable to Asset Purchaser and Seller acting reasonably and which is reasonable given the remaining term of the amounts payable by the Seller to the Asset Purchaser as set out in Schedule "A", prevailing interest rates for similar financings done at the time of payment of the lump sum and the creditworthiness of Seller at the time of payment of the lump sum.

9.   This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10.   This Agreement, the APA and any other agreement entered into by the parties pursuant to the
APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only a written agreement signed by the parties. Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing.

TCPM 000086

(i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned

subsidiary (direct or indirect) of TransCanada Pipelines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to Asset Purchaser shall thereafter by deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refiancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof, provided, however, the no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyances, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby otherwise altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11.   All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such such payment.

12.   This Agreement shall be of no force and effect until the Effective Date. If the APA shall have

been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA. As used in this Agreement, "Effective Date" shall mean the Effective Date (as defined in the APA).

13.   In the event that TransCanada Power Marketing, Ltd. or successor is in default of the Wholesale Standard Offer Agreement between TransCanada Power Marketing, Ltd. and

TCPM 000087

Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation and, having been given notice has failed to cure such default within the time specified in the Wholesale Standard Offer Agreement, Seller's obligation to make support payments under Section 8(a) will be suspended until such default is fully cured.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          6

TCPM 000088

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____
Name: Kevin A. Kiely
Title: V.P.

TRANSCANADA POWER MARKETING LTD.

By: _____
Name: Alec Porroe
Title: V.P.

By: _____
Name: Russ Girling
Title: B VP

TCPM 000089

# Tab 15



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## PUBLIC UTILITIES COMMISSION

IN RE:    BLACKSTONE VALLEY ELECTRIC COMPANY

NEWPORT ELECTRIC CORPORATION

STANDARD OFFER PRICING AND
EARLY IMPLEMENTATION OF
RETAIL CHOICE             DOCKET 2651

LAST RESORT POWER SUPPLY    DOCKET 2657

RETAIL SETTLEMENT AGREEMENT   DOCKET 2514

### REPORT AND ORDER

On November 7, and 12, 1997, the Blackstone Valley Electric Company and

Newport Electric Corporation (the "Companies") filed proposed Standard Offer rates and

Last Resort Service rates with the Public Utilities Commission ("Commission") pursuant

to R.I.G.L. § 39-3-10, to become effective January 1, 1998. The filing was made to

satisfy the Companies' obligations under the terms of a settlement agreement dated

October 17, 1997 amongst the Companies, Montaup Electric Company ("Montaup"), the

Division of Public Utilities and Carriers ("Division") and the Commission ("Settlement

Agreement"). The Settlement Agreement, which was filed with, and approved by the

Federal Energy Regulatory Commission ("FERC"), in relevant part, provides for the

termination of the all-requirements wholesale electric power contract between Montaup

and the Companies and the implementation of Utility Restructuring Act of 1997, as

amended, ("URA"). The general objective of the URA is to implement the deregulation

of electric power supply and to allow the development of a competitive market for the

purchase of electricity.

On November 19, 1997, the Companies and the Division moved to consolidate

Docket 2514 with the above referenced dockets, Electric Restructuring Plan, for the

review and approval of a retail settlement agreement among the Division, the Rhode

1

Island Attorney General and the Companies ("Retail Settlement Agreement"). The

Commission allowed the motion.

Public hearings were held on December 3, 4 and 9, 1997. The following

appearances were entered in this proceeding:

| | |
|---|---|
| FOR THE COMPANIES | David A. Fazzone, P.C. |
| FOR TEC-RI | Andrew Newman<br>Rubin and Rudman, LLP |
| | Alan D. Mandl<br>Ottenberg, Dunkless, Mandl & Mandl |
| FOR ENRON CAPITAL AND TRADE RESOUCES | |
| | Frank P. Pozniak<br>Rubin and Rudman, LLP |
| FOR NEV EAST L.L.C. | Richard W. Benka<br>Foley, Hoag & Eliot, LLP |
| FOR THE COALITION FOR CONSUMER JUSTICE<br>FOR THE GREY PANTHERS<br>FOR PARENTS FOR PROGRESS<br>FOR THE GEORGE WILEY CENTER | |
| | Hugo Ricci |
| FOR THE RHODE ISLAND LEAGUE OF CITIES AND TOWNS | |
| | Sydney Lima |
| FOR PROVIDENCE ENERGY CORPORATION | |
| | Dennis J. Duffy<br>Partridge, Snow & Hahn |
| FOR THE DIVISION | Allan M. Shoer<br>Special Asst. Attorney General |
| FOR THE COMMISSION | Adrienne G. Southgate<br>General Counsel |
| | Lindsay Johnson<br>Special Counsel |

## I. INTRODUCTION

The Companies are wholly owned subsidiaries of Eastern Utilities ("Eastern"), an integrated public utility holding company. The Companies are engaged primarily in the distribution of electricity to customers located in Rhode Island. The Companies purchase all their energy requirements from Montaup, Eastern's wholesale generating and transmission subsidiary. The power has been purchased under the terms of a long-term all-requirements contract, the terms and prices of which have been regulated by the FERC.

The Settlement Agreement terminates the all-requirements contract between the Companies and Montaup and replaces it with a new contract ("New Contract") with lower rates.[1] The Settlement Agreement requires the Companies, in turn, to reduce their retail rates and implement Retail Access effective January 1, 1998.

The URA allows competition by mandating "Retail Access" to alternative suppliers of electricity. The URA defines Retail Access as "the use of transmission or distribution facilities owned by an electric transmission company or an electric distribution company to transport electricity sold by a nonregulated power producer to retail customers . . .".[2] More simply put, the Companies are required to allow their customers to purchase electricity from other suppliers of electricity and are required to transport any such purchases on their lines from the supplier to the customer.

The URA provides for the phase-in of Retail Access as follows: On July 1, 1997, Retail Access was made available to large commercial and industrial customers and

---

[1] The rates are initially lower. See Section II.C.2 for a discussion of the costs under the New Contract.
[2] R.I.G.L. §39-1-2(7.6)

3

accounts in the name of the State of Rhode Island.[3]  On January 1, 1998, Retail Access

was scheduled to be extended to manufacturing customers with an average annual

demand of two hundred (200) kilowatts or greater, and all accounts in the name of the

cities and towns in Rhode Island. And finally, Retail Access is scheduled to be made

available to all other customers within three months after retail access is available to forty

percent or more of the kilowatt-hour sales in New England, including kilowatt-hour sales

in Rhode Island, but in no event later than July 1, 1998.  Pursuant to the terms of the

Settlement Agreement, however, retail access became universal on January 1, 1998.

The URA also requires each electric distribution company to arrange with a

wholesale power supplier for a standard power supply offer to sell electricity to all

customers at a stipulated rate.  More specifically, the URA provides:

> Within three (3) months after retail access is available to forty percent
> (40%) or more of the kilowatt-hour sales in New England and extending
> through year 2009, each electric distribution shall arrange for a standard
> power supply offer ("Standard Offer") to customers that have not elected
> to enter into power supply arrangements with other nonregulated power
> suppliers.  The power supply contract required for the standard offer shall
> be awarded by public competitive bidding to the lowest priced power
> supplier . . . .[4]

The URA provides compensation to all-requirements wholesale suppliers for costs

arising out of the transition to competition.  In order to compensate them for such costs,

the URA designates as a "Transition Charge" 2.8¢[5] of retail rates to be paid to the all-

requirements wholesale suppliers as a contract termination fee to recover these estimated

---

[3] On July 1, 1997, Retail Access was made available to (i) all new commercial and industrial customers,
including new manufacturing customers . . . . with an anticipated average annual demand of two hundred
(200) kilowatts or greater; (ii) all existing manufacturing customers with an average annual demand of
fifteen hundred (1500) kilowatts or greater; and (iii) all accounts in the name of the State of Rhode Island.
See R.I.G.L. §39-1-27.3(a)

[4] R.I.G.L. §39-1-27.3(d).  (Emphasis added).

costs.[6] The URA provides for subsequent adjustments to the Transition Charge to true up this estimate to reflect the actual gains and losses that are incurred.[7] This would include any gains or losses in the value of the utility property[8] ("Residual Value Credit").[9] In addition, the URA allows the recovery of any "estimated revenue lost by the wholesale power supplier as a result of retail access during the period prior to completion of such valuation" ("Revenue Loss").[10] The Division's witnesses expected the Residual Value Credit to exceed the Revenue Loss and reduce the Transition Charge below 2.8¢.[11]

The major issues presented to the Commission are how and when the Companies' rates should be reduced to reflect the reduced costs under the New Contract.

## II. RETAIL ACCESS AND STANDARD OFFER

### A. The Companies' Proposal

Under the proposed rates, Retail Access would be available to all customers on January 1, 1998. These proposed rates also reflect the lower purchased power costs experienced under the New Contract. The New Contract with Montaup, before any extraordinary adjustments for changes in fuel prices, reduces Blackstone's and Newport's purchased power costs by 30.52% and 13.79% respectively. The New Contract rates, before any extraordinary adjustments for changes in fuel prices, are as follows:[12]

---

[5] All references to rates and charges are for each kilowatthour of usage.
[6] R.I.G.L. §39-1-27.4(e).
[7] R.I.G.L. §39-1-27.4(g).
[8] See Id.
[9] EUA-7. The Stipulation and Agreement at p. 6 of the Settlement Agreement, provides that "Within three months after the sale of any or all of Montaup's generating facilities or any other property subject to divestiture, Montaup shall implement a Residual Value Credit as a direct offset to the Base Contract Termination Charges authorized under this Agreement."
[10] See R.I.G.L. §39-1-27.4(g).
[11] Tr. 12/4/97, pp. 184-188, also See Division Ex. 1.
[12] EUA-1, Letter p. 2.

5

| Calendar Year | Price Per Kilowatthour |
|---|---|
| 1998 | 3.2¢ |
| 1999 | 3.5¢ |
| 2000 | 3.8¢ |
| 2001 | 3.8¢ |
| 2002 | 4.2¢ |
| 2003 | 4.7¢ |
| 2004 | 5.1¢ |
| 2005 | 5.5¢ |
| 2006 | 5.9¢ |
| 2007 | 6.3¢ |
| 2008 | 6.7¢ |
| 2009 | 7.1¢ |

The rates under the New Contract were escalated at the rate of 7.5%[13] to encourage the Companies' customers to purchase energy from alternate suppliers. In other words, the rates were designed to price the Companies' energy services out of the market eventually.[14]

The Companies considered two alternative methods of designing retail rates to reflect the change in wholesale power costs under the New Contract. The Companies first considered charging all customers a flat energy charge per kilowatthour[15] equal to the flat rate it was paying to Montaup (the "Uniform Method"). The Companies rejected the Uniform Method, however, because it produced "unacceptable variations in the bill impacts on the rates and the customers within a rate, especially those on demand/energy rates."[16] For Blackstone, the savings for the rate classes ranged between 7.85% and 17.31%.[17] For Newport, the result ranged from an increase of 1.59% for one rate class and a decrease of 7.03% for another.[18]

---

[13] Tr.12/4/97, pp. 115-116.
[14] Id., Tr. 12/4/97, pp. 212-214.
[15] Customer bill impacts were based upon a recent twelve-month period of actual customer usage.
[16] EUA-1, Letter p. 3.
[17] Id., Attachment 3.
[18] Id.

Second, the Companies designed the proposed rates by reducing the power costs in all rate classes proportionately. In other words, Blackstone reduced the power costs in all rate classes by 30.52% and Newport reduced the power costs in all rate classes by 13.79%.[19] The result was that Blackstone's overall rates were reduced by 12.93% and Newport's overall rates were reduced by 4.56%. This method did not increase any customers' bills.

### B. Testimony of the Division

The Division presented the testimony of Dr. John K. Stutz of Tellus Institute. Dr. Stutz recommended that the Companies' filings be accepted, provided that they were modified to allow new customers to become eligible for Standard Offer service.

The Division also presented the testimony of Mr. David J. Effron who explained how the implementation of the proposed rates affected the Revenue Loss adjustment under the terms of the Settlement Agreement. Mr. Effron testified that, all other things remaining equal, the implementation of the proposed rates would produce net savings for ratepayers after allowing for Montaup's Revenue Loss adjustment.

### C. Findings

#### 1. "Standard Offer"

While the Companies referred to the proposed rates as the Standard Offer, the proposed rates do not qualify as such under the terms of the URA. The URA provides:

> Within three (3) months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England and extending through year 2009, each electric distribution company shall arrange for a standard power supply offer ("Standard Offer") to customers that have not

---

[19] Id.

7

elected to enter into power supply arrangements with other nonregulated power suppliers. <u>The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier.</u>[20]

The Legislature clearly intended that the power supply contract be put out to bid before a Standard Offer was arranged with the wholesale power supplier. The Companies have acknowledged that they have not begun the bidding process for the Standard Offer.[21] Accordingly, the Commission finds that the proposed rates do not comply with the public competitive bidding requirement of the URA, and therefor, do not constitute a standard offer within the meaning of §39-1-27.3(d) of the URA. To avoid confusion, the Commission directs that such rates shall be entitled "Interim Service Rates ".

Our finding that the proposed rates do not constitute a Standard Offer within the meaning of the URA makes it unnecessary to decide at this time how the Standard Offer Price Cap provision of the URA[22] is to be interpreted and applied.

2. <u>Competitive Markets</u>

Several Intervenors maintained that the basic objective of this proceeding is to establish a competitive market for electricity. These Intervenors stressed that the proposed rates would be below existing market rates and thus prevent the development of a competitive market.

These Intervenors argued that the Interim Service Rates could be increased to reflect estimated market prices, without increasing customers' bills. This result could be obtained by first reducing the Transition Charge by an estimate of the Residual Value

---

[20] R.I.G.L. §39-1-27.3(d). (Emphasis added).
[21] EUA-1, Letter p. 2.
[22] See R.I.G.L. §39-1-27.3(d).

8

Credit. The Interim Service Rates could then be increased by an equal amount. The net result would be an increase in the Interim Service Rates that would be offset by the application of the Residual Value Credit.

The basic issue is whether the Commission can order the Companies to apply an estimate of the Residual Value Credit in setting the Interim Service Rates. The essence of the Intervenors' argument is that mere valuation of the Companies' assets is sufficient to trigger the application of the Residual Value Credit as contemplated by the URA[23]and that an actual sale is not required. The Intervenors contend that because the value of Montaup's assets is known, the requisite valuation has been performed and that the Commission should apply the anticipated Residual Value Credit to reduce the Transition Charge as contemplated by the URA.

The Commission is not convinced. The URA provides that the utility "shall meet its obligations under this section by leasing, selling, spinning off or otherwise disposing of the assets . . .".[24] The Commission construes this to require an actual disposition of the assets. Accordingly, since the actual disposition of the assets has not occurred, the Commission finds that it does not have the authority to require the Companies to apply any portion of the anticipated Residual Value Credit to reduce the Transition Charge.

The Intervenors offered a second proposal to increase the Interim Service Rates without increasing customers' bills. It was argued that the Interim Service Rates could be increased with a corresponding credit to the "wires charge". In other words, the Companies would increase the Interim Service Rates and decrease the wires charge. The

---

[23] R.I.G.L. §39-1-27.4(g).
[24] Id. (Emphasis added).

9



problem with this approach is that it is at odds with the URA requirement that utilities unbundle their rates and "separately identify charges for use of transmission and distribution facilities".[25]  One objective of unbundling is to separately state the various elements of cost, including cost of power, so that other suppliers can compete against the electric distribution companies' cost of power.  This approach would accomplish just the opposite.  It would commingle the elements of cost so that the separate charges would be arbitrary in amount.  In short, "charges for the use of transmission and distribution facilities" would not be identified as required by the URA.[26]  The Commission therefore rejects this approach as being contrary to the requirements of the URA.

Finally, the Intervenors argued that the Companies' Interim Service Rates should be increased with no offsetting adjustments to any other element of the rate, to offset the liability for Revenue Loss.  As noted above, the URA allows recovery of the "estimated revenues lost by the wholesale power supplier as a result of retail access during the period prior to [the sale of assets]".[27]  All other things remaining equal, given the fact that Montaup is reducing its wholesale rate to the Companies, Montaup will incur Revenue Loss that will be subsequently recoverable from the Companies' ratepayers.[28]  The Intervenors argued that the Interim Service Rates should be increased so that customers are paying the total cost of the power, including the amount of Revenue Loss that will be payable to Montaup in the future.

---

[25] R.I.G.L. §39-1-27.3(e).
[26] Id.
[27] R.I.G.L. §39-1-27.4(g).
[28] For a more detailed discussion of the adjustment, see Division Ex. 1.

While this point is well taken, the proposed solution may exacerbate the problem. In effect, the Intervenors propose to roll the cost of the Revenue Loss adjustment into the Interim Service Rates. Assuming that more customers would then migrate to alternative suppliers with lower rates, this might increase the amount of the Revenue Loss that must be recovered. In this event, it would unfairly shift costs from one group of customers to another. Specifically, customers migrating to new suppliers would not have to pay their fair share of this cost; the vast bulk of these costs would be borne by the customers who continue to purchase power from the Companies. This would be unfair and the Commission rejects this approach.

Essentially, these Intervenors are asking the Commission to set Interim Service Rates at the estimated future market price for electric service. The problem with this approach is that no one knows what future market prices will be. In recognition of this fact, the Commission will not attempt to set rates based upon forecast market prices. If suppliers are able and willing to sell below the Companies' cost-based rates, there will be competition. If not, the Companies will be the low-cost suppliers. The Commission recognizes, however, that this simple paradigm is complicated by the fact that the measurement of costs is a matter of judgment. The FERC approved rates, which are consistent with the provisions of the URA, control both the definition and timing of the power costs incurred by the Companies. While the Intervenors may reasonably take issue with this measure of cost, the Commission is bound by the law to incorporate these costs into rates.

Finally, it must be emphasized that the creation of competition is beneficial only if it produces savings for the ratepayer. The payment of higher prices to create a

11

competitive market, simply for the sake of creating a competitive market, is economic logic turned upside down. The Commission rejects it.

### 3. Future Rates

The Commission makes no findings as to future rates. For this reason, the Commission rejects the Cumulative Multiplier Provision which would automatically increase rates in proportion to the increases in Montaup's rates. In addition, the Commission makes no commitment to any particular rate design method for establishing future rates.

## III. INTERIM REVENUE RECONCILIATION ADJUSTMENT

The Companies filed Revenue Reconciliation Adjustment provisions to reconcile the revenues billed to customers taking service under Interim Service Rates against payments to suppliers of such service and to recover or return any under- or over-collection.[29] The Commission finds that the provision, in relevant part, should be modified to read as follows:

> Any revenues billed by the Company for Interim Generation Service in excess of payments to Suppliers of that service shall be accumulated in an account and credited with interest. In the event that the revenues billed by the Company do not recover the Company's payments to Suppliers, the Company shall also be authorized to accumulate the deficiencies in this account together with interest. The Company will notify the Commission and the Division on a monthly basis of the balance of the account. Any excess or deficiency in the account shall be refunded to, or collected from, customers as ordered by the Commission.

## IV. LAST RESORT POWER

---

[29] EUA-1, Attachment 1, Blackstone Valley Electric Company, Standard Offer Service, pp. 7-8, Newport Electric Corporation, Standard Offer Service, p. 9.

In a competitive market suppliers may be unwilling to serve all customers, for example, customers with poor credit histories. To deal with this problem, the URA provides that within three (3) months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England, each distribution company shall:

> Arrange for a last resort power supply for customers who are no longer eligible to receive service under standard offer and are not adequately supplied by the market because they are unable to obtain or retain electric service from nonregulated power producers. The electric distribution company shall periodically solicit bids from nonregulated producers for such service at market prices plus a fixed contribution from the electric distribution company . . . . All fixed contributions and any reasonable costs incurred by the electric distribution company in arranging this service shall be included in the distribution rates charged to all other customers. [30]

The Companies are presently developing a request for bids.[31] In the interim, Montaup has agreed to supply Last Resort Service to the Companies at 3.2¢ per kilowatthour, the same price at which Montaup is providing service for the Interim Service Rates. Under its Last Resort Service Tariff, the Companies have, in turn, agreed to provide service to such customers under the rates approved in this Docket. Accordingly, the Commission finds the proposed arrangement to be reasonable and approves it.

V. COMPETITIVE BIDDING FOR POWER SUPPLY

While the Companies have presented details on their planning to seek requests for power supply bids, the Commission is not approving the bidding procedure because it is beyond the scope of this proceeding. Despite this, some comments are in order.

---

[30] R.I.G.L. §39-1-27.3(f)
[31] EUA-1, Letter p. 2.

13

It is imperative that the quality and reliability of service not be compromised. The

bidding procedure must give consideration to the bidder's resources and the bidder's

ability to provide a reliable supply of power. Lower prices that come at the cost of

reliability and quality of service are unacceptable.

VI.  DOCKET 2514 SETTLEMENT AGREEMENT

As noted above[32], the Commission consolidated Docket 2514 with the Retail

Access dockets for the purpose of reviewing the Retail Settlement Agreement among the

Division, the Rhode Island Attorney General and the Companies. In relevant part, the

Retail Settlement Agreement contained the following provisions.[33]

1. "Newport and Blackstone agree not to seek any distribution charge increase

which would be in effect during the years 1999 and 2000."[34]

2. The Companies will be required to refund to customers any overearnings for

1998 according to the following formula: "sixty percent (60%) of all earnings

up to one percent above the currently allowed rate of return on common

equity, eighty percent of all earnings between one percent and two percent

above the currently allowed rate of return on common equity, and ninety

---

[32] Infra at 1.

[33] See EUA-3

[34] The Agreement provides

Blackstone and Newport agree not to seek any distribution charge increase which would be in effect during the years 1999 and 2000. Specifically, after the next distribution charge increase, scheduled for effect on January 1, 1998, Blackstone's and Newport's distribution charges will be capped through at least the period ending December 31, 2000, except for any temporary credit or surcharge that results from the implementation of PBR or the reconciliation of the Standard Offer. Id., p. 3.

percent of all earnings in excess of two percent above the currently allowed rate of return on common equity.".[35]

3.   It was agreed that the Companies shall use approximately $4.5 million of purchased power refunds to mitigate their Contract Termination Charge payments to Montaup.[36] At the hearings, however, Mr. St. Pierre testified that Newport's $1.2 million purchased power refund had been applied to increase the balance of its storm fund. He stated that the remaining $3.3 million of BVE purchased power refunds would be applied to pay the difference between the 2.8¢ Transition Charge in BVE's retail rates and the 3.0¢ transition charge contained in Montaup's wholesale rate. Any refund not used to mitigate contract termination charge payments would be returned to ratepayers through the Revenue Reconciliation Adjustment. Newport will pay the difference between the 2.8¢ in its retail rates and the 3.0¢ Transition Charge in Montaup's wholesale rates from its 1998 PBR increase.[37] The Companies submitted a letter dated December 16, 1997 to the Commission which stated the commitment as follows:

> [I]f the Commission approves the Retail Settlement Agreement, Newport Electric Corporation has committed to use the 1998 Performance Based Rate ("PBR") increase to mitigate the CTC paid to Montaup and to use its own revenue to mitigate any CTC not mitigated by the 1998 PBR. Additionally, Blackstone Valley Electric Company has committed to use the 1998 PBR increase and its own

---

[35] Id.
[36] Id.
[37] Tr. 12/3/97, pp. 191-193.

revenue to mitigate the CTC to the extent that the CTC is
not fully mitigated by the PCAC refund.

4. It was agreed that in the event of a sale of the Pawtucket No. 2 Hydro Station

and associated properties, the amortization schedule would be reduced by the

sales proceeds.  At present the amortization schedule is:

|       | Annual    | Monthly  |
|-------|-----------|----------|
| 1998  | $430,000  | $35,833  |
| 1999  | 490,000   | 40,833   |
| 2000  | 558,000   | 46,500   |
| 2001  | 636,000   | 53,000   |
| 2002  | 725,000   | 60,417   |
| 2003  | 827,000   | 68,917   |
| 2004  | 942,000   | 78,500   |
| 2005  | 196,000   | 65,333   |

5. It was agreed that Interim Service Rates will include a Low Income rate R-2[38]

which will include expanded eligibility criteria as follows:

- Must be the head of a household or principal wage earner.
- Must be presently receiving Supplemental Security Income from the
  Social Security Administration or from one of the following Rhode
  Island agencies:
    - Medicaid
    - Food Stamps
    - General Public Assistance
    - Aid to Families with Dependent Children

The George Wiley Center (the "Center") objected to the Retail Settlement

Agreement because the expansion of the availability to the low-income rate did not

---

[38] It was also agreed that the proposed Low Income Rate R-2 shall continue to receive the same discount
off the R-1 Rate.

16

include individuals who are eligible for Energy Assistance Funds.[39] The basis for the objection was that 1) the Companies' affiliate Eastern Edison offers the Low Income Rate to similar individuals, and 2) the Companies could afford to expand the R-2 Rate to such individuals.

The Division argues that the record in this case is not adequate to reasonably evaluate either the need or the cost to expand the availability of the Low Income Rate R-2 to include individuals who are eligible to receive Energy Assistance Funds.[40] The Division emphasized that the record does not indicate how many people would be eligible or who the eligible people would be.[41]

The Commission agrees with the Division and finds that the record is not sufficient to establish the need to expand the availability of the R-2 rate as requested by the Center. The Commission also notes that the Center has not addressed the issue of whether the Commission has the authority to require the Companies to issue a discount of this nature to a select group of customers.[42] Finally, it should not go unnoticed that the Company is absorbing the cost of the expansion of the eligibility provision of the R-2 Rate and it is not being charged to other ratepayers.

Accordingly, it is

---

[39] Initial Brief of George Wiley Center, et al, p. 1.
[40] Division Brief, p. 11-12.
[41] Id.
[42] Alternatively, the Center has requested that the Commission order the Companies to provide all interested parties with quarterly statements "indicating how many customers will have been included in their low income protection category and who are continuing to be included for a period of at least three years, but not restrictively". Id. p. 3. There are a number of problems with this request. First, unless the Center establishes the Commission's authority to impose a discount, the information is not relevant. Second, assuming the Commission has the authority, the Center has not established that the Companies have the information that is being requested. Accordingly, the Commission denies the Center's request without prejudice and the Center may pursue this matter in any future general rate proceeding.

(15521) ORDERED:

1.  That the Commission's Order No. 15490, dated December17, 1997 is hereby incorporated by reference and is attached hereto as an appendix.

2.  That the Revenue Reconciliation Adjustment provision shall be modified as directed in the body of this Report and Order and filed with the Commission.

3.  That the Companies shall act in accordance with all other findings and instructions contained with this Report and Order.

EFFECTIVE AT PROVIDENCE, RHODE ISLAND PURSUANT TO AN OPEN MEETING DECISION ON DECEMBER 17, 1997. WRITTEN ORDER ISSUED JULY 10, 1998.

PUBLIC UTILITIES COMMISSION

James J. Malachowski, Chairman

Kate F. Racine, Commissioner

Brenda K. Gaynor, Commissioner

# Tab 16



Michael Hager
Standard Offer Portfolio Manager

April 18, 2000

Mr. Sean D. McMaster
TransCanada Power Marketing, Ltd.
3400, 237-4th Avenue S.W.
Calgary, Alberta T2P 5A4

Subject:     Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company
("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric Company ("Newport")
and TransCanada Power Marketing Ltd ("TCPM") dated April 7, 1998 (the "Agreement")

Dear Mr. McMaster:

Effective May 1, 2000 ("Merger Date") the subsidiaries of Eastern Utilities Associates ("EUA") will merge
with and into various subsidiaries of National Grid - USA (formerly New England Electric System)[1]. As a result of
the merger, the National Grid - USA subsidiaries will assume the obligations of the former EUA subsidiaries
pursuant to Article 11 of the Agreements.

The obligations of the parties or their successors and the terms of the Agreement are not affected by the
merger and assignments. The following actions will be taken in order to continue to facilitate the administration of
the Agreement. These actions are not intended and in no way constitute nor should be deemed to constitute a
modification of the terms of the Agreement.

1. Designation of Load Served.  Currently, Load Asset 983 is used within the NEPOOL Market
System to represent the loads covered by the Agreement.  Effective hour 1 of the Merger Date,
Load Asset 983 will no longer be used and its associated NEPOOL Market System contracts
66609 and 66610 will be terminated.  The following Load Assets will be used within the
NEPOOL Market System to represent the loads covered by the Agreement:

| Load Asset | Load Description |
|---|---|
| 1252 | Standard Offer load in the former Eastern Service Territory. |
| 1250 | Standard Offer load in the former Blackstone and Newport Service Territories. |



---

[1] Specifically, as it relates to the Agreements, Eastern will merge into Massachusetts Electric
Company ("Mass. Electric"), Blackstone and Newport will merge into The Narragansett Electric Company
("Narragansett") and Montaup Electric Company will merge into New England Power Company.

55 Bearfoot Road
Northboro, MA 01532
Tel: 508.421.7350 Fax: 508.421.7335
michael.hager@us.ngrid.com

NARR 22621

Mr. Sean D. McMaster
April 18, 2000
page 2 of 5

Mass. Electric will replace Eastern and Narragansett will replace Blackstone and Newport and, as Sellers within the NEPOOL Market System, Mass. Electric and Narragansett will be responsible for inputting Load Asset Contracts for each of the above Load Assets and assigning to TCPM, as Buyer within the NEPOOL Market System, 14.4550% of each Load Asset. Attachment 1 provides a list of the NEPOOL Market System Contracts that will be entered. Kindly submit the required Load Asset Contract Acknowledgment ("LACA") forms for each contract shown to ISO-NE by hour 1 of the Merger Date and forward copies of each LACA to me as well.

2. Application of the Fuel Adjustment Factor. Article 5 of the Agreement entitles TCPM to receive additional monies based on revenues collected from retail customers pursuant to Fuel Adjustment mechanisms contained in Eastern's, Blackstone's and Newport's Standard Offer Service tariffs. Mass. Electric and Narragansett will continue to make such Fuel Adjustment payments, if applicable, according to Attachment 2. Attachment 2 replaces the retail fuel adjustment mechanisms contained in the BUA Companies' respective Standard Offer Service tariffs. Said payments will be made by Mass. Electric or Narragansett in the month immediately following service.

3. Supplier Information to be Provided. In addition to any specific data or information required to be provided under the terms of the Agreement, Mass. Electric and Narragansett will provide TCPM with (i) customer "add" and "drop" notices and (ii) monthly customer enrollment counts by rate class. The add and drop notices will be sent electronically using the Advantis Value Added Network ("VAN"). To receive these notices TCPM must establish an account on the VAN and be responsible for paying any charges incurred in using the VAN. The customer counts will be compiled and e-mailed by our Standard Offer Portfolio Manager.

4. Change of Notice Recipient. The recipient of notices for the Companies, as designated in Article 18 of the Agreement, should be changed to the following:

Mr. Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
55 Bearfoot Road
Northboro, MA 01532
(508) 421-7350
(508) 421-7335 (facsimile)

Should you have any questions regarding the above implementation plans please do not hesitate to contact me.

Very truly yours,

cc: M. E. Hachey

Mr. Sean D. McMaster
April 18, 2000
page 3 of 5

ATTACHMENT 1

NEPOOL MARKET SYSTEM CONTRACTS

| Market System Contract # | Seller ID # | Load Asset | Product | Term |
|---|---|---|---|---|
| 113,915 | 50075 | 1252 | Energy | 01-May-2000 @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113,916 | 50075 | 1252 | ICAP | 01-May-2000 @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113,927 | 156 | 1250 | Energy | 01-May-2000 @ he 0100, to 31-Dec-2009 @ he 2400 |
| 113,928 | 156 | 1250 | ICAP | 01-May-2000 @ he 0100, to 31-Dec-2009 @ he 2400 |

NARR 22623

Mr. Sean D. McMaster
April 18, 2000
page 4 of 5

ATTACHMENT 2

STANDARD OFFER FUEL ADJUSTMENT PROVISION

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, Mass. Electric and Narragansett will pay additional amounts to Supplier in accordance with this Standard Offer Fuel Adjustment Provision which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 2000 | 3.4 cents (MA) 3.8 cents (RI) |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Supplier will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

NARR 22624

Mr. Sean D. McMaster
April 18, 2000
page 5 of 5

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

The additional amount paid to each supplier, on a per-kilowatt-hour basis, would be 0.2548 ¢/kWh (4.4548 - 4.2).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

**NARR 22625**

CN12\data\AMES\M&A\RASRR\plan7.wk4
Range: NEWPORT

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 2
Page 4 of 4

**NEWPORT ELECTRIC**
**Company Average ¢/kWh**
**Summary of Average Rates**

|  |  | 2000 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
|  |  | January 1 | April 1 | January 1 | January 1 | January 1 | January 1 |
| (1) | Distribution | 4.189 | 3.568 | 3.568 | 3.568 | 3.568 | 3.568 |
| (1a) | Cost of Removal Adj. |  |  | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) | DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) | Total Distribution | 4.419 | 3.798 | 3.837 | 3.837 | 3.837 | 3.837 |
| (4) | Transmission | 0.273 | 0.273 | 0.431 | 0.431 | 0.431 | 0.431 |
| (5) | Transition | 2.340 | 2.340 | 1.759 | 1.859 | 1.446 | 1.298 |
| (6) | Total Delivery | 7.032 | 6.411 | 6.027 | 6.127 | 5.714 | 5.566 |
| (7) | Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.700 | 5.100 |
| (8) | Total Average Price | 10.832 | 10.211 | 9.827 | 10.327 | 10.414 | 10.666 |
| (9) | Total Average Price Adj for GET | 11.283 | 10.636 | 10.236 | 10.757 | 10.848 | 11.110 |
| (10) | Percent Increase/(Decrease) | -5.73% | -5.73% | -3.76% | 5.09% | 0.84% | 2.42% |

Notes:
(1) Base Distribution Charges - Frozen from 2001 through 2004
(1a) Cost of Removal impact on rates 2001 through 2004
(2) Assumed at current level through 2004
(3) = Line (1) + Line (1a) + Line (2)
(4) Projected 2000 Newport alone; Projected 2001-2004 Consolidated Companies
(5) Projected 2000 Newport alone; Projected 2001-2004 Consolidated Companies

(6) = Line (3) + Line (4) + Line (5)
(7) per Settlement Agreements
(8) = Line (6) + Line (7)
(9) Line (8)/.96
(10) = (Line (9) - Line (9) prior column)/Line (9) prior column

Confidential

35

NEC092276

Exhibit JMM-1

Confidential

NEC092266

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-1

Exhibit JMM-1

Impact on Total Revenue

Confidential

File:     C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:    Summary21
Date:     14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 1
Page 1 of 3

## The Narragansett Electric Company
## Total Revenue Shift from Merger to BVE Customers

|           | Units (1)     | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|-----------|---------------|-------------------------|--------------------------|-------------------|----------------------------------|
| R-1       | 362,568,042   | $40,722,906             | $39,704,361              | ($1,018,544)      | -2.50%                           |
| R-2       | 10,464,104    | $892,790                | $885,564                 | ($7,225)          | -0.81%                           |
| R-3       | 9,162,722     | $931,422                | $974,130                 | $42,708           | 4.59%                            |
| R-4       | 4,487,447     | $437,683                | $425,523                 | ($12,161)         | -2.78%                           |
| W-1       | 3,602,371     | $324,151                | $372,483                 | $48,333           | 14.91%                           |
| H-1       | 3,639,022     | $350,069                | $336,483                 | ($13,587)         | -3.88%                           |
| H-2       | 2,290,392     | $233,468                | $242,340                 | $8,872            | 3.80%                            |
| G-1       | 43,670,643    | $5,088,566              | $5,146,385               | $57,819           | 1.14%                            |
| G-2       | 313,855,524   | $29,719,748             | $29,660,495              | ($59,253)         | -0.20%                           |
| T-2       | 45,916,407    | $4,263,798              | $3,874,164               | ($389,634)        | -9.14%                           |
| T-4       | 78,036,479    | $6,721,747              | $6,470,366               | ($251,381)        | -3.74%                           |
| G-5       | 23,108,580    | $2,025,532              | $1,986,230               | ($39,302)         | -1.94%                           |
| T-5       | 8,474,950     | $734,846                | $679,699                 | ($55,146)         | -7.50%                           |
| T-6       | 369,857,394   | $29,787,298             | $29,380,332              | ($406,966)        | -1.37%                           |
| A-6       | 6,085,455     | $553,736                | $531,237                 | ($22,499)         | -4.06%                           |
| S-1       | 14,647,035    | $2,399,359              | $2,402,553               | $3,194            | 0.13%                            |
| Total Company | 1,299,866,567 | $125,187,119        | $123,072,346             | ($2,114,773)      | -1.69%                           |

See Workpaper JMM - 1

Confidential

File:    C:\123dns\JAMES\M&A\BASE\Narrplan.wk4
Range:   Summary1
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 1
Page 2 of 3

## The Narragansett Electric Company
### Total Revenue Shift from Merger to Narragansett Customers

| | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| A-16 | 1,475,595,371 | $146,179,613 | $146,179,613 | $0 | 0.00% |
| A-18 | 299,522,556 | $27,232,677 | $27,232,677 | $0 | 0.00% |
| A-32 | 33,569,784 | $2,847,742 | $2,847,742 | $0 | 0.00% |
| A-60 | 45,194,386 | $3,572,777 | $3,572,777 | $0 | 0.00% |
| E-30 | 1,519,157 | $109,772 | $109,772 | $0 | 0.00% |
| E-40 | 12,436,324 | $872,223 | $872,223 | $0 | 0.00% |
| C-06 | 319,448,478 | $32,857,618 | $32,857,618 | $0 | 0.00% |
| G-02 | 857,825,162 | $71,725,832 | $71,725,832 | $0 | 0.00% |
| G-32 | 1,497,395,176 | $108,041,029 | $108,041,029 | $0 | 0.00% |
| G-62 | 360,114,300 | $23,033,841 | $23,033,841 | $0 | 0.00% |
| R-02 | 4,803,789 | $308,547 | $308,547 | $0 | 0.00% |
| S-10 | 49,529,091 | $9,620,076 | $9,620,076 | $0 | 0.00% |
| T-06 | 21,835,478 | $1,763,248 | $1,763,248 | $0 | 0.00% |
| V-02 | 7,686,406 | $718,448 | $718,448 | $0 | 0.00% |
| Total Company | 4,986,475,458 | $428,883,443 | $428,883,443 | $0 | 0.00% |

See Workpaper JMM - 2

Confidential

File:      C:\123data\JAMES\M&A\BASE\Hcopla10.WK4          Narragansett Electric
Range:     Summary21                                        BVE/Newport Electric
Date:      14-May-99                                        R.I.P.U.C. Docket No. _____
                                                            Exhibit JMM - 1
                                                            Page 3 of 3

## The Narragansett Electric Company
## Total Revenue Shift from Merger to Newport Customers

|  | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| R-1 | 167,201,036 | $19,896,925 | $19,237,969 | ($658,956) | -3.31% |
| R-2 | 1,764,819 | $164,092 | $162,833 | ($1,259) | -0.77% |
| R-4 | 7,100,991 | $808,011 | $718,668 | ($89,343) | -11.06% |
| W-1 | 13,383,268 | $1,422,017 | $1,474,430 | $52,412 | 3.69% |
| H-1 | 4,908,488 | $523,570 | $465,875 | ($57,695) | -11.02% |
| H-2 | 5,723,950 | $665,920 | $627,794 | ($38,126) | -5.73% |
| G-1 | 42,449,011 | $5,464,085 | $5,082,244 | ($381,841) | -6.99% |
| G-2 | 105,080,586 | $11,113,180 | $10,298,594 | ($814,586) | -7.33% |
| T-2 | 14,361,960 | $1,497,070 | $1,277,833 | ($219,237) | -14.64% |
| T-4 | 18,430,440 | $1,953,393 | $1,659,268 | ($294,126) | -15.06% |
| G-5 | 15,075,589 | $1,516,935 | $1,361,051 | ($155,884) | -10.28% |
| T-5 | 2,964,000 | $293,737 | $251,626 | ($42,112) | -14.34% |
| T-6 | 24,547,599 | $2,453,903 | $2,137,672 | ($316,231) | -12.89% |
| C-1 | 114,919,292 | $10,247,646 | $9,879,737 | ($367,909) | -3.59% |
| S-1 | 5,614,981 | $852,977 | $853,283 | $306 | 0.04% |
| **Total Company** | 543,526,010 | $58,873,463 | $55,488,877 | ($3,384,586) | -5.75% |

See Workpaper JMM - 3

Confidential

Exhibit JMM-2

Confidential

NEC092271

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-2

Exhibit JMM-2

Rate Paths

Confidential

31
NEC092272

CN123\aio\AMESM&A\BASE\plan7.wk4
Rang: SUMMARY

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 2
Page 1 of 4

## SUMMARY TABLE
### Consolidated Average ¢/kWh
### Summary of Average Rates

| | 2000 January 1 | 2000 April 1 | 2001 January 1 | 2002 January 1 | 2003 January 1 | 2004 January 1 |
|---|---|---|---|---|---|---|
| (1) Distribution | 3.071 | 2.993 | 2.993 | 2.993 | 2.993 | 2.993 |
| (1a) Cost of Removal Adj. | | | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) Total Distribution | 3.301 | 3.223 | 3.262 | 3.262 | 3.262 | 3.262 |
| (4) Transmission | 0.415 | 0.415 | 0.415 | 0.415 | 0.415 | 0.415 |
| (5) Transition | 1.467 | 1.467 | 1.314 | 1.341 | 1.230 | 1.190 |
| (6) Total Delivery | 5.183 | 5.105 | 4.991 | 5.018 | 4.907 | 4.867 |
| (7) Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.700 | 5.100 |
| (8) Total Average Price | 8.983 | 8.905 | 8.791 | 9.218 | 9.607 | 9.967 |
| (9) Total Average Price Adj for GET | 9.358 | 9.276 | 9.158 | 9.602 | 10.007 | 10.382 |
| (10) Percent Increase/(Decrease) | | -0.87% | -1.28% | 4.86% | 4.22% | 3.75% |

Notes:

(1) Weighted average of Page 2, Line (1), Page 3, Line (1), and Page 4, Line (1)

(1a) Cost of Removal impact on rates 2001 through 2004

(2) Assumed at current level through 2004

(3) = Line (1) + Line (1a) + Line (2)

(4) Weighted average of Page 2, Line (4), Page 3, Line (4), and Page 4, Line (4)

(5) Weighted average of Page 2, Line (5), Page 3, Line (5), and Page 4, Line (5)

(6) = Line (3) + Line (4) + Line (5)

(7) per Settlement Agreements

(8) = Line (6) + Line (7)

(9) Line (8)/.96

(10) = (Line (9) - Line (9) prior column)/Line (9) prior column

Confidential

32

NEC092273

C:\123data\JAMESNM&A\BASENplan7.wk4
Range: BVE

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 2
Page 2 of 4

## BLACKSTONE VALLEY
### Company Average ¢/kWh
### Summary of Average Rates

| | 2000 January 1 | 2000 April 1 | 2001 January 1 | 2002 January 1 | 2003 January 1 | 2004 January 1 |
|---|---|---|---|---|---|---|
| (1) Distribution | 3.003 | 2.852 | 2.852 | 2.852 | 2.852 | 2.852 |
| (1a) Cost of Removal Adj. | | | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) Total Distribution | 3.233 | 3.082 | 3.121 | 3.121 | 3.121 | 3.121 |
| (4) Transmission | 0.278 | 0.278 | 0.429 | 0.429 | 0.429 | 0.429 |
| (5) Transition | 2.320 | 2.320 | 1.759 | 1.859 | 1.446 | 1.298 |
| (6) Total Delivery | 5.831 | 5.680 | 5.309 | 5.409 | 4.996 | 4.848 |
| (7) Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.700 | 5.100 |
| (8) Total Average Price | 9.631 | 9.480 | 9.109 | 9.609 | 9.696 | 9.948 |
| (9) Total Average Price Adj for GET | 10.032 | 9.875 | 9.489 | 10.009 | 10.100 | 10.363 |
| (10) Percent Increase/(Decrease) | | -1.57% | -3.91% | 5.49% | 0.91% | 2.60% |

Notes:
(1) Base Distribution Charges - Frozen from 2001 through 2004
(1a) Cost of Removal impact on rates 2001 through 2004
(2) Assumed at current level through 2004
(3) = Line (1) + Line (1a) + Line (2)
(4) Projected 2000 BVE alone; Projected 2001-2004 Consolidated Companies
(5) Projected 2000 BVE alone; Projected 2001-2004 Consolidated Companies

(6) = Line (3) + Line (4) + Line (5)
(7) per Settlement Agreements
(8) = Line (6) + Line (7)
(9) Line (8)/.96
(10) = (Line (9) - Line (9) prior column)/Line (9) prior column

Confidential

33
NEC092274

C:\123data\JAMESM&A\BASER&plan7.wk4
Rang: NARRAGANSETT

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 2
Page 3 of 4

## NARRAGANSETT ELECTRIC
### Company Average ¢/kWh
### Summary of Average Rates

| | 2000 January 1 | 2000 April 1 | 2001 January 1 | 2002 January 1 | 2003 January 1 | 2004 January 1 |
|---|---|---|---|---|---|---|
| (1) Distribution | 2.967 | 2.967 | 2.967 | 2.967 | 2.967 | 2.967 |
| (1a) Cost of Removal Adj. | | | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) Total Distribution | 3.197 | 3.197 | 3.236 | 3.236 | 3.236 | 3.236 |
| (4) Transmission | 0.466 | 0.466 | 0.409 | 0.409 | 0.409 | 0.409 |
| (5) Transition | 1.150 | 1.150 | 1.150 | 1.150 | 1.150 | 1.150 |
| (6) Total Delivery | 4.813 | 4.813 | 4.795 | 4.795 | 4.795 | 4.795 |
| (7) Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.700 | 5.100 |
| (8) Total Average Price | 8.613 | 8.613 | 8.595 | 8.995 | 9.495 | 9.895 |
| (9) Total Average Price Adj for GET | 8.972 | 8.972 | 8.953 | 9.370 | 9.891 | 10.307 |
| (10) Percent Increase/(Decrease) | | 0.00% | -0.21% | 4.65% | 5.56% | 4.21% |

Notes:

(1)  Base Distribution Charges - Frozen from 2001 through 2004
(1a) Cost of Removal impact on rates 2001 through 2004
(2)  Assumed at current level through 2004
(3)  = Line (1) + Line (1a) + Line (2)
(4)  Projected 2000 Narragansett alone; Projected  2001-2004 Consolidated Companies
(5)  Projected 2000 Narragansett alone; Projected  2001-2004 Consolidated Companies
(6)  = Line (3) + Line (4) +Line (5)
(7)  per Settlement Agreements
(8)  = Line (6) + Line (7)
(9)  Line (8)/.96
(10) = (Line (9) prior column) - (Line (9) prior column)/Line (9) prior column

Confidential

34

NEC092275

C:\123data\AMESM\&A\BASER9jan7.wk4
Range: NEWPORT

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 2
Page 4 of 4

NEWPORT ELECTRIC
Company Average ¢/kWh
Summary of Average Rates

| | 2000 January 1 | 2000 April 1 | 2001 January 1 | 2002 January 1 | 2003 January 1 | 2004 January 1 |
|---|---|---|---|---|---|---|
| (1) Distribution | 4.189 | 3.568 | 3.568 | 3.568 | 3.568 | 3.568 |
| (1a) Cost of Removal Adj. | | | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) Total Distribution | 4.419 | 3.798 | 3.837 | 3.837 | 3.837 | 3.837 |
| (4) Transmission | 0.273 | 0.273 | 0.431 | 0.431 | 0.431 | 0.431 |
| (5) Transition | 2.340 | 2.340 | 1.759 | 1.859 | 1.446 | 1.298 |
| (6) Total Delivery | 7.032 | 6.411 | 6.027 | 6.127 | 5.714 | 5.566 |
| (7) Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.200 | 5.100 |
| (8) Total Average Price | 10.832 | 10.211 | 9.827 | 10.327 | 10.414 | 10.666 |
| (9) Total Average Price Adj for GET | 11.283 | 10.636 | 10.236 | 10.757 | 10.848 | 11.110 |
| (10) Percent Increase/(Decrease) | | -5.73% | -3.76% | 5.09% | 0.84% | 2.42% |

Notes:
(1) Base Distribution Charges - Frozen from 2001 through 2004
(1a) Cost of Removal impact on rates 2001 through 2004
(2) Assumed at current level through 2004
(3) = Line (1) + Line (1a) + Line (2)
(4) Projected 2000 Newport alone; Projected 2001-2004 Consolidated Companies
(5) Projected 2000 Newport alone; Projected 2001-2004 Consolidated Companies

(6) = Line (3) + Line (4) + Line (5)
(7) per Settlement Agreements
(8) = Line (6) + Line (7)
(9) Line (8)/.96
(10) = (Line (9) - Line (9) prior column)/Line (9) prior column

Exhibit JMM-3

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-3

Exhibit JMM-3

Rate Mapping

36

Confidential

NEC092278

C:\123data\UAMEPM&A\BASEMapping.wk4
BLACKSTONE
17-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 3
Page 1 of 2

Narragansett Electric Company
Blackstone Valley Electric Company

Summary of Rate Mapping

| Blackstone Rate | Description | Narragansett Rate | Description |
|---|---|---|---|
| R-1 | Residential Service | A-16 | Basic Residential |
| R-2 | Residential Low Income Service | A-60 | Low Income |
| R-3 | Residential Space Heating Service | A-16 | Basic Residential |
| R-4 | Residential Time of Use Service | A-32 | Residential Time of Use |
| G-1 | Small Secondary Voltage Service | C-06 | Small C&I |
| G-2 | Medium Secondary Voltage Service (10<kw<500, annual kWh>36,000) | C-06 | Small C&I |
| | | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| G-5 | Medium Primary Voltage Service (100<kw<500) | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| T-2 | Medium TOU Secondary Voltage Service (10<kw<500, annual kWh>36,000) | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| T-4 | Large Secondary Voltage Service | G-32 | 200 kW Demand |
| T-5 | Medium TOU Secondary Voltage Service (10<kw<500, annual kWh>36,000) | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| T-6 | Medium TOU Secondary Voltage Service (10<kw<500, annual kWh>36,000) | G-32 | 200 kW Demand |
| | | G-62 | 3,000 kW Demand |
| H-1 | Space Heating Service (non-industrial) | C-06 | Small C&I |
| | | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| H-2 | Space Heating Service (non-industrial) | C-06 | Small C&I |
| | | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| W-1 | Controlled Water Heating Service (all customer types) | A-16 | Basic Residential |
| | | C-06 | Small C&I |
| S-1 | Lighting Service (company owned) | S-14 | General Streetlighting |
| A-6 | Auxiliary Service | B-32 | 200 kW Back-Up |

Confidential

NEC092279

C:\123Mon\JAMES\M&A\BASE\Mapping.wk4
NEWPORT
17-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 3
Page 2 of 2

Narragansett Electric Company
Newport Electric Corporation

Summary of Rate Mapping

| Newport Rate | Description | Narragansett Rate | Description |
|---|---|---|---|
| R-1 | Residential Service | A-16 | Basic Residential |
| R-2 | Residential Low Income Service | A-60 | Low Income |
| R-4 | Residential Time of Use Service | A-32 | Residential Time-Of-Use |
| G-1 | Small Secondary Voltage Service | C-06 | Small C&I |
| G-2 | Medium Secondary Voltage Service (10<kw<500, annual kWh>36,000) | C-06 | Small C&I |
| | | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| G-5 | Medium Primary Voltage Service (100<kw<500) | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| T-2 | Medium TOU Secondary Voltage Service (10<kw<500, annual kWh>36,000) | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| T-4 | Large Secondary Voltage Service | G-32 | 200 kW Demand |
| T-5 | Medium TOU Secondary Voltage Service (10<kw<500, annual kWh>36,000) | G-32 | 200 kW Demand |
| T-6 | Medium TOU Secondary Voltage Service (10<kw<500, annual kWh>36,000) | G-32 | 200 kW Demand |
| | | G-62 | 3,000 kW Demand |
| H-1 | Space Heating Service (non-industrial) | C-06 | Small C&I |
| | | G-02 | General C&I |
| | | G-32 | 200 kW Demand |
| H-2 | Space Heating Service (non-industrial) | C-06 | Small C&I |
| | | G-02 | General C&I |
| W-1 | Controlled Water Heating Service (all customer types) | A-16 | Basic Residential |
| | | C-06 | Small C&I |
| | | G-02 | General C&I |
| S-1 | Lighting Service (company owned) | S-14 | General Streetlighting |
| C-1 | Transmission Voltage General Service | N-01 | 69 KV Rate |

Exhibit JMM-4

NEC092281

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-4

Exhibit JMM-4

Calculation of Newport Zonal Distribution Factor

39

Confidential

NEC092282

File:    C:\123data\JAMES\M&A\BASEDist\er4.WK4

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 4
Page 1 of 1

## The Narragansett Electric Company
## Calculation of Newport Zonal Distribution Factor

| | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| R-1 | 167,201,036 | $8,789,761 | $6,980,462 | ($1,809,299) | -20.58% |
| R-2 | 1,764,819 | $46,855 | $41,685 | ($5,170) | -11.03% |
| R-4 | 7,100,991 | $336,292 | $201,219 | ($135,073) | -40.17% |
| W-1 | 13,383,268 | $532,967 | $493,017 | ($39,950) | -7.50% |
| H-1 | 4,908,488 | $197,500 | $109,028 | ($88,471) | -44.80% |
| H-2 | 5,723,950 | $285,678 | $201,946 | ($83,733) | -29.31% |
| G-1 | 42,449,011 | $2,644,197 | $1,927,858 | ($716,339) | -27.09% |
| G-2 | 105,080,586 | $4,132,677 | $2,663,385 | ($1,469,292) | -35.55% |
| T-2 | 14,361,960 | $543,005 | $246,665 | ($296,340) | -54.57% |
| T-4 | 18,430,440 | $729,059 | $315,676 | ($413,383) | -56.70% |
| G-5 | 15,075,589 | $515,464 | $270,179 | ($245,285) | -47.59% |
| T-5 | 2,964,000 | $96,839 | $41,850 | ($54,989) | -56.78% |
| T-6 | 24,547,599 | $823,206 | $386,545 | ($436,661) | -53.04% |
| C-1 | 0 | $0 | $0 | $0 | 0.00% |
| S-1 | 5,614,981 | $479,974 | $611,896 | $131,922 | 27.49% |
| Total Company | 428,606,718 | $20,153,473 | $14,491,409 | ($5,662,063) | -28.09% |
| 50% of Savings | | | | $2,831,032 | 14.05% |
| Zonal Distribution Factor to Non C-1 Newport Customers | | | | $0.00661 | |

Calculation of C-1 Rate

| | Pre-Merger Rates | Allocation Percentage | Post Merger Rates | Adjustment Factors | Base Distribution |
|---|---|---|---|---|---|
| Distribution Charge per kW | $7.68 | 85.95% | $6.60 | | $6.60 |
| Distribution Charge per kVAR | $0.23 | 85.95% | $0.20 | | $0.20 |
| Distribution Charge per kWh | $0.00851 | 85.95% | $0.00731 | $0.00434 | $0.00297 |

40

Confidential

NEC092283

Exhibit JMM-5

Confidential

NEC092284

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-5

Exhibit JMM-5

Impact on Distribution Revenue

Confidential

File: C:\123data\JAMES\M&A\BASE\Bvepla10.wk4

Range: Summary22

Date: 14-May-99

Narragansett Electric

BVE/Newport Electric

R.I.P.U.C. Docket No. _____

Exhibit JMM - 5

Page 1 of 3

## The Narragansett Electric Company
### Distribution Revenue Shift by Moving BVE Customers to Narragansett Rates

| | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| R-1 | 362,568,042 | $16,691,896 | $15,568,207 | ($1,123,689) | -6.73% |
| R-2 | 10,464,104 | $199,229 | $199,223 | ($5) | -0.00% |
| R-3 | 9,162,722 | $324,117 | $364,168 | $40,051 | 12.36% |
| R-4 | 4,487,447 | $140,255 | $128,768 | ($11,488) | -8.19% |
| W-1 | 3,602,371 | $85,385 | $132,640 | $47,255 | 55.34% |
| H-1 | 3,639,022 | $108,875 | $91,618 | ($17,257) | -15.85% |
| H-2 | 2,290,392 | $81,661 | $85,917 | $4,256 | 5.21% |
| G-1 | 43,670,643 | $2,194,076 | $2,195,560 | $1,484 | 0.07% |
| G-2 | 313,855,524 | $8,917,404 | $8,661,946 | ($255,458) | -2.86% |
| T-2 | 45,916,407 | $1,220,459 | $855,627 | ($364,831) | -29.89% |
| T-4 | 78,036,479 | $1,549,489 | $1,328,989 | ($220,500) | -14.23% |
| G-5 | 23,108,580 | $493,896 | $446,164 | ($47,732) | -9.66% |
| T-5 | 8,474,950 | $173,126 | $129,562 | ($43,564) | -25.16% |
| T-6 | 369,857,394 | $5,273,150 | $5,336,703 | $63,552 | 1.21% |
| A-6 | 6,085,455 | $150,392 | $115,434 | ($34,958) | -23.24% |
| S-1 | 14,647,035 | $1,428,554 | $1,428,459 | ($95) | -0.01% |
| **Total Company** | 1,299,866,567 | $39,031,963 | $37,068,984 | ($1,962,978) | -5.03% |

See Workpaper JMM - 1

Confidential

File:    C:\123data\JAMES\M&A\BASE\Nerrplan.wk4
Range:   Semmary2
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 5
Page 2 of 3

## The Narragansett Electric Company
### Distribution Revenue Shift from Merger to Narragansett Customers

|  | Units (1) | Pre-Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| A-16 | 1,475,595,371 | $62,144,457 | $62,144,457 | $0 | 0.00% |
| A-18 | 299,522,556 | $10,321,633 | $10,321,633 | $0 | 0.00% |
| A-32 | 33,569,784 | $950,714 | $950,714 | $0 | 0.00% |
| A-60 | 45,194,386 | $1,043,247 | $1,043,247 | $0 | 0.00% |
| E-30 | 1,519,157 | $25,915 | $25,915 | $0 | 0.00% |
| E-40 | 12,436,324 | $114,501 | $114,501 | $0 | 0.00% |
| C-06 | 319,448,478 | $14,345,578 | $14,345,578 | $0 | 0.00% |
| G-02 | 857,825,162 | $23,269,571 | $23,269,571 | $0 | 0.00% |
| G-32 | 1,497,395,176 | $24,752,330 | $24,752,330 | $0 | 0.00% |
| G-62 | 360,114,300 | $3,268,759 | $3,268,759 | $0 | 0.00% |
| R-02 | 4,803,789 | $43,474 | $43,474 | $0 | 0.00% |
| S-10 | 49,529,091 | $6,887,061 | $6,887,061 | $0 | 0.00% |
| T-06 | 21,835,478 | $536,094 | $536,094 | $0 | 0.00% |
| V-02 | 7,686,406 | $272,175 | $272,175 | $0 | 0.00% |
| **Total Company** | 4,986,475,458 | $147,975,509 | $147,975,509 | $0 | 0.00% |

See Workpaper JMM - 2

Confidential

File:      C:\123data\JAMES\M&A\BASE\Necpia10.WK4
Range:     Summary22
Date:      14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 5
Page 3 of 3

## The Narragansett Electric Company
### Distribution Revenue Shift by Moving Newport Customers to Narragansett Rates

|  | Units<br>(1) | Pre Merger<br>Revenues<br>(2) | Post Merger<br>Revenues<br>(3) | Revenue<br>Shift<br>(4) | Percent<br>Increase/<br>(Decrease)<br>(5) |
|---|---|---|---|---|---|
| R-1 | 167,201,036 | $8,789,761 | $8,085,660 | ($704,100) | -8.01% |
| R-2 | 1,764,819 | $46,855 | $46,849 | ($6) | -0.01% |
| R-4 | 7,100,991 | $336,292 | $248,156 | ($88,136) | -26.21% |
| W-1 | 13,383,268 | $532,967 | $581,480 | $48,513 | 9.10% |
| H-1 | 4,908,488 | $197,500 | $141,474 | ($56,026) | -28.37% |
| H-2 | 5,723,950 | $285,678 | $239,781 | ($45,898) | -16.07% |
| G-1 | 42,449,011 | $2,644,197 | $2,208,446 | ($435,751) | -16.48% |
| G-2 | 105,080,586 | $4,132,677 | $3,357,967 | ($774,709) | -18.75% |
| T-2 | 14,361,960 | $543,005 | $341,598 | ($201,408) | -37.09% |
| T-4 | 18,430,440 | $729,059 | $437,501 | ($291,558) | -39.99% |
| G-5 | 15,075,589 | $515,464 | $368,832 | ($146,632) | -28.45% |
| T-5 | 2,964,000 | $96,839 | $61,246 | ($35,593) | -36.75% |
| T-6 | 24,547,599 | $823,206 | $547,182 | ($276,024) | -33.53% |
| C-1 | 114,919,292 | $2,613,557 | $2,245,649 | ($367,909) | -14.08% |
| S-1 | 5,614,981 | $479,974 | $479,932 | ($42) | -0.01% |
| **Total Company** | 543,526,010 | $22,767,030 | $19,391,754 | ($3,375,276) | -14.83% |

See Workpaper JMM - 3

Confidential

Exhibit JMM-6

NEC092289

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-6

Exhibit JMM-6

Impact on Transmission Revenue

File      C:\123data\JAMES\M&A\BASE\Bvrpla10.wk4
Range     Summary23
Date:     14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 6
Page 1 of 3

## The Narragansett Electric Company
### Transmission Revenue Shift by Moving BVE Customers to Consolidated Transmission Rates

|  | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| R-1 | 362,568,042 | $1,007,939 | $1,113,084 | $105,145 | 10.43% |
| R-2 | 10,464,104 | $29,090 | $21,870 | ($7,220) | -24.82% |
| R-3 | 9,162,722 | $25,472 | $28,130 | $2,657 | 10.43% |
| R-4 | 4,487,447 | $12,475 | $11,802 | ($673) | -5.40% |
| W-1 | 3,602,371 | $10,015 | $11,093 | $1,078 | 10.76% |
| H-1 | 3,639,022 | $10,116 | $13,786 | $3,670 | 36.28% |
| H-2 | 2,290,392 | $6,367 | $10,983 | $4,616 | 72.49% |
| G-1 | 43,670,643 | $121,404 | $177,740 | $56,335 | 46.40% |
| G-2 | 313,855,524 | $872,518 | $1,068,723 | $196,205 | 22.49% |
| T-2 | 45,916,407 | $127,648 | $102,845 | ($24,802) | -19.43% |
| T-4 | 78,036,479 | $216,941 | $186,061 | ($30,881) | -14.23% |
| G-5 | 23,108,580 | $64,242 | $81,984 | $17,742 | 27.62% |
| T-5 | 8,474,950 | $23,560 | $15,393 | ($8,167) | -34.66% |
| T-6 | 369,857,394 | $1,028,204 | $706,737 | ($321,466) | -31.26% |
| A-6 | 6,085,455 | $16,918 | $31,829 | $14,912 | 88.14% |
| S-1 | 14,647,035 | $40,719 | $19,542 | ($21,177) | -52.01% |
| Total Company | 1,299,866,567 | $3,613,629 | $3,601,602 | ($12,027) | -0.33% |

See Workpaper JMM - 1

Confidential

File:      C:\123data\JAMES\V4&A\BASE\Narrplan.wk4
Range:     Summary5
Date:      14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 6
Page 2 of 3

## The Narragansett Electric Company
### Transmission Revenue Shift from Merger to Narragansett Customers

|  | Units<br>(1) | Pre-Merger<br>Revenues<br>(2) | Post Merger<br>Revenues<br>(3) | Revenue<br>Shift<br>(4) | Percent<br>Increase/<br>(Decrease)<br>(5) |
|---|---|---|---|---|---|
| A-16 | 1,475,595,371 | $7,599,316 | $7,599,316 | $0 | 0.00% |
| A-18 | 299,522,556 | $1,395,775 | $1,395,775 | $0 | 0.00% |
| A-32 | 33,569,784 | $158,114 | $158,114 | $0 | 0.00% |
| A-60 | 45,194,386 | $188,461 | $188,461 | $0 | 0.00% |
| E-30 | 1,519,157 | $5,165 | $5,165 | $0 | 0.00% |
| E-40 | 12,436,324 | $27,360 | $27,360 | $0 | 0.00% |
| C-06 | 319,448,478 | $1,964,608 | $1,964,608 | $0 | 0.00% |
| G-02 | 857,825,162 | $4,020,918 | $4,020,918 | $0 | 0.00% |
| G-32 | 1,497,395,176 | $6,327,079 | $6,327,079 | $0 | 0.00% |
| G-62 | 360,114,300 | $1,256,287 | $1,256,287 | $0 | 0.00% |
| R-02 | 4,803,789 | $16,237 | $16,237 | $0 | 0.00% |
| S-10 | 49,529,091 | $167,408 | $167,408 | $0 | 0.00% |
| T-06 | 21,835,478 | $96,076 | $96,076 | $0 | 0.00% |
| V-02 | 7,686,406 | $48,117 | $48,117 | $0 | 0.00% |
| **Total Company** | 4,986,475,458 | $23,270,921 | $23,270,921 | $0 | 0.00% |

See Workpaper JMM - 2

Confidential

File.    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:   Summary23
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 6
Page 3 of 3

## The Narragansett Electric Company
### Transmission Revenue Shift by Moving Newport Customers to Consolidated Transmission Rates

|  | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| R-1 | 167,201,036 | $456,459 | $501,603 | $45,144 | 9.89% |
| R-2 | 1,764,819 | $4,818 | $3,565 | ($1,253) | -26.01% |
| R-4 | 7,100,991 | $19,386 | $18,179 | ($1,207) | -6.23% |
| W-1 | 13,383,268 | $36,536 | $40,435 | $3,899 | 10.67% |
| H-1 | 4,908,488 | $13,400 | $11,731 | ($1,669) | -12.46% |
| H-2 | 5,723,950 | $15,626 | $23,398 | $7,771 | 49.73% |
| G-1 | 42,449,011 | $115,886 | $169,796 | $53,910 | 46.52% |
| G-2 | 105,080,586 | $286,870 | $246,993 | ($39,877) | -13.90% |
| T-2 | 14,361,960 | $39,208 | $21,379 | ($17,829) | -45.47% |
| T-4 | 18,430,440 | $50,315 | $47,748 | ($2,568) | -5.10% |
| G-5 | 15,075,589 | $41,156 | $37,979 | ($3,177) | -7.72% |
| T-5 | 2,964,000 | $8,092 | $2,767 | ($5,324) | -65.80% |
| T-6 | 24,547,599 | $67,015 | $36,700 | ($30,315) | -45.24% |
| C-1 | 114,919,292 | $313,730 | $313,730 | $0 | 0.00% |
| S-1 | 5,614,981 | $15,329 | $7,073 | ($8,256) | -53.86% |
| Total Company | 543,526,010 | $1,483,826 | $1,483,075 | ($751) | -0.05% |

See Workpaper JMM - 3

Confidential

Exhibit JMM-7

Confidential

NEC092294

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-7

Exhibit JMM-7

Merged Transmission Adjustment Factors

Confidential

C:\123data\JAMES\M&A\BASE\Transmi2.WK4
Range:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 7
Page 1 of 7

The Narragansett Electric Company
Projected Year 2000 Narragansett Only Transmission Rate
Calculation of Narragansett's Projected Transmission Adjustment Factor

| | | |
|---|---|---|
| 1 | Projected Revenue on Present Rates | $19,288,812 |
| 2 | 1998 kWh Sales less Discounted kWh | 4,979,191,154 |
| 3 | Average Revenue per kWh | $0.00387 |
| 4 | Forecasted Transmission Expenses | $23,218,705 |
| 5 | 1998 kWh Sales less Discounted kWh | 4,979,191,154 |
| 6 | Average Expense per kWh | $0.00466 |
| 7 | Transmission Adjustment Factor per kWh | $0.00079 |

1  Exhibit JMM - 7, Page 2 of 7
2  1998 Actual kWh Less Discounted kWh
3  Line (1) ÷ Line (2)
4  Workpaper JMM - 4 , Line (3) + Line (4)
5  Line 2
6  Line (4) ÷ Line (5)
7  Line (6) - Line (3)

Confidential

C:\12Sept14ARESPkRA\RATESTransmitI.RK4
Range:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 7
Page 2 of 7

## The Narragansett Electric Company
### Projected Year 2000 Narragansett Only Transmission Rate
### Projected Transmission Revenue on Narragansett Base Rates

| | Total | A-16 | A-18 | A-32 | A-60 | E-30 | C-06 | E-40 | G-02 | G-32 | G-62 | T-06 | V-01 | Streetlight |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Projected Billing Determinants** | | | | | | | | | | | | | | |
| kW Demand | | | | | | | | | | | | | | |
| kW Demand In Excess of 10 kW | | | | | | | | | 2,393,998 | 4,100,824 | 631,081 | | | |
| kWh Sales | | 1,475,595,571 | 399,522,556 | 33,569,784 | 45,194,386 | 1,519,157 | 319,448,478 | 12,436,324 | | | | 21,835,478 | 7,686,406 | 4,332,880 |
| Less: High Voltage Metering Units | | | | | | | | | 142 | 9,055 | 6,311 | | | |
| | | | | | | | | | | | | | | |
| Present Transmission Rate | $0.00387 | $0.00416 | $0.00387 | $0.00392 | $0.00338 | $0.00261 | $0.00536 | $0.00141 | $1.40 | $1.27 | $1.39 | $0.00261 | $0.00547 | $0.00259 |
| | | | | | | | | | | | | | | |
| **Projected Transmission Revenues** | | | | | | | | | | | | | | |
| Demand Revenues | $9,616,846 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,351,597 | $5,208,046 | $817,203 | $0 | $0 | $0 |
| Energy Revenues | $9,872,436 | $6,433,596 | $1,159,152 | $131,594 | $152,757 | $3,965 | $1,712,244 | $517,535 | $0 | $0 | $0 | $78,826 | $42,045 | $140,721 |
| Less Discounts | ($310,470) | $-0 | $-0 | $-0 | $-0 | $-0 | $-0 | $-0 | ($198) | ($11,500) | ($8,772) | $-0 | $-0 | $-0 |
| Total Projected Revenues | $19,288,812 | $6,433,596 | $1,159,152 | $131,594 | $152,757 | $3,965 | $1,712,244 | $517,535 | $3,351,399 | $5,196,547 | $808,431 | $78,826 | $42,045 | $140,721 |

Confidential

C:\123data\JAMES\M&A\BASE\Transmi2.WK4
Range:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 7
Page 3 of 7

## The Narragansett Electric Company
### Projected Year 2000 Blackstone Valley Only Transmission Rate
### Calculation of Blackstone's Projected Transmission Adjustment Factor

| | | |
|---|---|---:|
| 1 | Projected Revenue on Present Rates | $5,273,670 |
| 2 | 1998 kWh Sales less Discounted kWh | 1,296,176,588 |
| 3 | Average Revenue per kWh | $0.00407 |
| 4 | Forecasted Transmission Expenses | $3,600,024 |
| 5 | 1998 kWh Sales less Discounted kWh | 1,296,176,588 |
| 6 | Average Expense per kWh | $0.00278 |
| 7 | Transmission Adjustment Factor per kWh | ($0.00129) |

1  Exhibit JMM - 7, Page 4 of 7
2  1998 Actual kWh Less Discounted kWh
3  Line (1) ÷ Line (2)
4  Workpaper JMM - 4, Line (5) + Line (6)
5  Line 2
6  Line (4) ÷ Line (5)
7  Line (6) - Line (3)

Confidential

Narragansett Electric
BVE/Newport Electric
R.L.P.U.C. Docket No._____
Exhibit JMM-7
Page 4 of 7

C:\123data\NARESNAR\NAR50\nar50.1WK4
narnar

**The Narragansett Electric Company**
Projected Year 2000 Blackstone Valley Only Transmission Rate
Projected Blackstone Transmission Revenue on Narragansett Base Rates

| | Total | A-16 | A-18 | A-32 | A-60 | E-30 | C-06 | E-40 | G-02 | G-32 | G-62 | T-06 | V-02 | Streetlight |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Projected Billing Determinants** | | | | | | | | | | | | | | |
| kW Demand | | | | | | | | | | | | | | |
| kW Demand in Excess of 10 kW | | | 0 | | | 0 | 0 | 0 | 658,159 | 1,493,946 | 142,198 | 0 | 0 | 0 |
| kWh Sales | | 375,399,762 | | 4,487,447 | 10,464,104 | | 101,265,144 | | | | | | | 15,032,320 |
| Less High Voltage Metering Units | | | | | | | | | 274 | 8,930 | 1,432 | | | |
| | | | | | | | | | | | | | | |
| Present Transmission Rate | $0.00407 | $0.00436 | $0.00387 | $0.00392 | $0.00338 | $0.00261 | $0.00536 | $0.00141 | $1.40 | $1.27 | $1.39 | $0.00361 | $0.00547 | $0.00259 |
| | | | | | | | | | | | | | | |
| **Projected Transmission Revenues** | | | | | | | | | | | | | | |
| Demand Revenues | $3,016,389 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $921,423 | $1,897,311 | $197,655 | $0 | $0 | $0 |
| Energy Revenues | $2,270,991 | $1,636,307 | $0 | $17,591 | $35,369 | $0 | $542,781 | $0 | $0 | $0 | $0 | $0 | $0 | $38,934 |
| Less Discounts | ($13,701) | $-0 | $-0 | $-0 | $-0 | $-0 | $-0 | $-0 | ($383) | ($11,341) | ($1,977) | $-0 | $-0 | $-0 |
| Total Projected Revenues | $5,273,670 | $1,636,307 | $0 | $17,591 | $35,369 | $0 | $542,781 | $0 | $921,039 | $1,885,970 | $195,679 | $0 | $0 | $38,934 |

Confidential

NEC092299

C:\123data\JAMES\M&A\BASE\Transmi2.WK4
Range:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 7
Page 5 of 7

The Narragansett Electric Company
Projected Year 2000 Newport Only Transmission Rate
Calculation of Newport's Projected Transmission Adjustment Factor

| | | |
|---|---|---|
| 1 | Projected Revenue on Present Rates | $2,221,874 |
| 2 | 1998 kWh Sales less Discounted kWh | 543,235,202 |
| 3 | Average Revenue per kWh | $0.00409 |
| 4 | Forecasted Transmission Expenses | $1,483,023 |
| 5 | 1998 kWh Sales less Discounted kWh | 543,235,202 |
| 6 | Average Expense per kWh | $0.00273 |
| 7 | Transmission Adjustment Factor per kWh | ($0.00136) |

1  Exhibit JMM - 7, Page 6 of 7
2  1998 Actual kWh Less Discounted kWh
3  Line (1) ÷ Line (2)
4  Workpaper JMM - 4 , Line (7) + Line (8)
5  Line 2
6  Line (4) ÷ Line (5)
7  Line (6) - Line (3)

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JNM4-7
Page 6 of 7

C:\1296xx\AMERNA&A\RATE\Transmit.WK4
Rates:

**The Narragansett Electric Company**
**Projected Year 2000 Newport Only Transmission Rate**
**Projected Newport Transmission Revenue on Narragansett Base Rates**

| | Total | A-16 | A-18 | A-32 | A-60 | C-01 | C-06 | E-40 | G-02 | G-32 | G-62 | T-06 | V-02 | Streetlight |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Projected Billing Determinants** | | | | | | | | | | | | | | |
| kW Demand | | | | | | | | | | | | | | |
| kW Demand in Excess of 10 kW | | 180,263,882 | 0 | 7,100,991 | 1,764,819 | 114,919,292 | 54,074,092 | 0 | 251,705 | 177,940 | 36,233 | 0 | 0 | 5,750,045 |
| kWh Sales | | | | | | | | | 148 | 512 | 362 | | | |
| Less: High Voltage Metering Units | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Present Transmission Rate | $0.00409 | $0.00456 | $0.00387 | $0.00392 | $0.00338 | $0.00409 | $0.00536 | $0.00141 | $1.40 | $1.27 | $1.39 | $0.00361 | $0.00347 | $0.00259 |
| | | | | | | | | | | | | | | |
| **Projected Transmission Revenues** | | | | | | | | | | | | | | |
| Demand Revenues | $628,735 | | | | | | | | $352,387 | $225,984 | $50,364 | | | |
| Energy Revenues | $1,594,501 | $785,951 | $0 | $27,836 | $5,965 | $470,020 | $289,837 | $0 | $0 | $0 | $0 | $0 | $0 | $14,893 |
| Less Discounts | ($1,361) | $-0 | $-0 | $-0 | $-0 | $-0 | $-0 | $-0 | ($208) | ($650) | ($504) | $-0 | $-0 | $-0 |
| Total Projected Revenues | $2,221,874 | $785,951 | $0 | $27,836 | $5,965 | $470,020 | $289,837 | $0 | $352,179 | $225,334 | $49,860 | $0 | $0 | $14,893 |

Confidential

55
NEC092301

C:\123data\JAMES\M&A\BASE\Transmi2.WK4
Range:

The Narragansett Electric Company
Projected Consolidated Transmission Rate
Calculation of Projected Consolidated Transmission Adjustment Factor

| | | |
|---|---|---|
| 1 | Projected Revenue on Present Rates | $26,784,356 |
| 2 | 1998 kWh Sales less Discounted kWh | 6,818,602,945 |
| 3 | Average Revenue per kWh | $0.00393 |
| 4 | Forecasted Transmission Expenses | $28,301,752 |
| 5 | 1998 kWh Sales less Discounted kWh | 6,818,602,945 |
| 6 | Average Expense per kWh | $0.00415 |
| 7 | Transmission Adjustment Factor per kWh | $0.00022 |

1  Page 1, Line (1) + Page 3, Line (1) + Page 5, Line (1)
2  Page 1, Line (2) + Page 3, Line (2) + Page 5, Line (2)
3  Line (1) ÷ Line (2)
4  Page 1, Line (4) + Page 3, Line (4) + Page 5, Line (4)
5  Line 2
6  Line (4) ÷ Line (5)
7  Line (6) - Line (3)

Confidential

Exhibit JMM-8

Confidential

NEC092303

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-8

Exhibit JMM-8

Post Merger Transition Charges

Confidential

# Tab 17



EXHIBIT
78

# The Narragansett Electric Company, Blackstone Valley Electric Company, and Newport Electric Corporation

## Rate Plan Filing in Support of Merger

## Volume 2 - **REVISED**

Testimony and Exhibits of:
James M. Molloy
James J. Bonner, Jr.

June, 1999

Submitted to:
    Rhode Island Public Utilities Commission
    RIPUC Docket 2930

Submitted by:





Eastern Utilities Associates

Confidential

NF

Testimony of
James M. Molloy

Confidential

NEC092238

THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
RHODE ISLAND PUBLIC UTILITIES COMMISSION

| | | |
|---|---|---|
| Narragansett Electric | ) | R.I.P.U.C. No. 2930 |
| BVE/Newport Electric | ) | |

DIRECT TESTIMONY

OF

JAMES M. MOLLOY

Confidential

THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
RHODE ISLAND PUBLIC UTILITIES COMMISSION

| | |
|---|---|
| _____ )<br>Narragansett Electric )<br>BVE/Newport Electric )<br>_____ ) | R.I.P.U.C. No. 2930 |

DIRECT TESTIMONY
OF
JAMES M. MOLLOY

Table of Contents

| | | |
|---|---|---|
| I. | Introduction and Qualifications | 1 |
| II. | Purpose of Testimony | 2 |
| III. | Summary of Current Rates | 3 |
| | A. Narragansett | 3 |
| | B. Blackstone and Newport | 5 |
| IV. | Proposed Rate Plan | 6 |
| | A. Overview | 6 |
| | B. Distribution Rates | 10 |
| | C. Transmission Rates | 14 |
| | D. Transition Charges | 16 |
| | E. Standard Offer Rates | 18 |
| | F. Other Rate Issues | 18 |
| V. | Revenue Effects | 19 |
| | A. Overall | 19 |
| | B. Typical Bills | 19 |
| VI. | Tariffs | 20 |
| | A. Terms and Conditions | 20 |
| | B. Tariffs | 21 |
| | C. Adjustment Provisions | 22 |
| VIII. | Conclusion | 23 |

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 1 of 23

1    **I.**    **Introduction and Qualifications**

2    Q.    Please state your full name and business address.

3    A.    James M. Molloy, 25 Research Drive, Westborough, Massachusetts 01582.

4    .

5    Q.    Please state your position.

6    A.    I am a Senior Rate Analyst for New England Power Service Company, performing rate

7        related services for the New England Electric System, including The Narragansett

8        Electric Company ("Narragansett" or "the Company").

9

10    Q.    Will you describe your educational background and training?

11    A.    In 1992, I graduated from Catholic University with a Bachelor of Arts degree in

12        Accounting.  In 1994, I received a Masters in Business Administration with a

13        concentration in Finance from the William E. Simon Graduate School of Business

14        Administration at the University of Rochester.

15

16    Q.    What is your professional background?

17    A.    In 1995, I was hired by the New England Power Service Company as an Assistant Rate

18        Analyst in the Rate Department.  In 1996, I was promoted to the position of Rate Analyst.

C:\DOC\MERGER\MOLLOY.D#6

3
NEC092241

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 2 of 23

1    In 1998, I was promoted to my current position of Senior Rate Analyst. In this position I

2    have been responsible for rate design analysis for various New England Electric System

3    companies.   Specifically, I have conducted allocated distribution cost of service studies

4    and supported others in the development of cost allocation and rate design studies.

5    Further, I have provided analytical support for witnesses in various NEES retail company

6    regulatory proceedings on various rate design and cost allocation issues.  In addition, I

7    have had primary responsibility for performing customer-specific rate impact analyses.

8    For the last two years, I have performed rate and cost allocation analytical work in the

9    unbundling of rates for the NEES retail companies in preparation of industry

10   restructuring.

11

12   Q.   Have you testified in Rhode Island Public Utilities Commission proceedings?

13   A.   Yes. I have testified at hearings during the past two years regarding the subject of

14   Narragansett's Standard Offer rates and other rate design matters.

15

16   **II.   <u>Purpose of Testimony</u>**

17   Q.   What is the purpose of your testimony?

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 3 of 23

1    A.    The purpose of my testimony is to present the proposed rate plan of Narragansett,

2          Blackstone Valley Electric Company ("Blackstone") and Newport Electric Company

3          ("Newport") (together, "the Companies"), in connection with the merger of NEES and

4          Eastern Utilities Associates ("EUA"). First, I will provide a brief summary of all three

5          companies' current rates. Second, I will describe the proposed rate plan, including

6          special rate mapping issues, which will serve as a means of consolidating the rates of

7          Narragansett, Blackstone and Newport. Next, I will present the anticipated effects of the

8          rate plan on revenues, both at the component level and at the total revenue level. This

9          presentation will include an analysis of typical customer bills. Finally, I will discuss

10         tariff changes made necessary by the proposed plan.

11

12   III.  **Summary of Current Rates**

13         **A.    Narragansett**

14   Q.    Please provide a brief summary of Narragansett's current rates.

15   A.    Narragansett's distribution rates were approved by the Commission in Docket No. 2290

16         effective December 15, 1996 and unbundled in Docket No. 2515. In accordance with the

17         Rhode Island Utility Restructuring Act ("URA") these rates remained frozen through

18         December, 1998 except for increases allowed through the Performance Based Rate

C:\DOC\MERGER\MOLLOY.D#6

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 4 of 23

1    mechanism of the URA, as approved by the Commission in Docket No. 2500.  Currently,

2    the average distribution charge is 2.967¢/kWh.

3

4    Narragansett's current average transmission rate of 0.455¢/kWh as approved by the

5    Commission in Docket No. 2841 collects both the base transmission rate of 0.387¢/kWh

6    and the transmission adjustment for calender year 1999 of 0.068¢/kWh.  Narragansett's

7    transmission rate recovers on a fully reconciling basis the costs it incurs to provide

8    transmission.  The transmission component of Narragansett's rates is based on

9    transmission costs incurred from New England Power Company ("NEP"), the New

10   England Power Pool ("NEPOOL") and the Independent System Operator ("ISO").

11   Narragansett's base transmission rate is composed of a different rate for each rate class

12   which is based on the class demands coincident with NEP's 12 monthly transmission

13   peaks.

14

15   The Transition Charge is currently 1.15¢/kWh as approved in Docket No. 2771.

16   Narragansett's transition charge recovers on a fully reconciling basis the Contract

17   Termination Charge ("CTC") billed to it by NEP.

18

C:\DOC\MERGER\MOLLOY.D46

6
NEC092244

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 5 of 23

1       Narragansett's uniform Standard Offer charge of 3.5¢/kWh mirrors the 3.5¢/kWh charged

2       to the Company by its Standard Offer suppliers.  The Standard Offer is scheduled to

3       increase to 3.8¢/kWh on January 1, 2000.

4

5       **B.**    **Blackstone and Newport**

6   Q.   Please provide a brief summary of Blackstone's and Newport's current rates.

7   A.   Blackstone's and Newport's distribution rates were approved by the Commission in

8       Docket No. 2514 except for the increases allowed through the Performance Based Rate

9       mechanism of the URA which were approved in Docket No. 2498 for Blackstone and

10      Docket No. 2499 for Newport.  Under the terms of the retail restructuring settlement in

11      consolidated Dockets 2514, 2651, and 2653 Blackstone's and Newport's distribution

12      rates are prohibited from any other increases through December 31, 2000.  Currently,

13      Blackstone's average distribution charge is 3.002¢/kWh while Newport's average

14      distribution charge is 4.187¢/kWh.  Finally, in Docket No. 2888 Blackstone and Newport

15      modified the distribution rates of certain rate classes as a means to hold customers

16      harmless from the implementation of a uniform, cents per kWh Standard Offer price.

17

C:\DOCMERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 6 of 23

1       Both Blackstone and Newport have a current average transmission rate of 0.267¢/kWh.

2       This rate collects the current annual cost of transmission for the calendar year 1999 for

3       each company. The transmission rate of each company is the transmission rate of

4       Montaup Electric Company ("Montaup") approved by FERC which recovers actual

5       transmission costs that Montaup, NEPOOL and the ISO incur to provide transmission

6       service based on a historical test year. Montaup's transmission rate, as billed to

7       customers by Blackstone and Newport, is an uniform ¢/kWh charge applicable to all

8       retail customers of Montaup's affiliated companies.

9

10      The transition charge is currently 2.040¢/kWh for Blackstone and 2.060¢/kWh for

11      Newport. This charge was approved in Docket No. 2888.

12

13      Blackstone's and Newport's uniform Standard Offer charge of 3.5¢/kWh mirrors the

14      3.5¢/kWh charged to them by their Standard Offer suppliers. This wholesale Standard

15      Offer is scheduled to increase to 3.8¢/kWh on January 1, 2000.

16

17   **IV.**   **Proposed Rate Plan**

18       **A.**    **Overview**

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 7 of 23

1    Q.    Before explaining the rate plan, are there any terms that you will be using that would be

2           helpful to define?

3    A.    Yes. I believe it would be helpful to provide a definition of certain terms that I will use

4           in describing the rates. Specifically, when I refer to "distribution rates" or "distribution

5           component", I am referring to the component of rates relating to distribution that excludes

6           Transmission, Transition, Conservation and Load Management, and Standard Offer

7           charges.  In contrast, when I refer to "delivery rates", I am referring to all rates,

8           excluding only Standard Offer service. Finally, when I refer to "rates" generically, I

9           intend to include all rates, including Standard Offer service.

10

11

12    Q.    Please provide a general description of the Companies' proposed rate plan.

13    A.    An overview of the rate plan is provided in the testimony of Mr. Jesanis. In summary,

14           the rate plan will become effective 120 days from the closing of the EUA-NEES merger

15           or April 1, 2000, whichever occurs later ("Rate Consolidation Date"). As described by

16           Mr. Jesanis, the plan creates immediate rate reductions for customers of Blackstone and

17           Newport, without increasing the delivery rates of Narragansett customers. After an

18           adjustment to the distribution rate is made on January 1, 2001, the distribution component

C:\DOC\MERGER\MOLLOY.D#6

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 8 of 23

1    of all customers bills will be frozen in two phases. The result would be a distribution rate

2    freeze through the year 2004. Mr. Jesanis describes the distribution rate freeze proposal

3    in greater detail, including exceptions for certain exogenous factors, as well as the

4    inflation protection provision that could only be triggered during the last two years of the

5    plan.

6

7    The plan would be implemented by placing all customers on Narragansett's rates with a

8    distribution surcharge to customers formerly served by Newport and a transition

9    surcharge to customers formerly served by Newport and BVE. However, there are three

10   exceptions to this general proposal. First, the companies are proposing special treatment

11   for the Newport C-1 rate as described below. The second exception allows an additional

12   credit to the low income customers of Blackstone and Newport during 2000 to ensure that

13   they are held harmless from the consolidation of rates during this period. A third

14   exception has been made for streetlighting customers of Blackstone and Newport who

15   would otherwise see significant increases under this proposal. Under the plan, all

16   customers of Blackstone and Newport would be moved onto the distribution rates of

17   Narragansett effective for bills rendered on the Rate Consolidation Date. However,

18   customers of Newport will be assessed a distribution surcharge as described below.

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 9 of 23

1     In the case of the Navy, Newport has a special rate class C-1. The Companies would

2     retain the C-1 rate, but reduce it by 14%, which is equal to the average distribution rate

3     decrease for all other Newport customers as a result of the merger. Instead of having the

4     rate function as an amendment to the antiquated 1961 contract entered into between

5     Newport and the Navy, the Company proposes a new tariff that embodies the old C-1 rate

6     reflecting the further 14% discount, with appropriate changes to the terms and conditions

7     in the tariff. The new tariff is designated as the "69kV Rate (N-01)".

8

9    Q.    What impact would these proposed changes have on the customers of Narragansett,

10      Blackstone and Newport?

11    A.    As shown in Exhibit JMM-1 the rate consolidation plan would reduce Blackstone's and

12      Newport's rates in 2000 by approximately $2.1 million and $3.4 million, respectively.

13      An exhibit summarizing the companies projected average rates or "rate paths" for the

14      years of the rate plan are included as Exhibit JMM-2. As shown in this exhibit, average

15      delivery rates for each of the Companies decline over the rate plan period.

16

17    Q.    How would the customers of Blackstone and Newport be transferred to Narragansett's

18      rates?

C:\DOC\MERGER\MOLLOY.D46

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 10 of 23

1    A.    Rate classes of Blackstone and Newport are proposed to be mapped to Narragansett's rate

2          classes as illustrated in Exhibit JMM-3. This proposed rate mapping is determined by

3          referring to the availability provisions of Blackstone and Newport retail delivery service

4          tariffs and matching each tariff to a corresponding Narragansett retail delivery service

5          tariff. Customer usage within several Blackstone and Newport general service rate

6          classes maps to more than one Narragansett rate class because the availability provisions

7          of the Blackstone and Newport tariffs encompass a wider range of customer usage levels

8          than the Narragansett tariffs. As part of the mapping process, the billing determinants

9          under some Blackstone and Newport rate classes have been broken down into

10         subcategories in order to assign them to the correct Narragansett rate classes. The

11         testimony of Mr. Bonner supports in more detail the rate mapping process and the billing

12         determinants that the Companies are using to determine the effect on revenue.

13

14         **B.    Distribution Rates**

15    Q.    What is the proposed plan for the distribution rates of Blackstone, Newport and

16          Narragansett?

17    A.    As briefly described earlier in my testimony, the Company is proposing to maintain

18          Narragansett's customers on their current distribution rates and to move Blackstone's

C:\DOC\MERGER\MOLLOY.D46

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 11 of 23

1        customers onto Narragansett distribution rates. In addition the Companies are proposing

2        to reduce the distribution rates of Newport's customers by half the distance to

3        Narragansett's distribution rates, with the exception of the Navy. The Navy's rate C-1

4        would be reduced by the average percentage decrease in the distribution rate of all the

5        other Newport customers. All Newport customers except for the C-1 class would be

6        moved onto Narragansett distribution rates and assessed a uniform ¢/kWh surcharge

7        designed to cut rates equal to 50% of the difference between Narragansett's distribution

8        rates and Newport's distribution rates, as shown in Exhibit JMM-4. For purposes of the

9        tariffs, we refer to this distribution surcharge in the Newport zone as the "Zonal

10        Distribution Factor".

11

12   Q.   Please explain the treatment for low income and streetlight customers.

13   A.   The Companies have designed a Low Income Equalization Credit to prevent the low

14        income rate classes in Blackstone and Newport from seeing rate increases due to the rate

15        plan. The credits apply to the first 300 kWh per month and equal the difference between

16        the R-2 billing units billed at Narragansett's rates as compared to Blackstone's and

17        Newport's rates divided by the initial 300 kWh block for the R-2 rate. The credits are

18        only necessary for the first year of the plan as reductions to transition charges for

C:\DOC\MERGER\MOLLOY.DR6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 12 of 23

1          Blackstone and Newport in 2001 will offset any distribution rate increases to the low

2          income rate classes.

3

4          The streetlight credit is designed to maintain the current distribution revenue from the

5          Blackstone's and Newport's streetlighting rates. The credit equals the difference between

6          the streetlight billing units billed at Narragansett rates as compared to

7          Blackstone/Newport's rates divided by total streetlight kWh. The total amount of the

8          annual credit is approximately $840,000. The Company proposed to apply its annual

9          streetlight refund ($827,494 for the past year) to fund the cost of the annual credit.

10

11  Q.     How does the Company plan to implement the distribution rate plan?

12  A.     As discussed above, Narragansett would implement its rates for customers of Blackstone

13         and Newport on a bills rendered basis for meter readings as of the Rate Consolidation

14         Date. Due to the complexity of prorating out Blackstone and Newport distribution rates

15         and prorating in Narragansett distribution rates, the Companies believe this "flash cut"

16         method would simplify bills and avoid any unnecessary customer confusion during the

17         transition.

18

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 13 of 23

1    Q.    Are the Companies proposing any other distribution rate changes?

2    A.    Yes.  As discussed in Mr. Webster's testimony, Narragansett is proposing to modify its

3          depreciation rates to resolve certain issues related to cost of removal.  The change to

4          depreciation rates results in an ongoing annual revenue requirement of $2.7 million and a

5          deficiency in deferred tax reserves of about $19.2 million.  The Company is proposing to

6          increase distribution rates to collect on an ongoing basis $2.7 million beginning January

7          1, 2001.  This would be done by increasing distribution energy charges by

8          $0.00039/kWh.  The Company is also proposing to use refunds due to customers from

9          any CTC reconciliations to resolve the accumulated deferred tax deficiency, as described

10         by Mr. Jesanis and Mr. Webster.

11

12   Q.    What is the estimated overall impact of the Companies' proposal on distribution rates?

13   A.    As shown in Exhibit JMM-5, Blackstone's and Newport's average distribution rates

14         would be reduced by approximately $2.0 million and $3.4 million, respectively.

15         Narragansett's distribution rates would remain unchanged in the year 2000.  In 2001, the

16         distribution component of all customers' rates would be increased by $.00039/kWh or

17         $2.7 million.  However, this would not present an increase for Narragansett's customers

18         because of the transmission rate decrease described below.  Similarly, because

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 14 of 23

1    Blackstone's and Newport's customers will see a significant decrease in transition

2    charges in 2001, their rates will also decrease.

3

4    **C.    Transmission Rates**

5    Q.    What is the plan for transmission rates?

6    A.    Beginning on the Rate Consolidation Date, the Company is proposing to move

7    Blackstone and Newport customers to the transmission rates of Narragansett.  However,

8    in order to avoid an increase in transmission rates for Blackstone and Newport customers

9    in 2000, the Companies propose to maintain separate transmission adjustment factors in

10    2000 for the Narragansett, Blackstone and Newport zones to continue the present

11    allocation of transmission costs currently assigned to each company.  However,

12    beginning in the year 2001, the Companies will complete the transmission rate

13    consolidation by creating one adjustment factor for all customers to recover the

14    consolidated transmission costs incurred above and beyond the revenue collected from

15    the base transmission rates.

16

17    Q.    What is the impact of this plan on the transmission revenues of each Company?

C:\DOC\MERGER\MOLLOY.D#6

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 15 of 23

1   A.   On the Rate Consolidation Date, the overall transmission revenue for each company

2       remains relatively unchanged, but as Exhibit JMM-6 demonstrates, revenues shift

3       between rate classes for Blackstone and Newport. This shift, however, provides a better

4       matching between ultimate cost occurrence and revenue from each of the rate classes.

5       Although the consolidation of transmission rates in 2001 represents an increase to

6       Blackstone's and Newport's customers, any increase to those customers is more than

7       offset by decreases in transition charges. The consolidation of transmission rates in 2001

8       represents a decrease to Narragansett customers which is partially offset by the

9       distribution rate increase mentioned earlier in my testimony.

10

11   Q.   How do the Companies plan to implement the transmission rate plan?

12   A.   The transmission adjustment factors that would become effective on the Rate

13       Consolidation Date are illustrated in Exhibit JMM-7. In this exhibit, forecasted

14       transmission expenses of each of the three Companies are compared to the revenues from

15       their respective billing determinants billed at Narragansett's base transmission rates and

16       the difference is divided by total kWh sales of each company to produce the Transmission

17       Adjustment Factor. Exhibit JMM-7 provides only a demonstration of the calculations.

18       Actual transmission adjustment factors would be implemented based on a subsequent

C:\DOC\MERGER\MOLLOY.DI6

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 16 of 23

1        filing by the companies in late 1999 which would incorporate the most current forecast of

2        transmission expenses. The consolidated transmission factors that would be in effect in

3        2001 are estimated on Page 7 in Exhibit JMM-7 for purposes of rate comparison.

4

5        In addition, it should be noted that Blackstone and Newport do not currently have a

6        transmission adjustment provision. Rather, both companies merely "pass-through" a

7        transmission factor charged to them by Montaup. Under the rate plan proposal, all

8        customers would fall under a transmission adjustment provision effective on the Rate

9        Consolidation Date. Thus, under the rate plan, the transmission component of the

10      Companies' rates would be set and reconciled on an annual basis.

11

12      **D.    Transition Charges**

13    Q.    What is the plan for transition charges?

14    A.    The Companies are proposing to set the transition charge to Narragansett's customers at

15        1.15¢/kWh. Thus, transition charges collected from Narragansett's customers that are

16      above the CTC level billed by NEP will be used to reduce the transition charges of

17      Newport's and Blackstone's customers. The ultimate aim will be to keep the "Base"

18      transition charge in effect for Narragansett's customers until the transition charges of all

C:\DOC\MERGER\MOLLOY.D#6

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 17 of 23

1      three Companies come into parity with each other and transition charges can be

2      consolidated into a single rate for all three Companies.

3

4   Q.    How do the Companies propose to implement the transition rate plan?

5   A.    The Companies would bill all customers in all three zones the same base transition charge

6      equal to the proposed Narragansett transition charge of 1.15 cents per kWh.  However,

7      customers in the Blackstone and Newport zones will be assessed a "Zonal Transition

8      Factor".  Effective on the Rate Consolidation Date, the Zonal Transition Factor will be

9      equal to the difference between the transition charge in effect prior to the Rate

10     Consolidation Date and the base transition charge of 1.15 cent per kWh.  Effective on

11     January 1, 2001, the Zonal Transition Factor will collect an amount equal to the

12     difference between:

13     (1)    Total projected CTC expense, including Narragansett; and

14     (2)    and total kWh sales including Narragansett times the new base transition charge

15          of 1.15¢/kWh.

16     An illustrative example of the Zonal Transition Factor calculations is shown in Exhibit

17     JMM-8.

18

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 18 of 23

1          **E.     Standard Offer Rates**

2     Q.    Is the Company proposing any change to the Standard Offer charge?

3     A.    No.  Because the uniform Standard Offer for customers in Blackstone and Newport

4           proposed in RIPUC Docket No. 2888 was approved, the Company would have no need to

5           alter the rate for Standard Offer Service because the rates among the companies would

6           already match.

7

8     Q.    How does the Company propose to collect any Standard Offer over/under collection?

9     A.    Because of the projected small dollar value of the Standard Offer adjustment, the

10          Company is proposing to consolidate the over/under balances of Narragansett, Blackstone

11          and Newport, and apply Narragansett's current Standard Offer Adjustment Provision to

12          all three zones.

13

14         **F.     Other Rate Issues**

15    Q.    Are there any other rate issues with respect to this rate plan?

16    A.    Yes.  The Company needs to consolidate other generic tariff provisions including Terms

17          and Conditions for both customers and nonregulated power producers, as well as the

18          adjustment provisions.  Accordingly, Narragansett's terms and conditions and adjustment

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 19 of 23

1    provisions will be applied to BVE and Newport customers. The consolidation of these

2    tariff provisions is discussed later in my testimony.

3

4    **V.    Revenue Effects**

5         **A.    Overall**

6    Q.    What is the estimated impact on Blackstone and Newport customers from the proposed

7    rate plan?

8    A.    As illustrated in Exhibit JMM-1, the impact on the Rate Consolidation Date is a decrease

9    of approximately $2.1 million for Blackstone's customers, and a decrease of

10    approximately $3.4 million for Newport's customers as illustrated in Exhibit JMM-1. As

11    discussed in more detail by Mr. Jesanis, there are additional benefits to customers after

12    the Rate Consolidation Date.

13

14        **B.    Typical Bills**

15    Q.    Has the Company provided typical bills showing the effects of the proposed rate plan on

16    the Rate Consolidation Date?

C:\DOC\MERGER\MOLLOY.D#6

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 20 of 23

1    A.    Yes, the Company has provided typical bills in Exhibit JMM-9 and Exhibit JMM-10 for

2         Blackstone and Newport, respectively.  The Company has not provided typical bills for

3         current Narragansett customers since their bills will not change.

4

5    Q.    What is the impact on a typical 500 kWh residential customer in all service territories?

6    A.    On the Rate Consolidation Date, there is no change for a current Narragansett customer, a

7         $1.35 decrease monthly or 2.3% for a current Blackstone customer and a $2.07 decrease

8         monthly or 3.3% for a current Newport customer.

9

10   VI.   **Tariffs**

11         **A.    Terms and Conditions**

12   Q.    Under which set of Terms and Conditions will customers be served?

13   A.    Blackstone and Newport customers will be moved onto the Terms and Conditions of

14        Narragansett effective on the Rate Consolidation Date.

15

16   Q.    Is the Company proposing any changes to the Terms and Conditions?

C:\DOC\MERGER\MOLLOY.DMS

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 21 of 23

1   A.   Yes, to facilitate the assessment of the zonal factors for transition and distribution rates,

2       the Company is proposing to add an additional definition to the Terms and Conditions.

3       The addition is shown in Exhibit JMM-11.

4

5       **B.   Tariffs**

6   Q.   Has the Company proposed updated tariffs reflecting the proposed rate plan?

7   A.   Yes, The proposed tariffs, including cover sheets for both April 1, 2000 and January 1,

8       2001, are included in Exhibit JMM-12 in Volume 2A.

9

10  Q.   What happens if the two operating companies of EUA have not been formally merged

11      into Narragansett by the Rate Consolidation Date because of the delay described in Mr

12      Jesanis's testimony?

13  A.   This does not substantively affect the Companies' proposal. My exhibits contemplate the

14      merger occurring. However, if there is a delay, the Companies propose the tariffs

15      presented in Volume 2B of Exhibit JMM-12 apply until the merger of the three operating

16      companies is consummated. The rates in both Volume 2A and Volume 2B are essentially

17      identical except for the cover sheets and company identification. Volume 2A has one set

18      of tariffs with the Narragansett headings. Volume 2B contains three separate sets of

C:\DOC\MERGER\MOLLOY.D#6

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 22 of 23

1        tariffs for the three operating companies.  The terms are the same for each company,

2        except for the format of the cover sheets and the headings.  In addition, Volume 2A refers

3        to "Zonal" charges for the Newport and Blackstone Valley zones.  In contrast, because

4        volume 2B provides separate tariffs for each company, there is no need to refer to any

5        charges as "Zonal" on the cover sheets for BVE and Newport.

6

7        **C.    Adjustment Provisions**

8    Q.    Under which set of adjustment provisions will customers be served?

9    A.    Similar to the proposal relating to the tariffs, Blackstone and Newport customers will be

10        moved onto the adjustment provisions of Narragansett effective on the Rate

11        Consolidation Date.  To the extent that there are any outstanding balances in any of the

12        BVE or Newport adjustment provisions that are in effect prior to the Rate Consolidation

13        Date, the Companies propose to roll those balances into the appropriate corresponding

14        adjustment provisions of the consolidated company.

15

16    Q.    Is the Company proposing any changes to the provisions?

17    A.    Yes.  The Company is updating the language of the Non-Bypassable Transition Charge

18        Adjustment Provision and the Transmission Service Cost Adjustment Provision to reflect

C:\DOC\MERGER\MOLLOY.D46

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. 2930
Testimony of J. M. Molloy
Page 23 of 23

1        the merger of the retail companies.  A red-lined copy of the proposed provisions are

2        included as Exhibit JMM-13.  All the other provisions will remain unchanged.

3

4    **VIII.**   **Conclusion**

5    Q.   Does this complete your testimony?

6    A.   Yes.

C:\DOC\MERGER\MOLLOY.D#6

Confidential

NEC092263

Exhibits of
James M. Molloy

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No.____

## Index of Exhibits

| | |
|---|---|
| JMM-1 | Impact on Total Revenue |
| JMM-2 | Rate Mapping |
| JMM-3 | Rate Paths |
| JMM-4 | Calculation of Newport Zonal Distribution Factor |
| JMM-5 | Impact on Distribution Revenue |
| JMM-6 | Impact on Transmission Revenue |
| JMM-7 | Merged Transmission Adjustment Factors |
| JMM-8 | Post Merger Transition Charges |
| JMM-9 | Blackstone Valley Typical Bills |
| JMM-10 | Newport Typical Bills |
| JMM-11 | Terms and Conditions |
| JMM-12 | Tariffs |
| JMM-13 | Adjustment Provisions |

C:\DOC\MERGER\MOLLOY.DR6

Confidential

Exhibit JMM-1

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-1

Exhibit JMM-1

Impact on Total Revenue

Confidential

File: C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range: Summary21
Date: 14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 1
Page 1 of 3

## The Narragansett Electric Company
### Total Revenue Shift from Merger to BVE Customers

| | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| R-1 | 362,568,042 | $40,722,906 | $39,704,361 | ($1,018,544) | -2.50% |
| R-2 | 10,464,104 | $892,790 | $885,564 | ($7,225) | -0.81% |
| R-3 | 9,162,722 | $931,422 | $974,130 | $42,708 | 4.59% |
| R-4 | 4,487,447 | $437,683 | $425,523 | ($12,161) | -2.78% |
| W-1 | 3,602,371 | $324,151 | $372,483 | $48,333 | 14.91% |
| H-1 | 3,639,022 | $350,069 | $336,483 | ($13,587) | -3.88% |
| H-2 | 2,290,392 | $233,468 | $242,340 | $8,872 | 3.80% |
| G-1 | 43,670,643 | $5,088,566 | $5,146,385 | $57,819 | 1.14% |
| G-2 | 313,855,524 | $29,719,748 | $29,660,495 | ($59,253) | -0.20% |
| T-2 | 45,916,407 | $4,263,798 | $3,874,164 | ($389,634) | -9.14% |
| T-4 | 78,036,479 | $6,721,747 | $6,470,366 | ($251,381) | -3.74% |
| G-5 | 23,108,580 | $2,025,532 | $1,986,230 | ($39,302) | -1.94% |
| T-5 | 8,474,950 | $734,846 | $679,699 | ($55,146) | -7.50% |
| T-6 | 369,857,394 | $29,787,298 | $29,380,332 | ($406,966) | -1.37% |
| A-6 | 6,085,455 | $553,736 | $531,237 | ($22,499) | -4.06% |
| S-1 | 14,647,035 | $2,399,359 | $2,402,553 | $3,194 | 0.13% |
| Total Company | 1,299,866,567 | $125,187,119 | $123,072,346 | ($2,114,773) | -1.69% |

See Workpaper JMM - 1

Confidential

File:    C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range:   Summary1
Desc:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 1
Page 2 of 3

### The Narragansett Electric Company
### Total Revenue Shift from Merger to Narragansett Customers

| | Units<br>(1) | Pre Merger<br>Revenues<br>(2) | Post Merger<br>Revenues<br>(3) | Revenue<br>Shift<br>(4) | Percent<br>Increase/<br>(Decrease)<br>(5) |
|---|---|---|---|---|---|
| A-16 | 1,475,595,371 | $146,179,613 | $146,179,613 | $0 | 0.00% |
| A-18 | 299,522,556 | $27,232,677 | $27,232,677 | $0 | 0.00% |
| A-32 | 33,569,784 | $2,847,742 | $2,847,742 | $0 | 0.00% |
| A-60 | 45,194,386 | $3,572,777 | $3,572,777 | $0 | 0.00% |
| E-30 | 1,519,157 | $109,772 | $109,772 | $0 | 0.00% |
| E-40 | 12,436,324 | $872,223 | $872,223 | $0 | 0.00% |
| C-06 | 319,448,478 | $32,857,618 | $32,857,618 | $0 | 0.00% |
| G-02 | 857,825,162 | $71,725,832 | $71,725,832 | $0 | 0.00% |
| G-32 | 1,497,395,176 | $108,041,029 | $108,041,029 | $0 | 0.00% |
| G-62 | 360,114,300 | $23,033,841 | $23,033,841 | $0 | 0.00% |
| R-02 | 4,803,789 | $308,547 | $308,547 | $0 | 0.00% |
| S-10 | 49,529,091 | $9,620,076 | $9,620,076 | $0 | 0.00% |
| T-06 | 21,835,478 | $1,763,248 | $1,763,248 | $0 | 0.00% |
| V-02 | 7,686,406 | $718,448 | $718,448 | $0 | 0.00% |
| **Total Company** | 4,986,475,458 | $428,883,443 | $428,883,443 | $0 | 0.00% |

See Workpaper JMM - 2

Confidential

File:       C:\123data\JAMEF\M&A\BASE\Necpla30.WK4
Range:      Summary21
Date:       14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 1
Page 3 of 3

## The Narragansett Electric Company
### Total Revenue Shift from Merger to Newport Customers

|  | Units (1) | Pre Merger Revenues (2) | Post Merger Revenues (3) | Revenue Shift (4) | Percent Increase/ (Decrease) (5) |
|---|---|---|---|---|---|
| R-1 | 167,201,036 | $19,896,925 | $19,237,969 | ($658,956) | -3.31% |
| R-2 | 1,764,819 | $164,092 | $162,833 | ($1,259) | -0.77% |
| R-4 | 7,100,991 | $808,011 | $718,668 | ($89,343) | -11.06% |
| W-1 | 13,383,268 | $1,422,017 | $1,474,430 | $52,412 | 3.69% |
| H-1 | 4,908,488 | $523,570 | $465,875 | ($57,695) | -11.02% |
| H-2 | 5,723,950 | $665,920 | $627,794 | ($38,126) | -5.73% |
| G-1 | 42,449,011 | $5,464,085 | $5,082,244 | ($381,841) | -6.99% |
| G-2 | 105,080,586 | $11,113,180 | $10,298,594 | ($814,586) | -7.33% |
| T-2 | 14,361,960 | $1,497,070 | $1,277,833 | ($219,237) | -14.64% |
| T-4 | 18,430,440 | $1,953,393 | $1,659,268 | ($294,126) | -15.06% |
| G-5 | 15,075,589 | $1,516,935 | $1,361,051 | ($155,884) | -10.28% |
| T-5 | 2,964,000 | $293,737 | $251,626 | ($42,112) | -14.34% |
| T-6 | 24,547,599 | $2,453,903 | $2,137,672 | ($316,231) | -12.89% |
| C-1 | 114,919,292 | $10,247,646 | $9,879,737 | ($367,909) | -3.59% |
| S-1 | 5,614,981 | $852,977 | $853,283 | $306 | 0.04% |
| Total Company | 543,526,010 | $58,873,463 | $55,488,877 | ($3,384,586) | -5.75% |

See Workpaper JMM - 3

Confidential

Exhibit JMM-2

NEC092271

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-2

Exhibit JMM-2

Rate Paths

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit IMM - 2
Page 1 of 4

C:\I2\data\IAMES\M&A\IBASE\Riplan7.wk4
Rage: SUMMARY

## SUMMARY TABLE
### Consolidated Average ¢/kWh
### Summary of Average Rates

| | 2000 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| | January 1 | April 1 | January 1 | January 1 | January 1 | January 1 |
| (1) Distribution | 3.071 | 2.993 | 2.993 | 2.993 | 2.993 | 2.993 |
| (1a) Cost of Removal Adj. | | | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) Total Distribution | 3.301 | 3.223 | 3.262 | 3.262 | 3.262 | 3.262 |
| (4) Transmission | 0.415 | 0.415 | 0.415 | 0.415 | 0.415 | 0.415 |
| (5) Transition | 1.467 | 1.467 | 1.314 | 1.341 | 1.230 | 1.190 |
| (6) Total Delivery | 5.183 | 5.105 | 4.991 | 5.018 | 4.907 | 4.867 |
| (7) Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.700 | 5.100 |
| (8) Total Average Price | 8.983 | 8.905 | 8.791 | 9.218 | 9.607 | 9.967 |
| (9) Total Average Price Adj for GET | 9.358 | 9.276 | 9.158 | 9.602 | 10.007 | 10.382 |
| (10) Percent Increase/(Decrease) | | -0.87% | -1.28% | 4.86% | 4.22% | 3.75% |

Notes:
(1) Weighted average of Page 2, Line (1), Page 3, Line (1), and Page 4, Line (1)
(1a) Cost of Removal impact on rates 2001 through 2004
(2) Assumed at current level through 2004
(3) = Line (1) + Line (1a) + Line (2)
(4) Weighted average of Page 2, Line (4), Page 3, Line (4), and Page 4, Line (4)
(5) Weighted average of Page 2, Line (5), Page 3, Line (5), and Page 4, Line (5)

(6) = Line (3) + Line (4) +Line (5)
(7) per Settlement Agreements
(8) = Line (6) + Line (7)
(9) Line (8)/.96
(10) = (Line (9) - Line (9) prior column)/Line (9) prior column

Confidential

NEC092273

C:\12Main\AMESM&A\BASE98\pln7.wk4
Rang: BVE

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 2
Page 2 of 4

## BLACKSTONE VALLEY
### Company Average ¢/kWh
### Summary of Average Rates

| | 2000 January 1 | 2000 April 1 | 2001 January 1 | 2002 January 1 | 2003 January 1 | 2004 January 1 |
|---|---|---|---|---|---|---|
| (1) Distribution | 3.003 | 2.852 | 2.852 | 2.852 | 2.852 | 2.852 |
| (1a) Cost of Removal Adj. | | | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) Total Distribution | 3.233 | 3.082 | 3.121 | 3.121 | 3.121 | 3.121 |
| (4) Transmission | 0.278 | 0.278 | 0.429 | 0.429 | 0.429 | 0.429 |
| (5) Transition | 2.320 | 2.320 | 1.759 | 1.859 | 1.446 | 1.298 |
| (6) Total Delivery | 5.831 | 5.680 | 5.309 | 5.409 | 4.996 | 4.848 |
| (7) Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.700 | 5.100 |
| (8) Total Average Price | 9.631 | 9.480 | 9.109 | 9.609 | 9.696 | 9.948 |
| (9) Total Average Price Adj for GET | 10.032 | 9.875 | 9.489 | 10.009 | 10.100 | 10.363 |
| (10) Percent Increase/(Decrease) | | -1.57% | -3.91% | 5.49% | 0.91% | 2.60% |

(6) = Line (3) + Line (4) + Line (5)
(7) per Settlement Agreements
(8) = Line (6) + Line (7)
(9) Line (8)/.96
(10) = (Line (9) - Line (9) prior column)/Line (9) prior column

Notes:
(1) Base Distribution Charges - Frozen from 2001 through 2004
(1a) Cost of Removal impact on rates 2001 through 2004
(2) Assumed at current level through 2004
(3) = Line (1) + Line (1a) + Line (2)
(4) Projected 2000 BVE alone; Projected 2001-2004 Consolidated Companies
(5) Projected 2000 BVE alone; Projected 2001-2004 Consolidated Companies

Confidential

33
NEC092274

CN123aaa\AMES\MA\AIBASE\htplan7.wM
Range: NARRAGANSETT

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 2
Page 3 of 4

## NARRAGANSETT ELECTRIC
### Company Average ¢/kWh
### Summary of Average Rates

| | | 2000 January 1 | 2000 April 1 | 2001 January 1 | 2002 January 1 | 2003 January 1 | 2004 January 1 |
|---|---|---|---|---|---|---|---|
| (1) | Distribution | 2.967 | 2.967 | 2.967 | 2.967 | 2.967 | 2.967 |
| (1a) | Cost of Removal Adj. | | | 0.039 | 0.039 | 0.039 | 0.039 |
| (2) | DSM | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 | 0.230 |
| (3) | Total Distribution | 3.197 | 3.197 | 3.236 | 3.236 | 3.236 | 3.236 |
| (4) | Transmission | 0.466 | 0.466 | 0.409 | 0.409 | 0.409 | 0.409 |
| (5) | Transition | 1.150 | 1.150 | 1.150 | 1.150 | 1.150 | 1.150 |
| (6) | Total Delivery | 4.813 | 4.813 | 4.795 | 4.795 | 4.795 | 4.795 |
| (7) | Standard Offer | 3.800 | 3.800 | 3.800 | 4.200 | 4.700 | 5.100 |
| (8) | Total Average Price | 8.613 | 8.613 | 8.595 | 8.995 | 9.495 | 9.895 |
| (9) | Total Average Price Adj for GET | 8.972 | 8.972 | 8.953 | 9.370 | 9.891 | 10.307 |
| (10) | Percent Increase/(Decrease) | 0.00% | 0.00% | -0.21% | 4.65% | 5.56% | 4.21% |

Notes:

(1) Base Distribution Charges - Frozen from 2001 through 2004
(1a) Cost of Removal impact on rates 2001 through 2004
(2) Assumed at current level through 2004
(3) = Line (1) + Line (1a) + Line (2)
(4) Projected 2000 Narragansett alone; Projected 2001-2004 Consolidated Companies
(5) Projected 2000 Narragansett alone; Projected 2001-2004 Consolidated Companies
(6) = Line (3) + Line (4) +Line (5)
(7) per Settlement Agreements
(8) = Line (6) + Line (7)
(9) Line (8)/.96
(10) = (Line (9) - Line (9) prior column)/Line (9) prior column

Confidential

C:\123data\JAMES\M&A\BASE\JMM8.wk4

Range:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JMM - 8
Page 1 of 2

### The Narragansett Electric Company
### Illustrative Calculation of Projected Zonal Transition Factors
### as of the Rate Consolidation Date

|   |                              | Narragansett | Blackstone | Newport     |
|---|------------------------------|--------------|------------|-------------|
| 1 | Pre Merger Transition Charge | $0.01150     | $0.02320   | $0.02340    |
| 2 | Base Transition              | $0.01150     | $0.01150   | $0.01150    |
| 3 | Zonal Transition Factor      | $0.00000     | $0.01170   | $0.01190    |

1 Estimated Pre Merger Transition Charges in 2000
2 Minimum Line (1)
3 Line (1) - Line (2)

58
NEC092305

C:\123data\JAMES\M&A\BASE\JMM8.wk4
Range:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. ____
Exhibit JMM - 8
Page 2 of 2

The Narragansett Electric Company
Illustrative Calculation of Projected Zonal Transition Factors
Effective January 1, 2001

| | | Narragansett | Blackstone | Newport | Total |
|---|---|---|---|---|---|
| 1 | Contract Termination Charge | $0.01030 | $0.02080 | $0.02090 | |
| 2 | Estimated MWh Sales | 5,000,000 | 1,300,000 | 550,000 | |
| 3 | Total CTC Expense | $51,500,000 | $27,040,000 | $11,495,000 | $90,035,000 |
| 4 | Base Transition Charge | $0.01150 | $0.01150 | $0.01150 | |
| 5 | Estimated MWh Sales | 5,000,000 | 1,300,000 | 550,000 | |
| 6 | Base Transition Revenue | $57,500,000 | $14,950,000 | $6,325,000 | $78,775,000 |
| 7 | Residual CTC Expense | | | | $11,260,000 |
| 8 | Blackstone and Newport MWh Sales | | | | 1,850,000 |
| 9 | Zonal Transition Factor | | $0.00609 | $0.00609 | $0.00609 |
| 10 | Total Nonbypassable Transition Charges | $0.01150 | $0.01759 | $0.01759 | |

1  From CTC Filings
2  Estimated
3  Line (1)* Line (2) * 1000
4  Set at 1.15¢/kWh
5  Line (2)
6  Line (4) * Line (5) * 1000
7  Line (3) less Line (6)
8  Line (2) Blackstone plus Newport columns
9  Line (7) / (Line (8) * 1000)
10  Line (4) + Line (9)

Confidential

Exhibit JMM-9

Confidential

NEC092307

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-9

Exhibit JMM-9

Blackstone Valley Typical Bills

Confidential

File: C:\123\en\JAMES\M&A\BASE\bvbill4.wk4
Range: A-10
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 1 of 26

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on R-1 Rate Customers**

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 120 | $16.33 | $4.75 | $11.58 | $15.57 | $4.75 | $10.82 | ($0.76) | -4.7% |
| 240 | $29.43 | $9.50 | $19.93 | $28.49 | $9.50 | $18.99 | ($0.94) | -3.2% |
| 480 | $55.64 | $19.00 | $36.64 | $54.33 | $19.00 | $35.33 | ($1.31) | -2.4% |
| 700 | $79.67 | $27.71 | $51.96 | $78.02 | $27.71 | $50.31 | ($1.65) | -2.1% |
| 950 | $106.97 | $37.60 | $69.37 | $104.93 | $37.60 | $67.33 | ($2.04) | -1.9% |
| 500 | $57.83 | $19.79 | $38.04 | $56.48 | $19.79 | $36.69 | ($1.35) | -2.3% |

**Blackstone Valley Rates:**  R-1

| | | |
|---|---|---|
| Customer Charge | | $3.09 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.03857 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**  A-16

| | | |
|---|---|---|
| Customer Charge | | $2.54 |
| Transmission Energy Charge | kWh x | $0.00436 |
| Distribution Energy Charge | kWh x | $0.03246 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 1 of 26

Confidential

File: CNJ23dcta\JAMES\MkAWBASEl\bvbillk.wk4
Range: A-11
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on R-3 Rate Customers

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 2 of 26

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 280 | $31.69 | $11.08 | $20.61 | $32.79 | $11.08 | $21.71 | $1.10 | 3.5% |
| 550 | $59.34 | $21.77 | $37.57 | $61.87 | $21.77 | $40.10 | $2.53 | 4.3% |
| 1,100 | $115.64 | $43.54 | $72.10 | $121.09 | $43.54 | $77.55 | $5.45 | 4.7% |
| 1,650 | $171.95 | $65.31 | $106.64 | $180.31 | $65.31 | $115.00 | $8.36 | 4.9% |
| 2,200 | $228.25 | $87.08 | $141.17 | $239.53 | $87.08 | $152.45 | $11.28 | 4.9% |

**Blackstone Valley Rates:** R-3

| Customer Charge | | $2.91 |
|---|---|---|
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.03200 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| FAS106 | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:** A-16

| Customer Charge | | $2.54 |
|---|---|---|
| Transmission Energy Charge | kWh x | $0.00436 |
| Distribution Energy Charge | kWh x | $0.03246 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| FAS106 | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 2 of 26

Confidential

NEC092310

File:    C:\123data\JAMES\M&A\BASE9b-v-bill14..xls4
Range:   TA
Date:    14-May-99
Time:    12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 3 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on W-I Rate Customers

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 750 | $67.16 | $29.69 | $37.47 | $80.76 | $29.69 | $51.07 | $13.60 | 20.3% |
| 1,500 | $132.94 | $59.38 | $73.56 | $161.52 | $59.38 | $102.14 | $28.58 | 21.5% |
| 3,000 | $264.50 | $118.75 | $145.75 | $323.03 | $118.75 | $204.28 | $58.53 | 22.1% |
| 4,600 | $404.83 | $182.08 | $222.75 | $495.31 | $182.08 | $313.23 | $90.48 | 22.4% |
| 6,000 | $527.63 | $237.50 | $290.13 | $646.06 | $237.50 | $408.56 | $118.43 | 22.4% |

**Blackstone Valley Rates:  W-1**

| | | |
|---|---|---|
| Customer Charge | | $1.32 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.01792 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    A-16

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00436 |
| Distribution Energy Charge | kWh x | $0.03246 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.09% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 3 of 26

Confidential

File:  C:\123data\AMES\MA&BASEB\netbill.wk4
Range:  A-30A
Date:  14-May-99
Time:  12:28 PM

kWh Split:  - On-Peak  18%
            - Off-Peak  82%

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on R-4 Rate Customers

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 4 of 26

| Monthly Summer kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 2,000 | $203.74 | $79.17 | $124.57 | $198.88 | $79.17 | $119.71 | ($4.86) | -2.4% |
| 2,500 | $253.46 | $98.96 | $154.50 | $246.84 | $98.96 | $147.88 | ($6.62) | -2.6% |
| 3,000 | $303.17 | $118.75 | $184.42 | $294.80 | $118.75 | $176.05 | ($8.37) | -2.8% |
| 4,000 | $402.59 | $158.33 | $244.26 | $390.73 | $158.33 | $232.40 | ($11.86) | -2.9% |
| 5,000 | $502.03 | $197.92 | $304.11 | $486.66 | $197.92 | $288.74 | ($15.37) | -3.1% |

**Blackstone Valley Rates:**  R-4

| | | |
|---|---|---|
| Customer Charge | | $4.69 |
| Meter Charge | | $0.00 |
| | | |
| Transmission Energy Charge | kWh x | $0.00000 |
| Dist Peak Energy Charge | kWh x | $0.11500 |
| Dist Off Peak Energy Charge | kWh x | $0.01033 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| | | |
| Gross Earnings Tax | | 4.00% |
| | | |
| Standard Offer Charge | | $0.03800 |

**Narragansett Rates:**  A-32

| | | |
|---|---|---|
| Customer Charge | | $2.30 |
| Meter Charge | | $4.44 |
| | | |
| Transmission Energy Charge | kWh x | $0.00392 |
| Distribution Energy Charge | kWh x | $0.02162 |
| | | |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| | | |
| Gross Earnings Tax | | 4.00% |
| | | |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 4 of 26

Confidential

File: C:\12des\AMESNA\ABASEBredilit.wk4
Rcspt: A-J0B
Date: 14-May-99
Time: 12:28 PM

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on R-4 Rate Customers**

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 5 of 26

kWh Split:  - On-Peak   22%
            - Off-Peak  78%

| Monthly Winter kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 3,000 | $316.25 | $118.75 | $197.50 | $294.80 | $118.75 | $176.05 | ($21.45) | -6.8% |
| 4,000 | $420.04 | $158.33 | $261.71 | $390.73 | $158.33 | $232.40 | ($29.31) | -7.0% |
| 5,000 | $523.83 | $197.92 | $325.91 | $486.66 | $197.92 | $288.74 | ($37.17) | -7.1% |
| 6,000 | $627.62 | $237.50 | $390.12 | $582.58 | $237.50 | $345.08 | ($45.04) | -7.2% |
| 7,000 | $731.40 | $277.08 | $454.32 | $678.51 | $277.08 | $401.43 | ($52.89) | -7.2% |

**Blackstone Valley Rates:**  R-4

| | | |
|---|---|---|
| Customer Charge | | $4.69 |
| Meter Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Dist Peak Energy Charge | kWh x | $0.11500 |
| Dist Off Peak Energy Charge | kWh x | $0.01033 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**  A-32

| | | |
|---|---|---|
| Customer Charge | | $2.30 |
| Meter Charge | | $4.44 |
| Transmission Energy Charge | kWh x | $0.00392 |
| Dist Peak Energy Charge | kWh x | $0.02162 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 5 of 26

Confidential

NEC092313

File:   C:\123\James\JAMES\NMA\NMA\BVEinvBill4_wk4
Range:  A-65A
Date:   14-May-99
Time:   12:42 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 6 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on R-2 Rate Customers

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 100 | $9.18 | $3.96 | $5.22 | $8.53 | $3.96 | $4.57 | ($0.65) | -7.1% |
| 300 | $23.34 | $11.88 | $11.46 | $25.59 | $11.88 | $13.71 | $2.25 | 9.6% |
| 500 | $44.37 | $19.79 | $24.58 | $44.17 | $19.79 | $24.38 | ($0.20) | -0.5% |
| 700 | $65.41 | $27.71 | $37.70 | $62.76 | $27.71 | $35.05 | ($2.65) | -4.1% |
| 1,000 | $96.97 | $39.58 | $57.39 | $90.63 | $39.58 | $51.05 | ($6.34) | -6.5% |

**Blackstone Valley Rates:   R-2**

| | | |
|---|---|---|
| Customer Charge | | $2.01 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Dist. Energy Charge first 300 kWh | kWh x | $0.00170 |
| Dist. Energy Charge excess 300 kWh | kWh x | $0.03470 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| A-60 Rate Credit | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:   A-60**

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00338 |
| Distribution Energy Charge | kWh x | $0.02521 |
| FAS 106 | kWh x | $0.00068 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.02320 |
| Transmission and S.O. Adjs. | kWh x | $0.00230 |
| Credit First 300 kWh | kWh x | ($0.00129) |
| A-60 Rate Credit | kWh x | ($0.00733) |
| | kWh x | ($0.00227) |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 6 of 26

File: C:\12d\eni\JAMES\M&A\BA\SEI\tv-bill4...v4
Range: C-02A
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 7 of 26

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on H-1 Rate Customers**

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 500 | $53.15 | $19.79 | $33.36 | $61.46 | $19.79 | $41.67 | $8.31 | 15.6% |
| 1,500 | $153.19 | $59.38 | $93.81 | $172.46 | $59.38 | $113.08 | $19.27 | 12.6% |
| 2,500 | $253.22 | $98.96 | $154.26 | $283.44 | $98.96 | $184.48 | $30.22 | 11.9% |
| 3,500 | $353.24 | $138.54 | $214.70 | $394.43 | $138.54 | $255.89 | $41.19 | 11.7% |
| 4,500 | $453.28 | $178.13 | $275.15 | $505.43 | $178.13 | $327.30 | $52.15 | 11.5% |

**Blackstone Valley Rates: H-1**

| | | |
|---|---|---|
| Customer Charge | | $3.01 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.02975 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:    C-06**

| | | |
|---|---|---|
| Customer Charge | | $5.73 |
| Transmission Energy Charge | kWh x | $0.00536 |
| Distribution Energy Charge | kWh x | $0.03464 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 7 of 26

Confidential

File: C:\12len\JAMES\M&A\BA\SEBvebill4.wk4
Range: C-02B
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 8 of 26

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on H-2 Rate Customers**

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 500 | $55.91 | $19.79 | $36.12 | $55.49 | $19.79 | $35.70 | ($0.42) | -0.8% |
| 1,000 | $108.25 | $39.58 | $68.67 | $110.99 | $39.58 | $71.41 | $2.74 | 2.5% |
| 1,500 | $160.59 | $59.38 | $101.21 | $166.49 | $59.38 | $107.11 | $5.90 | 3.7% |
| 2,000 | $212.93 | $79.17 | $133.76 | $221.98 | $79.17 | $142.81 | $9.05 | 4.3% |
| 2,500 | $265.27 | $98.96 | $166.31 | $277.48 | $98.96 | $178.52 | $12.21 | 4.6% |

**Blackstone Valley Rates:**   H-2            C-06

| | | |
|---|---|---|
| Customer Charge | | $3.43 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.03421 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00536 |
| Distribution Energy Charge | kWh x | $0.03464 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 8 of 26

Confidential

File: C:\123san\JAMESMA\JMBASEBVeillK.wk4
Range: C-02C
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 9 of 26

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on G-1 Rate Customers**

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 250 | $32.10 | $9.90 | $22.20 | $33.72 | $9.90 | $23.82 | $1.62 | 5.0% |
| 500 | $60.68 | $19.79 | $40.89 | $61.46 | $19.79 | $41.67 | $0.78 | 1.3% |
| 750 | $89.26 | $29.69 | $59.57 | $89.21 | $29.69 | $59.52 | ($0.05) | -0.1% |
| 1,000 | $117.84 | $39.58 | $78.26 | $116.96 | $39.58 | $77.38 | ($0.88) | -0.7% |
| 1,250 | $146.43 | $49.48 | $96.95 | $144.71 | $49.48 | $95.23 | ($1.72) | -1.2% |

**Blackstone Valley Rates:    G-1**

| | | |
|---|---|---|
| Customer Charge | | $3.37 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.04348 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:    C-06**

| | | |
|---|---|---|
| Customer Charge | | $5.73 |
| Transmission Energy Charge | kWh x | $0.00536 |
| Distribution Energy Charge | kWh x | $0.03464 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 9 of 26

Confidential

File: C:\123data\JAMES\MEA\BASEIU\wellM.wk4
Range: C-02D
Date: 14-May-99
Time: 12:42 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 10 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on W-1 Rate Customers

| Monthly kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 125 | $12.34 | $4.95 | $7.39 | $13.88 | $4.95 | $8.93 | $1.54 | 12.5% |
| 250 | $23.31 | $9.90 | $13.41 | $27.75 | $9.90 | $17.85 | $4.44 | 19.0% |
| 375 | $34.26 | $14.84 | $19.42 | $41.62 | $14.84 | $26.78 | $7.36 | 21.5% |
| 500 | $45.23 | $19.79 | $25.44 | $55.49 | $19.79 | $35.70 | $10.26 | 22.7% |
| 1,000 | $89.08 | $39.58 | $49.50 | $110.99 | $39.58 | $71.41 | $21.91 | 24.6% |

**Blackstone Valley Rates:   W-1**

| | | |
|---|---|---|
| Customer Charge | | $1.32 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.01792 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:   C-06**

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00536 |
| Distribution Energy Charge | kWh x | $0.03464 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 10 of 26

File: C:\123data\JAMES\MAIA\BASE0\veblbk.wk4
Range: G-00
Date: 14-May-99
Time: 12:28 PM

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on H-1 Rate Customers**

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 11 of 26

Hours Use: 300

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 6,000 | $603.32 | $237.50 | $365.82 | $605.80 | $237.50 | $368.30 | $2.48 | 0.4% |
| 50 | 15,000 | $1,503.60 | $593.75 | $909.85 | $1,420.27 | $593.75 | $826.52 | ($83.33) | -5.5% |
| 100 | 30,000 | $3,004.07 | $1,187.50 | $1,816.57 | $2,777.72 | $1,187.50 | $1,590.22 | ($226.35) | -7.5% |
| 150 | 45,000 | $4,504.54 | $1,781.25 | $2,723.29 | $4,135.17 | $1,781.25 | $2,353.92 | ($369.37) | -8.2% |

**Blackstone Valley Rates:** H-1

| | | |
|---|---|---|
| Customer Charge | $3.01 | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $0.00 | kW x |
| Distribution Energy Charge | $0.02975 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00278 | kWh x |
| PBR Adjustment & FAS 106 | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:** G-02

| | | |
|---|---|---|
| Customer Charge | $103.41 | |
| Transmission Demand Charge-xcs 10 kW | $1.40 | kW x |
| Distribution Demand Charge-xcs 10 kW | $2.91 | kW x |
| Distribution Energy Charge | $0.00596 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00129) | kWh x |
| PBR Adjustment & FAS 106 | $0.00434 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 11 of 26

Confidential

File:    CU23data\JANESMA\A\BASEB\wclilik.wk4
Range:  G-00A
Date:   14-May-99
Time:   12:42 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 12 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on H-2 Rate Customers

Hours Use:    300

| Monthly Power | | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 20 | 6,000 | $631.64 | $237.50 | $394.14 | $498.08 | $237.50 | $260.58 | ($133.56) | -21.1% |
| 50 | 15,000 | $1,573.73 | $593.75 | $979.98 | $1,312.55 | $593.75 | $718.80 | ($261.18) | -16.6% |
| 100 | 30,000 | $3,143.89 | $1,187.50 | $1,956.39 | $2,670.00 | $1,187.50 | $1,482.50 | ($473.89) | -15.1% |
| 150 | 45,000 | $4,714.04 | $1,781.25 | $2,932.79 | $4,027.45 | $1,781.25 | $2,246.20 | ($686.59) | -14.6% |

**Blackstone Valley Rates:    H-2**

| | | |
|---|---|---|
| Customer Charge | | $3.43 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $0.00 |
| Distribution Energy Charge | kWh x | $0.03421 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:    G-02**

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge-xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge-xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 12 of 26

Confidential

File: C:\123deat\AMES\MBA\BASE\Bxdll14.wk4
Range: 0-008
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 13 of 26

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on G-2 Rate Customers**

Hours Use: 300

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 6,000 | $589.00 | $237.50 | $351.50 | $605.80 | $237.50 | $368.30 | $16.80 | 2.9% |
| 50 | 15,000 | $1,472.50 | $593.75 | $878.75 | $1,420.27 | $593.75 | $826.52 | ($52.23) | -3.5% |
| 100 | 30,000 | $2,945.00 | $1,187.50 | $1,757.50 | $2,777.72 | $1,187.50 | $1,590.22 | ($167.28) | -5.7% |
| 150 | 45,000 | $4,417.50 | $1,781.25 | $2,636.25 | $4,135.17 | $1,781.25 | $2,353.92 | ($282.33) | -6.4% |

**Blackstone Valley Rates:**    G-2

| | | |
|---|---|---|
| Customer Charge | $0.00 | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $1.50 | kW x |
| Distribution Energy Charge | $0.02296 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00278 | kWh x |
| PBR Adjustment & FAS 106 | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:**    G-02

| | | |
|---|---|---|
| Customer Charge | $103.41 | |
| Transmission Demand Charge-xcs 10 kW | $1.40 | kW x |
| Distribution Demand Charge-xcs 10 kW | $2.91 | kW x |
| Distribution Energy Charge | $0.00596 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00129) | kWh x |
| PBR Adjustment & FAS 106 | $0.00434 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 13 of 26

Confidential

NEC092321

File: C:\12fdesVAMESMAAVBASEBvedIII-vk4
Range: G-00C
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit IMM - 9
Page 14 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on T-2 Rate Customers

Hours Use: 300

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 6,000 | $589.00 | $237.50 | $351.50 | $605.80 | $237.50 | $368.30 | $16.80 | 2.9% |
| 50 | 15,000 | $1,472.50 | $593.75 | $878.75 | $1,420.27 | $593.75 | $826.52 | ($52.23) | -3.5% |
| 100 | 30,000 | $2,945.00 | $1,187.50 | $1,757.50 | $2,777.72 | $1,187.50 | $1,590.22 | ($167.28) | -5.7% |
| 150 | 45,000 | $4,417.50 | $1,781.25 | $2,636.25 | $4,135.17 | $1,781.25 | $2,353.92 | ($282.33) | -6.4% |

**Blackstone Valley Rates:** T-2

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.50 |
| Distribution Energy Charge | kWh x | $0.02296 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:** G-02

| | | |
|---|---|---|
| Customer Charge | | $103.41 |
| Transmission Demand Charge-xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge-xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit IMM - 9
Page 14 of 26

Confidential

NEC092322

File:   C:\123w\JAMESM&A\BASE\BvesIIit-xl4
Range:  G-00D
Date:   14-May-99
Time:   12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 15 of 26

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on G-5 Rate Customers**

Hours Use: 400

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 8,000 | $722.96 | $316.67 | $406.29 | $756.87 | $316.67 | $440.20 | $33.91 | 4.7% |
| 50 | 20,000 | $1,807.40 | $791.67 | $1,015.73 | $1,797.93 | $791.67 | $1,006.26 | ($9.47) | -0.5% |
| 100 | 40,000 | $3,614.79 | $1,583.33 | $2,031.46 | $3,533.03 | $1,583.33 | $1,949.70 | ($81.76) | -2.3% |
| 150 | 60,000 | $5,422.19 | $2,375.00 | $3,047.19 | $5,268.14 | $2,375.00 | $2,893.14 | ($154.05) | -2.8% |

**Blackstone Valley Rates:**   G-5

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.35 |
| Distribution Energy Charge | kWh x | $0.01710 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**   G-02

| | | |
|---|---|---|
| Customer Charge | | $103.41 |
| Transmission Demand Charge-xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge-xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.02320 |
| Transmission and S.O. Adjs. | kWh x | $0.00230 |
| PBR Adjustment & FAS 106 | kWh x | ($0.00129) |
| | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 15 of 26

Confidential

File: C1123deoJAMESIMAAABASEIBwshii4.wk4
Range: G-002
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 16 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on T-5 Rate Customers

Hours Use: 350

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 7,000 | $636.10 | $277.08 | $359.02 | $681.33 | $277.08 | $404.25 | $45.23 | 7.1% |
| 50 | 17,500 | $1,590.26 | $692.71 | $897.55 | $1,609.10 | $692.71 | $916.39 | $18.84 | 1.2% |
| 100 | 35,000 | $3,180.52 | $1,385.42 | $1,795.10 | $3,155.38 | $1,385.42 | $1,769.96 | ($25.14) | -0.8% |
| 150 | 52,500 | $4,770.79 | $2,078.13 | $2,692.66 | $4,701.66 | $2,078.13 | $2,623.53 | ($69.13) | -1.4% |

**Blackstone Valley Rates:** T-5

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.35 |
| Distribution Energy Charge | kWh x | $0.01710 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:** G-02

| | | |
|---|---|---|
| Customer Charge | | $103.41 |
| Transmission Demand Charge-xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge-xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00230 |
| PBR Adjustment & FAS 106 | kWh x | ($0.00129) |
| | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 16 of 26

Confidential

File: C:\123data\AMESR\MEA\BASEBweB\lk.wk4
Range: G-09?
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 17 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on W-1 Rate Customers

Hours Use: 100

| Monthly Power | | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 100 | $10.15 | $3.96 | $6.19 | $7.55 | $3.96 | $3.59 | ($2.60) | -25.6% |
| 3 | 300 | $27.69 | $11.88 | $15.81 | $22.66 | $11.88 | $10.78 | ($5.03) | -18.2% |
| 5 | 500 | $45.23 | $19.79 | $25.44 | $37.76 | $19.79 | $17.97 | ($7.47) | -16.5% |
| 10 | 1,000 | $89.08 | $39.58 | $49.50 | $75.53 | $39.58 | $35.95 | ($13.55) | -15.2% |

**Blackstone Valley Rates:**   W-1

| | | |
|---|---|---|
| Customer Charge | $1.32 | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $0.00 | kW x |
| Distribution Energy Charge | $0.01792 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00278 | kWh x |
| PBR Adjustment & FAS 106 | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:**   G-02

| | | |
|---|---|---|
| Customer Charge | $0.00 | |
| Transmission Demand Charge-xcs 10 kW | $1.40 | kW x |
| Distribution Demand Charge-xcs 10 kW | $2.91 | kW x |
| Distribution Energy Charge | $0.00596 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00129) | kWh x |
| PBR Adjustment & FAS 106 | $0.00434 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 17 of 26

Confidential

NEC092325

File: C:\123data\IAMESM&A\BASED=chil1.wk4
Range: G-30A
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on H-1 Rate Customers

Hours Use: 300

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 200 | 60,000 | $6,005.01 | $2,375.00 | $3,630.01 | $5,435.86 | $2,375.00 | $3,060.86 | ($569.15) | -9.5% |
| 300 | 90,000 | $9,005.95 | $3,562.50 | $5,443.45 | $8,030.66 | $3,562.50 | $4,468.16 | ($975.29) | -10.8% |
| 400 | 120,000 | $12,006.89 | $4,750.00 | $7,256.89 | $10,625.45 | $4,750.00 | $5,875.45 | ($1,381.44) | -11.5% |
| 500 | 150,000 | $15,007.82 | $5,937.50 | $9,070.32 | $13,220.24 | $5,937.50 | $7,282.74 | ($1,787.58) | -11.9% |
| 600 | 180,000 | $18,008.76 | $7,125.00 | $10,883.76 | $15,815.03 | $7,125.00 | $8,690.03 | ($2,193.73) | -12.2% |

**Blackstone Valley Rates:    H-1**

| | | |
|---|---|---|
| Customer Charge | $3.01 | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $0.00 | kW x |
| Distribution Energy Charge | $0.02975 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00278 | kWh x |
| PBR Adjustment & FAS 106 | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:    G-32**

| | | |
|---|---|---|
| Customer Charge | $236.43 | |
| Transmission Demand Charge | $1.27 | kW x |
| Distribution Demand Charge | $1.56 | kW x |
| Distribution Energy Charge | $0.00705 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00129) | kWh x |
| PBR Adjustment & FAS 106 | $0.00434 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

Confidential

File: CH226saWAMESM&AIBASEBWaHH.wk4
Range: G-30B
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 19 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on H-2 Rate Customers

Hours Use:   300

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 200 | 60,000 | $6,284.20 | $2,375.00 | $3,909.20 | $5,435.86 | $2,375.00 | $3,060.86 | ($848.34) | -13.5% |
| 300 | 90,000 | $9,424.51 | $3,562.50 | $5,862.01 | $8,030.66 | $3,562.50 | $4,468.16 | ($1,393.85) | -14.8% |
| 400 | 120,000 | $12,564.82 | $4,750.00 | $7,814.82 | $10,625.45 | $4,750.00 | $5,875.45 | ($1,939.37) | -15.4% |
| 500 | 150,000 | $15,705.14 | $5,937.50 | $9,767.64 | $13,220.24 | $5,937.50 | $7,282.74 | ($2,484.90) | -15.8% |
| 600 | 180,000 | $18,845.45 | $7,125.00 | $11,720.45 | $15,815.03 | $7,125.00 | $8,690.03 | ($3,030.42) | -16.1% |

**Blackstone Valley Rates:**   H-2

| | | |
|---|---|---|
| Customer Charge | | $3.43 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $0.00 |
| Distribution Energy Charge | kWh x | $0.03421 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**   G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00230 |
| PBR Adjustment & FAS 106 | kWh x | ($0.00129) |
| | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 19 of 26

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 20 of 26

File: C:\123data\JAMESNMA\BASEB\etillit.wk4
Range: G-30C
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on G-2 Rate Customers

Hours Use:    300

| Monthly Power | | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 200 | 60,000 | $5,523.75 | $2,375.00 | $3,148.75 | $5,435.86 | $2,375.00 | $3,060.86 | ($87.89) | -1.6% |
| 300 | 90,000 | $8,285.63 | $3,562.50 | $4,723.13 | $8,030.66 | $3,562.50 | $4,468.16 | ($254.97) | -3.1% |
| 400 | 120,000 | $11,047.50 | $4,750.00 | $6,297.50 | $10,625.45 | $4,750.00 | $5,875.45 | ($422.05) | -3.8% |
| 500 | 150,000 | $13,809.38 | $5,937.50 | $7,871.88 | $13,220.24 | $5,937.50 | $7,282.74 | ($589.14) | -4.3% |
| 600 | 180,000 | $16,571.25 | $7,125.00 | $9,446.25 | $15,815.03 | $7,125.00 | $8,690.03 | ($756.22) | -4.6% |

**Blackstone Valley Rates:**    G-2

| | | |
|---|---|---|
| Customer Charge | | |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.50 |
| Distribution Energy Charge | kWh x | $0.01710 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00230 |
| PBR Adjustment & FAS 106 | kWh x | ($0.00129) |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 20 of 26

Confidential

File: CN\T2\bveVIAMESM&AVBASEDveblK.wk4
Range: G-30D
Date: 14-May-99
Time: 1:23 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 21 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on T-2 Rate Customers

Hours Use: 400

| Monthly Power | | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 500 | 200,000 | $19,372.92 | $7,916.67 | $11,456.25 | $17,053.58 | $7,916.67 | $9,136.91 | ($2,319.34) | -12.0% |
| 1,000 | 400,000 | $38,745.83 | $15,833.33 | $22,912.50 | $33,860.86 | $15,833.33 | $18,027.53 | ($4,884.97) | -12.6% |
| 1,500 | 600,000 | $58,118.75 | $23,750.00 | $34,368.75 | $50,668.16 | $23,750.00 | $26,918.16 | ($7,450.59) | -12.8% |
| 2,000 | 800,000 | $77,491.67 | $31,666.67 | $45,825.00 | $67,475.45 | $31,666.67 | $35,808.78 | ($10,016.22) | -12.9% |
| 2,500 | 1,000,000 | $96,864.58 | $39,583.33 | $57,281.25 | $84,282.74 | $39,583.33 | $44,699.41 | ($12,581.84) | -13.0% |

**Blackstone Valley Rates:    T-2**

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.50 |
| Distribution Energy Charge | kWh x | $0.02296 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:    G-32**

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 21 of 26

Confidential

File: C:\123data\JAMES\M&A\BASED\rebill1.wk4
Range: G-30E
Date: 14-May-95
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 22 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on T-4 Rate Customers

Hours Use:  400

| Monthly Power | | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 500 | 200,000 | $17,943.75 | $7,916.67 | $10,027.08 | $17,053.58 | $7,916.67 | $9,136.91 | ($890.17) | -5.0% |
| 1,000 | 400,000 | $35,887.50 | $15,833.33 | $20,054.17 | $33,860.86 | $15,833.33 | $18,027.53 | ($2,026.64) | -5.6% |
| 1,500 | 600,000 | $53,831.25 | $23,750.00 | $30,081.25 | $50,668.16 | $23,750.00 | $26,918.16 | ($3,163.09) | -5.9% |
| 2,000 | 800,000 | $71,775.00 | $31,666.67 | $40,108.33 | $67,475.45 | $31,666.67 | $35,808.78 | ($4,299.55) | -6.0% |
| 2,500 | 1,000,000 | $89,718.75 | $39,583.33 | $50,135.42 | $84,282.74 | $39,583.33 | $44,699.41 | ($5,436.01) | -6.1% |

**Blackstone Valley Rates:**  T-4

| | | |
|---|---|---|
| Customer Charge | $0.00 | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $1.44 | kW x |
| Distribution Energy Charge | $0.01625 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00278 | kWh x |
| PBR Adjustment & FAS 106 | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:**   G-32

| | | |
|---|---|---|
| Customer Charge | $236.43 | |
| Transmission Demand Charge | $1.27 | kW x |
| Distribution Demand Charge | $1.56 | kW x |
| Distribution Energy Charge | $0.00705 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00129) | kWh x |
| PBR Adjustment & FAS 106 | $0.00434 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 22 of 26

Confidential

NEC092330

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 23 of 26

File: CVI326end/JAMES/M&A/JBASEllBwsllH.wk4
Range: G-30F
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on G-5 Rate Customers

Hours Use: 300

| Monthly Power | | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 200 | 60,000 | $5,492.50 | $2,375.00 | $3,117.50 | $5,435.86 | $2,375.00 | $3,060.86 | ($56.64) | -1.0% |
| 300 | 90,000 | $8,238.75 | $3,562.50 | $4,676.25 | $8,030.66 | $3,562.50 | $4,468.16 | ($208.09) | -2.5% |
| 400 | 120,000 | $10,985.00 | $4,750.00 | $6,235.00 | $10,625.45 | $4,750.00 | $5,875.45 | ($359.55) | -3.3% |
| 500 | 150,000 | $13,731.25 | $5,937.50 | $7,793.75 | $13,220.24 | $5,937.50 | $7,282.74 | ($511.01) | -3.7% |
| 600 | 180,000 | $16,477.50 | $7,125.00 | $9,352.50 | $15,815.03 | $7,125.00 | $8,690.03 | ($662.47) | -4.0% |

**Blackstone Valley Rates:**     G-5

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.35 |
| Distribution Energy Charge | kWh x | $0.01710 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**     G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 23 of 26

Confidential

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 24 of 26

File:   C:\123dev\JAMES\MAJAIBASEB\reBill4.wk4
Range:  G-30G
Date:   14-May-99
Time:   12:28 PM

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting BVE Customers to Narragansett Rates**
**Impact on T-5 Rate Customers**

Hours Use:   400

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 200 | 80,000 | $7,229.59 | $3,166.67 | $4,062.92 | $6,969.20 | $3,166.67 | $3,802.53 | ($260.39) | -3.6% |
| 300 | 120,000 | $10,844.38 | $4,750.00 | $6,094.38 | $10,330.66 | $4,750.00 | $5,580.66 | ($513.72) | -4.7% |
| 400 | 160,000 | $14,459.16 | $6,333.33 | $8,125.83 | $13,692.11 | $6,333.33 | $7,358.78 | ($767.05) | -5.3% |
| 500 | 200,000 | $18,073.96 | $7,916.67 | $10,157.29 | $17,053.58 | $7,916.67 | $9,136.91 | ($1,020.38) | -5.6% |
| 600 | 240,000 | $21,688.75 | $9,500.00 | $12,188.75 | $20,415.03 | $9,500.00 | $10,915.03 | ($1,273.72) | -5.9% |

**Blackstone Valley Rates:    T-5**

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.35 |
| Distribution Energy Charge | kWh x | $0.01710 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:    G-32**

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 24 of 26

Confidential

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 25 of 26

File: C:\123dat\JAMES\M&A\BASEB\rebllt.wk4
Range: G-30H
Date: 14-May-99
Time: 12:42 PM

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on T-6 Rate Customers

Hours Use: 450

| Monthly Power kW | kWh | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 500 | 225,000 | $18,900.78 | $8,906.25 | $9,994.53 | $18,970.24 | $8,906.25 | $10,063.99 | $69.46 | 0.4% |
| 1,000 | 450,000 | $37,801.56 | $17,812.50 | $19,989.06 | $37,694.20 | $17,812.50 | $19,881.70 | ($107.36) | -0.3% |
| 1,500 | 675,000 | $56,702.34 | $26,718.75 | $29,983.59 | $56,418.16 | $26,718.75 | $29,699.41 | ($284.18) | -0.5% |
| 2,000 | 900,000 | $75,603.13 | $35,625.00 | $39,978.13 | $75,142.11 | $35,625.00 | $39,517.11 | ($461.02) | -0.6% |
| 2,500 | 1,125,000 | $94,503.91 | $44,531.25 | $49,972.66 | $93,866.07 | $44,531.25 | $49,334.82 | ($637.84) | -0.7% |

**Blackstone Valley Rates:**    T-6

| | | |
|---|---|---|
| Customer Charge | $0.00 | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $1.32 | kW x |
| Distribution Energy Charge | $0.01143 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00278 | kWh x |
| PBR Adjustment & FAS 106 | $0.00000 | kWh x |
| | | |
| Gross Earnings Tax | 4.00% | |
| | | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:**    G-32

| | | |
|---|---|---|
| Customer Charge | $236.43 | |
| Transmission Demand Charge | $1.27 | kW x |
| Distribution Demand Charge | $1.56 | kW x |
| Distribution Energy Charge | $0.00705 | kWh x |
| Transition Energy Charge | $0.02320 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00129) | kWh x |
| PBR Adjustment & FAS 106 | $0.00434 | kWh x |
| | | |
| Gross Earnings Tax | 4.00% | |
| | | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 25 of 26

Confidential

File: C:\123data\JAHESM&AUBASBweWH.wM
Range: G-60A
Date: 14-May-99
Time: 12:28 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 26 of 26

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting BVE Customers to Narragansett Rates
Impact on T-6 Rate Customers

Hours Use:     600

| Monthly Power | | Blackstone Valley Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 3,000 | 1,800,000 | $149,831.25 | $71,250.00 | $78,581.25 | $149,300.75 | $71,250.00 | $78,050.75 | ($530.50) | -0.4% |
| 4,000 | 2,400,000 | $199,775.00 | $95,000.00 | $104,775.00 | $193,123.67 | $95,000.00 | $98,123.67 | ($6,651.33) | -3.3% |
| 5,000 | 3,000,000 | $249,718.75 | $118,750.00 | $130,968.75 | $236,946.58 | $118,750.00 | $118,196.58 | ($12,772.17) | -5.1% |
| 6,000 | 3,600,000 | $299,662.50 | $142,500.00 | $157,162.50 | $280,769.50 | $142,500.00 | $138,269.50 | ($18,893.00) | -6.3% |
| 7,000 | 4,200,000 | $349,606.25 | $166,250.00 | $183,356.25 | $324,592.42 | $166,250.00 | $158,342.42 | ($25,013.83) | -7.2% |

**Blackstone Valley Rates:  T-6**

| | | |
|---|---|---|
| Customer Charge | | |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $0.00 |
| Transition Demand Charge | kW x | $1.32 |
| Distribution Energy Charge | kWh x | $0.01143 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00278 |
| PBR Adjustment & FAS 106 | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**     G-62

| | | |
|---|---|---|
| Customer Charge | | $17,118.72 |
| Transmission Demand Charge | kW x | $1.39 |
| Distribution Demand Charge | kW x | $0.75 |
| Transition Demand Charge | kW x | $0.00 |
| Distribution Energy Charge | kWh x | $0.00000 |
| Transition Energy Charge | kWh x | $0.02320 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00129) |
| PBR Adjustment & FAS 106 | kWh x | $0.00434 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 9
Page 26 of 26

Confidential

Exhibit JMM-10

Confidential

NEC092335

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-10

Exhibit JMM-10

Newport Typical Bills

Confidential

File: CN122data\AMESV&RA\BASENecbill.wk4
Range: A-10
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 1 of 23

## The Narragansett Electric Company
## Calculation of Monthly Typical Bill
## Shifting NEC Customers to Narragansett Rates
## Impact on R-1 Rate Customers

| Monthly kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 120 | $17.35 | $4.75 | $12.60 | $16.41 | $4.75 | $11.66 | ($0.94) | -5.4% |
| 240 | $31.47 | $9.50 | $21.97 | $30.17 | $9.50 | $20.67 | ($1.30) | -4.1% |
| 480 | $59.71 | $19.00 | $40.71 | $57.70 | $19.00 | $38.70 | ($2.01) | -3.4% |
| 700 | $85.60 | $27.71 | $57.89 | $82.94 | $27.71 | $55.23 | ($2.66) | -3.1% |
| 950 | $115.01 | $37.60 | $77.41 | $111.60 | $37.60 | $74.00 | ($3.41) | -3.0% |
| 500 | $62.06 | $19.79 | $42.27 | $59.99 | $19.79 | $40.20 | ($2.07) | -3.3% |

**Newport Rates:**    R-1

| | | |
|---|---|---|
| Customer Charge | | $3.10 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.04653 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    A-16

| | | |
|---|---|---|
| Customer Charge | | $2.54 |
| Transmission Energy Charge | kWh x | $0.00436 |
| Distribution Energy Charge | kWh x | $0.03246 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 1 of 23

Confidential

NEC092337

File: C:\123data\JAMES\M&A\BASE\Nec\iH4.wk4
Range: TA
Date: 14-May-99
Time: 12:15 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 2 of 23

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on W-1 Rate Customers**

| Monthly kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 750 | $74.07 | $29.69 | $44.38 | $86.03 | $29.69 | $56.34 | $11.96 | 16.1% |
| 1,500 | $144.71 | $59.38 | $85.33 | $172.05 | $59.38 | $112.67 | $27.34 | 18.9% |
| 3,000 | $285.99 | $118.75 | $167.24 | $344.09 | $118.75 | $225.34 | $58.10 | 20.3% |
| 4,600 | $436.69 | $182.08 | $254.61 | $527.61 | $182.08 | $345.53 | $90.92 | 20.8% |
| 6,000 | $568.55 | $237.50 | $331.05 | $688.19 | $237.50 | $450.69 | $119.64 | 21.0% |

**Newport Rates:**    W-1

| | | |
| --- | --- | --- |
| Customer Charge | | $3.29 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.02399 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    A-16

| | | |
| --- | --- | --- |
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00436 |
| Distribution Energy Charge | kWh x | $0.03246 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 2 of 23

Confidential

File: C\12desuJAMESJMA/ABASENedill4 w64
Range: A-30A
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 3 of 23

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on R-4 Rate Customers

kWh Split:
- On-Peak: 23%
- Off-Peak: 77%

| Monthly Summer kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 2,000 | $248.04 | $79.17 | $168.87 | $212.92 | $79.17 | $133.75 | ($35.12) | -14.2% |
| 2,500 | $308.29 | $98.96 | $209.33 | $264.39 | $98.96 | $165.43 | ($43.90) | -14.2% |
| 3,000 | $368.53 | $118.75 | $249.78 | $315.86 | $118.75 | $197.11 | ($52.67) | -14.3% |
| 4,000 | $489.01 | $158.33 | $330.68 | $418.81 | $158.33 | $260.48 | ($70.20) | -14.4% |
| 5,000 | $609.51 | $197.92 | $411.59 | $521.76 | $197.92 | $323.84 | ($87.75) | -14.4% |

**Newport Rates:** R-4

| | | |
|---|---|---|
| Customer Charge | $6.78 | |
| Meter Charge | $0.00 | |
| Transmission Energy Charge | $0.00000 | kWh x |
| Dist Peak Energy Charge | $0.11000 | kWh x |
| Dist Off Peak Energy Charge | $0.03109 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00273 | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:** A-32

| | | |
|---|---|---|
| Customer Charge | $2.30 | |
| Meter Charge | $4.44 | |
| Transmission Energy Charge | $0.00392 | kWh x |
| Distribution Energy Charge | $0.02162 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00136) | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.01095 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 3 of 23

Confidential

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 4 of 23

File: C:\1234xml\AMES\M&A\BRASEN\edsill4.wk4
Range: A-30B
Date: 14-May-99
Time: 12:55 PM

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on R-4 Rate Customers**

KWh Splits: - On-Peak    26%
            - Off-Peak   74%

| Monthly Winter kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 3,000 | $375.93 | $118.75 | $257.18 | $315.86 | $118.75 | $197.11 | ($60.07) | -16.0% |
| 4,000 | $498.88 | $158.33 | $340.55 | $418.81 | $158.33 | $260.48 | ($80.07) | -16.0% |
| 5,000 | $621.84 | $197.92 | $423.92 | $521.76 | $197.92 | $323.84 | ($100.08) | -16.1% |
| 6,000 | $744.79 | $237.50 | $507.29 | $624.71 | $237.50 | $387.21 | ($120.08) | -16.1% |
| 7,000 | $867.74 | $277.08 | $590.66 | $727.65 | $277.08 | $450.57 | ($140.09) | -16.1% |

**Newport Rates:**    R-4

| | | |
|---|---|---|
| Customer Charge | | $6.78 |
| Meter Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Dist Peak Energy Charge | kWh x | $0.11000 |
| Dist Off Peak Energy Charge | kWh x | $0.03109 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    A-32

| | | |
|---|---|---|
| Customer Charge | | $2.30 |
| Meter Charge | | $4.44 |
| Transmission Energy Charge | kWh x | $0.00392 |
| Dist Peak Energy Charge | kWh x | $0.02162 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 4 of 23

Confidential

NEC092340

File: C:\1121anx\A\EES\M&A\BASE\Nedi\H-mk4
Range: A-60A
Date: 14-May-99
Time: 12:49 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 5 of 23

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on R-2 Rate Customers

| Monthly kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 100 | $9.94 | $3.96 | $5.98 | $9.35 | $3.96 | $5.39 | ($0.59) | -5.9% |
| 300 | $25.37 | $11.88 | $13.49 | $28.06 | $11.88 | $16.18 | $2.69 | 10.6% |
| 500 | $47.96 | $19.79 | $28.17 | $48.05 | $19.79 | $28.26 | $0.09 | 0.2% |
| 700 | $70.57 | $27.71 | $42.86 | $68.04 | $27.71 | $40.33 | ($2.53) | -3.6% |
| 1,000 | $104.46 | $39.58 | $64.88 | $98.02 | $39.58 | $58.44 | ($6.44) | -6.2% |

R-2

Newport Rates:

| | | |
|---|---|---|
| Customer Charge | | $2.14 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Dist. Energy Charge first 300 kWh | kWh x | $0.00759 |
| Dist. Energy Charge excess 300 kWh | kWh x | $0.04206 |
| Transition Energy Charge | kWh x | $0.023340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| A-60 Rate Credit | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

A-60

Narragansett Rates:

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00338 |
| Distribution Energy Charge | kWh x | $0.02521 |
| Dist. Surcharge & FAS 106 | kWh x | $0.00729 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| Credit First 300 kWh | kWh x | ($0.00616) |
| A-60 Rate Credit | kWh x | ($0.00227) |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 5 of 23

Confidential

File: C:\1234en\IAMESM&AIBASENtechlit4.wk4
Range: C-02A
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 6 of 23

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on H-1 Rate Customers

| Monthly kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 500 | $67.80 | $19.79 | $48.01 | $64.97 | $19.79 | $45.18 | ($2.83) | -4.2% |
| 1,500 | $178.33 | $59.38 | $118.95 | $182.99 | $59.38 | $123.61 | $4.66 | 2.6% |
| 2,500 | $288.86 | $98.96 | $189.90 | $301.00 | $98.96 | $202.04 | $12.14 | 4.2% |
| 3,500 | $399.39 | $138.54 | $260.85 | $419.00 | $138.54 | $280.46 | $19.61 | 4.9% |
| 4,500 | $509.93 | $178.13 | $331.80 | $537.02 | $178.13 | $358.89 | $27.09 | 5.3% |

**Newport Rates:**     H-1

| | | |
| --- | --- | --- |
| Customer Charge | | $12.03 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.03968 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**     C-06

| | | |
| --- | --- | --- |
| Customer Charge | | $5.73 |
| Transmission Energy Charge | kWh x | $0.00536 |
| Distribution Energy Charge | kWh x | $0.03464 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 6 of 23

Confidential

NEC092342

File: C:\123dat\JAMES\M&A\BASE\Neotllk.wk4
Range: C-02B
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 7 of 23

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on H-2 Rate Customers

| Monthly kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 500 | $63.76 | $19.79 | $43.97 | $59.00 | $19.79 | $39.21 | ($4.76) | -7.5% |
| 1,000 | $122.74 | $39.58 | $83.16 | $118.01 | $39.58 | $78.43 | ($4.73) | -3.9% |
| 1,500 | $181.72 | $59.38 | $122.34 | $177.02 | $59.38 | $117.64 | ($4.70) | -2.6% |
| 2,000 | $240.70 | $79.17 | $161.53 | $236.02 | $79.17 | $156.85 | ($4.68) | -1.9% |
| 2,500 | $299.68 | $98.96 | $200.72 | $295.03 | $98.96 | $196.07 | ($4.65) | -1.6% |

**Newport Rates:** H-2

| | | |
|---|---|---|
| Customer Charge | | $4.59 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.04681 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:** C-06

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00536 |
| Distribution Energy Charge | kWh x | $0.03464 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 7 of 23

Confidential

94
NEC092343

File: C:\123data\AMESM&A\BASE\Needsf04.wk4
Range: C-02C
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 8 of 23

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on G-1 Rate Customers**

| Monthly kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 250 | $36.08 | $9.90 | $26.18 | $35.48 | $9.90 | $25.58 | ($0.60) | -1.7% |
| 500 | $68.57 | $19.79 | $48.78 | $64.97 | $19.79 | $45.18 | ($3.60) | -5.3% |
| 750 | $101.06 | $29.69 | $71.37 | $94.48 | $29.69 | $64.79 | ($6.58) | -6.5% |
| 1,000 | $133.54 | $39.58 | $93.96 | $123.98 | $39.58 | $84.40 | ($9.56) | -7.2% |
| 1,250 | $166.03 | $49.48 | $116.55 | $153.48 | $49.48 | $104.00 | ($12.55) | -7.6% |

**Newport Rates:** G-1

| | | |
|---|---|---|
| Customer Charge | $3.45 | |
| Transmission Energy Charge | $0.00000 | kWh x |
| Distribution Energy Charge | $0.05832 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00273 | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:** C-06

| | | |
|---|---|---|
| Customer Charge | $5.73 | |
| Transmission Energy Charge | $0.00536 | kWh x |
| Distribution Energy Charge | $0.03464 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00136) | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.01095 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 8 of 23

Confidential

File: C:\123data\JAMES\VM&A\BASE\Necbill4.w14
Range: C-02D
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 9 of 23

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on W-1 Rate Customers**

| Monthly kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|
| | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 125 | $15.20 | $4.95 | $10.25 | $14.75 | $4.95 | $9.80 | ($0.45) | -3.0% |
| 250 | $26.98 | $9.90 | $17.08 | $29.51 | $9.90 | $19.61 | $2.53 | 9.4% |
| 375 | $38.74 | $14.84 | $23.90 | $44.25 | $14.84 | $29.41 | $5.51 | 14.2% |
| 500 | $50.52 | $19.79 | $30.73 | $59.00 | $19.79 | $39.21 | $8.48 | 16.8% |
| 1,000 | $97.61 | $39.58 | $58.03 | $118.01 | $39.58 | $78.43 | $20.40 | 20.9% |

**Newport Rates:**    W-1

| | | |
|---|---|---|
| Customer Charge | | $3.29 |
| Transmission Energy Charge | kWh x | $0.00000 |
| Distribution Energy Charge | kWh x | $0.02399 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    C-06

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Energy Charge | kWh x | $0.00536 |
| Distribution Energy Charge | kWh x | $0.03464 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 9 of 23

Confidential

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 10 of 23

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on H-1 Rate Customers

File: C:\123data\JAMESNMA\JBASENecBill\H.wk4
Range: 0-00
Date: 14-May-99
Time: 12:35 PM

Hours Use: 300

| Monthly Power | | Newport Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 20 | 6,000 | $675.72 | $237.50 | $438.22 | $647.93 | $237.50 | $410.43 | ($27.79) | -4.1% |
| 50 | 15,000 | $1,670.50 | $593.75 | $1,076.75 | $1,525.58 | $593.75 | $931.83 | ($144.92) | -8.7% |
| 100 | 30,000 | $3,328.47 | $1,187.50 | $2,140.97 | $2,998.34 | $1,187.50 | $1,800.84 | ($340.13) | -10.2% |
| 150 | 45,000 | $4,986.44 | $1,781.25 | $3,205.19 | $4,451.10 | $1,781.25 | $2,669.85 | ($535.34) | -10.7% |

**Newport Rates:** H-1

| | | |
|---|---|---|
| Customer Charge | $12.03 | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $0.00 | kW x |
| Distribution Energy Charge | $0.03968 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00273 | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:** G-02

| | | |
|---|---|---|
| Customer Charge | $103.41 | |
| Transmission Demand Charge-xcs 10 kW | $1.40 | kW x |
| Distribution Demand Charge-xcs 10 kW | $2.91 | kW x |
| Distribution Energy Charge | $0.00596 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00136) | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.01095 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 10 of 23

Confidential

File: C:\123data\JAMES\M6A\RATES\NNeb\H4.wk4
Range: G-00A
Date: 14-May-99
Time: 12:55 PM

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on H-2 Rate Customers

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 11 of 23

Hours Use:  300

| Monthly Power kW | kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 6,000 | $712.53 | $237.50 | $475.03 | $540.21 | $237.50 | $302.71 | ($172.32) | -24.2% |
| 50 | 15,000 | $1,774.16 | $593.75 | $1,180.41 | $1,417.86 | $593.75 | $824.11 | ($356.30) | -20.1% |
| 100 | 30,000 | $3,543.53 | $1,187.50 | $2,356.03 | $2,880.63 | $1,187.50 | $1,693.13 | ($662.90) | -18.7% |
| 150 | 45,000 | $5,312.91 | $1,781.25 | $3,531.66 | $4,343.39 | $1,781.25 | $2,562.14 | ($969.52) | -18.3% |

**Newport Rates:**  H-2

| | | |
|---|---|---|
| Customer Charge | | $4.59 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $0.00 |
| Distribution Energy Charge | kWh x | $0.04681 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**  G-02

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge-xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge-xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 11 of 23

Confidential

File: C:\123data\JAMES\MBA\BAS\EN\ecbiik.wk4
Range: G-00B
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 12 of 23

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on G-2 Rate Customers**

Hours Use:    300

| Monthly Power kW | kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 6,000 | $663.71 | $237.50 | $426.21 | $647.93 | $237.50 | $410.43 | ($15.78) | -2.4% |
| 50 | 15,000 | $1,659.27 | $593.75 | $1,065.52 | $1,525.58 | $593.75 | $931.83 | ($133.69) | -8.1% |
| 100 | 30,000 | $3,318.54 | $1,187.50 | $2,131.04 | $2,988.34 | $1,187.50 | $1,800.84 | ($330.20) | -10.0% |
| 150 | 45,000 | $4,977.81 | $1,781.25 | $3,196.56 | $4,451.10 | $1,781.25 | $2,669.85 | ($526.71) | -10.6% |

**Newport Rates:**    G-2

| | | |
|---|---|---|
| Customer Charge | $0.00 | |
| Transmission Demand Charge | $0.00 | |
| Distribution Demand Charge | $1.60 | kW x |
| Distribution Energy Charge | $0.03443 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00273 | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:**    G-02

| | | |
|---|---|---|
| Customer Charge | $103.41 | |
| Transmission Demand Charge-xcs 10 kW | $1.40 | kW x |
| Distribution Demand Charge-xcs 10 kW | $2.91 | kW x |
| Distribution Energy Charge | $0.00596 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00136) | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.01095 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 12 of 23

Confidential

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 13 of 23

File: C:\1236en\AMESM6A\RASEN\ec\bl4.w44
Range: G-OC
Date: 14-May-99
Time: 12:55 PM

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on T-2 Rate Customers**

Hours Use: 300

| Monthly Power kW | kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 20 | 6,000 | $663.71 | $237.50 | $426.21 | $647.93 | $237.50 | $410.43 | ($15.78) | -2.4% |
| 50 | 15,000 | $1,659.27 | $593.75 | $1,065.52 | $1,525.58 | $593.75 | $931.83 | ($133.69) | -8.1% |
| 100 | 30,000 | $3,318.54 | $1,187.50 | $2,131.04 | $2,988.34 | $1,187.50 | $1,800.84 | ($330.20) | -10.0% |
| 150 | 45,000 | $4,977.81 | $1,781.25 | $3,196.56 | $4,451.10 | $1,781.25 | $2,669.85 | ($526.71) | -10.6% |

**Newport Rates:** T-2

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.60 |
| Distribution Energy Charge | kWh x | $0.03443 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:** G-02

| | | |
|---|---|---|
| Customer Charge | | $103.41 |
| Transmission Demand Charge>xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge>xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 13 of 23

Confidential

File: C:\123data\JAMESVM&A\BASEModelM vk4
Rege: G-00D
Doc: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 14 of 23

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on G-5 Rate Customers**

Hours Use: 400

| Monthly Power | | Newport Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 20 | 8,000 | $835.92 | $316.67 | $519.25 | $813.03 | $316.67 | $496.36 | ($22.89) | -2.7% |
| 50 | 20,000 | $2,089.80 | $791.67 | $1,298.13 | $1,938.35 | $791.67 | $1,146.68 | ($151.45) | -7.2% |
| 100 | 40,000 | $4,179.58 | $1,583.33 | $2,596.25 | $3,813.86 | $1,583.33 | $2,230.53 | ($365.72) | -8.8% |
| 150 | 60,000 | $6,269.38 | $2,375.00 | $3,894.38 | $5,689.39 | $2,375.00 | $3,314.39 | ($579.99) | -9.3% |

**Newport Rates:**    G-5

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | | $0.00 |
| Distribution Demand Charge | kW x | $1.76 |
| Distribution Energy Charge | kWh x | $0.02948 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    G-02

| | | |
|---|---|---|
| Customer Charge | | $103.41 |
| Transmission Demand Charge-xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge-xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 14 of 23

Confidential

File: C:\1234xx\JAMESNM4\BASEN\ecbill4.xls4
Range: G-40F
Date: 14-May-99
Time: 12:35 PM

Hours Use:    100

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on W-1 Rate Customers

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 15 of 23

| Monthly Power kW | kWh | Newport Rates Total | Standard Offer | "Wires" | Narragansett Rates Total | Standard Offer | "Wires" | Difference Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 100 | $12.85 | $3.96 | $8.89 | $8.26 | $3.96 | $4.30 | ($4.59) | -35.7% |
| 3 | 300 | $31.69 | $11.88 | $19.81 | $24.77 | $11.88 | $12.89 | ($6.92) | -21.8% |
| 5 | 500 | $50.52 | $19.79 | $30.73 | $41.27 | $19.79 | $21.48 | ($9.25) | -18.3% |
| 10 | 1,000 | $97.61 | $39.58 | $58.03 | $82.55 | $39.58 | $42.97 | ($15.06) | -15.4% |

**Newport Rates:**    W-1

| | | |
|---|---|---|
| Customer Charge | | $3.29 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $0.00 |
| Distribution Energy Charge | kWh x | $0.02399 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    G-02

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge-xcs 10 kW | kW x | $1.40 |
| Distribution Demand Charge-xcs 10 kW | kW x | $2.91 |
| Distribution Energy Charge | kWh x | $0.00596 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 15 of 23

Confidential

File: C:\12den\JAMES\M&A\BASENec\illit.wk4
Range: G-30A
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 16 of 23

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on H-1 Rate Customers

Hours Use:    300

| Monthly Power kW | kWh | Newport Rates Total | Standard Offer | "Wires" | Narragansett Rates Total | Standard Offer | "Wires" | Difference Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 200 | 60,000 | $6,644.41 | $2,375.00 | $4,269.41 | $5,857.11 | $2,375.00 | $3,482.11 | ($787.30) | -11.8% |
| 300 | 90,000 | $9,960.34 | $3,562.50 | $6,397.84 | $8,662.53 | $3,562.50 | $5,100.03 | ($1,297.81) | -13.0% |
| 400 | 120,000 | $13,276.28 | $4,750.00 | $8,526.28 | $11,467.95 | $4,750.00 | $6,717.95 | ($1,808.33) | -13.6% |
| 500 | 150,000 | $16,592.22 | $5,937.50 | $10,654.72 | $14,273.36 | $5,937.50 | $8,335.86 | ($2,318.86) | -14.0% |
| 600 | 180,000 | $19,908.16 | $7,125.00 | $12,783.16 | $17,078.78 | $7,125.00 | $9,953.78 | ($2,829.38) | -14.2% |

Newport Rates:    H-1

| | | |
|---|---|---|
| Customer Charge | | $12.03 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $0.00 |
| Distribution Energy Charge | kWh x | $0.03968 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

Narragansett Rates:    G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 16 of 23

Confidential

File: C:\122dm\VAMES\M&A\BASE\Necbill4.wk4
Range: G-30C
Date: 14-May-99
Time: 12:55 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 17 of 23

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on G-2 Rate Customers**

Hours Use: 300

| Monthly Power | | Newport Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 200 | 60,000 | $6,327.71 | $2,375.00 | $3,952.71 | $5,857.11 | $2,375.00 | $3,482.11 | ($470.60) | -7.4% |
| 300 | 90,000 | $9,491.56 | $3,562.50 | $5,929.06 | $8,662.53 | $3,562.50 | $5,100.03 | ($829.03) | -8.7% |
| 400 | 120,000 | $12,655.42 | $4,750.00 | $7,905.42 | $11,467.95 | $4,750.00 | $6,717.95 | ($1,187.47) | -9.4% |
| 500 | 150,000 | $15,819.27 | $5,937.50 | $9,881.77 | $14,273.36 | $5,937.50 | $8,335.86 | ($1,545.91) | -9.8% |
| 600 | 180,000 | $18,983.13 | $7,125.00 | $11,858.13 | $17,078.78 | $7,125.00 | $9,953.78 | ($1,904.35) | -10.0% |

**Newport Rates:** G-2

| | | |
|---|---|---|
| Customer Charge | $0.00 | |
| Transmission Demand Charge | $0.00 | |
| Distribution Demand Charge | $1.60 | kW x |
| Distribution Energy Charge | $0.02948 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00273 | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:** G-32

| | | |
|---|---|---|
| Customer Charge | $236.43 | |
| Transmission Demand Charge | $1.27 | kW x |
| Distribution Demand Charge | $1.56 | kW x |
| Distribution Energy Charge | $0.00705 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00200 | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | ($0.00136) | kWh x |
| | $0.01095 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 17 of 23

Confidential

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM-10
Page 18 of 23

File: C:\123en\IAMES\IAR&A\BASENecBill.wk4
Range: G-30D
Date: 14-May-99
Time: 12:55 PM

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NBC Customers to Narragansett Rates**
**Impact on T-2 Rate Customers**

Hours Use: 400

| Monthly Power kW | kWh | Newport Rates Total | Standard Offer | "Wires" | Narragansett Rates Total | Standard Offer | "Wires" | Difference Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 500 | 200,000 | $21,845.84 | $7,916.67 | $13,929.17 | $18,457.74 | $7,916.67 | $10,541.07 | ($3,388.10) | -15.5% |
| 1,000 | 400,000 | $43,691.66 | $15,833.33 | $27,858.33 | $36,669.19 | $15,833.33 | $20,835.86 | ($7,022.47) | -16.1% |
| 1,500 | 660,000 | $65,537.50 | $23,750.00 | $41,787.50 | $54,880.66 | $23,750.00 | $31,130.66 | ($10,656.84) | -16.3% |
| 2,000 | 800,000 | $87,383.34 | $31,666.67 | $55,716.67 | $73,092.12 | $31,666.67 | $41,425.45 | ($14,291.22) | -16.4% |
| 2,500 | 1,000,000 | $109,229.16 | $39,583.33 | $69,645.83 | $91,303.57 | $39,583.33 | $51,720.24 | ($17,925.59) | -16.4% |

**Newport Rates:**    T-2

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.60 |
| Distribution Energy Charge | kWh x | $0.03443 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00230 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | ($0.00136) |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM-10
Page 18 of 23

Confidential

105

File: C:\123w\AMES\M62\ABASE\Neb\H4.wk4
Range: O-30E
Date: 14-May-99
Time: 12:59 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 19 of 23

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on T-4 Rate Customers

Hours Use: 400

| Monthly Power | | | Newport Rates | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| kW | kWh | Total | "Wires" | Standard Offer | Total | Standard Offer | "Wires" | Amount | % of Total |
| 500 | 200,000 | $22,182.30 | $14,265.63 | $7,916.67 | $18,457.74 | $7,916.67 | $10,541.07 | ($3,724.56) | -16.8% |
| 1,000 | 400,000 | $44,364.58 | $28,531.25 | $15,833.33 | $36,669.19 | $15,833.33 | $20,835.86 | ($7,695.39) | -17.3% |
| 1,500 | 600,000 | $66,546.88 | $42,796.88 | $23,750.00 | $54,880.66 | $23,750.00 | $31,130.66 | ($11,666.22) | -17.5% |
| 2,000 | 800,000 | $88,729.17 | $57,062.50 | $31,666.67 | $73,092.12 | $31,666.67 | $41,425.45 | ($15,637.05) | -17.6% |
| 2,500 | 1,000,000 | $110,911.46 | $71,328.13 | $39,583.33 | $91,303.57 | $39,583.33 | $51,720.24 | ($19,607.89) | -17.7% |

**Newport Rates:**  T-4

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.95 |
| Distribution Energy Charge | kWh x | $0.03517 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**  G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 19 of 23

Confidential

File: C:\1234etal\AMESM&A\BASEMbeBIIK.wk4
Range: G-30F
Date: 14-May-99
Time: 1235 PM

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on G-5 Rate Customers**

Hours Use: 300

| Monthly Power kW | kWh | Newport Rates Total | Newport Rates Standard Offer | Newport Rates "Wires" | Narragansett Rates Total | Narragansett Rates Standard Offer | Narragansett Rates "Wires" | Difference Amount | Difference % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 200 | 60,000 | $6,361.04 | $2,375.00 | $3,986.04 | $5,857.11 | $2,375.00 | $3,482.11 | ($503.93) | -7.9% |
| 300 | 90,000 | $9,541.56 | $3,562.50 | $5,979.06 | $8,662.53 | $3,562.50 | $5,100.03 | ($879.03) | -9.2% |
| 400 | 120,000 | $12,722.08 | $4,750.00 | $7,972.08 | $11,467.95 | $4,750.00 | $6,717.95 | ($1,254.13) | -9.9% |
| 500 | 150,000 | $15,902.60 | $5,937.50 | $9,965.10 | $14,273.36 | $5,937.50 | $8,335.86 | ($1,629.24) | -10.2% |
| 600 | 180,000 | $19,083.13 | $7,125.00 | $11,958.13 | $17,078.78 | $7,125.00 | $9,953.78 | ($2,004.35) | -10.5% |

**Newport Rates:**    G-5

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | | $0.00 |
| Distribution Demand Charge | kW x | $1.76 |
| Distribution Energy Charge | kWh x | $0.02948 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

Confidential

File: C:\123aw\JAMES\M&A\BASEN\esBill.wk4
Range: G-30G
Date: 14-May-99
Time: 12:49 PM

The Narragansett Electric Company
Calculation of Monthly Typical Bill
Shifting NEC Customers to Narragansett Rates
Impact on T-5 Rate Customers

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 21 of 23

Hours Use: 400

| Monthly Power | | | Newport Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 200 | 80,000 | $8,359.17 | $3,166.67 | $5,192.50 | $7,530.87 | $3,166.67 | $4,364.20 | ($828.30) | -9.9% |
| 300 | 120,000 | $12,538.75 | $4,750.00 | $7,788.75 | $11,173.16 | $4,750.00 | $6,423.16 | ($1,365.59) | -10.9% |
| 400 | 160,000 | $16,718.33 | $6,333.33 | $10,385.00 | $14,815.44 | $6,333.33 | $8,482.11 | ($1,902.89) | -11.4% |
| 500 | 200,000 | $20,897.92 | $7,916.67 | $12,981.25 | $18,457.74 | $7,916.67 | $10,541.07 | ($2,440.18) | -11.7% |
| 600 | 240,000 | $25,077.50 | $9,500.00 | $15,577.50 | $22,100.03 | $9,500.00 | $12,600.03 | ($2,977.47) | -11.9% |

**Newport Rates:** T-5

| | | |
|---|---|---|
| Customer Charge | | |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.76 |
| Distribution Energy Charge | kWh x | $0.02948 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:** G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | ($0.00136) |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 21 of 23

Confidential

File: C:\122dewiAAMESiM&AiBASENecoilili.xs4
Range: G-30H
Date: 14-May-99
Time: 12:35 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM-10
Page 22 of 23

**The Narragansett Electric Company**
**Calculation of Monthly Typical Bill**
**Shifting NEC Customers to Narragansett Rates**
**Impact on T-6 Rate Customers**

Hours Use:    450

| Monthly Power kW | kWh | Newport Rates | | | Narragansett Rates | | | Difference | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
| 500 | 225,000 | $23,501.04 | $8,906.25 | $14,594.79 | $20,549.93 | $8,906.25 | $11,643.68 | ($2,951.11) | -12.6% |
| 1,000 | 450,000 | $47,002.08 | $17,812.50 | $29,189.58 | $40,853.57 | $17,812.50 | $23,041.07 | ($6,148.51) | -13.1% |
| 1,500 | 675,000 | $70,503.13 | $26,718.75 | $43,784.38 | $61,157.22 | $26,718.75 | $34,438.47 | ($9,345.91) | -13.3% |
| 2,000 | 900,000 | $94,004.17 | $35,625.00 | $58,379.17 | $81,460.86 | $35,625.00 | $45,835.86 | ($12,543.31) | -13.3% |
| 2,500 | 1,125,000 | $117,505.21 | $44,531.25 | $72,973.96 | $101,764.51 | $44,531.25 | $57,233.26 | ($15,740.70) | -13.4% |

**Newport Rates:**    T-6

| | | |
|---|---|---|
| Customer Charge | | $0.00 |
| Transmission Demand Charge | kW x | $0.00 |
| Distribution Demand Charge | kW x | $1.76 |
| Distribution Energy Charge | kWh x | $0.02993 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00273 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | $0.00000 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

**Narragansett Rates:**    G-32

| | | |
|---|---|---|
| Customer Charge | | $236.43 |
| Transmission Demand Charge | kW x | $1.27 |
| Distribution Demand Charge | kW x | $1.56 |
| Distribution Energy Charge | kWh x | $0.00705 |
| Transition Energy Charge | kWh x | $0.02340 |
| DSM Adjustment | kWh x | $0.00230 |
| Transmission and S.O. Adjs. | kWh x | $0.00230 |
| PBR Adj, FAS 106 & Dist. Surcharge | kWh x | ($0.00136) |
| | kWh x | $0.01095 |
| Gross Earnings Tax | | 4.00% |
| Standard Offer Charge | kWh x | $0.03800 |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM-10
Page 22 of 23

Confidential

File: C:\V2I\dealJAMESMA\AJBASENecbill4.wk4
Range: G-60A
Date: 14-Mar-99
Time: 12:25 PM

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 23 of 23

## The Narragansett Electric Company
### Calculation of Monthly Typical Bill
### Shifting NEC Customers to Narragansett Rates
### Impact on T-6 Rate Customers

Hours Use: 600

| Monthly Power | | Newport Rates | | | Narragansett Rates | | | Difference | |
| kW | kWh | Total | Standard Offer | "Wires" | Total | Standard Offer | "Wires" | Amount | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| 3,000 | 1,800,000 | $186,175.00 | $71,250.00 | $114,925.00 | $161,938.25 | $71,250.00 | $90,688.25 | ($24,236.75) | -13.0% |
| 4,000 | 2,400,000 | $248,233.33 | $95,000.00 | $153,233.33 | $209,973.67 | $95,000.00 | $114,973.67 | ($38,259.66) | -15.4% |
| 5,000 | 3,000,000 | $310,291.67 | $118,750.00 | $191,541.67 | $258,009.08 | $118,750.00 | $139,259.08 | ($52,282.59) | -16.8% |
| 6,000 | 3,600,000 | $372,350.00 | $142,500.00 | $229,850.00 | $306,044.50 | $142,500.00 | $163,544.50 | ($66,305.50) | -17.8% |
| 7,000 | 4,200,000 | $434,408.33 | $166,250.00 | $268,158.33 | $354,079.92 | $166,250.00 | $187,829.92 | ($80,328.41) | -18.5% |

**Newport Rates:**   T-6

| | | |
|---|---|---|
| Customer Charge | | |
| Transmission Demand Charge | $0.00 | kW x |
| Distribution Demand Charge | $0.00 | kW x |
| Transition Demand Charge | $1.76 | kW x |
| Distribution Energy Charge | $0.02993 | kWh x |
| Transition Energy Charge | $0.02340 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | $0.00273 | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.00000 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

**Narragansett Rates:**   G-62

| | | |
|---|---|---|
| Customer Charge | $17,118.72 | |
| Transmission Demand Charge | $1.39 | kW x |
| Distribution Demand Charge | $0.75 | kW x |
| Transition Demand Charge | $0.00 | kW x |
| Distribution Energy Charge | $0.02340 | kWh x |
| Transition Energy Charge | $0.00000 | kWh x |
| DSM Adjustment | $0.00230 | kWh x |
| Transmission and S.O. Adjs. | ($0.00136) | kWh x |
| PBR Adj, FAS 106 & Dist. Surcharge | $0.01095 | kWh x |
| Gross Earnings Tax | 4.00% | |
| Standard Offer Charge | $0.03800 | kWh x |

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit JMM - 10
Page 23 of 23

Confidential

Exhibit JMM-11

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JMM-11

Addition to Narragansett Terms and Conditions

Definitions of Zones

34.    For purposes of interpreting rates, tariffs and Terms and Conditions, the following terms
       will have the meanings as follows:

       Narragansett Zone is the cities and towns of: Providence, North Providence, East
       Providence, Cranston, Johnston, Smithfield, Scituate, Foster, Gloucester, Warren,
       Barrington, Bristol, Tiverton, Little Compton, Warwick, West Warwick, East Greenwich,
       Coventry, North Kingstown, Westerly, Richmond, Charlestown, Exeter, Hopkinton,
       Narragansett, South Kingstown and West Greenwich.

       Blackstone Valley Zone is the cities and towns of: Pawtucket, Central Falls, Cumberland,
       Lincoln, Woonsocket, North Smithfield, and Burrillville

       Newport Zone is the cities and towns of: Newport, Middletown, Portsmouth, and
       Jamestown.

C:\DOC\MERGER\NECT&C.ADD

Confidential

Exhibit JMM-12

Confidential

See Separate Volumes 2A and 2B

Confidential

NEC092363

Exhibit JMM-13

NEC092364

R.I.P.U.C. No. ~~1116~~

Sheet 1

Cancelling R.I.P.U.C. No. ~~1074~~

## THE NARRAGANSETT ELECTRIC COMPANY
## NON-BYPASSABLE TRANSITION CHARGE ADJUSTMENT PROVISION

The Non-Bypassable Transition Charge shall ~~be a pass through of the cents per kilowatthour contract termination charge that New England Power Company (NEP) bills to The Narragansett Electric Company (Company). The Non-Bypassable Transition Charge shall be adjusted each time that NEP's contract termination charge changes. The Non-Bypassable Transition Charge shall be computed to the nearest thousandth of a cent.~~ be designed to collect from customers all Contract Termination Charges billed to the Narragansett Electric Company (the Company) by the New England Power Company or Montaup Electric Company. The Non-Bypassable Transition Charge may be subject to adjustment each time any Contract Termination Charge changes.

Modifications to the Non-Bypassable Transition Charge shall be in accordance with a notice filed with the Public Utilities Commission (Commission) setting forth the revised charge and the amount of the increase or decrease. The notice shall further specify the effective date of the change.

A Base Transition Charge shall be established at 1.15 cents per kilowatthour and charged to all Customers in the Block Isle and Newport zones. Zonal Transition Factors also shall apply. On the effective date of this adjustment provision the Zonal Transition Factor shall be calculated as the difference between the Non-Bypassable Transition Charge in effect prior to the Effective Date of this adjustment provision and the Base Transition Charge. Effective on January 1, 2001, the Zonal Transition Factors shall be designed to recover the positive difference, if any, between the amounts to be recovered from Customers through the Base Transition Charge and the total Non-Bypassable Transition Charge revenue to be recovered. At such time that the Base Transition Charge recovers the entire cost of Contract Termination Charges or over collects Contract Termination Charges, the Company may make a filing to adjust the Base Transition Charge and eliminate the Zonal Transition Factors.

To the extent that there are any refunds made by New England Power Company or Montaup Electric Power Company to the Company in connection with Contract Termination Charges, such refunds shall be applied consistent with the methodology set forth in Attachment 1.

On an annual basis, the Company shall reconcile its total cost of Contract Termination Charges against its total transition charge revenue (appropriately adjusted the reflect the Rhode Island Gross Receipts Tax), and the excess or deficiency ("Transition Charge Adjustment Balance") shall be refunded to, or collected from, customers through the rate recovery/refund methodology approved by the Commission at the time the Company files its annual reconciliation. Any positive or negative balance will accrue interest calculated at the rate in effect for customer deposits.

Confidential

R.I.P.U.C. No. ~~1116~~
Sheet 2
Cancelling R.I.P.U.C. No. ~~1074~~ 1116

## THE NARRAGANSETT ELECTRIC COMPANY
## NON-BYPASSABLE TRANSITION CHARGE ADJUSTMENT PROVISION

For purposes of the above reconciliation, total transition charge revenues shall mean all revenue collected from customers through the transition charges for the applicable reconciliation period. If there is a positive or negative balance in the then current Transition Charge Adjustment Balance outstanding from the prior period, the balance shall be credited against or added to the new reconciliation amount, as appropriate, in establishing the Transition Charge Adjustment Balance for the new reconciliation period.

The Company shall annually determine the Transition Charge Adjustment Balance, if any, for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over a twelve month period. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only from those customer classes that underpaid or overpaid transition charges, or (iii) through any other reasonable method.

This provision is applicable to all Retail Delivery Service rates of the Company.

Effective ~~January 1, 1999~~ April 1, 2000

R.I.P.U.C. No. ~~1116~~
Sheet 3
Cancelling R.I.P.U.C. No. ~~1074~~ 1116

THE NARRAGANSETT ELECTRIC COMPANY
NON-BYPASSABLE TRANSITION CHARGE ADJUSTMENT PROVISION

Attachment 1

Refunds received by the Company in connection with Contract Termination Charges shall first be applied to offset the deficiency in the Company's deferred tax reserves in an amount not to exceed the total balance of the deficiency as of December 31, 2000. If any refunds are received in excess of the revenue requirement associated with the deficiency, the Commission may order the Company to refund such amounts to Customers or otherwise use the funds to offset other charges to Customers.

C:\DOC\MERGER\NBTCPROV.WPD

Confidential

115
NEC092367

R.I.P.U.C. No. ~~1054~~
Sheet 1
~~Cancelling R.I.P.U.C. No.~~ 1054

## THE NARRAGANSETT ELECTRIC COMPANY
## TRANSMISSION SERVICE COST ADJUSTMENT PROVISION

The Transmission Service Cost Adjustment (TCA) shall collect from customers transmission costs billed to The Narragansett Electric Company (Narragansett or the Company) by entities such as the New England Power Company, by any other transmission provider, and by regional transmission entities such as the New England Power Pool, a regional transmission group, an independent system operator or any other entity that is authorized to bill Narragansett Electric directly for transmission services.

~~On the Effective Date of this adjustment provision, the TCA shall be separately determined for the Customers in the Narragansett, Blackstone and Newport zones to reflect the transmission costs of those companies prior to the Effective Date as determined by a filing made by the Companies at least 30 days prior to the Effective Date.~~

~~Effective on January 1, 2001,~~ ~~T~~The transmission service cost adjustment shall be a uniform cents per kilowatthour factor applicable to all kilowatthours delivered by the Company. The factor shall be established annually based on a forecast of transmission costs, taking into account revenues that will be received from base rate transmission charges, and shall include a full reconciliation and adjustment for any over- or under-recoveries of transmission costs incurred during the prior year. The Company may file to change the factor adjustment at any time should significant over- or under-recoveries occur. The reconciliation shall calculate all revenues received by the Company through the base rate transmission charges and this TCA, compare these revenues to all transmission costs incurred during the corresponding year, and pass through the resulting credit or charge, as appropriate, on a uniform per kWh basis, as provided above.

Modifications to the Transmission Service Cost Adjustment Factor shall be in accordance with a notice filed with the Public Utilities Commission (the Commission) setting forth the amount of the revised factor and the amount of the increase or decrease. The notice shall further specify the effective date of such charges.

~~Effective April 1, 2000~~

Kpapers of
James M. Molloy

Confidential

NEC092369

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Workpaper JMM-1

Workpaper JMM-1

Blackstone Valley Back-up

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:   Rate R1
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 1 of 29

## The Narragansett Electric Company
### Shifting BVE Rate R-1 to Narragansett Rate A-16

| R-1/A-16 | BVE Rate R-1 | | | Narragansett Rate A-16 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 876,261 | $3.09 | $2,707,646 | 876,261 | $2.54 | $2,225,703 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 362,568,042 | $0.03857 | $13,984,249 | 362,568,042 | $0.03680 | $13,342,504 |
| Transmission Energy | | $0.00278 | $1,007,939 | | $0.00307 | $1,113,084 |
| Transition Energy | | $0.02320 | $8,411,579 | | $0.02320 | $8,411,579 |
| Standard Offer | | $0.03800 | $13,777,586 | | $0.03800 | $13,777,586 |
| DSM | | $0.00230 | $833,906 | | $0.00230 | $833,906 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $40,722,906 | | | $39,704,361 |
| 4 Total Revenue Shift: | | | | | | ($1,018,544) |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($1,123,689) |
| Transmission Revenue | | | | | | $105,145 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

118

NEC092371

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:   Rate R2
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 2 of 29

## The Narragansett Electric Company
### Shifting BVE Rate R-2 to Narragansett Rate A-60

| R-2/A-60 | BVE Rate R-2 | | | Narragansett Rate A-60 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 25,844 | $2.01 | $51,946 | 25,844 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy first 300 kWh | 6,540,065 | $0.00170 | $11,118 | 6,540,065 | ($0.00733) | ($47,939) |
| Distribution Energy over 300 kWh | 3,924,039 | $0.03470 | $136,164 | | | |
| Distribution Energy | | | | 10,464,104 | $0.02362 | $247,162 |
| Transmission Energy | | $0.00278 | $29,090 | | $0.00209 | $21,870 |
| Transition Energy | | $0.02320 | $242,767 | | $0.02320 | $242,767 |
| Standard Offer | | $0.03800 | $397,636 | | $0.03800 | $397,636 |
| DSM | | $0.00230 | $24,067 | | $0.00230 | $24,067 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $892,790 | | | $885,564 |
| 4 Total Revenue Shift: | | | | | | ($7,225) |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($5) |
| Transmission Revenue | | | | | | ($7,220) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:  C:\123data\JAMES\M-A\BASE\Bvepla10.wk4
Range:  Rate R3
Date:  14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 3 of 29

## The Narragansett Electric Company
### Shifting BVE Rate R-3 to Narragansett Rate A-16

| R-3/A-16 | BVE Rate R-3 | | | Narragansett Rate A-16 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 10,622 | $2.91 | $30,910 | 10,622 | $2.54 | $26,980 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 9,162,722 | $0.03200 | $293,207 | 9,162,722 | $0.03680 | $337,188 |
| Transmission Energy | | $0.00278 | $25,472 | | $0.00307 | $28,130 |
| Transition Energy | | $0.02320 | $212,575 | | $0.02320 | $212,575 |
| Standard Offer | | $0.03800 | $348,183 | | $0.03800 | $348,183 |
| DSM | | $0.00230 | $21,074 | | $0.00230 | $21,074 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $931,422 | | | $974,130 |
| 4 Total Revenue Shift: | | | | | | $42,708 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $40,051 |
| Transmission Revenue | | | | | | $2,657 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

120
NEC092373

File:   C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate R-4
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 4 of 29

## The Narragansett Electric Company
### Shifting BVE Rate R-4 to Narragansett Rate A-32

| R-4/A-32 | BVE Rate R-4 | | | Narragansett Rate A-32 | | |
|---|---|---|---|---|---|---|
|  | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 1,821 | $4.69 | $8,540 | 1,821 | $6.74 | $12,274 |
| 2 Energy Charges: |  |  |  |  |  |  |
| Distribution Peak | 815,510 | $0.11500 | $93,784 | 815,510 | $0.02596 | $21,171 |
| Distribution Off Peak | 3,671,937 | $0.01033 | $37,931 | 3,671,937 | $0.02596 | $95,323 |
| Transmission Energy | 4,487,447 | $0.00278 | $12,475 | 4,487,447 | $0.00263 | $11,802 |
| Transition Energy |  | $0.02320 | $104,109 |  | $0.02320 | $104,109 |
| Standard Offer |  | $0.03800 | $170,523 |  | $0.03800_ | $170,523 |
| DSM |  | $0.00230 | $10,321 |  | $0.00230 | $10,321 |
| Renewables |  | $0.00000 | $0 |  | $0.00000 | $0 |
| 3 Total Revenue before GET: |  |  | $437,683 |  |  | $425,523 |
| 4 Total Revenue Shift: |  |  |  |  |  | ($12,161) |
| 5 Revenue Shift by Function: |  |  |  |  |  |  |
| Distribution Revenue |  |  |  |  |  | ($11,488) |
| Transmission Revenue |  |  |  |  |  | ($673) |
| Transition Revenue |  |  |  |  |  | $0 |
| Standard Offer Revenue |  |  |  |  |  | $0 |
| DSM |  |  |  |  |  | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate W1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 5 of 29

## The Narragansett Electric Company
### Shifting BVE Rate W-1 to Narragansett Rate A-16

| W-1/A-16 | BVE Rate W-1 | | | Narragansett Rate A-16 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 15,594 | $1.32 | $20,584 | 15,594 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 3,568,998 | $0.01792 | $63,956 | 3,568,998 | $0.03680 | $131,339 |
| Transmission Energy | | $0.00278 | $9,922 | | $0.00307 | $10,957 |
| Transition Energy | | $0.02320 | $82,801 | | $0.02320 | $82,801 |
| Standard Offer | | $0.03800 | $135,622 | | $0.03800 | $135,622 |
| DSM | | $0.00230 | $8,209 | | $0.00230 | $8,209 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $321,094 | | | $368,927 |
| 4 Total Revenue Shift: | | | | | | $47,834 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $46,799 |
| Transmission Revenue | | | | | | $1,035 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bvepia10.wk4
Range  Rate W1
Date.  14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 6 of 29

## The Narragansett Electric Company
## Shifting BVE Rate W-1 to Narragansett Rate C-06

| W-1/C-06 | BVE Rate W-1 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| **1  Customer Charge:** | | | | | | |
| Customer Charge | 187 | $1.32 | $247 | 187 | $0.00 | $0 |
| Unmetered Charge | | | | 0 | $0.00 | $0 |
| **2  Energy Charges:** | | | | | | |
| Distribution Energy | 33,373 | $0.01792 | $598 | 33,373 | $0.03898 | $1,301 |
| Transmission Energy | | $0.00278 | $93 | | $0.00407 | $136 |
| Transition Energy | | $0.02320 | $774 | | $0.02320 | $774 |
| Standard Offer | | $0.03800 | $1,268 | | $0.03800 | $1,268 |
| DSM | | $0.00230 | $77 | | $0.00230 | $77 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| **3  Total Revenue before GET:** | | | $3,057 | | | $3,556 |
| **4  Total Revenue Shift:** | | | | | | $499 |
| **5  Revenue Shift by Function:** | | | | | | |
| Distribution Revenue | | | | | | $456 |
| Transmission Revenue | | | | | | $43 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvcpla10.wk4
Range:   Rate H1
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 7 of 29

## The Narragansett Electric Company
## Shifting BVE Rate H-1 to Narragansett Rate C-06

| H-1/C-06 | BVE Rate H-1 | | | Narragansett Rate C-06 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 85 | $3.01 | $256 | 85 | $5.73 | $487 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 225,822 | $0.02975 | $6,718 | 225,822 | $0.03898 | $8,803 |
| Transmission Energy | | $0.00278 | $628 | | $0.00407 | $919 |
| Transition Energy | | $0.02320 | $5,239 | | $0.02320 | $5,239 |
| Standard Offer | | $0.03800 | $8,581 | | $0.03800 | $8,581 |
| DSM | | $0.00230 | $519 | | $0.00230 | $519 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $21,942 | | | $24,548 |
| 4 Total Revenue Shift: | | | | | | $2,607 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $2,316 |
| Transmission Revenue | | | | | | $291 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate H1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 8 of 29

## The Narragansett Electric Company
## Shifting BVE Rate H-1 to Narragansett Rate G-02

| H-1/G-02 | BVE Rate H-1 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 104 | $3.01 | $313 | 104 | $103.41 | $10,755 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 8,848 | $0.00 | $0 | 8,848 | $2.91 | $25,748 |
| Transmission Demand | | | | | $1.40 | $12,387 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 2,380,400 | $0.02975 | $70,817 | 2,380,400 | $0.01030 | $24,518 |
| Transmission Energy | | $0.00278 | $6,618 | | ($0.00129) | ($3,071) |
| Transition Energy | | $0.02320 | $55,225 | | $0.02320 | $55,225 |
| Standard Offer | | $0.03800 | $90,455 | | $0.03800 | $90,455 |
| DSM | | $0.00230 | $5,475 | | $0.00230 | $5,475 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $228,903 | | | $221,492 |
| 5 Total Revenue Shift: | | | | | | ($7,411) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($10,110) |
| Transmission Revenue | | | | | | $2,699 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4

Range:    Rate H1

Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 9 of 29

## The Narragansett Electric Company
## Shifting BVE Rate H-1 to Narragansett Rate G-32

| H-1/G-32 | BVE Rate H-1 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 15 | $3.01 | $45 | 15 | $236.43 | $3,546 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 3,845 | $0.00 | $0 | 3,845 | $1.56 | $5,998 |
|    Transmission Demand | | | | | $1.27 | $4,883 |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 1,032,800 | $0.02975 | $30,726 | 1,032,800 | $0.01139 | $11,764 |
|    Transmission Energy | | $0.00278 | $2,871 | | ($0.00129) | ($1,332) |
|    Transition Energy | | $0.02320 | $23,961 | | $0.02320 | $23,961 |
|    Standard Offer | | $0.03800 | $39,246 | | $0.03800 | $39,246 |
|    DSM | | $0.00230 | $2,375 | | $0.00230 | $2,375 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $99,225 | | | $90,442 |
| 5 Total Revenue Shift: | | | | | | ($8,783) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($9,463) |
|    Transmission Revenue | | | | | | $680 |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate H2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 10 of 29

## The Narragansett Electric Company
## Shifting BVE Rate H-2 to Narragansett Rate C-06

| H-2/C-06 | BVE Rate H-2 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 940 | $3.43 | $3,224 | 940 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 2,034,902 | $0.03421 | $69,614 | 2,034,902 | $0.03898 | $79,320 |
| Transmission Energy | | $0.00278 | $5,657 | | $0.00407 | $8,282 |
| Transition Energy | | $0.02320 | $47,210 | | $0.02320 | $47,210 |
| Standard Offer | | $0.03800 | $77,326 | | $0.03800 | $77,326 |
| DSM | | $0.00230 | $4,680 | | $0.00230 | $4,680 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $207,712 | | | $216,819 |
| 4 Total Revenue Shift: | | | | | | $9,107 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $6,482 |
| Transmission Revenue | | | | | | $2,625 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

127
NEC092380

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:    Rate H2
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 11 of 29

## The Narragansett Electric Company
### Shifting BVE Rate H-2 to Narragansett Rate G-02

| H-2/G-02 | BVE Rate H-2 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12 | $3.43 | $41 | 12 | $0.00 | $0 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 0 | $0.00 | $0 | 0 | $2.91 | $0 |
| Transmission Demand | | | | | $1.40 | $0 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 33,090 | $0.03421 | $1,132 | 33,090 | $0.01030 | $341 |
| Transmission Energy | | $0.00278 | $92 | | ($0.00129) | ($43) |
| Transition Energy | | $0.02320 | $768 | | $0.02320 | $768 |
| Standard Offer | | $0.03800 | $1,257 | | $0.03800 | $1,257 |
| DSM | | $0.00230 | $76 | | $0.00230 | $76 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $3,366 | | | $2,399 |
| 5 Total Revenue Shift: | | | | | | ($967) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($832) |
| Transmission Revenue | | | | | | ($135) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate H2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 12 of 29

## The Narragansett Electric Company
### Shifting BVE Rate H-2 to Narragansett Rate G-32

| H-2/G-32 | BVE Rate H-2 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12 | $3.43 | $41 | 12 | $0.00 | $0 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 2,386 | $0.00 | $0 | 2,386 | $1.56 | $3,722 |
| Transmission Demand | | | | | $1.27 | $3,030 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 222,400 | $0.03421 | $7,608 | 222,400 | $0.01139 | $2,533 |
| Transmission Energy | | $0.00278 | $618 | | ($0.00129) | ($287) |
| Transition Energy | | $0.02320 | $5,160 | | $0.02320 | $5,160 |
| Standard Offer | | $0.03800 | $8,451 | | $0.03800 | $8,451 |
| DSM | | $0.00230 | $512 | | $0.00230 | $512 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $22,390 | | | $23,122 |
| 5 Total Revenue Shift: | | | | | | $731 |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($1,394) |
| Transmission Revenue | | | | | | $2,125 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

File:   C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range: Rate G1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 13 of 29

## The Narragansett Electric Company
## Shifting BVE Rate G-1 to Narragansett Rate C-06

| G-1/C-06 | BVE Rate G-1 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | | | | | | |
| Customer Charge | 87,619 | $3.37 | $295,276 | 85,368 | $5.73 | $489,159 |
| Unmetered Charge | | | | 2,251 | $1.83 | $4,119 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 43,670,643 | $0.04348 | $1,898,800 | 43,670,643 | $0.03898 | $1,702,282 |
| Transmission Energy | | $0.00278 | $121,404 | | $0.00407 | $177,740 |
| Transition Energy | | $0.02320 | $1,013,159 | | $0.02320 | $1,013,159 |
| Standard Offer | | $0.03800 | $1,659,484 | | $0.03800 | $1,659,484 |
| DSM | | $0.00230 | $100,442 | | $0.00230 | $100,442 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $5,088,566 | | | $5,146,385 |
| 4 Total Revenue Shift: | | | | | | $57,819 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $1,484 |
| Transmission Revenue | | | | | | $56,335 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate G2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 14 of 29

## The Narragansett Electric Company
### Shifting BVE Rate G-2 to Narragansett Rate C-06

| G-2/C-06 | BVE Rate G-2 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units<br>(1) | Rate<br>(2) | Revenues<br>(3) | Units<br>(4) | Rate<br>(5) | Revenues<br>(6) |
| 1 Customer Charge: | 17,427 | $0.00 | $0 | 17,427 | $5.73 | $99,857 |
| 2 Demand Charge: | | | | | | |
|   Distribution Demand | 293,038 | $1.50 | $439,557 | 0 | $0.00 | $0 |
|   Transmission Demand | | $0.00 | $0 | | $0.00 | $0 |
|   Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|   Distribution Energy | 55,207,092 | $0.02296 | $1,267,555 | 55,207,092 | $0.03898 | $2,151,972 |
|   Transmission Energy | | $0.00278 | $153,476 | | $0.00407 | $224,693 |
|   Transition Energy | | $0.02320 | $1,280,805 | | $0.02320 | $1,280,805 |
|   Standard Offer | | $0.03800 | $2,097,869 | | $0.03800 | $2,097,869 |
|   DSM | | $0.00230 | $126,976 | | $0.00230 | $126,976 |
|   Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $5,366,238 | | | $5,982,172 |
| 5 Total Revenue Shift: | | | | | | $615,934 |
| 6 Revenue Shift by Function: | | | | | | |
|   Distribution Revenue | | | | | | $544,717 |
|   Transmission Revenue | | | | | | $71,217 |
|   Transition Revenue | | | | | | $0 |
|   Standard Offer Revenue | | | | | | $0 |
|   DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate G2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 15 of 29

## The Narragansett Electric Company
### Shifting BVE Rate G-2 to Narragansett Rate G-02

| G-2/G-02 | BVE Rate G-2 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12,852 | $0.00 | $0 | 12,852 | $103.41 | $1,329,025 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 621,666 | $1.50 | $932,499 | 597,149 | $2.91 | $1,737,704 |
|    Transmission Demand | | $0.00 | $0 | | $1.40 | $836,009 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 189,662,772 | $0.02296 | $4,354,657 | 189,662,772 | $0.01030 | $1,953,527 |
|    Transmission Energy | | $0.00278 | $527,263 | | ($0.00129) | ($244,665) |
|    Transition Energy | | $0.02320 | $4,400,176 | | $0.02320 | $4,400,176 |
|    Standard Offer | | $0.03800 | $7,207,185 | | $0.03800 | $7,207,185 |
|    DSM | | $0.00230 | $436,224 | | $0.00230 | $436,224 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $17,858,005 | | | $17,655,185 |
| 5 Total Revenue Shift: | | | | | | ($202,820) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($266,901) |
|    Transmission Revenue | | | | | | $64,081 |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bvepln10.wk4
Ranger: Rate G2
Date: 14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 16 of 29

## The Narragansett Electric Company
### Shifting BVE Rate G-2 to Narragansett Rate G-32

| G-2/G-32 | BVE Rate G-2 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 780 | $0.00 | $0 | 780 | $236.43 | $184,415 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 226,150 | $1.50 | $339,225 | 269,038 | $1.56 | $419,699 |
|    Transmission Demand | | $0.00 | $0 | | $1.27 | $341,678 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 68,985,660 | $0.02296 | $1,583,911 | 68,985,660 | $0.01139 | $785,747 |
|    Transmission Energy | | $0.00278 | $191,780 | | ($0.00129) | ($88,992) |
|    Transition Energy | | $0.02320 | $1,600,467 | | $0.02320 | $1,600,467 |
|    Standard Offer | | $0.03800 | $2,621,455 | | $0.03800 | $2,621,455 |
|    DSM | | $0.00230 | $158,667 | | $0.00230 | $158,667 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $6,495,505 | | | $6,023,138 |
| 5 Total Revenue Shift: | | | | | | ($472,368) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($533,274) |
|    Transmission Revenue | | | | | | $60,907 |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvrpla10.wk4  
Range:  Rate T2  
Date:   14-May-99  

Narragansett Electric  
BVE/Newport Electric  
R.I.P.U.C. Docket No. _____  
Workpaper JMM - 1  
Page 17 of 29

## The Narragansett Electric Company
### Shifting BVE Rate T-2 to Narragansett Rate C-06

| T-2/C-06 | BVE Rate T-2 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 54 | $0.00 | $0 | 54 | $5.73 | $309 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 707 | $1.50 | $1,061 | 1,888 | $0.00 | $0 |
| Transmission Demand | | $0.00 | $0 | | $0.00 | $0 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 93,312 | $0.02296 | $2,142 | 93,312 | $0.03898 | $3,637 |
| Transmission Energy | | $0.00278 | $259 | | $0.00407 | $380 |
| Transition Energy | | $0.02320 | $2,165 | | $0.02320 | $2,165 |
| Standard Offer On Peak | 13,722 | $0.03800 | $521 | | $0.03800 | $3,546 |
| Standard Offer Off Peak | 79,590 | $0.03800 | $3,024 | | | |
| DSM | | $0.00230 | $215 | | $0.00230 | $215 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $9,388 | | | $10,252 |
| 5 Total Revenue Shift: | | | | | | $864 |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $744 |
| Transmission Revenue | | | | | | $120 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | ($0) |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bveple10.wk4
Range: Rate T2
Date:  14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - I
Page 18 of 29

## The Narragansett Electric Company
### Shifting BVE Rate T-2 to Narragansett Rate G-02

| T-2/G-02 | BVE Rate T-2 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 551 | $0.00 | $0 | 551 | $103.41 | $56,979 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 31,864 | $1.50 | $47,796 | 24,796 | $2.91 | $72,156 |
|    Transmission Demand | | $0.00 | $0 | | $1.40 | $34,714 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 13,353,435 | $0.02296 | $306,595 | 13,353,435 | $0.01030 | $137,540 |
|    Transmission Energy | | $0.00278 | $37,123 | | ($0.00129) | ($17,226) |
|    Transition Energy | | $0.02320 | $309,800 | | $0.02320 | $309,800 |
|    Standard Offer On Peak | 2,692,710 | $0.03800 | $102,323 | | $0.03800 | $507,431 |
|    Standard Offer Off Peak | 10,660,725 | $0.03800 | $405,108 | | | |
|    DSM | | $0.00230 | $30,713 | | $0.00230 | $30,713 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $1,239,457 | | | $1,132,107 |
| 5 Total Revenue Shift: | | | | | | ($107,349) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($87,715) |
|    Transmission Revenue | | | | | | ($19,634) |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate T2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 19 of 29

## The Narragansett Electric Company
## Shifting BVE Rate T-2 to Narragansett Rate G-32

| T-2/G-32 | BVE Rate T-2 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 251 | $0.00 | $0 | 251 | $236.43 | $59,344 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 78,241 | $1.50 | $117,362 | 99,892 | $1.56 | $155,832 |
| Transmission Demand | | $0.00 | $0 | | $1.27 | $126,863 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 32,469,660 | $0.02296 | $745,503 | 32,469,660 | $0.01139 | $369,829 |
| Transmission Energy | | $0.00278 | $90,266 | | ($0.00129) | ($41,886) |
| Transition Energy | | $0.02320 | $753,296 | | $0.02320 | $753,296 |
| Standard Offer On Peak | 6,866,980 | $0.03800 | $260,945 | | $0.03800 | $1,233,847 |
| Standard Offer Off Peak | 25,602,680 | $0.03800 | $972,902 | | | |
| DSM | | $0.00230 | $74,680 | | $0.00230 | $74,680 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $3,014,954 | | | $2,731,805 |
| 5 Total Revenue Shift: | | | | | | ($283,149) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($277,860) |
| Transmission Revenue | | | | | | ($5,289) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bveplx10.wk4
Range:  Rate T-4
Date:  14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 20 of 29

### The Narragansett Electric Company
### Shifting BVE Rate T-4 to Narragansett Rate G-32

| T-4/G-32 | BVE Rate T-4 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 372 | $0.00 | $0 | 372 | $236.43 | $87,952 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 195,414 | $1.44 | $281,396 | 225,770 | $1.56 | $352,201 |
|    Transmission Demand | | $0.00 | $0 | | $1.27 | $286,728 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 78,036,479 | $0.01625 | $1,268,093 | 78,036,479 | $0.01139 | $888,835 |
|    Transmission Energy | | $0.00278 | $216,941 | | ($0.00129) | ($100,667) |
|    Transition Energy | | $0.02320 | $1,810,446 | | $0.02320 | $1,810,446 |
|    Standard Offer On Peak | 18,111,219 | $0.03800 | $688,226 | | $0.03800 | $2,965,386 |
|    Standard Offer Off Peak | 59,925,260 | $0.03800 | $2,277,160 | | | |
|    DSM | | $0.00230 | $179,484 | | $0.00230 | $179,484 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $6,721,747 | | | $6,470,366 |
| 5 Total Revenue Shift: | | | | | | ($251,381) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($220,500) |
|    Transmission Revenue | | | | | | ($30,881) |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:    Rate G5
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 21 of 29

## The Narragansett Electric Company
### Shifting BVE Rate G-5 to Narragansett Rate G-02

| G-5/G-02 | BVE Rate G-5 | | | Narragansett Rate G-02 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 228 | $0.00 | $0 | 228 | $103.41 | $23,577 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 20,540 | $1.35 | $27,729 | 27,078 | $2.91 | $78,797 |
|    Transmission Demand | | $0.00 | $0 | | $1.40 | $37,909 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 7,714,640 | $0.01710 | $131,920 | 7,714,640 | $0.01030 | $79,461 |
|    Transmission Energy | | $0.00278 | $21,447 | | ($0.00129) | ($9,952) |
|    Transition Energy | | $0.02320 | $178,980 | | $0.02320 | $178,980 |
|    Standard Offer | | $0.03800 | $293,156 | | $0.03800 | $293,156 |
|    DSM | | $0.00230 | $17,744 | | $0.00230 | $17,744 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
|    Transformer Ownership | | | | 27,078 | ($0.37) | ($10,019) |
|    Primary Metering | | | | $699,672 | -1% | ($6,997) |
| 4 Total Revenue before GET: | | | $670,976 | | | $682,657 |
| 5 Total Revenue Shift: | | | | | | $11,681 |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | $8,559 |
|    Transmission Revenue | | | | | | $6,231 |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | ($2,932) |
|    DSM | | | | | | ($177) |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4

Range:    Rate G5

Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 22 of 29

## The Narragansett Electric Company
## Shifting BVE Rate G-5 to Narragansett Rate G-32

| G-5/G-32 | BVE Rate G-5 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 166 | $0.00 | $0 | 166 | $236.43 | $39,247 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 52,600 | $1.35 | $71,010 | 58,829 | $1.56 | $91,773 |
| Transmission Demand | | $0.00 | $0 | | $1.27 | $74,713 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 15,393,940 | $0.01710 | $263,236 | 15,393,940 | $0.01139 | $175,337 |
| Transmission Energy | | $0.00278 | $42,795 | | ($0.00129) | ($19,858) |
| Transition Energy | | $0.02320 | $357,139 | | $0.02320 | $357,139 |
| Standard Offer | | $0.03800 | $584,970 | | $0.03800 | $584,970 |
| DSM | | $0.00230 | $35,406 | | $0.00230 | $35,406 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
| Transformer Ownership | | | | 58,829 | ($0.37) | ($21,767) |
| Primary Metering | | | | $1,338,727 | -1% | ($13,387) |
| 4 Total Revenue before GET: | | | $1,354,557 | | | $1,303,573 |
| 5 Total Revenue Shift: | | | | | | ($50,983) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($56,290) |
| Transmission Revenue | | | | | | $11,511 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | ($5,850) |
| DSM | | | | | | ($354) |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate TS
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 23 of 29

## The Narragansett Electric Company
## Shifting BVE Rate T-5 to Narragansett Rate G-02

| T-5/G-02 | BVE Rate T-5 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 7 | $0.00 | $0 | 7 | $103.41 | $724 |
| 2 Demand Charge: | | | | | | |
|     Distribution Demand | 358 | $1.35 | $483 | 288 | $2.91 | $838 |
|     Transmission Demand | | $0.00 | $0 | | $1.40 | $403 |
|     Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|     Distribution Energy | 114,950 | $0.01710 | $1,966 | 114,950 | $0.01030 | $1,184 |
|     Transmission Energy | | $0.00278 | $320 | | ($0.00129) | ($148) |
|     Transition Energy | | $0.02320 | $2,667 | | $0.02320 | $2,667 |
|     Standard Offer On Peak | 27,650 | $0.03800 | $1,051 | | $0.03800 | $4,368 |
|     Standard Offer Off Peak | 87,300 | $0.03800 | $3,317 | | | |
|     DSM | | $0.00230 | $264 | | $0.00230 | $264 |
|     Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
|     Transformer Ownership | | | | 288 | ($0.37) | ($107) |
|     Primary Metering | | | | $10,300 | -1% | ($103) |
| 5 Total Revenue before GET: | | | $10,068 | | | $10,091 |
| 6 Total Revenue Shift: | | | | | | $23 |
| 7 Revenue Shift by Function: | | | | | | |
|     Distribution Revenue | | | | | | $136 |
|     Transmission Revenue | | | | | | ($67) |
|     Transition Revenue | | | | | | $0 |
|     Standard Offer Revenue | | | | | | ($44) |
|     DSM | | | | | | ($3) |

File:    C:\123data\JAMES\M&A\BASE\Bvepis10.wk4
Range:  Rate T5
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 24 of 29

## The Narragansett Electric Company
### Shifting BVE Rate T-5 to Narragansett Rate G-32

| T-5/G-32 | BVE Rate T-5 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 45 | $0.00 | $0 | 45 | $236.43 | $10,639 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 20,534 | $1.35 | $27,721 | 20,534 | $1.56 | $32,033 |
|    Transmission Demand | | $0.00 | $0 | | $1.27 | $26,078 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 8,360,000 | $0.01710 | $142,956 | 8,360,000 | $0.01139 | $95,220 |
|    Transmission Energy | | $0.00278 | $23,241 | | ($0.00129) | ($10,784) |
|    Transition Energy | | $0.02320 | $193,952 | | $0.02320 | $193,952 |
|    Standard Offer On Peak | 1,979,450 | $0.03800 | $75,219 | | $0.03800 | $317,680 |
|    Standard Offer Off Peak | 6,380,550 | $0.03800 | $242,461 | | | |
|    DSM | | $0.00230 | $19,228 | | $0.00230 | $19,228 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
|    Transformer Ownership | | | | 20,534 | ($0.37) | ($7,598) |
|    Primary Metering | | | | $684,047 | -1% | ($6,840) |
| 4 Total Revenue before GET: | | | $724,778 | | | $669,609 |
| 5 Total Revenue Shift: | | | | | | ($55,169) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($43,700) |
|    Transmission Revenue | | | | | | ($8,100) |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | ($3,177) |
|    DSM | | | | | | ($192) |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:   Rate T-6
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 25 of 29

## The Narragansett Electric Company
## Shifting BVE Rate T-6 to Narragansett Rate G-32

| T-6/G-32 | BVE Rate T-6 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 656 | $0.00 | $0 | 656 | $236.43 | $155,098 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 682,889 | $1.32 | $901,413 | 782,155 | $1.56 | $1,220,162 |
| Transmission Demand | | $0.00 | $0 | | $1.27 | $993,337 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 300,621,894 | $0.01143 | $3,436,108 | 300,621,894 | $0.01139 | $3,424,083 |
| Transmission Energy | | $0.00278 | $835,729 | | ($0.00129) | ($387,802) |
| Transition Energy | | $0.02320 | $6,974,428 | | $0.02320 | $6,974,428 |
| Standard Offer On Peak | 66,237,289 | $0.03800 | $2,517,017 | | $0.03800 | $11,423,632 |
| Standard Offer Off Peak | 234,384,605 | $0.03800 | $8,906,615 | | | |
| DSM | | $0.00230 | $691,430 | | $0.00230 | $691,430 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
| Transformer Ownership | | | | 782,155 | ($0.37) | ($289,397) |
| Primary Metering | | | | $24,494,368 | -1% | ($244,944) |
| 4 Total Revenue before GET: | | | $24,262,741 | | | $23,960,027 |
| 5 Total Revenue Shift: | | | | | | ($302,714) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $54,686 |
| Transmission Revenue | | | | | | ($236,250) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | ($114,236) |
| DSM | | | | | | ($6,914) |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Bvepla10.wk4
Range:  Rate T6
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 1
Page 26 of 29

## The Narragansett Electric Company
## Shifting BVE Rate T-6 to Narragansett Rate G-62

| T-6/G-62 | BVE Rate T-6 | | | Narragansett Rate G-62 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 36 | $0.00 | $0 | 36 | $17,118.72 | $616,274 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 109,293 | $1.32 | $144,267 | 142,198 | $0.75 | $106,649 |
| Transmission Demand | | $0.00 | $0 | | $1.39 | $197,655 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 69,235,500 | $0.01143 | $791,362 | 69,235,500 | $0.00434 | $300,482 |
| Transmission Energy | | $0.00278 | $192,475 | | ($0.00129) | ($89,314) |
| Transition Energy | | $0.02320 | $1,606,264 | | $0.02320 | $1,606,264 |
| Standard Offer On Peak | 11,791,499 | $0.03800 | $448,077 | | $0.03800 | $2,630,949 |
| Standard Offer Off Peak | 57,444,001 | $0.03800 | $2,182,872 | | | |
| DSM | | $0.00230 | $159,242 | | $0.00230 | $159,242 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
| Transformer Ownership | | | | 142,198 | ($0.37) | ($52,613) |
| Primary Metering | | | | $5,528,200 | -1% | ($55,282) |
| 4 Total Revenue before GET: | | | $5,524,557 | | | $5,420,305 |
| 5 Total Revenue Shift: | | | | | | ($104,253) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $8,866 |
| Transmission Revenue | | | | | | ($85,217) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | ($26,309) |
| DSM | | | | | | ($1,592) |

Confidential

File: C:\123data\JAMES\M&A\BASE\Bvepla10.wk4

Range: Rate A6

Date: 14-May-99

Narragansett Electric

BVE/Newport Electric

R.I.P.U.C. Docket No. _____

Workpaper JMM - 1

Page 27 of 29

## The Narragansett Electric Company
## Shifting BVE Rate A-6 to Narragansett Rate B-32

| A-6/B-32 | BVE Rate A-6 | | | Narragansett Rate B-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 48 | $14.17 | $680 | 48 | $236.43 | $11,349 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 31,497 | $2.00 | $62,994 | 31,497 | $1.56 | $49,135 |
|    Transmission Demand | | $0.00 | $0 | | $1.27 | $40,001 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 6,085,455 | $0.01425 | $86,718 | 6,085,455 | $0.01139 | $69,313 |
|    Transmission Energy | | $0.00278 | $16,918 | | ($0.00129) | ($7,850) |
|    Transition Energy | | $0.02320 | $141,183 | | $0.02320 | $141,183 |
|    Standard Offer On Peak | 1,172,792 | $0.03800 | $44,566 | | $0.03800 | $231,247 |
|    Standard Offer Off Peak | 4,912,663 | $0.03800 | $186,681 | | | |
|    DSM | | $0.00230 | $13,997 | | $0.00230 | $13,997 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
|    Transformer Ownership | | | | 31,497 | ($0.37) | ($11,654) |
|    Primary Metering | | | | $548,375 | -1% | ($5,484) |
| 4 Total Revenue before GET: | | | $553,736 | | | $531,237 |
| 5 Total Revenue Shift: | | | | | | ($22,499) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($34,958) |
|    Transmission Revenue | | | | | | $14,912 |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | ($2,312) |
|    DSM | | | | | | ($140) |

Confidential

Narragansett Electric
TP/Prospero Expense
R.I.P.U.C. Docket No. ___
Workpaper JWM - 1
Page 29 of 79

## The Narragansett Electric Company
### Shifting BVTR Rate S-1 to Narragansett Rate S-14

The table on this page is a dense, rotated spreadsheet listing lighting rate classes. The row categories are:

**Overhead**

**Sodium Vapor Lamp**
Existing or Prepaid Wood Poles
- 3500 Streetlight
- 5800 Streetlight
- 5800 Flood
- 9500 Streetlight
- 9500 T&C
- 16000 Streetlight
- 16000 Flood
- 22000 Streetlight
- 25000 Streetlight
- 25000 Flood
- 50000 Streetlight
- 50000 Flood

Lighting only Wood Poles
- 9500 Streetlight
- 16000 Streetlight
- 25000 Flood
- 50000 Flood
- 50000 Streetlight

Lighting only Metal Poles
- 9500 Streetlight
- 25000 Flood
- 50000 Streetlight
- 50000 Flood

**Mercury Vapor Lamp**
Existing or Prepaid Wood Poles
- 4200 Streetlight
- 8600 Streetlight
- 8600 T&C
- 22500 Streetlight
- 22500 Flood
- 63000 Flood

Lighting only Metal Poles
- 22500 Streetlight
- 22500 Flood

**Metal Halide Lamp**
Existing or Prepaid Wood Poles
- 20000 Flood
- 40000 Flood

**Total Overhead**

The column headers (repeated for two rate scenarios) include: Number of Units, Annual kWh, Annual Price, Total Annual kWh Sales, Distribution Revenues, Transmission Revenues, Transition Revenues, Standard Offer Revenues, DSM Revenues, and Total Revenues.

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. ___
Workpaper DuCsi - 1
Page 29 of 79

## The Narragansett Electric Company
### Shifting BVE Rate S-1 to Narragansett Rate S-14

| | Number of Units | Annual kWh | Annual Price | Total Annual kWh Sales | Distribution Revenues ($0.02178 | Transmission Revenues ($0.00218 | Standard Offer Revenues ($0.03800 | DSM Revenues $0.00210 | Total Revenue | Annual kWh | Annual Price | Total Annual kWh Sales | Distribution Revenues ($0.04250 | Transmission Revenues ($0.00150 | Transition Revenues ($0.02325 | Standard Offer Revenues ($0.03800 | DSM Revenues $0.00210 | Total Revenues |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Underground**

**Sodium Vapor Lamp**
Existing or Prepaid Standard Metal Poles

**Lighting only Standard Metal Poles**

**Lighting only Poles less than 15 ft.**
5800 TAC
5800 TAC

**Lighting only Poles greater than 15 ft.**
5800 Streetlight
5800 Shoe Box

**Lighting only Wood Poles**
5800 Streetlight

**Mercury Vapor Lamp**
Lighting only Standard Metal Poles

**Lighting only Poles less than 15 ft.**
5800 TAC

**Total Underground**

**Total Overhead and Underground**

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Workpaper JMM-2

Workpaper JMM-2

Narragansett Back-up

-

147
NEC092400

Confidential

File:   C:\123data\JAMES\M&A\BASE\Nample.wk4
Range:   Rate A16
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 1 of 14

## The Narragansett Electric Company
## Rate A-16

| A-16 | Pre Merger Rate A-16 | | | Post Merger Rate A-16 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 3,087,617 | $2.54 | $7,842,547 | 3,087,617 | $2.54 | $7,842,547 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 1,475,595,371 | $0.03680 | $54,301,910 | 1,475,595,371 | $0.03680 | $54,301,910 |
| Transmission Energy | | $0.00515 | $7,599,316 | | $0.00515 | $7,599,316 |
| Transition Energy | | $0.01150 | $16,969,347 | | $0.01150 | $16,969,347 |
| Standard Offer | | $0.03800 | $56,072,624 | | $0.03800 | $56,072,624 |
| DSM | | $0.00230 | $3,393,869 | | $0.00230 | $3,393,869 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $146,179,613 | | | $146,179,613 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

148

NEC092401

File:   C:\123data\JAMES\M&A\BASE\Newplan.wk4
Range:  Rate A18
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 2 of 14

## The Narragansett Electric Company
### Rate A-18

| A-18 | Pre Merger Rate A-18 | | | Post Merger Rate A-18 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 366,803 | $2.52 | $924,344 | 366,803 | $2.52 | $924,344 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 299,522,556 | $0.03602 | $10,788,802 | 299,522,556 | $0.03602 | $10,788,802 |
| Transmission Energy | | $0.00466 | $1,395,775 | | $0.00466 | $1,395,775 |
| Transition Energy | | $0.01150 | $3,444,509 | | $0.01150 | $3,444,509 |
| Standard Offer | | $0.03800 | $11,381,857 | | $0.03800 | $11,381,857 |
| DSM | | $0.00230 | $688,902 | | $0.00230_ | $688,902 |
| Water Heater Credit | 210,516,280 | ($0.00661) | ($1,391,513) | 210,516,280 | ($0.00661) | ($1,391,513) |
| 3 Total Revenue before GET: | | | $27,232,677 | | | $27,232,677 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

File:    C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range:   Rate A32
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 3 of 14

## The Narragansett Electric Company
### Rate A-32

| A-32 | Pre Merger Rate A-32 | | | Post Merger Rate A-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 11,757 | $6.74 | $79,242 | 11,757 | $6.74 | $79,242 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 33,569,784 | $0.02596 | $871,472 | 33,569,784 | $0.02596 | $871,472 |
| Transmission Energy | | $0.00471 | $158,114 | | $0.00471 | $158,114 |
| Transition Energy | | $0.01150 | $386,053 | | $0.01150 | $386,053 |
| Standard Offer On Peak | 7,649,055 | $0.03800 | $290,664 | 7,649,055 | $0.03800 | $290,664 |
| Standard Offer Off Peak | 25,920,729 | $0.03800 | $984,988 | 25,920,729 | $0.03800 | $984,988 |
| DSM | | $0.00230 | $77,211 | | $0.00230 | $77,211 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $2,847,742 | | | $2,847,742 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range:  Rate A-60
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 4 of 14

## The Narragansett Electric Company
### Rate A-60

| A-60 | Pre Merger Rate A-60 | | | Post Merger Rate A-60 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 100,072 | $0.00 | $0 | 100,072 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
|    Distribution Energy | 45,194,386 | $0.02362 | $1,067,491 | 45,194,386 | $0.02362 | $1,067,491 |
|    Transmission Energy | | $0.00417 | $188,461 | | $0.00417 | $188,461 |
|    Transition Energy | | $0.01150 | $519,735 | | $0.01150 | $519,735 |
|    Standard Offer | | $0.03800 | $1,717,387 | | $0.03800 | $1,717,387 |
|    DSM | | $0.00230 | $103,947 | | $0.00230 | $103,947 |
|    Water Heater Credit | 3,667,794 | ($0.00661) | ($24,244) | 3,667,794 | ($0.00661) | ($24,244) |
| 3 Total Revenue before GET: | | | $3,572,777 | | | $3,572,777 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | $0 |
|    Transmission Revenue | | | | | | $0 |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range:    Rate C06
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 5 of 14

### The Narragansett Electric Company
### Rate C-06

| C-06 | Pre Merger Rate C-06 | | | Post Merger Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | | | | | | |
| Customer Charge | 327,918 | $5.73 | $1,878,970 | 327,918 | $5.73 | $1,878,970 |
| Unmetered Charge | 7,927 | $1.83 | $14,506 | 7,927 | $1.83 | $14,506 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 319,448,478 | $0.03898 | $12,452,102 | 319,448,478 | $0.03898 | $12,452,102 |
| Transmission Energy | | $0.00615 | $1,964,608 | | $0.00615 | $1,964,608 |
| Transition Energy | | $0.01150 | $3,673,657 | | $0.01150 | $3,673,657 |
| Standard Offer | | $0.03800 | $12,139,042 | | $0.03800 | $12,139,042 |
| DSM | | $0.00230 | $734,731 | | $0.00230 | $734,731 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $32,857,618 | | | $32,857,618 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:  C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range:  Rate E30
Date:  14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 6 of 14

## The Narragansett Electric Company
## Rate E-30

| E-30 | Pre Merger Rate E-30 | | | Post Merger Rate E-30 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 173 | $7.54 | $1,304 | 173 | $7.54 | $1,304 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 1,519,157 | $0.01620 | $24,610 | 1,519,157 | $0.01620 | $24,610 |
| Transmission Energy | | $0.00340 | $5,165 | | $0.00340 | $5,165 |
| Transition Energy | | $0.01150 | $17,470 | | $0.01150 | $17,470 |
| Standard Offer | | $0.03800 | $57,728 | | $0.03800 | $57,728 |
| DSM | | $0.00230 | $3,494 | | $0.00230 | $3,494 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $109,772 | | | $109,772 |
| 4 Total Revenue Shift: | | | | | | ($0) |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($0) |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

153
NEC092406

File:    C:\U23\data\JAMES\M&A\BASE\Narrplan.wk4
Range:   Rate E40
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 7 of 14

## The Narragansett Electric Company
## Rate E-40

| E-40 | Pre Merger Rate E-40 | | | Post Merger Rate E-40 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 254 | $75.15 | $19,088 | 254 | $75.15 | $19,088 |
| 2 Energy Charges: | | | | | | |
| Distribution On/Shoulder Energy | 3,706,802 | $0.02574 | $95,413 | 3,706,802 | $0.02574 | $95,413 |
| Distribution Off Peak Energy | 8,729,522 | $0.00987 | $86,160 | 8,729,522 | $0.00987 | $86,160 |
| Transmission Energy | | $0.00220 | $27,360 | | $0.00220 | $27,360 |
| Transition Energy | | $0.01150 | $143,018 | | $0.01150 | $143,018 |
| Standard Offer | | $0.03800 | $472,580 | | $0.03800 | $472,580 |
| DSM | | $0.00230 | $28,604 | | $0.00230 | $28,604 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $872,223 | | | $872,223 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File: C:\123data\JAMES\M&A\BASE\Namplan.wk4
Range: Rate G02
Date: 14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 8 of 14

## The Narragansett Electric Company
### Rate G-02

| G-02 | Pre Merger Rate G-02 | | | Post Merger Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 72,380 | $103.41 | $7,484,816 | 72,380 | $103.41 | $7,484,816 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 2,388,026 | $2.91 | $6,949,156 | 2,388,026 | $2.91 | $6,949,156 |
| Transmission Demand | | $1.40 | $3,343,236 | | $1.40 | $3,343,236 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 857,825,162 | $0.01030 | $8,835,599 | 857,825,162 | $0.01030 | $8,835,599 |
| Transmission Energy | | $0.00079 | $677,682 | | $0.00079 | $677,682 |
| Transition Energy | | $0.01150 | $9,864,989 | | $0.01150 | $9,864,989 |
| Standard Offer | | $0.03800 | $32,597,356 | | $0.03800 | $32,597,356 |
| DSM | | $0.00230 | $1,972,998 | | $0.00230 | $1,972,998 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $71,725,832 | | | $71,725,832 |
| 5 Total Revenue Shift: | | | | | | $0 |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File: C:\1234data\JAMES\M&A\BASE\Nerrplan.wk4
Range: Rate O32
Date: 14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 9 of 14

## The Narragansett Electric Company
### Rate G-32

| G-32 | Pre Merger Rate G-32 | | | Post Merger Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 8,554 | $236.43 | $2,022,422 | 8,554 | $236.43 | $2,022,422 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 4,100,824 | $1.56 | $6,397,285 | 4,100,824 | $1.56 | $6,397,285 |
| Transmission Demand | | $1.27 | $5,208,046 | | $1.27 | $5,208,046 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 1,497,395,176 | $0.01139 | $17,055,331 | 1,497,395,176 | $0.01139 | $17,055,331 |
| Transmission Energy | | $0.00079 | $1,182,942 | | $0.00079 | $1,182,942 |
| Transition Energy | | $0.01150 | $17,220,045 | | $0.01150 | $17,220,045 |
| Standard Offer | | $0.03800 | $56,901,017 | | $0.03800 | $56,901,017 |
| DSM | | $0.00230 | $3,444,009 | | $0.00230 | $3,444,009 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
| Transformer Ownership | 799,345 | ($0.37) | ($295,758) | 799,345 | ($0.37) | ($295,758) |
| Primary Metering | $109,431,098 | -1% | ($1,094,311) | $109,431,098 | -1% | ($1,094,311) |
| 5 Total Revenue before GET: | | | $108,041,029 | | | $108,041,029 |
| 6 Total Revenue Shift: | | | | | | $0 |
| 7 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range:  Rate G-62
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 10 of 14

## The Narragansett Electric Company
### Rate G-62

| G-62 | Pre Merger Rate G-62 | | | Post Merger Rate G-62 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 84 | $17,118.72 | $1,437,972 | 84 | $17,118.72 | $1,437,972 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 631,081 | $0.75 | $473,311 | 631,081 | $0.75 | $473,311 |
| Transmission Demand | | $1.56 | $984,486 | | $1.56 | $984,486 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 360,114,300 | $0.00434 | $1,562,896 | 360,114,300 | $0.00434 | $1,562,896 |
| Transmission Energy | | $0.00079 | $284,490 | | $0.00079 | $284,490 |
| Transition Energy | | $0.01150 | $4,141,314 | | $0.01150 | $4,141,314 |
| Standard Offer | | $0.03800 | $13,684,343 | | $0.03800 | $13,684,343 |
| DSM | | $0.00230 | $828,263 | | $0.00230 | $828,263 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
| Transformer Ownership | 349,366 | ($0.37) | ($129,265) | 349,366 | ($0.37) | ($129,265) |
| Primary Metering | $23,397,077 | -1% | ($233,971) | $23,397,077 | -1% | ($233,971) |
| 5 Total Revenue before GET: | | | $23,033,841 | | | $23,033,841 |
| 6 Total Revenue Shift: | | | | | | $0 |
| 7 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Nerrplan.wk4
Range:  Rate R-02
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 11 of 14

## The Narragansett Electric Company
### Rate R-02

| R-02 | Pre Merger Rate R-02 | | | Post Merger Rate R-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 7,642 | $0.00 | $0 | 7,642 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
|    Distribution Energy | 4,803,789 | $0.00905 | $43,474 | 4,803,789 | $0.00905 | $43,474 |
|    Transmission Energy | | $0.00338 | $16,237 | | $0.00338 | $16,237 |
|    Transition Energy | | $0.01150 | $55,244 | | $0.01150 | $55,244 |
|    Standard Offer | | $0.03800 | $182,544 | | $0.03800 | $182,544 |
|    DSM | | $0.00230 | $11,049 | | $0.00230 | $11,049 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $308,547 | | | $308,547 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | $0 |
|    Transmission Revenue | | | | | | $0 |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

Confidential

The Narragansett Electric Company
Normalized Streetlight Revenue

Narragansett Electric
TW/Newport Electric
R.I.P.U.C. Docket No.
Workpaper INRM-3
Page 12 of 14

| | Lumen Code | Rate | Annual kWh | Units | kWh Sales | Pre-merger Rate Streetlights — Distribution $0.00434 | DSM $0.00230 | Transmission $0.00318 | Transition $0.01150 | Standard Offer $0.03800 | Total | Pre-merger Streetlights — Distribution $0.00434 | DSM $0.00230 | Transmission $0.00318 | Transition $0.01150 | Standard Offer $0.03800 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCANDESCENT** | | | | | | | | | | | | | | | | | |
| | 10 | $75.22 | 440 | 107 | 47,080 | $8,253 | $108 | $71 | $541 | $1,789 | $10,851 | $8,253 | $108 | $71 | $541 | $1,789 | $10,851 |
| | 50 | $75.22 | 440 | 4 | 1,760 | $309 | $4 | $6 | $20 | $67 | $406 | $309 | $4 | $6 | $20 | $67 | $406 |
| | 11 | $67.45 | 845 | 3 | 2,535 | $213 | $6 | $9 | $29 | $96 | $353 | $213 | $6 | $9 | $29 | $96 | $353 |
| **MERCURY VAPOR** | | | | | | | | | | | | | | | | | |
| 8,000 (Post Top) | 2 | $108.85 | 908 | 23 | 20,884 | $2,594 | $48 | $71 | $240 | $794 | $3,747 | $2,594 | $48 | $71 | $240 | $794 | $3,747 |
| 4,000 | 3 | $98.40 | 561 | 6,614 | 3,710,454 | $402,361 | $8,534 | $12,541 | $42,670 | $140,997 | $607,104 | $402,361 | $8,534 | $12,541 | $42,670 | $140,997 | $607,104 |
| 8,000 | 4 | $70.77 | 908 | 1,792 | 1,627,136 | $133,882 | $3,742 | $5,500 | $18,712 | $61,831 | $223,667 | $133,882 | $3,742 | $5,500 | $18,712 | $61,831 | $223,667 |
| 15,000 (Providence) | 17 | $122.97 | 1,874 | 115 | 215,510 | $15,077 | $496 | $728 | $2,478 | $8,189 | $26,969 | $15,077 | $496 | $728 | $2,478 | $8,189 | $26,969 |
| 15,000 (Outside) | 18 | $122.97 | 1,874 | 114 | 213,636 | $14,946 | $491 | $722 | $2,457 | $8,118 | $26,734 | $14,946 | $491 | $722 | $2,457 | $8,118 | $26,734 |
| 21,000 | 5 | $122.31 | 1,897 | 2,201 | 4,175,397 | $287,325 | $9,603 | $14,113 | $48,016 | $158,661 | $517,718 | $287,325 | $9,603 | $14,113 | $48,016 | $158,661 | $517,718 |
| 22,000 - 24 HR | 64 | $222.87 | 3,794 | | | $0 | | | $0 | $0 | $0 | $0 | | | $0 | $0 | $0 |
| 63,000 | 6 | $234.25 | 4,569 | 116 | 530,004 | $29,473 | $1,219 | $1,791 | $6,093 | $20,140 | $58,719 | $29,473 | $1,219 | $1,791 | $6,093 | $20,140 | $58,719 |
| **Floodlights** | | | | | | | | | | | | | | | | | |
| 22,000 | 23 | $152.08 | 1,897 | 910 | 1,726,270 | $145,885 | $3,970 | $5,835 | $19,852 | $65,598 | $241,140 | $145,885 | $3,970 | $5,835 | $19,852 | $65,598 | $241,140 |
| 63,000 | 24 | $262.72 | 4,569 | 588 | 2,686,572 | $166,139 | $6,179 | $9,081 | $30,896 | $102,090 | $314,384 | $166,139 | $6,179 | $9,081 | $30,896 | $102,090 | $314,384 |
| **SODIUM VAPOR** | | | | | | | | | | | | | | | | | |
| 4,000 | 70 | $62.78 | 248 | 24,157 | 5,990,936 | $1,542,577 | $13,779 | $20,249 | $68,896 | $227,636 | $1,873,157 | $1,542,577 | $13,779 | $20,249 | $68,896 | $227,636 | $1,873,157 |
| 4,000 | 750 | $62.78 | 248 | 248 | 61,504 | $15,836 | $141 | $208 | $707 | $2,337 | $19,230 | $15,836 | $141 | $208 | $707 | $2,337 | $19,230 |
| 4,000 | 735 | $62.78 | 248 | 2,411 | 597,928 | $153,598 | $1,375 | $2,021 | $6,876 | $22,721 | $186,991 | $153,598 | $1,375 | $2,021 | $6,876 | $22,721 | $186,991 |
| 4,000 | 756 | $62.78 | 248 | 458 | 113,584 | $29,246 | $261 | $384 | $1,306 | $4,316 | $35,514 | $29,246 | $261 | $384 | $1,306 | $4,316 | $35,514 |
| 4,000 | 711 | $62.78 | 248 | 248 | 61,504 | $15,836 | $141 | $208 | $707 | $2,337 | $19,230 | $15,836 | $141 | $208 | $707 | $2,337 | $19,230 |
| 4,000 | 710 | $62.78 | 248 | 10,698 | 2,653,104 | $683,135 | $6,102 | $8,967 | $30,511 | $100,818 | $829,533 | $683,135 | $6,102 | $8,967 | $30,511 | $100,818 | $829,533 |
| 5,800 | 71 | $66.28 | 349 | 385 | 134,365 | $26,101 | $309 | $454 | $1,545 | $5,106 | $33,515 | $26,101 | $309 | $454 | $1,545 | $5,106 | $33,515 |
| 9,600 | 72 | $72.63 | 490 | 11,786 | 5,773,140 | $881,081 | $13,283 | $19,520 | $66,414 | $219,455 | $1,199,751 | $881,081 | $13,283 | $19,520 | $66,414 | $219,455 | $1,199,751 |
| 27,500 | 74 | $120.39 | 1,284 | 12,641 | 16,231,044 | $1,592,293 | $37,331 | $54,861 | $186,657 | $616,780 | $2,487,922 | $1,592,293 | $37,331 | $54,861 | $186,657 | $616,780 | $2,487,922 |
| 27,500 (24 HR) | 84 | $172.21 | 2,568 | | | $0 | | | $0 | $0 | $0 | $0 | | | $0 | $0 | $0 |
| 50,000 | 86 | $165.46 | 1,968 | 466 | 917,088 | $80,153 | $2,109 | $3,100 | $10,547 | $34,849 | $130,757 | $80,153 | $2,109 | $3,100 | $10,547 | $34,849 | $130,757 |
| 50,000 (Flood) | 76 | $141.37 | 1,968 | 718 | 1,413,024 | $136,356 | $3,230 | $4,776 | $16,250 | $53,695 | $214,327 | $136,356 | $3,230 | $4,776 | $16,250 | $53,695 | $214,327 |
| 27,500 (Flood) | 77 | $143.14 | 1,968 | 298 | 382,632 | $44,316 | $880 | $1,293 | $4,400 | $14,540 | $65,430 | $44,316 | $880 | $1,293 | $4,400 | $14,540 | $65,430 |
| 9,600 (Post top) | 79 | $78.56 | 490 | 490 | 240,100 | $39,536 | $552 | $812 | $2,761 | $9,124 | $52,785 | $39,536 | $552 | $812 | $2,761 | $9,124 | $52,785 |
| **UNDERGROUND** | | | | | | | | | | | | | | | | | |
| Providence (In) /(Out) | P | $110.86 | | 3,298 | | $365,616 | | | | | $365,616 | $365,616 | | | | | $365,616 |
| Wood Poles | R | $35.45 | | 32 | | $1,774 | | | | | $1,774 | $1,774 | | | | | $1,774 |
| Fiberglass without base | S | $37.34 | | 368 | | $21,101 | | | | | $21,101 | $21,101 | | | | | $21,101 |
| Fiberglass with base <25 f | C | $111.04 | | | | $0 | | | | | $0 | $0 | | | | | $0 |
| Fiberglass with base >= 25 | D | $185.67 | | | | $0 | | | | | $0 | $0 | | | | | $0 |
| Metal Pole with base | T | $233.37 | | 204 | | $51,687 | | | | | $51,687 | $51,687 | | | | | $51,687 |
| Total | | | | | 49,529,091 | $6,887,061 | $113,917 | $167,408 | $569,585 | $1,882,105 | $9,620,076 | $6,887,061 | $113,917 | $167,408 | $569,585 | $1,882,105 | $9,620,076 |

Confidential

File: C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range: Rate T-06
Date: 14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 13 of 14

## The Narragansett Electric Company
## Rate T-06

| T-06 | Pre Merger Rate T-06 | | | Post Merger Rate T-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1  Customer Charge: | 4,739 | $7.84 | $37,154 | 4,739 | $7.84 | $37,154 |
| 2  Energy Charges: | | | | | | |
| Distribution Energy | 21,835,478 | $0.02285 | $498,941 | 21,835,478 | $0.02285 | $498,941 |
| Transmission Energy | | $0.00440 | $96,076 | | $0.00440 | $96,076 |
| Transition Energy | | $0.01150 | $251,108 | | $0.01150 | $251,108 |
| Standard Offer | | $0.03800 | $829,748 | | $0.03800 | $829,748 |
| DSM | | $0.00230 | $50,222 | | $0.00230 | $50,222 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3  Total Revenue before GET: | | | $1,763,248 | | | $1,763,248 |
| 4  Total Revenue Shift: | | | | | | $0 |
| 5  Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Narrplan.wk4
Range:  Rate V-02
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 2
Page 14 of 14

## The Narragansett Electric Company
### Rate V-02

| V-02 | Pre Merger Rate V-02 | | | Post Merger Rate V-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 4,553 | $7.85 | $35,741 | 4,553 | $7.85 | $35,741 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 7,686,406 | $0.03076 | $236,434 | 7,686,406 | $0.03076 | $236,434 |
| Transmission Energy | | $0.00626 | $48,117 | | $0.00626 | $48,117 |
| Transition Energy | | $0.01150 | $88,394 | | $0.01150 | $88,394 |
| Standard Offer | | $0.03800 | $292,083 | | $0.03800 | $292,083 |
| DSM | | $0.00230 | $17,679 | | $0.00230 | $17,679 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $718,448 | | | $718,448 |
| 4 Total Revenue Shift: | | | | | | $0 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $0 |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

161
NEC092414

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Workpaper JMM-3

Workpaper JMM-3

Newport Back-up

Confidential

File:    C:\123dm\JAMES\M&A\BASE\Necpla10.WK4
Range:   Rate R1
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 1 of 26

## The Narragansett Electric Company
### Shifting NEC Rate R-1 to Narragansett Rate A-16

| R-1/A-16 | NEC Rate R-1 | | | Narragansett Rate A-16 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 325,773 | $3.10 | $1,009,896 | 325,773 | $2.54 | $827,463 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 167,201,036 | $0.04653 | $7,779,864 | 167,201,036 | $0.04341 | $7,258,197 |
| Transmission Energy | | $0.00273 | $456,459 | | $0.00300 | $501,603 |
| Transition Energy | | $0.02340 | $3,912,504 | | $0.02340 | $3,912,504 |
| Standard Offer | | $0.03800 | $6,353,639 | | $0.03800 | $6,353,639 |
| DSM | | $0.00230 | $384,562 | | $0.00230 | $384,562 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $19,896,925 | | | $19,237,969 |
| 4 Total Revenue Shift: | | | | | | ($658,956) |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($704,100) |
| Transmission Revenue | | | | | | $45,144 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123dsta\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate R2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 2 of 26

## The Narragansett Electric Company
### Shifting NEC Rate R-2 to Narragansett Rate A-60

| R-2/A-60 | NEC Rate R-2 | | | Narragansett Rate A-60 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 4,208 | $2.14 | $9,005 | 4,208 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy first 300 kWh | 1,055,362 | $0.00759 | $8,010 | 1,055,362 | ($0.00616) | (6,501) |
| Distribution Energy over 300 kWh | 709,457 | $0.04206 | $29,840 | | | |
| Distribution Energy | | | | 1,764,819 | $0.03023 | $53,350 |
| Transmission Energy | | $0.00273 | $4,818 | | $0.00202 | $3,565 |
| Transition Energy | | $0.02340 | $41,297 | | $0.02340 | $41,297 |
| Standard Offer | | $0.03800 | $67,063 | | $0.03800 | $67,063 |
| DSM | | $0.00230 | $4,059 | | $0.00230 | $4,059 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $164,092 | | | $162,833 |
| 4 Total Revenue Shift: | | | | | | ($1,259) |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($6) |
| Transmission Revenue | | | | | | ($1,253) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123dan\JAMES\M&A\BASE\Necpla10.WK4
Range   Rate R4
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 3 of 26

## The Narragansett Electric Company
### Shifting NEC Rate R-4 to Narragansett Rate A-32

| R-4/A-32 | NEC Rate R-4 | | | Narragansett Rate A-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 2,504 | $6.78 | $16,977 | 2,504 | $6.74 | $16,877 |
| 2 Energy Charges: | | | | | | |
| Distribution Peak | 1,248,828 | $0.11000 | $137,371 | 1,248,828 | $0.03257 | $40,674 |
| Distribution Off Peak | 5,852,163 | $0.03109 | $181,944 | 5,852,163 | $0.03257 | $190,605 |
| Transmission Energy | 7,100,991 | $0.00273 | $19,386 | 7,100,991 | $0.00256 | $18,179 |
| Transition Energy | | $0.02340 | $166,163 | | $0.02340 | $166,163 |
| Standard Offer | | $0.03800 | $269,838 | | $0.03800 | $269,838 |
| DSM | | $0.00230 | $16,332 | | $0.00230 | $16,332 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $808,011 | | | $718,668 |
| 4 Total Revenue Shift: | | | | | | ($89,343) |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($88,136) |
| Transmission Revenue | | | | | | ($1,207) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:    Rate W1
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 4 of 26

## The Narragansett Electric Company
## Shifting NEC Rate W-1 to Narragansett Rate A-16

| W-1/A-16 | NEC Rate W-1 | | | Narragansett Rate A-16 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 63,065 | $3.29 | $207,484 | 63,065 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 13,062,846 | $0.02399 | $313,378 | 13,062,846 | $0.04341 | $567,058 |
| Transmission Energy | | $0.00273 | $35,662 | | $0.00300 | $39,189 |
| Transition Energy | | $0.02340 | $305,671 | | $0.02340 | $305,671 |
| Standard Offer | | $0.03800 | $496,388 | | $0.03800 | $496,388 |
| DSM | | $0.00230 | $30,045 | | $0.00230 | $30,045 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $1,388,626 | | | $1,438,350 |
| 4 Total Revenue Shift: | | | | | | $49,724 |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $46,197 |
| Transmission Revenue | | | | | | $3,527 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

166
NEC092419

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range   Rate W1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 5 of 26

## The Narragansett Electric Company
### Shifting NEC Rate W-1 to Narragansett Rate C-06

| W-1/C-06 | NEC Rate W-1 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| **1 Customer Charge:** | | | | | | |
| Customer Charge | 1,303 | $3.29 | $4,287 | 1,303 | $0.00 | $0 |
| Unmetered Charge | | | | 0 | $0.00 | $0 |
| **2 Energy Charges:** | | | | | | |
| Distribution Energy | 313,931 | $0.02399 | $7,531 | 313,931 | $0.04559 | $14,312 |
| Transmission Energy | | $0.00273 | $857 | | $0.00400 | $1,256 |
| Transition Energy | | $0.02340 | $7,346 | | $0.02340 | $7,346 |
| Standard Offer | | $0.03800 | $11,929 | | $0.03800 | $11,929 |
| DSM | | $0.00230 | $722 | | $0.00230 | $722 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| **3 Total Revenue before GET:** | | | $32,673 | | | $35,565 |
| **4 Total Revenue Shift:** | | | | | | $2,893 |
| **5 Revenue Shift by Function:** | | | | | | |
| Distribution Revenue | | | | | | $2,494 |
| Transmission Revenue | | | | | | $399 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

167

NEC092420

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate W1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 6 of 26

## The Narragansett Electric Company
## Shifting NEC Rate W-1 to Narragansett Rate G-02

| W-1/G-02 | NEC Rate W-1 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 40 | $3.29 | $132 | 40 | $0.00 | $0 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 0 | $0.00 | $0 | 0 | $2.91 | $0 |
|    Transmission Demand | | | | | $1.40 | $0 |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 6,491 | $0.02399 | $156 | 6,491 | $0.01691 | $110 |
|    Transmission Energy | | $0.00273 | $18 | | ($0.00136) | ($9) |
|    Transition Energy | | $0.02340 | $152 | | $0.02340 | $152 |
|    Standard Offer | | $0.03800 | $247 | | $0.03800 | $247 |
|    DSM | | $0.00230 | $15 | | $0.00230 | $15 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $719 | | | $514 |
| 5 Total Revenue Shift: | | | | | | ($204) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($178) |
|    Transmission Revenue | | | | | | ($27) |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | $0 |
|    DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:   Rate H1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 7 of 26

## The Narragansett Electric Company
## Shifting NEC Rate H-1 to Narragansett Rate C-06

| H-1/C-06 | NEC Rate H-1 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1  Customer Charge: | 36 | $12.03 | $433 | 36 | $5.73 | $206 |
| 2  Energy Charges: | | | | | | |
| Distribution Energy | 146,940 | $0.03968 | $5,831 | 146,940 | $0.04559 | $6,699 |
| Transmission Energy | | $0.00273 | $401 | | $0.00400 | $588 |
| Transition Energy | | $0.02340 | $3,438 | | $0.02340 | $3,438 |
| Standard Offer | | $0.03800 | $5,584 | | $0.03800 | $5,584 |
| DSM | | $0.00230 | $338 | | $0.00230 | $338 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3  Total Revenue before GET: | | | $16,025 | | | $16,853 |
| 4  Total Revenue Shift: | | | | | | $828 |
| 5  Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | $642 |
| Transmission Revenue | | | | | | $187 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\necpla10.WK4
Range:  Rate H1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 8 of 26

## The Narragansett Electric Company
### Shifting NEC Rate H-1 to Narragansett Rate G-02

| H-1/G-02 | NEC Rate H-1 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 179 | $12.03 | $2,153 | 179 | $103.41 | $18,510 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 7,866 | $0.00 | $0 | 7,866 | $2.91 | $22,890 |
| Transmission Demand | | | | | $1.40 | $11,012 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 3,203,948 | $0.03968 | $127,133 | 3,203,948 | $0.01691 | $54,179 |
| Transmission Energy | | $0.00273 | $8,747 | | ($0.00136) | ($4,357) |
| Transition Energy | | $0.02340 | $74,972 | | $0.02340 | $74,972 |
| Standard Offer | | $0.03800 | $121,750 | | $0.03800 | $121,750 |
| DSM | | $0.00230 | $7,369 | | $0.00230 | $7,369 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $342,124 | | | $306,326 |
| 5 Total Revenue Shift: | | | | | | ($35,799) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($33,707) |
| Transmission Revenue | | | | | | ($2,092) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:   Rate H1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 9 of 26

## The Narragansett Electric Company
### Shifting NEC Rate H-1 to Narragansett Rate G-32

| H-1/G-32 | NEC Rate H-1 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12 | $12.03 | $144 | 12 | $236.43 | $2,837 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 5,202 | $0.00 | $0 | 5,202 | $1.56 | $8,115 |
| Transmission Demand | | | | | $1.27 | $6,607 |
| 3 Energy Charges: | | | | | - | |
| Distribution Energy | 1,557,600 | $0.03968 | $61,806 | 1,557,600 | $0.01800 | $28,037 |
| Transmission Energy | | $0.00273 | $4,252 | | ($0.00136) | ($2,118) |
| Transition Energy | | $0.02340 | $36,448 | | $0.02340 | $36,448 |
| Standard Offer | | $0.03800 | $59,189 | | $0.03800 | $59,189 |
| DSM | | $0.00230 | $3,582 | | $0.00230 | $3,582 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $165,421 | | | $142,696 |
| 5 Total Revenue Shift: | | | | | | ($22,725) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($22,961) |
| Transmission Revenue | | | | | | $236 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:   Rate H2
Date:   14-May-99

## The Narragansett Electric Company
### Shifting NEC Rate H-2 to Narragansett Rate C-06

| H-2/C-06 | NEC Rate H-2 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 3,752 | $4.59 | $17,222 | 3,752 | $0.00 | $0 |
| 2 Energy Charges: | | | | | | |
| Distribution Energy | 4,457,199 | $0.04681 | $208,641 | 4,457,199 | $0.04559 | $203,204 |
| Transmission Energy | | $0.00273 | $12,168 | | $0.00400 | $17,829 |
| Transition Energy | | $0.02340 | $104,298 | | $0.02340 | $104,298 |
| Standard Offer | | $0.03800 | $169,374 | | $0.03800 | $169,374 |
| DSM | | $0.00230 | $10,252 | | $0.00230 | $10,252 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 3 Total Revenue before GET: | | | $521,955 | | | $504,956 |
| 4 Total Revenue Shift: | | | | | | ($16,999) |
| 5 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($22,659) |
| Transmission Revenue | | | | | | $5,661 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Neoplat0.WK4
Range:    Rate H2
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 11 of 26

## The Narragansett Electric Company
### Shifting NEC Rate H-2 to Narragansett Rate G-02

| H-2/G-02 | NEC Rate H-2 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 113 | $4.59 | $519 | 113 | $0.00 | $0 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 5,208 | $0.00 | $0 | 5,208 | $2.91 | $15,156 |
| Transmission Demand | | | | | $1.40 | $7,292 |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 1,266,751 | $0.04681 | $59,297 | 1,266,751 | $0.01691 | $21,421 |
| Transmission Energy | | $0.00273 | $3,458 | | ($0.00136) | ($1,723) |
| Transition Energy | | $0.02340 | $29,642 | | $0.02340 | $29,642 |
| Standard Offer | | $0.03800 | $48,137 | | $0.03800 | $48,137 |
| DSM | | $0.00230 | $2,914 | | $0.00230 | $2,914 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $143,966 | | | $122,838 |
| 5 Total Revenue Shift: | | | | | | ($21,127) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($23,238) |
| Transmission Revenue | | | | | | $2,111 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate G1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 12 of 26

## The Narragansett Electric Company
## Shifting NEC Rate G-1 to Narragansett Rate C-06

| G-1/C-06 | NEC Rate G-1 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| **1 Customer Charge:** | | | | | | |
| Customer Charge | 48,861 | $3.45 | $168,570 | 47,123 | $5.73 | $270,015 |
| Unmetered Charge | | | | 1,738 | $1.83 | $3,181 |
| **2 Energy Charges:** | | | | | | |
| Distribution Energy | 42,449,011 | $0.05832 | $2,475,626 | 42,449,011 | $0.04559 | $1,935,250 |
| Transmission Energy | | $0.00273 | $115,886 | | $0.00400 | $169,796 |
| Transition Energy | | $0.02340 | $993,307 | | $0.02340 | $993,307 |
| Standard Offer | | $0.03800 | $1,613,062 | | $0.03800 | $1,613,062 |
| DSM | | $0.00230 | $97,633 | | $0.00230 | $97,633 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| **3 Total Revenue before GET:** | | | $5,464,085 | | | $5,082,244 |
| **4 Total Revenue Shift:** | | | | | | ($381,841) |
| **5 Revenue Shift by Function:** | | | | | | |
| Distribution Revenue | | | | | | ($435,751) |
| Transmission Revenue | | | | | | $53,910 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

174
NEC092427

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate G2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 13 of 26

## The Narragansett Electric Company
### Shifting NEC Rate G-2 to Narragansett Rate C-06

| G-2/C-06 | NEC Rate G-2 | | | Narragansett Rate C-06 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 1,272 | $0.00 | $0 | 1,272 | $5.73 | $7,289 |
| 2 Demand Charge: | | | | | | |
|   Distribution Demand | 29,206 | $1.60 | $46,730 | 0 | $0.00 | $0 |
|   Transmission Demand | | $0.00 | $0 | | $0.00 | $0 |
|   Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|   Distribution Energy | 6,707,011 | $0.03443 | $230,922 | 6,707,011 | $0.04559 | $305,773 |
|   Transmission Energy | | $0.00273 | $18,310 | | $0.00400 | $26,828 |
|   Transition Energy | | $0.02340 | $156,944 | | $0.02340 | $156,944 |
|   Standard Offer | | $0.03800 | $254,866 | | $0.03800 | $254,866 |
|   DSM | | $0.00230 | $15,426 | | $0.00230 | $15,426 |
|   Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $723,199 | | | $767,126 |
| 5 Total Revenue Shift: | | | | | | $43,927 |
| 6 Revenue Shift by Function: | | | | | | |
|   Distribution Revenue | | | | | | $35,409 |
|   Transmission Revenue | | | | | | $8,518 |
|   Transition Revenue | | | | | | $0 |
|   Standard Offer Revenue | | | | | | $0 |
|   DSM | | | | | | $0 |

Confidential

File:    C:\1234ona\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate 02
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 14 of 26

## The Narragansett Electric Company
### Shifting NEC Rate G-2 to Narragansett Rate G-02

| G-2/G-02 | NEC Rate G-2 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 6,226 | $0.00 | $0 | 6,226 | $103.41 | $643,831 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 255,636 | $1.60 | $409,018 | 213,521 | $2.91 | $621,346 |
| Transmission Demand | | $0.00 | $0 | | $1.40 | $298,929 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 85,631,955 | $0.03443 | $2,948,308 | 85,631,955 | $0.01691 | $1,448,036 |
| Transmission Energy | | $0.00273 | $233,775 | | ($0.00136) | ($116,459) |
| Transition Energy | | $0.02340 | $2,003,788 | | $0.02340 | $2,003,788 |
| Standard Offer | | $0.03800 | $3,254,014 | | $0.03800 | $3,254,014 |
| DSM | | $0.00230 | $196,953 | | $0.00230 | $196,953 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $9,045,857 | | | $8,350,439 |
| 5 Total Revenue Shift: | | | | | | ($695,418) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($644,113) |
| Transmission Revenue | | | | | | ($51,305) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:  C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate G2
Date:  14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 15 of 26

## The Narragansett Electric Company
## Shifting NEC Rate G-2 to Narragansett Rate G-32

| G-2/G-32 | NEC Rate G-2 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 147 | $0.00 | $0 | 147 | $236.43 | $34,755 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 36,878 | $1.60 | $59,005 | 43,326 | $1.56 | $67,589 |
| Transmission Demand | | $0.00 | $0 | | $1.27 | $55,024 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 12,741,620 | $0.03443 | $438,694 | 12,741,620 | $0.01800 | $229,349 |
| Transmission Energy | | $0.00273 | $34,785 | | ($0.00136) | ($17,329) |
| Transition Energy | | $0.02340 | $298,154 | | $0.02340 | $298,154 |
| Standard Offer | | $0.03800 | $484,182 | | $0.03800 | $484,182 |
| DSM | | $0.00230 | $29,306 | | $0.00230 | $29,306 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $1,344,125 | | | $1,181,030 |
| 5 Total Revenue Shift: | | | | | | ($163,095) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($166,006) |
| Transmission Revenue | | | | | | $2,911 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate T2
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 16 of 26

## The Narragansett Electric Company
### Shifting NEC Rate T-2 to Narragansett Rate G-02

| T-2/G-02 | NEC Rate T-2 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 84 | $0.00 | $0 | 84 | $103.41 | $8,686 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 11,103 | $1.60 | $17,765 | 10,263 | $2.91 | $29,865 |
| Transmission Demand | | $0.00 | $0 | | $1.40 | $14,368 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 4,675,660 | $0.03443 | $160,983 | 4,675,660 | $0.01691 | $79,065 |
| Transmission Energy | | $0.00273 | $12,765 | | ($0.00136) | ($6,359) |
| Transition Energy | | $0.02340 | $109,410 | | $0.02340 | $109,410 |
| Standard Offer On Peak | 862,640 | $0.03800 | $32,780 | | $0.03800 | $177,675 |
| Standard Offer Off Peak | 3,813,020 | $0.03800 | $144,895 | | | |
| DSM | | $0.00230 | $10,754 | | $0.00230 | $10,754 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $489,352 | | | $423,466 |
| 5 Total Revenue Shift: | | | | | | ($65,886) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($61,131) |
| Transmission Revenue | | | | | | ($4,755) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | ($0) |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:   Rate T2
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 17 of 26

## The Narragansett Electric Company
## Shifting NEC Rate T-2 to Narragansett Rate G-32

| T-2/G-32 | NEC Rate T-2 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 72 | $0.00 | $0 | 72 | $236.43 | $17,023 |
| 2 Demand Charge: | | | | | | |
|    Distribution Demand | 19,224 | $1.60 | $30,758 | 20,900 | $1.56 | $32,604 |
|    Transmission Demand | | $0.00 | $0 | | $1.27 | $26,543 |
|    Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|    Distribution Energy | 9,686,300 | $0.03443 | $333,499 | 9,686,300 | $0.01800 | $174,353 |
|    Transmission Energy | | $0.00273 | $26,444 | | ($0.00136) | ($13,173) |
|    Transition Energy | | $0.02340 | $226,659 | | $0.02340 | $226,659 |
|    Standard Offer On Peak | 1,818,780 | $0.03800 | $69,114 | | $0.03800 | $368,079 |
|    Standard Offer Off Peak | 7,867,520 | $0.03800 | $298,966 | | | |
|    DSM | | $0.00230 | $22,278 | | $0.00230 | $22,278 |
|    Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $1,007,719 | | | $854,367 |
| 5 Total Revenue Shift: | | | | | | ($153,351) |
| 6 Revenue Shift by Function: | | | | | | |
|    Distribution Revenue | | | | | | ($140,277) |
|    Transmission Revenue | | | | | | ($13,074) |
|    Transition Revenue | | | | | | $0 |
|    Standard Offer Revenue | | | | | | ($0) |
|    DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M:A\BASE\Necpla10.WK4
Range:  Rate T4
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 18 of 26

## The Narragansett Electric Company
### Shifting NEC Rate T-4 to Narragansett Rate G-32

| T-4/G-32 | NEC Rate T-4 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 69 | $0.00 | $0 | 69 | $236.43 | $16,314 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 41,467 | $1.95 | $80,861 | 57,333 | $1.56 | $89,439 |
| Transmission Demand | | $0.00 | $0 | | $1.27 | $72,813 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 18,430,440 | $0.03517 | $648,199 | 18,430,440 | $0.01800 | $331,748 |
| Transmission Energy | | $0.00273 | $50,315 | | ($0.00136) | ($25,065) |
| Transition Energy | | $0.02340 | $431,272 | | $0.02340 | $431,272 |
| Standard Offer On Peak | 3,531,400 | $0.03800 | $134,193 | | $0.03800 | $700,357 |
| Standard Offer Off Peak | 14,899,040 | $0.03800 | $566,164 | | | |
| DSM | | $0.00230 | $42,390 | | $0.00230 | $42,390 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $1,953,393 | | | $1,659,268 |
| 5 Total Revenue Shift: | | | | | | ($294,126) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($291,558) |
| Transmission Revenue | | | | | | ($2,568) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Neopia10.WK4
Range:   Rate T-5
Date:    14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 19 of 26

## The Narragansett Electric Company
## Shifting NEC Rate T-5 to Narragansett Rate G-32

| T-5/G-32 | NEC Rate T-5 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12 | $0.00 | $0 | 12 | $236.43 | $2,837 |
| 2 Demand Charge: | | | | | | |
|   Distribution Demand | 5,375 | $1.76 | $9,460 | 5,375 | $1.56 | $8,385 |
|   Transmission Demand | | $0.00 | $0 | | $1.27 | $6,826 |
|   Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|   Distribution Energy | 2,964,000 | $0.02948 | $87,379 | 2,964,000 | $0.01800 | $53,352 |
|   Transmission Energy | | $0.00273 | $8,092 | | ($0.00136) | ($4,031) |
|   Transition Energy | | $0.02340 | $69,358 | | $0.02340 | $69,358 |
|   Standard Offer On Peak | 531,000 | $0.03800 | $20,178 | | $0.03800 | $112,632 |
|   Standard Offer Off Peak | 2,433,000 | $0.03800 | $92,454 | | | |
|   DSM | | $0.00230 | $6,817 | | $0.00230 | $6,817 |
|   Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
|   Transformer Ownership | | | | 5,375 | ($0.37) | ($1,989) |
|   Primary Metering | | | | $256,176 | -1% | ($2,562) |
| 4 Total Revenue before GET: | | | $293,737 | | | $251,626 |
| 5 Total Revenue Shift: | | | | | | ($42,112) |
| 6 Revenue Shift by Function: | | | | | | |
|   Distribution Revenue | | | | | | ($35,593) |
|   Transmission Revenue | | | | | | ($5,324) |
|   Transition Revenue | | | | | | $0 |
|   Standard Offer Revenue | | | | | | ($1,126) |
|   DSM | | | | | | ($68) |

Confidential

File:    C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate G5
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 20 of 26

### The Narragansett Electric Company
### Shifting NEC Rate G-5 to Narragansett Rate G-02

| G-5/G-02 | NEC Rate G-5 | | | Narragansett Rate G-02 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 158 | $0.00 | $0 | 158 | $103.41 | $16,339 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 12,834 | $1.76 | $22,588 | 14,847 | $2.91 | $43,205 |
| Transmission Demand | | $0.00 | $0 | | $1.40 | $20,786 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 4,061,340 | $0.02948 | $119,728 | 4,061,340 | $0.01691 | $68,677 |
| Transmission Energy | | $0.00273 | $11,087 | | ($0.00136) | ($5,523) |
| Transition Energy | | $0.02340 | $95,035 | | $0.02340 | $95,035 |
| Standard Offer | 4,061,340 | $0.03800 | $154,331 | | $0.03800 | $154,331 |
| DSM | | $0.00230 | $9,341 | | $0.00230 | $9,341 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
| Transformer Ownership | | | | 14,847 | ($0.37) | ($5,493) |
| Primary Metering | | | | $402,191 | -1% | ($4,022) |
| 4 Total Revenue before GET: | | | $412,111 | | | $392,675 |
| 5 Total Revenue Shift: | | | | | | ($19,436) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($21,821) |
| Transmission Revenue | | | | | | $4,022 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | ($1,543) |
| DSM | | | | | | ($93) |

Confidential

File:  C:\123data\JAMES\M&A\BASE\Neople1D.WK4
Range:  Rate G5
Date:  14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 21 of 26

## The Narragansett Electric Company
## Shifting NEC Rate G-5 to Narragansett Rate G-32

| G-5/G-32 | NEC Rate G-5 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1  Customer Charge: | 83 | $0.00 | $0 | 83 | $236.43 | $19,624 |
| 2  Demand Charge: | | | | | | |
| Distribution Demand | 27,527 | $1.76 | $48,448 | 29,984 | $1.56 | $46,775 |
| Transmission Demand | | $0.00 | $0 | | $1.27 | $38,080 |
| Standard Offer | | $0.00 | $0 | | | |
| 3  Energy Charges: | | | | | | |
| Distribution Energy | 11,014,249 | $0.02948 | $324,700 | 11,014,249 | $0.01800 | $198,256 |
| Transmission Energy | | $0.00273 | $30,069 | | ($0.00136) | ($14,979) |
| Transition Energy | | $0.02340 | $257,733 | | $0.02340 | $257,733 |
| Standard Offer | 11,014,249 | $0.03800 | $418,541 | | $0.03800 | $418,541 |
| DSM | | $0.00230 | $25,333 | | $0.00230 | $25,333 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
| Transformer Ownership | | | | 29,984 | ($0.37) | ($11,094) |
| Primary Metering | | | | $989,363 | -1% | ($9,894) |
| 4  Total Revenue before GET: | | | $1,104,824 | | | $968,375 |
| 5  Total Revenue Shift: | | | | | | ($136,449) |
| 6  Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($124,810) |
| Transmission Revenue | | | | | | ($7,200) |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | ($4,185) |
| DSM | | | | | | ($253) |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate T6
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 22 of 26

## The Narragansett Electric Company
## Shifting NEC Rate T-6 to Narragansett Rate G-32

| T-6/G-32 | NEC Rate T-6 | | | Narragansett Rate G-32 | | |
|---|---|---|---|---|---|---|
|  | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12 | $0.00 | $0 | 12 | $236.43 | $2,837 |
| 2 Demand Charge: |  |  |  |  |  |  |
| Distribution Demand | 14,305 | $1.76 | $25,177 | 15,820 | $1.56 | $24,679 |
| Transmission Demand |  | $0.00 | $0 |  | $1.27 | $20,091 |
| Standard Offer |  | $0.00 | $0 |  |  |  |
| 3 Energy Charges: |  |  |  |  |  |  |
| Distribution Energy | 6,958,000 | $0.02993 | $208,253 | 6,958,000 | $0.01800 | $125,244 |
| Transmission Energy |  | $0.00273 | $18,995 |  | ($0.00136) | ($9,463) |
| Transition Energy |  | $0.02340 | $162,817 |  | $0.02340 | $162,817 |
| Standard Offer On Peak | 1,417,000 | $0.03800 | $53,846 |  | $0.03800 | $264,404 |
| Standard Offer Off Peak | 5,541,000 | $0.03800 | $210,558 |  |  |  |
| DSM |  | $0.00230 | $16,003 |  | $0.00230 | $16,003 |
| Renewables |  | $0.00000 | $0 |  | $0.00000 | $0 |
| 4. High Voltage Credits |  |  |  |  |  |  |
| Transformer Ownership |  |  |  | 15,820 | ($0.37) | ($5,853) |
| Primary Metering |  |  |  | $606,613 | -1% | ($6,066) |
| 4 Total Revenue before GET: |  |  | $695,650 |  |  | $594,694 |
| 5 Total Revenue Shift: |  |  |  |  |  | ($100,956) |
| 6 Revenue Shift by Function: |  |  |  |  |  |  |
| Distribution Revenue |  |  |  |  |  | ($89,679) |
| Transmission Revenue |  |  |  |  |  | ($8,473) |
| Transition Revenue |  |  |  |  |  | $0 |
| Standard Offer Revenue |  |  |  |  |  | ($2,644) |
| DSM |  |  |  |  |  | ($160) |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range: Rate T6
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 23 of 26

### The Narragansett Electric Company
### Shifting NEC Rate T-6 to Narragansett Rate G-62

| T-6/G-62 | NEC Rate T-6 | | | Narragansett Rate G-62 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12 | $0.00 | $0 | 12 | $17,118.72 | $205,425 |
| 2 Demand Charge: | | | | | | |
|   Distribution Demand | 35,977 | $1.76 | $63,320 | 36,233 | $0.75 | $27,175 |
|   Transmission Demand | | $0.00 | $0 | | $1.39 | $50,364 |
|   Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
|   Distribution Energy | 17,589,599 | $0.02993 | $526,457 | 17,589,599 | $0.01095 | $192,606 |
|   Transmission Energy | | $0.00273 | $48,020 | | ($0.00136) | ($23,922) |
|   Transition Energy | | $0.02340 | $411,597 | | $0.02340 | $411,597 |
|   Standard Offer On Peak | 3,754,799 | $0.03800 | $142,682 | | $0.03800 | $668,405 |
|   Standard Offer Off Peak | 13,834,800 | $0.03800 | $525,722 | | | |
|   DSM | | $0.00230 | $40,456 | | $0.00230 | $40,456 |
|   Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4. High Voltage Credits | | | | | | |
|   Transformer Ownership | | | | 36,233 | ($0.37) | ($13,406) |
|   Primary Metering | | | | $1,572,105 | -1% | ($15,721) |
| 4 Total Revenue before GET: | | | $1,758,253 | | | $1,542,978 |
| 5 Total Revenue Shift: | | | | | | ($215,276) |
| 6 Revenue Shift by Function: | | | | | | |
|   Distribution Revenue | | | | | | ($186,345) |
|   Transmission Revenue | | | | | | ($21,842) |
|   Transition Revenue | | | | | | $0 |
|   Standard Offer Revenue | | | | | | ($6,684) |
|   DSM | | | | | | ($405) |

Confidential

File:   C:\123data\JAMES\M&A\BASE\Necpla10.WK4
Range:  Rate C1
Date:   14-May-99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 3
Page 24 of 26

## The Narragansett Electric Company
## Shifting NEC Rate C-1 to Narragansett Rate N-01

| C-1/N-01 | NEC Rate C-1 | | | Narragansett Rate N-01 | | |
|---|---|---|---|---|---|---|
| | Units (1) | Rate (2) | Revenues (3) | Units (4) | Rate (5) | Revenues (6) |
| 1 Customer Charge: | 12 | $0.00 | $0 | 12 | $0.00 | $0 |
| 2 Demand Charge: | | | | | | |
| Distribution Demand | 212,968 | $7.68 | $1,635,594 | 212,968 | $6.60 | $1,405,589 |
| Transmission Demand | | $0.00 | $0 | | $0.00 | $0 |
| Standard Offer | | $0.00 | $0 | | | |
| 3 Energy Charges: | | | | | | |
| Distribution Energy | 114,919,292 | $0.00851 | $977,963 | 114,919,292 | $0.00731 | $840,060 |
| Transmission Energy | | $0.00273 | $313,730 | | $0.00273 | $313,730 |
| Transition Energy | | $0.02340 | $2,689,111 | | $0.02340 | $2,689,111 |
| Standard Offer On Peak | 23,608,292 | $0.03800 | $897,115 | | $0.03800 | $4,366,933 |
| Standard Offer Off Peak | 91,311,000 | $0.03800 | $3,469,818 | | | |
| DSM | | $0.00230 | $264,314 | | $0.00230 | $264,314 |
| Renewables | | $0.00000 | $0 | | $0.00000 | $0 |
| 4 Total Revenue before GET: | | | $10,247,646 | | | $9,879,737 |
| 5 Total Revenue Shift: | | | | | | ($367,909) |
| 6 Revenue Shift by Function: | | | | | | |
| Distribution Revenue | | | | | | ($367,909) |
| Transmission Revenue | | | | | | $0 |
| Transition Revenue | | | | | | $0 |
| Standard Offer Revenue | | | | | | $0 |
| DSM | | | | | | $0 |

Confidential

186
NEC092439

Narragansett Electric
BW/Newton Electric
RI.PUC Docket No. __
Workpaper PMcM-2
Page 25 of 26

File: C:\Users\...\NEC
Dept: NEC
Date: 10-Apr-99

## The Narragansett Electric Company
### Shifting NEC Rate S-1 to Narragansett Rate S-14

Overhead

**Sodium Vapor Lamp**
Existing or Prepaid Wood Poles
- 5800 Streetlight
- 5800 Flood
- 9500 Streetlight
- 25000 Streetlight
- 50000 Flood
- 50000 Streetlight
- 50000 Flood

Lighting only Wood Poles
- 5800 Streetlight
- 25000 Streetlight
- 25000 Flood
- 50000 Streetlight
- 50000 Flood

**Mercury Vapor Lamp**
Existing or Prepaid Wood Poles
- 6800 Streetlight
- 11000 Streetlight
- 11000 Flood
- 21000 Flood
- 63000 Flood

Lighting only Wood Poles
- 6800 Streetlight
- 21000 Streetlight
- 21000 Flood
- 63000 Flood

**Incandescent**
Existing or Prepaid Standard Metal Poles
- 1000 Streetlight
- 2500 Flood

**Metal Halide Lamp**
Existing or Prepaid Wood Poles
- 20000 Streetlight
- 40000 Flood
- 115000 Flood

Total Overhead

Narragansett Electric
FERC/Report Exhibit
R.I.P.U.C. Docket No.—
Workpaper IMM-1.5
Page 24 of 26

## The Narragansett Electric Company
### Shifting NECrt Rate S-1 to Narragansett Rate S-14

| Underground | Number of Units | Annual kWh | Annual Price | Total Annual kWh Sales | Distribution Revenues | Transmission Revenues | Transition Revenues | Standard Offer Revenues | DSM Revenues | Total Revenues | Annual kWh | Annual Price | Total Annual kWh Sales | Distribution Revenues | Transmission Revenues | Transition Revenues | Standard Offer Revenues | DSM Revenues | Total Revenues |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sodium Vapor Lamp** | | | | | | | | | | | | | | | | | | | |
| Existing or Prepaid Standard Metal Poles | | | | | | | | | | | | | | | | | | | |
| 5800 Streetlight | 8 | 334 | $60.89 | 1,672 | $167 | $7 | $3 | $63 | $6 | $665 | 349 | $66.28 | 2,792 | $478 | $3 | $55 | $106 | $6 | $60 |
| 25000 Streetlight | 12 | 1,274 | $110.89 | 15,288 | $1,131 | $42 | $42 | $338 | $33 | $2,546 | 1284 | $120.59 | 15,408 | $1,118 | $19 | $351 | $596 | $33 | $2,158 |
| 25000 Flood | 1 | 1,274 | $115.74 | 1,274 | $116 | $3 | $3 | $30 | $3 | $309 | 1284 | $143.14 | 1,284 | $119 | $2 | $30 | $49 | $3 | $203 |
| 50000 Flood | 1 | 1,966 | $152.43 | 1,966 | $152 | $5 | $5 | $46 | $5 | $383 | 1968 | $181.37 | 1,968 | $145 | $2 | $46 | $75 | $3 | $273 |
| Lighting only Standard Metal Poles | | | | | | | | | | | | | | | | | | | |
| 5800 T&C | 14 | 334 | $161.51 | 4,676 | $2,261 | $13 | $225 | $178 | $11 | $2,572 | 349 | $110.65 | 4,886 | $4,354 | $6 | $114 | $186 | $11 | $4,701 |
| Existing or Prepaid Poles less than 15 ft. | | | | | | | | | | | | | | | | | | | |
| 5800 T&C | 247 | 334 | $54.12 | 82,498 | $13,368 | $225 | $1,930 | $3,135 | $190 | $18,848 | 349 | $56.28 | 86,203 | $14,767 | $106 | $2,017 | $3,276 | $198 | $20,364 |
| Existing or Prepaid Wood Poles | | | | | | | | | | | | | | | | | | | |
| 5800 Streetlight | 78 | 334 | $58.99 | 26,052 | $4,445 | $71 | $610 | $990 | $60 | $6,176 | 349 | $56.28 | 27,222 | $4,663 | $33 | $637 | $1,034 | $63 | $6,431 |
| 25000 Streetlight | 24 | 1,274 | $106.98 | 30,576 | $2,598 | $83 | $715 | $1,462 | $70 | $4,599 | 1284 | $120.59 | 30,816 | $2,316 | $18 | $721 | $1,171 | $53 | $5,637 |
| 50000 Streetlight-Twin | 12 | 3,932 | $278.25 | 47,184 | $3,319 | $129 | $1,104 | $1,293 | $109 | $6,449 | 3936 | $245.92 | 47,232 | $3,044 | $58 | $1,105 | $1,795 | $53 | $6,111 |
| Lighting only Wood Poles | | | | | | | | | | | | | | | | | | | |
| 25000 Flood | 1 | 1,274 | $171.14 | 1,274 | $171 | $3 | $3 | $30 | $3 | $156 | 1284 | $198.59 | 1,284 | $175 | $2 | $30 | $49 | $3 | $258 |
| **Mercury Vapor Lamp** | | | | | | | | | | | | | | | | | | | |
| Existing or Prepaid Standard Metal Poles | | | | | | | | | | | | | | | | | | | |
| 21500 Flood | 6 | 1,864 | $103.41 | 11,184 | $620 | $31 | $262 | $425 | $26 | $1,363 | 1897 | $153.08 | 11,382 | $701 | $14 | $266 | $433 | $26 | $1,440 |
| Lighting only Standard Metal Poles | | | | | | | | | | | | | | | | | | | |
| 4200 Streetlight | 2 | 511 | $143.76 | 1,022 | $288 | $5 | $39 | $59 | $5 | $355 | 561 | $311.17 | 1,122 | $603 | $1 | $36 | $43 | $5 | $676 |
| 21500 Streetlight | 16 | 1,864 | $191.76 | 29,824 | $5,005 | $81 | $598 | $1,133 | $69 | $5,049 | 1897 | $375.58 | 30,352 | $710 | $37 | $710 | $1,135 | $37 | $27,417 |
| 21500 Streetlight-Twin | 6 | 3,729 | $278.38 | 11,184 | $582 | $3 | $32 | $425 | $16 | $1,578 | 3794 | $497.99 | 11,382 | $1,332 | $14 | $286 | $413 | $126 | $2,031 |
| Existing or Prepaid Wood Poles | | | | | | | | | | | | | | | | | | | |
| 4200 Streetlight | 27 | 511 | $54.01 | 13,797 | $1,458 | $38 | $324 | $524 | $32 | $2,175 | 561 | $58.40 | 15,147 | $1,295 | $19 | $354 | $576 | $35 | $2,278 |
| 21500 Streetlight | 1 | 1,864 | $102.00 | 1,864 | $102 | $5 | $47 | $71 | $4 | $226 | 1897 | $123.31 | 1,897 | $87 | $2 | $44 | $72 | $4 | $210 |
| Lighting only Wood Poles | | | | | | | | | | | | | | | | | | | |
| 4200 Streetlight | 55 | 511 | $105.59 | 28,105 | $3,807 | $77 | $658 | $1,068 | $65 | $7,674 | 561 | $111.85 | 30,855 | $5,688 | $38 | $722 | $1,172 | $71 | $37,691 |
| 6900 Streetlight | 13 | 822 | $115.53 | 10,686 | $1,502 | $29 | $250 | $406 | $52 | $7,212 | 908 | $126.52 | 11,804 | $1,421 | $15 | $276 | $440 | $40 | $3,188 |
| 12100 Streetlight | 19 | 1,180 | $136.95 | 22,420 | $2,602 | $61 | $535 | $853 | $52 | $5,091 | 908 | $126.52 | 17,252 | $2,077 | $21 | $404 | $656 | $40 | $3,188 |
| 12100 Streetlight-Twin | 6 | 2,359 | $186.86 | 14,154 | $1,721 | $39 | $331 | $539 | $33 | $5,261 | 1116 | $136.95 | 10,896 | $979 | $13 | $255 | $414 | $25 | $1,687 |
| 21500 Streetlight | 231 | 1,864 | $193.38 | 430,584 | $35,677 | $1,178 | $10,076 | $16,562 | $999 | $64,081 | 1897 | $175.76 | 438,307 | $10,214 | $939 | $10,652 | $16,652 | $15,008 | $81,687 |
| 21500 Streetlight-Twin | 25 | 3,568 | $235.30 | 89,574 | $6,118 | $295 | $2,264 | $3,683 | $223 | $12,557 | 3794 | $300.07 | 93,864 | $5,966 | $121 | $2,308 | $3,748 | $91,260 | $61,260 |
| 63000 Streetlight | 7 | 4,463 | $245.38 | 31,241 | $1,718 | $93 | $731 | $1,147 | $72 | $5,039 | 4569 | $318.17 | 31,983 | $1,632 | $39 | $748 | $1,215 | $74 | $12,311 |
| Existing or Prepaid Poles less than 15 ft. | | | | | | | | | | | | | | | | | | | |
| 4200 T&C | 14 | 511 | $54.54 | 7,654 | $764 | $20 | $167 | $272 | $16 | $1,239 | 561 | $58.40 | 7,854 | $671 | $10 | $184 | $298 | $18 | $1,181 |
| **Total Underground** | 824 | | | 921,607 | $69,691 | $2,531 | $21,612 | $35,097 | $2,124 | $151,048 | | | 937,672 | $92,005 | $1,154 | $21,946 | $35,559 | $2,157 | $152,901 |
| **Total Overhead and Underground** | 6,234 | | | 5,614,941 | $479,974 | $15,329 | $131,281 | $213,369 | $12,916 | $852,977 | | | 5,720,045 | $479,833 | $7,073 | $194,551 | $218,502 | $13,225 | $853,283 |

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Workpaper JMM-4

Workpaper JMM-4

Transmission Back-up

Confidential

189
NEC092442

C:\123data\JAMES\M&A\BASE\tranwork.WK4
Range:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Workpaper JMM - 4
Page 1 of 1

### The Narragansett Electric Company
### Calculation of Projected Transmission Expenses
### (based on 1998 actual expenses and coincident peak data)

|  | Narragansett | Blackstone | Newport |
|---|---|---|---|
| 1 NEP Tariff No. 9 Expenses | $17,271,638 | $2,584,364 | $1,081,211 |
| 2 NEPOOL Tariff No. 1 | $5,947,067 | $1,015,660 | $401,812 |
| 3 Total Transmission Expenses | $23,218,705 | $3,600,024 | $1,483,023 |

1 FERC Docket ER99-2832-000, Exhibit ____ (PAV-2), Statement BH
2 Average 1998 12 Month Coincident Peak Load * NEPOOL Rate in effect during Year 2 of transition

|  | CP Load | NEPOOL Rate | NEPOOL Charges |
|---|---|---|---|
| Narragansett Electric | 838,570 | $7.02 | $5,883,405 |
| New England Power for Narragansett | 13,792 | $4.62 | $63,662 |
| Blackstone Valley Electric | 220,030 | $4.62 | $1,015,660 |
| Newport Electric | 87,048 | $4.62 | $401,812 |

3 Line (1) + Line (2)

Confidential

Testimony of
James J. Bonner, Jr.

Confidential

THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
RHODE ISLAND PUBLIC UTILITIES COMMISSION

|  |  |
|---|---|
| Narragansett Electric Company ) | R.I.P.U.C. No. _____ |
| Blackstone Valley Electric Company ) | |
| Newport Electric Corporation ) | |

DIRECT TESTIMONY

OF

JAMES J. BONNER, JR.

Confidential

THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
RHODE ISLAND PUBLIC UTILITIES COMMISSION

Narragansett Electric Company          )
Blackstone Valley Electric Company     )          R.I.P.U.C. No. _____
Newport Electric Corporation           )
                                       )

DIRECT TESTIMONY

OF

JAMES J. BONNER, JR.

Table of Contents

I.    Introduction and Qualifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.   Purpose of Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
III.  Mapping of Blackstone/Newport's Customers to Narragansett's Rates . . . . . . . . . . . . 4
IV.   Derivation of Billing Determinants for Blackstone/Newport's Customers
      Under Narragansett's Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 1 of 22

1    I.    **Introduction and Qualifications.**

2    Q.    Please state your full name and business address.

3    A.    My name is James J. Bonner, Jr.   My business address is 750 West Center Street, West

4         Bridgewater, Massachusetts.

5

6    Q.    Please state your present position and responsibilities.

7    A.    I am Manager of Retail Pricing and Rate Administration for EUA Service Corporation.

8         My responsibilities include the direct supervision of EUA Service Corporation's Retail

9         Pricing and Rate Administration supervisor and staff.  Among the responsibilities of that

10        staff are the study, analysis, and design of retail delivery electric service rates for

11        Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation

12        ("Newport") (collectively "Blackstone/Newport").

13

14    Q.    Please describe your educational background and work experience.

15    A.    I graduated from Northeastern University in 1976 with a Bachelor of Science degree in

16        Electrical Engineering (Power Systems).  I attended the Edison Electric Institute's ("EEI")

17        Rate Fundamentals Course at Indiana University in November 1985 and the EEI

18        Advanced Rate Course at Indiana University in August 1986 and in August 1988.  I was

19        Chairman of the Electric Council of New England's Rate and Regulatory Committee from

20        1993 through 1995.

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 2 of 22

1      From August 1976 through February 1983, I was employed by the Belcher Division of

2      Dayton Malleable Inc., a malleable iron foundry located in Easton, Massachusetts, as Plant

3      Engineer.  My duties included plant maintenance management, energy management,

4      capital budgeting, and production engineering.

5

6      In March 1983, I joined Eastern Edison Company ("Eastern") as Consumer Service

7      Engineer for the Brockton Division.  In that capacity, I served as Eastern's representative

8      for its fifty largest commercial-industrial customers in the Brockton Division's service area

9      and as a staff assistant to the Consumer Service Manager.

10

11     I transferred to the Rate Department of EUA Service Corporation in February 1985 as an

12     Associate Rate Engineer.  I was promoted to Rate Engineer in February 1987, to Senior

13     Rate Engineer in February 1989, to Supervisor of Rate Design in January 1991, and to

14     Manager of Retail Pricing and Rate Administration in January 1999.

15

16     Since assuming the position of Supervisor of Rate Design in 1991, I have supervised the

17     preparation of Blackstone/Newport's retail rates approved by the Commission in

18     subsequent regulatory proceedings.

19

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 3 of 22

1    Q.    Have you previously testified before the Commission?

2    A.    Yes, I have testified before the Commission on numerous occasions.  Most recently, I

3           testified in support of Blackstone/Newport's proposed Standard Offer Service tariffs in

4           Docket No. 2716 in May 1998.

5

6    Q.    Were the schedules attached to your direct testimony prepared by you or under your

7           supervision and direction?

8    A.    Yes, they were.

9

10    **II.**    **Purpose of Testimony**

11    Q.    What is the purpose of your testimony?

12    A.    The purpose of my testimony is to present and support the mapping of

13           Blackstone/Newport's customers under Blackstone/Newport's rates to Narragansett

14           Electric Company's ("Narragansett's") rates and the derivation of the billing determinants

15           for Blackstone/Newport's customers mapped to Narragansett's rates.  Mr. Molloy makes

16           use of this mapping and these billing determinants in his testimony and exhibits regarding

17           the Narragansett/Blackstone/Newport merger rate plan.

18

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 4 of 22

| | | |
|---|---|---|
| 1 | Q. | Please explain how you have organized your testimony. |
| 2 | A. | My testimony is organized as follows: (1) An explanation of the mapping process used to |
| 3 | | cross match the schedule of rates between Blackstone/Newport and Narragansett, and (2) |
| 4 | | an explanation of the derivation of the billing determinants used for transferring |
| 5 | | Blackstone/Newport's customers to Narragansett's rates. |
| 6 | | |
| 7 | **III.** | **Mapping of Blackstone/Newport's Customers to Narragansett's Rates** |
| 8 | Q. | Please describe how Blackstone/Newport's customers were mapped to Narragansett's |
| 9 | | rates. |
| 10 | A. | A mapping of Blackstone/Newport's current rates to Narragansett's current rates was |
| 11 | | performed by cross matching the availability provisions of Blackstone/Newport's rates and |
| 12 | | Narragansett's rates. Exhibit JJB-1 and Exhibit JJB-2 show comparisons of the availability |
| 13 | | provisions of Blackstone/Newport's and Narragansett's rates.  Mr. Molloy in his Exhibit |
| 14 | | JMM-2 provides a summary of the cross matching of Blackstone/Newport's rates to |
| 15 | | Narragansett's. |
| 16 | | |
| 17 | | Although Blackstone/Newport's schedule of rates is roughly comparable to Narragansett's |
| 18 | | schedule of rates, Blackstone/Newport's scheme is not the same as Narragansett's. |
| 19 | | Blackstone/Newport has, in some customer classes, more available rates than |
| 20 | | Narragansett—in others, less.  Blackstone/Newport uses distribution service voltage level |

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 5 of 22

1      and billing determinant breakpoints to subdivide its general service customers among

2      several rate classes. Narragansett uses only billing determinant breakpoints to subdivide

3      its general service customers among several rate classes, and these breakpoints differ from

4      Blackstone/Newport's. Narragansett has more auxiliary service and lighting service rates

5      than does Blackstone/Newport. Blackstone and Newport used rate riders for economic

6      development purposes, while Narragansett used provisions in their base rate tariffs.

7      Finally Blackstone/Newport offers more supplementary[1] rates than does Narragansett

8      (three rates to one).

9

10   Q.     How were the determinants for the rate mapping scheme developed?

11   A.     Blackstone/Newport based the mapping of Blackstone/Newport's rates to Narragansett's

12      rates on its customer billing information for calendar year 1998. For each of

13      Blackstone/Newport's rate classes, the number of bills rendered and annual energy

14      consumption were determined. In addition, monthly billing demands and annual peak and

15      off-peak energy consumption were determined when applicable. In many cases, especially

16      for those current Blackstone/Newport rate classes that were subdivided into two or more

---

[1]    A supplementary rate is a rate that is available only to customers who also receive part of their electric service under another rate, called a principal rate. A principal rate can be the only rate under which a customer receives service at a given location, but a supplementary rate cannot. For example, Blackstone/Newport's Controlled Water Heating Service Rate W-1 is a supplementary rate. To be eligible for Rate W-1, a customer must also receive service under one or more of Blackstone/Newport's residential or general service rates at the same service location.

197
NEC092451

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 6 of 22

1    Narragansett rate classes, these determinants were required to be developed on a

2    customer-by-customer basis and transformed from Blackstone/Newport's definition of a

3    determinant -- e.g., billing demand -- to Narragansett's definition of the same determinant.

4

5    Q.    Please describe Blackstone and Newport's Schedule of Rates.

6    A.    Blackstone and Newport's Schedule of Rates are similar but not identical. Exhibit JJB-1

7          and Exhibit JJB-2 provide a brief description of the availabilities of Blackstone's and

8          Newport's rates, respectively.

9

10         In addition to the above referenced rates, Blackstone/Newport's Schedule of Rates

11         contains the following rate riders, terms and conditions, generation services, and

12         adjustment clauses:

13              Late Payment Charge[2]

14              Economic Development Rate Rider ED[3]

15              Economic Development Rate Rider EDR

16              Economic Development Rate Rider VSR

17              Economic Development Rate Rider DIR[4]

18              Terms and Conditions for Electric Service

---

[2] Blackstone only.
[3] Id.
[4] Newport only.

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 7 of 22

1           Terms and Conditions for Electric Power Suppliers

2           Last Resort Service

3           Standard Offer Service

4           Transition Cost Adjustment Clause

5

6   Q.   Please describe Narragansett's Schedule of Rates.

7   A.   Exhibit JJB-1 and Exhibit JJB-2 provide a brief description of the availabilities of

8        Narragansett's rates.

9

10       In addition to the above referenced rates, Narragansett's Schedule of Rates contains the

11      following terms and conditions, adjustment provisions, and generation service tariffs:

12          Terms and Conditions

13          Terms and Conditions for Nonregulated Power Producers

14          Transmission Service Charge Adjustment Provision

15          Transition Charge Adjustment Provision

16          Standard Offer Adjustment Provision

17          Conservation and Load Management Adjustment Provision

18          Tariff for Standard Offer Service

19          Tariff for Last Resort Service

20

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 8 of 22

1   Q.   How were Blackstone/Newport's residential rates mapped to Narragansett's residential

2        rates?

3   A.   Blackstone/Newport's residential rates are available only to residential customers for

4        domestic purposes. Rate R-1 is the basic residential retail delivery service rate, Rate R-2

5        is restricted to low-income customers, and Rate R-4 is Blackstone/Newport's time-of-use

6        residential rate. For Blackstone customers, Rate R-3 is available to certain electric space

7        heating customers. This rate was closed to new customers in 1984.

8

9        Like Blackstone/Newport, Narragansett's residential rates are available to residential

10       customers for domestic purposes. In addition, farms and churches are eligible to receive

11       service under Narragansett's residential rates. Rate A-16 is Narragansett's basic

12       residential retail delivery service rate, Rate A-60 is restricted to low-income customers,

13       and Rate A-32 is Narragansett's large-use residential rate.

14

15       As shown on Exhibit JMM-2, Blackstone/Newport's Rates R-1 and the residential portion

16       of W-1 were mapped to Narragansett's Rate A-16. Blackstone/Newport's Rate R-2 was

17       mapped to Narragansett's Rate A-60. Blackstone's Rate R-3 was mapped to

18       Narragansett's Rate A-16. Blackstone/Newport's Rate R-4 was mapped to

19       Narragansett's Rate A-32.

20

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 9 of 22

1    Q.    Were any of Blackstone/Newport's residential customers mapped to Narragansett's

2          Rates A-18 and E-30?

3    A.    No.  Those Narragansett rates, Residential Water Heating Control Rate A-18 and

4          Residential Storage Heating Rate E-30, are closed to new customers.

5

6    Q.    Briefly describe Blackstone/Newport's general service rate scheme.

7    A.    Blackstone/Newport's "G" and "T" series rates form the main sequence of

8          Blackstone/Newport's general service tariffs.  The "G" and "T" series rates are divided

9          into two groups:  (1) Secondary distribution voltage rates—Rates G-1, G-2, T-2, and T-4,

10         and (2) primary distribution voltage rates—Rates G-5, T-5, and T-6.  The available

11         provisions in the "G" and "T" series rates for Blackstone differ somewhat from Newport's.

12

13         For Blackstone, the availability of the secondary distribution voltage rates is as follows:

14         Rate G-1 is available to customers whose annual maximum monthly demand is less than

15         10 kW and whose annual energy consumption is less than 36,000 kWh.  Rate G-2 is

16         available to customers whose annual maximum monthly demand is at least 10 kW but less

17         than 500 kW or whose annual energy consumption is 36,000 kWh or more.  For Newport,

18         the availability of the secondary voltage rates is as follows: Rate G-1 is available to

19         customers whose average monthly demand is less than 500 kW and whose annual energy

20         consumption is less than 54,000 kWh.  Rate G-2 is available to customers whose average

Confidential

1    monthly demand is less than 500 kW and whose annual energy consumption is 54,000

2    kWh or more.  For both Blackstone and Newport, Rate T-4 is mandatory for customers

3    whose monthly demand is 500 kW or more.

4

5    For Blackstone's general service customers served at primary distribution voltage, Rate

6    G-5 is available to customers whose annual maximum monthly demand is at least 10 kW

7    but less than 500 kW or whose annual energy consumption is 36,000 kWh or more.  Rate

8    T-5 is an optional time-of-use rate for Rate G-5 customers.  Rate T-6 is mandatory for

9    customers whose annual maximum monthly demand is 500 kW or more.

10

11    For Newport's general service customers served at primary voltage, Rate G-5 is available

12    to customers whose average monthly demand is at least 15 kW but less than 500 kW or

13    whose annual energy consumption is 54,000 kWh or more.  Rate T-5 is an optional time-

14    of-use rate for Rate G-5 customers.  Rate T-6 is mandatory for customers whose average

15    monthly demand is 500 kW or more.  In addition, Newport offers Transmission Voltage

16    General Retail Delivery Service Rate C-1, which is applicable only to the U.S. Navy under

17    the terms of a special electric service contract originally executed in 1961 and was

18    amended to incorporate the C-1.

19

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 11 of 22

1    Q.    How does Narragansett's general service rate scheme compare to Blackstone/Newport's?

2    A.    Narragansett's general service rate scheme is generally comparable to

3          Blackstone/Newport's.  Narragansett offers six general service rates, Rates C-06, E-40,

4          G-02, G-32, G-62, and T-06.

5

6          Narragansett's main sequence of general service rates consists of Rates C-06, G-02, G-32,

7          and G-62.  These rates roughly correspond with Blackstone/Newport's "G" and "T" series

8          rates and apply to customers as follows:  Rate C-06 is a non-demand metered general

9          service rate available to customers whose monthly demand is 200 kW or less.  Rate G-02

10         is a non-time-differentiated demand metered rate available to customers whose monthly

11         demand is at least 10 kW but not more than 200 kW.  Rate G-32 is a time-differentiated

12         demand metered rate available to customers whose monthly demand is more than 200 kW

13         but less than 3,000 kW.  Rate G-62 is a time-differentiated demand metered rate available

14         to customers whose demand is 3,000 kW or greater.

15

16         In addition, Narragansett offers Storage Cooling Rate E-40 and Limited Service – All

17         Electric Living Rate T-06.  Blackstone/Newport does not offer a rate that corresponds to

18         Narragansett's Rate E-40; however, Blackstone/Newport's Rate H-1 is comparable to

19         Narragansett's Rate T-06.

20

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 12 of 22

1   Q.   How were Blackstone/Newport's general service rates mapped to Narragansett's general

2       service rates?

3   A.   As shown in Exhibit JMM-2, Blackstone/Newport's Rate G-1 was mapped to

4       Narragansett's Rate C-06. Blackstone/Newport's Rate G-2 was mapped to

5       Narragansett's Rates C-06, G-02, and G-32. Blackstone/Newport's Rate T-4 was

6       mapped to Narragansett's Rate G-32. Blackstone/Newport's Rate G-5 was mapped to

7       Narragansett's Rates G-02 and G-32. Blackstone/Newport's Rate T-6 was mapped to

8       Narragansett's Rate G-32 and G-62. Blackstone/Newport's Rate H-1 was mapped to

9       Narragansett's Rates C-06, G-02, and G-32. Newport's Rate C-1 was mapped to

10      Narragansett's Rate N-01, which is a new rate and is described in greater detail in Mr.

11      Molloy's testimony.

12

13   Q.   Were any of Blackstone/Newport's general service customers mapped to Narragansett's

14      Rates E-40 and T-06?

15   A.   No. Blackstone/Newport does not have any customers who qualify for Narragansett Rate

16      E-40, and Narragansett Rate T-06 is closed to new customers.

17

18   Q.   How were Blackstone/Newport's auxiliary service Rates A-4 and A-6 mapped to

19      Narragansett's rates?

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 13 of 22

1    A.    Blackstone/Newport offers two auxiliary service rates: Large Secondary Voltage Auxiliary

2          General Retail Delivery Service Rate A-4 and Large Primary Voltage Auxiliary General

3          Retail Delivery Service Rate A-6.

4

5          Narragansett's auxiliary service rate offerings are more extensive than

6          Blackstone/Newport's. Narragansett offers rates that are applicable to partial

7          requirements customers whose total electric service requirements exceed 30 kW, while

8          Blackstone/Newport offers rates that are applicable to partial requirements customers

9          whose total electric service requirements exceed 500 kW.

10

11         The availability provisions of Narragansett's auxiliary rates, their "B" series rates,

12         correspond with the availability provisions of the general service rates having the same

13         numerical suffix. Thus, Narragansett's Rate B-06 is available to customers who supply

14         part of their load from on-site generation and who would otherwise be served by

15         Narragansett's Rate C-06. Likewise, Narragansett's Rate B-32 is available to partial

16         requirements customers who would otherwise be served by Narragansett's Rate G-32.

17         And, Narragansett's Rate B-62 is available to partial requirements customers who would

18         otherwise be served by Narragansett's Rate G-62.

19

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 14 of 22

1          Blackstone/Newport's Rate A-4 would be mapped to Narragansett's Rate B-06; however,

2          there are no customers on this rate; Blackstone/Newport's Rate A-6 was mapped to

3          Narragansett's Rate B-32.

4

5    Q.    How were Blackstone/Newport's supplementary service rates mapped to Narragansett's

6          rates?

7    A.    To determine the proper mapping of Blackstone/Newport's customers who receive part of

8          their service under a supplementary rate, the supplementary rate was paired with the

9          principal rate for each customer.  The supplementary rate was then mapped to the

10        Narragansett rate that corresponded to the customer's principal rate.  Thus, the residential

11        portion of Blackstone/Newport's Rate W-1 was mapped to Narragansett's Rate A-16, and

12        the non-residential portion of Blackstone/Newport's Rate W-1 was mapped to

13        Narragansett's Rate C-06.  Blackstone's Rate H-2 was mapped to three of Narragansett's

14        rates:  Rates C-06, G-02, and G-32.  Newport's Rate H-2 was mapped to two of

15        Narragansett's rates:  Rates C-06 and G-02.

16

17    Q.    Were any Blackstone/Newport supplementary rates mapped to Narragansett's

18        supplementary rate, Rate V-02?

19    A.    No.  Although Limited Service – Business Space Heating Rate V-02 is comparable to

20        Blackstone/Newport's Rate H-2, it is closed to new customers.

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 15 of 22

1   Q.   How was Blackstone/Newport's lighting service rate mapped to Narragansett's lighting

2       service rates?

3   A.   Blackstone/Newport offers only one lighting service rate to its customers, Rate S-1.

4       Blackstone/Newport's Rate S-1 provides customers with a wide choice of lighting fixtures

5       (streetlights, floodlights, and area lights) mounted on distribution or specialty lighting

6       poles served from overhead or underground conductors.  All lighting equipment

7       (luminaires, poles, conductors, etc.) required to provide service under Rate S-1 is

8       furnished, installed, owned, and maintained by Blackstone/Newport.  For certain fixture-

9       pole combinations, Blackstone/Newport permits customers to pay the initial cost of

10      installation by a contribution in aid of construction to obtain a lower monthly rate.

11

12      Although it appears that Narragansett offers more lighting rates than does

13      Blackstone/Newport, in fact, Narragansett offers only one.  Three of Narragansett's

14      lighting rates are frozen: Rates R-02, S-10, and S-12.  Only Rate S-14 is currently

15      available for new installations.

16

17      Blackstone/Newport's Rate S-1 was mapped to Narragansett's Rate S-14.

18

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 16 of 22

1  **IV.**  **Derivation of Billing Determinants for Blackstone/Newport's Customers**
2        **Under Narragansett's Rates**
3
4  Q.  Please summarize how billing determinants for Blackstone/Newport's customers under

5       Narragansett's rates were derived.

6  A.  Billing determinants are customer usage parameters that are applied to the component

7       charges of a rate schedule to calculate a customer's bill.  Examples of commonly used

8       billing determinants are the number of bills, monthly energy consumption, and monthly

9       maximum demand.  The precise definition of a billing determinant is dependent upon the

10      rate to which it is applied.  Consequently, the derivation of billing determinants for a

11      customer to be transferred from one rate to another depends upon the rate to which the

12      customer is to be transferred.

13

14      In some cases, the billing determinants for Blackstone/Newport's customers under

15      Narragansett's rates are the same determinants Blackstone/Newport uses to bill these

16      same customers under its rates.  This is exactly the case for Blackstone/Newport's

17      customers served under Rates R-1, R-2, R-3, R-4, G-1, W-1, and S-1 that will be

18      transferred to Narragansett's Rates A-16, A-32, A-60, C-06, and S-14.

19

20      In all other cases, the billing determinants for Blackstone/Newport's customers under

21      Narragansett's rates had to be calculated or estimated, at least for some of the customers

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 17 of 22

1       being transferred from a particular Blackstone/Newport rate to a particular Narragansett

2       rate. All of Blackstone/Newport's customers served under its general service rates, other

3       than Rate G-1 customers, and all of Blackstone/Newport's customers served under its

4       supplementary rates required the calculation or estimation of billing determinants under

5       Narragansett's rates.

6

7       Exhibit JJB-3 and Exhibit JJB-4 show the billing determinants for each Blackstone and

8       Newport to Narragansett rate mapping, respectively. Each Blackstone/Newport rate

9       mapping is shown on a separate page, and, where appropriate, explanatory notes detailing

10      how the billing determinants were derived is included on the page.

11

12   Q.  Why was it necessary to estimate billing determinants for some customers?

13   A.  Estimated billing determinants, particularly billing demands, for customers were used

14      where Blackstone/Newport's definition of a billing determinant differs from

15      Narragansett's and/or where Blackstone/Newport does not record, or does not have

16      readily available, the data required to calculate the determinant. For example,

17      Blackstone/Newport's Rate H-1 non-demand metered customers transferring to

18      Narragansett's demand metered Rates G-02 and G-32 required the estimation of billing

19      demands. Exhibits JJB-3 and JJB-4 detail each instance where estimated determinants

20      were required.

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 18 of 22

1   Q.   In general, is Blackstone/Newport's definition of billing demand for its general service

2        rates substantially different from Narragansett's?

3   A.   Yes, it is. Although both companies define demand as a fifteen-minute integrated demand,

4        the determination of billing demand from raw demand data is generally more complicated

5        under Narragansett's rates than it is under Blackstone/Newport's rates.

6

7        Blackstone/Newport generally defines billing demand as the maximum demand over all

8        hours for non-time-differentiated rates and as the maximum demand within peak hours for

9        time-differentiated rates.

10

11       Narragansett generally determines billing demand as the largest of several demands. For

12       example, Narragansett defines billing demand for their Rate G-32 customers as the

13       greatest of the following:

14            (a)   The greatest fifteen-minute demand occurring in such month during Peak

15                  or Shoulder hours as measured in kilowatts,

16            (b)   80% of the greatest fifteen-minute demand occurring in such month during

17                  Peak or Shoulder hours as measured in kilovolt-amperes,

18            (c)   50% of the greatest fifteen-minute demand occurring in such month during

19                  Off-Peak Hours as measured in kilowatts,

210
NEC092464

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 19 of 22

1      (d)     40% of the greatest fifteen-minute demand occurring in such month during

2                    Off-Peak Hours as measured in kilovolt-amperes,

3      (e)     75% of the greatest billing demand as determined above during the

4                    preceding eleven months, or

5      (f)     10 kilowatts.

6     Similar "greatest of" criteria are used to determine billing demand under other

7     Narragansett demand metered rates.

8

9   Q.     Is Blackstone/Newport's definition of time periods for its time-differentiated general

10     service rates substantially different from Narragansett's?

11   A.     Yes, it is. Blackstone/Newport use a two-part definition with relatively short peak hour

12     periods. Narragansett uses a three-part time period definition and relatively long peak-

13     shoulder hour periods.

14

15     Blackstone defines its time periods for all time-differentiated rates as follows:

16            Peak Hours

17            Monday through Friday excluding holidays:

18            April through September,     11:00 a.m. to 4:00 p.m.

19            October through March,     8:00 a.m. to 12:00 noon, and

20                                   4:00 p.m. to 7:00 p.m.

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 20 of 22

1       Off-Peak Hours

2           All other hours.

3   Newport's time periods are slightly differ from Blackstone's and are as follows for all

4   time-differentiated rates:

5           Peak Hours

6           Monday through Friday excluding holidays:

7           May through September,      10:00 a.m. to  4:00 p.m.

8           October through April,      9:00 a.m. to 12:00 noon, and

9                                       5:00 p.m. to  8:00 p.m.

10          Off-Peak Hours

11          All other hours.

12  Narragansett defines its time periods as follows:

13          Peak Hours

14          Monday through Friday excluding holidays:

15          June through September,     9:00 a.m. to 6:00 p.m.

16          December through February, 8:00 a.m. to 8:00 p.m.

17          Shoulder Hours

18          Monday through Friday excluding holidays:

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 21 of 22

| | | |
|---|---|---|
| 1 | June through September, | 8:00 a.m. to 9:00 a.m., and |
| 2 | | 6:00 p.m. to 10:00 p.m. |
| 3 | December through February, | 7:00 a.m. to 8:00 a.m. and |
| 4 | | 8:00 p.m. to 10:00 p.m. |
| 5 | October through November and March through May, | |
| 6 | | 8:00 a.m. to 9:00 p.m. |

7    Off-Peak Hours

8         All other hours.

9    All companies define holidays as follows:

| | | |
|---|---|---|
| 10 | New Year's Day | Columbus Day |
| 11 | President's Day | Veteran's Day |
| 12 | Memorial Day | Thanksgiving Day |
| 13 | Independence Day | Christmas Day |
| 14 | Labor Day | |

15

16   Q.   Are the differences in the definition of billing demand and TOU time periods between

17        Blackstone/Newport and Narragansett taken into consideration in the estimation of billing

18        determinants for affected rate classes.

213
NEC092467

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Testimony of J. J. Bonner
Page 22 of 22

1    A.    Yes.  As shown in Exhibit JJB-3 and Exhibit JJB-4, these definitional differences are taken

2          into account.  Where such considerations were material, they are so noted on the

3          individual pages of the exhibit.

4

5    Q.    Does this conclude your testimony?

6    A.    Yes, it does.

Exhibits of
James J. Bonner, Jr.

Confidential

NEC092469

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____

Exhibits
of
James J. Bonner, Jr.

JJB-1   Blackstone - Comparison of Availability Provisions of Rates

JJB-2   Newport - Comparison of Availability Provisions of Rates

JJB-3   Blackstone - Billing Determinants

JJB-4   Newport - Billing Determinants

Confidential

215

NEC092470

Exhibit JJB-1

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No._____
Exhibit JJB-1

Exhibit JJB-1

Blackstone - Comparison of Availability Provisions of Rates

Confidential

Narragansett Electric Company
Blackstone Valley Electric Company
R.I.P.U.C. Docket No. ____
Exhibit JJB-1
Page 1 of 7

**The Narragansett Electric Company**
**Blackstone Valley Electric Company**

**Comparison of Availability Provisions of Rates**

| **Blackstone's Rate** | **Narragansett's Rate** |
|---|---|

**Residential Retail Delivery Service Rate R-1**

Available only to residential customers whose energy consumption is < 30,000 kWh.

**Basic Residential Rate A-16**

Available for all domestic purposes in an individual private dwelling or an individual private apartment. Notwithstanding the foregoing, service is not available under this rate for any customer required to take service on the Residential Time-of-Use Rate A-32. Service is also available for farm customers where all electricity is delivered by the Company.

**Residential Water Heating Control Rate A-18**

This rate is closed to new customers as of January 1, 1998. Available for all domestic purposes wherein the customer has installed and has in regular operation an electric water heater.

**Residential SSI Retail Delivery Service Rate R-2**

Available to residential Customers that meet the following criteria:
1. Must be the head of a household or principal wage earner.
2. Must be presently receiving Supplemental Security Income from the Social Security Administration or one of the following from the appropriate Rhode Island agencies: Medicaid, Food Stamps, General Public Assistance or Aid to Families with Dependent Children.

**Low Income Rate A-60**

Available only to currently qualified customers for all domestic purposes in an individual private dwelling or an individual apartment, providing such customer meets both of the following criteria:
1. Must be the head of a household or principal wage earner.
2. Must be presently receiving Supplemental Security Income from the Social Security Administration or one of the following from the appropriate Rhode Island agencies: Medicaid, Food Stamps, General Public Assistance or Aid to Families with Dependent Children.

**Residential Space Heating Retail Delivery Service Rate R-3**

Closed to new customers. Available only yo residential customers where electricity is the sole source of energy used for comfort heating and water heating and energy consumption is <30,000 kWh.

Confidential

217
NEC092473

Narragansett Electric Company
Blackstone Valley Electric Company
R.I.P.U.C. Docket No. _____
Exhibit JJB-1
Page 2 of 7

| Blackstone's Rate | Narragansett's Rate |
|---|---|

**Large Residential Retail Delivery Service Rate R-4**

Available to residential customers whose actual or estimated energy consumption is at least 6,000 kWh but < 30,000 kWh.

**Residential Time-of-Use Rate A-32**

Available for all domestic purposes in an individual private dwelling or an individual private apartment. Service is also available for farm customers where delivery is provided by the Company. A church and adjacent buildings owned and operated by the church may be served under this rate, but any such buildings separated by public ways must be billed separately.

The Company will require any Customer taking service on the Basic Residential Rate A-16 or the Residential Water Heater Control Rate A-18 to take service on this rate if the Customer's usage for the previous 12 months exceeds 30,000 kWh. The Company will require any new customer to take service under this rate if the Company estimates that the Customer's annual usage will exceed 30,000 kWh. A Customer who has been placed on this rate pursuant to this paragraph may transfer to another available rate if the Customer's usage for the previous 12 months is less than 24,000 kWh.

**Residential Storage Heating Rate E-30**

Available to customers who were served under Limited Residential Service - Storage Heating (E-01) on July 1, 1990.

**General C&I Back-up Service Rate B-02**

Apply to Customers in the class identified below: (I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to an applicable retail delivery tariff, and (ii) who expect the Company to provide retail delivery service to supply the Customer's load at the

service location when the Generation Units are not supplying all of that load.

Narragansett Electric Company
Blackstone Valley Electric Company
R.I.P.U.C. Docket No. _____
Exhibit JJB-1
Page 3 of 7

| Blackstone's Rate | Narragansett's Rate |
|---|---|

**Small Secondary Voltage General Retail Delivery Service Rate G-1**

Available to customers whose actual or estimated average monthly demand is less than 500 kW and annual energy consumption is less than 54,000 kWh.

**Small C&I Rate C-06**

Available for all purposes. The Company may require any customer with a 12-month average demand greater than 200 kW to take service on the 200 kW Demand Rate G-32. If any electricity is delivered hereunder at a given location, then all electricity delivered by the Company at such location shall be delivered hereunder, except such electricity as may be delivered under the provisions of the Limited Service - Business Space Heating (V-02) rate.

**Storage Cooling Rate E-40**

Available to any customer solely for use in operating a full storage air conditioning system.

**Medium Secondary Voltage General Retail Delivery Service Rate G-2**

Available only to customers whose actual or estimated average monthly demand is less than 500 kW and whose actual or estimated annual energy consumption is 54,000 kWh or more.

**General C&I Rate G-02**

Available for all purposes to customers with a Demand of 10 kW or more. The Company may require any customer with a 12-month average Demand greater than 200 kW to take service on the 200 kW Demand Rate G-32.

**Medium Primary Voltage General Retail Delivery Service Rate G-5**

Available only to customers whose actual or estimated average monthly demand is at least 15 kW but less than 500 kW or whose actual or estimated annual energy consumption is 54,000 kWh or more.

**200 kW Demand Rate G-32**

The Company shall place on this rate any customer who has a 12-month average Demand of 200 kW or greater for 3 consecutive months as soon as practicable.

**Large Secondary Voltage General Retail Delivery Service Rate T-4**

Mandatory for all customers whose actual or estimated average monthly demand is 500 kW or more.

219
NEC092475

Narragansett Electric Company
Blackstone Valley Electric Company
R.I.P.U.C. Docket No. _____
Exhibit JJB-1
Page 4 of 7

| Blackstone's Rate | Narragansett's Rate |
|---|---|
| **Large Primary Voltage General Retail Delivery Service Rate T-6** | **3000 kW Demand Rate G-62** |
| Mandatory for all customers whose actual or estimated average monthly demand is 500 kW or more. | The Company shall place on this rate any customer who has a 12-month maximum Demand of 3,000 kW or greater. Delivery service can be taken under this rate by customers who do not meet the qualifications on a voluntary basis. New Customers: Delivery service will initially be taken under this rate by any new customer who requests delivery service capability of 3,375 kVA or greater. Transfers From Rate G-62: Any customer whose 12-month maximum demand is less than 2,700 kW for twelve consecutive months may elect to transfer from the 3,000 kW Demand Rate G-62 to another available rate. |
| **Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4** | **Small C&I Back-up Service Rate B-06** |
| Available to any Customer served at secondary voltage, who furnishes its own electric power supply for all or part of its total electric retail delivery service requirements. | Apply to Customers in the class identified below: (I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to an applicable retail delivery tariff, and (ii) who expect the Company to provide retail delivery service to supply the Customer's load at the service location when the Generation Units are not supplying all of that load. Electric delivery service under this rate is applicable to those Customers being served by Generation Unit(s) installed on or after April 1, 1998 and would otherwise be served under the Company's Small C&I Rate C-06 if the Generation Units were not supplying electricity to the Customer. This tariff shall not apply to customers with a contracted demand of 25 kVA or less. |

220
NEC092476

Narragansett Electric Company
Blackstone Valley Electric Company
R.I.P.U.C. Docket No. _____
Exhibit JJB-1
Page 5 of 7

**Blackstone's Rate**

**Narragansett's Rate**

**Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6**

Available to any Customer served at primary voltage, who furnishes its own electric power supply for all or part of its total electric retail delivery service requirements.

**200 kW Demand Back-up Service Rate B-32**

This service shall apply to Customers in the class identified below:
(I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to an applicable retail delivery tariff, and (ii) who expect the Company to provide retail delivery service to supply the Customer's load at the service location when the Generation Units are not supplying all of that load.

**3,000 kW Demand Back-up Service Rate B-62**

This service shall apply to Customers in the class identified below:
(I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to an applicable retail delivery tariff, and (ii) who expect the Company to provide retail delivery service to supply the Customer's load at the service location when the Generation Units are not supplying all of that load. Electric delivery service under this rate is applicable to those Customers being served by Generation Unit(s) installed on or after April 1, 1998 and would otherwise be served under the Company's 3,000 kW Demand Rate
G-62 if the Generation Units were not supplying electricity to the Customer. This tariff shall not apply to customers with a contracted demand of 25 kVA or less.

Narragansett Electric Company
Blackstone Valley Electric Company
R.I.P.U.C. Docket No. ____
Exhibit JJB-1
Page 6 of 7

**Blackstone's Rate**

**Narragansett's Rate**

**Limited Service – All Electric Living Rate T-06**

The availability of this rate is limited to those customers who were served under Limited Service – All Electric Living Rate T, on May 1, 1984 and have continuously been served under the All-Electric Living Rate since that date.

**Limited Service – Business Space Heating Rate V-02**

The availability of this rate is limited to those customers who were served under Limited Service – Business Space Heating Rate V on May 1, 1984 and have continuously been served under the Business Space Heating Rate since that date.

**General Space Heating Retail Delivery Service Rate H-1**

Closed to new Customers. Available only to Customers whose actual or estimated average monthly demand is < 500 kW that were taking service from the former Total Electric Living Rate –Limited, R.I.P.U.C. No. 205-L prior to April 1, 1988.

**General Heating Retail Delivery Service Rate H-2**

Closed to new Customers. Available to customers that were taking service under the Special Space Heating Provision – Limited of former General Service Rate R.I.P.U.C. No. 201-N prior to April 1, 1988.

**Controlled Water Heating Retail Delivery Service Rate W-1**

Closed to new Customers. Available to Customers that were taking retail delivery service from the Company under former Controlled Off-Peak Rate, R.I.P.U.C. No. 102-N before 10-28-92.

Confidential

Narragansett Electric Company
Blackstone Valley Electric Company
R.I.P.U.C. Docket No. ____
Exhibit JJB-1
Page 7 of 7

| Blackstone's Rate | Narragansett's Rate |
|---|---|
| | **Limited Traffic Signal Service Rate R-02** |
| | Availability of this rate is limited to the following customers and locations: those customers and locations who were served under Traffic Signal Rate R - R.I.P.U.C. No. 937 on May 10, 1992. |
| | **Limited Service – Private Lighting Rate S-10** |
| | Private lighting and floodlighting service is available under this rate to any Customer who prior to the date of this rate was served on Limited Service-Private Lighting Rate S-6, R.I.P.U.C. No. 872. There will be no new installations or relocations under this rate. |
| | **Limited Street Lighting Rate S-12** |
| | Street Lighting Service is available under this rate to any Customer who prior to the date of this rate was served on Limited Street Lighting Service (S-7), R.I.P.U.C. NO. 873. There will be no installations or relocations under this rate. |
| **Lighting Retail Delivery Service Rate S-1** | **General Streetlighting Service Rate S-14** |
| Available to all Customers where electricity is supplied to lighting equipment owned and maintained by the Company on Company owned poles, for dusk-to-dawn operation of approximately 4,000 burning hours per year. | Street Lighting Service is available under this rate to any city, town, or other public authority hereinafter referred to as the Customer, in accordance with the provisions and the specifications hereinafter set forth for all installations made after January 1, 1990. |
| | 1. For municipally-owned or accepted roadways, which includes those classified as "private ways" for which a municipality has agreed to supply street lighting service. |
| | 2. Service under this rate is contingent upon Company ownership and maintenance of street lighting equipment. |
| | 3. Service under this rate is not available for limited access highways or the access and egress ramps. |
| | 4. Service under this rate is available to private contractors for street lighting service for streets which have not yet been accepted by the municipality. |

Confidential

Exhibit JJB-2

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JJB-2

Exhibit JJB-2

Newport - Comparison of Availablity Provisions of Rates

Confidential

224
NEC092481

Narragansett Electric Company
Newport Electric Corporation
R.I.P.U.C. Docket No. ____
Exhibit JJB-2
Page 1 of 7

**The Narragansett Electric Company**
**Newport Electric Corporation**

**Comparison of Availability Provisions of Rates**

| Newport's Rate | Narragansett's Rate |
|---|---|
| **Residential Retail Delivery Service Rate R-1** | **Basic Residential Rate A-16** |
| Available only to residential customers whose energy consumption is < 30,000 kWh. | Available for all domestic purposes in an individual private dwelling or an individual private apartment. Notwithstanding the foregoing, service is not available under this rate for any customer required to take service on the Residential Time-of-Use Rate A-32. Service is also available for farm customers where all electricity is delivered by the Company. |
| | **Residential Water Heating Control Rate A-18** |
| | This rate is closed to new customers as of January 1, 1998. Available for all domestic purposes wherein the customer has installed and has in regular operation an electric water heater. |
| **Residential SSI Retail Delivery Service Rate R-2** | **Low Income Rate A-60** |
| Available to residential Customers that meet the following criteria: 1. Must be the head of a household or principal wage earner. 2. Must be presently receiving Supplemental Security Income from the Social Security Administration or one of the following from the appropriate Rhode Island agencies: Medicaid, Food Stamps, General Public Assistance or Aid to Families with Dependent Children. | Available only to currently qualified customers for all domestic purposes in an individual private dwelling or an individual apartment, providing such customer meets both of the following criteria: 1. Must be the head of a household or principal wage earner. 2. Must be presently receiving Supplemental Security Income from the Social Security Administration or one of the following from the appropriate Rhode Island agencies: Medicaid, Food Stamps, General Public Assistance or Aid to Families with Dependent Children. |

Confidential

Narragansett Electric Company
Newport Electric Corporation
R.I.P.U.C. Docket No. ____
Exhibit JJB-2
Page 2 of 7

| Newport's Rate | Narragansett's Rate |
|---|---|

**Large Residential Retail Delivery Service Rate R-4**

Available to residential customers whose actual or estimated energy consumption is at least 6,000 kWh but < 30,000 kWh.

**Residential Time-of-Use Rate A-32**

Available for all domestic purposes in an individual private dwelling or an individual private apartment. Service is also available for farm customers where delivery is provided by the Company. A church and adjacent buildings owned and operated by the church may be served under this rate, but any such buildings separated by public ways must be billed separately.

The Company will require any Customer taking service on the Basic Residential Rate A-16 or the Residential Water Heater Control Rate A-18 to take service on this rate if the Customer's usage for the previous 12 months exceeds 30,000 kWh. The Company will require any new customer to take service under this rate if the Company estimates that the Customer's annual usage will exceed 30,000 kWh. A Customer who has been placed on this rate pursuant to this paragraph may transfer to another available rate if the Customer's usage for the previous 12 months is less than 24,000 kWh.

**Residential Storage Heating Rate E-30**

Available to customers who were served under Limited Residential Service - Storage Heating (E-01) on July 1, 1990.

**General C&I Back-up Service Rate B-02**

Apply to Customers in the class identified below:
(I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to an applicable retail delivery tariff, and (ii) who expect the Company to provide retail delivery service to supply the Customer's load at the
service location when the Generation Units are not supplying all of that load.

Confidential

226

NEC092483

Narragansett Electric Company
Newport Electric Corporation
R.I.P.U.C. Docket No. _____
Exhibit JJB-2
Page 3 of 7

| Newport's Rate | Narragansett's Rate |
|---|---|
| **Small Secondary Voltage General Retail Delivery Service Rate G-1** | **Small C&I Rate C-06** |
| Available to customers whose actual or estimated average monthly demand is less than 500 kW and annual energy consumption is less than 54,000 kWh. | Available for all purposes. The Company may require any customer with a 12-month average demand greater than 200 kW to take service on the 200 kW Demand Rate G-32. If any electricity is delivered hereunder at a given location, then all electricity delivered by the Company at such location shall be delivered hereunder, except such electricity as may be delivered under the provisions of the Limited Service - Business Space Heating (V-02) rate. |
| | **Storage Cooling Rate E-40** |
| | Available to any customer solely for use in operating a full storage air conditioning system. |
| **Medium Secondary Voltage General Retail Delivery Service Rate G-2** | **General C&I Rate G-02** |
| Available only to customers whose actual or estimated average monthly demand is less than 500 kW and whose actual or estimated annual energy consumption is 54,000 kWh or more. | Available for all purposes to customers with a Demand of 10 kW or more. The Company may require any customer with a 12-month average Demand greater than 200 kW to take service on the 200 kW Demand Rate G-32. |
| **Medium Primary Voltage General Retail Delivery Service Rate G-5** | **200 kW Demand Rate G-32** |
| Available only to customers whose actual or estimated average monthly demand is at least 15 kW but less than 500 kW or whose actual or estimated annual energy consumption is 54,000 kWh or more. | The Company shall place on this rate any customer who has a 12-month average Demand of 200 kW or greater for 3 consecutive months as soon as practicable. |
| **Large Secondary Voltage General Retail Delivery Service Rate T-4** | |
| Mandatory for all customers whose actual or estimated average monthly demand is 500 kW or more. | |

Confidential

Narragansett Electric Company
Newport Electric Corporation
R.I.P.U.C. Docket No. _____
Exhibit JJB-2
Page 4 of 7

| Newport's Rate | Narragansett's Rate |
|---|---|
| **Large Primary Voltage General Retail Delivery Service Rate T-6** | **3000 kW Demand Rate G-62** |
| Mandatory for all customers whose actual or estimated average monthly demand is 500 kW or more. | The Company shall place on this rate any customer who has a 12-month maximum Demand of 3,000 kW or greater. Delivery service can be taken under this rate by customers who do not meet the qualifications on a voluntary basis.<br>New Customers: Delivery service will initially be taken under this rate by any new customer who requests delivery service capability of 3,375 kVA or greater. Transfers From Rate G-62: Any customer whose 12-month maximum demand is less than 2,700 kW for twelve consecutive months may elect to transfer from the 3,000 kW Demand Rate G-62 to another available rate. |
| **Transmission Voltage General Retail Delivery Service Rate C-1** | |
| Available only to the Dept. of the Navy under the provisions of the contract dated May 1, 1961. | |
| **Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4** | **Small C&I Back-up Service Rate B-06** |
| Available to any Customer served at secondary voltage, who furnishes its own electric power supply for all or part of its total electric retail delivery service requirements. | Apply to Customers in the class identified below:<br>(I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to<br>an applicable retail delivery tariff, and<br>(ii) who expect the Company to provide retail delivery service to supply the Customer's load at the service location when the Generation Units are not supplying all of that load.<br>Electric delivery service under this rate is applicable to those Customers being served by Generation Unit(s) installed on or after April 1, 1998 and would otherwise be served under the Company's Small C&I Rate C-06 if the Generation Units were not supplying electricity to the Customer. This tariff shall not apply to customers with a contracted demand of 25 kVA or less. |

Confidential

Narragansett Electric Company
Newport Electric Corporation
R.I.P.U.C. Docket No. ____
Exhibit JJB-2
Page 5 of 7

| Newport's Rate | Narragansett's Rate |
|---|---|
| **Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6** | **200 kW Demand Back-up Service Rate B-32** |
| Available to any Customer served at primary voltage, who furnishes its own electric power supply for all or part of its total electric retail delivery service requirements. | This service shall apply to Customers in the class identified below: (I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to an applicable retail delivery tariff, and (ii) who expect the Company to provide retail delivery service to supply the Customer's load at the service location when the Generation Units are not supplying all of that load. |

**3,000 kW Demand Back-up Service Rate B-62**

This service shall apply to Customers in the class identified below:
(I) who receive all or any portion of their electric supply from non-emergency generation unit(s) with a nameplate rating greater than 30 kW ("Generation Units"), where electricity received by the Customer from the Generation Units is not being delivered over Company-owned distribution facilities pursuant to an applicable retail delivery tariff, and (ii) who expect the Company to provide retail delivery service to supply the Customer's load at the service location when the Generation Units are not supplying all of that load. Electric delivery service under this rate is applicable to those Customers being served by Generation Unit(s) installed on or after April 1, 1998 and would otherwise be served under the Company's 3,000 kW Demand Rate G-62 if the Generation Units were not supplying electricity to the Customer. This tariff shall not apply to customers with a contracted demand of 25 kVA or less.

229
NEC092486

Narragansett Electric Company
Newport Electric Corporation
R.I.P.U.C. Docket No. _____
Exhibit JJB-2
Page 6 of 7

**Newport's Rate**

**Narragansett's Rate**

**Limited Service – All Electric Living Rate T-06**

The availability of this rate is limited to those customers who were served under Limited Service – All Electric Living Rate T, on May 1, 1984 and have continuously been served under the All-Electric Living Rate since that date.

**Limited Service – Business Space Heating Rate V-02**

The availability of this rate is limited to those customers who were served under Limited Service – Business Space Heating Rate V on May 1, 1984 and have continuously been served under the Business Space Heating Rate since that date.

**General Space Heating Retail Delivery Service Rate H-1**

Closed to new Customers. Available only to Customers whose actual or estimated average monthly demand is < 500 kW that were taking service from the former Total Electric Living Rate –Limited, R.I.P.U.C. No. 205-L prior to April 1, 1988.

**General Heating Retail Delivery Service Rate H-2**

Closed to new Customers. Available to customers that were taking service under the Special Space Heating Provision – Limited of former General Service Rate R.I.P.U.C. No. 201-N prior to April 1, 1988.

**Controlled Water Heating Retail Delivery Service Rate W-1**

Closed to new Customers. Available to Customers that were taking retail delivery service from the Company under former Controlled Off-Peak Rate, R.I.P.U.C. No. 102-N before 10-28-92.

Confidential

230
NEC092487

Narragansett Electric Company
Newport Electric Corporation
R.I.P.U.C. Docket No. ____
Exhibit JJB-2
Page 7 of 7

**Newport's Rate**

**Narragansett's Rate**

**Limited Traffic Signal Service Rate R-02**

Availability of this rate is limited to the following customers and locations: those customers and locations who were served under Traffic Signal Rate R - R.I.P.U.C. No. 937 on May 10, 1992.

**Limited Service – Private Lighting Rate S-10**

Private lighting and floodlighting service is available under this rate to any Customer who prior to the date of this rate was served on Limited Service-Private Lighting Rate S-6, R.I.P.U.C. No. 872. There will be no new installations or relocations under this rate.

**Limited Street Lighting Rate S-12**

Street Lighting Service is available under this rate to any Customer who prior to the date of this rate was
served on Limited Street Lighting Service (S-7), R.I.P.U.C. NO. 873. There will be no installations or relocations under this rate.

**Lighting Retail Delivery Service Rate S-1**

Available to all Customers where electricity is supplied to lighting equipment owned and maintained by the Company on Company owned poles, for dusk-to-dawn operation of approximately 4,000 burning hours per year.

**General Streetlighting Service Rate S-14**

Street Lighting Service is available under this rate to any city, town, or other public authority hereinafter
referred to as the Customer, in accordance with the provisions and the specifications hereinafter set forth for all installations made after January 1, 1990.
1. For municipally-owned or accepted roadways, which includes those classified as "private ways" for which a municipality has agreed to supply street lighting service.
2. Service under this rate is contingent upon Company ownership and maintenance of street lighting equipment.
3. Service under this rate is not available for limited access highways or the access and egress ramps.
4. Service under this rate is available to private contractors for street lighting service for streets which have not yet been accepted by the municipality.

Confidential

Exhibit JJB-3

Confidential

NEC092489

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JJB-3

Exhibit JJB-3

Blackstone - Billing Determinants

Confidential

C:\123data\JAMES\M&A\BASE\jbsch2.wk4
05/18/99

### Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

## Blackstone's Rate R-1 v. Narragansett's Rate A-16

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 876,261 | 876,261 |
| Energy (kWh) | 362,568,042 | 362,568,042 |

233
NEC092491

C:\123data\JAMES\M&A\BASE\Jjbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 2 of 16

### Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Blackstone's Rate R-2 v. Narragansett's Rate A-60

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 25,844 | 25,844 |
| Energy (kWh) | 10,464,104 | 10,464,104 |
| First 300 kWh | 6,540,065 | 6,540,065 |
| Excess 300 kWh | 3,924,039 | 3,924,039 |

234
NEC092492

C:\123data\JAMES\M&A\BASE\fjbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 3 of 16

### Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Blackstone's Rate R-3 v. Narragansett's Rate A-16

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 10,622 | 10,622 |
| Energy (kWh) | 9,162,722 | 9,162,722 |

Confidential

235
NEC092493

C:\123data\JAMES\M&A\BASE\jjbsch2.wk4
05/18/99

## Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

**Blackstone's Rate R-4 v. Narragansett's Rate A-32**

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 1,821 | 1,821 |
| Energy (kWh) | 4,487,447 | 4,487,447 |
| Peak Energy (kWh) | 815,510 | 0 |
| Off-Peak Energy (KWh) | 3,671,937 | 0 |

Confidential

C:\123data\JAMES\M&A\BASE\jbsch2.wk4
05/18/99

## Narragansett Electric Company
## Blackstone Valley Electric Company
## Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

**Blackstone's Rate G-1 v. Narragansett's Rate C-06**

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 87,619 | 85,368 |
| Unmetered | | 2,251 |
| Energy (kWh) | 43,670,643 | 43,670,643 |

Confidential

C:\123data\JAMES\M&A\BASE\ljbsch3.wk4
05/18/99

**Narragansett Electric Company**
**Blackstone Valley Electric Company**
**Apportionment of Company Billing Determinants**
**Year Ending December 31, 1998, Billing Determinants**

### Blackstone's Rate G-2: Total

| Billing Parameter | Blackstone's Billing Determinant |
|---|---|
| Bills | 31,059 |
| Demand (kW) | 1,140,854 |
| Energy (kWh) | 313,855,524 |

### Blackstone's Rate G-2 v. Narragansett's Rate C-06

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 17,427 | 17,427 |
| Demand (kW) | 293,038 | |
| Energy (kWh) | 55,207,092 | 55,207,092 |

### Blackstone's Rate G-2 v. Narragansett's Rate G-02

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 12,852 | 12,852 |
| Demand (kW) | 621,666 | 597,149 |
| Energy (kWh) | 189,662,772 | 189,662,772 |

### Blackstone's Rate G-2 v. Narragansett's Rate G-32

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 780 | 780 |
| Demand (kW) | 226,150 | 269,038 |
| Energy (kWh) | 68,985,660 | 68,985,660 |

Note:

1. For Blackstone's Rate G-2 customers apportioned to Narragansett's C-06, the revenue for each customer was calculation under both Narragansett's Rate C-06 and G-02. The Blackstone Rate G-2 customers were then transferred to the Narragansett rate producing the lower revenue.

Confidential

C:\123 data\JAMES\M&A\BASE\Jjbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 7 of 16

## Narragansett Electric Company
## Blackstone Valley Electric Company
## Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

### Blackstone's Rate G-5:   Total

| Billing Parameter | Blackstone's Billing Determinant |
|---|---|
| Bills | 394 |
| Demand (kW) | 73,140 |
| Energy (kWh) | 23,108,580 |

### Blackstone's Rate G-5 v. Narragansett's Rate G-02

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 228 | 228 |
| Demand (kW) | 20,540 | 27,078 |
| Energy (kWh) | 7,714,640 | 7,714,640 |

### Blackstone's Rate G-5 v. Narragansett's Rate G-32

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 166 | 166 |
| Demand (kW) | 52,600 | 58,829 |
| Energy (kWh) | 15,393,940 | 15,393,940 |

Note:

1. Blackstone's Rate G-5 determinants were apportioned among Narragansett Rates G-02 and G-32 based on the availability provisions of Narragansett's rates.

2. Narragansett's billing demands are estimated based upon Blackstone's Rate G-5 load research data using Narragansett TOU hours.

3. Billing demands used to determine whether a Blackstone Rate G-5 is to be transferred to Narragansett's Rate G-02 are the higher of each customer's actual demand or 75% of the highest demand in the previous 11 months less 10 kW.

4. Billing demands used to determine whether a Blackstone Rate G-5 customer is to be transferred to Narragansett's Rate G-32 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

Confidential

C:\123data\JAMES\M&A\BASE\jbsch3.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 8 of 16

### Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Blackstone's Rate T-2:  Total

| Billing Parameter | Blackstone's Billing Determinant |
|---|---|
| Bills | 856 |
| Demand (kW) | 110,812 |
| Energy (kWh) | 45,916,407 |
| Peak Energy (kWh) | 9,573,412 |
| Off-Peak Energy (kWh) | 36,342,995 |

#### Blackstone's Rate T-2 v. Narragansett's Rate C-06

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 54 | 54 |
| Demand (kW) | 707 | 1,888 |
| Energy (kWh) | 93,312 | 93,312 |
| Peak Energy (kWh) | 13,722 | 0 |
| Off-Peak Energy (kWh) | 79,590 | 0 |

#### Blackstone's Rate T-2 v. Narragansett's Rate G-02

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 551 | 551 |
| Demand (kW) | 31,864 | 24,796 |
| Energy (kWh) | 13,353,435 | 13,353,435 |
| Peak Energy (kWh) | 2,692,710 | 0 |
| Off-Peak Energy (kWh) | 10,660,725 | 0 |

#### Blackstone's Rate T-2 v. Narragansett's Rate G-32

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 251 | 251 |
| Demand (kW) | 78,241 | 99,892 |
| Energy (kWh) | 32,469,660 | 32,469,660 |
| Peak Energy (kWh) | 6,866,980 | 0 |
| Off-Peak Energy (kWh) | 25,602,680 | 0 |

Note:

1. For Blackstone's Rate T-2 customers apportioned to Narragansett's C-06, the revenue for each customer was calculation under both Narragansett's Rate C-06 and G-02.  The Blackstone Rate T-2 customers were then transferred to the Narragansett rate producing the lower revenue.

Confidential

C:\123data\JAMES\M&A\BASE\Jjbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 9 of 20

### Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Blackstone's Rate T-2:  Total

| Billing Parameter | Blackstone's Billing Determinant |
|---|---|
| Bills | 856 |
| Demand (kW) | 110,811 |
| Energy (kWh) | 45,916,407 |
| Peak Energy (kWh) | 9,573,412 |
| Off-Peak Energy (kWh) | 36,342,995 |

#### Blackstone's Rate T-2 v. Narragansett's Rate G-02

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 605 | 605 |
| Demand (kW) | 32,570 | 26,684 |
| Energy (kWh) | 13,446,747 | 13,446,747 |
| Peak Energy (kWh) | 2,706,432 | 0 |
| Off-Peak Energy (kWh) | 10,740,315 | 0 |

#### Blackstone's Rate T-2 v. Narragansett's Rate G-32

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 251 | 251 |
| Demand (kW) | 78,241 | 99,892 |
| Energy (kWh) | 32,469,660 | 32,469,660 |
| Peak Energy (kWh) | 6,866,980 | 0 |
| Off-Peak Energy (kWh) | 25,602,680 | 0 |

Note:

1. Blackstone's Rate T-2 determinants were apportioned among Narragansett Rates G-02 and G-32 based on the availability provisions of Narragansett's rates.

2. Narragansett's billing demands are estimated based upon Blackstone's Rate T-2 load research data using Narragansett TOU hours.

3. Billing demands used to determine whether a Blackstone Rate T-2 is to be transferred to Narragansett's Rate G-02 are the higher of each customer's actual demand or 75% of the highest demand in the previous 11 months less 10 kW.

4. Billing demands used to determine whether a Blackstone Rate T-2 customer is to be transferred to Narragansett's Rate G-32 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

Confidential

C:\123data\JAMES\M&A\BASE\jbxch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 9 of 16

### Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

**Blackstone's Rate T-4 v. Narragansett's Rate G-32**

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 372 | 372 |
| Demand (kW) | 195,414 | 225,770 |
| Energy (kWh) | 78,036,479 | 78,036,479 |
| Peak Energy (kWh) | 18,111,219 | 0 |
| Off-Peak Energy (kWh) | 59,925,260 | 0 |

Confidential

C:\123data\JAMES\M&A\BASE\jjbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 10 of 16

## Narragansett Electric Company
## Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

### Blackstone's Rate T-5:  Total

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant |
|---|---|
| Bills | 52 |
| Demand (kW) | 20,892 |
| Energy (kWh) | 8,474,950 |
| Peak Energy (kWh) | 2,007,100 |
| Off-Peak Energy (kWh) | 6,467,850 |

### Blackstone's Rate T-5 v. Narragansett's Rate G-02

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 7 | 7 |
| Demand (kW) | 358 | 288 |
| Energy (kWh) | 114,950 | 114,950 |
| Peak Energy (kWh) | 27,650 | 0 |
| Off-Peak Energy (kWh) | 87,300 | 0 |

### Blackstone's Rate T-5 v. Narragansett's Rate G-32

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 45 | 45 |
| Demand (kW) | 20,534 | 20,534 |
| Energy (kWh) | 8,360,000 | 8,360,000 |
| Peak Energy (kWh) | 1,979,450 | 0 |
| Off-Peak Energy (kWh) | 6,380,550 | 0 |

Note:

1. Blackstone's Rate T-5 determinants were apportioned among Narragansett Rates G-02 and G-32 based on the availability provisions of Narragansett's rates.

2. Narragansett's billing demands are estimated based upon Blackstone's Rate T-5 load research data using Narragansett TOU hours.

3. Billing demands used to determine whether a Blackstone Rate T-5 is to be transferred to Narragansett's Rate G-02 are the higher of each customer's actual demand or 75% of the highest demand in the previous 11 months less 10 kW.

4. Billing demands used to determine whether a Blackstone Rate T-5 customer is to be transferred to Narragansett's Rate G-32 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

Confidential

C:\123data\JAMES\M&A\BASE\jbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 11 of 16

## Narragansett Electric Company
## Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

**Blackstone's Rate T-6:   Total**

| Billing Parameter | Blackstone's Billing Determinant |
|---|---|
| Bills | 692 |
| Demand (kW) | 792,182 |
| Energy (kWh) | 369,857,394 |
| Peak Energy (kWh) | 78,028,788 |
| Off-Peak Energy (kWh) | 291,828,606 |

**Blackstone's Rate T-6 v. Narragansett's Rate G-32**

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 656 | 656 |
| Demand (kW) | 682,889 | 782,155 |
| Energy (kWh) | 300,621,894 | 300,621,894 |
| Peak Energy (kWh) | 66,237,289 | 0 |
| Off-Peak Energy (kWh) | 234,384,605 | 0 |

**Blackstone's Rate T-6 v. Narragansett's Rate G-62**

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 36 | 36 |
| Demand (kW) | 109,293 | 142,198 |
| Energy (kWh) | 69,235,500 | 69,235,500 |
| Peak Energy (kWh) | 11,791,499 | 0 |
| Off-Peak Energy (kWh) | 57,444,001 | 0 |

Note:

1. Blackstone's Rate T-6 determinants were apportioned among Narragansett Rates G-32 and G-62 based on the availability provisions of Narragansett's rates.

2. Billing demands used to determine whether a Blackstone Rate T-2 customer is to be transferred to Narragansett's Rate G-32 and G-62 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

Confidential

C:\123data\JAMES\M&A\BASE\Jjbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 12 of 16

## Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
#### Year Ending December 31, 1998, Billing Determinants

**Blackstone's Rate A-6 v. Narragansett's Rate B-32**

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---:|---:|
| Bills | 48 | 48 |
| Demand (kW) | 31,497 | 31,497 |
| Energy (kWh) | 6,085,455 | 6,085,455 |
| Peak Energy (kWh) | 1,172,792 | 0 |
| Off-Peak Energy (kWh) | 4,912,663 | 0 |

Confidential

C:\123data\JAMES\M&A\BASE\jjbsch2.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 3
Page 13 of 16

## Narragansett Electric Company
## Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

### Blackstone's Rate H-1:  Total

| Billing Parameter | Blackstone's Billing Determinant |
|---|---|
| Bills | 204 |
| Demand (kW) | 0 |
| Energy (kWh) | 3,639,022 |

### Blackstone's Rate H-1 v. Narragansett's Rate C-06

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 85 | 85 |
| Energy (kWh) | 225,822 | 225,822 |

### Blackstone's Rate H-1 v. Narragansett's Rate G-02

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 104 | 104 |
| Demand (kW) | 0 | 8,848 |
| Energy (kWh) | 2,380,400 | 2,380,400 |

### Blackstone's Rate H-1 v. Narragansett's Rate G-32

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 15 | 15 |
| Demand (kW) | 0 | 3,845 |
| Energy (kWh) | 1,032,800 | 1,032,800 |

Note:

1. Blackstone's Rate H-1 determinants were apportioned among Narragansett Rates C-06, G-02 and G-32 based on the availability provisions of Narragansett's rates.

2. Narragansett's billing demands are estimated based upon Blackstone's Rate H-1 load research data using Narragansett TOU hours.

3. Billing demands used to determine whether a Blackstone Rate H-1 is to be transferred to Narragansett's Rate G-02 are the higher of each customer's actual demand or 75% of the highest demand in the previous 11 months less 10 kW.

4. Billing demands used to determine whether a Blackstone Rate H-1 customer is to be transferred to Narragansett's Rate G-32 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

Confidential

C:\123data\JAMES\M&A\BASE\jjbsch3.wk4
05/18/99

### Narragansett Electric Company
### Blackstone Valley Electric Company
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Blackstone's Rate H-2:  Total

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant |
|---|---|
| Bills | 964 |
| Demand (kW) | 0 |
| Energy (kWh) | 2,290,392 |

#### Blackstone's Rate H-2 v. Narragansett's Rate C-06

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 940 | 940 |
| Energy (kWh) | 2,034,902 | 2,034,902 |

#### Blackstone's Rate H-2 v. Narragansett's Rate G-02

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 12 | 12 |
| Demand (kW) | 0 | 0 |
| Energy (kWh) | 33,090 | 33,090 |

#### Blackstone's Rate H-2 v. Narragansett's Rate G-32

| Billing<br>Parameter | Blackstone's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 12 | 12 |
| Demand (kW) | 0 | 2,386 |
| Energy (kWh) | 222,400 | 222,400 |

Note:

1. Blackstone's Rate H-2 is a supplementary rate. Each customer's Rate H-2 usage was combined with the customer's principal rate usage.
Based on the combined usage, revenue for each customer was calculated under both Narragansett's Rates C-06 and G-02. The
Blackstone Rate H-2 customers were then transferred to the Narragansett rate producing the lower revenue.

2. The billing determinants for Blackstone's H-2 customers to be transferred to Narragansett's Rate G-32 are identical to the determinants
shown in Schedule JJB-2

Confidential

C:\123data\JAMES\M&A\BASE\jjbsch3.wk4
05/18/99

## Narragansett Electric Company
## Blackstone Valley Electric Company
## Apportionment of Company Billing Determinants
## Year Ending December 31, 1998, Billing Determinants

### Blackstone's Rate W-1:  Total

| Billing Parameter | Blackstone's Billing Determinant |
|---|---|
| Bills | 15,781 |
| Energy (kWh) | 3,602,371 |

### Blackstone's Rate W-1 v. Narragansett's Rate A-16

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 15,594 | 15,594 |
| Energy (kWh) | 3,568,998 | 3,568,998 |

### Blackstone's Rate W-1 v. Narragansett's Rate C-06

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 187 | 187 |
| Energy (kWh) | 33,373 | 33,373 |

### Blackstone's Rate W-1 v. Narragansett's Rate G-02

| Billing Parameter | Blackstone's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 0 | 0 |
| Energy (kWh) | 0 | 0 |

Note:

1. Blackstone's Rate W-1 is a supplementary rate. Each customer's Rate W-1 usage was combined with the customer's principal rate usage. Based on the combined usage, revenue for each customer was calculated under both Narragansett's Rates C-06 and G-02. The Blackstone Rate W-1 customers were then transferred to the Narragansett rate producing the lower revenue.

Confidential

C:\LLMdata\VAREDETA\VAREDET\formatig.wks
05/25/00

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. ____
Exhibit JEB - 3
Page 16 of 16

**Narragansett Electric Company**
**Blackstone Valley Electric Company**
**Original Apportionment of Company Billing Determinants**
**Year Ending December 31, 1998, Billing Determinants**

**Blackstone's Rate S-1 Streetlighting Rate**

| Blackstone's Lighting Code | Lamp Wattage | Blackstone's Lumen Size | Service & Pole Type | Fixture Type | Special Pricing Option | Fixture Count | Blackstone's Annual kWh per Light | Blackstone's Total Annual Energy |
|---|---|---|---|---|---|---|---|---|
| **Metal Halide** | | | | | | | | |
| 0300-4-120 | 250 | 20,000 | OH_WoodLine | FMLt | | 5 | 1,180 | 5,900 |
| 0466-4-120 | 400 | 40,000 | OH_WoodLine | FMLt | | 28 | 1,832 | 51,296 |
| **Total Metal Halide** | | | | | | 33 | | 57,196 |
| **Mercury Vapor** | | | | | | | | |
| 0130-2-110 | 100 | 4,200 | OH_WoodLine | StLt | | 2,279 | 511 | 1,164,569 |
| 0130-2-211 | 100 | 4,200 | OH_WoodLkg | StLt | CastPaidPole | 1 | 511 | 511 |
| 0209-2-110 | 175 | 8,600 | OH_WoodLine | StLt | | 465 | 822 | 382,230 |
| 0209-2-140 | 175 | 8,600 | OH_WoodLine | T&C | | 16 | 822 | 13,152 |
| 0209-2-211 | 175 | 8,600 | OH_WoodLkg | StLt | CastPaidPole | 2 | 822 | 1,644 |
| 0209-2-610 | 175 | 8,600 | UG_Aluminum | StLt | | 28 | 822 | 23,016 |
| 0209-2-640 | 175 | 8,600 | UG_Aluminum | T&C | | 1 | 822 | 822 |
| 0209-2-940 | 175 | 8,600 | URD_WoodPost | T&C | | 268 | 822 | 220,296 |
| 0418-2-612 | 350 | 8,600 | UG_Aluminum | StLt | TwinFixt | 18 | 1,644 | 29,592 |
| 0474-2-110 | 400 | 22,500 | OH_WoodLine | StLt | | 105 | 1,864 | 195,770 |
| 0474-2-120 | 400 | 22,500 | OH_WoodLkg | FMLt | | 99 | 1,864 | 184,536 |
| 0474-2-310 | 400 | 22,500 | OH_Aluminum | StLt | | 3 | 1,864 | 5,592 |
| 0474-2-320 | 400 | 22,500 | OH_Aluminum | FMLt | | 2 | 1,864 | 3,728 |
| 0474-2-610 | 400 | 22,500 | UG_Aluminum | StLt | | 33 | 1,864 | 61,512 |
| 0948-2-612 | 800 | 22,500 | UG_Aluminum | StLt | TwinFixt | 3 | 3,728 | 11,184 |
| 1135-2-120 | 1,000 | 63,000 | OH_WoodLine | FMLt | | 23 | 4,463 | 102,649 |
| **Total Mercury Vapor** | | | | | | 3,346 | | 2,400,753 |
| **Sodium Vapor** | | | | | | | | |
| 0063-3-110 | 50 | 3,300 | OH_WoodLine | StLt | | 14 | 240 | 3,360 |
| 0085-3-110 | 70 | 5,800 | OH_WoodLine | StLt | | 9,055 | 334 | 3,024,370 |
| 0085-3-120 | 70 | 5,800 | OH_WoodLine | FMLt | | 9 | 334 | 3,006 |
| 0085-3-170 | 70 | 5,800 | OH_WoodLine | StLtSC | | 1,804 | 334 | 602,536 |
| 0085-3-440 | 70 | 5,800 | URD_Fiberglass | T&C | | 25 | 334 | 8,350 |
| 0085-3-710 | 70 | 5,800 | UG_WoodLkg | StLt | | 1 | 334 | 334 |
| 0085-3-810 | 70 | 5,800 | URD_LastWood | StLt | | 38 | 334 | 12,692 |
| 0085-3-940 | 70 | 5,800 | URD_WoodPost | T&C | | 104 | 334 | 34,736 |
| 0121-3-110 | 100 | 9,500 | OH_WoodLine | StLt | | 1,813 | 476 | 862,988 |
| 0121-3-140 | 100 | 9,500 | OH_WoodLine | T&C | | 3 | 476 | 1,428 |
| 0121-3-170 | 100 | 9,500 | OH_WoodLine | StLtSC | | 476 | 476 | 226,576 |
| 0121-3-440 | 100 | 9,500 | URD_Fiberglass | T&C | | 6 | 476 | 2,856 |
| 0121-3-460 | 100 | 9,500 | URD_Fiberglass | SRA | | 26 | 476 | 12,376 |
| 0121-3-610 | 100 | 9,500 | UG_Aluminum | StLt | | 95 | 476 | 45,220 |
| 0121-3-940 | 100 | 9,500 | URD_WoodPost | T&C | | 30 | 476 | 14,280 |
| 0176-3-110 | 150 | 16,000 | OH_WoodLine | StLt | | 30 | 692 | 20,760 |
| 0176-3-120 | 150 | 16,000 | OH_WoodLine | FMLt | | 78 | 692 | 53,976 |
| 0176-3-170 | 150 | 16,000 | OH_WoodLine | StLtSC | | 1 | 692 | 692 |
| 0176-3-210 | 150 | 16,000 | OH_Aluminum | StLt | | 1 | 692 | 692 |
| 0176-3-220 | 150 | 16,000 | OH_WoodLkg | FMLt | | 1 | 692 | 692 |
| 0176-3-624 | 150 | 16,000 | UG_Aluminum | FMLt | AddlFixt | 1 | 692 | 692 |
| 0242-3-612 | 200 | 9,500 | UG_Aluminum | StLt | TwinFixt | 2 | 992 | 1,984 |
| 0324-3-110 | 250 | 25,000 | OH_WoodLine | StLt | | 901 | 1,274 | 1,147,874 |
| 0324-3-120 | 250 | 25,000 | OH_WoodLine | FMLt | | 886 | 1,274 | 1,128,764 |
| 0324-3-170 | 250 | 25,000 | OH_WoodLine | StLtSC | | 168 | 1,274 | 214,032 |
| 0324-3-211 | 250 | 25,000 | OH_WoodLkg | StLt | CastPaidPole | 10 | 1,274 | 12,740 |
| 0324-3-220 | 250 | 25,000 | OH_WoodLkg | FMLt | | 7 | 1,274 | 8,918 |
| 0324-3-221 | 250 | 25,000 | OH_WoodLkg | FMLt | CastPaidPole | 3 | 1,274 | 3,822 |
| 0324-3-310 | 250 | 25,000 | OH_Aluminum | StLt | | 2 | 1,274 | 2,548 |
| 0324-3-320 | 250 | 25,000 | OH_Aluminum | FMLt | | 1 | 1,274 | 1,274 |
| 0324-3-324 | 250 | 25,000 | OH_Aluminum | FMLt | AddlFixt | 3 | 1,274 | 3,822 |
| 0324-3-370 | 250 | 25,000 | OH_Aluminum | StLtSC | | 22 | 1,274 | 28,028 |
| 0324-3-610 | 250 | 25,000 | UG_Aluminum | StLt | | 354 | 1,274 | 450,996 |
| 0324-3-614 | 250 | 25,000 | UG_Aluminum | StLt | AddlFixt | 4 | 1,274 | 5,096 |
| 0324-3-620 | 250 | 25,000 | UG_Aluminum | FMLt | | 18 | 1,274 | 22,932 |
| 0324-3-624 | 250 | 25,000 | UG_Aluminum | FMLt | AddlFixt | 1 | 1,274 | 1,274 |
| 0500-3-110 | 400 | 50,000 | OH_WoodLine | StLt | | 102 | 1,966 | 200,532 |
| 0500-3-120 | 400 | 50,000 | OH_WoodLine | FMLt | | 1,884 | 1,966 | 3,703,944 |
| 0500-3-210 | 400 | 50,000 | OH_WoodLkg | FMLt | | 1 | 1,966 | 1,966 |
| 0500-3-220 | 400 | 50,000 | OH_WoodLkg | FMLt | | 72 | 1,966 | 141,552 |
| 0500-3-221 | 400 | 50,000 | OH_WoodLkg | FMLt | CastPaidPole | 32 | 1,966 | 62,912 |
| 0500-3-310 | 400 | 50,000 | OH_Aluminum | StLt | | 1 | 1,966 | 1,966 |
| 0500-3-320 | 400 | 50,000 | OH_Aluminum | FMLt | | 5 | 1,966 | 9,830 |
| 0500-3-610 | 400 | 50,000 | UG_Aluminum | StLt | | 9 | 1,966 | 17,694 |
| 0500-3-620 | 400 | 50,000 | UG_Aluminum | FMLt | | 10 | 1,966 | 19,660 |
| 0500-3-621 | 400 | 50,000 | UG_Aluminum | FMLt | CastPaidPole | 2 | 1,966 | 3,932 |
| 0500-3-624 | 400 | 50,000 | UG_Aluminum | FMLt | AddlFixt | 9 | 1,966 | 17,694 |
| 0648-3-612 | 500 | 25,000 | UG_Aluminum | StLt | TwinFixt | 16 | 2,548 | 40,768 |
| **Total Sodium Vapor** | | | | | | 18,136 | | 12,189,086 |
| **Total Streetlighting** | | | | | | 21,515 | | 14,647,035 |

Exhibit JJB-4

Confidential

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. No. _____
Exhibit JJB-4

Exhibit JJB-4

Newport - Billing Determinants

Confidential

250
NEC092509

C:\123data\JAMES\M&A\BASE\Ijbsch1.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JIB - 4
Page 1 of 15

**Narragansett Electric Company**
**Newport Electric Corporation**
**Apportionment of Company Billing Determinants**
**Year Ending December 31, 1998, Billing Determinants**

## Newport's Rate R-1 v. Narragansett's Rate A-16

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 325,773 | 325,773 |
| Energy (kWh) | 167,201,036 | 167,201,036 |

Confidential

C:\123data\JAMES\M&A\BASE\Jbsch1.wk4
05/18/99

### Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

**Newport's Rate R-2 v. Narragansett's Rate A-60**

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 4,208 | 4,208 |
| Energy (kWh) | 1,764,819 | 1,764,819 |
| First 300 kWh | 1,055,362 | 1,055,362 |
| Excess 300 kWh | 709,457 | -709,457 |

Confidential

C:\123data\JAMES\M&A\BASE\Ujbsch1.wk4
05/18/99

### Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Newport's Rate R-4 v. Narragansett's Rate A-32

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 2,504 | 2,504 |
| Energy (kWh) | 7,100,991 | 7,100,991 |
| Peak Energy (kWh) | 1,248,828 | 0 |
| Off-Peak Energy (KWh) | 5,852,163 | 0 |

Confidential

C:\123data\JAMES\M&A\BASE\Jjbsch1.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 4 of 15

**Narragansett Electric Company**
**Newport Electric Corporation**
**Apportionment of Company Billing Determinants**
**Year Ending December 31, 1998, Billing Determinants**

## Newport's Rate G-1 v. Narragansett's Rate C-06

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 48,861 | 47,123 |
| Unmetered | | 1,738 |
| Energy (kWh) | 42,449,011 | 42,449,011 |

Confidential

C:\123data\JAMES\M&A\BASE\ljbsch4.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 5 of 15

## Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

### Newport's Rate G-2:  Total

| Billing Parameter | Newport's Billing Determinant |
|---|---|
| Bills | 7,645 |
| Demand (kW) | 321,720 |
| Energy (kWh) | 105,080,586 |

### Newport's Rate G-2 v. Narragansett's Rate C-06

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 1,272 | 1,272 |
| Demand (kW) | 29,206 | |
| Energy (kWh) | 6,707,011 | 6,707,011 |

### Newport's Rate G-2 v. Narragansett's Rate G-02

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 6,226 | 6,226 |
| Demand (kW) | 255,636 | 213,521 |
| Energy (kWh) | 85,631,955 | 85,631,955 |

### Newport's Rate G-2 v. Narragansett's Rate G-32

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 147 | 147 |
| Demand (kW) | 36,878 | 43,326 |
| Energy (kWh) | 12,741,620 | 12,741,620 |

Note:

1. For Newport's Rate G-2 customers apportioned to Narragansett's C-06, the revenue for each customer was calculation under both Narragansett's Rate C-06 and G-02. The Newport Rate G-2 customers were then transferred to the Narragansett rate producing the lower revenue.

Confidential

255
NEC092514

C:\123data\JAMES\M&A\BASE\ljbsch1.wk4
05/18/99

### Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Newport's Rate G-5:   Total

| Billing Parameter | Newport's Billing Determinant |
|---|---|
| Bills | 241 |
| Demand (kW) | 40,361 |
| Energy (kWh) | 15,075,589 |

#### Newport's Rate G-5 v. Narragansett's Rate G-02

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 158 | 158 |
| Demand (kW) | 12,834 | 14,847 |
| Energy (kWh) | 4,061,340 | 4,061,340 |

#### Newport's Rate G-5 v. Narragansett's Rate G-32

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 83 | 83 |
| Demand (kW) | 27,527 | 29,984 |
| Energy (kWh) | 11,014,249 | 11,014,249 |

Note:

1. Newport's Rate G-5 determinants were apportioned among Narragansett Rates G-02 and G-32 based on the availability provisions of Narragansett's rates.

2. Narragansett's billing demands are estimated based upon Newport's Rate G-5 load research data using Narragansett TOU hours.

3. Billing demands used to determine whether a Newport Rate G-5 is to be transferred to Narragansett's Rate G-02 are the higher of each customer's actual demand or 75% of the highest demand in the previous 11 months less 10 kW.

4. Billing demands used to determine whether a Newport Rate G-5 customer is to be transferred to Narragansett's Rate G-32 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

256
NEC092515

C:\123data\JAMES\M&A\BASE\jjbtch1.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 7 of 15

### Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Newport's Rate T-2:   Total

| Billing<br>Parameter | Newport's<br>Billing<br>Determinant |
|---|---|
| Bills | 156 |
| Demand (kW) | 30,327 |
| Energy (kWh) | 14,361,960 |
| Peak Energy (kWh) | 2,681,420 |
| Off-Peak Energy (kWh) | 11,680,540 |

#### Newport's Rate T-2 v. Narragansett's Rate G-02

| Billing<br>Parameter | Newport's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 84 | 84 |
| Demand (kW) | 11,103 | 10,263 |
| Energy (kWh) | 4,675,660 | 4,675,660 |
| Peak Energy (kWh) | 862,640 | 0 |
| Off-Peak Energy (kWh) | 3,813,020 | 0 |

#### Newport's Rate T-2 v. Narragansett's Rate G-32

| Billing<br>Parameter | Newport's<br>Billing<br>Determinant | Narragansett's<br>Billing<br>Determinant |
|---|---|---|
| Bills | 72 | 72 |
| Demand (kW) | 19,224 | 20,900 |
| Energy (kWh) | 9,686,300 | 9,686,300 |
| Peak Energy (kWh) | 1,818,780 | 0 |
| Off-Peak Energy (kWh) | 7,867,520 | 0 |

Note:

1. Newport's Rate T-2 determinants were apportioned among Narragansett Rates G-02 and G-32 based on the availability
provisions of Narragansett's rates.

2. Narragansett's billing demands are estimated based upon Newport's Rate T-2 load research data using Narragansett TOU hours.

3. Billing demands used to determine whether a Newport Rate T-2 is to be transferred to Narragansett's Rate G-02 are the higher of
each customer's actual demand or 75% of the highest demand in the previous 11 months less 10 kW.

4. Billing demands used to determine whether a Newport Rate T-2 customer is to be transferred to Narragansett's Rate G-32 are
the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest
monthly peak hours demand in the previous 11 months, or (4) 10 kW.

Confidential

C:\123data\JAMES\M&A\BASE\jbsch1.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 8 of 15

## Narragansett Electric Company
## Newport Electric Corporation
## Apportionment of Company Billing Determinants
## Year Ending December 31, 1998, Billing Determinants

### Newport's Rate T-4 v. Narragansett's Rate G-32

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 69 | 69 |
| Demand (kW) | 41,467 | 57,333 |
| Energy (kWh) | 18,430,440 | 18,430,440 |
| Peak Energy (kWh) | 3,531,400 | 0 |
| Off-Peak Energy (kWh) | 14,899,040 | 0 |

Confidential

C:\123data\JAMES\M&A\BASE\Jjbsch1.wk4
05/18/99

### Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Newport's Rate T-5 v. Narragansett's Rate G-32

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 12 | 12 |
| Demand (kW) | 5,375 | 5,375 |
| Energy (kWh) | 2,964,000 | 2,964,000 |
| Peak Energy (kWh) | 531,000 | 0 |
| Off-Peak Energy (kWh) | 2,433,000 | 0 |

Confidential

C:\123data\JAMES\M&A\BASE\jbsch1.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 10 of 15

## Narragansett Electric Company
## Newport Electric Corporation
## Apportionment of Company Billing Determinants
## Year Ending December 31, 1998, Billing Determinants

### Newport's Rate T-6:   Total

| Billing Parameter | Billing Determinant |
|---|---|
| Bills | 24 |
| Demand (kW) | 50,282 |
| Energy (kWh) | 24,547,599 |
| Peak Energy (kWh) | 5,171,799 |
| Off-Peak Energy (kWh) | 19,375,800 |

### Newport's Rate T-6 v. Narragansett's Rate G-32

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 12 | 12 |
| Demand (kW) | 14,305 | 15,820 |
| Energy (kWh) | 6,958,000 | 6,958,000 |
| Peak Energy (kWh) | 1,417,000 | 0 |
| Off-Peak Energy (kWh) | 5,541,000 | 0 |

### Newport's Rate T-6 v. Narragansett's Rate G-62

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 12 | 12 |
| Demand (kW) | 35,977 | 36,233 |
| Energy (kWh) | 17,589,599 | 17,589,599 |
| Peak Energy (kWh) | 3,754,799 | 0 |
| Off-Peak Energy (kWh) | 13,834,800 | 0 |

Note:

1. Newport's Rate T-6 determinants were apportioned among Narragansett Rates G-32 and G-62 based on the availability provisions of Narragansett's rates.

2. Billing demands used to determine whether a Newport Rate T-2 customer is to be transferred to Narragansett's Rate G-32 and G-62 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

260
NEC092519

C:\123data\JAMES\M&A\BASE\Jjbsch1.wk4
_05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 11 of 15

## Narragansett Electric Company
## Newport Electric Corporation
## Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

### Newport's Rate C-1 v. Narragansett's Rate N-01

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 12 | 12 |
| Demand (kW) | 212,968 | 212,968 |
| Energy (kWh) | 114,919,292 | 114,919,292 |
| Peak Energy (kWh) | 23,608,292 | 23,608,292 |
| Off-Peak Energy (kWh) | 91,311,000 | 91,311,000 |

Confidential

C:\123data\JAMES\M&A\BASE\jbsch1.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 12 of 15

## Narragansett Electric Company
## Newport Electric Corporation
## Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

### Newport's Rate H-1:  Total

| Billing Parameter | Newport's Billing Determinant |
|---|---|
| Bills | 227 |
| Demand (kW) | 0 |
| Energy (kWh) | 4,908,488 |

### Newport's Rate H-1 v. Narragansett's Rate C-06

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 36 | 36 |
| Energy (kWh) | 146,940 | 146,940 |

### Newport's Rate H-1 v. Narragansett's Rate G-02

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 179 | 179 |
| Demand (kW) | 0 | 7,866 |
| Energy (kWh) | 3,203,948 | 3,203,948 |

### Newport's Rate H-1 v. Narragansett's Rate G-32

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 12 | 12 |
| Demand (kW) | 0 | 5,202 |
| Energy (kWh) | 1,557,600 | 1,557,600 |

Note:

1. Newport's Rate H-1 determinants were apportioned among Narragansett Rates C-06, G-02 and G-32 based on the availability provisions of Narragansett's rates.

2. Narragansett's billing demands are estimated based upon Newport's Rate H-1 load research data using Narragansett TOU hours.

3. Billing demands used to determine whether a Narragansett Rate H-1 is to be transferred to Narragansett's Rate G-02 are the higher of each customer's actual demand or 75% of the highest demand in the previous 11 months less 10 kW.

4. Billing demands used to determine whether a Newport Rate H-1 customer is to be transferred to Narragansett's Rate G-32 are the highest of: (1) the customer's monthly peak hour demand, (2) 50% of monthly off-peak hours demand, (3) 75% of the highest monthly peak hours demand in the previous 11 months, or (4) 10 kW.

Confidential

C:\123data\JAMES\M&A\BASE\jbsch4.wk4
05/18/99

## Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Newport's Rate H-2:  Total

| Billing Parameter | Newport's Billing Determinant |
|---|---|
| Bills | 3,865 |
| Demand (kW) | 0 |
| Energy (kWh) | 5,723,950 |

#### Newport's Rate H-2 v. Narragansett's Rate C-06

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 3,752 | 3,752 |
| Energy (kWh) | 4,457,199 | 4,457,199 |

#### Newport's Rate H-2 v. Narragansett's Rate G-02

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 113 | 113 |
| Demand (kW) | 0 | 5,208 |
| Energy (kWh) | 1,266,751 | 1,266,751 |

Note:

1. Newport's Rate H-2 is a supplementary rate. Each customer's Rate H-2 usage was combined with the customer's principal rate usage. Based on the combined usage, revenue for each customer was calculated under both Narragansett's Rates C-06 and G-02.  The Newport Rate H-2 customers were then transferred to the Narragansett rate producing the lower revenue.

Confidential

C:\123data\JAMES\M&A\BASE\jjbsch4.wk4
05/18/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 14 of 15

### Narragansett Electric Company
### Newport Electric Corporation
### Apportionment of Company Billing Determinants
### Year Ending December 31, 1998, Billing Determinants

#### Newport's Rate W-1: Total

| Billing Parameter | Newport's Billing Determinant |
|---|---|
| Bills | 64,408 |
| Energy (kWh) | 13,383,268 |

#### Newport's Rate W-1 v. Narragansett's Rate A-16

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 63,065 | 63,065 |
| Energy (kWh) | 13,062,846 | 13,062,846 |

#### Newport's Rate W-1 v. Narragansett's Rate C-06

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 1,303 | 1,303 |
| Energy (kWh) | 313,931 | 313,931 |

#### Newport's Rate W-1 v. Narragansett's Rate G-02

| Billing Parameter | Newport's Billing Determinant | Narragansett's Billing Determinant |
|---|---|---|
| Bills | 40 | 40 |
| Energy (kWh) | 6,491 | 6,491 |

Note:
1. Newport's Rate W-1 is a supplementary rate. Each customer's Rate W-1 usage was combined with the customer's principal rate usage.
Based on the combined usage, revenue for each customer was calculated under both Narragansett's Rates C-06 and G-02. The
Newport Rate W-1 customers were then transferred to the Narragansett rate producing the lower revenue.

Confidential

C:\123tmp\NMNNPNABAVBADIWmmctg.wk4
04/14/99

Narragansett Electric
BVE/Newport Electric
R.I.P.U.C. Docket No. _____
Exhibit JJB - 4
Page 15 of 15

Narragansett Electric Company
Newport Electric Corporation
Original Apportionment of Company Billing Determinants
Year Ending December 31, 1998, Billing Determinants

Newport's Rate E-1 Streetlighting Rates

| Newport's Lighting Code | Lamp Wattage | Newport's Lumen Size | Service & Pole Type | Fixture Type | Special Pricing Option | Fixture Count | Newport's Annual kWh per Light | Newport's Total Annual Energy |
|---|---|---|---|---|---|---|---|---|
| **Incandescent** | | | | | | | | |
| 0092-1-110 | 92 | 1,000 OH_WoodLine | StLt | | | 383 | 362 | 138,646 |
| 0189-1-110 | 189 | 2,500 OH_WoodLine | StLt | | | 64 | 743 | 47,552 |
| **Total Incandescent** | | | | | | 447 | | 186,198 |
| **Metal Halide** | | | | | | | | |
| 0100-4-120 | 250 | 20,000 OH_WoodLine | FldLt | | | 5 | 1,180 | 5,900 |
| 0466-4-120 | 400 | 40,000 OH_WoodLine | FldLt | | | 6 | 1,832 | 10,992 |
| 1080-4-120 | 1,000 | 115,000 OH_WoodLine | FldLt | | | 37 | 4,247 | 157,139 |
| **Total Metal Halide** | | | | | | 48 | | 174,031 |
| **Mercury Vapor** | | | | | | | | |
| 0130-2-110 | 100 | 4,200 OH_WoodLine | StLt | | | 2,525 | 511 | 1,290,275 |
| 0130-2-210 | 100 | 4,200 OH_WoodLine | StLt | | | 74 | 511 | 37,814 |
| 0130-2-441 | 100 | 4,200 URD_Fiberglass | T&C | CustPaidPole | | 14 | 511 | 7,154 |
| 0130-2-610 | 100 | 4,200 UG_Aluminum | StLt | | | 2 | 511 | 1,022 |
| 0130-2-710 | 100 | 4,200 UG_WoodLtg | StLt | | | 55 | 511 | 28,105 |
| 0130-2-711 | 100 | 4,200 UG_WoodLtg | StLt | CustPaidPole | | 27 | 511 | 13,797 |
| 0209-2-110 | 175 | 8,600 OH_WoodLine | StLt | | | 47 | 822 | 38,634 |
| 0200-2-710 | 175 | 8,600 UG_WoodLtg | StLt | | | 13 | 822 | 10,685 |
| 0300-2-110 | 250 | 12,100 OH_WoodLine | StLt | | | 24 | 1,180 | 28,320 |
| 0300-2-710 | 250 | 12,100 UG_WoodLtg | StLt | | | 19 | 1,180 | 22,420 |
| 0474-2-110 | 400 | 22,500 OH_WoodLine | StLt | | | 377 | 1,864 | 702,728 |
| 0474-2-120 | 400 | 22,500 OH_WoodLine | FldLt | | | 111 | 1,864 | 206,904 |
| 0474-2-210 | 400 | 22,500 OH_WoodLine | StLt | | | 34 | 1,864 | 63,376 |
| 0474-2-220 | 400 | 22,500 OH_WoodLine | FldLt | | | 32 | 1,864 | 59,648 |
| 0474-2-610 | 400 | 22,500 UG_Aluminum | StLt | | | 16 | 1,864 | 29,824 |
| 0474-2-621 | 400 | 22,500 UG_Aluminum | FldLt | CustPaidPole | | 2 | 1,864 | 3,728 |
| 0474-2-624 | 400 | 22,500 UG_Aluminum | FldLt | AddlFixt | | 4 | 1,864 | 7,456 |
| 0474-2-710 | 400 | 22,500 UG_WoodLtg | StLt | | | 231 | 1,864 | 430,584 |
| 0474-2-711 | 400 | 22,500 UG_WoodLtg | StLt | CustPaidPole | | 1 | 1,864 | 1,864 |
| 0600-2-712 | 250 | 12,100 UG_WoodLtg | StLt | TwinFixt | | 6 | 2,359 | 14,154 |
| 0948-2-612 | 800 | 22,500 UG_Aluminum | StLt | TwinFixt | | 3 | 3,728 | 11,184 |
| 0948-2-712 | 800 | 22,500 UG_WoodLtg | StLt | TwinFixt | | 26 | 3,728 | 96,928 |
| 1135-2-120 | 1,000 | 63,000 OH_WoodLine | FldLt | | | 37 | 4,463 | 165,131 |
| 1135-2-220 | 1,000 | 63,000 OH_WoodLine | FldLt | | | 9 | 4,463 | 40,167 |
| 1135-2-710 | 1,000 | 63,000 UG_WoodLtg | StLt | | | 7 | 4,463 | 31,241 |
| **Total Mercury Vapor** | | | | | | 3,696 | | 3,343,144 |
| **Sodium Vapor** | | | | | | | | |
| 0083-3-110 | 70 | 5,800 OH_WoodLine | StLt | | | 642 | 334 | 214,428 |
| 0083-3-210 | 70 | 5,800 OH_WoodLine | StLt | | | 41 | 334 | 13,694 |
| 0083-3-210 | 70 | 5,800 OH_WoodLtg | StLt | | | 32 | 334 | 10,688 |
| 0083-3-211 | 70 | 5,800 OH_WoodLtg | StLt | CustPaidPole | | 9 | 334 | 3,006 |
| 0083-3-441 | 70 | 5,800 URD_Fiberglass | T&C | CustPaidPole | | 247 | 334 | 82,498 |
| 0083-3-610 | 70 | 5,800 UG_Aluminum | StLt | | | 14 | 334 | 4,676 |
| 0083-3-611 | 70 | 5,800 UG_Aluminum | StLt | CustPaidPole | | 8 | 334 | 2,672 |
| 0083-3-711 | 70 | 5,800 UG_WoodLtg | StLt | CustPaidPole | | 78 | 334 | 26,052 |
| 0121-3-110 | 100 | 9,500 OH_WoodLine | StLt | | | 7 | 476 | 3,332 |
| 0324-3-110 | 250 | 25,000 OH_WoodLine | StLt | | | 188 | 1,274 | 239,512 |
| 0324-3-120 | 250 | 25,000 OH_WoodLine | FldLt | | | 269 | 1,274 | 342,706 |
| 0324-3-210 | 250 | 25,000 OH_WoodLtg | StLt | | | 6 | 1,274 | 7,644 |
| 0324-3-211 | 250 | 25,000 OH_WoodLtg | StLt | CustPaidPole | | 1 | 1,274 | 1,274 |
| 0324-3-220 | 250 | 25,000 OH_WoodLtg | FldLt | | | 27 | 1,274 | 34,392 |
| 0324-3-221 | 250 | 25,000 OH_WoodLtg | FldLt | CustPaidPole | | 6 | 1,274 | 7,644 |
| 0324-3-611 | 250 | 25,000 UG_Aluminum | StLt | CustPaidPole | | 12 | 1,274 | 15,288 |
| 0324-3-621 | 250 | 25,000 UG_Aluminum | FldLt | CustPaidPole | | 1 | 1,274 | 1,274 |
| 0324-3-711 | 250 | 25,000 UG_WoodLtg | StLt | CustPaidPole | | 24 | 1,274 | 30,576 |
| 0324-3-720 | 250 | 25,000 UG_WoodLtg | FldLt | | | 1 | 1,274 | 1,274 |
| 0500-3-110 | 400 | 50,000 OH_WoodLine | StLt | | | 12 | 1,966 | 23,592 |
| 0500-3-210 | 400 | 50,000 OH_WoodLine | FldLt | | | 349 | 1,966 | 686,334 |
| 0500-3-210 | 400 | 50,000 OH_WoodLtg | StLt | | | 2 | 1,966 | 3,932 |
| 0500-3-220 | 400 | 50,000 OH_WoodLtg | FldLt | | | 50 | 1,966 | 98,300 |
| 0500-3-221 | 400 | 50,000 OH_WoodLtg | FldLt | CustPaidPole | | 4 | 1,966 | 7,864 |
| 0500-3-624 | 400 | 50,000 UG_Aluminum | FldLt | AddlFixt | | 1 | 1,966 | 1,966 |
| 1000-3-613 | 800 | 50,000 UG_Aluminum | StLt | CustPaidTwinFixt | | 6 | 3,932 | 23,592 |
| 1000-3-713 | 800 | 50,000 UG_WoodLtg | StLt | CustPaidTwinFixt | | 6 | 3,932 | 23,592 |
| **Total Sodium Vapor** | | | | | | 2,043 | | 1,911,608 |
| **Total Streetlighting** | | | | | | 6,234 | | 5,614,981 |

Confidential