UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                              )
TRANSCANADA POWER MARKETING LTD.,             )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )      C.A. No. 05-40076FDS
                                              )
NARRAGANSETT ELECTRIC COMPANY,                )
                                              )
            Defendant.                        )
                                              )
_____)


**<u>DOCUMENT APPENDIX</u>**

**(PART 4)**

# Tab 18



 **New England Power Service**
*A NEES company*

## FAX

To: *MIKE HACHEY*

Phone: **8 71 - 1852**

Fax: **898-0433**

Subject: Merger w/ EUA

Date: *FEB* 8, 2000

From: Michael J. Hager

Pages: 7, incl. cover sheet

---

Please review The enclosed draft letter and
call me so we can work Through The
administrative tasks needed to make
The cutover

Mike

*[handwritten notes]*

*This is a confidential business document, and the property of NEES companies.*
*If you do not receive all pages or if there are problems with this transmission, please call.*

Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
25 Research Drive
Westboro, MA 01582
Tel: (508) 389-3056
Fax: (508) 389-~~2469~~ 2929
hager@neesnet.com

NG/TC 026582

<<logo>>

<<date>>

Mr. Sean D. McMaster
TransCanada Power Marketing, Ltd.
3400, 237-4th Avenue S.W.
Calgary, Alberta T2P 5A4

Subject:     Wholesale Standard Offer Service Agreement between Blackstone Valley Electric
             Company ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric
             Company ("Newport") and TransCanada Power Marketing Ltd ("TCPM") dated
             April 7, 1998 (the "Agreement")

Dear Mr. McMaster:

        The subsidiaries of Eastern Utilities Associates ("EUA") will merge with and into various
subsidiaries of the New England Electric System ("NEES")[1] in the next few months. The actual
date of the merger is referred to herein as the "Merger Date". As a result of the merger, the
NEES subsidiaries will assume the obligations of the former EUA subsidiaries pursuant to
Article 10 of the Agreement.

        The obligations of the parties or their successors and the terms of the Agreement are not
affected by the merger and assignments. The following actions will be taken in order to continue
to facilitate the administration of the Agreement. These actions are not intended and in no way
constitute nor should be deemed to constitute a modification of the terms of the Agreement.

        **1. Designation of Load Served.** Currently, Load Asset 983 is used within the
        NEPOOL Market System to represent the loads covered by the Agreement.
        Effective hour 1 of the Merger Date, Load Asset 983 will no longer be used and
        its associated NEPOOL Market System contracts 66609 and 66610 will be
        terminated. The following Load Assets will be used within the NEPOOL Market
        System to represent the loads covered by the Agreement:

        _____

        [1] Specifically, as it relates to the Agreement, Eastern will merge into Massachusetts
Electric Company ("Mass. Electric"), Blackstone and Newport will merge into The Narragansett
Electric Company ("Narragansett") and Montaup Electric Company will merge into New
England Power Company.

Mr. Sean D. McMaster
<<date>>
page 2 of 6

| Load Asset | Load Description |
|---|---|
| <<aaaa>> 1252 | Standard Offer load in the former Eastern Service Territory. |
| <<bbbb>> 1250 | Standard Offer load in the former Blackstone and Newport Service Territories. |

Mass. Electric will replace Eastern and Narragansett will replace Blackstone and Newport and, as Sellers within the NEPOOL Market System, Mass. Electric and Narragansett will be responsible for inputting Load Asset Contracts for each of the above Load Assets and assigning to TCPM, as Buyer within the NEPOOL Market System, 14.4550% of each Load Asset. Attachment 1 provides a list of the NEPOOL Market System Contracts that will be entered. Kindly submit the required Load Asset Contract Acknowledgment ("LACA") forms for each contract shown to ISO-NE by hour 1 of the Merger Date and forward copies of each LACA to me as well.

**2. Application of the Fuel Adjustment Factor.** Article 5 of the Agreement entitles TCPM to receive additional monies based on revenues collected from retail customers pursuant to Fuel Adjustment mechanisms contained in Eastern's, Blackstone's and Newport's Standard Offer Service tariffs. Mass. Electric and Narragansett will continue to make such Fuel Adjustment payments, if applicable, according to Attachment 2. Attachment 2 replaces the retail fuel adjustment mechanisms contained in the EUA Companies' respective Standard Offer Service tariffs. Said payments will be made by Mass. Electric or Narragansett in the month immediately following service.

**3. Supplier Information to be Provided.** In addition to any specific data or information required to be provided under the terms of the Agreement, Mass. Electric and Narragansett will provide TCPM with (i) customer "add" and "drop" notices and (ii) monthly customer enrollment counts by rate class. The add and drop notices will be sent electronically using the Advantis Value Added Network ("VAN"). To receive these notices TCPM must establish an account on the VAN and be responsible for paying any charges incurred in using the VAN. The customer counts will be compiled and e-mailed by our Standard Offer Portfolio Manager.

**4. Change of Notice Recipient.** The recipient of notices for the Companies, as designated in Article 18 of the Agreement, should be changed to the following:

Mr. Sean D. McMaster
<<date>>
page 3 of 6

        Mr. Michael J. Hager
        Standard Offer Portfolio Manager
        New England Power Service Company
        25 Research Drive
        Westboro, MA 01582
        (508) 389-3056
        (508) 389-2929 (facsimile)

Should you have any questions regarding the above implementation plans please do not hesitate to contact me.

        Very truly yours,

        <<name>>
        <<title>>

cc: M. E. Hachey

Mr. Sean D. McMaster
<<date>>
page 4 of 6





## ATTACHMENT 1

## NEPOOL MARKET SYSTEM CONTRACTS

| Market System Contract # | Load Asset | Product | Term |
|---|---|---|---|
| <<tbd>> 113,915 | ~~aaaa~~ 1252 | Energy | <<date>> @ he 0100, to 31-Dec-2004 @ he 2400 |
| <<tbd>> 113,916 | ~~aaaa~~ 1252 | ICAP | <<date>> @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113927 <<tbd>> ~~113,924~~ | ~~bbbb~~ 1250 | Energy | <<date>> @ he 0100, to 31-Dec-2009 @ he 2400 |
| 113928 <<tbd>> ~~113,926~~ | ~~bbbb~~ 1250 | ICAP | <<date>> @ he 0100, to 31-Dec-2009 @ he 2400 |

14.455 %

Mr. Sean D. McMaster
<<date>>
page 5 of 6

ATTACHMENT 2

STANDARD OFFER FUEL ADJUSTMENT PROVISION

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, Mass. Electric and Narragansett will pay additional amounts to Supplier in accordance with this Standard Offer Fuel Adjustment Provision which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 2000 | 3.4 cents (MA) 3.8 cents (RI) |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Supplier will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York

NG/TC 026587

Mr. Sean D. McMaster
<<date>>
page 6 of 6

harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

The additional amount paid to each supplier, on a per-kilowatt-hour basis, would be 0.2548 ¢/kWh (4.4548 - 4.2).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

NG/TC 026588

**Tab 19**

EXHIBIT

140

8-23-07

1               STATE OF RHODE ISLAND

2        AND PROVIDENCE PLANTATIONS

3          PUBLIC UTILITIES COMMISSION

4

5

6   HEARING IN RE:       DOCKET NO. 3138

7   NARRAGANSETT ELECTRIC COMPANY
     STANDARD OFFER SERVICE TARIFF FILING

8   --------------/

9                JUNE 20, 2000
                10:00 A.M.

10

11            100 ORANGE STREET
              PROVIDENCE, RI

12

13   BEFORE THE COMMISSION:

14      ELIA GERMANI, CHAIRMAN
       KATE F. RACINE, COMMISSIONER

15      BRENDA GAYNOR, COMMISSIONER
       LINDSAY JOHNSON, LEGAL COUNSEL

16

17

18   APPEARANCES:

19

20   FOR THE COMPANY:     RONALD GERWATOWSKI, ESQ.

21   FOR THE DIVISION:    PAUL ROBERTI, ASSISTANT
                    ATTORNEY GENERAL

22

23   FOR TEC-RI:         ROGER BUCK,
                    EXECUTIVE DIRECTOR

24

RECEIVED
PUBLIC UTILITIES COMMISSION
00 JUN 21 PM 2: 07

2

1                               I-N-D-E-X

2                                                        PAGE NO.

3

        MICHAEL J. HAGER
4
        Direct Examination by Mr. Gerwatowski        10
5       Cross-Examination by Mr. Roberti              12
        Examination by the Chairman                   20
6       Examination by Mr. Johnson                    22
        Examination by Commissioner Racine            35
7       Examination by Commissioner Gaynor            54
        Further Examination by Mr. Johnson            55
8       Redirect Examination by Mr. Gerwatowski       67

9

10      STEPHEN SCIALABBA

11      Direct Examination by Mr. Roberti              71
        Cross-Examination by Mr. Gerwatowski          81

12

13
        ROGER BUCK
14
        Statement                                     96
15      Examination by Mr. Gerwatowski               108

16

17

18

19

20

21

22

23

24

                    A-1 COURT REPORTERS, INC.
                        (401) 231-8860

3

```
 1                    E-X-H-I-B-I-T-S

 2        EXHIBIT NO.                        PAGE NO.
                                             ID/FULL
 3
                         FOR THE COMPANY
 4
          1    Notice of amending tariff dated
 5             May 26, 2000                       /9

 6        2    Prefiled direct testimony of
               Michael J. Hager              10/12
 7

 8
                         FOR THE DIVISION
 9
          1    Excerpt from the Wall Street
10             Journal dated June 19, 2000       /19

11        2    Document prepared by Mr. Scialabba
               showing various standard offer
12             rates and impacts                 /73

13

14

15

16

17

18

19

20

21

22

23

24
```

1    estimated undercollections would be higher or

2    lower, our estimated undercollections would be

3    lower.

4  Q.  So if we went to -- if prices of a barrel of oil

5    were over $30 a barrel as we've seen recently and

6    those prices were to hold, that would also impact

7    the deferral calculation.

8  A.  If prices were different, it would impact the

9    calculation.

10         MR. ROBERTI:  That's all the questions

11    I have.

12         THE CHAIRMAN:  Can I ask a question?

13  EXAMINATION BY THE CHAIRMAN

14  Q.  Does the fuel adjustment clause reflect the

15    actual amounts of oil and gas consumed by the

16    suppliers?

17  A.  No, it does not.

18  Q.  Why not?

19  A.  I believe it was because we don't -- we don't

20    know the exact portfolio mix that the suppliers

21    will be using.  They are taking on a long-term

22    fixed price contract and they bear the risks of

23    higher prices and the benefits of managing their

24    portfolio to optimize their ability to serve at

```
 1            those fixed prices, so we didn't tie it directly
 2            to a portfolio.  To the extent that they manage
 3            it poorly and the base line numbers that are in
 4            here aren't enough to make it profitable for
 5            them, then they bear that risk as opposed to
 6            passing that poor management risk onto our
 7            customers.  At the same time to the extent that
 8            they can come out slightly better than the mix or
 9            the pricing under this contract, then they have
10            the opportunity to bear those rewards.
11      Q.    Correct me if I'm wrong.  Isn't the largest
12            source of generation nuclear power right now?
13            A.    It was -- it's my understanding -- I haven't
14            seen the current resource mix for New England,
15            but nuclear was 20 or 25 percent of the total
16            mix.
17      Q.    That's not reflected -- I'm just trying to
18            educate myself why that's not reflected in this,
19            in the fuel adjustment clause.
20            A.    Again, the fuel adjustment wasn't tied to a
21            particular portfolio.  And I believe another one
22            of the assumptions underlying that fuel trigger
23            was to allow a supplier to use an oil or gas
24            fired unit on the margin and -- or near the
```

1    margin and still be able to meet the base line

2    prices within a range of fuel prices and thus not

3    pass too much risk onto that supplier that normal

4    increases and decreases in fuel prices from some

5    base line would require them to come back and

6    struggle under this contract.  The approach here

7    was to cover only for extremely high oil and gas

8    prices and to protect suppliers who were serving

9    long-term fixed contracts from extreme increases

10   in fuel prices which is the current market that

11   we are experiencing, very high, record high gas

12   prices, $4 gas prices during the summer period

13   for gas, $30 a barrel plus for oil.

14            THE CHAIRMAN:  Thank you.

15   EXAMINATION BY MR. JOHNSON

16   Q.   I had a few questions on the fuel clause also.  I

17   looked at your Exhibit MJH-1 and this seems to me

18   to be the fuel clause that was contained in the

19   Narragansett contracts prior to the merger, is

20   that correct, for Narragansett's supply contract?

21   A.   This is the provision that's included in the

22   contracts between Narragansett Electric Company

23   and U.S. Gen. and TransCanada and that's

24   Narragansett Electric Company as it existed prior

1          to its merger with the EUA companies.

2     Q.   Now, as I understand it, Narragansett also has a

3          contract with NEPCO, is that correct, a supply

4          contract?

5     A.   Yes, it does.

6     Q.   And what does that fuel adjustment clause look

7          like?  Is that identical to this or is it

8          something else?

9     A.   NEP service is pursuant to a service

10         agreement under its Tariff 1 and it has a similar

11         provision to this as part of that service

12         agreement.

13    Q.   You say similar, but it's not identical?

14    A.   It has an identical provision.

15    Q.   Now, as I understand it, there are another set of

16         supply contracts that were entered into by BVE

17         and Newport prior to the merger, is that correct?

18    A.   That is correct.

19    Q.   And if we turn to your Exhibit MJH-2, could you

20         explain what this is?

21    A.   That is the text of -- the former EUA

22         companies entered into contracts with three

23         suppliers, four contracts with three suppliers

24         which included a payment -- a fuel trigger

1    payment as well. Their contracts did not hard

2    wire the language into the contracts. There was

3    a reference to language in their standard offer

4    tariff and the language in my Exhibit MJH-2 is

5    the language that was in that tariff just prior

6    to their merger with National Grid companies.

7    Q.   But as I recall it, that -- as I recall it, the

8         BVE companies took this language out of their

9         tariff before the merger, is that correct?

10   A.   It's my understanding that they made a

11        modification to this just prior to the merger.  I

12        believe the modification was filed in December of

13        '99 effective January of 2000, but it did not

14        take it out.

15   Q.   Okay.

16   A.   I believe the modification at that point was

17        to facilitate implementation. The prior language

18        had rates adjusting at a customer level revenues

19        flowing from that back to suppliers and the

20        implementation or change allowed them to pay

21        their suppliers up front and then to go back and

22        collect at a future date on a more uniform basis

23        those payments.

24   Q.   I'm a little confused because I went to the

1    supply contracts and the supply contracts said

2    that the suppliers get paid only to the extent

3    that BVE and Newport collect the money from their

4    customers.  Is that correct?  I could show you

5    the contract.

6              THE WITNESS:  May I refer to those?

7              MR. JOHNSON:  Sure.

8                   (BRIEF PAUSE)

9    A.   A read of the language suggests that the

10   factor is -- it says is a per kilowatt hour adder

11   based on the incremental revenues collected, if

12   any, attributed to the operation of the retail

13   standard offer fuel index mechanism and company's

14   standard offer service tariff.

15             As I said earlier, it's my

16   understanding that those tariffs were modified to

17   indicate that the EUA companies will pay their

18   suppliers each month according to that provision

19   and then work out a collection mechanism later on

20   from customers as opposed to adjusting customer

21   rates on a monthly basis in accordance with the

22   provisions in there and then passing those

23   revenues back.

24   Q.   I'm a little confused by that and let's go back

1    to your testimony and see if we can put this all

2    back into context.  At Pages 4 and 5 of your

3    testimony you talk about the first fuel

4    adjustment clause which is that of NEPCO, is that

5    correct?  And you've explained that -- the

6    Narragansett supply contracts fuel adjustment

7    clause.  Then you go on and I get confused by

8    this language, in addition to the base price --

9    another false start.  Let me go back.  Question.

10   "Do the contracts of the former EUA companies

11   provide for additional fuel adjustment payments

12   as well?"  Now, when you refer to contracts there

13   what contracts are you referring to?

14   A.  I'm referring to the contract between Eastern

15   Edison, BVE and Newport with TransCanada Power

16   Marketing.  There's a contract between those

17   three companies and NRG, I believe it's Power

18   Marketing or NRG Energy, and there are two

19   contracts between those three companies and

20   Constellation Power Source.

21   Q.  In other words, they are wholesale supply

22   contracts?

23   A.  Yes.

24   Q.  Then the answer is, "Yes.  In addition to the

```
 1           base price these contracts contain a fuel
 2           adjustment factor payment which is an adder that
 3           is based upon the retail standard offer fuel
 4           index."  Now that seems to -- contrary to what
 5           you just said.
 6           A.  No.
 7    Q.     Okay.
 8           A.  There is no period after index.  It says,
 9           "Based on the retail standard offer fuel index
10           mechanism in the former EUA standard offer
11           service retail tariffs."
12    Q.     This is where I'm confused.  You have a contract
13           with a supplier that has a provision that
14           indicates when they'll get paid for fuel.  I'm
15           confused as to how the relationship between
16           Narragansett and the supplier is controlled by
17           Narragansett's or even BVE's retail tariffs.
18           That's where I'm confused.
19           A.  The four contracts that the former EUA
20           companies entered into in the price section
21           indicate that the companies will pay a price and
22           the price equals the standard offer wholesale
23           price plus a fuel adjustment factor where the
24           standard offer wholesale price is defined as a
```

1          per kilowatt hour number defined in appendix an

2          in the contract, a series of fixed price values

3          hard wired as an appendix in the contract.  And

4          where the fuel adjustment factor is a cents per

5          kilowatt hour adder based on the incremental

6          revenues collected, if any, attributed to the

7          operation of the retail standard offer fuel index

8          mechanism in the company's standard offer service

9          tariffs.  So the actual calculation and basis on

10         which the adder is determined is not hard wired

11         in the contracts but is referred to in the

12         contracts to another tariff.  You go to that

13         tariff and you would find the text within that

14         tariff of how that mechanism operates and we have

15         taken the text from the former tariffs which are

16         no longer in effect and included that as Exhibit

17         MJH-2.

18    Q.   Okay.  So even though those tariffs are no longer

19         in effect, those tariffs are still controlling?

20         A.   An initial read of that from a business

21         perspective would say I could go to those

22         suppliers and say too bad, the tariff -- as a

23         result of the merger that tariff goes away and

24         you are no longer entitled to get those fuel

1 payments.   Too bad, you lost the benefit of the

2 bargain of what you signed up for.   It was my

3 understanding from my legal counsel at the time

4 we were doing the mergers that it was appropriate

5 for us to continue to honor those fuel price

6 payments, fuel adjustment payments that due to

7 the merger -- and the those tariffs being

8 superseded by Narragansett's tariffs which didn't

9 include that language was not appropriate and

10 that we should continue to make those payments --

11 Q.   Okay.

12 A.   -- under the terms that were previously

13 included in the tariff.

14 Q.   Okay.  So what we are looking at in your Exhibit

15 2 is the language that was in the old BVE and

16 Newport tariff, is that correct?

17 A.   That's correct.

18 Q.   What's confusing about it is it talks about --

19 and let me read the beginning of it.  "In the

20 event that substantial increases in the market

21 prices of No. 6 residual fuel oil (one percent

22 sulphur) and natural gas after 1999, Mass.

23 Electric and Narragansett will pay --

24 A.   Yep.

1    Q.    Well, if this is a BVE tariff --

2    A.    The contracts were entered into between the

3          three EUA retail companies, one of which was

4          Eastern Edison Company and they had similar

5          language in their Massachusetts contracts, so the

6          Eastern contracts went to Mass. Electric or the

7          Eastern obligations went to Mass. Electric, the

8          BVE and Newport obligations went to Narragansett.

9          So this language is what we sent to -- outside of

10         that first paragraph, the language below that

11         came out of the tariffs and this is what we sent

12         to their suppliers to say how we will continue to

13         make those payments to them.

14   Q.    Is this any different than the language that was

15         in the tariff?

16   A.    I believe this is the language that was in

17         the tariff.

18   Q.    And you just added the initial paragraph?

19   A.    We added the initial paragraph and because

20         Massachusetts and Rhode Island have slightly

21         different pricing mechanisms in Calendar Year

22         2000 when you look under the stipulated price

23         you'll see that we put both the Massachusetts and

24         Rhode Island prices in there.  If you go to the

1      Rhode Island tariff, you would just see a 3.8

2      cent number.  If you went to the Massachusetts

3      tariff, you would see a 3.4 cent number and we

4      consolidated those up to inform the supplier as

5      to what we would continue to do on an ongoing

6      basis.  There is not a single document which you

7      have here.  We put -- we added the opening

8      paragraph which refers to both Mass. Electric and

9      Narragansett.  We made the -- we put both prices

10     in there in 2000.  The rest of the language, I

11     believe, is identical in both cases.

12  Q.  With the exception of the difference and the six

13     and twelve month measurement of the trigger

14     point, is this fuel adjustment provision the same

15     as the fuel adjustment provision that's contained

16     in your Exhibit 1?

17  A.  There is one other deviation.  Appendix 1 --

18     excuse me -- Exhibit MJH-1 includes fuel trigger

19     points through 2009 whereas the tariffs -- former

20     tariffs and thus Exhibit MJH-2 only includes fuel

21     trigger points through 2004.

22  Q.  What's the reason for that?

23  A.  The only reason I have is that when EUA

24     developed their settlement agreements in its

A-1 COURT REPORTERS, INC.
(401) 231-8860

1    initial set of tariffs they only -- for whatever

2    business reason, they had only included fuel

3    trigger points and I assume fuel trigger payments

4    covering the period 2004 whereas we included

5    payments through 2009.

6    Q.   The term of the contract is through 2009, is that

7         correct?

8    A.   That's correct.

9    Q.   But for some reason you only put in the trigger

10        points for the fuel clause through the Year 2004.

11   A.   The tariffs only included numbers through

12        2004.  It's my -- the tariff only included fuel

13        trigger points through 2004 thus we only included

14        those payments through 2004.  Since their tariffs

15        didn't include trigger points beyond that we did

16        not take from our contract and add it to theirs.

17        We used what they had in effect at the time.

18   Q.   I see.  Let's go through that again.  In other

19        words, the original EUA contracts only had

20        trigger points through 2004.

21   A.   No.  The original EUA tariffs only had

22        triggers points through 2004.

23   Q.   And do you have any sense of what would happen in

24        the Year 2005?

A-1 COURT REPORTERS, INC.
(401) 231-8860

1       A.  My initial interpretation is since there are

2       no fuel trigger points beyond that, there are no

3       fuel trigger payments applicable after 2004 under

4       those terms.  I assume a supplier may have a

5       different opinion, but my initial opinion is it

6       doesn't provide for that.

7   Q.  That might be a good guess, although I don't mean

8       to suggest anything.  I have no idea what was

9       negotiated, so I don't mean to suggest anything.

10              It was my understanding that the EUA

11      trigger points on the fuel clause were exceeded

12      in January of this year.  Are you aware of that?

13  A.  Yes, they were.

14  Q.  And they were not billed, is that correct?

15              THE WITNESS:  Could you clarify what

16      you mean by not billed?

17  Q.  Did the EUA companies under its tariffs ever bill

18      any amounts for the fuel adjustment provision?

19  A.  As I had stated earlier, it's my

20      understanding that the modification made at the

21      -- in December of '99 was to calculate the

22      additional payments, have the EUA companies make

23      those payments to their suppliers but not

24      adjustment the retail rates on a month-to-month

1    basis, that they would make payments to suppliers

2    and reconcile those payments at a later date.

3    EUA has paid their suppliers each month since

4    that has been triggered but has not adjusted the

5    retail rate to its customers.

6    Q.   And in your testimony you show the payments by

7         EUA under the fuel clause, is that correct?  I

8         just can't fined it.

9    A.   I show that in Exhibit MJH-5 which is the

10        last page.

11   Q.   Turning to another subject.  Could you tell me

12        what the total revenues for the merged companies

13        are?  When I say the merged companies I mean

14        after the merger of the EUA companies and the

15        NEES companies.

16   A.   I do not know what total revenues are, no.

17   Q.   Could you provide that?

18   A.   Yes, we can.  So I'm clear, total revenues,

19        does that include any generation related charges,

20        distribution charges, transmission related

21        charges?

22   Q.   All revenues from retail customers.

23   A.   Okay.

24   Q.   Do you have a rough idea what that might be?

1    A.   I do not.

2              MR. JOHNSON:   I have no further

3    questions.

4    EXAMINATION BY COMMISSIONER RACINE

5    Q.   Good morning, Mr. Hager.

6    A.   Good morning.

7    Q.   Mr. Hager, my concern is this.   In arriving at

8         the price that you are recommending to the

9         Commission, the 4.1 in the underrecovery, did the

10        company ever consider going higher on the

11        standard offer price?  And why did you arrive at

12        the 4.1 knowing you are recommending a

13        substantial underrecovery?

14   A.   The roughly $26 million underrecovery that

15        was estimated there assumed fuel prices at a

16        certain level.  To the extent that fuel prices

17        are less than that, the amount of the

18        undercollection would be less than what we had

19        estimated there.  So we tried to balance out what

20        an appropriate number may be to lessen the impact

21        on customers should we try to collect the entire

22        amount next year.  If I look at the $26.7 million

23        undercollection and were to recover that in one

24        year over roughly seven billion kilowatt hours

1    total sales, that would produce a factor of .38

2    cents per kilowatt hour.  If I were to collect

3    that over a year-and-a-half or ten-and-a-half

4    billion kilowatt hours, I get a factor of

5    approximately a quarter of a cent per kilowatt

6    hour.  The three mill increase we proposed is in

7    the middle of those two.  To the extent that it's

8    -- fuel prices continue at these high levels,

9    which is higher than we estimated and the

10   undercollection is greater than we originally

11   estimated, we could consider coming back at a

12   later point in time and seeking to raise that

13   again or if the Commission feels that the factor

14   is not high enough or too high, they can take

15   appropriate action one way or the other.

16   Q.   You are saying today at this hearing that it's

17        properly before the Commission to consider a

18        higher -- if it shows a higher standard offer

19        rate at this point in time, to be more in sync

20        with the costs that the ratepayers are incurring

21        on a day-to-day basis, correct?  Is that your

22        testimony?

23   A.   I'm saying that if the Commission were to be

24        able to set a higher rate and chooses to set a

1    higher rate, the company at this point has no

2    objection.

3              THE CHAIRMAN:  Let me ask this question

4    a little differently.  If you were to file today

5    knowing what you know, what would the proposed

6    increase have been?

7              THE WITNESS:  I believe we would still

8    file the rate that we filed right now.  Again,

9    the amount of undercollection is a function of

10   what our actual fuel price is going to be down

11   the road.  So I think if we were to file today,

12   even seeing $4 gas prices versus the 3.11 or

13   whatever, I think we would file for 4.1.

14             COMMISSIONER GAYNOR:  At what point do

15   you see it -- I mean, in other words, would it

16   have to go up to five before you'd raise the

17   rate?  Where do you see the break point?

18             THE WITNESS:  I don't have a specific

19   number that is a threshold there.  We would

20   continue to monitor these undercollections.

21             COMMISSIONER GAYNOR:  What level of --

22   let's put it this way.  What level of

23   undercollection would you consider it to be

24   significant enough on a projected basis that you

1      would think it would be appropriate to raise the

2      standard offer?

3                  THE WITNESS:  I don't have a hard and

4      fast number that would trigger that.  It would be

5      a judgment based on where we see -- where we see

6      the monies going.  I don't have a hard and fast

7      number at this point.

8                  THE CHAIRMAN:  Would you make the

9      decision or would someone else make the decision?

10                 THE WITNESS:  Ultimately the decision

11     would be made by members of our management.

12                 COMMISSIONER RACINE:  All right.  Let

13     me go back.

14  Q.  The concern that I have as a Commissioner, and I

15     had it in the last resort and I have it again in

16     the standard offer, is the more that you let it

17     run, there is this undercollection that occurs

18     and all of a sudden you say to the ratepayer you

19     owe far more than you think you owe.  I think the

20     whole idea from where I stand is to try to price

21     it according to what costs they are incurring, A,

22     because our goal, as I understand it, of the URA

23     is to get people to market, and B, I think we are

24     just giving a false sense of security to people

1    knowing full well that they are not paying what

2    they should be and that ultimately they are going

3    to pay it.

4    You make a recommendation on the last

5    page of your testimony that if we had good reason

6    to believe that fuel prices will remain high, we

7    would file to increase the standard offer price

8    again in September, all right, as I understand

9    it.  Now we are having a substantial

10    underrecovery and that it's not going to go away.

11    I was wondering who advises you as to fuel prices

12    and what prognostications you have now on a going

13    forward basis.

14    A.  The only indication we have as to where fuel

15    prices are going are -- for the gas prices, look

16    at the NYMEX markets since that's what -- the

17    value that is used in the calculation and see

18    where those contracts are trading and to monitor

19    overall what's happening with oil prices there.

20    Q.  But as a portfolio manager, I mean, in a company

21    this size don't you have people that that's their

22    job that are working it, tracking it, well head,

23    who's investing it, when they expect a downturn

24    or an increase?  I mean, I can't believe in a

1    company your size that you are just looking at

2    the NYMEX and saying oh, not a good day today.

3    There are people that make a livlihood advising

4    you as a portfolio manager.

5    A.    And in the early days when we had generation

6    facilities and assets and we were managing a

7    portfolio of assets and controlling and

8    responsible for controlling those costs we had

9    staff of fuel folks who were monitoring these

10   markets, you know, relying on outside consulting

11   firms to provide them with some insight and that

12   team would be used to figure out where things

13   were going to optimize their fuel buying

14   purchases to minimize costs to the customers.

15         As a result of the URA and

16   restructuring here in New England our role is to

17   get out of those facilities and my portfolio

18   management is to manage suppliers by load

19   following services as opposed to managing assets

20   and fuel purchases and so forth.  So we no longer

21   have that team available to us.  We no longer

22   have that need to manage fuel and fuel related

23   assets.

24   Q.    So actually it's just a pass through from your

1    company to the ratepayer in terms of the fuel.

2    Is that your testimony?

3    A.   These standard offer contracts which were

4    entered into include adjustments to prices based

5    on where fuel markets settle up.

6    Q.   So who is watching them?  I guess that's my

7    concern now.  Is that -- you are saying well, we

8    are not in that business, so if they bill us at a

9    certain amount, that's what we pass through.

10    That's what the amount is.  As a regulator who is

11    watching them to be sure that the ratepayer isn't

12    paying more or the contracts aren't as good as

13    they should be or delivering the service at the

14    least cost to the ratepayer; where do we need to

15    go on a going forward basis to watch that as

16    well?

17    A.   The way these contracts are structured

18    there's no way to manage portfolios of gas

19    purchases to lessen the impacts of these fuel

20    prices.  The fuel price is set with the fuel

21    tracking mechanism and what the additional

22    payments are going to be.  What we need to watch

23    if anything to see if we are going to be impacted

24    at all is to see where those prices are trending

1      to in the future and --

2  Q.  But you don't do that.  That's what I'm trying to

3      get to.  You don't do that.  So who does it?  Is

4      it through contractual obligations?

5  A.  We monitor them by seeing where the current

6      prices are in the market place.  But the nature

7      of this mechanism doesn't say we think prices are

8      going to be $4, let's go out and buy $3 gas and

9      save some money.  That's not how these contracts

10     work.  It's the ultimate end result of gas is

11     this.  That is how it is settled and that's the

12     price that is used in here.  The ability to look

13     forward and see that prices are going to increase

14     and buy gas or oil or fuel at a low price doesn't

15     provide any benefits under these contracts.  The

16     contracts just say the price is ultimately

17     settled at this based on those settlement prices.

18     Here's what the adder may or may not be.

19 Q.  So there's one set of those contracts that is

20     until 2004 and there is another set of those

21     contracts that are until 2009?

22 A.  There are contracts that run for physical

23     supply through 2009.  There is one that has fuel

24     trigger points through 2009.  There is another

43

1    set of fuel trigger points that end in 2004.

2    Q.    At the time of the merger was there a sunset on

3    all of these contracts and provisions? I mean,

4    was there some language in the contracts that if

5    in fact the merger occurred where there is

6    different ownership, that the supply contract

7    would cease and desist?

8    A.    There was no language that said as a result

9    of the merger EUA companies or anybody else can

10   terminate the contracts.  There is assignment

11   language that says as a result of the merger the

12   new entity takes on the continuing obligation --

13   rights and obligations under that contract.

14   Q.    Okay.  So at the time of the merger then the

15   companies had to take on what was already in

16   existence?

17   A.    Correct.

18   Q.    And there's no sunset and there was no way, in

19   other words, to exit the contracts?

20   A.    Correct.

21   Q.    And that would be until 2004 or 2009?

22   A.    The EUA contracts provide for the supply of

23   power through 2009.  The fuel adjustment

24   mechanism in effect at the time only went through

A-1 COURT REPORTERS, INC.
(401) 231-8860

44

1   2004.

2   Q.   All right.  So right now, as I understand it, we

3        are under contractual obligations that these

4        payments are made to these suppliers at a fixed

5        price and the ratepayer must pay their portion

6        thereof?

7   A.   Yes.

8   Q.   All right.  And we are in a market that is highly

9        volatile and very expensive right now in terms of

10       fuel.

11  A.   Historically high fuel prices, yes.

12  Q.   And we don't have a crystal ball, and as you say,

13       we are not in the business any longer so we don't

14       really know where it's going.  We look at the

15       NYMEX.  Do you have any indices that tell you

16       that in two or three months this could break or

17       are people looking at it long-term and saying it

18       isn't going to break, if anything, they could

19       increase?

20  A.   We rely on where the market price is.

21  Q.   So day to day because basically it isn't your

22       business, you are a pass through.

23  A.   Right.

24  Q.   So if it's high, it's high; if it's low, it's

45

1    low.  Bottom line what you've seen so far, it

2    indicates on a going forward basis that we have a

3    substantial underrecovery of the standard offer

4    rate.

5    A.  Yes.

6  Q.  And you are recommending to the Commission that

7    4.1 be the standard offer, however, if prices

8    should go up, you'd be back again in a couple of

9    months for an adjustment.

10    A.  Correct.

11  Q.  And if the Commission saw fit, the Commission

12    could set the standard offer higher and at, say,

13    4.3 or 4.4, whatever, and still look to

14    adjustment on a going forward basis due to the

15    volatility of the market?

16    A.  If the Commission set the rate higher, the

17    company would have no objection at this point.

18  Q.  Not only that, the Commission would still be only

19    recovering the costs to the ratepayer of the

20    price per kilowatt hour of the electricity they

21    are now using.

22    A.  Yes.

23  Q.  It could help to eliminate a substantial

24    underrecovery, correct?

1    A.   Correct.

2    Q.   And be more in line with the actual cost of

3    delivering power to them?

4    A.   Yes.

5    Q.   If the Commission sees fit to allow an

6    underrecovery on a going for basis, at some point

7    the ratepayer is going to face a very large

8    underrecovery that could almost result in rate

9    shock?

10              THE WITNESS:   One more time on that,

11    please.

12   Q.   If we allowed it and we just sat back and said

13    all right, 4.1 or 3.9, whatever, let's go with

14    4.1 right now, but the Commission has information

15    it knowingly knows that it's pricing something

16    under the cost of providing it, have been told

17    that --

18   A.   Yes.

19   Q.   -- that eventually as time goes out, the

20    ratepayer must pay, so they are only going to get

21    hit much harder in maybe the cold winter months

22    where it's more difficult to pay all of the

23    utilities than it is to bring them up to what we

24    feel would cover the costs as they are being

1    incurred on a day-to-day basis.

2    A.   If the Commission were to set this price

3    lower knowing that the actual costs are higher,

4    then the rate that would be requested or possibly

5    set in the future would be higher and thus --

6    Q.   But the 4.1, you are relying -- asking the

7    Commission to set it when in fact we know that we

8    are not recovering the costs, correct?

9    A.   Based on current expectations in the market,

10   yes.

11   Q.   So would it not be more prudent for a Commission

12   to address it, to at least address the

13   underrecovery on a going forward basis, get

14   closer to the fairness in terms of the ratepayer

15   that they are paying the actual amount and not an

16   underrecovered amount that eventually is going to

17   be a negative for them in a cumulative action

18   whenever we decide to address what's already

19   known to us that the ratepayer is underpaying?

20   A.   It would appear that would be true.

21   Q.   When you set the 4.1 did you run numbers using

22   other standard offer rates, in other words, the

23   4.2?  I understand every time -- as I understand

24   it, we raise the standard offer rate a mill it's

1    equal to 50 cents, is that correct?  What's

2    proposed by the company, as I understand it,

3    today is the 4.1 and that would be like a $1.56

4    impact in a 500 kilowatt hour bill, correct?

5         THE CHAIRMAN:  That is what the

6    testimony provides.  That is what your testimony

7    provides, I believe.

8    Q.  Mr. Hager seems confused.  I guess that's what

9    the notice indicated, Mr. Hager.  It may not be

10   --

11   A.  I don't believe it's in my testimony.

12   Q.  But that's what the notice indicated, the 4.1.

13   All right?

14   A.  I look at 500 kilowatt hours times a

15   dollar-and-a-half, yes.

16        THE CHAIRMAN:  Plus the gross earnings

17   tax.  That is how you get the $1.56.

18   Q.  So each time -- I'm just trying very honestly,

19   and I had to make a very hard decision with last

20   resort and it was the same thing.  It was the

21   underrecovery and how we get people not to

22   believe that they are not owing something and I

23   just wondered if you ran a 4.2 or 4.3 and we can

24   keep going, I see Mr. Scialabba here, so I'm

1  going to wait to hear from the Division as to

2  what they are advocating, but bottom line, I

3  would rather stop the hemorrhaging now rather

4  than later and I don't want to see me as the

5  ratepayer or anybody else having costs that are

6  going to get passed through to them and that is

7  why I was trying to see -- there is no magic to

8  4.1, in other words.  It's where the company felt

9  that they could offer that at but at 4.1 you are

10  still underrecovering, the ratepayers still

11  aren't paying what they should be and they are

12  going to incur costs.

13  A.   As I said earlier, if we look at the $26.7

14  million number and if we were to collect it all

15  in one year over seven billion kilowatt hours,

16  that would be an incremental factor of just under

17  .4 cents per kilowatt hour.  If we were to

18  collect that over an 18-month period, it would be

19  approximately .25 cents per kilowatt hour.  We

20  have a number that is in the middle of those two

21  values based on current expectations, and again,

22  if fuel prices are higher, it would not -- we

23  would need another increase at some point in

24  time, whether it be September or January.  We'd

1    need another increase at some point in time to

2    the extent that fuel prices are lower and we've

3    overcollected.

4  Q.    Have you inquired of your suppliers as to what

5    they see so that you can at least plan in going

6    before Commissions?  Have they given you any

7    indication of what they perceive for the market?

8  A.    We are all looking at the same market and the

9    NYMEX gas markets trade at the NYMEX gas prices.

10   If you go out and buy fuel in the marketplace,

11   everything ultimately ties back to the NYMEX

12   marketplace.  That is where those markets are

13   currently trading.

14        As I indicated earlier, this mechanism

15   is just a pricing mechanism based on the fuel

16   triggers.  We could sit here and say we think

17   it's going to be a $4 gas market and they have an

18   opportunity somehow to buy $3 gas, but buying $3

19   gas does not do us any good.

20  Q.    Are we very quickly going back to fuel adjustment

21   provisions or clauses one more time?  Is that

22   where we are headed in your opinion?

23  A.    I'm not familiar with the earlier fuel

24   adjustment provisions.

1    Q.    We used to have them.  I mean, when I first came

2          here and we'd go to six months and they would

3          file and we'd update and so forth and in your

4          testimony, like you say, we may have to come back

5          in two months and readjust it.  Are you

6          advocating at this point the Commission consider

7          standard offer plus a fuel adjustment provision

8          or are you still comfortable with standard offer

9          and every two months revisit standard offer and

10         readjustment according to market?  And what are

11         the benefits to the ratepayer?

12   A.    The fuel adjustment proceedings were to

13         collect actual fuel related expenses that the

14         companies incurred in serving their customers.

15         We are now in an environment where we have a

16         long-term fixed price contract that has a

17         variable component tied to some gas and oil

18         indices.  Our intention is not to come back every

19         quarter and adjust this price based on fuel.  I

20         believe the overall intent is to come back once a

21         year.  Here's the base price of the contract.

22         Here are the undercollections from prior years.

23         Hopefully these historically low prices go away

24         and we don't incur any additional increases.

52

1      These markets could turn around and suddenly

2      plummet back to earlier levels and we won't be

3      making any additional payments and we won't be

4      having this issue before us.  Right now we are at

5      a point where at the current levels in the

6      marketplace we are expecting to make some

7      additional payments and we expect to do those

8      once a year, but this is a case where in order to

9      mitigate the impact on customers we are coming

10     earlier rather than later in the year.

11  Q.  So it's your testimony that we would continue the

12     standard offer as we've known it and set it

13     accordingly and at this point in time we are not

14     looking to do an add-on for fuel adjustment

15     clauses?

16  A.  Correct.

17          COMMISSIONER RACINE:  Thank you.  I

18     have no further questions chairman.

19          THE CHAIRMAN:  Let me ask the question

20     a little bit differently, less delicately.  You

21     said earlier that you had no objection if we

22     raised the price and passed a proposed price

23     increase.

24          THE WITNESS:  That's correct.

53

1    THE CHAIRMAN:  What you are doing is

2    transferring the public relations problem to us.

3        THE WITNESS:  That is not the intent of

4    my statement.  That is not the intent.

5        THE CHAIRMAN:  And your answer still is

6    that based upon what you know today about the

7    fuel prices you'd still come to us with the same

8    proposed price increase?  I recognize you said

9    earlier that you didn't make that decision, so

10   I'll be fair to you.  If you can't answer, you

11   don't have to answer.

12       THE WITNESS:  I assume that there

13   hasn't been a significant change from when we

14   made the filing that we probably would reach the

15   same conclusion.

16       THE CHAIRMAN:  So you don't think that

17   what's happened since you made the filing would

18   change it, is that it?

19       THE WITNESS:  I'd say overall the

20   market is about where it was when we made the

21   filing.  Understand that the current prices in

22   the NYMEX is higher than what we used in making

23   these projections, but we just saw the market

24   drop ten percent in one day yesterday.  If you

A-1 COURT REPORTERS, INC.
(401) 231-8860

1    read all the analyses of what's happening in the

2    marketplace, everyone expects that the summer

3    will be tough and hopefully things will get a

4    little softer come September.  Perhaps -- as I

5    said, we are looking at market prices that are

6    twice what they were a year ago.  If we get back

7    to last year's levels, the impact of these prices

8    will be much less.

9    EXAMINATION BY COMMISSIONER GAYNOR

10   Q.   So if your concern is in particular the summer

11   months where we are already seeing a significant

12   increase over your original assumptions, is that

13   why you would come in in September, in other

14   words, to recoup what you undercollected in the

15   summer?  Would that be the intent?

16   A.   What I expect we will do is continue to trend

17   the incremental payments we are required to make

18   to our suppliers under the contracts, compare

19   those to any incremental revenues that we may

20   collect from customers and continue to monitor

21   the amount of underrecovered amounts that we need

22   to seek from customers later on and to the extent

23   that we -- if the 4.1 price covers that, we are

24   okay.  To the extent that it looks like those

1    numbers are much higher than we are seeing right

2    now and we are looking at a much larger increase

3    come January 1 to collect that, we would come

4    back and consider seeking to get another increase

5    in September, again, as a means of cushioning the

6    impact on the customers.

7    Q.    Do you bill more kilowatt hours during the

8    summer?  Is the summer a higher usage period?

9    A.    Yes, it is.

10   Q.    For all customers classes?

11   A.    Yes, it is.

12           COMMISSIONER GAYNOR:   Thank you.

13           MR. JOHNSON:   I have one more question.

14   FURTHER EXAMINATION BY MR. JOHNSON

15   Q.    I wanted to turn again to your Exhibit 2.  I've

16   been thinking about what you told me, and as I

17   understood what you told me, you said that this

18   is a document that was sent out to the suppliers.

19   A.    Yes.

20   Q.    So this was a change in the contract, is that

21   correct?

22   A.    Again, the contract says you will be paid a

23   fuel trigger, whatever the term is under that, as

24   contained in the tariffs.  We sent notices to the

1    suppliers saying on such and such a day Eastern

2    companies will be merging with the National Grid

3    companies.  We are taking on all rights and

4    responsibilities under that contract.  Here's how

5    we are going to implement these things with the

6    NEPOOL.  We had to make some transfers with the

7    NEPOOL system to do that.  And by the way, there

8    is this reference in the contract to fuel

9    adjustment mechanisms in the EUA retail tariffs.

10   Those tariffs are being superseded by

11   Narragansett's tariffs.  Those tariffs don't have

12   that language.  We will continue to make those

13   payments to you under the terms and -- since it's

14   not, as I said, hard wired in the contracts but

15   contained in the tariffs, we took the language

16   out of the contract and included that in the

17   language to the suppliers to show in their mind

18   how we would make payments going forward.  We

19   took language out of the Massachusetts tariff and

20   language out of the Rhode Island tariff and

21   assembled it in what you see there which was sent

22   to suppliers.

23        MR. JOHNSON:  Could I get a copy of the

24   correspondence that was sent with this?  In other

1.      words, Ron, I assume you have a new contract if

2       this is a contract amendment.

3               MR. GERWATOWSKI:  From a legal

4       perspective there was no amendment from my

5       perspective.  We had a contract as was testified

6       to before.  The clear intent is that there would

7       be a fuel index that would be tracked.  When it

8       was set up it was set up to track the retail

9       tariffs so everybody would be using the same

10      document.  When the mergers came there wasn't any

11      tariff.  We weren't going to say nuh, nuh, we

12      don't have to pay the fuel anymore.  I think Mike

13      might have had a conversation with the suppliers.

14      It was our intent to follow this so we'll create

15      this document as a basis to continue to make the

16      payments.  I don't think anybody saw that as an

17      amendment.  It was a way to implement what

18      everybody thought it was intended to implement

19      and that was a fuel trigger.  Whether you want to

20      technically call it an amendment, I guess I would

21      disagree.  I think reasonable minds could differ.

22      We didn't want to play some games with the

23      suppliers.  We tried to work with the suppliers.

24      This was a general way to do it.  When we pulled

1    the testimony together we realized we had this

2    issue. This is how we decided to present it to

3    you. From the perspective of a lawyer I would

4    not describe it as an amendment. I think it was

5    a mechanism for implementing what was already

6    agreed to.

7              MR. JOHNSON: Could I get a copy of the

8    correspondence?

9              MR. GERWATOWSKI: Sure, if there is

10   something. I don't know.

11             THE WITNESS: There is.

12             THE CHAIRMAN: Do all of our contracts

13   contain this language?

14             THE WITNESS: All of the standard offer

15   contracts -- well. Let me go back to the

16   pre-merger days. Let me start up north and work

17   my way down. There's a contract. Initially the

18   power company had amended its Tariff 1s, service

19   supplied to the retail companies and agreed to

20   the amendment and agreed to provide the backstop

21   to standard offer service and that amended

22   service contract included the fixed base prices

23   and this fuel adjustment mechanism as part of all

24   the restructuring agreements and contracts that

1    were -- upon the sale of the assets that

2    transferred those obligations on to other

3    suppliers.  Currently we have a contract -- we

4    have contracts with suppliers in New Hampshire

5    and Massachusetts.  We have -- this is pre-merger

6    days, the old NEES retail companies here.  We

7    have the U. S. Gen., the TransCanada and we have

8    a NEP also provided some standard offer service

9    to Narragansett.  All of those contracts include

10   the provisions contained in my Exhibit MJH-1.

11        As a result of the merger of EUA, just

12   for standard offer service the default service

13   and last resort service are all market priced

14   service.  Our contracts are all hard wired and

15   specifically contained in the contract.  The

16   former EUA retail companies have four contracts

17   with three suppliers.  As I said earlier, those

18   contracts include a fuel adjustment mechanism,

19   but it's a reference to language contained in the

20   retail tariff as opposed to hard wired in the

21   contract.  The language in the retail tariffs is

22   similar to what we had in ours.  There is a

23   six-month average versus a 12-month average in

24   Rhode Island.  They only had trigger points

60

1    through 2004 whereas our contracts went through

2    2009.

3               THE CHAIRMAN:  So directly or

4    indirectly all your contracts contain this

5    language?

6               THE WITNESS:  All of our standard offer

7    contracts contain that, yes.

8               MR. JOHNSON:  This provision that I'm

9    talking about, they all have this?

10              THE WITNESS:  Yes.

11              COMMISSIONER GAYNOR:  Mr. Hager, what's

12   the story with the NEP standard offer

13   undercollection?  I'm assuming they are

14   experiencing the same fuel cost increases in

15   terms of its standard offer wholesale supply to

16   Narragansett and where does that fit in?

17              THE WITNESS:  I'd rather have someone

18   from NEP indicate how they are serving -- testify

19   as to how they are serving our needs.  We have --

20   the contract language where we pay them the base

21   price where we pay them incremental fuel payments

22   pursuant to the language we have here.  To the

23   extent that those payments were an

24   undercollection for Narragansett, it's all part

1    of 4.1 cent number we are asking for.  To the

2    extent that NEP is making purchases in the market

3    that exceed those revenues, that's a direct loss

4    to NEP and it's shareholder.  It's not a

5    recoverable amount back to Narragansett or

6    Narragansett's customers.

7                MR. ROBERTI:  I just had a question on

8    that.  Does NEP get a fuel cost increase similar

9    to the other suppliers?

10                THE WITNESS:  NEP's standard offer

11    service to Narragansett contains the same base

12    price for fuel adjustment provisions as we have

13    under our U. S. Gen. and TransCanada.

14                MR. ROBERTI:  For the new load.

15                THE WITNESS:  NEP serves standard offer

16    customers in the Narragansett zone and that came

17    on standard offer after retail access.

18                MR. ROBERTI:  Is there a written

19    contract to that effect?

20                THE WITNESS:  Part of the restructuring

21    settlement agreements there is a new service

22    agreement with NEP that provides the terms of

23    that along with fuel mechanism.

24                COMMISSIONER GAYNOR:  Is NEP going to

1    have that obligation through 2009 as the others

2    do, standard offer wholesale supply of

3    Narragansett?

4                THE WITNESS:  NEP is currently

5    obligated to provide through 2009.

6                COMMISSIONER GAYNOR:  Okay.

7                MR. JOHNSON:  Might I ask one more?

8    What is the current level of kilowatt hour sales

9    from NEP?

10               THE WITNESS:  I'll take a record

11   request for a more specific answer, but it's

12   roughly ten percent of the load in the

13   Narragansett zone I believe, but I'd like to take

14   that as a record request.

15               MR. JOHNSON:  Fine.

16               THE WITNESS:  That would be No. 2.

17               MR. GERWATOWSKI:  I have three from the

18   Commission.  Right?  Three -- I have three

19   requests from the Commission today.

20               MR. JOHNSON:  I thought I had two.

21               MR. GERWATOWSKI:  Let me just go

22   through them.

23               MR. JOHNSON:  I had sales --

24               MR. GERWATOWSKI:  Total revenues,

1    correspondence and then the NEP kilowatt hour

2    sales.  This would be No. 3.

3        MR. JOHNSON:  Yes.

4        COMMISSIONER GAYNOR:  Can I ask a

5    further question regarding the NEP wholesale

6    power supply?  Is that -- since it ties with a

7    new customer supply and that new customer base is

8    increasing presumably over the period through

9    2009, is that an absolute obligation that can't

10   be laid off if, like, for example, you have other

11   suppliers and then there's the NEP piece?  Is the

12   NEP piece -- will it always be that piece or is

13   there the potential to go and lay that piece off

14   or portions of that piece off to other suppliers

15   at another rate?

16       MR. GERWATOWSKI:  From a legal

17   perspective, I'm not a witness, but I could

18   describe my understanding on behalf of the

19   company on what the relationship is.  New England

20   Power Company and Narragansett have a bilateral

21   contract.  New England Power Company is obligated

22   to supply all standard offer customers who were

23   customers of record after a specific date of

24   restructuring.  And we've referred to it

1    generally as new customers that go onto standard

2    offer. That will tend to grow. It was very

3    small at first.

4        COMMISSIONER GAYNOR: We've never had

5    an estimate of where that is as of present, what

6    that piece is.

7        MR. GERWATOWSKI: That would be

8    responsive to one of the requests. Just to make

9    it also clear, it also runs -- from our

10   perspective it also runs the other way, that

11   Narragansett can't drop NEP without NEP's consent

12   and we see that as a bilateral contract. Today

13   when NEP is losing 10 to $20 million, tomorrow it

14   may be able to get some of that margin back, but

15   it is seen as two-way street so that one can't

16   drop the other without the other's consent.

17       COMMISSIONER GAYNOR: Would that have

18   to come before the Commission if there ever were

19   a change in that contract?

20       MR. GERWATOWSKI: To the extent that

21   Narragansett was dropping -- gosh, I mean, now

22   you are asking me a legal question that I have to

23   give some consideration to whether statutorily

24   Narragansett could do it without Commission

65

1    approval.

2              COMMISSIONER GAYNOR:  Could I make that

3    a record request, that you respond to that?

4              MR. GERWATOWSKI:  I'm not trying to be

5    evasive.  I'd just like to have some time to

6    think about that.

7              MR. JOHNSON:  Maybe I can say something

8    about that.  It seems to me that this question

9    came up in one of the hearings and the

10   Commission's order spoke to this subject and my

11   recollection, which is never very good, is that

12   the Commission said that it was not bilateral,

13   that Narragansett could go out and shop in the

14   market but we can go back and look at the order.

15             MR. GERWATOWSKI:  The order didn't take

16   a position one way or the other.  I think it said

17   that -- it raised the question of whether or not

18   Narragansett could on its own just release NEP

19   and didn't draw a conclusion.  In fact, I just

20   looked at it the other day.  This is an issue for

21   New England Power Company at the moment and I

22   think they would like to communicate with the

23   Commission and the Division.  While I have you

24   all here I can try to explain that a little.

1    Right now, as I understand, New England
2  Power Company would like to enter into a
3  long-term obligation with somebody else to try to
4  pick up what they see as a long-term supply. But
5  as long as there's doubt that's arisen in the
6  Commission's order that maybe Narragansett could
7  drop NEP at any time, it really hamstrings NEP.
8  They are going to really need a clarification of
9  that and I know that NEP is working on a letter,
10 actually, a communication with the Commission and
11 the Division because that needs to be discussed
12 because it needs to be clarified either with the
13 parties or at FERC because it really is
14 hamstringing New England Power Company's ability
15 to get a supply beyond just a short-term market
16 and I think there will be some communications
17 about that issue because it's really pressing at
18 NEP at the moment.
19    MR. JOHNSON:  It's now coming to me
20 that the Commission stated that they did not
21 think it was bilateral, but that was a subject
22 for the Division to deal with.  Is that what it
23 said?
24    MR. GERWATOWSKI:  That's close to my

1    recollection, but frankly, I'd love to go back

2    and look at the order. But in the context of --

3    I will answer that question, but I just wanted to

4    let you know that I think New England Power

5    Company was interested in having some

6    communication with the Division and the

7    Commission about the subject that I just

8    mentioned.

9              COMMISSIONER GAYNOR: Thank you.

10             THE CHAIRMAN: Anybody else?

11             MR. GERWATOWSKI: I do have a few

12   follow-ups. I just want to make sure the record

13   is clear on a few points.

14   REDIRECT EXAMINATION BY MR. GERWATOWSKI

15   Q.  Mr. Hager, do you remember years ago when

16   Narragansett had a fuel clause adjustment

17   provision?

18   A.  Yes.

19   Q.  And the fuel clause adjustment provision operated

20   in such a way that actual fuel costs incurred

21   were reconciled by New England Power Company?

22   A.  That's my understanding, yes.

23   Q.  And Narragansett would then pass the effects of

24   that fuel reconciliation through to customers?

68

1    A.  That's the way I understand that would

2    operate.

3    Q.  The mechanism that exists in the standard offer

4    contract is different than that, is it not?

5    A.  Yes, it is.

6    Q.  In fact, the mechanism in the contract is merely

7    a pricing mechanism.  It has no connection

8    whatsoever to actual fuel costs incurred.  Is

9    that a fair statement?

10    A.  That's correct.  Our suppliers could incur

11    much higher fuel prices than this mechanism

12    provides for and they could also incur lower fuel

13    prices than the mechanism provides for.

14    Q.  In fact, I think you may have testified that fuel

15    prices, if fuel prices came down to some level of

16    rationality, we may go back to fixed schedules

17    and not have any kind of adjustments to the cost

18    to Narragansett or to the contract, is that

19    correct?

20    A.  That's correct.

21    Q.  There was a number of questions relating to the

22    issue about why the company proposed 4.1 cents.

23    Was that your personal decision to file 4.1 -- a

24    proposal of 4.1 cents, Mr. Hager?

A.    No, it was not.

Q.    It was someone that you report to that indicated that the company would file 4.1 cents?

A.    Yes.  Our management team has decided that 4.1 cents -- using some bases they say that 4.1 cents would be what they'd like to receive at this time.

Q.    Let's just assume for the moment that the Commission would be interested in trying to make sure that by the time we get to the end of the year or sometime early in 2001 that we would not have an underrecovery resulting from standard offer and that the Commission wanted to propose a fairly conservative policy about pay as you go kind of arrangement where you would try to be sure that if you are going to get to the end of the year we'd rather have a slight overcollection than any undercollection.  Just assume that for the moment.  If that is the policy that the Commission wants to put forth through an order in this docket, would you agree that there certainly is a rational basis for increasing the standard offer price higher than the 4.1 that the company has proposed?

1    A.   I agree there would be a rational basis for

2    that.

3                   MR. GERWATOWSKI:   Thank you.

4    Q.   One other question.   The fixed price portion of

5    the contract for all of the standard offer

6    contracts for the Year 2000 is 3.8 cents, is that

7    correct?

8    A.   Correct.

9    Q.   The fixed price portion of the contract for 2001

10   is --

11   A.   3.8 cents.

12   Q.   So if a price was set at some level higher than

13   3.8 cents today, fuel prices came down, and the

14   Commission just left the standard offer price at

15   the level it was at in 2000, you'd end up

16   recovering some underrecovery by definition in

17   2001, is that correct?

18   A.   That's correct.

19                   MR. GERWATOWSKI:   I have no further

20   questions.

21                   THE CHAIRMAN:   Is that it?   Any other

22   questions?

23                   COMMISSIONER RACINE:   No, thank you.

24                   THE CHAIRMAN:   You may step down.   Just

70

1    A.   I agree there would be a rational basis for

2    that.

3              MR. GERWATOWSKI:  Thank you.

4    Q.   One other question.  The fixed price portion of

5    the contract for all of the standard offer

6    contracts for the Year 2000 is 3.8 cents, is that

7    correct?

8    A.   Correct.

9    Q.   The fixed price portion of the contract for 2001

10   is --

11   A.   3.8 cents.

12   Q.   So if a price was set at some level higher than

13   3.8 cents today, fuel prices came down, and the

14   Commission just left the standard offer price at

15   the level it was at in 2000, you'd end up

16   recovering some underrecovery by definition in

17   2001, is that correct?

18   A.   That's correct.

19              MR. GERWATOWSKI:  I have no further

20   questions.

21              THE CHAIRMAN:  Is that it?  Any other

22   questions?

23              COMMISSIONER RACINE:  No, thank you.

24              THE CHAIRMAN:  You may step down.  Just

1    out of curiosity, in case we wanted to call

2    somebody who made that decision, who would that

3    be?

4              MR. GERWATOWSKI:  You can start with me

5    and I would discuss it with the appropriate

6    people.  I can state definitively that we would

7    have no objection to the Commission setting a

8    price higher than the 4.1 that we proposed.

9              THE CHAIRMAN:  I won't repeat the

10   observation made earlier, but I think it's

11   apparent.

12             MR. ROBERTI:  The Division has one

13   witness at this time.  I'd call Stephen Scialabba

14   to the stand.

15   STEPHEN SCIALABBA (Sworn)

16   DIRECT EXAMINATION BY MR. ROBERTI

17   Q.  Could you state your full name and business

18       address for the record?

19   A.  Stephen Scialabba, chief accountant for the

20       Division of Public Utilities, 100 Orange Street,

21       Providence.

22   Q.  Mr. Scialabba, you've had an opportunity to

23       review the company's filing in this docket?

24   A.  Yes, I did.

| 1 | Q. | And would you -- why don't you point out your |
| 2 | | general observations with what you found before |
| 3 | | you get into your recommendation? |
| 4 | A. | Well, one observation which the Commission |
| 5 | | made today as well is that the company's proposal |
| 6 | | is not intended to get the deferral balance as of |
| 7 | | January 1st, 2001 to zero.  The company's |
| 8 | | proposal on the set of assumptions that jump off |
| 9 | | of May prices will need a significant planned |
| 10 | | underrecovery of approximately $17 million come |
| 11 | | December 31st of this year. |
| 12 | Q. | And that assumes that the fuel prices that are |
| 13 | | embodied in the standard offer contract fuel |
| 14 | | formulas stay consistent with what Mr. Hager used |
| 15 | | in calculating that deferral? |
| 16 | A. | Yes. |
| 17 | Q. | And to the extent that fuel prices are higher, |
| 18 | | which they are now and if they stay at that |
| 19 | | level, then deferral will be greater? |
| 20 | A. | Correct. |
| 21 | Q. | And to the extent that they hopefully drop in the |
| 22 | | coming months or in the fall the deferral might |
| 23 | | be less? |
| 24 | A. | Right.  To the extent they drop, that |

1    definitely would be -- would be less.

2  Q.    And would you perhaps articulate for the

3    Commission some of the general policy -- some of

4    the issues that are raised by having a deferral

5    grow at the level that is targeted in Mr. Hager's

6    testimony?

7  A.    It might help if we go right to the schedule

8    I prepared and I did notice just before I got up

9    here that there's a typographical mistake in here

10    which I have to correct right now.

11         MR. ROBERTI:   Let me pass this out.

12    I'll have this document marked as Division

13    Exhibit 2.

14              (WHEREUPON, THE EXHIBIT
               WAS RECEIVED IN EVIDENCE)
15
    Q.    Could you explain what's on the document here?
16    A.    Sure.   I'll explain it and then I'll correct

17    it.   I just tried to put together -- and I

18    literally put this together right before the

19    hearing started -- at different levels of the

20    standard offer rate how much additional

21    approximate revenue is raised how that affects

22    the amount of the deferral based upon the

23    company's filing and for a residential customer

24    in that column that says approximate bill

1    increase on the assumption of a ten cent per

2    kilowatt hour average residential rate, which is

3    approximately the rate, this is the billing

4    increase resulting from it would be from 3.8 to

5    other levels.  You can see the Narragansett

6    proposal is 4.1.  That's about a three percent

7    bill impact for residential.  And I've put down a

8    range of 4.3 to 4.5 as a range that we would not

9    find unreasonable that is supported by the

10   information we have and the impacts of that on

11   the deferral amount.

12   Q.  You are saying four to five percent overall bill

13   increase?

14   A.  It's five to seven.  It is within that range.

15   Five to seven percent bill increase.  Let me

16   correct the mistake here.  In the second column

17   that's labeled amount raised, the first number

18   shows 3.5 million, that should be zero.  The next

19   line shows 7 million, that should be 3.5.

20   Q.  In fact, why don't I have you make these on the

21   record copy?

22   A.  Okay.  And the next level, 10.5 should be 7.

23   And everything else would remain as it is.

24   Should I make that on the docket?

1              MR. JOHNSON:  I just made it.  I'm sure

2       could you make it much more neatly, but I have

3       made it.

4              THE WITNESS:  Okay.  Another document

5       that I have and I received this yesterday -- I

6       get these from time to time -- is a document put

7       out monthly by Standard and Poors' Data Research

8       Institute Standard entitled Monthly Natural Gas

9       Price Outlook and I read through this document

10      yesterday.  It led me to conclude that they were

11      coming to the conclusion, absent some unexpected

12      events, that prices would remain strong through

13      this year through the winter.  Of course, they

14      put a qualifier in there on the third page at the

15      bottom.  They say risk to the forecast.  Towards

16      the end of that they say what could result in

17      prices dropping, but if you read the entire

18      document, it led me to conclude that chances were

19      that prices would remain at higher than typical

20      historical levels due to storage being down and

21      production being down and more electric

22      generation using gas.

23  Q.  If prices do stay at the levels that Mr. Hager

24      assumed in his recommendation, that would mean,

1   then, that there would need to be a recovery in

2   2001 under the SOCA to recover approximately $17

3   million?

4   A.   Correct.

5   Q.   And he stated that that would require bills to be

6        -- it would be about four mills per kilowatt hour

7        for the entire year?

8        A.   To be honest with you, I don't recall.  I

9        know he gave a number.  I don't remember if that

10       was based -- if that number was based on a year

11       or six months or the eighteen months.  I think I

12       was fixing my schedule when he was testifying to

13       that.  But there would be an underrecovery that

14       would have to be dealt with over some period.

15  Q.   And would that not be -- that would be in

16       addition to any further adjustment they would

17       need to start recovering the shortfall that would

18       continue in 2001, would it not?

19       A.   Yes.  Let me give you a few reasons that I

20       think led me to recommend a higher standard offer

21       rate than the company's recommendation.  A

22       smaller deferral balance at the end of this year

23       will give the Commission more options to address

24       rate stability issues and to deal with potential

1    last resort deferrals which would not be a

2    surprise come the end of this year and potential

3    transmission expense deferrals which, again,

4    wouldn't surprise me at the end of this year on

5    top of any standard offer deferrals that would be

6    created by setting the rate too low right now.

7            Additionally, reviewing the

8    Commission's decision in the last resort case,

9    the Commission seemed to want to strike a balance

10   between rate impacts and having too big of an

11   underrecovery sitting there at the end of the

12   period to have to deal with.

13           Third, if these gas prices and oil

14   prices for that matter remain at the levels

15   currently in the futures prices, customers will

16   be faced with higher gas bills for heating and

17   oil bills for heating in the winter months and

18   that may not be the best time to add to that by

19   further increasing electric rates next January.

20           Further, if you have a big deferral

21   sitting there for standard offer within the

22   standard offer adjustment mechanism it's up --

23   it's not prescribed exactly how that deferral is

24   dealt with, whether it's through standard offer

78

1   customers or all distribution customers.  I think

2   there's three options, standard offer, everyone

3   or whatever reasonable method the Commission

4   determines.  I'm concerned that if you leave

5   standard offer rates where they are and put the

6   whole issue off to the future, customers will go

7   to the competitive marketplace next year will

8   object to a big deferral being laid on them if

9   that's the Division's recommendation or the

10  Commission's decision.

11  Q.   Would object or would object to recovery --

12       having the standard offer deferral recovered by

13       all customers?

14  A.   Right.

15  Q.   As opposed to just standard offer customers?

16  A.   Just standard offer.  So keeping all that in

17       mind led me to recommend a higher standard offer

18       rate than the company has proposed.

19  Q.   Could you summarize your recommendation as it's

20       laid out in Division Exhibit 2?

21  A.   I'm not coming to a specific number.  I'm

22       really giving a range of at least 4.3 cents up to

23       4.5 cents.  That's what we think would be

24       reasonable, coupled with the reporting maybe

79

1    every 60 days. In times when the fuel index is

2    being triggered when prices are higher than

3    historical prices and very volatile, I think it

4    would be helpful if a reporting on the deferral

5    balance or projected deferral balance is made so

6    if adjustments are warranted in the standard

7    offer rate, they can be made in a timely fashion.

8    Q.   So better reporting requirements would give the

9         Commission a more hands-on approach to monitoring

10        the deferral as opposed to just leaving it to the

11        company's discretion when to file for changes?

12   A.   Right.

13   Q.   In the standard offer rate?

14   A.   Right.  This wouldn't be an issue if the fuel

15        index was not being triggered, but these are

16        unusual times with these prices where they are.

17        And it probably warrants more frequent reporting

18        so we don't get surprised at the end of the

19        reporting, at the end of the typical reporting

20        period.

21   Q.   And perhaps more additional or more frequent

22        adjustments to the standard offer price if

23        perhaps the gas prices end up dropping

24        substantially in the fall and we see an

1    overrecovery during --

2    A.  Right.  The reporting allows them to make

3    that decision.  You can make that decision at the

4    time.  But a reporting may be every 60 days as to

5    where this deferral is projected to be would

6    allow you to adjust the standard offer price.

7    Q.  Now, I know that there wasn't a -- this hearing

8    was called on somewhat short notice and there

9    wasn't an opportunity to file prefiled testimony

10   and I know that you didn't have a lot of

11   opportunity to put together the Division's

12   recommendation.  Did you have an opportunity to

13   discuss this with any TEC-RI representative?

14   A.  Yes.  I called Mr. Newman yesterday early

15   afternoon and told him where it looked like we

16   were coming out so he wouldn't be surprised at

17   the hearing.  He did indicate he was not able to

18   make it here for today's hearing.  But I did want

19   him to know that so he could discuss it with

20   Roger and his members if possible.

21   Q.  Is there anything else you'd like to add to your

22   testimony?

23   A.  One other observation, that over time the

24   fuel trigger point increases over the standard

81

1    offer period, I do think it remains like a 5/3/5

2    level for another year, but then every year it

3    does increase, so hopefully, over time as the

4    trigger point increases and prices and oil and

5    gas, I don't know if they are stabilizing or if

6    they are going to increase as well, but hopefully

7    over time this won't be an issue. That as that

8    trigger point increases, we'll be under it and be

9    back to the scheduled prices that we thought

10   would be in place. I think that's it.

11              MR. ROBERTI: Thank you. That's all

12   the questions I had.

13              MR. GERWATOWSKI: Thank you, Mr.

14   Chairman.

15   CROSS-EXAMINATION BY MR. GERWATOWSKI

16   Q.  Mr. Scialabba, in your position with the Division

17       you regulate gas companies as well as electric

18       companies, is that correct?

19   A.  Correct.

20   Q.  So you have additional reasons to be nervous when

21       the fuel prices start going up or reach

22       historical highs, is that correct?

23   A.  Correct.

24   Q.  And so you watch these issues very carefully

A-1 COURT REPORTERS, INC.
(401) 231-8860

# Tab 20



The Narragansett Electric Company


Standard Offer Rate Change
for October 1, 2001


Testimony and Exhibits
of
Michael J. Hager and
Jeanne A. Lloyd


August 27, 2001


Submitted to:
Rhode Island Public Utilities Commission
R.I.P.U.C. Docket No. _____

Submitted by:

**Narragansett Electric**
A **National Grid** Company

NG/TC 008593

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Witness: Hager

DIRECT TESTIMONY

OF

MICHAEL J. HAGER

1

NG/TC 008594

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for October 1, 2001
Witness: Hager
Page 1 of 7

1  **I.**      **Introduction**

2  Q.      Please state your name and business address.

3  A.      Michael J. Hager, 55 Bearfoot Road, Northborough, Massachusetts 01532.

4

5  Q.      Please state your position.

6  A.      I am the Manager, Distribution Energy Services for National Grid USA Service

7          Company.  I am responsible for all power procurement and related activities for the

8          distribution companies of National Grid USA (formerly the New England Electric

9          System) including The Narragansett Electric Company ("Narragansett Electric" or

10         "Company").  These activities include the procurement of power for Standard Offer

11         Service and Last Resort Service.

12

13  Q.     Will you describe your educational background and training?

14  A.     In 1982, I graduated from the University of Hartford with a Bachelor of Science degree in

15         Mechanical Engineering.  In 1986, I received a Master of Science degree in Mechanical

16         Engineering from Northeastern University.  I am a Licensed Professional Engineer in the

17         Commonwealth of Massachusetts.

18

19

S:\RADATA.1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

2

NG/TC 008595

1   Q.   What is your professional background?

2   A.   From 1982 to 1992, I was employed by New England Power Service Company in various

3   engineering positions.  In these positions, I provided support to New England Power

4   Company's ("NEP") thermal and hydroelectric generating plants with overall

5   responsibility for the management and control of studies and projects from initiation to

6   completion.

7

8   From 1992 to 1997, I was employed by NEP where I conducted wholesale and retail

9   power marketing activities involving the sale and purchase of generation resources to and

10   from investor-owned utilities, municipalities, independent power producers, government

11   agencies, brokers, marketers, and end-use retail customers.

12

13   In June 1997, I was promoted to the position of Standard Offer Portfolio Manager for

14   New England Power Service Company (now National Grid USA Service Company).

15

16   In November 2000, my title was changed to Manager, Distribution Energy Services to

17   more fully reflect the scope of work performed by my department.

18

19

S:\RADATA1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

3

NG/TC 008596

1    Q.    Have you previously testified before the Commission?

2    A.    Yes.

3

4    **II.**    **Purpose of Testimony**

5    Q.    What is the purpose of your testimony?

6    A.    The purpose of my testimony is to provide (i) an update on the Company's previous

7          estimate of the costs that the Company expected to incur for the period April 2001

8          through December 2001as a result of the fuel index adjustment provisions contained in its

9          Standard Offer contracts and (ii) to provide an estimate of the expected costs for the

10         period September 2001 through December 2001.

11

12   **III.**   **Description of Fuel Index Adjustment Provision**

13   Q.    Can you describe the fuel index adjustment provision that is contained in the Standard

14         Offer contracts?

15   A.    Yes.  The Company's contracts with its Standard Offer suppliers contain a fuel index

16         adjustment provision that provides additional payments to those suppliers in the event of

17         substantial increases in the market price of No. 6 residual fuel oil (1% sulphur) and

18         natural gas.  In short, the provision compares the sum of the six-month and twelve-month

19         rolling average of oil and gas prices to a preset trigger point.  (The six-month rolling

S:\RADATA1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

4

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for October 1, 2001
Witness: Hager
Page 4 of 7

1    average is used for Standard Offer load in the EUA Zone while the twelve-month rolling

2    average is used for Standard Offer load in the Narragansett Zone.) If the sum of the fuel

3    index values exceeds the trigger point in a given month then the Company makes

4    additional payments to the suppliers in that month. If the sum of the fuel index values is

5    less than or equal to the trigger point in a given month, no additional payments are made

6    in that month. Comparisons are made each month and thus payments may be made in

7    some months and not in others. The text of the fuel index adjustment provision that is

8    applicable to each of the Standard Offer contracts is provided as Exhibit MJH-1.

9

10   **IV.   Previous Fuel Index Estimate - February 2001**

11   Q.    What were the Company's previously estimated expected costs under the fuel index

12         adjustment provisions for the period April 2001 through December 2001?

13   A.    In it's March 1, 2001 filing, the Company estimated its expected costs under the fuel

14         index adjustment provisions in the same manner as its September 2000 and December

15         2000 estimates but used average gas and crude oil prices as reported in The Wall Street

16         Journal on 21-Feb-01, 22-Feb-01 and 23-Feb-01.

17

18   Q.    What gas and oil prices were used in the previous estimate?

19   A.    Exhibit MJH-2 provides the gas and oil values used in the previous analysis.

S:\RADATA1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

5

NG/TC 008598

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for October 1, 2001
Witness: Hager
Page 5 of 7

1

2   Q.   What were the resulting expected fuel index trigger payments?

3   A.   Exhibit MJH-3 provides the resulting expected fuel index trigger payments from the

4      previous analysis. The analysis showed that the Company would pay an arithmetic

5      average fuel index adjustment payment for the period April 2001 through December 2001

6      of 2.53 ¢/kWh for the Narragansett Zone load and 2.44 ¢/kWh for the EUA Zone load.

7      This equates to a total Standard Offer cost of 6.33 ¢/kWh and 6.24 ¢/kWh respectively.

8

9   Q.   What were the actual oil and gas values and the actual fuel index trigger payments for the

10     period April 2001 to August 2001?

11   A.   Exhibit MJH-2 provides the actual gas and oil values and Exhibit MJH-3 provides the

12     actual fuel index trigger payments for the period April 2001 through August 2001. The

13     actual gas prices in the latter part of the period were up to 40% lower than the costs used

14     in the previous analysis while oil prices remained relatively unchanged, this resulted in

15     actual fuel index trigger payments being at or slightly below the expected levels for the

16     period.

17

18

NG/TC 008599

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for October 1, 2001
Witness: Hager
Page 6 of 7

1    V.    <u>Current Fuel Index Estimate - August 2001</u>

2    Q.    Has the Company conducted a more recent estimate of expected costs under the fuel

3          index adjustment provisions for the period April 2001 through December 2001?

4    A.    Yes.  The Company has estimated its expected costs under the fuel index adjustment

5          provisions in the same manner as its September 2000, December 2000 and March 2001

6          estimates but used average gas and crude oil prices as reported in The Wall Street Journal

7          on 22-Aug-01, 23-Aug-01 and 24-Aug-01.

8

9    Q.    What gas and oil prices were used in the current estimate?

10   A.    Exhibit MJH-2 provides the gas and oil values used in the current analysis.  The gas

11         prices used in this estimate are 35% to 45% lower than those used in the previous

12         estimate, reflecting the recent declines in gas prices, while the oil prices used in this

13         analysis are approximately 10% higher than the previous estimate.

14

15   Q.    What were the resulting fuel index trigger payments?

16   A.    Exhibit MJH-3 provides the resulting fuel index trigger payments from the current

17         analysis.  The analysis shows that the Company would pay an arithmetic average fuel

18         index adjustment payment for the period October 2001 through December 2001 of 1.899

S:\RADATA1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

7

NG/TC 008600

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for October 1, 2001
Witness: Hager
Page 7 of 7

1    ¢/kWh for the Narragansett Zone load and 0.998 ¢/kWh for the EUA Zone load. This

2    equates to a total Standard Offer cost of 5.699 ¢/kWh and 4.798 ¢/kWh respectively.

3

4    Q.   How do these costs compare to current market costs for power?

5    A.   The Company's market cost proxy for comparable service is the cost it incurs to procure

6    its Last Resort Service requirements or the cost its affiliates incur to procure their Default

7    Service requirements. The Company recently procured Last Resort Service for the period

8    September 2001 through February 2002 at 5.674 ¢/kWh.

9

10   Q.   Can you provide the details of the current calculations?

11   A.   Yes. Detailed calculations are provided in Exhibit MJH-4.

12

13   Q.   Does this conclude your testimony?

14   A.   Yes. It does.

NG/TC 008601

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 1 of 3

Standard Offer Fuel Index Adjustment Provision

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1 % sulphur) and natural gas after 1999, NECO will pay additional amounts to Seller in accordance with this Standard Offer Fuel Index Adjustment Provision, which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Index Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

> The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---------------|-------------------------|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Seller will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent available twelve months (six months for Standard Offer load in the EUA Zone), where:

> Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the

S:\RADATA1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

9

NG/TC 008602

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 2 of 3

month of delivery trades as reported in the "Wall Street Journal",
expressed in dollars per MMBtu. NYMEX Contract shall mean
the New York Mercantile Exchange Natural Gas Futures Con-
tract as approved by the Commodity Futures Trading Commis-
sion for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent
available twelve months (six months for Standard Offer load in the EUA Zone), where:

Oil Index is the average for the month of the daily low quotations
for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into
New York harbor, as reported in "Platt's Oilgram U.S.
Marketscan" in dollars per barrel and converted to dollars per
MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, NECO
shall file alternate indices with the RIPUC.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu,
applicable for all months in the specified calendar year:

| 2000 | $5.35/MMBtu |
|------|-------------|
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 | $8.48 |
| 2006 | $9.22 |
| 2007 | $9.95 |
| 2008 | $10.69 |
| 2009 | $11.42 |

S:\RADATA1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

10

NG/TC 008603

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 3 of 3

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

S:\RADATA1\2001NECO\SEP FILING_SORATE\MJHTESTIMONY-09SEP2001.DOC

11

NG/TC 008604

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-2
Page 1 of 1

Gas and Oil Values
used in Company's Analyses
($/mmBtu)

| Month | February 2001 Estimate | | August 2001 Estimate | |
|-------|-----------|-----------|-----------|-----------|
|       | Gas Index | Oil Index | Gas Index | Oil Index |
| Apr-01 | 5.192 | 3.35 | 5.442 | 3.60 |
| May-01 | 5.194 | 3.11 | 4.983 | 3.66 |
| Jun-01 | 5.221 | 3.26 | 3.922 | 3.21 |
| Jul-01 | 5.256 | 3.22 | 3.342 | 3.05 |
| Aug-01 | 5.272 | 3.18 | 3.190 | 3.20 |
| Sep-01 | 5.242 | 3.13 | 2.942 | 3.49 |
| Oct-01 | 5.253 | 3.09 | 2.965 | 3.38 |
| Nov-01 | 5.345 | 3.06 | 3.228 | 3.32 |
| Dec-01 | 5.457 | 3.02 | 3.522 | 3.31 |

Note:

(1) February 2001 Estimate values are all estimated values.

(2) August 2001 Estimate values include actual values for the Apr-01 through Jul-01 period; actual values for Aug-01 based on data available to date and estimated values for the Sep-01 through Dec-01 period.

NG/TC 008605

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-3
Page 1 of 1

Summary of Additional Payments Estimated to be
Made Pursuant to the Fuel Index Adjustment Provisions

(Cents/kWh)

| Month | February 2001 Estimate | | August 2001 Estimate | |
|-------|------------------|-----------|------------------|-----------|
| | Narragansett Zone | EUA Zone | Narragansett Zone | EUA Zone |
| Apr-01 | 2.513 | 3.198 | 2.550 | 3.223 |
| May-01 | 2.582 | 3.048 | 2.639 | 3.128 |
| Jun-01 | 2.580 | 2.963 | 2.563 | 3.077 |
| Jul-01 | 2.583 | 2.766 | 2.455 | 2.734 |
| Aug-01 | 2.627 | 2.206 | 2.392 | 1.954 |
| Sep-01 | 2.579 | 1.974 | 2.239 | 1.510 |
| Oct-01 | 2.493 | 1.959 | 2.049 | 1.262 |
| Nov-01 | 2.456 | 1.939 | 1.916 | 0.977 |
| Dec-01 | 2.357 | 1.949 | 1.732 | 0.755 |

Note:

(1) February 2001 Estimate values are all estimated values.

(2) August 2001 Estimate values include actual values for the Apr-01 through Jul-01 period; actual values for Aug-01 based on data available to date and estimated values for the Sep-01 through Dec-01 period.

13

NG/TC 008606

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit MJH-4
Page 1 of 3

## The Narragansett Electric Company
## Standard Offer Fuel Adjustment Estimate

### DETERMINATION OF MARKET GAS PRICE

| (Col. A) Contract Month | (Col. B) Last Month of Trading | (Col. C) Settlement Prices ($/mmBtu) 3rd Last | (Col. D) 2nd Last | (Col. E) Last | (Col. F) Gas Index | (Col. G) NGrid's Market Gas Price | (Col. H) EUA's Market Gas Price | (Col. I) SOS Delivery Month |
|---|---|---|---|---|---|---|---|---|
| May-00 | Apr-00 | $3.137 | $3.110 | $3.089 | $3.112 | $2.612 | $2.603 | May-00 |
| Jun-00 | May-00 | $4.073 | $4.236 | $4.406 | $4.238 | $2.782 | $2.615 | Jun-00 |
| Jul-00 | Jun-00 | $4.560 | $4.686 | $4.369 | $4.538 | $2.971 | $2.960 | Jul-00 |
| Aug-00 | Jul-00 | $3.660 | $3.763 | $3.820 | $3.748 | $3.069 | $3.326 | Aug-00 |
| Sep-00 | Aug-00 | $4.628 | $4.685 | $4.618 | $4.644 | $3.209 | $3.520 | Sep-00 |
| Oct-00 | Sep-00 | $5.276 | $5.324 | $5.312 | $5.304 | $3.433 | $3.868 | Oct-00 |
| Nov-00 | Oct-00 | $4.659 | $4.664 | $4.541 | $4.621 | $3.565 | $4.264 | Nov-00 |
| Dec-00 | Nov-00 | $6.577 | $6.368 | $6.016 | $6.320 | $3.911 | $4.516 | Dec-00 |
| Jan-01 | Dec-00 | $9.579 | $9.805 | $9.978 | $9.787 | $4.532 | $4.863 | Jan-01 |
| Feb-01 | Jan-01 | $7.270 | $7.256 | $6.293 | $6.940 | $4.895 | $5.737 | Feb-01 |
| Mar-01 | Feb-01 | $5.142 | $5.131 | $4.998 | $5.090 | $5.106 | $6.269 | Mar-01 |
| Apr-01 | Mar-01 | $5.322 | $5.621 | $5.384 | $5.442 | $5.315 | $6.344 | Apr-01 |
| May-01 | Apr-01 | $5.078 | $4.981 | $4.891 | $4.983 | $5.471 | $6.367 | May-01 |
|  | May-01 | $4.054 | $3.973 | $3.738 | $3.922 | $5.445 | $6.427 | Jan-00 |
| Jul-01 | Jan-00 | $3.446 | $3.397 | $3.182 | $3.342 | $5.345 | $6.027 | Jul-01 |
| Aug-01 | Jul-01 | $3.276 | $3.126 | $3.167 | $3.190 | $5.299 | $4.953 | Aug-01 |
| Sep-01 | Aug-01 | $2.848 | $2.811 | $3.166 | $2.942 | $5.157 | $4.328 | Sep-01 |
| Oct-01 | Sep-01 | $2.876 | $2.828 | $3.191 | $2.965 | $4.962 | $3.970 | Oct-01 |
| Nov-01 | Oct-01 | $3.151 | $3.092 | $3.441 | $3.228 | $4.846 | $3.557 | Nov-01 |
| Dec-01 | Nov-01 | $3.454 | $3.396 | $3.715 | $3.522 | $4.613 | $3.265 | Dec-01 |

Notes:
Col. A - Contract refers to the NYMEX Natural Gas Futures Contract, as approved by the CFTC,
 for the purchase and sale of natural gas at Henry Hub.
Col. B - Month that trading for the Contract ends (the month before the delivery month)
Col. C - Settlement price for the third last trading day as reported in the Wall Street Journal. (May-00 - Aug-01)
  - Settlement price as reported in the Wall Street Journal on 23-Aug-01. (Sept-01 - Dec-01)
Col. D - Settlement price for the second last trading day as reported in the Wall Street Journal. (May-00 - Aug-01)
  - Settlement price as reported in the Wall Street Journal on 24-Aug-01. (Sept-01 - Dec-01)
Col. E - Settlement price for the last trading day as reported in the Wall Street Journal. (May-00 - Aug-01)
  - Settlement price as reported in the Wall Street Journal on 22-Aug-01. (Sept-01 - Dec-01)
Col. F - Average value of Col. C, Col. D and Col. E (=AVERAGE(Col. C..Col. E))
Col. G - Average of the most recent twelve months of values in Col. F (including current SOS delivery month)
Col. H - Average of the most recent six months of values in Col. F (ending month prior to SOS delivery month)
Col. I - month in which SOS was delivered at wholesale.

NG/TC 008607

NG/TC 008608

The Narragansett Electric Company
Standard Offer Fuel Adjustment Estimate

DETERMINATION OF MARKET OIL PRICE

The Management Em.
(B.J.) - art
Exh. ___ MC-4
Page 2 of 3

15

Notes:
Col. A = month in which SOS was delivered at wholesale.
Col. B = months in which oil prices were quoted and delivered.
Col. C = Col. CQ = daily prices as quoted by Platts Market Scan.
Col. H = period noted in Col. C through Col. GG. (May-00 = Aug-01)
    - Final Costs of current prices as reported in the Wall Street Journal on 12 Aug-01 (Sept-01)
    - Average of Costs of current prices as reported in the Wall Street Journal on 12-Aug-01, 12-Aug-01, 24-Aug-01 (Oct-01 - Dec-01)
Col. II = number of non-zero values in Col. C through Col. GG.
Col. JJ = the division of II by the data per HH.
Col. KK = Col. H divided by II (May-00–Aug-01)
    - Current month values Col. HH * Aug-01 value in Col KK / 25.99 (Sept-01 - Dec-01)
Col. LL = Average of the Avg-01 closing value from the WSJ (during delivery month)
Col. MM = Average of the most recent twelve months of values in Col. KK (trailing month prior to SOS delivery month)

The Narragansett Electric Company
R.I.P.U.C. Docket
Exhibit MJH-4
Page 3 of 3

## The Narragansett Electric Company
## Standard Offer Fuel Adjustment Estimate

### CALCULATION OF FUEL ADJUSTMENT VALUE

| (Col. A) | (Col. B) | (Col. C) | (Col. D) | (Col. E) | (Col. F) | (Col. G) | (Col. H) | (Col. I) | (Col. J) |
|---|---|---|---|---|---|---|---|---|---|
| SOS | Narragansett Zone | | | | EUA Zone | | | | Weighted |
| Delivery | Fuel | Fuel | Stipulated | Adjustment | Fuel | Fuel | Stipulated | Adjustment | Adjustment |
| Month | Value | Trigger | Price | c/kWh | Value | Trigger | Price | c/kWh | ¢/kWh |
| Apr-01 | $9.37 | $5.35 | $3.80 | 2.550 | $10.43 | $5.35 | 3.80 | 3.223 | 2.725 |
| May-01 | $9.51 | $5.35 | $3.80 | 2.639 | $10.28 | $5.35 | 3.80 | 3.128 | 2.766 |
| Jun-01 | $9.39 | $5.35 | $3.80 | 2.563 | $10.20 | $5.35 | 3.80 | 3.077 | 2.697 |
| Jul-01 | $9.22 | $5.35 | $3.80 | 2.455 | $9.66 | $5.35 | 3.80 | 2.734 | 2.528 |
| Aug-01 | $9.12 | $5.35 | $3.80 | 2.392 | $8.43 | $5.35 | 3.80 | 1.954 | 2.278 |
| Sep-01 | $8.88 | $5.35 | $3.80 | 2.239 | $7.73 | $5.35 | 3.80 | 1.510 | 2.049 |
| Oct-01 | $8.58 | $5.35 | $3.80 | 2.049 | $7.34 | $5.35 | 3.80 | 1.262 | 1.844 |
| Nov-01 | $8.37 | $5.35 | $3.80 | 1.916 | $6.89 | $5.35 | 3.80 | 0.977 | 1.672 |
| Dec-01 | $8.08 | $5.35 | $3.80 | 1.732 | $6.54 | $5.35 | 3.80 | 0.755 | 1.478 |

Notes:
Col. A - month in which SOS was delivered at wholesale
Col. B - Average of the values of Gas Index for the most recent 12 months.
Col. C - Average of the values of Oil Index for the most recent 12 months.
Col. D - Applicable value from the Standard Offer Supply Contracts.
Col. E - @if(Col. B > Col. C, (((Col. B + $0.64) / (Col. C +$0.64)-1.0)*Col. D), 1.000)
Col. F - Average of the values of Gas Index for the most recent 6 months.
Col. G - Average of the values of Oil Index for the most recent 6 months.
Col. H - Applicable value from the Standard Offer Supply Contracts.
Col. I - @if(Col. F > Col. G, (((Col. F + $0.64) / (Col. G +$0.64)-1.0)*Col. H), 1.000)
Col. J - (0.74 * Col. G) + (0.26 * Col. M)
    WeightingValues based on 12 months of Standard Offer purchases ending 7/31/01

16

NG/TC 008609

# Tab 21



EXHIBIT

The Narragansett Electric Company

Rate Changes for January 1, 2002

Testimony and Exhibits
of
Jeanne A. Lloyd,
Michael J. Hager, and
Anne M. Rodrigues

November 2001

Submitted to:
Rhode Island Public Utilities Commission
R.I.P.U.C. Docket No. _____

Submitted by:

**Narragansett Electric**
A **National Grid** Company

NG/TC 010624

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Witness: Hager

**DIRECT TESTIMONY**

**OF**

**MICHAEL J. HAGER**

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 1 of 12

1  I.    **Introduction**

2  Q.    Please state your name and business address.

3  A.    Michael J. Hager, 55 Bearfoot Road, Northborough, Massachusetts 01532.

4

5  Q.    Please state your position.

6  A.    I am the Manager, Distribution Energy Services for National Grid USA Service

7        Company. I am responsible for all power procurement and related activities for the

8        distribution companies of National Grid USA (formerly the New England Electric

9        System) including The Narragansett Electric Company ("Narragansett" or "Company").

10       These activities include the procurement of power for Standard Offer Service and Last

11       Resort Service.

12

13  Q.   Will you describe your educational background and training?

14  A.   In 1982, I graduated from the University of Hartford with a Bachelor of Science degree in

15       Mechanical Engineering. In 1986, I received a Master of Science degree in Mechanical

16       Engineering from Northeastern University. I am a Licensed Professional Engineer in the

17       Commonwealth of Massachusetts.

18

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 2 of 12

1  Q.  What is your professional background?

2  A.  From 1982 to 1992, I was employed by New England Power Service Company in various

3      engineering positions. In these positions, I provided support to New England Power

4      Company's ("NEP") thermal and hydroelectric generating plants with overall

5      responsibility for the management and control of studies and projects from initiation to

6      completion.

7

8      From 1992 to 1997, I was employed by NEP where I conducted wholesale and retail

9      power marketing activities involving the sale and purchase of generation resources to and

10     from investor-owned utilities, municipalities, independent power producers, government

11     agencies, brokers, marketers, and end-use retail customers.

12

13     In June 1997, I was promoted to the position of Standard Offer Portfolio Manager for

14     New England Power Service Company (now National Grid USA Service Company).

15

16     In November 2000, my title was changed to Manager, Distribution Energy Services to

17     more fully reflect the scope of work performed by my department.

18

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 3 of 12

1  Q.   Have you previously testified before the Commission?

2  A.   Yes.

3

4  **II.**   **Purpose of Testimony**

5  Q.   What is the purpose of your testimony?

6  A.   The purpose of my testimony is to (i) provide an estimate of the costs Narragansett

7       expects to incur under its Standard Offer supply contracts for the period January 2002

8       through December 2004 and (ii) explain certain other costs that have been billed to

9       Narragansett by ISO New England.

10

11 **III.**  **Description of Fuel Index Adjustment Provision**

12 Q.   What are the Company's current arrangements for procurement of Standard Offer

13      Service?

14 A.   The Company has contracts with USGen New England, TransCanada Power Marketing

15      and, until recently, New England Power Company, to serve the load within its pre-merger

16      service territory ("Narragansett Zone").  The Company also has contracts with

17      TransCanada, Constellation Power Source and NRG Power Marketing to serve the load

18      within the service territory of the former Blackstone Valley Electric Company and

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

1    Newport Electric Company ("EUA Zone"). All of the Company's contracts run through

2    December 31, 2009.

3

4    The New England Power Company arrangement arose out of the FERC-approved

5    Wholesale Settlement from 1997, under which NEP provided Standard Offer supply for

6    new customers in the Narragansett Zone. New customer load in the EUA Zone is

7    covered by the contracts with the non-affiliated suppliers. As a result of a recent

8    solicitation conducted by the Company, the New England Power Company arrangement

9    was terminated effective December 1, 2001 and replaced with an arrangement with

10   another supplier.

11

12   Q.   Will the cost of power change from the new arrangement with the new supplier?

13   A.   No. Narragansett will pay the same cost per kilowatt-hour under the new arrangement as

14        it would have paid under the New England Power arrangement. To facilitate the transfer

15        to the new supplier; however, a $20 million credit is being provided to Narragansett

16        effective December 1, 2001. This credit will remain on Narragansett's books and earn

17        interest until the credit is passed on to customers. The funds can be used to offset future

18        rate increases or used in other ways to benefit customers, subject to Commission

19        approval. At this time, the Company is proposing to wait until after the winter period is

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 5 of 12

1       over before proposing any plan regarding the disposition of this credit.  This will allow

2       the Company and the Division to assess the direction of fuel prices that could impact

3       Standard Offer costs in the future.

4

5   Q.  Please describe the costs that Narragansett incurs under the Standard Offer supply

6       contracts.

7   A.  The Standard Offer supply contracts contain two price components – a base price and a

8       fuel index adjustment provision.

9

10  Q.  What are the base prices for the period January 2002 through December 2004?

11  A.  The base prices are 4.2 ¢/kWh, 4.7 ¢/kWh and 5.1 ¢/kWh for calendar years 2002, 2003

12      and 2004, respectively.

13

14  Q.  Can you describe the fuel index adjustment provision that is contained in the Standard

15      Offer contracts?

16  A.  Yes.  The Company's contracts with its Standard Offer suppliers contain a fuel index

17      adjustment provision that provides additional payments to those suppliers in the event of

18      substantial increases in the market price of No. 6 residual fuel oil (1% sulphur) and

19      natural gas.  In short, the provision compares the sum of the six-month and twelve-month

S:\RA DATA 1\2001\NECO\NOV FILING\MJH TESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 6 of 12

1    rolling average of oil and gas prices to a preset trigger point. (The six-month rolling

2    average is used for Standard Offer load in the EUA Zone while the twelve-month rolling

3    average is used for Standard Offer load in the Narragansett Zone.) If the sum of the fuel

4    index values exceeds the trigger point in a given month then the Company makes

5    additional payments to the suppliers in that month. If the sum of the fuel index values is

6    less than or equal to the trigger point in a given month, no additional payments are made

7    in that month. Comparisons are made each month and thus payments may be made in

8    some months and not in others. The text of the fuel index adjustment provision that is

9    applicable to the Standard Offer contracts is provided as Exhibit MJH-1.

10

11   **IV.    Fuel Index Estimate for the Period January 2002 through December 2004**

12   Q.    Has the Company selected an estimate of expected costs under the fuel index

13         adjustment provisions for the period January 2002 through December 2004?

14   A.    Yes. The Company has estimated its expected costs under the fuel index adjustment

15         provisions in the same manner as its September 2000, December 2000, March 2001 and

16         August 2001 estimates but used average gas and crude oil prices as reported in The Wall

17         Street Journal on 13-Nov-01, 14-Nov-01 and 15-Nov-01.

18

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 7 of 12

1   Q.   What gas and oil prices were used in the current estimate?

2   A.   Exhibit MJH-2 provides the gas and oil values used in the analysis.

3

4   Q.   What were the resulting fuel index trigger payments?

5   A.   Exhibit MJH-3 provides the resulting fuel index adjustment payments from the analysis.

6       The analysis shows that the Company would pay an arithmetic average fuel index

7       adjustment payment for the period January 2002 through March 2002 of 0.262 ¢/kWh for

8       the Narragansett Zone load and would make no fuel index adjustment payments for the

9       EUA Zone load.  This equates to a total Standard Offer cost of 4.462 ¢/kWh and 4.200

10     ¢/kWh respectively.

11

12     For the period April 2002 and beyond, the current analysis shows that the Company

13     would make no fuel index adjustment payments for either the Narragansett or the EUA

14     Zone loads.  Thus the total cost would be 4.200 ¢/kWh for the April 2002 through

15     December 2002 period, 4.700 ¢/kWh for the January 2003 through December 2003

16     period and 5.100 ¢/kWh for the January 2004 through December 2004 period.

17

18

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 8 of 12

1    Q.    How do these costs compare to current market costs for power?

2    A.    The Company's market cost proxy for comparable service is the cost it incurs to procure

3          its Last Resort Service requirements or the cost its affiliates incur to procure their Default

4          Service requirements.  The Company recently procured Last Resort Service for the period

5          September 2001 through February 2002 at 5.674 ¢/kWₕ and for the period March 2002

6          through August 2002 at 6.257 ¢/kWh.  The Company has not procured any supply

7          beyond August 2002; however, based on current forward market prices, the Company

8          estimates market prices for calendar year 2003 and calendar year 2004 to be

9          approximately 5.5 ¢/kWh.

10

11   Q.    Can you provide the details of the current calculations?

12   A.    Yes.  Detailed calculations are provided in Exhibit MJH-4.

13

14   V.    **Additional Charges Assessed by ISO New England**

15   Q.    Does ISO New England assess charges to Narragansett that are in addition to the charges

16         incurred under the Standard Offer supply contracts?

17   A.    Yes.  As explained in the testimony of Anne M. Rodrigues, ISO New England bills

18         Narragansett for various services under various FERC approved tariffs.

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 9 of 12

1   Q.   Please explain the ISO New England charges that are being disputed by Narragansett.

2   A.   ISO New England has been billing Narragansett certain charges which two of

3      Narragansett's Standard Offer suppliers, USGen New England and TransCanada, have

4      claimed are Narragansett's responsibility under certain of the Standard Offer supply

5      contracts. In particular, these suppliers are disputing the charges that ISO New England

6      has allocated to them and which are assessed on the basis of "Electrical Load" as defined

7      in the Restated NEPOOL Agreement. Currently, these charges include Energy market

8      uplift charges, inadvertent balance charges in the Energy market, Schedule 2 and

9      Schedule 3 charges under the ISO-NE FERC Electric Tariff No. 1, transition costs and

10     load response program costs.

11

12     These costs are billed to Narragansett's suppliers as a result of their providing Standard

13     Offer Service pursuant to the Standard Offer supply contracts. Beginning May 1, 2000,

14     two suppliers have contended that they are not responsible for these costs under the terms

15     of the supply contracts. Narragansett disagrees and believes these costs are the

16     responsibility of the suppliers. To ensure that the two suppliers continue to provide

17     service, Narragansett agreed to have ISO New England bill it for such disputed costs until

18     such time as a final resolution of the dispute is reached pursuant to the dispute resolution

19     process provided for in the supply contracts. Narragansett filed a demand for arbitration

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

1      against the supplier that represents over 90 percent of the disputed amounts. Narragansett

2      will pursue appropriate actions against the second supplier at the appropriate time.

3

4    Q.    Does ISO New England bill Narragansett Schedule 2 and Schedule 3 charges under its

5          FERC Electric Tariff No. 1 that are in addition to the disputed supplier charges?

6    A.    Yes. As explained in the testimony of Ms. Rodrigues, ISO New England bills

7          Narragansett Schedule 2 and Schedule 3 charges under its FERC Electric Tariff No. 1.

8          Prior to July 1, 2001, these charges were assessed to NEPOOL Participants on a

9          "volumetric" basis – that is, on the basis of their Electrical Load obligations or on the

10         basis of their generation entitlements. Since Narragansett has no generation entitlements

11         and has passed the settlement responsibility, and thus Electrical Load obligations, to its

12         suppliers, it has not been assessed any Schedule 2 or Schedule 3 charges (with the

13         exception of any disputed charges as discussed previously).

14

15         Effective July 1, 2001, the Schedule 2 charges have included, in addition to the

16         volumetric based charges, a "transaction" based charge. These transaction-based charges

17         are assessed to users of the NEPOOL settlement system based on each contract that is

18         entered into the system. The charges are assessed to both the buyer and the seller of the

19         contract. Narragansett must enter contracts into the NEPOOL settlement system to

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

141

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 11 of 12

1    transfer its Standard Offer and Last Resort Service loads to its wholesale suppliers.

2    Effective July 1, 2001, Narragansett has been assessed a "transaction unit" for each hour

3    that a contract was entered into the market system and a "volumetric unit" for any

4    Electrical Load obligations, generation entitlement or for each hour in which

5    purchases/sales were made from/to the ISO spot market (such as for purchases/sales

6    related to Qualifying Facilities). All such costs charged to Narragansett, whether for

7    Standard Offer Service or Last Resort Service, have been included in the transmission

8    service reconciliation.

9

10   Q.   Can you identify any recent reductions in Energy market uplift costs that have been

11        charged by ISO New England?

12   A.   Yes. NEPOOL implemented new Energy market rules effective July 1, 2001. Under

13        these new rules, which were approved by FERC, Energy market uplift costs are based on

14        a new methodology called Net Commitment Period Compensation ("NCPC"). Exhibit

15        MJH-5 shows the total NEPOOL Energy market uplift and NCPC costs for the period

16        July 2000 through September 2001. As the exhibits shows, the average NCPC costs for

17        the July 2001 through September 2001 period are approximately 50% of the average

18        Energy market costs in the immediately preceding six month period January 2001

19        through June 2001.

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 12 of 12

1    Q.    Does this conclude your testimony?

2    A.    Yes. It does.

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

143

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 1 of 3

### Standard Offer Fuel Index Adjustment Provision

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1 % sulphur) and natural gas after 1999, NECO will pay additional amounts to Seller in accordance with this Standard Offer Fuel Index Adjustment Provision, which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Index Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---------------|-------------------------|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Seller will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent available twelve months (six months for Standard Offer load in the EUA Zone), where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 2 of 3

month of delivery trades as reported in the "Wall Street Journal",
expressed in dollars per MMBtu. NYMEX Contract shall mean
the New York Mercantile Exchange Natural Gas Futures Con-
tract as approved by the Commodity Futures Trading Commis-
sion for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent
available twelve months (six months for Standard Offer load in the EUA Zone), where:

Oil Index is the average for the month of the daily low quotations
for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into
New York harbor, as reported in "Platt's Oilgram U.S.
Marketscan" in dollars per barrel and converted to dollars per
MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, NECO
shall file alternate indices with the RIPUC.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu,
applicable for all months in the specified calendar year:

| | |
|------|------------|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 | $8.48 |
| 2006 | $9.22 |
| 2007 | $9.95 |
| 2008 | $10.69 |
| 2009 | $11.42 |

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

145
NG/TC 010769

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 3 of 3

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

Fuel = (Market Gas Price + $.60/MMBtu) + (Market Oil Price + $.04/MMBtu)
Adjustment         Fuel Trigger Point + $.60 + $.04/MMBtu

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:

($3.50 + $.60/MMBtu) + ($3.00 + $.04/MMBtu)  =  1.0609
$6.09 + $.60 + $.04/MMBtu

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-2
Page 1 of 1

**Gas and Oil Values
used in Company's Analyses
($/mmBtu)**

| Month | Gas Index | Oil Index |
|-------|-----------|-----------|
| Jan-02 | 3.829 | 2.25 |
| Feb-02 | 3.499 | 2.26 |
| Mar-03 | 3.349 | 2.26 |
| Apr-02 | 3.141 | 2.26 |
| May-02 | 2.974 | 2.26 |
| Jun-02 | 2.899 | 2.26 |
| Jul-02 | 2.876 | 2.26 |
| Aug-02 | 2.869 | 2.26 |
| Sep-02 | 2.928 | 2.25 |
| Oct-02 | 3.034 | 2.25 |
| Nov-02 | 3.059 | 2.26 |
| Dec-02 | 3.128 | 2.26 |
| Jan-03 | 3.192 | 2.26 |
| Feb-03 | 3.246 | 2.26 |
| Mar-03 | 3.266 | 2.26 |
| Apr-03 | 3.313 | 2.26 |
| May-03 | 3.352 | 2.26 |
| Jun-03 | 3.389 | 2.26 |
| Jul-03 | 3.424 | 2.26 |
| Aug-03 | 3.456 | 2.26 |
| Sep-03 | 3.488 | 2.26 |
| Oct-03 | 3.522 | 2.26 |
| Nov-03 | 3.545 | 2.26 |
| Dec-03 | 3.577 | 2.27 |

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

NG/TC 010771

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-3
Page 1 of 1

### Summary of Additional Payments Estimated to be
### Made Pursuant to the Fuel Index Adjustment Provisions
### (Cents/kWh)

| Month | Narragansett Zone | EUA Zone |
|-------|-------------------|----------|
| Jan-02 | 0.505 | 0.000 |
| Feb-02 | 0.225 | 0.000 |
| Mar-03 | 0.056 | 0.000 |
| Apr-02 | 0.000 | 0.000 |
| May-02 | 0.000 | 0.000 |
| Jun-02 | 0.000 | 0.000 |
| Jul-02 | 0.000 | 0.000 |
| Aug-02 | 0.000 | 0.000 |
| Sep-02 | 0.000 | 0.000 |
| Oct-02 | 0.000 | 0.000 |
| Nov-02 | 0.000 | 0.000 |
| Dec-02 | 0.000 | 0.000 |
| Jan-03 | 0.000 | 0.000 |
| Feb-03 | 0.000 | 0.000 |
| Mar-03 | 0.000 | 0.000 |
| Apr-03 | 0.000 | 0.000 |
| May-03 | 0.000 | 0.000 |
| Jun-03 | 0.000 | 0.000 |
| Jul-03 | 0.000 | 0.000 |
| Aug-03 | 0.000 | 0.000 |
| Sep-03 | 0.000 | 0.000 |
| Oct-03 | 0.000 | 0.000 |
| Nov-03 | 0.000 | 0.000 |
| Dec-03 | 0.000 | 0.000 |

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

148

NG/TC 010772

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket No.
Exhibit MJH-4
Page 1 of 3

## DETERMINATION OF MARKET GAS PRICE

| (Col. A) | (Col. B) | (Col. C) | (Col. D) | (Col. E) | (Col. F) | (Col. G) | (Col. H) | (Col. I) |
|---|---|---|---|---|---|---|---|---|
| Contract Month | Last Month of Trading | Settlement Prices ($/mmBtu) | | | Gas Index | NGrid's Market Gas Price | EUA's Market Gas Price | SOS Delivery Month |
| | | 3rd Last | 2nd Last | Last | | | | |
| Jan-01 | Dec-00 | $9.579 | $9.805 | $9.976 | $9.787 | $4.532 | $4.863 | Jan-01 |
| Feb-01 | Jan-01 | $7.270 | $7.256 | $6.293 | $6.940 | $4.895 | $5.737 | Feb-01 |
| Mar-01 | Feb-01 | $5.142 | $5.131 | $4.998 | $5.090 | $5.106 | $6.269 | Mar-01 |
| Apr-01 | Mar-01 | $5.322 | $5.621 | $5.384 | $5.442 | $5.315 | $6.344 | Apr-01 |
| May-01 | Apr-01 | $5.078 | $4.981 | $4.891 | $4.983 | $5.471 | $6.367 | May-01 |
| Jun-01 | May-01 | $4.054 | $3.973 | $3.738 | $3.922 | $5.445 | $6.427 | Jun-01 |
| Jul-01 | Jun-01 | $3.446 | $3.397 | $3.182 | $3.342 | $5.345 | $6.027 | Jul-01 |
| Aug-01 | Jul-01 | $3.276 | $3.128 | $3.167 | $3.190 | $5.299 | $4.953 | Aug-01 |
| Sep-01 | Aug-01 | $2.544 | $2.415 | $2.295 | $2.418 | $5.113 | $4.328 | Sep-01 |
| Oct-01 | Sep-01 | $1.910 | $1.925 | $1.830 | $1.888 | $4.829 | $3.883 | Oct-01 |
| Nov-01 | Oct-01 | $2.938 | $3.041 | $3.202 | $3.060 | $4.699 | $3.291 | Nov-01 |
| Dec-01 | Nov-01 | $2.733 | $2.798 | $2.676 | $2.736 | $4.400 | $2.970 | Dec-01 |
| Jan-02 | Dec-01 | $2.930 | $2.992 | $2.884 | $2.935 | $3.829 | $2.772 | Jan-02 |
| Feb-02 | Jan-02 | $2.968 | $3.032 | $2.932 | $2.977 | $3.499 | $2.705 | Feb-02 |
| Mar-02 | Feb-02 | $3.953 | $3.020 | $2.924 | $3.299 | $3.349 | $2.669 | Mar-02 |
| Apr-02 | Mar-02 | $2.920 | $2.990 | $2.904 | $2.938 | $3.141 | $2.816 | Apr-02 |
| May-02 | Apr-02 | $2.960 | $3.030 | $2.946 | $2.979 | $2.974 | $2.991 | May-02 |
| Jun-02 | May-02 | $3.005 | $3.075 | $2.995 | $3.025 | $2.899 | $2.977 | Jun-02 |
| Jul-02 | Jun-02 | $3.045 | $3.115 | $3.041 | $3.067 | $2.876 | $3.026 | Jul-02 |
| Aug-02 | Jul-02 | $3.085 | $3.157 | $3.086 | $3.109 | $2.869 | $3.048 | Aug-02 |
| Sep-02 | Aug-02 | $3.098 | $3.167 | $3.101 | $3.122 | $2.928 | $3.070 | Sep-02 |
| Oct-02 | Sep-02 | $3.143 | $3.207 | $3.141 | $3.164 | $3.034 | $3.040 | Oct-02 |
| Nov-02 | Oct-02 | $3.340 | $3.402 | $3.336 | $3.359 | $3.059 | $3.078 | Nov-02 |
| Dec-02 | Nov-02 | $3.545 | $3.602 | $3.536 | $3.561 | $3.128 | $3.141 | Dec-02 |
| Jan-03 | Dec-02 | $3.695 | $3.732 | $3.666 | $3.698 | $3.192 | $3.230 | Jan-03 |
| Feb-03 | Jan-03 | $3.625 | $3.662 | $3.596 | $3.628 | $3.246 | $3.336 | Feb-03 |
| Mar-03 | Feb-03 | $3.535 | $3.572 | $3.506 | $3.538 | $3.266 | $3.422 | Mar-03 |
| Apr-03 | Mar-03 | $3.439 | $3.572 | $3.506 | $3.506 | $3.313 | $3.491 | Apr-03 |
| May-03 | Apr-03 | $3.449 | $3.477 | $3.411 | $3.446 | $3.352 | $3.548 | May-03 |
| Jun-03 | May-03 | $3.480 | $3.477 | $3.446 | $3.468 | $3.389 | $3.563 | Jun-03 |
| Jul-03 | Jun-03 | $3.505 | $3.477 | $3.481 | $3.488 | $3.424 | $3.547 | Jul-03 |
| Aug-03 | Jul-03 | $3.540 | $3.477 | $3.481 | $3.499 | $3.456 | $3.512 | Aug-03 |
| Sep-03 | Aug-03 | $3.550 | $3.477 | $3.481 | $3.503 | $3.488 | $3.501 | Sep-03 |
| Oct-03 | Sep-03 | $3.550 | $3.624 | $3.558 | $3.577 | $3.522 | $3.485 | Oct-03 |
| Nov-03 | Oct-03 | $3.550 | $3.782 | $3.558 | $3.630 | $3.545 | $3.497 | Nov-03 |
| Dec-03 | Nov-03 | $3.955 | $3.967 | $3.901 | $3.941 | $3.577 | $3.527 | Dec-03 |

Notes:

Col. A - Contract refers to the NYMEX Natural Gas Futures Contract, as approved by the CFTC, for the purchase and sale of natural gas at Henry Hub.

Col. B - Month that trading for the Contract ends (the month before the delivery month)

Col. C - Settlement price for the third last trading day as reported in the Wall Street Journal. (Jan-99 - Nov-01)
    - Settlement price as reported in the Wall Street Journal on 13-Nov-01. (Dec-01 - Dec-03)

Col. D - Settlement price for the second last trading day as reported in the Wall Street Journal. (Jan-99 - Nov-01)
    - Settlement price as reported in the Wall Street Journal on 14-Nov-01. (Dec-01 - Dec-03)

Col. E - Settlement price for the last trading day as reported in the Wall Street Journal. (Jan-99 - Nov-01)
    - Settlement price as reported in the Wall Street Journal on 15-Nov-01. (Dec-01 - Dec-03)

Col. F - Average value of Col. C, Col. D and Col. E (=AVERAGE(Col. C...Col. E))

Col. G - Average of the most recent twelve months of values in Col. F (including current SOS delivery month)

Col. H - Average of the most recent six months of values in Col. F (ending month prior to SOS delivery month)

Col. I - month in which SOS was delivered at wholesale.

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket No.
Exhibit MJH-4
Page 2 of 3

## DETERMINATION OF MARKET OIL PRICE



Notes:
Col. A - month in which EGS was delivered or whopesale.
Col. B - 6 month months of prices were quoted and delivered
Col. C - Col. C0 - daily prices as quoted by Platt's Marketscan
Col. NH - term at which EGS C through Col. V21 (prior 01-Oct-03)
  - Non-All Final Guide of received price as reported in the Wall Street Journal on November 12, 14, 51, 2001 (Dec-01 - Dec-03)
  - average of Guide oil received prices as reported in the Wall Street Journal (prior to 01-Oct-03)
Col. U - number of hours a price is in Col. C through Col. O0.
Col. U - is the factor of 0.4 in the low value ter
Col. KK - Col. H0 divided by Col. U (i.e. JJ) (Jan-97 - Dec-97)
  - Current oven value Col. HK = Col.CU value = Col-CU 23.53 (Nov-01 - Dec-03)
  - Where a 25 represents the 40-Oct delivery period from the High 12-Oct-03
Col. LL - Average of the market in twelve months of values in Col. KK (trailing month prior to 12 delivery months)

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket No.
Exhibit MJH-4
Page 3 of 3

## The Narragansett Electric Company
## Standard Offer Fuel Adjustment Estimate

### CALCULATION OF FUEL ADJUSTMENT VALUE

| (Col. A) | (Col. B) | (Col. C) | (Col. D) | (Col. E) | (Col. F) | (Col. G) | (Col. H) | (Col. I) | (Col. J) |
|---|---|---|---|---|---|---|---|---|---|
| SOS | Narragansett Zone | | | | EUA Zone | | | | Weighted |
| Delivery Month | Fuel Value | Fuel Trigger | Stipulated Price | Adjustment c/kWh | Fuel Value | Fuel Trigger | Stipulated Price | Adjustment c/kWh | Adjustment ¢/kWh |
| Jan-02 | $6.90 | $6.09 | 4.200 | 0.505 | $5.57 | $6.09 | 4.200 | 0.000 | 0.374 |
| Feb-02 | $6.45 | $6.09 | 4.200 | 0.225 | $5.37 | $6.09 | 4.200 | 0.000 | 0.167 |
| Mar-02 | $6.18 | $6.09 | 4.200 | 0.056 | $5.18 | $6.09 | 4.200 | 0.000 | 0.041 |
| Apr-02 | $5.86 | $6.09 | 4.200 | 0.000 | $5.17 | $6.09 | 4.200 | 0.000 | 0.000 |
| May-02 | $5.58 | $6.09 | 4.200 | 0.000 | $5.25 | $6.09 | 4.200 | 0.000 | 0.000 |
| Jun-02 | $5.43 | $6.09 | 4.200 | 0.000 | $5.23 | $6.09 | 4.200 | 0.000 | 0.000 |
| Jul-02 | $5.34 | $6.09 | 4.200 | 0.000 | $5.28 | $6.09 | 4.200 | 0.000 | 0.000 |
| Aug-02 | $5.25 | $6.09 | 4.200 | 0.000 | $5.31 | $6.09 | 4.200 | 0.000 | 0.000 |
| Sep-02 | $5.23 | $6.09 | 4.200 | 0.000 | $5.33 | $6.09 | 4.200 | 0.000 | 0.000 |
| Oct-02 | $5.29 | $6.09 | 4.200 | 0.000 | $5.30 | $6.09 | 4.200 | 0.000 | 0.000 |
| Nov-02 | $5.31 | $6.09 | 4.200 | 0.000 | $5.33 | $6.09 | 4.200 | 0.000 | 0.000 |
| Dec-02 | $5.39 | $6.09 | 4.200 | 0.000 | $5.40 | $6.09 | 4.200 | 0.000 | 0.000 |
| Jan-03 | $5.45 | $7.01 | 4.700 | 0.000 | $5.49 | $7.01 | 4.700 | 0.000 | 0.000 |
| Feb-03 | $5.50 | $7.01 | 4.700 | 0.000 | $5.59 | $7.01 | 4.700 | 0.000 | 0.000 |
| Mar-03 | $5.52 | $7.01 | 4.700 | 0.000 | $5.68 | $7.01 | 4.700 | 0.000 | 0.000 |
| Apr-03 | $5.57 | $7.01 | 4.700 | 0.000 | $5.75 | $7.01 | 4.700 | 0.000 | 0.000 |
| May-03 | $5.61 | $7.01 | 4.700 | 0.000 | $5.80 | $7.01 | 4.700 | 0.000 | 0.000 |
| Jun-03 | $5.65 | $7.01 | 4.700 | 0.000 | $5.82 | $7.01 | 4.700 | 0.000 | 0.000 |
| Jul-03 | $5.68 | $7.01 | 4.700 | 0.000 | $5.80 | $7.01 | 4.700 | 0.000 | 0.000 |
| Aug-03 | $5.71 | $7.01 | 4.700 | 0.000 | $5.77 | $7.01 | 4.700 | 0.000 | 0.000 |
| Sep-03 | $5.74 | $7.01 | 4.700 | 0.000 | $5.75 | $7.01 | 4.700 | 0.000 | 0.000 |
| Oct-03 | $5.78 | $7.01 | 4.700 | 0.000 | $5.74 | $7.01 | 4.700 | 0.000 | 0.000 |
| Nov-03 | $5.80 | $7.01 | 4.700 | 0.000 | $5.75 | $7.01 | 4.700 | 0.000 | 0.000 |
| Dec-03 | $5.84 | $7.01 | 4.700 | 0.000 | $5.79 | $7.01 | 4.700 | 0.000 | 0.000 |

Notes:
Forecast of fuel prices based on NYMEX futures as reported in the Wall Street Journal on November 13, 14 & 15, 2001

Col. A - month in which SOS was delivered at wholesale
Col. B - Average of the values of Gas Index for the most recent 12 months.
Col. C - Average of the values of Oil Index for the most recent 12 months.
Col. D - Applicable value from the Standard Offer Supply Contracts.
Col. E - @if(Col. B > Col. C, (((Col. B + $0.64) / (Col. C +$0.64)-1.0)*Col. D), 1.000)
Col. F - Average of the values of Gas Index for the most recent 6 months.
Col. G - Average of the values of Oil Index for the most recent 6 months.
Col. H - Applicable value from the Standard Offer Supply Contracts.
Col. I - @if(Col. F > Col. G, (((Col. F + $0.64) / (Col. G +$0.64)-1.0)*Col. H), 1.000)
Col. J - (0.74 * Col. G) + (0.26 * Col. M)
   Weighting Values based on 12 months of Standard Offer purchases ending 10/31/01

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-5
Page 1 of 1

### Summary of Total NEPPOL Energy Market Uplift
### and
### Net Commitment Period Compensation Payments

| Month | Total Payments |
|---|---|
| Jul-00 | $6,826,051.77 |
| Aug-00 | $19,315,809.14 |
| Sep-00 | $6,840,405.98 |
| Oct-00 | $4,477,781.95 |
| Nov-00 | $6,410,998.98 |
| Dec-00 | $16,861,258.48 |
| Jan-01 | $5,693,984.86 |
| Feb-01 | $2,107,810.68 |
| Mar-01 | $6,828,149.26 |
| Apr-01 | $3,180,886.70 |
| May-01 | $1,907,756.26 |
| Jun-01 | $1,918,413.04 |
| Jul-01 | $739,184.71 |
| Aug-01 | $2,631,414.13 |
| Sep-01 | $1,925,907.85 |

# Tab 22

# The Narragansett Electric Company

## Rate Changes for January 1, 2002

Testimony and Exhibits
of
Jeanne A. Lloyd,
Michael J. Hager, and
Anne M. Rodrigues

November 2001

Submitted to:
Rhode Island Public Utilities Commission
R.I.P.U.C. Docket No. _____

Submitted by:

**Narragansett Electric**

A **National Grid** Company 

EXHIBIT

Lloyd 93
3-6-07

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2002
Witness: Jeanne A. Lloyd

# DIRECT TESTIMONY

## OF

## Jeanne A. Lloyd

S:\RADATA1\2001neco\Nov Filing\index.wpd

1

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2002
Witness: Jeanne A. Lloyd

### Table of Contents

| | | |
|---|---|---|
| I. | Introduction and Qualifications | 1 |
| II. | Purpose of Testimony | 2 |
| III. | Standard Offer Rate | 4 |
| IV. | Transition Charge | 12 |
| V. | Transmission Rate | 18 |
| VI. | Revised Tariff and Tariff Cover Sheets | 24 |
| VII. | Typical Bills and Tariffs | 24 |
| VIII. | Conclusion | 25 |

R.I.P.U.C. No. 1163
Cancelling R.I.P.U.C. No. 1162

## THE NARRAGANSETT ELECTRIC COMPANY
## STANDARD OFFER SERVICE

### AVAILABILITY

All Customers (including new Customers) who have not elected to take their electric supply from a non-regulated power producer will receive their power supply under this Standard Offer Rate until the Customer either : (1) takes its electric supply from a non-regulated power producer; or (2) takes Last Resort Service.

Customers who leave Standard Offer Service may not return to Standard Offer Service.

Standard Offer Service may be terminated by a Customer upon the next scheduled meter read provided that notice of the change of supplier was received in accordance with the Company's Terms and Conditions for Nonregulated Power Producers.

### MONTHLY CHARGE

The Monthly Charge for Service under this tariff will be the sum of the applicable Standard Offer Service charges in addition to all appropriate Retail Delivery charges a stated in the applicable tariff.

### RATE FOR ALL CLASSES

Standard Offer per kWh                4.662¢

### RATE CHANGES

The rates set forth in this tariff are effective for usage on and after January 1, 2002 until changes. Any changes will be filed with the Commission and are subject to Commission review and approval.

Effective: January 1, 2002

S:\RADATA1\2001neco\Nov Filing\so.wpd

7

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Witness: Hager

DIRECT TESTIMONY

OF

MICHAEL J. HAGER

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 1 of 12

1    I.    **Introduction**

2    Q.    Please state your name and business address.

3    A.    Michael J. Hager, 55 Bearfoot Road, Northborough, Massachusetts 01532.

4

5    Q.    Please state your position.

6    A.    I am the Manager, Distribution Energy Services for National Grid USA Service

7          Company.  I am responsible for all power procurement and related activities for the

8          distribution companies of National Grid USA (formerly the New England Electric

9          System) including The Narragansett Electric Company ("Narragansett" or "Company").

10         These activities include the procurement of power for Standard Offer Service and Last

11         Resort Service.

12

13   Q.    Will you describe your educational background and training?

14   A.    In 1982, I graduated from the University of Hartford with a Bachelor of Science degree in

15         Mechanical Engineering.  In 1986, I received a Master of Science degree in Mechanical

16         Engineering from Northeastern University.  I am a Licensed Professional Engineer in the

17         Commonwealth of Massachusetts.

18

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 2 of 12

1    Q.    What is your professional background?

2    A.    From 1982 to 1992, I was employed by New England Power Service Company in various

3        engineering positions. In these positions, I provided support to New England Power

4        Company's ("NEP") thermal and hydroelectric generating plants with overall

5        responsibility for the management and control of studies and projects from initiation to

6        completion.

7

8        From 1992 to 1997, I was employed by NEP where I conducted wholesale and retail

9        power marketing activities involving the sale and purchase of generation resources to and

10       from investor-owned utilities, municipalities, independent power producers, government

11       agencies, brokers, marketers, and end-use retail customers.

12

13       In June 1997, I was promoted to the position of Standard Offer Portfolio Manager for

14       New England Power Service Company (now National Grid USA Service Company).

15

16       In November 2000, my title was changed to Manager, Distribution Energy Services to

17       more fully reflect the scope of work performed by my department.

18

19

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 3 of 12

1   Q.    Have you previously testified before the Commission?

2   A.    Yes.

3

4   **II.**   **Purpose of Testimony**

5   Q.    What is the purpose of your testimony?

6   A.    The purpose of my testimony is to (i) provide an estimate of the costs Narragansett

7        expects to incur under its Standard Offer supply contracts for the period January 2002

8        through December 2004 and (ii) explain certain other costs that have been billed to

9        Narragansett by ISO New England.

10

11   **III.**   **Description of Fuel Index Adjustment Provision**

12   Q.    What are the Company's current arrangements for procurement of Standard Offer

13        Service?

14   A.    The Company has contracts with USGen New England, TransCanada Power Marketing

15        and, until recently, New England Power Company, to serve the load within its pre-merger

16        service territory ("Narragansett Zone"). The Company also has contracts with

17        TransCanada, Constellation Power Source and NRG Power Marketing to serve the load

18        within the service territory of the former Blackstone Valley Electric Company and

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

1   Newport Electric Company ("EUA Zone"). All of the Company's contracts run through

2   December 31, 2009.

3

4   The New England Power Company arrangement arose out of the FERC-approved

5   Wholesale Settlement from 1997, under which NEP provided Standard Offer supply for

6   new customers in the Narragansett Zone.   New customer load in the EUA Zone is

7   covered by the contracts with the non-affiliated suppliers.  As a result of a recent

8   solicitation conducted by the Company, the New England Power Company arrangement

9   was terminated effective December 1, 2001 and replaced with an arrangement with

10  another supplier.

11

12  Q.   Will the cost of power change from the new arrangement with the new supplier?

13  A.   No.  Narragansett will pay the same cost per kilowatt-hour under the new arrangement as

14  it would have paid under the New England Power arrangement.  To facilitate the transfer

15  to the new supplier; however, a $20 million credit is being provided to Narragansett

16  effective December 1, 2001.  This credit will remain on Narragansett's books and earn

17  interest until the credit is passed on to customers.  The funds can be used to offset future

18  rate increases or used in other ways to benefit customers, subject to Commission

19  approval.  At this time, the Company is proposing to wait until after the winter period is

S:\RADATA\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 5 of 12

1    over before proposing any plan regarding the disposition of this credit. This will allow

2    the Company and the Division to assess the direction of fuel prices that could impact

3    Standard Offer costs in the future.

4

5    Q.    Please describe the costs that Narragansett incurs under the Standard Offer supply

6          contracts.

7    A.    The Standard Offer supply contracts contain two price components – a base price and a

8          fuel index adjustment provision.

9

10   Q.    What are the base prices for the period January 2002 through December 2004?

11   A.    The base prices are 4.2 ¢/kWh, 4.7 ¢/kWh and 5.1 ¢/kWh for calendar years 2002, 2003

12         and 2004, respectively.

13

14   Q.    Can you describe the fuel index adjustment provision that is contained in the Standard

15         Offer contracts?

16   A.    Yes. The Company's contracts with its Standard Offer suppliers contain a fuel index

17         adjustment provision that provides additional payments to those suppliers in the event of

18         substantial increases in the market price of No. 6 residual fuel oil (1% sulphur) and

19         natural gas. In short, the provision compares the sum of the six-month and twelve-month

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

136

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 6 of 12

1      rolling average of oil and gas prices to a preset trigger point. (The six-month rolling

2      average is used for Standard Offer load in the EUA Zone while the twelve-month rolling

3      average is used for Standard Offer load in the Narragansett Zone.) If the sum of the fuel

4      index values exceeds the trigger point in a given month then the Company makes

5      additional payments to the suppliers in that month. If the sum of the fuel index values is

6      less than or equal to the trigger point in a given month, no additional payments are made

7      in that month. Comparisons are made each month and thus payments may be made in

8      some months and not in others. The text of the fuel index adjustment provision that is

9      applicable to each of the Standard Offer contracts is provided as Exhibit MJH-1.

10

11    IV.    **Fuel Index Estimate for the Period January 2002 through December 2004**

12    Q.     Has the Company conducted an estimate of expected costs under the fuel index

13           adjustment provisions for the period January 2002 through December 2004?

14    A.     Yes. The Company has estimated its expected costs under the fuel index adjustment

15           provisions in the same manner as its September 2000, December 2000, March 2001 and

16           August 2001 estimates but used average gas and crude oil prices as reported in The Wall

17           Street Journal on 13-Nov-01, 14-Nov-01 and 15-Nov-01.

18

19

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

1    Q.    What gas and oil prices were used in the current estimate?

2    A.    Exhibit MJH-2 provides the gas and oil values used in the analysis.

3

4    Q.    What were the resulting fuel index trigger payments?

5    A.    Exhibit MJH-3 provides the resulting fuel index adjustment payments from the analysis.

6    The analysis shows that the Company would pay an arithmetic average fuel index

7    adjustment payment for the period January 2002 through March 2002 of 0.262 ¢/kWh for

8    the Narragansett Zone load and would make no fuel index adjustment payments for the

9    EUA Zone load.  This equates to a total Standard Offer cost of 4.462 ¢/kWh and 4.200

10    ¢/kWh respectively.

11

12    For the period April 2002 and beyond, the current analysis shows that the Company

13    would make no fuel index adjustment payments for either the Narragansett or the EUA

14    Zone loads.  Thus the total cost would be 4.200 ¢/kWh for the April 2002 through

15    December 2002 period, 4.700 ¢/kWh for the January 2003 through December 2003

16    period and 5.100 ¢/kWh for the January 2004 through December 2004 period.

17

18

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 8 of 12

1    Q.    How do these costs compare to current market costs for power?

2    A.    The Company's market cost proxy for comparable service is the cost it incurs to procure

3          its Last Resort Service requirements or the cost its affiliates incur to procure their Default

4          Service requirements. The Company recently procured Last Resort Service for the period

5          September 2001 through February 2002 at 5.674 ¢/kWh and for the period March 2002

6          through August 2002 at 6.257 ¢/kWh. The Company has not procured any supply

7          beyond August 2002; however, based on current forward market prices, the Company

8          estimates market prices for calendar year 2003 and calendar year 2004 to be

9          approximately 5.5 ¢/kWh.

10

11    Q.    Can you provide the details of the current calculations?

12    A.    Yes. Detailed calculations are provided in Exhibit MJH-4.

13

14    **V.**    **Additional Charges Assessed by ISO New England**

15    Q.    Does ISO New England assess charges to Narragansett that are in addition to the charges

16          incurred under the Standard Offer supply contracts?

17    A.    Yes. As explained in the testimony of Anne M. Rodrigues, ISO New England bills

18          Narragansett for various services under various FERC approved tariffs.

19

1  Q.  Please explain the ISO New England charges that are being disputed by Narragansett.

2  A.  ISO New England has been billing Narragansett certain charges which two of

3  Narragansett's Standard Offer suppliers, USGen New England and TransCanada, have

4  claimed are Narragansett's responsibility under certain of the Standard Offer supply

5  contracts.  In particular, these suppliers are disputing the charges that ISO New England

6  has allocated to them and which are assessed on the basis of "Electrical Load" as defined

7  in the Restated NEPOOL Agreement.  Currently, these charges include Energy market

8  uplift charges, inadvertent balance charges in the Energy market, Schedule 2 and

9  Schedule 3 charges under the ISO-NE FERC Electric Tariff No. 1, transition costs and

10  load response program costs.

11

12  These costs are billed to Narragansett's suppliers as a result of their providing Standard

13  Offer Service pursuant to the Standard Offer supply contracts.  Beginning May 1, 2000,

14  two suppliers have contended that they are not responsible for these costs under the terms

15  of the supply contracts.  Narragansett disagrees and believes these costs are the

16  responsibility of the suppliers.  To ensure that the two suppliers continue to provide

17  service, Narragansett agreed to have ISO New England bill it for such disputed costs until

18  such time as a final resolution of the dispute is reached pursuant to the dispute resolution

19  process provided for in the supply contracts.  Narragansett filed a demand for arbitration

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 10 of 12

1      against the supplier that represents over 90 percent of the disputed amounts. Narragansett

2      will pursue appropriate actions against the second supplier at the appropriate time.

3

4   Q.   Does ISO New England bill Narragansett Schedule 2 and Schedule 3 charges under its

5        FERC Electric Tariff No. 1 that are in addition to the disputed supplier charges?

6   A.   Yes. As explained in the testimony of Ms. Rodrigues, ISO New England bills

7        Narragansett Schedule 2 and Schedule 3 charges under its FERC Electric Tariff No. 1.

8        Prior to July 1, 2001, these charges were assessed to NEPOOL Participants on a

9        "volumetric" basis – that is, on the basis of their Electrical Load obligations or on the

10       basis of their generation entitlements. Since Narragansett has no generation entitlements

11       and has passed the settlement responsibility, and thus Electrical Load obligations, to its

12       suppliers, it has not been assessed any Schedule 2 or Schedule 3 charges (with the

13       exception of any disputed charges as discussed previously).

14

15       Effective July 1, 2001, the Schedule 2 charges have included, in addition to the

16       volumetric based charges, a "transaction" based charge. These transaction-based charges

17       are assessed to users of the NEPOOL settlement system based on each contract that is

18       entered into the system. The charges are assessed to both the buyer and the seller of the

19       contract. Narragansett must enter contracts into the NEPOOL settlement system to

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 11 of 12

1          transfer its Standard Offer and Last Resort Service loads to its wholesale suppliers.

2          Effective July 1, 2001, Narragansett has been assessed a "transaction unit" for each hour

3          that a contract was entered into the market system and a "volumetric unit" for any

4          Electrical Load obligations, generation entitlement or for each hour in which

5          purchases/sales were made from/to the ISO spot market (such as for purchases/sales

6          related to Qualifying Facilities). All such costs charged to Narragansett, whether for

7          Standard Offer Service or Last Resort Service, have been included in the transmission

8          service reconciliation.

9

10    Q.    Can you identify any recent reductions in Energy market uplift costs that have been

11          charged by ISO New England?

12    A.    Yes. NEPOOL implemented new Energy market rules effective July 1, 2001. Under

13          these new rules, which were approved by FERC, Energy market uplift costs are based on

14          a new methodology called Net Commitment Period Compensation ("NCPC"). Exhibit

15          MJH-5 shows the total NEPOOL Energy market uplift and NCPC costs for the period

16          July 2000 through September 2001. As the exhibits shows, the average NCPC costs for

17          the July 2001 through September 2001 period are approximately 50% of the average

18          Energy market costs in the immediately preceding six month period January 2001

19          through June 2001.

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Standard Offer Rate Change for January 1, 2002
Witness: Hager
Page 12 of 12

1    Q.    Does this conclude your testimony?

2    A.    Yes. It does.

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

143

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 1 of 3

### Standard Offer Fuel Index Adjustment Provision

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, NECO will pay additional amounts to Seller in accordance with this Standard Offer Fuel Index Adjustment Provision, which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Index Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---------------|-------------------------|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Seller will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent available twelve months (six months for Standard Offer load in the EUA Zone), where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 2 of 3

month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent available twelve months (six months for Standard Offer load in the EUA Zone), where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, NECO shall file alternate indices with the RIPUC.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|------|------|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 | $8.48 |
| 2006 | $9.22 |
| 2007 | $9.95 |
| 2008 | $10.69 |
| 2009 | $11.42 |

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 3 of 3

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-2
Page 1 of 1

**Gas and Oil Values
used in Company's Analyses
($/mmBtu)**

| Month | Gas Index | Oil Index |
|-------|-----------|-----------|
| Jan-02 | 3.829 | 2.25 |
| Feb-02 | 3.499 | 2.26 |
| Mar-03 | 3.349 | 2.26 |
| Apr-02 | 3.141 | 2.26 |
| May-02 | 2.974 | 2.26 |
| Jun-02 | 2.899 | 2.26 |
| Jul-02 | 2.876 | 2.26 |
| Aug-02 | 2.869 | 2.26 |
| Sep-02 | 2.928 | 2.25 |
| Oct-02 | 3.034 | 2.25 |
| Nov-02 | 3.059 | 2.26 |
| Dec-02 | 3.128 | 2.26 |
| Jan-03 | 3.192 | 2.26 |
| Feb-03 | 3.246 | 2.26 |
| Mar-03 | 3.266 | 2.26 |
| Apr-03 | 3.313 | 2.26 |
| May-03 | 3.352 | 2.26 |
| Jun-03 | 3.389 | 2.26 |
| Jul-03 | 3.424 | 2.26 |
| Aug-03 | 3.456 | 2.26 |
| Sep-03 | 3.488 | 2.26 |
| Oct-03 | 3.522 | 2.26 |
| Nov-03 | 3.545 | 2.26 |
| Dec-03 | 3.577 | 2.27 |

S:\RADATA1\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

147

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-3
Page 1 of 1

### Summary of Additional Payments Estimated to be Made Pursuant to the Fuel Index Adjustment Provisions (Cents/kWh)

| Month | Narragansett Zone | EUA Zone |
|---|---|---|
| Jan-02 | 0.505 | 0.000 |
| Feb-02 | 0.225 | 0.000 |
| Mar-03 | 0.056 | 0.000 |
| Apr-02 | 0.000 | 0.000 |
| May-02 | 0.000 | 0.000 |
| Jun-02 | 0.000 | 0.000 |
| Jul-02 | 0.000 | 0.000 |
| Aug-02 | 0.000 | 0.000 |
| Sep-02 | 0.000 | 0.000 |
| Oct-02 | 0.000 | 0.000 |
| Nov-02 | 0.000 | 0.000 |
| Dec-02 | 0.000 | 0.000 |
| Jan-03 | 0.000 | 0.000 |
| Feb-03 | 0.000 | 0.000 |
| Mar-03 | 0.000 | 0.000 |
| Apr-03 | 0.000 | 0.000 |
| May-03 | 0.000 | 0.000 |
| Jun-03 | 0.000 | 0.000 |
| Jul-03 | 0.000 | 0.000 |
| Aug-03 | 0.000 | 0.000 |
| Sep-03 | 0.000 | 0.000 |
| Oct-03 | 0.000 | 0.000 |
| Nov-03 | 0.000 | 0.000 |
| Dec-03 | 0.000 | 0.000 |

S:\RADATA\2001NECO\NOV FILING\MJHTESTIMONY-FINAL.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket No.
Exhibit MJH-4
Page 1 of 3

## DETERMINATION OF MARKET GAS PRICE

| (Col. A) | (Col. B) | (Col. C) | (Col. D) | (Col. E) | (Col. F) | (Col. G) | (Col. H) | (Col. I) |
|---|---|---|---|---|---|---|---|---|
| Contract Month | Last Month of Trading | Settlement Prices ($/mmBtu) 3rd Last | 2nd Last | Last | Gas Index | NGrid's Market Gas Price | EUA's Market Gas Price | SOS Delivery Month |
| Jan-01 | Dec-00 | $9.579 | $9.805 | $9.978 | $9.787 | $4.532 | $4.863 | Jan-01 |
| Feb-01 | Jan-01 | $7.270 | $7.256 | $6.293 | $6.940 | $4.895 | $5.737 | Feb-01 |
| Mar-01 | Feb-01 | $5.142 | $5.131 | $4.998 | $5.090 | $5.106 | $6.269 | Mar-01 |
| Apr-01 | Mar-01 | $5.322 | $5.621 | $5.384 | $5.442 | $5.315 | $6.344 | Apr-01 |
| May-01 | Apr-01 | $5.078 | $4.981 | $4.891 | $4.983 | $5.471 | $6.367 | May-01 |
| Jun-01 | May-01 | $4.054 | $3.973 | $3.738 | $3.922 | $5.445 | $6.427 | Jun-01 |
| Jul-01 | Jun-01 | $3.446 | $3.397 | $3.182 | $3.342 | $5.345 | $6.027 | Jul-01 |
| Aug-01 | Jul-01 | $3.276 | $3.128 | $3.167 | $3.190 | $5.299 | $4.953 | Aug-01 |
| Sep-01 | Aug-01 | $2.544 | $2.415 | $2.295 | $2.418 | $5.113 | $4.328 | Sep-01 |
| Oct-01 | Sep-01 | $1.910 | $1.925 | $1.830 | $1.888 | $4.829 | $3.883 | Oct-01 |
| Nov-01 | Oct-01 | $2.938 | $3.041 | $3.202 | $3.060 | $4.699 | $3.291 | Nov-01 |
| Dec-01 | Nov-01 | $2.733 | $2.798 | $2.676 | $2.736 | $4.400 | $2.970 | Dec-01 |
| Jan-02 | Dec-01 | $2.930 | $2.992 | $2.884 | $2.935 | $3.829 | $2.772 | Jan-02 |
| Feb-02 | Jan-02 | $2.968 | $3.032 | $2.932 | $2.977 | $3.499 | $2.705 | Feb-02 |
| Mar-02 | Feb-02 | $3.953 | $3.020 | $2.924 | $3.299 | $3.349 | $2.669 | Mar-02 |
| Apr-02 | Mar-02 | $2.920 | $2.990 | $2.904 | $2.938 | $3.141 | $2.816 | Apr-02 |
| May-02 | Apr-02 | $2.960 | $3.030 | $2.946 | $2.979 | $2.974 | $2.991 | May-02 |
| Jun-02 | May-02 | $3.005 | $3.075 | $2.996 | $3.025 | $2.899 | $2.977 | Jun-02 |
| Jul-02 | Jun-02 | $3.045 | $3.115 | $3.041 | $3.067 | $2.876 | $3.026 | Jul-02 |
| Aug-02 | Jul-02 | $3.085 | $3.157 | $3.086 | $3.109 | $2.869 | $3.048 | Aug-02 |
| Sep-02 | Aug-02 | $3.098 | $3.167 | $3.101 | $3.122 | $2.928 | $3.070 | Sep-02 |
| Oct-02 | Sep-02 | $3.143 | $3.207 | $3.141 | $3.164 | $3.034 | $3.040 | Oct-02 |
| Nov-02 | Oct-02 | $3.340 | $3.402 | $3.336 | $3.359 | $3.059 | $3.078 | Nov-02 |
| Dec-02 | Nov-02 | $3.545 | $3.602 | $3.536 | $3.561 | $3.128 | $3.141 | Dec-02 |
| Jan-03 | Dec-02 | $3.695 | $3.732 | $3.666 | $3.698 | $3.192 | $3.230 | Jan-03 |
| Feb-03 | Jan-03 | $3.625 | $3.662 | $3.596 | $3.628 | $3.246 | $3.336 | Feb-03 |
| Mar-03 | Feb-03 | $3.535 | $3.572 | $3.506 | $3.538 | $3.266 | $3.422 | Mar-03 |
| Apr-03 | Mar-03 | $3.439 | $3.572 | $3.506 | $3.506 | $3.313 | $3.491 | Apr-03 |
| May-03 | Apr-03 | $3.449 | $3.477 | $3.411 | $3.446 | $3.352 | $3.546 | May-03 |
| Jun-03 | May-03 | $3.480 | $3.477 | $3.446 | $3.468 | $3.389 | $3.563 | Jun-03 |
| Jul-03 | Jun-03 | $3.505 | $3.477 | $3.481 | $3.488 | $3.424 | $3.547 | Jul-03 |
| Aug-03 | Jul-03 | $3.540 | $3.477 | $3.481 | $3.499 | $3.456 | $3.512 | Aug-03 |
| Sep-03 | Aug-03 | $3.550 | $3.477 | $3.481 | $3.503 | $3.488 | $3.491 | Sep-03 |
| Oct-03 | Sep-03 | $3.550 | $3.624 | $3.558 | $3.577 | $3.522 | $3.485 | Oct-03 |
| Nov-03 | Oct-03 | $3.550 | $3.782 | $3.558 | $3.630 | $3.545 | $3.497 | Nov-03 |
| Dec-03 | Nov-03 | $3.955 | $3.967 | $3.901 | $3.941 | $3.577 | $3.527 | Dec-03 |

Notes:
Col. A - Contract refers to the NYMEX Natural Gas Futures Contract, as approved by the CFTC,
for the purchase and sale of natural gas at Henry Hub.
Col. B - Month that trading for the Contract ends (the month before the delivery month)
Col. C - Settlement price for the third last trading day as reported in the Wall Street Journal. (Jan-99 - Nov-01)
- Settlement price as reported in the Wall Street Journal on 13-Nov-01. (Dec-01 - Dec-03)
Col. D - Settlement price for the second last trading day as reported in the Wall Street Journal. (Jan-99 - Nov-01)
- Settlement price as reported in the Wall Street Journal on 14-Nov-01. (Dec-01 - Dec-03)
Col. E - Settlement price for the last trading day as reported in the Wall Street Journal. (Jan-99 - Nov-01)
- Settlement price as reported in the Wall Street Journal on 15-Nov-01. (Dec-01 - Dec-03)
Col. F - Average value of Col. C, Col. D and Col. E (=AVERAGE(Col. C..Col. E))
Col. G - Average of the most recent twelve months of values in Col. F (including current SOS delivery month)
Col. H - Average of the most recent six months of values in Col. F (ending month prior to SOS delivery month)
Col. I - month in which SOS was delivered at wholesale.

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket No.
Exhibit MJH-4
Page 2 of 3

## DETERMINATION OF MARKET OIL PRICE

Daily low quotation, Gulp Delivery, 1.8% No. 6 residual fuel oil, NY Harbor ($/barrel)



Notes:
Col. A - month in which ESB was entered at and recoverable.
Col. B - month for which oil prices were applied and delivered.
Col. C - Col. D - daily prices as quoted by Platt's Marketscan.
Col. HH - count of values in Col. C through Col. DD. (Jan24 - Dec01)
Col. II - Sum of Values in Col. C through Col. DD.
Col. JJ - = Sum Col. II / Count Col. HH.
Col. KK - Col. II (divided by) Col. JJ values (Nov01 - Dec07)
Col. LL - 
Col. MM -

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket No.
Exhibit MJH-4
Page 3 of 3

## The Narragansett Electric Company
## Standard Offer Fuel Adjustment Estimate

### CALCULATION OF FUEL ADJUSTMENT VALUE

| (Col. A) | (Col. B) | (Col. C) | (Col. D) | (Col. E) | (Col. F) | (Col. G) | (Col. H) | (Col. I) | (Col. J) |
|---|---|---|---|---|---|---|---|---|---|
| SOS | Narragansett Zone | | | | EUA Zone | | | | Weighted |
| Delivery Month | Fuel Value | Fuel Trigger | Stipulated Price | Adjustment c/kWh | Fuel Value | Fuel Trigger | Stipulated Price | Adjustment c/kWh | Adjustment ¢/kWh |
| Jan-02 | $6.90 | $6.09 | 4.200 | 0.505 | $5.57 | $6.09 | 4.200 | 0.000 | 0.374 |
| Feb-02 | $6.45 | $6.09 | 4.200 | 0.225 | $5.37 | $6.09 | 4.200 | 0.000 | 0.167 |
| Mar-02 | $6.18 | $6.09 | 4.200 | 0.056 | $5.18 | $6.09 | 4.200 | 0.000 | 0.041 |
| Apr-02 | $5.86 | $6.09 | 4.200 | 0.000 | $5.17 | $6.09 | 4.200 | 0.000 | 0.000 |
| May-02 | $5.58 | $6.09 | 4.200 | 0.000 | $5.25 | $6.09 | 4.200 | 0.000 | 0.000 |
| Jun-02 | $5.43 | $6.09 | 4.200 | 0.000 | $5.23 | $6.09 | 4.200 | 0.000 | 0.000 |
| Jul-02 | $5.34 | $6.09 | 4.200 | 0.000 | $5.28 | $6.09 | 4.200 | 0.000 | 0.000 |
| Aug-02 | $5.25 | $6.09 | 4.200 | 0.000 | $5.31 | $6.09 | 4.200 | 0.000 | 0.000 |
| Sep-02 | $5.23 | $6.09 | 4.200 | 0.000 | $5.33 | $6.09 | 4.200 | 0.000 | 0.000 |
| Oct-02 | $5.29 | $6.09 | 4.200 | 0.000 | $5.30 | $6.09 | 4.200 | 0.000 | 0.000 |
| Nov-02 | $5.31 | $6.09 | 4.200 | 0.000 | $5.33 | $6.09 | 4.200 | 0.000 | 0.000 |
| Dec-02 | $5.39 | $6.09 | 4.200 | 0.000 | $5.40 | $6.09 | 4.200 | 0.000 | 0.000 |
| Jan-03 | $5.45 | $7.01 | 4.700 | 0.000 | $5.49 | $7.01 | 4.700 | 0.000 | 0.000 |
| Feb-03 | $5.50 | $7.01 | 4.700 | 0.000 | $5.59 | $7.01 | 4.700 | 0.000 | 0.000 |
| Mar-03 | $5.52 | $7.01 | 4.700 | 0.000 | $5.68 | $7.01 | 4.700 | 0.000 | 0.000 |
| Apr-03 | $5.57 | $7.01 | 4.700 | 0.000 | $5.75 | $7.01 | 4.700 | 0.000 | 0.000 |
| May-03 | $5.61 | $7.01 | 4.700 | 0.000 | $5.80 | $7.01 | 4.700 | 0.000 | 0.000 |
| Jun-03 | $5.65 | $7.01 | 4.700 | 0.000 | $5.82 | $7.01 | 4.700 | 0.000 | 0.000 |
| Jul-03 | $5.68 | $7.01 | 4.700 | 0.000 | $5.80 | $7.01 | 4.700 | 0.000 | 0.000 |
| Aug-03 | $5.71 | $7.01 | 4.700 | 0.000 | $5.77 | $7.01 | 4.700 | 0.000 | 0.000 |
| Sep-03 | $5.74 | $7.01 | 4.700 | 0.000 | $5.75 | $7.01 | 4.700 | 0.000 | 0.000 |
| Oct-03 | $5.78 | $7.01 | 4.700 | 0.000 | $5.74 | $7.01 | 4.700 | 0.000 | 0.000 |
| Nov-03 | $5.80 | $7.01 | 4.700 | 0.000 | $5.75 | $7.01 | 4.700 | 0.000 | 0.000 |
| Dec-03 | $5.84 | $7.01 | 4.700 | 0.000 | $5.79 | $7.01 | 4.700 | 0.000 | 0.000 |

Notes:
Forecast of fuel prices based on NYMEX futures as reported in the Wall Street Journal on November 13, 14 & 15, 2001

Col. A - month in which SOS was delivered at wholesale
Col. B - Average of the values of Gas Index for the most recent 12 months.
Col. C - Average of the values of Oil Index for the most recent 12 months.
Col. D - Applicable value from the Standard Offer Supply Contracts.
Col. E - @if(Col. B > Col. C, (((Col. B + $0.64) / (Col. C +$0.64)-1.0)*Col. D), 1.000)
Col. F - Average of the values of Gas Index for the most recent 6 months.
Col. G - Average of the values of Oil Index for the most recent 6 months.
Col. H - Applicable value from the Standard Offer Supply Contracts.
Col. I - @if(Col. F > Col. G, (((Col. F + $0.64) / (Col. G +$0.64)-1.0)*Col. H), 1.000)
Col. J - (0.74 * Col. G) + (0.26 * Col. M)
      Weighting Values based on 12 months of Standard Offer purchases ending 10/31/01

The Narragansett Electric Company

Rate Changes for January 1, 2002

Testimony and Exhibits
of
Jeanne A. Lloyd,
Michael J. Hager, and
Anne M. Rodrigues

November 2001

Submitted to:
Rhode Island Public Utilities Commission
R.I.P.U.C. Docket No. _____

Submitted by:

**Narragansett Electric**
A **National Grid** Company

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2002
Witness: Jeanne A. Lloyd

# DIRECT TESTIMONY

## OF

## Jeanne A. Lloyd

S:\RA\DATA\12001\ecco\Nov Filing\index.wpd

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2002
Witness: Jeanne A. Lloyd

## Table of Contents

I.  Introduction and Qualifications .............................................. 1

II.  Purpose of Testimony ...................................................... 2

III.  Standard Offer Rate ...................................................... 4

IV.  Transition Charge ........................................................ 12

V.  Transmission Rate ........................................................ 18

VI.  Revised Tariff and Tariff Cover Sheets .................................... 24

VII.  Typical Bills and Tariffs ................................................ 24

VIII.  Conclusion ............................................................ 25

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-1-

1    **I.    Introduction and Qualifications**

2    Q.    Please state your full name and business address.

3    A.    Jeanne A. Lloyd, 55 Bearfoot Road, Northborough, Massachusetts 01532.

4

5    Q.    Please state your position.

6    A.    I am a Principal Financial Analyst in the Distribution Financial Analysis Department of

7    National Grid USA Service Company, Inc.  The Distribution Financial Analysis

8    Department provides rate related support to The Narragansett Electric Company

9    ("Narragansett" or the "Company").

10

11    Q.    Please describe your educational background and training.

12    A.    In 1980, I graduated from Bradley University in Peoria, Illinois with a Bachelor's Degree

13    in English.   In December 1982, I received a Master of Arts Degree in Economics from

14    Northern Illinois University in De Kalb, Illinois.

15

16    Q.    Please describe your professional experience.

17    A.    I was employed by EUA Service Corporation in December 1990 as an Analyst in the

18    Rate Department.  I was promoted to Senior Rate Analyst on January 1, 1993.  My

19    responsibilities included the study, analysis and design of the retail electric service rates,

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-2-

1       rate riders and special contracts for the EUA retail companies. I assumed my present

2       position after the merger of New England Electric System and Eastern Utilities

3       Associates in April 2000. Prior to my employment at EUA, I was on the staff of the

4       Missouri Public Service Commission in Jefferson City, Missouri in the position of

5       research economist. My responsibilities included presenting both written and oral

6       testimony before the Missouri Commission in the areas of cost of service and rate design

7       for electric and natural gas rate proceedings.

8

9    Q.    Have you previously testified before Rhode Island Public Utilities Commission

10          ("Commission")?

11   A.    Yes.

12

13   **II.    Purpose of Testimony**

14   Q.    What is the purpose of the Company's filing?

15   A.    The purpose of the Company's filing is to propose several different rate changes. The

16          rate changes relate to three different components of the Company's rates: the Standard

17          Offer, the transition charge, and transmission rates.

18

19          First, the Company is proposing to decrease the Standard Offer Service rate from its

S:\RADATA\2001neco\Nov Filing\jslestimony.wpd

4

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-3-

1    current level of 5.5¢ per kWh to 4.662¢ per kWh.  In addition, the Company is proposing

2    to use the Standard Offer over recovery through September 30, 2001 to eliminate an

3    under recovery of Last Resort Service expenses and to use a projected over recovery

4    through December 31, 2001 to offset additional fuel index adjustment payments to

5    suppliers that the Company expects to incur during the first quarter of 2002.

6

7    Second, the Company is proposing to decrease its non-bypassable transition charge

8    ("transition charge") from its current level of 0.988¢ per kWh to 0.896¢ per kWh for all

9    customers in its service territory for calendar year 2002.  This decrease is based upon

10   New England Power Company's ("NEP") annual contract termination charge ("CTC")

11   for 2002 for Narragansett, the former Blackstone Valley Electric Company ("Blackstone

12   Valley") and the former Newport Electric Corporation ("Newport").  Under the

13   Company's proposal, the transition charge in Narragansett's entire service territory will

14   be the same for all customers in 2002.  The Company is also proposing to use the 2001

15   transition reconciliation over recovery to further reduce the 2002 transition charge.

16

17   Third, the Company is proposing to decrease its transmission adjustment factor from

18   0.411¢ per kWh to 0.064¢ per kWh.  The decrease is due, in part, to the elimination of

19   two reconciliation adjustment factors contained in the currently effective transmission

S:\RADATA1\2001nrecolNov Filing\jaltestimony.wpd

5

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-4-

1    adjustment factor which were designed to collect prior period under recoveries.  In

2    addition, a portion of the proposed decrease is due to an over recovery of expenses

3    incurred for the period January 2001 through September 2001.

4

5    The Company is requesting that all of these rate changes be approved for consumption on

6    and after January 1, 2002.  The net effect of these changes is a bill decrease for a typical

7    residential customer of 10.9%.

8

9    Q.    Has the Company summarized its proposed rate changes for January 1, 2002?

10   A.    Exhibit JAL-1 presents a summary of the proposed rate changes.

11

12   **III.    Standard Offer Rate**

13   Q.    What is the Company's current Standard Offer charge?

14   A.    Effective October 1, 2001, the Company implemented a Standard Offer charge of 5.5¢

15         per kWh.

16

17   Q.    What is the Company's proposed Standard Offer charge for January 1, 2002?

18   A.    The Company is proposing a rate of 4.662¢ per kWh.  This represents  a decrease of

19         0.838¢ per kWh from the current charge and is based on the Standard Offer costs

6

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-5-

1    expected to be incurred during the three-year period from January 2002 through

2    December 2004.

3

4    Q.   How was the new rate determined?

5    A.   The calculation of this proposed rate is shown in Exhibit JAL-2 (page 1 of 3, Section 3).

6         In effect, the Company has taken the three year weighted average of the cost it expects to

7         incur under its Standard Offer supply contracts from 2002 through 2004. Specifically,

8         the fixed component of the Standard Offer under the Company's supply contracts are

9         4.2¢ per kWh in 2002, 4.7¢ per kWh in 2003, and 5.1¢ per kWh in 2004. Taking into

10        account projected kilowatt-hour consumption, the three year weighted Standard Offer

11        payments are calculated as shown in Exhibit JAL-2, Section 2.

12

13        The proposed Standard Offer rate is calculated in Section 3 of Exhibit JAL-2. The

14        Standard Offer payments calculated in Section 2 are reduced by the remaining over

15        recovery balance in the Standard Offer reconciliation for the period October 2000 through

16        September 2001. This will be explained in more detail later in my testimony. Dividing

17        this amount shown on Line (3) by the projected kWh deliveries for January 2002 through

18        December 2004 results in a weighted average Standard Offer rate of 4.662¢ per kWh.

19

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-6-

1    Q.    Why is the Company proposing a three-year average rate?

2    A.    The Company discussed various options for setting the Standard Offer rate with the

3          Division of Public Utilities and Carriers ("Division"). During those discussions, three

4          options were considered. The options included setting the rate based on a one year

5          average, a two year weighted average, and a three year weighted average. In the end, the

6          Company and the Division reached a consensus that the three year weighted average was

7          preferable for several reasons. First, the proposal stabilizes the Standard Offer rate for

8          three years, assuming the fuel index trigger is not exceeded. This three year period also

9          matches the remaining three years of the Company's distribution rate freeze. By setting

10         the Standard Offer at the three year weighted average, it sets up the possibility of having

11         the two largest components of the Company's rates remain stable for the same period.

12.

13         In addition, if this proposed Standard Offer rate goes into effect, it will be over-collecting

14         Standard Offer costs in the first year in order to permit the levelized rate to be charged in

15         the third year. Specifically, the three year weighted average rate is higher than the first

16         year fixed cost, essentially the same as the second year fixed cost, and lower than the

17         fixed cost in the third year. There is a beneficial feature to this approach. If it turns out

18         that the fuel index trigger is exceeded in 2002 or 2003, the over collection in the first year

19         would help to soften the effects of any fuel index payments. Although such a negative

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-7-

1    event would mean that the Standard Offer rate would have to be increased above the three

2    year weighted average, the fuel index-related increases would be substantially mitigated.

3    The mitigation would be even greater if the $20 million that will be available to

4    customers as a result of the termination of NEP as a Standard Offer supplier is used to

5    mitigate future fuel index-related increases. This payment is discussed in the testimony

6    of Mr. Michael Hager.

7

8    Finally, levelizing the Standard Offer rate for three years provides customers and

9    suppliers a uniform ceiling price from which any long-term negotiated commodity

10   arrangements can be compared. If the three year weighted average rate is adopted,

11   customers will know that the Standard Offer rate will not drop below 4.662¢ per kWh for

12   that period. If market conditions change and, as a result, the three year weighted average

13   rate is better than what can be obtained in the market, customers are protected. But if

14   market prices continue to fall, customers have a three year "price to beat".

15

16   Q.    What were the other alternatives evaluated?

17   A.    Exhibit JAL-2, pages 2 and 3, shows the calculation of a one-year and a two-year

18         Standard Offer rate, respectively. The one-year average would have resulted in a

19         Standard Offer rate of 4.173¢ per kWh. Although the rate is lower than the proposed

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-8-

1    three-year rate, the disadvantage of using a one year average is rate instability.

2    Specifically, if the one year rate were put into effect, the Company would have to

3    increase the Standard Offer rate a year later. The Standard Offer has been moving

4    significantly up and down over the last two years, causing much customer upset and

5    confusion. From a rate stability perspective, therefore, reducing the rate down to 4.173¢

6    per kWh, only to increase it again to 4.7¢ per kWh on January 1, 2003, was not an

7    attractive option. The Company's three-year plan attempts to stabilize the rate, to avoid

8    this undesirable "up, down, and up" effect.

9

10   Q.    What about the two-year weighted average rate option?

11   A.    The other option considered by the Company was a two year weighted average rate,

12        based on the expected cost per kWh from 2002 and 2003. This would result in a Standard

13        Offer rate of 4.438¢ per kWh. This option has the same characteristic as the three-year

14        plan, in that it stabilizes the rate for two years, assuming the fuel index trigger is not

15        exceeded during the period. The two-year rate, however, stops one year earlier than the

16        proposed three year plan and does not match the distribution rate freeze period.

17

18   Q.    If the Commission approves the three-year Standard Offer rate, what would the projected

19        Standard Offer Reconciliation balances be for the years ending 2002, 2003 and 2004?

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-9-

1   A.   The projected Standard Offer Reconciliation balances at December 31 for 2002, 2003 and

2       2004 are shown on Exhibit JAL-3. Section 1 shows the results for the proposed three

3       year Standard Offer rate. Section 2 shows the projected year end balances if a two year

4       rate were implemented.

5

6   Q.   Does the Company expect to incur fuel index adjustment payments under the terms of the

7       Fuel Index Adjustment Provision contained in the Standard Offer supplier contracts after

8       December 2001?

9   A.   Yes. Due to the residual effects of the 12 month rolling average, which includes some

10      high cost fuel months from last year, the Company expects to incur approximately $3.4

11      million in additional fuel index adjustment payments for the period January 2002 through

12      March 2002. After the first quarter, however, the Company is not projecting any further

13      fuel index adjustment payments for the remainder of 2002, based on current fuel market

14      conditions. These estimated fuel index adjustment payments are supported by the

15      testimony of Mr. Hager.

16

17   Q.   Why is the Company not including these fuel index adjustment payments in the

18      calculation of the proposed Standard Offer charge?

19   A.   The Company is expecting to incur an over recovery of Standard Offer costs for the

S:\RADATA1\2001neco\Nov Filing\jalcstimony.wpd

11

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-10-

1    period October 2001 through December 2001. The Company is proposing to use this

2    over recovery to offset any additional fuel index adjustment payments assessed by

3    Standard Offer suppliers from January 2002 through March 2002. This will be described

4    in more detail below.

5

6    Standard Offer/Last Resort Reconciliations

7    Q.    Has the Company prepared a Standard Offer Reconciliation for the year ending

8          September 30, 2001?

9    A.    The Company's Standard Offer Reconciliation for the period October 2000 through

10         September 30, 2001 is shown in Exhibit JAL-4. This exhibit shows that the balance in

11         the account is an over recovery of $3,842,280.

12

13   Q.    Has the Company prepared a Last Resort Service Reconciliation for the year ending

14         September 30, 2001?

15   A.    Yes. The Company's Last Resort Service Reconciliation for the period October 2000

16         through September 30, 2001 is shown in Exhibit JAL-6. This exhibit shows that the

17         balance in the account is an under recovery of $2,095,094.

18

19   Q.    How is the Company proposing to treat both the Standard Offer over recovery and the

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-11-

1       Last Resort under recovery at September 30, 2001?

2   A.  The Company is first proposing to transfer a portion of its Standard Offer over recovery

3       to eliminate the Last Resort under recovery as of September 30, 2001. The remaining

4       Standard Offer over recovery of $1,747,186, shown on Exhibit JAL-5, Page 1 of 3,

5       Section 1, Line (3), will be used to further reduce the Standard Offer rate as shown in

6       Exhibit JAL-2, Pages 1 through 3.

7

8   Q.  What is the Company's projection of the Standard Offer reconciliation account balance

9       through December 31, 2001?

10  A.  Exhibit JAL-5, Page 1 of 3, Section 2, show that the projected balance of the Standard

11      Offer reconciliation account for the period October 1, 2001 through December 31, 2001 is

12      an over recovery of approximately $5.6 million. The beginning balance shown in

13      Column (a) of $1.7 million is the over recovered balance for the period October 2000

14      through September 2001 net of the Last Resort under recovery for the same period. As

15      explained above, this amount has been used to reduce the proposed Standard Offer rate

16      for January 1, 2002. Therefore, the Company is estimating an incremental over recovery

17      for the three months of October 2001 through December 2001 of $3.9 million.

18

19  Q.  How is the Company proposing to use the incremental over recovery estimated at

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-12-

1    December 31, 2001?

2    A.    The estimated incremental over recovery will be used to offset the expected fuel index

3          adjustment payments in the first quarter of 2002.   The projected fuel index adjustment

4          payments for the period January 2002 through March 2002 are approximately $3.4

5          million and are calculated in Exhibit JAL-7.

6

7    IV.   **Transition Charge**

8    Q.    Please describe the Company's transition charge.

9    A.    The transition charge is intended to recover from all retail delivery service customers the

10         CTC billed to the Company by NEP, including charges from the former Montaup Electric

11         Company ("Montaup"), which has been billing the Company CTC since Montaup was

12         merged into NEP.  The transition charge was originally designed to change annually as

13         NEP and Montaup established their CTC for the upcoming calendar year.  The

14         Company's Non-Bypassable Transition Charge Adjustment Provision, as established by

15         the settlement in the merger proceeding in Docket 2930 ("Merger Agreement"), specifies

16         fixed transition charges for customers in the Narragansett zone for each year of the Rate

17         Freeze (2000 through 2004).  The Provision then allows for zonal charges to be

18         determined by a specific formula for customers of former Blackstone Valley and former

19         Newport.

S:\RADATA\2001new\Nov Filing\jalretdirecxy.wpd

14

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-13-

1

2   Q.    Please provide more detail on the zonal transition charges.

3   A.    Pursuant to the Merger Agreement, the Company implemented zonal transition charges

4         effective on the rate consolidation date of May 1, 2000. Prior to the merger of

5         Narragansett, Blackstone Valley, and Newport, each of the three companies billed its

6         customers a different transition charge. The zonal charges were implemented on May 1,

7         2000 to ensure that all customers were paying the same transition charge after the merger

8         that they were paying prior to the merger.

9

10  Q.    Did the Merger Agreement provide for the calculation of transition charges during the

11        period of time subsequent to the merger?

12  A.    Yes, it did. Section 15 of the Merger Agreement describes how transition charges will be

13        determined during the five year period subsequent to the merger, also known as the Rate

14        Freeze period. The transition charges for the Narragansett zone would be fixed in

15        accordance with the following schedule:

16              Year            Fixed Transition Charge

17              2000            1.15¢ per kWh
18              2001            1.05¢ per kWh
19              2002            1.05¢ per kWh
20              2003            1.00¢ per kWh
21              2004            0.95¢ per kWh
22

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-14-

1    The transition charge in the Blackstone Valley and Newport zones is to be determined by

2    calculating the balance of the Company's total CTC expenses during each year of the

3    Rate Freeze period less the estimated transition charge revenues collected from customers

4    in the Narragansett zone and dividing the remaining balance of CTC expenses by the

5    estimated kWh deliveries in the Blackstone Valley and Newport zones. The zonal

6    transition charge calculated for Blackstone Valley and Newport are to be capped at the

7    FERC approved CTC rates already established for Montaup through 2004. However,

8    should this calculation result in the transition charge in the Blackstone Valley and

9    Newport zones being less than that in the Narragansett zone, then the Merger Agreement

10   provides that the transition charges are equalized, and the resulting transition charge will

11   be calculated as the weighted average CTC of those charged to the Company by NEP and

12   Montaup, and all customers in the Company's service territory will be charged one

13   transition charge.

14

15   Q.    Is Narragansett currently assessing zonal charges for customers of former Blackstone

16         Valley and Newport?

17   A.    No. In R.I.P.U.C. Docket No. 3243, filed December 1, 2000, and approved by the

18         Commission at the Open Meeting held on December 15, 2000, the application of the

19         transition charge formula resulted in an equalized transition charge of 0.988¢ per kWh for

S:\RADATA1\2001neco\Nov Filing\alternimony.wpd

16

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-15-

1      all zones.

2

3    Q.    Has the Company prepared a calculation of the zonal transition charges for 2002?

4    A.    Yes, it has.  Exhibit JAL-8, page 1 illustrates what the zonal transition charges would be

5          under the formula.  The individual CTCs are taken directly from the NEP CTC

6          Reconciliation Reports.  This is reflected in Section I of Exhibit JAL-8, page 1.  The

7          amounts in Section I are aggregated in Section II.  From the total expected CTC costs to

8          be billed to the Company, approximately $54.9 million will be collected from customers

9          in the Narragansett zone, leaving approximately $10.9 million to be recovered equally

10         from customers in the Blackstone Valley and Newport zones.  Line (7) of Exhibit JAL-8,

11         page 1, shows the transition charge for the Blackstone Valley and Newport zones as a

12         result of this calculation.  Consequently, customers in the Blackstone Valley and Newport

13         zones would have had a transition charge of 0.572¢ per kWh while customers in the

14         Narragansett zone would have had a transition charge of 1.050¢ per kWh.  Since the

15         transition charge for the Blackstone Valley and Newport zones is less than that for the

16         Narragansett zone, the transition charges must be equalized in accordance with the terms

17         of the Merger Agreement.  Therefore, the transition charge for 2002 is to be based on a

18         weighted average CTC rate from NEP and Montaup.

19

S:\RADATA1\2001ncco\Nov Filing\jaltestimony.wpd

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-16-

1    Q.    Has the Company prepared the weighted average CTC calculation?

2    A.    Yes it has.  Exhibit JAL-8, page 1,  presents this calculation. The total CTC amount

3          determined in Section I of Exhibit JAL-8, page 1, is divided by the total GWh sales to

4          arrive at a weighted average transition charge.  This calculation results in a weighted

5          transition charge of 0.921¢ per kWh for all of its retail delivery customers in the

6          Company's three zones, as shown in Column (4), Line (7) of Exhibit JAL-8, page 1.

7

8    Q.    Is the Company proposing any other adjustments to the transition charge for 2002?

9    A.    Yes.  The Company is proposing to apply a per kWh credit of 0.025¢ per kWh to the

10         weighted transition charge.  This credit is designed to refund an over recovery balance of

11         approximately $1.9 million in the 2001 transition charge reconciliation.  The

12         development of this credit is found in Exhibit JAL-8, page 2, and is discussed in more

13         detail below.

14

15         Transition Reconciliation

16   Q.    Please describe the Company's 2001 transition reconciliation?

17   A.    The Company is required to reconcile transition revenues and CTC in accordance with its

18         Non-Bypassable Transition Adjustment Provision.  The provision provides for an annual

19         reconciliation of the Company's total CTC expense against the Company's total revenue

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-17-

1   from its Non-Bypassable Transition Charges. The excess or deficiency is to be refunded

2   to or collected from customers with interest accruing at the rate in effect for customer

3   deposits.

4

5   Q.   Please describe the reconciliation in more detail?

6   A.   The reconciliation of transition revenues and expenses is included as Exhibit JAL-9. The

7        Company compares its transition charge revenue to its CTC expense and applies interest

8        to the balance, whether positive or negative, on a monthly basis. Page 1 shows the

9        reconciliation for the total company. Pages 2 through 4 show individual reconciliations

10       for the former Blackstone Valley, the former Newport, and Narragansett.

11

12  Q.   What is the total Company transition reconciliation account balance for year ending

13       September 30, 2001?

14  A.   The account balance for the period January 2001 through September 30, 2001, shown in

15       Exhibit JAL-9, page 1, reflects an over recovery of $1,892,233.

16

17  Q.   Why is the Company proposing a reconciliation period of only nine months?

18  A.   The Company has collected actual billing and expense information only through

19       September. The Company prefers to calculate the refund based on actual billing data,

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-18-

1    rather than rely on projections, which will undoubtably be different than actuals.  In

2    addition, no further significant over or under recoveries are expected through the end of

3    the year.

4

5    Q.    How is the Company proposing to treat the over recovery?

6    A.    The Company is proposing to reduce the weighted average transition charge of 0.921¢

7          per kWh, calculated on Exhibit JAL-8, page 1, by a credit factor of 0.025¢ per kWh.  The

8          credit factor is developed on Exhibit JAL-8, page 2.  The transition charge reconciliation

9          over recovery is shown on Line (2) on page 2 of Exhibit JAL-8.  This amount is divided

10         by the 2002 forecasted kWh deliveries, resulting in a credit of 0.025¢ per kWh.  This

11         credit, when subtracted from the weighted transition charge of 0.921¢ per kWh, produces

12         a net transition charge of 0.896¢ per kWh, as shown on Line (5).

13

14   V.    **Transmission Rate**

15   Q.    What is the Company's proposed Transmission Adjustment Factor?

16   A.    The Company's proposed Transmission Adjustment Factor is 0.064¢ per kWh,

17         representing a decrease of 0.347¢ per kWh from the current factor, as shown on Exhibit

18         JAL-10, Lines (10) through (12).  The reduction of 0.347¢ per kWh is comprised of the

19         following:

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-19-

1    1)   a decrease of 0.068¢ per kWh, representing a reduction in the Company's

2         2002 forecasted transmission expenses,

3    2)   a decrease of 0.081¢ per kWh, due to the elimination of the 1999

4         transmission reconciliation factor,

5    3)   a decrease of 0.076¢ per kWh, due to the elimination of the 2000

6         transmission reconciliation factor, and

7    4)   a decrease of 0.122¢ per kWh, which is designed to refund an over

8         recovery of $8.7 million from 2001.

9    Each of these adjustments is discussed in more detail below.

10

11   Transmission Cost Forecast

12   Q.   Has the Company prepared a forecast of transmission costs for 2002?

13   A.   Yes it has.  It is included in the testimony and exhibits of Ms. Anne M. Rodrigues, who

14        will explain the forecast, how it was derived, and the reasons for the decrease in

15        transmission costs.

16

17   Q.   How has the Company evaluated this forecast?

18   A.   The Company has evaluated this forecast by comparing it on a cents per kWh basis to the

19        average rate currently in effect.  This comparison is performed in Exhibit JAL-10.

S:\RADATA1\2001nozolNov.Filing\jaltestimony.wpd

21

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-20-

1

2  Q.     Please describe the evaluation contained in Exhibit JAL-10.

3  A.     The average transmission cost per kWh is calculated by dividing forecasted transmission

4         cost for 2002 of approximately $42.8 million by the Company's forecast of kWh

5         deliveries during 2002.  This results in a forecasted transmission cost per kWh of 0.583¢

6         per kWh for calendar year 2002, as shown on Line (3).  Next, the Company compares this

7         cost per kWh to the 2001 average transmission expense of 0.651¢ per kWh shown on

8         Line (4).  Comparing the forecasted transmission cost per kWh of 0.583¢ per kWh to the

9         2001 average transmission rate of 0.651¢ per kWh leads to the conclusion that the current

10        transmission rate of 0.651¢ per kWh is high by 0.068¢ per kWh, without taking into

11        account the over collection to date.  The forecast of transmission expense is supported in

12        the testimony of Ms. Rodrigues.

13

14        <u>Transmission Service Reconciliation</u>

15  Q.    Please provide a status of the Company's current transmission service reconciliation.

16  A.    The Company's transmission service reconciliation is in Exhibit JAL-11.  This

17        reconciliation reflects both actual transmission revenue and expense for the period

18        January 2001 through September 2001.  This reconciliation is provided in accordance

19        with the Company's Transmission Adjustment Provision, which allows for the

S:\RADATA.1\2001necn\Nov Filing\jaltestimony.wpd

22

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-21-

1    reconciliation, along with interest on any balance, and the recovery or refund of any

2    under collection or over collection, respectively.

3

4    Q.    What is the balance of the transmission reconciliation as of September 30, 2001?

5    A.    Exhibit JAL-11, Section 1 shows that the balance of the transmission reconciliation as of

6    September 30, 2001 is an over recovery of approximately $8.7 million.

7

8    Q.    How is the Company treating the deferred ISO Tariff charges that are discussed in the

9    testimony of Mr. Hager?

10   A.    The Company's transmission expenses include $5.1 million of ISO Tariff charges for the

11   years 1999, 2000, and year to date 2001.   These charges are currently being disputed by

12   Narragansett in arbitration and are listed as a separate line item in the calculation of the

13   reconciliation balance shown in Exhibit JAL-11, Page 1.  When the Company first began

14   incurring these expenses, the Commission ordered recovery of the expenses to be

15   deferred.  This occurred at a time when transmission rates were rising sharply.

16

17   Because the Company has such a significant over recovery of transmission expenses from

18   2001 which far exceeds $5.1 million, the Company is not proposing to refund the $5.1

19   million at this time.  Instead, because the arbitration process has commenced, it is our

S:\RADATA1\2001nscc\Nov Filing\jslttestimony.wpd

23

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-22-

1    hope to have a resolution of the issue within the next year.    For that reason, we are

2    proposing to continue to account for the ISO Tariff charges as a deferred line item, but

3    have not designed the current transmission adjustment factor to return that amount to

4    customers in 2002.    Of course, should arbitration be successful, the Company would

5    reflect a credit in the transmission reconciliation account.    The Company recognizes,

6    however, that the Commission has not yet made a definitive ruling regarding recovery of

7    the expenses.    For that reason, holding the amount as a deferred line item does not

8    change the "deferred" status of those expenses.

9

10   Q.   How is the Company proposing to treat the transmission service reconciliation over

11        recovery?

12   A.   The Company is proposing to implement a credit factor of 0.122¢ per kWh to refund

13        during the calendar 2002 the over collection of $8.7 million plus interest during the

14        recovery period.

15

16   Q.   In the past, the Company has estimated the balance through the end of the year.  Why is

17        this not presented this year?

18   A.   The Company recommends that the refund factor be calculated with actual billing data to

19        date, because transmission expenses have been difficult to project.  Therefore, the

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd
-23-

1      Company is proposing future reconciliations covering the twelve month period October

2      through the following September, and any over recovery related to the fourth quarter of

3      2001 will be reflected in the next period's transmission reconciliation.

4

5    Q.    Why are the 1999 and 2000 under recovery factors, as shown on Exhibit JAL-10, Lines

6          (6) and (7), respectively, being eliminated at this time?

7    A.    The factor of 0.081¢ per kWh shown on Line (6) of Exhibit JAL-10, was implemented on

8          June 1, 2000 and designed to collect an under recovery of $4.03 million incurred during

9          the period January 1, 1999 through December 31, 1999.  The factor was approved in

10         R.I.P.U.C. Docket No. 3031 and was intended to be a 12-month factor. Page 5 of Exhibit

11         JAL-11 shows that at the end of the recovery period, May 30, 2000, the factor had over

12         collected the original $4.03 million by approximately $1.76 million.  This amount was

13         credited to the base Transmission Reconciliation on Exhibit JAL-11, page 1, Column(c)

14         in the month of May 2001. The revenue collected after May 2001 attributable to the

15         0.081¢ per kWh factor is being used as an offset to transmission expenses in the base

16         transmission reconciliation.

17

18         The factor of 0.076¢ per kWh, shown on Line (7) of Exhibit JAL-10, was implemented

19         for consumption on and after January 1, 2001 and was designed to collect an under

THE NARRAGANSETT ELECTRIC COMPANY
Witness: Jeanne A. Lloyd

-24-

1    recovery of $5.2 million incurred during the period January 1, 2000 through December

2    31, 2000. This factor was approved by the Commission in R.I.P.U.C. Docket No. 3243.

3    Page 8 of Exhibit JAL-11 shows that the projected balance of this account at December

4    31, 2001 will be an over recovery of $260,116. Therefore, the Company proposes to end

5    the billing of this factor for consumption on and after to January 1, 2002. Any remaining

6    balance of the recovery of this under collection balance, whether positive or negative will

7    be reflected as an adjustment to the base transmission reconciliation in January 2002.

8

9    VI.   **Revised Tariffs and Cover Sheets**

10   Q.   Has the Company prepared a revised Standard Offer tariff and tariff cover sheets

11      reflecting the proposed rates?

12   A.   The Company's proposed Standard Offer tariff, R.I.P.U.C. No. 1163, is included in

13      Exhibit JAL-13. Exhibit JAL-14 is a marked to show changes version of this tariff. The

14      revised tariff cover sheets are included in Exhibit JAL-15.

15

16   VII.  **Typical Bills and Tariffs**

17   Q.   Has the Company provided a typical bill analysis to illustrate the impact of the proposed

18      rate changes?

19   A.   Yes it has. The typical bill analysis for each rate class is in Exhibit JAL-16.

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2001
Witness: Jeanne A. Lloyd

1

2  Q.   What is the impact on a typical residential customer of the Company's proposed rate

3       changes?

4  A.   Exhibit JAL-16, page 1, shows that for a 500 kWh residential customer the monthly bill

5       would decrease by $6.66, from $61.02 to $54.36, or 10.9%.

6

7  **VIII.  <u>Conclusion</u>**

8  Q.   Does this conclude your testimony?

   A.   Yes it does.

S:\RADATA1\2001nacoNov Filing\jalsestimony.wpd

R.I.P.U.C. No. 1163
Cancelling R.I.P.U.C. No. 1162

## THE NARRAGANSETT ELECTRIC COMPANY
### STANDARD OFFER SERVICE

### AVAILABILITY

All Customers (including new Customers) who have not elected to take their electric supply from a non-regulated power producer will receive their power supply under this Standard Offer Rate until the Customer either : (1) takes its electric supply from a non-regulated power producer; or (2) takes Last Resort Service.

Customers who leave Standard Offer Service may not return to Standard Offer Service.

Standard Offer Service may be terminated by a Customer upon the next scheduled meter read provided that notice of the change of supplier was received in accordance with the Company's Terms and Conditions for Nonregulated Power Producers.

### MONTHLY CHARGE

The Monthly Charge for Service under this tariff will be the sum of the applicable Standard Offer Service charges in addition to all appropriate Retail Delivery charges a stated in the applicable tariff.

### RATE FOR ALL CLASSES

Standard Offer per kWh              4.662¢

### RATE CHANGES

The rates set forth in this tariff are effective for usage on and after January 1, 2002 until changes. Any changes will be filed with the Commission and are subject to Commission review and approval.

Effective: January 1, 2002

S:\RADATA1\2001neco\Nov Filing\so.wpd

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2002
Witness: Jeanne A. Lloyd

# Exhibit JAL-14
## Standard Offer Tariff
## Marked to Show Changes Version

S:\RADATA1\2001neco\Nov Filing\index.wpd

R.I.P.U.C. No. ~~1162~~ 1163
Cancelling R.I.P.U.C. No. ~~1160~~ 1162

## THE NARRAGANSETT ELECTRIC COMPANY
## ~~STANDARD OFFER SERVICE~~

### AVAILABILITY

All Customers (including new Customers) who have not elected to take their electric supply from a non-regulated power producer will receive their power supply under this Standard Offer Rate until the Customer either : (1) takes its electric supply from a non-regulated power producer; or (2) takes Last Resort Service.

Customers who leave Standard Offer Service may not return to Standard Offer Service.

Standard Offer Service may be terminated by a Customer upon the next scheduled meter read provided that notice of the change of supplier was received in accordance with the Company's Terms and Conditions for Nonregulated Power Producers.

### MONTHLY CHARGE

The Monthly Charge for Service under this tariff will be the sum of the applicable Standard Offer Service charges in addition to all appropriate Retail Delivery charges a stated in the applicable tariff.

### RATE FOR ALL CLASSES

Standard Offer per kWh          ~~5.5¢~~ 4.662¢

### RATE CHANGES

The rates set forth in this tariff are effective for usage on and after ~~October 1, 2001~~ January 1, 2002 until changes. Any changes will be filed with the Commission and are subject to Commission review and approval.

Effective: ~~October 1, 2001~~ January 1, 2002

S:\RADATA1\2001neco\Nov Filing\so.redlined.wpd

∞

# Tab 23



November 18, 2002

Luly E. Massaro, Commission Clerk
R.I. Public Utilities Commission
89 Jefferson Blvd.
Warwick, RI  02889

Re:    **January 2003 Retail Rate Filing**

Dear Ms. Massaro:

Enclosed for filing with the Commission are ten copies of The Narragansett Electric Company's ("Narragansett" or "Company") annual filing reconciling its tariff adjustment provisions through September 2002, estimating its 2003 expenses and revenues under these provisions and proposing rate changes effective January 1, 2003.

Specifically, the Company is reconciling actual revenues and expenses for the 12 months ending September 2002 under its Non-bypassable Transition Charge Adjustment Provision, its Standard Offer Adjustment Provision and its Transmission Service Cost Adjustment Provision. The Company has also estimated its annual expenditures and revenues for each of these adjustment provisions. As a result, the Company is proposing to increase its Transition Charge and Transmission Adjustment Factor effective January 1, 2003. The Company is proposing to increase the Non-bypassable Transition Charge from the present level of 0.874¢ per kWh to 0.944¢ per kWh, an increase of 0.070¢ per kWh.    The proposed increase in the Transmission Adjustment Factor is 0.044¢ per kWh, from 0.063¢ per kWh to 0.107¢ per kWh.

Although permitted to do so under the terms of its Standard Offer Adjustment Provision, the Company is not proposing any increase to its Standard Offer rate at this time. Rather, the Company is requesting Commission approval to retain a $20 million payment received last year as an offset to fuel index payments it has begun to incur. Details surrounding this proposal are provided in the testimony and exhibits of Ms. Lloyd.

These rate changes presented by this filing would increase the total bill of a typical residential customer consuming 500 kWh per month by 1.1%, or $.60 per month, from $54.24 to $54.84, including the effects of gross receipts taxes.

Thank you for your attention to this filing. If you have any questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

Terry L. Schwennesen
General Counsel

c. .  S. Scialabba
P. Roberti
J. Stutz

Confidential

The Narragansett Electric Company

January 2003 Retail Rate Filing

Testimony and Schedules
of
Jeanne A. Lloyd
Michael J. Hager, and
Anne M. Rodrigues

November 2002

Submitted to:
Rhode Island Public Utilities Commission
R.I.P.U.C. Docket No. 3479

Submitted by:


Narragansett Electric
A National Grid Company

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Witness: Hager

## DIRECT TESTIMONY

### OF

### MICHAEL J. HAGER

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 1 of 9

1  I.    **Introduction**

2  Q.    Please state your name and business address.

3  A.    Michael J. Hager, 55 Bearfoot Road, Northborough, Massachusetts 01532.

4

5  Q.    Please state your position.

6  A.    I am the Director, Energy Supply - NE for National Grid USA Service Company.  I am

7        responsible for, among other things, all power procurement and related activities for the

8        distribution companies of National Grid USA (formerly the New England Electric

9        System) including The Narragansett Electric Company ("Narragansett" or "Company").

10       These activities include the procurement of power for Standard Offer Service and Last

11       Resort Service.

12

13 Q.    Will you describe your educational background and training?

14 A.    In 1982, I graduated from the University of Hartford with a Bachelor of Science degree in

15       Mechanical Engineering.  In 1986, I received a Master of Science degree in Mechanical

16       Engineering from Northeastern University.  I am a Licensed Professional Engineer in the

17       Commonwealth of Massachusetts.

18

19

S:\RADATA1\2002 NECO\YEAR END FILING\MJHTESTIMONY.DOC

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 2 of 9

1   Q.    What is your professional background?

2   A.    From 1982 to 1992, I was employed by New England Power Service Company in various

3         engineering positions.  In these positions, I provided support to New England Power

4         Company's ("NEP") thermal and hydroelectric generating plants with overall

5         responsibility for the management and control of studies and projects from initiation to

6         completion.

7

8         From 1992 to 1997, I was employed by NEP where I conducted wholesale and retail

9         power marketing activities involving the sale and purchase of generation resources to and

10        from investor-owned utilities, municipalities, independent power producers, government

11        agencies, brokers, marketers, and end-use retail customers.

12

13        In June 1997, I was promoted to the position of Standard Offer Portfolio Manager for

14        New England Power Service Company (now National Grid USA Service Company).  In

15        November 2000, my title was changed to Manager, Distribution Energy Services to more

16        fully reflect the scope of work performed by my department.

17

18        In April 2002, I was promoted to the position of Director, Energy Supply – NE.

19

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 3 of 9

1   Q.    Have you previously testified before the Commission?

2   A.    Yes.

3

4   **II.**    **Purpose of Testimony**

5   Q.    What is the purpose of your testimony?

6   A.    The purpose of my testimony is to (i) provide an estimate of the costs Narragansett

7         expects to incur under its Standard Offer supply contracts for the period January 2003

8         through December 2004, (ii) provide an update on the status of the dispute resolution

9         with one of the Company's Standard Offer suppliers and (iii) explain the effect on the

10        Company's congestion cost payments resulting from the implementation of the proposed

11        NEPOOL Standard Market Design ("SMD") system.

12

13  **III.**    **Description of Fuel Index Adjustment Provision**

14  Q.    What are the Company's current arrangements for procurement of Standard Offer

15        Service?

16  A.    The Company has contracts with USGen New England, TransCanada Power Marketing

17        and Constellation Power Source, to serve the load within its pre-merger service territory

18        ("Narragansett Zone").  The Company also has contracts with TransCanada Power

19        Marketing, Constellation Power Source and NRG Power Marketing to serve the load

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 4 of 9

1    within the service territory of the former Blackstone Valley Electric Company and

2    Newport Electric Company ("EUA Zone"). All of the Company's contracts run through

3    December 31, 2009.

4

5  Q.   Please describe the costs that Narragansett incurs under the Standard Offer supply

6       contracts.

7  A.   The Standard Offer supply contracts contain two price components – a base price and a

8       fuel index adjustment provision.

9

10 Q.   What are the base prices for the period January 2003 through December 2004?

11 A.   The base prices are 4.7 ¢/kWh for calendar year 2003 and 5.1 ¢/kWh for calendar year

12      2004.

13

14 Q.   Can you describe the fuel index adjustment provision that is contained in the Standard

15      Offer contracts?

16 A.   Yes. The Company's contracts with its Standard Offer suppliers contain a fuel index

17      adjustment provision that provides additional payments to those suppliers in the event of

18      substantial increases in the market price of No. 6 residual fuel oil (1% sulphur) and

19      natural gas. In short, the provision compares the sum of the six-month and twelve-month

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 5 of 9

1    rolling average of oil and gas prices to a preset trigger point. (The six-month rolling

2    average is used for Standard Offer load in the EUA Zone while the twelve-month rolling

3    average is used for Standard Offer load in the Narragansett Zone.) If the sum of the fuel

4    index values exceeds the trigger point in a given month then the Company makes

5    additional payments to the suppliers in that month. If the sum of the fuel index values is

6    less than or equal to the trigger point in a given month, no additional payments are made

7    in that month. Comparisons are made each month and thus payments may be made in

8    some months and not in others. The text of the fuel index adjustment provision that is

9    applicable to each of the Standard Offer contracts is provided as Exhibit MJH-1.

10

11  **IV.    <u>Fuel Index Estimate for the Period January 2003 through December 2004</u>**

12  Q.    Has the Company conducted an estimate of expected costs under the fuel index

13        adjustment provisions for the period January 2003 through December 2004?

14  A.    Yes. The Company has estimated its expected costs under the fuel index adjustment

15        provisions in the same manner as its September 2000, December 2000, March 2001,

16        August 2001 and December 2001 estimates but used average gas and crude oil prices as

17        reported in The Wall Street Journal on October 28, 2002, October 29, 2002 and October

18        30, 2002.

19

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 6 of 9

1    Q.    What gas and oil prices were used in the current estimate?

2    A.    Exhibit MJH-2 provides the gas and oil values used in the analysis.

3

4    Q.    What were the resulting fuel index trigger payments?

5    A.    Exhibit MJH-3 provides the resulting fuel index adjustment payments from the analysis.

6       The analysis shows that the Company would pay an arithmetic average fuel index

7       adjustment payment for the period January 2003 through December 2003 of 0.333 ¢/kWh

8       for the Narragansett Zone load and would pay an arithmetic average fuel index

9       adjustment payment for the same period of 0.353 ¢/kWh for the EUA Zone load. This

10      equates to a total Standard Offer cost of 5.033 ¢/kWh and 5.053 ¢/kWh, respectively.

11

12      For the period January 2004 through December 2004, the current analysis shows that the

13      Company would make no fuel index adjustment payments for either the Narragansett or

14      the EUA Zone loads. Thus the total cost would be 5.100 ¢/kWh for the period.

15

16    Q.    How do these costs compare to current market costs for power?

17    A.    The Company's market cost proxy for comparable service is the cost it incurs to procure

18       its Last Resort Service requirements or the cost its affiliates incur to procure their Default

19       Service requirements. In August 2002, the Company procured Last Resort Service for the

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 7 of 9

1   period September 2002 through February 2003 at an arithmetic average rate of 4.307

2   ¢/kWh and for the period March 2003 through August 2003 at 5.429 ¢/kWh.  In

3   September 2002, the Company's affiliate in Massachusetts procured its Default Service

4   requirements for the period November 2002 through April 2003 at an arithmetic average

5   rate of 5.081 ¢/kWh for residential customers 4.993 ¢/kWh for small commercial

6   customers and 4.973 ¢/kWh for industrial customers,

7

8   Q.   Can you provide the details of the current calculations?

9   A.   Yes.  Detailed calculations are provided in Exhibit MJH-4.

10

11  **V.   Status of Dispute Resolution**

12  Q.   Is Narragansett still disputing costs billed to it from its Standard Offer suppliers?

13  A.   Yes.  As stated in prior proceedings, two of Narragansett's Standard Offer suppliers

14  contend that they are not responsible for certain costs billed to them by ISO New England

15  that are associated with their provision of Standard Offer service.  To ensure that the two

16  suppliers continue to provide service, Narragansett agreed to have ISO New England bill

17  it for such disputed costs until such time as a final resolution of the dispute is reached

18  pursuant to the dispute resolution process provided for in the supply contracts.

19

1    Q.    When will the dispute be finally resolved?

2    A.    Narragansett anticipates that the formal dispute resolution process with one supplier will

3         be completed in mid-2003. Narragansett will pursue appropriate actions against the

4         second supplier at the appropriate time.

5

6    VI.    **Effect of NEPOOL Standard Market Design on Congestion Costs**

7    Q.    When will NEPOOL implement its proposed SMD system?

8    A.    The NEPOOL SMD system is presently targeted to begin March 1, 2003. The actual start

9         date is subject to final rules being approved by FERC and the successful deployment of

10        the market system software by ISO New England. ISO New England has indicated that it

11        expects to meet the March 1, 2003 "Go-Live" date provided that FERC does not require

12        any substantive changes to the market system rules currently pending before it.

13

14    Q.    Will congestion costs be allocated differently under the proposed SMD system then they

15        are currently allocated?

16    A.    Yes. Under the current market system rules, congestion costs are allocated to all

17        NEPOOL transmission customers on the basis of each customer's Network Load.

18        Network Load is a customer's peak load under the NEPOOL transmission tariff for each

19        month.

THE NARRAGANSETT ELECTRIC COMPANY
Re: Rate Changes for January 1, 2003
Witness: Hager
Page 9 of 9

1

2       Under the proposed SMD system, congestion costs will be reflected in the congestion

3       component of the locational marginal energy price in each of the eight zones being

4       established throughout NEPOOL.  Suppliers of energy in each zone will be responsible

5       for congestion costs.

6

7    Q. Will the Company's cost of procuring its Standard Offer supply change as a result of the

8       new congestion cost allocation method under SMD?

9    A. That depends on the final interpretation of the Company's contracts.  The Company

10      believes that it is not responsible for any congestion costs under the proposed SMD

11      system and that it will not pay any additional amounts as a result of the implementation of

12      the system.  One of the Company's suppliers claims that the Company is responsible for

13      certain congestion costs and has initiated a formal dispute resolution to resolve this

14      dispute.  The Company anticipates having a final ruling on this issue in early-2003.

15

16   Q. Does this conclude your testimony?

17   A. Yes. It does.

S:\RADATA1\2002 NECO\YEAR END FILING\MJHTESTIMONY.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 1 of 3

Standard Offer Fuel Index Adjustment Provision

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, NECO will pay additional amounts to Seller in accordance with this Standard Offer Fuel Index Adjustment Provision, which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Index Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Seller will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent available twelve months (six months for Standard Offer load in the EUA Zone), where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal",

S:\RADATA1\2002 NECO\YEAR END FILING\MJHTESTIMONY.DOC

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 2 of 3

expressed in dollars per MMBtu.  NYMEX Contract shall mean
the New York Mercantile Exchange Natural Gas Futures Contract
as approved by the Commodity Futures Trading Commission for
the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent available
twelve months (six months for Standard Offer load in the EUA Zone), where:

Oil Index is the average for the month of the daily low quotations
for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New
York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in
dollars per barrel and converted to dollars per MMBtu by dividing
by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, NECO shall
file alternate indices with the RIPUC.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable
for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 * | $8.48 |
| 2006 * | $9.22 |
| 2007 * | $9.95 |
| 2008 * | $10.69 |
| 2009 * | $11.42 |

* For Narragansett Zone only

THE NARRAGANSETT ELECTRIC COMPANY
R.I.P.U.C. Docket
Exhibit MJH-1
Page 3 of 3

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

# Tab 24

EXHIBIT

182

1

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PUBLIC UTILITIES COMMISSION


**HEARING IN RE:**


NARRAGANSETT ELECTRIC COMPANY
ANNYAL RATE RECONCILIATION
TARIFF FILING

DOCKET NO. 3648


-------------/

DECEMBER 13, 2004
9:30 A.M.

89 JEFFERSON BOULEVARD
WARWICK, RHODE ISLAND

**BEFORE THE COMMISSION:**

ELIA GERMANI, CHAIRMAN
ROBERT B. HOLBROOK, COMMISSIONER

ALAN NAULT, FISCAL ANALYST
CYNTHIA WILSON, LEGAL COUNSEL


**APPEARANCES:**


FOR THE COMPANY:        LAURA OLTON, ESQ.


FOR THE DIVISION:       PAUL ROBERTI,
                        ASSISTANT ATTORNEY GENERAL


**ORIGINAL**

2

I-N-D-E-X

PAGE NO.

PUBLIC COMMENT

Lela Coons                                          8
Patricia Ault                                      10
Salvino Salerno                                    13
Julie Silvia                                       17
Margaret Rogers                                    18
Henry Shelton                                      21
Elaine Gambardello                                 26
George Page                                        32
Richard Bidwell                                    35

12/13/04
9:30am

JEANNE A. LLOYD
MICHAEL J. HAGER
CAROL A. CURRIER

Direct Examination by Ms. Olton                    45
Cross-Examination by Mr. Roberti                   54
Examination by Ms. Wilson                          83
Examination by Mr. Nault                          131
Examination by Commissioner Holbrook             137

A-1 COURT REPORTERS, INC.
(401) 333-3381

3

E-X-H-I-B-I-T-S

EXHIBIT NO.

PAGE NO.
ID/FULL

FOR THE COMPANY

1    Filing submitted November 10, 2004    7/143

1A    Testimony and schedules of
      Jeanne A. Lloyd                                7/143

1A         Revised Schedules JAL-1,
Amended    JAL-7, JAL-8, JAL-12 &
           MJH-4                                     54/143

1B    Testimony and schedules of
      Michael J. Hager                               7/143

1C    Testimony and schedules of
      Carol A. Currier                               7/143

2    Updated schedules                              7/143


FOR THE COMMISSION

1    Narragansett's responses to
     Commission data requests                        7/143


FOR TEC-RI

1    Narragansett's responses to
     TEC-RI's data requests                          7/143

A-1 COURT REPORTERS, INC.
(401) 333-3381

83

1    better to -- that would help to facilitate the

2    transfer of customer related information to NPPs,

3    correct?

4         MR. HAGER:  Correct.

5         MR. ROBERTI:  And is there any reason

6    why these changes couldn't be pursued by the

7    company and implemented?

8         MR. HAGER:  We believe they require

9    Commission approval, but there's no reason why we

10   can't bring them forward.

11        MR. ROBERTI:  That's all the questions

12   I have at this time.  Thank you.

13        THE CHAIRMAN:  Counsel Wilson?

14        MS. WILSON:  Can I have Dr. Stutz sworn

15   in at the same time please?

16              **JOHN STUTZ** (Sworn)

17        **EXAMINATION BY MS. WILSON**

18        MS. WILSON:  I would first ask Dr.

19   Stutz what the Division's position is regarding

20   Narragansett's filing.

21        DR. STUTZ:  I think it's fair to say

22   that some aspects of the filing, the large

23   percentage increase in transmission and the

24   rather erratic behavior of the standard offer

1    give us some concern.  That being said, we

2    support the proposal that's currently before the

3    Commission.

4            MS. WILSON:  And that's the proposal to

5    leave the standard offer at 6.7 cents a kilowatt

6    hour, to reduce the transition charge slightly

7    and to increase the transmission adjustment

8    factor?

9            DR. STUTZ:  That's correct.

10           MS. WILSON:  Okay.  I'll come back in a

11   minute.  Ms. Lloyd, is the transmission service

12   adjustment provision the same as the transmission

13   adjustment factor?

14           MS. LLOYD:  Yes.  The transmission

15   adjustment factor is implemented pursuant to that

16   provision.

17           MS. WILSON:  Okay.  And with regard to

18   transition -- the transition charge, what's the

19   most recent year that's been closed?

20           MS. LLOYD:  I'm sorry.  When you say

21   has been --

22           MS. WILSON:  There's no outstanding

23   issues between the Commission, Division and the

24   company?

85

1          MS. LLOYD:  I'll have to check.  I'm

2     not sure about that.

3          MS. WILSON:  Okay.

4          MS. LLOYD:  Do you want that to be a

5     record request?

6          MS. WILSON:  Please.  And Mr. Hager,

7     with regard to the EUA fuel adjustment provision

8     expiring, have you had any feedback from

9     suppliers different from what you discussed in

10    August which was two of the suppliers agreed that

11    it was -- that it would end and one of the

12    suppliers was still up in the air?

13         MR. HAGER:  Two of the suppliers -- two

14    out of the three suppliers which covered three

15    out of four of my contracts in conversations have

16    indicated that they understand that it expires.

17    The company has not had any reason to discuss it

18    with the third supplier and the company continues

19    to believe that the terms of the agreement are

20    straightforward and there's no reason to -- for

21    any -- or any basis for any dispute then it does

22    end.

23         MS. WILSON:  In the event that there is

24    a dispute, does that go to arbitration or is that

86

1        a court action?

2                MR. HAGER:  Standard offer agreements

3        are covered by an arbitration proceeding.

4                MS. WILSON:  And were the standard

5        offer agreements originally approved by FERC?

6        Did anybody approve those?

7                MR. HAGER:  I'm not as familiar with

8        the EUA agreements but --

9                MS. WILSON:  I just meant in general.

10               MR. HAGER:  I can tell you on the

11       Narragansett agreements that they were included

12       as part of the restructuring dockets presented

13       both here at the Rhode Island Commission and down

14       at FERC.  Whether those agreements were

15       specifically approved or whether they were

16       approved as part of the overall approval of the

17       docket, I believe the latter is what has

18       occurred.

19               MS. WILSON:  The latter being --

20               MR. HAGER:  That they may not have been

21       specifically approved but approved as part of the

22       overall restructuring arrangements in place.  But

23       I would need the legal department to do more

24       research on that if need be.

1          MS. WILSON:  Ms. Olton, if there were

2     disputes over the terms of a wholesale standard

3     offer contract, would that -- is there any

4     regulatory agency that would be responsible for

5     reviewing those disputes?  Would it be FERC?

6          MS. OLTON:  Paul, do you want to weigh

7     in here?  I think it's FERC jurisdictional, but I

8     recall many years ago doing research on this when

9     I was back in private practice at the time of

10    restructuring in both Massachusetts and Rhode

11    Island and being questionable.  I concur with

12    what Mike said which was that -- with what Mr.

13    Hager said which was that these agreements were

14    part of the whole restructuring agreements that

15    were approved at FERC as well as filed with the

16    PUC here.

17         MS. WILSON:  Did you want to add

18    anything?

19         MR. ROBERTI:  My understanding is the

20    same, that the arbitration proceedings are

21    governed by a FERC approved agreement and

22    ultimately if someone is -- if a party is

23    aggrieved by the result of that arbitration

24    decision, I believe they have a right to petition

88

1    FERC for further review.

2           My only question is given that this

3    comes up time and again and being startled that

4    some supplier out there -- and you ought to send

5    a copy of this transcript to that one remaining

6    supplier that's not convinced to the contrary

7    that somehow a contract that does not specify any

8    increases for fuel after a certain date should be

9    interpreted otherwise, but we've been startled

10   with the results of these arbitration procedures

11   before and my question would be what right does

12   the Attorney General and the Division and even

13   the Commission have to intervene in those

14   arbitration procedures and have a stake in that

15   procedure so that we may pursue any appellate

16   review at the FERC level or the D.C. Court of

17   Appeals if necessary if we are indeed aggrieved

18   by a results on these types of decisions.

19           MS. WILSON:  Ms. Lloyd, with regard to

20   the last resort service balance that is currently

21   pending, normally it's rolled into the standard

22   offer to either increase it or reduce it, and it

23   appears, unless I've misread it, that you're not

24   doing that this year.

1          MS. LLOYD:  Because the balance was so

2     small we it just proposed to carry it forward

3     into the next period.  Normally, as you said, we

4     have used to it offset fuel expenses in the

5     standard offer reconciliation.

6          MS. WILSON:  Given the fact that it's

7     an overrecovery, ratepayers will earn interest on

8     that?

9          MS. LLOYD:  That's right.

10         MS. WILSON:  And what is the basis for

11    that overrecovery, like, how does it occur?

12         MS. LLOYD:  Most of the overrecovery

13    occurred in the C&I reconciliation.  The C&I

14    customers pay charges that change monthly

15    pursuant to whatever the prices are in their

16    contract, so most of the reconciliation is not

17    due to differences in wholesale and retail

18    prices.  Most of the difference is most likely

19    due to the timing effect of the kilowatt hours

20    billed to our customers on a cycle billing basis

21    versus the wholesale kilowatt hours which are

22    done on a calendar month basis.

23         MS. WILSON:  Okay.  So I'm a little

24    confused.  For every kilowatt hour used in a

1    and with the EUA -- former EUA territory it is a

2    six-month average.

3          MS. WILSON:  Which will be ending.

4          MR. HAGER:  Correct.

5          MS. WILSON:  So what would -- at what

6    point would you -- let me rephrase that.  The

7    fuel index adjustments are based on the 12-month

8    rolling average based on a formula that includes

9    natural gas and oil, and we're talking about

10    market volatility and so forth.  What would --

11    let's just take a month or a few months.  At what

12    point would natural gas and oil prices rise to

13    that would cause you to need to increase the

14    rate?

15          MR. HAGER:  In Calendar Year 2005 each

16    month we look at the 12-month average to date of

17    gas prices and oil prices, add those two averages

18    together and we compare them to a trigger point

19    in the contract.  For Calendar Year 2005 that

20    trigger point is 8.48 cents per million Btu, so

21    when you add up those two averages, if they're

22    equal to or less than 8.45 -- $8.48, we do not

23    make any fuel index payments to our suppliers in

24    that month.  If the fuel trigger -- if these two

116

1    values exceed that level, then we make a payment

2    to that month based on how far above the trigger

3    point the averages have been.

4              MS. WILSON:  8.48 seems like a lot of

5    money.

6              MR. HAGER:  It seems like a lot of

7    money at the time when -- you know, as I said,

8    gas prices were $2.50 a million Btu.  If you

9    figure oil was comparable to that, at the time

10   you add the two, that's $5.  We did not

11   anticipate making any fuel prices this late into

12   the contract.  We didn't anticipate these back at

13   the time these -- these prices no one believed

14   would ever be sustained.

15             MS. WILSON:  Now, for 2004 it was $7.74

16   was the trigger point.

17             MR. HAGER:  Just to follow-up on my

18   last -- based on the fuel prices in our

19   Exhibit 2, in January of '05 we're anticipating

20   that the gas price alone will be $6.24 a million

21   Btu and oil price of $4.38 for a total of $10.62

22   versus that $8.48 trigger point.  And we

23   anticipate because as we move off in time we're

24   subject to even higher prices than one month,

A-1 COURT REPORTERS, INC.
(401) 333-3381

117

1      than a month that is rolling off.  We see that

2      that trigger point will continue to remain

3      stable, but the actual gas and oil adders will

4      increase over time throughout the Calendar Year

5      2005.

6              MS. WILSON:  Are there oil fired units

7      in New England right now?

8              MR. HAGER:  Yes, there are.

9              MS. WILSON:  So some of Narragansett's

10     retail customers could be getting -- could be

11     purchasing electricity that was produced and put

12     into the grid from oil powered units?

13             MR. HAGER:  Correct.

14             MS. WILSON:  What was the basis behind

15     doing the field trigger point and in the way

16     that's calculated?

17             MR. HAGER:  In general the fuel

18     adjustment provisions were put in there as a

19     market fuel cost hedge to the suppliers.  Without

20     that they'd be looking at long-term fixed price

21     contracts from 1998 through 2009 and they had no

22     protections against fuel price movements.  So the

23     index was taken to provide them with protections

24     against what was reasonably anticipated to be

118

1    high market prices, and I believe the actual

2    language we use in the contract is protection

3    against extraordinary increases.  It wasn't

4    necessarily set at here's what we think prices

5    are going to be, here's an extraordinary gas and

6    oil price level that has to be exceeded in order

7    for you to get additional payments.  You factor

8    in the normal volatility and normal prices and

9    spikes and so forth and what that does is provide

10   some price protection.  So that these

11   contracts -- so that if we do send a market price

12   signal or market price adjuster so that they're

13   not that far out of the market and our suppliers

14   still have a continued incentive to perform.

15         MS. WILSON:  Do you believe these are

16   above-market contracts or below-market contracts?

17         MR. HAGER:  If I'm looking at an

18   average 6.7 cent for 2005, that is consistent if

19   not a little bit below some of the recent market

20   purchases that Narragansett or its affiliates

21   have been making for Calendar Year 2005

22   purchases.  Clearly, this is not an overpriced

23   contract relative to the market.

24         MS. WILSON:  Clearly.  Okay.  My next

A-1 COURT REPORTERS, INC.
(401) 333-3381

119

1    question was for Miss Currier.  Looking at the

2    bottom right-hand corner of Page 132 of your

3    testimony, and I don't know if I'm reasking some

4    of Mr. Roberti's questions, so if I am, please

5    feel free to remind me.  You discussed the

6    derivation for pre '97 property under the NEPOOL

7    tariff and you talked to zonal transmission rates

8    and single postage stamp rates and I'm not really

9    clear on that, but also I guess my question is

10   how do you determine that Narragansett is only

11   being charged what is appropriate for

12   Narragansett to be charged, and I guess maybe

13   what I'm getting confused about is moving from

14   zonal transmission to postage stamp, so if you

15   could start there.

16        MS. CURRIER:  There is a transition in

17   place where the rate being charged for all

18   transmission facilities will be a single rate

19   throughout the region.  The pre '97 assets are

20   based on zonal rates which are dependent upon

21   each transmission owner's revenue requirement

22   associated with those facilities.  There's a

23   portion of the total R&S rate that is based upon

24   the pre '97 revenue requirement and then the post

1       '96 is the average rate for post '96 assets.  The

2       sum total for each New England transmission owner

3       is charged to their local load, to their -- to

4       their load.  Over time it's transitioned to the

5       single rate that will be charged throughout New

6       England.

7                   MS. WILSON:  And what's the reason for

8       that, do you know, to have the one single rate?

9                   MS. CURRIER:  As part of the NEPOOL

10      settlement the decision was to move toward a

11      single average rate for the region and this

12      mechanism was put in place to gradually come to a

13      blended rate for New England customers.

14                  MS. WILSON:  So do you have a situation

15      where certain New England customers are

16      subsidizing other New England customers under

17      this rate?

18                  MS. CURRIER:  For the pre '97 there is

19      a band width that's been established which keeps

20      the rate within a certain percentage from the

21      average rate to the extent that a transmission

22      owner's pre '97 exceeds I believe in 2005 above

23      or below 118 percent above and below the average,

24      then there is a subsidization of the transmission

1    owner's rate.

2           MS. WILSON:  MRM contract costs are

3    still only charged to the region in which those

4    costs those -- the need arises?

5           MS. CURRIER:  That's right, within the

6    reliability region.

7           MS. WILSON:  And so Rhode Island should

8    again not have any MRM costs this coming year?

9           MS. CURRIER:  That's correct.

10          MS. WILSON:  With regard to response to

11   TEC-RI response to Data Request 1-8, Mr. Hager,

12   Mr. Roberti asked you a few questions about this

13   one.  With regard to the electronic exchange of

14   usage information, if there was a way that the

15   NPP could provide an electronic signature to

16   Narragansett Electric.  Would that be a problem,

17   if you know -- otherwise, I can direct this to

18   legal counsel -- under the Commission's current

19   NPP consumer protection rules, to do an

20   electronic transfer?

21          MR. HAGER:  I don't believe either one

22   of these is asking for electronic signature.  On

23   the electronic exchange of historical information

24   currently an NPP has to get written authorization

# Tab 25

1

STATE OF RHODE ISLAND

AND PROVIDENCE PLANTATIONS

PUBLIC UTILITIES COMMISSION


HEARING IN RE:

NARRAGANSETT ELECTRIC COMPANY
STANDARD OFFER FILING

DOCKET NO. 3571

- - - - - - - - - - - - -/

JULY 26, 2004
9:30 A.M.

89 JEFFERSON BOULEVARD
WARWICK, RHODE ISLAND


BEFORE THE COMMISSION:

ELIA GERMANI, CHAIRMAN
KATE F. RACINE, COMMISSIONER
ROBERT B. HOLBROOK, COMMISSIONER, PRESIDING


APPEARANCES:

FOR THE COMPANY:     THOMAS G. ROBINSON, ESQ.

FOR THE DIVISION:    PAUL ROBERTI, ASSISTANT
                     ATTORNEY GENERAL


ORIGINAL

EXHIBIT
98

A-1 COURT REPORTERS, INC.
(401) 333-3381

2

1                           I-N-D-E-X

2                                                   PAGE NO.

3       JEANNE A. LLOYD      MICHAEL J. HAGER

4       Direct Examination by Mr. Robinson        6
        Cross-Examination by Mr. Roberti          9
5       Examination by Ms. Wilson                 14
        Examination by Mr. Nault                  30
6       Examination by Commissioner Racine        39
        Examination by the Chairman               50
7       Examination by Commissioner Holbrook      53
        Further Examination by Ms. Wilson         59

8

9                      PUBLIC STATEMENTS

10      Henry Shelton                             64

11

12                      E-X-H-I-B-I-T-S

13      EXHIBIT NO.                            PAGE NO.
                                               FULL
14
                      FOR THE COMPANY
15
        04-1  Standard offer filing             68
16
        04-1A Testimony and exhibits of
17            Jeanne A. Lloyd                    68

18      04-1B Testimony and exhibits of
              Michael J. Hager                   68
19
        04-2  Updated filing dated July 23, 2004 68
20

21                      FOR THE DIVISION

22      04-1  Memo from Mr. Stearns              70

23

24

1              (COMMENCED AT 9:30 A.M.)

2         COMMISSIONER HOLBROOK:  Good morning.

3    This morning's public hearing on Docket No. 3571

4    is a continuation of the public hearing held on

5    Thursday, July 22nd, 2004 to receive public

6    comment.  Docket 3571 is in regard to

7    Narragansett Electric Company's standard offer

8    tariff filing requesting revised standard offer

9    service rates for effect August 1st of 2004.  May

10   I have appearances please?

11         MR. ROBINSON:  Thomas G. Robinson for

12   Narragansett Electric Company.

13         MR. ROBERTI:  Paul Roberti, Assistant

14   Attorney General for the Division of Public

15   Utilities and Carriers.

16         MS. WILSON:  Cynthia Wilson, Commission

17   counsel.

18         MR. NAULT:  Alan Nault, Commission rate

19   analyst.

20         COMMISSIONER HOLBROOK:  To my left is

21   Kate Racine, Commissioner at the PUC.  To my

22   immediate left is Chairman Elia Germani.  I'm

23   Commissioner Robert Holbrook.  Miss Wilson, do

24   you have any administrative matters?

1          MS. WILSON:  Just the last time the

2  filing was marked as Narragansett Exhibit 1 with

3  the testimony and exhibits of Jeanne Lloyd being

4  Narragansett 04-1A and the testimony and exhibits

5  of Michael Hager being 04-1B.  The Division's

6  memo from Mr. Stearns was marked as Division

7  04-1, and I would just ask Mr. Robinson if he

8  wants the filing that was made on July 23rd

9  updating the numbers based on more current fuel

10  projections to be marked as Narragansett Exhibit

11  04-2.

12          MR. ROBINSON:  Yes.

13          MS. WILSON:  Commissioner, normally we

14  put Ms. Lloyd and Mr. Hager up as a panel.

15          COMMISSIONER HOLBROOK:  Okay.  Were

16  there any opening remarks, any opening

17  statements, Mr. Robinson, or --

18          MR. ROBINSON:  Yes.  I can give a brief

19  statement of events that have occurred since the

20  opening hearing last week.  On Friday, as Ms.

21  Wilson indicated, Narragansett filed an update a

22  to the exhibits in this testimony reflecting the

23  fuel prices on July 20th, 21st and 22nd of 2004

24  as indicated in the July 23rd filing.  That

5

1       reduced our projected underrecovery by about $4

2       million.

3               In addition, we had received the

4       Division's position on the implementation of the

5       factor which would be to implement it as of

6       August 1st rather than October as we had

7       suggested.  As a result -- and we've adopted that

8       approach for a recommendation here to the

9       Commission.  And as a result the standard offer

10      rate dropped from our proposal initially in our

11      initial filing of $0.0686 per kilowatt hour to

12      $0.0658 per kilowatt hour.  We are proposing that

13      that become effective on August 1st, 2004, and

14      Mr. Hager and Ms. Lloyd can respond to any

15      questions about the update.

16              COMMISSIONER HOLBROOK:  Mr. Roberti, do

17      you have any comment?

18              MR. ROBERTI:  Nothing to add to that

19      except we have Dave Stearns here to testify and

20      he can take the stand at the appropriate time.

21              COMMISSIONER HOLBROOK:  Mr. Robinson,

22      do you have your witnesses then?

23              MR. ROBINSON:  I do, and I would like

24      to call them now, Ms. Lloyd and Mr. Hager.

6

JEANNE A. LLOYD/MICHAEL H. HAGER

(Previously Sworn)

DIRECT EXAMINATION BY MR. ROBINSON

1    MR. ROBINSON:  I have some brief direct
2
3
4    testimony for both.  By the way, I have some
5    extra copies of the filing that we made on Friday
6    in case anyone needs it.  Turning to Ms. Lloyd,
7    would you please state your name and business
8    address?
9
10    MS. LLOYD:  My name is Jeanne A. Lloyd.
11    My business address is 55 Barefoot Road,
12    Northboro, Massachusetts.
13    MR. ROBINSON:  What is your position?
14    MS. LLOYD:  I'm Principal Financial
15    Analyst in the distribution regulatory services
16    department.
17    MR. ROBINSON:  Have you testified
18    before the Commission in this proceeding?
19    MS. LLOYD:  Yes, I have.
20    MR. ROBINSON:  I hand you your prefiled
21    testimony and exhibits that were included in
22    Narragansett's July 1st, 2004 filing that have
23    been marked as Exhibit 1A and ask if you can
24    identify them.

A-1 COURT REPORTERS, INC.
(401) 333-3381

1      MS. LLOYD:  Yes.  That's my testimony

2  and exhibits in this docket.

3      MR. ROBINSON:  Do you adopt the

4  testimony and exhibits as your own?

5      MS. LLOYD:  Yes, I do.

6      MR. ROBINSON:  Have you updated the

7  schedules in Exhibit 1A?

8      MS. LLOYD:  Yes, I have.  On Friday,

9  July 23rd we filed an update to Schedules JAL-1,

10  JAL-2 and JAL-4 of my testimony.

11      MR. ROBINSON:  And those have been

12  premarked as Exhibit Narragansett 2, I believe?

13      MS. LLOYD:  Yes.

14      MR. ROBINSON:  Do you adopt those

15  updates as your testimony as well?

16      MS. LLOYD:  Yes, I do.

17      MR. ROBINSON:  Could you tell us what

18  factor Narragansett is proposing in this case,

19  what's the standard offer rate that Narragansett

20  is proposing?

21      MS. LLOYD:  Based on the updated

22  schedules filed on July 23rd, we're now proposing

23  a standard offer rate of 6.58 cents per kilowatt

24  hour effective August 1st, 2004.

A-1 COURT REPORTERS, INC.
(401) 333-3381

8

1    MR. ROBINSON:  How will the

2    implementation of that rate affect a monthly bill

3    of a typical residential customer using 500

4    kilowatt hours?

5        MS. LLOYD:  For the typical residential

6    customer that equates to a monthly increase of

7    $3.54 or approximately 5.9 percent.

8        MR. ROBINSON:  Thank you.  I have no

9    further questions for Ms. Lloyd.  I'd like to

10   turn to Mr. Hager if I could.  Would you please

11   state your name and business address?

12       MR. HAGER:  Michael J. Hager, 55

13   Barefoot Road, Northboro, Massachusetts.

14       MR. ROBINSON:  And what is your

15   position?

16       MR. HAGER:  I am Vice President of

17   Energy Supply New England for National Grid USA

18   Service Company.

19       MR. ROBINSON:  And have you testified

20   before this Commission in this proceeding?

21       MR. HAGER:  Yes, I have.

22       MR. ROBINSON:  I hand you testimony and

23   exhibits that have been marked as Exhibit

24   Narragansett 1B and ask you to identify it.

9

1    MR. HAGER: This is my prefiled

2    testimony and exhibits in Docket -- in this

3    docket.

4        MR. ROBINSON: And do you adopt those

5    as your own in this proceeding?

6        MR. HAGER: Yes, I do.

7        MR. ROBINSON: Have you updated the

8    schedules in Exhibit 1B?

9        MR. HAGER: Yes, I have.

10       MR. ROBINSON: And have those updated

11   schedules been included in the package that was

12   marked as Exhibit Narragansett 2 today?

13       MR. HAGER: Yes. The exhibit which is

14   included in Exhibit 2 is Exhibit MJH-4 which has

15   been updated and filed last Friday.

16       MR. ROBINSON: And do you adopt that

17   exhibit as your own in this case?

18       MR. HAGER: Yes, I do.

19       MR. ROBINSON: Thank you. I have no

20   further questions.

21       COMMISSIONER HOLBROOK: Mr. Roberti, do

22   you have any?

23       MR. ROBERTI: Thank you.

24   CROSS-EXAMINATION BY MR. ROBERTI

1          MR. ROBERTI:  Mr. Hager, if the

2     standard offer rate were set at $.0658 per kwh,

3     do you have any information regarding how that

4     would compare with the market prices available

5     today?

6          MR. HAGER:  Yes.  In the most recent

7     set of market prices that I can refer to we

8     expect to file with the Commission by the end of

9     this week and that would be our just recently

10    completed solicitation for last resort service

11    here in Rhode Island.  As a result of that

12    solicitation which was completed last week, the

13    market price for residential customer load here

14    in Rhode Island for the six-month period

15    September of '04 through February of '05 on

16    average is about seven-and-a-half cents per

17    kilowatt hour.  For the same period the market

18    price that we see for commercial/industrial

19    customers in Rhode Island is about 7.2 to 7.3

20    cents per kilowatt hour.

21         MR. ROBERTI:  And any idea how that

22    would be going forward from today?  Any sense of

23    what the market prices will be coming into this

24    next year?

1       MR. HAGER:  Well, those prices were for

2   the September '04 through February '05 period.

3       MR. ROBERTI:  Okay.  I misheard you.

4   Would you anticipate greater movement from -- by

5   customers from the standard offer to the market?

6       MR. HAGER:  It's Narragansett's hope

7   that customers will eventually move to the

8   marketplace.  On the residential side we don't

9   see any competition for customers and so I have

10  very low expectations for residential customers

11  to move from standard offer to the marketplace.

12  For commercial/industrial customers that's the

13  area where there is some competition for those

14  customers.  We've seen quite a number of those

15  customers who are moving to the marketplace.  As

16  to whether more customers will leave standard

17  offer to go to the marketplace or not, I guess I

18  have low expectations at this point.  Higher than

19  the residential class, but I don't see that

20  there's a strong enough spread in prices for

21  those customers to leave, especially if the

22  market is indicating a 7.2 to 7.3 price for the

23  next six-month period of time and we have a

24  standard offer rate that's just about 6.6 cents.

1   There's not enough incentive for those customers

2  to leave standard offer.

3     MR. ROBERTI:  Are the last resort

4  service prices higher than what you might be able

5  to get if you had firm commitments and entered

6  into an agreement with a supplier for, say, six

7  months or one year or beyond?

8     MR. HAGER:  Yes.  All of the last

9  resort pricing, default prices in other service

10  territories, that price from our wholesale

11  suppliers includes a migration premium for

12  customers to be able to freely come and go from

13  that service, and it's our understanding that if

14  customers make firm commitments to remain for a

15  period of time, that the supplier can remove that

16  migration premium or the premium related to the

17  uncertainty of the customer staying on, so

18  customers that make firm commitments should be

19  able to receive lower prices.

20     MR. ROBERTI:  Any sense on -- can you

21  point to what the migration premium is?

22     MR. HAGER:  I can only do that based on

23  general discussions with suppliers, but for

24  residential customers it's about .1 to .2 cents a

1   kilowatt hour.  For the larger

2   commercial/industrial customers it could be up to

3   about 4/10th's of a cent per kilowatt hour,

4   sometimes slightly higher, maybe six in some

5   cases.

6           MR. ROBERTI:  Do you have any

7   information regarding whether the market is

8   offering long-term contracts beyond, say, one to

9   three years?

10          MR. HAGER:  Again, just based on

11  discussions with various suppliers that the

12  marketplace is capable and willing to provide

13  price quotes for that period of time to customers

14  who have an interest in them.

15          MR. ROBERTI:  The prices that you

16  quoted in the filing that you're going to make at

17  the end of the week on the last resort service,

18  are those prices -- are those basically -- is

19  that public information at this point?

20          MR. HAGER:  I just testified at a

21  public hearing, so yes, it is.

22          MR. ROBERTI:  But those numbers are

23  reliable enough that if a customer were to call

24  to the Division and ask for information about

14

1      last resort service prices, the Division could

2      quote those prices?

3              MR. HAGER:  Those are the numbers that

4      Narragansett will be filing sometime this week.

5              MR. ROBERTI:  Okay.  Thank you.  That's

6      all I have.

7              COMMISSIONER HOLBROOK:  Miss Wilson, do

8      you have any questions?

9              MS. WILSON:  Thank you, Commissioner.

10            EXAMINATION BY MS. WILSON

11              MS. WILSON:  Ms. Lloyd, the proposal

12      that would result in a rate of 5.68 cents per

13      kilowatt hour, is that expected to remain in

14      effect through December 31st, 2005?

15              MS. LLOYD:  That's the rate that would

16      remain in effect assuming that fuel prices don't

17      change significantly from what our most recent

18      estimate has been.

19              MS. WILSON:  Given -- and have fuel

20      prices been volatile over the last three months?

21              MR. HAGER:  I can address that.  If I

22      were to just look at -- let's just look at gas

23      prices for now.

24              MS. WILSON:  Which exhibit is that?

15

1    MR. HAGER:  I'm just going to refer

2 from some notes as opposed to a specific exhibit.

3    MS. WILSON:  Okay.

4    MR. HAGER:  Let me just look at January

5 of '05.  The prices that are contained in the

6 Exhibit C filing, numbers through July or gas

7 prices for the three-day period through July

8 22nd, the January 2005 gas price in there is

9 $6.77.  A month ago as of June 28th of 2004 that

10 same gas price for that month was $6.39; two

11 months ago as of May 26, 2004 it was $7.20 and

12 six months ago -- three months ago, April 28th it

13 was $6.48.  Six months ago on January 28th of

14 2004, $5.75.  We've gone up but we're starting to

15 come back down.  In between there's been quite a

16 bit of movement.  For the January '05 generally

17 there's less movement in the outer month prices,

18 but when we go to earlier months, say, August of

19 '04 we would see more movement.

20    MS. WILSON:  Given the fact that there

21 is movement in prices, how realistic is it that

22 this rate would be in place through December

23 31st, 2005?

24    MR. HAGER:  Based on past experience

16

1   it's difficult to believe that these prices will

2   remain where they are over the 18-month period of

3   time.  There will probably be some movement,

4   hopefully more downward than upward movement.

5           MS. WILSON:  So why is it reasonable to

6   attempt to implement a rate to collect the funds

7   over a 17-month period?

8           MS. LLOYD:  Well, if you refer to my

9   updated Schedule JAL-2, Page 2, if we implemented

10  a rate to recover just the underrecovery expected

11  through December, we would propose a rate of

12  about 6.7.  The one we're proposing is close to

13  6.6.  That's not a huge difference in the rate.

14  I think it's obvious we'll be back at the end of

15  the year on our normal year end filing based on

16  the then current prices at that time and we'll

17  make any adjustment that's necessary.  If at that

18  point in time the underrecovery expected for next

19  year is significantly different, we would propose

20  to adjust the rate at that time.

21          MS. WILSON:  And what would you

22  consider to be significant?

23          MS. LLOYD:  Well, certainly I would

24  think the $16 million threshold that the

A-1 COURT REPORTERS, INC.
(401) 333-3381

17

Commission has included in its order and the directive to the company to file should the under or overrecovery exceed that amount.

MS. WILSON: Do you think it sends a more realistic price signal if the entire -- if the rate was designed to collect the entire underrecovery through December 31st of 2004 rather than December 31st, 2005?

MS. LLOYD: Well, in this case, as I said, the difference between the two rates isn't that significant, and I'm sure fuel prices will change somewhat by the end of the year anyway. I think that either rate would be appropriate at this point in time.

MS. WILSON: Now Ms. Lloyd, does Narragansett Electric make a profit on this portion of the bill?

MS. LLOYD: Not on the -- no, we don't, not on the standard offer.

MS. WILSON: And the standard offer is made up entirely of the energy charges portion of the bill?

MS. LLOYD: The base and fuel related standard offer prices, yes.

18

MS. WILSON:  Okay.  And now I notice
when I look at the comparison of rates which is
JAL-4, and I'm just going to take the typical
residential customer on Rate A-16 using 500
kilowatt hours a month, let's start with the
information below the box.  Okay?

MS. LLOYD:  Okay.

MS. WILSON:  And it indicates that the
standard offer charge right now is 5.9 cents per
kilowatt hour.

MS. LLOYD:  That's right.

MS. WILSON:  And that includes a base
price and a fuel index price.

MS. LLOYD:  That's right.

MS. WILSON:  Okay.  And now in June of
2003 the Commission held a hearing in Docket 3496
which dealt with an amendment to the standard
offer wholesale contracts.  Do you remember that?

MS. LLOYD:  Yes.

MS. WILSON:  Now, the base price, the
aggregated base price for standard offer changed
slightly after that order, correct?

MS. LLOYD:  That's right.

MS. WILSON:  Okay.  So whereas the

19

contract would say five -- whereas a generic standard offer contract would say the 2004 base price was 5.1 cents per kilowatt hour, the aggregated price was 5.143 cents per kilowatt hour after the amendment.

MS. LLOYD: The estimated aggregated price, yes.

MS. WILSON: For 2005 it would be 5.43 cents would be the estimated aggregated cost per kilowatt hour.

MS. LLOYD: Yes, that's right.

MS. WILSON: Okay. Now, under your proposal the total monthly bill for a typical residential customer on standard offer would be $64.03, correct?

MS. LLOYD: For the customer using 500 kilowatt hours per month that would be correct.

MS. WILSON: And of that the standard offer makes up $34.27?

MS. LLOYD: That's right.

MS. WILSON: Okay. Now, would you -- so would you agree that the standard offer portion of the bill is approximately 53.3 percent of the bill or more than half?

20

1                MS. LLOYD:  I would agree.  Your

2    calculations sound correct.

3                MS. WILSON:  Okay.  Now, if I take the

4    6.58 cents per kilowatt hour and subtract the new

5    base price of 5.143 cents per kilowatt hour,

6    would you agree that point or .1437 or 1.437 of

7    the standard offer per kilowatt hour rate is due

8    to standard offer -- I mean is due to the fuel

9    adjustment provision?

10              MS. LLOYD:  Yes.  Again, subject to

11    check, that sounds correct.

12              MS. WILSON:  Okay.  And would you agree

13    that that sounds like approximately 21.8 percent

14    of the new rate would be due to the fuel costs?

15              MS. LLOYD:  That sounds approximately

16    right, yes.

17              MS. WILSON:  And again, you don't make

18    a profit on this portion of the bill?

19              MS. LLOYD:  That's right.

20              MS. WILSON:  Mr. Hager, could we turn

21    to MJH-1, please, and on Page 2 you have a

22    section that's underlined that says fuel trigger

23    point.  Do you have that?

24              MR. HAGER:  Yes.

1          MS. WILSON:  Okay.  Now, I notice that

2     for Years 2005 through 2009 there are stars next

3     to the dates.  Could you explain why there are

4     stars next to the dates?

5          MR. HAGER:  The section that you're

6     referring to is the fuel trigger point which is

7     the dollar per mmBtu value for which we compared

8     the fuel prices to.  If prices exceed the values

9     in this section, then we make a fuel adjustment

10    -- fuel trigger adjustment payments to our

11    wholesale suppliers.  The table contains trigger

12    points through 2009.  The asterisk is next to

13    years 2005 through 2009 and it indicates it's for

14    the Narragansett zone only.  The former EUA zone

15    and related contracts only included fuel trigger

16    payments under their former retail tariffs

17    through 2004.  So it's the company's position

18    that the fuel trigger payments will cease to be

19    made to suppliers of the old EUA standard offer

20    load but will continue for the old Narragansett

21    load.

22          MS. WILSON:  And has that expectation

23    been calculated into the rates being proposed

24    today?

22

1    MR. HAGER: Yes.

2    MS. WILSON: And would you agree

3  subject to check that the first time that

4  Narragansett included those asterisks in its

5  filing was in Docket No. 3496 filed November

6  18th, 2002?

7    MR. HAGER: Subject to check, yes.

8    MS. WILSON: Now, you've discussed this

9  issue with the Commission in the past, correct?

10   MR. HAGER: Yes, we have.

11   MS. WILSON: I went back to Docket 3508

12 and I'm just going to show you the official

13 transcript, Page 86. Have you had an opportunity

14 to review Pages 86 through 92 of the transcript

15 in Docket 3508?

16   MR. HAGER: Yes, I have.

17   MS. WILSON: In that you provided

18 testimony with regard to this very issue,

19 correct?

20   MR. HAGER: Correct.

21   MS. WILSON: Okay. And do you agree

22 with the testimony that you provided in Docket

23 3508?

24   MR. HAGER: Yes, I do.

1    MS. WILSON:  I'd ask the Commission to

2  take administrative notice of the entire

3  transcript, but specifically Pages 86 to 91 from

4  Docket 3508 -- Page 92.

5            (BRIEF PAUSE)

6    COMMISSIONER RACINE:  Ms. Wilson, is it

7  fair to say that the Commission is awaiting the

8  reaction of Commissioner Holbrook from the Bench

9  to take administrative notice?

10    MS. WILSON:  Or of the Commission.  You

11  were reviewing it so I wanted to wait.  If you

12  could just rule for the record.

13    COMMISSIONER HOLBROOK:  I'm sorry?

14    MS. WILSON:  If you could just rule on

15  the request to take administrative notice which

16  means that this would be -- the Commission could

17  take it under consideration in its deliberations

18  if necessary.

19    COMMISSIONER HOLBROOK:  Is there any

20  objection to the request?

21    MR. ROBINSON:  No objections.

22    MR. ROBERTI:  No objection.

23    COMMISSIONER HOLBROOK:  So ordered.

24    MS. WILSON:  And Mr. Hager, in the

1    order that came out of Docket 3508, and for the

2    record it is Order No. 17495, that portion of

3    your testimony was discussed on Pages 7 and 8.

4    Do you agree with the characterizations that the

5    Commission -- of your testimony that the

6    Commission made in that order?

7            MR. HAGER:  Yes, I do.

8            MS. WILSON:  Now Mr. Hager, in your

9    testimony you discuss the fact that it was

10   Narragansett's opinion that the fuel adjustment

11   trigger amounts and payments for the EUA

12   contracts extend only through 2004.  Is that

13   still Narragansett Electric's position?

14           MR. HAGER:  Yes.

15           MS. WILSON:  And in that testimony you

16   indicated that there hadn't been a formal notice

17   to the suppliers but some informal discussions

18   regarding the fact that that was Narragansett's

19   position.  I'm looking at Pages 90 and 91 of the

20   transcript.

21           MR. HAGER:  That's my testimony in

22   Docket 3508, that's correct.

23           MS. WILSON:  Since that time, which was

24   May 28, 2003, have there been any further

25

 1      discussions with suppliers, either formal or

 2      informal, regarding this provision of the EUA

 3      contracts?

 4              MR. HAGER:  I'm having difficulty

 5      recalling discussions prior to that date or after

 6      that date, but I would characterize it as it's

 7      not something that we've had frequent discussions

 8      about.  We've brought it up once or twice with

 9      suppliers and I do not have frequent

10      conversations over.

11              MS. WILSON:  Has any supplier -- any

12      EUA supplier notified Narragansett Electric of

13      their position on this provision of the EUA

14      contract?

15              MR. HAGER:  I do not have any formal

16      communications from suppliers indicating that

17      they disagree with Narragansett's position.  I

18      may have had suppliers who were unaware of it or

19      hadn't realized that that's what we had, but I

20      know that we've had -- we briefly mentioned it to

21      all of our suppliers.  There's at least one

22      contract where we have been able to clarify that

23      and rather than refer the fuel trigger payment to

24      a tariff that no longer exists, that contract

1    includes the fuel trigger provisions within the

2    body of the contract so it should be -- it is a

3    non-issue under that contract.

4         MS. WILSON:  What percentage of the

5    total standard offer load does that contract make

6    up, if you can remember off the top of your head?

7         MR. HAGER:  Approximately 30 percent.

8         MS. WILSON:  And how many other

9    contracts are there in the EUA zone?

10        MR. HAGER:  Three.

11        MS. WILSON:  For a total of four?

12        MR. HAGER:  Correct.

13        MS. WILSON:  And of the total standard

14   offer load how much do the other three contracts

15   make up?

16        MR. HAGER:  70 percent.

17        MS. WILSON:  But only of the EUA area

18   -- zone.

19        MR. HAGER:  That's correct.

20        MS. WILSON:  And how much of the total

21   standard offer load is covered by the EUA

22   contracts versus the Narragansett contracts?

23        MR. HAGER:  I haven't done that

24   calculation recently but if I could refer back to

1    the order in Docket 3508 which you had referred

2    to earlier, Footnote 10 on Page 7 of that

3    indicates that as of April, 2003 approximately 73

4    percent of the standard offer load was in the

5    Narragansett zone and 27 percent in the EUA zone.

6    I would expect that those ratios would be

7    approximately the same today.

8           MS. WILSON:  Okay.  So you've received

9    no formal communication from the suppliers

10   serving the other 70 percent of the EUA zone?

11          MR. HAGER:  Correct.

12          MS. WILSON:  What is the current

13   standard off rate in Massachusetts?

14          MS. LLOYD:  I believe it's about 6.8

15   cents.

16          MS. WILSON:  Do you know what the

17   current default rate is for residential

18   customers?  If you don't, that's okay.

19          MR. HAGER:  Yes.  If I refer back to my

20   prefiled testimony, Exhibit 1B, Page 7 of 7, in

21   there we contain default service prices based on

22   Narragansett Electric as 2004 default service

23   procurement and for the period May 2004 through

24   October 2004 residential customers' price was

28

1    approximately six cents a kilowatt hour, small

2    commercial customers approximately 6.22 cents per

3    kilowatt hour and for the three-month period May

4    '04 through July of '04 the large industrial

5    customers were -- let's call it seven cents on

6    average.

7        MS. WILSON:  Okay.  And when will you

8    go out for procurement beyond October of '04 in

9    Massachusetts?

10        MR. HAGER:  That procurement in March

11   of '04 included half of the residential and

12   commercial requirements for the November '04

13   through April '05 period.  We will go out and

14   procure the other half of that plus half of the

15   requirements for the six-month period beyond

16   that; we will complete that procurement in

17   September of '05.

18        MS. WILSON:  And now Massachusetts'

19   standard offer ends in April of 2005, is that

20   correct?

21        MS. LLOYD:  February.

22        MS. WILSON:  February.

23        MR. HAGER:  February '05, yes.

24        MS. WILSON:  And has Massachusetts

1    taken any steps for the transition of standard

2    offer customers to default service or are

3    standard -- sorry -- standard offer customers to

4    the market or some other service or are standard

5    offer customers just going to automatically be

6    switched over to default service or don't you

7    know yet?

8              MR. HAGER:  Assuming the existing rules

9    remain in effect, standard offer customers who

10   have not chosen to go to the marketplace will

11   automatically switch from standard offer to

12   default service.  Mass. Electric has proposed a

13   number of programs to help provide competitive

14   offerings to customers and is also actively

15   involved in discussions with stakeholder groups

16   to explore other means of providing competitive

17   supply options to customers and/or transitioning

18   the supply requirements directly to the supplier

19   so that the supplier and customers have more of a

20   direct relationship rather than have a

21   relationship through Mass. Electric as the

22   provider of the commodity service.

23             MS. WILSON:  Has competition developed

24   for residential customers in Massachusetts?

30

1        MR. HAGER:  Yes.  More so for the large

2   industrial customers than for the residential and

3   small commercial customers.  I don't know the

4   exact number offhand but 40 percent or more of

5   the large industrial customers have taken

6   competitive supply offers and are being served by

7   competitive suppliers.

8        MS. WILSON:  But how about residential

9   customers?

10        MR. HAGER:  There are a small number of

11   residential accounts that are on competitive

12   supply.  I believe somewhere in the order of one

13   percent but it's not a market that is well

14   established at this point.

15        MS. WILSON:  Okay.

16        MS. WILSON:  I don't have any more

17   questions for these witnesses.

18        COMMISSIONER HOLBROOK:  Do you have any

19   questions, Mr. Nault?

20        MR. NAULT:  Yes, I do, Commissioner.

21   Thank you.

22        **EXAMINATION BY MR. NAULT**

23        MR. NAULT:  You had mentioned, Mr.

24   Hager, that approximately 70 percent of the load

31

1     remaining for the EUA portion of your contracts

2     was essentially unresolved in terms of the ending

3     of the fuel trigger or you haven't buttoned that

4     up entirely.  Is that a fair statement?

5               MR. HAGER:  I'm uncomfortable with the

6     word unresolved.  In my mind it is a resolved

7     issue.

8               MR. HAGER:  In the company's mind.

9               MR. HAGER:  Yes.  The language in the

10    former contracts and the tariff that they refer

11    to, which is no longer in existence, it was very

12    clear that fuel trigger payments only went

13    through '04.  For 30 percent of the load we've

14    got contractual provisions that do make it clear

15    that it ends in '04 and we do have discussions

16    with that supplier and an acknowledgment that

17    they understand it ends in 2004.  For the others,

18    as I said, we've had discussions.  We've

19    indicated our position.  We've had no objections

20    to the point that there's disagreement on what

21    the terms are.

22              THE CHAIRMAN:  Have they agreed to it?

23              MR. HAGER:  I do not have formal

24    acknowledgment and agreement.

32

1          THE CHAIRMAN:  So it's fair to say it's

2    unresolved then.

3          MR. NAULT:  They haven't formally

4    agreed to it and in the Chairman's mind it's

5    unresolved.  That 70 percent would you agree

6    makes up about 19 percent of the total load, and

7    I'm just taking 27 percent times 70 percent?

8          MR. HAGER:  That's --

9          MR. NAULT:  And if my Texas Instruments

10   is correct, it's about 19 percent.

11         MR. HAGER:  Okay.

12         MR. NAULT:  If you haven't gotten

13   formal agreement from the suppliers and you are

14   unable to reach formal agreement with the

15   suppliers as of December 31st, '04, is it

16   possible that the suppliers could walk away and

17   cease supplying 19 percent of the standard offer

18   load in the state?

19         MR. HAGER:  The Chairman and I might

20   have a discussion of the interpretation.  Is it

21   possible?  Yes.  I think the more realistic

22   approach would be I will not be making those fuel

23   payments in my bills come January of next year.

24   If a supplier feels aggrieved by that, the

1      contracts provide for a formal dispute resolution

2      process for which they can pursue any harm that

3      they feel is done.  I have to go back and reread

4      those specific contracts, but I don't think the

5      supplier has the option to just discontinue

6      service to me until we've gone through the formal

7      dispute resolution process.  So it's possible,

8      yes, but I think there's very close to zero

9      probability that they can just discontinue.

10              MR. NAULT:  Okay.

11              MR. HAGER:  Technically they cannot

12      under the contract.

13              MR. NAULT:  Does the supplier have any

14      incentive to keep supplying at 5.5 cents in

15      January '05 and is there a disincentive for the

16      supplier to continue supplying Narragansett when

17      you said recently that the market price even

18      absent the migration premium is almost seven

19      cents, and what I'm moving towards is it would

20      seem that the supplier could serve Narragansett

21      at 5.5 cents and if they're able to get out of

22      that contract, they could sell that same

23      electricity to someone else for seven cents.  So

24      would there be an incentive for the supplier to

```
 1        try to get out of the contract?
 2              MR. HAGER:  You've clearly indicated
 3        one incentive for them to get out in that time.
 4        Compared to current market prices when the fuel
 5        trigger payments go away these contracts appear
 6        to be less valuable than current market
 7        contracts, however, I will have to point out to
 8        that supplier that should our company's
 9        interpretation of the contract prevail, they'll
10        end up reimbursing us for any damages there and
11        so the perceived value that they get from other
12        market purchasers may erode quickly if the
13        company's -- when the company's position is
14        upheld.
15              MR. NAULT:  Okay.  What would entice
16        the supplier to continue supplying Narragansett?
17              MR. HAGER:  They have a contractual
18        obligation to continue to supply me.  Breach of
19        that contract is -- doesn't provide them brownie
20        points when they go to the marketplace.  When
21        they go to serve other customers they'll have to
22        disclose -- certainly in Narragansett's, its
23        affiliates' solicitations, we request our
24        suppliers for any breach of contracts and that
```

1    that's clearly something that we would take note

2    of and perhaps pass over a supplier if they

3    breached any past performance.

4         MR. NAULT:  Okay.  Does Narragansett

5    have any thoughts, plans or considerations about

6    offering a financial incentive to the supplier to

7    continue supplying, and by that I mean is the

8    company considering paying the supplier anything

9    above 5.5 cents per kilowatt hour?

10        MR. HAGER:  No, I don't see why I need

11   to.  The contract is pretty clear.  It was a

12   bargain that was struck at the time and I think

13   that Narragansett has fulfilled its obligation by

14   paying those fuel trigger payments through the

15   '04 period and a supplier has received the

16   benefit of those payments.  Now Narragansett will

17   get -- continue to perform and the suppliers

18   should perform as well.

19        MR. NAULT:  Okay.  On a different

20   topic, if we could turn for a second to JAL-2,

21   the updated version, Page 2 of 3, in the top of

22   the page, Section 1, the first set of

23   alternatives which is alternative standard offer

24   charge designed to collect entire underrecovery

1   through December '04, it's my understanding that

2   what this alternative represents if the rate

3   effective August 1st of 6.7 would collect the

4   entire undercollection by December and the fuel

5   prices were to remain constant as they were at

6   the rates that were used, the values that were

7   used to calculate this rate, it would allow for a

8   decrease in January.

9           MS. LLOYD:  That's right.

10          MR. NAULT:  And if fuel prices tended

11  to go down, the January increase would be larger

12  potentially if fuel prices went down looking

13  forward.

14          MS. LLOYD:  If the fuel prices go down,

15  then probably the January rate would be a little

16  lower also.

17          MR. NAULT:  If fuel prices went up, the

18  January rate would be higher?

19          MS. LLOYD:  Probably.

20          MR. NAULT:  In your professional

21  opinion where do you folks see fuel prices going

22  in the near future?

23          MR. HAGER:  I don't forecast where the

24  will be.  In general I think there's probably

A-1 COURT REPORTERS, INC.
(401) 333-3381

1    more downward opportunity than upward, but we
2    have over the last several years seen some rather
3    high prices at times since -- there could be some
4    upward movement as well.  But we don't perform
5    forecasts nor try to predict where these fuel
6    markets are going to go; we just look at current
7    market prices in our analyses.
8         MR. NAULT:  How about in your
9    professional opinion based on what's happening in
10   the Middle East, the articles that have come out
11   on China and the fact that their consumption of
12   fossil fuels is projected to go up?  Would you
13   have a projection based on that or is that
14   something you're not comfortable making?
15        MR. HAGER:  We don't -- I don't spend a
16   lot of time trying to forecast where the prices
17   and what the other movements in the marketplace
18   are going to be to come up with a forecast for
19   future fuel prices.
20        MR. NAULT:  Fair enough.  If we could
21   turn to JAL-1 updated, Page 1 of 6, Miss Lloyd,
22   in December of '03 you have included the last
23   resort overcollection into the calculation of the
24   standard offer rate and I noticed you didn't

1      include any standard -- any last resort over or

2      undercollection in your calculations going

3      forward.  Do you have any thoughts on what the

4      over or undercollection for the last resort would

5      be as of the end of 2004?

6              MS. LLOYD:  As of this point in time,

7      and I think I've updated it through June I guess

8      or probably May, we're very near zero, no under

9      or overcollection.  I don't know what will happen

10     through the end of the reconciliation period

11     which is actually September.  I expect roughly

12     the same, about zero.

13             MR. NAULT:  Okay.  With zero going into

14     the calculation so it should have no bearing on

15     this calculation going forward or very little

16     bearing.

17             MS. LLOYD:  It should be.  There could

18     be some undercollection by the end of the period

19     but it wouldn't significantly affect this

20     calculation.

21             MR. NAULT:  Okay.  That's all I have

22     Commissioner.

23             COMMISSIONER HOLBROOK:  Commissioner

24     Racine?

1              COMMISSIONER RACINE:  Thank you,

2   Chairman.  Good morning, Ms. Lloyd and Mr. Hager.

3            EXAMINATION BY COMMISSIONER RACINE

4              COMMISSIONER RACINE:  Here's my

5   confusion being an old BVE person, all right?

6   After '04, there's no more fuel in the contract

7   supplying me my power, correct?

8              MR. HAGER:  Correct.

9              COMMISSIONER RACINE:  So we're being

10  asked to approve something that goes into the

11  following year, which is 2005, correct?

12             MR. HAGER:  Correct.

13             COMMISSIONER RACINE:  Have you taken

14  into consideration that I don't have to pay those

15  fuel costs and they've been deleted from the

16  amount that you're seeking in the underrecovery?

17             MR. HAGER:  Yes, they have.

18             COMMISSIONER RACINE:  And what's the

19  amount?

20             MR. HAGER:  Let me be a little more

21  specific.  It's not that we deleted them, it's

22  just that we did not include them.

23             COMMISSIONER RACINE:  However you want

24  to phrase it.  What's the amount?

MR. ROBINSON:  Should we take a record request on that?

MR. HAGER:  Commissioner, are you looking for a dollar amount?

COMMISSIONER RACINE:  If percentage is easier, it's just while we were going through all this my thought was maybe they forgot to subtract it, you know, always looking for a lesser amount that the ratepayer may have to pay and then became more interested in what my value is as a BVE customer to you because you don't have to pay for fuel.

MR. HAGER:  Just ball parking the adjustment values under the Narragansett contracts, ball park the fuel adjustment payment would be approximately 1.2 cents per kilowatt hour under those contracts in January through December of '05.  There is no fuel trigger adjustment payments for the EUA load so we calculated that at zero and included nothing in that in our calculated piece.  The weighted adjustment factor when you average the 1.2 cents over the entire customer base including EUA is approximately .9 to one cents per kilowatt hour,

41

1   so we're shaving on average about 2/10th's, maybe

2   3/10th's of a cent per kilowatt hour off the

3   total price for all customers.

4           COMMISSIONER RACINE:  Okay.  Let's go

5   to the low income and that rate is still in

6   place, that A-60, correct?

7           MS. LLOYD:  That's right.

8           COMMISSIONER RACINE:  That doesn't

9   change and the percentage is the same.  What are

10  the A-60 individuals paying now and what will

11  they pay as of August 1st?

12          MS. LLOYD:  Referring to Exhibit JAL-4

13  updated, Page 4 of 23 shows the typical bill

14  impact for Rate A-60 low income customers.  This

15  particular one is for those without controlled

16  water heating credits.  This would indicate that

17  a customer using 550 kilowatt hours per month

18  will see an increase of about $3.90 a month or

19  about seven percent on a total bill basis.

20          COMMISSIONER RACINE:  Now, if you're

21  low income, do you get it on 550 or is it based

22  on 300 or something and then you go into another

23  rate?

24          MS. LLOYD:  You mean do they get the

A-1 COURT REPORTERS, INC.
(401) 333-3381

42

1          low income credit?

2                    COMMISSIONER RACINE:  Right.

3                    MS. LLOYD:  The credit applies to all

4          kilowatt hours.

5                    COMMISSIONER RACINE:  All kilowatt

6          hours.  All right.

7                    MS. LLOYD:  That's right.

8                    COMMISSIONER RACINE:  So you're saying

9          it's about a seven percent increase for them as

10         well?

11                   MS. LLOYD:  That's right.

12                   COMMISSIONER RACINE:  That's across the

13         board?

14                   MS. LLOYD:  It appears to be.

15                   COMMISSIONER RACINE:  EUA,

16         Narragansett, whatever territory.

17                   MS. LLOYD:  The EUA customers have a

18         slightly different rate structure right now.

19         They have a blocked rate where they pay a

20         different charge for the first 300 kilowatt hours

21         and as opposed to the usage in excess of that, so

22         the impact might vary slightly for them.

23                   COMMISSIONER RACINE:  Well, can we have

24         both?  I mean, do we have -- we actually have two

43

1    sets of low income people now, those that were in

2    the old EUA as I am and those that are in

3    Narragansett.

4            MS. LLOYD:  That's right; that was a

5    provision of the merger.

6            COMMISSIONER RACINE:  And they don't

7    get blended.

8            MS. LLOYD:  So we specifically designed

9    the rate differently for the former EUA customers

10   because of the impacts that would have resulted

11   had they been moved directly onto the

12   Narragansett low income rate.

13           COMMISSIONER RACINE:  When do you

14   expect that they'll be eligible for the

15   Narragansett low income rate?

16           MS. LLOYD:  Well, in the settlement

17   that we filed in June of this year we have

18   proposed to blend that together, blend that rate.

19           COMMISSIONER RACINE:  How different are

20   they right now?

21           MS. LLOYD:  If I remember right -- I'm

22   referring now to a copy of the settlement that we

23   filed in Docket 3617, June 29, 2004.  Exhibit 6

24   contains a typical bill comparison and I do have

44

```
1          the rates by former company in this schedule. So

2          for the former Narragansett customers their

3          current distribution energy charge for all

4          kilowatt hours is about 2.6 cents per kilowatt

5          hour.  That doesn't include the credits of about

6          two mils.  For a former EUA customers or former

7          BVE customer for the first 300 block they pay

8          about 1.2 cents per kilowatt hour.  For the

9          rest -- for kilowatt hours in excess of that they

10         pay about 3.8 cents.  Again, that doesn't include

11         the credit of two mils that applies to all

12         kilowatt hours.

13                  COMMISSIONER RACINE:  And do you know

14         how many customers from the old EUA are on that

15         rate approximately?

16                  MS. LLOYD:  About 9,000, approximately.

17                  COMMISSIONER RACINE:  And on the

18         Narragansett Electric?

19                  MS. LLOYD:  About 22, 23,000.

20                  COMMISSIONER RACINE:  All right.  So

21         it's your testimony that the Commission has a

22         settlement before it from the company and the

23         company was proposing to blend it and have one

24         rate, is that correct?
```

A-1 COURT REPORTERS, INC.
(401) 333-3381

1          MS. LLOYD:  That's our proposal in the

2     settlement.

3          COMMISSIONER RACINE:  And when was that

4     settlement to be effective that would benefit the

5     low income people?

6          MS. LLOYD:  We had proposed an

7     effective date of October 1, 2004 in the

8     settlement.

9          COMMISSIONER RACINE:  All right.  So we

10     have -- the Commission has before it a settlement

11     for October 4th -- October 1st.  If the

12     Commission approved today on the low income or

13     the request to raise, would they get raised for

14     August, raised for September and then the

15     Commission agrees in October and then there's a

16     whole other set of numbers?

17          MS. LLOYD:  They would see -- if the

18     standard offer rate is approved for August 1,

19     they will see that increase and then they will

20     see whatever rate changes are proposed within the

21     settlement whenever it's approved.

22          COMMISSIONER RACINE:  Now, was the

23     October 1 of the settlement due to the fact that

24     originally that was the position of the company

1    as well for putting into effect the rates before

2    the Commission?  Is that how the October 1 came

3    into effect?

4        MS. LLOYD:  The original proposal in

5    our standard offer filing of October 1 was

6    partially proposed for the same reason that we

7    had -- that at that point in time we had proposed

8    an October 1 effective date for the settlement.

9        COMMISSIONER RACINE:  All right.  The

10   criteria for being a low income or an A-60 is

11   what if you might?

12       MS. LLOYD:  You have to be, first of

13   all, a head of household and then you have to be

14   receiving assistance from one of various state

15   agencies, LIHEAP, supplemental security income,

16   and a number of others.

17       COMMISSIONER RACINE:  Will you take a

18   look at it when we're doing this today in terms

19   of what the Commission might do on a going

20   forward basis in the settlement?  Is there any

21   way we can take a look at these low income A-60

22   people and maybe go halfway and await any further

23   decisions where you really want to bump them up

24   to the effect of everybody else the full seven

1      percent only to drop them down again?  I mean,
2      has the Division thought about it in terms of the
3      role of this Commission regarding that rate?  Mr.
4      Robinson?
5                MR. ROBINSON:  In general terms we do
6      not discount the A-60 or the commodity component
7      of the A-60 rates, so although the delivery rates
8      are -- would go down if the settlement were
9      approved for all of our customers, we're
10     proposing to -- we would propose not to implement
11     the -- not to implement a rate decrease on the
12     commodity components in the rate.  That is the
13     standard offer or last resort service.  Now, the
14     ability to implement low income rate discounts in
15     advance of the -- on the delivery component of
16     the rates in advance of the Commission's review
17     and approval of the settlement is something we
18     can think about I would guess.
19               COMMISSIONER RACINE:  I don't know.
20     Mr. Roberti, do you have any comment?
21               MR. ROBERTI:  I'd like to have Mr.
22     Scialabba answer that for the Commission.  Would
23     you just -- why don't we just have him sworn
24     before he makes any statement?

48

```
 1                  STEPHEN SCIALABBA (Sworn)
 2             MR. ROBERTI:  Would you just state your
 3        full name and address and position for the record
 4        please?
 5             MR. SCIALABBA:  Steve Scialabba, Chief
 6        Accountant with the Division of Public Utilities.
 7        The discount given to the low income customers of
 8        Narragansett, both the former Narragansett and
 9        the former EUA customers, it's all included
10        within the delivery charges.  The standard offer
11        rate has been the same for low income and non-low
12        income customers so I think it would be difficult
13        to delay implementing the increase in the
14        standard offer for the low income.  That would
15        just add to the underrecovery within the total
16        account.  Whether you could advance the effect of
17        the proposed settlement before a full proceeding
18        on it, I think that would be difficult and add a
19        lot of complications to an already complicated
20        filing.  So unfortunately, I don't think we can
21        do anything additional within this hearing for
22        the low income.  So that's the position of the
23        Division.
24             THE CHAIRMAN:  While we're speaking out
```

49

1    loud or thinking out load, I would be opposed to

2    any reduction in the energy portion of the low

3    income group.

4            COMMISSIONER RACINE:  Thank you.  I

5    pursued it.  I kind of thought I was going to get

6    that response, but I pursued it.

7            THE CHAIRMAN:  Before we leave that

8    point, the low income point, if I understand the

9    BVE rate right now for low income and looking at

10   the settlement, the settlement talks in terms of

11   having the low income rate limited to the first

12   500 kilowatt hours, correct?

13           MS. LLOYD:  That's right.

14           THE CHAIRMAN:  As it affects a BVE

15   customer would not the implementation of the

16   proposed rate in the settlement result in an

17   increase in their rates?

18           MS. LLOYD:  It depends on the lower

19   usage blocks.  For the first 300 or customers

20   that use less than that, it would actually --

21   could result in an increase on customers that use

22   more.

23           THE CHAIRMAN:  So putting it another

24   way, turning it another way, if a customer in BVE

50

1    were very, very prudent in reducing their

2    consumption, say, to 300 or below, that prudent

3    customer is going to see an increase, isn't he or

4    she?

5            MS. LLOYD:  Could, yes.

6            COMMISSIONER RACINE:  If the Commission

7    didn't catch it.

8            THE CHAIRMAN:  I'm just saying under

9    the proposal.

10           COMMISSIONER RACINE:  Well, they

11   propose a lot of things.  The question is where

12   the Commission comes out on it.

13           THE CHAIRMAN:  But that's not a topic

14   for today, but go ahead.  I thought I'd bring it

15   up.

16           COMMISSIONER RACINE:  I just wanted

17   that on the record that the Division at this

18   point in time doesn't see an ability to adjust on

19   behalf of the low income.  Thank you.

20           COMMISSIONER HOLBROOK:  Commissioner

21   Germani?

22             EXAMINATION BY THE CHAIRMAN

23           THE CHAIRMAN:  Yes.  Mr. Hager,

24   thinking out loud again, one of the reasons you

1      don't express much interest in predicting the

2      future, I take it, is because it's a pass

3      through, I mean, if the company had some

4      incentive mechanism in place or incentive/penalty

5      relating to purchasing, effective purchasing on

6      an ongoing basis, not -- you'd have a different

7      attitude, wouldn't you?

8           MR. HAGER:  I don't think that's the

9      reason for my lack of trying to predict future

10     fuel prices.  I think it's more fundamental in

11     that the standard offer service, including those

12     fuel trigger related payments, was designed to be

13     a transitional service and basically an unmanaged

14     service.  We were not supposed to be in the

15     business of managing supplies and along with

16     energy supplies and along with that trying to

17     worry about fuel market movements up and down.

18     We're supposed to be exiting this business and

19     trying to get the customers into a competitive

20     marketplace.  And early on we have through

21     various proceedings here at the Commission toyed

22     with the idea of should we in order to manage or

23     provide some rate stability or predictability

24     take some actions to manage these ups and downs

1    and volatility in the fuel prices and have

2    consistently said no, we should just leave it as

3    an unmanaged supply.  So with that background,

4    more than the one you propose, is why we don't

5    spend a lot of time trying to forecast fuel

6    market prices.

7         THE CHAIRMAN:  What I read and what I'm

8    reading is that the trend of prices for both oil

9    and gas is going to continue to go up.

10        MR. HAGER:  Yes, and I always go back

11   to these fuel adjustment provisions were crafted

12   in the 1996, 1997 time frame and to go back to

13   what would gas prices be historically for several

14   years prior to that, I look at the charts and

15   they run about $2 to $3 a million Btu.  We got to

16   $3, that was a very high price, people were

17   concerned about that, you know, 2.50 on average

18   seemed like the normal going rate on average for

19   gas.  We got a spike a few years ago to about $9

20   per million Btu in January.  We thought the world

21   was going to come to an end.  A year later it

22   spiked to $10 and nobody was as shocked.  Now

23   we're seeing gas prices $5.50 average.  They've

24   been there quite regularly for the past period of

53

1    time and I'm starting to see when I do read the

2    commodities section of the newspaper some

3    analysts are saying well, maybe that's the price

4    target that we should have in our minds and get

5    out of the old two to $3 target.

6              THE CHAIRMAN:   That's it.

7         EXAMINATION BY COMMISSIONER HOLBROOK

8              COMMISSIONER HOLBROOK:   Mr. Hager, if

9    we find with the passage of time that the

10   position of the suppliers on the fuel adjustment

11   clause and the EUA contracts if they conclude

12   that they disagree with you, and there's an

13   additional cost to be borne, would it be borne by

14   ratepayers or would it be borne by Narragansett

15   Electric?  And I ask the question I guess in the

16   context of the due diligence that Narragansett

17   must have done when it took a look at Newport

18   Electric and took a look at BVE.  You certainly

19   would have reviewed all the contracts and a

20   conclusion must have been reached with respect to

21   the contracts in place and they would to me have

22   a significant impact on perceived value, I mean,

23   as to who would bear the risk of the additional

24   fuel cost if it exceeded the base in pricing the

1    company, if you will. So I guess an argument

2    could be made on one side that that cost should

3    be borne by ratepayers but then an argument might

4    be made on the other side that that cost should

5    borne by the company because of what they did not

6    do or concluded in their due diligence for the

7    purchase.

8         MR. HAGER:  I'm going to have a hard

9    time figuring out where it's going to go.

10   Certainly I have a preference as to where it

11   goes, but I would think in the end which of those

12   two parties or another party that we haven't

13   identified that may bear that cost probably

14   hinges on the final cost, assuming it's a dispute

15   resolution process, the basis for which the

16   payment is due to the supplier, so -- it might

17   hinge on the legal issue that was finally

18   disputed.

19        MR. ROBINSON:  Well, that's what I was

20   going to say. To the extent that it's a legal

21   issue in the contract, that is, there's an

22   arbitration provision, we send it off to the

23   arbitrator. The arbitrator's job and duty is to

24   construe the contract as it was intended between

55

1     the initial parties and to the extent that they

2     find that they disagree with Narragansett, as

3     happens occasionally when we have arbitrations,

4     despite the fact that we put on what we think is

5     a reasonable and persuasive case, that really

6     determines what the contract itself means at that

7     point.  And given the contract and given the

8     basic statutory arrangement here in Rhode Island

9     and our agreements, we would say that whatever

10    the arbitrators find to be a reasonable

11    contractual payment for the commodity should be

12    recovered from customers.  But that's speculation

13    way down the road.  The ideal outcome, of course,

14    is that Mr. Hager's testimony is correct and that

15    the contracts don't allow the costs to be

16    recovered.

17           COMMISSIONER HOLBROOK:  I would be the

18    first one to concede that it's an incredibly

19    difficult task to sit down and work with your

20    forecast on consumption and on price to set a

21    rate that will recover an estimated loss between

22    now and December 31st of '05, and I guess I would

23    also appreciate that your basic estimate that

24    we're dealing with today is based on prices for

1              three days, is that correct?

2                   MR. HAGER:  Correct.

3                   COMMISSIONER HOLBROOK:  And obviously

4         they're going to change.  I mean, it would be

5         silly for all of us to sit here and say that

6         those rates are going to apply for the next 17

7         months, but in the process of working with this

8         information once again, which I concede is very

9         difficult to deal with, do you have any kind of a

10        matrix that you have developed that says in

11        effect that if prices vary by one percent, five

12        percent, ten percent from the assumed cost of

13        fuel through the end of the 12/31/05 period, then

14        the effect on the undercollection or

15        overcollection will be X dollars?  I mean, do you

16        try to quantify it in that context?  It's very

17        difficult to sit here and talk in terms of

18        hundreds of millions of kilowatt hours for

19        consumption and the undercollection or

20        overcollection which really is a function of

21        1/100th of a cent per kilowatt hour -- I mean

22        12/100th's or 14/100th's or whatnot.  I mean, it

23        magnifies as you go through the calculation.  But

24        have you done or would it be possible for you to

1    come up with some kind of a table that would just

2    say look, if the prices that we're assuming for

3    fuel change by one percent, five percent, ten

4    percent, and once again, it gets difficult

5    because it's a question of when they change.

6    Maybe I'm asking something -- for something

7    that's really impossible, but if you could do

8    something like that or if you have done it, if

9    you could make it available for us, it would put

10   in context what kind of dollars that we're

11   talking about that would result in the eventual

12   overcollection or overcollection based on the

13   rate assumptions that we're using.

14        MR. HAGER:  I have not done that in

15   this case.  We don't regularly do that.  We have

16   done it from time to time in preparation for some

17   of these hearings in the past.  I could take that

18   as a record request.  Probably the easiest way to

19   do that would be to go back and say we've got a

20   set of prices that we've presented today, that's

21   the forward gas and oil prices as of three days

22   ending July 22nd.  If those prices were one

23   percent, five percent, ten percent higher across

24   the board, the resulting impact on the standard

58

1    offer rate would be so many cents per kilowatt

2    hour.  We can do that in both directions up and

3    down.  We can do that quite easily.  I'd be happy

4    to take that as a record request.

5              COMMISSIONER HOLBROOK:  I almost got

6    the sense that if we approve the recommendation

7    on the table now so that the rate increase will

8    be effective August 1st and it will be the one

9    that you've identified, the .658 standard offer

10   rate, 6.58 cents compared to 6.86, that because

11   of the discussion where everybody thinks that

12   fuel costs are going to go up between now and

13   whenever, we're just setting ourselves up

14   inevitably for an undercollection that will have

15   to be addressed at some point in the future.  So

16   if everything remained stable and the prices for

17   the three days and the assumptions bear out for

18   the whole period, August 1st of '04 through

19   12/31/05 and the $66 million undercollection that

20   you forecast without a change would be zero, but

21   I mean, it's going to change tomorrow and it will

22   change the next day and the next day and it will

23   go up and it will go down and it will be a

24   function of consumption and everything else, so I

59

1    only point that out as a thought that you will be

2    back.  I mean, we should not sit here and think

3    that the $66 million projected problem without a

4    change has been solved.  It's all a function of

5    consumption.  It's all a function of fuel costs

6    going forward.  I don't have any further

7    questions.  I think we've been through the list.

8    I do want -- Miss Wilson, do you have --

9         MS. WILSON:  I just had one more

10   question.  It's a follow-up to one of Mr. Nault's

11   questions if I might.

12        COMMISSIONER HOLBROOK:  Sure.

13      FURTHER EXAMINATION BY MS. WILSON

14        MS. WILSON:  Ms. Lloyd, you indicated

15   to Mr. Nault that the expected last resort

16   service over/undercollection at the end of the

17   period September 30, 2004 would be very near

18   zero.

19        MS. LLOYD:  I hope it will be, yes.

20   Expected to be.

21        MS. WILSON:  Okay.  Now, do you --

22   normally when you're doing your projections out

23   for the following year during the reconciliation

24   case do you normally project out what the

60

1      expected last resort service over or

2      undercollection will be for residential customers

3      for that period when determining the rate --

4      when determining the standard offer rate?

5           MS. LLOYD:  I don't normally project

6      the last resort reconciliation.  Standard offer

7      is the only one I really do.  In the past few

8      periods I don't think that we've had a

9      significant over or undercollection in last

10     resort service.  But normally I don't try to

11     include it in setting the rate for the future

12     period for standard offer.

13          MS. WILSON:  Okay.  So what you

14     normally do and the Commission approves is you

15     simply take what's collected or what the under or

16     overcollection is at the end of the period and

17     work that reconciliation and you don't actually

18     project out for the following year, so whatever

19     over or undercollection there may be in last

20     resort given the new rates that will be in effect

21     will show up in the 2005 reconciliation for 2006

22     rates?

23          MS. LLOYD:  Normally at the end of the

24     period or in our annual filing we determine the

61

1    reconciliations for all of our reconciliation

2    factors.  We determine at that point in time

3    actually what we're going to do with the last

4    resort service underrecovery.  We don't assume

5    that it will always be rolled in with the

6    standard offer reconciliation so for that reason

7    I don't deal with it.  We set it once the actual

8    amount is known.

9            MS. WILSON:  And then the other

10   question I had is that when you were discussing

11   the A-60 rate you focussed on the customer using

12   550 kilowatt hours.

13           MS. LLOYD:  I picked that one, yes.

14           MS. WILSON:  When you look at JAL-4,

15   Page 4 of 23 updated, it appears that a higher

16   percentage of customers use 380 kilowatt hours a

17   month.  Is that fair to say?

18           MS. LLOYD:  It appears that -- what's

19   on Page 4 of 23 of JAL-4 indicates is that

20   approximately 38 percent of all the bills

21   rendered during a year are normally for 380

22   kilowatt hours or less.

23           MS. WILSON:  Okay.

24           MS. LLOYD:  That's 38 percent of the

62

1    rate A-60 bills.  Yes.  Thank you.

2              MS. WILSON:  Right.  And the -- just

3    for comparison purposes like we do for the

4    typical 500 kilowatt hour residential customer on

5    A-16, an A-60 customer using 380 kilowatt hours a

6    month currently has a bill of $38.35?

7              MS. LLOYD:  That will be the proposed.

8              MS. WILSON:  I have rates in effect.

9              MS. LLOYD:  I'm sorry.  You're right.

10   Currently it's 38.35 for a customer using 380

11   kilowatt hours.

12             MS. WILSON:  And under the proposal it

13   would be $41.05.

14             MS. LLOYD:  That's right.

15             MS. WILSON:  And for a 550 kilowatt

16   hour a month user the rate is currently $55.51.

17             MS. LLOYD:  That is right.

18             MS. WILSON:  And it would rise to

19   $59.41.

20             MS. LLOYD:  That's right.

21             MS. WILSON:  Compared to an A-16

22   customer whose current rate is using 500 kilowatt

23   hours is $60.49.

24             MS. LLOYD:  That's right.

63

1         MS. WILSON:  And under the proposal

2    would raise to $64.03.

3         MS. LLOYD:  That's right.

4         MS. WILSON:  Thank you.  Thank you,

5    Commissioner.

6         COMMISSIONER HOLBROOK:  If there are no

7    further questions of the witnesses, let me thank

8    Miss Lloyd and Mr. Hager for their testimony and

9    I'll excuse you.

10        COMMISSIONER RACINE:  Commissioner, are

11   there any members of the public?

12        COMMISSIONER HOLBROOK:  Yes.  When we

13   had the meeting last Thursday the purpose of that

14   meeting was public comments.  Ordinarily we would

15   not have more public comment today, but certainly

16   if anyone here from the public would like to

17   comment, I would welcome your comments.  Mr.

18   Shelton?

19        MR. SHELTON:  Thank you.  Henry

20   Shelton.

21        COMMISSIONER HOLBROOK:  Could you

22   please give us your name and whatnot for the

23   record?

24        MR. SHELTON:  My name is Henry Shelton.

1          I'm the Coordinator of the George Wiley Center

2     and we manage the Campaign to Eliminate Childhood

3     Poverty.  Do you want anything else?

4          COMMISSIONER HOLBROOK:  No.  If you

5     have anything -- if you have any comment for the

6     record.

7          HENRY SHELTON (Sworn)

8          MR. SHELTON: Members of the Commission

9     and ladies and gentlemen, I guess briefly we

10     would like to see that this proposed increase

11     that is being proposed today exempt the A-60

12     participants from that increase, particularly

13     because the overwhelming costs now are just

14     causing all kinds of problems in the community

15     for many working people and low income people.

16     The shutoffs keep rising and the gap between the

17     shutoffs and the restoration is widening to

18     record numbers compared to other years.

19          We also would like to think that it

20     might be bets if the original request by

21     Narragansett Electric to start October 1st be

22     implemented rather than the proposal that would

23     start within I guess a week if it was August 1st,

24     by next Sunday.

65

1                         And thirdly, I'd like to -- we have
2          communicated this with the Division, but we've
3          had occasion over the last few weeks to have
4          families call who have children under one with
5          shutoffs.  In one case I think it went for a
6          couple of weeks.  We just feel that since the
7          State of Massachusetts exempts any family from a
8          shutoff who has a child under one, then the --
9          this Commission could do the same for no other
10         reason than particularly a health reason if it's
11         a young baby, whether it's a loss of gas for
12         cooking or whatever, heat in a cooler period like
13         April or the electric shutoff.  In one case it
14         was a family in South County that also stopped
15         the pump from working, the -- for water and so we
16         just think just to be reasonable and we would
17         hope that Narragansett would do this on their
18         own, you know, cooperate with the Commission and
19         be willing to exempt any family from a shutoff if
20         it's proven that that family has a child under
21         one year old.
22                         I think those would be the comments
23         that I would like to make at this point based
24         particularly the number of calls that we're

66

1    getting, Mr. Commissioner, keeps increasing over

2    the last couple of months and by all means we're

3    not the only one that people are calling and when

4    we refer to agencies now, practically all of them

5    say that they ran out of money, you know, so --

6    and we were disappointed at the -- when this

7    Commission actually did suggest when we came in

8    with our energy plan that they could not or felt

9    they could not accept our plan to go to the

10   legislature.  We were disappointed that we had a

11   second proposal which wasn't the original one we

12   put here that was really minor compared to the

13   original plan to the people that pay a percentage

14   of income have a back bill for and all of us pay

15   one percent.  I'm sure you remember that

16   proposal.

17            The second one was very minor and that

18   was -- there were two points that we were trying

19   to make and that was that people who were shut

20   off could get back on with ten percent of the

21   bill to get turned on and that they would have a

22   longer period of time to pay that bill which was

23   18 months rather than the 12 months.  What we're

24   finding is so far in the hearings we have

1    attended here at the Division that there's been
2    no flexibility at all on the 12 months.  In other
3    words, it looks like Family X just doesn't have
4    the amount of money to pay it all in 12 months or
5    to go forward.  They could eventually afford a
6    longer period of time to pay off that same bill.
7    In our cases so far there's been no flexibility
8    of going beyond the 12 months and the other is
9    the gap between once they're shut off trying to
10   pay that 25 percent which would be the lowest
11   amount according to the new laws.  They can't
12   meet that either.  So what we're finding is the
13   period of restoration is longer going forward
14   than the way it is now, and so we -- and so we're
15   disappointed because the same -- the gas company,
16   the electric company, the U. S. Navy, the
17   Commission itself all went against that second
18   proposal which we thought was -- so that's what's
19   out there and that's why I'm saying that this new
20   proposal would at least exempt the lowest income
21   people from the new raise.  Thank you.
22        COMMISSIONER HOLBROOK:  Thank you, Mr.
23   Shelton.  Is there anyone else from the public
24   who would care to comment?· No?  Mr. Robinson, do

68

1    you have any closing remarks?

2              MR. ROBINSON:  Well, first, I would

3    like to move the exhibits into evidence if I

4    might.

5              COMMISSIONER HOLBROOK:  Is there any

6    objection to the motion?  If not, so ordered.

7                   (WHEREUPON, THE EXHIBITS
                    WERE RECEIVED IN EVIDENCE)

8

9              MR. ROBINSON:  And I really don't

10   think I have much to add to all the options that

11   we have discussed today.  It's really a question

12   of policy I think for the Commission as to which

13   option to follow now.

14             COMMISSIONER HOLBROOK:  Thank you.  Mr.

15   Roberti, do you have any closing remarks?

16             MR. ROBERTI:  The Division recommends

17   that the Commission adopt the August 1

18   implementation to get recovery of these costs

19   updated as reflected in the company's filing.

20             COMMISSIONER HOLBROOK:  Is there any

21   other business to come before the Commission?

22             MR. NAULT:  Can I ask one question of

23   the Division?  Can I ask a question of the

24   Division please?

1          COMMISSIONER HOLBROOK:  Yes.

2          MR. NAULT:  Mr. Scialabba, in terms of

3     the EUA contracts that were being talked about

4     this morning, do you feel that the ratepayer is

5     at risk as a result of the lack of agreement

6     between the company and its suppliers on these

7     standard offer contracts where the fuel charges

8     are going away in December?

9          MR. ROBERTI:  I think that really calls

10    for a legal conclusion.

11         MR. NAULT:  Do you have any thoughts on

12    that, Mr. Roberti?

13         MR. ROBERTI:  We would like to think

14    that we're insulated from those costs and that

15    it's not our responsibility, that the agreement

16    is clear.  I could make the same argument about

17    up lift energy charges but the legal question

18    really resolves -- revolves around whether or not

19    the parties to that agreement to which Rhode

20    Island -- Rhode Island's rights are affected, if

21    the parties kick off an arbitration proceeding

22    concerning the scope of that agreement and FERC

23    makes a declaration, the legal question is do we

24    have a separate agreement that immunizes Rhode

1        Island from the effects of a FERC declaration

2        concerning the rights and obligations of the

3        parties to that agreement.  It's a very

4        complicated question.  I'm going -- I would sit

5        here and say that we'll fight it and we hope to

6        prevail on such a claim but I cannot predict how

7        that will actually play out.

8                    MR. NAULT:  But there is the potential

9        for exposure.  Nobody knows what it is at this

10       point, but --

11                   MR. ROBERTI:  There is the potential

12       for exposure.

13                   MR. NAULT:  Thank you.

14                   MS. WILSON:  Mr. Roberti, did you want

15       to move Mr. Stearn's memo?

16                   MR. ROBERTI:  Yes.  I would offer that

17       into evidence as Division Exhibit 1.

18                   COMMISSIONER HOLBROOK:  Is there any

19       objection?  If not, so ordered.

20                        (WHEREUPON, THE EXHIBIT
                           WAS RECEIVED IN EVIDENCE)
21

22                   COMMISSIONER HOLBROOK:  If there's no

23       further business, could I have a motion to

24       adjourn?

71

1          COMMISSIONER RACINE:  So moved.

2          COMMISSIONER HOLBROOK:  Second.

3     Approved.  Thank you for coming.

4                         (ADJOURNED AT 11:05 A.M.)

5

6

7               C E R T I F I C A T E

8

9          I hereby certify that the foregoing is

10    a true and accurate transcript of the hearing

11    taken before the Rhode Island Public Utilities

12    Commission, on July 26, 2004, at 9:30 a.m.

13

14

15    _____
      JO ANNE M. SUTCLIFFE, RPR/CSR
16    Notary Public, State of Rhode Island

17

18

19

20

21

22

23

24

A-1 COURT REPORTERS, INC.
(401) 333-3381

# Tab 26

EXHIBIT
_144_
3-23-07

## ANDREWS & KURTH L.L.P.
### ATTORNEYS

1701 PENNSYLVANIA AVENUE, N.W., SUITE 300
WASHINGTON, D.C. 20006-5805

AUSTIN
DALLAS
HOUSTON
LONDON
LOS ANGELES
NEW YORK
THE WOODLANDS

TELEPHONE: 202.662.2700
FACSIMILE: 202.662.2739
KENNETH L. WISEMAN
DIRECT: 202.662.2715

August 12, 2002

Timothy A. Ngau
Swidler, Berlin, Shereff, Friedman, LLP
3000 K Street
Suite 300
Washington, D.C. 20007

Re:   *In The Matter Of The Arbitration Between TransCanada Power Marketing Ltd. And National Grid USA*

Dear Tim:

Enclosed is TransCanada's First Set of Discovery Requests to National Grid. If you have any questions regarding this request please do not hesitate to contact me.

Sincerely,

Kenneth L. Wiseman
Counsel for TransCanada Power
   Marketing Ltd.

Enclosure

WAS:95004.1

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

## FIRST SET OF DISCOVERY REQUESTS
## OF TRANSCANADA POWER MARKETING LTD.

TransCanada Power Marketing Ltd. ("TransCanada") hereby requests that National Grid

U.S.A. (as that term is defined in Part II hereof) provide responses to each of the following

requests for information and production of documents ("Requests") under oath. Each Request

incorporates fully by reference each and every instruction and definition set forth below.

## I.
## INSTRUCTIONS

1.  In answering each Request, please state the text of the Request prior to providing the response. Each Request and applicable response should be on a separate page. Where there are subparts to a Request, the answer to each subpart should be separately identified and labeled. Each Request is continuing in nature. Thus, if National Grid acquires or discovers additional or different information with respect to a Request after the Request has been initially answered, please supplement the response promptly following the receipt of such additional or different information, giving the additional or different information to the same extent as originally requested. National Grid may not postpone serving such responsive supplemental information until after the filing of any testimony or supporting documents in this proceeding. Initial and supplementary responses shall be full, complete and accurate since they will be relied upon for the purposes of this proceeding. For each Request, list all assumptions made by National Grid in answering said Request.

2.  In the event that National Grid asserts that any of the information requested is privileged or proprietary, then National Grid in its written response should identify any such data, and any supporting documents, by date and general content. National Grid should also identify all persons who participated in the preparation of the document and all persons, inside or outside National Grid, who received a copy, read, have had access to or examined any such document. In addition, National Grid should indicate its claim of privilege with particularity and describe the grounds upon which privilege is claimed. State the present location of the document and all copies thereof and identify each person having custody or control of the document and said copies.

3.  To the extent that National Grid asserts that any requested information is not relevant or not material to any issue in the above-captioned matter, National Grid, in its written

1

response hereto, should indicate a specific basis for said assertion in the context of any issues arising in this proceeding.

4. In the event National Grid asserts that any requested information is not available in the form requested, National Grid, in its written response thereto, should disclose the following:

    (a) the form in which the requested data currently exists (identifying documents by title);

    (b) whether it is possible under any circumstances for National Grid to provide the data in the form requested;

    (c) the procedures or calculation necessary to provide the data in the form requested;

    (d) the length of time (in hours or days) necessary for National Grid to prepare the data in the form requested; and

    (e) the earliest dates, time period, and location that our representatives may inspect National Grid's files, records or documents in which the requested information currently exists.

5. Please provide all responses that include workpapers, data, calculations and spreadsheets in non-password protected and executable PC-compatible computer programs/models/software. Formulae and cells should be intact.

6. In providing documents, National Grid is requested to furnish all documents or items in its physical possession or custody, as well as those materials under the physical possession, custody or control of any other person acting or purporting to act on behalf of National Grid or any of National Grid's employees or representatives, whether as an agent, independent contractor, attorney, consultant, witness, or otherwise.

7. To the extent any requested document cannot be provided in full, it shall be provided to the extent possible, with an indication of what document or portion of what document is being withheld and the reasons for withholding said document.

8. All documents shall be provided in the same order as they are kept or maintained in your files. To the extent they are attached to each other, documents should not be separated.

9. Documents not otherwise responsive to this Request shall be provided if such documents are attached to documents responsive to this Request, and constitute routing slips, transmittal memoranda, letters, comments, evaluations, or similar materials.

10. For each Request answered, provide the name of the person or persons answering, the title of such persons and the name of the witness or witnesses who will be prepared to testify concerning the matters contained in each response or document provided. National Grid shall provide all responses under oath.

2

WAS:94977.1

11. Where these Requests seek quantitative or computational information (e.g., models, analyses, databases, formulas) stored by National Grid or its consultants in machine-readable form, in addition to providing hard copy, National Grid is requested to furnish such machine-readable information, in order of preference on 3.5 or 5.25 inch diskettes for IBM PC compatibles, as:

    (a)    Excel or Lotus 1-2-3rm worksheet files;

    (b)    ASCII text files; or

    (c)    other IBM PC compatible worksheet or database files.

12. Responses to any of these Requests may include incorporation by reference to responses to other Requests provided in this arbitration only under the following circumstances:

    (a)    the reference is explicit and the cross-referenced material is appended to your response to the TransCanada request; and

    (b)    unless the entirety of the referenced response is to be incorporated, the specific information or documents of the referenced response shall be expressly identified.

13. For each document on which the name(s) of the author(s) or recipient(s), or date of creation is not identified, please provide all of the foregoing information. For each recipient or contributor to a responsive document whose job title or affiliation is not identified on the document, please specify the job title and affiliation of the individual.

14. TransCanada requests that National Grid send by overnight delivery service its responses to this Request to the following:

Angela Avery
TransCanada PipeLines Limited
450 1st Street SW
Calgary, Alberta
Canada, T2P 5H1

Michael Hachey
TransCanada Power Marketing Ltd.
110 Turnpike Road, Suite 203
Westborough, Massachusetts 01581

Kenneth L. Wiseman
Mark F. Sundback
Andrews & Kurth L.L.P.
1701 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20006

15. Responses to these requests should be delivered in hand no later than 10 days from your receipt of the requests.

3

WAS:94977.1

## II.
## DEFINITIONS

1.  "National Grid," refers to National Grid U.S.A., its parent, subsidiaries (including, but not limited to, New England Power Company, Massachusetts Electric Company and The Narragansett Electric Company), affiliates, predecessors (including, but not limited to, Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation), successors, officers, directors, agents, employees, and other persons acting in its behalf.

2.  "Contracts" refers to: (1) the Amended and Restated MECo Wholesale Standard Offer Service Agreement II – Wholesale Standard Offer Service Agreement between Massachusetts Electric Company and USGen New England, Inc., dated September 1, 1998; (2) the Amended and Restated NECo Wholesale Standard Offer Service Agreement II – Wholesale Standard Offer Service Agreement between The Narragansett Electric Company and USGen New England, Inc., dated September 1, 1998; and (3) the Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and TransCanada Power Marketing Ltd., dated April 7, 1998.

3.  "USGen" refers to USGen New England, Inc., its parent, subsidiaries, affiliates, predecessors, successors, officers, directors, agents, employees, and other persons acting in its behalf.

4.  "NEPOOL" refers to the New England Power Pool.

5.  "ISO-New England" refers to ISO-New England, Inc.

6.  "Identify" means as follows:

    (a)  when used in reference to an individual, to state his full name and present or last known business address and telephone number, his present or last known position and business affiliation, and his position and business affiliation at the time relevant to the conduct, fact, circumstance or document at issue in a particular request;

    (b)  when used in reference to a commercial or governmental entity, to state its full name, type of entity (e.g., corporation, partnership, single proprietorship), and its present or last known address;

    (c)  when used in reference to a document, to state the date, author, title, type of document (e.g., letter, memorandum, photograph, tape recording, etc.) and its present or last known location and custodian;

    (d)  when used in reference to a communication, to state the type of communication (i.e., letter, personal conversation, etc.), the date thereof, and the parties thereto and, in the case of a conversation, to state the

4

substance, place, and approximate time thereof, and identity of other persons in the presence of each party thereto; and

(e)    when used in reference to an act to state the substance of the act, the date, time, and place of performance, and the identity of the actor and all other persons present.

7.    The term "document" as used in the Requests contained herein is used in its customary broad sense, and includes, without limitation, any kind of printed, electronic, recorded, written, graphic, or photographic matter and things similar to any of the foregoing, regardless of their author or origin. The term specifically includes reports, studies, statistics, projections, forecasts, decisions and orders, contracts, intra-office and inter-office communications, correspondence, memoranda, financial data, summaries or records of conversations or interviews, statements, returns, diaries, workpapers, graphs, sketches, computer printouts, summaries or reports of investigations or negotiations, opinions or reports of consultants, photographs, brochures, bulletins, pamphlets, books, articles, advertisements, circulars, press releases, graphic records or representations or publications of any kind (including microfilm, videotape and records, however produced or reproduced), electronic, mechanical and electrical records of any kind (including, without limitation, tapes, tape cassettes, disks and records or stored but not tangibly replicated or printed on an existent paper form), other data compilations (including, without limitation, input/output files, source codes, object codes, program documentation, computer programs, computer printouts, cards, tapes, disks and recordings used in automated data processing together with the programming instructions and other material necessary to translate, understand or use the same), all drafts, prints, issues, alterations, modifications, changes and amendments to the foregoing, and all other documents or tangible things of whatever description that constitute or contain information within the scope of a Request that are in the possession of National Grid. A Request seeking the identification or production of documents addressing, relating or referring to, or discussing a specified matter encompasses documents having a factual, contextual, or logical nexus to the matter, as well as documents making explicit or implicit reference thereto in the body of the documents. Originals and duplicates of the same document need not be separately identified or provided; however, drafts of a document or documents differing from one another by initials, interlineations, notations, erasures, file stamps, and the like shall be deemed to be distinct documents requiring separate identification or production.

8.    "Communication" shall mean any transmission of information by oral, graphic, written, pictorial, or otherwise perceptible means, including, but not limited to, telephone conversations, letters, telegrams, e-mails and personal conversations. A Request seeking the identity of a communication addressing, relating or referring to, or discussing a specified matter encompasses documents having factual, contextual, or logical nexus to the matter, as well as communications in which explicit or implicit reference is made to the matter in the course of the communication.

9.    The "substance" of a communication or act includes the essence, purport or meaning of the same, as well as the exact words or actions involved.

5

10.   "Relates," "related to" or "relating" to a subject means discussing, addressing, describing, concerning, dealing with, consisting of, forming the basis of, involved in the derivation of, reflecting, presuming, comprising or in any way concerning, or mentioning in whole or in part, the subject.

11.   Words expressing the singular number shall be deemed to express the plural number; those expressing the masculine gender shall be deemed to express the feminine and neuter genders; those expressing the past tense shall be deemed to express the present tense; and vice versa.

12.   The terms "and" and "or" shall be construed either conjunctively or disjunctively to bring within the scope of these Requests any matters that might otherwise be construed to be outside their scope.

13.   The unqualified term "person" shall mean an individual, corporation, partnership, unincorporated association or other business or governmental entity.

14.   The term "*e.g.*" or "for example" indicates illustration by example, not limitation.

15.   Unless defined otherwise, all capitalized terms have the meaning contained in the Contracts.

### III.
### INTERROGATORIES AND DOCUMENT REQUESTS

1.   Please produce a copy of National Grid's *pro forma* contract for a supplier to provide Standard Offer Service. Also, to the extent that the *pro forma* contract changed over time, please produce copies of all differing versions of the *pro forma* contract and identify the term over which each was or has been in effect.

2.   Please provide copies of all documents that discuss or refer to a *pro forma* contract for a supplier to provide Standard Offer Service.

3.   Please produce all drafts of *pro forma* contracts for a supplier to provide Standard Offer Service.

4.   Please provide copies of all documents that discuss or refer to drafts of *pro forma* contracts for a supplier to provide Standard Offer Service.

5.   Please identify all persons involved in the drafting or revision of the Standard Offer Agreement provided to bidders in the generation divestiture by New England Power Company.

6.   Please provide a copy of Standard Offer Auction Letters to Bidders, dated September 1997.

7.   Please provide copies of all drafts of the Contracts.

6

8.  Please provide copies of all documents that discuss or refer to drafts of the Contracts and/or the Contracts.

9.  Please provide copies of all correspondence between National Grid and USGen related to the Contracts, negotiation thereof and/or Standard Offer Service in general.

10. Please provide copies of all correspondence between National Grid and TransCanada related to the contracts, negotiation thereof and/or Standard Offer Service in general.

11. Please provide copies of all correspondence between National Grid and any other person related to the Contracts, negotiation thereof and/or Standard Offer Service in general.

12. Please identify all persons involved in the negotiation and/or drafting of the Contracts for National Grid and USGen and describe the role of each person identified.

13. Please identify all persons involved in the negotiation and/or drafting of the Contract between National Grid and TransCanada and describe the role of each person identified.

14. Please provide copies of all notes, memoranda, correspondence and other documents of each person involved in negotiations of the Contracts on behalf of National Grid.

15. Please provide copies of all regulatory filings, transcripts, prepared testimony and discovery responses provided in any regulatory proceeding related to Standard Offer Service.

16. Please provide copies of all documents that discuss or refer to transmission congestion, locational pricing and/or congestion management in NEPOOL or on National Grid's system or any part thereof dated September 1, 1998 or earlier.

17. Please provide copies of all documents that discuss or refer to cost responsibility for congestion charges.

18. Please state whether NEPOOL or ISO-New England has any policy or rule in place or proposed to impose congestion costs on suppliers of Standard Offer Service. If your answer is anything other than an unqualified no, please provide a full explanation of the basis for your answer.

19. Based upon your understanding of the proposal filed by NEPOOL in FERC Docket No. ER02-2330, please provide an explanation of the basis upon which entities will be determined to be responsible for paying congestion charges under proposed NEPOOL Market Rule 1. Please produce any documents related to your answer.

20. Please provide copies of all documents that contain analyses that relate to the costs of congestion on locational pricing that will be, or has been, experienced within National Grid's service territory.

7

21.    Please provide copies of all documents related to strategies, plans or methods, including transmission line improvements, intended to reduce the congestion at any location on the National Grid system.

22.    Please provide copies of all documents related to strategies, plans or methods, including transmission line improvements, intended to reduce the costs exposure of National Grid, its customers and/or users of the National Grid system to congestion or locational price differentials.

23.    Please provide copies of all documents related to dispute resolution, arbitration, litigation or regulatory proceedings involving the issue of cost responsibility for congestion under Standard Offer Service.

24.    Please provide copies of all contracts intended to serve default, last resort or Standard Offer Service within National Grid's service territory.

25.    Please provide a copy of the Progress Report on Implementation of Standard Offer Service Auction, dated July 16, 1997.

Kenneth L. Wiseman
Mark F. Sundback
Counsel for TransCanada Power
Marketing Ltd.

8

WAS:94977.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August, 2002, a true and correct copy of the foregoing First Set Of Discovery Requests Of Transcanada Power Marketing Ltd. was served upon the following by electronic mail and United States First Class Mail, postage pre-paid:

Timothy A Ngau
Swidler, Berlin, Shereff, Friedman, LLP
3000 K Street
Suite 300
Washington, D.C. 20007

Kenneth L. Wiseman

9

# Tab 27



IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

### NATIONAL GRID U.S.A.'S RESPONSES TO
### THE FIRST SET OF DISCOVERY REQUESTS
### OF TRANSCANADA POWER MARKETING LTD.

National Grid U.S.A. hereby responds to the first set of discovery requests of

TransCanada Power Marketing Ltd. ("TransCanada").

SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

Timothy A. Ngau
Lynn M. Gallagher
3000 K Street, N.W.
Washington, DC 20007
(202) 424-7500
(202) 424-7643 (fax)

Attorneys for National Grid USA, Inc.

August 30, 2002

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 1**

Please produce a copy of National Grid's *pro forma* contract for a supplier to provide Standard
Offer Service.  Also, to the extent that the *pro forma* contract changed over time, please produce
copies of all differing versions of the *pro forma* contract and identify the term over which each
was or has been in effect.

**Response**

National Grid's only *pro forma* contract for Standard Offer Service is the one that was sent to
bidders in the generation divestiture by New England Power Company in 1997.  National Grid is
providing a copy of that *pro forma* contract in response to these requests.

Person(s) answering and/or prepared to testify:  Michael Hager



IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 2**

Please provide copies of all documents that discuss or refer to a *pro forma* contract for a supplier
to provide Standard Offer Service.

**Response**

National Grid is providing documents that discuss or refer to the *pro forma* contract identified in
response to Request No. 1.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 3**

Please produce all drafts of *pro forma* contracts for a supplier to provide Standard Offer Service.

**Response**

National Grid is providing available drafts of the *pro forma* contract identified in response to Request No. 1.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 4**

Please provide copies of all documents that discuss or refer to drafts of *pro forma* contracts for a supplier to provide Standard Offer Service.

**Response**

National Grid is providing documents that discuss or refer to the drafts of the *pro forma* contract identified in response to Request No. 1. These documents include memoranda prepared by counsel that, upon review, National Grid has determined do not include communications providing legal advice. By producing these memoranda, National Grid is not waiving the attorney-client privilege applicable to its communications with counsel to obtain or provide legal advice.

Person(s) answering and/or prepared to testify:  Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN** 
**TRANSCANADA POWER MARKETING LTD.**
**AND NATIONAL GRID USA**

**TransCanada Request No. 5**

Please identify all persons involved in the drafting or revision of the Standard Offer Agreement provided to bidders in the generation divestiture by New England Power Company.

**Response**

Initial drafts of the Wholesale Standard Offer Service Agreement provided to bidders in the generation divestiture by New England Power Company were prepared by Kenneth Jaffe and Mark Klupt of Swidler & Berlin, Chtd., whose involvement with the drafting, negotiation and revision of the agreement ended with the transmittal of the draft to the client on or about June 3, 1997. The initial drafts were sent to Michael Hager, William Hayes, Thomas Robinson, Gregory Hale, and Michael Jesanis. Gregory Hale, in consultation primarily with Michael Hager and with the assistance of Michael Frankel (an attorney then at the firm of Skadden Arps Slate Meagher & Flom), was principally responsible on behalf of National Grid for revisions to the agreement after its receipt from Messrs. Jaffe and Klupt. Other persons involved in the drafting and revision of this agreement include representatives of U.S. Generating Company, possibly including James Utt and Elias Farrah (of the Leboeuf Lamb law firm).

Person(s) answering and/or prepared to testify:  Michael Hager; Gregory Hale

IN THE MATTER OF THE ARBITRATION BETWEEN 
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 6**

Please provide a copy of Standard Offer Auction Letters to Bidders, dated September 1997.

**Response**

National Grid understands the requested document to be the submittal to the Massachusetts Department of Public Utilities, Docket No. 96-25, entitled "Standard Offer Auction Letters to Bidders," dated September 1997. National Grid is providing a copy of this document.

Person(s) answering and/or prepared to testify: Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 7**

Please provide copies of all drafts of the Contracts.

**Response**

National Grid is providing available drafts of the Contracts.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN 
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 8**

Please provide copies of all documents that discuss or refer to drafts of the Contracts and/or the Contracts.

**Response**

National Grid is providing documents discussing or referring to drafts of the Contracts, or to the responsibility for congestion costs under the Contracts. To the extent that this request seeks documents that discuss or refer to the Contracts with respect to matters other than congestion cost responsibility, such as the Contracts' fuel cost adjustment, National Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the subject matter of this proceeding.

Person(s) answering and/or prepared to testify:  Michael Hager; Gregory Hale

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 9**

Please provide copies of all correspondence between National Grid and USGen related to the Contracts, negotiation thereof and/or Standard Offer Service in general.

**Response**

National Grid is providing copies of correspondence between National Grid and USGen relating to the negotiation of the Contracts and/or the responsibility for congestion costs thereunder. To the extent that this request seeks correspondence between National Grid and USGen that relates to other matters involving the Contracts and/or Standard Offer Service in general, National Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the subject matter of this proceeding.

Person(s) answering and/or prepared to testify:  Michael Hager



**IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA**

### TransCanada Request No. 10

Please provide copies of all correspondence between National Grid and TransCanada related to the contracts, negotiation thereof and/or Standard Offer Service in general.

### Response

National Grid is providing copies of correspondence between National Grid and TransCanada related to the contracts, negotiation thereof and/or Standard Offer Service.

Person(s) answering and/or prepared to testify:  Michael Hager



**IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA**

**TransCanada Request No. 11**

Please provide copies of all correspondence between National Grid and any other person related
to the Contracts, negotiation thereof and/or Standard Offer Service in general.

**Response**

National Grid is providing copies of correspondence between National Grid and other persons
related to the negotiation of the Contracts and/or the responsibility for congestion costs
thereunder.  To the extent that this request seeks correspondence between National Grid and
other persons that relates to matters involving the Contracts and/or Standard Offer Service in
general, but not related to the responsibility for congestion costs (such as the fuel cost
adjustment), National Grid objects to the request as overly broad, unduly burdensome and not
reasonably related to the subject matter of this proceeding.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 12**

Please identify all persons involved in the negotiation and/or drafting of the Contracts for National Grid and USGen and describe the role of each person identified.

**Response**

Please see the response to Request No. 5.

Person(s) answering and/or prepared to testify:  Michael Hager; Gregory Hale



IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 13**

Please identify all persons involved in the negotiation and/or drafting of the Contract between
National Grid and TransCanada and describe the role of each person identified.

**Response**

Gregory Hale and Michael Hager were involved on behalf of National Grid in the negotiation
and drafting of the assignment of the Contracts from USGen to TransCanada.  William Taylor
and perhaps others were involved on behalf of TransCanada in the negotiation of this assignment
See also the response to Request No. 5.  With respect to the contract between TransCanada and
Blackstone Valley Electric Company, *et al.*, other than the signatories to that agreement,
National Grid is attempting to determine what persons were involved.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 14**

Please provide copies of all notes, memoranda, correspondence and other documents of each
person involved in negotiations of the Contracts on behalf of National Grid.

**Response**

To the extent that this request seeks documents relating to the negotiation of the Contracts and/or
the responsibility for congestion costs, National Grid is providing responsive documents. To the
extent that the request seeks documents of persons involved in the negotiation of the Contracts,
but that are unrelated to such negotiations or the responsibility for congestion costs, National
Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the
subject matter of this proceeding.

Person(s) answering and/or prepared to testify: Michael Hager; Gregory Hale

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 15**

Please provide copies of all regulatory filings, transcripts, prepared testimony and discovery responses provided in any regulatory proceeding related to Standard Offer Service.

**Response**

National Grid is providing responsive documents that it filed in regulatory proceedings related to Standard Offer Service.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 16**

Please provide copies of all documents that discuss or refer to transmission congestion, locational pricing and/or congestion management in NEPOOL or on National Grid's system or any part thereof dated September 1, 1998 or earlier.

**Response**

National Grid is providing responsive documents.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 17**

Please provide copies of all documents that discuss or refer to cost responsibility for congestion charges.

**Response**

National Grid is providing responsive documents.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 18**

Please state whether NEPOOL or ISO-New England has any policy or rule in place or proposed to impose congestion costs on suppliers of Standard Offer Service. If your answer is anything other than an unqualified no, please provide a full explanation of the basis for your answer.

**Response**

Yes. The "Congestion Paying Entity," as defined in NEPOOL's proposed Market Rule 1, section 1.3.2, is "deemed to include, but not be limited to, the seller of internal bilateral transactions that transfer Real-Time Load Obligations." Further, NEPOOL's proposed Market Rule 1, section 3.2.1, similar to Rule 5.4.1 of NEPOOL's current Market Rules and Procedures, provide that a participant supplier's hourly settlement obligation for energy includes the amount of any "Real-Time bilateral transactions." Where a supplier supplies Standard Offer Service under a bilateral contract that transfers the buyer's load obligations to the supplier, and where congestion costs are reflected in the price paid by party with the obligation for the energy required to meet that Standard Offer Service obligation (as NEPOOL proposes to do in its proposed Market Rule 1), these rules impose congestion costs on the supplier because the supplier's cost to meet its energy obligation for the Standard Offer Service load includes congestion costs. The Wholesale Standard Offer Service Agreements between Massachusetts Electric Company, Nantucket Electric Company and The Narrangansett Electric Company, on the one hand, and TransCanada Power Marketing, Ltd., on the other, are bilateral transactions of the type described in these rules because Section 6.3 and Appendix B of these agreements specifically require TransCanada to add National Grid's Standard Offer Service load obligations to TransCanada's settlement account for purposes of the financial settlement process conducted by NEPOOL and the ISO.

Person(s) answering and/or prepared to testify: Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 19**

Based upon your understanding of the proposal filed by NEPOOL in FERC Docket No. ER02-2330, please provide an explanation of the basis upon which entities will be determined to be responsible for paying congestion charges under proposed NEPOOL Market Rule 1.  Please produce any documents related to your answer.

**Response**

Please see response to Request No. 18.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 20**

Please provide copies of all documents that contain analyses that relate to the costs of congestion on locational pricing that will be, or has been, experienced within National Grid's service territory.

**Response**

National Grid is providing responsive documents that are not subject to the prohibition in National Grid's Code of Conduct that prevents the selective disclosure of information to entities using the transmission system (including the parties to this proceeding) where such information might provide a competitive or commercial advantage. To the extent that this request seeks documents subject to this prohibition, National Grid objects to the request as improper.

Among the responsive documents that National Grid has in its possession are several voluminous documents that National Grid will provide upon request, but that TransCanada may already have in its possession or that may be found on the ISO New England web site: (1) 2001_RTEP-1_Approved_Report_10_19_01.doc; (1)May 2002-Interim LMP.doc; (3)May_2002_LMP.xls; (4) CP10 FinalReportGZ4.pdf.

Person(s) answering and/or prepared to testify:  Michael Hager; Masheed Rosenqvist

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 21**

Please provide copies of all documents related to strategies, plans or methods, including transmission line improvements, intended to reduce the congestion at any location on the National Grid system.

**Response**

To the extent described in the response to Request No. 20, National Grid is providing responsive documents.

Among the responsive documents that National Grid has in its possession are several voluminous documents that National Grid will provide upon request, but that TransCanada may already have in its possession or that may be found on the ISO New England web site: (1) NEMA Interim Report.doc; (2) Attendance NEMA Upgrade Study Meeting.doc; (3) NEPOOL Project Listing 2Q-2002 08-15-02.doc; (3) Minutes TEAC8 4-12-02.doc; (4) OP3FIN.doc; (5)OP5FIN.doc; (6) 08.27.01Filing.pdf (NEPOOL filing with FERC on a Transmission Incentive Pilot).

Person(s) answering and/or prepared to testify:  Michael Hager; Masheed Rosenqvist

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 22**

Please provide copies of all documents related to strategies, plans or methods, including transmission line improvements, intended to reduce the costs exposure of National Grid, its customers and/or users of the National Grid system to congestion or locational price differentials.

**Response**

To the extent described in the response to Request No. 20, National Grid is providing responsive documents. See also the documents identified in response to Request No. 21.

Person(s) answering and/or prepared to testify: Michael Hager; Masheed Rosenqvist

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 23**

Please provide copies of all documents related to dispute resolution, arbitration, litigation or regulatory proceedings involving the issue of cost responsibility for congestion under Standard Offer Service.

**Response**

National Grid understands the terms "dispute resolution" and "regulatory proceeding" in this request to refer to a formal adversary proceeding akin to an arbitration or litigation, as opposed to informal NEPOOL proceedings to develop its rules or generic regulatory proceedings to review the proposed rules of NEPOOL or the ISO. With that understanding, National Grid has no responsive documents.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 24**

Please provide copies of all contracts intended to serve default, last resort or Standard Offer
Service within National Grid's service territory.

**Response**

National Grid is providing copies of all contracts for Standard Offer Service with confidential
and commercially sensitive information redacted.  To the extent that this requests seeks such
information and/or contracts for services other than Standard Offer Service, National Grid
objects to the request as overly broad, unduly burdensome and not reasonably related to the
subject matter of this proceeding

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 25**

Please provide a copy of the Progress Report on Implementation of Standard Offer Service Auction, dated July 16, 1997.

**Response**

National Grid is providing the requested document.

Person(s) answering and/or prepared to testify:  Michael Hager

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

## VERIFICATION

Michael J. Hager affirms under penalty of perjury on this 29th day of August 2002 that he

has read the foregoing Responses to the First Set of Discovery Requests of TransCanada Power

Marketing Ltd. and that these responses are true and correct to the best of his knowledge and

belief.

Michael J. Hager

# Tab 28

**Winston, Daniel C.**



**From:** Pickett, Diane E. [mailto:DIANE.PICKETT@us.ngrid.com]
**Sent:** Thursday, February 10, 2005 7:47 AM
**To:** Richard Schuler
**Cc:** Paula Spirito; Warshaw, John
**Subject:** RE: January Std Offer Invoice for Blackstone Valley Electric

Hi Richard,

   It ended 12/31/04.

diane
-----Original Message-----
**From:** Richard Schuler [mailto:richard_schuler@transcanada.com]
**Sent:** Wednesday, February 09, 2005 2:50 PM
**To:** Pickett, Diane E.
**Cc:** Paula Spirito; Warshaw, John
**Subject:** January Std Offer Invoice for Blackstone Valley Electric

Diane,

I don't see the fuel adjustment on the January EUA RI Invoice. Could you please check into this. Thanks

Richard

This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

This electronic message and any attached documents are intended only for the named addressee(s). This communication from TransCanada may contain information that is privileged, confidential or otherwise protected from disclosure and it must not be disclosed, copied, forwarded or distributed without authorization. If you have received this message in error, please notify the sender immediately and delete the original message. Thank you.

5/27/05

**Tab 29**

EXHIBIT 118
WIT: _Hachey_
DATE: 3/13/0
Victoria S. Reade



## TransCanada
In business to deliver

**fax**

date _3/1/05_
attention _Michael Hager_
company _NEPSCo_
fax no. _508-421-7335_
cc _____

from _Mike Hachey_
phone _508-871-1852_
fax _____
email _____
no. of pages _2_   (including this page)

TransCanada Power Marketing Ltd
110 Turnpike Road · Suite 203
Westborough, MA 01581

tel 508-871-1850
fax 508-898-0433
web www.transcanada.com

CC: GK
    JFS
    RHM

**Confidential** : This fax may be solicitor-client privileged and may contain confidential information intended only for the person (s) named above. Any other distribution, copying or disclosure is strictly prohibited. If you have received this fax in error, please notify us immediately by telephone and return the original transmission to us.

03/01/2005 16:04 FAX 5088980433    FR NATIONAL GRID    TRANSCANADA    5084217335 TO 915184717800    P.03





**Trans**Canada
*in business to deliver*™

March 1, 2005

Mr. Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
55 Bearfoot Road
Northboro, MA 01532

Re:   Wholesale Standard Offer Service Agreement between Blackstone Valley Electric
Company ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric
Company ("Newport") and TransCanada Power Marketing Ltd. ("TCPM") dated
April 7, 1998 (the "Agreement")

Dear Mr. Hager:

I am writing to provide notice of default under Article 7(1)(b) of the above-referenced
Agreement, based upon The Narragansett Electric Company's ("Narragansett's") failure to
comply with Article V of the Agreement. Specifically, Narragansett has refused to include the
required Fuel Adjustment Factor in its price calculations, and to comply with its obligations
under Article V before the Rhode Island Public Utilities Commission with respect to its Standard
Offer Service tariffs.

As you know, Narragansett's failure to cure or rectify a noticed default within thirty (30)
days shall be deemed an Event of Default under Agreement Article 7.

Sincerely,

Michael Hachey

MH/DCW/slw:3837458

NARR 07932

# Tab 30



National Grid

EXHIBIT 121
WIT: Hachey
DATE: 3/13/07
Victoria S. Reade

April 29, 2005

Michael J. Hager
Vice President, Energy Supply – New England

VIA FACSIMILE and U. S. MAIL

Mr. Michael E. Hachey
Director, Power Marketing
TransCanada Power Marketing Ltd.
100 Turnpike Road, Suite 203
Westboro, MA 01581-2863

RE:    Wholesale Standard Offer Service Agreement

Dear Mike:

The Narragansett Electric Company ("Narragansett") is issuing via wire transfer today to TransCanada Power Marketing Ltd. ("TCPM's") account # 40760055 funds in the amount of $319,613.07 (the "Funds"). Narragansett is paying the Funds to TCPM under protest, without prejudice, and with a full reservation of all rights, claims (including for interest), counterclaims and defenses under or in relation to the Wholesale Standard Offer Service Agreement between Narragansett, as the successor in interest to the Blackstone Valley Electric Company and Newport Electric Corporation, and TCPM dated April 7, 1998 (the "WSOS Agreement"), or in law or equity. The payment of the Funds shall not be construed to be an admission, assent or acquiescence to any allegation or assertion by TCPM whether or not in writing, or to alter, waive, invalidate, impair or forfeit any of the terms or conditions of the WSOS Agreement or Narragansett's rights in relation thereto in law or equity, or TCPM's obligations.

With reference to TCPM's letter dated March 1, 2005, TCPM alleges that Narragansett is in default under the WSOS Agreement. As TCPM is aware, Narragansett vehemently denies and protests that assertion. While Narragansett believes that TCPM would be in breach if TCPM served a notice of termination, Narragansett is seeking to mitigate damages for TCPM's potential breaches. Accordingly, the transferred Funds are based upon a calculation of the portion of the payments that would have been due for the month of March 2005 under the WSOS Agreement if a Fuel Adjustment Factor ("FAF") for the WSOS Agreement had been in existence and in effect in Narragansett's tariffs, and which permitted Narragansett to recover the FAF amount from customers. As noted above, Narragansett's position is that no such FAF was in existence or in effect.

The Funds should be placed by TCPM in a bankruptcy-remote escrow account for the benefit of the party that prevails in a resolution of the dispute.

Very truly yours,

cc:    Gloria Kavanah
       Daniel C. Winston, Esq.

55 Bearfoot Road
Northborough, MA 01532
508.421.7350   Fax: 508.421.7335

NARR 07497

# Tab 31

22

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
**PUBLIC UTILITIES COMMISSION**

IN RE:  NARRAGANSETT ELECTRIC COMPANY          :
PROPOSED STANDARD OFFER RATE                   :          DOCKET NO. 3689

<u>REPORT AND ORDER</u>

I. <u>BACKGROUND</u>

The Utility Restructuring Act of 1996 ("URA") requires each electric distribution

company to arrange with wholesale power suppliers for a standard power supply offer to

sell electricity to all customers at a stipulated rate.  Pursuant to the URA, Narragansett

Electric Company ("Narragansett" or "Company") entered into long term, all

requirements, load following, wholesale Standard Offer supply contracts with the

following base prices:[1]

| Calendar Year | Price per kWh |
|---|---|
| 2005 | 5.543 cents |
| 2006 | 5.943 cents |
| 2007 | 6.343 cents |
| 2008 | 6.743 cents |
| 2009 | 7.143 cents |

The wholesale Standard Offer supply contracts also provide for increases in the

price per kilowatt-hour ("kWh") of wholesale power supplied to Narragansett in the event

fuel prices increase above certain levels.  As mandated by R.I.G.L. § 39-1-27.3(b), to the

extent that the total cost of the wholesale power supply to Narragansett, including fuel

charges in some of the wholesale contracts, is greater than the retail Standard Offer

Service ("SOS") charge, the under-collection is recoverable from Narragansett's

---

[1] In Docket No. 3496, the Commission approved a Settlement entered into between Narragansett and one of its standard offer suppliers to address responsibility for congestion costs in light of new locational marginal pricing rules in the wholesale electricity market.  The settlement altered the base SOS cost in that contract.

**Confidential**

customers through the annual reconciliation provisions of Narragansett's Standard Offer Adjustment Provision. Likewise, to the extent Narragansett collects more than its total cost of providing SOS, the ratepayers are entitled to recoup the benefit, with interest.

II.    NARRAGANSETT

On July 29, 2005, Narragansett filed with the Rhode Island Public Utilities Commission ("Commission") seeking approval to increase its Standard Offer Rate from 6.7 cents per kWh to 8.2 cents per kWh. The rate was designed to recover Narragansett's SOS costs over the twelve month period September 1, 2005 through August 31, 2006. The Company's proposed filing would result in an increase of $7.81, or 12.4%, to a typical residential customer using 500 kWh per month.[2]  Absent the increase, Narragansett projected an under-recovery at December 31, 2005 of approximately $28.7 million.[3]

In support of the proposed rate increases, Narragansett presented the Pre-Filed Testimony of Ronald T. Gerwatowski, Vice President of Distribution Regulatory Services, Jeanne A. Lloyd, Principal Financial Analyst in the Distribution Regulatory Services Department of National Grid USA Service Company, and Michael J. Hager, Vice President, Energy Supply – New England for National Grid USA Service Company.

In his Pre-Filed Testimony, Ronald Gerwatowski explained disputes between the Company and its SOS suppliers. He first discussed the Company's ongoing dispute between itself and TransCanada regarding fuel index adjustment payments on its SOS

---

The chart in this Order reflects the effect of that change when averaged over all SOS contracts. Order No. 17592 (issued October 28, 2003).
[2] Narragansett Ex. 1B (Pre-Filed Testimony of Jeanne A. Lloyd), p. 3, 9, Exhibit JAL-3. On August 11, 2005, the Commission by a unanimous vote suspended the effective date of the filing in order to hold public comment hearings across the State.
[3] Id. at 4, JAL-1.

2

Confidential

contract which serves customers in the former EUA zone. It is Narragansett's position that fuel index adjustment payments on SOS contracts serving customers in the former EUA zone did not continue past 2004. According to Mr. Gerwatowski, TransCanada has argued otherwise in its Complaint filed in federal court.[4] During the pendency of court cases to resolve this dispute, Narragansett has been making payments <u>under protest</u> to TransCanada.[5] Mr. Gerwatowski stated that Narragansett believes continued payments are important and should be included in the reconciliation subject to refund at the conclusion of the court actions.[6] He maintained that continuation of payments, despite the Company's contention that none are due, eliminates TransCanada's ability to attempt to use non-payment as a basis to terminate the contract.[7]

The amount Narragansett has included in this filing for protest payments through June 2005 is $2.1 million, or approximately 0.1 cent of the proposed rate of 8.2 cents.[8] Relying on cost causation principles, Mr. Gerwatowski argued that it would be more equitable for current ratepayers to pay these costs, even if they may be refunded to future ratepayers.[9] He also maintained that the SOS Contracts with fuel index adjustment payments are still less expensive to ratepayers than replacement power at market rates.[10]

Addressing the other dispute, this one between the successor supplier to USGen New England, Inc. and the Company, Mr. Gerwatowski explained that prior to USGen filing bankruptcy they had agreed to arbitrate disputed congestion costs with Narragansett. The dispute was whether the supplier or the Company was responsible for

---

[4] Narragansett Ex. 1A (Pre-Filed Testimony of Ronald T. Gerwatowski), pp. 4-6.
[5] <u>Id</u>. at 5 (emphasis added).
[6] <u>Id</u>. at 5, 10.
[7] <u>Id</u>. at 5-6.
[8] <u>Id</u>. at 7.
[9] <u>Id</u>. at 8.
[10] <u>Id</u>. at 8-9.

3

**Confidential**

those costs.    However, the filing of bankruptcy prohibited this from happening.
Therefore, between August 2003 and December 2004, the Company incurred
approximately $689,000 in congestion costs which were paid as part of the bankruptcy
settlement.[11]  Mr. Gerwatowski noted that the Company has since received a bill from the
new supplier for congestion costs, but had not yet paid it pending communications with
the supplier regarding resolution of future responsibility for congestion costs.[12]

In his Pre-Filed Testimony, Michael Hager explained that the fuel index
adjustments contained in some of Narragansett's SOS contracts are based on
Narragansett's forecasted costs under the fuel index adjustment provisions using the
future gas and crude oil prices reported in the Wall Street Journal.  For his analysis in the
instant filing, Mr. Hager used the prices reported in the Wall Street Journal on July 25-27,
2005.[13]

Mr. Hager's analysis showed that, based on the July natural gas and crude oil
prices, Narragansett will pay an estimated arithmetic average fuel index adjustment
payment of 2.458 cents per kWh for the Narragansett Zone and an arithmetic average of
1.819 cents per kWh for both zones for the period July 2005 through December 2005.[14]
This equates to a total weighted average SOS cost under the contracts of 7.319 cents per
kWh.[15]

---

[11] Id. at 10-11.  In the event these costs are addressed by the Commission as part of a separate filing by the
Company regarding a bankruptcy settlement between Narragansett and USGen, the reconciliation account
may then be credited.  Id. at 11.
[12] Id. at 11.
[13] Narragansett Ex. 1C (Pre-Filed Testimony of Michael J. Hager), p. 5.
[14] Id. at 5.  According to Narragansett, the fuel index adjustment is not applicable to the former EUA zone
in 2005.  Id.
[15] Id.  (This average is developed by adding the arithmetic average across the entire service area of 1.819
cents per kWh to the base contract price of 5.5 cents per kWh).

4

NARR 46306

Mr. Hager noted that Narragansett does not independently forecast oil and natural gas prices, but rather, relies on futures prices for purpose of estimating its expected SOS expenses. He indicated that general publications and power market publications have not provided indications that prices will subside from their current levels in the near future.[16]

In her Pre-Filed Testimony, Ms. Lloyd explained that the proposed SOS rate is designed to recover an estimated under-collection of $28.7 million expected to accrue as of December 31, 2005, which is related to the effect of increased oil and natural gas prices on Narragansett's SOS contractual expenses.[17] The proposed rate is designed to remain effective for a twelve-month period assuming no significant changes in the oil and natural gas market.[18] According to Ms. Lloyd, the balance in the SOS reconciliation account as of June 2005 was an under-collection of approximately $2.3 million, indicating that the current SOS rate of 6.7 cents per kWh, approved for effect August 1, 2004, has been sufficient to recover SOS expenses through June 2005.[19]

In her testimony, Ms. Lloyd explained that the total SOS charge is based on the addition of the base contract charge plus the estimated fuel index adjustment payment on a per kWh basis through the end of the chosen reconciliation period.[20] She indicated that Narragansett's proposed rate change to 8.2 cents per kWh for usage on and after September 1, 2005 would be designed to collect the total SOS expenses over a twelve

---

[16] Id. at 6.  On September 19, 2005, Narragansett filed a letter with the Commission in response to a question from the Division of Public Utilities and Carriers ("Division"), noting that more recent natural gas and oil prices, both prior to and subsequent to a major hurricane in the Gulf Region of the United States, showed that a standard offer retail price of 9.7 cents per kWh would be necessary to meet expenses through September 2006. The reasoning for this increase in the forecasted expenses was the increase in the natural gas and crude oil prices.  Narragansett Exhibit 2.

[17] Narragansett Ex. 2, p. 2-3.

[18] Narragansett Ex. 1B, p. 9.  Ms. Lloyd's calculations assume continued fuel index adjustment protest payments to TransCanada during the twelve month period.

[19] Id. at 4.

[20] Id. at 3-4.

5

Confidential

NARR 46307

month period ending August 31, 2006.[21]  The calculation of the proposed SOS rate begins with estimating the expenses for the upcoming twelve month period, including the base price and the fuel index adjustment payments, and adding the expected under-recovery as of August 31, 2005.  That sum is then divided by the estimated SOS kWh deliveries for the same time period.[22]

<div align="center">III.    GEORGE WILEY CENTER</div>

On September 14, 2005, the George Wiley Center submitted the Pre-Filed Testimony of John Howat, Senior Energy Policy Analyst at the National Consumer Law Center in Boston, Massachusetts.  Mr. Howat's background is in the design and implementation of low-income energy affordability and efficiency programs and low-income regulatory consumer protection.[23]  Mr. Howat's testimony covered three areas: (1) impacts of the proposed increase on SOS customers; (2) recommendations for mitigating the impacts; and (3) recommendations for long-term SOS procurement strategies.

Mr. Howat stated that the proposed increase of more than 12% over current rates would exacerbate the pre-existing crisis in home energy affordability that low income households face.[24]  He asserted that low income families pay three times the percentage of income on utility service than do median income families.[25]  He pointed out that the futures prices for heating sources during the winter 2005-2006 have risen from prior years and argued that these prices will result in price shock for residential customers.[26]

---

[21] Id. at 9.
[22] Id.
[23] Wiley Center Exhibit 2 (Pre-Filed Testimony of John Howat), p. 1.
[24] Id. at 3.
[25] Id. at 3-4.
[26] Id. at 4.

<div align="center">6</div>

NARR 46308

He noted that projections for Rhode Island's share of the federal Low Income Home Energy Assistance Program ("LIHEAP") in FYE September 30, 2006 will be less than FYE September 30, 2005.[27]  He noted that grants in similar size to prior years will provide less assistance in FY 2006 because of increasing heating costs.[28]

In order to address the concerns of low income electric customers, Mr. Howat recommended that approval of Narragansett's SOS rate should be accompanied by a low income discount program designed to keep the electric costs below a certain percentage of income and designed to provide arrearage forgiveness.  Mr. Howat, on behalf of the Wiley Center, recommended that costs associated with such program(s) should come from federal sources as well as a non-bypassable kWh surcharge on all customers' bills.[29]

Addressing price volatility, Mr. Howat maintained that electric restructuring has not resulted in low cost, reliable service from competitors and will be unlikely to do so for low income customers.  He opined that SOS, last resort service, and their successor services will most likely remain the only viable option to residential customers for the long term.  Therefore, he recommended SOS be procured in a staggered manner, designed to insulate customers from price volatility.[30]

## IV.    ATTORNEY GENERAL/TEC-RI

On September 12, 2005, the Attorney General submitted the Corrected Pre-Filed Direct Testimony of John Farley, Executive Director of The Energy Council of Rhode Island ("TEC-RI").[31]  Mr. Farley addressed four areas in his testimony: (1) the impact of

---

[27] Id. at 5.
[28] Id.
[29] Id. at 5-6.
[30] Id. at 6-7.
[31] In the Attorney General's filing letter, he noted that because TEC-RI did not have an attorney in this matter, the Attorney General had agreed to sponsor the testimony, but "to the extent that Mr. Farley's testimony goes beyond the essentially factual discussion of the impact of rate hikes on his organization's

7

the rate increase; (2) an assessment of the situation; (3) TEC-RI's recommendations; and (4) the TransCanada dispute.

Mr. Farley noted that the SOS rate has risen from 4.662 cents per kWh in 2003 to a proposed 8.2 cents per kWh in 2005, or 75 percent in 2 ½ years. He indicated that the average TEC-RI customer using 4 GWh per year will experience an increase of $60,000 if the 1.5 cent increase to 8.2 cents per kWh is approved.[32]

In assessing the situation, Mr. Farley argued that ratepayers should not be expected to shoulder the entire burden of the increases, but rather, that burden should be spread across ratepayers, the distribution company (Narragansett Electric) and wholesale suppliers. In mitigating the impact on ratepayers, however, Mr. Farley testified that TEC-RI is strongly opposed to solutions that do not benefit all standard offer customers, but rather, benefit one subgroup of customers at the expense of others.[33] With regard to Narragansett's role, Mr. Farley suggested that to the extent the Company is in a position of realizing excess earnings, those earnings should be used to mitigate these unprecedented increases in the standard offer price.[34] With regard to wholesale suppliers, Mr. Farley noted that there is currently no way to determine whether or not the suppliers are realizing a "windfall" from the fuel index adjustment which is legal and allowed under the SOS contracts.[35] He implied that the suppliers should make pricing concessions if they are realizing "windfall profits."[36] He also noted that recent tax

---

membership to include energy policy and other recommendations, Mr. Farley's testimony must [be] viewed as reflecting only his position and that of TEC-RI; it may not be viewed as reflective of the position of the Attorney General in this matter." Attorney General's Filing Letter, 9/12/05. The Attorney General did not proffer any other witnesses.

[32] AG/TEC-RI Exhibit 1 (Pre-Filed Testimony of John Farley), p. 2.
[33] Id. at 3.
[34] Id.
[35] Id. at 4.
[36] Id. at 5.

8

changes for suppliers likely represent millions of dollars in tax savings which he believed Narragansett should pursue from the suppliers.[37]

Turning to the State of Rhode Island, after noting that ratepayers' bills/rates already include systems benefits charges, low income subsidies, and will include additional costs for the recently passed renewable energy standard, Mr. Farley suggested that "the Commission should petition the [General Assembly] to reduce the gross earnings tax on electricity in order to offset the dramatic increase in electricity commodity prices."[38]

Addressing the TransCanada contract dispute, Mr. Farley had no position regarding the protest payments that have been made, but believes that costs associated with disputed fuel adjustment payments should not be collected from customers until such time, if at all, it is determined that such payments are required.[39]

## V.    NARRAGANSETT'S UPDATE

On September 16, 2005, Narragansett submitted a response to a Division request for updated fuel prices. Using fuel indices for periods prior to and subsequent to the date when Category 5 Hurricane Katrina made landfall on the Louisiana and Mississippi coastline, Narragansett estimated that in order to avoid a substantial under-collection, the SOS rate for the twelve-month period ending September 2006, should be between 9.3 cents per kWh and 9.7 cents per kWh. In the September 16, 2005 filing Narragansett requested the Commission approve a SOS rate of 9.7 cents per kWh for effect on usage on and after October 1, 2005.[40]

---

[37] Id. at 6.
[38] Id.
[39] Id. at 7-8.
[40] Letter to Luly Massaro, Commission Clerk dated 9/16/05, pp. 1-2.

9

Confidential

## VI.   DIVISION

On September 19, 2005, the Division of Public Utilities and Carriers ("Division") submitted the Pre-Filed Direct Testimony of its consultant, John Stutz.  Dr. Stutz's testimony "focus[ed] on the Company's revised proposal to increase the Standard Offer rate to 9.7 cents per kWh."  He also addressed TEC-RI's position as well as that of the Wiley Center.[41]  Dr. Stutz recommended setting a SOS rate at 9.0 cents per kWh, or halfway between the initial and updated proposals in order to avoid both a significant under-collection and rate shock.[42]  He recommended this rate be reviewed approximately six months from the effective date.[43]  With regard to the protest payments, Dr. Stutz recommended those costs be recovered on a going forward basis rather than after a decision on the applicability of fuel adjustment payments is decided.[44]

Addressing the impact of the rate on low income customers taking service under the A-60 distribution rate, Dr. Stutz recommended diverting a portion of funds that would be returned to ratepayers following a bankruptcy settlement to those customers, thus providing an additional $2 million per year, for a total of $8 million to expand the subsidy provided to write down the distribution rate for A-60 customers.  He maintained that because this would not increase customers' rates, it is preferable to an additional non-bypassable charge.[45]

Finally, Dr. Stutz recommended the Commission order the Company to explore "possibilities for promoting additional conservation, as well as any other options it can identify, and then provide a report on its findings within six weeks of the Commission's

---

[41] Division Ex. 1 (Pre-Filed Direct Testimony of John Stutz), pp. 1-2.
[42] Id. at 4-5.
[43] Id. at 6.
[44] Id. at 5-6.

10

order." He believed that this six week period could also be used to provide the Commission with ideas to develop a comprehensive energy policy for Rhode Island.[46]

## VII.    PUBLIC COMMENT

The Commission conducted six public hearings for the purposes of taking public comment on the following dates and in the following places: August 18, 2005 at 7:00 p.m. in the City of Newport, August 25, 2005 at 9:30 a.m. in the City of Warwick, September 12, 2005 at 7:00 p.m. in the City of Warwick, September 13, 2005 at 7:00 p.m. in the City of Woonsocket, September 19, 2005 at 7:00 p.m. in the City of Providence, and September 21, 2005 at 7:00 p.m. in the Town of North Providence. Seventy-four members of the public, including some elected officials, provided comment to the Commission.

Some of the public comment addressed allegations related to the Company's distribution service and the associated rates rather than the energy portion of the bill which was the subject of Narragansett's filing.

Regarding the subject of the hearing, the energy charge, several members of the public suggested that the Commission not allow Narragansett to raise its rates as long as there are customers who are unable to afford the charges. Members of the public suggested that until there is a percentage of income program in place to assist low income customers with their arrearages and forward payments, those customers should be exempt from the increase. Similarly, a few members of the public suggested that customers taking SOS who participate in the voluntary "Green-Up Program," a program in which

---

[45] Id. at 7-8.
[46] Id. at 8.

11

customers voluntarily pay an additional charge on their bills in order to encourage the development of more renewable power in New England, be exempted from the increase.

## VIII.  HEARING

A public hearing was held at the Commission's offices, 89 Jefferson Boulevard, Warwick, Rhode Island, on September 23, 2005.  The following appearances were entered:

| | |
|---|---|
| FOR NARRAGANSETT: | Thomas G. Robinson, Esq. |
| FOR WILEY CENTER: | B. Jeanne Rosiello, Esq. |
| FOR ATTORNEY GENERAL: | William K. Lueker, Esq.<br>Special Assistant Attorney General |
| FOR DIVISION: | Paul J. Roberti, Esq.<br>Assistant Attorney General |
| FOR COMMISSION: | Cynthia G. Wilson-Frias, Esq.<br>Senior Legal Counsel |

### A.    Attorney General's Objection to Consideration of Narragansett's Revision

On September 22, 2005, the Attorney General filed an objection to Narragansett's revised request regarding the magnitude of the proposed SOS increase.  The Attorney General argued that because the request to raise the rate by 3.0 cents per kWh was twice the amount of the original filing, it was "so substantively different from the original filing as to trigger anew the notice requirements of Rhode Island General Laws § 39-3-11(a)."[47]

At the hearing, Commission legal counsel advised the Commission that its notice does indicate the Commission could set rates that are higher or lower than those proposed by Narragansett.  However, neither Narragansett's notice nor the Commission's notice

12

NARR 46314

anticipated proposals related to the distribution of funds related to a bankruptcy settlement, something that would normally be considered part of the Transition Charge, a charge separate from the energy charge which is designed to collect stranded costs associated with electric restructuring.[48]

The Commission considered oral argument by counsel for all parties regarding the scope of the proceedings and after a short recess, the Chairman, with concurrence of the other Commissioners, held that he was "specifically not ruling whether the Commission has the discretion to approve rates that are different from what was filed based on [R.I.G.L. § 39-3-11] or [R.I.G.L.] 39-3-12, [but] that the notice is sufficient to move forward on Narragansett's original filing seeking to increase rates to 8.2 cents per kWh." Furthermore, the Commission determined that "any proposal to affect transition charges or the distribution of settlement money which would normally be flowed through to the transition rate needs to be filed separately...."[49]  Narragansett was allowed to submit evidence showing trends in the market.[50]

**B.    Cross-Examination of Narragansett's Witnesses**

*1.    Market Trend*

Mr. Gerwatowski explained that the fuel index adjustment provision in those SOS contracts which contain such provisions, are based on a twelve-month average, creating a lag in increases and in decreases. Therefore, prices trend upward slowly and trend downward slowly rather than directly reflecting the market. He noted that since the

---

[47] Attorney General's Objection, p. 1-2.  During oral argument, the Attorney General agreed that the Commission could make an adjustment to the request within the Commission's notice provisions, but not to the magnitude of doubling the request. Tr. 9/23/05, p. 45-46.
[48] Id. at 14-15, 44-45.
[49] Id. at 47-48.
[50] Id. at 115.

13

**Confidential**

**NARR 46315**

initial filing, the subject of the hearing, oil and natural gas prices continued to climb higher than they were at the time of the July 2005 filing.[51]  Mr. Hager stated that:

> while there may be in the current forecast prices some premiums for storms in the near term and the hope that those premiums will strip away to levels that are lower, we're still in a period of time where prices continue to show nothing but continued upward pressure, no near term expectations that these things will moderate significantly.[52]

He opined that the underlying forces driving these increases in the oil and natural gas markets appear to be increases in demand.[53]

Mr. Gerwatowski noted that the Company's analysis of rates was based on the assumption that the rate would be in effect for twelve-months.[54]  He testified that the Company chose to attempt to project a twelve-month rate knowing that the Company could return to the Commission to reduce the rate and provide some relief than to have incremental increases at a higher rate that will be harder to manage during the winter period.[55]  Both Mr. Hager and Mr. Gerwatowski noted that the Commission has had a policy of promoting rate stability when possible.  However, Mr. Hager also noted that during the years 2000 through 2001, the Company experienced a level of volatility similar to that which is currently being experienced.  At that time, the Company was appearing fairly frequently before the Commission in order to, as Mr. Gerwatowski had previously testified, to match the retail rate with the costs as much as possible.  This frequency, about quarterly according to Mr. Hager, allowed the Company to appear with regularity to reduce rates once the market stabilized and began to soften.[56]  Therefore,

---

[51] Id. at 51-52.
[52] Id. at 98.
[53] Id.
[54] Id. at 72.
[55] Id. at 165.
[56] Id. at 90, 142,161-63, 165-66.

14

NARR 46316

Mr. Gerwatowski noted that once the Commission determines the appropriate policy for the current period of market volatility, the Company can propose a rate.[57]

Both Mr. Hager and Mr. Gerwatowski indicated that large deferrals are not preferable because of several reasons: (1) customers will not realize the softening of the market because of the need to pay off a large under-collection;[58] (2) if SOS is artificially high in the future because of the need to pay off a large under-collection, it will send the wrong signal to customers in the event the market opens up, thereby potentially leaving fewer customers to pay the under-collection or conversely, making them pay the under-collection after they move to competitive supply;[59] (3) retail rates should match costs for purposes of intergenerational equity;[60] and (4) customers should be aware of the actual costs of their usage in order to encourage conservation.[61] Mr. Gerwatowski stated that as long as the deferral is not excessive, it can be managed.[62]

### 2. Procurement and Hedging

With regard to the actual procurement of SOS power by suppliers, Mr. Gerwatowski explained that the Company does not know who is generating and under what circumstances they obtain the fuel to do so.[63] He stated that, with regard to whether or not suppliers were being enriched by the fuel index adjustment provisions, "it would be pure speculation at this point."[64] Mr. Hager stated, "we have no information as to how any particular supplier is managing its portfolio in order to meet its supply obligations." [65]

---

[57] Id. at 167-68.
[58] Id. at 138.
[59] Id. at 139-40.
[60] Id. at 141.
[61] Id. at 143.
[62] Id. at 140.
[63] Id. at 60.
[64] Id. at 116.
[65] Id. at 116-17.

15

**Confidential**

He noted that the SOS contracts are not tied to the suppliers' operations or the use of particular facilities.[66] In discussing potential possibilities for hedging costs, Mr. Hager noted that the Company would not be entering into contracts to actually take delivery of any particular product, but rather, would be entering a particular market as a speculator. Speculation, for purposes of the discussion at the hearing was defined as entering into an arrangement to purchase a product in the future, with no intention of taking delivery of that product, but rather, selling in back into the market at a future point in time. Hedging was described as taking physical delivery of the product being for which a sales contract is made.[67]

In discussing hedging possibilities, Mr. Hager cautioned several times that hedging should not be equated to decreased costs. He indicated that there is no hedging program of which he is aware which would guarantee lower costs. Rather, he explained that all hedging programs are strategies which intend to try to guarantee or direct an outcome toward a certain goal, such as price stability. All hedging programs have associated costs, such as transactional costs.[68]

Turning to specific possibilities, Mr. Hager indicated that a basic plan would entail the Company seeking another entity with the resources, skills and expertise to manage the elements affecting the fuel index and enter into an arrangement with that party such that, for a kWh premium payment, "the fuel index drives to zero or is no greater than a particular number or is within a band width or some established criteria we feel is best for customers."[69] The costs associated with this strategy would include the

---

[66] Id. at 117.
[67] Id. at 117-21.
[68] Id. at 60-63, 178-81.
[69] Id. at 61.

16

premium. Mr. Hager opined that this approach would cost customers more "because in the end you were driving towards a certain outcome, whether it be the lowest one possible or not."[70]

Discussing what he termed a more risky strategy, Mr. Hager indicated that the Company could go into the market and procure a commodity, such as oil, gas, coal, silver, wheat, corn, pork bellies, coffee, or any other commodity it chose, on a speculative basis as part of a plan where the Company would then sell the commodity prior to taking delivery at the then market price. The hope would be that the Company purchase low and sell high. The profit could then be applied against fuel index adjustment payments on behalf of customers. However, if market prices decline during the period chosen, customers would be charged an additional amount to cover those losses.[71] Costs for such a program would include the underlying commodity price, the broker or dealer transaction fee, and other related costs.[72]

He agreed that such a program is different from that which is exercised by New England Gas Company ("NEGas"), whereby NEGas is required to make regular purchases on a monthly basis prior the month in which they expect to take physical delivery of the gas for delivery to their customers. He likened this to National Grid's gas affiliate in New York, which buys the gas little by little each month in order to use a dollar cost averaging approach for ratemaking purposes.[73]

After discussing these possibilities, Mr. Hager commented that with regard to hedging of costs with purchases and through the use of fuel diversity, "restructuring had

---

[70] Id. at 62.
[71] Id. at 62, 119-20, 180-81.
[72] Id. at 122-23.
[73] Id. at 120-21.

17

[the Company] exit from that marketplace and exit for the most part [from] the responsibilities associated with those issues and put those into the hands of other suppliers who at the time were saying that they could do it better, smarter, more efficiently and certainly cheaper than [the Company] could."[74]  Therefore, where the Company, as part of a vertically integrated entity, having no risk of customer loss and large reductions in load, required management of long term procurement obligations. In contrast, with the exception of last resort service obligations, the Company currently has none of those responsibilities.[75]  Now, as explained by Mr. Hager, generators are setting up portfolios based on long-term, medium-term, and short-term transactions, in order to be competitive in the marketplace and meet the supply obligations of contracts.  Whereas the goal of regulation of the vertically integrated utility was to get the lowest reasonable cost, the goal of restructuring is to get the market-based cost.[76]

### 3.    Protest Fuel Index Adjustment Payments

Mr. Gerwatowski explained that the Company was seeking a Commission determination that the Company should be making protest payments to TransCanada and that it is appropriate to recover those payments through the current reconciliation.  He indicated that the Company has had "an indication that TransCanada is trying to terminate the contract…" and if that occurred, it would be more expensive for the Company to obtain replacement power under the market as it existed at the time of the hearing.    Additionally, Mr. Gerwatowski discussed damages issues under various outcomes of the pending litigation.[77]

---

[74] Id. at 123-24.
[75] Id. at 125.
[76] Id. at 125-26.
[77] Id. at 106-111.

18

Confidential

C.    Cross-Examination of Division's Witness

Dr. Stutz testified that rate stability is an important ratemaking policy during times of price volatility and price stability.[78] He maintained that even in a period of price volatility, if the rate is set high enough, it can remain stable during a longer period of time.[79] He indicated that while the goal is to set a correct rate, in the event the rate is set correctly based on long term projections, but turns out to be too low, further increases can be spread over more than one filing, lessening the impact of the increase, whereas, if the rate is not set correctly up front, the next rate increase would have to be large.[80] However, he maintained that rates set on a quarterly basis would be "terrible." He opined that not only would ratepayers be unable to budget, but marketers would be unable to compete against a volatile rate.[81] He concluded that he had a "degree of optimism here that we have seen the worst of it and that if we were to set a rate in the 9 to 9.3 [cent] range, we could at least feel comfortable" that the rate could remain in effect through most of the heating season.[82]

With regard to the impact of the increase on ratepayers, Dr. Stutz conceded that all ratepayers, residential and non-residential would be impacted, but maintained that businesses, even very small ones, can absorb the increase better than a residential customer.[83] However, later in the hearing when discussing the impact of rates on large businesses and all customers, Dr. Stutz testified that:

> you have to distinguish between abatement and doing things which lower the cost of electricity on average. Because what happens when you offer an abatement but

---

[78] Id. at 197.
[79] Id. at 205.
[80] Id. at 205-06.
[81] Id. at 204.
[82] Id. at 206.
[83] Id. at 200.

19

NARR 46321

the cost of electricity stays the same? Well, there's some .transfer payment somewhere so someone else's bill goes up. If you do things which cause the price of electricity to fall in general, then everyone can benefit. So I'm much more interested in those sorts of things.[84]

### D.    Cross-Examination of TEC-RI's Witness

There was no cross-examination of Mr. John Farley by any of the parties or the Commission.

### E.    Cross-Examination of Wiley Center Witness

There was one question from the Bench regarding conservation in conjunction with any low-income arrangement, to which Mr. Howat responded that they need to be addressed simultaneously. He stated that "promotion of energy efficiency needs to be really the cornerstone of energy affordability and stability for low income and all residential [energy] users..." There was no further cross examination of Mr. Howat.[85]

## V.    COMMISSION FINDINGS

At its open meeting on September 29, 2005, a majority of the Commission approved a SOS rate of 8.2 cents per kWh effective for consumption on and after October 1, 2005. The Commission unanimously agreed that the rate of 6.7 cents per kWh was insufficient to allow Narragansett to recover its costs. The disagreement centered on the appropriate rate to be set.

The necessity of this increase is due to the increases in the cost of wholesale oil and natural gas. As part of some of Narragansett's SOS agreements with suppliers, when the fuel indices increase above a certain level, Narragansett must pay the suppliers a calculated amount in addition to the base contract price for SOS, which, for 2005 is 5.5 cents per kWh. The Commission notes that Narragansett does not earn any profit on the

---

[84] Id. at 214-15.

20

SOS charge. This portion of the rate is the result of charges that Narragansett must pay in order to distribute the electricity to homes and businesses. With regard to the SOS rate, the Commission regulates Narragansett, but does not regulate the wholesale oil and natural gas prices. It is important to keep including this point in Commission Orders, as there is always ample public comment that Narragansett is profiting from these charges. While there may be some public policy disagreement as to whether Narragansett's profits should be insulated from increases in the cost of SOS contracts, it is not for the Commission to make decisions that would be contrary to state law requiring the Commission to allow Narragansett to recoup the costs of the SOS contracts.

The Commission heard public comment and other testimony which advocated for the Commission to find that Narragansett's rate should not be increased on the basis that customers would not be able to pay for the service or that because people do not usually get raises in the amount of 12.4%, they should not be expected to shoulder recovery by the Company of additional expenses. The Rhode Island Supreme Court has found in the past that "the Commission erred in relying upon the ability of consumers to pay for services in setting a cost of equity."[86] Likewise, the Commission cannot deny recovery of Narragansett's SOS expenses, but can only control, on a reasonable basis, the flow of those expenses through to retail rates. To deny recovery in its entirety today would only force ratepayers to absorb an even larger rate increase in the future.

If the Commission were to deny a rate increase until Narragansett's annual reconciliation filing, Narragansett is projecting an under-collection of approximately $45 million as of December 31, 2005. The rate approved in this docket is designed to halt the

---

[85] Id. at 223.

[86] Narragansett Electric Company v. Harsch, 117 R.I. 395, 429 (1977).

21

NARR 46323

growth of the under-collection as of December 31, 2005 to the approximate amount of the projection which prompted Narragansett to file in July 2005.

Additionally, the Commission reviewed a Motion requesting the low income rate not be raised until a percentage of income subsidy or some other subsidy is provided to those customers. The Commission denied the Motion on the basis that it would be discriminatory and other customers would be expected to pick up the costs to which Narragansett is entitled.

One of the frustrations expressed by ratepayers and legislators is that the Commission does not appear to be requiring Narragansett to provide customers with the lowest possible energy rate because of the manner in which the SOS contracts function. The Commission agrees with Mr. Hager's testimony that while the vertically integrated utility had the obligation to provide the energy component at the lowest reasonable cost, the goal of electric restructuring was to set the energy component based on market rates.[87] However, with that explained, the SOS contracts were never meant to provide either the lowest price or a market-based price, but rather, were designed to provide transitional pricing which would increase every year, to be above market, and ease customers into the market as competitors had a rate against which to compete. Ironically, those SOS contracts, according to marketers, have consistently been below market for competitive purposes.

---

[87] Prior to restructuring, when Narragansett had an obligation to obtain energy for every customer, it entered into contracts for its power, primarily with New England Power Company ("NEP"). The energy component of Narragansett's rate was set through a Federal Energy Regulatory Commission ("FERC", formerly Federal Power Commission)-approved Tariff based on a contract between Narragansett and NEP. The Division acted as a party before FERC in its approval process. Such contracts were subject to full proceedings before FERC. Once the wholesale rate was set at FERC, it was passed through Narragansett's retail rates, much as those costs currently are passed through. The pre-restructuring rates were subject to a fuel clause, similar to the fuel index adjustment, but for the fact that the old fuel clauses were based on NEP's actual costs, whereas the current fuel index adjustment is based on a benchmark calculation.

Confidential

NARR 46324

Unfortunately, because of their design, these long-term contracts, many of which were accepted as part of the Federal Energy Regulatory Commission's ("FERC") administrative process almost ten years ago, are difficult to explain. Because generation is not regulated, fuel index adjustment provisions are based on calculations in accordance with pre-set benchmarks, rather than on the effect of higher costs on a generator's cost of service. This causes confusion with customers and newcomers to the regulatory world, alike. However, without a regulatory process where a *competitive* supplier would have to justify its price, the proxy in those contracts which contain the fuel index adjustment clause provides the measure against which both parties to the supply contract can calculate their expenses and revenues.[88]

Rhode Islanders want the Rhode Island Public Utilities Commission to control the price of electricity and to the extent the Commission has jurisdiction, it does so. For example, this has been done by lowering distribution rates by over $23 million in the last five years through two rate freezes, each with a reduction from the prior one. However, the Commission cannot control those costs which are outside the regulatory process; it can only try to mitigate the impact through the timing of collections.

The Commission notes that a market is inherently unstable and, arguably, a truly competitive market would track that instability. Unfortunately, at this point in time, choice in the electricity market does not exist for residential customers. Therefore, in each request for an increase relative to wholesale fuel prices, the Commission attempts to balance the legal requirement of the increase against a goal of rate stability.

---

[88] Of course, it would be illogical to suggest that a competitive supplier in a competitive market would be subject to rate regulation where the point of regulation is to address the rates of a monopoly provider. While Narragansett is a monopoly provider of distribution services, the Rhode Island General Assembly has made electric generation a purely competitive service.

23

Confidential

NARR 46325

Despite the goal of rate stability, the Commission will not order Narragansett to undertake a hedging program as discussed at the hearing because such a program would make Narragansett a speculator in the market. Narragansett does not ever take possession of fuel for generation or for coffee, silver or pork bellies. It is no longer in the generation business and no longer has the obligation to serve the entire Rhode Island load. Such a program would be inherently risky for customers with no guarantee that it would result in lower retail rates. Narragansett is in a very different position from NEGas, which is charged, by regulation, to procure natural gas on behalf of all but the largest customers in Rhode Island. That is why the Commission has been able to support and order a hedging program which provides stability through dollar cost averaging over 24 month periods. However, even this program is not designed to provide customers with the lowest possible rate, but is designed to reach the specific goal of protecting customers from price spikes and attempting to provide rate stability.

Because hedging is impractical for Narragansett, the Commission has established a policy of not allowing a large under-collection to accrue in the SOS account. History shows that during periods of quickly increasing rates, the Commission has implemented steady rate increases in order to avoid a large under-collection that could lead to rate shock at a future time. During 2000-2001, in order to avoid accrual of significant under-collections due to rising oil and natural gas prices, the Commission approved five rate increases over the course of ten months. The base SOS rate was 3.8 cents per kWh in 2000.[89] During this period of ten months, the Commission raised the SOS rate from 3.8

---

[89] The following shows the history of SOS increases and decreases since January 2000. Although meant to be a relatively stabilized transition rate between a fully regulated industry and a competitive market, the SOS rate is impacted by the competitive wholesale fuel market, as shown below. During periods of

24

Confidential

per kWh to 6.3 cents per kWh.  The Commission was then able to reduce the rate over a

nine-month period of time from 6.3 cents per kWh to 4.662.

In 2002, the base contract rate increased to 4.2 cents per kWh and the

Commission attempted to set a three-year rate which would have insulated customers

from contract increases had the market not risen to the level requiring further fuel index

adjustment payments.  This rate remained in effect for 18 months.  Following another

increase in the fuel market, the Commission then approved a rate which stayed in effect

for 14 months.  The most recent rate of 6.7 cents per kWh was in effect for 14 months.

This has produced stability for customers in an inherently volatile market.  However, we

are now faced with a market that is acting more like the 2000-2001 market and need to

use the experience developed during that period of time, namely, to proceed slowly

---

unusual price increases and volatility, the prices reflect that aspect of the market.  During periods of relative
market stability, retail prices reflect that aspect of the market.

| | |
|---|---|
| January 2000 | 3.8 cents per kWh |
| July 1, 2000 | 4.1 cents per kWh (designed to be in effect through 2000 and to allow a small under-collection by December 31, 2000). |
| September 1, 2000 | 4.5 cents per kWh (under-collection growing so rapidly, PUC required Narragansett to file for effect October 1, 2000 in order to eliminate the under-collection that had accrued when retail prices were below cost). |
| October 1, 2000 | 5.401 cents per kWh (designed to cover costs of SOS through March 2001 plus an additional Standard Offer Adjustment Factor (SOAF) to cover an already-accumulated under-collection). |
| January 1, 2001 | 5.905 cents per kWh (designed to cover costs of SOS through the end of 2001 plus continuation of the additional SOAF to cover an already-accumulated under-collection). |
| April 1, 2001 | 6.3 cents per kWh (designed to cover costs of SOS through the end of 2001 plus continuation of the additional SOAF to cover an already-accumulated under-collection). |
| October 1, 2001 | 5.5 cents per kWh (designed to leave an over-collection of $1.6 million plus elimination of the SOAF). |
| January 1, 2002 | 4.662 cents per kWh (designed to over-collect for purposes of hopefully providing a three-year rate). |
| June 1, 2003 | 5.5 cents per kWh (designed to be in effect through December 31, 2003). |
| January 1, 2004 | 5.9 cents per kWh (designed to recover Narragansett's SO costs through December 31, 2004). |
| August 2004 | 6.7 cents per kWh (designed to collect costs through December 2005). |
| October 2005 | 8.2 cents per kWh (designed to halt the growth of the under-collection at the end of December 2005). |

Confidential

NARR 46327

without over-reacting, but with the knowledge that further rate increases over shorter periods of time will be necessary and likely.

The majority notes that at the open meeting, the dissenting commissioner did not object to a rate change, but rather, expressed a different preference regarding the amount of the increase, noting that, regardless of notice issues, more recent information indicates that the Commission is not setting the appropriate rate. The dissent made a valid argument that ratepayers should not be left to face large under-collections. The dissent also made a valid point that the Commission does have more recent information regarding the trend of the market. However, as noted by this Commissioner at the hearing, the trending and resulting magnitude of the under-collection is based on projections at a time when the market it responding to recent natural disasters and may be abnormally high. In fact, Narragansett's request to double the increase was based on events which occurred during the short 30-day delay in the decision-making process resulting from the desire to take extended public comment.

Therefore, when balancing the Commission's policies of attempting to provide rate stability against avoiding large under-collections, the majority finds that the scales in this case need to tip toward halting the growth of the under-collection projected for December 31, 2005, at a point, according to Narragansett, between $18.9 million and $21.3 million.[90] We note that even on the high end, this projection is $7.4 million less than that which was projected by Narragansett in its original filing.

This decision may appear to be inconsistent with the Commission's decision in Docket No. 3571, where a majority of the Commission refused to extend the recovery

---

[90] Since the open meeting decision, Narragansett's December 31, 2005 projection as of November 30, 2005 is an under-collection of $17.2 million.

26

NARR 46328

period for the under-collection in order to provide additional rate stability, the Commission found the scales tipped in favor of recovery over a shorter period (17 months).[91]  However, each time the Commission holds the scales, it needs to take into account all surrounding factors.  While Mr. Hager provided similar testimony regarding the trend of the market to move upward, the Commission is concerned about the very real possibility of a "hurricane premium" and finds that to be a distinguishing factor from the prior case.

The Commission will review Narragansett's SOS rate during its annual reconciliation filing in December and may very well have to adjust the rate upward again, given the most recent information.  However, it is not the Commission's general policy to raise rates more than is necessary in order to provide stability, something which was a concern given the volatility shown in a one-month period.  In fact, the Commission routinely builds a small under-collection into NEGas' rates in order to provide some stability.  As Narragansett indicated, as long as the under-collection is kept at a manageable level, the strength of the Company will not suffer and it will still be able to meet its obligations to customers.  Likewise, as long as the under-collection is kept at a manageable level, it will not cause ratepayers the harm that an ever-growing balance would cause.  Furthermore, moderate, stepped increases over shorter periods of time provide their own kind of rate stability, preventing rate shock and furthering the rate principles of gradualism as the rate transitions to the actual costs.

The Commission notes that the General Assembly has voted in favor of electric restructuring twice, once in 1996 and again in 2002, following the price spikes of 2000-

---

[91] In that instance, extending the recovery period would have only reduced the increase by 1% while in this case, elimination of the under-collection as of December 2006 would have doubled Narragansett's

Confidential

2001. The SOS contracts are operating no differently than they did during that time of extreme volatility. The State of Rhode Island was told competition would cause prices to drop. According to the New England Independent System Operator ("ISO-NE"), the market has become more efficient and prices have decreased, if one discounts the large increases in the wholesale commodity prices.[92] The Commission is aware that the General Assembly is interested in revisiting the decisions to embrace restructuring. However, the Commission respectfully cautions the General Assembly to take a moderated approach.

The Commission believes it would be prudent for the General Assembly to focus on a long-term energy policy for the post-standard offer service period commencing in 2010. These SOS contracts, in effect through 2009, are all requirements, load following contracts, some of which do not contain fuel index adjustment provisions. They each contain various "change of law" provisions which, if State law were to be enacted which substantially changes the suppliers' obligations without an adequate transition period, customers could end up with new stranded costs in addition to those which they are currently paying as a result of the original URA. Furthermore, although not comforting to ratepayers, these contracts have consistently been resulting in retail rates below those sought by competitive suppliers and those of Rhode Island's neighbors, particularly those who no longer have SOS contracts, but who have the distribution company procuring for customers in the market.

---

proposed increase, potentially causing rate shock.
[92] See ISO-NE Annual Reports, comparing generation under competitive market rules with generation under traditional cost of service regulation. Additionally, testimony at Commission hearings has consistently indicated that few, if any experts contemplated that wholesale natural gas prices would settle out at $5 and $6 per MMBTU, when they hovered around $2 and $3 in 1996. In fact, in Docket No. 3571, Mr. Hager noted that $5.50 per MMBTU seems to be the average, with spikes to $9.00 or $10.00 not

Confidential

NARR 46330

The concern, of course, is that Rhode Island not mirror California. California's original restructuring legislation did not allow long term contracts, resulting in blackouts from a lack of any supply obligation on the part of competitive generators. California's legislature then moved quickly to require long-term contracts at a high point in the market. The result was higher costs for customers. While the Commission has faith that the Rhode Island General Assembly will take an educated and measured approach to the situation, certain concepts are helpful to remember when making the tough decisions that will be required for the long term.

In the short-term, the Commission finds the suggestion that the gross earnings tax be reduced as rates increase appealing, particularly where the State was not relying on the increased revenues when setting the State budget. This would provide immediate relief on all customers' overall bills.

Finally, with regard to recovery of the disputed fuel index adjustment payments to TransCanada, the Commission specifically did not rule on the issue. Because there is a deferral built into the rate that has been set in this case, it was not necessary to address the request. The Commission may address the request as part of the annual reconciliation filing.

Accordingly, it is hereby

(18474) <u>ORDERED</u>:

1. Narragansett Electric Company's proposed retail Standard Offer Service Rate of 8.2 cents per kWh is approved to become effective for service on and after October 1, 2005.

---

surprising, whereas spikes to $3.00 used to surprise observers. The Commission reminds ratepayers that neither it nor the General Assembly has any control over these commodity prices.

Confidential                                                                                      NARR 46331

2. The Motion of the George Wiley Center for Interim Relief Under Rule 1.17 is hereby denied.

3. Narragansett Electric Company shall comply with all other findings and instructions as contained in this Report and Order.

EFFECTIVE AT WARWICK, RHODE ISLAND PURSUANT TO AN OPEN MEETING DECISION ON SEPTEMBER 29, 2005. WRITTEN ORDER ISSUED DECEMBER 14, 2005.

PUBLIC UTILITIES COMMISISON

_____
Elia Germani, Chairman


_____
*Robert B. Holbrook, Commissioner


_____
Mary E. Bray, Commissioner


*Commissioner Holbrook concurs with the Commission's decision to deny the Wiley Center's Motion for Interim Relief and with the decision to increase the Standard Offer Service charge, but dissents from the amount of the increase. A separate opinion follows.

30

Confidential

Commissioner Robert B. Holbrook, concurring in part and dissenting in part:

I concur with the decision by the majority to deny the George Wiley Center's Motion for Interim Relief and with the Commission's decision to increase the Standard Offer Service ("SOS") charge in order to halt the continued growth of the under-collection. However, I dissent from the amount of the increase. A delayed filing update prevented Narragansett from increasing its proposed rate increase from 12.4% to 24.0%. It was known by the Commission at the time of the approval of the initial request that a second proposal to increase rates would be filed within a matter of weeks. I believe that the Commission's primary goal should be to set rates that recover current costs and eliminate or reduce the under-collection to a de minimus amount.

State law requires the Commission to allow Narragansett to collect no more and no less than its costs associated with SOS contracts. Although it is the Commission's prerogative regarding the length of the recovery period, the Commission cannot deny every increase sought by Narragansett. To do so would cause an unmanageable under-collection to grow. An under-collection can be addressed by one or a combination of only two events: (1) a rate increase or (2) a decline in the market price of oil and natural gas below the value included in the rate charged to ratepayers. The current volatile energy market should raise serious doubts over undue reliance on falling prices to erase under-collections.

Furthermore, because the majority approved an increase that it knew to be insufficient to collect Narragansett's total costs for the period as set forth in the filing, all that the majority accomplished was to take the deferred charges today and push them off to tomorrow, benefiting no one. By not addressing this matter squarely and equitably, the

31

NARR 46333

Commission is doing a disservice to itself and to ratepayers because this decision does not provide adequate price signals to customers to encourage conservation. Conservation may provide the single most effective means of mitigating volatile and rising rates.

The majority, through this decision, is endorsing deficit spending by ratepayers. Narragansett has purchased, and will continue to purchase, electricity for its SOS customers. However, rather than having customers pay for the current cost of the product as it is purchased and used, the majority decision will allow a deferral to build up. This can only result in higher rates in the future as customers are hit with a one-two punch reflecting the higher rates projected by Narragansett in the future plus recovery of costs that the majority decision will continue to defer.

Unfortunately, like everyone else, I do not have the ability to forecast exactly what the rates will need to be in the future. Relying however on the information filed, and the testimony of the Company's witnesses, along Narragansett's exhibit showing the expected trend of the market, I can be reasonably certain that the rate of 8.2 cents per kWh set by the majority in this docket is not sufficient to recover the current cost of electricity. I would have preferred to set the rate at a level between 8.7 cents per kWh and 9.0 cents per kWh in order to avoid rate shock, possibly avoid a second increase so soon after this change, and to reduce the expected under-collection to or below the $16 million level previously determined to be reasonable by the Commission.

_____

Robert B. Holbrook, Commissioner

32

**Confidential**

**NARR 46334**

# Tab 32



EXHIBIT

37

PENGAD 800-631-6989

10·24·97

pre-submittal standard offer
auction conference @
EUA corporate offices

STANDARD OFFER SERVICE

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation

Pre-Submittal Conference
October 24, 1997

- lead by Peter Fuller
- introduction by Bob
  Clark of power supply
- Q&A with Keith Gordon
  (Treasury), Deb (rates) &
  Larry (contract-related)

Today's Presentation

♦ Key Dates
♦ Standard Offer Service
♦ Qualifications
♦ Auction Process
♦ Q & A

October 24, 1997                    1

Key Dates

♦ Request for Qualifications       10/3/97
♦ Pre-Submittal conference         10/24/97
♦ Qualifications Due               11/14/97
♦ Notification of Qualified Bidders 12/5/97
♦ Final Rules and Auction
  Participation Agreement          P & S

October 24, 1997                    3

Question from audience: will
qualified bidders be public?
Answer? yes. names of qualified
bidders will be submitted to the
MA DPU.

TCPM 000954



### Key Dates
(continued)

| Dependent upon Divestiture and Retail Access | |
|---|---|
| • Bid Deposits & Executed APA's | A - 2 weeks |
| • Eligibil' y Notification | A - 1 week |
| • Auction Training | A - 1 week |
| • Auction | A |
| • Execute Service Agreements | A + 2 weeks |

October 24, 1997                                                    4

- Set auction date a reasonable period ahead of retail access date (can't set date until know when retail access set by regulators)
- executive service agreements include performance assurances
- retail access date will be the later of 2 states (MA & RI) date



### Standard Offer Service

- Required by Settlement and by law
- Transitional service for customers who have not yet chosen a new supplier
- Full requirements service delivered to customer meters
- Capped prices

October 24, 1997                                                    5



### What is Being Auctioned?

- Responsibility for serving load requirements
  - Energy
  - Capacity
  - Reserves
  - Losses
  - Ancillary Services
  - Transmission (as needed)
  - Hour-by-hour loads

October 24, 1997                                                    6

- aggregate load of 3 retail companies
- your share will be based on a % of total load of 3 companies

TCPM 000955



**What is Being Auctioned?**
*(continued)*

- Percentage of combined Standard Offer Service Load of the three companies
- Bid as much as 100% or as little as 1%
- Fixed at the conclusion of the auction

*October 24, 1997*

- at the end of the auction's once contracts are complete → thats what share you win.
- there will be no revisions to the %s, no cutting of suppliers as load decreases. Your % share is yours for the full 7-year term



**Supplier Terms**

- Aggregated load of all customers on retail Standard Offer tariffs
- Standard Offer hourly load is estimated in the same manner as all other competitively-supplied loads
- Payment for energy delivered to retail meters at fixed discounted prices
- Fuel index may add to revenues

*October 24, 1997*

- Question: Are we assigned particular customers? Answer: No, you are assigned a share of load.
- What is the basis for payment? Answer: payments are for energy delivered to the meter.



**Supplier Terms**
*(continued)*

| Supplier Price Cap, ¢/kWh | |
|---|---|
| 1998 | 3.2 |
| 1999 | 3.5 |
| 2000 | 3.8 |
| 2001 | 3.8 |
| 2002 | 4.2 |
| 2003 | 4.7 |
| 2004 | 5.1 |

Subject to Auction Discounts and Fuel Index revenues
*October 24, 1997*

- Supplier price cap exists because Montaup (or Montaup's successor) guarantees to supply at the cap.
- looking for suppliers to match or beat the price caps

3

TCPM 000956



### Fuel Index

- Begins in 2000
- Extra revenues if market oil and gas prices are high
- Adjusts retail rates through tariff provisions
- All revenues will be allocated pro-rata to Standard Offer Suppliers

October 24, 1997                                    10

- Fuel index in total turns any revenues it come in under that get passed through PECO eventually to suppliers.
- If Montaup is the supplier do they share it. Answer: Yes



### Hourly Load Estimation and Losses

- "Top-down" estimation process
  - Company loads via SCADA
  - Proxy day load shapes
  - Actual usage data
  - Allocate classes to Suppliers
  - Sum Suppliers' hourly loads
  - Allocate Standard Offer by percentage shares
- Loss allocations reflect:
  - Primary/secondary
  - Hourly load variations

October 24, 1997                                    11

- Within load have rate class tagged to supplier. SOS shred down.
- Question: Does this get trued up at the end of the month. Answer: yes.



### Load Information

The Companies will make available to all Qualified Bidders:

- 1996 Unitized Class Load Shapes
- 1996 Customer Count by Class
- 1996 Energy Usage by Class

October 24, 1997                                    12

- Question: what is the unitization methodology? Answer: Unitized where peak = 1.
- Comment: Does EUA welcome/willing to share additional info with suppliers? Answer: yes please let us know what additional information you would like to access & we will try to accommodate you.

TCPM 000957



**Load Information**
*(continued)*

Companies will make available to all
Suppliers:
- Daily reports of hourly loads
- Monthly reconciliations
- Annual summaries
- Departing customers

October 24, 1997                    13

- EUA is working on a
  methodology to share w when
  customers will / are likely to
  leave the system so you can
  make adjustments to load forecasts
  accordingly.
- Please let EUA know what else you
  would like to see.



**Departing Customers**

- Companies require 2-day notice from
  customers leaving Standard Offer Service
- One option: Periodic posting of departing
  customers
- No customer-specific information
- E.g., "25 R-1 customers, 3 T-2 customers,
  etc."

October 24, 1997                    14

- MA policy. Need at least 2 days
- will likely provide weekly or
  even daily posting of departing
  customers.
- Will not provide customer specific
  info but may total up use by
  class & then when hit a threshold
  release.



**Term of Service**

- Full-term auction leads to seven-year
  commitment
- Begins on or after the later of the two states'
  Retail Access Dates
- No adjustment to shares, except:
  - *de minimis* loads
  - regulatory or other changes in structure or
    cost-recovery

October 24, 1997                    15

- Under MA agreement — 7 years
- RI runs through 2012
  (sos) however auction is only
  for 7 years at this time.
- Service begins on the
  later of the two retail
  access dates
- Only times your % share may be
  terminated are 1) load goes below —
  sur - 1 mw 2) becomes an
  administrative burden

5

TCPM 000958



### Standard Offer Service Recap

- ◆ Responsibility for serving load
- ◆ Fixed percentage shares
- ◆ Seven-year term
- ◆ Capped prices
- ◆ Fuel Index
- ◆ On-going information support

October 24, 1997                                    16

Question: Is there a regulatory
out built into the process —
the contract. Answer: its
in the contract.



### Break

- ◆ Auction Process in Fifteen Minutes

October 24, 1997                                    17



(meet people from Cinergy,
energy services, etc)



### Auction Process

- ◆ Qualification
- ◆ Auction Participation Agreement
- ◆ Auction

October 24, 1997                                    18

Process

6

TCPM 000959



### Qualifications

- Going concerns
- Ability to provide the service
- Financial assurances
- Standing with states and regional power pool

October 24, 1997                                    19

- Important that company demonstrates that know what doing, can do a good job, now been & will be around.
- Financial allocation of risk



### Qualification Submittal Package

- Complete Package due November 14
- $1,000 Non-refundable fee
- General corporate information
- Financial Statements
- References, Experience, Authority

October 24, 1997                                    20

- Cash, letter of credit, other financial instruments



### Qualification Submittal Package
*(continued)*

- Commitment to provide Bid Deposit
- Commitment to provide Performance Surety
- NEPOOL Participation
- State registration
- Comments on Standard Offer Service Agreement
- Notification by December 5

October 24, 1997                                    21

- performance surety largest $ item
- kicks in w/ SOS itself
- prefer membership in NEPOOL or min. read agreement
- registration requirements with state still fuzzy.
- still opportunities to refine terms of deal → looking for comments



### Auction Participation Agreement

- Available with Final Auction Rules
- Three main provisions:
  - Abide by Final Auction Rules
  - Abide by decisions of Auctioneer
  - Commit to execute Agreement if successful
- Must be accompanied by Bid Deposit

October 24, 1997                    33



send with Final auction
rules (agreement)



### Auction Design

- 100 Shares of Load Responsibility
- Separate full-term and single-year auctions
- Ascending-clock auction

October 24, 1997                    35



If Full term does not
procure 100% then have
single years to fill-in gap



### Full-Term Auction

- Fixed percentage of load over seven years
- Single percentage discount applied to all years

October 24 1997                    36

Question: Are you projecting
that after 7 years the
load will go to zero?
Answer: not necessarily,
the Key is the provision for
SOS in MA expires in 7 yrs.

8

TCPM 000961



### Eligibility - Full-Term

- Bid Deposit = $180,000/percentage share
- Surety = $1,800,000/percentage share
- Eligibility is the lesser of (Bid Deposit / $180,000) or (Surety / $1,800,000)
- Expressed in percentage shares

October 24, 1997                                           25



### Ascending-Clock Auction

- Discount stated by the auctioneer
- Bidders respond with desired shares
- Clock increases if total shares exceeds 100
- Bid increments determined by auctioneer
- Bidders may decrease shares bid as clock ascends, but may not increase
- Auction ends when total shares bid is less than 100

October 24, 1997                                           26

### Ascending Clock Example

| Round | Discount | Total Shares Bid |
|-------|----------|------------------|
| 1 | 0% | 200 |
| 2 | 1% | 160 |
| 3 | 2% | 135 |
| 4 | 3% | 115 |
| 5 | 3.5% | 108 |
| 6 | 4% | 101 |
| 7 | 4.5% | 97 |

October 24, 1997                                           27

- Surety amounts decrease as bad decreases. Not a fixed amount
- Once sign contract, performance surety set on contract
- Question: who holds the deposit? Answer: EUA.
- Question: if something happens to EUA do we lose it. Answer? Possibly yes. Reason may not want to give cash.
  - Start at 0%, then discount increase 1% at a time (or .5%) until below 100%.
  - you may back down on the # of shares you want but can not increase. Therefore bid at outset critical. You should bid the highest % you want.

- Question? If you get greater then 100 shares in the full-term will the single term (year) take place? Answer: No.
- Question: what if return 100 at 0% but 0 at 8%? Answer: No discount required. Issue all shares out at 0% discount.
- What about the generation company? Answer: The generation company is free to bid in the

9

TCPM 000962



### Standard Offer Service Agreement

- ◆ Within ten days:
  - ◆ Provide performance surety
  - ◆ Execute Standard Offer Service Agreement
- ◆ Failure to provide surety and/or execute will result in forfeiture of Bid Deposit

October 24, 1997                    30



### Single-Year Auction

- ◆ For shares not sold in full-term auction
- ◆ Same ascending-clock process
- ◆ Seven auctions proceeding simultaneously

October 24, 1997                    39

- Clock every 7 years. Idea is that EUA believes the load for SOS is shrinking.
- Each year runs independently.



### Eligibility - Single-Year

- ◆ Bid Deposit and Performance Surety amounts vary across the seven years

|      | Deposit $/Share | Surety $/Share |
|------|-----------------|----------------|
| 1998 | 45,000          | 450,000        |
| 1999 | 39,000          | 390,000        |
| 2000 | 32,000          | 320,000        |
| 2001 | 26,000          | 260,000        |
| 2002 | 19,000          | 190,000        |
| 2003 | 13,000          | 130,000        |
| 2004 | 6,000           | 60,000         |

October 24, 1997                    39

① - if add up 7 years get 1.8.

10

TCPM 000963



### Eligibility - Single-Year

- "Eligibility" is thus described in dollars of bid deposit or performance surety

| | | | Deposit |
|---|---|---|---|
| 10% year 1 | 10 x $45,000 | = | $450,000 |
| 10% year 2 | 10 x $39,000 | = | $390,000 |
| 10% year 7 | 10 x $6,000 | = | $60,000 |
| | | | $900,000 |

- Corresponding Performance Surety is $9,000,000
- Eligibility is adjusted for any shares won in the full-term auction

October 24, 1997                                        16

Question: Do I tell you what 1/2 per year I want or do I give you a lump sum? You give a deposit, then as bid EUA makes sure you don't exceed that. You don't need to declare upfront how you intend to bid. EUA wants you to have flexibility.



### Eligibility - Single-Year

- $900,000 of Bid Deposit Eligibility = up to
  - 20% Year 1 ($900,000 / $45,000); or
  - 23% Year 3 ($900,000 / $39,000); or
  - 28% Year 3 ($900,000 / $32,000); or
  - 34% Year 4 ($900,000 / $26,000); or
  - 47% Year 5 ($900,000 / $19,000); or
  - 69% Year 6 ($900,000 / $13,000); or
  - 100% Year 7 ($900,000 / $6,000)

October 24, 1997                                        22



### Single-Year Auction

- Four introductory rounds
  - 25% minimum activity increments
  - Allows bidders to gauge level of activity
  - Once bid in a given year, cannot switch
- Each year closes as shares bid drops below the amount available

October 24, 1997                                        23

- Once you commit to being in any one of the given years, you can not switch.

11

TCPM 000964

## Single-Year Auction Example

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |  |
|---|---|---|---|---|---|---|---|---|
| Deposit | 45k | 39k | 32k | 26k | 19k | 13k | 6k | Activity |
| Round 1 |  |  |  |  | 10% |  |  | $190,000 |
| Round 2 |  |  |  | 8% | 10% |  |  | $398,000 |
| Round 3 |  |  | 7% | 16% | 10% |  |  | $830,000 |
| Round 4 |  |  | 7% | 16% | 10% |  |  | $830,000 |
| Round 5 |  |  | 7% | 10% | 10% |  |  | $674,000 |
| . |
| . |

October 24, 1997                                                                           38

## Single-Year Auction Example
*(continued)*

Initial Eligibility: $900,000



|  |  | Activity | Reduction | Eligibility |
|---|---|---|---|---|
| Round 1 | 25% Min. | $225,000 | $190,000 | $35,000 | $865,000 |
| Round 2 | 50% Min. | $432,500 | $398,000 | $34,500 | $830,500 |
| Round 3 | 75% Min. | $622,875 | $830,000 | $0 | $830,500 |
| Round 4 | 100% Min. | $830,500 | $830,000 | $500 | $830,000 |
| Round 5 | 100% Min. | $830,000 | $674,000 | $156,000 | $674,000 |

October 24, 1997                                                                           39

- IF exceed the minimum, EUA does not decrease your eligibility. IF below eligibility, then your eligibility will be decreased moving forward.

## Our Questions

- Load Information - content and frequency
- Customer Migration - content and frequency
- Standard Offer Service Agreement
- Remote vs. On-site auction
- Timing of auction with respect to Retail Access Date

October 24, 1997                                                                           36

- what do you think? (room silent)

12

TCPM 000965

*STANDARD OFFER SERVICE*

Questions and Comments

*Thank You*

♦ Direct any additional comments or questions to:

Peter Fuller
pfuller@nua.com

October 24, 1997                                    33

- Question 3: does the generation company face similar terms w/ respect to price, etc. to us. Answer: yes.
- Question: Does Montaup have the same deal w/ Fuel adjustment. Answer: Yes.
- Question: Can we opt to serve in one particular state (RI or MA) Answer: N. you do not get particular customers you get ... e of the ng regulated load.

TCPM 000966

**Tab 33**

1

1    STATE OF RHODE ISLAND

2    AND PROVIDENCE PLANTATIONS

3    PUBLIC UTILITIES COMMISSION

4

5

6    HEARING IN RE:

7    NARRAGANSETT ELECTRIC COMPANY
     STANDARD OFFER RATE TARIFF FILING

8
     DOCKET NO. 3508
9
     - - - - - - - - - - - - /

10
                              MAY 28, 2003
11                            10:00 A.M.

12                            89 JEFFERSON BOULEVARD
                              WARWICK, RHODE ISLAND

13

14

     BEFORE THE COMMISSION:
15
         ELIA GERMANI, CHAIRMAN
16       KATE F. RACINE, COMMISSIONER
         ROBERT HOLBROOK, COMMISSIONER
17
         CYNTHIA WILSON, LEGAL COUNSEL
18       ALAN NAULT, RATE ANALYST

19
     APPEARANCES:
20

21   FOR THE COMPANY:     TERRY SCHWENNESEN, ESQ.

22   FOR THE DIVISION:    PAUL ROBERTI,
                          ASSISTANT ATTORNEY GENERAL
23
     FOR THE DEPT.
24   OF THE NAVY:         AUDREY VAN DYKE, ESQ.



A-1 COURT REPORTERS, INC.
(401) 333-3381



2

1                           I-N-D-E-X

2                                           PAGE NO.

3

     HENRY SHELTON

4    Statement                                10

5

6

7    JEANNE A. LLOYD    MICHAEL J. HAGER

8    Direct Examination by Ms. Schwennesen    24
     Cross-Examination by Mr. Roberti         37
9    Examination by Ms. Wilson                37
     Examination by Mr. Nault                 83
10   Further Examination by Ms. Wilson        91

11

12   DR. JOHN STUTZ

13   Direct Examination by Mr. Roberti        98
     Examination by Ms. Wilson               101
14   Examination by Commissioner Racine      118
     Examination by Commissioner Holbrook    121

15

16

17

18

19

20

21

22

23

24

3

1                        E-X-H-I-B-I-T-S

2        EXHIBIT NO.                           PAGE NO.
                                                 FULL
3
                        FOR THE COMPANY
4
         1    Filing of April 14, 2003            30
5
        1A    Testimony and exhibits of
6             Jeanne a. Lloyd                     30

7       1B    Revised Schedules JAL-2,
              JAL-5 submitted on 5/28/03          30
8
        1C    Testimony and exhibits of
9             Michael J. Hager                    30

10       2    Updated Schedules JAL-1, JAL-2
              MJH-4 and Commission Data
11            Requests 1-5B and 1-7              33

12       3    Chart entitled Narragansett
              Electric Company alternative
13            Calculation of Proposed Standard
              Offer Charge                        37
14

15

16                     FOR THE DIVISION

         1    Direct testimony of Dr. John
17            Stutz dated May 21, 2003           101

18

19                     FOR THE COMMISSION

20      1-7   Data request responses to
              Commission Data Requests 1
21            through 7                           97

22

23

24

                    A-1 COURT REPORTERS, INC.
                        (401) 333-3381

1    sure other people have questions for these

2    witnesses.

3              MR. NAULT:  Ready to go?

4    EXAMINATION BY MR. NAULT

5              MR. NAULT:  Earlier, I'm not sure if it

6    was you, Ms. Lloyd, or you, Mr. Hager, indicated

7    that a seven-month rate would provide some

8    stability for the ratepayers.  I would agree with

9    that statement if your fuel projections, you

10    could be sure that those fuel projections would

11    be accurate to the end of the year.  My thought,

12    though, is that if your fuel projections aren't

13    accurate and rates prove -- continue to be

14    volatile, would you agree it gives a false sense

15    of stability because you also mentioned the need

16    to monitor if it's a seven-month rate, a 5.5 cent

17    rate and if it looks like a large over or

18    undercollection to come in and modify that rate,

19    so would you be sending a false sense of

20    stability with the seven-month rate?

21              MR. HAGER:  I don't know if I'd say it

22    is a false sense of stability if you look at

23    where we were when we set these rates at a

24    year-and-a-half ago, 17 months ago where we knew

A-1 COURT REPORTERS, INC.
(401) 333-3381

84

1    that our expected costs were less than the rate

2    that we were setting for the second year, the

3    rate was pretty much equal to what our expected

4    costs were and for the third year our procurement

5    costs would be greater than the rate that we're

6    establishing for customers and we would use the

7    money that we overcollected in the first year.

8    So I hesitate to say it's a false sense of

9    security, I'd say it's not inconsistent with the

10   policy decision that was made to establish a

11   three-year rate.

12            MR. NAULT:  Wasn't that made in an

13   environment where the fuel prices weren't as

14   volatile as they are today?

15            MR. HAGER:  It was made at a time when

16   we didn't anticipate the level of fuel expenses

17   that we've been seeing over the last several

18   months.

19            MR. NAULT:  Okay.  Exhibit 3 where you

20   present three alternatives, the June rate, five

21   cents, 5.2 or 5.4, do you have or could you get

22   us a bill analysis of what that affect would have

23   on a typical bill across the customer classes?

24            MS. LLOYD:  Sure.  Of each alternative

1    or of the three?

2           MR. NAULT:  Probably all three would be

3    helpful if that's possible.

4           THE CHAIRMAN:  I don't want to

5    interrupt your data request, but would it be even

6    more helpful if we had typical billing for those

7    months of the year which it's going to be in

8    effect?  I don't know if you have such an animal,

9    but we're coming in the air conditioning season.

10          MR. NAULT:  Are you saying rates vary

11    from month to month?

12          THE CHAIRMAN:  Yes.

13          MR. NAULT:  How complicated is that

14    calculation process?

15          MS. WILSON:  Answering that question,

16    understanding that the open meeting for this

17    docket is at ten o'clock on Friday.

18          MS. LLOYD:  Yes; we can try to comply.

19    Would you just state again exactly what you would

20    like me to do?  To provide a typical bill

21    analysis for each rate class with rates that --

22          THE CHAIRMAN:  My view would be

23    residential, I'm just thinking my own bill.  I

24    know the fluctuations it's low in December, it's

86

1        high in the summer, so my sense of the usage, the
2        maximum usage I have is July and August.
3                    MS. LLOYD:  I understand.  So for a
4        customer whose usage varies by month going into
5        the season, what the effect would be?
6                    THE CHAIRMAN:  Yes.
7                    MR. NAULT:  I would also be interested
8        in non-residential impacts.  I would imagine most
9        of those are probably fairly stable rates
10       throughout the year.
11                   MS. LLOYD:  Probably for the most part.
12       Some would vary.  Of the same analysis or are you
13       talking about the three scenarios now?
14                   MR. NAULT:  The three scenarios.
15                   MS. LLOYD:  All right.  I'll provide
16       yours for every rate class.
17                   MR. NAULT:  Thank you.  Narragansett
18       has standard offer contracts out to 2009 and
19       there are fuel adjustment clauses attached to
20       those contracts.  But for the record, are those
21       fuel adjustment contracts -- fuel adjustments
22       attachments to the contracts on all territories
23       through 2009?
24                   MR. HAGER:  The standard offer

1    contracts come in two basic varieties.  Contracts

2    associated with what we call the Narragansett

3    zone, that's the Narragansett service territory

4    prior to its merger with EUA, and the contracts

5    in that zone have the fuel adjustment clauses

6    hard wired into those contracts as attachments in

7    part of the pricing provisions.  The other form

8    of contract is in what we call the EUA zone, the

9    service territory of Blackstone Valley Electric

10   Company, Newport Electric Company prior to the

11   merger into Narragansett.  Those forms of

12   contracts, the price sections specify the fixed

13   price components which is identical to the fixed

14   price components in the Narragansett zone

15   contracts.  Rather than have the standard offer

16   fuel adjustment provision as an integral

17   component of the contract there's a reference in

18   the pricing section to the standard offer

19   adjustment provisions that were contained in the

20   former EUA retail company tariffs and the

21   supplier would get the revenues that were

22   collected pursuant to those tariffs.  In May of

23   2000 when we completed the merger the EUA company

24   tariffs ceased to exist and as Narragansett

88

1    assumed the responsibilities under those

2    contracts we notified those suppliers that we

3    would continue to make the fuel adjustment

4    payments pursuant to the terms that were

5    contained in the tariff at the time. So we're

6    making those payments by reference to a tariff as

7    opposed to being part of our attachment to the

8    contract.

9        MR. NAULT: And that will extend

10    through 2009?

11        MR. HAGER: It's Narragansett's opinion

12    that the -- it is a fact that the tariffs at the

13    time of the EUA merger only included fuel

14    adjustment trigger amounts and payments through

15    2004. It's Narragansett's opinion that those

16    suppliers are only entitled to fuel adjustment

17    payments through 2004 and that they cease to

18    those entitlements on January 1, 2005, whereas in

19    the Narragansett zone contracts, those do include

20    trigger payments through 2009.

21        MR. NAULT: So could I very simply say

22    that the fuel adjustment clause component in the

23    EUA zone will cease to exist after 2004?

24        MR. HAGER: That's the position that

1          the company is taking with its suppliers, yes.

2               MR. NAULT:  And if the company's

3     position proves correct, will that mean that the

4     potential amount of fuel adjustment charges,

5     expenses that the company would incur would be

6     reduced, everything else being equal, between --

7     from 2004 to 2005?

8               MR. HAGER:  As of April, 2003 roughly

9     73 percent of our standard offer load was served

10    under Narragansett zone contracts and the other

11    27 percent was served under former EUA contracts.

12    Our hope is that by the time we get out to 2005

13    the trigger levels under which payments will be

14    made, they increase annually, that they are

15    finally at a level that even though we get these

16    extraordinary increases in gas and oil prices

17    that we didn't trigger the payments under the

18    contracts and there are no payments under each

19    form.  However, if we do exceed that trigger

20    amount, we will only be paying fuel amounts on

21    the roughly 73 percent as of today that's covered

22    under the Narragansett contracts and we wouldn't

23    be paying any amounts under the EUA contracts and

24    thus customers will be seeing less fuel expenses

90

1    and they will see lower expenses than they are in

2    today's environment.

3         MR. NAULT:  Okay.  And in a lot of what

4    you just said you said in Narragansett's opinion

5    and the company's opinion.  What about the

6    suppliers' opinion?

7         MR. HAGER:  We've informed them that

8    that's what it is.  We wait to see if they accept

9    our belief or whether they wish to pursue the

10   issue in some manner.

11        MR. NAULT:  But that's still out to

12   debate between Narragansett and the suppliers?

13        MR. HAGER:  I'm not aware of any

14   supplier who disputes that, but I think suppliers

15   are hoping that there's a continuation and it's

16   our opinion that the record should be clear that

17   those payments cease in 2004 and there was no

18   expectation, should have been no expectation on

19   their part at the time that amounts would

20   continue.

21        MR. NAULT:  Okay.  Thank you.  Thank

22   you, both.

23        MS. WILSON:  May I have a follow-up?

24        THE CHAIRMAN:  Sure

1    FURTHER EXAMINATION BY MS. WILSON

2         MS. WILSON:  When did you notify

3    suppliers of this interpretation of the EUA

4    contracts?

5         MR. HAGER:  We have not made formal

6    notification to suppliers.  There has just

7    been -- during the normal course of discussions

8    in business we have made reference to -- in

9    discussing various fuel trigger payments that

10   we've just brought it up in conversations that

11   that condition exists.

12        MS. WILSON:  Just for the record, my

13   concern as Commission counsel is that the

14   Commission has and the Division as well has

15   plenty of clear warning if this is going to

16   become a contested issue and that it not become a

17   short -- a decision that the Commission is being

18   asked to make sometime in the future but in a

19   short period of time.  In other words, if there's

20   a dispute and it results in some sort of

21   agreement that the Commission needs to look at

22   it, I request that the Commission be given

23   sufficient enough time to be able to look at it

24   and the Division be able to fully look at those

1    issues.

2              MR. HAGER:  Should there be a dispute

3    of those issues, we will promptly inform the

4    Commission and Division of such issues.

5              MS. WILSON:  I did want to go back to

6    one issue.  It was Mr. Shelton's issue.  The --

7    Narragansett still has an A-60 rate for low

8    income customers, correct?

9              MS. LLOYD:  That's right.

10              MS. WILSON:  And in looking at JAL-5,

11    Revised Page 4 of 23 it looks like the average

12    A-60 customers without a credit for a water

13    heater uses 380 kilowatt hours per month.

14              MS. LLOYD:  Yes, 380.

15              MS. WILSON:  And it looks like they're

16    starting out with a bill -- an average bill of

17    $33.88 and that with the proposed rate of

18    five-and-a-half cents per kilowatt hour their

19    bill would go up to $37.20 per month as opposed

20    to an A-16 customer which is an average

21    residential customer not on -- not falling into

22    those low income guidelines.

23              MS. LLOYD:  Well, this is based on 380

24    kilowatt hours.

1         MS. WILSON:  Right, but I'm looking at

2    just average versus average customers.

3         MS. LLOYD:  Oh, okay.  Yes.  That would

4    -- I believe the average for an A-60 is probably

5    a little higher than 380, but it is lower than

6    what a regular residential customer would be

7    paying.

8         MS. WILSON:  Now, the current standard

9    offer rate, just to reiterate, has been in effect

10   for about a year-and-a-half now, correct?

11        MS. LLOYD:  Since January, 1, 2002.

12        MS. WILSON:  And this is just -- and

13   this may be an historical question.  Why -- when

14   Narragansett makes a filing to increase the

15   standard offer service rate, why is it increased

16   to the overall rate as opposed to the base rate

17   with the adder of the actual adjustment -- the

18   adjustment amount?  You know, I guess -- just

19   why?

20        MS. LLOYD:  As opposed to establishing

21   two separate components to the rate you mean, a

22   base and a fuel adjustment?

23        MS. WILSON:  Yes.

24        MS. LLOYD:  I think you're right, it's

1   probably just the way we've done it.

2           MS. WILSON:  Occasionally when we talk

3   about competition we talk about price signals.

4   Is it a better price signal to increase the

5   entire rate or to have the base rate plus the

6   adder?

7           MS. LLOYD:  To the extent that

8   customers may look at the pieces separately and

9   get valuable information from that and to the

10  extent that they understand both pieces of the

11  rate, a separate rate may provide a better price

12  signal.  I'm not sure how customers view the

13  rate, if they understand the pieces that make up

14  the rate.

15          MS. WILSON:  I guess, and I'm probably

16  thinking more of commercial customers to whom a

17  market is potentially available right now.

18          MS. LLOYD:  I think the rate is the

19  rate is what they're paying.  They look at it in

20  total.  The fact that the base piece of it is

21  predictable and the schedule may not mean

22  anything because it's really the fluctuation of

23  the fuel piece that is going to make a

24  difference.

95

1          MR. HAGER:  And I believe that the

2    customers that are taking the initiative to go

3    out and shop in the marketplace are smart enough

4    to understand that the prices they're getting

5    from a competitive supplier, comparing that to

6    the cost that they see on the bill and whether

7    it's a single combined number on the bill or two

8    separate components on the bill between hopefully

9    the smartness of the customer and the explanation

10    from the supplier who's trying to win that

11    customer the customer will quickly understand

12    whether it's one piece or two piece, the total

13    amount that they will be avoiding from

14    Narragansett if they choose the supplier and the

15    related savings that the supplier hopefully is

16    offering.

17          MS. WILSON:  Okay.  And with regard to

18    the fuel trigger I guess I'm looking at response

19    to Commission Data Request 1-1.  Even though

20    there may be different provisions for the EUA

21    zone and the former Narragansett zone, with

22    regard to the charge to customers even if the

23    provision ends in the former EUA zone, would you

24    -- if the trigger was hit in 2005, would you

96

1    spread those costs overall customers taking

2    standard offer service?  Or would you

3    differentiate between the two zones?

4         MS. LLOYD:  Currently our standard

5    offer adjustment provision doesn't specify zonal

6    cost accounting of the former EUA versus former

7    Narragansett customers, so I don't think that

8    would be our proposal at this point.

9         MS. WILSON:  And in fact, even though

10   if I look at Mr. Hager's testimony, there is a

11   difference between the two zones and the amounts

12   that would be incurred but it's calculated to all

13   customers.

14        MS. LLOYD:  That's right.

15        MR. HAGER:  For clarity, while the

16   trigger points are identical in both zones, the

17   Narragansett zone uses a 12-month rolling average

18   of gas and oil prices whereas the EUA tariff used

19   a six-month rolling average price.

20        MS. WILSON:  And an analogy, the

21   transition charges under certain circumstances,

22   all customers pay the same transition charge as

23   well, correct?

24        MS. LLOYD:  That's right.  We did

97

1    establish zonal charges as opposed to transition

2    charges and I believe transmission charges after

3    the merger, but there were certain circumstances

4    specified whether those charges became

5    consolidated.

6         MS. WILSON:  And before I forget, I

7    would ask that Commission Data Requests 1-1

8    through 1-7 be made Commission Exhibits 1 through

9    7, please.

10        THE CHAIRMAN:  Any objection?  So

11   ordered.

12             (WHEREUPON, THE EXHIBITS
              WERE RECEIVED IN EVIDENCE)
13

14        MS. WILSON:  Thank you.

15        THE CHAIRMAN:  Commissioner Racine?

16        COMMISSIONER RACINE:  No thanks,

17   Chairman.  I think I'm all set.  I think we've

18   gone through why we have the fuel increase, how

19   directed by the URA, why they're entitled to a

20   refund, what increase, what the amount would be

21   and the reasons for it.  I'm just awaiting Dr.

22   Stutz, Advocacy Section for the ratepayer so we

23   can hear from Dr. Stutz as to the recommended

24   increase, the duration of it, what the impact

98

1    would be on the ratepayer, and most importantly,

2    how he looks at stability in terms of setting the

3    rate and it's impact upon the ratepayer.

4                THE CHAIRMAN:  Commissioner Holbrook,

5    any questions?

6                COMMISSIONER HOLBROOK:  No.

7                THE CHAIRMAN:  You may step down.

8                MR. ROBERTI:  The Division calls -- the

9    Division will call Dr. John Stutz.

10   DR. JOHN STUTZ (Sworn)

11   DIRECT EXAMINATION BY MR. ROBERTI

12   Q.   Would you state your full name and business

13        address for the record please?

14        A.   Yes.  My name is John Stutz.  My business

15        address is the Tellus Institute, Boston.

16   Q.   In what capacity are you testifying here today,

17        Dr. Stutz?

18        A.   As an expert witness on behalf of the

19        Division.

20   Q.   I'm showing you what's been marked as Division

21        Exhibit 1 for identification.  Can you describe

22        that document for me?

23        A.   Yes.  This is my direct testimony that was

24        prefiled.  It was obviously prepared before we

# Tab 34

R.I.P.U.C. NO. 1200
CANCELS NO. 1180

## BLACKSTONE VALLEY ELECTRIC COMPANY
## STANDARD OFFER SERVICE

### AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

### APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

### RATE:

The Rate shall consist of the following charge:

    Energy Charge:        $.03800      per kWh

The foregoing Rate shall be adjusted from time to time in accordance with provisions of the Standard Offer Cost Adjustment described below:

### STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, including all excess payments made to Suppliers in accordance with the Standard Offer Fuel Index provision. Notwithstanding the foregoing, the Company may not recover, without full disclosure and the express approval of the Commission, any costs

Date Filed, December 7, 1999                  Date Effective, January 1, 2000
                                              for consumption on and after
                                              January 1, 2000

**Confidential**                                    **NARR 43040**

R.I.P.U.C. NO. 1200

-2-

of Standard Offer Service in excess of the costs billable under the Settlement Agreement dated October 17, 1997.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month for the purpose of computing payments to Suppliers of Standard Offer Service shall be multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer

Date Filed, December 7, 1999

Date Effective, January 1, 2000 for consumption on and after January 1, 2000

Confidential

NARR 43041

-3-

suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU |
| 2001 | $5.35  per MMBTU |
| 2002 | $6.09  per MMBTU |
| 2003 | $7.01  per MMBTU |
| 2004 | $7.74  per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.  The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

The Company shall pay the Suppliers of Standard Offer Service an amount equal to the incremental revenues the Company would have received from the application of the Fuel Adjustment to retail Standard Offer Service customers applicable to the billing month. The foregoing incremental revenues shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.  The Company shall be authorized to accumulate payments to Suppliers in excess of revenues billed by the Company to customers of Standard Offer Service in the Standard Offer Cost Adjustment reconciliation account.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the Energy Charge as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier

Date Filed, December 7, 1999          Date Effective, January 1, 2000
                                      for consumption on and after
                                      January 1, 2000

Confidential          NARR 43042

R.I.P.U.C. NO. 1200

-4-

of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, December 7, 1999                    Date Effective, January 1, 2000
                                                for consumption on and after
                                                January 1, 2000

Confidential                                    NARR 43043

# Tab 35



PUR Slip Copy                                                                                                                                    Page 1
2001 WL 1823618 (R.I.P.U.C.)
**(Cite as: 2001 WL 1823618 (R.I.P.U.C.))**

                              Re Narragansett Electric Company
                                     Docket No. 3379
                                     Order No. 16731

                          Rhode Island Public Utilities Commission
                                      October 2, 2001

Before Germani, chairman, and Racine and Gaynor, commissioners.

BY THE COMMISSION:

REPORT AND ORDER

I.  BACKGROUND

 *1 The Utility Restructuring Act of 1996, as amended ('URA'), requires each
electric distribution company to arrange with wholesale power suppliers for a
standard power supply offer to sell electricity to all customers at a stipulated
rate. Pursuant to the URA, Narragansett Electric Company ('Narragansett' or
'Company') entered into wholesale Standard Offer supply contracts with the
following prices for the years 1999 through 2003:

 Calendar Year  Price per kWh
 1999            3.5 cents
 2000            3.8 cents
 2001            3.8 cents
 2002            4.2 cents
 2003            4.7 cents
  The wholesale Standard Offer supply contracts also provide for increases in the
price per kilowatt-hour ('kWh') of wholesale power supplied to Narragansett in the
event fuel prices increase above certain levels. To the extent that the total cost
of the wholesale power supply to Narragansett, including fuel charges, exceeds
retail Standard Offer Service ('SOS') and Last Resort Service ('LRS') revenues, the
under-collection is recoverable from Narragansett's retail customers through the
annual reconciliation provisions of the Standard Offer Adjustment Provision
contained in the Company's tariff.

II.  NARRAGANSETT'S FILING

 On August 28, 2001, Narragansett filed with the Rhode Island Public Utilities
Commission ('Commission') a request to decrease the retail SOS rate from the
present rate of 6.302 cents per kWh to 5.5 cents per kWh. Narragansett also
proposed to eliminate the existing Standard Offer Adjustment Factor ('SOAF ') of
.232 cents per kWh which is currently billed to all customers whether or not they
are taking SOS. The Company requested an effective date of October 1, 2001 for the
proposed rate changes. The net result of the proposed rate reductions for a typical
residential customer using 500 kWh per month would be an 8.1% decrease equal to
$5.38 per month. Therefore, the average monthly residential bill would drop from
$66.40 to $61.02. [FN1] In support of the proposed rate decreases, Narragansett
presented the pre-filed testimony of Michael J. Hager, Manager of Distribution

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                                                                      Page 2
2001 WL 1823618 (R.I.P.U.C.)
**(Cite as: 2001 WL 1823618 (R.I.P.U.C.))**

Energy Services for National Grid USA Service Company, and Jeanne A. Lloyd,
Principal Financial Analyst from National Grid USA Service Company.

 In his pre-filed testimony, Mr. Hager explained that the Company's estimated fuel
index adjustment payments for the period April 2001 through December 2001 had been
calculated pursuant to the fuel index adjustment provisions contained in
Narragansett's Standard Offer supply contracts, using the future gas and crude oil
prices reported in the Wall Street Journal on February 21 - 23, 2001. Since then,
however, actual gas prices have fallen, requiring smaller fuel index adjustment
payments than expected between April 2001 and August 2001. Accordingly, for
purposes of calculating the proposed SOS rate reduction, Mr. Hager based the
estimated fuel index adjustment payments for October, November and December 2001 on
the future gas and crude oil prices for these months as reported in the Wall Street
Journal on August 22 - 24, 2001. Consequently, instead of paying an arithmetic
average fuel index adjustment payment of 2.53 cents per kWh for the Narragansett
zone load and 2.44 cents per kWh for the EUA zone load for the period October
through December 2001, as originally projected in February 2001, the Company's
revised arithmetic average fuel index adjustment payment for the same period is
reduced to 1.899 cents per kWh and 0.998 cents per kWh, respectively. [FN2]

 **\*2** In her prefiled testimony, Ms. Lloyd noted that Narragansett's proposed
decrease in the SOS rate is based on a revised estimate of the average cost of SOS
for the period October 2001 through December 2001. [FN3] She explained that the
current SOS rate of 6.302 cents per kWh was approved by the Commission in Docket
3287 on March 29, 2001, after the Company petitioned for a rate increase in order
to avoid a significant under-collection of SOS revenues. The Company based that SOS
rate on projected fuel prices over the nine-month period from April 2001 through
December 2001, because the Company expected its monthly fuel index adjustment
payments to increase through July 2001, and then decrease through the end of the
year. [FN4]

 As of March 31, 2001, there was a projected under-recovery in SOS revenues of $2.3
million, because Narragansett had underestimated gas and oil prices in Docket 3243.
However, because fuel prices have in fact turned out to be lower than estimated in
Docket 3287, Narragansett has now determined that the entire under-collection ($1.9
million balance remaining as of September 1, 2001) will be recovered as of
September 30, 2001. [FN5] As a result, Narragansett estimates that, if the current
SOS rate of 6.302 cents per kWh is continued, an SOS revenue over -collection of
approximately $15.8 million would accumulate by December 31, 2001. [FN6]

 Ms. Lloyd testified that Narragansett's proposal to reduce the SOS rate to 5.5
cents per kWh would have the effect of avoiding the accumulation of a significant
SOS revenue over-collection while still providing consumer protection in the event
of an increase in fuel prices. Thus, if prices during the months of October through
December 2001 follow the estimates, Narragansett still anticipates an over-recovery
of approximately $1.65 million in SOS revenues as of December 2001. However,
Narragansett expressly endorses this approach as providing 'a reasonable cushion
that allows the Company to reduce the [SOS] rate, while at the same time providing
'insurance'' against the need for a rate increase early next year in the event that
actual fuel prices turn out to be higher than anticipated. Any actual over-
collection that may occur will be credited or refunded to customers through the
Standard Offer reconciliation mechanism. [FN7] Mr. Hager added that the revised SOS
rate of 5.5 cents is very close to the Last Resort Service ('LRS') rate of 5.674

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                      Page 3
2001 WL 1823618 (R.I.P.U.C.)
**(Cite as: 2001 WL 1823618 (R.I.P.U.C.))**

cents per kWh recently procured by the Company for the period September 2001
through February 2002. [FN8]

At this time, Narragansett is also proposing to eliminate the SOAF of 232 cents
per kWh, previously approved by the Commission in Docket 3138. The SOAF was
implemented for usage on and after October 1, 2000, to recover over a twelve-month
period the combined SOS and LRS revenue under-collections of some $16 million that
had accumulated during the period January 2000 through September 2000. Because the
entire under-collection will now be recovered as of September 30, 2001, as planned,
the SOAF is no longer necessary. In fact, the Company estimates that there will be
a modest over-collection from the SOAF of $415,736 at September 30, 2001. Any
actual over-collection will be reflected in the base reconciliation in the month of
October 2001 and be used to offset any future under-recoveries in those
reconciliations. [FN9]

III.  DIVISION

*3  In response to the Company's filing, on September 13, 2001, the Division of
Public Utilities and Carriers ('Division') submitted a Memorandum prepared by David
R. Stearns, a Division Rate Analyst. [FN10] The Division noted that the current
standard offer rate had become effective on April 1, 2001 for the purpose of
collecting the estimated cost of SOS for the period April 2001 through December
2001. [FN11] The Division further noted that Narragansett's proposal of 5.5 cents
per kWh represented a reduction of .802 cents per kWh, or 12.7%, compared to the
current rate of 6.302 cents per kWh. [FN12]

The Division also noted that the SOAF had been implemented on October 1, 2000 to
collect an under-recovery of SOS and LRS costs, totaling some $16 million, that had
accumulated between January 2000 and September 2000. However, the Division pointed
out, Narragansett was now projecting an over -recovery from the SOAF of $415, 736
at September 30, 2001. [FN13]

In conclusion, the Division recommended that the Commission approve Narragansett's
proposal to decrease the SOS rate to 5.5 cents per kWh and to eliminate the SOAF.
The Division stated that it had 'performed an analysis, based upon the base
Standard Offer cost per kWh to Narragansett in 2002 and the 2002 Fuel Trigger Point
in the Standard Offer Supply contracts, along with forecasted fuel prices as of
[September 13, 2001].' The Division pointed out that, even with the scheduled
increase in Standard Offer base cost to Narragansett from 3.8 cents to 4.2 cents
per kWh in 2002, due to lower expected fuel costs and the contractual increase in
the Fuel Trigger Point from $5.35 to $6.09 in 2002, a reduction of the SOS rate to
5.5 cents would 'adequately recover Standard Offer fuel costs during 2002'. [FN14]
Therefore, the Division recommended that the proposed SOS rate reduction to 5.5
cents per kWh be approved for Standard Offer sales on and after October 1, 2001,
and that the SOAF be eliminated as of that date, as well. [FN15]

IV.  HEARING

Following notice, a public hearing was held at the Commission's offices, 89
Jefferson Boulevard, Warwick, Rhode Island, on September 20, 2001. The following
appearances were entered:

FOR NARRAGANSETT: Ronald T. Gerwatowski, Esq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                              Page 4
2001 WL 1823618 (R.I.P.U.C.)
**(Cite as: 2001 WL 1823618 (R.I.P.U.C.))**

   FOR DIVISON: Paul J. Roberti, Esq. Assistant Attorney General

   FOR COMMISSION: Cynthia G. Wilson, Esq. Senior Legal Counsel

At the hearing, Mr. Hager and Ms. Lloyd testified on behalf of Narragansett. Each witness adopted his or her respective pre-filed testimony and was subject to cross-examination. Under questioning by the Commission, Mr. Hager acknowledged that because fuel prices have continued to drop since the date of the Company's filing, if conditions remain stable for the remainder of the year, Narragansett could expect to have an SOS revenue over-recovery of almost twice that estimated at the time of the filing, or approximately $3 million by December 31, 2001. However, Mr. Hager cautioned that because of recent world events (i.e., the September 11 terrorist attack on the World Trade Center in New York City) and the prospect of impending military action by the United States in the Middle East, current estimates are somewhat unreliable.

**\*4** Therefore, Mr. Hager and Ms. Lloyd testified, it was Narragansett's position that it would be more prudent to set the SOS rate at 5.5 cents per kWh, with an anticipated revenue over-recovery, than to set the rate lower and risk an under-recovery. Ms. Lloyd testified that setting the SOS rate at 5.5 cents provided a reasonable 'cushion' to insulate consumers from another rate increase in the event fuel prices were to rise over the next three months. Ms. Lloyd and Mr. Hager agreed that even if fuel prices did rise significantly, there might be no further need to change the SOS rate. Furthermore, they acknowledged that 'optimistically,' if fuel prices remain stable, consumers could see a further SOS rate decrease to 4.7 cents per kWh as early as January 2002.

The Division presented Mr. Stephen Scialabba, Chief Accountant for the Division, as its witness at the hearing. Mr. Scialabba testified that he had reviewed the Memorandum submitted to the Commission by Mr. Stearns and that he agreed with its findings and recommendations. He then adopted the Memorandum as his own pre-filed testimony in this matter. Mr. Scialabba also relied on several documents introduced as Division exhibits during his testimony. He provided the Commission with the most recent NYMEX gas prices. [FN16] He also provided the Commission with industry commentary upon which he relied in reaching his opinion that there should be a decrease in the SOS rate to 5.5 cents per kWh. [FN17] He testified that the industry analysis indicated that oil and gas prices were likely to continue to decrease more than originally expected during the fall of 2001. Therefore, he concurred with the Company that, even at the lower SOS rate of 5.5 cents per kWh, Narragansett could expect a greater over-recovery than initially anticipated. He also agreed with Narragansett that a further SOS rate reduction would be warranted as early as January 2002, if there are no significant changes in the oil and gas price trends. However, he also cautioned the Commission not to be overly aggressive in reducing the SOS rate, given the uncertainty created by recent world events. Under questioning by the Commission, Mr. Scialabba stated that the Division considered a projected SOS over-recovery in excess of $5 million to be significant enough to warrant a rate reduction. However, he also indicated that the projected over-recovery associated with an SOS rate of 5.5 cents per kWh fell below that level.

COMMISSION FINDINGS

Immediately following the close of the hearing on September 20th , the Commission publicly deliberated the evidence and testimony presented regarding the rate filing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in this docket. In a bench decision rendered the same day, the Commission voted unanimously to approve the Company's proposal to reduce the SOS rate to 5.5 cents per kWh and eliminate the SOAF, effective October 1, 2001, as just and reasonable and in the best interests of the ratepayers.

The Commission is pleased that the Company's Standard Offer customers will now be able to reap the rewards of the tough choices the Commission had to make in raising the SOS rate five times over the last nine months. The Commission recognizes that it was difficult for Narragansett and the Division to appear before the Commission several times to ask for rate increases in order to keep up with the unprecedented increases in fuel index adjustment payments associated with the provision of SOS during this period.

**\*5** However, ratepayers will now benefit from the diligent efforts of the Company and the Division to avoid a substantial under-collection of SOS costs which, if deferred, would have resulted in significant amounts (including interest) now owing to Narragansett. Because of the incremental SOS rate increases we approved during the period July 2000 through April 2001, this Commission is now in the position to approve the first of what it hopes will be future incremental decreases in the SOS rate, if current forecasts of oil and gas prices remain accurate. [FN18]

We also find that, because the SOS/LRS under-collection that accumulated during the period January 2000 through September 2000 will be recovered in its entirety as of September 30, 2001, the SOAF is no longer necessary, and approve its elimination effective October 1, 2001.

Accordingly, it is hereby

(16731) ORDERED:

1. Narragansett Electric Company's proposed retail Standard Offer Service Rate of 5.5 cents per kWh is approved to become effective for usage on and after October 1, 2001.

2. Narragansett Electric Company's proposed elimination of the Standard Offer Adjustment Factor of 0.232 cents per kWh is approved to become effective October 1, 2001.

3. Narragansett Electric Company shall comply with all other findings and instructions as contained in this Report and Order.

EFFECTIVE AT WARWICK, RHODE ISLAND PURSUANT TO A UNANIMOUS BENCH DECISION ON SEPTEMBER 20, 2001. WRITTEN ORDER ISSUED OCTOBER 2, 2001.

Seal

FOOTNOTES

FN1 Narragansett Ex. 1B, Pre-filed testimony of Jeanne A. Lloyd, pp. 8-9.

FN2 Narragansett Ex. 1A, Prefiled testimony of Michael Hager, pp. 4-7, and Ex. MJH-3.

FN3 Narragansett Ex. 1B, Prefiled testimony of Jeanne Lloyd, p. 3.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy                                                            Page 6
2001 WL 1823618 (R.I.P.U.C.)
**(Cite as: 2001 WL 1823618 (R.I.P.U.C.))**


FN4 See  Commission Order 16651  (issued July 10, 2001), pp. 1-2.

FN5 Narragansett Ex. 1B, pp. 6-8.

FN6 Id., at 6.

FN7 Id., at 5-7.

FN8 Narragansett Ex. 1A, p. 7.

FN9 Narragansett Ex. 1B, pp. 7-8.

FN10 Division Exhibit 1, Memorandum dated 9/13/01, p. 1.

FN11 Id.

FN12 Id.

FN13 Id., at 2.

FN14 Id. In fact, the Division went on to predict that if the current fuel price
forecast is accurate and conditions remain static, 'there may well be an
opportunity for a further reduction in the Standard Offer Retail rate in 2002.'

FN15 Id.

FN16 Division Exhibit 2.

FN17 Division Exhibits 3 and 4.

FN18 The Commission notes that the average residential customer's monthly electric
bill, which was $61.92 in December 1997, will now be reduced to $61.02, or a
decrease of 1.5%.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.