UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

Civil Action No. 05-40076FDS

TRANSCANADA POWER MARKETING LTD.

Plaintiff,

v.

THE NARRAGANSETT ELECTRIC COMPANY

Defendant.

**AFFIDAVIT OF CHANDA L. KELLEY**

I, Chanda L. Kelley, being sworn under oath, depose and state as follows:

1. I am a paralegal at the law firm of Bowditch & Dewey, LLP and participated in the production of documents by The Narragansett Electric Company in this matter.

2. Attached hereto as Exhibit A is a true and accurate copy of Deposition Exhibit No. 36 which is a letter from Alexander Pourbaix, Vice President of Power and Projects of TransCanada Power to Salomon Brothers Inc. dated September 9, 1997 containing the preliminary proposal to assume Montaup Electric Company's unit power agreements for Ocean State Power and Ocean State Power II.

3. Attached hereto as Exhibit B is a true and accurate copy of Deposition Exhibit No. 31 which is the Standard Offer Service Tariff Advice issued by EUA and dated November 1997.

4.    Attached hereto as Exhibit C is a true and accurate copy of the Standard Offer Service Agreement between Montaup Electric Company and Blackstone Valley Electric Company dated December 23, 1997 which was maintained in the files of National Grid, USA and produced in this matter at Narragansett 06372 – 06392.

5.    Attached hereto as Exhibit D is a true and accurate copy of the Standard Offer Service Agreement between Montaup Electric Company and Newport Electric Corporation dated December 23, 1997 which was maintained in the files of National Grid, USA and produced in this matter as Narragansett 06393 – 06413.

6.    Attached hereto as Exhibit E is a true and accurate copy of Deposition Exhibit No. 50 which is EUA's responses to the First Set of Record Requests of RIPUC dated May 12, 1998 for Blackstone Valley Electric Company and Newport Electric Corporation.

7.    Attached hereto as Exhibit F is a true and accurate copy of Deposition Exhibit No. 184 containing a standard offer filing in April 1998.

8.    Attached hereto as Exhibit G is a true and accurate copy of Deposition Exhibit No. 122 which is a copy of the Request for Qualifications published by EUA on or about October 30, 1998, produced in this matter by TransCanada.

9.    Attached hereto as Exhibit H is a true and accurate copy of Deposition Exhibit No. 111 which is a letter dated April 18, 2000 from Michael Hirsh to Sean McMaster.

10.    Attached hereto as Exhibit I is a true and accurate copy of Deposition Exhibit No. 187 which is a letter from Michael Hager to TransCanada dated March 31, 2005.

11.    Attached hereto as Exhibit J is true and accurate copy of Deposition Exhibit No. 29 which is a redacted copy of the Request for Qualifications by EUA on or about August 29, 1997.

12.     Attached hereto as Exhibit K is a true and accurate copy of Deposition Exhibit No. 30 which is a draft copy of the Request for Qualifications by EUA on or about September 18, 1997.

13.     Attached hereto as Exhibit L is a true and accurate copy of Deposition Exhibit 20 which is a letter from Counsel for Montaup Electric Co. to FERC filing Offers of Settlement.

14.     Attached hereto as Exhibit M is a true and accurate copy of Deposition Exhibit 74 containing the Standard Offer Service Tariffs of Blackstone Valley Electric Company and Newport Electric Company filed on or about July 17, 1998 in accord with RIPUC Docket No. 2716, Order No. 15640.

15.     Attached hereto as Exhibit N is a true and accurate copy of Deposition Exhibit 88 which is memorandum and letter dated October 29, 1999 attaching the proposed Standard Offer Tariff Advice Filing for Blackstone Valley Electric Company and Newport Electric Corporation.

16.     Attached hereto as Exhibit O is a true and accurate copy of Deposition Exhibit 89 which is a memorandum and letter dated December 1999 attaching the EUA's request to RIPUC to consider alternative Standard Offer Service tariffs.

17.     Attached hereto as Exhibit P is a true and accurate copy of Deposition Exhibit 105 containing the Analysis of Eastern Utilities Associates' Standard Offer Service Backstop Obligation.

18.     Attached hereto as Exhibit Q is a true and accurate copy of Deposition Exhibit 202 which is a memorandum from Pourbaix to Robert Hodgins dated February 26, 1998 regarding the Divestiture by EUA of its Power Purchase Agreement with Ocean State Power.

19. Attached hereto as Exhibit R is a true and accurate copy of Deposition Exhibit 145 which is National Grid U.S.A.'s Responses to the First Set of Discovery Requests of TCPM dated August 30, 2002.

20. Attached hereto as Exhibit S is a true and accurate copy of RIPUC's Report and Order dated December 13, 2004.

Signed under the pains and penalties of perjury this 12th day of September, 2007.

/s/ Chanda L. Kelley
Chanda L. Kelley

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 12, 2007.

*/s/ Vincent F. O'Rourke, Jr.*
Vincent F. O'Rourke, Jr.

# EXHIBIT A



EXHIBIT
PENGAD 800-631-6989
36

TransCanada

TransCanada Power

3400, 237 - 4th Avenue S.W.
Calgary, Alberta, Canada T2P 5A4
Telephone: (403) 213-3100
Fax: (403) 213-3111

September 9, 1997

Salomon Brothers Inc.
Seven World trade Center
30th Floor
New York, NY 10048

Fax No: (212) 783-4166

Attention: Mr. Kevin M. Sisson

Dear Sir:

Re: TransCanada Energy Ltd. ("TransCanada") preliminary proposal to acquire certain assets of Eastern Utilities Associates ('EUA")

TransCanada, an indirect, wholly owned subsidiary of TransCanada Pipelines Limited ("TCPL") is pleased to submit the following preliminary proposal to assume Montaup Electric Companies ("Montaup(s)") unit power agreements for Ocean State Power and Ocean State Power II (each a "PPA" and collectively the "PPA's").

1. Consideration

In consideration of assuming the PPA's, TransCanada will require EUA to pay the following annual support payments for each of the remaining contract years of the PPA terms.

| Year* | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Support Payment (MM) | 21 | 21 | 21 | 21 | 14 | 14 | 14 | 14 | 14 | 12 | 12 | 12 | 12 |

* Assumes January 2, 1999 transaction closing date. If closing occurs later, support payment will be reduced proportionately.

2. Description of Bidding Entity

a) TCPL:

TCPL is one of North America's leading transporters and marketers of energy commodities with assets in excess of $12.6 billion and 1996 earnings of $385 million. The Company owns and operates a 8,700 mile natural gas pipeline system which transports 7.8 Bcf/day of natural gas from Alberta to markets United States and Canada. In addition, TCPL is affiliated with several Canadian and U.S. regional pipelines and through TransCanada, has complementary business in energy marketing and trading, gas fueled electric power generation, gas liquids extraction and gas storage.

TCPL has extensive experience managing large scale transactions. Recent TCPL transactions have included:

i) TransCanada Power, L.P. (June, 1997) - $475 million offering;
ii) Enron Louisiana Gas Processing Assets (January, 1997) - $210 million;
ii)i Paiton Power Project (December, 1996) - Purchase Price Confidential:
iv) Cibola Marketing Companies (September, 1996) - Purchase Price Confidential
v) Alberta Natural Gas (March, 1996) - $367 million; and

TCPL's experience with acquisitions and substantial internal resources will ensure the transaction contemplated herein will be completed in an expeditious manner.

b) TransCanada:

TransCanada will be the bidding entity for the preliminary proposal. TransCanada is responsible for all of TCPL's power generation and marketing activities in North America. TransCanada, in its power division, employs or manages over 150 operations, technical and commercial staff in offices in Calgary, Toronto, Houston and New England.

TransCanada is a FERC authorized power marketer and is active in most NERC regions including NPCC, MAAC and ECAR. TransCanada also manages TCPL's three Ontario power plants. TransCanada is a 40% equity owner of OSP I and OSP II and is contracted to the Ocean State Partnership to manage and administer Ocean State for a term of seven years ending January 1, 2003.

3) Financing

The proposal is not subject to financing.

4) Conditions Precedent / Approvals

This preliminary proposal is subject to the following conditions precedent:

a) Approval of senior management and Board of Directors of TCPL. Such approval will be sought after completion of due diligence and all other conditions set out below.

b) Execution on or before closing of all formal agreements encompassing the terms contained in this proposal, together with such other terms and conditions negotiated and agreed on by the parties.

c) TransCanada having completed the due diligence enquiries referred to below to its satisfaction.

d) TransCanada and/or EUA having received such third party consents and approvals as required by law or by contract. TransCanada anticipates it may be required to file pre-merger notification under the Hart-Scott-Rodino Act which will require a minimum 30 day waiting day period.

e) TransCanada and EUA agreeing to the form and type of security for EUA's obligations to make the support payments.

5) Additional Information / Due Diligence

If the transaction is structured as an assignment of the PPA's, TransCanada does not require any due diligence review related to the PPA's. If TransCanada will be required to assume a portion of EUA's Standard Offer obligations, enter into Short -Term Transitional Power Contracts, or if the terms of the transaction is materially different from that contemplated herein, TransCanada will require due diligence review on these items.

6) Outside Advisors

TransCanada has not retained any outside advisors.

7) TransCanada Contact

Please direct all inquires regarding this preliminary proposal to the writer at the following address:

Alexander J Pourbaix
Vice President
Power and Projects
3400, 327 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4
Telephone: (403) 213-5692
Fax: (403) 213-3538

TransCanada is pleased to be offered the opportunity to participate in EUA's restructuring process. We believe that our unique position as Administrator/Manager and equity owner at Ocean State places TransCanada in the best position to minimize EUA's stranded costs associated with the PPA's. We further believe that our preliminary proposal confirms this.

We look forward to the opportunity to conclude a successful transaction with EUA.

Yours truly,

Alexander J. Pourbaix
Vice President
Power and Projects

Salomon bros.ltr/bmo

# EXHIBIT B

**PART 1 OF 2**



PENGAD 800-6
31

# Standard Offer Service
# Tariff Advice

**November 1997**

State of Rhode Island and Providence Plantations
Public Utilities Commission

Eastern Utilities
Blackstone Valley Electric
Newport Electric

Confidential

NARR 42415

# Standard Offer Service
# Tariff Advice

November 1997

State of Rhode Island and Providence Plantations
Public Utilities Commission

Eastern Utilities
Blackstone Valley Electric
Newport Electric

Eastern Utilities
Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

November 7, 1997

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

Re: Blackstone Valley Electric Company
Newport Electric Corporation
Standard Offer Service Tariff Advice

Dear Ms. Massaro:

Enclosed herewith for filing on behalf of Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") are an original and nine copies of a Tariff Advice containing proposed Standard Offer Service Rate Schedules to be effective on the Retail Access Date of January 1, 1998. The Rate Schedules are designated R.I.P.U.C. No. 1099 in Blackstone, and R.I.P.U.C. No. 1324 in Newport.

Explanation of Proposed Rate Schedules

By enacting the Utility Restructuring Act of 1996 ("URA"), the Legislature intended that the principal benefit of competition, lower prices for electricity, would accrue over time to all customers. Although the URA does not yet require a Standard Offer filing (*See* Section 39-1-27.3(d)), Blackstone and Newport are now offering Standard Offer Service for all customers on the Retail Access Date of January 1, 1998. The Standard Offer Service Rate Schedules are in Attachment 1.

The Standard Offer Service Rate Schedules are being submitted at this time based upon our expectation that the Federal Energy Regulatory Commission ("FERC") will expeditiously approve the recently filed unanimous Settlement Agreements in Dockets ER97-3127-000 and ER97-2800-000.

That Settlement resolves all remaining federal jurisdictional issues necessary to implement retail choice for Blackstone's and Newport's customers on the Retail Access Date. Included in the Settlement is a backstop commitment by Montaup Electric Company of a Maximum Company Average Retail Delivered Price for Standard Offer Service as follows:

Q:\STDOFFER\STNDOFF.SVC

| Calendar Year | Maximum Price |
|---|---|
| 1998 | $0.032 |
| 1999 | $0.035 |
| 2000 | $0.038 |
| 2001 | $0.038 |
| 2002 | $0.042 |
| 2003 | $0.047 |
| 2004 | $0.051 |
| 2005 | $0.055 |
| 2006 | $0.059 |
| 2007 | $0.063 |
| 2008 | $0.067 |
| 2009 | $0.071 |

This pricing is subject only to the Standard Offer Fuel Index as it is contained in the Settlement Attachment 1, Amendment to Service Agreement, Section 10 and Attachment 4 Standard Offer Auction Proposed Design, Section D.

For rate design purposes, the above Standard Offer prices have been converted to a cumulative multiplier series:

| | |
|---|---|
| 1998 | 1.00000 |
| 1999 | 1.09375 |
| 2000 | 1.18750 |
| 2001 | 1.18750 |
| 2002 | 1.31250 |
| 2003 | 1.46875 |
| 2004 | 1.59375 |
| 2005 | 1.71875 |
| 2006 | 1.84375 |
| 2007 | 1.96875 |
| 2008 | 2.09375 |
| 2009 | 2.21875 |

Blackstone and Newport, in conjunction with Eastern Edison Company, shall put the Standard Offer Service out for bid by offering alternative suppliers the opportunity to provide Standard Offer Service, consistent with the Rhode Island General Laws, Section 39-1-27.3(d). Information concerning the Companies' Standard Offer Auction Proposed Design is provided in Attachment 5.

Q:\STDOFFER\STNDOFF.SVC

Any revenues billed by the Companies for Standard Offer Service in excess of payments to the Suppliers of that service shall be accumulated in an account and credited with interest. Also, in the unlikely event that the revenues billed by the Companies do not recover the their payments to the Suppliers in any calendar year, they shall be authorized to accumulate the deficiencies in this account together with interest into the next calendar year, except when the accumulated balance is expected to be a credit at the end of a calendar year; in such case, the Companies will petition the Commission to refund that balance to all of their Retail Delivery Service customers through a uniform cents per kilowatt-hour factor in the following year. The Companies will periodically notify the Division of the status of the account, and a filing, if necessary, would be made by December 1 based on 10 months actual and 2 months estimated, for a factor to be effective January 1 through December 31 of the following year.

Standard Offer Service shall be available to all of Blackstone's and Newport's retail customers on the Retail Access Date, including those retail customers who were taking service from a non-regulated power producer prior to the Retail Access Date and who have provided Blackstone and Newport with a written notice on or before November 28, 1997 of their decision to terminate service from their non-regulated power producer and take Standard Offer Service.

After the Retail Access Date, customers are free to leave the Standard Offer at any time to purchase electricity from a non-regulated power producer, but once this option is selected, a customer may not return to Standard Offer Service, with one exception. Blackstone and Newport will provide all residential and small general service customers with a one-time option to return to Standard Offer Service within the first one hundred and twenty days of first taking service from the non-regulated power producer. Also, any customer taking Standard Offer Service who moves within the service territory of the Companies will be allowed to retain this service.

The Companies' Standard Offer price cap determined in accordance with the terms of Rhode Island General Laws, Section 39-1-27.3(d), can be seen in Attachment 4, where it is compared to the aforementioned backstop commitment of Montaup Electric Company.

Initial Proposal - The Companies evaluated a rate design based upon a Standard Offer price set at $0.032 per kilowatt-hour for each rate. The results of this design produced unacceptable variations in the bill impacts on the rates and the customers within a rate, especially those on demand/energy rates. The results of this rate design can be seen in Attachment 3.

Alternate Proposal - As Filed - In order to limit the variation in customer bill impacts, the Standard Offer was designed based on the impact of a $0.032 per kilowatt-hour cost on the Companies. Their Generation Cost would have to be decreased by 30.52% in Blackstone and 13.79% in Newport to equal $0.032. The Generation Charges in each rate of each Company were reduced by that amount, respectively.

The proposed Standard Offer provides Blackstone with a company-average reduction of 12.93% and Newport with a company-average reduction of 4.56% compared with distribution rates estimated to be effective on January 1, 1998. A summary of the impact per rate, and the

Q:\STDOFFER\STNDOFF.SVC

Average Standard Offer that results, is seen in Attachment 2, as are the workpapers for this design.

In Blackstone, the major rate classes Residential R-1, Small General Service G-2, and Large General Service T-6 have decreases of 10.91%, 13.87%, and 14.79%, respectively.

In Newport, the major rate classes Residential R-1, Small General Service G-2, and Large General Service T-6 have decreases of 4.31%, 4.93%, and 4.70%, respectively.

Absent any effect from the Customer Charge, all customers in a rate class receive the same percentage decrease as the rate class.

The Standard Offer plus the Retail Delivery Rate yields the same rate structure as the unbundled rates in effect except the Generation Charge of the unbundled rate is replaced by the lower Standard Offer. This applies to all rates, even complex demand/energy or partial requirements rates such as the A-Rates.

The Low Income Rate R-2 retains the same discount relative to Rate R-1. A discount will be applied to the Retail Delivery Rate of the Economic Development customers whose contract would have expired after 1/1/98 absent Restructuring. A listing of these Economic Development customers is provided in Attachment 2.

Upon implementation of the Standard Offer on January 1, 1998, only the year-end 1997 balance in the Fuel and Purchased Power accounts would remain to be billed. This amount will be separately stated in the upcoming Fuel and Purchased Power filings being made December 1, 1997.

This proposal is submitted on condition that the provisions in the Rhode Island Settlement now being considered by FERC are approved as filed. If that Settlement is not approved as filed, the Standard Offer Service Rate Schedules filed shall be withdrawn and considered null and void.

If you have any questions or if you need more information, please call me at (508)-559-2000 ext. 3700.

Very truly yours,

Dennis St. Pierre
Vice President - Rates

gmr

Enclosures

Q:\STDOFFER\STNDOFF.SVC

November 7, 1997

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Alan Shoer, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

N:\BVE\PUC2514\TRANSMLISTOFRE.WPD

Attachment 1

# STANDARD OFFER SERVICE TARIFF

NARR 42422

Confidential

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, and to Customers who were taking generation service from a Non-Regulated Power Producer before January 1, 1998, and who have provided the Company with a written notice on or before November 28, 1997, of their intent to terminate generation service from their Non-Regulated Power Producer and take Standard Offer Service hereunder. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential Space Heating Retail Delivery Service Rate R-3

| | | |
|---|---|---|
| Energy Charge: | $0.03158 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| | | |
|---|---|---|
| Energy Charge | | |
| Peak Hours: | $0.15384 | per kWh |
| Off-Peak Hours: | $0.00570 | per kWh |

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03589 | per kWh |

Date Filed, November 7, 1997 Date Effective, January 1, 1998

C:\WORK\SO_BVE2.doc 11/06/97 4:31 PM

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $5.81 | per kW |
| Energy Charge: | $0.01403 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $6.11 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.02978 | per kWh |
| Off-Peak Hours: | $0.00877 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $5.29 | per kW |
| Energy Charge: | $0.01610 | per kWh |

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $5.48 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03241 | per kWh |
| Off-Peak Hours: | $0.01054 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |

Confidential

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

Maintenance Provision:

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

Maintenance Provision:

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency

and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

| Energy Charge: | $0.03308 | per kWh |
|---|---|---|

General Heating Retail Delivery Service Rate H-2

| Energy Charge: | $0.03339 | per kWh |
|---|---|---|

Controlled Water Heating Retail Delivery Service Rate W-1

| Energy Charge: | $0.03509 | per kWh |
|---|---|---|

Lighting Retail Delivery Service Rate S-1

| Energy Charge: | $0.03408 | per kWh |
|---|---|---|

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours

Monday through Friday excluding holidays defined below

April through September, 11:00 a.m. to 4:00 p.m.

October through March, 8:00 a.m. to 12:00 noon, and 4:00 p.m. to 7:00 p.m.

Off-Peak Hours

All other hours.

Holidays are defined as:

- New Year's Day
- President's Day
- Memorial Day
- Independence Day
- Labor Day
- Columbus Day
- Veteran's Day
- Thanksgiving Day
- Christmas Day

POWER FACTOR ADJUSTMENT:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power Factor Adjustment (PFA) to their Demand Charge based on the following

method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted effective January 1 of each calendar year beginning in the year 1998 and ending in the year 2009 by multiplying the Rates by the appropriate Cumulative Multiplier shown in the Standard Offer Calendar Year Multiplier Table below. The foregoing Rates shall also be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Revenue Reconciliation Adjustment described below:

STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:

| Year | Cumulative Multiplier |
|---|---|
| 1998 | 1.00000 |
| 1999 | 1.09375 |
| 2000 | 1.18750 |
| 2001 | 1.18750 |
| 2002 | 1.31250 |
| 2003 | 1.46875 |
| 2004 | 1.59375 |
| 2005 | 1.71875 |
| 2006 | 1.84375 |
| 2007 | 1.96875 |
| 2008 | 2.09375 |
| 2009 | 2.21875 |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

> Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:
>
> > Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

> Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER REVENUE RECONCILIATION ADJUSTMENT:

The Company shall reconcile the revenues billed to Customers taking Standard Offer Service against payments to Suppliers of Standard Offer Service and recover or refund any under- or overcollection in accordance with the following terms:

> Any revenues billed by the Company for Standard Offer Service in excess of payments to Suppliers of that service

shall be accumulated in an account and credited with interest. In the unlikely event that the revenues billed by the Company do not recover the Company's payments to Suppliers in any calendar year, the Company shall also be authorized to accumulate the deficiencies in this account together with interest into the next calendar year, except when the accumulated balance is expected to be a credit at the end of a calendar year, the Company will petition the Commission to refund that balance to all of the Company's Retail Delivery Service customers through a uniform cents per kilowatt-hour factor in the following year. The Company will periodically notify the Division of the status of the account, and a filing, if necessary, would be made by December 1 based on 10 months actual and 2 months estimated, for a factor to be effective January 1 through December 31, of the following year.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Calendar Year Multiplier and the Standard Offer Fuel Index, and applicable Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period of not more than twelve (12) years beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect take electric power service from another Supplier during the period beginning January 1, 1998, and ending December 31, 1998, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's various Terms and Conditions in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Attachment 4

COMPARISON OF STANDARD OFFER CAP PER URA TO PROPOSED
STANDARD OFFER

Confidential

NARR 42478

# Blackstone Valley Electric Company

## Standard Offer Service Tariff Advice

### Standard Offer Price Cap per URA

| Year | URA Standard Offer * | Proposed Maximum Standard Offer |
|---|---|---|
| 1998 | $0.041 | $0.032 |
| 1999 | 0.044 | 0.035 |
| 2000 | 0.046 | 0.038 |
| 2001 | 0.049 | 0.038 |
| 2002 | 0.052 | 0.042 |
| 2003 | 0.054 | 0.047 |
| 2004 | 0.057 | 0.051 |
| 2005 | 0.061 | 0.055 |
| 2006 | 0.064 | 0.059 |
| 2007 | 0.068 | 0.063 |
| 2008 | 0.071 | 0.067 |
| 2009 | 0.075 | 0.071 |

Notes:
Price Cap: Inflation Rate from National Price Index Forecast dated August 1997.
All charges are exclusive of RI Gross Receipts Tax.

* 1996 Benchmark 10.4 ¢/kWh inflated at 80% of CPI

n:\RISTLMNT\CPMPREHE\So_alt2b.xls,SOCALC,11/6/97,LSO'D

# Newport Electric Corporation

## Standard Offer Service Tariff Advice

### Standard Offer Price Cap per URA

| Year | URA Standard Offer * | Proposed Maximum Standard Offer |
|---|---|---|
| 1998 | $0.037 | $0.032 |
| 1999 | 0.039 | 0.035 |
| 2000 | 0.042 | 0.038 |
| 2001 | 0.045 | 0.038 |
| 2002 | 0.048 | 0.042 |
| 2003 | 0.051 | 0.047 |
| 2004 | 0.055 | 0.051 |
| 2005 | 0.058 | 0.055 |
| 2006 | 0.062 | 0.059 |
| 2007 | 0.065 | 0.063 |
| 2008 | 0.069 | 0.067 |
| 2009 | 0.074 | 0.071 |

Notes:
Price Cap: Inflation Rate from National Price Index Forecast dated August 1997.
All charges are exclusive of RI Gross Receipts Tax.

* 1996 Benchmark $0.112/kWh inflated at 80% of CPI

N:\RISTLMNT\COMPREHE\So_alt2n.xls,SOCALC,11/6/97,LSO'D

Attachment 5

# STANDARD OFFER AUCTION PROCESS

Confidential

NARR 42481

**Eastern Utilities**
*Blackstone Valley Electric*
*Eastern Edison*
*EUA Service Corporation*
*Montaup Electric*
*Newport Electric*

# News Release

DATE: November 3, 1997
RELEASE: Upon Receipt
CONTACT: Robert P. Clarke
(508) 559-2000
Ext. 3839

---

## Eastern Utilities Sets Nov. 14 Deadline For Standard Offer Bidders To Qualify

W. BRIDGEWATER, Mass., Nov. 3 — Eastern Utilities Associates (NYSE: EUA) has set a Nov. 14 deadline for potential suppliers to submit their qualifications to bid on rights to supply standard offer electricity to the Massachusetts and Rhode Island customers of its retail electric utility subsidiaries, Blackstone Valley Electric, Eastern Edison and Newport Electric.

Qualification requirements, terms of the standard offer service and the auction process were described in a "Request for Qualification" issued on Oct. 3. Power marketers, brokers and utilities have been invited to participate in the auction.

"We are proposing a simple, straightforward auction approach for our standard offer load that we hope will stimulate bidder participation," said Kevin A. Kirby, Power Supply Vice President.

- m o r e -

news\spot\AUCTION

In 1996, the 300,000 customers of Blackstone Valley Electric, Eastern Edison and Newport Electric used 4.5 million kilowatt-hours of electricity. Peak demand was 835 megawatts.

When retail competition begins among electricity suppliers in Massachusetts and Rhode Island, customers will have the option to choose a new energy supplier or to continue receiving power from their current utility for several years through standard offer service.

"When the Massachusetts and Rhode Island electricity markets are opened to competition, some customers may wait to choose a new generation supplier until they have a better idea of the potential savings available to them," Kirby said. "Standard offer service is designed to bridge that time period."

EUA's schedule for its standard offer auction calls for Potential bidders to submit their qualifications by Nov. 14. EUA will notify qualified bidders by Dec. 5. The auction will be scheduled to occur shortly before the later of the two states' retail access dates. The companies will begin taking standard offer service from the auction winners when there is full retail access in both states.

Potential suppliers may receive a copy of EUA's 'Request for Qualification' by contacting:

Peter Fuller
Energy Strategy Advisor
EUA Service Corporation
Post Office Box 543
W. Bridgewater, MA 02379
(508) 559-2000 ext. 3833
pfuller@eua.com

- more -

news\spot\AUCTION

EUA is a diversified energy services company whose shares are traded on the New York and Pacific Stock Exchanges. Besides Blackstone Valley Electric, Eastern Edison and Newport Electric, subsidiaries include Montaup Electric Co., EUA Service Corp., EUA Cogenex Corp., EUA Energy Investment Corp., EUA Ocean State, and EUA Energy Services. Together, the companies are referred to as the EUA System. Information about EUA is available on the world wide web at *http://www.eua.com*

###

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION

## REQUEST FOR QUALIFICATIONS TO BID TO SUPPLY STANDARD OFFER SERVICE

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting electricity suppliers for their qualifications to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Qualifications ("RFQ") must be received at the address set forth below no later than 4:00 p.m. on Friday, November 14, 1997. Responses to the RFQ must adhere to the specifications herein. Interested parties must submit five (5) copies of their responses to:

Robert P. Clarke
Director, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379

Please submit any questions concerning interpretation of the RFQ in writing to:

Peter D. Fuller
Energy Strategy Advisor
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
pfuller@eua.com

*The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall vest in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to modification by certain state and federal regulatory agencies having jurisdiction of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any regulator or court having jurisdiction, or legislation may require the Companies to modify or withdraw their plans as described herein. The Companies expressly reserve the right to modify the schedule and any provision herein to accommodate the standard offer procurement process of one or more other utilities. Furthermore, the Companies, for their convenience and in their sole discretion, may change the timetable for the actions described herein.*

Table of Contents

I. Introduction

II. General Description

A. Standard Offer Service

B. Market Procurement for Suppliers of Standard Offer Service

III. Threshold Qualifications to Bid in Standard Offer Auction

A. Administrative Fee

B. Financial Qualifications

C. Bid Deposit

D. Performance Surety Commitment

E. NEPOOL Participation

F. State Registration

G. Proposed Changes to the Standard Offer Service Agreement

IV. Auction Process

V. Administrative Issues

A. Auction

B. Standard Offer Service

Appendix 1 Standard Offer Service Price Schedules

Appendix 2 Fuel Index

Appendix 3 Draft Standard Offer Service Agreement

Appendix 4 Calculation of Bid Deposit Amounts, Performance Surety Amounts, and Maximum Eligibility

Appendix 5 Form of Bid Deposit and Performance Surety Documents

Appendix 6 NEPOOL Membership Application Requirements

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) are jointly seeking qualified parties to participate in their planned auction of Standard Offer Service obligations. Eastern, Blackstone, and Newport (collectively, "the Companies") are wholly-owned subsidiaries of Eastern Utilities Associates, a registered public utility holding company, and are cooperating on the design and implementation of a process for soliciting suppliers of Standard Offer Service. In 1996, the Companies had total retail billings of 4,420 GWh and an annual peak of approximately 835 MW.

During the transition to a competitive retail electricity marketplace, the Companies will be providing Standard Offer Service to their retail customers that have not yet chosen a competitive supplier. "Standard Offer Service" is defined as firm, all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs[1]. Standard Offer Service is a transitional service which is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace. Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. Suppliers who successfully bid in the auction will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply. Suppliers will be responsible for meeting their share of the Companies' Standard Offer Service load under the Restated NEPOOL Agreement and rules of ISO New England, Inc. or successor rules, and their responsibilities will include, without limitation the following: i) installed and operable capacity; ii) operating reserves; iii) transmission arrangements and expenses not recovered in the Companies' transmission cost adjustment provisions; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Forecasts of Standard Offer Service load are uncertain. Retail electric customers may terminate Standard Offer Service at any time to purchase electricity from an alternative supplier and, with few exceptions, may not return to Standard Offer Service. Rather than bidding to supply given quantities of capacity or energy, Qualified Bidders will bid in the auction for percentage shares of the Standard Offer Service load. At the conclusion of the auction, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time. The Companies will provide Suppliers with certain load information on a periodic basis, such as numbers of customers taking Standard Offer Service and representative load shapes for each customer class. It

[1] Eastern's Standard Offer Service Tariff, No. M.D.P.U 340, is currently pending before the Massachusetts Department of Public Utilities. Blackstone's and Newport's tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

Confidential

will be the Supplier's responsibility to forecast its capacity and energy requirements to meet its Standard Offer Service responsibilities.

Each Supplier will have complete responsibility for its fixed percentage share of the Companies' real-time Standard Offer Service load (minute by minute, hour by hour, day by day). Although the quantities of energy and capacity required (MWh and MW) will fluctuate with changes in customer demand resulting from factors including, but not limited to, seasonal factors, normal daily load patterns, increased usage by existing Standard Offer customers, demand side management activities, extremes in weather, *etc.*, the Supplier's percentage of Standard Offer Service load will not vary within a calendar year.

This document provides Prospective Bidders with an overview of the qualification and auction processes, as well as the specific information necessary for a Prospective Bidder to be qualified by the Companies to participate in the auction. Section II presents a general description and approximate schedule for the implementation of the qualification and auction processes. Section III spells out the specific content and form requirements of qualification submittals. Prospective Bidders must satisfy certain financial criteria and must be recognized by the appropriate regulatory agencies to be considered Qualified Bidders. Section IV presents the design of the auction. Section V presents logistical details of the auction process and the Companies' proposed methods for administering their Standard Offer Service Agreements with Suppliers.

Several appendices are attached, including the wholesale and retail price schedules for Standard Offer Service (Appendix 1), a Fuel Index which will produce additional revenues to Suppliers in the event of high oil and gas prices after 1999 (Appendix 2), and a draft Standard Offer Service Agreement (Appendix 3). In addition, Appendix 4 presents the Companies' methodology for calculating bid deposit amounts, performance surety amounts, and Qualified Bidders' eligibility to bid in the auction. Appendix 5 presents acceptable forms of bid deposit and performance surety documents. Appendix 6 contains information regarding NEPOOL membership.

## II. General Description

### A. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. The Companies will solicit the competitive market for Suppliers of this service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and resell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs. To the extent that the auction of Standard Offer Service does not procure sufficient supplies to meet the Companies' full Standard Offer Service load, the Companies' affiliated power supply company, Montaup Electric Company (Montaup), or its successors or assigns, will provide service at a fixed price cap ("backstop" service).

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for forecasting energy and demand requirements and maintaining sufficient capacity entitlements to meet their obligations under the rules of ISO New England, Inc. for the full requirements of their share of Standard Offer Service load. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customers' meters. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments to Suppliers for Standard Offer Service will be based on the annual average prices shown in Appendix 1, adjusted for discounts bid in the auction and for the operation of the Fuel Index (Appendix 2), with no adjustment for time of use, load factor, or any other characteristics of the load.

**Massachusetts**

Under the terms of an agreement between Eastern, Montaup, the Massachusetts Attorney General, the Massachusetts Division of Energy Resources, and other parties (Massachusetts Settlement Agreement), Eastern has agreed to provide Standard Offer Service to those of its customers who have not yet entered into power supply arrangements with competitive power suppliers, at fixed cents-per-kWh prices.[2] Eastern's Standard Offer Service will be available beginning on the Massachusetts Retail Access Date and continuing through 2004. The Massachusetts Retail Access Date is defined as the later of January 1, 1998 or the date when retail access is made available to all customers of the investor-owned utilities in Massachusetts, provided, however, in the event that retail access is not available to all customers of investor-owned utilities in Massachusetts by January 1, 1998, Eastern in its sole discretion shall have the option to accelerate the Retail Access Date and implement retail access for its customers with 90

[2] During the first year after the Massachusetts Retail Access Date, residential and certain small commercial customers will have the ability to return to Standard Offer Service within 90 days of first taking service from an alternative supplier.

Confidential

days advance notice. The Massachusetts Settlement Agreement is currently pending before the Massachusetts Department of Public Utilities and the Federal Energy Regulatory Commission.

**Rhode Island**

Under the Rhode Island Utility Restructuring Act of 1996, Blackstone and Newport are each required to "arrange . . . for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers." This service is expected to be offered beginning on the Rhode Island Retail Access Date, and must remain in place through 2009. Under a comprehensive agreement (Rhode Island Settlement Agreement) between Blackstone, Newport, Montaup, the Rhode Island Attorney General, and the Rhode Island Division of Public Utilities and Carriers, a schedule of price caps will be established for Standard Offer Service offered to retail customers of Blackstone and Newport who have not yet chosen a supplier in the competitive market. The Rhode Island Retail Access Date is defined as the later of January 1, 1998 or the date of the RIPUC's final approval of Montaup's generation divestiture methodology, provided, however, that in any event, the Rhode Island Retail Access Date shall occur no later than three months after retail access is made available to forty percent or more of the kilowatt-hour sales in New England. The Rhode Island Settlement Agreement is subject to approval by the appropriate regulatory authorities, and approval is anticipated prior to the auction.

The Companies will use the qualification and auction processes described here to procure power supplies to provide this service for the years 1998-2004. Blackstone and Newport will arrange at a later date for power supplies to provide Standard Offer Service in 2005-2009.

**B. Market Procurement for Suppliers of Standard Offer Service**

In order to obtain the lowest-cost, reliable supplies of Standard Offer Service for their customers, the Companies will procure supplies for a seven-year term through a competitive auction process open to all qualified suppliers of power. The Companies will auction percentage shares of their Standard Offer Service load for each year of the seven-year term. Bids will be in the form of percentage discounts off the stipulated Supplier Rates shown in Appendix 1. Contracts to provide Standard Offer Service will be awarded to the Qualified Bidders who offer the greatest discounts.

**Procedural Schedule**

Prospective Bidders who wish to be considered for certification to participate in the auction must submit their qualifications, pursuant to Section III, no later than November 14, 1997. A pre-submittal conference will be held at EUA's West Bridgewater offices on Friday, October 24, 1997, at 10 a.m., to provide Prospective Bidders with additional information on the qualification requirements, the auction process, and the administration of Standard Offer Service by the Companies. The Companies will review the submittals and will provide written notification to each Prospective Bidder of its certification to participate or its failure to qualify no later than December 5, 1997. Prospective Bidders

who submit satisfactory documentation of their qualifications to supply Standard Offer Service will subsequently be referred to as Qualified Bidders.

Any proposed changes to the draft Standard Offer Service Agreement (Appendix 3) must be submitted in writing along with submittals for qualification, but the Companies are under no obligation to incorporate any proposed changes into the final Agreement, which will be distributed with the Final Auction Rules.

The Companies will issue the Final Auction Rules upon execution of purchase and sale agreements for two of Montaup's primary fossil generating assets, Somerset Station and Montaup's share of the Canal 2 Unit, anticipated to occur before the end of 1997. The Final Auction Rules will contain details on the date and procedures for participating in the auction, the final form of the Standard Offer Service Agreement, and an Auction Participation Agreement.

The auction will consist of an ascending-bid auction for shares of the Companies' Standard Offer Service load for the full seven-year term. The auction will continue for multiple rounds, subject to activity rules described in Section IV and more fully specified in the Final Auction Rules. In the event that less than one hundred percent (100%) of the Standard Offer Service load is taken in the full-term auction, the Companies will conduct a supplemental, single-year auction for the remaining shares. The results of the full-term auction will not be affected by the single-year auction in any way; a winning bid in the full-term auction will not be displaced by any combination of bids in the supplemental single-year auction.

The auction is anticipated to take place approximately 30 days after the issuance of the Final Auction Rules. Standard Offer Service Agreements will be executed with winning bidders within ten (10) business days after completion of the auction. The Companies will begin taking deliveries from Suppliers under the Standard Offer Service Agreements on the later of i) the later of the Massachusetts or Rhode Island Retail Access Date, or ii) the effective date of the contracts. The Retail Access Date in both states may occur as early as January 1, 1998.

Confidential

### III. Threshold Qualifications to Bid in Standard Offer Auction

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the auction must meet the Companies' minimum eligibility requirements as outlined below. Documentation of compliance with each item must be provided. The Companies will have final authority to determine if a respondent meets or does not meet these requirements.

#### A. Administrative Fee

Each Prospective Bidder who wishes to participate in the standard offer auction must submit a complete package documenting its qualifications, plus a non-refundable administrative fee of $1,000, to the address above no later than 4:00 p.m. on November 14, 1997. The Companies reserve the right to accept submittals after this date but are under no obligation to do so.

#### B. Financial Strength

Each Prospective Bidder wishing to participate in the auction must submit the following information to be considered for certification:

1. General Information

- The full legal name of Prospective Bidder and any Guarantor(s).
- The name and title of the authorized contact person(s), with a street address, mailing address, telephone number, facsimile number and e-mail address for each.
- A legal description of the Prospective Bidder and any Guarantor(s) (*e.g.*, corporation, joint venture, limited partnership, partnership or sole proprietorship) and state of organization or residency for each. If the Prospective Bidder or any Guarantor(s) is a corporation, include the names and titles of all officers and directors of the corporation and the names of all stockholders possessing five percent (5%) or more of the stock of the corporation. If a partnership, include the names of all general and limited partners for each.
- The date of founding and the corporate history of Prospective Bidder and any Guarantor(s).
- A description of any corporate affiliations or joint venture partnerships.

2. Financial Information

- Audited or certified financial statements, including balance sheet and statement of income and cash flow for Prospective Bidder and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.
- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.

Confidential

- A description of any corporate affiliations or joint venture partnerships.

3. References

- The name, title, address, and telephone number for five (5) references knowledgeable of Prospective Bidder's or any Guarantor's business practices, organization and finances.

4. Defaults, Litigation and Penalties

- For each Prospective Bidder and any Guarantor(s) or any affiliate of each which in the past five years has been determined in writing by an arbitration panel or a court to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.
- A detailed description of any situation within the past five (5) years in which the Prospective Bidder or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations.
- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the Prospective Bidder or its Guarantor(s), or their respective officers or directors.
- A detailed description of any penalties, judgments, consent decrees, or other sanctions within the past five (5) years in any venue involving the Prospective Bidder or its Guarantor(s).

5. Other Adverse Matters

- A detailed description of any present or anticipated facts known to the Prospective Bidder or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

6. Authority

Prospective Bidder and its Guarantor(s) must provide a statement:

- that it has or will obtain all necessary regulatory authorizations for it to perform lawfully its obligations under each Standard Offer Service Agreement that it may enter into with the Companies;
- that the execution, delivery and performance of each Standard Offer Service Agreement will be within its lawful powers;
- that each Standard Offer Service Agreement will be duly authorized by all necessary corporate action and will not violate any of the terms and conditions in its governing documents, any contract or other agreement to which it is a party, or any law applicable to it; and

- that each Standard Offer Service Agreement when entered into will constitute its legally valid and binding obligation enforceable in accordance with its terms.

The Companies agree that all information they receive from the Prospective Bidders and any Guarantor(s) shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the Prospective Bidder's and/or Guarantors' qualifications to bid in the auction described herein.

**C. Bid Deposit**

To ensure that all bidding in the auction is the legitimate action of a serious bidder, the Companies will require a bid deposit, calculated in accordance with Appendix 4, from each Qualified Bidder prior to the auction. The amount of the bid deposit or the face amount of the Qualified Bidder's performance surety commitment, whichever is more restrictive, will establish a limit on the Qualified Bidder's eligibility to participate in the auction. A Qualified Bidder who successfully bids in the auction and fails to provide a performance surety and execute a Standard Offer Service Agreement within the terms of the Auction Participation Agreement will forfeit its entire bid deposit amount.

As part of its submittal of qualifications, a Prospective Bidder and any Guarantor(s) must provide a statement that they understand the bid deposit mechanism and that they are prepared to supply a bid deposit, in a form acceptable to the Companies, prior to execution of an Auction Participation Agreement.

**D. Performance Surety Commitment**

Each Prospective Bidder or any Guarantor(s) of each Prospective Bidder must provide one of the following:

(a) A commitment letter to the Companies from a bank or banks stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the bank(s) will arrange for the issuance of performance letters of credit collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each bank proposing to issue letters of credit on behalf of a Prospective Bidder or its Guarantor(s) maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. The bank(s) shall specify the face amount of letters of credit each can arrange and the periods in which they can be outstanding. The bank(s) shall affirm that, upon completion of the auction, they will be prepared to issue such letter(s) of credit to the Companies within ten (10) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

(b) A commitment letter to the Companies from a surety company or companies stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the surety company or companies will arrange for the issuance of performance bonds collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each surety company proposing to issue performance bonds on behalf of said Prospective Bidder or its Guarantor(s) maintain a rating of "B+" or better from A.M. Best Company. The surety company or companies shall specify the face amount of performance bonds each can arrange and the periods in which they can be outstanding. The surety company or companies shall affirm that, upon completion of the auction, they will be prepared to issue such performance bonds to the Companies within ten (10) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

(c) Such other financial assurances as the Companies, in their sole discretion, deem appropriate to secure all of a Prospective Bidder's or its Guarantor(s)' obligations to the Companies, including those arising from participation in the auction and those contained in the Standard Offer Service Agreement.

All performance letters of credit or performance bonds shall be issued in substantially the forms given in Appendix 5.

The face amount of the performance letters of credit or performance bonds specified in such a commitment letter or the value of such other acceptable financial assurances provided will be used, as will the required bid deposits, to determine the Prospective Bidder's maximum eligibility to bid in the auction as described in Appendix 4.

**E. NEPOOL Participation**

To participate in the Standard Offer Service auction, a Prospective Bidder must be a member in good standing of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England, Inc. billing system. As an alternative to being a member, the Prospective Bidder may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the Prospective Bidder's proposed commitment to provide Standard Offer Service or for such period until the Prospective Bidder becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the Prospective Bidder in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the Prospective Bidder's submittal of qualifications.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement.

Confidential

NARR 42495

The requirements for becoming a NEPOOL participant are included in Appendix 6. For new members, it is recommended that the NEPOOL Membership Committee be contacted as early as possible because the application process, including Federal Energy Regulatory Commission (FERC) approval, may take several months.

### F. State Registration

To participate in the auction, each Prospective Bidder must provide documentation that it is registered with the Rhode Island Division of Public Utilities and Carriers as a Non-Regulated Power Producer and must provide documentation that it has complied with the Massachusetts Department of Public Utilities' registration requirements for competitive suppliers then in effect, if any.

### G. Proposed Modifications of the Draft Standard Offer Service Requirements Agreement

At the completion of the auction, each successful bidder will be required to sign the Companies' Standard Offer Service Agreement, without modification, within ten (10) business days. To accommodate this schedule, Prospective Bidders are requested to review the draft Agreement attached as Appendix 3 and to provide any comments, exceptions, or proposed changes as part of their submittal of qualifications.

The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement. The final Standard Offer Service Agreement will be provided to all Qualified Bidders with the Final Auction Rules and the Auction Participation Agreement. By executing the Auction Participation Agreement, Qualified Bidders will agree to the terms in the final Standard Offer Service Agreement and to execute the Agreement, without modification, if they are successful in the auction.

Confidential

NARR 42496

## IV. Auction Process

To be auctioned are 100 shares of the Standard Offer Service load for each year. Each share represents one percent of the Companies' aggregated Standard Offer Service load. These shares will be sold in an ascending-clock auction. In each round, Qualified Bidders will bid the number of shares they desire at the discount specified on the auction "clock". If more than 100 shares are bid, then the discount is increased by a clock increment and Qualified Bidders indicate the number of shares they desire at the new, higher discount. The auction ends when fewer than 100 shares are bid on at the specified discount. Before the auction, Qualified Bidders will provide a bid deposit, which, along with the face amount of the Qualified Bidder's performance surety commitment, will determine the maximum number of shares they are eligible to bid on.

The auction may actually consist of two auctions conducted in sequence. First, a full-term auction will be held. Bids in the full-term auction will be for a specified number of shares of Standard Offer Service load across all seven years, 1998 through 2004. At the conclusion of the full-term auction, if there are remaining shares that did not sell, a single-year auction will be held. In the single-year auction, bids are for shares in a specified year. Each Qualified Bidder's initial eligibility in the single-year auction will be its initial eligibility in the full-term auction less its winnings in the full-term auction.

The rules for the full-term and the single-year auctions are nearly identical. We begin with a description of the full-term auction and then point out the differences in the single-year auction.

### A. The Full-Term Auction

In the initial round, each Qualified Bidder submits a bid indicating the number of shares it desires at a discount of 0% off the stipulated Supplier Rates (see Appendix 1). If the total shares bid is less than or equal to 100, then the auction ends with each bidder winning the number of shares it bid at the 0% discount. If the total shares bid exceeds 100, then the discount is raised by one clock increment and a new round begins. In each round, each Qualified Bidder bids the number of shares it desires at the specified discount. If the total shares bid is greater than 100, then the discount is increased by another clock increment and the process repeats. If the total shares bid is less than or equal to 100, then each bidder wins the shares bid at the specified discount. If the total shares bid is less than 100, then the Rationing Rule is invoked to assign the remaining shares.

*Rationing Rule*: Any remaining shares not awarded at the highest clock discount are awarded to the Qualified Bidders that reduced their bids in the final round. The Qualified Bidder that reduced its shares bid by the smallest amount (in percentage terms) is awarded additional shares, at the previous round's clock discount, up to the total amount of its reduction from the previous round. If needed, additional shares will be awarded to other Qualified Bidders in ascending order of their percentage reductions from the previous rounds. In the event of two or more Qualified Bidders with identical percentage reductions, the smaller absolute reduction will be favored. This rationing mechanism

Confidential

NARR 42497

ensures that shares not bid at the highest clock discount are awarded at the next highest discount.

*Activity Rule*: The shares bid in any round cannot exceed the bidder's eligibility. Eligibility is initially determined by the bidder's bid deposit and its available performance surety. If a bidder bids less than its full eligibility in any round, its eligibility is permanently reduced to the shares bid. Hence, a bidder can only hold its shares bid at a constant level or decrease the number as the discount increases.

Each bid is binding and remains in force until it is accepted or rejected by the Companies at the conclusion of the auction. Each successful Qualified Bidder is required to execute a Standard Offer Service Agreement. Upon execution of Standard Offer Service Agreements for 100 shares, the remaining bids are rejected.

*The table below gives an example of an ascending-clock auction. At a discount of 0%, 200 shares are bid. Hence, the "clock" increases by one increment to 1%. The total shares bid drops to 160 at a 1% discount. The process continues until the total shares bid is less than 100 (round 7). At this point, the auction ends. Ninety-seven shares are awarded to Qualified Bidders at a 4.5% discount. The remaining three shares are awarded, at a 4% discount, to the Qualified Bidders that reduced their bids in round 7 by the smallest percentage relative to their bids in round 6.*

| Round | Discount | Total Shares Bid |
|---|---|---|
| 1 | 0% | 200 |
| 2 | 1% | 160 |
| 3 | 2% | 135 |
| 4 | 3% | 115 |
| 5 | 3.5% | 108 |
| 6 | 4% | 101 |
| 7 | 4.5% | 97 |

*The Rationing Rule would operate as shown in the table below for this example. Qualified Bidder A would be awarded two shares at a 4% discount, and Qualified Bidder B would be awarded one.*

| Bidder | Round 6 Shares Bid | Round 7 Shares Bid | % Decrease | Absolute Decrease | Shares Awarded |
|---|---|---|---|---|---|
| A | 20 | 18 | 10% | 2 | 2 |
| B | 10 | 8 | 20% | 2 | 1 |
| C | 50 | 50 | - | - | - |
| D | 21 | 21 | - | - | - |
| | 101 | 97 | | | |

*The total shares awarded would be as shown in the following table.*

| Bidder | Shares | Discount |
|---|---|---|
| A | 18 | 4.5% |
| | 2 | 4.0% |
| B | 8 | 4.5% |
| | 1 | 4.0% |
| C | 50 | 4.5% |
| D | 21 | 4.5% |
| | 100 | |

### B. The Single-Year Auction

If Standard Offer Service Agreements for less than 100 shares are executed after the full-term auction, the remaining shares will be sold in a single-year auction. Rather than having a single discount across all years, as in the full-term auction, there is a separate discount or "clock" for each of the seven years. Also, since the bid deposit and performance surety amounts required to be eligible to bid vary over the seven years, eligibility in the single-year auction is expressed in dollars rather than in percent shares.

Qualified Bidders may bid on any one or more years, and may bid for different shares and at different discounts in each year. The shares bid in any round cannot exceed the Qualified Bidder's eligibility. A Qualified Bidder's initial eligibility in the single-year auction reflects its initial eligibility in the full-term auction less any shares won in the full-term auction. The activity rule in the single-year auction permits Qualified Bidders to increase the shares bid during the first four rounds.

*Activity Rule*: A Qualified Bidder must submit bids totaling at least 25% of its initial eligibility in the first round of the single-year auction, 50% in the second round, 75% in the third round, and 100% in the fourth round. Failure to meet or exceed these activity levels will result in a corresponding reduction in eligibility. *For example, if a Qualified Bidder has eligibility equivalent to $900,000 of bid deposit, but only bids on the equivalent of $180,000 of shares in the first round, then its eligibility is reduced by $55,000 ($900,000 x 25% = $225,000; $225,000 - $180,000 = $55,000).* After the fourth round, if a bidder bids less than its eligibility, then in all subsequent rounds its eligibility is limited to the shares bid in the prior round. Hence, a bidder can increase its shares bid only in the first four rounds.

### C. Initial Discounts and Clock Increments

The initial discount is 0%. In subsequent rounds, the discount is increased by the clock increment. The clock increment will likely change as the auction progresses and will be stated before each round of bidding. In the single-year auction, different years may have different clock increments. Typically, the increments decrease later in the auction.

## V. Administrative Issues

### A. Auction

1. Auction Participation Agreement

Participation in the auction will be governed by an Auction Participation Agreement and the terms of the Final Auction Rules. Qualified Bidders will be required to execute an Auction Participation Agreement, affirming their commitment to i) abide by the rules of the auction as stated in the Final Auction Rules, ii) abide by any decisions of the auctioneer[3], and iii) if successful in the auction, provide the requisite performance surety documents and execute a Standard Offer Service Agreement within ten (10) business days after the conclusion of the auction.

2. Bid Deposit

At least ten (10) business days prior to the commencement of the auction, each Qualified Bidder or its Guarantor(s) shall deliver to the Companies a bid deposit proportional to the percentage share of Standard Offer Service load that the Qualified Bidder proposes to bid on. The bid deposit will be determined in accordance with a formula generally as provided in Appendix 4. The bid deposit shall be provided in one of the following forms:

- Qualified Bidder's or its Guarantor's certified check payable to the Companies;
- a bank check drawn on a financial institution acceptable to the Companies;
- funds electronically transferred to the account of the Companies in accordance with the following instructions:

  Fleet Bank<br>
  ABA # 011-000-206<br>
  For Credit to: Eastern Edison Company<br>
  Blackstone Valley Electric Company<br>
  Newport Electric Corporation<br>
  A/C # xxxxxxxxxxxxx<br>
  Ref: (Bidder/Guarantor Name) Bid Deposit; or

- a performance letter of credit or performance bond issued by a bank or surety company which satisfies the rating criteria established in Section III.B(a) and (b), respectively. Each performance letter of credit or bond will be required to be in substantially the form given in Appendix 5.

As a condition of the auction, the Companies will not accept any bid for which the Qualified Bidder or its Guarantor(s) has not previously provided the required amount of

[3] The Companies may act as auctioneer, or may hire an independent entity with particular auction expertise.

bid deposit.

3. Maximum Eligibility

A Qualified Bidder's maximum eligibility to bid in the auction will be based on whichever of the following two measures results in the lower eligibility:

i) the face amount of a performance bond or equivalent surety for which the Qualified Bidder provides a commitment letter, as outlined in Section III.D; or
ii) the amount of the bid deposit.

Eligibility, in terms of shares of Standard Offer Service load, will be governed by the relationships presented in Appendix 4. At least five (5) business days prior to the start of the full-term auction, the Companies will certify in writing each Qualified Bidder's maximum eligibility to bid in the full-term auction.

4. Bid Deposit Refunds/Credits:

Bid deposits will be refunded in accordance with the Prospective Bidder's or Guarantor's direction in one of the following manners:

- For bids selected by the Companies:

  Cash deposits will be fully refundable, with interest, one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor; or

  Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor.

- For bids which are not selected by the Companies:

Cash deposits will be fully refundable, with interest, one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid; or

Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid.

If a successful Qualified Bidder or its Guarantor(s) fails to honor its bid by providing the required performance surety and executing a Standard Offer Service Agreement within ten (10) business days of completion of the auction, the entire bid deposit amount will be forfeited. The next bidder(s) whose aggregate shares would bring the total shares to exactly 100 will then be considered winning bidders and will be

required to provide performance sureties and to execute Standard Offer Service Agreement within ten (10) business days of notification.

Cash deposits will be eligible for earnings at a rate of three percent (3%) per annum commencing with the business day that said funds become fully available to the Companies and continuing through the business day that the Companies issue a refund. All refunds will be in the form of a Company check payable to the Qualified Bidder or its Guarantor(s) with accrued interest.

**B. Standard Offer Service**

1. Performance Surety

Within ten (10) business days of the completion of the auction, and as a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Bidder will be required to deliver to the Companies a performance surety securing the Qualified Bidder's full responsibility for Standard Offer Service load over the seven-year term.

Acceptable forms of surety include a performance letter of credit or a performance bond, in substantially the form as provided in Appendix 5. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. Each surety company or companies issuing a performance bond must maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Agreement. Performance letters of credit or bonds, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and shall be renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

Failure to provide the performance surety within ten (10) business days after the completion of the auction will disqualify the Qualified Bidder and will result in forfeiture of its entire bid deposit. Failure to maintain such surety in good standing after execution of the Standard Offer Service Agreement will be considered an event of default and the Companies will exercise their rights under the Agreement accordingly.

2. Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England, Inc. each Supplier's hourly share of the aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a

Confidential

proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the MDPU and RIPUC, summarized as follows:

-Energy and demand for each retail account will be estimated for each hour using a combination of inputs including weather and load data from the EUA Supervisory Control and Data Acquisition (SCADA) system, sample meter data, historical load shapes, and individual customer usage ratios.

-The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.

-The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.

-Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.

-The hourly Standard Offer loads, including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.

-The daily load information will be transferred to ISO New England, Inc. for inclusion in each Supplier's own-load dispatch (or such other settlement process developed by NEPOOL or ISO New England, Inc.).

The Terms and Conditions for Suppliers may be revised, amended, supplemented, or supplanted in whole or in part from time to time by state regulatory agencies or by law.

3. Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

Suppliers will receive daily reports of their estimated hourly Standard Offer Service loads, and monthly reports of the number of customers in each rate class taking Standard Offer Service along with representative customer load shapes for each rate class. The Companies will also provide, on an annual basis, estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for the prior twelve months and a forecast of Standard Offer Service peak and energy demands for the upcoming twelve months, assuming no incremental migration of customers to competitive suppliers.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies receive customer notifications of

significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts.  Suppliers are advised to rely on their own projections of load and market dynamics.

4.  Minimum Load Obligations

Over time, it is expected that Standard Offer Service load will decline, and thus the actual energy and demand  responsibilities (in MW and MWh) associated with a given percentage of the load will decline as well.  The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater.  If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

5.  Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement.  The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, etc.

Confidential

NARR 42504

**PART 2 OF 2**

# APPENDIX 1
## STANDARD OFFER SERVICE PRICE SCHEDULES

Confidential

NARR 42505

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction will be based on the following predetermined schedules of prices for energy consumed, as described in the applicable retail Standard Offer Service tariffs. The rate for customers of Eastern is subject to adjustment only for the operation of the Fuel Index. Rates charged to customers of Blackstone and Newport [will be determined].

| Calendar Year | Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | TO BE DETERMINED |
| 1999 | 3.1 cents | |
| 2000 | 3.4 cents | |
| 2001 | 3.8 cents | |
| 2002 | 4.2 cents | |
| 2003 | 4.7 cents | |
| 2004 | 5.1 cents | |

The Supplier Rate defines the price cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement. Prices apply to energy as measured at the retail customers' meters.

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Supplier Rates, reduced by the applicable Discounts offered in the Companies' auction. Additional revenues to Suppliers may be realized through the operation of the Fuel Index.

# APPENDIX 2

## FUEL INDEX

Confidential

NARR 42507

The Companies will incorporate a Fuel Adjustment mechanism in their respective retail Standard Offer Service tariffs which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulfur) and natural gas after 1999. This fuel adjustment mechanism is subject to continued regulatory supervision and approval which allows the Companies to collect such revenues from their retail customers taking Standard Offer Service. The formula and indices used for calculating such revenues are also subject to regulatory change.

Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels. The Companies' retail Standard Offer Service tariffs are not yet finalized, and will likely differ between Massachusetts and Rhode Island. The actual Fuel Adjustment mechanism will vary in accordance with the differing retail terms in the two states, but will operate substantially in the manner described below:

The retail Standard Offer rate in effect for a given month is multiplied by a "Fuel Adjustment Multiplier" that is set equal to 1.0 and thus has no impact unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The benchmark rates for retail Standard Offer Service are based on the following predetermined average annual flat rates for energy consumed:

| Calendar Year | Annual Company Average Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | TO BE DETERMINED |
| 1999 | 3.1 cents | |
| 2000 | 3.4 cents | |
| 2001 | 3.8 cents | |
| 2002 | 4.2 cents | |
| 2003 | 4.7 cents | |
| 2004 | 5.1 cents | |

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in *The Wall Street Journal*, expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No.6 oil into New York harbor, as reported in *Platt's Oilgram U.S. Marketscan* in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies for approval. Upon regulatory approval, such indices will be used for calculating Fuel Adjustment revenues in accordance with the order(s) and shall be incorporated into the terms of the retail Standard Offer Service tariffs.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment Multiplier for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment Multiplier} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + \$0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where: Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment Multiplier would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate is increased by this Fuel Adjustment Multiplier for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

The incremental revenues attributable to the Customer Rate Fuel Adjustment mechanism will be allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier in the applicable billing month, pursuant to Article 5 of the Standard Offer Service Agreement.

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment Multiplier determined.

## APPENDIX 3

## DRAFT STANDARD OFFER SERVICE AGREEMENT

NARR 42511

Confidential

Appendix 3 Standard Offer Service Agreement

DRAFT

# Standard Offer Service Agreement

between

## Blackstone Valley Electric Company

## Eastern Edison Company

## Newport Electric Corporation

and

______________________________

Dated ______________________________

10/2/97 Draft

draft

NARR 42512

Confidential

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1. | Definitions | 1 |
| ARTICLE 2. | Term | 3 |
| ARTICLE 3. | Supplier Responsibilities | 3 |
| ARTICLE 4. | Estimation of Hourly Loads and Reporting to the ISO | 4 |
| ARTICLE 5. | Price | 5 |
| ARTICLE 6. | Billing and Payments | 6 |
| ARTICLE 7. | Security Provisions | 6 |
| ARTICLE 8. | Events of Default, Liability, Relationship of the Companies | 7 |
| ARTICLE 9. | Termination | 8 |
| ARTICLE 10. | Force Majeure | 9 |
| ARTICLE 11. | Assignment | 10 |
| ARTICLE 12. | Successors and Assigns | 10 |
| ARTICLE 13. | Resolution of Disputes | 10 |
| ARTICLE 14. | Interpretation | 12 |
| ARTICLE 15. | Severability of Provisions | 12 |
| ARTICLE 16. | Accounts and Records | 12 |
| ARTICLE 17. | Limitations on Liability and Indemnification | 12 |
| ARTICLE 18. | Regulation | 13 |
| ARTICLE 19. | Notices | 14 |
| ARTICLE 20. | Miscellaneous | 14 |

Appendix A Schedule of Supplier's Share of Offer Service and Delivered Energy Price

draft

STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this __________ day of __________________, __________, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and __________________________________________________________________________________________ ("Supplier"), on the other hand.

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any action by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1. Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Bid Price" shall mean the Standard Offer Wholesale Price in each calendar year multiplied by the Supplier's Discount in the same calendar year as shown in Appendix A.

"Commencement Date of Service" shall mean 12:01 A.M. on ______________________________.

NARR 42514

Confidential

Draft

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"Discount" shall mean the percentage discount off the Standard Offer Wholesale Price of electricity, which discount is offered by Supplier for a given Contract Year as determined through the Company's Standard Offer auction.

"D.P.U." shall mean the Massachusetts Department of Public Utilities.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NYMEX Contract" shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time of use, seasonality, or any other factor except as specified in Article 5 and Appendix B. The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

Confidential

NARR 42515

draft

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. ______, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. ______. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.P.U., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.P.U. or as otherwise provided by law.

ARTICLE 2. Term:

The term of this Agreement shall begin on the Commencement Date of Service and end on 12:00 a.m. ______________________, unless terminated in accordance with Article 8 or 9.

ARTICLE 3. Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power

Confidential

support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

ARTICLE [illegible] <u>Estimation of Hourly Loads and Reporting to the ISO</u>:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.P.U., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer

Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5. Price:

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price + Fuel Adjustment Factor

where: Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to the Suppliers will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which is required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

Confidential

ARTICLE 6. <u>Billing and Payments</u>:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for the dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 13 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment.

ARTICLE 7. <u>Security Provisions</u>:

As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

The amount of the financial surety shall be calculated annually based on the following formula:

$$
\begin{aligned}
SD(n) = SF \times STDL(n-1) \times \{ & (PSTD(n) \times TD(n)) \\
& + (PSTD(n+1) \times TD(n+1)) \\
& + (PSTD(n+2) \times TD(n+2)) + \ldots\ldots + \\
& + (PSTD(2004) \times TD(2004)) \}
\end{aligned}
$$

NARR 42519

Confidential

Where:

| | |
|---|---|
| SD(n) | is the Security Deposit in Contract Year (n) |
| SF | is the Security Fee equal to $10.00/MWh |
| STDL(n-1) | is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year (n-1), expressed in MWh. In 1997, STDL shall be 4,500,000 MWh. |
| PSTD(n) | is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n). |
| TD(n) | is the Transition Discount in Contract Year (n), calculated as follows: |

TD(n) =1.00
TD(n+1) =(7-1)/7 = 0.857
TD(n+2) =(7-2)/7 = 0.714
TD(n+3) =(7-3)/7 = 0.571
TD(n+4) =(7-4)/7 = 0.429
TD(n+5) =(7-5)/7 = 0.286
TD(n+6) =(7-6)/7 = 0.143

To secure the above amounts, Supplier shall provide a letter of credit or performance bond in a form acceptable to Company. The bank issuing such letter of credit on behalf of a Supplier must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. If a performance bond is provided it is required that each surety company issuing such performance bond on behalf of a Supplier must maintain a rating of "B[illegible]" or better from A.M. Best Company.

The performance Letter of Credit or Bond, if not issued for the full term of the Supplier's Standard Offer Service obligation shall be renewed on an annual basis or replaced and superseded by a like kind of surety at least thirty (30) days prior to the expiration of such prior surety on a continuing basis to the termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial security may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 for the remaining term of this Agreement.

ARTICLE 8. <u>Events of Default, Liability, Relationship of the Companies</u>:

(1) With the exception of Force Majeure described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

NARR 42520

Confidential

(a) Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b) Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c) Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days after notice thereof from the Companies.

(2) Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3) Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security Amounts calculated pursuant to Article 7 and regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the financial surety used to secure such amounts. The Parties expressly agree that the amounts set forth in the financial surety documents do not constitute liquidated damages. In addition to the financial surety amounts, the Supplier shall be liable to the Companies for any direct damages resulting from an Event of Default, including replacement power costs incremental to the Bid Price. The Companies may pursue any remedies or other damages provided for under law, including indirect, consequential, reliance and incidental damages, and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9. <u>Termination</u>:

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

Confidential

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier.

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide financial surety to the Companies pursuant to Article 7 [illegible] terminated.

ARTICLE 10. Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and not due to the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event directly and adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

Any event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, or affects the availability or cost of operating any generating facilities, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) The non-performing Party promptly, but in no case later than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b) The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

Confidential

(c) The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d) The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 11. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (I) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 12. Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 13. Resolution of Disputes:

Subject to Section 4 of Article 8, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such senior representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such

Confidential

other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 13 shall prevent the Companies from issuing, pursuant to Sections 1(a) and © of Article 8, notice of failure to comply with, observe or perform this Agreement or to maintain any of the security requirements under Article 7 to Supplier, and upon failure to cure or rectify by Supplier, exercise their rights under the financial surety. Supplier, however, may dispute the exercise by the Companies of their rights under the financial surety, under this Article 13, after such exercise.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall be provided in alphabetical order with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its

Confidential

own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 14. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 15. Severability of Provisions:

Subject to the provisions of Article 14 above, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 16. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 17. Limitations on Liability and Indemnification:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all third party damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the negligent acts or omissions of the indemnifying Party's employees or agents.

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

Confidential

ARTICLE 18. Regulation:

(a) This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b) This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 19. Notices:

Any notice, demand or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director of Power Supply
EUA Service Corporation
P. O. Box
[illegible]50 West Center Street
West Bridgewater, MA 02379

To Supplier:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 20. Miscellaneous:

(a) Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b) Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c) Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d) This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e) Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f) Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier: Supplier's NAME

By: ______________________

On Behalf of the Companies:

Blackstone: BLACKSTONE VALLEY ELECTRIC COMPANY

By: ______________________

Eastern: EASTERN EDISON COMPANY

By: ______________________

Newport: NEWPORT ELECTRIC CORPORATION

By: ______________________

draft

APPENDIX A

SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY
AND
PRICE

| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 cents/kWh | | |
| 1999 | | 3.5 cents/kWh | | |
| 2000 | | 3.8 cents/kWh | | |
| 2001 | | 3.8 cents/kWh | | |
| 2002 | | 4.2 cents/kWh | | |
| 2003 | | 4.7 cents/kWh | | |
| 2004 | | 5.1 cents/kWh | | |

# EXHIBIT C

# STANDARD OFFER SERVICE AGREEMENT

BETWEEN

MONTAUP ELECTRIC COMPANY

AND

BLACKSTONE VALLEY ELECTRIC COMPANY

STANDARD OFFER SERVICE AGREEMENT

THIS AGREEMENT, made and entered as of the 23rd day of December, 1997, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation, hereinafter called the "Company", and BLACKSTONE VALLEY ELECTRIC COMPANY, a Rhode Island corporation, hereinafter called the "Customer".

W I T N E S S E T H:

WHEREAS, the Customer is currently an all-requirements customer of the Company under the Company's FERC Tariff and a Service Agreement; and

WHEREAS, under the Service Agreement, the Customer purchases from the Company for resale all of the electric requirements of the ultimate customers in the Customer's service territory; and

WHEREAS, the Rhode Island Legislature passed into law the URA, which extends wholesale competition in power supply markets to retail customers through the provision of retail access; and

WHEREAS, the Company and the Customer are parties to a Settlement; and

WHEREAS, the Settlement provides for the termination of all-requirements service under the Tariff and the provision of unbundled transmission service by the Company to the Customer under the Company's open access tariff so as to implement retail access in a manner consistent with the URA.

NOW, THEREFORE, for and in consideration of the mutual commitments set forth herein, and other good and valuable consideration, the Company and the Customer agree as follows:

1. Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this agreement, including its appendices, as amended.

"FERC" shall mean the Federal Energy Regulatory Commission.

"Nonregulated Power Producer" shall have the same meaning as set forth in Section 39-1-2.(7.1) of the URA.

"Retail Access Date" shall have the same meaning as set forth in paragraph 3.1 of the Stipulation and Agreement to the Settlement.

"Service Agreement" shall mean the Customer's currently effective service agreement, as amended, under which all-requirements service is being provided to the Customer by the Company.

"Settlement" shall mean the settlement which was approved by the FERC in Docket No. ER97-2800 et al. on December 19, 1997.

"Standard Offer Retail Service" shall have the same meaning as the service set forth in Section 39-1-27.2 of the URA.

"Standard Offer Service" shall mean the service provided under the Settlement consisting of the provision by the Company of wholesale supply of power sufficient to meet the requirements of retail customers served by the Customer's distribution system that purchase Standard Offer Retail Service.

"Tariff" shall mean the Company's FERC Tariff, First Revised Volume No. 1.

"URA" shall mean the Rhode Island Utility Restructuring Act of 1996.

2. The Parties agree that, notwithstanding anything to the contrary in the Service Agreement or in the Tariff, the Customer's obligation to purchase all of its requirements and the Company's obligation to provide such all-requirements service shall terminate as of January 1, 1998.

3. Commencing January 1, 1998, effective upon the termination of said all-requirements service, and continuing for the period through December 31, 2009 the Company shall provide Standard Offer Service to the Customer. The Company and the Customer shall have the right in their sole discretion to shorten the period of Standard Offer Service to December 31, 2004 if the Customer no longer has the obligation under the URA to extend Standard Offer Service through 2009.

(a) Standard Offer Service shall be made available at the prices set forth in Article 5 of the "Stipulation and Agreement", included as part of the Settlement (which is attached hereto for convenience as Appendix A), adjusted for a fuel index set forth in "Attachment 4" to the Settlement (relevant pages of which are attached hereto for convenience as Appendix B). The prices for Standard Offer Service shall be for electricity delivered to the meters of Customer's ultimate customers, not including the charges for Customer's distribution services or for the Company's "Network Integration Transmission Service" provided under the Settlement, but including any and all transmission charges to reach the Company's system that are not recovered in Customer's transmission cost recovery provisions.

(b) From and after the commencement of Standard Offer Service, the Customer, in its sole discretion, is free to reduce its purchases thereunder by pursuing other opportunities in the wholesale market by giving the Company at least 90 days advance written notice directed to the first day of a calendar month. Reductions by the Customer

on less than 90 days notice shall be permitted with the mutual consent of the parties. Once the Customer has reduced or terminated its purchases of Standard Offer Service from the Company, the Company shall have no obligation to supply Standard Offer Service to the Customer with respect to the terminated or reduced purchases, except as may be provided by law.

(c) The Company acknowledges that the Customer may periodically offer alternative power suppliers the opportunity in an auction to supply the Customer with Standard Offer Service to enable it to provide Standard Offer Retail Service to its ultimate customers in its service territory after the Retail Access Date. The Company, its successors or assigns, shall be free to bid in the auction, provided that the Company's bid shall not exceed the prices set forth in Article 5 of the Stipulation and Agreement, adjusted for the fuel index set forth in Attachment 4.

4. To the extent not inconsistent with any of the provisions of this Agreement or the Settlement, incorporated herein by reference are the general terms and conditions of service set out in the Tariff at Original Sheet Nos. 8 through 13 which have been slightly modified to reflect service under this New Standard Offer Service Agreement (and which are attached hereto for convenience at Appendix C), as the same may be amended from time to time.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed by their respective authorized officials.

MONTAUP ELECTRIC COMPANY

By ______________________
Kevin Kirby

Its Vice President

Dated: December 23, 1997

BLACKSTONE VALLEY ELECTRIC COMPANY

By ______________________
John Carney

Its President

Dated: December 23, 1997

# APPENDIX A

| Calendar Year | Price per kilowatthour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

# APPENDIX B

NARR 06379

D. **Standard Offer Fuel Index**

The Customer Rate in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year.

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

> Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

*For example, if for a month in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50 + \$.60/MMBtu) + (\$3.00 + \$.04/MMBtu)}{\$6.09 + \$.60 + \$.04/MMBtu} = 1.0609$$

*The Customer Rate paid to the distribution company is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548 c/KWH (4.2 x 1.0609)*

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

Incremental revenues received by the distribution company as the result of a Fuel Adjustment would be fully allocated to Standard Offer suppliers in proportion to the Standard Offer energy provided by a supplier to the distribution company in the applicable billing month.

# APPENDIX C

NARR 06383

(Revised Sheet No. 8)

GENERAL TERMS AND CONDITIONS FOR
STANDARD OFFER SERVICE AGREEMENT

ARTICLE 1. OBLIGATIONS OF COMPANY AND CUSTOMER

The Company will offer the electric service described in the Standard Offer Service Agreement. Acceptance of such service by the Customer binds the Customer to all applicable provisions of this tariff, including those regarding payment, as they may be in effect from time to time. All obligations of the Company and the Customer are subject to action of the Federal Energy Regulatory Commission and such other governmental agencies as may have jurisdiction in the premises.

ARTICLE 2. CHANGES IN TARIFF

The provisions of this tariff, including these General Terms and Conditions, Original Sheet Nos. 8 through 10, and the Standard Offer Service Agreement, may be amended from time to time or superseded by the Company by notifying the Customer in writing of such change and making the appropriate filing with the Federal Energy Regulatory Commission (or such other governmental agency as may have jurisdiction in the premises).

ARTICLE 3. CONTINUITY OF SERVICE

The Company shall not be responsible for any failure to supply electric service, nor for interruption, reversal or abnormal voltage of the supply, if such failure, interruption, reversal or abnormal voltage is without willful default or gross negligence on its part. Whenever the integrity of the Company's system or the supply of electricity is threatened by conditions on its system or on the system with which it is directly or indirectly interconnected, or whenever it is necessary or desirable to aid in the restoration of service, the Company may, in its sole

judgement, curtail or interrupt electric service or reduce voltage to some or all of its customers and such curtailment, interruption or reduction shall not constitute willful default by the Company. When the Company interrupts or varies electric service to make repairs to or changes in its facilities, such action shall be taken upon reasonable notice to the customers affected, or without notice in an emergency when such notification would prolong a dangerous situation.

ARTICLE 4. USE OF SERVICE

The customer will exercise diligence to use the electric service furnished under this tariff with a view to securing the efficiency of the Company's apparatus and system in keeping with generally accepted good operating standards, will maintain a power factor as near unity as practicable consistent with good engineering practice, will coordinate its system relaying and fusing with that of the Company so as to preclude unnecessary interruptions, will maintain its lines at all times in a safe operating condition, will operate lines in such manner as not to interfere with the service of the Company to its customers, will coordinate with the Company maintenance which may adversely affect the operation of the Company facilities, and will use electric service equally from the three phases as nearly as possible. If the customer shall deem it necessary that voltage regulating equipment including but not limited to the structures and devices associated with such equipment, is required at any delivery point, such equipment shall be provided, owned and maintained by the customer.

ARTICLE 5. LIABILITY

The customer assumes all responsibility for electricity beyond the point of delivery and the Company shall not be liable for damages to the person or property of the customer or its

employees or any other persons resulting from the use or presence of electricity beyond the point of delivery, except where damage shall have been occasioned by the negligence of the Company, its agents, or employees.

ARTICLE 6. ACCESS

The customer gives all necessary permission to enable the agents of the Company to carry out the terms of this tariff and construct and maintain its lines and circuits in and at all places required by the Company and owned, leased or controlled by the customer. The customer gives to the Company the right for its duly authorized agents and employees to enter the premises of the customer at all reasonable times for the purpose of reading meters, keeping in repair or removing its property or inspecting its work incident to rendering service under this tariff.

ARTICLE 7. BILLING

Bills shall be rendered during the first part of the succeeding month and shall be due within ten days of receipt of the bill. If the transmittal of payment is not postmarked by the due date, the Purchaser shall pay the Company an interest charge on the unpaid balance computed daily from the due date at an annual rate equal to 2% more than the then current prime interest rate charge by The First National Bank of Boston. In order that bills may be rendered promptly after the end of each month, it may be necessary from time to time to estimate certain factors involved in calculating the monthly billing. Adjustments for errors in such estimates shall be included in the bill for the month following the time when information becomes available to make such corrections or adjustments in the billing for the preceding month or months.

(Original Sheet No. 8)

GENERAL TERMS AND CONDITIONS FOR
RESALE SERVICE RATE M

ARTICLE 1. OBLIGATIONS OF COMPANY AND CUSTOMER

The Company will offer the electric service described in the Resale Service Rate Schedule M, Original Sheet Nos. 3 through 7. Acceptance of such service by the Customer binds the Customer to all applicable provisions of this tariff, including those regarding payment, as they may be in effect from time to time. All obligations of the Company and the Customer are subject to action of the Federal Energy Regulatory Commission and such other governmental agencies as may have jurisdiction in the premises.

ARTICLE 2. TERMINATION OF SERVICE

Unless other provisions for termination is made in a service agreement between the Company and the Customer, either party may terminate service by giving three years' written notice.

ARTICLE 3. CHANGES IN TARIFF

The provisions of this tariff, including these General Terms and Conditions, Original Sheet Nos. 8 through 13, and the Resale Service Rate Schedule M, Original Sheet Nos. 3 through 7, may be amended from time to time or superseded by the Company by notifying the Customer in writing of such change and making the appropriate filing with the Federal Energy Regulatory Commission (or such other governmental agency as may have jurisdiction in the premises).

(Original Sheet No. 9)

ARTICLE 4. CONTINUITY OF SERVICE

The Company shall not be responsible for any failure to supply electric service, nor for interruption, reversal or abnormal voltage of the supply, if such failure, interruption, reversal or abnormal voltage is without willful default or gross negligence on its part. Whenever the integrity of the Company's system or the supply of electricity is threatened by conditions on its system or on the system with which it is directly or indirectly interconnected, or whenever it is necessary or desirable to aid in the restoration of service, the Company may, in its sole judgement, curtail or interrupt electric service or reduce voltage to some or all of its customers and such curtailment, interruption or reduction shall not constitute willful default by the Company. When the Company interrupts or varies electric service to make repairs to or changes in its facilities, such action shall be taken upon reasonable notice to the customers affected, or without notice in an emergency when such notification would prolong a dangerous situation.

ARTICLE 5. METERING

Metering equipment utilized at delivery points for billing of all sales of capacity and energy made by Montaup Electric shall be supplied, installed, wired, owned and maintained, calibrated and scaled by the Company. Such meters shall be of a type selected by the Company.

When metering is at a point other than the delivery point, the metering equipment shall be compensated to register values which would have been recorded if the equipment had been located at the delivery point.

The accuracy of the metering equipment shall be verified by proper test at any time upon reasonable notice given by either of the parties to the other, and each party shall be entitled to have a representative present at such verification.

The work of testing and adjusting any meter for accuracy shall be performed by and at the expense of the Company, provided that such test is not called for by the other party more often than once in twelve months. If either party shall require more than one verification of any meter in any twelve month period, and the meter proves to be accurate within two (2) percent up or down, the additional verification shall be at the expense of the party requesting it.

If such equipment is found to be inaccurate by more than two (2) percent up or down, the equipment shall be made accurate and the meter readings for the period of inaccuracy shall be adjusted to correct such inaccuracies as far as the same can be reasonably ascertained. If the period of inaccuracy cannot be reasonably ascertained the period of inaccuracy will be deemed to have encompassed one-half of the time period since the last test of the meter.

In the event that the Company's meters fail to register properly during any billing period, the demand and energy quantities will be estimated by the Company from the best available data.

If requested, the customer agrees to supply, free of cost, at each point of delivery to its system a suitable location for the installation of the Company's metering equipment and such other facilities as are required by the Company in its judgement in providing the requested service. Such location shall be in accordance with specifications as supplied by the Company.

ARTICLE 6. USE OF SERVICE

The customer will exercise diligence to use the electric service furnished under this tariff with a view to securing the efficiency of the Company's apparatus and system in keeping with generally accepted good operating standards, will maintain a power factor as near unity as practicable consistent with good engineering practice, will coordinate its system relaying and fusing with that of the Company so as to preclude unnecessary interruptions, will maintain its lines at all times in a safe operating condition, will operate lines in such manner as not to interfere with the service of the Company to its customers, will coordinate with the Company maintenance which may adversely affect the operation of the Company facilities, and will use electric service equally from the three phases as nearly as possible. If the customer shall deem it necessary that voltage regulating equipment

(Original Sheet No. 12)

including but not limited to the structures and devices associated with such equipment, is required at any delivery point, such equipment shall be provided, owned and maintained by the customer.

ARTICLE 7. LIABILITY

The customer assumes all responsibility for electricity beyond the point of delivery and the Company shall not be liable for damages to the person or property of the customer or its employees or any other persons resulting from the use or presence of electricity beyond the point of delivery, except where damage shall have been occasioned by the negligence of the Company, its agents, or employees.

ARTICLE 8. ACCESS

The customer gives all necessary permission to enable the agents of the Company to carry out the terms of this tariff and construct and maintain its lines and circuits in and at all places required by the Company and owned, leased or controlled by the customer. The customer gives to the Company the right for its duly authorized agents and employees to enter the premises of the customer at all reasonable times for the purpose of reading meters, keeping in repair or removing its property or inspecting its work incident to rendering service under this tariff.

(Original Sheet No. 13)

ARTICLE 9. BILLING

Bills shall be rendered during the first part of the succeeding month and shall be due within ten days of receipt of the bill. If the transmittal of payment is not postmarked by the due date, the Purchaser shall pay the Company an interest charge on the unpaid balance computed daily from the due date at an annual rate equal to 2% more than the then current prime interest rate charge by The First National Bank of Boston. In order that bills may be rendered promptly after the end of each month, it may be necessary from time to time to estimate certain factors involved in calculating the monthly billing. Adjustments for errors in such estimates shall be included in the bill for the month following the time when information becomes available to make such corrections or adjustments in the billing for the preceding month or months.

# EXHIBIT D

# STANDARD OFFER SERVICE AGREEMENT

BETWEEN

MONTAUP ELECTRIC COMPANY

AND

NEWPORT ELECTRIC CORPORATION

STANDARD OFFER SERVICE AGREEMENT

THIS AGREEMENT, made and entered as of the 23rd day of December, 1997, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation, hereinafter called the "Company", and NEWPORT ELECTRIC CORPORATION, a Rhode Island corporation, hereinafter called the "Customer".

W I T N E S S E T H:

WHEREAS, the Customer is currently an all-requirements customer of the Company under the Company's FERC Tariff and a Service Agreement; and

WHEREAS, under the Service Agreement, the Customer purchases from the Company for resale all of the electric requirements of the ultimate customers in the Customer's service territory; and

WHEREAS, the Rhode Island Legislature passed into law the URA, which extends wholesale competition in power supply markets to retail customers through the provision of retail access; and

WHEREAS, the Company and the Customer are parties to a Settlement; and

WHEREAS, the Settlement provides for the termination of all-requirements service under the Tariff and the provision of unbundled transmission service by the Company to the Customer under the Company's open access tariff so as to implement retail access in a manner consistent with the URA.

NOW, THEREFORE, for and in consideration of the mutual commitments set forth herein, and other good and valuable consideration, the Company and the Customer agree as follows:

1. Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this agreement, including its appendices, as amended.

"FERC" shall mean the Federal Energy Regulatory Commission.

"Nonregulated Power Producer" shall have the same meaning as set forth in Section 39-1-2.(7.1) of the URA.

"Retail Access Date" shall have the same meaning as set forth in paragraph 3.1 of the Stipulation and Agreement to the Settlement.

"Service Agreement" shall mean the Customer's currently effective service agreement, as amended, under which all-requirements service is being provided to the Customer by the Company.

"Settlement" shall mean the settlement which was approved by the FERC in Docket No. ER97-2800 et al. on December 19, 1997.

"Standard Offer Retail Service" shall have the same meaning as the service set forth in Section 39-1-27.2 of the URA.

"Standard Offer Service" shall mean the service provided under the Settlement consisting of the provision by the Company of wholesale supply of power sufficient to meet the requirements of retail customers served by the Customer's distribution system that purchase Standard Offer Retail Service.

"Tariff" shall mean the Company's FERC Tariff, First Revised Volume No. 1.

"URA" shall mean the Rhode Island Utility Restructuring Act of 1996.

2. The Parties agree that, notwithstanding anything to the contrary in the Service Agreement or in the Tariff, the Customer's obligation to purchase all of its requirements and the Company's obligation to provide such all-requirements service shall terminate as of January 1, 1998.

on less than 90 days notice shall be permitted with the mutual consent of the parties. Once the Customer has reduced or terminated its purchases of Standard Offer Service from the Company, the Company shall have no obligation to supply Standard Offer Service to the Customer with respect to the terminated or reduced purchases, except as may be provided by law.

(c) The Company acknowledges that the Customer may periodically offer alternative power suppliers the opportunity in an auction to supply the Customer with Standard Offer Service to enable it to provide Standard Offer Retail Service to its ultimate customers in its service territory after the Retail Access Date. The Company, its successors or assigns, shall be free to bid in the auction, provided that the Company's bid shall not exceed the prices set forth in Article 5 of the Stipulation and Agreement, adjusted for the fuel index set forth in Attachment 4.

4. To the extent not inconsistent with any of the provisions of this Agreement or the Settlement, incorporated herein by reference are the general terms and conditions of service set out in the Tariff at Original Sheet Nos. 8 through 13 which have been slightly modified to reflect service under this New Standard Offer Service Agreement (and which are attached hereto for convenience at Appendix C), as the same may be amended from time to time.

IN WITNESS WHEREOF, the parties have caused this instrument to be executed by their respective authorized officials.

MONTAUP ELECTRIC COMPANY

By Kevin A Kirby
Kevin Kirby

Its Vice President

Dated: December 23, 1997

NEWPORT ELECTRIC CORPORATION

By John Carney
John Carney

Its President

Dated: December 23, 1997

# APPENDIX A

| Calendar Year | Price per kilowatthour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

# APPENDIX B

NARR 06399

**D. Standard Offer Fuel Index**

The Customer Rate in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

> Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:
>
> > Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year.

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

> Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

*For example, if for a month in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50 + \$.60/MMBtu) + (\$3.00 + \$.04/MMBtu)}{\$6.09 + \$.60 + \$.04/MMBtu} = 1.0609$$

*The Customer Rate paid to the distribution company is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548 c/KWH (4.2 x 1.0609).*

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

Incremental revenues received by the distribution company as the result of a Fuel Adjustment would be fully allocated to Standard Offer suppliers in proportion to the Standard Offer energy provided by a supplier to the distribution company in the applicable billing month.

# APPENDIX C

NARR 06403

(Revised Sheet No. 8)

GENERAL TERMS AND CONDITIONS FOR
STANDARD OFFER SERVICE AGREEMENT

ARTICLE 1. OBLIGATIONS OF COMPANY AND CUSTOMER

The Company will offer the electric service described in the Standard Offer Service Agreement. Acceptance of such service by the Customer binds the Customer to all applicable provisions of this tariff, including those regarding payment, as they may be in effect from time to time. All obligations of the Company and the Customer are subject to action of the Federal Energy Regulatory Commission and such other governmental agencies as may have jurisdiction in the premises.

ARTICLE 2. CHANGES IN TARIFF

The provisions of this tariff, including these General Terms and Conditions, Original Sheet Nos. 8 through 10, and the Standard Offer Service Agreement, may be amended from time to time or superseded by the Company by notifying the Customer in writing of such change and making the appropriate filing with the Federal Energy Regulatory Commission (or such other governmental agency as may have jurisdiction in the premises).

ARTICLE 3. CONTINUITY OF SERVICE

The Company shall not be responsible for any failure to supply electric service, nor for interruption, reversal or abnormal voltage of the supply, if such failure, interruption, reversal or abnormal voltage is without willful default or gross negligence on its part. Whenever the integrity of the Company's system or the supply of electricity is threatened by conditions on its system or on the system with which it is directly or indirectly interconnected, or whenever it is necessary or desirable to aid in the restoration of service, the Company may, in its sole

judgement, curtail or interrupt electric service or reduce voltage to some or all of its customers and such curtailment, interruption or reduction shall not constitute willful default by the Company. When the Company interrupts or varies electric service to make repairs to or changes in its facilities, such action shall be taken upon reasonable notice to the customers affected, or without notice in an emergency when such notification would prolong a dangerous situation.

ARTICLE 4. USE OF SERVICE

The customer will exercise diligence to use the electric service furnished under this tariff with a view to securing the efficiency of the Company's apparatus and system in keeping with generally accepted good operating standards, will maintain a power factor as near unity as practicable consistent with good engineering practice, will coordinate its system relaying and fusing with that of the Company so as to preclude unnecessary interruptions, will maintain its lines at all times in a safe operating condition, will operate lines in such manner as not to interfere with the service of the Company to its customers, will coordinate with the Company maintenance which may adversely affect the operation of the Company facilities, and will use electric service equally from the three phases as nearly as possible. If the customer shall deem it necessary that voltage regulating equipment including but not limited to the structures and devices associated with such equipment, is required at any delivery point, such equipment shall be provided, owned and maintained by the customer.

ARTICLE 5. LIABILITY

The customer assumes all responsibility for electricity beyond the point of delivery and the Company shall not be liable for damages to the person or property of the customer or its

employees or any other persons resulting from the use or presence of electricity beyond the point of delivery, except where damage shall have been occasioned by the negligence of the Company, its agents, or employees.

ARTICLE 6. ACCESS

The customer gives all necessary permission to enable the agents of the Company to carry out the terms of this tariff and construct and maintain its lines and circuits in and at all places required by the Company and owned, leased or controlled by the customer. The customer gives to the Company the right for its duly authorized agents and employees to enter the premises of the customer at all reasonable times for the purpose of reading meters, keeping in repair or removing its property or inspecting its work incident to rendering service under this tariff.

ARTICLE 7. BILLING

Bills shall be rendered during the first part of the succeeding month and shall be due within ten days of receipt of the bill. If the transmittal of payment is not postmarked by the due date, the Purchaser shall pay the Company an interest charge on the unpaid balance computed daily from the due date at an annual rate equal to 2% more than the then current prime interest rate charge by The First National Bank of Boston. In order that bills may be rendered promptly after the end of each month, it may be necessary from time to time to estimate certain factors involved in calculating the monthly billing. Adjustments for errors in such estimates shall be included in the bill for the month following the time when information becomes available to make such corrections or adjustments in the billing for the preceding month or months.

(Original Sheet No. 8)

GENERAL TERMS AND CONDITIONS FOR
RESALE SERVICE RATE M

ARTICLE 1. OBLIGATIONS OF COMPANY AND CUSTOMER

The Company will offer the electric service described in the Resale Service Rate Schedule M, Original Sheet Nos. 3 through 7. Acceptance of such service by the Customer binds the Customer to all applicable provisions of this tariff, including those regarding payment, as they may be in effect from time to time. All obligations of the Company and the Customer are subject to action of the Federal Energy Regulatory Commission and such other governmental agencies as may have jurisdiction in the premises.

ARTICLE 2. TERMINATION OF SERVICE

Unless other provisions for termination is made in a service agreement between the Company and the Customer, either party may terminate service by giving three years' written notice.

ARTICLE 3. CHANGES IN TARIFF

The provisions of this tariff, including these General Terms and Conditions, Original Sheet Nos. 8 through 13, and the Resale Service Rate Schedule M, Original Sheet Nos. 3 through 7, may be amended from time to time or superseded by the Company by notifying the Customer in writing of such change and making the appropriate filing with the Federal Energy Regulatory Commission (or such other governmental agency as may have jurisdiction in the premises).

(Original Sheet No. 9)

ARTICLE 4. CONTINUITY OF SERVICE

The Company shall not be responsible for any failure to supply electric service, nor for interruption, reversal or abnormal voltage of the supply, if such failure, interruption, reversal or abnormal voltage is without willful default or gross negligence on its part. Whenever the integrity of the Company's system or the supply of electricity is threatened by conditions on its system or on the system with which it is directly or indirectly interconnected, or whenever it is necessary or desirable to aid in the restoration of service, the Company may, in its sole judgement, curtail or interrupt electric service or reduce voltage to some or all of its customers and such curtailment, interruption or reduction shall not constitute willful default by the Company. When the Company interrupts or varies electric service to make repairs to or changes in its facilities, such action shall be taken upon reasonable notice to the customers affected, or without notice in an emergency when such notification would prolong a dangerous situation.

ARTICLE 5. METERING

Metering equipment utilized at delivery points for billing of all sales of capacity and energy made by Montaup Electric shall be supplied, installed, wired, owned and maintained, calibrated and scaled by the Company. Such meters shall be of a type selected by the Company.

(Original Sheet No. 10)

When metering is at a point other than the delivery point, the metering equipment shall be compensated to register values which would have been recorded if the equipment had been located at the delivery point.

The accuracy of the metering equipment shall be verified by proper test at any time upon reasonable notice given by either of the parties to the other, and each party shall be entitled to have a representative present at such verification.

The work of testing and adjusting any meter for accuracy shall be performed by and at the expense of the Company, provided that such test is not called for by the other party more often than once in twelve months. If either party shall require more than one verification of any meter in any twelve month period, and the meter proves to be accurate within two (2) percent up or down, the additional verification shall be at the expense of the party requesting it.

If such equipment is found to be inaccurate by more than two (2) percent up or down, the equipment shall be made accurate and the meter readings for the period of inaccuracy shall be adjusted to correct such inaccuracies as far as the same can be reasonably ascertained. If the period of inaccuracy cannot be reasonably ascertained the period of inaccuracy will be deemed to have encompassed one-half of the time period since the last test of the meter.

In the event that the Company's meters fail to register properly during any billing period, the demand and energy quantities will be estimated by the Company from the best available data.

(Original Sheet No. 11)

If requested, the customer agrees to supply, free of cost, at each point of delivery to its system a suitable location for the installation of the Company's metering equipment and such other facilities as are required by the Company in its judgement in providing the requested service. Such location shall be in accordance with specifications as supplied by the Company.

ARTICLE 6. USE OF SERVICE

The customer will exercise diligence to use the electric service furnished under this tariff with a view to securing the efficiency of the Company's apparatus and system in keeping with generally accepted good operating standards, will maintain a power factor as near unity as practicable consistent with good engineering practice, will coordinate its system relaying and fusing with that of the Company so as to preclude unnecessary interruptions, will maintain its lines at all times in a safe operating condition, will operate lines in such manner as not to interfere with the service of the Company to its customers, will coordinate with the Company maintenance which may adversely affect the operation of the Company facilities, and will use electric service equally from the three phases as nearly as possible. If the customer shall deem it necessary that voltage regulating equipment

including but not limited to the structures and devices associated with such equipment, is required at any delivery point, such equipment shall be provided, owned and maintained by the customer.

ARTICLE 7. LIABILITY

The customer assumes all responsibility for electricity beyond the point of delivery and the Company shall not be liable for damages to the person or property of the customer or its employees or any other persons resulting from the use or presence of electricity beyond the point of delivery, except where damage shall have been occasioned by the negligence of the Company, its agents, or employees.

ARTICLE 8. ACCESS

The customer gives all necessary permission to enable the agents of the Company to carry out the terms of this tariff and construct and maintain its lines and circuits in and at all places required by the Company and owned, leased or controlled by the customer. The customer gives to the Company the right for its duly authorized agents and employees to enter the premises of the customer at all reasonable times for the purpose of reading meters, keeping in repair or removing its property or inspecting its work incident to rendering service under this tariff.

(Original Sheet No. 13)

ARTICLE 9.  BILLING

Bills shall be rendered during the first part of the succeeding month and shall be due within ten days of receipt of the bill.  If the transmittal of payment is not postmarked by the due date, the Purchaser shall pay the Company an interest charge on the unpaid balance computed daily from the due date at an annual rate equal to 2% more than the then current prime interest rate charge by The First National Bank of Boston.  In order that bills may be rendered promptly after the end of each month, it may be necessary from time to time to estimate certain factors involved in calculating the monthly billing.  Adjustments for errors in such estimates shall be included in the bill for the month following the time when information becomes available to make such corrections or adjustments in the billing for the preceding month or months.

# LIST OF RECIPIENTS

NARR 06413

# EXHIBIT E

**PART 1 OF 2**


Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

BVE Drawer
Responses
EXHIBIT

May 15, 1998

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

RE: Blackstone Valley Electric Company
Newport Electric Corporation
RIPUC Docket No. 2716

Dear Ms. Massaro:

Enclosed is an original and nine copies of the Companies' responses to the First Set of Record Requests of the Rhode Island Public Utilities Commission RR-1-1 to RR-1-7 and Division, RR-1-1-DIV, dated May 12, 1998 for Blackstone Valley Electric Company and Newport Electric Corporation.

If you have any questions in this regard, please feel free to call.

Respectfully submitted,

Mark Sorgman
Supervisor
Rate Administration

gmr

Enclosures

cc: Lindsay Johnson, Esq.

Q:\RR\2716COMM\RECORD~1\LULYLTR.doc

750 West Center Street P.O. Box 543, West Bridgewater, MA 02379 508-559-2000 FAX: 508-559-8932



Eastern Utilities

*Blackstone Valley Electric*
*Eastern Edison*
*EUA Service Corporation*
*Montaup Electric*
*Newport Electric*

May 15, 1998

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

RE: Blackstone Valley Electric Company
Newport Electric Corporation
RIPUC Docket No. 2716

Dear Ms. Massaro:

Enclosed is an original and nine copies of the Companies' responses to the First Set of Record Requests of the Rhode Island Public Utilities Commission RR-1-1 to RR-1-7 and Division, RR-1-1-DIV, dated May 12, 1998 for Blackstone Valley Electric Company and Newport Electric Corporation.

If you have any questions in this regard, please feel free to call.

Respectfully submitted,

Mark Sorgman
Supervisor
Rate Administration

gmr

Enclosures

cc: Lindsay Johnson, Esq.

98 MAY 15 PM 2:35

Q:\RR\2716COMM\RECORD~1\LULYLTR.doc

*750 West Center Street P.O. Box 543, West Bridgewater, MA 02379 508-559-2000 FAX: 508-559-8932*

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Division Record Requests
May 12, 1998

The Division's First Set of Record Requests dated May 12, 1998.

Item: RR1-1-DIV: Provide the Companies' definition of a new customer.

Reply:

For purposes of procuring Standard Offer Service pursuant to the Montaup Wholesale Settlement Agreement, the Companies define "new" customer by exclusion--that is, a "new" customer is a customer who is not an "old" customer. An "old" customer is defined by applying the following two-part test. A customer that meets both parts of the test is an "old" customer.

1. Is the customer currently a "customer of record" whose electric service commenced before January 1, 1998, and has continued thereafter? A "customer of record" is a person in whose name electric power was delivered under one or more rate schedules at one or more service locations within the service areas of the Companies and who is legally responsible for paying the bill for the electric power so delivered.

2. Did the service location at which Standard Offer Service is to be delivered physically exist before January 1, 1998? Rebuilding or upgrading distribution facilities at a service location after December 31, 1997, that physically existed before January 1, 1998, are deemed to have physically existed before January 1, 1998.

The two parts of the foregoing test are applied independently. An "old" customer need not be a "customer of record" presently receiving service whose service commenced before January 1, 1998, at the same physical service location as the customer did before January 1, 1998, although such customers are "old" customers. Rather, an "old" customer is a customer presently receiving service whose service commenced before January 1, 1998, at any physical service location that existed before January 1, 1998.

Witness Responsible: J. J. Bonner

Q:\RI\2716COMM\RECORD R\DIVRR1-1.DOC

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-1 Provide a copy of the Wholesale Standard Offer Service Agreement between Montaup and Transcanada relative to the purchase of the OSP entitlements. Include a copy of the surety agreement.

Reply: Attached

Witness Responsible: M. J. Hirsh

Q:\RR\2716COMM\RECORD~1\RR1-1.DOC

# Wholesale Standard Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

TABLE OF CONTENTS

Page

ARTICLE 1. Definitions ..... 2

ARTICLE 2. Term ..... 3

ARTICLE 3. Supplier Responsibilities ..... 3

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO ..... 4

ARTICLE 5. Price ..... 5

ARTICLE 6. Billing and Payments ..... 6

ARTICLE 7. Events of Default, Liability, Relationship of the Companies ..... 6

ARTICLE 8. Termination/Reimbursement ..... 8

ARTICLE 9. Force Majeure ..... 8

ARTICLE 10. Assignment ..... 9

ARTICLE 11. Successors and Assigns ..... 10

ARTICLE 12. Resolution of Disputes ..... 10

ARTICLE 13. Interpretation ..... 11

ARTICLE 14. Severability of Provisions ..... 11

ARTICLE 15. Accounts and Records ..... 11

ARTICLE 16. Limitations on Liability and Indemnification ..... 12

ARTICLE 17. Regulation ..... 12

ARTICLE 18. Notices ..... 12

ARTICLE 19. Miscellaneous ..... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this seventh day of April, 1998, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation;("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1. Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"PPA Transfer Agreement" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer customers shall not be obligated

Confidential

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2. Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.

ARTICLE 3. Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5. <u>Price</u>:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

Price = Standard Offer Wholesale Price
+ Fuel Adjustment Factor

Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6. Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 12 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7. Events of Default, Liability, Relationship of the Companies:

(1) Unless excused by a Force Majeure as described in Article 9, each of the following events shall be deemed to be an Event of Default hereunder:

(a) Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b) Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2) Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

(3) Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4) As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement. The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

ARTICLE 8. Termination/Reimbursement:

(1) In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

a. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

b. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

c. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2) In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice. In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3) In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materially of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9. Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b) The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c) The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d) The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 11. Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. Resolution of Disputes:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 16. Limitations on Liability and Indemnification:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. Regulation:

(a) This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b) This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a) Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b) Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c) Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d) This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e) Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f) Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g) Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h) Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly

Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier: TransCanada Power Marketing Ltd.

By:_______________

BY:

On Behalf of the Companies:

Blackstone: BLACKSTONE VALLEY ELECTRIC COMPANY

By:_______________

Eastern: EASTERN EDISON COMPANY

By:_______________

Newport: NEWPORT ELECTRIC CORPORATION

By:_______________

APPENDIX A

SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
AND
STANDARD OFFER WHOLESALE PRICE

TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

* Standard Offer Service for Eastern Edison terminates at 12:00 midnight on December 31, 2004.

GUARANTY

1. (a) Reference is made to the Asset Purchase Agreement, dated as of April 2, 1998 (the "Purchase Agreement"), by and among MONTAUP ELECTRIC COMPANY (the "Seller") and TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "Buyer"). For good and valuable consideration received, TransCanada PipeLines Limited and TransCanada PipeLine USA Ltd., (collectively, the "Guarantors"), hereby irrevocably and unconditionally jointly and severally guaranty to the Seller and its successors and assigns that the Buyer shall perform all of its obligations under the Purchase Agreement and each of the Ancillary Agreements (as defined in the Purchase Agreement), including, but not limited to, the due and punctual:

(i) payment of all amounts required to be paid by the Buyer pursuant to the Purchase Agreement and each Ancillary Agreement; and

(ii) performance and observance of and compliance with all other obligations, covenants, and undertakings of the Buyer contained in the Purchase Agreement and any other agreement or instrument relating thereto, including the Ancillary Agreements (such payments and other obligations referred to in clauses (i) and (ii), collectively, the "Obligations"), at the times and in the manner provided therein.

This Guaranty shall be an absolute, unconditional, present and continuing guaranty of payment and performance (not of collection or collectibility) which shall remain in full force and effect until each and all of the Obligations guaranteed hereunder shall have been fully and satisfactorily discharged in accordance with the terms and provisions of the Purchase Agreement, the Ancillary Agreements and any other agreement or instrument relating thereto, and that Guarantors' undertakings hereunder are not contingent upon the bringing of any action against the Buyer or any other person or entity or resorting to any security or exercise or assertion of any other right or remedy against the Buyer or any other person or entity, and Guarantors hereby expressly waive any claim that its undertakings hereunder are so contingent.

(b) Notwithstanding Section 1(a) or any other paragraph hereof:

The Guarantors' liability hereunder shall be and is specifically limited to payment or performance expressly required by the Buyer in accordance with the Purchase Agreement or the Ancillary Agreements (even if such payments are deemed to be damages) and, except to the extent specifically provided in the Purchase Agreement or the Ancillary Agreements, in no event shall the Guarantors be subject hereunder to consequential, exemplary, equitable, loss of profits, punitive, tort, or any other damages, costs or attorney's fees.

2. The liability of the Guarantors under this Guaranty shall be absolute, unconditional and irrevocable, irrespective of:

(a) any change in time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of, or any consent to departure from, the Purchase Agreement, the Ancillary Agreements or any other agreement or instrument relating thereto;

(b) any change in ownership of the Guarantors or the Buyer; or

(c) any bankruptcy, insolvency or reorganization of, or other similar proceedings involving the Guarantors or the Buyer;

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by the Seller upon the insolvency, bankruptcy or reorganization of the Buyer or otherwise, all as though such payment had not been made.

3. The Guarantors hereby irrevocably, unconditionally and expressly waive, to the fullest extent permitted by applicable law, promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Seller protect, secure or perfect any security interest or exhaust any right or first proceed against the Buyer or any other person or entity.

4. This Guaranty constitutes a primary obligation of the Guarantors and is a continuing guaranty and shall:

   (a) be binding upon the Guarantors and their successors and assigns; and

   (b) inure to the benefit of and be enforceable by the Seller and its successors and assigns.

5. Upon payment of all Obligations owing to the Seller, the Guarantors shall be subrogated to the rights of the Seller against the Buyer.

6. This Guaranty shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and the Guarantors hereto submit to the jurisdiction of the courts of the Commonwealth of Massachusetts or of the federal courts located in Boston, Massachusetts, exclusively, without request for arbitration. Process shall be made by certified mail.

At any time after the second anniversary of this Guaranty, the Guarantors shall be released from all obligations hereunder upon providing to or for the benefit of Seller a letter of credit, collateral or other security in substitution for, and replacement of, the Guaranty which shall be at least equivalent in value to the security represented by the Guaranty as agreed among the Guarantors, the Buyer and Seller in the exercise by each of its reasonable commercial judgment and is otherwise in form and substance satisfactory to Seller.

IN WITNESS WHEREOF, the Guarantors have caused this Guaranty to be duly executed by their proper duly authorized officers as of the 2nd day of April, 1998.

TRANSCANADA PIPELINES LIMITED

Per: ______________________
George W. Watson
President and Chief Executive Officer

Per: ______________________
Robert A.M. Young
Senior Vice-President, Law and
Chief Compliance Officer

TRANSCANADA PIPELINE USA LTD.

Per: ______________________
George W. Watson
President

Per: ______________________
Robert A.M. Young
Vice-President

s:\counterparty credit\assurances\guarantees\
montaup\tcpml\1998-04-02\guaranty.doc/ks

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-2: With regards to Last Resort Service, what components go into fixed contribution, and how will it be recovered?

Reply:

In accordance with the Utility Restructuring Act of 1996 ("URA"), as amended, Last Resort Service will be procured from Non-regulated Power Producers ("NPP's") at market prices plus a fixed contribution. The Companies anticipate that the "market price" will be based on the prices of the appropriate NEPOOL products required to deliver the service (as explained by Division witness, Dr. Stutz). This would allow all energy, capacity, capacity reservation and load following costs to be captured entirely in the market price.The fixed contribution is envisioned to be a monthly payment by the Companies to the Supplier, regardless of the amount of energy delivered, which is expected to cover only the NPP's administrative costs incurred in supplying Last Resort Service.

Upon successfully procuring Last Resort Service from NPP's, the Companies will file new Last Resort Service tariffs. The charges for Last Resort Service under the new tariffs will be based on market prices. The fixed contribution paid to the NPP's plus other costs incurred by the Companies in arranging for Last Resort Service will be proposed to be recovered under a Last Resort Cost Adjustment ("LRCA") provision. The LRCA provision is expected to be similar in structure to the Companies' proposed Standard Offer Cost Adjustment provision. A LRCA factor will be proposed as an equal cents per kilowatthour factor applied to the distribution portion of bills to all customers.

The URA requires distribution companies to periodically solicit bids from NPP's to serve the electric requirements of customers taking Last Resort Service. At this time, the Companies plan to seek bids for Last Resort Service on a six month basis. Consequently, the price for Last Resort Service billed to customers receiving this service and the LRCA factor applied to all customers is expected to change every six months.

Witness Responsible: J. J. Bonner

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-3: Provide a copy of the Companies' Standard Offer Service RFP.

Reply: Copy Attached

Witness Responsible: L. R. Boisvert

Q:\RI\2716COMM\RECORD R\RR1-3.DOC

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION

## REQUEST FOR PROPOSALS
## TO SUPPLY
## STANDARD OFFER SERVICE

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting suppliers for proposals to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Proposals ("RFP") must be received at the address set forth below no later than 4:00 p.m. on Wednesday, April 1, 1998. Responses to the RFP must adhere to the specifications herein. Questions and responses to this RFP should be submitted to:

Lawrence R. Boisvert
Supervisor, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
Lboisvert@eua.com

**The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall vest in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to modification by certain state and federal regulatory agencies having jurisdiction of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any regulator or court having jurisdiction, or legislation may require the Companies to modify or withdraw their plans as described herein. Furthermore, the Companies, for their convenience and in their sole discretion, may change the timetable for the actions described herein.**

Table of Contents

I. Introduction

II. Standard Offer Service
- A. Customer Eligibility - Massachusetts
- B. Customer Eligibility - Rhode Island

III. Supplier Eligibility
- A. General Requirements
  1. NEPOOL Membership
  2. Regulatory Authorizations
- B. Additional Requirements for Option 2 Suppliers
  1. Modifications to Standard Offer Agreement
  2. Financial Information
  3. Default, Litigation and Penalties
  4. Performance Surety

IV. Administration of Standard Offer Service
- A. Hourly Load Estimation and Loss Allocation
- B. Load Information
- C. Minimum Load Obligation
- D. Supplier Defaults

V. Proposal Terms and Evaluation

VI. RFP Schedule

Appendix 1 Standard Offer Price Schedule

Appendix 2 Standard Offer Fuel Index

Appendix 3 Five-Year Load Forecast

Appendix 4 Proposal Bid Forms

Appendix 5 Draft Standard Offer Service Agreement

Appendix 6 Form of Performance Surety Documents

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) (collectively, the "Companies") are jointly seeking qualified parties to submit proposals to provide wholesale power supply to fulfill the Companies' Standard Offer Service obligations. Eastern, Blackstone, and Newport are wholly-owned retail subsidiaries of Eastern Utilities Associates, a registered public utility holding company, and are cooperating on the design and implementation of a process for-soliciting suppliers of this service. In 1997, the Companies had total retail billings of 4,455 GWh and an annual peak of approximately 904 MW.

During the transition to a competitive retail electricity marketplace, the Companies are required to arrange for Standard Offer Service to their retail customers that have not yet chosen a competitive supplier. "Standard Offer Service" is defined as firm, all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs.[1] Standard Offer Service is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace. Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. The Companies are providing two options for submitting proposals. Prospective Suppliers can submit bids for either one or both options. The solicitation options are as follows:

| | |
|---|---|
| <u>Option 1: 1998 Standard Offer</u> | Bids are to be provided for a fixed percentage of the Companies' Standard Offer Load for the period June 1, 1998 through December 31, 1998. |
| <u>Option 2: 1999-2004 Standard Offer</u> | Bids are to be provided for a fixed percentage of the Companies' Standard Offer Load for the period January 1, 1999 through December 31, 2004. |

Suppliers who successfully bid will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply as described in Section II. At the conclusion of the evaluation of the bids provided in response to this solicitation, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time. The Companies will make available to Suppliers certain load information, as described in Section IV. However, it will be the Suppliers' ultimate responsibility for estimating and meeting its Standard Offer Service responsibilities.

---

1/ Eastern's Standard Offer Service Tariff is currently pending before the Massachusetts Department of Telecommunications and Energy. Blackstone's and Newport's tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

The Suppliers will also be required to provide power plant emissions and labor information in appropriate form to enable Eastern Edison to comply with the Massachusetts Department of Telecommunications and Energy's Uniform Label Disclosure requirements.

**II. Standard Offer Service**

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. Eastern, Blackstone, and Newport are required to solicit through the competitive market for Suppliers of Standard Offer Service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and resell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs.

Initially, the Companies expect that many of its existing customers will continue to take Standard Offer Service for the remainder of 1998. However, long-term forecasts of Standard Offer Service load are uncertain. As the electricity market matures, retail electric customers are expected to terminate Standard Offer Service to purchase electricity from an alternative supplier and, with the few exceptions described below, may not return to Standard Offer Service after 1998.

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for meeting their share of the Companies' Standard Offer Service load under the Restated NEPOOL Agreement and rules of ISO New England, Inc. or successor rules, and their responsibilities will include, without limiting the scope of such responsibilities, the following: i) installed and operable capacity; ii) operating reserves and automatic generator control; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customers' meters. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments to Suppliers for Standard Offer Service will be based on the discounts to the annual average prices shown in Appendix 1 determined through this solicitation as adjusted for the Fuel Index (Appendix 2), if applicable. No adjustments will be made for time of use, load factor, or any other characteristics of the load.

A five-year forecast of monthly energy billings and requirements of the Companies' aggregated Standard Offer Service load, assuming no migration of customers from Standard Offer Service to competitive suppliers, is shown in Appendix 3. Additional load information, consisting of "percent of annual peak" customer class load shapes, can be obtained from the EUA System's Internet website at www.eua.com, under "Supplier/EBT Information."

**A. Customer Eligibility - Massachusetts**

Standard Offer Service shall be available to each customer who was a customer of record as of March 1, 1998 and who has not received generation service from a competitive supplier since March 1, 1998, subject to the following conditions:

1. A customer receiving Standard Offer Service shall be allowed to retain such service upon moving within Eastern Edison's service territory.
2. A customer who previously received generation service from a competitive supplier is no longer eligible to receive Standard Offer Service, except that a low-income customer may return to Standard Offer Service at any time, regardless of whether the customer has previously received generation service from a competitive supplier.
3. Residential or small commercial or industrial customers taking retail delivery service under Eastern Edison's residential rates or Small General Service Retail Delivery Rate G-1 who have received generation service from a competitive supplier since March 1, 1998 are eligible to receive Standard Offer Service by so notifying Eastern Edison within one-hundred-twenty (120) days of the date when the customer first began to receive generation service from a competitive supplier, provided that such notification occurs prior to March 1, 1999.
4. A customer who moves into Eastern Edison's service territory after March 1, 1998 is not eligible to receive Standard Offer Service, except that a low-income customer who moves into Eastern Edison's service territory after March 1, 1998 shall be eligible for Standard Offer Service.
5. A customer who has received generation service pursuant to an agreement with a municipal aggregator is eligible to receive Standard Offer Service by so notifying Eastern Edison with one-hundred-eighty (180) days of the date when the customer first began to receive generation service through such agreement.

**B. Customer Eligibility - Rhode Island**

Standard Offer Service shall be available to all customers taking electric service from Blackstone or Newport before January 1, 1998 and customers moving into the Blackstone or Newport service territories on or after January 1, 1998, subject to the following conditions:

1. Such customers shall have the right to relocate to a different service location within Blackstone's or Newport's service territory and continue to receive Standard Offer Service.
2. Customers shall be ineligible to receive Standard Offer Service after terminating such service, except that customers who receive service under any of Blackstone's or Newport's residential retail delivery service rates or under the Small General Retail Delivery Service Rate G-1 may elect to take electric power service from another supplier during the period beginning January 1, 1998 and ending December 31, 1998, and elect to return to Standard Offer Service within one-hundred-twenty (120) days of commencing service from that supplier.

## III. Supplier Eligibility

### A. General Requirements

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the solicitation must meet the Companies' minimum eligibility requirements as outlined below. Prospective Suppliers submitting proposals under Option 2 are required to submit additional information about their qualifications, due to the extended term of the service and the correspondingly larger commitment on behalf of the Companies' retail customers. Documentation of compliance with each applicable requirement must be provided as part of the proposal. The Companies will have the final authority to determine, in their sole discretion, whether a respondent meets or does not meet these requirements.

#### 1. NEPOOL Membership

To participate in this Standard Offer Service RFP, a prospective Supplier must be a member in good standing of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England, Inc. billing system. As an alternative to being a member, the prospective Supplier may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the prospective Supplier's proposed commitment to provide Standard Offer Service or for such period until the prospective Supplier becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the prospective Supplier in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the prospective Supplier's proposal.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement.

#### 2. Regulatory Authorizations

Each proposal must include a positive declaration that the prospective Supplier has obtained or will obtain in a timely manner all applicable state and federal regulatory authorizations necessary for the Supplier to lawfully perform its obligations under any Standard Offer Service Agreement that it may enter into with the Companies.

### B. Additional Requirements for Option 2 Suppliers

#### 1. Modifications to the Standard Offer Agreement

At the completion of the evaluation process, each successful Supplier for Option 2 will be required to sign a Standard Offer Service Agreement substantially in the form provided in Appendix 5. Alternatively, the Companies will consider using a Supplier's existing FERC wholesale tariff, provided the tariff's terms and conditions are acceptable.

Confidential

Prospective Suppliers wishing to utilize their existing tariff must include it with their proposal package. Prospective Suppliers who do not provide a tariff for the Companies' consideration are requested to review the draft Agreement and to provide any comments, exceptions, or proposed changes as part of their proposal. The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement.

**2. Financial Information**

- Audited or certified financial statements, including balance sheet and statement of income and cash flow for prospective Supplier and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.
- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.
- A description of any corporate affiliations or joint venture partnerships.

**3. Defaults, Litigation, and Penalties**

- For each prospective Supplier and any Guarantor(s) or any affiliate of each which in the past five years has been determined by an arbitrator, regulator, or court, having jurisdiction of the matter, to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.
- A detailed description of any situation within the past five (5) years in which the prospective Supplier or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations by an arbitrator, regulator, or court having jurisdiction of the matter.
- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the prospective Supplier or its Guarantor(s), or their respective officers or directors.
- A detailed description of any penalties, judgments, consent decrees, or other sanctions within the past five (5) years in any venue involving the prospective Supplier or its Guarantor(s).
- A detailed description of any present or anticipated facts known to the prospective Supplier or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

**4. Performance Surety**

As a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Supplier under Option 2 will be required to deliver to the Companies a performance surety securing the Qualified Supplier's full responsibility for Standard Offer Service load over the six-year term.

Acceptable forms of surety include a performance letter of credit, a performance bond, or a parent guaranty, in substantially the form as provided in Appendix 3. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. Each surety company or companies issuing a performance bond must maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Agreement. Performance letters of credit or bonds, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and shall be renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

## IV. Administration of Standard Offer Service

### A. Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England, Inc. each Supplier's hourly share of the aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the Massachusetts Department of Telecommunications and Energy and Rhode Island Public Utilities Commission, summarized as follows:

- Energy and demand for each retail account will be estimated for each hour using a combination of inputs, including weather and load data from the EUA Supervisory Control and Data Acquisition ("SCADA") system, sample meter data, historical load shapes, and individual customer usage ratios.
- The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.
- The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.
- Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.
- The hourly Standard Offer loads, including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.
- The daily load information will be transferred to ISO New England, Inc. for inclusion in each Supplier's own-load dispatch (or such other settlement process developed by NEPOOL or ISO New England, Inc.).

The Terms and Conditions for Suppliers may be revised, amended, supplemented, or supplanted in whole or in part from time to time by state regulatory agencies or by law.

### B. Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

The Companies will make available information to enable Suppliers to track their actual Standard Offer Service loads and to forecast their future obligations. Such information will include daily reports of estimated hourly Standard Offer Service loads,

numbers of customers in each rate class taking Standard Offer Service, and representative customer load shapes for each rate class. The Companies may also make available estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for prior monthly or annual periods, as appropriate.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies receive customer notifications of significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts. Suppliers are advised to rely on their own projections of load and market dynamics.

### C. Minimum Load Obligations

Over time, it is expected that Standard Offer Service load will decline, and thus the actual energy and demand responsibilities (in MWh and MW) associated with a given percentage of the load will decline as well. The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater. If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

### D. Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement. The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, and other factors the Companies deem appropriate.

## V. Proposal Terms and Evaluation

### A. Proposal Requirements

The Companies in this Request for Proposals are providing prospective Suppliers with two options for providing bids. Prospective Suppliers may respond to this solicitation by bidding on the Single Year (Option 1) Standard Offer which is for the period June 1, 1998 through December 31, 1998 and/or for the full remaining term of Standard Offer (Option 2) which is for the period January 1, 1999 through February 28, 2005.

The Companies require that Suppliers of Standard Offer Service take on a fixed percentage share of the Companies' load obligations for the term of such Suppliers' obligations, and that prospective Suppliers' bids, exclusive of the Fuel Index revenues, not exceed the fixed annual cents-per-kilowatt-hour prices for energy delivered to retail customer meters given in Appendix 1. Consequently, for either Option, bids must contain two elements: i) a percentage share of the Companies' aggregate Standard Offer Service Load that the prospective Supplier wishes to serve (the "Share"); and ii) a percentage discount off of the wholesale rate caps shown in Appendix 1 at which the prospective Supplier would serve Standard Offer Service Load (the "Discount"). The Share should be stated as an integer-valued percentage, no smaller than 1% and no larger than 100%. The Discount must be stated as a non-negative percentage. Under Option 2, the Share and the Discount must remain constant year-to-year. The Discount must be stated as a fixed value, and must not be indexed in any way.

Proposals should be submitted on the appropriate Proposal Forms included in Appendix 4. Proposals must also conform in all material respects to the appropriate Standard Offer Service Agreement included in Appendix 5. Alternatively, the Companies will consider using a Supplier's existing FERC wholesale tariff, provided the tariff's terms and conditions are acceptable. Prospective Suppliers wishing to utilize their existing tariff must include it with their proposal package.

The Companies agree that all information they receive from the prospective Suppliers shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the prospective Supplier's qualifications and proposals. To the extent that such information is required to be disclosed to a third person in any proceeding, the Companies will produce it under a confidentiality agreement or protective order of the tribunal or agency having jurisdiction of the matter.

### B. Proposal Evaluation

For each of the two Options, proposals which offer the largest Discounts to the wholesale rate cap will be selected first until 100% of the Companies' Standard Offer Service Load has been subscribed. In the event that two or more prospective Suppliers offer the same discount and the aggregate of such bids represent more than 100% of the Standard Offer Load, the Companies will pro-rate each of those bids, such that the sum of all bids selected equals 100%.

Confidential

The Companies shall have the exclusive right to accept or reject any or all of the proposals submitted at any time, for any reason. All submissions shall constitute an offer to sell Standard Offer Service and such offer shall be deemed to be held open until May 31, 1998. Pricing contained in such proposal may not be changed or withdrawn during this period.

## VI. RFP Schedule

| | |
|---|---|
| RFP Issued | March 2, 1998 |
| Proposals Due | April 1, 1998 |
| <u>Option 1: 1998 Standard Offer</u> | |
| Proposal Evaluations Complete | April 7, 1998 |
| Sign Standard Offer Service Agreements | April 10, 1998 |
| File Agreements for Regulatory Approval | April 15, 1998 |
| Begin Standard Offer Service | June 1, 1998 |
| <u>Option 2: 1999-2004 Standard Offer</u> | |
| Proposal Evaluations Complete | May 1, 1998 |
| Sign Standard Offer Service Agreements | May 29, 1998 |
| File Agreements for Regulatory Approval | June 12, 1998 |
| Begin Standard Offer Service | January 1, 1998 |

## APPENDIX 1

## STANDARD OFFER SERVICE PRICE SCHEDULE

Confidential NARR 48945

The rate for retail customers who receive Standard Offer Service will be based on the applicable retail Standard Offer Service tariffs on file with the applicable regulatory agencies. The Standard Offer Wholesale rate cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement is as follows:

| Calendar Year | Price per Kilowatt-hour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Standard Offer Wholesale rates, reduced by the applicable Discounts offered by Suppliers in the Companies' solicitation. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers are responsible for all losses between their sources of supply and the customers' meters, as well as all responsibility for meeting their share of the following: i) installed and operable capacity; ii) operating reserves; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Additional revenues to Suppliers may be realized through the operation of the Fuel Index (Appendix 2).

**PART 2 OF 2**

# APPENDIX 2

## FIVE-YEAR LOAD FORECAST

Confidential

NARR 48947

# EASTERN UTILITIES ASSOCIATES

## STANDARD OFFER LOAD INFORMATION

## HISTORICAL AND FORECAST MONTHLY PEAK AND ENERGY DETAIL

## 1997 - 2002

Load Forecasting and Profiling
Power Supply Department
February 26, 1998

EUA SYSTEM
1997 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1997 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Mon | Tue | Thu | Wed | Mon | Thu | Thu | Fri | Wed | Tue | Tue | Tue | |
| Date | 01/20/97 | 02/11/97 | 03/13/97 | 04/02/97 | 05/19/97 | 06/26/97 | 07/17/97 | 08/01/97 | 09/02/97 | 10/28/97 | 11/24/97 | 12/15/97 | |
| Hour | 6 PM | 7 PM | 7 PM | 8 PM | 12 PM | 2 PM | 3 PM | 2 PM | 3 PM | 6 PM | 6 PM | 6 PM | |
| Temperature | 28 | 28 | 28 | 41 | 54 | 86 | 93 | 86 | 82 | 40 | 33 | 31 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 444,400 | 429,800 | 414,000 | 395,900 | 366,500 | 512,800 | 540,600 | 473,900 | 450,800 | 413,000 | 441,500 | 465,400 | 445,717 |
| Blackstone | 203,500 | 194,300 | 190,700 | 179,200 | 186,100 | 250,800 | 265,300 | 227,040 | 201,630 | 170,120 | 180,500 | 185,780 | 202,914 |
| Newport | 89,400 | 85,400 | 81,200 | 76,000 | 70,100 | 90,800 | 97,900 | 87,300 | 87,400 | 82,500 | 89,000 | 90,800 | 85,650 |
| Total | 737,300 | 709,500 | 685,900 | 651,100 | 622,700 | 854,400 | 903,800 | 788,240 | 739,830 | 665,620 | 711,000 | 741,980 | 734,281 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 4,400 | 6,100 | 6,100 | 6,000 | 7,800 | 5,400 | 7,300 | 6,100 | 6,600 | 3,000 | 9,000 | 5,400 | 6,100 |
| NEPOOL External | -2,500 | -2,520 | 3,010 | 1,940 | 2,750 | 7,310 | 8,520 | -1,570 | -100 | 760 | 520 | -3,100 | 1,252 |
| Total | 1,900 | 3,580 | 9,110 | 7,940 | 10,550 | 12,710 | 15,820 | 4,530 | 6,500 | 3,760 | 9,520 | 2,300 | 7,352 |
| TOTAL STANDARD OFFER DEMAND | 739,200 | 713,080 | 695,010 | 659,040 | 633,250 | 867,110 | 919,620 | 792,770 | 746,330 | 669,380 | 720,520 | 744,280 | 741,633 |

EUA SYSTEM
1998 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1998 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 476,100 | 448,800 | 431,300 | 396,749 | 412,984 | 488,216 | 538,810 | 514,394 | 462,221 | 397,325 | 431,357 | 478,035 | 456,358 |
| Blackstone | 202,900 | 192,400 | 184,400 | 179,900 | 200,400 | 231,300 | 256,100 | 239,300 | 223,100 | 182,100 | 191,300 | 207,300 | 207,542 |
| Newport | 99,000 | 91,500 | 86,200 | 78,900 | 74,600 | 85,500 | 98,700 | 90,400 | 84,600 | 78,600 | 85,300 | 97,400 | 87,558 |
| Total | 778,000 | 732,700 | 701,900 | 655,549 | 687,984 | 805,016 | 893,610 | 844,094 | 769,921 | 658,025 | 707,957 | 782,735 | 751,458 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,500 | 3,300 | 4,900 | 3,800 | 5,400 | 3,800 | 4,600 | 5,800 | 5,000 | 4,300 | 6,800 | 4,900 | 4,592 |
| NEPOOL External | 0 | 470 | 1,670 | 1,620 | 1,130 | 1,180 | 3,270 | 4,060 | 1,720 | 2,200 | 2,520 | 210 | 1,671 |
| Total | 2,500 | 3,770 | 6,570 | 5,420 | 6,530 | 4,980 | 7,870 | 9,860 | 6,720 | 6,500 | 9,320 | 5,110 | 6,263 |
| TOTAL STANDARD OFFER DEMAND | 780,500 | 736,470 | 708,470 | 660,969 | 694,514 | 809,996 | 901,480 | 853,954 | 776,641 | 664,525 | 717,277 | 787,845 | 757,720 |

Confidential

EUA SYSTEM
1999 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 470,216 | 442,635 | 423,602 | 391,643 | 409,081 | 484,139 | 537,321 | 515,256 | 463,330 | 400,356 | 436,308 | 485,035 | 454,910 |
| Blackstone | 204,200 | 193,700 | 185,600 | 181,000 | 202,000 | 233,400 | 258,400 | 241,500 | 225,200 | 183,800 | 193,000 | 209,100 | 209,242 |
| Newport | 100,300 | 92,700 | 87,400 | 80,000 | 75,200 | 85,900 | 99,300 | 90,900 | 85,000 | 79,000 | 85,800 | 98,000 | 88,292 |
| Total | 774,716 | 729,035 | 696,602 | 652,643 | 686,281 | 803,439 | 895,021 | 847,656 | 773,530 | 663,156 | 715,108 | 792,135 | 752,444 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,300 | 5,000 | 3,800 | 5,500 | 3,800 | 4,600 | 5,900 | 5,000 | 4,400 | 6,800 | 5,000 | 4,642 |
| NEPOOL External | 0 | 470 | 1,690 | 1,640 | 1,140 | 1,190 | 3,310 | 4,110 | 1,740 | 2,230 | 2,520 | 210 | 1,688 |
| Total | 2,600 | 3,770 | 6,690 | 5,440 | 6,640 | 4,990 | 7,910 | 10,010 | 6,740 | 6,630 | 9,320 | 5,210 | 6,329 |
| **TOTAL STANDARD OFFER DEMAND** | 777,316 | 732,805 | 703,292 | 658,083 | 692,921 | 808,429 | 902,931 | 857,666 | 780,270 | 669,786 | 724,428 | 797,345 | 758,773 |

Confidential

NARR 48951

EUA SYSTEM
2000 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2000 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 477,116 | 449,135 | 429,802 | 397,443 | 413,981 | 489,339 | 543,021 | 520,756 | 468,230 | 404,656 | 440,908 | 490,135 | 460,377 |
| Blackstone | 206,200 | 195,500 | 187,300 | 182,700 | 203,400 | 234,600 | 259,800 | 242,600 | 226,300 | 184,700 | 193,900 | 210,200 | 210,600 |
| Newport | 100,900 | 93,300 | 87,900 | 80,400 | 75,400 | 86,200 | 99,500 | 91,200 | 85,200 | 79,200 | 86,000 | 98,200 | 88,617 |
| Total | 784,216 | 737,935 | 705,002 | 660,543 | 692,781 | 810,139 | 902,321 | 854,556 | 779,730 | 668,556 | 720,808 | 798,535 | 759,594 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,300 | 5,000 | 3,800 | 5,500 | 3,800 | 4,600 | 5,900 | 5,000 | 4,400 | 6,800 | 5,000 | 4,642 |
| NEPOOL External | 0 | 470 | 1,690 | 1,640 | 1,140 | 1,190 | 3,310 | 4,100 | 1,730 | 2,220 | 2,530 | 210 | 1,686 |
| Total | 2,600 | 3,770 | 6,690 | 5,440 | 6,640 | 4,990 | 7,910 | 10,000 | 6,730 | 6,620 | 9,330 | 5,210 | 6,328 |
| **TOTAL STANDARD OFFER DEMAND** | 786,816 | 741,705 | 711,692 | 665,983 | 699,421 | 815,129 | 910,231 | 864,556 | 786,460 | 675,176 | 730,138 | 803,745 | 765,921 |

Confidential

EUA SYSTEM
2001 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 482,216 | 453,935 | 434,402 | 401,643 | 419,281 | 496,039 | 550,421 | 527,856 | 474,730 | 410,156 | 447,008 | 496,835 | 466,210 |
| Blackstone | 207,100 | 196,400 | 188,200 | 183,600 | 205,000 | 236,900 | 262,300 | 245,000 | 228,500 | 186,500 | 195,800 | 212,200 | 212,292 |
| Newport | 101,100 | 93,500 | 88,100 | 80,600 | 75,800 | 86,700 | 100,200 | 91,800 | 85,800 | 79,700 | 86,600 | 98,900 | 89,067 |
| Total | 790,416 | 743,835 | 710,702 | 665,843 | 700,081 | 819,639 | 912,921 | 864,656 | 789,030 | 676,356 | 729,408 | 807,935 | 767,569 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,300 | 5,000 | 3,800 | 5,500 | 3,800 | 4,700 | 5,900 | 5,000 | 4,400 | 6,900 | 5,000 | 4,658 |
| NEPOOL External | 0 | 480 | 1,690 | 1,650 | 1,150 | 1,200 | 3,330 | 4,130 | 1,750 | 2,240 | 2,560 | 210 | 1,699 |
| Total | 2,600 | 3,780 | 6,690 | 5,450 | 6,650 | 5,000 | 8,030 | 10,030 | 6,750 | 6,640 | 9,460 | 5,210 | 6,358 |
| TOTAL STANDARD OFFER DEMAND | 793,016 | 747,615 | 717,392 | 671,293 | 706,731 | 824,639 | 920,951 | 874,686 | 795,780 | 682,996 | 738,868 | 813,145 | 773,926 |

Confidential

EUA SYSTEM
2002 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 488,816 | 460,135 | 440,402 | 407,243 | 423,881 | 500,939 | 555,921 | 533,056 | 479,430 | 414,256 | 451,308 | 501,635 | 471,419 |
| Blackstone | 209,100 | 198,300 | 190,100 | 185,400 | 206,700 | 238,700 | 264,300 | 246,900 | 230,300 | 188,000 | 197,300 | 213,900 | 214,083 |
| Newport | 101,800 | 94,100 | 88,700 | 81,100 | 76,200 | 87,100 | 100,500 | 92,100 | 86,100 | 80,000 | 86,900 | 99,300 | 89,492 |
| Total | 799,716 | 752,535 | 719,202 | 673,743 | 706,781 | 826,739 | 920,721 | 872,056 | 795,830 | 682,256 | 735,508 | 814,835 | 774,994 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,400 | 5,100 | 3,900 | 5,500 | 3,900 | 4,700 | 6,000 | 5,100 | 4,400 | 6,900 | 5,100 | 4,717 |
| NEPOOL External | 0 | 480 | 1,710 | 1,670 | 1,160 | 1,210 | 3,360 | 4,170 | 1,760 | 2,250 | 2,580 | 220 | 1,714 |
| Total | 2,600 | 3,880 | 6,810 | 5,570 | 6,660 | 5,110 | 8,060 | 10,170 | 6,860 | 6,650 | 9,480 | 5,320 | 6,431 |
| TOTAL STANDARD OFFER DEMAND | 802,316 | 756,415 | 726,012 | 679,313 | 713,441 | 831,849 | 928,781 | 882,226 | 802,690 | 688,906 | 744,988 | 820,155 | 781,424 |

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1997 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1997 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 109,987,752 | 108,232,456 | 99,351,339 | 100,731,095 | 94,820,086 | 98,714,610 | 111,951,573 | 115,729,175 | 101,329,949 | 88,364,608 | 89,711,850 | 99,481,569 | 1,218,347,140 |
| Company Use | 338,232 | 374,872 | 304,432 | 370,232 | 345,852 | 179,032 | 243,832 | 212,152 | 228,312 | 305,592 | 361,752 | 376,152 | 3,638,624 |
| Losses and Unbilled | 5,439,086 | -7,660,384 | 9,044,918 | -845,317 | 5,897,764 | 13,713,398 | 10,018,792 | -1,096,955 | -3,708,690 | 8,319,416 | 3,009,719 | 676,936 | 42,808,683 |
| Requirements | 115,765,070 | 100,946,944 | 108,700,889 | 100,256,010 | 101,062,462 | 112,607,040 | 122,213,997 | 114,844,370 | 97,840,571 | 96,989,616 | 93,082,801 | 100,484,657 | 1,264,794,447 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 237,368,173 | 230,914,965 | 208,534,112 | 211,379,336 | 199,566,664 | 203,503,122 | 235,817,416 | 237,097,504 | 227,669,922 | 207,610,909 | 207,611,754 | 235,063,535 | 2,640,157,392 |
| Company Use | 394,709 | 366,246 | 295,863 | 266,158 | 211,130 | 167,461 | 188,604 | 173,612 | 131,389 | 157,016 | 206,818 | 262,262 | 2,821,268 |
| Losses and Unbilled | 14,053,006 | -16,346,806 | 24,123,657 | -1,392,163 | 7,409,544 | 27,211,458 | 18,762,624 | 7,138,509 | -7,538,405 | 12,469,576 | 17,278,894 | 16,822,969 | 119,992,863 |
| Requirements | 251,835,888 | 214,934,405 | 232,953,632 | 210,253,331 | 207,187,338 | 230,882,041 | 254,768,644 | 244,409,625 | 220,262,986 | 220,237,501 | 225,097,446 | 258,148,766 | 2,762,971,523 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 48,180,530 | 48,253,784 | 42,813,638 | 42,562,158 | 39,722,065 | 41,308,090 | 46,419,459 | 48,379,318 | 46,725,711 | 41,695,395 | 42,626,375 | 47,400,551 | 536,087,074 |
| Company Use | 24,918 | 521,667 | 472,503 | 118,643 | 66,161 | 43,271 | 36,397 | 36,467 | 35,081 | 38,295 | 78,699 | 102,762 | 1,574,764 |
| Losses and Unbilled | 4,906,892 | -3,717,031 | 5,452,999 | 632,399 | 2,887,244 | 4,086,109 | 5,772,244 | 2,156,375 | -888,252 | 3,487,930 | 3,768,906 | 3,757,167 | 32,302,982 |
| Requirements | 53,112,340 | 45,058,420 | 48,739,140 | 43,313,100 | 42,675,470 | 45,437,470 | 52,228,100 | 50,572,160 | 45,872,540 | 45,221,620 | 46,473,980 | 51,260,480 | 569,964,820 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 395,556,455 | 387,401,205 | 350,699,089 | 354,672,589 | 334,109,615 | 343,525,822 | 394,188,248 | 401,205,995 | 375,716,582 | 337,670,912 | 339,949,439 | 379,895,655 | 4,394,591,606 |
| Company Use | 757,859 | 1,262,785 | 1,072,998 | 754,933 | 621,125 | 389,764 | 468,833 | 422,251 | 394,782 | 500,905 | 647,269 | 741,176 | 8,034,656 |
| Losses and Unbilled | 24,398,984 | -27,724,221 | 38,621,574 | -1,605,081 | 16,194,552 | 45,010,965 | 34,553,660 | 8,197,929 | -12,135,847 | 24,276,922 | 24,057,519 | 21,257,072 | 195,104,528 |
| Requirements | 420,713,298 | 360,939,769 | 390,393,661 | 353,822,441 | 350,925,290 | 388,926,551 | 429,210,741 | 409,826,155 | 363,976,017 | 362,448,737 | 364,654,227 | 401,893,903 | 4,597,730,790 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | 2,198,760 | 2,108,708 | 5,018,872 | 513,844 | 4,085,373 | -336,416 | 4,621,552 | 2,614,650 | 204,861 | -54,689 | 1,402,023 | 1,000,674 | 23,376,212 |
| External | -49,650 | 206,420 | 612,770 | 494,120 | 373,500 | -870,390 | -773,650 | -74,443 | 458,290 | 556,100 | 668,010 | 1,074,420 | 2,675,497 |
| Total | 2,149,110 | 2,315,128 | 5,631,642 | 1,007,964 | 4,458,873 | -1,206,806 | 3,847,902 | 2,540,207 | 663,151 | 501,411 | 2,070,033 | 2,075,094 | 26,051,709 |
| **TOTAL STANDARD OFFER** | 422,862,408 | 363,252,897 | 396,025,303 | 354,830,405 | 355,384,163 | 387,719,745 | 433,058,643 | 412,366,362 | 364,639,168 | 362,950,148 | 366,724,260 | 403,968,997 | 4,623,782,499 |

Confidential

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1998 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1998 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 106,624,259 | 104,548,958 | 98,570,333 | 95,835,248 | 92,099,855 | 96,697,570 | 103,877,166 | 115,550,974 | 106,471,604 | 93,034,490 | 95,166,944 | 102,356,865 | 1,210,032,266 |
| Company Use | 334,289 | 375,336 | 304,691 | 299,461 | 234,328 | 234,102 | 200,594 | 239,832 | 232,897 | 250,811 | 261,467 | 338,888 | 3,306,196 |
| Losses and Unbilled | 3,519,117 | -4,957,091 | 5,503,553 | -828,747 | 5,319,371 | 10,275,529 | 13,445,297 | 2,043,624 | -5,956,133 | 7,870,786 | 5,171,018 | 5,135,315 | 46,541,630 |
| Requirements | 110,477,665 | 99,967,203 | 104,378,577 | 95,305,962 | 97,653,554 | 107,207,201 | 117,523,057 | 117,834,430 | 100,748,368 | 101,155,587 | 100,599,429 | 107,831,068 | 1,260,680,101 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 243,575,851 | 238,676,808 | 226,411,148 | 213,348,329 | 201,559,849 | 207,864,323 | 228,607,805 | 243,774,042 | 220,697,104 | 193,183,605 | 197,255,250 | 222,779,510 | 2,637,733,623 |
| Company Use | 381,263 | 370,126 | 306,998 | 249,068 | 182,808 | 157,964 | 165,773 | 174,828 | 159,204 | 167,723 | 208,944 | 318,783 | 2,843,482 |
| Losses and Unbilled | 8,941,748 | -9,566,436 | 13,268,236 | -533,614 | 12,373,692 | 22,530,882 | 30,187,628 | 5,366,945 | -10,986,887 | 17,159,789 | 11,674,867 | 12,152,966 | 112,569,814 |
| Requirements | 252,898,862 | 229,480,498 | 239,986,382 | 213,063,782 | 214,116,349 | 230,553,169 | 258,961,206 | 249,315,815 | 209,869,421 | 210,511,117 | 209,139,061 | 235,251,259 | 2,753,146,918 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,020,595 | 49,220,298 | 46,487,603 | 43,497,820 | 40,096,554 | 42,549,117 | 46,073,940 | 49,147,430 | 46,456,168 | 40,725,837 | 40,641,490 | 48,223,494 | 543,140,354 |
| Company Use | 155,130 | 362,052 | 321,807 | 154,853 | 98,477 | 68,597 | 57,860 | 71,632 | 69,514 | 74,561 | 91,249 | 141,374 | 1,666,726 |
| Losses and Unbilled | 2,637,314 | -1,189,756 | 3,537,267 | 696,638 | 3,253,794 | 5,360,869 | 6,792,714 | 1,885,765 | -1,431,351 | 4,325,336 | 3,156,025 | 3,369,554 | 52,394,169 |
| Requirements | 52,813,039 | 48,392,594 | 50,346,677 | 44,349,311 | 43,448,825 | 47,978,383 | 52,924,522 | 51,104,827 | 45,094,131 | 45,125,754 | 43,888,764 | 51,734,622 | 577,201,249 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 400,228,705 | 392,446,064 | 371,469,084 | 352,679,397 | 333,756,258 | 347,111,010 | 378,558,919 | 408,472,446 | 373,624,876 | 326,943,932 | 333,063,684 | 373,359,869 | 4,391,706,243 |
| Company Use | 870,682 | 1,107,514 | 933,496 | 703,382 | 515,613 | 460,663 | 424,227 | 486,292 | 461,415 | 492,615 | 561,660 | 799,045 | 7,816,404 |
| Losses and Unbilled | 15,098,179 | -15,713,283 | 22,309,056 | -665,725 | 20,946,857 | 38,167,280 | 50,425,639 | 9,296,332 | -18,374,371 | 29,355,911 | 20,001,910 | 20,657,835 | 191,505,622 |
| Requirements | 416,189,566 | 377,840,295 | 394,711,636 | 352,717,055 | 355,218,728 | 385,738,753 | 429,408,785 | 418,255,070 | 355,711,920 | 356,792,458 | 353,627,254 | 394,816,749 | 4,591,028,268 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -263,402 | 1,795,816 | 2,457,811 | 1,689,633 | 3,791,466 | 684,537 | 1,373,896 | 2,565,722 | 1,278,726 | 1,281,425 | 2,085,350 | 2,925,520 | 21,666,494 |
| External | 12,686 | 482,221 | 440,969 | 701,427 | 499,851 | 232,141 | 497,774 | 692,128 | 593,287 | 1,024,013 | 1,088,258 | 392,236 | 6,656,983 |
| Total | -250,716 | 2,278,031 | 2,898,780 | 2,391,060 | 4,291,317 | 916,678 | 1,871,670 | 3,257,842 | 1,872,013 | 2,305,438 | 3,173,608 | 3,317,756 | 28,323,477 |
| **TOTAL STANDARD OFFER** | 415,938,850 | 380,118,326 | 397,610,416 | 355,108,115 | 359,510,045 | 386,655,431 | 431,280,455 | 421,512,912 | 357,583,933 | 359,097,896 | 356,800,862 | 398,134,505 | 4,619,351,745 |

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1999 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 107,720,384 | 105,517,794 | 99,387,771 | 96,704,116 | 92,921,701 | 97,361,787 | 105,120,775 | 116,620,468 | 107,479,363 | 93,945,563 | 95,922,845 | 103,366,368 | 1,222,068,935 |
| Company Use | 334,728 | 375,829 | 305,091 | 299,854 | 234,636 | 234,410 | 200,857 | 240,147 | 255,202 | 250,639 | 261,810 | 339,334 | 3,310,537 |
| Losses and Unbilled | 3,548,570 | -5,025,349 | 5,551,604 | -849,634 | 5,366,555 | 10,374,655 | 13,596,431 | 2,053,947 | -6,056,037 | 7,947,516 | 5,214,168 | 5,181,763 | 46,924,189 |
| Requirements | 111,603,682 | 100,868,274 | 105,244,466 | 96,154,336 | 98,522,892 | 107,970,852 | 118,918,063 | 118,914,562 | 101,676,528 | 102,143,718 | 101,398,823 | 108,887,465 | 1,272,303,661 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 238,155,119 | 233,948,785 | 221,042,645 | 209,822,760 | 198,791,246 | 205,681,142 | 227,194,419 | 243,752,851 | 221,315,742 | 194,297,400 | 199,305,049 | 226,019,097 | 2,619,326,255 |
| Company Use | 381,934 | 370,778 | 307,539 | 249,507 | 183,130 | 158,243 | 166,065 | 175,136 | 159,484 | 168,018 | 209,312 | 319,344 | 2,848,490 |
| Losses and Unbilled | 8,871,846 | -9,904,630 | 13,271,833 | -700,399 | 12,423,249 | 22,747,263 | 30,535,352 | 5,353,411 | -11,232,868 | 17,365,045 | 11,811,331 | 12,311,759 | 112,853,213 |
| Requirements | 247,408,899 | 224,414,933 | 234,622,017 | 209,371,867 | 211,397,625 | 228,586,648 | 257,895,837 | 249,281,398 | 210,242,358 | 211,830,463 | 211,325,692 | 238,650,200 | 2,735,027,958 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,318,901 | 49,495,707 | 46,741,937 | 43,727,201 | 40,302,606 | 42,776,491 | 46,343,181 | 49,453,877 | 46,735,731 | 40,953,209 | 40,860,613 | 48,490,680 | 546,200,134 |
| Company Use | 157,064 | 366,565 | 325,818 | 156,785 | 99,705 | 69,249 | 58,581 | 72,525 | 70,178 | 75,511 | 92,386 | 143,135 | 1,687,500 |
| Losses and Unbilled | 2,641,158 | -1,219,640 | 3,548,663 | 684,009 | 3,263,301 | 5,388,169 | 6,833,614 | 1,884,363 | -1,461,655 | 4,345,140 | 3,165,315 | 3,379,721 | 32,452,158 |
| Requirements | 53,117,123 | 48,642,632 | 50,616,418 | 44,567,995 | 43,665,612 | 48,235,909 | 53,235,376 | 51,410,765 | 45,344,254 | 45,373,860 | 44,118,314 | 52,013,536 | 580,339,792 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 396,194,404 | 388,962,286 | 367,172,353 | 350,254,077 | 332,015,553 | 345,819,420 | 378,658,375 | 409,827,196 | 375,530,836 | 329,196,172 | 336,088,507 | 377,876,145 | 4,387,595,324 |
| Company Use | 873,726 | 1,113,172 | 938,448 | 706,144 | 517,471 | 461,902 | 425,503 | 487,808 | 462,864 | 494,168 | 563,508 | 801,813 | 7,846,527 |
| Losses and Unbilled | 15,061,574 | -16,149,619 | 22,372,100 | -866,024 | 21,053,105 | 38,510,107 | 50,965,397 | 9,291,721 | -18,730,560 | 29,657,701 | 20,190,814 | 20,873,245 | 192,229,560 |
| Requirements | 412,129,704 | 373,925,839 | 390,482,901 | 350,094,196 | 353,586,129 | 384,791,429 | 430,049,276 | 419,606,725 | 357,263,140 | 359,348,041 | 356,842,829 | 399,551,201 | 4,587,671,411 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -268,812 | 1,817,563 | 2,488,620 | 1,710,249 | 3,838,964 | 690,779 | 1,389,735 | 2,599,051 | 1,293,682 | 1,296,505 | 2,110,021 | 2,963,603 | 21,929,960 |
| External | 9,423 | 485,497 | 443,784 | 707,566 | 504,392 | 233,353 | 502,972 | 698,603 | 599,457 | 1,035,099 | 1,100,750 | 392,918 | 6,713,814 |
| Total | -259,389 | 2,303,060 | 2,932,404 | 2,417,815 | 4,343,356 | 924,132 | 1,892,707 | 3,297,654 | 1,893,139 | 2,331,604 | 3,210,771 | 3,356,521 | 28,643,774 |
| **TOTAL STANDARD OFFER** | 411,870,315 | 376,228,899 | 393,415,305 | 352,512,011 | 357,929,485 | 385,715,561 | 431,941,983 | 422,904,379 | 359,156,279 | 361,679,645 | 360,053,600 | 402,907,722 | 4,616,315,185 |

Confidential

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2000 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2000 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 108,517,973 | 106,172,940 | 100,188,114 | 97,632,302 | 93,499,313 | 98,150,340 | 106,062,682 | 117,511,516 | 108,436,322 | 94,610,854 | 96,659,326 | 104,211,952 | 1,231,653,634 |
| Company Use | 335,125 | 376,275 | 305,453 | 300,210 | 234,915 | 234,688 | 201,096 | 240,432 | 233,479 | 250,937 | 262,121 | 339,734 | 3,314,465 |
| Losses and Unbilled | 3,570,461 | -5,090,730 | 5,594,941 | -865,867 | 5,404,986 | 10,466,209 | 13,723,948 | 2,061,303 | -6,105,875 | 8,012,360 | 5,252,877 | 5,220,417 | 47,245,030 |
| Requirements | 112,423,559 | 101,458,485 | 106,088,508 | 97,066,645 | 99,139,214 | 108,851,237 | 119,987,726 | 119,813,251 | 102,563,926 | 102,874,151 | 102,174,324 | 109,772,103 | 1,282,213,129 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 241,337,599 | 237,114,504 | 224,091,707 | 212,789,552 | 201,613,013 | 208,897,515 | 230,328,768 | 247,086,427 | 224,338,728 | 196,941,613 | 201,953,406 | 228,890,171 | 2,655,082,983 |
| Company Use | 382,542 | 371,567 | 308,028 | 249,984 | 183,422 | 158,494 | 166,329 | 175,414 | 159,738 | 168,285 | 209,645 | 319,852 | 2,853,828 |
| Losses and Unbilled | 8,972,652 | -10,056,542 | 13,436,980 | -722,271 | 12,680,788 | 25,046,376 | 30,936,678 | 5,409,057 | -11,404,038 | 17,584,663 | 11,951,969 | 12,452,481 | 114,187,994 |
| Requirements | 250,692,793 | 227,429,529 | 237,836,715 | 212,317,164 | 214,577,223 | 231,602,385 | 261,431,776 | 252,670,898 | 213,093,428 | 214,694,561 | 214,115,020 | 241,662,504 | 2,772,128,997 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,612,217 | 49,769,075 | 46,996,297 | 43,958,532 | 40,508,729 | 42,994,439 | 46,596,236 | 49,740,155 | 46,996,190 | 41,166,976 | 41,067,760 | 46,752,596 | 549,159,202 |
| Company Use | 158,903 | 370,857 | 329,633 | 158,619 | 100,872 | 70,060 | 59,267 | 73,374 | 78,999 | 76,395 | 93,468 | 144,812 | 1,707,259 |
| Losses and Unbilled | 2,645,842 | -1,246,358 | 3,560,535 | 673,465 | 3,273,175 | 5,413,898 | 6,871,496 | 1,883,648 | -1,488,840 | 4,363,708 | 3,174,229 | 5,389,956 | 32,514,754 |
| Requirements | 53,416,962 | 48,893,574 | 50,886,465 | 44,790,616 | 43,882,776 | 48,478,397 | 53,526,999 | 51,697,177 | 45,578,349 | 45,607,079 | 44,335,457 | 52,287,364 | 583,381,215 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 400,467,789 | 393,056,519 | 371,276,118 | 354,380,366 | 335,621,055 | 349,742,294 | 382,987,686 | 414,338,098 | 379,771,240 | 332,719,443 | 339,680,492 | 381,854,719 | 4,435,895,819 |
| Company Use | 876,570 | 1,118,499 | 943,114 | 708,733 | 519,209 | 463,242 | 426,692 | 489,220 | 464,216 | 495,617 | 565,234 | 804,398 | 7,874,744 |
| Losses and Unbilled | 15,188,955 | -16,393,630 | 22,592,456 | -914,673 | 21,258,949 | 38,926,483 | 51,532,122 | 9,354,008 | -18,999,553 | 29,960,731 | 20,379,075 | 21,062,854 | 193,947,778 |
| Requirements | 416,333,314 | 377,781,388 | 394,811,688 | 354,174,425 | 357,399,213 | 389,132,019 | 434,946,501 | 424,181,326 | 361,235,905 | 363,175,791 | 360,624,801 | 403,721,971 | 4,637,718,341 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -273,442 | 1,837,466 | 2,516,844 | 1,729,469 | 3,882,919 | 697,428 | 1,404,208 | 2,628,994 | 1,306,967 | 1,310,446 | 2,132,243 | 2,997,587 | 22,171,129 |
| External | 6,934 | 489,011 | 447,005 | 714,491 | 509,405 | 235,160 | 507,720 | 704,587 | 605,204 | 1,045,272 | 1,112,259 | 393,156 | 6,770,204 |
| Total | -266,508 | 2,326,477 | 2,963,849 | 2,443,960 | 4,392,324 | 932,588 | 1,911,928 | 3,333,581 | 1,912,171 | 2,355,718 | 3,244,502 | 3,390,743 | 28,941,333 |
| **TOTAL STANDARD OFFER** | 416,066,806 | 380,107,865 | 397,775,537 | 356,618,385 | 361,791,537 | 390,064,607 | 436,858,429 | 427,514,907 | 363,148,074 | 365,531,509 | 363,869,303 | 407,112,714 | 4,666,659,674 |

Confidential

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2001 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 109,233,337 | 107,098,641 | 100,946,412 | 98,228,907 | 94,129,065 | 98,895,437 | 106,760,018 | 118,371,715 | 109,294,460 | 95,147,518 | 97,282,103 | 104,877,214 | 1,240,264,827 |
| Company Use | 335,486 | 376,680 | 305,782 | 300,534 | 235,168 | 234,941 | 201,312 | 240,691 | 233,751 | 251,207 | 262,403 | 340,101 | 3,318,036 |
| Losses and Unbilled | 3,589,354 | -5,147,123 | 5,634,874 | -888,129 | 5,441,981 | 10,552,041 | 13,839,137 | 2,067,283 | -6,174,521 | 8,070,824 | 5,286,755 | 5,252,528 | 47,525,004 |
| Requirements | 113,158,177 | 102,328,198 | 106,887,068 | 97,641,312 | 99,806,214 | 109,682,419 | 120,800,467 | 120,679,689 | 103,353,670 | 103,469,549 | 102,831,261 | 110,469,843 | 1,291,107,867 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 244,003,107 | 239,724,523 | 226,598,430 | 215,212,867 | 203,900,981 | 210,981,102 | 232,919,753 | 249,850,754 | 226,828,767 | 199,055,497 | 203,999,884 | 231,032,357 | 2,684,108,022 |
| Company Use | 383,094 | 371,904 | 308,473 | 250,264 | 183,686 | 158,723 | 166,569 | 175,668 | 159,969 | 168,528 | 209,948 | 320,313 | 2,857,139 |
| Losses and Unbilled | 9,055,891 | -10,193,759 | 13,573,700 | -748,922 | 12,710,189 | 23,300,545 | 31,279,409 | 5,451,152 | -11,562,139 | 17,767,672 | 12,062,431 | 12,558,392 | 115,254,562 |
| Requirements | 253,442,092 | 229,902,668 | 240,480,603 | 214,714,208 | 216,794,856 | 234,440,370 | 264,365,732 | 255,477,574 | 215,426,597 | 216,991,697 | 216,272,263 | 243,911,062 | 2,802,219,723 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,852,063 | 49,992,791 | 47,200,718 | 44,138,995 | 40,661,905 | 43,153,532 | 46,781,266 | 49,946,873 | 47,178,859 | 41,306,320 | 41,195,299 | 48,915,082 | 551,323,699 |
| Company Use | 160,656 | 374,950 | 333,271 | 160,369 | 181,985 | 70,833 | 59,921 | 74,184 | 71,783 | 77,238 | 94,499 | 146,411 | 1,726,100 |
| Losses and Unbilled | 2,649,507 | -1,268,806 | 3,569,993 | 663,712 | 3,200,083 | 5,433,935 | 6,901,502 | 1,880,377 | -1,514,766 | 4,376,546 | 3,178,461 | 3,394,624 | 32,545,168 |
| Requirements | 53,662,226 | 49,098,935 | 51,103,980 | 44,963,074 | 44,043,973 | 48,658,300 | 53,742,689 | 51,901,434 | 45,735,876 | 45,760,104 | 44,468,259 | 52,456,117 | 585,594,967 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 404,088,507 | 396,815,955 | 374,745,558 | 357,580,767 | 338,691,951 | 353,030,071 | 386,461,037 | 418,169,342 | 383,302,086 | 335,509,335 | 342,477,286 | 384,824,653 | 4,475,696,548 |
| Company Use | 879,236 | 1,123,534 | 947,526 | 711,167 | 520,839 | 464,497 | 427,802 | 490,543 | 465,483 | 496,973 | 566,850 | 806,825 | 7,901,275 |
| Losses and Unbilled | 15,294,752 | -16,609,688 | 22,778,567 | -973,339 | 21,432,253 | 39,286,521 | 52,020,048 | 9,398,812 | -19,251,426 | 30,215,042 | 20,527,647 | 21,205,544 | 195,324,734 |
| Requirements | 420,262,495 | 381,329,801 | 398,471,651 | 357,318,594 | 360,645,043 | 392,781,089 | 438,908,888 | 428,058,697 | 364,516,143 | 366,221,350 | 363,571,783 | 406,837,022 | 4,678,922,557 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -277,589 | 1,854,504 | 2,541,229 | 1,746,000 | 3,920,931 | 702,091 | 1,415,976 | 2,654,933 | 1,317,770 | 1,321,858 | 2,150,446 | 3,027,058 | 22,375,207 |
| External | 4,319 | 491,651 | 449,104 | 719,461 | 512,963 | 236,166 | 511,377 | 708,622 | 609,270 | 1,052,842 | 1,121,049 | 390,336 | 6,807,140 |
| Total. | -273,270 | 2,346,135 | 2,990,333 | 2,465,461 | 4,433,894 | 938,257 | 1,927,353 | 3,363,555 | 1,927,040 | 2,374,700 | 3,271,495 | 3,417,394 | 29,182,347 |
| TOTAL STANDARD OFFER | 419,989,225 | 383,675,936 | 401,461,984 | 359,784,055 | 365,078,937 | 393,719,346 | 440,836,241 | 431,422,252 | 366,443,183 | 368,596,050 | 366,843,278 | 410,254,416 | 4,708,104,904 |

Confidential

NARR 48959

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2002 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 109,920,916 | 107,795,118 | 101,716,724 | 98,831,691 | 94,840,205 | 99,798,697 | 107,552,751 | 119,459,514 | 110,189,957 | 96,011,085 | 98,242,954 | 105,795,656 | 1,250,155,268 |
| Company Use | 335,816 | 377,050 | 306,083 | 300,829 | 235,399 | 235,172 | 201,510 | 240,927 | 233,960 | 251,454 | 262,661 | 340,435 | 3,321,296 |
| Losses and Unbilled | 3,606,671 | -5,202,326 | 5,674,315 | -906,045 | 5,482,447 | 10,641,160 | 13,952,723 | 2,085,821 | -6,228,446 | 8,141,097 | 5,335,169 | 5,299,050 | 47,881,636 |
| Requirements | 113,863,403 | 102,969,842 | 107,697,122 | 98,226,475 | 100,558,051 | 110,675,029 | 121,706,984 | 121,786,262 | 104,195,471 | 104,403,636 | 103,840,784 | 111,435,141 | 1,301,358,200 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 246,051,675 | 241,802,787 | 228,435,857 | 217,233,695 | 205,886,912 | 213,098,028 | 235,278,653 | 252,415,207 | 229,225,554 | 201,221,646 | 206,265,871 | 233,590,168 | 2,710,784,053 |
| Company Use | 383,598 | 372,393 | 508,879 | 250,594 | 183,928 | 158,932 | 166,788 | 175,899 | 160,179 | 168,750 | 210,224 | 320,735 | 2,860,899 |
| Losses and Unbilled | 9,115,451 | -10,325,337 | 13,686,351 | -778,631 | 12,823,122 | 23,527,159 | 31,886,155 | 5,493,692 | -11,696,281 | 17,944,378 | 12,181,432 | 12,682,835 | 116,242,327 |
| Requirements | 255,550,724 | 231,849,843 | 242,631,087 | 216,705,657 | 218,893,962 | 236,784,119 | 267,051,597 | 258,084,798 | 217,689,452 | 219,334,774 | 218,657,527 | 246,593,738 | 2,829,887,279 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,998,273 | 50,139,693 | 47,341,083 | 44,270,754 | 40,798,082 | 43,315,637 | 46,901,813 | 50,162,092 | 47,407,680 | 41,515,679 | 41,416,336 | 49,199,435 | 553,566,477 |
| Company Use | 162,332 | 378,861 | 336,747 | 162,042 | 103,049 | 71,572 | 60,546 | 74,958 | 72,551 | 78,043 | 95,485 | 147,937 | 1,744,103 |
| Losses and Unbilled | 2,648,891 | -1,289,580 | 3,575,809 | 654,963 | 3,286,640 | 5,452,332 | 6,929,401 | 1,882,576 | -1,529,912 | 4,393,691 | 3,190,221 | 3,409,310 | 32,604,342 |
| Requirements | 53,809,496 | 49,228,974 | 51,253,639 | 45,087,759 | 44,187,771 | 48,839,541 | 53,971,760 | 52,139,626 | 45,950,219 | 45,987,413 | 44,702,042 | 52,756,682 | 587,914,922 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 406,970,864 | 399,737,598 | 377,493,664 | 360,336,140 | 341,525,199 | 356,212,362 | 389,813,217 | 422,036,813 | 386,821,111 | 338,748,410 | 345,925,161 | 388,585,259 | 4,514,425,798 |
| Company Use | 881,746 | 1,128,304 | 951,709 | 713,465 | 522,376 | 465,676 | 428,844 | 491,784 | 466,670 | 498,247 | 568,370 | 809,107 | 7,926,298 |
| Losses and Unbilled | 15,371,013 | -16,817,243 | 22,936,475 | -1,029,713 | 21,592,209 | 39,620,651 | 52,468,279 | 9,462,089 | -19,452,639 | 30,479,166 | 20,706,822 | 21,391,195 | 196,728,805 |
| Requirements | 423,223,623 | 384,048,659 | 401,381,848 | 360,019,891 | 363,639,784 | 396,298,689 | 442,710,341 | 432,010,686 | 367,835,142 | 369,725,823 | 367,200,353 | 410,785,561 | 4,719,080,401 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | -282,414 | 1,868,800 | 2,562,428 | 1,760,206 | 3,955,376 | 707,087 | 1,427,763 | 2,678,931 | 1,329,509 | 1,333,979 | 2,170,750 | 3,054,528 | 22,566,943 |
| External | 83 | 492,472 | 449,981 | 723,529 | 516,371 | 237,311 | 515,524 | 714,133 | 614,555 | 1,062,600 | 1,131,738 | 395,240 | 6,853,537 |
| Total | -282,331 | 2,361,272 | 3,012,409 | 2,483,735 | 4,471,747 | 944,398 | 1,943,287 | 3,393,064 | 1,944,064 | 2,396,579 | 3,302,488 | 3,449,768 | 29,420,480 |
| **TOTAL STANDARD OFFER** | 422,941,292 | 386,409,931 | 404,394,257 | 362,503,626 | 368,111,531 | 397,243,087 | 444,653,628 | 435,403,750 | 369,779,206 | 372,122,402 | 370,502,841 | 414,235,329 | 4,748,500,881 |

Confidential

NARR 48960

APPENDIX 3

STANDARD OFFER FUEL INDEX

Confidential

NARR 48961

The Companies have a Fuel Adjustment mechanism in their respective retail Standard Offer Service tariffs which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulfur) and natural gas after 1999. This fuel adjustment mechanism is subject to continued regulatory supervision and approval which allows the Companies to collect such revenues from their retail customers taking Standard Offer Service. The formula and indices used for calculating such revenues are also subject to regulatory change.

Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels.

The retail Standard Offer rate in effect for a given month is multiplied by a "Fuel Adjustment Multiplier" that is set equal to 1.0 and thus has no impact unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

> Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in *The Wall Street Journal*, expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No.6 oil into New York harbor, as reported in *Platt's Oilgram U.S. Marketscan* in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies for approval. Upon regulatory approval, such indices will be used for calculating Fuel Adjustment revenues in accordance with the order(s) and shall be incorporated into the terms of the retail Standard Offer Service tariffs.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment Multiplier for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment Multiplier} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + 0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where: Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment Multiplier would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate is increased by this Fuel Adjustment Multiplier for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

The incremental revenues attributable to the Customer Rate Fuel Adjustment mechanism will be allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier in the applicable billing month, pursuant to Article 5 of the Standard Offer Service Agreement.

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment Multiplier determined.

# APPENDIX 4

# PROPOSAL BID FORMS

Confidential

NARR 48964

**Appendix 1**

**Standard Offer Service**
**Project Proposal Bid Form**

Bidder Name: ______
Authorized Contact Person: ______
Mailing Address: ______
______
City/State/Zip: ______

Telephone Number: ______
Facsimile Number: ______
E-Mail Address: ______

Legal Description of Bidder: ______
______
______

Description of Affiliations: ______
______
______

Is Bidder a NEPOOL Member: ___ Yes ___ No

If No, please identify the NEPOOL Member that the Bidder has a contract with that will include the Standard Offer Load in their Own-load dispatch.

Entity Name: ______
Contact Person: ______
Telephone Number: ______
Facsimile Number: ______

Is Bidder Registered as a Non-Regulated Power Supplier in Rhode Island?

___ Yes ___ No

Is Bidder Registered as a Non-Regulated Power Supplier in Massachusetts?

Yes No

Does the Bidder have changes to the Standard Offer Service Agreement?

______
______
______
______

( attach additional sheets as required)

02/27/98

# Appendix 1

## Standard Offer Service
## Project Proposal Bid Form

| | Calendar Year | (a) Standard Offer Wholesale Rate ($/kwh) | (b) % Discount | (c) Bid Rate (a) x (b) ($/kwh) | | (d) % Standard Offer Load |
|---|---|---|---|---|---|---|
| Option 1 | 1998 | | | | | |
| | | | | | | |
| Option 2 | 1999 | | | | | |
| | 2000 | | | | | |
| | 2001 | | | | | |
| | 2002 | | | | | |
| | 2003 | | | | | |
| | 2004 | | | | | |

Note:

The Standard Offer Wholesale rate and resulting Bid Rate will be paid based on actual energy delivered to the meters of those customers taking Standard Offer Service under the Companies Standard Offer tarriffs.

The Calendar Year for Option 1 is from June 1, 1998 through December 31, 1998.

02/27/98

# APPENDIX 5

## DRAFT STANDARD OFFER SERVICE AGREEMENT

Confidential

NARR 48967

Appendix 5 Standard Offer Service Agreement

# Standard Offer Service Agreement

between

## Blackstone Valley Electric Company

## Eastern Edison Company

## Newport Electric Corporation
## and

________________________________________

Dated ____________________________________

3/2/98

Confidential NARR 48968

## TABLE OF CONTENTS

Page

| | | Page |
|---|---|---|
| ARTICLE 1. | Definitions | 1 |
| ARTICLE 2. | Term | 3 |
| ARTICLE 3. | Supplier Responsibilities | 3 |
| ARTICLE 4. | Estimation of Hourly Loads and Reporting to the ISO | 4 |
| ARTICLE 5. | Price | 5 |
| ARTICLE 6. | Billing and Payments | 6 |
| ARTICLE 7. | Security Provisions | 7 |
| ARTICLE 8. | Events of Default, Liability, Relationship of the Companies | 8 |
| ARTICLE 9. | Termination | 9 |
| ARTICLE 10. | Force Majeure | 9 |
| ARTICLE 11. | Assignment | 10 |
| ARTICLE 12. | Successors and Assigns | 11 |
| ARTICLE 13. | Resolution of Disputes | 11 |
| ARTICLE 14. | Interpretation | 13 |
| ARTICLE 15. | Severability of Provisions | 13 |
| ARTICLE 16. | Accounts and Records | 13 |
| ARTICLE 17. | Limitations on Liability and Indemnification | 13 |
| ARTICLE 18. | Regulation | 14 |
| ARTICLE 19. | Notices | 14 |
| ARTICLE 20. | Miscellaneous | 15 |

Appendix A Schedule of Supplier's Share of Offer Service and Delivered Energy Price

STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this ___________ day of ________________ ___________, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and _________ ______________________________ ______________________________ ______________________________ ______________________________, ("Supplier"), on the other hand.

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1. Definitions.

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Bid Price" shall mean the Standard Offer Wholesale Price multiplied by one minus the Supplier's Discount for each of the calendar years as shown in Appendix A.

"Commencement Date of Service" shall mean 12:01 A.M. on ____________________________.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"Discount" shall mean the percentage discount off the Standard Offer Wholesale Price of electricity, which discount is offered by Supplier for a given Contract Year as determined through the Company's Standard Offer auction.

"D.T.E." shall mean the Massachusetts Department of Energy and Telecommunications, formerly the Department of Public Utilities.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B. The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2. Term.

The term of this Agreement shall begin on the Commencement Date of Service and end at 11:59 p.m. on December 31, 2004, unless terminated sooner in accordance with Article 8 or 9.

ARTICLE 3. Supplier Responsibilities.

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO.

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

At the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, less losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5. Price.

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price + Fuel Adjustment Factor

where: Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6. Billing and Payments.

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 13 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment.

ARTICLE 7. Security Provisions.

*(Applicable to Option 2 Full Term Standard Offer)*

As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n) = SF \times STDL(n-1) \times \{ (PSTD(n) \times TD(n)) + (PSTD(n+1) \times TD(n+1)) + (PSTD(n+2) \times TD(n+2)) + \ldots\ldots + (PSTD(2004) \times TD(2004)) \}$$

Where:

SD(n) is the Security Deposit in Contract Year (n)

SF is the Security Fee equal to $10.00/MWh

STDL(n-1) is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year (n-1), expressed in MWh. In 1997, STDL shall be 4,500,000 MWh.

PSTD(n) is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n)

TD(n) is the Transition Discount in Contract Year (n), calculated as follows:

| | |
|---|---|
| TD(n) | =1.00 |
| TD(n+1) | =(7-1)/7 = 0.857 |
| TD(n+2) | =(7-2)/7 = 0.714 |
| TD(n+3) | =(7-3)/7 = 0.571 |
| TD(n+4) | =(7-4)/7 = 0.429 |
| TD(n+5) | =(7-5)/7 = 0.286 |
| TD(n+6) | =(7-6)/7 = 0.143 |

To secure the above amounts, Supplier shall provide a letter of credit, performance bond, or a parent guarantee in a form acceptable to Company. The bank issuing such letter of credit on behalf of a Supplier must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. If a performance bond is provided it is required that each surety company issuing such performance bond on behalf of a Supplier must maintain a rating of "B+" or better from A.M. Best Company. If a parent guarantee is provided the parent company must maintain investment grade long-term bond ratings of at least BBB- by Standard and Poor's Rating Service or Baa3 by Moody's Investors Service.

The Performance Letter of Credit or Bond, if not issued for the full term of the Supplier's Standard Offer Service obligation, shall be renewed on an annual basis or replaced and superseded by a like kind of surety at least thirty (30) days prior to the expiration of such prior surety on a continuing basis to the termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial security may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 for the remaining term of this Agreement.

ARTICLE 8. Events of Default, Liability, Relationship of the Companies.

(1) Unless excused by a Force Majeure as described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

(a) Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b) Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c) Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days after notice thereof from the Companies.

(2) Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3) Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security amounts calculated pursuant to Article 7 and regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the financial surety used to secure such amounts. The Parties expressly agree that the amounts set forth in the financial surety documentation do not constitute liquidated damages. In addition to the financial surety amounts, the Supplier shall be liable to the Companies for any direct damages resulting from an Event of Default, including replacement power costs incremental to the Bid Price. The Companies may pursue any remedies or other damages provided for under law, including indirect, consequential, reliance and incidental damages, and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9. Termination.

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier.

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide financial surety to the Companies pursuant to Article 7 shall be terminated.

ARTICLE 10. Force Majeure.

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having

jurisdiction thereof, but only if and to the extent that the event directly and adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating any generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b) The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

(c) The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d) The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 11. Assignment.

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (I) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can

meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 12. Successors and Assigns.

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 13. Resolution of Disputes.

Subject to Section 3 of Article 8, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 13 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (c) of Article 8, notice of failure to comply with, observe or perform this Agreement or to maintain any of the security requirements under Article 7 to Supplier, and upon failure to cure or rectify by Supplier, exercise their rights under the financial surety. Supplier, however, may dispute the exercise by the Companies of their rights under the financial surety, under this Article 13, after such exercise.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall be provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 14. Interpretation.

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 15. Severability of Provisions.

Subject to the provisions of Article 14 above, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 16. Accounts and Records.

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 17. Limitations on Liability and Indemnification.

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all third party damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the negligent acts or omissions of the indemnifying Party's employees or agents.

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 18. Regulation.

(a) This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b) This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 19. Notices.

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 20. Miscellaneous.

(a) Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b) Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c) Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d) This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e) Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f) Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g) Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h) Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier: Supplier's NAME

By:______________________

On Behalf of the Companies:

Blackstone: BLACKSTONE VALLEY ELECTRIC COMPANY

By:______________________

Eastern: EASTERN EDISON COMPANY

By:______________________

Newport: NEWPORT ELECTRIC CORPORATION

By:______________________

# APPENDIX A

## SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY AND PRICE

| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 cents/kWh | | |
| 1999 | | 3.5 cents/kWh | | |
| 2000 | | 3.8 cents/kWh | | |
| 2001 | | 3.8 cents/kWh | | |
| 2002 | | 4.2 cents/kWh | | |
| 2003 | | 4.7 cents/kWh | | |
| 2004 | | 5.1 cents/kWh | | |

# APPENDIX 6

## FORM OF PERFORMANCE SURETY DOCUMENTS

Confidential

NARR 48987

## Form of Performance Surety Letter of Credit

Performance surety provided in the form of a letter of credit must be in substantially the form given below.

Irrevocable Standby Letter of Credit Date: ( )

BENEFICIARY Credit Number: ( )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

BY ORDER OF:
(Supplier name and address)

or (Guarantor name and address)

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of (the Supplier)[(the Guarantor) on behalf of (the Supplier)]for a sum or sums not exceeding a total of US DOLLARS $xx,xxx.xx(written dollar amount AND xx/100 U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES effective(date)and expiring on (date).

Draft(s) must be accompanied by:

1. Your written letter requesting payment under this Letter of Credit signed by a representative of Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the EUA Companies"). Such letter from the EUA Companies shall include a statement of the dollar amount due to the EUA Companies, pursuant to the obligations of (Supplier/Guarantor)as set forth in the Standard Offer Service Agreement by and between (Supplier/Guarantor) and the EUA Companies.

Partial drawings are permitted under this Letter of Credit.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. ( ) dated ( ) of the (Bank)."

We agree to renew this Letter of Credit automatically for a period of one (1) year from the initial expiration and each subsequent expiry date unless the beneficiary has received by registered or certified mail, return receipt requested, written notification of our intention not to renew, post marked no less than thirty (30) days prior to the expiration of any term.

If this Letter of Credit shall not be extended and the obligation of (Supplier/Guarantor)under the Standard Offer Service Agreement, as secured by this Letter of Credit, remains outstanding, and (Supplier/Guarantor)has failed to provide an amended or substitute Letter of Credit in accordance with your terms and conditions, you may draw upon us forthwith for the full amount of this Letter of Credit by means of your sight draft together with the following document:

Your signed statement certifying that (Supplier/Guarantor)has failed to provide you with a substitute Letter of Credit within fifteen (15) days from the date of your receipt of our notice not to renew.

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before (FILL IN EXPIRATION DATE), or any subsequent expiration date.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name) and, attention (Bank credit operations contact), mentioning our reference number as it appears above. Telephone inquires can be made to(Bank credit operations contact).

## Form of Performance Surety Performance Bond

Performance surety provided in the form of a performance bond must be in substantially the form given below.

PERFORMANCE BOND NO. [ ]

KNOW ALL MEN BY THESE PRESENTS, that ( Prospective Supplier or Guarantor(s) name(s)) as Principal, and ( Surety Company name ) as Surety, are held firmly bound unto Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation as Obligees in the sum of [dollars] lawful money of the United States of America, to be paid to the Obligees, for which payment, well and truly to be made, we bind ourselves, our respective heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has entered a written Standard Offer Service Agreement dated ( ) (the "Agreement") with the Obligees for the delivery of requirements electric service (the "Standard Offer Service").

NOW THEREFORE, the condition of this obligation is such that, if the Principal shall promptly and faithfully perform delivery of the Standard Offer Service pursuant to the undertakings, covenants, terms and conditions of the Agreement, then this obligation shall become null and void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to, or for the use or benefit of anyone other than the named Obligees.

Whenever the Principal shall be declared by the Obligees to be in default in relation to the Principal's obligations under the Agreement, the Surety shall:

1. Immediately upon the presentation by the Obligees to the Surety of a Notice of Claim stating that the Principal is in default of Principal's obligations under the Agreement, pay to the Obligees such dollar amount due to the Obligees under the Agreement.

In witness whereof we hereunto set our hands and seals this ( ) day of ( ), A.D. 19( ).

( )

(Principal)

by: ( ) (seal)
( )
(Surety)
by: ( ) (seal)

Confidential

NARR 48991

GUARANTY

1.(a) Reference is made to the Standard Offer Service Agreement dated as of ______________________ 1998 (the "Agreement") between Blackstone Valley Electric Company, Newport Electric Corporation, and Eastern Edison Company (collectively the "Companies") on the one hand, and ______________________ (the "Supplier"), on the other hand. For good and valuable consideration received, ______________________________________, (the "Guarantors") hereby irrevocably and unconditionally jointly and severally guarantee to the Companies and their successors and assigns that the Supplier shall perform all of its obligations under the Agreement, including, but not limited to, the delivery of electric service and the due and punctual payment of all amounts required to be paid by the Supplier pursuant to Article 7 of the Agreement; and insofar as the Guarantors are able, performance and observance of and compliance with all other obligations, covenants, and undertakings of the Supplier contained in the Agreement and any other agreement or instrument relating thereto (collectively, the "Obligations"), at the times and in the manner provided therein. This Guaranty shall be an absolute, unconditional, present and continuing guaranty of payment and performance (not of collection or collectibility) which shall remain in full force and effect until each and all of the Obligations guaranteed hereunder shall have been fully and satisfactorily discharged in accordance with the terms and provisions of the Agreement and any other agreement or instrument relating thereto, and that its undertakings hereunder are not contingent upon the bringing of any action against the Supplier or any other person or entity or resorting to any security or exercise or assertion of any other right or remedy against the Supplier or any other person or entity, and Guarantor hereby expressly waives any claim that its undertakings hereunder are so contingent.

1.(b) Notwithstanding Section 1(a) or any other paragraph hereof:

i) the Guarantors' liability hereunder shall be and is specifically limited to payments or performance expressly required by the Supplier in accordance with the Obligations (even if such payments are deemed to be damages) and except to the extent specifically provided in the Agreement and any other agreement or instrument relating thereto, in no event shall the Guarantors be subject hereunder to consequential, exemplary, equitable, loss of profits, punitive, tort, or any other damages, costs, or attorney's fees.

2. The liability of the Guarantor under this Guaranty shall be absolute, unconditional and irrevocable, irrespective of:

(a) any change in time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of, or any consent to departure from, the Agreement or any other agreement or instrument relating thereto;

(b) any change in ownership of the Guarantor or the Supplier; or

(c)    any bankruptcy, insolvency or reorganization of, or other similar proceedings involving the Supplier.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by the Companies upon the insolvency, bankruptcy or reorganization of the Supplier or otherwise, all as though such payment had not been made.

3.    The Guarantor hereby irrevocably, unconditionally and expressly waives, to the fullest extent permitted by applicable law, promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Companies protect, secure or perfect any security interest or exhaust any right or first proceed against the Supplier or any other person or entity.

4.    This Guaranty constitutes a primary obligation of the Guarantor and is a continuing guaranty and shall (a) be binding upon the Guarantor and its successors and assigns and (b) inure to the benefit of and be enforceable by the Companies and their successors and assigns.

5.    Upon payment of all Obligations owing to the Companies, the Guarantors shall be subrogated to the rights of the Companies against the Supplier.

6.    This Guarantee may be terminated upon the later of February 28, 2005, or such time as all Obligations incurred prior to such termination have been satisfied.

7.    This Guarantee shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and the Guarantors hereto submit to the non-exclusive jurisdiction of the courts of the Commonwealth of Massachusetts or of the federal courts located in Boston, Massachusetts, exclusively, without request for arbitration. Process shall be made by certified mail.

[GUARANTOR]

By:
Name:
Title:

G:\STDOFFER\RFP\GUARANTY.DOC

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-4: Please provide a response to Commission Data Requests Comm-1-5 to indicate estimates for BVE & NEC separately.

Reply:

The Companies estimated total power requirements for new customers taking service after January 1, 1998 from 1998-2002 are as follows:

| | kWh Requirements | | Peak kW Demand | |
|---|---|---|---|---|
| Year | BVE | NEC | BVE | NEC |
| 1998 | 9,090,679 | 2,321,570 | 2,602 | 668 |
| 1999 | 26,095,834 | 6,747,556 | 5,525 | 1,272 |
| 2000 | 43,356,953 | 11,242,080 | 8,945 | 1,961 |
| 2001 | 60,866,352 | 15,784,755 | 12,397 | 2,714 |
| 2002 | 78,718,570 | 20,411,815 | 15,923 | 3,484 |

Witness Responsible: J.J. Bonner

Q:\RR\2716COMM\RECORD R\RR1-4.DOC

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-5: How does the method proposed by the Companies to apply interest to the SOCA over/underrecoveries compare to how interest was applied to the Fuel & PPCA balances.

Reply:

The SOCA provisions submitted in the original filing presented on April 15, 1998 included the application of interest to SOCA balance as that balance was being recovered from or returned to customers (Exhibit BVE/NEC-A pages 104 and 117).

The SOCA provisions submitted into evidence on May 12, 1998 (Exhibit BVE/NEC-B) replaced the original SOCA provisions and pages 104 and 117 were removed from evidence in this proceeding.

The Companies intend to address the issue of the application of interest in their March 1999 filings, as required under the provisions of the SOCA

The Companies will continue to apply interest to the final balance remaining in the fuel and purchased power accounts. The final balances are as follows:

| | Fuel | Purchased Power |
|---|---|---|
| Blackstone | ($610,048.30) | $366,835.26 |
| Newport | ($126,969.66) | ($18,148.52) |

The proposed interest rate to be applied to the above final balances is the Companies' effective average short-term borrowing rate which has been the practice under the Fuel and PPCA factor clauses.

Witness Responsible: J. J. Bonner

Q:\RI\2716COMM\RECORD R\RR1-5.DOC

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-6: Provide a copy of the Letter of Rejection sent to the Standard Offer Service bidder.

Reply: As Mr. Boisvert testified, the bidder of Standard Offer Service was notified of its rejection by telephone during the first or second week of April. A copy of the redacted letter of rejection, dated April 21, 1998 is attached.

Witness Responsible: L. R. Boisvert



Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

April 21, 1998

Re: Standard Offer Service RFP

Dear :

Thank you for submitting a response to the above referenced RFP. As we discussed, your proposal did not conform to the requirements of the RFP because losses were not included in your pricing. When losses are added, your proposed price exceeds the standard offer price cap. In addition, the proposal was not for a fixed percentage of the standard offer load requirements as specified in the RFP.

In our discussions, you mentioned that [redacted] may be is interested in pursuing other wholesale type of transactions. Montaup is currently in the market for the purchase of peaking capacity and energy for the remainder of 1998. If you have resources available, we would be happy to discuss the prospects of a transaction.

Also, note that Montaup is active in the daily, weekly and monthly markets. Paul Lopes and Joe Rossignoli are the contacts. They can be reached at (508) 559-2000 extensions 3836 or 3841, respectively.

If you have any questions, please feel free call me at extension 3832. Again, thank you for submitting a response to the RFP and we look forward to doing business with you in the future.

Sincerely

Lawrence R. Boisvert
Supervisor,
Power Supply Administration

750 West Center Street P.O. Box 543, West Bridgewater, MA 02379 508-559-2000 FAX: 508-559-8932

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-7: Regarding an educational television advertisement run by the company related to retail competition, please provide cost and confirm whether costs are paid by ratepayers:

Reply:

The Company has recently produced two educational advertisements related to electric utility industry restructuring. The ads state that customers "can now buy electricity from a competitive supplier" and then informs them about the ongoing role of Eastern Utilities as their "distribution company." In one case the message is "safe reliable service," and in the other, it is continuing safety and science programs in our schools.

Advertising Costs:

| | |
|---|---|
| Production of two thirty-second spots - BVE & Newport's share: | $16,000 |
| RI TV time spent to date - WJAR-TV, WSBE-TV, Cable Rep: | 10,916 |
| Total: | $26,916 |

Are the costs of advertising being paid by ratepayers?

Reasonable levels of educational and informational advertising expenses are allowed to be included in the cost of service for ratemaking purposes. These costs are reported through FERC account #9090 - "Informational and Instructional Advertising Expenses," - and, as such, are "above the line." We have used this FERC account number since we began television advertising in 1989. Furthermore, at the request of Commissioner Racine, the Companies have re-examined the contents of these ads and found them to be truthful and consistent with information about the availability of retail choice provided to the public by the Commission and the Division.

Witness Responsible: M. J. Hirsh

# EXHIBIT F

 Fax

**To:** Mike Hackey
**Fax:** 508.898.0433
**From:** Michael J Hager, Vice President, Energy Supply - NE
**Date:** Feb 15, 2005
**Subject:**
**Pages:** 30 including cover.

EUA's RI Std Offer filings in April/July 1998.

is is a confidential business document, and the property of National Grid.
you do not receive all pages, or if there are problems with this transmission, please call:

55 Bearfoot Road
Northboro, MA 01532
508.421.7350 Fax 508.421.7335
michael.hager@us.ngrid.com

02/18/2005 16:43 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 003
EB 15 2005 2:02 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.02/30

# Standard Offer and Last Resort Service Docket No. 2716

## April 1998

State of Rhode Island and Providence Plantations
Public Utilities Commission

Eastern Utilities
Blackstone Valley Electric
Newport Electric

Eastern Utilities
Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

April 15, 1998

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

Re: Blackstone Valley Electric Company and
Newport Electric Corporation
R. I. P. U. C. Docket No. 2716 Standard Offer Service and Last Resort Service

Dear Ms. Massaro:

Enclosed herewith for filing are Standard Offer Service and Last Resort Service tariffs and revised Retail Delivery Rate Schedules for Blackstone Valley Electric Company ("Blackstone"), R.I.P.U.C. Nos. 1154-1170, and for Newport Electric Corporation ("Newport"), R.I.P.U.C. Nos. 1379-1395. The Standard Offer Service, Last Resort Service and revised Retail Delivery Rate Schedules replace the currently effective Tariffs, R.I.P.U.C. Nos. 1135, 1136 and 1139-1153 for Blackstone and R.I.P.U.C. Nos. 1360, 1361 and 1364-1378 for Newport.

Blackstone and Newport have included with this filing:

- redlined copies of the proposed Standard Offer Service and Last Resort Service tariffs marked to show all changes between the proposed tariffs and the current Interim Generation Service and Last Resort Service tariffs and

- as a sample to serve for all of the Retail Delivery Rate Schedules, redline copies of Blackstone's and Newport's Rate R1 Retail Delivery Rate Schedules marked to show the changes between the revised tariffs and current tariffs.

750 West Center Street P.O. Box 543, West Bridgewater, MA 02379 508-559-2000 FAX: 508-559-8832

02/18/2005 16:43 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 005
EB 15 2005 2:03 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.04/30

Ms. Luly Massaro - 2 - April 15, 1998

The inclusion of the reference to the Standard Offer Cost Adjustment ("SOCA") Clause is the only revision to Blackstone's and Newport's current Retail Delivery Rate Schedules.

Blackstone and Newport request that the Standard Offer Service and Last Resort Service tariffs as well as the revised Retail Delivery tariffs and associated Standard Offer Cost Adjustment Factors be made effective June 1, 1998.

If you have any questions or if you need more information, please call me at 508/559-2000 ext. 3700.

Very truly yours,

Dennis St. Pierre
Vice President of Rates

Enc.
Service List

q:\mark\stdoffer\filelo~1.doc

April 15, 1998

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
R.I.P.U.C. Docket No. 2716

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Alan Shoer, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

Sam DeFrawi
Navy Rate Intervention
901 M Street S.E., Building 212
Washington, DC 20374-5018

02/18/2005 16:43 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 007
B 15 2005 2:03 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.06/30

# Standard Offer and Last Resort Service
# Docket No. 2716

April 1998

State of Rhode Island and Providence Plantations
Public Utilities Commission

Eastern Utilities
Blackstone Valley Electric
Newport Electric

# BLACKSTONE VALLEY ELECTRIC COMPANY
# and
# NEWPORT ELECTRIC CORPORTION
# DOCKET NO. 2716

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| **Section I:** | |
| Direct Testimony of Michael J. Hirsh | 1 |
| **Section II:** | |
| Direct Testimony of Lawrence R. Boisvert | 12 |
| **Section III:** | |
| Direct Testimony of James J. Bonner, Jr. | 28 |
| 1. Standard Offer Service Tariffs | |
| - Proposed | 45 |
| - Redlined | 65 |
| 2. Last Resort Service Tariffs | |
| - Proposed | 85 |
| - Redlined | 90 |
| 3. Rate R-1 Tariffs - Redlined | 94 |
| 4. Standard Offer Cost Adjustment ("SOCA") | 99 |
| 5. URA 80% Cap Calculation | 126 |
| 6. Sample Bills and Typical Bill Calculations | 129 |
| 7. Proposed Retail Delivery Tariffs | |
| - Blackstone Valley Electric | 134 |
| -Newport Electric Corporation | 175 |

02/18/2005 16:43 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 009
:B 15 2005 2:03 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.08/30

# SECTION III.1

# STANDARD OFFER SERVICE TARIFFS

# PROPOSED AND REDLINED

45

R.I.P.U.C. NO. 1154
CANCELS NO. 1135

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential Space Heating Retail Delivery Service Rate R-3

| | | |
|---|---|---|
| Energy Charge: | $0.03158 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| | | |
|---|---|---|
| Energy Charge | | |
| Peak Hours: | $0.15384 | per kWh |
| Off-Peak Hours: | $0.00570 | per kWh |

Date Filed, April 15, 1998 Date Effective, June 1, 1998

\\Alfred\ratedgn\BVE\RIPUC2716\SO_BVE4-15.doc 04/13/98 12:51 PM

02/18/2005 16:44 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 011
2:03 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.10/3

R.I.P.U.C. NO. 1154

-2-

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03589 | per kWh |

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $5.81 | per kW |
| Energy Charge: | $0.01403 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.11 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.02978 | per kWh |
| Off-Peak Hours: | $0.00877 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $5.29 | per kW |
| Energy Charge: | $0.01610 | per kWh |

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $5.48 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03241 | per kWh |
| Off-Peak Hours: | $0.01054 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, April 15, 1998 Date Effective, June 1, 1998

47

02/18/2005 16:44 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 012
B 15 2005 2:04 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.11/30

R.I.P.U.C. NO. 1154

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, April 15, 1998 Date Effective, June 1, 1998

48

02/18/2005 16:44 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 013
FR NATIONAL GRID 5084217335 TO 915088980433 P.12/32

R.I.P.U.C. NO. 1154

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the

Date Filed, April 15, 1998

49

Date Effective, June 1, 1998

02/18/2005 16:44 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 014
NATIONAL GRID 5084217335 TO 915088980433 P.13/36

R.I.P.U.C. NO. 1154

-5-

customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

Energy Charge: $0.03308 per kWh

General Heating Retail Delivery Service Rate H-2

Energy Charge: $0.03339 per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

Energy Charge: $0.03509 per kWh

Lighting Retail Delivery Service Rate S-1

Energy Charge: $0.03408 per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours

Monday through Friday excluding holidays defined below
April through September, 11:00 a.m. to 4:00 p.m.
October through March, 8:00 a.m. to 12:00 noon, and 4:00 p.m. to 7:00 p.m.

Off-Peak Hours

All other hours.

Holidays are defined as:

New Year's Day
President's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power

Date Filed, April 15, 1998 Date Effective, June 1, 1998

50

02/18/2005 16:44 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 015
2:04 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.14/30

R.I.P.U.C. NO. 1154

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted effective January 1 of each calendar year beginning in the year 1998 and ending in the year 2009 by multiplying the Rates by the appropriate Cumulative Multiplier shown in the Standard Offer Calendar Year Multiplier Table below. The foregoing Rates shall also be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Revenue Reconciliation Adjustment described below:

STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:

| Year | Cumulative Multiplier |
|---|---|
| 1998 | 1.00000 |
| 1999 | 1.09375 |
| 2000 | 1.18750 |
| 2001 | 1.18750 |
| 2002 | 1.31250 |
| 2003 | 1.46875 |
| 2004 | 1.59375 |
| 2005 | 1.71875 |
| 2006 | 1.84375 |
| 2007 | 1.96875 |
| 2008 | 2.09375 |
| 2009 | 2.21875 |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Date Filed, April 15, 1998 Date Effective, June 1, 1998

51

02/18/2005 16:45 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 016
EB 15 2005 2:04 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.15/30

R.I.P.U.C. NO. 1154

-7-

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | \$5.35 per MMBTU |
| 2001 | \$5.35 per MMBTU |
| 2002 | \$6.09 per MMBTU |
| 2003 | \$7.01 per MMBTU |
| 2004 | \$7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of \$0.60 and \$0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the differences between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer

Date Filed, April 15, 1998 Date Effective, June 1, 1998

52

02/18/2005 16:45 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 017
EB 15 2005 2:04 PM FR NATIONAL GRID 5084217335 TO 915088980433 P.16/30

R.I.P.U.C. NO. 1154

-8-

Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

The Company shall refund any overcollection or recover any undercollection of monies attributable to the foregoing differences through a Standard Offer Cost Adjustment ("SOCA") factor applied on a uniform cents per kilowatthour basis to the bills of all Customers taking Retail Delivery Service from the Company. The SOCA shall be estimated for each year in advance and shall be effective for bills rendered to Customers commencing on January 1 and ending on December 31 of each year, except for calendar year 1998 where the SOCA shall commence on June 1.

The SOCA shall be determined for each year as follows:

(1) The Standard Offer Service costs shall be reconciled with the Standard Offer Service revenues billed to Customers taking Standard Offer Service for the prior year. If actual costs and revenues are not available for any month for the prior year reconciliation, they shall be estimated, subject to further adjustment, for purposes of the foregoing calculations;

(2) The difference between Standard Offer Service costs and the Standard Offer Service revenues to be billed to Customers taking Standard Offer Service shall be estimated for the year;

(3) The sum of (1) and (2) above shall be divided by the estimated total kilowatthour sales for Retail Delivery Service for the year to yield the SOCA for the year.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs and revenues that exists.

<u>BILLING:</u>

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Calendar Year Multiplier and the Standard Offer Fuel Index, and Rhode Island Gross Receipts Tax.

Date Filed, April 15, 1998 Date Effective, June 1, 1998

53

02/18/2005 16:45 FAX 5088980433 TRANSCANADA PWR MKTG LTD → Kristine Delkus 018
FR NATIONAL GRID 5084217335 TO 915088980433 P.17/30

R.I.P.U.C. NO. 1154

-9-

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, April 15, 1998 Date Effective, June 1, 1998

54

# EXHIBIT G

**PART 1 OF 2**

 Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

October 30, 1998

To: All Interested Power Suppliers

From: Lawrence R. Boisvert

Subject: Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation Standard Offer Service Request for Proposal, dated October 30, 1998

Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation ("Companies") are seeking, through the attached Request for Proposals, competitive bids from prospective suppliers to service a share of its Standard Offer Service requirements.

As described in the attached Standard Offer Service RFP, the Companies are seeking suppliers to provide a share of the firm all-requirements service for the aggregated load of those customers taking retail Standard Offer Service. In 1998, the Companies Standard Offer retail billings are anticipated to be approximately 4,465 GWh with an annual peak of approximately 921 MW.

All bids should be for a fixed percentage of the Companies' Standard Offer Load, not to exceed 63.947%, with a fixed percentage discount to the Standard Offer Wholesale price provided in the RFP.

All bids are due on Thursday November ~~12~~ 18, 1998 at our offices in West Bridgewater, Massachusetts. The Companies reserve the exclusive right to accept or reject any or all bids for any reason. All bids will be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any other purpose other than in connection with the Companies' evaluation of proposals through this solicitation process.

Any questions regarding the RFP should be addressed to me by phone at (508) 559-2000 extension 3832, or via E-mail at Lboisvert@eua.com.

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION

## REQUEST FOR PROPOSALS
## TO SUPPLY
## STANDARD OFFER SERVICE

October 30, 1998

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting suppliers for proposals to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Proposals ("RFP") must be received at the address set forth below no later than 4:00 p.m. on Wednesday, November 18, 1998. Responses to the RFP must adhere to the specifications herein. Questions and responses to this RFP should be submitted to:

Lawrence R. Boisvert
Supervisor, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
Lboisvert@eua.com

**The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall vest in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to modification by certain state and federal regulatory agencies having jurisdiction of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any regulator or court having jurisdiction, or legislation may require the Companies to modify or withdraw their plans as described herein. Furthermore, the Companies, for their convenience and in their sole discretion, may change the timetable for the actions described herein.**

Table of Contents

I. Introduction

II. Standard Offer Service
- A. Customer Eligibility - Massachusetts
- B. Customer Eligibility - Rhode Island

III. Supplier Eligibility
- A. General Requirements
  1. NEPOOL Membership
  2. Regulatory Authorizations
- B. Additional Requirements for Option 2 Suppliers
  1. Modifications to Standard Offer Agreement
  2. Financial Information
  3. Default, Litigation and Penalties
  4. Performance Surety

IV. Administration of Standard Offer Service
- A. Hourly Load Estimation and Loss Allocation
- B. Load Information
- C. Minimum Load Obligation
- D. Supplier Defaults

V. Proposal Terms and Evaluation

VI. RFP Schedule

Appendix 1 Standard Offer Price Schedule

Appendix 2 Standard Offer Fuel Index

Appendix 3 Five-Year Load Forecast

Appendix 4 Proposal Bid Forms

Appendix 5 Wholesale Standard Offer Service Agreement

Appendix 6 Form of Performance Surety Documents

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) (collectively, the "Companies") are jointly seeking qualified parties to submit proposals to provide wholesale power supply to fulfill the Companies' un-subscribed Standard Offer Service obligations. Eastern, Blackstone, and Newport are wholly-owned retail subsidiaries of Eastern Utilities Associates, a registered public utility holding company, and are cooperating on the design and implementation of a process for soliciting suppliers of this service. Approximately, 36.053% of the Companies' Standard Offer Service requirements is subscribed under firm commitments, not subject to reduction. The RFP is for the remaining 63.047% of the Companies' Standard Offer Service requirements. In 1998, the Companies' total Standard Offer billings are projected to be approximately 4,465 GWh and with an annual peak of approximately 921 MW.

"Standard Offer Service" is defined as firm, all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs.[1] Standard Offer Service is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace. Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide the un-subscribed share of the firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. Bids are to be provided for a fixed percentage of the Companies' Standard Offer Load for the period January 1, 1999 through December 31, 2009.

Suppliers who successfully bid will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply as described in Section II. At the conclusion of the evaluation of the bids provided in response to this solicitation, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time. The Companies will make available to Suppliers certain load information, as described in Section IV. However, it will be the Suppliers' ultimate responsibility for estimating and meeting its Standard Offer Service responsibilities.

The Suppliers will also be required to provide power plant emissions and labor information in appropriate form to enable Eastern Edison to comply with the Massachusetts Department of Telecommunications and Energy's Uniform Label Disclosure requirements.

---

1/ Eastern's Standard Offer Service Tariff is currently pending before the Massachusetts Department of Telecommunications and Energy. Blackstone's and Newport's tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

TCP

## II. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. Eastern, Blackstone, and Newport are required to solicit through the competitive market for Suppliers of Standard Offer Service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and resell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs. Selected Suppliers will begin providing Wholesale Standard Offer Service on January 1, 1999.

Initially, the Companies expect that many of customers will continue to take Standard Offer Service for much of 1999. However, long-term forecasts of Standard Offer Service load are uncertain. As the electricity market matures, retail electric customers are expected to terminate Standard Offer Service to purchase electricity from an alternative supplier and, with the few exceptions described below, may not return to Standard Offer Service.

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for meeting their share of the Companies' Standard Offer Service load under the Restated NEPOOL Agreement and rules of ISO New England, Inc. or successor rules, and their responsibilities will include, without limiting the scope of such responsibilities, the following: i) installed and operable capacity; ii) operating reserves and automatic generator control; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customers' meters. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments to Suppliers for Standard Offer Service will be based on the discounts to the annual average prices shown in Appendix 1 determined through this solicitation as adjusted for the Fuel Index (Appendix 2), if applicable. No adjustments will be made for time of use, load factor, or any other characteristics of the load.

A five-year forecast of monthly energy billings and requirements of the Companies' aggregated Standard Offer Service load, assuming no migration of customers from Standard Offer Service to competitive suppliers, is shown in Appendix 3. Additional load information, consisting of "percent of annual peak" customer class load shapes, can be obtained from the EUA System's Internet website at www.eua.com, under "Supplier/EBT Information."

**A. Customer Eligibility - Massachusetts**

Standard Offer Service shall be available to each customer who was a customer of record as of March 1, 1998 and who has not received generation service from a competitive supplier since March 1, 1998, subject to the following conditions:

1. A customer receiving Standard Offer Service shall be allowed to retain such service upon moving within Eastern Edison's service territory.
2. A customer who previously received generation service from a competitive supplier is no longer eligible to receive Standard Offer Service, except that a low-income customer may return to Standard Offer Service at any time, regardless of whether the customer has previously received generation service from a competitive supplier.
3. Residential or small commercial or industrial customers taking retail delivery service under Eastern Edison's residential rates or Small General Service Retail Delivery Rate G-1 who have received generation service from a competitive supplier since March 1, 1998 are eligible to receive Standard Offer Service by so notifying Eastern Edison within one-hundred-twenty (120) days of the date when the customer first began to receive generation service from a competitive supplier, provided that such notification occurs prior to March 1, 1999.
4. A customer who moves into Eastern Edison's service territory after March 1, 1998 is not eligible to receive Standard Offer Service, except that a low-income customer who moves into Eastern Edison's service territory after March 1, 1998 shall be eligible for Standard Offer Service.
5. A customer who has received generation service pursuant to an agreement with a municipal aggregator is eligible to receive Standard Offer Service by so notifying Eastern Edison with one-hundred-eighty (180) days of the date when the customer first began to receive generation service through such agreement.

**B. Customer Eligibility - Rhode Island**

Standard Offer Service shall be available to all customers taking electric service from Blackstone or Newport before January 1, 1998 and customers moving into the Blackstone or Newport service territories on or after January 1, 1998, subject to the following conditions:

1. Such customers shall have the right to relocate to a different service location within Blackstone's or Newport's service territory and continue to receive Standard Offer Service.
2. Customers shall be ineligible to receive Standard Offer Service after terminating such service, except that customers who receive service under any of Blackstone's or Newport's residential retail delivery service rates or under the Small General Retail Delivery Service Rate G-1 may elect to take electric power service from another supplier during the period beginning January 1, 1998 and ending December 31, 1998, and elect to return to Standard Offer Service within one-hundred-twenty (120) days of commencing service from that supplier.

## III. Supplier Eligibility

### A. General Requirements

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the solicitation must meet the Companies' minimum eligibility requirements as outlined below. Documentation of compliance with each applicable requirement must be provided as part of the proposal. The Companies will have the final authority to determine, in their sole discretion, whether a respondent meets or does not meet these requirements.

#### 1. NEPOOL Membership

To participate in this Standard Offer Service RFP, a prospective Supplier must be a member in good standing of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England, Inc. billing system. As an alternative to being a member, the prospective Supplier may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the prospective Supplier's proposed commitment to provide Standard Offer Service or for such period until the prospective Supplier becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the prospective Supplier in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the prospective Supplier's proposal.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement.

#### 2. Regulatory Authorizations

Each proposal must include a positive declaration that the prospective Supplier has obtained or will obtain in a timely manner all applicable state and federal regulatory authorizations necessary for the Supplier to lawfully perform its obligations under any Standard Offer Service Agreement that it may enter into with the Companies.

#### 3. Standard Offer Agreement

The Companies recommend that Suppliers review the Wholesale Standard Offer Service Agreement provided in attachment 5 to provide any comments, exceptions, or proposed changes by Thursday November 12, 1998. The Companies will consider all comments and proposed changes, but are under no obligation to alter the Wholesale Standard Offer Service Agreement.

With their bid submittal, Suppliers are required to sign and return two originals of the Wholesale Standard Offer Service Agreement. If the Companies select the Supplier,

the Companies will sign the Wholesale Standard Offer Service Agreement and return one original for the Suppliers' records. The signed Agreements for those companies not selected as a supplier will be destroyed.

**2. Financial Information**

Suppliers wishing to provide Standard Offer Service under this solicitation must demonstrate creditworthiness by providing a current rating agency report indicating that Supplier has an investment grade rating. Such rating agency report shall be provided by one of the following: Standard & Poor's, Moody's, Duff & Phelps, or Fitch, In addition, Buyer shall provide the following information:

(i) a copy of Supplier's most recent: (a) audited financial statement(s); (b) twelve months financial statements; (c) annual report; (d) 10- K forms, as applicable; and

(ii) a list of Supplier's affiliates, including parent and subsidiaries, if applicable; and

In the event, Supplier cannot provide the information requested above, Supplier shall, if applicable, provide such information for its parent company. Where the above information is available on the Internet, Supplier may provide a statement with their proposal identifying where such information may be located and retrieved.

**3. Defaults, Litigation, and Penalties**

- For each prospective Supplier and any Guarantor(s) or any affiliate of each which in the past five years has been determined by an arbitrator, regulator, or court, having jurisdiction of the matter, to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.
- A detailed description of any situation within the past five (5) years in which the prospective Supplier or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations by an arbitrator, regulator, or court having jurisdiction of the matter.
- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the prospective Supplier or its Guarantor(s), or their respective officers or directors.
- A detailed description of any penalties, judgments, consent decrees, or other sanctions within the past five (5) years in any venue involving the prospective Supplier or its Guarantor(s).
- A detailed description of any present or anticipated facts known to the prospective Supplier or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

**4. Performance Surety**

As a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Supplier will be required to deliver to the Companies a performance surety securing the Supplier's full responsibility for Standard Offer Service load over the term of service.

Acceptable forms of surety include a performance letter of credit, or a parent guaranty, in substantially the form as provided in Appendix 3. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service.

The amount of the surety shall be determined in accordance with Article 7 of the Wholesale Standard Offer Service Agreement. Performance letters of credit, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and shall be renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

## IV. Administration of Standard Offer Service

### A. Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England, Inc. each Supplier's hourly share of the aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the Massachusetts Department of Telecommunications and Energy and Rhode Island Public Utilities Commission, summarized as follows:

- Energy and demand for each retail account will be estimated for each hour using a combination of inputs, including weather and load data from the EUA Supervisory Control and Data Acquisition ("SCADA") system, sample meter data, historical load shapes, and individual customer usage ratios.
- The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.
- The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.
- Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.
- The hourly Standard Offer loads, including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.
- The daily load information will be transferred to ISO New England, Inc. for inclusion in Supplier's Adjusted Net Interchange (ANI), own-load dispatch (or such other settlement process developed by NEPOOL or ISO New England, Inc.).

The Terms and Conditions for Suppliers may be revised, amended, supplemented, or supplanted in whole or in part from time to time by state regulatory agencies or by law.

### B. Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

The Companies will make available information to enable Suppliers to track their actual Standard Offer Service loads and to forecast their future obligations. Such

information will include daily reports of estimated hourly Standard Offer Service loads, numbers of customers in each rate class taking Standard Offer Service, and representative customer load shapes for each rate class. The Companies may also make available estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for prior monthly or annual periods, as appropriate.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies receive customer notifications of significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will ~~assume no responsibility or liability for estimating~~ Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts. Suppliers are advised to rely on their own projections of load and market dynamics.

**C. Minimum Load Obligations**

Over time, it is expected that Standard Offer Service load will decline, and thus the actual energy and demand responsibilities (in MWh and MW) associated with a given percentage of the load will decline as well. The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater. If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

**D. Supplier Default**

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement. The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, and other factors the Companies deem appropriate.

## V. Proposal Terms and Evaluation

### A. Proposal Requirements

The Companies require that Suppliers of Standard Offer Service take on a fixed percentage share of the Companies' load obligations for the term of such Suppliers' obligations, and that prospective Suppliers' bids, exclusive of the Fuel Index revenues, not exceed the fixed annual cents-per-kilowatt-hour prices for energy delivered to retail customer meters given in Appendix 1. Consequently, for the proposal must contain two elements: i) a percentage share of the Companies' aggregate Standard Offer Service Load that the prospective Supplier wishes to serve (the "Share"); and ii) a percentage discount off of the wholesale rate caps shown in Appendix 1 at which the prospective Supplier would serve Standard Offer Service Load (the "Discount"). The percentage bid must be no smaller than 1% and no greater than 63.947%. The Discount must be stated as a non-negative percentage. The Share and the Discount must remain constant year-to-year. The Discount must be stated as a fixed value, and must not be indexed in any way.

Proposals should be submitted on the appropriate Proposal Forms included in Appendix 4. Proposals must include two properly executed Wholesale Standard Offer Service Agreements.

The Companies agree that all information they receive from the prospective Suppliers shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the prospective Supplier's qualifications and proposals. To the extent that such information is required to be disclosed to a third person in any proceeding, the Companies will produce it under a confidentiality agreement or protective order of the tribunal or agency having jurisdiction of the matter.

### B. Proposal Evaluation

Proposals offering the largest Discounts to the wholesale rate cap will be selected first until all the Companies' un-subscribed Standard Offer Service Load has been subscribed. In the event that two or more prospective Suppliers offer the same discount and the aggregate of such bids represent more than the un-subscribed of the Standard Offer Load, the Companies will pro-rate each of those bids, such that the sum of all bids selected equals the un-subscribed Standard Offer Service load.

The Companies shall have the exclusive right to accept or reject any or all of the proposals submitted at any time, for any reason. All submissions shall constitute an offer to sell Standard Offer Service and such offer shall be deemed to be held open until December 31, 1998. Pricing contained in such proposal may not be changed or withdrawn during this period.

## VI. RFP Schedule

| | |
|---|---|
| RFP Issued | October 30, 1998 |
| Wholesale Standard Offer Service Agreement Comments Due | November 12, 1998 |
| RFP Proposals Due | November 18, 1998 |
| Proposal Evaluation Complete | November 23, 1998 |
| Return Executed Wholesale Standard Offer Service Agreements to Selected Suppliers | November 30, 1998 |
| Begin Standard Offer Service | January 1, 1999 |

# APPENDIX 1

## STANDARD OFFER SERVICE PRICE SCHEDULE

TCPM 001157

The rate for retail customers who receive Standard Offer Service will be based on the applicable retail Standard Offer Service tariffs on file with the applicable regulatory agencies. The Standard Offer Wholesale rate cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement is as follows:

| Calendar Year | Price per Kilowatt-hour |
|---|---|
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

Prices paid to Suppliers will be based on the stipulated Standard Offer Wholesale rates, reduced by the applicable Discounts offered by Suppliers in the Companies' solicitation. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers are responsible for all losses between their sources of supply and the customers' meters, as well as all responsibility for meeting their share of the following: i) installed and operable capacity; ii) operating reserves; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Additional revenues to Suppliers may be realized through the operation of the Fuel Index (Appendix 2).

# APPENDIX 2

## STANDARD OFFER FUEL INDEX

TCPM 001159

The Companies have a Fuel Adjustment mechanism in their respective retail Standard Offer Service tariffs which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulfur) and natural gas after 1999. This fuel adjustment mechanism is subject to continued regulatory supervision and approval which allows the Companies to collect such revenues from their retail customers taking Standard Offer Service. The formula and indices used for calculating such revenues are also subject to regulatory change.

Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels.

The retail Standard Offer rate in effect for a given month is multiplied by a "Fuel Adjustment Multiplier" that is set equal to 1.0 and thus has no impact unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in *The Wall Street Journal*, expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No.6 oil into New York harbor, as reported in *Platt's Oilgram U.S. Marketscan* in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies for approval. Upon regulatory approval, such indices will be used for calculating Fuel Adjustment revenues in accordance with the order(s) and shall be incorporated into the terms of the retail Standard Offer Service tariffs.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment Multiplier for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment Multiplier} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + 0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where: Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment Multiplier would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate is increased by this Fuel Adjustment Multiplier for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

The incremental revenues attributable to the Customer Rate Fuel Adjustment mechanism will be allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier in the applicable billing month, pursuant to Article 5 of the Standard Offer Service Agreement.

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment Multiplier determined.

# APPENDIX 3

# FIVE-YEAR LOAD FORECAST

TCPM 001162

# EASTERN UTILITIES ASSOCIATES

## STANDARD OFFER LOAD INFORMATION

## HISTORICAL AND FORECAST MONTHLY PEAK AND ENERGY DETAIL

1998 - 2003

Load Forecasting
Retail Business Services
October 19, 1998

EUA SYSTEM FIVE YEAR FORECAST
1998 STANDARD OFFER PEAK DEMANDS

(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1998 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Thu | Thu | Wed | Fri | Fri | Thu | Fri | Wed | Tue | Tue | Tue | |
| Date | 01/15/98 | 02/05/98 | 03/12/98 | 04/01/98 | 05/29/98 | 06/26/98 | 07/23/98 | | | | | | |
| Hour | 6 PM | 6 PM | 7 PM | 7 PM | 3 PM | 2 PM | 2 PM | | | | | | |
| Temperature | 30 | 28 | 19 | 45 | 83 | 89 | 85 | | | | | | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 445,200 | 445,900 | 440,595 | 399,066 | 433,260 | 515,584 | 551,735 | 508,663 | 465,755 | 403,152 | 436,150 | 474,642 | 459,975 |
| Blackstone | 198,470 | 195,610 | 193,930 | 177,670 | 207,420 | 239,020 | 259,240 | 245,750 | 229,980 | 191,110 | 199,156 | 213,565 | 212,577 |
| Newport | 88,200 | 90,900 | 89,700 | 76,700 | 71,700 | 92,200 | 101,500 | 99,700 | 93,100 | 80,400 | 87,400 | 97,600 | 89,092 |
| Total | 731,870 | 732,410 | 724,225 | 653,436 | 712,380 | 846,804 | 912,475 | 854,113 | 788,835 | 674,662 | 722,706 | 785,807 | 761,644 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 6,160 | 8,060 | 4,660 | 6,350 | 5,030 | 5,830 | 9,300 | 2,570 | 2,380 | 1,400 | 3,780 | 2,700 | 4,852 |
| NEPOOL External | -980 | -220 | -2,380 | 3,840 | 270 | 620 | -460 | 9,920 | 9,140 | 7,840 | 8,390 | 8,880 | 3,738 |
| Total | 5,180 | 7,840 | 2,280 | 10,190 | 5,300 | 6,450 | 8,840 | 12,490 | 11,520 | 9,240 | 12,170 | 11,580 | 8,590 |
| TOTAL STANDARD OFFER DEMAND | 737,050 | 740,250 | 726,505 | 663,626 | 717,680 | 853,254 | 921,315 | 866,603 | 800,355 | 683,902 | 734,876 | 797,387 | 770,234 |

TCPM 001164

EUA SYSTEM FIVE YEAR FORECAST
1999 STANDARD OFFER PEAK DEMANDS

(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 5 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 91 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 454,553 | 428,010 | 408,534 | 373,460 | 392,435 | 463,834 | 512,260 | 484,181 | 436,749 | 375,419 | 407,361 | 448,360 | 432,096 |
| Blackstone | 212,630 | 200,520 | 191,830 | 186,830 | 209,530 | 243,020 | 262,830 | 250,230 | 233,830 | 191,920 | 201,590 | 217,520 | 216,857 |
| Newport | 99,300 | 93,800 | 88,500 | 80,100 | 79,300 | 95,500 | 102,400 | 100,900 | 94,200 | 80,500 | 87,400 | 98,800 | 91,725 |
| Total | 766,483 | 722,330 | 688,864 | 640,390 | 681,265 | 802,354 | 877,490 | 835,311 | 764,779 | 647,839 | 696,351 | 764,680 | 740,678 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,650 | 2,550 | 2,440 | 2,240 | 2,340 | 2,810 | 3,080 | 2,890 | 2,680 | 2,220 | 2,410 | 2,680 | 2,583 |
| NEPOOL External | 8,650 | 8,150 | 7,780 | 7,230 | 7,680 | 9,060 | 9,900 | 9,420 | 8,640 | 7,320 | 7,860 | 8,630 | 8,360 |
| Total | 11,300 | 10,700 | 10,220 | 9,470 | 10,020 | 11,870 | 12,980 | 12,310 | 11,320 | 9,540 | 10,270 | 11,310 | 10,943 |
| TOTAL STANDARD OFFER DEMAND | 777,783 | 733,030 | 699,084 | 649,860 | 691,285 | 814,224 | 890,470 | 847,621 | 776,099 | 657,379 | 706,621 | 775,990 | 751,621 |

TCPM 001165

EUA SYSTEM FIVE YEAR FORECAST
2000 STANDARD OFFER PEAK DEMANDS

(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2000 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 91 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 441,617 | 415,817 | 397,107 | 362,891 | 380,061 | 448,127 | 494,259 | 467,364 | 421,515 | 362,673 | 393,302 | 432,335 | 418,089 |
| Blackstone | 216,530 | 204,120 | 195,230 | 190,230 | 211,920 | 244,820 | 264,930 | 252,130 | 235,630 | 193,420 | 203,090 | 219,220 | 219,273 |
| Newport | 100,500 | 95,000 | 89,600 | 81,100 | 79,900 | 96,100 | 103,000 | 101,500 | 94,800 | 81,000 | 88,000 | 99,300 | 92,483 |
| Total | 758,647 | 714,937 | 681,937 | 634,221 | 671,881 | 789,047 | 862,189 | 820,994 | 751,945 | 637,093 | 684,392 | 750,855 | 729,845 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,670 | 2,480 | 2,370 | 2,180 | 2,380 | 2,730 | 2,990 | 2,910 | 2,610 | 2,260 | 2,340 | 2,610 | 2,544 |
| NEPOOL External | 8,560 | 8,070 | 7,690 | 7,160 | 7,590 | 8,900 | 9,730 | 9,260 | 8,490 | 7,190 | 7,720 | 8,480 | 8,237 |
| Total | 11,230 | 10,550 | 10,060 | 9,340 | 9,970 | 11,630 | 12,720 | 12,170 | 11,100 | 9,450 | 10,060 | 11,090 | 10,781 |
| TOTAL STANDARD OFFER DEMAND | 769,877 | 725,487 | 691,997 | 643,561 | 681,851 | 800,677 | 874,909 | 833,164 | 763,045 | 646,543 | 694,452 | 761,945 | 740,626 |

EUA SYSTEM FIVE YEAR FORECAST
2001 STANDARD OFFER PEAK DEMANDS

(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 91 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 426,619 | 403,351 | 386,711 | 354,950 | 374,133 | 443,328 | 490,531 | 465,731 | 421,793 | 364,342 | 396,619 | 437,766 | 413,823 |
| Blackstone | 218,130 | 205,620 | 196,730 | 191,730 | 213,730 | 247,220 | 267,430 | 254,530 | 237,830 | 195,320 | 204,990 | 221,320 | 221,215 |
| Newport | 101,100 | 95,500 | 90,100 | 81,600 | 80,500 | 96,800 | 103,700 | 102,300 | 95,500 | 81,600 | 88,600 | 100,100 | 93,117 |
| Total | 745,849 | 704,471 | 673,541 | 628,280 | 668,363 | 787,348 | 861,661 | 822,561 | 755,123 | 641,262 | 690,209 | 759,186 | 728,155 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 2,420 | 2,320 | 2,230 | 2,340 | 2,790 | 3,050 | 2,880 | 2,590 | 2,240 | 2,440 | 2,600 | 2,542 |
| NEPOOL External | 8,410 | 7,940 | 7,590 | 7,090 | 7,530 | 8,880 | 9,720 | 9,280 | 8,530 | 7,230 | 7,780 | 8,570 | 8,213 |
| Total | 11,010 | 10,360 | 9,910 | 9,320 | 9,870 | 11,670 | 12,770 | 12,160 | 11,120 | 9,470 | 10,220 | 11,170 | 10,754 |
| TOTAL STANDARD OFFER DEMAND | 756,859 | 714,831 | 683,451 | 637,600 | 678,233 | 799,018 | 874,431 | 834,721 | 766,243 | 650,732 | 700,429 | 770,356 | 738,909 |

TCPM 001167

EUA SYSTEM FIVE YEAR FORECAST
2002 STANDARD OFFER PEAK DEMANDS

(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 91 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 432,626 | 409,112 | 392,210 | 360,006 | 378,601 | 448,071 | 495,781 | 470,644 | 426,339 | 368,256 | 400,811 | 442,378 | 418,736 |
| Blackstone | 220,230 | 207,620 | 198,630 | 193,530 | 214,830 | 248,120 | 268,330 | 255,430 | 238,730 | 196,020 | 205,790 | 222,120 | 222,448 |
| Newport | 101,800 | 96,200 | 90,800 | 82,200 | 80,800 | 96,900 | 103,900 | 102,400 | 95,600 | 81,700 | 88,700 | 100,200 | 93,433 |
| Total | 754,656 | 712,932 | 681,640 | 635,736 | 674,231 | 793,091 | 868,011 | 828,474 | 760,669 | 645,976 | 695,301 | 764,698 | 734,618 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 2,510 | 2,410 | 2,230 | 2,330 | 2,790 | 3,050 | 2,870 | 2,690 | 2,240 | 2,430 | 2,700 | 2,571 |
| NEPOOL External | 8,510 | 8,040 | 7,690 | 7,170 | 7,600 | 8,940 | 9,790 | 9,340 | 8,580 | 7,280 | 7,840 | 8,630 | 8,284 |
| Total | 11,110 | 10,550 | 10,100 | 9,400 | 9,930 | 11,730 | 12,840 | 12,210 | 11,270 | 9,520 | 10,270 | 11,330 | 10,855 |
| TOTAL STANDARD OFFER DEMAND | 765,766 | 723,482 | 691,740 | 645,136 | 684,161 | 804,821 | 880,851 | 840,684 | 771,939 | 655,496 | 705,571 | 776,028 | 745,473 |

EUA SYSTEM
2003 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2003 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 91 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 437,095 | 413,409 | 396,348 | 363,778 | 382,475 | 452,673 | 500,796 | 475,498 | 430,653 | 372,838 | 404,958 | 446,869 | 423,849 |
| Blackstone | 221,030 | 208,320 | 199,430 | 194,330 | 216,230 | 249,920 | 270,430 | 257,430 | 240,530 | 197,520 | 207,290 | 223,820 | 223,857 |
| Newport | 102,000 | 96,400 | 90,900 | 82,300 | 81,000 | 97,300 | 104,300 | 102,800 | 96,000 | 82,800 | 89,100 | 100,600 | 93,725 |
| Total | 760,125 | 718,129 | 686,678 | 640,408 | 679,705 | 799,893 | 875,526 | 835,728 | 767,183 | 651,558 | 701,348 | 771,289 | 740,631 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,700 | 2,510 | 2,410 | 2,230 | 2,330 | 2,790 | 3,050 | 2,970 | 2,690 | 2,240 | 2,430 | 2,700 | 2,588 |
| NEPOOL External | 8,580 | 8,100 | 7,740 | 7,230 | 7,660 | 9,020 | 9,880 | 9,420 | 8,660 | 7,350 | 7,910 | 8,700 | 8,354 |
| Total | 11,280 | 10,610 | 10,150 | 9,460 | 9,990 | 11,810 | 12,930 | 12,390 | 11,350 | 9,590 | 10,340 | 11,400 | 10,942 |
| TOTAL STANDARD OFFER DEMAND | 771,405 | 728,739 | 696,828 | 649,868 | 689,695 | 811,703 | 888,456 | 848,118 | 778,533 | 661,148 | 711,688 | 782,689 | 751,573 |

EUA SYSTEM FIVE YEAR FORECAST

STANDARD OFFER BILLINGS AND REQUIREMENTS

1998 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1998 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BLACKSTONE | | | | | | | | | | | | | |
| Sales Billed | 103,939,733 | 93,869,365 | 101,393,863 | 98,860,316 | 95,266,891 | 101,124,490 | 106,292,393 | 119,260,060 | 112,165,353 | 100,666,907 | 101,857,725 | 112,522,124 | 1,253,219,220 |
| Company Use | 334,392 | 329,752 | 331,512 | 284,152 | 220,152 | 220,737 | 232,417 | 192,307 | 206,955 | 277,007 | 327,913 | 340,966 | 3,298,262 |
| Losses and Unbilled | 6,266,769 | -1,422,088 | 5,607,972 | -1,106,702 | 6,665,217 | 6,678,358 | 14,926,884 | 3,917,718 | -4,933,000 | 6,190,959 | 1,111,143 | 496,037 | 44,399,267 |
| Requirements | 110,540,894 | 98,777,029 | 107,333,347 | 98,037,766 | 102,152,260 | 108,023,585 | 121,451,694 | 123,370,085 | 107,439,308 | 107,134,873 | 103,296,781 | 113,359,127 | 1,300,916,749 |
| EASTERN EDISON | | | | | | | | | | | | | |
| Sales Billed | 246,571,559 | 228,795,792 | 215,698,306 | 211,065,066 | 204,557,928 | 210,359,324 | 233,568,303 | 245,426,672 | 230,051,748 | 208,104,949 | 206,733,185 | 228,314,369 | 2,669,247,201 |
| Company Use | 314,831 | 276,368 | 249,967 | 225,731 | 168,759 | 133,722 | 165,643 | 140,808 | 106,563 | 127,348 | 167,739 | 212,707 | 2,288,166 |
| Losses and Unbilled | -36,857 | -9,890,919 | 20,961,920 | 259,909 | 12,705,567 | 16,339,098 | 27,449,920 | 15,716,314 | -9,847,791 | 8,518,677 | 13,229,018 | 17,513,500 | 112,918,356 |
| Requirements | 246,849,533 | 219,181,241 | 236,910,193 | 211,548,706 | 217,432,254 | 226,832,144 | 261,183,866 | 261,283,794 | 220,310,520 | 216,750,974 | 220,129,942 | 246,040,576 | 2,784,453,743 |
| NEWPORT | | | | | | | | | | | | | |
| Sales Billed | 49,320,149 | 47,056,432 | 42,942,083 | 42,370,996 | 41,286,965 | 41,739,056 | 46,744,660 | 51,928,640 | 47,431,325 | 42,054,822 | 42,857,270 | 47,079,960 | 542,812,354 |
| Company Use | 114,296 | 115,755 | 95,277 | 75,443 | 58,416 | 34,069 | 36,520 | 15,053 | 14,481 | 15,808 | 32,486 | 42,419 | 650,043 |
| Losses and Unbilled | 1,975,215 | -1,684,157 | 5,758,190 | 722,441 | 2,927,201 | 4,405,415 | 7,331,090 | 2,798,257 | -415,065 | 3,722,559 | 4,104,617 | 5,193,127 | 36,838,890 |
| Requirements | 51,409,660 | 45,488,030 | 48,795,550 | 43,168,880 | 44,272,600 | 46,178,540 | 54,112,270 | 54,741,950 | 47,030,739 | 45,793,189 | 46,994,373 | 52,315,506 | 580,301,287 |
| TOTAL INCLUDING DISTRIBUTION LOSSES | | | | | | | | | | | | | |
| Sales Billed | 399,831,441 | 375,721,589 | 360,034,252 | 352,296,378 | 341,111,802 | 353,222,850 | 386,605,356 | 416,615,372 | 389,648,424 | 350,826,678 | 351,448,180 | 387,916,453 | 4,465,278,775 |
| Company Use | 763,519 | 721,875 | 676,756 | 583,326 | 447,327 | 388,548 | 434,580 | 348,168 | 327,999 | 420,163 | 528,138 | 596,092 | 6,230,991 |
| Losses and Unbilled | 8,205,127 | -12,997,164 | 32,328,082 | -124,352 | 22,297,985 | 27,422,871 | 49,707,894 | 22,432,289 | -15,195,856 | 18,432,195 | 18,444,778 | 23,202,664 | 194,156,513 |
| Requirements | 408,800,087 | 363,446,300 | 393,039,090 | 352,755,352 | 363,857,114 | 381,034,269 | 436,747,830 | 439,395,829 | 374,780,567 | 369,679,036 | 370,421,096 | 411,715,209 | 4,665,671,779 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| Internal | 4,072,365 | 2,797,291 | 12,790,753 | 5,659,751 | 5,218,454 | 2,596,257 | -20,707,386 | 2,463,899 | 695,798 | 771,407 | 1,965,878 | 1,448,400 | 19,765,087 |
| External | 1,159,457 | 731,310 | -902,220 | -197,553 | 1,579 | 148,309 | -96,964 | -164,555 | 114,721 | 501,506 | 683,662 | 4,650,430 | 6,629,462 |
| Total | 5,231,822 | 3,528,601 | 11,888,533 | 5,462,198 | 5,220,033 | 2,744,566 | -20,804,350 | 2,299,344 | 810,519 | 1,272,913 | 2,649,540 | 6,098,830 | 26,394,549 |
| TOTAL STANDARD OFFER | 414,031,909 | 366,974,901 | 404,927,623 | 358,217,550 | 369,077,147 | 383,778,835 | 415,943,480 | 441,695,173 | 375,591,086 | 370,951,949 | 373,070,636 | 417,806,039 | 4,692,066,326 |

EUA SYSTEM FIVE YEAR FORECAST

STANDARD OFFER BILLINGS AND REQUIREMENTS

1999 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 111,509,960 | 108,100,207 | 103,557,126 | 101,552,726 | 98,204,952 | 102,034,640 | 109,898,096 | 119,292,224 | 113,080,817 | 99,995,786 | 101,089,795 | 110,871,932 | 1,278,768,261 |
| Company Use | 342,734 | 355,696 | 303,006 | 281,370 | 243,049 | 178,528 | 200,350 | 234,190 | 232,400 | 265,658 | 304,763 | 361,764 | 3,303,508 |
| Losses and Unbilled | 4,690,821 | -4,433,461 | 6,129,198 | -918,993 | 5,140,518 | 9,461,803 | 11,314,039 | 2,913,686 | -6,286,299 | 7,952,197 | 5,131,546 | 3,012,286 | 44,107,341 |
| Requirements | 116,543,515 | 104,022,442 | 109,769,330 | 100,915,103 | 103,588,519 | 111,674,971 | 121,412,485 | 122,440,100 | 107,026,918 | 108,213,641 | 106,526,104 | 114,245,982 | 1,326,179,110 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 234,546,956 | 226,425,509 | 210,630,651 | 202,990,426 | 193,551,960 | 198,222,217 | 219,437,550 | 227,777,260 | 214,205,102 | 188,825,603 | 190,617,213 | 216,636,721 | 2,523,867,168 |
| Company Use | 314,604 | 284,273 | 233,061 | 203,391 | 150,034 | 124,003 | 136,484 | 143,425 | 124,219 | 138,404 | 180,995 | 259,871 | 2,292,764 |
| Losses and Unbilled | 7,395,809 | -12,035,974 | 15,326,265 | -836,070 | 9,644,116 | 19,829,258 | 21,558,226 | 7,509,905 | -11,773,987 | 15,611,719 | 20,584,366 | 16,703,411 | 109,517,044 |
| Requirements | 242,257,369 | 214,673,808 | 226,189,977 | 202,357,747 | 203,346,110 | 218,175,478 | 241,132,260 | 235,430,590 | 202,555,334 | 204,575,726 | 211,382,574 | 233,602,003 | 2,635,676,976 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 50,941,914 | 49,647,303 | 45,614,194 | 43,970,416 | 41,309,366 | 42,849,102 | 47,050,147 | 49,168,444 | 47,546,056 | 41,748,561 | 42,054,664 | 49,215,149 | 551,117,330 |
| Company Use | 60,328 | 145,530 | 130,981 | 59,199 | 38,430 | 24,511 | 21,682 | 26,905 | 26,341 | 27,717 | 38,981 | 55,764 | 656,349 |
| Losses and Unbilled | 3,299,441 | -1,703,637 | 4,610,127 | 734,074 | 3,321,211 | 3,975,855 | 6,557,277 | 3,060,277 | -1,487,384 | 3,879,296 | 5,575,831 | 3,668,213 | 35,490,581 |
| Requirements | 54,301,683 | 48,089,196 | 50,355,302 | 44,763,689 | 44,669,007 | 46,849,468 | 53,629,106 | 52,255,626 | 46,087,013 | 45,655,594 | 47,669,478 | 52,939,126 | 587,264,288 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 396,798,830 | 384,173,019 | 359,581,971 | 348,513,568 | 333,066,278 | 343,105,959 | 376,385,793 | 396,237,928 | 374,833,975 | 330,567,970 | 383,761,674 | 376,725,802 | 4,353,752,767 |
| Company Use | 717,666 | 785,499 | 667,648 | 543,960 | 431,513 | 327,042 | 358,516 | 404,520 | 382,960 | 431,779 | 524,739 | 677,399 | 6,252,641 |
| Losses and Unbilled | 15,386,071 | -18,173,072 | 26,065,590 | -1,020,969 | 18,105,845 | 33,266,916 | 39,429,542 | 13,483,868 | -19,547,670 | 27,443,212 | 31,291,743 | 23,383,910 | 189,114,966 |
| Requirements | 412,902,567 | 366,785,446 | 386,314,609 | 348,036,559 | 351,603,636 | 376,699,917 | 416,175,851 | 410,126,316 | 355,669,265 | 358,442,961 | 395,578,156 | 400,787,111 | 4,549,120,374 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | 1,444,028 | 1,282,675 | 1,350,914 | 1,216,998 | 1,229,474 | 1,317,198 | 1,455,270 | 1,434,039 | 1,243,512 | 1,253,218 | 1,278,161 | 1,401,295 | 15,906,782 |
| External | 4,662,150 | 4,141,208 | 4,361,522 | 3,929,164 | 3,969,441 | 4,252,669 | 4,698,443 | 4,629,898 | 4,014,767 | 4,046,103 | 4,126,636 | 4,524,184 | 51,356,185 |
| Total | 6,106,178 | 5,423,883 | 5,712,436 | 5,146,162 | 5,198,915 | 5,569,867 | 6,153,713 | 6,063,937 | 5,258,279 | 5,299,321 | 5,404,797 | 5,925,479 | 67,262,967 |
| **TOTAL STANDARD OFFER** | 419,008,745 | 372,209,329 | 392,027,045 | 353,182,701 | 356,802,551 | 382,269,784 | 422,327,564 | 416,190,253 | 360,927,544 | 363,742,282 | 370,982,953 | 406,712,590 | 4,616,383,341 |

-8-

TCPM 001171

EUA SYSTEM FIVE YEAR FORECAST

STANDARD OFFER BILLINGS AND REQUIREMENTS

2000 KWH

| | January | February | March | April | May | June |
|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | |
| Sales Billed | 112,383,334 | 109,066,157 | 104,460,325 | 102,817,905 | 99,137,675 | 103,164,384 |
| Company Use | 343,226 | 356,208 | 303,442 | 281,774 | 243,399 | 178,784 |
| Losses and Unbilled | 4,737,914 | -4,478,747 | 6,194,442 | -922,178 | 5,193,631 | 9,562,933 |
| Requirements | 117,464,474 | 104,943,618 | 110,958,209 | 102,177,501 | 104,574,705 | 112,906,101 |
| **EASTERN EDISON** | | | | | | |
| Sales Billed | 229,670,422 | 221,540,816 | 206,457,042 | 199,106,919 | 189,776,264 | 194,392,286 |
| Company Use | 315,173 | 284,786 | 233,482 | 203,758 | 150,305 | 124,227 |
| Losses and Unbilled | 7,363,359 | -11,701,287 | 15,142,457 | -720,068 | 9,565,346 | 19,568,911 |
| Requirements | 237,348,954 | 210,124,315 | 221,832,981 | 198,590,609 | 199,491,915 | 214,085,424 |
| **NEWPORT** | | | | | | |
| Sales Billed | 51,361,187 | 50,065,974 | 46,004,737 | 44,353,209 | 41,677,852 | 43,240,844 |
| Company Use | 60,881 | 146,864 | 132,182 | 59,742 | 38,782 | 24,736 |
| Losses and Unbilled | 3,325,582 | -1,719,051 | 4,648,546 | 739,388 | 3,349,734 | 4,011,073 |
| Requirements | 54,747,650 | 48,493,787 | 50,785,465 | 45,152,339 | 45,066,368 | 47,276,653 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | |
| Sales Billed | 393,414,943 | 380,672,947 | 356,922,104 | 346,278,033 | 330,591,791 | 340,797,514 |
| Company Use | 719,280 | 787,858 | 669,106 | 545,274 | 432,486 | 327,747 |
| Losses and Unbilled | 15,426,855 | -17,899,085 | 25,985,445 | -902,858 | 18,108,711 | 33,142,917 |
| Requirements | 409,561,078 | 363,561,720 | 383,576,655 | 345,920,449 | 349,132,988 | 374,268,178 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | |
| Internal | 1,431,901 | 1,270,991 | 1,340,930 | 1,209,253 | 1,220,464 | 1,308,310 |
| External | 4,622,998 | 4,103,483 | 4,329,315 | 3,904,162 | 3,940,354 | 4,223,972 |
| Total | 6,054,899 | 5,374,474 | 5,670,253 | 5,113,415 | 5,160,818 | 5,532,282 |
| **TOTAL STANDARD OFFER** | 415,615,977 | 368,936,194 | 389,246,908 | 351,033,864 | 354,293,806 | 379,800,460 |

| | July | August | September | October | November | December | 2000 TOTAL |
|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | |
| Sales Billed | 111,123,664 | 120,478,111 | 114,377,518 | 101,031,718 | 102,191,988 | 112,095,901 | 1,292,328,680 |
| Company Use | 200,638 | 234,527 | 232,734 | 266,039 | 305,201 | 362,283 | 3,308,255 |
| Losses and Unbilled | 11,431,304 | 2,944,306 | -6,346,180 | 8,035,941 | 5,186,971 | 3,046,254 | 44,588,591 |
| Requirements | 122,755,606 | 123,656,944 | 108,264,072 | 109,333,698 | 107,684,160 | 115,504,438 | 1,340,225,526 |
| **EASTERN EDISON** | | | | | | | |
| Sales Billed | 214,930,254 | 223,083,869 | 209,950,276 | 185,086,130 | 186,808,465 | 212,124,712 | 2,472,927,455 |
| Company Use | 136,731 | 143,684 | 124,444 | 138,654 | 181,321 | 260,340 | 2,296,905 |
| Losses and Unbilled | 21,250,943 | 7,481,615 | -11,440,786 | 15,420,963 | 20,294,697 | 16,482,556 | 108,708,706 |
| Requirements | 236,317,928 | 230,709,168 | 198,633,934 | 200,645,747 | 207,284,483 | 228,867,608 | 2,583,933,066 |
| **NEWPORT** | | | | | | | |
| Sales Billed | 47,477,655 | 49,613,755 | 47,978,612 | 42,124,671 | 42,423,593 | 49,633,006 | 555,955,095 |
| Company Use | 21,880 | 27,152 | 26,583 | 27,971 | 39,338 | 56,275 | 662,386 |
| Losses and Unbilled | 6,615,734 | 3,086,873 | -1,501,973 | 3,913,129 | 5,623,662 | 3,698,310 | 35,791,007 |
| Requirements | 54,115,269 | 52,727,780 | 46,503,222 | 46,065,771 | 48,086,593 | 53,387,591 | 592,408,488 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | |
| Sales Billed | 375,531,573 | 393,175,735 | 372,306,406 | 328,242,519 | 331,424,046 | 373,853,619 | 4,321,211,230 |
| Company Use | 359,249 | 405,363 | 383,761 | 432,664 | 525,860 | 678,898 | 6,267,546 |
| Losses and Unbilled | 39,297,981 | 13,512,794 | -19,288,939 | 27,370,033 | 31,105,338 | 23,227,120 | 189,086,304 |
| Requirements | 413,188,803 | 407,093,892 | 353,401,228 | 356,045,216 | 363,055,236 | 397,759,637 | 4,516,565,080 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | |
| Internal | 1,444,400 | 1,423,001 | 1,235,221 | 1,244,462 | 1,268,959 | 1,390,283 | 15,788,183 |
| External | 4,663,347 | 4,594,259 | 3,988,000 | 4,017,835 | 4,096,925 | 4,488,628 | 50,973,276 |
| Total | 6,107,747 | 6,017,260 | 5,223,221 | 5,262,297 | 5,365,882 | 5,878,911 | 66,761,459 |
| **TOTAL STANDARD OFFER** | 419,296,550 | 413,111,152 | 358,624,449 | 361,307,513 | 368,421,118 | 403,638,548 | 4,583,326,539 |

TCPM 001172

EUA SYSTEM FIVE YEAR FORECAST

STANDARD OFFER BILLINGS AND REQUIREMENTS

2001 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BLACKSTONE | | | | | | | | | | | | | |
| Sales Billed | 113,042,337 | 109,955,351 | 105,215,598 | 103,429,707 | 99,804,037 | 105,924,749 | 111,798,886 | 121,278,558 | 115,232,822 | 101,626,433 | 102,872,320 | 112,816,195 | 1,300,997,193 |
| Company Use | 343,674 | 356,672 | 303,838 | 282,141 | 243,716 | 179,018 | 208,900 | 234,833 | 233,038 | 266,366 | 305,599 | 362,755 | 3,312,570 |
| Losses and Unbilled | 4,767,450 | -4,501,794 | 6,236,706 | -928,088 | 5,228,873 | 9,628,510 | 11,505,152 | 2,964,781 | -6,384,467 | 8,088,068 | 5,221,890 | 3,066,660 | 44,893,741 |
| Requirements | 118,153,461 | 105,810,229 | 111,756,142 | 102,783,760 | 105,276,626 | 113,732,277 | 123,504,938 | 124,478,172 | 109,881,393 | 109,981,087 | 108,399,809 | 116,245,610 | 1,349,203,504 |
| EASTERN EDISON | | | | | | | | | | | | | |
| Sales Billed | 224,491,143 | 217,612,344 | 203,232,610 | 196,521,987 | 187,973,840 | 193,103,510 | 213,808,654 | 222,686,531 | 210,271,293 | 185,870,148 | 188,155,802 | 214,188,873 | 2,457,916,735 |
| Company Use | 315,689 | 285,253 | 233,864 | 204,092 | 150,552 | 124,431 | 136,955 | 143,919 | 124,648 | 138,882 | 181,619 | 260,765 | 2,300,669 |
| Losses and Unbilled | 7,317,590 | -11,390,742 | 15,003,194 | -640,155 | 9,543,792 | 19,504,522 | 21,209,946 | 7,517,111 | -11,422,212 | 15,512,541 | 20,452,936 | 14,645,779 | 109,254,302 |
| Requirements | 232,124,422 | 206,506,855 | 218,469,668 | 196,085,924 | 197,668,184 | 212,732,463 | 235,155,555 | 230,347,561 | 198,973,729 | 201,521,571 | 208,790,357 | 231,095,417 | 2,569,471,706 |
| NEWPORT | | | | | | | | | | | | | |
| Sales Billed | 51,587,251 | 50,285,541 | 46,209,739 | 44,552,298 | 41,869,765 | 43,446,283 | 47,704,832 | 49,854,589 | 48,211,588 | 42,326,251 | 42,617,106 | 49,849,210 | 558,516,471 |
| Company Use | 61,408 | 148,136 | 133,327 | 60,260 | 39,118 | 24,950 | 22,070 | 27,387 | 26,813 | 28,213 | 39,679 | 56,763 | 668,124 |
| Losses and Unbilled | 3,339,691 | -1,727,156 | 4,668,764 | 742,155 | 3,364,602 | 4,029,550 | 6,646,809 | 3,101,263 | -1,509,870 | 3,931,272 | 5,648,770 | 3,713,899 | 35,949,749 |
| Requirements | 54,988,350 | 48,706,521 | 51,011,830 | 45,354,713 | 45,273,505 | 47,500,783 | 54,373,711 | 52,983,239 | 46,728,531 | 46,285,736 | 48,305,555 | 53,619,872 | 595,132,344 |
| TOTAL INCLUDING DISTRIBUTION LOSSES | | | | | | | | | | | | | |
| Sales Billed | 389,120,731 | 377,853,236 | 354,657,947 | 344,503,992 | 329,647,662 | 348,474,542 | 373,312,372 | 393,819,678 | 373,715,703 | 329,823,052 | 333,645,226 | 376,854,278 | 4,317,428,399 |
| Company Use | 720,771 | 790,061 | 671,029 | 546,493 | 433,386 | 328,399 | 359,925 | 406,139 | 384,699 | 433,461 | 526,897 | 680,283 | 6,281,363 |
| Losses and Unbilled | 15,424,731 | -17,619,692 | 25,908,664 | -826,088 | 18,137,267 | 33,162,582 | 39,361,907 | 13,583,155 | -19,316,549 | 27,531,881 | 31,323,596 | 23,426,338 | 190,097,792 |
| Requirements | 405,266,233 | 361,023,605 | 381,237,640 | 344,224,397 | 348,218,315 | 373,965,523 | 413,034,204 | 407,808,972 | 354,783,853 | 357,788,394 | 365,495,719 | 400,960,899 | 4,513,807,554 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| Internal | 1,416,450 | 1,261,799 | 1,332,440 | 1,203,057 | 1,217,038 | 1,307,045 | 1,443,648 | 1,425,339 | 1,239,955 | 1,250,474 | 1,277,446 | 1,401,463 | 15,774,154 |
| External | 4,573,113 | 4,073,807 | 4,301,879 | 3,884,157 | 3,929,292 | 4,219,898 | 4,660,924 | 4,601,810 | 4,003,285 | 4,037,244 | 4,124,324 | 4,524,720 | 50,934,445 |
| Total | 5,989,563 | 5,335,606 | 5,634,319 | 5,087,214 | 5,146,330 | 5,526,935 | 6,104,572 | 6,027,149 | 5,243,240 | 5,287,718 | 5,401,770 | 5,926,183 | 66,718,599 |
| TOTAL STANDARD OFFER | 411,255,796 | 366,359,211 | 386,871,959 | 349,311,611 | 353,364,645 | 379,492,458 | 419,138,776 | 413,836,121 | 360,026,893 | 363,076,112 | 370,897,489 | 406,887,082 | 4,580,518,153 |

EUA SYSTEM FIVE YEAR FORECAST

STANDARD OFFER BILLINGS AND REQUIREMENTS

2002 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BLACKSTONE | | | | | | | | | | | | | |
| Sales Billed | 113,442,448 | 110,351,505 | 105,691,644 | 103,722,361 | 100,177,690 | 104,409,048 | 112,111,802 | 121,782,362 | 115,589,592 | 102,008,172 | 103,321,072 | 113,167,544 | 1,305,775,240 |
| Company Use | 344,083 | 357,096 | 304,199 | 282,477 | 244,006 | 179,231 | 201,139 | 235,112 | 233,315 | 266,703 | 305,963 | 363,187 | 3,316,511 |
| Losses and Unbilled | 4,784,516 | -4,516,557 | 6,261,317 | -932,297 | 5,248,469 | 9,665,862 | 11,544,138 | 2,977,328 | -6,407,703 | 8,117,993 | 5,242,705 | 3,077,005 | 45,062,776 |
| Requirements | 118,571,047 | 106,192,044 | 112,257,160 | 103,072,541 | 105,670,165 | 114,254,141 | 123,857,079 | 124,994,802 | 109,415,204 | 110,392,868 | 108,869,740 | 116,607,736 | 1,354,154,527 |
| EASTERN EDISON | | | | | | | | | | | | | |
| Sales Billed | 226,739,943 | 219,835,867 | 205,425,443 | 198,568,956 | 190,037,075 | 195,265,085 | 215,956,334 | 225,066,395 | 212,455,532 | 187,908,784 | 190,228,551 | 216,344,093 | 2,483,832,058 |
| Company Use | 316,161 | 285,679 | 234,214 | 204,397 | 158,777 | 124,617 | 137,159 | 144,134 | 124,834 | 139,089 | 181,890 | 261,156 | 2,304,107 |
| Losses and Unbilled | 7,391,553 | -11,499,299 | 15,159,080 | -643,851 | 9,647,773 | 19,712,812 | 21,421,632 | 7,596,931 | -11,535,728 | 15,678,563 | 20,667,826 | 16,812,781 | 110,410,073 |
| Requirements | 234,447,657 | 208,622,247 | 220,818,737 | 198,129,502 | 199,835,625 | 215,102,514 | 237,515,125 | 232,807,460 | 201,044,638 | 203,726,436 | 211,078,267 | 233,418,030 | 2,596,546,238 |
| NEWPORT | | | | | | | | | | | | | |
| Sales Billed | 51,666,411 | 50,355,940 | 46,274,542 | 44,612,732 | 41,927,020 | 43,507,453 | 47,775,352 | 49,933,243 | 48,287,486 | 42,390,838 | 42,677,176 | 49,915,852 | 559,324,045 |
| Company Use | 61,912 | 149,352 | 134,421 | 60,754 | 39,439 | 25,155 | 22,251 | 27,612 | 27,033 | 28,445 | 40,004 | 57,228 | 673,606 |
| Losses and Unbilled | 3,344,651 | -1,729,784 | 4,675,227 | 743,000 | 3,369,053 | 4,055,065 | 6,656,472 | 3,105,971 | -1,512,448 | 3,937,099 | 5,656,593 | 3,718,726 | 35,999,625 |
| Requirements | 55,072,974 | 48,775,508 | 51,084,190 | 45,416,486 | 45,335,512 | 47,587,673 | 54,454,075 | 53,066,826 | 46,802,071 | 46,356,382 | 48,373,773 | 53,691,806 | 595,997,276 |
| TOTAL INCLUDING DISTRIBUTION LOSSES | | | | | | | | | | | | | |
| Sales Billed | 391,848,802 | 380,543,312 | 357,391,629 | 346,904,049 | 332,141,785 | 343,181,586 | 375,843,488 | 396,782,000 | 376,332,610 | 332,307,794 | 336,226,799 | 379,427,489 | 4,348,931,343 |
| Company Use | 722,156 | 792,127 | 672,834 | 547,628 | 434,222 | 329,003 | 360,549 | 406,858 | 385,182 | 434,237 | 527,857 | 681,571 | 6,294,224 |
| Losses and Unbilled | 15,520,720 | -17,745,640 | 26,095,624 | -833,148 | 18,265,295 | 33,413,739 | 39,622,242 | 13,680,230 | -19,455,879 | 27,733,655 | 31,567,124 | 23,608,512 | 191,472,474 |
| Requirements | 408,091,678 | 363,589,799 | 384,160,087 | 346,618,529 | 350,841,302 | 376,924,328 | 415,826,279 | 410,869,088 | 357,261,913 | 360,475,686 | 368,321,780 | 403,717,572 | 4,546,698,041 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| Internal | 1,426,331 | 1,270,771 | 1,342,667 | 1,211,420 | 1,226,210 | 1,317,400 | 1,453,405 | 1,436,046 | 1,248,615 | 1,259,870 | 1,287,334 | 1,411,096 | 15,891,165 |
| External | 4,605,011 | 4,102,777 | 4,334,898 | 3,911,159 | 3,958,908 | 4,253,322 | 4,692,419 | 4,636,379 | 4,031,243 | 4,067,585 | 4,156,252 | 4,555,824 | 51,305,777 |
| Total | 6,031,342 | 5,373,548 | 5,477,565 | 5,122,579 | 5,185,118 | 5,570,722 | 6,145,824 | 6,072,425 | 5,279,858 | 5,327,455 | 5,443,586 | 5,966,920 | 67,196,942 |
| TOTAL STANDARD OFFER | 414,123,020 | 368,963,347 | 389,637,652 | 351,741,108 | 356,026,420 | 382,495,050 | 421,972,103 | 416,941,513 | 362,541,771 | 365,803,141 | 373,765,366 | 409,684,492 | 4,613,894,983 |

TCPM 001174

EUA SYSTEM FIVE YEAR FORECAST

STANDARD OFFER BILLINGS AND REQUIREMENTS

2003 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2003 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | 114,273,041 | 111,186,621 | 106,512,227 | 104,534,587 | 100,979,696 | 105,240,074 | 112,945,387 | 122,714,480 | 116,491,333 | 102,826,852 | 104,136,009 | 114,020,212 | 1,315,858,719 |
| Company Use | 344,458 | 357,485 | 304,530 | 282,765 | 244,272 | 179,426 | 201,358 | 235,368 | 233,569 | 266,994 | 386,296 | 363,581 | 3,320,122 |
| Losses and Unbilled | 4,819,866 | -4,547,515 | 6,309,578 | -937,348 | 5,290,429 | 9,741,306 | 11,628,620 | 3,001,097 | -6,453,753 | 8,182,016 | 5,204,115 | 3,101,059 | 45,419,470 |
| Requirements | 119,437,365 | 106,996,591 | 113,126,335 | 103,880,024 | 106,514,597 | 115,160,806 | 124,773,365 | 125,950,945 | 110,271,149 | 111,275,862 | 109,726,420 | 117,484,852 | 1,364,598,311 |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | 228,945,690 | 222,004,742 | 207,503,725 | 200,608,984 | 192,039,962 | 197,328,275 | 218,147,515 | 227,361,612 | 214,662,316 | 189,902,108 | 192,203,190 | 218,483,744 | 2,509,191,863 |
| Company Use | 316,593 | 286,070 | 234,534 | 204,676 | 150,983 | 124,787 | 137,347 | 144,332 | 125,005 | 139,279 | 182,139 | 261,513 | 2,307,258 |
| Losses and Unbilled | 7,464,340 | -11,604,959 | 15,309,845 | -646,457 | 9,748,986 | 19,915,968 | 21,633,312 | 7,675,039 | -11,646,739 | 15,841,174 | 20,876,937 | 16,976,414 | 111,543,860 |
| Requirements | 236,726,623 | 210,685,853 | 223,048,104 | 200,167,203 | 201,939,931 | 217,369,030 | 239,918,174 | 235,180,983 | 203,140,582 | 205,882,561 | 213,262,266 | 235,721,671 | 2,623,042,981 |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | 51,869,375 | 50,546,835 | 46,451,016 | 44,781,281 | 42,087,035 | 43,676,820 | 47,965,173 | 50,137,248 | 48,484,851 | 42,560,807 | 42,840,718 | 50,101,089 | 561,502,246 |
| Company Use | 62,394 | 150,516 | 135,468 | 61,227 | 39,746 | 25,351 | 22,424 | 27,827 | 27,244 | 28,666 | 40,316 | 57,676 | 678,855 |
| Losses and Unbilled | 3,357,319 | -1,736,832 | 4,692,637 | 745,343 | 3,381,451 | 4,050,300 | 6,682,440 | 3,118,162 | -1,519,139 | 3,952,399 | 5,677,816 | 3,732,084 | 36,133,960 |
| Requirements | 55,289,088 | 48,960,517 | 51,279,121 | 45,587,851 | 45,508,232 | 47,752,471 | 54,670,037 | 53,283,237 | 46,992,956 | 46,541,872 | 48,558,850 | 53,890,849 | 596,315,061 |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | 395,088,106 | 383,738,196 | 360,466,968 | 349,924,852 | 335,106,693 | 346,245,169 | 379,056,075 | 400,213,340 | 379,638,500 | 335,289,767 | 339,179,917 | 382,695,045 | 4,386,552,828 |
| Company Use | 723,445 | 794,071 | 674,532 | 548,668 | 435,001 | 329,564 | 361,129 | 407,527 | 385,818 | 434,939 | 528,751 | 682,770 | 6,306,235 |
| Losses and Unbilled | 15,641,525 | -17,889,306 | 26,312,060 | -838,462 | 18,420,866 | 33,707,574 | 39,944,372 | 13,794,298 | -19,619,631 | 27,975,589 | 31,038,868 | 23,809,557 | 193,097,310 |
| Requirements | 411,453,076 | 366,642,961 | 387,453,560 | 349,635,078 | 353,962,760 | 380,282,307 | 419,361,576 | 414,415,165 | 360,404,687 | 363,700,295 | 371,547,536 | 407,097,372 | 4,585,956,373 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | 1,438,084 | 1,281,449 | 1,354,185 | 1,221,970 | 1,237,127 | 1,329,143 | 1,465,768 | 1,448,448 | 1,259,606 | 1,271,148 | 1,298,615 | 1,422,915 | 16,028,460 |
| External | 4,642,965 | 4,137,250 | 4,372,084 | 3,945,218 | 3,994,152 | 4,291,236 | 4,732,334 | 4,676,417 | 4,066,727 | 4,103,993 | 4,192,673 | 4,593,984 | 51,749,031 |
| Total | 6,081,049 | 5,418,699 | 5,726,269 | 5,167,188 | 5,231,279 | 5,620,379 | 6,198,102 | 6,124,865 | 5,326,333 | 5,375,141 | 5,491,288 | 6,016,899 | 67,777,491 |
| TOTAL STANDARD OFFER | 417,534,125 | 372,061,660 | 393,179,829 | 354,802,266 | 359,194,039 | 385,902,686 | 425,559,678 | 420,540,030 | 365,731,020 | 369,075,436 | 377,038,824 | 413,114,271 | 4,653,733,864 |

TCPM 001175

# APPENDIX 4

## PROPOSAL BID FORMS

TCPM 001176

**Appendix 1**

**Standard Offer Service**
**Project Proposal Bid Form**

Bidder Name: __________
Authorized Contact Person: __________
Mailing Address: __________

City/State/Zip: __________

Telephone Number: __________
Facsimile Number: __________
E-Mail Address: __________

Legal Description of Bidder: __________

Description of Affiliations: __________

Is Bidder a NEPOOL Member: ____ Yes ____ No

If No, please identify the NEPOOL Member that the Bidder has a contract with that will include the Standard Offer Load in their Own-load dispatch.

Entity Name: __________
Contact Person: __________
Telephone Number: __________
Facsimile Number: __________

Did the Bidder enclosed are two executed originals of the Wholesale Standard Offer Agreement?

____ Yes ____ No

Is Bidder providing current rating agency report to demonstrate creditworthiness?

____ Yes ____ No

Is Buyer providing the Financial Information as requested in the RFP and Article 7 of Wholesale Standard Offer Agreement?

____ Yes ____ No

# Appendix 1

## Standard Offer Service
## Project Proposal Bid Form

| | Calendar Year | | (a) Standard Offer Wholesale Rate ($/kwh) | (b) % Discount | (c) Bid Rate (a) x (b) ($/kwh) | | (d) % Standard Offer Load |
|---|---|---|---|---|---|---|---|
| | 1999 | | 3.5 | | | | |
| | 2000 | | 3.8 | | | | |
| | 2001 | | 3.8 | | | | |
| | 2002 | | 4.2 | | | | |
| | 2003 | | 4.7 | | | | |
| | 2004 | | 5.1 | | | | |
| | 2005 | | 5.5 | | | | |
| | 2006 | | 5.9 | | | | |
| | 2007 | | 6.3 | | | | |
| | 2008 | | 6.7 | | | | |
| | 2009 | | 7.1 | | | | |

Note:

The Standard Offer Wholesale rate and resulting Bid Rate will be paid based on actual energy delivered to the meters of those customers taking Standard Offer Service under the Companies' Standard Offer tariffs.

# APPENDIX 5

# WHOLESALE STANDARD OFFER SERVICE AGREEMENT

TCPM 001179

**PART 2 OF 2**

# Wholesale Standard Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

_______________________________

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1. | Definitions | 1 |
| ARTICLE 2. | Term | 3 |
| ARTICLE 3. | Supplier Responsibilities | 4 |
| ARTICLE 4. | Companies' Responsibilities | 5 |
| ARTICLE 5. | Price | 5 |
| ARTICLE 6. | Billing and Payments | 6 |
| ARTICLE 7. | Security Provisions | 7 |
| ARTICLE 7. | Events of Default, Liability, Relationship of the Companies | 9 |
| ARTICLE 9. | Termination | 11 |
| ARTICLE 10. | Force Majeure | 11 |
| ARTICLE 11. | Assignment | 12 |
| ARTICLE 12. | Successors and Assigns | 12 |
| ARTICLE 13. | Resolution of Disputes | 13 |
| ARTICLE 14. | Interpretation | 14 |
| ARTICLE 15. | Severability of Provisions | 15 |
| ARTICLE 16. | Accounts and Records | 15 |
| ARTICLE 17. | Limitations on Liability and Indemnification | 15 |
| ARTICLE 18. | Regulation | 16 |
| ARTICLE 19. | Notices | 16 |
| ARTICLE 20. | Representations and Warranties | 17 |
| ARTICLE 21. | Miscellaneous | 18 |
| Appendix A | Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price | |

# WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this [____]day of [___________], 1998 between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to individually as the "Company" or collectively as the "Companies"), on the one hand, and [_______________________________________]("Supplier"), on the other hand.

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1. Definitions

Whenever used in this Agreement, the following terms shall have the following meanings. In addition, except as otherwise expressly provided, where terms used in this Agreement are defined in the Restated NEPOOL Agreement and not otherwise defined herein, such terms shall have the meanings given them in the Restated NEPOOL Agreement.

"Affiliate" shall mean, with resect to any entity, any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean January 1, 1998.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy or its successor state regulatory agency.

"Good Utility Practice" B Any of the applicable practices, methods and acts (i) required by NEPOOL, the Northeast Power Coordinating Council, the North American Electric Reliability Council, the ISO or the successor of any of them; (ii) required by the policies and standards of the D.T.E. relating to emergency operations; or (iii) otherwise engaged in or approved by a significant portion of the electric utility industry during the relevant time period; which in each case in the exercise of reasonable judgment in light of the facts known or that should have been known at the time a decision was made, could have been expected to accomplish the desired result in a manner consistent with law, regulation, safety, environmental protection, economy, and expedition. Good utility practice is intended to be acceptable practices, methods or acts generally accepted in the region, and is not intended to be limited to the optimum practices, methods or acts to the exclusion of all others.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer Service customers shall not be obligated under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission or its successor state regulatory agency.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended and supplemented from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean any agreement or agreements that have been approved by the D.T.E. in Docket No. 96-24, P.U.C. in Docket No. 2514, and the Federal Energy Regulatory Commission in Docket Nos. ER97-2800-000 and ER97-3127-000, together with all conditions, terms and modifications imposed by those agencies.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with the Settlement Agreements.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2. Term

2.1 The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 8 or 9; provided, however, that the applicable provisions of this Agreement shall continue in effect after termination to the extent necessary to provide for final billing and payment, and the provisions of Article 17 and 21.8 shall survive such termination.

ARTICLE 3. Supplier Responsibilities

3.1 Supplier shall, prior to the Commencement Date of Service, (i) be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement, or (ii) have an agreement in place, for the full term of this Agreement, with a NEPOOL member whereby the NEPOOL member agrees to include the load to be served by Supplier under this Agreement in its own-load dispatch or settlement account. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

3.2 Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service, including changes in Standard Offer Service customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

3.3 As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those generation-related services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, line losses, automatic generation control, and other generation-related ancillary services associated with the provision of its share of Standard Offer Service. If the ISO or any successor entity or NEPOOL allocates any expenses or uplift cost to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise.

3.4 Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service; provided, however, the Companies shall operate their respective distribution systems in accordance with Good Utility Practice.

3.5 Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power to the Delivery Point(s). In the event that NEPOOL adopts a transmission congestion management approach assigning priority rights or other benefits to transmission customers serving native load in the congested

area, then, if so requested by Supplier, the Companies shall assign to the Supplier at no cost the proportional share of such priority rights or other benefits associated with Seller's proportional share of Standard Offer Service under this Agreement at such time. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF or the Companies' systems.

3.6 In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide, subject to any confidentiality obligations to which it is bound, such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Companies' Responsibilities

4.1 To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time.

4.2 As described in the Terms and Conditions for Suppliers, to determine Supplier's share of Delivered Energy, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads as reported to the ISO for each hour of the month. The Supplier's aggregate share of Standard Offer Service, excluding losses, will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

4.3 The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5. Price

5.1 For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per

kilowatt-hour calculated as follows:

Price = Standard Offer Wholesale Price
+ Fuel Adjustment Factor

Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the Retail Standard Offer Fuel Index ("Fuel Index") mechanism in the Companies' Standard Offer Service tariffs. The revenues attributed to the Fuel Index will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The Fuel Index, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

5.2 With the exception of any sales or gross receipt taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state, and federal taxes, fees and levies applicable as of the date hereof. For any new taxes, fees and levies, assessed with respect to the services provided by Supplier after the Commencement Date of Service, the Companies will fully support and pursue in good faith the recovery of any such new tax, fee and levy imposed on Supplier from the Companies' Standard Offer Service customers. To the extent such new taxes, fees and levies are allowed to be recoverable by the Companies from their Standard Offer Service customers, the Companies shall reimburse Supplier for such generation related taxes, fees and levies paid by Supplier.

ARTICLE 6. Billing and Payments

6.1 Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

6.2 On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

6.3 If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 13 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

6.4 The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7. Security Provisions

7.1 As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement under one of the following forms:

(1) Except as otherwise provided in this Article, Supplier shall at all times during the term of this Agreement (i) maintain an investment grade rating, as determined by Standard & Poor's Corporation, Moody's Investors Service, Inc. or another nationally recognized rating service reasonably acceptable to the Companies and (ii) maintain total assets of at least $500,000,000 times the percentage of the Companies' Standard Offer Service which is initially satisfied by the Wholesale Standard Offer Service under this Agreement (the foregoing items (i) and (ii) being herein referred to as the "Creditworthiness Criteria"). If on the Commencement Date of Service or at any time during the term of this Agreement the Supplier shall fail to meet the Creditworthiness Criteria, then the Supplier shall promptly deliver to the Companies an unconditional and irrevocable guaranty of its obligations under this Agreement in form and substance acceptable to the Companies and issued by an entity meeting the Creditworthiness Criteria (a "Guaranty"). The amount of any such Guaranty shall be the difference between the value of Supplier's total assets and its requirements pursuant to part (ii) of the Creditworthiness Criteria; provided, however, that if Supplier meets or exceeds its obligations pursuant to part (ii) of the Creditworthiness Criteria no Guaranty will be required of it. Supplier or the issuer of the Guaranty, as applicable, shall certify to the Companies no less frequently than the end of every calendar quarter that it meets the Creditworthiness Criteria (which certification shall include such calculations and evidence as the Companies shall reasonably request from time to time), and shall deliver financial statements to the Companies certified by a firm of certified public accountants of national standing at least

annually within sixty (60) days following the end of the Supplier's or the guarantor's fiscal year.

(2) In lieu of meeting the Creditworthiness Criteria or delivering the Guaranty as required in Article 7.1(1), Supplier shall have the right on the Commencement Date of Service to deliver to the Companies an irrevocable standby letter of credit issued by a commercial bank reasonably acceptable to the Companies. The amount of such letter of credit shall be calculated annually based on the following formula:

SD(n) = SF x STDL(n-1) x { (PSTD(n) x TD(n)) + (PSTD(n+1) x TD(n+1)) + (PSTD(n+2) x TD(n+2)) + .......... + (PSTD(2009) x TD(2009)) }

Where:

SD(n) is the Security Deposit in Contract Year (n)

SF is the Security Fee equal to $10.00/MWh

STDL(n-1) is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year (n-1), expressed in MWh. In Contract Year 1997, STDL shall be 4,500,000 MWh.

PSTD(n) is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n) as shown in Appendix A.

TD(n) is the Transition Discount in Contract Year (n), calculated as follows:

| | |
|---|---|
| TD(n) | = 1.00 |
| TD(n+1) | = (7-1)/7 = 0.857 |
| TD(n+2) | = (7-2)/7 = 0.714 |
| TD(n+3) | = (7-3)/7 = 0.571 |
| TD(n+4) | = (7-4)/7 = 0.429 |
| TD(n+5) | = (7-5)/7 = 0.286 |
| TD(n+6) | = (7-6)/7 = 0.143 |
| TD(n+7) | =0 |
| TD(n+8) | =0 |
| TD(n+9) | =0 |
| TD(n+10) | =0 |

7.2 The letter of credit shall be available to be drawn upon by the Companies in the event that an event of default occurs with respect to the Supplier hereunder and shall otherwise be in form and substance reasonably acceptable to the Companies (the "Initial Letter of Credit"). The draw down on the Initial Letter of Credit shall be limited to the amount the Companies are entitled to pursuant to Article 8.3 hereof. The bank issuing such Initial Letter

of Credit on behalf of a Supplier must maintain a long term debt rating of "A" or better from Standard and Poor's Rating Service or Moody's Investment Service.

7.3 The Initial Letter of Credit, if not issued for the full term of the Supplier's Standard Offer Service obligation, shall be renewed on an annual basis or replaced and superseded by a like kind of surety at least thirty (30) days prior to the expiration of such prior surety on a continuing basis to the termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial surety may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 for the remaining term of this Agreement, provided that, if such Initial Letter of Credit is drawn down upon by the Companies, Supplier shall have no duty to renew or replace it with a letter of credit having a face amount greater than that remaining on the drawn down Initial Letter of Credit.

ARTICLE 8. Events of Default, Liability, Relationship of the Companies

8.1 Unless excused by a Force Majeure as described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

(a) Failure of the Company to pay when due any undisputed payment due to Supplier and such failure shall continue for five (5) days following the receipt of written notice from the Supplier specifying the overdue amount.

(b) Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within forty-five (45) days after receipt of written notice thereof from the Companies.

(c) Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, other than as described in (a) above, and such failure is not cured or rectified within forty-five (45) days after receipt of written notice thereof from the Supplier.

(d) Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within ten (10) days after notice thereof from the Companies.

(e) And with respect to the Supplier, any Company and/or the Companies, a custodian, receiver, liquidator or trustee for such Party is appointed or takes possession and such appointment or possession remains uncontested or in effect for more than sixty days; or the Party makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts as they mature; or the Party is adjudicated as bankrupt or

insolvent; or an order for relief is entered under the Federal Bankruptcy Code against the Party; or any material property of the Party is sequestered by court order and the order remains in effect for more than sixty days; or a petition is filed against the Party under any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution or liquidation law of any jurisdictions, whether now or subsequently in effect, and is not stayed or dismissed within sixty days after filing; or the Party files a petition in voluntary bankruptcy or seeking relief under any provision of any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or subsequently in effect; or the Party consents to the filing of any petition against it under any such law; or the Party consents to the appointment or taking possession by a custodian, receiver, trustee or liquidator of the Party or any material portion of its property.

8.2 Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Companies failure to perform. Supplier shall take all commercially reasonable measures to mitigate such direct damages. In addition, the Supplier may unconditionally terminate this Agreement by giving written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Company's share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements during the period of time in which the right, obligation or liability in questions arose, accrued and/or matured, and in the event of difficulty or a dispute in determining the appropriate period of time, during the entire duration of the Agreement.

8.3 Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall include the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatt-hour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The Parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

8.4 The Parties expressly agree that the amounts set forth in Article 8.3 do not constitute liquidated damages. In addition to the amounts established in Article 8.3 above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default associated with reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to perform, and the Companies may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice. The Parties expressly agree that the Companies may exercise their rights under the financial surety provided under Article 7 to collect any and all amounts owed and due from the Supplier resulting under this Article 8.

Nothing in this Article 8 shall be construed to limit the right of any party to seek any remedies for a breach specified in this Agreement by the other Party or Parties of its or their obligations hereunder, whether or not such breach results in a termination of this Agreement under this Article 8 and whether or not such breach is cured per Articles 8.1(a) or 8.1(b), or during any period during which the non-breaching Party elects not to exercise its right to terminate this Agreement. In particular, each Party shall have the right to seek a specific performance of any of the obligations of any other Party hereunder.

ARTICLE 9. Termination

9.1 In addition to the termination rights for an Event of Default provided in Article 8, the Companies may terminate this Agreement if Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

ARTICLE 10. Force Majeure

10.1 As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

10.2 An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

10.3 If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b) The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c) The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d) The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available and deliverable.

ARTICLE 11. Assignment

11.1 Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes, and demonstrates to the reasonable satisfaction of the non-assigning party that it can meet, all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 12. Successors and Assigns

12.1 This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 13. Resolution of Disputes

13.1 Subject to Article 8.3, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. For any dispute or claim arising out of or relating to any charges incurred under this Agreement having a value less than or equivalent to $100,000, such arbitration shall be mandatory. Nothing in this Article 13 shall prevent the Companies from issuing, pursuant to Articles 8.1(a) and 8.3 notice of failure to comply with, observe or perform this Agreement.

13.2 Any arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall be provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

13.3 Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any

other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. Sect. 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, Sect. 1 et seq.).

13.4 Notwithstanding any other provisions of this Article 13, disagreements between the Parties as to their rights and obligations arising out of Article 17 in the context of a lawsuit brought by a third party shall not be arbitrable. Nothing in this Agreement shall preclude, or be construed to preclude, any party from filing a petition or complaint with the FERC with respect to any arbitrable claim over which the FERC has jurisdiction. In such case, the other party may request the FERC to reject or waive jurisdiction. If the FERC rejects or waives jurisdictions, with respect to all or a portion of the claim, the portion of the claim not so accepted by the FERC shall be resolved through arbitration, as provided in this Agreement. To the extent that the FERC asserts or accepts jurisdiction over the claim, the decision, fining of fact, or order of the FERC shall be final and binding, subject to judicial review under the Federal Power Act, and any arbitration proceedings that may have been commenced prior to the assertion or acceptance of jurisdiction by the FERC shall be stayed, pending the outcome of the FERC proceedings. The arbitrator shall have no authority to modify, and shall be conclusively bound by, any decision, finding of fact, or order of the FERC. However, to the extent that a decision, finding of fact, order of the FERC does not provide a final or complete remedy seeking relief, such party may proceed to arbitration under this Article 13 to secure such remedy, subject to the FERC decision, finding or order.

13.5 Nothing in this Article 13 shall preclude, or be construed to preclude, the resort by any Party to a court of competent jurisdiction solely for the purposes of securing a temporary or preliminary injunction to preserve the status quo or avoid irreparable harm pending arbitration pursuant to this Article 13.

ARTICLE 14. Interpretation

14.1 The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 15. Severability of Provisions

15.1 Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 16. Accounts and Records

16.1 The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 17. Limitations on Liability and Indemnification

17.1 Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents in connection with this Agreement or the transactions contemplated hereby, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

17.2 The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

17.3 To the fullest extent permissible by law, neither the Companies nor Supplier, nor their respective officers, directors, agents, employees, parent or Affiliates, successors or assigns, or their respective officers, directors, agents or employees, successors or assigns, shall be liable to the other Party or its parent, subsidiaries, Affiliates, officers, directors, agents, employees, successors or assigns, for claims, suits, actions or causes of action for incidental, indirect, special, punitive, multiple or consequential damages (including attorneys' fees or litigation costs) connected with or resulting from performance or non-performance of the Agreement, or any actions undertaken in connection with or related to this Agreement, including without limitation any such damages which are based upon causes of action for breach of contract, tort (including negligence and misrepresentation), breach of warranty, strict liability, Massachusetts General Laws Chapter 93A, statute, operation of law, or any other theory of recovery. The provisions of this Section 17 shall apply regardless of fault and shall survive termination, cancellation, suspension, completion or expiration of this Agreement.

ARTICLE 18. Regulation

18.1 This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

18.2 This Agreement is intended to comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or altered by NEPOOL or the ISO, in a manner which materially affects the costs and obligations to provide Standard Offer Service, the Companies and Supplier shall meet to determine appropriate compensation to the affected Party. In the event that the Parties are not able to agree on the materiality of the cost or obligations or the amount to be reimbursed, Parties shall attempt to resolve the matter in accordance with Article 13.

18.3 In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service or the Companies are prevented from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier, the Companies and Supplier shall meet to determine appropriate compensation to the negatively impacted Party. In the event that the Parties are not able to agree on the materiality of the increased cost or obligations or the amount to be reimbursed, Parties shall attempt to resolve the matter in accordance with Article 13.

ARTICLE 19. Notices

19.1 Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:

Robert P. Clarke
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:

[Supplier's Address]

______________________
______________________
______________________
______________________
______________________
______________________

19.2 Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 20. Representations and Warranties

20.1 Companies' Representations and Warranties

20.1.1 Organization.

(a) Eastern represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts, is qualified to do business and is in good standing under the laws of each jurisdiction where its activities require such qualification (except where the failure to so qualify would not have a material adverse effect on its performance hereunder)), and that it has full power, authority and legal right to enter into and perform its obligations under this Agreement.

(b) Blackstone represents and warrants that is a corporation duly organized, validly existing and in good standing under the laws of the State of Rhode Island, is qualified to do business and is in good standing under the laws of each jurisdiction where its activities require such qualification (except where the failure to so qualify would not have a material adverse effect on its performance hereunder)), and that it has full power, authority and legal right to enter into and perform its obligations under this Agreement.

(c) Newport represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the State of Rhode Island, is qualified to do business and is in good standing under the laws of each jurisdiction where its activities require such qualification (except where the failure to so qualify would not have a material adverse effect on its performance hereunder)), and that it has full power, authority and legal right to enter into and perform its obligations under this Agreement.

20.1.2 Authorization. Each Company represents and warrants that the expedition, delivery and performance of the Agreement have been duly authorized and that this Agreement constitutes the legal, valid and binding obligation of such Company in accordance with its

terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforcement is considered in equity or at law).

20.1.3 No Defaults. Each Company represents and warrants that the execution, delivery and performance by such Company of this Agreement will not conflict with, constitute a default under or result in a breach or violation of the corporate charter or by-laws of such company or any material agreement to which such Company is a party or by which it or any of its property is bound.

20.2 Supplier's Representations and Warranties

20.2.1 Organization. Supplier represents and warrants that it is a limited liability company duly organized, validly existing and in good standing under the laws of the ______________________________, is qualified to do business and is in good standing under the laws of each jurisdiction where its activities require such qualification (except where the failure to do so qualify would not have a material adverse effect on its performance hereunder), and that it has full power, authority and legal right to enter into and perform its obligations under this Agreement.

20.2.2 Authorization. Supplier represents and warrants that the execution, delivery and performance of the Agreement have been duly authorized and that this Agreement constitutes the legal, valid and binding obligation of Supplier in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforcement is considered in equity or at law).

20.2.3 No Defaults. Supplier represents and warrants that the execution, delivery and performance of the Agreement will not conflict with, constitute a default under or result in a breach or violation of the corporate charter or by-laws of Supplier or any material agreement to which Supplier is a party or by which it or any of its property is bound.

ARTICLE 21. Miscellaneous

21.1 Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

21.2 Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

21.3 This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

21.4 Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

21.5 Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

21.6 Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity at wholesale.

21.7 Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

21.8 The administration of this Agreement may require the exchange of Confidential Information (as defined below), including, without limitation, production costs, load requirements, and NEPOOL system obligations. As used herein, the term "Confidential Information" means any information given by one Party to the other, except: (a) information known generally to the Public, (b) information derived by the receiving Party from sources other than the disclosing Party and not as a result of a breach of this Agreement, (c) information required to be disclosed by any law, rule, regulation or lawful order, but only to the extent disclosure is so required, and (d) information already known by the receiving Party prior to disclosure hereunder. Each Party agrees to protect Confidential Information received from the other Party, not to disclose the same (except to its employees, agents, attorneys and accountants having a business need to the same), and to cause those to whom it discloses Confidential Information to conform to the requirements of this Article 21.9 for a period of two (2) years after receipt thereof. In the event that information must be disclosed under Article 21.9(c), the disclosing Party shall promptly notify the other and shall seek to have the disclosed information sealed or held confidential by the court, regulatory, governmental entity or other recipient.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier: [NAME OF SUPPLIER]

By:________________________
Name:
Title:

On Behalf of the Companies:

Blackstone: BLACKSTONE VALLEY ELECTRIC COMPANY

By:________________________
Name: Kevin A. Kirby
Title: Vice President

Eastern: EASTERN EDISON COMPANY

By:________________________
Name: Kevin A. Kirby
Title: Vice President

Newport: NEWPORT ELECTRIC CORPORATION

By:________________________
Name: Kevin A. Kirby
Title: Vice President

# APPENDIX A

## SCHEDULE OF SUPPLIER'S SHARE of STANDARD OFFER SERVICE AND STANDARD OFFER WHOLESALE PRICE

TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | % | 3.5 cents/kWh |
| 2000 | % | 3.8 cents/kWh |
| 2001 | % | 3.8 cents/kWh |
| 2002 | % | 4.2 cents/kWh |
| 2003 | % | 4.7 cents/kWh |
| 2004 | % | 5.1 cents/kWh |
| 2005 | % | 5.5 cents/kWh * |
| 2006 | % | 5.9 cents/kWh |
| 2007 | % | 6.3 cents/kWh |
| 2008 | % | 6.7 cents/kWh |
| 2009 | % | 7.1 cents/kWh |

* Standard Offer Service for Eastern Edison terminates at 12:00 midnight on February 28, 2005.

# APPENDIX 6

## FORM OF PERFORMANCE SURETY DOCUMENTS

TCPM 001203

Form of Performance Surety Letter of Credit

Performance surety provided in the form of a letter of credit must be in substantially the form given below.

Irrevocable Standby Letter of Credit Date: ( )

BENEFICIARY Credit Number: ( )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

BY ORDER OF:

(Supplier name and address)

or (Guarantor name and address)

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of (the Supplier)[(the Guarantor) on behalf of (the Supplier)]for a sum or sums not exceeding a total of US DOLLARS $xx,xxx.xx(written dollar amount AND xx/100 U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES effective(date)and expiring on (date).

Draft(s) must be accompanied by:

1. Your written letter requesting payment under this Letter of Credit signed by a representative of Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the EUA Companies"). Such letter from the EUA Companies shall include a statement of the dollar amount due to the EUA Companies, pursuant to the obligations of (Supplier/Guarantor)as set forth in the Standard Offer Service Agreement by and between (Supplier/Guarantor) and the EUA Companies.

Partial drawings are permitted under this Letter of Credit.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. ( ) dated ( ) of the (Bank)."

We agree to renew this Letter of Credit automatically for a period of one (1) year from the initial expiration and each subsequent expiry date unless the beneficiary has received by registered or certified mail, return receipt requested, written notification of our intention not to renew, post marked no less than thirty (30) days prior to the expiration of any term.

If this Letter of Credit shall not be extended and the obligation of (Supplier/Guarantor)under the Standard Offer Service Agreement, as secured by this Letter of Credit, remains outstanding, and (Supplier/Guarantor)has failed to provide an amended or substitute Letter of Credit in accordance with your terms and conditions, you may draw upon us forthwith for the full amount of this Letter of Credit by means of your sight draft together with the following document:

Your signed statement certifying that (Supplier/Guarantor)has failed to provide you with a substitute Letter of Credit within fifteen (15) days from the date of your receipt of our notice not to renew.

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before (FILL IN EXPIRATION DATE), or any subsequent expiration date.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name) and, attention (Bank credit operations contact), mentioning our reference number as it appears above. Telephone inquires can be made to(Bank credit operations contact).

# GUARANTY

1.(a) Reference is made to the Standard Offer Service Agreement dated as of _______________ 1998 (the "Agreement") between Blackstone Valley Electric Company, Newport Electric Corporation, and Eastern Edison Company (collectively the "Companies") on the one hand, and _______________ (the "Supplier"), on the other hand. For good and valuable consideration received, _______________, (the "Guarantors") hereby irrevocably and unconditionally jointly and severally guarantee to the Companies and their successors and assigns that the Supplier shall perform all of its obligations under the Agreement, including, but not limited to, the delivery of electric service and the due and punctual payment of all amounts required to be paid by the Supplier pursuant to Article 7 of the Agreement; and insofar as the Guarantors are able, performance and observance of and compliance with all other obligations, covenants, and undertakings of the Supplier contained in the Agreement and any other agreement or instrument relating thereto (collectively, the "Obligations"), at the times and in the manner provided therein. This Guaranty shall be an absolute, unconditional, present and continuing guaranty of payment and performance (not of collection or collectibility) which shall remain in full force and effect until each and all of the Obligations guaranteed hereunder shall have been fully and satisfactorily discharged in accordance with the terms and provisions of the Agreement and any other agreement or instrument relating thereto, and that its undertakings hereunder are not contingent upon the bringing of any action against the Supplier or any other person or entity or resorting to any security or exercise or assertion of any other right or remedy against the Supplier or any other person or entity, and Guarantor hereby expressly waives any claim that its undertakings hereunder are so contingent.

1.(b) Notwithstanding Section 1(a) or any other paragraph hereof:

i) the Guarantors' liability hereunder shall be and is specifically limited to payments or performance expressly required by the Supplier in accordance with the Obligations (even if such payments are deemed to be damages) and except to the extent specifically provided in the Agreement and any other agreement or instrument relating thereto, in no event shall the Guarantors be subject hereunder to consequential, exemplary, equitable, loss of profits, punitive, tort, or any other damages, costs, or attorney's fees.

2. The liability of the Guarantor under this Guaranty shall be absolute, unconditional and irrevocable, irrespective of:

(a) any change in time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of, or any consent to departure from, the Agreement or any other agreement or instrument relating thereto;

    (b) any change in ownership of the Guarantor or the Supplier; or

(c) any bankruptcy, insolvency or reorganization of, or other similar proceedings involving the Supplier.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by the Companies upon the insolvency, bankruptcy or reorganization of the Supplier or otherwise, all as though such payment had not been made.

3. The Guarantor hereby irrevocably, unconditionally and expressly waives, to the fullest extent permitted by applicable law, promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Companies protect, secure or perfect any security interest or exhaust any right or first proceed against the Supplier or any other person or entity.

4. This Guaranty constitutes a primary obligation of the Guarantor and is a continuing guaranty and shall (a) be binding upon the Guarantor and its successors and assigns and (b) inure to the benefit of and be enforceable by the Companies and their successors and assigns.

5. Upon payment of all Obligations owing to the Companies, the Guarantors shall be subrogated to the rights of the Companies against the Supplier.

6. This Guarantee may be terminated upon the later of February 28, 2005, or such time as all Obligations incurred prior to such termination have been satisfied.

7. This Guarantee shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and the Guarantors hereto submit to the non-exclusive jurisdiction of the courts of the Commonwealth of Massachusetts or of the federal courts located in Boston, Massachusetts, exclusively, without request for arbitration. Process shall be made by certified mail.

[GUARANTOR]

By:
Name:
Title:

G:\STDOFFER\RFP\GUARANTY.DOC

# EXHIBIT H

EXHIBIT 111
WIT: Taylor
DATE: 3/12/07
Victoria S. Reade

National Grid

Michael Hager
Standard Offer Portfolio Manager

April 18, 2000

Mr. Sean D. McMaster
TransCanada Power Marketing, Ltd.
3400, 237-4th Avenue S.W.
Calgary, Alberta T2P 5A4

Subject: Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company ("Blackstone"), Eastern Edison Company ("Eastern"), Newport Electric Company ("Newport") and TransCanada Power Marketing Ltd ("TCPM") dated April 7, 1998 (the "Agreement")

Dear Mr. McMaster:

Effective May 1, 2000 ("Merger Date") the subsidiaries of Eastern Utilities Associates ("EUA") will merge with and into various subsidiaries of National Grid - USA (formerly New England Electric System)[1]. As a result of the merger, the National Grid - USA subsidiaries will assume the obligations of the former EUA subsidiaries pursuant to Article 11 of the Agreements.

The obligations of the parties or their successors and the terms of the Agreement are not affected by the merger and assignments. The following actions will be taken in order to continue to facilitate the administration of the Agreement. These actions are not intended and in no way constitute nor should be deemed to constitute a modification of the terms of the Agreement.

1. **Designation of Load Served.** Currently, Load Asset 983 is used within the NEPOOL Market System to represent the loads covered by the Agreement. Effective hour 1 of the Merger Date, Load Asset 983 will no longer be used and its associated NEPOOL Market System contracts 66609 and 66610 will be terminated. The following Load Assets will be used within the NEPOOL Market System to represent the loads covered by the Agreement:

| Load Asset | Load Description |
|---|---|
| 1252 | Standard Offer load in the former Eastern Service Territory. |
| 1250 | Standard Offer load in the former Blackstone and Newport Service Territories. |

[1] Specifically, as it relates to the Agreements, Eastern will merge into Massachusetts Electric Company ("Mass. Electric"), Blackstone and Newport will merge into The Narragansett Electric Company ("Narragansett") and Montaup Electric Company will merge into New England Power Company.

55 Bearfoot Road
Northboro, MA 01532
Tel: 508.421.7350 Fax: 508.421.7335
michael.hager@us.ngrid.com

Mass. Electric will replace Eastern and Narragansett will replace Blackstone and Newport and, as Sellers within the NEPOOL Market System, Mass. Electric and Narragansett will be responsible for inputting Load Asset Contracts for each of the above Load Assets and assigning to TCPM, as Buyer within the NEPOOL Market System, 14.4550% of each Load Asset. Attachment 1 provides a list of the NEPOOL Market System Contracts that will be entered. Kindly submit the required Load Asset Contract Acknowledgment ("LACA") forms for each contract shown to ISO-NE by hour 1 of the Merger Date and forward copies of each LACA to me as well.

**2. Application of the Fuel Adjustment Factor.** Article 5 of the Agreement entitles TCPM to receive additional monies based on revenues collected from retail customers pursuant to Fuel Adjustment mechanisms contained in Eastern's, Blackstone's and Newport's Standard Offer Service tariffs. Mass. Electric and Narragansett will continue to make such Fuel Adjustment payments, if applicable, according to Attachment 2. Attachment 2 replaces the retail fuel adjustment mechanisms contained in the EUA Companies' respective Standard Offer Service tariffs. Said payments will be made by Mass. Electric or Narragansett in the month immediately following service.

**3. Supplier Information to be Provided.** In addition to any specific data or information required to be provided under the terms of the Agreement, Mass. Electric and Narragansett will provide TCPM with (i) customer "add" and "drop" notices and (ii) monthly customer enrollment counts by rate class. The add and drop notices will be sent electronically using the Advantis Value Added Network ("VAN"). To receive these notices TCPM must establish an account on the VAN and be responsible for paying any charges incurred in using the VAN. The customer counts will be compiled and e-mailed by our Standard Offer Portfolio Manager.

**4. Change of Notice Recipient.** The recipient of notices for the Companies, as designated in Article 18 of the Agreement, should be changed to the following:

Mr. Michael J. Hager
Standard Offer Portfolio Manager
New England Power Service Company
55 Bearfoot Road
Northboro, MA 01532
(508) 421-7350
(508) 421-7335 (facsimile)

Should you have any questions regarding the above implementation plans please do not hesitate to contact me.

Very truly yours,

[signature]

cc: M. E. Hachey

ATTACHMENT 1

NEPOOL MARKET SYSTEM CONTRACTS

| Market System Contract # | Seller ID # | Load Asset | Product | Term |
|---|---|---|---|---|
| 113,915 | 50075 | 1252 | Energy | 01-May-2000 @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113,916 | 50075 | 1252 | ICAP | 01-May-2000 @ he 0100, to 31-Dec-2004 @ he 2400 |
| 113,927 | 156 | 1250 | Energy | 01-May-2000 @ he 0100, to 31-Dec-2009 @ he 2400 |
| 113,928 | 156 | 1250 | ICAP | 01-May-2000 @ he 0100, to 31-Dec-2009 @ he 2400 |

ATTACHMENT 2

STANDARD OFFER FUEL ADJUSTMENT PROVISION

In the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, Mass. Electric and Narragansett will pay additional amounts to Supplier in accordance with this Standard Offer Fuel Adjustment Provision which is calculated as follows:

The Stipulated Price that is in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on the rate paid unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Stipulated Price is the following predetermined, flat rate, for energy consumed at the customer meter point:

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 2000 | 3.4 cents (MA) 3.8 cents (RI) |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Supplier will be paid the difference between the Stipulated Price as adjusted in accordance with this Standard Offer Fuel Adjustment Provision and the Stipulated Price for each kilowatt-hour it provides in the applicable month.

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

> Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

For example if at a point in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:

$$\frac{(\$3.50+\$.60/\text{MMBtu})+(\$3.00+\$.04/\text{MMBtu})}{\$6.09+\$.60+\$.04/\text{MMBtu}} = 1.0609$$

The Stipulated Price is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548¢/kWh (4.2 x 1.0609).

The additional amount paid to each supplier, on a per-kilowatt-hour basis, would be 0.2548 ¢/kWh (4.4548 - 4.2).

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

# EXHIBIT I

EXHIBIT 187

National Grid

National Grid USA Service Company, Inc.

Michael J. Hager
Vice President, Energy Supply – New England

March 31, 2005

VIA FACSIMILE and OVERNIGHT DELIVERY

TransCanada Power Marketing Ltd.
3400, 237-4th Avenue S.W.
Calgary, Alberta T2P5A4

RE: Wholesale Standard Offer Service Agreement

Dear Sir/Madam:

The Narragansett Electric Company ("Narragansett") is issuing via wire transfer today to TransCanada Power Marketing Ltd. ("TCPM's") account # 40760055 funds in the amount of $602,214.39 (the "Funds"). Narragansett is paying the Funds to TCPM under protest, without prejudice, and with a full reservation of all rights, claims (including for interest), counterclaims and defenses under or in relation to the Wholesale Standard Offer Service Agreement between Narragansett, as the successor in interest to the Blackstone Valley Electric Company and Newport Electric Corporation, and TCPM dated April 7, 1998 (the "WSOS Agreement"), or in law or equity. The payment of the Funds shall not be construed to be an admission, assent or acquiescence to any allegation or assertion by TCPM whether or not in writing, or to alter, waive, invalidate, impair or forfeit any of the terms or conditions of the WSOS Agreement or Narragansett's rights in relation thereto in law or equity, or TCPM's obligations.

With reference to TCPM's letter dated March 1, 2005, TCPM alleges that Narragansett is in default under the WSOS Agreement. As TCPM is aware, Narragansett vehemently denies and protests that assertion. While Narragansett believes that TCPM would be in breach if TCPM served a notice of termination, Narragansett is seeking to mitigate damages for TCPM's potential breaches. Accordingly, the transferred Funds are based upon a calculation of the portion of the payments that would have been due for the months of January and February 2005 under the WSOS Agreement if a Fuel Adjustment Factor ("FAF") for the WSOS Agreement had been in existence and in effect in Narragansett's tariffs, and which permitted Narragansett to recover the FAF amount from customers. As noted above, Narragansett's position is that no such FAF was in existence or in effect.

The Funds should be placed by TCPM in a bankruptcy-remote escrow account for the benefit of the party that prevails in a resolution of the dispute.

Very truly yours,

Michael Hager

Michael J. Hager MP

cc: Michael E. Hachey
Daniel C. Winston, Esq.

55 Bearfoot Road
Northborough, MA 01532
508.421.7350 Fax: 508.421.7335

# EXHIBIT J

**PART 1 OF 3**

REDACTED

Privileged and Confidential
Draft

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION



## REQUEST FOR QUALIFICATIONS
## TO BID TO SUPPLY
## STANDARD OFFER SERVICE POWER

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting electricity suppliers for their qualifications to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Qualifications ("RFQ") must be received at the below address no later than 5:00 PM on _____. Responses to the RFQ must adhere to the specifications herein. Interested parties must submit five (5) copies of their responses to:

Mr. Robert P. Clarke
Director, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379

Any questions concerning interpretation of the RFQ should be submitted in writing to:

Mr. Peter D. Fuller
Energy Strategy Advisor
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
pfuller@eua.com

*The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall be vested in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to continued approval by the Massachusetts Department of Public Utilities of Eastern Edison's settlement in D.P.U. 96-24 and approval by the Rhode Island Public Utilities Commission of Blackstone's and Newport's settlement pursuant to the Rhode Island Utility Restructuring Act of 1996. Any changes to the terms of the settlements caused by any action or appeal, legislation, or otherwise may require the Companies to modify or withdraw their plans as described herein. The Companies expressly reserve the right to modify the schedule and any provision herein to accommodate the standard offer procurement process of one or more other utilities. Furthermore, the time table for actions described herein is subject to change by the Companies for any other reason.*

nfidential                                                                    NEC087219

Privileged and Confidential
Draft
Table of Contents

I. Introduction

II. General Description

A. Standard Offer Service

B. Market Procurement for Suppliers of Standard Offer Service Power

III. Threshold Qualifications to Bid in Standard Offer Auction

A. Administrative Fee

B. Financial Qualifications

C. Bid Deposit

D. ~~Performance Bond Commitment~~

E. NEPOOL Participation

F. State Registration

G. Proposed Changes to the Standard Offer Service Requirements Agreement

IV. Auction Process

V. Administrative Issues

A. Auction

B. Standard Offer Service Power

Appendix 1 Standard Offer Service Price Schedules

Appendix 2 Fuel Index

Appendix 3 Draft Standard Offer Service Requirements Agreement

Appendix 4 Bid Deposits

Appendix 5 Performance Bonds

Appendix 6 NEPOOL Membership Application Requirements

"Agreement" is the Standard Offer Service Requirements Agreement (Appendix 3)

"Auction Participation Agreement" is the agreement governing a Qualified Bidder's participation in the Companies' Standard Offer auction.

"Discount" is the discount, in percent, off the Standard Offer Wholesale Price of electricity offered by Seller for a given Contract Year as determined through the Company's Standard Offer Auction.

"Final Auction Rules" shall mean the document describing fully the rules by which the auction will be conducted.

"ISO" shall mean ISO New England Inc. - the independent system operator established in accordance with the Restated NEPOOL Agreement.

"Load Responsibility" shall mean a Supplier's percentage share of the Companies' requirements (minute by minute, hour by hour, day by day) including but not limited to: energy, installed capacity, operable capacity, and reserves necessary to fulfill all NEPOOL and ISO obligations, as they may change from time to time, associated with providing firm all-requirements electric power to the Companies' retail customers taking Standard Offer Service. Supplier is responsible for changes in customer demand for any reason, including but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand-side management activities, extremes in weather, etc.

"Massachusetts Retail Access Date" is defined as the later of January 1, 1998 or the date when retail access is made available to all customers of the investor-owned electric utilities in Massachusetts.

"Massachusetts Settlement Agreement" is the "Electric Utility Industry Restructuring Offer of Settlement" between Eastern Edison, Montaup Electric, the Massachusetts Attorney General, the Massachusetts Division of Energy Resources, and other parties, filed with the Department of Public Utilities on May 16, 1997.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Prospective Bidder" is any party which has not yet been certified by the Companies to bid and to supply Standard Offer Service Power.

"Qualified Bidder" is any party that has been certified, in writing, by the Companies as being qualified to bid and to supply Standard Offer Service Power.

"Restated NEPOOL Agreement", shall mean the restated New England Power Pool Agreement dated December 31, 1996, as amended from time to time.

"Retail Access Date" shall mean January 1, 1998, or such later time as designated to be

the date that all retail customers of the Company are allowed the ability to choose their power supplier.

"Rhode Island Retail Access Date" is defined as the later of January 1, 1998 or the date when retail access is made available to all customers of the investor-owned electric utilities in Rhode Island.

"Rhode Island Settlement Agreement" is the "Electric Utility Industry Restructuring Offer of Settlement" between Blackstone Valley Electric, Newport Electric, Montaup Electric, the Rhode Island Attorney General, the Rhode Island Division of Public Utilities and Carriers, and other parties, filed with the Federal Energy Regulatory Commission on ___________, 1997.

"Standard Offer Customer" shall mean any retail customer(s) taking service under Company' Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. No. - or Newport's Standard Offer Service Tariff No. R.I.P.U.C. No. -.

"Standard Offer Service Requirements Agreement" is the agreement under which the Companies will receive Standard Offer Service Power from Suppliers (Appendix 3).

"Standard Offer Service" shall mean firm all-requirements electric service provided by the Companies to their retail customers who have not yet chosen a competitive electricity supplier, under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. No. - or Newport's Standard Offer Service Tariff No. R.I.P.U.C. No. - .

"Standard Offer Service Power" shall mean the generation and delivery, to any location on the NEPOOL PTF system or the Companies' system, of electric capacity, energy, and ancillary services required by the Companies to meet the needs of the Companies' retail customers taking Standard Offer Service and to fulfill related NEPOOL and ISO obligations.

"Supplier" is any party which supplies Standard Offer Service Power to the Companies under the terms of a Standard Offer Power Supply Agreement.

REDACTED

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) are jointly seeking qualified parties to participate in their planned auction of Standard Offer Service Power obligations. Eastern, Blackstone, and Newport (collectively, "the Companies") are affiliated companies in the Eastern Utilities Associates holding company system and are cooperating on the design and implementation of the standard offer process.

The Companies will be providing Standard Offer Service to their retail customers that have not yet chosen a competitive supplier. The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. Suppliers who successfully bid in the auction will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service Power requirements, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply. Suppliers' responsibilities will include, without limitation, i) installed and operable capacity sufficient to meet the Supplier's Load Responsibility under the Restated NEPOOL Agreement, ISO New England or successor rules; ii) operating reserves; iii) transmission arrangements and expenses not recovered in the Companies' transmission cost adjustment provisions; and iv) transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Each Supplier will have complete responsibility for its fixed percentage share of the Companies' real-time Standard Offer Service Power demand (minute by minute, hour by hour, day by day). The quantities of energy and capacity required (MWh and MW) will fluctuate with changes in customer demand resulting from factors including, but not limited to, seasonal factors, normal daily load patterns, increased usage by existing standard offer customers, demand side management activities, extremes in weather, etc., but Supplier percentage responsibilities will not vary within a calendar year.

Standard Offer Service Power requirements are expected to erode over time as customers choose electricity supply options in the competitive market. Rather than ~~bidding to supply given~~ quantities of capacity or energy, Suppliers will bid in the auction for percentage shares of the Load Responsibility. At the conclusion of the auction, Suppliers will know with certainty what percentage of the Standard Offer Service Power they will be responsible for over time. The Companies will provide certain load information on a periodic basis, such as numbers of customers taking Standard Offer Service and representative load shapes for each customer class. It will be the Supplier's responsibility to forecast its capacity and energy requirements to meet its Standard Offer Load Responsibility.

This document provides Prospective Bidders with an overview of the qualification and auction processes, as well as the specific information necessary for a Prospective

onfidential NEC087223

Bidder to be qualified by the Companies to participate in the auction. Section II presents a general description and approximate schedule for the implementation of the qualification and auction processes. Section III spells out the specific content and form requirements of qualification submittals. Prospective Bidders must satisfy certain financial criteria and must be recognized by the appropriate regulatory agencies to be considered Qualified Bidders. Section IV explains the particulars of the auction. Section V presents logistical details of the auction process and the Companies' proposed methods for administering the Standard Offer Service Power. Issues include the handling of bid deposits, procedures for providing load information to Suppliers, estimating actual hourly load responsibility for each Supplier, administering additional revenues realized through the Fuel Index, and procedures in the event of a Supplier default.

Appendices are attached which include the wholesale and retail price schedules for Standard Offer Service (Appendix 1), a Fuel Index which will produce additional revenues to Suppliers in the event of high oil and gas prices (Appendix 2), and a draft Standard Offer Service Requirements Agreement (Appendix 3). Appendix 4 presents the proposed methodology for calculating bid deposits and includes an acceptable form of a Performance Letter of Credit. Appendix 5 describes the calculation of performance bond amounts and an acceptable form of a Performance Bond. Appendix 6 contains information regarding NEPOOL membership.

REDACTED

## II. General Description

### A. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. The Companies have agreed to solicit the competitive market for Suppliers of this service. The Companies will purchase power under the resulting Service Requirements Agreements with Suppliers, and re-sell the power to retail customers pursuant to the terms of the settlement agreements in each state. To the extent that the auction of Standard Offer Service does not procure sufficient supplies to meet the Companies' full standard offer load, the Companies' affiliated power supply company, Montaup Electric Company (Montaup) will provide service at the fixed price cap ("backstop" service).

Suppliers of Standard Offer Service Power will have complete responsibility for meeting their share of the total retail load of customers taking Standard Offer Service. Suppliers will be responsible for forecasting energy and demand requirements and maintaining sufficient capacity entitlements to meet their obligations under the rules of ISO New England for the full requirements of their Load Responsibility. Standard Offer Service will be measured as energy delivered to retail customer meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customer meter. Each Supplier will experience the same load factor, which will reflect the composition of the retail load customers taking Standard Offer Service. Payments for Standard Offer Service will be based on the annual average prices shown in Appendix 1, adjusted for discounts bid in the auction and for the operation of the Fuel Index (Appendix 2), with no adjustment for time of use, load factor, or any other characteristics of the load.

**Massachusetts**

Under the terms of an agreement between Eastern, Montaup, the Massachusetts Attorney General, the Massachusetts Division of Energy Resources, and other parties (Massachusetts Settlement Agreement), Eastern has agreed to provide Standard Offer Service to those of its customers who have not yet entered into power supply arrangements with competitive power suppliers, at fixed prices. Eastern's Standard Offer will be available beginning on the Massachusetts Retail Access Date and continuing through 2004.

The Massachusetts Settlement Agreement establishes per-kWh retail prices at which Eastern may sell Standard Offer service to its customers, and per-kWh wholesale prices which cap the price Eastern will pay to Suppliers of Standard Offer Service Power. These prices are given in Appendix 1, and are subject to adjustment only for the operation of the Fuel Index (Appendix 2).

**Rhode Island**

Under the Rhode Island Utility Restructuring Act of 1996, Blackstone and Newport are each required to "arrange . . . for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers." This service is expected to be offered beginning on the Rhode Island Retail Access Date, and must remain in place through 2009. Under a comprehensive agreement (Rhode Island Settlement Agreement) between Blackstone, Newport, Montaup, the Rhode Island Attorney General, and the Rhode Island Division of Public Utilities and Carriers, a schedule of fixed average price caps has been established for Standard Offer Service offered to retail customers of Blackstone and Newport who have not yet chosen a supplier in the competitive market.

Blackstone and Newport will use the qualification and auction processes described here to procure power supplies to provide this service for the years 1998-2004. Blackstone and Newport will arrange at a later date for power supplies to serve the Standard offer load in 2005-2009.

The price schedules for the standard offer are provided in Appendix 1. The Customer Rates are averages across all rate classes and will be reduced by the discounts obtained through the auction described herein. The prices established through the auction will be subject to adjustment only for a Fuel Index described in Appendix 2.

**B. Market Procurement for Suppliers of Standard Offer Service**

In order to obtain the lowest-cost, reliable supplies of standard offer power for their customers, the Companies will procure supplies for a seven-year term through a competitive auction process open to all qualified suppliers of power. The Companies will auction percentage shares of their standard offer load for each year of the seven-year term. Bids will be in the form of percentage discounts off the stipulated supplier rates given in Appendix 1. Contracts to provide Standard Offer Service Power will be awarded to the bidders who offer the greatest discounts.

**Procedural Schedule**

Prospective Bidders who wish to be considered for certification to participate in the auction must submit their qualifications, pursuant to Section III, no later than [October 10, 1997]. A pre-submittal conference will be held at [EUA's West Bridgewater offices] on [September 19, 1997] to provide Prospective Bidders with additional information on the qualification requirements, the auction process, and the administration of Standard Offer Service Power by the Companies. The Companies will review the submittals and will provide written notification to each Prospective Bidder of its certification to participate or its failure to qualify no later than [November 3, 1997].

Any proposed changes to the draft Standard Offer Service Requirements Agreement (Appendix 3) must be submitted in writing along with submittals for qualification, but the

Companies are under no obligation to incorporate any proposed changes into the final Agreement, which will be distributed with the Final Auction Rules.

Consistent with the terms of the Massachusetts [and Rhode Island] Settlement Agreement[s], the Companies will issue the Final Auction Rules upon execution of purchase and sale agreements for two of Montaup's primary fossil generating assets, anticipated to be as early as [November 28, 1997]. The Final Auction Rules will contain particularized detail on the date and procedures for participating in the auction, the final form of the Standard Offer Service Requirements Agreement, and an Auction Participation Agreement.

REDACTED

The auction is anticipated to take place approximately 30 days after the issuance of the Final Auction Rules and will likely span several days. Standard Offer Service Requirements Agreements will be executed with winning bidders within ten (10) business days after completion of the auction. The Companies will begin taking deliveries from Suppliers under the Standard Offer Service Requirements Agreements i) on the later of the Massachusetts or Rhode Island Retail Access Date, ii) upon the effective date of the contracts, or iii) upon the closing of Montaup's divestiture of its major fossil units, whichever is later. Full retail access is anticipated to be available in both states as early as January 1, 1998.

**Certification to Participate**

Prospective Bidders who submit satisfactory documentation of their qualifications to supply Standard Offer Service Power will be certified, by written notice, as qualified to participate in the auction, and will subsequently be referred to as Qualified Bidders.

**Auction Outline**

The auction will consist of an interactive ascending-bid auction for shares of the Companies' Standard Offer Service load for the full seven-year term. In the event that less than 100% of the standard offer Load Responsibility is taken in the full-term auction, the Companies will conduct a supplemental, single-year auction for the remaining shares. The results of the full-term auction will not be affected by the single-year auction in any way; a winning bid in the full-term auction will not be displaced by any combination of bids in the supplemental single-year auction.

The Companies anticipate using auction software with Internet access for all Qualified Bidders. The Final Auction Rules will provide Qualified Bidders with complete instructions for participating in the auction. Orientation and training will be provided in advance of the auction.

All bids from Qualified Bidders in the full-term auction will consist of a percentage discount off the standard offer wholesale price (Discount), and the number of percentage shares of the standard offer load responsibility (Shares) that the bidder proposes to provide in each of the seven years. Both the Discount and the Shares are single values

that will apply throughout the seven-year term. These elements will be the only criteria by which bids will be evaluated. All bids from Qualified Bidders will otherwise be considered to be equivalent.

The Discount will be a fixed, non-negative percentage which will be applied to the stipulated price stream as described in Appendix 1 to determine the price to be paid to the Supplier. The Discount in the full-term auction will be constant over the seven years. Bids will be ranked according to the rules summarized in Section IV, which will be more fully described in the Final Auction Rules. Larger discounts will be viewed more favorably. At the conclusion of each round of the auction, all Qualified Bidders will be able to see the current ranking of Shares and the associated Discounts, but the identity of the bidders associated with the bids will not be available. The auction will continue for multiple rounds, subject to activity rules described in Section IV and more fully specified in the Final Auction Rules.

The single-year supplemental auction will begin immediately following the completion of the full-term auction, if the standard offer load responsibility is not fully subscribed. In this auction, each bid from a Qualified Bidder will specify a year, the percentage share the bidder proposes to serve in that year, and a non-negative discount, expressed in percent. Bids in the single-year auction cannot be grouped, nor can any bid be conditioned on the success of another bid or any other event or circumstance. All seven years of the standard offer term will be auctioned simultaneously. Bidding will continue for multiple rounds according to the activity rules described in Section IV and in the Final Auction Rules.

At the completion of the bidding, the Companies will execute a Standard Offer Service Requirements Agreement with each of the successful bidders, whereupon they will be referred to as Suppliers. Such Agreements will represent the Suppliers' commitment to provide Standard Offer Service Power, and the Companies' commitment to take such power to the extent that that the Standard Offer Service load has not been reduced to zero through the actions of customers choosing to leave the standard offer for competitive power suppliers.

**Administrative Outline**

Each Supplier will be responsible to meet its Load Responsibility, reflected in for its percentage of the Companies' real-time standard offer customer energy demand (minute by minute, hour by hour, day by day). Load Responsibility also includes all associated capacity, energy, and reserves necessary to fulfill all NEPOOL and ISO requirements. The Companies will provide Suppliers with estimated hourly loads, determined pursuant to the procedures outlined in Section V.B, on a daily basis. On a monthly basis, the Companies will provide the actual number of customers in each rate class taking Standard Offer Service in the month, the total hourly load for Standard Offer Service, and representative customer load shapes for each rate class. The Companies will also establish procedures for notifying Suppliers in a timely manner when the Companies

receive notification of customers' intentions to leave Standard Offer Service that may have a significant impact on standard offer load. The Companies will report Supplier loads to ISO New England or its successor agency.

A Supplier's Load Responsibility in any year (its percentage share of the Companies' standard offer load) shall be fixed at the conclusion of the auction, and shall not be subject to adjustment, with two exceptions. Over time, as standard offer load declines, the actual load (in MW and MWh) associated with a given percentage of the load will decline as well. The Companies propose to limit a Supplier's load responsibility to one megawatt (1 MW) or greater. If a Supplier's annual peak load responsibility drops below 1 MW, the Companies will terminate that Supplier's agreement and assign the load responsibility to the remaining Supplier(s).

In the event that another Supplier defaults on its obligations to provide Standard Offer Service Power under the terms of its Agreement with the Companies, the remaining non-defaulting Suppliers will have a pro-rata right of first refusal to assume the defaulting Supplier's Load Responsibility on the same terms as those in the defaulting Supplier's Standard Offer Service Requirements Agreement.

## III. Threshold Qualifications to Bid in Standard Offer Auction

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the auction must meet the Companies' minimum eligibility requirements as outlined below. Documentation of compliance with each item must be provided. The Companies will have final authority to determine if a respondent meets or does not meet these requirements.

### A. Administrative Fee

Prospective Bidders who wish to participate in the standard offer auction must submit a complete package documenting their qualifications, plus a non-refundable administrative fee of $1,000 to the address above no later than 5:00 pm on [Friday October 10, 1997]. The Companies reserve the right to accept submittals after this date but are under no obligation to do so.

### B. Financial Strength

Each Prospective Bidder wishing to participate in the auction must submit the following information to be considered for certification.

1. General Information

- The name of Prospective Bidder and any Guarantor(s).
- The name and title of the authorized contact person(s), with a street address, mailing address, telephone number, facsimile number and e-mail address for each.
- A legal description of the Prospective Bidder and any Guarantor(s) (e.g., corporation, joint venture, limited partnership, partnership or sole proprietorship) and state of organization or residency for each. If the Prospective Bidder or any Guarantor(s) is a corporation, include the names and titles of all officers and directors of the corporation and the names of all stockholders possessing five percent (5%) or more of the stock of the corporation. If a partnership, include the names of all general and limited partners for each.
- For each Prospective Bidder and any Guarantor(s) or any affiliate of each which in the past five years has been determined in writing by an arbitration panel or a court to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.

2. Financial Information

- The date of founding and the corporate history of Prospective Bidder and any Guarantor(s).
- Audited or certified financial statements, including balance sheet and statement of

income and cash flow for Prospective Bidder and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.

- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.
- A description of any corporate affiliations or joint venture partnerships.

3. References

- The name, title, and telephone number for five (5) references knowledgeable of Prospective Bidder's or any Guarantor's business practices, organization and finances.

4. Defaults, Litigation and Penalties

- A detailed description of any situation within the past five (5) years in which the Prospective Bidder or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations.
- A detailed description of any and all indictments within the past five (5) years or pending litigation in any venue.
- A detailed description of any penalties, judgments, consent decrees or other sanctions within the past five (5) years in any venue.

5. Other Adverse Matters

- A detailed description of any present or anticipated facts known to the Prospective Bidder or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Requirements Agreement.

6. Authority

Prospective Bidder and its Guarantor(s) must state:

- that it has or will obtain all necessary regulatory authorizations for it to legally perform its obligations under each Standard Offer Service Requirements Agreement that it may enter into with the Companies;
- that the execution, delivery and performance of each Standard Offer Service Requirements Agreement will be within its lawful powers;
- that each Standard Offer Service Requirements Agreement will be duly authorized by all necessary business entity action and will not violate any of the terms and conditions in its governing documents, any contract or other agreement to which it is a party or any law applicable to it; and

- that each Standard Offer Service Requirements Agreement when entered into will constitute its legally valid and binding obligation enforceable in accordance with its terms.

The Companies agree that all information they receive from the Prospective Bidders and any Guarantors shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the Prospective Bidder's and/or any Guarantor's qualification to bid in the auction described herein.

**C. Bid Deposit**

To ensure that all bidding in the auction is the legitimate action of a serious bidder, the Companies will require a bid deposit, calculated in accordance with Appendix 4, from each Qualified Bidder prior to the auction. The amount of the bid deposit or the face amount of the Qualified Bidder's performance bond commitment, whichever is smaller, will establish a limit on the bidder's eligibility to participate in the auction. A Qualified Bidder who successfully bids to provide shares of Standard Offer Service Power in the auction and fails to provide a Performance Bond and execute a Standard Offer Service Requirements Agreement within the terms of the Auction Participation Agreement will forfeit its entire bid deposit amount.

As part of its submittal of qualifications, a Prospective Bidder or its Guarantor(s) must state that they understand the bid deposit mechanism and that they are prepared to supply a bid deposit, in a form acceptable to the Companies, prior to execution of an Auction Participation Agreement.

**D. Performance Bond Commitment**

Each Prospective Bidder or any Guarantor(s) of each Prospective Bidder must provide one of the following:

(a) A commitment letter to the Companies from a bank or banks stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service Power to the Companies, the bank(s) will arrange for the issuance of performance letters of credit collectively in an aggregate amount equal to $10/MWh, applied to the percentage share of Load Responsibility that the Prospective Bidder proposes to serve in such year in accordance with Article 7 of the Standard Offer Service Requirements Agreement. It is required that each bank proposing to issue letters of credit on behalf of a Prospective Bidder or its Guarantor(s) maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. The bank(s) shall specify the face amount of letters of credit each can arrange and the periods in which they can be outstanding. The bank(s) shall affirm that, upon completion of the auction, they will be prepared to

issue such letter(s) of credit to the Companies within five (5) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

(b) A commitment letter to the Companies from a surety company or companies stating, that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service Power to the Companies, the surety company or companies will arrange for the issuance of performance bonds collectively in an aggregate amount equal to $10/MWh, applied to the percentage share of Load Responsibility that the Prospective Bidder proposes to serve in such year in accordance with Article 7 of the Standard Offer Service Requirements Agreement. It is required that each surety company proposing to issue performance bonds on behalf of said Prospective Bidder or its Guarantor(s), maintain a rating of "B+" or better from A.M. Best Company. The surety company or companies shall specify the face amount of performance bonds each can arrange and the periods in which they can be outstanding. The surety company or companies shall affirm that, upon completion of the auction, they will be prepared to issue such performance bonds to the Companies within five (5) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

(c) Such other financial assurances as the Companies, in their sole discretion, deem appropriate to secure all of a Prospective Bidder's or its Guarantor(s)' obligations to the Companies, including those arising from participation in the auction and those contained in the Standard Offer Service Requirements Agreement.

All performance letters of credit or performance bonds shall be issued in substantially the forms given in Appendix 5.

If a Prospective Bidder or its Guarantor(s) provides a letter as described in item (a) or (b) above, the face amount of the performance letters of credit or performance bonds specified in such letter will be used, as will the required bid deposits, to determine the Prospective Bidder's maximum eligibility to bid in the auction.

**E. NEPOOL Participation**

To participate in the standard offer auction, the Prospective Bidder must be a member of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England Billing System. As an alternative to being a member, the Prospective Bidder may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the Prospective Bidder's proposed commitment to provide Standard Offer Service Power or for such period until the Prospective Bidder becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Load Responsibility to be served by the Prospective Bidder in its own-load dispatch or settlement system.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement. The requirements for becoming a NEPOOL participant are included in Appendix 6. For new members, it is recommended that the NEPOOL Membership Committee be contacted as early as possible because the application process, including Federal Energy Regulatory Commission (FERC) approval, may take several months.

**F. State Registration**

To participate in the auction, each Prospective Bidder must provide documentation that it is registered with the Rhode Island Division of Public Utilities and Carriers as a Non-Regulated Power Producer and must provide documentation that it has complied with the Massachusetts Department of Public Utilities' registration requirements for competitive suppliers then in effect.

**G. Proposed Modifications of the Draft Standard Offer Service Requirements Agreement**

At the completion of the auction, each successful bidder will be required to sign the Companies' Standard Offer Service Requirements Agreement, without modification, within ten (10) business days. To accommodate this schedule, Prospective Bidders are requested to review the draft Agreement attached as Appendix 3 and to provide any comments, exceptions, or proposed changes as part of the pre-qualification submittal.

The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement. The final Standard Offer Service Requirements Agreement will be provided to all Qualified Bidders with the Final Auction Rules and the Auction Participation Agreement. By executing the Auction Participation Agreement, Qualified Bidders will agree to the terms in the final Standard Offer Service Requirements Agreement and to execute the Agreement, without modification, if they are successful in the auction.

## IV. Auction Process

To be auctioned are 100 shares of the Load Responsibility for each year. These shares will be sold in a simultaneous ascending auction, in which the service obligation for each year is on the block at the same time. Suppliers will bid for service over a series of rounds until no bidder is willing to improve a bid. This format is similar to the successful FCC auctions for radio frequency spectrum. Before the auction, bidders will make a deposit, which, along with the face amount of the bidder's performance bond, will determine the maximum number of shares they are eligible to bid on.

The auction may actually consist of two auctions conducted in sequence. First, the full-term auction will be held. Bids in the full-term auction will be for a specified share of Load Responsibility across all seven years. At the conclusion of the full-term auction, if there are remaining shares that did not sell in the full-term auction, the single-year auction will be held. In the single-year auction, bids are for shares in a specified year. Each bidder's initial eligibility in the single-year auction will be its initial eligibility in the full-term auction less its winnings in the full-term auction. After the final round of bidding, all winning bids will be awarded at the Discounts bid.

The rules for the full-term and the single-year auctions are nearly identical. We begin with a description of the full-term auction and then point out the differences in the single-year auction.

### A. The Full-Term Auction

In each round, each bidder tenders a supply schedule as a group of bids. A bid is a pair $(s, d)$, where $s$ is the Shares and $d$ is the Discount (in percent) off the standard offer wholesale price. A winner of $s$ Shares at a Discount $d$ is obligated to serve $s$% of the Standard Offer Service load in each year at a discount of $d$% off the stipulated wholesale price. A bidder can submit as many bids as it likes, for as many Shares as it likes, subject to its eligibility.

At the end of each round of bidding, the bids will be ranked in descending order of Discount, then in ascending order of time-stamp (earlier bids are ranked higher) to form the aggregate supply schedule. Starting with the largest discount, bids will be designated as winning bids until the cumulative Shares reaches 100. All other bids are designated losing bids. The winning bid with the lowest Discount defines the clearing discount $d^*$. The example in Figure 1 includes a partial supply schedule at the conclusion of a round to illustrate the ranking, the designation of "winning" and "losing" bids, and how the clearing discount is determined. A bid is also referred to as a "step," since each bid represents a step on the supply schedule.

Bids A-D are all "winning" bids, since their Discounts exceed the clearing discount. If the auction were to end on this round, Bids A-D would be awarded Agreements. Bid E would be rationed, as discussed below. The bidder would be awarded an Agreement for

only part of the Bid E Shares. Bids F through I, and any others farther down on the supply schedule, would be "losing" bids, since their Discounts were less than the clearing discount. Bidders sponsoring those bids have the opportunity in the next round to improve their bids. If they failed to do so, those bids would be rejected from further consideration.

| Bid | Discount | Time-stamp | Shares | Cumulative Shares | Status |
|---|---|---|---|---|---|
| A | 5.0% | 10/16/97 09:35:42 | 20 | 20 | Winning |
| B | 4.8% | 10/18/97 12:14:25 | 15 | 35 | Winning |
| C | 4.7% | 10/16/97 11:51:45 | 25 | 60 | Winning |
| D | 4.3% | 10/17/97 14:21:52 | 20 | 80 | Winning |
| E | 4.0% | 10/19/97 10:02:47 | 30 | 110 | Rationed |
| F | 4.0% | 10/19/97 13:12:45 | 40 | 150 | Losing |
| G | 3.5% | 10/19/97 13:47:20 | 15 | 165 | Losing |
| H | 3.2% | 10/19/97 13:14:06 | 20 | 185 | Losing |
| I | 3.2% | 10/19/97 13:36:42 | 15 | 200 | Losing |

The following are the activity rules for the full-term auction:

*Eligibility Rule*: The bid deposit and the face amount of the available performance bond will determine a bidder's maximum eligibility, in accordance with Appendix 4.

*Opening Rule*: A new step in the bid schedule can be submitted only in the first round. A bidder must submit bids totaling 100% of its eligibility in the initial round, otherwise the bidder's eligibility in the full-term auction will be reduced to the number of shares bid for in the initial round.

*Sorting Rule*: In each round, the steps will be sorted in decreasing order be discount, and then in increasing order by time-stamp. Steps will be designated as "winning" bids, until the cumulative Shares exceeds 100. (If the total Shares bid is less than or equal to 100, then all steps will be designated as winners). The next step will be rationed as follows:

*Rationing Rule*: The first step that straddles 100 – that is, with cumulative Shares greater than 100 – will be split into two steps: a winning step with shares so that cumulative Shares are exactly 100 and a losing step for the remaining Shares of the step. All steps further down the schedule will be losing steps.

*Revision Rule*: A step can be divided into two or more steps with total Shares equal to the initial step. (This will allow a bidder to raise its bid on only part of a step.) A step can be revised only by improving its Discount so that it exceeds the previous round's clearing discount by at least the specified minimum bid increment.

The revision rule has four parts. In each round after the first, for each step of the bid schedule:

1. The Discount cannot be decreased.
2. A step can be split into two or more steps with total Shares equal to the original step.
3. The Discount can be increased only if the new Discount is more than the clearing discount in the previous round by at least the minimum bid increment.
4. Steps designated as losing in the prior round that do not improve the previous clearing discount are rejected and can never be improved.

*Rejection Rule*: A losing step from the prior round is rejected after the current round if its Discount is not improved (i.e. its Discount is not raised above the previous round's clearing discount by the minimum bid increment). Rejected steps are permanently removed from the bidder's bid schedule. All steps that are not rejected are automatically carried over to the next round.

*Closing Rule*: The full-term auction stays open until a round goes by with no improvements to any bid.

The activity rules apply separately for each step on the bid schedule. Each step is a binding bid that remains in force until it is improved or rejected. An improved step replaces the prior step. Except for those rejected or improved, all steps continue in force for the next round. At the close of the auction, those steps with Discounts below the clearing discount are rejected, and any bid straddling the clearing discount is resolved by the Rationing Rule. The remaining steps are accepted, and each successful bidder is required to execute a Standard Offer Service Requirements Agreement.

### B. The Single-Year Auction

If not all of the 100 shares are sold in the full-term auction, the remaining shares will be sold in the single-year auction. The single-year auction will commence immediately on completion of the full-term auction. A bid is a triple ($y$, $s$, $d$), where $y$ is the year, $s$ is the number of shares, and $d$ is the Discount (in percent) off the stipulated wholesale price for year $y$. A winner of $s$ shares in year $y$ at a discount $d$ is obligated to serve $s$% of the Standard Offer Service load in year $y$ at a discount $d$%. Rather than having a single supply schedule, as in the full-term auction, there is a separate schedule for each of the seven years. Bidders may bid on any one or more years, and may bid for different Shares and at different Discounts in each year. Bids must be for a pre-defined increment of Shares (e.g., 5 Shares, or 5% of the Load Responsibility). The Auctioneer will assemble seven-year strips, starting with the highest Discount in each year. Only bids which are part of a seven-year strip will be eligible for Agreements at the conclusion of the auction.

The following are the activity rules that are specific to the single-year auction (i.e. all other rules provided above for the full-term auction apply, with these exceptions):

*Eligibility Rule*: A bidder's initial eligibility in the single-year auction is its initial eligibility in the full-term auction less any shares won in the full-term auction.

*Opening Rule*: A new step in the bid schedule can be submitted only in the first four rounds. A bidder must submit bids totaling at least 25% of this initial eligibility in the first round of the single-year auction, 50% in the second round, 75% in the third round, and 100% in the fourth round. Failure to meet or exceed these activity levels will result in a reduction in eligibility.

The Sorting, Revision, Rationing, and Rejection Rules all function as in the full-term auction.

*Closing Rule*: All the yearly markets stay open until a round goes by with no improvements in any market. Hence, all markets close simultaneously.

### C. Minimum Initial Bids and Minimum Bid Increments

The minimum initial Discount is 0%. In subsequent rounds, revisions to steps must improve on the clearing discount by at least the "minimum bid increment." The minimum bid increment will likely change as the auction progresses and will be stated before each round of bidding. Different years may have different minimum bid increments in the single-year auction. Typically, the increments decrease later in the auction; however, it is unlikely that an increment would ever drop below ½%. The following increments are likely, but these are subject to change at the discretion of the auctioneer based on initial eligibility of bidders and bid activity:

| Minimum Bid Increment | Full-Term | Years 1 and 2 | Years 3 to 7 |
|---|---|---|---|
| Early in the Auction | 1% | 1% | 2% |
| Late in the Auction | ½% | ½% | 1% |

## V. Administrative Issues

### A. Auction

Qualified Bidders will be required to agree to abide by the rules of the auction, as will be described in the Final Auction Rules. Qualified Bidders will also be required to submit deposits proportional to their intended interest in participation in the auction, and their participation will be capped by the amount of bid deposit provided (if not more stringently limited by the face value of a Qualified Bidder's available Performance Bond). Bid deposits will be fully refundable (with interest paid on cash deposits) to all Qualified Bidders who do not submit successful bids. Successful bidders will be required to post a Performance Bond or comparable surety instrument as a condition to execution of the Standard Offer Service Requirements Agreement.

1. Auction Participation Agreement

Participation in the auction will be governed by an Auction Participation Agreement and the terms of the Final Auction Rules. Qualified Bidders will be required to execute an Auction Participation Agreement, affirming their commitment i) to abide by the rules of the auction as stated in the Final Auction Rules, ii) to abide by any decisions of the Auctioneer[1], and iii) to provide the requisite security documents and execute a Standard Offer Service Requirements Agreement within ten (10) business days after the conclusion of the auction.

2. Bid Deposits

At least ten (10) business days prior to the commencement of the auction, each Prospective Bidder or its Guarantor(s) shall deliver to the Companies a bid deposit proportional to the percentage share of Load Responsibility that the Prospective Bidder proposes to bid on. The bid deposit will be determined in accordance with a formula generally as provided in Appendix 4. The bid deposit shall be provided in one of the following forms:

- Prospective Bidder's or its Guarantor's certified check payable to the Companies;
- a bank check drawn on a financial institution acceptable to the Companies; or
- funds electronically transferred to the account of the Companies in accordance with the following instructions:

Fleet Bank
ABA # 011-000-206
For Credit to: (the Companies)
A/C # xxxxxxxxxxxxx

[1] The Companies may act as Auctioneer, or may hire an independent entity with particular auction expertise.

- a performance letter of credit or performance bond issued by a bank or surety company which satisfies the rating criteria established in Section III.B(a) and (b), respectively. Each performance letter of credit or bond will be required to be in substantially the form given in Appendix 4 and 5, respectively.

As a condition of the auction, the Companies will not accept any bid for which the Prospective Bidder or its Guarantor(s) has not previously provided the required amount of bid deposit.

3. Maximum Eligibility

A Qualified Bidder's maximum eligibility to bid in the auction will be based on whichever of the following two measures results in the lower eligibility:

i) the face amount of a performance bond or equivalent surety for which the Qualified Bidder provides a commitment letter, as outlined in Section III.D, or
ii) the amount of the bid deposit.

Eligibility, in terms of Shares of Load Responsibility, depends upon which auction (full-term vs. single-year) and which years a bidder bids in. The relationships are presented in Appendices 4 and 5.

4. Bid Deposit Refunds/Credits:

Bid deposits will be refunded or credited in accordance with the Prospective Bidder's or Guarantor's direction in one of the following manners:

- For bids which are not selected by the Companies:

  Cash deposits will be fully refundable, with interest, one business day following the Companies' notice to the Prospective Bidder or Guarantor(s) of the Companies' rejection of said bid; or

  Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' notice to the Prospective Bidder or Guarantor(s) of the Companies' rejection of said bid.

- For bids selected by the Companies:

  Cash deposits will be fully refundable, with interest, one business day following the Companies' receipt of the required financial surety securing the aggregate Load Responsibility the bidder has secured as a result of the auction and an executed Standard Offer Service Requirements Agreement therefor; or

  Bid deposits in the form of a performance letter of credit or performance bond will be

returned one business day following the Companies' receipt of the required financial surety securing the aggregate Load Responsibility the bidder has secured as a result of the auction and an executed Standard Offer Service Requirements Agreement therefor.

If a successful Qualified Bidder or its Guarantor(s) fails to honor its bid by providing the required Performance Bond and executing a Standard Offer Service Requirements Agreement within ten (10) business days of completion of the auction, the entire bid deposit amount will be forfeited. The Companies will then offer an Agreement to the next bidder(s) whose aggregate Shares would bring the total Shares to exactly 100.

Bid deposits received in the form of a certified or bank check will be eligible for earnings at a rate of 3% per annum commencing with the business day that said funds become fully available to the Companies and continuing through the business day that the Companies issue a refund. All refunds will be in the form of a Company check payable to the bidder or its Guarantor(s) with accrued interest.

### B. Standard Offer Service Power

Administration of the Companies' Standard Offer Service Power involves the posting of Performance Bonds by Suppliers, estimation of hourly loads and allocation of losses to Suppliers, billing and settlement procedures, load information which will be provided by the Companies, minimum load obligations, and the Companies' procedures in the event of a default by a Supplier.

1. Performance Bonds

Within ten (10) business days of the completion of the auction, and as a condition to the execution of a Standard Offer Service Requirements Agreement, each successful bidder will be required to deliver to the Companies a financial surety securing the bidder's full Load Responsibility over the seven-year term of standard offer service.

Acceptable forms of surety include a performance letter of credit or a performance bond. Letters of credit must be from a bank or banks, in substantially the same form as provided in Appendix 4. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. Performance bonds must be in substantially the same form as provided in Appendix 5 and must be issued by a surety company or companies which maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Requirements Agreement. Performance letters of credit or bonds, if not issued for the full term of a Supplier's load responsibility, shall be renewed on an

annual basis or replaced and superseded by a like kind surety thirty (30) days prior to the expiration of any term. The amount of the financial surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service Power delivery obligations.

Failure to provide the performance surety within the allotted time after the completion of the auction will disqualify the bidder and will result in forfeiture of its entire bid deposit. Failure to maintain such surety in good standing after execution of the Standard Offer Service Requirements Agreement will be considered an event of default and the Companies will exercise their rights under the Agreement accordingly.

2. Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England each Supplier's share of the Companies' aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's Load Responsibility, and will include a proportional share of all distribution and transmission losses. The process used to estimate hourly loads and losses and the billing and settlement process are described in Articles 4 and 6 of the Standard Offer Service Requirements Agreement.

3. Load Information

The Companies will provide certain actual and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Requirements Agreement.

Suppliers will receive daily reports of their estimated hourly standard offer loads, and monthly reports of the number of customers in each rate class taking Standard Offer Service along with representative customer load shapes for each rate class. The Companies will also provide, on an annual basis, estimated peak and energy demand of the aggregated load of their customers taking Standard Offer Service for the prior twelve months and a forecast of Standard Offer Service peak and energy demands for the upcoming twelve months, assuming no further migration of customers to competitive suppliers.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies become aware of significant amounts of standard offer load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual standard offer loads from information provided by the Companies or from Supplier forecasts. Suppliers are advised to rely on their own projections of load

and market dynamics and not to interpret any information provided by the Companies as a forecast of likely, or even possible, outcomes.

4. Minimum Load Obligations

Over time, as standard offer load declines, the actual energy and demand responsibilities (in MW and MWh) associated with a given percentage of the load will decline as well. The Companies propose to limit a Supplier's load responsibility to one megawatt (1 MW) or greater. If a Supplier's annual peak load responsibility drops below 1 MW, the Companies will terminate that Supplier's agreement and assign the load responsibility to the remaining Supplier(s).

5. Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service Power under the terms of its Agreement with the Companies, the remaining non-defaulting Suppliers will have a pro-rata right of first refusal to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Requirements Agreement. Such assumption of a defaulting Supplier's obligations must be exercised within five (5) days of receipt of written notice from the Companies, and will be effective retroactively to the commencement of the default for settlement purposes. Non-defaulting Suppliers will be asked to indicate the maximum amount of the defaulting Supplier's obligations they would be willing to assume. In the event that some non-defaulting Suppliers refuse to assume any of the defaulted obligations, the Companies will assign the obligations proportionally, up to the maximum stated amounts. In the event of remaining obligations not assumed by non-defaulting Suppliers, the Companies will solicit bids for replacement power.

Confidential NEC087243

Privileged and Confidential
Draft

# APPENDIX 1
# STANDARD OFFER SERVICE PRICE SCHEDULES

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction will be based on the following predetermined schedules of prices for energy consumed. The rate for customers of Eastern is subject to adjustment only for the operation of the Fuel Index. Rates charged to customers of Blackstone and Newport will reflect the stipulated prices shown, and will be reduced by the Supplier Discounts obtained in the auction.

| Calendar Year | Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | 3.2 cents |
| 1999 | 3.1 cents | 3.5 cents |
| 2002 | 3.4 cents | 3.8 cents |
| 2001 | 3.8 cents | 3.8 cents |
| 2002 | 4.2 cents | 4.2 cents |
| 2003 | 4.7 cents | 4.7 cents |
| 2004 | 5.1 cents | 5.1 cents |

The Supplier Rate defines the price cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Requirements Agreement. Prices apply to energy as measured at the retail customers' meters.

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2002 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Supplier Rates, reduced by the applicable Discounts offered in the Companies' auction. Additional revenues to Suppliers may be realized through the operation of the Fuel Index.

Privileged and Confidential
Draft

# APPENDIX 2
## FUEL INDEX

**Fuel Index**

The Companies have incorporated a Customer Rate Fuel Adjustment mechanism in the standard offer terms of service which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil ( 1% sulfur) and natural gas after 1999. Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service Power in proportion to the standard offer energy provided by the Suppliers to the Companies in the applicable billing month.. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels. The Companies' Customer Rate Fuel Adjustment is calculated as follows:

The Customer Rate in effect for a given month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction is, if not defined elsewhere, the following predetermined flat rate for energy consumed:

| Calendar Year | Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | 3.2 cents |
| 1999 | 3.1 cents | 3.5 cents |
| 2000 | 3.4 cents | 3.8 cents |
| 2001 | 3.8 cents | 3.8 cents |
| 2002 | 4.2 cents | 4.2 cents |
| 2003 | 4.7 cents | 4.7 cents |
| 2004 | 5.1 cents | 5.1 cents |

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent

six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No.6 oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + \$0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where:
Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate paid to the retail company is increased by this Fuel Adjustment factor for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

**PART 2 OF 3**

PRIVILEGED & CONFIDENTIAL
DRAFT

**Appendix 3 Standard Offer Service Requirements Agreement**

DRAFT

# Standard Offer Service Requirements Agreement

between

# Blackstone Valley Electric Company

# Eastern Edison Company

# Newport Electric Corporation

and

______________________________

Dated __________

E:\STDOFFER\AGRMTWP.RI

PRIVILEGED & CONFIDENTIAL
DRAFT

Table of Contents Page

Article 1. Definitions ........ 1
Article 2. Term ........ 3
Article 3. Supplier Responsibilities ........ 4
Article 4. Estimation of Hourly Loads and Reporting to the ISO ........ 4
Article 5. Price ........ 5
Article 6. Billing and Payment ........ 5
Article 7. Security Provisions ........ 6
Article 8. Events of Default ........ 8
Article 9. Force Majeure ........ 9
Article 10. Assignment ........ 10
Article 11. Resolution of Disputes ........ 10
Article 12. Interpretation ........ 11
Article 13. Severability of Provisions ........ 11
Article 14. Accounts and Records ........ 11
Article 15. Limitations on Liability and Indemnification ........ 12
Article 16. Notices ........ 12
Article 17. Miscellaneous ........ 13

Appendix A Schedule of Supplier's Load Responsibility and Delivered Energy Price [needs work]

Appendix B Procedures for Estimating Hourly Loads and for Estimating and Allocating Losses [need to add]

Appendix C Fuel Index

PRIVILEGED & CONFIDENTIAL
DRAFT

# STANDARD OFFER SERVICE REQUIREMENTS AGREEMENT

This Standard Offer Service Requirements Agreement ("Agreement"), is made and entered into this _____ day of _______________, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporations; and Newport Electric Corporation ("Newport"), a Rhode Island Corporations (referred to collectively as the "Companies"), and ________________________________________________,("Supplier").

The Companies are required to provide firm all requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. ___, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. ___, as amended from time to time. This Agreement provides for the transfer, from Companies to Supplier, the responsibility of providing firm all requirements electric service including capacity, energy, reserves and other related services necessary to assume full responsibility for a specified share of the Companies' aggregate load attributed to those customers taking Standard Offer Service. This Agreement includes the Appendices attached hereto and incorporated herein by reference.

By entering into this Agreement, Supplier agrees to provide and Company agrees to receive and pay for electricity and other services provide in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by the governmental bodies having regulatory jurisdiction over services rendered hereunder.

In consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

## ARTICLE 1. Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this document, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean 12:01 A.M. on ________________ ________________.

"Contract Year" shall mean any calendar year or part of a calendar year after the Commencement Date of Service in which Supplier is scheduled to provide electricity to Company for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"Discount" shall mean the discount, in percent, off the Standard Offer Wholesale Price of electricity offered by Supplier for a given Contract Year as determined through the Company's Standard Offer Auction.

"DPU" shall mean the Massachusetts Department of Public Utilities.

"Good Utility Practice(s)" shall mean the practices, methods and acts (including but not limited to the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry) that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should have been known at the time a decision was made, would have accomplished the desired results in a manner consistent with law, regulation, codes, standards, equipment manufacturer's recommendations, reliability, safety, environmental protection, economy and expedition.

"ISO" shall mean ISO New England Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement.

"Load Responsibility" shall be Supplier's percentage of the Companies' requirements (minute by minute, hour by hour, day by day) including but not limited to: energy, installed capacity, operable capacity and reserves necessary to fulfill all NEPOOL and ISO obligations, as they may change time to time, associated with providing firm all requirements electric power to the Companies' retail customers taking service under Standard Offer Service. Supplier is responsible for changes in customer demand for any reason, including but not limited to, seasonal factors, daily load fluctuations, increase or decreased usage, demand side management activities, extremes in weather, etc.

"NYMEX Contract" shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Parties" shall mean the Supplier and the Companies and their respective assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix C. The Companies or its retail customers taking Standard Offer Service shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5 and Appendix B.__.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"Restated NEPOOL Agreement", shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time.

"Retail Access Date" shall mean January 1, 1998, or such later time as designated to be the date that all retail customers of the Companies are allowed the ability to choose their power supplier.

"Standard Offer Service" shall mean firm all requirements electric service provided by the Companies to its retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. ___, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. ___.

"Standard Offer Service Power" shall mean the generation and delivery, to the Delivery Point, of electric capacity, energy and ancillary services required by the Companies to meet the needs of the those customers taking Standard Offer Service and to fulfill its NEPOOL and ISO obligations.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service Power, as shown in Appendix A.

ARTICLE 2. Term:

The term of this Agreement shall begin on the Commencement Date of Service, and end on 12:00 a.m. ______________________________.

ARTICLE 3. Supplier Responsibilities

Supplier is responsible for providing firm all requirements service necessary to meet its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service. Supplier shall deliver its Load Responsibility in the form of three-phase sixty-hertz alternating electric current to the Delivery Point.

Supplier, as a provider of Standard Offer Service Power, is responsible for all present or future requirements and associated costs for installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, including the receipt of tie benefits and responsibility for their associated payments, losses, etc., associated with the Supplier's Load Responsibility and any other requirements imposed by the ISO, as they may be in effect from time to time. To the extent that the ISO, or any successor entity allocates expenses or uplift costs on a load or peak load basis, the portion of such costs associated with the Supplier's Load Responsibility will also be Supplier's responsibility.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Customers taking Standard Offer Service for NEPOOL Regional Network Transmission Service ("RNS"), Montaup's Local Area Network Transmission Service ("LNS"), and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges needed to deliver the power to the NEPOOL PTF.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet its NEPOOL obligations, the Companies shall report to the ISO, Supplier's hourly Load Responsibility, including losses. The Companies will estimate Supplier's Load Responsibility based on the Terms and Conditions provided in Appendix B. The Companies reserves the right to modify Appendix B in the future, subject to regulatory approval.

The Companies will normally report to the ISO Supplier's hourly Load Responsibility by 12:00 noon of the second following business day. Supplier's Load Responsibility should be added by the ISO to Supplier's other NEPOOL loads.

At the end of each month, the Companies shall aggregate Supplier's hourly loads for the month, as described in Appendix B. The result, less losses from the Delivery Point to the meters of those customers on Standard Offer Service will be deemed to be the quantity of Delivered Energy that Supplier provided for that month, and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month. Appendix B also provides a general description of this reconciliation process.

ARTICLE 5. Price:

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and Appendix B, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price x Fuel Adjustment

where: Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment is defined and calculated monthly in accordance with Appendix C.

The Price for Delivered Energy as set forth herein include all local, state and federal taxes, fees and assessments applicable as of the date hereof. It is expressly understood that Supplier is obligated to pay all present and future taxes, fees and levies which may be assessed by any applicable governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6 Billing and Payments:

Pending the availability of actual metered data, computations by the Companies of the charges for the purposes of billings hereunder shall be based on the estimate of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable

for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, or otherwise only to the extent allowed by the terms of this Article 6.

Companies shall pay Supplier any amounts due and payable on or before the last day of each month ("Due Date"). Any amount remaining unpaid after the last day of the month shall bear interest at the Prime Rate then in effect at the main office of the Bank of Boston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier, in good faith, disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 11 of this Agreement. Upon final resolution of the dispute, if refunds are due to either Party, the owing Party shall make such refunds together with interest calculated at the rate set forth above on all disputed amounts within thirty (30) days from the date of the final resolution of such dispute.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of such original billing in order to reflect differences in charges resulting from receipt of more current data. Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment. The Companies shall make additional adjustments to billings after the one-year period to the extent such adjustments are required based upon final resolution of any claim, action, or proceeding that is based upon data contained in an original billing and that is formally initiated by, or noticed to the Companies prior to the end of the one-year period following the date of such original billing.

ARTICLE 7. Security Provisions:

As a condition of this Agreement and upon execution thereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

FULL TERM AUCTION

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n)=SF \times STDL(n-1) \times \{ (PSTD(n) \times TD(n)) + (PSTD(n+1) \times TD(n+1)) + (PSTD(n+2) \times TD(n+2)) + \ldots + (PSTD(2004) \times TD(2004)) \}$$

Where:

| | |
|---|---|
| SD(n) | is the Security Deposit in year (n) |
| SF | is the Security Fee equal to $10.00/MWh |
| STDL(n-1) | is the aggregate load of those customers taking Standard Offer Service in the previous the previous year (n-1), expressed in MWh |
| PSTD(n) | is the percentage share of Standard Offer Service Power that the Supplier has committed to provide in year (n) |
| TD(n) | is the Transition Discount in year n, calculated as follows: |

| | |
|---|---|
| TD(n) | =1.00 |
| TD(n+1) | =(7-1)/7 = 0.857 |
| TD(n+2) | =(7-2)/7 = 0.714 |
| TD(n+3) | =(7-3)/7 = 0.571 |
| TD(n+4) | =(7-4)/7 = 0.429 |
| TD(n+5) | =(7-5)/7 = 0.286 |
| TD(n+6) | =(7-6)/7 = 0.143 |

SINGLE YEAR AUCTION

The amount of the financial surety shall be calculated annually based on the following formula:

SD(n)=SF x STDL(n-1) x { PSTD(n) + PSTD(n+1) + ..... + PSTD(2004) }

Where:

| | |
|---|---|
| SD(n) | is the Security Deposit in year (n) |
| SF | is the Security Fee equal to $10.00/MWh |
| STDL(n-1) | is the aggregate load of those customers taking Standard Offer Service in the previous the previous year (n-1), expressed in MWh |
| PSTD(n) | is the percentage share of Standard Offer Service Power that the Supplier has committed to provide in year (n) |

onfidential

NEC087255

To secure the above amounts, Supplier shall provide a letter of credit or performance bond in a form acceptable to Company. It is required that each bank issuing such letters of credit on behalf of a Supplier, maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service; or if a performance bonds are to be provided it is required that each surety company issuing such performance bonds on behalf of a Supplier, maintain a rating of "B+" or better from A.M. Best Company.

Performance Letter of Credits and Bonds, if not issued for the full term of the Supplier's Load Responsibility obligation, shall be renewed on an annual basis or replaced and superseded by a like kind surety thirty (30) days prior to the expiration of any term, on a continuing basis up to the termination of this Agreement or until Supplier's Load Responsibility is zero. The amount of such financial sureties may be amended on an annual basis to reflect the security amount calculated above over the remaining term of this Agreement.

ARTICLE 8. Events of Default:

With the exception of Force Majeure covered in Article 11, each of the following events shall be deemed to be an Event of Default hereunder:

(a) Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within (30) days after notice thereof from the Companies.

(b) Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within (30) days after notice thereof from the Supplier.

(c) Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days notice thereof.

In the event either Party contests the enforceability of this Agreement, the Party contesting enforceability shall be deemed to be the Party in default hereunder.

Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.

Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security amounts calculated pursuant to Article 7 and the Companies may exercising its rights under the financial surety used to secure such amounts. In addition, Supplier shall be liable to the Companies for any direct damages resulting from the Event of Default. The Companies may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving sixty (30) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9. Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, act of public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or similarly cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event directly affects the availability of the transmission or distribution facilities of NEPOOL, the Companies or an affiliate of the

Companies necessary to deliver Standard Offer Service Power to the Companies' customers. Events affecting the availability of any generating facility, transmission or distribution facilities outside the NEPOOL control area, or an event that causes an economic hardship of either Party shall not constitute a Force Majeure under this Agreement.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) The non-performing Party promptly, but in no case longer than five working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b) The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

(c) The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d) The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party.

(e) Supplier's Load Responsibility shall be modified in proportion to the effect of Force Majeure conditions.

(f) Companies' obligation to make payment for Delivered Energy shall be modified in proportion to the effect of the Force Majeure conditions.

ARTICLE 10. Assignment:

This Agreement shall be binding upon and shall inure to the benefit of, and may be performed by, certain successors and assignees of the Parties as follows: (i) the assignment, pledge or other transfer is to another company in the same holding company system as the assignor, pledgor or transferor and the assignee, pledgee or transferee expressly assumes and demonstrates it can meet the obligations of the assignor, pledgor or transferor, or (ii) such transfer is incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor to another person or business entity which shall, as a part of such succession, assume all the obligations of the assignor, pledgor or transferor under this Agreement. Except as otherwise provided in the above, or as otherwise mutually agreed to by the Parties, no other assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld.

ARTICLE 11. Resolution of Disputes:

Any dispute between the Companies and Supplier involving performance under this Agreement shall be referred to a senior representative of Companies designated by Companies and a senior representative of Supplier designated by Supplier for resolution on an informal basis as promptly as practicable. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration.

The arbitration shall be conducted before a single neutral arbitrator appointed by the Parties. If the Parties fail to agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, Companies and Supplier shall each choose one arbitrator, who shall sit on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. In either case, the arbitrators shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliates of such Party. The arbitrator(s) shall afford each of the Parties an opportunity to be heard and, except as otherwise provided herein, shall generally

conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, however, the Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrators(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to modify or change any of the above in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards set forth in the Federal Arbitration Act and/or the Administrative Dispute Resolution Act.

ARTICLE 12. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts.

ARTICLE 13. Severability of Provisions:

Subject to the provisions of Article 13 above, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 14. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least one year after final billing. Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 15. Limitations on Liability and Indemnification:

Supplier will endeavor to furnish reliable electric service under this Agreement, but it does not guarantee that service will not be curtailed or interrupted for reasons beyond its control and Supplier, its trustees, directors, officers, employees, and agents shall not be liable for any claim arising from or claimed to have arisen from any disruptions in service due to a Force Majeure. Companies agrees to indemnify, defend, and hold Supplier, its affiliated Companies, trustees, directors, officers, employees, and agents harmless from and against any and all costs, claims, liabilities, actions, or proceedings whatsoever arising from or claimed to have arisen from such disruptions in service due to a Force Majeure.

Except for claims arising from disruptions in service which are provided for in the above paragraph, each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated Companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all third party damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the negligent acts or omissions of the indemnifying Party's employees or agents.

The Parties hereby waive and release the other Party as well as the other Party's affiliated Companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this contract.

ARTICLE 16. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Company:
Director, Power Management
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 17. Miscellaneous:

(a) Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b) Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c) Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d) This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this

(e) The Parties intend that this Agreement shall only be changed by a written amendment executed by both Parties, and shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(f) Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

IN WITNESS WHEREOF, Supplier and Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier: Supplier's NAME

By:________________________

On Behalf of the Companies:

Blackstone: BLACKSTONE VALLEY ELECTRIC COMPANY

By:________________________

Eastern: EASTERN EDISON COMPANY

By:________________________

Newport: NEWPORT ELECTRIC CORPORATION

By:________________________

PRIVILEGED & CONFIDENTIAL
DRAFT

# APPENDIX A

## SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY AND PRICE

| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 | | |
| 1999 | | 3.5 | | |
| 2000 | | 3.8 | | |
| 2001 | | 3.8 | | |
| 2002 | | 4.2 | | |
| 2003 | | 4.7 | | |
| 2004 | | 5.1 | | |
| 2005 | | 5.5 | | |
| 2006 | | 5.9 | | |
| 2007 | | 6.3 | | |
| 2008 | | 6.7 | | |
| 2009 | | 7.1 | | |

PRIVILEGED & CONFIDENTIAL
DRAFT

# APPENDIX B

## PROCEDURES FOR ESTIMATING HOURLY LOADS AND FOR ESTIMATING AND ALLOCATING LOSSES

E:\STDOFFER\AGRMTWP.RI 16

Confidential NEC087264

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

## TERMS AND CONDITIONS FOR COMPETITIVE SUPPLIERS

1. Applicability

1A. The following Terms & Conditions shall apply to every registered Competitive Supplier authorized to do business within the Commonwealth of Massachusetts, and to every Customer doing business with said Competitive Suppliers.

1B. These Terms & Conditions may be revised, amended, supplemented or supplanted in whole or in part from time to time according to the procedures provided in MDPU regulations and Massachusetts law. In case of conflict between these Terms & Conditions and any orders or regulations of the MDPU, said orders or regulations shall govern.

1C. No agent or employee of the Company is authorized to orally modify any provision contained in these Terms & Conditions or to bind the Company to any promise or representation contrary thereto. Any such modification to these Terms & Conditions or any such promise contrary thereto shall be in writing, duly executed by an authorized officer of the Company, and subject in all cases to applicable statutes and to the orders and regulations of the MDPU.

2. Definitions

"Competitive Supplier" or "Supplier" shall mean any entity registered with the MDPU, engaged in selling electricity to retail Customers in Massachusetts, with the exception of a Distribution Company providing Standard Offer Service and Default Service to its distribution Customers.

"Customer" shall mean all persons, partnerships, corporations, or any other entities, whether public or private, who obtain Distribution Service at a Customer Delivery Point and who are Customers of record of the Company.

"Customer Delivery Point" shall mean the Company's meter or a point designated by the Company located on the Customer's premises.

"Default Service" shall be as defined in the Company's tariffs approved by the MDPU.

"Distribution Company" or "Company" shall mean an lectric ompany organized under the laws of Massachusetts that provides Distribution Service in Massachusetts.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

"Distribution Service" shall mean the delivery of electricity to Customers by the Distribution Company.

"Generation Service" shall mean the sale of electricity, including ancillary services such as the provision of reserves, to Customers by the Competitive Supplier.

"ISO" shall mean the Independent System Operator of the New England bulk power system.

"MDPU" shall mean the Massachusetts Department of Public Utilities.

"NEPOOL" shall mean the New England Power Pool and its successors.

"NEPOOL PTF Facilities" shall mean pool transmission facilities included in the NEPOOL Open Access Transmission Tariff on file with the Federal Energy Regulatory Commission.

"Own-Load- Calculation" shall mean the settlement methodology utilized by NEPOOL for Suppliers.

"Standard Offer Service" shall be as defined in the Company's tariffs approved by the MDPU.

"Terms & Conditions" shall mean these Terms and Conditions for Competitive Suppliers.

3. Obligations of Parties

3A. Customer

A Customer shall select one Competitive Supplier for each account at any given time, or authorize an agent to make the selection for the Customer. The Customer must provide the selected Competitive Supplier with its applicable Company account number. A Customer may choose only a Competitive Supplier who meets the terms described below and is registered with the MDPU.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

3B. Distribution Company

The Company will:

(1) Arrange for or provide regional network transmission service over NEPOOL PTF Facilities and local network transmission services from NEPOOL PTF Facilities to the Company's Distribution System for each Customer, unless the Customer or the Supplier otherwise arranges for such service;

(2) Deliver power over distribution facilities to each Customer Delivery Point;

(3) Provide customer service and support for Distribution Service and, if contracted by the Competitive Supplier, for Generation Service;

(4) Respond to service interruptions or power quality problems;

(5) Handle connections and terminations;

(6) Read meters;

(7) Submit bills to Customers for Distribution Service and Generation Service pursuant to Section 5 of these Terms and Conditions;

(8) Address billing inquiries for Distribution Service and, if contracted by the Competitive Supplier, for Generation Service;

(9) Answer general questions about Distribution Service;

(10) Report Competitive Suppliers' estimated and/or metered loads, including local network transmission and distribution losses, to the ISO;

(11) Provide to Competitive Suppliers, on request, the data format and procedures for electronic information transfers and funds transfers; and

(12) Provide Default Service to the Customer at the request of the Customer or in accordance with the Company's tariff.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

3C. Competitive Supplier

1. The Competitive Supplier shall be responsible for providing all requirements Generation Service to meet each of its Customer's needs and to deliver the associated capacity and energy to a point or points on NEPOOL PTF Facilities.

2. Each Competitive Supplier must meet the registration requirements established by law or regulation, and either be a member of NEPOOL subject to an Own-Load Calculation or have an agreement in place with a NEPOOL member whereby the NEPOOL member agrees to make the load to be served by the Competitive Supplier subject to its Own-Load Calculation.

Competitive Suppliers providing Generation Services to Customers will be responsible for ancillary services and any and all losses, which shall include all distribution and transmission losses to the Customer Delivery Point and may also include losses on facilities linking generation to NEPOOL PTF Facilities. Competitive Suppliers shall also be responsible for all transmission wheeling charges necessary to reach NEPOOL PTF Facilities.

3. The Competitive Supplier must provide the Company with the following minimum information electronically in the Company's predetermined format at least five (5) business days prior to the commencement or termination of service by the Competitive Supplier:

(a) The Customer's Distribution Service account number;

(b) An identification number for the Competitive Supplier, or the Competitive Supplier's NEPOOL sponsor;

(c) The Customer's billing option; and

(d) Any additional information as reasonably required by the Company.

The Company shall determine whether each Customer's electronic enrollment request as provided by a Competitive Supplier is complete and accurate, and matches the Customer's account record. In the event that the enrollment request

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

is incomplete, inaccurate, or does not match the Customer's account record, then the Company will electronically notify the Competitive Supplier so that the Competitive Supplier can resolve any discrepancies.

4. A request by the Competitive Supplier to the Company that contains the Customer's account number and the type of Customer authorization obtained in accordance with MDPU regulations will be deemed to be confirmation that the Customer has consented to the enrollment or switch. The Competitive Supplier assumes all responsibility for Customer enrollment documentation required by applicable laws or regulations. The Competitive Supplier shall maintain verification of Customer enrollment. In the event of oral Customer enrollment, the Competitive Supplier shall obtain third-party verification of such enrollment.

5. Changes in Generation Service normally will be made to coincide with the Customer's normal cycle meter read dates. Enrollment forms must be transmitted no less than five (5) or more business days prior to the proposed change in Generation Service. A Supplier transmitting an enrollment form will be charged an administrative fee for each enrollment form that is transmitted . The Company will not impose a fee when a Customer moves from Standard Offer Service to Generation Service.

If the Competitive Supplier informs the Company of any desired change in Generation Service five (5) or more business days prior to the scheduled meter read date on which the change is to become effective, there will be no additional charge for reading the meter. If the Distribution Company offers the option of an off-cycle change in order to accommodate the change in Generation Service, there may be an additional charge.

Appendix A of these Terms and Conditions specifies the applicable fee that will be charged.

6. The Competitive Supplier is responsible for completing all transactions with the Company electronically.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

4. Service Standards

4A. Distribution Service Interruption

1. Planned Outages

In the event that the loading of the distribution system, or a portion thereof, must be reduced for safe and reliable operation, such reduction in loading shall be performed in accordance with good utility practice.

2. Unplanned Outages

In the event of unplanned outages, service will be restored in accordance with good utility practice. When appropriate, service restoration shall be accomplished in accordance with the Company System Storm Emergency Plan on file with the MDPU.

3. Disconnection of Service

Should a Customer fail to pay the full amount due to the Company for Distribution Service, Default Service or Standard Offer Service, the Company may disconnect the Customer pursuant to the applicable disconnection procedures. The Company shall provide electronic notice of disconnection to the Customer's Competitive Supplier. The Company shall not be liable for any revenue loss or losses to the Competitive Supplier as a result of any disconnection of any Customer.

The Competitive Supplier may discontinue Generation Service in conformance with the specific Customer/Competitive Supplier contract. Competitive Suppliers shall provide the Company with electronic notice of intent to discontinue Generation Service five (5) or more business days prior to the Customer's scheduled meter read. Generation Service by the Competitive Supplier shall terminate upon said scheduled meter read. Customers not physically disconnected from the local distribution system by the Company who do not choose a new Supplier will become Default Service Customers of the Company.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

4B. Authorization to Release Customer Information

Authorization to release Customer information shall be as provided in the Standards of Conduct, 220 CMR 12.03. The historic billing information will be limited to billing information that the Company has readily available on-line. The Company may charge a fee to any recipient for the release of this or any other information (see Appendix A).

4C. Metering

The Company shall meter each Customer in accordance with tariff provisions. Should a change in metering be required at a Customer location for the Competitive Supplier's billing or the determination of the Competitive Supplier's Own-Load-Calculation, the Company shall select, provide, install, test and maintain the required metering. The Customer or the Competitive Supplier shall bear the cost of providing and installing the meter and/or related communications equipment. Upon installation, the meter shall become the property of the Company and will be maintained by the Company. The Company shall complete installation of the meter, if reasonably possible, within 30 days of receiving a written request to do so. .

5. Billings

The Company shall provide complete billing and customer services for Customers who receive Standard Offer or Default Service. The Company offers either Standard Complete Billing or Optional Pass Through Billing and may, at its option, also offer Optional Customer Services, described below, to Competitive Suppliers for their customers.

Information exchange, problem resolution and revenue liability issues may require that a service contract exist between a Competitive Supplier and the Company before these services start.

5A. Standard Complete Billing Service

Unless a Customer otherwise chooses, the Customer shall receive a single bill from the Company for both Generation Service and Distribution Service.

The Company shall schedule meter reads on a monthly or bimonthly cycle. The Company shall use the rates supplied by the Competitive Supplier to calculate the

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

Competitive Supplier's portion of a Customer's bill, and integrate this billing with its own billing in a single mailing to the Customer. The Company shall provide an electronic file for the Competitive Supplier that will, in addition to the usage being billed, contain the calculated Competitive Supplier billing amounts for the current bill cycle. The Company shall provide this billing service for the fee identified in Appendix A, The Competitive Supplier shall adhere to the customer classes and rate pricing structure as specified in the current Distribution Service tariffs on file with and approved by the MDPU. If a Competitive Supplier requests different customer classes or rate structures, the Company shall consider accommodating changes to the billing system at the Competitive Supplier's expense. The costs of making the designated changes shall be quoted by the Company to the Competitive Supplier prior to the start of programming.

If a Customer pays the Company less than the full amount billed, the Company shall apply the payment first to Distribution Service and, if any payment is left over, to Generation Service.

Upon receipt of Customer payments, the Company shall provide a file for the Competitive Supplier summarizing all revenue from Competitive Supplier sales which have been received and recorded that day.

Existing Company service fees, such as interest charges for unpaid balances and bad checks charges, shall remain in effect and shall be assessed, as applicable, according to the Company's Terms and Conditions for Distribution Service, Standard Offer Service, and Default Service, applicable to all Customers.

5B. Optional Pass Through Billing Service

If the Customer elects to receive a separate bill for Generation Service from a Supplier, the Company shall issue a bill for Distribution Service only. The Competitive Supplier shall be responsible for separately billing Customers for the cost of Generation Service provided by the Competitive Supplier and for the collection of amounts due to the Competitive Supplier from the Customer.

The Company shall schedule meter reads on a monthly or bimonthly cycle. The Company shall make available to the Competitive Supplier an electronic file containing the applicable billing determinants for each Customer. The Company may provide this billing service for the fee identified in Appendix A.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

5C. Optional Customer Services

Upon agreement with a Competitive Supplier, the Company may offer customer services to that Competitive Supplier at an agreed upon price.

6. Definition of Standard Units of Service

6A. Billing Demand

Units of billing demand if applicable shall be as defined in the Company's applicable tariff on file with the MDPU.

6B. On-Peak / Off-Peak Period Definitions

The on-peak and off-peak periods shall be as defined in the Company's applicable tariff on file with the MDPU.

Competitive Suppliers may define on-peak and off-peak periods differently from the Company's; however, they will be required to make special metering arrangements with the Company to reflect different on-peak and off-peak definitions. Any costs incurred to provide the special metering arrangements shall be paid by the Competitive Supplier.

7. Determination of Hourly Loads

7A. For each Competitive Supplier, hourly loads for each day shall be estimated or telemetered and reported daily to the ISO for inclusion in the Competitive Supplier's Own-Load Calculation . Hourly load estimates for non-telemetered customers will be based upon load profiles or data developed for each customer class or Customer of the Company. The total hourly loads will be determined in accordance with the appropriate hourly load for the Company.

7B. The Company shall normally report previous days' hourly loads to the ISO by a specified time. This is the load which the Competitive Supplier shall be obligated to include in its Own-Load Calculation. The ISO shall add these loads to the Competitive Supplier's other loads.

7C. The process of Supplier load estimation involves statistical samples and estimating error. Competitive Suppliers shall be responsible for all estimating error and the Company shall not be liable to Competitive Suppliers for any costs including, without

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

limitation, cost of power supply or penalties that may be assessed by NEPOOL or the ISO that are associated with deficiencies in estimating error.

7D. To refine the estimates of the Competitive Suppliers' monthly KWH that result from the estimated hourly loads, a monthly calculation shall be performed to incorporate the most recent customer usage information, which is available after the monthly meter readings are processed. This step will lag the daily estimation process by at least a month.

To the extent that errors are identified by the Company through the monthly reconciliation process, through discovery of metering errors or through any other means, the Company will quantify and communicate these errors to NEPOOL for adjustment of Supplier settlement results in accordance with NEPOOL rules. The Company will not be otherwise responsible for making such adjustments, nor shall the Company be responsible for reimbursing Suppliers. NEPOOL settlement rules and procedures, including the applicability of any time limitations, shall be the exclusive means available to Suppliers for obtaining settlement adjustments and reimbursements arising out of any errors in Suppliers' estimated loads.

7E. The hourly loads referenced in sections 7A and 7B shall be determined consistent with the following steps:

(1) The Company shall identify or develop a load profile for each customer class or each Customer for use in each days' determination of hourly load.

(2) The Company shall calculate a usage factor for each Customer that reflects its relative usage level.

(3) The Company shall develop estimates of hourly load profiles for the previous days for each Competitive Supplier such that the sum of the Competitive Supplier loads equals the hourly metered Company loads collected each day. Distribution losses, which are included in the hourly metered Company loads, shall be fully allocated into Competitive Supplier loads.

(4) Transmission losses shall be approximated and added to the Competitive Supplier's hourly loads.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

8. Liability and Indemnification

The Company shall not be liable for any direct, special, indirect, or consequential damages whatsoever under any theory of law that is now or may in the future be in effect, including without limitation: contract, tort, G.L. c. 93A, strict liability, or negligence, caused by interruption, abnormal voltage, discontinuance or reversal of energy delivered, circumstances beyond the Company's immediate control, including but not limited to acts of God, accidents, labor difficulties, actions of transmission service provider(s), Competitive Suppliers, federal, state, or municipal authorities, the failure to receive electricity from any Competitive Supplier(s), implementation of an emergency load reduction program, or the inability for any other reason to maintain uninterrupted and continuous deliveries. The Competitive Supplier shall indemnify and save harmless the Company from and against any and all claims, expenses, legal fees, losses, suits, awards, or judgments for injuries to or deaths of persons or damage of any kind whether to property or otherwise, arising directly or indirectly by reason on the Competitive Supplier's performance of any of its duties and obligations as set forth in these Terms and Conditions.

M.D.P.U. No.
Sheet 12
Canceling M.D.P.U.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

TABLE OF APPENDICES

Appendix A: Administrative Fees

M.D.P.U. No.
Sheet 13
Canceling M.D.P.U.

DRAFT - ELECTRIC UTILITIES OF MASSACHUSETTS

TERMS AND CONDITIONS

Appendix A: Fees

**PART 3 OF 3**

# BLACKSTONE VALLEY ELECTRIC COMPANY

# NEWPORT ELECTRIC CORPORATION

# TERMS AND CONDITIONS FOR ELECTRIC POWER SUPPLIERS

May 29, 1997

# BLACKSTONE VALLEY ELECTRIC COMPANY

# NEWPORT ELECTRIC CORPORATION

# TERMS AND CONDITIONS FOR ELECTRIC POWER SUPPLIERS

## 1. Applicability

1.1 The following Terms and Conditions for Electric Power Suppliers shall apply to every registered electric power Supplier doing business as such, or authorized to do so, within the State of Rhode Island and Providence Plantations, and to every customer doing business with said Suppliers.

1.2 These Terms & Conditions may be revised, amended, supplemented or supplanted in whole or in part from time to time according to the procedures provided in RIPUC and RIDPUC regulations and Rhode Island law. In case of conflict between these Terms & Conditions and any orders or regulations of the RIPUC or RIDPUC, said orders or regulations shall govern.

1.3 No agent or employee of the Company is authorized to orally modify any provision contained in these Terms & Conditions or to bind the Company to any promise or representation contrary thereto. Any such modification to these Terms & Conditions or any such promise contrary thereto shall be in writing, duly executed by an authorized officer of the Company, and subject in all cases to applicable statutes and to the orders and regulations of the RIPUC and RIDPUC.

## 2. Definitions

"Aggregator" shall mean a person or persons who are authorized by Customers to arrange for supply of electricity on the Customer's behalf.

"Customer" shall mean all persons, partnerships, corporations, or others taking electric service at a single point of delivery or meter location that are Customers of Record for the Company.

"Customer Delivery Point" shall mean the terminus of the Company's incoming service conductors located on the Customer's premises.

"Distribution Company" or "Company" shall mean Blackstone Valley Electric (BVE) or Newport Electric Corporation (NEC).

"Montaup" shall mean Montaup Electric Company.

"NEPOOL" shall mean New England Power Pool and its successors.

"NEPOOL PTF Facilities" shall mean pool transmission facilities noted 69kV or above owned by NEPOOL Participants and required to allow energy from significant power sources to move freely on the New England Transmission Network.

"Own-Load-Dispatch" shall mean the determination of the output level required of a NEPOOL Participant's generating entitlements in order to meet that Participant's stand-alone energy needs in the most economical manner.

"RIDPUC" shall mean the Rhode Island Division of Public Utilities and Carriers.

"RIPUC" shall mean the Rhode Island Public Utilities Commission.

"Supplier" shall mean an electric power supplier registered with the RIDPUC.

"Terms & Conditions" shall mean these Terms and Conditions for Electric Power Suppliers.

"Transmission Delivery Point" shall mean a location on Montaup's transmission system where the Supplier delivers capacity and energy for a Customer, or a location where Montaup's transmission system and the Company's distribution system interconnect.

## 3. Obligations of Parties

### *3.1 Customer*

A Customer will select one Supplier at any given time, or authorize an Aggregator (hereinafter, Supplier) to make the selection for them if aggregation becomes an available opportunity. Customers must provide the selected Supplier with their applicable Company account number(s).

### *3.2 Distribution Company*

The Company is responsible for providing local distribution services from the Transmission Delivery Point(s) to the Customer Delivery Point(s).

The Company will:

- arrange for or provide network transmission service on behalf of each Supplier to each Transmission Delivery Point;
- deliver power over distribution facilities to each Customer Delivery Point;
- provide customer service and support;
- respond to service interruptions or power quality problems;
- handle connections and terminations;
- read meters;

- submit bills to Customers for distribution services and, unless the Customer chooses separate bills, for generation services;
- address billing inquiries for the retail delivery services bill portion and, if contracted by Supplier, the generation services portion;
- answer general questions about retail delivery service; and
- report Suppliers' loads, including losses to NEPOOL.
- The Company will also provide last resort power supply for Customers that are not on standard offer service and do not have a Supplier.

### *3.3 Supplier*

The Supplier shall be responsible for providing firm, all-requirements service to meet Customers' needs and to deliver the associated capacity and energy to a point or points on Montaup's transmission system, as well as provide any and all necessary installed and operating reserves required to serve each Customer's load.

Each Supplier must meet the registration requirements established by law, be a member of NEPOOL and have an Own-Load Dispatch established within the NEPOOL billing system[1] or have an agreement in place with a NEPOOL member whereby the NEPOOL member agrees to include the load to be served by the Supplier in its Own-Load Dispatch.

Suppliers providing generation service to Customers from outside of NEPOOL will be responsible for any and all losses incurred on other transmission systems, which may also include losses on facilities linking generation to NEPOOL PTF Facilities.

---

[1]Membership in NEPOOL is open to any person or organization engaged in the electric utility business (the generation and/or transmission and/or distribution of electricity for consumption by the public, or the purchase, as principal or broker, of electric energy and/or capacity for resale at wholesale), whether in the United States of America or Canada or a state or province or a political subdivision thereof or a duly established agency of any of them, a private corporation, a partnership, an individual, an electric cooperative or any other person or organization recognized in law as capable of owning property and contracting with respect thereto. No person or organization shall be deemed to be eligible for membership if the generation, transmission, or distribution of electricity by such person or organization is primarily conducted to provide electricity for consumption by such person or organization or an affiliated person or organization.

The Supplier must provide the Company with information electronically, in the Company's predetermined format, at least five (5) work days prior to the commencement or termination of service by the Supplier. The following items are representative of the type of data required:

- The Customer's account number(s);
- The identification number of the Supplier, or the Supplier's NEPOOL sponsor;
- Customer billing option, and;
- The start or stop date of service (The Company can pro-rate the Customer's usage based on normal cycle readings).

The Supplier will send this data using FTP (File Transfer Protocol ) via the Internet to a predetermined area on the Company's server.

Suppliers will be charged an administration fee specified in Appendix A, Section 1, *Administration Fees*, for every transaction.

Suppliers requesting the enrollment of a new customer, or a customer that is switching to them, will be presumed to have obtained the authorization of the customer by an approved method. A request by the supplier, to the Company, that contains the Customer's account number will be deemed as confirmation that the customer has consented to the enrollment or switch.

## 4. Service Standards

### *4.1 Distribution Service Interruption*

The Company shall provide retail delivery service to each Customer. In the event that the loading of the distribution system, or portion thereof, must be reduced for safe and reliable operation, such reduction will be made in accordance with standard business practices and in compliance with NEPOOL directives.

In the event of unplanned outages, service will be restored in accordance with standard business practices. When appropriate, service restoration will be done in accordance with the *EUA System Storm Emergency Plan* on file with the Rhode Island Public Utilities Commission and the Rhode Island Division of Public Utilities and Carriers.

The discontinuance of electric service to Customers is solely controlled by the Company in accordance with the Company's *Terms and Conditions for Electric Service* and the billing and termination regulations of the RIPUC and the RIDPUC.

### *4.2 Authorization to Release Customer Information*

Customer authorization is required for the release of any of the Company's Customer specific data, including, but not limited to, Customer name, address, account number(s), load and usage data. The Company shall provide this information to the Customer or the Supplier, as requested by the Customer."

### *4.3 Metering*

The Company shall meter each Customer. Should a change in metering be required at a Customer location for the Supplier's billing or the determination of the Supplier's Own-Load-Dispatch, the Company will provide, install, test and maintain the required metering. The Supplier shall bear the cost of providing and installing the meter. Upon installation, the meter shall become the property of the Company and will be maintained by the Company. The Company will complete installation of the meter, if it is available, within 30 days of receiving a written request from the Supplier. The Company shall bill the Supplier upon installation.

## 5. Billings

The Company will provide complete billing and customer services for Customers who receive the standard offer or last resort power supply. The Company offers either Standard Complete Billing or Standard Passthru Billing and also Optional Customer Services, described below, to competitive Suppliers for their Customers.

The Customer will have the right to choose separate bills. The cost of the customer selection of separate bills will be borne by the Customer or the Supplier.

The Company will put all of the electronic files needed by the Suppliers on an in-house file server. Once there, the Supplier can retrieve the files at their convenience, using FTP (File Transfer Protocol) via the internet. Security measures will be implemented to allow each Supplier permission to only retrieve their data.

Information exchange, problem resolution and revenue liability issues require that a service contract exist between a Supplier and the Company before these services start. Since each of these service contracts will be different, they should be developed on a company by company basis.

### *5.1 Standard Passthru Billing Service*

The Customer elects the option to receive a separate bill for generation from the Supplier. The Company will issue a bill for retail delivery service to each Customer. The Supplier will be responsible for billing Customers for the cost of generation service provided by the Supplier and for the collection of amounts due to the Supplier from the Customer.

The Company schedules meters to be read on a monthly cycle. The Company will provide for the Supplier, an electronic file containing the applicable billing determinants for each customer.

### *5.2 Standard Complete Billing Service*

This is the default billing service.

#### *5.2.1 Billing Service*

The Company schedules meters to be read on a monthly cycle. The Company will use the Supplier's rates to calculate the Supplier portion of Customer bills, and integrate this billing with its own billing in a single mailing to the Customer. The Company will provide an electronic file for the Supplier that will, in addition to the usage being billed, contain the calculated billing amounts for the current bill cycle.

The Company offers this billing service for set fees, identified in Appendix A, Section 2, "*Charges for Service*," provided the Supplier adheres to the customer classes and rate pricing structure as specified in the current retail delivery tariffs on file with the RIPUC.

If a Supplier requests different customer classes or rate structures, the Company will consider accommodating changes to the billing system at the Supplier's expense. The costs of making the designated changes will be quoted by the Company to the Supplier prior to the start of programming.

Upon receipt of Customer payments, the Company will provide a file for the Supplier summarizing all revenue from Supplier sales which have been received and recorded that day. Payments to a Supplier will be made in a lump sum for all Customer revenue due the Supplier for a given day. These lump sum Supplier payments will be made via an Automated Clearing House (ACH) credit to a predetermined Supplier bank account. The electronic file containing detail records supporting this transaction will be available to Suppliers. This money transfer will take place on the 2nd day following the payment receipt, when the money has become available to the Company.

Existing Company service fees, such as interest charges for unpaid balances, returned check charges, etc., shall remain in effect and shall be assessed, as applicable, according to the Company's *Terms and Conditions for Electric Service*, applicable to all Customers. The cash posting sequence for Customer payments is detailed in Appendix B, *"Company Cash Posting Sequence"*.

#### *5.2.2 Optional Customer Services*

The Company will offer optional Customer Services to Suppliers who elect the complete billing service.

These services include, but are not limited to, providing customer service representatives to answer phone calls from a Supplier's Customers. The Company can provide a Supplier contracting for optional customer service with a unique toll free phone number which would be printed on the Supplier portion of the Customer's bill. Telephone calls can be answered using the appropriate Supplier's name and operators can respond to a wide variety of call types.

Pricing for this optional service will be customized to the Supplier's needs, and is dependent on several factors such as the specific customer services required by the Supplier, the volume of Customer calls, requested coverage hours and/or the specific number of customer service representatives requested.

## 6. Generation Requirements

### *6.1 Delivery Points*

The Supplier shall be obligated to deliver the capacity and energy used by the Customer plus losses to a Transmission Delivery Point. The Supplier shall be obligated to arrange for and pay all costs associated with delivery of its capacity and energy to the Transmission Delivery Point(s).

Montaup will transmit the power received at the Transmission Delivery Point to the Company and deliver it to the interconnection point(s) between Montaup's system and the Company's system. This service will be provided by Montaup.

The Company will provide local distribution service to deliver the power from the interconnection point to the Customer Delivery Point.

### *6.2 Back-up Supply*

Since the load for each Customer will be included in the Supplier's Own-Load Dispatch at NEPOOL, the Supplier will be responsible for obtaining any back-up supply that it may need. This supply can be obtained from other supply sources or through service offered by NEPOOL to cover energy and/or capacity deficiencies.

### *6.3 Losses*

The Supplier shall be responsible for supplying all transmission and distribution system losses required to meet the load requirements of each Customer. To compensate for system losses, the Company requires a Supplier to provide an excess quantity of electricity and associated ancillary services. The percentages above the quantities actually delivered to said Supplier's retail Customer in each hour of the billing period shall be determined in the estimation of the suppliers hourly loads as specified in Section 7 *"Determination of Hourly Loads"*.

### *6.4 Own-load Dispatch*

The Supplier, or host NEPOOL member, shall be required to include the load for each Customer it serves, including losses, in its Own-Load Dispatch.

Each day the Company shall normally report the previous day's adjusted hourly loads for each Supplier to NEPOOL. This is the load which the Supplier will be obligated to include in its Own-Load Dispatch at NEPOOL and is the amount it was required to have delivered to the Transmission Delivery Point(s).

# 7. Determination of Hourly Loads

## 7.1 Overview

On a daily basis the Company will determine and report each Supplier's previous day hourly loads to NEPOOL for inclusion in the Supplier's Own-Load Dispatch. NEPOOL determines if a Supplier is a net buyer or seller from these hourly load profiles.

The Supplier's hourly loads will be based on individual Customers' loads and on load profiles for each Company rate class which are developed from rate class populations and statistically designed samples using ratio estimation methodology that meet the RIPUC sampling criteria for load research.

On a monthly basis the estimates of each Supplier's energy are updated to calendar month values for: Customers' metered energy, rate class load profiles, and, where available, customer load profiles. The difference between the monthly sum of the daily Supplier's energy estimates and the monthly energy estimates for each Supplier is reported to NEPOOL. Also, each Supplier's non-coincident peak demand is reported to NEPOOL monthly.

## 7.2 Daily Estimation of Suppliers' Own Load Dispatch

In the daily estimation process, each Supplier's hourly loads will be determined by weighting the Company's statistically developed historical generator-level (inclusive of losses) load profiles for each rate class and summing by Supplier the weighted rate class hourly loads and, where available, individual Customer load profiles. The sum of all the Suppliers' hourly load profiles shall equal the Company's load profile of the previous day.

### 7.2.1 Company Hourly Load Profile for Previous Day

The previous day Company hourly loads are known from hourly interval data collected daily at the point of delivery between transmission and distribution.

### 7.2.2 Historical Day

The Company will identify the proxy date from historical Company load shapes which best fits the Company's previous day's characteristics such as day type, load, load shape, and weather. The criteria used to select the best proxy day minimizes the statistical distance between the Company's previous day and the proxy Company day. Rate class hourly loads and, when necessary, Customer's hourly loads for the selected proxy date are then used as the primary inputs for the determination of the daily Supplier hourly load profiles.

### 7.2.3 Customer Energy Usage Ratio for Weighting Factor

An Energy Usage Ratio will be calculated for each Customer from their current metered energy. Each Customer is identified by Supplier and rate class to calculate the Supplier's percentage weight of each rate class , which is equal to the sum of the individual Customers' Energy Usage

Ratios by Supplier and rate class, divided by the sum of the individual Customers' Energy Usage Ratios by the rate class. The Supplier's weighting factor for each rate class accounts for the proportion of the Supplier's Customers' loads within a rate class relative to the total rate class.

#### *7.2.4 Determine Daily Supplier Load Profile*

Each Supplier's hourly loads are determined by multiplying the rate class load profiles (7.2.2) for each hour by a corresponding Supplier's rate class weighting factor (7.2.3) and then summing the weighted rate class hourly loads, and, where available , individual Customer loads for each Supplier inclusive of losses. The sum of all the Suppliers' load profiles shall equal the Company's hourly metered loads for the previous day. The Company will report each Supplier's previous day hourly loads to NEPOOL for inclusion in the Supplier's Own-Load Dispatch.

### *7.3 Monthly Supplier kWh Reconciliation*

After all actual hourly load data is collected for the calendar month, approximately 45 days after the month end. The Suppliers' energy estimates will be recalculated to calendar month values for: Customers' metered energy, hourly generator-level rate class load profiles and, where available, individual Customers' load profiles.

#### *7.3.1 Customer Energy Usage Ratio for Weighting Factor*

A current Energy Usage Ratio will be calculated for each Customer from the metered energy used in the calendar month. Each Customer is identified by Supplier and rate class to calculate the Supplier's percentage weight of each rate class, which is equal to the sum of the individual Customers' Current Energy Usage Ratios by Supplier and rate class, divided by the sum of the individual Customers' Current Energy Usage Ratios by the rate class. The Supplier's weighting factor for each rate class accounts for the proportion of the Supplier's Customers' loads within a rate class relative to the total rate class.

#### *7.3.2 Determine Calendar Month Supplier Hourly Load Profiles*

The Supplier estimated hourly loads are recalculated using the updated Supplier's weighting factor for each rate class (7.3.1), which are applied to actual hourly loads collected for the calendar month, by day. Each Supplier's hourly profiles are summed over the days to yield the Supplier's total calendar month hourly load profile inclusive of losses. The sum of all the Supplier's load profiles shall equal the Company's hourly loads for the actual calendar month. The resulting total monthly energy estimate for each Supplier is then compared to the monthly sum of the daily energy estimates (7.2.4), to calculate the energy adjustment for each Supplier.

### *7.4 NEPOOL Reporting*

Based on NEPOOL daily and monthly reporting requirements , the Company will report each Supplier's previous day hourly loads (7.2.4) to NEPOOL for inclusion in the Supplier's Own-Load Dispatch. Monthly energy adjustments (7.3.2) will be provided to NEPOOL to determine the adjustments to the Supplier payments that had been calculated daily. In addition, the Company will provide each Supplier's non-coincident hourly demand for the previous month. The Company will calculate this peak hourly demand for each Supplier from the Supplier's monthly load profile (7.3.2).

## 8. Liability and Indemnification

The Company shall not be liable for any direct, special, indirect or consequential damages whatsoever under any theory of Law that is now or may in the future be in effect, including without limitation: act of God, contract, tort, strict liability or negligence, caused by interruption, abnormal voltage, discontinuance or reversal of energy delivered, circumstances beyond its immediate control, including but not limited to accidents, labor difficulties, actions of transmission services provider(s), Suppliers, public authorities, the failure to receive electricity from any Supplier(s), implementation of an emergency load reduction program, or the inability for any other reason to maintain uninterrupted and continuous deliveries.

# APPENDIX A

***1. Administration Fees $TBD***

***2 Charges for Service***

The following standard and optional monthly charges will apply to Suppliers:

**A. Charges for Billing of Supplier Use:**

| Rate Class | Billing Fee (per Account Record, per Month) (See Notes) |
|---|---|
| R-1, R-2, R-3, W-1, S-1, Non-Metered | $TBD |
| R-4 | $TBD |
| G-1, H-1, H-2 | $TBD |
| G-2 | $TBD |
| T-2, T4, T5, T6, G-5 | $TBD |

**Notes:**

1) These fees will be charged to all Suppliers who elect the Standard Complete Billing Service. All costs above are per Customer account per month.

2) Any Supplier choosing the Standard Complete Billing Service will receive a monthly minimum charge.

# APPENDIX B

## *Company Cash Posting Sequence*

For those Suppliers electing the Standard Complete Billing Service, the following Account cash posting sequence will be in effect upon receipt of Customer payments:

**A. Cash Posting:**

1) Electric Arrears, 90 days and Greater
2) Other Arrears, 90 Days and Greater
3) Electric Arrears, 60 Days
4) Other Arrears, 60 Days
5) Electric Arrears, 30 Days
6) Other Arrears, 30 Days
7) Net Current Balance
8) Miscellaneous Arrears
9) Miscellaneous Current
10) Charge Off Transfer Balance

**Note:** Following the Cash Posting sequence as outlined above, remaining dollars will be credited to the Supplier as follows:

**B. Supplier Cash Posting:**

1) Arrears, 90 Days and Greater
2) Arrears, 60 Days
3) Arrears, 30 Days
4) Net Current Balance

**Note:** Following the Supplier Cash Posting sequence as outlined above, any remaining dollars, i.e., credit balance will be held and applied to the Company Net Current Balance.

onfidential

---

[1]Membership in NEPOOL is open to any person or organization engaged in the electric utility business (the generation and/or transmission and/or distribution of electricity for consumption by the public, or the purchase, as principal or broker, of electric energy and/or capacity for resale at wholesale), whether in the United States of America or Canada or a state or province or a political subdivision thereof or a duly established agency of any of them, a private corporation, a partnership, an individual, an electric cooperative or any other person or organization recognized in law as capable of owning property and contracting with respect thereto. No person or organization shall be deemed to be eligible for membership if the generation, transmission, or distribution of electricity by such person or organization is primarily conducted to provide electricity for consumption by such person or organization or an affiliated person or organization.

# APPENDIX C
# FUEL INDEX

**Fuel Index**

Company has incorporated a Customer Rate Fuel Adjustment mechanism in the Standard Offer terms of service which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil ( 1% sulfur) and natural gas after 1999. Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to Company in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels. Company's Customer Rate Fuel Adjustment is calculated as follows:

The Customer Rate in effect for a given month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the Fuel Trigger Point" then in effect, where:

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction is, if not defined elsewhere, the following predetermined flat rate for energy consumed:

| Calendar Year | Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | 3.2 cents |
| 1999 | 3.1 cents | 3.5 cents |
| 2002 | 3.4 cents | 3.8 cents |
| 2001 | 3.8 cents | 3.8 cents |
| 2002 | 4.2 cents | 4.2 cents |
| 2003 | 4.7 cents | 4.7 cents |
| 2004 | 5.1 cents | 5.1 cents |
| 2005 | N/A | 5.5 cents |
| 2006 | N/A | 5.9 cents |
| 2007 | N/A | 6.3 cents |
| 2008 | N/A | 6.7 cents |
| 2009 | N/A | 7.1 cents |

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

> Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No.6 oil into New York harbor, as reported in "Platt's Oilgram U.S. Markets can" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, Company shall file alternate indices with the proper regulatory agencies.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 | ? |
| 2006 | ? |
| 2007 | ? |
| 2008 | ? |
| 2009 | ? |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined according to the following formula:

Fuel = (Market Gas Price + $0.60/MMBtu) + ( Market Oil Price + 0.04/MMBtu)

Adjustment Fuel Trigger Point + $0.60 + $0.04/MMBtu

where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate paid to the retail company is increased by this Fuel Adjustment factor for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

Privileged and Confidential
Draft

# APPENDIX 4
# CALCULATION OF BID DEPOSIT AMOUNTS
# AND
# FORM OF BID DEPOSIT DOCUMENTS

Bidders will be required to submit a lump-sum bid deposit, which, along with the face amount of the bidder's performance bond commitment letter, will establish the bidder's maximum eligibility to participate in the auction. Bidders will have flexibility, subject to their maximum eligibility and the deposit calculation procedures set out below, to bid in the auction.

Bidders who intend to bid in the full-term auction should submit a bid deposit amount of $185,000 for each percentage share of the Companies' aggregated standard offer load that they intend to bid on. A bidder who submits a bid deposit of $18.5 million ($185,000 x 100 percent) will be eligible to submit bids for 100 percent of the Companies' standard offer load (assuming they demonstrate the ability to produce a performance bond to secure their performance for the entire load). No Qualified Bidder will be required to submit a bid deposit in excess of $18.5 million.

Annual Bid Deposit Amounts, $/%

| | |
|---|---|
| 1998 | $45,000 |
| 1999 | $39,000 |
| 2000 | $33,000 |
| 2001 | $27,000 |
| 2002 | $20,000 |
| 2003 | $14,000 |
| 2004 | $7,000 |
| | $185,000 |

Bidders who intend to bid only in the single-year auction should multiply the annual deposit amounts in the table above by the percentage shares they intend to bid in each year to arrive at a lump sum bid deposit amount. For example, a bidder intending to bid on ten percent shares in years 1, 2, and 7 would submit a bid deposit amount of $910,000.

10% year 1 (10 x $45,000 = $450,000)
10% year 2 (10 x $39,000 = $390,000)
10% year 7 (10 x $7,000 = $70,000)
$910,000

During the first round of the full-term auction, bids will be accepted only up to the limits of a bidder's eligibility. In each of the first four rounds of the single-year auction, each bidder's bid deposit amount will be decremented by the appropriate amount for each percentage share for which a bid is submitted in each year. Bids will be accepted only up

Privileged and Confidential
Draft

to the limits of the bidder's eligibility. If a bidder's entire eligibility is used up prior to the completion of the fourth round of the single-year auction, any subsequent bids for additional shares submitted by that bidder will be rejected.

Q:\StdOffer\RFQ.doc 28 2:58 pm 8/29/97

Confidential NEC087297

Privileged and Confidential
Draft
Form of Bid Deposit Letter of Credit

Irrevocable Standby Letter of Credit Date: ( )

BENEFICIARY Credit Number: ( )

(The EUA Company and address)
x
x
x
x

Gentlemen:

BY ORDER OF:
(Bidder name and address)

or (Guarantor name and address)

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of (the Bidder)[(the Guarantor) on behalf of (the Bidder)]for a sum or sums not exceeding a total of US DOLLARS $xx,xxx.xx(written dollar amount AND xx/100 U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES effective(date)and expiring on(date).

Draft(s) must be accompanied by:

1. Your written letter requesting payment under this Letter of Credit signed by a representative of(the EUA Company name)("the EUA Company short name"). Such letter from (the EUA Company short name) shall include a statement indicating (the Bidder/ Guarantor)has forfeited their Bid Deposit due to their failure to execute the Standard Offer Service Requirements Agreement and/or deliver the required financial surety in connection with said Agreement.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. ( ) dated ( ) of the (Bank)."

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before **(FILL IN EXPIRATION DATE)**.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and

Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name and, attention (Bank credit operations contact), mentioning our reference number as it appears above. Telephone inquires can be made to(Bank credit operations contact).

# APPENDIX 5
# FORM OF PERFORMANCE BOND DOCUMENTS

Form of Load Responsibility Letter of Credit

Irrevocable Standby Letter of Credit Date: ( )

BENEFICIARY Credit Number: ( )

(The EUA Company and address)
x
x
x
x

Gentlemen:

BY ORDER OF:
(Bidder name and address)

or (Guarantor name and address)

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of (the Bidder) [(the Guarantor) on behalf of (the Bidder)] for a sum or sums not exceeding a total of US DOLLARS $xx,xxx.xx (written dollar amount AND xx/100 U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES effective (date) and expiring on (date).

Draft(s) must be accompanied by:

1. Your written letter requesting payment under this Letter of Credit signed by a representative of (the EUA Company name) ("the EUA Company short name"). Such letter from (the EUA Company short name) shall include a statement of the dollar amount due to (the EUA Company short name), pursuant to the obligations of (Bidder/Guarantor) as set forth in the Standard Offer Service Requirements Agreement by and between (Bidder/Guarantor) and (the EUA Company short name).

Partial drawings are permitted under this Letter of Credit.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. ( ) dated ( ) of the (Bank)."

We agree to renew this Letter of Credit automatically for a period of one (1) year from the initial expiration and each subsequent expiry date unless the beneficiary has received by registered or certified mail, return receipt requested, written notification of our intention not to renew, post marked no less than thirty (30) days prior to the expiration of any term.

If this Letter of Credit shall not be extended and the obligation of (Bidder/Guarantor) under the Standard Offer Service Requirements Agreement, as secured by this Letter of Credit, remains outstanding, and (Bidder/Guarantor) has failed to provide an amended or substitute Letter of Credit in accordance with your terms and conditions, you may draw upon us forthwith for the full amount of this Letter of Credit by means of your sight draft together with the following document:

Your signed statement certifying that (Bidder/Guarantor) has failed to provide you with a substitute Letter of Credit within fifteen (15) days from the date of your receipt of our notice not to renew.

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before (FILL IN EXPIRATION DATE), or any subsequent expiration date.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name and, attention (Bank credit operations contact), mentioning our reference number as it appears above. Telephone inquires can be made to (Bank credit operations contact).

Privileged and Confidential
Draft
Form of Load Responsibility Performance Bond

PERFORMANCE BOND NO. [ ]

KNOW ALL MEN BY THESE PRESENTS, that ( Prospective Bidder or Guarantor(s) name(s)) as Principal, and ( Surety Company name ) as Surety, are held firmly bound unto ( Company name) as Obligee in the sum of [dollars] lawful money of the United States of America, to be paid to the Obligee, for which [ performance], well and truly to be made, we bind ourselves, our respective heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has entered a written Standard Offer Service Requirements Agreement dated ( ) (the "Agreement") with the Obligee for the delivery of energy (the "Load Responsibility").

NOW THEREFORE, the condition of this obligation is such that, if the Principal shall promptly and faithfully perform delivery of the Load Responsibility pursuant to the undertakings, covenants, terms and conditions of the Agreement, then this obligation shall become null and void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to, or for the use or benefit of anyone other than the named Obligee.

Whenever the Principal shall be, and declared by the Obligee to be in default in relation to the Principal's obligations under the Agreement, the Obligee having performed Obligee's obligations thereunder, the Surety shall:

1. Pay to the Obligee such dollar amount due to the Obligee pursuant to the obligations of the Principal as set forth in the Agreement.

In witness whereof we hereunto set our hands and seals this ( ) day of ( ), A.D. 19( ).

( )
(Principal)

by: ( ) (seal)

( )
(Surety)

by: ( ) (seal)

## APPENDIX 6

### NEPOOL Membership Application Requirements

In accordance with Sections 1.18 and 3.0 of the Restated NEPOOL Agreement, membership is open to any Entity, which is defined as:

> "any person or organization in the electric power business (the generation and/or transmission and/or distribution of electricity for the consumption by the public, or the purchase, as a principal or broker, of Installed Capability, Operable Capability, Energy, Operating Reserves, and/or AGC for resale at wholesale or retail), whether the United States of America or Canada or a state or province or a political subdivision thereof or a duly established agency of any of them, a private corporation recognized in law as capable of owning property with respect thereto.
> No person or organization shall be deemed to be an Entity if the generation, transmission, or distribution of electricity by such person or organization is primarily conducted to provide electricity for consumption by such person or organization is primarily conducted to provide electricity for consumption by such person or organization or a Related Person."

To become a NEPOOL Participant, a letter requesting membership must be sent to the Secretary of the NEPOOL Management Committee with the following documents:

1. A completed NEPOOL Membership Application Questionnaire

2. An executed counterpart of the Restated NEPOOL Agreement, as amended

3. Evidence of a certified vote of the company's board of directors, or such other body or bodies as may be appropriate, duly authorizing execution and performance of the Restated NEPOOL Agreement

4. A check for $500, payable to the New England Power Pool.

Once the above documents are received, the application will be forwarded to the NEPOOL Membership Subcommittee to review conditions on memberships and to consider if any waivers of obligations are applicable. Such issues are based on the nature of the electric business that will be conducted in New England identified in the NEPOOL Membership Application Questionnaire. Also note that per Section 3.5 of the Restated NEPOOL Agreement, the NEPOOL Management Committee may prescribe that the applicant provide and maintain in effect an unconditional and irrevocable letter of credit to meet the applicant's responsibilities and obligations under the agreement to protect

other Participants against the risk of the applicant's non-payment of its obligations.

In addition to the initial application of $500, NEPOOL Members must also pay an annual fee of $500 and a monthly variable charge based on business activity. This monthly fee will be determined using an approved formula that weights load responsibility, market activity and other matters.

Once membership has been approved, NEPOOL must file with the Federal Energy Regulatory Agency (FERC). The filing is reviewed by FERC and a public notice of the filing is published. If there are no problems with the filing, FERC sends NEPOOL a letter accepting the filing within two months after its been made. Typically the process, from initial application with NEPOOL to the final approval by FERC, will take approximately six months to complete. Applicants are encouraged to submit all requested information as completely as possible in order to expedite the application process.

Attachment 1-1 NEPOOL Membership Application Questionnaire

Attachment 1-2 Executable Counterpart of the Restated NEPOOL Agreement

## NEPOOL Membership Applicant Questionnaire

I. **Applicant:** ______________________________

Applicant is (please check appropriate category):

- ___ A corporation created under the laws of ______________
- ___ A political subdivision of the US or Canada, or an agency thereof
- ___ A partnership ___ An electric cooperative
- ___ An individual
- ___ Other (please describe) ______________________

Applicant operates as (please check all categories that apply):

- ___ Vertically Integrated Utility ___ Municipal
- ___ Qualifying Facility ___ Cogenerator
- ___ Independent Power Producer ___ Exempt Wholesale Generator
- ___ Cooperative ___ Transmitter
- ___ Load Aggregator (purchases at wholesale to sell at retail)
- ___ Power Marketer (purchases and sells at wholesale)
- ___ Broker (arranges power transactions without taking title)

II. **What is the nature of your electric business in New England?**
(Please answer all of the following)

a. Do you own, operate, or hold assignable entitlements in generating capability located in New England? ________

b. Do you own, operate, or hold assignable rights to transmission facilities rated 69 kV or above located in New England? ________

c. Do you distribute electricity directly to end-users in New England, or to end-users whose loads you intend to transfer to New England? ________

d. Are you engaged, as principal or broker, in the purchase or ownership of electric energy and/or capacity for resale at wholesale? ________

e. Describe the activities you have conducted (or will conduct pending appropriate approvals) in New England? ______________________________

f. If you answered yes to a, b, or c above, is any of your generation, transmission, or distribution of electricity conducted to provide energy for your own consumption? ________

If yes, please describe the nature of your own consumption. ______________________________

g. i. Do you have a direct or indirect ownership interest in any entity engaged in the electric business or are you owned directly or indirectly by any entity engaged in the electric business? ________

ii. If yes, please identify and describe all related entities engaged in the electric business and the nature of your relationship with them.

________________________________________

________________________________________

iii. If you answered yes to a, b, or c above, is any of your generation, transmission, or distribution of electricity conducted to provide energy for consumption by any of the organizations identified in ii. above? ____

If yes, please describe the nature of such entities' consumption. ______

________________________________________

________________________________________

h. If the primary answers to a, b, c, and d above are all negative, what is your interest in becoming a member of NEPOOL? ________________

________________________________________

________________________________________

III. Who are your contact individuals?

Applicant Contact(s): ________________________

________________________

Address: ________________________

________________________

________________________

________________________

Phone(s): ________________________

________________________

Fax: ________________________

We anticipate that you may have a number of questions in considering membership in NEPOOL. To avoid any confusion or misinformation that could result from differing interpretations of questions and/or answers, please direct any questions concerning NEPOOL membership to:

E. Kenneth Nielsen
Director, NEPOOL Billing

Phone: (413) 535-4075
New England Power Pool
One Sullivan Road
Holyoke, MA 01040-2841

HARTO1-129369-1
66227-10180
May 8, 1997 10:59 am

COUNTERPART SIGNATURE PAGE
NEW ENGLAND POWER POOL AGREEMENT

The NEPOOL Agreement, being dated as of September 1, 1971, as amended.

_______________________
(Applicant)

By:_____________________
Name:
Title:
Address:

HARTO1-129303-1
66227-10120
May 8, 1997 10:59 am

RESOLUTION FOR ADOPTION BY NEPOOL APPLICANTS

CERTIFIED RESOLUTION OF THE BOARD OF DIRECTORS

The undersigned, being the Secretary of the [Company], a [State] corporation, certifies that on a meeting of the Board of Directors of the [Company] held on [Date] in accordance with the provisions of the duly-adopted by-laws of the [Company], the following resolution was adopted and the same remains in full force and effect as of the date hereof.

> RESOLVED, that the [Company] shall apply to become a Participant in the New England Power Pool under the New England Power Pool Agreement dated as of September 1, 1971, as amended, (the "Agreement") and the [officers] are severally authorized to execute a counterpart of the Agreement on behalf of the [Company] and to cause the [Company] to perform its obligations under the Agreement upon the effectiveness of its membership.

Dated: ______________

______________________________
By [Name of Secretary]
Its Secretary

HARTO1-111673-1
66227-00012
May 8, 1997 10:59 am

# EXHIBIT K

MJH

DRAFT

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION

## REQUEST FOR QUALIFICATIONS TO BID TO SUPPLY STANDARD OFFER SERVICE

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting electricity suppliers for their qualifications to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Qualifications ("RFQ") must be received at the below address no later than 4:00 PM on _________. Responses to the RFQ must adhere to the specifications herein. Interested parties must submit five (5) copies of their responses to:

Mr. Robert P. Clarke
Director, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379

Any questions concerning interpretation of the RFQ should be submitted in writing to:

Mr. Peter D. Fuller
Energy Strategy Advisor
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
pfuller@eua.com

*The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall be vested in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to continued approval by state and federal regulatory agencies of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any action or appeal, legislation, or otherwise may require the Companies to modify or withdraw their plans as described herein. The Companies expressly reserve the right to modify the schedule and any provision herein to accommodate the standard offer procurement process of one or more other utilities. Furthermore, the time table for actions described herein is subject to change by the Companies for any other reason.*

Confidential NEC077919

DRAFT

Table of Contents

I. Introduction

II. General Description

A. Standard Offer Service

B. Market Procurement for Suppliers of Standard Offer Service

III. Threshold Qualifications to Bid in Standard Offer Auction

A. Administrative Fee

B. Financial Qualifications

C. Bid Deposit

D. Performance Surety Commitment

E. NEPOOL Participation

F. State Registration

G. Proposed Changes to the Standard Offer Service Agreement

IV. Auction Process

V. Administrative Issues

A. Auction

B. Standard Offer Service

Appendix 1 Standard Offer Service Price Schedules

Appendix 2 Fuel Index

Appendix 3 Draft Standard Offer Service Agreement

Appendix 4 Calculation of Bid Deposit Amounts, Performance Surety Amounts, and Maximum Eligibility

Appendix 5 Form of Bid Deposit and Performance Surety Documents

Appendix 6 NEPOOL Membership Application Requirements

Confidential NEC077920

DRAFT

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) are jointly seeking qualified parties to participate in their planned auction of Standard Offer Service obligations. Eastern, Blackstone, and Newport (collectively, "the Companies") are affiliated companies in the Eastern Utilities Associates holding company system and are cooperating on the design and implementation of the standard offer procurement process.

During the transition to a competitive retail electricity marketplace, the Companies will be providing Standard Offer Service to their retail customers that have not yet chosen a competitive supplier. "Standard Offer Service" is defined as firm all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs[1]. Standard Offer Service is a transitional service which is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace. Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. Suppliers who successfully bid in the auction will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load requirements, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply. Suppliers' responsibilities will include, without limitation, i) installed and operable capacity sufficient to meet the Supplier's Standard Offer Service load responsibility under the Restated NEPOOL Agreement, ISO New England or successor rules; ii) operating reserves; iii) transmission arrangements and expenses not recovered in the Companies' transmission cost adjustment provisions; and iv) transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Forecasts of Standard Offer Service load are uncertain. Customers may terminate Standard Offer Service at any time to purchase from an alternative supplier and, with few exceptions, may not return to Standard Offer Service. Rather than bidding to supply given quantities of capacity or energy, Qualified Bidders will bid in the auction for percentage shares of the Standard Offer Service load. At the conclusion of the auction, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time. The Companies will provide to Suppliers certain load information on a periodic basis, such as numbers of customers taking Standard Offer Service and representative load shapes for each customer class. It will be the Supplier's responsibility to forecast its capacity and energy requirements to meet its Standard Offer

[1] Eastern's Standard Offer Service Tariff, No. M.D.P.U 340 is currently pending before the Massachusetts Department of Public Utilities. Blackstone's and Newport' tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

Service obligations.

Each Supplier will have complete responsibility for its fixed percentage share of the Companies' real-time Standard Offer Service load (minute by minute, hour by hour, day by day). Although the quantities of energy and capacity required (MWh and MW) will fluctuate with changes in customer demand resulting from factors including, but not limited to, seasonal factors, normal daily load patterns, increased usage by existing standard offer customers, demand side management activities, extremes in weather, etc., the Supplier's percentage of Standard Offer Service load will not vary within a calendar year.

This document provides Prospective Bidders with an overview of the qualification and auction processes, as well as the specific information necessary for a Prospective Bidder to be qualified by the Companies to participate in the auction. Section II presents a general description and approximate schedule for the implementation of the qualification and auction processes. Section III spells out the specific content and form requirements of qualification submittals. Prospective Bidders must satisfy certain financial criteria and must be recognized by the appropriate regulatory agencies to be considered Qualified Bidders. Section IV presents the design of the auction. Section V presents logistical details of the auction process and the Companies' proposed methods for administering their Standard Offer Service Agreements with Suppliers.

Several appendices are attached, including the wholesale and retail price schedules for Standard Offer Service (Appendix 1), a Fuel Index which will produce additional revenues to Suppliers in the event of high oil and gas prices after 1999 (Appendix 2), and a draft Standard Offer Service Agreement (Appendix 3). Appendix 4 presents the Companies' methodology for calculating bid deposit amounts, performance surety amounts, and Qualified Bidders' eligibility to bid in the auction. Appendix 5 presents acceptable forms of bid deposit and performance surety documents. Appendix 6 contains information regarding NEPOOL membership.

DRAFT

## II. General Description

### A. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. The Companies have agreed to solicit the competitive market for Suppliers of this service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and re-sell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs. To the extent that the auction of Standard Offer Service does not procure sufficient supplies to meet the Companies' full Standard Offer Service load, the Companies' affiliated power supply company, Montaup Electric Company (Montaup), or its successors or assigns, will provide service at a fixed price cap ("backstop" service).

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for forecasting energy and demand requirements and maintaining sufficient capacity entitlements to meet their obligations under the rules of ISO New England for the full requirements of their share of Standard Offer Service. Standard Offer Service will be measured as energy delivered to retail customer meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customer meter. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments for Standard Offer Service will be based on the annual average prices shown in Appendix 1, adjusted for discounts bid in the auction and for the operation of the Fuel Index (Appendix 2), with no adjustment for time of use, load factor, or any other characteristics of the load.

**Massachusetts**

Under the terms of an agreement between Eastern, Montaup, the Massachusetts Attorney General, the Massachusetts Division of Energy Resources, and other parties (Massachusetts Settlement Agreement), Eastern has agreed to provide Standard Offer Service to those of its customers who have not yet entered into power supply arrangements with competitive power suppliers, at fixed cents-per-kWh prices.[2] Eastern's Standard Offer Service will be available beginning on the Massachusetts Retail Access Date and continuing through 2004. The Massachusetts Retail Access Date is defined as the later of January 1, 1998 or the date when retail access is made available to all customers of the investor-owned utilities in Massachusetts, provided however in the event that retail access is not available to all customers of investor-owned utilities in Massachusetts by January 1, 1998, Eastern in its sold discretion shall have the option to

[2] During the first year after the Massachusetts Retail Access Date, residential and certain small commercial customers will have the ability to return to Standard Offer Service within 90 days of first taking service from an alternative supplier.

Confidential NEC077923

accelerate the Retail Access Date and implement retail access for its customers with 90 days advance notice. The Massachusetts Settlement Agreement is currently pending before the Massachusetts Department of Public Utilities and the Federal Energy Regulatory Commission.

**Rhode Island**

Under the Rhode Island Utility Restructuring Act of 1996, Blackstone and Newport are each required to "arrange . . . for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers." This service is expected to be offered beginning on the Rhode Island Retail Access Date, and must remain in place through 2009. Under a comprehensive agreement (Rhode Island Settlement Agreement) between Blackstone, Newport, Montaup, the Rhode Island Attorney General, and the Rhode Island Division of Public Utilities and Carriers, a schedule of fixed average price caps has been established for Standard Offer Service offered to retail customers of Blackstone and Newport who have not yet chosen a supplier in the competitive market. The Rhode Island Retail Access Date is defined as the later of January 1, 1998 or the date of the RIPUC's final approval of Montaup's generation divestiture methodology, provided however that in any event, the Rhode Island Retail Access Date shall occur no later than three months after retail access is made available to forty percent or more of the kilowatt-hour sales in New England. The Rhode Island Settlement Agreement is subject to approval by the Rhode Island Public Utilities Commission and the Federal Energy Regulatory Commission.

1997 — requires bidding

The Companies will use the qualification and auction processes described here to procure power supplies to provide this service for the years 1998-2004. Blackstone and Newport will arrange at a later date for power supplies to serve the Standard Offer Service load in 2005-2009.

**B. Market Procurement for Suppliers of Standard Offer Service**

In order to obtain the lowest-cost reliable supplies of Standard Offer Service for their customers, the Companies will procure supplies for a seven-year term through a competitive auction process open to all qualified suppliers of power. The Companies will auction percentage shares of their Standard Offer Service load for each year of the seven-year term. Bids will be in the form of percentage discounts off the stipulated Supplier Rates shown in Appendix 1. Contracts to provide Standard Offer Service will be awarded to the Qualified Bidders who offer the greatest discounts.

**Procedural Schedule**

Prospective Bidders who wish to be considered for certification to participate in the auction must submit their qualifications, pursuant to Section III, no later than [ (date) ]. A pre-submittal conference will be held at [EUA's West Bridgewater offices] on [ (date) ] to provide Prospective Bidders with additional information on the qualification requirements, the auction process, and the administration of Standard Offer Service by the Companies. The Companies will review the submittals and will

Confidential NEC077924

DRAFT

provide written notification to each Prospective Bidder of its certification to participate or its failure to qualify no later than [ (date) ]. Prospective Bidders who submit satisfactory documentation of their qualifications to supply Standard Offer Service will subsequently be referred to as Qualified Bidders.

Any proposed changes to the draft Standard Offer Service Agreement (Appendix 3) must be submitted in writing along with submittals for qualification, but the Companies are under no obligation to incorporate any proposed changes into the final Agreement, which will be distributed with the Final Auction Rules. -No RI settlement

Consistent with the terms of the Massachusetts and Rhode Island Settlement Agreements, the Companies will issue the Final Auction Rules upon execution of purchase and sale agreements for two of Montaup's primary fossil generating assets, Somerset Station and Montaup's share of the Canal 2 Unit, anticipated to occur before the end of 1997. The Final Auction Rules will contain particularized detail on the date and procedures for participating in the auction, the final form of the Standard Offer Service Agreement, and an Auction Participation Agreement.

The auction will consist of an interactive ascending-bid auction for shares of the Companies' Standard Offer Service load for the full seven-year term. The auction will continue for multiple rounds, subject to activity rules described in Section IV and more fully specified in the Final Auction Rules. In the event that less than 100% of the Standard Offer Service load is taken in the full-term auction, the Companies may conduct a supplemental, single-year auction for the remaining shares. The results of the full-term auction will not be affected by the single-year auction in any way; a winning bid in the full-term auction will not be displaced by any combination of bids in the supplemental single-year auction.

The auction is anticipated to take place approximately 30 days after the issuance of the Final Auction Rules and will likely span several days. Standard Offer Service Agreements will be executed with winning bidders within ten (10) business days after completion of the auction. The Companies will begin taking deliveries from Suppliers under the Standard Offer Service Agreements on the later of i) the later of the Massachusetts or Rhode Island Retail Access Date, or ii) the effective date of the contracts. The Retail Access Date in both states may occur as early as January 1, 1998.

DRAFT

## III. Threshold Qualifications to Bid in Standard Offer Auction

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the auction must meet the Companies' minimum eligibility requirements as outlined below. Documentation of compliance with each item must be provided. The Companies will have final authority to determine if a respondent meets or does not meet these requirements.

### A. Administrative Fee

Each Prospective Bidder who wishes to participate in the standard offer auction must submit a complete package documenting its qualifications, plus a non-refundable administrative fee of $1,000 to the address above no later than 4:00 pm on [ (date) ]. The Companies reserve the right to accept submittals after this date but are under no obligation to do so.

### B. Financial Strength

Each Prospective Bidder wishing to participate in the auction must submit the following information to be considered for certification:

1. General Information

- The full legal name of Prospective Bidder and any Guarantor(s).
- The name and title of the authorized contact person(s), with a street address, mailing address, telephone number, facsimile number and e-mail address for each.
- A legal description of the Prospective Bidder and any Guarantor(s) (e.g., corporation, joint venture, limited partnership, partnership or sole proprietorship) and state of organization or residency for each. If the Prospective Bidder or any Guarantor(s) is a corporation, include the names and titles of all officers and directors of the corporation and the names of all stockholders possessing five percent (5%) or more of the stock of the corporation. If a partnership, include the names of all general and limited partners for each.
- The date of founding and the corporate history of Prospective Bidder and any Guarantor(s).
- A description of any corporate affiliations or joint venture partnerships.

2. Financial Information

- Audited or certified financial statements, including balance sheet and statement of income and cash flow for Prospective Bidder and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.
- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.

Confidential NEC077926

- A description of any corporate affiliations or joint venture partnerships.

3. References

- The name, title, address, and telephone number for five (5) references knowledgeable of Prospective Bidder's or any Guarantor's business practices, organization and finances.

4. Defaults, Litigation and Penalties

- For each Prospective Bidder and any Guarantor(s) or any affiliate of each which in the past five years has been determined in writing by an arbitration panel or a court to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.
- A detailed description of any situation within the past five (5) years in which the Prospective Bidder or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations.
- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the Prospective Bidder, its Guarantor(s), or their respective officers or directors.
- A detailed description of any penalties, judgments, consent decrees or other sanctions within the past five (5) years in any venue involving the Prospective Bidder or its Guarantor(s).

5. Other Adverse Matters

- A detailed description of any present or anticipated facts known to the Prospective Bidder or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

6. Authority

Prospective Bidder and its Guarantor(s) must provide a statement:

- that it has or will obtain all necessary regulatory authorizations for it to legally perform its obligations under each Standard Offer Service Agreement that it may enter into with the Companies;
- that the execution, delivery and performance of each Standard Offer Service Agreement will be within its lawful powers;
- that each Standard Offer Service Agreement will be duly authorized by all necessary business entity action and will not violate any of the terms and conditions in its governing documents, any contract or other agreement to which it is a party, or any

law applicable to it; and

- that each Standard Offer Service Agreement when entered into will constitute its legally valid and binding obligation enforceable in accordance with its terms.

The Companies agree that all information they receive from the Prospective Bidders and any Guarantor(s) shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the Prospective Bidder's and/or Guarantors' qualifications to bid in the auction described herein.

**C. Bid Deposit**

To ensure that all bidding in the auction is the legitimate action of a serious bidder, the Companies will require a bid deposit, calculated in accordance with Appendix 4, from each Qualified Bidder prior to the auction. The amount of the bid deposit or the face amount of the Qualified Bidder's performance surety commitment, whichever is more restrictive, will establish a limit on the Qualified Bidder's eligibility to participate in the auction. A Qualified Bidder who successfully bids in the auction and fails to provide a performance surety and execute a Standard Offer Service Agreement within the terms of the Auction Participation Agreement will forfeit its entire bid deposit amount.

As part of its submittal of qualifications, a Prospective Bidder and any Guarantor(s) must state that they understand the bid deposit mechanism and that they are prepared to supply a bid deposit, in a form acceptable to the Companies, prior to execution of an Auction Participation Agreement.

**D. Performance Surety Commitment**

Each Prospective Bidder or any Guarantor(s) of each Prospective Bidder must provide one of the following:

(a) A commitment letter to the Companies from a bank or banks stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the bank(s) will arrange for the issuance of performance letters of credit collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each bank proposing to issue letters of credit on behalf of a Prospective Bidder or its Guarantor(s) maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. The bank(s) shall specify the face amount of letters of credit each can arrange and the periods in which they can be outstanding. The bank(s) shall affirm that, upon completion of the auction, they will be prepared to issue such letter(s) of credit to the Companies within ten (10) business days in amounts sufficient to support said

Prospective Bidder's winning bid(s); or

(b) A commitment letter to the Companies from a surety company or companies stating, that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the surety company or companies will arrange for the issuance of performance bonds collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each surety company proposing to issue performance bonds on behalf of said Prospective Bidder or its Guarantor(s) maintain a rating of "B+" or better from A.M. Best Company. The surety company or companies shall specify the face amount of performance bonds each can arrange and the periods in which they can be outstanding. The surety company or companies shall affirm that, upon completion of the auction, they will be prepared to issue such performance bonds to the Companies within ten (10) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

(c) Such other financial assurances as the Companies, in their sole discretion, deem appropriate to secure all of a Prospective Bidder's or its Guarantor(s)' obligations to the Companies, including those arising from participation in the auction and those contained in the Standard Offer Service Agreement.

All performance letters of credit or performance bonds shall be issued in substantially the forms given in Appendix 5.

If a Prospective Bidder or its Guarantor(s) provides a letter as described in item (a) or (b) above, the face amount of the performance letters of credit or performance bonds specified in such letter will be used, as will the required bid deposits, to determine the Prospective Bidder's maximum eligibility to bid in the auction as described in Appendix 4.

**E. NEPOOL Participation**

To participate in the Standard Offer Service auction, the Prospective Bidder must be a member of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England billing system. As an alternative to being a member, the Prospective Bidder may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the Prospective Bidder's proposed commitment to provide Standard Offer Service or for such period until the Prospective Bidder becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the Prospective Bidder in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the Prospective Bidder's submittal of qualifications.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement. The requirements for becoming a NEPOOL participant are included in Appendix 6. For new members, it is recommended that the NEPOOL Membership Committee be contacted as early as possible because the application process, including Federal Energy Regulatory Commission (FERC) approval, may take several months.

**F. State Registration**

To participate in the auction, each Prospective Bidder must provide documentation that it is registered with the Rhode Island Division of Public Utilities and Carriers as a Non-Regulated Power Producer and must provide documentation that it has complied with the Massachusetts Department of Public Utilities' registration requirements for competitive suppliers then in effect, if any.

**G. Proposed Modifications of the Draft Standard Offer Service Requirements Agreement**

At the completion of the auction, each successful bidder will be required to sign the Companies' Standard Offer Service Agreement, without modification, within ten (10) business days. To accommodate this schedule, Prospective Bidders are requested to review the draft Agreement attached as Appendix 3 and to provide any comments, exceptions, or proposed changes as part of their submittal of qualifications.

The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement. The final Standard Offer Service Agreement will be provided to all Qualified Bidders with the Final Auction Rules and the Auction Participation Agreement. By executing the Auction Participation Agreement, Qualified Bidders will agree to the terms in the final Standard Offer Service Agreement and to execute the Agreement, without modification, if they are successful in the auction.

Confidential NEC077930

## IV. Auction Process

To be auctioned are 100 shares of the Standard Offer Service load for each year. Each share represents one percent of the Companies' aggregated Standard Offer Service load. These shares will be sold in a simultaneous ascending auction, in which the service obligation for each year is on the block at the same time. Qualified Bidders will bid over a series of rounds until no bidder is willing to improve a bid. This format is similar to the successful FCC auctions for radio frequency spectrum. Before the auction, Qualified Bidders will provide a bid deposit, which, along with the face amount of the Qualified Bidder's performance surety commitment, will determine the maximum number of shares they are eligible to bid on.

The auction may actually consist of two auctions conducted in sequence. First, a full-term auction will be held. Bids in the full-term auction will be for a specified number of shares of Standard Offer Service load across all seven years. At the conclusion of the full-term auction, if there are remaining shares that did not sell in the full-term auction, a single-year auction may be held. In the single-year auction, bids are for shares in a specified year. Each Qualified Bidder's initial eligibility in the single-year auction will be its initial eligibility in the full-term auction less its winnings in the full-term auction.

The rules for the full-term and the single-year auctions are nearly identical. We begin with a description of the full-term auction and then point out the differences in the single-year auction.

### A. The Full-Term Auction

In each round, each Qualified Bidder tenders a supply schedule as a group of one or more bids. A bid is a pair $(s, d)$, where $s$ is the shares and $d$ is the discount (in percent) off the standard offer Supplier Rate (see, Appendix 1). A winner of $s$ shares at a discount $d$ is obligated to serve $s$% of the Standard Offer Service load in each year at a discount of $d$% off the stipulated Supplier Rate. A Qualified Bidder can submit as many bids as it likes, for as many shares as it likes, subject to its eligibility.

At the end of each round of bidding, the bids will be ranked in descending order of discount, then in ascending order of time-stamp (earlier bids are ranked higher) to form the aggregate supply schedule. Starting with the largest discount, bids will be designated as winning bids until the cumulative shares reaches 100. All other bids are designated losing bids. The winning bid with the lowest discount defines the clearing discount, $d^*$. The example in Figure 1 includes a partial supply schedule at the conclusion of a round to illustrate the ranking, the designation of "winning" and "losing" bids, and how the clearing discount is determined. A bid is also referred to as a "step," since each bid represents a step on the supply schedule.

DRAFT

| Bid | Discount | Time-stamp | Shares | Cumulative Shares | Status |
|---|---|---|---|---|---|
| A | 5.0% | 10/16/97 09:35:42 | 20 | 20 | Winning |
| B | 4.8% | 10/18/97 12:14:25 | 15 | 35 | Winning |
| C | 4.7% | 10/16/97 11:51:45 | 25 | 60 | Winning |
| D | 4.3% | 10/17/97 14:21:52 | 20 | 80 | Winning |
| E | 4.0% | 10/19/97 10:02:47 | 30 | 110 | Rationed |
| F | 4.0% | 10/19/97 13:12:45 | 40 | 150 | Losing |
| G | 3.5% | 10/19/97 13:47:20 | 15 | 165 | Losing |
| H | 3.2% | 10/19/97 13:14:06 | 20 | 185 | Losing |
| I | 3.2% | 10/19/97 13:36:42 | 15 | 200 | Losing |

Example:

Bids A through D are all "winning" bids, since their discounts exceed the clearing discount. If the auction were to end on this round, Bids A through D would be awarded Agreements. Bid E would be rationed, as discussed below, and the bidder would be awarded an Agreement for only part of the Bid E Shares. Bids F through I, and any others farther down on the supply schedule, would be "losing" bids, since their discounts were less than the clearing discount. Qualified bidders sponsoring those bids have the opportunity in the next round to improve their bids. If they fail to do so, those bids would be "frozen" and would be excluded from improvement in subsequent rounds.

The following are the activity rules for the full-term auction:

**DRAFT**

*Eligibility Rule*: The bid deposit and the face amount of the available performance surety will determine a Qualified Bidder's maximum eligibility, in accordance with Appendix 4.

*Opening Rule*: A new step in the bid schedule can be submitted only in the first round of the full-term auction. A Qualified Bidder must submit bids totaling 100% of its eligibility in the initial round, otherwise its eligibility in the full-term auction will be reduced to the number of shares bid in the initial round.

*Sorting Rule*: In each round, the steps will be sorted in decreasing order by discount, and then in increasing order by time-stamp. Steps will be designated as "winning" bids, until the cumulative shares exceeds 100. The next step will be rationed as follows:

*Rationing Rule*: The first step that straddles 100 – that is, with cumulative shares greater than 100 – will be split into two steps: a winning step with shares so that cumulative shares are exactly 100 and a losing step for the remaining shares of the step. All steps further down the schedule will be losing steps.

*Revision Rule*: A step can be divided into two or more steps with total shares equal to the initial step. (This will allow a Qualified Bidder to raise its bid on only part of a step.) A step can be revised only by improving its discount so that it exceeds the previous round's clearing discount by at least the specified minimum bid increment.

The revision rule has four parts. In each round after the first, for each step of the bid schedule:

1. The discount cannot be decreased.
2. A step can be split into two or more steps with total shares equal to the original step.
3. The discount can be increased only if the new discount is more than the clearing discount in the previous round by at least the minimum bid increment.
4. Steps designated as losing in the prior round that do not improve the previous clearing discount are "frozen" and can never be improved.

*Exclusion Rule*: A losing step from the prior round is frozen after the current round if its discount is not improved (i.e. its discount is not raised above the previous round's clearing discount by the minimum bid increment). Frozen steps are permanently fixed at the discount bid, and are excluded from improvement in subsequent rounds. All frozen bids remain binding commitments by the Qualified Bidder.

*Closing Rule*: The full-term auction stays open until a round goes by with no improvements to any bid.

The activity rules apply separately for each step on the bid schedule. Each step is a binding bid that remains in force until it is improved by the Qualified Bidder in a subsequent round or rejected by the Companies at the conclusion of the auction. An improved step replaces the prior step. Except for improved bids, all steps continue in force for the next round. At the close of the auction, those steps with discounts greater than the clearing discount are accepted, and any bid straddling the clearing discount is

resolved by the Rationing Rule. Each successful bidder is required to execute a Standard Offer Service Agreement. Upon execution of Standard Offer Service Agreements for 100 shares, the remaining steps with discounts below the clearing discount are rejected.

### B. The Single-Year Auction

If not all of the 100 shares are sold in the full-term auction, the remaining shares may be sold in a single-year auction. A bid is a triple (*y*, *s*, *d*), where *y* is the year, *s* is the number of shares, and *d* is the discount (in percent) off the stipulated Supplier Rate for year *y*. A winner of *s* shares in year *y* at a discount *d* is obligated to serve *s*% of the Standard Offer Service load in year *y* at a discount *d*%. Rather than having a single supply schedule, as in the full-term auction, there is a separate schedule for each of the seven years. Qualified Bidders may bid on any one or more years, and may bid for different shares and at different discounts in each year. Bids must be for a pre-defined increment of shares (e.g., 5 shares, or 5% of the Standard Offer Service Load), which will be determined prior to commencement of the single-year auction.

The following are the activity rules that are specific to the single-year auction (i.e. all other rules provided above for the full-term auction apply, with these exceptions):

*Eligibility Rule*: A Qualified Bidder's initial eligibility in the single-year auction is its initial eligibility in the full-term auction less any shares won in the full-term auction.

*Opening Rule*: A new step in the bid schedule can be submitted only in the first four rounds. A Qualified Bidder must submit bids totaling at least 25% of its initial eligibility in the first round of the single-year auction, 50% in the second round, 75% in the third round, and 100% in the fourth round. Failure to meet or exceed these activity levels will result in a reduction in eligibility.

The Sorting, Revision, Rationing, and Exclusion Rules all function as in the full-term auction.

*Closing Rule*: All the yearly markets stay open until a round goes by with no improvements in any market. Hence, all markets close simultaneously.

### C. Minimum Initial Bids and Minimum Bid Increments

The minimum initial discount is 0%. In subsequent rounds, revisions to steps must improve on the clearing discount by at least the "minimum bid increment." The minimum bid increment will likely change as the auction progresses and will be stated before each round of bidding. Different years may have different minimum bid increments in the single-year auction. Typically, the increments decrease later in the auction; however, it is unlikely that an increment would ever drop below ½%. The following increments are likely, but these are subject to change at the discretion of the auctioneer based on initial eligibility of bidders and bid activity:

DRAFT

| Minimum Bid Increment | Full-Term Auction | Single-Year Auction Years 1 and 2 | Single-Year Auction Years 3 to 7 |
|---|---|---|---|
| Early in the Auction | 1% | 1% | 2% |
| Late in the Auction | ½% | ½% | 1% |

who is auctioneer?

Confidential NEC077935

DRAFT

## V. Administrative Issues

### A. Auction

1. Auction Participation Agreement

Participation in the auction will be governed by an Auction Participation Agreement and the terms of the Final Auction Rules. Qualified Bidders will be required to execute an Auction Participation Agreement, affirming their commitment to i) abide by the rules of the auction as stated in the Final Auction Rules, ii) abide by any decisions of the auctioneer[3], and iii) if successful in the auction, provide the requisite security documents and execute a Standard Offer Service Agreement within ten (10) business days after the conclusion of the auction.

2. Bid Deposit

At least ten (10) business days prior to the commencement of the auction, each Qualified Bidder or its Guarantor(s) shall deliver to the Companies a bid deposit proportional to the percentage share of Standard Offer Service load that the Qualified Bidder proposes to bid on. The bid deposit will be determined in accordance with a formula generally as provided in Appendix 4. The bid deposit shall be provided in one of the following forms:

- Qualified Bidder's or its Guarantor's certified check payable to the Companies;
- a bank check drawn on a financial institution acceptable to the Companies;
- funds electronically transferred to the account of the Companies in accordance with the following instructions:

  Fleet Bank
  ABA # 011-000-206
  For Credit to: Eastern Edison Company
  Blackstone Valley Electric Company
  Newport Electric Corporation
  A/C # xxxxxxxxxxxxx
  Ref: (Bidder/Guarantor Name) Bid Deposit

- a performance letter of credit or performance bond issued by a bank or surety company which satisfies the rating criteria established in Section III.B(a) and (b), respectively. Each performance letter of credit or bond will be required to be in substantially the form given in Appendix 5.

[3] The Companies may act as auctioneer, or may hire an independent entity with particular auction expertise.

As a condition of the auction, the Companies will not accept any bid for which the Qualified Bidder or its Guarantor(s) has not previously provided the required amount of bid deposit.

3. Maximum Eligibility

A Qualified Bidder's maximum eligibility to bid in the auction will be based on whichever of the following two measures results in the lower eligibility:

i) the face amount of a performance bond or equivalent surety for which the Qualified Bidder provides a commitment letter, as outlined in Section III.D, or
ii) the amount of the bid deposit.

Eligibility, in terms of shares of Standard Offer Service load, will be governed by the relationships presented in Appendix 4. At least five (5) business days prior to the start of the full-term auction, the Companies will certify in writing each Qualified Bidder's maximum eligibility to bid in the full-term auction.

4. Bid Deposit Refunds/Credits:

Bid deposits will be refunded in accordance with the Prospective Bidder's or Guarantor's direction in one of the following manners:

- For bids selected by the Companies:

  Cash deposits will be fully refundable, with interest, one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor; or

  Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor.

- For bids which are not selected by the Companies:

  Cash deposits will be fully refundable, with interest, one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid; or

  Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid.

If a successful Qualified Bidder or its Guarantor(s) fails to honor its bid by

providing the required performance surety and executing a Standard Offer Service Agreement within ten (10) business days of completion of the auction, the entire bid deposit amount will be forfeited. The next bidder(s) whose aggregate shares would bring the total shares to exactly 100 will then be considered winning bidders and will be required to provide performance sureties and to execute Standard Offer Service Agreement within ten (10) business days of notification.

Cash deposits will be eligible for earnings at a rate of 3% per annum commencing with the business day that said funds become fully available to the Companies and continuing through the business day that the Companies issue a refund. All refunds will be in the form of a Company check payable to the Qualified Bidder or its Guarantor(s) with accrued interest.

**B. Standard Offer Service**

1. Performance Surety

Within ten (10) business days of the completion of the auction, and as a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Bidder will be required to deliver to the Companies a performance surety securing the Qualified Bidder's full responsibility for Standard Offer Service load over the seven-year term.

Acceptable forms of surety include a performance letter of credit or a performance bond, in substantially the form as provided in Appendix 5. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. Each surety company or companies issuing a performance bond must maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Agreement. Performance letters of credit or bonds, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

Failure to provide the performance surety within ten (10) business days after the completion of the auction will disqualify the Qualified Bidder and will result in forfeiture of its entire bid deposit. Failure to maintain such surety in good standing after execution of the Standard Offer Service Agreement will be considered an event of default and the Companies will exercise their rights under the Agreement accordingly.

2. Hourly Load Estimation and Loss Allocation

Confidential NEC077938

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England each Supplier's share of the aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the MDPU and RIPUC, summarized as follows:

-Energy and demand for each retail account will be estimated for each hour using a combination of inputs including weather and load data from the EUA Supervisory Control and Data Acquisition (SCADA) system, sample meter data, historical load shapes, and individual customer usage ratios.

-The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.

-The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.

-Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.

-The hourly Standard Offer loads including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.

-The daily load information will be transferred to ISO New England for inclusion in each Supplier's own-load dispatch (or such other settlement process developed by NEPOOL or ISO New England).

3. Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

Suppliers will receive daily reports of their estimated hourly Standard Offer Service loads, and monthly reports of the number of customers in each rate class taking Standard Offer Service along with representative customer load shapes for each rate class. The Companies will also provide, on an annual basis, estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for the prior twelve months and a forecast of Standard Offer Service peak and energy demands for the upcoming twelve months, assuming no migration of customers to competitive suppliers.

The Companies will institute a procedure for notifying Suppliers with as much

advance notice as possible when the Companies receive customer notifications of significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts. Suppliers are advised to rely on their own projections of load and market dynamics.

4. Minimum Load Obligations

Over time, if Standard Offer Service load declines, the actual energy and demand responsibilities (in MW and MWh) associated with a given percentage of the load may [will] decline as well. The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater. If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

5. Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement. The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, etc. Any such assumption of a defaulting Supplier's obligations will be effective retroactive to the commencement of the default for settlement purposes.

Confidential NEC077940

DRAFT

# APPENDIX 1
# STANDARD OFFER SERVICE PRICE SCHEDULES

Q:\STDOFFER\RFQ.DOC 23 1:33 pm 9/18/97

Confidential NEC077941

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction will be based on the following predetermined schedules of prices for energy consumed. The rate for customers of Eastern is subject to adjustment only for the operation of the Fuel Index. Rates charged to customers of Blackstone and Newport will reflect the stipulated prices shown, will be reduced by the Supplier Discounts obtained in the auction, and are also subject to the operation of the Fuel Index.

| Calendar Year | Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | 3.2 cents |
| 1999 | 3.1 cents | 3.5 cents |
| 2002 | 3.4 cents | 3.8 cents |
| 2001 | 3.8 cents | 3.8 cents |
| 2002 | 4.2 cents | 4.2 cents |
| 2003 | 4.7 cents | 4.7 cents |
| 2004 | 5.1 cents | 5.1 cents |

The Supplier Rate defines the price cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement. Prices apply to energy as measured at the retail customers' meters.

| Calendar Year | Price per Kilowatt hour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2002 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Supplier Rates, reduced by the applicable Discounts offered in the Companies' auction. Additional revenues to Suppliers may be realized through the operation of the Fuel Index.

Confidential NEC077942

DRAFT

**APPENDIX 2**
**FUEL INDEX**

Q:\STDOFFER\RFQ.DOC 25 1:33 pm 9/18/97

Confidential NEC077943

**DRAFT**

The Companies have incorporated a Customer Rate Fuel Adjustment mechanism in the standard offer terms of service which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil ( 1% sulfur) and natural gas after 1999. Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the standard offer energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels. The Companies' Customer Rate Fuel Adjustment is calculated as follows:

The Customer Rate in effect for a given month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction is, if not defined elsewhere, the following predetermined flat rate for energy consumed:

| Calendar Year | Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | 3.2 cents |
| 1999 | 3.1 cents | 3.5 cents |
| 2000 | 3.4 cents | 3.8 cents |
| 2001 | 3.8 cents | 3.8 cents |
| 2002 | 4.2 cents | 4.2 cents |
| 2003 | 4.7 cents | 4.7 cents |
| 2004 | 5.1 cents | 5.1 cents |

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo

delivery of 1.0% sulphur No.6 oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + \$0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where:
Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate paid to the retail company is increased by this Fuel Adjustment factor for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

DRAFT

# APPENDIX 3

# DRAFT STANDARD OFFER SERVICE AGREEMENT

Q:\STDOFFER\RFQ.DOC 28 1:33 pm 9/18/97

Confidential NEC077946

**PART 2 OF 2**

**Appendix 3 Standard Offer Service Agreement**

DRAFT

Standard Offer Service Agreement

between

# Blackstone Valley Electric Company

# Eastern Edison Company

# Newport Electric Corporation

and

______________________________

Dated ______________________________

Confidential NEC077947

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE 1. | Definitions | 1 |
| ARTICLE 2. | Term | 3 |
| ARTICLE 3. | Supplier Responsibilities | 3 |
| ARTICLE 4. | Estimation of Hourly Loads and Reporting to the ISO | 4 |
| ARTICLE 5. | Price | 5 |
| ARTICLE 6. | Billing and Payments | 5 |
| ARTICLE 7. | Security Provisions | 6 |
| ARTICLE 8. | Events of Default, Liability, Relationship of the Companies | 8 |
| ARTICLE 9. | Force Majeure | 9 |
| ARTICLE 10. | Assignment | 10 |
| ARTICLE 11. | Successors and Assigns | 10 |
| ARTICLE 12. | Resolution of Disputes | 10 |
| ARTICLE 13. | Interpretation | 11 |
| ARTICLE 14. | Severability of Provisions | 11 |
| ARTICLE 15. | Accounts and Records | 12 |
| ARTICLE 16. | Limitations on Liability and Indemnification | 12 |
| ARTICLE 17. | Regulation | 12 |
| ARTICLE 18. | Notices | 13 |
| ARTICLE 19. | Miscellaneous | 13 |

Appendix A Schedule of Supplier's Share of Offer Service and Delivered Energy Price [needs work]

Appendix B Fuel Index

STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this __________ day of ______________________ __________, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), and ________________________ ______________________________________________________________ ______________________________________________________________ ______________________________________________________________ ______, ("Supplier").

WHEREAS, the Companies are required to provide firm all requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time. This Agreement provides for the transfer, from the Companies to Supplier, of the responsibility of providing firm all requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service. This Agreement includes the Appendices attached hereto and incorporated herein by reference.

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity and other services provide in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1. Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this document, including its Appendices as amended from time to time.

"Bid Price" shall mean the current Standard Offer Wholesale Price multiplied by the Supplier's Discount.

"Commencement Date of Service" shall mean 12:01 A.M. on ____________________________.

"Contract Year" shall mean any calendar year or part of a calendar year after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"Discount" shall mean the discount, in percent, off the Standard Offer Wholesale Price of electricity offered by Supplier for a given Contract Year as determined through the Company's Standard Offer Auction.

"DPU" shall mean the Massachusetts Department of Public Utilities.

"ISO" shall mean ISO New England Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement.

"NYMEX Contract" shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B. The Companies or their Standard Offer Customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"PUC" shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time.

"Standard Offer Service" shall mean firm all requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____. Supplier is responsible for changes in customer demand for any reason, including but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weathers, etc.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service Power, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the PUC, or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the DPU, as applicable. These Terms and Conditions may be revised, amended, supplemented or supplanted in whole or in part from time to time according to the procedures provided by the PUC or DPU and state regulation as applicable.

ARTICLE 2. Term:

The term of this Agreement shall begin on the Commencement Date of Service and end on 12:00 a.m. _______________________.

ARTICLE 3. Supplier Responsibilities

Supplier is responsible for providing firm all requirements service necessary to meet its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

Supplier, as a provider of Standard Offer Service power, is responsible for all present or future requirements and associated costs for installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, including the receipt of tie benefits and responsibility for their associated payments, losses, etc., associated with the delivery of its share of Standard Offer Service load and any other requirements imposed by the ISO, as they may be in effect from time to time. To the extent that the

ISO, or any successor entity allocates any NEPOOL expenses or uplift costs on a load or peak load basis, the portion of such costs associated with the Supplier's share of Standard Offer Service load will also be Supplier's responsibility.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the Delivery Point to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), Montaup's Local Area Network Transmission Service ("LNS"), and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges needed to deliver the power to the NEPOOL PTF.

ARTICLE 4. <u>Estimation of Hourly Loads and Reporting to the ISO</u>:

To meet its NEPOOL obligations, the Companies shall report to the ISO, Supplier's hourly Standard Offer Service load, including distribution and non-PTF losses. The Companies will estimate Supplier's share of Standard Offer Service load based on the Terms and Conditions for Suppliers. The Companies reserves the right to modify the Terms and Conditions for Suppliers in the future, subject to regulatory approval.

As required by NEPOOL, the Companies will take all reasonable efforts to report to the ISO, Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day. Supplier's load, including its share of Standard Offer Service load and other customer loads on the Companies' System which it is responsible for, if any, should be added by the ISO to Supplier's other NEPOOL loads.

At the end of each month, the Companies shall aggregate Supplier's hourly loads for the month, as described in the Terms and Conditions for Suppliers. The Supplier's aggregate share of Standard Offer Service, not including losses from the Delivery Point to the meters of those customers on Standard Offer Service will be deemed to be the quantity of Delivered Energy that Supplier provided for that month, and is the unadjusted Kwh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5. Price:

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price + Fuel Adjustment

where: Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment is defined and calculated monthly in accordance with Appendix B.

who pay GRT?

The Price for Delivered Energy as set forth herein include all local, state and federal taxes, fees and assessments applicable as of the date hereof. It is expressly understood that Supplier is obligated to pay all present and future taxes, fees and levies which may be assessed by any applicable governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6. Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on the estimate of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

Companies shall pay Supplier any amounts due and payable on or before the last day of each month for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston,

or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier, in good faith, disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 11 of this Agreement. Upon final resolution of the dispute, if refunds are due to either Party, the owing Party shall make such refunds together with interest from the Due Date calculated at the rate set forth above on all disputed amounts within thirty (30) days from the date of the final resolution of such dispute.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of such original billing in order to reflect differences in charges resulting from receipt of more current data. Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment. The Companies shall make additional adjustments to billings after the one-year period to the extent such adjustments are required based upon final resolution of any claim, action, or proceeding that is based upon data contained in an original billing and that is formally initiated by, or noticed to the Companies prior to the end of the one-year period following the date of such original billing.

ARTICLE 7. <u>Security Provisions</u>:

As a condition of this Agreement and upon execution thereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

<u>FULL TERM AUCTION</u>

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n) = SF \times STDL(n-1) \times \{ (PSTD(n) \times TD(n)) + (PSTD(n+1) \times TD(n+1)) + (PSTD(n+2) \times TD(n+2)) + \ldots\ldots + (PSTD(2004) \times TD(2004)) \}$$

Where:

SD(n) is the Security Deposit in Contract Year(n).

SF is the Security Fee equal to $10.00/MWh.

STDL(n-1) is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year (n-1), expressed in MWh. In 1997, STDL shall be 4,500,000 MWh.

180 million per ~ 900 mw?

PSTD(n) is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n).

TD(n) is the Transition Discount in Contract Year (n), calculated as follows:

| | |
|---|---|
| TD(n) | =1.00 |
| TD(n+1) | =(7-1)/7 = 0.857 |
| TD(n+2) | =(7-2)/7 = 0.714 |
| TD(n+3) | =(7-3)/7 = 0.571 |
| TD(n+4) | =(7-4)/7 = 0.429 |
| TD(n+5) | =(7-5)/7 = 0.286 |
| TD(n+6) | =(7-6)/7 = 0.143 |

SINGLE YEAR AUCTION

The amount of the financial surety shall be calculated annually based on the following formula:

SD(n)=SF x STDL(n-1) x { PSTD(n) + PSTD(n+1) + ..... + PSTD(2004)}

Where:

SD(n) is the Security Deposit in Contract Year(n).

SF is the Security Fee equal to $10.00/MWh.

STDL(n-1) is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year (n-1), expressed in MWh. In 1997, STDL shall be 4,500,000 MWh.

PSTD(n) is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year (n).

To secure the above amounts, Supplier shall provide a letter of credit or performance bond in a form acceptable to Company. It is required that each bank issuing such letters of credit on behalf of a Supplier, maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service; or if a performance bonds are to be provided it is required that each surety company issuing such performance bonds on behalf of a Supplier, maintain a rating of "B+" or better from A.M. Best Company.

Performance Letter of Credits and Bonds, if not issued for the full term of the Supplier's Standard Offer Service obligation, shall be renewed on an annual basis or replaced and superseded by a like kind surety thirty (30) days prior to the expiration of such prior surety, on a continuing basis up to the

termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial sureties may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 over the remaining term of this Agreement.

ARTICLE 8. Events of Default, Liability, Relationship of the Companies:

With the exception of Force Majeure covered in Article 9, each of the following events shall be deemed to be an Event of Default hereunder:

(a) Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within (30) days after notice thereof from the Companies.

(b) Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within (30) days after notice thereof from the Supplier.

(c) Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days notice thereof from the Companies.

In the event either Party contests the enforceability of this Agreement, the Party contesting enforceability shall be deemed to be in default hereunder.

Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.

separate contracts!

Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service Power requirements.

Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security amounts calculated pursuant to Article 7 and the Companies may exercise their rights under the financial surety used to secure

such amounts. Supplier shall be liable to the Companies for any direct damages resulting from the Event of Default, including replacement power costs incremental to the Bid Price. In addition, the Companies may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9. Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, act of public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or similarly cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event directly affects the availability of the transmission or distribution facilities of NEPOOL, the Companies or an affiliate of the Companies absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers. Any event (i) affecting the availability or cost of operating any (A) generating facility, or (B) transmission or distribution facilities outside the NEPOOL control area, or (ii) that causes an economic hardship on either Party shall not constitute a Force Majeure under this Agreement.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) The non-performing Party promptly, but in no case longer than five working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b) The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

(c) The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d) The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such power is available.

(e) Supplier's Standard Offer Service load shall be modified in proportion to the effect of Force Majeure conditions.

(f) Companies' obligation to make payment for Delivered Energy shall be modified in proportion to the effect of the Force Majeure conditions.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 11. Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. Resolution of Disputes:

Any and all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies and a senior representative of Supplier with authority to settle, designated by Supplier for resolution on an informal basis as promptly as practicable. The discussions between such representatives shall be considered "settlement talks" and shall have no evidentiary value. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration.

The arbitration shall be conducted before a single neutral arbitrator appointed by the Parties. If the Parties fail to agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, the Companies and

Supplier shall each choose one arbitrator, who shall sit on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, they shall submit a request to the Center for Public Resources for a third arbitrator. In either case, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliates of such Party. The arbitrator(s) shall afford each of the Parties an opportunity to be heard and, except as otherwise provided herein, shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, however, the Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrators(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to modify or change any of the above in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or the Administrative Dispute Resolution Act (5 U.S.C.A. § 571 et. al.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 12 above, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least one year after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 16. Limitations on Liability and Indemnification:

Supplier will endeavor to furnish reliable electric service under this Agreement, but it does not guarantee that service will not be curtailed or interrupted for reasons beyond its control and Supplier, its trustees, directors, officers, employees, and agents shall not be liable for any claim arising from or claimed to have arisen from any disruptions in service due to a Force Majeure. The Companies agree to indemnify, defend, and hold Supplier, its affiliated companies, trustees, directors, officers, employees, and agents harmless from and against any and all costs, claims, liabilities, actions, or proceedings whatsoever arising from or claimed to have arisen from such disruptions in service due to a Force Majeure.

Except for claims arising from disruptions in service which are provided for in the above paragraph, each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all third party damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the negligent acts or omissions of the indemnifying Party's employees or agents.

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. Regulation:

(a) This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and Federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b) This Agreement must comply with all NEPOOL Criteria, Rules, and Standard Operating Procedures ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a) Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b) Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c) Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d) This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this

(e) The Parties intend that this Agreement shall only be changed by a written amendment executed by both Parties, and shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(f) Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(g) Article and Section heading used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier: Supplier's NAME

By:________________________

On Behalf of the Companies:

Blackstone: BLACKSTONE VALLEY ELECTRIC COMPANY

By:________________________

Eastern: EASTERN EDISON COMPANY

By:________________________

Newport: NEWPORT ELECTRIC CORPORATION

By:________________________

# APPENDIX A

## SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY AND PRICE

| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 | | |
| 1999 | | 3.5 | | |
| 2000 | | 3.8 | | |
| 2001 | | 3.8 | | |
| 2002 | | 4.2 | | |
| 2003 | | 4.7 | | |
| 2004 | | 5.1 | | |
| 2005 | | 5.5 | | |
| 2006 | | 5.9 | | |
| 2007 | | 6.3 | | |
| 2008 | | 6.7 | | |
| 2009 | | 7.1 | | |

Confidential NEC077963

**APPENDIX B**
**FUEL INDEX**

**Fuel Index**

Company has incorporated a Customer Rate Fuel Adjustment mechanism in the Standard Offer terms of service which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil ( 1% sulfur) and natural gas after 1999. Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to Company in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels. Company's Customer Rate Fuel Adjustment is calculated as follows:

The Customer Rate in effect for a given month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect,

where:

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction is, if not defined elsewhere, the following predetermined flat rate for energy consumed:

| Calendar Year | Price per Kilowatt hour | |
|---|---|---|
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | 3.2 cents |
| 1999 | 3.1 cents | 3.5 cents |
| 2002 | 3.4 cents | 3.8 cents |
| 2001 | 3.8 cents | 3.8 cents |
| 2002 | 4.2 cents | 4.2 cents |
| 2003 | 4.7 cents | 4.7 cents |
| 2004 | 5.1 cents | 5.1 cents |
| 2005 | N/A | 5.5 cents |
| 2006 | N/A | 5.9 cents |
| 2007 | N/A | 6.3 cents |
| 2008 | N/A | 6.7 cents |
| 2009 | N/A | 7.1 cents |

Confidential

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No.6 oil into New York harbor, as reported in "Platt's Oilgram U.S. Markets can" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, Company shall file alternate indices with the proper regulatory agencies.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |
| 2005 | ? |
| 2006 | ? |
| 2007 | ? |
| 2008 | ? |
| 2009 | ? |

Confidential NEC077965

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined according to the following formula:

Fuel = (Market Gas Price + $0.60/MMBtu) + (Market Oil Price +0.04/MMBtu)

Adjustment Fuel Trigger Point + $0.60 + $0.04/MMBtu

where:

Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate paid to the retail company is increased by this Fuel Adjustment factor for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

Confidential

DRAFT

# APPENDIX 4

## CALCULATION OF BID DEPOSIT AMOUNTS, PERFORMANCE SURETY AMOUNTS, AND MAXIMUM ELIGIBILITY

Confidential NEC077967

DRAFT

Eligibility of Qualified Bidders to bid in the auction is governed by the amount of the bid deposit provided or by the amount of the performance surety for which the Qualified Bidder has a commitment from a bank or surety company, whichever results in the lower eligibility.

**Bid Deposit Amounts**

Qualified Bidders will be required to submit a lump-sum bid deposit proportional to their intended participation in the auction, based on the amounts shown below.

Full-Term Auction

Qualified Bidders who intend to bid in the full-term auction should submit a bid deposit amount of $180,000 for each percentage share of the Companies' aggregated Standard Offer Service load that they intend to bid on. A Qualified Bidder who submits a bid deposit of $18.0 million ($180,000 x 100 percent) will be eligible to submit bids for 100 percent of the Companies' Standard Offer Service load (assuming the Qualified Bidder also provides the requisite commitment letter(s) for a performance surety to secure their performance for the entire load). No Qualified Bidder will be required to submit a bid deposit in excess of $18.0 million.

Single-Year Auction

Qualified Bidders who intend to bid only in the single-year auction should multiply the annual deposit amounts in the table below by the percentage shares they intend to bid in each year to arrive at a lump sum bid deposit amount.

Single-Year Auction
Annual Bid Deposit Amounts, $/%

| | |
|---|---|
| 1998 | $45,000 |
| 1999 | $39,000 |
| 2000 | $32,000 |
| 2001 | $26,000 |
| 2002 | $19,000 |
| 2003 | $13,000 |
| 2004 | $6,000 |
| | $180,000 |

*For example, a Qualified Bidder intending to bid on a ten percent share in each of years 1, 2, and 7 would submit a bid deposit amount of $900,000.*

| | |
|---|---|
| *10% year 1* | *10 x $45,000 = $450,000* |
| *10% year 2* | *10 x $39,000 = $390,000* |
| *10% year 7* | *10 x $6,000 = $60,000* |
| | *$900,000* |

*The Qualified Bidder would not be bound to bid for those amounts in those years, however, and could deploy its bids in the full-term auction or in different years of the single-year auction, subject to its eligibility as determined below.*

**Performance Surety Amounts**

In order to qualify to participate in the auction, Prospective Bidders must provide commitment letter from banks or surety companies demonstrating their commitment to provide performance surety instruments to secure the Prospective Bidder's obligations under a Standard Offer Service Agreement with the Companies. The amount of performance surety required for execution of the Agreement and for ongoing performance under the Agreement will be governed by Article 7 of the Agreement. For purposes of establishing a Prospective Bidder's qualifications and eligibility to bid, the following amounts will apply.

Full-Term Auction

The amount of the performance surety commitment required to bid in the full-term auction is $1.8 million per percent of Standard Offer Service load that the Prospective Bidder proposes to bid on. A Prospective Bidder who wishes to bid on one hundred percent of the Companies' Standard Offer Service load in the full-term auction must provide commitment letter(s) for an aggregate performance surety amount of $180 million. Note, however, that in order to maintain maximum flexibility to participate in the subsequent single-year auction, a larger amount of performance surety commitments will be required.

Single-Year Auction

Prospective Bidders intending to participate in the single-year auction must provide commitment letter(s) for an aggregate performance surety amount of $450,000 for each percentage share in each of the seven years that the Prospective Bidder proposes to bid on. A Prospective Bidder who wishes to bid on one hundred percent of the Companies' Standard Offer Service load in each of the seven years of the single-year auction must provide performance surety commitments for an aggregate amount of $315 million ($450,000 per percent x 100 percent per year x 7 years).

**Maximum Eligibility**

Upon execution of an Auction Participation Agreement with a Qualified Bidder, the Companies will determine, based on the bid deposit provided and the performance surety commitments previously provided, the Qualified Bidder's maximum eligibility to bid in the full-term auction. The Companies will provide written notification of eligibility to each Qualified Bidder no less than five (5) business days prior to the commencement of the full-term auction. If the Companies' full Standard Offer Service load is not subscribed in the full-term auction and a subsequent single-year auction will be held, the Companies will promptly notify in writing all Qualified Bidders of their maximum eligibility to participate in the single-year auction.

Full-Term Auction

Each Qualified Bidder's maximum eligibility to bid in the full-term auction is determined by the lesser of the following two quotients, provided however, that the maximum eligibility can never exceed 100:

DRAFT

i) Deposit eligibility, in percent = $\frac{\text{bid deposit, in dollars}}{\$180{,}000}$

or

ii) Surety eligibility, in percent = $\frac{\text{aggregate surety commitments, in dollars}}{\$1{,}800{,}000}$

Single-Year Auction

In the single-year auction, each Qualified Bidder's maximum eligibility to bid is determined by whichever of the following two expressions yields the lower value, provided however that the maximum eligibility can never exceed 700:

i) Deposit eligibility = $\frac{\text{bid deposit}}{\$25{,}714}$ - (Full-Term Shares Won x 7)

or

ii) Surety eligibility = $\frac{\text{aggregate surety commitments}}{\$450{,}000}$ - (Full-Term Shares Won x 7)

where: "Full-Term Shares Won" means the percentage share of the Companies' Standard Offer Service load for which the Qualified Bidder is responsible for a seven-year term under the terms of an executed Standard Offer Service Agreement.

In each of the first four rounds of the single-year auction, each Qualified Bidder's maximum eligibility will be decremented, based on the table of annual bid deposit amounts shown above and the percentage shares for which it submits bids in each year. Bids will be accepted only up to the limits of the Qualified Bidder's maximum eligibility. If a Qualified Bidder's entire eligibility is used up prior to the completion of the fourth round of the single-year auction, any subsequent bids for additional shares submitted by that Qualified Bidder will not be accepted.

DRAFT

# APPENDIX 5

## FORM OF BID DEPOSIT AND PERFORMANCE SURETY DOCUMENTS

Confidential NEC077971

DRAFT

Form of Bid Deposit Letter of Credit

Bid Deposits in the form of letters credit must be in substantially the form given below.

Irrevocable Standby Letter of Credit Date: ( )

BENEFICIARY Credit Number: ( )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

BY ORDER OF:
(Bidder name and address)

or (Guarantor name and address).

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of (the Bidder)[(the Guarantor) on behalf of (the Bidder)]for a sum or sums not exceeding a total of US DOLLARS $xx,xxx.xx(written dollar amount AND xx/100 U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES effective(date)and expiring on(date).

Draft(s) must be accompanied by:

1. Your written letter requesting payment under this Letter of Credit signed by a representative of Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the EUA Companies"). Such letter from the EUA Companies shall include a statement indicating (the Bidder/ Guarantor)has forfeited their Bid Deposit due to their failure to execute the Standard Offer Service Agreement and/or deliver the required performance surety in connection with said Agreement in accordance with the terms of an Auction Participation Agreement between (the Bidder) and the EUA Companies dated ( ).

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. ( ) dated ( ) of the (Bank)."

**DRAFT**

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before **(FILL IN EXPIRATION DATE).**

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name) and, attention (Bank credit operations contact), mentioning our reference number as it appears above. Telephone inquires can be made to(Bank credit operations contact).

**DRAFT**

Form of Bid Deposit Performance Bond

Bid Deposits provided in the form of performance bonds must be in substantially the form given below.

PERFORMANCE BOND NO. [ ]

KNOW ALL MEN BY THESE PRESENTS, that ( Prospective Bidder or Guarantor(s) name(s)) as Principal, and ( Surety Company name ) as Surety, are held firmly bound unto Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation as Obligees in the sum of [dollars] lawful money of the United States of America, to be paid to the Obligees, for which [performance], well and truly to be made, we bind ourselves, our respective heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has entered a written Auction Participation Agreement dated ( ) (the "Agreement") with the Obligees affirming Principal's commitment 1) to abide by the rules of the Auction as stated or referenced in the Agreement, 2) to abide by any decisions of the Auctioneer, and 3) to provide the requisite security documents and execute a Standard Offer Service Agreement within ten (10) business days upon notification of their status as a Successful Bidder.

NOW THEREFORE, the condition of this obligation is such that, if the Principal shall promptly and faithfully perform the undertakings, covenants, terms and conditions of the Agreement, then this obligation shall become null and void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to, or for the use or benefit of anyone other than the named Obligees.

Whenever the Principal shall be, and declared by the Obligees to be in default in relation to the Principal's failure to abide by the undertakings, covenants, terms and conditions of the Agreement, the Obligees having performed Obligees' obligations thereunder, the Surety shall:

1. Pay to the Obligees such dollar amount representing the Principal's Bid Deposit due to the Obligees pursuant to the obligations of the Principal as set forth in the Agreement.

**DRAFT**

In witness whereof we hereunto set our hands and seals this ( ) day of ( ), A.D. 19( ).

( ) ( )
(Principal) (Surety)
by: ( ) (seal) by: ( ) (seal)

DRAFT

Form of Performance Surety Letter of Credit

Performance surety provided in the form of a letter of credit must be in substantially the form given below.

Irrevocable Standby Letter of Credit Date:( )

BENEFICIARY Credit Number: ( )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

BY ORDER OF:
(Bidder name and address)

or (Guarantor name and address)

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of (the Bidder)[(the Guarantor) on behalf of (the Bidder)]for a sum or sums not exceeding a total of US DOLLARS $xx,xxx.xx(written dollar amount AND xx/100 U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES effective(date)and expiring on (date).

Draft(s) must be accompanied by:

1. Your written letter requesting payment under this Letter of Credit signed by a representative of Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the EUA Companies "). Such letter from the EUA Companies shall include a statement of the dollar amount due to the EUA Companies, pursuant to the obligations of (Bidder/Guarantor)as set forth in the Standard Offer Service Agreement by and between (Bidder/Guarantor) and the EUA Companies.

Partial drawings are permitted under this Letter of Credit.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. ( ) dated ( ) of the (Bank)."

We agree to renew this Letter of Credit automatically for a

DRAFT

period of one (1) year from the initial expiration and each subsequent expiry date unless the beneficiary has received by registered or certified mail, return receipt requested, written notification of our intention not to renew, post marked no less than thirty (30) days prior to the expiration of any term.

If this Letter of Credit shall not be extended and the obligation of (Bidder/Guarantor)under the Standard Offer Service Agreement, as secured by this Letter of Credit, remains outstanding, and (Bidder/Guarantor)has failed to provide an amended or substitute Letter of Credit in accordance with your terms and conditions, you may draw upon us forthwith for the full amount of this Letter of Credit by means of your sight draft together with the following document:

Your signed statement certifying that (Bidder/Guarantor)has failed to provide you with a substitute Letter of Credit within fifteen (15) days from the date of your receipt of our notice not to renew.

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before **(FILL IN EXPIRATION DATE)**, or any subsequent expiration date.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name) and, attention (Bank credit operations contact), mentioning our reference number as it appears above. Telephone inquires can be made to(Bank credit operations contact).

**DRAFT**

Form of Performance Surety Performance Bond

Performance surety provided in the form of a performance bond must be in substantially the form given below.

PERFORMANCE BOND NO. [ ]

KNOW ALL MEN BY THESE PRESENTS, that ( Prospective Bidder or Guarantor(s) name(s)) as Principal, and ( Surety Company name ) as Surety, are held firmly bound unto Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation as Obligees in the sum of [dollars] lawful money of the United States of America, to be paid to the Obligees, for which [ performance], well and truly to be made, we bind ourselves, our respective heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has entered a written Standard Offer Service Agreement dated ( ) (the "Agreement") with the Obligees for the delivery of requirements electric service (the "Standard Offer Service").

NOW THEREFORE, the condition of this obligation is such that, if the Principal shall promptly and faithfully perform delivery of the Standard Offer Service pursuant to the undertakings, covenants, terms and conditions of the Agreement, then this obligation shall become null and void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to, or for the use or benefit of anyone other than the named Obligees.

Whenever the Principal shall be, and declared by the Obligees to be in default in relation to the Principal's obligations under the Agreement, the Obligees having performed Obligees' obligations thereunder, the Surety shall:

1. Pay to the Obligees such dollar amount due to the Obligees pursuant to the obligations of the Principal as set forth in the Agreement.

DRAFT

In witness whereof we hereunto set our hands and seals this ( ) day of ( ), A.D. 19( ).

( )
(Principal)

by: ( ) (seal)

( )
(Surety)

by: ( ) (seal)

Confidential NEC077979

DRAFT

# APPENDIX 6

## NEPOOL Membership Application Requirements

Q:\STDOFFER\RFQ.DOC 42 1:33 pm 9/18/97

Confidential NEC077980

In accordance with Sections 1.18 and 3.0 of the Restated NEPOOL Agreement, membership is open to any Entity, which is defined as:

> "any person or organization in the electric power business (the generation and/or transmission and/or distribution of electricity for the consumption by the public, or the purchase, as a principal or broker, of Installed Capability, Operable Capability, Energy, Operating Reserves, and/or AGC for resale at wholesale or retail), whether the United States of America or Canada or a state or province or a political subdivision thereof or a duly established agency of any of them, a private corporation recognized in law as capable of owning property with respect thereto.
> No person or organization shall be deemed to be an Entity if the generation, transmission, or distribution of electricity by such person or organization is primarily conducted to provide electricity for consumption by such person or organization or a Related Person."

To become a NEPOOL Participant, a letter requesting membership must be sent to the Secretary of the NEPOOL Management Committee with the following documents:

1. A completed NEPOOL Membership Application Questionnaire

2. An executed counterpart of the Restated NEPOOL Agreement, as amended

3. Evidence of a certified vote of the applicant's board of directors, or such other body or bodies as may be appropriate, duly authorizing execution and performance of the Restated NEPOOL Agreement

4. A check for $500, payable to the New England Power Pool.

Once the above documents are received, the application will be forwarded to the NEPOOL Membership Subcommittee to review conditions on memberships and to consider if any waivers of obligations are applicable. Such issues are based on the nature of the electric business that will be conducted in New England identified in the NEPOOL Membership Application Questionnaire. Also note that per Section 3.5 of the Restated NEPOOL Agreement, the NEPOOL Management Committee may prescribe that the applicant provide and maintain in effect an unconditional and irrevocable letter of credit to meet the applicant's responsibilities and obligations under the agreement to protect other Participants against the risk of the applicant's non-payment of its obligations.

In addition to the initial application of $500, NEPOOL Members must also pay an annual fee of $500 and a monthly variable charge based on business activity. This monthly fee will be determined using an approved formula that weights load responsibility, market activity and other matters.

Once membership has been approved, NEPOOL must file with the Federal Energy Regulatory Agency (FERC). The filing is reviewed by FERC and a public notice of the filing is published. If there are no problems with the filing, FERC sends NEPOOL a letter accepting the filing within two months after its been made. Typically the process, from initial application with NEPOOL to the final approval by FERC, will take approximately six months to complete. Applicants are encouraged to submit all requested information as completely as possible in order to expedite the application process.

Attachment 1-1 NEPOOL Membership Application Questionnaire

Attachment 1-2 Executable Counterpart of the Restated NEPOOL Agreement

Confidential

# NEPOOL Membership Applicant Questionnaire

I. **Applicant:** ______________________________

Applicant is (please check appropriate category):

___ A corporation created under the laws of ______________________
___ A political subdivision of the US or Canada, or an agency thereof
___ A partnership ___ An electric cooperative
___ An individual
___ Other (please describe) ______________________________

Applicant operates as (please check all categories that apply):

___ Vertically Integrated Utility ___ Municipal
___ Qualifying Facility ___ Cogenerator
___ Independent Power Producer ___ Exempt Wholesale Generator
___ Cooperative ___ Transmitter
___ Load Aggregator (purchases at wholesale to sell at retail)
___ Power Marketer (purchases and sells at wholesale)
___ Broker (arranges power transactions without taking title)

II. **What is the nature of your electric business in New England?**
(Please answer all of the following)

a. Do you own, operate, or hold assignable entitlements in generating capability located in New England? ________

b. Do you own, operate, or hold assignable rights to transmission facilities rated 69 kV or above located in New England? ________

c. Do you distribute electricity directly to end-users in New England, or to end-users whose loads you intend to transfer to New England? ________

d. Are you engaged, as principal or broker, in the purchase or ownership of electric energy and/or capacity for resale at wholesale? ________

e. Describe the activities you have conducted (or will conduct pending appropriate approvals) in New England? ______________________________
______________________________
______________________________

f. If you answered yes to a, b, or c above, is any of your generation, transmission, or distribution of electricity conducted to provide energy for your own consumption? ________

If yes, please describe the nature of your own consumption. ______________
______________________________
______________________________

g. i. Do you have a direct or indirect ownership interest in any entity engaged in the electric business or are you owned directly or indirectly by any entity engaged in the electric business? ________

ii. If yes, please identify and describe all related entities engaged in the electric business and the nature of your relationship with them.

________________________________________

________________________________________

iii. If you answered yes to a, b, or c above, is any of your generation, transmission, or distribution of electricity conducted to provide energy for consumption by any of the organizations identified in ii. above? ____

If yes, please describe the nature of such entities' consumption. ______

________________________________________

________________________________________

h. If the primary answers to a, b, c, and d above are all negative, what is your interest in becoming a member of NEPOOL? ________________

________________________________________

________________________________________

**III. Who are your contact individuals?**

Applicant Contact(s): ____________________

____________________

Address: ____________________

____________________

____________________

____________________

Phone(s): ____________________

____________________

Fax: ____________________

We anticipate that you may have a number of questions in considering membership in NEPOOL. To avoid any confusion or misinformation that could result from differing interpretations of questions and/or answers, please direct any questions concerning NEPOOL membership to:

E. Kenneth Nielsen
Director, NEPOOL Billing

Phone: (413) 535-4075
New England Power Pool
One Sullivan Road
Holyoke, MA 01040-2841

HARTD1-129369-1
66227-10100
May 8, 1997 10:39 am

COUNTERPART SIGNATURE PAGE
NEW ENGLAND POWER POOL AGREEMENT

The NEPOOL Agreement, being dated as of September 1, 1971, as amended.

______________________________
(Applicant)

By:___________________________
Name:
Title:
Address:

HART01-129203-1
66227-10120
May 8, 1997 10:59 am

## RESOLUTION FOR ADOPTION BY NEPOOL APPLICANTS

## CERTIFIED RESOLUTION OF THE BOARD OF DIRECTORS

The undersigned, being the Secretary of the [Company], a [State] corporation, certifies that on a meeting of the Board of Directors of the [Company] held on [Date] in accordance with the provisions of the duly-adopted by-laws of the [Company], the following resolution was adopted and the same remains in full force and effect as of the date hereof.

> RESOLVED, that the [Company] shall apply to become a Participant in the New England Power Pool under the New England Power Pool Agreement dated as of September 1, 1971, as amended, (the "Agreement") and the [officers] are severally authorized to execute a counterpart of the Agreement on behalf of the [Company] and to cause the [Company] to perform its obligations under the Agreement upon the effectiveness of its membership.

Dated: _______________

_______________________________
By [Name of Secretary]
Its Secretary

HART01-111673-1
66227-00012
May 8, 1997 10:59 am

# EXHIBIT L

**PART 1 OF 4**

EXHIBIT 20

ORIGINAL

WINTHROP, STIMSON, PUTNAM & ROBERTS

1133 CONNECTICUT AVENUE
WASHINGTON, DC 20036

TELEPHONE: 202-775-9800
TELEFAX: 202-833-8491
TELEX: 316229 WINSTIM DC

ONE BATTERY PARK PLAZA
NEW YORK, NY 10004-1490
TELEPHONE: 212-858-1000
TELEFAX: 212-858-1500

695 EAST MAIN STREET
STAMFORD, CT 06904-6760
TELEPHONE: 203-348-2300
TELEFAX: 203-965-8226

125 WORTH AVENUE
PALM BEACH, FL 33480
TELEPHONE: 407-655-7297
TELEFAX: 407-833-6726

2 THROGMORTON
LONDON EC2N 2DL ENGLAND
TELEPHONE: 011-44171-628-4931
TELEFAX: 011-44171-638-0443

RUE DU TACITURNE 42
B-1040 BRUSSELS, BELGIUM
TELEPHONE: 011-322-230-1392
TELEFAX: 011-322-230-9288

6-7, ATAGO 1-CHOME
MINATO-KU, TOKYO 105, JAPAN
TELEPHONE: 011-813-3437-9740
TELEFAX: 011-813-3437-9261

2505 ASIA PACIFIC FINANCE TOWER
CITIBANK PLAZA
3 GARDEN ROAD, CENTRAL, HONG KONG
TELEPHONE: 011-852-2530-3400
TELEFAX: 011-852-2530-3355

ISAAC D. BENKIN
202-775-9880

FILED
OFFICE OF THE SECRETARY
97 OCT 29 AM 11:11
FEDERAL ENERGY
REGULATORY
COMMISSION

October 29, 1997

Hon. Lois D. Cashell, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re: Montaup Electric Company, Docket Nos. ER97-2800-000, ER97-3127-000 and ER97-2338-000 (Consolidated) -- Offers of Settlement

Dear Ms. Cashell:

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602, Montaup Electric Company (Montaup) is herewith filing an original and fourteen copies of a package of Offers of Settlement in Docket Nos. ER97-2800-000, ER97-3200-000 and ER97-2338-000 together with a single Explanatory Statement covering all such settlements.

The settlement offers consist of: (1) A Stipulation and Agreement by and between The Office of the Attorney General of Massachusetts, the Division of Energy Resources, Edison Electric Company and Montaup in Docket No. ER97-3127-000; (2) A Stipulation and Agreement by and between the Rhode Island Public Utilities Commission, the Rhode Island Division of Public Utilities and Carriers, Blackstone Valley Electric Company, Montaup and Newport Electric Corporation in Docket No. ER97-2800-000; (3) A Stipulation and Agreement between Montaup and the Pascoag Fire District of Rhode Island (Pascoag) in Docket Nos. ER97-3127-000 and ER97-2800-000, settling issues pertaining to the restructuring of their current contract for Contract Demand Service; (4) A Stipulation and Agreement between Montaup and the Gas and Electric Department of the Town of Middleborough, Massachusetts (Middleborough) in Docket Nos. ER97-3127-000 and ER97-2800-000, settling issues pertaining to the restructuring of their current contract for Contract Demand Service; (5) A series of agreements between Montaup, on

POOR QUALITY ORIGINAL

POOR QUALITY ORIGINAL

FERC - DOCKETED
OCT 29 1997

971031-0085-1

one hand, and the Taunton Municipal Lighting Plant, Pascoag and Middleborough, on the other, in Docket No. ER97-2338-000, settling issues pertaining to the provision of Transmission Service by Montaup to those three municipal customers.

The settlement offers are unanimously supported by all active parties to this consolidated proceeding.

If accepted and approved by the Commission, these Offers of Settlement would resolve all issues which have been set for hearing before Presiding Administrative Law Judge Lawrence Brenner.

In accordance with Rule 602(d), Montaup states that (i) copies of this filing are being served upon all participants in this proceeding and upon all other persons on whom the service agreements in the captioned dockets were served, and (ii) initial comments on the Offers of Settlement are due on or before November 18, 1997 and reply comments are due no later than November 28, 1997.

The Stipulations and Agreements that make up the Offers of Settlement tendered herewith are intended to enable Montaup's retail affiliates to implement the provisions of retail open access programs in Massachusetts and Rhode Island. On January 1, 1998, the Massachusetts retail open access program is scheduled to commence and the Rhode Island program is scheduled to undergo a significant expansion. In addition, the Stipulations and Agreements with Montaup's unaffiliated customers, Pascoag First District in Rhode Island and the Town of Middleborough, Massachusetts, are designed to restructure their power supply arrangements with Montaup, and it is important to place their new agreements into effect on January 1, 1998 also. For this reason, Montaup wishes to call to the Commission's attention the importance of acting on these settlement proposals in time to allow them to be placed into effect on January 1, 1998.

We are providing two courtesy copies of this filing to Presiding Judge Brenner.

We are also transmitting two additional copies of this filing and ask that your office date-stamp them to indicate

#60103201.1

their receipt and return them to us in the envelope provided for that purpose. Finally, we request that you call us immediately if you have any questions about this filing.

Sincerely,

Isaac D. Benkin
Counsel for Montaup
Electric Co.

Atch.

cc: Judge Brenner
All persons required to
be served under Rule 602(d)

#60103201.1

OFFICE OF THE SECRETARY
97 OCT 29 AM 11:11
FILED
FEDERAL ENERGY REGULATORY COMMISSION

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Montaup Electric Company ) Docket Nos. ER97-2800-000,
) ER97-2338-000 and
) ER97-3127-000

EXPLANATORY STATEMENT TO ACCOMPANY
STIPULATIONS AND AGREEMENTS

Montaup Electric Company ("Montaup"), pursuant to Rule 602(c)(ii) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602(c)(ii), submits this Explanatory Statement in connection with four packages of settlement proposals intended to dispose of all issues pending before the Commission in this consolidated proceeding.

The four packages are as follows:

(1) A Stipulation and Agreement filed in Docket No. ER97-2800-000 (referred to hereinafter as the "RI Agreement") by and among the Rhode Island Public Utilities Commission, the Rhode Island Division of Public Utilities and Carriers, Montaup's affiliated customers in Rhode Island, Blackstone Valley Electric Company ("Blackstone"), Newport Electric Corporation ("Newport"), and Montaup.

(2) A Stipulation and Agreement in Docket No. ER97-3127-000 (referred to hereafter as the "MA Agreement"), by and among the Massachusetts Office of the Attorney General, the Massachusetts Division of Energy Resources, Montaup's affiliated customer in Massachusetts, Eastern Edison Company ("Eastern Edison"), and Montaup. 1/

---

1/ The MA Agreement is also jurisdictional to the Massachusetts Department of Public Utilities ("DPU") and will be filed with the DPU at a later date. Montaup anticipates that the original May 16, 1997 MA Agreement, as modified by a compliance filing on October 10, 1997, will be acted upon by the Massachusetts Department of Public Utilities ("DPU") on or before November 9, 1997. As discussed in the attached press release issued by Montaup's parent, Eastern Utilities Associates, the modified agreement reflects certain technical changes which EUA expects will fully resolve the (continued...)

(3) Stipulations and Agreements between Montaup and its non-affiliated sales customers, the Pascoag, Rhode Island, Fire District ("Pascoag") and the Town of Middleborough, Massachusetts ("Middleborough") in Docket Nos. ER97-2800-000 and ER97-3127-000, incorporating by reference Agreements between Montaup and each of those customers (hereinafter referred to as the "Pascoag-Middleborough Transition Sales Agreements"). Those Agreements will replace Montaup's existing contracts for Contract Demand service ("CD contracts") to Pascoag and Middleborough with more flexible service arrangements and provide for Montaup's recovery of contract termination charges to compensate it for the loss of contract demand service to the non-affiliated customers.

(4) Stipulations and Agreements between Montaup and its three non-affiliated transmission customers, Pascoag, Middleborough and the City of Taunton's Municipal Lighting Plant ("Taunton") in Docket No. ER97-2338-000, providing for a transmission tariff service agreement for network transmission service and a network operating agreement between Montaup and each of those customers, under which Montaup will provide each of those customers with Network Integration Transmission Service (referred to hereinafter as the "NIS Agreements").

If accepted and approved by the Commission, the RI and MA Agreements would specify the terms and conditions for the termination of the wholesale electric requirements contracts between Montaup and Blackstone and Newport, Montaup's retail affiliates doing business in the State of Rhode Island (Docket No. ER97-2800-000), and between Montaup and Eastern Edison, Montaup's retail affiliate doing business in the Commonwealth of Massachusetts (Docket No. ER97-3127-000).

Montaup presently supplies all of its Affiliates' requirements for electricity. Prior to the institution of this consolidated proceeding, all of the Affiliates were subject to a

---

1/(...continued)
outstanding issues in connection with the introduction of retail open access in Massachusetts.

three-year notice provision in order to terminate their all-requirements contracts. To permit the Affiliates to participate in the phase-in of retail open access in Rhode Island and full retail access in Massachusetts, the Agreements provide for the modification of the three-year notice provision.

The RI Agreement implements the requirements of a Rhode Island statute, the Utility Restructuring Act of 1996, under which the first step of a three-step process introducing retail open access in that state commenced on July 1, 1997. The MA Agreement responds to an initiative of the Massachusetts Department of Public Utilities which has promulgated Model Rules establishing guidelines for restructuring utilities so that they can, and will, provide unbundled retail open access service. In addition, the Agreements reflect the Commission's policies under its Order No. 888, favoring wholesale competition. Hence, the Agreements present a unique circumstance: the Commission must approve the voluntary termination of wholesale requirements service in order to enable state-mandated or -sponsored retail competition programs to go forward. Therefore, the Agreements implicate important state interests and are consistent with the Commission's policy of "cooperative federalism," under which it strives to strike an appropriate balance between federal and state interests.

**The RI and MA Agreements**

The significant features of the RI and MA Agreements are as follows:

1. **Termination of Wholesale Service Agreements.** The signatories to the RI and MA Agreements agree that it is just and reasonable and in the public interest to terminate the respective obligations of Montaup, Newport, Blackstone and Eastern Edison under their FERC Tariff First Revised Volume No. 1 ("Tariff No. 1") wholesale requirements service agreements in accordance with the provisions of amendments to those service agreements which are being submitted as part of this settlement (the "Amendments"). Major provisions of the Amendments are as follows:

a. The Amendments permit Newport and Blackstone to reduce purchases of their wholesale requirements from Montaup as of July 1, 1997, and for all the Affiliates to terminate their purchases of wholesale requirements service on or after January 1, 1998, upon 90 days' advance notice (or less upon mutual consent of the parties) rather than the three-years' notice provided for in the pre-existing contracts.

b. The Amendments require each of the Affiliates to pay Montaup Contract Termination Charges ("CTC") commencing with the termination of its wholesale requirements purchase obligation. The CTC payments will enable Montaup to recover an allocable share of the costs it has incurred to provide requirements service to each of these Tariff No. 1 customers. As detailed in a formula included as part of each of the Amendments, these costs include, for example, the costs associated with Montaup's investments in generating assets, Montaup's contractual commitments for purchased power and fuel transportation, deferred costs and other regulatory assets, nuclear post-shutdown costs including decommissioning costs and employee severance and retraining costs, together with a return on unrecovered costs. The Agreements include a mechanism for resolving disputes that may arise in the implementation of the CTC formula.

c. Each of the Amendments requires Montaup to credit against the respective Affiliate's responsibility for CTC a proportionate share of the full market

value of Montaup's generating business. Montaup has committed to divest itself of its generating assets and purchased power contracts. The allocable share of the net proceeds of the divestitures will be applied to reduce the responsibility of each of the Affiliates for CTC, rather than being retained by Montaup or its shareholders.

d. The Amendments require Montaup to offer wholesale "Standard Offer Service" to the Affiliates after the termination of their Tariff No. 1 purchase obligations, at a fixed schedule of prices (subject to adjustment for a fuel index only) to enable the Affiliates to meet their obligations to provide continued service to their retail customers who choose not to avail themselves of the opportunity to acquire their retail power supplies from alternate suppliers. Although Montaup is obligated to supply wholesale Standard Offer Service to the Affiliates, the Affiliates are not obligated to purchase wholesale power from Montaup after the Contract Termination Date, as such date is defined in the Amendments applicable to the Affiliates. The Agreements and the Amendments reflect the fact that each of the Affiliates may choose to afford other suppliers the opportunity to bid to supply the power it needs to meet its obligations to retail customers after retail open access commences. This will provide greater opportunities for wholesale competition to develop in conjunction with the introduction of retail competition. Montaup's obligation to supply wholesale power at a preset rate will, moreover, afford a high level of assurance that all retail customers of the Affiliates will have an opportunity to benefit from the introduction of competition at the wholesale and retail levels.

e. Base rates for the wholesale requirements service of Blackstone and Newport are frozen until the Contract Termination Date, as such date is defined in their Amendments. With respect to Eastern Edison, its base rates for wholesale requirements service are frozen until the earlier of December 31, 2000 or the Contract Termination Date, as such date is defined in the Amendment pertaining to Eastern Edison.

f. Montaup commits to provide unbundled Network Integration Transmission Service to each of the Affiliates from and after the Contract Termination

Date, as such date is defined in the Amendment applicable to that Affiliate.

2. **Divestiture of Generation Assets.** Montaup agrees to divest its generation assets and to attempt to divest its contractual entitlements to purchase power from third parties and its minority interests in nuclear power facilities. A proportionate share of the net proceeds received by Montaup through the divestiture will be credited against each of the Affiliates' respective obligation to pay CTC. Montaup's divestiture is subject to a final Commission order approving the method of sale and the reasonableness of the proceeds. Principal aspects of the divestiture are as follows:

a. In the event that Montaup retains the obligation to pay post-shutdown, decommissioning or site restoration costs with respect to its interests in nuclear generating facilities as part of the disposition of those interests, Montaup will be entitled to recover a proportionate share of those costs from the Affiliates through the CTC. In the event Montaup is unable to dispose of its interests in nuclear generating facilities, it will be entitled to recover 80 percent of the reasonable going-forward costs of operating the facilities through the CTC and will credit 80 percent of the revenues from the kilowatt-hour sales from its interests in the facilities in the calculation of the CTC. Montaup also agrees to present a proposed performance standard applicable to its nuclear facility interests and to support adoption at those facilities of a detailed procedure to be implemented in the event the decision is made to shut down any of those plants prematurely.

b. Montaup may recover in CTC paid by each of its Affiliates a proportionate share of the payments to power suppliers and other costs associated with buying out or buying down purchased power contracts. In the event Montaup is unable to dispose of its rights under those contracts, Montaup is expected to resell the power purchased under those contracts. The CTC will reflect both contract payments and revenues received from the

sale of power into the market. The Agreements also provide that Montaup may use its rights under those contracts to fulfill its backstop obligations to supply wholesale Standard Offer Service to the Affiliates.

3. **Emission Reductions.** Montaup agrees to reduce emissions of $NO_x$ and $SO_2$ from certain generating units by the amounts and on the schedule specified in an attachment to the MA Agreement. This requirement will also apply to the party or parties that might acquire the generating units upon their divestiture by Montaup.

4. **Other Matters.** The Agreements also reflect agreement on the following matters:

a. The signatories agree that market pricing is appropriate for sales from Montaup's generation.

b. The signatories agree to the appropriateness of the designation of Montaup's generating units as eligible facilities under section 32 of the Public Utility Holding Company Act.

c. The signatories agree that all of the facilities of Montaup and the Affiliates used for the delivery of electricity to retail customers (with the exception of a few specified facilities) are properly classified as distribution facilities subject to the ratemaking jurisdiction of the Rhode Island or Massachusetts state regulatory bodies, as appropriate. Nevertheless, the Agreements expressly provide that the Commission's acceptance or approval of the signatories' resolution of the above matters is not a condition of the Commission's acceptance and approval of the Agreements.

5. **Need for Assurances.** The Agreements recognize that Montaup is making substantial and irreversible commitments, including the divestiture of its generating business and the assignment of the Affiliates' share of the residual value of Montaup's generating assets for the benefit of the Affiliates and

their customers, primarily in consideration for an entitlement to the recovery of CTC from the Affiliates, determined in accordance with the particular Amendment applicable to each such Affiliate, over an extended period of time. To give effect to Montaup's reliance on the bargain reflected in the Agreements and the Amendments, the signatories to the RI and MA Agreements seek the Commission's assurance that it will, to the fullest extent permissible under the Federal Power Act, give permanent effect to Montaup's right to charge and recover the allocable amount of CTC from the Affiliates in accordance with the particular Amendment applicable to each such Affiliate. The Agreements specifically preclude application to the Commission for changes to the CTC formula, under either section 205 or section 206 of the Federal Power Act, absent Montaup's agreement (section 3.6) and call upon the Commission to refrain from revisiting the issue of the justness and reasonableness of the CTC or from limiting Montaup's right to recover in full the CTC contemplated by the Agreements (section 6.1).

Montaup recognizes that the Commission's responsibility to order changes in jurisdictional rates that are contrary to the public interest cannot be precluded by a settlement agreement. See El Paso Electric Co., 43 FERC ¶ 61,201 (1988). Nevertheless, the parties have concluded that, taken as a whole, the provisions of the Agreements, including Montaup's recovery of the CTC in full, are just, reasonable and consistent with the public interest. Significantly, the signatories reaching that conclusion with respect to the MA Agreement include the Attorney

General, who is authorized by Massachusetts law to represent the interests of Eastern Edison's retail customers in proceedings before this Commission. See Mass. Gen. Laws, c. 12, sec. 11E. With respect to the RI Agreement, the signatories include the Rhode Island Public Utilities Commission as well as the Rhode Island Division of Public Utilities and Carriers, acting through the Rhode Island Attorney General who is authorized to act on its behalf. These institutions are authorized under Rhode Island law to represent the interests of the retail customers of Blackstone and Newport in this proceeding. See R.I. Gen. Laws § 39-1-27.1 (Rhode Island Public Utilities Commission), § R.I. Gen Laws § 39-1-29 (Rhode Island Division of Public Utilities and Carriers).

The parties to the RI and MA Agreements have also recognized that the Agreements go well beyond the resolution of a single wholesale rate proceeding. Indeed, they provide the framework for the fundamental restructuring of the contractual relationships between Montaup and its Affiliates, committing Montaup to divestiture of its generating business in the process. In light of the gravity and the irreversible nature of the mutual commitments reflected in the Agreements, the parties seek to assure the continued vitality of those commitments to the greatest extent possible, consistent with the Commission's exercise of its statutory authority. As other regulatory agencies have done when they have approved similarly long-lived settlements, see Pacific Gas & Electric Co., 99 P.U.R. 4th 141 (Cal. Publ. Util. Com'n 1988), the Commission should indicate that it recognizes the unusual nature of the commitments in the

Agreements, and will not disturb them absent an unequivocal showing that the public interest cannot be served in any other way.

**The Pascoag-Middleborough Transition Sales Agreements**

Pascoag and Middleborough had protested Montaup's original filings in Docket Nos. ER97-2800-000 and ER97-3127-000 as adversely affecting their existing CD contracts with Montaup, pursuant to which these customers had purchased contract demand service. In its August 1, 1997 order accepting Montaup's filing in Docket No. ER97-3127-000 and consolidating it for hearing with Docket No. ER97-2800-000, the Commission ruled that the issues raised by Pascoag and Middleborough "are best pursued at the hearing we have ordered on Montaup's filing."

Montaup, on the one hand, and Pascoag and Middleborough, on the other, now wish to settle those issues in Docket Nos. ER97-2800-000 and ER97-3127-000 (as consolidated with Docket No. ER97-2338-000) regarding the impact of the filings on these customers' CD contracts by entering into new power supply agreements, restructuring their existing obligations to take and pay for contract demand electric service under the CD contracts. Under the new agreements, Montaup will receive certain compensation in connection with the termination of contract demand service under the pre-existing contracts. Copies of the new agreements are attached to and incorporated in the Stipulations and Agreements between Montaup and Pascoag and between Montaup and Middleborough (Attachment 1). They form an integral part of the settlement which we are now submitting to the Commission. In addition,

there are attached to the Stipulations and Agreements, as Attachment 2, spreadsheets which the parties had before them while negotiating the new agreements, demonstrating that, for each of the customers, the new agreements produce cost savings when compared with the rates they would have paid under their CD contracts, which had previously been deemed just and reasonable by the Commission. It should be noted that the new agreements produce rate decreases even when the customers' obligations to make Contract Termination Charge payments are taken into account.

The Agreements between Montaup and Middleborough and between Montaup and Pascoag provide for those customers to receive from Montaup sales services tailored to the needs of the specific customer in lieu of its old CD contract service. Each of the customers is given the right to reduce or terminate the amount of its service upon 90 days' notice to Montaup. Hence, the non-affiliated customers will have the flexibility to continue to receive service from Montaup or to purchase their electricity needs from the evolving competitive bulk power market.

**The NIS Agreements**

The transmission settlements are between Montaup, on the one hand, and Middleborough, Taunton and Pascoag (collectively "Municipals") on the other. They consist of a transmission tariff service agreement for network transmission service and a network operating agreement between Montaup and each Municipal, a letter agreement with Municipal stating the terms of the settlement and an attachment to the letter stating the conditions of the settlement. The terms of the settlement --

- Require Montaup and each Municipal to renegotiate their network operating agreement if NEPOOL and the ISO should cease to exist.

- Municipals have the right to terminate service on one year's notice.

- Include in the agreement for network service to Taunton a provision with respect to credit for the reactive power contribution of Taunton's generation in case NEPOOL no longer exists.

- Provide that 115 kV radial support provisions in the CD contract between Montaup and Middleborough shall remain in effect following the termination of contract demand service under that agreement, and that contracts pertaining to the E-1/115 kV radial and breaker are intended to be life-of-facilities agreements.

- Provide for use of current-month coincident demands in determining load ratio shares of Montaup's revenue requirement.

- Provide for revenue credits against each Municipal's load ratio share of Montaup's transmission revenue requirement for any revenues from retail transmission service which Montaup provides to customers within that Municipal's service area.

- Provide that Montaup shall not charge a Municipal customer for any ancillary services provided by NEPOOL for Montaup's load or such services billed directly by NEPOOL to them.

- Provide that Montaup shall not bypass a Municipal customer's distribution facilities and interconnect directly with a retail customer unless required to do so by order of the FERC or such state regulatory authority as may have jurisdiction.

- Provide that the network operating agreements and service agreements shall be revised to include any changes required as a result of FERC proceedings on transmission filings made by NEPOOL.

- Provide that Montaup will correct service agreements between Montaup and its affiliates to eliminate delivery points below 115 kV.

- Provide that Montaup will amend its tariff to make it clear that Pascoag will not be charged twice for the costs of 13.8 kV facilities used to serve Pascoag.

- Provide that provisions for subtransmission service in the CD contract between Montaup and Pascoag shall remain in effect following the termination of contract demand service under that agreement, and that this subtransmission service shall apply to, and be available for, requests for transmission service to retail customers within Pascoag's service territory.

The negotiation of this package of agreements has involved a delicate balancing of many interests and a great deal of give and take among the parties. We urge the Commission to act promptly and favorably upon this settlement and to allow the several agreements that make up the settlement to become effective on January 1, 1998 to enable Montaup and its customers to participate on schedule in the initiation of retail access in Massachusetts and the expansion of retail access in Rhode Island.

Respectfully submitted,
MONTAUP ELECTRIC COMPANY

Isaac D. Benkin
Marvin T. Griff
Winthrop, Stimson, Putnam & Roberts
1133 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 775-9800

Its Attorneys

Atch.

Dated: October 29, 1997

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, D.C. this 29th day of October, 1997.

Isaac D. Benkin
Winthrop, Stimson, Putnam & Roberts
1133 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 775-9800

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Montaup Electric Company | ) ) ) | Docket No.. ER97-2800-000 |

**STIPULATION AND AGREEMENT**

ARTICLE 1.0
BACKGROUND

1.1 Parties.

This Stipulation and Agreement ("Agreement") is entered into by and among the Rhode Island Public Utilities Commission ("RIPUC"), the Rhode Island Division of Public Utilities and Carriers ("RI Division"), Montaup Electric Company (" Montaup"), Blackstone Valley Electric Company (" Blackstone") and Newport Electric Corporation ("Newport"). The foregoing entities are referred to as the Signatories.

Montaup is now obligated to sell electric energy at wholesale to meet the service area requirements of both Blackstone and Newport pursuant to its FERC Electric Tariff, First Revised Volume No. 1 ("Tariff 1"). The RIPUC and RI Division are authorized under the Rhode Island General Laws to participate in all proceedings before the Federal Energy Regulatory Commission (" FERC") with respect to the modification and/or termination of the wholesale Tariff 1.

A:\STIP&A~1.CLN

1.2 Introduction.

This Agreement is designed to implement a resolution of the issues presented by the restructuring of the contract relationship between Montaup and Blackstone and between Montaup and Newport arising out of the passage by the Rhode Island Legislature of the Utility Restructuring Act of 1996 ("URA").

Under Tariff 1, Montaup is obligated to sell to Blackstone and Newport, and Blackstone and Newport are obligated to purchase from Montaup, the requirements of their retail service territories, and they may only terminate those mutual obligations upon three years' notice. The Signatories to this Agreement desire to terminate those obligations earlier in order that retail choice in Rhode Island can proceed as set forth in the URA and in order to provide additional benefits to all electric consumers in Rhode Island.

The URA extends competition in power supply markets to retail customers through the provision of retail access directly to Blackstone's and Newport's customers. Termination of Tariff 1 and the provision of unbundled transmission service by Montaup to Blackstone and Newport under Montaup's open access tariff are both necessary to implement retail access in a manner consistent with the URA. In addition, the provisions of this Agreement provide additional assurance, beyond those reflected in the URA, that consumers will benefit from expanded competition in wholesale and retail power supply markets and that competition will take place on an open and non-discriminatory basis.

This Agreement, all provisions of which are interdependent, except where expressly stated otherwise, is intended upon its acceptance by FERC to provide a final and binding

resolution of all issues associated with the liquidation of the mutual sale and purchase obligations under Tariff 1 and Blackstone's and Newport's Service Agreements with Montaup. Nothing in the language of this Agreement shall be construed to permit Montaup, Blackstone or Newport to recover more than once any of the charges authorized hereunder.

## ARTICLE 2.0
## AMENDMENT OF SERVICE AGREEMENT AND WHOLESALE RATE FREEZE

2.1 Amendment of Service Agreement.

The Service Agreements between Montaup and Blackstone and between Montaup and Newport shall be amended in accordance with the Amendment to the Service Agreement included in Attachments 1B and 1N ("Amendment"). The Signatories agree that the Amendment sets forth rates and other terms for the termination of the reciprocal sale and purchase rights and obligations of Montaup, Blackstone and Newport, including, without limitation, provisions for the payment and collection of Contract Termination Charges, that are just, reasonable and in the public interest.

2.2 Wholesale Rate Freeze

Blackstone and Newport are now served by Montaup under Montaup's wholesale rate M-14 approved by FERC in Docket ER94-1062-000. As set forth in the Amendment, the M-14 base rates in effect as of January 1, 1997 shall remain in effect for Montaup's

service to Blackstone and Newport through the Contract Termination Date defined in Section 3.1 below. Nothing in this Agreement or the Amendment shall preclude Montaup from petitioning FERC for modification of Montaup's fuel or purchase power clauses.

ARTICLE 3.0
CONTRACT TERMINATION

3.1 Contract Termination Date Defined.

As specified in the Amendment, Montaup's obligations to provide requirements service to Blackstone and Newport shall cease on the Contract Termination Date. The Contract Termination Date shall occur on the earlier of the Retail Access Date or the Wholesale Access Date, defined as follows:

3.1.1 The Retail Access Date shall be the later of January 1, 1998 or the date of a final, nonappealable order of the RIPUC approving the implementation methodology for the disposition of Montaup's non-nuclear generating facilities, provided, however, the Retail Access Date shall occur no later than three months after retail access is made available to forty percent (40%) or more of the kilowatt-hour sales in New England, including the total kilowatt-hour sales in Rhode Island, and in any event, not later than July 1, 1998.

3.1.2 The Wholesale Access Date shall be the earlier of the Retail Access Date or the date on which Blackstone or Newport in its sole discretion decides to terminate purchases under Tariff 1 and its Service Agreement with Montaup by providing FERC and

the Signatories with 90 days advance notice in writing, or less with the mutual consent of the parties, said date not to be earlier than January 1, 1998.

3.2 Contract Termination Charges .

Commencing on the Contract Termination Date, Blackstone and Newport shall pay Montaup the Contract Termination Charges pursuant to the terms of the Amendment. If this Agreement is approved by FERC, the Amendment shall be deemed to be a just and reasonable rate for wholesale electric service pursuant to the Federal Power Act and FERC's regulations. The Contract Termination Charges under the Amendment shall apply to all kilowatthours delivered by Blackstone or Newport or their successors or assigns in Blackstone's or Newport's Service Areas. Service Areas are defined to include the area served by Blackstone and Newport on December 1, 1996. Kilowatthours delivered are defined to include all kilowatthours delivered to electricity consumers in Blackstone's or Newport's Service Areas, whether or not they are present customers of Blackstone or Newport. The Base Contract Termination Charges shall equal the cents per kilowatthour amounts shown on Schedule 1 of the Amendment.

The Base Contract Termination Charges shall recover Blackstone's and Newport's proportionate share of Montaup's total contract termination costs shown in Schedule 1 to the Amendment, which respective shares equal 29.13 percent and 11.85 percent of the total. The Base Contract Termination Charges shall be subject to adjustments for a Residual Value Credit described in Section 3.3 and a Reconciliation Account described in Section 3.4.

3.3 Residual Value Credit.

As set forth under Section 6.1 below, Montaup has agreed to a divestiture of its generation business within six months after the later of (1) the Retail Access Date as defined in Montaup's settlement with Eastern Edison Company ("Eastern") in Docket ER97-3127-000, or (2) the receipt of all governmental approvals necessary for such divestiture. Within three months after the sale of any or all of Montaup's generating facilities or any other property subject to divestiture, Montaup shall implement a Residual Value Credit as a direct offset to the Base Contract Termination Charges authorized under this Agreement. The Residual Value Credit shall be deemed to be fully implemented upon completion of the initial divestiture process for Montaup's non-nuclear generating facilities. The Residual Value Credit shall be calculated as set forth in the Amendment.

3.4 Reconciliation Account.

The Base Contract Termination Charges shall be adjusted through a Reconciliation Account in which differences, whether positive or negative, between the estimates for costs and revenues included in the Base Contract Termination Charges and actual costs and revenues are added to or subtracted from the Base Contract Termination Charges from Montaup to Blackstone and Newport. The Reconciliation Account shall be calculated as set forth in the Amendment.

3.5 Resolution of Disputes Associated with the Implementation of the Contract Termination Charge.

It is intended that disputes about the calculation of the Residual Value Credit, other than disputes about the method of sale or reasonableness of the proceeds and adjustments to

the Contract Termination Charges to Blackstone and Newport made by Montaup pursuant to sections 3.3 and 3.4, and the calculation of the purchased power mitigation incentive are, to the extent possible, to be resolved informally and, accordingly, such disputes may not be submitted to FERC until a good faith effort to achieve a consensual resolution has first been made by following the procedures prescribed herein, provided, however, nothing shall preclude FERC from examining any such adjustment including, without limitation, any capital addition made by Montaup after December 31, 1995, by opening its own investigation. Within 30 days after it has modified Blackstone's and Newport's Contract Termination Charges to reflect the Residual Value Credit or a Reconciliation Adjustment, Montaup shall submit to the Signatories, and to any person or entity that is to receive, under FERC's regulations, notice of Montaup rate filings affecting Blackstone and Newport, including, but not limited to the RIPUC and RI Division, an explanation of the adjustment including supporting workpapers. If a recipient desires to challenge any portion of the adjustment, it shall advise Montaup in writing identifying the basis for its dispute. Montaup shall, within 30 days, respond in writing. If the recipient is not satisfied with Montaup's further explanation it shall, within 15 days, notify Montaup in writing of any remaining disagreements and may request that Montaup convene a conference which is to be held within 30 days of such request. The Signatories are to receive from Montaup written notice of, and may participate at, any such conference and are to be provided all written communications relevant to the dispute. At such conference the participants are to make a good faith effort to resolve outstanding disputes. If, following exhaustion of the foregoing

procedure, a participant still disputes any portion of Montaup's adjustment, it may petition FERC for appropriate relief. A copy of such petition shall be served on the Signatories.

If, either as a result of the informal dispute resolution procedure or of FERC action, it is determined that Montaup's calculation of the Residual Value Credit or Reconciliation Account balances for Blackstone's and Newport's Contract Termination Charges were inappropriate, the credit or charges shall nevertheless remain in effect for the balance of the calendar year but Montaup shall adjust the Reconciliation Account for any such overcharge, together with a return equal to that specified in Section 1.1.2 of Appendix 1 to the Amendment, and shall reflect that adjustment in Blackstone's and Newport's Contract Termination Charges effective January 1 of the following calendar year.

3.6 Formula For Contract Termination Charges Not Subject to Change.

The Contract Termination Charges reflected in this Agreement and in the Amendment shall not be subject to change and shall remain in effect until Montaup has collected all amounts subject to collection thereunder. Neither the formulae as set forth in Appendix 1 and Schedules 1 and 2 to the Amendment nor the Contract Termination Charges recoverable under this Agreement and the Amendment shall be subject to change through application to FERC pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act, absent the agreement of Montaup or its successors or assigns.

3.7 Hold Harmless Deferral

Effective on July 1, 1997, Montaup shall institute a Hold Harmless Deferral ("HHD"), in accordance with Article 6 of the Amendment, to defer a portion of the M-Rate Billings to Blackstone and Newport to ensure Blackstone and Newport are held harmless as a result of the phase in of retail access in Rhode Island.

ARTICLE 4.0
TRANSMISSION

4.1 Montaup to Provide Network Integration Transmission Service.

Effective on the Contract Termination Date, Montaup shall provide Blackstone and Newport Network Integration Transmission Service under Montaup's open access transmission tariffs as filed and allowed to become effective from time to time, and on the terms set forth in the Service Agreement for Network Integration Transmission Service included as Attachments 2B and 2N to this Agreement. The Network Integration Transmission Service provided under the Service Agreement shall include transmission service necessary for Blackstone and Newport to provide transmission and distribution access to retail customers. The Signatories to this Agreement support the approval by FERC of Attachments 2B and 2N as filed as part of this Agreement. However, with the exception of the commitments in the following paragraph, approval of Attachments 2B and 2N without change is not a condition of this Agreement. Rather, with respect to transmission access and pricing, Montaup, Blackstone and Newport will modify the Transmission Service Agreement in a manner that is necessary to accommodate FERC's policy.

In addition to the charges for Network Integration Transmission Service, in the event Blackstone or Newport is denied the ability to recover in its transition charges established for the provision of local distribution service the full amount of the Contract Termination Charges billed to them, Montaup or its successors and assigns shall be entitled to collect the unrecovered balance of the Contract Termination Charges as a surcharge on any rate paid for the transmission in interstate commerce of electric energy to Blackstone and Newport or to every consumer located in their Service Area that takes delivery of electric energy from the transmission facilities of Montaup and the distribution facilities of Blackstone and Newport. The amount of any such surcharge shall be submitted to the Federal Energy Regulatory Commission for review by a filing under section 205 of the Federal Power Act. Approval of this provision is a condition of this Agreement.

4.2 Separation of Transmission and Distribution Facilities.

In Order 888, FERC set forth a seven-factor test for determining whether facilities used to provide access to ultimate customers are subject to the ratemaking jurisdiction of FERC or of the RIPUC under state law. Blackstone and Newport have completed such an analysis for the jurisdictional separation of their facilities. The analysis was approved by the RIPUC on June 4, 1997 in Docket 2514, and is included as Attachment 3 to this Agreement. Based on that analysis, the Signatories agree that all of Blackstone's and Newport's facilities meet FERC's seven-factor test for designation as distribution facilities

subject to the RIPUC's jurisdiction with two exceptions. The first exception consists of the facilities that are paid for by Montaup pursuant to FERC Rate Schedules No. 19, No. 21 and No. 6. The Signatories agree that those facilities are transmission facilities subject to FERC's exclusive jurisdiction. The second exception consists of certain facilities that have in the past been classified as distribution plant and that are proposed to be retained by Blackstone and Newport as distribution although they could be classified as transmission under FERC's seven-factor test. The Signatories agree that since these instances of distribution plant that could also be classified as transmission are few in number and have a de minimis impact on the costs of either distribution or transmission service, and because classification of the facilities as transmission would be burdensome to Blackstone, Newport and Montaup, their historical classification as distribution plant should be retained. The Signatories to this Agreement therefore support the approval by FERC of the jurisdictional separation of facilities set forth in Attachment 3. However, approval of the jurisdictional separation of facilities without change is not a condition of this Agreement.

4.3 Sale of Assets.

If, within twelve years from the date of this Agreement, Montaup sells or spins off all or part of its transmission business to an entity that is not a regulated public utility or does not become a regulated public utility immediately following the acquisition, then Montaup will credit any net proceeds in excess of book value to the Reconciliation Account.

ARTICLE 5.0
TRANSITIONAL SERVICE

5.1 Standard Offer Service.

Standard Offer Service shall consist of the wholesale supply of power sufficient to meet the requirements of retail customers served by Blackstone's and Newport's distribution facilities that purchase Standard Offer retail service from Blackstone and Newport. For the period from the Contract Termination Date through December 31, 2009, Montaup shall provide Blackstone and Newport with Standard Offer Service.[1] Standard Offer Service shall be provided at the prices shown below, adjusted for the fuel index set forth in Attachment 5 to this Agreement:

| Calendar Year | Price per kilowatthour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

The prices shown above shall be for electricity delivered to the meter of Blackstone's and Newport's ultimate customers, not including the charges for Blackstone's and Newport's

[1] Montaup, Blackstone and Newport shall have the right in their sole discretion to shorten the period of Standard Offer Service to December 31, 2004, if Blackstone and Newport no longer have the obligation under the Rhode Island URA to extend Standard Offer Service through 2009.

distribution services or for Montaup's Network Integration Transmission Service, but including any and all transmission charges to reach Montaup's system that are not recovered in Blackstone's and Newport's transmission cost adjustment provisions. Standard Offer Service shall be available to Blackstone and Newport after the Wholesale Access Date or to their ultimate customers after the Retail Access Date. After those dates, Blackstone and Newport are free to reduce their purchases under the Standard Offer by pursuing other opportunities in the wholesale market, and their ultimate customers may terminate Standard Offer Service at any time to purchase from a non-regulated power producer as defined in Section 39-1-2(7.1) of the Rhode Island General Laws. Once Blackstone and Newport have reduced their wholesale purchases for those ultimate customers who have terminated Standard Offer Service, they may only elect to increase their purchase for any of Blackstone's and Newport's residential or small general service customers who have taken service from a non-regulated power producer within the first year after the Retail Access Date and such residential or small general service customer elects to return to Standard Offer Service within 120 days of taking service from such non-regulated power producer.

5.2 Right to Bid the Standard Offer.

Blackstone and Newport shall offer alternative suppliers the opportunity to bid on the provision of Standard Offer Service. Blackstone and Newport shall have the ability to defer the bid for standard offer service to coordinate with the Standard Offer Service auction of their affiliate, Eastern. The terms for the bid shall be as set forth in Attachment 4. Montaup shall be free to bid in such auction at prices less than those set forth in Section 5.1,

provided, however, that, if suppliers do not bid to supply any part of the Standard Offer, Montaup, its successors or assignees shall guarantee to provide the unsubscribed portion of such service to Blackstone and Newport at the prices set forth in Section 5.1.

5.3 Assignment by Montaup of Unsubscribed Standard Offer Obligation through Divestiture

As Montaup has agreed to divest its generating business, as set forth in Article 6.0, it will assign the obligation to provide a share of the unsubscribed portion of Standard Offer service with each unit divested in proportion to that unit's contribution to providing Blackstone's and Newport's energy requirements. Montaup will have no further obligation for Standard Offer backstop service so assigned. Any Standard Offer service obligation remaining with Montaup after completion of the divestiture will be supplied first from Montaup's remaining power contracts then from Montaup's remaining nuclear units at the prices set forth in Section 5.1. Montaup will purchase capacity and energy to meet any obligatory Standard Offer Service at the prices set forth in Section 5.1 that cannot be served from Montaup's remaining purchase power and nuclear units.

5.4 Montaup's Obligation to Install Additional Generation Terminated.

Effective on the Contract Termination Date, Montaup shall have no further obligation to meet the electricity demands of Blackstone or Newport, and nothing in this Agreement shall be deemed to require Montaup to make any plan, investment, purchase, or commitment to maintain sufficient generating capacity to provide adequate, continuous, or reliable electricity supplies to Blackstone or Newport except as required to fulfill

Montaup's obligation under this Agreement to provide Standard Offer Service or as is expressly set forth in a separate power purchase contract between Montaup and Blackstone or between Montaup and Newport.

ARTICLE 6.0
DIVESTITURE AND MARKET PRICING OF MONTAUP'S GENERATION

6.1 Divestiture of Montaup's Generating Business.

6.1.1 Montaup agrees, subject to the receipt of all required governmental approvals, to lease, sell, spin off, or otherwise transfer ownership of its generating business to a nonaffiliated entity or entities, other than properties, assets, and entitlements classified to the transmission function. The parties intend that the properties to be divested shall also include: properties currently held in FERC Account 105 Land Held for Future Use - (Production) and FERC Account 121 Nonutility Property. Montaup has developed and, on July 1, 1997 filed with FERC in Docket Nos. ER97-2800-000 and ER97-3127-000, a plan to implement divestiture. This plan includes in particularized detail the generating business to be divested and all properties, assets, and entitlements to be included in the divestiture. The divestiture shall be completed by six months after the later of the Retail Access Date as defined under the filing in Docket No. ER97-3127-000, or the receipt of all governmental approvals necessary for the transfer, and shall be updated with an informational filing 90 days before the date of divestiture. FERC shall review the plan and shall issue a final order on the method of sale and the reasonableness of the proceeds as part of its plan approval.

6.1.2 As part of the divestiture, Montaup will endeavor to sell, lease, assign, or otherwise dispose of its minority shares of nuclear units or entitlements on terms that will assign ongoing operating costs and responsibility to a nonaffiliated third party, but may require Montaup to retain the obligation for post-shutdown, decommissioning, and site restoration for these units or entitlements. Montaup shall recover these post-shutdown, decommissioning, and site restoration costs from Blackstone and Newport through the Contract Termination Charge, and shall credit any net positive value or recover any payments associated with such transaction in the Reconciliation Account of the Contract Termination Charge or the Residual Value Credit. The Signatories agree that this approach is reasonable and Montaup is authorized to include it in its divestiture plan. The transfer of nuclear entitlements will be subject to the approval of the Nuclear Regulatory Commission ("NRC") to the extent required by NRC regulations. In the event that Montaup is unable to sell, lease, assign, or otherwise dispose of its nuclear units or entitlements, Montaup shall include 80 percent of the reasonable going forward costs of operating the units and entitlements, including variable costs and capital additions on a cost of service basis,[2] and 80 percent of the revenues from kilowatthour sales from the units and entitlements, in the Reconciliation Account. Within six months prior to implementing the Performance Based Rate set forth in the prior sentence, Montaup will consult with the Signatories on a performance standard for nuclear safety indicators and will file such performance standard

[2] In the event that the nuclear unit is retired before the end of its license life, the capital addition shall be amortized with a return over the remainder of the license or in accordance with its depreciation schedule, whichever is shorter.

with a maximum potential credit for nonperformance of $250,000. Montaup shall also encourage and support a procedure for maintaining a detailed early shutdown plan at each nuclear unit in which it has an entitlement that can be updated easily and that can form the basis to expedite the preparation of a NRC Post-Shutdown Decommissioning Activities Report ("PSDAR") under 10 C.F.R. 50.82 in the event of early shutdown. Montaup's sales, if any, from its nuclear units shall not be made directly to retail customers of Blackstone and Newport, however these units may be used by Montaup to fulfill its backstop obligations under the Standard Offer.

6.1.3 As part of the divestiture, Montaup will endeavor to sell, assign or otherwise dispose of its power contracts on terms that will assign ongoing contract payments to a nonaffiliated third party. In that event, changes to the above-market payments to power suppliers and any buyout or buydown costs shall be reflected in the Reconciliation Account. In the event that such contracts cannot be sold, assigned, or otherwise disposed of, the power purchased from those contracts shall be sold and the contract payments and market value associated with the sale shall be reflected in the Reconciliation Account. Such sales, if any, shall not be made directly to retail customers of Blackstone and Newport, however, the contracts, including that with Hydro Quebec, may be used by Montaup to fulfill its backstop obligations under the Standard Offer. Nothing in this Settlement shall affect the rights of suppliers or Montaup under purchased power contracts.

6.1.4 The non-utility Signatories have expressed the goals of attaining a market valuation of utility stranded costs, creating a competitive market for supplying electricity to

consumers, and separating generating assets from the transmission system to assure comparability of transmission service. They have expressed a preference for voluntary divestiture of utility generation as a means of achieving these goals. Montaup, Blackstone and Newport have agreed, as part of this Agreement, voluntarily to undertake such divestiture. In exchange, and as consideration for this voluntary divestiture, the Signatories and FERC by its approval of this Agreement, agree that Montaup's Contract Termination Charges to Blackstone and Newport and, in the circumstances described in the second paragraph of section 4.1, to every consumer located in their Service Areas as set forth in the Amendment for the period contemplated by this Agreement are just and reasonable. Accordingly, and to give effect to the reliance placed by the Signatories on the foregoing, FERC shall treat the finding that such Contract Termination Charges are just and reasonable as a final determination made after public notice and a full investigation of the merits, and, in any future proceeding brought by any person or party, or by FERC on its own motion, shall accord such finding the full benefit of policies of repose including, without limitation, the application of the doctrines of res judicata, laches, collateral estoppel, the filed rate doctrine, the prohibition against retroactive ratemaking, and the finality of contracts, it being the express intention of the Signatories to prevent, as a matter of law and policy, FERC or any other authority from: (1) revisiting the issue of the justness and reasonableness of the Contract Termination Charges; (2) reducing, other than as set forth in the Amendment, the amount of the Contract Termination Charges either directly or indirectly; and (3) or otherwise limiting the right of Montaup, its successors or assigns, to charge and recover the

Contract Termination Charges set forth in this Agreement for any reason prior to their recovery in full as contemplated by this Agreement.

6.2 Market Pricing of Montaup's Generation.

To facilitate the divestiture and valuation of Montaup's units, the Signatories agree that it is in the public interest for Montaup or its successors or assigns to be authorized to price its wholesale electricity sales subject to the FERC's jurisdiction at market prices. The Signatories to this Agreement support the approval by FERC of market pricing for Montaup's or its successors' or assigns' wholesale electricity sales after the Contract Termination Date as part of its approval of this Agreement. However, such approval is not a condition of this Agreement.

6.3 Exempt Wholesale Generator Status.

Effective upon appropriate findings by the two states in which Montaup provides wholesale service to affiliate distribution companies, Montaup shall be authorized to apply for status as an exempt wholesale generator under Section 32 of the Public Utility Holding Company Act of 1935, and its entitlements in generating units shall become eligible facilities under that statute. The Signatories agree that these designations as an Exempt Wholesale Generator and eligible facilities will meet the statutory and regulatory standards for such designation and are appropriate to increase the number of potential purchasers for the market valuation of Montaup's assets. The receipt of Exempt Wholesale Generator Status is not a condition to this Agreement.

6.4 Re-entry into Business.

Nothing in this Agreement shall prevent Montaup or an affiliate from re-entering the generation business following the completion of divestiture, and nothing in this Agreement shall prevent Montaup or an affiliate from marketing electricity, other energy sources, or energy services to customers within or outside Blackstone's or Newport's Service Areas.

6.5 Environmental Commitments at Montaup's Facilities.

Subject to the DPU approving Eastern's Restructuring Settlement, Montaup or its successors in interest shall reduce the emissions of $NO_x$ and $SO_2$ from its Somerset Station and its share of Canal No. 2 by the amounts and on the schedule and terms set forth in Eastern's Restructuring Settlement.

ARTICLE 7.0
SUCCESSORS AND ASSIGNS

The rights conferred and obligations imposed on any Signatory by this Agreement shall be binding on or inure to the benefit of its successors in interest or assignees as if such successor or assignee was itself a Signatory hereto.

ARTICLE 8.0
ADDITIONAL PROVISIONS

8.1 This Agreement is the product of settlement negotiations. The content of those negotiations shall be privileged and all offers of settlement shall be without prejudice to the position of any party or participant presenting such offer.

8.2 The Signatories to this Agreement recognize and fully understand that their mutual promises in this Agreement evidence the consideration they have extended to each other in their efforts to settle the issues associated with the termination of the rights and obligations of Montaup, Blackstone and Newport to each other under Tariff 1, in connection with the introduction of wholesale and retail competition for electricity supplies in Blackstone's and Newport's Service Areas . The willingness and ability of Montaup, Blackstone and Newport to commit to and fulfill any and all of their obligations under this Agreement are predicated and conditioned upon FERC's approval of Montaup's Contract Termination Charges to Blackstone and Newport and the commitments by the other Signatories to this Agreement to such recovery.

8.3 Acceptance of this Agreement and the Amendment by FERC shall not be deemed to restrain FERC's exercise of its authority to promulgate future orders, regulations or rules which resolve similar matters affecting other parties in different fashion.

8.4 FERC's approval of this Stipulation and Agreement shall endure so long as is necessary to fulfill this Agreement's objectives. In the event of future regulatory or legislative actions which may render any part of this Agreement ineffective, Montaup shall nevertheless be held harmless and made whole for the payments it has agreed to accept as consideration for relinquishing its existing rights under Montaup's Tariff 1.

8.5 Except as expressly set forth above, this Agreement is submitted on the condition that it be approved in full by FERC and on the further condition that if FERC does not approve

the Agreement in its entirety, the Agreement shall be deemed withdrawn and shall not constitute a part of the record in any proceeding or used for any purpose.

IN WITNESS WHEREOF, each of the Signatories has executed Agreement, intending to be bound by its terms.

Montaup Electric Company
Settlement Agreement

FERC Docket No. ER97-2800-000

Alan Shoer
Special Assistant Attorney General
Counsel for Rhode Island
Division of Public Utilities and Carriers

Office of the Attorney General
150 So. Main Street
Providence, RI 02903

October 9, 1997

NARR 23327

Montaup Electric Company
Settlement Agreement

FERC Docket No. ER97-2800-000

Robert G. Powderly
Executive Vice President

John D. Carney
President
Blackstone Valley Electric Company
Newport Electric Corporation

October 17, 1997

Q:\SETTLMNT\POWCAR.SIG

Montaup Electric Company
Settlement Agreement

FERC Docket No. ER97-2800-000

Harvey L. Reiter
Counsel for Rhode Island
Public Utilities Commission

McCarthy, Sweeney & Harkaway, P.C.
1750 Pennsylvania Avenue, N.W.
Washington, DC 20006

October 17, 1997

NARR 23329

**ATTACHMENT 1B**

**PURCHASE OF ELECTRIC SERVICE FOR RESALE**
**AMENDMENT TO SERVICE AGREEMENT**

FILED
OFFICE OF THE SECRETARY
97 OCT 29 AM 11:11
FEDERAL ENERGY
REGULATORY
COMMISSION

MONTAUP ELECTRIC COMPANY

Purchase of Electric Service for Resale

AMENDMENT TO SERVICE AGREEMENT

Dated: October , 1997

Parties: MONTAUP ELECTRIC COMPANY
a Massachusetts corporation (the "Company")

and

BLACKSTONE VALLEY ELECTRIC COMPANY,
a Rhode Island corporation (the "Customer"),

WHEREAS, the Customer is currently an all-requirements electric customer of the Company under the Company's FERC Tariff, First Revised Volume No. 1 (the "Tariff"), and a Service Agreement as amended (the "Service Agreement"); and

WHEREAS, under the Service Agreement, the Customer purchases from the Company for resale all of the electric requirements of the ultimate customers in the Customer's service territory; and

WHEREAS, the Rhode Island Legislature passed into law the Rhode Island Utility Restructuring Act of 1996 ("URA"), which extends wholesale competition in power supply markets to retail customers through the provision of retail access; and

WHEREAS, termination of all-requirements service under the Tariff and the provision of unbundled transmission service by the Company to Customer under the Company's open access tariff are necessary to implement retail access in a manner consistent with the URA; and

WHEREAS, the Customer desires to comply with the URA which mandates a reduction in the purchase of its energy requirements from the Company under the Tariff before the term of the Service Agreement has expired and the Customer further desires to

retain the flexibility to terminate all purchase requirements under the Tariff on the Contract Termination Date, as defined in Section 3 of this Amendment; and

WHEREAS, the Customer desires to continue to receive transmission service over the transmission facilities owned or operated by the Company after the termination of its purchases under the Tariff; and

WHEREAS, the Customer desires to retain the option, but not the obligation, to purchase electricity from the Company after the termination of its purchases under the Tariff or the option for the ultimate customers in the Customer's service territory to do so; and

WHEREAS, the Company is willing to permit the Customer to terminate its purchase requirement before the Term has expired and to provide the options desired by the Customer, but only upon the terms and conditions set forth in this Amendment to Service Agreement ("Amendment"),

NOW, THEREFORE, the Company and the Customer, in consideration of their mutual commitments set forth herein, agree as follows:

1. The Parties agree that, notwithstanding anything to the contrary in the Service Agreement or in the Tariff, the Customer's obligation to purchase energy under the Service Agreement and the Company's obligation to provide energy under the Service Agreement shall be reduced as of July 1, 1997, in accordance with the Retail Access Schedule (as defined in Section 2 of this Amendment) and shall terminate as of the Contract Termination Date, which shall be determined pursuant to Section 3 of this Amendment. Except as provided in Section 10 below, or in a separate contract for power supply, the Company shall have no further obligation to meet the electricity demands of the ultimate customers in the service territory of the Customer on or after

the Contract Termination Date, or to make any plan, investment, purchase, or commitment to maintain sufficient generating capacity to provide adequate, continuous, or reliable electricity supplies to the Customer or its ultimate customers on or after such date.

2. Commencing on July 1, 1997, the Customer shall not be obligated to purchase, and the Company shall not be obligated to supply, energy required by any distribution service customer of the Customer, or its successor or assign, that is taking retail access in accordance with the following schedule ("Retail Access Schedule"):

Phase 1: On July 1, 1997, the following customers shall have retail access: (i) all new commercial and industrial customers, including new manufacturing customers, commencing service on or after July 1, 1997, with an anticipated average annual demand of two hundred (200) kilowatts or greater; (ii) all existing manufacturing customers with an average annual demand of fifteen hundred (1500) kilowatts or greater; and (iii) all accounts in the name of the State of Rhode Island, provided, however, the Customer may limit retail access to no more than ten percent (10%) of its total kilowatt-hour sales.

Phase 2: On January 1, 1998, retail access shall be extended to the following customers: all existing manufacturing customers with an average annual demand of two hundred (200) kilowatts or greater and all accounts in the name of the cities and towns in Rhode Island, provided, however, the Customer may limit retail access to no more than twenty percent (20%) of its total kilowatt-hour sales.

Attachment 1B

Phase 3: The remaining customers shall have retail access on the earliest to occur of: (i) July 1, 1998; (ii) within three months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England including the total kilowatt-hour sales in Rhode Island, provided, however, if the Rhode Island Public Utilities Commission ("RIPUC") extends the deadline beyond July 1, 1998, then the remaining customers shall have access on the extended date established by the RIPUC; or (iii) the Retail Access Date defined in Section 3(a).

3. Montaup's obligations to provide requirements service shall cease on the Contract Termination Date. The Contract Termination Date shall occur on the earlier of the Retail Access Date or the Wholesale Access Date, defined as follows:

(a) The Retail Access Date shall be the later of January 1, 1998 or the date of a final nonappealable order of the RIPUC approving the implementation methodology for the disposition of Montaup's non-nuclear generating facilities, provided, however that the Retail Access Date shall occur no later than three months after retail access is made available to forty percent (40%) or more of the kilowatt-hour sales in New England, including the total kilowatt-hour sales in Rhode Island and, in any event, not later than July 1, 1998.

(b) The Wholesale Access Date shall be the earlier of the Retail Access Date or the date on which the Customer in its sole discretion decides to terminate purchases under Tariff 1 and its Service Agreement with Montaup by providing FERC and the Signatories with 90 days advance notice in writing, or less with the mutual consent of the parties, said date not to be earlier than January 1, 1998.

4. For service under the Tariff commencing July 1, 1997 and continuing to the Contract Termination Date, the Company shall continue to charge and the Customer shall continue to pay the Demand and Energy Charges shown on Sheet No. 4 as revised, which sets forth the M-14 rates, and the Company shall defer a portion of the M-Rate billings to the Customer to ensure that the Customer is held harmless as a result of the phase-in of retail access in Rhode Island.

5. The Customer agrees that its Billing Determinants for calculating Demand Charges shall apply to all kilowatts recorded by the Customer in the Customer's service territory. The Customer further agrees that its Billing Determinants for calculating Energy Charges shall apply to all kilowatt-hours recorded by Customer less all kilowatt-hours recorded by Customer as supplied by a Non-Regulated Power Producer ("NRPP") as that term is defined in the URA.6. The Company agrees to defer a portion of the Demand Charges in accordance with the following formula:

Hold Harmless Deferral (HHD)= $(\text{amdr} * kW_{\text{retail access}})$ - $(\text{TC per kWh} * kWh_{\text{retail access}})$ - $\text{Trans}_{\text{Retail}}$

Where:

a) average monthly demand rate:

$$\text{amdr} = \frac{\text{Base} \pm \text{PCAC}}{kW_{cp}}$$

b) Base - Base Rate Demand Charges (initial and tail block charges) as specified in the Company's effective rate under Section III and applied to the full requirements of the Customer.

c) PCAC - Purchased Capacity Adjustment Clause rate as provided for in the Company's effective rate under Section III B and applied to the initial block of the full requirements of the Customer.

d) $\text{Trans}_{\text{Retail}}$ - Represents Transmission billings, for all kWh gone to retail choice

e) [1]$kW_{cp}$ - The Customer's coincident peak demand in kilowatts, including kW gone to

Attachment 1B

retail choice.

f) $^{(1)}kW_{retail\ access}$ & $kWh_{retail\ access}$ - kW demand and associated energy gone to retail choice.

g) TC - Transition Charge, initially set at $0.028 per kWh per the URA and revised from time-to-time as approved by the Commission.

(1) Adjusted for losses to the wholesale metering points.

7. The Company shall record the HHD as a regulatory asset on its books as a receivable, and the Customer shall record on its books a corresponding payable, owed to the Company at the completion of the Company's divestiture of its non-nuclear generating facilities in accordance with Section 1.1.4(c)(ii) of Appendix 1. The Company shall mitigate the HHD upon the reconciliation of the 1997 Purchase Capacity Adjustment Clause by allocating that portion of the Sales Credit which can be attributed to the sales of capacity resulting from $kW_{retail\ access}$.

8. Commencing on the Contract Termination Date, the Customer shall pay to the Company the Contract Termination Charges determined in accordance with Appendix 1 and Schedules 1 and 2 to this Amendment, which sets forth Base Contract Termination Charges and formulae for the adjustment of the Base Contract Termination Charges. The Contract Termination Charges shall apply to all kilowatt-hours delivered by the Customer, or its successor or assign, in the Customer's Service Area, whether or not such kilowatthours are sold by the Customer. The Customer's Service Area is defined to include the area served by the Customer on December 1, 1996. Kilowatt-hours delivered are defined to include all kilowatt-hours delivered to electricity consumers in the Customer's Service Area, whether or not they are present customers of the

Customer. The Base Contract Termination Charges shall equal the cents per kilowatt-hour amounts shown on Schedule 1.

The Base Contract Termination Charges shall recover the Customer's proportionate share of the Company's total contract termination costs shown in Schedule 1, which share equals 29.13 percent of the Company's total contract termination costs. The Base Contract Termination Charges shall be subject to adjustments for a Residual Value Credit described in Appendix 1. The Base Contract Termination Charges shall be adjusted through a Reconciliation Account in which differences, whether positive or negative, between the estimates for costs and revenues included in the Base Contract Termination Charges and actual costs and revenues are subtracted from the Base Contract Termination Charges from the Company to the Customer.

9. Notwithstanding anything to the contrary in the Tariff or the Service Agreement, the Contract Termination Charges specified in Appendix 1 and Schedules 1 and 2 to this Amendment shall remain in effect until the Company has collected all amounts subject to collection thereunder and neither the Customer's obligation to pay the Contract Termination Charges in full nor the formulae for the calculation of the Contract Termination Charges set forth in Appendix 1 and Schedules 1 and 2 to this Amendment shall be subject to change by the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act, absent the agreement of the Company or its successors or assigns.

10. The Company shall provide "Standard Offer Service" to the Customer commencing on the Contract Termination Date and continuing for the period through December 31, 2009 (the "Standard Offer Period"). Standard Offer Service, shall consist of the

wholesale supply of power sufficient to meet the requirements of retail customers served by the Customer's distribution system that purchase Standard Offer retail service from the Customer.

(a) Standard Offer Service shall be made available at the prices set forth in the Stipulation and Agreement adjusted for a fuel index. The prices for Standard Offer Service shall be for electricity delivered to the meter of Customer's ultimate customers, not including the charges for Customer's distribution services or for the Company's Network Integration Transmission Service, but including any and all transmission charges to reach the Company's system that are not recovered in Customer's transmission cost recovery provisions.

(b) Standard Offer Service shall be available to Customer after the Contract Termination Date. After that date, Customer, in its sole discretion, is free to reduce its purchases under the Standard Offer by pursuing other opportunities in the wholesale market, and Customer's ultimate customers may terminate Standard Offer Service at any time to purchase from a nonregulated power producer as defined in Section 39-1-2(7.1) of the Rhode Island General Laws. Once Customer has reduced its wholesale purchases for those ultimate customers who have terminated Standard Offer Service, it may only elect to increase its purchase for resale to any of Customer's residential or small general service customers who: (1) purchased power from Customer immediately prior to the Retail Access Date; (2) begin to purchase power from a nonregulated power producer on or within one year of the Retail Access Date; and (3) elect to return to Standard Offer Service within 120 days of taking service from such nonregulated power producer.

(c) In the event the Contract Termination Date is determined by the Wholesale Access Date, the Customer shall be free, either in its notice pursuant to Section 3(b), or thereafter by giving the Company at least 90 days advance written notice directed to the first day of a calendar month, to terminate or reduce its purchases of Standard Offer Service from the Company in order to obtain electricity from other suppliers in the market. Once the Customer has reduced or terminated its purchases of Standard Offer Service from the Company, the Company shall have no obligation to supply Standard Offer Service to the Customer with respect to the terminated or reduced purchases, except as provided for in Section 10(b).

(d) No less than 90 days before the Retail Access Date, the Customer shall notify the Company in writing of its estimate of the capacity and energy it shall purchase under Standard Offer Service for resale to ultimate customers in its service territory. The Customer shall provide the Company with at least 30 days prior advance written notice, directed to the first day of a calendar month, of reductions in the quantity of energy so purchased due to decisions by Standard Offer Service customers to purchase electricity from other nonregulated power producers after the Retail Access Date. Nothing in this Amendment shall restrict the right of any ultimate customer to purchase electricity from nonregulated power producers after the Retail Access Date, provided that, except as set forth in Section 10(b) above, once any such ultimate customer has purchased electricity from a nonregulated power producer, the Company shall have no obligation to supply Standard Offer Service to the Customer for resale to such ultimate customer.

(e) The Company acknowledges that the Customer will offer alternative power

suppliers the opportunity in an auction to supply electricity to enable the Customer to provide Standard Offer Service to ultimate customers in its service territory after the Retail Access Date. The Company, its successors or assigns, shall be free to bid in the auction, provided that the Company's bid shall not exceed the prices set forth in the Stipulation and Agreement, adjusted for the fuel index set forth in that Agreement.

11. Commencing on the Contract Termination Date, the Company (including any successor or assign of the Company that succeeds to the Company's obligations with respect to the operation of its transmission facilities) shall, upon request of the Customer, provide network integration transmission service to the Customer in accordance with the Service Agreement for Network Integration Transmission Service between the Customer and the Company of even date, and with the terms and conditions of the tariff or successor tariff or tariffs for such service in accordance with the policy of the Federal Energy Regulatory Commission as in effect from time to time. Such service shall be provided to the Customer after the Wholesale Access Date to enable the Customer to integrate its loads and resources and shall be provided to the Customer after the Retail Access Date to enable the ultimate customers in the Customer's service territory to integrate their loads and resources.

12. This Amendment shall take effect as of the date it is permitted to become effective by FERC, which date shall be referred to as the "Effective Date." This Amendment, together with all provisions of the Tariff and the Service Agreement necessary to effectuate all provisions of this Amendment, shall remain in effect until all obligations of the parties under this Amendment, including, without limitation, the obligation of the Customer to pay to the Company the Contract Termination Charges, have been

discharged in full. Upon the discharge in full of all such obligations, this Amendment and the Service Agreement shall terminate.

13. The provisions of this Amendment shall override any inconsistent provisions of the Service Agreement and, with respect to the Customer, all inconsistent provisions of the Tariff, but all provisions of the Tariff and the Service Agreement that are not inconsistent with this Amendment shall remain in full force and effect.

14. The rights conferred and obligations imposed on the parties to this Amendment shall be binding on or inure to the benefit of their successors in interest or assignees as if such successor or assignee was itself a party hereto.

Attachment 1B

IN WITNESS WHEREOF, the parties have executed this Amendment of Service Agreement as of the date first written above.

MONTAUP ELECTRIC COMPANY

By ________________
Robert G. Powderly

Title: Executive Vice President

BLACKSTONE VALLEY ELECTRIC COMPANY

By ________________
John D. Carney

Title: President

Q:\SETTLMNT\ATTACH3.BVE\AMENDM~1.CLN

**PART 2 OF 4**

# APPENDIX 1

## FORMULA FOR CALCULATING CONTRACT TERMINATION CHARGES

Appendix 1

OFFICE OF THE SECRETARY
97 OCT 29 AM 11:11
FEDERAL ENERGY REGULATORY COMMISSION

MONTAUP ELECTRIC COMPANY
AMENDMENT TO SERVICE AGREEMENT WITH
BLACKSTONE VALLEY ELECTRIC COMPANY UNDER
FERC ELECTRIC TARIFF, FIRST REVISED VOLUME NO. 1
FORMULA FOR CALCULATING CONTRACT
TERMINATION CHARGES

1.1 The Fixed Component of the Contract Termination Charge shall include Blackstone Valley Electric Company's ("Blackstone") 29.13 percent allocated share of Montaup's costs as shown on Schedule 1, Page 2, which shall include:

1.1.1 Revenues sufficient to amortize over a twelve year period commencing on January 1, 1998 and continuing through December 31, 2009 the following plant balances and regulatory assets:

(a) Plant balances shall include unrecovered net book value as shown on Schedule 1, Page 4, Column (7), of the following Montaup generation-related investments as of December 31, 1997,[1] excluding any capital additions made after December 31, 1995:

(i) Somerset Unit 6, Jet 1 and Jet 2 including general plant allocated to generation;
(ii) Montaup's ownership Share of Canal Unit 2, including capital additions past December 31, 1995, but committed prior to that date;
(iii) Montaup's and Newport's ownership share of Wyman Unit 4;
(iv) Montaup's ownership share of Millstone Unit 3;
(v) Montaup's ownership share of Seabrook Unit 1;
(vi) Montaup's Entitlements in the Maine Yankee and Vermont Yankee Units, including the balances for materials and supplies;

---

[1] The figures shown on Schedule 1, Page 4, Column (7) are estimates and will be updated for actual balances as of December 31, 1997. Changes, if any, shall be reconciled at the Divestiture Date.

(vii) Newport's generation related investment in the Diesel Units at Jepson and Eldred;
(viii) Step-up transformers at Montaup generating units which are excluded from Montaup's transmission rates;
(ix) Montaup's non-utility property; and
(x) Generation-related property held for future use including net investment in Somerset Unit 5, through November 1, 1997, per settlement agreement in Docket ER94-1062-000.

(b) Regulatory assets shall include the generation-related unrecovered net book balances shown in Schedule 1, Page 5, Column (2), as of December 31, 1997[2/]:

(i) FAS 109;
(ii) Net pension liability/(asset) of Montaup and allocated to Montaup by affiliates to the extent that they exceed 5% of the greater of the total pension benefits obligation or the fair market value of plan assets.
(iii) Unamortized deferred FAS 106 costs;
(iv) Unamortized deferred dredging costs;
(v) Unamortized ITC; and
(vi) Montaup's share of unamortized debt expense recorded on the balance sheet of its parent, Eastern Edison Company.

1.1.2 Revenues sufficient to provide an overall pre-tax return of 11.34 percent based on a combined state and federal income tax rate of 39.225 percent, and Montaup's 1995 year-end capital structure as shown in Schedule 1, Page 14, Column (8), including a return on common equity of 9.2 percent for the period prior to the completion of the initial divestiture process for Montaup's non-nuclear generating

[2/]The figures shown on Schedule 1, Page 5, Column (2) are estimates and will be updated for actual balances as of December 31, 1997. Changes, if any, shall be reconciled at the Divestiture Date.

facilities ("Divestiture Date")[3], and sufficient to provide an overall pretax return of 13.09 percent including a return on common equity of 11.4 percent for the period after the Divestiture Date,[4] multiplied by the average of the beginning and ending balances in each calendar year beginning in 1998 of the sum of the following:

(a) Unrecovered net book value of Montaup's generation investments as defined under 1.1.1(a) above, plus

(b) Unrecovered net book value of generation-related Regulatory Assets as defined under 1.1.1(b) above, excluding the unamortized ITC under 1.1.1(b)(v), less

(c) Deferred Taxes as shown in Schedule 1, Page 13, Column (9), equal to the combined state and federal income tax rate of 39.225 percent, which shall be adjusted for changes in tax laws, multiplied by the sum of:

(i) the unrecovered net book value of Montaup's generation investment, plus

(ii) the unrecovered net book value of generation-related regulatory assets, less

---

[3] If Montaup sells its non-nuclear generating facilities in more than one transaction, the rights and obligations associated with the divestiture shall be allocated among the transactions using appropriate allocators. In the case of return, the allocator shall be based on the net book value of the sold facility or facilities to total net book value of the non-nuclear generating facilities in Section 1.1.1(a). This percentage allocation shall be applied to the total of plant, regulatory asset balances, and deferred tax balances as set forth below.

[4] The difference between the 11.34 percent and 13.09 percent returns as applied to unamortized balances prior to the Divestiture Date shall be recovered, if divestiture occurs, through an offset to the Residual Value Credit, and the difference between the 11.34 percent and 13.09 percent returns that occurs after the Divestiture Date shall be included in the Reconciliation Account. The 11.34 percent and 13.09 percent returns shall be used as the return wherever a return is referenced throughout this Appendix. However, the 13.09 percent return after the Divestiture Date shall be adjusted in accordance with Section 1.1.4(d). Notwithstanding the above, an equity return of 9.2% will be applied to Montaup's equity investment in the Ocean States Power facility for purposes of estimating Contract Termination Charges under the Amendment.

(iii) the unrecovered balance of generation investment for tax purposes, less
(iv) the unrecovered balance of generation-related regulatory assets for tax purposes.

1.1.3 Revenues sufficient to: (i) amortize over a twelve year period commencing on January 1, 1998 and continuing through December 31, 2009 the generation-related, unrecovered net book balances associated with the FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates[5]; and (ii) pay a return of 7.25 percent equal to the interest rate reflected in the actuarial analysis of the FAS 106 Transition Obligation of Montaup and allocated to Montaup by affiliates multiplied by the outstanding balances remaining for the FAS 106 Transition Obligation of Montaup and allocated to Montaup by affiliates. Following the Divestiture Date, these outstanding balances shall be subject to a one time adjustment as set forth in Section 1.1.4(b) below. At the same time, the interest rate return for the period after the Divestiture Date shall be established using the most current actuarial analysis available at the time, which rate shall remain in place for the remainder of the fixed cost recovery period.

1.1.4 The Fixed Components shall be subject only to the following adjustments:

(a) For each month that the Contract Termination Date is delayed beyond January 1, 1998, Montaup shall adjust the Reconciliation Account in the Variable Component of the Contract Termination Charge by an

[5] Any FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates that is not allocated to generating facilities shall be deemed transmission related.

amount equal to the difference between the depreciation and amortization expense authorized under the M-14 rate and the depreciation and amortization under Section 1.1.1, together with the associated return computed in accordance with Section 1.1.2 of this Appendix, multiplied by Blackstone's 29.13 percent allocated share. An exhibit showing the difference between depreciation and amortization under the M-14 rate and the Contract Termination Charge is included in Schedule 2.

(b) Following the Divestiture Date and at the time of implementing the Residual Value Credit, Montaup shall reconcile the balances in Sections 1.1.1 and 1.1.3 for Blackstone's 29.13 percent allocated share of (i) the unrecognized transition obligation, prior service cost, and unrecognized gains or losses associated with the FAS 106 obligation; and (ii) the unrecognized transition obligation, prior service cost, and unrecognized gains or losses associated with the FAS 87 obligation, but the gains or losses associated with FAS 87 shall be recognized only to the extent that they exceed five percent of the greater of total pension benefits obligation or fair market value of plan assets. Montaup shall fund the FAS 106 and FAS 87 obligations under this Section and Section 1.2.2(f) as rapidly as permitted by the tax law up to the level of

revenues collected for this purpose.[6] Any revenues associated with these obligations that cannot be immediately funded shall be put into a separate account on the books to be reserved with the return specified in Section 1.1.3 until tax deductible funding becomes possible. The one-time adjustment associated with FAS 106 and FAS 87, whether positive or negative, shall be subtracted from or added to the schedules for prospective recovery of FAS 106, as appropriate, and amortized with the return specified in Section 1.1.3 over the period between the sale and December 31, 2009. An exhibit showing the reconciliations is included in Schedule 3, page 1. In addition, Montaup shall reconcile the balances for Blackstone's 29.13 percent allocated share of (i) the FAS 109 regulatory asset; and (ii) the general plant allocated to generation, provided, however, that any general plant not allocated to generation shall be functionalized to transmission. The one-time adjustment associated with differences in the balances for FAS 109 and general plant, whether positive or negative, shall be subtracted from or added to the net proceeds reflected in the Residual Value Credit as appropriate and shall be amortized, with the return specified in Section 1.1.2, over the period between the sale and December 31, 2009.

[6] Montaup's post-divestiture FAS 106 or FAS 87 gains or losses recognized on Montaup's books shall be fully reflected in rates to customers and shall neither be retained nor borne by Montaup. Montaup shall propose an allocation of these post-divestiture gains or losses between customers paying Contract Termination Charges and transmission customers.

(c) Montaup has agreed to divest its generating business within six months after the later of the Retail Access Date as defined in the Settlement filed in Docket ER97-3127-000 or the receipt of all governmental approvals and other consents necessary for the divestiture. Within three months after the completion of divestiture or the sale of any property,[7] the cost of which is included in the Contract Termination Charge, Montaup shall implement a Residual Value Credit as a direct offset to the Contract Termination Charges authorized under this Amendment. The Residual Value Credit will be deemed to be fully implemented upon completion of the initial divestiture process for Montaup's non-nuclear generating facilities. Proceeds from the divestiture which are realized after the full implementation of the Residual Value Credit will be reflected in the variable component of the CTC as hereinafter described. The Residual Value Credit to Blackstone shall be calculated as follows:

(i) Blackstone's 29.13 percent allocated share of Total Proceeds[8]

---

[7]Proceeds, if any, from Montaup's future leases of nuclear entitlements will also be flowed through the Residual Value Credit if such proceeds can be definitively calculated at the time the Residual Value Credit is determined. The proceeds from leases determined after the Residual Value Credit is set will be flowed through the Reconciliation Account as received.

[8]As part of the terms of the Divestiture, Montaup shall require the buyer of the facility to pay Montaup the net book value for all inventories and materials and supplies associated with the generating facility. As a result, inventories and materials and supplies for Montaup's non-nuclear facilities are excluded from the plant balances under Section 1.1.1, and shall be excluded from the calculation of the Residual Value Credit. In addition, the Buyer may assume other obligations that

equal to the sale price and other consideration received by Montaup excluding $15 million[9] which purchasers will be required to pay into an account for employee benefits pursuant to Section 1.2.2(f), less

(ii) The revenues lost or gained by Montaup between July 1, 1997 and the Divestiture Date measured by the difference between the revenues excluding revenues attributable to items included in the Contract Termination Charge or in Montaup's transmission rates, that Montaup would have collected under Rate M-14 had it continued to make the sales to Blackstone under Tariff 1 and the revenues, excluding transmission revenues and Contract Termination Charge revenues, that it actually collected from sales to Blackstone's customers during the period, together with a credit for Blackstone's share of the revenue from sales at no less than market prices made by Montaup to third parties during the period, provided, however, the lost revenues so calculated shall not exceed $0.008 per kilowatthour multiplied by the number of

---

are included in the variable component of the Contract Termination Charge. Montaup reserves its right to revise the variable cost estimates and the amortization of fixed cost components in Schedule 1 to reflect the assignment of obligations to the purchasers, if such revision is necessary to maintain a stable and declining pattern of Contract Termination Charges as offset by the Residual Value Credit.

[9]This figure consists of $11.8 million as shown on Schedule 5 and an estimated $3.2 million for Canal 2 based on Montaup's 25% share of employee costs for Canal Station. The parties agree to use a reasonable actual figure for Canal 2 when available from Canal Electric.

kilowatthours delivered[10] by Blackstone during the period between July 1, 1997 and the Divestiture Date, less

(iii) Blackstone's 29.13 percent allocated share of capital investments demonstrated to be prudently incurred after December 31, 1995, excluded from the plant balances in Section 1.1.1 (a) above,[11] less

(iv) Blackstone's 29.13 percent allocated share of reasonable transaction costs associated with the divestiture including the cost of necessary refinancings, repurchases, and retirements of securities occurring after May 1, 1997.

The Net Proceeds from the divestiture including amortization and the pretax return specified in Section 1.1.2 on the unreturned credit balance net of tax impacts shall be credited to the Fixed Component in equal annual amounts over the period commencing on the date the Residual Value Credit is implemented through December 31, 2009. The Residual Value Credit shall be implemented even if: (i) the Divestiture Date occurs before the Contract

---

[10] "Delivered", as used herein, refers to the kilowatt hours delivered by Newport other than of purchases from Montaup under Rate M-14.

[11] Montaup's capital investments shall include construction work in progress. The investments in non-nuclear generating facilities during the period January 1, 1996 through May 31, 1997 are shown in Schedule 4. These projects have been reviewed by the parties and are included as an offset to the Residual Value Credit subject only to a further review for the reasonableness of the amounts expended in the construction of the projects under Section 3.5 of the Agreement. Montaup may include additional projects, if any, at the time of the calculation of the Residual Value Credit, subject to the dispute resolution procedures under Section 3.5 of the Agreement.

Termination Date, or (ii) the Residual Value Credit exceeds the Contract Termination Charge in any given year. If for any reason, generation assets which were not sold at the Divestiture Date and therefore were not in the Residual Value Credit but remained in the Contract Termination Charge, are sold at a later date, the proceeds of such a sale will be amortized, with a return as specified in Section 1.1.2, over the remaining fixed component recovery period or over a five year period, whichever period is greater, and credited to the Reconciliation Account as received.

(d) Effective with refinancings, repurchases, and retirements of securities relating to assets being recovered through Contract Termination Charge, Montaup shall flow through the Reconciliation Account the annual effects associated with any differences between the 13.09 percent overall pre-tax return and the actual pre-tax return, calculated using an 11.4 percent return on common equity, attributable to changes in the cost of long-term debt, preferred stock, capital structure or income tax rates, provided that the overall pre-tax return shall not exceed 13.09 percent so long as the yield on 10-year Treasury constant maturities as reported in the Federal Reserve Statistical Release is 9 percent or lower. In the event that the yield on Treasury maturities as so reported exceeds 9 percent, the 13.09 percent overall pre-tax return shall be adjusted to include Montaup's actual cost of long-term debt and preferred stock using an 11.40 percent return on common equity. This reconciliation will apply to

the period following the Divestiture Date whether or not securitization has been implemented. Notwithstanding the foregoing, nothing shall require a change in capital structure prior to any financing to take advantage of securitization.

Securitization will be implemented only if it would produce net savings to customers after taking into account all transaction costs including call provisions and prepayments, if applicable. Notwithstanding the above, savings from securitization, (pursuant to the terms of a qualified rate order), will be reflected in the Contract Termination Charge.

Any and all financing savings associated with refinancing related to divestiture and following the implementation of the Residual Value Credit, shall be allocated to the Contract Termination Charge through this paragraph, and shall not be reflected in Montaup's capital structure used for transmission rates. To the extent any financing savings are allocated to transmission rates by FERC, however, they shall not also be allocated to the Contract Termination Charge under this paragraph.

1.2 The Variable Component of the Contract Termination Charge shall include Blackstone's allocated share of the items specified in Section 1.2.2, below adjusted for the Reconciliation Account discussed in Section 1.2.1.

1.2.1 The Variable Component shall be adjusted through a Reconciliation Adjustment in which differences, whether positive or negative, between the estimates

for Contract Termination Charge Payments by Blackstone and Blackstone's allocated share of the estimated variable costs listed in Section 1.2.2 below and actual Contract Termination Charge payments by Blackstone and its allocated share of the actual variable costs will be accumulated in a Reconciliation Account and added to or subtracted from the Contract Termination Charge from Montaup to Blackstone. The Reconciliation Account shall also include the adjustments under Sections 1.1.2, note 4, 1.1.4(a) and 1.1.4(d) above. A pretax return equal to that specified in Section 1.1.2 shall be included on any balance in the Reconciliation Account, whether positive or negative.

The Reconciliation Account shall accumulate through December 31, 2000, and shall be used to adjust Montaup's Base Contract Termination Charges to Blackstone on January 1, 2001. Thus, effective January 1, 2001, Montaup shall return or collect Blackstone's allocated share of any outstanding balance in the Reconciliation Account by implementing an adjustment to the Base Contract Termination Charges to Blackstone. Thereafter, the balance including the accumulated return in the Reconciliation Account at the end of a year shall be used to adjust Montaup's Base Contract Termination Charges for the following year. Reconciliation Account adjustments to the Contract Termination Charges shall not cause the Contract Termination Charges to exceed 2.8 cents per kilowatthour. Any deferrals caused by the limitation in the prior sentence shall be carried forward with a return into the next annual adjustment to the Base Contract Termination Charge. Any Reconciliation

Account adjustments occurring prior to January 1, 2001 that would otherwise cause the Contract Termination Charge to increase or decrease by more than 0.2 cent per kilowatthour shall be implemented up to 0.2 cents per kilowatthour. The excess above 0.2 cents per kilowatthour shall be amortized with a return over the three years following January 1, 2001.

1.2.2 Blackstone's 29.13 percent allocated share of the specific cost items included in the Variable Component are set forth in Schedule 1 at page 3. The difference between Blackstone's percent allocated share of the actual variable costs incurred by Montaup and the estimated variable costs in this section shall be included in the Reconciliation Account. The costs included in the Variable Component shall include the following:

(a) Nuclear Decommissioning and Other Post Shutdown Costs shown on Schedule 1, Pages 6 and 7, shall include: (i) all charges, excluding any net incremental decommissioning costs caused by operations after the Retail Access Date, for decommissioning and site restoration assessed to Montaup by the operators of each nuclear electric generating facility specified in Section 1.1.1(a) (iv), (v), and (vi) above, subject to the regulatory authority of the agencies having jurisdiction over the operation and collection of such funds; (ii) all other reasonable post shutdown costs associated with Montaup's entitlements in the units listed in Section 1.1.1(a), (iv), (v), and (vi) above; and (iii) all

remaining reasonable costs, including decommissioning costs and unrecovered capital costs, associated with Yankee Rowe and Connecticut Yankee shown on Schedule 1, page 7. Funding for the decommissioning costs will be placed in irrevocable trusts in accordance with NRC regulations. If, upon the completion of decommissioning for any of the above listed nuclear generating facilities, it is determined that there has been an over collection of funds, such over collection will be transferred to Montaup's decommissioning fund for either Millstone 3 or Seabrook 1 pending final disposition of their decommissioning. Once all decommissioning is complete, any over collection will be refunded to Blackstone in the Reconciliation Adjustment. Other post shutdown costs will also be fully reconciled in the Reconciliation Adjustment.

Montaup's share of the Book Value of the Actual Nuclear Core at Shutdown or time of sale, which Montaup has not previously recovered through sales or lease proceeds and the Book Value of Materials and Supply at Shutdown or time of sale, which have not been addressed by other recovery mechanisms, will be recovered with a carrying charge in equal amounts over three years at a pre-tax return provided for in Section 1.1.2.

(b) Above Market Payments to Power Suppliers will be (i) all payments by Montaup for Long-Term Power Supply Contracts less the market value realized from the resale of electricity purchased under the contracts into the wholesale market, plus (ii) Economic Buyout Payments associated with those contracts, less (iii) Credit for Unit Sales Contracts, plus (iv) the Power Contract Buyout Incentive realized.

(i) Long-Term Power Supply Contracts will be the power supply contracts listed below which were in place as of December 31, 1995, between Montaup and a third party supplier, continuing to the termination date of each contract. The Long-Term Supply Contracts include:

(1) Ocean State Power I and II
(2) Canal 1, including transmission wheeling, rental andsupport payments
(3) Northeast Energy Associates, including transmission wheeling payments
(4) Potter 2, including transmission wheeling payments
(5) Cleary 9
(6) McNeil, including transmission wheeling payments
(7) Blackstone Hydro, Inc., including transmission wheeling payments
(8) Hydro Quebec, including AC and DC facilities support payments
(9) Pilgrim, including transmission wheeling, rental and support payments
(10) Bear Swamp Hydro
(11) Green Mountain Power Peakers, including transmission wheeling payments

(ii) Economic Buyout Payments will be all reasonable payments agreed to by Montaup after May 1, 1997 associated with the sale, assignment, disposition or buy down of the Long-Term Power Supply Contracts. Economic Buyout Payments shall be recovered as incurred to the extent that current recovery does not increase rates to customers above the level that would have been incurred absent the sale, assignment, disposition, or buy down of the Long-Term Power Supply Contract. The portion of the Economic Buyout Payment that cannot be recovered currently under the prior sentence shall be deferred and recovered with the return specified in Section 1.1.2 as soon as such recovery will not increase rates to customers above the level that would have been incurred absent the sale, assignment, disposition, or buy down of the Long-Term Power Supply Contract.

For purposes of calculating above market payments in (b)(i) and economic buyout payments in (b)(ii), associated with the long term supply contracts with Ocean State Power I and II,

Montaup's total obligation under the contracts will be based on a return on equity of 9.2%.

(iii) Credit for Unit Sales Contracts will be all unit sales contracts entered into by Montaup as of December 31, 1995, for sales from (i) Canal Unit 2 if it is not otherwise subject to market valuation and (ii) Contract Demands to non-affiliates, less the market value of these contracts as shown in Schedule 1, Page 3, Columns (7) through (9).

(iv) Power Contract Buyout Incentive will be the sum of: (a) the Power Contract Buyout Incentive Associated with Canal 2 Divestiture calculated in accordance with Schedule 3, pages 2 and 3; and (b) the Power Contract Buyout Incentive Independent of Divestiture which shall represent 10% of the savings realized by customers as the result of the sale, assignment, disposition or buy down of its power supply contracts occurring outside of the divestiture process. The Power Contract Buyout Incentive Independent of Divestiture shall be determined at the time of the sale, assignment, disposition or buy down. The Buyout Incentive for the Ocean State Power units will be calculated in accordance with Page 4 of Schedule 3. The Total Power Contract Buyout Incentive shall not exceed $3.9 million, stated on a present value

basis upon the divestiture using a discount rate equal to the actual pre-tax return in place following completion of post divestiture refinancing as determined under Section 1.1.4(d). Montaup shall document the level of the Power Contract Buyout Incentive in a report, and the amount of the Power Contract Buyout Incentive shall be subject to the dispute resolution procedures set forth under Section 3.5 of the Stipulation and Agreement. The Power Contract Buyout Incentive Associated with Canal 2 Divestiture will be recovered in equal increments over the period from the divestiture through December 31, 2009, with appropriate adjustments for the time value of money, and the Power Contract Buyout Incentive Independent of Divestiture will be recovered in equal increments over the remaining term of the related purchased power contract, with appropriate adjustments for the time value of money.

(c) Above Market Fuel Transportation as shown in Schedule 1, Page 15, Column 10 will be Montaup's continuing long-term payment obligations associated with Capacity Payments to Algonquin Natural Gas Pipeline for Canal 2 less the market value of that capacity. The Market Value of Capacity Payments to Algonquin Natural Gas Pipelines will equal the actual proceeds associated with the sale or assignment or

termination of contractual obligations. For the purposes of calculating the Contract Termination Charges, prior to the date that Montaup's contractual entitlements to the pipeline capacity are assigned to a nonaffiliate, the Market Value of Capacity Payments to Algonquin Natural Gas Pipeline shall be deemed to equal the savings associated with actual unit operation on natural gas compared to the unit's avoided operation on oil at prevailing market prices. For illustrative purposes, the amounts shown on page 15 of Schedule 1 reflect a market value which is 50 percent of the capacity payments.

(d) Transmission wheeling, rental and support charges as shown in Schedule 1, Page 3, associated with the transmission of electricity from Montaup's entitlements in Seabrook Unit 1, Connecticut Yankee, Maine Yankee, Millstone Unit 3, Wyman Unit 4, Canal Unit 2, Vermont Yankee, which units are located off of Montaup's transmission system. These wheeling and support payments shall include only costs that are excluded from recovery under Montaup's and NEPOOL's open access transmission tariffs or are not assigned to a purchaser of the unit.

(e) Payments in Lieu of Property Taxes will include all reasonable costs incurred by Montaup or its affiliates associated with payments in lieu of property taxes to the cities and towns in which Montaup owns generating facilities to mitigate the loss of tax revenues that those cities

and towns would otherwise incur in connection with restructuring. For the purposes of calculating the Base Contract Termination Charges and the estimate included in the Reconciling Account, the Payments in Lieu of Property Taxes are assumed to be zero.

(f) Employee Severance and Retraining Costs as shown in Schedule 1, page 3, Column (13), will include all reasonable costs and expenses incurred by Montaup or its affiliates associated with the adjustment of their workforces in connection with the implementation of retail access, divestiture, or the termination of Montaup's Tariff No 1, including, but not limited to early retirement, severance, retraining and other reasonable costs associated with the implementation of the benefits to employees included in Schedule 5. Montaup shall require purchasers of its generating assets to pay $15 million[12] for the costs under this paragraph incurred by Montaup or its affiliates. In the event that the actual costs incurred under this paragraph are less than $15 million, excluding costs found by FERC to be recoverable in Montaup's transmission rates, Montaup shall flow back the difference to customers in the Reconciliation Account. The procedure established in this paragraph shall be the exclusive method for recovering the costs under

[12] The parties agree that $11.8 million will be reserved for Montaup and EUASC employees and estimate that $3.2 million will be reserved for Canal 2 and paid by the buyer of Canal 2. The Canal 2 figure may be adjusted when actual figures are available from Canal Electric.

this paragraph, and, except in the event of legislation changing required benefits, neither Montaup nor its affiliates shall be able to recover more than $15 million, subject to the Canal 2 adjustment, for these costs. Thus, for the purposes of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, the Employee Severance and Retraining Costs are assumed to be zero and, except in the event of legislation changing required benefits, these costs shall not result in an increase to the Reconciliation Account or to the Contract Termination Charge.

(g) Damages, Costs, or Net Recoveries from claims by or against third parties shall include all damages, costs, or recoveries associated with Montaup's generating business which accrued prior to the date of divestiture and which were not: (i) included in the reserves for generation related, uninsured claims other than claims associated with Environmental Response Costs as of May 21, 1994, plus annual additions to the reserves for uninsured claims in Montaup's M-14 rate, less actual payments out of the reserve for generation related claims during the period from May 21, 1994 through the Contract Termination Date; (ii) assigned to Montaup's successor in interest; (iii) recovered from Montaup's insurance carriers; or (iv) the result of gross negligence. For the purposes of calculating the Base Contract

Termination Charges and the estimate included in the Reconciliation Account, Damages, Costs, or Net Recoveries from claims are assumed to be zero.

(h) Performance Based Rate for Nuclear Units Remaining After Divestiture shall credit value received that is not otherwise reflected in the Residual Value Credit, or recover any payments or costs associated with the sale, lease or disposal of Montaup's minority ownership share of the Seabrook, Millstone #3, and Vermont Yankee Nuclear Units ("PBR Nuclear Units") that are not otherwise reflected in the Residual Value Credit. If Montaup is unable to sell, lease, assign, or otherwise dispose of its PBR Nuclear Units on the terms set forth in the Stipulation and Agreement prior to the Contract Termination Date, the Performance Based Rate shall include 80 percent of the reasonable going forward costs, including variable costs and post-1995 capital additions on a cost of service basis,[13/] associated with Montaup's PBR Nuclear Units that are not otherwise recovered in contract termination charges less 80 percent of the revenues from sales of energy or capacity from such units or entitlements that are not otherwise reflected in contract termination charges. The Performance

[13/] In the event that the nuclear unit is retired before the end of its license life, the capital addition shall be amortized with a return over the remainder of the license or in accordance with its depreciation schedule, whichever is shorter.

Based Rate shall apply for the period from the Contract Termination Date to the date that Montaup either sells, leases, assigns or otherwise disposes of the PBR Nuclear Units or to the date such units are shutdown. Within six months prior to implementing the Performance Based Rate, Montaup will consult with the Signatories on a performance standard for nuclear safety indicators and will file such performance standard with a maximum potential credit for nonperformance of $250,000. Such sales, if any, shall not be made directly to Blackstone's retail customers, however, Montaup shall retain the right to use its minority shares of the PBR Nuclear Units to fulfill its backstop obligations under the standard offer. For the purpose of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, the Performance Based Rate for Nuclear Units is assumed to be zero.

(i) Environmental Response Costs defined as:

(i) Reasonable and prudently incurred costs associated with the investigation, testing, remediation, liabilities, damages, claims, settlements, or judgments attributable to or incurred by Montaup or Blackstone relating to deposits or waste from divested generating facilities off the site of properties sold, whether or not such material is regulated under the statutes and

authorities referenced in paragraph (iv), including material deposited before the Divestiture Date at disposal sites, sites to which material may have migrated from off-site disposal sites, or any off-site location at which generation related material may have been deposited before the Divestiture Date associated with the operation of generating facilities sold pursuant to the divestiture plan;

(ii) Reasonable and prudently incurred costs associated with the investigation, testing, remediation, liabilities, damages, claims, settlements, or judgments attributable to or incurred by Montaup or Blackstone relating to deposits and wastes occurring prior to the Divestiture Date whether or not such material is regulated under the statutes and authorities referenced in paragraph (iv) from facilities located within the switchyards for which Montaup will retain a permanent easement on parcels that are otherwise being divested if such costs are not recovered in transmission rates;

(iii) Reasonable and prudently incurred costs associated with the purchase of property that is acquired as part of an overall mitigation and response plan associated with sites identified in paragraphs (i) and (ii);

(iv) The statutes and authorities referenced in paragraphs (i) and (ii) shall be the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), Resource Conservation and Recovery Act (RCRA), Massachusetts G.L. c. 21C and 21E, and Rhode Island General Laws 23-19.14, or any other laws, regulations or orders by courts or governmental authorities, or resulting from claims and contentions arising in tort, breach of contract or violation of law;

(v) Except for property acquired under paragraph (iii), Environmental Response Costs shall not include costs associated with the investigation, testing, remediation, or other liabilities relating to property acquired after the Divestiture Date. Environmental Response Costs recovered under paragraphs (i), (ii), and (iii) shall also be offset by: (i) proceeds from insurance companies related to Environmental Response Costs; (ii) proceeds from the sale of properties purchased under paragraph (iii); and (iii) recoveries from third parties;

(vi) Nothing herein is intended to limit, alter, or otherwise affect any liability of Montaup to governmental authorities or third parties other than the buyer or buyers of Montaup generating facilities under any environmental law including those

Appendix I

referenced in paragraph (iv).

C:\FORMUL~1.RED 26

NARR 23369

## SCHEDULE 1

## SUMMARY OF CONTRACT TERMINATION CHARGES

NARR 23370

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES TO BLACKSTONE VALLEY ELECTRIC

Schedule1
Page 1 of 15

| YEAR (1) | EST. BVE MWH SALES (2) | SHARE OF FIXED COMPONENT $ IN 000 (3) | SHARE OF FIXED COMPONENT CENTS/KWH (4) | SHARE OF VAR. COMPONENT $ IN 000 (5) | SHARE OF VAR. COMPONENT CENTS/KWH (6) | SHARE OF TOT. TERM CHARGE $ IN 000 (7) | BASE CONTRACT TERM CHARG CENTS/KWH (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 1,293,212 | 14,900 | 1.15 | 23,897 | 1.85 | 38,796 | 3.00 |
| 1999 | 1,309,137 | 16,084 | 1.23 | 23,190 | 1.77 | 39,274 | 3.00 |
| 2000 | 1,329,905 | 16,899 | 1.27 | 22,998 | 1.73 | 39,897 | 3.00 |
| 2001 | 1,346,024 | 13,060 | 0.97 | 23,084 | 1.72 | 36,145 | 2.69 |
| 2002 | 1,360,074 | 15,070 | 1.11 | 19,955 | 1.47 | 35,026 | 2.58 |
| 2003 | 1,377,851 | 16,099 | 1.17 | 17,931 | 1.30 | 34,030 | 2.47 |
| 2004 | 1,399,848 | 16,895 | 1.21 | 16,261 | 1.16 | 33,157 | 2.37 |
| 2005 | 1,423,866 | 15,343 | 1.08 | 17,001 | 1.19 | 32,344 | 2.27 |
| 2006 | 1,452,574 | 15,967 | 1.10 | 15,677 | 1.08 | 31,644 | 2.18 |
| 2007 | 1,471,219 | 14,203 | 0.97 | 16,535 | 1.12 | 30,737 | 2.09 |
| 2008 | 1,493,432 | 15,041 | 1.01 | 14,882 | 1.00 | 29,923 | 2.00 |
| 2009 | 1,512,696 | 12,836 | 0.85 | 16,231 | 1.07 | 29,067 | 1.92 |
| 2010 | 1,534,838 | 0 | 0.00 | 13,437 | 0.88 | 13,437 | 0.88 |
| 2011 | 1,550,398 | 0 | 0.00 | 12,585 | 0.81 | 12,585 | 0.81 |
| 2012 | 1,566,958 | 0 | 0.00 | 7,517 | 0.48 | 7,517 | 0.48 |
| 2013 | 1,597,666 | 0 | 0.00 | 3,988 | 0.25 | 3,988 | 0.25 |
| 2014 | 1,624,096 | 0 | 0.00 | 4,126 | 0.25 | 4,126 | 0.25 |
| 2015 | 1,644,785 | 0 | 0.00 | 2,802 | 0.17 | 2,802 | 0.17 |
| 2016 | 1,671,116 | 0 | 0.00 | 2,758 | 0.17 | 2,758 | 0.17 |
| 2017 | 1,693,977 | 0 | 0.00 | 2,140 | 0.13 | 2,140 | 0.13 |
| 2018 | 1,713,946 | 0 | 0.00 | 1,999 | 0.12 | 1,999 | 0.12 |
| 2019 | 1,739,097 | 0 | 0.00 | 2,018 | 0.12 | 2,018 | 0.12 |
| 2020 | 1,762,428 | 0 | 0.00 | 2,084 | 0.12 | 2,084 | 0.12 |
| 2021 | 1,787,024 | 0 | 0.00 | 1,797 | 0.10 | 1,797 | 0.10 |
| 2022 | 1,811,988 | 0 | 0.00 | 514 | 0.03 | 514 | 0.03 |
| 2023 | 1,837,328 | 0 | 0.00 | 529 | 0.03 | 529 | 0.03 |
| 2024 | 1,863,048 | 0 | 0.00 | 545 | 0.03 | 545 | 0.03 |
| 2025 | 1,889,155 | 0 | 0.00 | 561 | 0.03 | 561 | 0.03 |
| 2026 | 1,915,656 | 0 | 0.00 | 201 | 0.01 | 201 | 0.01 |
| 2027 | 2,011,439 | 0 | 0.00 | 207 | 0.01 | 207 | 0.01 |
| 2028 | 2,112,011 | 0 | 0.00 | 214 | 0.01 | 214 | 0.01 |
| 2029 | 2,217,611 | 0 | 0.00 | 220 | 0.01 | 220 | 0.01 |

COLUMN NOTES:
(2) PER 1996 LONG RANGE ENERGY & DEMAND FORECAST.
(3) SCHEDULE 1, P2, COLUMN (8).
(4) COLUMN (3)/COLUMN (2).
(5) SEE SCHEDULE 1, P.3, COLUMN (18).
(6) COLUMN (5)/COLUMN (2).
(7) COLUMN (3) + COLUMN (5).
(8) COLUMN (7)/COLUMN (2).

BV30BAS2.WK4 10/23/97

**SUMMARY OF CONTRACT TERMINATION CHARGES**
**BLACKSTONE VALLEY ELECTRIC COMPANY SHARE (29.13%)**
**FIXED COMPONENT**
**$ IN 000**

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 106 TRANSITION OBLIGATION (4) | BASE TOTAL FIXED COMPONENT (6) | ADJ. FOR RESIDUAL VALUE CREDIT (7) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (8) |
|---|---|---|---|---|---|---|
| 1998 | 9,035 | 5,507 | 357 | 14,900 | 0 | 14,900 |
| 1999 | 8,517 | 7,225 | 343 | 16,084 | 0 | 16,084 |
| 2000 | 7,876 | 8,694 | 329 | 16,899 | 0 | 16,899 |
| 2001 | 7,304 | 5,441 | 315 | 13,060 | 0 | 13,060 |
| 2002 | 6,758 | 8,012 | 301 | 15,070 | 0 | 15,070 |
| 2003 | 6,047 | 9,766 | 287 | 16,099 | 0 | 16,099 |
| 2004 | 5,205 | 11,418 | 272 | 16,895 | 0 | 16,895 |
| 2005 | 4,325 | 10,759 | 258 | 15,343 | 0 | 15,343 |
| 2006 | 3,411 | 12,312 | 244 | 15,967 | 0 | 15,967 |
| 2007 | 2,469 | 11,504 | 230 | 14,203 | 0 | 14,203 |
| 2008 | 1,487 | 13,338 | 216 | 15,041 | 0 | 15,041 |
| 2009 | 481 | 12,154 | 202 | 12,836 | 0 | 12,836 |

COLUMN NOTES:
EACH COLUMN REPRESENTS 29.13% OF THE SAME COLUMN NUMBER ON P. 12.

BV30BAS2.WK4 10/23/97

Schedule 1
Page 3 of 15

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES
BLACKSTONE VALLEY ELECTRIC COMPANY SHARE (20.13%)
VARIABLE COMPONENT

| | | | POWER CONTRACTS | | | CREDIT FOR UNIT SALES CONTRACTS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR END (1) | NUCLEAR DECOMMISS AND OTHER POST SHUTDOWN COSTS (2) | TOTAL OBLIGATION (3) | ASSUMED MARKET VALUE (4) | NET EXCESS OVER MARKET (5) | FUTURE POWER CONTRACT BUYOUTS (6) | POWER TOTAL OBLIGATION (7) | ASSUMED MARKET VALUE (8) | NET EXCESS OVER MARKET (9) | ABOVE MARKET FUEL TRANSPORT COSTS (10) | TRANSMISSION IN SUPPORT OF REMOTE GEN UNITS (11) | PMTS IN LIEU OF PROP TAXES (12) | EMPLOYEE SEVERANCE & RETRAINING COSTS (13) | DAMAGES COSTS, OR NET RECOVERIES FROM CLAIMS (14) | PBR FOR NUKE UNITS REMAIN AFTER MKT VALUATION (15) | BASE TOTAL VARIABLE COMPONENT (16) | RECONCIL ACCOUNT (17) | TOTAL VARIABLE COMPONENT INCLUDING INCENTIVE (18) |
| 1998 | 2,334 | 42,517 | 20,002 | 22,454 | 0 | (1,414) | 0 | (1,414) | 138 | 365 | 0 | 0 | 0 | 0 | 23,897 | 0 | 23,897 |
| 1999 | 2,152 | 42,556 | 20,729 | 21,826 | 0 | (1,297) | 0 | (1,297) | 131 | 378 | 0 | 0 | 0 | 0 | 23,190 | 0 | 23,190 |
| 2000 | 1,853 | 42,496 | 21,157 | 21,340 | 0 | (690) | 0 | (690) | 125 | 371 | 0 | 0 | 0 | 0 | 22,998 | 0 | 22,998 |
| 2001 | 1,503 | 40,575 | 19,024 | 21,551 | 0 | (453) | 0 | (453) | 119 | 364 | 0 | 0 | 0 | 0 | 23,084 | 0 | 23,084 |
| 2002 | 1,495 | 37,787 | 19,340 | 18,448 | 0 | (453) | 0 | (453) | 109 | 357 | 0 | 0 | 0 | 0 | 19,955 | 0 | 19,955 |
| 2003 | 1,519 | 31,940 | 15,535 | 16,405 | 0 | (453) | 0 | (453) | 101 | 350 | 0 | 0 | 0 | 0 | 17,931 | 0 | 17,931 |
| 2004 | 1,558 | 31,411 | 16,700 | 14,711 | 0 | (453) | 0 | (453) | 93 | 352 | 0 | 0 | 0 | 0 | 16,261 | 0 | 16,261 |
| 2005 | 1,590 | 31,985 | 16,552 | 15,433 | 0 | (453) | 0 | (453) | 85 | 346 | 0 | 0 | 0 | 0 | 17,001 | 0 | 17,001 |
| 2006 | 1,574 | 31,844 | 17,706 | 14,138 | 0 | (453) | 0 | (453) | 77 | 340 | 0 | 0 | 0 | 0 | 15,677 | 0 | 15,677 |
| 2007 | 1,395 | 32,775 | 17,585 | 15,189 | 0 | (453) | 0 | (453) | 69 | 334 | 0 | 0 | 0 | 0 | 16,535 | 0 | 16,535 |
| 2008 | 647 | 33,273 | 18,975 | 14,298 | 0 | (453) | 0 | (453) | 61 | 329 | 0 | 0 | 0 | 0 | 14,882 | 0 | 14,882 |
| 2009 | 509 | 34,587 | 18,749 | 15,839 | 0 | (453) | 0 | (453) | 53 | 283 | 0 | 0 | 0 | 0 | 16,231 | 0 | 16,231 |
| 2010 | 567 | 33,478 | 20,199 | 13,278 | 0 | (453) | 0 | (453) | 45 | 0 | 0 | 0 | 0 | 0 | 13,437 | 0 | 13,437 |
| 2011 | 578 | 26,734 | 14,205 | 12,449 | 0 | (453) | 0 | (453) | 11 | 0 | 0 | 0 | 0 | 0 | 12,585 | 0 | 12,585 |
| 2012 | 434 | 12,703 | 5,187 | 7,538 | 0 | (453) | 0 | (453) | 0 | 0 | 0 | 0 | 0 | 0 | 7,517 | 0 | 7,517 |
| 2013 | 394 | 7,171 | 3,124 | 4,047 | 0 | (453) | 0 | (453) | 0 | 0 | 0 | 0 | 0 | 0 | 3,988 | 0 | 3,988 |
| 2014 | 405 | 7,367 | 3,193 | 4,173 | 0 | (453) | 0 | (453) | 0 | 0 | 0 | 0 | 0 | 0 | 4,125 | 0 | 4,125 |
| 2015 | 417 | 5,894 | 3,056 | 2,838 | 0 | (453) | 0 | (453) | 0 | 0 | 0 | 0 | 0 | 0 | 2,802 | 0 | 2,802 |
| 2016 | 430 | 5,950 | 3,169 | 2,781 | 0 | (453) | 0 | (453) | 0 | 0 | 0 | 0 | 0 | 0 | 2,758 | 0 | 2,758 |
| 2017 | 443 | 4,357 | 2,660 | 1,697 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,140 | 0 | 2,140 |
| 2018 | 456 | 4,257 | 2,715 | 1,542 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,999 | 0 | 1,999 |
| 2019 | 470 | 4,189 | 2,641 | 1,548 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,018 | 0 | 2,018 |
| 2020 | 484 | 4,181 | 2,581 | 1,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,084 | 0 | 2,084 |
| 2021 | 498 | 3,910 | 2,621 | 1,299 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,797 | 0 | 1,797 |
| 2022 | 514 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 514 | 0 | 514 |
| 2023 | 529 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 529 | 0 | 529 |
| 2024 | 545 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 545 | 0 | 545 |
| 2025 | 561 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 561 | 0 | 561 |
| 2026 | 201 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 201 | 0 | 201 |
| 2027 | 207 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 207 | 0 | 207 |
| 2028 | 214 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 214 | 0 | 214 |
| 2029 | 220 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 220 | 0 | 220 |

COLUMN NOTES
COLUMN (2) THROUGH (10) REPRESENT 20.13% OF THE SAME COLUMN NUMBER ON P 15
(17) SEE SCHEDULE 2, P.3, COLUMN (8) X -1.
(18) COLUMN (16) + COLUMN (17)

BV308AS2 WK4 10/23/97

**MONTAUP ELECTRIC COMPANY**
**NET CAPABILITY & UNRECOVERED COSTS**
**AS OF DECEMBER 31, 1995**

| SOURCE (1) | LOCATION (2) | YEAR(S) PLACED IN SERVICE (3) | ENERGY SOURCE (4) | NET CAPABILITY MW (5) | $ IN 000 1995 (6) | $ IN 000 1997 (7) | APPLICABLE ANNUAL DEPRECIATION FOR 1996 AND BEYOND (8) |
|---|---|---|---|---|---|---|---|
| FOSSIL FUEL UNITS | | | | | | | |
| SOMERSET 6 & JETS | SOMERSET, MA | 1959 | COAL/JET FUEL | 153.2 | 28,032 | 23,716 | 2,158 |
| CANAL 2 | SANDWICH, MA | 1976 | OIL | 233 | 41,041 | 35,207 | 2,917 |
| WYMAN 4 | YARMOUTH, ME | 1978 | OIL | 12.2 | 2,030 | 1,806 | 112 |
| NEWPORT DIESELS | JAMESTOWN/<br>PORTSMOUTH, RI/<br>YARMOUTH, ME | 1961<br>1978<br>1978 | DIESEL<br>DIESEL<br>OIL | 8.8<br>8.3<br>4.1 | 1,803 | 1,499 | 152 |
| NUCLEAR UNITS | | | | | | | |
| SEABROOK | SEABROOK, NH | 1990 | NUCLEAR | 33.5 | 170,705 | 160,949 | 4,878 |
| MILLSTONE 3 | WATERFORD, CT | 1986 | NUCLEAR | 45.9 | 137,749 | 128,279 | 4,735 |
| VERMONT YANKEE | BRATTLEBORO, VT | | NUCLEAR | 12.0 | 3,786 (a) | 3,092 | 347 |
| MAINE YANKEE | BRUNSWICK, ME | | NUCLEAR | 31.6 | 7,439 (a) | 6,105 | 667 |
| PLANT HELD FOR FUTURE USE - LAND IN SOMERSET, MA | | | | | 604 | 604 | |
| - NET INVESTMENT IN SOMERSET UNIT 5 | | | | | 5,860 | 6,449 | (b) |
| NONUTILITY PROPERTY (LAND IN PORTSMOUTH, RI & DIGHTON, MA) | | | | | 2,610 | 2,610 | |
| | | | TOTAL | 542.6 | 401,659 | 370,316 | 15,966 |

(a) PLANT IN SERVICE AS OF 12/31/95 INCLUDING MATERIALS AND SUPPLIES.
(b) PER M-14 FERC SETTLEMENT AGREEMENT, SOMERSET UNIT 5 IS EXCLUDED FROM PLANT IN SERVICE BUT IS ALLOWED A RETURN THROUGH 11/1/97. (321k IN 1996 AND 268k IN 1997).

BV30BAS2.WK4 10/23/97

**MONTAUP ELECTRIC COMPANY**
**REGULATORY ASSET BALANCE**
**$ IN 000**

| | BALANCE AS OF DECEMBER 31, 1995 (1) | BALANCE AS OF DECEMBER 31, 1997 (2) | APPLICABLE AMORTIZATION FOR 1996 AND BEYOND (3) | BASIS FOR DEFERRAL (4) |
|---|---|---|---|---|
| FAS 109 - ASSET | 39,916 | 37,466 | 1,225 | FERC RATEMAKING POLICY |
| - LIABILITY | (14,583) | (8,717) | (2,933) | FERC RATEMAKING POLICY |
| FAS 106 DEFERRAL | 1,313 | 538 | 387 (a) | FERC RATEMAKING POLICY |
| NET PENSION LIABILITY / (ASSET) | (485) | (415) | (35) | FAS 87 |
| UNAMORTIZED DEBT PREMIUMS | 13,879 | 10,665 | 1,607 | FERC RATEMAKING POLICY |
| UNAMORTIZED ITC | (12,523) | (11,367) | (578) | FERC RATEMAKING POLICY |
| DREDGING | 424 | 173 | 125 (b) | FERC RATEMAKING POLICY |
| TOTAL REG. ASSETS | 27,941 | 28,343 | (202) | |

(a) REMAINING AMORTIZATION SCHEDULE: 387 IN 1998, 151 IN 1999.
(b) REMAINING AMORTIZATION SCHEDULE: 125 IN 1998, 48 IN 1999.

BV30BAS2.WK4 10/23/97

**MONTAUP ELECTRIC COMPANY**
**FAS 106 TRANSITION OBLIGATION REGULATORY ASSET**
**$ IN 000**

| | |
|---|---|
| UNRECOVERED BALANCE AS OF 12/31/95 | 9,091 |
| AMORTIZATION AMOUNT (1996 & BEYOND) | 534 |
| DISCOUNT RATE | 7.25% |

| | AMORTIZATION (1) | INTEREST (2) | TOTAL EXPENSE (3) | UNAMORTIZED BALANCE (4) |
|---|---|---|---|---|
| | | | | 8,023 |
| 1998 | 669 | 557 | 1,226 | 7,354 |
| 1999 | 669 | 509 | 1,178 | 6,686 |
| 2000 | 669 | 460 | 1,129 | 6,017 |
| 2001 | 669 | 412 | 1,081 | 5,349 |
| 2002 | 669 | 364 | 1,032 | 4,680 |
| 2003 | 669 | 315 | 984 | 4,011 |
| 2004 | 669 | 267 | 935 | 3,343 |
| 2005 | 669 | 218 | 887 | 2,674 |
| 2006 | 669 | 170 | 838 | 2,006 |
| 2007 | 669 | 121 | 790 | 1,337 |
| 2008 | 669 | 73 | 741 | 669 |
| 2009 | 669 | 24 | 693 | (0) |

COLUMN NOTES:
(1) 12/31/97 Balance straight lined over 12 years.
(2) (Prior Year Column (4) + Current Year Column (4) ) / 2 * 7.25%
(3) Column (1) + Column (2)
(4) Prior Year Column (4) - Current Year Column (1)

BV30BAS2.WK4 10/23/97

**MONTAUP ELECTRIC COMPANY**
**OTHER POST-SHUTDOWN NUCLEAR COSTS**
**$ IN 000**

**Schedule 1**
**Page 6 of 15**

| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | VERMONT YK (4) | MAINE YK (5) | TOTAL (6) |
|---|---|---|---|---|---|
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 |
| 2011 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 |

BV30BAS2.WK4 10/23/97

MONTAUP ELECTRIC COMPANY
TOTAL ANNUAL DECOMMISSIONING COST
$ IN 000

| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | CONNECTICUT YANKEE (4) | VERMONT YANKEE (5) | MAINE YANKEE (6) | YANKEE ATOMIC (7) | TOTAL (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 602 | 319 | 3,868 | 317 | 599 | 2,306 | 8,011 |
| 1999 | 621 | 328 | 3,102 | 318 | 711 | 2,306 | 7,386 |
| 2000 | 639 | 339 | 3,058 | 407 | 713 | 1,206 | 6,362 |
| 2001 | 658 | 349 | 2,972 | 408 | 716 | 58 | 5,161 |
| 2002 | 679 | 359 | 2,906 | 409 | 718 | 60 | 5,131 |
| 2003 | 699 | 370 | 2,823 | 456 | 803 | 63 | 5,214 |
| 2004 | 721 | 382 | 2,742 | 457 | 983 | 65 | 5,350 |
| 2005 | 743 | 394 | 2,681 | 585 | 986 | 68 | 5,457 |
| 2006 | 766 | 405 | 2,587 | 587 | 990 | 70 | 5,405 |
| 2007 | 770 | 409 | 2,013 | 578 | 967 | 52 | 4,789 |
| 2008 | 759 | 406 | 0 | 546 | 510 | 0 | 2,221 |
| 2009 | 782 | 418 | 0 | 546 | 0 | 0 | 1,746 |
| 2010 | 806 | 431 | 0 | 710 | 0 | 0 | 1,947 |
| 2011 | 830 | 444 | 0 | 710 | 0 | 0 | 1,984 |
| 2012 | 855 | 457 | 0 | 177 | 0 | 0 | 1,489 |
| 2013 | 880 | 471 | 0 | 0 | 0 | 0 | 1,351 |
| 2014 | 907 | 485 | 0 | 0 | 0 | 0 | 1,392 |
| 2015 | 934 | 499 | 0 | 0 | 0 | 0 | 1,433 |
| 2016 | 962 | 514 | 0 | 0 | 0 | 0 | 1,476 |
| 2017 | 991 | 530 | 0 | 0 | 0 | 0 | 1,521 |
| 2018 | 1,021 | 546 | 0 | 0 | 0 | 0 | 1,567 |
| 2019 | 1,051 | 562 | 0 | 0 | 0 | 0 | 1,613 |
| 2020 | 1,083 | 579 | 0 | 0 | 0 | 0 | 1,662 |
| 2021 | 1,115 | 596 | 0 | 0 | 0 | 0 | 1,711 |
| 2022 | 1,149 | 614 | 0 | 0 | 0 | 0 | 1,763 |
| 2023 | 1,183 | 633 | 0 | 0 | 0 | 0 | 1,816 |
| 2024 | 1,219 | 652 | 0 | 0 | 0 | 0 | 1,871 |
| 2025 | 1,255 | 671 | 0 | 0 | 0 | 0 | 1,926 |
| 2026 | 0 | 691 | 0 | 0 | 0 | 0 | 691 |
| 2027 | 0 | 712 | 0 | 0 | 0 | 0 | 712 |
| 2028 | 0 | 733 | 0 | 0 | 0 | 0 | 733 |
| 2029 | 0 | 755 | 0 | 0 | 0 | 0 | 755 |

BV30BAS2.WK4 10/23/97

Purchase Power Total $000

Schedule 1
Page 8 of 15

| | Pilgrim | Canal 1 | Potter 2 | Cleary | McNeil | OSP 1 | OSP 2 | NEA | Blackstone Hydro | HQ | GMP | BSH | OSP @ 9.2% ROE | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 36,042 | 25,977 | 3,932 | 330 | 3,562 | 25,446 | 27,471 | 12,513 | 526 | 10,662 | 150 | 550 | (1,206) | 145,955 |
| 1999 | 35,710 | 27,181 | 3,976 | 339 | 3,566 | 25,636 | 27,005 | 12,519 | 528 | 10,770 | 0 | 0 | (1,146) | 146,086 |
| 2000 | 36,174 | 27,040 | 4,023 | 347 | 3,612 | 24,978 | 27,541 | 12,632 | 531 | 10,096 | 0 | 0 | (1,089) | 145,885 |
| 2001 | 36,184 | 28,546 | 4,079 | 361 | 3,710 | 25,895 | 27,914 | 6,063 | 533 | 6,935 | 0 | 0 | (1,034) | 139,288 |
| 2002 | 35,333 | 21,448 | 4,137 | 376 | 3,818 | 27,647 | 27,097 | 6,380 | 536 | 3,731 | 0 | 0 | (983) | 129,720 |
| 2003 | 35,763 | 0 | 4,198 | 391 | 3,935 | 25,332 | 29,839 | 6,970 | 539 | 3,612 | 0 | 0 | (934) | 109,045 |
| 2004 | 34,910 | 0 | 4,261 | 406 | 4,057 | 25,953 | 27,792 | 7,290 | 541 | 3,508 | 0 | 0 | (887) | 107 831 |
| 2005 | 35,889 | 0 | 4,327 | 423 | 4,192 | 26,533 | 27,430 | 7,907 | 544 | 3,397 | 0 | 0 | (842) | 109,800 |
| 2006 | 34,468 | 0 | 4,395 | 440 | 4,335 | 26,001 | 28,508 | 8,179 | 547 | 3,225 | 0 | 0 | (800) | 109,316 |
| 2007 | 36,141 | 0 | 4,466 | 457 | 4,485 | 26,907 | 28,363 | 8,815 | 550 | 3,086 | 0 | 0 | (760) | 112,512 |
| 2008 | 33,952 | 0 | 4,540 | 476 | 4,643 | 30,870 | 27,976 | 8,937 | 553 | 2,997 | 0 | 0 | (722) | 114,222 |
| 2009 | 36,999 | 0 | 4,616 | 495 | 4,805 | 27,074 | 32,561 | 9,404 | 557 | 2,909 | 0 | 0 | (686) | 118,734 |
| 2010 | 34,533 | 0 | 4,696 | 514 | 4,969 | 28,398 | 29,600 | 9,479 | 560 | 2,823 | 0 | 0 | (652) | 114,920 |
| 2011 | 40,427 | 0 | 4,779 | 535 | 5,146 | 0 | 27,329 | 10,560 | 563 | 2,740 | 0 | 0 | (303) | 91,776 |
| 2012 | 18,360 | 0 | 4,865 | 556 | 5,331 | 0 | 0 | 10,270 | 567 | 2,659 | 0 | 0 | 0 | 43,608 |
| 2013 | 0 | 0 | 4,955 | 579 | 5,519 | 0 | 0 | 10,413 | 571 | 2,581 | 0 | 0 | 0 | 24,618 |
| 2014 | 0 | 0 | 5,049 | 602 | 5,717 | 0 | 0 | 10,841 | 575 | 2,505 | 0 | 0 | 0 | 25,289 |
| 2015 | 0 | 0 | 5,146 | 628 | 0 | 0 | 0 | 11,453 | 578 | 2,432 | 0 | 0 | 0 | 20,235 |
| 2016 | 0 | 0 | 5,247 | 651 | 0 | 0 | 0 | 11,586 | 582 | 2,360 | 0 | 0 | 0 | 20,426 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,384 | 586 | 1,986 | 0 | 0 | 0 | 14,956 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,095 | 591 | 1,927 | 0 | 0 | 0 | 14,613 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,512 | 0 | 1,869 | 0 | 0 | 0 | 14,381 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,769 | 0 | 1,584 | 0 | 0 | 0 | 14,353 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,455 | 0 | 0 | 0 | 0 | 0 | 13,455 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

BV30BAS2.WK4 10/23/97

Schedule 1
Page 9 of 15

**Purchase Power MWh**

| | Pilgrim | Canal 1 | Potter 2 | Cleary | McNeil | OSP 1 | OSP 2 | NEA | Blackstone Hydro | HQ | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 323,962 | 2,781,183 |
| 1999 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 324,157 | 2,710,592 |
| 2000 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 283,092 | 2,740,313 |
| 2001 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 134,017 | 2,520,452 |
| 2002 | 553,418 | 441,228 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 2,310,145 |
| 2003 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2004 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2005 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2006 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2007 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2008 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2009 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2010 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2011 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 0 | 541,959 | 194,911 | 5,453 | 0 | 1,289,588 |
| 2012 | 184,473 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 449,470 |
| 2013 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 264,997 |
| 2014 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 264,997 |
| 2015 | 0 | 0 | 36,979 | 10,234 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 247,577 |
| 2016 | 0 | 0 | 36,979 | 10,234 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 247,577 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 200,364 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 200,364 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [illegible]3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| [illegible]24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

BV30BAS2.WK4 10/23/97



Schedule 1
Page 10 of 15

**UNIT CONTRACT & NON AFFILIATE REVENUE CREDIT**
**$ IN 000**

| YEAR END (1) | M-RATE SALES TO MIDDLEBORO (2) | M-RATE SALES TO PASCOAG (3) | CANAL UNIT SALES TO BRAINTREE (4) | TOTAL (5) |
|---|---|---|---|---|
| 1998 | 2,004 | 1,295 | 1,555 | 4,854 |
| 1999 | 1,663 | 1,234 | 1,555 | 4,452 |
| 2000 | 0 | 815 | 1,555 | 2,370 |
| 2001 | 0 | 0 | 1,555 | 1,555 |
| 2002 | 0 | 0 | 1,555 | 1,555 |
| 2003 | 0 | 0 | 1,555 | 1,555 |
| 2004 | 0 | 0 | 1,555 | 1,555 |
| 2005 | 0 | 0 | 1,555 | 1,555 |
| 2006 | 0 | 0 | 1,555 | 1,555 |
| 2007 | 0 | 0 | 1,555 | 1,555 |
| 2008 | 0 | 0 | 1,555 | 1,555 |
| 2009 | 0 | 0 | 1,555 | 1,555 |
| 2010 | 0 | 0 | 1,555 | 1,555 |
| 2011 | 0 | 0 | 1,555 | 1,555 |
| 2012 | 0 | 0 | 1,555 | 1,555 |
| 2013 | 0 | 0 | 1,555 | 1,555 |
| 2014 | 0 | 0 | 1,555 | 1,555 |
| 2015 | 0 | 0 | 1,555 | 1,555 |
| 2016 | 0 | 0 | 1,555 | 1,555 |
| 2017 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 |

BV30BAS2.WK4 10/23/97

**TRANSMISSION IN SUPPORT OF REMOTE GENERATING UNITS**
**DETAIL BY UNIT**
**$ IN 000**

| (1) | SEABROOK (2) | MILLSTONE (3) | CANAL 2 (4) | WYMAN 4 (5) | MAINE YNK (6) | VERMONT YNK (7) | TOTAL (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 297 | 138 | 527 | 91 | 214 | 55 | 1,322 |
| 1999 | 292 | 138 | 507 | 91 | 214 | 55 | 1,297 |
| 2000 | 286 | 138 | 488 | 91 | 214 | 55 | 1,272 |
| 2001 | 280 | 138 | 470 | 91 | 214 | 55 | 1,248 |
| 2002 | 275 | 138 | 452 | 91 | 214 | 55 | 1,225 |
| 2003 | 269 | 138 | 435 | 91 | 238 | 61 | 1,232 |
| 2004 | 264 | 138 | 418 | 91 | 238 | 61 | 1,210 |
| 2005 | 259 | 138 | 402 | 91 | 238 | 61 | 1,189 |
| 2006 | 254 | 138 | 386 | 91 | 238 | 61 | 1,168 |
| 2007 | 249 | 138 | 371 | 91 | 238 | 61 | 1,148 |
| 2008 | 245 | 138 | 357 | 91 | 238 | 61 | 1,130 |
| 2009 | 240 | 138 | 443 | 91 | 0 | 61 | 973 |

BV30BAS2.WK4 10/23/97

**SUMMARY OF CONTRACT TERMINATION CHARGES**
**MONTAUP ELECTRIC COMPANY (100%)**
**FIXED COMPONENT**
**$ IN 000**

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 106 TRANSITION OBLIGATION (4) | BASE TOTAL FIXED COMPONENT (5) | ADJ. FOR RESIDUAL VALUE CREDIT (6) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (7) |
|---|---|---|---|---|---|---|
| 1998 | 31,016 | 18,907 | 1,226 | 51,148 | 0 | 51,148 |
| 1999 | 29,236 | 24,802 | 1,178 | 55,216 | 0 | 55,216 |
| 2000 | 27,038 | 29,844 | 1,129 | 58,011 | 0 | 58,011 |
| 2001 | 25,074 | 18,679 | 1,081 | 44,834 | 0 | 44,834 |
| 2002 | 23,200 | 27,503 | 1,032 | 51,735 | 0 | 51,735 |
| 2003 | 20,758 | 33,525 | 984 | 55,267 | 0 | 55,267 |
| 2004 | 17,868 | 39,196 | 935 | 57,999 | 0 | 57,999 |
| 2005 | 14,848 | 36,936 | 887 | 52,671 | 0 | 52,671 |
| 2006 | 11,711 | 42,265 | 838 | 54,814 | 0 | 54,814 |
| 2007 | 8,475 | 39,490 | 790 | 48,756 | 0 | 48,756 |
| 2008 | 5,105 | 45,788 | 741 | 51,635 | 0 | 51,635 |
| 2009 | 1,650 | 41,723 | 693 | 44,066 | 0 | 44,066 |

COLUMN NOTES:
(2) See Schedule 1, p. 14, Column (8).
(3) p. 1 Column (7) /.2913 - p. 15 Column (16) - p. 12 Column (2) - p. 12 Column (4) - p. 12 Column (6) - p. 3 Column (17)/.2913.
(4) See p. 5a, Column (3).
(5) Sum of Columns (2) through (4).
(6) To be based on results of actual market valuation.
(7) Columns (5) + (6).

BV30BAS2.WK4 10/23/97

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES
DEFERRED TAXES ON FIXED COMPONENT
$ IN 000

| YEAR END (1) | BALANCE NET BOOK VALUE OF GENERATION (2) | BOOK BASIS BALANCE GENERATION RELATED REG. ASSETS (3) | TOTAL NET BOOK BASIS (4) | BALANCE NET TAX VALUE OF GENERATION (5) | TAX BASIS BALANCE GENERATION RELATED REG. ASSETS (6) | TOTAL TAX BASIS (7) | EXCESS BOOK OVER TAX (8) | DEFERRED TAXES (9) |
|---|---|---|---|---|---|---|---|---|
| 1997 | 370,316 | 28,343 | 398,659 | 68,206 | 0 | 68,206 | 330,453 | 129,620 |
| 1998 | 352,754 | 26,999 | 379,752 | 64,971 | 0 | 64,971 | 314,781 | 123,473 |
| 1999 | 329,715 | 25,236 | 354,951 | 60,728 | 0 | 60,728 | 294,223 | 115,409 |
| 2000 | 301,993 | 23,114 | 325,106 | 55,622 | 0 | 55,622 | 269,484 | 105,705 |
| 2001 | 284,641 | 21,786 | 306,427 | 52,426 | 0 | 52,426 | 254,001 | 99,632 |
| 2002 | 259,093 | 19,830 | 278,924 | 47,721 | 0 | 47,721 | 231,203 | 90,689 |
| 2003 | 227,952 | 17,447 | 245,398 | 41,985 | 0 | 41,985 | 203,414 | 79,789 |
| 2004 | 191,543 | 14,660 | 206,203 | 35,279 | 0 | 35,279 | 170,924 | 67,045 |
| 2005 | 157,233 | 12,034 | 169,267 | 28,960 | 0 | 28,960 | 140,307 | 55,036 |
| 2006 | 117,972 | 9,029 | 127,001 | 21,728 | 0 | 21,728 | 105,273 | 41,293 |
| 2007 | 81,289 | 6,222 | 87,511 | 14,972 | 0 | 14,972 | 72,539 | 28,453 |
| 2008 | 38,757 | 2,966 | 41,723 | 7,138 | 0 | 7,138 | 34,585 | 13,566 |
| 2009 | (0) | (0) | (0) | (0) | 0 | (0) | (0) | (0) |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P. 4 COLUMN (7) FOR 1997 BALANCE.
(3) SEE SCHEDULE 1, P. 5 COLUMN (2) FOR 1997 BALANCE.
(4) COLUMN (2) + COLUMN (3).
(5) PER TAX RECORDS OF THE COMPANY.
(6) PER TAX RECORDS OF THE COMPANY.
(7) COLUMN (5) + COLUMN (6).
(8) COLUMN (4) - COLUMN (7).
(9) COLUMN (8) x TAX RATE .39225.

BV30BAS2.WK4 10/23/97

**SUMMARY OF CONTRACT TERMINATION CHARGES**
**MONTAUP ELECTRIC COMPANY**
**RETURN ON FIXED COMPONENT**

| YEAR END (1) | BALANCE OF FIXED COMPONENT (2) | DEFERRED TAXES (3) | NET BALANCE (4) | AVG NET BALANCE (5) | SUBTOTAL ANNUAL RETURN ON UNAMORTIZED BALANCE USING BASE ROE (6) | PLUS: RETURN ON UNAMORT. ITC (7) | TOTAL ANNUAL RETURN (8) |
|---|---|---|---|---|---|---|---|
| 1997 | 398,659 | 129,620 | 269,039 | | | | |
| 1998 | 379,752 | 123,473 | 256,280 | 262,659 | 29,781 | 1,235 | 31,016 |
| 1999 | 354,951 | 115,409 | 239,542 | 247,911 | 28,109 | 1,128 | 29,236 |
| 2000 | 325,106 | 105,705 | 219,401 | 229,471 | 26,018 | 1,020 | 27,038 |
| 2001 | 306,427 | 99,632 | 206,795 | 213,098 | 24,161 | 913 | 25,074 |
| 2002 | 278,924 | 90,689 | 188,234 | 197,515 | 22,395 | 806 | 23,200 |
| 2003 | 245,398 | 79,789 | 165,609 | 176,922 | 20,060 | 698 | 20,758 |
| 2004 | 206,203 | 67,045 | 139,158 | 152,384 | 17,278 | 591 | 17,868 |
| 2005 | 169,267 | 55,036 | 114,231 | 126,695 | 14,365 | 483 | 14,848 |
| 2006 | 127,001 | 41,293 | 85,708 | 99,970 | 11,335 | 376 | 11,711 |
| 2007 | 87,511 | 28,453 | 59,058 | 72,383 | 8,207 | 269 | 8,475 |
| 2008 | 41,723 | 13,566 | 28,157 | 43,607 | 4,944 | 161 | 5,105 |
| 2009 | (0) | (0) | (0) | 14,078 | 1,596 | 54 | 1,650 |

EECo 12/31/95
**CAPITAL STRUCTURE**

| | | | ATWACC | BTWACC |
|---|---|---|---|---|
| COMMON | 48.45% | 9.20% (a) | 4.46% | 7.33% |
| PFD | 5.95% | 9.83% | 0.58% | 0.96% |
| LTD | 45.60% | 6.67% | 3.04% | 3.04% |
| | 100.00% | | 8.08% | 11.338% |
| TAX RATE | | | | 39.225% |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P 13 COLUMN (4).
(3) SEE SCHEDULE 1, P 13 COLUMN (9).
(4) COLUMN (2) - COLUMN (3).
(5) COLUMN (4) PRIOR YEAR+COLUMN (4)/2.
(6) COLUMN (5) x TOTAL RATE OF RETURN.
(7) AVERAGE UNAMORT. ITC (ASSUMING 12 YR SL AMORT OF P. 5, COLUMN (2) * BTWACC).
(8) COLUMN (6) + COLUMN (7).
(a) PER NEP RI FILING.

BV30BAS2.WK4 10/23/97

Schedule 1
Page 15 of 15

**MONTAUP ELECTRIC COMPANY**
**SUMMARY OF CONTRACT TERMINATION CHARGES**
**BLACKSTONE VALLEY ELECTRIC COMPANY SHARE (100%)**
**VARIABLE COMPONENT**

| | | | POWER CONTRACTS | | | CREDIT FOR UNIT SALES CONTRACTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR END (1) | NUCLEAR DECOMMISS. AND OTHER POST SHUTDOWN COSTS (2) | TOTAL OBLIGATION (3) | ASSUMED MARKET VALUE (4) | NET: EXCESS OVER MARKET (5) | FUTURE POWER CONTRACT BUYOUTS (6) | TOTAL OBLIGATION (7) | ASSUMED MARKET VALUE (8) | NET: EXCESS OVER MARKET (9) | ABOVE MARKET FUEL TRANSPORT. COSTS (10) | TRANSMISSION IN SUPPORT OF REMOTE GEN. UNITS (11) | PAYMENTS IN LIEU OF PROPERTY TAXES (12) | EMPLOYEE SEVERANCE AND RETRAINING COSTS (13) | DAMAGES, COSTS OR NET RECOVERIES FROM CLAIMS (14) | PBR FOR NUKE UNITS REM. AFTER MKT. VALUATION (15) | BASE TOTAL VARIABLE COMPONENT (16) |
| 1998 | 8,011 | 145,955 | 68,872 | 77,083 | 0 | (4,854) | 0 | (4,854) | 473 | 1,322 | 0 | 0 | 0 | 0 | 82,035 |
| 1999 | 7,385 | 146,086 | 71,160 | 74,926 | 0 | (4,452) | 0 | (4,452) | 451 | 1,297 | 0 | 0 | 0 | 0 | 79,608 |
| 2000 | 5,382 | 145,885 | 72,628 | 73,257 | 0 | (2,370) | 0 | (2,370) | 430 | 1,272 | 0 | 0 | 0 | 0 | 78,951 |
| 2001 | 5,161 | 139,288 | 65,306 | 73,982 | 0 | (1,555) | 0 | (1,555) | 410 | 1,248 | 0 | 0 | 0 | 0 | 79,246 |
| 2002 | 5,131 | 129,720 | 66,390 | 63,330 | 0 | (1,555) | 0 | (1,555) | 373 | 1,225 | 0 | 0 | 0 | 0 | 68,504 |
| 2003 | 5,214 | 109,645 | 53,329 | 56,316 | 0 | (1,555) | 0 | (1,555) | 348 | 1,232 | 0 | 0 | 0 | 0 | 61,553 |
| 2004 | 5,350 | 107,831 | 57,331 | 50,500 | 0 | (1,555) | 0 | (1,555) | 319 | 1,210 | 0 | 0 | 0 | 0 | 55,824 |
| 2005 | 5,457 | 109,800 | 56,820 | 52,980 | 0 | (1,555) | 0 | (1,555) | 291 | 1,189 | 0 | 0 | 0 | 0 | 56,362 |
| 2006 | 5,405 | 109,318 | 60,784 | 48,534 | 0 | (1,555) | 0 | (1,555) | 264 | 1,168 | 0 | 0 | 0 | 0 | 53,816 |
| 2007 | 4,769 | 112,512 | 60,369 | 52,143 | 0 | (1,555) | 0 | (1,555) | 237 | 1,146 | 0 | 0 | 0 | 0 | 56,762 |
| 2008 | 2,221 | 114,222 | 65,139 | 49,083 | 0 | (1,555) | 0 | (1,555) | 209 | 1,130 | 0 | 0 | 0 | 0 | 51,088 |
| 2009 | 1,746 | 118,734 | 64,362 | 54,372 | 0 | (1,555) | 0 | (1,555) | 182 | 973 | 0 | 0 | 0 | 0 | 55,718 |
| 2010 | 1,947 | 114,920 | 69,338 | 45,582 | 0 | (1,555) | 0 | (1,555) | 155 | 0 | 0 | 0 | 0 | 0 | 46,128 |
| 2011 | 1,984 | 91,776 | 49,040 | 42,736 | 0 | (1,555) | 0 | (1,555) | 37 | 0 | 0 | 0 | 0 | 0 | 43,202 |
| 2012 | 1,489 | 43,608 | 17,737 | 25,871 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 25,805 |
| 2013 | 1,351 | 24,618 | 10,724 | 13,894 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 13,690 |
| 2014 | 1,392 | 25,289 | 10,962 | 14,327 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 14,164 |
| 2015 | 1,433 | 20,235 | 10,492 | 9,743 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 9,621 |
| 2016 | 1,476 | 20,426 | 10,879 | 9,547 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 9,468 |
| 2017 | 1,521 | 14,956 | 9,131 | 5,825 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,346 |
| 2018 | 1,567 | 14,613 | 9,319 | 5,294 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,881 |
| 2019 | 1,613 | 14,381 | 9,066 | 5,315 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,928 |
| 2020 | 1,662 | 14,353 | 8,860 | 5,493 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,155 |
| 2021 | 1,711 | 13,455 | 8,996 | 4,459 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,170 |
| 2022 | 1,763 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,763 |
| 2023 | 1,816 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,816 |
| 2024 | 1,871 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,871 |
| 2025 | 1,926 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,926 |
| 2026 | 691 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 691 |
| 2027 | 712 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 712 |
| 2028 | 733 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 733 |
| 2029 | 755 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 755 |

Column Notes:
(2) Schedule 1, p. 6 Column (6) + Schedule 1, p. 7 Column (8)
(3) Schedule 1, p. 8
(5) Column (3) - Column (4).
(7) See Schedule 1, p. 10 Column (5)
(9) Column (7) - Column (8).
(11) Schedule1, p. 11 Column (8).
(16) Sum of Columns (2), (5), (6), (9), (10), (11), (12), (13), (14), and (15)

BV30BAS2 WK4 10/23/97

## SCHEDULE 2

## CALCULATION OF ADJUSTMENT FOR DEFERRAL OF CONTRACT TERMINATION DATE

Schedule 2
Page 1 of 3

**IMPACT OF CONTRACT TERMINATION DEFERRAL ON STARTING BALANCE OF SUNK COMMITMENTS MONTAUP ELECTRIC COMPANY ($ IN 000's)**

| | 1998 | |
|---|---|---|
| CONTINUATION OF CURRENT RECOVERY | | |
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 332 (b) | 28 |
| TOTAL | 16,298 | 1,358 |
| AMORT PER CTC | | |
| TOTAL | 19,575 (c) | 1,631 |
| EXCESS AMORTIZATION | (3,277) | (273) |
| CUMULATIVE EXCESS AMORT. | (3,277) | (273) |

| | 1999 | |
|---|---|---|
| CONTINUATION OF CURRENT RECOVERY | | |
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 19 (b) | 2 |
| TOTAL | 15,985 | 1,332 |
| AMORT PER CTC | | |
| TOTAL | 25,470 (c) | 2,123 |
| EXCESS AMORTIZATION | (9,485) | (790) |
| CUMULATIVE EXCESS AMORT. | (12,763) | (1,064) |

| | 2000 | |
|---|---|---|
| CONTINUATION OF CURRENT RECOVERY | | |
| DEPRECIATION OF GEN. PLANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | (180)(b) | (15) |
| TOTAL | 15,786 | 1,316 |
| AMORT PER CTC | | |
| TOTAL | 30,513 (c) | 2,543 |
| EXCESS AMORTIZATION | (14,727) | (1,227) |
| CUMULATIVE EXCESS AMORT. | (27,489) | (2,291) |

(a) Schedule 1, p. 4, Column (8)
(b) Schedule 1, p. 5, Column (3) + Schedule 1, p. 5a, Amortization Amount (1996 & Beyond)
(c) Schedule 1, p. 12, Column (3) + Schedule 1, p. 5a, Column (1)

BV30BAS2.WK4 10/23/97

Schedule 2
Page 2 of 8

RECONCILIATION ADJUSTMENT ILLUSTRATION CALCULATION
BLACKSTONE VALLEY SHARE

REVENUE ADJUSTMENTS

MONTAUP ELECTRIC COMPANY VARIABLE COST ADJUSTMENT

| YEAR (1) | ESTIMATED KWH DELIVERED (2) | ACTUAL KWH DELIVERED (3) | DELTA KWH DELIVERED (4) | TRANSITION CHARGE BILLED (5) | BLACKSTONE VALLEY REVENUE EXCESS/(SHORTFALL) (6) | ESTIMATED BASE VARIABLE COMPONENT (7) | ACTUAL NUCLEAR DECOM COSTS (8) | ACTUAL POWER CONTRACTS OBLIGATIONS (9) | ACTUAL POWER CONTRACTS MARKET VALUE (10) | ACTUAL POWER CONTRACT BUYOUTS (11) | ACTUAL UNIT SALES CONTRACTS REVENUE (12) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 1,293,213 | 1,293,213 | 0 | 3.00 | 0 | 82,035 | 8,031 | 149,864 | 44,872 | 0 | (4,854) |
| 1999 | 1,309,137 | 1,309,137 | 0 | 3.00 | 0 | 79,608 | 7,396 | 148,096 | 71,180 | 0 | (4,487) |
| 2000 | 1,329,905 | 1,329,905 | 0 | 3.00 | 0 | 78,851 | 6,362 | 145,846 | 72,823 | 0 | (2,370) |
| 2001 | 1,346,024 | 1,346,024 | 0 | 2.90 | 0 | 79,244 | 5,161 | 139,289 | 65,306 | 0 | (1,560) |
| 2002 | 1,360,074 | 1,360,074 | 0 | 2.58 | 0 | 64,504 | 5,171 | 129,729 | 68,390 | 0 | (1,553) |
| 2003 | 1,377,451 | 1,377,451 | 0 | 2.47 | 0 | 61,563 | 5,216 | 109,346 | 53,329 | 0 | (1,558) |
| 2004 | 1,399,848 | 1,399,848 | 0 | 2.37 | 0 | 55,624 | 5,300 | 107,831 | 57,331 | 0 | (1,556) |
| 2005 | 1,423,866 | 1,423,866 | 0 | 2.27 | 0 | 58,382 | 5,657 | 109,800 | 58,870 | 0 | (1,566) |
| 2006 | 1,452,574 | 1,452,574 | 0 | 2.18 | 0 | 53,816 | 5,405 | 109,318 | 60,754 | 0 | (1,566) |
| 2007 | 1,471,219 | 1,471,219 | 0 | 2.09 | 0 | 54,762 | 4,709 | 113,512 | 60,369 | 0 | (1,560) |
| 2008 | 1,493,432 | 1,493,432 | 0 | 2.00 | 0 | 51,068 | 2,221 | 114,222 | 65,139 | 0 | (1,558) |
| 2009 | 1,512,696 | 1,512,696 | 0 | 1.92 | 0 | 55,718 | 1,740 | 116,734 | 64,363 | 0 | (1,565) |
| 2010 | 1,534,838 | 1,534,838 | 0 | 0.88 | 0 | 48,128 | 1,947 | 114,920 | 60,336 | 0 | (1,568) |
| 2011 | 1,550,306 | 1,550,306 | 0 | 0.81 | 0 | 43,202 | 1,364 | 91,778 | 40,040 | 0 | (1,565) |
| 2012 | 1,566,958 | 1,566,958 | 0 | 0.48 | 0 | 25,505 | 1,400 | 43,909 | 17,737 | 0 | (1,566) |
| 2013 | 1,587,866 | 1,587,866 | 0 | 0.25 | 0 | 13,800 | 1,351 | 24,818 | 10,724 | 0 | (1,556) |
| 2014 | 1,624,096 | 1,624,096 | 0 | 0.25 | 0 | 14,184 | 1,392 | 25,296 | 10,967 | 0 | (1,566) |
| 2015 | 1,644,785 | 1,644,785 | 0 | 0.17 | 0 | 9,621 | 1,433 | 20,235 | 10,487 | 0 | (1,564) |
| 2016 | 1,671,118 | 1,671,118 | 0 | 0.17 | 0 | 9,468 | 1,478 | 20,428 | 10,979 | 0 | (1,558) |
| 2017 | 1,693,977 | 1,693,977 | 0 | 0.13 | 0 | 7,349 | 1,521 | 14,908 | 9,131 | 0 | 0 |
| 2018 | 1,713,946 | 1,713,946 | 0 | 0.12 | 0 | 6,881 | 1,567 | 14,613 | 9,319 | 0 | 0 |
| 2019 | 1,736,087 | 1,736,087 | 0 | 0.12 | 0 | 6,928 | 1,613 | 14,391 | 9,066 | 0 | 0 |
| 2020 | 1,762,428 | 1,762,428 | 0 | 0.11 | 0 | 7,185 | 1,662 | 14,343 | 8,860 | 0 | 0 |
| 2021 | 1,787,024 | 1,787,024 | 0 | 0.10 | 0 | 6,170 | 1,711 | 13,456 | 8,866 | 0 | 0 |
| 2022 | 1,811,998 | 1,811,998 | 0 | 0.03 | 0 | 1,763 | 1,763 | 0 | 0 | 0 | 0 |
| 2023 | 1,837,328 | 1,837,328 | 0 | 0.03 | 0 | 1,816 | 1,816 | 0 | 0 | 0 | 0 |
| 2024 | 1,863,048 | 1,863,048 | 0 | 0.03 | 0 | 1,871 | 1,871 | 0 | 0 | 0 | 0 |
| 2025 | 1,889,155 | 1,889,155 | 0 | 0.03 | 0 | 1,929 | 1,929 | 0 | 0 | 0 | 0 |
| 2026 | 1,915,656 | 1,915,656 | 0 | 0.01 | 0 | 691 | 691 | 0 | 0 | 0 | 0 |
| 2027 | 2,011,430 | 2,011,430 | 0 | 0.01 | 0 | 712 | 712 | 0 | 0 | 0 | 0 |
| 2028 | 2,112,011 | 2,112,011 | 0 | 0.01 | 0 | 733 | 733 | 0 | 0 | 0 | 0 |
| 2029 | 2,217,611 | 2,217,611 | 0 | 0.01 | 0 | 758 | 758 | 0 | 0 | 0 | 0 |

| YEAR (1) | ACTUAL UNIT SALES CONTRACTS MARKET VALUE (13) | ACTUAL ABOVE MARKET FUEL TRANSPORT COSTS (14) | TRANSMISSION IN SUPPORT OF REMOTE GENERATING UNITS (15) | ACTUAL PAYMENTS IN LIEU OF PROPERTY TAXES (16) | ACTUAL EMPLOYEE REVENUES SEVERANCE AND RETRAINING COSTS (17) | ACTUAL DAMAGES COSTS OR NET RECOVERIES FROM CLAIMS (18) | ACTUAL PMT FOR NUKE UNITS REMAINING AFTER MARKET VALUATION (19) | MONTAUP ACTUAL TOTAL VARIABLE COMPONENT (20) | DELTA VARIABLE COMP (21) | BLACKSTONE VALLEY SHARE DELTA VAR COMP (22) | BLACKSTONE VALLEY ANNUAL RECON ADJ EXCESS (SHORTFALL) (23) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 0 | 473 | 1,322 | 0 | 0 | 0 | 0 | 82,036 | 0 | 0 | 0 |
| 1999 | 0 | 451 | 1,297 | 0 | 0 | 0 | 0 | 79,608 | 0 | 0 | 0 |
| 2000 | 0 | 430 | 1,272 | 0 | 0 | 0 | 0 | 78,851 | 0 | 0 | 0 |
| 2001 | 0 | 410 | 1,246 | 0 | 0 | 0 | 0 | 79,244 | 0 | 0 | 0 |
| 2002 | 0 | 373 | 1,225 | 0 | 0 | 0 | 0 | 64,504 | 0 | 0 | 0 |
| 2003 | 0 | 346 | 1,232 | 0 | 0 | 0 | 0 | 61,563 | 0 | 0 | 0 |
| 2004 | 0 | 319 | 1,210 | 0 | 0 | 0 | 0 | 55,624 | 0 | 0 | 0 |
| 2005 | 0 | 291 | 1,189 | 0 | 0 | 0 | 0 | 58,382 | 0 | 0 | 0 |
| 2006 | 0 | 264 | 1,169 | 0 | 0 | 0 | 0 | 53,816 | 0 | 0 | 0 |
| 2007 | 0 | 237 | 1,149 | 0 | 0 | 0 | 0 | 54,762 | 0 | 0 | 0 |
| 2008 | 0 | 209 | 1,130 | 0 | 0 | 0 | 0 | 51,068 | 0 | 0 | 0 |
| 2009 | 0 | 182 | 973 | 0 | 0 | 0 | 0 | 55,718 | 0 | 0 | 0 |
| 2010 | 0 | 155 | 0 | 0 | 0 | 0 | 0 | 48,128 | 0 | 0 | 0 |
| 2011 | 0 | 37 | 0 | 0 | 0 | 0 | 0 | 43,202 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25,505 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,800 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,184 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,621 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,468 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,349 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,881 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,928 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,185 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,170 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,763 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,816 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,871 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,929 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 691 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 712 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 733 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 755 | 0 | 0 | 0 |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P. 1 COLUMN (2)
(3) FOR DEMONSTRATION PURPOSES, ACTUAL KWH'S DELIVERED ASSUMED TO EQUAL EST. KWH DELIVERED
(4) COLUMN (3) - COLUMN (2)
(5) SEE SCHEDULE 1, P. 1 COLUMN (7).
(6) COLUMN (4) X COLUMN (5)
(7) SEE SCHEDULE 1, P. 15, COLUMN (17).
(8) - (19) FOR DEMONSTRATION PURPOSES ACTUAL VARIABLE COMPONENTS ARE ASSUMED TO EQUAL THE ESTIMATED VARIABLE COMPONENTS ILLUSTRATED ON SCHEDULE 1, P. 15
(20) COLUMN (8) + COLUMN (9) - COLUMN (10) + COLUMN (11) + COLUMN (12) - COLUMN (13) + COLUMN (14) + COLUMN (15) + COLUMN (16) + COLUMN (17) + COLUMN (18) + COLUMN (19)
(21) COLUMN (20) - COLUMN (7).
(22) COLUMN (21) * 29.13%
(23) COLUMN (6) - COLUMN (22)

BV308A32.WK4 10/23/97

NARR 23389

Schedule 2
Page 3 of 3

RECONCILIATION ADJUSTMENT ILLUSTRATION CALCULATION
BLACKSTONE VALLEY ELECTRIC SHARE

| | ADJUSTMENTS TO MONTAUP ELECTRIC COMPANY COSTS | | BLACKSTONE VALLEY ELECTRIC COMPANY ACCOUNT | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR (1) | DEFERRAL OF CONTRACT TERMINATION DATE (2) | CREDIT FOR DIFF. BETWEEN 9.20%ROE & 11.4% ROE (3) | BUYOUT SAVINGS (4) | VARIABLE RECONCIL. ADJUSTMENT (4) | DEFERRAL OF CONTRACT TERM. DATE (5) | CREDIT FOR DIFF. BETWEEN 9.20%ROE & 11.4% ROE (6) | BUYOUT SAVINGS (8) | ANNUAL SHORTFALL/ (EXCESS) (7) | ANNUAL PRE-TAX RETURN ON BALANCE (8) | COLLECTION OF PRIOR YR BAL. INCL. INTEREST (9) | END OF YR. ACCOUNT BALANCE (10) |
| 1997 | | | | | | | | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

COLUMN NOTES:
(2) ASSUMED TO BE ZERO.
(3) TO BE DETERMINED AT VALUATION.
(4) SEE SCHEDULE 2, PG. 2, COLUMN (23) X -1.
(5) COLUMN (2) x BLACKSTONE'S % OF SALES.
(6) COLUMN (3) x BLACKSTONE'S % OF SALES.
(7) SUM OF COLUMN (4) THROUGH (6).
(8) COLUMN (10) PRIOR YEAR x RETURN @ BTWACC.
(9) COLUMN (10) PRIOR YEAR x -1- COLUMN (8) CURRENT YEAR.
(10) PRIOR YEAR COLUMN (10) + CURRENT YEAR SUM COLUMN (7) THROUGH (9).

BV30BAS2.WK4 10/23/97

**PART 3 OF 4**

**SCHEDULE 3**

**RECONCILIATION OF FAS 106 AND FAS 87 UPON DIVESTITURE**

**Reconciliation of FAS 106 and 87**
**Upon Divestiture**

**$ in Thousands**

| | Actual After Date of Divesture |
|---|---|
| ***One-Time Adjustments Upon Divesture:*** | |
| **(1) Post Retirement Health Care Benefits -** | |
| Unrecognized FAS 106 Gain or (Loss) | |
| (a) **Unrecognized Net Gain/(Loss) associated with FAS 106** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total unrecognized Net Gain/(loss) allocated to MEC | - |
| (b) Generation Related Portion | 93.08% |
| (c) Total Unrecognized Net Gain/(Loss) allocated to Generation | - |
| **(2) Pensions -** | |
| Unrecognized FAS 87 Gain or (Loss) * | |
| (d) **Unrecognized Net Gain/(Loss) associated with FAS 87** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total Unrecognized Net Gain/(Loss) allocated to MEC | - |
| (e) **Less: Unrecognized Prior Service Costs associated with FAS 87** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total Unrecognized Prior Service Costs Allocated to MEC | - |
| (f) **Less: FAS 87 Transition Liability** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total FAS 87 Transition Asset allocated to MEC | - |
| (g) **Plus: FAS 87 Transition Asset** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total FAS 87 Transition Asset allocated to MEC | - |
| (h) Net Unrecognized Gain/(Loss) Associated with Pension | - |
| (i) Generation Related Portion | 93.08% |
| (j) Net Unrecognized Gain/(Loss) allocated to Generation | - |

* For the purpose of this reconciliation the unrecognized FAS 87 gains or losses shall be the amount of the net unrecognized transition obligation, prior service cost, and unrecognized FAS 87 gains or losses only to the extent that such gains or losses exceed five percent of the greater of plan assets or liabilities.

Row Notes:
(a) Per actual accounting and actuarial records.
(b) = Generation allocator based upon salaries and wages.
(c) = (a) x (b)
(d), (e), (f), (g) Per actual accounting records.
Specific Company balances for Union, Non-Union, and SERP plans will be allocated by multiplying the total EUA balance for these plans by the ratio of the Company liability to the total EUA liability, by plan.
(h) = (a) - (b) - (c) + (d)
(i) See (b) above.
(j) = (h) x (i)

NARR 23393

**Power Contract Buyout Incentive**
**Associated with Canal Divestiture**

**$ in Thousands**

**Market Price Assumptions ***

| | cents/kwh |
|---|---|
| 1998 | 2.48 |
| 1999 | 2.63 |
| 2000 | 2.65 |
| 2001 | 2.59 |
| 2002 | 2.87 |
| 2003 | 2.97 |
| 2004 | 3.07 |
| 2005 | 3.16 |
| 2006 | 3.25 |
| 2007 | 3.36 |
| 2008 | 3.49 |
| 2009 | 3.58 |
| 2010 | 3.71 |
| 2011 | 3.80 |
| 2012 | 3.95 |
| 2013 | 4.05 |
| 2014 | 4.14 |
| 2015 | 4.24 |
| 2016 | 4.39 |
| 2017 | 4.51 |
| 2018 | 4.62 |
| 2019 | 4.74 |
| 2020 | 4.85 |
| 2021 | 4.97 |
| 2022 | 5.09 |
| 2023 | 5.20 |
| 2024 | 5.32 |
| 2025 | 5.43 |
| 2026 | 5.55 |
| 2027 | 5.67 |
| 2028 | 5.79 |
| 2029 | 5.90 |

* Note: Market Price Assumptions are fixed for purposes of the calculation of the Power Contract Buyout Incentive associated with the Canal divestiture.

**Ocean State Power Buyout Incentive**
For Illustrative Purposes Only
$ in 000

| | | |
|---|---|---|
| 1 | NPV of OSP Costs in CTC | $335,759 |
| 2 | NPV for Incentive Purposes | 302,184 |
| 3 | NPV of Market Value | 188,977 |
| 4 | Above Market Cost for Incentive | 113,207 |
| 5 | NPV of Buyout Amount | 100,000 |
| 6 | Net Value Attributable to Buyout | 13,207 |
| 7 | 10% Buyout Incentive | 1,321 |
| 8 | Blackstone Valley Electric Share | 29.13% |
| 9 | Blackstone Share of Incentive | $385 |

1 NPV at time of divestiture, @ full cost-of-service, using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined under section 1.1.4(d). For this example, the discount rate used equals 13.092% under Section 1.1.2.
2 90% of Line 1.
3 NPV at time of divestiture of market value for remaining contract lives using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined in Section 1.1.4 (d). For this example, the discount rate used equals 13.092%.
4 Line 2 - Line 3.
5 NPV, at the time of divestiture, for stipulated term of buyout payments using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined in Section 1.1.4 (d). For this example, the discount rate used equals 13.092%.
6 Line 4 - Line 5. Cannot be less than zero.
7 Line 6 * 10%.
8 Blackstone Valley Electric Company's share of MEC stranded costs.
9 Line 8 x Line 7.

# SCHEDULE 4

## MONTAUP ELECTRIC COMPANY
## POST 1995 CAPITAL INVESTMENTS

NARR 23397

15-96/97
X15-96/97

**Minor Imps/Rets - Canal #2 Common** - $83,105
Perform miscellaneous minor improvements and retirements of Canal Unit #2 equipment, which is common to Canal Unit #1.

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Project: To increase the operational and maintenance efficiency of the unit.

16-96/97
X16-96/97

**Minor Imps/Rets - Wyman #4** - $6,565
Perform miscellaneous minor improvements and retirements at Wyman Unit #4.

Charges and credits to plant will reflect Montaup's 1.9618% share of ownership.

Reason for Project: To increase the operational and maintenance efficiency of the unit.

34
X34

**1994 Miscellaneous Projects, Canal 2** - $708,661
This requisition includes the following projects which began during 1994, and is net of $11,985,355 for gas conversion which is included in December 31, 1995 embedded plant amounts.

1. Miscellaneous Improvements under $25,000
2. Gas for Canal Unit #2
3. Generator Stator Refurbishment
4. Emission Monitoring, Common
5. NOx Ports and Register Assemblies
6. Replace Breaker Mufflers, Common
7. Replace ID Fan Inlet Box
8. Discharge Flume Repairs, Common
9. CO Reduction
10. Resin for Polishers
11. Refurbish Marine Building, Common
12. Ash Pit and Expansion Joint Work
13. Economizer Expansion Joints
14. Cold End Air Preheater B
15. Piping Restraint System
16. Maintenance Management System, Common
17. Electrostatic Precipitator Refurbishment
18. Condensate Polisher Refurbishment
19. Generator Rings & Stator Windings

Charges and credits to plant will reflect Montaup's 50% share of ownership

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

35
X35

**1995 Miscellaneous Projects, Canal 2** - $137,978

This requisition includes the following projects which began during 1995:

1. Replace Turbine Room Roof
2. Training/Visitor Building
3. Waste Neutralizing Tank
4. Caustic & Acid Storage Area Repairs
5. Combustion Modifications & CO
6. Neutralizing Wash System
7. Reheat Controls Upgrade

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

36
X36

**1996 Miscellaneous Projects, Canal 2** - $2,698,884

This requisition includes the following projects which began during 1996:

1. ID Fan Attenuators
2. NOx/CO Reduction

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

37
X37

**1997 Miscellaneous Projects, Canal 2** - $21,678

This requisition includes the following projects which began during 1997:

1. Callon Regeneration Vessel Replacement
2. Rework Furnace Wall
3. Replace ID Fan Attenuators
4. Precipitator Roof Enclosure
5. Precipitator Inlet Flow Distribution

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

718
X718

**Warehouse No. 2 Roof and Side Walls** - $57,740

Install a new metal roof and metal siding on warehouse. Retire existing roof and siding.

Reason for Project: Existing roof and sidewalls are heavily corroded and leak excessively.

797

**Preservation of Unit 5** - $40,366

Design, supply and maintain a dehumidification and sealing system to protect the generating equipment of Unit No. 5 from corrosion damage while the unit remains in a deactivated reserve status. Several tasks must be performed by Engineering, plant personnel and outside contractors to prepare the unit for the acceptance of the dehumidification system.

Reason for Project: As a result of Unit No. 5 being placed in a deactivated reserve status, procedures must be followed to preserve the mechanical and electrical components. The preservation is to prevent moisture attack to the metal components and to maintain operational integrity of the Unit.

**X806** <u>**1995 Asbestos Abatement, LP Station**</u> - $738,326

Remove asbestos insulating material from Units 1-4, low pressure station. Reinsulate the equipment which is still in service.

Reason for Project: Remove insulation, refractories, coatings and gasketing material from the equipment to allow dismantlement, reduce environmental liability and diminish ongoing maintenance and re-encapsulation costs.

**X808** <u>**Units 1, 2, 3 & 4 Salvage**</u> - ($100,132)

To capture salvage value for reserve of physical plant equipment from Somerset Units 1, 2, 3 and 4, previously retired. This work addresses salvage of unit generators 1, 2 and 4 as one effort. A second effort addresses salvage of units 1, 2 and 4 main transformers and numerous other station service transformers.

Unit generators have a salvage value of $10,000 each for a total of $30,000. The last of 15 transformers have a salvage value of $40,000. Montaup labor will consist of electrical disconnects and isolation, and operation of overhead cranes. Montaup labor is estimated at $10,000.

Reason for Project: To obtain existing secondary market value of used equipment.

**812**
**X812** <u>**Abatement & Encapsulation, Stacks 1-4**</u> - $29,682

Complete abatement and encapsulation of stacks 1-4 at Montaup Electric's Somerset Station. Air monitoring and proper disposal of all asbestos materials and debris included.

Reason for Project: The existing mastic coating is flaking off stacks 1-4. In order to contain this mastic material is necessary to completely abate all four stacks. In addition, once this coating is removed, stacks 1-4 must be sealed in order to preserve their weather integrity.

**815**
**X815** <u>**J2 Gas Turbine Exhaust Silencer**</u> - $105,095

Purchase and install a new exhaust silencer for the J2 gas turbine. Remove and retire the existing silencer.

Reason for Project: The existing silencer is severely corroded. Internal attenuating baffles are damaged beyond repair. Installation of the new silencer will be performed during the annual overhaul of the unit.

**816**
**X816** <u>**J1 Gas Turbine Exhaust Silencer**</u> - $98,342

Purchase and install a new exhaust silencer for the J1 gas turbine. Remove and retire the existing silencer.

Reason for Project: The existing silencer is severely corroded. Internal attenuating baffles are damaged beyond repair. Installation of the silencer will be performed during the annual overhaul of the unit.

818
X818

**Air Preheater Basket Replacement** - $244,066
Replace air preheater heat exchange basket assemblies.

Reason for Project: This project will improve unit heat rate. In addition, it will increase combustion air temperature due to improved heat transfer from new baskets.

822
X822

**New Cond. Tubes** - $491,620
Install approximately 11,200 new 90-10 Cu-Ni, 7/8" OD, 18 BWG, 30' long tubes in Unit #6 steam condenser.

Reason for Project: The existing tubes will be in service for 30 years by 1997. The condition of these tubes was such that 5,500 tube end inserts had to be installed in 1990 to prevent further corrosion of tubes. Tube leaks will necessitate load reduction or unit outage, threaten the boiler water chemistry, and also lead to degradation of the heat rate of the unit. New condenser tubes will assure improved boiler water chemistry and better thermal performance for many years.

**SCHEDULE 5**

**DETAIL OF EARLY RETIREMENT, EMPLOYEE TERMINATION & RETRAINING COSTS RESULTING
FROM DIVESTITURE**

**Schedule 5**
Detail of
Early Retirement, Employee Terminations & Retraining Costs
Resulting from Divestiture

**$ in Thousands**

| | | Non-Union | Union | Total All |
|---|---|---|---|---|
| **I.** | **Accounting Costs:** | | | |
| **A.** | **Early Retirement** | | | |
| | -Additional Benefits: | | | |
| (1) | Pension | $5,726.0 | $1,312.0 | |
| (2) | Severance | $134.0 | $199.0 | |
| (3) | Health | $1,643.0 | $266.0 | |
| (4) | Retraining | $108.0 | $51.0 | |
| | **Subtotal Early Retirement (I.A)** | $7,611.0 | $1,828.0 | $9,439.0 |
| **B.** | **Terminations & Employee Retraining** | | | |
| | -Severance: | | | |
| (1) | Payments | $830.7 | $938.8 | |
| (2) | Health | $145.8 | $248.4 | |
| (3) | Retraining | $81.0 | $138.0 | |
| | **Subtotal Terminations & Retraining (I.B)** | $1,057.5 | $1,325.2 | $2,382.7 |
| | **TOTAL PROGRAM COSTS (I.A, I.B)** | $8,668.5 | $3,153.2 | $11,821.7 |
| **II.** | **Position Reductions:** | | | |
| A. | # Employees Eligible for Early Retirement | 50 | 17 | 67 |
| B. | # Employees Accepting Early Retirement | 36 | 17 | 53 |
| C. | # Employees to be Severed | 27 | 46 | 73 |
| D. | Total Reductions (Early Retirement & Severance) | 63 | 63 | 126 |

Notes:
Assumes a 7.5% discount rate
Costs include those of Montaup Electric Company and EUA Service Corporation in support of generation function

**ATTACHMENT 1N**

**PURCHASE OF ELECTRIC SERVICE FOR RESALE AMENDMENT TO SERVICE AGREEMENT**

MONTAUP ELECTRIC COMPANY

Purchase of Electric Service for Resale

AMENDMENT TO SERVICE AGREEMENT

Dated: October , 1997

Parties: MONTAUP ELECTRIC COMPANY
a Massachusetts corporation (the "Company")

and

NEWPORT ELECTRIC CORPORATION,
a Rhode Island corporation (the "Customer"),

WHEREAS, the Customer is currently an all-requirements electric customer of the Company under the Company's FERC Tariff, First Revised Volume No. 1 (the "Tariff"), and a Service Agreement as amended (the "Service Agreement"); and

WHEREAS, under the Service Agreement, the Customer purchases from the Company for resale all of the electric requirements of the ultimate customers in the Customer's service territory; and

WHEREAS, the Rhode Island Legislature passed into law the Rhode Island Utility Restructuring Act of 1996 ("URA"), which extends wholesale competition in power supply markets to retail customers through the provision of retail access; and

WHEREAS, termination of all-requirements service under the Tariff and the provision of unbundled transmission service by the Company to Customer under the Company's open access tariff are necessary to implement retail access in a manner consistent with the URA; and

WHEREAS, the Customer desires to comply with the URA which mandates a reduction in the purchase of its energy requirements from the Company under the Tariff before the term of the Service Agreement has expired and the Customer further desires to

retain the flexibility to terminate all purchase requirements under the Tariff on the Contract Termination Date, as defined in Section 3 of this Amendment; and

WHEREAS, the Customer desires to continue to receive transmission service over the transmission facilities owned or operated by the Company after the termination of its purchases under the Tariff; and

WHEREAS, the Customer desires to retain the option, but not the obligation, to purchase electricity from the Company after the termination of its purchases under the Tariff or the option for the ultimate customers in the Customer's service territory to do so; and

WHEREAS, the Company is willing to permit the Customer to terminate its purchase requirement before the Term has expired and to provide the options desired by the Customer, but only upon the terms and conditions set forth in this Amendment to Service Agreement ("Amendment"),

NOW, THEREFORE, the Company and the Customer, in consideration of their mutual commitments set forth herein, agree as follows:

1. The Parties agree that, notwithstanding anything to the contrary in the Service Agreement or in the Tariff, the Customer's obligation to purchase energy under the Service Agreement and the Company's obligation to provide energy under the Service Agreement shall be reduced as of July 1, 1997, in accordance with the Retail Access Schedule (as defined in Section 2 of this Amendment) and shall terminate as of the Contract Termination Date, which shall be determined pursuant to Section 3 of this Amendment. Except as provided in Section 10 below, or in a separate contract for power supply, the Company shall have no further obligation to meet the electricity demands of the ultimate customers in the service territory of the Customer on or after

the Contract Termination Date, or to make any plan, investment, purchase, or commitment to maintain sufficient generating capacity to provide adequate, continuous, or reliable electricity supplies to the Customer or its ultimate customers on or after such date.

2. Commencing on July 1, 1997, the Customer shall not be obligated to purchase, and the Company shall not be obligated to supply, energy required by any distribution service customer of the Customer, or its successor or assign, that is taking retail access in accordance with the following schedule ("Retail Access Schedule"):

Phase 1: On July 1, 1997, the following customers shall have retail access: (i) all new commercial and industrial customers, including new manufacturing customers, commencing service on or after July 1, 1997, with an anticipated average annual demand of two hundred (200) kilowatts or greater; (ii) all existing manufacturing customers with an average annual demand of fifteen hundred (1500) kilowatts or greater; and (iii) all accounts in the name of the State of Rhode Island, provided, however, the Customer may limit retail access to no more than ten percent (10%) of its total kilowatt-hour sales.

Phase 2: On January 1, 1998, retail access shall be extended to the following customers: all existing manufacturing customers with an average annual demand of two hundred (200) kilowatts or greater and all accounts in the name of the cities and towns in Rhode Island, provided, however, the Customer may limit retail access to no more than twenty percent (20%) of its total kilowatt-hour sales.

Attachment 1N

Phase 3: The remaining customers shall have retail access on the earliest to occur of: (i) July 1, 1998; (ii) within three months after retail access is available to forty percent (40%) or more of the kilowatt-hour sales in New England including the total kilowatt-hour sales in Rhode Island, provided, however, if the Rhode Island Public Utilities Commission ("RIPUC") extends the deadline beyond July 1, 1998, then the remaining customers shall have access on the extended date established by the RIPUC; or (iii) the Retail Access Date defined in Section 3(a).

3. Montaup's obligations to provide requirements service shall cease on the Contract Termination Date. The Contract Termination Date shall occur on the earlier of the Retail Access Date or the Wholesale Access Date, defined as follows:

(a) The Retail Access Date shall be the later of January 1, 1998 or the date of a final nonappealable order of the RIPUC approving the implementation methodology for the disposition of Montaup's non-nuclear generating facilities, provided, however that the Retail Access Date shall occur no later than three months after retail access is made available to forty percent (40%) or more of the kilowatt-hour sales in New England, including the total kilowatt-hour sales in Rhode Island and, in any event, not later than July 1, 1998.

(b) The Wholesale Access Date shall be the earlier of the Retail Access Date or the date on which the Customer in its sole discretion decides to terminate purchases under Tariff 1 and its Service Agreement with Montaup by providing FERC and the Signatories with 90 days advance notice in writing, or less with the mutual consent of the parties, said date not to be earlier than January 1, 1998.

4. For service under the Tariff commencing July 1, 1997 and continuing to the Contract Termination Date, the Company shall continue to charge and the Customer shall continue to pay the Demand and Energy Charges shown on Sheet No. 4 as revised, which sets forth the M-14 rates, and the Company shall defer a portion of the M-Rate billings to the Customer to ensure that the Customer is held harmless as a result of the phase-in of retail access in Rhode Island.

5. The Customer agrees that its Billing Determinants for calculating Demand Charges shall apply to all kilowatts recorded by the Customer in the Customer's service territory. The Customer further agrees that its Billing Determinants for calculating Energy Charges shall apply to all kilowatt-hours recorded by Customer less all kilowatt-hours recorded by Customer as supplied by a Non-Regulated Power Producer ("NRPP") as that term is defined in the URA.6. The Company agrees to defer a portion of the Demand Charges in accordance with the following formula:

Hold Harmless Deferral (HHD) = $(\text{amdr} * kW_{\text{retail access}}) - (\text{TC per kWh} * kWh_{\text{retail access}}) - \text{Trans}_{\text{Retail}}$

Where:

a) average monthly demand rate:

$$\text{amdr} = \frac{\text{Base} + \text{PCAC}}{kW_{cp}}$$

b) Base - Base Rate Demand Charges (initial and tail block charges) as specified in the Company's effective rate under Section III and applied to the full requirements of the Customer.

c) PCAC - Purchased Capacity Adjustment Clause rate as provided for in the Company's effective rate under Section III B and applied to the initial block of the full requirements of the Customer.

d) $\text{Trans}_{\text{Retail}}$ - Represents Transmission billings, for all kWh gone to retail choice

e) [1]$kW_{cp}$ - The Customer's coincident peak demand in kilowatts, including kW gone to

NARR 23409

retail choice.

f) [1]$kW_{retail\ access}$ & $kWh_{retail\ access}$ - kW demand and associated energy gone to retail choice.

a) TC - Transition Charge, initially set at $0.028 per kWh per the URA and revised from time-to-time as approved by the Commission.

(1) Adjusted for losses to the wholesale metering points.

7. The Company shall record the HHD as a regulatory asset on its books as a receivable, and the Customer shall record on its books a corresponding payable, owed to the Company at the completion of the Company's divestiture of its non-nuclear generating facilities in accordance with Section 1.1.4(c)(ii) of Appendix 1. The Company shall mitigate the HHD upon the reconciliation of the 1997 Purchase Capacity Adjustment Clause by allocating that portion of the Sales Credit which can be attributed to the sales of capacity resulting from $kW_{retail\ access}$.

8. Commencing on the Contract Termination Date, the Customer shall pay to the Companythe Contract Termination Charges determined in accordance with Appendix 1 and Schedules 1 and 2 to this Amendment, which sets forth Base Contract Termination Charges and formulae for the adjustment of the Base Contract Termination Charges. The Contract Termination Charges shall apply to all kilowatt-hours delivered by the Customer, or its successor or assign, in the Customer's Service Area, whether or not such kilowatthours are sold by the Customer. The Customer's Service Area is defined to include the area served by the Customer on December 1, 1996. Kilowatt-hours delivered are defined to include all kilowatt-hours delivered to electricity consumers in the Customer's Service Area, whether or not they are present customers of the Customer. The Base Contract Termination Charges shall equal the

cents per kilowatt-hour amounts shown on Schedule 1.

The Base Contract Termination Charges shall recover the Customer's proportionate share of the Company's total contract termination costs shown in Schedule 1, which share equals 29.13 percent of the Company's total contract termination costs. The Base Contract Termination Charges shall be subject to adjustments for a Residual Value Credit described in Appendix 1. The Base Contract Termination Charges shall be adjusted through a Reconciliation Account in which differences, whether positive or negative, between the estimates for costs and revenues included in the Base Contract Termination Charges and actual costs and revenues are subtracted from the Base Contract Termination Charges from the Company to the Customer.

9. Notwithstanding anything to the contrary in the Tariff or the Service Agreement, the Contract Termination Charges specified in Appendix 1 and Schedules 1 and 2 to this Amendment shall remain in effect until the Company has collected all amounts subject to collection thereunder and neither the Customer's obligation to pay the Contract Termination Charges in full nor the formulae for the calculation of the Contract Termination Charges set forth in Appendix 1 and Schedules 1 and 2 to this Amendment shall be subject to change by the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 or Section 206 of the Federal Power Act, absent the agreement of the Company or its successors or assigns.

10. The Company shall provide "Standard Offer Service" to the Customer commencing on the Contract Termination Date and continuing for the period through December 31, 2009 (the "Standard Offer Period"). Standard Offer Service, shall consist of the wholesale supply of power sufficient to meet the requirements of retail customers

served by the Customer's distribution system that purchase Standard Offer retail service from the Customer.

(a) Standard Offer Service shall be made available at the prices set forth in the Stipulation and Agreement adjusted for a fuel index. The prices for Standard Offer Service shall be for electricity delivered to the meter of Customer's ultimate customers, not including the charges for Customer's distribution services or for the Company's Network Integration Transmission Service, but including any and all transmission charges to reach the Company's system that are not recovered in Customer's transmission cost recovery provisions.

(b) Standard Offer Service shall be available to Customer after the Contract Termination Date. After that date, Customer, in its sole discretion, is free to reduce its purchases under the Standard Offer by pursuing other opportunities in the wholesale market, and Customer's ultimate customers may terminate Standard Offer Service at any time to purchase from a nonregulated power producer as defined in Section 39-1-2(7.1) of the Rhode Island General Laws. Once Customer has reduced its wholesale purchases for those ultimate customers who have terminated Standard Offer Service, it may only elect to increase its purchase for resale to any of Customer's residential or small general service customers who: (1) purchased power from Customer immediately prior to the Retail Access Date; (2) begin to purchase power from a nonregulated power producer on or within one year of the Retail Access Date; and (3) elect to return to Standard Offer Service within 120 days of taking service from such nonregulated power producer.

(c) In the event the Contract Termination Date is determined by the Wholesale

NARR 23412

Access Date, the Customer shall be free, either in its notice pursuant to Section 3(b), or thereafter by giving the Company at least 90 days advance written notice directed to the first day of a calendar month, to terminate or reduce its purchases of Standard Offer Service from the Company in order to obtain electricity from other suppliers in the market. Once the Customer has reduced or terminated its purchases of Standard Offer Service from the Company, the Company shall have no obligation to supply Standard Offer Service to the Customer with respect to the terminated or reduced purchases, except as provided for in Section 10(b).

(d) No less than 90 days before the Retail Access Date, the Customer shall notify the Company in writing of its estimate of the capacity and energy it shall purchase under Standard Offer Service for resale to ultimate customers in its service territory. The Customer shall provide the Company with at least 30 days prior advance written notice, directed to the first day of a calendar month, of reductions in the quantity of energy so purchased due to decisions by Standard Offer Service customers to purchase electricity from other nonregulated power producers after the Retail Access Date. Nothing in this Amendment shall restrict the right of any ultimate customer to purchase electricity from nonregulated power producers after the Retail Access Date, provided that, except as set forth in Section 10(b) above, once any such ultimate customer has purchased electricity from a nonregulated power producer, the Company shall have no obligation to supply Standard Offer Service to the Customer for resale to such ultimate customer.

(e) The Company acknowledges that the Customer will offer alternative power suppliers the opportunity in an auction to supply electricity to enable the Customer to

provide Standard Offer Service to ultimate customers in its service territory after the Retail Access Date. The Company, its successors or assigns, shall be free to bid in the auction, provided that the Company's bid shall not exceed the prices set forth in the Stipulation and Agreement, adjusted for the fuel index set forth in that Agreement.

11. Commencing on the Contract Termination Date, the Company (including any successor or assign of the Company that succeeds to the Company's obligations with respect to the operation of its transmission facilities) shall, upon request of the Customer, provide network integration transmission service to the Customer in accordance with the Service Agreement for Network Integration Transmission Service between the Customer and the Company of even date, and with the terms and conditions of the tariff or successor tariff or tariffs for such service in accordance with the policy of the Federal Energy Regulatory Commission as in effect from time to time. Such service shall be provided to the Customer after the Wholesale Access Date to enable the Customer to integrate its loads and resources and shall be provided to the Customer after the Retail Access Date to enable the ultimate customers in the Customer's service territory to integrate their loads and resources.

12. This Amendment shall take effect as of the date it is permitted to become effective by FERC, which date shall be referred to as the "Effective Date." This Amendment, together with all provisions of the Tariff and the Service Agreement necessary to effectuate all provisions of this Amendment, shall remain in effect until all obligations of the parties under this Amendment, including, without limitation, the obligation of the Customer to pay to the Company the Contract Termination Charges, have been discharged in full. Upon the discharge in full of all such obligations, this Amendment

and the Service Agreement shall terminate.

13. The provisions of this Amendment shall override any inconsistent provisions of the Service Agreement and, with respect to the Customer, all inconsistent provisions of the Tariff, but all provisions of the Tariff and the Service Agreement that are not inconsistent with this Amendment shall remain in full force and effect.

14. The rights conferred and obligations imposed on the parties to this Amendment shall be binding on or inure to the benefit of their successors in interest or assignees as if such successor or assignee was itself a party hereto.

Attachment 1N

IN WITNESS WHEREOF, the parties have executed this Amendment of Service Agreement as of the date first written above.

MONTAUP ELECTRIC COMPANY

By ______________________
Robert G. Powderly

Title: Executive Vice President

NEWPORT ELECTRIC CORPORATION

By ______________________
John D. Carney

Title: President

Q:\SETTLMNT\ATTACH3.BVE\NECAMEND.WPD

# APPENDIX 1

## FORMULA FOR CALCULATING CONTRACT TERMINATION CHARGES

Appendix 1

MONTAUP ELECTRIC COMPANY
AMENDMENT TO SERVICE AGREEMENT WITH
NEWPORT ELECTRIC CORPORATION UNDER
FERC ELECTRIC TARIFF, FIRST REVISED VOLUME NO. 1
FORMULA FOR CALCULATING CONTRACT
TERMINATION CHARGES

1.1 The Fixed Component of the Contract Termination Charge shall include Newport Electric Corporation's ("Newport") 11.85 percent allocated share of Montaup's costs as shown on Schedule 1, Page 2, which shall include:

1.1.1 Revenues sufficient to amortize over a twelve year period commencing on January 1, 1998 and continuing through December 31, 2009 the following plant balances and regulatory assets:

(a) Plant balances shall include unrecovered net book value as shown on Schedule 1, Page 4, Column (7), of the following Montaup generation-related investments as of December 31, 1997,[1] excluding any capital additions made after December 31, 1995:

(i) Somerset Unit 6, Jet 1 and Jet 2 including general plant allocated to generation;
(ii) Montaup's ownership Share of Canal Unit 2, including capital additions past December 31, 1995, but committed prior to that date;
(iii) Montaup's and Newport's ownership share of Wyman Unit 4;
(iv) Montaup's ownership share of Millstone Unit 3;
(v) Montaup's ownership share of Seabrook Unit 1;
(vi) Montaup's Entitlements in the Maine Yankee and Vermont Yankee Units, including the balances for materials and supplies;

[1] The figures shown on Schedule 1, Page 4, Column (7) are estimates and will be updated for actual balances as of December 31, 1997. Changes, if any, shall be reconciled at the Divestiture Date.

(vii) Newport's generation related investment in the Diesel Units at Jepson and Eldred;
(viii) Step-up transformers at Montaup generating units which are excluded from Montaup's transmission rates;
(ix) Montaup's non-utility property; and
(x) Generation-related property held for future use including net investment in Somerset Unit 5, through November 1, 1997, per settlement agreement in Docket ER94-1062-000.

(b) Regulatory assets shall include the generation-related unrecovered net book balances shown in Schedule 1, Page 5, Column (2), as of December 31, 1997[2/]:

(i) FAS 109;
(ii) Net pension liability/(asset) of Montaup and allocated to Montaup by affiliates to the extent that they exceed 5% of the greater of the total pension benefits obligation or the fair market value of plan assets.
(iii) Unamortized deferred FAS 106 costs;
(iv) Unamortized deferred dredging costs;
(v) Unamortized ITC; and
(vi) Montaup's share of unamortized debt expense recorded on the balance sheet of its parent, Eastern Edison Company.

1.1.2 Revenues sufficient to provide an overall pre-tax return of 11.34 percent based on a combined state and federal income tax rate of 39.225 percent, and Montaup's 1995 year-end capital structure as shown in Schedule 1, Page 14, Column (8), including a return on common equity of 9.2 percent for the period prior to the completion of the initial divestiture process for Montaup's non-nuclear generating

[2/]The figures shown on Schedule 1, Page 5, Column (2) are estimates and will be updated for actual balances as of December 31, 1997. Changes, if any, shall be reconciled at the Divestiture Date.

facilities ("Divestiture Date")[3], and sufficient to provide an overall pretax return of 13.09 percent including a return on common equity of 11.4 percent for the period after the Divestiture Date,[4] multiplied by the average of the beginning and ending balances in each calendar year beginning in 1998 of the sum of the following:

(a) Unrecovered net book value of Montaup's generation investments as defined under 1.1.1(a) above, plus

(b) Unrecovered net book value of generation-related Regulatory Assets as defined under 1.1.1(b) above, excluding the unamortized ITC under 1.1.1(b)(v), less

(c) Deferred Taxes as shown in Schedule 1, Page 13, Column (9), equal to the combined state and federal income tax rate of 39.225 percent, which shall be adjusted for changes in tax laws, multiplied by the sum of:

  (i) the unrecovered net book value of Montaup's generation investment, plus
  (ii) the unrecovered net book value of generation-related regulatory assets, less

---

[3] If Montaup sells its non-nuclear generating facilities in more than one transaction, the rights and obligations associated with the divestiture shall be allocated among the transactions using appropriate allocators. In the case of return, the allocator shall be based on the net book value of the sold facility or facilities to total net book value of the non-nuclear generating facilities in Section 1.1.1(a). This percentage allocation shall be applied to the total of plant, regulatory asset balances, and deferred tax balances as set forth below.

[4] The difference between the 11.34 percent and 13.09 percent returns as applied to unamortized balances prior to the Divestiture Date shall be recovered, if divestiture occurs, through an offset to the Residual Value Credit, and the difference between the 11.34 percent and 13.09 percent returns that occurs after the Divestiture Date shall be included in the Reconciliation Account. The 11.34 percent and 13.09 percent returns shall be used as the return wherever a return is referenced throughout this Appendix. However, the 13.09 percent return after the Divestiture Date shall be adjusted in accordance with Section 1.1.4(d). Notwithstanding the above, an equity return of 9.2% will be applied to Montaup's equity investment in the Ocean States Power facility for purposes of estimating Contract Termination Charges under the Amendment.

(iii) the unrecovered balance of generation investment for tax purposes, less
(iv) the unrecovered balance of generation-related regulatory assets for tax purposes.

1.1.3 Revenues sufficient to: (i) amortize over a twelve year period commencing on January 1, 1998 and continuing through December 31, 2009 the generation-related, unrecovered net book balances associated with the FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates[5/]; and (ii) pay a return of 7.25 percent equal to the interest rate reflected in the actuarial analysis of the FAS 106 Transition Obligation of Montaup and allocated to Montaup by affiliates multiplied by the outstanding balances remaining for the FAS 106 Transition Obligation of Montaup and allocated to Montaup by affiliates. Following the Divestiture Date, these outstanding balances shall be subject to a one time adjustment as set forth in Section 1.1.4(b) below. At the same time, the interest rate return for the period after the Divestiture Date shall be established using the most current actuarial analysis available at the time, which rate shall remain in place for the remainder of the fixed cost recovery period.

1.1.4 The Fixed Components shall be subject only to the following adjustments:

(a) For each month that the Contract Termination Date is delayed beyond January 1, 1998, Montaup shall adjust the Reconciliation Account in

[5/]Any FAS 106 Transition Obligation of Montaup and allocated to Montaup by its affiliates that is not allocated to generating facilities shall be deemed transmission related.

the Variable Component of the Contract Termination Charge by an amount equal to the difference between the depreciation and amortization expense authorized under the M-14 rate and the depreciation and amortization under Section 1.1.1, together with the associated return computed in accordance with Section 1.1.2 of this Appendix, multiplied by Newport's 11.85 percent allocated share. An exhibit showing the difference between depreciation and amortization under the M-14 rate and the Contract Termination Charge is included in Schedule 2.

(b) Following the Divestiture Date and at the time of implementing the Residual Value Credit, Montaup shall reconcile the balances in Sections 1.1.1 and 1.1.3 for Newport's 11.85 percent allocated share of (i) the unrecognized transition obligation, prior service cost, and unrecognized gains or losses associated with the FAS 106 obligation; and (ii) the unrecognized transition obligation, prior service cost, and unrecognized gains or losses associated with the FAS 87 obligation, but the gains or losses associated with FAS 87 shall be recognized only to the extent that they exceed five percent of the greater of total pension benefits obligation or fair market value of plan assets. Montaup shall fund the FAS 106 and FAS 87 obligations under this Section and Section 1.2.2(f) as rapidly as permitted by the tax law up to the level of

revenues collected for this purpose.[6] Any revenues associated with these obligations that cannot be immediately funded shall be put into a separate account on the books to be reserved with the return specified in Section 1.1.3 until tax deductible funding becomes possible. The one-time adjustment associated with FAS 106 and FAS 87, whether positive or negative, shall be subtracted from or added to the schedules for prospective recovery of FAS 106, as appropriate, and amortized with the return specified in Section 1.1.3 over the period between the sale and December 31, 2009. An exhibit showing the reconciliations is included in Schedule 3, page 1. In addition, Montaup shall reconcile the balances for Newport's 11.85 percent allocated share of (i) the FAS 109 regulatory asset; and (ii) the general plant allocated to generation, provided, however, that any general plant not allocated to generation shall be functionalized to transmission. The one-time adjustment associated with differences in the balances for FAS 109 and general plant, whether positive or negative, shall be subtracted from or added to the net proceeds reflected in the Residual Value Credit as appropriate and shall be amortized, with the return specified in Section 1.1.2, over the period between the sale and December 31, 2009.

[6] Montaup's post-divestiture FAS 106 or FAS 87 gains or losses recognized on Montaup's books shall be fully reflected in rates to customers and shall neither be retained nor borne by Montaup. Montaup shall propose an allocation of these post-divestiture gains or losses between customers paying Contract Termination Charges and transmission customers.

(c) Montaup has agreed to divest its generating business within six months after the later of the Retail Access Date as defined in the Settlement filed in Docket ER97-3127-000 or the receipt of all governmental approvals and other consents necessary for the divestiture. Within three months after the completion of divestiture or the sale of any property,[7] the cost of which is included in the Contract Termination Charge, Montaup shall implement a Residual Value Credit as a direct offset to the Contract Termination Charges authorized under this Amendment. The Residual Value Credit will be deemed to be fully implemented upon completion of the initial divestiture process for Montaup's non-nuclear generating facilities. Proceeds from the divestiture which are realized after the full implementation of the Residual Value Credit will be reflected in the variable component of the CTC as hereinafter described. The Residual Value Credit to Newport shall be calculated as follows:

(i) Newport's 11.85 percent allocated share of Total Proceeds[8]

---

[7] Proceeds, if any, from Montaup's future leases of nuclear entitlements will also be flowed through the Residual Value Credit if such proceeds can be definitively calculated at the time the Residual Value Credit is determined. The proceeds from leases determined after the Residual Value Credit is set will be flowed through the Reconciliation Account as received.

[8] As part of the terms of the Divestiture, Montaup shall require the buyer of the facility to pay Montaup the net book value for all inventories and materials and supplies associated with the generating facility. As a result, inventories and materials and supplies for Montaup's non-nuclear facilities are excluded from the plant balances under Section 1.1.1, and shall be excluded from the calculation of the Residual Value Credit. In addition, the Buyer may assume other obligations that

equal to the sale price and other consideration received by Montaup excluding $15 million[9/] which purchasers will be required to pay into an account for employee benefits pursuant to Section 1.2.2(f), less

(ii) The revenues lost or gained by Montaup between July 1, 1997 and the Divestiture Date measured by the difference between the revenues excluding revenues attributable to items included in the Contract Termination Charge or in Montaup's transmission rates, that Montaup would have collected under Rate M-14 had it continued to make the sales to Newport under Tariff 1 and the revenues, excluding transmission revenues and Contract Termination Charge revenues, that it actually collected from sales to Newport's customers during the period, together with a credit for Newport's share of the revenue from sales at no less than market prices made by Montaup to third parties during the period, provided, however, the lost revenues so calculated shall not exceed $0.008 per kilowatthour multiplied by the number of

are included in the variable component of the Contract Termination Charge. Montaup reserves its right to revise the variable cost estimates and the amortization of fixed cost components in Schedule 1 to reflect the assignment of obligations to the purchasers, if such revision is necessary to maintain a stable and declining pattern of Contract Termination Charges as offset by the Residual Value Credit.

[9/]This figure consists of $11.8 million as shown on Schedule 5 and an estimated $3.2 million for Canal 2 based on Montaup's 25% share of employee costs for Canal Station. The parties agree to use a reasonable actual figure for Canal 2 when available from Canal Electric.

kilowatthours delivered by Newport during the period between the July 1, 1997 and the Divestiture Date, less

(iii) Newport's 11.85 percent allocated share of capital investments demonstrated to be prudently incurred after December 31, 1995, excluded from the plant balances in Section 1.1.1 (a) above,[10] less

(iv) Newport's 11.85 percent allocated share of reasonable transaction costs associated with the divestiture including the cost of necessary refinancings, repurchases, and retirements of securities occurring after May 1, 1997.

The Net Proceeds from the divestiture including amortization and the pretax return specified in Section 1.1.2 on the unreturned credit balance net of tax impacts shall be credited to the Fixed Component in equal annual amounts over the period commencing on the date the Residual Value Credit is implemented through December 31, 2009. The Residual Value Credit shall be implemented even if: (i) the Divestiture Date occurs before the Contract Termination Date, or (ii) the Residual Value Credit exceeds the Contract

[10] Montaup's capital investments shall include construction work in progress. The investments in non-nuclear generating facilities during the period January 1, 1996 through May 31, 1997 are shown in Schedule 4. These projects have been reviewed by the parties and are included as an offset to the Residual Value Credit subject only to a further review for the reasonableness of the amounts expended in the construction of the projects under Section 3.5 of the Agreement. Montaup may include additional projects, if any, at the time of the calculation of the Residual Value Credit, subject to the dispute resolution procedures under Section 3.5 of the Agreement.

Termination Charge in any given year. If for any reason, generation assets which were not sold at the Divestiture Date and therefore were not in the Residual Value Credit but remained in the Contract Termination Charge, are sold at a later date, the proceeds of such a sale will be amortized, with a return as specified in Section 1.1.2, over the remaining fixed component recovery period or over a five year period, whichever period is greater, and credited to the Reconciliation Account as received.

(d) Effective with refinancings, repurchases, and retirements of securities relating to assets being recovered through Contract Termination Charge, Montaup shall flow through the Reconciliation Account the annual effects associated with any differences between the 13.09 percent overall pre-tax return and the actual pre-tax return, calculated using an 11.4 percent return on common equity, attributable to changes in the cost of long-term debt, preferred stock, capital structure or income tax rates, provided that the overall pre-tax return shall not exceed 13.09 percent so long as the yield on 10-year Treasury constant maturities as reported in the Federal Reserve Statistical Release is 9 percent or lower. In the event that the yield on Treasury maturities as so reported exceeds 9 percent, the 13.09 percent overall pre-tax return shall be adjusted to include Montaup's actual cost of long-term debt and preferred stock using an 11.40 percent return on common equity. This reconciliation will apply to the period following the Divestiture Date whether or not

securitization has been implemented. Notwithstanding the foregoing, nothing shall require a change in capital structure prior to any financing to take advantage of securitization.

Securitization will be implemented only if it would produce net savings to customers after taking into account all transaction costs including call provisions and prepayments, if applicable. Notwithstanding the above, savings from securitization, (pursuant to the terms of a qualified rate order), will be reflected in the Contract Termination Charge.

Any and all financing savings associated with refinancing related to divestiture and following the implementation of the Residual Value Credit, shall be allocated to the Contract Termination Charge through this paragraph, and shall not be reflected in Montaup's capital structure used for transmission rates. To the extent any financing savings are allocated to transmission rates by FERC, however, they shall not also be allocated to the Contract Termination Charge under this paragraph.

1.2 The Variable Component of the Contract Termination Charge shall include Newport's allocated share of the items specified in Section 1.2.2, below adjusted for the Reconciliation Account discussed in Section 1.2.1.

1.2.1 The Variable Component shall be adjusted through a Reconciliation Adjustment in which differences, whether positive or negative, between the estimates for Contract Termination Charge Payments by Newport and Newport's allocated

share of the estimated variable costs listed in Section 1.2.2 below and actual Contract Termination Charge payments by Newport and its allocated share of the actual variable costs will be accumulated in a Reconciliation Account and added to or subtracted from the Contract Termination Charge from Montaup to Newport. The Reconciliation Account shall also include the adjustments under Sections 1.1.2, note 4, 1.1.4(a) and 1.1.4(d) above. A pretax return equal to that specified in Section 1.1.2 shall be included on any balance in the Reconciliation Account, whether positive or negative.

The Reconciliation Account shall accumulate through December 31, 2000, and shall be used to adjust Montaup's Base Contract Termination Charges to Newport on January 1, 2001. Thus, effective January 1, 2001, Montaup shall return or collect Newport's allocated share of any outstanding balance in the Reconciliation Account by implementing an adjustment to the Base Contract Termination Charges to Newport. Thereafter, the balance including the accumulated return in the Reconciliation Account at the end of a year shall be used to adjust Montaup's Base Contract Termination Charges for the following year. Reconciliation Account adjustments to the Contract Termination Charges shall not cause the Contract Termination Charges to exceed 2.8 cents per kilowatthour. Any deferrals caused by the limitation in the prior sentence shall be carried forward with a return into the next annual adjustment to the Base Contract Termination Charge. Any Reconciliation Account adjustments occurring prior to January 1, 2001 that would otherwise cause the Contract

Termination Charge to increase or decrease by more than 0.2 cents per kilowatthour shall be implemented up to 0.2 cents per kilowatthour. The excess above 0.2 cents per kilowatthour shall be amortized with a return over the three years following January 1, 2001.

1.2.2 Newport's 11.85 percent allocated share of the specific cost items included in the Variable Component are set forth in Schedule 1 at page 3. The difference between Newport's percent allocated share of the actual variable costs incurred by Montaup and the estimated variable costs in this section shall be included in the Reconciliation Account. The costs included in the Variable Component shall include the following:

(a) Nuclear Decommissioning and Other Post Shutdown Costs shown on Schedule 1, Pages 6 and 7, shall include: (i) all charges, excluding any net incremental decommissioning costs caused by operations after the Retail Access Date, for decommissioning and site restoration assessed to Montaup by the operators of each nuclear electric generating facility specified in Section 1.1.1(a) (iv), (v), and (vi) above, subject to the regulatory authority of the agencies having jurisdiction over the operation and collection of such funds; (ii) all other reasonable post shutdown costs associated with Montaup's entitlements in the units listed in Section 1.1.1(a), (iv), (v), and (vi) above; and (iii) all remaining reasonable costs, including decommissioning costs and

unrecovered capital costs, associated with Yankee Rowe and Connecticut Yankee shown on Schedule 1, page 7. Funding for the decommissioning costs will be placed in irrevocable trusts in accordance with NRC regulations. If, upon the completion of decommissioning for any of the above listed nuclear generating facilities, it is determined that there has been an over collection of funds, such over collection will be transferred to Montaup's decommissioning fund for either Millstone 3 or Seabrook 1 pending final disposition of their decommissioning. Once all decommissioning is complete, any over collection will be refunded to Newport in the Reconciliation Adjustment. Other post shutdown costs will also be fully reconciled in the Reconciliation Adjustment.

Montaup's share of the Book Value of the Actual Nuclear Core at Shutdown or time of sale, which Montaup has not previously recovered through sales or lease proceeds and the Book Value of Materials and Supply at Shutdown or time of sale, which have not been addressed by other recovery mechanisms, will be recovered with a carrying charge in equal amounts over three years at a pre-tax return provided for in Section 1.1.2.

(b) Above Market Payments to Power Suppliers will be (i) all payments by Montaup for Long-Term Power Supply Contracts less the market value

realized from the resale of electricity purchased under the contracts into the wholesale market, plus (ii) Economic Buyout Payments associated with those contracts, less (iii) Credit for Unit Sales Contracts, plus (iv) the Power Contract Buyout Incentive realized.

(i) Long-Term Power Supply Contracts will be the power supply contracts listed below which were in place as of December 31, 1995, between Montaup and a third party supplier, continuing to the termination date of each contract. The Long-Term Supply Contracts include:

(1) Ocean State Power I and II
(2) Canal 1, including transmission wheeling, rental and support payments
(3) Northeast Energy Associates, including transmission wheeling payments
(4) Potter 2, including transmission wheeling payments
(5) Cleary 9
(6) McNeil, including transmission wheeling payments
(7) Newport Hydro, Inc., including transmission wheeling payments
(8) Hydro Quebec, including AC and DC facilities support payments
(9) Pilgrim, including transmission wheeling, rental and support payments
(10) Bear Swamp Hydro
(11) Green Mountain Power Peakers, including transmission wheeling payments

(ii) Economic Buyout Payments will be all reasonable payments agreed to by Montaup after May 1, 1997 associated with the sale, assignment, disposition or buy

down of the Long-Term Power Supply Contracts. Economic Buyout Payments shall be recovered as incurred to the extent that current recovery does not increase rates to customers above the level that would have been incurred absent the sale, assignment, disposition, or buy down of the Long-Term Power Supply Contract. The portion of the Economic Buyout Payment that cannot be recovered currently under the prior sentence shall be deferred and recovered with the return specified in Section 1.1.2 as soon as such recovery will not increase rates to customers above the level that would have been incurred absent the sale, assignment, disposition, or buy down of the Long-Term Power Supply Contract.

For purposes of calculating above market payments in (b)(i)and economic buyout payments in (b)(ii), associated with the long term supply contracts with Ocean State Power I and II, Montaup's total obligation under the contracts will be based on a return on equity of 9.2%.

(iii) Credit for Unit Sales Contracts will be all unit sales contracts entered into by Montaup as of December 31,

1995, for sales from (i) Canal Unit 2 if it is not otherwise subject to market valuation and (ii) Contract Demands to non-affiliates, less the market value of these contracts as shown in Schedule 1, Page 3, Columns (7) through (9).

(iv) Power Contract Buyout Incentive will be the sum of: (a) the Power Contract Buyout Incentive Associated with Canal 2 Divestiture calculated in accordance with Schedule 3, pages 2 and 3; and (b) the Power Contract Buyout Incentive Independent of Divestiture which shall represent 10% of the savings realized by customers as the result of the sale, assignment, disposition or buy down of its power supply contracts occurring outside of the divestiture process. The Power Contract Buyout Incentive Independent of Divestiture shall be determined at the time of the sale, assignment, disposition or buy down. The Buyout Incentive for the Ocean State Power units will be calculated in accordance with Page 4 of Schedule 3. The Total Power Contract Buyout Incentive shall not exceed $ 1.6 million, stated on a present value basis upon the divestiture using a discount rate equal to

the actual pre-tax return in place following completion of post divestiture refinancing as determined under Section 1.1.4(d). Montaup shall document the level of the Power Contract Buyout Incentive in a report, and the amount of the Power Contract Buyout Incentive shall be subject to the dispute resolution procedures set forth under Section 3.5 of the Stipulation and Agreement. The Power Contract Buyout Incentive Associated with Canal 2 Divestiture will be recovered in equal increments over the period from the divestiture through December 31, 2009, with appropriate adjustments for the time value of money, and the Power Contract Buyout Incentive Independent of Divestiture will be recovered in equal increments over the remaining term of the related purchased power contract, with appropriate adjustments for the time value of money.

(c) Above Market Fuel Transportation as shown in Schedule 1, Page 15, Column 10 will be Montaup's continuing long-term payment obligations associated with Capacity Payments to Algonquin Natural Gas Pipeline for Canal 2 less the market value of that capacity. The Market Value of Capacity Payments to Algonquin Natural Gas Pipelines will equal

the actual proceeds associated with the sale or assignment or termination of contractual obligations. For the purposes of calculating the Contract Termination Charges, prior to the date that Montaup's contractual entitlements to the pipeline capacity are assigned to a nonaffiliate, the Market Value of Capacity Payments to Algonquin Natural Gas Pipeline shall be deemed to equal the savings associated with actual unit operation on natural gas compared to the unit's avoided operation on oil at prevailing market prices. For illustrative purposes, the amounts shown on page 15 of Schedule 1 reflect a market value which is 50 percent of the capacity payments.

(d) Transmission wheeling, rental and support charges as shown in Schedule 1, Page 3, associated with the transmission of electricity from Montaup's entitlements in Seabrook Unit 1, Connecticut Yankee, Maine Yankee, Millstone Unit 3, Wyman Unit 4, Canal Unit 2, Vermont Yankee, which units are located off of Montaup's transmission system. These wheeling and support payments shall include only costs that are excluded from recovery under Montaup's and NEPOOL's open access transmission tariffs or are not assigned to a purchaser of the unit.

(e) Payments in Lieu of Property Taxes will include all reasonable costs incurred by Montaup or its affiliates associated with payments in lieu of property taxes to the cities and towns in which Montaup owns

generating facilities to mitigate the loss of tax revenues that those cities and towns would otherwise incur in connection with restructuring. For the purposes of calculating the Base Contract Termination Charges and the estimate included in the Reconciling Account, the Payments in Lieu of Property Taxes are assumed to be zero.

(f) Employee Severance and Retraining Costs as shown in Schedule 1, page 3, Column (13), will include all reasonable costs and expenses incurred by Montaup or its affiliates associated with the adjustment of their workforces in connection with the implementation of retail access, divestiture, or the termination of Montaup's Tariff No 1, including, but not limited to early retirement, severance, retraining and other reasonable costs associated with the implementation of the benefits to employees included in Schedule 5. Montaup shall require purchasers of its generating assets to pay $15 million[11] for the costs under this paragraph incurred by Montaup or its affiliates. In the event that the actual costs incurred under this paragraph are less than $15 million, excluding costs found by FERC to be recoverable in Montaup's transmission rates, Montaup shall flow back the difference to customers in the Reconciliation Account. The procedure established in this

[11] The parties agree that $11.8 million will be resrved for Montaup and EUASC employees and estimate that $3.2 million will be reserved for Canal 2 and paid by the buyer of Canal 2. The Canal 2 figure may be adjusted when actual figures are avilable from Canal Electric.

paragraph shall be the exclusive method for recovering the costs under this paragraph, and, except in the event of legislation changing required benefits, neither Montaup nor its affiliates shall be able to recover more than $15 million, subject to the Canal 2 adjustment, for these costs. Thus, for the purposes of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, the Employee Severance and Retraining Costs are assumed to be zero and, except in the event of legislation changing required benefits, these costs shall not result in an increase to the Reconciliation Account or to the Contract Termination Charge.

(g) Damages, Costs, or Net Recoveries from claims by or against third parties shall include all damages, costs, or recoveries associated with Montaup's generating business which accrued prior to the date of divestiture and which were not: (i) included in the reserves for generation related, uninsured claims other than claims associated with Environmental Response Costs as of May 21, 1994, plus annual additions to the reserves for uninsured claims in Montaup's M-14 rate, less actual payments out of the reserve for generation related claims during the period from May 21, 1994 through the Contract Termination Date; (ii) assigned to Montaup's successor in interest; (iii) recovered from Montaup's insurance carriers; or (iv) the result of gross

negligence. For the purposes of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, Damages, Costs, or Net Recoveries from claims are assumed to be zero.

(h) Performance Based Rate for Nuclear Units Remaining After Divestiture shall credit value received that is not otherwise reflected in the Residual Value Credit, or recover any payments or costs associated with the sale, lease or disposal of Montaup's minority ownership share of the Seabrook, Millstone #3, and Vermont Yankee Nuclear Units ("PBR Nuclear Units") that are not otherwise reflected in the Residual Value Credit. If Montaup is unable to sell, lease, assign, or otherwise dispose of its PBR Nuclear Units on the terms set forth in the Stipulation and Agreement prior to the Contract Termination Date, the Performance Based Rate shall include 80 percent of the reasonable going forward costs, including variable costs and post-1995 capital additions on a cost of service basis,[12/] associated with Montaup's PBR Nuclear Units that are not otherwise recovered in contract termination charges less 80 percent of the revenues from sales of energy or capacity from such units or entitlements that are not

[12/]In the event that the nuclear unit is retired before the end of its license life, the capital addition shall be amortized with a return over the remainder of the license or in accordance with its depreciation schedule, whichever is shorter.

otherwise reflected in contract termination charges. The Performance Based Rate shall apply for the period from the Contract Termination Date to the date that Montaup either sells, leases, assigns or otherwise disposes of the PBR Nuclear Units or to the date such units are shutdown. Within six months prior to implementing the Performance Based Rate, Montaup will consult with the Signatories on a performance standard for nuclear safety indicators and will file such performance standard with a maximum potential credit for nonperformance of $250,000. Such sales, if any, shall not be made directly to Newport's retail customers, however, Montaup shall retain the right to use its minority shares of the PBR Nuclear Units to fulfill its backstop obligations under the standard offer. For the purpose of calculating the Base Contract Termination Charges and the estimate included in the Reconciliation Account, the Performance Based Rate for Nuclear Units is assumed to be zero.

(i) Environmental Response Costs defined as:

(i) Reasonable and prudently incurred costs associated with the investigation, testing, remediation, liabilities, damages, claims, settlements, or judgments attributable to or incurred by Montaup or Newport relating to deposits or waste from divested generating facilities off the site of properties sold, whether or

not such material is regulated under the statutes and authorities referenced in paragraph (iv), including material deposited before the Divestiture Date at disposal sites, sites to which material may have migrated from off-site disposal sites, or any off-site location at which generation related material may have been deposited before the Divestiture Date associated with the operation of generating facilities sold pursuant to the divestiture plan;

(ii) Reasonable and prudently incurred costs associated with the investigation, testing, remediation, liabilities, damages, claims, settlements, or judgments attributable to or incurred by Montaup or Newport relating to deposits and wastes occurring prior to the Divestiture Date whether or not such material is regulated under the statutes and authorities referenced in paragraph (iv) from facilities located within the switchyards for which Montaup will retain a permanent easement on parcels that are otherwise being divested if such costs are not recovered in transmission rates;

(iii) Reasonable and prudently incurred costs associated with the purchase of property that is acquired as part of an overall mitigation and response plan associated with sites identified in paragraphs (i) and (ii);

(iv) The statutes and authorities referenced in paragraphs (i) and (ii) shall be the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), Resource Conservation and Recovery Act (RCRA), Massachusetts G.L. c. 21C and 21E, and Rhode Island General Laws 23-19.14, or any other laws, regulations or orders by courts or governmental authorities, or resulting from claims and contentions arising in tort, breach of contract or violation of law;

(v) Except for property acquired under paragraph (iii), Environmental Response Costs shall not include costs associated with the investigation, testing, remediation, or other liabilities relating to property acquired after the Divestiture Date. Environmental Response Costs recovered under paragraphs (i), (ii), and (iii) shall also be offset by: (i) proceeds from insurance companies related to Environmental Response Costs; (ii) proceeds from the sale of properties purchased under paragraph (iii); and (iii) recoveries from third parties;

(vi) Nothing herein is intended to limit, alter, or otherwise affect any liability of Montaup to governmental

authorities or third parties other than the buyer or buyers of Montaup generating facilities under any environmental law including those referenced in paragraph (iv).

## SCHEDULE 1

## SUMMARY OF CONTRACT TERMINATION CHARGES

NARR 23444

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES TO NEWPORT ELECTRIC COMPANY

Schedule1
Page 1 of 15

| YEAR (1) | EST. NEC MWH SALES (2) | SHARE OF FIXED COMPONENT $ IN 000 (3) | SHARE OF FIXED COMPONENT CENTS/KWH (4) | SHARE OF VAR. COMPONENT $ IN 000 (5) | SHARE OF VAR. COMPONENT CENTS/KWH (6) | SHARE OF TOT. TERM CHARGE $ IN 000 (7) | BASE CONTRACT TERM CHARG CENTS/KWH (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 530,586 | 6,196 | 1.17 | 9,721 | 1.83 | 15,918 | 3.00 |
| 1999 | 536,555 | 6,663 | 1.24 | 9,434 | 1.76 | 16,097 | 3.00 |
| 2000 | 544,130 | 6,968 | 1.28 | 9,356 | 1.72 | 16,324 | 3.00 |
| 2001 | 549,613 | 5,350 | 0.97 | 9,391 | 1.71 | 14,741 | 2.68 |
| 2002 | 555,606 | 6,156 | 1.11 | 8,118 | 1.46 | 14,274 | 2.57 |
| 2003 | 563,367 | 6,569 | 1.17 | 7,294 | 1.29 | 13,863 | 2.46 |
| 2004 | 571,358 | 6,853 | 1.20 | 6,615 | 1.16 | 13,468 | 2.36 |
| 2005 | 580,288 | 6,186 | 1.07 | 6,916 | 1.19 | 13,102 | 2.26 |
| 2006 | 589,480 | 6,372 | 1.08 | 6,377 | 1.08 | 12,749 | 2.16 |
| 2007 | 596,369 | 5,628 | 0.94 | 6,726 | 1.13 | 12,354 | 2.07 |
| 2008 | 603,135 | 5,914 | 0.98 | 6,054 | 1.00 | 11,968 | 1.98 |
| 2009 | 609,079 | 4,974 | 0.82 | 6,603 | 1.08 | 11,577 | 1.90 |
| 2010 | 616,061 | 0 | 0.00 | 5,466 | 0.89 | 5,466 | 0.89 |
| 2011 | 622,439 | 0 | 0.00 | 5,119 | 0.82 | 5,119 | 0.82 |
| 2012 | 627,545 | 0 | 0.00 | 3,058 | 0.49 | 3,058 | 0.49 |
| 2013 | 636,621 | 0 | 0.00 | 1,622 | 0.25 | 1,622 | 0.25 |
| 2014 | 643,741 | 0 | 0.00 | 1,678 | 0.26 | 1,678 | 0.26 |
| 2015 | 649,276 | 0 | 0.00 | 1,140 | 0.18 | 1,140 | 0.18 |
| 2016 | 654,269 | 0 | 0.00 | 1,122 | 0.17 | 1,122 | 0.17 |
| 2017 | 661,599 | 0 | 0.00 | 870 | 0.13 | 870 | 0.13 |
| 2018 | 667,717 | 0 | 0.00 | 813 | 0.12 | 813 | 0.12 |
| 2019 | 673,767 | 0 | 0.00 | 821 | 0.12 | 821 | 0.12 |
| 2020 | 680,723 | 0 | 0.00 | 848 | 0.12 | 848 | 0.12 |
| 2021 | 687,311 | 0 | 0.00 | 731 | 0.11 | 731 | 0.11 |
| 2022 | 694,002 | 0 | 0.00 | 209 | 0.03 | 209 | 0.03 |
| 2023 | 700,796 | 0 | 0.00 | 215 | 0.03 | 215 | 0.03 |
| 2024 | 707,697 | 0 | 0.00 | 222 | 0.03 | 222 | 0.03 |
| 2025 | 714,705 | 0 | 0.00 | 228 | 0.03 | 228 | 0.03 |
| 2026 | 721,821 | 0 | 0.00 | 82 | 0.01 | 82 | 0.01 |
| 2027 | 757,912 | 0 | 0.00 | 84 | 0.01 | 84 | 0.01 |
| 2028 | 795,808 | 0 | 0.00 | 87 | 0.01 | 87 | 0.01 |
| 2029 | 835,598 | 0 | 0.00 | 89 | 0.01 | 89 | 0.01 |

COLUMN NOTES:
(2) PER 1996 LONG RANGE ENERGY & DEMAND FORECAST.
(3) SCHEDULE 1, P2, COLUMN (8).
(4) COLUMN (3)/COLUMN (2).
(5) SEE SCHEDULE 1, P.3, COLUMN (18).
(6) COLUMN (5)/COLUMN (2).
(7) COLUMN (3) + COLUMN (5).
(8) COLUMN (7)/COLUMN (2).

NP30BAS2.WK4 10/23/97

Schedule 1
Page 2 of 15

**SUMMARY OF CONTRACT TERMINATION CHARGES**
**NEWPORT ELECTRIC COMPANY SHARE (11.85%)**
**FIXED COMPONENT**
**$ IN 000**

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 106 TRANSITION OBLIGATION (4) | BASE TOTAL FIXED COMPONENT (5) | ADJ. FOR RESIDUAL VALUE CREDIT (6) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (7) |
|---|---|---|---|---|---|---|
| 1998 | 3,670 | 2,381 | 145 | 6,196 | 0 | 6,196 |
| 1999 | 3,449 | 3,075 | 140 | 6,663 | 0 | 6,663 |
| 2000 | 3,178 | 3,656 | 134 | 6,968 | 0 | 6,968 |
| 2001 | 2,938 | 2,284 | 128 | 5,350 | 0 | 5,350 |
| 2002 | 2,711 | 3,323 | 122 | 6,156 | 0 | 6,156 |
| 2003 | 2,417 | 4,036 | 117 | 6,569 | 0 | 6,569 |
| 2004 | 2,071 | 4,671 | 111 | 6,853 | 0 | 6,853 |
| 2005 | 1,712 | 4,369 | 105 | 6,186 | 0 | 6,186 |
| 2006 | 1,344 | 4,928 | 99 | 6,372 | 0 | 6,372 |
| 2007 | 968 | 4,566 | 94 | 5,628 | 0 | 5,628 |
| 2008 | 580 | 5,247 | 88 | 5,914 | 0 | 5,914 |
| 2009 | 186 | 4,706 | 82 | 4,974 | 0 | 4,974 |

COLUMN NOTES;
EACH COLUMN REPRESENTS 11.85% OF THE SAME COLUMN NUMBER ON P. 12.

NP30BAS2.WK4 10/23/97



Schedule 1
Page 3 of 19

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES
NEWPORT ELECTRIC COMPANY SHARE (11.85%)
VARIABLE COMPONENT

| YEAR END (1) | NUCLEAR DECOMMISS AND OTHER POST SHUTDOWN COSTS (2) | TOTAL OBLIGATION (3) | POWER CONTRACTS ASSUMED MARKET VALUE (4) | POWER CONTRACTS NET EXCESS OVER MARKET (5) | FUTURE POWER CONTRACT BUYOUTS (6) | CREDIT FOR UNIT SALES CONTRACTS POWER TOTAL OBLIGATION (7) | CREDIT FOR UNIT SALES CONTRACTS ASSUMED MARKET VALUE (8) | CREDIT FOR UNIT SALES CONTRACTS NET EXCESS OVER MARKET (9) | ABOVE MARKET FUEL TRANSPORT COSTS (10) | TRANSMISSION IN SUPPORT OF REMOTE GEN UNITS (11) | PMTS IN LIEU OF PROP TAXES (12) | EMPLOYEE SEVERANCE & RETRAINING COSTS (13) | DAMAGES, COSTS, OR NET RECOVERIES FROM CLAIMS (14) | PBR FOR NUKE UNITS REMAIN AFTER MKT VALUATION (15) | BASE TOTAL VARIABLE COMPONENT (16) | RECONCIL ACCOUNT (17) | TOTAL VARIABLE COMPONENT INCLUDING INCENTIVE (18) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 949 | 17,296 | 8,161 | 9,134 | 0 | (575) | 0 | (575) | 56 | 157 | 0 | 0 | 0 | 0 | 9,721 | 0 | 9,721 |
| 1999 | 875 | 17,311 | 8,432 | 8,879 | 0 | (528) | 0 | (528) | 53 | 154 | 0 | 0 | 0 | 0 | 9,434 | 0 | 9 434 |
| 2000 | 754 | 17,287 | 8,606 | 8,681 | 0 | (281) | 0 | (281) | 51 | 151 | 0 | 0 | 0 | 0 | 9,356 | 0 | 9,356 |
| 2001 | 612 | 16,506 | 7,739 | 8,767 | 0 | (104) | 0 | (184) | 49 | 148 | 0 | 0 | 0 | 0 | 9,391 | 0 | 9,391 |
| 2002 | 608 | 15,372 | 7,867 | 7,505 | 0 | (184) | 0 | (184) | 44 | 145 | 0 | 0 | 0 | 0 | 9,116 | 0 | 9,116 |
| 2003 | 618 | 12,993 | 6,319 | 6,673 | 0 | (184) | 0 | (184) | 41 | 146 | 0 | 0 | 0 | 0 | 7,294 | 0 | 7 294 |
| 2004 | 634 | 12,778 | 6,794 | 5,984 | 0 | (184) | 0 | (184) | 38 | 143 | 0 | 0 | 0 | 0 | 6,615 | 0 | 6 615 |
| 2005 | 647 | 13,011 | 6,733 | 6,278 | 0 | (184) | 0 | (184) | 34 | 141 | 0 | 0 | 0 | 0 | 6,916 | 0 | 6 916 |
| 2006 | 640 | 12,954 | 7,203 | 5,751 | 0 | (184) | 0 | (184) | 31 | 138 | 0 | 0 | 0 | 0 | 6,377 | 0 | 6,377 |
| 2007 | 567 | 13,333 | 7,154 | 6 179 | 0 | (184) | 0 | (184) | 28 | 136 | 0 | 0 | 0 | 0 | 6,726 | 0 | 6,726 |
| 2008 | 283 | 13,935 | 7,719 | 5,810 | 0 | (184) | 0 | (184) | 25 | 134 | 0 | 0 | 0 | 0 | 6,054 | 0 | 6,054 |
| 2009 | 207 | 14,070 | 7,627 | 6,443 | 0 | (184) | 0 | (184) | 22 | 115 | 0 | 0 | 0 | 0 | 6,603 | 0 | 6,603 |
| 2010 | 231 | 13,618 | 8 217 | 5,401 | 0 | (184) | 0 | (184) | 18 | 0 | 0 | 0 | 0 | 0 | 5,466 | 0 | 5,466 |
| 2011 | 235 | 10,875 | 5,811 | 5,064 | 0 | (184) | 0 | (184) | 4 | 0 | 0 | 0 | 0 | 0 | 5,119 | 0 | 5,119 |
| 2012 | 178 | 5,188 | 2,102 | 3,086 | 0 | (184) | 0 | (184) | 0 | 0 | 0 | 0 | 0 | 0 | 3,058 | 0 | 3,058 |
| 2013 | 160 | 2,917 | 1,271 | 1,646 | 0 | (184) | 0 | (184) | 0 | 0 | 0 | 0 | 0 | 0 | 1,622 | 0 | 1,622 |
| 2014 | 165 | 2,097 | 1,299 | 1,608 | 0 | (184) | 0 | (184) | 0 | 0 | 0 | 0 | 0 | 0 | 1,678 | 0 | 1,678 |
| 2015 | 170 | 2,398 | 1,243 | 1,154 | 0 | (184) | 0 | (184) | 0 | 0 | 0 | 0 | 0 | 0 | 1,140 | 0 | 1,140 |
| 2016 | 175 | 2,420 | 1,289 | 1 131 | 0 | (184) | 0 | (184) | 0 | 0 | 0 | 0 | 0 | 0 | 1,122 | 0 | 1,122 |
| 2017 | 180 | 1,772 | 1,082 | 690 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 870 | 0 | 870 |
| 2018 | 186 | 1,732 | 1,104 | 627 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 813 | 0 | 813 |
| 2019 | 191 | 1,704 | 1,074 | 630 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 821 | 0 | 821 |
| 2020 | 197 | 1,701 | 1,050 | 651 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 848 | 0 | 848 |
| 2021 | 203 | 1,594 | 1,066 | 528 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 731 | 0 | 731 |
| 2022 | 209 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 209 | 0 | 209 |
| 2023 | 215 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 215 | 0 | 215 |
| 2024 | 222 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 222 | 0 | 222 |
| 2025 | 228 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 228 | 0 | 228 |
| 2026 | 82 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 82 | 0 | 82 |
| 2027 | 84 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 84 | 0 | 84 |
| 2028 | 87 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 87 | 0 | 87 |
| 2029 | 89 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 89 | 0 | 89 |

COLUMN NOTES.
COLUMN (2) THROUGH (10) REPRESENT 11 85% OF THE SAME COLUMN NUMBER ON P.15
(16) SEE SCHEDULE 2, P 3, COLUMN (9) X -1
(18) COLUMN (16) + COLUMN (17)

NP308AS2 WK4 10/23/97

Schedule 1
Page 4 of 15

MONTAUP ELECTRIC COMPANY
NET CAPABILITY & UNRECOVERED COSTS
AS OF DECEMBER 31, 1995

| SOURCE (1) | LOCATION (2) | YEAR(S) PLACED IN SERVICE (3) | ENERGY SOURCE (4) | NET CAPABILITY MW (5) | $ IN 000 1995 (6) | $ IN 000 1997 (7) | APPLICABLE ANNUAL DEPRECIATION FOR 1996 AND BEYOND (8) |
|---|---|---|---|---|---|---|---|
| FOSSIL FUEL UNITS | | | | | | | |
| SOMERSET 6 & JETS | SOMERSET, MA | 1959 | COAL/JET FUEL | 153.2 | 28,032 | 23,716 | 2,158 |
| CANAL 2 | SANDWICH, MA | 1976 | OIL | 233 | 41,041 | 35,207 | 2,917 |
| WYMAN 4 | YARMOUTH, ME | 1978 | OIL | 12.2 | 2,030 | 1,806 | 112 |
| NEWPORT DIESELS | JAMESTOWN/<br>PORTSMOUTH, RI/<br>YARMOUTH, ME | 1961<br>1978<br>1978 | DIESEL<br>DIESEL<br>OIL | 8.8<br>8.3<br>4.1 | 1,803 | 1,499 | 152 |
| NUCLEAR UNITS | | | | | | | |
| SEABROOK | SEABROOK, NH | 1990 | NUCLEAR | 33.5 | 170,705 | 160,949 | 4,878 |
| MILLSTONE III | WATERFORD, CT | 1986 | NUCLEAR | 45.9 | 137,749 | 128,279 | 4,735 |
| VERMONT YANKEE | BRATTLEBORO, VT | | NUCLEAR | 12.0 | 3,786 (a) | 3,092 | 347 |
| MAINE YANKEE | BRUNSWICK, ME | | NUCLEAR | 31.6 | 7,439 (a) | 6,105 | 667 |
| PLANT HELD FOR FUTURE USE - LAND IN SOMERSET, MA | | | | | 604 | 604 | |
| - NET INVESTMENT IN SOMERSET UNIT 5 | | | | | 5,860 | 6,449 | (b) |
| NONUTILITY PROPERTY (LAND IN PORTSMOUTH, RI & DIGHTON, MA) | | | | | 2,610 | 2,610 | |
| | | | TOTAL | 542.6 | 401,659 | 370,316 | 15,966 |

(a) PLANT IN SERVICE AS OF 12/31/95 INCLUDING FUEL AND MATERIALS AND SUPPLIES.
(b) PER M-14 FERC SETTLEMENT AGREEMENT, SOMERSET UNIT 5 IS EXCLUDED FROM PLANT IN SERVICE BUT IS ALLOWED A RETURN THROUGH 11/1/97. (321k IN 1996 AND 268k IN 1997).

NP30BAS2.WK4 10/23/97

**MONTAUP ELECTRIC COMPANY**
**REGULATORY ASSET BALANCE**
**$ IN 000**

| | BALANCE AS OF DECEMBER 31, 1995 (1) | BALANCE AS OF DECEMBER 31, 1997 (2) | APPLICABLE AMORTIZATION FOR 1998 AND BEYOND (3) | BASIS FOR DEFERRAL (4) |
|---|---|---|---|---|
| FAS 109 - ASSET | 39,916 | 37,466 | 1,225 | FERC RATEMAKING POLICY |
| - LIABILITY | (14,583) | (8,717) | (2,933) | FERC RATEMAKING POLICY |
| FAS 106 DEFERRAL | 1,313 | 538 | 387 (a) | FERC RATEMAKING POLICY |
| NET PENSION LIABILITY / (ASSET) | (485) | (415) | (35) | FAS 87 |
| UNAMORTIZED DEBT PREMIUMS | 13,879 | 10,665 | 1,607 | FERC RATEMAKING POLICY |
| UNAMORTIZED ITC | (12,523) | (11,367) | (578) | FERC RATEMAKING POLICY |
| DREDGING | 424 | 173 | 125 (b) | FERC RATEMAKING POLICY |
| TOTAL REG. ASSETS | 27,941 | 28,343 | (202) | |

(a) REMAINING AMORTIZATION SCHEDULE: 416 IN 1998, 162 IN 1999.
(b) REMAINING AMORTIZATION SCHEDULE: 125 IN 1998, 48 IN 1999.

NP30BAS2.WK4 10/23/97

**MONTAUP ELECTRIC COMPANY**
**FAS 106 TRANSITION OBLIGATION REGULATORY ASSET**
**$ IN 000**

| | |
|---|---|
| UNRECOVERED BALANCE AS OF 12/31/95 | 9,091 |
| AMORTIZATION AMOUNT (1996 & BEYOND) | 534 |
| DISCOUNT RATE | 7.25% |

| | AMORTIZATION (1) | INTEREST (2) | TOTAL EXPENSE (3) | UNAMORTIZED BALANCE (4) |
|---|---|---|---|---|
| | | | | 8,023 |
| 1998 | 669 | 557 | 1,226 | 7,354 |
| 1999 | 669 | 509 | 1,178 | 6,686 |
| 2000 | 669 | 460 | 1,129 | 6,017 |
| 2001 | 669 | 412 | 1,081 | 5,349 |
| 2002 | 669 | 364 | 1,032 | 4,680 |
| 2003 | 669 | 315 | 984 | 4,011 |
| 2004 | 669 | 267 | 935 | 3,343 |
| 2005 | 669 | 218 | 887 | 2,674 |
| 2006 | 669 | 170 | 838 | 2,006 |
| 2007 | 669 | 121 | 790 | 1,337 |
| 2008 | 669 | 73 | 741 | 669 |
| 2009 | 669 | 24 | 693 | (0) |

COLUMN NOTES:
(1) 12/31/97 Balance straight lined over 12 years.
(2) (Prior Year Column (4) + Current Year Column (4) ) / 2 * 7.25%
(3) Column (1) + Column (2)
(4) Prior Year Column (4) - Current Year Column (1)

NP30BAS2.WK4 10/23/97

MONTAUP ELECTRIC COMPANY
OTHER POST-SHUTDOWN NUCLEAR COSTS
$ IN 000

| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | VERMONT YK (4) | MAINE YK (5) | TOTAL (6) |
|---|---|---|---|---|---|
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 |
| 2011 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 |

NP30BAS2.WK4 10/23/97

**MONTAUP ELECTRIC COMPANY**
**TOTAL ANNUAL DECOMMISSIONING COST**
**$ IN 000**

| (1) | MILLSTONE 3 (2) | SEABROOK 1 (3) | CONNECTICUT YANKEE (4) | VERMONT YANKEE (5) | MAINE YANKEE (6) | YANKEE ATOMIC (7) | TOTAL (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 602 | 319 | 3,868 | 317 | 599 | 2,306 | 8,011 |
| 1999 | 621 | 328 | 3,102 | 318 | 711 | 2,306 | 7,386 |
| 2000 | 639 | 339 | 3,058 | 407 | 713 | 1,206 | 6,362 |
| 2001 | 658 | 349 | 2,972 | 408 | 716 | 58 | 5,161 |
| 2002 | 679 | 359 | 2,906 | 409 | 718 | 60 | 5,131 |
| 2003 | 699 | 370 | 2,823 | 456 | 803 | 63 | 5,214 |
| 2004 | 721 | 382 | 2,742 | 457 | 983 | 65 | 5,350 |
| 2005 | 743 | 394 | 2,681 | 585 | 986 | 68 | 5,457 |
| 2006 | 766 | 405 | 2,587 | 587 | 990 | 70 | 5,405 |
| 2007 | 770 | 409 | 2,013 | 578 | 967 | 52 | 4,789 |
| 2008 | 759 | 406 | 0 | 546 | 510 | 0 | 2,221 |
| 2009 | 782 | 418 | 0 | 546 | 0 | 0 | 1,746 |
| 2010 | 806 | 431 | 0 | 710 | 0 | 0 | 1,947 |
| 2011 | 830 | 444 | 0 | 710 | 0 | 0 | 1,984 |
| 2012 | 855 | 457 | 0 | 177 | 0 | 0 | 1,489 |
| 2013 | 880 | 471 | 0 | 0 | 0 | 0 | 1,351 |
| 2014 | 907 | 485 | 0 | 0 | 0 | 0 | 1,392 |
| 2015 | 934 | 499 | 0 | 0 | 0 | 0 | 1,433 |
| 2016 | 962 | 514 | 0 | 0 | 0 | 0 | 1,476 |
| 2017 | 991 | 530 | 0 | 0 | 0 | 0 | 1,521 |
| 2018 | 1,021 | 546 | 0 | 0 | 0 | 0 | 1,567 |
| 2019 | 1,051 | 562 | 0 | 0 | 0 | 0 | 1,613 |
| 2020 | 1,083 | 579 | 0 | 0 | 0 | 0 | 1,662 |
| 2021 | 1,115 | 596 | 0 | 0 | 0 | 0 | 1,711 |
| 2022 | 1,149 | 614 | 0 | 0 | 0 | 0 | 1,763 |
| 2023 | 1,183 | 633 | 0 | 0 | 0 | 0 | 1,816 |
| 2024 | 1,219 | 652 | 0 | 0 | 0 | 0 | 1,871 |
| 2025 | 1,255 | 671 | 0 | 0 | 0 | 0 | 1,926 |
| 2026 | 0 | 691 | 0 | 0 | 0 | 0 | 691 |
| 2027 | 0 | 712 | 0 | 0 | 0 | 0 | 712 |
| 2028 | 0 | 733 | 0 | 0 | 0 | 0 | 733 |
| 2029 | 0 | 755 | 0 | 0 | 0 | 0 | 755 |

NP30BAS2.WK4 10/23/97

Schedule 1
Page 8 of 15

Purchase Power Total $000

| | Pilgrim | Canal 1 | Potter 2 | Cleary | McNeil | OSP 1 | OSP 2 | NEA | Blackstone Hydro | HQ | GMP | BSH | OSP @ 9.2% ROE | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 36,042 | 25,977 | 3,932 | 330 | 3,562 | 25,448 | 27,471 | 12,513 | 526 | 10,662 | 150 | 650 | (1,206) | 145,955 |
| 1999 | 35,710 | 27,181 | 3,976 | 339 | 3,566 | 25,638 | 27,005 | 12,519 | 528 | 10,770 | 0 | 0 | (1,146) | 146,096 |
| 2000 | 36,174 | 27,040 | 4,023 | 347 | 3,612 | 24,978 | 27,541 | 12,632 | 531 | 10,096 | 0 | 0 | (1,089) | 145,865 |
| 2001 | 36,184 | 28,548 | 4,079 | 361 | 3,710 | 25,995 | 27,914 | 6,063 | 533 | 6,935 | 0 | 0 | (1,034) | 139,288 |
| 2002 | 35,333 | 21,448 | 4,137 | 376 | 3,818 | 27,847 | 27,097 | 6,380 | 536 | 3,731 | 0 | 0 | (983) | 129,720 |
| 2003 | 35,763 | 0 | 4,198 | 391 | 3,935 | 25,332 | 29,839 | 6,870 | 539 | 3,612 | 0 | 0 | (934) | 109,645 |
| 2004 | 34,910 | 0 | 4,261 | 406 | 4,057 | 25,953 | 27,792 | 7,290 | 541 | 3,508 | 0 | 0 | (887) | 107,831 |
| 2005 | 35,889 | 0 | 4,327 | 423 | 4,192 | 28,533 | 27,430 | 7,907 | 544 | 3,397 | 0 | 0 | (842) | 109,800 |
| 2006 | 34,488 | 0 | 4,395 | 440 | 4,335 | 28,001 | 28,508 | 8,179 | 547 | 3,225 | 0 | 0 | (800) | 109,318 |
| 2007 | 38,141 | 0 | 4,466 | 457 | 4,485 | 26,907 | 28,363 | 8,815 | 550 | 3,088 | 0 | 0 | (760) | 112,512 |
| 2008 | 33,952 | 0 | 4,540 | 476 | 4,643 | 30,870 | 27,976 | 8,937 | 553 | 2,997 | 0 | 0 | (722) | 114,222 |
| 2009 | 38,999 | 0 | 4,616 | 495 | 4,805 | 27,074 | 32,561 | 9,404 | 557 | 2,909 | 0 | 0 | (688) | 118,734 |
| 2010 | 34,533 | 0 | 4,696 | 514 | 4,969 | 28,398 | 29,600 | 9,479 | 560 | 2,823 | 0 | 0 | (652) | 114,920 |
| 2011 | 40,427 | 0 | 4,779 | 535 | 5,148 | 0 | 27,329 | 10,560 | 563 | 2,740 | 0 | 0 | (303) | 91,776 |
| 2012 | 19,380 | 0 | 4,865 | 556 | 5,331 | 0 | 0 | 10,270 | 567 | 2,859 | 0 | 0 | 0 | 43,608 |
| 2013 | 0 | 0 | 4,955 | 579 | 5,519 | 0 | 0 | 10,413 | 571 | 2,581 | 0 | 0 | 0 | 24,618 |
| 2014 | 0 | 0 | 5,049 | 602 | 5,717 | 0 | 0 | 10,841 | 575 | 2,505 | 0 | 0 | 0 | 25,289 |
| 2015 | 0 | 0 | 5,146 | 626 | 0 | 0 | 0 | 11,453 | 578 | 2,432 | 0 | 0 | 0 | 20,235 |
| 2016 | 0 | 0 | 5,247 | 651 | 0 | 0 | 0 | 11,588 | 582 | 2,380 | 0 | 0 | 0 | 20,428 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,384 | 586 | 1,986 | 0 | 0 | 0 | 14,956 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,095 | 591 | 1,927 | 0 | 0 | 0 | 14,613 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,512 | 0 | 1,869 | 0 | 0 | 0 | 14,381 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,769 | 0 | 1,584 | 0 | 0 | 0 | 14,353 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,455 | 0 | 0 | 0 | 0 | 0 | 13,455 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

NP30BAS2.WK4 10/23/97

Purchase Power MWh

| | Pilgrim | Canal 1 | Potter 2 | Cleary | McNeil | OSP 1 | OSP 2 | NEA | Blackstone Hydro | HQ | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 323,962 | 2,781,183 |
| 1999 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 324,157 | 2,710,592 |
| 2000 | 553,418 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 283,092 | 2,740,313 |
| 2001 | 482,632 | 588,304 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 134,017 | 2,520,452 |
| 2002 | 553,418 | 441,228 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 2,310,145 |
| 2003 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2004 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2005 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2006 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2007 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2008 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2009 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,798,131 |
| 2010 | 553,418 | 0 | 36,979 | 10,234 | 17,420 | 508,543 | 541,959 | 194,911 | 5,453 | 0 | 1,868,917 |
| 2011 | 482,632 | 0 | 36,979 | 10,234 | 17,420 | 0 | 541,959 | 194,911 | 5,453 | 0 | 1,289,588 |
| 2012 | 184,473 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 449,470 |
| 2013 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 264,997 |
| 2014 | 0 | 0 | 36,979 | 10,234 | 17,420 | 0 | 0 | 194,911 | 5,453 | 0 | 264,997 |
| 2015 | 0 | 0 | 36,979 | 10,234 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 247,577 |
| 2016 | 0 | 0 | 36,979 | 10,234 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 247,577 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 200,364 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 5,453 | 0 | 200,364 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 194,911 | 0 | 0 | 194,911 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

NP30BAS2.WK4 10/23/97

Schedule 1
Page 10 of 15

# UNIT CONTRACT & NON AFFILIATE REVENUE CREDIT
$ IN 000

| YEAR END (1) | M-RATE SALES TO MIDDLEBORO (2) | M-RATE SALES TO PASCOAG (3) | CANAL UNIT SALES TO BRAINTREE (4) | TOTAL (5) |
|---|---|---|---|---|
| 1998 | 2,004 | 1,295 | 1,555 | 4,854 |
| 1999 | 1,663 | 1,234 | 1,555 | 4,452 |
| 2000 | 0 | 815 | 1,555 | 2,370 |
| 2001 | 0 | 0 | 1,555 | 1,555 |
| 2002 | 0 | 0 | 1,555 | 1,555 |
| 2003 | 0 | 0 | 1,555 | 1,555 |
| 2004 | 0 | 0 | 1,555 | 1,555 |
| 2005 | 0 | 0 | 1,555 | 1,555 |
| 2006 | 0 | 0 | 1,555 | 1,555 |
| 2007 | 0 | 0 | 1,555 | 1,555 |
| 2008 | 0 | 0 | 1,555 | 1,555 |
| 2009 | 0 | 0 | 1,555 | 1,555 |
| 2010 | 0 | 0 | 1,555 | 1,555 |
| 2011 | 0 | 0 | 1,555 | 1,555 |
| 2012 | 0 | 0 | 1,555 | 1,555 |
| 2013 | 0 | 0 | 1,555 | 1,555 |
| 2014 | 0 | 0 | 1,555 | 1,555 |
| 2015 | 0 | 0 | 1,555 | 1,555 |
| 2016 | 0 | 0 | 1,555 | 1,555 |
| 2017 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 |

NP30BAS2.WK4 10/23/97

**TRANSMISSION IN SUPPORT OF REMOTE GENERATING UNITS**
**DETAIL BY UNIT**
**$ IN 000**

| (1) | SEABROOK (2) | MILLSTONE (3) | CANAL 2 (4) | WYMAN 4 (5) | MAINE YNK (6) | VERMONT YNK (7) | TOTAL (8) |
|---|---|---|---|---|---|---|---|
| 1998 | 297 | 138 | 527 | 91 | 214 | 55 | 1,322 |
| 1999 | 292 | 138 | 507 | 91 | 214 | 55 | 1,297 |
| 2000 | 286 | 138 | 488 | 91 | 214 | 55 | 1,272 |
| 2001 | 280 | 138 | 470 | 91 | 214 | 55 | 1,248 |
| 2002 | 275 | 138 | 452 | 91 | 214 | 55 | 1,225 |
| 2003 | 269 | 138 | 435 | 91 | 238 | 61 | 1,232 |
| 2004 | 264 | 138 | 418 | 91 | 238 | 61 | 1,210 |
| 2005 | 259 | 138 | 402 | 91 | 238 | 61 | 1,189 |
| 2006 | 254 | 138 | 386 | 91 | 238 | 61 | 1,168 |
| 2007 | 249 | 138 | 371 | 91 | 238 | 61 | 1,148 |
| 2008 | 245 | 138 | 357 | 91 | 238 | 61 | 1,130 |
| 2009 | 240 | 138 | 443 | 91 | 0 | 61 | 973 |

**SUMMARY OF CONTRACT TERMINATION CHARGES**
**MONTAUP ELECTRIC COMPANY (100%)**
**FIXED COMPONENT**
**$ IN 000**

| YEAR (1) | PRE-TAX RETURN ON GENERATION RELATED INV. & REG. ASSETS (2) | AMORT. OF GEN. RELATED INVESTMENT & REG. ASSETS (3) | AMORT. OF FAS 106 TRANSITION OBLIGATION (4) | **BASE TOTAL FIXED COMPONENT (5)** | ADJ. FOR RESIDUAL VALUE CREDIT (6) | NET FIXED COMPONENT INCLUDING ADJ. FOR RESIDUAL VALUE CREDIT (7) |
|---|---|---|---|---|---|---|
| 1998 | 30,970 | 20,094 | 1,226 | **52,290** | 0 | 52,290 |
| 1999 | 29,101 | 25,950 | 1,178 | **56,229** | 0 | 56,229 |
| 2000 | 26,821 | 30,854 | 1,129 | **58,803** | 0 | 58,803 |
| 2001 | 24,796 | 19,273 | 1,081 | **45,149** | 0 | 45,149 |
| 2002 | 22,878 | 28,040 | 1,032 | **51,950** | 0 | 51,950 |
| 2003 | 20,395 | 34,059 | 984 | **55,437** | 0 | 55,437 |
| 2004 | 17,477 | 39,416 | 935 | **57,828** | 0 | 57,828 |
| 2005 | 14,451 | 36,865 | 887 | **52,203** | 0 | 52,203 |
| 2006 | 11,342 | 41,588 | 838 | **53,768** | 0 | 53,768 |
| 2007 | 8,169 | 38,536 | 790 | **47,494** | 0 | 47,494 |
| 2008 | 4,894 | 44,274 | 741 | **49,909** | 0 | 49,909 |
| 2009 | 1,573 | 39,711 | 693 | **41,977** | 0 | 41,977 |

COLUMN NOTES:
(2) See Schedule 1, p. 14, Column (8).
(3) p. 1 Column (7) /.1185 - p. 15 Column (16).- p. 12 Column (2) - p. 12 Column (4) - p. 12 Column (6) - p. 3 Column (17)/.1185.
(4) See p. 5a, Column (3).
(6) Sum of Columns (2) through (4).
(7) To be based on results of actual market valuation.
(8) Columns (5) + (6).

NP30BAS2.WK4 10/23/97

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES
DEFERRED TAXES ON FIXED COMPONENT
$ IN 000

| YEAR END (1) | BALANCE NET BOOK VALUE OF GENERATION (2) | BOOK BASIS BALANCE GENERATION RELATED REG. ASSETS (3) | TOTAL NET BOOK BASIS (4) | BALANCE NET TAX VALUE OF GENERATION (5) | TAX BASIS BALANCE GENERATION RELATED REG. ASSETS (6) | TOTAL TAX BASIS (7) | EXCESS BOOK OVER TAX (8) | DEFERRED TAXES (9) |
|---|---|---|---|---|---|---|---|---|
| 1997 | 370,316 | 28,343 | 398,659 | 68,206 | 0 | 68,206 | 330,453 | 129,620 |
| 1998 | 351,651 | 26,914 | 378,565 | 64,768 | 0 | 64,768 | 313,797 | 123,087 |
| 1999 | 327,546 | 25,069 | 352,615 | 60,328 | 0 | 60,328 | 292,287 | 114,649 |
| 2000 | 298,886 | 22,876 | 321,762 | 55,050 | 0 | 55,050 | 266,712 | 104,618 |
| 2001 | 280,983 | 21,506 | 302,489 | 51,752 | 0 | 51,752 | 250,736 | 98,351 |
| 2002 | 254,937 | 19,512 | 274,449 | 46,955 | 0 | 46,955 | 227,494 | 89,235 |
| 2003 | 223,300 | 17,091 | 240,391 | 41,128 | 0 | 41,128 | 199,263 | 78,161 |
| 2004 | 186,686 | 14,288 | 200,975 | 34,384 | 0 | 34,384 | 166,590 | 65,345 |
| 2005 | 152,442 | 11,667 | 164,109 | 28,077 | 0 | 28,077 | 136,032 | 53,359 |
| 2006 | 113,810 | 8,711 | 122,521 | 20,962 | 0 | 20,962 | 101,559 | 39,837 |
| 2007 | 78,015 | 5,971 | 83,986 | 14,369 | 0 | 14,369 | 69,617 | 27,307 |
| 2008 | 36,888 | 2,823 | 39,711 | 6,794 | 0 | 6,794 | 32,917 | 12,912 |
| 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P. 4 COLUMN (7) FOR 1997 BALANCE.
(3) SEE SCHEDULE 1, P. 5 COLUMN (2) FOR 1997 BALANCE.
(4) COLUMN (2) + COLUMN (3).
(5) PER TAX RECORDS OF THE COMPANY.
(6) PER TAX RECORDS OF THE COMPANY.
(7) COLUMN (5) + COLUMN (6).
(8) COLUMN (4) - COLUMN (7).
(9) COLUMN (8) x TAX RATE .39225.

NP30BAS2.WK4 10/23/97

SUMMARY OF CONTRACT TERMINATION CHARGES
MONTAUP ELECTRIC COMPANY
RETURN ON FIXED COMPONENT

| YEAR END (1) | BALANCE OF FIXED COMPONENT (2) | DEFERRED TAXES (3) | NET BALANCE (4) | AVG NET BALANCE (5) | SUBTOTAL ANNUAL RETURN ON UNAMORTIZED BALANCE USING BASE ROE (6) | PLUS: RETURN ON UNAMORT. ITC (7) | TOTAL ANNUAL RETURN (8) |
|---|---|---|---|---|---|---|---|
| 1997 | 398,659 | 129,620 | 269,039 | | | | |
| 1998 | 378,565 | 123,087 | 255,478 | 262,258 | 29,735 | 1,235 | 30,970 |
| 1999 | 352,615 | 114,649 | 237,966 | 246,722 | 27,974 | 1,128 | 29,101 |
| 2000 | 321,762 | 104,618 | 217,144 | 227,555 | 25,801 | 1,020 | 26,821 |
| 2001 | 302,489 | 98,351 | 204,137 | 210,641 | 23,883 | 913 | 24,796 |
| 2002 | 274,449 | 89,235 | 185,215 | 194,676 | 22,073 | 806 | 22,876 |
| 2003 | 240,391 | 78,161 | 162,230 | 173,722 | 19,697 | 698 | 20,395 |
| 2004 | 200,975 | 65,345 | 135,630 | 148,930 | 16,886 | 591 | 17,477 |
| 2005 | 164,109 | 53,359 | 110,751 | 123,190 | 13,967 | 483 | 14,451 |
| 2006 | 122,521 | 39,837 | 82,685 | 96,718 | 10,966 | 376 | 11,342 |
| 2007 | 83,986 | 27,307 | 56,678 | 69,682 | 7,901 | 269 | 8,169 |
| 2008 | 39,711 | 12,912 | 26,799 | 41,739 | 4,732 | 161 | 4,894 |
| 2009 | 0 | 0 | 0 | 13,400 | 1,519 | 54 | 1,573 |

EECo 12/31/95
CAPITAL STRUCTURE

| | | | ATWACC | BTWACC |
|---|---|---|---|---|
| COMMON | 48.45% | 9.20% (a) | 4.46% | 7.33% |
| PFD | 5.95% | 9.83% | 0.58% | 0.96% |
| LTD | 45.60% | 6.67% | 3.04% | 3.04% |
| | 100.00% | | 8.08% | 11.338% |
| TAX RATE | | | | 39.225% |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P 13 COLUMN (4).
(3) SEE SCHEDULE 1, P 13 COLUMN (9).
(4) COLUMN (2) - COLUMN (3).
(5) COLUMN (4) PRIOR YEAR+COLUMN (4)/2.
(6) COLUMN (5) x TOTAL RATE OF RETURN.
(7) AVERAGE UNAMORT. ITC (ASSUMING 12 YR S/L AMORT. OF P. 5, COLUMN (2) * BTWACC).
(8) COLUMN (6) + COLUMN (7).
(a) PER NEP RI FILING

NP30BAS2.WK4 10/23/97

Schedule 1
Page 15 of 15

MONTAUP ELECTRIC COMPANY
SUMMARY OF CONTRACT TERMINATION CHARGES
NEWPORT ELECTRIC COMPANY SHARE (100%)
VARIABLE COMPONENT

| | | | POWER CONTRACTS | | | CREDIT FOR UNIT SALES CONTRACTS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR END (1) | NUCLEAR DECOMMISS. AND OTHER POST SHUTDOWN COSTS (2) | TOTAL OBLIGATION (3) | ASSUMED MARKET VALUE (4) | NET: EXCESS OVER MARKET (5) | FUTURE POWER CONTRACT BUYOUTS (6) | TOTAL OBLIGATION (7) | ASSUMED MARKET VALUE (8) | NET. EXCESS OVER MARKET (9) | ABOVE MARKET FUEL TRANSPORT. COSTS (10) | TRANSMISSION IN SUPPORT OF REMOTE GEN UNITS (11) | PMTS IN LIEU OF PROP. TAXES (12) | EMPLOYEE SEVERANCE & RETRAINING COSTS (13) | DAMAGES, COSTS OR NET RECOVERIES FROM CLAIMS (14) | PBR FOR NUKE UNITS REM. AFTER MKT VALUATION (15) | BASE TOTAL VARIABLE COMPONENT (16) |
| 1998 | 8,011 | 145,955 | 68,872 | 77,083 | 0 | (4,854) | 0 | (4,854) | 473 | 1,322 | 0 | 0 | 0 | 0 | 82,035 |
| 1999 | 7,386 | 146,089 | 71,160 | 74,926 | 0 | (4,452) | 0 | (4,452) | 451 | 1,297 | 0 | 0 | 0 | 0 | 79,608 |
| 2000 | 6,382 | 145,885 | 72,628 | 73,257 | 0 | (2,370) | 0 | (2,370) | 430 | 1,272 | 0 | 0 | 0 | 0 | 78,851 |
| 2001 | 6,161 | 139,288 | 65,306 | 73,982 | 0 | (1,555) | 0 | (1,555) | 410 | 1,248 | 0 | 0 | 0 | 0 | 79,246 |
| 2002 | 5,131 | 129,720 | 66,390 | 63,330 | 0 | (1,555) | 0 | (1,555) | 373 | 1,225 | 0 | 0 | 0 | 0 | 68,504 |
| 2003 | 5,214 | 109,649 | 53,329 | 56,316 | 0 | (1,555) | 0 | (1,555) | 346 | 1,232 | 0 | 0 | 0 | 0 | 61,553 |
| 2004 | 5,350 | 107,831 | 57,331 | 50,500 | 0 | (1,555) | 0 | (1,555) | 319 | 1,210 | 0 | 0 | 0 | 0 | 55,824 |
| 2005 | 5,457 | 109,800 | 56,820 | 52,880 | 0 | (1,555) | 0 | (1,555) | 291 | 1,189 | 0 | 0 | 0 | 0 | 58,362 |
| 2006 | 5,405 | 109,318 | 60,784 | 48,534 | 0 | (1,555) | 0 | (1,555) | 264 | 1,168 | 0 | 0 | 0 | 0 | 53,816 |
| 2007 | 4,789 | 112,512 | 60,389 | 52,143 | 0 | (1,555) | 0 | (1,555) | 237 | 1,148 | 0 | 0 | 0 | 0 | 56,762 |
| 2008 | 2,221 | 114,222 | 65,139 | 49,083 | 0 | (1,555) | 0 | (1,555) | 209 | 1,130 | 0 | 0 | 0 | 0 | 51,088 |
| 2009 | 1,746 | 118,734 | 64,362 | 54,372 | 0 | (1,555) | 0 | (1,555) | 182 | 973 | 0 | 0 | 0 | 0 | 55,718 |
| 2010 | 1,947 | 114,920 | 69,338 | 45,582 | 0 | (1,555) | 0 | (1,555) | 155 | 0 | 0 | 0 | 0 | 0 | 46,128 |
| 2011 | 1,984 | 91,778 | 49,040 | 42,738 | 0 | (1,555) | 0 | (1,555) | 37 | 0 | 0 | 0 | 0 | 0 | 43,202 |
| 2012 | 1,489 | 43,608 | 17,737 | 25,871 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 25,805 |
| 2013 | 1,351 | 24,618 | 10,724 | 13,894 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 13,690 |
| 2014 | 1,392 | 25,289 | 10,962 | 14,327 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 14,164 |
| 2015 | 1,433 | 20,235 | 10,492 | 9,743 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 9,621 |
| 2016 | 1,476 | 20,426 | 10,879 | 9,547 | 0 | (1,555) | 0 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 9,468 |
| 2017 | 1,521 | 14,956 | 9,131 | 5,825 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,348 |
| 2018 | 1,567 | 14,613 | 9,319 | 5,294 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,861 |
| 2019 | 1,613 | 14,381 | 9,066 | 5,315 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,928 |
| 2020 | 1,662 | 14,353 | 8,860 | 5,493 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,155 |
| 2021 | 1,711 | 13,455 | 8,996 | 4,459 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,170 |
| 2022 | 1,763 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,763 |
| 2023 | 1,816 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,816 |
| 2024 | 1,871 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,871 |
| 2025 | 1,926 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,926 |
| 2026 | 691 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 691 |
| 2027 | 712 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 712 |
| 2028 | 733 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 733 |
| 2029 | 755 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 755 |

Column Notes:
(2) Schedule 1, p. 6, Column (8) + Schedule 1, p. 7 Column (8).
(3) Schedule 1, p. 8.
(5) Column (3) - Column (4).
(7) See Schedule 1, p. 10 Column (5)
(9) Column (7) - Column (8).
(11) Schedule 1, p. 11, Column (8).
(16) Sum of Columns (2), (5), (6), (9), (10), (11), (12), (13), (14), and (15).

NP30BAS2.WK4 10/23/97

SCHEDULE 2

CALCULATION OF ADJUSTMENT FOR DEFERRAL
OF CONTRACT TERMINATION DATE

**PART 4 OF 4**

**IMPACT OF CONTRACT TERMINATION DEFERRAL ON STARTING BALANCE OF SUNK COMMITMENTS MONTAUP ELECTRIC COMPANY ($ IN 000's)**

**Schedule 2**
**Page 1 of 3**

| | 1998 | |
|---|---|---|
| CONTINUATION OF CURRENT RECOVERY | | |
| DEPRECIATION OF GEN. PL ANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 332 (b) | 28 |
| TOTAL | 16,298 | 1,358 |
| AMORT PER CTC | | |
| TOTAL | 20,763 (c) | 1,730 |
| EXCESS AMORTIZATION | (4,465) | (372) |
| CUMULATIVE EXCESS AMORT. | (4,465) | (372) |

| | 1999 | |
|---|---|---|
| CONTINUATION OF CURRENT RECOVERY | | |
| DEPRECIATION OF GEN. PL ANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | 19 (b) | 2 |
| TOTAL | 15,985 | 1,332 |
| AMORT PER CTC | | |
| TOTAL | 26,618 (c) | 2,218 |
| EXCESS AMORTIZATION | (10,633) | (886) |
| CUMULATIVE EXCESS AMORT. | (15,098) | (1,258) |

| | 2000 | |
|---|---|---|
| CONTINUATION OF CURRENT RECOVERY | | |
| DEPRECIATION OF GEN. PL ANT | 15,966 (a) | 1,331 |
| AMORTIZATION OF REG ASSETS | (180)(b) | (15) |
| TOTAL | 15,786 | 1,316 |
| AMORT PER CTC | | |
| TOTAL | 31,522 (c) | 2,627 |
| EXCESS AMORTIZATION | (15,736) | (1,311) |
| CUMULATIVE EXCESS AMORT. | (30,834) | (2,570) |

(a) Schedule 1, p. 4, Column (8)
(b) Schedule 1, p. 5, Column (3) + Schedule 1, p. 5a, Amortization Amount (1996 & Beyond)
(c) Schedule 1, p. 12, Column (3) + Schedule 1, p. 5a, Column (1)

NP30BAS2.WK4 10/23/97

Schedule 2
Page 2 of 3

RECONCILIATION ADJUSTMENT ILLUSTRATION CALCULATION
NEWPORT ELECTRIC SHARE

REVENUE ADJUSTMENTS

MONTAUP ELECTRIC COMPANY VARIABLE COST ADJUSTMENT

| YEAR (1) | ESTIMATED KWH DELIVERED (2) | ACTUAL KWH DELIVERED (3) | DELTA KWH DELIVERED (4) | TRANSITION CHARGE ¢/KWH (5) | NEWPORT ELECTRIC REVENUE EXCESS/ (SHORTFALL) (6) | ESTIMATED BASE VARIABLE COMPONENT (7) | ACTUAL NUCLEAR DECOM COSTS (8) | ACTUAL POWER CONTRACTS OBLIGATIONS (9) | ACTUAL POWER CONTRACTS MARKET VALUE (10) | ACTUAL POWER CONTRACT BUYOUTS (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 530,586 | 530,586 | 0 | 3.00 | 0 | 63,035 | 6,011 | 146,866 | 66,872 | 0 |
| 1999 | 536,566 | 536,566 | 0 | 3.00 | 0 | 79,808 | 7,366 | 146,048 | 71,160 | 0 |
| 2000 | 544,130 | 544,130 | 0 | 3.00 | 0 | 78,851 | 6,542 | 146,886 | 72,826 | 0 |
| 2001 | 548,613 | 548,613 | 0 | 2.98 | 0 | 79,246 | 5,181 | 130,266 | 86,308 | 0 |
| 2002 | 556,806 | 556,806 | 0 | 2.87 | 0 | 68,504 | 5,131 | 129,720 | 96,396 | 0 |
| 2003 | 563,367 | 563,367 | 0 | 2.49 | 0 | 61,553 | 5,214 | 109,646 | 53,379 | 0 |
| 2004 | 571,358 | 571,358 | 0 | 2.36 | 0 | 56,824 | 5,350 | 107,831 | 57,331 | 0 |
| 2005 | 580,258 | 580,258 | 0 | 2.26 | 0 | 58,382 | 5,457 | 109,800 | 56,820 | 0 |
| 2006 | 589,460 | 589,460 | 0 | 2.15 | 0 | 53,816 | 4,405 | 109,319 | 60,784 | 0 |
| 2007 | 596,360 | 596,360 | 0 | 2.07 | 0 | 56,782 | 4,780 | 112,512 | 60,396 | 0 |
| 2008 | 603,135 | 603,135 | 0 | 1.98 | 0 | 51,068 | 2,221 | 114,222 | 65,139 | 0 |
| 2009 | 609,079 | 609,079 | 0 | 1.50 | 0 | 56,718 | 1,749 | 116,734 | 64,362 | 0 |
| 2010 | 618,061 | 618,061 | 0 | 0.89 | 0 | 46,126 | 1,947 | 114,300 | 60,334 | 0 |
| 2011 | 622,438 | 622,438 | 0 | 0.82 | 0 | 43,202 | 1,964 | 91,778 | 49,040 | 0 |
| 2012 | 627,545 | 627,545 | 0 | 0.49 | 0 | 25,905 | 1,686 | 43,609 | 17,737 | 0 |
| 2013 | 636,921 | 636,921 | 0 | 0.25 | 0 | 13,890 | 1,251 | 24,818 | 10,724 | 0 |
| 2014 | 643,741 | 643,741 | 0 | 0.29 | 0 | 14,184 | 1,397 | 25,798 | 10,963 | 0 |
| 2015 | 649,278 | 649,278 | 0 | 0.15 | 0 | 9,421 | 1,433 | 20,229 | 10,402 | 0 |
| 2016 | 654,290 | 654,290 | 0 | 0.17 | 0 | 9,468 | 1,470 | 20,426 | 10,879 | 0 |
| 2017 | 661,509 | 661,509 | 0 | 0.13 | 0 | 7,348 | 1,521 | 19,856 | 9,171 | 0 |
| 2018 | 667,717 | 667,717 | 0 | 0.12 | 0 | 6,861 | 1,567 | 14,613 | 9,319 | 0 |
| 2019 | 673,787 | 673,787 | 0 | 0.12 | 0 | 6,528 | 1,613 | 14,381 | 9,096 | 0 |
| 2020 | 680,723 | 680,723 | 0 | 0.12 | 0 | 7,150 | 1,662 | 14,353 | 9,390 | 0 |
| 2021 | 687,311 | 687,311 | 0 | 0.11 | 0 | 5,170 | 1,711 | 13,466 | 8,906 | 0 |
| 2022 | 694,002 | 694,002 | 0 | 0.03 | 0 | 1,763 | 1,763 | 0 | 0 | 0 |
| 2023 | 700,799 | 700,799 | 0 | 0.03 | 0 | 1,816 | 1,816 | 0 | 0 | 0 |
| 2024 | 707,887 | 707,887 | 0 | 0.03 | 0 | 1,871 | 1,871 | 0 | 0 | 0 |
| 2025 | 714,705 | 714,705 | 0 | 0.03 | 0 | 1,929 | 1,926 | 0 | 0 | 0 |
| 2026 | 721,821 | 721,821 | 0 | 0.01 | 0 | 691 | 691 | 0 | 0 | 0 |
| 2027 | 757,912 | 787,912 | 0 | 0.01 | 0 | 712 | 717 | 0 | 0 | 0 |
| 2028 | 735,808 | 705,808 | 0 | 0.01 | 0 | 733 | 733 | 0 | 0 | 0 |
| 2029 | 835,586 | 835,586 | 0 | 0.01 | 0 | 756 | 756 | 0 | 0 | 0 |

| YEAR (1) | ACTUAL UNIT SALES CONTRACTS REVENUE (12) | ACTUAL UNIT SALES CONTRACTS MARKET VALUE (13) | ACTUAL ABOVE MARKET FUEL TRANSPORT COSTS (14) | TRANSMISSION IN SUPPORT OF REMOTE GENERATING UNITS (15) | ACTUAL PAYMENTS IN LIEU OF PROPERTY TAXES (16) | ACTUAL EMPLOYEE REVENUES SEVERANCE AND RETRAINING COSTS (17) | ACTUAL DAMAGES COSTS, OR NET RECOVERIES FROM CLAIMS (18) | ACTUAL PBR FOR NUKE UNITS REMAINING AFTER MARKET VALUATION (19) | MONTAUP ACTUAL TOTAL VARIABLE COMPONENT (20) | DELTA VARIABLE COMP (21) | NEWPORT ELECTRIC SHARE DELTA VAR COMP (22) | NEWPORT ELECTRIC ANNUAL RECON ADJ EXCESS/ (SHORTFALL) (23) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | (4,854) | 0 | 473 | 1,322 | 0 | 0 | 0 | 0 | 63,035 | 0 | 0 | 0 |
| 1999 | (4,465) | 0 | 431 | 1,297 | 0 | 0 | 0 | 0 | 79,808 | 0 | 0 | 0 |
| 2000 | (2,370) | 0 | 430 | 1,272 | 0 | 0 | 0 | 0 | 78,851 | 0 | 0 | 0 |
| 2001 | (1,555) | 0 | 410 | 1,248 | 0 | 0 | 0 | 0 | 79,246 | 0 | 0 | 0 |
| 2002 | (1,556) | 0 | 373 | 1,225 | 0 | 0 | 0 | 0 | 68,504 | 0 | 0 | 0 |
| 2003 | (1,555) | 0 | 348 | 1,232 | 0 | 0 | 0 | 0 | 61,553 | 0 | 0 | 0 |
| 2004 | (1,556) | 0 | 319 | 1,210 | 0 | 0 | 0 | 0 | 55,824 | 0 | 0 | 0 |
| 2005 | (1,549) | 0 | 291 | 1,190 | 0 | 0 | 0 | 0 | 58,382 | 0 | 0 | 0 |
| 2006 | (1,550) | 0 | 264 | 1,166 | 0 | 0 | 0 | 0 | 53,816 | 0 | 0 | 0 |
| 2007 | (1,565) | 0 | 237 | 1,148 | 0 | 0 | 0 | 0 | 56,782 | 0 | 0 | 0 |
| 2008 | (1,565) | 0 | 209 | 1,139 | 0 | 0 | 0 | 0 | 61,068 | 0 | 0 | 0 |
| 2009 | (1,653) | 0 | 182 | 973 | 0 | 0 | 0 | 0 | 58,718 | 0 | 0 | 0 |
| 2010 | (1,664) | 0 | 155 | 0 | 0 | 0 | 0 | 0 | 46,128 | 0 | 0 | 0 |
| 2011 | (1,554) | 0 | 37 | 0 | 0 | 0 | 0 | 0 | 43,202 | 0 | 0 | 0 |
| 2012 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25,905 | 0 | 0 | 0 |
| 2013 | (1,555) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,880 | 0 | 0 | 0 |
| 2014 | (1,535) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14,184 | 0 | 0 | 0 |
| 2015 | (1,565) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,821 | 0 | 0 | 0 |
| 2016 | (1,550) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9,468 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,348 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,861 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,078 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,156 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,170 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,763 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,816 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,871 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,929 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 691 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 712 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 733 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 755 | 0 | 0 | 0 |

COLUMN NOTES:
(2) SEE SCHEDULE 1, P. 1 COLUMN (2)
(3) FOR DEMONSTRATION PURPOSES, ACTUAL KWH'S DELIVERED ASSUMED TO EQUAL EST. KWH DELIVERED.
(4) COLUMN (3) - COLUMN (2)
(5) SEE SCHEDULE 1, P. 1 COLUMN (6)
(6) COLUMN (4) X COLUMN (5)
(7) SEE SCHEDULE 1, P. 15, COLUMN (18).
(8) - (19) FOR DEMONSTRATION PURPOSES ACTUAL VARIABLE COMPONENTS ARE ASSUMED TO EQUAL THE ESTIMATED VARIABLE COMPONENTS ILLUSTRATED ON SCHEDULE 1, P. 15
(20) COLUMN (8) + COLUMN (9) - COLUMN (10) + COLUMN (11) + COLUMN (12) - COLUMN (13) + COLUMN (14) + COLUMN (15) + COLUMN (16) + COLUMN (17) + COLUMN (18) + COLUMN (19)
(21) COLUMN (20) - COLUMN (7).
(22) COLUMN (21) * 11.65%.
(23) COLUMN (6) - COLUMN (22)

NP20BAS2 WK4 10/23/97

NARR 23463

Schedule 2
Page 3 of 3

RECONCILIATION ADJUSTMENT ILLUSTRATION CALCULATION
NEWPORT ELECTRIC COMPANY SHARE

| | ADJUSTMENTS TO MONTAUP ELECTRIC COMPANY COSTS | | NEWPORT ELECTRIC COMPANY ACCOUNT | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| YEAR (1) | DEFERRAL OF CONTRACT TERMINATION DATE (2) | CREDIT FOR DIFF. BETWEEN 9.083%ROE & 11.4% ROE (3) | VARIABLE RECONCIL. ADJUSTMENT (4) | DEFERRAL OF CONTRACT TERM. DATE (5) | CREDIT FOR DIFF. BETWEEN 9.083%ROE & 11.4% ROE (6) | ANNUAL SHORTFALL/ (EXCESS) (7) | ANNUAL PRE-TAX RETURN ON BALANCE (8) | COLLECTION OF PRIOR YR BAL. INCL. INTEREST (9) | END OF YR. ACCOUNT BALANCE (10) |
| 1997 | | | | | | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2011 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2012 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2021 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2022 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2023 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2024 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2025 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2026 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2027 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2028 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

COLUMN NOTES:
(2) ASSUMED TO BE ZERO.
(3) TO BE DETERMINED AT VALUATION.
(4) SEE SCHEDULE 2, PG. 2, COLUMN (23) X -1.
(5) COLUMN (2) x NEWPORT'S % OF SALES.
(6) COLUMN (3) x NEWPORT'S % OF SALES.
(7) SUM OF COLUMN (4) THROUGH (6).
(8) COLUMN (10) PRIOR YEAR x RETURN @ BTWACC.
(9) COLUMN (10) PRIOR YEAR x -1- COLUMN (8) CURRENT YEAR.
(10) PRIOR YEAR COLUMN (10) + CURRENT YEAR SUM COLUMNS (7) THROUGH (9).

NP30BAS2.WK4 10/23/97

**SCHEDULE 3**

**RECONCILIATION OF FAS 106 AND FAS 87 UPON DIVESTITURE**

Schedule 3
Page 1 of 4

**Reconciliation of FAS 106 and 87**
**Upon Divestiture**

**$ in Thousands**

| | Actual After Date of Divesture |
|---|---|
| ***One-Time Adjustments Upon Divesture:*** | |
| **(1) Post Retirement Health Care Benefits -** | |
| Unrecognized FAS 106 Gain or (Loss) | |
| **(a) Unrecognized Net Gain/(Loss) associated with FAS 106** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total unrecognized Net Gain/(loss) allocated to MEC | - |
| (b) Generation Related Portion | 93.08% |
| (c) Total Unrecognized Net Gain/(Loss) allocated to Generation | - |
| **(2) Pensions -** | |
| Unrecognized FAS 87 Gain or (Loss) * | |
| **(d) Unrecognized Net Gain/(Loss) associated with FAS 87** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total Unrecognized Net Gain/(Loss) allocated to MEC | - |
| **(e) Less: Unrecognized Prior Service Costs associated with FAS 87** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total Unrecognized Prior Service Costs Allocated to MEC | - |
| **(f) Less: FAS 87 Transition Liability** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total FAS 87 Transition Asset allocated to MEC | - |
| **(g) Plus: FAS 87 Transition Asset** | |
| MEC | - |
| EUASC x 23.504% | - |
| Total FAS 87 Transition Asset allocated to MEC | - |
| (h) Net Unrecognized Gain/(Loss) Associated with Pension | - |
| (i) Generation Related Portion | 93.08% |
| (j) Net Unrecognized Gain/(Loss) allocated to Generation | - |

* For the purpose of this reconciliation the unrecognized FAS 87 gains or losses shall be the amount of the net unrecognized transition obligation, prior service cost, and unrecognized FAS 87 gains or losses only to the extent that such gains or losses exceed five percent of the greater of plan assets or liabilities.

Row Notes:
(a) Per actual accounting and actuarial records.
(b) = Generation allocator based upon salaries and wages.
(c) = (a) x (b)
(d), (e), (f), (g) Per actual accounting records.
Specific Company balances for Union, Non-Union, and SERP plans will be allocated by multiplying the total EUA balance for these plans by the ratio of the Company liability to the total EUA liability, by plan.
(h) = (a) - (b) - (c) + (d)
(i) See (b) above.
(j) = (h) x (i)

Schedule 3
Page 2 of 4

**Power Contract Buyout Incentive**
**Associated with Canal Divesture**

**$ in Thousands**

| | **Divestiture Transaction:** | | *Illustrative Example Only* |
|---|---|---|---|
| (1) | Total MEC Proceeds from Canal 2 Divestiture | $0 | $35,207 |
| | MEC Power Contracts Assumptions: | | |
| (2) | Annual Buyout Payments | 0 | 4,889 |
| (3) | NPV of Annual Buyout Payments | 0 | 28,812 |
| (4) | Net Proceeds Realized for Assets | 0 | 6,396 |
| (5) | Proceeds Necessary to Realize 125% Net Book Value | 0 | 44,009 |
| (6) | Net Value Attributable to Power Contracts | 0 | (37,613) |
| (7) | NPV of Above-Market Power Contracts in CTC | 0 | (57,623) |
| (8) | Total Power Contracts Savings | 0 | (20,010) |
| (9) | 10% Buyout Incentive | 0.0 | 2,001 |
| (10) | Newport Electric Share | 11.85% | 11.85% |
| (11) | Newport Share of Incentive | $0.0 | $237.1 |

Line Notes:

(1) Actual sale proceeds realized through Canal 2 divestiture.
(2) Actual annual power contract buyout payments for Canal 1, Potter 2 and Cleary 9.
(3) NPV, at the time of divestiture, of Line (2) for stipulated term of buyout payments using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined under Section 1.1.4 (d). For this example, the discount rate used equals the pre-tax return of 13.092% pursuant to Section 1.1.2.
(4) Line (1) - Line (3).
(5) Actual net book value of Canal 2 generating unit upon divestiture x 125%.
(6) Line (5) - Line (4). The result cannot exceed zero.
(7) NPV, at the time of divestiture, of Schedule 1, Page 15, Column (5), remaining years only, using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined under Section 1.1.4 (d) and the market prices shown in Page 3 of this Schedule, even if actual market prices are different. For this example, the discount rate used equals the pre-tax return of 13.092% pursuant to Section 1.1.2.
(8) Line (7) - Line (6).
(9) Line (8) x -1 x 10%
(10) Newport Electric Corporation's share of MEC stranded costs.
(11) Line (9) x Line (10).

**Power Contract Buyout Incentive**
**Associated with Canal Divestiture**

**$ in Thousands**

**Market Price Assumptions ***

| | cents/kwh |
|---|---|
| 1998 | 2.48 |
| 1999 | 2.63 |
| 2000 | 2.65 |
| 2001 | 2.59 |
| 2002 | 2.87 |
| 2003 | 2.97 |
| 2004 | 3.07 |
| 2005 | 3.16 |
| 2006 | 3.25 |
| 2007 | 3.36 |
| 2008 | 3.49 |
| 2009 | 3.58 |
| 2010 | 3.71 |
| 2011 | 3.80 |
| 2012 | 3.95 |
| 2013 | 4.05 |
| 2014 | 4.14 |
| 2015 | 4.24 |
| 2016 | 4.39 |
| 2017 | 4.51 |
| 2018 | 4.62 |
| 2019 | 4.74 |
| 2020 | 4.85 |
| 2021 | 4.97 |
| 2022 | 5.09 |
| 2023 | 5.20 |
| 2024 | 5.32 |
| 2025 | 5.43 |
| 2026 | 5.55 |
| 2027 | 5.67 |
| 2028 | 5.79 |
| 2029 | 5.90 |

* Note: Market Price Assumptions are fixed for purposes of the calculation of the Power Contract Buyout Incentive associated with the Canal divestiture.

Schedule 3
Page 4 of 4

**Ocean State Power Buyout Incentive**
For Illustrative Purposes Only
$ in 000

| | | |
|---|---|---|
| 1 | NPV of OSP Costs in CTC | $335,759 |
| 2 | NPV for Incentive Purposes | 302,184 |
| 3 | NPV of Market Value | 188,977 |
| 4 | Above Market Cost for Incentive | 113,207 |
| 5 | NPV of Buyout Amount | 100,000 |
| 6 | Net Value Attributable to Buyout | 13,207 |
| 7 | 10% Buyout Incentive | 1,321 |
| 8 | Newport Electric Share | 11.85% |
| 9 | Newport Share of Incentive | $156 |

1 NPV at time of divestiture, @ full cost-of-service, using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined under section 1.1.4(d). For this example, the discount rate used equals 13.092% under Section 1.1.2.
2 90% of Line 1.
3 NPV at time of divestiture of market value for remaining contract lives using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined in Section 1.1.4 (d). For this example, the discount rate used equals 13.092%.
4 Line 2 - Line 3.
5 NPV, at the time of divestiture, for stipulated term of buyout payments using a discount rate equal to the actual pre-tax return in place following completion of post-divestiture refinancing as determined in Section 1.1.4 (d). For this example, the discount rate used equals 13.092%.
6 Line 4 - Line 5. Cannot be less than zero.
7 Line 6 * 10%.
8 Newport Electric Corporation's share of MEC stranded costs.
9 Line 8 x Line 7.

SCHEDULE 4

MONTAUP ELECTRIC COMPANY
POST 1995 CAPITAL INVESTMENTS

**MONTAUP ELECTRIC COMPANY**

**POST 1995 CAPITAL INVESTMENTS**

**Through May 1997**

**Project Descriptions**

| Project No. | Title - Total Project Cash Through May 1997 |
|---|---|
| 7-96/97<br>X7-96/97 | Building Improvements/Retirements $4,502<br>Perform routine minor building improvements and retirements.<br><br>The maximum single expenditure for any one project shall not exceed $25,000.<br><br>Reason for Project: To improve various work facilities through improvement of system buildings and retirement of obsolete facilities. |
| 10-96/97<br>X10-96/97 | Furniture, Tools, Lab and Comm. Equipment - $68,375<br>Purchase and install furniture, tools, laboratory, garage and communications equipment. Also remove or retire the aforementioned which are either replaced or abandoned.<br><br>The maximum single expenditure under this authorization shall not exceed $25,000.<br><br>Reason for Project: To improve various work facilities through additions and replacements of furniture, tools and equipment. |
| 13-96/97<br>X13-96/97 | Miscellaneous Production Improvements/Retirements - $345,944<br>Perform routine production improvements and retirements.<br><br>Reason for Project: To improve various work facilities through improvement of system buildings and retirements of obsolete facilities. |
| 14-96/97<br>X14-96/97 | Minor Imps/Rets - Canal #2 - $798,492<br>Perform miscellaneous minor improvements and retirements of Canal Unit #2 equipment.<br><br>Charges and credits to plant will reflect Montaup's 50% share of ownership.<br><br>Reason for Project: To increase the operational and maintenance efficiency of the unit. |

15-96/97
X15-96/97

**Minor Imps/Rets - Canal #2 Common** - $83,105

Perform miscellaneous minor improvements and retirements of Canal Unit #2 equipment, which is common to Canal Unit #1.

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Project: To increase the operational and maintenance efficiency of the unit.

16-96/97
X16-96/97

**Minor Imps/Rets - Wyman #4** - $6,565

Perform miscellaneous minor improvements and retirements at Wyman Unit #4.

Charges and credits to plant will reflect Montaup's 1.9618% share of ownership.

Reason for Project: To increase the operational and maintenance efficiency of the unit.

34
X34

**1994 Miscellaneous Projects, Canal 2** - $708,661

This requisition includes the following projects which began during 1994, and is net of $11,985,355 for gas conversion which is included in December 31, 1995 embedded plant amounts.

1. Miscellaneous Improvements under $25,000
2. Gas for Canal Unit #2
3. Generator Stator Refurbishment
4. Emission Monitoring, Common
5. NOx Ports and Register Assemblies
6. Replace Breaker Mufflers, Common
7. Replace ID Fan Inlet Box
8. Discharge Flume Repairs, Common
9. CO Reduction
10. Resin for Polishers
11. Refurbish Marine Building, Common
12. Ash Pit and Expansion Joint Work
13. Economizer Expansion Joints
14. Cold End Air Preheater B
15. Piping Restraint System
16. Maintenance Management System, Common
17. Electrostatic Precipitator Refurbishment
18. Condensate Polisher Refurbishment
19. Generator Rings & Stator Windings

Charges and credits to plant will reflect Montaup's 50% share of ownership

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

35
X35

**1995 Miscellaneous Projects, Canal 2** - $137,978
This requisition includes the following projects which began during 1995:

1. Replace Turbine Room Roof
2. Training/Visitor Building
3. Waste Neutralizing Tank
4. Caustic & Acid Storage Area Repairs
5. Combustion Modifications & CO
6. Neutralizing Wash System
7. Reheat Controls Upgrade

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

36
X36

**1996 Miscellaneous Projects, Canal 2** - $2,698,884
This requisition includes the following projects which began during 1996:

1. ID Fan Attenuators
2. NOx/CO Reduction

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

37
X37

**1997 Miscellaneous Projects, Canal 2** - $21,678
This requisition includes the following projects which began during 1997:

1. Callon Regeneration Vessel Replacement
2. Rework Furnace Wall
3. Replace ID Fan Attenuators
4. Precipitator Roof Enclosure
5. Precipitator Inlet Flow Distribution

Charges and credits to plant will reflect Montaup's 50% share of ownership.

Reason for Projects: To increase the operational and maintenance efficiency of the unit.

718
X718

**Warehouse No. 2 Roof and Side Walls** - $57,740
Install a new metal roof and metal siding on warehouse. Retire existing roof and siding.

Reason for Project: Existing roof and sidewalls are heavily corroded and leak excessively.

797

**Preservation of Unit 5** - $40,366
Design, supply and maintain a dehumidification and sealing system to protect the generating equipment of Unit No. 5 from corrosion damage while the unit remains in a deactivated reserve status. Several tasks must be performed by Engineering, plant personnel and outside contractors to prepare the unit for the acceptance of the dehumidification system.

Reason for Project: As a result of Unit No. 5 being placed in a deactivated reserve status, procedures must be followed to preserve the mechanical and electrical components. The preservation is to prevent moisture attack to the metal components and to maintain operational integrity of the Unit.

**X806** **1995 Asbestos Abatement, LP Station** - $738,326
Remove asbestos insulating material from Units 1-4, low pressure station. Reinsulate the equipment which is still in service.

Reason for Project: Remove insulation, refractories, coatings and gasketing material from the equipment to allow dismantlement, reduce environmental liability and diminish ongoing maintenance and re-encapsulation costs.

**X808** **Units 1, 2, 3 & 4 Salvage** - ($100,132)
To capture salvage value for reserve of physical plant equipment from Somerset Units 1, 2, 3 and 4, previously retired. This work addresses salvage of unit generators 1, 2 and 4 as one effort. A second effort addresses salvage of units 1, 2 and 4 main transformers and numerous other station service transformers.

Unit generators have a salvage value of $10,000 each for a total of $30,000. The last of 15 transformers have a salvage value of $40,000. Montaup labor will consist of electrical disconnects and isolation, and operation of overhead cranes. Montaup labor is estimated at $10,000.

Reason for Project: To obtain existing secondary market value of used equipment.

812
X812 **Abatement & Encapsulation, Stacks 1-4** - $29,682
Complete abatement and encapsulation of stacks 1-4 at Montaup Electric's Somerset Station. Air monitoring and proper disposal of all asbestos materials and debris included.

Reason for Project: The existing mastic coating is flaking off stacks 1-4. In order to contain this mastic material is necessary to completely abate all four stacks. In addition, once this coating is removed, stacks 1-4 must be sealed in order to preserve their weather integrity.

815
X815 **J2 Gas Turbine Exhaust Silencer** - $105,095
Purchase and install a new exhaust silencer for the J2 gas turbine. Remove and retire the existing silencer.

Reason for Project: The existing silencer is severely corroded. Internal attenuating baffles are damaged beyond repair. Installation of the new silencer will be performed during the annual overhaul of the unit.

816
X816 **J1 Gas Turbine Exhaust Silencer** - $98,342
Purchase and install a new exhaust silencer for the J1 gas turbine. Remove and retire the existing silencer.

Reason for Project: The existing silencer is severely corroded. Internal attenuating baffles are damaged beyond repair. Installation of the silencer will be performed during the annual overhaul of the unit.

818
X818

Air Preheater Basket Replacement - $244,066
Replace air preheater heat exchange basket assemblies.

Reason for Project: This project will improve unit heat rate. In addition, it will increase combustion air temperature due to improved heat transfer from new baskets.

822
X822

New Cond. Tubes - $491,620
Install approximately 11,200 new 90-10 Cu-Ni, 7/8" OD, 18 BWG, 30' long tubes in Unit #6 steam condenser.

Reason for Project: The existing tubes will be in service for 30 years by 1997. The condition of these tubes was such that 5,500 tube end inserts had to be installed in 1990 to prevent further corrosion of tubes. Tube leaks will necessitate load reduction or unit outage, threaten the boiler water chemistry, and also lead to degradation of the heat rate of the unit. New condenser tubes will assure improved boiler water chemistry and better thermal performance for many years.

**SCHEDULE 5**

**DETAIL OF EARLY RETIREMENT, EMPLOYEE TERMINATION & RETRAINING COSTS RESULTING FROM DIVESTITURE**

**Schedule 5**
Detail of
Early Retirement, Employee Terminations & Retraining Costs
Resulting from Divestiture

$ in Thousands

| | Non-Union | Union | Total All |
|---|---|---|---|
| **I. Accounting Costs:** | | | |
| **A. Early Retirement** | | | |
| -Additional Benefits: | | | |
| (1) Pension | $5,726.0 | $1,312.0 | |
| (2) Severance | $134.0 | $199.0 | |
| (3) Health | $1,643.0 | $266.0 | |
| (4) Retraining | $108.0 | $51.0 | |
| **Subtotal Early Retirement (I.A)** | $7,611.0 | $1,828.0 | $9,439.0 |
| **B. Terminations & Employee Retraining** | | | |
| -Severance: | | | |
| (1) Payments | $830.7 | $938.8 | |
| (2) Health | $145.8 | $248.4 | |
| (3) Retraining | $81.0 | $138.0 | |
| **Subtotal Terminations & Retraining (I.B)** | $1,057.5 | $1,325.2 | $2,382.7 |
| **TOTAL PROGRAM COSTS (I.A, I.B)** | **$8,668.5** | **$3,153.2** | **$11,821.7** |
| **II. Position Reductions:** | | | |
| A. # Employees Eligible for Early Retirement | 50 | 17 | 67 |
| B. # Employees Accepting Early Retirement | 36 | 17 | 53 |
| C. # Employees to be Severed | 27 | 46 | 73 |
| D. Total Reductions (Early Retirement & Severance) | 63 | 63 | 126 |

Notes:
Assumes a 7.5% discount rate
Costs include those of Montaup Electric Company and EUA Service Corporation in support of generation function

## ATTACHMENT 2B

## SERVICE AGREEMENT FOR NETWORK INTEGRATION TRANSMISSION SERVICE

# Service Agreement For Network Integration Transmission Service Between Montaup Electric Company and Blackstone Valley Electric Company, Agent for Retail Transmission Customers

THIS AGREEMENT is made this 3rd day of June, 1997, by and between Montaup Electric Company (hereinafter called "Transmission Provider"), and Blackstone Valley Electric Company, acting as agent for certain retail electric customers (hereinafter called "Transmission Customer").

In consideration of the mutual covenants and agreements herein contained, the Parties hereto agree as follows:

1. For purposes of transmission service under the Transmission Provider's Tariff No. 7, the Transmission Customer is agent for its retail customers who are eligible for retail choice but that do not obtain Network Integration Transmission Service directly from the Transmission Provider ("Blackstone Retail Transmission Customers").

2. Customers who are eligible for retail choice are as follows:

   a) In the period beginning July 1, 1997:

      (i) All new commercial and industrial customers, including new manufacturing customers, commencing service on or after July 1, 1997, with an anticipated average annual demand of two hundred (200) kilowatts or greater;

(ii) All existing manufacturing customers with an average annual demand of fifteen hundred (1500) kilowatts or greater; and

(iii) All accounts in the name of the State of Rhode Island;

subject to a limitation of no more than ten percent (10%) of the Transmission Customer's total kilowatt-hour sales.

b) In the period beginning January 1, 1998:

(i) The customers specified in section (a), above; and

(ii) Existing manufacturing customers with an average annual demand of two hundred (200) kilowatts or greater and all accounts in the name of cities and towns in Rhode Island;

subject to a limitation of no more than 20% of the Transmission Customer's total kilowatt-hour sales.

c) In the period beginning July 1, 1998, all retail customers shall be eligible for retail choice.

3. The aggregated transmission requirements of the Blackstone Retail Transmission Customers are the Transmission Customer's Network Load.

4. The Transmission Provider agrees to furnish Network Transmission Service over the Transmission Provider's transmission system to the Transmission Customer, acting as agent for the Blackstone Retail Transmission Customers, commencing on July 1, 1997. The Transmission Customer agrees to serve as the billing agent for provision of such Network Transmission Service to the Network Retail Transmission Customers and for the provision to the Blackstone Retail

Transmission Customers of Regional Transmission Service and Ancillary Services pursuant to the NEPOOL Open Access Tariff. The terms and conditions of service and the rates shall be as provided in FERC Transmission Tariff No. 7 of the Transmission Provider (the Tariff) and Schedule 13 of the Tariff.

5. Service under this Agreement shall not be terminated before the date on which the Transmission Provider recovers all Contract Termination Charges established pursuant to the Amendment to the Service Agreement for Purchase of Electric Service for Resale dated May 1, 1997, as amended from time to time.

6. In the event that the Transmission Customer is denied permission to recover, through its rates for local distribution service, access charges sufficient to collect the full amount of the Contract Termination Charges billed to the Transmission Customer, the Transmission Provider shall collect the unrecovered balance of the Contract Termination Charges as a surcharge to all retail customers taking delivery of electric energy over the transmission or distribution facilities of the Transmission Provider.

7. Service under this Agreement shall be subject to the following charges:

7.1 Transmission Charge: The charge set out in Schedule 13 of the Tariff.

7.2 Ancillary Services Charges: Ancillary Services customarily will be provided by NEPOOL pursuant to the NEPOOL Open Access Tariff. The Transmission Provider will provide Ancillary Services only if they are not available from NEPOOL. The charges for any Ancillary

Services provided by the Transmission Provider are set out in Schedules 1 through 6 of the Tariff.

7.3 Losses: The charges to the Transmission Customer for such losses shall be based on application of the Real Power Loss factor set out in Section 28.5 of the Tariff, as modified from time to time.

8. Except as provided in paragraphs 5 through 7, above, which may be modified only by mutual consent of the parties, nothing contained herein shall be construed as affecting in any way the Transmission Provider's right to unilaterally make application to the Federal Energy Regulatory Commission, or other regulatory agency having jurisdiction, for any change in the Tariff or this Service Agreement under Section 205 of the Federal Power Act, or other applicable statute, and any rules and regulations promulgated thereunder; or the Transmission Customer's rights under the Federal Power Act and rules and regulations promulgated thereunder.

9. The obligations under this Agreement may be assigned only with the express written consent of the other party, which consent shall not be unreasonably withheld; provided, however, that the Transmission Provider shall not be obligated to consent to any assignment that adversely affects the ability of the Transmission Provider to recover from the Transmission Customer the payments required to be made under the Tariff, this Service Agreement, including any Contract Termination Charges that may be billed to the Transmission Customer pursuant to this Agreement.

10. This Service Agreement is subject to any present and future state and federal laws, regulations, orders or other duly promulgated requirements.

IN WITNESS HEREOF, the Parties have caused this Service Agreement to be executed by their respective authorized officials.

MONTAUP ELECTRIC COMPANY

Dated: June 4, 1997 BY: [signature]

Title: Vice President

BLACKSTONE VALLEY ELECTRIC COMPANY, AGENT FOR BLACKSTONE RETAIL TRANSMISSION CUSTOMERS

Dated: June 4, 1997 BY: [signature]

Title: President

# Specifications for Network Integration Transmission Service To Blackstone Valley Electric Company

1. Term of Service:

   Start Date: July 1, 1997

   Termination Date: Pursuant to mutual agreement of the Parties.

2. List of Network Resources and Point(s) of Receipt:

   The system generating resources of Montaup Electric Company.

3. a) List of Point(s) of Delivery including and identifying Remote Delivery Point(s):

   See Attachment 1.

   b) List of Metering Point(s) when they differ from Point(s) of Delivery:

   To be provided.

4. List of non-Network Resource(s), to the extent known today:

   None.

5. Ancillary Services Requested or Proof of Satisfactory Arrangements for Ancillary Services:

   All Ancillary Services will be provided pursuant to the NEPOOL Open Access Tariff or, if necessary, pursuant to Montaup's Open Access Tariff.

6. Other Specified Provisions:

   A. Billing will include any applicable charges in accordance with the rates, terms and conditions of the Tariff.

   B. The Transmission Provider has agreed to terminate those requirements of its FERC Electric Tariff, Revised Volume No. 1 ("Tariff No. 1") that obligate the Transmission Customer to buy all of its electricity requirements under

Tariff No. 1 and Transmission Customer has agreed to pay contract termination charges pursuant to the Amendment. Service under this Agreement is conditioned on the Commission's approval of the Amendment filed on May 1, 1997.

C. In no event shall the Transmission Provider bypass the Transmission Customer's distribution facilities and interconnect directly with a retail customer.

**Attachment 1**
**Montaup Delivery Points for Newport Electric Corporation**

| Substation Delivery Point | Delivery Voltage (Nominal kV) |
|---|---|
| Canonicus Street | 115 |

File Name: deliv

NARR 23487

EUA SYSTEM COMPANIES

**BLACKSTONE VALLEY ELECTRIC COMPANY**
**EASTERN EDISON COMPANY**
**MONTAUP ELECTRIC COMPANY**
**NEWPORT ELECTRIC CORPORATION**

# JURISDICTIONAL SEPARATION OF TRANSMISSION AND DISTRIBUTION FACILITIES PURSUANT TO FERC ORDER 888

Table of Contents

| | | Page |
|---|---|---|
| I. | Executive Summary | 1 |
| | **Analysis** | |
| II. | Federal and State Jurisdictional Requirements per FERC Order 888 | 3 |
| III. | Summary of EUA System Structure | 4 |
| IV. | Definition of EUA Retail Companies' Distribution Systems | 6 |
| V. | Definition of EUA Transmission System | 10 |
| VI. | Attachments | |

## I. Executive Summary

In its Order Number 888, the Federal Energy Regulatory Commission (FERC) proposed a seven-factor test to delineate the jurisdictional line between transmission facilities subject to FERC's jurisdiction and distribution facilities subject to state rate-making authority. FERC has claimed exclusive authority over all transmission and distribution facilities used for wholesale wheeling and over the transmission component of unbundled interstate retail wheeling. The seven-factor test is designed to identify the characteristics of local distribution systems that differentiate them from transmission systems. The seven-part test proposed by FERC is flexible and based on the actual use of the distribution and transmission systems. The application of the test depends on the facts of each case.

The corporate structure of the EUA System Companies generally separates transmission or distribution functions into different subsidiaries in a way that parallels FERC's seven-factor test. The individual subsidiaries within the EUA System are segregated by function, and not vertically integrated, as is the standard organization of most electric utilities. Wholesale services, comprising generation and transmission functions, are primarily under one subsidiary, Montaup Electric Company (Montaup). Retail distribution functions are under separate retail subsidiaries, Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport).[1] This unique structuring of the subsidiary utilities creates functional and jurisdictional separations that are consistent with FERC's definition of wholesale transmission and local distribution.

---

[1] Blackstone, Newport, and Eastern currently own transmission facilities. All of Blackstone's and Eastern's transmission facilities, and some of Newport's, are leased to and operated by Montaup under an agreement that is subject to FERC's jurisdiction. Thus, even while ownership is not completely consolidated by function, the system is functionally separated for rate jurisdiction purposes.

Based on the analysis in this report, the EUA Companies conclude that their current usage and jurisdictional rate treatment of transmission and distribution facilities is appropriate and is consistent with FERC's definitions of transmission and local distribution facilities as expressed in the seven factor test, with the exception of Newport's transmission facilities. The facilities owned and/or operated by Montaup are properly classified as transmission, based on Montaup's customers and the voltage class and system configuration of the facilities. Where distribution facilities of the distribution companies are used for a wholesale wheeling purpose, appropriate support costs are allocated to Montaup and included in its FERC-jurisdictional rates. When the ownership and operation of transmission is further consolidated in a new transmission company, contemplated as part of a comprehensive corporate restructuring plan, all of the Newport transmission facilities will be transferred or leased, as appropriate, and made part of a FERC-jurisdictional transmission tariff.

The distribution facilities of the EUA retail subsidiaries which are subject to state rate-making jurisdiction today fit the seven-part test established by FERC for the definition of local distribution facilities used for retail access in a restructured industry.

## II. Overview of Federal and State Jurisdictional Requirements per FERC Order 888

In its Order Number 888, FERC addressed the issue of federal and state jurisdiction over retail transmission by defining what constitutes "local distribution". FERC claimed exclusive jurisdiction over transmission facilities and service used for retail wheeling up to the point of local distribution.[2] To determine the jurisdictional line, FERC proposed the seven-factor test of local distribution. This test of functional and technical characteristics of facilities defines local distribution facilities and thus demarcates the line between federal and state jurisdiction.

Under Order 888, FERC will defer jurisdiction over local distribution facilities to state commissions if the state commission applies the seven part criteria set forth in Order 888. Accordingly, this report is prepared for use before the state commissions in Massachusetts and Rhode Island, as well as FERC, when evaluating the jurisdictional separation between transmission and distribution facilities. A consistent separation for each state will prevent gaps or overlaps in rate making and will protect against cross subsidies among customers that could otherwise occur if the states adopted different dividing lines between transmission and distribution for ratemaking purposes.

[2] In addition, FERC claimed exclusive jurisdiction over all facilities, whether transmission or distribution, used for wholesale wheeling.

## III. Summary of EUA System Structure

The EUA System has a unique structure. Most utilities are vertically integrated, and a single corporate entity owns the utility's generation, transmission, and distribution assets. However, the EUA System is already organized along functional lines. Montaup, a separate subsidiary of the EUA System, owns, operates and/or controls through integrated facilities arrangements, most of the System's generation and transmission assets[3] and has contracted for all of the System's power purchases and transmission support obligations.[4] The EUA retail companies-Eastern, Blackstone, and Newport- obtain the power supplies they need to serve the retail customers in their service territories, as well as the transmission service to deliver that generation to their distribution systems, from Montaup under Montaup's FERC Electric Tariff, Revised Volume Number 1 (Tariff 1). The EUA retail companies separately own all of the distribution facilities needed to serve retail customers in their individual service territories.[5]

Thus, within the EUA System, transmission and distribution are generally owned by separate corporations. In those instances where ownership is not separated, control and rate-making authority over assets have been established through agreements between Montaup and the distribution companies. Under these agreements, Blackstone, Eastern, and Newport receive support payments from Montaup to compensate them for the rental costs of their transmission and generation facilities. Likewise, Montaup receives compensation from Eastern for its use of the Montaup-

[3]Blackstone owns and operates a small run-of-river hydro facility in Pawtucket, RI. Newport has retained ownership and rate treatment of most of its 115kV and 69kV transmission facilities to date; these will be consolidated into the FERC-jurisdictional transmission function as part of a comprehensive corporate reorganization.

[4] This is true with the exception of certain Qualifying Facilities (QFs) with capacity less than 1 megawatt, the output of which is purchased directly by the EUA retail companies under PURPA guidelines in each of the respective states in which the EUA retail companies operate.

[5] Montaup owns a very limited number of distribution facilities in Eastern's service area. These facilities are supported by Eastern under an agreement with Montaup.

owned distribution facilities.

Under the disaggregated structure of the EUA system, the costs of Montaup's wholesale power supply and transmission investments and commitments are reflected in Montaup's FERC-jurisdictional rates. Montaup's rates also recover the costs associated with distribution facilities used for wholesale services. Montaup compensates the retail affiliates for use of those distribution facilities. Thus, the rate recovery of investments and commitments for all wholesale wheeling is determined by FERC. Conversely, state commissions address directly the distribution costs and other costs associated exclusively with retail service.

**IV. Definition of EUA Retail Companies' Distribution Systems**

Attachment 1 shows the geographic areas served by the EUA retail companies. The local distribution systems of the EUA Retail Companies are primarily 14kV voltage class systems. Some areas also have 4, 23, or 69kV voltage class systems. These systems are radial in nature, serving retail load in the vicinity of the local distribution facilities. The local distribution systems are typically supplied from the 115 kV transmission system owned or controlled by Montaup through one or more step-down transformers owned or controlled by the EUA retail companies. Metering that measures the total kilowatt hours flowing into each local distribution area of the EUA retail companies at each delivery point is typically on the low voltage side of the step-down transformers and compensated for transformer losses and adjusted to the high side. The line of demarcation between transmission facilities and distribution facilities is designated at the high side bushing of the step-down transformers.

Attachment 2 shows a typical distribution system for the EUA retail companies. This diagram indicates that the system is served from a transmission line, typically 115 kV, through one or more step-down transformers. Typically, several distribution feeders emanate radially from each distribution substation, with normally open switch points connecting to feeders from neighboring substations. Distribution systems are generally 14, 23 or 69 kV voltage class distribution systems which serve some customers directly through service transformers (Type I Facilities) and serve other customers through step-down transformers to distribution systems which have 4 or 23 kV voltage class distribution feeders (Type II Facilities).

As is shown on Attachment 2, the distribution system is radial in nature. Although power may be supplied from more than one transmission/distribution interface, power flow is always into the geographic area served by the distribution facilities. Distribution facilities are not used to transmit bulk power from one geographic area to another; the power is consumed within the distribution service area. The distribution circuit often terminates at an open switch to tie with an adjacent circuit for reliability and maintenance purposes; opening or closing tie points on the

distribution system has no affect on the integrity or reliability of the bulk transmission system. Switching of distribution tie points may be manual or automatic and is done to restore service to customers in the event of an outage or to perform maintenance on equipment.

Attachment 3 is a list of the EUA System transmission/distribution supply points. This attachment identifies each supply point by name, delivery voltage (kV), and the type of distribution system supplied from that location. The distribution systems of the EUA retail companies supplied by points listed in Attachment 3 meet the seven-part test for distribution systems as described below.

**(1) Local distribution facilities are normally in close proximity to retail customers.**

The EUA retail companies' distribution facilities are in close proximity to retail customers, as these are the circuits that emanate from local distribution substations and serve customers in a limited geographical area as shown in Attachment 2. These circuits typically are installed along public roads and private rights-of-way and serve adjacent customers.

**(2) Local distribution facilities are primarily radial in character.**

The distribution facilities of the EUA retail companies are primarily radial in character, and serve a limited area from one or more transmission supply points. These facilities typically benefit the local area, and do not affect the operation or integrity of the transmission system other than as local load delivery points (Reference Attachment 2).

**(3) Power flows into local distribution systems; it rarely, if ever, flows out.**

Power flow is into a local distribution system, and is metered at the transmission/distribution interface. More than one supply point may exist as previously described in item (2) above and shown in Attachment 4 page 1. Because these systems are radial in nature, the net power flow will be into the system to serve the local load. Pages 2 and 3 of Attachment 4 show the billing metering facilities at Staples and Washington Substations, respectively. Refer to Attachment 9 for a description of symbols and designations used on billing meter layouts.

If generation exists on the distribution system, separate billing metering facilities would be located at the local generation facility to segregate wholesale services from local distribution deliveries. In Attachment 5, the BFI generation facility in East Bridgewater resides on a 14 kV system in Massachusetts. Generation facilities interconnected to the distribution system are typically much smaller than the load being served by the local distribution facilities. The net power flow across the transmission/distribution interface will generally be reduced, but power will typically not flow from the distribution system to the transmission system.

**(4) When power enters a local distribution system, it is not reconsigned or transported on to some other market.**

The EUA retail companies' distribution systems serve retail end-use customers. In cases where distribution facilities are also used to serve wholesale customers, an allocation of the cost of the system used for wholesale services would be assigned to the wholesale transaction. Separate metering is located at the wholesale customer to segregate wholesale deliveries from local distribution deliveries. Attachment 5 shows an example of the BFI generating facility interconnected to a 14 kV distribution line (#941) and the corresponding meter location. This line also serves retail end-use customers in East Bridgewater, Massachusetts. In this case a portion of the 941 line is allocated to the wholesale transaction and such portion is considered to be transmission. The remaining portion is considered to be a distribution facility.

**(5) Power entering a local distribution system is consumed in a comparatively restricted geographical area.**

The EUA retail companies' distribution systems serve load in a comparatively restricted geographical area. The geographical area served by a local distribution system depends on the load density of the area. For example, several distribution circuits of the types shown in Attachment 2 may serve a city or a number of rural towns.

Attachment 6 shows the area map and electrical one-line diagram for distribution feeders which serve the town of Scituate, Massachusetts and portions of adjacent towns. This represents how a typical distribution system of the EUA retail companies serves a restricted geographic area.

**(6) Meters are based at the transmission/distribution interface to measure flows into the local distribution system**

Metering to measure flows into the local distribution systems of the EUA retail companies is typically on the low voltage side of the step-down transformer and compensated for transformer losses and adjusted to the high side. Refer to Attachment 2 for a general overview. As an example, Attachment 7 shows a typical billing metering installation at the Valley Substation from the 115 kV transmission system.

**(7) Local distribution system will be of reduced voltage.**

The local distribution voltages of the EUA retail companies are less than 115 kV. Typical voltage classes used are 4, 14, 23 and 69 kV. Attachment 8 shows the actual distribution voltages used by the EUA retail companies.

## V. Definition of EUA Transmission System

The function of transmission facilities is to integrate generation resources over large geographical areas and deliver the needed power to local distribution supply systems. The EUA transmission system is used to transmit power from generation resources located on its system or on the transmission systems of other utilities to the loads served by the distribution system. By definition, a transmission system is typically interconnected to the neighboring transmission systems of neighboring utilities. Transmission lines are rarely, if ever, directly connected to retail customers. The EUA Companies' transmission system is generally operated at voltages of 115kV and above.



Eastern Utilities

# TERRITORY OVERVIEW

Leominster
Salem
Lynn
Cambridge
Boston
Northampton
Worcester
Framingham
Dedham
Holyoke
Chicopee
Springfield
Pascoag Fire District
Webster
Brockton
Plymouth
Putnam
Pawtucket
Taunton
Providence
Hartford
Willimantic
Fall River
Barnstable
East Greenwich
Hyannis
Warwick
New Bedford
Middletown
Norwich
Newport
West Kingston
Edgartown
New London
Nantucket

NARR 23500



Attachment 2

Eastern Utilities

# TYPICAL LOCAL DISTRIBUTION SYSTEMS
## VOLTAGE CLASS: 4, 14, 23 kV

A typical Type I Distribution System will emanate from a transmission supplied substation, will be built along right-of-way and streets, will provide distribution supply service to substations serving Type II Distribution Systems and, often times, to larger commercial/industrial customers.

ATTACHMENT 3
Page 1 of 3

# BLACKSTONE VALLEY ELECTRIC COMPANY

| Operating District | Substation | Distribution Type | Delivery Voltage (Nominal KV) | Metering Point | Metering Voltage (Nominal KV) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|---|
| Lincoln | Center St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Central Falls | II | 13.8 | SDP | 4 | SDP | SL |
| | Cottage St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Crossman St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Daggett Ave. | II | 13.8 | SDP | 4 | SDP | SL |
| | East School St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Farnum | I | 115 | SDP | 23 | SDP | SL |
| | Front St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Hyde Ave. | II | 13.8 | SDP | 4 | SDP | SL |
| | Lee St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Merry St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Nasonville | I | 115 | SDP | 13.8 | SDP | SL |
| | Pawtucket #1 | I | 115 | SDP | 13.8 | SDP | SL |
| | Pawtucket #2 | II | 13.8 | SDP* | 4 | SDP* | SL |
| | Riverside | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Southeast | II | 13.8 | SDP | 4 | SDP | SL |
| | Staples | I | 115 | SDP | 13.8 | SDP | SL |
| | Valley | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Washington | I | 115 | SDP | 13.8 | SDP | SL |
| | West Farnum | I | 115 | SDP | 13.8 | SDP | SL |
| | York Ave. | II | 13.8 | SDP | 4 | SDP | SL |

SDP = Standard Delivery Point
SL = Supply Line
SDP* = Hydro Generation Metered as leaving Generators

ATTACHMENT 3
Page 2 of 3

# EASTERN EDISON COMPANY

| Operating District | Substation | Distribution Type | Delivery Voltage (Nominal KV) | Metering Point | Metering Voltage (Nominal KV) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|---|
| Brockton | Ames | I | 115 | SDP | 13.8 | SDP | SL |
| | Ames St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Avon Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Belmont | I | 115 | SDP | 13.8 | SDP | SL |
| | Court St. | II | 13.8 | SDP | 4 | SDP | SL |
| | Dupont | I | 115 | SDP | 13.8 | SDP | SL |
| | Easton | I | 115 | SDP | 13.8 | SDP | SL |
| | East Bridgewater | I | 115 | SDP | 13.8 | SDP | SL |
| | Lincoln St. | II | 13.8 | SDP | 4 | SDP | SL |
| | North Abington | I | 115 | SDP | 13.8 | SDP | SL |
| | Parkview | I | 115 | SDP | 13.8 | SDP | SL |
| | Pond St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Plymouth | I | 115 | SDP | 13.8 | SDP | SL |
| | Spring St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Stoughton | I | 115 | SDP | 13.8 | SDP | SL |
| | Temple St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | West Bridgewater Unit | II | 13.8 | SDP | 4 | SDP | SL |
| Fall River | Adamsville | II | 13.8 | SDP | 4 | SDP | SL |
| | Bates | I | 115 | SDP | 13.8 | SDP | SL |
| | Dighton | I | 115 | SDP | 13.8 | SDP | SL |
| | Hartwell | II | 23 | SDP | 4 | SDP | SL |
| | Hathaway | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Palmer | II | 23 | SDP | 4 | SDP | SL |
| | Riverside | II | 23 | SDP | 4 | SDP | SL |
| | Swansea | I | 115 | SDP | 13.8 | SDP | SL |
| | Sykes | I | 115 | SDP | 13.8 | SDP | SL |
| Hanover | Central St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | County Rd. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Division St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Hanover Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | King St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Mill St. | I | 115 | SDP | 13.8 | SDP | SL |
| | North Scituate Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Norwell | I | 115 | SDP | 13.8 | SDP | SL |
| | Rockland St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Scituate | I | 115 | SDP | 13.8 | SDP | SL |
| | Scituate Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Scituate St. Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Silver Lake | II | 13.8 | SDP | 4 | SDP | SL |
| | Sunnyside Unit | II | 13.8 | SDP | 4 | SDP | SL |
| | Water St. | I | 115 | SDP | 13.8 | SDP | SL |

SDP = Standard Delivery Point
SL = Supply Line

ATTACHMENT 3
Page 3 of 3

# NEWPORT ELECTRIC CORPORATION

| Operating District | Substation | Distribution Type | Delivery Voltage (Nominal KV) | Metering Point | Metering Voltage (Nominal KV) | Metering Adjustments | Delivery Adjustments |
|---|---|---|---|---|---|---|---|
| Middletown | Bailey Brook | II | 23 | SDP | 4 | SDP | SL |
| | Clarke | II | 23 | SDP | 4 | SDP | SL |
| | Dexter | I | 115 | SDP | 13.8/23 | SDP | SL |
| | Eldred | II | 23 | SDP** | 4 | SDP | SL |
| | Gate 2 | II | 69 | SDP | 23 | SDP | SL |
| | Harrison | II | 23 | SDP | 4 | SDP | SL |
| | Hospital | II | 23 | SDP | 4 | SDP | SL |
| | Jepson | I | 69 | SDP** | 13.8/23 | SDP | SL |
| | Kingston | II | 23 | SDP | 4 | SDP | SL |
| | Merton | II | 23 | SDP | 4 | SDP | SL |
| | North Aquidneck | II | 23 | SDP | 4 | SDP | SL |
| | South Aquidneck | II | 23 | SDP | 4 | SDP | SL |
| | Vernon | II | 23 | SDP | 4 | SDP | SI |
| | West Howard | II | 23 | SDP | 4 | SDP | SL |

SDP = Standard Delivery Point which is at Canonicus St.Transmission Substation

SL = Supply Line

SDP** = Standard Delivery Point with Generation Metering on Output of Local Generators



STAPLES and WASHINGTON
SUBSTATION FEEDER TIE
Attachment
1 of 3
1243 LINE
205 AMP
1241
STAPLES SUB
14.3 KV
MENDON
MENDON
1242 LINE
865 LINE
2642 LINE
RAILROAD STREET
244 LINE
14.2 KV
2641
292 AMP
WASHINGTON
2640 LINE
2642 LINE
1241 LINE
2641 LINE
1242 LINE
NEW RIVER RD



Attachment 4
2 of 3
STAPLES ONE-LINE
J16 LINE
RIVERSIDE
1216
14.3 MVA
T
LLI
120-2
120
120-1
LINKED SWITCH
121
I
T
124
AGS
1210
117.1 KV
Q10 LINE
ROBINSON
124
0.0 MVA
To SCADA - Lincoln
(Typ.Billing Metering)
Pri
SS
124T
14.1 KV
13.7 MW
-2.7 MX
48 IA
14.0 MVA
1241
R
0 AMP
1241
LINE
Alt SS
M54 Staples Rd
1242
72 AMP
1242
LINE
1243
0 AMP
1243
LINE
1244
75 AMP
1244
LINE
1245
3.0MX
0.0 MX
1245-1
3.0MX

NARR 23506





Attachment 4
3 of 3

# WASHINGTON ONE-LINE

To SCADA - Lincoln
(Typ.Billing Metering)
261
V148
LINE
261-1
261-2AGS
DUMMY
MAIN
261
Pri
SS
Alt SS - Feed from old BVE
Office Building
14.4 KV
23.1 MW
5.3 MX
75 MA
23.7 MVA
2640
R
184 AMP
2640
LINE
2641
R
208 AMP
2641
LINE
2642
R
384 AMP
2642
LINE
2643
0.0 MX
4.0MX

NARR 23507



*Attachment 5*

# BFGSI - E.BRIDGEWATER ONE-LINE

*Independant Power Producer*



1 of 2

Eastern Utilities

SCITUATE AREA

Dedham
Milton
Quincy
Cohasset
Minot
Hingham
Weymouth
Braintree
East Weymouth
North Scituate
Norwood
Scituate
South Weymouth
Accord
Atlantic Ocean
East Walpole
Canton
Randolph
Holbrook
Norwell
North Marshfield
Sharon
Stoughton
Avon
Rockland
Hanover
Abington
Brockton
Whitman
Hanson
North Pembroke
Marshfield
North Easton
South Easton
East Bridgewater
Mansfield
Easton
East Mansfield
West Bridgewater
Elmwood
Bridgewater
Halifax
Kingston
Duxbury
Norton
Raynham
Plympton
Plymouth
Raynham Center
North Carver
White Horse Beach
Taunton

NARR 23509



Attachment 6
2 of 2

Eastern Utilities
SCITUATE ONE-LINE
9640
9641
37
9642
9643
82
35
36
KING ST
NORWELL SUB
NO. SCITUATE
SCITUATE SUB UNIT
SCITUATE UNIT
SCITUATE SUB

NARR 23510

*Attachment 7*

# VALLEY ONE-LINE



1.0 THIS STANDARD LISTS THOSE SYSTEM VOLTAGES PRESENTLY IN USE WITHIN EASTERN UTILITIES SERVICE TERRITORY

2.0 TRANSMISSION VOLTAGES

C 69,000 volts

115,000 volts

345,000 volts

3.0 PRIMARY DISTRIBUTION VOLTAGES

3.1 THREE PHASE THREE WIRE

| | Voltage | Bil (kV) | Notes | Operating Location |
|---|---|---|---|---|
| | 2400 Delta | 75 | | BVE |
| | 23,000Y | 125 | (2) | BVE |
| | 23,000Y | 150 | (3) | EECo/Fall River |
| C | 23,000 Delta | 150 | | Newport Electric |
| | 69,000Y | 230 | | Newport Electric |

3.2 THREE PHASE FOUR WIRE

| | Voltage | Bil (kV) | Notes | Operating Location |
|---|---|---|---|---|
| | 4160Y/2400 | 75 | | BVE<br>EECo (All Divisions)<br>Newport Electric |
| | 4160Y/2400 | 75 | (4) | EECo/Fall River |
| | 12,470 GRDY/7200 | 95 | (1) | EECo/Fall River |
| C | 13,600 GRDY/7600 | 95 | (9) | EECo/Fall River |
| C | 13,800 GRDY/7970 | 95 | | BVE<br>EECo (All Divisions)<br>Newport Electric |

4.0 SECONDARY DISTRIBUTION VOLTAGES

4.1 SINGLE PHASE

4.1.1 Single Phase Two Wire

120 Volts (Note 5)

4.1.2 SINGLE PHASE THREE WIRE

120/240 volts

120/208 volts (Note 6)

4.2 THREE PHASE

4.2.1 THREE PHASE THREE WIRE

| Voltage | Notes |
|---|---|
| 240 | 7 & 8 |
| 480 | 7 & 8 |
| 600 | 7 & 8 |

4.2.2 THREE PHASE FOUR WIRE

| Voltage | Notes |
|---|---|
| 208Y/120 | |
| 240/120 | 7 & 8 |
| 480Y/277 | |

NOTES

1. The Westport Harbor area is fed from the Narragansett Electric Company System.
2. Grounded at station - is a three-wire Y system.
3. Resistively grounded Wye transformer. No distribution customers on this voltage.
4. Ungrounded primary neutral system.
5. Usually used only for lighting purposes.
6. C A three-wire system to provide single-phase service from a three-phase four-wire system. Only available from specific underground network systems.
7. Not available for new installations.
8. C Special overload protection is required for motor circuits. Transformers are susceptible to burnouts on primary faults. Refer to EUA Construction Standard 1508; TRANSFORMER LOADING GUIDELINE FOR THREE - PHASE DELTA CONNECTED SECONDARY TRANSFORMER BANKS.
9. C Maple Swamp Road, Dighton.

Attachment 9

# TYPICAL SYMBOLS

PRIMARY/BILLING METERING

TRANSFORMER

GROUND

AIR BREAK - OPEN

AIR BREAK - CLOSED

DISCONNECT SWITCH

OPEN CIRCUIT BREAKER

CLOSED CIRCUIT BREAKER

FUSE

REGULATOR

N.O. - NORMALLY OPEN

**ATTACHMENT 4**

**STANDARD OFFER AUCTION PROPOSED DESIGN (INCLUDES FUEL INDEX)**

**The Standard Offer Auction**
**Proposed Design**

## A. Administrative Process and Time Line

It is the parties' intent that the bidding process for securing standard offer service be as competitive as possible and proceed in a timely manner. Therefore, based on the parties' current understanding of the timeframe for the Retail Access Date and divestiture, the parties believe at this time that the Final RFP for Standard Offer Service should be issued no sooner than the execution of purchase and sale agreements for Montaup's interest in the Somerset Station and Canal 2 but, in any event, no later than six months after the Retail Access Date.

The principal steps and approximate timing of events will be as outlined below.

October 1997 - Preliminary RFP Issued

The Preliminary RFP will detail all of the major elements, requirements and commercial terms and conditions of the final RFP that will be issued in April,1988. Its purpose is to give potential bidders the necessary information to determine whether they intend to participate in the Auction. Specific pre-bid qualifications will be established including an audited statement of financial qualifications and other relevant information to ascertain a bidder's ability to perform. Neither the terms of the Preliminary RFP nor Final RFP shall require a bidder to hold title to the power needed to fulfill its obligations under its bid.

Pre-bid applications including required bidder qualification information are due by (a date to be specified in the Preliminary RFP) along with a modest non-refundable administration fee of $1,000.

February 1998 - List of Qualified Bidders Submitted to the PUC (for informational purposes)

April 1998 - Final RFP Issued (including a standard contract)

May 1998 - Bids Due

Bids would be accepted only from pre-qualified bidders and must include a deposit of $5,000/MW-year the bidder proposes to supply. *For example, if a bidder proposed to supply 100 MW for seven years, its deposit would total $3,500,000 ($5,000/MW-year x 100 MW x 7 yrs).* This deposit is refunded in the event that a bidder is not selected. If successful, at the bidder's election, the deposit can either be refunded or applied toward the performance bond (described below).

June 1998 - Winning Bidders Selected

Contracts are expected to be executed between bidders and the distribution companies and become effective upon the bidders (now considered "suppliers" in this description) establishing a "performance bond" in the amount of $50,000/MW-year to be supplied under the Standard Offer. The performance bond would be returned to the supplier upon completion of its contractual obligations.

Notwithstanding the above schedule, the timing of the standard offer bidding process will be coordinated with generation divestiture and the Retail Access Date as described in the introductory paragraph above.

**B. Important Auction Rules and Conditions**

1. Minimum Bid Elements. In order to conduct a fair and effective Auction, all bids from pre-qualified bidders in each round must include a "Percentage Discount Off the Standard Offer" (the "Discount") and the "Peak Energy Delivery Rate" as described and applied below. These two elements will be the only criteria by which winning bidders are chosen in each auction. All bids from pre-qualified bidders will otherwise be considered to be equivalent.

2. The Auction Procedures. Blackstone and Newport shall implement the following auction procedures for determining the suppliers of Standard Offer Service:

   a. Seven Year Flat Discount Auction. This is a single, constant discount to be in effect for all seven years of the Standard Offer, expressed as a percentage greater than 0%, with larger discounts viewed more favorably. Winning bidders are to be paid based upon the next highest Discount bid whether determined by the Seven Year Flat Discount Auction or by the lowest discount bid in the next best Alternative Individual Auction Increment, discussed below (a second-price, or Vickery auction)[1]. The bids in this auction shall be sealed until the Alternative Individual Year Auction set forth below is completed.

   b. Alternative Individual Year Auction ("Alternative Auction"). This Alternative Auction shall take place immediately following the Seven Year Flat Discount Auction. Bidders will be required to bid separately for each year, and unlike the Seven Year Flat Discount Auction, a bid for any single year may not be conditioned on success in any other year. Thus, the Alternative Auction shall allow bidders to specify different discounts in

1 For example, if the best four winning bids (out of ten submitted) met the distribution company's expected demand at Discounts of 12.5%, 10%, 9%, and 7%, respectively, the first winning bidder would be paid based on a 10% Discount, the second based on a 9% Discount, the third 7%, and the fourth would be paid based on the Discount bid by the first losing bidder (e.g., 6.5%).

different years. Bid amounts must be in annual increments of 25 megawatts, which will be delivered as specified below. Prices in the Alternative Auction shall be open to other bidders, but the identity of the bidders associated with the prices will not be identified. The Alternative Auction will continue for multiple rounds until the next bid fails to improve the discount offered in the prior bid by one percent.

Following the completion of the bidding, Blackstone and Newport shall rank the bids for each individual year, with larger discounts viewed more favorably, and shall identify the best bids in each year that would fill a 25 megawatt increment covering all seven years of the purchase period. Blackstone and Newport will then repeat the process for as many increments as possible until the bids no longer cover all seven years in the period.

c.  Selection of Suppliers from Both Auctions. The increments from the Alternative Individual Year Auction will then be compared to the Seven Year Flat Discount Auction by assigning the Alternative Individual Auction Increment the lowest discount bid in any single year of the increment. In the event of ties, the earliest, highest discount shall have priority. Suppliers in the Alternative Individual Year Auction shall be held to their bids, unlike the second price or Vickery auction used in the Seven Year Flat Discount Auction.

Blackstone's and Newport's affiliated power supply company shall be allowed, but not required, to bid in both auctions.

3.  Payment by Distribution Company. The distribution company is responsible for paying suppliers at the following electric delivery rates, reduced by the applicable Discount, for all energy the supplier delivers (less losses) in the respective year. These rates are flat annual values and do not include a demand or capacity component and will not be adjusted for seasonal or time of day factors.

| Distribution Company Rates | |
|---|---|
| 1998 | 3.2 ¢/KWH |
| 1999 | 3.5 |
| 2000 | 3.8 |
| 2001 | 3.8 |
| 2002 | 4.2 |
| 2003 | 4.7 |
| 2004 | 5.1 |

*For example, if a supplier bid a Discount of 5.5% and delivered 500 GWH to ultimate customers in 1999, that supplier would receive $16,537,500 from the distribution company (3.5¢/kWh x (1-.055) x 500 GWH x 1,000,000 kWh/GWH x .01 $/¢).*

A fuel index adjustment mechanism, applied to Customer Rates, may provide additional revenues to suppliers in the event that large, unexpected increases in market oil and gas prices occur. This adjustment is further described below.

4.    Peak Energy Delivery Rate ("Delivery Rate")  Bids shall specify a peak energy delivery rate, expressed in MWH per hour, that the bidder commits to supply to the distribution company in each year of the Standard Offer. This amount represents the nominal maximum amount of energy a supplier is responsible to provide to the distribution company in any given hour, as measured at the ultimate customer's meter.  For purposes of determining the amount of the bid deposit and performance bond, the total megawatts to be supplied under the standard offer will be the Delivery Rate times the number of years the capacity will be provided. Suppliers are responsible for any necessary transmission arrangements and costs that are not recovered in Blackstone's and Newport's transmission cost adjustment provisions and all electric delivery losses.

5.    Right to Bid a Joint Supply - Prequalified bidders will have the right, subject to any provision of law, to submit joint bids pursuant to which one supplier may provide less than the full amount of the bid's Delivery Rate in any or all hours as long as the other suppliers on the joint bid provide the remainder of the Delivery Rate obligation, and the total performance bond is posted and in effect for the term of the bid.

6.    Higher Discounts Ensure a Right to a Longer Term of Supply - Customers have the right to leave the Standard Offer at any time to receive service in the competitive energy market (subject to minimal notice provisions).  As such, the amount of capacity and energy required from suppliers under the Standard Offer may likely decline over time.  Supplier(s) who are in the increment with the highest assigned discount will have the right to provide capacity and energy for the longest period of time.  With declining customer load due to departures from Standard Offer service, lower discount suppliers whose Delivery Rate amount exceeds the distribution company's needs will have their Delivery Rate amounts reduced and Standard Offer supply contracts ultimately terminated.

7.    Load Responsibility and Allocation - Suppliers are responsible for a percentage of the distribution company's Standard Offer real-time customer energy demand (minute by minute, hour by hour, day by day). This includes changes in customer demand for any reason, including but not limited to, seasonal factors, normal daily load patterns, increased usage, demand side management activities, extremes in weather, etc. The only exception is for the loss of Standard Offer customers as described in the section immediately above. Responsibility is allocated to a supplier based on its Delivery Rate bid divided by the estimated annual Standard Offer peak energy demand of the distribution company.  The percentage

allocation shall be determined each year on an estimated forecast basis. Once the percentage is determined, the supplier is responsible for that percentage share of the distribution company's Standard Offer load, including variances from the forecast peak and load factor estimates.

8. Responsibility for Electric Delivery Losses - Suppliers will provide all losses, in kilowatts and kilowatthours, from the supplier's generation sources to the customer meter.

## C. Standard Offer Customer Rates and Customer Rights

At any time during the Standard Offer customers have the right to leave Standard Offer service and receive energy from another supplier in the marketplace. In addition, residential and G-1 customers have a limited right to return to standard offer service in the first year after the Retail Access Date.

Customer Rates are subject to upward adjustment in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulphur) and natural gas after 1999, as described in the following section. If invoked, prices would change as a function of the amount by which market fuel prices exceed the predetermined price "trigger" levels. These triggers have been set to allow a large dead-band in which no increases to Customer Rates would apply.

## D. Standard Offer Fuel Index

The Customer Rate in effect for a given billing month is multiplied by a "Fuel Adjustment" that is set equal to 1.0 and thus has no impact on Customer Rates unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the "Wall Street Journal", expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulphur No. 6 residual fuel oil into New York harbor, as reported in "Platt's Oilgram U.S. Marketscan" in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year.

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$.60/\text{MMBtu}) + (\text{Market Oil Price} + \$.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$.60 + \$.04/\text{MMBtu}}$$

Where:

> Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $.60 and $.04/MMBtu represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

*For example, if for a month in the year 2002 the Market Gas Price and Market Oil Price total $6.50 ($3.50/MMBtu plus $3.00/MMBtu respectively), the Fuel Trigger Point of 6.09 would be exceeded. In this case the Fuel Adjustment value would be:*

$$\frac{(\$3.50 + \$.60/\text{MMBtu}) + (\$3.00 + \$.04/\text{MMBtu})}{\$6.09 + \$.60 + \$.04/\text{MMBtu}} = 1.0609$$

*The Customer Rate paid to the distribution company is increased by this Fuel Adjustment factor for the billing month, becoming 4.4548 ¢/KWH (4.2 x 1.0609).*

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment determined.

Incremental revenues received by the distribution company as the result of a Fuel Adjustment would be fully allocated to Standard Offer suppliers in proportion to the Standard Offer energy provided by a supplier to the distribution company in the applicable billing month.

ATTACHMENT 5

MONTAUP ELECTRIC COMPANY
EMISSION REDUCTIONS FROM SOMERSET AND CANAL

EMISSION REDUCTION PROGRAM
EASTERN EDISON COMPANY's RESTRUCTURING PLAN
February 1997

I. Purpose

The purpose of the emission reduction program detailed in this restructuring plan is to provide a vehicle whereby the new competitive industry structure can support and advance efforts to further reduce the environmental impacts of electricity generation. This will be accomplished by requiring older fossil-fuel fired electric generating facilities to reduce certain air emissions to a level that is roughly equivalent to new source standards. The program will not supersede any environmental agency's legal authority to regulate these units nor require the units to meet emission standards other than the most stringent standards required by law. It is a simple and straightforward program that can be applied to other older utility sources in Massachusetts, the region, and elsewhere in the country.

II. Generic Components

1. The program is designed to require all older fossil-fueled electric generating units throughout the U.S. to meet "old source performance standards" (OSPS) for $NO_x$ and $SO_2$ on January 1 of the year following the year a unit becomes 40 years old. The 40 year time period starts from the year a unit commenced commercial operation. For those units that are 40 years or older in the year the program becomes effective, they will be required to meet OSPS by January 1 of the following year. The end point for this program is the year 2010; therefore, all units will be assumed to be 40 years old on or before December 31, 2009.

2. As of the date this program becomes effective, each existing operating unit will receive "allowances" for that unit's emissions of $NO_x$ and $SO_2$. Each allowance equals one ton of allowable emissions. Unit-specific allowances are aggregated to become a utility company-wide cap.

3. New units or repowered units subject to new source permitting regulations will not receive allowances, and thus not be included in the program. Emissions from new or repowered units will not be included in determining a company's overall cap of $NO_x$ or $SO_2$.

4. Unit-specific allowances are calculated as follows:

a. For units 40 years old or older, or by the year 2010:

$$\text{Yearly Net Electric Generation (kWh)} \times \text{Heat Rate (Btu/kWh)} \times \text{Emission Rate (lbs/mmBtu)} \times \text{Conversion Factor } \frac{1}{2 \times 10^9} = \text{Tons/Year}$$

The elements of the formula are derived as follows:

i) Yearly Net Electric Generation = average kWh of the highest eight (8) of ten (10) year period of 1986-1995, as reported on U.S. Department of Energy Form EIA-767, Schedule IV.

ii) Heat Rate = 10,000 Btu/kWh

iii) Emission Rate = 0.30 lbs/mmBtu for $SO_2$
= 0.15 lbs/mmBtu for $NO_x$

PROVIDED, however, that if a unit's required emission rate is lower than the rates listed above, the lowest, most stringent emission rate applies.

iv) Conversion Factor = factor required to convert differing measures used in formula to result in tons per year of emissions ( 1,000,000 Btu/mmBtu x 2,000 lbs/ton)

b. For units less than 40 years old:

$NO_x$ — Same formula as in 4.a. above, except that emission rate is set at the regulatory limit.

$SO_2$ — Allowances as allocated under Acid Rain Program, Title IV of federal Clean Air Act.

5. Each utility company may meet its allowance cap by any combination of control technologies, fuel switching, unit retirements, operational changes and/or retirements of purchased or surplus allowances. Selection of any one or a combination of more than one of these options to meet the company cap will be at the sole discretion of the utility company.

6. $SO_2$ allowances may be traded freely in the market as allowed under the Clean Air Act, Title IV Acid Rain Program regulations. Unused allowances may be banked and carried forward also as allowed under the Acid Rain Program regulations.

7. It is anticipated that a $NO_x$ trading program will be established similar to the federal $SO_2$ program. Unused $NO_x$ allowances also may be banked, provided, however, that allowance withdrawals from the bank may be subject to a "flow control" mechanisms specified in the Ozone Transport Commission model rule.

8. With respect to jointly-owned units, their participation in the program will be governed in the same manner as jointly-owned units are governed under the federal Acid Rain Program.

## III. Eastern Edison Company-Specific Requirements Under the Proposal

1. The Eastern Edison Company("EECo")-specific emission reductions included in this proposal apply to the following fossil-fueled power plants:

Somerset Station, Somerset, MA
Unit Nos. 5 and 6

Canal Electric Co.'s Unit #2

Montaup Electric Company ("Montaup"), a subsidiary of EECo, is the owner and operator of the Somerset Station facility, and a 50% owner of Canal Unit #2. Montaup may meet its allowance caps by any combination of control technologies, fuel switching, unit retirements, operational changes, and/or retirements of purchased or surplus allowances.

2. The program start date for Somerset Units 5 and 6, and Canal Unit 2 is January 1, 2000. OSPS will apply to Somerset Units 5 and 6 on that date. Unit 5 was placed in "deactivated reserve" in 1993, with no current plans to reactivate it[1]. Montaup's portion of Canal Unit 2 will be subject to OSPS on 1/1/2010.

3. $SO_2$ Emissions. Somerset's Units 5 and 6 will comply with an annual emission rate of 0.30 lbs $SO_2$/mmBtu, using the formulas, factors, and other provisions in Section II, above.

[1] The $NO_x$ and $SO_2$ emission totals indicated on the tables and graphs appended hereto will not include Unit 5's totals unless the unit is reactivated.

4. $NO_x$ Emissions.

a. On 1/1/2000, Somerset Units 5 and 6 will comply with an effective $NO_x$ emission rate of 0.21 lbs $NO_x$/mmBtu for the seven months outside the ozone season ( October through April), and an effective rate of 0.15 lbs $NO_x$/mmBtu during the 5 month ozone season ( May through September).

Proposed MADEP regulations will institute a $NO_x$ "cap and trade" system (the Massachusetts $NO_x$ Allowance Program) that sets a total emissions cap for Units 5 and 6 during the 5-month ozone season. This 582 ton $NO_x$ emissions cap is based on an effective emission rate of 0.21 lbs $NO_x$/mmBtu during the 5 month ozone season, and 0.38 lbs $NO_x$/mmBtu during the other seven months, effective 5/1/99.

Montaup has agreed with MADEP that, if Unit 5 is reactivated, the unit will have to comply with Best Available Control Technology ("BACT") standards. Montaup hereby agrees that, if Unit 5 is reactivated, it will comply with the more stringent of: 1) BACT as determined by MADEP upon reactivation; or 2) the same emission rates agreed to herein for Unit 6 ( 0.15 lbs $NO_x$/mmBtu for the 5 month ozone season and 0.21 lbs $NO_x$/mmBtu for the other seven months). Montaup further agrees that, if Unit 5 is reactivated, it would comply with these limitations with no cost cap.

The compliance strategy for Unit 6 is to acquire $NO_x$ credits or allowances, with the cost capped at $405,000, based on an assumption that $NO_x$ allowances will cost $500/ton. If credits and allowances are not available at this market price, EECo will use the most effective combination of credits/allowances, urea injection, or other methods to achieve $NO_x$ reductions for Unit 6 at a cost not to exceed $405,000/year. This plan achieves significant reductions below the MADEP regulations all 12 months of the year, yet focuses the reductions when they are most needed.

UNIT 6:

| | |
|---|---|
| $NO_x$ emissions at 0.38 lbs $NO_x$/mmBtu, 80 % CF, 12 months: | 1579 tons |
| $NO_x$ emissions at 0.15 lbs $NO_x$/mmBtu, 80 % CF, 5 months: | -260 tons |
| $NO_x$ emissions at 0.21 lbs $NO_x$/mmBtu, 80 % CF, 7 months: | -509 tons |
| $NO_x$ ALLOWANCES/ CREDITS REQUIRED: | 810 tons |

TOTAL ANNUAL COST = 810 tons x $500/ton
= $405,000

b. On 1/1/2003, Unit 5, if reactivated, will comply with the more stringent of: 1) BACT as determined by MADEP upon reactivation; or 0.15 lbs $NO_x$/mmBtu. Unit 6 will comply with an annual emission limit of 0.15 lbs $NO_x$/mmBtu.

c. On 1/1/2010, Canal Electric's Unit 2 will comply with an $SO_2$ emission rate of 0.30 lbs/mmBtu, and a $NO_x$ emission rate of 0.15 lbs/mmBtu, on an annual basis, using the formulas, factors, and other provisions in Section II of this plan. Canal Unit 2 may meet its allowance caps using any combination of control technologies, fuel switching, operational changes, and/or the use of purchased or surplus allowances. This commitment can only be made for Montaup Electric's 50 % ownership share of Canal Unit 2.



Eastern Edison Emission Reduction Program
Somerset Station Annual NOx Tonnage
NOx Tonnage
4,500
4,000
3,500
3,000
2,500
2,000
1,500
1,000
500
0
1994
1996
1998
2000
2002
2004
2006
2008
2010
Year Beginning
Unit 5
Unit 6
Total
2/13/97

# Eastern Edison Emission Reduction Program
## Somerset Station Unit 6

**Somerset Station kWh Production**

| Year | Unit 6 |
|---|---|
| 1995 | 665,991,846 |
| 1994 | 648,004,641 |
| 1993 | |
| 1992 | 694,810,132 |
| 1991 | 642,263,989 |
| 1990 | |
| 1989 | 774,449,000 |
| 1988 | 767,134,000 |
| 1987 | 790,635,600 |
| 1986 | 584,046,700 |
| *Average* | 699,665,788 |

**Somerset Station Unit 6 Emissions Calculations**

**SO2**

| Year | Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) |
|---|---|---|
| 1994 | 1.2 | 4,966 |
| 1995 | 1.2 | 4,966 |
| 1996 | 1.2 | 4,966 |
| 1997 | 1.2 | 4,966 |
| 1998 | 1.2 | 4,966 |
| 1999 | 1.2 | 4,966 |
| 2000 | 0.3 | 1,049 |
| 2001 | 0.3 | 1,049 |
| 2002 | 0.3 | 1,049 |
| 2003 | 0.3 | 1,049 |
| 2004 | 0.3 | 1,049 |
| 2005 | 0.3 | 1,049 |
| 2006 | 0.3 | 1,049 |
| 2007 | 0.3 | 1,049 |
| 2008 | 0.3 | 1,049 |
| 2009 | 0.3 | 1,049 |
| 2010 | 0.3 | 1,049 |

**NOx**

| Year | Non-Ozone Season Effective Emission Rate (lb/mmBtu) | Ozone Season Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) |
|---|---|---|---|
| 1994 | 0.60 | 0.60 | 2,493 |
| 1995 | 0.49 | 0.49 | 2,036 |
| 1996 | 0.38 | 0.38 | 1,579 |
| 1997 | 0.38 | 0.38 | 1,579 |
| 1998 | 0.38 | 0.38 | 1,579 |
| 1999 | 0.38 | 0.21 | 1,285 |
| 2000 | 0.21 | 0.15 | 647 |
| 2001 | 0.21 | 0.15 | 647 |
| 2002 | 0.21 | 0.15 | 647 |
| 2003 | 0.15 | 0.15 | 525 |
| 2004 | 0.15 | 0.15 | 525 |
| 2005 | 0.15 | 0.15 | 525 |
| 2006 | 0.15 | 0.15 | 525 |
| 2007 | 0.15 | 0.15 | 525 |
| 2008 | 0.15 | 0.15 | 525 |
| 2009 | 0.15 | 0.15 | 525 |
| 2010 | 0.15 | 0.15 | 525 |

2/13/97



Eastern Edison Emission Reduction Program
Somerset Station Annual SO2 Tonnage
9,000
8,000
7,000
6,000
5,000
4,000
3,000
2,000
1,000
0
SO2 Tonnage
1994
1996
1998
2000
2002
2004
2006
2008
2010
Year Beginning
Unit 5
Unit 6
Total
2/13/97

# Eastern Edison Emission Reduction Program
## Somerset Station Unit 5

**Somerset Station kWh Production**

| Year | Unit 5 |
|---|---|
| 1995 | |
| 1994 | |
| 1993 | 133,337,052 |
| 1992 | 230,950,101 |
| 1991 | 4,053,743 |
| 1990 | 368,513,699 |
| 1989 | 501,471,000 |
| 1988 | 384,634,800 |
| 1987 | 496,427,900 |
| 1986 | 287,419,900 |
| *Average* | *300,851,049* |

**Somerset Station Unit 5 Emissions Calculations**

SO2

| Year | Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) |
|---|---|---|
| 1994 | 1.2 | 3293 |
| 1995 | 1.2 | 3293 |
| 1996 | 1.2 | 3293 |
| 1997 | 1.2 | 3293 |
| 1998 | 1.2 | 3293 |
| 1999 | 1.2 | 3293 |
| 2000 | 0.3 | 451 |
| 2001 | 0.3 | 451 |
| 2002 | 0.3 | 451 |
| 2003 | 0.3 | 451 |
| 2004 | 0.3 | 451 |
| 2005 | 0.3 | 451 |
| 2006 | 0.3 | 451 |
| 2007 | 0.3 | 451 |
| 2008 | 0.3 | 451 |
| 2009 | 0.3 | 451 |
| 2010 | 0.3 | 451 |

NOx

| Year | Non-Ozone Season Effective Emission Rate (lb/mmBtu) | Ozone Season Effective Emission Rate (lb/mmBtu) | Total Emissions (tons) |
|---|---|---|---|
| 1994 | 0.60 | 0.60 | 1,647 |
| 1995 | 0.49 | 0.49 | 1,345 |
| 1996 | 0.38 | 0.38 | 1,043 |
| 1997 | 0.38 | 0.38 | 1,043 |
| 1998 | 0.38 | 0.38 | 1,043 |
| 1999 | 0.38 | 0.21 | 848 |
| 2000 | 0.21 | 0.15 | 278 |
| 2001 | 0.21 | 0.15 | 278 |
| 2002 | 0.21 | 0.15 | 278 |
| 2003 | 0.15 | 0.15 | 226 |
| 2004 | 0.15 | 0.15 | 226 |
| 2005 | 0.15 | 0.15 | 226 |
| 2006 | 0.15 | 0.15 | 226 |
| 2007 | 0.15 | 0.15 | 226 |
| 2008 | 0.15 | 0.15 | 226 |
| 2009 | 0.15 | 0.15 | 226 |
| 2010 | 0.15 | 0.15 | 226 |

2/13/97

# EXHIBIT M

**PART 1 OF 3**



Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

July 17, 1998

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

RE: Blackstone Valley Electric Company
Newport Electric Corporation
Docket No. 2716, Order No. 15640
Compliance Filing

Dear Ms. Massaro:

Enclosed herewith for filing are Standard Offer Service tariffs for Blackstone Valley Electric Company ("Blackstone"), R.I.P.U.C. No. 1173, and for Newport Electric Corporation ("Newport"), R.I.P.U.C. No. 1398. These tariffs are filed in compliance with Order No.15640, dated July 10, 1998, in the above referenced docket. The foregoing Standard Offer Service tariffs were approved by the Commission at its May 29, 1998 Open Meeting effective June 1, 1998 for consumption on and after that date.

In compliance with the directives of the above Order, the following changes have been made to the Standard Offer Service tariffs of Blackstone and Newport:

1. The Standard Offer Calendar Year Multiplier Table and all references thereto have been deleted from the tariff.

2. The Standard Offer Cost Adjustment provision has been modified to incorporate the language specified on pages 14 and 15 of the Order.

The Standard Offer tariffs are in Section I of this filing. In addition, Section II includes red-lined copies of the Standard Offer Service tariffs, which compare the compliance tariffs to the Standard Offer Service tariffs submitted as Exhibit BVE/NEC-B during the proceeding.

Further, copies of Blackstone's and Newport's Last Resort Service tariffs and Retail Delivery Service tariffs are included in Section III. These tariffs were approved as filed. The docket references and filing date footers on the tariffs have been updated to reflect the Commission's decision in this docket.

letter2716.doc

750 West Center Street P.O. Box 543 West Bridgewater, MA 02379 508-559-2000 FAX: 508-559-8932

If you have any questions on this matter, please call me at (508) 559-2000 ext. 3700.

Very truly yours,

Dennis St. Pierre
Vice President - Rates

Attachment

cc: Service List

letter2716 doc

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
R.I.P.U.C. Docket No. 2716

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Paul Roberti, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

Sam DeFrawi
Navy Rate Intervention
901 M Street S.E., Building 212
Washington, DC 20374-5018

Frank P. Pozniak, Esq.
Robert D. Shapiro, Esq.
Rubin & Rudman LLP
50 Rowes Wharf
Boston, MA 02110
For: Enron Capital & Trade Resources

Mary Elizabeth Tighe, V.P.
Eastern Power Distribution, Inc.
2800 Eisenhower Ave.
Alexandria, VA 22314

Douglas F. John, Esq.
John & Hengerer
1200 17th St., NW, Suite 600
Washington, DC 20036-3006
For: NorAm Energy Mgmt., Inc. &
Duke Energy Trading and Marketing LLC

Lindsay Johnson, Esq.
1 Boston Place, Suite 1210
Boston, MA 02108

Kris Errickson
Duke Energy Trading & Marketing
One Westchase Center
10777 Westsheimer, Suite 650
Houston, TX 77042

Q:\RI\2716COMM\2716NEW.WPD

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
R.I.P.U.C. Docket No. 2716

Sydney M. Lima, Esq.
RI League of Cities and Towns
One State St., Suite 502
Providence, RI 02908

Hugo Ricci, Esq.
Ricci & Ricci
578 Charles Street
Providence, RI 02904

Richard W. Benka, Esq.
Foley, Hoag & Eliot LLP
One Post Office Square
Boston, MA 02109-2170
For: NEV East, LLC

Andrew Galli, Executive Director
Coalition for Consumer Justice
1468 Broad Street
Providence, RI 02905

Keith Sappenfield, II.
Director of Marketing
NorAm Energy Management, Inc.
P.O. Box 2628
Houston, TX 77252-2628

Dennis Duffy, Esq.
Kevin J. McNeely, Esq.
Partridge, Snow & Hahn
180 South Main Street
Providence, RI 02903

Ronald T. Gerwatowski, Esq.
Narragansett Electric Company
280 Melrose Street, P.O. Box 1438
Providence, RI 02901-1438

Q:\RI\2716COMM\2716NEW.WPD

# SECTION I.

# COMPLIANCE TARIFFS

NARR 07334

R.I.P.U.C. NO. 1173
CANCELS NO. 1172

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential Space Heating Retail Delivery Service Rate R-3

| | | |
|---|---|---|
| Energy Charge: | $0.03158 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| | | |
|---|---|---|
| Energy Charge | | |
| Peak Hours: | $0.15384 | per kWh |
| Off-Peak Hours: | $0.00570 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03589 | per kWh |

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $5.81 | per kW |
| Energy Charge: | $0.01403 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.11 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.02978 | per kWh |
| Off-Peak Hours: | $0.00877 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $5.29 | per kW |
| Energy Charge: | $0.01610 | per kWh |

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $5.48 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03241 | per kWh |
| Off-Peak Hours: | $0.01054 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1173

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07338

R.I.P.U.C. NO. 1173

-5-

customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

| Energy Charge: | $0.03308 | per kWh |
|---|---|---|

General Heating Retail Delivery Service Rate H-2

| Energy Charge: | $0.03339 | per kWh |
|---|---|---|

Controlled Water Heating Retail Delivery Service Rate W-1

| Energy Charge: | $0.03509 | per kWh |
|---|---|---|

Lighting Retail Delivery Service Rate S-1

| Energy Charge: | $0.03408 | per kWh |
|---|---|---|

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours

Monday through Friday excluding holidays defined below

April through September, 11:00 a.m. to 4:00 p.m.

October through March, 8:00 a.m. to 12:00 noon, and 4:00 p.m. to 7:00 p.m.

Off-Peak Hours

All other hours.

Holidays are defined as:

New Year's Day
President's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07339

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

R.I.P.U.C. NO. 1173

-7-

| | | |
|---|---|---|
| 2003 | $7.01 | per MMBTU |
| 2004 | $7.74 | per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07341

R.I.P.U.C. NO. 1173

-8-

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07342

R.I.P.U.C. NO. 1398
CANCELS NO. 1397

NEWPORT ELECTRIC CORPORATION
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03341 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03341 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| | | |
|---|---|---|
| Energy Charge | | |
| Peak Hours: | $0.15396 | per kWh |
| Off-Peak Hours: | $0.00667 | per kWh |

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03357 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $6.10 | per kW |
| Energy Charge: | $0.01534 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.59 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06416 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $6.92 | per kW |
| Energy Charge: | $0.01436 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $7.24 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06222 | per kWh |
| Off-Peak Hours: | $0.00228 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1398

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $8.04 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $7.27 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Transmission Voltage General Retail Delivery Service Rate C-1

| | | |
|---|---|---|
| Demand Charge: | $5.99 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.01882 | per kWh |
| Off-Peak Hours: | $0.01555 | per kWh |

I.   Billing Period

The Billing Period consists of the days between consecutive meter readings.  Service under this Rate is rendered on a full calendar day basis.  The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

II.   Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered.  Backup Service is rendered when any part of a forced outage occurs during Peak Hours and electric service is actually taken.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07345

R.I.P.U.C. NO. 1398

-4-

III. Maintenance Billing Period

The Maintenance Billing Period consists of the Peak Days within a Billing Period during which Maintenance Service is rendered. Maintenance Service is rendered when any part of a planned outage occurs during Peak Hours and electric service is actually taken.

IV. Standard Offer Billing Demand

A. Requirements Service

The Standard Offer Billing Demand in kilowatts for each month is the maximum metered fifteen-minute demand during Peak Hours within the Billing Period.

B. Partial Requirements Service

The Supplementary Demand in kilowatts is the maximum metered fifteen-minute demand recorded during Peak Hours within the Billing Period excluding Backup and Maintenance Billing Periods.

The Backup Demand in kilowatts is the maximum metered fifteen-minute demand recorded during Peak Hours within the Backup Billing Period in excess of the Supplementary Demand.

The Standard Offer Demand in kilowatts for each month shall be the sum of:

1. The Supplementary Demand, and

2. The Backup Demand times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.

V. Billing Demand Charge

The Billing Demand Charge shall be the Standard Offer Billing Demand times the Demand Rate.

The terms Requirement Service, Partial Requirements Service, Supplementary Service, and Backup Service shall be as defined in Transmission Voltage General Retail Delivery Service Rate C-1.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $4.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07346

R.I.P.U.C. NO. 1398

-5-

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $4.40 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07347

during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

Energy Charge: $0.03209 per kWh

General Heating Retail Delivery Service Rate H-2

Energy Charge: $0.03241 per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

Energy Charge: $0.03433 per kWh

Lighting Retail Delivery Service Rate S-1

Energy Charge: $0.03341 per kWh

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

Monday through Friday excluding holidays defined below

| | |
|---|---|
| May through September, | 10:00 a.m. to 4:00 p.m. |
| October through April, | 9:00 a.m. to 12:00 noon, and 5:00 p.m. to 8:00 p.m. |

Off-Peak Hours

All other hours.

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1398

-8-

suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07350

Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

# SECTION II.

# RED-LINED TARIFFS

NARR 07352

R.I.P.U.C. NO. 115473
CANCELS NO. 113572

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| Energy Charge: | $0.03051 | per kWh |
|---|---|---|

Residential SSI Retail Delivery Service Rate R-2

| Energy Charge: | $0.03051 | per kWh |
|---|---|---|

Residential Space Heating Retail Delivery Service Rate R-3

| Energy Charge: | $0.03158 | per kWh |
|---|---|---|

Large Residential Retail Delivery Service Rate R-4

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.15384 | per kWh |
| Off-Peak Hours: | $0.00570 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03589 | per kWh |

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $5.81 | per kW |
| Energy Charge: | $0.01403 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.11 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.02978 | per kWh |
| Off-Peak Hours: | $0.00877 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $5.29 | per kW |
| Energy Charge: | $0.01610 | per kWh |

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $5.48 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03241 | per kWh |
| Off-Peak Hours: | $0.01054 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

R.I.P.U.C. NO. 115473

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07355

R.I.P.U.C. NO. 11~~54~~73

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07356

R.I.P.U.C. NO. 115473

-5-

customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

| | | |
|---|---|---|
| Energy Charge: | $0.03308 | per kWh |

General Heating Retail Delivery Service Rate H-2

| | | |
|---|---|---|
| Energy Charge: | $0.03339 | per kWh |

Controlled Water Heating Retail Delivery Service Rate W-1

| | | |
|---|---|---|
| Energy Charge: | $0.03509 | per kWh |

Lighting Retail Delivery Service Rate S-1

| | | |
|---|---|---|
| Energy Charge: | $0.03408 | per kWh |

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours

Monday through Friday excluding holidays defined below

| | |
|---|---|
| April through September, | 11:00 a.m. to 4:00 p.m. |
| October through March, | 8:00 a.m. to 12:00 noon, and 4:00 p.m. to 7:00 p.m. |

Off-Peak Hours

All other hours.

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07357

R.I.P.U.C. NO. 11~~54~~73

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

~~The foregoing Rates shall be adjusted effective January 1 of each calendar year beginning in the year 1998 and ending in the year 2009 by multiplying the Rates by the appropriate Cumulative Multiplier shown in the Standard Offer Calendar Year Multiplier Table below.~~ The foregoing Rates shall ~~also~~ be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer ~~Revenue Reconciliation~~ Cost Adjustment described below:

~~STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:~~

| ~~Year~~ | ~~Cumulative Multiplier~~ |
|---|---|
| ~~1998~~ | ~~1.00000~~ |
| ~~1999~~ | ~~1.09375~~ |
| ~~2000~~ | ~~1.18750~~ |
| ~~2001~~ | ~~1.18750~~ |
| ~~2002~~ | ~~1.31250~~ |
| ~~2003~~ | ~~1.46875~~ |
| ~~2004~~ | ~~1.59375~~ |
| ~~2005~~ | ~~1.71875~~ |
| ~~2006~~ | ~~1.84375~~ |
| ~~2007~~ | ~~1.96875~~ |
| ~~2008~~ | ~~2.09375~~ |
| ~~2009~~ | ~~2.21875~~ |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07358

R.I.P.U.C. NO. 11~~54~~73

-7-

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference~~s~~ between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07359

R.I.P.U.C. NO. 11~~54~~73

-8-

those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

~~The Company shall refund any overcollection or recover any undercollection of monies attributable to the foregoing differences through a Standard Offer Cost Adjustment ("SOCA") factor applied on a uniform cents per kilowatthour basis to the bills of all Customers taking Retail Delivery Service from the Company. The Company shall file annually on or before March 1 of each year its calculation of the SOCA factor with the Commission. The Commission shall review and approve the SOCA factor to be effective for bills rendered to Customers commencing April 1 of the current year and ending March 31 of the following year or such other period that the Commission may determine.~~

~~The SOCA factor for each year or such other period that the Commission may determine shall be established by calculating the difference between the Standard Offer Service costs incurred and the Standard Offer Service revenues billed to Customers during the previous calendar year and dividing the difference by the total kilowatthour sales for Retail Delivery Service for the year or such other period that the Commission may determine.~~ By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs ~~and~~ or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer ~~Calendar Year Multiplier and the Standard Offer~~ Fuel Index~~,~~ and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07360

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

**PART 2 OF 3**

R.I.P.U.C. NO. 13~~79~~98
CANCELS NO. 13~~60~~97

NEWPORT ELECTRIC CORPORATION
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03341 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03341 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| | | |
|---|---|---|
| Energy Charge | | |
| Peak Hours: | $0.15396 | per kWh |
| Off-Peak Hours: | $0.00667 | per kWh |

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03357 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 137998

-2-

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $6.10 | per kW |
| Energy Charge: | $0.01534 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.59 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06416 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $6.92 | per kW |
| Energy Charge: | $0.01436 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $7.24 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06222 | per kWh |
| Off-Peak Hours: | $0.00228 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07363

R.I.P.U.C. NO. 137998

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $8.04 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $7.27 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Transmission Voltage General Retail Delivery Service Rate C-1

| | | |
|---|---|---|
| Demand Charge: | $5.99 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.01882 | per kWh |
| Off-Peak Hours: | $0.01555 | per kWh |

I. Billing Period

The Billing Period consists of the days between consecutive meter readings. Service under this Rate is rendered on a full calendar day basis. The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

II. Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered. Backup Service is rendered when any part of a forced outage occurs during Peak Hours and electric service is actually taken.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07364

R.I.P.U.C. NO. 1379~~98~~

-4-

III. Maintenance Billing Period

The Maintenance Billing Period consists of the Peak Days within a Billing Period during which Maintenance Service is rendered. Maintenance Service is rendered when any part of a planned outage occurs during Peak Hours and electric service is actually taken.

IV. Standard Offer Billing Demand

A. Requirements Service

The Standard Offer Billing Demand in kilowatts for each month is the maximum metered fifteen-minute demand during Peak Hours within the Billing Period.

B. Partial Requirements Service

The Supplementary Demand in kilowatts is the maximum metered fifteen-minute demand recorded during Peak Hours within the Billing Period excluding Backup and Maintenance Billing Periods.

The Backup Demand in kilowatts is the maximum metered fifteen-minute demand recorded during Peak Hours within the Backup Billing Period in excess of the Supplementary Demand.

The Standard Offer Demand in kilowatts for each month shall be the sum of:

1. The Supplementary Demand, and

2. The Backup Demand times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.

V. Billing Demand Charge

The Billing Demand Charge shall be the Standard Offer Billing Demand times the Demand Rate.

The terms Requirement Service, Partial Requirements Service, Supplementary Service, and Backup Service shall be as defined in Transmission Voltage General Retail Delivery Service Rate C-1.

Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $4.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07365

R.I.P.U.C. NO. 137998

-5-

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $4.40 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07366

R.I.P.U.C. NO. 137998

-6-

during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

| Energy Charge: | $0.03209 | per kWh |
|---|---|---|

General Heating Retail Delivery Service Rate H-2

| Energy Charge: | $0.03241 | per kWh |
|---|---|---|

Controlled Water Heating Retail Delivery Service Rate W-1

| Energy Charge: | $0.03433 | per kWh |
|---|---|---|

Lighting Retail Delivery Service Rate S-1

| Energy Charge: | $0.03341 | per kWh |
|---|---|---|

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07367

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours

Monday through Friday excluding holidays defined below

| | |
|---|---|
| May through September, | 10:00 a.m. to 4:00 p.m. |
| October through April, | 9:00 a.m. to 12:00 noon, and<br>5:00 p.m. to 8:00 p.m. |

Off-Peak Hours

All other hours.

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

The foregoing Rates shall be adjusted ~~effective January 1 of each calendar year beginning in the year 1998 and ending in the year 2009 by multiplying the Rates by the appropriate Cumulative Multiplier shown in the Standard Offer Calendar Year Multiplier Table below. The foregoing Rates shall also be adjusted~~ from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer ~~Revenue Reconciliation~~ Cost Adjustment described below:

~~STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:~~

| ~~Year~~ | ~~Cumulative Multiplier~~ |
|---|---|
| ~~1998~~ | ~~1.00000~~ |
| ~~1999~~ | ~~1.09375~~ |
| ~~2000~~ | ~~1.18750~~ |
| ~~2001~~ | ~~1.18750~~ |
| ~~2002~~ | ~~1.31250~~ |
| ~~2003~~ | ~~1.46875~~ |
| ~~2004~~ | ~~1.59375~~ |
| ~~2005~~ | ~~1.71875~~ |
| ~~2006~~ | ~~1.84375~~ |
| ~~2007~~ | ~~1.96875~~ |
| ~~2008~~ | ~~2.09375~~ |
| ~~2009~~ | ~~2.21875~~ |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

| | |
|---|---|
| Date Filed, July 17, 1998<br>per Order No. 15640 dated<br>July 10, 1998 in Docket No. 2716. | Date Effective, June 1, 1998<br>for consumption on and after<br>June 1, 1998. |

R.I.P.U.C. NO. 13~~79~~98

-8-

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07369

R.I.P.U.C. NO. 13~~79~~98

-9-

where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference~~s~~ between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

~~The Company shall refund any overcollection or recover any undercollection of monies attributable to the foregoing differences through a Standard Offer Cost Adjustment ("SOCA") factor applied on a uniform cents per kilowatthour basis to the bills of all Customers taking Retail Delivery Service from the Company. The Company shall file annually on or before March 1 of each year its calculation of the SOCA factor with the Commission. The Commission shall review and approve the SOCA factor to be effective for bills rendered to Customers. commencing April 1 of the current year and ending March 31 of the following year or such other period that the Commission may determine.~~

~~The SOCA factor for each year or such other period that the Commission may determine shall be established by calculating the difference between the Standard Offer Service costs incurred and the Standard Offer Service revenues billed to Customers during the previous calendar year and dividing the difference by the total kilowatthour sales for Retail Delivery Service for the year or such other period that the Commission may determine.~~By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07370

R.I.P.U.C. NO. 137998

-10-

approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs ~~and~~ or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer ~~Calendar Year Multiplier and the Standard Offer~~ Fuel Index~~,~~ and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07371

# SECTION III.

# RETAIL DELIVERY SERVICE TARIFFS

NARR 07372

BLACKSTONE VALLEY ELECTRIC COMPANY
RATE SCHEDULE INDEX

| RATE DESCRIPTION | COMPANY IDENTIFIER | R.I.P.U.C. NUMBER |
|---|---|---|
| Late Payment Charge | --- | 425 |
| Economic Development Rate Rider * | ED | 937 |
| Vacant Space Rider * | VSR | 940 |
| Economic Development Rate Rider * | EDR | 941 |
| Economic Development New Construction * | NCR | 977 |
| Retail Delivery Fuel Adjustment Clause | --- | 1081 |
| Retail Delivery Purchased Power Adjustment Clause | --- | 1082 |
| Terms and Conditions for Electric Service | --- | 1137 |
| Terms and Conditions for Electric Power Suppliers | --- | 1138 |
| Last Resort Service | --- | 1155 |
| Residential Retail Delivery Service | R-1 | 1156 |
| Residential SSI Retail Delivery Service | R-2 | 1157 |
| Residential Space Heating Retail Delivery Service | R-3 | 1158 |
| Large Residential Retail Delivery Service | R-4 | 1159 |
| Small Secondary Voltage General Retail Delivery Service | G-1 | 1160 |
| Medium Secondary Voltage General Retail Delivery Service | G-2 | 1161 |
| Medium Primary Voltage General Retail Delivery Service | G-5 | 1162 |
| Large Secondary Voltage General Retail Delivery Service | T-4 | 1163 |
| Large Primary Voltage General Retail Delivery Service | T-6 | 1164 |
| Large Secondary Voltage Auxiliary General Retail Delivery Service | A-4 | 1165 |
| Large Primary Voltage Auxiliary General Retail Delivery Service | A-6 | 1166 |
| General Space Heating Retail Delivery Service | H-1 | 1167 |
| General Heating Retail Delivery Service | H-2 | 1168 |
| Controlled Water Heating Retail Delivery Service | W-1 | 1169 |
| Lighting Retail Delivery Service | S-1 | 1170 |
| Temporary Interruptible Load Rate Rider | --- | 1171 |
| Standard Offer Service | --- | 1173 |

* Availability Frozen

July 17, 1998

R.I.P.U.C. NO. 1155
CANCELS NO. 1136

BLACKSTONE VALLEY ELECTRIC COMPANY
LAST RESORT SERVICE

AVAILABILITY:

This Rate Schedule for Last Resort Service is available to all Customers who are ineligible to receive service under the Company's Standard Offer Service Rate Schedule. A Customer receiving electric service from a Nonregulated Power Producer will be automatically transferred to Last Resort Service under this Rate Schedule in the event the Customer's Nonregulated Power Producer fails to deliver sufficient electric capacity and energy to meet the Customer's electric power requirements.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATES AND PROVISIONS:

The rates and provisions for Last Resort Service shall be the Rates for each Rate Class shown in the Company's Standard Offer Service Rate Schedule, the same, as amended, or as superseded, together with all other provisions pertaining thereto including, but not limited to, the Rate, Time-of-Use Period, Power Factor Adjustment, and Billing provisions contained in the Company's foregoing Standard Offer Service Rate Schedule.

TERM OF CONTRACT:

The Term of Contract for Last Resort Service shall be one (1) month and shall continue thereafter until terminated by the Customer by notice given to the Company at least five (5) days prior to the date of termination. The above Term of Contract shall not apply in the event of an involuntary transfer of the Customer to Last Resort Service in accordance with the Availability provision hereof. The Term of Contract under the conditions of an involuntary transfer shall be not less than five (5) days nor more than one (1) month. Customers who fail to procure electric service from another Nonregulated Power Producer or who fail to elect the Company's Standard Offer Service, if eligible therefor, within the foregoing time period shall be deemed to have elected to voluntarily receive Last Resort Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1155

-2-

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07375

R.I.P.U.C. NO. 1156
CANCELS NO. 1139

BLACKSTONE VALLEY ELECTRIC COMPANY

RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-1

AVAILABILITY:

This Rate Schedule is available only to residential Customers whose actual or estimated annual energy consumption is less than 30,000 kWh.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for predominantly domestic purposes in an individual residence, apartment, residential condominium, or residential condominium common area.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $3.09 | per month |
| Energy Charge: | $0.03857 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1157
CANCELS NO. 1140

BLACKSTONE VALLEY ELECTRIC COMPANY

RESIDENTIAL SSI RETAIL DELIVERY SERVICE RATE R-2

AVAILABILITY:

This Rate Schedule is available only to residential customers that meet both of the following criteria:

1. the Customer is the head of household or principal wage earner, and
2. the Customer is presently receiving Supplemental Security Income from the United States Social Security Administration, or aid from one of the following Rhode Island agencies:
   (a) Medicaid
   (b) Food Stamps
   (c) General Public Assistance
   (d) Aid to Families with Dependent Children

The customer is required to annually certify his/her continued eligibility for this Rate Schedule on forms supplied by the Company.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for predominantly domestic purposes in an individual residence, apartment, or residential condominium.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $2.01 | per month |
| Energy Charge: | | |
| First 300 kWh | $0.00170 | per kWh |
| Over 300 kWh | $0.03470 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1158
CANCELS NO. 1141

BLACKSTONE VALLEY ELECTRIC COMPANY

RESIDENTIAL SPACE HEATING RETAIL DELIVERY SERVICE RATE R-3

AVAILABILITY:

This rate is closed to new Customers. This Rate Schedule is available only to residential Customers whose actual or estimated annual energy consumption is less than 30,000 kWh that were taking service from the Company under former Space Heating Rate No. 11 before June 1, 1984, and who meet the following criteria:

1. The Customer has permanently installed electric space heating equipment and electricity is the Customer's sole source of energy used for comfort heating and water heating, and

2. All electric space heating equipment and the installation thereof shall conform with the Company's requirements and shall be designed for such voltage as shall be designated by the Company for the service required.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for predominantly domestic purposes in an individual residence, apartment, residential condominium, or residential condominium common area.

Electricity shall be the sole source of energy used for comfort heating and water heating.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| Distribution Charges: | | |
|---|---|---|
| Customer Charge: | $2.91 | per month |
| Energy Charge: | $0.03200 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1159
CANCELS NO. 1142

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-4

AVAILABILITY:

This Rate Schedule applies to residential customers whose actual or estimated annual energy consumption is at least 6,000 kWh but less than 30,000 kWh, and this Rate Schedule is mandatory for all residential customers whose actual or estimated annual energy consumption is 30,000 kWh or more, except for residential customers eligible for service under Residential SSI Rate R-2.

APPLICABILITY:

Electricity delivered under this Rate shall be used for domestic purposes in an individual residence, apartment, residential condominium, or residential condominium common area.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $4.69 | per month |
| Energy Charge: | $0.02935 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1159

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07383

R.I.P.U.C. NO. 1160
CANCELS NO. 1143

BLACKSTONE VALLEY ELECTRIC COMPANY

SMALL SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-1

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated annual maximum monthly demand is less than 10 kW and whose actual or estimated annual energy consumption is less than 36,000 kWh.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $3.37 | per month |
| Energy Charge: | $0.04348 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1160

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07385

R.I.P.U.C. NO. 1161
CANCELS NO. 1144

BLACKSTONE VALLEY ELECTRIC COMPANY

MEDIUM SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-2

AVAILABILITY:

This Rate Schedule is available to Customers whose actual or estimated annual maximum monthly demand is at least 10 kW but less than 500 kW or whose actual or estimated annual energy consumption is 36,000 kWh or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.02819 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1161

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07387

R.I.P.U.C. NO. 1162
CANCELS NO. 1145

BLACKSTONE VALLEY ELECTRIC COMPANY

MEDIUM PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-5

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated annual maximum monthly demand is at least 10 kW but less than 500 kW or whose actual or estimated annual energy consumption is 36,000 kWh or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.02112 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1162

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07389

R.I.P.U.C. NO. 1163
CANCELS NO. 1146

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-4

AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or estimated annual maximum monthly demand is 500 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.01987 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1163

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07391

R.I.P.U.C. NO. 1164
CANCELS NO. 1147

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-6

AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or estimated annual maximum monthly demand is 500 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.01425 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and the Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1164

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07393

R.I.P.U.C. NO. 1165
CANCELS NO. 1148

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE SECONDARY VOLTAGE AUXILIARY
GENERAL RETAIL DELIVERY SERVICE RATE A-4

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric Power Service ("Contract"), this Rate Schedule applies to all customers served at secondary distribution voltages where the customer furnishes its own electric power supply ("Facility") for all or part of its total electric service requirements provided that:

1. the customer's total electric service requirements are greater than 500 kW, and
2. the Net Capability of the Facility is at least 100 kW but less than 1,000 kW and the Facility is designed to provide at least 20% of the customer's total electric service requirements, or the Net Capability of the Facility is 1,000 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $14.17 | per month |
| Reservation Charge: | $2.18 | per kW |
| Energy Charge: | $0.01987 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Peak Hours
Monday through Friday excluding holidays defined below
April through September, 11:00 a.m. to 4:00 p.m.
October through March, 8:00 a.m. to 12:00 noon, and 4:00 p.m. to 7:00 p.m.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1165

Off-Peak Hours
All other hours.

Holidays are defined as:

New Year's Day
President's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day

DETERMINATION OF BILLING PERIODS:

a. Billing Period

The Billing Period consists of the days between consecutive meter readings. Service under this Rate is rendered on a full calendar day basis. The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

b. Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered. Backup Service is rendered when any part of a forced outage occurs during Peak Hours and backup power is actually delivered.

DETERMINATION OF BILLING DEMANDS:

a. Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum metered 15 minute average load recorded during Peak Hours within a Billing Period excluding the Backup Billing Period and the maximum metered 15 minute average load recorded during Peak Hours in excess of the Net Capability of the Facility during the Backup Billing Period.

b. Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand in excess of the Supplementary Demand.

DETERMINATION OF BILLING DEMAND CHARGES:

a. Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07395

- 3 - R.I.P.U.C. NO. 1165

b. Backup Reservation Charge

The Backup Reservation Demand Charge shall be the Backup Reservation Demand times the Distribution Reservation Charge.

BACKUP POWER:

The Contract will specify the customer's maximum Backup Power requirements. Said Backup Power requirements must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Backup Power requirements of the customer. The customer's maximum Backup Power requirements shall be the Contract Demand. The Contract Demand shall not exceed the Net Capability of the Facility.

The Contract Demand will be in effect for a period of one year and shall continue thereafter unless amended in writing by mutual agreement between the Company and the customer, or automatically amended as hereinafter provided. Each such amended Contract Demand shall be in effect for the period of one year from the date specified in the amendment agreement and shall continue thereafter or until superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the Contract Demand in any Backup Billing Period, the Contract Demand shall be automatically amended to an amount equal to said metered demand beginning with the Backup Billing Period in which said metered demand occurred. Each such automatically amended Contract Demand shall be in effect for a period of one year and shall continue thereafter or until superseded by another amended Contract Demand.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

Billing for electric service delivered under this Rate shall consist of the sum, as applicable, of the Customer Charge, the Supplementary Demand Charge, the Backup Reservation Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Electric service charges, determined under this Rate will be calculated separately for each Billing Period using the appropriate billing determinants for the Billing Period. Bills rendered for Short Billing Periods will be prorated on the ratio of the number of days of

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07396

- 4 - R.I.P.U.C. NO. 1165

the Short Billing Period to the number of days of the Normal Billing Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility within three working days following the end of a Billing Period.

Where the customer fails to notify the Company, billing will be rendered as if the Company furnished only Supplementary Power during the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement in accordance with the Company's Interconnection Guidelines for Small Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation, which are attributable solely to the Company's provision of service under this Rate Schedule will be borne by the customer. The actual incremental interconnection costs will be calculated by the Company separately for each customer. The customer may choose to pay his interconnection costs at once or to amortize them on a monthly basis over a period not exceeding five years, including interest at the rate of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by either the Company or the customer by written notice given to the other party at least thirty (30) days prior to the date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the Company to replace energy and capacity ordinarily provided by the Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short Billing Period.

"Net Capability" means the design net electrical capability of the Facility under International Standards Organization ("ISO") conditions.

"Normal Billing Period" means the time period between two consecutive billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting metering reading date and the next billing cycle date or the time

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07397

- 5 - R.I.P.U.C. NO. 1165

period between a previous billing cycle date and an ending meter reading date during which electric service is rendered.

"Supplementary Power" means electrical energy and capacity delivered by the Company regularly used by the customer in addition to that which is provided by the Facility itself.

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where consistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07398

R.I.P.U.C. NO. 1166
CANCELS NO. 1149

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE PRIMARY VOLTAGE AUXILIARY
GENERAL RETAIL DELIVERY SERVICE RATE A-6

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric Power Service ("Contract"), this Rate Schedule applies to all customers served at primary distribution voltages where the customer furnishes its own electric power supply ("Facility") for all or part of its total electric service requirements provided that:

1. the customer's total electric service requirements are greater than 500 kW, and
2. the Net Capability of the Facility is at least 100 kW but less than 1,000 kW and the Facility is designed to provide at least 20% of the customer's total electric service requirements, or the Net Capability of the Facility is 1,000 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $14.17 | per month |
| Reservation Charge: | $2.00 | per kW |
| Energy Charge: | $0.01425 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Peak Hours
Monday through Friday excluding holidays defined below
April through September, 11:00 a.m. to 4:00 p.m.
October through March, 8:00 a.m. to 12:00 noon, and 4:00 p.m. to 7:00 p.m.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

Off-Peak Hours
All other hours.

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

DETERMINATION OF BILLING PERIODS:

a. Billing Period

The Billing Period consists of the days between consecutive meter readings. Service under this Rate is rendered on a full calendar day basis. The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

b. Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered. Backup Service is rendered when any part of a forced outage occurs during Peak Hours and backup power is actually delivered.

DETERMINATION OF BILLING DEMANDS:

a. Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum metered 15 minute average load recorded during Peak Hours within a Billing Period excluding the Backup Billing Period and the maximum metered 15 minute average load recorded during Peak Hours in excess of the Net Capability of the Facility during the Backup Billing Period.

b. Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand in excess of the Supplementary Demand.

DETERMINATION OF BILLING DEMAND CHARGES:

a. Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 3 - R.I.P.U.C. NO. 1166

b. Backup Reservation Charge

The Backup Reservation Demand Charge shall be the Backup Reservation Demand times the Distribution Reservation Charge.

BACKUP POWER:

The Contract will specify the customer's maximum Backup Power requirements. Said Backup Power requirements must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Backup Power requirements of the customer. The customer's maximum Backup Power requirements shall be the Contract Demand. The Contract Demand shall not exceed the Net Capability of the Facility.

The Contract Demand will be in effect for a period of one year and shall continue thereafter unless amended in writing by mutual agreement between the Company and the customer, or automatically amended as hereinafter provided. Each such amended Contract Demand shall be in effect for the period of one year from the date specified in the amendment agreement and shall continue thereafter or until superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the Contract Demand in any Backup Billing Period, the Contract Demand shall be automatically amended to an amount equal to said metered demand beginning with the Backup Billing Period in which said metered demand occurred. Each such automatically amended Contract Demand shall be in effect for a period of one year and shall continue thereafter or until superseded by another amended Contract Demand.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

Billing for electric service delivered under this Rate shall consist of the sum, as applicable, of the Customer Charge, the Supplementary Demand Charge, the Backup Reservation Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Electric service charges, determined under this Rate will be calculated separately for each Billing Period using the appropriate billing determinants for the Billing Period. Bills rendered for Short Billing Periods will be prorated on the ratio of the number of days of

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07401

the Short Billing Period to the number of days of the Normal Billing Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility within three working days following the end of a Billing Period.

Where the customer fails to notify the Company, billing will be rendered as if the Company furnished only Supplementary Power during the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement in accordance with the Company's Interconnection Guidelines for Small Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation, which are attributable solely to the Company's provision of service under this Rate Schedule will be borne by the customer. The actual incremental interconnection costs will be calculated by the Company separately for each customer. The customer may choose to pay his interconnection costs at once or to amortize them on a monthly basis over a period not exceeding five years, including interest at the rate of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by either the Company or the customer by written notice given to the other party at least thirty (30) days prior to the date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the Company to replace energy and capacity ordinarily provided by the Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short Billing Period.

"Net Capability" means the design net electrical capability of the Facility under International Standards Organization ("ISO") conditions.

"Normal Billing Period" means the time period between two consecutive billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting metering reading date and the next billing cycle date or the time period between a previous billing cycle date and an ending meter reading date during which electric service is rendered.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 5 - R.I.P.U.C. NO. 1166

"Supplementary Power" means electrical energy and capacity delivered by the Company regularly used by the customer in addition to that which is provided by the Facility itself.

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where consistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07403

**PART 3 OF 3**

R.I.P.U.C. NO. 1167
CANCELS NO. 1150

BLACKSTONE VALLEY ELECTRIC COMPANY

GENERAL SPACE HEATING RETAIL DELIVERY SERVICE RATE H-1

AVAILABILITY:

This rate is closed to new Customers. This Rate Schedule was formerly available only to non-residential Customers having permanently installed space heating equipment as the Customer's primary source of space heating in accordance with the Company's specifications where electricity is the sole source of energy used for comfort heating and water heating.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's premises for domestic use in buildings principally used for living quarters, and in buildings regularly used for educational or religious purposes.

Electricity shall be the sole source of energy used for comfort heating and water heating.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $3.01 | per month |
| Energy Charge: | $0.02975 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate *Adjustments and Rhode Island Gross Receipts Tax.*

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1168
CANCELS NO. 1151

BLACKSTONE VALLEY ELECTRIC COMPANY

GENERAL HEATING RETAIL DELIVERY SERVICE RATE H-2

AVAILABILITY:

This rate is closed to new Customers. This Rate Schedule is available only to commercial and industrial Customers that were taking service under former General Heating Service Rate No. 35 before June 1, 1984, for purposes where electricity is the source of energy for space heating, cooking, air conditioning, and water heating for other than industrial purposes.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used soley by the Customer on the Customer's own premises. Electricity delivered hereunder will be metered separately and service for other purposes will be delivered under other applicable Rate Schedules.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $3.43 | per month |
| Energy Charge: | $0.03421 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1169
CANCELS NO. 1152

BLACKSTONE VALLEY ELECTRIC COMPANY

CONTROLLED WATER HEATING RETAIL DELIVERY SERVICE RATE W-1

AVAILABILITY:

This rate is closed to new Customers. This Rate Schedule is available to Customers for controlled electric water heating service that were taking service under former Off-Peak Water Heating Rate No. 41 before April 15, 1992, except for customers receiving service under Time-of-Use Residential Service Rate R-4.

APPLICABILITY:

Electricity delivered hereunder will be metered separately and service for other purposes will be furnished under other applicable Rate Schedules. The Company will, by means of a controlling device, fix the hours when this service is available.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| Charge | Amount | Unit |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $1.32 | per month |
| Energy Charge: | $0.01792 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1170
CANCELS NO. 1153

BLACKSTONE VALLEY ELECTRIC COMPANY

LIGHTING RETAIL DELIVERY SERVICE RATE S-1

AVAILABILITY:

This Rate Schedule is available only to Customers where electricity is supplied to lighting equipment owned and maintained by the Company, on Company owned poles, for dusk-to-dawn operation of approximately 4,000 burning hours per year.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for lighting purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at the utilization voltage of the Company's lighting equipment.

RATE:

The Rate shall consist of the following charges:

CUSTOMER AND DISTRIBUTION:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS:

SODIUM VAPOR LAMP

1. For lights on ordinary wood poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 3,300 | Streetlight | $53.29 | $135.00 |
| 5,800 | Streetlight | 54.80 | 136.51 |
| 5,800 | Floodlight | 67.92 | 149.63 |
| 9,500 | Streetlight | 56.38 | 138.06 |
| 9,500 | PBU | 60.76 | 142.48 |
| 16,000 | Streetlight | 58.36 | 140.04 |
| 16,000 | Floodlight | 72.14 | 154.25 |
| 25,000 | Streetlight | 69.73 | 151.44 |
| 25,000 | Floodlight | 77.44 | 159.13 |
| 50,000 | Streetlight | 80.57 | 162.28 |
| 50,000 | Floodlight | 88.32 | 170.02 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| **A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS: (Cont'd)** | | | |
| SODIUM VAPOR LAMP (Cont'd) | | | |
| 2. For lights on standard metal poles: | | | |
| 25,000 | Streetlight | ... | $254.90 |
| 25,000 | Floodlight | ... | 266.39 |
| 50,000 | Streetlight | ... | 265.71 |
| MERCURY VAPOR LAMP | | | |
| 3. For lights on ordinary wood poles: | | | |
| 4,200 | Streetlight | $ 44.44 | $103.49 |
| 8,600 | Streetlight | 47.05 | 106.10 |
| 8,600 | PBU | 51.55 | ... |
| 8,600 | T&C | 45.87 | ... |
| 22,500 | Streetlight | 64.97 | ... |
| 22,500 | Floodlight | 63.52 | 122.56 |
| 63,000 | Streetlight | 91.70 | ... |
| 63,000 | Floodlight | 98.19 | ... |
| 4. For lights on standard metal poles: | | | |
| 22,500 | Streetlight | ... | $198.77 |
| 22,500 | Floodlight | ... | 200.07 |
| 63,000 | Floodlight | ... | 234.73 |
| METAL HALIDE LAMP | | | |
| 5. For lights on ordinary wood poles: | | | |
| 20,000 | Floodlight | $ 94.69 | $193.17 |
| 40,000 | Floodlight | 124.67 | 239.18 |
| 115,000 | Floodlight | 103.46 | 217.87 |
| **B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS:** | | | |
| SODIUM VAPOR LAMP | | | |
| 1. For lights on standard metal poles: | | | |
| 9,500 | Streetlight | $ 64.00 | $227.66 |
| 9,500 | Streetlight-Twin | 151.17 | 283.46 |
| 16,000 | Streetlight | 65.98 | 229.55 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| **A. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS: (Cont'd)** | | | |
| **1. For lights on standard metal poles: (Cont'd)** | | | |
| 16,000 | Floodlight | 83.98 | 247.53 |
| 25,000 | Streetlight | 77.37 | 240.95 |
| 25,000 | Streetlight-Twin | 186.44 | 318.71 |
| 25,000 | Floodlight | 88.86 | 252.43 |
| 50,000 | Streetlight | 88.22 | 251.76 |
| 50,000 | Floodlight | 99.76 | 263.32 |
| **2. For lights on poles less than 15 ft. high:** | | | |
| 5,800 | T&C | $ 59.81 | $148.75 |
| 9,500 | T&C | 62.03 | 150.96 |
| 16,000 | T&C | 64.02 | 152.94 |
| **3. For lights on poles more than 15 ft. high:** | | | |
| 3,300 | Streetlight | $ 55.38 | $213.83 |
| 5,800 | Streetlight | 56.89 | 215.36 |
| 5,800 | Shoe Box | 106.31 | 204.75 |
| 9,500 | Streetlight | 58.46 | 216.92 |
| 9,500 | Shoe Box | 115.57 | 214.01 |
| **4. For lights on ordinary wood poles:** | | | |
| 3,300 | Streetlight | $ 58.19 | $172.97 |
| 5,800 | Streetlight | 59.70 | 174.47 |
| 5,800 | Floodlight | 72.83 | 187.61 |
| 9,500 | Streetlight | 61.26 | 176.03 |
| 9,500 | PBU | 65.57 | 180.45 |
| 16,000 | Streetlight | 63.25 | 178.04 |
| 16,000 | Floodlight | 77.43 | 192.22 |
| 25,000 | Streetlight | 74.64 | 189.42 |
| 25,000 | Floodlight | 82.33 | 197.11 |
| 50,000 | Streetlight | 85.45 | 200.25 |
| 50,000 | Floodlight | 93.23 | 207.99 |
| **MERCURY VAPOR LAMP** | | | |
| **5. For lights on standard metal poles:** | | | |
| 8,600 | Streetlight | $ 52.58 | $170.78 |
| 8,600 | Streetlight-Twin | 128.04 | 223.65 |
| 22,500 | Streetlight | 70.49 | 188.70 |
| 22,500 | Streetlight-Twin | 157.14 | 252.74 |
| 63,000 | Floodlight | 106.43 | 224.65 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 4 - R.I.P.U.C. NO. 1170

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS: (Cont'd) | | | |
| MERCURY VAPOR LAMP (Cont'd) | | | |
| 6. For lights on poles less than 15 ft. high: | | | |
| 8,600 | T&C | $ 49.41 | $109.84 |
| 8,600 | PMA | 56.22 | 110.85 |
| 7. For lights on poles more than 15 ft. high: | | | |
| 4,200 | Streetlight | $ 45.96 | $160.49 |

(a) For fixtures mounted on existing poles or prepaid lighting poles.
(b) For fixtures mounted on lighting poles.

Conservation Charge: $0.00230 per kWh

Transition Charge: $0.02800 per kWh

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for retail delivery lighting service supplied under this Rate Schedule shall consist of the sum, as applicable, of one-twelfth of the Annual Price per Luminaire, the Conservation Charge, Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

EQUIPMENT AND INSTALLATION:

The Company will furnish, install, own, and maintain all necessary lighting service equipment including but not limited to luminaires, lamps, brackets, controls, conductors, and poles; and will furnish the electrical energy supply for the lights. For installations supplied by underground conductors, the customer will provide trenching and backfilling, and will furnish, install, and maintain the conduit and base. All lighting service equipment will be of Company standard design and construction. Where additional equipment is required, such as additional poles required to serve the light or transformers installed to provide the electrical energy supply for the lights, the

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07413

customer will pay for the full cost of such additional equipment in advance of installation.

If the lights installed under this Rate Schedule are to be spaced such that the distance between the lights is to be more than 150 feet, the Customer will pay any additional costs incurred by the Company prior to the installation of the lights.

EXCESSIVE DAMAGE:

Excessive damage due to wanton or malicious acts shall be charged to the customer at the actual cost of labor and material required to repair or replace the unit. Excessive damage is defined as a pole, lamp, fixture, or conductors that is broken or damaged more than once a year. Notifications of excessive damage shall be made to the customer by the Company prior to billing for repairs.

DISCONTINUANCE OF LIGHTS:

Municipalities or other public authorities shall not discontinue service to more than five percent of the number of lights in service in a calendar year, except that any number of lights in excess of the five percent limit may be discontinued by mutual agreement provided that the municipality or other public authority agrees to pay the Company for the undepreciated value of each light in excess of the five percent limit that has been in service for a period of less than ten years.

CONVERSION OF EXISTING MERCURY VAPOR LIGHTS TO SODIUM VAPOR:

Upon request by a municipality or other public authority, the Company will initiate a conversion schedule for the replacement of mercury vapor lights with an appropriate sodium vapor light upon payment of the undepreciated value of the existing light if such light has been installed for a period less than ten years. This payment may be amortized over the following twelve month period. The conversion will be completed in a period as agreed upon, provided that not more than 20% of the lights eligible for conversion are converted each year.

TERM OF CONTRACT:

The term of contract shall be one year and shall continue thereafter until terminated by the Company or the customer by written notice given to the other party at least sixty (60) days prior to the date of termination given in such notice.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1173
CANCELS NO. 1172

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

Energy Charge: $0.03051 per kWh

Residential SSI Retail Delivery Service Rate R-2

Energy Charge: $0.03051 per kWh

Residential Space Heating Retail Delivery Service Rate R-3

Energy Charge: $0.03158 per kWh

Large Residential Retail Delivery Service Rate R-4

Energy Charge
Peak Hours: $0.15384 per kWh
Off-Peak Hours: $0.00570 per kWh

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03589 | per kWh |

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $5.81 | per kW |
| Energy Charge: | $0.01403 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.11 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.02978 | per kWh |
| Off-Peak Hours: | $0.00877 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $5.29 | per kW |
| Energy Charge: | $0.01610 | per kWh |

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $5.48 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03241 | per kWh |
| Off-Peak Hours: | $0.01054 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1173

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07417

R.I.P.U.C. NO. 1173

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07418

R.I.P.U.C. NO. 1173

-5-

customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

Energy Charge: $0.03308 per kWh

General Heating Retail Delivery Service Rate H-2

Energy Charge: $0.03339 per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

Energy Charge: $0.03509 per kWh

Lighting Retail Delivery Service Rate S-1

Energy Charge: $0.03408 per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours

Monday through Friday excluding holidays defined below
April through September, 11:00 a.m. to 4:00 p.m.
October through March, 8:00 a.m. to 12:00 noon, and 4:00 p.m. to 7:00 p.m.

Off-Peak Hours

All other hours.

Holidays are defined as:

- New Year's Day
- President's Day
- Memorial Day
- Independence Day
- Labor Day
- Columbus Day
- Veteran's Day
- Thanksgiving Day
- Christmas Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07419

R.I.P.U.C. NO. 1173

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07420

R.I.P.U.C. NO. 1173

-7-

| | | |
|---|---|---|
| 2003 | $7.01 | per MMBTU |
| 2004 | $7.74 | per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07421

R.I.P.U.C. NO. 1173

-8-

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07422

NEWPORT ELECTRIC CORPORATION
RATE SCHEDULE INDEX

| ?TE DESCRIPTION | COMPANY IDENTIFIER | R.I.P.U.C. NUMBER |
|---|---|---|
| Economic Development Rate Rider VSR * | VSR | 1130 |
| Economic Development Rate Rider EDR * | EDR | 1131 |
| Economic Development Defense Industry Recovery * | DIR | 1186 |
| Retail Delivery Fuel Adjustment Clause | --- | 1306 |
| Retail Delivery Purchased Power Adjustment Clause | --- | 1307 |
| Terms and Conditions for Electric Service | --- | 1362 |
| Terms and Conditions for Electric Power Suppliers | --- | 1363 |
| Last Resort Service | --- | 1380 |
| Residential Retail Delivery Service | R-1 | 1381 |
| Residential SSI Retail Delivery Service | R-2 | 1382 |
| Large Residential Retail Delivery Service | R-4 | 1383 |
| Small Secondary Voltage General Retail Delivery Service | G-1 | 1384 |
| ?edium Secondary Voltage General Retail Delivery Service | G-2 | 1385 |
| Medium Primary Voltage General Retail Delivery Service | G-5 | 1386 |
| Large Secondary Voltage General Retail Delivery Service | T-4 | 1387 |
| Large Primary Voltage General Retail Delivery Service | T-6 | 1388 |
| Transmission Voltage General Retail Delivery Service | C-1 | 1389 |
| Large Secondary Voltage Auxiliary General Retail Delivery Service | A-4 | 1390 |
| Large Primary Voltage Auxiliary General Retail Delivery Service | A-6 | 1391 |
| General Space Heating Retail Delivery Service | H-1 | 1392 |
| Supplementary General Space Heating Retail Delivery Service | H-2 | 1393 |
| Controlled Water Heating Retail Delivery Service | W-1 | 1394 |
| Lighting Retail Delivery Service | S-1 | 1395 |
| Temporary Interruptible Load Rate Rider | --- | 1396 |
| Standard Offer Service | --- | 1398 |

Availability Frozen

July 17, 1998

R.I.P.U.C. NO. 1380
CANCELS NO. 1361

NEWPORT ELECTRIC CORPORATION
LAST RESORT SERVICE

AVAILABILITY:

This Rate Schedule for Last Resort Service is available to all Customers who are ineligible to receive service under the Company's Standard Offer Service Rate Schedule. A Customer receiving electric service from a Nonregulated Power Producer will be automatically transferred to Last Resort Service under this Rate Schedule in the event the Customer's Nonregulated Power Producer fails to deliver sufficient electric capacity and energy to meet the Customer's electric power requirements.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATES AND PROVISIONS:

The rates and provisions for Last Resort Service shall be the Rates for each Rate Class shown in the Company's Standard Offer Service Rate Schedule, the same, as amended, or as superseded, together with all other provisions pertaining thereto including, but not limited to, the Rate, Time-of-Use Period, and Billing provisions contained in the Company's foregoing Standard Offer Service Rate Schedule.

TERM OF CONTRACT:

The Term of Contract for Last Resort Service shall be one (1) month and shall continue thereafter until terminated by the Customer by notice given to the Company at least five (5) days prior to the date of termination. The above Term of Contract shall not apply in the event of an involuntary transfer of the Customer to Last Resort Service in accordance with the Availability provision hereof. The Term of Contract under the conditions of an involuntary transfer shall be not less than five (5) days nor more than one (1) month. Customers who fail to procure electric service from another Nonregulated Power Producer or who fail to elect the Company's Standard Offer Service, if eligible therefor, within the foregoing time period shall be deemed to have elected to voluntarily receive Last Resort Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1381
CANCELS NO. 1364

NEWPORT ELECTRIC CORPORATION

RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-1

AVAILABILITY:

This Rate Schedule is available only to residential Customers whose actual or estimated annual energy consumption is less than 30,000 kWh.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for predominantly domestic purposes in an individual apartment, condominium, private home, other private dwelling, condominium common area, or in rooming houses with five rooms or less for rent.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| Distribution Charges: | | |
|---|---|---|
| Customer Charge: | $3.10 | per month |
| Energy Charge: | $0.04653 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1382
CANCELS NO. 1365

NEWPORT ELECTRIC CORPORATION

RESIDENTIAL SSI RETAIL DELIVERY SERVICE RATE R-2

AVAILABILITY:

This Rate Schedule is available only to residential Customers that meet both of the following criteria:

1. the Customer is the head of the household or principal wage earner, and
2. the Customer is presently receiving Supplemental Security Income from the United States Social Security Administration, or aid from one of the following Rhode Island agencies:
   (a) Medicaid
   (b) Food Stamps
   (c) General Public Assistance
   (d) Aid to Families with Dependent Children

The Customer will be required to annually certify his/her continued eligibility for this Rate Schedule on forms provided by the Company.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for domestic purposes in an individual apartment, condominium, private home, other private dwelling, or condominium common area.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| Charge | Rate | Unit |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $2.14 | per month |
| Energy Charge: | | |
| First 300 kWh | $0.00759 | per kWh |
| Over 300 kWh | $0.04206 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1382

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07429

R.I.P.U.C. NO. 1383
CANCELS NO. 1366

NEWPORT ELECTRIC CORPORATION

LARGE RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-4

AVAILABILITY:

This Rate Schedule is available to residential Customers whose actual or estimated annual energy consumption is at least 6,000 kWh but less than 30,000 kWh, and this Rate Schedule is mandatory for all residential Customers whose actual or estimated annual energy consumption is 30,000 kWh or more, except for residential Customers eligible for retail delivery service under Residential SSI Rate R-2.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for predominantly domestic purposes in an individual apartment, condominium, private home, other private dwelling, condominium common area, or in rooming houses with five rooms or less for rent.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $6.78 | per month |
| Energy Charge: | $0.04497 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1384
CANCELS NO. 1367

NEWPORT ELECTRIC CORPORATION

SMALL SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-1

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated average monthly demand is less than 500 kW and whose actual or estimated annual energy consumption is less than 54,000 kWh, and to those Customers taking service from the Company under former General Service Rate, R.I.P.U.C. No. 201-N, prior to October 28, 1992, whose demand is not metered.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $3.45 | per month |
| Energy Charge: | $0.05832 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1385
CANCELS NO. 1368

NEWPORT ELECTRIC CORPORATION

MEDIUM SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-2

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated average monthly demand is less than 500 kW and whose actual or estimated annual energy consumption is 54,000 kWh or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03918 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1385

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07435

R.I.P.U.C. NO. 1386
CANCELS NO. 1369

NEWPORT ELECTRIC CORPORATION

MEDIUM PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-5

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated average monthly demand is at least 15 kW but less than 500 kW or whose actual or estimated annual energy consumption is 54,000 kWh or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03395 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1386

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
*per Order No. 15640 dated*
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
*for consumption on and after*
June 1, 1998.

NARR 07437

R.I.P.U.C. NO. 1387
CANCELS NO. 1370

NEWPORT ELECTRIC CORPORATION

LARGE SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-4

AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or estimated average monthly demand is 500 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03956 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1387

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07439

R.I.P.U.C. NO. 1388
CANCELS NO. 1371

NEWPORT ELECTRIC CORPORATION

LARGE PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-6

AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or estimated average monthly demand is 500 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03354 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1388

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07441

R.I.P.U.C. NO. 1389
CANCELS NO. 1372

NEWPORT ELECTRIC CORPORATION

TRANSMISSION VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE C-1

AVAILABILITY:

This Rate Schedule is available only to the Department of the Navy, its successors, or assigns, for electric power service to the Naval Education and Training Center, Newport, Rhode Island, under the provisions of that certain Negotiated Electric Service Contract ("Contract"), dated May 1, 1961, by and between Newport Electric Corporation and the Department of the Navy, the same, as amended, or as superseded.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Navy on the premises of the Naval Education and Training Center, Newport, Rhode Island, for all purposes that are in accordance with the provisions of the Contract.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a nominal voltage of 69,000 volts, and shall be delivered and sold to the Navy at the point of delivery specified in the Contract.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Demand Charge: | $7.68 | per kW |
| Reactive Demand Charge: | $0.23 | per kvar |
| Energy Charge: | $0.00851 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

DETERMINATION OF BILLING PERIODS:

The Billing Period consists of the days between consecutive meter readings. Service under this Rate is rendered on a full calendar day basis. The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1389

DETERMINATION OF BILLING DEMAND:

I. Billing Demand

A. Requirements Service

The Demand in kilowatts for each month is the maximum metered fifteen-minute demand during the Billing Period.

B. Partial Requirements Service

The Demand in kilowatts for each month is the maximum fifteen-minute total demand during the month, where the total demand is the combined demand of the Partial Requirements Service delivered by the Company and the service supplied by the Navy's other power source.

The Billing Demand in kilowatts for each month shall be the largest of:

1. the Demand,

2. Seventy-five percent (75%) of the highest Demand recorded during the previous eleven months, or

3. Fifty percent (50%) of the highest Demand recorded during the term of the Contract, where:

For the purposes of determining the Billing Demand, all demands recorded before December 1, 1994, shall be deemed Demands, all Standby Demands recorded after December 1, 1994, through June 30, 1997 shall be deemed Demands, and all Distribution Demands recorded after June 30, 1997, shall be deemed Demands.

II. Reactive Billing Demand

The Reactive Billing Demand in kilovars for each month shall be the Reactive Demand in excess of seventeen and one-half percent (17.5%) of the Demand, where the Reactive Demand in kilovars for each month is the metered fifteen-minute reactive demand coincident with the Demand.

DETERMINATION OF BILLING DEMAND CHARGES:

I. Billing Demand Charge

The Billing Demand Charge shall be the Billing Demand times the Demand Rate.

I. Reactive Billing Demand Charge

The Reactive Billing Demand Charge shall be the Reactive Billing Demand times the Reactive Demand Rate.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07443

- 3 - R.I.P.U.C. NO. 1389

DETERMINATION OF MINIMUM BILLING ENERGY CHARGE

The Minimum Billing Energy Charge shall be the Total Energy Requirements times the Transition Charge. For the purposes of the foregoing, Total Energy Requirements shall mean the sum of the energy delivered by the Company and the energy supplied by the Navy's other power sources other than electrically isolated emergency power sources.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of:

1. the Billing Demand Charge,
2. the Reactive Billing Demand Charge,
3. the higher of the Minimum Billing Energy Charge or the sum of the Distribution Energy Charges, the Conservation Charge and the Transition Charge, Rate Adjustments
4. and Rhode Island Gross Receipts Tax

TERMS AND CONDITIONS:

"Requirements Service" means that the Company delivers all the energy and capacity necessary to meet the total electric service requirements of the Navy, other than electric service requirements provided by electrically isolated emergency power sources.

"Partial Requirements Service" means Supplementary Service, Backup Service, and Maintenance Service, either individually or in any combination.

"Supplementary Service" means electric energy and capacity delivered by the Company on a regular basis in addition to that which is normally provided by the Navy's other power source.

"Backup Service" means electric energy and capacity delivered by the Company to replace energy and capacity ordinarily provided by the Navy's other power source during a unscheduled outage of the power source.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07444

- 4 -                    R.I.P.U.C. NO. 1389

"Maintenance Service" means electric energy and capacity delivered by the Company to replace energy and capacity ordinarily provided by the Navy's other power source during a scheduled outage of the power source.

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07445

R.I.P.U.C. NO. 1390
CANCELS NO. 1373

NEWPORT ELECTRIC CORPORATION

LARGE SECONDARY VOLTAGE AUXILIARY
GENERAL RETAIL DELIVERY SERVICE RATE A-4

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric Power Service ("Contract"), this Rate Schedule applies to all customers served at secondary distribution voltages where the customer furnishes its own electric power supply ("Facility") for all or part of its total electric service requirements provided that:

1. the customer's total electric service requirements are greater than 500 kW, and
2. the Net Capability of the Facility is at least 100 kW but less than 1,000 kW and the Facility is designed to provide at least 20% of the customer's total electric service requirements, or the Net Capability of the Facility is 1,000 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $26.17 | per month |
| Reservation Charge: | $3.16 | per kW |
| Energy Charge: | $0.03956 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Peak Hours
Monday through Friday excluding holidays defined below
May through September, 10:00 a.m. to 4:00 p.m.
October through April, 9:00 a.m. to 12:00 noon, and 5:00 p.m. to 8:00 p.m.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1390

Off-Peak Hours
All other hours.

Holidays are defined as:

New Year's Day
President's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day

DETERMINATION OF BILLING PERIODS:

a. Billing Period

The Billing Period consists of the days between consecutive meter readings. Service under this Rate is rendered on a full calendar day basis. The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

b. Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered. Backup Service is rendered when any part of a forced outage occurs during Peak Hours and backup power is actually delivered.

DETERMINATION OF BILLING DEMANDS:

a. Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum metered 15 minute average load recorded during Peak Hours within a Billing Period excluding the Backup Billing Period and the maximum metered 15 minute average load recorded during Peak Hours in excess of the Net Capability of the Facility during the Backup Billing Period.

b. Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand in excess of the Supplementary Demand.

DETERMINATION OF BILLING DEMAND CHARGES:

a. Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07447

- 3 -

R.I.P.U.C. NO. 1390

b.    Backup Reservation Charge

The Backup Reservation Demand Charge shall be the Backup Reservation Demand times the Distribution Reservation Charge.

BACKUP POWER:

The Contract will specify the customer's maximum Backup Power requirements.  Said Backup Power requirements must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Backup Power requirements of the customer.  The customer's maximum Backup Power requirements shall be the Contract Demand.  The Contract Demand shall not exceed the Net Capability of the Facility.

The Contract Demand will be in effect for a period of one year and shall continue thereafter unless amended in writing by mutual agreement between the Company and the customer, or automatically amended as hereinafter provided.  Each such amended Contract Demand shall be in effect for the period of one year from the date specified in the amendment agreement and shall continue thereafter or until superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the Contract Demand in any Backup Billing Period, the Contract Demand shall be automatically amended to an amount equal to said metered demand beginning with the Backup Billing Period in which said metered demand occurred.  Each such automatically amended Contract Demand shall be in effect for a period of one year and shall continue thereafter or until superseded by another amended Contract Demand.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

Billing for electric service delivered under this Rate shall consist of the sum, as applicable, of the Customer Charge, the Supplementary Demand Charge, the Backup Reservation Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Electric service charges, determined under this Rate will be calculated separately for each Billing Period using the appropriate billing determinants for the Billing Period.  Bills rendered for Short

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07448

- 4 - R.I.P.U.C. NO. 1390

Billing Periods will be prorated on the ratio of the number of days of the Short Billing Period to the number of days of the Normal Billing Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility within three working days following the end of a Billing Period. Where the customer fails to notify the Company, billing will be rendered as if the Company furnished only Supplementary Power during the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement in accordance with the Company's Interconnection Guidelines for Small Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation, which are attributable solely to the Company's provision of service under this Rate Schedule will be borne by the customer. The actual incremental interconnection costs will be calculated by the Company separately for each customer. The customer may choose to pay his interconnection costs at once or to amortize them on a monthly basis over a period not exceeding five years, including interest at the rate of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by either the Company or the customer by written notice given to the other party at least thirty (30) days prior to the date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the Company to replace energy and capacity ordinarily provided by the Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short Billing Period.

"Net Capability" means the design net electrical capability of the Facility under International Standards Organization ("ISO") conditions.

"Normal Billing Period" means the time period between two consecutive billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting metering reading date and the next billing cycle date or the time

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07449

- 5 - R.I.P.U.C. NO. 1390

period between a previous billing cycle date and an ending meter reading date during which electric service is rendered.

"Supplementary Power" means electrical energy and capacity delivered by the Company regularly used by the customer in addition to that which is provided by the Facility itself.

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07450

R.I.P.U.C. NO. 1391
CANCELS NO. 1374

NEWPORT ELECTRIC CORPORATION

LARGE PRIMARY VOLTAGE AUXILIARY
GENERAL RETAIL DELIVERY SERVICE RATE A-6

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric Power Service ("Contract"), this Rate Schedule applies to all customers served at primary distribution voltages where the customer furnishes its own electric power supply ("Facility") for all or part of its total electric service requirements provided that:

1. the customer's total electric service requirements are greater than 500 kW, and
2. the Net Capability of the Facility is at least 100 kW but less than 1,000 kW and the Facility is designed to provide at least 20% of the customer's total electric service requirements, or the Net Capability of the Facility is 1,000 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $26.17 | per month |
| Reservation Charge: | $2.86 | per kW |
| Energy Charge: | $0.03354 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Peak Hours
Monday through Friday excluding holidays defined below
May through September, 10:00 a.m. to 4:00 p.m.
October through April, 9:00 a.m. to 12:00 noon, and 5:00 p.m. to 8:00 p.m.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1391

Off-Peak Hours
All other hours.

Holidays are defined as:

- New Year's Day
- President's Day
- Memorial Day
- Independence Day
- Labor Day
- Columbus Day
- Veteran's Day
- Thanksgiving Day
- Christmas Day

DETERMINATION OF BILLING PERIODS:

a. Billing Period

The Billing Period consists of the days between consecutive meter readings. Service under this Rate is rendered on a full calendar day basis. The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

b. Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered. Backup Service is rendered when any part of a forced outage occurs during Peak Hours and backup power is actually delivered.

DETERMINATION OF BILLING DEMANDS:

a. Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum metered 15 minute average load recorded during Peak Hours within a Billing Period excluding the Backup Billing Period and the maximum metered 15 minute average load recorded during Peak Hours in excess of the Net Capability of the Facility during the Backup Billing Period.

b. Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand in excess of the Supplementary Demand.

DETERMINATION OF BILLING DEMAND CHARGES:

a. Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07452

- 3 -                    R.I.P.U.C. NO. 1391

b.    Backup Reservation Charge

The Backup Reservation Demand Charge shall be the Backup Reservation Demand times the Distribution Reservation Charge.

BACKUP POWER:

The Contract will specify the customer's maximum Backup Power requirements.  Said Backup Power requirements must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Backup Power requirements of the customer.  The customer's maximum Backup Power requirements shall be the Contract Demand.  The Contract Demand shall not exceed the Net Capability of the Facility.

The Contract Demand will be in effect for a period of one year and shall continue thereafter unless amended in writing by mutual agreement between the Company and the customer, or automatically amended as hereinafter provided.  Each such amended Contract Demand shall be in effect for the period of one year from the date specified in the amendment agreement and shall continue thereafter or until superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the Contract Demand in any Backup Billing Period, the Contract Demand shall be automatically amended to an amount equal to said metered demand beginning with the Backup Billing Period in which said metered demand occurred.  Each such automatically amended Contract Demand shall be in effect for a period of one year and shall continue thereafter or until superseded by another amended Contract Demand.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

            Standard Offer Cost Adjustment

BILLING:

Billing for electric service delivered under this Rate shall consist of the sum, as applicable, of the Customer Charge, the Supplementary Demand Charge, the Backup Reservation Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Electric service charges, determined under this Rate will be calculated separately for each Billing Period using the appropriate billing determinants for the Billing Period.  Bills rendered for Short

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07453

- 4 - R.I.P.U.C. NO. 1391

Billing Periods will be prorated on the ratio of the number of days of the Short Billing Period to the number of days of the Normal Billing Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility within three working days following the end of a Billing Period. Where the customer fails to notify the Company, billing will be rendered as if the Company furnished only Supplementary Power during the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement in accordance with the Company's Interconnection Guidelines for Small Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation, which are attributable solely to the Company's provision of service under this Rate Schedule will be borne by the customer. The actual incremental interconnection costs will be calculated by the Company separately for each customer. The customer may choose to pay his interconnection costs at once or to amortize them on a monthly basis over a period not exceeding five years, including interest at the rate of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by either the Company or the customer by written notice given to the other party at least thirty (30) days prior to the date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the Company to replace energy and capacity ordinarily provided by the Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short Billing Period.

"Net Capability" means the design net electrical capability of the Facility under International Standards Organization ("ISO") conditions.

"Normal Billing Period" means the time period between two consecutive billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting metering reading date and the next billing cycle date or the time period between a previous billing cycle date and an ending meter reading date during which electric service is rendered.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07454

- 5 - R.I.P.U.C. NO. 1391

"Supplementary Power" means electrical energy and capacity delivered by the Company regularly used by the customer in addition to that which is provided by the Facility itself.

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07455

R.I.P.U.C. NO. 1392
CANCELS NO. 1375

NEWPORT ELECTRIC CORPORATION

GENERAL SPACE HEATING RETAIL DELIVERY SERVICE RATE H-1

AVAILABILITY:

This Rate Schedule is closed to new customers. This Rate Schedule is available only to Customers whose actual or estimated average monthly demand is less than 500 kW that were taking service from the Company under former Total Electric Living Rate-Limited, R.I.P.U.C. No. 205-L, prior to April 1, 1988, provided that the Customer has permanently installed building insulation and electric space heating equipment as the Customer's primary source of space heating in accordance with the Company's specifications, and electricity is the sole source of energy used for all purposes.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's premises for predominantly domestic purposes in a building or a group of buildings used for living quarters under common ownership and operation, or for all purposes in hotels and motels, or for all purposes in hospitals and licensed nursing homes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $12.03 | per month |
| Energy Charge: | $0.03968 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1393
CANCELS NO. 1376

NEWPORT ELECTRIC CORPORATION

SUPPLEMENTARY GENERAL SPACE HEATING RETAIL DELIVERY SERVICE RATE H-2

AVAILABILITY:

This rate is closed to new customers. This Rate Schedule is available only to Customers taking service from the Company under the terms of the Special Space Heating Provision-Limited of former General Service Rate, R.I.P.U.C. No. 201-N, prior to April 1, 1988, whose average monthly demand is either less than 500 kW or is not metered, provided that the Customer has permanently installed, in accordance with the Company's specifications, electric space heating equipment as the Customer's sole source of space heating.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for space heating and air conditioning purposes provided that the building space that is air conditioned is also heated solely by electricity, and said electricity shall be metered separately. Electricity for other purposes shall be furnished under other applicable Rate Schedules.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

| Distribution Charges: | | |
|---|---|---|
| Minimum Charge: | $4.59 | per month |
| Energy Charge: | $0.04681 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the higher of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax or the sum of $4.59 per month, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

R.I.P.U.C. NO. 1394
CANCELS NO. 1377

NEWPORT ELECTRIC CORPORATION

CONTROLLED WATER HEATING RETAIL DELIVERY SERVICE RATE W-1

AVAILABILITY:

This Rate is closed to new Customers. This Rate Schedule is available only to customers for controlled electric water heating service, except for residential Customers whose actual or estimated annual energy consumption is 30,000 kWh or more, taking service from the Company under the former Controlled Off-Peak Rate, R.I.P.U.C. No. 102-N, prior to October 28, 1992, under the following conditions:

1. The supply of electricity shall be controlled by a Company owned and operated switching device. The Company reserves the right to limit the specific hours of the day service is available provided that the total duration of all such daily time periods that service is available is 16 hours or more, and
2. The Customer is required to provide all necessary equipment for use with the Company's switching device, and
3. The Customer's electric thermal storage space heating system and/or the Customer's water heating equipment provides at least eight (8) hours of storage capacity.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for the purposes listed below :

1. For residential Customers, the electricity delivered shall be used to supply power to an electric thermal storage space heating system and/or combination heating system which uses both electricity and another energy source permanently installed in an individual apartment, condominium, private home, other private dwelling, or condominium common area as the primary source of space heating, or
2. For non-residential Customers, the electricity delivered shall be used to supply power to an electric thermal storage space heating system and/or combination heating system which uses both electricity and another energy source permanently installed as the primary source of space heating to a single building or a group of buildings, or
3. For all Customer, the electricity delivered shall be used to supply power to electric water heating equipment provided that said equipment is of a type approved by the Company and installed in accordance with the Company's specifications, and
4. Where the electricity delivered is used in accordance with the above provisions, the Customer may elect to supply power to other electrical loads.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 - R.I.P.U.C. NO. 1394

Electricity delivered hereunder shall be metered separately, and electricity for other purposes shall be delivered under other applicable Rate Schedules.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charges: | | |
| Customer Charge: | $3.29 | per month |
| Energy Charge: | $0.02399 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998 per Order No. 15640 dated July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998 for consumption on and after June 1, 1998.

NARR 07461

R.I.P.U.C. NO. 1395
CANCELS NO. 1378

NEWPORT ELECTRIC CORPORATION

LIGHTING RETAIL DELIVERY SERVICE RATE S-1

AVAILABILITY:

This Rate Schedule is available to all Customers.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for lighting purposes only.

CHARACTER OF SERVICE:

Electric service shall be supplied hereunder to lighting equipment owned and maintained by the Company, on Company owned poles, for dusk-to-dawn operation of approximately 4000 burning hours per year.

RATE:

The Rate shall consist of the following charges:

CUSTOMER AND DISTRIBUTION:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| **A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS:** | | | |
| | SODIUM VAPOR LAMP | | |
| 1. For lights on ordinary wood poles: | | | |
| 3,300 | Streetlight | $48.92 | $118.71 |
| 5,800 | Streetlight | 53.46 | 123.20 |
| 5,800 | Floodlight | 62.46 | 132.20 |
| 9,500 | Streetlight | 60.43 | 130.16 |
| 16,000 | Floodlight | 70.76 | 140.50 |
| 25,000 | Streetlight | 103.46 | 173.20 |
| 25,000 | Floodlight | 107.55 | 177.28 |
| 50,000 | Streetlight | 144.74 | 214.48 |
| 50,000 | Floodlight | 144.25 | 215.91 |
| | MERCURY VAPOR LAMP | | |
| 2. For lights on ordinary wood poles: | | | |
| 4,200 | Streetlight | $50.98 | $110.86 |
| 8,600 | Streetlight | 60.92 | 120.79 |
| 12,100 | Streetlight | 77.08 | 136.93 |
| 22,500 | Streetlight | 98.98 | 158.85 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS: (Cont'd)

MERCURY VAPOR LAMP

2. For lights on ordinary wood poles: (cont'd)

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 22,500 | Floodlight | 100.38 | 160.26 |
| 63,000 | Floodlight | 195.06 | 254.94 |

INCANDESCENT LAMP

3. For lights on ordinary wood poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 1,000 | Streetlight | $22.57 | ... |
| 2,500 | Streetlight | 19.46 | ... |

METAL HALIDE LAMP

4. For lights on ordinary wood poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 20,000 | Floodlight | $129.45 | $253.73 |
| 40,000 | Floodlight | 168.76 | 293.05 |
| 115,000 | Floodlight | 216.90 | 341.18 |

B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS:

SODIUM VAPOR LAMP

1. For lights on standard metal poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 5,800 | Streetlight | $60.89 | $161.51 |
| 5,800 | Floodlight | 70.67 | 171.30 |
| 9,500 | Streetlight | 67.84 | 168.47 |
| 16,000 | Floodlight | 78.18 | 178.81 |
| 25,000 | Streetlight | 110.89 | 211.50 |
| 25,000 | Floodlight | 115.74 | 216.37 |
| 50,000 | Streetlight | 152.16 | 252.79 |
| 50,000 | Floodlight | 152.43 | 253.07 |
| 50,000 | Streetlight-Twin | 283.22 | 313.38 |

2. For lights on ordinary wood poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 5,800 | Streetlight | $56.99 | $117.06 |
| 5,800 | Floodlight | 66.00 | 126.06 |
| 9,500 | Streetlight | 63.94 | 124.01 |
| 16,000 | Floodlight | 74.29 | 134.35 |
| 25,000 | Streetlight | 106.98 | 167.06 |
| 25,000 | Floodlight | 111.07 | 171.14 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| **B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS: (Cont'd)** | | | |
| **SODIUM VAPOR LAMP** | | | |
| 2. For lights on ordinary wood poles: (cont'd) | | | |
| 50,000 | Streetlight | 148.28 | 208.34 |
| 50,000 | Floodlight | 147.76 | 207.84 |
| 50,000 | Streetlight-Twin | 276.25 | 332.97 |
| 3. For lights on poles less than 15 ft. high: | | | |
| 5,800 | T&C | $54.12 | $100.64 |
| **MERCURY VAPOR LAMP** | | | |
| 4. For lights on standard metal poles: | | | |
| 4,200 | Streetlight | $57.35 | $143.76 |
| 8,600 | Streetlight | 63.95 | 153.69 |
| 12,100 | Streetlight | 77.08 | 169.82 |
| 12,100 | Streetlight-Twin | 141.70 | 234.59 |
| 22,500 | Streetlight | 102.00 | 191.74 |
| 22,500 | Floodlight | 103.41 | 190.50 |
| 22,500 | Streetlight-Twin | 184.79 | 278.38 |
| 63,000 | Streetlight | 193.33 | 278.28 |
| 5. For lights on ordinary wood poles: | | | |
| 4,200 | Streetlight | $54.01 | $105.59 |
| 8,600 | Streetlight | 63.95 | 115.53 |
| 12,100 | Streetlight | 77.08 | 136.93 |
| 12,100 | Streetlight-Twin | 138.16 | 186.86 |
| 22,500 | Streetlight | 102.00 | 153.58 |
| 22,500 | Floodlight | 103.41 | 154.98 |
| 22,500 | Streetlight-Twin | 186.59 | 235.30 |
| 63,000 | Streetlight | 188.52 | 245.38 |
| 6. For lights on Poles less than 15 ft. high | | | |
| 4,200 | T&C | $54.54 | $94.48 |

(a) For fixtures mounted on existing poles or prepaid lighting poles.
(b) For fixtures mounted on lighting poles.

| | | |
|---|---|---|
| CONSERVATION CHARGE | $0.00230 | per kWh |
| TRANSITION CHARGE | $0.02800 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 4 - R.I.P.U.C. NO. 1395

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for retail delivery lighting service supplied under this Rate Schedule shall consist of the sum, as applicable, of one-twelfth of the Annual Price per Luminaire, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

EQUIPMENT AND INSTALLATION:

The Company will furnish, install, own, and maintain all necessary lighting service equipment including but not limited to luminaires, lamps, brackets, controls, conductors, and poles; and will furnish the electrical energy supply for the lights. For installations supplied by underground conductors, the customer will provide trenching and backfilling, and will furnish, install, and maintain the conduit and base. All lighting service equipment will be of Company standard design and construction. Where additional equipment is required, such as additional poles required to serve the light or transformers installed to provide the electrical energy supply for the lights, the customer will pay for the full cost of such additional equipment in advance of installation.

If the lights installed under this Rate Schedule are to be spaced such that the distance between the lights is to be more that 150 feet, the Customer will pay any additional costs incurred by the Company prior to the installation of the lights.

EXCESSIVE DAMAGE:

Excessive damage due to wanton or malicious acts shall be charged to the Customer at the actual cost of labor and material required to repair or replace the unit. Excessive damage is defined as a pole, lamp, fixture, or conductors that is broken or damaged more than once a year. Notifications of excessive damage shall be made to the Customer by the Company prior to billing for repairs.

FAILURE OF LIGHTS TO BURN:

Should any light or lights fail to burn during normal burning hours due to causes which might reasonably have been prevented by the Company, a pro-rata deduction from the above rates will be made upon presentation by the Customer of a written claim therefor to the Company. This provision will not apply when such failure of lights to burn is due to an Act of God, to any act or order of any public

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07465

- 5 - R.I.P.U.C. NO. 1395

authority, to malicious breakage, or other acts of a third party reasonably beyond control of the Company.

DISCONTINUANCE OF LIGHTS:

Municipalities or other public authorities shall not discontinue service to more than five percent of the number of lights in service in a calendar year, except that any number of lights in excess of the five percent limit may be discontinued by mutual agreement provided that the municipality or other public authority agrees to pay the Company for the undepreciated value of each light in excess of the five percent limit that has been in service for a period less than ten years.

CONVERSION OF EXISTING MERCURY VAPOR LIGHTS TO SODIUM VAPOR:

Upon request by a municipality or other public authority, the Company will initiate a conversion schedule for the replacement of incandescent and mercury vapor lights with an appropriate sodium vapor light upon payment of the undepreciated value of each existing light if such light has been installed for a period less than ten years. This payment may be amortized over the following twelve month period. The conversion will be completed in a period mutually agreeable to the Customer and the Company provided that not more than 20% of the lights eligible for conversion are converted each year.

TERM OF CONTRACT:

The term of contract shall be one year and shall continue thereafter until terminated by the Company or the Customer by written notice given to the other party at least sixty (60) days prior to date of termination given in such notice.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07466

# EXHIBIT N

STANDARD OFFER

**Eastern Utilities**
*Blackstone Valley Electric*
*Eastern Edison*
*EUA Service Corporation*
*Montaup Electric*
*Newport Electric*

October 29, 1999

To: R. G. Powderly
M. J. Hirsh
J. D Carney
R. P. Clarke
P. D. Fuller
S. T. Hall
K. A. Kirby
L. R. Boisvert
A.M. Rosbottom

From: M. Sorgman MS

Re: Blackstone Valley Electric and Newport Electric Corporation
Standard Offer Filing for January 1, 2000 RIPUC No. 3022

Attached is a copy of the proposed Standard Offer Tariff Advice Filing for Blackstone Valley Electric Company and Newport Electric Corporation that was filed at the R. I. P. U. C. on October 29, 1999.

On January 1, 2000, in accordance with the Wholesale Settlement Agreement approved by F. E. R. C. and submitted in R. I. P. U. C. Docket No. 2716 , the wholesale price of Standard Offer Service for Blackstone and Newport will increase from $ 0.035 per kWh to $ 0.038 per kWh, an increase of 8.6 %. The monthly bill for a typical 500 kWh Residential Rate R-1 customer will increase from $52.62 to $54.12 ( + $1.50 or 2.9%) for Blackstone customers , and from $56.66 to $58.16 ( +$1.50 or 2.6%) for Newport customers.

If you have any questions or if you need more information, please call me at ext. 3702 .

cc: D. St. Pierre, J. Lloyd, L. O' Donnell, D. Sorgman, E. Atchison, F. Mason, D. Jacobs, T. McLeish, H. Sennott, C. Roach, D. Olson, A. Thompson, K. Menard, D. Tufts, D. O'Connor

Circulation:

J. R. Stevens
D. G. Pardus
C. J. Hebert
D. T. Sena

EXHIBIT
Lloyd 88
3-6-07

750 West Center Street P.O. Box 543, West Bridgewater, MA 02379 508-559-2000 FAX: 508-559-8932

STANDARD OFFER

Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

October 29, 1999

EUA 1

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

Re: Blackstone Valley Electric Company RIPUC 3022
Newport Electric Corporation
Standard Offer Service Tariff Advice

Dear Ms. Massaro:

Enclosed herewith for filing on behalf of Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") (collectively the "Companies") are an original and nine copies of the Companies' Tariff Advice containing proposed Standard Offer Service ("SOS") tariffs to be effective January 1, 2000, for consumption on and after that date. The proposed SOS tariffs are designated R.I.P.U.C. No. 1199 in Blackstone, and R.I.P.U.C. No. 1424 in Newport. The proposed SOS tariffs cancel currently effective SOS tariffs R.I.P.U.C. No. 1180 for Blackstone and R.I.P.U.C. No. 1405 for Newport.

The Companies have prepared their tariff advice filing pursuant to the Commission's *Rules of Practice and Procedure*, Rule 1.9(c), and have organized the filing in two sections as follows:

Section 1: Proposed Standard Offer Service Tariffs
Section 2: Compliance with Standard Offer Price Cap per G.L. § 39-1-27.3(c)

The Companies have, pursuant to the Commission's *Rules of Practice and Procedure*, Rule 1.9(c)(2), attached to this letter a copy of the form of notice the Companies will issue to the public thirty (30) days prior to the effective date of the proposed tariffs and a copy of the service list of known parties to whom the Companies have served a copy of this filing.

\\ALFRED\RATEDGN\RIPUC\SO_2000\FILINGLETTER.DOC

750 West Center Street P.O. Box 543, West Bridgewater, MA 02379 508-559-2000 FAX: 508-559-8932

On January 1, 2000, in accordance with the Wholesale Settlement Agreement approved by F.E.R.C. and submitted in Docket No. 2716, the wholesale price of Standard Offer Service to Blackstone and Newport will increase from $0.03500/kWh to $0.03800/kWh. Correspondingly, Blackstone and Newport are hereby requesting approval of tariffs to increase the price of Retail Standard Offer Service to the wholesale price level.

Section 1 of this filing shows the proposed Standard Offer Tariffs for Blackstone and Newport . A red-lined version of the tariff is not included, since the only proposed change is in the energy charge from $ 0.03500 to $ 0.03800 per kWh.

Section 2 shows the Companies' Standard Offer Price Cap determined in accordance with G.L. § 39-1-27.3(d).

The monthly bill for a typical 500 kWh Residential Rate R-1 customer taking Standard Offer Service will increase $ 1.50 for Blackstone and for Newport.

If you have any questions or if you need more information, please call me at (508)-559-2000 ext. 3700.

Very truly yours,

Dennis St. Pierre
Vice President

Enclosures

\\ALFRED\RATEDGN\RIPUC\SO_2000\FILINGLETTER.DOC

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
Filing Date October 29, 1999

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Paul Roberti, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

Sam DeFrawi
Navy Rate Intervention
901 M Street S.E., Building 212
Washington, DC 20374-5018

Frank P. Pozniak, Esq.
Robert D. Shapiro, Esq.
Rubin & Rudman LLP
50 Rowes Wharf
Boston, MA 02110
For: Enron Capital & Trade Resources

Mary Elizabeth Tighe, V.P.
Eastern Power Distribution, Inc.
2800 Eisenhower Ave.
Alexandria, VA 22314

Douglas F. John, Esq.
John & Hengerer
1200 17th St., NW, Suite 600
Washington, DC 20036-3006
For: NorAm Energy Mgmt., Inc. &
Duke Energy Trading and Marketing LLC

Lindsay Johnson, Esq.
1 Boston Place, Suite 1210
Boston, MA 02108

Kris Errickson
Duke Energy Trading & Marketing
One Westchase Center
10777 Westsheimer, Suite 650
Houston, TX 77042

N:\ripuc\so_2000\SERVICELIST.DOC\

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
Filing Date October 29, 1999

Sydney M. Lima, Esq.
RI League of Cities and Towns
One State St., Suite 502
Providence, RI 02908

Hugo Ricci, Esq.
Ricci & Ricci
578 Charles Street
Providence, RI 02904

Richard W. Benka, Esq.12
Foley, Hoag & Eliot LLP
One Post Office Square
Boston, MA 02109-2170
For: NEV East, LLC

Andrew Galli, Executive Director
Coalition for Consumer Justice
1468 Broad Street
Providence, RI 02905

Keith Sappenfield, II.
Director of Marketing
NorAm Energy Management, Inc.
P.O. Box 2628
Houston, TX 77252-2628

Dennis Duffy, Esq.
Kevin J. McNeely, Esq.
Partridge, Snow & Hahn
180 South Main Street
Providence, RI 02903

Ronald T. Gerwatowski, Esq.
Narragansett Electric Company
280 Melrose Street, P.O. Box 1438
Providence, RI 02901-1438

Notice of Filing with the
State of Rhode Island and Providence Plantations
Public Utilities Commission

On October 29, 1999, Blackstone Valley Electric Company filed with the Rhode Island Public Utilities Commission rate schedules for Standard Offer Service, R.I.P.U.C. No. 1199 by tariff advice. The proposed tariff cancels R.I.P.U.C. No. 1180.

In accordance with the Settlement Agreement, on January 1, 2000, the wholesale price of Standard Offer Service to Blackstone will increase from $0.03500/kWh to $0.03800/kWh. The Company has incorporated this increase in its proposed Standard Offer Service tariffs as filed with the Rhode Island Public Utilities Commission on October 29, 1999. The proposed effective date for the filed tariffs is January 1, 2000.

A copy of the tariff advice is on file at the Commission at 100 Orange Street, Providence and at the Company's office at 750 West Center Street, West Bridgewater, Ma. 02379. The copy may be examined by the public during business hours.

Blackstone Valley Electric Company
750 West Center Street
West Bridgewater, Ma. 02379

Notice of Filing with the
State of Rhode Island and Providence Plantations
Public Utilities Commission

On October 29, 1999, Newport Electric Corporation filed with the Rhode Island Public Utilities Commission rate schedules for Standard Offer Service, R.I.P.U.C. No. 1424 by tariff advice. The proposed tariff cancels R.I.P.U.C. No. 1405.

In accordance with the Settlement Agreement, on January 1, 2000, the wholesale price of Standard Offer Service to Newport will increase from $0.03500/kWh to $0.03800/kWh. The Company has incorporated this increase in its proposed Standard Offer Service tariffs as filed with the Rhode Island Public Utilities Commission on October 29, 1999. The proposed effective date for the filed tariffs is January 1, 2000.

A copy of the tariff advice is on file at the Commission at 100 Orange Street, Providence and at the Company's office at 750 West Center Street, West Bridgewater, Ma. 02379. The copy may be examined by the public during business hours.

Newport Electric Corporation
750 West Center Street
West Bridgewater, Ma. 02379

# BLACKSTONE VALLEY ELECTRIC COMPANY
# and
# NEWPORT ELECTRIC CORPORATION

## STANDARD OFFER SERVICE

## TARIFF ADVICE FILING

**October 29, 1999**

# SECTION 1.

# PROPOSED
# STANDARD OFFER SERVICE
# TARIFFS

NARR 02565

R.I.P.U.C. NO. 1199
CANCELS NO. 1180

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

Energy Charge: $.03800 per kWh

The foregoing Rate shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Date Filed, October 29, 1999 Date Effective, January 1, 2000

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all-costs recoverable through the Standard Offer Fuel Index provision. Notwithstanding the foregoing, the Company may not recover, without full disclosure and the express approval of the Commission, any costs of Standard Offer Service in excess of the costs billable under the Settlement Agreement dated October 17, 1997.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the Energy Charge as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31,

R.I.P.U.C. NO. 1199

-4-

1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, October 29, 1999                Date Effective, January 1, 2000

NARR 02569

R.I.P.U.C. NO. 1424
CANCELS NO. 1405

NEWPORT ELECTRIC CORPORATION
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

      Energy Charge:   $.03800    per kWh


The foregoing Rate shall be adjusted from time to time in accordance
with provisions of the Standard Offer Fuel Index and the Standard
Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied
by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas
Price plus Market Oil Price for the billing month exceeds the Fuel
Trigger Point then in effect, where:

    Market Gas Price is the average of the values of Gas Index for
    the most recent six months through and including the billing
    month, where:

Date Filed, October 29, 1999         Date Effective, January 1, 2000

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision. Notwithstanding the foregoing, the Company may not recover, without full disclosure and the express approval of the Commission, any costs of Standard Offer Service in excess of the costs billable under the Settlement Agreement dated October 17, 1997.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the Energy Charge as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31,

R.I.P.U.C. NO. 1424

-4-

1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, October 29, 1999          Date Effective, January 1, 2000

NARR 02573

# SECTION 2.

## STANDARD OFFER PRICE CAP PER URA

# Blackstone Valley Electric Company

## Comparison of Standard Offer Price Cap per URA to Proposed Standard Offer

| | Sep-96 | 1997 | 1998 | 1999 | 2000 | |
|---|---|---|---|---|---|---|
| Average Revenue | $ 0.09998 | $ 0.09998 | $ 0.10190 | $ 0.10320 | $ 0.10477 | |
| times: 80% CPI | | 1.019 | 1.013 | 1.015 | 1.018 | |
| Adjusted Average Revenue | | $ 0.10190 | $ 0.10320 | $ 0.10477 | $ 0.10661 | |
| less: Transmission Charge | | 0.00226 | 0.00226 | 0.00226 | 0.00278 | (1) |
| less: Transition Charge | | 0.02800 | 0.02800 | 0.02040 | 0.02320 | (2) |
| less: Distribution Charge | | 0.02830 | 0.02995 | 0.02995 | 0.02995 | |
| less: CCA Charge | | 0.00230 | 0.00230 | 0.00230 | 0.00230 | |
| Standard Offer Price Cap | | $ 0.04104 | $ 0.04068 | $ 0.04986 | $ 0.04837 | |
| Actual Standard Offer | | | $ 0.03200 | $ 0.03500 | $ 0.03800 | |

CPI incr.

Notes:
Price Cap: Inflation Rate from National Price Index Forecast dated October 1999.
All charges are exclusive of RI Gross Receipts Tax.

* 1996 Benchmark 9.998 ¢/kWh (10.4¢ including GRT) inflated at 80% of CPI
(1) Year ending September 1999 12 mos. avg. (weighted) total $ / tot. kwh.
(2) Projected from Montaup's 1999 RVC filing.

N:\RIPUC\SO_2000\CAPB2000.xls,10/28/99,EJA

# Newport Electric Corporation

## Comparison of Standard Offer Price Cap per URA to Proposed Standard Offer

| | Sep-96 | 1997 | 1998 | 1999 | 2000 | |
|---|---|---|---|---|---|---|
| Average Revenue | $ 0.10795 | $ 0.10795 | $ 0.11002 | $ 0.11143 | $ 0.11312 | |
| times: 80% CPI | | 1.019 | 1.013 | 1.015 | 1.018 | |
| Adjusted Average Revenue | | $ 0.11002 | $ 0.11143 | $ 0.11312 | $ 0.11511 | |
| less: Transmission Charge | | 0.00213 | 0.00213 | 0.00213 | 0.00278 | (1) |
| less: Transition Charge | | 0.02800 | 0.02800 | 0.02060 | 0.02340 | (2) |
| less: Distribution Charge | | 0.04078 | 0.04256 | 0.04256 | 0.04256 | |
| less: CCA Charge | | 0.00230 | 0.00230 | 0.00230 | 0.00230 | |
| Standard Offer Price Cap | | $ 0.03680 | $ 0.03643 | $ 0.04553 | $ 0.04407 | |
| Actual Standard Offer | | | $ 0.03200 | $ 0.03500 | $ 0.03800 | |

Notes:
Price Cap: Inflation Rate from National Price Index Forecast dated October 1999.
All charges are exclusive of RI Gross Receipts Tax.

* 1996 Benchmark 10.795¢/kWh (11.2¢ including GRT) inflated at 80% of CPI
(1) Year ending September 1999
(2) Projected from Montaup's 1999 RVC filing.

N:\RIPUC\SO_2000\SO_CAPN2000.xls,10/28/99,EJA

# EXHIBIT O

 # Memorandum

December 8, 1999

To: R. G. Powderly
M. J. Hirsh
J. D. Carney
R. P. Clarke
P. D. Fuller
S. T. Hall
K. A. Kirby
L. R. Boisvert
A.M. Rosbottom

From: M. Sorgman MS

Re Blackstone Valley Electric and Newport Electric Corporation
Docket 3022
Standard Offer Service

Attached is a copy of the Companies' request to the R.I.P.U.C. to consider alternative Standard Offer Service tariffs. The tariffs would permit the deferral of expected Standard Offer price increases due to the Standard Offer Fuel index. Hearings on this docket were held December 6, 1999.

cc:

| D. St. Pierre | D. Sorgman | T. McLeish | A. Thompson |
|---|---|---|---|
| J. J. Bonner | E. Atchison | H. Sennott | K. Menard |
| J. A. Lloyd | F. Mason | C. Roach | D. Tufts |
| L. S. O'Donnell | D. Jacobs | D. O'Connor | J. Carlton |
| D. Fazzone | T. Schwennesen | | |

Circulation:

D. G. Pardus
J. R. Stevens
C. J. Hebert
D. T. Sena

EXHIBIT
Lloyd 89
3-6-07



Blackstone Valley Electric
Eastern Edison
EUA Service Corporation
Montaup Electric
Newport Electric

December 7, 1999

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

Re: Blackstone Valley Electric Company
Newport Electric Corporation
Docket No. 3022
Standard Offer Service

Dear Ms. Massaro:

Enclosed herewith for filing on behalf of Blackstone Valley Electric Company ("Blackstone") and Newport Electric Corporation ("Newport") (collectively the "Companies") are an original and three (3) copies of the following documents in the above captioned docket.

1. The Companies' Reply to Record Request No. 1 (12/6/99 Hearing),
2. The Companies' Reply to Record Request No. 2 (12/6/99 Hearing),
3. Proposed alternative *Standard Offer Service* tariffs (R.I.P.U.C. No. 1200 for Blackstone and R.I.P.U.C. No. 1425 for Newport) to be effective January 1, 2000, for consumption on and after that date. The proposed alternative tariffs cancel the Companies' currently effective *Standard Offer Service* tariffs (R.I.P.U.C. No. 1180 for Blackstone and R.I.P.U.C. No. 1405 for Newport), and
4. Redlined copies of the foregoing tariffs marked to show the changes made.

As discussed by Mr. Sorgman, the Companies' witness in the December 6 hearing in this docket, the Companies are proposing for the Commission consideration alternative Standard Offer Service tariffs which permit the deferral of expected Standard Offer price increase due to the Standard Offer Fuel Index provision. The Standard Offer Fuel Index is predicted to be in excess of 1.0 commencing January 1, 2000. The proposed alternative tariffs permit the costs the Companies would experience from the application of the Standard Offer Fuel Index to included as part of the Companies' Standard Offer Cost Adjustment, an annual reconciliation filing, instead of being immediately billed to customers.

In response to the Commission's concern, voiced at the December 6 hearing, over the appropriateness of interest on deferred recoveries of expenses attributable to the Standard Offer Fuel Index, the Companies have given the matter additional consideration. Thus, the proposed

alternative Standard Offer Services filed herewith do not propose to apply interest to any deferred expenses with respect to the Standard Offer Fuel Index.

If you have any questions or if you need more information, please call me at (508)-559-2000 ext. 3700.

Very truly yours,

Dennis St. Pierre
Vice President

cc: Service List

Enc.

N \RIPUC\SO_2000\L991207A.DOC

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
Filing Date December 7, 1999

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

~~Diane A.~~ Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Paul Roberti, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

Sam DeFrawi
Navy Rate Intervention
901 M Street S.E., Building 212
Washington, DC 20374-5018

Lindsay Johnson, Esq.
100 State Street-10th floor
Boston, MA 02109-2403

Ronald T. Gerwatowski, Esq.
Narragansett Electric Company
280 Melrose Street, P.O. Box 1438
Providence, RI 02901-1438

\\ALFRED\RATEDGN\ripuc\so_2000\SERVICELIST.DOC\

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY AND NEWPORT ELECTRIC
DOCKET NO. 3022

RECORD REQUEST OF THE PUBLIC UTILITIES COMMISSION

The Commission's Record Request pursuant to ~~the hearing~~ on December 6, 1999.

COMM-RR-1 Please explain how the prorated Standard Offer will be calculated and presented on customers' January bills.

Reply: See attached workpaper that demonstrates the calculation of the prorated Standard Offer charge for each billing cycle in January. Also attached is a copy of a sample customer bill showing how the Standard Offer will be presented and explained to customers on January bills.

Prepared by or under the supervision of: M. Sorgman

# BLACKSTONE VALLEY ELECTRIC COMPANY
## Calculation of Prorated Standard Offer for Rate Change Effective January 1, 2000
### Rate R-1

Present Standard Offer $ 0.03500

Proposed Standard Offer (Effective 1/1/2000) $ 0.03800

| (A) Billing Cycle Date | (B) Days in Cycle | (C) Days Billed @ Old Rate | (D) Days Billed @ New Rate | (E) Energy Usage | (F) Present Standard Offer Revenues | (G) Proposed Standard Offer Revenues | (H) Prorated Standard Offer Charge |
|---|---|---|---|---|---|---|---|
| 3-Jan-00 | 32 | 29 | 3 | 500 | $17.50 | $17.64 | $0.03528 |
| 4-Jan-00 | 32 | 28 | 4 | 500 | 17.50 | 17.69 | 0.03538 |
| 5-Jan-00 | 30 | 25 | 5 | 500 | 17.50 | 17.75 | 0.03550 |
| 6-Jan-00 | 30 | 24 | 6 | 500 | 17.50 | 17.80 | 0.03560 |
| 7-Jan-00 | 30 | 23 | 7 | 500 | 17.50 | 17.85 | 0.03570 |
| 10-Jan-00 | 32 | 22 | 10 | 500 | 17.50 | 17.97 | 0.03594 |
| 11-Jan-00 | 32 | 21 | 11 | 500 | 17.50 | 18.02 | 0.03604 |
| 12-Jan-00 | 30 | 18 | 12 | 500 | 17.50 | 18.10 | 0.03620 |
| 13-Jan-00 | 30 | 17 | 13 | 500 | 17.50 | 18.15 | 0.03630 |
| 14-Jan-00 | 30 | 16 | 14 | 500 | 17.50 | 18.20 | 0.03640 |
| **17-Jan-00** | **32** | **15** | **17** | **500** | **17.50** | 18.30 | **0.036600** |
| 18-Jan-00 | 32 | 14 | 18 | 500 | 17.50 | 18.34 | 0.03668 |
| 19-Jan-00 | 30 | 11 | 19 | 500 | 17.50 | 18.45 | 0.03690 |
| 20-Jan-00 | 30 | 10 | 20 | 500 | 17.50 | 18.50 | 0.03700 |
| 21-Jan-00 | 30 | 9 | 21 | 500 | 17.50 | 18.55 | 0.03710 |
| 24-Jan-00 | 32 | 8 | 24 | 500 | 17.50 | 18.63 | 0.03726 |
| 25-Jan-00 | 29 | 4 | 25 | 500 | 17.50 | 18.79 | 0.03758 |
| 26-Jan-00 | 29 | 3 | 26 | 500 | 17.50 | 18.84 | 0.03768 |
| 27-Jan-00 | 29 | 2 | 27 | 500 | 17.50 | 18.90 | 0.03780 |
| 28-Jan-00 | 29 | 1 | 28 | 500 | 17.50 | 18.95 | 0.03790 |

Column Notes:

Column A: Scheduled cycle reading dates for January, 2000.
Column B: Number of days between scheduled cycle reading date in January and scheduled cycle reading date in December
Column C: Number of December days in the billing cycle.
Column D: Number of January days in the billing cycle.
Column E: kWh usage for one month.
Column F: Column E * $.03500.
Column G: (Column C/Column B)*$.03500 + (Column D/Column B)*$.03800.
Column H: Column G/Column E

N:\BVE\recreq1.proration.xls, R1_allcharges, JAL, 12/7/99,1:36 PM

**Eastern Utilities**

| | ACCOUNT NUMBER |
|---|---|
| 99 | 1-3199-999999-9 |

BILLING DATE
JAN 17, 2000

Make check payable to

*Blackstone Valley Electric*
PO Box 15611
Worcester MA 01615-0611

AMOUNT DUE
$56.75
MUST BE RETURNED BY

JOHN Q CUSTOMER
123 MAIN ST
LINCOLN RI 02865

FEB 11, 2000
TO BE CREDITED TO
YOUR NEXT BILLING

AMOUNT ENCLOSED

| NEXT METER READ DATE | | ACCOUNT NUMBER |
|---|---|---|
| FEB 14, 2000 | 99 | 1-3199-999999-9 |

BILLING DATE
JAN 17, 2000

JOHN Q CUSTOMER
123 MAIN ST
NEWPORT RI 02840

PREVIOUS BALANCE $0.00

| METER NUMBER | RATE | FROM | TO | PREV. READ | PRES. READ | CONSTANT | KWH USE | DEMAND | |
|---|---|---|---|---|---|---|---|---|---|
| 52502 | R1 | DEC 16 | JAN 17 | 1144 | 1644 | 1 | 500 | | $56.75 |

PLEASE PAY THIS AMOUNT $56.75

RATE R-1 COST OF ELECTRICITY

| DELIVERY SERVICE CHARGES | | | | | | |
|---|---|---|---|---|---|---|
| CUSTOMER | | | | | $3.09 | |
| DISTRIBUTION | $.03857 | X | 500 KWH | = | $19.29 | |
| TRANSITION** | $.02040 | X | 500 KWH | = | $10.20 | |
| CONSERVATION | $.00230 | X | 500 KWH | = | $1.15 | |
| TRANSMISSION (MONTAUP ELECTRIC CO.) | $.00489 | X | 500 KWH | = | $2.45 | |
| GROSS RECEIPTS TAX | | | | | $1.51 | |
| TOTAL DELIVERY SERVICES | | | | | | $37.69 |
| SUPPLIER SERVICES - EUA STANDARD OFFER 1-401-333-1110 | | | | | | |
| TOTAL ENERGY CHARGE* | $.03660 | X | 500 KWH | = | | $18.30 |
| GROSS RECEIPTS TAX | | | | | | $0.76 |
| TOTAL COST OF ELECTRICITY | | | | | | $56.75 |

* THE STANDARD OFFER INCREASED BY .003 CENTS PER KWH FOR ELECTRIC CONSUMPTION ON AND AFTER JANUARY 1, 2000.
**INCLUDES A BASE TRANSITION CHARGE OF $.02800 AND A TRANSITION COST ADJUSTMENT CHARGE FACTOR OF $.00760 CREDIT AS OF MAY 1, 1999.

Average kWh And kW Billed Per Day For Last 13 Months

| Usage | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| kWh | | | | | | | | | | | | | |
| kW | | | | | | | | | | | | | |

Energy Conservation Report

| Bill Term | Bill Days | kWh Use | kWh/Day |
|---|---|---|---|
| This Year | | | |
| Last Year | | | |

*Blackstone Valley Electric* PO Box 15611 Worcester MA 01615-0611 TELEPHONE (SEE REVERSE SIDE)

NARR 02701

RHODE ISLAND PUBLIC UTILITIES COMMISSION
INFORMATION REQUESTS
BLACKSTONE/NEWPORT

RECORD REQUEST OF THE PUBLIC UTILITIES COMMISSION

DOCKET NO. 3022

The Commission's Record Request pursuant to the hearing on December 6, 1999.

COM-RR-2: Please provide the most recent calculation of the Standard Offer Fuel Index.

Reply: Attached is the most recent calculation of the Standard Offer Fuel Index. The information provided is based upon actual data for the period of July 1999 through November 1999 and estimated data for the month of December 1999.

Prepared by or under the supervision of: M. Sorgman

Q:\RI\3022\COM-RR-2.WPD

RIPUC Dock . 3022
Record Request No. 2

# Blackstone Valley Electric Company
## Newport Electric Corporation
## Calculation of Standard Offer Fuel Index

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | Jul-99 | Aug-99 | Sep-99 | Oct-99 | Nov-99 | Dec-99 | Average | | |
| 2 | Fuel Oil Index | 16 26 | 18.49 | 19.36 | 19 31 | 19.45 | 19 45 (1) | 18.72 | $ 2.97143 | /mmbtu |
| 3 | Gas Index | 2.272 | 2 572 | 2 963 | 2.607 | 3.04 | 2.169 (1) | 2.60383 | | |
| 4 | Standard Offer Rate | $ 0.0380 /kWh | | | | | | | | |
| 5 | Year 2000 fuel trigger | 5.35 | | | | | | | | |
| 6 | Market Gas Price | $ 2.60383 | | | | | | | | |
| 7 | Market Oil Price | $ 2.97143 | | | | | | | | |
| 8 | Total Price Index | **5.57526** > | "Trigger of" | **5.35000** | 4.21% Greater than trigger,(Fuel Adj.Required) | | | | | |

9 Fuel Adjustment = (Gas Market price + $0.60/mmbtu) + (Market Oil Price + $.04/mmbtu)
10 Fuel Trigger Point + $0.60 + $0.04/mmbtu
11 = 1.03761

12 => 1.03761 X $ 0.0380 = $ 0.03943 The Adjusted Standard offer rate is a $ 0.00143 /kWh increase

14 Change in the Standard Offer Rate = $ 0.00143

| | | | | kWh (2) | | Standard Offer Revenue @ $ 0 03943 | | Standard Offer Revenue @ 0 03800 | DELTA | |
|---|---|---|---|---|---|---|---|---|---|---|
| 16 | Blackstone | $ 0.03943 | X | 116,924,737 | = | 4,610,247 | V | 4,443,140 | 167,106 | 3 76% |
| 17 | Newport | $ 0.03943 | X | 51,361,187 | = | 2,025,129 | V | 1,951,725 11 | 73,404 | 3 76% |
| 18 | | | | | | | | | 240,511 | |

NOTES
1 Estimated value
2 Forecast January 2000 sales

fuel index bve nec xls 12/7/99 MNS REV 00

R.I.P.U.C. NO. 1200
CANCELS NO. 1180

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

Energy Charge: $.03800 per kWh

The foregoing Rate shall be adjusted from time to time in accordance with provisions of the Standard Offer Cost Adjustment described below:

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, including all excess payments made to Suppliers in accordance with the Standard Offer Fuel Index provision. Notwithstanding the foregoing, the Company may not recover, without full disclosure and the express approval of the Commission, any costs

Date Filed, December 7, 1999

Date Effective, January 1, 2000
for consumption on and after
January 1, 2000

of Standard Offer Service in excess of the costs billable under the Settlement Agreement dated October 17, 1997.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month for the purpose of computing payments to Suppliers of Standard Offer Service shall be multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer

suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

The Company shall pay the Suppliers of Standard Offer Service an amount equal to the incremental revenues the Company would have received from the application of the Fuel Adjustment to retail Standard Offer Service customers applicable to the billing month. The foregoing incremental revenues shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month. The Company shall be authorized to accumulate payments to Suppliers in excess of revenues billed by the Company to customers of Standard Offer Service in the Standard Offer Cost Adjustment reconciliation account.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the Energy Charge as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier

R.I.P.U.C. NO. 1200

-4-

of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, December 7, 1999          Date Effective, January 1, 2000
                                      for consumption on and after
                                      January 1, 2000

NARR 02707

R.I.P.U.C. NO. 1200
CANCELS NO. 1180

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

Energy Charge: $.03800 per kWh

The foregoing Rate shall be adjusted from time to time in accordance with provisions of the ~~Standard Offer Fuel Index and the~~ Standard Offer Cost Adjustment described below:

~~STANDARD OFFER FUEL INDEX:~~

~~The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:~~

~~Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:~~

~~Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined~~

Date Filed, December 7, 1999

Date Effective, January 1, 2000
for consumption on and after
January 1, 2000

~~below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;~~

~~Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:~~

~~Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.~~

~~Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:~~

| ~~Year~~ | ~~Fuel Trigger Point~~ |
|---|---|
| ~~2000~~ | ~~$5.35 per MMBTU~~ |
| ~~2001~~ | ~~$5.35 per MMBTU~~ |
| ~~2002~~ | ~~$6.09 per MMBTU~~ |
| ~~2003~~ | ~~$7.01 per MMBTU~~ |
| ~~2004~~ | ~~$7.74 per MMBTU~~ |

~~In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:~~

~~Fuel Adjustment = (Market Gas Price+$0.60/MMBTU)+(Market Oil Price+$0.04/MMBTU) / Fuel Trigger Point + $0.60 + $0.04/MMBTU~~

~~Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.~~

~~Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.~~

STANDARD OFFER COST ADJUSTMENT:

Date Filed, December 7, 1999

Date Effective, January 1, 2000 for consumption on and after January 1, 2000

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, ~~excluding~~ including all excess payments made to Suppliers ~~costs recoverable through~~ in accordance with the Standard Offer Fuel Index provision. Notwithstanding the foregoing, the Company may not recover, without full disclosure and the express approval of the Commission, any costs of Standard Offer Service in excess of the costs billable under the Settlement Agreement dated October 17, 1997.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month for the purpose of computing payments to Suppliers of Standard Offer Service shall be multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures

Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

The Company shall pay the Suppliers of Standard Offer Service an amount equal to the incremental revenues the Company would have received from the application of the Fuel Adjustment to retail Standard Offer Service customers applicable to the billing month. The foregoing incremental revenues shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month. The Company shall be authorized to accumulate payments to Suppliers in excess of revenues billed by the Company to customers of Standard

Offer Service in the Standard Offer Cost Adjustment reconciliation account.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the Energy Charge as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

R.I.P.U.C. NO. 1425
CANCELS NO. 1405

NEWPORT ELECTRIC CORPORATION
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

Energy Charge: $.03800 per kWh

The foregoing Rate shall be adjusted from time to time in accordance with provisions of the Standard Offer Cost Adjustment described below:

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, including all excess payments made to Suppliers in accordance with the Standard Offer Fuel Index provision. Notwithstanding the foregoing, the Company may not recover, without full disclosure and the express approval of the Commission, any costs

Date Filed, December 7, 1999

Date Effective, January 1, 2000
for consumption on and after
January 1, 2000

of Standard Offer Service in excess of the costs billable under the Settlement Agreement dated October 17, 1997.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month for the purpose of computing payments to Suppliers of Standard Offer Service shall be multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

> Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:
>
> > Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;
>
> Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:
>
> > Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer

suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

The Company shall pay the Suppliers of Standard Offer Service an amount equal to the incremental revenues the Company would have received from the application of the Fuel Adjustment to retail Standard Offer Service customers applicable to the billing month. The foregoing incremental revenues shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month. The Company shall be authorized to accumulate payments to Suppliers in excess of revenues billed by the Company to customers of Standard Offer Service in the Standard Offer Cost Adjustment reconciliation account.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the Energy Charge as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier

R.I.P.U.C. NO. 1425

-4-

of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, December 7, 1999

Date Effective, January 1, 2000
for consumption on and after
January 1, 2000

NARR 02716

R.I.P.U.C. NO. 1425
CANCELS NO. 1405

NEWPORT ELECTRIC CORPORATION
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

Energy Charge: $.03800 per kWh

The foregoing Rate shall be adjusted from time to time in accordance with provisions of the ~~Standard Offer Fuel Index and the~~ Standard Offer Cost Adjustment described below:

~~STANDARD OFFER FUEL INDEX:~~

~~The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:~~

~~Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:~~

~~Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the~~

Date Filed, December 7, 1999

Date Effective, January 1, 2000 for consumption on and after January 1, 2000

~~Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;~~

~~Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:~~

~~Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.~~

~~Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:~~

| ~~Year~~ | ~~Fuel Trigger Point~~ |
|---|---|
| ~~2000~~ | ~~$5.35 per MMBTU~~ |
| ~~2001~~ | ~~$5.35 per MMBTU~~ |
| ~~2002~~ | ~~$6.09 per MMBTU~~ |
| ~~2003~~ | ~~$7.01 per MMBTU~~ |
| ~~2004~~ | ~~$7.74 per MMBTU~~ |

~~In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:~~

~~Fuel Adjustment = (Market Gas Price+$0.60/MMBTU)+(Market Oil Price+$0.04/MMBTU) / Fuel Trigger Point + $0.60 + $0.04/MMBTU~~

~~Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.~~

~~Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.~~

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, ~~excluding~~ including all excess payments made to Suppliers ~~costs recoverable through~~ in accordance with the Standard Offer Fuel Index provision. Notwithstanding the foregoing, the Company may not recover, without full disclosure and the express approval of the Commission, any costs of Standard Offer Service in excess of the costs billable under the Settlement Agreement dated October 17, 1997.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month for the purpose of computing payments to Suppliers of Standard Offer Service shall be multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

> Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:
>
> > Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures

Date Filed, December 7, 1999

Date Effective, January 1, 2000 for consumption on and after January 1, 2000

Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|---|---|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

The Company shall pay the Suppliers of Standard Offer Service an amount equal to the incremental revenues the Company would have received from the application of the Fuel Adjustment to retail Standard Offer Service customers applicable to the billing month. The foregoing incremental revenues shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month. The Company shall be authorized to accumulate payments to Suppliers in excess of revenues billed by the Company to customers of Standard

Offer Service in the Standard Offer Cost Adjustment reconciliation account.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the Energy Charge as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, December 7, 1999

Date Effective, January 1, 2000 for consumption on and after January 1, 2000

# EXHIBIT P

EXHIBIT 105
WIT: Taylor
DATE: 3/12/07
Victoria S. Reade

DRAFT

# Analysis of Eastern Utilities Associates'

# Standard Offer Service

# Backstop Obligation

REED
CONSULTING GROUP
200 Wheeler Road • Burlington, Massachusetts 01803
617-270-0101

DRAFT

## I. Introduction

The purpose of this report is to assess the implications of the Eastern Utilities Associates' (EUA) Standard Offer Service (SOS) backstop obligation on TransCanada Energy Limited (TransCanada) in the event that TransCanada purchases EUA's entitlement in Ocean States Power Project (OSP). Per the Backstop Agreement,

> Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.
>
> As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capacity, operable capacity, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service.

First, this report reviews the Load Serving Entity (LSE) supply responsibilities for which TransCanada will potentially be responsible as a SOS supplier. These responsibilities, as stated in the Backstop Agreement, include, as well as energy, ancillary services and other non-energy products in the restructured New England Power Pool (NEPOOL) market which a LSE must provide. In particular, this section provides a detailed review of the various NEPOOL products and their potential value. Secondly, the key provisions of EUA's SOS auction process are presented. Finally, the strategic implications of the backstop obligation and LSE responsibilities are discussed.

The focus throughout this paper will be the strategic issues and implications to TransCanada of the potential SOS backstop obligation if TransCanada is successful in its purchase bid for EUA's entitlement share in the Ocean States Power (OSP) generating facilities. These strategic issues are critical in TransCanada's evaluation of the opportunities and risks associated with the purchase of EUA's entitlement share in OSP.

## II. Load Serving Entity Supply Responsibilities

Under the Restated NEPOOL Agreement and rules of ISO New England, Inc. responsibilities of LSE's or Suppliers under the EUA's Backstop Agreement will include, without limitation,

DRAFT

the following: i) installed and operable capacity, ii) operating reserves, iii) transmission arrangements and expenses not recovered in EUA's transmission cost adjustment provisions, and iv) energy, including transmission and distribution losses between sources of supply and the ultimate retail customers meters'.

**1. Installed and Operable Capacity & Ancillary Services**

In December 1996, NEPOOL filed with the Federal Energy Regulatory Commission (FERC) proposing a restructuring of the pool. The proposed restructuring is part of NEPOOL's effort to create a competitive market for electricity while maintaining reliable electric supply throughout the New England region. One of the key features of NEPOOL's restructuring proposal is the disaggregation of electricity supply service into seven products: Installed Capability (IC), Operable Capability (OC), Energy, Ten-Minute Spinning Reserve (TMSR), Ten-Minute Non-Spinning Reserve (TMNR), Thirty-Minute Operating Reserve (TMOR), and Automatic Generation Control (AGC). These seven products will ultimately be purchased and sold within the pool at market rates under the proposed NEPOOL rules. These products are discussed in detail in **Appendix A.**

All NEPOOL participants will have the opportunity to self-supply these services, sell surplus capability to the pool, or purchase from the pool if they are deficient. For each of the products except installed capability, market prices will be submitted on an hourly basis, creating an hourly spot market for the service. Installed capability will be bid into the pool monthly, rather than hourly. Under EUA's Backstop Agreement, TransCanada could potentially have a long or short exposure in most of these product markets, either directly or as an 'opportunity cost.' For example, TransCanada may be limited by its potential LSE responsibility from selling into the ancillary services markets and thus suffering an opportunity loss, and yet, to provide cover during periods of outage, it may be necessary to procure OC.

Four ancillary services have been defined by NEPOOL to create market-based incentives for pool Participants to maintain desired levels of reliability in system operations under the new

DRAFT

deregulated structure. Currently, this is accomplished through the use of various administratively determined penalties and cost reimbursement. The intent and requirements, as well as the potential sources and customers for each of the ancillary services are discussed as well in **Appendix A**.

Consistent with the full requirements nature of the backstop supply obligation placed on EUA's assets, TransCanada has a default obligation to supply all of these products for its load share.

The system operator will determine the amounts of each ancillary service required and the responsibility of each load-serving participant, according to the restated NEPOOL agreement. Those participants who elect to purchase ancillary services at their respective clearing prices (or by contract), rather than supplying them by unit ownership, will be the customers for these ancillary services.

The market for Installed Capability is expected to develop as a slowly fluctuating, cyclical market where prices, in many instances, will be set through bilateral contracts. Gaming strategies employed by NEPOOL Participants such as establishing "firm" contracts with energy marketers, or returning previously mothballed units to service will cause larger swings in the prices paid for capacity. However, this market is not expected to experience significant volatility due to the fact that the IC responsibility will be determined semi-annually and the market will be cleared monthly. However, volatility in this market could be more significant if loads are allowed to switch suppliers on very short-notice, such as a month or less. There is no significant risk that OSP will not be able to serve this market. The issue is that there may be an opportunity cost to TransCanada if IC is tied up serving SOS load.

The market for OC, on the other hand, is an hourly market and is expected to be much more volatile. Large swings in the spot price of OC can occur during peak hours or during a system contingency. Theoretically, because the OC market is a subset of the IC market which has a much larger pool-wide MW requirement, it should have relatively low value in most hours. However, potential gaming in the IC market is likely to produce more volatility

DRAFT

and very high prices during a few hours in the OC market if the gaming results in capacity shortages.

The market for TMSR should be closely related to the market for energy since TMSR is typically provided by units that are providing energy but are not fully loaded. Also, the price of TMSR includes a component for the lost opportunity cost for not providing energy. However, how the market develops in practice will depend to a great degree on the bidding strategies for both energy and TMSR by the NEPOOL Participants. While the lowest cost producers of energy should be able to capture the largest market share of TMSR, they also have the highest opportunity cost for supplying the service. The highest cost producers that are also dispatched to provide energy have the lowest opportunity cost to provide TMSR, and may employ a bidding strategy to capture market share. Therefore, TMSR revenues are likely to closely track energy prices with potentially some additional margin given the uncertainty of TMSR costs.

The market for TMNR and TMOR is characterized by over-capacity due to the fact that they are backup reserve services and there are no variable costs associated with them until actual service is provided. Consequently, there is little profit opportunity expected from providing these services, or little lost opportunity from not being able to provide these services.

Providing AGC service has a non-zero cost, but the presence of significant excess capacity means that the AGC clearing price is likely to be set very near the cost of providing service and there will be little or no profit opportunity. Historical AGC payments by NEPOOL have been too low to be of much economic significance. While AGC capability is concentrated in a few suppliers, there are low barriers to entry, which will limit the exertion of market power to increase profits.

**2. Tie Benefits, Line Losses & Other Responsibilities**

Each NEPOOL Participant which receives an identifiable and traceable benefit (a "Tie Benefit"), in the determination of its Installed Capability responsibility or otherwise, from the existing transmission ties between the NEPOOL Control Area, on the one hand, and New

DRAFT

York or New Brunswick on the other hand, shall be deemed a recipient of a Tie Benefit Service. The amount in Kilowatts of Tie Benefit Service received by a NEPOOL Participant at any time shall be the firm load equivalent of the amount of the reduction in its Installed Capability responsibility obligation because of its receipt of the Tie Benefit Service. Monthly payments for Tie Benefit Service shall be an amount computed at the applicable rate[1] times the number of Kilowatts of Tie Benefit Service received divided by 12.

The EUA distribution companies will continue to provide and bill customers for transmission and distribution service. Suppliers of SOS will be responsible for all losses between their sources of supply and the customers' meters, as well as for any transmission and/or distribution arrangements and charges required to get power to the NEPOOL PTF system or EUA's transmission and distribution system.

## III. Key Strategic Provisions of EUA's SOS Auction Process

### 1. Product Specification

EUA is auctioning "100 shares of the Standard Offer Service load for each year."[2] Bidders will bid into the SOS auction for percentage shares of the SOS load rather than bidding to supply given quantities of capacity or energy. EUA has avoided the use of peak demand or total energy as measures of SOS and, instead, is auctioning 100 equally sized shares of service. Each supplier into SOS will experience the same load factor, which will reflect the composition of the loads of all retail customers taking SOS. While historic 1996 peak and energy values are mentioned in the RFQ, EUA never actually stipulates the size of each share. As stated in the EUA RFQ to bid to supply SOS:

> Each Supplier will have complete responsibility for its fixed percentage share of the Companies' [EUAs] real-time Standard Offer Service Load (minute by minute, hour by hour, day by day). Although the quantities of energy and capacity required (MWh and MW) will fluctuate with changes in customer

[1] $10/kW-Yr in years 1 to 5, $4/kW-Yr in years 6 & 7, $3/kW-Yr in years 8 & 9, and $2/kW-Yr in year 10.

[2] EUA RFQ to Bid to Supply Standard Offer Service, October 3, 1997.

DRAFT

demand resulting from factors including, but not limited to, seasonal factors, norman daily load patterns, increased usage by existing Standard Offer customers, demand side management activities, extremes in whether, etc., the Suppliers' percentage of Standard Offer Service load will not vary within a calendar year.

This method of assigning SOS load responsibility creates significantly more load uncertainty risk than do other SOS auction processes in New England as discussed further below.

**2. Reduction of Standard Offer Service Load**

As Standard Offer Service progresses through the transition period to full retail access, it is expected that total load will diminish as more and more customers elect to take service from independent retail suppliers. SOS is designed to be transitional, and the stipulated price stream is designed to provide customers with increasing incentives to choose an alternative supplier in the marketplace. This migration will necessitate periodic reduction of SOS load. Unlike other SOS programs, shares in the EUA SOS program will not be terminated as SOS load diminishes; rather, the size of each share will diminish proportionately as SOS load decreases.

One major difference between the backstop service agreement and the SOS Agreements which will be awarded to winners in the standard offer auction is that the backstop providers' shares of SOS load can be reduced at EUA's discretion. EUA has a strong incentive to pursue cheaper market supplies since, to the extent that their payments to SOS backstop suppliers exceed their revenues from customers at the SOS rate (which will likely be the case for the first three years – at least in Massachusetts), EUA would be required to defer these under-recoveries. Thus, EUA has an incentive to pursue cheaper market alternatives than the backstop supplies in order to keep their deferred under-recoveries to a minimum. EUA's option to diminish (or effectively terminate) load on the part of EUA has important implications for TransCanada and any purchaser of EUA's power supply assets. This option, combined with retail customers' economic incentive to choose an alternative supplier if market rates are below SOS rates, effectively caps TransCanada's revenue on SOS load at the minimum of SOS or market rates. Potential upside associated with customers choosing

DRAFT

not to migrate to lower priced alternative supplies must be severely discounted due to EUA's option and incentive to replace higher cost backstop supplies with market purchases. This issue also suggests that migration rates are not relevant for TransCanada's analysis of the risks and opportunities associated with the valuation of OSP.

## IV. Strategic Implications of the Backstop Obligation and LSE Responsibilities

As discussed above, suppliers of EUA's Standard Offer Service (SOS) will in essence take on all responsibilities of a Load Serving Entity with respect to their allocated share of SOS load. These basic responsibilities are imposed on suppliers which successfully bid into EUA's SOS load auction, as well as the future owners of EUA's divested assets in the event that the SOS auction does not result in a full subscription, thus requiring the backstop obligation to be invoked.

It is important to reiterate that the SOS suppliers will be responsible for providing **firm all-requirements electric service** including capacity, energy, reserves, losses, and other services. In light of this, there are a number of key strategic issues which need to be considered in order to accurately reflect the financial implications of the SOS backstop obligations placed upon EUA's share of OSP. These issues are addressed below.

### 1. Importance of the Need for a Flexible Power Supply Portfolio

The full-requirements nature of the SOS supply obligations essentially require each SOS supplier to possess or assemble a flexible power supply portfolio that is capable of meeting their respective obligations with respect to each of the seven NEPOOL product markets. Thus, entities which do not have a portfolio providing each of these products in a sufficient amount to meet their requirements may be at a relative disadvantage, since they will otherwise need to make up any shortfalls in each of these products through bilateral contracts or spot market purchases. Since it is anticipated that these product markets will not be very liquid for at least the first one or two years, and as a result market prices may be very volatile, such reliance on the market for supplementary needs is likely to be particularly risky.

DRAFT

To the extent that TransCanada's resource portfolio is limited to its shares in OSP, it may be required to acquire additional resources to meet its LSE obligations for certain products or during certain periods. For example, with a portfolio limited to the OSP facility, TransCanada would be required to procure operable capability to meet its requirements during hours in which there is either a planned or unplanned outage at OSP. While any planned maintenance at the facility would likely be scheduled at times when there are not shortages of available capacity, and thus the market price of operable capability may be quite low, it is still an expense that should be considered in valuing OSP. More importantly, however, there is a more significant risk that TransCanada would be subject to high market prices for operable capability in the event that there is an unplanned outage at OSP, particularly if such an outage occurs at peak times. This is an added expense that should be considered in the valuation model being used by TransCanada to assess the market value of EUA's share in OSP.

Additionally, as an LSE, TransCanda would be required to have a sufficient amount of the other six NEPOOL products. However, the OSP facility may not be capable of providing some of these products, such as 10-minute non-spinning reserves. As discussed earlier, this product can be met by the capacity of resources that is capable of being synchronized to the grid within 10 minutes. Thus, it is likely that TransCanada would need to procure additional resources (either through bilateral contract or through the spot market) which are capable of providing 10-minute non-spinning reserve. While REED believes that the market price of 10-minute spinning will be low in most hours, it is still an incremental need that TransCanada should be aware of.

A key issue with respect to TransCanada's potential need to procure additional resources to supplement its portfolio is that resources external to NEPOOL are not likely to be attractive sources. This point is important to the extent that TransCanada currently has or is planning to develop/procure additional supplies from within Canada to supplement its shares in OSP. For example, NEPOOL has proposed to apply an Outside Transaction Adjustment (OTA) to all firm capacity purchases from resources located outside the NEPOOL control area. The

OTA essentially discounts the MW amount of credits which purchasers of capacity from outside NEPOOL are awarded towards meeting their installed capability requirements. For example, a 50 MW purchase may only warrant 45 MW of installed capability credits.[3]

The rationale for the OTA is that firm imports from sources outside of NEPOOL reduce the amount of available transmission transfer capacity over inter-regional ties, thus limiting the extent to which neighboring control areas may provide backup supplies in an emergency condition. In calculating the total installed capacity requirement for the NEPOOL region as a whole, the reliability benefits of the available transfer capabilities on inter-regional ties are explicitly considered. Thus, to the extent that incremental transactions are entered into over tie lines with neighboring regions, there would be an attendant increase in the total amount of installed capability needed to result in the same system reliability target, i.e. a loss-of-load-probability (LOLP) of not more than 1 day in 10 years. The OTA is intended to allocate the full extent of this increase to the entity engaging in the external transaction.

While the OTA specifically pertains to the installed capability market, there are likely to be other "discounts" to supplies from external resources with respect to some of the other NEPOOL products. For example, REED is aware that the ISO is currently drafting detailed rules with respect to operable capability, and that these rules may likely apply more stringent operable capability rating criteria for external resources than would be applied to internal resources. These more stringent criteria would presumably be reflective of the fact that NEPOOL would likely not have as high a degree of dispatch control over resources located outside of the NEPOOL control area.

**2. SOS Load Obligation Uncertainty and Risks**

As stated previously, under EUA's SOS program, suppliers are required to serve a fixed percentage of SOS load on an day-to-day, minute-by-minute, hour-to-hour basis. As such, there is not a concrete, definitive supply obligation in terms of MW of capacity or MWh of

[3] The actual amount of the discount may be more or less in practice, and will be determined on a transaction by transaction basis.

DRAFT

energy, but rather SOS suppliers are obligated to take on the risk of load forecast error due to factors including: seasonal factors, daily load fluctuations, increased or decreased usage, DSM activities, extremes of weather, etc. Importantly, this is fundamentally different to how some other New England utilities have structured their standard offer programs, which provide suppliers with a more tangible measure of their supply obligation.[4]

To illustrate the implications of the load risks which are being placed on SOS suppliers, it is useful to examine a worst-case scenario in which no supplies are bid into EUA's SOS auction and no customers have yet migrated from SOS to the competitive market. In this case, the full extent of EUA's SOS supply needs would be met through the backstop obligation imposed on Montaup's current assets. Taking EUA's projected demand for 1998 of 924 MW, and adding a 15% reserve requirement, EUA's total capacity requirements would be about 1062 MW. However, in this worst-case scenario, EUA would only have about 1031 MW of summer capacity available from its existing portfolio, which is roughly 31 MW less than its projected requirements. However, given that backstop supply obligations are stated in the form of a percentage of EUA's SOS needs, responsibility for this shortfall would presumably be allocated to the backstop suppliers in proportion to their backstop assignment percentages. For example, since OSP's backstop percentage is about 14%, under this scenario TransCanda would be obligated to provide an additional 4 MW (14% X 31MW) more capacity than the roughly 135 MW of summer capacity it would be acquiring through EUA's share of OSP.[5] It would presumably need to purchase this capacity from the market, which at a hypothetical market capacity price of $30/kW-year, could mean an additional expense on the order of about $130,000. Moreover, to the extent that EUA's forecast is

[4] For example, Boston Edison (BECO) has structured their SOS auction such that suppliers bid a maximum peak demand amount that they are willing to supply, stated in MWh/Hr. While suppliers' actual hour-to-hour load obligation would vary proportionally with BECO's total SOS load, which is uncertain, each supplier would know with certainty what its maximum hourly obligation could be, i.e., the peak demand amount of their bid.

[5] A key issue is that 44 MW of SOS backstop obligation is allocated to EUA's Millstone entitlement. Given the uncertainty around these units, the question arises as to how EUA would replace the backstop capacity provided by Millstone in the event some or all of the Millstone units did not return to service (i.e., Would it result in greater proportional backstop obligations being placed on remaining EUA assets, or would EUA replace this deficit through market purchases?) Based on REED's review of the documents provided by EUA on the backstop obligation, it does not appear that any shortfall due to a retirement of Millstone would be allocated to the other backstop resources. Rather, EUA would likely need to replace these resources through market purchases.

DRAFT

wrong and actual SOS demand exceeds the 924 MW, TransCanada would be obligated to provide roughly an additional 160 kW for each 1 MW of demand above the forecast level of 924 MW.[6]

In reality, at least after the first couple of years as a result of customer migration, it is likely that TransCanda's potential SOS supply obligation would be considerably less than the 135 MW of OSP capacity it would acquire. Therefore, there would be little risk that TransCanda's SOS load obligations would exceed the amount of capacity it would acquire through EUA's share in OSP (and therefore would not necessitate purchasing incremental capacity resources from the market.) However, EUA's designation of SOS load responsibility in the form of a fixed percentage share serves to limit TransCanada's portfolio flexibility. For example, without knowing the maximum amount SOS load obligation, in MW, it would be obligated to supply, TransCanada would presumably need to hold more of its OSP capacity in "reserve" than would otherwise be the case if a maximum load obligation amount were know with certainty. This capacity held in reserve would not be available for meeting TransCanda's broader marketing objectives, such as establishing bilateral sales contracts.

The risks associated with TransCanada's potential obligations to provide energy are price related, i.e., how do the SOS Wholesale Prices compare to the prices that TransCanada could obtain in the spot or bilateral energy markets. In essence, any energy that TransCanada provides out of OSP that is not required to serve its SOS obligation will be sold to the spot market at the market clearing price. This simplifies the issue of making nominations to the ISO as a LSE entity since there is no need to forecast the SOS loads since any surplus will be sold automatically to the pool as a transaction in the energy imbalance market. Conversely, this SOS obligation effectively prevents TransCanada from using OSP to backstop bilateral transactions, except to the degree that TransCanada is able to accurately forecast its SOS load and offer OSP's the surplus to the bilateral market.

[6] (1 MW) (1.15 reserve margin gross up )(14% OSP backstop assignment)

Another issue associated with the SOS obligation is that to the degree that the combination of the full-term and single-year auctions results in greater under-subscription in some years than in others (see below), TransCanada could have potentially have greater supply obligations in future years than in the near term.[7] This would limit TransCanada's ability to pursue long-term bilateral contract for the output of OSP.

### 3. Impacts on OSP Market Revenue Potential if SOS Backstop Obligation is Imposed

In the restructured NEPOOL market, TransCanada will be able derive revenues from EUA's share of OSP in each of the seven markets proposed for NEPOOL. That is, TransCanada could feasibly sell OSP's energy output to one entity, installed capacity to another, and operable capability, reserves, and AGC to any number of different entities. In return, TransCanada would be compensated in the form of payments from each of the various entities to which these products are being sold.

[7] Clearly, the degree to which this occurs depends the rate of customer migration and prospective SOS suppliers' forward curves for the mix of customers remaining on SOS relative to the wholesale SOS prices.

DRAFT

However, in the event that the backstop obligation is imposed on Montaup's assets, it is important to note that the Standard Offer Wholesale Prices are *the only form of compensation that TransCanada will receive for providing all of the required services.* For example, in 1998, to the extent that OSP is required to backstop SOS, TransCanada would be paid the Standard Offer Wholesale Price of 3.2 cents/kWh. Given the fact that SOS suppliers are required to provide all seven NEPOOL power supply products, TransCanada would not be able to recover additional revenues for capacity and operating reserves to the extent that OSP's entire output is committed to provide SOS.[8] Thus, evaluation of the economics of the OSP plant under the SOS backstop scenario needs to be based on the assumption that the Standard Offer Wholesale Prices paid by EUA to backstop suppliers represent the all-in revenue for the SOS services provided.

More importantly, this all in-price is applicable to a capacity factor equal to the load factor associated with EUA's SOS load remaining at any given point in time. This is because each supplier will be responsible for supplying a fixed percentage of EUA's SOS load in each hour, and therefore each supplier's load obligation will track the aggregate SOS load shape. For example, based on EUA's peak demand forecast for 1998 of 924 MW and total energy forecast for 1998 of 4,826 GWh, the load factor for EUA's system in 1998 is expected to be 59.6%. As a result, at the start of SOS (i.e., before any customers migrate), the capacity factor of any SOS backstop sales obligation imposed on EUA's OSP entitlement would be at a capacity factor of 59.6%, and it would be compensated at an all-in rate of $32/MWh. Arguably, this all-in rate is lower than what a market rate required by a new entrant at a 60% capacity factor. For example, based on analysis performed by REED, a new combined cycle operating at a 60% capacity factor would require an all-in revenue rate (on a real-levelized basis) of about $39/MWh.

[8] REED recognizes that during the vast majority of the year that if it were to inherit the SOS supply obligation that TransCanada would have surplus output available from OSP to offer in the various NEPOOL product markers. However, the point here is that the SOS wholesale price is the only revenue received for all of the products provided as part of the SOS obligation.

DRAFT

The risk that the Standard Offer Wholesale Price is below market is further pronounced as customers migrate from SOS, particularly since the most likely customers to leave first are those with the most attractive load shapes (i.e., high load factor customers). As these high load factor customers leave SOS, the effective load factor of the remaining SOS load will be lowered. For example, the starting load factor in 1998 of 60% could be lowered to something on the order of 40% by 2000 as a result of higher load factor customers leaving SOS. The Standard Offer Wholesale Price in 2000 is $38/MWh. However, the required all-in price of a new entrant operating at a 40% capacity factor is estimated by REED to be in the range of $50/MWh. Thus, clearly there is a significant risk that the Standard Offer Wholesale Prices which are paid to suppliers will be substantially lower than the all-in market price applicable to a similar capacity factor sale. This risk becomes greater in the later years of the SOS transition period as the load factor will likely continue to diminish.

Another potential economic penalty associated with the SOS obligation is that as customers with the flattest load shapes migrate to the competitive retail market, OSP's output would be dedicated to the SOS market for a disproportionately larger number of hours when energy prices are likely to be at their highest. Conversely, the hours when OSP would have output that is surplus to its SOS obligation and is able to make sales to the spot energy market will be those hours when the value of the output is lowest.

Even if some customers do not migrate to capitalize on lower market prices, the fact that EUA has an option to replace backstop supplies with market purchases severely discounts any potential upside associated with customers that choose not to migrate. This is especially the case given the fact that EUA has a pretty strong incentive to pursue cheaper market supplies since, to the extent that their payments to SOS backstop suppliers exceed their revenues from customers at the SOS rate (which will be the case for the first three years – at least in MA), EUA would be required to defer these under-recoveries. Thus, they have an incentive to pursue cheaper market alternatives than the backstop supplies in order to keep their deferred under-recoveries to a minimum.

DRAFT

Given that the SOS revenue rate which EUA receives from customers is equal to the prices paid to backstop suppliers beginning in the fourth year of SOS, it may appear that EUA's incentive to displace any SOS backstop supplies with cheaper market supplies disappears. This would appear to be the case because EUA would no longer be recovering less from SOS customers than they are paying out to backstop suppliers. However, even in this case, EUA has a strong incentive to displace backstop SOS supplies with cheaper market alternatives, since EUA has an ongoing obligation to minimize their CTC to the greatest degree possible. Thus, to the extent that EUA can lock in cheaper SOS supplies than the backstop resources, it has a strong incentive to do so because this would result in a lowering of the access charge through the crediting mechanism in EUA's Restructuring Settlement Agreement.

## 4. Estimation of SOS Supplier "Netback" Revenues

**Assumptions for 1998**

| | | | |
|---|---|---|---|
| 1 | SOS Supplier Price | $32 /MWh | |
| 2 | Regional Transmission Losses | 3% | |
| 3 | Local T&D Losses | 6% | |
| 4 | Tie-line Benefit Share | 48 MW | = 1,200 MW times EUA's load ratio share of 847/20870 |
| 5 | Tie-line Benefit Payments | $10 /kW-Yr | |
| 6 | Tie-line Benefit Payments | $0.11 /MWh | = (line 4 X line 5 X 1000)/(847 MW X 8760 X 60%) |
| 7 | Ancillary Services | | |
| 8 | Scheduling, system control, and dispatch service | ???? /kW-Yr | |
| 9 | VAr and Voltage Control | ???? /kW-Yr | |
| 10 | Energy Imbalance Service | ???? /kW-Yr | |

**Supplier Netback for 1998**

| | | |
|---|---|---|
| = (line 1)(1-line 2)(1- line 3) - line 6 - lines 8-10 | $28.07 | 29.07 |

no wheeling charges to suppliers

This analysis shows the effective netback that TransCanada would receive in 1998 for the various products provided as part of its default SOS supplier obligation. EUA has not provided an information on losses. Therefore, these estimates are REED's best estimates and are consistent with losses that have been estimated for other New England electric utilities. The tie benefit share and payments are calculated in accordance with the proposal that NEPOOL filed with the FERC. We do not have estimates for the scheduling, system control, and dispatch service which will be assessed by the ISO, the VAr and voltage control,

DRAFT

or energy imbalance service charges.[9] However, to the degree that these costs are included they would further reduce the netback received by default SOS suppliers. Another potential cost which would further reduce the netback and which is also not quantified is the cost to TransCanada, or any default SOS supplier, of procuring ancillary services that it cannot otherwise provide out of the EUA resources that it has purchased. As discussed in the appendix, for TransCanada this is likely to include the various operating reserves that LSE are required to provide or procure.

## 5. Factors Influencing Market Response to EUA's SOS Auction

An assessment of the likelihood that the SOS backstop supply obligation will need to be invoked by EUA should appropriately begin with an assessment of the extent to which market participants will bid into EUA's SOS Supply Auction for the right to supply a portion of EUA's SOS needs. There are at least two dimensions impacting the likelihood that some or all of EUA's SOS supply needs will be met through the SOS Auction: 1) the availability of uncommitted market supplies other than Montaup's assets that are capable of providing SOS supply; and 2) for those supplies that are available to supply EUA's SOS needs, what incentives to owners of these supplies have for bidding into EUA's SOS auction vis a vis other market alternatives. These two dimensions are discussed below.

### a. *Assessment of Market Supplies Available to Be Bid Into EUA's SOS Auction*

There are a number of potential sources of suppliers that could be used to bid Into EUA's SOS Auction:

(1) Surplus utility and NUG capacity in NEPOOL. For electric utilities that retain a native load obligation surplus capacity is that which is surplus to this native load obligation and for NUGs this is any uncontracted for capacity.

(2) Existing utility assets after they are divested, except to the degree that these assets have a backstop obligation that will render them unavailable to supply EUA's SOS, at least until

[9] However, as discussed earlier the energy imbalance service charges should be insignificant because TransCanada presumably will not be operating the unit solely to satisfy its SOS default obligations and therefore, an imbalances will just reflect a reallocation of spot energy market revenues.

DRAFT

the divesting electric utility conducts its SOS auction. For example, this is the case with the NEES generation assets until NEES conducts its SOS auction.

(3) Suppliers from outside NEPOOL (Hydro Quebec, New York suppliers, or New Brunswick) However, the OTA, external wheeling charges, and potential additional requirements for the provision of operating reserves are likely to limit the attractiveness of the NEPOOL market.

(4) New entrants within NEPOOL. However, the development schedule for the vast majority of these resources will not allow them to feasibly supply EUA's SOS until around 2000 or later.

***b. Assessment of Market Incentives to Bid Into EUA's SOS Supply Auction***

There are a number of alternative markets to EUA's SOS which REED believes represent more attractive opportunities. Other market alternatives to bidding into EUA's SOS are:

(1) Other companies' SOS auctions that may offer more attractive potential. If other companies SOS appears to offer better load profiles, for essentially the same price per MWh, these auctions will attract the greatest interest. Other SOS programs also may be perceived to offer more favorable supply reduction schemes. Supplying a fixed amount of SOS capacity or energy that terminates at some point appears to be a superior alternative to supplying a fixed percentage of load that continuously diminishes, and likely degradation of load shape.

(2) Holding out of auctions and supplying NEPOOL spot markets or "default" SOS market at prices above the SOS price caps. It is likely that for many suppliers, there will be no incentive to bid into SOS auctions at a discount. Waiting will allow SOS load to be served at 'full' SOS prices.

(3) Contestable markets which may provide better market potential and lower risk. One direct benefit of serving contestable retail markets as opposed to SOS load is that it provides suppliers direct customer marketing/servicing benefits, brand recognition. Contestable sales are less risky (and, thus less costly) to service than SOS load, since the load risk, load shape risk, and price risk assumed by suppliers in SOS can eliminated through contestable sales contracts.

DRAFT

⇒ Suppliers can lock in their supply obligations (term, load shape, etc.),

⇒ Suppliers will know exactly which customers they are supplying, and therefore are not subject to nearly as much load shape risk,

⇒ Reduces cost of supply because the implicit free options in SOS supply terms are eliminated,

⇒ Picking off those customers with better load shapes and thus lower cost of service than the average SOS supply rate.

One conclusion, then, is that for the first one or two years Montaup's assets will comprise the bulk of supplies that are feasible for supplying EUA's SOS requirements. This also holds for other companies as well. As a result, it is fairly likely that there will be little incentive, if any, for suppliers to bid into any of the SOS programs in New England, since their best course of action may be to just "hold out." This means that assets with SOS backstop obligations will simple be obligated to provide backstop service at zero discount off of the SOS supplier price caps. Other surplus supplies in the market may just hold out to supply any unmet SOS needs at market prices above the standard offer price caps. For example, everyone will know that EUA may likely need to procure more supplies than what can be provided by its existing assets, i.e. since Millstone which represents about 44% of its total capacity is so highly uncertain.

## 6. Estimation of Customer Migration and SOS Residual Load

As discussed, REED believes that to a large degree, the SOS offers TransCanada little upside potential because when the wholesale prices for the SOS service obligation become above market, EUA will displace the SOS default suppliers with lower cost market alternatives. A critical determinant of customer migration and the SOS residual load that TransCanada would inherit as a default supplier will be how market prices compare to the SOS retail and wholesale prices. Therefore, we have developed two potential scenarios one in which market prices are above the SOS prices for the majority of the transition period and a second in which market prices are below SOS prices. The customer migration rates and

DRAFT

residual SOS load obligation assumed to be inherited by TransCanada based on its interest in the OSP project are outlined below.

**Migration Rates off SOS**

| Year | Market Above SOS | Market Below SOS |
|---|---|---|
| 1998 | 7% | 10% |
| 1999 | 15% | 25% |
| 2000 | 30% | 40% |
| 2001 | 55% | 70% |
| 2002 | 70% | 80% |
| 2003 | 75% | 85% |
| 2004 | 80% | 85% |

## 7. Implications on TransCanada's Potential SOS Backstop Obligations

- In many respects, the SOS backstop obligation "ensures" that TransCanada would be selling at or below market prices for all SOS load

DRAFT

## Appendix A: Seven NEPOOL Products

### *Installed Capability*

Installed Capability is the rated capacity, or Maximum Claimed Capability (MCC), of an electric generating unit (or units) expressed in megawatts (MW) as measured by a capability audit which will be performed semiannually (summer and winter) and initiated by the Participants. If the MCC is four MW or greater than the Normal Claimed Capability (NCC), NEPOOL will initiate quarterly audits of MCC in addition to the Participant initiated semiannual audits. Currently there are only 12 to 15 units in the NEPOOL area with MCCs four MW or greater than NCC.

Under the proposed restructuring, each load serving entity is responsible for providing an amount of Installed Capability. Under the NEPOOL proposal, the amount required by each load serving entity in any given month is calculated retrospectively based on a formula,[1] which depends primarily on the Participant's share of the total pool monthly peak load and transactions outside the NEPOOL control area. The pool-wide Objective Capability requirement is determined semiannually, and NEPOOL Participants will be bid their capacity on a monthly basis, prior to when their IC requirements have been established by the pool. Participants may satisfy their IC requirement through unit ownership or capacity entitlements through bilateral contracts. If their IC entitlements are less than their requirement, they will purchase the balance of their requirement from the pool. Participants with IC entitlements greater than their requirement will be sellers to the pool. The price paid by purchasers and received by sellers will be established each month by sorting the bids from lowest to highest. The Clearing Price will be set by the last increment of Installed Capability required to meet the pool requirements.

*?

The bottom line impact on TransCanada as a supplier and LSE under the SOS backstop obligation is that TransCanada will have to have provide IC in an amount equal to 115%[2] of

[1] NEPOOL Restated Agreement §12.2.

[2] 15% is the effective reserve requirement.

DRAFT

peak demand for which it is responsible (assuming perfect coincidence between EUA load NEPOOL load).

Because IC bids will be submitted prior to when Participants know their IC requirements, Participants that are load-serving entities with generation entitlements are likely to be reluctant to bid up IC prices. However, Participants with no retail service obligation will be able to bid up the price of IC during those capability periods when the pool is projected to be deficient. Because of the lead times required to bring additional supply of installed capability on line, the IC supply will be relatively inelastic. In addition, the Outside Transaction Adjustment limits the effectiveness of purchases from outside the region by reducing credits for Installed Capability for those purchases. Therefore, there would be potential for significant increases in the prices of IC when the market tightens. Over the long-run we anticipate that Installed Capability prices will be driven largely by the cost of capacity offered by new entrants.

Certain participants may be seasonal purchasers, with net deficits in the summer months and net surpluses in the winter. Several utilities with lower saturation of air conditioning (e.g. Central Maine Power and Vermont Electric Power) are expected to have seasonal surpluses in the summer.

Because IC requirements are based on semiannual projections and capability audits, we expect the IC market to be relatively static without much volatility, and easily predictable. As a relatively stable market, participants will have a good idea well in advance as to what their net position will be. In fact, we believe that it is more likely to develop as a bilateral market with participants offering their surpluses or purchasing their net requirements through bilateral contracts. However, in cases where retail loads may change suppliers with very short notice, load-serving entities will be less able to predict their IC requirements with certainty. The shorter the notice periods which load must give to change suppliers, the more volatile and dynamic the IC market will be.

DRAFT

In general, the market for Installed Capability is likely to slowly fluctuate with overall supply and demand. The overall value of capacity will hold relatively stable throughout the year with only seasonal variations and relatively slow, cyclical movements in prices. Participants may also attempt to game the system by double-counting capacity with generators outside NEPOOL, establishing "firm" capacity commitments with power marketers, or de-mothballing and minimally staffing inefficient and unreliable units. Actions such as these will tend to drive down the value of capacity until stricter enforcement measures are enacted, or the costs of staffing, maintenance, and property taxes exceed the value of the capacity. These sorts of actions are expected to create a slowly fluctuating market for Installed Capability.

– who has mrkt power buyers or sellers ... ?

There is the possibility that Participants will minimally staff and maintain their old, inefficient, and unreliable units to fulfill their installed capability requirement. This will have the effect of driving down IC prices. A crucial consideration, however, will be the reliability of the Installed Capability. If the true reliable capability is overstated, then during peak periods or in the event of an unplanned outage, a capacity shortage could result. Since the supply of OC is likely to be inelastic in the short-term, this would have the effect of placing a greater premium on Operable Capability during peak periods. Thus, an oversupply of IC in the restructured NEPOOL market may be an indication that the hourly OC market may have more value during peak periods. In an efficient market without gaming, prices should be based on the capital costs of a new capacity. However, to the degree that market participants are able to offer IC to the pool that is unable or unlikely to actually operate, revenues would be depressed for the IC market, and OC revenues would be higher.

### *Operable Capability*

Operable Capability is the portion of Installed Capability which is operating or available in any given hour to respond to the System Operator's call for Energy, Reserve, or AGC requirements. The requirement for each hour is equal to the peak load plus a proportionate share of the NEPOOL operating reserve requirement. In the past, sufficient OC was ensured by the imposition of penalties or Performance Incentive Program (PIP) adjustments for failure to maintain sufficient back-up generation. The PIP adjustment would adjust the Participants'

DRAFT

capability responsibility (CR) up or down, depending on the average OC available compared to the targets over the previous 12 months. The PIP, however, will be phased out over three years. In the restructured pool, each Participant must provide an amount of OC equal to its hourly load plus a pro-rata share of the pool-wide operating reserve requirement. Participants may self-provide their OC requirements, purchase from the pool, or sell surplus OC into the pool. Participants with surplus OC will submit hourly bids to the pool. Sellers will receive and purchasers will pay a clearing price, calculated each hour by sorting bids from lowest to highest. The bid price of the last increment (highest cost) of Operable Capability needed by the pool will set the Operable Capability Clearing Price.

Sources for Operable Capability are the subset of units in the Installed Capability market which are operating or available to operate within an appropriate time period to respond to the System Operator's call to meet Energy and/or Operating Reserves and/or Automatic Generator Control requirements.[3] Because Operable Capability is simply a resource that is available to be called upon to supply Energy, Operating Reserves, or AGC, any capacity that is available for these other markets is also a potential source for the Operable Capability requirement (i.e., The markets are not mutually exclusive as a block of capacity can be used to meet the requirements for more than one of these markets.) Since the total pool-wide installed capability requirement greatly exceeds the pool-wide operable capability requirement, there will be substantial surplus Operable Capability existing within NEPOOL during most hours.[4] However, during some hours the market could be very tight and the value of the service could be quite high. If NEPOOL Participants use unreliable units to meet their Installed Capability requirements, then, in the event of a contingency, the amount of truly reliable Operable Capability available to the pool could be very tight. This is most likely to be an issue during peak hours, and the OC Clearing Price during these hours could be

[3] While "appropriate time period" has yet to be explicitly defined in the NEPOOL market arrangements, the intent has been to define as "available capacity" any capacity which is not on planned or unplanned maintenance and thus capable of being dispatched to meet energy, operating reserve, or AGC requirements in the following dispatch day, as determined at the time which the preliminary dispatch schedule for the following day is established (e.g., 2 PM the day before).

[4] Installed Capability can fulfill Operable Capability needs as long as it is available. Also, the Installed Capability requirement is much greater than the Operable Capability requirement: 15% versus 6% of load.

DRAFT

very high. While high OC prices are likely to attract capacity from adjacent pools, REED believes that during some peak hours when there is a capacity deficiency prices could be established by demand bids to reduce load. In essence, the OC market price patterns could follow those of the U.K. and be based on the value of lost load.

The bottom line impact on TransCanada is that as an LSE TransCanada will have to have provide OC in an amount equal to approximately 109% of hourly load for which it is responsible (assuming perfect coincidence between EUA land NEPOOL load). Exposure to the OC market is not a risk when OSP is available and given the high availability of OSP, exposure to the OC market is not a significant risk overall.

In sum, due to the low opportunity costs associated with making idle units available to meet Operable Capability requirements, for most hours prices for Operable Capability will be near zero. However, it should have a high value in a limited number of peak hours. The market for OC is expected to be very volatile, and much more dynamic than the market for IC.

***Operating Reserves***

The NEPOOL Operating Reserve categories include 10-Minute Spinning Reserve, 10-Minute Non-Spinning Reserve, and 30-Minute Operating Reserve. Because the operable capability requirement for individual participants and the pool as a whole is set at the sum of hourly load and required operating reserves, the operating reserve market is essentially a subset of the OC market. In essence, the operating reserve requirement is intended to ensure that an appropriate percentage of operable capacity has response characteristics which are set forth in the definition of each of the three categories of operating reserves. Thus, all generation used to meet the operating reserve requirement also counts towards the more global OC requirement; however, if an LSE otherwise meets its OC requirement, it may still need to acquire resources to meet operating reserves requirements.

The creation of each of these spot markets is aimed at the same result, namely, to ensure that a price signal exists to ensure system reliability through the readiness of units to serve

DRAFT

on short notice in the event of contingencies. However, the markets for spinning and non-spinning reserves are likely to be quite different from one another in practice. This is because the capability to provide non-spinning reserves is a function of the design and construction of a generating unit, but the capability to provide spinning reserves also depends on its operation, in particular, how fully the unit is loaded.

In the restructured pool, each Participant's share of the system Operating Reserve requirements in any hour will be determined by its share of the system hourly electrical load.[5] Participants will submit bids for Operating Reserves for units capable of providing each product. Currently, Ten-Minute reserves in total (spinning and non-spinning) must be maintained in a MW amount equal to the largest single contingency, while 30-minute operating reserves must be held in an amount equal to one-half of the second largest contingency.

The single largest system contingency has typically been the HQ Des Cantons – Sandy Pond HVDC line rated at 1,200 MW, while the second largest contingency has been Seabrook at 1,150 MW. Thus the total 10-minute reserves are set at about 1,200 MW, which has been split equally between 10-minute spinning and 10-minute non-spinning reserves (600 MW each). This translates into requirements of about 2.9% of peak load for spinning and non-spinning reserves (total 10-minute reserves equal about 5.7% of peak demand). On the other hand, 30-minute reserves are set at about 575 MW, or about 2.75% of peak demand.

For TMNR and TMOR, the applicable clearing price will be the weighted average of the highest bid prices for the last 1 MW of that category of Operating Reserve that are designated by the System Operator for use in the hour. For TMSR the clearing price has two components: the TMSR bid price plus the lost opportunity cost of providing TMSR rather than energy (i.e., the difference between the Energy Clearing Price and the unit's Bid Price).[6]

---

[5] Restated NEPOOL Agreement, §14.1b

[6] Restated NEPOOL Agreement, §14.9(d)(ii)

DRAFT

**Ten-Minute Spinning Reserve**

While most NEPOOL utility participants are potential providers of TMSR, The NEPOOL Market Power Analysis study indicates that surplus TMSR capability is concentrated in three potential providers, primarily due to their hydroelectric capacity.[7] This follows from a similar concentration in the Energy market, because spinning reserves are provided by generating units that are on-line and serving load, and therefore synchronized with the grid. These units must be operating at less than their maximum capability and able to increase output immediately in the event of an unplanned outage. Because the TMSR market will be based on bids and not on marginal costs, the TMSR market shares of the Participants is difficult to predict. Much will depend on the bidding strategies of the different Participants, and the ability of the Participants to accurately measure their variable costs of providing TMSR. Furthermore, the current ramp ratings are probably too conservative and the actual providers of TMSR will likely be much less concentrated than indicated by an analysis of currently specified ramp rates.

Because the source of spinning reserve is operating plants which are also providing energy, and calculation of the TMSR Clearing Price is designed to make suppliers indifferent between the sale of energy and the sale of spinning reserve (by including the lost opportunity cost of energy sales), we expect TMSR pricing to follow energy pricing closely. The requirement to provide TMSR can be viewed as an effective increase in the size of the energy market. *However, the lowest cost providers of energy will have the largest opportunity costs and are less likely to have the physical capability to provide TMSR.*

Units that are able to bid energy at a low enough price to operate at full load will price TMSR in a manner that satisfies the following condition:

*[Energy Revenues @ partial load] + [TMSR Revenues] > [Energy revenues @ full load]*

It is important to note that Energy and TMSR revenues need to be greater than energy-only revenues (at equivalent loading) because TMSR imposes some efficiency penalties and therefore increases cost. In order to remain indifferent between sales of TMSR and Energy on a net basis, operators must recover this increased cost with increased revenues. For plants which have the opportunity to be fully loaded supplying energy, providing TMSR does add costs which will need to be factored into TMSR bidding. First, there is the opportunity cost of not providing Energy. Secondly, backing down a generating unit from full load to partial load (in order to create TMSR capability) reduces the thermal efficiency of the plant, increasing the cost of the energy being produced and sold from the loaded part of the generating unit. This efficiency loss is not constant but varies depending on the unit's characteristics and loading. The efficiency loss is greatest at the lowest loads, so a unit turned down to its minimum load limit will have a different efficiency penalty than when it is backed off from full load to 75%, even though the amount of TMSR provided might be similar. However, there does not seem to be widespread agreement among utilities on the magnitude of variable costs associated with providing TMSR. To the extent that operators systematically underestimate their costs, TMSR will be chronically undervalued. Conversely, systematic overestimation of costs would create opportunity for greater profits than equivalent sales of Energy.

In a recent study of variable costs of providing ancillary services, EPRI analyzed rates filed with FERC by twenty utilities across the U.S. to determine whether there was general agreement on the variable costs associated with supplying spinning reserve.[8] The rate comparison shows that utility rate filings for spinning reserve vary by a factor of more than 200 (maximum divided by minimum). This is in spite of variation in economy energy prices (where costs are well understood) of only a factor of three. Whether these variations in rates filed with the FERC are the result of attempts to game the FERC's rules or actually represent utilities' best estimates of variable costs is unclear and difficult to verify.

[7] Hydroelectric capacity is as follows: Northeast Utilities – 1,420 MW; New England Power – 1,166 MW; and Central Maine Power – 369 MW.

[8] Cost of Providing Ancillary Services from Power Plants, T/Systems, EPRI TR-107270-V1, December, 1996

DRAFT

Analysis of filed rates for spinning reserve service among NEPOOL utilities does not show the same degree of variation, but there is still considerably more variation than would be found in energy prices. Spinning reserve rates filed with the FERC by six NEPOOL utilities cluster around $0.22/kW and vary (maximum divided by minimum) by a factor of approximately eight.

The EPRI study of ancillary services identified efficiency losses in the turbine and control valves, maintenance and repair of steam control valves, and wear and tear in the turbine/boiler as variable costs of providing spinning reserves. Measurement of these costs as they are directly attributable to providing TMSR will be difficult at best, and probably not consistent among the NEPOOL Participants. Thus, NEPOOL Participants will need to carefully analyze their own costs and bid prices to ensure that providing TMSR fully reflects their underlying costs, while watching for extra profit opportunities in this market. Participants are not likely to assess their variable costs of providing TMSR consistently. Thus, there will be periods of over- and under-estimation of those costs. As stated above, the overestimation of costs will provide opportunities to profit more from providing TMSR than from equivalent sales of Energy.

**Ten-Minute Non-Spinning Reserve and Thirty-Minute Operating Reserve**

Any generating units which are not designated to provide Energy, TMSR, and/or AGC are available to provide TMNR and TMOR, as long as they have the capability to start-up and synchronize with the grid within the time allowed under NEPOOL rules (ten minutes and 30 minutes, respectively). Currently, there is substantial excess capability for TMNR and TMOR and no likely opportunity cost associated with providing these services, since this is idle capacity already standing by. According to the NEPOOL Market Power Analysis, approximately 5,950 MW of TMNR capability and 5,550 MW of TMOR capability are surplus. These estimates do not include capacity which has been committed to providing Energy or TMSR, and can thus be considered conservative. Virtually all NEPOOL utility participants appear able to self-supply their requirements for TMNR and TMOR.

DRAFT

Because aggregate system TMNR and TMOR capabilities are currently available in excess of requirements and opportunity costs of providing them are at or near zero, bid prices for these services are also expected to stay near zero in the near term.

In summary, given that participants' operating reserve requirements are essentially a subset of their more global OC requirements, these markets are very closely related. The operating reserve requirement is essentially intended to ensure that an appropriate percentage of each participants' operable capability has response characteristics as called for in each of the operating reserve categories. It is conceivable that a participant could have sufficient capability to meet its OC requirement, but that its mix of capacity does not include an appropriate amount of capacity with response characteristics as called for in the operating reserve categories. In this case, this participant would either need to purchase additional operable capability which exhibits the required response characteristics (either through the spot market or through bi-lateral arrangement) However, it may be preferable for this participant to seek opportunities to swap through a bilateral arrangement some of its operable capability for faster responding operable capability, perhaps with a participant which has more fast responding operable capability than it actually needs.

***Automatic Generation Control***

In order to control system voltage and frequency within desired limits, certain generating units are equipped to continuously regulate their output in response to directions from the system operator. Historically, NEPOOL has ensured adequate supply of AGC by imposing requirements on generators. AGC operations may affect unit efficiency by increasing certain losses in the generator. In the past, NEPOOL made a separate adjustment to compensate participants for AGC-related costs.

Under NEPOOL's proposed restructuring, participants will bid to provide AGC from their AGC-capable units. AGC bid prices will be filed with the system operator who will determine AGC requirements as needed and dispatch AGC-capable units. Participants' AGC Requirements will be the total hourly pool use allocated to each participant based on its

DRAFT

share of pool load. The AGC clearing price will be calculated hourly, based on the highest Bid Prices that were designated by the system operator for use as AGC in the hour.

Within NEPOOL there is currently total AGC capability of approximately 2,200 MW/10 min. This capability is widely distributed but concentrated in two utilities, New England Power and Northeast Utilities (primarily due to their hydroelectric capacity). Combined, these two utilities account for about 70% of the AGC capability within NEPOOL. The total NEPOOL requirement for AGC is approximately 750 MW/ 10 min. Thus, there does not appear to be any opportunity to exert market power, especially considering the low barriers to entry for providing the service. A listing of the companies and generating units that were required to provide AGC duty in 1996 is given in **Table 2**.

DRAFT

**Table 2**
**Generators Required to Provide AGC in 1996**

| Lead Participant | Generator | Capability (MW/ 10 Minutes) |
|---|---|---|
| Boston Edison | Mystic 4,5,6<br>New Boston 1,2<br>Masspower | 195 |
| Braintree Electric Light Dept. | Potter Combined Cycle | |
| Central Maine Power | Harris 1,2,3<br>Mason 3,4,5<br>Wyman 1,2,3<br>Yarmouth 1,2,3,4 | 176 |
| Commonwealth Energy System | Canal 1,2 | 13 |
| Eastern Utilities Associates | Ocean State 1,2<br>Somerset 5,6 | 50 |
| Mass. Municipal Wholesale Electric Co. | Stony Brook Combined Cycle | 69 |
| New England Electric System | Bear Swamp 1,2<br>Brayton Point 1,2,4<br>Comerford<br>Harriman<br>Salem Harbor 1,2,3,4 | 789 |
| Northeast Utilities | Devon 3,4,5,6,7,8<br>Middletown 1,2,3,4<br>Montville 5,6<br>Mount Tom<br>Northfield 1,2,3,4<br>Norwalk Harbor 1,2<br>West Springfield 3<br>Merrimack 1,2<br>Newington | 773 |
| Taunton Municipal Lighting Plant | Cleary Combined Cycle | |
| United Illuminating | Bridgeport Harbor 1,2,3<br>New Haven Harbor | 92 |

In the restructured market, AGC requirements will be allocated hourly based on participant loads instead of being imposed by the system operator based on operating considerations. Obviously, utility allocations will vary hourly, and different utility load shapes will cause the relative allocations of AGC requirement to vary significantly. However, based on a comparison of annual load share with AGC capabilities, certain utilities can be identified which are more likely to have a net deficit in their AGC Capability. These utilities will be the most likely customers for AGC, either on the spot market or by contract. These utilities are listed in **Table 3**.

DRAFT

**Table 3**
**AGC Deficient Utilities**

| Company | AGC Capability (MW/10 Min) |
|---|---|
| Bangor Hydro-Electric | 2 |
| Commonwealth Energy System | 13 |
| Eastern Utilities Associates | 50 |
| Vermont Electric Power Company | 17 |

Currently, system-wide capability is more than twice the system requirement even under the current conservative operating practices of the New England electric utilities.[9] As a result, prices for AGC are expected to remain at or near a level that will recover costs for the service but provide little, if any, net earnings, or, as may be the case for TransCanada, not being able to provide AGC to the market will not create an opportunity cost of revenue forgone. As in the case of TMSR, there is some uncertainty about the actual costs of providing AGC. However, based on analysis of filed tariffs for AGC service, there is less uncertainty about these costs than exists for variable costs associated with TMSR. This may be because AGC has a large fixed cost component which TMSR does not.

Historical levels of payments for AGC by NEPOOL, which have been based on the estimated costs of providing the service based on a one percent assumed efficiency penalty, are less than $5 million annually. Payments for AGC in 1996 totaled $3.6 million. Current AGC rates filed with FERC by New England Electric System and Northeast Utilities, the utilities with the largest AGC capabilities, are $0.05/kW/month and $0.02/kW/month.

***Voltage Control and Reactive Support***

Voltage control and reactive support (VAr) are needed to stabilize system voltage due to changes in load. The system operator will determine what units will provide the service at any given time. The FERC, however, views VAr has a very localized service, with a large potential for the exertion of market power. Thus, an open market for the service is not being developed within NEPOOL. VAr support will be cost-based in the NEPOOL market. As such, there will be opportunity for some fixed-cost contribution for providing this service, with

[9] Ibid., page 43

DRAFT

the amount of the fixed cost recovery depending on the rate-making methodology used to establish these changes. In addition, to the extent the ISO reduces Energy production form a unit in order to provide VAr support, the owner of the unit may receive the lost opportunity costs for the Energy not provided.

Calculation of the costs of providing VAr support can be tedious and imprecise. The variable costs of VAr are the maintenance and repair costs directly associated with providing the service, and increased losses in the rotor, stator, and transformer. These costs are relatively low when the unit is operating near to unity power factor. However, they increase in a non-linear manner as reactive power increases, i.e. costs of providing the service increase faster than the reactive power supplied. There are also substantial fixed costs associated with providing the service because generators and transformers are designed for power factors of 0.8 or 0.9, but the provision of VArs requires that they be operated at less than optimum levels. This can increase the equipment size required to produce the same amount of energy and the equipment cost significantly.

# EXHIBIT Q

Mat with Bob H, Russ, Dave Butler + Rob Guilbeau Mar 2/98

TransCanada

TransCanada Power, a division of TransCanada Energy Ltd.

InterOffice Correspondence

(F) EUA PPA acquisition

**Date:** February 26, 1998

**To:** Robert Hodgins

**From:** Alex Pourbaix

**cc:** Dave Butler, Rob Guilbeau, Russ Girling, Brad Thomson

**Re:** **Divestiture by Eastern Utilities Associates ("EUA") of its Power Purchase Agreement ("PPA") with Ocean State Power ("OSP")**

---

## I. Background

On December 1, 1997, TransCanada's board approved the acquisition by TransCanada of EUA's PPA with OSP. As the PPA requires TransCanada to purchase power from OSP at a price substantially over market, TransCanada required an annual subsidy from EUA over the term of the PPA to assume the PPA (the "Support Payment"). The board approved the acquisition at a Support Payment of at least $160 million (USD) over the term of the PPA.

TransCanada subsequently submitted a bid to EUA requiring Support Payments of $180 million (USD) over 13 years. EUA advised TransCanada that it was the successful bidder pending resolution of several issues, including the magnitude of the Support Payment.

EUA's position regarding the Support Payment was that it would only divest of the PPA if it could be prudently shown to the regulator that the Support Payments were less then the liability to ratepayors associated with keeping the PPA. EUA indicated that the $180 million Support Payment was substantially in excess of EUA's own estimate of the liability associated with keeping the PPA. Therefore, if TransCanada was not willing to reduce the required Support Payment, EUA would keep the PPA.

After a series of negotiations we have reached a tentative agreement with EUA that preserves a substantial portion of the economic benefit of the transaction for TransCanada while at the same time advancing TransCanada's strategy to consolidate ownership of OSP.

EXHIBIT
202
Pourbaix
4/17/07
tabbies

## II. Proposed Transaction

The agreement reached with EUA contains two main components:

### 1. Support Payment

| | 1999 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Bid (MMRUS) | 20 | 20 | 18.5 | 18.5 | 12.32 | 12.32 | 12.32 | 12.32 | 12.32 | 10.56 | 10.56 | 10.56 | 10.56 |
| Option 1 (MM$US) | 20 | 20 | 18.5 | 18.5 | 11.3 | 11.3 | 11.3 | 11.3 | 11.3 | — | — | — | — |
| Option 2 (MM$US) | 14.6 | 14.6 | 14.6 | 14.6 | 12.32 | 12.32 | 12.32 | 12.32 | 12.32 | 10.56 | 10.56 | 10.56 | 10.56 |

We have reached agreement with EUA to reduce the original Support Payments to one of the options set out above, subject to approval of TCPL Senior Management and the Board. Please refer to Section III for an analysis of the economic impact of the revised Support Payments.

### 2. EUA Equity Sales

It is critical to TransCanada's North-East strategy to consolidate ownership of OSP. As compensation for reducing the Support Payments as outlined above, EUA has agreed to enter into exclusive, good faith negotiations with TransCanada to sell their 30% equity in OSP. If TransCanada has not purchased EUA's equity within one year of the date of the final state regulatory orders relating to the divestiture of the PPA, EUA must pay TransCanada a break-up fee of $1.5 million USD. Management believes EUA's commitment to negotiate coupled with the break-up fee will result in the successful acquisition by TransCanada of EUA's equity interest in 1998.

## III. Deal Economics

The original Bid to EUA with the $180 million Support Payment produced the following results:

| | |
|---|---|
| Support Payment (nominal) | $180 million |
| NPV: | $ 23.4 million (USD) |
| EPS: (unmonitized) | 1.2 ¢ |

Since the original bid, management has adjusted two of the assumptions in the OSP model relating to energy output and capacity. Based on discussions with plant management and outside consultants, it is clear that the original OSP model understated OSPs' energy output (in GWh's) and capacity sales. These adjustments had the effect of improving the NPV of the original bid to $32.4 million (USD).

The proposed deal with the reduced Support Payments and applying the improved assumptions produces the following results:

| | **Option 1** | **Option 2** |
|---|---|---|
| Support Payment (nominal) | $133.4 million | $162 million |
| NPV: | $ 18.5 million | $ 21.8 million |
| EPS: (unmonitized) | 1.9 ¢ | .7 ¢ |
| Incremental L.P. Proceeds | $ 55 million | $ 1.6 million |

## IV. Management Recommendation

Management recommends TransCanada proceed with Option 1 as it maximizes up-front cash flow which allows TransCanada to maximize the value of OSP paid when OSP is vended into the TransCanada Power Limited Partnership.

Option 1 produces an NPV within the $15 – 25 million range presented to the Board at the December board meeting. The aggregate Support Payment of $133.4 million however, falls below the $160 million aggregate Support Payment which was set as the minimum aggregate Support Payment to proceed with a transaction in the Board resolution. Please note that the foregoing analysis does not place any value on the EUA equity.

# EXHIBIT R

EXHIBIT
145
3-23-07

**IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA**

**NATIONAL GRID U.S.A.'S RESPONSES TO
THE FIRST SET OF DISCOVERY REQUESTS
OF TRANSCANADA POWER MARKETING LTD.**

National Grid U.S.A. hereby responds to the first set of discovery requests of TransCanada Power Marketing Ltd. ("TransCanada").

SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

Timothy A. Ngau

Timothy A. Ngau
Lynn M. Gallagher
3000 K Street, N.W.
Washington, DC 20007
(202) 424-7500
(202) 424-7643 (fax)

Attorneys for National Grid USA, Inc.

August 30, 2002

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 1**

Please produce a copy of National Grid's *pro forma* contract for a supplier to provide Standard Offer Service. Also, to the extent that the *pro forma* contract changed over time, please produce copies of all differing versions of the *pro forma* contract and identify the term over which each was or has been in effect.

**Response**

National Grid's only *pro forma* contract for Standard Offer Service is the one that was sent to bidders in the generation divestiture by New England Power Company in 1997. National Grid is providing a copy of that *pro forma* contract in response to these requests.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 2**

Please provide copies of all documents that discuss or refer to a *pro forma* contract for a supplier to provide Standard Offer Service.

**Response**

National Grid is providing documents that discuss or refer to the *pro forma* contract identified in response to Request No. 1.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 3**

Please produce all drafts of *pro forma* contracts for a supplier to provide Standard Offer Service.

**Response**

National Grid is providing available drafts of the *pro forma* contract identified in response to Request No. 1.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 4**

Please provide copies of all documents that discuss or refer to drafts of *pro forma* contracts for a supplier to provide Standard Offer Service.

**Response**

National Grid is providing documents that discuss or refer to the drafts of the *pro forma* contract identified in response to Request No. 1. These documents include memoranda prepared by counsel that, upon review, National Grid has determined do not include communications providing legal advice. By producing these memoranda, National Grid is not waiving the attorney-client privilege applicable to its communications with counsel to obtain or provide legal advice.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 5**

Please identify all persons involved in the drafting or revision of the Standard Offer Agreement provided to bidders in the generation divestiture by New England Power Company.

**Response**

Initial drafts of the Wholesale Standard Offer Service Agreement provided to bidders in the generation divestiture by New England Power Company were prepared by Kenneth Jaffe and Mark Klupt of Swidler & Berlin, Chtd., whose involvement with the drafting, negotiation and revision of the agreement ended with the transmittal of the draft to the client on or about June 3, 1997. The initial drafts were sent to Michael Hager, William Hayes, Thomas Robinson, Gregory Hale, and Michael Jesanis. Gregory Hale, in consultation primarily with Michael Hager and with the assistance of Michael Frankel (an attorney then at the firm of Skadden Arps Slate Meagher & Flom), was principally responsible on behalf of National Grid for revisions to the agreement after its receipt from Messrs. Jaffe and Klupt. Other persons involved in the drafting and revision of this agreement include representatives of U.S. Generating Company, possibly including James Utt and Elias Farrah (of the Leboeuf Lamb law firm).

Person(s) answering and/or prepared to testify: Michael Hager; Gregory Hale

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 6**

Please provide a copy of Standard Offer Auction Letters to Bidders, dated September 1997.

**Response**

National Grid understands the requested document to be the submittal to the Massachusetts Department of Public Utilities, Docket No. 96-25, entitled "Standard Offer Auction Letters to Bidders," dated September 1997. National Grid is providing a copy of this document.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 7**

Please provide copies of all drafts of the Contracts.

**Response**

National Grid is providing available drafts of the Contracts.

Person(s) answering and/or prepared to testify: Michael Hager



**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 8**

Please provide copies of all documents that discuss or refer to drafts of the Contracts and/or the Contracts.

**Response**

National Grid is providing documents discussing or referring to drafts of the Contracts, or to the responsibility for congestion costs under the Contracts. To the extent that this request seeks documents that discuss or refer to the Contracts with respect to matters other than congestion cost responsibility, such as the Contracts' fuel cost adjustment, National Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the subject matter of this proceeding.

Person(s) answering and/or prepared to testify: Michael Hager; Gregory Hale

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 9**

Please provide copies of all correspondence between National Grid and USGen related to the Contracts, negotiation thereof and/or Standard Offer Service in general.

**Response**

National Grid is providing copies of correspondence between National Grid and USGen relating to the negotiation of the Contracts and/or the responsibility for congestion costs thereunder. To the extent that this request seeks correspondence between National Grid and USGen that relates to other matters involving the Contracts and/or Standard Offer Service in general, National Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the subject matter of this proceeding.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 10**

Please provide copies of all correspondence between National Grid and TransCanada related to the contracts, negotiation thereof and/or Standard Offer Service in general.

**Response**

National Grid is providing copies of correspondence between National Grid and TransCanada related to the contracts, negotiation thereof and/or Standard Offer Service.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 11**

Please provide copies of all correspondence between National Grid and any other person related to the Contracts, negotiation thereof and/or Standard Offer Service in general.

**Response**

National Grid is providing copies of correspondence between National Grid and other persons related to the negotiation of the Contracts and/or the responsibility for congestion costs thereunder. To the extent that this request seeks correspondence between National Grid and other persons that relates to matters involving the Contracts and/or Standard Offer Service in general, but not related to the responsibility for congestion costs (such as the fuel cost adjustment), National Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the subject matter of this proceeding.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 12**

Please identify all persons involved in the negotiation and/or drafting of the Contracts for National Grid and USGen and describe the role of each person identified.

**Response**

Please see the response to Request No. 5.

Person(s) answering and/or prepared to testify: Michael Hager; Gregory Hale

IN THE MATTER OF THE ARBITRATION BETWEEN
TRANSCANADA POWER MARKETING LTD.
AND NATIONAL GRID USA

**TransCanada Request No. 13**

Please identify all persons involved in the negotiation and/or drafting of the Contract between National Grid and TransCanada and describe the role of each person identified.

**Response**

Gregory Hale and Michael Hager were involved on behalf of National Grid in the negotiation and drafting of the assignment of the Contracts from USGen to TransCanada. William Taylor and perhaps others were involved on behalf of TransCanada in the negotiation of this assignment See also the response to Request No. 5. With respect to the contract between TransCanada and Blackstone Valley Electric Company, *et al.*, other than the signatories to that agreement, National Grid is attempting to determine what persons were involved.

Person(s) answering and/or prepared to testify:  Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 14**

Please provide copies of all notes, memoranda, correspondence and other documents of each person involved in negotiations of the Contracts on behalf of National Grid.

**Response**

To the extent that this request seeks documents relating to the negotiation of the Contracts and/or the responsibility for congestion costs, National Grid is providing responsive documents. To the extent that the request seeks documents of persons involved in the negotiation of the Contracts, but that are unrelated to such negotiations or the responsibility for congestion costs, National Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the subject matter of this proceeding.

Person(s) answering and/or prepared to testify: Michael Hager; Gregory Hale

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 15**

Please provide copies of all regulatory filings, transcripts, prepared testimony and discovery responses provided in any regulatory proceeding related to Standard Offer Service.

**Response**

National Grid is providing responsive documents that it filed in regulatory proceedings related to Standard Offer Service.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 16**

Please provide copies of all documents that discuss or refer to transmission congestion, locational pricing and/or congestion management in NEPOOL or on National Grid's system or any part thereof dated September 1, 1998 or earlier.

**Response**

National Grid is providing responsive documents.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 17**

Please provide copies of all documents that discuss or refer to cost responsibility for congestion charges.

**Response**

National Grid is providing responsive documents.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 18**

Please state whether NEPOOL or ISO-New England has any policy or rule in place or proposed to impose congestion costs on suppliers of Standard Offer Service. If your answer is anything other than an unqualified no, please provide a full explanation of the basis for your answer.

**Response**

Yes. The "Congestion Paying Entity," as defined in NEPOOL's proposed Market Rule 1, section 1.3.2, is "deemed to include, but not be limited to, the seller of internal bilateral transactions that transfer Real-Time Load Obligations." Further, NEPOOL's proposed Market Rule 1, section 3.2.1, similar to Rule 5.4.1 of NEPOOL's current Market Rules and Procedures, provide that a participant supplier's hourly settlement obligation for energy includes the amount of any "Real-Time bilateral transactions." Where a supplier supplies Standard Offer Service under a bilateral contract that transfers the buyer's load obligations to the supplier, and where congestion costs are reflected in the price paid by party with the obligation for the energy required to meet that Standard Offer Service obligation (as NEPOOL proposes to do in its proposed Market Rule 1), these rules impose congestion costs on the supplier because the supplier's cost to meet its energy obligation for the Standard Offer Service load includes congestion costs. The Wholesale Standard Offer Service Agreements between Massachusetts Electric Company, Nantucket Electric Company and The Narrangansett Electric Company, on the one hand, and TransCanada Power Marketing, Ltd., on the other, are bilateral transactions of the type described in these rules because Section 6.3 and Appendix B of these agreements specifically require TransCanada to add National Grid's Standard Offer Service load obligations to TransCanada's settlement account for purposes of the financial settlement process conducted by NEPOOL and the ISO.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 19**

Based upon your understanding of the proposal filed by NEPOOL in FERC Docket No. ER02-2330, please provide an explanation of the basis upon which entities will be determined to be responsible for paying congestion charges under proposed NEPOOL Market Rule 1. Please produce any documents related to your answer.

**Response**

Please see response to Request No. 18.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 20**

Please provide copies of all documents that contain analyses that relate to the costs of congestion on locational pricing that will be, or has been, experienced within National Grid's service territory.

**Response**

National Grid is providing responsive documents that are not subject to the prohibition in National Grid's Code of Conduct that prevents the selective disclosure of information to entities using the transmission system (including the parties to this proceeding) where such information might provide a competitive or commercial advantage. To the extent that this request seeks documents subject to this prohibition, National Grid objects to the request as improper.

Among the responsive documents that National Grid has in its possession are several voluminous documents that National Grid will provide upon request, but that TransCanada may already have in its possession or that may be found on the ISO New England web site: (1) 2001_RTEP-1_Approved_Report_10_19_01.doc; (1)May 2002-Interim LMP.doc; (3)May_2002_LMP.xls; (4) CP10 FinalReportGZ4.pdf.

Person(s) answering and/or prepared to testify: Michael Hager; Masheed Rosenqvist

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 21**

Please provide copies of all documents related to strategies, plans or methods, including transmission line improvements, intended to reduce the congestion at any location on the National Grid system.

**Response**

To the extent described in the response to Request No. 20, National Grid is providing responsive documents.

Among the responsive documents that National Grid has in its possession are several voluminous documents that National Grid will provide upon request, but that TransCanada may already have in its possession or that may be found on the ISO New England web site: (1) NEMA Interim Report.doc; (2) Attendance NEMA Upgrade Study Meeting.doc; (3) NEPOOL Project Listing 2Q-2002 08-15-02.doc; (3) Minutes TEAC8 4-12-02.doc; (4) OP3FIN.doc; (5)OP5FIN.doc; (6) 08.27.01Filing.pdf (NEPOOL filing with FERC on a Transmission Incentive Pilot).

Person(s) answering and/or prepared to testify: Michael Hager; Masheed Rosenqvist

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 22**

Please provide copies of all documents related to strategies, plans or methods, including transmission line improvements, intended to reduce the costs exposure of National Grid, its customers and/or users of the National Grid system to congestion or locational price differentials.

**Response**

To the extent described in the response to Request No. 20, National Grid is providing responsive documents. See also the documents identified in response to Request No. 21.

Person(s) answering and/or prepared to testify: Michael Hager; Masheed Rosenqvist

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 23**

Please provide copies of all documents related to dispute resolution, arbitration, litigation or regulatory proceedings involving the issue of cost responsibility for congestion under Standard Offer Service.

**Response**

National Grid understands the terms "dispute resolution" and "regulatory proceeding" in this request to refer to a formal adversary proceeding akin to an arbitration or litigation, as opposed to informal NEPOOL proceedings to develop its rules or generic regulatory proceedings to review the proposed rules of NEPOOL or the ISO. With that understanding, National Grid has no responsive documents.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 24**

Please provide copies of all contracts intended to serve default, last resort or Standard Offer Service within National Grid's service territory.

**Response**

National Grid is providing copies of all contracts for Standard Offer Service with confidential and commercially sensitive information redacted. To the extent that this requests seeks such information and/or contracts for services other than Standard Offer Service, National Grid objects to the request as overly broad, unduly burdensome and not reasonably related to the subject matter of this proceeding

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**TransCanada Request No. 25**

Please provide a copy of the Progress Report on Implementation of Standard Offer Service Auction, dated July 16, 1997.

**Response**

National Grid is providing the requested document.

Person(s) answering and/or prepared to testify: Michael Hager

**IN THE MATTER OF THE ARBITRATION BETWEEN TRANSCANADA POWER MARKETING LTD. AND NATIONAL GRID USA**

**VERIFICATION**

Michael J. Hager affirms under penalty of perjury on this 29th day of August 2002 that he has read the foregoing Responses to the First Set of Discovery Requests of TransCanada Power Marketing Ltd. and that these responses are true and correct to the best of his knowledge and belief.

[signature]

Michael J. Hager

# EXHIBIT S

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
**PUBLIC UTILITIES COMMISSION**

IN RE: NARRAGANSETT ELECTRIC COMPANY PROPOSED RATE CHANGES TO STANDARD OFFER RATE, TRANSITION CHARGE AND TRANSMISSTION ADJUSTMENT FACTOR : DOCKET NO. 3648

REPORT AND ORDER

I. BACKGROUND

The Utility Restructuring Act of 1996 ("URA") requires each electric distribution company to arrange with wholesale power suppliers for a standard power supply offer to sell electricity to all customers at a stipulated rate. Pursuant to the URA, Narragansett Electric Company ("Narragansett" or "Company") entered into wholesale Standard Offer supply contracts with the following prices:

| Calendar Year | Price per kWh[1] |
|---|---|
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

The wholesale Standard Offer supply contracts also provide for increases in the price per kilowatt-hour ("kWh") of wholesale power supplied to Narragansett in the event fuel prices increase above certain levels. To the extent that the total cost of the wholesale power supply to Narragansett, including fuel charges, exceeds retail Standard Offer Service ("SOS") and Last Resort Service ("LRS") revenues, the under-collection is recoverable from Narragansett's customers through the annual reconciliation provisions of Narragansett's Standard Offer Adjustment Provision. Likewise, to the extent Narragansett collects more than its total cost of providing SOS, the ratepayers are entitled

to recoup the benefit, with interest. Furthermore, Narragansett's transmission and transition charges are fully reconciling on an annual basis, the transition charges through an adjustment based on the annual reconciliation of wholesale power contract termination charges ("CTC") filed by National Grid and the transmission charges through a change in Narragansett's transmission adjustment factor ("TAF").

## II. NARRAGANSETT

On November 10, 2004, Narragansett filed with the Rhode Island Public Utilities Commission ("Commission") its annual reconciliation filing with respect to SOS, transition and transmission rates. The filing included: a proposed 11.94% increase in the retail SOS rate from the present rate of 6.7 cents per kWh to 7.5 cents per kWh; a proposed 1.17% decrease in the transition rate from the present rate of .855 cents per kWh to .845 cents per kWh; and a proposed 469% increase in the transmission service adjustment factor from the present rate of .042 cents per kWh to .239 cents per kWh.[2]

On December 9, 2004, in response to Commission data requests, Narragansett filed a revised proposed SOS charge of 6.7 cents per kWh, resulting in no change to the rate then in effect.[3] The result for a typical residential customer using 500 kWh of service would be an increase of 1.6% equal to $0.97 per month. Therefore, the average monthly residential bill would increase from $61.80 to $62.77.[4] In support of the proposed rates, Narragansett presented the pre-filed testimony of Jeanne A. Lloyd, Principal Financial Analyst for National Grid USA Service Company, Michael J. Hager,

[1] The contractual increase over the five year period will be 29.09% before fuel index adjustments.
[2] Narragansett Ex. 1A, Pre-filed testimony of Jeanne A. Lloyd, pp. 3-4, Exhibit JAL-10, p. 1.
[3] PUC Ex. 1, Response to Commission Data Request 1-3.
[4] Narragansett Ex. , Exhibit JAL-12 Update, p. 1.

Vice President, Energy Supply - NE for National Grid USA Service Company, and Carol A. Currier, Senior Analyst in Transmission Rates for New England Power Company.

A. Standard Offer Service

In his pre-filed testimony, Michael Hager explained that Narragansett has wholesale power supply contracts with three suppliers to serve the retail SOS load within its pre-merger ("Narragansett zone") and post-merger (both "Narragansett zone" and "EUA zone") service territories. All of these wholesale SOS supply contracts run through December 31, 2009 and contain a fixed price component.[5] Mr. Hager explained that the Narragansett zone SOS supply contracts contain two price components – a base price and a fuel index adjustment provision. According to Mr. Hager, the fuel index adjustment provides for additional payments ("fuel index payments") to be made to the SOS suppliers in the event of substantial increases in the market price of No. 6 residual fuel and natural gas. The price is based on a comparison of the twelve-month ("Narragansett zone") rolling average of oil and gas prices to a current trigger price. The base price for SOS contracts in both zones in calendar year 2005 is 5.5 cents per kWh.[6]

In order to determine the extent of any fuel index payments for the period January 2005 through December 2005, Mr. Hager based the fuel index adjustment calculations on future gas and crude oil projections. In performing his calculations, he used the average gas and crude oil prices as reported in the Wall Street Journal on November 22, 23, and 24, 2004. Based on the numbers examined, Mr. Hager determined that Narragansett will have to make fuel index payments of 1.158 cents per kWh in the pre-merger Narragansett zone. There are no payments in the former EUA zone, due to the expiration of the fuel

[5] Narragansett Ex. 1B, (Pre-filed testimony of Michael Hager), p. 3.
[6] Id. at 4.

index in the EUA SOS contracts, for the period January 2005 through December 2005. This equates to a total weighted average SOS cost of 6.653 cents per kWh, slightly below the current level.[7] Mr. Hager noted that recent procurements in Massachusetts had resulted in energy charges ranging from 6.646 cents per kWh for certain industrial customers to 7.093 for residential customers for the periods beginning in November 2004 and extending into 2005.[8]

In her pre-filed testimony, Jeanne Lloyd noted that Narragansett's current SOS rate is 6.7 cents per kWh. The charge was designed in a manner where Narragansett would neither over-collect nor under-collect its total wholesale SOS expenses through December 2004.[9] According to Ms. Lloyd's Updated Exhibit JAL-7, Narragansett projected an under collection of approximately $1,522,134 as of December 31, 2004.

Ms. Lloyd stated that Narragansett is proposing to maintain its SOS rate of 6.7 cents per kWh in order to meet anticipated fuel index payments.[10] According to Ms. Lloyd, maintaining the current level of 6.7 cents per kWh will cause Narragansett's SOS expenses to be approximately $882,184 more than the Company's revenues.[11] Because the over recovery of $72,938 in the Last Resort Service ("LRS") reconciliation is

---

[7] Id. at 5.
[8] Id. at 6.
[9] Narr. Ex. 1A (Pre-filed testimony of Jeanne A. Lloyd), p. 18. Narragansett incurred fuel index payments of approximately $66.8 million for the period October 2002 through September 2003, with approximately $21.4 million offset by a supplier credit to Narragansett during a prior period. Id. at 21. In Docket No. 3508, the Commission directed Narragansett to monitor its SOS reconciliation on a monthly basis and file with the Commission for an adjustment to the rate if the projected balance as of December 2003 were to exceed $16 million, either positive or negative. The balance as of December 2003 is estimated to be an over recovery of $8.1 million, which Ms. Lloyd uses to mitigate the proposed rate increase. Id. at 18-19, JAL-7, p. 2.
[10] Id. at Exhibit JAL-1-Update. The base SOS charge for 2005 is 5.5 cents per kWh. The remainder of the proposed charge is related to anticipated fuel index payments.
[11] Id. at Exhibit JAL-7-Update.

minimal, rather than applying it to the SOS balance as in the past, Narragansett proposes to carry it forward to the next reconciling period.[12]

B. Transition Charge

In her pre-filed testimony, Ms. Lloyd explained that the transition charge is intended to recover the CTC that was billed to Narragansett by its affiliated supplier, New England Power ("NEP"), when NEP released Narragansett from the all-requirements contract whereby Narragansett had contracted to buy all of the power required to serve Narragansett's customer load.[13]

Narragansett reconciles transition revenues on an annual basis in accordance with the requirements of the Non-Bypassable Transition Charge Adjustment Provision, which requires an annual reconciliation of Narragansett's total CTC expense against Narragansett's total revenue from the Transition Charge. Any over or under-collection is to be refunded to or collected from customers, with interest. Ms. Lloyd indicated that the current transition rate produced an over-recovery of approximately $437,110 for the period October 1, 2003 through September 30, 2004.[14] Narragansett proposed reducing the weighted average transition charge by a transition charge adjustment factor credit to return the over recovery to customers.[15]

Therefore, the Company's proposed transition charge of 0.845 cents per kWh represents the weighted average base transition charge of 0.850 cents per kWh and a

[12] Narr. Exhibit 1A, p. 18. The non-residential over recovery is $74,704 and the residential under recovery is $1,767 for the period October 2003 through September 2004. The balance will earn interest on behalf of ratepayers.
[13] Id. at 4.
[14] Id. at 5-6.
[15] Id. at 6. The weighted average transition charge is based on a formula comparing the transition charges of the Narragansett zone and the EUA zone. Id. at 5.

transition charge adjustment factor credit of 0.005 cents per kWh designed to refund the transition over recovery for the period October 2003 through September 2004.[16]

C. Transmission Rate

In her pre-filed testimony, Ms. Lloyd outlined the three components of Narragansett's proposed increase in the Transmission Adjustment Factor: (1) an increase of 0.061 cents per kWh to represent an increase in forecasted transmission costs for 2005; (2) an increase of 0.048 cents per kWh to collect a $3.8 million under recovery from the period October 2003 through September 2004; (3) an increase of .064 cents per kWh, due to the elimination of the 2004 transmission reconciliation factor and (4) an increase of 0.024 cents per kWh designed to recover approximately $5.6 million over three years for the deferred ISO Tariff Expenses.[17] The net result was a proposed increase of 0.197 cents per kWh, increasing the Transmission Adjustment Factor from 0.042 cents per kWh to 0.239 cents per kWh.[18]

Narragansett forecasted total transmission costs for 2005 of approximately $44.2 million, resulting in a unit cost of 0.564 cents per kWh for 2005, or .061 cents more than the 2004 average transmission expense of .503 cents per kWh.[19] Narragansett reported a $3.8 million transmission revenue under recovery as of September 30, 2004, which will be collected in 2005. Ms. Lloyd noted that in accordance with the Commission's Order in Docket No. 3617, Narragansett will begin collecting $5.6 million of the total $7.45 million of previously disputed transmission costs over a three-year period.[20]

---

16 Id. at 4-5.
17 Id. at 6-7. Approval of the three year recovery was provided by the Commission in Docket No. 3617, Order No. 18037 (issued November 9, 2004).
18 Id. at 6-7, Exhibit JAL-1-Update.
19 Id. at 7-8.
20 Id. at 8-11.

In her pre-filed testimony, Ms. Carol Currier explained that since January 1, 1998, Narragansett has been taking transmission services on behalf of its entire customer base under two open tariffs, New England Power Company's NEP Federal Energy Regulatory Commission ("FERC") Electric Tariff No. 9 and New England Power Pool's ("NEPOOL") FERC Electric Tariff No. 1.[21] FERC Tariff No. 9 provides service over NEP's local, non-PTF facilities. NEP also provides metering, transformation and certain ancillary services to Narragansett to the extent such services are required by Narragansett and not otherwise provided under the NEPOOL Tariff.[22] NEPOOL's FERC Tariff No. 1 covers regional transmission service over Pool Transmission Facilities ("PTF"), calculated pursuant to a FERC-approved formula. The NEPOOL Tariff also provides for Black Start, Reactive Power, and Scheduling, System Control and Dispatch Services.[23] Additionally, since January 1, 1999, Narragansett takes service pursuant to the New England Independent System Operator's ("ISO-NE") FERC Electric Tariff No. 1, under which ISO-NE provides Scheduling System Control and Dispatch, Energy Administration Service, and Reliability Administration Service.[24]

Ms. Currier estimated Narragansett's total transmission and ISO-NE Tariff expenses for 2005 to be approximately $44.2 million, representing a net increase of $5.49

[21] Narragansett Ex. 1C, Pre-filed testimony of Carol A. Currier, p. 3.
[22] Id. at 9-10.
[23] Id. at 4. Pool Transmission Facilities are defined as "the transmission facilities owned by Participating Transmission Owners (PTO) over which the ISO shall exercise Operating Authority in the terms set forth in the Transmission Owners Agreement (TOA), rated 69kV or above required to allow energy from significant power sources to move freely on the New England transmission system as defined in the Open Access Transmission Tariff, and include: 1. All transmission lines and associated facilities owned by PTOs rated 69 kV and above, except for lines and associated facilities that contribute little or no parallel capability to the PTF . The following do not constitute PTF: (a) Those lines and associated facilities which are required to serve local load only. (b) Generator leads, which are defined as radial transmission from a generation bus to the nearest point on the NEPOOL Transmission System. (c) Lines that are normally operated open. The remainder of the definition as contained in FERC Electric Tariff 3 (Open Access Tariff) has not been included in this footnote.
[24] Id. at 3.

million, or 14.2% from the 2004 forecast, primarily due to the combination of eliminating border charges with New York, increased PTF transmission investments and the updated RNS Rate, and increased NEPOOL Reactive Power costs.[25] She explained that her estimate included NEP Tariff.9 charges, NEPOOL Regional Network Service ("RNS") transmission charges, Black Start, Reactive Power and Load Dispatch charges.[26]

In estimating the 2005 NEPOOL RNS charges, Ms. Currier indicated that she used the currently effective rates and adjusted them to reflect an estimated rate increase that becomes effective on June 1st each year. The estimated cost for Black Start Service is based on the January 1, 2005 rate. She calculated the Reactive Power cost by using the actual costs for the period September 2003 through August 2004. She also based the costs associated with Scheduling and Dispatch Service on the currently effective rate. All rates are further based on Narragansett's network load. Ms. Currier explained that no Reliability Must Run ("RMR") contract charges have been estimated because Rhode Island does not appear to be an affected reliability region.[27]

Ms. Currier calculated NEP Tariff No. 9 charges based on NEP's actual Non-PTF expenses for the 12 months ending August 2004 increased to reflect additional costs associated with forecasted capital additions anticipated for the rate period. Likewise, she based metering, transformation and ancillary service charges on current rates.[28] Ms. Currier estimated the ISO-NE charges based on the ISO-NE revenue requirement filed with FERC. To estimate Narragansett's 2005 ISO-NE charges, Ms. Currier adjusted ISO-NE's actual costs for the period September 2003 through August 2004 by an

---

[25] Id. at 14.
[26] Id. at 11-14.
[27] Id. at 11-13.
[28] Id. at

inflationary factor which is intended to recognize the increase or decrease in the ISO-NE revenue requirement from the budget as filed for the periods ending December 2004 versus December 2005.[29]

Finally, Ms. Currier provided an explanation of the primary changes from the 2004 forecasted expenses. She indicated that in response to a FERC Order regarding elimination of market "seams" between New England and New York, the two control areas reached an agreement which became effective on December 1, 2004. She explained that elimination of this charge will decrease NEP's credit to its transmission revenue requirement by the amount it currently receives from New York for the border charge. This increases the Non-PTF costs allocated to Narragansett. Ms. Currier indicated that the increase in the PTF forecast for 2005 is primarily due to an increased PTF rate in 2005. The increase in Reactive Power costs is primarily due to the costs associated with system changes in the Boston area which are allocated to the entire New England region.[30]

## III. DATA REQUESTS

The Energy Council of Rhode Island ("TEC-RI"), a full party intervenor, and the Commission issued data requests to which Narragansett responded. TEC-RI asked several questions regarding transmission costs and allocations from NEP. TEC-RI also requested information regarding the current rules related to the procurement of last resort service. Both TEC-RI and the Commission requested updated fuel information and cost projections from Narragansett. The Commission requested information regarding the

[29] Id. at 14. The inflationary factor varies based on the category of expense, but when the cost of all categories is combined, the average inflationary factor is 5.24%

[30] Id. at 15-16.

impact of Standard Market Design ("SMD") on RMR costs.[31] Under the pre-SMD model, Rhode Island would have been required to pay $11,497,893 for RMR costs in 2004.

Finally, the Commission requested an analysis from the Company as to whether or not SMD has resulted in an overall savings to customers in Rhode Island. In response, Narragansett provided information from ISO-NE's website and 2003 Annual Markets Report which indicates that if energy costs are excluded, SMD has resulted in more efficiency in the New England wholesale electricity market. Including energy costs does not decrease efficiency, but shows increased overall costs to customers.

## IV. HEARING

A public hearing was held at the Commission's offices, 89 Jefferson Boulevard, Warwick, Rhode Island, on December 13, 2004. The following appearances were entered:[32]

| | |
|---|---|
| FOR NARRAGANSETT: | Laura S. Olton, Esq. |
| FOR DIVISON: | Paul J. Roberti, Esq.<br>Assistant Attorney General |
| FOR COMMISSION: | Cynthia G. Wilson, Esq.<br>Senior Legal Counsel |

### A. Public Comment

Nine members of the public provided comment regarding the proposed rate change.

### B. Narragansett's Testimony

[31] Reliability Must Run costs are those associated with electric generating units in congested areas that ISO-NE must run regardless of price in order to ensure system reliability.
[32] Mr. John Farley, Executive Director of TEC-RI, an intervenor, was allowed to make a statement for the record without counsel present during the hearing after no objection was made by the parties.

At the hearing, Mr. Hager, Ms. Lloyd and Ms. Currier testified on behalf of Narragansett. Ms. Lloyd testified regarding the effect of the revised calculations, indicating that there would be an increase of $0.97 on the typical residential monthly bill, or approximately 1.6%, for a total bill of $62.77 per month. The effect on the average low income residential customer without a water heater credit would be an increase of $0.97 or approximately 1.9%, for a total bill of $51.29 per month.[33]

The witnesses summarized their pre-filed testimony and were presented for cross examination. Ms. Currier and Ms. Lloyd responded to questions regarding transmission calculations. Ms. Lloyd acknowledged that the TAF is increasing by a significant amount, approximately 69%. Ms. Currier noted that approximately $3.5 million of the PTF charges are due to increased NEPOOL charges. She agreed that the non-PTF charges increased by approximately 13.8%. She indicated that $2.6 million is associated with transmission plant and other infrastructure improvements. She noted that $3.6 million is associated with payments to affiliate companies that own transmission facilities which NEP may use in the provision of transmission services pursuant to an integrated facilities agreement. She acknowledged that the largest component of the increase is $6 million associated with Administrative and General expenses resulting from NEP's costs pursuant to the formula set forth in FERC Tariff 9. She indicated that any transmission customer, such as Narragansett can ask for an audit to determine if the charges agree with the costs. She was not aware if Narragansett has ever sought such an audit. She was also not aware of the administrative procedure for approving the costs or for triggering the audit provision. Finally, she was unsure of whether any reasonableness review is

[33] Id. at 56.

undertaken by any jurisdictional entity such as FERC.[34] With regard to the costs associated with Reactive Power, Ms. Currier explained that the reactive power allocation per the NEPOOL Tariff is allocated to all of New England as it is necessary to maintain reliability of the New England transmission system, rather than something which is identifiable to a subset of customers.[35]

Mr. Hager clarified that the National Grid USA costs are allocated to the various distribution companies, including Narragansett, either based on actual costs for a Narragansett-specific project or based on a formula for a project that benefits all of the distribution companies. He indicated that an employee's daily wages are allocated based on the hours he has incurred for his various functions throughout the day to ensure no double billing.[36]

With regard to SOS issues, Mr. Hager indicated that the EUA fuel adjustment provision expired in accordance with the contracts between EUA and Narragansett on December 31, 2004. Two of the three suppliers had acknowledged the expiration and one had remained silent. In the event the remaining supplier disagreed with Narragansett's interpretation of the contract, the supplier could request arbitration. However, Mr. Roberti noted that this issue has been raised by the Commission in the last several SOS proceedings and should come as no surprise to the remaining supplier. He expressed

[34] Id. at 55-71. In response to Record Requests, Ms. Currier indicated that the Integrated Facilities Agreements were filed with FERC and that the recovery of the costs are provided for in the Agreements and Tariff 9. The Integrated Facilities Agreements were approved by FERC in 1975 (Blackstone Valley Electric), 1990 (Blackstone Valley Electric), 1996 (Narragansett), and 1999 (Newport Electric Corporation). She indicated further that Narragansett has never sought an audit of NEP's accounts and records as allowed under Tariff 9. She explained that the revenue requirements under NEP's FERC Tariff 9 are calculated pursuant to a formula rate filed with and approved by FERC. The approved formula rate permits NEP to recover its actual costs for cost components approved as part of the cost of service formula. Thus, she explained, FERC approves the formula but does not specifically review the Tariff 9 costs. However, FERC may audit the application of NEP's formula or the transmission customers may conduct an audit. See Responses to Record Requests, 2, 3, and 4.

concern that if there were arbitration, a ratepayer advocate should have a right to be involved.

With regard to the treatment of the LRS over collection, Ms. Lloyd acknowledged that the Company is not recommending rolling it into the SOS balance in 2005 and explained that because the balance is so small, the Company believed it would be more appropriate to carry it forward in an interest bearing account through to the next reconciliation. She noted that most of the over collection was due to a timing issue between the monthly usage and the billing cycles, specifically regarding prorating of usage on bills.

Addressing public comment that restructuring was supposed to provide lower electric prices for customers, Mr. Hager explained that there is competition in the wholesale market, although not in the retail market for residential customers in Rhode Island. He reiterated a point from a prior SOS proceeding, noting that gas prices at the end of November 2004 for calendar year 2005 purchases were averaging $7.15 per MMBtu. He reminded the Commission that when the restructuring concept was being developed in 1996, 1997 and 1998, the natural gas market prices would fluctuate between $2.00 and $3.00 per MMBtu. At that time, $3.00 per MMBtu put people into crisis mode. He indicated that economists are advising market participants to "forget the old prices [and that] $5.00 or $5.50 should be the normal price." Both Mr. Hager and Dr. Stutz, the Division's witness agreed that some of the reason for the increased energy

---

[35] Id. at 78-79. See Response to Record Request 7.
[36] Id. at 72-75.

prices is due to increased generating capacity, built after the commencement of restructuring, which is dependent on natural gas.[37]

Mr. Hager noted that ISO-NE had issued a report which indicated that if one backs out the increased fuel costs, and normalizes them back to the oil and gas prices of the prior year, the actual wholesale market prices were lower in 2003 than in the year prior. According to ISO-NE, this shows the efficiencies created by the restructured market. Therefore, while customers were experiencing actual increases in their bills, it was due to increases in energy costs rather than inefficiencies in the system.[38]

C. Division's Testimony

The Division presented Dr. John Stutz of the Tellus Institute in support of its position. Dr. Stutz indicated that while the transmission costs and erratic behavior of the SOS costs concern the Division, the Division supports the amended proposal that Narragansett filed with the Commission.[39] In response to a question from the Bench inquiring as to whether or not the SOS rate should be increased, Dr. Stutz agreed with a comment made by Mr. Hager that the current SOS rate should provide some cushion in the midst of volatility. Dr. Stutz also pointed out that with a volatile market such as the historical natural gas market, a valid projection of a trend is very difficult. He noted that the natural gas market, shown on a graph, tends to have peaks and valleys. Therefore, while there has been an overall upward trend in the energy market over time, it is very difficult to project what the market will do in the next twelve-month period for the purposes of setting rates. He also indicated that 6.7 cents per kWh is a reasonable level

---

[37] Id, at 94-102.
[38] Id. at 96-98.
[39] Id. at 83-84.

for the SOS rate and that it provides a cushion.[40] He stated that "I do have to admit that the cushion isn't anywhere near as big as these swings we've seen, but I hope these swings are more indicative of spikes than trends."[41] He maintained that in light of the volatility, where a clear trend is not discernable, this was not the time to be building up large surpluses.[42] With regard to the Commission's previous Orders which contained provisions to encourage the Company to file for a rate change when the over- or under-collection in the SOS account reaches $16 million, Dr. Stutz noted that in light of the volatility, such a benchmark should not be an absolute mandate, but rather a trigger that a rate change may be necessary.[43]

D. TEC-RI's Testimony

Mr. John Farley, Executive Director of TEC-RI, stated that the organization has some concerns with the transmission rate. Furthermore, with regard to the SOS rate, he noted that TEC-RI has two competing positions within the organization. Some customers are receiving energy through competitive supply while others are taking SOS. Addressing the SOS concerns, he acknowledged that there is still no clear answer as to what the base line price will be. He maintained that it is important for Rhode Island to seek the best strategy for mitigating risk when it comes to the prices. He believed that the procurement of SOS is not flexible enough to mitigate risk. He opined that the State is at a point where it should either move forward in encouraging the competitive market or

[40] Id. at 123-26, 128.
[41] Id. at 127-28.
[42] Id. at 128-129.
[43] Id. at 126-27.

that Narragansett will continue to procure most of the power, in which case there needs o be a review of the Company's ability to procure it in the best way possible.[44]

## V. COMMISSION FINDINGS

After considering the evidence presented, the Commission approved Narragansett's amended rate proposal as filed. Specifically, the Commission approved Narragansett's proposals with regard to the SOS rate, TAF, transition rate, and the LRS over-recovery, as just and reasonable and in the best interests of the ratepayers.

The Commission determined that Narragansett's proposal to continue reporting monthly on the projected balance of the SOS account as of December 31, 2004 is reasonable. Furthermore, Narragansett Electric should consider filing for a SOS rate adjustment if monthly projections indicate that the SOS account will accrue an over- or under-collection in excess of $16 million as of December 31, 2005. The Commission agrees with Dr. Stutz that the filing should not be required based solely on the projected number, but should consider the time of year and projections of oil and gas prices. In other words, if there appears to be a large over- or under-collection after only a couple of months of the year, time may smooth out the result. Likewise, if the over- or under-collection does not appear until after September, when Narragansett will be filing shortly for its annual reconciliation, it may not be appropriate to file. In other words, the Company has discretion utilizing various factors to determine when a rate adjustment is necessary beyond simply the figure of $16 million. It is encouraged to seek Division input prior to filing for a rate change if one is not clearly necessary.

The Commission notes that Narragansett does not earn any profit on the SOS, transmission or transition charges. These rates are the result of charges that Narragansett

---

[44] Id. at 129-131.

must pay in order to distribute the electricity to homes and businesses. With regard to the SOS rate, the Commission regulates Narragansett, but does not regulate the wholesale oil and natural gas prices. The Commission must appropriately address those costs and allocate those costs to the different groups of customers as those costs are incurred.

While the Commission is hopeful that a market will develop under restructuring, it will continue to diligently ensure that rates remain as stable as possible given the wholesale market volatility. The Commission reiterates that the General Assembly has voted in favor of electric restructuring twice based on the theory that competition will ensure lower energy prices. What the Commission has seen, however, is that the wholesale market prices have increased dramatically since 2000. Testimony at Commission hearings has consistently indicated that no one contemplated wholesale natural gas prices would settle out at $5, $6 and $7 per MMBtu, when they hovered around $2 and $3 in 1996. The Commission reminds ratepayers that it does not control or regulate these commodity prices.

While the Commission has heard the concerns of TEC-RI with regard to the procurement of SOS supply, the Commission notes that the SOS contracts that are currently in place are all requirements load following contracts with fixed prices, some that have fuel adjustment clauses, which extend through 2009. These contracts were approved by FERC after its administrative process back in 1998. If large commercial and industrial ("C&I") customers are truly concerned with what they perceive as above-market SOS prices, we encourage them to seek pricing in the market. It may be that while there may be less long-term price certainty, actual costs could be lessened in the market.

However, in response to a generalized concern that the SOS pricing may be in excess of the market, the Commission notes that after a review of Mr. Hager's pre-filed testimony, recent procurements in Massachusetts resulted in energy charges ranging from 6.646 cents per kWh for certain industrial customers to 7.093 cents per kWh for residential customers for the periods beginning in November 2004 and extending into 2005. Although filed after determination in this docket and not a part of the Commission's deliberations, the Commission notes that the average LRS pricing for non-residential customers for the eight month period January 1, 2005 through August 31, 2005 is 6.987.

Accordingly, it is hereby

(18151) ORDERED:

1. Narragansett Electric Company's proposed retail Standard Offer Service Rate of 6.7 cents per kWh is approved for service on and after January 1, 2005.
2. Narragansett Electric Company's proposed Transition Rate of 0.845 cents per kWh is approved to become effective for service on and after January 1, 2005.
3. Narragansett Electric Company shall file a monthly reconciliation of the projected SOS balance for December 31, 2005.
4. Narragansett Electric Company shall comply with all other findings and instructions as contained in this Report and Order.

EFFECTIVE AT WARWICK, RHODE ISLAND PURSUANT TO A BENCH DECISION ON DECEMBER 13, 2004. WRITTEN ORDER ISSUED FEBRUARY 17, 2005.

PUBLIC UTILITIES COMMISSION

Elia Germani, Chairman

Robert B. Holbrook, Commissioner

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS PUBLIC UTILITIES COMMISSION SEAL