UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

(CENTRAL DIVISION)

| | | |
|---|---|---|
| TRANSCANADA POWER | ) | |
| MARKETING LTD., | ) | C.A. NO. 95-40076-FDS |
| Plaintiff, | ) | |
| | ) | (Michael P. Angelini, #019340) |
| v. | ) | (Vincent F. O'Rourke, Jr., #380335) |
| | ) | (Daniel P. Flynn, #655180) |
| NARRAGANSETT ELECTRIC | ) | |
| COMPANY, | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN
## OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

(Leave to File Brief in Excess of 20 Pages Granted on August 31, 2007)

### INTRODUCTION

Although dressed as a breach of contract case and including a claim under Chapter 93A, this case is in essence a declaratory judgment action. The dispute between Narragansett Electric Company ("Narragansett") and TransCanada Power Marketing LTD ("TransCanada") is whether the Wholesale Standard Offer Service Agreement ("WSOSA") required Narragansett to include a so-called Fuel Adjustment Factor ("FAF") in its WSOSA rate filings with RIPUC for the period 2005 to 2010. TransCanada has as of this date suffered no damages because since before the filing of this lawsuit in 2005, Narragansett has made contingent payments of all FAF amounts to which TransCanada claims entitlement. Resolution of this matter will determine whether those payments should be returned to Narragansett (and thereafter to its Rhode Island electric customers) or whether TransCanada is entitled to retain the contingent payments and to

1

receive future payments (if fuel prices remain higher than the FAF trigger points) for the duration of the contract.[1]

This dispute, however, cannot be resolved by summary judgment. In its motion TransCanada sweeps aside evidence, ignores hotly disputed issues of material fact, and fails to address precedent that plainly precludes its request. While the Court would never know it from reading TransCanada's recitation of selective facts, the evidence indicates that:

1. There was never an agreement between TransCanada and Eastern Utility Associates ("EUA") that an FAF would be filed through the end of the contract period. The fact is that EUA never intended to provide a fuel adjustment factor to TransCanada – or to any other wholesale electric supplier, including its own subsidiaries, after 2004 and EUA consistently took this position in every one of its internal documents, contracts, regulatory filings, requests for proposal and tariffs, dating back to the period before the WSOSA was signed with TransCanada and through EUA's merger with National Grid in 2000.

2. There is not a single document from EUA or TransCanada that suggests that EUA promised, or that TransCanada understood or even cared at the time of contracting that the FAF would extend beyond 2004. In fact, TransCanada's own analyses of the deal (including those of its consultants) simply ignored the FAF provision and instead focused on how the deal could be structured to maximize short-term profits.

3. There is a real dispute about what was said, if anything, about the term of the FAF in April 1998. One former EUA employee testified that he told TransCanada that the FAF ended in 2004, while another former EUA employee testified that the issue was never raised. Only TransCanada's witness – the only person involved in the contract negotiations who still has any interest in the outcome of the litigation – claims to recall a verbal promise extending the FAF past 2004, although no record or memorialization of any such conversation was ever made.

4. TransCanada's allegation that National Grid engaged in what amounts to a sophisticated multi-year conspiracy to intentionally mislead TransCanada and Rhode Island's regulators about TransCanada's right to an FAF in the years after 2004 is hotly disputed by National Grid witnesses, who have offered persuasive contrary interpretations of the facts and events of the period.

---

[1]     Where documents referenced herein have already been filed by TransCanada in support of its Motion, Narragansett will reference those documents to the Tab number employed by TransCanada. Documents not previously filed by TransCanada are attached as Exhibits to the Affidavit of Chanda Kelley and will be referenced by Exhibit Letter. Referenced deposition excerpts are being filed herewith in the Narragansett Deposition Excerpt Attachment, which are organized alphabetically by name.

5.    In 2000, following the merger with EUA, National Grid's management concluded that the FAF expired in 2004, after carefully reviewing the WSOSA in conjunction with EUA's tariffs and other agreements, and after being so informed by EUA personnel who had responsibility for administering those contracts.[2]  National Grid's post merger testimony and conduct is consistent with this good faith belief that TransCanada's right to an FAF expired at the end of 2004.

In support of its own version of the facts, TransCanada has advanced a handful of documents and statements taken out of context and has asked this court to draw broad inferences about National Grid's intent that are not only hotly disputed, but that are clearly impermissible at summary judgment.  TransCanada's motion must therefore be denied as it is not supported by the evidence, the law, or the equities of this case.

## COUNTERSTATEMENT OF FACTS

A.    <u>Pre-Merger Tariff Filings and Agreements</u>.

As developed more fully in TransCanada's brief (Section A, pp. 2-6)[3], in the mid-1990's Rhode Island and Massachusetts (and other states) restructured the laws governing public utilities in an effort to inject more competition into the electric power industry.  In 1997, TransCanada, a $12.6 billion dollar enterprise with 1996 earnings of $385 million, approached EUA and offered to buy certain assets of EUA.  (Ex. A).  TransCanada represented that it had "extensive experience in managing large scale transactions" and listed several such transactions. <u>Id</u>.  Because TransCanada was seeking to purchase assets which EUA used to provide power to its customers, TransCanada and EUA negotiated the WSOSA, in which TransCanada agreed to

---

[2]    This conclusion was shared by Steve Scialabba of the Rhode Island Division of Utilities and Carriers, the agency charged with protecting the public's interest, who arrived at this conclusion independently after reviewing much the same evidence as National Grid. (Scialabba, 100-102).

[3]    For purposes of this motion, Narragansett accepts the material set forth in Section A of TransCanada's Statement of Facts.

{Client Files\LIT\304810\0001\00988439.DOC;1}

supply replacement power to EUA for distribution to a portion of EUA's customers in Rhode Island for the years 1999-2009.

Under Rhode Island law, EUA was required to file tariffs with the Rhode Island Public Utilities Commission ("RIPUC" or the "Commission") to obtain approval of the rate to be charged customers and paid to TransCanada for providing the electricity supplied to EUA's retail customers. (Affidavit of Michael Hachey, ¶ 7). The issue in this case is whether EUA was required to include an FAF (which would increase the rate paid to TransCanada when prices of gas and oil exceeded specified levels) in the tariffs filed with RIPUC for the years 2005-2009.

EUA never offered or proposed to provide an FAF after 2004 to TransCanada or any other provider of electric power. Both before and after the WSOSA, EUA consistently indicated its intent to terminate the FAF in 2004. On October 20, 1997, EUA entered into a settlement with the Rhode Island Attorney General and its Division of Public Utilities, which is referenced in the WSOSA (Tab 14, 3) and was approved by the Federal Energy Regulatory Commission ("FERC") (hereinafter "the R.I. Settlement"). (Tab 4, NARR 23520-23521). The R.I. Settlement authorizes an FAF only through 2004 even though standard offer pricing for customers who did not obtain competitive suppliers was established through 2009. (Tab 4, NARR 23316).[4] Thereafter, in November, 1997, EUA filed a proposed tariff with RIPUC. Consistent with the earlier R.I. Settlement, EUA's November 1997 proposed tariff described standard offer pricing through 2009, but an FAF only through 2004. (Ex. B, NARR 42428, 42429).

---

[4]     The settlement filed by the New England Electric System ("NEES") earlier that same year also contained approved standard offer rates through 2009 and rates for the FAF through 2004. Although the settlement filed by NEES stated that figures for the FAF for the years 2005-2009 would be developed and filed at a later date, (Tab 5, NARR 61839), EUA's settlement did not in any way indicate such an intention.

In December, 1997, Blackstone and Newport both contracted with their sister corporation, Montaup, for so-called "backstop standard offer service" which Montaup was required by the terms of the R.I. Settlement to provide to Newport and Blackstone, as needed, through 2009. (Tab 4, NARR 23295 (¶ d)). TransCanada maintains that it "assumed" Montaup's backstop obligation as a requirement of its purchase of EUA's assets. (TransCanada Br. at 6, fn. 9). Notably, the FAF in Montaup's backstop agreements with Blackstone and Newport, which TransCanada claims to have "assumed," also terminated in 2004. (Ex. C at NARR 06401; Ex. D, NARR 06381; see also Boisvert, 91-93, 154-156). The tariff filed by EUA in November 1997 (Ex. B, NARR 42428-42429) and the Requests for Qualifications ("RFQ") issued by EUA in early 1998 (Ex. E, NARR 48931, 48963) also stated that the FAF expired in 2004. Consistent with this background, when EUA negotiated the WSOSA, it intended that the FAF in the WSOSA would only continue through 2004. (Hirsh, 360-361; Boisvert, 43, 46, 67, 72-73, 152-153). EUA's tariff filed with RIPUC on April 15, 1998 (8 days after the signing of the WSOSA) (Ex. F, 51-52) and the RFQ it issued a few months later on October 30, 1998 (Ex. G, TCPM 001158, 001161) both contained Standard Offer prices through 2009 and an FAF only through 2004.

B.    The Merger.

When Narragansett assumed EUA's responsibilities in 2000 in connection with the WSOSA, Michael Hager ("Hager"), who oversaw integration of the WSOSA for Narragansett, reviewed the EUA RFQs and tariffs, all of which indicated that the FAF terminated in 2004. (Hager, 92-97). Hager was advised by representatives of Blackstone and Newport that the FAF was payable only for the years 2000 through 2004 and was not applicable to subsequent years of

the contract.  (Boisvert, 197; Hager 90-93, 108-109, 114-115, 149-150).  Based on this

information he developed the reasonable understanding that the EUA FAF lasted only until 2004.

      In February of 2000, Hager communicated with TransCanada's representative Michael

Hachey ("Hachey") and told him that Narragansett would continue to honor the WSOSA.  (Tab

18).  Hager provided Hachey with a draft letter of official notice to TransCanada of the merger in

order to obtain Hachey's comments.  (Id.; Hager, 120-121).  Because EUA's tariffs ceased to be

operative with the merger, the draft stated that Narragansett "will continue to make Fuel

Adjustment payments, if applicable, according to Attachment 2.  Attachment 2 replaces the retail

fuel adjustment mechanisms contained in the EUA Companies' respective Standard Offer

Service Tariffs." (Tab 18, ¶ 2, emphasis added).  Attachment 2 to Hager's letter set forth the

rates that would be paid TransCanada for electricity supplied for the years 2000-2004, including

the FAF through 2004.  Hager's letter neither listed nor attached a standard offer rate or FAF for

the years 2005-2009.  Neither Hachey nor TransCanada's in-house lawyer, Sean McMaster, who

negotiated the WSOSA and who received the final version of the draft letter which had been sent

to Hachey (Ex. H), objected or even inquired concerning the absence of a fuel adjustment in the

letter after 2004.  (Hager, 120-121; Hachey, 38, 56-58; McMaster, 55).

      C.    Narragansett's Post-Merger Conduct.

      In August and November of 2001, Hager filed written testimony at RIPUC in

proceedings to set Narragansett's standard offer rates for the period April to December, 2001,

and from January 2002 through December 2004, respectively.  Hager's testimony addressed

Narragansett's cost estimates for the period April 2001 through December 2001 and from

January 2002 to December 2004. (Tab 20, 6; Tab 21, 6).  In connection with his pre-filed

testimony he introduced exhibits which compiled information concerning Narragansett's FAF.

Because the testimony was intended to provide only a general description of the standard offer and did not concern the FAF for the period now in dispute (2004-2009), the compilation did not distinguish among the different contracts with FAFs through 2004 and those with FAFs through 2009.[5]  (Hager, 199-200).  In later years, when it came time to address rates for the period starting in 2005 and therefore became important to distinguish between those contracts with an FAF through 2009 and those with an FAF through 2004, Hager changed this exhibit to state that the FAF only applied until 2004 in the area served by its contracts with TransCanada, Constellation Power Source and NRG Power Marketing (the so-called EUA zone). (Hager, 200-203).

In his public appearances before RIPUC concerning Narragansett's distribution of electricity in Rhode Island, when asked explicitly to compare the Narragansett and EUA FAF provisions, Hager took pains to distinguish the different contracts and advised RIPUC that Narragansett interpreted the WSOSA as requiring that Narragansett pay an FAF to TransCanada only through 2004.  (Tab 19, 31-33).  The hearings were open to the public and copies of the documents filed at these proceedings were contained on RIPUC's website.  (Hager, 174-175). Based on his conversations with Hachey, Hager believed that TransCanada reviewed proceedings at RIPUC.  (Hager, 176-177).

When Hager was subsequently asked during the course of testimony before RIPUC whether all the suppliers affected agreed that the FAF expired in 2004, he stated that he did not

---

[5]    TransCanada has complained because Hager's testimony and supporting exhibits were produced to it in 2002 in connection with the so-called Congestion Arbitration between TransCanada and Narragansett.  (TransCanada Br. at 14).  TransCanada argues that the production of this testimony and related documents in response to TransCanada's document request was part of Hager's alleged effort to mislead TransCanada as to Narragansett's intent concerning the FAF.  This argument is totally without merit.  Hager had advised TransCanada that the FAF expired in 2004 (Tab 18), the documents complained of were produced at the direction of Narragansett's counsel and another employee and not by Hager (Hager, 192).  Moreover, Hachey stated that he did not take note of them at the time they were produced.  (Hachey, 104).

have formal acknowledgement and agreement (Tab 19, 33) and that he "assumed" there may be some disagreement. (Tab 19, 33). Hager explained at his deposition that he used the term "assumed" because he was unable to guarantee that every supplier that had been notified would eventually agree with this position. (Hager 164-165).

TransCanada claims not to have known about Hager's interpretation of the WSOSA, but nor did it make any inquiries in the years between 2000 and December of 2004 as to whether Narragansett was including an FAF in its tariffs filed with RIPUC for 2005 and thereafter and, if so, what that FAF would be. (Hachey, 126-127). TransCanada's inaction and lack of interest is most striking in 2004. Despite never having seen anything from either EUA or Narragansett that contained an FAF after 2004 in the EUA Zone, and knowing that Narragansett was due to file its first tariff for the 2005 period, TransCanada did not make even a casual inquiry of Narragansett as to (1) whether it intended to file for an FAF, (2) when it intended to file, (3) what trigger points it intended to request from RIPUC, and (4) what were the likely chances that such a filing would be successful.[6]

Narragansett did not request an FAF in the proposed tariff it filed with RIPUC for 2005 and the tariff approved by RIPUC for 2005 did not include an FAF. Thereafter, for the first time, TransCanada advised Narragansett that it maintained that it was entitled to an FAF through 2009 and stated that Narragansett was in breach of the contract by failing to request RIPUC to approve an FAF for 2005. (Tab 29). In order to forestall disruption of the delivery of electric power to Rhode Island customers, Narragansett agreed to pay, under protest, all amounts to which

---

[6]  TransCanada's silence can not plausibly be explained by its confidence that Section 8.3 would protect it in the event that RIPUC disallowed the FAF. Even if TransCanada's version of events is 100% credited, TransCanada would have known that its right to an FAF after 2004 was based on an alleged un-memorialized verbal comment by Mike Hirsch. Furthermore, TransCanada would have realized that, in the event that RIPUC disallowed the FAF, it faced a potentially difficult litigation to rescind or reform the contract based on its interpretation of Section 8.3 -- an interpretation which is now subject to a pending Motion for Summary Judgment.

8

TransCanada claimed it was entitled under its interpretation of the WSOSA.  (Hager, 435).

Narragansett, with RIPUC's approval, has continued to pay these amounts under protest in 2005,

2006 and in 2007 to date.  (Hager, 435; Ex. I).  Thus, TransCanada has suffered no damages as a

result of its dispute concerning the WSOSA.

## ARGUMENT

**I.      TransCanada's Motion Relies on Material Issues of Fact That Are
        Genuinely in Dispute, Mandating Denial of Its Motion**

TransCanada is entitled to summary judgment only if it can show that "there is no

genuine issue as to any material fact and ... [TransCanada] is entitled to a judgment as a

matter of law."  Fed.R.Civ.P. 56(c).  As the moving party, TransCanada assumes the

burden of affirmatively demonstrating that there is no genuine issue of material fact on

every relevant issue, even if it would have no burden on an issue if the case were to go to

trial.  Pederson v. Time, Inc., 404 Mass. 14, 17 (1989), (citing Attorney General v.

Bailey, 386 Mass. 367, 371 (1982), cert. denied sub nom. Bailey v. Bellotti, 459 U.S. 970

(1982)).  That burden has not been met.

Where, as here, there are competing accounts of conversations and events, and the

parties present wildly different explanations of those events, "credibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts are

jury functions, not those of a judge … ruling on a motion for summary judgment."

Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen, 878 F.2d 16,

17 (1st Cir. 1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

When, as here, competing accounts and explanations are provided by TransCanada and

Narragansett, it is the evidence of Narragansett, as the nonmoving party, that must be

credited. Id. ("The evidence of the nonmovant is to be believed, and all justifiable

inferences are to be drawn in his favor."); see also Shinberg v. Bruk, 875 F.2d 973, 974 (1st Cir. 1989) ("we are mindful of our duty to review the record in the light most favorable to the party opposing the motion for summary judgment".)

TransCanada's Motion is riddled with allegations concerning the motives and intent of EUA and Narragansett.  Nowhere is this more apparent than in TransCanada's claim that it is entitled to summary judgment on its bad faith count based on Narragansett's "exercising [its] discretion in bad faith . . . affirmatively convincing the Commission to deny a fuel adjustment factor, and . . . affirmatively misleading TransCanada and the Commission."  (TransCanada Br. at 23).   In reciting its litany of alleged misrepresentations and double-dealing, TransCanada has put Narragansett's motives and intent at the heart of its claim for summary judgment.  Id.  In doing so, TransCanada runs roughshod over the well-established rule that where motive, intent, or other state of mind questions are at issue, summary judgment is disfavored.  See Evans v. Certified Engineering & Testing Co., Inc., 834 F.Supp. 488, 499 (D.Mass. 1993); Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Wallis v. City of Worcester, 2007 WL 690050, *5 (D.Mass. 2007); Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984) ("The generally accepted rule is that the 'granting of summary judgment in a case where a party's state of mind ... constitutes an essential element of the cause of action is disfavored.'")  See also 10A C. Wright, A. Miller, & M. Kane, supra at § 2730.  Summary judgment is particularly inappropriate in matters like this where intent, motive and state of mind are at issue because "[m]uch depends on the credibility of the witnesses testifying as to their own states of mind.  In these circumstances, the jury should be given an opportunity to observe the demeanor, during

10

direct and cross-examination, of the witnesses whose states of mind are at issue."

Flesner, 410 Mass. at 809 (quoting Croley v. Matson Navigation Co., 434 F.2d 73, 77

(5th Cir. 1971)); Gual Morales v. Hernandez Vega, 579 F.2d 677, 680-81 (1st Cir. 1978).

II.    **TransCanada's Motion for Summary Judgment on Its Breach of Contract and Declaratory Judgment Claims Ignores EUA's Clearly Evidenced Intent to Have the Fuel Adjustment Factor End in 2004 and Improperly Disregards Competing Versions of the Contract Negotiations.**

After taking over 16 days of testimony of 13 fact witnesses concerning the negotiations

and meaning of the WSOSA, TransCanada now claims that the language of the WSOSA

unambiguously entitles it to summary judgment declaring that Narragansett breached Article 5 of

the WSOSA by failing to include an FAF in its proposed tariff for approval by RIPUC in 2005.

TransCanada's motion must be denied because Article 5 does not unambiguously establish either

that (1) Narragansett was required to include an FAF in its proposed tariff for 2005 or (2) what

the terms of that FAF should have included.

Article 5 of the WSOSA provides in pertinent part (Tab 14):

Price    =    Standard Offer Wholesale Price +
              Fuel Adjustment Factor

Where:  Standard Offer Wholesale Price in cents per kilowatt hour
is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on
the incremental revenues collected, if any, attributed to the
operation of the retail Rate Fuel Adjustment mechanism in the
Companies' Standard Offer Service tariffs.  The incremental
revenues attributed to the retail Fuel Adjustment will be fully
allocated to Suppliers in proportion to the Standard Offer Service
energy provided by each Supplier for the applicable billing month
through the Fuel Adjustment Factor.  The retail Fuel Adjustment,
and the resulting Fuel Adjustment Factor to be paid to Supplier,
will be made subject to regulatory approval and only to the extent

11

that the Companies are allowed to collect such revenues from their
retail customers taking Standard Offer Service.

Article 5 fails to provide the essential elements of a meeting of the minds:  it does not
contain an explicit reference to (1) the duration of the FAF, (2) the mechanism to be used in
calculating the FAF, or (3) the thresholds or "trigger points" to be used in applying the FAF.[7]  In
cases of such ambiguity, this Court is required to "fill in the blanks" by looking to the intent of
the parties at the time of contracting.  See Shea v. Bay State Gas Co., 383 Mass. 218, 222-23
(1981).

A.    EUA never intended to provide an FAF after 2004.

A review of the over 125,000 documents produced in this case and of the evidence
developed in the thirteen fact depositions taken by TransCanada establishes that EUA always
intended the FAF to end in 2004 and that EUA never provided TransCanada with any document
which indicated an intent to include an FAF in its tariffs after 2004.  Indeed, EUA was 100%
consistent on this point.  Starting in the summer of 1997, EUA prepared a number of draft
Requests for Qualifications ("RFQ") to be sent to electric generation companies to provide
power to serve EUA's standard offer service customers through 2009.  These drafts contained
FAF triggers through 2004 and question marks where the triggers for the years 2005-2009 might
appear.  (Ex. J, NEC 087294; Ex. K, NEC 077965).

While the internal EUA discussions and decisions that logically must have attended this
issue are now lost to memory, these draft documents provide compelling evidence, contrary to
the assertion of TransCanada in its brief at p. 10, that the duration of the FAF was in fact
considered by EUA.  EUA's October 1997 R.I. Settlement, negotiated with and agreed to by

---

[7] TransCanada's apparent assumption that the NEES FAF provisions are the only possible terms
for an FAF is misplaced.  Fuel trigger mechanisms in the electric industry vary widely.  (Hamal, 111-
114).

12

RIPUC and the Rhode Island Division of Public Utilities, was approved by FERC.  It provided

for standard offer service through 2009 and an FAF only through 2004.  (Tab 4, NARR 23316,

23521).  One month later, the proposed Standard Offer Service Tariff which EUA submitted to

RIPUC in November 1997 also provided for standard offer service through 2009 and an FAF

through 2004.  (Ex. B).  Thereafter, EUA decided to seek bids for Rhode Island standard offer

suppliers through 2004 (as it was doing in Massachusetts), and not to seek Rhode Island

suppliers for the full 2009 duration of the standard offer service period.  (St. Pierre, 124, 136-

138).  The final Request for Qualifications which EUA issued to prospective suppliers of

standard offer service in early 1998 requested bids on a contract and an FAF only through 2004.

(Ex. E, NARR 48931).

      Equally telling is the agreement that EUA made with itself.  In December 1997,

Blackstone and Newport both contracted with their sister corporation, Montaup, for so-called

"backstop standard offer service" which Montaup was required by the terms of the R.I.

Settlement to provide to Newport and Blackstone through 2009.  (Ex. L).  TransCanada

maintains that it "assumed" Montaup's backstop obligation as a requirement of its purchase of

EUA's assets.  (TransCanada Br. at 6, fn. 9).  Notably, while the term of the power supply

contract was for the full standard offer service period (that is through 2009), the FAF in

Montaup's backstop agreements with Blackstone and Newport (which TransCanada claims to

have "assumed") terminated in 2004.  (Ex. C, NARR 06381; Ex. D, NARR 06401; see also

Boisvert, 91-93, 154-156).

      All of these documents establish that EUA's decision not to include an FAF after 2004

was based on its determination not to do so that it made several years earlier.  The Tariff filed

publicly just eight days after the signing of the WSOSA on April 15, 1998 (Ex. F) contained

standard offer prices through 2009 but an FAF only through 2004.  Thereafter, RIPUC approved

a tariff with fuel triggers only through 2004.  (Ex. M, NARR 07340-07341).  What clearer

demonstration of EUA's contemporaneous understanding and intent could there be?[8]

The documentary record leading up to, and immediately following the signing of the

WSOSA on April 7, 1998 is, without more, sufficient to establish EUA's intent with regard to

the duration of the FAF.  But there is more.  EUA's second standard offer supply solicitation

clearly lays the issue to rest.  In November 1998, just seven months after the WSOSA was signed

with TransCanada, EUA again issued a solicitation signed by Laurence Boisvert (who was

responsible for soliciting standard offer suppliers), seeking additional suppliers of standard offer

service.  Consistent with Boisvert's testimony that it was always EUA's intent that the FAF

would not be provided after 2004, (Boisvert, 43-46), this RFQ unequivocally provided Standard

Offer Prices through 2009 and an FAF through 2004.  (Ex. G, TCPM 001158, 001161).

Thereafter all tariffs filed by EUA concerning the WSOSA consistently contained FAFs

only through 2004.[9]  (Ex. M, NARR 07340-07341, 07350; Ex. N, NARR 02567; Ex. O, NARR

02706; Hager, 149-150).  All of these documents are entirely consistent with the information

provided to Hager by Boisvert and other EUA employees in 1999 and early 2000 advising him

---

[8]     In its Motion, TransCanada carefully writes that "all the pricing documents that EUA shared with
TransCanada described a pricing structure (i) which extended the fuel adjustment "after 1999 for the full
term of the contract then being offered by EUA; and (ii) matched the NEES pricing."  (TransCanada Br.
at 8-9).  Lest this statement produce any misunderstanding, no EUA document (shared with TransCanada
or otherwise) included the phrase "through the end of the contract" or any facsimile thereof.  Moreover
none made any reference to "NEES pricing" or any other aspect of the NEES contract.  The bald fact is
that in all the EUA documents shared with TransCanada, the FAF ended in 2004.

[9]     In its Motion, TransCanada takes pains to note that "pursuant to an Order of the Commission,
these tariffs were to address and contain the standard offer service pricing only for the upcoming year."
(TransCanada Br. at 11).  This is true as far as it goes.  What TransCanada, however, fails to inform the
court is the fact that while the stipulated price was included only for the upcoming year, the tariffs all
included the full term of the FAF through 2004.  (Ex. M, NARR 07340-07341, 07350; Ex. N, NARR
02567; Ex. O, NARR 02706).  At trial, TransCanada is free to argue that this apparent anomaly was an
error, or that the inclusion of the 2004 date was arbitrarily chosen by EUA.   However, it is Narragansett's
position that these tariffs are strong evidence of EUA's understanding that the FAF ended in 2004.

that the FAF in the WSOSA was intended to expire in 2004. (Hager, 90-93, 109; Boisvert, 197) All of these publicly available documents flatly contradict TransCanada's contention that EUA's Michael Hirsh had agreed with Alexander Pourbaix that EUA would provide an FAF through 2009, a contention that Mr. Hirsh has denied. (Hirsh, 306, 335-336, 338, 340, 342, 360-361).

      B.    <u>Hirsh and Pourbaix did not agree to an FAF after 2004.</u>

Contrary to TransCanada's position (TransCanada Br. at 9),[10] neither Pourbaix nor EUA's Hirsh testified to an agreement that an <u>FAF</u> would be provided in tariffs filed after 2004. Indeed, TransCanada's Pourbaix admitted that he only asked Hirsh about "price" in his alleged discussion with Hirsh and that he did not ask Hirsh about the FAF. (Pourbaix, 86-87). The testimony of Hirsh, fairly read, is an unqualified denial of TransCanada's position. Under lengthy and rigorous examination by TransCanada's counsel, Hirsh denied that he ever promised TransCanada that there would be an FAF through 2009 or that it would be the same as the FAF in TransCanada's contract with NEES. At his deposition, Hirsh testified as follows:

    <u>Question</u>:    "When you signed the contract, what was your expectation as to the length of the time the Fuel Adjustment Factor would apply relative to the term of the contract?"

    <u>Answer</u>:    "You know, I can't say I had any expectation other than it went through 2004." (Hirsh, 326).

He was later asked the following questions by TransCanada's counsel:

    <u>Question</u>:    "When you extended the term [of the WSOSA] from 2004 to 09 what elements of the basic terms did you tell them had changed for the added term?" "If any?"

---

[10]    As developed in this brief, Narragansett disputes the factual assertions made by TransCanada in Section B of its brief concerning the FAF. Both Michael Hirsh and Laurence Boisvert testified that EUA always proposed and intended that the FAF would not be included in the WSOSA or in standard offer tariff filings after 2004. The evidence fully supports that testimony and disputes TransCanada's assertions.

<u>Answer</u>:        "I believe the only thing we would have discussed is that term now goes through 2009 and provided to them what schedules of price we had."  (Hirsh, 335).

<u>Question</u>:        "Okay.  Did you mention to them – and your testimony is that when you extended the term to 2009, you weren't sure whether the second component of the price term was going to apply for that term?"

<u>Answer</u>:  "Well that's true, because we had no settlement or no agreement with the PUC regarding the existence of the level of the trigger for the fuel beyond 2004…."  (Hirsh, 335-336).

<u>Question</u>:  "What was your understanding when you extended the term from 2004 to 2009 as to whether you were going to ask to seek from the PUC a fuel adjustment for the time period after 2004?"

<u>Answer</u>:  "I don't recall having a specific expectation."  (Hirsh, 336).

* * *

<u>Question</u>:  "Did you tell them [TransCanada] that the same terms apply for the added four years in the contract?"

<u>Answer</u>:        "No."  (Hirsh, 338).

<u>Question</u>:        "You didn't say that?"

<u>Answer</u>:        "Well I don't recall any specific discussions, but I wouldn't have said that."  (Hirsh, 338).

<u>Question</u>:        "Did you tell them the added four years were the same numbers as the NEES contract that runs through 2009?"

<u>Answer</u>:        "I couldn't have possibly said that because – I mean it's just not the way I did business.  It's still subject to PUC approval, and they had no obligation to approve the NEES numbers…. So had the subject come up, I would have couched it that way.  I would have said "Anything is subject to PUC approval."  (Hirsh, 338).

* * *

<u>Question</u>:        "Your understanding when you extended the term to 2009 was that you might not apply for a fuel adjustment for the last four years, but you decided not to tell them?"

16

<u>Answer</u>:        "I'm saying that it wasn't on the radar screen and they didn't ask."
(Hirsh, 340).

<u>Question</u>:        "Mr. Hirsh, isn't the reason that you didn't say anything about the
fuel trigger at the time is because you assumed the fuel trigger would run through
2009?"

<u>Answer</u>:        "I'd say it was because it didn't come up in our conversation.  I
don't think it was on their radar screen and it wasn't on ours as a big issue."
(Hirsh, 342).

* * *

<u>Question</u>:        "So is it your understanding when you signed the TransCanada
contract that EUA had no obligation one way or the other as to whether they
should try to get a fuel adjustment for 2005 to 09 time period?"

<u>Answer</u>:  "I don't recall being aware of any obligation we had to file for a fuel
trigger beyond the 2004 time period…when I signed the contract."  (Hirsh, 360).

<u>Question</u>:  "When you signed the contract, you had no obligation to file a fuel
index for any of the years of the contract?"

<u>Answer</u>:  "We had an obligation to file through 2004."  (Hirsh, 360-61).

Pourbaix's position is also disputed by Boisvert.  Boisvert testified that it was always

EUA's intent to end the FAF in 2004 and that throughout his dealings with TransCanada both

before and after the signing of the WSOSA, he told TransCanada that the FAF would end in

2004.  (Boisvert, 43, 45-46, 66-67, 72-73, 93, 153, 155, 197, 209-210, 216-217, 225).[11]

Even putting aside the conflicting testimony of both Hirsh and Boisvert, Pourbaix's

credibility is suspect.  Pourbaix (and his assistant Taylor) are the only witnesses to the

---

[11]        TransCanada's brief relegates the testimony of Mr. Boisvert to a footnote in which it attacks the
credibility of Mr. Boisvert on the grounds that Mr. Boisvert now "holds a sales position in which he
competes for contracts with Narragansett."  TransCanada Br. at 10, fn.12.  While TransCanada is, of
course, free to attack Mr. Boisvert's credibility at trial, such credibility determinations do not belong in a
summary judgment context where "the evidence of the nonmovant is to be believed."  <u>Yerardi's Moody
Street Restaurant v. Board of Selectmen</u>, 878 F.2d at 17.

negotiation of the WSOSA who have an interest in the results of this litigation. Unlike the former EUA employees, they are employed by TransCanada in significant managerial positions (Pourbaix, 46; Taylor, 15-16), and it is their negotiations in 1998 which are under the microscope in this case. Pourbaix was a licensed attorney with substantial corporate and business experience prior to negotiating the WSOSA. (Pourbaix, 5-6). He was assisted in his negotiations by an in-house lawyer with substantial experience in energy matters. (McMaster, 6-7). It is simply implausible that in this circumstance, Pourbaix and McMaster would accept an oral representation concerning what TransCanada now claims is a lynchpin of its contract. Pourbaix and his assistant Taylor both testified that Taylor had repeatedly requested to see the tariff referenced in Article 5 of the WSOSA which Narragansett was to file but never received one. (Pourbaix, 119; Taylor, 36-37). Both TransCanada's witnesses testified that they were satisfied that TransCanada was protected in the event that a tariff filed by EUA was unacceptable because of paragraph 8.3 of the WSOSA, which they interpreted as providing price (rather than cost) protection. (Taylor 53, 149-152; Pourbaix, 194, 263).[12]

　　　　Contradicting this claim are the facts that (1) it was believed by many, including TransCanada's expert consultant, that there would be very few people purchasing electricity at the Standard Offer Price after 2004 (Ex. P, TCPM 258-259; Hager, 211-212, 358, 408; Hirsh, 355-356), (2) these analyses also indicated that fuel prices were unlikely to reach the trigger points set out in the FAF (Hager 77-79, 359), and (3) TransCanada's own documents show that its corporate decision-makers were focused on generating short term profits, even at the expense of long-term value (Ex. Q, TCPM 000503). These provide the only credible explanation for the complete absence of analyses, projections and calculations on the part of TransCanada regarding

---

[12]　　　　There is presently pending before this Court the Motion of Narragansett for Partial Summary Judgment on Count II of the Amended Complaint, which disputes this interpretation of Paragraph 8.3.

the value of the FAF provision in the deal, and support the conclusion that TransCanada was

simply not concerned whether or not the FAF would be provided after 2004.

If in fact Pourbaix was told that the terms would be the same as the NEES contract which

contained Standard Offer and FAF figures through 2009, there is no reason that Pourbaix and/or

his counsel would not have attached the NEES FAF figures as an Appendix B to the WSOSA

immediately after Appendix A to which the parties had already attached the Standard Offer

Wholesale Prices through 2009.  This Court should not do it for them.  See Northern Heel Corp.

v. Compo Industries, Inc., 851 F.2d 456, 467 (1st Cir. 1988) ("We decline to rewrite the

agreement between the parties to include a representation which they were mutually content to

let slide in the course of their negotiations . . . ."); Matthewson Corp. v. Allied Marine Industries,

Inc., 827 F.2d 850, 856 (1st Cir. 1987) (where "the transaction is commercial, the principals

practiced and represented by counsel, and the contract itself reasonably clear, it is far wiser for a

court to honor the parties' words than to imply other and further promises out of thin air.")  See

also New England Structures, Inc. v. Loranger, 354 Mass. 62, 68 (1968) (refusing to imply a

contract term in circumstances where "it would have been natural for the parties to have

provided expressly [for the terms]… if that had been the purpose.")

     C.      The URA does not require an FAF after 2004 or at all.

TransCanada's contention (TransCanada Br. at 19) that the Rhode Island Uniform

Restructuring Act ("URA") required EUA and subsequently Narragansett to include an FAF in

all tariff filings through 2009 is based upon a grossly misleading presentation of Section 39-1-

27.3 of the URA.  Section 39-1-27.3(a) of the URA required that "tariffs [filed by electricity

distribution companies] shall (1) conform to the standards, policies, and requirements of the

federal energy regulatory commission or the commission as appropriate with respect to

nondiscriminatory access to transmission and distribution services, (2) fulfill such standards with respect to both transmission and distribution services for the benefit of both wholesale and retail customers and their suppliers, and (3) provide retail access in accordance with the schedule set forth in Section 39-1-27.3." (Tab 3, 27) (Emphasis added.). Thus, Section 39-1-27(a) plainly deals with the requirement that tariffs ensure there be "nondiscriminatory access to transmission and distribution services" in order to benefit "both wholesale and retail customers and their suppliers" and does not speak at all to Standard Offer Service pricing or whether tariff filings must contain an FAF as TransCanada repeatedly argues. (TransCanada Br. at 5, 16, 20-22).

Similarly, Paragraph 39-1-27.3(d) does not support TransCanada's position that an FAF must be included in all tariff filings and paid over to competitive suppliers like it. That provision provided that, in establishing the Standard Offer price to be charged to consumers, an allowance should be made "for other factors reasonably beyond the control of the electric distribution company and its former wholesale power supplier." (Emphasis added.)

While TransCanada has attempted to argue this sentence to its advantage, (TransCanada Br. at 5, 21, 27), its interpretation suffers from numerous infirmities. First, in arguing that this provision somehow provides substantive rights to prospective wholesale suppliers like TransCanada in the new competitive market, TransCanada ignores the impact of the word "former" when it is used in conjunction with "wholesale power supplier." The modifier "former" clearly restricts the class of suppliers to whom this provision relates to just two: Montaup (Newport and Blackstone's former wholesale supplier) and New England Power Company (NECO's former wholesale power supplier). Sensibly, the URA left prospective wholesale suppliers in the new competitive market to look after themselves.

More importantly, however, TransCanada's argument ignores the words of the very next sentence, which provides that "[t]he standard offer is to be a price cap and may, after notice to the commission, be less than the maximum allowed at any time for the generation component of the standard offer." (Emphasis added). (Tab 3, 35). Taken as a whole and read fairly, this provision allowed electric distribution companies (like Blackstone and Newport and former wholesale power suppliers like Montaup) to charge lower prices to their customers. It had nothing at all to do with competitive suppliers like TransCanada, NRG or Constellation. The only part of section 39-1-27.3(d) which speaks to competitive suppliers simply requires that "the power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest priced power supplier." Indeed, it would run counter to the purpose of the URA if distribution companies like Newport and Blackstone were somehow prohibited by the statute from making their best deal with the lowest priced power supplier.

The fact that in 2005 RIPUC approved Narragansett's tariffs which paid TransCanada "less than the maximum allowed" and did not contain an FAF for the competitive supplier, (Ex. S, NARR 01041-01043) establishes that the administrative agency charged with enforcing the URA did not interpret the 1996 URA as requiring that all tariffs contain an FAF for suppliers for all years. RIPUC's interpretation of the URA is, of course, entitled to substantial deference and supports the conclusion that the URA did not require an FAF in all contracts. See Investment Co. Inst. v. Camp, 401 U.S. 617, 626-627 (1971) (weight should be given "to any reasonable construction of a regulatory statute adopted by the agency charged with . . . (its) enforcement."); Young v. Community Nutrition Institute, 476 U.S. 974, 981 (1986); Town of Middleborough v. Housing Appeals Committee, 449 Mass. 514, 523-24 (2007) ("great weight [given] to a reasonable construction of a regulatory statute adopted by the agency charged with [its]

enforcement"); Pawtucket Power Associates Ltd. Partnership v. City of Pawtucket, 622 A.2d 452, 456-57 (R.I. 1993) ("Deference is accorded even when the agency's interpretation is not the only permissible interpretation that could be applied.")  Thus, even had TransCanada relied on the URA when it signed the WSOSA (a position for which there is no evidence), its reliance would have been misplaced.  See Eastern Casualty Ins. Co. v. Roberts, 52 Mass.App.Ct. 619, 629 (2001) ("Stripped of their possibly misleading references to existing law becoming part of the contract, cases such as Feakes actually turn on what the parties intended"); cf. Feakes v. Bozyczko, 373 Mass. 633 (1977).

### III.    From the Date of the Merger with EUA, Narragansett Acted Consistently on Its Reasonable Good Faith Belief That TransCanada's Right to a Fuel Adjustment Factor Ended in 2004.

No aspect of this case is more hotly disputed than TransCanada's allegation that Narragansett acted in bad faith in terminating the FAF in 2004.  TransCanada alleges what amounts to a sophisticated, multi-year conspiracy on the part of Narragansett to exploit for its own benefit its right to file for fuel adjustments in its retail tariffs.  According to TransCanada, the elements of this conspiracy included repeated intentional misrepresentations and double dealing intended to "convince the Commission to deny a fuel adjustment factor" and to mislead both TransCanada and the Commission.  (TransCanada Br. at 25).[13]

It is of course well settled that summary judgment is disfavored where issues of intent and state of mind are involved.  See Evans v. Certified Engineering & Testing Co., Inc., 834 F.Supp. 488, 499 (D.Mass. 1993), quoting Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Wallis v. City of Worcester, 2007 WL 690050, *5 (D.Mass. 2007), citing

---

[13]    As developed herein and in the Counterstatement of Facts, supra, Narragansett disputes the factual assertions concerning Narragansett's alleged bad faith made in Section C of its factual statement and throughout its brief.

Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984) ("The generally accepted rule is that the 'granting of summary judgment in a case where a party's state of mind ... constitutes an essential element of the cause of action is disfavored' "). See also 10A C. Wright, A. Miller, & M. Kane, supra at § 2730. Where intent or state of mind is at issue, "[m]uch depends on the credibility of the witnesses testifying as to their own states of mind. In these circumstances, the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue." See Flesner, 410 Mass. at 809 (quoting Croley v. Matson Navigation Co., 434 F.2d 73, 77 (5th Cir. 1971)); Gual Morales v. Hernandez Vega, 579 F.2d 677, 680-81 (1st Cir. 1978).

TransCanada does not come close to carrying its burden of establishing that there is no factual dispute as to Narragansett's intent. Some of its allegations collapse due to their own inconsistencies (e.g. if Narragansett's Michael Hager was "affirmatively convincing the Commission to deny a fuel adjustment" for TransCanada (TransCanada Br. at 23), why would he testify in such ambivalent tones that it was Narragansett's "initial opinion" that the FAF did not apply after 2004, and that he "assumed" that the EUA suppliers might disagree with him – statements that are surely better characterized as "balanced" than "convincing"). (Tab 19, 31-33). Other allegations require the court to draw impermissibly broad inferences from documents taken out of context (e.g. that Narragansett intentionally provided to TransCanada misleading public documents produced years earlier for other purposes in order to mislead it as to Narragansett's intent to terminate the FAF in 2004). Other allegations are plainly wrong (e.g., that Hager used his testimony in a 2002 arbitration proceeding concerning the congestion charge dispute as an opportunity to deceive TransCanada about the duration of the FAF when he was

23

simply generally describing the standard offer contracts (Hager, 199-200).  (TransCanada Br. at 14).  All TransCanada's allegations ultimately beg the question "why?"

Completely absent from TransCanada's claims is any suggestion of motive by Narragansett.  Narragansett's witnesses have strenuously denied engaging in any intentionally misleading conduct and have offered far more plausible explanations of events than those proposed by TransCanada.  The record facts are these:  Just prior to EUA's merger with Narragansett, Narragansett's Michael Hager was given the job of reviewing and developing an understanding of EUA's wholesale standard offer service agreements with suppliers like TransCanada and Constellation.  (Hager, 95).  In order to do this, Hager reviewed all of EUA's tariffs and a variety of EUA's other regulatory filings.  (Hager, 95, 107, 149-150).  Finding that every single one included an FAF that expired in 2004, he came to the unsurprising conclusion that EUA's agreements with wholesale standard offer service power suppliers expired at the end of 2004.  (Hager, 149-150).  This conclusion was supported by the former EUA employee responsible for administering the WSOSA contracts, Larry Boisvert, who told Hager that the FAF was intended to expire in 2004.  (Hager, 90-93, 109; Boisvert, 197).  No EUA employee testified to any understanding or any obligation of EUA that was inconsistent with this position.  (Hirsch, 326; St. Pierre, 110-111).[14]

Acting on this reasonable understanding, Hager prepared a <u>draft</u> letter to TransCanada and other wholesale power suppliers that he shared first with Boisvert (Hager, 116-117) and,

---

[14]    TransCanada points out in its brief that none of the key EUA employees recalls deciding not to include a fuel adjustment after 2004, and none recalled any statutory or regulatory prohibition on filing for such an adjustment.  (TransCanada Br. at 10).  Here, as elsewhere in the brief, TransCanada turns the facts on their head by asking the witnesses to prove a negative.  The fact is that the EUA's witnesses most directly involved in the issue testified consistently that, as far as they were aware, the FAF expired in 2004 and they knew of no plans to file for an FAF after that – these witnesses included Michael Hirsh, who negotiated the WSOSA, (Hirsh, 326) Larry Boisvert, who administered the WSOSA, (Boisvert, 197) and Dennis St. Pierre, who was responsible for all EUA's regulatory filings.  (St. Pierre, 110-111).

after receiving Boisvert's sign-off, (Hager, 117-118) sent the draft letter to, among others, TransCanada's Michael Hachey for his comments. (Tab 18; Hager, 120-121). Hager advised TransCanada that although the EUA Tariffs had expired, Narragansett would "continue to make Fuel Adjustment payments, if applicable, according to Attachment 2. <u>Attachment 2 replaces the retail fuel adjustment mechanisms contained in the EUA Companies' respective Standard Offer Service Tariffs</u>." (Tab 18, ¶ 2, NG/TC 026584). (Emphasis added). Attachment 2 listed FAF rates through 2004 and no FAF (or other rates) after 2004. Although Hachey and Hager communicated concerning the draft letter, Hachey did not question Hager's statements in the letter or attachment. (Hager, 120-121; Hachey, 38, 56-58).[15] Hager then sent a final version of the letter containing the same statement concerning the "replace[ment] fuel adjustment mechanisms" to Hachey and to TransCanada's in-house lawyer, who had negotiated the WSOSA and who was given notice pursuant to the WSOSA. (Tab 16). It is admitted that neither one <u>ever</u> commented concerning the letter. (Hager, 120-121; McMaster, 55; Hachey, 38, 56-58).

During the next several years Hager represented to RIPUC and others in a variety of public fora that he believed that the right to an FAF in the former EUA WSOSA expired in 2004. (Tab 19, 31-33; Tab 23 at MJH-1). Hager generally did so in measured terms, being careful not to preclude the possibility that one or more of the wholesale suppliers might challenge this interpretation (Hager, 164-166), as TransCanada had challenged Hager's reading of the congestion charge language in the contract in a pending arbitration.[16]

---

[15]   Contrary to TransCanada's position (TransCanada Br. at 15), Hager did not mislead RIPUC when he testified that he had spoken with Narragansett's suppliers concerning his interpretation of the FAF. He had spoken with Hachey concerning his letter setting forth that interpretation and Hachey had no comment. (Hager, 120-121).

[16]   In the end, the arbitration panel, the Massachusetts Superior Court and the Appeals Court agreed with Hager that the contractual language was clear and that TransCanada should bear the cost of the congestion charges. Nevertheless, Hager testified that he learned from this experience that explicit contract language did not necessarily preclude litigation. (Hager, 164-166).

In an effort to support its contention that Narragansett did not act in good faith, TransCanada complains both that Narragansett advised RIPUC that the FAF expired in 2004 and that it failed to highlight that fact in a chart that Narragansett filed with RIPUC. (TransCanada Br. at 13-15). The chart in question (Tab 20, NG/TC 008603, NG/TC 010769) consolidates information pertaining to several contracts, some of which had FAFs through 2009 (the so-called NEES contracts) and others, including TransCanada's, that did not. (Hager, 148, 236-240, 250-256). The chart was produced in 2002, and was publicly filed with RIPUC in connection with explaining Narragansett's costs of service for 2000 and 2001. The presence or absence of an FAF in the period after 2004 was completely irrelevant to the RIPUC proceedings for which the documents were produced. (Hager, 199-200). Hachey has acknowledged that TransCanada received these filings in 2002 in connection with the arbitration proceeding between Narragansett and TransCanada concerning other aspects of the WSOSA unrelated to the FAF. (Hachey, 104; Hachey Affidavit, ¶ 14).[17] The FAF was not relevant to the document production (Ex. R) and Narragansett's production was not supervised by Hager. (Hager, 197).[18]

TransCanada also complains that Hachey was misled in 2002 when Hager testified that another of its contracts with Narragansett (the NECO contract) had fuel triggers through 2009. The NECO contract in fact does have such triggers (Tab 8, NARR 35240) and TransCanada's

[17]    These documents clearly could not have induced TransCanada to sign the WSOSA and Hachey notably fails to state in his affidavit that these documents influenced any actions taken by TransCanada, after the signing of the WSOSA. This is not surprising because Hachey admitted that he did not take "specific note" of these documents when they were produced in the arbitration proceedings in 2002. (Hachey, 104).

[18]    Similarly, TransCanada's contention that Narragansett acted improperly in not producing transcripts of Hager's RIPUC testimony at the Congestion Charge arbitration in response to TransCanada's overbroad document request is meritless. Narragansett produced precisely what it said it would produce in its response to the request – its filings at RIPUC. (Ex. R, ¶ 15). In any event, Hager's RIPUC testimony is public record and could easily have been obtained directly from RIPUC by TransCanada. Had TransCanada been entitled to more or had RIPUC testimony had any conceivable relevance, TransCanada had every right to pursue it in the arbitration.

{Client Files\LIT\304810\0001\00988439.DOC;1}

implication that Hager's testimony with regard to that contract was part of a grand conspiracy is pure foolishness.[19]

Finally, TransCanada tenders no argument either as to how this "conspiracy" in any way harmed it or benefited Narragansett. Had Hachey recognized Narragansett's position before 2005, the parties would be in the same position they are in today – appearing before a court in a declaratory judgment action seeking this Court's interpretation of the WSOSA. Neither Hager nor Narragansett received any economic or other benefit by not including the FAF, since the payments from ratepayers are passed on directly to TransCanada. (Hager, 385; Scialabba, 129-131; Hamal 35-38).

Neither the facts nor the law support a claim of bad faith conduct. Narragansett acted transparently and without in any way advancing "its own self-interest." See Speakman v. Allmerica Financial Life Ins., 367 F.Supp.2d, 122, 134 (D. Mass. 2005) ("[Defendant] took unilateral, voluntary action that advanced its own self-interest…"); Tufankjian v. Rockland Trust Co., 57 Mass.App.Ct. 173, 177 (2003) ("[Defendant], by its actions, was seeking 'to recapture opportunities foregone on contracting'…and to secure a better deal….") Indeed, the facts developed herein establish that TransCanada violated its contractual commitments and duty of good faith and fair dealing by lying in the weeds and springing its unsupported claims on

---

[19]     TransCanada's complaint that Narragansett later filed a chart which correctly advised RIPUC that EUA's FAF expired in 2004 (updating the charts TransCanada complained of) is also misplaced. The issue of the duration of EUA's FAF was not germane to Hager's testimony when submitted to RIPUC in 2000 and 2001. At the time that the adjusted chart was filed, the duration of the FAF was becoming more relevant as the termination date of the FAF became closer and it became more important for RIPUC to be aware of that fact and distinguish between those contracts that included an FAF through 2004 and those that included an FAF through 2009. (Hager, 200-201).

Narragansett in an effort to extort FAF payments, which it had not bargained for or received in the WSOSA.[20]

### IV. TransCanada's Alleged Unilateral Mistake Does Not Support Either Reformation or Rescission of the Contracts.

A.    Legal Standards for Reformation and Rescission.

Reformation is an appropriate remedy for an agreement containing a mistake if the mistake was mutual or was made by one party with the actual or constructive knowledge of the other's mistake.  See Nissan Automobiles Of Marlborough, Inc. v. Glick, 62 Mass.App.Ct. 302, 306 (2004); Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 756 (1993); First Safety Fund Natl. Bank v. Friel, 23 Mass.App.Ct. 583, 588 (1987); Torrao v. Cox, 26 Mass.App.Ct. 247, 250-251 (1988); Restatement (Second) of Contracts § 153 (1981).  A party seeking recovery for a unilateral mistake must present full, clear, and decisive proof that a mistake occurred and that the other party knew or had reason to know of the mistake.  See Nissan, 62 Mass.App.Ct. at 306; Polaroid Corp., 414 Mass. at 756; First Safety Fund Natl. Bank, 23 Mass.App.Ct. at 588. Only if these conditions are met may the court reform the agreement.  See Nissan, 62 Mass.App.Ct. at 306; Mickelson v. Barnet, 390 Mass. 786, 791-792 (1984); Torrao, 26 Mass.App.Ct. at 252; 2 Farnsworth on Contracts § 7.5, at 244-245 (2d ed. 1998).

There are limited circumstances in which a party may seek to rescind (as opposed to reform) a contract on the basis of a unilateral mistake: "if he does not bear the risk of the mistake ..., and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake."  See Covich v. Chambers, 8 Mass.App.Ct. 740, 749-750 and n. 13 (1979); Shea v.

---

[20]    For these reasons, TransCanada's motion for summary judgment on Narragansett's counterclaims must also be rejected.

Eisenberg, 2004 WL 2550450, *4 (Mass.Super.); Restatement (Second) of Contracts § 153.

Both parties must share the erroneous state of mind as to the basic assumption on which the

contract was made.  See Covich, 8 Mass.App.Ct. at 749-50; Dover Pool & Racquet Club, Inc. v.

Brooking, 366 Mass. 629, 633 (1975); Taylor v. Buttrick, 165 Mass. 547, 548-549 (1896).

Avoidance of this contract is not permitted simply because one party is disappointed.  See

Covich, 8 Mass.App.Ct. at 750.

       B.      TransCanada Has Failed to Meet the Legal Standards for Rescission or
              Reformation.

       Relying on the Restatement of Contracts (Second), § 153, TransCanada argues that the

WSOSA should be rescinded or reformed because EUA allegedly caused TransCanada to make a

unilateral mistake concerning the terms of the FAF when it signed the WSOSA in 1998.

However, TransCanada cannot point to any EUA document or statement which represented that

the FAF would last until 2009.[21]  Moreover, TransCanada admits that although it repeatedly

requested to see the tariffs which EUA expected to file, it decided to sign the WSOSA without

seeing those tariffs and without including an appendix containing the FAF terms to which it now

claims that Hirsh had verbally agreed. (Taylor, 53, 149-152; Pourbaix, 194, 263).

       If TransCanada made a mistake in entering into the WSOSA, it was a unilateral mistake

caused by its own failure to follow the practices one would reasonably expect of a $12.6 billion

dollar multi-national company represented by an attorney as lead negotiator and with the services

of in-house lawyer and with self-proclaimed "extensive experience managing large scale

transactions..." (Ex. A).  TransCanada's claim that its lead negotiator and its lawyer were rushed

into entering a multi-million dollar transaction by EUA's lay representatives, thereby causing a

---

[21]      Pourbaix claims he was advised of "price terms" through 2009, by Michael Hirsh, a claim which
Hirsh disputes.  See supra.  However, Pourbaix admits he never discussed an extension of the FAF to
2009. (Pourbaix, 86-87).

unilateral mistake, is simply not credible.  Moreover, TransCanada has provided <u>no</u> evidence, let alone "full, clear, and decisive proof" to carry its burden that EUA either "knew or had reason to know" of TransCanada's mistake.[22]  <u>Nissan</u>, 62 Mass. App. Ct. at 306; <u>Polaroid Corp</u>., 414 Mass at 756.  TransCanada's motion for summary judgment on this claim should be denied both because there are factual disputes as to whether any mistake was made and, if so, whether TransCanada caused the mistake by its own actions.  <u>See</u> <u>Covich</u>, 8 Mass.App.Ct. at 749; <u>Shea</u>, 2004 WL 2550450 at *4; Restatement (Second) of Contracts § 154 ("A party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates, but treats his limited knowledge as sufficient. . .")

## <u>CONCLUSION</u>

For the foregoing reasons, TransCanada's Motion for Summary Judgment should be denied in all respects.

---

[22]    TransCanada implies in its brief that EUA had an obligation to distinguish its contract pricing from that of NEES (TransCanada Br. at 8 and 11), and EUA's "failure" to do so somehow misled TransCanada.  Id.  Again, this turns the facts on their head.  There is nothing in the record to indicate that the EUA and TransCanada negotiators had an agreement that any deviations from the NEES contract were to be noted.  Had it intended to incorporate the NEES pricing terms, TransCanada could easily have done so.  If TransCanada had, in fact, harbored an unspoken assumption that the two contracts were to be identical, it should not now be allowed to blame Narragansett for its own mistake.  Moreover, TransCanada's assumption that the NEES FAF provisions are the only possible terms for an FAF is misplaced.  Fuel trigger mechanisms vary widely (Hamal, 111-114) and the record does not support TransCanada's contention that the NEES FAF was agreed upon.  (Pourbaix, 86-87; Hirsh, 338).

{Client Files\LIT\304810\0001\00988439.DOC;1}

NARRAGANSETT ELECTRIC COMPANY
By its attorneys,


/s/ Vincent F. O'Rourke, Jr.
Michael P. Angelini (BBO #019340)
Vincent F. O'Rourke, Jr. (BBO #318335)
Daniel P. Flynn (BBO #655180)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511


Of Counsel:

John F. Sherman,
Deputy General Counsel
David G. Lodemore, Esquire
National Grid, USA
25 Research Drive
Westborough, MA  01582
(508) 389-2971


September 12, 2007


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 12, 2007.

/s/ Vincent F. O'Rourke, Jr.
Vincent F. O'Rourke, Jr.

{Client Files\LIT\304810\0001\00988439.DOC;1}