UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

Civil Action No. 05-40076FDS

| | |
|---|---|
| TRANSCANADA POWER MARKETING LTD. | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE NARRAGANSETT ELECTRIC COMPANY | ) ) |
| Defendant. | ) ) |

## DEPOSITION TRANSCRIPT EXCERPTS FOR DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**PART 1 OF 5**

# BOISVERT

1          UNITED STATES DISTRICT COURT

            DISTRICT OF MASSACHUSETTS

2

3

   --------------------------x

4

TRANSCANADA POWER MARKETING,

5 LTD.,

6

        Plaintiff,

7

   v.                          CASE NO.: 05-40076

8

NARRAGANSETT ELECTRIC COMPANY,

9

        Defendant.

10

   --------------------------x

11

12

13 Job No. 8924                 Pages 1 - 227

14

15

16          DEPOSITION OF LAWRENCE R. BOISVERT, a

17 witness called by counsel for the Plaintiff,

18 taken pursuant to the applicable Rules of Civil

19 Procedure before Dena M. O'Brien, CSR, and

20 Notary Public in and for the State of Rhode

21 Island, at the law office of Blish & Kavanaugh,

22 30 Exchange Terrace, Providence, Rhode Island,

23

24 on March 1, 2007, commencing at 9:30 a.m.

Page 42

1 standard offer contracts, and then we had
2 retail tariffs that were very, very similar.
3   Q.   And so the retail tariffs would charge
4 through to the rate payers -- the retail
5 companies filed retail tariffs with state
6 regulatory agencies?
7   A.   Yes.
8   Q.   And in Rhode Island, that would be the
9 Public Utilities Commission or PUC?
10   A.   Yes.
11   Q.   And those would include a price
12 component for the stipulated price and fuel
13 adjustment?
14      MR. O'ROURKE:  Objection.
15      THE WITNESS:  I recall a tariff having
16 the base rate with a fuel provision.
17 BY MR. WINSTON:
18   Q.   Okay.  And -- okay.  So I'm just
19 trying -- so, in other words, the way it works
20 is the wholesale suppliers have signed contracts
21 to supply power and the costs of those contracts
22 are placed into the retail tariffs by the retail
23 companies?
24      MS. BUDKE:  Object to the form.

Page 43

1      THE WITNESS:  Yes.
2 BY MR. WINSTON:
3   Q.   You've seen the URA in Rhode Island.
4 You said your memory is that the standard offer
5 service in Rhode Island ran through 2009?
6   A.   Yes.
7   Q.   Do you recall the stipulated percent
8 of prices going through 2009?
9      MR. O'ROURKE:  Objection.
10      THE WITNESS:  There are fixed prices
11 that go through 2009, yes.
12 BY MR. WINSTON:
13   Q.   Do you recall any discussion about the
14 fuel adjustment running for a shorter period of
15 time than 2009?
16   A.   Yes.
17   Q.   What do you remember?
18   A.   I recall our standard offer contracts
19 we had a fuel adjustment provision going
20 through I think it was December of 2004.
21   Q.   Let me show you what's been marked as
22 Exhibit 1, which is -- take a look at it.  I'll
23 represent to you it's TransCanada's wholesale
24 standard offer service contract.

Page 44

1   A.   Did you want me to read the contract?
2   Q.   I'm just asking -- let me ask you
3 this:  Would you have seen TransCanada's
4 wholesale standard offer service contract when
5 you were at EUA?
6   A.   Yes.
7   Q.   Do you recall that TransCanada had
8 such a standard offer service contract?
9   A.   Yes.
10   Q.   Instead of giving you my copy -- I've
11 scribbled on it -- there's Exhibit 1.  If you
12 turn to page five of that contract, do you
13 recall that pricing term?
14   A.   It looks familiar.
15   Q.   Do you know who drafted that pricing
16 term?
17   A.   I'm sorry.  What was that?
18   Q.   Do you know who drafted that?
19   A.   It could have been me or Bob Clark.
20   Q.   Okay.  What do you recall about the
21 drafting of this particular provision?
22   A.   I don't remember.
23   Q.   Okay.  Can you show me where in this
24 contract -- you've said that you thought that

Page 45

1 the wholesale standard offer service contract
2 limited the fuel adjustment to 2004.  I think
3 that's what you said.
4   A.   Yes.
5   Q.   Can you show me where in that contract
6 that is?
7      MR. O'ROURKE:  Objection to form.
8      THE WITNESS:  I didn't find anything
9 in the agreement that specifically states that.
10 BY MR. WINSTON:
11   Q.   Okay.  So what leads you to give the
12 answer that -- what is your understanding based
13 upon as to the length of the fuel adjustment in
14 that contract?
15   A.   What was the question again?
16   Q.   Well, my question was whether or not
17 you -- my original question was whether you had
18 an understanding whether the -- let me start
19 from the beginning.  My first question was do
20 you recall that there was a stipulated set of
21 standard offer service prices through 2009?
22   A.   Yes.
23   Q.   My next question was do you recall
24 that there was any understanding or discussion

12 (Pages 42 to 45)

Page 46

1 about the fuel adjustment not extending for that
2 full period of 2009?
3    A.  Yes.
4    Q.  And your answer is?
5    A.  I thought it was in the agreement.
6    Q.  And why did you think that?
7    A.  I just recall that the fuel adjustment
8 provision did not run for the full term of the
9 agreement.
10    Q.  Okay.  To the best of your memory as
11 you sit there, what is that recollection based
12 upon?
13    A.  That was based on discussions and work
14 that we had done when I was at EUA.
15    Q.  Who were they with?
16    A.  Bob Clark, Kevin Kirby, Mike Hirsch.
17    Q.  Tell me everything you remember about
18 those discussions.
19    A.  I remember -- not a lot.  I remember
20 that the fuel adjustment provision was supposed
21 to be -- terminate before 2009.
22    Q.  Do you remember the reasons for that?
23    A.  No, I don't.
24    Q.  Do you think you would have given me

Page 47

1 the same answer before you met with Narragansett
2 last summer?
3    A.  Yes.
4    Q.  So your recollection is there were
5 discussions about it ending.  You don't remember
6 any reasons why EUA would have done that?
7    A.  No.
8    Q.  Any other recollection as to the basis
9 for that -- for those discussions?
10    A.  It might have been in the Rhode Island
11 settlement.  I don't know for sure.
12    Q.  Is it your understanding that the URA
13 permitted a fuel adjustment through 2009?
14    A.  I don't recall what the URA permitted.
15    Q.  Well, you've got it in front of you.
16 If you turn to page 34 that we looked at, which
17 is Section D, which is the provision you read,
18 you can see it mentions standard offer through
19 2009 and then to be adjusted annually for
20 factors, including extraordinary fuel cost.
21        Do you see anything in that provision
22 that limits the fuel adjustment to shorter than
23 2009?
24    A.  No.

Page 48

1        MR. O'ROURKE:  Objection.
2 BY MR. WINSTON:
3    Q.  Were you aware of any law or
4 regulatory decision that prevented EUA from
5 seeking a fuel adjustment after 2004?
6    A.  I don't remember.
7    Q.  Do you have a sense of how much energy
8 FPL sells to National Grid on a yearly basis?
9    A.  It varies a year.
10    Q.  Roughly?
11    A.  I don't know.  I'd have to calculate
12 it.
13    Q.  Can you give me a ball park, 100,000,
14 100 million, 100 billion?
15    A.  Probably a couple of million megawatt
16 hours annually.
17    Q.  How much is that in terms of dollars?
18    A.  Total dollars?
19    Q.  Sure.
20    A.  If it's two million megawatt hours
21 at -- it would be 180 million.
22    Q.  Is that for last year?
23    A.  I said it varies.  It depends upon
24 what contracts we have.

Page 49

1    Q.  You're estimating that over the last
2 couple of years on average FPL has sold about
3 somewhere in the range of 180 million in energy
4 per year to National Grid?
5    A.  No, I came up with an estimate of two
6 million megawatt hours.
7    Q.  Okay.  And what's your best
8 understanding of what the dollar value has been
9 on average over the last five years?
10    A.  I don't remember.
11    Q.  More than 100 million per year?
12    A.  I don't know.  I'd have to go back and
13 look at my records.
14    Q.  Okay.  How often does FPL respond to
15 solicitations from National Grid?
16    A.  National Grid issues four RFP's a
17 year, and we respond typically to two of them.
18    Q.  Do you know why if there were
19 discussions at EUA -- well, are you aware of any
20 discussions between EUA and TransCanada
21 informing TransCanada that EUA wouldn't seek a
22 fuel adjustment for the post 2004 time period?
23    A.  I don't remember any of those
24 discussions.

13 (Pages 46 to 49)

Page 66

1  Q.  Okay.  Do you know why that difference
2  existed?
3  A.  No.
4  Q.  Do you recall any other differences in
5  the pricing terms?
6  A.  No.
7  Q.  Do you recall any difference in the
8  pricing -- in the stipulated price streams
9  through 2009 between NEES and the EUA?
10  A.  I think they were very similar.
11  Q.  You don't remember any differences?
12  A.  I don't remember any differences.
13  Q.  Do you remember any difference in the
14  trigger numbers between NEES and EUA on the fuel
15  adjustment?
16      MR. O'ROURKE:  Objection.
17      THE WITNESS:  No.
18  BY MR. WINSTON:
19  Q.  Do you recall being aware of any
20  differences in the length that the fuel
21  adjustment would be offered in Rhode Island
22  between NEES and EUA?
23  A.  Yes.
24  Q.  Other than what you've told me before

Page 67

1  about discussions internally with Bob Clark,
2  Kevin Kirby, and Mike Hirsch, do you have any
3  other recollection as to why that was?
4  A.  No.
5  Q.  What was the difference that you
6  understood there to be?
7  A.  My understanding is that the
8  Narragansett contract, the fuel adjustment
9  provision goes full term, and under the EUA
10  contracts, we terminated on December 31, 2004.
11  Q.  As you sit here today, can you think
12  of any reason why EUA would terminate its fuel
13  adjustment short of the full term of the
14  standard offer service?
15      MR. O'ROURKE:  Objection.
16      THE WITNESS:  It could have been
17  something that we discussed with the PUC.
18  BY MR. WINSTON:
19  Q.  You're surmising, but do you have any
20  basis to say that?
21  A.  I have no basis to say that.  I don't
22  recall.
23  Q.  Wouldn't cutting off the fuel
24  adjustment in 2004 affect your ability to bid

Page 68

1  off the standard offer service contracts?
2      MR. O'ROURKE:  Objection.
3      THE WITNESS:  No.
4  BY MR. WINSTON:
5  Q.  Why not?
6  A.  It would just -- I'm not sure what
7  you're getting at.
8  Q.  Well, I think you told me before that
9  you wanted a fuel adjustment so that you could
10  provide some security to bidders for wholesale
11  standard offer service they'd be protected
12  against fuel price rises, correct?
13  A.  That's correct.
14  Q.  And so -- well, what was your memory
15  as to the length that you were offering
16  wholesale standard offer service contracts in
17  Rhode Island?
18  A.  For the full 2009 period.
19  Q.  And wouldn't a bidding contractor for
20  those contractors desire a fuel adjustment in
21  the last four years of the contract?
22  A.  Sure, yes.
23  Q.  And so what would be the advantage to
24  EUA of not offering that, if any?

Page 69

1      MS. BUDKE:  Object to the form.
2      THE WITNESS:  That would be a risk
3  that EUA would then have in the future because
4  if prices were high, then EUA's utility would
5  then have to either bear that cost or have to go
6  back to the PUC and collect that money.
7  BY MR. WINSTON:
8  Q.  Well, it is it your understanding that
9  it was -- EUA was -- was EUA offering wholesale
10  standard offer service contracts that provided
11  fuel protection through 2009 to its wholesale
12  standard offer service providers?
13      MR. O'ROURKE:  Objection.
14      THE WITNESS:  No.
15  BY MR. WINSTON:
16  Q.  So who -- isn't it then the provider
17  that's bearing the risk of the fuel?
18  A.  Yes.
19  Q.  And wouldn't that affect the sale
20  price for those contracts?
21  A.  Not necessarily.
22  Q.  Do you recall any discussions with any
23  bidder for wholesale standard offer service
24  about the fuel adjustment ending in 2004?

18 (Pages 66 to 69)

Page 70

1  A.  I don't recall any specific
2 discussions with any of the suppliers.
3  Q.  Do you recall ever selling any
4 supplier or potential bidder for wholesale
5 standard offer service that EUA did not intend
6 to apply for a fuel adjustment after 2004?
7  A.  I'm sure I did.
8  Q.  Tell me what you remember.
9  A.  I don't remember.
10  Q.  So your answer is you don't have any
11 recollection as you sit here today of ever
12 telling any actual wholesale standard offer
13 service supplier or bidder that EUA did not
14 intend to apply for a fuel adjustment after
15 2004?
16    MR. O'ROURKE:  Objection.
17    MS. BUDKE:  Object.
18    THE WITNESS:  I'm sure we had those
19 discussions.  I just don't recall ever talking
20 about it.
21 BY MR. WINSTON:
22  Q.  Why are you sure you had them?
23  A.  Because that provision, as well as
24 several other provisions in the contract, were

Page 71

1 very important.
2  Q.  You'd agree that it would be important
3 to disclose to a wholesale standard offer
4 supplier that it would not be getting a fuel
5 adjustment for the last four years of the
6 contract?
7    MR. O'ROURKE:  Objection.
8    THE WITNESS:  Yes.
9 BY MR. WINSTON:
10  Q.  That would be an important term to
11 anybody negotiating a wholesale standard service
12 offer contract with EUA?
13    MR. O'ROURKE:  Objection.
14    THE WITNESS:  Yes.
15 BY MR. WINSTON:
16  Q.  Do you recall whether EUA ever bid out
17 the wholesale standard offer service contracts
18 for less than the full term?
19  A.  We might have.
20  Q.  Do you know why that was?
21  A.  I don't remember.
22  Q.  Do you recall whether the bid was done
23 independently for Massachusetts and Rhode Island
24 or jointly?

Page 72

1  A.  I don't remember.
2  Q.  Do you recall how NEES did it?
3  A.  No.
4  Q.  Do you recall knowing at the time that
5 you solicited the bids what term NEES was
6 offering the wholesale standard offer service
7 contracts for?
8  A.  Could you ask that again?
9  Q.  Would you have been familiar at the
10 time you were bidding the wholesale standard
11 offer service contracts for EUA what the terms
12 that NEES was offering for its wholesale
13 standard offer service contracts?
14    MR. O'ROURKE:  Objection.
15    THE WITNESS:  I was probably aware.
16 BY MR. WINSTON:
17  Q.  Okay.  Were you aware that NEES was
18 offering the wholesale standard offer service
19 contracts with a fuel adjustment through 2009?
20  A.  Yes.
21  Q.  And your memory as you sit here today
22 is that EUA was offering wholesale standard
23 offer service contracts with a fuel adjustment
24 only through 2004?

Page 73

1  A.  That's correct.
2  Q.  Do you recall any supplier ever
3 expressing concern about the absence of a fuel
4 adjustment after 2004?
5  A.  No.
6  Q.  Do you recall that fact ever coming up
7 in any conversation with an actual potential
8 wholesale standard offer service supplier?
9  A.  No.
10  Q.  Let me show you what has been marked
11 as Exhibit 17.
12  A.  Would you like me to read this?
13    MR. WINSTON:  No.  This is why we
14 premark exhibits because we carry around
15 phonebooks.  Actually, do you want to take just
16 a five-minute break?
17    THE WITNESS:  Yes, please.
18    (Recess.)
19 BY MR. WINSTON:
20  Q.  So I'm showing you what's been marked
21 as Exhibit 17, which I will represent to you is
22 a settlement agreement with FERC for Rhode
23 Island filed by NEES.  Is this something that --
24 do you recall reviewing settlement agreements

19 (Pages 70 to 73)

Page 90

1 sit here today as to who that would have been
2 farmed out to?
3    A.    It could have gone to me, it could
4 have gone to Don Bishop or it could have
5 gone to -- you know, it could have gone to a
6 number of people.
7    Q.    So your best testimony is you could
8 have been involved with this; you don't recall?
9    A.    I just don't remember.
10    Q.    If you turn to ECT 114, you see
11 there's a question about the fuel adjustment
12 there, if you just read that to yourself.
13    A.    Okay.
14    Q.    Do you recall anything about the
15 preparation of this answer?
16    A.    No.
17    Q.    Is your answer the same with respect
18 to this answer, that it could have been you
19 answering it; you don't recall?
20        MR. O'ROURKE:  Objection.
21        THE WITNESS:  Yes.
22 BY MR. WINSTON:
23    Q.    Do you know whether any discussions
24 had been had as of the time of this answer at

Page 91

1 EUA about whether the fuel adjustment would go
2 through 2004 or 2009?
3    A.    I don't know.  I don't remember.
4    Q.    Well, had EUA intended to cut off the
5 fuel adjustment in 2004 at this time.  At this
6 time do you think that's something that would
7 have been disclosed in here?
8        MR. O'ROURKE:  Objection.
9        THE WITNESS:  I don't know.
10 BY MR. WINSTON:
11    Q.    Well, had you prepared this answer, is
12 this the way you would have answered it had you
13 understood the fuel adjustment not to apply at
14 all in 2005 to '09?
15    A.    I don't -- I don't know.
16    Q.    So your recollection is that as of
17 this point, you don't know whether or not any
18 discussions had been had about ending the fuel
19 adjustment before 2009?
20        MR. O'ROURKE:  Objection.
21        THE WITNESS:  That's correct.
22 BY MR. WINSTON:
23    Q.    Is it your understanding that EUA had
24 decided that if Montaup still bore the backstop

Page 92

1 obligation in 2005 to '09, it would not be
2 receiving a fuel adjustment?
3    A.    That's my understanding, yes.
4    Q.    And do you have any recollection as to
5 why Montaup agreed to that?
6    A.    No.
7    Q.    And you don't have any recollection as
8 to whether or not that was discussed with
9 regulators at all?
10        MS. BUDKE:  Objection.
11        THE WITNESS:  I don't know.
12 BY MR. WINSTON:
13    Q.    The extent of your memory is that at
14 some point you had discussions internally with
15 EUA about the fuel adjustment ending in 2004?
16    A.    I'm sorry.  What was the question
17 again?
18    Q.    I'm trying to get the full extent of
19 your memory as to the date and time of any
20 discussions you had about fuel adjustment not
21 applying in the EUA zone after 2004?
22    A.    I don't know when that decision to
23 change it was made.
24    Q.    Do you know who made that decision?

Page 93

1    A.    No.
2    Q.    Do you know for a fact such a decision
3 was made?
4    A.    Yes.  I'm pretty sure there was a
5 decision made, yes.
6    Q.    And how do you know that?
7    A.    I just remember it being that way.
8    Q.    You remember somebody telling you --
9 your best memory is you remember discussions
10 that a decision had been made?
11    A.    I remember that discussions -- I don't
12 know with who.  We used to have meetings all
13 the time.  I just -- I mean, just one of the
14 things I remember with the standard offer that
15 the fuel adjustment provision was ending in
16 December 2004.
17    Q.    Do you recall -- I apologize if I
18 asked you this before.  Do you recall whether
19 EUA at some point bid the standard offer service
20 for less than the full 2009 term?
21    A.    We might have.  I would have to go
22 back and look at our old RFP's to be sure.
23    Q.    Let me show you what's been marked as
24 Exhibit 32.  You can see that is May 12, 1998

24 (Pages 90 to 93)

Page 150

1  A.  What?

2  Q.  You recall that these documents we've
3 looked at have seen fuel adjustment mechanisms
4 and provisions through 2004, correct?

5  A.  Yes.

6  Q.  Okay.  Is your testimony that no
7 decision had been made one way or the other as
8 to what fuel adjustment provision would apply
9 after 2004?

10  A.  I dont know.  I wasn't part of the
11 settlement discussions with the PUC and the
12 parties involved.

13  Q.  So to your knowledge there was no
14 specific decision made one way or the other with
15 EUA as to whether or not a fuel adjustment would
16 be sought after 2004?

17    MR. O'ROURKE:  Objection.

18    THE WITNESS:  My understanding was a
19 fuel adjustment terminated December 31, 2004.

20 BY MR. WINSTON:

21  Q.  The fuel adjustment which had been set
22 forth in the documents?

23  A.  Yes.

24  Q.  Okay.  What I'm asking you is whether

Page 151

1 or not a decision had been made as to whether or
2 not to subsequently seek a fuel adjustment after
3 2004 one way or the other?

4  A.  I don't know.

5  Q.  Then is your testimony then you are
6 not aware of any decision to affirmatively
7 forego any opportunity to seek a fuel adjustment
8 after 2004?

9    MR. O'ROURKE:  Objection.

10    MS. BUDKE:  Object to the form.

11    MR. O'ROURKE:  Objection.

12    THE WITNESS:  Could you ask that
13 question again?

14    MS. PLOTKIN:  She can read it back, if
15 you want.

16    MR. WINSTON:  Yes.  Can you read it
17 back?

18    The pending question was read by the
19 reporter as follows:

20    ("Q.  Then is your testimony then you
21 are not aware of any decision to affirmatively
22 forego any opportunity to seek a fuel adjustment
23 after 2004?")

24    THE WITNESS:  Yes.

Page 152

1 BY MR. WINSTON:

2  Q.  And you're not aware of any
3 discussions with the regulators one way or the
4 other as to whether or not EUA had the right to
5 seek a fuel adjustment after 2004?

6    MR. O'ROURKE:  Objection.

7    THE WITNESS:  My understanding was
8 that this fuel adjustment provision did not go
9 beyond December 31, 2004.

10 BY MR. WINSTON:

11  Q.  When you say this fuel adjustment
12 provision, I see you're referring to a 2004 bid
13 document.

14  A.  I'm talking about the fuel trigger
15 point that this is the -- it's called the fuel
16 adjustment.

17  Q.  Right.  Which is in Exhibit 20?

18  A.  Yes.

19  Q.  Okay.  And if you turn to your
20 testimony in Exhibit 32, on page 28 you refer in
21 that testimony, do you not, to the fact that
22 what Attachment 4 describes is a seven-year bid
23 term through 2004, correct?

24  A.  Yes.

Page 153

1  Q.  And so we can both agree, I think,
2 that Attachment 4, which is a 2004 bid document,
3 does not contain any provisions whatsoever about
4 a fuel trigger after 2004, correct?

5  A.  That's correct.

6  Q.  My question to you is are you aware of
7 any decision at EUA one way or the other as to
8 what triggers might conceivably apply for the
9 2005 to '09 time period?

10    MR. O'ROURKE:  Objection.

11    MS. BUDKE:  Object to the form.

12    THE WITNESS:  My understanding no fuel
13 triggers applied beyond -- for the 2005 and
14 beyond period.

15 BY MR. WINSTON:

16  Q.  Okay.  And again, I'm asking you what
17 discussion -- what is that based on?

18  A.  Just my recollection.

19  Q.  Okay.  Your recollection is you don't
20 recall when those conversations occurred?

21  A.  Correct.

22  Q.  You don't remember who they were with?

23  A.  We had conversations day in and day
24 out with the management team, the people that

39 (Pages 150 to 153)

Page 154

1 were working in my department.

2 **Q. Name each person that you believe you**
3 **had a discussion with to the effect that EUA**
4 **would not seek a fuel adjustment after 2004**
5 **because I'm going to depose them.**

6 A.   That's fine.

7 **Q.   Name them.**

8 A.   Bob Clark, Peter Fuller, Mike Hirsh,
9 Dennis St. Pierre.

10 **Q.   To the best of your memory, what were**
11 **the dates of those conversations?**

12 A.   They were numerous dates that would
13 have occurred in this time period, the year
14 that the settlement negotiations and testimony
15 occurred.

16 **Q.   Your testimony also is that you don't**
17 **recall that fact being mentioned to any bidder**
18 **or purchaser or provider of wholesale standard**
19 **offer service; am I right?**

20 A.   What was the question again?

21 **Q.   Do you remember any discussions with**
22 **anyone outside of EUA at any time about any**
23 **intent of EUA never to seek a fuel trigger after**
24 **2004?**

Page 155

1 A.   I don't remember having those
2 discussions.

3 **Q.   Are you aware of anyone other than**
4 **yourself in EUA ever having those discussions**
5 **outside of EUA with anyone to the effect that**
6 **EUA never intended to seek a fuel trigger after**
7 **2004?**

8 A.   I don't know.

9 **Q.   Do you recall anything about the**
10 **conceivable rational by which EUA would not have**
11 **sought a fuel trigger through the full term of**
12 **the standard offer service in Rhode Island?**

13 A.   My understanding is that was the deal
14 that was cut with Rhode Island.

15 **Q.   That's your understanding?**

16 A.   That's my understanding.

17 **Q.   And who told you that?**

18 A.   It would have been any one of those
19 people that I mentioned.

20 **Q.   Okay. And do you have any**
21 **understanding as to anything Montaup received in**
22 **return for foregoing any fuel adjustment for the**
23 **last four years of the term of standard offer**
24 **service?**

Page 156

1 A.   It was the settlement agreement we
2 got, the right to divest in the generation and
3 collect our stranded costs.

4 **Q.   Did NEES also recover stranded costs**
5 **in divested assets?**

6 A.   As far as I know, yes.

7 **Q.   Are you aware that they got a fuel**
8 **adjustment through 2009?**

9 A.   Yes.

10 **Q.   Are you aware of any additional**
11 **benefits Montaup got or sought in order to give**
12 **up its fuel adjustment after 2004?**

13 A.   I don't know what went into the rates
14 and what went into the standard -- excuse me,
15 stranded costs calculation, the differences.

16 **Q.   You're not aware of any benefits that**
17 **Montaup obtained yourself for giving up a fuel**
18 **adjustment after 2004?**

19 A.   Right.

20 **Q.   Are you aware of any document that**
21 **sets forth an agreement with the regulators not**
22 **to seek a fuel adjustment after 2004?**

23 A.   No.

24 **Q.   Is it your understanding that was a**

Page 157

1 **verbal understanding?**

2         MR. O'ROURKE:   Objection.

3         THE WITNESS:   I don't know.

4 BY MR. WINSTON:

5 **Q.   Do you recall a specific conversation**
6 **with Mike Hirsh about how long a fuel**
7 **adjustment would run in Rhode Island after**
8 **2004?**

9 A.   I'm sure we had conversations about
10 it. I don't remember a specific conversation
11 or any specific date, but I'm sure we talked
12 about it.

13 **Q.   Your best memory is you had multiple**
14 **conversations?**

15 A.   Yes.

16 **Q.   Have you ever seen a document ever**
17 **that indicates that EUA will not seek a fuel**
18 **adjustment after 2004?**

19 A.   No.

20 **Q.   Was it a secret?**

21 A.   No.

22 **Q.   Let me show you what's been marked as**
23 **Exhibit 37, which is presubmittal conference**
24 **slides dated October 24, '97.**

40 (Pages 154 to 157)

**Page 194**

1 an exhibit. Well, actually -- I mean, if you
2 look at the first substantive page of the
3 letter, you see the subject here is wholesale
4 standard offer service of Blackstone, Eastern,
5 and Newport?
6   A.   Yes.
7   Q.   And, in fact, it's the one dated
8 April 7, '98 that we've looked at?
9   A.   Yes.
10   Q.   Okay. So here before the merger,
11 you've got Mike Hager sending a letter to
12 TransCanada concerning a EUA wholesale standard
13 offer service contract?
14   A.   Yes.
15   Q.   Okay. And to the best of your memory
16 what at that point is your -- what role do you
17 have in still administering these contracts?
18   A.   My role at that point was to continue
19 beyond ongoing billing, and this letter was to
20 explain how the contract was going to be
21 administered going forward.
22   Q.   Okay. I mean, is this a letter that
23 you recall preparing with him?
24   A.   We had done several letters. I think

**Page 195**

1 these letters were prepared by I think it was
2 NEES's attorneys or Mike. I don't know.
3   Q.   But you recall these letters being
4 sent?
5   A.   Yes.
6   Q.   Okay. And I'll show you I'll mark as
7 Exhibit 87.
8   (Plaintiff's Exhibit No. 87 was marked.)
9 BY MR. WINSTON:
10   Q.   This is a Hager letter to NRG dated
11 February 2000. It went out the same day. It's
12 quite similar. In fact, it's the same
13 handwritten language. Do you recall whether a
14 letter like this was also sent to Constellation?
15   A.   I'm sure there was.
16   MR. WINSTON: Okay. I guess, Vin,
17 I'll ask you. We've never seen a letter like
18 this to Constellation. Oh, actually, we have.
19 Never mind.
20   MR. O'ROURKE: That's okay. I had no
21 answer to what I expected your question was
22 anyway.
23 BY MR. WINSTON:
24   Q.   Okay. So do you recall reviewing

**Page 196**

1 these letters and discussing them with Mike
2 Hager? I mean, what was your role in these
3 letters?
4   A.   Again, I don't remember all of the
5 specifics, but there were a bunch of
6 transitional issues that we had to do to
7 change, as this letter points out, primarily
8 the load assets, and that's the tracking
9 mechanism that we had with NEPOOL assigning the
10 new load assets to make sure that they got
11 credit for the load and got paid.
12   Q.   Okay. And do you recall discussing
13 these letters with Mike Hager at all?
14   A.   I don't remember any specific time or
15 call, but I'm sure we talked about it.
16   Q.   Okay. You're assuming you talked
17 about it because you were both there doing this,
18 but you don't recall specific conversations?
19   A.   At that point in time I was talking
20 with Mike on a regular basis on a variety of
21 transitional issues, this being just one of
22 them.
23   Q.   Do you recall discussing with Mike or
24 anyone else at National Grid during the time of

**Page 197**

1 the merger the length of the fuel adjustment in
2 the EUA zone?
3   A.   With Mike Hager?
4   Q.   Yes.
5   A.   I'm sure we did, but I don't remember
6 anything specifically.
7   Q.   Let me say this: We've got a case
8 riding on this and a lot of money. So I'm sure
9 we did just doesn't do it. What is your
10 specific memory as to whether or not you talked
11 to him? Do you definitely remember talking to
12 him or not?
13   A.   I'm sure I talked to him. If you want
14 me to -- do I remember having a specific
15 conversation on a specific day at a specific
16 hour? I don't remember that. Do I remember
17 talking to him? Yes, we talked every -- almost
18 every single day on these issues.
19   Q.   Do you remember talking to him at any
20 time specifically about the fuel adjustment
21 ending in the EUA zone in 2004?
22   A.   I'm sure I talked to him about it. I
23 don't -- I can't point to a specific
24 conversation that we had.

50 (Pages 194 to 197)

Esquire Deposition Services
1-866-619-3925

Page 206

1  A.  No.

2  Q.  How about Mike Hirsch?

3  A.  No.

4  Q.  Did you talk to -- when you -- have

5 you me with Mr. O'Rourke prior to our deposition

6 here at all?

7  A.  Were you part of the team? I don't

8 know.

9  Q.  I don't think he can testify.

10  A.  I think he was there this past summer.

11  Q.  My guess is yes, but --

12  A.  As I mentioned, I know Mike Hager was

13 there. I know there were a couple of attorneys

14 that were there.

15  Q.  If it becomes a big deal, I'll send

16 him a deposition notice.

17  MR. O'ROURKE:  A bunch of suits.

18  THE WITNESS:  It was in August

19 sometime and --

20 BY MR. WINSTON:

21  Q.  Were there any former EUA employees at

22 that meeting?

23  A.  No.

24  Q.  Do you recall Bob Powderly

Page 207

1 (phonetically) being there?

2  A.  No.

3  Q.  Did you talk to Mike Hachey before or

4 after that meeting?

5  A.  Well before.

6  Q.  You said you recall telling Mike

7 Hachey that you weren't sure about the length of

8 the fuel adjustment without checking the

9 contract?

10  MR. O'ROURKE:  Objection.

11  THE WITNESS:  I remember -- again,

12 this goes back a while ago, but I remember

13 telling Mike that -- because Mike was -- he had

14 called up asking about the fuel adjustment

15 provision asking me whether it went out to 2009,

16 and I told him absolutely it did not. I said I

17 wasn't sure when it was ending, but I was

18 definitely, definitely sure it wasn't going

19 through 2009.

20  I don't remember whether it was 2 --

21 February of 2005 because that's when the

22 standard offer in Massachusetts ran out, or

23 whether it was December 31, 2004, but it was --

24 I told him it was in and around that time frame.

Page 208

1 BY MR. WINSTON:

2  Q.  And did he ask you why that was?

3  A.  I'm sure he did.

4  Q.  What did you tell him?

5  A.  I don't remember.

6  MR. WINSTON:  I'm done.

7  MR. O'ROURKE:  Just to put a cap on it

8 and at least make sure we have a good dispute

9 here.

10  EXAMINATION

11 BY MR. O'ROURKE:

12  Q.  Did you ever tell anybody from

13 TransCanada that the fuel trader would run

14 through 2009, that is the end of the contract?

15  A.  Absolutely not.

16  MR. O'ROURKE:  I don't have any

17 further questions.

18  EXAMINATION

19 BY MR. WINSTON:

20  Q.  Did you ever tell anybody at

21 TransCanada it was going to cut off before 2009?

22  A.  Yes.

23  Q.  When did you do that?

24  A.  I know I had that conversation with

Page 209

1 Mike Hachey. Like I said, I don't know whether

2 it was a year ago June or a year and a half,

3 but it was -- he called me a couple of times.

4  Q.  Other than that conversation, which

5 we're going to have to have testimony about, I

6 guess --

7  A.  Sure.

8  Q.  -- did you have any other

9 conversations with TransCanada in which you told

10 them that the fuel adjustment did not run

11 through 2009?

12  A.  I don't remember. I don't recall.

13  Q.  So your recollection is the only

14 conversation that you had with TransCanada in

15 which you discussed the possibility of the fuel

16 adjustment ending before 2009 is your

17 conversation with Mike Hachey?

18  A.  That's the one I'm definitely sure on,

19 yes.

20  Q.  You don't recall any other

21 conversations with anyone from TransCanada?

22  A.  As I mentioned before, I'm sure that,

23 you know, during our discussions and the

24 meetings I had with Bill and Mike back when the

53 (Pages 206 to 209)

Page 210

1 contract was being negotiated back when I'm
2 sure we had discussions.
3    Q.    You actually haven't said that until
4 now.
5    A.    Oh.
6    Q.    Your recollection now, Mr. Boisvert,
7 is that you did talk to TransCanada about the
8 fuel adjustment ending before 2009?
9    A.    I'm sure -- as I said before, I'm sure
10 we talked about that, as well as other parts of
11 the contract, but I can't point to a specific
12 meeting or a specific phone call or a specific
13 date.
14    Q.    Who?  Name a person at TransCanada you
15 said -- I want your every memory who and what
16 date and where you told someone from TransCanada
17 there would be no fuel adjustment after 2004.
18    A.    I just said -- other than the specific
19 phone call that Mike Hachey called me looking
20 for information on that -- on that -- on the
21 fuel provision, which was, as I said, it was
22 spring a year or two 'ago -- June I think it
23 was -- I told him specifically at that point in
24 time that there's no way.  It did not go back

Page 211

1 to 2009 --
2    Q.    I understand.  Let's leave off -- I
3 understand that you've got testimony about what
4 you talked about with Mike Hachey a year ago.
5    A.    Sure.
6    Q.    Okay.  Take that off the table.  I'm
7 talking about back when you worked at EUA and
8 I'm asking you under oath do you recall a
9 conversation with someone at TransCanada in
10 which you discussed the length of the fuel
11 trader?
12    A.    I'm sure we talked about it.  I can't
13 recall a specific meeting or a specific time,
14 no.
15    Q.    Are you aware you were negotiating a
16 2004 deal with TransCanada until the days before
17 the deal was signed?
18    A.    Yes.
19    Q.    Oh, you are aware of that?
20    A.    We were negotiating the contract all
21 during that time period, yes.
22    Q.    Okay.  You recall changing the term
23 from 2004 to '09 in the last days before
24 signing?

Page 212

1    A.    I did not make that change, no.  I was
2 not the person who was negotiating.  I'm aware
3 that the company was negotiating the contract.
4    Q.    Are you aware that the company made a
5 change at the last minute on the term of the
6 TransCanada contract from 2004 to 2009?
7        MR. O'ROURKE:  Objection.
8        MS. BUDKE:  Object to the form.
9        THE WITNESS:  I'm aware that the
10 standard offer changed because of delays in the
11 start-up of the restructure.
12 BY MR. WINSTON:
13    Q.    In what state?
14    A.    In Massachusetts.
15    Q.    Okay.  Are you aware that TransCanada
16 was negotiating a 2004 contract in Rhode Island
17 up until the days before it signed the deal?
18        MS. BUDKE:  Object to the form.
19        MR. O'ROURKE:  Objection.
20        THE WITNESS:  I'm confused what you're
21 saying.  You're saying they were negotiating a
22 2004 contract.  What do you mean by that?
23 BY MR. WINSTON:
24    Q.    Are you aware that -- Exhibit 1 is a

Page 213

1 2009 contract, correct?
2    A.    Where is it?  Yes, it was 2009.
3    Q.    Okay.  Are you aware that up until
4 April 1, 1998, six days before that that the
5 term of that contract was through 2004 that was
6 being negotiated?
7        MR. O'ROURKE:  Objection.
8        THE WITNESS:  No, I'm not aware of
9 that.
10 BY MR. WINSTON:
11    Q.    Do you know you would have been
12 discussing with TransCanada the length of a fuel
13 adjustment after 2004 if they were negotiating
14 only a 2004 contract up to the last minute
15 before the deal was signed?
16    A.    Ask that question again, please.
17    Q.    Is it -- you were bidding a 2004
18 wholesale standard offer service contract in
19 March of 1998 --
20    A.    Yes.
21        MS. BUDKE:  Object to the form.
22 BY MR. WINSTON:
23    Q.    -- through 2004, correct?
24        MR. O'ROURKE:  Objection.

54 (Pages 210 to 213)

Page 214

1    THE WITNESS: We had an RFP that was
2 out on the street that we had the incorrect date
3 on, yes.
4 BY MR. WINSTON:
5    Q.    Correct. And what I'm asking you
6 is -- and you saw that there was an oversight
7 and that the wholesale standard offer service
8 bid documents subsequent to April or May of '98
9 were changed to 2009, correct?
10    A.    Yes.
11    Q.    And you see that the TransCanada
12 contract is dated April 7, 1998?
13    A.    Yes.
14    Q.    Are you aware that TransCanada prior
15 to the date that contract was signed, the term
16 in that contract was changed from 2004 to 2009?
17    A.    No, I'm not aware of that.
18    Q.    And were you discussing with them
19 specifically their contract with EUA?
20    A.    I'm sure they were talking about it.
21 I wasn't the primary negotiator on this, no.
22    Q.    I'm trying to understand why were you
23 discussing with TransCanada fuel adjustments
24 after 2004 when you were putting on a bid for a

Page 215

1 2004 RFP during that time period?
2    MR. O'ROURKE: Objection.
3    MS. BUDKE: Object to the form.
4    THE WITNESS: The intent was not to go
5 out to 2004. The intent was to go out to 2009,
6 and we made a mistake.
7 BY MR. WINSTON:
8    Q.    So your testimony is that you recall a
9 discussion with which individuals of TransCanada
10 about a fuel adjustment -- the fuel adjustment
11 in their -- you discussed the fuel adjustment in
12 their contract?
13    MS. BUDKE: Object to the form.
14    MR. O'ROURKE: Objection.
15    THE WITNESS: What time period are
16 you --
17 BY MR. WINSTON:
18    Q.    Before the contract was signed?
19    A.    Before the contract was signed, I
20 don't remember.
21    Q.    So before -- do you recall any
22 conversation before that contract was signed
23 with TransCanada in which you informed them that
24 EUA had any intent to file a fuel trigger for

Page 216

1 less than the full term?
2    A.    I don't remember.
3    Q.    Before you talked to Mike Hachey a
4 year ago, do you recall any conversation with
5 anybody from TransCanada in which you informed
6 them that the fuel trigger would run for any
7 term less than 2009?
8    A.    As I mentioned before, we had a series
9 of meetings with TransCanada about the
10 contract, about all -- several other points,
11 and I'm sure this was brought up.
12    Q.    Okay. So your testimony is that
13 subsequent to the contract being signed, you're
14 sure it was brought up at some point?
15    A.    Absolutely.
16    Q.    You're not sure whether it was brought
17 up before the contract was signed?
18    A.    I think it was.
19    Q.    What's your best memory?
20    A.    My best memory it was.
21    Q.    With who?
22    MS. BUDKE: Object to the form.
23    THE WITNESS: I don't remember.
24

Page 217

1 BY MR. WINSTON:
2    Q.    Who are all of the individuals you
3 talked to at TransCanada?
4    MS. BUDKE: Object to the form.
5    MR. O'ROURKE: Objection.
6    THE WITNESS: We met on a regular
7 basis and talked with Bill Taylor and Mike
8 Hachey.
9 BY MR. WINSTON:
10    Q.    Do you know that Mike didn't work at
11 TransCanada until 1999?
12    A.    Yes.
13    Q.    I mean, Mr. Boisvert, what's your
14 basis for asserting that you talked to anybody
15 at TransCanada before the date of the contract?
16 I mean, what's your reference point for thinking
17 that?
18    MS. BUDKE: Object to the form.
19    MR. O'ROURKE: Objection.
20    THE WITNESS: It's quite simple. I
21 was in the department that was responsible for
22 these contracts. We had meetings with these
23 people. The contracts didn't just mysteriously
24 rise out and show up on the table. We had a

55 (Pages 214 to 217)

Page 222

1 the way, are these drafts you think you saw?
2    A.   I don't know.
3    Q.   Do you recall attending any meetings
4 with TransCanada in the days leading up to the
5 signing of this agreement?
6    A.   I don't remember.
7    Q.   It's Exhibit 59 faxed from Mike Hirsch
8 to Sean McMaster subject line "Agreements
9 4/3/98," and you see here the term has been
10 changed to 2009?
11    A.   Okay.
12    Q.   Okay. And the pricing is through
13 2009?
14    A.   Yes.
15    Q.   Do you recall any discussions -- I
16 mean, does this refresh your recollection at all
17 as to TransCanada negotiating a 2004 contract up
18 until the final days before it was signed?
19    A.   No.
20    Q.   These discussions -- let me show you
21 one other document.  It's entitled document --
22 do you recall ever sitting down with TransCanada
23 and actually discussing with them the actual
24 terms written in their standard offer service

Page 223

1 agreement?
2    A.   I don't think I was -- not, any
3 negotiate -- are you asking about a specific
4 negotiation session?
5    Q.   Yes.
6    A.   No, I was not involved in any specific
7 negotiation sessions.
8    Q.   Do you recall ever on the phone
9 talking with them while you were looking at
10 specific provisions of the wholesale standard
11 offer service agreement and discussing them?
12    A.   No, I don't recall that.
13    Q.   Okay. Do you recall discussing with
14 them the wholesale standard offer service in
15 terms of the bid process that was separately
16 going on?
17       MR. O'ROURKE:  Objection.
18       THE WITNESS:  I don't recall.
19 BY MR. WINSTON:
20    Q.   I'm showing you Exhibit 58, which is
21 an April 2, '98 fax to Mike Hirsch from Sean
22 McMaster, and you see it attaches multiple
23 copies of the same fax sheet.  The last page
24 says "Attached is the provision regarding

Page 224

1 changes to standard offer service which Alex has
2 discussed with you."
3       Just take a look at this provision.
4 Do you recall ever discussing this provision
5 with TransCanada or anybody at EUA?
6       MR. O'ROURKE:  For the record, it's
7 the last page of the exhibit that you're
8 pointing him to?
9       MR. WINSTON:  It's TCPM 7325.
10       THE WITNESS:  I don't recall ever
11 seeing this.
12 BY MR. WINSTON:
13    Q.   Okay. With reference to the dates
14 we've seen as to the dates of the TransCanada
15 contract, which you can see that there's a draft
16 on April 1 with a 2004 term, and then you can
17 see the signed version is April 7, '98 with a
18 2009 term.
19    A.   Yes.
20    Q.   Conversations that you recall having
21 with TransCanada about the length of the
22 standard offer of the fuel adjustment for
23 standard offer service, with reference to those
24 dates, what's your best recollection as to when

Page 225

1 those conversations might have occurred?
2    A.   It would have to have occurred during
3 that time period.
4    Q.   So your best memory is that between
5 April 1, '98 and April 7, '98, you believe you
6 had conversations with TransCanada about the
7 length of the fuel adjustment?
8    A.   Or it could have been after that.  I
9 don't recall the specific dates.
10    Q.   Do you recall one way or the other
11 whether you had conversations with TransCanada
12 before their contract was signed as to whether
13 the fuel adjustment would be cut off prior to
14 2009?
15    A.   I -- I don't remember.
16       MR. WINSTON:  I think I'm going to
17 stop.
18       EXAMINATION
19 BY MR. O'ROURKE:
20    Q.   But we started this with your
21 testimony, am I not correct, that you never told
22 them that it would extend until 2009?
23    A.   Absolutely; that is correct.
24    Q.   Ever?

57 (Pages 222 to 225)

# __HACHEY__

Page 1

 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3                 (Central Division)

 4  - - - - - - - - - - - - - - - - - - - -

 5  TRANSCANADA POWER MARKETING, LTD.,

 6        Plaintiff,

 7

 8        vs                    C.A. No. 05-40076FDS

 9

10  NARRAGANSETT ELECTRIC COMPANY,

11         Defendant.

12  - - - - - - - - - - - - - - - - - - - -

13      DEPOSITION OF MICHAEL HACHEY, called as a

14  witness by counsel for the Defendant, pursuant to

15  the provisions of Massachusetts Rules of Civil

16  Procedure, before Victoria S. Reade, Professional

17  Court Reporter and Notary Public, in and for the

18  Commonwealth of Massachusetts, taken at Bowditch &

19  Dewey, 311 Main Street, Worcester, Massachusetts, on

20  Tuesday, March 13, 2007, commencing at 10:14 a.m.

21

22

23

24

Page 38

1  A.  Yes.
2  Q.  At the time you -- or after you received
3      it, did you contact Mr. Hager concerning
4      its contents?
5  A.  I don't recall whether I contacted him, or
6      he contacted me, but we spoke about it.
7  Q.  Do you recall when that was?
8  A.  On or about February 8th.
9  Q.  Okay.  And what did he say to you, and
10     what did you say to him?
11 A.  I recall a brief conversation along the
12     lines of, you know, why don't you take a
13     look at this, we need to get the
14     settlement square for the fact that we're
15     merging with the EUA, and load asset
16     numbers need to be changed.
17 Q.  And what did you say in response to that?
18 A.  We'd look at it.
19 Q.  And did you?
20 A.  Yes.
21 Q.  And did you get back to Mr. Hager?
22 A.  I don't know that I was involved in
23     follow-through.  I know Richard Schuler
24     was.

Page 39

1  Q.  And how do you know that?
2  A.  Because I wouldn't be doing the NEPOOL
3      settlement activities.  That is filing and
4      paperwork at NEPOOL.
5      In fact, there seemed to be some
6      notes on this document that indicate
7      Mr. Hager's following conversations with
8      Mr. Schuler, that's the way I interpret it
9      anyway.
10     And that would be consistent
11     with the way I would have thought it would
12     have been held -- it would have unfolded.
13 Q.  What were Mr. Schuler's responsibilities
14     at the time?
15 A.  Among them his NEPOOL Settlement
16     activities.
17 Q.  Did you review this when you received it?
18 A.  I certainly looked at it, yes.
19 Q.  Did you observe attachment two to the
20     facsimile -- to the draft letter?  Excuse
21     me.
22 A.  I would have, yes.
23 Q.  And did you take note of the sentence in
24     the letter were it says that, "Attachment

Page 40

1      two replaces the retail fuel adjustment
2      mechanisms contained in the EUA Company's
3      respective standard-offer service tariffs.
4      Said payments will be made by Mass
5      Electric or Narragansett in the month
6      immediately following service."
7  A.  Could you point me to where you're reading
8      from?
9  Q.  I'm reading from Paragraph 2, application
10     of the fuel adjustment factor.
11 A.  I would have read that, yes.
12 Q.  And did you have any impressions on the
13     fact that the fuel trigger points listed
14     in this letter only went through 2004?
15 A.  Well, the pricing -- stipulated pricing
16     only goes through 2004.
17     But more to the point, I think, on
18     No. 2 it simply reads that Mass Electric
19     and Narragansett will be making fuel
20     adjustment payments.
21     I believed that I understood how
22     Mass Electric and Narragansett were making
23     those payments, and it seemed consistent
24     with my understanding of how the

Page 41

1      standard-offer and the fuel mechanism
2      would work in Massachusetts and Rhode
3      Island.
4  Q.  What was your understanding of the way
5      that Mass Electric and Narragansett were
6      making those fuel adjustment payments you
7      were relying on in your interpretation of
8      this document?
9  A.  Well, it would be on a consistent basis
10     between Mass Electric and the eastern
11     affiliate that they were taking on, and
12     the Narragansett and the Blackstone
13     affiliate that it was taking on.
14 Q.  Consistent in what way?
15 A.  Well, this indicated to me that there is
16     no discrepancy between the way that the
17     tariffs would be handled between what
18     we've come to know as old Narragansett and
19     new Narragansett.
20 Q.  What indicated that to you?  What gave you
21     that sense?
22 A.  What gave me the sense is there is nothing
23     here that distinguishes between the two.
24     It says Mass Electric and

11 (Pages 38 to 41)

Page 54

1    MR. WINSTON: As a 30(b)(6) you
2    can testify to your knowledge.
3    A.    My expectation of what we were using was a
4    consistent set of trigger points.
5    Q.    And where were those trigger points
6    derived from?
7    A.    In the contracts.
8    Q.    Okay.
9    A.    I'm sorry. Did you ask -- I'm losing
10    track of what the original question was.
11        Was the original question relative to
12    post-2004, or was it pre-2004.
13    Q.    Let me go back to the beginning because I
14    think my original question led you to tell
15    me about formulas, and how one determines
16    the market price via the formula, and that
17    probably was a problem with my question.
18        I really was asking you about trigger
19    points, okay? And I wanted to know what
20    trigger points EUA believed would be
21    applicable in connection with it's --
22    excuse me, not EUA, that TransCanada
23    believed would be applicable in connection
24    with its contract with EUA, that was

Page 55

1    eventually assumed by Narragansett, in the
2    years following January of 2005?
3    A.    It's my understanding that we were using a
4    consistent set of trigger points between
5    -- for Narragansett.
6    Q.    So, when you say "a consistent set of
7    trigger points", do mean you were using
8    the same trigger points for the EUA zone
9    as were applicable to the portion of the
10    U.S. Gen contract that Ocean State Power
11    was responsible for in the Narragansett
12    zone?
13    A.    Well, I'm sorry, I hate to pick points,
14    but you said Ocean State Power was
15    responsible for.
16        Ocean State Power was never
17    responsible for. I believe it was,
18    TransCanada Power Marketing that had the
19    responsibility for the contract.
20        So, to the question, with that
21    correction the -- we would have used a
22    consistent set of trigger points.
23    Q.    But where did you derive those trigger
24    points?

Page 56

1    A.    The Narragansett contract.
2    Q.    Okay. The Narragansett contract with what
3    entity?
4    A.    Well, it was an assignment to TransCanada
5    Power Marketing.
6    Q.    From?
7    A.    U.S. Gen, if I recall the original -- the
8    way these contracts were designated.
9    Q.    And it was your belief that those same
10    trigger points were going to be applicable
11    to the EUA contract when that contract was
12    taken over by Narragansett?
13    A.    Yes.
14    Q.    And was that your belief in 2004?
15    A.    Yes.
16    Q.    And was that your belief in 2000?
17    A.    Yes.
18    Q.    When you received Exhibit 77, did it at
19    all raise a question in your mind as to
20    why Exhibit 77 had trigger points that
21    concluded in 2004?
22    A.    No.
23    Q.    And did you think about that at all?
24    A.    I don't believe so, no.

Page 57

1    Q.    Do you recall whether there were any
2    discussions at TransCanada with regard to
3    that issue, as to the fact that this
4    document indicated trigger points only
5    through 2004?
6    A.    The document indicated pricing through
7    2004, and trigger points through 2004, and
8    it really didn't raise a concern.
9        I will also add, as I repeated
10    before, that the document was sent to us
11    for administrative purposes and provided a
12    paragraph right up front that said look
13    there's nothing in here that the
14    obligation of the parties, or the
15    successors, and the terms of the agreement
16    are not affected by the merger and the
17    assignments.
18        So that, again, gave us an
19    indication -- further indication that
20    really all that was going on here was
21    necessary communications to make sure that
22    we got the NEPOOL settlement square so
23    that we didn't have any big snafus.
24        And it was an indication by

15 (Pages 54 to 57)

Page 58

1  Narragansett that they were setting up
2  their tariffs, if you will, on a
3  consistent basis.
4  Q.  The fact that Paragraph 2 states that
5  attachment two replaces the retail fuel
6  adjustment mechanisms contained in the EUA
7  companies respective standard-offer of
8  services, did that not indicate something
9  to you in connection with how long
10  Narragansett believed it was obliged to
11  continue providing fuel trigger -- fuel
12  adder payments?
13  A.  No.
14  Q.  Do you have any understanding that EUA or
15  Narragansett was deceptive in its
16  treatment of TransCanada?
17  A.  Could you repeat that question.
18      (THE LAST QUESTION WAS READ BACK
19  AS REQUESTED.)
20  A.  Yes, I do.
21  Q.  And what -- do you have any facts that you
22  base that understanding on?
23  A.  Yes.
24  Q.  And what are those facts?

Page 59

1  A.  Well, I have reviewed testimony that
2  Narragansett gave before its regulator in
3  Rhode Island that indicated Narragansett
4  had discussions with its standard-offer
5  suppliers relative to the -- their view
6  that the fuel adjustment would terminate
7  for the former EUA zone in 2004.
8      Some of these other issues really
9  relate to what seems to be a changing
10  position by Narragansett.
11      But to the extent that
12  Narragansett sent tariffs and fuel
13  adjustment filings to TransCanada, that
14  indicated that the EUA and Narragansett
15  fuel adjustment proceeded through 200.
16      While they were thinking
17  something quite to the contrary is, in our
18  view, deceptive to the extent that
19  Narragansett by use of this Exhibit, is
20  this 77?
21  Q.  Yes, it is.
22  A.  Was intended to indicate to TransCanada
23  that the intended to end the fuel
24  adjustment for the EUA zone in 2004, yet

Page 60

1  did it in a manner that was indicated to
2  us that this was for administrative tasks
3  these were administrative tasks.
4      And very clearly up front saying
5  that there's no -- that the obligations of
6  the parties are not affected by the merger
7  and assignments is deceptive.
8      To the extent that EUA made
9  representations to TransCanada that the
10  fuel adjustment extended for the term of
11  the contract, and they were thinking that
12  it did not, that would be deceptive.
13  Q.  Are you aware of any such representations
14  by EUA to TransCanada?
15      MR. WINSTON: This is of your
16  own personal knowledge.
17  A.  Not of my own personal knowledge, no.
18  Q.  You indicated that tariffs had been sent
19  to TransCanada indicating that the, maybe
20  I misunderstood you, but I thought you
21  said that the obligation to provide fuel
22  triggers or fuel adders of EUA lasted
23  through 2009?
24  A.  Yes.

Page 61

1  Q.  Do you recall when those documents were
2  sent to you?
3  A.  They were sent in conjunction with the
4  congestion arbitration, if you're familiar
5  with that.
6  Q.  I'm aware of it.
7  A.  And was your question when?
8      It was, I believe, sometime in 2000,
9  but it may be early 2003. It was part of
10  the document production.
11  Q.  In this case?
12  A.  Did I say, I'm sorry. Did I say 2000 or
13  2002?
14  Q.  Actually, you said 2000, and then you said
15  2003, so.
16  A.  No. I intended to say 2002 or 3.
17  Q.  So these are documents that were sent to
18  TransCanada by EUA in the 2002, 20 -- by
19  Narragansett in the 2002 - 2003 time
20  frame?
21  A.  Yes. But whether that was Narragansett or
22  under an affiliate company, I don't know.
23      It would have been National Grid,
24  because I'm looking at the designation.

16 (Pages 58 to 61)

Page 102

1  it to be deceptive with respect to the to
2  fuel adjustment provision and
3  Narragansett's beliefs with respect to it?
4  A.  Well, again, it wasn't just related to
5  this document. It was the idea that if
6  they were of the belief in 2002 that the
7  adjustment in the EUA zone was not going
8  to be paid after 2004, that by delivering
9  this to us, which clearly indicated that
10  the fuel -- EUA fuel adjustment would
11  continue through 2009.
12        In fact, as I understood it,
13  that there was no material difference
14  between the old Narragansett and the EUA
15  fuel adjustments.
16        Yet, if at the same time they had
17  quite a different belief, then that whole
18  package would have been deceptive.
19  Q.  Where do you see that in here? I haven't
20  had a chance to read it yet, I've just
21  been trying to find out what document
22  you've been referring to.
23        If you could just point that out
24  to me in Exhibit 92 where you see that

Page 103

1  representation.
2  A.  Where do I see the --
3  Q.  The representation that it would run
4  through 2009.
5  A.  That the two -- that the old Narragansett
6  and the new Narragansett fuel adjustments
7  were similar in all material respects.
8        It's in the testimony, embedded
9  in the testimony, as well as in the
10  Exhibit 1.
11        This is the Exhibit MJH1. And the
12  only difference noted between the EUA and
13  the Narragansett or old -- at this point
14  it's old Narragansett and new
15  Narragansett, relates to the 12 month or 6
16  month rolling averages for market gas, and
17  then market oil.
18  Q.  Were there other documents that were
19  provided to you in connection with that
20  congestion --
21  A.  Yes.
22  Q.  -- transaction that had similar
23  statements in them?
24  A.  Yes.

Page 104

1  Q.  And did you rely on them at the time for
2  that proposition? Did you take note of
3  that proposition?
4  A.  I reviewed 11 boxes of documents in
5  conjunction with the Congestion Cost
6  Arbitration, extensively. I did, and two
7  of our attorneys did, and it was
8  consistent with my understanding.
9        So to that extent you know when
10  you say take note, it was, went through
11  it, it was the matter at hand involved
12  congestion.
13        But I certainly was interested in any
14  other concerns that might arise with our
15  contracts, and that document and at least
16  one other document simply gave me comfort
17  that those two were consistent.
18        So, no, in answer to the direct
19  question, there was no specific note
20  because it was consistent with what I
21  always understood.
22  Q.  But it was inconsistent with the letter
23  that you received from Mr. Hager back
24  January of 2000?

Page 105

1        MR. WINSTON: Objection.
2  A.  That wasn't my testimony.
3  Q.  The charts certainly are different?
4  A.  I guess the difference in my mind was
5  being presented with something that looked
6  like it was intended to get the
7  administration straight, and in this case
8  is filed testimony, which in my experience
9  typically would have involved review by
10  attorneys.
11        And, you know, looking back on the
12  2000 letter today, it appears that it was
13  a little sloppy in that it didn't
14  distinguish at all between the old
15  Narragansett and the new Narragansett,
16  which is the way I understood it at the
17  time.
18        So as to the charts themselves, these
19  charts extend through 2009, those charts
20  extended through 2004, however, the
21  stipulated pricing only showed through
22  2004. So I really can't say that they're
23  inconsistent, it's just different.
24  Q.  Did you ever have any discussions with

27 (Pages 102 to 105)

Page 126

1    30(b)(6) here.
2  A.  Okay.
3         MR. WINSTON:  And after 1/1/99?
4         MR. O'ROURKE:  Right.  You're in
5    charge of that caveat.
6  A.  I'm sorry.  You said it was prior to
7    1/1/05?
8  Q.  Yes.  And so between 1/1/99 and 1/1/05.
9  A.  I don't believe so, no.
10 Q.  Between February of 2000 and January 1,
11   2005 did TransCanada have communications
12   with Narragansett concerning the wholesale
13   Standard-Offer Service Agreement and the
14   fuel adjustment factor?
15 A.  I'm sorry, could you repeat those dates
16   again.
17 Q.  Sure.  I'm picking February, just so you
18   know, I'm picking February of 2000 because
19   that's the letter from Mr. McMaster from
20   Mr. Hager, which you have seen.
21       And January 1, 2005, which is when I
22   have some other stuff to show you.
23       So during that period of time before
24   this dispute arose, essentially, were

Page 127

1    there any communications between
2    Narragansett and TransCanada concerning
3    the fuel adjustment factor and the
4    Standard-Offer Agreement?
5         MR. WINSTON:  Other than what
6    he's testified to?
7         MR. O'ROURKE:  I'm trying to
8    bracket it because I'm not recalling him
9    giving me real dates on any of those other
10   testimonies, other than the congestion
11   factor.
12 A.  You had on-going billing going on, of
13   course, so in conjunction with that at a
14   minimum there were communications back and
15   forth.
16 Q.  Any other communications, or were there
17   any disputes with respect to the fuel
18   adder provision?
19 A.  Not that I recall.
20 Q.  Do you recall any issues that arose with
21   respect to the administration of the fuel
22   adder provision in that time frame?
23 A.  I don't recall any, no.
24 Q.  During the period of time between January

Page 128

1    1, 1999 and the conclusion of the merger
2    of EUA into Narragansett, which I believe
3    was May of 2000, are you aware of any
4    communications between TransCanada and any
5    individuals at EUA or former individuals
6    at EUA concerning the Standard-Offer
7    Service Agreement and the fuel adjustment
8    factor?
9  A.  Well, I mentioned the -- you've got the
10   term "and" in there.  So we had
11   communications with EUA relative to the
12   standard-offer as I mentioned earlier, but
13   it wasn't an issue involving the fuel
14   adjustment.
15 Q.  And you have to pardon my memory, what was
16   the issue that you discussed with them
17   earlier?
18 A.  If I've got my dates correct we had a
19   dispute with, regarding up-lift.
20 Q.  With EUA?
21 A.  Yes.  And, of course, back to the
22   communications.  To the extent that in
23   that time frame that EUA was still in
24   existence, which I don't recall whether it

Page 129

1    was, you know, any billing issues would
2    have been a communication, if you will.
3         MR. O'ROURKE:  Would you mark
4    this next in line.
5         MR. WINSTON:  118?
6         (EXHIBIT NO. 118 WAS MARKED FOR
7    IDENTIFICATION.)
8  Q.  Can you identify this letter.
9  A.  It's a letter from me to Michael Hager
10   dated 3/1/05 that provides a notice of
11   default under the Standard-Offer Contract.
12 Q.  In the second sentence of your first
13   paragraph you say specifically,
14   "Narragansett has refused to include the
15   required fuel adjustment factor in its
16   pricing calculations."
17       Could you tell me what -- how you
18   were using the term "refused" when you
19   made this notice of default?
20 A.  Well, I think we indicated to them that we
21   believed that that adjustment was to be
22   included, and they didn't include it.
23 Q.  So it's a refusal that arose after
24   February of 2005?

33 (Pages 126 to 129)

**PART 2 OF 5**

# HAGER (DAY 1)

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

------------------------------------x

TRANSCANADA POWER MARKETING,

LTD.,

      Plaintiff,    Case No. 05-40076 FDS

   v.

NARRAGANSETT ELECTRIC CO.,

      Defendant.

------------------------------------x

Volume I                 1 - 222


    VIDEOTAPED DEPOSITION of MICHAEL J. HAGER,

a witness called for examination by the

Plaintiff, taken pursuant to the Applicable

Provisions of the Federal Rules of Civil

Procedure, before Laurie K. Langer, Registered

Professional Reporter and Notary Public in and

for the Commonwealth of Massachusetts, at the

offices of Choate Hall & Stewart, Two

International Place, Boston, Massachusetts, on

Friday, March 23, 2007, commencing at 9:15 a.m.

Page 74

1    you are probably correct. I mean, you're right.
2    There is -- this is 1996 and the, the Subsection
3    2 does mention an amendment in 1997. For which
4    I apologize.
5    Q.  I will represent to you this is 1997, 1996,
6    before the TransCanada contract was signed.
7         The, has -- and looking at the next section
8    after the, the next sentence after the sentence
9    that was read in the transcript here, which
10    says, "the standard offer shall be priced." And
11    then it goes on "such that the average revenue
12    per kilowatt hour received from the customer for
13    such power together with approved distribution,
14    transmission and transition charges shall equal
15    the price that would have been paid." It goes
16    on to say, "for the period ending September 30,
17    '96. Adjusted annually for consumer price index
18    change and also for other factors reasonably
19    beyond the control of the electric distribution
20    company" and then it refers to extraordinary
21    fuel costs. Has the company ever done an
22    analysis to determine its obligations under the
23    sentence I just read with respect to the use of
24    the word "shall" in that provision?

Page 75

1         MR. LODEMORE: Objection.
2    A.  Again, I'm not qualified to offer a legal
3    opinion on it, I don't know what if any analysis
4    had been done by our legal department with
5    respect to that issue.
6    Q.  Okay. And again, you haven't been referencing
7    this provision with respect to decisions you
8    made as to the fuel adjustment provision in the
9    TransCanada contract; correct?
10    A.  Oh, absolutely not. That section, these are two
11    completely separate items.
12    Q.  How so?
13    A.  The section of the statute you just read relates
14    to the rates Narragansett can charge its
15    customers, it has nothing to do with its
16    supplier arrangements with its wholesale
17    suppliers. Such as TransCanada.
18    Q.  That's your understanding based on what?
19    A.  The reading of that section.
20    Q.  So is it your understanding that had EUA and
21    Narragansett not merged a fuel adjustment would
22    have been required for the retail customers but
23    not to the wholesale suppliers?
24    A.  I don't read that section as requiring a fuel

Page 76

1    adjustment for retail customers.
2    Q.  Okay. And why don't you read that into it?
3         MR. LODEMORE: Objection.
4    A.  Well, among other things the following sentence
5    says that the standard offer is to be a price
6    cap and may be less than the maximum allowed at
7    anytime.
8    Q.  Anything other than that line?
9    A.  I'm reading the prior line in its entirety as
10    well.
11    Q.  Turning to page 76.
12    A.  Again, I wouldn't rule out the entire extent of
13    the URA itself --
14    Q.  That's fine.
15    A.  -- also.
16         MR. LODEMORE: I'm sorry, what page?
17    Q.  Bottom of page 76 in Exhibit 135. Okay, and I
18    think you'll see there's an answer there that
19    refers to the pricing scheme for the standard
20    offer?
21         MR. LODEMORE: Is this still Peter Flynn's
22    testimony?
23         MR. WINSTON: This is still Peter Flynn's
24    testimony.

Page 77

1    Q.  Starting with, "and I say that because the
2    standard offer in the FERC settlement" and then
3    he goes on to the end of the sentence. Is his
4    answer consistent with your understanding of the
5    purpose of the standard offer service pricing in
6    the NEES agreements?
7    A.  May I hear the question again.
8         (Prior testimony read back.)
9         "Is his answer consistent with
10              your understanding of the purpose
11              of the standard offer service
12              pricing in the NEES agreements?"
13    A.  I think it's consistent, yes.
14    Q.  Yeah, I think it's what you just said.
15    A.  Yeah.
16    Q.  Did you have an understanding as to how the fuel
17    adjustment provision worked with respect to the,
18    that overall purpose of the standard offer
19    service pricing?
20    A.  Well, at the time the index was designed,
21    however, everyone was of the mind set that it
22    would never kick in. That the trigger points
23    with this, that band we talked about earlier
24    were so high relative to expectations at the

20  (Pages 74 to 77)

Page 78

1    time that no one anticipated over the course of
2    time that we would pay out under the fuel index
3    provision.
4    Q.  Why did you include the fuel index after, for
5    the full term, then?
6    A.  I need to go back to the exhibit you showed me
7    earlier, the '97 FERC filing where one of the
8    attachments included an initial design of the
9    standard offer auction and a provision that we
10   would file '05 through '09 trigger points with
11   the Commission at some point.  I believe we had
12   agreed to extend the fixed pricing but had not
13   agreed as to what if any fuel index amounts
14   would be applicable in that period and just
15   needed some more time to work them through with
16   suppliers and other parties to the proceedings.
17   Q.  Okay.  But, but if, if the expectation was that,
18   that price -- well.
19        The reason that NEES included fuel triggers
20   for the full term through 2009 was because there
21   was a chance fuel prices would go above the
22   stipulated prices through 2009; correct?
23   A.  No one ever envisioned that that would happen at
24   that time.  I think it was a product of

Page 79

1    negotiation with the parties, asset purchases
2    and other parties to the proceeding.
3    Q.  Well, you would agree with me that people
4    wouldn't spend time developing the 2005 to 9
5    triggers unless somebody thought that they were
6    necessary to cover potential high price?
7    A.  That could be one of many reasons, yes.
8    Q.  You see at the bottom of page 77 the chairman
9    refers to a question as to why they don't have a
10   different model called a Safe Harbor Model.  And
11   Mr. Flynn says "the company's position" -- well,
12   what was the Safe Harbor Model as you understood
13   it?
14   A.  (Witness reviewing.)  At the -- even now I
15   don't, I am unfamiliar with the use of the term
16   "Safe Harbor Model", although I -- I'll leave it
17   at that.
18   Q.  Okay.  Were options in the standard offer
19   considered which -- were standard offer designs
20   considered which would have kept the prices
21   below market?
22   A.  I was not involved in any of the analyses
23   regarding standard offer price models nor have I
24   come across anything that would give me an

Page 80

1    indication of what other options were
2    considered.
3    Q.  In other words, you can read the words here but
4    you don't have independent knowledge of what
5    Mr. Flynn is talking about?
6    A.  Correct.
7    Q.  Okay.  The, going into 30 (b)(6) mode here for a
8    second.  On EUA's negotiation and drafting of
9    its settlement agreements, did EUA have the same
10   set of stipulated prices through 2009 as NEES
11   did in Rhode Island?
12   A.  Yes.
13   Q.  What was --
14   A.  Excuse me.  And by stipulated price we are
15   referring to the fixed prices under the
16   contracts?
17   Q.  Yes.  I'm not asking about the fuel adjustment
18   in that provision.
19   A.  Okay.
20   Q.  The -- what was EUA -- what was the design
21   behind EUA's pricing structure?  And if it was
22   the same as NEES's you can just say that.
23        MR. LODEMORE:  Objection.
24   A.  With respect to the standard offer price and

Page 81

1    design?
2    Q.  Yeah.
3    A.  They're fixed or stipulated prices, fixed and
4    stipulated prices in the Narragansett contracts.
5    Q.  Okay.  The, your understanding is that NEES and,
6    and EUA both had the same design of providing a
7    series of pricing that would provide an
8    incentive for customers ultimately to seek
9    cheaper market-based electricity in the open
10   market?
11   A.  It's clearly what NEES's intent was, I would
12   have to infer that EUA had the similar goal.
13   Q.  Pre any of your merger work with EUA, were you
14   aware of any difference in, between NEES and EUA
15   with respect to the fuel adjustment provision?
16   A.  I know I certainly became aware of it in the
17   1998 time frame with the merger, I can't recall
18   what I knew prior to that period.
19   Q.  Okay.  The -- prior to the merger-related
20   activity did you know who EUA had entered into
21   standard offer service contracts with?
22   A.  Those would have been at some point filed at
23   FERC and I'm sure I would have been aware of it.
24   But I cannot be specific as to when or if prior

21 (Pages 78 to 81)

Page 90

```
 1   Q.  And where was your office at that time?
 2   A.  Westborough.
 3   Q.  Is that where your office is now?
 4   A.  No.
 5   Q.  Where is your office now?
 6   A.  Northborough.
 7   Q.  Fair enough.  The -- okay.  What -- who do you
 8       recall attended those meetings on behalf of EUA
 9       to discuss the wholesale standard offer service
10       contracts?
11   A.  I can't recall who would have attended any
12       specific meetings.
13   Q.  Uh-huh.
14   A.  You know, in general I would have talked with
15       Kevin Kirby, Bob Clark, Pete Fuller, Harry
16       Boisvert.  I believe Mike Hirsh.  At some point
17       in time Dennis St. Pierre.  I don't know Dennis'
18       role.  I would have talked with Dennis.  Those
19       are the names that come to mind now.
20   Q.  And who from the NEES side was a party to the
21       meetings or discussions about the wholesale
22       standard offer service terms in early '99?
23   A.  I can't recall any, other than myself.
24   Q.  Okay.  Do you think it was just you?
```

Page 91

```
 1   A.  I would say for the most part I picture just
 2       myself attending those meetings.
 3   Q.  Okay.  And --
 4   A.  With respect to the standard offer contracts
 5       other NEES representatives may have been in
 6       attendance of meetings for other matters but I
 7       can't recall who would have been there.
 8   Q.  Okay.  And I assume you were given copies of
 9       these wholesale standard offer service
10       contracts?
11   A.  Yes.
12   Q.  Okay.  Do you recall what wholesale standard
13       offer service contracts there were?
14   A.  I certainly remember the TransCanada contract.
15       I can't recall if in early '99, but certainly
16       during '99, I would have had copies of the
17       Constellation contracts.  I think at some point
18       I would have obtained the NRG contract.  I
19       remember a contract with Southern, one of the
20       Southern Energy affiliates as well.
21   Q.  Okay.  The -- your memory is that Southern
22       Energy affiliates had a wholesale standard offer
23       service contract?
24   A.  One of the affiliates of Southern Energy, yes.
```

Page 92

```
 1   Q.  Okay.  The -- and what discussions do you recall
 2       at that time frame concerning the fuel
 3       adjustment?  If any.
 4   A.  Again, what time frame are we talking?
 5   Q.  '99.
 6   A.  Early on when we were just reviewing the
 7       contracts and the discussions centered around
 8       the -- your question was directed to which
 9       portion of the contract?
10   Q.  Well, what discussions do you recall having
11       about the the, the fuel adjustment provisions in the
12       contracts?
13   A.  That the contract was different than the NEES
14       contract.  That it, with respect to the fuel
15       payment mechanism, fuel index mechanism, it was
16       tied to amounts that were collected under a
17       retail tariff that EUA was only obligated to pay
18       the amounts that it actually collected from
19       customers to its suppliers.  And at some point
20       six month versus the 12-month nature of the
21       difference between the two mechanisms.
22   Q.  Okay.  Do you -- did you receive copies of the
23       referenced tariffs in Article 5?
24   A.  At some point in that process I did.
```

Page 93

```
 1   Q.  Okay.  Do you recall when during the process you
 2       received copies of the tariffs?
 3   A.  No.
 4   Q.  Was it in 1999?
 5   A.  Yes.
 6   Q.  Do you recall any discussions about the fuel
 7       adjustment provision in the 2005 to 9 time
 8       period with anybody from the EUA during the 1999
 9       time period?
10   A.  Yes.
11   Q.  And what do you recall about those
12       conversations?
13   A.  That their mechanisms only went through 2004,
14       whereas the NEES mechanisms went through 2009.
15   Q.  Okay.  And who do you remember discussing that
16       with?
17   A.  I had many discussions with the individuals I
18       named prior.  I can't recall any specific
19       discussions relative to the fuel index.
20   Q.  What were you told about -- well, I assume you
21       were made aware that the EUA tariff at the time
22       only had trigger numbers through 2004; correct?
23   A.  It's my understanding the tariff only had a fuel
24       index provision through 2004.
```

24 (Pages 90 to 93)

Page 94

1    Q.  Well, I don't want to get into an argument about
2      what the document says. The, but what
3      discussions did you have with them about why
4      there were no trigger numbers put into the
5      tariff?
6    A.  I can't recall any discussions as to why they
7      only included a mechanism through 2004.
8    Q.  Okay. The tariffs that you discussed with them,
9      this would have been in the 1999 time period?
10    A.  It could have included 2000 as well.
11    Q.  Okay. Was it your understanding that those
12      tariffs were filed on a yearly basis?
13    A.  No.
14    Q.  What was your understanding?
15    A.  That the tariffs for the most part were to be
16      filed in static over the remaining term. Early
17      on the tariffs only included specific pricing
18      for a given period of time. But ultimately they
19      were going to a period where they would include
20      the pricing through the remainder of the term
21      and not need to be refiled.
22    Q.  One second. Let me show you what we've
23      marked --
24         MR. LODEMORE: You've lost your mike.

Page 95

1    Q.  Take a look at number 4. Exhibit No. 4. And
2      you'll see that this is a tariff filing dated
3      October 30, '98. And it includes a tariff which
4      begins at Bates stamp 6240 at the bottom. And
5      you see it says, "date effective January 1,
6      1999"?
7    A.  Yes.
8    Q.  In your discussions with EUA in '99 did you
9      actually review copies of the tariffs?
10    A.  I'm sure that I did.
11    Q.  Okay. Can you show me where in that -- and your
12      understanding of that tariff at the time was
13      that it would not be filed more than once?
14    A.  My understanding is that the plan was to file
15      tariffs that reflected the price that was
16      expected there early on. There were periods of
17      time where we hadn't got to that long term
18      pricing mechanism in there.
19    Q.  Well, does, looking -- this is the January 1,
20      '99 tariff, the, that would have been in effect
21      when you had your discussions. How long did you
22      think this tariff was going to be in effect?
23      Wouldn't it need to be refiled in 2000 when the
24      stipulated prices went up?

Page 96

1    A.  It appears that would be the case.
2    Q.  Okay. Well, was that your understanding at the
3      time that it -- I'm trying to get your
4      understanding at the time, was that the tariff
5      in effect for EUA was effective for how long?
6    A.  And I can't opine on the effective for how long.
7      My understanding is the goal, we should
8      establish standard offer tariffs that would
9      allow customers to know over the term of the
10      standard offer period what their rates would be
11      should they choose not to go to the competitive
12      marketplace.
13    Q.  Okay. And can you tell me whether this contains
14      any pricing information beyond the year 1999?
15    A.  Well, this document contains a standard offer
16      fuel index amount that includes how the standard
17      offer charge would be adjusted for the years
18      2001 through 2004 under that index provision.
19      The standard offer adjustment provision on Bates
20      page 6246 talks about how standard offer costs
21      would be adjusted under that adjustment
22      mechanism to reflect, using the words here, "the
23      difference between the cost of standard offer
24      service paid by the company to its suppliers and

Page 97

1      the revenues billed from its customers." By
2      definition the rates contained in here would
3      remain in effect up until the time EUA filed a
4      future tariff, if it ever filed a future tariff.
5    Q.  Okay. So it was your understanding at the time
6      that that tariff was going to be superseded by a
7      subsequent tariff filing?
8    A.  I can't recall whether I had that understanding
9      at that time.
10    Q.  Okay. And did anyone from EUA explain to you
11      that they needed to refile the tariff on a
12      roughly yearly basis?
13    A.  I can't recall that.
14    Q.  What precisely were you told, if anything, by
15      EUA as to what their plan was with respect to
16      what their tariffs would contain when they filed
17      them in 2005 through 2009?
18    A.  I don't recall any discussions that they would
19      file tariffs in 2005 or later.
20    Q.  Okay. So you didn't have any discussions with
21      EUA about the subject matter or content of their
22      tariff filings between 2005 and 2009?
23    A.  The intent of the tariff was to establish the
24      rates for the entire standard offer period.

25 (Pages 94 to 97)

Page 106

1    in early 2000, as to whether another standard
2    offer service tariff would be filed?
3  A.  I can't recall what my understanding at the time
4    was.
5  Q.  Did you review the tariff closely?
6  A.  I certainly reviewed the tariff, I'm not sure
7    what the appropriate adjective or adverb is to
8    describe, though.
9  Q.  Do you think you had an understanding at the
10   time as to what the tariff filing plan of the
11   EUA was following the year 2000?
12       MR. LODEMORE:  Objection.
13 A.  I'm not aware of any, any plans to make any
14   future filings, or revisions to that tariff.
15 Q.  Okay.  So in early 2000, your understanding in
16   administering the TransCanada contract is that
17   no future standard offer service tariff filings
18   would be made?
19       MR. LODEMORE:  Objection.
20 A.  I don't recall having -- again, the question,
21   please.
22       (Prior testimony read back.)
23       "So in early 2000, your
24       understanding in administering the

Page 107

1        TransCanada contract is that no
2        future standard offer service
3        tariff filings would be made?"
4  A.  I don't know whether I had that understanding or
5    not.
6  Q.  Did you reach any conclusions at that time in
7    early 2000 as to the fuel adjustment applicable
8    to the TransCanada contract for the 2005 to 9
9    time period?
10 A.  Yes.
11 Q.  Okay.  And what was that understanding based on?
12 A.  Discussions with, many discussions with the EUA
13   representatives that I identified earlier.  I'm
14   sure I reviewed their filings as well.
15 Q.  The tariff filings?
16 A.  Including tariff filings and FERC filings.
17 Q.  Tell me every conversation that you can remember
18   with somebody from EUA prior to May 1, 2000
19   concerning EUA's plans with respect to its fuel
20   adjustment from 2005 to 9.
21 A.  I had many discussions with the EUA folks.  I
22   cannot recall any specific discussions.
23 Q.  Can you recall any single person that you had a
24   conversation with that you can recollect about

Page 108

1    the fuel adjustment plans for 2005 to 2009?
2       MR. LODEMORE:  I'm sorry, I'm not sure what
3    the question is, whether he can recollect the
4    substance of the conversation or the person?
5       MR. WINSTON:  The person.
6  Q.  Can you recall a single person specifically that
7    you know you talked to who told you something of
8    substance about EUA's plans with respect to the
9    fuel adjustments in its tariffs from 2005 to 9?
10       MR. LODEMORE:  Objection.
11 A.  Again, I had many discussions with the
12   individuals identified earlier.  I can't recall
13   specific discussions, but the names Boisvert and
14   Kirby come to mind as folks that I would have
15   talked most specifically with in connection with
16   their plans for that mechanism.
17 Q.  Okay.  Do you recall any specific statements
18   that, in sum or substance, that Mr. Boisvert
19   said to you about the fuel adjustment plans of
20   the EUA from 2004 to -- from 2005 to 2009?
21 A.  At with point in time?
22 Q.  Prior to May 1, 2000.
23 A.  Again, I don't recall specific conversations.
24       MR. LODEMORE:  I think the question was sum

Page 109

1    or substance.
2  Q.  Sum or -- what did they tell you about -- what
3    did Larry Boisvert and/or Kevin Kirby tell you
4    about EUA's plans with respect to the fuel
5    adjustment in its standard offer service tariffs
6    between 2005 to 2009?
7  A.  Again, not being able to recall specific
8    conversations for those individuals, but
9    collectively, working with the EUA folks that I
10   identified earlier, the sum and substance of
11   their plans were their elements of their
12   restructuring and their contracts were similar
13   in many respects, different in other respects
14   than NEES.  That their plan, for whatever
15   reason, I don't recall it being specifically
16   identified why, only included fuel index
17   provisions through 2004 and their plan was to
18   wrap-up these contracts and tariffs and
19   everything else and put them together and they
20   would just continue to be administered, that
21   there would not be any ongoing renegotiations,
22   openers, need to take any specific actions other
23   than to administer the terms of those contracts.
24   They would be handed over for administration

28  (Pages 106 to 109)

Page 114

1    said in his deposition?
2    A.  I can't recall being told what Kirby said,
3       specifics of what Kirby said or anything in
4       general as to what Kirby said.
5    Q.  Okay.  The tariff that you've attached to your
6       letter in exhibit --
7    A.  136.
8    Q.  Yeah, that one.  136.  Beyond, I mean, we can
9       all look at it and see that this tariff has fuel
10      trigger numbers only through 2004.  Beyond the
11      fact that there was a piece of paper which is a
12      tariff which only had the fuel triggers through
13      2004, what conversations if any did you have
14      with Kevin Kirby about plans with respect to the
15      tariffs that would be filed in 2005 through 2009
16      when that time period came?
17         MR. LODEMORE:  Objection.
18   A.  I'm struggling with, you know, the limitation to
19      conversations specifically in general with
20      Kirby.  Again, through many conversations I had
21      at the time it's my understanding that these
22      provisions were being -- they were what they
23      were.  There was no intent to go back and
24      reopen, renegotiate, relook at, that these

Page 115

1    things were being put out there and they were
2    what they were for the remainder of the term and
3    just simply handed over for administration
4    purposes.
5    Q.  And those are, and that's your summarization of
6       conversations with Mr. Boisvert and Mr. Kirby?
7    A.  That would be my summarizations of conversations
8       with everyone.  Your earlier question is, you
9       know, I'll identify Boisvert and Kirby as the
10      ones that I probably spoke the most with with
11      regard to administration of these arrangements,
12      but, again, all that was coming over was in my
13      understanding of all of the obligations and
14      things were coming over based on the many
15      conversations with that entire crowd of the EUA
16      folks.
17   Q.  The -- did you ever speak before May 1, 2000 to
18      any of the, anyone from the State Regulatory
19      Agency about the fuel adjustment mechanism and
20      the EUA tariffs?
21   A.  I may have, but I can't recall any
22      conversations, whether specific or general.
23   Q.  What did you do to announce to contractors to
24      transfer the contracts?

Page 116

1    A.  By contractors do you mean wholesale standard
2       offer suppliers that we had contracts with?
3    Q.  Yes.
4    A.  Each one of those received a letter, a draft
5       letter very similar to the April 18, 2000 letter
6       contained in Exhibit 136.  They all received it
7       on or about the same time.
8    Q.  Okay.  Who was involved in drafting those
9       letters?
10   A.  I would have had --
11   Q.  Let me take it.
12   A.  I would have had, you know, internal counsel
13      review it.  You know, EUA, the Kirbys and the
14      Boisverts and others would have looked at it,
15      perhaps their internal counsel.  We may have
16      had -- I don't know, whoever I was reporting to
17      at the time.  I may have sent a copy to them.
18      Counsel and/or other parties leading the
19      integration effort would probably, we may have
20      sent a copy to them and to the extent they
21      wanted to see what was going out.
22   Q.  Okay.  Who from EUA do you recall being involved
23      in the drafting of, for example, Exhibit 77?
24      Which is an earlier version of the letter to

Page 117

1    TransCanada dated February 8, 2000.
2    A.  At this stage of the game Larry Boisvert would
3       have been my primary contact.  I can't recall
4       who he would have shared it with on the other
5       end.
6    Q.  Do you recall discussing this letter with
7       anybody else at EUA other than Mr. Boisvert?
8         MR. LODEMORE:  Just the draft?  This
9       letter, Exhibit 77, or the final document or
10      both?
11        MR. WINSTON:  Both.
12   A.  I don't have a recollection of who other than
13      Larry I would have talked to.
14   Q.  Okay.  So you don't have any recollection as you
15      sit here today of talking to anyone other than
16      Larry about this form of letter?
17   A.  No, I don't.
18   Q.  Okay.  What do you recall about discussing this
19      form of letter with Larry Boisvert?
20   A.  Making sure that we got the -- we would have
21      discussed making sure that we got the
22      designation of the loads correct.  That we
23      were -- certainly there was -- we anticipated a
24      concern from suppliers, we anticipated a

30  (Pages 114 to 117)

Page 118

1  potential concern as suppliers would say, "since
2  my contract only gives me payments under the
3  tariff, if the tariff were to disappear or
4  otherwise become non-effective do my payments go
5  away" that we wanted to make sure that we
6  included the provision that we would continue to
7  make that payment under the tariff language
8  regardless of what happened to that tariff. And
9  just making sure that, you know, you know, at
10 the time in April these were EUA suppliers and
11 Larry was the counter-party, so just making sure
12 that he knew what, what messages we were
13 communicating to the suppliers in case they
14 called him rather than calling us.
15 Q.  Okay.  Let me show you what's been marked as
16 Exhibit 87, which is a very similar looking fax
17 to NRG.  Is it your memory that Constellation
18 received the February 8th letter as well?
19 A.  They received a very similar letter, I'll, you
20 know, assume the date was February 8th.  I
21 probably shouldn't assume that; I don't know the
22 date, but I received a similar letter.  I would
23 expect it to be issued at the same time.
24 Q.  Okay.  The reason I'm asking is just because it,

Page 119

1  it wasn't produced and I just want, your memory
2  is that Constellation did receive a first draft
3  of this around the same time?
4  A.  Yes.
5  Q.  Okay.  It worked the same way with respect to
6  Constellation as the other two?
7  A.  Yes.
8      MR. LODEMORE:  When you get to a convenient
9  stop, Dan, if we can just take a couple minute
10 break.
11 Q.  Okay, let me just finish with these letters.
12 Okay.  And what discussions did you have
13 with -- let me show you what's been marked as
14 Exhibit 90 and I ask if that appears to, is that
15 what you understand to be the final letter to
16 TransCanada?
17 A.  Yes.
18 Q.  Okay.  What discussions did you have with
19 TransCanada -- did you -- well, let me ask this.
20     Before this February 8, 2000 fax to Mike
21 Hachey had you had any discussions with
22 TransCanada about the wholesale standard offer
23 service contracts that you can recall?
24 A.  Not that I can recall.

Page 120

1  Q.  Okay.  What discussions after you sent the
2  February 8, 2000 letter do you recall having
3  with anyone from TransCanada?
4  A.  Very few discussions.  I most likely called each
5  one of these folks to let them know that the
6  letter was coming.  According to articles,
7  excuse me, Exhibit 77, I followed up almost
8  about a week later to Mike.  As I recall he said
9  he hadn't really looked at it and he handed it
10 over to Richard Schueler to make sure that the
11 ISO administration part was right.  And it looks
12 like the next day Richard got back and said
13 you're all set.  Other than that not a, not a
14 lot of discussion.
15 Q.  Okay.  Did you have any discussion with either
16 Mike Hachey or Richard Schueler about the fuel
17 adjustment provision?
18 A.  That was the discussion I think we in our
19 initial calls, again, "here's what we're doing
20 and by the way, to the extent this tariff,"
21 again, I don't know what the proper word,
22 whether it was -- the tariff was no longer
23 effective, we were having Narragansett tariffs
24 versus Blackstone tariffs, so rather than say to

Page 121

1  our suppliers, "hey, too bad for you, the tariff
2  went away and your contract referred to a tariff
3  that doesn't exist, you're not getting paid."
4  We wanted to make sure, since that would
5  probably be the most critical issue for
6  suppliers that we assured them that we would
7  continue to pay under the index provisions that
8  were in the tariff at the time.
9  Q.  And who did you have that conversation with?
10 A.  That would have been with Mike.
11 Q.  Mike Hachey?
12 A.  Yes.
13 Q.  Okay.  And you recall having a telephone
14 conversation with him to that effect?
15 A.  I can recall that, yes.
16 Q.  Any other -- anything else that you can recall
17 about that conversation?
18 A.  No, norther than we'll take a look at it and
19 we'll get back to you.
20 Q.  The -- did you have any other discussions with
21 TransCanada about the fuel adjustment before
22 sending the final letter which is Exhibit 90?
23 A.  I can't recall any at all.
24 Q.  Okay.  Did you say anything to Mike on the

31  (Pages 118 to 121)

Page 146

1    fuel adjustment provisions in two sets of
2    contracts, the U.S. Gen, TransCanada contracts
3    in the first question and then the EUA companies
4    in the second?
5    A.  Yes.
6    Q.  Okay.  And where, looking at your Exhibit MJH 2
7        for the, for the EUA contracts; where does
8        Exhibit 2 come from?
9    A.  It appears to be the text contained in our April
10       2000 letters.
11   Q.  Okay.
12   A.  Or something very similar to it.
13   Q.  Okay.  Would you have prepared Exhibit 2?
14   A.  Yes.
15   Q.  Okay.  Do you have a recollection of copying
16       that provision out of Attachment 2?
17   A.  I don't recall doing that but it appears very
18       similar to it, yes.
19   Q.  Did you draft -- your testimony which is 91, is
20       this testimony that you drafted at the time?
21   A.  Yes.
22   Q.  Okay.  Exhibit 1 which describes the
23       Narragansett, the old Narragansett contracts,
24       where did that language come from?

Page 147

1    A.  It appears to be a photocopy of one of the
2        appendices to one of our old, one of our NEES
3        standard offer contracts.
4    Q.  Okay.  Is there a -- now, you'll notice that
5        Exhibit Appendix A refers to NECO and Rhode
6        Island.  Okay.  And appendix, if you'll look at
7        Attachment 2 to your Affidavit which is the one
8        for the EUA contracts, it refers to Mass.
9        Electric and Narragansett.  Why does this, and a
10       Rhode Island filing, refer to Massachusetts?
11   A.  I have no particular reason why we would have
12       also included the Mass. Electric portion of it.
13       Other than we took it out of the -- we had
14       indeed taken it out of the April letter and it
15       contained that language it got carried over.
16   Q.  I see in your answers on pages 4 and 7 you refer
17       to differences in the tariffs as to the 12-month
18       and six-month rolling averages?
19   A.  Four and 7 or 4 of 7?
20   Q.  There's a question at the bottom -- there's a
21       question at the bottom of 4 of 7 which refers to
22       your contracts with U.S. Gen and TransCanada and
23       refers to the operation of the trigger.
24   A.  Uh-huh.  Yes.

Page 148

1    Q.  And then there's a question as to the EUA
2        companies and there's a sentence at the bottom
3        of that question, "this mechanism is similar to
4        Narragansett's fuel adjustment provision except
5        it uses a six-month rolling average instead of a
6        12 month."
7    A.  Yes.
8    Q.  Is there a reason -- was it, was it the
9        company's position at the time of this filing
10       that the EUA fuel adjustment did not apply after
11       2004?
12   A.  Yes.
13   Q.  Okay.  Is there a reason why it wasn't disclosed
14       here in the answer as a difference?
15          MR. LODEMORE:  Objection.
16   A.  The purpose of the testimony is to explain why
17       we're raising the rate from 38 to 4.1 effective
18       for usage on and after July 1, 2000.  Therefore,
19       the applicability of the fuel index in some
20       future period four or five years down the road
21       was not relevant to the scope of this filing.
22   Q.  Okay.  So when you're filing a tariff for only
23       one year you weren't particularly focused on
24       things like the fuel index in the future years?

Page 149

1    A.  Not necessarily.  We were focused on the rate
2        for the period of time for which we're, which is
3        the subject of the particular hearing.  When I
4        go in for a January or a July 2000 rate we're
5        more interested in what that rate is now and in
6        the period shortly beyond that, not what I'm
7        going to pay in 2005, 2006, 2009.
8    Q.  So, so is what you're saying that this isn't a
9        reliable indicator of what you intended for 2005
10       to 9, that's why you weren't focused on it?
11   A.  I don't understand that question.
12   Q.  Well, EUA before the merger was filing tariffs
13       just for a one-year period, wasn't it?
14   A.  It appears to be, yes.
15   Q.  So why did you draw conclusions from a one-year
16       tariff that EUA had as to what it intended with
17       their fuel adjustment from 2005 to 9?
18   A.  In their tariff filings included the rate that
19       would be applicable for maybe one year at a
20       time.  However, all of those tariffs included
21       the mechanism, fuel index mechanism, that would
22       be applicable in the future.  That mechanism
23       consistently carried forward in those tariffs
24       and consistently was through 2004, and again

38  (Pages 146 to 149)

Page 150

1   based on the discussions, many discussions with
2   folks at EUA as to how they saw the nature of
3   their restructuring plans and their transactions
4   under that, it was very clear that they only
5   intended a fuel index through '04.
6   Q.  The many discussions you referred to, are there
7       any additional ones than you mentioned here so
8       far?
9   A.  I can't recall any.
10  Q.  Okay.  Did you -- and I think you said that
11      EUA -- did EUA ever give you any reasoning as to
12      why the tariffs they had on file had advanced
13      triggers to 2004 but none after that time?
14  A.  Yeah, I don't recall that we ever asked or
15      otherwise understood nor really focused on the
16      why; just the what.
17  Q.  You never asked why the tariff was forward
18      looking through 2004 but not after?
19  A.  If I asked I don't recall that, an answer as to
20      why.  Other than they did things differently
21      than we did.
22  Q.  Did you ever review the filings, the original
23      tariff filings to determine what the length of
24      the bid they were offering the standard, the

Page 151

1   standard offer service was with those original
2   tariff filings?
3   A.  Could I hear that again.
4       (Prior testimony read back.)
5           "Did you ever review the filings,
6           the original tariff filings to
7           determine what the length of the
8           bid they were offering the
9           standard, the standard offer
10          service was with those original
11          tariff filings?"
12          MR. LODEMORE:  Does that mean at this time
13      period, around 2000 or through the current?
14  Q.  Well, did you ever at this time period back in
15      2000, did you ever go back and look at the, the
16      documents regarding the scheme that EUA had
17      planned with respect to the joint bidding of the
18      Massachusetts and Rhode Island wholesale
19      standard offer service only through 2004?
20  A.  I can't recall whether I reviewed those or -- I
21      certainly followed them.  I was paying
22      attention, in the 2000 time frame we would have
23      gone through the whole merger process.  I would
24      have understood through our integration efforts,

Page 152

1   efforts they took, things that they did,
2   results, how they got to where they did, what
3   their portfolio consisted of.  I just can't
4   recall, you know, having read a tariff or at
5   what point in time I had read the tariff and
6   their filings.
7   Q.  When you filed this with Exhibit 2, describing
8       the EUA contracts, can you think of any reason
9       at the time why you didn't just say in there,
10      for example, in the first paragraph "in the
11      event of substantial increase in market prices
12      between 1999 and 2004," for example?  Is there a
13      reason why you just didn't state an intention to
14      end the fuel trigger?
15          MR. LODEMORE:  Objection.
16  Q.  If that's what you intended?
17  A.  I can't think of any reason why we did not
18      specifically identify the end date other than we
19      understood clearly that the intention was it
20      ended in 2004.
21  Q.  And when you say "clearly," is that based on
22      anything other than what you've said today so
23      far?
24  A.  No.

Page 153

1   Q.  Okay.  What --
2   A.  Uhm.
3   Q.  Back at that time frame I'm talking about now.
4   A.  It's unclear exactly how many things I've told
5       you today, so to be clear, it's based on
6       conversation with the EUA folks, my review of
7       whatever documents I had reviewed at the time of
8       the merger; whether I have identified every
9       document in every year I've conducted I'm not
10      sure.
11  Q.  What was the purpose of the fuel clause in the
12      standard offer service contracts as you
13      understood it at that time?
14  A.  The mechanism provides suppliers with additional
15      revenues to the extent fuel prices exceeded the
16      indices.
17  Q.  Let me show you what I've marked as exhibit,
18      what I will mark as Exhibit 140 which is PUC
19      testimony dated June 20, 2000.
20          (Deposition Exhibit 140 marked for
21          identification.)
22  Q.  Have you seen that testimony recently?
23  A.  I have seen this testimony.
24  Q.  The, if you look at pages 21 and 22 there's a

39 (Pages 150 to 153)

Page 162

1    Did you have any concern at this time as to
2    whether or not your April letter that included
3    this as an attachment might have been misleading
4    or confusing to your suppliers?
5  A.  No.
6  Q.  The, then again he asks on page 30, "is this any
7    different from the language that was in the
8    tariff, I believe this is the language in the
9    tariff." Why didn't you submit a redline copy
10   to them that indicated all of the changes that
11   you made?
12 A.  I'm not sure why we didn't do that.
13 Q.  Okay.  Did you ever disclose to them the fact
14   that you had put in prices through 2004 when in
15   fact the EUA tariff was only filed for a
16   one-year period?
17 A.  Again, we're putting in the fuel trigger
18   mechanism and not the, not the standard offer
19   rate mechanism.
20 Q.  Right.  Well, you say this is the language in
21   the tariff, and my question for you is did you
22   ever disclose to the Commission at all that
23   EUA's tariff differed from your attachment by
24   means of the fact that that tariff did not

Page 163

1    reflect any stipulated prices except for the
2    given year 2000?
3  A.  I don't recall making such disclosure.
4  Q.  Okay.  And then again on page 31 there's yet
5    another question asking for any other
6    differences.  And you disclose another
7    difference, not that one, but you mention there
8    is the fuel adjustment triggers that only go
9    through 2004.  And you say, "the only reason I
10   have, is that when EUA developed their
11   settlement agreement in its initial set of
12   tariffs they only, for whatever business reason,
13   they only included fuel trigger points for the
14   period through 2004." And that's accurate, that
15   at this point you, you didn't have any knowledge
16   as to what the reason might have been for that?
17 A.  As I said previously we knew what, what their
18   mechanism included, how long it included for,
19   but we, we never inquired or otherwise
20   understood why they had ended it in '04.
21 Q.  So you, you adopted a limited 2004 trigger
22   without inquiring as to why it was that way in
23   the tariff?
24 A.  Yes.  Or if I didn't inquire I don't recall the

Page 164

1    reason being.
2  Q.  Okay.  And here's a question at the bottom
3    of page 32.  "And do you have any sense of what
4    would happen in the year 2005?" And you say,
5    "my initial interpretation is since there are no
6    fuel trigger appointments beyond that there are
7    no fuel trigger payments applicable after 2004."
8    Had -- had you made a final decision at this
9    point or was this just an initial
10   interpretation?
11 A.  I was very certain that it ended in 2004.
12 Q.  And why did you use the term "initial
13   interpretation" before the PUC under oath?
14 A.  When we get into contract interpretations and we
15   were being grilled on the interpretation, we
16   only speak about hours as opposed to suppliers.
17   We've had instances over the years where we
18   believe it's very clear by the language in the
19   contract what the contract means and we would
20   represent to a Commission, you know, the
21   contract says this, therefore, we expect no
22   other charges; they get a level of comfort in
23   that.  All of a sudden you get a supplier out of
24   the blue comes up with a different view.  So I

Page 165

1    find it very, I make it a practice not to
2    represent how suppliers would otherwise
3    interpret contracts or for a supplier who agrees
4    with you today that it means one thing and then
5    has, changes their mind down the future that we
6    got it locked in stone, so it's being cautious.
7  Q.  So is it your policy in your tariff filings
8    never to mention what a contractor says to you
9    about their interpretation of a contract?
10 A.  To the extent I know what my contractor says
11   about their contractor I can pass that along.
12   But to the extent that, you know, I don't
13   specifically know, nor have had a specific
14   conversation, I probably would not pass that
15   along.
16 Q.  Okay.  And your next sentence says, "I assume a
17   supplier may have a different opinion."
18 A.  Uh-huh.
19 Q.  What was that assumption based on?
20 A.  Again, I'm just leaving the door open that if a
21   supplier wanted in the future to take a
22   different point of view that, you know, I wasn't
23   locking into a guarantee that we would not have
24   the issue, that the issue would not arise in the

42  (Pages 162 to 165)

Page 166

1  future.
2  Q. Well, why, why would a supplier take a different
3     opinion? Why would you make a statement that
4     you assume that a supplier would have a
5     different opinion?
6  A. I guess it's --
7     MR. LODEMORE: Objection. It says "may
8     have a different opinion" not will have a
9     different opinion.
10 Q. Why would you assume that?
11 A. I don't know that it was necessary to make any
12    assumption. Perhaps I could have used a
13    different choice of words in the heated moment
14    within the filing there. In the proceeding
15    there.
16    I had no reason at the time to assume
17    somebody would. Again, I'm trying to convey to
18    the Commission that while I wanted to tell you
19    the contract says A, we've had instances in the
20    past where suppliers say, "well, no, now we
21    think it means B or something changes and I want
22    to think it means B now," so we're trying to
23    avoid a, making rock solid representations that
24    are beyond our control.

Page 167

1  Q. If you knew that the NRG folks agreed with your
2     interpretation why didn't you disclose that
3     here?
4  A. Again, I'm just going with the flow of the
5     questions as they come and responding as best I
6     can with information that I feel is relevant at
7     the time.
8  Q. Is it because in fact they disagreed with you,
9     Mr. Hager?
10 A. Absolutely not.
11 Q. The -- turn to page 55, if you would. And
12    there's a question here by Mr. Johnson, and who
13    is he again?
14 A. Commission counsel.
15 Q. And he says, "I've been thinking about what you
16    told me and as I understood what you told me you
17    said this is a document that was sent out to
18    suppliers." And you said, "yes." And he asks,
19    "is this a change in the contract?" And you
20    say, "we sent notices to the suppliers." You're
21    referring there to the April notices?
22 A. Yep.
23 Q. And then Mr. Johnson says at the bottom of page
24    56 and 57 to Mr. Gerwatowski, "in other words,

Page 168

1  Ron, I assume you have a new contract if this is
2  a contract amendment."
3     MR. LODEMORE: I'm sorry, Dan, is there a
4  question?
5  Q. Yeah. And then at the bottom of 57 Ron
6  Gerwatowski says, "whether you want to
7  technically call it an amendment I guess I would
8  disagree, I think reasonable minds could
9  differ." He says, "we didn't want to play some
10 games with the suppliers, we tried to work with
11 the suppliers." What did you do to try to work
12 with the suppliers concerning the fuel
13 adjustment provision up to that point.
14 A. Again, the testimony on pages 56 and 57 talk
15 about, you know, you have a contract that says
16 you get paid your pro rata share of the revenues
17 that we collect pursuant to a BVE Newport
18 tariff. A merger comes along, that tariff goes
19 away, therefore, there are no revenues coming in
20 pursuant to that tariff by the language in that
21 contract, therefore, no revenues in, no pro
22 rata, or you get your pro rata share of zero
23 which is zero. We did not want to take that
24 position with those suppliers because we're

Page 169

1  making those tariffs go away. So we worked with
2  them by sending them notices and upfront in
3  those notices saying, "we will continue to pay
4  you pursuant to the terms of those tariff
5  language even though the tariffs go away." Gave
6  them the text of how we will operate that
7  provision going forward to keep them whole
8  pursuant to the terms of that tariff that had
9  gone away.
10 Q. In the middle of page 57 he says, "I think Mike
11 might have had a conversation with the
12 suppliers." Do you have an understanding of
13 what he's referring to there?
14 A. In my communications with the suppliers in April
15 and the follow-up communications from that,
16 those draft letters.
17 Q. Okay. After this hearing did you, did you make
18 any contacts with any of the three suppliers
19 about the subject matter of the fuel index in
20 2005 to 9?
21 A. I can't recall any.
22 Q. Did you do anything to inform any of them about
23 the discussion that you had with the Commission?
24 A. I don't recall any.

43 (Pages 166 to 169)

Page 174

1    Mr. Michael Hager.
2    Q.  The PUC hearings like the one that we were just
3        talking about, who usually attends those
4        hearings?
5    A.  Well, they're open hearings that are publicly
6        posted and noticed throughout the state.
7        Members of the general public who wish to
8        comment on our rate proposals, you know,
9        competitive suppliers can attend, wholesale
10       suppliers can attend, but generally it's members
11       of the general public.
12   Q.  Okay.  I mean, are you wholesale suppliers
13       generally in attendance at those?
14   A.  Generally, no.
15   Q.  Do you -- your pre-filing -- your pre-filed
16       testimony, who do you send that to?
17   A.  I don't personally send it to anyone.  But our
18       counsel would file that with the Clerk of the
19       Commission, to the extent that there's a service
20       list established they may or may not send copies
21       to folks that are on the service list.  I
22       believe all of the filings are posted on the
23       Commission's website.
24   Q.  Okay.  Do you know what date and time

Page 175

1        Narragansett began to post its filings on its
2        website?
3    A.  I don't know if Narragansett posts its filings
4        on its website.  I know the Commission posts the
5        filings on its website.  I don't know when that
6        began.
7    Q.  Okay.  Are you aware that the Commission does
8        not post transcripts on its website?
9    A.  I'm not aware of that.
10   Q.  The -- in what circumstances do you inform your,
11       as a general matter, your suppliers about the
12       subject matter of a particular hearing?
13   A.  Our hearings involve the rates that we were
14       setting, resulting from things that occur, costs
15       incurred under our contract.  We generally don't
16       provide notice to our suppliers of our filings
17       other than public notices that are made.  Some
18       such as TransCanada, you know, follow
19       proceedings on their own, others, perhaps, don't
20       follow them as closely.
21   Q.  When you say "TransCanada follows proceedings,"
22       on what do you base that comment?
23   A.  Conversations with Mike Hachey.
24   Q.  When were those conversations?

Page 176

1    A.  At various times throughout the course of the
2        years.
3    Q.  What were the sum and substance of those
4        conversations?
5    A.  You know, part of a phone call on another, if I
6        were to call on him about a particular matter,
7        or if I saw him at a NEPO meeting or something
8        he would generally say hey; you know, he's
9        running a retail business, competitive retail
10       operation, he generally would comment that he
11       saw a filing in a particular state and, you
12       know, was seeing what, what rates we were
13       charging and so forth.
14   Q.  Did he ever talk to you about, mention that he
15       had seen any standard offer service retail
16       tariff filings before 2005 in Rhode Island?
17   A.  You know, those are general conversations that
18       I've had over time.  So, yeah, I can't give you
19       a specific date but I wouldn't, I would believe
20       they would be prior to '05 as well as beyond
21       '05.
22   Q.  You believe.  Do you recall Mike Hachey ever
23       discussing with you any standard offer retail
24       filing made by TransCanada in which he said he

Page 177

1        had seen it prior to 2005?
2        MR. LODEMORE:  Could I get that back one
3        second.
4    Q.  I'll ask it again.  It's a mess.
5        Do you recall Mr. Hachey ever indicating to
6        you that he had independently obtained and
7        reviewed a Narragansett standard offer retail
8        filing before 2005?
9    A.  I'm sure I had those conversations before 2005.
10       You know, they were not in-depth conversations
11       so I don't know to the extent at which he gained
12       materials regarding the filings.  It was my
13       understanding that he followed what we were
14       setting for rates in the various states.
15   Q.  Were you aware that he obtained his information
16       from e-mail notices sent by Narragansett?
17   A.  I don't know the particular sources of his
18       information.
19   Q.  Okay.  Do you have any reason to believe that he
20       was aware prior to 2005 of your retail tariff
21       filing specifically related to the fuel
22       adjustment applicability after 2005?
23   A.  I'm losing the question, but I believe my answer
24       is going to be I don't know what Mike Hachey

45  (Pages 174 to 177)

Page 190

1  standard offer supply contracts." And it says
2  "the standard offer supply contracts contain two
3  price components, a base price and a fuel index
4  adjustment provision." That's an accurate
5  statement; right?
6  A.  Yes.
7  Q.  And I take it -- you can take your time and
8  look, but --
9        MR. LODEMORE:  I'm sorry, what page was
10  this?
11        MR. WINSTON:  Page 5.
12  Q.  And your answer at the bottom of page 5 onto 6
13  and Exhibit MJH 1 you'll see, I think, are
14  identical to your similar answer in Exhibit MJH
15  1 and Exhibit 142 that we just looked at.  Is
16  your -- would your answer be the same with
17  respect to that tariff as to what your intent
18  was when you filed that tariff filing?
19  A.  When you say "tariff filing" are you referring
20  to the testimony in Exhibit 142 that you just
21  showed me?  I'm going to have to take issue with
22  that characterization, that that is not a tariff
23  filing.
24  Q.  I understand.  Would you -- regardless, let's

Page 191

1  not argue about the semantics.  What is Exhibit
2  143 as to what you were intending by that filing
3  your answers would be the same as with respect
4  to Exhibit 142; correct?
5  A.  Again, my, my Exhibit 143 talks about a cost
6  incurred in the period 2002 through 2004 only
7  were limiting our scope of this filing to that
8  period of time.  And, yes, the description of
9  these mechanisms are similar.
10  Q.  Right.  Well, it's setting the standard offer,
11  sir.  The intent of that filing is to set the
12  standard offer service rate for a given period
13  of time; correct?
14  A.  Correct.
15  Q.  Do you recall that TransCanada and Narragansett
16  or National Grid had an arbitration regarding
17  congestion costs?
18  A.  Yes.
19  Q.  What was your involvement in that case?
20  A.  I would characterize myself as the business lead
21  in the proceeding.
22  Q.  Okay.  Were you involved in -- did you testify?
23  A.  Yes.
24  Q.  Were you involved in the document production in

Page 192

1  that case?
2  A.  It would have been led by counsel but I would
3  have played a role in helping to make sure we
4  produced all relevant documents.
5  Q.  Okay.  The -- let me show you what we'll mark as
6  Exhibit 144.
7        (Deposition Exhibit 144 marked for
8  identification.)
9  Q.  It's an August 12, 2002 document request.  Were
10  you involved in preparing the response to this
11  document request?
12  A.  I believe the response would have been prepared
13  by counsel, I would have, again, taken whatever
14  efforts were needed to make sure the documents
15  that I was aware of were provided to counsel.
16  Q.  Okay.  Would you have been the one to provide
17  any documents regarding the standard offer
18  service filings with respect to the EUA
19  contracts in Rhode Island?
20  A.  That probably would have fallen in the hands of
21  Jeanne Lloyd.
22  Q.  Okay.  The -- this document request, the
23  congestion cost dispute related to both the NECO
24  contract and the EUA TransCanada contract;

Page 193

1  correct?
2  A.  We're strictly limiting our discussion to Rhode
3  Island?  Because --
4  Q.  Yeah, sure.  If I'm missing one feel free to add
5  it.  The NECO contract.
6  A.  There was a third contract in Massachusetts as
7  well.
8  Q.  Okay.  But it related to the, to the TC EUA
9  contract in Rhode Island; correct?
10  A.  Yes.
11  Q.  Okay.  And the -- let me mark Exhibit 145.
12        (Deposition Exhibit 145 marked for
13  identification.)
14  Q.  Do you see this is a response to discovery
15  requests.  Was Tim Ngau your counsel?
16  A.  Yes.
17  Q.  And looking at request number 15 in the
18  response.  Do you see you're the person
19  answering or prepared to testify?
20  A.  Yes.
21  Q.  Did you review these responses?
22  A.  Most likely I did.
23  Q.  Okay.  Do you see number 15 asks for all
24  regulatory filings, transcript, prepared

49  (Pages 190 to 193)

Page 194

1    testimony and discovery in any regulatory
2    proceeding relating to standard offer service?
3    A.  Yes.
4    Q.  And National Grid is providing responsive
5        documents that it filed in the regulatory
6        proceeding?
7    A.  Yes.
8    Q.  Do you know why National Grid didn't provide the
9        transcripts of the wholesale standard offer
10       service filings?
11   A.  I do not.
12   Q.  Do you know why they didn't provide a copy of
13       the June 2000 proceeding in which you discuss
14       with the PUC your view that the fuel adjustment
15       cut off in 2004?
16   A.  I'm going to need to go back and review the
17       evolution of this request, how things were
18       defined, you know, and how things may have been
19       interpreted by counsel.  But I, at this point
20       do not know any decisions we made.
21   Q.  Were you aware at the time of responding to this
22       in August of 2002 that TransCanada might dispute
23       your view of the fuel adjustment provision in
24       2005 to 9?

Page 195

1    A.  Absolutely not.
2    Q.  You weren't aware of any potential dispute with
3        TransCanada on the fuel adjustment provision?
4    A.  I was not, no.
5    Q.  Take a look at your response to request number
6        11.  And that asks for copies of correspondence
7        between National Grid and any other person.  And
8        you see you're the person.  And the middle
9        sentence says "to the extent this request seeks
10       correspondence between National Grid and other
11       persons," it goes on, blah, blah, blah.  "But
12       not related to the responsibility for good
13       gesture costs (such as fuel cost adjustment)
14       National Grid objects."  Do you know why that
15       objection was put in there?
16       MR. LODEMORE:  Objection.  And I caution
17       the witness to answer only the, based on your
18       own knowledge and not through anything you
19       learned through discussions with your counsel.
20       MR. WINSTON:  Well, and anything you were
21       to answer and prepared to testify about as it
22       says here in your answer.
23   A.  I can't recall any, many discussions at that
24       point in time regarding fuel cost adjustment.

Page 196

1    Q.  Are you aware that you sent to TransCanada both
2        of the tariff filings that we've marked as
3        Exhibit 143 and 144 which show the same tariff
4        filing applicable to Narragansett and the EUA
5        companies through 2009?
6        MR. LODEMORE:  I'm sorry, what exhibits
7        were those?
8    Q.  143 and 144.
9    A.  Again, I don't consider those tariffs or tariff
10       filings that were specifically acted on or
11       approved.  So when and if and what mechanism you
12       provided them to TransCanada I'm not sure.  I
13       don't know every document that was produced in
14       response to this request.
15   Q.  Did someone from Narragansett review all of the
16       documents that were produced related to standard
17       offer service in that congestion cost, whether
18       you or Jeanne Lloyd?
19   A.  In that document -- that was conducted by
20       counsel and we would have been, some of the
21       parties had provided input into those, into that
22       request.
23   Q.  Well, was it you or Jeanne Lloyd that chose
24       which tariff filings to give to your counsel to

Page 197

1        provide?
2    A.  I do not have, nor keep copies of rate filings
3        related to standard offer.  At the conclusion of
4        a hearing I turn over all of my documents and
5        work papers to the applicable rate analyst for
6        inclusion in their rate files rather than me
7        maintain separate files.  So we would have gone
8        to the rate regulatory group and asked them to
9        produce, as well as perhaps our rate counsel
10       representing us to seek all relevant documents
11       for that.  Would I have reviewed what was turned
12       over?  Perhaps.  Would I have gone searching and
13       hauled filed cabinets to make sure they got all
14       the relevant stuff?  No, that would have been
15       their responsibility on that particular matter.
16   Q.  Who is their?
17   A.  The rate analyst.
18   Q.  Who was that rate analyst on this congestion
19       cost matter?
20   A.  I don't recall.  If we're in the 2000 time frame
21       and you're asking for Rhode Island rates most
22       likely Jeanne Lloyd.
23   Q.  What -- where did Jeanne Lloyd keep those files?
24   A.  Generally she has a central filing system.  In a

50  (Pages 194 to 197)

Page 198

1    Northborough office. I'm not aware of any files
2    other than those.
3  Q. Okay. Did you testify -- you testified in a
4    congestion cost case, didn't you?
5  A. Yes.
6  Q. And that was in Boston?
7  A. Yes.
8  Q. I'll mark Exhibit 146.
9       (Deposition Exhibit 146 marked for
10   identification.)
11 A. There were other proceedings held in Washington
12   I believe as well.
13 Q. Okay. I'm going to show you testimony taken in
14   Boston, Massachusetts November 5, 2002.
15 A. (Witness reviewing.)
16 Q. 146. And who attended this proceeding from
17   TransCanada?
18 A. Which TransCanada employees?
19 Q. Uh-huh.
20 A. I recall Mr. Taylor being there, I believe
21   Mr. Hachey was there and I believe Angela, is it
22   Avery, of the Calgary office, in-house counsel.
23 Q. Okay. And if you look at the bottom of page 37
24   of your testimony -- well, look at, there's a

Page 199

1    question, "how is the standard offer service
2    priced"?
3  A. What page should I refer to?
4  Q. The question is at the bottom of 37 and your
5    answer is at the top of 38. And the third
6    sentence says, "and to provide wholesale
7    suppliers with protections against extraordinary
8    increases in fuel prices over the term of the
9    agreements. There was a fuel price adjustment
10   mechanism that was included as well."
11      Is your -- at the time that you made that
12   testimony was it your understanding that
13   Narragansett intended not to pay a fuel
14   adjustment on the EUA contracts after 2004?
15 A. It's been our contention and understanding all
16   along that those were not applicable beyond
17   2004.
18 Q. Is there a reason you didn't say that in this
19   proceeding?
20 A. Other than it wasn't necessary. We were
21   providing a high level response on the
22   background of this one and it was not
23   necessarily relevant at that point in time.
24   Providing a general characterization of these

Page 200

1    contracts to set a stage through the arbitration
2    panel on a matter that was not directly relevant
3    to the instant proceeding.
4  Q. Well, that's interesting. Because let me show
5    you a filing you make that very month in Rhode
6    Island. I think right after that proceeding.
7       (Deposition Exhibit 147 marked for
8    identification.)
9  Q. And you'll see your question and answer on page
10   4 to 5 appears to be identical, but you indicate
11   a difference in 6 and 12 month fuel and then
12   refer to the text of the fuel adjustment
13   provision that is applicable to each contract.
14   And then if you look at your attachment on page
15   2 there's an asterisk that appears. Starting in
16   2005. Why are you putting an asterisk in there?
17   This is a rate filing applicable to November of
18   2002, isn't it?
19 A. This is for rates effective in 2003 and we're
20   starting to get to the point where we're looking
21   for additional exhibits here, but we get to the
22   point where we're looking beyond 2004. This
23   deals with rates through 2004 and we're getting
24   to the point where we're starting to look at

Page 201

1    what's going beyond that. And again trying to
2    make it clear in our description to the
3    Commission that this thing is going to tic down.
4    You know, we're looking at the rates, these
5    costs keep going up and up and up, you know,
6    what is happening in the future and we're
7    signaling that, hey, we haven't perhaps
8    necessarily talked about this in a while but
9    let's make it clear that for at least a portion
10   of these contracts those fuel mechanisms will
11   end in that period of time.
12 Q. And the difference during this filing and the
13   one that we looked at at the end of the previous
14   year is simply that in other years past in 2005
15   is that much closer?
16 A. We're getting closer to 2005, perhaps at the
17   time, again, we're 2003, fuel is kicking in
18   again, you know, people are getting a little
19   troubled by these things. Where is the relief.
20   And we're at least starting to indicate that for
21   a portion of these contracts some relief is in
22   sight because that fuel index goes away. But it
23   does continue on for the majority of the load.
24 Q. Did you send -- did you send this rate filing to

51 (Pages 198 to 201)

Page 202

1  TransCanada?
2  A.  Again, we don't generally send our rate filings
3    to our wholesale suppliers.
4  Q.  What discussions did you have within
5    Narragansett about the addition of the asterisk?
6  A.  Other than we're getting to a point where it's
7    time to, you know, at least make it clear to the
8    Commission that it, as we've said in prior
9    proceedings and prior testimony, that it ends
10   for EUA at 2004. So we're getting to a point
11   where folks are starting to look at and focus on
12   that period of time and we're trying to do this
13   to make it clear in, in our documents what's
14   happening there.  Or what will happen.
15 Q.  But it wouldn't have been relevant to look for
16   it in 2005, just the year earlier?
17 A.  Again, a whole lot happens in a course of a
18   year.  A year earlier we're probably not looking
19   out.  A year earlier we're looking at setting
20   fixed rates for '02, '03, '04; we don't think we
21   were going to have any rate issues over that
22   period.  I think we were setting a levelized
23   rate for a three-year period that we were unable
24   to obtain because fuel indices kicked in again.

Page 203

1    I wish I had my graphic of fuel prices to
2    understand exactly when the big $15 spike is, or
3    these huge spikes came in, but.  For the
4    remainder of my exhibits there.
5  Q.  Uhm.
6  A.  Again, we've been on the record in prior
7    proceedings as to the applicability of that
8    through 2004, we're now getting to a point where
9    it's becoming a --
10 Q.  Well, you're on the record.  Other than your
11   June 20 testimony in which you referred to an
12   initial impression, is there anywhere else on
13   the public record that's indicated?
14 A.  I'll rely on the transcripts from the various
15   hearings to indicate at what points in time
16   we've had that discussion.
17 Q.  Okay.  And again, you don't know why that
18   transcript wasn't sent to TransCanada in the
19   congestion cost case?
20 A.  I don't.  I don't.
21 Q.  What happened to the, the NRG contract, to your
22   memory?
23 A.  NRG was in default of its obligations and they
24   were terminated.

Page 204

1  Q.  Okay.  And what did, what did Narragansett do to
2    replace that contract?
3  A.  We sought replacement supplies and ended up
4    signing a contract with another supplier.  To
5    become effective upon the termination of the NRG
6    contract.
7  Q.  Okay.  Who was that supplier?
8  A.  I would have to look at the contract, the legal
9    name, but let's call it Florida Power and Light
10   or Florida Power and Marketing.  Let's call it
11   Florida Power and Light.
12 Q.  Okay.  Did, did Narragansett engage in any bid
13   solicitation to replace the NRG contract?
14 A.  Narragansett did not conduct an open
15   solicitation, Narragansett sought discussions
16   with several wholesale suppliers and through
17   those negotiations arrived at a, at the Florida
18   contract.
19 Q.  Okay.  What were the terms that were offered,
20   the pricing terms that were offered to FPL?
21 A.  We tried to -- we asked all the bidders to start
22   by looking at the pricing terms under the NRG
23   contract, the fixed price stream, the fuel
24   payments that were in effect through 2004 as

Page 205

1    well as the NRG contract had a rebate provision
2    where we got additional monies refunded several
3    years during that contract.  We asked them to
4    use that as a starting point and provide
5    additional benefits, if possible, or to let us
6    know how much it would cost us to enter in a
7    contract under those terms.
8  Q.  Okay.  Let me show you what's been marked as
9    Exhibit 82.  And that's a letter from John
10   Warshaw to Larry Boisvert.  Who is John Warshaw?
11 A.  He's an analyst that works for me.
12 Q.  Okay.  What was your involvement in this e-mail?
13 A.  I would have been having discussions with, with
14   those suppliers and asked John to provide
15   information as those requests came in from my
16   conversation.
17 Q.  Now, I notice there's a sentence here "finally
18   the fuel trigger for standard offer service for
19   the former EUA companies is only applicable
20   through 12/31/2004."  Did you have any
21   discussion with Mr. Warshaw about offering that
22   term to FPL?
23 A.  Again, it's been our understanding all along
24   that that's what it is, so when people do the

52  (Pages 202 to 205)

Page 210

1  where I was taking a vacation and some of the
2  responses would come back to both John and I so
3  that we would know we would get them and, you
4  know, do the analysis. John was going to do the
5  analysis for me of their answers so he needed to
6  get them back, so.
7  Q.  And then if you turn to the next page which is
8  the following Monday on the 31st of March,
9  there's another note here. "Larry B, FPL" and
10  there's a fourth bullet down "may have discount
11  later no fuel adjustment question mark." And
12  then about six more lines down, "no fuel
13  starting 2005." Did you have any discussions
14  with Larry with -- I'm sorry -- with Mr. Warshaw
15  about his conversations with Larry Boisvert
16  about the fuel adjustment?
17  A.  Again, those conversations would not have been,
18  you know, do we believe that one is applicable
19  in '05 and beyond in the EUA contracts because
20  we're clearly of the opinion that they're not.
21  Any discussions with Larry Boisvert after his
22  acknowledgment that he understood the EUA
23  formulation was how was he going to structure
24  his deal back to us.

Page 211

1  Q.  That's what you think these notes show?
2  A.  I can't read that. It says, "fuel trigger
3  GM" --
4  Q.  Rather than speculate, let me ask you. Have you
5  talked with Mr. Warshaw about the subject of his
6  conversations with Larry Boisvert as indicated
7  in these notes?
8  A.  I would have talked to him during the time that
9  these were taking place. He worked for me and
10  he was helping me in these discussions.
11  Q.  And your testimony is that Larry Boisvert simply
12  acknowledged that the fuel adjustment ended and
13  that was the end of the matter?
14  A.  Larry was very clear in my discussion with him
15  that he was the one that was responsible for
16  administering those contracts and he was very
17  clear that he understood that the EUA contract
18  had a six-month provision whereas NEES had 12
19  months and theirs ended in 2004 and ours
20  continued on.
21  Q.  Did the lack of a fuel adjustment in his
22  contract affect the purchase price of that
23  contract?
24  A.  I have no idea how suppliers would have valued

Page 212

1  that or not. Although many suppliers believed
2  that by the time you got to 2005 all the load
3  would have left, market prices were high,
4  customers would take the rational decision and
5  leave, they would not be serving load, so I
6  think even though some contracts may have had
7  one or not, most suppliers were significantly
8  discounting the value of the fuel index that
9  late in the contract. Or any value from those
10  contracts that late in the contract period.
11  Q.  Well, under the standard offer service in 2003
12  the fuel adjustment had been running, giving
13  value for several years, hadn't it? It's in
14  your public filings.
15  A.  Yeah. It had been producing results. Now,
16  folks are now stepping in where market prices
17  are different. We got compensated at that point
18  in time, got discounts at that price from
19  Florida Power and Light that we ultimately took.
20  We got discounts from other suppliers as well.
21  Q.  Why would Florida Power and Light agree to a
22  discount when the standard offer service rate in
23  this time was below market?
24        MR. LODEMORE: Objection. Were you fully

Page 213

1  finished with your last question or your last
2  answer?
3  A.  I'm going to need to hear the question and
4  answer again.
5        (Prior testimony read back.)
6        "A: Yeah. It had been producing
7        results. Now, folks are now
8        stepping in where market prices
9        are different. We got compensated
10        at that time point in time, got
11        discounts at that price from
12        Florida Power and Light that we
13        ultimately took. We got discounts
14        from other suppliers as well. Q:
15        Why would Florida Power and Light
16        agree to a discount when the
17        standard offer service rate in
18        this time was below market?"
19  A.  I can continue from there. In the 1998 time
20  frame where we were doing those standard offer
21  arrangements, those suppliers and their asset
22  sales probably were discounting any value from
23  those contracts in the out years including under
24  fuel contracts strong expectation at that point

54  (Pages 210 to 213)

**PART 3 OF 5**

# HAGER (DAY 2)

Page 223

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

- - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING    :

LTD,                           :

      Plaintiff,              :    CASE NO.

VS.                            :    05-40076 FDS

NARRAGANSETT ELECTRIC CO.,     :

      Defendant.              :

- - - - - - - - - - - - - -


VIDEOTAPED CONTINUED 30(B)(6) DEPOSITION OF

NARRAGANSETT ELECTRIC COMPANY by MICHAEL J.

HAGER, a witness called by and on behalf of the

Plaintiff, taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Sandra L. Bray, Registered

Diplomate Reporter, CSR Number 103593, and

Notary Public in and for Commonwealth of

Massachusetts, at the offices of Choate Hall &

Stewart LLP, Two International Place, Boston,

Massachusetts, on Tuesday, April 3, 2007,

commencing at 9:42 a.m.

Page 236

1      MR. LODEMORE:  Thank you.
2  A.  Exhibit MJH-1, Page 8602 of Exhibit 155 contains
3      the text of the various provisions under which
4      we provide payments to our suppliers.  Again,
5      this testimony only refers to costs that were
6      expected to be incurred during the time of
7      filing, which would be April through December
8      2001.
9  Q.  Well, let me -- my question is, was the fuel
10     adjustment component of the price in the
11     standard offer service tariff in Exhibit 155
12     calculated using the fuel adjustment provision
13     set forth in Exhibit MJH-1?
14 A.  Exhibit MJH-1 was used to determine the costs
15     that were to be paid under applicable contracts
16     for the period that this testimony covers here,
17     and those costs, if any, were then added to the
18     fixed price to come up with -- and averaged over
19     all the contracts to come up with a price that
20     was contained in the tariff.
21 Q.  So the answer to my question is yes, right?  To
22     come up with the price of 5.5 cents in the
23     standard offer service tariff in Exhibit 155,
24     what fuel adjustment mechanism did you refer to?

Page 237

1  A.  Went to each individual contract and determined
2      the applicable mechanism that was in effect.
3      The various mechanisms are summarized in
4      Exhibit MJH-1.
5  Q.  Let me turn your attention to Page 4 of this
6      exhibit.  There's a lot of different -- Bates
7      Stamp 8597 of Exhibit 155, which is your
8      affidavit.  And there's a question, "Can you
9      describe the fuel adjustment provision that is
10     contained in the standard offer service
11     contracts," and you answered, and the last
12     sentence states, "The text of the fuel index
13     provision that is applicable to each of the
14     contracts is provided in Exhibit MJH-1."  Was
15     that an accurate statement?
16 A.  Yes.
17 Q.  Turning to Exhibit MJH-1, on Page 2 of that
18     exhibit, which is Bates-stamped 8603, there are
19     fuel trigger points set forth.  Are those
20     accurate?
21 A.  I want to be sure we're not misunderstanding the
22     statement on Bates Page 8598 that says, "The
23     text of the fuel index provision that is
24     applicable to each of the contracts is in

Page 238

1      Exhibit MJH-1."  It should not be inferred that
2      MJH-1 is applicable to every contract.  What
3      we're saying is that's the text we have taken
4      from various sources.  We have put this together
5      to describe the mechanisms in here, but each
6      contract has its own mechanism.  So yes, MJH-1
7      does contain fuel trigger mechanisms through
8      2009 but does not imply those are applicable to
9      each and every contract.
10 Q.  The -- are you distinguishing between the
11     trigger numbers and the mechanism in the tariff?
12     Are the triggers part of the mechanism?
13 A.  What are you referring to as the mechanism?
14 Q.  Well, you say -- I'm referring you to your last
15     sentence in your answer on Bates Stamp 8598.  It
16     says, "The text of the fuel adjustment -- fuel
17     index adjustment provision that is applicable to
18     each of the standard offer contracts is provided
19     in Exhibit MJH-1."  Show me where in
20     Exhibit MJH-1 what you're referring to as the
21     text.  The whole thing?
22 A.  It would be the whole thing.
23 Q.  So the entire MJH-1 is the text of the fuel
24     adjustment provision?

Page 239

1  A.  Again, MJH-1 is a compilation of the various
2      mechanisms and the text of what's covered in
3      those mechanisms.  The actual mechanism
4      applicable to each contract is found in each
5      contract.
6  Q.  Well, I'm reading what it says here, and is --
7      when you refer to the text of the fuel
8      adjustment provision that is applicable to each
9      of the standard offer contracts, is the text the
10     entirety of MJH-1 or only a portion of MJH-1?
11 A.  The intent of the sentence that you're referring
12     to in the exhibit was to say, "There's the
13     language that applies to those various
14     mechanisms.  The mechanisms that are applicable
15     to any contract are found in each contract.  We
16     have compiled those together here so you can see
17     how it fits, you know, together here," whereas
18     in previous filings, we had multiple attachments
19     and we compiled them down to a single attachment
20     to just provide the text of overall how they
21     work, not to suggest that this was the language
22     that applied to any particular contract.
23 Q.  So is what you're saying that the text of the
24     fuel adjustment provision in MJH-1 does not

Page 240

1    apply to each of the contracts individually?
2  A.  Yes, I'm saying that.
3  Q.  Okay.  Let me show you -- actually, let's just
4      stay organized here.  Just keep those.  So let
5      me show you what we'll mark as Exhibit 156,
6      which is a fax to Mike Hager from Mark Rush,
7      dated April 26th, 2000.
8          (Fax to Mr. Hager from Mr. Rush, dated
9           April 26, 2000 was marked Exhibit Number
10          156 for identification.)
11 Q.  Is that your final letter to NRG, similar to the
12     letter you sent to TransCanada, which is Exhibit
13     90?
14 A.  Yes.
15 Q.  And would your view be the same that after May
16     of 2000, the fuel adjustment mechanism that
17     applies under Article 5 of the NRG contract is
18     what's contained in the attachment to this
19     exhibit?
20 A.  Yes.
21 Q.  What -- energies contract, as you know, ends in
22     February of 2005.  What mechanism governs the
23     payments to -- at the time of this amendment,
24     what payments -- what mechanism were you

Page 241

1      intending to refer to for 2005 with respect to
2      the NRG contract?
3  A.  That attachment did not anticipate a fuel index
4      mechanism in 2005.
5  Q.  Well, let me show you Exhibit 137, which is a
6      fax you sent to Jim Bergeron a few days before,
7      and you attach a Massachusetts tariff, which
8      you'll note on Bates Stamp 43051 includes a fuel
9      adjustment payment for 2005.  Which one of these
10     two documents governs the fuel adjustment
11     changes that NRG was entitled to in January,
12     February of 2005, if any?
13 A.  I would say we intended to pay in accordance
14     with the attachment -- Attachment 2 to
15     Exhibit 156.
16 Q.  So your intention at that time was not to pay a
17     fuel adjustment to NRG in January and February
18     of 2005, at the time you sent your letter which
19     is Exhibit 137 -- no, I'm sorry, Exhibit 156?
20 A.  I don't know if their contract includes
21     deliveries through 2005.
22 Q.  Well, take a look at the attachment in 156.
23     Attachment 1 references a term of contract
24     through February of 2005.

Page 242

1  A.  Okay.
2  Q.  What was Narragansett's intent at this time as
3      to whether it planned to pay a fuel adjustment
4      to NRG had that contract remained through
5      February of 2005?
6  A.  Well, Exhibit 156 indicates that our intent was
7      to pay it through 2004.  Had -- I guess I can
8      speculate what I would have done had the
9      supplier raised the issue at the time.
10 Q.  Well, what was your intent or did you have an
11     intent what you planned to pay through February
12     of 2005?
13 A.  The letter indicates, you know, we had a
14     mechanism in place through 2004.  Therefore, I
15     would suggest that that would be our intent was
16     to pay through 2004.
17 Q.  Okay.  Although the Massachusetts tariff in
18     effect at the time of the merger had a fuel
19     adjustment through 2005, that was your intent?
20 A.  Again, looking at the letter, that appears to be
21     the intent.  Again, I can speculate as to what
22     we would have -- how we would have responded had
23     the supplier stated tariff for the Massachusetts
24     load provides for mechanism for an additional

Page 243

1      two months.
2  Q.  Okay.  Your intent at the time, though, that you
3      sent Exhibit 156 was not to pay a fuel
4      adjustment in 2005 to NRG because it was not
5      contained in the attachment to Exhibit 156?
6  A.  That's what the letter appears to suggest, yes.
7  Q.  Let me take those two back from you.
8          MR. LODEMORE:  Are you keeping the
9      originals, Dan, on this one?  I know there was
10     some question about what happened to the
11     originals last time?
12         MS. PLOTKIN:  We're keeping them.
13         MR. WINSTON:  The only question was
14     that the court reporter took them.
15         MR. LODEMORE:  Off the record.  Any
16     criticism of the court reporter gets off the
17     record.
18         MR. WINSTON:  I should be careful,
19     huh?
20         (Letter to Mr. Pearlman from Mr. Hager,
21          dated April 18, 2000 was marked Exhibit
22          Number 157 for identification.)
23 Q.  Let me show you a new exhibit which we'll mark
24     as 157, which is a letter from Hager to

Page 248

1  A.  Their various business reps.
2  Q.  What are their names?
3  A.  Certainly Ed Quinn comes to mind.  Perhaps Sarah
4      Wright, his predecessor.
5  Q.  What, to your knowledge, is Constellation's
6      current position as to entitlement to fuel
7      adjustment payments in Rhode Island from 2005 to
8      2009?
9  A.  Constellation has always agreed it was not part
10     of the deal and they were not entitled to those
11     payments beginning in 2005 for the EUA
12     contracts.
13  Q.  Do you have anything in writing from
14      Constellation indicating their agreement that
15      they will not seek a fuel adjustment payment in
16      2005 to '9?
17  A.  I believe we have things in writing that
18      indicate that they are not applicable.  I don't
19      believe I have anything along the lines of your
20      question that they specifically will not seek.
21  Q.  Do you have any understanding with Constellation
22      under which you believe they've agreed to waive
23      any claim they might bring for loss of a fuel
24      adjustment from 2005 to '9?

Page 249

1        MR. LODEMORE:  Objection.
2  A.  To date, Constellation has not made a claim nor
3      indicated it has a claim.  So I don't think I
4      have anything that they're waiving something
5      that hasn't existed yet or hasn't arisen yet.
6  Q.  Okay.  But you don't have any formal agreement
7      from Constellation that you believe would bar
8      them from asserting a claim against
9      Narragansett?
10  A.  No, nor do I have anything from them waiving any
11      claims that they might want to pay the fixed
12      prices, anything other than what's in the
13      contract document.
14  Q.  So is it fair to say that the issue of
15      Constellation's payments from 2005 to '9 are an
16      unresolved issue?
17        MR. LODEMORE:  Objection.
18  A.  In my mind, Constellation and Narragansett have
19      a meeting of the minds that for the EUA
20      contracts, the fuel trigger mechanisms ended in
21      2004, and I don't believe there are any
22      outstanding issues or potential claims related
23      to that at this time.
24  Q.  You said in your mind.  What's the foundation

Page 250

1      for that statement?
2  A.  Various conversations with Constellation over
3      time.
4  Q.  Okay.  When's the first time it came up with
5      Constellation?
6  A.  I don't have an exact date, but it was certainly
7      before 2005.
8  Q.  What was the context of the conversation?
9  A.  Certainly would have come up in our discussions
10     in how we might reformulate these contracts.
11  Q.  Could you elaborate what conversations?
12  A.  Again, I can't recall specific conversations,
13     but in general, as we're incurring fuel costs
14     and we're trying to find ways to manage some of
15     those costs going forward, we would have had
16     some conversations as to ways we could otherwise
17     maybe fix their prices, alter the pricing,
18     eliminate the fuel index mechanism.  There was
19     several times where Constellation was looking to
20     split the pricing mechanisms apart in the
21     contract where we'd have one contract that
22     provides for the physical delivery of power at
23     the fixed price stream, we would have a
24     separate, stand-alone financial contract where

Page 251

1      we made fuel index payments, and in those
2      discussions, how they would all split apart, it
3      was very clear that when we split the EUA ones,
4      those mechanisms would only run through '05,
5      whereas the Narragansett ones would run through
6      '09.
7  Q.  Okay.  Those discussions, are you referring to
8      the settlement discussions in mid-2005 under
9      which Constellation was going to take over the
10     TransCanada contracts?
11  A.  Those discussions happened many times prior to
12     2005 in addition to those same discussions
13     taking place in 2005.
14  Q.  Referring you back to Exhibit 155 and
15     Exhibit MJH-1, is it your testimony that the
16     fuel adjustment provision set forth at Pages 1
17     to 3 of MJH-1 is not the fuel adjustment
18     provision applicable to the EUA's own contracts?
19        MR. LODEMORE:  Objection.
20  A.  The fuel index mechanism applicable under each
21     contract is contained in the contract or, in the
22     case of EUA 1, is contained in my April 2000
23     letters.  Exhibit MJH-1 contained in Exhibit 155
24     is a compilation of the various provisions -- a

8 (Pages 248 to 251)

Page 252

1  compilation of the text of the various
2  provisions placed in this testimony to provide
3  illustration in this docket for the 2001 period
4  in which we're setting rates as to how the
5  mechanism operates.  So it's a compilation of
6  the various mechanisms from the various
7  contracts put here for illustration purposes.
8  Q.  So is your testimony that the fuel adjustment
9  provision here as you've compiled it is not the
10  fuel adjustment provision that applies to the
11  EUA contracts as written here?
12      MR. LODEMORE:  Objection.
13  A.  The mechanism that applies to EUA contracts is
14  the one that's contained in their contracts,
15  and, in some cases, those contracts refer to
16  the -- or the April 2000 letters would be what's
17  applicable under those contracts.
18  Q.  So the fuel adjustment provision that applies to
19  the EUA contracts is not MJH-1 but, rather, is a
20  document attached to your letters?
21  A.  Certainly for the TransCanada, Constellation,
22  and the NRG contracts, yes.
23  Q.  How would a reader of Exhibit 155, whether the
24  PUC or a contractor if it saw it, know that

Page 253

1  this -- that your intent was not to apply MJH-1
2  as written to the EUA's own contracts?
3      MR. LODEMORE:  Objection.
4  A.  Certainly there's nothing in here to suggest
5  that that's the case.
6  Q.  There's nothing in here that suggests that what
7  is the case?
8  A.  That this is the mechanism that would apply to
9  each one of those contracts.
10  Q.  Okay.  Well, there's a line on your testimony at
11  Bates Stamp 8598, which is under oath, that
12  says, "The text of the fuel adjustment provision
13  that is applicable to each of the standard offer
14  contracts is provided in MJH-1," which I think
15  is just the opposite of what you said.
16      Other than this document, how would --
17  what in this document would indicate to a
18  contractor or the PUC that, in fact, the fuel
19  adjustment provision at MJH-1 is not applicable
20  to the EUA's own contracts?
21      MR. LODEMORE:  Objection.
22  A.  Let's go back to Page 8597, Line 15, which
23  states, "The company's contract with the
24  standard offer suppliers contain a fuel index

Page 254

1  adjustment provision."  It clearly says that the
2  contracts contain the provision, and the
3  sentence you read says the text of the
4  provisions that are applicable are back there.
5  Q.  When you -- why did you create one compilation
6  to attach to describe all contracts?
7  A.  For convenience.
8  Q.  For convenience to who?
9  A.  The parties in the proceeding.  As I indicated
10  earlier, prior filings had two attachments that
11  we would refer to.  As we worked through those
12  issues over time to explain the mechanisms in
13  the various proceedings, it became easier just
14  to combine them into a single description, as we
15  did here in Exhibit MJH-1.
16  Q.  Why didn't you identify the fact that the 2005
17  to '9 triggers in your view did not apply to the
18  EUA's own contracts in MJH-1?
19  A.  The period of time covered by this filing is
20  April 2001 through December 2001.  In previous
21  hearings before the Commission, we actively --
22  we discussed the applicable mechanisms, we
23  discussed that EUA tariffs only went through
24  2004.  This mechanism -- this filing only

Page 255

1  relates to the April 2001 to December 2001
2  period, and we were not looking beyond that
3  period and did not in providing the text really
4  focus on that detail since we were not really
5  addressing costs at that point in time.  As we
6  had later filings that started to look at costs
7  being incurred near that and in that period of
8  time, then we made that clarification to the --
9  in our future filings.
10  Q.  So you put this -- so is this correct -- is this
11  MJH-1 a correct depiction of the operation of
12  the fuel adjustment mechanism for the EUA's own
13  contracts from 2005 to 2009?
14  A.  It was not intended to be that.
15  Q.  Is it correct?
16      MR. LODEMORE:  Objection.
17      THE WITNESS:  May I hear the question
18  again?
19      (Reporter read back the last two
20      questions and answer.)
21      MR. LODEMORE:  I'll just restate my
22  objection.
23  A.  Exhibit MJH-1 was not intended to reflect the
24  mechanism under any particular contract.  The

Page 256

1    applicable mechanism is found within the
2    contract. MJH-1 provides the text of the
3    various provisions that are compiled here for
4    purposes of illustrating in this docket what
5    those overall mechanisms are.
6  Q.  So my question is, would it be accurate to
7    apply the fuel adjustment mechanism as set forth
8    in MJH-1 for the EUA's own contracts for the
9    years 2005 to 2009?
10 A.  No.
11 Q.  And so when you filed this, did you consider
12   whether to simply put an asterisk in with an
13   extra line to say it is not applicable after
14   2004?
15 A.  At this point in time, no, because we're only
16   focusing on costs from the April through
17   December 2001 time frame.
18 Q.  Why did you include the fuel trigger points from
19   2005 to '9 at all?
20 A.  Again, we compiled the text from the various
21   mechanisms. One of those mechanisms included
22   trigger points beyond 2004.
23 Q.  Let me show you your Exhibit 140, which is your
24   testimony, June 20, 2000, and I'll turn you to

Page 257

1    Page 33. And you'll see at the top, you make a
2    statement that your, quote, initial
3    interpretation, end quote, since there's no fuel
4    trigger payments beyond that, and you refer to
5    an initial opinion. Between your testimony in
6    June 2000 and the submission of Exhibit 155 to
7    the Commission in August of 2001, had
8    Narragansett done anything further to clarify
9    what its final interpretation was with respect
10   to the standard offer service tariffs in the EUA
11   zone?
12       MR. LODEMORE:  Objection.
13 A.  Narragansett was always of the opinion that it
14   ended in 2004, and my testimony reflects the
15   fact that despite our strong opinion, despite
16   clear words in contracts, sometimes suppliers
17   view those words differently; and having had
18   some litigation issues come up in the past where
19   language was pretty -- appeared very clear in
20   the contract, we hesitate in front of the
21   Commission to make affirmative opinions that the
22   contract is such and such because you never know
23   what a supplier may do in the end.
24 Q.  My question for you is, between your June 2000

Page 258

1    testimony, which is Exhibit 140, and the
2    Narragansett filing in August of 2001, which is
3    Exhibit 155, did Narragansett make any further
4    communication to the Commission to clarify its
5    position beyond what was stated in your June
6    2000 testimony?
7  A.  Other than what was contained in any filings
8    that may have taken place in between there, I'm
9    not aware of any conversations that may have
10   taken place.
11 Q.  Okay. Are you aware as you sit here today of
12   any mention of it in any testimony or filing by
13   Narragansett between June 2000 and August 2001?
14 A.  I don't have here in front of me today a
15   complete list of our filings. I'm sure we would
16   have provided them as part of the discovery.
17 Q.  I'm just asking you, as you sit here today, are
18   you aware of any mention of the company's
19   position on the 2005 to 2009 EUA zone triggers
20   between June 2000 and August 2001?
21 A.  If there was, it would have been contained in
22   the filing before the Public Utilities
23   Commission.
24 Q.  And as you sit here today -- the documents say

Page 259

1    what they say. I'm just asking you what you
2    know of right now. Are you aware of anything?
3  A.  I don't have a complete list of whether we went
4    from June 2000 to October 2001 in front of me
5    today. If we did -- if we did make our filing,
6    our position is contained in that filing. If we
7    haven't made any filings, then no, there's
8    nothing contained between here and there.
9  Q.  What filings or discussions in any -- what
10   filings or testimony are you aware of as you sit
11   here today between June 2000 and August of 2001
12   that discuss the fuel trigger in the EUA zone
13   between 2005 and 2009?
14 A.  Exhibit 140 is a partial part of the transcript,
15   correct?
16 Q.  I'm just asking what you know as you sit here
17   this minute.
18 A.  Exhibit 155 says, "The purpose is to provide an
19   update of costs incurred from April 2001 to
20   December 2001," which suggests that perhaps
21   there was a filing late 2000, maybe early 2001.
22   I can't recall the specific date, how many were
23   between June of 2000 and August of 2001. It
24   suggests there's at least one.

Page 356

1  comes to my mind is often she's asked what's in
2  that price, what's causing the rate to do
3  whatever it is or what's included, not included,
4  and maybe that's her way of communicating,
5  anticipating questions that typically come from
6  suppliers. Other than that, I can't speak as to
7  what she was thinking as to why she included the
8  language she did.
9        MR. WINSTON:  When we get to the
10  30(b)(6) part, I'll probably come back to this,
11  David, but I'm going to have some more questions
12  about this.
13        MR. LODEMORE:  Which one?
14        MR. WINSTON:  These e-mails coming
15  from Yetman.
16        MR. LODEMORE:  In other words --
17        MR. WINSTON:  Well, the document in --
18  you'll see the other e-mail. It's an
19  interesting e-mail.
20  Q.  I'm referring you to your testimony which is in
21  Exhibit 171. Do you see at the bottom of Page
22  7, Ms. Lloyd refers to the 6.58 cents per
23  kilowatt that is in the updated filing?
24  A.  Yes.

Page 357

1  Q.  And then at the top of Page 10, a question is
2  asked of you regarding how that compares with
3  market prices, and your answer; and at the bottom
4  of your answer, you say, "For the same period,
5  the market price that we see for commercial
6  industrial customers is around 7.2 to 7.3 cents
7  per kilowatt hour." I assume that was an
8  accurate statement when you made it?
9  A.  Yes.
10  Q.  And where do you determine the market prices
11  that you refer to in this answer?
12  A.  Typically, we turn to the most recent
13  procurements we did for default service in, say,
14  Massachusetts or last-resort service in Rhode
15  Island and use those as indicators of current
16  market pricing.
17  Q.  At the bottom of Page -- on the next page, 11,
18  Mr. Roberti asked you about whether you
19  anticipate movement by customers from the
20  standard offer to the market, and I believe you
21  testified previously that the original purpose
22  of the standard offer service pricing, as you
23  understood it, was to transition customers onto
24  the general market?

Page 358

1  A.  Something to that effect, yes.
2  Q.  And you answer at the bottom of Page 11 you have
3  low expectations -- I won't torture the court
4  reporter with the answer, but it essentially
5  says given this 7.2 to 7.3 price for the market
6  versus the standard offer that's about 6.6, you
7  conclude there's not enough incentive for those
8  customers to leave standard offer.
9        Did Narragansett -- well, I assume
10  that was a true statement when you made it,
11  correct?
12  A.  Yes.
13  Q.  Has Narragansett -- leaving a fuel adjustment
14  out for the EUA zone further deflates the
15  standard offer service below market; does it
16  not?
17  A.  Not necessarily.
18  Q.  Why not?
19  A.  A function of what period of time you're in,
20  what market prices are, what fuel prices are.
21  Q.  Well, in a market like this in which the --
22  would you agree with me that if the EUA zone
23  were to be paid a fuel adjustment, the predicted
24  standard offer service rate would be higher than

Page 359

1  6.6 percent, closer to market?
2  A.  It would be higher. I don't know if it would be
3  closer to market or above market at that point
4  in time.
5  Q.  And I mean, is keeping the standard offer
6  service price below market in the long term
7  consistent with the original design of the
8  standard offer?
9  A.  The design was to provide a continually
10  gradually increasing rate that would, over time,
11  continue to send a signal for customers -- the
12  prices going up, consider alternative means,
13  transition them to the marketplace. Many folks
14  anticipated that after a few years the market
15  price would be below the fixed price streams.
16  No one anticipated fuel triggers would ever kick
17  in and that the standard offer rates would be
18  above market. I don't think there were many
19  folks, if any, anticipated this late in the game
20  that standard offer would be reflective of, or,
21  in certain periods of time, slightly below
22  market.
23  Q.  Well, would including a fuel adjustment --
24  including a fuel adjustment for the EUA zone

35  (Pages 356 to 359)

Page 372

```
 1      load. "We've got contractual provisions that
 2      makes it clear it ends in '04." That's the FPL
 3      contract, correct?
 4   A.  Yes.
 5   Q.  At the bottom, the chairman asks you, "Have they
 6      agreed to it," and you say, "I do not have
 7      formal acknowledgment and agreement."
 8            Why don't you mention that
 9      Constellation agrees with your assessment here?
10   A.  Again, I'm hedging my bets. I've got a supplier
11      who has agreed with me, but I don't have, even
12      to this day, a formal signed acknowledgment or
13      some other, you know, binding thing that says
14      yes, it's not there. I have no reason to
15      believe that they disagree or that they will
16      change their position in the future. So I can't
17      make a representation that this is a 100 percent
18      done deal, one I can take this one to the bank. I
19      have an understanding with the supplier. I
20      have no reason to anticipate they will take an
21      alternative position.
22   Q.  At the bottom of Page 32, you say, "I think the
23      more realistic approach would be I will not be
24      making those fuel adjustment payments in my
```

Page 373

```
 1      bills come January of next year, and if a
 2      supplier feels aggrieved by that, contracts
 3      provide for a formal dispute resolution
 4      process." Why not just call up TransCanada and
 5      mention it to them at some point?
 6   A.  And I don't want to shed light on Mike and
 7      TransCanada, but this is not our most joyful and
 8      hand-in-hand supplier. We have constantly had
 9      issues ongoing involving litigation. I can't
10      recall exactly where we are in the congestion
11      litigation, but even when you appear -- this is
12      a supplier, when you appear to win something,
13      you know, the answer isn't what -- we're going
14      to take issue with the final decision there
15      multiple times. So, you know, this is not one.
16      If I were to call Mike Hachey and say, "Mike,
17      this is a friendly call. Just want to make sure
18      it's clear the fuel index ends in 2004. We're
19      not going to make those payments in 2005," if he
20      had a different opinion, maybe we would have
21      uncovered it earlier. However, I wouldn't put
22      it past Mike or other representatives of
23      TransCanada to say, "Oh, the fact that you're
24      making a phone call may suggest there's some
```

Page 374

```
 1      doubt to this thing. I think I'm going to take
 2      a position I otherwise hadn't thought of because
 3      of the phone call."
 4            Again, the contract was pretty clear.
 5      All the other affected suppliers were viewing it
 6      in the same way. There was no need, given the
 7      adversarial or less-than-friendly relationship
 8      we were having with TransCanada at the time, to
 9      have that call. Just like I don't call them
10      every year, "Are we clear that the base price is
11      moving up? It's 5.5, not 5.1." It's very clear
12      under the terms of the contract what happens
13      when.
14   Q.  If you felt that TransCanada was likely to
15      dispute the issue, wouldn't that have made it
16      more appropriate for you to contact them in view
17      of the Commission's request that you identify
18      any disputes early on?
19   A.  The Commission's request is that once a dispute
20      occurs that they be notified immediately, not
21      that we try to settle disputes and bring them
22      settlements at the end and ask them to approve
23      them. They want to be involved in the
24      understanding of any settlement discussions at
```

Page 375

```
 1      the outset rather than respond to things at the
 2      end. Certainly, could I have called him and
 3      found out he had a different opinion? Yes.
 4      Again, the contract was pretty clear as to what
 5      the payments were. The communication we gave
 6      him in April 2000, in February 2000 was clear.
 7      Likewise, I have not received any phone calls
 8      from Mike that I can recall ever expressing his
 9      understanding that it's going to extend or
10      whether extend similar to Narragansett or for
11      him to provide me any reason to believe that he
12      didn't expect it to end when it did.
13   Q.  Well, the Division -- both the Division and the
14      PUC had a copy of the TransCanada contract
15      dating back to 1998, correct?
16   A.  I'm sure they've had copies of that over time,
17      yes.
18   Q.  And both the Division and the Commission were
19      aware that that contract referred to a standard
20      offer service tariff, correct?
21   A.  I assume they did. I can't speak for them.
22   Q.  Well, I think you've explained it to them on
23      numerous occasions in testimony, correct?
24   A.  Correct.
```

Page 384

1  Q.  And the customers in the old Narragansett zone
2      pay a slightly lower rate than they would have
3      had the merger not occurred, correct?
4          MR. LODEMORE:  Objection.
5  A.  Yes.
6  Q.  We're almost done with this testimony.  There's
7      just so much.
8  A.  I think this is taking longer than the actual
9      hearing itself.
10         MR. LODEMORE:  I noticed that this is
11     the only exhibit that you haven't provided me a
12     copy with.
13         MR. WINSTON:  Oh, did I not?
14         MR. LODEMORE:  No, you didn't, but I'm
15     sure it was accidental.
16         MR. WINSTON:  This is the one you're
17     supposed to share.  I'm sorry.  It was
18     accidental.
19         MR. LODEMORE:  It happens to the best
20     of us.
21 Q.  At the bottom of Page 50 going on to the top of
22     51, there's a question to you by the chairman
23     that refers to a pass-through to Narragansett.
24     Do you have an understanding what he's referring

Page 385

1      to there?
2  A.  Yes.
3  Q.  What is he referring to?
4  A.  The fact that whatever costs we incur on these
5      standard offer contracts, we pass through to
6      customers and we get full cost recovery.
7      Therefore, we're not at risk for any costs we
8      incur under those contracts.  We also don't make
9      any profit or receive any value associated with
10     those contracts.
11 Q.  What -- so what is Narragansett's interest in
12     providing or not providing a fuel adjustment to
13     TransCanada in the EUA zone after 2004?
14 A.  Other than having to, you know, be the advocate
15     for the customer in enforcing the customer's
16     rights under the contract, we have no financial
17     interest one way or another as to whether we pay
18     that or are required to make that payment or
19     not.
20 Q.  Well, the standard offer service rate is
21     included within an entire bundle of rates that
22     Narragansett presents for approval to the PUC,
23     right?
24 A.  Yes.

Page 386

1  Q.  And to the extent Narragansett can lower the
2      standard offer service rate, it lowers the
3      overall rate that it's charging to the rate
4      payers, correct?
5  A.  That would be correct.
6  Q.  The other portions of the rates charged to the
7      rate payer include distribution costs and other
8      rates that, in fact, are not a pass-through,
9      correct?
10 A.  Distribution rates are not a pass-through.  CTC
11     and transmission, I would classify as pass-
12     through rates as well.
13 Q.  What rates -- does Narragansett include any
14     charges in its rates for services it itself
15     provides?
16 A.  Yes.
17 Q.  What are those?
18 A.  Distribution services.
19 Q.  And those are what, the lines that run down my
20     street?
21 A.  The meter, the distribution lines, poles,
22     transformers, meter reader, customer service.
23 Q.  And are those -- how does Narragansett -- how
24     does it support those distribution rates?  How

Page 387

1      does Narragansett support -- in its rate
2      filings, how does it support the distribution
3      costs it puts into the tariff?
4  A.  They are subject to a rate agreement that spans
5      five or ten years in duration, where we've
6      agreed to a fixed set of rates over that period
7      of time, and we have to manage our business to
8      make sure that we can provide the services
9      within those rates.
10 Q.  I see.  Is there any analysis done concerning --
11     is there a total overall rate that's presented
12     to the end customers that accumulates all the
13     various distribution, transmission, standard
14     offer service components?
15         MR. LODEMORE:  Objection.  Do you mean
16     on the bills or -- I'm just confused by what you
17     mean by the end customer.
18         MR. WINSTON:  The end customer meaning
19     the rate payer that's receiving the service.
20         MR. LODEMORE:  Okay.
21 A.  Yes.
22 Q.  Are there any agreements or caps on that overall
23     rate?  Are there any agreements concerning how
24     high that rate could be?  What do you call that

1   one to get a big gain on the other one. Maybe
2   they had a blend of contracts and said, "While
3   one is above market and one is below market, on
4   average, the two give me a reasonable price
5   going forward as a portfolio."
6   Q.  That list of possible reasons, are you aware of
7       any facts that support any of those reasons
8       applying to TransCanada?
9   A.  I know TransCanada has said many times that they
10      didn't expect to be serving load this far out in
11      time, that they expected, you know, these
12      costs -- these contract prices in these years to
13      be above market and all customers would have
14      left and, therefore, they never would have made
15      any sales.
16  Q.  When has -- what statements by TransCanada are
17      you referring to?
18  A.  Bill Taylor said that a couple of times,
19      including in the congestion arbitration
20      proceeding.
21  Q.  Okay.  Other than the congestion costs
22      proceeding -- okay.  Leaving aside what he said
23      or he didn't say -- you mean the stated
24      transcript testimony in the arbitration

1   proceeding?
2   A.  Yes.
3   Q.  Other than that testimony, are you aware of any
4       other statements by Bill Taylor concerning his
5       expectations about the load that would be served
6       in the 2005 to '9 time period?
7   A.  I can't place specific conversations, but I
8       believe I've heard him make those statements
9       outside of that proceeding as well in the past.
10  Q.  To who?
11  A.  Again, I can't recall specific -- I can't
12      recall.
13  Q.  Were you there?
14  A.  I have this image of hearing Bill say this
15      either via phone or in some proceeding -- some
16      form somewhere, but I can't give you a specific
17      one.
18  Q.  After 2005 or before 2005?
19  A.  It would have been before 2005.
20  Q.  Well, other than in the congestion cost case,
21      under what circumstances have you ever seen Bill
22      Taylor?
23  A.  We would have talked to him early on on some
24      uplift issue.  We would have talked to him early

1   on on some of the contract provisions when we
2   were negotiating the NECO contract.  He would
3   have been a participant in some fashion in some
4   of our auction processes that took place in the
5   '97, '98 time frame as well.
6   Q.  And your belief is that other than the
7       arbitration testimony, Mr. Taylor at some point,
8       although you can't remember the time or place,
9       stated he didn't think there would be load
10      remaining on the EUA contract from 2005 to 2009?
11  A.  Yep.  Yes.
12  Q.  Anybody else from TransCanada you think made
13      statements about their expectations as to the
14      load on the EUA zone contract?
15  A.  I think early on Mike Hachey had a similar
16      viewpoint as to Bill, although I don't think he
17      was as emphatic as I've heard Bill make those
18      statement or -- as I've heard Bill make those
19      statements.
20  Q.  When did Mike Hachey make those statements?
21  A.  Again, early on in these -- I can't give you a
22      specific date, but they were early on, and then
23      as time has moved along and, you know, customers
24      were stickier than people had anticipated, I

1   believe Mike's position had softened as to
2   future expectations.
3   Q.  Did anybody else from NEES hear these -- was
4       anyone at NEES present for these statements?
5   A.  I can't recall anyone.
6   Q.  What was NEES's expectation as to the load that
7       would remain on the standard offer service
8       contracts from 2005 to '9 back in the 1998 time
9       period?
10  A.  We never conducted any particular analyses.  I
11      mean we had envisioned a marketplace where
12      customers -- where market prices would lean,
13      where load wouldn't leave standard offer and go
14      to the marketplace, where we'd probably not have
15      much of a remaining load obligation, if any at
16      all.  We were generally bullish on the markets
17      and that they were going to flourish, and from
18      time to time, we'd sit here -- we'd sit and
19      discuss what would we do in Rhode Island if
20      customers in these out years still took these
21      5.5, 5.9, 7.1, we are still sitting here paying
22      7.1 cents in 2009 with a much lower marketplace,
23      what would we do; would we continue to serve
24      them or somehow beat them over the head and tell

Page 432

1  Q.  Okay.  And did you inform Mike Hachey that were
2      TransCanada to stop providing power that the
3      cross-default provisions would apply?
4  A.  I think I recall discussion that, you know,
5      those provisions were there and we both had to
6      review their applicability related to those.
7      I'm not sure -- as much as I like to think it's
8      black and white, every time we get into one of
9      these discussions, what's clear to us is not --
10     is clear to you means something different, not
11     you personally but the counter-party, and you
12     get into these issues of this is an element in
13     play here and we both need to be wary of actions
14     we take here.
15  Q.  Your meeting with Mike Hachey, did you meet with
16     him in person?
17  A.  I can envision a meeting with Mike in our office
18     in Northborough.  I can visualize you there
19     tearing your jacket that day.  I can't recall
20     whether that was relative to this issue or the
21     long saga on the congestion case or yet some
22     other issue, but I remember that particular
23     meeting.  I can't recall a specific one relative
24     to -- was it March 2nd or March 3rd or whatever

Page 433

1      else.
2  Q.  Okay.  Did you discuss these cross-default
3      provisions with Mike over the telephone as well?
4  A.  I may have.  I can't recall.
5  Q.  Okay.  Your -- the discussions that you've had
6      with Mike Hachey are from your offices in
7      Massachusetts, correct?
8  A.  Most likely, yes, but on any given day, I could
9      be working out of another location.  I may have
10     had a conversation with him someplace other than
11     my Massachusetts office.
12  Q.  Okay.  And -- okay.  Let me show you what's been
13     marked as Exhibit 118, which is a notice of
14     default, dated March 1, '05.  Do you recall
15     receiving this notice?
16  A.  Yes.
17  Q.  And was your meeting with Mike Hachey after you
18     received this notice of default?
19  A.  Most likely yes.
20  Q.  And were the cross-default discussions with
21     regard to this notice of default?
22  A.  I recall that they -- all discussions we had
23     after that were as a result of this letter and
24     the alleged actions, so yes.

Page 434

1  Q.  Did you inform the Division or the PUC following
2      this notice of default that you received it?
3  A.  Given both the Division and Commission's desire
4      to know as soon as we get any dispute on any
5      contract, I'm sure we made a timely notification
6      in some form to them.  Exactly when or in what
7      form that was relative to this issue, I don't
8      have any recollection.
9  Q.  Okay.  Let me just show you one more, which
10     we'll mark Exhibit 186.
11         (Fax to Mr. Hachey, et al. from
12         Mr. Hager, dated March 15, 2005 was
13         marked Exhibit Number 186 for
14         identification.)
15  Q.  It's a fax from Hager to Hachey and others,
16     dated 3-15-05.  And, again, do you recall why
17     you're continuing to send Mr. Hachey additional
18     EUA tariff filings?
19  A.  Other than I assume he's looking for additional
20     background information back at that point in
21     time as to -- I assume that's the reason why I'm
22     sending it to him.  And I see your name on here
23     and the two sides, so I would assume whatever
24     meeting I had in early March, you were a

Page 435

1      participant in as well.
2  Q.  Okay.  At some point, Narragansett made what
3      have been termed protest payments to
4      TransCanada, correct?
5  A.  Correct.
6  Q.  And how did that come about?
7  A.  That's part of the give and take in the
8      not-so-black-and-white issues related to these
9      contract provisions.  I recall TransCanada
10     alleging that we're in default for not making
11     the payments.  Therefore, they were defaulting
12     us and terminating the contract.  We did not
13     wish to have the contract terminated nor us to
14     be considered in default.  So rather than run
15     the risk of not making the payment and giving
16     TransCanada a basis for which to assert that
17     default and a basis for a termination, we
18     elected to make the payments under protest.
19  Q.  Did you have discussions with TransCanada before
20     making those protest payments about the subject
21     of protest payments?
22  A.  I believe we did.  I can't recall a particular
23     conversation, but -- let me just say I can't
24     recall.

54 (Pages 432 to 435)

# HAMAL

Page 1

```
1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                    (Central Division)

4      - - - - - - - - - - - - - - - -

5    TRANSCANADA POWER MARKETING    :

6    LTD,                           :

7              Plaintiff,           :   CASE NO.

8    VS.                            :   05-40076 FDS

9    NARRAGANSETT ELECTRIC CO.,     :

10             Defendant.           :

11     - - - - - - - - - - - - - - -

12

13       DEPOSITION OF CLIFF W. HAMAL, a witness

14    called by and on behalf of the Plaintiff, taken

15    pursuant to the applicable provisions of the

16    Federal Rules of Civil Procedure, before

17    Sandra L. Bray, Registered Diplomate Reporter,

18    CSR Number 103593, and Notary Public in and for

19    Commonwealth of Massachusetts, at the offices of

20    Choate Hall & Stewart LLP, Two International

21    Place, Boston, Massachusetts, on Tuesday,

22    July 10, 2007, commencing at 9:11 a.m.

23

24
```

1    because of interest to lower rates to rate
2    payers?
3  A.  Well, I'm not planning on opining on anything.
4    My opinion is what's set forth in my reports.
5    I'm just answering your questions.
6  Q.  Do you know for a fact what EUA was thinking as
7    to what it intended with respect to a fuel
8    adjustment with respect to 2005 to '9?
9        MR. LODEMORE:  Objection.
10  A.  When?
11  Q.  In 1998.
12  A.  Well, in 1998, it agreed to the Rhode Island
13    settlement, which is an agreement which does not
14    include fuel triggers for that five-year period.
15    So it seems to me its intentions are not to
16    accept those.  And it also filed tariffs --
17    filed that material with the FERC and filed
18    tariffs in Rhode Island, which also reflected no
19    fuel adjustment in those time periods.
20  Q.  Okay.  So your -- are you inferring from the
21    documentation what EUA's intent was?
22  A.  No, and if I did that or gave that impression of
23    that, that was not my intention.  I do not have
24    an opinion, I'm not an expert on EUA's

1    intentions.
2  Q.  You state at the top of Page 3 that EUA is
3    financially indifferent.  What does that mean?
4  A.  This sentence comes out of a paragraph which
5    talks about the wholesale standard offer service
6    agreement with TransCanada, and as that sentence
7    goes on to say, "EUA does not retain any extra
8    revenues nor does it have any incremental
9    benefits" -- "incremental payments," I'm sorry,
10    "that are not matched by this revenue."  So that
11    sentence fragment is meant to narrowly define
12    the money we're talking about here which is
13    dealing with potential adjustments under the
14    fuel adjustment factor in '05 through '09.  That
15    payment or cash flow stream doesn't end up at
16    EUA.  It flows from the customers through to
17    TransCanada if it were to occur or not occur.
18  Q.  So you are not saying, for example, that Montaup
19    is financially indifferent as to whether it has
20    a fuel adjustment from 2005 to '9 on a backstop
21    obligation?
22        MR. LODEMORE:  Objection.
23  A.  EUA has this agreement.  If there were to be an
24    adjustment for fuel factor, the pass-through to

1    TransCanada, it would leave Montaup and EUA
2    financially independent as narrowly defined
3    here.  And if there wasn't one such that there
4    was none of this extra money being passed from
5    customers to TransCanada, that would leave EUA,
6    Montaup in the same position, narrowly defined
7    here.
8  Q.  I understand.  In other words, when you are
9    talking about financial indifference here, you
10    are only speaking as to under the wholesale
11    standard offer service agreement as signed and
12    executed?
13  A.  Well, it's the relationship between that and the
14    retail or -- the backstop obligation and the
15    retail rates.
16  Q.  Well, once the agreement is executed, Montaup
17    doesn't have a backstop obligation with respect
18    to that load served by the WSOS agreement,
19    correct?
20  A.  It was being served by that other agreement.
21  Q.  Correct.
22  A.  And so it's -- yeah.
23  Q.  Okay.  You would agree with me that to the
24    extent Montaup -- prior to this agreement,

1    Montaup had a backstop obligation for the load
2    that TransCanada agreed to take on, correct?
3  A.  That's right.
4  Q.  And you would agree with me that Montaup did
5    have a financial interest at that point as to
6    whether or not a fuel adjustment applied from
7    2005 to '9, correct?
8  A.  That's right.
9  Q.  I take it then that your statement here that EUA
10    is financially indifferent would also -- is it
11    your opinion that -- okay.  In 2000, there was a
12    merger, correct, in which EUA's obligations
13    under the WSOS agreement were taken on by
14    Narragansett, correct?  Not your legal
15    interpretation.  Is that your understanding?
16  A.  There was a merger between the parties.
17  Q.  Is it your understanding that in or around 2000
18    Narragansett stepped into the EUA distribution
19    company's shoes under the WSOS agreement?
20  A.  Generally, yes.
21  Q.  Okay.  Is it your opinion that Narragansett
22    likewise is financially indifferent under the
23    WSOS agreement as to whether a fuel adjustment
24    is paid in 2005 to '9?

10 (Pages 34 to 37)

Page 38

1  A.  Again, Narragansett has, as you said, stepped
2      into the shoes of EUA, and this sentence
3      narrowly defined talking about prices paid by
4      customers and whether any of that money stops
5      at, in this case, Narragansett or whether it
6      passes on to TransCanada. Yes, in this narrow
7      sense, they are indifferent in the sense that if
8      that money were to be paid by customers and goes
9      to TransCanada or is not paid by customers and,
10     therefore, does not go to TransCanada, it leaves
11     Narragansett, narrowly defined, financially
12     indifferent.
13  Q.  I mean when Narragansett -- and I'm not speaking
14     Narragansett in the post-2000 world in which
15     it's under the WSOSA agreement. Are you saying
16     that Narragansett has no incentives or interests
17     one way or another as to whether or not the
18     rates include a fuel adjustment for TransCanada
19     or other wholesale standard offer service
20     suppliers?
21  A.  No.
22  Q.  What interest does Narragansett have?
23  A.  It's my understanding that Narragansett as a
24     regulated utility is looked to by the regulator

Page 39

1      to aid in providing electricity at the lowest
2      cost to the customers in the region, and this is
3      consistent with other utilities and traditions
4      of this industry; and in that context, the
5      regulators look for that utility to act in those
6      customers' best interests. And that's what I'm
7      referring to earlier when I'm talking about
8      narrowly defined because broadly speaking, I
9      think that Narragansett has an interest to not
10     charge customers rates and prices that it
11     doesn't have to charge.
12  Q.  So you'd agree that Narragansett has an
13     incentive to keep rates down to the extent it
14     can?
15  A.  Yes.
16  Q.  Does Narragansett have a financial incentive to
17     keep wholesale standard offer service rates
18     down?
19  A.  You mean that broadly speaking? We've been
20     talking about narrowly and broadly speaking
21     about financial incentives. Any financial
22     incentives?
23  Q.  Yes.
24  A.  For the reasons we just talked about, I believe

Page 40

1      that Narragansett has an incentive, has looked
2      at it to take actions to keep rates down to
3      customers and also to keep -- you mentioned
4      wholesale costs. To the effect that the
5      wholesale costs could affect stockholders -- it
6      has a fiduciary responsibility to its
7      stockholders as well.
8   Q.  Okay. What are some of the ways in which
9      wholesale standard offer service rates affect
10     Narragansett in an economic or financial sense?
11  A.  If rates were higher for energy that it was
12     purchasing that it could not pass those costs on
13     to customers, then that cost would be borne by
14     stockholders, which would be a financial
15     interest to it. If costs were higher that could
16     be passed on to customers, then there is still
17     the, broadly speaking, financial incentives in
18     terms of maintaining its responsibilities before
19     the regulators to keep those costs down.
20  Q.  Okay. Narragansett is also charging customers
21     for distribution rates, correct?
22  A.  That's right.
23  Q.  Is that how Narragansett essentially makes its
24     money?

Page 41

1   A.  Generally speaking, yes.
2   Q.  Okay. And it's a fair statement that the rates
3      charged to customers include Narragansett's
4      distribution rates as well as wholesale standard
5      offer service rates paid to third-party
6      suppliers?
7   A.  That's right.
8   Q.  You'd agree with me that from a financial
9      standpoint, it's better for Narragansett to keep
10     rates down by lowering wholesale standard offer
11     service rates than its own distribution rates,
12     correct?
13         MR. LODEMORE: Objection.
14         THE WITNESS: Could you read just the
15     last part of that question?
16     (Reporter read back the record as
17     requested.)
18  A.  I've set that up as a choice that is not
19     directly weighed one against the other in terms
20     of how this company is regulated, but given a
21     choice between lowering rates by not taking the
22     money itself or lowering rates by -- let me
23     start over.
24         Narragansett has an interest in

11 (Pages 38 to 41)

**PART 4 OF 5**

# HIRSH (DAY 2)

Page 320

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3                  (Central Division)

 4  - - - - - - - - - - - - - - -

 5  TRANSCANADA POWER MARKETING     :

 6  LTD,                            :

 7           Plaintiff,            :  CASE NO.

 8  VS.                             :  05-40076 FDS

 9  NARRAGANSETT ELECTRIC CO.,      :

10           Defendant.            :

11  - - - - - - - - - - - - - - - -

12

13      VIDEOTAPED CONTINUED DEPOSITION OF MICHAEL J.

14  HIRSH, a witness called by and on behalf of the

15  Plaintiff, taken pursuant to the applicable

16  provisions of the Federal Rules of Civil

17  Procedure, before Sandra L. Bray, Registered

18  Diplomate Reporter, CSR Number 103593, and

19  Notary Public in and for Commonwealth of

20  Massachusetts, at the offices of Choate Hall &

21  Stewart LLP, Two International Place, Boston,

22  Massachusetts, on Thursday, February 15, 2007,

23  commencing at 4:03 p.m.

24
```

Page 325

1 A.  No.

2 Q.  Okay.  You recall the subject of this dispute is

3    the TransCanada wholesale standard offer service

4    agreement?

5 A.  Yes, I do.

6 Q.  Okay.  When you signed that agreement, what did

7    you understand its pricing terms to be?

8 A.  Well, I understood them a lot better when I

9    signed them than I do now.  So I really can't do

10    justice to what I understood them to be at the

11    time.  My recollection is that they -- there was

12    some series of payments they made to us.  Maybe

13    if you showed me something, it would refresh my

14    memory.

15 Q.  Sure.  I'm happy to show you Exhibit 1.

16 A.  This is -- oh, you're asking me about the

17    standard offer.  I'm sorry.  I was thinking

18    about the --

19 Q.  Asset purchase agreement.

20 A.  -- asset purchase.  I have no recollection of

21    that.  Okay.  So you're talking about the price

22    that would be paid to TransCanada for standard

23    offer service?

24 Q.  Yes.

Page 326

1 A.  Okay.  Which I recall, as it says here.  It says

2    standard offer wholesale price plus fuel

3    adjustment factor.

4 Q.  Okay.  What was your understanding when you

5    signed the agreement as to why the fuel

6    adjustment factor was included in the contract?

7 A.  Well, the purpose of the fuel adjustment factor

8    was to provide some compensation to the supplier

9    if the price of fuels went above a certain

10    preset trigger.

11 Q.  When you signed the contract, what was your

12    expectation as to the length of the time the

13    fuel adjustment factor would apply relative to

14    the term of the contract?

15 A.  You know, I can't say I had any expectation

16    other than that it went through 2004.

17 Q.  It's your testimony that when you signed the

18    contract, you did not know what EUA's intent was

19    with respect to including a fuel adjustment in

20    its tariffs for the latter half of the contract?

21 A.  You mean 2005 to 2009?

22 Q.  Yes.

23 A.  I don't think I testified I didn't know.  I

24    testified of not having any specific

Page 327

1    recollection of what we intended to do for 2005

2    through 2009.

3 Q.  Okay.  Do you think you knew at the time you

4    signed the contract what EUA's intent was with

5    respect to whether a fuel adjustment would be

6    included in its tariffs from 2005 to 2009?

7 A.  Can you ask that again?

8 Q.  When you signed the contract, did you have an

9    understanding at that time as to whether EUA

10    intended a fuel adjustment to apply for the 2005

11    to '09 period?

12 A.  You know, I don't actually recall whether I did.

13 Q.  It's possible you had an expectation at the time

14    you signed the contract that the fuel adjustment

15    would extend all the way to 2009?

16        MR. O'ROURKE:  Objection.

17 A.  Well, you know, when I say I don't, what I'm

18    really saying is that -- as I think you've come

19    to understand, there were a lot of people

20    involved in this.  In my role there, I never

21    presumed anything.  The rate department was

22    looking at this with their intentions.  The

23    power supply department was looking at this.

24    They had their intention.  I think lacking any

Page 328

1    recollection of a specific discussion with them

2    and what was intended for 2005 to 2009, I would

3    have said I wasn't positive.

4 Q.  Okay.  Did you tell TransCanada that you weren't

5    positive whether a fuel adjustment would apply

6    for the last four years of the contract term?

7 A.  I have to say I don't recollect any specific

8    discussion, but the most likely thing I would

9    have told them, had they asked me, is that I was

10    not positive and we'd need some further

11    discussion with others, and I guess I also would

12    have said that we can't be positive of anything

13    until we had an approval from the commission.

14    The commission -- I was aware this whole time

15    that the commission approval was necessary to do

16    anything, and I don't think I would have

17    presented anything as a done deal.

18 Q.  Well, I'm asking you what, when you signed this

19    contract --

20 A.  Yeah.

21 Q.  -- EUA intended to file with the PUC as proposed

22    standard offer tariffs.

23 A.  Uh-huh.

24 Q.  At the time you signed this, was it your

3 (Pages 325 to 328)

Page 333

1　back. Let me show you a document which has been
2　marked as Exhibit 54. And you'll see that's one
3　of the drafts that we talked about last time of
4　the backstop agreement being negotiated between
5　TransCanada and EUA? Take your time -- take a
6　minute to look at it.
7　　　MR. O'ROURKE: I guess I'd object to
8　your question as being inaccurate.
9　　　MR. WINSTON: How so?
10　　　MR. O'ROURKE: Because it's a lot more
11　than the backstop agreement.
12　　　MR. WINSTON: It's what?
13　　　MR. O'ROURKE: It's a lot more than
14　the backstop agreement.
15　　　MR. WINSTON: That's fine. It
16　includes the backstop agreement being
17　negotiated.
18 A.  Okay.
19 Q.  If you turn to Page 7221.
20 A.  Yep.
21 Q.  And you see there's a draft backstop, and if you
22　turn to 7226, you see there's a term at the top,
23　2004?
24 A.  Right.

Page 334

1 Q.  And then if you turn down to Article 5, 7227,
2　you see standard offer wholesale price and fuel
3　adjustment factor?
4 A.  Yes.
5 Q.  And you'd agree with me at the time you're
6　negotiating this contract in March, the
7　understanding is that that wholesale price and
8　fuel adjustment factor applies for the whole
9　contract term?
10 A.  Through 2004, which is the contract term, I
11　agree.
12 Q.  Okay. Do you recall asking in the days before
13　signing that the term be extended to 2009?
14 A.  I don't recall the specifics of asking it, but
15　clearly it was changed from 2004 to 2009 at some
16　point.
17 Q.  Okay. Do you recall that was done at EUA's
18　request?
19 A.  Yes.
20 Q.  Do you recall why that was?
21 A.  That was done because the Rhode Island
22　commission required us to provide standard offer
23　service through 2009.
24 Q.  Okay. Why had the contract previously been only

Page 335

1　through 2004?
2 A.  I believe what we saw before is that Larry
3　Boisvert admitted that that was an oversight on
4　the part of EUA only going out to 2004.
5 Q.  Okay. Did you tell TransCanada that the fact
6　that it'd only gone through 2004 was an
7　oversight and you needed it to go through 2009?
8 A.  I'm sure we did.
9 Q.  When you extended the term from 2004 to '09,
10　what elements of the basic terms did you tell
11　them had changed for the added term?
12　　　MR. O'ROURKE: Objection.
13 Q.  If any?
14 A.  I believe the only thing we would have discussed
15　is that the term now goes through 2009 and
16　provided to them what schedules of price we had.
17 Q.  Okay. Did you mention to them -- and your
18　testimony is that when you extended the term to
19　2009, you weren't sure whether the second
20　component of the price term was going to apply
21　for that term?
22 A.  Well, that's true, because we had no settlement
23　or no agreement with the PUC regarding the
24　existence or the level of the trigger for the

Page 336

1　fuel beyond 2004. As you showed me, it was
2　question marks --
3 Q.  What was your understanding when you extended
4　the term from 2004 to 2009 as to whether you
5　were going to seek from the PUC a fuel
6　adjustment for the time period after 2004?
7 A.  I don't recall having a specific expectation. I
8　think I've already testified had that question
9　come up, before I made a commitment to that, I
10　would have discussed it with the rate department
11　and the power supply department.
12 Q.  Well, you'd been negotiating contracts with
13　price terms, A plus B equals price, through the
14　term of the contract up until the days before
15　contract signing; isn't that correct?
16　　　MR. O'ROURKE: Objection.
17 A.  We were negotiating them through -- said through
18　2004, up until the day we signed the contract.
19　Then it was extended to 2009, for which we
20　had -- I'm agreeing we had a price, and that was
21　also in our settlement with Rhode Island for the
22　wholesale standard service, but we did not have
23　a fuel trigger beyond that point.
24 Q.  And was it your intent when you extended the

5 (Pages 333 to 336)

Page 337

1  term and asked TransCanada to extend it at your
2  request that you intended not to seek from them
3  one-half of the price component that had been
4  part of the previous contract price?
5 A.  Well, it's not one-half of the price. It's one
6     component of the price, but it wasn't one-half
7     of the price.
8 Q.  So what was your understanding when you extended
9     the term as to whether or not you intended to
10    try to get a fuel adjustment for TransCanada for
11    the added four years that you asked them to add
12    to the contract?
13 A.  I don't really recall whether there were
14    discussions about it or not. I wouldn't -- you
15    know, the way things went with the PUC and with
16    the complications of this, the interactions
17    between the various agreements, the existence of
18    the wholesale standard -- the wholesale
19    settlement, the retail settlements. I wouldn't
20    have presumed anything. If someone had sat down
21    and said, "What is going on with this fuel
22    adjustment beyond 2005," I would have said, "You
23    know, I really need to find out what the fuel
24    supply people and the rate supply people are

Page 338

1     thinking, and we're going to have to talk about
2     this." I don't -- I didn't intend to presume
3     anything if it wasn't down in writing.
4 Q.  Did you tell them that the same terms applied
5     for the added four years in the contract?
6 A.  No.
7 Q.  You didn't say that?
8 A.  Well, I don't recall any specific discussions,
9     but I wouldn't have said that.
10 Q.  Did you tell them the added four years were the
11    same numbers as the NEES contract that run
12    through 2009?
13 A.  I couldn't have possibly said that because -- I
14    mean it's just not the way I did business. It's
15    still subject to PUC approval, and they had no
16    obligation to approve the NEES numbers. They
17    change numbers -- well, they were known to
18    change numbers. There's no guarantee because
19    they agreed on a set of NEES numbers that they
20    were going to agree on that same set of numbers
21    for us. So had the subject come up, I would
22    have couched it that way. I would have said,
23    "Anything is subject to PUC approval."
24 Q.  Do you think when you're negotiating a contract

Page 339

1     that has two price components and that you
2     extend the term for an added four years, you
3     have some obligation to tell them you think that
4     one of the two price components might not extend
5     for the added four years?
6        MR. O'ROURKE: Objection.
7 A.  I think they have the obligation to ask. The
8     information was all out there. It's their job
9     to look out for their interests. We didn't -- I
10    wouldn't have deliberately tried to mask it from
11    them. I wouldn't have made a point of not
12    saying it. If it didn't come up, it's possible
13    it just didn't come up. It may not have been on
14    anybody's radar screen.
15 Q.  My question is, do you think you had some
16    obligation to raise with them the fact that half
17    the price component might not apply for the
18    added four years you requested be added to the
19    contract?
20        MR. O'ROURKE: Objection.
21 A.  I think I had an obligation to provide them the
22    information they asked for. You know, I can't
23    think of what's important to them. They've got
24    to really represent their interests. We didn't

Page 340

1     try to hide anything, but the information was
2     all out there. The fact that there was no --
3     there was a standard offer wholesale price
4     beyond 2005 but no fuel index beyond 2005, it
5     was question marks in the agreement, and no
6     filing had been made, I really think it's up to
7     them to look out for their interests, but if
8     they had asked me the question, I would have
9     answered it as honestly and as completely as I
10    could.
11 Q.  Your understanding when you signed the
12    contract -- start over. Your understanding when
13    you extended the term to 2009 was that you might
14    not apply for a fuel adjustment for the last
15    four years but you decided not to tell them?
16        MR. O'ROURKE: Objection.
17 A.  I'm saying it wasn't on the radar screen and
18    they didn't ask.
19 Q.  Can you think of a reason why EUA wouldn't have
20    applied for a fuel adjustment for the last four
21    years of the contract?
22        MR. O'ROURKE: Objection.
23 A.  You know, I don't know of any specific reasons.
24    I can think of reasons possibly why. There may

6 (Pages 337 to 340)

Page 341

1  have been a technical reason, something -- since
2  it wasn't included in the initial agreement with
3  the PUC, that we didn't think we were allowed
4  to. I'm not aware that that was true. We may
5  have had some indication from the PUC that they
6  weren't interested in having a fuel trigger
7  beyond 2005 as a consumer device.
8 Q.  **Mr. Hirsh, when you signed this, if I had asked**
9  **you -- if someone had asked you when you signed**
10  **this, "Do you think the EUA is going to apply**
11  **for some sort of fuel adjustment for the last**
12  **four years of standard offer service," what**
13  **would have been your answer?**
14      MR. O'ROURKE:  Objection.
15 A.  Ask the question again, please. I'm sorry.
16  I've lost...
17      MR. WINSTON:  You can read it.
18      (Reporter read back the last question.)
19 A.  So we're talking across the table and you ask me
20  that question as TransCanada. There's two
21  possibilities, I think. One, I would have said,
22  "I don't know. Let me check on that, and I'll
23  get back to you," and I would have found out and
24  got an answer. Or the other is I would have

Page 342

1  said, well, yes or no, but I still would have
2  checked on it and got back to them. If I
3  represented to someone I was negotiating with
4  that there was going to be a fuel trigger, then
5  I think I would have made damn sure that there
6  either was a fuel trigger or that I closed the
7  loop with them and said, "You know, I just
8  talked to the rate department and I'm wrong;
9  there's not going to be a fuel trigger."
10 Q.  **Mr. Hirsh, isn't the reason that you didn't say**
11  **anything about the fuel trigger at the time is**
12  **because you assumed the fuel trigger would run**
13  **through 2009?**
14 A.  I'd say it was because it didn't come up in our
15  conversation. I don't think it was on their
16  radar screen and it wasn't on ours as a big
17  issue.
18 Q.  **Okay. You'd represented them -- you'd**
19  **represented to them -- wouldn't you agree you'd**
20  **represented to them up until the time you**
21  **extended the contract term to 2009 that fuel**
22  **would be provided through the term of the**
23  **contract?**
24 A.  That fuel would be provided through the --

Page 343

1 Q.  **Term of the contract.**
2 A.  What do you mean that fuel would be provided
3  through --
4 Q.  **Well, is it not true that up until the change to**
5  **2009, all of the representations EUA had made**
6  **had been that there would be a fuel adjustment**
7  **through the term of the contract?**
8 A.  Represented that there would be a fuel
9  adjustment through 2004, which was what was
10  stated in our settlement agreement. So we
11  provided them exactly the terms that was in our
12  settlement agreements.
13 Q.  **You provided them in all drafts and offers up**
14  **until the change to 2009 an offer which included**
15  **a fuel adjustment through the term of the**
16  **contract; isn't that correct?**
17 A.  Well, the wording didn't say term of the
18  contract. It said through 2009.
19 Q.  **Was it through the term of the contract?**
20 A.  There could be different meanings to those
21  words. We gave them a yearly schedule through
22  2004. If the words in the contract said
23  "through the term of the contract" -- do they
24  say "through the term of the contract" -- I

Page 344

1  would say then it would be through the term of
2  the contract, whatever it is.
3 Q.  **Was it your understanding that you were**
4  **assigning to TransCanada Montaup's backstop**
5  **obligation?**
6      MR. O'ROURKE:  Objection.
7 A.  You know, what we were assigning to them is
8  exactly what it says in the contract. I mean we
9  can look at it. Whatever words are in there,
10  that's what we were assigning to them.
11 Q.  **Okay. Well, is that your memory? You testified**
12  **to that last week, and you read your transcript.**
13  **Is that your memory, that you were assigning a**
14  **backstop to TransCanada?**
15 A.  Is that what the contract says?
16 Q.  **I'm asking you, Mr. Hirsh. You signed the**
17  **contract.**
18 A.  Can I look at the contract?
19 Q.  **Take your time.**
20 A.  Okay. All right. Well, I read the fourth
21  whereas clause on 7223 as essentially saying we
22  were assigning to -- assigning to whoever signed
23  the contract a share of Montaup's backstop
24  obligation.

7 (Pages 341 to 344)

Page 353

1  come to any conclusion without talking to power
2  supply and rates. Sometimes they had
3  information or points of view that I was
4  completely unaware of. I just generally didn't
5  make any kind of commitment until I knew what
6  the other parties were thinking of and what had
7  been analyzed.
8 Q.  When you extended the term to 2009, did you make
9     an effort to determine whether the pricing
10    stayed the same for the remaining four years?
11        MR. O'ROURKE: Objection.
12 A.  Okay. I'm going to presume you're talking about
13    the fuel trigger remained the same?
14 Q.  When I talk about the pricing, there are two
15    price components; stipulated price plus fuel
16    adjustment. A plus B.
17 A.  Okay.
18 Q.  Contract gets extended to 2009. And I'm
19    wondering whether you made an affirmative effort
20    to determine whether or not there was some
21    question about whether one of those two
22    components would still apply for the added four
23    years.
24 A.  Well, the wholesale price through 2009 was

Page 354

1  already specified, so there was nothing to
2  determine there. As far as the other part goes,
3  as I've already said, I don't recall any
4  discussion about what would happen one way or
5  another.
6 Q.  Did you have any understanding about whether EUA
7     intended to ask for a fuel adjustment for the
8     last four years?
9 A.  No.
10 Q.  You didn't know one way or the other when you
11    signed this contract what EUA's intent was with
12    respect to including a fuel adjustment in its
13    tariffs?
14 A.  I may have known. I don't recall any discussion
15    about it. So at this particular point in time,
16    I can't say what I knew in 1998 about that.
17    I'll amend that a little. I think I'm unlikely
18    to have -- I don't think it was thought about a
19    heck of a lot.
20 Q.  Was a fuel adjustment in the contract one of the
21    terms of the contract that you promoted as a
22    sales device to attract people to the contracts?
23 A.  Not as far as I know.
24 Q.  Did you review the RFQ presentations and things?

Page 355

1 A.  You know, I might have. I don't really recall.
2 Q.  Okay. Your testimony today is you don't recall
3     that being a sale point for the wholesale
4     standard offer service contracts?
5 A.  That's correct.
6 Q.  What was the intent behind the wholesale
7     standard offer service pricing structure as you
8     understood it, meaning the rise in the
9     stipulated set of prices?
10 A.  The price (sic) was to give consumers an
11    increasing incentive to seek a competitive
12    supplier.
13 Q.  Okay. And how did the incentive work?
14 A.  Well, by -- what was envisioned was within two
15    or three years of customers being offered a
16    standard offer price, the price of the standard
17    offer would be so high that consumers would
18    realize a significant benefit by seeking out a
19    competitive supplier. So we expected the
20    competitive market to be well below the standard
21    offer price long before 2004. I think this was
22    one of the reasons that the fuel index wasn't
23    much on anybody's radar screen beyond 2004,
24    because everybody, including the suppliers,

Page 356

1  thought there'd be no chance anybody would be on
2  standard offer beyond 2004.
3 Q.  Would adding -- keeping a fuel adjustment in the
4     price aid in making sure that the stipulated
5     price stayed above market price?
6 A.  Well, certainly if we made the price of the
7     standard offer higher, it would be higher.
8 Q.  So, in other words, it would be consistent with
9     the intent of the pricing structure at the time,
10    as you understood it, to include a fuel
11    adjustment for the whole term?
12 A.  It would make the price higher, and the idea was
13    that competitive suppliers would provide an
14    attractive alternative to standard offer. Part
15    of the problem is that never happened.
16 Q.  Right. So the answer to my question is yes,
17    correct?
18 A.  The answer was whatever I just said.
19 Q.  Well, isn't the answer that consistent with the
20    purpose of keeping the wholesale standard offer
21    service price higher than market price, a fuel
22    adjustment aids rather than hinders that
23    purpose, correct?
24 A.  Correct, a fuel adjustment does not hinder that

10 (Pages 353 to 356)

Page 357

1    purpose. Right. It would help it.
2 Q.  It aids the purpose. When you -- did you
3      understand that the purpose of filing -- well,
4      is it consistent with the purpose of the
5      standard offer service pricing at the time -- as
6      you understood it in 1998, is it consistent with
7      the purpose of wholesale standard offer service
8      to file tariffs that keep the stipulated
9      price -- scratch that.
10          As you understood the purpose of the
11     standard offer service pricing when you were at
12     EUA, was it consistent with that purpose to file
13     tariffs which attempt to keep the wholesale
14     standard offer service price less than market
15     price?
16          THE WITNESS: Can I have that question
17     again?
18          (Reporter read back the last question.)
19 A.  The wholesale standard offer price was
20     stipulated in the agreement. You couldn't
21     change the wholesale standard offer price
22     regardless of what the market price was.
23 Q.  Well, the goal of the wholesale standard offer
24     service pricing through 2009 was to stay above

Page 358

1    market price, correct, back when you were at
2      EUA?
3 A.  Well, we didn't know what the market price was.
4      The goal of it was, by increasing every year, to
5      give the market an increasing incentive to be
6      able to supply a competitive alternative and to
7      give consumers an increasing incentive to go
8      off. At the same time, clearly the regulators
9      had some incentive in mind to make sure the
10     customers had a backstop at a reasonable price.
11     We could have set standard offer at $5 a
12     kilowatt hour, but clearly they didn't want to
13     do that.
14 Q.  Were you involved in any of the wholesale
15     standard offer service negotiations with other
16     wholesale standard offer service contractors?
17 A.  Not that I recall.
18 Q.  Okay. Did you negotiate at all with anyone from
19     Constellation?
20 A.  I don't think so.
21 Q.  Anybody from NRG?
22 A.  I was -- NRG purchased our Somerset plant, as I
23     recall. Is that right? I was involved in the
24     asset transfer. I don't recall being involved

Page 359

1    with them in discussing the wholesale backstop.
2 Q.  Do you get a pension from National Grid?
3 A.  Yes.
4 Q.  How much is that pension?
5 A.  Well, currently, what I'm getting is called a
6      key executive incentive payment, which is
7      $36,000 a year. Then I am entitled to a regular
8      pension when I reach age.
9 Q.  Who funds the pension?
10 A.  I don't know.
11 Q.  Okay. What percentage of your income roughly
12     comes from the National Grid pension?
13 A.  Perhaps 20 percent.
14 Q.  Okay. You mentioned you had a conversation with
15     Tom McBride of National Grid. What was the
16     substance of that conversation?
17 A.  I think the first time I talked to him was right
18     after I spoke to you the first time, just to let
19     him know I'd been contacted by you and that you
20     had asked some questions and I thought that Grid
21     might be interested in that fact.
22 Q.  Did you express any opinion about the dispute at
23     all?
24 A.  Not that I recall. I mean the main reason was

Page 360

1    that I'd spoken to you and I answered some
2      questions, and I just thought it was fair that
3      they knew and had the same opportunity.
4 Q.  So is it your understanding when you signed the
5      TransCanada contract that EUA had no obligation
6      one way or the other as to whether they should
7      try to get a fuel adjustment for the 2005 to '09
8      time period?
9 A.  I don't recall being aware of any obligation we
10     had to file for a fuel trigger beyond the 2004
11     time period.
12 Q.  When you signed the contract?
13 A.  When I signed the contract.
14 Q.  Okay.
15 A.  Well, I'll go further. I guess if we had an
16     obligation to file, I would have made sure we
17     did file, or if I thought we had an obligation.
18 Q.  Well, you didn't work at National Grid in 2005;
19     did you?
20 A.  Oh, you're asking about 2005. I'm sorry. I
21     thought you were asking at the time we signed
22     the contract if we had the obligation to file.
23     No, in 2005, I wasn't aware.
24 Q.  Is it your understanding in 200-- -- when you

11 (Pages 357 to 360)

Page 361

1 signed the contract, you had no obligation to
2 file a fuel index for any of the years of the
3 contract?
4        THE WITNESS: Can I hear that again?
5        (Reporter read back the last question.)
6 A.  We had an obligation to file through 2004.
7 Q.  Okay.  And as best you recall, what was your
8     understanding at the time you filed as to what
9     your obligation was as to whether to put a fuel
10     adjustment into your proposed tariffs for 2005
11     to '09?
12 A.  I would have said our obligation is whatever the
13     contract said our obligation is.
14 Q.  Okay.  And what was your understanding of that
15     when you signed the contract?
16 A.  I don't recall I would have understood anything
17     except what the words of the contract said.
18 Q.  Well, I mean, did you think that EUA was going
19     to -- had some obligation to at least try to put
20     a fuel adjustment in if fuel prices went crazy?
21        MR. O'ROURKE:  Objection.
22 A.  I don't think any more so than we would have had
23     an obligation to reduce the price if fuel prices
24     went way down.  I mean to some extent the whole

Page 362

1 purpose of this was that competitive suppliers
2 accept some -- get some upside and accept some
3 downside.
4 Q.  Okay.  So your understanding is that regardless
5     of what happened to fuel prices in 2005 to '09,
6     when you signed that contract, you didn't have
7     any obligation to try for a fuel adjustment for
8     TransCanada during that time period?
9        MR. O'ROURKE:  Objection.
10        THE WITNESS:  Read that back, please.
11        (Reporter read back the last question.)
12 A.  My understanding regarding our obligations is
13     that they're laid out in the contract.  So
14     whatever obligations are here in black and white
15     is what obligations I understood at that time.
16 Q.  Show me where in the contract it says what those
17     obligations are from 2005 to '09.
18 A.  Well, if it doesn't have any in here, then we
19     don't have any obligations.  I can't find
20     obligations -- I can't find a negative here.  If
21     it says we're not obligated for anything beyond
22     2005, then the obligation isn't here.
23 Q.  Okay.  So it's your testimony when you signed
24     that contract with TransCanada, you had no

Page 363

1 obligation to try for a fuel adjustment for
2 TransCanada for 2005 to 2009, regardless of what
3 happened with fuel prices?
4 A.  What I said is our contractual obligation is in
5     the contract.  Therefore, if the contract lays
6     out an obligation, we had an obligation.  If it
7     doesn't, we didn't.
8 Q.  And what was your understanding at the time you
9     signed the contract as to what the contract said
10     about that obligation?
11 A.  You know, if it had been asked at that time, I
12     would have opened the contract and looked.  As,
13     you know, I think I said, if it's not in here,
14     the reason is it wasn't on the radar screen, so
15     I don't recall any discussions about that
16     obligation.
17 Q.  Well, I'm asking what you thought --
18 A.  I don't recall thinking about that obligation.
19 Q.  Well, as you sit and look at the contract now --
20 A.  Uh-huh.
21 Q.  -- is it your understanding that regardless of
22     what fuel prices do, EUA or its successors has
23     no obligation to try for a fuel adjustment for
24     TransCanada in its tariffs regardless of what

Page 364

1 happens with fuel prices?
2        MR. O'ROURKE:  Objection.
3 A.  So you'd like me to provide you my legal opinion
4     on the obligation of National Grid under this
5     contract?  Is that what you're asking me for?
6 Q.  I'm asking as a person who signed that contract
7     what you think.
8        MR. O'ROURKE:  Objection.
9 A.  Well, so I said I think you're asking me a legal
10     question because the whole purpose of the
11     contract is, as I understand it, so we don't
12     have to deal with what people thought ten years
13     ago.  We got in here in black and white the
14     terms under which the parties agreed to be
15     bound.  I don't really think I have the right to
16     say how National Grid ought to --
17 Q.  Your understanding is that whatever is dictated
18     by -- do you recall what law governs the
19     contract?
20 A.  No, I don't.
21 Q.  Okay.  Just so we're all talking about the same
22     thing --
23 A.  Yeah.
24 Q.  -- look at Page 11 of the contract.

12 (Pages 361 to 364)

# McMASTER

Page 1

1                                          Vol. 1, Pgs. 1-68

2                                          Exhibits 192-193

3

4            UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6

7  - - - - - - - - - - - - - - - - -

8  TRANSCANADA POWER MARKETING, LTD.

9               Plaintiff

10 v.                          CA No. 05-40076 FDS

11 NARRAGANSETT ELECTRIC CO.,

12              Defendant

13 - - - - - - - - - - - - - - - - -

14

15         DEPOSITION of SEAN McMASTER

16   Wednesday, April 11, 2007 - 10:09 a.m.

17           Bowditch & Dewey, LLP

18          One International Place

19           Boston, Massachusetts

20

21

22

23   Reporter:  Jill K. Ruggieri, RMR/CRR

24

Page 6

1 A   Since 1990.

2 Q   **And how old are you, sir?**

3 A   Forty-eight.

4 Q   **Just trying to get the big picture.**

5       MR. WINSTON: He's younger than you.

6       MR. O'ROURKE:  Way younger.

7       (Laughter.)

8 Q   **And could you please tell me your employment**

9     **background since -- I guess since finishing**

10    **college?**

11 A   I was -- after my first degree, I was in the

12    Canadian Armed Forces as a tank commander,

13    and then --

14 Q   **How long were you -- were you in the armed**

15    **forces?**

16 A   For six years.

17 Q   **And that was from when to when?  I'm working**

18    **backwards to figure these things out.**

19 A   From '81 to '87, 1981 to 1987.

20       After that, I went to law school and

21    then practiced law from -- graduated in 1989

22    from the University of Alberta.

23       I was in private practice until 1996

24    when I joined TransCanada as a lawyer.

Page 7

1 Q   **What was the nature of your private**

2     **practice?**

3 A   Oil and gas law, energy, corporate and

4     commercial.

5 Q   **You worked with a law firm in that area?**

6 A   That's correct, two law firms.

7 Q   **What positions have you held at TransCanada**

8     **since 1996?**

9 A   In-house counsel and director and vice

10    president of business development in the

11    power group.

12 Q   **Is that your present position?**

13 A   No.

14       And then I became a president of

15    TransCanada Power Limited Partnership, and

16    last year I became general counsel --

17    executive vice president and general counsel

18    of TransCanada Corporation.

19 Q   **TransCanada Power Limited Partnership, is**

20    **that the plaintiff here?**

21 A   No, it's a subset of TransCanada's power

22    business but did not include the -- the

23    assets, the Ocean State Power assets.

24 Q   **Could you just, if possible, give a brief**

Page 8

1     **overview of what TransCanada's corporate**

2     **structure is?**

3 A   TransCanada Corporation is the parent

4     company.  TransCanada PipeLine Limited is

5     the operating subsidiary.

6       The business is split into two

7     divisions:  Energy and power -- sorry,

8     energy and pipelines.  And in the energy

9     business, you have all of the unregulated

10    businesses, such as power, LNG, gas storage.

11 Q   **Where would TransCanada Power Marketing fit**

12    **in?**

13 A   TransCanada Power Marketing is in the energy

14    side.

15 Q   **What are the overall assets of TransCanada**

16    **PipeLines Limited?**

17 A   Do you mean value or --

18 Q   **Value.**

19 A   I don't know the answer to that.  It's in

20    the neighborhood of $25 billion Canadian.

21 Q   **Just if I could show you what's previously**

22    **been marked as Exhibit 36.**

23       (Witness read document.)

24 Q   **And just -- I see here that TransCanada**

Page 9

1     **Power Limited indicates that it has energy**

2     **commodities in excess of 12.6 billion.**

3       **Is that distinct from the 25 billion**

4     **that you -- is that a different set of**

5     **assets or --**

6 A   Yes.

7       So the $25 billion number that I was

8     referring to is sort of book value -- not

9     book value.  The market value of the assets

10    that TransCanada owns.

11       This 12 billion would have been -- I

12    think that -- in '97, that would have been

13    the value of the assets, so we've just

14    grown.

15 Q   **You've essentially doubled in the last ten**

16    **years?**

17 A   Correct.

18 Q   **How about earnings in 2007 or 2006; do you**

19    **know what those are?**

20 A   In excess of a billion dollars; although,

21    again, I don't know the exact number.

22 Q   **Has the number of natural gas -- miles of**

23    **natural gas pipeline also increased in those**

24    **ten years?**

3 (Pages 6 to 9)

**Esquire Deposition Services**
**1-866-619-3925**

Page 54

1  have been.
2 Q  Was it sometime prior to 2004?
3 A  I believe this was, again, sort of passed
4    across my desk through Mike Hachey.  Didn't
5    come directly to me.
6 Q  At the time you received it, did you observe
7    the provisions on Attachment 2?
8        (Witness read document.)
9 A  I can't say for sure I would have reviewed
10   the attachments.
11       In all likelihood, what I would have
12   done is just confirmed that it went through
13   the business representative in this case,
14   Mike Hachey, and would have waited for
15   comments or questions from him.
16 Q  Do you have any recollection of taking note
17   that the fuel adder provided for on
18   Attachment 2 only ran through 2004?
19 A  No, I don't.
20 Q  With respect to Exhibit 111, do you
21   recall -- is it your testimony here today,
22   then, that you acknowledge that you received
23   it but have no other recollection concerning
24   it?

Page 55

1 A  Yes.
2 Q  Do you recall making any response to
3    Mr. Hager in connection with it?
4 A  No, I don't.
5 Q  Was there anyone else within TransCanada
6    that would have been appropriate to
7    respond -- would more appropriately have
8    responded to this?
9 A  Yes.
10 Q  Who would that have been?
11 A  Likely either Bill Taylor or Mike Hachey.
12 Q  Do you have any understanding as to why this
13   document was sent to you?
14 A  Yes.
15 Q  And what's that understanding?
16 A  I was the designated recipient of notices
17   under the standard offer service contract.
18       MR. O'ROURKE:  Would you mark this
19   next in line.
20       (Exhibit No. 193 marked for
21   identification.)
22 BY MR. O'ROURKE:
23 Q  Can you identify for me who Mr. Jon Bennett
24   is?

Page 56

1 A  He worked in Bill Taylor's group in
2    TransCanada Power in Westborough.
3 Q  Do you know what his role was in that group?
4 A  No, I don't.
5 Q  Do you have any understanding as to why he
6    would be communicating with Ms. Yetman with
7    respect to the Rhode Island standard offer?
8 A  No, I don't.
9        MR. O'ROURKE:  Let's take about five
10   minutes.
11       MR. WINSTON:  Sure.
12       (Recess.)
13 BY MR. O'ROURKE:
14 Q  Just looking at Exhibit 77, do you know
15   whose notations they are on the draft that's
16   attached to the facsimile cover page?
17 A  Are you referring to this piece?
18 Q  No, inside.  No, the -- the draft, there are
19   some changes to the numbers and --
20 A  No, I don't know whose those are.
21 Q  Was that provided to you -- and I'm sorry if
22   I asked you this already -- in or about
23   February of 1998?
24 A  I believe so.  And that's based just on the

Page 57

1    date that's on the fax cover page.
2 Q  Okay.
3 A  I believe that on Attachment 1, the writing
4    at the top is my writing.
5 Q  Okay.
6 A  Not the writing in the columns.
7 Q  What page was that writing that was your
8    handwriting?
9 A  On Attachment 1 at the top.
10 Q  Okay.  Thank you.
11       Do you -- let me ask you if you could
12   take a look at Exhibit 111.
13       Do you see if the changes that were
14   made in -- or at least the notations that
15   were made on Exhibit 77, were they
16   replicated in Exhibit 111, the letter
17   eventually sent to you?
18       (Witness read document.)
19 A  They appear to be, but the -- the format has
20   changed, so there's a new column added to
21   the chart, so it's different.
22       But the handwritten notations do
23   appear to have been made, other than the
24   addition of the 14.455 percent.

15 (Pages 54 to 57)

# POURBAIX

Page 1

1                                    Vol. 1, Pgs. 1-280

2                                    Exhibits 194-219

3

4           UNITED STATES DISTRICT COURT

5            DISTRICT OF MASSACHUSETTS

6

7  - - - - - - - - - - - - - - - - - - -

8  TRANSCANADA POWER MARKETING, LTD.

9              Plaintiff

10 v.                            CA No. 05-40076 FDS

11 NARRAGANSETT ELECTRIC CO.,

12             Defendant

13 - - - - - - - - - - - - - - - - - - -

14

15

16

17          DEPOSITION of ALEX POURBAIX

18      Tuesday, April 17, 2007 - 9:17 a.m.

19            Bowditch & Dewey, LLP

20           One International Place

21           Boston, Massachusetts

22

23     Reporter:  Jill K. Ruggieri, RMR/CRR

24

Page 2

```
1 APPEARANCES:
2
3 Choate Hall & Stewart LLP
4     Daniel C. Winston, Esq.
5     Two International Place
6     Boston, Massachusetts 02110
7     (617) 248-5000  Fax:  (617) 248-4000
8     on behalf of the plaintiff
9
10 Bowditch & Dewey, LLP
11    Vincent F. O'Rourke, Jr., Esq.
12    311 Main Street
13    Worcester, Massachusetts 01615
14    (508) 926-3424  Fax:  (508) 929-3035
15    on behalf of the Defendant
16
17 Also present:  Jody D. M. Johnson, Esq.
18             TransCanada Power Marketing, Ltd.
19
20
21
22
23
24
```

Page 3

```
1          PROCEEDINGS
2
3     ALEX POURBAIX, a witness having been
4  duly sworn, on oath deposes and says as
5  follows:
6          EXAMINATION
7 BY MR. O'ROURKE:
8 Q  Mr. Pourbaix, could you please state your
9  full name and spell it for the reporter.
10 A  Sure.  It's Alexander John Pourbaix,
11  A-L-E-X-A-N-D-E-R, J-O-H-N, P-O-U-R-B-A-I-X.
12 Q  And we met on the way in, but my name is Vin
13  O'Rourke, and I represent Narragansett in
14  this litigation.
15      Have you been deposed before?
16 A  Years and years ago.
17 Q  Briefly, I'm going to ask you a series of
18  questions about this litigation that
19  TransCanada has brought against
20  Narragansett.
21      If you have any questions or don't
22  understand my questions, feel free to stop
23  me, and I'll rephrase them.
24      If you have a problem with a
```

Page 4

```
1  question, you have a right to talk to your
2  lawyer, but I request that you not stop to
3  talk to your lawyer in the middle of a
4  question.
5      MR. O'ROURKE:  We're going to reserve
6  all objections except objections as to form
7  and motions to strike until the time of
8  trial?
9      MR. WINSTON:  Yes.
10     MR. O'ROURKE:  Thank you.
11     MR. WINSTON:  Waive notarization, and
12  we'll read and sign.
13     MR. O'ROURKE:  That's great.
14 BY MR. O'ROURKE:
15 Q  How old are you, sir?
16 A  Forty-one.
17 Q  And could you please describe your education
18  since high school?
19 A  Sure.
20     I graduated with a bachelor's of
21  economics in -- I'm going to say that was
22  1986.
23     In 1989, I graduated with an LLB,
24  which is a Canadian law degree.
```

Page 5

```
1      Both those degrees were at the
2  University of Alberta in Edmonton, Alberta.
3      Sorry, that was my education.
4 Q  Okay.  That's fine.
5 A  Okay.
6 Q  Could you tell me where you presently
7  reside?
8 A  In Calgary, Alberta.
9 Q  And how long have you resided there?
10 A  Since 1991.
11 Q  What year did you get your LLB?
12 A  1989.
13 Q  And could you please give me your employment
14  background?
15 A  Sure.
16     I practiced -- when I graduated from
17  law school, I practiced corporate commercial
18  law in Edmonton for a firm called Bryan &
19  Company, B-R-Y-A-N, & Company.
20     In 1991, I was offered a job with a
21  company called Northridge Canada, Inc.
22  Northridge Canada, Inc., was an energy
23  trading and marketing company, and I worked
24  with them as a lawyer until 1995, at which
```

2 (Pages 2 to 5)

Page 6

1 time we sold the company to TransCanada
2 PipeLines at the time.
3        And at that time I became associate
4 general counsel of TransCanada, and I
5 remained in that position for a relatively
6 short time, I'm going to say it was about
7 eight months, after which time I moved over
8 into a commercial role in the power group,
9 in the energy segment of TransCanada, and I
10 was in charge of business development.
11        And I would have -- that job
12 continued. I -- from 1996 until I'm going
13 to say 2001, I just maintained positions of
14 increasing responsibility in the power group
15 in TransCanada.
16        In around 2001, I was made the head
17 of the power group and also became an
18 executive vice president of TransCanada
19 Corporation.
20        That remained the same until June of
21 last year, at which time I became president
22 of all of the unregulated businesses of
23 TransCanada.
24 Q    **What do those entail?**

Page 7

1 A    The power business, which would be power
2 generation, power marketing, power trading,
3 construction of power plants, operation of
4 power plants, gas storage, gas trading and
5 marketing, to the extent that we do that.
6        That's a relatively small component
7 of our business.
8        And then there's a number of much
9 smaller businesses, what I would call just
10 sort of orphan businesses in TransCanada
11 which I'm responsible for, none of which
12 really amount materially in terms of income
13 or cash flow.
14 Q    **You say this was the unregulated business.**
15        **What is the regulated TransCanada?**
16 A    TransCanada is split into two businesses.
17 The pipeline business, which is run by a
18 fellow named Russ Girling, who is the
19 president of the pipeline business, and then
20 I run the other half of the company, which
21 is the unregulated energy business, and I'm
22 the president of energy.
23 Q    **What are the overall assets of TransCanada**
24        **Power if you put the two businesses**

Page 8

1        together?
2 A    TransCanada, the entire corporation?
3 Q    Yes.
4 A    Sorry.
5        I would -- I would -- I think we
6 have a total value probably in the range of
7 $30 billion, and that would be split
8 probably in the range of 20 billion for the
9 pipeline business and 10 billion for the
10 energy business.
11 Q    **When you say the energy business, is that**
12        **the --**
13 A    The business I'm responsible for, yes.
14 Q    **And how many employees does TransCanada**
15        **have?**
16 A    Probably about I'm going to say in the range
17 of 32 to 3500.
18 Q    **If I could bring you back to 1997, how many**
19        **employees did TransCanada have?**
20 A    The entire entity?
21 Q    Yes.
22 A    It was actually a much bigger company at
23 that time in terms of employees.
24        It probably would have been in the

Page 9

1 range of 4 or 5,000.
2        Subsequent to 1997, we did a
3 significant divestiture. We sold our
4 international business, and that business --
5 that business had many hundreds of employees
6 but also assets around the globe, and we
7 sold that business and refocused on the
8 North American market, and that's our bigger
9 company, smaller number of employees today.
10 Q    **What were your assets in 1997?**
11 A    I'm going to say probably around 15 billion.
12 Q    **And how did they break down between the**
13        **unregulated --**
14 A    Oh, it was overwhelmingly pipeline assets.
15 Q    **What were the assets of the unregulated**
16        **business at that time?**
17 A    At that time we had a 40 percent interest in
18 Ocean State Power. We were in -- I can't
19 remember the exact date, but it -- at the
20 time of this issue that we're going to talk
21 about today, we were very close to acquiring
22 New England Electric's interest in Ocean
23 State Power, but, you know, depending on
24 when your time horizon is.

3 (Pages 6 to 9)

Page 86

1    And he said it is -- he was very
2  familiar with our deal we had done with
3  NEES, particularly with Narragansett in
4  Rhode Island; and he described it to me as
5  being identical in pricing terms to that of
6  the Narragansett deal, which we had
7  recently -- we were recently part of with
8  NEES.
9 Q    You say he was familiar with the
10  Narragansett deal.
11    How do you know he was familiar with
12  that deal?
13 A  Because he used it -- he referred to that
14  agreement on multiple occasions and the
15  similarities between our agreements.
16 Q  In those conversations, did Mr. Hirsh ever
17  say there will be a fuel adder through 2009?
18 A  My recollection is my question was more --
19  it was focused on pricing, not the two
20  components of pricing.
21    I said, "What is the pricing going to
22  be?" He said, "Exactly as it was in
23  Narragansett."
24 Q  So the answer to my question is that you do

Page 87

1  not recall that he ever specifically said
2  there will be a fuel adder for the period
3  2005 to 2009?
4 A  Correct.
5 Q  You had previously been -- I guess your
6  previous contract, was that a contract that
7  you had with Narragansett, that TransCanada
8  had with Narragansett?
9 A  It was a contract that I believe it was
10  USGen entered into and was generally
11  assigned to us when we acquired their
12  interests in Ocean State.
13 Q  When had that contract been assigned to you?
14 A  I can't recall the exact date.
15 Q  Was it prior to April 7, 199 --
16 A  The negotiations had been concluded.
17    I can't state explicitly if the
18  formal assignment date had occurred, but our
19  deal was done with New England or with USGen
20  at the time.
21 Q  Where did you have the meeting with Mike
22  Hirsh when he discussed the Narragansett
23  contract with you and said that the pricing
24  would be the same as the Narragansett

Page 88

1  contract?
2 A  My recollection was that it was at their
3  Boston office.
4    But I had a series of meetings with
5  Mike, at least one of which was in their
6  Boston office and at least one of which was
7  at their -- their office I think in West
8  Bridgeport [sic], and I --
9    My recollection is Boston, but I
10  could be wrong on that.
11 Q  And now I'm speaking about the meeting when
12  you and he discussed the extension from 2004
13  to 2009 --
14 A  Mm-hmm.
15 Q  -- and when he spoke to you concerning the
16  Narragansett deal, just so that we have a --
17  know what we're talking about.
18    Who else was present?
19 A  At the time, I think it was just he and I.
20  His -- he had a -- a right-hand man, Bob
21  Clarke, who might have been -- sometimes he
22  was there. Sometimes he was not there.
23 Q  And no one was present from your side?
24 A  I think our counsel was in Calgary at the

Page 89

1  time. I think he didn't make the trip. He
2  was just participating by phone.
3 Q  He was on -- your counsel was on the line at
4  the time of this?
5 A  Sorry, he -- when he participated in this
6  period, he was participating by phone. I
7  cannot recall if he was on the phone at that
8  time.
9 Q  Who was your counsel?
10 A  Sean McMaster.
11 Q  Do you recall what day of the week this was?
12 A  I want to say it was -- like it was towards
13  the end of week. I mean, as I said, I -- I
14  am -- my recollection is the agreement was
15  signed -- the 7th was a Tuesday, and this
16  was as late as Thursday or Friday, is my
17  recollection, that Mike came up with this
18  change.
19    It could have been Wednesday, but it
20  was -- it was the latter half of the week.
21 Q  When he came up with this change, did he
22  discuss it before he included it in the
23  draft or did he just give you a draft with
24  it or how did it come up?

23 (Pages 86 to 89)

Page 118

1 extraordinary fuel is to be provided for in
2 the tariff.
3     So I had no -- I mean, it -- it was
4 beyond my comprehension that there would be
5 a scenario where we -- the -- half the
6 pricing, the fixed price stays for the term
7 and then just for some inexplicable reason
8 the fuel adder just ceased to apply at some
9 time in the middle of that term.
10 Q  **At the time of this conversation, did you**
11 **and Mr. Taylor have that kind of discussion**
12 **that you just described to me in terms of**
13 **your reasoning?**
14 A  We were very concerned that we understood
15 what the pricing was, and I was comfortable
16 that the pricing was going to be
17 representative of the NEES pricing in Rhode
18 Island, and that corresponded with my
19 understanding.
20     I did not pursue it beyond that.
21 Q  **Did you give any thought to having it --**
22 **that confirmation specifically included in**
23 **the contract?**
24 A  I saw absolutely -- I mean, I couldn't -- I

Page 119

1 really didn't think there was an outcome
2 that could be different than that.
3     It wasn't front and center on my mind
4 that I would have that documented anywhere.
5 Q  **Isn't it true that prior to this discussion**
6 **with Mr. Hirsh, Mr. Taylor had been making**
7 **repeated efforts to find out what the tariff**
8 **would be?**
9 A  Yes.
10 Q  **And Mr. Taylor has testified that he was**
11 **frustrated that he couldn't do that?**
12 A  Mm-hmm.
13 Q  **And in light of that, wouldn't it have made**
14 **sense to tie it down more completely?**
15 A  Well, my recollection at the time it was
16 not us who were anxious to get this deal
17 concluded. It was EUA who was anxious to
18 get this deal concluded.
19     And from my perspective, your
20 statement of Bill's concern is very correct.
21 He was exceedingly concerned about EUA's
22 ability to provide us with executed,
23 approved tariffs.
24     And that was why over time you saw

Page 120

1 the change in that section in the agreement,
2 that it moved to reference the settlement
3 agreements and then subsequently moved to
4 reference the infamous Section 8.3.
5     That was our -- those changes were
6 made in order to accommodate EUA, because
7 they weren't able to deliver to us executed,
8 approved tariffs.
9 Q  **But Mr. Taylor's concern was that he -- as I**
10 **understood it was you didn't know what**
11 **tariff EUA would be requesting?**
12     MR. WINSTON: Objection. You can
13 answer.
14 A  Sorry, we didn't know what tariff they would
15 be --
16 Q  **What tariff rates they would be seeking.**
17 A  No, that is not -- I --
18     I wasn't there when you were
19 obviously deposing Mr. Taylor.
20     From my perspective, we were very
21 anxious to see the tariffs. They had
22 provided us with interim tariffs, which were
23 less than any use whatsoever, because they
24 didn't even reference the standard offer;

Page 121

1 and we had repeated assurances from EUA that
2 they were preparing the filings.
3     They were going to file them, but
4 they weren't approved; and, hence, they
5 could not provide them to us.
6     But I don't -- I mean, are you
7 suggesting that Bill was saying we thought,
8 for example, the --
9     I don't know what you're suggesting.
10 Q  **What was your concern that led you to or led**
11 **Mr. Taylor to continually seek to see the**
12 **tariffs?**
13 A  Well, obviously the tariffs were what were
14 going to memorialize the standard offer
15 rates.
16 Q  **And as of the date of April 7, 1998, there**
17 **was no tariff, correct?**
18 A  Yes.
19 Q  **And so my question is, why, then, did you**
20 **not memorialize the tariff that you expected**
21 **EUA to file --**
22 A  Because --
23 Q  **-- as of that date?**
24 A  I don't even think they were sure what they

31 (Pages 118 to 121)

Page 194

1 Q   I show you what's been marked Exhibit 54.
2       And is that a letter that you
3   prepared?
4 A   That is a letter that is under my signature,
5   but the specific comments with respect to
6   the legal language would have been prepared
7   by Mr. McMaster.
8 Q   Okay.
9       You've testified a few times that
10   there was a provision 8.3 that was added in
11   connection with your concerns with regard to
12   the tariffs?
13 A   Yes.
14 Q   Is this Rider 1 the language that was
15   proposed in that respect?
16 A   Rider 1, I believe, was the first iteration
17   of what eventually became Section 8.3.
18 Q   Did Rider 1 address your concerns?
19 A   I think -- sorry.
20       My recollection was that this was our
21   first cut at it.  And over time, we expanded
22   that language in order to better protect
23   ourselves.
24 Q   Isn't Rider 1 as written a tautology?

Page 195

1 A   In what regard?
2 Q   The price increases -- the price increases
3   and you get it?
4 A   No, I think its meaning is clear.
5 Q   And what would that be?
6 A   That -- well, sorry.  Let me think about
7   that.  The -- I think this -- this is my
8   explanation about how this clause evolved.
9       I think this was a first cut at it,
10   and further cuts at it which ultimately
11   resulted in 8.3 gave us better protection.
12       I see your point by referring to
13   capital P, price, in Rider 1.
14 Q   Did you have any discussions with Mr. Hirsh
15   regarding Rider 1 at that point?
16 A   In meetings with Mr. Hirsh, Mr. Taylor
17   typically led the discussion on -- either
18   call it Rider 1 or call it Section 8.3, so I
19   was there, but I would not have been leading
20   that.
21       This was very much Mr. Taylor's --
22 Q   Do you recall any discussions concerning
23   this provision as proposed in this Exhibit
24   54?

Page 196

1 A   You're talking about the specific Rider 1
2   provision?
3 Q   Right.
4 A   I don't recall the exact discussion.
5 Q   What generally were the discussions
6   Mr. Taylor had with -- and you'll have to
7   tell me who he has them with -- concerning
8   8.3?
9 A   So I -- I would have been present when he
10   would have had those discussions with
11   Mr. Hirsh.  And he may have had those
12   discussions at other times not in my
13   presence.
14       But the gist of his concern was that
15   we were being asked to execute this
16   agreement, which would obligate us to
17   provide standard offer service to customers
18   of EUA; and it would be almost impossible
19   for us to be part of and follow every future
20   regulatory hearing regarding -- regarding
21   standard offer service.
22       Or, in fact, we may not even be
23   allowed to be part of the discussions.
24       And Bill requested the insertion of

Page 197

1   language which ultimately ended up as
2   Section 8.3 in order to protect us from some
3   subsequent action by regulators that
4   could -- regulators, politicians.
5       It was drafted very broadly to ensure
6   that if anything changed, we would not -- we
7   would be held harmless for it in the future.
8       And I'll give you something -- I
9   mean, one of the concerns at the time was
10   this concern over the ability of people to
11   leave and come back on to standard offer
12   service.
13       I think the concerns of TransCanada
14   went even beyond that, though.  I mean, for
15   example, if -- if there was a subsequent
16   change in the actual fixed price of power
17   under the standard offer service agreement,
18   we did not want to be held responsible for
19   that, and hence the insertion of the 8.3
20   language.
21 Q   If I could show you what's been marked
22   Exhibit 56, and I refer you to page 007312.
23       Do you recall receiving this
24   document?

50 (Pages 194 to 197)

Page 262

1    deliver us the tariffs when they were filed
2    and approved.
3 Q  But if you didn't confirm the tariffs, how
4    were you able to -- how would you be able to
5    check the payments that you were being made
6    pursuant to the tariffs?
7 A  You'll have to ask Mike Hachey about that.
8 Q  Did you ever consider that the Rhode Island
9    PUC might not approve EUA operating under
10    the terms of the Narragansett contract?
11 A  I think if -- my recollection, which is
12    somewhat hazy, was that if the Rhode Island
13    PUC refused to ratify it, that was an event
14    entitling us to termination.
15 Q  Under what provision -- you're thinking
16    under the standard offer agreement?
17 A  Yes.
18 Q  What provision are you thinking of?
19 A  I could be wrong.  That is a recollection
20    that I thought I had.
21      (Discussion off the record.)
22      (Recess.)
23 A  So I was looking in the asset purchase
24    agreement, because I thought at one time we

Page 263

1    had a condition in there regarding the
2    approval of the tariffs, and it only refers
3    to the FERC stipulations.
4      So I would just rely on Section 8.3,
5    which I think covers that situation you
6    referred to.
7 Q  Which portion of 8.3 in your view would
8    apply to a situation where a tariff was not
9    approved?
10      MR. WINSTON: Objection.
11      (Witness read document.)
12 A  I would -- I can just read it.
13      "In the event that the standard offer
14    service or the terms and conditions for
15    suppliers are terminated, amended or
16    replaced by any governmental or regulatory
17    agency having jurisdiction over the
18    provision of standard offer service," blah,
19    blah, blah, "the company shall promptly
20    reimburse suppliers for any such costs or
21    increased obligations."
22 Q  Where does approval fit in on those three
23    operative terms, or disapproval?
24 A  If they disapproved it, I think they would

Page 264

1    replace it -- I mean, you have -- you have
2    an act which states that standard offer
3    service is going to be provided and that
4    suppliers are entitled to the protection of
5    fuel adjustment provisions.
6      So I think the Rhode Island PUC had
7    an obligation to approve a tariff related to
8    the provision of standard offer service.
9 Q  That act applied to wholesale suppliers,
10    doesn't it?
11 A  You're suggesting if they were to -- you're
12    asking me to speculate if they did not
13    apply -- if they did not approve it with
14    respect to retail?
15 Q  Yes.
16      MR. WINSTON: Objection.
17 A  I can't --
18 Q  You have no opinion on that?
19 A  Yes, I have no opinion on that.
20 Q  What benefits or advantages do you think
21    Narragansett got or was trying to get by not
22    applying for a fuel adjustment factor after
23    2004?
24 A  I can't even speculate.  I -- I --

Page 265

1      Sorry, I can speculate by not
2    applying -- if they were successful in an
3    argument that the fuel adjustment factor did
4    not apply for that period, the resulting
5    overall power purchase cost to their
6    ratepayers would have been lower, and they
7    would have seen that as a positive.
8 Q  I show you Exhibit 121 and ask if you've
9    seen that.
10      (Witness read document.)
11 A  I have not seen this, that I am aware of;
12    but I am -- I was aware when the document
13    was received.  I was advised that we had
14    received such a document.
15 Q  Are you aware that the funds being paid by
16    National Grid to TransCanada are not being
17    placed in an escrow account?
18 A  I wasn't aware of that.
19 Q  Do you know whether -- I guess that means
20    you don't know whether Narragansett was ever
21    advised of that fact before this litigation?
22 A  I mean, Narragansett can make all kinds of
23    requests as to where they would prefer the
24    money to go, but I don't know that --

67 (Pages 262 to 265)

# SCIALABBA

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

- - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING    :

LTD,                           :

        Plaintiff,          :    CASE NO.

VS.                            :    05-40076 FDS

NARRAGANSETT ELECTRIC CO.,     :

        Defendant.          :

- - - - - - - - - - - - - - -


    DEPOSITION OF STEPHEN T. SCIALABBA, a witness

called by and on behalf of the Plaintiff, taken

pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before

Sandra L. Bray, Registered Diplomate Reporter,

CSR Number 103593, and Notary Public in and for

Commonwealth of Massachusetts, at the offices of

Choate Hall & Stewart LLP, Two International

Place, Boston, Massachusetts, on Thursday,

March 29, 2007, commencing at 10:15 a.m.

Page 98

1    relative to the fuel that indicated the fuel for
2    the legacy EUA contracts did not continue post-
3    2004.
4    Q.  You think that was in the year 2000?
5    A.  I'm speculating now.  Thinking about this now,
6        that would have been the time frame it came in,
7        soon after the rate plan was approved and the
8        merger was approved by the regulators.
9    Q.  I show you what's been marked as Exhibit 142.
10       Do you recognize this document?
11   A.  Sure.  It's a standard offer filing of
12       Narragansett Electric, August of 2001.
13   Q.  Is this something you would have reviewed?
14   A.  Yes.
15   Q.  If I could turn your attention to Page 3 of the
16       prefile testimony of Mr. Hager.
17   A.  Yes.
18   Q.  If you could read his question and answer on the
19       description of the fuel index provision.
20          MR. LODEMORE:  I'm sorry.  What page?
21          MS. PLOTKIN:  Page 3 of 7 at the top.
22          MR. LODEMORE:  Oh, I see.  Thanks.
23   A.  Read it to myself --
24   Q.  Yeah.

Page 99

1    A.  -- or out loud?  Yes, I've read it.
2    Q.  And the last sentence refers -- states that,
3        "The text of the fuel adjustment provision that
4        is applicable to each of the standard offer
5        contracts is provided as MJH 1," and if you
6        could turn to that.  It's 8602 at the bottom, if
7        that helps you.
8    A.  Yes.
9    Q.  Does this list fuel triggers through 2009?
10   A.  This does, but this wouldn't represent the fuel
11       index provisions for all the standard offer
12       contracts.
13   Q.  Is there somewhere that says that it doesn't in
14       here?
15   A.  Is there somewhere that says it does not?
16          MR. LODEMORE:  Objection.
17   Q.  You said this wouldn't represent the standard
18       offer fuel index in all of the contracts.  Why
19       do you say that?
20   A.  Well, it obviously doesn't represent the fuel
21       index provision in the TransCanada contract or I
22       wouldn't be sitting here.
23   Q.  I don't know -- I mean this is the filing.  The
24       filing is what it is.  We don't have any

Page 100

1    knowledge -- I mean, do you have any knowledge
2    of what the fuel index provision for the
3    TransCanada contract is?  Do you know?
4    A.  Well, we talked about it earlier today, and I
5        told you that I looked at it earlier this week.
6    Q.  And what is your understanding of what the fuel
7        trigger --
8    A.  There's no trigger point after 2004.
9    Q.  And is that in that document there?
10   A.  Which document?
11   Q.  Exhibit 1, the standard offer service contract.
12       How do you know there's no fuel trigger?
13   A.  It's actually in the standard offer tariff
14       between Newport and Blackstone.  The contract
15       refers to the tariff as stating what the fuel
16       provision would be.  So by reference to the
17       tariff, that's -- it's in the contract by
18       reference to the tariff, and the tariff is the
19       item that has the fuel trigger on it.
20   Q.  And which tariff in particular?  We saw a few
21       tariffs today from EUA.  It looks like they
22       filed numerous ones.  Which one --
23   A.  The tariff approved as a result of the April
24       1998 filing --

Page 101

1    Q.  And to your recollection --
2    A.  -- and any subsequent tariff that was approved.
3    Q.  And to your recollection, did EUA, before they
4        merged, would they have filed the tariff --
5        would they have ever updated that tariff -- do
6        you know whether they ever intended to update
7        the tariff that was on the books at the time of
8        the merger?
9    A.  I do not know.
10   Q.  They could have updated the tariff to include
11       fuel triggers through 2009; couldn't they have?
12   A.  Could they have?
13   Q.  Could they have?
14   A.  I suppose.
15   Q.  Do you have any knowledge as to whether or not
16       they intended to file an updated tariff with
17       fuel triggers through 2000?
18   A.  I have no idea.  I don't know.
19   Q.  So your statement that the fuel index provision
20       of the TransCanada contract only has triggers
21       through 2009 is just based on the tariff that
22       was on the books at the time of the merger; is
23       that correct?
24          MR. LODEMORE:  Objection.

26 (Pages 98 to 101)

Page 102

1   A.  Say that again, please.  I didn't hear the
2       question.
3   Q.  The statement that you made that your
4       understanding of the fuel index provision of the
5       TransCanada contract only has triggers through
6       2004; is that correct?
7           MR. LODEMORE:  I'm sorry.  Could I get
8       that back?
9           MS. PLOTKIN:  I can rephrase it.  It
10      wasn't correct.
11  Q.  You stated that your understanding that the
12      TransCanada contract fuel index provision only
13      had triggers through 2004; is that correct?
14  A.  Let me clarify.  The contract does not have any
15      trigger provisions in it.  The contract refers
16      to the retail companies making -- seeking
17      regulatory approval for fuel payments.  To the
18      extent regulators approve fuel payments, then
19      those would be passed through to TransCanada.
20      That's more clear.
21  Q.  Okay.  So do you have any reason to believe that
22      EUA would not have filed tariffs with fuel
23      triggers through 2005 -- 2005 through 2009?
24  A.  I don't have any information whether they would

Page 103

1       or wouldn't file.
2   Q.  So no information whatsoever.
3           (The witness shook his head.)
4   Q.  Back to this document, if you could read again
5       Mr. Hager's description of the fuel index
6       provision and whether this attachment -- whether
7       he states the attachment only represents the
8       fuel index provision for the Narragansett
9       contracts.
10  A.  It's a quote.  It says, "The text of the fuel
11      index adjustment provision as applicable to each
12      of the standard offer contracts is provided in
13      Exhibit MJH-1."
14  Q.  So that doesn't make any differentiation; is
15      that correct?
16  A.  That's correct.
17  Q.  And this lists trigger numbers through 2001,
18      MJH-1?
19  A.  That's correct.
20  Q.  And do you recall at the time reviewing this
21      thinking this was incorrect in any way?
22  A.  I don't recall thinking if this was incorrect.
23      I don't think at this time I was all that well
24      versed in the underlying contracts.

Page 104

1   Q.  Back in the 2000 time frame, do you recall
2       Mr. Hager testifying concerning before the PUC
3       the issue of the fuel trigger and the EUA
4       contracts?
5   A.  Back in the 2000 time frame?  I didn't go back
6       and look at transcripts.  I didn't go back and
7       try to research this.  I recall -- I recall it
8       more currently, closer to the end point of the
9       2004 period, maybe a year or two before that.
10  Q.  Okay.  So let's say --
11  A.  In 2002 -- going back to right after the merger,
12      I don't recall whether he did or didn't.  You
13      know, I don't have a -- I know for -- I'm much
14      more sure he did it 2002-2003.  I don't recall
15      2000-2001 came out.
16  Q.  So in the 2002-2003 time period, you recall you
17      were at hearings where Mr. Hager testified
18      concerning the issue concerning the EUA fuel
19      index payment?
20  A.  Right.
21  Q.  And do you recall what he stated?
22  A.  He indicated for the EUA contracts there's no
23      more fuel after 2004, and I'm not sure what
24      else.  I remember him disclosing that at that

Page 105

1       point or discussing it in answer to some
2       questions from the Commission.  There was some
3       discussions from Mr. Hager about, you know, what
4       he relayed back to the suppliers.
5   Q.  Do you recall what he stated about what he had
6       relayed back to the suppliers about the issue?
7   A.  You know, not specifically.  I'd have to go back
8       and look at documents.
9   Q.  Were you -- do you recall at all at the time
10      being concerned as to whether the suppliers had
11      the same view as Mr. Hager on the issue?
12  A.  I don't recall if I was concerned.  I think the
13      question came up.
14  Q.  Were you --
15  A.  I'm not sure if it ever got resolved.
16  Q.  The question came up at the hearing or the
17      question came up --
18  A.  No, no, at the hearing.
19  Q.  And you're not sure whether the issue ever got
20      resolved.
21  A.  Well, I think now we all know how it got
22      resolved.
23  Q.  Do you recall at the time being concerned that a
24      supplier could terminate and walk away from

27 (Pages 102 to 105)

Page 126

1      MR. ROBERTI: Objection.
2   Q. -- in the reconciliation calculation? They
3      could have just not put it in there at all,
4      correct?
5   A. They could have excluded it. The Commission may
6      have discussed this point. In fact, I think
7      they did, but I don't know ultimately what the
8      Commission told them to do.
9   Q. And the Division didn't take a position on that;
10     is that correct?
11  A. I don't believe we took a position in opposition
12     to include those in the reconciliation account.
13  Q. So you don't think you took a position in
14     opposition?
15  A. Correct.
16          MS. PLOTKIN: If I could just take
17     five minutes, I'm probably done.
18          MR. LODEMORE: Sure.
19          (Recess taken from 2:13 p.m. to
20          2:18 p.m.)
21          MS. PLOTKIN: I'm done pending
22     Mr. Lodemore's questions.
23          MR. LODEMORE: Yes, I've just got a
24     few, and I'll do my best to be quick as I will

Page 127

1      be. Wendy, is it okay if I borrow some of your
2      exhibits?
3          MS. PLOTKIN: Of course.
4          MR. LODEMORE: Could we start with
5      Exhibit 9, please?
6          THE WITNESS: I have it.
7      EXAMINATION BY MR. LODEMORE:
8   Q. Great. Mr. Scialabba, you recall that counsel
9      asked you various questions about this document
10     earlier in the day?
11  A. Yes.
12  Q. Really centered around -- and obviously, I'm
13     just paraphrasing here, but centered around the
14     reason or your understanding of the rationale
15     that the dates ended in 2004, correct?
16  A. Yes.
17  Q. If you could flip to a page that we didn't
18     review this morning, and it's 61659, and just
19     take a quick look at the reduced -- the section
20     that's marked Reduced Rates to All Customers?
21  A. Yes.
22  Q. And what I'm going to do is once you've reviewed
23     that section, just ask you, does that refresh
24     your recollection about any negotiations that

Page 128

1      had taken place with EUA concerning some type of
2      rate guarantee for some portion of the standard
3      offer service period?
4   A. Let me read this.
5          Okay. I've read it. The question
6      again?
7   Q. Does that refresh your recollection about any
8      negotiations or agreement between the Division
9      and the distribution companies concerning a
10     guaranteed rate through January 1, 2004?
11  A. It indicates here that at the time, February
12     1997, the intent was to provide for the EUA
13     customers a 10 percent, I guess, overall rate
14     reduction through 2004.
15  Q. But that doesn't refresh your recollection about
16     any of the surrounding discussions or
17     negotiations?
18  A. In what context?
19  Q. And, frankly, one of the puzzling features of
20     this case is that we see so many documents,
21     especially early in the period in question, '96,
22     '97, refer to a 2004 end date, and I think all
23     parties are struggling to figure out why that
24     was. And so -- and that's the context in which

Page 129

1      I'm asking you for your best recollection of
2      that period.
3   A. It doesn't trigger it.
4   Q. It was worth a shot. We have asked a lot of
5      other witnesses, and their testimony is
6      completely consistent with that, I'm afraid. So
7      you're not alone.
8          You recall, Mr. Scialabba, that you
9      testified quite early in the day today about the
10     financial relationship between the suppliers,
11     the distribution companies, and the customers
12     with regard to the fuel index -- or the fuel
13     adjustment, excuse me, in which -- I'm
14     paraphrasing, excuse me, the costs of the fuel
15     index are parsed from the fuel companies through
16     the distribution companies to the supplier. Do
17     you recall that?
18  A. Yes.
19  Q. Is that a fair summary of the financial
20     relationship?
21  A. Yes.
22  Q. Is it your understanding that that financial
23     relationship also existed under the standard
24     offer service agreement between TransCanada, the

33 (Pages 126 to 129)

Page 130

1  distribution companies, and the customers?
2       MS. PLOTKIN: Objection.
3  A.  You're asking relative to TransCanada to the
4     extent fuel payments were made or collected and
5     rates, that they would go from customers to the
6     utility to the supplier?
7  Q.  That's correct.
8  A.  Yes, that's the same.
9  Q.  And so would it be fair to say that
10     Narragansett -- sorry, strike that.  Would it be
11     fair to say that EUA in 1998, when they formed
12     this contract, would neither make money nor lose
13     money on the fuel adjustment factor in the
14     TransCanada contract?
15  A.  That's my understanding, correct.
16  Q.  And would they have had any financial interest
17     in whether that fuel adjustment ceased in 2004
18     or in 2009?
19  A.  Not that I am aware of or not that I can
20     understand, correct.
21  Q.  Would that also have gone for National Grid when
22     it merged with EUA in 2000?
23  A.  Correct.
24  Q.  Now, you testified earlier that it was your

Page 131

1     understanding sitting here today that the
2     TransCanada contract had fuel -- had a fuel
3     index that ended in 2004, correct?
4  A.  The standard offer tariff of Blackstone and
5     Narragansett had a fuel index that ended in
6     2004.  The contract referred to -- I forget the
7     terminology, but it referred to some retail --
8     something the retail companies would seek from
9     the Commission.
10  Q.  Understood.  Now, you saw a lot of tariffs this
11     morning, both draft and final tariffs for EUA,
12     correct?
13  A.  Correct.
14  Q.  And, in fact, counsel for TransCanada made a
15     point of pointing out that many of those had
16     stipulated rates in them for just one year,
17     correct?
18  A.  Yes.
19  Q.  Do you recall seeing any tariff this morning,
20     either draft or final, that had a fuel index in
21     it with anything but an end date in 2004?
22       MS. PLOTKIN: Objection.
23  A.  No.
24  Q.  Now, do you have any reason to believe that all

Page 132

1     those tariffs that include a fuel index with an
2     end date of 2004 -- or, strike that.  Do you
3     have any reason to believe that the end date in
4     2004 of the fuel index was an arbitrary date?
5       MS. PLOTKIN: Objection.
6  Q.  Or an error?
7       MS. PLOTKIN: Objection.
8  A.  No.
9  Q.  Do you have any reason to believe that it was
10     EUA's intent that the fuel index ended in 2004
11     as it's stated in those tariffs?
12       MS. PLOTKIN: Objection.
13  A.  The tariff which I had looked at prior to coming
14     to this deposition was the tariff filing made in
15     April of '98 to the Commission, which had the
16     base price go through 2009 and the fuel trigger
17     points listed through '04.  If you'll bear with
18     me for one second.
19  Q.  Please take your time and refer to any of the
20     exhibits that you feel are relevant.
21  A.  And I'm not sure that filing was actually made
22     an exhibit today.  The closest thing to it was,
23     I guess, a subsequent compliance filing that the
24     companies made July 17th, 1998, which was in

Page 133

1     compliance upon the Commission decision rendered
2     based upon the April '98 filing by Blackstone
3     and Newport.  Both the April '98 filing and its
4     compliance filing -- I'm looking for the
5     standard offer provision in here.  Excuse me.
6  Q.  Excuse me.  Let's just identify what you're
7     flicking through for the record.  It's
8     Exhibit --
9  A.  I'm flipping through Exhibit 74.  Let me step
10     back.  This has a fuel trigger point that goes
11     through 2004.
12  Q.  Right.  And that's, again, for the record, on
13     07359, correct?  Is that the page you're looking
14     at?
15  A.  I was actually looking at 07340 and carries over
16     to 07341.  The page you just referred to is a
17     red-lined version.
18  Q.  Oh, I see.  Thanks.
19  A.  This has fuel trigger points go through 2004.
20     As you look at the -- if you looked at a prior
21     page, 07358 -- this is what I was remembering --
22     this has the multiplier that goes through 2009.
23     If you look at the clean tariff, it doesn't have
24     the multiplier -- this is what just confused

34  (Pages 130 to 133)

**PART 5 OF 5**

# ST. PIERRE

Page 1

1                 VOL. I, PAGES 1 - 211

2             U.S. DISTRICT COURT

3          DISTRICT OF MASSACHUSETTS

4             (Cental Division)

5

6  Civil Action No. 05-400076 FDS

7

8  TRANSCANADA POWER MARKETING, LTD

9                 Plaintiff

10  V.

11  NARRAGANSETT ELECTRIC COMPANY

12                 Defendant

13

14          - - - - - - -

15   VIDEOTAPED DEPOSITION OF DENNIS ST. PIERRE

16       Tuesday, January 30, 2007

17             9:01 a.m.

18          Choate Hall & Stewart

19       Two International Place

20          Boston, Massachusetts

21          - - - - - - -

22      Reporter:  Deborah Roth, RPR/CSR

23

24

Page 58

| | |
|---|---|
| 1 the fuel adjustment mechanism kicking in if it | 10:18:46 |
| 2 does kick in. | 10:18:49 |
| 3    A.  Uh-huh. | 10:18:50 |
| 4    Q.  Okay.  "If it does kick in" is the | 10:18:51 |
| 5 regulatory approval? | 10:18:53 |
| 6    A.  Right. | 10:18:54 |
| 7    Q.  Let me also show you what has been | 10:18:58 |
| 8 marked as Exhibit 4.  If you would look at | 10:19:08 |
| 9 that, that is a letter to the Public Utilities | 10:19:20 |
| 10 Commission. | 10:19:22 |
| 11      If you just look at Page 4, that's | 10:19:27 |
| 12 what you write in that letter. | 10:19:34 |
| 13    A.  Yes. | 10:19:35 |
| 14    Q.  If you see on the second page -- who | 10:19:35 |
| 15 generally wrote these letters?  Did you write | 10:19:40 |
| 16 them? | 10:19:42 |
| 17      MR. O'ROURKE:  Objection. | 10:19:44 |
| 18    A.  A combination of things would happen. | 10:19:46 |
| 19 Any time we are filing a tariff advice, we | 10:20:02 |
| 20 also work with legal counsel. | 10:20:06 |
| 21      So whether this was drafted by me or | 10:20:10 |
| 22 drafted by legal counsel, or vice versa, we | 10:20:15 |
| 23 always go through that process before anything | 10:20:18 |
| 24 goes to the utility commission, on a | 10:20:21 |

Page 59

| | |
|---|---|
| 1 regulatory basis, like a tariff advice filing, | 10:20:24 |
| 2 is reviewed by counsel. | 10:20:26 |
| 3    Q.  Okay.  You would have reviewed this | 10:20:27 |
| 4 letter before you signed it? | 10:20:32 |
| 5    A.  Yes, uh-huh. | 10:20:33 |
| 6    Q.  And you would have made sure it was | 10:20:34 |
| 7 accurate? | 10:20:35 |
| 8    A.  Yes. | 10:20:36 |
| 9    Q.  And if you look at the second page, it | 10:20:36 |
| 10 refers to an order of the PUC dated July 10, | 10:20:43 |
| 11 1998, at the very top. | 10:20:47 |
| 12    A.  Yes. | 10:20:49 |
| 13    Q.  And then you note in the order that the | 10:20:49 |
| 14 Commission noted, and the first sentence, it | 10:20:51 |
| 15 refers to the settlement agreement which -- or | 10:20:55 |
| 16 the -- it refers to something called the ASA, | 10:20:59 |
| 17 a service agreement with Montaup. | 10:21:02 |
| 18    A.  Right. | 10:21:04 |
| 19    Q.  And then it says, "Under the terms of | 10:21:05 |
| 20 the ASA, Montaup Electric Company is committed | 10:21:08 |
| 21 to provide this standard offer power supply to | 10:21:11 |
| 22 the companies at fixed standard offer price | 10:21:12 |
| 23 subject to fuel index over term that this | 10:21:15 |
| 24 standard offer service will be available in | 10:21:17 |

Page 60

| | |
|---|---|
| 1 Rhode Island." | 10:21:19 |
| 2    A.  Yes, I read that. | 10:21:20 |
| 3    Q.  This was an accurate letter when you | 10:21:27 |
| 4 wrote it? | 10:21:30 |
| 5      MR. O'ROURKE:  Objection.  Are you | 10:21:30 |
| 6 implying that he wrote those words? | 10:21:36 |
| 7      MR. WINSTON:  I am implying he sent | 10:21:38 |
| 8 the letter. | 10:21:40 |
| 9      MR. O'ROURKE:  Okay. | 10:21:40 |
| 10    A.  I guess in reading that sentence, it | 10:21:41 |
| 11 could be interpreted several ways. | 10:21:59 |
| 12    Q.  Mr. St. Pierre, when you were at EUA, | 10:22:02 |
| 13 did you ever discuss with anybody the | 10:22:06 |
| 14 possibility of the fuel adjustment ending | 10:22:08 |
| 15 prior to the end of 2009? | 10:22:10 |
| 16    A.  Not ending prior to, but I recall | 10:22:12 |
| 17 discussions way late in the game, where we | 10:22:21 |
| 18 were made aware that Narragansett Electric and | 10:22:25 |
| 19 the New England electric systems were | 10:22:31 |
| 20 proposing to extend the fuel index mechanism | 10:22:33 |
| 21 out to 2009. | 10:22:37 |
| 22    Q.  Okay.  When was that? | 10:22:44 |
| 23    A.  It surely had to be within this late | 10:22:47 |
| 24 1998 time frame, and I don't recall | 10:22:53 |

Page 61

| | |
|---|---|
| 1 specifically the dates. | 10:22:59 |
| 2    Q.  Did you ever have any discussions at | 10:23:00 |
| 3 EUA about a decision of EUA not to have a fuel | 10:23:02 |
| 4 adjustment for the standard offer service | 10:23:06 |
| 5 through 2009? | 10:23:09 |
| 6    A.  The way you phrased the question, I | 10:23:10 |
| 7 would have to say no. | 10:23:33 |
| 8    Q.  Okay.  And the standard offer service | 10:23:39 |
| 9 was priced by the filing of tariffs by your | 10:23:41 |
| 10 department, was it not? | 10:23:44 |
| 11    A.  Yes, it was. | 10:23:45 |
| 12    Q.  You were director of that department? | 10:23:47 |
| 13    A.  Yes. | 10:23:49 |
| 14    Q.  And as the director of that department, | 10:23:50 |
| 15 you were unaware of any decision or plan by | 10:23:55 |
| 16 EUA to stop the fuel adjustment prior to 2009; | 10:23:56 |
| 17 isn't that correct? | 10:24:01 |
| 18    A.  Could you restate that? | 10:24:08 |
| 19    Q.  Were you aware of any plan or decision | 10:24:08 |
| 20 by any of the EUA companies to stop applying | 10:24:12 |
| 21 for a fuel adjustment before 2009? | 10:24:17 |
| 22    A.  No.  But I would have to qualify that | 10:24:21 |
| 23 answer, because I don't recall any discussion | 10:24:30 |
| 24 of the fuel adjustment extending out to 2009 | 10:24:33 |

16 (Pages 58 to 61)

Page 62

| | |
|---|---|
| 1 in our original settlement negotiations. | 10:24:37 |
| 2     The construct that I recall was that | 10:24:43 |
| 3 the fuel adjustment mechanism was going to be | 10:24:46 |
| 4 in place in Mass. and Rhode Island only | 10:24:48 |
| 5 through 2004. | 10:24:50 |
| 6   Q.   Did you intend to comply with the URA | 10:24:53 |
| 7 requirement that the standard offer service be | 10:24:57 |
| 8 provided in Rhode Island through 2009? | 10:24:58 |
| 9     MR. O'ROURKE:  Objection. | 10:25:00 |
| 10  A.  Yes. | 10:25:00 |
| 11  Q.   Did you understand that you made some | 10:25:01 |
| 12 agreement with the regulators that was | 10:25:04 |
| 13 inconsistent with the statute? | 10:25:05 |
| 14  A.  No. | 10:25:07 |
| 15  Q.  Okay. | 10:25:14 |
| 16  A.   And I say that, because if the statute | 10:25:16 |
| 17 is the law, and the law says that at some | 10:25:21 |
| 18 point in time the companies have the ability | 10:25:24 |
| 19 to petition the Commission for an adjustment | 10:25:27 |
| 20 to standard offer, that language doesn't have | 10:25:32 |
| 21 to be in a tariff to be in effect, that | 10:25:34 |
| 22 legislation is the law. | 10:25:38 |
| 23     So that carries with it the ability | 10:25:40 |
| 24 of the companies to seek permission to recover | 10:25:43 |

Page 63

| | |
|---|---|
| 1 in rates extraordinary fuel costs if in fact | 10:25:46 |
| 2 they incur them. | 10:25:49 |
| 3   Q.   Through 2009, correct? | 10:25:51 |
| 4   A.   Right. | 10:25:53 |
| 5   Q.   Or if their suppliers incur them | 10:25:54 |
| 6 through 2009, correct? | 10:25:57 |
| 7   A.  I am not sure I can agree to that, if | 10:26:03 |
| 8 their suppliers. | 10:26:05 |
| 9   Q.   Well, the retail companies incur fuel | 10:26:06 |
| 10 costs. | 10:26:09 |
| 11  A.   The retail companies would have been | 10:26:10 |
| 12 billed under the wholesale -- amended service | 10:26:13 |
| 13 agreement at those stipulated prices, if we | 10:26:16 |
| 14 are still in that time frame. | 10:26:21 |
| 15     What I am saying to you is that the | 10:26:25 |
| 16 law as written provides that there be an | 10:26:32 |
| 17 opportunity to recover extraordinary fuel | 10:26:38 |
| 18 costs as well as increases in federal and | 10:26:41 |
| 19 state taxes, if and when those events happen. | 10:26:43 |
| 20  Q.   Through 2009? | 10:26:47 |
| 21  A.   Through 2009. | 10:26:48 |
| 22     THE VIDEOGRAPHER:  We need to | 10:26:52 |
| 23 change tapes. | 10:26:54 |
| 24     MR. WINSTON:  Okay. | 10:26:54 |

Page 64

| | |
|---|---|
| 1     THE VIDEOGRAPHER:  This is the end | 10:26:54 |
| 2 of tape number one.  The time is 10:24.  We | 10:26:55 |
| 3 are off the record. | 10:27:00 |
| 4     (A recess was taken.) | 10:35:27 |
| 5     THE VIDEOGRAPHER:  We are back on | 10:35:27 |
| 6 the record.  The time is 10:32. | 10:35:38 |
| 7   BY MR. WINSTON: | 10:35:43 |
| 8   Q.   Okay.  Mr. St. Pierre, you mentioned | 10:35:44 |
| 9 that there was discussion about stopping the | 10:35:49 |
| 10 Rhode Island standard offer service at 2004. | 10:35:53 |
| 11 What did you mean by that? | 10:35:55 |
| 12  A.   My recall goes back to our federal | 10:35:56 |
| 13 filing, and that's the filing where we | 10:36:04 |
| 14 submitted to the federal commission the | 10:36:07 |
| 15 settlement agreements for Mass. and Rhode | 10:36:09 |
| 16 Island, and the construct that I recall for | 10:36:12 |
| 17 those settlements was that the fuel trigger | 10:36:15 |
| 18 mechanism for both states only extended | 10:36:22 |
| 19 through 2004. | 10:36:25 |
| 20  Q.   Okay.  Did you ever have any | 10:36:29 |
| 21 discussions with regulators about the retail | 10:36:46 |
| 22 companies not being able to file for | 10:37:00 |
| 23 extraordinary fuel cost through the full term | 10:37:01 |
| 24 of the standard offer service? | 10:37:05 |

Page 65

| | |
|---|---|
| 1   A.  No, I did not. | 10:37:06 |
| 2   Q.   Are you aware of any such discussions | 10:37:07 |
| 3 with regulators? | 10:37:10 |
| 4   A.  I am not. | 10:37:12 |
| 5   Q.   What did EUA -- what was the process | 10:37:13 |
| 6 that EUA went through to implement the URA? | 10:37:17 |
| 7   A.   First we had to understand what impact | 10:37:20 |
| 8 the URA had on our company, which is why you | 10:37:37 |
| 9 see some of those summaries of the URA. | 10:37:40 |
| 10     Then we had to formulate a business | 10:37:45 |
| 11 plan and add and allocate the appropriate | 10:37:49 |
| 12 resources to implement whatever the URA called | 10:37:52 |
| 13 for, and the rate department made a full | 10:37:59 |
| 14 commitment, power management made a full | 10:38:06 |
| 15 commitment, and it was just mind-boggling with | 10:38:09 |
| 16 everything that was going on, how a small | 10:38:12 |
| 17 company could allocate resources and come out | 10:38:14 |
| 18 at the end of this process with something that | 10:38:18 |
| 19 looked like we made it, but it definitely was | 10:38:20 |
| 20 a trying experience, and I remember some of my | 10:38:24 |
| 21 people, it was not unusual to work 80, 90 hour | 10:38:28 |
| 22 weeks. | 10:38:33 |
| 23  Q.   For what time period was that? | 10:38:39 |
| 24  A.   Almost two years. | 10:38:40 |

17 (Pages 62 to 65)

Page 106

1 fuel index only applied to 2004.                          11:34:50
2   Q.  Well, did you have an understanding at             11:34:53
3 the time as to the length of time Narragansett            11:34:55
4 had a fuel -- had planned to file a fuel                  11:34:58
5 index?                                                    11:35:01
6   A.  Again, when we first started our                   11:35:02
7 settlement discussions, our construct, which             11:35:04
8 was based upon information that we received              11:35:07
9 from NEES and from the Division and the                  11:35:13
10 Attorney General, that we were talking the             11:35:16
11 2004 period for the fuel adjustment mechanism.          11:35:21
12   Q.  And what was that information?                    11:35:25
13   A.  That was the construct for the standard           11:35:27
14 offer itself that NEES had developed at that            11:35:30
15 time.                                                    11:35:34
16   Q.  And how was that communicated to you?             11:35:36
17   A.  That was -- and as I indicated, that              11:35:38
18 was already in the hands of the Division,                11:35:40
19 already in the hands of the Attorney General            11:35:44
20 in Massachusetts, not Rhode Island, but                 11:35:46
21 Massachusetts, that formulated the basis for            11:35:48
22 what the Attorney General wanted to see with            11:35:53
23 our company as well.                                     11:35:55
24   Q.  Okay.  So your memory is that the                 11:35:56

Page 107

1 regulators told you that --                               11:35:59
2   A.  Not --                                             11:36:02
3   Q.  -- NEES did not have a fuel index                  11:36:02
4 through 2009?                                             11:36:04
5   A.  Not regulators.  The people that were             11:36:06
6 involved in negotiating the settlement between           11:36:11
7 Mass. Electric and whoever else was in the               11:36:14
8 settlement discussions, that the -- what they            11:36:18
9 were discussing in that time was a fuel index            11:36:26
10 that only extended through 2004.                         11:36:28
11   Q.  Well, Mass. Electric is a Massachusetts           11:36:31
12 company?                                                 11:36:35
13   A.  Yes.  If you recall, I indicated to you           11:36:35
14 that both our Mass. settlements and our Rhode            11:36:37
15 Island settlements were -- for our intents and          11:36:40
16 purposes, we were trying to make them as                11:36:42
17 identical as possible so our Rhode Island and           11:36:45
18 Mass. files had the index for 2004.                      11:36:47
19   Q.  Didn't your Mass. and Rhode Island --             11:36:50
20   A.  And we first started with Mass., and             11:36:52
21 then brought that to Rhode Island, and it was           11:36:55
22 accepted by the signatories to that settlement          11:36:56
23 agreement that was filed at FERC, that the              11:36:59
24 index only applied through 2004.                         11:37:01

Page 108

1   Q.  And your understanding at the time was            11:37:05
2 that NEES's settlement also only applied, the            11:37:07
3 fuel index only applied through 2004?                    11:37:10
4   A.  Yes, at that time, yes.                            11:37:13
5   Q.  Do you have an understanding of why the           11:37:16
6 fuel index would only apply through 2004?                11:37:20
7   A.  I could guess, but I am not really an             11:37:27
8 expert on --                                             11:37:47
9   Q.  What's your guess?                                 11:37:50
10   A.  -- what it is.                                    11:37:49
11      Well, I would assume, based on                    11:37:55
12 everything that was going on, that when you             11:37:57
13 look at the series of prices in standard                11:37:59
14 offer, that at the end of 2004, those prices            11:38:02
15 looked pretty good in terms of the competitive          11:38:05
16 market.                                                  11:38:09
17   Q.  So your memory is that the regulators            11:38:09
18 wanted you to mimic the NEES fuel and trigger           11:38:12
19 pricing through 2009?                                    11:38:17
20      MR. O'ROURKE:  Objection.                          11:38:21
21   A.  You're talking about the Rhode Island            11:38:22
22 regulators?                                              11:38:27
23   Q.  Yes.                                              11:38:28
24   A.  I don't know.                                     11:38:28

Page 109

1   Q.  Well, I thought you just told me that             11:38:29
2 you were encouraged to follow what NEES had              11:38:33
3 done with its triggers as to how far their              11:38:35
4 fuel index went?                                         11:38:39
5   A.  That's true.                                      11:38:43
6   Q.  Okay.  So your understanding was you             11:38:44
7 were instructed by the regulators to adopt a            11:38:47
8 length of fuel adjustments similar to NEES's            11:38:50
9 in Rhode Island?                                         11:38:54
10      MR. O'ROURKE:  Objection.                         11:38:57
11   A.  No.  We were not instructed directly.            11:38:58
12 There was nothing in the stenographic public            11:39:03
13 record that tells us that the chairman or               11:39:06
14 commissioners in Rhode Island wanted to see            11:39:11
15 that implemented --                                     11:39:18
16   Q.  Didn't you --                                    11:39:19
17   A.  -- for the EUA companies.                        11:39:20
18   Q.  Didn't you tell me that you were trying          11:39:22
19 to implement uniform pricing with NEES in              11:39:28
20 Rhode Island?                                           11:39:31
21   A.  Pricing is one thing, yes.                       11:39:33
22   Q.  Didn't you just tell me --                       11:39:36
23   A.  And I said to you that that had the             11:39:38
24 benefit, to the competitive market, of a fixed         11:39:39

28 (Pages 106 to 109)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 110

1 stream of prices that they could compete    11:39:42
2 against, and people knew exactly what they    11:39:46
3 were going to pay. That's what we agreed to,    11:39:48
4 and that would have an overall -- overriding    11:39:50
5 benefit.    11:39:53
6    Q. Was it EUA's -- is it your    11:39:53
7 understanding that it was EUA's intent to    11:39:56
8 adopt a length-of-fuel adjustment which was    11:39:58
9 the same as NEES's in Rhode Island?    11:40:03
10    A. Not to my knowledge.    11:40:07
11    Q. Then how did you decide to stop the    11:40:09
12 fuel index in 2004?    11:40:11
13    A. It was the construct that we originally    11:40:13
14 started with in Massachusetts, a fuel index    11:40:16
15 through 2004.    11:40:20
16       We brought that template in our    11:40:21
17 Rhode Island settlement and maintained that    11:40:25
18 template and got signatories to that    11:40:27
19 settlement agreement that was filed at the    11:40:30
20 federal level, and even the chairman of the    11:40:32
21 Public Utility Commission signed that    11:40:35
22 settlement agreement.    11:40:36
23       So it was our expectation that that    11:40:37
24 is what the chairman wanted to see in Rhode    11:40:39

Page 111

1 Island.    11:40:42
2    Q. And it is your memory that NEES also    11:40:42
3 had fuel triggers only through 2004 in Rhode    11:40:45
4 Island?    11:40:51
5       MR. O'ROURKE: Objection.    11:40:52
6    A. I'm not sure at what point in time I    11:40:53
7 became aware that NEES was changing.    11:41:14
8    Q. Okay.    11:41:20
9    A. Certainly it looks like in this time    11:41:20
10 frame, around May, when they were filing their    11:41:22
11 amended wholesale service agreement with the    11:41:28
12 federal commission.    11:41:31
13    Q. Was the consideration of whether a fuel    11:41:31
14 adjustment went through 2004 or 2009 a    11:41:35
15 significant thing?    11:41:39
16       MR. O'ROURKE: Objection.    11:41:45
17    A. I don't recall it being a significant    11:41:47
18 thing in my discussions with the staff working    11:41:51
19 on the settlements and filings. It didn't    11:41:57
20 come up as a glaring roadblock to what we were    11:42:04
21 trying to achieve.    11:42:11
22    Q. Okay. Was it an identified -- was it    11:42:11
23 identified in the documents that there was no    11:42:15
24 fuel trigger until after 2004?    11:42:17

Page 112

1    A. Of course. I mean, it's right there in    11:42:20
2 black and white. It ends 2004.    11:42:23
3    Q. Where is it in black and white?    11:42:26
4    A. In our federal filing.    11:42:29
5    Q. Okay. Let me show you what's been    11:42:31
6 marked as Exhibit 24. These are responses to    11:42:36
7 some requests of FERC.    11:42:53
8    A. Okay.    11:42:55
9    Q. You see it says, "On May 30, '98" --    11:43:01
10 would you have been involved in responses to    11:43:08
11 FERC about questions about the settlement?    11:43:12
12    A. Some directly and some indirectly.    11:43:14
13       One of my responsibilities was to    11:43:22
14 coordinate the preparation and response and    11:43:25
15 review of data requests.    11:43:29
16    Q. Okay. So you would have reviewed this    11:43:31
17 request and response?    11:43:37
18    A. I might have, and I might not have.    11:43:38
19 There's so many of them, that once a request    11:43:40
20 is reviewed or once a review is prepared, it's    11:43:43
21 normally sent to legal counsel for review --    11:43:49
22    Q. Okay.    11:43:56
23    A. -- by the person, for example, in this    11:43:56
24 particular one, Mike Hirsh, prepared under his    11:43:58

Page 113

1 supervision and direction.    11:44:02
2       Mike Hirsh would have sent this up    11:44:04
3 to legal counsel for review; and if legal    11:44:06
4 counsel made comments or changes or whatever,    11:44:08
5 those would have been incorporated; and once    11:44:10
6 the preparer and legal counsel was satisfied    11:44:13
7 that we answered the question, it would be    11:44:17
8 sent out.    11:44:19
9    Q. This identifies differences between the    11:44:22
10 NEP and EUA settlements. Is that a    11:44:27
11 significant type of response to FERC?    11:44:31
12       MR. O'ROURKE: Objection.    11:44:34
13    A. It's the first one that I'm aware of    11:44:36
14 that we have ever received from FERC comparing    11:44:43
15 -- asking for a comparison.    11:44:47
16    Q. So you think you would have reviewed    11:44:48
17 the response to that?    11:44:51
18    A. I don't recall exactly how many    11:44:53
19 questions they asked. I mean, this says,    11:44:57
20 "Staff 2-5."    11:45:02
21    Q. So you recall that was the first    11:45:03
22 request?    11:45:05
23    A. So it's the second request, No. 5, we    11:45:05
24 are responding to. So this is second set of    11:45:08

29 (Pages 110 to 113)

Page 118

1  make sure they comport with whatever we are    11:49:03
2  trying to comport to and meet requirements of    11:49:06
3  the law.    11:49:09
4    Q.  And is it your understanding that EUA    11:49:09
5  agreed with the regulators that its tariffs    11:49:11
6  would provide the same pricing and fuel    11:49:15
7  triggers as the NEES tariffs for the term of    11:49:17
8  the standard offer service?    11:49:20
9    A.  I don't recall that.    11:49:20
10    Q.  Do you recall that there was discussion    11:49:26
11  that they would be different than the NEES    11:49:28
12  pricing and fuel triggers?    11:49:29
13    A.  I recall that we noted that ours was    11:49:31
14  different, yes.    11:49:41
15    Q.  In what way?    11:49:41
16    A.  That we only extended the fuel trigger    11:49:43
17  through 2004.    11:49:46
18    Q.  Where was that noted?    11:49:47
19    A.  Just a recognition, when you look at    11:49:49
20  some of these documents, that there is a    11:49:54
21  different.    11:49:56
22    Q.  Okay.  Can you look at Exhibit 2 that    11:49:56
23  lists the differences and show me where that    11:50:00
24  is noted?    11:50:03

Page 119

1    A.  I can't.  I didn't prepare it.    11:50:04
2    Q.  Did you read it, Mr. St. Pierre?    11:50:06
3    A.  Did I review this specifically?    11:50:07
4    Q.  Yes.    11:50:08
5    A.  I might have looked at it, but I didn't    11:50:09
6  review it in terms of its complete accuracy,    11:50:11
7  because I wasn't charged with conducting the    11:50:14
8  analysis.    11:50:16
9    Q.  So if someone else is in charge of    11:50:22
10  making a filing that would dictate what your    11:50:24
11  tariffs include, you don't review that?    11:50:27
12    A.  I may be asked for an opinion, and    11:50:32
13  legal counsel may be asked for an opinion, if    11:50:39
14  what we are proposing would pass regulatory    11:50:41
15  muster; but other than that, my job is to put    11:50:46
16  into tariffs what language would comport to    11:50:49
17  comply with agreements and other things.    11:50:55
18    Q.  Is it your understanding that Montaup    11:50:59
19  was obligated to provide backstop service    11:51:01
20  through 2009, if necessary?    11:51:04
21    A.  Yes.    11:51:06
22    Q.  Is it your testimony that Montaup would    11:51:06
23  have been willing to provide backstop service    11:51:09
24  without a fuel adjustment for the last five    11:51:11

Page 120

1  years even though NEES was getting a fuel    11:51:14
2  adjustment?    11:51:16
3    A.  Yes.    11:51:16
4    Q.  That's your understanding?    11:51:17
5    A.  Yes.  Because the URA also had a    11:51:18
6  provision that said if Montaup -- or if the    11:51:21
7  utility incurred extraordinary fuel costs, or    11:51:24
8  increases in taxes, or whatever, we could    11:51:27
9  petition the Commission for adjustments.    11:51:29
10    Q.  No. 6.  Let me show you what has been    11:51:32
11  marked as Exhibit 6.    11:51:46
12        Let me show you what has been    11:51:58
13  marked as Exhibit 6, and that's the responses    11:52:00
14  to Enron.    11:52:17
15        Are these responses you would have    11:52:17
16  been involved with?    11:52:29
17    A.  I am not sure.  I don't see a name    11:52:30
18  associated with the responses.    11:52:45
19    Q.  When you respond to responses, are they    11:52:46
20  generally -- at EAU, are they generally    11:52:49
21  circulated to everyone?    11:52:52
22    A.  Not generally, no.    11:52:54
23        As I indicated, once we receive a    11:53:00
24  data request response, we go through it and    11:53:01

Page 121

1  identify what particular areas are involved in    11:53:04
2  preparing the response.    11:53:07
3        For example, if it is a power    11:53:13
4  management area, we would signify to power    11:53:15
5  management that it has been deemed that this    11:53:18
6  was your responsibility and someone from power    11:53:20
7  management would prepare the draft or do the    11:53:21
8  analysis or whatever to comply with the    11:53:24
9  request.    11:53:26
10        That draft reply would go through a    11:53:27
11  review process.  I might or might not be    11:53:29
12  involved in that review process, because if it    11:53:32
13  is a power-management-related issue, it's not    11:53:35
14  my responsibility.    11:53:37
15    Q.  Okay.  Turn to Page 2564.    11:53:38
16    A.  Okay.    11:53:42
17    Q.  You see there, "Will Montaup Electric    11:53:43
18  Company provide backstop service to both BVE    11:53:47
19  and Newport?"    11:53:48
20        And then it says at the bottom,    11:53:50
21  "Article 5 of this stipulation and agreement    11:53:51
22  provides Montaup shall provide Blackstone and    11:53:53
23  Newport with standard offer service through    11:53:56
24  2009."    11:53:58

31 (Pages 118 to 121)

Page 122

1  A.  Yes.    11:53:58
2  Q.  And if you turn the page to 56523 --    11:54:01
3  A.  Okay.    11:54:16
4  -- there is the question, "What average    11:54:16
5 annual increases in the price of residual oil    11:54:17
6 and gas would trigger the fuel adjustment    11:54:19
7 mechanism in 1999, 2000 and 2010?"    11:54:21
8  A.  Yes.  I see the question.    11:54:25
9  Q.  And then there is an answer that refers    11:54:26
10 to, "Unable to estimate rates of growth that    11:54:30
11 would cause the fuel index to be triggered in    11:54:32
12 2000 and thereafter.  The fuel index does not    11:54:37
13 apply in 1998 or 1999."    11:54:40
14  A.  I see that.    11:54:43
15  Q.  Did EUA feel an obligation to be honest    11:54:44
16 in its responses to requests from parties such    11:54:56
17 as Enron?    11:54:56
18  A.  Yes.    11:54:56
19  Q.  Do you think this is a fair disclosure,    11:54:56
20 if there was no fuel index intended at all    11:54:58
21 from 2005 to '9?    11:55:01
22  A.  Well, I don't read that.  It says:  The    11:55:04
23 fuel index to be triggered in 2000 and    11:55:07
24 thereafter.  I don't know what "thereafter"    11:55:10

Page 123

1 means.  "Thereafter" could be mean 2004.    11:55:11
2    It says we are unable to do --    11:55:18
3  Q.  Let me show --    11:55:20
4  A.  -- to prepare the answer, and    11:55:21
5 "thereafter" to me means -- it could be any    11:55:26
6 time, "thereafter."    11:55:29
7  Q.  Would Montaup agree to a worse deal    11:55:30
8 than NEES on its backstop obligation?    11:55:35
9  A.  I can't comment on that, because I    11:55:38
10 don't know what you are saying.    11:55:46
11    Why would I even have an    11:55:48
12 understanding that the NEES deal was better    11:55:51
13 than the EUA deal?    11:55:52
14  Q.  If you're --    11:55:53
15  A.  You are asking me something that I    11:55:54
16 can't.  I am not an expert there.    11:55:56
17  Q.  Do you think it's preferable for    11:55:58
18 Montaup to have a fuel index from 2005 to '9    11:56:00
19 or to not have a fuel index on a stipulated    11:56:03
20 set of prices?    11:56:06
21  A.  I can't envision what Montaup's    11:56:07
22 circumstances would be.    11:56:15
23    It's not -- I am not part of that    11:56:16
24 business.  I don't know what risks Montaup    11:56:18

Page 124

1 would face if it was putting itself in that    11:56:22
2 position; or if it did or did not have a fuel    11:56:27
3 index.  It's just not my bailiwick.    11:56:29
4  Q.  Before this dispute arose, did you ever    11:56:40
5 have any discussions at EUA about the FERC    11:56:47
6 agreement limiting the fuel adjustment to    11:56:50
7 2004?    11:56:53
8  A.  I'm sure there were discussions amongst    11:56:53
9 our team.    11:57:06
10  Q.  Do you recall any, Mr. St. Pierre?    11:57:07
11  A.  The discussions I recall were the fact    11:57:09
12 that we wanted uniformity in Rhode Island and    11:57:16
13 Massachusetts with respect to our companies.    11:57:18
14  Q.  Well, then why did you -- then why did    11:57:20
15 you do stipulated prices in Rhode Island after    11:57:27
16 2004 in Rhode Island?    11:57:29
17  A.  Because the period extended through    11:57:31
18 2009.  It was either agree to a set of    11:57:34
19 stipulated prices or follow what the URA is    11:57:37
20 telling us to do beyond 2004.    11:57:43
21  Q.  Doesn't the URA provide for    11:57:46
22 extraordinary fuel prices, all the way through    11:57:48
23 the term, Mr. St. Pierre?    11:57:51
24  A.  The way I read it, yes, there is a    11:57:52

Page 125

1 provision that if extraordinary fuel costs are    11:57:57
2 incurred -- and I would have to go back and    11:58:02
3 make sure that's defined as the supplier    11:58:06
4 incurred the extraordinary fuel costs, because    11:58:08
5 you could read that that if the retail company    11:58:12
6 went out for competitive bid for a    11:58:16
7 solicitation, and the prices came in way out    11:58:20
8 of whack, but there was no other choice but to    11:58:24
9 accept them, then the Commission would be    11:58:27
10 allowed, or the Commission would allow the    11:58:29
11 company to recover those extraordinary costs.    11:58:31
12    THE VIDEOGRAPHER:  We have to go    11:58:36
13 off the record and change the tapes.    11:58:37
14    MR. WINSTON:  Okay.    11:58:39
15    THE VIDEOGRAPHER:  This is the end    11:58:40
16 of tape number two.  The time is 11:55.  We    11:58:41
17 are off the record.    11:58:46
18    (A lunch recess was taken from    11:58:46
19    11:55 a.m. to 12:32 p.m.)    11:58:46
20
21
22
23
24

32 (Pages 122 to 125)

Page 134

1 provision, --                                          12:45:37
2  A. Right.                                            12:45:38
3  Q. -- through 2009.                                  12:45:38
4  A. Right.                                            12:45:39
5  Q. Is this the document that you mentioned           12:45:40
6 before that you think specifies limiting the          12:45:41
7 fuel adjustment to 2004?                              12:45:45
8  A. Yes.                                              12:45:47
9  Q. Can you show me where that's detailed,            12:45:49
10 how that is detailed?                                 12:45:52
11  A. I would have to go to Attachment 5,              12:45:53
12 wherever that might be.                               12:46:03
13        Well, my understanding is consistent          12:46:52
14 with the information that appears on Page              12:46:54
15 23520.                                               12:46:59
16  Q. Okay. That's Attachment 4, right?                12:47:01
17  A. Is that what that says? Hang on a                12:47:04
18 second.                                               12:47:27
19        Attachment 4. Which has it in                 12:47:28
20 fuel triggers.                                        12:47:33
21  Q. If you turn back to 23316.                        12:47:34
22  A. Yep.                                             12:47:37
23  Q. That refers to a fuel index in                    12:47:38
24 Attachment 5. Is that an error?                       12:47:42

Page 135

1  A. Hold on a second.                                 12:47:44
2        Yes. Because Attachment 5 says,                12:47:45
3 "Emission reductions from Somerset Canal."             12:47:47
4  Q. Attachment 5 is the attachment in the              12:47:51
5 NEES/FERC settlement that describes the fuel           12:47:54
6 settlement.                                            12:47:59
7  A. I will accept that.                               12:47:59
8  Q. If you turn the page to 23317.                     12:48:01
9  A. 17, 17, okay.                                     12:48:12
10  Q. Do you see, "Right to bid the standard           12:48:15
11 offer."                                               12:48:18
12  A. Uh-huh.                                          12:48:18
13  Q. And it says, "The terms for the bid              12:48:19
14 shall be set forth in Attachment 4"?                   12:48:21
15  A. Uh-huh.                                          12:48:23
16  Q. So Attachment 4 is the bid description?          12:48:24
17  A. Whatever Attachment 4 is.                        12:48:28
18  Q. Attachment 4 is a bid description.               12:48:43
19        If you turn to 23517, okay, you see           12:48:45
20 it describes a seven-year flat discount               12:48:53
21 option?                                               12:48:57
22  A. Yes.                                             12:48:58
23  Q. So that's the term of the standard               12:48:59
24 offer in Massachusetts, right?                        12:49:00

Page 136

1  A. Right. That extends out to 2004.                  12:49:02
2  Q. If you turn the next page, to 23518.              12:49:04
3  A. Yes.                                              12:49:08
4  Q. There are the prices --                           12:49:08
5  A. Through 2004, yes.                                12:49:09
6  Q. And if you turn to 23521 --                       12:49:11
7  A. Okay.                                             12:49:18
8  Q. -- you've got the triggers through               12:49:21
9 2004.                                                 12:49:24
10  A. Exactly.                                         12:49:24
11  Q. You see the indices, if they are                 12:49:25
12 obsolete, are filed with the Department.              12:49:28
13  A. Right.                                           12:49:29
14  Q. That's the Massachusetts entity, right?          12:49:30
15  A. That would have been, yes, our Eastern           12:49:33
16 Edison division.                                      12:49:38
17  Q. So I am wondering where in here the              12:49:39
18 fuel index is for the Rhode Island entity that        12:49:44
19 you can point me to that limits the fuel             12:49:48
20 trigger to 2004?                                      12:49:49
21  A. What I am suggesting is that the Mass.            12:49:50
22 became the standard for our Rhode Island             12:49:52
23 settlement. So whatever was in the Mass. one         12:49:54
24 was copied over into our Rhode Island one.           12:49:58

Page 137

1  Q. I see. But is it possible Attachment 4            12:50:02
2 describes a four-year bid and that's why it is         12:50:07
3 limited to 2004?                                      12:50:10
4  A. No. Attachment 4 is a seven-year bid,             12:50:12
5 isn't it?                                             12:50:35
6  Q. Yep.                                              12:50:38
7  A. Okay. And that's consistent with our              12:50:39
8 intent to put the Rhode Island and                    12:50:45
9 Massachusetts loads out for bid concurrently.        12:50:47
10  Q. Right. And so my question is, when you           12:50:51
11 turn to 23316, and it is referencing a fuel          12:50:55
12 index in Attachment 5 --                             12:51:06
13  A. 23316?                                           12:51:09
14  Q. Yes.                                             12:51:14
15  A. 23316. Okay.                                     12:51:14
16  Q. Isn't that consistent with your intent          12:51:18
17 to match the pricing in the NEES agreement as        12:51:20
18 far as both stipulated price and fuel triggers       12:51:24
19 throughout the total standard offer service          12:51:26
20 period?                                              12:51:29
21  A. I don't think so.                                12:51:29
22  Q. Why do you say that?                             12:51:30
23  A. Because our companion filings that used         12:51:31
24 this as the template -- because we filed at          12:51:38

35 (Pages 134 to 137)

Page 138

```
 1 FERC, that was our initial filings -- became        12:51:43
 2 what governed what we filed in Rhode Island          12:51:46
 3 and Mass., and then Rhode Island and Mass, it        12:51:49
 4 is plain, when you look at the language we            12:51:52
 5 filed, the fuel triggers went out throughout          12:51:54
 6 2004 and not beyond, in both jurisdictions.          12:51:56
 7    Q.  Is that an error in Section 5.0 on             12:51:59
 8 Attachment 5?                                         12:52:04
 9    A.  Whatever it is.                                12:52:04
10    Q.  You would agree there is no fuel index         12:52:05
11 here in Attachment 5?                                 12:52:08
12    A.  Right.                                         12:52:09
13    Q.  You would agree that the fuel index in         12:52:09
14 Attachment 4 refers to filings with the               12:52:13
15 Department in Massachusetts, doesn't it?              12:52:15
16    A.  Right.                                         12:52:16
17    Q.  Do you recall discussions at EUA about         12:52:19
18 how that -- the Rhode Island -- the FERC              12:52:23
19 agreement should have been extended through           12:52:25
20 2009?                                                 12:52:28
21       MR. O'ROURKE:  Objection.                       12:52:35
22    A.  Your question is too vague when you            12:52:36
23 say --                                                12:52:37
24    Q.  Let me show you --                             12:52:38
```

Page 140

```
 1       Do you recall discussions about --             12:54:49
 2    A.  I think he says the standard offer             12:54:51
 3 auction should go out through 2009, not 2004.         12:54:54
 4    Q.  Yes.                                           12:54:59
 5    A.  That's consistent with the URA, that           12:55:00
 6 you are going to go out for bid for standard          12:55:05
 7 offer service.                                        12:55:08
 8    Q.  And fuel prices going through 2009 is          12:55:08
 9 consistent, too, isn't it?                            12:55:12
10    A.  It doesn't not saying that.  He is just        12:55:13
11 talking about the auction.                            12:55:14
12    Q.  Mr. St. Pierre, the discussions that          12:55:16
13 you recall -- do you recall any discussions at        12:55:19
14 the time that this settlement agreement was           12:55:21
15 filed in October 1997 about this agreement            12:55:23
16 prohibiting Montaup from getting a fuel               12:55:30
17 adjustment after 2004?                                12:55:34
18    A.  I don't understand your question about         12:55:40
19 prohibiting Montaup from having a fuel                12:55:44
20 adjustments.                                          12:55:48
21    Q.  What discussions do you recall about           12:55:49
22 the impact of this upon Montaup -- what               12:55:50
23 discussions do you remember about the impact          12:55:54
24 of this settlement agreement upon the fuel            12:55:57
```

Page 139

```
 1    A.  -- should be -- what should be                 12:52:40
 2 extended?                                             12:52:45
 3    Q.  And do you know that EUA eventually bid        12:52:46
 4 the standard offer service out for the full 12        12:52:51
 5 years?                                                12:52:55
 6    A.  I don't know that.  I don't recall             12:52:55
 7 that, but...                                          12:52:57
 8    Q.  Do you know that the -- okay.                  12:52:57
 9    A.  I know initially we went out for seven         12:53:07
10 years.  I don't recall what happened after            12:53:09
11 that, whether the bids were unsuccessful, and         12:53:11
12 we went out for a longer period, I don't know.        12:53:18
13    Q.  Let me show you Exhibit 32.                    12:53:21
14    A.  Okay.                                          12:53:40
15    Q.  And this is testimony before FERC -- I         12:53:44
16 mean, not FERC, PUC, and if you turn to Page          12:53:49
17 56.                                                   12:54:06
18    A.  Okay.                                          12:54:06
19    Q.  Actually, if you turn to 58, I'm sorry.        12:54:07
20    A.  Okay.                                          12:54:17
21    Q.  Do you see Mr. Hirsh there?                    12:54:19
22    A.  Yes.                                           12:54:22
23    Q.  Just read to yourself what Mr. Hirsh           12:54:23
24 says there.                                           12:54:26
```

Page 141

```
 1 index for EUA companies after 2004?                   12:55:59
 2    A.  The FERC settlement agreement that was         12:56:04
 3 filed on October 29th?                                12:56:08
 4    Q.  Yes.                                           12:56:09
 5    A.  Well, this, as I said, formed a                12:56:10
 6 foundation upon which we would put a team             12:56:23
 7 together to meet with Rhode Island and                12:56:28
 8 Massachusetts interested parties to figure out        12:56:32
 9 what we needed to do to take this to the              12:56:36
10 retail commissions, to conform with whatever          12:56:39
11 the regulators and the legislative bodies             12:56:42
12 enacted, to bring us through the deregulation         12:56:48
13 process.  So this was the first step.                 12:56:52
14    Q.  What discussions do you remember about         12:56:54
15 the length of the fuel index in Rhode Island          12:56:55
16 at the time that this was filed?                      12:57:00
17    A.  The only discussions that I recall were        12:57:02
18 internal discussions, as I indicated before,          12:57:05
19 where our goal was to have our Rhode Island           12:57:08
20 and Massachusetts settlements as uniform as           12:57:11
21 possible between our companies.                       12:57:15
22    Q.  Okay.  Well, Massachusetts ended in            12:57:17
23 2004.  So after Massachusetts is over --              12:57:20
24    A.  As uniformed as possible, complying            12:57:25
```

36 (Pages 138 to 141)

Page 142

| | |
|---|---|
| 1 with legislative mandates and other factors. | 12:57:27 |
| 2    So, I mean, there are differences in | 12:57:31 |
| 3 Rhode Island and Mass. with respect to the | 12:57:33 |
| 4 Utility Restructuring Acts. You can't have | 12:57:35 |
| 5 the same ball of wax in both jurisdictions | 12:57:37 |
| 6 when there is different legislative bodies. | 12:57:41 |
| 7    Q.  The period after Massachusetts ends in | 12:57:43 |
| 8 2004, you have Rhode Island going on for four | 12:57:45 |
| 9 more years, correct? | 12:57:48 |
| 10    A.  That's right. | 12:57:49 |
| 11    Q.  What discussions do you remember about | 12:57:50 |
| 12 the fuel index after 2004 in Rhode Island | 12:57:53 |
| 13 concerning this settlement agreement, if any? | 12:57:58 |
| 14    A.  None.  I don't recall any discussions, | 12:58:01 |
| 15 other than when we made our Rhode Island and | 12:58:04 |
| 16 Mass. filings as uniformed as possible with | 12:58:09 |
| 17 respect to standard offer in fuel index, | 12:58:12 |
| 18 because Rhode Island was going out through | 12:58:15 |
| 19 2009, we felt that the URA language provided a | 12:58:18 |
| 20 guideline beyond the 2004 period, as indicated | 12:58:23 |
| 21 in the document that was noted as Paragraph C. | 12:58:26 |
| 22    Q.  And you have told me what you think is | 12:58:31 |
| 23 what the URA provided is that the retail | 12:58:33 |
| 24 companies were permitted to apply for | 12:58:37 |

Page 143

| | |
|---|---|
| 1 extraordinary fuel costs through 2009? | 12:58:39 |
| 2    A.  Right.  Because they were also required | 12:58:42 |
| 3 to do competitive solicitation for standard | 12:58:44 |
| 4 offer service; and if that meant that the | 12:58:49 |
| 5 prices that they incurred for standard offer | 12:58:52 |
| 6 service were deemed by the commission to be | 12:58:57 |
| 7 excessive, they would limit recovery and | 12:58:59 |
| 8 retail rates and defer recovery of dollars to | 12:59:01 |
| 9 later periods. | 12:59:05 |
| 10    Q.  You didn't view this settlement | 12:59:06 |
| 11 agreement as prohibiting the retail companies | 12:59:07 |
| 12 from filing for a fuel adjustment in Rhode | 12:59:11 |
| 13 Island after 2005 under the EUA, did you? | 12:59:17 |
| 14    MR. O'ROURKE:  What settlement? | 12:59:19 |
| 15    MR. WINSTON:  This EUA settlement. | 12:59:21 |
| 16    A.  The federal commission?  It certainly | 12:59:22 |
| 17 didn't prohibit, but it didn't require either. | 12:59:26 |
| 18    Q.  But you did not view this settlement | 12:59:30 |
| 19 agreement with FERC in Rhode Island in October | 12:59:33 |
| 20 '97 as prohibiting the retail companies from | 12:59:39 |
| 21 filing for a fuel index in Rhode Island for | 12:59:42 |
| 22 the period 2005 to 2009? | 12:59:44 |
| 23    A.  It didn't prohibit, but when you look | 12:59:47 |
| 24 at the fact that this was a settlement | 12:59:50 |

Page 144

| | |
|---|---|
| 1 agreement amongst many parties; if you wanted | 12:59:53 |
| 2 to take something beyond the terms of this | 12:59:57 |
| 3 settlement agreement and file it with the | 13:00:00 |
| 4 appropriate regulators, say, a fuel index | 13:00:02 |
| 5 mechanism, then you would have all of the | 13:00:06 |
| 6 other interveners petition to oppose that. | 13:00:10 |
| 7    Q.  Well, let's not speculate on what would | 13:00:16 |
| 8 have happened. | 13:00:16 |
| 9    I am simply asking the question: | 13:00:17 |
| 10 Did you view the retail companies to have | 13:00:17 |
| 11 retained the ability to file for a fuel index | 13:00:20 |
| 12 for the period 2005 to 2009 in their standard | 13:00:22 |
| 13 offer service retail tariffs? | 13:00:26 |
| 14    MR. O'ROURKE:  Objection. | 13:00:29 |
| 15    A.  I am giving you an answer, and I am | 13:00:30 |
| 16 qualifying that answer. | 13:00:32 |
| 17    No, it didn't prohibit it; but in | 13:00:33 |
| 18 terms of the facts, the retail regulators | 13:00:36 |
| 19 would suggest that if a company on its own | 13:00:39 |
| 20 wanted to file something beyond the terms of a | 13:00:44 |
| 21 settlement agreement, the other parties would | 13:00:47 |
| 22 have the right to come in and object. | 13:00:49 |
| 23    Why would they have the right? | 13:00:52 |
| 24 Because that would lead to higher costs to | 13:00:53 |

Page 145

| | |
|---|---|
| 1 consumers, and the Attorney General's office | 13:00:55 |
| 2 and the Division do not want higher rates. | 13:00:58 |
| 3    Q.  My question -- just focus on my | 13:01:00 |
| 4 question -- my question is, in your view, | 13:01:03 |
| 5 after this FERC settlement in October of '97, | 13:01:07 |
| 6 the retail companies retained the ability to | 13:01:11 |
| 7 file for a fuel index in their standard offer | 13:01:13 |
| 8 service tariffs for the period 2004 to 2009; | 13:01:18 |
| 9 yes or no? | 13:01:22 |
| 10    MR. O'ROURKE:  Objection. | 13:01:22 |
| 11    A.  They were not prohibited from doing so. | 13:01:23 |
| 12    Q.  Does that mean they were permitted to | 13:01:25 |
| 13 do so? | 13:01:28 |
| 14    A.  The companies can file anything they | 13:01:30 |
| 15 want.  Whether it goes through the regulatory | 13:01:33 |
| 16 process with some success, that is a risk. | 13:01:36 |
| 17    Q.  Sure.  It's always a risk, right? | 13:01:38 |
| 18    A.  Of course. | 13:01:40 |
| 19    Q.  As you told us, Montaup's filings | 13:01:41 |
| 20 weren't even approved all of the time for fuel | 13:01:43 |
| 21 indexes? | 13:01:46 |
| 22    A.  Right.  Exactly. | 13:01:47 |
| 23    Q.  Now, you also mentioned that -- let's | 13:01:56 |
| 24 do this:  Were you involved in any discussions | 13:02:12 |

37 (Pages 142 to 145)

Page 182

| | | |
|---|---|---|
| 1 | A. Yes. | 13:56:24 |
| 2 | Q. -- you would agree with me that they | 13:56:24 |
| 3 | were filed in combination with a four-year bid | 13:56:26 |
| 4 | for both Massachusetts and Rhode Island? | 13:56:29 |
| 5 | MR. O'ROURKE: With a who? | 13:56:33 |
| 6 | Q. They were filed in combination with bid | 13:56:34 |
| 7 | documents for a bid through 2004? | 13:56:36 |
| 8 | A. I don't see that stated in my cover | 13:56:41 |
| 9 | letter. These are just compliance tariffs. | 13:56:57 |
| 10 | Q. This is the -- | 13:57:01 |
| 11 | A. July 17th -- | 13:57:02 |
| 12 | Q. Here's the -- do you have Exhibit 50 | 13:57:03 |
| 13 | there? | 13:57:15 |
| 14 | A. Nope, I don't. | 13:57:15 |
| 15 | Q. You may not have Exhibit 50. | 13:57:17 |
| 16 | MR. WINSTON: Do you have it? | 13:57:21 |
| 17 | Q. There's Exhibit 50. | 13:57:33 |
| 18 | A. Okay. | 13:57:36 |
| 19 | Q. You see these are data requests in that | 13:57:38 |
| 20 | same docket. | 13:57:40 |
| 21 | A. Okay. | 13:57:41 |
| 22 | Q. And then you see 48930. | 13:57:43 |
| 23 | A. Okay. | 13:57:53 |
| 24 | Q. "Please provide a copy of the | 13:57:59 |

Page 183

| | | |
|---|---|---|
| 1 | companies' standard offer RFP." | 13:58:03 |
| 2 | A. Yes. | 13:58:06 |
| 3 | Q. Then if you turn the page, you see the | 13:58:06 |
| 4 | RFP is due April 1, '98. | 13:58:07 |
| 5 | A. Yes. | 13:58:10 |
| 6 | Q. Then if you are turn 48946 -- | 13:58:10 |
| 7 | A. Okay. | 13:58:15 |
| 8 | Q. -- you see there is a seven-year price | 13:58:16 |
| 9 | schedule -- | 13:58:18 |
| 10 | A. Seven-year price schedule. | 13:58:18 |
| 11 | Q. -- through 2004. | 13:58:20 |
| 12 | A. Right. | 13:58:21 |
| 13 | Q. You would agree with me that the | 13:58:30 |
| 14 | settlement agreement in the fall, that the | 13:58:32 |
| 15 | filing in the fall anticipated -- well, the | 13:58:36 |
| 16 | filing in the fall had an RFQ attached to it | 13:58:43 |
| 17 | that spoke of a future bid for the 2005 to '9 | 13:58:46 |
| 18 | time period? | 13:58:49 |
| 19 | MR. O'ROURKE: Objection. | 13:58:50 |
| 20 | A. I -- | 13:58:50 |
| 21 | Q. It is in the documents. | 13:58:55 |
| 22 | A. If it is in the documents, it is in the | 13:58:56 |
| 23 | documents. | 13:58:59 |
| 24 | Q. So my question is, if appropriate for | 13:59:02 |

Page 184

| | | |
|---|---|---|
| 1 | the solicitation for the wholesale standard | 13:59:05 |
| 2 | offer service in 2005 to '9, wouldn't you have | 13:59:10 |
| 3 | updated the triggers for that time period? | 13:59:14 |
| 4 | MR. O'ROURKE: Objection. | 13:59:16 |
| 5 | A. The fuel triggers? | 13:59:17 |
| 6 | Q. Yes. | 13:59:25 |
| 7 | A. I don't see why. | 13:59:25 |
| 8 | Q. Well, let's say that you -- what if you | 13:59:27 |
| 9 | bid out the standard offer service with fuel | 13:59:30 |
| 10 | triggers for that time period? | 13:59:32 |
| 11 | MR. O'ROURKE: Objection. | 13:59:34 |
| 12 | A. It's not my area of expertise. I don't | 13:59:35 |
| 13 | know "what if." | 13:59:41 |
| 14 | Q. Right. But if instructed by others | 13:59:42 |
| 15 | within the organization, you would have filed | 13:59:49 |
| 16 | updated fuel triggers, correct? | 13:59:53 |
| 17 | MR. O'ROURKE: Objection. | 13:59:56 |
| 18 | A. If instructed by others? Only if it | 13:59:56 |
| 19 | was appropriate to do so as a result of some | 14:00:14 |
| 20 | action that the management of the company felt | 14:00:16 |
| 21 | was appropriate to accept and go forward with. | 14:00:20 |
| 22 | Q. Right. Well, if the management had | 14:00:24 |
| 23 | solicited the standard offer service for the | 14:00:27 |
| 24 | 2005 to '9 time period with suppliers who were | 14:00:31 |

Page 185

| | | |
|---|---|---|
| 1 | promised a fuel index, it would have been | 14:00:34 |
| 2 | appropriate for you to file the triggers, | 14:00:37 |
| 3 | correct? | 14:00:38 |
| 4 | MR. O'ROURKE: Objection. | 14:00:39 |
| 5 | A. I don't know. | 14:00:40 |
| 6 | Q. You would have awaited instruction from | 14:00:41 |
| 7 | the power supply department? | 14:00:45 |
| 8 | A. I would have taken my direction from | 14:00:47 |
| 9 | power supply since it is their responsibility | 14:00:50 |
| 10 | to go out with that solicitation. | 14:00:53 |
| 11 | Q. Okay. And so -- | 14:00:55 |
| 12 | A. And the rate departments. | 14:00:57 |
| 13 | Q. So if the company signs a contract that | 14:00:58 |
| 14 | requires it to provide a fuel adjustment to a | 14:01:01 |
| 15 | contract for 2005 to '9, wouldn't you expect | 14:01:04 |
| 16 | that you would be asked to put that fuel | 14:01:08 |
| 17 | adjustment into the tariff? | 14:01:10 |
| 18 | MR. O'ROURKE: Objection. | 14:01:11 |
| 19 | A. Not really, because the tariff language | 14:01:12 |
| 20 | applies to anybody who qualifies. | 14:01:18 |
| 21 | So if a hypothetical that we have | 14:01:34 |
| 22 | five suppliers, only one of which has a fuel | 14:01:39 |
| 23 | trigger, and I put tariff language in, unless | 14:01:41 |
| 24 | I qualify that tariff language to say it only | 14:01:45 |

47 (Pages 182 to 185)

# TAYLOR

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

- - - - - - - - - - - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING, LTD.,

      Plaintiff,


      vs                C.A. No. 05-40076FDS


NARRAGANSETT ELECTRIC COMPANY,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -

     DEPOSITION OF WILLIAM C. TAYLOR, called as a
witness by counsel for the Defendant, pursuant to
the provisions of Massachusetts Rules of Civil
Procedure, before Victoria S. Reade, Professional
Court Reporter and Notary Public, in and for the
Commonwealth of Massachusetts, taken at Bowditch &
Dewey, 311 Main Street, Worcester, Massachusetts, on
Monday, March 12, 2007, commencing at 9:30 a.m.

Page 14

1    office in the fall, I can't remember
2    exactly which month it was but it was
3    certainly the fall of '98.
4    Q.   Where did you live when you were working
5        out of the Ocean State Power Plant?
6    A.   I lived in a home that we were renting in
7        Hopkinton, Massachusetts.
8    Q.   Do you recall exactly when that was that
9        you moved and started actually operating
10       out of Ocean State Power?
11   A.   That I started operating?
12   Q.   That you started working in the
13       United States.
14   A.   Oh, I started working in the
15       United States --
16       MR. WINSTON: I'll object
17       because I am not sure what the question
18       is.
19   Q.   Could you tell me when you started working
20       for TransCanada in the Massachusetts,
21       Rhode Island area?
22   A.   Let's see, it was that first quarter of
23       '98 I was transitioning away from other
24       responsibilities that I had.

Page 15

1    Q.   As a member of the business development --
2        did you call it the business development
3        power group?
4    A.   I don't know if that was the official name
5        of the group, but I was working on
6        business development activities. We were
7        trying to grow our business. It was a
8        fairly -- it was fairly new area for the
9        company. We had some power investments
10       but nothing significant so we were trying
11       to develop it.
12   Q.   What exactly is the business of
13       TransCanada here, TransCanada Power
14       Marketing, is that your current employer?
15   A.   That's right. Jody may be able to help me
16       but I think technically I might be
17       employed by some other U.S. entity but we
18       operate as TransCanada Marketing in
19       Westboro.
20   Q.   And what exactly is the business of
21       TransCanada Power Marketing?
22   A.   We buy and sell electric power at the
23       wholesale and retail level. We manage the
24       electric power that is produced by the

Page 16

1    assets that the company owns.
2        We own 100 percent of the equity
3    interest in Ocean State. We also own in
4    this region a series of hydroelectric
5    plant on the Connecticut -- Connecticut
6    and Deerfield Rivers in Massachusetts so
7    we manage the commercial operations
8    associated with all those facilities.
9        In addition, myself and some of
10   my some staff in Westboro work on the
11   management in a similar vein on assets
12   that we own and control in Canada, in the
13   eastern part of Canada.
14       This would include, we have one
15   facility in New Brunswick, we have
16   another few Quebec and some in Ontario.
17   Q.   You indicate that you own 100 percent of
18       Ocean State Power, when did that come
19       about?
20   A.   Our interest in Ocean State started at 40
21       percent when the facility was first
22       constructed and that was in '89 or '90 and
23       then through a series of transactions the
24       exact dates of which I can't recall, we

Page 17

1    consolidated that interest to 100 percent.
2        I believe the first transaction
3    was for a small interest that was owned by
4    a company called Jay McCowskie and then
5    the NEES companies through an affiliate
6    the name of which I can't recall also
7    owned some of the equity, we purchased
8    that and then there was a subsequent
9    transaction where the EUA companies which
10   I believe Montaup was the entity that
11   owned the interest, if I have that right,
12   but that was a further consolidation of
13   our equity interest.
14   Q.   I want to show you what's previously been
15       marked as Exhibit 36 and ask if you have
16       ever seen that document before.
17   A.   Yes, I recall that document.
18   Q.   Did you assist Mr. Pourbaix in connection
19       with the preparation of this document?
20   A.   I don't believe -- I don't believe I
21       assisted with the preparation of this
22       specific document, but I was certainly
23       aware of its contents.
24   Q.   And just to ask you the obvious, is the

Page 34

1    revenues collected, if any, attributed to
2    the operation of their retail rate fuel
3    adjustment mechanism in the company's
4    standard-offer service tariffs.
5        Have I correctly read the
6    definition of the fuel adder or fuel
7    adjustment factors?
8        MR. WINSTON: Objection.
9  A.  Well, you have read it in part.
10 Q.  What else do you think is necessary for an
11   understanding of the term?
12 A.  Which term?
13 Q.  Fuel adder or fuel adjustment factor.
14 A.  Well, there is more words there on the
15   contract which refers to standard-offer
16   service tariffs and then it goes on to say
17   the incremental revenues and so forth
18   until the end of that section.
19       And as I said a moment ago, it
20   refers to standard-offer service which is
21   a defined term under the contact so this
22   definition links you to the standard-offer
23   service definition which I referred you to
24   a moment ago.

Page 35

1  Q.  Is it your position in this case that a
2    fuel adder was required to be included in
3    all tariffs submitted by Narragansett?
4  A.  Yes, absolutely.
5  Q.  Through what period of time?
6  A.  Through the term of the contract.
7  Q.  And what do you base that on?
8  A.  Well, I think I have already answered that
9    question.
10 Q.  I am sorry, I missed it.
11       MR. WINSTON: Objection.
12 A.  You started off asking me a question
13   about --
14       MR. WINSTON: Just answer his
15   question.  If he doesn't like your answer,
16   that's okay.
17 Q.  Could you tell me what portion of what you
18   just told me you thought answers that
19   question.
20 A.  Well, the price is, as I said a moment
21   ago, comprised of two parts:
22   Standard-offer wholesale price and a fuel
23   adjustment factor and the price applies
24   for the entire term of the contract,

Page 36

1    which, if you look under the term section
2    ends on December 31, 2009, so the fuel
3    adjustment factor is part of the price
4    through 2009.
5  Q.  On April 7, 1998 do you know if there was
6    any --
7  A.  April 7, 1998  okay.
8  Q.  Is that the date this was signed?
9  A.  It appears that is the case, yes.
10 Q.  Do you know if there was any fuel
11   adjustment factor in a tariff that was
12   applicable to this contract?
13 A.  Well, that's a good question because one
14   of the challenges that I recall as the
15   contract was being negotiated was the fact
16   that EUA representatives that we were
17   dealing with had not provided us with full
18   and complete copies of the tariffs, the
19   retail tariffs.
20       This was a concern to the
21   company and you may know that earlier
22   drafts of the contact, in fact, very much
23   approximate to this date, I believe a day
24   or two before, still contained references

Page 37

1    to retail tariffs that we were
2    uncomfortable with because we weren't
3    gaining visibility from EUA on these.
4        We were asking them for them
5    and they weren't providing them, they
6    weren't ready.  A lot of, as I recall it,
7    a lot of concern on their part that these
8    things were not complete and so forth, we
9    were, therefore, uncomfortable with that
10   and, therefore, referenced in this final
11   draft of the contract under standard-offer
12   service referenced the standard-offer
13   service to the settlement agreements
14   rather than referencing to the retail
15   tariffs.
16 Q.  And by the settlement agreements do you
17   mean EUA's agreements with the State of
18   Massachusetts and the State of Rhode
19   Island?
20 A.  Yes, that's correct.  That's also a
21   defined term in the agreement, actually
22   just above the definition of
23   standard-offer service.
24       EUA had represented the nature

Page 50

1     in respect of the settlement agreements.
2     That's why I referred to earlier to the
3     fact that very late in the negotiation
4     they had references under standard-offer
5     that were referring these to retail
6     tariffs, tariffs that they weren't
7     prepared or able to provide to us.
8          We linked to standard-offer
9     service to the definition in the
10    settlement agreements because that was
11    something that based on the totality of
12    everything that they had said to us about
13    that and that we had learned through our
14    consultants allowed us to have an
15    understanding of what that obligation was.
16         So, to the extent that that is
17    now different, this is what I would refer
18    to as the deceptive, to answer your
19    question, those elements that were
20    deceptive.
21    Q.   At the time did you review the Rhode
22         Island settlement agreement?
23    A.   I don't recall reading the Rhode Island
24         settlement agreement directly. I recall

Page 51

1     certainly discussing with my colleagues
2     who were attorneys and who had reviewed
3     it. I recall discussing it at some length
4     with EUA and with Reed.
5     Q.   Who at EUA did you discuss it with?
6     A.   Mike Hirsh, Robert Clark, to a lesser
7          degree, Mr. Boisvert. Mr. Boisvert was
8          kind of in the background and I was more
9          directly discussing thing with Mr. Hirsh
10         and Mr. Clark.
11    Q.   And what did they tell you about the
12         length of the fuel adder in the Rhode
13         Island settlement agreement?
14              MR. WINSTON: Objection.
15    A.   My recollection of discussions
16         specifically with Mr. Hirsh were in
17         relation to the retail -- more
18         specifically in respect to the retail
19         tariffs.
20    Q.   And what were those discussions?
21    A.   They centered around my concern that the
22         retail tariffs were referred in the price
23         section and they had not provided those to
24         us as I mentioned a moment ago.

Page 52

1          Because we hadn't seen them --
2     they had provided us some drafts of them,
3     they weren't complete -- because we hadn't
4     seen them we really couldn't have a
5     specific discussion about them so this is
6     what led to the change that I referred to
7     earlier.
8          That would be the extent of my
9     recollections of specific discussions with
10    Mr. Hirsh.
11    Q.   The change that you referred to earlier is
12         the change to referencing the settlement
13         agreements in connection with the
14         standard-offer service definition?
15    A.   Correct.
16    Q.   That change didn't carry over to the fuel
17         adjustment factor, did it?
18    A.   I believe it did.
19    Q.   As I understand it, you were objecting to
20         the use of the tariffs as a part of the
21         definition?
22    A.   Yes, that's correct. I recall personally
23         being specifically concerned about it
24         because it was a regulatory arena that we

Page 53

1     were not overly familiar with, we didn't
2     want to have to be fully familiar with
3     that area.
4          They in the earlier drafts of
5     the contract insisted that this was the
6     way to accomplish the contract, but I
7     personally become quite concerned about it
8     when they could not and would not be clear
9     about it.
10         Another term of the contract,
11    which you may be familiar with, which I
12    was personally involved in was the
13    inclusion of Article 8.3 and this related
14    to my general concern that, as I recall it
15    as I represented it to my boss, Alex, I
16    was concerned about regulatory
17    shenanigans, as I called it, that we
18    wouldn't be able to follow so this is what
19    led to our concern to reference this, back
20    to something which was grounded and was
21    timed, if you will, it was grounded and it
22    was known and it was timed in that it
23    related to the settlement agreements that
24    were in these various documents.

Page 146

| | |
|---|---|
| 1 | A.   That isn't what you asked me. |
| 2 | Q.   During that period of time did you see |
| 3 | Exhibit 31? |
| 4 | A.   I don't recall seeing this exhibit. |
| 5 | Q.   And do you know if anyone else in |
| 6 | TransCanada saw this Exhibit 31? |
| 7 | A.   I can't speak to that.  I don't think I |
| 8 | saw it. |
| 9 | Q.   Let me show you what's been marked Exhibit |
| 10 | 51. |
| 11 | A.   Yes. |
| 12 | Q.   Do you recall seeing this document in or |
| 13 | around January 1, 1998? |
| 14 | A.   Yes, I do. |
| 15 | Q.   And in connection with this, did you |
| 16 | observe the Eastern Edison standard-offer |
| 17 | service contract which appears on Page |
| 18 | 7158? |
| 19 | A.   I recall getting the document because I |
| 20 | recall it being sent to be by Alex because |
| 21 | this was right around the time that I was |
| 22 | providing the opinion to him that I was |
| 23 | concerned about the lack of clarity we |
| 24 | were getting in these tariffs and then |

Page 147

| | |
|---|---|
| 1 | this all likelihood arose because of that. |
| 2 | I see Mr. Hirsh is cc'd on it. |
| 3 | I recall looking through it and |
| 4 | not being appeased or having my concerns |
| 5 | appeased with regards to the clarity.  I |
| 6 | wasn't clear how this set of documents |
| 7 | helped us understand what -- how it would |
| 8 | relate to the standard-offer service |
| 9 | agreement that was under discussion so I |
| 10 | continued to express concerns. |
| 11 | I didn't delve too far into it. |
| 12 | I read it and continued to be concerned as |
| 13 | it related to the contracts, continued to |
| 14 | express my concerns to Mr. Pourbaix that |
| 15 | there was an awful lot going on in these |
| 16 | retail tariffs and that we shouldn't and |
| 17 | perhaps be expected to stay on top of that |
| 18 | over the term of the contract and that we |
| 19 | needed to find a different way to deal |
| 20 | with it. |
| 21 |         (THEREUPON, THERE WAS A SHORT |
| 22 | RECESS.) |
| 23 | BY MR. O'ROURKE: |
| 24 | Q.   Let me show you what's been marked |

Page 148

| | |
|---|---|
| 1 | Exhibit 57. |
| 2 | A.   Yes. |
| 3 | Q.   Do you recall receiving this? |
| 4 | A.   Not specifically.  This was April 2nd? |
| 5 | Q.   Right. |
| 6 | A.   Just given the date, like I said, it was |
| 7 | around the same time I was concerned about |
| 8 | the tariffs so that may have been why this |
| 9 | was provided. |
| 10 | Q.   Okay. |
| 11 | A.   I don't have a specific recollection of |
| 12 | getting it. |
| 13 | Q.   Okay, fair enough.  Do you recall when you |
| 14 | first began negotiating the provision, I |
| 15 | think it's 8.3, that you indicate took |
| 16 | care of your concerns about the tariffs? |
| 17 | A.   I don't recall exactly what date it would |
| 18 | be, but it was in the latter stages. |
| 19 |         We had reached -- we had reached |
| 20 | fundamental agreement and were down to -- |
| 21 | this was in February, so I can deduce that |
| 22 | it was would be after February 19th and |
| 23 | before April 7th. |
| 24 | Q.   This you're referring to? |

Page 149

| | |
|---|---|
| 1 | A.   Yes, Exhibit 1. |
| 2 | Q.   Let me show you what's been marked Exhibit |
| 3 | 61 and ask you if received that on or |
| 4 | about April 15th of 1998? |
| 5 | A.   Yes, I must have received it because it's |
| 6 | got my name on it. |
| 7 | Q.   Do you recall the circumstances with |
| 8 | respect to, looks like Mr. Hirsh is |
| 9 | sending that to you? |
| 10 | A.   Only to repeat what I had said earlier |
| 11 | that we had been through the negotiations |
| 12 | asking for these materials and they had |
| 13 | been suggesting that these were not |
| 14 | available and so on and the status |
| 15 | regulatory of where things were at was |
| 16 | unclear and that's why we were seeking the |
| 17 | language that we did. |
| 18 | Q.   In 8.3? |
| 19 | A.   And in the final throws of the contract, |
| 20 | so I presume Mr. Hirsh took it upon |
| 21 | himself to send this given my interest in |
| 22 | it after we had signed the contract. |
| 23 | Q.   Is it fair to say that once you negotiated |
| 24 | Section 8.3 that it was included in the |

Page 150

```
 1    document to be signed on April 7th you
 2    really lost interest in what tariff was
 3    filed, it became irrelevant to you?
 4            MR. WINSTON: Objection.
 5    A.   I would say that as I've already
 6    expressed, my concern was that they were
 7    being unclear on these matters so 8.3 was
 8    inserted for that reason.
 9            To say that I lost interest I
10    don't think would be a fair
11    characterization.
12    Q.   You signed it on April 7th without knowing
13    what tariff they were going to be filing,
14    what its terms would be?
15    A.   Right.
16    Q.   And you did that because you negotiated
17    8.3?
18    A.   Which gave us financial protection  on
19    material losses. The fact that they made
20    a filing eight days later and provided it
21    to me didn't allow me to maybe avail
22    myself of any protections under 8.3
23    because the contract wasn't even operative
24    at that point.
```

Page 151

```
 1            So 8.3 was a clause that would
 2    provide us protection over the term as I
 3    read it.
 4    Q.   Did you ever consider entering into
 5    proceedings at RIPUC in respect to the
 6    tariffs that EUA or eventually
 7    Narragansett filed with respect to the
 8    fuel adder?
 9    A.   No.
10    Q.   And that was because 8.3, you felt that
11    8.3 gave you sufficient protection?
12    A.   Well, I wouldn't say it was just 8.3. We
13    had been told how that was going to work
14    through the discussions with EUA.
15            We had the knowledge of the
16    Narragansett contract which had been
17    approved by the regulators at that point,
18    it certainly predated it and we had that
19    knowledge so we moved forward to do what
20    we felt was our obligation under the
21    contract which was get ready to be able to
22    supply this product to the customer.
23            And as I testified to earlier,
24    we weren't interested nor did I have the
```

Page 152

```
 1    resources to put a number of people,
 2    regulatory people, spending time on Rhode
 3    Island retail rates.
 4    Q.   And so to save a lot paper, you have never
 5    seen any of the retail tariffs that EUA
 6    and subsequently Narragansett filed with
 7    respect to the standard-offer service
 8    obligations of TransCandaa prior to this
 9    litigation.
10            MR. WINSTON: Objection.
11    A.   Prior to the litigation, no.  Well, let me
12    just clarify one point which is that I
13    recall not long after this dispute arose
14    Mr. Hager sent some materials to
15    Mr. Hachey so I think I saw those.
16    Q.   But this dispute arose in 2005, right?
17    A.   Right.
18    Q.   When did you first learn that the fuel
19    adjustment factor expired in 2004, that
20    tariffs?
21            MR. WINSTON: Objection.
22    A.   I don't know that I learned that it
23    expired at that point so with that I would
24    ask you to rephrase the question.
```

Page 153

```
 1    Q.   You think it's still in existence?
 2    A.   What?
 3    Q.   The fuel adjustment factor.
 4    A.   Yes.
 5    Q.   But that the tariff that required the
 6    payment of it expired at the end of 2004,
 7    when did you first learn that?
 8            MR. WINSTON: Objection.
 9    A.   Mr. Hager made representations to
10    Mr. Hachey, as I understand it, I wasn't
11    involved in the discussions, in I gather
12    early to mid February of 2005 where he
13    expressed that the fuel adder was no
14    longer applicable under our contract.
15    That's the first time that I was made
16    aware of that, no longer applicable in his
17    view.
18            MR. O'ROURKE:  Would you mark
19    that.
20            (EXHIBIT NO. 111 WAS MARKED FOR
21    IDENTIFICATION.)
22    Q.   Have you ever seen this document?
23    A.   Yes, I have.
24    Q.   And when was the first time you saw this
```