UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                )
TRANSCANADA POWER MARKETING LTD.,   )
                                                )
               Plaintiff,                    )
                                                )
          v.                    )       C.A. No. 05-40076FDS
                                                )
NARRAGANSETT ELECTRIC COMPANY,     )
                                                )
               Defendant.                 )
_____)

**OPPOSITION OF PLAINTIFF TRANSCANADA POWER MARKETING LTD. TO
NARRAGANSETT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff TransCanada Power Marketing Ltd. ("TransCanada") submits this Memorandum in Opposition to defendant Narragansett Electric Company's ("Narragansett") Motion for Partial Summary Judgment ("Motion") on Count II of TransCanada's Amended Complaint.[1] Defendant's Motion should be denied for a variety of reasons: (i) it rests almost entirely on disputed facts; (ii) it grossly misrepresents the factual record; and (iii) it is incorrect as a matter of law.

TransCanada's Count II claims breach of Article 8(3) of the Wholesale Standard Offer Services Agreement between the parties ("Agreement," or "WSOSA"). Narragansett's Motion is based on the mistaken premise that loss of a fuel adjustment provision to compensate TransCanada for its increased supply costs due to extraordinary fuel prices somehow does not

---

[1] Narragansett also filed with its Motion a "Concise Statement of Undisputed Material Fact in Support of Defendant's Motion for Partial Summary Judgment," and "Defendant's Memorandum in Support of Defendant's Motion for Partial Summary Judgment," which TransCanada refers to herein as Narragansett's "Fact Statement" and "Memorandum," respectively.

1

"increase [TransCanada's] costs or obligations" to supply Standard Offer Service under the Agreement. Narragansett's argument fails because TransCanada's costs have in fact increased due to the loss of a fuel adjustment. Moreover, Narragansett relies on clearly disputed facts concerning the relevant negotiations and intent underlying Article 8(3). Finally, Narragansett proffers an incorrect reading of the language of the Agreement. Narragansett's Motion as to Article 8(3) of the Agreement must therefore be denied.

In addition, it appears based on Narragansett's statement of "undisputed facts" (but not its legal argument) that Narragansett may also be arguing in its Motion that the absence of a fuel adjustment after 2005 is not a "change" at all in the obligations under the Agreement. (*See, e.g.*, Def. Mem., at 4-5; Def. Fact Statement, ¶¶ 4-7). To the extent that this underlying premise is also part of Narragansett's Motion (*i.e.*, that loss of a fuel adjustment in 2005-2009 is not a "change" at all), summary judgment is also clearly inappropriate. Indeed, as set forth in TransCanada's own Summary Judgment filings, the undisputed facts establish that Narragansett was obligated to file for, and to pay to TransCanada, a fuel adjustment for delivery of Standard Offer Service through the Agreement's full term including the years 2005-2009.

## STATEMENT OF DISPUTED FACTS

TransCanada respectfully incorporates herein its "Response of TransCanada Power Marketing, Ltd. to Narragansett's Statement of Undisputed Material Fact" (hereinafter "Fact Response"), filed herewith. TransCanada also incorporates herein its own Statement of Undisputed Material Facts and cited exhibits filed in support of its own pending Motion for Summary Judgment, as set forth in its previously filed "Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment" (hereinafter "TC Facts/Mem."). As set forth in TransCanada's Fact Response, Narragansett's papers misrepresent the factual record in a number

of significant ways. *See* Fact Response, at ¶¶ 4-6, 9-11. For the Court's convenience, TransCanada summarizes below its most significant points of opposition to Narragansett's Statement of Undisputed Facts, as set forth more fully in its Fact Response.

First, Narragansett states that it "does not set the prices" at which it provides services to consumers; rather, "it sells and delivers electricity pursuant to retail tariffs that the RIPUC has approved." (Def. Mem., at 2; Def. Fact Statement, ¶ 4). Narragansett's statements are misleading, because they fail to acknowledge (i) that no Standard Offer Service tariffs were on file or approved when the Agreement was executed; and (ii) EUA/Narragansett itself is the party that files the Standard Offer retail tariffs and decides what information is submitted in those tariffs – including, for example, whether to include a fuel adjustment for the period 2005-2009. (TC Facts/Mem, at 8 (citing Tab 7, Pourbaix Dep. at 119-121; Hirsh Dep. at 285-286; Hager Dep. at 506), 10 (citing, *inter alia,* St. Pierre Dep. at 52-53, 61-63, 143-145; Hager Dep. at 544-547, 555; Hirsh Dep. at 157-162, 377), 14-15 (and cited materials)). The Rhode Island Public Utilities Commission (the "RIPUC") must approve the pricing in EUA/Narragansett's proposed tariffs, but does not act *sua sponte* to set prices. Rather, the tariffs approved by the RIPUC result from the proposed tariffs that EUA/Narragansett chooses to file. *See* TransCanada Fact Response, ¶ 4.

The RIPUC, in ruling upon EUA/Narragansett's proposed tariffs, also receives and relies upon the representations that EUA/Narragansett makes concerning its contractual pricing obligations to suppliers. Leading to this dispute, for example, Narragansett presented various tariff related filings and testimony to the RIPUC in which it set forth and described (incorrectly) the terms of the fuel adjustment applicable to the Agreement. *(See, e.g.*, TC Facts/Mem., at 14-15 (citing, *inter alia*, Tab 20-25, 33)). Based on these filings, the RIPUC approved

Narragansett's proposed Standard Offer Service tariff which omitted a fuel adjustment for TransCanada in 2005. (*See* RIPUC Report and Order dated Feb. 17, 2005, 2005 WL 1536529, Supp. App. Tab. 36).[2] *See* TransCanada Fact Response, ¶ 4.

Second, Narragansett both mischaracterizes the proposed retail tariffs filed on April 15, 1998 (and November, 1997), and incorrectly states that those tariffs were approved by the RIPUC. (Def. Mem. at 4; Def. Fact Statement, ¶ 5). Narragansett does not mention that the proposed April 15, 1998 tariffs, like the earlier November, 1997 proposed tariffs, were filed in concert with EUA solicitations seeking Standard Offer Service supply contracts only through 2004. (*Id*. at 51-53; *see also* May 15, 1998 Filing, Supp. App. Tab 40 at 48930-993). *See also* TransCanada Fact Response, ¶ 5 (containing additional description and exhibits). Hence, it makes sense that they contained fuel triggers only through 2004. And while Narragansett asserts that "there were no provisions in the [proposed] tariffs that provided for extending the FAF beyond 2004," (Def. Fact Statement, at 4; Def. Mem., at 4), there was nothing in these tariffs that explicitly ended the fuel adjustment in 2004 and nothing that prevented EUA from filing, consistent with the Agreement, later, updated tariffs with the applicable fuel triggers added through 2009. (TC Facts/Mem. at 8 (citing Tab 7, Pourbaix Dep. at 119-121; Hirsh Dep. at 285-286; Hager Dep. at 505), 10 (including citations)). *See* TransCanada Fact Response, ¶ 5.

In addition, and contrary to Narragansett's statements, none of the proposed tariffs mentioned by Narragansett was approved by the RIPUC. *See* Exhibit E to Flynn Aff., at 15. Instead, the RIPUC rejected these proposed tariffs and the notion of a Standard Offer Service tariff containing Standard Offer Service prices for more than the upcoming year. (*See* July 17,

---

[2] Similarly, in 2003 Narragansett entered a contract amendment with another wholesale supplier in the EUA Zone which changed the benchmark stipulated price for Standard Offer Service for that supplier in each year through 2009. Narragansett submitted a rate filing seeking approval for this rate increase, and the RIPUC approved its request. (*See* RIPUC Report and Order dated Oct. 23, 2003, Supp. App. Tab 37, at 1-2, 3-5, 12).

1998 Filing, Supp. App. Tab 41 at NARR 07330, 07335-07351; October 30, 1998 Filing, Supp. App. Tab 42 at NARR 06231-2; TC Facts/ Mem, at 11(citing Tab 15 and 12)).  Instead, the RIPUC's Order required EUA (and Narragansett) to refile Standard Offer Service tariffs on a roughly yearly basis for the entire Standard Offer Service Period with prices only for the upcoming year.  (Supp. App. Tab 41 at NARR 07330, 07335-07351, Supp. App. Tab 42 at NARR 06231-2; TC Facts/Mem. at 11 (citing Tab 15 at 12)).

Thus, contrary to Narragansett's statements, there was no previously filed tariff pending or approved at the time the Agreement was signed, and no tariff or other document anywhere stated that a fuel adjustment would not ultimately be included in the tariffs filed for the period 2005-2009.  (TC Facts/Mem. at 8 (citing Tab 7, Pourbaix Dep. at 119-121, Hirsh Dep. at 285-286, Hager Dep. at 505), 10 (and citations)).  As set forth in TransCanada's summary judgment papers, EUA/Narragansett agreed to, and was obligated to, file Standard Offer Service tariffs in 2005-2009 which included a Fuel Adjustment mechanism in each year from 2005 through 2009.  (TC Fact/Mem., at 2-11 (and citations)).  *See* TransCanada Fact Response, ¶¶ 4, 5, 6.

Third, Narragansett makes the incorrect factual statement that the loss of a fuel adjustment does not increase TransCanada's costs or obligations to supply Standard Offer Service under the Agreement.  (Def. Mem., at 6-7; Def. Fact Statement, ¶ 9).  To the contrary, extraordinarily high fuel prices after 2005 have in fact materially increased the costs to TransCanada of supplying Standard Offer Service electricity under the Agreement.  (Supp. Hachey Aff. ¶ 3; *see also* December 9, 2003 Testimony, Supp. App. Tab 43 at 36-37).  Without the Fuel Adjustment Factor, TransCanada is forced to bear these increased costs to supply Standard Offer Service entirely on its own.  (Supplemental Hachey Aff. ¶ 3; Supp. App., Pourbaix Dep. at 201-03, 261-64; Supp. App. Tab 43 at 36-37).  Similarly, TransCanada's

"obligations" to provide Standard Offer Service increase in the absence of a Fuel Adjustment Factor, since TransCanada is then obliged to cover on its own its higher supply costs due to extraordinary fuel costs.  (Supp. Hachey Aff. ¶ 3; Supp. App., Pourbaix Dep. at 201-03).  *See* TransCanada Fact Response, ¶ 9.

Finally, Narragansett grossly misrepresents the factual record concerning the parties' negotiations and intent with respect to Article 8(3).  Narragansett first argues that Article 8(3) was solely drafted by TransCanada.  Def. Mem., at 8-9; Def. Fact Statement, ¶ 10-11.  The factual record clearly shows, however, that the parties exchanged multiple drafts of Article 8(3), negotiated its language on several occasions, and that the final language of Article 8(3) included specific contributions and edits of both EUA and TransCanada.  (Supp. App., Pourbaix Dep. at 194-207, 225-35; s*ee* Drafts of Article 8(3), Supp. App. Tabs 44 (at TCPM 007194-7195), 45 (at TCPM 000625), 46 (at TCPM 007312), 47 (at TCPM 007325), 48 (at TCPM 000468), 49 (at TCPM 007515)).  Similarly, the testimony indicates that TransCanada intended Article 8(3) to cover a broad range of regulatory activity that could affect the economics of the Agreement, including loss of the Fuel Adjustment Factor.  (Supp. App., Pourbaix Dep. at 196-197, 201-03; 261-64.; Taylor Dep. at 70-73, 164-65).  Lastly, the record shows that TransCanada's witnesses affirmatively discussed with EUA negotiators their intent that Article 8(3) apply broadly to any economic changes under the Agreement, such as loss of the Fuel Adjustment Factor.  (Supp. App. Taylor Dep. at 162-65, 168-69; Pourbaix Dep. at 196-97).  *See* TransCanada Fact Response, ¶¶ 10-11.

Accordingly, virtually every "undisputed fact" on which Narragansett relies is incorrect, or at least disputed.

**ARGUMENT**

I.  **NARRAGANSETT IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF THE AMENDED COMPLAINT.**

   A. **Under the Terms of the Agreement, EUA/Narragansett was Obligated to File for A Fuel Adjustment Through the 2009 Term of The Contract.**

While Narragansett does not move for summary judgment on TransCanada's breach of contract claim, Narragansett nevertheless leaps to the conclusion (without adequate factual and legal support) that the Fuel Adjustment Factor in the Agreement originally ended in 2004. (Def. Mem. at 4-5; Def. Fact Statement ¶¶ 4-7). It is not entirely clear that Narragansett asserts this premise as part of its Motion (for example, it submits no legal argument on the point), but TransCanada nevertheless addresses it in an abundance of caution.

Narragansett argues in its Memorandum that, pursuant to the Agreement, TransCanada was entitled to a fuel adjustment only to the extent that the Fuel Adjustment Factor "was to be reflected" in Blackstone's and Newport's retail tariffs; Narragansett then references proposed, rejected tariffs containing the fuel triggers input only through 2004. (Def. Mem. at 4). What Narragansett fails to acknowledge is that these proposed tariffs were filed to address earlier solicitations for Standard Offer Service only through 2004, the tariffs were rejected, and no tariff was approved or pending at the time the Agreement was executed. Narragansett itself dictated whether to include a fuel adjustment in its subsequent tariffs consistent with its stated obligations to suppliers, and made the unilateral decision (despite its obligations under the Agreement) to omit a fuel adjustment in its tariffs after 2004. (TransCanada Fact Response, ¶¶ 4-5; TC Facts/Law at 15).

Article 5 of the Agreement provides:

   Price =   Standard Offer Wholesale Price
            + *Fuel Adjustment Factor*

7

>Where:   Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and
>
>*Fuel Adjustment Factor* is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of *the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs*.  The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor.  The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.  (Emphasis added.)

As set forth in TransCanada's summary judgment papers, the undisputed facts and applicable law – including the language of the Agreement, the governing Standard Offer Service statute (the URA), the actual negotiations and understanding between the parties, as well as applicable Massachusetts contract law – all required EUA/Narragansett to make reasonable efforts to file tariffs to obtain, and pay to TransCanada, a fuel adjustment through 2009.  Fact Response, ¶¶ 4-6.[3]  *See generally* TransCanada Facts/Memorandum and cited exhibits.

---

[3] In support of its argument under Article 8(3), Narragansett also makes much of the legal premises that: (i) language in a particular contract provision should be construed against its drafter; and (ii) contract language should be read in light of similar provisions in the contract. (Def. Mem., at 7-9).  These principles have particular applicability with respect to Article V of the Agreement, since it was a form pricing provision drafted solely by EUA and with no input from TransCanada. (TC Facts/Mem., at 6, Tab 12, Tab 7).  Similarly, the disputed Standard Offer Service tariffs referenced in Article V were drafted exclusively by EUA.  The EUA Settlement Agreement was also entirely drafted by EUA, with no chance for input by TransCanada.  (TC Facts/Mem. at 5-6).  Thus, any and all ambiguities in Article V of the Agreement, in the retail Standard Offer Service tariffs, and in the EUA Settlement Agreement must therefore be construed against EUA/Narragansett.  (*See*(TC Facts/Mem., at 18 n. 18).

  As to Narragansett's second legal premise, when EUA extended the term of the Agreement from 2004 to 2009 it clearly noted that the Massachusetts Standard Offer Service pricing ended in 2004. (TC Facts/Mem., at 9, 17-18, Tab 15 at TCPM 00082).  In contrast, EAU did not indicate that the fuel adjustment pricing in Article V ended in 2004.  Thus, as Narragansett points out (Def. Mem. at 8), EUA's failure to note an end to the fuel adjustment in 2004, while expressly noting a 2004 end-date for Massachusetts Standard Offer Service pricing,

Therefore, it is undisputed (or at least "disputed" for purposes of Narragansett's Motion) that the lack of a fuel adjustment in the years 2005-2009 was a "change" in the fuel adjustment pricing for Standard Offer Service under the Agreement.

### B. Narragansett's Interpretation of Article 8(3) Is Contrary to the Facts and Law

Narragansett's main argument is that, under the "plain language" of Article 8(3), TransCanada is not entitled to indemnification for a change in the availability of a Fuel Adjustment Factor in the final five years of the contract term. (Def. Mem., at 6). Narragansett's arguments fail for a number of reasons: TransCanada's costs to supply Standard Offer Service actually have increased due to the loss of a fuel adjustment; Narragansett relies entirely on disputed facts concerning the relevant negotiations and intent concerning Article 8(3); and Narragansett advances an incorrect and overly restrictive reading of Article 8(3). Narragansett's Motion as to Article 8(3) of the Agreement must therefore be denied.

#### 1. Loss of a Fuel Adjustment after 2005 "Materially Increases [TransCanada's] Costs or Obligations to Provide Standard Offer Service."

Narragansett relies on the "undisputed fact" that "a change in the amount or availability of an FAF does not materially increase any costs or obligations to TransCanada," and thus "does not affect [TransCanada's] costs or obligations to provide Standard Offer Service." (Def. Mem. at 6-7; Def. Fact Statement, ¶ 9). In so stating, Narragansett relies upon a misstatement of fact, as well upon an interpretation of Article 8(3) that is inconsistent with the parties' negotiations.

Article 8.3 of the Agreement provides:

> In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory

---

strongly indicates the parties' intent and undertaking to include a fuel adjustment all the way through 2009. *See Fried v. Fried*, 5 Mass. App. Ct. 660, 663-664 and n. 3 (1977); *Allstate Ins. Co. v. Bearce*, 412 Mass. 422, 477 (1992).

> agency having jurisdiction over the provision of Standard Offer Service *in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service*, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier or indemnify the Supplier from such changes.  In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier.  In the event that the Parties are not able to agree on the materially [sic] of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice. (Emphasis added.)

Contrary to Narragansett's assertion, extraordinarily high fuel prices after 2005 have in fact increased the costs to TransCanada of supplying Standard Offer Service electricity under the Agreement.  (Supp. Hachey Aff. ¶ 3).  The Fuel Adjustment Factor compensates TransCanada for those increased costs of supplying Standard Offer Service.  Without the Fuel Adjustment Factor, TransCanada is forced to bear the increased costs of supplying Standard Offer Service entirely on its own.  (Supp. Hachey Aff. ¶ 3; Supp. App., Pourbaix Dep. at 201-03, 261-64; Supp. App. Tab 43 at 36-37).  As stated by Narragansett's own witness, Mr. Hager, in testimony before the RIPUC, the purpose of the fuel adjustment provision in the Agreement was to minimize increases in TransCanada's costs to supply Standard Offer Service due to extraordinary increases in fuel prices. (Supp. App. Tab 43 at 36-37).  By taking away this "pass-through" mechanism for TransCanada's increased costs, the costs borne by TransCanada to supply Standard Offer Service under the Agreement are increased.  *Id*.  Similarly, TransCanada's "obligations" to provide Standard Offer Service increase in the absence of Fuel Adjustment Factor, since TransCanada is then obliged to cover its higher supply costs due to extraordinary fuel costs entirely on its own.  (Supp. Hachey Aff. ¶ 3; Supp. App., Pourbaix at 201-03; Tab 43 at 36-37).

Addressing Narragansett's reliance upon the dictionary (Def. Mem., at 6), the word "cost" is defined by *Black's Law Dictionary* as "the amount paid or charged for something; price or *expenditure*." *Black's Law Dictionary* (1996) (emphasis added). Webster's Dictionary defines "cost" as, *inter alia*, "loss or penalty incurred in gaining something." (Webster's Ninth New Collegiate Dictionary (1988)). Narragansett concludes that, even if TransCanada is forced to bear entirely on its own the increased costs to supply Standard Offer Service in the final five years of the contract term due to extraordinary fuel prices, TransCanada's costs (*i.e.*, the expenditures made by TransCanada) in providing that Standard Offer Service somehow do not increase. This is absurd, since, if TransCanada is obligated to pay out of its own pocket the higher price of procuring electricity to supply Standard Offer Service under the Agreement due to higher fuel costs, its costs of providing that electricity obviously increase. Indeed, under Narragansett's logic, even if the RIPUC took action that prevented TransCanada from being compensated *at all* for its expenditures associated with supplying Standard Offer Service, Narragansett would argue that TransCanada's costs and obligations to supply Standard Offer Service remain the same. This argument defies logic.

In addition, the factual record shows that loss of a fuel adjustment for extraordinary fuel costs is precisely the type of regulatory action from which TransCanada sought protection when it insisted upon the inclusion of Article 8(3) in the Agreement.[4] For example, Alex Pourbaix (of TransCanada) testified that he understood the language of Article 8(3) to cover a broad range of regulatory activity that could be economically detrimental to TransCanada, including a change in

---

[4] Under Massachusetts law, a contract need not be ambiguous on its face in order that extrinsic evidence may be admitted to clarify the meaning of the contract. *See Keating v. Stadium Mgmt. Corp.*, 24 Mass. App. Ct. 246, 249 (1987); *see also Robert Indus. v. Spence*, 362 Mass. 751, 754 (1973). Even if a court does not consider an agreement ambiguous, it may consider parol evidence "not to vary the terms of the contract, but instead to aid in interpreting what the parties intended those terms to mean." *SMS Fin. V, LLC v. Conti*, 68 Mass. App. Ct. 738, 750 (2007) Therefore, regardless of whether it finds Article 8(3) ambiguous, this Court may consider extrinsic evidence regarding the drafting of the language of Article 8(3) in order to clarify the provision's intended meaning.

11

the price paid or loss of a fuel adjustment.  (Supp. App., Pourbaix Dep. at 196-197, 201-03; 261-64; Taylor Dep. at 70-73, 164-65.)  Mr. Pourbaix stated: "We were seeking a very general blanket protection against future regulatory or other changes that would harm the economics of the deal."  (*Id.*; *see also* Supp. App., Pourbaix Dep. at 201-03).  He specifically described how this included a loss of the fuel adjustment.  *Id.*  Likewise, Bill Taylor (of TransCanada) testified that the purpose of Article 8(3) was to protect TransCanada from regulatory filings that could have a negative impact on TransCanada, such as loss of the fuel adjustment.  (*See* Supp. App., Taylor Dep. at 71-73; 164-165).

At the time Article 8(3) was negotiated, TransCanada actually *informed* EUA/Narragansett that TransCanada believed Article 8(3) was necessary to protect TransCanada from regulatory action that could be detrimental to TransCanada such as loss of a fuel adjustment.  During his deposition, Mr. Taylor was asked whether he told Mr. Hirsh (EUA's lead negotiator and signatory to the Agreement) why TransCanada believed it was necessary to include Article 8(3) in the Agreement.  (Supp. App., Taylor Dep. at 164).  Mr. Taylor responded that he told Mr. Hirsh that TransCanada was concerned about regulatory actions that might have a "negative impact" on TransCanada, and that TransCanada "needed to obtain some protection in the event that that occurred."  (*Id.* at 162-165; *see also* 168-169).  Likewise, Mr. Pourbaix testified that that Article 8(3) was intentionally drafted broadly so that TransCanada would not have to "be part of and follow every regulatory hearing regarding . . . standard offer service," and to ensure that "if anything changed [as a result of regulatory action]" TransCanada "would be held harmless."  (Supp. App., Pourbaix Dep. at 196-197; 201-03).

In sum, the factual record shows that TransCanada intended Article 8(3) to cover the precise type of regulatory action at issue in this dispute, and that TransCanada communicated

this intent to EUA/Narragansett. TransCanada's costs and obligations to supply Standard Offer Service have now increased due to the loss of the Fuel Adjustment, as described in Article 8(3).

### 2. Article 8(3) was Negotiated by the Parties, Not Drafted Exclusively by TransCanada.

Narragansett also bases its argument on the incorrect factual premise that TransCanada drafted Article 8(3) of the Agreement. Thus, Narragansett asserts that any uncertainty as to the meaning of the provision should be construed against TransCanada. (Def. Mem., at 8-9). While TransCanada agrees with Narragansett's general legal proposition (Def. Memo., at 9), the underlying "fact" that TransCanada drafted Article 8(3) is clearly disputed. In fact, an examination of the factual record makes it abundantly clear that it should be undisputed that Article 8(3) was *fully negotiated* by the parties, not drafted exclusively by TransCanada.

Bill Taylor and Alex Pourbaix both testified that they negotiated the language of Article 8(3) with Mr. Hirsh. (Supp. App., Pourbaix Dep. at 194-207, 225-35; Taylor Dep. at 162-65, 168-169). The parties exchanged multiple drafts of Article 8(3), negotiated its language on several occasions over a period of weeks, and the final language of Article 8(3) included specific contributions and edits of both EUA and TransCanada. (Supp. App., Pourbaix Dep. at 194-207, 225-35; Tabs 44-46, 47, 48, 49). In addition to the clear deposition testimony on this subject, the documents exchanged by the parties between March 24, 1998 and April 7, 1998 clearly illustrate these negotiations. These documents trace the development of the language of Article 8(3) from an initial proposal drafted by TransCanada, to the final version reached after a period of negotiations by the parties. For example, on March 24, 1998, TransCanada first proposed the insertion of Article 8(3). (Supp. App. Tab 44 at TCPM 007194). Following this proposal, on April 2, 1998, TransCanada sent EAU an amended version of Article 8(3) based on a discussion over its terms. (Supp. App. Tab 47, Pourbaix Dep. at 209-210). The cover sheet of the fax

reads: "Attached is the provision regarding 'changes' to Standard Offer Service which Alex [Pourbaix] has discussed with you . . . ." (*Id.* at TCPM007324). The second page of the fax is a draft of proposed language for what would eventually become Article 8(3) of the Agreement. (*Id.* at TCPM007325). This version of Article 8(3), which was greatly expanded from the language which was originally proposed by TransCanada, was thereafter discussed, debated and altered further based on the parties' negotiations. (Supp. App. Tabs 45, 46, 47, Pourbaix Dep. at 194-200, 210-14). Because Article 8(3) was negotiated by the parties and not drafted exclusively by TransCanada, this provision may not be construed against TransCanada.

### 3. The Language of Article 8(1) Does not Detract From TransCanada's Interpretation of Article 8(3).

Finally, Narragansett argues that TransCanada's interpretation of Article 8(3) of the Agreement is contradicted by Article 8(1) of the Agreement. (Def. Mem. at 7-8). However, Article 8(1) pertains to conditions under which EUA/Narragansett could terminate the Agreement; it does not speak to conditions under which TransCanada could terminate the Agreement. Moreover, even if the language of Article 8(3) could have been worded more clearly to effectuate the parties' intent, that does not render the clause unenforceable. Under Massachusetts law, courts routinely enforce contractual provisions to effectuate the parties' intent even where the court recognizes that such provisions could have been worded more clearly. *See*, *e.g.*, *Cavanagh v. Cavanagh*, 33 Mass. App. Ct. 240, 242 (1992) (even if a contractual provision "could have been better written," it should be enforced in a manner consistent with the intent of the parties at the time the agreement was signed). Thus, the notion that Article 8(3) could have been worded more clearly does not change the fact that the provision should be enforced consistent with the parties' negotiations and intent at the time Article 8(3) was drafted. *Id.*

14

In sum, because there is a genuine issue of material fact as to the meaning of Article 8(3), Narragansett is not entitled to summary judgment on Count II of the Amended Complaint.

## CONCLUSION

For the foregoing reasons, TransCanada respectfully requests that this Court deny Narragansett's Motion for Summary Judgment on Count II of the Amended Complaint.

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD.

By its attorneys,

/s/ Wendy S. Plotkin Esq.
Daniel C. Winston (BBO #562209)
Wendy S. Plotkin (BBO #647716)
Dara Z. Kesselheim (BBO #660256)
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA  02110
Tel. (617) 248-5000
Fax (617) 248-4000

Dated:  September 12, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document (and other associated documents) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 12, 2007.

/s/ Wendy S. Plotkin
Wendy S. Plotkin

4243688v2