UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                            )
TRANSCANADA POWER MARKETING LTD.,           )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )   C.A. No. 05-40076FDS
                                            )
                                            )
NARRAGANSETT ELECTRIC COMPANY,              )
                                            )
                Defendant.                  )
_____)

**RESPONSE OF TRANSCANADA POWER MARKETING LTD. TO NARRAGANSETT'S STATEMENT OF UNDISPUTED MATERIAL FACT**

Plaintiff TransCanada Power Marketing, Ltd. ("TransCanada"), pursuant to Local Rule 56.1 and Federal Rule of Civil Procedure 56, hereby responds to Defendant Narragansett Electric Company's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (the "Statement").

**Response to Defendant's Statement of Undisputed Material Facts**

1.  For purposes of Narragansett's Motion, TransCanada does not dispute the facts stated in Paragraph 1. TransCanada adds, however, that Narragansett has a customer service office in Northborough, Worcester County, Massachusetts, and that its service agent is also located in Northborough, Massachusetts. *See* Taylor Aff. ¶¶ 4, 5.[1]

---

[1] The Affidavit of Bill Taylor was previously filed on June 16, 2005 in the action that was pending between the parties in the United States District Court for the District of Rhode Island, and is submitted herewith. Throughout this Response and TransCanada's Opposition filed herewith, TransCanada will be referring to documents and testimony previously submitted to the Court as part of the Appendix to TransCanada's Motion for Summary Judgment. For convenience of the Court and to avoid unnecessary duplication of exhibits, TransCanada has cited exhibits in that filing by reference to the Appendices filed therewith rather than refiling duplicate and voluminous copies of the same documents.

1

2.  For purposes of Narragansett's Motion, TransCanada does not dispute the facts stated in Paragraph 2.

3.  For purposes of Narragansett's Motion, TransCanada does not dispute the facts stated in Paragraph 3.

4.  For purposes of Narragansett's Motion, TransCanada does not dispute the facts stated in the second and third sentences of Paragraph 4. To the extent that the first sentence of Paragraph 4 contains a statement of fact, however (as opposed to a legal interpretation of the Wholesale Standard Offer Service Agreement (the "Agreement," or "WSOSA")), that "fact" is disputed to the extent it implies that the Fuel Adjustment Factor to be paid under Article V was dependent on a pre-existing retail tariff or a retail tariff outside of Blackstone and Newport's (and successor Narragansett's) control.[2] As set forth in TransCanada's Statement of Undisputed Facts in Support of its own Motion for Summary Judgment,[3] Blackstone and Newport (also referred to herein as "EUA" and, collectively with successor Narragansett, "EUA/Narragansett") had no Standard Offer Service tariffs approved or pending at the time the WSOSA was executed. (TC Facts/Mem. at 8 (citing Tab 7; Pourbaix Dep. at 119-121; Hirsh Dep. at 285-86; Hager Dep. at 506)).

EUA and Narragansett draft and file their own Standard Offer Service tariffs, to be considered and approved by the Rhode Island Public Utilities Commission (the "Commission,"

---

[1] For documents and testimony that were not previously submitted to the Court, TransCanada is filing its "Supplemental Appendix." TransCanada will refer to documents in the Supplemental Appendix as " Supp. App. Tab __" and will specifically identify testimony that can be found in the Supplemental Appendix (e.g. Supp. App., Pourbaix Dep. at 30.) As with the Appendix to TransCanada's Motion for Summary Judgment, documentary exhibits in the Supplemental Appendix will be organized by numerical tabs (which continue numerically from the original appendix), and transcript excerpts in the Supplemental Appendix will be organized alphabetically by witness.

[2] Narragansett similarly makes the factual statement in its Memorandum in Support of its Motion for Partial Summary Judgment, at 3, that Narragansett "does not set the prices" for the electricity it delivers but simply relies on the tariffs that the Rhode Island Public Utilities Commission "has approved." *Id.*

[3] TransCanada's Statement of Undisputed Facts is included within TransCanada's Memorandum of Law in Support of its Motion for Summary Judgment ("TC Facts/Mem."), filed on August 15, 2007.

or "RIPUC"). (*See* TC Facts/Mem. at 4 n.4 (citing Hachey Decl. ¶ 7); 5 (citing Tab 3 at p. 27), 11 (citing Hirsh Dep. at 48-51, 208, 311-13); *see generally id*. at 11 (last paragraph and cited exhibits), 13-15 (and cited exhibits)). EUA and Narragansett prepare(d) and file(d) these Standard Offer Service tariffs periodically, on roughly a yearly basis, to establish the Standard Offer Service pricing and fuel adjustment approximately for the upcoming year. (*See* TC Facts/Mem. at 11 (last paragraph and cited documents)).

Narragansett's statements are misleading because they fail to acknowledge that EUA/Narragansett itself is the party that files the retail tariffs and is the party that decides what information is submitted in those tariffs – including, for example, whether to include a fuel adjustment for the period 2005-2009. (*See* TC Facts/Mem., at 10 (citing, *inter alia,* St. Pierre Dep. at 52-53, 61-63, 143-145; Hager Dep. at 544-547, 555; Hirsh Dep. at 157-162, 377), 14-15 (citing, *inter alia*, Tabs 20-25, 33)). Narragansett's statements subtly imply that it has no control over the price setting process, which is wholly untrue. The RIPUC must approve the pricing in EUA/Narragansett's proposed tariffs, but does not act *sua sponte* to set prices. Rather, the tariffs approved by the RIPUC result from the proposed tariffs that EUA/Narragansett choose to file. The RIPUC, in ruling upon these proposed tariffs, receives and relies upon the representations that EUA/Narragansett makes concerning contractual pricing obligations to suppliers. Leading to this dispute, for example, Narragansett presented various filings and testimony before the RIPUC in which it set forth and described (incorrectly) the terms of the fuel adjustment applicable to the Agreement. (*See, e.g.,* TC Facts/Mem., at 14-15 (citing, *inter alia*, Tabs 20-25, 33)). Based on these filings, the RIPUC approved Narragansett's proposed Standard Offer Service tariff which omitted a fuel adjustment for TransCanada in 2005. (*See* RIPUC Report and Order dated Feb. 17, 2005, 2005 WL 1536259, Supp. App. Tab 36). Similarly, in 2003

Narragansett entered a contract amendment with another wholesale supplier in the EUA Zone which changed the benchmark stipulated price for Standard Offer Service for that supplier in each year through 2009. Narragansett submitted a rate filing seeking approval for this rate increase, and the RIPUC approved its request. (*See* RIPUC Report and Order dated October 23, 2003, Supp. App. Tab 37 at 1-2, 3-5, 12).

Here, the Agreement states that TransCanada was and is to receive two price components in exchange for delivery of Standard Offer Service through 2009: (1) a stipulated Standard Offer Wholesale Price; and (2) a Fuel Adjustment Factor. The Fuel Adjustment Factor is to be the revenues collected from "the retail rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs." (TC Facts/Mem. at 16 (citing Tab 14)). There were no applicable Standard Offer Service tariffs on file at the time the Agreement was executed. (TC Facts/Mem. at 8 (citing Tab 7, Pourbaix Dep. at 119-121, Hirsh Dep. at 285-286, Hager Dep. at 506)). As set forth in TransCanada's summary judgment papers, EUA/Narragansett agreed to, and was obligated to, file Standard Offer Service tariffs in the future which included a Fuel Adjustment mechanism in each year from 2000 through 2009. (TC Fact/Mem., at 2-11 and citations referenced).

5.   The facts set forth by Narragansett in Paragraph 5 are also disputed, as follows: In November 1997, Blackstone and Newport submitted proposed Standard Offer Service tariffs in concert with an EUA solicitation for supply of Standard Offer Service through 2004 (in both Massachusetts and Rhode Island collectively). (*See* November 1997 Tariff Advice, Supp. App. at Tab 38, NARR 42423-30, 42489-90, 42505-09, 42528). The tariff filing and attached solicitation documents included fuel adjustment trigger numbers only through 2004, and stated that EUA would arrange for the remaining Rhode Island Standard Offer Service period (2005-

2009) at "a later date." (*Id.* at NARR 42490). The filing included a Fuel Index description stating that EUA would include a fuel adjustment mechanism in its Standard Offer Service tariffs "after 1999"; that the tariffs were subject to "continued regulatory supervision and approval"; that the tariffs at that point were "not yet finalized"; and that the "actual Fuel Adjustment mechanism will vary in accordance with the differing retail terms in the two states." (*Id.* at NARR 42489-90, 42508); *see also* TC Facts/Mem. at 6 n.7 (citing Tab 6, at NEC 079524)). In Rhode Island, the term of the retail Standard Offer Service was through 2009. (TC Facts/Mem. at 4 (citing Tab 3 at p. 34)). EUA indicated in RIPUC filings at roughly the same time, in response to an Information Request as to "what annual percentage increases in the price of residual oil and gas would trigger the fuel adjustment mechanisms from 1999-2010," that the fuel index did not apply in 1998-99 but would apply and be triggered "in 2000 and thereafter" based on future oil and gas prices. (*See* Responses to Enron Data Requests, Supp. App. Tab 39 at NARR 05253).

In late December, 1997, the RIPUC rejected EUA's proposed tariff filing, since EUA had failed to complete the competitive bid for Standard Offer Service as required by the URA. (TC Facts/Mem. at Tab 15, p. 8). The RIPUC instead required EUA to file Interim Generation Service tariffs, pending the filing of future Standard Offer Service retail tariffs. *Id.* On April 15, 1998, after the WSOSA was executed, Blackstone and Newport filed new proposed retail standard offer service tariffs. (*See* Ex. D to Flynn Aff. at 51). Again, Blackstone and Newport filed these proposed tariffs in concert with an EUA solicitation for Standard Offer Service only through 2004. (*Id.* at 51-53; *see also* May 15, 1998 Filing, Supp. App. Tab 40 at 48930-993). *Contrary* to Narragansett's statement in the third sentence of paragraph 5, these proposed tariffs filed by EUA on April 15, 1998 *were not* approved by the RIPUC. (*See* Exhibit E to Flynn Aff.,

at 15.) Instead, RIPUC rejected the tariffs and the notion of a tariff containing Standard Offer Service prices for more than the upcoming year. Instead, RIPUC's Order required EUA (and Narragansett) to refile Standard Offer Service tariffs on a roughly yearly basis for the entire Standard Offer Service Period with prices only for the upcoming year. (*See* July 17, 1998 Filing, Supp. App. Tab 41 at NARR 07330, 07335-07351, October 30, 1998 Filing, Supp. App. Tab 42 at NARR 06231-2); TC Facts/Mem. at 11 (citing Tab 15 at 12)).

Thus, contrary to Narragansett's statements in paragraph 5, there was no previously filed tariff pending or approved at the time the Agreement was signed, and no tariff or other document anywhere stated that a fuel adjustment would not ultimately be included in tariffs filed for the period 2005-2009. (TC Facts/Mem. at 8 (citing Tab 7, Pourbaix Dep. at 119-121, Hirsh Dep. at 285-286, Hager Dep. at 505), 10 (and citations)).

6. Narragansett's characterization of the facts contained in Paragraph 6 is disputed. Narragansett's draft letter speaks for itself, but also states (as did the final version of the letter) that Narragansett had assumed the obligations of Blackstone and Newport under the Agreement and that the parties' obligations under the Agreement were not affected by the merger. (Ex. F to Flynn Aff.; TC Facts/Mem. at 11-12 (citing Amend. Compl. 25/Amend. Ans. 25, Tab 16 at NARR 22621)). The draft letter further stated that the former EUA retail tariffs would be canceled, but that Narragansett as Blackstone's and Newport's successor would continue to pay TransCanada's fuel adjustment as required under the Agreement. (TC Facts/Mem at 11-12 (citing Tab 16 at NARR 22622)).

As did the final version of the letter, the draft letter attached a document addressing Narragansett's (and Mass. Electric's) obligations in both Rhode Island and Massachusetts. It stated that a fuel adjustment applied "after 1999," and listed the prices and triggers applicable in

both Massachusetts and Rhode Island through the joint Massachusetts/Rhode Island Standard Offer Service term of 2004. (TC Facts/Mem., at 12-13 (citing Tab. 16 at NARR 22624; Hager Dep. at 129-130, 140-141)). Mr. Hager (the Narragansett officer in charge of administering Narragansett's Standard Offer Service contracts) and Mr. Hachey (the TransCanada officer in charge of the Agreement and the NECO Agreement) discussed the letter. Mr. Hager did not mention any intent to end the Rhode Island fuel adjustment in either the Agreement or the NECO Agreement in 2004, or to treat the fuel adjustment in TransCanada's two Narragansett Standard Offer contracts any differently from one another. (TC Facts/Mem. at 12-13 (citing Tab 18; Hachey Decl. ¶ 12; Hager Dep. at 119-122, 140-141)).

7. TransCanada does not dispute that on April 18, 2000 Michael Hager sent a signed version of the letter to Sean McMaster of TransCanada and that a true and correct copy of that letter is Exhibit H to the Flynn Affidavit.

8. TransCanada does not dispute Narragansett's recitation of Article 8(3) of the WSOSA.

9. To the extent that Paragraph 9 contains statements of fact (as opposed to a legal interpretation of the disputed language in Article 8(3) of the Agreement), these facts are disputed. Extraordinarily high fuel prices after 2005 have increased the costs to TransCanada of supplying Standard Offer Service electricity under the Agreement. (Supplemental Hachey Aff. ¶ 3; *cf.* December 9, 2003 Testimony, Supp. App. Tab 43 at 36-37). The Fuel Adjustment Factor compensates TransCanada for those increased costs of supplying Standard Offer Service. Without the Fuel Adjustment Factor, TransCanada is forced to bear the increased costs of fuel and of supplying Standard Offer Service entirely on its own. (Suppl. Hachey Aff. ¶ 3; Supp. App., Pourbaix Dep. at 201-03, 261-64; Supp. App. Tab 43 at 36-7). By taking away this "pass-

7

through" mechanism for TransCanada's increased costs, the costs borne by TransCanada to supply Standard Offer Service under the Agreement are increased. *Id.* Similarly, TransCanada's "obligations" to provide Standard Offer Service increase in the absence of a Fuel Adjustment Factor, since TransCanada is then obliged to cover its higher supply costs due to extraordinary fuel costs entirely on its own. (Supp. Hachey Aff. ¶ 3; Supp. App., Pourbaix at 201-03).

10. The facts set forth in Paragraph 10 are disputed, and grossly misrepresent the record. The parties exchanged multiple drafts of Article 8(3), negotiated its language on several occasions over a period of weeks, and the final language of Article 8(3) included specific contributions and edits of both EUA and TransCanada. (Supp. App., Pourbaix Dep. at 194-207, 225-35; *see* Drafts of Article 8(3), Supp. App. Tabs 44 (at TCPM 007194-7195), 45 (at TCPM 000625), 46 (at TCPM 007312), 47 (at TCPM 007325), 48 (at TCPM 000468), 49 (at TCPM 007515)). For example, on March 24, 1998, TransCanada first proposed the insertion of Article 8(3). (Supp. App., Tab 44 at TCPM 007194). Following this proposal, on April 2, 1998, TransCanada sent EUA an amended version of Article 8(3) based on a discussion over its terms. (Supp. App., Tab. 47, Pourbaix Dep. at 209-210). This version of Article 8(3), which was greatly expanded from the language which was originally proposed by TransCanada, was thereafter discussed, debated and altered further based on the parties' negotiations. (Supp. App. Tabs 45 (at TCPM 00625), 46 (at TCPM 007312), 47 (at TCPM 007325), Pourbaix Dep. at 194-200, 210-214).

11. Narragansett's characterization of the facts in Paragraph 11 is disputed. Narragansett has cherry picked *one* statement by a TransCanada witness concerning the drafting of Article 8(3), and has flagrantly misread that statement. (Supp. App., Pourbaix Dep. at 196-197, Flynn Aff. Ex. I (in fact stating that an alteration of the pricing paid to TransCanada for

supplying Standard Offer Service would trigger section 8.3.); *see also* Supp. App. Pourbaix Dep. at 201-03; 261-64)).  Narragansett has also chosen to omit entirely from its filing the testimony from TransCanada's witnesses that they understood the language of Article 8(3) to cover a broad range of regulatory activity that could be economically detrimental to TransCanada, including a change in the price paid or loss of a fuel adjustment.  (Supp. App., Pourbaix Dep. at 196-197, 201-03; 261-64.; Taylor Dep. at 70-73, 164-65).  For example, in his deposition, Mr. Pourbaix was asked what he believed Article 8(3) would accomplish at the time it was negotiated.  (Supp. App., Pourbaix Dep. at 203).  Mr. Pourbaix responded:  "We were seeking a very general blanket protection against future regulatory or other changes that would harm the economics of the deal." (*Id.*; *see also* Supp. App. Pourbaix Dep. at 201-03; Taylor Dep. at 70-73).  He specifically described how this included a loss of the fuel adjustment.  *Id.*

     Finally, Narragansett has also chosen not to cite the testimony from TransCanada's witnesses that they affirmatively discussed with EUA negotiators their belief that Article 8(3) applied to economic changes such as loss of the fuel adjustment.  For example, Bill Taylor, of TransCanada, specifically testified that he discussed TransCanada's purposes for Article 8(3) with Michael Hirsh, EUA's lead negotiator, before the Agreement was executed. (Supp. App., Taylor Dep. at 162-65, 168-69; Pourbaix Dep. at 196-97).  There is no evidence that EUA disagreed with that interpretation.  *Id.*

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD.

By its attorneys,

/s/  Wendy S. Plotkin Esq._____
Daniel C. Winston (BBO #562209)
Wendy S. Plotkin (BBO #647716)
Dara Z. Kesselheim (BBO #660256)
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, MA  02110
Tel. (617) 248-5000
Fax (617) 248-4000

4244311v1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

|  |  |  |
|---|---|---|
| TRANSCANADA POWER MARKETING LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-40076FDS |
| NARRAGANSETT ELECTRIC COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

### SUPPLEMENTAL AFFIDAVIT OF MICHAEL HACHEY

I, Michael Hachey, hereby depose and state as follows:

1. I am currently the Director, Eastern Commercial, for TransCanada Power Marketing, Ltd ("TransCanada"). I have worked for TransCanada for 9 years. Prior to working for TransCanada I worked in the Generation Marketing department of New England Power Company, a New England Electric System ("NEES") subsidiary. I have worked in the electric/power supply industry for nearly 30 years. I make this affidavit in support of TransCanada's Opposition to Narragansett's Motion for Summary Judgment.

2. Article 5 of the Wholesale Standard Offer Service Agreement ("Agreement") that is the subject of this lawsuit sets forth a two part price component for Standard Offer Service – a stipulated price plus a Fuel Adjustment Factor. The Fuel Adjustment Factor is to be calculated based on an adjustment mechanism which relies on current market prices of gas and oil, and which essentially reimburses TransCanada for the impact of extraordinarily high fuel prices that increase its costs in supplying power under the Agreement.

4249558v1

3. In early 2005, Narragansett stopped paying TransCanada a Fuel Adjustment Factor, despite the fact that fuel costs after 2005 would have triggered payment, under the Fuel Adjustment mechanism had the anticipated triggers numbers for 2005 been approved. These high fuel prices after 2005 have in fact increased the costs to TransCanada of supplying Standard Offer Service electricity under the Agreement because TransCanada supplied the power from electric market sources whose pricing is today primarily driven by the cost of producing electric power from natural gas-fired generators. Without the Fuel Adjustment Factor, TransCanada is forced to bear these increased costs of supplying Standard Offer Service due to higher fuel prices entirely on its own. In other words, without the fuel adjustment "pass-through" mechanism for TransCanada's increased costs, the costs actually borne by TransCanada to supply Standard Offer Service under the Agreement are increased.

4. Similarly, TransCanada's "obligations" to provide Standard Offer Service increase in the absence of a Fuel Adjustment Factor, since TransCanada is obliged to cover its higher supply costs due to extraordinary fuel costs entirely on its own.

5. Thus, the absence of a Fuel Adjustment Factor causes a material increase in TransCanada's costs and obligations to provide Standard Offer Service power to Narragansett.

Signed under the pains and penalties of perjury this 12th day of September.

_____
Michael Hachey

4249558v1