UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                )
TRANSCANADA POWER  MARKETING LTD.,              )
                                                )
                    Plaintiff,                   )
                                                )
          v.                                     )        C.A. No. 05-40076FDS
                                                )
                                                )
NARRAGANSETT ELECTRIC COMPANY,                   )
                                                )
                    Defendant.                   )
_____)


**SUPPLEMENTAL DEPOSITION APPENDIX**

# Pourbaix

Page 1

1                              Vol. 1, Pgs. 1-280

2                              Exhibits 194-219

3

4              UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6

7  - - - - - - - - - - - - - - - - - - - - - -

8  TRANSCANADA POWER MARKETING, LTD.

9              Plaintiff

10 v.                          CA No. 05-40076 FDS

11 NARRAGANSETT ELECTRIC CO.,

12             Defendant

13 - - - - - - - - - - - - - - - - - - - - - -

14

15

16

17             DEPOSITION of ALEX POURBAIX

18       Tuesday, April 17, 2007 - 9:17 a.m.

19             Bowditch & Dewey, LLP

20             One International Place

21             Boston, Massachusetts

22

23       Reporter:  Jill K. Ruggieri, RMR/CRR

24

Page 2

1 APPEARANCES:
2
3 Choate Hall & Stewart LLP
4     Daniel C. Winston, Esq.
5     Two International Place
6     Boston, Massachusetts 02110
7     (617) 248-5000 Fax: (617) 248-4000
8     on behalf of the plaintiff
9
10 Bowditch & Dewey, LLP
11     Vincent F. O'Rourke, Jr., Esq.
12     311 Main Street
13     Worcester, Massachusetts 01615
14     (508) 926-3424 Fax: (508) 929-3035
15     on behalf of the Defendant
16
17 Also present: Jody D. M. Johnson, Esq.
18        TransCanada Power Marketing, Ltd.
19
20
21
22
23
24

Page 3

1     PROCEEDINGS
2
3     ALEX POURBAIX, a witness having been
4 duly sworn, on oath deposes and says as
5 follows:
6     EXAMINATION
7 BY MR. O'ROURKE:
8 Q   Mr. Pourbaix, could you please state your
9    full name and spell it for the reporter.
10 A   Sure. It's Alexander John Pourbaix,
11    A-L-E-X-A-N-D-E-R, J-O-H-N, P-O-U-R-B-A-I-X.
12 Q   And we met on the way in, but my name is Vin
13    O'Rourke, and I represent Narragansett in
14    this litigation.
15     Have you been deposed before?
16 A   Years and years ago.
17 Q   Briefly, I'm going to ask you a series of
18    questions about this litigation that
19    TransCanada has brought against
20    Narragansett.
21     If you have any questions or don't
22    understand my questions, feel free to stop
23    me, and I'll rephrase them.
24     If you have a problem with a

Page 4

1   question, you have a right to talk to your
2   lawyer, but I request that you not stop to
3   talk to your lawyer in the middle of a
4   question.
5     MR. O'ROURKE: We're going to reserve
6   all objections except objections as to form
7   and motions to strike until the time of
8   trial?
9     MR. WINSTON: Yes.
10     MR. O'ROURKE: Thank you.
11     MR. WINSTON: Waive notarization, and
12   we'll read and sign.
13     MR. O'ROURKE: That's great.
14 BY MR. O'ROURKE:
15 Q   How old are you, sir?
16 A   Forty-one.
17 Q   And could you please describe your education
18    since high school?
19 A   Sure.
20     I graduated with a bachelor's of
21    economics in -- I'm going to say that was
22    1986.
23     In 1989, I graduated with an LLB,
24    which is a Canadian law degree.

Page 5

1     Both those degrees were at the
2    University of Alberta in Edmonton, Alberta.
3     Sorry, that was my education.
4 Q   Okay. That's fine.
5 A   Okay.
6 Q   Could you tell me where you presently
7    reside?
8 A   In Calgary, Alberta.
9 Q   And how long have you resided there?
10 A   Since 1991.
11 Q   What year did you get your LLB?
12 A   1989.
13 Q   And could you please give me your employment
14    background?
15 A   Sure.
16     I practiced -- when I graduated from
17    law school, I practiced corporate commercial
18    law in Edmonton for a firm called Bryan &
19    Company, B-R-Y-A-N, & Company.
20     In 1991, I was offered a job with a
21    company called Northridge Canada, Inc.
22    Northridge Canada, Inc., was an energy
23    trading and marketing company, and I worked
24    with them as a lawyer until 1995, at which

2 (Pages 2 to 5)

Page 6

1  time we sold the company to TransCanada
2  PipeLines at the time.
3       And at that time I became associate
4  general counsel of TransCanada, and I
5  remained in that position for a relatively
6  short time, I'm going to say it was about
7  eight months, after which time I moved over
8  into a commercial role in the power group,
9  in the energy segment of TransCanada, and I
10  was in charge of business development.
11       And I would have -- that job
12  continued.  I -- from 1996 until I'm going
13  to say 2001, I just maintained positions of
14  increasing responsibility in the power group
15  in TransCanada.
16       In around 2001, I was made the head
17  of the power group and also became an
18  executive vice president of TransCanada
19  Corporation.
20       That remained the same until June of
21  last year, at which time I became president
22  of all of the unregulated businesses of
23  TransCanada.
24 Q  What do those entail?

Page 7

1 A  The power business, which would be power
2  generation, power marketing, power trading,
3  construction of power plants, operation of
4  power plants, gas storage, gas trading and
5  marketing, to the extent that we do that.
6       That's a relatively small component
7  of our business.
8       And then there's a number of much
9  smaller businesses, what I would call just
10  sort of orphan businesses in TransCanada
11  which I'm responsible for, none of which
12  really amount materially in terms of income
13  or cash flow.
14 Q  You say this was the unregulated business.
15       What is the regulated TransCanada?
16 A  TransCanada is split into two businesses.
17  The pipeline business, which is run by a
18  fellow named Russ Girling, who is the
19  president of the pipeline business, and then
20  I run the other half of the company, which
21  is the unregulated energy business, and I'm
22  the president of energy.
23 Q  What are the overall assets of TransCanada
24  Power if you put the two businesses

Page 8

1  together?
2 A  TransCanada, the entire corporation?
3 Q  Yes.
4 A  Sorry.
5       I would -- I would -- I think we
6  have a total value probably in the range of
7  $30 billion, and that would be split
8  probably in the range of 20 billion for the
9  pipeline business and 10 billion for the
10  energy business.
11 Q  When you say the energy business, is that
12  the --
13 A  The business I'm responsible for, yes.
14 Q  And how many employees does TransCanada
15  have?
16 A  Probably about I'm going to say in the range
17  of 32 to 3500.
18 Q  If I could bring you back to 1997, how many
19  employees did TransCanada have?
20 A  The entire entity?
21 Q  Yes.
22 A  It was actually a much bigger company at
23  that time in terms of employees.
24       It probably would have been in the

Page 9

1  range of 4 or 5,000.
2       Subsequent to 1997, we did a
3  significant divestiture.  We sold our
4  international business, and that business --
5  that business had many hundreds of employees
6  but also assets around the globe, and we
7  sold that business and refocused on the
8  North American market, and that's our bigger
9  company, smaller number of employees today.
10 Q  What were your assets in 1997?
11 A  I'm going to say probably around 15 billion.
12 Q  And how did they break down between the
13  unregulated --
14 A  Oh, it was overwhelmingly pipeline assets.
15 Q  What were the assets of the unregulated
16  business at that time?
17 A  At that time we had a 40 percent interest in
18  Ocean State Power.  We were in -- I can't
19  remember the exact date, but it -- at the
20  time of this issue that we're going to talk
21  about today, we were very close to acquiring
22  New England Electric's interest in Ocean
23  State Power, but, you know, depending on
24  when your time horizon is.

3 (Pages 6 to 9)

**Esquire Deposition Services**
**1-866-619-3925**

Page 118

1  extraordinary fuel is to be provided for in
2  the tariff.
3      So I had no -- I mean, it -- it was
4  beyond my comprehension that there would be
5  a scenario where we -- the -- half the
6  pricing, the fixed price stays for the term
7  and then just for some inexplicable reason
8  the fuel adder just ceased to apply at some
9  time in the middle of that term.
10 Q  At the time of this conversation, did you
11     and Mr. Taylor have that kind of discussion
12     that you just described to me in terms of
13     your reasoning?
14 A  We were very concerned that we understood
15     what the pricing was, and I was comfortable
16     that the pricing was going to be
17     representative of the NEES pricing in Rhode
18     Island, and that corresponded with my
19     understanding.
20     I did not pursue it beyond that.
21 Q  Did you give any thought to having it --
22     that confirmation specifically included in
23     the contract?
24 A  I saw absolutely -- I mean, I couldn't -- I

Page 119

1  really didn't think there was an outcome
2  that could be different than that.
3      It wasn't front and center on my mind
4  that I would have that documented anywhere.
5 Q  Isn't it true that prior to this discussion
6    with Mr. Hirsh, Mr. Taylor had been making
7    repeated efforts to find out what the tariff
8    would be?
9 A  Yes.
10 Q  And Mr. Taylor has testified that he was
11     frustrated that he couldn't do that?
12 A  Mm-hmm.
13 Q  And in light of that, wouldn't it have made
14     sense to tie it down more completely?
15 A  Well, my recollection at the time was it was
16     not us who were anxious to get this deal
17     concluded. It was EUA who was anxious to
18     get this deal concluded.
19     And from my perspective, your
20     statement of Bill's concern is very correct.
21     He was exceedingly concerned about EUA's
22     ability to provide us with executed,
23     approved tariffs.
24     And that was why over time you saw

Page 120

1  the change in that section in the agreement,
2  that it moved to reference the settlement
3  agreements and then subsequently moved to
4  reference the infamous Section 8.3.
5      That was our -- those changes were
6  made in order to accommodate EUA, because
7  they weren't able to deliver to us executed,
8  approved tariffs.
9 Q  But Mr. Taylor's concern was that he -- as I
10     understood it was you didn't know what
11     tariff EUA would be requesting?
12     MR. WINSTON: Objection. You can
13     answer.
14 A  Sorry, we didn't know what tariff they would
15     be --
16 Q  What tariff rates they would be seeking.
17 A  No, that is not -- I --
18     I wasn't there when you were
19     obviously deposing Mr. Taylor.
20     From my perspective, we were very
21     anxious to see the tariffs. They had
22     provided us with interim tariffs, which were
23     less than any use whatsoever, because they
24     didn't even reference the standard offer;

Page 121

1  and we had repeated assurances from EUA that
2  they were preparing the filings.
3      They were going to file them, but
4  they weren't approved; and, hence, they
5  could not provide them to us.
6      But I don't -- I mean, are you
7  suggesting that Bill was saying we thought,
8  for example, the --
9      I don't know what you're suggesting.
10 Q  What was your concern that led you to or led
11     Mr. Taylor to continually seek to see the
12     tariffs?
13 A  Well, obviously the tariffs were what were
14     going to memorialize the standard offer
15     rates.
16 Q  And as of the date of April 7, 1998, there
17     was no tariff, correct?
18 A  Yes.
19 Q  And so my question is, why, then, did you
20     not memorialize the tariff that you expected
21     EUA to file --
22 A  Because --
23 Q  -- as of that date?
24 A  I don't even think they were sure what they

31 (Pages 118 to 121)

Page 194

1 Q    I show you what's been marked Exhibit 54.
2        And is that a letter that you
3    prepared?
4 A    That is a letter that is under my signature,
5    but the specific comments with respect to
6    the legal language would have been prepared
7    by Mr. McMaster.
8 Q    Okay.
9        You've testified a few times that
10    there was a provision 8.3 that was added in
11    connection with your concerns with regard to
12    the tariffs?
13 A    Yes.
14 Q    Is this Rider 1 the language that was
15    proposed in that respect?
16 A    Rider 1, I believe, was the first iteration
17    of what eventually became Section 8.3.
18 Q    Did Rider 1 address your concerns?
19 A    I think -- sorry.
20        My recollection was that this was our
21    first cut at it. And over time, we expanded
22    that language in order to better protect
23    ourselves.
24 Q    Isn't Rider 1 as written a tautology?

Page 195

1 A    In what regard?
2 Q    The price increases -- the price increases
3    and you get it?
4 A    No, I think its meaning is clear.
5 Q    And what would that be?
6 A    That -- well, sorry. Let me think about
7    that. The -- I think this -- this is my
8    explanation about how this clause evolved.
9        I think this was a first cut at it,
10    and further cuts at it which ultimately
11    resulted in 8.3 gave us better protection.
12        I see your point by referring to
13    capital P, price, in Rider 1.
14 Q    Did you have any discussions with Mr. Hirsh
15    regarding Rider 1 at that point?
16 A    In meetings with Mr. Hirsh, Mr. Taylor
17    typically led the discussion on -- either
18    call it Rider 1 or call it Section 8.3, so I
19    was there, but I would not have been leading
20    that.
21        This was very much Mr. Taylor's --
22 Q    Do you recall any discussions concerning
23    this provision as proposed in this Exhibit
24    54?

Page 196

1 A    You're talking about the specific Rider 1
2    provision?
3 Q    Right.
4 A    I don't recall the exact discussion.
5 Q    What generally were the discussions
6    Mr. Taylor had with -- and you'll have to
7    tell me who he has them with -- concerning
8    8.3?
9 A    So I -- I would have been present when he
10    would have had those discussions with
11    Mr. Hirsh. And he may have had those
12    discussions at other times not in my
13    presence.
14        But the gist of his concern was that
15    we were being asked to execute this
16    agreement, which would obligate us to
17    provide standard offer service to customers
18    of EUA; and it would be almost impossible
19    for us to be part of and follow every future
20    regulatory hearing regarding -- regarding
21    standard offer service.
22        Or, in fact, we may not even be
23    allowed to be part of the discussions.
24        And Bill requested the insertion of

Page 197

1    language which ultimately ended up as
2    Section 8.3 in order to protect us from some
3    subsequent action by regulators that
4    could -- regulators, politicians.
5        It was drafted very broadly to ensure
6    that if anything changed, we -- we
7    would be held harmless for it in the future.
8        And I'll give you something -- I
9    mean, one of the concerns at the time was
10    this concern over the ability of people to
11    leave and come back on to standard offer
12    service.
13        I think the concerns of TransCanada
14    went even beyond that, though. I mean, for
15    example, if -- if there was a subsequent
16    change in the actual fixed price of power
17    under the standard offer service agreement,
18    we did not want to be held responsible for
19    that, and hence the insertion of the 8.3
20    language.
21 Q    If I could show you what's been marked
22    Exhibit 56, and I refer you to page 007312.
23        Do you recall receiving this
24    document?

50 (Pages 194 to 197)

Page 198

1        (Witness read document.)
2 A    7312?
3 Q    Right.
4        Generally do you recall receiving
5    Exhibit 56?
6 A    I recall seeing this document, but I believe
7    I recall seeing this document only with my
8    counsel's marked-up comments on it, and I
9    don't know that this one has that.
10 Q    That may be the ubiquitous redacted...
11        (Laughter.)
12 A    I mean, I -- I have seen this document.
13 Q    But with additional comments on it, you'd
14    said?
15 A    Yes. By the time I got it, it was already
16    marked up.
17 Q    Referring you to Section 7312 --
18        MR. WINSTON: You main Bates-stamp?
19 Q    I'm sorry?
20 A    Bates-stamp?
21 Q    Yes, I'm sorry.
22 A    Okay.
23 Q    Section 8.3, did you interpret that as being
24    a proposal to address your Rider 1 concerns?

Page 199

1        (Witness read document.)
2 A    Yes.
3 Q    And that was not acceptable to TransCanada?
4 A    No.
5 Q    Why not?
6 A    First of all, it's in the company's sole
7    discretion not the supply's sole --
8        (Witness read document.)
9 A    This -- this appears to be for the benefit
10    of the companies rather than the benefit of
11    the supplier.
12 Q    Okay.
13        And did TransCanada make a response
14    in connection with response to this?
15 A    Yes.
16 Q    And you proposed Section 8.3?
17 A    Eventually we did. I don't know if the very
18    next correspondence included the fully born
19    Section 8.3.
20 Q    I'm going to show you what's been marked
21    Exhibit 58.
22        (Witness read document.)
23 Q    Does that -- is that what eventually became
24    Exhibit 8.3?

Page 200

1 A    It appears to be fairly close to it.
2 Q    That's an unfair question, I recognize.
3        Here is Exhibit 1, which is the
4    standard offer service agreement that you
5    ultimately negotiated; is that right?
6 A    I -- yes.
7        MR. WINSTON: There are slight
8    differences, I just note for the record.
9        MR. O'ROURKE: Okay. I'll move it
10    along.
11 Q    There are slight -- I'll give you the rest,
12    but --
13 A    Okay.
14 Q    And we might as well actually go to the
15    final version, if you just take a look at
16    8.3.
17 A    Mm-hmm.
18 Q    And my question is, how does the failure to
19    have a fuel adder increase supplier's costs
20    or obligations?
21 A    The obligation -- we have an obligation --
22        (Witness read document.)
23 A    I consider the term "obligation" broad
24    enough for us to fall under that, is that we

Page 201

1    certainly have a financial obligation.
2 Q    In what sense?
3 A    We have an obligation to provide standard
4    offer service, and the -- I'm trying to
5    think how to describe this.
6        (Pause.)
7 A    Could you repeat your question for me?
8 Q    I'll give you another one.
9        The failure to have a fuel adder
10    doesn't increase supplier's costs, does it?
11 A    We have to supply the power. The fuel adder
12    is an offset to our cost of supplying that
13    power.
14        So therefore, the absence of it
15    increases our costs, in my mind.
16 Q    Although the adder is actually an addition
17    to price, isn't it, which is a payment?
18 A    We have an obligation to deliver power, and
19    that power costs us something to deliver.
20        The standard offer -- the fuel adder,
21    if you think of it in that way, was an
22    offset to our costs of delivering that
23    power.
24 Q    Well, it's a payment for you delivering that

51 (Pages 198 to 201)

Esquire Deposition Services
1-866-619-3925

Page 202

```
 I   power?
 2 A  I consider that semantics.
 3        There is a cost for us to deliver the
 4   power we were obligated to deliver under the
 5   standard offer service.
 6        There are puts and takes associated
 7   with that, and one of the puts was the
 8   credit we receive under the fuel adder.
 9        So in the absence of that, our costs
10   are higher.
11 Q  And the question before that had been how do
12   you believe that the absence or do you
13   believe that the absence of a fuel adder
14   increases your obligations to provide
15   standard offer service?
16 A  It -- it depends on the definition of
17   "obligations."
18        I look at -- we have an obligation to
19   deliver power under the standard offer, and
20   one of our obligations in doing that is the
21   cost of that power.
22        That -- that cost is increased for
23   us. I consider that an increased
24   obligation.
```

Page 203

```
 1 Q  Okay.
 2        And when you negotiated this
 3   provision, that was your understanding of
 4   what it would accomplish?
 5 A  At the time we negotiated this section, we
 6   were not at all having a discussion about
 7   what the fuel adder would or wouldn't be
 8   doing in the period 2005 to 2004.
 9        We were having a discussion about
10   a -- we were seeking a very general blanket
11   protection against future regulatory or
12   other changes that would harm the economics
13   of the deal.
14        It was not at all intended
15   specifically to deal with the '05 to '09
16   presence or absence of the fuel adder.
17        We would have requested this
18   regardless.
19 Q  I show you what's been marked Exhibit 59.
20        I refer you to page 463, TCPM463.
21 A  Mm-hmm.
22 Q  Do you recall whether Mr. Hirsh advised you
23   before sending this to you that the term was
24   going to be increased to 2009?
```

Page 204

```
 1        (Witness read document.)
 2 A  The -- the document you showed -- the
 3   previous document you showed me, I believe I
 4   was in transit to Boston at the time. I did
 5   not -- I did not receive that.
 6        And I can't remember if the first I
 7   saw the term change was in this document or
 8   if Mike Hirsh had told me that prior to --
 9   prior to sending this.
10        MR. WINSTON: I'll note Exhibit 56
11   also has 2009, which is the earlier one you
12   referred him to.
13 Q  Well, if I refer you to, actually, 56, is it
14   over in -- maybe it's in front of you.
15        If you look at page --
16 A  This is -- sorry.
17        58?
18 Q  58 is the 8.3, I think. 56 should be there.
19 A  Okay.
20 Q  I think 56 is what you're referring to as
21   one that you said you were in transit?
22 A  Yes, yes.
23 Q  That would have been -- so on April 1, 1998,
24   you were in transit from Calgary to --
```

Page 205

```
 1 A  Yes, I believe so.
 2 Q  And the term page, page 7307, is -- at least
 3   as of that date is still 2004? 7307.
 4 A  Oh. It -- it is, but I also see that the
 5   standard offer service goes to 2009.
 6 Q  So by -- by this September 1st, then, it's
 7   your understanding --
 8        MR. WINSTON: April 1st.
 9        MR. O'ROURKE: April 1st, excuse me.
10   Thank you.
11 Q  By April 1st, it's your understanding that
12   EUA was at that point requesting that it go
13   through 2009?
14 A  At the time this document was sent, I did
15   not receive it, so I can't say that on
16   April 1st that I was aware of this.
17 Q  Okay.
18        I see that this was sent both to
19   Mr. McMaster and to yourself on April 1st.
20 A  Mm-hmm.
21 Q  Would that have been faxed out to Calgary?
22 A  My -- my expectation and my recollection is
23   that he wasn't faxing these to two
24   different -- he was just faxing it to Sean
```

52 (Pages 202 to 205)

Page 206

1   and then putting my name on it, and it would
2   get to me.
3 Q   Do you know if between April 1st and
4   April 3rd you became aware that --
5 A   Yes.
6       If you're asking me did I become
7   aware that the term had changed, yes.
8 Q   Prior to receiving the draft on April 3rd?
9 A   I -- it would have been obviously either
10  right before or right after that.
11 Q   And in terms of -- I see that the Exhibit 59
12  dated April 3rd is faxed again to
13  Mr. McMaster.
14      Was Mr. McMaster with you in Boston
15  at that time?
16 A   No, he was in Calgary.
17 Q   So what -- how would you have gotten a copy
18  of this or how did you get a copy of this,
19  if you did?
20 A   My recollection is he faxed it to my hotel
21  room.
22 Q   "He" meaning?
23 A   Mr. McMaster.
24 Q   And is -- is the fax to your hotel room --

Page 207

1   did that disappear in the 1996 to whatever
2   transactions?
3 A   Yes, yes.
4 Q   If you look at Section 8.3 on Exhibit 59,
5   it's --
6 A   I'm sorry?
7 Q   Are you back on -- to 59?
8 A   Sorry, in the asset purchase agreement or in
9   the wholesale standard offer?
10 Q   The wholesale standard offer, so it would be
11  page 4680.
12 A   Okay.
13 Q   Which is in the back of this fax.
14 A   Yes.
15 Q   I'm not sure why.
16      Do you see the Section 8.3 there has
17  a provision which says, "If supplier
18  determines, acting reasonably, that its
19  costs or obligations have materially
20  increased, and so demonstrates to the
21  companies, acting reasonably, then the
22  companies and supplier shall meet to
23  determine the amount to be reimbursed to
24  supplier."

Page 208

1 A   Yes, I see that.
2 Q   You see that now.
3       Do you recall having any discussions
4   with Mr. Hirsh or anyone at EUA concerning
5   that provision?
6 A   No.
7 Q   Was Mr. McMaster having discussions
8   independently with -- from you with EUA
9   concerning drafts of this agreement?
10 A   Not -- not to my knowledge. I mean, there
11  might have been a phone call to clarify what
12  Mr. Hirsh was getting to, but he was not
13  independently negotiating the document.
14 Q   And, I'm sorry, I forget if I asked you, did
15  Mr. McMaster travel with you to Boston in
16  this April time frame?
17 A   No, I believe he was in Calgary at this
18  time.
19 Q   So for the finalization, was he on the phone
20  in connection with your negotiations?
21 A   When he was required. He was not on the
22  phone for the duration of all calls -- or of
23  all discussions that Mr. Hirsh and I had.
24      MR. WINSTON: Is this a good time for

Page 209

1   me to take a break?
2       MR. O'ROURKE: Sure, sure.
3       (Recess.)
4 A   So I just wanted to take a look, the one
5   thing that I was somewhat confused about --
6 Q   Is that Exhibit 56?
7 A   This is Exhibit 56.
8       And Exhibit 56 has a timestamp across
9   the top?
10 Q   Yes.
11 A   And that is timestamped Wednesday, so
12  April 1st was a Wednesday. And this is
13  the -- this is the fax from Hirsh to
14  McMaster and myself timestamped 5:19, so
15  that is Wednesday and that is the time I was
16  en route to Boston.
17      Then I -- there is this document, 58,
18  timestamped April 2, '98, at 1:07.
19  That's -- and that is received at the
20  Calgary number, so that would be
21  11:07 Boston time or -- so -- no, I guess
22  that's right. That's sent. Yes, sent at
23  1:06 Calgary time.
24      So this is Sean sending to Mike

53 (Pages 206 to 209)

1   marked-up --
2 Q   58?
3 A   The --
4 Q   **Right.**
5 A   And saying that I have not seen it yet.
6      So this is me still AWOL. Probably
7   he sent this before he had a chance to talk
8   to me.
9      And then I know that I -- one of my
10   previous documents has, I believe, an -- I
11   think it's this email, is it not? But it --
12   it is Sean to Mike and I together.
13      So that would put Mike and I meeting
14   on Thursday on this issue.
15 Q   **Thursday being the --**
16 A   Thursday, April 2nd.
17 Q   **Thursday has to be April 2nd.**
18 A   Yes. April 1st is a Wednesday.
19      So then this April 2nd -- can I --
20   can I find that document?
21      MR. WINSTON: I think there's a
22   document that would help him, which is a
23   fax.
24      MR. O'ROURKE: Is it one of the

1   exhibits?
2      MR. WINSTON: I'm not sure it is.
3   It's an April 2nd fax that is from Sean
4   McMaster to --
5      THE WITNESS: Oh.
6      MR. WINSTON: I can obtain a copy.
7   It's a fax from Sean to Mike Hirsh and Alex
8   collectively in Boston on 4/2.
9      MR. O'ROURKE: A different April 2nd
10   one than I already have?
11      THE WITNESS: Can I take a look at
12   them?
13      MR. WINSTON: I'm going to get it for
14   you.
15      Well, let me ask Vin. Is that okay?
16   It's your deposition.
17      MR. O'ROURKE: No, you can -- sure,
18   you can --
19      MR. WINSTON: I think it would help
20   him refresh his recollection as to the
21   timing of all this.
22      MR. O'ROURKE: We should mark it, I
23   suppose.
24      MR. WINSTON: Yes, yes.

1      (Witness read document.)
2 A   Yes. So this is a document -- I'm just
3   looking at the fax cover page, and this is a
4   fax cover page dated April 2nd addressed to
5   Mike Hirsh and myself at a 508 fax number,
6   which is I think -- it is -- puts me with
7   Mike at EUA's offices on Thursday.
8      MR. WINSTON: He doesn't have the
9   benefit of it. Maybe we should give him a
10   minute to --
11      THE WITNESS: Yes, go ahead.
12      (Counsel read document.)
13 Q   **Oh.**
14      **This is a fax dealing with the**
15      **guaranty --**
16 A   Mm-hmm.
17      MR. WINSTON: Yes.
18 A   Yes.
19 Q   **Okay.**
20      **But you're referring to this**
21      **because --**
22 A   I'm only referring to it to sort of place
23   where Mike and I were together that day.
24 Q   **So by April 2nd, you think you were together**

1      **in --**
2 A   In the -- with Hirsh at EUA's offices.
3 Q   **Okay.**
4      **And in connection with that**
5   **refreshing your recollection, you reviewed a**
6   **document with TransCanada numbers 01756?**
7      MR. WINSTON: I mean, you can mark it
8   as an exhibit if you want. It's probably
9   better.
10      MR. O'ROURKE: Better, all right,
11   I'll copy it then.
12      MR. WINSTON: Yes, I don't -- I don't
13   need that copy back. You can just -- you
14   can either mark it and send it to us later
15   or whatever you want to do with it.
16      MR. O'ROURKE: All right.
17      If you could mark that next in line,
18   please.
19      (Exhibit No. 217 marked for
20   identification.)
21      (Discussion off the record.)
22      (Recess.)
23 A   So just -- sorry? Ready to go?
24 Q   **Ready.**

54 (Pages 210 to 213)

Page 214

1 A  So, as I said, I'm just sort of going
2    through the chronology.
3        So Thursday I was with Hirsh. And
4    then you had asked me about 59.
5 Q  Yes.
6 A  And I noted that 59 was sent at -- at
7    5:43 on Friday afternoon.
8        And it is very likely that I did
9    not -- I would have been en route back to
10   Calgary.
11 Q  If you could hold up one minute, I want to
12   find 59.
13 A  Sure.
14 Q  So 59 was sent at 5:43 on April 3rd?
15 A  Yes.
16       And I have a recollection that I went
17   back home to Calgary that weekend. So I --
18   I -- you were asking me when I received
19   this, and I -- I think I would have received
20   it sometime significantly after this.
21       Whether it was Saturday or Sunday, I
22   can't tell you.
23 Q  So on the 4th or the 5th?
24 A  Sometime over the weekend I would have

Page 215

1    likely received this.
2 Q  And I think I had asked you earlier whether
3    prior to receiving this Mr. Hirsh had
4    advised you that it was required that the
5    standard offer service would go through
6    2009, that you had discussed this before he
7    sent you this?
8        MR. WINSTON:  "This" being exhibit --
9        MR. O'ROURKE:  59.
10 A  Yes, my -- the last meeting I had that week
11   with Hirsh would have been Thursday, that
12   Thursday. And I'm sure that we discussed it
13   at that meeting.
14 Q  Okay.
15       And just for the record, Exhibit 217
16   is the document that you used to refresh
17   your recollection?
18 A  Yes.
19 Q  And not to clutter up the record, but have
20   you testified on the record as to how that
21   refreshed your recollection?
22 A  I just -- I just remembered that the cover
23   note on this was addressed to Hirsh and
24   myself at the 508 Massachusetts number, and

Page 216

1    that was what -- that was what got me
2    thinking about this.
3        I knew we had met. I just couldn't
4    remember exactly at what time.
5 Q  I'm actually seeing a 403 number there --
6    oh, I see, that's --
7 A  That's -- that's the number it was sent
8    from.
9 Q  Sent from.
10 A  Yes.
11 Q  Okay.  Thank you.
12 A  Okay.
13 Q  Could I show you what's been marked
14   Exhibit 192 and ask if you've seen that
15   document before?
16 A  Yes.
17 Q  And what is this document?
18 A  These are further amendments to the
19   wholesale standard offer service agreement.
20 Q  And do you know who prepared this draft?
21 A  Those are my comments. Certainly on the one
22   you have stamped 7510, those are my dark
23   comments.
24       There's a comment in the right margin

Page 217

1    that says "was agreed." That is not my
2    handwriting.
3 Q  Do you know whose handwriting that is?
4 A  I am not sure. I don't believe that is -- I
5    think it likely could only be McMaster's.
6 Q  Okay.
7        The writing above that where it says
8    "Settlement agreements mean Bob to provide,"
9    who's Bob?
10 A  Bob is Bob Clarke.
11 Q  And is that also your handwriting?
12 A  Yes.
13 Q  And the addition that you were making to the
14   body of the definition of standard offer
15   service was all in accordance with the
16   settlement agreements?
17 A  Yes. And to delete as amended from time to
18   time with respect to those references to the
19   tariffs.
20 Q  And what was your purpose in making this
21   amendment -- these amendments?
22 A  EUA was very anxious to get this deal done,
23   and my recollection is the rationale at the
24   time was that they had a filing they wanted

55 (Pages 214 to 217)

Page 222

1  Montaup to offer wholesale standard offer
2  service to the affiliates after the
3  termination of their tariff No. 1 purchase
4  obligations at a fixed scheduled price
5  subject to adjustment for a fuel index only.
6      So, sorry, you were going to direct
7  me?
8 Q  I was going to -- I thought you were
9  referring to the portion that deals with
10  standard offer service, page 23 --
11      First of all, the agreement is a
12  settlement agreement?
13 A  Mm-hmm.
14 Q  It's called a stipulation of agreement
15  between Montaup -- and it's page 23305?
16 A  Yes.
17 Q  Between Montaup, Blackstone and Newport
18  Electric.
19 A  Mm-hmm.
20 Q  And do] you see that at page 23316, the
21  agreement speaks of transitional standard
22  offer service?
23 A  Yes.
24 Q  And that has standard offer running through

Page 223

1  2009?
2 A  Yes.
3 Q  And were those the standard offer prices
4  that you would have expected to be paid in
5  connection with the wholesale standard offer
6  service agreement?
7 A  I believe so.
8 Q  And then do you see if you refer yourself to
9  page 23515 --
10 A  Sorry, bear with me for a moment.
11 Q  Sure.
12      (Witness read document.)
13 A  Sorry, 23515?
14 Q  Right.
15 A  Yes.
16 Q  Do you see that there's a standard offer
17  auction proposed design includes fuel index?
18 A  Mm-hmm.
19 Q  And then at page 23521, it sets forth the
20  trigger points that are applicable to that
21  auction process?
22 A  Yes.
23 Q  And do you see that the trigger points there
24  are listed only through 2004?

Page 224

1 A  Which, by definition, they would, because
2  this was an RFP, until 2004.
3 Q  Where is there -- where do you see this
4  being an RFP?
5 A  Sorry.
6 Q  This is --
7 A  Sorry, the auction. It's an auction, and
8  they chose to run the auction till 2004.
9 Q  So --
10 A  They could have chosen to run it for a
11  different period, but I presume they had a
12  reason to run it till 2004.
13 Q  So the only document that's referenced in
14  the standard offer service agreement, which
15  also includes fuel adders and -- includes
16  fuel adders only through 2004?
17      MR. WINSTON: Objection.
18 A  The standard offer auction proposed design
19  Attachment 4 references triggers until 2004,
20  which was the term of the proposed action.
21 Q  But am I correct that the only document
22  referenced in the wholesale standard offer
23  service agreement that provides numbers with
24  respect to the fuel adder provides numbers

Page 225

1  only through 2004?
2 A  This appears to be a several-hundred-page
3  document, and I have -- do not have the
4  opportunity to go through it.
5      I will concur with you that this
6  Attachment 4 goes through 2004.
7 Q  And this Exhibit 20 is the document that's
8  referenced in the paragraph entitled
9  Settlement Agreements?
10 A  Yes.
11 Q  And wholesale standard offer service
12  agreement?
13 A  Yes, yes.
14 Q  Now, back to 192 --
15 A  Yes.
16 Q  -- are there any other pages here where the
17  editorial comments reflect your input or --
18      I'm sorry, which is your handwriting?
19 A  These are my comments on 7514.
20 Q  Did you ultimately negotiate a provision to
21  terminate if EUA defaulted under the PPA --
22      I can't read that word.
23 A  I think that says PPA transfer agreement.
24 Q  Transfer.

57 (Pages 222 to 225)

Page 226

1 A   I don't recall offhand.
2       The comments on 7515 are mine.
3 Q   Could you tell me -- were all these comments
4   yours on 7515?
5 A   Yes.
6       The star is not mine.
7 Q   The star.  Okay.
8 A   Do you see that asterisk?
9 Q   The "reasonably accepts"?
10 A   No, no, that is actually my -- what I --
11   what I've done is I've marked this up twice.
12   I have two different pens, one thicker and
13   one thinner; but these are all my -- this is
14   all my -- my writing.
15 Q   Okay.
16       In terms of 8.3, you've made an
17   editorial.  The previous version had said,
18   If supplier determines acting reasonably
19   that its costs or obligations had materially
20   increased demonstrates the companies acting
21   reasonably, then the -- and I guess it says
22   so demonstrates to the companies acting
23   reasonably, then the companies and supplier
24   shall meet to determine the amount to be

Page 227

1   reimbursed to supplier.
2       You've stricken the language "and so
3   demonstrates to the companies acting
4   reasonably."
5       Do you recall why you struck that
6   language?
7 A   I recall at the time I struck the language
8   because I felt it was getting too impossible
9   to ever meet the test.
10       If you added the second "demonstrate
11   to the companies acting reasonably," the --
12   we first had to act reasonably in
13   determining in our costs or obligations have
14   materially increased.
15       And then even if we reasonably
16   determined, then we had to demonstrate; and
17   I felt that that just created too high a
18   standard, a threshold of proof, so I struck
19   that.
20 Q   Did you have any discussions concerning this
21   edit with --
22 A   Yes, yes.
23 Q   What was -- who did you have those
24   discussions with?

Page 228

1 A   It was Hirsh.
2 Q   And --
3 A   And I believe -- I believe that this was one
4   that Kevin Kirby made an appearance on.
5 Q   Okay.
6       What was Mr. Hirsh's response to your
7   obligation?
8       MR. WINSTON:  Objection.
9 A   I -- I can't recall.
10 Q   And how about Mr. Kirby, you said that he
11   made an appearance?
12       Did he make any comments during his
13   appearance?
14 A   Yes.  I know that I spoke to Hirsh about
15   this.  I believe, but I'm not entirely
16   certain, that Kirby came in and we had a
17   discussion about this, which I believe was
18   relatively heated, that he did not want that
19   language in the document.
20       Or, sorry, he wanted that language in
21   the document, which I wanted struck.
22 Q   And ultimately it was struck?
23 A   I'm just confirming that.
24       (Witness read documents.)

Page 229

1 A   Yes, we -- the final version was a slight
2   amendment, I think in an effort to reach
3   consensus on this, whereas --
4       So the final version, in the event
5   that our costs -- that our costs have
6   materially increased, then we agreed to get
7   together between the two companies to
8   determine the amount to be reimbursed, and
9   we agreed to take the matter -- to resolve
10   the matter in accordance with the dispute
11   resolution provision under this agreement.
12 Q   You would -- you also had a second -- it
13   looks like a second suggested revision
14   there.
15 A   Which is?
16 Q   Underneath paragraph 3, there is a line that
17   says -- it looks like you were trying to add
18   something, unless you struck it.  I can't
19   tell.
20 A   Yeah, that -- so it says semicolon, or --
21 Q   Standard offer service --
22 A   Standard offer service differs materially
23   from the provisions of tariffs.
24       And so that was -- that would have

58 (Pages 226 to 229)

Page 230

1   been us seeking further protection on top of
2   this section, the 8.3, and on top of the
3   reference to the settlement agreements.
4 Q   And did you make that proposal to EUA?
5 A   Yes.
6 Q   And ultimately that was not accepted by EUA?
7 A   Yes. At the end of the day, that one did
8   not make it in.
9 Q   What did you have in mind by that proposal?
10 A   I think -- my recollection was that even up
11   at this point, I was expecting that we were
12   going to be -- to receive some kind of a
13   draft tariff.
14       And Mr. Hirsh explained to me at that
15   point that there wasn't even any tariff that
16   they could put in our hand that we could
17   even reference in this, and that it just --
18   there wasn't anything to -- concrete to
19   refer to in this section, because they had
20   not finalized the tariffs, and hence the
21   proposal for the settlement agreement
22   language.
23 Q   And when did you have that discussion
24   with --

Page 231

1 A   I think all this was taking place on
2   Thursday.
3 Q   Thursday the --
4 A   Or, sorry, sorry, let me...
5       So this is April 3rd of '98. What·
6   did I say April 3rd was? That was Friday.
7 Q   Friday.
8 A   It was sent at 6:23, so this would have
9   occurred in -- in a subsequent discussion,
10   probably a phone call.
11 Q   So is this Exhibit 192 a copy that you faxed
12   to EUA or that they had faxed to you with
13   your notes on it?
14 A   No.
15       I believe that this was -- this
16   was -- I was marking up this document as I
17   was talking to Mike Hirsh. That's why when
18   you see this "settlement agreement mean,"
19   three dots, "Bob to provide," that would be
20   Mike saying, well, let me -- I'll get Bob to
21   draft the language to reference the
22   settlement agreements.
23       So this -- this -- my practice -- and
24   I'm quite positive here that I was marking

Page 232

1   this up to some degree as I was talking with
2   Mike.
3 Q   And where were you when you were doing this?
4 A   I think I was in Calgary.
5 Q   And what time -- when would that
6   conversation have taken place?
7 A   It would have been over the weekend or on
8   Monday morning, or -- sorry, not Monday
9   morning, but Monday.
10 Q   And these, then, are notes that you made as
11   you spoke with Hirsh?
12 A   Some of them are notes that I -- I should be
13   clear on this.
14       For example, go to -- I'm trying to
15   find that other section that I marked up.
16   On page 7514, these -- where you see my
17   lighter-colored or sort of thinner pen and
18   notations --
19 Q   Yes.
20 A   -- those would be I have reviewed this and
21   these are comments that I made.
22       And then I believe that this dark --
23   the dark ink represents things I was writing
24   down as I was -- as I was dealing with Mike

Page 233

1   on the phone.
2 Q   Okay.
3       Was these written proposed language
4   ever sent directly to Narragansett -- excuse
5   me, to EUA?
6 A   I can't recall. My expectation is that we
7   were just talking about this over the phone.
8       For -- sorry.
9 Q   So the lighter writing on page 7515 is
10   something that you had prepared to speak
11   with him about?
12 A   Yes.
13 Q   Do you recall that you did speak to him
14   about it?
15 A   Yes.
16       I very specifically recall that,
17   because you'll see that language I had put
18   in at the bottom of the paragraph further
19   amending the section to say that standard
20   offer service or that the standard offer
21   service differs materially from the
22   provision of tariffs.
23       And what I mean by three dots is -- I
24   identify the tariffs, and that was when Mike

59 (Pages 230 to 233)

Page 234

1   would have said, Look, we don't even have
2   anything we can refer to here, so I crossed
3   that out.
4       And then you see this black
5   settlement agreement language --
6 Q  Yes.
7 A  -- which would have been the proposed
8   solution to that concern.
9 Q  And by settlement agreements, you were
10  referring to the FERC settlement agreement
11  that we spoke about before?
12 A  The definition that ultimately ended up in
13  Exhibit 1.
14 Q  During this period of time, did you ever ask
15  to see the tariff that the company was in
16  the process of developing for submittal?
17 A  Yes.
18 Q  And what was -- who did you ask?
19 A  Mike Hirsh.
20 Q  And what did Mike say?
21 A  My recollection is I -- the -- they were --
22  they were working on it. They still weren't
23  sure what at the end was going to be in it,
24  and it just wasn't in a form that they

Page 235

1   could --
2       I was proposing to actually attach it
3   or somehow reference it to make it clear,
4   and I was told that that wouldn't be --
5   wouldn't be suitable, because they weren't
6   even sure at the end what might all be in
7   that tariff.
8 Q  And when did you have that conversation with
9   Mr. Hirsh?
10 A  This would have occurred at the time we
11  were -- we were discussing these other
12  issues. And particularly because of this
13  language you see here.
14 Q  So you think you had that discussion with
15  him on -- sometime after April 3rd?
16 A  Yes.
17 Q  And that was a discussion by phone?
18 A  I don't recall traveling out again on
19  Monday, so I think it probably was by phone.
20 Q  You signed this agreement when you were in
21  Calgary?
22 A  By "this agreement," you mean Exhibit 1?
23 Q  Exhibit 1.
24 A  Yes, I believe I did. And Russ Girling, who

Page 236

1   was the other signatory, I know was in
2   Calgary. He wouldn't have been in -- in
3   Boston.
4 Q  Did Kevin Kirby travel to Calgary?
5 A  No, not that I'm aware of.
6 Q  I'm just wondering what procedure you --
7 A  Yes, I can't recall if we executed it in
8   counterparts and then exchanged fax
9   signature pages.
10 Q  Actually, looking at page 00081, I think
11  we've always had an extra document attached
12  to Exhibit 1, but 00081, whose signature is
13  that?
14 A  That is mine and that is Russ Girling's.
15 Q  That's two signatures?
16 A  Yes.
17 Q  Oh, that might explain it.
18 A  Yes, it's hard to -- at the time, and maybe
19  even to this day, these kind of agreements
20  required the signature of two officers.
21 Q  Okay.
22 A  That's why you see the two of them there.
23  They're pretty jumbled up.
24 Q  Well -- okay.

Page 237

1       Do you know if there's a facsimile
2   version of this anywhere?
3 A  If there was one available and we had it, we
4   would have produced it.
5 Q  So you -- so you signed it, sent back a page
6   and faxed back a page?
7       I'm just wondering how we got it all
8   on one page here.
9 A  Typically -- and I -- I cannot speak
10  specifically for this, but often what
11  happens is each party executes their side,
12  they fax their signatures, you sign it and
13  just --
14 Q  You each have a fully executed copy?
15 A  Yes, yes.
16 Q  Do you recall that's what happened here?
17 A  I don't offhand.
18 Q  Does this Exhibit 1 contain the entire
19  agreement between the parties with respect
20  to the provision of wholesale standard offer
21  service?
22     MR. WINSTON: Objection.
23 A  I think you're asking me to make a legal
24  determination.

60 (Pages 234 to 237)

Page 258

1 BY MR. O'ROURKE:
2 Q   I show you Exhibit 218.
3       MR. WINSTON:  Do you have another
4   copy?
5       MR. O'ROURKE:  Sure.
6       MR. WINSTON:  Can you hang on one
7   second while I just get my pen?
8       THE WITNESS:  Want a pen?
9       Don't put it in your pocket.
10      MR. WINSTON:  No, I will not.  I just
11  want to label this.  218?  Sorry.
12      (Witness read document.)
13 BY MR. O'ROURKE:
14 Q   Have you seen this document before?
15 A   No.
16 Q   Do you know what its purpose is?
17 A   I don't.
18 Q   Had the provision of standard offer service
19  not commenced as of December of 1998?
20 A   I'm sorry, let me -- let me get through
21  this.
22 Q   I'm sorry.  I didn't mean to interrupt you.
23      (Witness read document.)
24 A   I have no idea what -- what this document is

Page 259

1   in regards to.
2 Q   When did the asset purchase close?
3 A   I don't recall offhand.
4 Q   It wasn't scheduled to close until 1999, was
5   it?
6 A   I'd have to refresh my memory.  I can't
7   recall.
8 Q   Do you know how TransCanada went about
9   checking the amounts that EUA and
10  subsequently Narragansett paid for standard
11  offer service?
12 A   I know that it was checked on a monthly
13  basis.  I do not know the mechanism by how
14  they did that or how they compared it.
15 Q   Do you know how they determined what the
16  fuel adjustment factor should be?
17 A   I presume they would just have regard to the
18  indices and calculate it, but I would ask
19  Mike or Bill that.
20      I'm sure they have a much more
21  illuminating answer.
22 Q
23      (Discussion off the record.)
24 A   Actually, sorry, Richard Schuler, I believe,

Page 260

1   would have been the person directly charged
2   with doing that analysis, so he -- hopefully
3   he will be more enlightening than I am.
4 Q   If he doesn't do a good job, I'll report
5   him.
6       (Laughter.)
7 Q   Do you -- did you ever deal with Dennis
8   St. Pierre in connection with your
9   negotiations with EUA?
10 A   That name is not familiar to me.
11 Q   It is not?
12 A   No.
13 Q   And did you ever see the tariff at that EUA
14  filed -- I think you probably have given me
15  a global answer on this -- but on April 15,
16  1998, tariff?
17 A   I saw a copy of a document which was from
18  EUA to Bill Taylor able I believe enclosing
19  the -- enclosing the tariffs.
20      But I've only seen that in
21  preparation for this.  I did not see it at
22  the time.
23 Q   And globally, you never saw any of the
24  tariffs that EUA filed after April 7, 1998?

Page 261

1 A   No.
2 Q   And globally, no one at TransCanada ever
3   made any efforts to keep track of what was
4   being filed with RIPUC after April 7, 1998?
5       MR. WINSTON:  Well, objection.  Only
6   through the end of '99.
7 A   Yes, yes.  I can't speak for after --
8 Q   Right.
9       But through the end of '99?
10 A   I'm not aware of any direct contact made
11  with RIPUC.
12 Q   If the question of what the tariff was going
13  to be was such an important issue in the
14  months up until April 7th, why did that
15  issue become unimportant after April 7th?
16 A   In our view, the application of the Section
17  8.3 and the incorporation of the reference
18  to the settlement agreements, in our view,
19  gave us the protection that we felt we
20  were -- it was not necessary to constantly
21  be following up.
22      And, as I said before, I also at the
23  time the deal was done did have an
24  undertaking from Mike Hirsh that he would

66 (Pages 258 to 261)

Page 262

1 deliver us the tariffs when they were filed
2 and approved.
3 Q  But if you didn't confirm the tariffs, how
4    were you able to -- how would you be able to
5    check the payments that you were being made
6    pursuant to the tariffs?
7 A  You'll have to ask Mike Hachey about that.
8 Q  Did you ever consider that the Rhode Island
9    PUC might not approve EUA operating under
10   the terms of the Narragansett contract?
11 A  I think if -- my recollection, which is
12   somewhat hazy, was that if the Rhode Island
13   PUC refused to ratify it, that was an event
14   entitling us to termination.
15 Q  Under what provision -- you're thinking
16   under the standard offer agreement?
17 A  Yes.
18 Q  What provision are you thinking of?
19 A  I could be wrong.  That is a recollection
20   that I thought I had.
21     (Discussion off the record.)
22     (Recess.)
23 A  So I was looking in the asset purchase
24   agreement, because I thought at one time we

Page 263

1 had a condition in there regarding the
2 approval of the tariffs, and it only refers
3 to the FERC stipulations, and it only refers
4     So I would just rely on Section 8.3,
5 which I think covers that situation you
6 referred to.
7 Q  Which portion of 8.3 in your view would
8    apply to a situation where a tariff was not
9    approved?
10     MR. WINSTON:  Objection.
11     (Witness read document.)
12 A  I would -- I can just read it.
13     "In the event that the standard offer
14 service or the terms and conditions for
15 suppliers are terminated, amended or
16 replaced by any governmental or regulatory
17 agency having jurisdiction over the
18 provision of standard offer service," blah,
19 blah, blah, "the company shall promptly
20 reimburse suppliers for any such costs or
21 increased obligations."
22 Q  Where does approval fit in on those three
23   operative terms, or disapproval?
24 A  If they disapproved it, I think they would

Page 264

1 replace it -- I mean, you have -- you have
2 an act which states that standard offer
3 service is going to be provided and that
4 suppliers are entitled to the protection of
5 fuel adjustment provisions.
6     So I think the Rhode Island PUC had
7 an obligation to approve a tariff related to
8 the provision of standard offer service.
9 Q  That act applied to wholesale suppliers,
10   doesn't it?
11 A  You're suggesting if they were to -- you're
12   asking me to speculate if they did not
13   apply -- if they did not approve it with
14   respect to retail?
15 Q  Yes.
16     MR. WINSTON:  Objection.
17 A  I can't --
18 Q  You have no opinion on that?
19 A  Yes, I have no opinion on that.
20 Q  What benefits or advantages do you think
21   Narragansett got or was trying to get by not
22   applying for a fuel adjustment factor after
23   2004?
24 A  I can't even speculate.  I -- I --

Page 265

1     Sorry, I can speculate by not
2 applying -- if they were successful in an
3 argument that the fuel adjustment factor did
4 not apply for that period, the resulting
5 overall power purchase cost to their
6 ratepayers would have been lower, and they
7 would have seen that as a positive.
8 Q  I show you Exhibit 121 and ask if you've
9    seen that.
10     (Witness read document.)
11 A  I have not seen this, that I am aware of;
12   but I am -- I was aware when the document
13   was received.  I was advised that we had
14   received such a document.
15 Q  Are you aware that the funds being paid by
16   National Grid to TransCanada are not being
17   placed in an escrow account?
18 A  I wasn't aware of that.
19 Q  Do you know whether -- I guess that means
20   you don't know whether Narragansett was ever
21   advised of that fact before this litigation?
22 A  I mean, Narragansett can make all kinds of
23   requests as to where they would prefer the
24   money to go, but I don't know that --

67 (Pages 262 to 265)

# Taylor

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

- - - - - - - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING, LTD.,

        Plaintiff,


      vs             C.A. No. 05-40076FDS


NARRAGANSETT ELECTRIC COMPANY,

        Defendant.

- - - - - - - - - - - - - - - - - - - -

    DEPOSITION OF WILLIAM C. TAYLOR, called as a
witness by counsel for the Defendant, pursuant to
the provisions of Massachusetts Rules of Civil
Procedure, before Victoria S. Reade, Professional
Court Reporter and Notary Public, in and for the
Commonwealth of Massachusetts, taken at Bowditch &
Dewey, 311 Main Street, Worcester, Massachusetts, on
Monday, March 12, 2007, commencing at 9:30 a.m.

136788bd-3feb-4de5-adae-87690562d901

| | | Page 2 |
|---|---|---|
| 1 | APPEARANCES: | |
| 2 | CHOAT HALL & STEWART | |
| 3 | BY: Mr. Daniel C. Winston, Esq. | |
| 4 | Two International Place | |
| 5 | Boston, Massachusetts 02110 | |
| 6 | 617-248-4049 | |
| 7 | dwinston@choate.com | |
| 8 | Counsel for the Plaintiff | |
| 9 | | |
| 10 | TRANSCANADA PIPELINES LIMITED | |
| 11 | BY: Ms. Jody D.M. Johnson, Esq. | |
| 12 | 450 1ST Street S.W. | |
| 13 | Calgery, Alberta, Canada T2P 5H1 | |
| 14 | 403-920-2706 | |
| 15 | | |
| 16 | BOWDITCH & DEWEY | |
| 17 | BY: Mr. Vincent O'Rourke, Esq. | |
| 18 | 311 Main Street | |
| 19 | Worcester, Massachusetts 01615 | |
| 20 | 508-926-3424 | |
| 21 | vorourke@bowditch.com | |
| 22 | Counsel for the Defendant | |
| 23 | | |
| 24 | | |

**Page 4**

| 1 | 110 | News Release | 140 |
| 2 | | | |
| 3 | 111 | Correspondence | 153 |
| 4 | | | |
| 5 | 112 | Chart | 158 |
| 6 | | | |
| 7 | 113 | Handwritten Notes of W. Taylor | 160 |
| 8 | | | |
| 9 | 114 | PUC2 Correspondence | 175 |
| 10 | | | |
| 11 | EXHIBITS RETAINED BY ATTORNEY O'ROURKE |

**Page 3**

INDEX

Testimony of: Direct  Cross  Redirect  Recross
William C. Taylor
by Mr. O'Rourke  5

EXHIBITS

| Exhibit No. | | Page |
|---|---|---|
| 103 | Correspondence | 59 |
| 104 | Handwritten Notes of W. Taylor | 78 |
| 105 | Analysis | 88 |
| 106 | Arbitration Hearing Transcript | 102 |
| 107 | Invoice | 103 |
| 108 | Analysis | 106 |
| 109 | Handwritten Notes of W. Taylor | 111 |

**Page 5**

```
 1          PROCEEDINGS
 2          WILLIAM CHARLES TAYLOR, having
 3   first been satisfactorily identified by
 4   the production of his driver's license,
 5   was duly sworn by the Notary Public and
 6   testified as follows:
 7   DIRECT EXAMINATION BY MR. O'ROURKE:
 8   Q.  Mr. Taylor, could you please state your
 9       full name for the record, please.
10   A.  William Charles Taylor.
11   Q.  And if other than shaking your hand I
12       didn't introducing myself, my name is Vin
13       O'Rourke.  I represent Narragansett
14       TransCanada in this matter.
15          Have you been deposed before,
16       sir?
17   A.  Yes.
18   Q.  How many times?
19   A.  Couple of times.
20   Q.  You probably know the drill but I'll give
21       you a little bit of it.
22          MR. O'ROURKE:  Before we do
23       that, stand stipulates, all objections
24       except as to form, all motions to strike
```

2  (Pages 2 to 5)

136788bd-3feb-4de5-adae-87690562d901

Page 6

1    reserved until trial. Is the witness
2    going to read and sign?
3              MR. WINSTON: Yes, we'll read
4    and sign, waive notarization.
5              MR. O'ROURKE: Any other
6    standard stips?
7              MR. WINSTON: That's it.
8    BY MR. O'ROURKE;
9    Q.   If you have been deposed before, you know
10        I am going to be asking you questions
11        regarding the matter of TransCanada versus
12        Narragansett.
13             If you don't understand any of
14        my questions, feel free to say so and I
15        will rephrase them for you. You have to
16        answer yes or no verbally so the court
17        reporter can take it down and from time to
18        time I will remind you of that if I
19        remember to.
20             If you need a break at any time,
21        that's fine, we'll be taking breaks and if
22        you need to break to talk to your counsel,
23        that's fine too, but I'd appreciate it if
24        you'd not do so while a question is

Page 7

1    pending, okay.
2    A.   Sure.
3    Q.   I don't think I had him spell his name for
4        you, why don't I do that?
5    A.   W-i-l-l-i-a-m  C-h-a-r-l-e-s T-a-y-l-o-r.
6    Q.   And, sir, how old are you?
7    A.   42.
8    Q.   Where do you live?
9    A.   In live in Westboro, Mass.
10   Q.   Your address?
11   A.   7 Katie Drive, Westboro, 01581.
12   Q.   And where are you employed?
13   A.   I am employed with TransCanada Power
14        Marketing in Westboro.
15   Q.   And what is the address?
16   A.   110 Turnpike Road, Suite 203.
17   Q.   Could you summarize for me your
18        educational background since high school.
19   A.   Sure. I attended University of Waterloo
20        which is located it Waterloo Ontario. I
21        have a bachelor of applied science in
22        civil engineering.
23             I graduated in 1988 and then I
24        also have a power technology certificate

Page 8

1    from Southern Alberta Institute of
2    Technology and I have attended an advanced
3    management program at Harvard University
4    Q.   When did you attend the power technology
5        certificate?
6    A.   I believe that was 1987.
7    Q.   During the course of your studies at
8        Waterloo?
9    A.   Yes, my studies at Waterloo were a coop
10        program so I was working in the energy
11        industry and obtain the power technology
12        certificate while I was on work term.
13   Q.   What does the power technology certificate
14        entail?
15   A.   It's basically power operations so steam
16        plant operations, power plant operations,
17        gas plant operations, that kind of thing.
18   Q.   And when did you obtain the advanced
19        management degree from Harvard?
20   A.   About 18 months ago.
21   Q.   How long is that course of study?
22   A.   It's nine or ten weeks on campus.
23   Q.   And what did you study in connection with
24        that?

Page 9

1    A.   It's basically a condensed -- it's sort
2        of -- I hate to use this term, but it's
3        kind of like an MBA in a can, you know.
4        It's kind of like a condensed version of
5        an MBA.
6    Q.   I am sure Harvard hates for you to use
7        that term also.
8    A.   Yes. It's actually a very good program.
9    Q.   Could you give me your employment
10        background, I guess beginning with college
11        given that it was a coop program.
12   A.   Sure. Through college I worked. I worked
13        at a few traditional civil engineering
14        roles during college, but than I started
15        in the energy industry in 1985 through the
16        college work programs.
17             I worked for Imperial Oil
18        through 1992, I believe. Imperial Oil is
19        the Canadian affiliate of Exxon and then
20        following that I worked for a company
21        called PanCanadian Petroleum and during
22        that time when I left Imperial Oil and
23        PanCanadian I began working in the
24        commercial area national gas marketing and

3 (Pages 6 to 9)

Page 10

```
1    I worked at PanCanadian in the natural gas
2    marketing group basically selling their
3    production to customers throughout Canada
4    and the U.S.
5         I left PanCanadian to work a
6    U.S. based company called Tenaska and
7    they're based out of Omaha, Nebraska.
8.        They were a natural gas, natural
9    gas marketing and power generation
10   development company so that is how I sort
11   of made the transition over to the
12   electric power electric period, that was
13   around 1990, that would be around the
14   1995, 1996 time at Tenaska and then I
15   started with TransCanada in say mid 1996
16   and I have been with TransCanada since
17   that time.
18 Q.  Let me just step back. In terms of your
19   experience while you were in college, what
20   companies did you work for there?
21 A.  First couple of terms while in college I
22   worked for Parks Canada doing civil
23   engineering work on some of their
24   facilities and then I started with
```

Page 11

```
1    Imperial in '85.
2  Q.  So from '85 from '92 you were with
3    Imperial?
4  A.  Yeah, some of that time I was a student,
5    but, yeah.
6  Q.  And what were your duties there?
7  A.  I started my full-time career with them
8    in the drilling department doing drilling
9    work, then I did field work on pipelines
10   installation of pipelines at facilities,
11   again, doing sort of traditional civil
12   engineering work geotechnical and then
13   from there I moved into the natural gas
14   marketing and business areas just towards
15   the tail end of my career with Imperial.
16 Q.  So you began at PanCanadian in 1992 and
17   how long did you work there?
18 A.  Until '95.
19 Q.  And what were your duties there?
20 A.  I was in the natural gas marketing.
21 Q.  So that's that and then from '95 to '96
22   you were at Tanaska?
23 A.  Just a year at Tanaska, yeah.
24 Q.  And at Tanaska your obligations were?
```

Page 12

```
1  A.  I managed our started-up and managed our
2    Canadian natural gas marketing office. As
3    I said, they were based in Ontario, so I
4    got their operations started in Canada and
5    from there I moved over to TransCanada in
6    the power group.
7  Q.  And initially what were your obligations
8    at TransCanada and where were you located?
9  A.  I was located in Calgary, which is where
10   TransCanada's head office is, and my
11   responsibilities were primarily around
12   business development for our power group
13   in the areas of -- well, geographically I
14   worked primarily in Ontario, however, I
15   did have some responsibilities for a
16   project that involved an oil pipeline
17   called the Express Oil Pipeline and we
18   were needing to power the pumps on that
19   line with power so there was a lot of
20   power work associated exercise so I worked
21   on that which kind of went down through
22   the western part of the U.S. and across to
23   Illinois so I worked on that as well.
24        Then it was 1998 I'd say
```

Page 13

```
1    actually late '97, early 1998 that I began
2    to work on the northeast U.S. area. I was
3    asked by the company in early part of '98
4    to consider moving down to New England
5    which I did and I started up our operation
6    in Westboro, Massachusetts at that time.
7  Q.  Do you recall exactly when you moved to
8    open up your Westboro operations?
9  A.  I moved to the U.S., I believe in May of
10   1998, if I am recalling correctly. Our
11   office in Westboro wasn't opened until a
12   little laterr that year because when I
13   first came down I operated out of our
14   Ocean State Power Plant.
15        We had a pretty substantial
16   office, administrative office down at the
17   plant and it took a while to get our
18   office space sorted out in Westboro so we
19   started out down there.
20 Q.  And that would have been in May 1998?
21 A.  Well, I physically started living in the
22   U.S. in May 1998 but I worked out of the
23   plant at Ocean State for a number of
24   months then we started up the Westboro
```

4  (Pages 10 to 13)

Page 70

```
1          I recall it specifically because
2     I was at the center of that concern.
3  Q.  When this contact was signed on April 7th,
4     did you know what tariff EUA intended to
5     submit in connection with standard-offer
6     service?
7  A.  No.
8  Q.  Did you ask?
9  A.  Yes.
10 Q.  And what were you advised?
11 A.  That they weren't sure.
12 Q.  Was there any reason that you went ahead
13    and signed the contract without knowing
14    what tariff they were going to submit?
15 A.  Yes, because we didn't reference it to
16    them.
17 Q.  I don't mean to be thicker than I usually
18    am, but the word tariffs is rather
19    prominent in this Paragraph 5.
20        MR. WINSTON:  Is that a
21    question?
22 Q.  Well, I am just asking if you agree that
23    the word tariffs certainly appears in this
24    Paragraph 5?
```

Page 71

```
1  A.  As well as the words standard-offer
2     service, which, again, I've gone over this
3     with you before, it refers back to --
4  Q.  Company standard-offer service tariffs?
5        MR. WINSTON:  Objection.
6  A.  Again, unless you want to keep going over
7     the same ground, I think I have answered
8     the question.
9  Q.  As best you can?
10 A.  Yes.
11 Q.  Did you think the word tariffs was
12    surplusage in that sentence?
13 A.  I didn't think about it in the context of
14    sur -- whatever word you just used.
15 Q.  Did you think it was excess baggage,
16    unneeded verbiage?
17 A.  Again, I will reiterate that I was
18    specifically concerned about the tariffs.
19    This led to the inclusion specifically in
20    Clause 8.3, which, if you have read that,
21    states that to the extent that there is a
22    regulatory change that is, I forget the
23    exact words, but essentially economically
24    harmful to us as a supplier that would
```

Page 72

```
1  materially increase our cost to supply
2  standard-offer service under this
3  agreement, then we had certain remedies
4  that we could avail ourselves under the
5  contract.
6        So was I concerned about the use
7  of the word tariffs in here, yes.  I was
8  concerned about it for two reasons but
9  mostly because they were being, as I said
10 earlier, either unclear or elusive, I
11 wasn't sure which, about making these
12 tariffs clear to us so we needed to find a
13 solution to the fact that they were unable
14 or unwilling to put these tariffs forward
15 to us and that solution was embodied in
16 the change you see to the definition of
17 standard-offer service and the inclusion
18 of Clause 8.3.
19 Q.  Well, you recognize that any tariff that
20    they submitted had to be approved,
21    correct?
22 A.  I presume so, yes.
23 Q.  That's what included 8.3 you have just
24    said?
```

Page 73

```
1  A.  Yes.
2  Q.  And you have being asking to see the
3     tariffs?
4  A.  We had been asking to see the tariffs,
5     yes.
6  Q.  Up until the days before the signing?
7  A.  Yes.
8  Q.  And when was this provision amending the
9     definition of standard-offer service
10    negotiated?
11 A.  As I recall it, it was very much at the
12    last minute of the discussions.
13 Q.  Now, if the company never submitted any
14    fuel tariff that never sought a fuel
15    adder, would you have considered that a
16    violation of the contract?
17        MR. WINSTON:  Objection.
18 A.  Yes.
19 Q.  So the submission of tariffs was in your
20    view a requirement of this contract?
21 A.  To the extent that the inability or the --
22    let me go at that another way.
23        To the extent that this resulted
24    in payments to us that were lower than
```

19 (Pages 70 to 73)

136788bd-3feb-4de5-adae-87690562d901

Page 162

1   transaction so that bullet point that you
2   just asked me about, that was Boston
3   Edison had filed for intervenor status as
4   I recall it.
5          Mr. Hirsh was telling me that
6   they excepted to be giving standing in the
7   proceeding and they weren't sure if they
8   were going to cause a ruckus or whatever.
9   It was not unusual for Edison to do that.
10  Q.  Before I give you Exhibit 1, if I could
11  just show you what's been marked Exhibit
12  55 and do you know who sent this to
13  Mr. Hirsh?
14  A.  I don't other than it's coming from
15  TransCanada's law department I see based
16  on the activity report so I would presume
17  it might be Mr. McMaster.
18  Q.  Other than discussions you may or may not
19  have had with Mr. McMaster about Section
20  8.3 of Paragraph 1, did you personally,
21  were you involved in negotiating the terms
22  of Section 8.3 other than discussions with
23  McMaster?
24  A.  Other that discussions with McMaster, yes,

Page 163

1   because we were meeting with Mr. Hirsh to
2   discuss that, Mr. Pourbaix and I.
3          (THEREUPON, THERE WAS A SHORT
4   RECESS.)
5   Q.  Now, in connection with your discussions
6   with Mr. Pourbaix, were you also involved
7   in assisting in the preparation of the
8   drafts for that language of 8.3?
9   A.  I recall that I was, yes.
10  Q.  Did you have any discussions with
11  Mr. Hirsh or anyone else at EUA concerning
12  that provision, 8.3?
13  A.  Yes, I recall discussing it with them from
14  the perspective of the need for why we
15  needed that language and this sort of
16  thing.
17         Counsel was involved in, you
18  know, the final preparation of the
19  language and putting that forward to EUA
20  counsel and what have you.
21  Q.  Do you ever have any discussions with
22  Mr. Hirsh concerning your understanding of
23  the language that was proposed by your
24  counsel?

Page 164

1   A.  Not a specific recollection. Mr. Hirsh
2   would have understood what our concern was
3   and my typical approach to negotiating and
4   I would have done the same thing in this
5   case as I do in all cases, to be very
6   clear as why we thought we needed it, but
7   I would likely have not provided him any
8   interpretation of it.
9   Q.  Do you recall when you spoke with
10  Mr. Hirsh what you told him as to why you
11  needed it?
12  A.  Yes, I do?
13  Q.  What did you tell him?
14  A.  Again, what I testified to earlier that
15  our concern was in regards to the fact
16  that the regulator, they were busy with
17  plethora of retail regulatory filings and
18  other regulatory filings and we were
19  concerned that changes could be made that
20  would have a negative impact on us and
21  that we needed to tie this to something
22  that was -- first of all, we needed to
23  obtain some protection in the event that
24  that could occur.

Page 165

1          We were worried about a whole
2   host of things, inclusion of other
3   services, the migration issue that I
4   referred to earlier where customers maybe
5   could be allowed to come back on to
6   standard-offer, that was something we were
7   thinking about. There was a number of
8   things that we were just generally
9   concerned could be implemented at the hand
10  of the regulator that we want to be
11  reimbursed for if it had a material
12  financial impact on us.
13  Q.  Have customers been allowed to come back
14  on to the standard-offer?
15  A.  Not to my knowledge.
16  Q.  Pardon me if I've asked this, but your
17  counsel will object if I have, why did it
18  have to be signed on April 7th if there
19  was such uncertainty as to what the
20  tariffs were going to be?
21  A.  Well, it wasn't clear that the tariffs
22  were become clear any time soon. We
23  certainly weren't getting that message
24  from Mr. Hirsh.

42 (Pages 162 to 165)

Page 166

1    We wanted to proceed with the
2 transaction. We were interested on
3 consolidating our interest on Ocean State,
4 that was our primary business objective.
5    They were interested in doing a
6 transaction. We knew they were going to
7 divest of their interest in Ocean State
8 somehow, that was part of their
9 restructuring so we were interested in
10 assuring that that transaction to the
11 extent we could do it on reasonable terms
12 was something that we could be part of.
13    Again, they were being quite
14 unclear about the regulatory side,
15 however, you know, we knew that ultimately
16 they would get there, we just didn't know
17 what that path would look like so we chose
18 to try and find a means to that end. They
19 clearly wanted to transact as well.
20 Q.  Let me show you what's been market Exhibit
21 58 as well. Do you recall seeing this
22 document?
23 A.  I have some recollection of this. This
24 was Rider One as I think it started out

Page 167

1 and this was the same issue. Again, this
2 is a communication between my counsel and
3 Mr. Hirsh.
4    I haven't read it exactly
5 comparing it to the contract, but I think
6 it's pretty similar to what ended up in
7 the final contract.
8 Q.  Let me refer you back to Exhibit 55. It
9 looks like Exhibit 55 was Rider One or so
10 entitled.
11 A.  Okay, well, whatever. I don't think Rider
12 One ended up in the contract, but I think
13 this one certainly did.
14 Q.  Did you discuss that with Mr. Pourbaix
15 before it was sent?
16 A.  I recall having discussions with
17 Mr. Pourbaix from the perspective of this
18 was my issue, this was my concern, and Mr.
19 Pourbaix was my senior and he was the lead
20 negotiator and I was expressing to him the
21 severity of my concerns and why I thought
22 we really shouldn't proceed with the
23 transaction unless we had protections
24 similar to what it appears Mr. McMaster

Page 168

1 finally drafted here.
2 Q.  Did this provision satisfy your concerns?
3 A.  Well, again, I didn't do a word for word
4 check against that, but I can tell you
5 that I focused on the final wording of the
6 contract and it did satisfy my concerns in
7 this regard.
8 Q.  Going to Exhibit 1 which is the contract
9 you have do and to Paragraph 8.3. You
10 personally had discussions with Hirsh
11 about your need for this provision, but
12 did you ever personally discuss with him
13 the terms of this provision?
14 A.  I recall having discussions with Mr. Hirsh
15 about this provision. I believe
16 Mr. Pourbaix was present and we were in
17 the EUA's offices.
18 Q.  Do you recall when these discussions
19 occurred?
20 A.  It was in early April. It was around the
21 time -- well, you know what, I can't
22 recall specifically when that was.
23    I do recall being in EUA's
24 offices discussing these terms and

Page 169

1 conditions. I guess I am not sure whether
2 I can recall whether it was specifically
3 8.3 we were discussing at point, but my
4 recollection is certainly this was a major
5 concerned I was heavily involved in
6 essence convincing the senior commercial
7 people on our side that we needed this
8 protection and in explaining to Mr. Hirsh
9 why we felt that way.
10 Q.  But in terms of actually talking about
11 this approach versus the Rider One
12 approach, did you ever have any of those
13 discussions with Mr. Hirsh?
14 A.  That would have been up to our attorneys.
15 Q.  And so this clause was drafted by your
16 attorney?
17 A.  I don't recall but given that this was
18 faxed from Mr. McMaster and it looks like
19 the language is the same, I would think
20 that's a safe assumption, but I don't know
21 for certain. Sorry, and I was referring
22 to Exhibit 58.
23 Q.  Thank you. Is it your understanding that
24 the standard-offer service or the terms

43  (Pages 166 to 169)