UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                )
TRANSCANADA POWER  MARKETING LTD.,              )
                                                )
                      Plaintiff,                )
                                                )
            v.                                  )        C.A. No. 05-40076FDS
                                                )
                                                )
NARRAGANSETT ELECTRIC COMPANY,                  )
                                                )
                      Defendant.                )
_____)

## SUPPLEMENTAL DOCUMENT APPENDIX
### Part I

# Tab 36

Westlaw.

PUR Slip Copy                                                                                    Page 1

2005 WL 1536259 (R.I.P.U.C.)

(Cite as: 2005 WL 1536259 (R.I.P.U.C.))


Re Narragansett Electric Company
Docket No. 3648

Rhode Island Public Utilities Commission
February 17, 2005


*1 REPORT AND ORDER

I. BACKGROUND

 The Utility Restructuring Act of 1996 ('URA') requires each electric distribution
company to arrange with wholesale power suppliers for a standard power supply
offer to sell electricity to all customers at a stipulated rate. Pursuant to the
URA, Narragansett Electric Company ('Narragansett' or 'Company ') entered into
wholesale Standard Offer supply contracts with the following prices:


| Calendar Year | Price per kWh [FN1] |
|---------------|---------------------|
| 2005          | 5.5 cents           |
| 2006          | 5.9 cents           |
| 2007          | 6.3 cents           |
| 2008          | 6.7 cents           |
| 2009          | 7.1 cents           |

 The wholesale Standard Offer supply contracts also provide for increases in the
price per kilowatt-hour ('kWh') of wholesale power supplied to Narragansett in the
event fuel prices increase above certain levels. To the extent that the total cost
of the wholesale power supply to Narragansett, including fuel charges, exceeds
retail Standard Offer Service ('SOS') and Last Resort Service ('LRS') revenues,
the under-collection is recoverable from Narragansett's customers through the
annual reconciliation provisions of Narragansett's Standard Offer Adjustment
Provision. Likewise, to the extent Narragansett collects more than its total cost
of providing SOS, the ratepayers are entitled to recoup the benefit, with
interest. Furthermore, Narragansett's transmission and transition charges are
fully reconciling on an annual basis, the transition charges through an adjustment
based on the annual reconciliation of wholesale power contract termination charges
('CTC') filed by National Grid and the transmission charges through a change in
Narragansett's transmission adjustment factor ('TAF').

II. NARRAGANSETT

 On November 10, 2004, Narragansett filed with the Rhode Island Public Utilities

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

Commission ('Commission') its annual reconciliation filing with respect to SOS, transition and transmission rates. The filing included: a proposed 11.94% increase in the retail SOS rate from the present rate of 6.7 cents per kWh to 7.5 cents per kWh; a proposed 1.17% decrease in the transition rate from the present rate of .855 cents per kWh to .845 cents per kWh; and a proposed 469% increase in the transmission service adjustment factor from the present rate of .042 cents per kWh to .239 cents per kWh. [FN2]

On December 9, 2004, in response to Commission data requests, Narragansett filed a revised proposed SOS charge of 6.7 cents per kWh, resulting in no change to the rate then in effect. [FN3] The result for a typical residential customer using 500 kWh of service would be an increase of 1.6% equal to $0.97 per month. Therefore, the average monthly residential bill would increase from $61.80 to $62.77. [FN4] In support of the proposed rates, Narragansett presented the pre-filed testimony of Jeanne A. Lloyd, Principal Financial Analyst for National Grid USA Service Company, Michael J. Hager, Vice President, Energy Supply -- NE for National Grid USA Service Company, and Carol A. Currier, Senior Analyst in Transmission Rates for New England Power Company.

A. Standard Offer Service

**\*2** In his pre-filed testimony, Michael Hager explained that Narragansett has wholesale power supply contracts with three suppliers to serve the retail SOS load within its pre-merger ('Narragansett zone') and post-merger (both 'Narragansett zone' and 'EUA zone') service territories. All of these wholesale SOS supply contracts run through December 31, 2009 and contain a fixed price component. [FN5] Mr. Hager explained that the Narragansett zone SOS supply contracts contain two price components -- a base price and a fuel index adjustment provision. According to Mr. Hager, the fuel index adjustment provides for additional payments ('fuel index payments') to be made to the SOS suppliers in the event of substantial increases in the market price of No. 6 residual fuel and natural gas. The price is based on a comparison of the twelve-month ('Narragansett zone') rolling average of oil and gas prices to a current trigger price. The base price for SOS contracts in both zones in calendar year 2005 is 5.5 cents per kWh. [FN6]

In order to determine the extent of any fuel index payments for the period January 2005 through December 2005, Mr. Hager based the fuel index adjustment calculations on future gas and crude oil projections. In performing his calculations, he used the average gas and crude oil prices as reported in the Wall Street Journal on November 22, 23, and 24, 2004. Based on the numbers examined, Mr. Hager determined that Narragansett will have to make fuel index payments of 1.158 cents per kWh in the pre-merger Narragansett zone. There are no payments in the former EUA zone, due to the expiration of the fuel index in the EUA SOS contracts, for the period January 2005 through December 2005. This equates to a total weighted average SOS cost of 6.653 cents per kWh, slightly below the current level. [FN7] Mr. Hager noted that recent procurements in Massachusetts had resulted in energy charges ranging from 6.646 cents per kWh for certain industrial customers to 7.093 for residential customers for the periods beginning in November

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

2004 and extending into 2005. [FN8]

 In her pre-filed testimony, Jeanne Lloyd noted that Narragansett's current SOS
rate is 6.7 cents per kWh. The charge was designed in a manner where Narragansett
would neither over-collect nor under-collect its total wholesale SOS expenses
through December 2004. [FN9] According to Ms. Lloyd's Updated Exhibit JAL-7,
Narragansett projected an under collection of approximately $1,522,134 as of
December 31, 2004.

 Ms. Lloyd stated that Narragansett is proposing to maintain its SOS rate of 6.7
cents per kWh in order to meet anticipated fuel index payments. [FN10] According
to Ms. Lloyd, maintaining the current level of 6.7 cents per kWh will cause
Narragansett's SOS expenses to be approximately $882,184 more than the Company's
revenues. [FN11] Because the over recovery of $72,938 in the Last Resort Service
('LRS') reconciliation is minimal, rather than applying it to the SOS balance as
in the past, Narragansett proposes to carry it forward to the next reconciling
period. [FN12]

B. Transition Charge

 **\*3** In her pre-filed testimony, Ms. Lloyd explained that the transition charge is
intended to recover the CTC that was billed to Narragansett by its affiliated
supplier, New England Power ('NEP'), when NEP released Narragansett from the
all-requirements contract whereby Narragansett had contracted to buy all of the
power required to serve Narragansett's customer load. [FN13]

 Narragansett reconciles transition revenues on an annual basis in accordance with
the requirements of the Non-Bypassable Transition Charge Adjustment Provision,
which requires an annual reconciliation of Narragansett's total CTC expense
against Narragansett's total revenue from the Transition Charge. Any over or
under-collection is to be refunded to or collected from customers, with interest.
Ms. Lloyd indicated that the current transition rate produced an over-recovery of
approximately $437,110 for the period October 1, 2003 through September 30, 2004.
[FN14] Narragansett proposed reducing the weighted average transition charge by a
transition charge adjustment factor credit to return the over recovery to
customers. [FN15]

 Therefore, the Company's proposed transition charge of 0.845 cents per kWh
represents the weighted average base transition charge of 0.850 cents per kWh and
a transition charge adjustment factor credit of 0.005 cents per kWh designed to
refund the transition over recovery for the period October 2003 through September
2004. [FN16]

C. Transmission Rate

 In her pre-filed testimony, Ms. Lloyd outlined the three components of
Narragansett's proposed increase in the Transmission Adjustment Factor: (1) an
increase of 0.061 cents per kWh to represent an increase in forecasted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

transmission costs for 2005; (2) an increase of 0.048 cents per kWh to collect a
$3.8 million under recovery from the period October 2003 through September 2004;
(3) an increase of .064 cents per kWh, due to the elimination of the 2004
transmission reconciliation factor and (4) an increase of 0.024 cents per kWh
designed to recover approximately $5.6 million over three years for the deferred
ISO Tariff Expenses. [FN17] The net result was a proposed increase of 0.197 cents
per kWh, increasing the Transmission Adjustment Factor from 0.042 cents per kWh to
0.239 cents per kWh. [FN18]

 Narragansett forecasted total transmission costs for 2005 of approximately  $44.2
million, resulting in a unit cost of 0.564 cents per kWh for 2005, or . 061 cents
more than the 2004 average transmission expense of .503 cents per kWh. [FN19]
Narragansett reported a $3.8 million transmission revenue under recovery as of
September 30, 2004, which will be collected in 2005. Ms. Lloyd noted that in
accordance with the Commission's Order in Docket No. 3617, Narragansett will begin
collecting $5.6 million of the total $7.45 million of previously disputed
transmission costs over a three-year period. [FN20]

 In her pre-filed testimony, Ms. Carol Currier explained that since January 1,
1998, Narragansett has been taking transmission services on behalf of its entire
customer base under two open tariffs, New England Power Company's NEP Federal
Energy Regulatory Commission ('FERC') Electric Tariff No. 9 and New England Power
Pool's ('NEPOOL') FERC Electric Tariff No. 1. [FN21] FERC Tariff No. 9 provides
service over NEP's local, non-PTF facilities. NEP also provides metering,
transformation and certain ancillary services to Narragansett to the extent such
services are required by Narragansett and not otherwise provided under the NEPOOL
Tariff. [FN22] NEPOOL's FERC Tariff No. 1 covers regional transmission service
over Pool Transmission Facilities ('PTF'), calculated pursuant to a FERC-approved
formula. The NEPOOL Tariff also provides for Black Start, Reactive Power, and
Scheduling, System Control and Dispatch Services. [FN23] Additionally, since
January 1, 1999, Narragansett takes service pursuant to the New England
Independent System Operator's ('ISO-NE') FERC Electric Tariff No. 1, under which
ISO-NE provides Scheduling System Control and Dispatch, Energy Administration
Service, and Reliability Administration Service. [FN24]

 **\*4** Ms. Currier estimated Narragansett's total transmission and ISO-NE Tariff
expenses for 2005 to be approximately $44.2 million, representing a net increase
of $5.49 million, or 14.2% from the 2004 forecast, primarily due to the
combination of eliminating border charges with New York, increased PTF
transmission investments and the updated RNS Rate, and increased NEPOOL Reactive
Power costs. [FN25] She explained that her estimate included NEP Tariff 9 charges,
NEPOOL Regional Network Service ('RNS') transmission charges, Black Start,
Reactive Power and Load Dispatch charges. [FN26]

 In estimating the 2005 NEPOOL RNS charges, Ms. Currier indicated that she used
the currently effective rates and adjusted them to reflect an estimated rate
increase that becomes effective on June 1st each year. The estimated cost for
Black Start Service is based on the January 1, 2005 rate. She calculated the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

Reactive Power cost by using the actual costs for the period September 2003 through August 2004. She also based the costs associated with Scheduling and Dispatch Service on the currently effective rate. All rates are further based on Narragansett's network load. Ms. Currier explained that no Reliability Must Run ('RMR') contract charges have been estimated because Rhode Island does not appear to be an affected reliability region. [FN27]

Ms. Currier calculated NEP Tariff No. 9 charges based on NEP's actual Non-PTF expenses for the 12 months ending August 2004 increased to reflect additional costs associated with forecasted capital additions anticipated for the rate period. Likewise, she based metering, transformation and ancillary service charges on current rates. [FN28] Ms. Currier estimated the ISO-NE charges based on the ISO-NE revenue requirement filed with FERC. To estimate Narragansett's 2005 ISO-NE charges, Ms. Currier adjusted ISO-NE's actual costs for the period September 2003 through August 2004 by an inflationary factor which is intended to recognize the increase or decrease in the ISO-NE revenue requirement from the budget as filed for the periods ending December 2004 versus December 2005. [FN29]

Finally, Ms. Currier provided an explanation of the primary changes from the 2004 forecasted expenses. She indicated that in response to a FERC Order regarding elimination of market 'seams' between New England and New York, the two control areas reached an agreement which became effective on December 1, 2004. She explained that elimination of this charge will decrease NEP's credit to its transmission revenue requirement by the amount it currently receives from New York for the border charge. This increases the Non-PTF costs allocated to Narragansett. Ms. Currier indicated that the increase in the PTF forecast for 2005 is primarily due to an increased PTF rate in 2005. The increase in Reactive Power costs is primarily due to the costs associated with system changes in the Boston area which are allocated to the entire New England region. [FN30]

### III. DATA REQUESTS

*5 The Energy Council of Rhode Island ('TEC-RI'), a full party intervenor, and the Commission issued data requests to which Narragansett responded. TEC-RI asked several questions regarding transmission costs and allocations from NEP. TEC-RI also requested information regarding the current rules related to the procurement of last resort service. Both TEC-RI and the Commission requested updated fuel information and cost projections from Narragansett. The Commission requested information regarding the impact of Standard Market Design ('SMD') on RMR costs. [FN31] Under the pre-SMD model, Rhode Island would have been required to pay $11,497,893 for RMR costs in 2004.

Finally, the Commission requested an analysis from the Company as to whether or not SMD has resulted in an overall savings to customers in Rhode Island. In response, Narragansett provided information from ISO-NE's website and 2003 Annual Markets Report which indicates that if energy costs are excluded, SMD has resulted in more efficiency in the New England wholesale electricity market. Including energy costs does not decrease efficiency, but shows increased overall costs to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PUR Slip Copy
Page 6

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

customers.

### IV. HEARING

A public hearing was held at the Commission's offices, 89 Jefferson Boulevard, Warwick, Rhode Island, on December 13, 2004. The following appearances were entered: [FN32]

| | |
|---|---|
| FOR NARRAGANSETT: | Laura S. Olton, Esq. |
| FOR DIVISION: | Paul J. Roberti, Esq. |
| | Assistant Attorney General |
| FOR COMMISSION: | Cynthia G. Wilson, Esq. |
| | Senior Legal Counsel |

### A. Public Comment

Nine members of the public provided comment regarding the proposed rate change.

### B. Narragansett's Testimony

At the hearing, Mr. Hager, Ms. Lloyd and Ms. Currier testified on behalf of Narragansett. Ms. Lloyd testified regarding the effect of the revised calculations, indicating that there would be an increase of $0.97 on the typical residential monthly bill, or approximately 1.6%, for a total bill of $62.77 per month. The effect on the average low income residential customer without a water heater credit would be an increase of $0.97 or approximately 1.9%, for a total bill of $51.29 per month. [FN33]

The witnesses summarized their pre-filed testimony and were presented for cross examination. Ms. Currier and Ms. Lloyd responded to questions regarding transmission calculations. Ms. Lloyd acknowledged that the TAF is increasing by a significant amount, approximately 69%. Ms. Currier noted that approximately $3.5 million of the PTF charges are due to increased NEPOOL charges. She agreed that the non-PTF charges increased by approximately 13.8%. She indicated that $2.6 million is associated with transmission plant and other infrastructure improvements. She noted that $3.6 million is associated with payments to affiliate companies that own transmission facilities which NEP may use in the provision of transmission services pursuant to an integrated facilities agreement. She acknowledged that the largest component of the increase is $6 million associated with Administrative and General expenses resulting from NEP's costs pursuant to the formula set forth in FERC Tariff 9. She indicated that any transmission customer, such as Narragansett can ask for an audit to determine if the charges agree with the costs. She was not aware if Narragansett has ever sought such an audit. She was also not aware of the administrative procedure for approving the costs or for triggering the audit provision. Finally, she was unsure of whether any reasonableness review is undertaken by any jurisdictional entity such as FERC.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

(Cite as: 2005 WL 1536259 (R.I.P.U.C.))

[FN34] With regard to the costs associated with Reactive Power, Ms. Currier explained that the reactive power allocation per the NEPOOL Tariff is allocated to all of New England as it is necessary to maintain reliability of the New England transmission system, rather than something which is identifiable to a subset of customers. [FN35]

 *6 Mr. Hager clarified that the National Grid USA costs are allocated to the various distribution companies, including Narragansett, either based on actual costs for a Narragansett-specific project or based on a formula for a project that benefits all of the distribution companies. He indicated that an employee's daily wages are allocated based on the hours he has incurred for his various functions throughout the day to ensure no double billing. [FN36]

 With regard to SOS issues, Mr. Hager indicated that the EUA fuel adjustment provision expired in accordance with the contracts between EUA and Narragansett on December 31, 2004. Two of the three suppliers had acknowledged the expiration and one had remained silent. In the event the remaining supplier disagreed with Narragansett's interpretation of the contract, the supplier could request arbitration. However, Mr. Roberti noted that this issue has been raised by the Commission in the last several SOS proceedings and should come as no surprise to the remaining supplier. He expressed concern that if there were arbitration, a ratepayer advocate should have a right to be involved.

 With regard to the treatment of the LRS over collection, Ms. Lloyd acknowledged that the Company is not recommending rolling it into the SOS balance in 2005 and explained that because the balance is so small, the Company believed it would be more appropriate to carry it forward in an interest bearing account through to the next reconciliation. She noted that most of the over collection was due to a timing issue between the monthly usage and the billing cycles, specifically regarding prorating of usage on bills.

 Addressing public comment that restructuring was supposed to provide lower electric prices for customers, Mr. Hager explained that there is competition in the wholesale market, although not in the retail market for residential customers in Rhode Island. He reiterated a point from a prior SOS proceeding, noting that gas prices at the end of November 2004 for calendar year 2005 purchases were averaging $7.15 per MMBtu. He reminded the Commission that when the restructuring concept was being developed in 1996, 1997 and 1998, the natural gas market prices would fluctuate between $2.00 and $3.00 per MMBtu. At that time, $3.00 per MMBtu put people into crisis mode. He indicated that economists are advising market participants to 'forget the old prices [and that] $5.00 or $5.50 should be the normal price.' Both Mr. Hager and Dr. Stutz, the Division's witness agreed that some of the reason for the increased energy prices is due to increased generating capacity, built after the commencement of restructuring, which is dependent on natural gas. [FN37]

 Mr. Hager noted that ISO-NE had issued a report which indicated that if one backs out the increased fuel costs, and normalizes them back to the oil and gas prices

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

of the prior year, the actual wholesale market prices were lower in 2003 than in the year prior. According to ISO-NE, this shows the efficiencies created by the restructured market. Therefore, while customers were experiencing actual increases in their bills, it was due to increases in energy costs rather than inefficiencies in the system. [FN38]

C. Division's Testimony

*7 The Division presented Dr. John Stutz of the Tellus Institute in support of its position. Dr. Stutz indicated that while the transmission costs and erratic behavior of the SOS costs concern the Division, the Division supports the amended proposal that Narragansett filed with the Commission. [FN39] In response to a question from the Bench inquiring as to whether or not the SOS rate should be increased, Dr. Stutz agreed with a comment made by Mr. Hager that the current SOS rate should provide some cushion in the midst of volatility. Dr. Stutz also pointed out that with a volatile market such as the historical natural gas market, a valid projection of a trend is very difficult. He noted that the natural gas market, shown on a graph, tends to have peaks and valleys. Therefore, while there has been an overall upward trend in the energy market over time, it is very difficult to project what the market will do in the next twelve-month period for the purposes of setting rates. He also indicated that 6.7 cents per kWh is a reasonable level for the SOS rate and that it provides a cushion. [FN40] He stated that 'I do have to admit that the cushion isn't anywhere near as big as these swings we've seen, but I hope these swings are more indicative of spikes than trends.' [FN41] He maintained that in light of the volatility, where a clear trend is not discernable, this was not the time to be building up large surpluses. [FN42] With regard to the Commission's previous Orders which contained provisions to encourage the Company to file for a rate change when the over- or under-collection in the SOS account reaches $16 million, Dr. Stutz noted that in light of the volatility, such a benchmark should not be an absolute mandate, but rather a trigger that a rate change may be necessary. [FN43]

D. TEC-RI's Testimony

Mr. John Farley, Executive Director of TEC-RI, stated that the organization has some concerns with the transmission rate. Furthermore, with regard to the SOS rate, he noted that TEC-RI has two competing positions within the organization. Some customers are receiving energy through competitive supply while others are taking SOS. Addressing the SOS concerns, he acknowledged that there is still no clear answer as to what the base line price will be. He maintained that it is important for Rhode Island to seek the best strategy for mitigating risk when it comes to the prices. He believed that the procurement of SOS is not flexible enough to mitigate risk. He opined that the State is at a point where it should either move forward in encouraging the competitive market or that Narragansett will continue to procure most of the power, in which case there needs o be a review of the Company's ability to procure it in the best way possible. [FN44]

V. COMMISSION FINDINGS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

After considering the evidence presented, the Commission approved Narragansett's amended rate proposal as filed. Specifically, the Commission approved Narragansett's proposals with regard to the SOS rate, TAF, transition rate, and the LRS over-recovery, as just and reasonable and in the best interests of the ratepayers.

*8 The Commission determined that Narragansett's proposal to continue reporting monthly on the projected balance of the SOS account as of December 31, 2004 is reasonable. Furthermore, Narragansett Electric should consider filing for a SOS rate adjustment if monthly projections indicate that the SOS account will accrue an over-or under-collection in excess of $16 million as of December 31, 2005. The Commission agrees with Dr. Stutz that the filing should not be required based solely on the projected number, but should consider the time of year and projections of oil and gas prices. In other words, if there appears to be a large over- or under-collection after only a couple of months of the year, time may smooth out the result. Likewise, if the over- or under-collection does not appear until after September, when Narragansett will be filing shortly for its annual reconciliation, it may not be appropriate to file. In other words, the Company has discretion utilizing various factors to determine when a rate adjustment is necessary beyond simply the figure of $16 million. It is encouraged to seek Division input prior to filing for a rate change if one is not clearly necessary.

The Commission notes that Narragansett does not earn any profit on the SOS, transmission or transition charges. These rates are the result of charges that Narragansett must pay in order to distribute the electricity to homes and businesses. With regard to the SOS rate, the Commission regulates Narragansett, but does not regulate the wholesale oil and natural gas prices. The Commission must appropriately address those costs and allocate those costs to the different groups of customers as those costs are incurred.

While the Commission is hopeful that a market will develop under restructuring, it will continue to diligently ensure that rates remain as stable as possible given the wholesale market volatility. The Commission reiterates that the General Assembly has voted in favor of electric restructuring twice based on the theory that competition will ensure lower energy prices. What the Commission has seen, however, is that the wholesale market prices have increased dramatically since 2000. Testimony at Commission hearings has consistently indicated that no one contemplated wholesale natural gas prices would settle out at $5, $6 and $7 per MMBtu, when they hovered around $2 and $3 in 1996. The Commission reminds ratepayers that it does not control or regulate these commodity prices.

While the Commission has heard the concerns of TEC-RI with regard to the procurement of SOS supply, the Commission notes that the SOS contracts that are currently in place are all requirements load following contracts with fixed prices, some that have fuel adjustment clauses, which extend through 2009. These contracts were approved by FERC after its administrative process back in 1998. If large commercial and industrial ('C&I') customers are truly concerned with what

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

they perceive as above-market SOS prices, we encourage them to seek pricing in the market. It may be that while there may be less long-term price certainty, actual costs could be lessened in the market.

*9 However, in response to a generalized concern that the SOS pricing may be in excess of the market, the Commission notes that after a review of Mr. Hager's pre-filed testimony, recent procurements in Massachusetts resulted in energy charges ranging from 6.646 cents per kWh for certain industrial customers to 7.093 cents per kWh for residential customers for the periods beginning in November 2004 and extending into 2005. Although filed after determination in this docket and not a part of the Commission's deliberations, the Commission notes that the average LRS pricing for nonresidential customers for the eight month period January 1, 2005 through August 31, 2005 is 6.987.

Accordingly, it is hereby

(18151) ORDERED:

1. Narragansett Electric Company's proposed retail Standard Offer Service Rate of 6.7 cents per kWh is approved for service on and after January 1, 2005.

2. Narragansett Electric Company's proposed Transition Rate of 0.845 cents per kWh is approved to become effective for service on and after January 1, 2005.

3. Narragansett Electric Company shall file a monthly reconciliation of the projected SOS balance for December 31, 2005.

4. Narragansett Electric Company shall comply with all other findings and instructions as contained in this Report and Order.

EFFECTIVE AT WARWICK, RHODE ISLAND PURSUANT TO A BENCH DECISION ON DECEMBER 13, 2004. WRITTEN ORDER ISSUED FEBRUARY 17, 2005.

PUBLIC UTILITIES COMMISSION

Elia Germani, Chairman Robert B. Holbrook, Commissioner

FOOTNOTES

FN1 The contractual increase over the five year period will be 29.09% before fuel index adjustments.

FN2 Narragansett Ex. 1A, Pre-filed testimony of Jeanne A. Lloyd, pp. 3-4, Exhibit JAL-10, p. 1.

FN3 PUC Ex. 1, Response to Commission Data Request 1-3.

FN4 Narragansett Ex., Exhibit JAL-12 Update, p. 1.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**


FN5 Narragansett Ex. 1B, (Pre-filed testimony of Michael Hager), p. 3.

FN6 Id.  at 4.

FN7 Id.  at 5.

FN8 Id.  at 6.

FN9 Narr. Ex. 1A (Pre-filed testimony of Jeanne A. Lloyd), p. 18. Narragansett
incurred fuel index payments of approximately $66.8 million for the period October
2002 through September 2003, with approximately $21.4 million offset by a supplier
credit to Narragansett during a prior period.  Id.  at 21. In Docket No. 3508, the
Commission directed Narragansett to monitor its SOS reconciliation on a monthly
basis and file with the Commission for an adjustment to the rate if the projected
balance as of December 2003 were to exceed $16 million, either positive or
negative. The balance as of December 2003 is estimated to be an over recovery of
$8.1 million, which Ms. Lloyd uses to mitigate the proposed rate increase.  Id.
at 18-19, JAL-7, p. 2.

FN10 Id.  at Exhibit JAL-1-Update. The base SOS charge for 2005 is 5.5 cents per
kWh. The remainder of the proposed charge is related to anticipated fuel index
payments.

FN11 Id.  at Exhibit JAL-7-Update.

FN12 Narr. Exhibit 1A, p. 18. The non-residential over recovery is $74,704 and the
residential under recovery is $1,767 for the period October 2003 through September
2004. The balance will earn interest on behalf of ratepayers.

FN13 Id.  at 4.

FN14 Id.  at 5-6.

FN15 Id.  at 6. The weighted average transition charge is based on a formula
comparing the transition charges of the Narragansett zone and the EUA zone. Id.
at 5.

FN16 Id.  at 4-5.

FN17 Id.  at 6-7. Approval of the three year recovery was provided by the
Commission in Docket No. 3617, Order No. 18037 (issued November 9, 2004).

FN18 Id.  at 6-7, Exhibit JAL-1-Update.

FN19 Id.  at 7-8.

FN20 Id.  at 8-11.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**


FN21 Narragansett Ex. 1C, Pre-filed testimony of Carol A. Currier, p. 3.

FN22 Id. at 9-10.

FN23 Id. at 4. Pool Transmission Facilities are defined as 'the transmission facilities owned by Participating Transmission Owners (PTO) over which the ISO shall exercise Operating Authority in the terms set forth in the Transmission Owners Agreement (TOA), rated 69kV or above required to allow energy from significant power sources to move freely on the New England transmission system as defined in the Open Access Transmission Tariff, and include: 1. All transmission lines and associated facilities owned by PTOs rated 69 kV and above, except for lines and associated facilities that contribute little or no parallel capability to the PTF. The following do not constitute PTF: (a) Those lines and associated facilities which are required to serve local load only. (b) Generator leads, which are defined as radial transmission from a generation bus to the nearest point on the NEPOOL Transmission System. (c) Lines that are normally operated open. The remainder of the definition as contained in FERC Electric Tariff 3 (Open Access Tariff) has not been included in this footnote.

FN24 Id. at 3.

FN25 Id. at 14.

FN26 Id. at 11-14.

FN27 Id. at 11-13.

FN28 Id. at

FN29 Id. at 14. The inflationary factor varies based on the category of expense, but when the cost of all categories is combined, the average inflationary factor is 5.24%

FN30 Id. at 15-16.

FN31 Reliability Must Run costs are those associated with electric generating units in congested areas that ISONE must run regardless of price in order to ensure system reliability.

FN32 Mr. John Farley, Executive Director of TEC-RI, an intervenor, was allowed to make a statement for the record without counsel present during the hearing after no objection was made by the parties.

FN33 Id. at 56.

FN34 Id. at 55-71. In response to Record Requests, Ms. Currier indicated that the Integrated Facilities Agreements were filed with FERC and that the recovery of the costs are provided for in the Agreements and Tariff 9. The Integrated Facilities

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1536259 (R.I.P.U.C.)

**(Cite as: 2005 WL 1536259 (R.I.P.U.C.))**

Agreements were approved by FERC in 1975 (Blackstone Valley Electric), 1990
(Blackstone Valley Electric), 1996 (Narragansett), and 1999 (Newport Electric
Corporation). She indicated further that Narragansett has never sought an audit of
NEP's accounts and records as allowed under Tariff 9. She explained that the
revenue requirements under NEP's FERC Tariff 9 are calculated pursuant to a
formula rate filed with and approved by FERC. The approved formula rate permits
NEP to recover its actual costs for cost components approved as part of the cost
of service formula. Thus, she explained, FERC approves the formula but does not
specifically review the Tariff 9 costs. However, FERC may audit the application of
NEP's formula or the transmission customers may conduct an audit.  See  Responses
to Record Requests, 2, 3, and 4.

FN35 Id.  at 78-79.  See  Response to Record Request 7.

FN36 Id.  at 72-75.

FN37 Id.  at 94-102.

FN38 Id.  at 96-98.

FN39 Id.  at 83-84.

FN40 Id.  at 123-26, 128.

FN41 Id.  at 127-28.

FN42 Id.  at 128-129.

FN43 Id.  at 126-27.

FN44 Id.  at 129-131.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 37



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
**PUBLIC UTILITIES COMMISSION**

IN RE: NARRAGANSETT ELECTRIC COMPANY     :
REQUEST FOR APPROVAL AND CORRESPONDING  :    Docket No. 3496
RATE TREATMENT FOR STANDARD OFFER      :
SUPPLY CONTRACT AMENDMENT         :

<u>REPORT AND ORDER</u>

I.    <u>BACKGROUND</u>

The Utility Restructuring Act of 1996 ("URA") requires each electric distribution

company to arrange with wholesale power suppliers for a standard power supply offer to

sell electricity to all customers at a stipulated rate. Pursuant to the URA, Narragansett

Electric Company ("Narragansett") entered into wholesale Standard Offer supply

contracts with the following prices:

| Calendar Year | Price per kWh |
|---------------|---------------|
| 2003 | 4.7 cents[1] |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

The wholesale Standard Offer supply contracts also provide for increases in the

price per kilowatt-hour ('kWh") of wholesale power supplied to Narragansett in the event

fuel prices increase above certain levels. To the extent that the total cost of the wholesale

---

[1] The SOS rate increased to 5.5 cents per kWh commencing with usage on and after June 1, 2003, as a direct result of increased wholesale oil and natural gas costs. <u>See</u> Order No. 17495 (issued June 20, 2003).

power supply to Narragansett, including fuel charges, exceeds retail SOS revenues, the under-collection is recoverable from Narragansett's customers through the annual reconciliation provisions of the Narragansett's Standard Offer Adjustment Provision. Likewise, any over-collection is credited back to Narragansett's customers in the same manner.

Through its instant request, Narragansett is requesting that the Commission allow it to recover increased costs, due to congestion related charges, as a result of the implementation of ISO-NE's Standard Market Design ("SMD"). The effect of the recovery would be factored into the annual reconciliation of SOS, transmission and transition that occurs in December each year.

SMD is a set of rules and procedures for the wholesale electricity market in New England that is applied through a software system. The core components are Locational Marginal Pricing ("LMP"), a Multi-Settlement System, and the possibility to mitigate against the adverse effects of paying higher LMP's through Financial Transmission Right auctions. Prior to the implementation of SMD, New England operated under a "single energy clearing price wholesale market," where every region of New England paid the same spot market price for the generation of electricity. The purpose of LMP is to identify the areas on the New England transmission system where congestion occurs and to price the energy being delivered to those areas at a premium. According to ISO-NE, under LMP, the marginal cost of electricity will be calculated at locations on the New England transmission system and will be included in the commodity cost to account for the cost of congestion.[2] However, according to Narragansett, even though there is no

---

[2] Standard Market Design, "Background and Overview," pp. 1-5. ISO New England, Inc. (2003).

2

actual congestion in delivering power to the Rhode Island Zone, the market rules allow for electricity procured for consumption in Rhode Island to incur congestion costs if its contractual delivery point were at a location other than the Rhode Island Zone. Furthermore, under two of its SOS contracts, Narragansett was concerned that those costs could be passed through to Narragansett, rather than being paid for by the supplier.

II.    NARRAGANSETT'S REQUEST

On February 28, 2003, Narragansett Electric Company ("Narragansett" or "the Company") filed a request with the Commission for approval and corresponding rate treatment for an amendment to one of Narragansett's Standard Offer Supply ("SOS") contracts. Narragansett indicated that two of its SOS contracts with one supplier contains unique language that is not found in any of the Company's remaining SOS contracts. Under the pre-SMD market rules, the terms of the SOS contracts at issue clearly delineated the allocations of costs between the Company and the Supplier. However, under the SMD and LMP rules, the Company and the Supplier disagree as to the appropriate cost allocations.

According to Narragansett, "under the supplier's interpretation, in reliance on language unique to this supplier's agreement, the supplier would have flexibility to deliver to any point on the NEPOOL PTF System without incurring any additional congestion cost, thereby leaving the Company and its customers to bear the incremental congestion cost burden." Furthermore, Narragansett asserted that it was unable to predict the magnitude of potential cost exposure under this interpretation. Finally, Narragansett maintained that only the Supplier, and not Narragansett, is in a position to mitigate the congestion costs under the new market rules.

3

Therefore, in order to avoid uncertainty associated with arbitration and/or litigation, Narragansett and the Supplier agreed to an Amendment to their SOS agreement. The Amendment, if approved, would increase the base amount of the SOS kWh charge for one of Narragansett's contracts commencing with usage on and after March 1, 2003 through the end of 2009, when the SOS term expires.

If recovery of costs under this Amendment is approved, the base SOS price for all customers will be as follows:

| Calendar Year | Price per kWh |
|---|---|
| 2003 | 4.737 cents[3] |
| 2004 | 5.143 cents |
| 2005 | 5.543 cents |
| 2006 | 5.943 cents |
| 2007 | 6.343 cents |
| 2008 | 6.743 cents |
| 2009 | 7.143 cents |

According to Narragansett, the effect of the Amendment would be to raise the average SOS customer's bill 23 cents per month, or less than .4%. The additional amount paid to the supplier would be approximately $2.8 million per year (using 2002 deliveries as a base). However, this total amount could be higher or lower, depending on the total kWh deliveries for each year during which the Amendment is in effect.

Narragansett has requested approval under R.I.G.L. § 39-1-27.3(b), which allows the Company to collect its costs arising out of wholesale standard offer supply arrangements approved by the Commission after January 1, 2002. According to

---

[3] See supra note 1 and accompanying text.

4

Narragansett, this Amendment will terminate if not approved by the Commission on or before June 27, 2003. Finally, in a response to a Commission Request, Narragansett noted that currently, the parties are acting in accordance with the Amendment, but will true up, as if the agreement were never executed, if the Amendment is not approved.

Finally, Narragansett argued that under R.I.G.L. § 39-1-27.3(b) (as amended in 2002), the ratepayers will be liable for all congestion costs incurred by Narragansett from this supplier if the Commission does not approve the Amendment.

III.    DIVISION'S POSITION

On June 13, 2003, the Division submitted a memorandum authored by its expert witness, Dr. John Stutz of the Tellus Institute. Dr. Stutz summarized Narragansett's position and highlighted data provided in Narragansett's Third Supplemental Response to Commission Data Request 1-9. This data showed that if the Supplier is correct in its interpretation of the contract provision in question, the total congestion costs that would have been incurred by Narragansett for the months March through May 2003 is $3,210,463, whereas, under the agreement, the payment to the supplier is $725,507. Therefore, he indicated that "analysis shows that, if the right of the Supplier to select the delivery point were affirmed, the cost of either paying congestion costs or purchasing hedges would likely be much greater than the costs associated with the Amendment." Because there was no evidence that supported a position that the Supplier would not prevail on its claim of the appropriate contract interpretation, Dr. Stutz recommended approving recovery under the Amendment.

5

IV.   HEARING

Following notice, a public hearing was conducted on June 19, 2003, at the Commission's offices, 89 Jefferson Boulevard, Warwick, Rhode Island. The following appearances were entered:

FOR NARRAGANSETT ELECTRIC:   Terry L. Schwennesen, Esq.

FOR THE DIVISION:   Paul J. Roberti, Esq.
Assistant Attorney General

FOR THE COMMISSION:   Cynthia G. Wilson, Esq.
Senior Legal Counsel

Narragansett presented Michael Hager, Vice President of Energy Supply New England for National Grid USA Service Company and Jeanne A. Lloyd, Principal Financial Analyst in the Distribution Regulatory Services Department of National Grid USA Service Company in support of its proposal. The Division presented Dr. John Stutz in support of its position.

A.   Congestion Costs

Mr. Hager explained that congestion occurs on a transmission system when there is a physical inability of the system to transmit power from one location to another. For example, the lines may not be large enough to get the power from one area to the next. This happens when the ISO conducts an economic dispatch of generation in the lowest economic order. Mr. Hager indicated that when the next lowest cost generator is in location A but the power cannot be delivered to location B for use, there is congestion. In that situation, the dispatcher passes over the lower cost generator in location A in favor of a higher cost generator physically situated in location B in order to meet reliability requirements for the system. When the higher cost generator is dispatched out of

6

economic order, there is an economic incremental cost that has to be paid to the generator and allocated to the members of the power pool.[4]

Under LMP, each location, or zone, in the system has a separate energy price at any given hour. During periods when there is no congestion, the locational prices are the same in each zone. During hours when there is congestion, the area where there is congestion will experience higher energy costs than other areas. The difference between the zones is the congestion cost.[5]

According to Mr. Hager, Narragansett, like any distribution company, can be exposed to congestion costs if it has distribution obligations in one area and its generation comes from another area where there is a difference in cost due to congestion and the different locational pricing. To the extent that either the power Narragansett purchases for its customers is delivered directly to the Rhode Island Zone or the supplier is responsible for the costs under the two SOS contracts, Narragansett would not incur separate congestion costs. However, Narragansett could incur separate congestion costs if the power Narragansett purchases for its customers is not delivered to the Rhode Island Zone and Narragansett were to be found responsible for the cost difference between the delivery zone and the Rhode Island Zone. Furthermore, there are separate nodes within the Rhode Island Zone that may experience slightly different locational prices. Therefore, it is possible that congestion costs could be incurred even if the power were delivered directly to the Rhode Island Zone.[6]

However, Mr. Hager maintained that the Supplier is in a position to hedge against increased congestion costs, whereas, Narragansett would not be able to hedge against

---

[4] Tr. 6/19/03, pp. 12-13.
[5] Id. at 13-14.
[6] Id. at 14-18.

7

such costs in an effective way.[7] He explained that because the supplier does not need to provide Narragansett with the delivery location prior to delivery and in fact, has up to a day after delivery to provide that information, there will always be a mismatch between where Narragansett physically takes delivery and where the Supplier delivers for financial purposes.[8] Furthermore, Mr. Hager indicated that even if Narragansett were to try to hedge through purchases of Financial Transmission Rights ("FTR"), it will not know the exact load level or the place of delivery, thus making it impossible to effectively hedge costs in this manner.[9] Mr. Hager noted, however, that the Supplier can buy FTRs with the knowledge of the location of their settlement responsibilities versus the location of their generation and thus, predict the load and risk in a way Narragansett cannot.[10]

B.    Amendment Costs versus Congestion Costs

Mr. Hager testified that Narragansett's pre-SMD analysis indicated that the Amendment is in the best interests of ratepayers and is very reasonable. The analysis compared the Amendment charges to the charges that could be incurred if the power was delivered to one of forty (40) possible locations. According to Mr. Hager, the analysis showed that the prices resulting from the Amendment were reasonable and "that there [were] quite a number of locations that perhaps could have been chosen for delivery points that would have incurred much higher congestion cost exposure than the proposed

---

[7] Id. at 88-89.
[8] Id. at 89-90, 91-92. "Physically, Narragansett's customers are always taking load off of the system through the Narragansett zone…[but] it is possible for suppliers to put all their contracts at a particular – one single location for financial settlement purposes even though physically, [the] load is throughout New England." Id. at 92-93.
[9] Id. at 90-91.
[10] Id. at 112-113.

8

price."[11]  In fact, Mr. Hager testified, that the post-SMD analysis showed that congestion costs have been more than double the costs charged under the Amendment for the first three months that SMD has been in effect.[12]

Mr. Hager indicated that the per kWh settlement amount was a negotiated number between Narragansett and the Supplier.[13]  Ms. Lloyd testified that the estimated effect of the Amendment on the base SOS kWh rate is an increase of .043 cents per kWh beginning on March 1, 2003.  Ms. Lloyd explained that this is a blended rate, where the effect of the Amendment to two SOS contracts is spread over all of the SOS contracts which all ratepayers will pay through 2009.  She further explained that the amount is an estimate based on 2002 usage.[14]  Finally, Ms. Lloyd testified that if the Commission were ordering recovery through rates immediately, the impact on an average residential customer using 500 kWh of electricity per month would be approximately 23 cents or a .39% increase on the total bill based on rates in effect as of June 1, 2003.[15]

Dr. Stutz testified that the Division had reviewed the materials submitted by Narragansett to determine whether it is reasonable to accept the Amendment.  Dr. Stutz discussed the fact that there was no evidence to show Narragansett's likelihood of success at arbitration, nor was there evidence to show the Supplier's likelihood of success.  He further maintained that Narragansett's likelihood of success would have to be "fairly high" in order to make rejecting the Amendment a more attractive option than

---

[11] Id. at 36-38, Narr. Exs. 5-7.
[12] Tr. 6/19/03, pp. 38-44, Narr. Exs. 6-7, PUC Ex. 9 (Narragansett's Third Supplemental Response to Commission Data Request 1-9).
[13] Tr. 6/19/03, p. 86.
[14] Id. at 45-47, Narr. Ex. 8.
[15] Tr. 6/19/03, pp. 48-49, Narr. Ex. 9. The Commission's decision in the instant docket will not affect rates immediately. However, the effect of the Amendment will be to increase rates. The impact will be addressed in Narragansett's annual reconciliation filing in November 2003, for effect January 1, 2004. Therefore, Narragansett and the Commission provided public notice in accordance with R.I.G.L. § 39-3-11.

submitting the issue to arbitration. Therefore, his recommendation was that the Commission accept the Amendment.[16]

    C.    <u>Level of Review</u>

Mr. Hager agreed that Narragansett is currently seeking approval of recovery of costs associated with the Amendment under R.I.G.L. § 39-1-27.3(b)(2), which states, "The electric distribution company will be entitled to recover its costs incurred from providing the standard offer arising out of...power supply arrangements that are approved by the commission after January 1, 2002." In order to provide the Commission with a basis upon which to determine whether the Amendment is reasonable, Mr. Hager indicated that the Supplier agreed to a unique situation where Commission approval did not need to be provided for three months. Noting that the Amendment has produced lower payments than actual congestion costs for the first three months of SMD, Mr. Hager argued that even if there had been no actual congestion costs during those same months, "it's still my belief that this is a fantastic arrangement for customers because it provides them certainty over the long period of time that we have to be exposed to these costs."[17]

    D.    <u>Confidentiality</u>

Narragansett requested confidential and proprietary treatment of certain information under the APRA, specifically, under §§ 38-2-2(4)(B) and (E). No member of the public requested review of the information during the proceeding. In accordance with the Commission's Rules of Practice and Procedure, a preliminary finding of confidentiality was made by the presiding commissioner. The issue was also addressed at

---

[16] Tr. 6/17/03, pp. 51-52.
[17] <u>Id.</u> at 80. <u>See id.</u> at 77-82 (discussing the performance of the Amendment for the first three months of SMD).

the hearing and the Commission allowed Narragansett to submit confidential exhibits together with a public redacted version.[18]  At the hearing, counsel for the Division indicated that:

> normally our policy is to put as much information in the public record [as possible].  I can say that I'm comfortable with the approach on behalf of the Attorney General and the Division.  My client is also comfortable with the approach in which the Commission is dealing with this because ultimately it's in the best interest of customers to have these safeguards in place.[19]

## V.  COMMISSION FINDINGS

After consideration of all of the evidence presented, the Commission rendered a Bench decision approving recovery of costs as a result of the Amendment between Narragansett and one of its Suppliers.[20]  The Commission finds that the Company has met its burden of showing that the Amendment is reasonable and in the best interests of the ratepayers.  The Amendment provides rate certainty, whereas absent the Amendment, ratepayers would be at a potential risk of paying significantly higher rates.  Furthermore,

---

[18] R.I.G.L. § 38-2-2(4)(B) exempts from the public record, "trade secrets and commercial or financial information obtained from a person, firm or corporation which is of a privileged and confidential nature." The SOS contracts and this Amendment contain competitively sensitive information with regard to the unique terms and clauses that contained in each.  Furthermore, with regard to the Amendment, the specific per kWh pricing is sensitive, both to National Grid and the Supplier.  The Supplier may be in the process of addressing similar disputes with other distribution companies and National Grid/Narragansett may be attempting to address disputes with other suppliers as well.  Neither wishes to adversely impact their bargaining positions.

R.I.G.L. § 38-2-2(4)(E) exempts from the public record "any records which would not be available by law or rule of court to an opposing party in litigation."  In this case, Narragansett has provided the Commission and Division with everything they have asked for through data requests - much of which is legal analysis of the contract provisions, analysis of success at arbitration, analysis of the cost/benefit analysis of the impact on ratepayers between the respective costs at market and under the amendment. This information would not be available to an opposing party at litigation.

Accordingly, Narragansett and the Supplier requested the following information be kept confidential: (1) Supplier identity; (2) Price terms shown in Section 5 and Appendix A of the Amendment; (3) Security provisions and the Form of Guaranty provided in Article 7 and Appendix B to the original agreement, respectively; (4) Supplier Responsibilities shown in the second and fifth paragraphs of Article 3 on Page 5 of the original agreement; and (5) The definition of Delivery Point on Page 2 of the original agreement and Section 3 of the amendment.  Narragansett also requested that it not be asked during a public hearing to do either of the following: (1) Make any admissions with respect to the strengths and weaknesses of its position or relative chances of success or failure at arbitration; (2) Reveal litigation strategy.

[19] Tr. 6/17/03, p. 35.

[20] The Commission has reviewed the confidential and public evidence as part of its deliberations.

the outcome of an arbitration and/or litigation between Narragansett and the Supplier is uncertain. Therefore, this solution also avoids protracted costs and uncertainty associated with dispute resolution.

The Commission also notes that the Division, as the ratepayer advocate before the Commission, recommended approval of Narragansett's request for recovery of the additional charges under the Amendment.

Finally, the Commission declines to address Narragansett's claim that under R.I.G.L. § 39-1-27.3(b), as amended in 2002, if Commission approval were not granted, Narragansett would automatically recover any congestion related costs from ratepayers, in the event it were unsuccessful in arbitration or litigation with its Supplier.

Accordingly, it is hereby

(17592) ORDERED:

1. Narragansett Electric Company's request to recover costs associated with the Amendment to its Standard Offer Supply Contract is approved.

2. Narragansett Electric Company shall comply with all other findings and instructions contained in this Report and Order.

EFFECTIVE AT WARWICK, RHODE ISLAND PURSUANT TO A BENCH DECISION ON JUNE 19, 2003. WRITTEN ORDER ISSUED OCTOBER 28, 2003.

PUBLIC UTILITIES COMMISSION



_____
Elia Germani, Chairman

_____
Kate F. Racine, Commissioner

_____
Robert B. Holbrook, Commissioner

# Tab 38-1


EXHIBIT
31

# Standard Offer Service Tariff Advice

**November 1997**

State of Rhode Island and Providence Plantations
Public Utilities Commission


**Eastern Utilities**
*Blackstone Valley Electric*
*Newport Electric*

Confidential                                                    NARR 42415

# Standard Offer Service
# Tariff Advice

**November 1997**

State of Rhode Island and Providence Plantations
Public Utilities Commission



**Eastern Utilities**
*Blackstone Valley Electric*
*Newport Electric*



**Blackstone Valley Electric**
**Eastern Edison**
**EUA Service Corporation**
**Montaup Electric**
**Newport Electric**

November 7, 1997

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

Re:    Blackstone Valley Electric Company
       Newport Electric Corporation
       Standard Offer Service Tariff Advice

Dear Ms. Massaro:

Enclosed herewith for filing on behalf of Blackstone Valley Electric Company
("Blackstone") and Newport Electric Corporation ("Newport") are an original and nine copies of
a Tariff Advice containing proposed Standard Offer Service Rate Schedules to be effective on
the Retail Access Date of January 1, 1998. The Rate Schedules are designated R.I.P.U.C. No.
1099 in Blackstone, and R.I.P.U.C. No. 1324 in Newport.

Explanation of Proposed Rate Schedules

By enacting the Utility Restructuring Act of 1996 ("URA"), the Legislature intended that
the principal benefit of competition, lower prices for electricity, would accrue over time to all
customers. Although the URA does not yet require a Standard Offer filing (*See* Section 39-1-
27.3(d)), Blackstone and Newport are now offering Standard Offer Service for all customers on
the Retail Access Date of January 1, 1998. The Standard Offer Service Rate Schedules are in
Attachment 1.

The Standard Offer Service Rate Schedules are being submitted at this time based upon
our expectation that the Federal Energy Regulatory Commission ("FERC") will expeditiously
approve the recently filed unanimous Settlement Agreements in Dockets ER97-3127-000 and
ER97-2800-000.

That Settlement resolves all remaining federal jurisdictional issues necessary to
implement retail choice for Blackstone's and Newport's customers on the Retail Access Date.
Included in the Settlement is a backstop commitment by Montaup Electric Company of a
Maximum Company Average Retail Delivered Price for Standard Offer Service as follows:

Confidential

NARR 42417

Ms. Massaro
Page 2

| Calendar Year | Maximum Price |
|---|---|
| 1998 | $0.032 |
| 1999 | $0.035 |
| 2000 | $0.038 |
| 2001 | $0.038 |
| 2002 | $0.042 |
| 2003 | $0.047 |
| 2004 | $0.051 |
| 2005 | $0.055 |
| 2006 | $0.059 |
| 2007 | $0.063 |
| 2008 | $0.067 |
| 2009 | $0.071 |

This pricing is subject only to the Standard Offer Fuel Index as it is contained in the Settlement Attachment 1, Amendment to Service Agreement, Section 10 and Attachment 4 Standard Offer Auction Proposed Design, Section D.

For rate design purposes, the above Standard Offer prices have been converted to a cumulative multiplier series:

| | |
|---|---|
| 1998 | 1.00000 |
| 1999 | 1.09375 |
| 2000 | 1.18750 |
| 2001 | 1.18750 |
| 2002 | 1.31250 |
| 2003 | 1.46875 |
| 2004 | 1.59375 |
| 2005 | 1.71875 |
| 2006 | 1.84375 |
| 2007 | 1.96875 |
| 2008 | 2.09375 |
| 2009 | 2.21875 |

Blackstone and Newport, in conjunction with Eastern Edison Company, shall put the Standard Offer Service out for bid by offering alternative suppliers the opportunity to provide Standard Offer Service, consistent with the Rhode Island General Laws, Section 39-1-27.3(d). Information concerning the Companies' Standard Offer Auction Proposed Design is provided in Attachment 5.

Q:\STDOFFER\STNDOFF.SVC

Confidential

NARR 42418

Ms. Massaro
Page 3

Any revenues billed by the Companies for Standard Offer Service in excess of payments to the Suppliers of that service shall be accumulated in an account and credited with interest. Also, in the unlikely event that the revenues billed by the Companies do not recover the their payments to the Suppliers in any calendar year, they shall be authorized to accumulate the deficiencies in this account together with interest into the next calendar year, except when the accumulated balance is expected to be a credit at the end of a calendar year; in such case, the Companies will petition the Commission to refund that balance to all of their Retail Delivery Service customers through a uniform cents per kilowatt-hour factor in the following year. The Companies will periodically notify the Division of the status of the account, and a filing, if necessary, would be made by December 1 based on 10 months actual and 2 months estimated, for a factor to be effective January 1 through December 31 of the following year.

Standard Offer Service shall be available to all of Blackstone's and Newport's retail customers on the Retail Access Date, including those retail customers who were taking service from a non-regulated power producer prior to the Retail Access Date and who have provided Blackstone and Newport with a written notice on or before November 28, 1997 of their decision to terminate service from their non-regulated power producer and take Standard Offer Service.

After the Retail Access Date, customers are free to leave the Standard Offer at any time to purchase electricity from a non-regulated power producer, but once this option is selected, a customer may not return to Standard Offer Service, with one exception. Blackstone and Newport will provide all residential and small general service customers with a one-time option to return to Standard Offer Service within the first one hundred and twenty days of first taking service from the non-regulated power producer. Also, any customer taking Standard Offer Service who moves within the service territory of the Companies will be allowed to retain this service.

The Companies' Standard Offer price cap determined in accordance with the terms of Rhode Island General Laws, Section 39-1-27.3(d), can be seen in Attachment 4, where it is compared to the aforementioned backstop commitment of Montaup Electric Company.

Initial Proposal - The Companies evaluated a rate design based upon a Standard Offer price set at $0.032 per kilowatt-hour for each rate. The results of this design produced unacceptable variations in the bill impacts on the rates and the customers within a rate, especially those on demand/energy rates. The results of this rate design can be seen in Attachment 3.

Alternate Proposal - As Filed - In order to limit the variation in customer bill impacts, the Standard Offer was designed based on the impact of a $0.032 per kilowatt-hour cost on the Companies. Their Generation Cost would have to be decreased by 30.52% in Blackstone and 13.79% in Newport to equal $0.032. The Generation Charges in each rate of each Company were reduced by that amount, respectively.

The proposed Standard Offer provides Blackstone with a company-average reduction of 12.93% and Newport with a company-average reduction of 4.56% compared with distribution rates estimated to be effective on January 1, 1998. A summary of the impact per rate, and the

QASTDOFFER\STNDOFF.SVC

NARR 42419

Ms. Massaro
Page 4

Average Standard Offer that results, is seen in <u>Attachment 2,</u> as are the workpapers for this design.

In Blackstone, the major rate classes Residential R-1, Small General Service G-2, and Large General Service T-6 have decreases of 10.91%, 13.87%, and 14.79%, respectively.

In Newport, the major rate classes Residential R-1, Small General Service G-2, and Large General Service T-6 have decreases of 4.31%, 4.93%, and 4.70%, respectively.

Absent any effect from the Customer Charge, all customers in a rate class receive the same percentage decrease as the rate class.

The Standard Offer plus the Retail Delivery Rate yields the same rate structure as the unbundled rates in effect except the Generation Charge of the unbundled rate is replaced by the lower Standard Offer. This applies to all rates, even complex demand/energy or partial requirements rates such as the A-Rates.

The Low Income Rate R-2 retains the same discount relative to Rate R-1. A discount will be applied to the Retail Delivery Rate of the Economic Development customers whose contract would have expired after 1/1/98 absent Restructuring. A listing of these Economic Development customers is provided in Attachment 2.

Upon implementation of the Standard Offer on January 1, 1998, only the year-end 1997 balance in the Fuel and Purchased Power accounts would remain to be billed. This amount will be separately stated in the upcoming Fuel and Purchased Power filings being made December 1, 1997.

This proposal is submitted on condition that the provisions in the Rhode Island Settlement now being considered by FERC are approved as filed. If that Settlement is not approved as filed, the Standard Offer Service Rate Schedules filed shall be withdrawn and considered null and void.

If you have any questions or if you need more information, please call me at (508)-559-2000 ext. 3700.

Very truly yours,

Dennis St. Pierre
Vice President - Rates

gmr

Enclosures

Q:\STDOFFER\STNDOFF.SVC

**Confidential**

**NARR 42420**

November 7, 1997

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Alan Shoer, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
 Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

N:\BVE\PUC2514\TRANSMLISTOFRE.WPD

Confidential

NARR 42421

**Attachment 1**

**STANDARD OFFER SERVICE TARIFF**

Confidential

NARR 42422

R.I.P.U.C. NO. 1099

<u>BLACKSTONE VALLEY ELECTRIC COMPANY</u>
<u>STANDARD OFFER SERVICE</u>

<u>AVAILABILITY:</u>

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, and to Customers who were taking generation service from a Non-
Regulated Power Producer before January 1, 1998, and who have provided
the Company with a written notice on or before November 28, 1997, of
their intent to terminate generation service from their Non-Regulated
Power Producer and take Standard Offer Service hereunder. Said
Customers shall have the right to relocate to a different service
location within the Company's service area and continue to receive
service under this Rate Schedule.

<u>APPLICABILITY:</u>

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

<u>CHARACTER OF SERVICE:</u>

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

<u>RATE:</u>

The Rate for each Rate Class shall consist of the following charges:

<u>Residential Retail Delivery Service Rate R-1</u>

    Energy Charge:              $0.03051        per kWh

<u>Residential SSI Retail Delivery Service Rate R-2</u>

    Energy Charge:              $0.03051        per kWh

<u>Residential Space Heating Retail Delivery Service Rate R-3</u>

    Energy Charge:              $0.03158        per kWh

<u>Large Residential Retail Delivery Service Rate R-4</u>

    Energy Charge
        Peak Hours:            $0.15384        per kWh
        Off-Peak Hours:       $0.00570        per kWh

<u>Small Secondary Voltage General Retail Delivery Service Rate G-1</u>

    Energy Charge:              $0.03589        per kWh

Date Filed, November 7, 1997        Date Effective, January 1, 1998

*C:\WORK\SO_BVE2.doc*                *11/06/97 4:31 PM*

Confidential

NARR 42423

R.I.P.U.C. NO. 1099

-2-

<u>Medium Secondary Voltage General Retail Delivery Service Rate G-2</u>

Non Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $5.81 | per kW |
| Energy Charge: | $0.01403 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $6.11 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.02978 | per kWh |
| Off-Peak Hours: | $0.00877 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

<u>Medium Primary Voltage General Retail Delivery Service Rate G-5</u>

Non Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $5.29 | per kW |
| Energy Charge: | $0.01610 | per kWh |

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option:

| | | |
|---|---|---|
| Demand Charge: | $5.48 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03241 | per kWh |
| Off-Peak Hours: | $0.01054 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

<u>Large Secondary Voltage General Retail Delivery Service Rate T-4</u>

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |

Date Filed, November 7, 1997                Date Effective, January 1, 1998

**Confidential**                                      NARR 42424

R.I.P.U.C. NO. 1099

-3-

Energy Charge
    Peak Hours:                  $0.03919      per kWh
    Off-Peak Hours:          $0.01027      per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

## Large Primary Voltage General Retail Delivery Service Rate T-6

    Demand Charge:            $5.37         per kW

Energy Charge
    Peak Hours:                  $0.03914      per kWh
    Off-Peak Hours:          $0.01239      per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

## Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4

    Demand Charge:            $3.70         per kW

Energy Charge
    Peak Hours:                  $0.03919      per kWh
    Off-Peak Hours:          $0.01027      per kWh

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

Date Filed, November 7, 1997         Date Effective, January 1, 1998

Confidential                                        NARR 42425

R.I.P.U.C. NO. 1099

-4-

Maintenance Provision:

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
|     Peak Hours: | $0.03914 | per kWh |
|     Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6.

Maintenance Provision:

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency

Date Filed, November 7, 1997              Date Effective, January 1, 1998

Confidential

NARR 42426

R.I.P.U.C. NO. 1099

-5-

and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

     Energy Charge:                 $0.03308          per kWh

General Heating Retail Delivery Service Rate H-2

     Energy Charge:                 $0.03339          per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

     Energy Charge:                 $0.03509          per kWh

Lighting Retail Delivery Service Rate S-1

     Energy Charge:                 $0.03408          per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

     Peak Hours
          Monday through Friday excluding holidays defined below
          April through September,    11:00 a.m. to  4:00 p.m.
          October through March,       8:00 a.m. to 12:00 noon, and
                                       4:00 p.m. to  7:00 p.m.

     Off-Peak Hours
          All other hours.

          Holidays are defined as:

               New Year's Day            Columbus Day
               President's Day           Veteran's Day
               Memorial Day              Thanksgiving Day
               Independence Day          Christmas Day
               Labor Day

POWER FACTOR ADJUSTMENT:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power Factor Adjustment (PFA) to their Demand Charge based on the following

Date Filed, November 7, 1997          Date Effective, January 1, 1998

Confidential                                          NARR 42427

R.I.P.U.C. NO. 1099

-6-

method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted effective January 1 of each calendar year beginning in the year 1998 and ending in the year 2009 by multiplying the Rates by the appropriate Cumulative Multiplier shown in the Standard Offer Calendar Year Multiplier Table below. The foregoing Rates shall also be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Revenue Reconciliation Adjustment described below:

STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:

| Year | Cumulative Multiplier |
|------|----------------------|
| 1998 | 1.00000 |
| 1999 | 1.09375 |
| 2000 | 1.18750 |
| 2001 | 1.18750 |
| 2002 | 1.31250 |
| 2003 | 1.46875 |
| 2004 | 1.59375 |
| 2005 | 1.71875 |
| 2006 | 1.84375 |
| 2007 | 1.96875 |
| 2008 | 2.09375 |
| 2009 | 2.21875 |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Date Filed, November 7, 1997          Date Effective, January 1, 1998

Confidential                                    NARR 42428

R.I.P.U.C. NO. 1099

-7-

<u>Market Oil Price</u> is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

> <u>Oil Index</u> is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

<u>Fuel Trigger Point</u> is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

> Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

<u>STANDARD OFFER REVENUE RECONCILIATION ADJUSTMENT:</u>

The Company shall reconcile the revenues billed to Customers taking Standard Offer Service against payments to Suppliers of Standard Offer Service and recover or refund any under- or overcollection in accordance with the following terms:

> Any revenues billed by the Company for Standard Offer Service in excess of payments to Suppliers of that service

Date Filed, November 7, 1997                Date Effective, January 1, 1998

**Confidential**                                                **NARR 42429**

R.I.P.U.C. NO. 1099

-8-

shall be accumulated in an account and credited with
interest. In the unlikely event that the revenues billed by
the Company do not recover the Company's payments to
Suppliers in any calendar year, the Company shall also be
authorized to accumulate the deficiencies in this account
together with interest into the next calendar year, except
when the accumulated balance is expected to be a credit at
the end of a calendar year, the Company will petition the
Commission to refund that balance to all of the Company's
Retail Delivery Service customers through a uniform cents
per kilowatt-hour factor in the following year.  The Company
will periodically notify the Division of the status of the
account, and a filing, if necessary, would be made by
December 1 based on 10 months actual and 2 months estimated,
for a factor to be effective January 1 through December 31,
of the following year.

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum of the Demand Charge and the Energy
Charges as adjusted by the Standard Offer Calendar Year Multiplier and
the Standard Offer Fuel Index, and applicable Rhode Island Gross
Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
of not more than twelve (12) years beginning on the date service is
first taken and ending on the earlier of December 31, 2009, or the
date the Customer terminates service.  The Customer may terminate
service on five (5) days notice.  The Customer shall be ineligible to
receive Standard Offer Service thereafter.  The foregoing provision
shall not apply to Customers who receive service under any of the
Company's residential Retail Delivery Service Rates or under Small
General Retail Delivery Service Rate G-1.   Said Customers may elect
take electric power service from another Supplier during the period
beginning January 1, 1998, and ending December 31, 1998, and elect to
return to Standard Offer Service within one hundred twenty (120) days
of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's various Terms and Conditions in effect from time to
time, where not inconsistent with the specific provisions hereof, are
a part of this Rate Schedule.

Date Filed, November 7, 1997            Date Effective, January 1, 1998

Confidential                                    NARR 42430

Attachment 4

COMPARISON OF STANDARD OFFER CAP PER URA TO PROPOSED
STANDARD OFFER

Confidential

# Blackstone Valley Electric Company
## Standard Offer Service Tariff Advice

### Standard Offer Price Cap per URA

| Year | URA Standard Offer * | Proposed Maximum Standard Offer |
|------|------|------|
| 1998 | $0.041 | $0.032 |
| 1999 | 0.044 | 0.035 |
| 2000 | 0.046 | 0.038 |
| 2001 | 0.049 | 0.038 |
| 2002 | 0.052 | 0.042 |
| 2003 | 0.054 | 0.047 |
| 2004 | 0.057 | 0.051 |
| 2005 | 0.061 | 0.055 |
| 2006 | 0.064 | 0.059 |
| 2007 | 0.068 | 0.063 |
| 2008 | 0.071 | 0.067 |
| 2009 | 0.075 | 0.071 |

Notes:

Price Cap: Inflation Rate from National Price Index Forecast dated August 1997.

All charges are exclusive of RI Gross Receipts Tax.

\* 1996 Benchmark 10.4 ¢/kWh inflated at 80% of CPI

n:\RISTLMNT\CPMPREHE\So_alt2b.xls,SOCALC,11/6/97,LSO'D

Confidential

NARR 42479

# Newport Electric Corporation

### Standard Offer Service Tariff Advice

#### Standard Offer Price Cap per URA

| Year | URA Standard Offer * | Proposed Maximum Standard Offer |
|------|------|------|
| 1998 | $0.037 | $0.032 |
| 1999 | 0.039 | 0.035 |
| 2000 | 0.042 | 0.038 |
| 2001 | 0.045 | 0.038 |
| 2002 | 0.048 | 0.042 |
| 2003 | 0.051 | 0.047 |
| 2004 | 0.055 | 0.051 |
| 2005 | 0.058 | 0.055 |
| 2006 | 0.062 | 0.059 |
| 2007 | 0.065 | 0.063 |
| 2008 | 0.069 | 0.067 |
| 2009 | 0.074 | 0.071 |

Notes:

Price Cap: Inflation Rate from National Price Index Forecast dated August 1997.

All charges are exclusive of RI Gross Receipts Tax.

\* 1996 Benchmark $0.112/kWh inflated at 80% of CPI

N:\RIST\LMNT\COMPREHE\So_alt2n.xls,SOCALC,11/6/97,LSO'D

Confidential

NARR 42480

Attachment 5

STANDARD OFFER AUCTION PROCESS


**Blackstone Valley Electric**
**Eastern Edison**
**EUA Service Corporation**
**Montaup Electric**
**Newport Electric**

# News Release

DATE:     November 3, 1997
RELEASE: Upon Receipt
CONTACT: Robert P. Clarke
              (508) 559-2000
              Ext. 3839

---

### Eastern Utilities Sets Nov. 14 Deadline
### For Standard Offer Bidders To Qualify

W. BRIDGEWATER, Mass., Nov. 3 — Eastern Utilities Associates (NYSE: EUA) has set a

Nov. 14 deadline for potential suppliers to submit their qualifications to bid on rights to supply

standard offer electricity to the Massachusetts and Rhode Island customers of its retail electric

utility subsidiaries, Blackstone Valley Electric, Eastern Edison and Newport Electric.

Qualification requirements, terms of the standard offer service and the auction process were

described in a "Request for Qualification" issued on Oct. 3. Power marketers, brokers and

utilities have been invited to participate in the auction.

"We are proposing a simple, straightforward auction approach for our standard offer load that

we hope will stimulate bidder participation," said Kevin A. Kirby, Power Supply Vice President.

- m o r e -

news\spot\AUCTION

*750 West Center Street   P.O. Box 543, West Bridgewater, MA 02379   508-559-2000   FAX: 508-559-8932*

Confidential

NARR 42482

In 1996, the 300,000 customers of Blackstone Valley Electric, Eastern Edison and Newport Electric used 4.5 million kilowatt-hours of electricity. Peak demand was 835 megawatts.

When retail competition begins among electricity suppliers in Massachusetts and Rhode Island, customers will have the option to choose a new energy supplier or to continue receiving power from their current utility for several years through standard offer service.

"When the Massachusetts and Rhode Island electricity markets are opened to competition, some customers may wait to choose a new generation supplier until they have a better idea of the potential savings available to them," Kirby said. "Standard offer service is designed to bridge that time period."

EUA's schedule for its standard offer auction calls for Potential bidders to submit their qualifications by Nov. 14.  EUA will notify qualified bidders by Dec. 5. The auction will be scheduled to occur shortly before the later of the two states' retail access dates. The companies will begin taking standard offer service from the auction winners when there is full retail access in both states.

Potential suppliers may receive a copy of EUA's 'Request for Qualification' by contacting:

Peter Fuller
Energy Strategy Advisor
EUA Service Corporation
Post Office Box 543
W. Bridgewater, MA 02379
    (508) 559-2000 ext. 3833
    pfuller@eua.com

- m o r e -

Confidential

NARR 42483

EUA is a diversified energy services company whose shares are traded on the New York and Pacific Stock Exchanges. Besides Blackstone Valley Electric, Eastern Edison and Newport Electric, subsidiaries include Montaup Electric Co., EUA Service Corp., EUA Cogenex Corp., EUA Energy Investment Corp., EUA Ocean State, and EUA Energy Services. Together, the companies are referred to as the EUA System. Information about EUA is available on the world wide web at *http://www.eua.com*

### 

Confidential

NARR 42484

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION

## REQUEST FOR QUALIFICATIONS
## TO BID TO SUPPLY
## STANDARD OFFER SERVICE

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting electricity suppliers for their qualifications to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Qualifications ("RFQ") must be received at the address set forth below no later than 4:00 p.m. on Friday, November 14, 1997. Responses to the RFQ must adhere to the specifications herein. Interested parties must submit five (5) copies of their responses to:

Robert P. Clarke
Director, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379

Please submit any questions concerning interpretation of the RFQ in writing to:

Peter D. Fuller
Energy Strategy Advisor
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
pfuller@eua.com

*The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall vest in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to modification by certain state and federal regulatory agencies having jurisdiction of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any regulator or court having jurisdiction, or legislation may require the Companies to modify or withdraw their plans as described herein. The Companies expressly reserve the right to modify the schedule and any provision herein to accommodate the standard offer procurement process of one or more other utilities. Furthermore, the Companies, for their convenience and in their sole discretion, may change the timetable for the actions described herein.*

Table of Contents

I.    Introduction

II.   General Description

    A.    Standard Offer Service

    B.    Market Procurement for Suppliers of Standard Offer Service

III.  Threshold Qualifications to Bid in Standard Offer Auction

    A.    Administrative Fee

    B.    Financial Qualifications

    C.    Bid Deposit

    D.    Performance Surety Commitment

    E.    NEPOOL Participation

    F.    State Registration

    G.    Proposed Changes to the Standard Offer Service Agreement

IV.   Auction Process

V.    Administrative Issues

    A.    Auction

    B.    Standard Offer Service


Appendix 1    Standard Offer Service Price Schedules

Appendix 2    Fuel Index

Appendix 3    Draft Standard Offer Service Agreement

Appendix 4    Calculation of Bid Deposit Amounts, Performance Surety Amounts, and Maximum Eligibility

Appendix 5    Form of Bid Deposit and Performance Surety Documents

Appendix 6    NEPOOL Membership Application Requirements

Confidential

## I. Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) are jointly seeking qualified parties to participate in their planned auction of Standard Offer Service obligations. Eastern, Blackstone, and Newport (collectively, "the Companies") are wholly-owned subsidiaries of Eastern Utilities Associates, a registered public utility holding company, and are cooperating on the design and implementation of a process for soliciting suppliers of Standard Offer Service. In 1996, the Companies had total retail billings of 4,420 GWh and an annual peak of approximately 835 MW.

During the transition to a competitive retail electricity marketplace, the Companies will be providing Standard Offer Service to their retail customers that have not yet chosen a competitive supplier. "Standard Offer Service" is defined as firm, all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs[1]. Standard Offer Service is a transitional service which is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace. Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. Suppliers who successfully bid in the auction will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply. Suppliers will be responsible for meeting their share of the Companies' Standard Offer Service load under the Restated NEPOOL Agreement and rules of ISO New England, Inc. or successor rules, and their responsibilities will include, without limitation the following: i) installed and operable capacity; ii) operating reserves; iii) transmission arrangements and expenses not recovered in the Companies' transmission cost adjustment provisions; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Forecasts of Standard Offer Service load are uncertain. Retail electric customers may terminate Standard Offer Service at any time to purchase electricity from an alternative supplier and, with few exceptions, may not return to Standard Offer Service. Rather than bidding to supply given quantities of capacity or energy, Qualified Bidders will bid in the auction for percentage shares of the Standard Offer Service load. At the conclusion of the auction, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time. The Companies will provide Suppliers with certain load information on a periodic basis, such as numbers of customers taking Standard Offer Service and representative load shapes for each customer class. It

---

[1] Eastern's Standard Offer Service Tariff, No. M.D.P.U 340, is currently pending before the Massachusetts Department of Public Utilities. Blackstone's and Newport's tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

1

will be the Supplier's responsibility to forecast its capacity and energy requirements to meet its Standard Offer Service responsibilities.

Each Supplier will have complete responsibility for its fixed percentage share of the Companies' real-time Standard Offer Service load (minute by minute, hour by hour, day by day). Although the quantities of energy and capacity required (MWh and MW) will fluctuate with changes in customer demand resulting from factors including, but not limited to, seasonal factors, normal daily load patterns, increased usage by existing Standard Offer customers, demand side management activities, extremes in weather, *etc.*, the Supplier's percentage of Standard Offer Service load will not vary within a calendar year.

This document provides Prospective Bidders with an overview of the qualification and auction processes, as well as the specific information necessary for a Prospective Bidder to be qualified by the Companies to participate in the auction. Section II presents a general description and approximate schedule for the implementation of the qualification and auction processes. Section III spells out the specific content and form requirements of qualification submittals. Prospective Bidders must satisfy certain financial criteria and must be recognized by the appropriate regulatory agencies to be considered Qualified Bidders. Section IV presents the design of the auction. Section V presents logistical details of the auction process and the Companies' proposed methods for administering their Standard Offer Service Agreements with Suppliers.

Several appendices are attached, including the wholesale and retail price schedules for Standard Offer Service (Appendix 1), a Fuel Index which will produce additional revenues to Suppliers in the event of high oil and gas prices after 1999 (Appendix 2), and a draft Standard Offer Service Agreement (Appendix 3). In addition, Appendix 4 presents the Companies' methodology for calculating bid deposit amounts, performance surety amounts, and Qualified Bidders' eligibility to bid in the auction. Appendix 5 presents acceptable forms of bid deposit and performance surety documents. Appendix 6 contains information regarding NEPOOL membership.

2

## II. General Description

### A. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. The Companies will solicit the competitive market for Suppliers of this service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and resell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs. To the extent that the auction of Standard Offer Service does not procure sufficient supplies to meet the Companies' full Standard Offer Service load, the Companies' affiliated power supply company, Montaup Electric Company (Montaup), or its successors or assigns, will provide service at a fixed price cap ("backstop" service).

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for forecasting energy and demand requirements and maintaining sufficient capacity entitlements to meet their obligations under the rules of ISO New England, Inc. for the full requirements of their share of Standard Offer Service load. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customers' meters. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments to Suppliers for Standard Offer Service will be based on the annual average prices shown in Appendix 1, adjusted for discounts bid in the auction and for the operation of the Fuel Index (Appendix 2), with no adjustment for time of use, load factor, or any other characteristics of the load.

### Massachusetts

Under the terms of an agreement between Eastern, Montaup, the Massachusetts Attorney General, the Massachusetts Division of Energy Resources, and other parties (Massachusetts Settlement Agreement), Eastern has agreed to provide Standard Offer Service to those of its customers who have not yet entered into power supply arrangements with competitive power suppliers, at fixed cents-per-kWh prices.[2] Eastern's Standard Offer Service will be available beginning on the Massachusetts Retail Access Date and continuing through 2004. The Massachusetts Retail Access Date is defined as the later of January 1, 1998 or the date when retail access is made available to all customers of the investor-owned utilities in Massachusetts, provided, however, in the event that retail access is not available to all customers of investor-owned utilities in Massachusetts by January 1, 1998, Eastern in its sole discretion shall have the option to accelerate the Retail Access Date and implement retail access for its customers with 90

---

[2] During the first year after the Massachusetts Retail Access Date, residential and certain small commercial customers will have the ability to return to Standard Offer Service within 90 days of first taking service from an alternative supplier.

3

days advance notice. The Massachusetts Settlement Agreement is currently pending before the Massachusetts Department of Public Utilities and the Federal Energy Regulatory Commission.

### Rhode Island

Under the Rhode Island Utility Restructuring Act of 1996, Blackstone and Newport are each required to "arrange . . . for a standard power supply offer ("Standard Offer") to customers that have not elected to enter into power supply arrangements with other nonregulated power suppliers." This service is expected to be offered beginning on the Rhode Island Retail Access Date, and must remain in place through 2009. Under a comprehensive agreement (Rhode Island Settlement Agreement) between Blackstone, Newport, Montaup, the Rhode Island Attorney General, and the Rhode Island Division of Public Utilities and Carriers, a schedule of price caps will be established for Standard Offer Service offered to retail customers of Blackstone and Newport who have not yet chosen a supplier in the competitive market. The Rhode Island Retail Access Date is defined as the later of January 1, 1998 or the date of the RIPUC's final approval of Montaup's generation divestiture methodology, provided, however, that in any event, the Rhode Island Retail Access Date shall occur no later than three months after retail access is made available to forty percent or more of the kilowatt-hour sales in New England. The Rhode Island Settlement Agreement is subject to approval by the appropriate regulatory authorities, and approval is anticipated prior to the auction.

The Companies will use the qualification and auction processes described here to procure power supplies to provide this service for the years 1998-2004. Blackstone and Newport will arrange at a later date for power supplies to provide Standard Offer Service in 2005-2009.

### B. Market Procurement for Suppliers of Standard Offer Service

In order to obtain the lowest-cost, reliable supplies of Standard Offer Service for their customers, the Companies will procure supplies for a seven-year term through a competitive auction process open to all qualified suppliers of power. The Companies will auction percentage shares of their Standard Offer Service load for each year of the seven-year term. Bids will be in the form of percentage discounts off the stipulated Supplier Rates shown in Appendix 1. Contracts to provide Standard Offer Service will be awarded to the Qualified Bidders who offer the greatest discounts.

### Procedural Schedule

Prospective Bidders who wish to be considered for certification to participate in the auction must submit their qualifications, pursuant to Section III, no later than November 14, 1997. A pre-submittal conference will be held at EUA's West Bridgewater offices on Friday, October 24, 1997, at 10 a.m., to provide Prospective Bidders with additional information on the qualification requirements, the auction process, and the administration of Standard Offer Service by the Companies. The Companies will review the submittals and will provide written notification to each Prospective Bidder of its certification to participate or its failure to qualify no later than December 5, 1997. Prospective Bidders

4

who submit satisfactory documentation of their qualifications to supply Standard Offer Service will subsequently be referred to as Qualified Bidders.

Any proposed changes to the draft Standard Offer Service Agreement (Appendix 3) must be submitted in writing along with submittals for qualification, but the Companies are under no obligation to incorporate any proposed changes into the final Agreement, which will be distributed with the Final Auction Rules.

The Companies will issue the Final Auction Rules upon execution of purchase and sale agreements for two of Montaup's primary fossil generating assets, Somerset Station and Montaup's share of the Canal 2 Unit, anticipated to occur before the end of 1997. The Final Auction Rules will contain details on the date and procedures for participating in the auction, the final form of the Standard Offer Service Agreement, and an Auction Participation Agreement.

The auction will consist of an ascending-bid auction for shares of the Companies' Standard Offer Service load for the full seven-year term. The auction will continue for multiple rounds, subject to activity rules described in Section IV and more fully specified in the Final Auction Rules. In the event that less than one hundred percent (100%) of the Standard Offer Service load is taken in the full-term auction, the Companies will conduct a supplemental, single-year auction for the remaining shares. The results of the full-term auction will not be affected by the single-year auction in any way; a winning bid in the full-term auction will not be displaced by any combination of bids in the supplemental single-year auction.

The auction is anticipated to take place approximately 30 days after the issuance of the Final Auction Rules. Standard Offer Service Agreements will be executed with winning bidders within ten (10) business days after completion of the auction. The Companies will begin taking deliveries from Suppliers under the Standard Offer Service Agreements on the later of i) the later of the Massachusetts or Rhode Island Retail Access Date, or ii) the effective date of the contracts. The Retail Access Date in both states may occur as early as January 1, 1998.

5

### III. Threshold Qualifications to Bid in Standard Offer Auction

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the auction must meet the Companies' minimum eligibility requirements as outlined below. Documentation of compliance with each item must be provided. The Companies will have final authority to determine if a respondent meets or does not meet these requirements.

#### A. Administrative Fee

Each Prospective Bidder who wishes to participate in the standard offer auction must submit a complete package documenting its qualifications, plus a non-refundable administrative fee of $1,000, to the address above no later than 4:00 p.m. on November 14, 1997. The Companies reserve the right to accept submittals after this date but are under no obligation to do so.

#### B. Financial Strength

Each Prospective Bidder wishing to participate in the auction must submit the following information to be considered for certification:

1. General Information

- The full legal name of Prospective Bidder and any Guarantor(s).
- The name and title of the authorized contact person(s), with a street address, mailing address, telephone number, facsimile number and e-mail address for each.
- A legal description of the Prospective Bidder and any Guarantor(s) (*e.g.*, corporation, joint venture, limited partnership, partnership or sole proprietorship) and state of organization or residency for each. If the Prospective Bidder or any Guarantor(s) is a corporation, include the names and titles of all officers and directors of the corporation and the names of all stockholders possessing five percent (5%) or more of the stock of the corporation. If a partnership, include the names of all general and limited partners for each.
- The date of founding and the corporate history of Prospective Bidder and any Guarantor(s).
- A description of any corporate affiliations or joint venture partnerships.

2. Financial Information

- Audited or certified financial statements, including balance sheet and statement of income and cash flow for Prospective Bidder and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.
- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.

6

- A description of any corporate affiliations or joint venture partnerships.

    3. References

- The name, title, address, and telephone number for five (5) references knowledgeable of Prospective Bidder's or any Guarantor's business practices, organization and finances.

    4. Defaults, Litigation and Penalties

- For each Prospective Bidder and any Guarantor(s) or any affiliate of each which in the past five years has been determined in writing by an arbitration panel or a court to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.

- A detailed description of any situation within the past five (5) years in which the Prospective Bidder or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations.

- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the Prospective Bidder or its Guarantor(s), or their respective officers or directors.

- A detailed description of any penalties, judgments, consent decrees, or other sanctions within the past five (5) years in any venue involving the Prospective Bidder or its Guarantor(s).

    5. Other Adverse Matters

- A detailed description of any present or anticipated facts known to the Prospective Bidder or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

    6. Authority

Prospective Bidder and its Guarantor(s) must provide a statement:

- that it has or will obtain all necessary regulatory authorizations for it to perform lawfully its obligations under each Standard Offer Service Agreement that it may enter into with the Companies;

- that the execution, delivery and performance of each Standard Offer Service Agreement will be within its lawful powers;

- that each Standard Offer Service Agreement will be duly authorized by all necessary corporate action and will not violate any of the terms and conditions in its governing documents, any contract or other agreement to which it is a party, or any law applicable to it; and

7

NARR 42493

- that each Standard Offer Service Agreement when entered into will constitute its legally valid and binding obligation enforceable in accordance with its terms.

The Companies agree that all information they receive from the Prospective Bidders and any Guarantor(s) shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the Prospective Bidder's and/or Guarantors' qualifications to bid in the auction described herein.

### C. Bid Deposit

To ensure that all bidding in the auction is the legitimate action of a serious bidder, the Companies will require a bid deposit, calculated in accordance with Appendix 4, from each Qualified Bidder prior to the auction. The amount of the bid deposit or the face amount of the Qualified Bidder's performance surety commitment, whichever is more restrictive, will establish a limit on the Qualified Bidder's eligibility to participate in the auction. A Qualified Bidder who successfully bids in the auction and fails to provide a performance surety and execute a Standard Offer Service Agreement within the terms of the Auction Participation Agreement will forfeit its entire bid deposit amount.

As part of its submittal of qualifications, a Prospective Bidder and any Guarantor(s) must provide a statement that they understand the bid deposit mechanism and that they are prepared to supply a bid deposit, in a form acceptable to the Companies, prior to execution of an Auction Participation Agreement.

### D. Performance Surety Commitment

Each Prospective Bidder or any Guarantor(s) of each Prospective Bidder must provide one of the following:

(a) A commitment letter to the Companies from a bank or banks stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the bank(s) will arrange for the issuance of performance letters of credit collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each bank proposing to issue letters of credit on behalf of a Prospective Bidder or its Guarantor(s) maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. The bank(s) shall specify the face amount of letters of credit each can arrange and the periods in which they can be outstanding. The bank(s) shall affirm that, upon completion of the auction, they will be prepared to issue such letter(s) of credit to the Companies within ten (10) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

8

NARR 42494

# Tab 38-2

(b) A commitment letter to the Companies from a surety company or companies stating that prior to each year in which the Prospective Bidder proposes to provide Standard Offer Service, the surety company or companies will arrange for the issuance of performance bonds collectively in an aggregate amount sufficient to secure the Prospective Bidder's full remaining Standard Offer Service obligations in accordance with Article 7 of the Standard Offer Service Agreement. Eligibility to bid in the auction will be based on the aggregate amount of a Prospective Bidder's commitment letters, as described in Appendix 4. It is required that each surety company proposing to issue performance bonds on behalf of said Prospective Bidder or its Guarantor(s) maintain a rating of "B+" or better from A.M. Best Company. The surety company or companies shall specify the face amount of performance bonds each can arrange and the periods in which they can be outstanding. The surety company or companies shall affirm that, upon completion of the auction, they will be prepared to issue such performance bonds to the Companies within ten (10) business days in amounts sufficient to support said Prospective Bidder's winning bid(s); or

(c) Such other financial assurances as the Companies, in their sole discretion, deem appropriate to secure all of a Prospective Bidder's or its Guarantor(s)' obligations to the Companies, including those arising from participation in the auction and those contained in the Standard Offer Service Agreement.

All performance letters of credit or performance bonds shall be issued in substantially the forms given in Appendix 5.

The face amount of the performance letters of credit or performance bonds specified in such a commitment letter or the value of such other acceptable financial assurances provided will be used, as will the required bid deposits, to determine the Prospective Bidder's maximum eligibility to bid in the auction as described in Appendix 4.

### E. NEPOOL Participation

To participate in the Standard Offer Service auction, a Prospective Bidder must be a member in good standing of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England, Inc. billing system. As an alternative to being a member, the Prospective Bidder may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the Prospective Bidder's proposed commitment to provide Standard Offer Service or for such period until the Prospective Bidder becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the Prospective Bidder in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the Prospective Bidder's submittal of qualifications.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement.

9

Confidential

The requirements for becoming a NEPOOL participant are included in Appendix 6. For new members, it is recommended that the NEPOOL Membership Committee be contacted as early as possible because the application process, including Federal Energy Regulatory Commission (FERC) approval, may take several months.

### F. State Registration

To participate in the auction, each Prospective Bidder must provide documentation that it is registered with the Rhode Island Division of Public Utilities and Carriers as a Non-Regulated Power Producer and must provide documentation that it has complied with the Massachusetts Department of Public Utilities' registration requirements for . competitive suppliers then in effect, if any.

### G. Proposed Modifications of the Draft Standard Offer Service Requirements Agreement

At the completion of the auction, each successful bidder will be required to sign the Companies' Standard Offer Service Agreement, without modification, within ten (10) business days. To accommodate this schedule, Prospective Bidders are requested to review the draft Agreement attached as Appendix 3 and to provide any comments, exceptions, or proposed changes as part of their submittal of qualifications.

The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement. The final Standard Offer Service Agreement will be provided to all Qualified Bidders with the Final Auction Rules and the Auction Participation Agreement. By executing the Auction Participation Agreement, Qualified Bidders will agree to the terms in the final Standard Offer Service Agreement and to execute the Agreement, without modification, if they are successful in the auction.

10

#### IV. Auction Process

To be auctioned are 100 shares of the Standard Offer Service load for each year. Each share represents one percent of the Companies' aggregated Standard Offer Service load. These shares will be sold in an ascending-clock auction. In each round, Qualified Bidders will bid the number of shares they desire at the discount specified on the auction "clock". If more than 100 shares are bid, then the discount is increased by a clock increment and Qualified Bidders indicate the number of shares they desire at the new, higher discount. The auction ends when fewer than 100 shares are bid on at the specified discount. Before the auction, Qualified Bidders will provide a bid deposit, which, along with the face amount of the Qualified Bidder's performance surety commitment, will determine the maximum number of shares they are eligible to bid on.

The auction may actually consist of two auctions conducted in sequence. First, a full-term auction will be held. Bids in the full-term auction will be for a specified number of shares of Standard Offer Service load across all seven years, 1998 through 2004. At the conclusion of the full-term auction, if there are remaining shares that did not sell, a single-year auction will be held. In the single-year auction, bids are for shares in a specified year. Each Qualified Bidder's initial eligibility in the single-year auction will be its initial eligibility in the full-term auction less its winnings in the full-term auction.

The rules for the full-term and the single-year auctions are nearly identical. We begin with a description of the full-term auction and then point out the differences in the single-year auction.

#### A. The Full-Term Auction

In the initial round, each Qualified Bidder submits a bid indicating the number of shares it desires at a discount of 0% off the stipulated Supplier Rates (see Appendix 1). If the total shares bid is less than or equal to 100, then the auction ends with each bidder winning the number of shares it bid at the 0% discount. If the total shares bid exceeds 100, then the discount is raised by one clock increment and a new round begins. In each round, each Qualified Bidder bids the number of shares it desires at the specified discount. If the total shares bid is greater than 100, then the discount is increased by another clock increment and the process repeats. If the total shares bid is less than or equal to 100, then each bidder wins the shares bid at the specified discount. If the total shares bid is less than 100, then the Rationing Rule is invoked to assign the remaining shares.

*Rationing Rule*: Any remaining shares not awarded at the highest clock discount are awarded to the Qualified Bidders that reduced their bids in the final round. The Qualified Bidder that reduced its shares bid by the smallest amount (in percentage terms) is awarded additional shares, at the previous round's clock discount, up to the total amount of its reduction from the previous round. If needed, additional shares will be awarded to other Qualified Bidders in ascending order of their percentage reductions from the previous rounds. In the event of two or more Qualified Bidders with identical percentage reductions, the smaller absolute reduction will be favored. This rationing mechanism

11

ensures that shares not bid at the highest clock discount are awarded at the next highest discount.

*Activity Rule*: The shares bid in any round cannot exceed the bidder's eligibility. Eligibility is initially determined by the bidder's bid deposit and its available performance surety. If a bidder bids less than its full eligibility in any round, its eligibility is permanently reduced to the shares bid. Hence, a bidder can only hold its shares bid at a constant level or decrease the number as the discount increases.

Each bid is binding and remains in force until it is accepted or rejected by the Companies at the conclusion of the auction. Each successful Qualified Bidder is required to execute a Standard Offer Service Agreement. Upon execution of Standard Offer Service Agreements for 100 shares, the remaining bids are rejected.

*The table below gives an example of an ascending-clock auction. At a discount of 0%, 200 shares are bid. Hence, the "clock" increases by one increment to 1%. The total shares bid drops to 160 at a 1% discount. The process continues until the total shares bid is less than 100 (round 7). At this point, the auction ends. Ninety-seven shares are awarded to Qualified Bidders at a 4.5% discount. The remaining three shares are awarded, at a 4% discount, to the Qualified Bidders that reduced their bids in round 7 by the smallest percentage relative to their bids in round 6.*

| Round | Discount | Total Shares Bid |
|-------|----------|------------------|
| 1 | 0% | 200 |
| 2 | 1% | 160 |
| 3 | 2% | 135 |
| 4 | 3% | 115 |
| 5 | 3.5% | 108 |
| 6 | 4% | 101 |
| 7 | 4.5% | 97 |

*The Rationing Rule would operate as shown in the table below for this example. Qualified Bidder A would be awarded two shares at a 4% discount, and Qualified Bidder B would be awarded one.*

| Bidder | Round 6 Shares Bid | Round 7 Shares Bid | % Decrease | Absolute Decrease | Shares Awarded |
|--------|--------------------|--------------------|------------|-------------------|----------------|
| A | 20 | 18 | 10% | 2 | 2 |
| B | 10 | 8 | 20% | 2 | 1 |
| C | 50 | 50 | - | - | - |
| D | 21 | 21 | - | - | - |
|   | 101 | 97 | | | |

12

Confidential

*The total shares awarded would be as shown in the following table.*

| Bidder | Shares | Discount |
|--------|--------|----------|
| A | 18 | 4.5% |
|  | 2 | 4.0% |
| B | 8 | 4.5% |
|  | 1 | 4.0% |
| C | 50 | 4.5% |
| D | 21 | 4.5% |
|  | 100 | |

## B.  The Single-Year Auction

If Standard Offer Service Agreements for less than 100 shares are executed after the full-term auction, the remaining shares will be sold in a single-year auction. Rather than having a single discount across all years, as in the full-term auction, there is a separate discount or "clock" for each of the seven years. Also, since the bid deposit and performance surety amounts required to be eligible to bid vary over the seven years, eligibility in the single-year auction is expressed in dollars rather than in percent shares.

Qualified Bidders may bid on any one or more years, and may bid for different shares and at different discounts in each year.  The shares bid in any round cannot exceed the Qualified Bidder's eligibility. A Qualified Bidder's initial eligibility in the single-year auction reflects its initial eligibility in the full-term auction less any shares won in the full-term auction. The activity rule in the single-year auction permits Qualified Bidders to increase the shares bid during the first four rounds.

*Activity Rule*: A Qualified Bidder must submit bids totaling at least 25% of its initial eligibility in the first round of the single-year auction, 50% in the second round, 75% in the third round, and 100% in the fourth round. Failure to meet or exceed these activity levels will result in a corresponding reduction in eligibility. *For example, if a Qualified Bidder has eligibility equivalent to $900,000 of bid deposit, but only bids on the equivalent of $180,000 of shares in the first round, then its eligibility is reduced by $55,000 ($900,000 x 25% = $225,000; $225,000 - $180,000 = $55,000).* After the fourth round, if a bidder bids less than its eligibility, then in all subsequent rounds its eligibility is limited to the shares bid in the prior round. Hence, a bidder can increase its shares bid only in the first four rounds.

## C.  Initial Discounts and Clock Increments

The initial discount is 0%. In subsequent rounds, the discount is increased by the clock increment. The clock increment will likely change as the auction progresses and will be stated before each round of bidding.  In the single-year auction, different years may have different clock increments. Typically, the increments decrease later in the auction.

13

### V. Administrative Issues

#### A. Auction

1. Auction Participation Agreement

Participation in the auction will be governed by an Auction Participation Agreement and the terms of the Final Auction Rules. Qualified Bidders will be required to execute an Auction Participation Agreement, affirming their commitment to i) abide by the rules of the auction as stated in the Final Auction Rules, ii) abide by any decisions of the auctioneer[3], and iii) if successful in the auction, provide the requisite performance surety documents and execute a Standard Offer Service Agreement within ten (10) business days after the conclusion of the auction.

2. Bid Deposit

At least ten (10) business days prior to the commencement of the auction, each Qualified Bidder or its Guarantor(s) shall deliver to the Companies a bid deposit proportional to the percentage share of Standard Offer Service load that the Qualified Bidder proposes to bid on. The bid deposit will be determined in accordance with a formula generally as provided in Appendix 4. The bid deposit shall be provided in one of the following forms:

- Qualified Bidder's or its Guarantor's certified check payable to the Companies;

- a bank check drawn on a financial institution acceptable to the Companies;

- funds electronically transferred to the account of the Companies in accordance with the following instructions:

> Fleet Bank
> ABA # 011-000-206
> For Credit to: Eastern Edison Company
>                Blackstone Valley Electric Company
>                Newport Electric Corporation
> A/C # xxxxxxxxxxxxx
> Ref: (Bidder/Guarantor Name) Bid Deposit; or

- a performance letter of credit or performance bond issued by a bank or surety company which satisfies the rating criteria established in Section III.B(a) and (b), respectively. Each performance letter of credit or bond will be required to be in substantially the form given in Appendix 5.

As a condition of the auction, the Companies will not accept any bid for which the Qualified Bidder or its Guarantor(s) has not previously provided the required amount of

---

[3] The Companies may act as auctioneer, or may hire an independent entity with particular auction expertise.

14

bid deposit.

### 3. Maximum Eligibility

A Qualified Bidder's maximum eligibility to bid in the auction will be based on whichever of the following two measures results in the lower eligibility:

i) the face amount of a performance bond or equivalent surety for which the Qualified Bidder provides a commitment letter, as outlined in Section III.D; or
ii) the amount of the bid deposit.

Eligibility, in terms of shares of Standard Offer Service load, will be governed by the relationships presented in Appendix 4. At least five (5) business days prior to the start of the full-term auction, the Companies will certify in writing each Qualified Bidder's maximum eligibility to bid in the full-term auction.

### 4. Bid Deposit Refunds/Credits:

Bid deposits will be refunded in accordance with the Prospective Bidder's or Guarantor's direction in one of the following manners:

- For bids selected by the Companies:

    Cash deposits will be fully refundable, with interest, one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor; or

    Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' receipt of the required performance surety securing the aggregate shares of Standard Offer Service load the Supplier has secured as a result of the auction and an executed Standard Offer Service Agreement therefor.

- For bids which are not selected by the Companies:

Cash deposits will be fully refundable, with interest, one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid; or

Bid deposits in the form of a performance letter of credit or performance bond will be returned one business day following the Companies' notice to the Qualified Bidder or Guarantor(s) of the Companies' rejection of said bid.

If a successful Qualified Bidder or its Guarantor(s) fails to honor its bid by providing the required performance surety and executing a Standard Offer Service Agreement within ten (10) business days of completion of the auction, the entire bid deposit amount will be forfeited. The next bidder(s) whose aggregate shares would bring the total shares to exactly 100 will then be considered winning bidders and will be

15

NARR 42501

required to provide performance sureties and to execute Standard Offer Service Agreement within ten (10) business days of notification.

Cash deposits will be eligible for earnings at a rate of three percent (3%) per annum commencing with the business day that said funds become fully available to the Companies and continuing through the business day that the Companies issue a refund. All refunds will be in the form of a Company check payable to the Qualified Bidder or its Guarantor(s) with accrued interest.

### B. Standard Offer Service

1. Performance Surety

Within ten (10) business days of the completion of the auction, and as a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Bidder will be required to deliver to the Companies a performance surety securing the Qualified Bidder's full responsibility for Standard Offer Service load over the seven-year term.

Acceptable forms of surety include a performance letter of credit or a performance bond, in substantially the form as provided in Appendix 5. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. Each surety company or companies issuing a performance bond must maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Agreement. Performance letters of credit or bonds, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and shall be renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

Failure to provide the performance surety within ten (10) business days after the completion of the auction will disqualify the Qualified Bidder and will result in forfeiture of its entire bid deposit. Failure to maintain such surety in good standing after execution of the Standard Offer Service Agreement will be considered an event of default and the Companies will exercise their rights under the Agreement accordingly.

2. Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England, Inc. each Supplier's hourly share of the aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a

16

NARR 42502

proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the MDPU and RIPUC, summarized as follows:

-Energy and demand for each retail account will be estimated for each hour using a combination of inputs including weather and load data from the EUA Supervisory Control and Data Acquisition (SCADA) system, sample meter data, historical load shapes, and individual customer usage ratios.

-The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.

-The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.

-Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.

-The hourly Standard Offer loads, including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.

-The daily load information will be transferred to ISO New England, Inc. for inclusion in each Supplier's own-load dispatch (or such other settlement process developed by NEPOOL or ISO New England, Inc.).

The Terms and Conditions for Suppliers may be revised, amended, supplemented, or supplanted in whole or in part from time to time by state regulatory agencies or by law.

3. Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

Suppliers will receive daily reports of their estimated hourly Standard Offer Service loads, and monthly reports of the number of customers in each rate class taking Standard Offer Service along with representative customer load shapes for each rate class. The Companies will also provide, on an annual basis, estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for the prior twelve months and a forecast of Standard Offer Service peak and energy demands for the upcoming twelve months, assuming no incremental migration of customers to competitive suppliers.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies receive customer notifications of

Confidential

NARR 42503

significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts. Suppliers are advised to rely on their own projections of load and market dynamics.

4. Minimum Load Obligations

Over time, it is expected that Standard Offer Service load will decline, and thus the actual energy and demand responsibilities (in MW and MWh) associated with a given percentage of the load will decline as well. The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater. If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

5. Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement. The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, etc.

18

Confidential

**APPENDIX 1**
**STANDARD OFFER SERVICE PRICE SCHEDULES**

Confidential

The Customer Rate for retail customers who elect Standard Offer Service by choice or inaction will be based on the following predetermined schedules of prices for energy consumed, as described in the applicable retail Standard Offer Service tariffs. The rate for customers of Eastern is subject to adjustment only for the operation of the Fuel Index. Rates charged to customers of Blackstone and Newport [will be determined].

| Calendar Year | Price per Kilowatt hour | |
| --- | --- | --- |
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | |
| 1999 | 3.1 cents | TO BE |
| 2000 | 3.4 cents | DETERMINED |
| 2001 | 3.8 cents | |
| 2002 | 4.2 cents | |
| 2003 | 4.7 cents | |
| 2004 | 5.1 cents | |

The Supplier Rate defines the price cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement. Prices apply to energy as measured at the retail customers' meters.

| Calendar Year | Price per Kilowatt hour |
| --- | --- |
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Supplier Rates, reduced by the applicable Discounts offered in the Companies' auction. Additional revenues to Suppliers may be realized through the operation of the Fuel Index.

1-1

Confidential

**APPENDIX 2**

**FUEL INDEX**

Confidential

The Companies will incorporate a Fuel Adjustment mechanism in their respective retail Standard Offer Service tariffs which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulfur) and natural gas after 1999. This fuel adjustment mechanism is subject to continued regulatory supervision and approval which allows the Companies to collect such revenues from their retail customers taking Standard Offer Service. The formula and indices used for calculating such revenues are also subject to regulatory change.

Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels. The Companies' retail Standard Offer Service tariffs are not yet finalized, and will likely differ between Massachusetts and Rhode Island. The actual Fuel Adjustment mechanism will vary in accordance with the differing retail terms in the two states, but will operate substantially in the manner described below:

The retail Standard Offer rate in effect for a given month is multiplied by a "Fuel Adjustment Multiplier" that is set equal to 1.0 and thus has no impact unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

The benchmark rates for retail Standard Offer Service are based on the following predetermined average annual flat rates for energy consumed:

| Calendar Year | Annual Company Average Price per Kilowatt hour | |
| --- | --- | --- |
| | Eastern | Blackstone, Newport |
| 1998 | 2.8 cents | |
| 1999 | 3.1 cents | TO BE |
| 2000 | 3.4 cents | DETERMINED |
| 2001 | 3.8 cents | |
| 2002 | 4.2 cents | |
| 2003 | 4.7 cents | |
| 2004 | 5.1 cents | |

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in *The Wall Street Journal*, expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

2 -1

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No.6 oil into New York harbor, as reported in *Platt's Oilgram U.S. Marketscan* in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies for approval. Upon regulatory approval, such indices will be used for calculating Fuel Adjustment revenues in accordance with the order(s) and shall be incorporated into the terms of the retail Standard Offer Service tariffs.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment Multiplier for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment Multiplier} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + \$0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where:   Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment Multiplier would be:*

$$\frac{(\$3.50+\$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate is increased by this Fuel Adjustment Multiplier for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

The incremental revenues attributable to the Customer Rate Fuel Adjustment mechanism will be allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier in the applicable billing month, pursuant to Article 5 of the Standard Offer Service Agreement.

Confidential

NARR 42509

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment Multiplier determined.

2-3

Confidential

NARR 42510

**APPENDIX 3**

**DRAFT STANDARD OFFER
SERVICE AGREEMENT**

Appendix 3   Standard Offer Service Agreement

DRAFT

Standard Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

_____



Dated _____

10/2/97 Draft

Confidential

NARR 42512

## TABLE OF CONTENTS

Page

ARTICLE 1.    Definitions . . . . . . . . . . . . . . .    1

ARTICLE 2.    Term . . . . . . . . . . . . . . . . . . .    3

ARTICLE 3.    Supplier Responsibilities . . . . . . . .    3

ARTICLE 4.    Estimation of Hourly Loads and Reporting to
              the ISO . . . . . . . . . . . . . . . . .    4

ARTICLE 5.    Price . . . . . . . . . . . . . . . . . .    5

ARTICLE 6.    Billing and Payments . . . . . . . . . .    6

ARTICLE 7.    Security Provisions . . . . . . . . . . .    6

ARTICLE 8.    Events of Default, Liability, Relationship of
              the Companies . . . . . . . . . . . . . .    7

ARTICLE 9.    Termination . . . . . . . . . . . . . . .    8

ARTICLE 10.   Force Majeure . . . . . . . . . . . . . .    9

ARTICLE 11.   Assignment . . . . . . . . . . . . . . .    10

ARTICLE 12.   Successors and Assigns . . . . . . . . .   10

ARTICLE 13.   Resolution of Disputes . . . . . . . . .   10

ARTICLE 14.   Interpretation . . . . . . . . . . . . .   12

ARTICLE 15.   Severability of Provisions . . . . . . .   12

ARTICLE 16.   Auditors and Records . . . . . . . . . .   12

ARTICLE 17.   Limitations on Liability and Indemnification .  12

ARTICLE 18.   Regulation . . . . . . . . . . . . . . .   13

ARTICLE 19.   Notices . . . . . . . . . . . . . . . . .   14

ARTICLE 20.   Miscellaneous . . . . . . . . . . . . . .   14

Appendix A Schedule of Supplier's Share of Offer Service and
Delivered Energy Price

I

STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this _____ day of _____ _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and _____

_____
_____
_____
_____, ("Supplier"), on the other hand.

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, and Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any action by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1.      Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Bid Price" shall mean the Standard Offer Wholesale Price in each calendar year multiplied by the Supplier's Discount in the same calendar year as shown in Appendix A.

"Commencement Date of Service" shall mean 12:01 A.M. on _____.

1

Confidential

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"Discount" shall mean the percentage discount off the Standard Offer Wholesale Price of electricity, which discount is offered by Supplier for a given Contract Year as determined through the Company's Standard Offer auction.

"D.P.U." shall mean the Massachusetts Department of Public Utilities.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NYMEX Contract" shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub.

"NEPOOL" shall mean the New England Power Pool or its successors.

"Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time of use, seasonality, or any other factor except as specified in Article 5 and Appendix B.  The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

2

NARR 42515

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the R.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.P.U., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.P.U. or as otherwise provided by law.

ARTICLE 2.    Term:

The term of this Agreement shall begin on the Commencement Date of Service and end on 12____ p.m. _____, unless terminated in accordance with Article 8 or 9.

ARTICLE 3.    Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power

3

support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission link, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the ISO system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

ARTICLE 4    Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.P.U., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer

4

NARR 42517

Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers.  The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.    Price:

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price + Fuel Adjustment Factor

where:    Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor in cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail rate Fuel Adjustment mechanism in the Companies Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Suppliers will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which is required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

5

                    NARR 42518

ARTICLE 6.    <u>Billing and Payments</u>:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers, or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for the dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 15 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment.

ARTICLE 7.    <u>Security Provisions</u>:

As a condition of this Agreement and upon execution hereof, Supplier shall deliver to the Companies a financial surety to Supplier's performance under this Agreement.

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n) = SF \times STDL(n-1) \times \{ \ (PSTD(n) \times TD(n)) $$
$$+ (PSTD(n+1) \times TD(n+1))$$
$$+ (PSTD(n+2) \times TD(n+2)) + \ldots\ldots +$$
$$+ (PSTD(2004) \times TD(2004)) \ \}$$

6

Where:

SD(n)      is the Security Deposit in Contract Year (n)

SF         is the Security Fee equal to $10.00/MWh

STDL(n-1)  is the aggregate load of those customers
           taking Standard Offer Service in the previous
           Contract Year (n-1), expressed in MWh.  In
           1997, STDL shall be 4,500,000 MWh.

PSTD(n)    is the percentage share of Standard Offer
           Service load that the Supplier has committed
           to provide in Contract Year (n).

TD(n)      is the Transition Discount in Contract Year
           (n), calculated as follows:

           TD(n)   =1.00
           TD(n+1) =(7-1)/7 = 0.857
           TD(n+2) =(7-2)/7 = 0.714
           TD(n+3) =(7-3)/7 = 0.571
           TD(n+4) =(7-4)/7 = 0.429
           TD(n+5) =(7-5)/7 = 0.286
           TD(n+6) =(7-6)/7 = 0.143

    To secure the above amounts, Supplier shall provide a letter
of credit or performance bond in a form acceptable to Company.
The bank issuing such letter of credit on behalf of a Supplier
must maintain a long-term debt rating of "A" or better from
Standard and Poor's Rating Services or Moody's Investors Service.
If a performance bond is provided it is required that each surety
company issuing such performance bond on behalf of a Supplier
must maintain a rating of "B" or better from A.M. Best Company.

    The performance Letter of Credit or Bond, if not issued for
the full term of the Supplier's Standard Offer Service
obligation, shall be renewed on an annual basis or replaced and
superseded by a like kind of surety at least thirty (30) days
prior to the expiration of such prior surety on a continuing
basis to the termination of this Agreement or until Supplier's
share of Standard Offer Service load is zero. The amount of such
financial security may be amended on an annual basis to reflect
the security amount calculated pursuant to this Article 7 for the
remaining term of this Agreement.

Article 8.    Events of Default, Liability, Relationship of the
              Companies:

    (1)  With the exception of Force Majeure described in
Article 10, each of the following events shall be deemed to be an
Event of Default hereunder:

7

Confidential

NARR 42520

(a)  Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)  Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c)  Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days after notice thereof from the Companies.

(2)  Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default.  In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint.  Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3)  Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security Amounts calculated pursuant to Article 7 and regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the financial surety used to secure such amounts. The Parties expressly agree that the amounts set forth in the financial surety documents do not constitute liquidated damages.  In addition to the financial surety amounts, the Supplier shall be liable to the Companies for any direct damages resulting from an Event of Default, including replacement power costs incremental to the Bid Price. The Companies may pursue any remedies or other damages provided for under law, including indirect, consequential, reliance and incidental damages, and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9.    <u>Termination</u>:

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

8

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier.

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide financial surety to the Companies pursuant to Article 7 shall be terminated.

ARTICLE 10.    Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or any limitation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event directly and adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

Any event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area or affects the availability or cost of operating any generating unit or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a) the non-performing Party promptly, but in no case later than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b) The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

9

Confidential

(c)  The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d)  The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 11.    Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (I) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer incident to a merger or consolidation with, or transfer of (all or substantially all) of the assets of the transferor to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 12.    Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 13.    Resolution of Disputes:

Subject to Section 4 of Article 8, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as applicable. The Parties agree that such informal discussion be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks.  In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such

10

NARR 42523

other period as the Companies and the Supplier may jointly agree
upon, such dispute may be submitted to arbitration and resolved
in accordance with the arbitration procedure set forth herein if
the Companies and Supplier jointly agree to submit it to
arbitration.  Nothing in this Article 13 shall prevent the
Companies from issuing, pursuant to Sections 1(a) and © of
Article 8, notice of failure to comply with, observe or perform
this Agreement or to maintain any of the security requirements
under Article 7 to Supplier, and upon failure to cure or rectify
by Supplier, exercise their rights under the financial surety.
Supplier, however, may dispute the exercise by the Companies of
their rights under the financial surety, under this Article 13,
after such exercise.

    The arbitration shall be conducted before a single neutral
arbitrator or arbitrator panel appointed by the Parties.  If the
Parties agree upon a single arbitrator within ten (10) days of
the referral of the dispute to arbitration, that arbitrator shall
serve, otherwise the Companies and Supplier shall each choose one
arbitrator, who shall serve on a three-member arbitration panel.
The two arbitrators so chosen shall within twenty (20) days
select a third arbitrator to act as chairman of the arbitration
panel. If the two arbitrators are unable to select a third
arbitrator, each arbitrator shall select three candidates.  A
list of the six candidates, along with their resumes, shall be
provided in alphabetical order, with an indication of the
arbitrator who selected such candidate to the Party who selected
the arbitrator who selected such candidate to the American
Arbitration Association ("AAA"), who will select one candidate.
If that candidate is unable or unwilling to serve, AAA shall
select another candidate.  This process will be repeated until a
third arbitrator is selected or the list of candidates is
exhausted.  If the list of candidates is exhausted, the
arbitrators shall submit a new list of candidates and the process
set forth above shall be repeated a second time. In all cases,
the arbitrator(s) shall be knowledgeable in electric utility
matters, including electricity transmission and bulk power
issues, and shall not have any current or past substantial
business or financial relationships with any Party to the
arbitration or any affiliate of such Party.

    Except as otherwise provided herein, the arbitrator(s),
shall generally conduct the arbitration in accordance with the
Commercial Arbitration Rules of the American Arbitration
Association.  There shall be no formal discovery conducted in
connection with the arbitration, except as specifically
authorized by a vote of the panel.  The Parties shall exchange
witness lists and copies of any exhibits that they intend to
use in their direct presentations at any hearing before the
arbitrator(s) at least ten (10) days prior to such hearing, along
with any other information or documents specifically requested by
the arbitrator(s) prior to the hearing.  Unless otherwise agreed,
the arbitrator(s) shall render a decision within ninety (90) days
of his, her, or their appointment and shall notify the Parties in
writing of such decision and the reasons therefor, and shall make
an award apportioning the payment of the costs and expenses of
arbitration, including panel costs, among the Parties, provided,
however, that each Party shall bear the costs and expenses of its

Confidential

NARR 42524

own attorneys, expert witnesses and consultants.  The
arbitrator(s) shall be authorized only to interpret and apply the
provisions of this Agreement and shall have no power to amend or
modify this Agreement in any manner.  The decision of the
arbitrator(s) shall be final and binding upon the Parties, and
judgment on the award may be entered in any court having
jurisdiction.  The decision of the arbitrator(s) may be appealed
solely on the grounds that the conduct of the arbitrator(s), or
the decision itself, violated the standards required under the
Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The
Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c.
251, § 1 et seq.).

ARTICLE 14.    Interpretation:

     The interpretation and performance of this Agreement shall
be in accordance with and shall be controlled by the laws of the
Commonwealth of Massachusetts, without regard to Massachusetts
conflict of law principles.

ARTICLE 15.    Severability of Provisions:

     Subject to the provisions of Article 14 above, a holding by
any court having jurisdiction that any provision of this
Agreement is invalid or unenforceable shall not result in
invalidation or unenforceability of the entire Agreement but all
remaining terms shall remain in full force and effect.

ARTICLE 16.    Accounts and Records:

     The Companies and Supplier shall keep complete and accurate
records of their transactions hereunder and shall maintain such
data for a period of at least two (2) years after final billing.
The Companies and Supplier shall have the right, during normal
business hours to examine and inspect all such records insofar
as may be necessary for the purpose of ascertaining the
reasonableness and accuracy of all relevant data, estimates or
statement of charges associated with service hereunder.

ARTICLE 17.    Limitations on Liability and Indemnification:

     Each Party agrees to indemnify, defend, and hold the other
Party (including the other Party's affiliated companies,
trustees, directors, board members, officers, employees, and
agents) harmless from and against any and all third party
damages, costs, claims, liabilities, actions or proceedings
arising from or claimed to have arisen from the negligent acts or
omissions of the indemnifying Party's employees or agents.

     The Parties hereby waive and release the other Party as well
as the other Party's affiliated companies, trustees, directors,
officers, employees, and agents from any liability, claim, or
action arising from damage to its property due to the performance
of this Agreement.

12

Confidential

ARTICLE 18.    Regulation:

(a)  This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)  This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules").  If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule.  If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 19.    Notices:

Any notice, demand or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Commonwealth:
Director of Power Supply
EUA Service Corporation
P. O. Box
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

13

Confidential

NARR 42526

ARTICLE 20.    <u>Miscellaneous</u>:

(a)  Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)  Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)  Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)  This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)  Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)  Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:                SUPPLIER'S NAME

                         By:_____

On Behalf of the Companies:

    Blackstone:          BLACKSTONE VALLEY ELECTRIC COMPANY

                         By:_____

    Eastern:             EASTERN EDISON COMPANY

                         By:_____

    Newport:             NEWPORT ELECTRIC CORPORATION

                         By:_____

14

Confidential

NARR 42527

APPENDIX A

SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY
AND
PRICE

| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 cents/kWh | | |
| 1999 | | 3.5 cents/kWh | | |
| 2000 | | 3.8 cents/kWh | | |
| 2001 | | 3.8 cents/kWh | | |
| 2002 | | 4.2 cents/kWh | | |
| 2003 | | 4.7 cents/kWh | | |
| 2004 | | 5.1 cents/kWh | | |



Confidential

# Tab 39



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653


Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-1    Please state or provide an estimate of the value of BVE's and Newport's
                   residual credit, in $ and $/kWh, for the years 1998-2009.

Reply:     The Companies have not made an estimate of the value of their respective residual
           value credit.  Until the EUA System generation assets are sold, a reasonable estimate
           of this value cannot be made.


Q:\RJ\2651\DATA\ENRON\ECTFAX.WPD

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-2     Please describe BVE's and Newport's two Standard Offer pricing options
referred to as the Initial Proposal and the Alternate Proposal-As Filed on
page 3 of the November 7, 1997 letter to Ms. Massaro.

Reply:     Blackstone and Newport have not proposed two Standard Offer pricing options in
their November 7, 1997 filing. Rather Blackstone and Newport have proposed only
one Standard Offer pricing option, namely the option designated as "Alternate
Proposed-As Filed" on page 3 of the Companies' November 7, 1997, filing letter.
The proposal designated "Initial Proposal" on the same letter was evaluated and found
to be unsatisfactory because of adverse customer impacts. See Reply to TECRI-1-6.
Thereafter, the Initial Proposal was used only as a benchmark for comparison
purposes with the Companies' Alternate Proposal-As Filed. Both options are
described on page 3 of the Companies' November 7, 1997, filing letter.

In addition to the description provided on page 3 of the Tariff Advice Letter, the
Companies have provided supportive comments concerning the "Alternate Proposal-
As Filed" Standard Offer in response to ECT-1-13.

Q:\RJ2651DATA\ENRON\ECTFAX.WPD

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:    ECT-1-3    (a)    Please discuss the implications for the marketplace if the Commission adopts the Initial Proposal for BVE and Newport customers?

(b)    Please discuss the implications for the marketplace if the Commission adopts the Alternate Proposal-As Filed for BVE and Newport customers?

In responding to this question, for each pricing plan please discuss at least the following: the likelihood that customers will select alternate suppliers; which customer classes would be more likely to select alternate suppliers; whether and at what pace selection of alternate suppliers would increase over the twelve-year Standard Offer period; and the likelihood that alternate suppliers will enter the Rhode Island marketplace.

Reply:    (a) and (b)    Standard Offer Service under either pricing option is a transitional service that is not intended to be directly competitive with other market alternatives, or necessarily to reflect market prices. Rather, it provides that all retail customers have service at the outset of the transition. Under either pricing option Standard Offer Service will have a fixed price stream against which customers can evaluate the options available to them. The annual increase to the price of Standard Offer Service will be the motivating factor that will encourage customers to seek lower prices for energy services in the competitive market. Likewise, the competitive market is advantaged by knowing how the Standard Offer Service prices will change. What no one knows today, with any great certainty, is what market prices will be in the future and how customers will respond to such price signals.

The Companies have not performed any attrition studies of how customers will respond to either Standard Offer Service pricing option nor do the Companies have any knowledge of the pace of attrition of customers from Standard Offer Service to alternate suppliers or the likelihood that alternate suppliers will enter the Rhode Island marketplace.

In addition, please refer to the Companies' response to TECRI-1-2.

Q:\RI2651DATA\ENRON\ECTFAX.WPD

**NARR 05243**

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-4      Will any customers in each of the rate classes for both BVE and Newport
                     see bill increases under either the Initial Proposal or Alternate Proposal - As
                     Filed pricing options in 1998? If yes, please provide the number of
                     customers that will receive an increase and the percentage increase. Please
                     answer the same question for 1999 and 2000.

Reply:   Yes, some customers in the following Newport rate classes will experience bill
         increases in 1998 under the Initial Proposal: Rates G-2, G-5, T-2, T-4, T-5, and T-6.
         See Reply to TECRI-1-6.  No quantification of the number of customers so affected
         was performed.  No determination of bill increases nor quantification of the number
         of customers affected was performed for 1999 and 2000.

Q:\RUI2651DATA\ENRON\ECTFAX.WPD

NARR 05244

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-5      Does BVE and Newport have any provision in its access charge for
                     maintaining a discounted rate to low income users?

Reply:   In designing the low income rate R-2, the Companies maintained the same level of
         discount by adjusting the Distribution Charges.  The Access Charge has not been
         discounted and is the same for all customers.

Q:\RI\2651DATA\ENRON\ECTFAX.WPD

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:    ECT-1-7    Will Montaup Electric Company provide backstop service to both BVE and
Newport? For what time period will Montaup provide this service?

Reply:    Yes, Montaup Electric Company will provide Standard Offer backstop service to both
BVE and NEC. That commitment is contained in a wholesale rate settlement
submitted to the Federal Energy Regulatory Commission on October 29, 1997 in
Docket No. ER97-2800-000. Article 5.0 of the Stipulation and Agreement provides
that Montaup Electric Company shall provide Blackstone and Newport with Standard
Offer Service through the year 2009.

Q:\RJ2651DATA\ENRONECTFAX.WPD

NARR 05246

BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:    ECT-1-8        Will Montaup Electric Company divest 100 percent of its generation assets?

Please provide a description of the status of the bidding process for
Montaup's generation assets since September 29, 1997, when the
Commission approved the divestiture methodology of BVE, Newport, and
Montaup.

Reply:    Montaup is endeavoring to divest 100% of its generation assets.

Salomon Brothers has set December 5 as the due date for definitive binding offers.
The short-listed bidders have been conducting their due diligence, including plant
visits.

NARR 05247

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:    ECT-1-9     Does BVE and Newport intend that Last Resort Power Service will be an
open market bid without a backstop provision from any generation
company?

Reply:    Yes.

Q:\U2651DATA\ENRON\ECTFAX.WPD

NARR 05248

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-10   Does BVE and Newport have an opinion as to a reasonable expectation of
the price for firm load following wholesale power for 1998? If so, specify
the price(s) and any source documents.

Reply:   BVE and Newport have no data regarding reasonable expectations for the price of
firm load following wholesale power for 1998.

Q:\RJ2651DATA\ENRON\ECTFAX.WPD

NARR 05249

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-11    Can BVE and Newport provide an estimate for the service specified in
Question ECT-1-7 for the period 1999-2004?

Reply:    Under the wholesale rate settlement referred to in response to ETC-1-7, the prices for
backstop Standard Offer Service are as follows:

| Calendar Year | Price per Kilowatthour |
|---------------|------------------------|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

For the period 1999-2004, Montaup's Standard Offer backstop to Blackstone and
Newport will be at the prices listed above.

Q:\RJ\2651DATA\ENRONECTFAX.WPD

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-12   Please provide the terms of the backstop provision that requires certain
supplier(s) to either limit their bid to the standard offer price or provide
service at the standard offer price regardless of whether a bid was submitted.

Reply:   The wholesale rate settlement presented to the Federal Energy Regulatory
Commission on October 29, 1997 contains the terms for Montaup's backstop
obligation for Standard Offer Service.  The appropriate reference is in the Stipulation
and Agreement, Article 5.0, Section 5.3.  Section 5.3 reads as follows:

"5.3   <u>Assignment by Montaup of Unsubscribed Standard Offer Obligation
through Divestiture</u>

As Montaup has agreed to divest its generating business, as set forth in

Article 6.0, it will assign the obligation to provide a share of the unsubscribed

portion of Standard Offer service with each unit divested in proportion to that

unit's contribution to providing Blackstone's and Newport's energy

requirements.  Montaup will have no further obligation for Standard Offer

backstop service so assigned.  Any Standard Offer service obligation

remaining with Montaup after completion of the divestiture will be supplied

first from Montaup's remaining power contracts then from Montaup's

remaining nuclear units at the prices set forth in Section 5.1.  Montaup will

purchase capacity and energy to meet any obligatory Standard Offer Service at

the prices set forth in Section 5.1 that cannot be served from Montaup's

remaining purchase power and nuclear units."

Q:\RI2651DATA\ENRON\ECTFAX.WPD

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-13    Did BVE and Newport consider any other pricing options for Standard Offer
service? If so, please describe these options and explain why such options
were not presented to the Commission for consideration.

Reply:    The Companies did not evaluate or consider any pricing options for Standard Offer
Service other than the Initial Proposal and the Alternate Proposal-As Filed. The
Alternate Proposal-As Filed is the Companies recommended proposal and is the
only proposal presented to the Commission for consideration in this docket. See
ECT-1-2.

Q:\RJQ651DATA\ENRON\ECTFAX.WPD

NARR 05252

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-14    What average annual percentage increases in the price of residual oil and gas
would trigger the fuel adjustment mechanism in 1999, 2000-2010?

Reply:    The Companies have not been tracking the relevant market price indices for oil and
gas to establish their current levels, and so are unable to estimate the rates of growth
that would cause the fuel index to be triggered in 2000 and thereafter.  The fuel index
does not apply in 1998 or 1999.

During the course of settlement negotiations, in November-December, 1996, EUA
System staff analyzed the fuel index to understand its operation.  No record of this
analysis was retained.

Q:\RI\2651DATA\ENRON\ECTFAX.WPD

NARR 05253

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
BEFORE THE PUBLIC UTILITIES COMMISSION

BLACKSTONE VALLEY ELECTRIC COMPANY
AND
NEWPORT ELECTRIC CORPORATION
DOCKET NOS. 2651 AND 2653

Enron Capital & Trade Resources' First Set of Information Requests dated December 1, 1997.

Item:   ECT-1-15   Please provide an update on the stage of the Federal Energy Regulatory
Commission's review of the Settlement Agreements in Dockets ER97-3127-
000 and ER97-2800-000.

Reply:   On November 21, 1997 a Certification of Uncontested Offers of Settlement in
Dockets ER97-3127-000 and ER97-2800-000 was sent to FERC by the presiding
administrative law judge.  The submittal to FERC also included the FERC staff
comments supporting the Settlement Agreements, issued November 18, 1997, and the
Motion to Waive Reply Comments and for Immediate Certification of Uncontested
settlement dated November 20, 1997.  The motion, supported by all parties to the
dockets seek FERC approval prior to January 1, 1998 to allow open access to proceed
in Rhode Island.  This request is noted by the administrative law judge in his
certification.

Q:\RJ\2651DATA\ENRON\ECTFAX.WPD

NARR 05254

# Tab 40-1



**Blackstone Valley Electric**
**Eastern Edison**
**EUA Service Corporation**
**Montaup Electric**
**Newport Electric**

*BVE Drawer*
*Responses*

EXHIBIT
**50**

May 15, 1998

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

RE:     Blackstone Valley Electric Company
          Newport Electric Corporation
          RIPUC Docket No. 2716

Dear Ms. Massaro:

        Enclosed is an original and nine copies of the Companies' responses to the First Set of
Record Requests of the Rhode Island Public Utilities Commission RR-1-1 to RR-1-7 and
Division, RR-1-1-DIV, dated May 12, 1998 for Blackstone Valley Electric Company and
Newport Electric Corporation.

        If you have any questions in this regard, please feel free to call.

                                        Respectfully submitted,

                                        Mark Sorgman
                                        Supervisor
                                        Rate Administration

gmr

Enclosures

cc:     Lindsay Johnson, Esq.

*750 West Center Street    P.O. Box 543, West Bridgewater, MA 02379    508-559-2000    FAX: 508-559-8932*

**Confidential**                                                                          **NARR 48905**


**Eastern Utilities**
*Blackstone Valley Electric*
*Eastern Edison*
*EUA Service Corporation*
*Montaup Electric*
*Newport Electric*

May 15, 1998

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

RE:    Blackstone Valley Electric Company
       Newport Electric Corporation
       RIPUC Docket No. 2716

Dear Ms. Massaro:

Enclosed is an original and nine copies of the Companies' responses to the First Set of
Record Requests of the Rhode Island Public Utilities Commission RR-1-1 to RR-1-7 and
Division, RR-1-1-DIV, dated May 12, 1998 for Blackstone Valley Electric Company and
Newport Electric Corporation.

If you have any questions in this regard, please feel free to call.

Respectfully submitted,

Mark Sorgman
Supervisor
Rate Administration

gmr

Enclosures

cc:    Lindsay Johnson, Esq.

Q:\RR\2716COMM\RECORD~1\LULYLTR.doc

*750 West Center Street   P.O. Box 543, West Bridgewater, MA 02379   508-559-2000  FAX: 508-559-8932*

**Confidential**

**NARR 48906**

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Division Record Requests
May 12, 1998

The Division's First Set of Record Requests dated May 12, 1998.

Item: RR1-1-DIV:    Provide the Companies' definition of a new customer.

Reply:

For purposes of procuring Standard Offer Service pursuant to the Montaup Wholesale Settlement Agreement, the Companies define "new" customer by exclusion--that is, a "new" customer is a customer who is not an "old" customer. An "old" customer is defined by applying the following two-part test. A customer that meets both parts of the test is an "old" customer.

1. Is the customer currently a "customer of record" whose electric service commenced before January 1, 1998, and has continued thereafter? A "customer of record" is a person in whose name electric power was delivered under one or more rate schedules at one or more service locations within the service areas of the Companies and who is legally responsible for paying the bill for the electric power so delivered.

2. Did the service location at which Standard Offer Service is to be delivered physically exist before January 1, 1998? Rebuilding or upgrading distribution facilities at a service location after December 31, 1997, that physically existed before January 1, 1998, are deemed to have physically existed before January 1, 1998.

The two parts of the foregoing test are applied independently. An "old" customer need not be a "customer of record" presently receiving service whose service commenced before January 1, 1998, at the same physical service location as the customer did before January 1, 1998, although such customers are "old" customers. Rather, an "old" customer is a customer presently receiving service whose service commenced before January 1, 1998, at any physical service location that existed before January 1, 1998.

Witness Responsible: J. J. Bonner

Q:\RR\2716COM\RECORD R\DIVRR1-1.DOC

Confidential

NARR 48907

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-1   Provide a copy of the Wholesale Standard Offer Service Agreement between
Montaup and Transcanada relative to the purchase of the OSP entitlements.
Include a copy of the surety agreement.

Reply: Attached


Witness Responsible: M. J. Hirsh

Q:\RR\2716COMM\RECORD–1\RR1-1.DOC

**Confidential**

Wholesale Standard Offer
Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 7, 1998

Confidential

## TABLE OF CONTENTS

Page

ARTICLE 1.  Definitions ........................................................................... 2

ARTICLE 2.  Term ..............................................................................3

ARTICLE 3.  Supplier Responsibilities ........................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO ...........................4

ARTICLE 5.  Price .....................................................................5

ARTICLE 6.  Billing and Payments .................................................. 6

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies ................... 6

ARTICLE 8.  Termination/Reimbursement ........................................8

ARTICLE 9.  Force Majeure ...................................................... 8

ARTICLE 10. Assignment .......................................................... 9

ARTICLE 11. Successors and Assigns........................................ 10

ARTICLE 12. Resolution of Disputes.........................................10

ARTICLE 13. Interpretation ...................................................... 11

ARTICLE 14. Severability of Provisions..................................... 11

ARTICLE 15. Accounts and Records......................................... 11

ARTICLE 16. Limitations on Liability and Indemnification ........................ 12

ARTICLE 17. Regulation ............................................................ 12

ARTICLE 18. Notices ................................................................ 12

ARTICLE 19. Miscellaneous ..................................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

i

## WHOLESALE STANDARD OFFER SERVICE AGREEMENT

This Wholesale Standard Offer Service Agreement ("Agreement"), is made and entered into this seventh day of April, 1998_____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation;("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated April 7, 1998; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking Standard Offer Service in accordance with the Settlement Agreements; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

1

ARTICLE 1.  <u>Definitions</u>:

Whenever used in this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"<u>Agreement</u>" shall mean this Agreement, including its Appendices as amended from time to time.

"<u>Commencement Date of Service</u>" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"<u>Contract Year</u>" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"<u>Companies' System</u>" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"<u>Delivered Energy</u>" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"<u>Delivery Point</u>" shall be any location on the NEPOOL PTF system or Companies' System.

"<u>D.T.E.</u>" shall mean the Massachusetts Department of Telecommunications and Energy.

"<u>ISO</u>" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"<u>NEPOOL</u>" shall mean the New England Power Pool or its successor.

"<u>Party</u>" or "<u>Parties</u>" shall mean the Supplier and the Companies and their respective successors and assigns.

"<u>PPA Transfer Agreement</u>" shall mean the PPA Transfer Agreement as defined in the Asset Purchase Agreement.

"<u>Price</u>" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer customers shall not be obligated

2

under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Settlement Agreements" shall mean the agreement or agreements that have been approved by the MDTE in Docket No. 96-24, the RIPUC in Docket No. 2514 and by the FERC in Docket Nos. ER97-2800-000 and ER97-3127-000 together with all conditions, terms and modifications imposed by those agencies as of the date of this Agreement.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service in accordance with and as defined in the Settlement Agreements. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.   Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.

ARTICLE 3.   Supplier Responsibilities

3

NARR 48913

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all costs incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer Service, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or costs so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

4

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

## ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

$$Price = Standard\ Offer\ Wholesale\ Price + Fuel\ Adjustment\ Factor$$

Where:         Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to

5

regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6.   Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 12 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7.   Events of Default, Liability, Relationship of the Companies:

(1)   Unless excused by a Force Majeure as described in Article 9, each of the following events shall be deemed to be an Event of Default hereunder:

6

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represented as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the Companies resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to, reasonable additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this Agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this Agreement. The Companies accept the Guarantee attached to the Asset Purchase Agreement as reasonable financial surety.

7

ARTICLE 8.    Termination/Reimbursement:

(1)    In addition to the termination rights for an Event of Default provided in Article 7, the Companies may terminate this Agreement, if:

    a.    Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

    b.    The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; or

    c.    Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice. In the event that the default by Montaup under the PPA Transfer Agreement is cured prior to the effective date of notice of termination, such termination will be cancelled and the Agreement will remain in full force and effect.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptable to supplier to or indemnify the Supplier from such changes. In such event the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materially of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.    Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

8

Confidential

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)    The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)    The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)    The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)    The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

9

ARTICLE 11. <u>Successors and Assigns</u>:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. <u>Resolution of Disputes</u>:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value <u>provided, however,</u> that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

10

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. <u>Interpretation</u>:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. <u>Severability of Provisions</u>:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. <u>Accounts and Records</u>:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

11

ARTICLE 16. Limitations on Liability and Indemnification:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. Regulation:

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

12

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a)     Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)     Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)     Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)     This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)     Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)     Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)     Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)     Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by  the portion of its monthly

13

**Confidential**

**NARR 48923**

Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

Confidential

NARR 48924

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:          TransCanada Power Marketing Ltd.

By:_____

BY:_____

On Behalf of the Companies:

Blackstone:        BLACKSTONE VALLEY ELECTRIC COMPANY

By:_____

Eastern:           EASTERN EDISON COMPANY

By:_____

Newport:           NEWPORT ELECTRIC CORPORATION

By:_____

15

APPENDIX A

SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
AND
STANDARD OFFER WHOLESALE PRICE

<u>TABLE 1</u>

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

* Standard Offer Service for Eastern Edison terminates
   at 12:00 midnight on December 31, 2004.

16

**Confidential**

**NARR 48926**

## GUARANTY

1.  (a)  Reference is made to the Asset Purchase Agreement, dated as of April 2, 1998 (the "Purchase Agreement"), by and among MONTAUP ELECTRIC COMPANY (the "Seller") and TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "Buyer"). For good and valuable consideration received, TransCanada PipeLines Limited and TransCanada PipeLine USA Ltd., (collectively, the "Guarantors"), hereby irrevocably and unconditionally jointly and severally guaranty to the Seller and its successors and assigns that the Buyer shall perform all of its obligations under the Purchase Agreement and each of the Ancillary Agreements (as defined in the Purchase Agreement), including, but not limited to, the due and punctual:

    (i)  payment of all amounts required to be paid by the Buyer pursuant to the Purchase Agreement and each Ancillary Agreement; and

    (ii)  performance and observance of and compliance with all other obligations, covenants, and undertakings of the Buyer contained in the Purchase Agreement and any other agreement or instrument relating thereto, including the Ancillary Agreements (such payments and other obligations referred to in clauses (i) and (ii), collectively, the "Obligations"), at the times and in the manner provided therein.

    This Guaranty shall be an absolute, unconditional, present and continuing guaranty of payment and performance (not of collection or collectibility) which shall remain in full force and effect until each and all of the Obligations guaranteed hereunder shall have been fully and satisfactorily discharged in accordance with the terms and provisions of the Purchase Agreement, the Ancillary Agreements and any other agreement or instrument relating thereto, and that Guarantors' undertakings hereunder are not contingent upon the bringing of any action against the Buyer or any other person or entity or resorting to any security or exercise or assertion of any other right or remedy against the Buyer or any other person or entity, and Guarantors hereby expressly waive any claim that its undertakings hereunder are so contingent.

    (b)  Notwithstanding Section 1(a) or any other paragraph hereof:

    The Guarantors' liability hereunder shall be and is specifically limited to payment or performance expressly required by the Buyer in accordance with the Purchase Agreement or the Ancillary Agreements (even if such payments are deemed to be damages) and, except to the extent specifically provided in the Purchase Agreement or the Ancillary Agreements, in no event shall the Guarantors be subject hereunder to consequential, exemplary, equitable, loss of profits, punitive, tort, or any other damages, costs or attorney's fees.

2.  The liability of the Guarantors under this Guaranty shall be absolute, unconditional and irrevocable, irrespective of:

    (a)  any change in time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of, or any consent to departure from, the Purchase Agreement, the Ancillary Agreements or any other agreement or instrument relating thereto;

    (b)  any change in ownership of the Guarantors or the Buyer; or

    (c)  any bankruptcy, insolvency or reorganization of, or other similar proceedings involving the Guarantors or the Buyer;

**Confidential**

- 2 -

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by the Seller upon the insolvency, bankruptcy or reorganization of the Buyer or otherwise, all as though such payment had not been made.

3.  The Guarantors hereby irrevocably, unconditionally and expressly waive, to the fullest extent permitted by applicable law, promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty and any requirement that the Seller protect, secure or perfect any security interest or exhaust any right or first proceed against the Buyer or any other person or entity.

4.  This Guaranty constitutes a primary obligation of the Guarantors and is a continuing guaranty and shall:

    (a)   be binding upon the Guarantors and their successors and assigns; and

    (b)   inure to the benefit of and be enforceable by the Seller and its successors and assigns.

5.  Upon payment of all Obligations owing to the Seller, the Guarantors shall be subrogated to the rights of the Seller against the Buyer.

6.  This Guaranty shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts and the Guarantors hereto submit to the jurisdiction of the courts of the Commonwealth of Massachusetts or of the federal courts located in Boston, Massachusetts, exclusively, without request for arbitration. Process shall be made by certified mail.

At any time after the second anniversary of this Guaranty, the Guarantors shall be released from all obligations hereunder upon providing to or for the benefit of Seller a letter of credit, collateral or other security in substitution for, and replacement of, the Guaranty which shall be at least equivalent in value to the security represented by the Guaranty as agreed among the Guarantors, the Buyer and Seller in the exercise by each of its reasonable commercial judgment and is otherwise in form and substance satisfactory to Seller.

IN WITNESS WHEREOF, the Guarantors have caused this Guaranty to be duly executed by their proper duly authorized officers as of the 2nd day of April, 1998.

TRANSCANADA PIPELINES LIMITED          TRANSCANADA PIPELINE USA LTD.

Per: _____          Per: _____
     George W. Watson                      George W. Watson
     President and Chief Executive Officer  President

Per: _____          Per: _____
     Robert A.M. Young                     Robert A.M. Young
     Senior Vice-President, Law and        Vice-President
     Chief Compliance Officer

s:\counterparty credit\assurances\guarantees\
montaup\tcpml\1998-04-02\guranty.doc/ks

**Confidential**                                         **NARR 48928**

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-2: With regards to Last Resort Service, what components go into fixed contribution,
and how will it be recovered?

Reply:

In accordance with the Utility Restructuring Act of 1996 ("URA"), as amended, Last Resort
Service will be procured from Non-regulated Power Producers ("NPP's") at market prices plus a
fixed contribution. The Companies anticipate that the "market price" will be based on the prices
of the appropriate NEPOOL products required to deliver the service (as explained by Division
witness, Dr. Stutz). This would allow all energy, capacity, capacity reservation and load
following costs to be captured entirely in the market price. The fixed contribution is envisioned to
be a monthly payment by the Companies to the Supplier, regardless of the amount of energy
delivered, which is expected to cover only the NPP's administrative costs incurred in supplying
Last Resort Service.

Upon successfully procuring Last Resort Service from NPP's, the Companies will file new Last
Resort Service tariffs. The charges for Last Resort Service under the new tariffs will be based on
market prices. The fixed contribution paid to the NPP's plus other costs incurred by the
Companies in arranging for Last Resort Service will be proposed to be recovered under a Last
Resort Cost Adjustment ("LRCA") provision. The LRCA provision is expected to be similar in
structure to the Companies' proposed Standard Offer Cost Adjustment provision. A LRCA factor
will be proposed as an equal cents per kilowatthour factor applied to the distribution portion of
bills to all customers.

The URA requires distribution companies to periodically solicit bids from NPP's to serve the
electric requirements of customers taking Last Resort Service. At this time, the Companies plan
to seek bids for Last Resort Service on a six month basis. Consequently, the price for Last Resort
Service billed to customers receiving this service and the LRCA factor applied to all customers is
expected to change every six months.

Witness Responsible: J. J. Bonner

Q:\RR\2716COMM\RECORD R\rr1-2.fin.doc

**Confidential**

**NARR 48929**

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-3:   Provide a copy of the Companies' Standard Offer Service RFP.

Reply:  Copy Attached

Witness Responsible:  L. R. Boisvert

Q:\RR\2716COMM\RECORD R\RR1-3.DOC

**Confidential**                                                            **NARR 48930**

# EASTERN EDISON COMPANY
# BLACKSTONE VALLEY ELECTRIC COMPANY
# NEWPORT ELECTRIC CORPORATION

## REQUEST FOR PROPOSALS
## TO SUPPLY
### STANDARD OFFER SERVICE

Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation ("the Companies") are hereby soliciting suppliers for proposals to supply standard offer requirements service to the Companies as described herein. Responses to this Request for Proposals ("RFP") must be received at the address set forth below no later than 4:00 p.m. on Wednesday, April 1, 1998. Responses to the RFP must adhere to the specifications herein. Questions and responses to this RFP should be submitted to:

Lawrence R. Boisvert
Supervisor, Power Supply
EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
Lboisvert@eua.com

The Companies expressly reserve the right to modify or withdraw from the process initiated and described herein. No rights shall vest in any party, individual, or entity by virtue of its preparation to participate in, or its participation in, such process. In addition, information contained herein is subject to modification by certain state and federal regulatory agencies having jurisdiction of the Companies' restructuring settlement agreements. Any changes to the terms of the settlements caused by any regulator or court having jurisdiction, or legislation may require the Companies to modify or withdraw their plans as described herein. Furthermore, the Companies, for their convenience and in their sole discretion, may change the timetable for the actions described herein.

**Confidential**

NARR 48931

## Table of Contents

I.    Introduction

II.   Standard Offer Service
      A.    Customer Eligibility - Massachusetts
      B.    Customer Eligibility - Rhode Island

III.  Supplier Eligibility
      A.    General Requirements
            1.    NEPOOL Membership
            2.    Regulatory Authorizations
      B.    Additional Requirements for Option 2 Suppliers
            1.    Modifications to Standard Offer Agreement
            2.    Financial Information
            3.    Default, Litigation and Penalties
            4.    Performance Surety

IV.   Administration of Standard Offer Service
      A.    Hourly Load Estimation and Loss Allocation
      B.    Load Information
      C.    Minimum Load Obligation
      D.    Supplier Defaults

V.    Proposal Terms and Evaluation

VI.   RFP Schedule


Appendix 1     Standard Offer Price Schedule

Appendix 2     Standard Offer Fuel Index

Appendix 3     Five-Year Load Forecast

Appendix 4     Proposal Bid Forms

Appendix 5     Draft Standard Offer Service Agreement

Appendix 6     Form of Performance Surety Documents

i

## I.  Introduction

Eastern Edison Company (Eastern), Blackstone Valley Electric Company (Blackstone), and Newport Electric Corporation (Newport) (collectively, the "Companies") are jointly seeking qualified parties to submit proposals to provide wholesale power supply to fulfill the Companies' Standard Offer Service obligations. Eastern, Blackstone, and Newport are wholly-owned retail subsidiaries of Eastern Utilities Associates, a registered public utility holding company, and are cooperating on the design and implementation of a process for soliciting suppliers of this service.  In 1997, the Companies had total retail billings of 4,455 GWh and an annual peak of approximately 904 MW.

During the transition to a competitive retail electricity marketplace, the Companies are required to arrange for Standard Offer Service to their retail customers that have not yet chosen a competitive supplier.  "Standard Offer Service" is defined as firm, all-requirements electric service delivered to the meters of the Companies' retail customers taking service under the respective Companies' Standard Offer Service tariffs.[1]  Standard Offer Service is intended to provide retail electric customers with a stable source of electric service at known prices while they evaluate other options in the competitive marketplace.  Standard Offer Service will be available in Massachusetts through 2004 and in Rhode Island through 2009.

The Companies are seeking Suppliers to provide firm all-requirements service for the aggregated load of the Companies' customers taking Standard Offer Service. The Companies are providing two options for submitting proposals.  Prospective Suppliers can submit bids for either one or both options.  The solicitation options are as follows:

| | |
|---|---|
| Option 1: 1998 Standard Offer | Bids are to be provided for a fixed percentage of the Companies' Standard Offer Load for the period June 1, 1998 through December 31, 1998. |
| Option 2:  1999-2004 Standard Offer | Bids are to be provided for a fixed percentage of the Companies' Standard Offer Load for the period January 1, 1999 through December 31, 2004. |

Suppliers who successfully bid will assume responsibility for a fixed percentage share of the Companies' Standard Offer Service load, with all attendant obligations in the regional market for ensuring an adequate and reliable electricity supply as described in Section II.  At the conclusion of the evaluation of the bids provided in response to this solicitation, Suppliers will know with certainty what percentage of the Standard Offer Service load they will be responsible for over time.  The Companies will make available to Suppliers certain load information, as described in Section IV. However, it will be the Suppliers' ultimate responsibility for estimating and meeting its Standard Offer Service responsibilities.

---

[1]  Eastern's Standard Offer Service Tariff is currently pending before the Massachusetts Department of Telecommunications and Energy.  Blackstone's and Newport's tariffs will be subject to approval by the Rhode Island Public Utilities Commission.

1

**Confidential**

The Suppliers will also be required to provide power plant emissions and labor information in appropriate form to enable Eastern Edison to comply with the Massachusetts Department of Telecommunications and Energy's Uniform Label Disclosure requirements.

2

Confidential

NARR 48934

# Tab 40-2

## II. Standard Offer Service

Standard Offer Service is a feature of electric industry restructuring in Massachusetts and Rhode Island designed to provide a competitively-priced source of electricity to retail customers who have not yet chosen a supplier from the competitive market. Eastern, Blackstone, and Newport are required to solicit through the competitive market for Suppliers of Standard Offer Service. The Companies will purchase power under the resulting Standard Offer Service Agreements with Suppliers, and resell the power to retail customers pursuant to the terms of their respective retail Standard Offer Service tariffs.

Initially, the Companies expect that many of its existing customers will continue to take Standard Offer Service for the remainder of 1998. However, long-term forecasts of Standard Offer Service load are uncertain. As the electricity market matures, retail electric customers are expected to terminate Standard Offer Service to purchase electricity from an alternative supplier and, with the few exceptions described below, may not return to Standard Offer Service after 1998.

Each Supplier of Standard Offer Service will have complete responsibility for meeting its share of the total retail load requirements of customers in the Companies' service territories taking Standard Offer Service. Suppliers will be responsible for meeting their share of the Companies' Standard Offer Service load under the Restated NEPOOL Agreement and rules of ISO New England, Inc. or successor rules, and their responsibilities will include, without limiting the scope of such responsibilities, the following: i) installed and operable capacity; ii) operating reserves and automatic generator control; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers will be responsible for all losses between their sources of supply and the customers' meters. Each Supplier will experience the same load factor, which will reflect the composition of the loads of the retail customers taking Standard Offer Service. Payments to Suppliers for Standard Offer Service will be based on the discounts to the annual average prices shown in Appendix 1 determined through this solicitation as adjusted for the Fuel Index (Appendix 2), if applicable. No adjustments will be made for time of use, load factor, or any other characteristics of the load.

A five-year forecast of monthly energy billings and requirements of the Companies' aggregated Standard Offer Service load, assuming no migration of customers from Standard Offer Service to competitive suppliers, is shown in Appendix 3. Additional load information, consisting of "percent of annual peak" customer class load shapes, can be obtained from the EUA System's Internet website at www.eua.com, under "Supplier/EBT Information."

3

**NARR 48935**

### A. Customer Eligibility - Massachusetts

Standard Offer Service shall be available to each customer who was a customer of record as of March 1, 1998 and who has not received generation service from a competitive supplier since March 1, 1998, subject to the following conditions:

1. A customer receiving Standard Offer Service shall be allowed to retain such service upon moving within Eastern Edison's service territory.

2. A customer who previously received generation service from a competitive supplier is no longer eligible to receive Standard Offer Service, except that a low-income customer may return to Standard Offer Service at any time, regardless of whether the customer has previously received generation service from a competitive supplier.

3. Residential or small commercial or industrial customers taking retail delivery service under Eastern Edison's residential rates or Small General Service Retail Delivery Rate G-1 who have received generation service from a competitive supplier since March 1, 1998 are eligible to receive Standard Offer Service by so notifying Eastern Edison within one-hundred-twenty (120) days of the date when the customer first began to receive generation service from a competitive supplier, provided that such notification occurs prior to March 1, 1999.

4. A customer who moves into Eastern Edison's service territory after March 1, 1998 is not eligible to receive Standard Offer Service, except that a low-income customer who moves into Eastern Edison's service territory after March 1, 1998 shall be eligible for Standard Offer Service.

5. A customer who has received generation service pursuant to an agreement with a municipal aggregator is eligible to receive Standard Offer Service by so notifying Eastern Edison with one-hundred-eighty (180) days of the date when the customer first began to receive generation service through such agreement.

### B. Customer Eligibility - Rhode Island

Standard Offer Service shall be available to all customers taking electric service from Blackstone or Newport before January 1, 1998 and customers moving into the Blackstone or Newport service territories on or after January 1, 1998, subject to the following conditions:

1. Such customers shall have the right to relocate to a different service location within Blackstone's or Newport's service territory and continue to receive Standard Offer Service.

2. Customers shall be ineligible to receive Standard Offer Service after terminating such service, except that customers who receive service under any of Blackstone's or Newport's residential retail delivery service rates or under the Small General Retail Delivery Service Rate G-1 may elect to take electric power service from another supplier during the period beginning January 1, 1998 and ending December 31, 1998, and elect to return to Standard Offer Service within one-hundred-twenty (120) days of commencing service from that supplier.

4

**Confidential**

## III. Supplier Eligibility

### A. General Requirements

In order to secure reliable sources of power for their customers taking Standard Offer Service, the Companies require that any party interested in participating in the solicitation must meet the Companies' minimum eligibility requirements as outlined below. Prospective Suppliers submitting proposals under Option 2 are required to submit additional information about their qualifications, due to the extended term of the service and the correspondingly larger commitment on behalf of the Companies' retail customers. Documentation of compliance with each applicable requirement must be provided as part of the proposal. The Companies will have the final authority to determine, in their sole discretion, whether a respondent meets or does not meet these requirements.

#### 1. NEPOOL Membership

To participate in this Standard Offer Service RFP, a prospective Supplier must be a member in good standing of NEPOOL or its successor entity and have an own-load dispatch or settlement account established in accordance with the rules and criteria of the ISO New England, Inc. billing system. As an alternative to being a member, the prospective Supplier may have a contract in place with a NEPOOL member, provided that such contract is for the full term of the prospective Supplier's proposed commitment to provide Standard Offer Service or for such period until the prospective Supplier becomes a member of NEPOOL. In addition, the NEPOOL member must agree to include the Standard Offer Service load to be served by the prospective Supplier in its own-load dispatch or settlement account. Documentation of membership in NEPOOL or an agreement with a NEPOOL member must be provided as part of the prospective Supplier's proposal.

Membership in NEPOOL is open to any person or organization engaged in the electric power business in New England, as defined in the Restated NEPOOL Agreement.

#### 2. Regulatory Authorizations

Each proposal must include a positive declaration that the prospective Supplier has obtained or will obtain in a timely manner all applicable state and federal regulatory authorizations necessary for the Supplier to lawfully perform its obligations under any Standard Offer Service Agreement that it may enter into with the Companies.

### B. Additional Requirements for Option 2 Suppliers

#### 1. Modifications to the Standard Offer Agreement

At the completion of the evaluation process, each successful Supplier for Option 2 will be required to sign a Standard Offer Service Agreement substantially in the form provided in Appendix 5. Alternatively, the Companies will consider using a Supplier's existing FERC wholesale tariff, provided the tariff's terms and conditions are acceptable.

5

Prospective Suppliers wishing to utilize their existing tariff must include it with their proposal package. Prospective Suppliers who do not provide a tariff for the Companies' consideration are requested to review the draft Agreement and to provide any comments, exceptions, or proposed changes as part of their proposal. The Companies will consider all comments and proposed changes, but are under no obligation to alter the draft Agreement.

## 2. Financial Information

- Audited or certified financial statements, including balance sheet and statement of income and cash flow for prospective Supplier and Guarantor(s), for the five (5) previous fiscal years and the most recent interim periods.

- Forms 10-K covering the five (5) previous fiscal years and Form 10-Q for the most recent interim periods, if applicable.

- A description of any corporate affiliations or joint venture partnerships.

## 3. Defaults, Litigation, and Penalties

- For each prospective Supplier and any Guarantor(s) or any affiliate of each which in the past five years has been determined by an arbitrator, regulator, or court, having jurisdiction of the matter, to have breached or defaulted under any agreement relating to the sale of electricity, provide a description of said breach or default and the resolution thereof, including any financing agreements.

- A detailed description of any situation within the past five (5) years in which the prospective Supplier or its Guarantor(s) defaulted or was deemed to be in noncompliance with its contractual obligations by an arbitrator, regulator, or court having jurisdiction of the matter.

- A detailed description of any and all indictments and criminal investigations within the past five (5) years or pending litigation in any venue involving the prospective Supplier or its Guarantor(s), or their respective officers or directors.

- A detailed description of any penalties, judgments, consent decrees, or other sanctions within the past five (5) years in any venue involving the prospective Supplier or its Guarantor(s).

- A detailed description of any present or anticipated facts known to the prospective Supplier or its Guarantor(s) that might reasonably be expected to adversely affect its ability to perform any aspect of the Standard Offer Service Agreement.

## 4. Performance Surety

As a condition to the execution of a Standard Offer Service Agreement, each successful Qualified Supplier under Option 2 will be required to deliver to the Companies a performance surety securing the Qualified Supplier's full responsibility for Standard Offer Service load over the six-year term.

6

**NARR 48938**

Acceptable forms of surety include a performance letter of credit, a performance bond, or a parent guaranty, in substantially the form as provided in Appendix 3. Each bank issuing a letter of credit must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. Each surety company or companies issuing a performance bond must maintain a long-term debt rating of "B+" or better from A.M. Best Company.

The amount of the surety shall be determined in accordance with Article 7 of the Standard Offer Service Agreement. Performance letters of credit or bonds, if not issued for the full term of a Supplier's Standard Offer Service obligations, shall be for a minimum one-year term and shall be renewed on an annual basis or replaced and superseded by a like kind surety at least thirty (30) days prior to the expiration of any term. The amount of the performance surety may be amended no more frequently than on an annual basis to reflect a Supplier's partial completion of its Standard Offer Service obligations.

Confidential

NARR 48939

## IV.  Administration of Standard Offer Service

### A.  Hourly Load Estimation and Loss Allocation

To meet their obligations for reporting load and supplier information, the Companies will report to ISO New England, Inc. each Supplier's hourly share of the aggregated load requirements of those customers taking Standard Offer Service. The reported load will reflect each Supplier's share of Standard Offer Service load, and will include a proportional share of all distribution and transmission losses. The process used to estimate hourly loads is described in the Terms and Conditions for Electric Power Suppliers as approved and on file with the Massachusetts Department of Telecommunications and Energy and Rhode Island Public Utilities Commission, summarized as follows:

- Energy and demand for each retail account will be estimated for each hour using a combination of inputs, including weather and load data from the EUA Supervisory Control and Data Acquisition ("SCADA") system, sample meter data, historical load shapes, and individual customer usage ratios.

- The hourly loads for each account will be aggregated by supplier. The hourly loads of customers on Standard Offer Service will be aggregated.

- The aggregated hourly loads of all retail customers will be reconciled to the sum of the Companies' actual substation loads.

- Transmission losses as recorded or estimated by the SCADA system will be allocated to all suppliers and to the Standard Offer based on their load ratio share for each hour.

- The hourly Standard Offer loads, including losses, will then be allocated to the Suppliers of Standard Offer Service, based on their percentage shares.

- The daily load information will be transferred to ISO New England, Inc. for inclusion in each Supplier's own load dispatch (or such other settlement process developed by NEPOOL or ISO New England, Inc.).

The Terms and Conditions for Suppliers may be revised, amended, supplemented, or supplanted in whole or in part from time to time by state regulatory agencies or by law.

### B.  Load Information

The Companies will provide certain historic and forecast load information to Suppliers, but will not be liable for forecasting Suppliers' energy and demand responsibilities under the Standard Offer Service Agreement.

The Companies will make available information to enable Suppliers to track their actual Standard Offer Service loads and to forecast their future obligations. Such information will include daily reports of estimated hourly Standard Offer Service loads,

8

numbers of customers in each rate class taking Standard Offer Service, and representative customer load shapes for each rate class. The Companies may also make available estimated peak and energy demands of the aggregated load of their customers taking Standard Offer Service for prior monthly or annual periods, as appropriate.

The Companies will institute a procedure for notifying Suppliers with as much advance notice as possible when the Companies receive customer notifications of significant amounts of load that have elected to discontinue Standard Offer Service.

The Companies will assume no responsibility or liability for estimating Supplier requirements and will not be responsible for Supplier surpluses or deficiencies due to variances of actual Standard Offer Service loads from information provided by the Companies or from Supplier forecasts. Suppliers are advised to rely on their own projections of load and market dynamics.

### C. Minimum Load Obligations

Over time, it is expected that Standard Offer Service load will decline, and thus the actual energy and demand responsibilities (in MWh and MW) associated with a given percentage of the load will decline as well. The Companies, at their sole option, may limit a Supplier's share of Standard Offer Service load to one megawatt (1 MW) or greater. If a Supplier's annual peak share of Standard Offer Service load drops below 1 MW, the Companies may terminate that Supplier's agreement and assign the load to the remaining Supplier(s) on a pro-rata or other appropriate basis.

### D. Supplier Default

In the event that a Supplier defaults on its obligations to supply Standard Offer Service under the terms of its Agreement with the Companies, the Companies may offer the remaining non-defaulting Suppliers the opportunity to assume the defaulting Supplier's obligations on the same terms as those in the defaulting Supplier's Standard Offer Service Agreement. The Companies will replace the defaulting Supplier's obligations in the most expeditious and cost-effective manner, given the status of the other Suppliers, market conditions, and other factors the Companies deem appropriate.

9

**Confidential**

**NARR 48941**

## V. Proposal Terms and Evaluation

### A. Proposal Requirements

The Companies in this Request for Proposals are providing prospective Suppliers with two options for providing bids. Prospective Suppliers may respond to this solicitation by bidding on the Single Year (Option 1) Standard Offer which is for the period June 1, 1998 through December 31, 1998 and/or for the full remaining term of Standard Offer (Option 2) which is for the period January 1, 1999 through February 28, 2005.

The Companies require that Suppliers of Standard Offer Service take on a fixed percentage share of the Companies' load obligations for the term of such Suppliers' obligations, and that prospective Suppliers' bids, exclusive of the Fuel Index revenues, not exceed the fixed annual cents-per-kilowatt-hour prices for energy delivered to retail customer meters given in Appendix 1. Consequently, for either Option, bids must contain two elements: i) a percentage share of the Companies' aggregate Standard Offer Service Load that the prospective Supplier wishes to serve (the "Share"); and ii) a percentage discount off of the wholesale rate caps shown in Appendix 1 at which the prospective Supplier would serve Standard Offer Service Load (the "Discount"). The Share should be stated as an integer-valued percentage, no smaller than 1% and no larger than 100%. The Discount must be stated as a non-negative percentage. Under Option 2, the Share and the Discount must remain constant year-to-year. The Discount must be stated as a fixed value, and must not be indexed in any way.

Proposals should be submitted on the appropriate Proposal Forms included in Appendix 4. Proposals must also conform in all material respects to the appropriate Standard Offer Service Agreement included in Appendix 5. Alternatively, the Companies will consider using a Supplier's existing FERC wholesale tariff, provided the tariff's terms and conditions are acceptable. Prospective Suppliers wishing to utilize their existing tariff must include it with their proposal package.

The Companies agree that all information they receive from the prospective Suppliers shall be treated in a confidential manner and will not, except as required by law or regulatory authority, be disclosed to a third party or used for any purpose other than in connection with the Companies' evaluation of the prospective Supplier's qualifications and proposals. To the extent that such information is required to be disclosed to a third person in any proceeding, the Companies will produce it under a confidentiality agreement or protective order of the tribunal or agency having jurisdiction of the matter.

### B. Proposal Evaluation

For each of the two Options, proposals which offer the largest Discounts to the wholesale rate cap will be selected first until 100% of the Companies' Standard Offer Service Load has been subscribed. In the event that two or more prospective Suppliers offer the same discount and the aggregate of such bids represent more than 100% of the Standard Offer Load, the Companies will pro-rate each of those bids, such that the sum of all bids selected equals 100%.

10

**Confidential**                                                           **NARR 48942**

The Companies shall have the exclusive right to accept or reject any or all of the proposals submitted at any time, for any reason.  All submissions shall constitute an offer to sell Standard Offer Service and such offer shall be deemed to be held open until May 31, 1998.  Pricing contained in such proposal may not be changed or withdrawn during this period.

11

**Confidential**

## VI.    RFP Schedule

RFP Issued                                           March 2, 1998
Proposals Due                                        April 1, 1998

Option 1: 1998 Standard Offer
Proposal Evaluations Complete                        April 7, 1998
Sign Standard Offer Service Agreements               April 10, 1998
File Agreements for Regulatory Approval              April 15, 1998
Begin Standard Offer Service                         June 1, 1998

Option 2: 1999-2004 Standard Offer
Proposal Evaluations Complete                        May 1, 1998
Sign Standard Offer Service Agreements               May 29, 1998
File Agreements for Regulatory Approval              June 12, 1998
Begin Standard Offer Service                         January 1, 1998

12

**Confidential**

**NARR 48944**

**APPENDIX 1**

**STANDARD OFFER SERVICE PRICE SCHEDULE**

Confidential

The rate for retail customers who receive Standard Offer Service will be based on the applicable retail Standard Offer Service tariffs on file with the applicable regulatory agencies. The Standard Offer Wholesale rate cap that the Companies will pay to a Supplier for Delivered Energy under a Standard Offer Service Agreement is as follows:

| Calendar Year | Price per Kilowatt-hour |
|---|---|
| 1998 | 3.2 cents |
| 1999 | 3.5 cents |
| 2000 | 3.8 cents |
| 2001 | 3.8 cents |
| 2002 | 4.2 cents |
| 2003 | 4.7 cents |
| 2004 | 5.1 cents |

Prices paid to Suppliers will be based on the stipulated Standard Offer Wholesale rates, reduced by the applicable Discounts offered by Suppliers in the Companies' solicitation. Standard Offer Service load will be measured as energy delivered to retail customers' meters, and payments will be made on that basis. Suppliers are responsible for all losses between their sources of supply and the customers' meters, as well as all responsibility for meeting their share of the following: i) installed and operable capacity; ii) operating reserves; iii) transmission arrangements and expenses not covered in Montaup Electric Company's Open Access Transmission Tariff provisions as they apply to the Companies' retail customers; and iv) energy, including transmission and distribution losses between the sources of supply and the ultimate retail customers' meters.

Additional revenues to Suppliers may be realized through the operation of the Fuel Index (Appendix 2).

**Confidential**

APPENDIX 2

FIVE-YEAR LOAD FORECAST

Confidential

NARR 48947

EASTERN UTILITIES ASSOCIATES

STANDARD OFFER LOAD INFORMATION

HISTORICAL AND FORECAST MONTHLY PEAK AND ENERGY DETAIL

1997 - 2002

Load Forecasting and Profiling
Power Supply Department
February 26, 1998

Confidential

NARR 48948

EUA SYSTEM
1997 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1997 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Mon | Tue | Thu | Wed | Mon | Thu | Thu | Fri | Wed | Tue | Tue | Tue | |
| Date | 01/20/97 | 02/11/97 | 03/13/97 | 04/02/97 | 05/19/97 | 06/26/97 | 07/17/97 | 08/01/97 | 09/02/97 | 10/28/97 | 11/04/97 | 12/15/97 | |
| Hour | 5 PM | 7 PM | 7 PM | 8 PM | 12 PM | | 5 PM | 2 PM | 3 | 6 PM | 6 PM | 6 PM | |
| Temperature | 28 | 28 | 28 | 41 | 54 | 86 | 93 | 86 | 82 | 40 | 53 | 31 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 444,400 | 429,800 | 414,000 | 395,900 | 366,500 | 512,600 | 560,600 | 673,900 | 660,800 | 913,000 | 641,500 | 465,500 | 455,717 |
| Blackstone | 203,500 | 194,300 | 191,200 | 179,200 | 184,100 | 259,800 | 265,300 | 223,340 | 201,650 | 170,120 | 180,500 | 185,200 | 222,914 |
| Newport | 87,400 | 85,400 | 80,200 | 76,000 | 72,100 | 90,400 | 97,900 | 87,500 | 87,400 | 82,500 | 89,000 | 92,800 | 66,650 |
| Total | 757,300 | 709,500 | 685,900 | 651,100 | 622,700 | 865,400 | 905,800 | 785,240 | 759,850 | 665,620 | 711,000 | 741,980 | 736,281 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 4,400 | 6,100 | 6,100 | 6,000 | 7,800 | 5,400 | 7,300 | 6,100 | 6,600 | 3,900 | 9,000 | 5,400 | 6,100 |
| NEPOOL External | -2,500 | -2,520 | 3,010 | 1,940 | 2,750 | 7,310 | 8,520 | -1,570 | -100 | -760 | 520 | -3,100 | 1,252 |
| Total | 1,900 | 3,580 | 9,110 | 7,940 | 10,550 | 12,710 | 15,820 | 4,530 | 6,500 | 3,760 | 9,520 | 2,300 | 7,352 |
| **TOTAL STANDARD OFFER DEMAND** | 759,200 | 713,080 | 695,010 | 659,040 | 633,250 | 867,110 | 919,620 | 792,770 | 766,350 | 669,380 | 720,520 | 744,280 | 741,633 |

Confidential

NARR 48949

EUA SYSTEM
1998 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1998 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 15 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 476,100 | 468,800 | 431,300 | 396,740 | 412,984 | 469,216 | 530,810 | 514,394 | 462,721 | 397,325 | 431,357 | 479,635 | 456,358 |
| Blackstone | 202,900 | 191,400 | 186,400 | 179,900 | 280,400 | 231,200 | 359,120 | 259,300 | 225,100 | 182,310 | 193,300 | 207,300 | 207,262 |
| Newport | 97,100 | 197,500 | 184,200 | 178,500 | 74,600 | 85,500 | 98,700 | 90,400 | 84,600 | 78,680 | 65,300 | 97,400 | 67,556 |
| Total | 776,000 | 733,700 | 701,900 | 655,869 | 687,984 | 895,016 | 893,610 | 844,094 | 769,921 | 658,025 | 707,957 | 782,735 | 751,458 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,500 | 3,300 | 4,900 | 3,000 | 5,400 | 3,000 | 4,600 | 5,800 | 5,000 | 4,300 | 6,800 | 4,900 | 4,592 |
| NEPOOL External | 0 | 370 | 1,670 | 1,620 | 1,130 | 1,180 | 1,270 | 4,060 | 1,720 | 2,200 | 2,520 | 210 | 1,671 |
| Total | 2,500 | 3,770 | 6,570 | 5,426 | 6,530 | 4,980 | 7,870 | 9,860 | 6,720 | 6,500 | 9,320 | 5,110 | 6,263 |
| **TOTAL STANDARD OFFER DEMAND** | 789,500 | 735,470 | 708,470 | 666,969 | 694,514 | 899,996 | 901,480 | 853,954 | 776,641 | 664,525 | 717,277 | 787,845 | 757,720 |

-2-

Confidential

NARR 48950

EUA SYSTEM
1999 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 15 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 470,216 | 462,655 | 423,602 | 391,643 | 409,081 | 484,139 | 557,521 | 515,256 | 565,350 | 408,556 | 526,508 | 485,035 | 454,910 |
| Blackstone | 204,200 | 193,700 | 185,600 | 181,600 | 202,000 | 233,600 | 258,400 | 241,550 | 225,200 | 195,200 | 195,600 | 209,100 | 209,242 |
| Newport | 100,300 | 72,700 | 87,400 | 86,000 | 75,200 | 85,700 | 79,100 | 90,900 | 85,000 | 79,400 | 93,000 | 98,000 | 88,292 |
| Total | 774,716 | 729,055 | 696,602 | 651,643 | 686,281 | 803,439 | 895,021 | 847,656 | 775,550 | 683,156 | 715,100 | 799,155 | 752,444 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,300 | 5,000 | 3,800 | 5,500 | 3,000 | 4,600 | 5,900 | 5,400 | 4,400 | 6,800 | 5,000 | 4,442 |
| NEPOOL External | 0 | 470 | 1,690 | 1,640 | 1,140 | 1,990 | 2,310 | 5,110 | 1,740 | 2,250 | 2,520 | 210 | 1,648 |
| Total | 2,600 | 3,770 | 6,690 | 5,440 | 6,640 | 4,990 | 7,910 | 10,010 | 6,740 | 6,650 | 9,320 | 5,210 | 6,359 |
| **TOTAL STANDARD OFFER DEMAND** | 777,316 | 732,805 | 703,292 | 658,083 | 692,921 | 808,429 | 902,931 | 857,666 | 780,270 | 669,786 | 724,428 | 797,345 | 758,773 |

-5-

Confidential

NARR 48951

EUA SYSTEM
2000 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2000 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STANDARD OFFER PEAK INFORMATION | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| STANDARD OFFER DEMANDS BY COMPANY | | | | | | | | | | | | | |
| Eastern Edison | 477,116 | 449,135 | 429,802 | 397,443 | 415,981 | 489,339 | 543,021 | 520,756 | 469,230 | 404,956 | 440,908 | 491,135 | 460,377 |
| Blackstone | 206,200 | 195,500 | 187,300 | 182,700 | 201,400 | 255,400 | 259,600 | 242,600 | 236,300 | 186,700 | 195,900 | 215,200 | 210,600 |
| Newport | 100,900 | 93,300 | 87,900 | 80,400 | 75,400 | 65,200 | 99,200 | 91,200 | 81,200 | 72,200 | 84,000 | 92,200 | 88,617 |
| Total | 784,216 | 737,935 | 705,002 | 660,543 | 692,781 | 810,139 | 902,321 | 854,556 | 779,730 | 666,556 | 720,808 | 798,535 | 759,594 |
| STANDARD OFFER TRANSMISSION LOSSES | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 5,350 | 5,000 | 3,800 | 5,500 | 3,800 | 4,510 | 5,900 | 5,750 | 3,200 | 5,600 | 5,000 | 4,642 |
| NEPOOL External | 0 | 0 | 1,690 | 1,660 | 1,140 | 1,090 | 2,800 | 4,100 | 1,750 | 3,420 | 2,630 | 210 | 1,686 |
| Total | 2,600 | 3,770 | 6,690 | 5,460 | 6,640 | 4,990 | 7,310 | 10,000 | 6,730 | 6,620 | 9,330 | 5,210 | 6,328 |
| TOTAL STANDARD OFFER DEMAND | 786,816 | 741,705 | 711,692 | 665,983 | 699,421 | 815,129 | 910,231 | 864,556 | 786,460 | 675,176 | 730,135 | 803,745 | 765,921 |

-4-

Confidential

NARR 48952

EUA SYSTEM
2001 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 12 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | | 42 | 70 | 66 | 89 | 89 | 82 | 48 | 33 | | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 482,216 | 453,935 | 426,402 | 501,663 | 439,281 | 496,039 | 550,421 | 527,856 | 674,720 | 410,156 | 447,008 | 495,835 | 466,210 |
| Blackstone | 207,100 | 195,500 | 198,200 | 183,600 | 295,000 | 256,900 | 262,300 | 245,000 | 228,500 | 186,500 | 195,800 | 212,200 | 213,292 |
| Newport | 101,100 | 93,500 | 86,100 | 80,600 | 75,800 | 66,700 | 100,200 | 91,800 | 85,800 | 79,700 | 86,600 | 98,900 | 89,067 |
| Total | 790,416 | 743,835 | 710,702 | 665,843 | 700,081 | 819,639 | 912,921 | 864,656 | 789,030 | 676,356 | 729,408 | 807,935 | 767,569 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,580 | 5,000 | 3,800 | 5,800 | 5,800 | 7,700 | 5,900 | 5,000 | 5,400 | 6,900 | 5,000 | 5,655 |
| NEPOOL External | 0 | 460 | 1,690 | 1,650 | 650 | 1,200 | 2,130 | 5,130 | 1,750 | 2,240 | 2,560 | 210 | 1,699 |
| Total | 2,600 | 3,780 | 6,690 | 5,450 | 6,650 | 5,000 | 9,530 | 10,830 | 6,750 | 6,640 | 9,460 | 5,210 | 6,358 |
| **TOTAL STANDARD OFFER DEMAND** | 793,016 | 747,615 | 717,392 | 671,293 | 706,731 | 824,639 | 920,951 | 874,666 | 795,780 | 682,996 | 738,868 | 813,145 | 775,926 |

-5-

Confidential

NARR 48953

EUA SYSTEM
2002 STANDARD OFFER PEAK DEMANDS
(KW)

MONTHLY LOADS

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STANDARD OFFER PEAK INFORMATION** | | | | | | | | | | | | | |
| Day | Thu | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Wed | Tue | Tue | Tue | |
| Hour | 6 PM | 6 PM | 11 AM | 11 AM | 2 PM | 3 PM | 2 PM | 2 PM | 2 PM | 7 PM | 6 PM | 6 PM | |
| Temperature | 11 | 13 | 22 | 42 | 70 | 86 | 89 | 89 | 82 | 48 | 35 | 20 | |
| **STANDARD OFFER DEMANDS BY COMPANY** | | | | | | | | | | | | | |
| Eastern Edison | 408,816 | 460,135 | 460,402 | 407,263 | 423,881 | 500,939 | 555,921 | 533,056 | 572,503 | 416,256 | 461,308 | 501,635 | 471,419 |
| Blackstone | 289,100 | 198,100 | 190,100 | 185,583 | 265,700 | 238,700 | 264,500 | 246,900 | 232,100 | 186,000 | 197,300 | 213,900 | 214,083 |
| Newport | 101,800 | 94,100 | 88,700 | 81,100 | 76,200 | 87,100 | 100,500 | 92,100 | 86,100 | 80,000 | 86,900 | 97,300 | 89,492 |
| Total | 799,716 | 752,535 | 719,202 | 673,743 | 766,781 | 826,739 | 920,721 | 872,056 | 795,830 | 682,256 | 735,508 | 815,835 | 774,994 |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| EUA Internal | 2,600 | 3,400 | 5,100 | 3,900 | 5,500 | 3,900 | 4,700 | 4,000 | 5,100 | 4,400 | 6,900 | 5,100 | 4,711 |
| NEPOOL External | 0 | 400 | 1,710 | 1,670 | 1,160 | 1,210 | 3,160 | 6,170 | 1,760 | 2,250 | 2,580 | 220 | 1,314 |
| Total | 2,600 | 3,800 | 6,810 | 5,570 | 6,660 | 5,110 | 8,860 | 10,170 | 6,860 | 6,650 | 9,480 | 5,320 | 6,451 |
| **TOTAL STANDARD OFFER DEMAND** | 802,316 | 756,415 | 726,012 | 679,313 | 773,441 | 831,849 | 929,781 | 882,226 | 802,690 | 688,906 | 744,988 | 820,155 | 781,424 |

-6-

Confidential

NARR 48954

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1997 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1997 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | |
| External | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| **TOTAL STANDARD OFFER** | | | | | | | | | | | | | |

Confidential

NARR 48955

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1998 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1998 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | |
| External | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| **TOTAL STANDARD OFFER** | | | | | | | | | | | | | |

Confidential

NARR 48956

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

1999 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 1999 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | |
| External | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| **TOTAL STANDARD OFFER** | | | | | | | | | | | | | |

Confidential

NARR 48957

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2000 XM1

| | January | February | March | April | May | June | July | August | September | October | November | December | 2000 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | |
| External | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| **TOTAL STANDARD OFFER** | | | | | | | | | | | | | |

-14-

Confidential

NARR 48958

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2001 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2001 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | |
| External | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| **TOTAL STANDARD OFFER** | | | | | | | | | | | | | |

-1-

Confidential

NARR 48959

EUA SYSTEM

STANDARD OFFER BILLINGS AND REQUIREMENTS

2002 KWH

| | January | February | March | April | May | June | July | August | September | October | November | December | 2002 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BLACKSTONE** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **EASTERN EDISON** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **NEWPORT** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **TOTAL INCLUDING DISTRIBUTION LOSSES** | | | | | | | | | | | | | |
| Sales Billed | | | | | | | | | | | | | |
| Company Use | | | | | | | | | | | | | |
| Losses and Unbilled | | | | | | | | | | | | | |
| Requirements | | | | | | | | | | | | | |
| **STANDARD OFFER TRANSMISSION LOSSES** | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | |
| External | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | |
| **TOTAL STANDARD OFFER** | | | | | | | | | | | | | |

-12-

Confidential

**APPENDIX 3**

**STANDARD OFFER FUEL INDEX**

NARR 48961

The Companies have a Fuel Adjustment mechanism in their respective retail Standard Offer Service tariffs which will produce additional revenues in the event of substantial increases in the market prices of No. 6 residual fuel oil (1% sulfur) and natural gas after 1999. This fuel adjustment mechanism is subject to continued regulatory supervision and approval which allows the Companies to collect such revenues from their retail customers taking Standard Offer Service. The formula and indices used for calculating such revenues are also subject to regulatory change.

Any incremental revenues received under this mechanism will be fully allocated to Suppliers of Standard Offer Service in proportion to the Standard Offer Service energy provided by the Suppliers to the Companies in the applicable billing month. The amount of such incremental revenue will depend on the amount by which market fuel prices exceed the predetermined price trigger levels.

The retail Standard Offer rate in effect for a given month is multiplied by a "Fuel Adjustment Multiplier" that is set equal to 1.0 and thus has no impact unless the "Market Gas Price" plus "Market Oil Price" for the billing month exceeds the "Fuel Trigger Point" then in effect, where:

Market Gas Price is the average of the values of "Gas Index" for the most recent six months through and including the billing month, where:

> Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in *The Wall Street Journal*, expressed in dollars per MMBtu. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of "Oil Index" for the most recent six months through and including the billing month, where:

> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No.6 oil into New York harbor, as reported in *Platt's Oilgram U.S. Marketscan* in dollars per barrel and converted to dollars per MMBtu by dividing by 6.3; and

If the indices referred to above should become obsolete or no longer suitable, the Companies shall file alternate indices with the appropriate regulatory agencies for approval. Upon regulatory approval, such indices will be used for calculating Fuel Adjustment revenues in accordance with the order(s) and shall be incorporated into the terms of the retail Standard Offer Service tariffs.

<u>Fuel</u> <u>Trigger</u> <u>Point</u> is the following amounts, expressed in dollars per MMBtu, applicable for all months in the specified calendar year:

| | |
|---|---|
| 2000 | $5.35/MMBtu |
| 2001 | $5.35 |
| 2002 | $6.09 |
| 2003 | $7.01 |
| 2004 | $7.74 |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment Multiplier for the billing month is determined according to the following formula:

$$\text{Fuel Adjustment Multiplier} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBtu}) + (\text{Market Oil Price} + 0.04/\text{MMBtu})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBtu}}$$

where:   Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above.

*For example, if for a month in the year 2002 the Market Gas price and Market Oil price total $6.50 ($3.50/MMBtu and $3.00/MMBtu respectively), the Fuel Trigger Point of $6.09 would be exceeded. In this case the Fuel Adjustment Multiplier would be:*

$$\frac{(\$3.50 + \$0.60) + (\$3.00 + \$0.04)}{\$6.09 + \$0.60 + \$0.04} = 1.0609$$

*The Customer Rate is increased by this Fuel Adjustment Multiplier for the billing month, becoming 4.45 cent/KWH (4.2 x 1.0609).*

The incremental revenues attributable to the Customer Rate Fuel Adjustment mechanism will be allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier in the applicable billing month, pursuant to Article 5 of the Standard Offer Service Agreement.

In subsequent months the same comparisons are made and, if applicable, a Fuel Adjustment Multiplier determined.

**Confidential**

**APPENDIX 4**

**PROPOSAL BID FORMS**

Confidential

**Appendix 1**

**Standard Offer Service
Project Proposal Bid Form**

Bidder Name:  _____
Authorized Contact Person:  _____
Mailing Address:  _____

City/State/Zip:  _____

Telephone Number:  _____
Facsimile Number:  _____
E-Mail Address:  _____

Legal Description of Bidder:  _____
_____
_____

Description of Affiliations:  _____
_____
_____

Is Bidder a NEPOOL Member:
                                           _____                      _____
                                           Yes                        No

If No, please identify the NEPOOL Member that the Bidder has a
contract with that will include the Standard Offer Load in their Own-load
dispatch.
                    Entity Name:  _____
                    Contact Person:  _____
                    Telephone Number:  _____
                    Facsimile Number:  _____

Is Bidder Registered as a Non-Regulated Power Supplier in Rhode Island?
                                           _____                      _____
                                           Yes                        No
Is Bidder Registered as a Non-Regulated Power Supplier in Massachusetts?

                                           Yes                        No

Does the Bidder have changes to the Standard Offer Service Agreement?

_____  _____
_____
_____

( attach additional sheets as required)

02/27/98

**Confidential**

**NARR 48965**

**Appendix 1**

**Standard Offer Service
Project Proposal Bid Form**

| | Calendar Year | (a) Standard Offer Wholesale Rate ($/kwh) | (b) % Discount | (c) Bid Rate (a) x (b) ($/kwh) | (d) % Standard Offer Load |
|---|---|---|---|---|---|
| Option 1 | 1998 | | | | |
| | | | | | |
| Option 2 | 1999 | | | | |
| | 2000 | | | | |
| | 2001 | | | | |
| | 2002 | | | | |
| | 2003 | | | | |
| | 2004 | | | | |

Note:

The Standard Offer Wholesale rate and resulting Bid Rate will be paid based on actual energy delivered to the meters of those customers taking Standard Offer Service under the Companies Standard Offer tariffs.

The Calendar Year for Option 1 is from June 1, 1998 through December 31, 1998.

02/27/98

**Confidential**

**NARR 48966**

# Tab 40-3

## APPENDIX 5

### DRAFT STANDARD OFFER
### SERVICE AGREEMENT

**Confidential**

**NARR 48967**

**Appendix 5   Standard Offer Service Agreement**

Standard Offer Service Agreement

between

# Blackstone Valley Electric Company

# Eastern Edison Company

# Newport Electric Corporation
# and

_____

Dated _____

3/2/98

**Confidential**

**NARR 48968**

## TABLE OF CONTENTS

Page

ARTICLE 1.   Definitions ...................................... 1

ARTICLE 2.   Term ............................................. 3

ARTICLE 3.   Supplier Responsibilities ....................... 3

ARTICLE 4.   Estimation of Hourly Loads and Reporting to
             the ISO .......................................... 4

ARTICLE 5.   Price ............................................ 5

ARTICLE 6.   Billing and Payments ............................ 6

ARTICLE 7.   Security Provisions .............................. 7

ARTICLE 8.   Events of Default, Liability, Relationship of
             the Companies .................................... 8

ARTICLE 9.   Termination ...................................... 9

ARTICLE 10.  Force Majeure .................................... 9

ARTICLE 11.  Assignment ...................................... 10

ARTICLE 12.  Successors and Assigns .......................... 11

ARTICLE 13.  Resolution of Disputes .......................... 11

ARTICLE 14.  Interpretation .................................. 13

ARTICLE 15.  Severability of Provisions ...................... 13

ARTICLE 16.  Accounts and Records ............................ 13

ARTICLE 17.  Limitations on Liability and Indemnification ... 13

ARTICLE 18.  Regulation ...................................... 14

ARTICLE 19.  Notices ......................................... 14

ARTICLE 20.  Miscellaneous ................................... 15

Appendix A Schedule of Supplier's Share of Offer Service and
Delivered Energy Price

**Confidential**                                                                    **NARR 48969**

STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this _____ day of _____ _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and _____
_____
_____
_____, ("Supplier"), on the other hand.

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

ARTICLE 1.    Definitions.

Whenever used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Bid Price" shall mean the Standard Offer Wholesale Price multiplied by one minus the Supplier's Discount for each of the calendar years as shown in Appendix A.

- 1 -

**Confidential**

"<u>Commencement Date of Service</u>" shall mean 12:01 A.M. on

_____

"<u>Contract Year</u>" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"<u>Companies' System</u>" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"<u>Delivered Energy</u>" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"<u>Delivery Point</u>" shall be any location on the NEPOOL PTF system or Companies' System.

"<u>Discount</u>" shall mean the percentage discount off the Standard Offer Wholesale Price of electricity, which discount is offered by Supplier for a given Contract Year as determined through the Company's Standard Offer auction.

"<u>D.T.E.</u>" shall mean the Massachusetts Department of Energy and Telecommunications, formerly the Department of Public Utilities.

"<u>ISO</u>" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"<u>NEPOOL</u>" shall mean the New England Power Pool or its successor.

"<u>Parties</u>" shall mean the Supplier and the Companies and their respective successors and assigns.

"<u>Price</u>" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B.  The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

"<u>PTF</u>" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"<u>P.U.C.</u>" shall mean the Rhode Island Public Utilities Commission.

-2-

**Confidential**

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service.Tariff No. M.D.T.E. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time.  Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable.  These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.    Term.

The term of this Agreement shall begin on the Commencement Date of Service and end at 11:59 p.m. on December 31, 2004, unless terminated sooner in accordance with Article 8 or 9.

ARTICLE 3. Supplier Responsibilities.

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

-3-

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO.

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

-4-

**Confidential**

**NARR 48973**

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

At the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, less losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.


ARTICLE 5.    Price.

For each kilowatt hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt hour calculated as follows:

Price = Bid Price + Fuel Adjustment Factor

where:    Bid Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

-5-

**Confidential**

**NARR 48974**

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6.    Billing and Payments.

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5.  The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 13 of this Agreement.  Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data.  Supplier may dispute such adjustment in writing within thirty days of receipt of the proposed adjustment.

-6-

ARTICLE 7.    Security Provisions.

*(Applicable to Option 2 Full Term Standard Offer)*

As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a financial surety to secure Supplier's performance under this Agreement.

The amount of the financial surety shall be calculated annually based on the following formula:

$$SD(n) = SF \times STDL(n-1) \times \{ (PSTD(n) \times TD(n)) \\ + (PSTD(n+1) \times TD(n+1)) \\ + (PSTD(n+2) \times TD(n+2)) + \ldots + \\ + (PSTD(2004) \times TD(2004)) \}$$

Where:

| | |
|---|---|
| $SD(n)$ | is the Security Deposit in Contract Year $(n)$ |
| $SF$ | is the Security Fee equal to \$10.00/MWh |
| $STDL(n-1)$ | is the aggregate load of those customers taking Standard Offer Service in the previous Contract Year $(n-1)$, expressed in MWh. In 1997, STDL shall be 4,500,000 MWh. |
| $PSTD(n)$ | is the percentage share of Standard Offer Service load that the Supplier has committed to provide in Contract Year $(n)$ |
| $TD(n)$ | is the Transition Discount in Contract Year $(n)$, calculated as follows: |

$$
\begin{aligned}
TD(n) &= 1.00 \\
TD(n+1) &= (7-1)/7 = 0.857 \\
TD(n+2) &= (7-2)/7 = 0.714 \\
TD(n+3) &= (7-3)/7 = 0.571 \\
TD(n+4) &= (7-4)/7 = 0.429 \\
TD(n+5) &= (7-5)/7 = 0.286 \\
TD(n+6) &= (7-6)/7 = 0.143
\end{aligned}
$$

To secure the above amounts, Supplier shall provide a letter of credit, performance bond, or a parent guarantee in a form acceptable to Company. The bank issuing such letter of credit on behalf of a Supplier must maintain a long-term debt rating of "A" or better from Standard and Poor's Rating Services or Moody's Investors Service. If a performance bond is provided it is required that each surety company issuing such performance bond on behalf of a Supplier must maintain a rating of "B+" or better from A.M. Best Company. If a parent guarantee is provided the parent company must maintain investment grade long-term bond ratings of at least BBB- by Standard and Poor's Rating Service or Baa3 by Moody's Investors Service.

-7-

**Confidential**

The Performance Letter of Credit or Bond, if not issued for the full term of the Supplier's Standard Offer Service obligation, shall be renewed on an annual basis or replaced and superseded by a like kind of surety at least thirty (30) days prior to the expiration of such prior surety on a continuing basis to the termination of this Agreement or until Supplier's share of Standard Offer Service load is zero. The amount of such financial security may be amended on an annual basis to reflect the security amount calculated pursuant to this Article 7 for the remaining term of this Agreement.

ARTICLE 8.    Events of Default, Liability, Relationship of the Companies.

(1)  Unless excused by a Force Majeure as described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

(a)  Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)  Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c)  Failure of Supplier to maintain any of the security requirements outlined in Article 7, and such failure is not cured or rectified within five (5) days after notice thereof from the Companies.

(2)  Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default.  In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint.  Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service Power requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

-8-

**Confidential**

(3)  Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the Security amounts calculated pursuant to Article 7 and regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the financial surety used to secure such amounts. The Parties expressly agree that the amounts set forth in the financial surety documentation do not constitute liquidated damages.  In addition to the financial surety amounts, the Supplier shall be liable to the Companies for any direct damages resulting from an Event of Default, including replacement power costs incremental to the Bid Price. The Companies may pursue any remedies or other damages provided for under law, including indirect, consequential, reliance and incidental damages, and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

ARTICLE 9.    Termination.

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months.

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier.

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide financial surety to the Companies pursuant to Article 7 shall be terminated.

ARTICLE 10.    Force Majeure.

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure.  A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having

-9-

**Confidential**

jurisdiction thereof, but only if and to the extent that the event directly and adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are absolutely necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating any generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)  The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence.

(b)  The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure.

(c)  The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition.

(d)  The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.


ARTICLE 11.    Assignment.

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (I) the assignment, pledge or other transfer to another company in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can

- 10 -

meet the obligations of the assignor, pledgor or transferor under
this Agreement, or (ii) the transfer, incident to a merger or
consolidation with, or transfer of all (or substantially all) of
the assets of the transferor, to another person or business
entity, provided, such transferee expressly assumes and
demonstrates, to the reasonable satisfaction of the non-assigning
party, that it can meet all the obligations of the assignor,
pledgor or transferor under this Agreement.

ARTICLE 12.     <u>Successors and Assigns.</u>

     This Agreement shall be binding upon and shall inure to the
benefit of the Parties and their successors and assignees.

ARTICLE 13.     <u>Resolution of Disputes.</u>

     Subject to Section 3 of Article 8, all disputes between the
Companies and Supplier resulting from or arising out of
performance under this Agreement shall be referred to a senior
representative of the Companies with authority to settle,
designated by the Companies, and a senior representative of
Supplier with authority to settle, designated by Supplier, for
resolution on an informal, face-to-face basis as promptly as
practicable.  The Parties agree that such informal discussion
shall be conducted in good faith.  The discussions between such
representatives shall be considered "settlement talks" under Rule
403 of the Federal Rules of Evidence or analogous Massachusetts
rules or practices and such discussions shall have no evidentiary
value <u>provided</u>, <u>however</u>, that either Party may introduce evidence
of matters discussed in such settlement talks, if the facts and
documents reflecting such matters are discovered or otherwise
come into a Party's possession independent of such settlement
talks.  In the event the designated senior representatives are
unable to resolve the dispute within thirty (30) days, or such
other period as the Companies and the Supplier may jointly agree
upon, such dispute may be submitted to arbitration and resolved
in accordance with the arbitration procedure set forth herein if
the Companies and Supplier jointly agree to submit it to
arbitration.  Nothing in this Article 13 shall prevent the
Companies from issuing, pursuant to Sections 1(a) and (c)of
Article 8, notice of failure to comply with, observe or perform
this Agreement or to maintain any of the security requirements
under Article 7 to Supplier, and upon failure to cure or rectify
by Supplier, exercise their rights under the financial surety.
Supplier, however, may dispute the exercise by the Companies of
their rights under the financial surety, under this Article 13,
after such exercise.

- 11 -

**Confidential**

**NARR 48980**

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall be provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et. seq.).

- 12 -

ARTICLE 14.    <u>Interpretation.</u>

The interpretation and performance of this Agreement shall
be in accordance with and shall be controlled by the laws of the
Commonwealth of Massachusetts, without regard to Massachusetts
conflict of law principles.

ARTICLE 15.    <u>Severability of Provisions.</u>

Subject to the provisions of Article 14 above, a holding by
any court having jurisdiction that any provision of this
Agreement is invalid or unenforceable shall not result in
invalidation or unenforceability of the entire Agreement but all
remaining terms shall remain in full force and effect.

ARTICLE 16.    <u>Accounts and Records.</u>

The Companies and Supplier shall keep complete and accurate
records of their operations hereunder and shall maintain such
data for a period of at least two (2) years after final billing.
The Companies and Supplier shall have the right, during normal
business hours, to examine and inspect all such records insofar
as may be necessary for the purpose of ascertaining the
reasonableness and accuracy of all relevant data, estimates or
statement of charges associated with service hereunder.

ARTICLE 17.    <u>Limitations on Liability and Indemnification.</u>

Each Party agrees to indemnify, defend, and hold the other
Party (including the other Party's affiliated companies,
trustees, directors, board members, officers, employees, and
agents) harmless from and against any and all third party
damages, costs, claims, liabilities, actions or proceedings
arising from or claimed to have arisen from the negligent acts or
omissions of the indemnifying Party's employees or agents.

The Parties hereby waive and release the other Party as well
as the other Party's affiliated companies, trustees, directors,
officers, employees, and agents from any liability, claim, or
action arising from damage to its property due to the performance
of this Agreement.

- 13 -

**Confidential**

**NARR 48982**

ARTICLE 18.    <u>Regulation.</u>

(a)  This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided</u>, <u>however</u>, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)  This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules").  If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule.  If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 19.    <u>Notices.</u>

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

<u>To Companies</u>:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

<u>To Supplier</u>:
Title
Wholesale Marketing Company
Post Office or Street Address
City, State, Zip Code

Such addresses may be changed from time to time by written notice by either Party to the other Party.

-14-

ARTICLE 20.    <u>Miscellaneous.</u>

(a)  Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)  Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)  Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)  This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)  Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)  Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)  Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

-15-

**Confidential**

**NARR 48984**

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:        Supplier's NAME

By:_____

On Behalf of the Companies:

Blackstone:     BLACKSTONE VALLEY ELECTRIC COMPANY

By:_____

Eastern:        EASTERN EDISON COMPANY

By:_____

Newport:        NEWPORT ELECTRIC CORPORATION

By:_____

- 16 -

Confidential

NARR 48985

## APPENDIX A

### SCHEDULE OF SUPPLIER'S LOAD RESPONSIBILITY
### AND
### PRICE

| Calendar Year | Supplier's Load Responsibility | Standard Offer Wholesale Price | Discount Offered | Bid Price |
|---|---|---|---|---|
| 1998 | | 3.2 cents/kWh | | |
| 1999 | | 3.5 cents/kWh | | |
| 2000 | | 3.8 cents/kWh | | |
| 2001 | | 3.8 cents/kWh | | |
| 2002 | | 4.2 cents/kWh | | |
| 2003 | | 4.7 cents/kWh | | |
| 2004 | | 5.1 cents/kWh | | |

**Confidential**

**APPENDIX 6**

**FORM OF PERFORMANCE SURETY DOCUMENTS**

**Confidential**

**NARR 48987**

Form of Performance Surety Letter of Credit

Performance surety provided in the form of a letter of credit must be in substantially the
form given below.

```
Irrevocable Standby Letter of Credit    Date:(        )

BENEFICIARY                    Credit Number: (      )

Eastern Edison Company
Blackstone Valley Electric Company
Newport Electric Corporation
One Liberty Square
P.O. Box 2333
Boston, MA 02107

Gentlemen:

     BY ORDER OF:
                     (Supplier name and address)

                 or (Guarantor name and address)

     We hereby open in your favor our Irrevocable Standby Letter
of Credit for the account of (the Supplier)[(the Guarantor) on
behalf of (the Supplier)]for a sum or sums not exceeding a
total of US DOLLARS $xx,xxx.xx(written dollar amount AND xx/100
U.S. DOLLARS) available by your draft(s) at SIGHT on OURSELVES
effective(date)and expiring on (date).

Draft(s) must be accompanied by:

1.   Your written letter requesting payment under this
     Letter of Credit signed by a representative of Eastern
     Edison Company, Blackstone Valley Electric Company, and
     Newport Electric Corporation ("the EUA Companies").
     Such letter from the EUA Companies shall include a
     statement of the dollar amount due to the EUA
     Companies, pursuant to the obligations of
     (Supplier/Guarantor)as set forth in the Standard Offer
     Service Agreement by and between (Supplier/Guarantor)
     and the EUA Companies.

Partial drawings are permitted under this Letter of Credit.

Each draft must bear upon its face the clause "Drawn under
Letter of Credit No. (    .    ) dated (          ) of the
(Bank)."

We agree to renew this Letter of Credit automatically for a
period of one (1) year from the initial expiration and each
subsequent expiry date unless the beneficiary has received
by registered or certified mail, return receipt requested,
written notification of our intention not to renew, post
marked no less than thirty (30) days prior to the expiration
of any term.
```

**Confidential**

**NARR 48988**

If this Letter of Credit shall not be extended and the obligation of (Supplier/Guarantor)under the Standard Offer Service Agreement, as secured by this Letter of Credit, remains outstanding, and (Supplier/Guarantor)has failed to provide an amended or substitute Letter of Credit in accordance with your terms and conditions, you may draw upon us forthwith for the full amount of this Letter of Credit by means of your sight draft together with the following document:

Your signed statement certifying that (Supplier/Guarantor)has failed to provide you with a substitute Letter of Credit within fifteen (15) days from the date of your receipt of our  notice not to renew.

We hereby agree that drafts drawn under and in compliance with the terms of this letter of credit will be duly honored if presented to the above-mentioned drawee on or before (FILL IN EXPIRATION DATE), or any subsequent expiration date.

Except so far as otherwise expressly stated herein, this letter of credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500.

Kindly address all correspondence regarding this letter of credit to the attention of our (Bank credit operations name) and, attention (Bank credit operations contact), mentioning our reference number as it appears above.  Telephone inquires can be made to(Bank credit operations contact).

**Confidential**

**NARR 48989**

Form of Performance Surety Performance Bond

**Performance surety provided in the form of a performance bond must be in substantially the form given below.**

PERFORMANCE BOND    NO. [    .    ].

KNOW ALL MEN BY THESE PRESENTS, that ( Prospective Supplier or Guarantor(s) name(s)) as Principal, and ( Surety Company name ) as Surety, are held firmly bound unto Eastern Edison Company, Blackstone Valley Electric Company, and Newport Electric Corporation as Obligees in the sum of [dollars] lawful money of the United States of America, to be paid to the Obligees, for which payment, well and truly to be made, we bind ourselves, our respective heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has entered a written Standard Offer Service Agreement dated (        ) (the "Agreement") with the Obligees for the delivery of requirements electric service (the "Standard Offer Service").

NOW THEREFORE, the condition of this obligation is such that, if the Principal shall promptly and faithfully perform delivery of the Standard Offer Service pursuant to the undertakings, covenants, terms and conditions of the Agreement, then this obligation shall become null and void; otherwise it shall remain in full force and virtue.

No right of action shall accrue upon or by reason hereof to, or for the use or benefit of anyone other than the named Obligees.

Whenever the Principal shall be declared by the Obligees to be in default in relation to the Principal's obligations under the Agreement, the Surety shall:

1. Immediately upon the presentation by the Obligees to the Surety of a Notice of Claim stating that the Principal is in default of Principal's obligations under the Agreement, pay to the Obligees such dollar amount due to the Obligees under the Agreement.

In witness whereof we hereunto set our hands and seals this (    ) day of (        ), A.D. 19(   ).
(                        )
        (Principal)

**Confidential**

```
          by: (                    ) (seal)
    }        (                    )
                      (Surety)
          by: (                    ) (seal)
```

Confidential

## GUARANTY

1.(a)    Reference is made to the Standard Offer Service Agreement dated as of _____ 1998 (the "Agreement") between Blackstone Valley Electric Company, Newport Electric Corporation, and Eastern Edison Company (collectively the "Companies") on the one hand, and _____ (the "Supplier"), on the other hand. For good and valuable consideration received, _____, (the "Guarantors") hereby irrevocably and unconditionally jointly and severally guarantee to the Companies and their successors and assigns that the Supplier shall perform all of its obligations under the Agreement, including, but not limited to, the delivery of electric service and the due and punctual payment of all amounts required to be paid by the Supplier pursuant to Article 7 of the Agreement; and insofar as the Guarantors are able, performance and observance of and compliance with all other obligations, covenants, and undertakings of the Supplier contained in the Agreement and any other agreement or instrument relating thereto (collectively, the "Obligations"), at the times and in the manner provided therein. This Guaranty shall be an absolute, unconditional, present and continuing guaranty of payment and performance (not of collection or collectibility) which shall remain in full force and effect until each and all of the Obligations guaranteed hereunder shall have been fully and satisfactorily discharged in accordance with the terms and provisions of the Agreement and any other agreement or instrument relating thereto, and that its undertakings hereunder are not contingent upon the bringing of any action against the Supplier or any other person or entity or resorting to any security or exercise or assertion of any other right or remedy against the Supplier or any other person or entity, and Guarantor hereby expressly waives any claim that its undertakings hereunder are so contingent.

1.(b)    Notwithstanding Section 1(a) or any other paragraph hereof:

i) the Guarantors' liability hereunder shall be and is specifically limited to payments or performance expressly required by the Supplier in accordance with the Obligations (even if such payments are deemed to be damages) and except to the extent specifically provided in the Agreement and any other agreement or instrument relating thereto, in no event shall the Guarantors be subject hereunder to consequential, exemplary, equitable, loss of profits, punitive, tort, or any other damages, costs, or attorney's fees.

2.    The liability of the Guarantor under this Guaranty shall be absolute, unconditional and irrevocable, irrespective of:

(a)    any change in time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or, waiver of, or any consent to departure from, the Agreement or any other agreement or instrument relating thereto;

(b)    any change in ownership of the Guarantor or the Supplier; or

**Confidential**

(c)    any bankruptcy, insolvency or reorganization of, or other similar
proceedings involving the Supplier.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if
at any time any payment of any of the Obligations is rescinded or must otherwise
be returned by the Companies upon the insolvency, bankruptcy or reorganization
of the Supplier or otherwise, all as though such payment had not been made.

3.    The Guarantor hereby irrevocably, unconditionally and expressly waives, to the
fullest extent permitted by applicable law, promptness, diligence, notice of
acceptance and any other notice with respect to any of the Obligations and this
Guaranty and any requirement that the Companies protect, secure or perfect any
security interest or exhaust any right or first proceed against the Supplier or any
other person or entity.

4.    This Guaranty constitutes a primary obligation of the Guarantor and is a
continuing guaranty and shall (a) be binding upon the Guarantor and its
successors and assigns and (b) inure to the benefit of and be enforceable by the
Companies and their successors and assigns.

5.    Upon payment of all Obligations owing to the Companies, the Guarantors shall be
subrogated to the rights of the Companies against the Supplier.

6.    This Guarantee may be terminated upon the later of February 28, 2005, or such
time as all Obligations incurred prior to such termination have been satisfied.

7.    This Guarantee shall be governed by and construed in accordance with the laws of
the Commonwealth of Massachusetts and the Guarantors hereto submit to the
non-exclusive jurisdiction of the courts of the Commonwealth of Massachusetts
or of the federal courts located in Boston, Massachusetts, exclusively, without
request for arbitration.  Process shall be made by certified mail.

[GUARANTOR]


By:
Name:
Title:


G:\STDOFFER\RFP\GUARANTY.DOC

Confidential                                                                    NARR 48993

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item:  RR1-4:  Please provide a response to Commission Data Requests Comm-1-5 to indicate
estimates for BVE & NEC separately.

Reply:

The Companies  estimated total power requirements for new customers
taking service after January 1, 1998 from 1998-2002 are as follows:

| | kWh Requirements | | Peak kW Demand | |
|---|---|---|---|---|
| Year | BVE | NEC | BVE | NEC |
| 1998 | 9,090,679 | 2,321,570 | 2,602 | 668 |
| 1999 | 26,095,834 | 6,747,556 | 5,525 | 1,272 |
| 2000 | 43,356,953 | 11,242,080 | 8,945 | 1,961 |
| 2001 | 60,866,352 | 15,784,755 | 12,397 | 2,714 |
| 2002 | 78,718,570 | 20,411,815 | 15,923 | 3,484 |

Witness Responsible:  J.J. Bonner

Q:\RR\2716COMM\RECORD R\RR1-4.DOC

**Confidential**

**NARR 48994**

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-5: How does the method proposed by the Companies to apply interest to the SOCA over/underrecoveries compare to how interest was applied to the Fuel & PPCA balances.

- Reply:

The SOCA provisions submitted in the original filing presented on April 15, 1998 included the application of interest to SOCA balance as that balance was being recovered from or returned to customers (Exhibit BVE/NEC-A pages 104 and 117).

The SOCA provisions submitted into evidence on May 12, 1998 (Exhibit BVE/NEC-B) replaced the original SOCA provisions and pages 104 and 117 were removed from evidence in this proceeding.

The Companies intend to address the issue of the application of interest in their March 1999 filings, as required under the provisions of the SOCA

The Companies will continue to apply interest to the final balance remaining in the fuel and purchased power accounts. The final balances are as follows:

|  | Fuel | Purchased Power |
|---|---|---|
| Blackstone | ($610,048.30) | $366,835.26 |
| Newport | ($126,969.66) | ($18,148.52) |

The proposed interest rate to be applied to the above final balances is the Companies' effective average short-term borrowing rate which has been the practice under the Fuel and PPCA factor clauses.

Witness Responsible: J. J. Bonner

Q:\RJT2716COMMRECORD R\RR1-5.DOC

**Confidential**

**NARR 48995**

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-6:  Provide a copy of the Letter of Rejection sent to the Standard Offer Service
bidder.

Reply:        As Mr. Boisvert testified, the bidder of Standard Offer Service was notified of its
rejection by telephone during the first or second week of April. A copy of the
redacted letter of rejection, dated April 21, 1998 is attached.

Witness Responsible:  L. R. Boisvert

\\ALFRED\RESTRUCT\RI\2716COMM\RECORD R\RR1-6.doc

**Confidential**                                                              **NARR 48996**



**Eastern Utilities**

*Blackstone Valley Electric*
*Eastern Edison*
*EUA Service Corporation*
*Montaup Electric*
*Newport Electric*

April 21, 1998



Re: Standard Offer Service RFP

Dear ▮▮▮▮▮:

Thank you for submitting a response to the above referenced RFP. As we discussed, your proposal did not conform to the requirements of the RFP because losses were not included in your pricing. When losses are added, your proposed price exceeds the standard offer price cap. In addition, the proposal was not for a fixed percentage of the standard offer load requirements as specified in the RFP.

In our discussions, you mentioned that ▮▮▮▮▮ may be is interested in pursuing other wholesale type of transactions. Montaup is currently in the market for the purchase of peaking capacity and energy for the remainder of 1998. If you have resources available, we would be happy to discuss the prospects of a transaction.

Also, note that Montaup is active in the daily, weekly and monthly markets. Paul Lopes and Joe Rossignoli are the contacts. They can be reached at (508) 559-2000 extensions 3836 or 3841, respectively.

If you have any questions, please feel free call me at extension 3832. Again, thank you for submitting a response to the RFP and we look forward to doing business with you in the future.

Sincerely



Lawrence R. Boisvert
Supervisor,
Power Supply Administration

*750 West Center Street   P.O. Box 543, West Bridgewater, MA 02379   508-559-2000   FAX: 508-559-8932*

**Confidential**

NARR 48997

BLACKSTONE VALLEY ELECTRIC COMPANY
NEWPORT ELECTRIC CORPORATION
Docket 2716
Commission Record Requests
May 12, 1998

The Commission's First Set of Record Requests dated May 12, 1998.

Item: RR1-7: Regarding an educational television advertisement run by the company related to retail competition, please provide cost and confirm whether costs are paid by ratepayers:

Reply:

The Company has recently produced two educational advertisements related to electric utility industry restructuring. The ads state that customers "can now buy electricity from a competitive supplier" and then informs them about the ongoing role of Eastern Utilities as their "distribution company." In one case the message is "safe reliable service," and in the other, it is continuing safety and science programs in our schools.

<u>Advertising Costs:</u>

| | |
|---|---|
| Production of two thirty-second spots – BVE & Newport's share: | $16,000 |
| RI TV time spent to date – WJAR-TV, WSBE-TV, Cable Rep: | 10,916 |
| Total: | $26,916 |

<u>Are the costs of advertising being paid by ratepayers?</u>

Reasonable levels of educational and informational advertising expenses are allowed to be included in the cost of service for ratemaking purposes. These costs are reported through FERC account #9090 – "Informational and Instructional Advertising Expenses," – and, as such, are "above the line." We have used this FERC account number since we began television advertising in 1989. Furthermore, at the request of Commissioner Racine, the Companies have re-examined the contents of these ads and found them to be truthful and consistent with information about the availability of retail choice provided to the public by the Commission and the Division.

Witness Responsible: M. J. Hirsh

**Confidential**