UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                )
TRANSCANADA POWER  MARKETING LTD.,              )
                                                )
                    Plaintiff,                  )
                                                )
          v.                                    )        C.A. No. 05-40076FDS
                                                )
                                                )
NARRAGANSETT ELECTRIC COMPANY,                  )
                                                )
                    Defendant.                  )
_____)

**SUPPLEMENTAL DOCUMENT APPENDIX**
**Part II**

# Tab 41-1





July 17, 1998

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

RE:    Blackstone Valley Electric Company
       Newport Electric Corporation
       Docket No. 2716, Order No. 15640
       Compliance Filing

Dear Ms. Massaro:

Enclosed herewith for filing are Standard Offer Service tariffs for Blackstone Valley Electric Company ("Blackstone"), R.I.P.U.C. No. 1173, and for Newport Electric Corporation ("Newport"), R.I.P.U.C. No. 1398. These tariffs are filed in compliance with Order No.15640, dated July 10, 1998, in the above referenced docket. The foregoing Standard Offer Service tariffs were approved by the Commission at its May 29, 1998 Open Meeting effective June 1, 1998 for consumption on and after that date.

In compliance with the directives of the above Order, the following changes have been made to the Standard Offer Service tariffs of Blackstone and Newport:

1. The Standard Offer Calendar Year Multiplier Table and all references thereto have been deleted from the tariff.

2. The Standard Offer Cost Adjustment provision has been modified to incorporate the language specified on pages 14 and 15 of the Order.

The Standard Offer tariffs are in Section I of this filing. In addition, Section II includes red-lined copies of the Standard Offer Service tariffs, which compare the compliance tariffs to the Standard Offer Service tariffs submitted as Exhibit BVE/NEC-B during the proceeding.

Further, copies of Blackstone's and Newport's Last Resort Service tariffs and Retail Delivery Service tariffs are included in Section III. These tariffs were approved as filed. The docket references and filing date footers on the tariffs have been updated to reflect the Commission's decision in this docket.

letter2716.doc

NARR 07330

If you have any questions on this matter, please call me at (508) 559-2000 ext. 3700.

Very truly yours,

Dennis St. Pierre
Vice President - Rates

Attachment

cc:     Service List

letter2716.doc

NARR 07331

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
R.I.P.U.C. Docket No. 2716

David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Paul Roberti, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For: TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

Sam DeFrawi
Navy Rate Intervention
901 M Street S.E., Building 212
Washington, DC 20374-5018

Frank P. Pozniak, Esq.
Robert D. Shapiro, Esq.
Rubin & Rudman LLP
50 Rowes Wharf
Boston, MA 02110
For: Enron Capital & Trade Resources

Mary Elizabeth Tighe, V.P.
Eastern Power Distribution, Inc.
2800 Eisenhower Ave.
Alexandria, VA 22314

Douglas F. John, Esq.
John & Hengerer
1200 17th St., NW, Suite 600
Washington, DC 20036-3006
For: NorAm Energy Mgmt., Inc. &
Duke Energy Trading and Marketing LLC

Lindsay Johnson, Esq.
1 Boston Place, Suite 1210
Boston, MA 02108

Kris Errickson
Duke Energy Trading & Marketing
One Westchase Center
10777 Westsheimer, Suite 650
Houston, TX 77042

Q:\RI2716COMM\2716NEW.WPD

**NARR 07332**

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
R.I.P.U.C. Docket No. 2716

Sydney M. Lima, Esq.
RI League of Cities and Towns
One State St., Suite 502
Providence, RI 02908

Hugo Ricci, Esq.
Ricci & Ricci
578 Charles Street
Providence, RI 02904

Richard W. Benka, Esq.
Foley, Hoag & Eliot LLP
One Post Office Square
Boston, MA 02109-2170
For: NEV East, LLC

Andrew Galli, Executive Director
Coalition for Consumer Justice
1468 Broad Street
Providence, RI 02905

Keith Sappenfield, II.
Director of Marketing
NorAm Energy Management, Inc.
P.O. Box 2628
Houston, TX 77252-2628

Dennis Duffy, Esq.
Kevin J. McNeely, Esq.
Partridge, Snow & Hahn
180 South Main Street
Providence, RI 02903

Ronald T. Gerwatowski, Esq.
Narragansett Electric Company
280 Melrose Street, P.O. Box 1438
Providence, RI 02901-1438

Q.WJ\2716CDMM\2716NEW.WPD

NARR 07333

# SECTION I.

# COMPLIANCE TARIFFS

NARR 07334

R.I.P.U.C. NO. 1173
CANCELS NO. 1172

## BLACKSTONE VALLEY ELECTRIC COMPANY
### STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998.  Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:               $0.03051      per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:               $0.03051      per kWh

Residential Space Heating Retail Delivery Service Rate R-3

    Energy Charge:               $0.03158      per kWh

Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:            $0.15384     per kWh
        Off-Peak Hours:       $0.00570     per kWh

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated           for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07335

R.I.P.U.C. NO. 1173

-2-

<u>Small Secondary Voltage General Retail Delivery Service Rate G-1</u>

Energy Charge:                         $0.03589         per kWh

<u>Medium Secondary Voltage General Retail Delivery Service Rate G-2</u>

Non Time-of-Use Billing Option (Rate Code G-2):

Demand Charge:                         $5.81            per kW

Energy Charge:                         $0.01403         per kWh

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

Demand Charge:                         $6.11            per kW

Energy Charge
    Peak Hours:                        $0.02978         per kWh
    Off-Peak Hours:                    $0.00877         per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

<u>Medium Primary Voltage General Retail Delivery Service Rate G-5</u>

Non Time-of-Use Billing Option (Rate Code G-5):

Demand Charge:                         $5.29            per kW

Energy Charge:                         $0.01610         per kWh

The Billing Demand in kilowatts for each month will be the maximum
metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

Demand Charge:                         $5.48            per kW

Energy Charge
    Peak Hours:                        $0.03241         per kWh
    Off-Peak Hours:                    $0.01054         per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

**NARR 07336**

R.I.P.U.C. NO. 1173

-3-

## Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

## Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

## Large Secondary Voltage Auxiliary
## General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07337

R.I.P.U.C. NO. 1173

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07338

R.I.P.U.C. NO. 1173

-5-

customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:              $0.03308        per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:              $0.03339        per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:              $0.03509        per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:              $0.03408        per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

    Peak Hours
        Monday through Friday excluding holidays defined below
        April through September,    11:00 a.m. to  4:00 p.m.
        October through March,       8:00 a.m. to 12:00 noon, and
                                     4:00 p.m. to  7:00 p.m.

    Off-Peak Hours
        All other hours.

        Holidays are defined as:

            New Year's Day              Columbus Day
            President's Day             Veteran's Day
            Memorial Day                Thanksgiving Day
            Independence Day            Christmas Day
            Labor Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07339

R.I.P.U.C. NO. 1173

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

> Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

>> Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU.  NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

> Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

>> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

> Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU |
| 2001 | $5.35  per MMBTU |
| 2002 | $6.09  per MMBTU |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

**NARR 07340**

R.I.P.U.C. NO. 1173

-7-

| 2003 | $7.01 | per MMBTU |
| 2004 | $7.74 | per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07341

R.I.P.U.C. NO. 1173

-8-

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer Fuel Index
and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
beginning on the date service is first taken and ending on the earlier
of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under <u>Small General Retail Delivery Service Rate G-1</u>.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and</u>
<u>Conditions for Electric Power Suppliers</u> in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07342

R.I.P.U.C. NO. 1398
CANCELS NO. 1397

NEWPORT ELECTRIC CORPORATION
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03341 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03341 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| | | |
|---|---|---|
| Energy Charge | | |
| Peak Hours: | $0.15396 | per kWh |
| Off-Peak Hours: | $0.00667 | per kWh |

Small Secondary Voltage General Retail Delivery Service Rate G-1

| | | |
|---|---|---|
| Energy Charge: | $0.03357 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07343

R.I.P.U.C. NO. 1398

-2-

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $6.10 | per kW |
| Energy Charge: | $0.01534 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.59 | per kW |

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.06416 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $6.92 | per kW |
| Energy Charge: | $0.01436 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $7.24 | per kW |

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.06222 | per kWh |
| Off-Peak Hours: | $0.00228 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07344

R.I.P.U.C. NO. 1398

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $8.04 | per kW |
| | | |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $7.27 | per kW |
| | | |
| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Transmission Voltage General Retail Delivery Service Rate C-1

| | | |
|---|---|---|
| Demand Charge: | $5.99 | per kW |
| | | |
| Energy Charge | | |
| Peak Hours: | $0.01882 | per kWh |
| Off-Peak Hours: | $0.01555 | per kWh |

I.   Billing Period

     The Billing Period consists of the days between consecutive meter
     readings.  Service under this Rate is rendered on a full calendar
     day basis.  The first day of any billing period is included in
     its entirety and the last day of any billing period is excluded
     in its entirety.

II.  Backup Billing Period

     The Backup Billing Period consists of the Peak Days within a
     Billing Period during which Backup Service is rendered.  Backup
     Service is rendered when any part of a forced outage occurs
     during Peak Hours and electric service is actually taken.

Date Filed, July 17, 1998               Date Effective, June 1, 1998
per Order No. 15640 dated               for consumption on and after
July 10, 1998 in Docket No. 2716.       June 1, 1998.

NARR 07345

R.I.P.U.C. NO. 1398

-4-

III. Maintenance Billing Period

The Maintenance Billing Period consists of the Peak Days within a
Billing Period during which Maintenance Service is rendered.
Maintenance Service is rendered when any part of a planned outage
occurs during Peak Hours and electric service is actually taken.

IV. Standard Offer Billing Demand

A.   Requirements Service

The Standard Offer Billing Demand in kilowatts for each month is
the maximum metered fifteen-minute demand during Peak Hours
within the Billing Period.

B.   Partial Requirements Service

The Supplementary Demand in kilowatts is the maximum metered
fifteen-minute demand recorded during Peak Hours within the
Billing Period excluding Backup and Maintenance Billing Periods.

The Backup Demand in kilowatts is the maximum metered fifteen-
minute demand recorded during Peak Hours within the Backup
Billing Period in excess of the Supplementary Demand.

The Standard Offer Demand in kilowatts for each month shall be
the sum of:

1.   The Supplementary Demand, and

2.   The Backup Demand times the ratio of the number of
Backup Billing Period Days to the number of Billing
Period Peak Days.

V. Billing Demand Charge

The Billing Demand Charge shall be the Standard Offer Billing
Demand times the Demand Rate.

The terms Requirement Service, Partial Requirements Service,
Supplementary Service, and Backup Service shall be as defined in
Transmission Voltage General Retail Delivery Service Rate C-1.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $4.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07346

R.I.P.U.C. NO. 1398

-5-

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $4.40 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07347

R.I.P.U.C. NO. 1398

-6-

during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:                    $0.03209        per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:                    $0.03241        per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:                    $0.03433        per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:                    $0.03341        per kWh

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07348

Monday through Friday excluding holidays defined below
May through September,      10:00 a.m. to  4:00 p.m.
October through April,        9:00 a.m. to 12:00 noon, and
                              5:00 p.m. to  8:00 p.m.

Off-Peak Hours
    All other hours.

    Holidays are defined as:

        New Year's Day            Columbus Day
        President's Day           Veteran's Day
        Memorial Day              Thanksgiving Day
        Independence Day          Christmas Day
        Labor Day

The foregoing Rates shall be adjusted from time to time in accordance
with provisions of the Standard Offer Fuel Index and the Standard
Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied
by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas
Price plus Market Oil Price for the billing month exceeds the Fuel
Trigger Point then in effect, where:

    Market Gas Price is the average of the values of Gas Index for
    the most recent six months through and including the billing
    month, where:

        Gas Index is the average of the daily settlement prices for
        the last three days that the NYMEX Contract (as defined
        below) for the month of delivery trades as reported in the
        Wall Street Journal, expressed in dollars per MMBTU.  NYMEX
        Contract shall mean the New York Mercantile Exchange Natural
        Gas Futures Contract as approved by the Commodity Futures
        Trading Commission for the purchase and sale of natural gas
        at Henry Hub;

    Market Oil Price is the average of the values of Oil Index for
    the most recent six months through and including the billing
    month, where:

        Oil Index is the average for the month of the daily low
        quotations for cargo delivery of 1.0% sulfur No. 6 residual
        fuel oil into New York harbor, as reported in Platt's
        Oilgram U.S. Marketscan in dollars per barrel and converted
        to dollars per MMBTU by dividing by 6.3; and if the indices
        referred to above should become obsolete or no longer

Date Filed, July 17, 1998           Date Effective, June 1, 1998
per Order No. 15640 dated           for consumption on and after
July 10, 1998 in Docket No. 2716.   June 1, 1998.

NARR 07349

R.I.P.U.C. NO. 1398

-8-

suitable, the distribution company *shall* file alternate
indices with the Department.

<u>Fuel Trigger Point</u> is the following amounts, expressed in dollars
per MMBTU, applicable for all months in the specified calendar
year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU |
| 2001 | $5.35  per MMBTU |
| 2002 | $6.09  per MMBTU |
| 2003 | $7.01  per MMBTU |
| 2004 | $7.74  per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel
Adjustment value for the billing month is determined based according
to the *following formula*:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point
are as defined above.  The values of $0.60 and $0.04/MMBTU
represent for gas and oil respectively, estimated basis
differentials or market costs of transportation from the point
where the index is calculated to a proxy power plant in the New
England market.

Incremental revenues received by the Company from the application of
the Fuel Adjustment shall be fully allocated to Standard Offer
Suppliers in proportion to the Standard Offer energy provided by a
Supplier to the Company in the applicable billing month.

<u>STANDARD OFFER COST ADJUSTMENT</u>:

The following Standard Offer Cost Adjustment shall reflect the
difference between the cost of Standard Offer Service paid by the
Company to wholesale suppliers thereof and the revenues billed by the
Company to Customers taking Standard Offer Service under this Rate
Schedule.  As used herein "Standard Offer Service costs" shall be
those costs incurred by the Company in providing Standard Offer
Service under this Rate Schedule including wholesale rate discounts
arising from the competitive procurement process and any or all other
costs determined by the Public Utilities Commission to be includable
therewith, excluding all costs recoverable through the Standard Offer
Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any
over- or under-collection for the prior calendar year and make a
filing with the Commission.  The Company will propose at that time a
rate recovery/refund methodology to recover or refund the balance, as
appropriate, over the twelve-month period commencing April 1.  The

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07350

R.I.P.U.C. NO. 1398

-9-

Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice.  The Customer shall be ineligible to receive Standard Offer Service thereafter.  The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07351

# SECTION II.

## RED-LINED TARIFFS

NARR 07352

R.I.P.U.C. NO. 115473
CANCELS NO. 113572

## BLACKSTONE VALLEY ELECTRIC COMPANY
### STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:              $0.03051        per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:              $0.03051        per kWh

Residential Space Heating Retail Delivery Service Rate R-3

    Energy Charge:              $0.03158        per kWh

Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:        $0.15384      per kWh
        Off-Peak Hours:   $0.00570      per kWh

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07353

R.I.P.U.C. NO. 11~~54~~73

-2-

Small Secondary Voltage General Retail Delivery Service Rate G-1

    Energy Charge:               $0.03589      per kWh

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

    Demand Charge:             $5.81          per kW

    Energy Charge:               $0.01403      per kWh

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

    Demand Charge:             $6.11          per kW

    Energy Charge
        Peak Hours:           $0.02978      per kWh
        Off-Peak Hours:      $0.00877      per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

    Demand Charge:             $5.29          per kW

    Energy Charge:               $0.01610      per kWh

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

    Demand Charge:             $5.48          per kW

    Energy Charge
        Peak Hours:           $0.03241      per kWh
        Off-Peak Hours:      $0.01054      per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated         for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07354

R.I.P.U.C. NO. 11~~54~~73

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

| | |
|---|---|
| Date Filed, July 17, 1998 | Date Effective, June 1, 1998 |
| per Order No. 15640 dated | for consumption on and after |
| July 10, 1998 in Docket No. 2716. | June 1, 1998. |

NARR 07355

R.I.P.U.C. NO. 11~~54~~73

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the

| | |
|---|---|
| Date Filed, July 17, 1998 | Date Effective, June 1, 1998 |
| per Order No. 15640 dated | for consumption on and after |
| July 10, 1998 in Docket No. 2716. | June 1, 1998. |

NARR 07356

R.I.P.U.C. NO. 1~~154~~73

-5-

customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

     Energy Charge:          $0.03308      per kWh

General Heating Retail Delivery Service Rate H-2

     Energy Charge:          $0.03339      per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

     Energy Charge:          $0.03509      per kWh

Lighting Retail Delivery Service Rate S-1

     Energy Charge:          $0.03408      per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

    Peak Hours
        Monday through Friday excluding holidays defined below
        April through September,   11:00 a.m. to  4:00 p.m.
        October through March,    8:00 a.m. to 12:00 noon, and
                              4:00 p.m. to  7:00 p.m.
    Off-Peak Hours
        All other hours.

        Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or more in the current or preceding eleven months will receive a Power

| | |
|---|---|
| Date Filed, July 17, 1998 | Date Effective, June 1, 1998 |
| per Order No. 15640 dated | for consumption on and after |
| July 10, 1998 in Docket No. 2716. | June 1, 1998. |

NARR 07357

R.I.P.U.C. NO. 11~~54~~73

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

~~The foregoing Rates shall be adjusted effective January 1 of each calendar year beginning in the year 1998 and ending in the year 2009 by multiplying the Rates by the appropriate Cumulative Multiplier shown in the Standard Offer Calendar Year Multiplier Table below.~~ The foregoing Rates shall ~~also~~ be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer ~~Revenue Reconciliation~~ Cost Adjustment described below:

~~STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:~~

| ~~Year~~ | ~~Cumulative Multiplier~~ |
|---|---|
| ~~1998~~ | ~~1.00000~~ |
| ~~1999~~ | ~~1.09375~~ |
| ~~2000~~ | ~~1.18750~~ |
| ~~2001~~ | ~~1.18750~~ |
| ~~2002~~ | ~~1.31250~~ |
| ~~2003~~ | ~~1.46875~~ |
| ~~2004~~ | ~~1.59375~~ |
| ~~2005~~ | ~~1.71875~~ |
| ~~2006~~ | ~~1.84375~~ |
| ~~2007~~ | ~~1.96875~~ |
| ~~2008~~ | ~~2.09375~~ |
| ~~2009~~ | ~~2.21875~~ |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

−7−

<u>Market Oil Price</u> is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

> <u>Oil Index</u> is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

<u>Fuel Trigger Point</u> is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU |
| 2001 | $5.35  per MMBTU |
| 2002 | $6.09  per MMBTU |
| 2003 | $7.01  per MMBTU |
| 2004 | $7.74  per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

> Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

<u>STANDARD OFFER COST ADJUSTMENT:</u>

The following Standard Offer Cost Adjustment shall reflect the differences between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07359

-8-

those costs incurred by the Company in providing Standard Offer
Service under this Rate Schedule including wholesale rate discounts
arising from the competitive procurement process and any or all other
costs determined by the Public Utilities Commission to be includable
therewith, excluding all costs recoverable through the Standard Offer
Fuel Index provision.

~~The Company shall refund any overcollection or recover any~~
~~undercollection of monies attributable to the foregoing differences~~
~~through a Standard Offer Cost Adjustment ("SOCA") factor applied on a~~
~~uniform cents per kilowatthour basis to the bills of all Customers~~
~~taking Retail Delivery Service from the Company.  The Company shall~~
~~file annually on or before March 1 of each year its calculation of the~~
~~SOCA factor with the Commission.  The Commission shall review and~~
~~approve the SOCA factor to be effective for bills rendered to~~
~~Customers commencing April 1 of the current year and ending March 31~~
~~of the following year or such other period that the Commission may~~
~~determine.~~

~~The SOCA factor for each year or such other period that the Commission~~
~~may determine shall be established by calculating the difference~~
~~between the Standard Offer Service costs incurred and the Standard~~
~~Offer Service revenues billed to Customers during the previous~~
~~calendar year and dividing the difference by the total kilowatthour~~
~~sales for Retail Delivery Service for the year or such other period~~
~~that the Commission may determine.~~ By March 1 of each year, the
Company shall determine the amount of any over- or under-collection
for the prior calendar year and make a filing with the Commission.
The Company will propose at that time a rate recovery/refund
methodology to recover or refund the balance, as appropriate, over the
twelve-month period commencing April 1.  The Commission may order the
Company to collect or refund the balance over any reasonable time
period from (i) all customers, (ii) only Standard Offer customers, or
(iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31,
2009, the Company will apply to the Public Utilities Commission for
approval of a temporary per kilowatthour surcharge or credit factor to
be applied to the distribution component of the Retail Delivery Rates
for such a duration as necessary to provide for full recovery or
return of any outstanding balance of Standard Offer Service costs ~~and~~
or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer ~~Calendar Year~~
~~Multiplier and the Standard Offer~~ Fuel Index~~,~~ and Rhode Island Gross
Receipts Tax.

TERM OF CONTRACT:

| | |
|---|---|
| Date Filed, July 17, 1998 | Date Effective, June 1, 1998 |
| per Order No. 15640 dated | for consumption on and after |
| July 10, 1998 in Docket No. 2716. | June 1, 1998. |

NARR 07360

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07361

# Tab 41-2

R.I.P.U.C. NO. 137998
CANCELS NO. 136097

## NEWPORT ELECTRIC CORPORATION
### STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:                   $0.03341         per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:                   $0.03341         per kWh

Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:              $0.15396      per kWh
        Off-Peak Hours:     $0.00667      per kWh

Small Secondary Voltage General Retail Delivery Service Rate G-1

    Energy Charge:                   $0.03357         per kWh

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated         for consumption on and after
July 10, 1998 in Docket No. 2716.     June 1, 1998.

NARR 07362

R.I.P.U.C. NO. 13~~79~~98

-2-

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $6.10 | per kW |
| Energy Charge: | $0.01534 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.59 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.06416 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $6.92 | per kW |
| Energy Charge: | $0.01436 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $7.24 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.06222 | per kWh |
| Off-Peak Hours: | $0.00228 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

R.I.P.U.C. NO. 13~~7~~998

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| Demand Charge: | $8.04 | per kW |
|---|---|---|

Energy Charge
| Peak Hours: | $0.05990 | per kWh |
|---|---|---|
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| Demand Charge: | $7.27 | per kW |
|---|---|---|

Energy Charge
| Peak Hours: | $0.06060 | per kWh |
|---|---|---|
| Off-Peak Hours: | $0.00241 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Transmission Voltage General Retail Delivery Service Rate C-1

| Demand Charge: | $5.99 | per kW |
|---|---|---|

Energy Charge
| Peak Hours: | $0.01882 | per kWh |
|---|---|---|
| Off-Peak Hours: | $0.01555 | per kWh |

I.   Billing Period

The Billing Period consists of the days between consecutive meter
readings.  Service under this Rate is rendered on a full calendar
day basis.  The first day of any billing period is included in
its entirety and the last day of any billing period is excluded
in its entirety.

II.  Backup Billing Period

The Backup Billing Period consists of the Peak Days within a
Billing Period during which Backup Service is rendered.  Backup
Service is rendered when any part of a forced outage occurs
during Peak Hours and electric service is actually taken.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

**NARR 07364**

R.I.P.U.C. NO. 13~~77~~998

-4-

III. Maintenance Billing Period

The Maintenance Billing Period consists of the Peak Days within a
Billing Period during which Maintenance Service is rendered.
Maintenance Service is rendered when any part of a planned outage
occurs during Peak Hours and electric service is actually taken.

IV.  Standard Offer Billing Demand

A.    Requirements Service

The Standard Offer Billing Demand in kilowatts for each month is
the maximum metered fifteen-minute demand during Peak Hours
within the Billing Period.

B.    Partial Requirements Service

The Supplementary Demand in kilowatts is the maximum metered
fifteen-minute demand recorded during Peak Hours within the
Billing Period excluding Backup and Maintenance Billing Periods.

The Backup Demand in kilowatts is the maximum metered fifteen-
minute demand recorded during Peak Hours within the Backup
Billing Period in excess of the Supplementary Demand.

The Standard Offer Demand in kilowatts for each month shall be
the sum of:

1.    The Supplementary Demand, and

2.    The Backup Demand times the ratio of the number of
Backup Billing Period Days to the number of Billing
Period Peak Days.

V.   Billing Demand Charge

The Billing Demand Charge shall be the Standard Offer Billing
Demand times the Demand Rate.

The terms Requirement Service, Partial Requirements Service,
Supplementary Service, and Backup Service shall be as defined in
Transmission Voltage General Retail Delivery Service Rate C-1.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $4.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

**NARR 07365**

R.I.P.U.C. NO. 13~~77~~998

-5-

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $4.40 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded

Date Filed, July 17, 1998                          Date Effective, June 1, 1998
per Order No. 15640 dated                          for consumption on and after
July 10, 1998 in Docket No. 2716.                  June 1, 1998.

NARR 07366

R.I.P.U.C. NO. 13~~7~~998

-6-

during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>General Space Heating Retail Delivery Service Rate H-1</u>

    Energy Charge:                $0.03209      per kWh

<u>General Heating Retail Delivery Service Rate H-2</u>

    Energy Charge:                $0.03241      per kWh

<u>Controlled Water Heating Retail Delivery Service Rate W-1</u>

    Energy Charge:                $0.03433      per kWh

<u>Lighting Retail Delivery Service Rate S-1</u>

    Energy Charge:                $0.03341      per kWh

Date Filed, <u>July 17, 1998</u>            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07367

R.I.P.U.C. NO. 137~~998~~

-7-

<u>Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6</u>

<u>Peak Hours</u>
Monday through Friday excluding holidays defined below
May through September,     10:00 a.m. to  4:00 p.m.
October through April,      9:00 a.m. to 12:00 noon, and
                           5:00 p.m. to  8:00 p.m.

<u>Off-Peak Hours</u>
All other hours.

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

The foregoing Rates shall be adjusted ~~effective January 1 of each calendar year beginning in the year 1998 and ending in the year 2009 by multiplying the Rates by the appropriate Cumulative Multiplier shown in the Standard Offer Calendar Year Multiplier Table below.   The foregoing Rates shall also be adjusted~~ from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer ~~Revenue Reconciliation~~ Cost Adjustment described below:

~~STANDARD OFFER CALENDAR YEAR MULTIPLIER TABLE:~~

| ~~Year~~ | ~~Cumulative Multiplier~~ |
|---|---|
| ~~1998~~ | ~~1.00000~~ |
| ~~1999~~ | ~~1.09375~~ |
| ~~2000~~ | ~~1.18750~~ |
| ~~2001~~ | ~~1.18750~~ |
| ~~2002~~ | ~~1.31250~~ |
| ~~2003~~ | ~~1.46875~~ |
| ~~2004~~ | ~~1.59375~~ |
| ~~2005~~ | ~~1.71875~~ |
| ~~2006~~ | ~~1.84375~~ |
| ~~2007~~ | ~~1.96875~~ |
| ~~2008~~ | ~~2.09375~~ |
| ~~2009~~ | ~~2.21875~~ |

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Date Filed, <u>July 17, 1998</u>                    <u>Date Effective, June 1, 1998</u>
<u>per Order No. 15640 dated</u>              <u>for consumption on and after</u>
<u>July 10, 1998 in Docket No. 2716.</u>      <u>June 1, 1998.</u>

**NARR 07368**

R.I.P.U.C. NO. 13~~79~~98

-8-

<u>Market Gas Price</u> is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

> <u>Gas Index</u> is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

<u>Market Oil Price</u> is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

> <u>Oil Index</u> is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

<u>Fuel Trigger Point</u> is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| <u>Year</u> | <u>Fuel Trigger Point</u> |
|------|-------------------|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{\text{(Market Gas Price+\$0.60/MMBTU)+(Market Oil Price+\$0.04/MMBTU)}}{\text{Fuel Trigger Point + \$0.60 + \$0.04/MMBTU}}$$

> Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07369

R.I.P.U.C. NO. 13~~7~~998

-9-

where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the differences between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule.  As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

~~The Company shall refund any overcollection or recover any undercollection of monies attributable to the foregoing differences through a Standard Offer Cost Adjustment ("SOCA") factor applied on a uniform cents per kilowatthour basis to the bills of all Customers taking Retail Delivery Service from the Company.  The Company shall file annually on or before March 1 of each year its calculation of the SOCA factor with the Commission.  The Commission shall review and approve the SOCA factor to be effective for bills rendered to Customers commencing April 1 of the current year and ending March 31 of the following year or such other period that the Commission may determine.~~

~~The SOCA factor for each year or such other period that the Commission may determine shall be established by calculating the difference between the Standard Offer Service costs incurred and the Standard Offer Service revenues billed to Customers during the previous calendar year and dividing the difference by the total kilowatthour sales for Retail Delivery Service for the year or such other period that the Commission may determine.~~ By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission.  The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1.  The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for

| Date Filed, July 17, 1998 | Date Effective, June 1, 1998 |
| per Order No. 15640 dated | for consumption on and after |
| July 10, 1998 in Docket No. 2716. | June 1, 1998. |

NARR 07370

R.I.P.U.C. NO. 13~~79~~98

-10-

approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs ~~and~~ or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer ~~Calendar Year Multiplier and the Standard Offer~~ Fuel Index~~,~~ and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice.  The Customer shall be ineligible to receive Standard Offer Service thereafter.  The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

**NARR 07371**

# SECTION III.

# RETAIL DELIVERY SERVICE TARIFFS

NARR 07372

BLACKSTONE VALLEY ELECTRIC COMPANY
RATE SCHEDULE INDEX

| RATE DESCRIPTION | COMPANY IDENTIFIER | R.I.P.U.C. NUMBER |
|---|---|---|
| Late Payment Charge | --- | 425 |
| Economic Development Rate Rider * | ED | 937 |
| Vacant Space Rider * | VSR | 940 |
| Economic Development Rate Rider * | EDR | 941 |
| Economic Development New Construction * | NCR | 977 |
| Retail Delivery Fuel Adjustment Clause | --- | 1081 |
| Retail Delivery Purchased Power Adjustment Clause | --- | 1082 |
| Terms and Conditions for Electric Service | --- | 1137 |
| Terms and Conditions for Electric Power Suppliers | --- | 1138 |
| Last Resort Service | --- | 1155 |
| Residential Retail Delivery Service | R-1 | 1156 |
| Residential SSI Retail Delivery Service | R-2 | 1157 |
| Residential Space Heating Retail Delivery Service | R-3 | 1158 |
| Large Residential Retail Delivery Service | R-4 | 1159 |
| Small Secondary Voltage General Retail Delivery Service | G-1 | 1160 |
| Medium Secondary Voltage General Retail Delivery Service | G-2 | 1161 |
| Medium Primary Voltage General Retail Delivery Service | G-5 | 1162 |
| Large Secondary Voltage General Retail Delivery Service | T-4 | 1163 |
| Large Primary Voltage General Retail Delivery Service | T-6 | 1164 |
| Large Secondary Voltage Auxiliary General Retail Delivery Service | A-4 | 1165 |
| Large Primary Voltage Auxiliary General Retail Delivery Service | A-6 | 1166 |
| General Space Heating Retail Delivery Service | H-1 | 1167 |
| General Heating Retail Delivery Service | H-2 | 1168 |
| Controlled Water Heating Retail Delivery Service | W-1 | 1169 |
| Lighting Retail Delivery Service | S-1 | 1170 |
| Temporary Interruptible Load Rate Rider | --- | 1171 |
| Standard Offer Service | --- | 1173 |

* Availability Frozen

July 17, 1998

NARR 07373

R.I.P.U.C. NO. 1155
CANCELS NO. 1136

## BLACKSTONE VALLEY ELECTRIC COMPANY
## LAST RESORT SERVICE

### AVAILABILITY:

This Rate Schedule for Last Resort Service is available to all
Customers who are ineligible to receive service under the Company's
Standard Offer Service Rate Schedule.  A Customer receiving electric
service from a Nonregulated Power Producer will be automatically
transferred to Last Resort Service under this Rate Schedule in the
event the Customer's Nonregulated Power Producer fails to deliver
sufficient electric capacity and energy to meet the Customer's
electric power requirements.

### APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

### RATES AND PROVISIONS:

The rates and provisions for Last Resort Service shall be the Rates
for each Rate Class shown in the Company's Standard Offer Service Rate
Schedule, the same, as amended, or as superseded, together with all
other provisions pertaining thereto including, but not limited to, the
Rate, Time-of-Use Period, Power Factor Adjustment, and Billing
provisions contained in the Company's foregoing Standard Offer Service
Rate Schedule.

### TERM OF CONTRACT:

The Term of Contract for Last Resort Service shall be one (1) month
and shall continue thereafter until terminated by the Customer by
notice given to the Company at least five (5) days prior to the date
of termination.  The above Term of Contract shall not apply in the
event of an involuntary transfer of the Customer to Last Resort
Service in accordance with the Availability provision hereof.  The
Term of Contract under the conditions of an involuntary transfer shall
be not less than five (5) days nor more than one (1) month.  Customers
who fail to procure electric service from another Nonregulated Power
Producer or who fail to elect the Company's Standard Offer Service, if
eligible therefor, within the foregoing time period shall be deemed to
have elected to voluntarily receive Last Resort Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07374

R.I.P.U.C. NO. 1155

-2-

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07375

R.I.P.U.C. NO. 1156
CANCELS NO. 1139

## BLACKSTONE VALLEY ELECTRIC COMPANY

### RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-1

AVAILABILITY:

This Rate Schedule is available only to residential Customers whose
actual or estimated annual energy consumption is less than 30,000 kWh.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for predominantly domestic
purposes in an individual residence, apartment, residential
condominium, or residential condominium common area.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $3.09 | per month |
| Energy Charge: | $0.03857 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07376

- 2 -                    R.I.P.U.C. NO. 1156

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07377

R.I.P.U.C. NO. 1157
CANCELS NO. 1140

BLACKSTONE VALLEY ELECTRIC COMPANY

RESIDENTIAL SSI RETAIL DELIVERY SERVICE RATE R-2

AVAILABILITY:

This Rate Schedule is available only to residential customers that
meet both of the following criteria:
1.  the Customer is the head of household or principal wage
    earner, and
2.  the Customer is presently receiving Supplemental Security
    Income from the United States Social Security
    Administration, or aid from one of the following Rhode
    Island agencies:
    (a)  Medicaid
    (b)  Food Stamps
    (c)  General Public Assistance
    (d)  Aid to Families with Dependent Children

The customer is required to annually certify his/her continued
eligibility for this Rate Schedule on forms supplied by the Company.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for predominantly domestic
purposes in an individual residence, apartment, or residential
condominium.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $2.01 | per month |
| Energy Charge: | | |
| First 300 kWh | $0.00170 | per kWh |
| Over 300 kWh | $0.03470 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Date Filed, July 17, 1998               Date Effective, June 1, 1998
per Order No. 15640 dated               for consumption on and after
July 10, 1998 in Docket No. 2716.       June 1, 1998.

NARR 07378

- 2 -                    R.I.P.U.C. NO. 1157

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

       Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

**NARR 07379**

R.I.P.U.C. NO. 1158
CANCELS NO. 1141

## BLACKSTONE VALLEY ELECTRIC COMPANY

## RESIDENTIAL SPACE HEATING RETAIL DELIVERY SERVICE RATE R-3

### AVAILABILITY:

This rate is closed to new Customers.  This Rate Schedule is available only to residential Customers whose actual or estimated annual energy consumption is less than 30,000 kWh that were taking service from the Company under former Space Heating Rate No. 11 before June 1, 1984, and who meet the following criteria:

1. The Customer has permanently installed electric space heating equipment and electricity is the Customer's sole source of energy used for comfort heating and water heating, and

2. All electric space heating equipment and the installation thereof shall conform with the Company's requirements and shall be designed for such voltage as shall be designated by the Company for the service required.

### APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for predominantly domestic purposes in an individual residence, apartment, residential condominium, or residential condominium common area.

Electricity shall be the sole source of energy used for comfort heating and water heating.

### CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

### RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $2.91 | per month |
| Energy Charge: | $0.03200 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

**NARR 07380**

- 2 -            R.I.P.U.C. NO. 1158

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

        Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07381

R.I.P.U.C. NO. 1159
CANCELS NO. 1142

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-4

AVAILABILITY:

This Rate Schedule applies to residential customers whose actual or
estimated annual energy consumption is at least 6,000 kWh but less
than 30,000 kWh, and this Rate Schedule is mandatory for all
residential customers whose actual or estimated annual energy
consumption is 30,000 kWh or more, except for residential customers
eligible for service under Residential SSI Rate R-2.

APPLICABILITY:

Electricity delivered under this Rate shall be used for domestic
purposes in an individual residence, apartment, residential
condominium, or residential condominium common area.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $4.69 | per month |
| Energy Charge: | $0.02935 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07382

- 2 -                    R.I.P.U.C. NO. 1159

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07383

R.I.P.U.C. NO. 1160
CANCELS NO. 1143

BLACKSTONE VALLEY ELECTRIC COMPANY

SMALL SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-1

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated annual maximum monthly demand is less than 10 kW and whose actual or estimated annual energy consumption is less than 36,000 kWh.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

    Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $3.37 | per month |
| Energy Charge: | $0.04348 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

    Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07384

- 2 -                    R.I.P.U.C. NO. 1160

<u>TERMS AND CONDITIONS:</u>

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07385

R.I.P.U.C. NO. 1161
CANCELS NO. 1144

## BLACKSTONE VALLEY ELECTRIC COMPANY

## MEDIUM SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-2

### AVAILABILITY:

This Rate Schedule is available to Customers whose actual or estimated annual maximum monthly demand is at least 10 kW but less than 500 kW or whose actual or estimated annual energy consumption is 36,000 kWh or more.

### APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

### RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.02819 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

### RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

### BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

### TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07386

- 2 -                    R.I.P.U.C. NO. 1161

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07387

R.I.P.U.C. NO. 1162
CANCELS NO. 1145

## BLACKSTONE VALLEY ELECTRIC COMPANY

### MEDIUM PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-5

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated annual maximum monthly demand is at least 10 kW but less than 500 kW or whose actual or estimated annual energy consumption is 36,000 kWh or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| Distribution Charge: | $0.02112 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07388

- 2 -                    R.I.P.U.C. NO. 1162

<u>TERMS AND CONDITIONS:</u>

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and
Conditions for Electric Power Suppliers</u> in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07389

R.I.P.U.C. NO. 1163
CANCELS NO. 1146

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-4

AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or
estimated annual maximum monthly demand is 500 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a nominal frequency of sixty Hertz, and
at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.01987 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charge, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter
until terminated by the Company or the Customer in accordance with the
Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07390

- 2 -                          R.I.P.U.C. NO. 1163

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07391

R.I.P.U.C. NO. 1164
CANCELS NO. 1147

## BLACKSTONE VALLEY ELECTRIC COMPANY

## LARGE PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-6

### AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or
estimated annual maximum monthly demand is 500 kW or more.

### APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a nominal frequency of sixty Hertz, and
at a locally available primary distribution voltage.

### RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.01425 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

### RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

Standard Offer Cost Adjustment

### BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charge, the Conservation Charge, the Transition Charge, Rate
Adjustments and the Rhode Island Gross Receipts Tax.

### TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter
until terminated by the Company or the Customer in accordance with the
Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07392

- 2 -                R.I.P.U.C. NO. 1164

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07393

# Tab 41-3

R.I.P.U.C. NO. 1165
CANCELS NO. 1148

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE SECONDARY VOLTAGE AUXILIARY
GENERAL RETAIL DELIVERY SERVICE RATE A-4

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric
Power Service ("Contract"), this Rate Schedule applies to all
customers served at secondary distribution voltages where the customer
furnishes its own electric power supply ("Facility") for all or part
of its total electric service requirements provided that:

1.  the customer's total electric service requirements are
    greater than 500 kW, and

2.  the Net Capability of the Facility is at least 100 kW but
    less than 1,000 kW and the Facility is designed to provide
    at least 20% of the customer's total electric service
    requirements, or the Net Capability of the Facility is 1,000
    kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for
Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a frequency of sixty Hertz, and at a
locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $14.17 | per month |
| Reservation Charge: | $2.18 | per kW |
| Energy Charge: | $0.01987 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Peak Hours
Monday through Friday excluding holidays defined below
April through September,    11:00 a.m. to  4:00 p.m.
October through March,       8:00 a.m. to 12:00 noon, and
                             4:00 p.m. to  7:00 p.m.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07394

- 2 -                    R.I.P.U.C. NO. 1165

Off-Peak Hours
All other hours.

Holidays are defined as:

New Year's Day              Columbus Day
President's Day             Veteran's Day
Memorial Day                Thanksgiving Day
Independence Day            Christmas Day
Labor Day

## DETERMINATION OF BILLING PERIODS:

a.    Billing Period

The Billing Period consists of the days between consecutive meter
readings.  Service under this Rate is rendered on a full calendar
day basis.  The first day of any billing period is included in
its entirety and the last day of any billing period is excluded
in its entirety.

b.    Backup Billing Period

The Backup Billing Period consists of the Peak Days within a
Billing Period during which Backup Service is rendered.  Backup
Service is rendered when any part of a forced outage occurs
during Peak Hours and backup power is actually delivered.

## DETERMINATION OF BILLING DEMANDS:

a.    Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum
metered 15 minute average load recorded during Peak Hours within
a Billing Period excluding the Backup Billing Period and the
maximum metered 15 minute average load recorded during Peak Hours
in excess of the Net Capability of the Facility during the Backup
Billing Period.

b.    Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand
in excess of the Supplementary Demand.

## DETERMINATION OF BILLING DEMAND CHARGES:

a.    Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand
times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07395

- 3 -                    R.I.P.U.C. NO. 1165

b.    Backup Reservation Charge

      The Backup Reservation Demand Charge shall be the Backup
      Reservation Demand times the Distribution Reservation Charge.

BACKUP POWER:

The Contract will specify the customer's maximum Backup Power
requirements.  Said Backup Power requirements must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Backup Power requirements of the customer.  The
customer's maximum Backup Power requirements shall be the Contract
Demand.  The Contract Demand shall not exceed the Net Capability of
the Facility.

The Contract Demand will be in effect for a period of one year and
shall continue thereafter unless amended in writing by mutual
agreement between the Company and the customer, or automatically
amended as hereinafter provided.  Each such amended Contract Demand
shall be in effect for the period of one year from the date specified
in the amendment agreement and shall continue thereafter or until
superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the
Contract Demand in any Backup Billing Period, the Contract Demand
shall be automatically amended to an amount equal to said metered
demand beginning with the Backup Billing Period in which said metered
demand occurred.  Each such automatically amended Contract Demand
shall be in effect for a period of one year and shall continue
thereafter or until superseded by another amended Contract Demand.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

            Standard Offer Cost Adjustment

BILLING:

Billing for electric service delivered under this Rate shall consist
of the sum, as applicable, of the Customer Charge, the Supplementary
Demand Charge, the Backup Reservation Charge, the Conservation Charge,
the Transition Charge, Rate Adjustments and Rhode Island Gross
Receipts Tax.

Electric service charges, determined under this Rate will be
calculated separately for each Billing Period using the appropriate
billing determinants for the Billing Period.  Bills rendered for Short
Billing Periods will be prorated on the ratio of the number of days of

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07396

- 4 -                          R.I.P.U.C. NO. 1165

the Short Billing Period to the number of days of the Normal Billing
Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility
within three working days following the end of a Billing Period.

Where the customer fails to notify the Company, billing will be
rendered as if the Company furnished only Supplementary Power during
the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement
in accordance with the Company's Interconnection Guidelines for Small
Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation,
which are attributable solely to the Company's provision of service
under this Rate Schedule will be borne by the customer.  The actual
incremental interconnection costs will be calculated by the Company
separately for each customer.  The customer may choose to pay his
interconnection costs at once or to amortize them on a monthly basis
over a period not exceeding five years, including interest at the rate
of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter
until terminated by either the Company or the customer by written
notice given to the other party at least thirty (30) days prior to the
date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the
Company to replace energy and capacity ordinarily provided by the
Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short
Billing Period.

"Net Capability" means the design net electrical capability of the
Facility under International Standards Organization ("ISO")
conditions.

"Normal Billing Period" means the time period between two consecutive
billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting
metering reading date and the next billing cycle date or the time

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07397

- 5 -                    R.I.P.U.C. NO. 1165

period between a previous billing cycle date and an ending meter reading date during which electric service is rendered.

"Supplementary Power" means electrical energy and capacity delivered by the Company regularly used by the customer in addition to that which is provided by the Facility itself.

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where consistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07398

R.I.P.U.C. NO. 1166
CANCELS NO. 1149

BLACKSTONE VALLEY ELECTRIC COMPANY

LARGE PRIMARY VOLTAGE AUXILIARY
GENERAL RETAIL DELIVERY SERVICE RATE A-6

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric Power Service ("Contract"), this Rate Schedule applies to all customers served at primary distribution voltages where the customer furnishes its own electric power supply ("Facility") for all or part of its total electric service requirements provided that:

1. the customer's total electric service requirements are greater than 500 kW, and
2. the Net Capability of the Facility is at least 100 kW but less than 1,000 kW and the Facility is designed to provide at least 20% of the customer's total electric service requirements, or the Net Capability of the Facility is 1,000 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $14.17 | per month |
| Reservation Charge: | $2.00 | per kW |
| Energy Charge: | $0.01425 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Peak Hours
Monday through Friday excluding holidays defined below
April through September,    11:00 a.m. to  4:00 p.m.
October through March,       8:00 a.m. to 12:00 noon, and
                             4:00 p.m. to  7:00 p.m.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07399

- 2 -                    R.I.P.U.C. NO. 1166

<u>Off-Peak Hours</u>
<u>All other hours.</u>

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

## DETERMINATION OF BILLING PERIODS:

a.   Billing Period

The Billing Period consists of the days between consecutive meter readings.  Service under this Rate is rendered on a full calendar day basis.  The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

b.   Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered.  Backup Service is rendered when any part of a forced outage occurs during Peak Hours and backup power is actually delivered.

## DETERMINATION OF BILLING DEMANDS:

a.   Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum metered 15 minute average load recorded during Peak Hours within a Billing Period excluding the Backup Billing Period and the maximum metered 15 minute average load recorded during Peak Hours in excess of the Net Capability of the Facility during the Backup Billing Period.

b.   Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand in excess of the Supplementary Demand.

## DETERMINATION OF BILLING DEMAND CHARGES:

a.   Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07400

- 3 -                     R.I.P.U.C. NO. 1166

b.    Backup Reservation Charge

      The Backup Reservation Demand Charge shall be the Backup
      Reservation Demand times the Distribution Reservation Charge.

## BACKUP POWER:

The Contract will specify the customer's maximum Backup Power
requirements.  Said Backup Power requirements must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Backup Power requirements of the customer.  The
customer's maximum Backup Power requirements shall be the Contract
Demand.  The Contract Demand shall not exceed the Net Capability of
the Facility.

The Contract Demand will be in effect for a period of one year and
shall continue thereafter unless amended in writing by mutual
agreement between the Company and the customer, or automatically
amended as hereinafter provided.  Each such amended Contract Demand
shall be in effect for the period of one year from the date specified
in the amendment agreement and shall continue thereafter or until
superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the
Contract Demand in any Backup Billing Period, the Contract Demand
shall be automatically amended to an amount equal to said metered
demand beginning with the Backup Billing Period in which said metered
demand occurred.  Each such automatically amended Contract Demand
shall be in effect for a period of one year and shall continue
thereafter or until superseded by another amended Contract Demand.

## RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

              Standard Offer Cost Adjustment

## BILLING:

Billing for electric service delivered under this Rate shall consist
of the sum, as applicable, of the Customer Charge, the Supplementary
Demand Charge, the Backup Reservation Charge, the Conservation Charge,
the Transition Charge, Rate Adjustments and Rhode Island Gross
Receipts Tax.

Electric service charges, determined under this Rate will be
calculated separately for each Billing Period using the appropriate
billing determinants for the Billing Period.  Bills rendered for Short
Billing Periods will be prorated on the ratio of the number of days of

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

- 4 -                      R.I.P.U.C. NO. 1166

the Short Billing Period to the number of days of the Normal Billing
Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility
within three working days following the end of a Billing Period.

Where the customer fails to notify the Company, billing will be
rendered as if the Company furnished only Supplementary Power during
the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement
in accordance with the Company's Interconnection Guidelines for Small
Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation,
which are attributable solely to the Company's provision of service
under this Rate Schedule will be borne by the customer.  The actual
incremental interconnection costs will be calculated by the Company
separately for each customer.  The customer may choose to pay his
interconnection costs at once or to amortize them on a monthly basis
over a period not exceeding five years, including interest at the rate
of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter
until terminated by either the Company or the customer by written
notice given to the other party at least thirty (30) days prior to the
date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the
Company to replace energy and capacity ordinarily provided by the
Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short
Billing Period.

"Net Capability" means the design net electrical capability of the
Facility under International Standards Organization ("ISO")
conditions.

"Normal Billing Period" means the time period between two consecutive
billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting
metering reading date and the next billing cycle date or the time
period between a previous billing cycle date and an ending meter
reading date during which electric service is rendered.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07402

- 5 -                    R.I.P.U.C. NO. 1166

"Supplementary Power" means electrical energy and capacity delivered
by the Company regularly used by the customer in addition to that
which is provided by the Facility itself.

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and
Conditions for Electric Power Suppliers</u> in effect from time to time,
where consistent with the specific provisions hereof, are a part of
this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07403

R.I.P.U.C. NO. 1167
CANCELS NO. 1150

BLACKSTONE VALLEY ELECTRIC COMPANY

GENERAL SPACE HEATING RETAIL DELIVERY SERVICE RATE H-1

AVAILABILITY:

This rate is closed to new Customers.  This Rate Schedule was formerly
available only to non-residential Customers having permanently
installed space heating equipment as the Customer's primary source of
space heating in accordance with the Company's specifications where
electricity is the sole source of energy used for comfort heating and
water heating.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's premises for domestic use in buildings
principally used for living quarters, and in buildings regularly used
for educational or religious purposes.

Electricity shall be the sole source of energy used for comfort
heating and water heating.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

    Distribution Charges:

        Customer Charge:            $3.01           per month

        Energy Charge:              $0.02975        per kWh

    Conservation Charge:            $0.00230        per kWh

    Transition Charge:              $0.02800        per kWh

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

        Standard Offer Cost Adjustment

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07404

- 2 -                    R.I.P.U.C. NO. 1167

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07405

R.I.P.U.C. NO. 1168
CANCELS NO. 1151

BLACKSTONE VALLEY ELECTRIC COMPANY

GENERAL HEATING RETAIL DELIVERY SERVICE RATE H-2

AVAILABILITY:

This rate is closed to new Customers.  This Rate Schedule is available
only to commercial and industrial Customers that were taking service
under former General Heating Service Rate No. 35 before June 1, 1984,
for purposes where electricity is the source of energy for space
heating, cooking, air conditioning, and water heating for other than
industrial purposes.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used soley by
the Customer on the Customer's own premises.  Electricity delivered
hereunder will be metered separately and service for other purposes
will be delivered under other applicable Rate Schedules.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

> Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $3.43 | per month |
| Energy Charge: | $0.03421 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

> Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07406

- 2 -                    R.I.P.U.C. NO. 1168

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07407

R.I.P.U.C. NO. 1169
CANCELS NO. 1152

BLACKSTONE VALLEY ELECTRIC COMPANY

CONTROLLED WATER HEATING RETAIL DELIVERY SERVICE RATE W-1

AVAILABILITY:

This rate is closed to new Customers.  This Rate Schedule is available to Customers for controlled electric water heating service that were taking service under former Off-Peak Water Heating Rate No. 41 before April 15, 1992, except for customers receiving service under Time-of-Use Residential Service Rate R-4.

APPLICABILITY:

Electricity delivered hereunder will be metered separately and service for other purposes will be furnished under other applicable Rate Schedules.  The Company will, by means of a controlling device, fix the hours when this service is available.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $1.32 | per month |
| Energy Charge: | $0.01792 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07408

- 2 -                          R.I.P.U.C. NO. 1169

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.                          Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07409

R.I.P.U.C. NO. 1170
CANCELS NO. 1153

BLACKSTONE VALLEY ELECTRIC COMPANY

LIGHTING RETAIL DELIVERY SERVICE RATE S-1

AVAILABILITY:

This Rate Schedule is available only to Customers where electricity is
supplied to lighting equipment owned and maintained by the Company, on
Company owned poles, for dusk-to-dawn operation of approximately 4,000
burning hours per year.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for
lighting purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
hertz, and at the utilization voltage of the Company's lighting
equipment.

RATE:

The Rate shall consist of the following charges:

CUSTOMER AND DISTRIBUTION:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS:

SODIUM VAPOR LAMP

1. For lights on ordinary wood poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 3,300 | Streetlight | $53.29 | $135.00 |
| 5,800 | Streetlight | 54.80 | 136.51 |
| 5,800 | Floodlight | 67.92 | 149.63 |
| 9,500 | Streetlight | 56.38 | 138.06 |
| 9,500 | PBU | 60.76 | 142.48 |
| 16,000 | Streetlight | 58.36 | 140.04 |
| 16,000 | Floodlight | 72.14 | 154.25 |
| 25,000 | Streetlight | 69.73 | 151.44 |
| 25,000 | Floodlight | 77.44 | 159.13 |
| 50,000 | Streetlight | 80.57 | 162.28 |
| 50,000 | Floodlight | 88.32 | 170.02 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07410

- 2 -                    R.I.P.U.C. NO. 1170

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

**A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS:** (Cont'd)

SODIUM VAPOR LAMP (Cont'd)

2. For lights on standard metal poles:

| | | | |
|---|---|---|---|
| 25,000 | Streetlight | ... | $254.90 |
| 25,000 | Floodlight | ... | 266.39 |
| 50,000 | Streetlight | ... | 265.71 |

MERCURY VAPOR LAMP

3. For lights on ordinary wood poles:

| | | | |
|---|---|---|---|
| 4,200 | Streetlight | $ 44.44 | $103.49 |
| 8,600 | Streetlight | 47.05 | 106.10 |
| 8,600 | PBU | 51.55 | ... |
| 8,600 | T&C | 45.87 | ... |
| 22,500 | Streetlight | 64.97 | ... |
| 22,500 | Floodlight | 63.52 | 122.56 |
| 63,000 | Streetlight | 91.70 | ... |
| 63,000 | Floodlight | 98.19 | ... |

4. For lights on standard metal poles:

| | | | |
|---|---|---|---|
| 22,500 | Streetlight | ... | $198.77 |
| 22,500 | Floodlight | ... | 200.07 |
| 63,000 | Floodlight | ... | 234.73 |

METAL HALIDE LAMP

5. For lights on ordinary wood poles:

| | | | |
|---|---|---|---|
| 20,000 | Floodlight | $ 94.69 | $193.17 |
| 40,000 | Floodlight | 124.67 | 239.18 |
| 115,000 | Floodlight | 103.46 | 217.87 |

**B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS:**

SODIUM VAPOR LAMP

1. For lights on standard metal poles:

| | | | |
|---|---|---|---|
| 9,500 | Streetlight | $ 64.00 | $227.66 |
| 9,500 | Streetlight-Twin | 151.17 | 283.46 |
| 16,000 | Streetlight | 65.98 | 229.55 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07411

- 3 -                R.I.P.U.C. NO. 1170

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

A. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS:  (Cont'd)

1. For lights on standard metal poles: (Cont'd)

| | | | |
|---|---|---|---|
| 16,000 | Floodlight | 83.98 | 247.53 |
| 25,000 | Streetlight | 77.37 | 240.95 |
| 25,000 | Streetlight-Twin | 186.44 | 318.71 |
| 25,000 | Floodlight | 88.86 | 252.43 |
| 50,000 | Streetlight | 88.22 | 251.76 |
| 50,000 | Floodlight | 99.76 | 263.32 |

2. For lights on poles less than 15 ft. high:

| | | | |
|---|---|---|---|
| 5,800 | T&C | $ 59.81 | $148.75 |
| 9,500 | T&C | 62.03 | 150.96 |
| 16,000 | T&C | 64.02 | 152.94 |

3. For lights on poles more than 15 ft. high:

| | | | |
|---|---|---|---|
| 3,300 | Streetlight | $ 55.38 | $213.83 |
| 5,800 | Streetlight | 56.89 | 215.36 |
| 5,800 | Shoe Box | 106.31 | 204.75 |
| 9,500 | Streetlight | 58.46 | 216.92 |
| 9,500 | Shoe Box | 115.57 | 214.01 |

4. For lights on ordinary wood poles:

| | | | |
|---|---|---|---|
| 3,300 | Streetlight | $ 58.19 | $172.97 |
| 5,800 | Streetlight | 59.70 | 174.47 |
| 5,800 | Floodlight | 72.83 | 187.61 |
| 9,500 | Streetlight | 61.26 | 176.03 |
| 9,500 | PBU | 65.57 | 180.45 |
| 16,000 | Streetlight | 63.25 | 178.04 |
| 16,000 | Floodlight | 77.43 | 192.22 |
| 25,000 | Streetlight | 74.64 | 189.42 |
| 25,000 | Floodlight | 82.33 | 197.11 |
| 50,000 | Streetlight | 85.45 | 200.25 |
| 50,000 | Floodlight | 93.23 | 207.99 |

MERCURY VAPOR LAMP

5. For lights on standard metal poles:

| | | | |
|---|---|---|---|
| 8,600 | Streetlight | $ 52.58 | $170.78 |
| 8,600 | Streetlight-Twin | 128.04 | 223.65 |
| 22,500 | Streetlight | 70.49 | 188.70 |
| 22,500 | Streetlight-Twin | 157.14 | 252.74 |
| 63,000 | Floodlight | 106.43 | 224.65 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07412

- 4 -                    R.I.P.U.C. NO. 1170

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS: (Cont'd)

MERCURY VAPOR LAMP (Cont'd)

6. For lights on poles less than 15 ft. high:

| 8,600 | T&C | $ 49.41 | $109.84 |
| 8,600 | PMA | 56.22 | 110.85 |

7. For lights on poles more than 15 ft. high:

| 4,200 | Streetlight | $ 45.96 | $160.49 |

(a)  For fixtures mounted on existing poles or prepaid lighting poles.
(b)  For fixtures mounted on lighting poles.

Conservation Charge:          $0.00230   per kWh

Transition Charge:            $0.02800   per kWh

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

    Standard Offer Cost Adjustment

BILLING:

The Billing Amount for retail delivery lighting service supplied under this Rate Schedule shall consist of the sum, as applicable, of one-twelfth of the Annual Price per Luminaire, the Conservation Charge, Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

EQUIPMENT AND INSTALLATION:

The Company will furnish, install, own, and maintain all necessary lighting service equipment including but not limited to luminaires, lamps, brackets, controls, conductors, and poles; and will furnish the electrical energy supply for the lights.  For installations supplied by underground conductors, the customer will provide trenching and backfilling, and will furnish, install, and maintain the conduit and base.  All lighting service equipment will be of Company standard design and construction.  Where additional equipment is required, such as additional poles required to serve the light or transformers installed to provide the electrical energy supply for the lights, the

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07413

- 5 -                    R.I.P.U.C. NO. 1170

customer will pay for the full cost of such additional equipment in advance of installation.

If the lights installed under this Rate Schedule are to be spaced such that the distance between the lights is to be more than 150 feet, the Customer will pay any additional costs incurred by the Company prior to the installation of the lights.

EXCESSIVE DAMAGE:

Excessive damage due to wanton or malicious acts shall be charged to the customer at the actual cost of labor and material required to repair or replace the unit. Excessive damage is defined as a pole, lamp, fixture, or conductors that is broken or damaged more than once a year. Notifications of excessive damage shall be made to the customer by the Company prior to billing for repairs.

DISCONTINUANCE OF LIGHTS:

Municipalities or other public authorities shall not discontinue service to more than five percent of the number of lights in service in a calendar year, except that any number of lights in excess of the five percent limit may be discontinued by mutual agreement provided that the municipality or other public authority agrees to pay the Company for the undepreciated value of each light in excess of the five percent limit that has been in service for a period of less than ten years.

CONVERSION OF EXISTING MERCURY VAPOR LIGHTS TO SODIUM VAPOR:

Upon request by a municipality or other public authority, the Company will initiate a conversion schedule for the replacement of mercury vapor lights with an appropriate sodium vapor light upon payment of the undepreciated value of the existing light if such light has been installed for a period less than ten years. This payment may be amortized over the following twelve month period. The conversion will be completed in a period as agreed upon, provided that not more than 20% of the lights eligible for conversion are converted each year.

TERM OF CONTRACT:

The term of contract shall be one year and shall continue thereafter until terminated by the Company or the customer by written notice given to the other party at least sixty (60) days prior to the date of termination given in such notice.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.


Date Filed, July 17, 1998             Date Effective, June 1, 1998
per Order No. 15640 dated             for consumption on and after
July 10, 1998 in Docket No. 2716.     June 1, 1998.


NARR 07414

R.I.P.U.C. NO. 1173
CANCELS NO. 1172

## BLACKSTONE VALLEY ELECTRIC COMPANY
## STANDARD OFFER SERVICE

### AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all Customers taking electric service from the Company before January 1, 1998, to all new Customers taking retail delivery electric service on and after January 1, 1998, and to Customers who were taking generation service from a Nonregulated Power Producer before January 1, 1998, who provided the Company with a written notice on or before December 26, 1997, of their intent to terminate generation service from their Nonregulated Power Producer and who were transferred to Interim Generation Service on January 1, 1998. Said Customers shall have the right to relocate to a different service location within the Company's service area and continue to receive service under this Rate Schedule.

### APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty hertz, and at a locally available primary or secondary distribution voltage.

### RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential Space Heating Retail Delivery Service Rate R-3

| | | |
|---|---|---|
| Energy Charge: | $0.03158 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.15384 | per kWh |
| Off-Peak Hours: | $0.00570 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07415

R.I.P.U.C. NO. 1173

-2-

Small Secondary Voltage General Retail Delivery Service Rate G-1

    Energy Charge:               $0.03589       per kWh

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

    Demand Charge:             $5.81         per kW

    Energy Charge:               $0.01403       per kWh

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

    Demand Charge:             $6.11         per kW

    Energy Charge
      Peak Hours:             $0.02978       per kWh
      Off-Peak Hours:        $0.00877       per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

    Demand Charge:             $5.29         per kW

    Energy Charge:               $0.01610       per kWh

The Billing Demand in kilowatts for each month will be the maximum
metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

    Demand Charge:             $5.48         per kW

    Energy Charge
      Peak Hours:             $0.03241       per kWh
      Off-Peak Hours:        $0.01054       per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated        for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07416

R.I.P.U.C. NO. 1173

-3-

### Large Secondary Voltage General Retail Delivery Service Rate T-4

| Demand Charge: | $5.88 | per kW |
|---|---|---|

Energy Charge
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

### Large Primary Voltage General Retail Delivery Service Rate T-6

| Demand Charge: | $5.37 | per kW |
|---|---|---|

Energy Charge
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

### Large Secondary Voltage Auxiliary
### General Retail Delivery Service Rate A-4

| Demand Charge: | $3.70 | per kW |
|---|---|---|

Energy Charge
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period. The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days. No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07417

R.I.P.U.C. NO. 1173

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary</u>
<u>General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
|     Peak Hours: | $0.03914 | per kWh |
|     Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07418

R.I.P.U.C. NO. 1173

-5-

customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

<u>General Space Heating Retail Delivery Service Rate H-1</u>

    Energy Charge:               $0.03308        per kWh

<u>General Heating Retail Delivery Service Rate H-2</u>

    Energy Charge:               $0.03339        per kWh

<u>Controlled Water Heating Retail Delivery Service Rate W-1</u>

    Energy Charge:               $0.03509        per kWh

<u>Lighting Retail Delivery Service Rate S-1</u>

    Energy Charge:               $0.03408        per kWh

<u>Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6</u>

    <u>Peak Hours</u>
        Monday through Friday excluding holidays defined below
        April through September,   11:00 a.m. to  4:00 p.m.
        October through March,    8:00 a.m. to 12:00 noon, and
                              4:00 p.m. to  7:00 p.m.
    <u>Off-Peak Hours</u>
        All other hours.

        Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

<u>Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:</u>

Customers who have established a Billing Demand of 100 kilowatts or
more in the current or preceding eleven months will receive a Power

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07419

R.I.P.U.C. NO. 1173

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07420

-7-

|      |                   |
|------|-------------------|
| 2003 | $7.01  per MMBTU  |
| 2004 | $7.74  per MMBTU  |

In the event that the Fuel Trigger Point is exceeded, the Fuel
Adjustment value for the billing month is determined based according
to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

> Where Market Gas Price, Market Oil Price and Fuel Trigger Point
> are as defined above.  The values of $0.60 and $0.04/MMBTU
> represent for gas and oil respectively, estimated basis
> differentials or market costs of transportation from the point
> where the index is calculated to a proxy power plant in the New
> England market.

Incremental revenues received by the Company from the application of
the Fuel Adjustment shall be fully allocated to Standard Offer
Suppliers in proportion to the Standard Offer energy provided by a
Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the
difference between the cost of Standard Offer Service paid by the
Company to wholesale suppliers thereof and the revenues billed by the
Company to Customers taking Standard Offer Service under this Rate
Schedule.  As used herein "Standard Offer Service costs" shall be
those costs incurred by the Company in providing Standard Offer
Service under this Rate Schedule including wholesale rate discounts
arising from the competitive procurement process and any or all other
costs determined by the Public Utilities Commission to be includable
therewith, excluding all costs recoverable through the Standard Offer
Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any
over- or under-collection for the prior calendar year and make a
filing with the Commission.  The Company will propose at that time a
rate recovery/refund methodology to recover or refund the balance, as
appropriate, over the twelve-month period commencing April 1.  The
Commission may order the Company to collect or refund the balance over
any reasonable time period from (i) all customers, (ii) only Standard
Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31,
2009, the Company will apply to the Public Utilities Commission for
approval of a temporary per kilowatthour surcharge or credit factor to
be applied to the distribution component of the Retail Delivery Rates
for such a duration as necessary to provide for full recovery or
return of any outstanding balance of Standard Offer Service costs or
revenues that exists.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

R.I.P.U.C. NO. 1173

-8-

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer Fuel Index
and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
beginning on the date service is first taken and ending on the earlier
of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07422

NEWPORT ELECTRIC CORPORATION
RATE SCHEDULE INDEX

| RATE DESCRIPTION | COMPANY IDENTIFIER | R.I.P.U.C. NUMBER |
|---|---|---|
| Economic Development Rate Rider VSR * | VSR | 1130 |
| Economic Development Rate Rider EDR * | EDR | 1131 |
| Economic Development Defense Industry Recovery * | DIR | 1186 |
| Retail Delivery Fuel Adjustment Clause | --- | 1306 |
| Retail Delivery Purchased Power Adjustment Clause | --- | 1307 |
| Terms and Conditions for Electric Service | --- | 1362 |
| Terms and Conditions for Electric Power Suppliers | --- | 1363 |
| Last Resort Service | --- | 1380 |
| Residential Retail Delivery Service | R-1 | 1381 |
| Residential SSI Retail Delivery Service | R-2 | 1382 |
| Large Residential Retail Delivery Service | R-4 | 1383 |
| Small Secondary Voltage General Retail Delivery Service | G-1 | 1384 |
| Medium Secondary Voltage General Retail Delivery Service | G-2 | 1385 |
| Medium Primary Voltage General Retail Delivery Service | G-5 | 1386 |
| Large Secondary Voltage General Retail Delivery Service | T-4 | 1387 |
| Large Primary Voltage General Retail Delivery Service | T-6 | 1388 |
| Transmission Voltage General Retail Delivery Service | C-1 | 1389 |
| Large Secondary Voltage Auxiliary General Retail Delivery Service | A-4 | 1390 |
| Large Primary Voltage Auxiliary General Retail Delivery Service | A-6 | 1391 |
| General Space Heating Retail Delivery Service | H-1 | 1392 |
| Supplementary General Space Heating Retail Delivery Service | H-2 | 1393 |
| Controlled Water Heating Retail Delivery Service | W-1 | 1394 |
| Lighting Retail Delivery Service | S-1 | 1395 |
| Temporary Interruptible Load Rate Rider | --- | 1396 |
| Standard Offer Service | --- | 1398 |

   Availability Frozen

July 17, 1998

NARR 07423

R.I.P.U.C. NO. 1380
CANCELS NO. 1361

NEWPORT ELECTRIC CORPORATION
LAST RESORT SERVICE

AVAILABILITY:

This Rate Schedule for Last Resort Service is available to all
Customers who are ineligible to receive service under the Company's
Standard Offer Service Rate Schedule.  A Customer receiving electric
service from a Nonregulated Power Producer will be automatically
transferred to Last Resort Service under this Rate Schedule in the
event the Customer's Nonregulated Power Producer fails to deliver
sufficient electric capacity and energy to meet the Customer's
electric power requirements.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATES AND PROVISIONS:

The rates and provisions for Last Resort Service shall be the Rates
for each Rate Class shown in the Company's Standard Offer Service Rate
Schedule, the same, as amended, or as superseded, together with all
other provisions pertaining thereto including, but not limited to, the
Rate, Time-of-Use Period, and Billing provisions contained in the
Company's foregoing Standard Offer Service Rate Schedule.

TERM OF CONTRACT:

The Term of Contract for Last Resort Service shall be one (1) month
and shall continue thereafter until terminated by the Customer by
notice given to the Company at least five (5) days prior to the date
of termination.  The above Term of Contract shall not apply in the
event of an involuntary transfer of the Customer to Last Resort
Service in accordance with the Availability provision hereof.  The
Term of Contract under the conditions of an involuntary transfer shall
be not less than five (5) days nor more than one (1) month.  Customers
who fail to procure electric service from another Nonregulated Power
Producer or who fail to elect the Company's Standard Offer Service, if
eligible therefor, within the foregoing time period shall be deemed to
have elected to voluntarily receive Last Resort Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07424

R.I.P.U.C. NO. 1380

-2-

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07425

R.I.P.U.C. NO. 1381
CANCELS NO. 1364

NEWPORT ELECTRIC CORPORATION

RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-1

AVAILABILITY:

This Rate Schedule is available only to residential Customers whose
actual or estimated annual energy consumption is less than 30,000 kWh.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for predominantly domestic
purposes in an individual apartment, condominium, private home, other
private dwelling, condominium common area, or in rooming houses with
five rooms or less for rent.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

  Distribution Charges:

|   |   |   |
|---|---|---|
| Customer Charge: | $3.10 | per month |
| Energy Charge: | $0.04653 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

    Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07426

- 2 -                          R.I.P.U.C. NO. 1381

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07427

R.I.P.U.C. NO. 1382
CANCELS NO. 1365

NEWPORT ELECTRIC CORPORATION

RESIDENTIAL SSI RETAIL DELIVERY SERVICE RATE R-2

AVAILABILITY:

This Rate Schedule is available only to residential Customers that meet both of the following criteria:

1.  the Customer is the head of the household or principal wage earner, and
2.  the Customer is presently receiving Supplemental Security Income from the United States Social Security Administration, or aid from one of the following Rhode Island agencies:
    (a) Medicaid
    (b) Food Stamps
    (c) General Public Assistance
    (d) Aid to Families with Dependent Children

The Customer will be required to annually certify his/her continued eligibility for this Rate Schedule on forms provided by the Company.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for domestic purposes in an individual apartment, condominium, private home, other private dwelling, or condominium common area.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $2.14 | per month |
| Energy Charge: | | |
| First 300 kWh | $0.00759 | per kWh |
| Over 300 kWh | $0.04206 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07428

- 2 -                    R.I.P.U.C. NO. 1382

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

        Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998           Date Effective, June 1, 1998
per Order No. 15640 dated           for consumption on and after
July 10, 1998 in Docket No. 2716.   June 1, 1998.

NARR 07429

R.I.P.U.C. NO. 1383
CANCELS NO. 1366

NEWPORT ELECTRIC CORPORATION

LARGE RESIDENTIAL RETAIL DELIVERY SERVICE RATE R-4

AVAILABILITY:

This Rate Schedule is available to residential Customers whose actual or estimated annual energy consumption is at least 6,000 kWh but less than 30,000 kWh, and this Rate Schedule is mandatory for all residential Customers whose actual or estimated annual energy consumption is 30,000 kWh or more, except for residential Customers eligible for retail delivery service under Residential SSI Rate R-2.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for predominantly domestic purposes in an individual apartment, condominium, private home, other private dwelling, condominium common area, or in rooming houses with five rooms or less for rent.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $6.78 | per month |
| Energy Charge: | $0.04497 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07430

- 2 -                    R.I.P.U.C. NO. 1383

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated             for consumption on and after
July 10, 1998 in Docket No. 2716.     June 1, 1998.

NARR 07431

# Tab 41-4

R.I.P.U.C. NO. 1384
CANCELS NO. 1367

## NEWPORT ELECTRIC CORPORATION

### SMALL SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-1

### AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated average monthly demand is less than 500 kW and whose actual or estimated annual energy consumption is less than 54,000 kWh, and to those Customers taking service from the Company under former General Service Rate, R.I.P.U.C. No. 201-N, prior to October 28, 1992, whose demand is not metered.

### APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

### CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

### RATE:

The Rate shall consist of the following charges:

Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $3.45 | per month |
| Energy Charge: | $0.05832 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

### RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

### BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07432

- 2 -                         R.I.P.U.C. NO. 1384

<u>TERMS AND CONDITIONS:</u>

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07433

R.I.P.U.C. NO. 1385
CANCELS NO. 1368

NEWPORT ELECTRIC CORPORATION

MEDIUM SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-2

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or estimated average monthly demand is less than 500 kW and whose actual or estimated annual energy consumption is 54,000 kWh or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03918 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07434

- 2 -                          R.I.P.U.C. NO. 1385

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07435

R.I.P.U.C. NO. 1386
CANCELS NO. 1369

NEWPORT ELECTRIC CORPORATION

MEDIUM PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE G-5

AVAILABILITY:

This Rate Schedule is available only to Customers whose actual or
estimated average monthly demand is at least 15 kW but less than 500
kW or whose actual or estimated annual energy consumption is 54,000
kWh or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a nominal frequency of sixty Hertz, and
at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03395 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charge, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter
until terminated by the Company or the Customer in accordance with the
Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07436

- 2 -                    R.I.P.U.C. NO. 1386

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07437

R.I.P.U.C. NO. 1387
CANCELS NO. 1370

## NEWPORT ELECTRIC CORPORATION

### LARGE SECONDARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-4

AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or
estimated average monthly demand is 500 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a nominal frequency of sixty Hertz, and
at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03956 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

> Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charge, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter
until terminated by the Company or the Customer in accordance with the
Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07438

- 2 -                   R.I.P.U.C. NO. 1387

TERMS AND CONDITIONS:

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and Conditions for Electric Power Suppliers</u> in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated           for consumption on and after
July 10, 1998 in Docket No. 2716.   June 1, 1998.

NARR 07439

R.I.P.U.C. NO. 1388
CANCELS NO. 1371

NEWPORT ELECTRIC CORPORATION

LARGE PRIMARY VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE T-6

AVAILABILITY:

This Rate Schedule is mandatory for all Customers whose actual or estimated average monthly demand is 500 kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

| | | |
|---|---|---|
| Distribution Charge: | $0.03354 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charge, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by the Company or the Customer in accordance with the Company's Terms and Conditions for Electric Service.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

- 2 -                          R.I.P.U.C. NO. 1388

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07441

R.I.P.U.C. NO. 1389
CANCELS NO. 1372

## NEWPORT ELECTRIC CORPORATION

### TRANSMISSION VOLTAGE GENERAL RETAIL DELIVERY SERVICE RATE C-1

AVAILABILITY:

This Rate Schedule is available only to the Department of the Navy,
its successors, or assigns, for electric power service to the Naval
Education and Training Center, Newport, Rhode Island, under the
provisions of that certain Negotiated Electric Service Contract
("Contract"), dated May 1, 1961, by and between Newport Electric
Corporation and the Department of the Navy, the same, as amended, or
as superseded.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Navy on the premises of the Naval Education and Training Center,
Newport, Rhode Island, for all purposes that are in accordance with
the provisions of the Contract.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a nominal frequency of sixty Hertz, and
at a nominal voltage of 69,000 volts, and shall be delivered and sold
to the Navy at the point of delivery specified in the Contract.

RATE:

The Rate shall consist of the following charges:

    Distribution Charges:

| | | |
|---|---|---|
| Demand Charge: | $7.68 | per kW |
| Reactive Demand Charge: | $0.23 | per kvar |
| Energy Charge: | $0.00851 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

DETERMINATION OF BILLING PERIODS:

    The Billing Period consists of the days between consecutive meter
readings.  Service under this Rate is rendered on a full calendar
day basis.  The first day of any billing period is included in
its entirety and the last day of any billing period is excluded
in its entirety.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

**NARR 07442**

Case 4:05-cv-40076-FDS    Document 79-5    Filed 09/12/2007    Page 13 of 36

DETERMINATION OF BILLING DEMAND:

I.    Billing Demand

A.    Requirements Service

The Demand in kilowatts for each month is the maximum metered fifteen-minute demand during the Billing Period.

B. Partial Requirements Service

The Demand in kilowatts for each month is the maximum fifteen-minute total demand during the month, where the total demand is the combined demand of the Partial Requirements Service delivered by the Company and the service supplied by the Navy's other power source.

The Billing Demand in kilowatts for each month shall be the largest of:

1.    the Demand,

2.    Seventy-five percent (75%) of the highest Demand recorded during the previous eleven months, or

3.    Fifty percent (50%) of the highest Demand recorded during the term of the Contract, where:

For the purposes of determining the Billing Demand, all demands recorded before December 1, 1994, shall be deemed Demands, all Standby Demands recorded after December 1, 1994, through June 30, 1997 shall be deemed Demands, and all Distribution Demands recorded after June 30, 1997, shall be deemed Demands.

II.   Reactive Billing Demand

The Reactive Billing Demand in kilovars for each month shall be the Reactive Demand in excess of seventeen and one-half percent (17.5%) of the Demand, where the Reactive Demand in kilovars for each month is the metered fifteen-minute reactive demand coincident with the Demand.

DETERMINATION OF BILLING DEMAND CHARGES:

I.    Billing Demand Charge

The Billing Demand Charge shall be the Billing Demand times the Demand Rate.

I.    Reactive Billing Demand Charge

The Reactive Billing Demand Charge shall be the Reactive Billing Demand times the Reactive Demand Rate.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07443

- 3 -                        R.I.P.U.C. NO. 1389

DETERMINATION OF MINIMUM BILLING ENERGY CHARGE

The Minimum Billing Energy Charge shall be the Total Energy
Requirements times the Transition Charge.  For the purposes of the
foregoing, Total Energy Requirements shall mean the sum of the energy
delivered by the Company and the energy supplied by the Navy's other
power sources other than electrically isolated emergency power
sources.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

            Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of:

    1.    the Billing Demand Charge,

    2.    the Reactive Billing Demand Charge,

    3.    the higher of the Minimum Billing Energy Charge or the sum
          of the Distribution Energy Charges, the Conservation Charge
          and the Transition Charge, Rate Adjustments

    4.    and Rhode Island Gross Receipts Tax

TERMS AND CONDITIONS:

"Requirements Service" means that the Company delivers all the energy
and capacity necessary to meet the total electric service requirements
of the Navy, other than electric service requirements provided by
electrically isolated emergency power sources.

"Partial Requirements Service" means Supplementary Service, Backup
Service, and Maintenance Service, either individually or in any
combination.

"Supplementary Service" means electric energy and capacity delivered
by the Company on a regular basis in addition to that which is
normally provided by the Navy's other power source.

"Backup Service" means electric energy and capacity delivered by the
Company to replace energy and capacity ordinarily provided by the
Navy's other power source during a unscheduled outage of the power
source.

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07444

- 4 -                    R.I.P.U.C. NO. 1389

"Maintenance Service" means electric energy and capacity delivered by
the Company to replace energy and capacity ordinarily provided by the
Navy's other power source during a scheduled outage of the power
source.

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and
Conditions for Electric Power Suppliers</u> in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07445

R.I.P.U.C. NO. 1390
CANCELS NO. 1373

## NEWPORT ELECTRIC CORPORATION

### LARGE SECONDARY VOLTAGE AUXILIARY
### GENERAL RETAIL DELIVERY SERVICE RATE A-4

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric
Power Service ("Contract"), this Rate Schedule applies to all
customers served at secondary distribution voltages where the customer
furnishes its own electric power supply ("Facility") for all or part
of its total electric service requirements provided that:

1.   the customer's total electric service requirements are
     greater than 500 kW, and

2.   the Net Capability of the Facility is at least 100 kW but
     less than 1,000 kW and the Facility is designed to provide
     at least 20% of the customer's total electric service
     requirements, or the Net Capability of the Facility is 1,000
     kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for
Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a frequency of sixty Hertz, and at a
locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

   Distribution Charges:

       Customer Charge:            $26.17      per month

       Reservation Charge:         $3.16       per kW

       Energy Charge:              $0.03956    per kWh

   Conservation Charge:            $0.00230    per kWh

   Transition Charge:              $0.02800    per kWh

       Peak Hours
       Monday through Friday excluding holidays defined below
       May through September,    10:00 a.m. to  4:00 p.m.
       October through April,     9:00 a.m. to 12:00 noon, and
                                  5:00 p.m. to  8:00 p.m.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07446

- 2 -                    R.I.P.U.C. NO. 1390

<u>Off-Peak Hours</u>
All other hours.

Holidays are defined as:

New Year's Day          Columbus Day
President's Day         Veteran's Day
Memorial Day            Thanksgiving Day
Independence Day        Christmas Day
Labor Day

## DETERMINATION OF BILLING PERIODS:

a.   Billing Period

The Billing Period consists of the days between consecutive meter
readings.  Service under this Rate is rendered on a full calendar
day basis.  The first day of any billing period is included in
its entirety and the last day of any billing period is excluded
in its entirety.

b.   Backup Billing Period

The Backup Billing Period consists of the Peak Days within a
Billing Period during which Backup Service is rendered.  Backup
Service is rendered when any part of a forced outage occurs
during Peak Hours and backup power is actually delivered.

## DETERMINATION OF BILLING DEMANDS:

a.   Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum
metered 15 minute average load recorded during Peak Hours within
a Billing Period excluding the Backup Billing Period and the
maximum metered 15 minute average load recorded during Peak Hours
in excess of the Net Capability of the Facility during the Backup
Billing Period.

b.   Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand
in excess of the Supplementary Demand.

## DETERMINATION OF BILLING DEMAND CHARGES:

a.   Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand
times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07447

- 3 -                    R.I.P.U.C. NO. 1390

b.    Backup Reservation Charge

    The Backup Reservation Demand Charge shall be the Backup
    Reservation Demand times the Distribution Reservation Charge.

BACKUP POWER:

The Contract will specify the customer's maximum Backup Power
requirements.  Said Backup Power requirements must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Backup Power requirements of the customer.  The
customer's maximum Backup Power requirements shall be the Contract
Demand.  The Contract Demand shall not exceed the Net Capability of
the Facility.

The Contract Demand will be in effect for a period of one year and
shall continue thereafter unless amended in writing by mutual
agreement between the Company and the customer, or automatically
amended as hereinafter provided.  Each such amended Contract Demand
shall be in effect for the period of one year from the date specified
in the amendment agreement and shall continue thereafter or until
superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the
Contract Demand in any Backup Billing Period, the Contract Demand
shall be automatically amended to an amount equal to said metered
demand beginning with the Backup Billing Period in which said metered
demand occurred.  Each such automatically amended Contract Demand
shall be in effect for a period of one year and shall continue
thereafter or until superseded by another amended Contract Demand.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

        Standard Offer Cost Adjustment

BILLING:

Billing for electric service delivered under this Rate shall consist
of the sum, as applicable, of the Customer Charge, the Supplementary
Demand Charge, the Backup Reservation Charge, the Conservation Charge,
the Transition Charge, Rate Adjustments and Rhode Island Gross
Receipts Tax.

Electric service charges, determined under this Rate will be
calculated separately for each Billing Period using the appropriate
billing determinants for the Billing Period.  Bills rendered for Short

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07448

- 4 -                        R.I.P.U.C. NO. 1390

Billing Periods will be prorated on the ratio of the number of days of
the Short Billing Period to the number of days of the Normal Billing
Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility
within three working days following the end of a Billing Period.
Where the customer fails to notify the Company, billing will be
rendered as if the Company furnished only Supplementary Power during
the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement
in accordance with the Company's Interconnection Guidelines for Small
Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation,
which are attributable solely to the Company's provision of service
under this Rate Schedule will be borne by the customer.  The actual
incremental interconnection costs will be calculated by the Company
separately for each customer.  The customer may choose to pay his
interconnection costs at once or to amortize them on a monthly basis
over a period not exceeding five years, including interest at the rate
of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter
until terminated by either the Company or the customer by written
notice given to the other party at least thirty (30) days prior to the
date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the
Company to replace energy and capacity ordinarily provided by the
Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short
Billing Period.

"Net Capability" means the design net electrical capability of the
Facility under International Standards Organization ("ISO")
conditions.

"Normal Billing Period" means the time period between two consecutive
billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting
metering reading date and the next billing cycle date or the time

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07449

- 5 -                           R.I.P.U.C. NO. 1390

period between a previous billing cycle date and an ending meter
reading date during which electric service is rendered.

"Supplementary Power" means electrical energy and capacity delivered
by the Company regularly used by the customer in addition to that
which is provided by the Facility itself.

The Company's <u>Terms and Conditions for Electric Service</u> and <u>Terms and
Conditions for Electric Power Suppliers</u> in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated             for consumption on and after
July 10, 1998 in Docket No. 2716.     June 1, 1998.

NARR 07450

R.I.P.U.C. NO. 1391
CANCELS NO. 1374

NEWPORT ELECTRIC CORPORATION

LARGE PRIMARY VOLTAGE AUXILIARY
GENERAL RETAIL DELIVERY SERVICE RATE A-6

AVAILIABILITY:

Upon execution of a separate written contract for Auxiliary Electric
Power Service ("Contract"), this Rate Schedule applies to all
customers served at primary distribution voltages where the customer
furnishes its own electric power supply ("Facility") for all or part
of its total electric service requirements provided that:
1. the customer's total electric service requirements are
greater than 500 kW, and
2. the Net Capability of the Facility is at least 100 kW but
less than 1,000 kW and the Facility is designed to provide
at least 20% of the customer's total electric service
requirements, or the Net Capability of the Facility is 1,000
kW or more.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for
Supplementary Power and Backup Power purposes only.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be three
phase, alternating current, at a frequency of sixty Hertz, and at a
locally available primary distribution voltage.

RATE:

The Rate shall consist of the following charges:

    Distribution Charges:

| | | |
|---|---|---|
| Customer Charge: | $26.17 | per month |
| Reservation Charge: | $2.86 | per kW |
| Energy Charge: | $0.03354 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

    Peak Hours
Monday through Friday excluding holidays defined below
May through September,    10:00 a.m. to  4:00 p.m.
October through April,    9:00 a.m. to 12:00 noon, and
    5:00 p.m. to  8:00 p.m.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07451

- 2 -                    R.I.P.U.C. NO. 1391

<u>Off-Peak Hours</u>
All other hours.

Holidays are defined as:

| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

## DETERMINATION OF BILLING PERIODS:

a.    Billing Period

The Billing Period consists of the days between consecutive meter readings.  Service under this Rate is rendered on a full calendar day basis.  The first day of any billing period is included in its entirety and the last day of any billing period is excluded in its entirety.

b.    Backup Billing Period

The Backup Billing Period consists of the Peak Days within a Billing Period during which Backup Service is rendered.  Backup Service is rendered when any part of a forced outage occurs during Peak Hours and backup power is actually delivered.

## DETERMINATION OF BILLING DEMANDS:

a.    Supplementary Demand

The Supplementary Demand in kilowatts is the sum of the maximum metered 15 minute average load recorded during Peak Hours within a Billing Period excluding the Backup Billing Period and the maximum metered 15 minute average load recorded during Peak Hours in excess of the Net Capability of the Facility during the Backup Billing Period.

b.    Backup Reservation Demand

The Backup Reservation Demand in kilowatts is the Contract Demand in excess of the Supplementary Demand.

## DETERMINATION OF BILLING DEMAND CHARGES:

a.    Supplementary Demand Charge

The Supplementary Demand Charge shall be the Supplementary Demand times the Distribution Reservation Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07452

- 3 -                      R.I.P.U.C. NO. 1391

b.    Backup Reservation Charge

   The Backup Reservation Demand Charge shall be the Backup
   Reservation Demand times the Distribution Reservation Charge.

BACKUP POWER:

The Contract will specify the customer's maximum Backup Power
requirements.  Said Backup Power requirements must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Backup Power requirements of the customer.  The
customer's maximum Backup Power requirements shall be the Contract
Demand.  The Contract Demand shall not exceed the Net Capability of
the Facility.

The Contract Demand will be in effect for a period of one year and
shall continue thereafter unless amended in writing by mutual
agreement between the Company and the customer, or automatically
amended as hereinafter provided.  Each such amended Contract Demand
shall be in effect for the period of one year from the date specified
in the amendment agreement and shall continue thereafter or until
superseded by another amended Contract Demand.

In the event the customer's maximum metered demand exceeds the
Contract Demand in any Backup Billing Period, the Contract Demand
shall be automatically amended to an amount equal to said metered
demand beginning with the Backup Billing Period in which said metered
demand occurred.  Each such automatically amended Contract Demand
shall be in effect for a period of one year and shall continue
thereafter or until superseded by another amended Contract Demand.

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

          Standard Offer Cost Adjustment

BILLING:

Billing for electric service delivered under this Rate shall consist
of the sum, as applicable, of the Customer Charge, the Supplementary
Demand Charge, the Backup Reservation Charge, the Conservation Charge,
the Transition Charge, Rate Adjustments and Rhode Island Gross
Receipts Tax.

Electric service charges, determined under this Rate will be
calculated separately for each Billing Period using the appropriate
billing determinants for the Billing Period.  Bills rendered for Short

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07453

Billing Periods will be prorated on the ratio of the number of days of the Short Billing Period to the number of days of the Normal Billing Period that the Short Billing Period lies within.

The customer shall notify the Company of all outages of the Facility within three working days following the end of a Billing Period. Where the customer fails to notify the Company, billing will be rendered as if the Company furnished only Supplementary Power during the entire Billing Period.

INTERCONNECTION REQUIREMENTS:

The customer will execute a separate written Interconnection Agreement in accordance with the Company's Interconnection Guidelines for Small Scale Generators in effect from time to time.

All incremental interconnection costs, including meter installation, which are attributable solely to the Company's provision of service under this Rate Schedule will be borne by the customer. The actual incremental interconnection costs will be calculated by the Company separately for each customer. The customer may choose to pay his interconnection costs at once or to amortize them on a monthly basis over a period not exceeding five years, including interest at the rate of the Company's cost of capital.

TERM OF CONTRACT:

The Term of Contract shall be one year and shall continue thereafter until terminated by either the Company or the customer by written notice given to the other party at least thirty (30) days prior to the date of termination specified in such notice.

OTHER TERMS AND CONDITIONS:

"Backup Power" means electrical energy and capacity delivered by the Company to replace energy and capacity ordinarily provided by the Facility during an unscheduled outage of the Facility.

"Billing Period" means either a Normal Billing Period or a Short Billing Period.

"Net Capability" means the design net electrical capability of the Facility under International Standards Organization ("ISO") conditions.

"Normal Billing Period" means the time period between two consecutive billing cycle dates during which electric service is rendered.

"Peak Day" means any day that contains Peak Hours.

"Short Billing Period" means the time period between a starting metering reading date and the next billing cycle date or the time period between a previous billing cycle date and an ending meter reading date during which electric service is rendered.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07454

- 5 -                    R.I.P.U.C. NO. 1391

"Supplementary Power" means electrical energy and capacity delivered
by the Company regularly used by the customer in addition to that
which is provided by the Facility itself.

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998              Date Effective, June 1, 1998
per Order No. 15640 dated              for consumption on and after
July 10, 1998 in Docket No. 2716.      June 1, 1998.

NARR 07455

R.I.P.U.C. NO. 1392
CANCELS NO. 1375

NEWPORT ELECTRIC CORPORATION

GENERAL SPACE HEATING RETAIL DELIVERY SERVICE RATE H-1

AVAILABILITY:

This Rate Schedule is closed to new customers.  This Rate Schedule is
available only to Customers whose actual or estimated average monthly
demand is less than 500 kW that were taking service from the Company
under former Total Electric Living Rate-Limited, R.I.P.U.C. No. 205-L,
prior to April 1, 1988, provided that the Customer has permanently
installed building insulation and electric space heating equipment as
the Customer's primary source of space heating in accordance with the
Company's specifications, and electricity is the sole source of energy
used for all purposes.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by
the Customer on the Customer's premises for predominantly domestic
purposes in a building or a group of buildings used for living
quarters under common ownership and operation, or for all purposes in
hotels and motels, or for all purposes in hospitals and licensed
nursing homes.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or
three phase, alternating current, at a nominal frequency of sixty
Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

> Distribution Charges:
>
> | | | |
> |---|---|---|
> | Customer Charge: | $12.03 | per month |
> | Energy Charge: | $0.03968 | per kWh |
> | Conservation Charge: | $0.00230 | per kWh |
> | Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

> Standard Offer Cost Adjustment

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07456

- 2 -                    R.I.P.U.C. NO. 1392

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Distribution
Charges, the Conservation Charge, the Transition Charge, Rate
Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07457

R.I.P.U.C. NO. 1393
CANCELS NO. 1376

NEWPORT ELECTRIC CORPORATION

SUPPLEMENTARY GENERAL SPACE HEATING RETAIL DELIVERY SERVICE RATE H-2

AVAILABILITY:

This rate is closed to new customers.  This Rate Schedule is available only to Customers taking service from the Company under the terms of the Special Space Heating Provision-Limited of former General Service Rate, R.I.P.U.C. No. 201-N, prior to April 1, 1988, whose average monthly demand is either less than 500 kW or is not metered, provided that the Customer has permanently installed, in accordance with the Company's specifications, electric space heating equipment as the Customer's sole source of space heating.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for space heating and air conditioning purposes provided that the building space that is air conditioned is also heated solely by electricity, and said electricity shall be metered separately.  Electricity for other purposes shall be furnished under other applicable Rate Schedules.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charge:

Distribution Charges:

| | | |
|---|---|---|
| Minimum Charge: | $4.59 | per month |
| Energy Charge: | $0.04681 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

Standard Offer Cost Adjustment

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07458

- 2 -                    R.I.P.U.C. NO. 1393

BILLING:

. The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the higher of the sum, as applicable, of the
Distribution Charges, the Conservation Charge, the Transition Charge,
Rate Adjustments and Rhode Island Gross Receipts Tax or the sum of
$4.59 per month, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

R.I.P.U.C. NO. 1394
CANCELS NO. 1377

## NEWPORT ELECTRIC CORPORATION

### CONTROLLED WATER HEATING RETAIL DELIVERY SERVICE RATE W-1

AVAILABILITY:

This Rate is closed to new Customers.  This Rate Schedule is available only to customers for controlled electric water heating service, except for residential Customers whose actual or estimated annual energy consumption is 30,000 kWh or more, taking service from the Company under the former Controlled Off-Peak Rate, R.I.P.U.C. No. 102-N, prior to October 28, 1992, under the following conditions:

1.  The supply of electricity shall be controlled by a Company owned and operated switching device.  The Company reserves the right to limit the specific hours of the day service is available provided that the total duration of all such daily time periods that service is available is 16 hours or more, and

2.  The Customer is required to provide all necessary equipment for use with the Company's switching device, and

3.  The Customer's electric thermal storage space heating system and/or the Customer's water heating equipment provides at least eight (8) hours of storage capacity.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used solely by the Customer on the Customer's own premises for the purposes listed below :

1.  For residential Customers, the electricity delivered shall be used to supply power to an electric thermal storage space heating system and/or combination heating system which uses both electricity and another energy source permanently installed in an individual apartment, condominium, private home, other private dwelling, or condominium common area as the primary source of space heating, or

2.  For non-residential Customers, the electricity delivered shall be used to supply power to an electric thermal storage space heating system and/or combination heating system which uses both electricity and another energy source permanently installed as the primary source of space heating to a single building or a group of buildings, or

3.  For all Customer, the electricity delivered shall be used to supply power to electric water heating equipment provided that said equipment is of a type approved by the Company and installed in accordance with the Company's specifications, and

4.  Where the electricity delivered is used in accordance with the above provisions, the Customer may elect to supply power to other electrical loads.

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.            June 1, 1998.

NARR 07460

Electricity delivered hereunder shall be metered separately, and electricity for other purposes shall be delivered under other applicable Rate Schedules.

CHARACTER OF SERVICE:

Electric retail delivery service supplied hereunder shall be single or three phase, alternating current, at a nominal frequency of sixty Hertz, and at a locally available secondary distribution voltage.

RATE:

The Rate shall consist of the following charges:

   Distribution Charges:

|  |  |  |
|---|---|---|
| Customer Charge: | $3.29 | per month |
| Energy Charge: | $0.02399 | per kWh |
| Conservation Charge: | $0.00230 | per kWh |
| Transition Charge: | $0.02800 | per kWh |

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be adjusted in accordance with the provisions of the following clause in effect from time to time:

   Standard Offer Cost Adjustment

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Distribution Charges, the Conservation Charge, the Transition Charge, Rate Adjustments and Rhode Island Gross Receipts Tax.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

R.I.P.U.C. NO. 1395
CANCELS NO. 1378

NEWPORT ELECTRIC CORPORATION

LIGHTING RETAIL DELIVERY SERVICE RATE S-1

AVAILABILITY:

This Rate Schedule is available to all Customers.

APPLICABILITY:

Electricity delivered under this Rate Schedule shall be used for
lighting purposes only.

CHARACTER OF SERVICE:

Electric service shall be supplied hereunder to lighting equipment
owned and maintained by the Company, on Company owned poles, for dusk-
to-dawn operation of approximately 4000 burning hours per year.

RATE:

The Rate shall consist of the following charges:

CUSTOMER AND DISTRIBUTION:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS:

SODIUM VAPOR LAMP

1. For lights on ordinary wood poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 3,300 | Streetlight | $48.92 | $118.71 |
| 5,800 | Streetlight | 53.46 | 123.20 |
| 5,800 | Floodlight | 62.46 | 132.20 |
| 9,500 | Streetlight | 60.43 | 130.16 |
| 16,000 | Floodlight | 70.76 | 140.50 |
| 25,000 | Streetlight | 103.46 | 173.20 |
| 25,000 | Floodlight | 107.55 | 177.28 |
| 50,000 | Streetlight | 144.74 | 214.48 |
| 50,000 | Floodlight | 144.25 | 215.91 |

MERCURY VAPOR LAMP

2. For lights on ordinary wood poles:

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|
| 4,200 | Streetlight | $50.98 | $110.86 |
| 8,600 | Streetlight | 60.92 | 120.79 |
| 12,100 | Streetlight | 77.08 | 136.93 |
| 22,500 | Streetlight | 98.98 | 158.85 |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07462

- 2 -                        R.I.P.U.C. NO. 1395

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

A. LIGHTING SUPPLIED BY OVERHEAD CONDUCTORS: (Cont'd)

### MERCURY VAPOR LAMP

2. For lights on ordinary wood poles:  (cont'd)

| | | | |
|---|---|---|---|
| 22,500 | Floodlight | 100.38 | 160.26 |
| 63,000 | Floodlight | 195.06 | 254.94 |

### INCANDESCENT LAMP

3. For lights on ordinary wood poles:

| | | | |
|---|---|---|---|
| 1,000 | Streetlight | $22.57 | ... |
| 2,500 | Streetlight | 19.46 | ... |

### METAL HALIDE LAMP

4. For lights on ordinary wood poles:

| | | | |
|---|---|---|---|
| 20,000 | Floodlight | $129.45 | $253.73 |
| 40,000 | Floodlight | 168.76 | 293.05 |
| 115,000 | Floodlight | 216.90 | 341.18 |

B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS:

### SODIUM VAPOR LAMP

1. For lights on standard metal poles:

| | | | |
|---|---|---|---|
| 5,800 | Streetlight | $60.89 | $161.51 |
| 5,800 | Floodlight | 70.67 | 171.30 |
| 9,500 | Streetlight | 67.84 | 168.47 |
| 16,000 | Floodlight | 78.18 | 178.81 |
| 25,000 | Streetlight | 110.89 | 211.50 |
| 25,000 | Floodlight | 115.74 | 216.37 |
| 50,000 | Streetlight | 152.16 | 252.79 |
| 50,000 | Floodlight | 152.43 | 253.07 |
| 50,000 | Streetlight-Twin | 283.22 | 313.38 |

2. For lights on ordinary wood poles:

| | | | |
|---|---|---|---|
| 5,800 | Streetlight | $56.99 | $117.06 |
| 5,800 | Floodlight | 66.00 | 126.06 |
| 9,500 | Streetlight | 63.94 | 124.01 |
| 16,000 | Floodlight | 74.29 | 134.35 |
| 25,000 | Streetlight | 106.98 | 167.06 |
| 25,000 | Floodlight | 111.07 | 171.14 |

Date Filed, July 17, 1998            Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    June 1, 1998.

NARR 07463

- 3 -                          R.I.P.U.C. NO. 1395

| Nominal Lumens | Type Fixture | Annual Price per Luminaire (a) | Annual Price per Luminaire (b) |
|---|---|---|---|

**B. LIGHTING SUPPLIED BY UNDERGROUND CONDUCTORS: (Cont'd)**

### SODIUM VAPOR LAMP

2. For lights on ordinary wood poles: (cont'd)

| | | | |
|---|---|---|---|
| 50,000 | Streetlight | 148.28 | 208.34 |
| 50,000 | Floodlight | 147.76 | 207.84 |
| 50,000 | Streetlight-Twin | 276.25 | 332.97 |

3. For lights on poles less than 15 ft. high:

| | | | |
|---|---|---|---|
| 5,800 | T&C | $54.12 | $100.64 |

### MERCURY VAPOR LAMP

4. For lights on standard metal poles:

| | | | |
|---|---|---|---|
| 4,200 | Streetlight | $57.35 | $143.76 |
| 8,600 | Streetlight | 63.95 | 153.69 |
| 12,100 | Streetlight | 77.08 | 169.82 |
| 12,100 | Streetlight-Twin | 141.70 | 234.59 |
| 22,500 | Streetlight | 102.00 | 191.74 |
| 22,500 | Floodlight | 103.41 | 190.50 |
| 22,500 | Streetlight-Twin | 184.79 | 278.38 |
| 63,000 | Streetlight | 193.33 | 278.28 |

5. For lights on ordinary wood poles:

| | | | |
|---|---|---|---|
| 4,200 | Streetlight | $54.01 | $105.59 |
| 8,600 | Streetlight | 63.95 | 115.53 |
| 12,100 | Streetlight | 77.08 | 136.93 |
| 12,100 | Streetlight-Twin | 138.16 | 186.86 |
| 22,500 | Streetlight | 102.00 | 153.58 |
| 22,500 | Floodlight | 103.41 | 154.98 |
| 22,500 | Streetlight-Twin | 186.59 | 235.30 |
| 63,000 | Streetlight | 188.52 | 245.38 |

6. For lights on Poles less than 15 ft. high

| | | | |
|---|---|---|---|
| 4,200 | T&C | $54.54 | $94.48 |

(a) For fixtures mounted on existing poles or prepaid lighting poles.
(b) For fixtures mounted on lighting poles.

| | | |
|---|---|---|
| CONSERVATION CHARGE | $0.00230 | per kWh |
| TRANSITION CHARGE | $0.02800 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 07464

- 4 -                    R.I.P.U.C. NO. 1395

RATE ADJUSTMENTS:

The Billing Amount determined under this Rate Schedule shall be
adjusted in accordance with the provisions of the following clause in
effect from time to time:

    Standard Offer Cost Adjustment

BILLING:

The Billing Amount for retail delivery lighting service supplied under
this Rate Schedule shall consist of the sum, as applicable, of one-
twelfth of the Annual Price per Luminaire, the Conservation Charge,
the Transition Charge, Rate Adjustments and Rhode Island Gross
Receipts Tax.

EQUIPMENT AND INSTALLATION:

The Company will furnish, install, own, and maintain all necessary
lighting service equipment including but not limited to luminaires,
lamps, brackets, controls, conductors, and poles; and will furnish the
electrical energy supply for the lights.  For installations supplied
by underground conductors, the customer will provide trenching and
backfilling, and will furnish, install, and maintain the conduit and
base.  All lighting service equipment will be of Company standard
design and construction.  Where additional equipment is required, such
as additional poles required to serve the light or transformers
installed to provide the electrical energy supply for the lights, the
customer will pay for the full cost of such additional equipment in
advance of installation.

If the lights installed under this Rate Schedule are to be spaced such
that the distance between the lights is to be more that 150 feet, the
Customer will pay any additional costs incurred by the Company prior
to the installation of the lights.

EXCESSIVE DAMAGE:

Excessive damage due to wanton or malicious acts shall be charged to
the Customer at the actual cost of labor and material required to
repair or replace the unit.  Excessive damage is defined as a pole,
lamp, fixture, or conductors that is broken or damaged more than once
a year.  Notifications of excessive damage shall be made to the
Customer by the Company prior to billing for repairs.

FAILURE OF LIGHTS TO BURN:

Should any light or lights fail to burn during normal burning hours
due to causes which might reasonably have been prevented by the
Company, a pro-rata deduction from the above rates will be made upon
presentation by the Customer of a written claim therefor to the
Company.  This provision will not apply when such failure of lights to
burn is due to an Act of God, to any act or order of any public

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.  June 1, 1998.

NARR 07465

- 5 -                    R.I.P.U.C. NO. 1395

authority, to malicious breakage, or other acts of a third party
reasonably beyond control of the Company.

DISCONTINUANCE OF LIGHTS:

Municipalities or other public authorities shall not discontinue
service to more than five percent of the number of lights in service
in a calendar year, except that any number of lights in excess of the
five percent limit may be discontinued by mutual agreement provided
that the municipality or other public authority agrees to pay the
Company for the undepreciated value of each light in excess of the
five percent limit that has been in service for a period less than ten
years.

CONVERSION OF EXISTING MERCURY VAPOR LIGHTS TO SODIUM VAPOR:

Upon request by a municipality or other public authority, the Company
will initiate a conversion schedule for the replacement of
incandescent and mercury vapor lights with an appropriate sodium vapor
light upon payment of the undepreciated value of each existing light
if such light has been installed for a period less than ten years.
This payment may be amortized over the following twelve month period.
 The conversion will be completed in a period mutually agreeable to
the Customer and the Company provided that not more than 20% of the
lights eligible for conversion are converted each year.

TERM OF CONTRACT:

The term of contract shall be one year and shall continue thereafter
until terminated by the Company or the Customer by written notice
given to the other party at least sixty (60) days prior to date of
termination given in such notice.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated                for consumption on and after
July 10, 1998 in Docket No. 2716.        June 1, 1998.

NARR 07466

# Tab 42-1



**Blackstone Valley Electric**
**Eastern Edison**
**EUA Service Corporation**
**Montaup Electric**
**Newport Electric**



October 30, 1998

VIA HAND DELIVERY

Luly E. Massaro, Commission Clerk
Rhode Island Public Utilities Commission
100 Orange Street
Providence, RI 02903

Re:    Blackstone Valley Electric Company
       Newport Electric Corporation
       Standard Offer Service Tariff Advice

Dear Ms. Massaro:

        Enclosed herewith for filing on behalf of Blackstone Valley Electric Company
("Blackstone") and Newport Electric Corporation ("Newport") (collectively the "Companies")
are an original and nine copies of the Companies' Tariff Advice containing proposed Standard
Offer Service ("SOS") tariffs to be effective January 1, 1999, for consumption on and after that
date. The proposed SOS tariffs are designated R.I.P.U.C. No. 1178 in Blackstone, and
R.I.P.U.C. No. 1403 in Newport. The proposed SOS tariffs cancel currently effective SOS tariffs
R.I.P.U.C. No. 1173 for Blackstone and R.I.P.U.C. No. 1398 for Newport.

        The Companies have prepared their tariff advice filing pursuant to the Commission's
*Rules of Practice and Procedure*, Rule 1.9(c), and have organized the filing in six sections as
follows:

        Section 1: Proposed Standard Offer Service Tariffs
        Section 2: Present Standard Offer Service Tariffs
        Section 3: Redlined Standard Offer Service Tariffs
        Section 4: Compliance with Standard Offer Price Cap per G.L. § 39-1-27.3(c)
        Section 5: Calculation of Proposed Standard Offer Service Rates
        Section 6: Summary of Proposed Standard Offer Service Rate Changes

        The Companies have, pursuant to the Commission's *Rules of Practice and Procedure*,
Rule 1.9(c)(2), attached to this letter a copy of the form of notice the Companies will issue to the
public thirty (30) days prior to the effective date of the proposed tariffs and a copy of the service
list of known parties to whom the Companies have served a copy of this filing.

N:\SOFIL1~1\L981028A.WPD

NARR 06230

Ms. Massaro
Page 2

Background

On July 10, 1998, the Commission issued Order No. 15640 in *Blackstone Valley Electric Company and Newport Electric Corporation Standard Offer Service,* Docket No. 2716. The Order disallowed the Standard Offer Service and Last Resort Service tariffs filed by the Companies on April 15, 1998, pursuant to the requirements of the Utility Restructuring Act of 1997, as amended ("URA"). In compliance with the Order, the Companies filed revised Standard Offer Service and Last Resort Service tariffs on July 17, 1998. These tariffs were subsequently approved by the Commission at its August 19, 1998, open meeting and are the Companies' tariffs in effect today.

In the Order, the Commission noted:

> . . . that under the terms of the Settlement Agreement[1], the Companies entered into an agreement entitled Purchase of Electric Service for Resale, Amendment to Service Agreement with Montaup ("ASA"). Under the terms of the ASA, Montaup [Electric Company] is committed to provide the Standard Offer power supply to the Companies at fixed Standard Offer prices, subject to a fuel index, over the term that the Standard Offer will be available in Rhode Island. In the event that the Companies reduce their purchases from Montaup by purchasing wholesale standard offer power supply from another supplier, Montaup has no further obligation to supply that portion of the Companies' Standard Offer Load. *See* Order No. 15640, Docket No. 2716, pp. 4-5.

The Commission found that:

> The URA provides:
>
> > The power supply contract required for the standard offer shall be awarded by public competitive bidding to the lowest power supplier.
>
> The Companies' power supply acquisition procedures are also stipulated by the Settlement Agreement. First, the Settlement Agreement required the Companies to issue an RFP [Request for Proposal]. To qualify, a proposal was required to produce cost savings to the Companies. Any qualifying bidder, in

---

[1]  Stipulation and Agreement by and among the Rhode Island Public Utilities Commission, the Rhode Island Division of Public Utilities and Carriers, Montaup Electric Company, Blackstone Valley Electric Company, and Newport Electric Corporation, *Montaup Electric Company,* Federal Energy Regulatory Commission Docket No. ER97-2800-000, filed October 29, 1997.

N:\SOFILJ-1\L981028A.WPD

Ms. Massaro
Page 3

turn, would be required to enter into a Standard Offer Service Agreement
("SOSA"). If the RFP did not solicit enough qualifying bids to meet the
Companies' load requirements, the Settlement Agreement requires Montaup to
supply the difference.

The Companies did receive one bid in response to the RFP solicitation.
This proposal, however, did not conform to the requirements of the RFP. . . The
proposal was rejected. Consequently, the Companies continue to receive their
power supply requirements from Montaup under the terms of the ASA.

The Commission finds that the Companies have satisfied the competitive
bidding requirements of the URA. . . *Id.*, pp. 8-9.

The Companies during the course of the Docket No. 2716 proceeding indicated that they
"intend to issue another RFP [for Standard Offer Service] in the fourth quarter of this year·
[1998]" *Id.*, p.5

Explanation of Proposed Rate Changes

At this time, the Companies are actively engaged in issuing another RFP for Standard
Offer Service. In addition, Montaup has not yet completed its divestiture process. Thus, matters
remain as they are. Montaup will continue to provide Standard Offer Service to the Companies
under the terms of the ASA.

On January 1, 1999, in accordance with the Settlement Agreement, Montaup will increase
its price of Standard Offer Service to Blackstone and Newport from $0.03200/kWh to
$0.03500/kWh, an increase of 9.375%. The Companies have incorporated this increase in its
proposed Standard Offer Service tariffs as shown in Section 5 of its Tariff Advice filing.

The average effect of the increased Standard Offer Service prices on the total price paid
for electric service by the Companies' customers by rate class is shown in Section 6 of the filing.
These effects range from 2.1% to 3.7% increases for Blackstone customers and from 2.5% to
3.5% for Newport customers. The monthly bill for a typical 500 kWh Residential Rate R-1
customer will increase from $56.15 to $57.64 (+$1.49 or 2.7%) for Blackstone customers and
from $61.82 to $63.45 (+$1.63 or 2.6%) for Newport customers.

The Companies' Standard Offer Price Cap determined in accordance with
G.L. § 39-1-27.3(d), is shown in Section 4. The schedules in this section are the same schedules
presented in the Companies' April 15, 1998, filing in Docket No. 2716 updated for most recent
inflation data available to the Companies.

Ms. Massaro
Page 4


     If you have any questions or if you need more information, please call me at
(508)-559-2000 ext. 3700.

Very truly yours,

*Dennis St. Pierre*

Dennis St. Pierre
Vice President

jjb

Enclosures

NARR 06233

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
Filing Date October 30, 1998


David Effron
Berkshire Consulting Services
386 Main Street
Ridgefield, CT 06877

David A. Fazzone, P.C.
Doron F. Ezickson, Esq.
McDermott, Will & Emery
75 State Street
Boston, MA 02109-1807

Paul Roberti, Esq.
Assistant Attorney General
Dept. of Attorney General
150 South Main Street
Providence, RI 02903

Andrew J. Newman, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110-3319
For:  TEC-RI

Stephen Scialabba, Chief Accountant
Rhode Island Division of
Public Utilities & Carriers
100 Orange Street
Providence, RI 02903

Dr. John Stutz
Tellus Institute
11 Arlington Street
Boston, MA 02116-3411

Audrey VanDyke, Counsel
Dept. of the Navy
NFEC, Litigation Headquarters
Washington Navy Yard, Bldg. 218
901 M Street SE
Washington, D.C. 20374-5018

Mr. Roger Buck
The Energy Council of Rhode Island
P.O. Box 3235
Newport, RI 02840

Sam DeFrawi
Navy Rate Intervention
901 M Street S.E., Building 212
Washington, DC  20374-5018

Frank P. Pozniak, Esq.
Robert D. Shapiro, Esq.
Rubin & Rudman LLP
50 Rowes Wharf
Boston, MA 02110
For:  Enron Capital & Trade Resources

Mary Elizabeth Tighe, V.P.
Eastern Power Distribution, Inc.
2800 Eisenhower Ave.
Alexandria, VA  22314

Douglas F. John, Esq.
John & Hengerer
1200 17th St., NW, Suite 600
Washington, DC 20036-3006
For:  NorAm Energy Mgmt., Inc. &
Duke Energy Trading and Marketing LLC

Lindsay Johnson, Esq.
1 Boston Place, Suite 1210
Boston, MA 02108

Kris Errickson
Duke Energy Trading & Marketing
One Westchase Center
10777 Westsheimer, Suite 650
Houston, TX 77042

N:\SOfilmg99\SERVICELIST.DOC\

NARR 06234

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PUBLIC UTILITIES COMMISSION
Filing Date October 30, 1998

Sydney M. Lima, Esq.
RI League of Cities and Towns
One State St., Suite 502
Providence, RI 02908

Hugo Ricci, Esq.
Ricci & Ricci
578 Charles Street
Providence, RI 02904

Richard W. Benka, Esq.
Foley, Hoag & Eliot LLP
One Post Office Square
Boston, MA 02109-2170
For: NEV East, LLC

Andrew Galli, Executive Director
Coalition for Consumer Justice
1468 Broad Street
Providence, RI 02905

Keith Sappenfield, II.
Director of Marketing
NorAm Energy Management, Inc.
P.O. Box 2628
Houston, TX 77252-2628

Dennis Duffy, Esq.
Kevin J. McNeely, Esq.
Partridge, Snow & Hahn
180 South Main Street
Providence, RI 02903

Ronald T. Gerwatowski, Esq.
Narragansett Electric Company
280 Melrose Street, P.O. Box 1438
Providence, RI 02901-1438

Notice of Filing with the
State of Rhode Island and Providence Plantations
Public Utilities Commission

On October 30, 1998, Blackstone Valley Electric Company filed with the Rhode Island Public Utilities Commission rate schedules for Standard Offer Service, R.I.P.U.C. No. 1178 by tariff advice. The proposed tariff cancels R.I.P.U.C. No. 1173.

In accordance with the Settlement Agreement, on January 1, 1999, Montaup Electric Company will increase its price of Standard Offer Service to Blackstone from $0.03200/kWh to $0.03500/kWh, an increase of 9.375%. The Company has incorporated this increase in its proposed Standard Offer Service tariffs as filed with the Rhode Island Public Utilities Commission on October 30, 1998. The proposed effective date for the filed tariffs is January 1, 1999.

A copy of the tariff advice is on file at the Commission at 100 Orange Street, Providence and at the Company's office at 750 West Center Street, West Bridgewater, Ma. 02379. The copy may be examined by the public during business hours.

                                    Blackstone Valley Electric Company
                                    750 West Center Street
                                    West Bridgewater, Ma.  02379

NARR 06236

Notice of Filing with the
State of Rhode Island and Providence Plantations
Public Utilities Commission


On October 30, 1998, Newport Electric Corporation filed with the Rhode Island Public Utilities Commission rate schedules for Standard Offer Service, R.I.P.U.C. No. 1403 by tariff advice.  The proposed tariff cancels R.I.P.U.C. No. 1398.

In accordance with the Settlement Agreement, on January 1, 1999, Montaup Electric Company will increase its price of Standard Offer Service to Blackstone from $0.03200/kWh to $0.03500/kWh, an increase of 9.375%.  The Company has incorporated this increase in its proposed Standard Offer Service tariffs as filed with the Rhode Island Public Utilities Commission on October 30, 1998.  The proposed effective date for the filed tariffs is January 1, 1999.

A copy of the tariff advice is on file at the Commission at 100 Orange Street, Providence and at the Company's office at 750 West Center Street, West Bridgewater, Ma.  02379.  The copy may be examined by the public during business hours.

                    Newport Electric Corporation
                    750 West Center Street
                    West Bridgewater, Ma.  02379

# BLACKSTONE VALLEY ELECTRIC COMPANY
## and
# NEWPORT ELECTRIC CORPORATION

## STANDARD OFFER SERVICE

## TARIFF ADVICE FILING

## October 30, 1998

1

NARR 06238

# BLACKSTONE VALLEY ELECTRIC COMPANY
## and
# NEWPORT ELECTRIC CORPORATION

## STANDARD OFFER SERVICE
## TARIFF ADVICE FILING

## TABLE OF CONTENTS

PAGE

Section 1.:
  Proposed Standard Offer Service Tariffs
    Blackstone Valley Electric................................................................. 4
    Newport Electric Corporation.............................................................12

Section 2.:
  Present Standard Offer Service Tariffs
    Blackstone Valley Electric.................................................................22
    Newport Electric Corporation.............................................................30

Section 3.:
  Redlined Standard Offer Service Tariffs
    Blackstone Valley Electric.................................................................40
    Newport Electric Corporation.............................................................48

Section 4.:
  Standard Offer Price Cap per URA
    Blackstone Valley Electric.................................................................58
    Newport Electric Corporation.............................................................59

Section 5.:
  Calculation of Proposed Standard Offer Service Rates
    Blackstone Valley Electric.................................................................61
    Newport Electric Corporation.............................................................63

Section 6.:
  Summary of Proposed Rate Changes
    Blackstone Valley Electric.................................................................67
    Newport Electric Corporation.............................................................68

NARR 06239

R.I.P.U.C. NO. 1178
CANCELS NO. 1173

BLACKSTONE VALLEY ELECTRIC COMPANY
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF .SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

        Energy Charge:              $0.03337        per kWh

Residential SSI Retail Delivery Service Rate R-2

        Energy Charge:              $0.03337        per kWh

Residential Space Heating Retail Delivery Service Rate R-3

        Energy Charge:              $0.03454        per kWh

Large Residential Retail Delivery Service Rate R-4

        Energy Charge
          Peak Hours:              $0.16826        per kWh
          Off-Peak Hours:          $0.00623        per kWh

Date Filed, October 30, 1998                Date Effective, January 1, 1999
                                            for consumption on and after
                          4                 January 1, 1999

**NARR 06240**

R.I.P.U.C. NC. 1178

-2-

Small Secondary Voltage General Retail Delivery Service Rate G-1

 Energy Charge:     $0.03925  per kWh

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

 Demand Charge:     $6.35  per kW

 Energy Charge:     $0.01535  per kWh

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

 Demand Charge:     $6.68  per kW

 Energy Charge
  Peak Hours:     $0.03257  per kWh
  Off-Peak Hours:   $0.00959  per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

 Demand Charge:     $5.79  per kW

 Energy Charge:     $0.01761  per kWh

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

 Demand Charge:     $5.99  per kW

 Energy Charge
  Peak Hours:     $0.03545  per kWh
  Off-Peak Hours:   $0.01153  per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, October 30, 1998      Date Effective, January 1, 1999
              for consumption on and after
       5      January 1, 1999

NARR 06241

R.I.P.U.C. NO. 1178

-3-

## Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $6.43 | per kW |

Energy Charge
    Peak Hours:          $0.04286      per kWh
    Off-Peak Hours:    $0.01123      per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

## Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.87 | per kW |

Energy Charge
    Peak Hours:          $0.04281      per kWh
    Off-Peak Hours:    $0.01355      per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

## Large Secondary Voltage Auxiliary
## General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $4.05 | per kW |

Energy Charge
    Peak Hours:          $0.04286      per kWh
    Off-Peak Hours:    $0.01123      per kWh

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, October 30, 1998

6

Date Effective, January 1, 1999
for consumption on and after
January 1, 1999

NARR 06242

R.I.P.U.C. NC. 1178

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in <u>Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4</u>.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.69 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.04281 | per kWh |
| Off-Peak Hours: | $0.01355 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the
Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in
excess of the Supplementary Demand, where the Average Daily Demand is
the sum of the daily maximum metered 15 minute average loads recorded
during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in <u>Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6</u>.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the

Date Filed, October 30, 1998               Date Effective, January 1, 1999
                                           for consumption on and after
                                           January 1, 1999

7

**NARR 06243**

R.I.P.U.C. NC. 1175

-5-

customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:               $0.03618      per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:               $0.03652      per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:               $0.03838      per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:               $0.03728      per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

    Peak Hours
        Monday through Friday excluding holidays defined below
        April through September,   11:00 a.m. to  4:00 p.m.
        October through March,    8:00 a.m. to 12:00 noon, and
                                 4:00 p.m. to  7:00 p.m.

    Off-Peak Hours
        All other hours.

        Holidays are defined as:

            New Year's Day          Columbus Day
            President's Day        Veteran's Day
             Memorial Day          Thanksgiving Day
            Independence Day    Christmas Day
            Labor Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or
more in the current or preceding eleven months will receive a Power

Date Filed, October 30, 1998        Date Effective, January 1, 1999
                                     for consumption on and after
                                   January 1, 1999

NARR 06244

R.I.P.U.C. NO. 1178

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

> Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

>> Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

> Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

>> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

> Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

> | Year | Fuel Trigger Point |
> |------|--------------------|
> | 2000 | $5.35  per MMBTU |
> | 2001 | $5.35  per MMBTU |
> | 2002 | $6.09  per MMBTU |

Date Filed, October 30, 1998

Date Effective, January 1, 1999
for consumption on and after
January 1, 1999

9

NARR 06245

R.I.P.U.C. NO. 1178

-7-

2003            $7.01  per MMBTU
2004            $7.74  per MMBTU

In the event that the Fuel Trigger Point is exceeded, the Fuel
Adjustment value for the billing month is determined based according
to the following formula:

Fuel Adjustment = (Market Gas Price+$0.60/MMBTU)+(Market Oil Price+$0.04/MMBTU)
$$\frac{}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

   Where Market Gas Price, Market Oil Price and Fuel Trigger Point
   are as defined above.  The values of $0.60 and $0.04/MMBTU
   represent for gas and oil respectively, estimated basis
   differentials or market costs of transportation from the point
   where the index is calculated to a proxy power plant in the New
   England market.

Incremental revenues received by the Company from the application of
the Fuel Adjustment shall be fully allocated to Standard Offer
Suppliers in proportion to the Standard Offer energy provided by a
Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the
difference between the cost of Standard Offer Service paid by the
Company to wholesale suppliers thereof and the revenues billed by the
Company to Customers taking Standard Offer Service under this Rate
Schedule.  As used herein "Standard Offer Service costs" shall be
those costs incurred by the Company in providing Standard Offer
Service under this Rate Schedule including wholesale rate discounts
arising from the competitive procurement process and any or all other
costs determined by the Public Utilities Commission to be includable
therewith, excluding all costs recoverable through the Standard Offer
Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any
over- or under-collection for the prior calendar year and make a
filing with the Commission.  The Company will propose at that time a
rate recovery/refund methodology to recover or refund the balance, as
appropriate, over the twelve-month period commencing April 1.  The
Commission may order the Company to collect or refund the balance over
any reasonable time period from (i) all customers, (ii) only Standard
Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31,
2009, the Company will apply to the Public Utilities Commission for
approval of a temporary per kilowatthour surcharge or credit factor to
be applied to the distribution component of the Retail Delivery Rates
for such a duration as necessary to provide for full recovery or
return of any outstanding balance of Standard Offer Service costs or
revenues that exists.

Date Filed, October 30, 1998                Date Effective, January 1, 1999
                                            for consumption on and after
                        10                  January 1, 1999

NARR 06246

R.I.P.U.C. NO. 1178

-8-

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer Fuel Index
and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
beginning on the date service is first taken and ending on the earlier
of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, October 30, 1998                Date Effective, January 1, 1999
                                            for consumption on and after
                                11          January 1, 1999

NARR 06247

R.I.P.U.C. NO. 1403
CANCELS NO. 1398

NEWPORT ELECTRIC CORPORATION
STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

|  | | |
|---|---|---|
| Energy Charge: | $0.03654 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

|  | | |
|---|---|---|
| Energy Charge: | $0.03654 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.16839 | per kWh |
| Off-Peak Hours: | $0.00730 | per kWh |

Small Secondary Voltage General Retail Delivery Service Rate G-1

|  | | |
|---|---|---|
| Energy Charge: | $0.03672 | per kWh |

Date Filed, October 30, 1998                    Date Effective, January 1, 1999
                                                for consumption on and after
                                                January 1, 1999

12

**NARR 06248**

R.I.P.U.C. NO. 1403

-2-

Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $6.67 | per kW |
| Energy Charge: | $0.01678 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $7.21 | per kW |

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.07018 | per kWh |
| Off-Peak Hours: | $0.00105 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 15 kilowatts.

Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $7.57 | per kW |
| Energy Charge: | $0.01571 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $7.92 | per kW |

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.06805 | per kWh |
| Off-Peak Hours: | $0.00249 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 15 kilowatts.

Date Filed, October 30, 1998                    Date Effective, January 1, 1999
                                                for consumption on and after
                                  13            January 1, 1999

**NARR 06249**

R.I.P.U.C. NO. 1403

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $8.79 | per kW |
| | | |
| Energy Charge | | |
| Peak Hours: | $0.06552 | per kWh |
| Off-Peak Hours: | $0.00105 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $7.95 | per kW |
| | | |
| Energy Charge | | |
| Peak Hours: | $0.06628 | per kWh |
| Off-Peak Hours: | $0.00264 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Transmission Voltage General Retail Delivery Service Rate C-1

| | | |
|---|---|---|
| Demand Charge: | $6.55 | per kW |
| | | |
| Energy Charge | | |
| Peak Hours: | $0.02058 | per kWh |
| Off-Peak Hours: | $0.01701 | per kWh |

I.    Billing Period

The Billing Period consists of the days between consecutive meter
readings.  Service under this Rate is rendered on a full calendar
day basis.  The first day of any billing period is included in
its entirety and the last day of any billing period is excluded
in its entirety.

II.   Backup Billing Period

The Backup Billing Period consists of the Peak Days within a
Billing Period during which Backup Service is rendered.  Backup
Service is rendered when any part of a forced outage occurs
during Peak Hours and electric service is actually taken.

Date Filed, October 30, 1998                 Date Effective, January 1, 1999
                                             for consumption on and after
                                             January 1, 1999

14

NARR 06250

R.I.P.U.C. NO. 1403

-4-

III. Maintenance Billing Period

The Maintenance Billing Period consists of the Peak Days within a Billing Period during which Maintenance Service is rendered. Maintenance Service is rendered when any part of a planned outage occurs during Peak Hours and electric service is actually taken.

IV. Standard Offer Billing Demand

A.  Requirements Service

The Standard Offer Billing Demand in kilowatts for each month is the maximum metered fifteen-minute demand during Peak Hours within the Billing Period.

B.  Partial Requirements Service

The Supplementary Demand in kilowatts is the maximum metered fifteen-minute demand recorded during Peak Hours within the Billing Period excluding Backup and Maintenance Billing Periods.

The Backup Demand in kilowatts is the maximum metered fifteen-minute demand recorded during Peak Hours within the Backup Billing Period in excess of the Supplementary Demand.

The Standard Offer Demand in kilowatts for each month shall be the sum of:

1.  The Supplementary Demand, and

2.  The Backup Demand times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.

V.  Billing Demand Charge

The Billing Demand Charge shall be the Standard Offer Billing Demand times the Demand Rate.

The terms Requirement Service, Partial Requirements Service, Supplementary Service, and Backup Service shall be as defined in Transmission Voltage General Retail Delivery Service Rate C-1.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $5.34 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06552 | per kWh |
| Off-Peak Hours: | $0.00105 | per kWh |

Date Filed, October 30, 1998

Date Effective, January 1, 1999
for consumption on and after
15    January 1, 1999

**NARR 06251**

R.I.P.U.C. NO. 1403

-5-

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| | | |
|---|---|---|
| Demand Charge: | $4.81 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06628 | per kWh |
| Off-Peak Hours: | $0.00264 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded

Date Filed, October 30, 1998

Date Effective, January 1, 1999
for consumption on and after
January 1, 1999

NARR 06252

R.I.P.U.C. NO. 1403

-6-

during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

| | | |
|---|---|---|
| Energy Charge: | $0.03510 | per kWh |

General Heating Retail Delivery Service Rate H-2

| | | |
|---|---|---|
| Energy Charge: | $0.03545 | per kWh |

Controlled Water Heating Retail Delivery Service Rate W-1

| | | |
|---|---|---|
| Energy Charge: | $0.03755 | per kWh |

Lighting Retail Delivery Service Rate S-1

| | | |
|---|---|---|
| Energy Charge: | $0.03654 | per kWh |

Date Filed, October 30, 1998                    Date Effective, January 1, 1999
                                                for consumption on and after
                              17                January 1, 1999

NARR 06253

R.I.P.U.C. NO. 1403

-7-

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

    Peak Hours
        Monday through Friday excluding holidays defined below
        May through September,    10:00 a.m. to  4:00 p.m.
        October through April,    9:00 a.m. to 12:00 noon, and
                                  5:00 p.m. to  8:00 p.m.

    Off-Peak Hours
        All other hours.

        Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

    Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

        Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU.  NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

    Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

        Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer

Date Filed, October 30, 1998

Date Effective, January 1, 1999
for consumption on and after
January 1, 1999

18

**NARR 06254**

R.I.P.U.C. NO. 1403

-8-

suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point | |
|------|------|------|
| 2000 | $5.35 | per MMBTU |
| 2001 | $5.35 | per MMBTU |
| 2002 | $6.09 | per MMBTU |
| 2003 | $7.01 | per MMBTU |
| 2004 | $7.74 | per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}} -$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The

Date Filed, October 30, 1998

Date Effective, January 1, 1999 for consumption on and after January 1, 1999

19

NARR 06255

R.I.P.U.C. NC. 1403

-9-

Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice. The Customer shall be ineligible to receive Standard Offer Service thereafter. The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, October 30, 1998                    Date Effective, January 1, 1999
                                                for consumption on and after
                                                January 1, 1999

                            20

# Tab 42-2

# SECTION 2.

# PRESENT
# STANDARD OFFER SERVICE
# TARIFFS

21

NARR 06257

R.I.P.U.C. NO. 1173
CANCELS NO. 1172

### BLACKSTONE VALLEY ELECTRIC COMPANY
### STANDARD OFFER SERVICE

#### AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

#### APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

#### CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

#### RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential SSI Retail Delivery Service Rate R-2

| | | |
|---|---|---|
| Energy Charge: | $0.03051 | per kWh |

Residential Space Heating Retail Delivery Service Rate R-3

| | | |
|---|---|---|
| Energy Charge: | $0.03158 | per kWh |

Large Residential Retail Delivery Service Rate R-4

| Energy Charge | | |
|---|---|---|
| Peak Hours: | $0.15384 | per kWh |
| Off-Peak Hours: | $0.00570 | per kWh |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 06258

R.I.P.U.C. NO. 1173

-2-

<u>Small Secondary Voltage General Retail Delivery Service Rate G-1</u>

    Energy Charge:               $0.03589       per kWh

<u>Medium Secondary Voltage General Retail Delivery Service Rate G-2</u>

Non Time-of-Use Billing Option (Rate Code G-2):

    Demand Charge:             $5.81          per kW

    Energy Charge:               $0.01403       per kWh

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

    Demand Charge:             $6.11          per kW

    Energy Charge
        Peak Hours:            $0.02978       per kWh
        Off-Peak Hours:       $0.00877       per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

<u>Medium Primary Voltage General Retail Delivery Service Rate G-5</u>

Non Time-of-Use Billing Option (Rate Code G-5):

    Demand Charge:             $5.29          per kW

    Energy Charge:               $0.01610       per kWh

The Billing Demand in kilowatts for each month will be the maximum metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

    Demand Charge:             $5.48          per kW

    Energy Charge
        Peak Hours:            $0.03241       per kWh
        Off-Peak Hours:       $0.01054       per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 10 kilowatts.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.    23

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 06259

R.I.P.U.C. NO. 1173

-3-

## Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $5.88 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

## Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $5.37 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

## Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $3.70 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.03919 | per kWh |
| Off-Peak Hours: | $0.01027 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.    24

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 06260

R.I.P.U.C. NO. 1173

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary</u>
<u>General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.37 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.03914 | per kWh |
| Off-Peak Hours: | $0.01239 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the

| | |
|---|---|
| Date Filed, July 17, 1998 | Date Effective, June 1, 1998 |
| per Order No. 15640 dated | for consumption on and after |
| July 10, 1998 in Docket No. 2716. | June 1, 1998. |

25

NARR 06261

R.I.P.U.C. NO. 1173

-5-

customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods. Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer. The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:               $0.03308        per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:               $0.03339        per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:               $0.03509        per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:               $0.03408        per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

    Peak Hours
        Monday through Friday excluding holidays defined below
        April through September,   11:00 a.m. to  4:00 p.m.
        October through March,    8:00 a.m. to 12:00 noon, and
                              4:00 p.m. to  7:00 p.m.

    Off-Peak Hours
        All other hours.

        Holidays are defined as:

                New Year's Day         Columbus Day
                President's Day        Veteran's Day
                 Memorial Day           Thanksgiving Day
                 Independence Day     Christmas Day
                 Labor Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or
more in the current or preceding eleven months will receive a Power

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated             for consumption on and after
July 10, 1998 in Docket No. 2716.    26     June 1, 1998.

NARR 06262

R.I.P.U.C. NO. 1173

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:

Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;

Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:

Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU |
| 2001 | $5.35  per MMBTU |
| 2002 | $6.09  per MMBTU |

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

27

NARR 06263

R.I.P.U.C. NO. 1173

-7-

| | | |
|---|---|---|
| 2003 | $7.01 | per MMBTU |
| 2004 | $7.74 | per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.    2B

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 06264

R.I.P.U.C. NO. 1173

-8-

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer Fuel Index
and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
beginning on the date service is first taken and ending on the earlier
of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, July 17, 1998             Date Effective, June 1, 1998
per Order No. 15640 dated             for consumption on and after
July 10, 1998 in Docket No. 2716.   29   June 1, 1998.

**NARR 06265**

R.I.P.U.C. NO. 1396
CANCELS NO. 1397

### NEWPORT ELECTRIC CORPORATION
### STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:               $0.03341        per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:               $0.03341        per kWh

Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:           $0.15396     per kWh
        Off-Peak Hours:      $0.00667     per kWh

Small Secondary Voltage General Retail Delivery Service Rate G-1

    Energy Charge:               $0.03357        per kWh

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

NARR 06266

R.I.P.U.C. NO. 1398

-2-

## Medium Secondary Voltage General Retail Delivery Service Rate G-2

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $6.10 | per kW |
| Energy Charge: | $0.01534 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.59 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06416 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

## Medium Primary Voltage General Retail Delivery Service Rate G-5

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $6.92 | per kW |
| Energy Charge: | $0.01436 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of the maximum metered demand in any fifteen-minute period during the month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $7.24 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.06222 | per kWh |
| Off-Peak Hours: | $0.00228 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 15 kilowatts.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

31

**NARR 06267**

R.I.P.U.C. NO. 1398

-3-

Large Secondary Voltage General Retail Delivery Service Rate T-4

    Demand Charge:              $8.04        per kW

    Energy Charge
        Peak Hours:          $0.05990    per kWh
        Off-Peak Hours:     $0.00096    per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Large Primary Voltage General Retail Delivery Service Rate T-6

    Demand Charge:              $7.27        per kW

    Energy Charge
        Peak Hours:          $0.06060    per kWh
        Off-Peak Hours:     $0.00241    per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

Transmission Voltage General Retail Delivery Service Rate C-1

    Demand Charge:              $5.99        per kW

    Energy Charge
        Peak Hours:          $0.01882    per kWh
        Off-Peak Hours:     $0.01555    per kWh

I.    Billing Period

    The Billing Period consists of the days between consecutive meter
    readings.  Service under this Rate is rendered on a full calendar
    day basis.  The first day of any billing period is included in
    its entirety and the last day of any billing period is excluded
    in its entirety.

II.    Backup Billing Period

    The Backup Billing Period consists of the Peak Days within a
    Billing Period during which Backup Service is rendered.  Backup
    Service is rendered when any part of a forced outage occurs
    during Peak Hours and electric service is actually taken.

Date Filed, July 17, 1998                Date Effective, June 1, 1998
per Order No. 15640 dated            for consumption on and after
July 10, 1998 in Docket No. 2716.    32    June 1, 1998.

NARR 06268

R.I.P.U.C. NO. 1398

-4-

III.  Maintenance Billing Period

The Maintenance Billing Period consists of the Peak Days within a
Billing Period during which Maintenance Service is rendered.
Maintenance Service is rendered when any part of a planned outage
occurs during Peak Hours and electric service is actually taken.

IV.  Standard Offer Billing Demand

A.  Requirements Service

The Standard Offer Billing Demand in kilowatts for each month is
the maximum metered fifteen-minute demand during Peak Hours
within the Billing Period.

B.  Partial Requirements Service

The Supplementary Demand in kilowatts is the maximum metered
fifteen-minute demand recorded during Peak Hours within the
Billing Period excluding Backup and Maintenance Billing Periods.

The Backup Demand in kilowatts is the maximum metered fifteen-
minute demand recorded during Peak Hours within the Backup
Billing Period in excess of the Supplementary Demand.

The Standard Offer Demand in kilowatts for each month shall be
the sum of:

1.  The Supplementary Demand, and

2.  The Backup Demand times the ratio of the number of
Backup Billing Period Days to the number of Billing
Period Peak Days.

V.  Billing Demand Charge

The Billing Demand Charge shall be the Standard Offer Billing
Demand times the Demand Rate.

The terms Requirement Service, Partial Requirements Service,
Supplementary Service, and Backup Service shall be as defined in
Transmission Voltage General Retail Delivery Service Rate C-1.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| | | |
|---|---|---|
| Demand Charge: | $4.88 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.05990 | per kWh |
| Off-Peak Hours: | $0.00096 | per kWh |

Date Filed, July 17, 1998                    Date Effective, June 1, 1998
per Order No. 15640 dated                    for consumption on and after
July 10, 1998 in Docket No. 2716.      33      June 1, 1998.

NARR 06269

R.I.P.U.C. NO. 1398

-5-

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6

| Demand Charge: | $4.40 | per kW |
|---|---|---|

| Energy Charge | | |
| Peak Hours: | $0.06060 | per kWh |
| Off-Peak Hours: | $0.00241 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.          Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

34

NARR 06270

R.I.F.U.C. NO. 1398

-6-

during Peak Hours within the Backup Billing Period divided by the
number of days in the Backup Billing Period.  The Backup Usage Demand
Charge shall be the Backup Usage Demand times the Demand Charge times
the ratio of the number of Backup Billing Period Days to the number of
Billing Period Peak Days.  No Backup Usage Demand Charge shall be
incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary
Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing
Period shall be as defined in Large Primary Voltage Auxiliary General
Retail Delivery Service Rate A-6.

The Company agrees to furnish Maintenance Power to the customer at
times convenient to the Company.  The Contract will specify the
customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:                $0.03209       per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:                $0.03241       per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:                $0.03433       per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:                $0.03341       per kWh

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.    35    June 1, 1998.

NARR 06271

R.I.P.U.C. NO. 1398

-7-

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours
Monday through Friday excluding holidays defined below
May through September,    10:00 a.m. to  4:00 p.m.
October through April,     9:00 a.m. to 12:00 noon, and
                           5:00 p.m. to  8:00 p.m.

Off-Peak Hours
All other hours.

Holidays are defined as:

New Year's Day          Columbus Day
President's Day         Veteran's Day
Memorial Day            Thanksgiving Day
Independence Day        Christmas Day
Labor Day

The foregoing Rates shall be adjusted from time to time in accordance
with provisions of the Standard Offer Fuel Index and the Standard
Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied
by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas
Price plus Market Oil Price for the billing month exceeds the Fuel
Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for
the most recent six months through and including the billing
month, where:

Gas Index is the average of the daily settlement prices for
the last three days that the NYMEX Contract (as defined
below) for the month of delivery trades as reported in the
Wall Street Journal, expressed in dollars per MMBTU.  NYMEX
Contract shall mean the New York Mercantile Exchange Natural
Gas Futures Contract as approved by the Commodity Futures
Trading Commission for the purchase and sale of natural gas
at Henry Hub;

Market Oil Price is the average of the values of Oil Index for
the most recent six months through and including the billing
month, where:

Oil Index is the average for the month of the daily low
quotations for cargo delivery of 1.0% sulfur No. 6 residual
fuel oil into New York harbor, as reported in Platt's
Oilgram U.S. Marketscan in dollars per barrel and converted
to dollars per MMBTU by dividing by 6.3; and if the indices
referred to above should become obsolete or no longer

Date Filed, July 17, 1998          Date Effective, June 1, 1998
per Order No. 15640 dated          for consumption on and after
July 10, 1998 in Docket No. 2716.   36   June 1, 1998.

NARR 06272

R.I.P.U.C. NO. 1398

-8-

suitable, the distribution company shall file alternate indices with the Department.

Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35 per MMBTU |
| 2001 | $5.35 per MMBTU |
| 2002 | $6.09 per MMBTU |
| 2003 | $7.01 per MMBTU |
| 2004 | $7.74 per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.          Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

37

NARR 06273

R.I.P.U.C. NO. 1398

-9-

Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate Schedule shall consist of the sum, as applicable, of the Demand Charge and the Energy Charges as adjusted by the Standard Offer Fuel Index and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period beginning on the date service is first taken and ending on the earlier of December 31, 2009, or the date the Customer terminates service. The Customer may terminate service on five (5) days notice.  The Customer shall be ineligible to receive Standard Offer Service thereafter.  The foregoing provision shall not apply to Customers who receive service under any of the Company's residential Retail Delivery Service Rates or under Small General Retail Delivery Service Rate G-1. Said Customers may elect to take electric power service from another Supplier during the period beginning June 1, 1998, and ending May 31, 1999, and elect to return to Standard Offer Service within one hundred twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and Conditions for Electric Power Suppliers in effect from time to time, where not inconsistent with the specific provisions hereof, are a part of this Rate Schedule.

Date Filed, July 17, 1998
per Order No. 15640 dated
July 10, 1998 in Docket No. 2716.        38

Date Effective, June 1, 1998
for consumption on and after
June 1, 1998.

**NARR 06274**

# Tab 42-3

# SECTION 3.

## REDLINED
## STANDARD OFFER SERVICE
## TARIFFS

NARR 06275

R.I.P.U.C. NO. 1173̶6̶
CANCELS NO. 1172̶5̶

## BLACKSTONE VALLEY ELECTRIC COMPANY
## STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:              $0.030̶5̶1̶337          per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:              $0.030̶5̶1̶337          per kWh

Residential Space Heating Retail Delivery Service Rate R-3

    Energy Charge:              $0.031̶5̶8̶454          per kWh

Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:             $0.153̶8̶4̶6826         per kWh
        Off-Peak Hours:         $0.005̶7̶0̶623          per kWh

Date Filed, October 30, 1998          Date Effective, January 1, 1999
                                      for consumption on and after
                                      January 1, 1999

40

NARR 06276

R.I.P.U.C. NO. 1173~~5~~<u>6</u>

-2-

<u>Small Secondary Voltage General Retail Delivery Service Rate G-1</u>

Energy Charge:                 $0.03~~589~~<u>925</u>            per kWh

<u>Medium Secondary Voltage General Retail Delivery Service Rate G-2</u>

Non Time-of-Use Billing Option (Rate Code G-2):

Demand Charge:                 ~~$5.81~~<u>6.35</u>             per kW

Energy Charge:                 $0.01~~403~~<u>535</u>            per kWh

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

Demand Charge:                 $6.~~11~~<u>68</u>              per kW

Energy Charge
    Peak Hours:                $0.02~~9783~~<u>3257</u>    per kWh
    Off-Peak Hours:            $0.008~~77~~<u>959</u>     per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

<u>Medium Primary Voltage General Retail Delivery Service Rate G-5</u>

Non Time-of-Use Billing Option (Rate Code G-5):

Demand Charge:                 $5.~~29~~ <u>79</u>             per kW

Energy Charge:                 $0.01~~610~~<u>761</u>            per kWh

The Billing Demand in kilowatts for each month will be the maximum
metered demand in any fifteen minute period during the month.

Time-of-Use Billing Option (Rate Code T-5):

Demand Charge:                 $5.~~48~~<u>99</u>              per kW

Energy Charge
    Peak Hours:                $0.03~~241~~<u>545</u>     per kWh
    Off-Peak Hours:            $0.01~~054~~<u>153</u>     per kWh

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 10 kilowatts.

<u>Date Filed, October 30, 1998              Date Effective, January 1, 1999
                                          for consumption on and after
                                          January 1, 1999</u>

NARR 06277

R.I.P.U.C. NO. 1173E

-3-

### Large Secondary Voltage General Retail Delivery Service Rate T-4

Demand Charge: $5.886.43 per kW

Energy Charge
Peak Hours: $0.039194286 per kWh
Off-Peak Hours: $0.01027123 per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

### Large Primary Voltage General Retail Delivery Service Rate T-6

Demand Charge: $5.3787 per kW

Energy Charge
Peak Hours: $0.039144281 per kWh
Off-Peak Hours: $0.01239355 per kWh

The Billing Demand in kilowatts for each month will be the higher of the maximum metered demand in any fifteen-minute period during Peak Hours in the month or 100 kilowatts.

### Large Secondary Voltage Auxiliary
### General Retail Delivery Service Rate A-4

Demand Charge: $3.704.05 per kW

Energy Charge
Peak Hours: $0.039194286 per kWh
Off-Peak Hours: $0.01027123 per kWh

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

Date Filed, October 30, 1998    Date Effective, January 1, 1999
for consumption on and after
January 1, 1999

NARR 06278

R.I.P.U.C. NO. 1173E

-4-

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary</u>
<u>General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $3.~~37~~69 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.0~~3914~~4281 | per kWh |
| Off-Peak Hours: | $0.01~~239~~355 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the

| | |
|---|---|
| <u>Date Filed, October 30, 1998</u> | <u>Date Effective, January 1, 1999</u> |
| | <u>for consumption on and after</u> |
| | <u>January 1, 1999</u> |

43

NARR 06279

R.I.P.U.C. NO. 1173E

-5-

customer's expected Maintenance Power requirements, expected frequency
and duration of Maintenance Power periods, and the expected calendar
schedule of Maintenance Power periods.  Said Maintenance Power
requirements, frequency, duration, and schedule must be determined by
the Company to be reasonable given the design specifications and
operating characteristics of the customer's Facility, and such other
information the Company considers pertinent to the determination of
the appropriate Maintenance Power requirements, frequency, duration,
and schedule for the customer.  The customer shall make all requests
for Maintenance Power in writing at least thirty (30) days prior to a
planned outage of the Facility, and the Company will consent to such
requests in writing, which consent shall not be unreasonably withheld.

General Space Heating Retail Delivery Service Rate H-1

    Energy Charge:              $0.03~~308~~618          per kWh

General Heating Retail Delivery Service Rate H-2

    Energy Charge:              $0.03~~329~~652          per kWh

Controlled Water Heating Retail Delivery Service Rate W-1

    Energy Charge:              $0.03~~509~~838          per kWh

Lighting Retail Delivery Service Rate S-1

    Energy Charge:              $0.03~~408~~728          per kWh

Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

        Peak Hours
            Monday through Friday excluding holidays defined below
            April through September,    11:00 a.m. to  4:00 p.m.
            October through March,       8:00 a.m. to 12:00 noon, and
                                         4:00 p.m. to  7:00 p.m.

        Off-Peak Hours
            All other hours.

        Holidays are defined as:

                New Year's Day              Columbus Day
                President's Day             Veteran's Day
                Memorial Day                Thanksgiving Day
                Independence Day            Christmas Day
                Labor Day

Power Factor Adjustment for Rates G-2, T-4, G-5, and T-6:

Customers who have established a Billing Demand of 100 kilowatts or
more in the current or preceding eleven months will receive a Power

NARR 06280

-6-

Factor Adjustment (PFA) to their Demand Charge based on the following method, except that the Demand Charge shall not be less than 95% nor more than 110% of the Demand Charge before adjustment:

PFA = ((0.80 / Power Factor) - 1) x (Unadjusted Demand Charge / 3)

The foregoing Rates shall be adjusted from time to time in accordance with provisions of the Standard Offer Fuel Index and the Standard Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas Price plus Market Oil Price for the billing month exceeds the Fuel Trigger Point then in effect, where:

> Market Gas Price is the average of the values of Gas Index for the most recent six months through and including the billing month, where:
>
>> Gas Index is the average of the daily settlement prices for the last three days that the NYMEX Contract (as defined below) for the month of delivery trades as reported in the Wall Street Journal, expressed in dollars per MMBTU. NYMEX Contract shall mean the New York Mercantile Exchange Natural Gas Futures Contract as approved by the Commodity Futures Trading Commission for the purchase and sale of natural gas at Henry Hub;
>
> Market Oil Price is the average of the values of Oil Index for the most recent six months through and including the billing month, where:
>
>> Oil Index is the average for the month of the daily low quotations for cargo delivery of 1.0% sulfur No. 6 residual fuel oil into New York harbor, as reported in Platt's Oilgram U.S. Marketscan in dollars per barrel and converted to dollars per MMBTU by dividing by 6.3; and if the indices referred to above should become obsolete or no longer suitable, the distribution company shall file alternate indices with the Department.
>
> Fuel Trigger Point is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU |
| 2001 | $5.35  per MMBTU |
| 2002 | $6.09  per MMBTU |

Date Filed, October 30, 1998                    Date Effective, January 1, 1999
                                                for consumption on and after
                                                January 1, 1999

NARR 06281

R.I.P.U.C. NO. 1173E

~7~

|      |        |          |
|------|--------|----------|
| 2003 | $7.01  | per MMBTU |
| 2004 | $7.74  | per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price}+\$0.60/\text{MMBTU})+(\text{Market Oil Price}+\$0.04/\text{MMBTU})}{\text{Fuel Trigger Point}+\$0.60+\$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

STANDARD OFFER COST ADJUSTMENT:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The Commission may order the Company to collect or refund the balance over any reasonable time period from (i) all customers, (ii) only Standard Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31, 2009, the Company will apply to the Public Utilities Commission for approval of a temporary per kilowatthour surcharge or credit factor to be applied to the distribution component of the Retail Delivery Rates for such a duration as necessary to provide for full recovery or return of any outstanding balance of Standard Offer Service costs or revenues that exists.

Date Filed, October 30, 1998     Date Effective, January 1, 1999
for consumption on and after
January 1, 1999

46

NARR 06282

R.I.P.U.C. NO. 1173§

-8-

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer Fuel Index
and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
beginning on the date service is first taken and ending on the earlier
of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, October 30, 1998          Date Effective, January 1, 1999
                                      for consumption on and after
                                      January 1, 1999

47

NARR 06283

R.I.P.U.C. NO. ~~1396~~403
CANCELS NO. ~~1396~~

## NEWPORT ELECTRIC CORPORATION
## STANDARD OFFER SERVICE

AVAILABILITY:

This Rate Schedule for Standard Offer Service is available to all
Customers taking electric service from the Company before January 1,
1998, to all new Customers taking retail delivery electric service on
and after January 1, 1998, and to Customers who were taking generation
service from a Nonregulated Power Producer before January 1, 1998, who
provided the Company with a written notice on or before December 26,
1997, of their intent to terminate generation service from their
Nonregulated Power Producer and who were transferred to Interim
Generation Service on January 1, 1998.  Said Customers shall have the
right to relocate to a different service location within the Company's
service area and continue to receive service under this Rate Schedule.

APPLICABILITY:

Electricity supplied under this Rate Schedule shall be used solely by
the Customer on the Customer's own premises for all purposes.

CHARACTER OF SERVICE:

Electric service supplied hereunder shall be single or three phase,
alternating current, at a nominal frequency of sixty hertz, and at a
locally available primary or secondary distribution voltage.

RATE:

The Rate for each Rate Class shall consist of the following charges:

Residential Retail Delivery Service Rate R-1

    Energy Charge:               $0.03~~341~~654          per kWh

Residential SSI Retail Delivery Service Rate R-2

    Energy Charge:               $0.03~~341~~654          per kWh

Large Residential Retail Delivery Service Rate R-4

    Energy Charge
        Peak Hours:         $0.1~~5296~~6839      per kWh
        Off-Peak Hours:     $0.00~~667~~730      per kWh

Small Secondary Voltage General Retail Delivery Service Rate G-1

    Energy Charge:               $0.03~~357~~672          per kWh

Date Filed, October 30, 1998       Date Effective, January 1, 1999
for consumption on and after
48    January 1, 1999

NARR 06284

R.I.P.U.C. NO. ~~1398~~403

-2-

<u>Medium Secondary Voltage General Retail Delivery Service Rate G-2</u>

Non Time-of-Use Billing Option (Rate Code G-2):

| | | |
|---|---|---|
| Demand Charge: | $6.~~10~~67 | per kW |
| Energy Charge: | $0.01~~534~~678 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-2):

| | | |
|---|---|---|
| Demand Charge: | $6.~~59~~7.21 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.06~~4167~~7018 | per kWh |
| Off-Peak Hours: | $0.000~~96~~105 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 15 kilowatts.

<u>Medium Primary Voltage General Retail Delivery Service Rate G-5</u>

Non Time-of-Use Billing Option (Rate Code G-5):

| | | |
|---|---|---|
| Demand Charge: | $6.~~92~~7.57 | per kW |
| Energy Charge: | $0.01~~436~~571 | per kWh |

The Billing Demand in kilowatts for each month will be the lower of
the maximum metered demand in any fifteen-minute period during the
month or the monthly energy consumption divided by 150.

Time-of-Use Billing Option (Rate Code T-5):

| | | |
|---|---|---|
| Demand Charge: | $7.~~24~~92 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.06~~222~~2805 | per kWh |
| Off-Peak Hours: | $0.002~~28~~849 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 15 kilowatts.

.

Date Filed, October 30, 1998        Date Effective, January 1, 1999
                                     for consumption on and after
                                     January 1, 1999

49

NARR 06285

R.I.P.U.C. NO. ~~1296~~403

-3-

### Large Secondary Voltage General Retail Delivery Service Rate T-4

| | | |
|---|---|---|
| Demand Charge: | $8.~~04~~79 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.05~~9990~~6552 | per kWh |
| Off-Peak Hours: | $0.00~~096~~105 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

### Large Primary Voltage General Retail Delivery Service Rate T-6

| | | |
|---|---|---|
| Demand Charge: | $7.~~27~~95 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.06~~0606~~28 | per kWh |
| Off-Peak Hours: | $0.002~~41~~64 | per kWh |

The Billing Demand in kilowatts for each month will be the higher of
the maximum metered demand in any fifteen-minute period during Peak
Hours in the month or 100 kilowatts.

### Transmission Voltage General Retail Delivery Service Rate C-1

| | | |
|---|---|---|
| Demand Charge: | ~~$5.99~~6.55 | per kW |

Energy Charge
| | | |
|---|---|---|
| Peak Hours: | $0.01~~8882~~2058 | per kWh |
| Off-Peak Hours: | $0.01~~555~~701 | per kWh |

I.   Billing Period

   The Billing Period consists of the days between consecutive meter
   readings.  Service under this Rate is rendered on a full calendar
   day basis.  The first day of any billing period is included in
   its entirety and the last day of any billing period is excluded
   in its entirety.

II.  Backup Billing Period

   The Backup Billing Period consists of the Peak Days within a
   Billing Period during which Backup Service is rendered.  Backup
   Service is rendered when any part of a forced outage occurs
   during Peak Hours and electric service is actually taken.

NARR 06286

R.I.P.U.C. NO. ~~1398~~203

-4-

III. Maintenance Billing Period

The Maintenance Billing Period consists of the Peak Days within a
Billing Period during which Maintenance Service is rendered.
Maintenance Service is rendered when any part of a planned outage
occurs during Peak Hours and electric service is actually taken.

IV.    Standard Offer Billing Demand

A.    Requirements Service

The Standard Offer Billing Demand in kilowatts for each month is
the maximum metered fifteen-minute demand during Peak Hours
within the Billing Period.

B.    Partial Requirements Service

The Supplementary Demand in kilowatts is the maximum metered
fifteen-minute demand recorded during Peak Hours within the
Billing Period excluding Backup and Maintenance Billing Periods.

The Backup Demand in kilowatts is the maximum metered fifteen-
minute demand recorded during Peak Hours within the Backup
Billing Period in excess of the Supplementary Demand.

The Standard Offer Demand in kilowatts for each month shall be
the sum of:

1.    The Supplementary Demand, and

2.    The Backup Demand times the ratio of the number of
Backup Billing Period Days to the number of Billing
Period Peak Days.

V.    Billing Demand Charge

The Billing Demand Charge shall be the Standard Offer Billing
Demand times the Demand Rate.

The terms Requirement Service, Partial Requirements Service,
Supplementary Service, and Backup Service shall be as defined in
Transmission Voltage General Retail Delivery Service Rate C-1.

Large Secondary Voltage Auxiliary
General Retail Delivery Service Rate A-4

| Demand Charge: | $~~4.88~~5.34 | per kW |
|---|---|---|
| Energy Charge | | |
| Peak Hours: | $0.0~~5990~~6552 | per kWh |
| Off-Peak Hours: | $0.00~~096~~105 | per kWh |

Date Filed, October 30, 1998            Date Effective, January 1, 1999
                                        for consumption or and after
                            51          January 1, 1999

NARR 06287

R.I.P.U.C. NO. ~~1298~~405

-5-

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period. The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days. No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Secondary Voltage Auxiliary General Retail Delivery Service Rate A-4</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company. The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods. Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer. The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>Large Primary Voltage Auxiliary
General Retail Delivery Service Rate A-6</u>

| | | |
|---|---|---|
| Demand Charge: | $4.~~40~~81 | per kW |
| Energy Charge | | |
| Peak Hours: | $0.0~~6060~~628 | per kWh |
| Off-Peak Hours: | $0.002~~41~~64 | per kWh |

The Supplementary Standard Offer Demand Charge shall be the Supplementary Demand times the Demand Charge.

The Backup Usage Demand in kilowatts is the Average Daily Demand in excess of the Supplementary Demand, where the Average Daily Demand is the sum of the daily maximum metered 15 minute average loads recorded

Date Filed, October 30, 1998     Date Effective, January 1, 1999
for consumption on and after
January 1, 1999

52

NARR 06288

R.I.P.U.C. NO. ~~1398~~403

-6-

during Peak Hours within the Backup Billing Period divided by the number of days in the Backup Billing Period.  The Backup Usage Demand Charge shall be the Backup Usage Demand times the Demand Charge times the ratio of the number of Backup Billing Period Days to the number of Billing Period Peak Days.  No Backup Usage Demand Charge shall be incurred for planned outages due to Maintenance.

The Billing Demand Charge shall be the sum of the Supplementary Standard Offer Demand Charge and the Backup Usage Demand Charge.

The terms Supplementary Demand, Backup Billing Period, and Billing Period shall be as defined in <u>Large Primary Voltage Auxiliary General Retail Delivery Service Rate A-6</u>.

The Company agrees to furnish Maintenance Power to the customer at times convenient to the Company.  The Contract will specify the customer's expected Maintenance Power requirements, expected frequency and duration of Maintenance Power periods, and the expected calendar schedule of Maintenance Power periods.  Said Maintenance Power requirements, frequency, duration, and schedule must be determined by the Company to be reasonable given the design specifications and operating characteristics of the customer's Facility, and such other information the Company considers pertinent to the determination of the appropriate Maintenance Power requirements, frequency, duration, and schedule for the customer.  The customer shall make all requests for Maintenance Power in writing at least thirty (30) days prior to a planned outage of the Facility, and the Company will consent to such requests in writing, which consent shall not be unreasonably withheld.

<u>General Space Heating Retail Delivery Service Rate H-1</u>

    Energy Charge:                $0.03~~2095~~510          per kWh

<u>General Heating Retail Delivery Service Rate H-2</u>

    Energy Charge:                $0.03~~2415~~545          per kWh

<u>Controlled Water Heating Retail Delivery Service Rate W-1</u>

    Energy Charge:                $0.03~~4337~~755          per kWh

<u>Lighting Retail Delivery Service Rate S-1</u>

    Energy Charge:                $0.03~~2416~~654          per kWh

NARR 06289

R.I.P.U.C. NO. ~~1398~~4~~93~~

-7-

## Time-Of-Use Time Periods for Rates R-4, G-2, T-4, G-5, T-6, A-4, & A-6

Peak Hours
Monday through Friday excluding holidays defined below
May through September,      10:00 a.m. to  4:00 p.m.
October through April,       9:00 a.m. to 12:00 noon, and
                             5:00 p.m. to  8:00 p.m.

Off-Peak Hours
All other hours.

Holidays are defined as:

| | |
|---|---|
| New Year's Day | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |
| Labor Day | |

The foregoing Rates shall be adjusted from time to time in accordance
with provisions of the Standard Offer Fuel Index and the Standard
Offer Cost Adjustment described below:

STANDARD OFFER FUEL INDEX:

The Standard Offer Charge in effect for a billing month is multiplied
by a Fuel Adjustment that is set equal to 1.0 unless the Market Gas
Price plus Market Oil Price for the billing month exceeds the Fuel
Trigger Point then in effect, where:

Market Gas Price is the average of the values of Gas Index for
the most recent six months through and including the billing
month, where:

Gas Index is the average of the daily settlement prices for
the last three days that the NYMEX Contract (as defined
below) for the month of delivery trades as reported in the
Wall Street Journal, expressed in dollars per MMBTU.  NYMEX
Contract shall mean the New York Mercantile Exchange Natural
Gas Futures Contract as approved by the Commodity Futures
Trading Commission for the purchase and sale of natural gas
at Henry Hub;

Market Oil Price is the average of the values of Oil Index for
the most recent six months through and including the billing
month, where:

Oil Index is the average for the month of the daily low
quotations for cargo delivery of 1.0% sulfur No. 6 residual
fuel oil into New York harbor, as reported in Platt's
Oilgram U.S. Marketscan in dollars per barrel and converted
to dollars per MMBTU by dividing by 6.3; and if the indices
referred to above should become obsolete or no longer

NARR 06290

R.I.P.U.C. NO. 1398403

-6-

suitable, the distribution company shall file alternate indices with the Department.

<u>Fuel Trigger Point</u> is the following amounts, expressed in dollars per MMBTU, applicable for all months in the specified calendar year:

| Year | Fuel Trigger Point |
|------|--------------------|
| 2000 | $5.35  per MMBTU |
| 2001 | $5.35  per MMBTU |
| 2002 | $6.09  per MMBTU |
| 2003 | $7.01  per MMBTU |
| 2004 | $7.74  per MMBTU |

In the event that the Fuel Trigger Point is exceeded, the Fuel Adjustment value for the billing month is determined based according to the following formula:

$$\text{Fuel Adjustment} = \frac{(\text{Market Gas Price} + \$0.60/\text{MMBTU}) + (\text{Market Oil Price} + \$0.04/\text{MMBTU})}{\text{Fuel Trigger Point} + \$0.60 + \$0.04/\text{MMBTU}}$$

Where Market Gas Price, Market Oil Price and Fuel Trigger Point are as defined above. The values of $0.60 and $0.04/MMBTU represent for gas and oil respectively, estimated basis differentials or market costs of transportation from the point where the index is calculated to a proxy power plant in the New England market.

Incremental revenues received by the Company from the application of the Fuel Adjustment shall be fully allocated to Standard Offer Suppliers in proportion to the Standard Offer energy provided by a Supplier to the Company in the applicable billing month.

<u>STANDARD OFFER COST ADJUSTMENT</u>:

The following Standard Offer Cost Adjustment shall reflect the difference between the cost of Standard Offer Service paid by the Company to wholesale suppliers thereof and the revenues billed by the Company to Customers taking Standard Offer Service under this Rate Schedule. As used herein "Standard Offer Service costs" shall be those costs incurred by the Company in providing Standard Offer Service under this Rate Schedule including wholesale rate discounts arising from the competitive procurement process and any or all other costs determined by the Public Utilities Commission to be includable therewith, excluding all costs recoverable through the Standard Offer Fuel Index provision.

By March 1 of each year, the Company shall determine the amount of any over- or under-collection for the prior calendar year and make a filing with the Commission. The Company will propose at that time a rate recovery/refund methodology to recover or refund the balance, as appropriate, over the twelve-month period commencing April 1. The

NARR 06291

R.I.P.U.C. NO. 1295403

-9-

Commission may order the Company to collect or refund the balance over
any reasonable time period from (i) all customers, (ii) only Standard
Offer customers, or (iii) through any other reasonable method.

At the conclusion of the Standard Offer Service period on December 31,
2009, the Company will apply to the Public Utilities Commission for
approval of a temporary per kilowatthour surcharge or credit factor to
be applied to the distribution component of the Retail Delivery Rates
for such a duration as necessary to provide for full recovery or
return of any outstanding balance of Standard Offer Service costs or
revenues that exists.

BILLING:

The Billing Amount for electric service supplied under this Rate
Schedule shall consist of the sum, as applicable, of the Demand Charge
and the Energy Charges as adjusted by the Standard Offer Fuel Index
and Rhode Island Gross Receipts Tax.

TERM OF CONTRACT:

The Term of Contract for Standard Offer Service shall be for a period
beginning on the date service is first taken and ending on the earlier
of December 31, 2009, or the date the Customer terminates service.
The Customer may terminate service on five (5) days notice.  The
Customer shall be ineligible to receive Standard Offer Service
thereafter.  The foregoing provision shall not apply to Customers who
receive service under any of the Company's residential Retail Delivery
Service Rates or under Small General Retail Delivery Service Rate G-1.
Said Customers may elect to take electric power service from another
Supplier during the period beginning June 1, 1998, and ending May 31,
1999, and elect to return to Standard Offer Service within one hundred
twenty (120) days of commencing service from that Supplier.

TERMS AND CONDITIONS:

The Company's Terms and Conditions for Electric Service and Terms and
Conditions for Electric Power Suppliers in effect from time to time,
where not inconsistent with the specific provisions hereof, are a part
of this Rate Schedule.

Date Filed, October 30, 1998          Date Effective, January 1, 1999
                                       for consumption on and after
                                  56   January 1, 1999

NARR 06292

# SECTION 4.

## STANDARD OFFER PRICE CAP
## PER URA

NARR 06293

# Blackstone Valley Electric Company

## Standard Offer Service Tariff Advice

### Standard Offer Price Cap per URA

| Year | URA Standard Offer * | Proposed Maximum Standard Offer |
|------|----------------------|----------------------------------|
| 1998 | $0.041               | $0.032                           |
| 1999 | 0.043                | 0.035                            |
| 2000 | 0.046                | 0.038                            |
| 2001 | 0.048                | 0.038                            |
| 2002 | 0.050                | 0.042                            |
| 2003 | 0.053                | 0.047                            |
| 2004 | 0.055                | 0.051                            |
| 2005 | 0.058                | 0.055                            |
| 2006 | 0.060                | 0.059                            |
| 2007 | 0.063                | 0.063                            |
| 2008 | 0.066                | 0.067                            |
| 2009 | 0.070                | 0.071                            |

Notes:

Price Cap: Inflation Rate from National Price Index Forecast dated May 1998.

All charges are exclusive of RI Gross Receipts Tax.

* 1996 Benchmark 10.4 ¢/kWh inflated at 80% of CPI

N:\SO_ALT3B10-30.xls.SOCALC,10/26/98,LSO'D

NARR 06294

# Newport Electric Corporation
## Standard Offer Service Tariff Advice

### Standard Offer Price Cap per URA

| Year | URA Standard Offer * | Proposed Maximum Standard Offer |
|------|------|------|
| 1998 | $0.037 | $0.032 |
| 1999 | 0.039 | 0.035 |
| 2000 | 0.042 | 0.038 |
| 2001 | 0.044 | 0.038 |
| 2002 | 0.047 | 0.042 |
| 2003 | 0.049 | 0.047 |
| 2004 | 0.052 | 0.051 |
| 2005 | 0.055 | 0.055 |
| 2006 | 0.058 | 0.059 |
| 2007 | 0.061 | 0.063 |
| 2008 | 0.064 | 0.067 |
| 2009 | 0.068 | 0.071 |

Notes:
Price Cap:  Inflation Rate from National Price Index Forecast dated May 1998.
All charges are exclusive of RI Gross Receipts Tax.

* 1996 Benchmark $0.112/kWh inflated at 80% of CPI

N:\NEC\SO_ALT3N10-30.xls,SOCALC,10/26/88,LSO'D

NARR 06295

# SECTION 5.

# CALCULATION OF PROPOSED
# STANDARD OFFER SERVICE
# RATES

NARR 06296

BLACKSTONE VALLEY ELECTRIC COMPANY
Standard Offer Service Tariff Advice
Determination of Proposed Rates

CALCULATION OF THE STANDARD OFFER MULTIPLIER

| | | |
|---|---|---|
| 1. * Present Wholesale Standard Offer ———————— | $ | 0.03200 |
| 2. * Proposed Wholesale Standard Offer ———————— | $ | 0.03500 |
| 3. Multiplier (Line 2 / Line 1) ———————— | | 1.093750 |

* Wholesale Standard Offer Prices from October, 1997 Settlement Agreement with Montaup Electric Co.

CALCULATION OF RATE CLASS STANDARD OFFER CHARGES

| | (1)<br>Present<br>Rate | (2)<br>Multiplier | (3)<br>Proposed<br>Rate<br>[C1*C2] |
|---|---|---|---|
| **RATE R-1** | | | |
| Energy Charge .............. | $0.03051 | 1.09375 | $0.03337 |
| **RATE R-2** | | | |
| Energy Charge .............. | $0.03051 | 1.09375 | $0.03337 |
| **RATE R-3** | | | |
| Energy Charge .............. | $0.03158 | 1.09375 | $0.03454 |
| **RATE R-4** | | | |
| Energy Charge | | | |
|   Peak kWh . ............. | $0.15384 | 1.09375 | $0.16826 |
|   Off Peak kWh .............. | $0.00570 | 1.09375 | $0.00623 |
| **RATE G-1** | | | |
| Energy Charge .............. | $0.03589 | 1.09375 | $0.03925 |
| **RATE G-2** | | | |
| Demand Charge ............. | $5.81 | 1.09375 | $6.35 |
| Energy Charge ............ | $0.01403 | 1.09375 | $0.01535 |
| **RATE G-5** | | | |
| Demand Charge ............ . | $5.29 | 1.09375 | $5.79 |
| Energy Charge ............ | $0.01610 | 1.09375 | $0.01761 |
| **RATE T-2** | | | |
| Demand Charge (Peak kW) ..... | $6.11 | 1.09375 | $6.68 |
| Energy Charge | | | |
|   Peak kWh ... .... ....... | $0.02978 | 1.09375 | $0.03257 |
|   Off Peak kWh .... ....... . | $0.00877 | 1.09375 | $0.00959 |

file  N \BVE\SOFILING\summary1.xls,EJA,10/29/98

NARR 06297

BLACKSTONE VALLEY ELECTRIC COMPANY
Standard Offer Service Tariff Advice
Determination of Proposed Rates

| | (1)<br>Present<br>Rate | (2)<br>Mulitplier | (3)<br>Proposed<br>Rate<br>[(1)*(2)] |
|---|---|---|---|
| **RATE T-4** | | | |
| Demand Charge (Peak kW) ..... | $5.88 | 1.09375 | $6.43 |
| Energy Charge | | | |
| Peak kWh ... ............. | $0.03919 | 1.09375 | $0.04286 |
| Off Peak kWh ............. | $0.01027 | 1.09375 | $0.01123 |
| **RATE T-5** | | | |
| Demand Charge (Peak kW) ..... | $5.48 | 1.09375 | $5.99 |
| Energy Charge | | | |
| Peak kWh ... ............. | $0.03241 | 1.09375 | $0.03545 |
| Off Peak kWh ............. | $0.01054 | 1.09375 | $0.01153 |
| **RATE T-6** | | | |
| Demand Charge (Peak kW) .... | $5.37 | 1.09375 | $5.87 |
| Energy Charge | | | |
| Peak kWh ... ............. | $0.03914 | 1.09375 | $0.04281 |
| Off Peak kWh ............. | $0.01239 | 1.09375 | $0.01355 |
| **RATE A-4** | | | |
| Dist Demand Charge .......... | $3.70 | 1.09375 | $4.05 |
| Energy Charge | | | |
| Peak kWh ... ............. | $0.03915 | 1.09375 | $0.04286 |
| Off Peak kWh ............. | $0.01027 | 1.09375 | $0.01123 |
| **RATE A-6** | | | |
| Dist Demand Charge .... .... | $3.37 | 1.09375 | $3.69 |
| Energy Charge | | | |
| Peak kWh ... ............. | $0.03914 | 1.09375 | $0.04281 |
| Off Peak kWh .. ........... | $0.01239 | 1.09375 | $0.01355 |
| **RATE H-1** | | | |
| Energy Charge ... ..... . | $0.03308 | 1.09375 | $0.03618 |
| **RATE H-2** | | | |
| Energy Charge .. .......... | $0.03339 | 1.09375 | $0.03652 |
| **RATE N-1** | | | |
| Energy Charge ............ | $0.03506 | 1.09375 | $0.03838 |
| **RATE S-1** | | | |
| Energy Charge ............ | $0.03408 | 1.09375 | $0.03728 |

file: N:\BVE\SOFILING\summary1.xls,EJA,10/29/98

62

NARR 06298

NEWPORT ELECTRIC CORPORATION
Standard Offer Service Tariff Advice
Determination of Proposed Rates

CALCULATION OF THE STANDARD OFFER MULTIPLIER

| | | |
|---|---|---|
| 1. * Present Wholesale Standard Offer | $ | 0.03200 |
| 2. * Proposed Wholesale Standard Offer | $ | 0.03500 |
| 3. Multiplier (Line 2 / Line 1) | | 1.09375 |

* Wholesale Standard Offer Prices from October, 1997 Settlement Agreement with Montaup Electric Co.

CALCULATION OF RATE CLASS STANDARD OFFER CHARGES

| | (1) Present Rate | (2) Multiplier | (3) Proposed Rate (C1*C2) |
|---|---|---|---|
| **RATE R-1** | | | |
| Energy Charge ............. | $0.03341 | 1.09375 | 0.03654 |
| **RATE R-2** | | | |
| Energy Charge ............. | $0.03341 | 1.09375 | 0.03654 |
| **RATE R-4** | | | |
| Energy Charge | | | |
| Peak kWh ................ | $0.15396 | 1.09375 | 0.16839 |
| Off Peak kWh ............. | $0.00667 | 1.09375 | 0.00730 |
| **RATE G-1** | | | |
| Energy Charge ............. | $0.03357 | 1.09375 | 0.03672 |
| **RATE G-2** | | | |
| Demand Charge ............. | $6.10 | 1.09375 | $6.67 |
| Energy Charge ............. | $0.01534 | 1.09375 | 0.01678 |
| **RATE G-5** | | | |
| Demand Charge .... ......... | $6.92 | 1.09375 | $7.57 |
| Energy Charge ............. | $0.01436 | 1.09375 | 0.01571 |
| **RATE T-2** | | | |
| Demand Charge (Peak kW) ..... | $6.59 | 1.09375 | $7.21 |
| Energy Charge | | | |
| Peak kWh ................ | $0.06416 | 1.09375 | 0.07018 |
| Off Peak kWh . ............ | $0.00096 | 1.09375 | 0.00105 |

NARR 06299

NEWPORT ELECTRIC CORPORATION
Standard Offer Service Tariff Advice
Determination of Proposed Rates

|  | (1) | (2) | (3) |
|---|---|---|---|
|  | Present Rate | Multiplier | Proposed Rate [C1*C2] |
| **RATE T-4** |  |  |  |
| Demand Charge (Peak kW) ..... | $8.04 | 1.09375 | $8.79 |
| Energy Charge |  |  |  |
|   Peak kWh ................. | $0.05990 | 1.09375 | 0.06552 |
|   Off Peak kWh ............. | $0.00096 | 1.09375 | 0.00105 |
| **RATE T-5** |  |  |  |
| Demand Charge (Peak kW) ..... | $7.24 | 1.09375 | $7.92 |
| Energy Charge |  |  |  |
|   Peak kWh ................. | $0.06222 | 1.09375 | 0.06805 |
|   Off Peak kWh ............. | $0.00228 | 1.09375 | 0.00249 |
| **RATE T-6** |  |  |  |
| Demand Charge (Peak kW) ..... | $7.27 | 1.09375 | $7.95 |
| Energy Charge |  |  |  |
|   Peak kWh ................. | $0.06060 | 1.09375 | 0.06628 |
|   Off Peak kWh ............. | $0.00241 | 1.09375 | 0.00264 |
| **RATE C-1** |  |  |  |
| Demand Charge (Peak kW) ..... | $5.99 | 1.09375 | $6.55 |
| Energy Charge |  |  |  |
|   Peak kWh ................. | $0.01882 | 1.09375 | 0.02058 |
|   Off Peak kWh ............. | $0.01555 | 1.09375 | 0.01701 |
| **RATE A-4** |  |  |  |
| Dist Demand Charge .......... | $4.88 | 1.09375 | $5.34 |
| Energy Charge |  |  |  |
|   Peak kWh ................. | $0.05990 | 1.09375 | 0.06552 |
|   Off Peak kWh ............. | $0.00096 | 1.09375 | 0.00105 |
| **RATE A-6** |  |  |  |
| Dist Demand Charge .......... | $4.40 | 1.09375 | $4.81 |
| Energy Charge |  |  |  |
|   Peak kWh ..... ... ........ | $0.06060 | 1.09375 | 0.06628 |
|   Off Peak kWh ............. | $0.00241 | 1.09375 | 0.00264 |
| **RATE H-1** |  |  |  |
| Energy Charge ............. | $0.03209 | 1.09375 | 0.03510 |
| **RATE H-2** |  |  |  |
| Energy Charge ............. | $0.03241 | 1.09375 | 0.03545 |

file  N:\NEC\SOFILING\summary.xls,EJA,10/29/98

NARR 06300

NEWPORT ELECTRIC CORPORATION
Standard Offer Service Tariff Advice
Determination of Proposed Rates

| | (1) | (2) | (3) |
|---|---|---|---|
| | Present Rate | Multiplier | Proposed Rate [C1*C2] |
| **RATE N-1** | | | |
| Energy Charge .............. | $0.03433 | 1.09375 | 0.03755 |
| **RATE S-1** | | | |
| Energy Charge .............. | $0.03341 | 1.09375 | 0.03654 |

NARR 06301

# SECTION 6.

## SUMMARY OF PROPOSED RATE CHANGES

NARR 06302

**BLACKSTONE VALLEY ELECTRIC COMPANY**
**STANDARD OFFER SERVICE TARIFF ADVICE**

SUMMARY OF RATE CHANGES BY RATE CLASS

| RATE CLASS | PRESENT AVERAGE TOTAL RATE | PROPOSED AVERAGE TOTAL RATE | PERCENTAGE INCREASE |
|---|---|---|---|
| Residential Rate R-1 | $ 0.11392 | $ 0.11690 | 2.6% |
| Residential Rate R-2 | 0.08383 | 0.08681 | 3.6% |
| Residential Rate R-3 | 0.10323 | 0.10632 | 3.0% |
| Residential Time-of-Use Rate R-4 | 0.09983 | 0.10296 | 3.1% |
| Small General Service Rate G-1 | 0.12392 | 0.12743 | 2.8% |
| Medium General Service Rate G-2 | 0.09997 | 0.10341 | 3.4% |
| Medium Primary Voltage General Service Rate G-5 | 0.08934 | 0.09247 | 3.5% |
| Medium General Service Time-of-Use Rate T-2 | 0.09217 | 0.09488 | 2.9% |
| Large General Service Service Rate T-4 | 0.08842 | 0.09159 | 3.6% |
| Medium Primary Voltage General Service Time-of-Use Rate T-5 | 0.09103 | 0.09432 | 3.6% |
| Large Primary Voltage General Service Rate T-6 | 0.08066 | 0.08365 | 3.7% |
| Large Primary Voltage Auxiliary General Service Rate A-6 | 0.08411 | 0.08659 | 2.9% |
| Gneral Space Heating Rate H-1 | 0.09952 | 0.10275 | 3.2% |
| General Heating Rate H-2 | 0.10581 | 0.10907 | 3.1% |
| Controlled Water Heating Rate W-1 | 0.09501 | 0.09844 | 3.6% |
| Lighting Rate S-1 | 0.16107 | 0.16439 | 2.1% |
| **Company Average** | **0.09850** | **0.10163** | **3.2%** |

Note   All prices include RI Gross Receipts Tax

NARR 06303

## NEWPORT ELECTRIC CORPORATION
## STANDARD OFFER SERVICE TARIFF ADVICE

### SUMMARY OF STANDARD OFFER BY RATE CLASS

| RATE CLASS | PRESENT AVERAGE TOTAL RATE | PROPOSED AVERAGE TOTAL RATE | PERCENTAGE INCREASE |
|---|---|---|---|
| Residential Rate R-1 | $ 0.12363 | $ 0.12689 | 2.6% |
| Residential Rate R-2 | 0.09457 | 0.09783 | 3.5% |
| Residential Time-of-Use Rate R-4 | 0.11552 | 0.11858 | 2.7% |
| Small General Service Rate G-1 | 0.13376 | 0.13704 | 2.5% |
| Medium General Service Rate G-2 | 0.11052 | 0.11387 | 3.0% |
| Medium Primary Voltage General Service Rate G-5 | 0.10434 | 0.10763 | 3.2% |
| Medium General Service Time-of-Use Rate T-2 | 0.10200 | 0.10456 | 2.5% |
| Large General Service Service Rate T-4 | 0.10742 | 0.11045 | 2.8% |
| Medium Primary Voltage General Service Time-of-Use Rate T-5 | 0.09649 | 0.09905 | 2.6% |
| Large Primary Voltage General Service Rate T-6 | 0.09954 | 0.10242 | 2.9% |
| Transmission Voltage Rate C-1 | 0.08697 | 0.08967 | 3.1% |
| Gneral Space Heating Rate H-1 | 0.10920 | 0.11234 | 2.9% |
| General Heating Rate H-2 | 0.11643 | 0.11959 | 2.7% |
| Controlled Water Heating Rate W-1 | 0.11002 | 0.11337 | 3.0% |
| Lighting Rate S-1 | 0.11749 | 0.12075 | 2.8% |
| Company Average | 0.11165 | 0.11477 | 2.8% |

Note: All prices include RI Gross Receipts Tax

N:\nec\sofiling\.% (INCREASE),10/29/98,eja

NARR 06304

# Tab 43



EXHIBIT

16 9

1    STATE OF RHODE ISLAND

2    AND PROVIDENCE PLANTATIONS

3    PUBLIC UTILITIES COMMISSION

4

5    RECEIVED
2004 FEB -4  AM 10: 39
PUBLIC UTILITIES COMMISSION.

6    HEARING IN RE:

6    NARRAGANSETT ELECTRIC
7    COMPANY ANNUAL RATE              DOCKET NO. 3571
     RECONCILIATION FILING

8    ------------------/

9

10                            DECEMBER 9, 2003
                              9:30 A.M.
11
                              89 JEFFERSON BOULEVARD
12                            WARWICK, RI

13

14

15   BEFORE THE COMMISSION:

16     ROBERT HOLBROOK, COMMISSIONER PRESIDING
       ELIA GERMANI, CHAIRMAN
17     KATE RACINE, COMMISSIONER
       CYNTHIA WILSON, LEGAL COUNSEL
18     ALAN NAULT, RATE ANALYST

19   APPEARANCES:

20   FOR THE COMPANY:       TERRY SCHWENNESEN, ESQ.

21

22   FOR THE DIVISION:      PAUL J. ROBERTI, ASSISTANT
                            ATTORNEY GENERAL
23

24

          A-1 COURT REPORTERS, INC.
               (401) 333-3381

          ORIGINAL

2

1

2                                  I N D E X

3                                                          PAGE NO.

4                    PUBLIC WITNESSES:                        6
     MARGARET ROGERS                                          9
5    ROSANNA MASHIA                                           9
     LELA COONS
6

7

8               JEANNE A. LLOYD
                ANN RODERICKS
9               MICHAEL J. HAGER                             19
     DIRECT EXAMINATION BY MS. SCHWENNESEN                   24
10   CROSS-EXAMINATION BY MR. ROBERTI                        25
     EXAMINATION BY MR. NAULT                                32
11   EXAMINATION BY MS. WILSON

12

13              DAVID STEARNS                                60
     EXAMINATION BY MS. WILSON

14

15

16

17

18

19

20

21

22

23

24

                    A-1 COURT REPORTERS, INC.
                        (401) 333-3381

9

1    Providence I believe that it's not fair for the

2    utility to get a raise.

3         MR. HOLBROOK:  Okay, thank you, Ms.

4    Mashia.  The final person speaking for at public

5    is Lela Coons.

6    LELA COONS (Sworn)

7         THE WITNESS:  And it's Coons.  I

8    probably wrote it badly.  A few years ago I went

9    to see the IMAX about Tibet, and I noticed

10   something that you probably already knew, and

11   this was a wonderful way of praying where you

12   could just spin the wheel and the prayer went

13   around.  And I'm a praying person, I pray a lot,

14   and I sometimes feel like in some other parts of

15   my life where we're spinning the wheel.  So I

16   apologize if my coming here today is spinning the

17   prayer wheel and walking fastly back to a warm

18   home.

19        Last night my neighbor came over

20   because her sink was stopped, and my first

21   thought was, we know them well, she had turned

22   her heat down too low.  This happened last year

23   and her pipes froze.  And she and her husband are

24   invalid, and she works at Shaw's.  Even though it

1    sounds like a tiny thing when everything else is

2    going up to say $1.75, if we have it, we spend it

3    almost unconsciously.  But when we don't have it

4    it's a huge amount.  So philosophically I ask you

5    to please consider our objections to raising

6    rates.  A spin of the wheel, and then walking on

7    down the path even though I get tired of coming

8    here and you get tired of listening to us,

9    philosophically we know that there are cold

10   people.

11           I sleep in an unheated bedroom because

12   I -- I do that out of choice, and I fairly often

13   think when I go back down to where it's warm and

14   where we have the power to keep it warm how good

15   it is.  Yesterday at a CASS session I thought

16   about my coming here because this mother of three

17   small children cannot pay her bills and hearing

18   the things that had happened to her, I can't take

19   any credit for our doing it and discredit her for

20   not being able to do it because it was just

21   really beyond her control.  I ask your

22   benevolence and your help.  We need you to think

23   about cold people and to share as well.

24           Last time that we spoke I wanted to say

11

we will pay some every month if you will find a way to accept our payment to you and keep people without shutoffs. And that's a whole different philosophy, and I ask you to please think about it from the point of view of your customers, that customers cannot afford more. And I thank you for listening to all of this.

MR. HOLBROOK:  Thank you very much. Are there any administrative matters?

MS. WILSON:  Yes, Commissioner, there are. Narragansett has asked that the yellow book that it filed be marked as Narragansett Exhibit 1, the testimony and schedules of Jeanne A. Lloyd is Narragansett Exhibit 1A, Michael J. Hager 1B, and Ann M. Rodericks is 1C.

Narragansett had provided today an update to Commission Data Request 1-8, hearing update, it's Narragansett Exhibit 2.

And today Narragansett provided exhibits of Jeanne Lloyd, hearing update, is Exhibit No. 3.

The Division has asked that the memorandum from Mr. Stearns dated December 5th, 2003 be marked as Division Exhibit 1.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

I am asking that the Narragansett responses to Commission data requests 1 through 11 be marked as PUC 1 through 11.

I would like to note that Narragansett has asked for confidential treatment of 1-5, 1-6, 1-7, and 1-11 citing the Access to Public Records Act exemptions 4 (b) and 4 (e). Four (b) exempts from public disclosure any trade secrets and commercial or financial information obtained from the person, firm or corporation which is of a privileged and confidential nature; and subsection 4 (e) exempts from public access any records which would be available by law or rule of court to any opposing party in litigation. Narragansett has argued that the information that it has provided is competitively sensitive, goes to ongoing disputes with suppliers, and is in some of which has been prepared in preparation of litigation so for those reasons they would be confidential and not a public exhibit.

MR. HOLBROOK: Are there any objections to the exhibits as proposed to be marked? If none, so ordered.

(WHEREUPON, THE EXHIBIT WAS MARKED FOR IDENTIFICATION)

13

1        MR. HOLBROOK:  Before we begin the

2   hearing, let me ask if the parties have any

3   opening statements.  Ms. Schwennesen, do you have

4   anything to say?

5        MS. SCHWENNESEN:  Yes, thank you very

6   much, Commissioner Holbrook.  I would like to add

7   on to what Counsel Wilson has discussed with you

8   on the matter of the confidential treatment of

9   the responses that we made.  As you know, the

10  company has been involved in disputes and has

11  potential disputes out there because many of the

12  contracts that it has with its wholesale

13  suppliers are linked inextricably together; and

14  accordingly we have provided confidential

15  responses.  We have also provided some general

16  information about what is happening with those

17  agreements.  We stand ready today to attempt to

18  answer any questions you may have in a general

19  manner.  However, if I should find that we appear

20  to be venturing off into territory that I would

21  consider privileged and confidential, I will

22  notify the Commission of such; and if it is

23  necessary for us to go into the details of those

24  matters, I would ask that we do so in a closed

14

1       proceeding.

2               MR. HOLBROOK:  Is there any objection

3       to what counsel is proposing?  I guess there are

4       two ways we can do it.  One is that as they come

5       up if you so indicate that it's confidential, we

6       could mark it and then go into one session to

7       review other questions that may come up during

8       the meeting.  In other words, just hold them all

9       until one time.  It will be less disruptive to

10      the meeting.  Or we can do them one at a time,

11      which probably would take a bit longer.  Does

12      anyone have any preferences to that, how we

13      handle it?

14              MS. WILSON:  I think if we get to the

15      point where the Commission actually entertains a

16      closed session, we hold them all in one closed

17      session.  I will note for the record that in the

18      past we have had this issue come up, and between

19      the bench and Narragansett's witnesses we can

20      usually glean what information we need without

21      having to go into a closed session in order to

22      keep the process as open as possible.

23              MR. HOLBROOK:  Why don't we try them as

24      they come, and if it becomes too disruptive we'll

15

just hold it and have one session.

MS. SCHWENNESEN:  I would prefer that.
I have no objection.

MR. HOLBROOK:  Did you have an opening
statement?

MS. SCHWENNESEN:  I do, sir.  Thank
you.  I won't repeat what you read off the
notice.  It's completely accurate with respect to
the company's original filing on November 18th.
However, as Commission Counsel Wilson has already
noted, we brought some new exhibits with us
today, and so I wanted to describe briefly what
those are.

Let's see, as you know, this is an
annual reconciliation filing in which we set fo
2004 three components of our rates.  The major
components of the increase that you have seen
today come from our Standard Offer Rate, and is
combination of both prescheduled increases whic
are part of the rate, the long-term power supp
contracts that the company has with its
suppliers.  So in part that increase is due to
that.  And in part that increase is due to
continuing high gas and oil prices which have

triggered the Fuel Index payments under those contracts.

In our data responses which we answere last week we gave the Commission an update, and in Data Request 1-8, which I believe is now PUC Exhibit 8, and today we have brought a further update to that response which contains our -- t fuel price estimates from the most recent three trading days that we had as of yesterday, and that would be December 3rd, 4th and 5th, and a result of that update to the estimate, the company is proposing today a Standard Offer factor of 5.9 cents, which happens to be identical to the one that we originally filed And that's what that current estimate shows.

Finally, we have also reviewed the Division's memo which was provided to us yesterday in which Mr. Stearns has proposed the transmission factor be reduced to return its entirety the amount that had been deferr previously in the prior docket in this proceeding. And I'm here to say that we ha objection to doing so. That deferred amoun actually stems from earlier proceedings whe

Commission decided that it would not rule on the company's ability to recover certain disputed amounts that it had with its suppliers until those disputes were complete. We actually have -- one of those disputes has been completed, and we will shortly be coming in to the Commission to seek recovery of those amounts. However, we did not want to do that in this proceeding because we have such a short time frame in these annual filings that we would not have been able to fully brief the matter for the Commission. And, thus, we will be coming in, we intend to come in in the first quarter of 2004.

Accordingly, since we have no entitlement to that amount, we have brought Narragansett Exhibit 3 which proposes to do exactly what Mr. Stearns has suggested in his memo, to return the entire deferred amount as mitigate the increase to customers effective January 1, '04. We do so without prejudice to our ability later on to come in and try to see that additional amount. That concludes my opening statement.

MR. HOLBROOK: Thank you, Ms.

16

Schwennesen.

Mr. Roberti, do you have an opening

statement?

MR. ROBERTI:   No formal opening

statement.  We have Dave Stearns here who will

testify on behalf of the Division.  And we have

the memo that was previously submitted to the

Commission from Mr. Stearns; and a copy of that

had been provided to the company before the

hearing.

He does have a slight -- one correct

to that memo.  It might be helpful just to poi

it out now and have it.  When he takes the sta

he can formally correct the document.  But it'

in paragraph 2 on page 2.  The last line in th

paragraph, No. 2, there's a figure there that

reads 0.70, and that should be $1.70.  And th

in that same line all the way at the end of t

line there's a figure that reads $0.50, and t

figure should be $1.50.  Thank you.

MR. HOLBROOK:  Thank you, Mr. Robe

Ms. Schwennesen, do you have witne

and how would you like to proceed?

MS. SCHWENNESEN:  Commissioner

A-1 COURT REPORTERS, INC.
(401) 333-3381

19

Holbrook, I have three witnesses today who I
would like to bring up as a panel if I might so
that we can address all questions at once. They
are Mr. Hager, Ms. Lloyd, and Ms. Ann Rodericks.

        MR. HOLBROOK:  Is there any objection
to the request to bring the witnesses up as a
panel?  If not, so ordered.

JEANNE A. LLOYD (Sworn)

ANN RODERICKS (Sworn)

MICHAEL J. HAGER (Sworn)

DIRECT EXAMINATION BY MS. SCHWENNESEN

        MS. SCHWENNESEN:  If I might go through
the formality and do the direct testimony for all
the witnesses and then release them to you, I
think that may be the efficient -- most efficient
way to go forward.

        Ms. Lloyd, could you please identify
yourself for the record.

        MS. LLOYD:  My name is Jeanne A. Lloyd.
I'm a Principal Financial Analyst in the
Distribution Regulatory Services Department at
National Grid USA Service Company.

        MS. SCHWENNESEN:  Thank you, Ms. Lloyd.
And I show you a document which has been marked

1    MS. WILSON:  So are we going to be

2    facing an underrecovery next year?

3        MS. LLOYD:  Because of the residential?

4        MS. WILSON:  Yes.

5        MS. LLOYD:  Again, it will contribute

6    to the total over/underrecovery balance.

7        MS. WILSON:  Okay.  Could you provide

8    an estimate at least through August as a record

9    request of the difference, the underrecovery that

10   will be accrued for the residential customers?

11   Because I understand that the Last Resort Service

12   for the second six month period for commercial

13   customers has yet to be bid.

14       MS. LLOYD:  Could you say again what

15   period of time you want?

16       MS. WILSON:  Sure, January through

17   August.

18       Mr. Hager, with regard to the fuel

19   adjustment and the filing came in with the

20   estimates based on three dates and then using

21   three more dates we got a lower Standard offer

22   and then using the most recent three days'

23   projections we're back up to where the filing

24   first came in, have you been seeing that kind

1  volatility throughout the year with regard to

2  projections of wholesale fuel costs?

3          MR. HAGER:  Yes.  In general I always

4  expect the gas and oil markets to be volatile,

5  that there's always daily price movements.  This

6  is a time of year where they tend to be larger

7  than during the summer and shoulder periods of

8  time.  There's not a lot of weather activity and

9  other reports of, storage reports and so forth

10  going on; but every time we do the calculations,

11  one would expect a change in market prices or the

12  next day or two days later you'll get different

13  answers.  Given the period of time that we're

14  going into, the cold weather, the start of the

15  heating season didn't really kick off in November

16  but is starting to kick off here in early

17  December, it's not uncommon to see that type of

18  price movement.

19          MS. WILSON:  Now the benchmark goes up

20  every year for when the Fuel Index is triggered;

21  correct?

22          MR. HAGER:  Correct.

23          MS. WILSON:  Could you just explain to

24  me generally for 2004 the trigger point is $7.74.

36

how does that work? I know there's a formula in
here every year. I have problems remembering
what the formula really does.

MR. HAGER: The specifics are contained
in my Exhibit MJH-1. For 2004, the trigger, the
fuel trigger point that's used in the fuel
payment calculation for 2004, it's $7.74 per
million Btus. And in general terms what that
equates to is a 12 month average price of natural
gas reported at the Emery Hub, and then the, plus
the 12 month rolling average cost for 1 percent
sulfur oil as reported in Pratt's Index. If you
add those two values together, compare it to the
$7.74 trigger point, if when you add the two
values together they're at or below the trigger
point, we do not make payments in that particular
month to our suppliers. If they exceed the
trigger point, then the suppliers are entitled to
a payment.

MS. WILSON: What's the purpose of
the -- of having this fuel adjustment provision?

MR. HAGER: The Standard Offer Service
was designed as a long-term fixed price service
with -- that ran from 1998 through 2009 to take

37

1    some of the risks away from the supplier of a

2    long-term fixed price contract, particularly in

3    the area of fuel prices that have the most

4    dramatic effect on their supply costs.  We

5    included the Fuel Index adjustment provisions so

6    that in the event of extraordinary increases in

7    gas and oil prices the suppliers would be

8    entitled to some additional revenues, again, as a

9    means of mitigating risks.  What we didn't want

10    is a supplier to say, "This contract is so below

11    market or it's impossible for me to perform given

12    the fuel prices that it takes to operate my

13    facilities or to operate other facilities I'm

14    buying from, I can't perform.  Therefore, I'm

15    going to walk away from the contract."  So it's a

16    means of keeping them whole.

17         We never expected the Fuel Index

18    trigger to be kicking in at this stage; but if

19    you go back to the charts of what is the gas

20    price over the last five years, ten years or so,

21    at the time we were designing these indices, one

22    would have expected natural gas prices to on

23    average over a period of time be two to $3 a

24    million Btu's, so around $2.50 on average over a

1    period of time.  Gas got up to the three or $4

2    range everyone was worried, those were unheard of

3    prices back then.  Today gas seems to settle out

4    between five and $6 on average.  And so they're

5    essentially doubling from where they were

6    historically and at the time that these indices

7    were kicked in, which is the reason why we're

8    continuing to see them be affected when we're

9    hoping that they wouldn't.

10           MS. WILSON:  Now, the point of the nine

11   year contract or the contract through 2009 which

12   escalates each year for Standard Offer, the point

13   of that was to ease people into the market as the

14   Standard Offer price went above the market;

15   correct?

16           MR. HAGER:  I believe there were two

17   aspects of that.  One is to provide a level of

18   certainty to customers as to what their prices

19   would be over that period of time if they for

20   whatever reason didn't choose a competitive

21   market alternative.

22           The second part of that was to provide,

23   as you said, an increasing price signal that over

24   time if these prices should increase they should

39

send -- the hope was eventually they'd increase

above the market price and customers would

naturally have the incentive to choose a

competitive market alternative, which is at least

some indication where customers were suppose to

end up by this stage and certainly by this period

of time. So it was designed to give a signal to

transition customers to the marketplace.

MS. WILSON:  I am looking at

Narragansett's response to Commission Data

Request 1-10 which has been marked as PUC 10.

And first I'd like to look at page 1 of 2. Could

you first just explain Mass. Electric --

Massachusetts' Standard Offer as it relates to

Rhode Island's Standard Offer, how it's similar

or different, very briefly?

MR. HAGER:  I would say in general the

difference comes from the way in which the

applicable regulatory agencies in each state have

chosen to set the rate. Narragansett and Mass.

Electric during that period of time have incurred

the same monthly procurement costs, they have

identical contracts pricing wise. In Rhode

Island we utilize a forward looking approach that

1    looks at what the costs have been in or are

2    expected to be in the upcoming three, six, 12

3    month period.  At one point we did a three year

4    look not too long ago, attempted in the effort of

5    minimizing undercollections that have to be

6    collected at a later date from customers to set

7    the cost prospectively based on what's expected

8    with minimizing those undercollections.  And as

9    we got into increasing costs because fuel prices

10   were on the rise, we were setting rates that were

11   going higher and higher more frequently.  As fuel

12   prices were declining, we were coming back in and

13   reducing those prices accordingly.  Massachusetts

14   has adopted a more stable approach.  It's an

15   approach that has resulted in some significant

16   undercollections over time that the Company is

17   still looking to recover, and it's setting a rate

18   for the future based on -- it normally would set

19   a rate for, say, the January through June period,

20   I'm just making up periods here, based on the

21   cost that was incurred at the end of October of a

22   given year.

23        So as a result of that, I'm hesitant to

24   use the word "backward looking," but as a result

1    of the approach they've utilized, thereby

2    utilizing a prior period to establish rates for a

3    future period, it's resulted in fuel price

4    changes. We've gone in every six months in

5    Massachusetts for those updates and again set a

6    different rate stream, unlike Rhode Island, still

7    has significant undercollections that need to be

8    recovered.

9         MS. WILSON:  You're still carrying an

10   undercollection in Massachusetts?

11        MR. HAGER:  Yes.

12        MS. RACINE:  How much please?

13        MR. HAGER:  Subject to check, $60

14   million.

15        MS. RACINE:  Rhode Island?

16        MS. LLOYD:  Right now we're -- I think

17   I'm projecting about 8 million overrecovery

18   through December of this year.

19        MS. RACINE:  Eight million over?

20        MS. LLOYD:  Eight million over.

21        MS. RACINE:  And Mass. is 60 million

22   under?

23        MR. HAGER:  Massachusetts at one time I

24   believe was about $150 million undercollected.

42

MR. NAULT: What's the difference in the size of the market customer wise?

MR. HAGER: In general I view Massachusetts Electric as being three times the size of Narragansett.

MS. WILSON: Now, Mrs. Lloyd, you're suggesting to roll the $8 million overrecovery into the proposed rate, and that's part -- that is part of how you came up with the 5.9?

MS. LLOYD: That's right.

MS. WILSON: Looking again at page 1-2 -- 1 of 2 of that PUC 10, would you agree from looking at that that throughout January -- throughout 2003 Mass. Electric's Standard Offer charge has been higher than Narragansett's?

MR. HAGER: Yes.

MS. WILSON: And could you tell us what Mass. Electric has filed for a Standard Offer Rate for effect January of 2004?

MS. LLOYD: It's on that schedule, 6.524.

MS. WILSON: Now turning to what I think should be page 2 of 2, the next page --

MR. HAGER: Just to provide you a

A-1 COURT REPORTERS, INC.
(401) 333-3381

43

little more clarity on that, the 6.524 number,
part of that filing also requests that that rate
remain steady through the end of Mass. Electric's
Standard Offer period, which would be February
28th of '05.

MS. WILSON: So that's 14 months?

MR. HAGER: Fourteen months. If we had
followed the -- this is slightly different from
the DTE prescribed method on setting this rate.
Had we followed that, I believe this number would
have been closer to 6.7 or 6.8 for January.

MS. WILSON: What do you mean by
following the Mass. DTE prescribed method?

MR. HAGER: Setting the rate for that
period based on procurement costs for a previous
month, I believe was October.

MS. WILSON: Okay. And just for my own
curiosity, could you tell me what Massachusetts
is doing in anticipation of the end of the
Standard Offer contract only about 14 months
away, 15 months away?

MR. HAGER: The "do nothing"
alternative is established under the
restructuring statute, which says that all

1    customers who were on Standard Offer as of

2    February 28th of 2005 would by defaulting to

3    Default Service on March 1 of 2005.  And the DTE

4    has established a set of rules under which Mass.

5    Electric goes out and procures its Default

6    Service needs.  There are a number of entities

7    including DTE that are still reviewing that

8    process to see if that's the best alternative for

9    customers or there's another structure that makes

10   more sense.  As I said, if there isn't, if there

11   isn't an alternative structure that's adopted,

12   that's what the outcome will be.

13            MS. WILSON:  In Massachusetts Standard

14   Offer it looks like Standard Offer Service

15   residential customers are currently and will

16   actually be paying more than their Default

17   Service counterparts.  It looks like right now

18   they're paying 6.1 cents per kilowatt hour for

19   Standard Offer and 5.375 cents for Default

20   Service.

21            MR. HAGER:  That's correct.  Again, the

22   Standard Offer was a transitional service with

23   annual increases in price to meet established

24   rate criteria and to send a signal to customers

1    to slowly transition to the marketplace. We had

2    hoped that the crossover when -- the point when

3    the Standard Offer rates would be greater than

4    market rates and market rates reflected in

5    Default Service pricing, which would have

6    occurred back in 1998, 1999, but in the case of

7    Mass. Electric that has occurred as a result of

8    the last Default Service procurement which was

9    conducted in September and October.

10            MS. WILSON:  And are you seeing any

11   movement by competitive suppliers to try to

12   obtain these customers not through the regulatory

13   scheme, not through something that the Mass. DTE

14   is proactively doing, but just in general?  Is a

15   market developing for these customers knowing

16   that the price differential exists?

17            MR. HAGER:  I don't have specific data;

18   but, yes, at least with respect to the large

19   industrial customers, suppliers are out there

20   actively marketing them -- to them.  And that's

21   the group that certainly when we get these price

22   differentials are the ones that have typically

23   elected to move to the competitive marketplace.

24   The residential and small commercial market are

46

1    still slow to develop, although, there are still

2    some suppliers that are starting to look at it.

3    But it's the market that have the least amount of

4    movement and activity from competitive suppliers.

5         MS. WILSON:  And there's competitive

6    supply for large industrial customers in Rhode

7    Island too; correct?

8         MR. HAGER:  That's correct.

9         MS. WILSON:  Now since the

10   implementation of Standard Market Design, have

11   there been any sort of new charges that

12   Narragansett has seen in the market that could

13   potentially affect customers?

14        MR. HAGER:  With the implementation of

15   Standard Market Design there has been a series of

16   new charges that are associated with either

17   Narragansett or its wholesale suppliers'

18   obligations to settle up hourly with the ISO the

19   various load obligations, and there's a list of

20   charges that are new, different than what the

21   responsibilities were in the prior market

22   settlement system.  If you'd like I could run

23   down a list of what those charges would be.

24        MS. WILSON:  That would be helpful.

47

1          MR. HAGER:  Standard Market Design is

2     a -- has two markets associated with it.

3     Whereas, the prior market design only had one

4     market.  Under Standard Market Design we have a

5     day ahead market and a real time market, real

6     time being today, customers are consuming power

7     right this moment, generators are dispatched to

8     meet that load requirement.  And they're based

9     upon bids that generators have given to the ISO

10     that they're being compensated for providing

11     power.  Today the real time market is a physical

12     market.  It's actually happening, power's

13     consumed, generation is put on the system.

14          Yesterday the ISO conducted a day ahead

15     market, which is a financial settlement of

16     obligations.  So if you were a supplier looking

17     to hedge your cost exposure to your obligations

18     in today's market, you would place bids in the

19     day ahead market.  You would have done this

20     yesterday.  The ISO would have accepted bids from

21     generators who are looking to get dispatched

22     today and would match up those bids from the

23     supply and demand sides.  And suppliers and

24     generators who were -- had their bids cleared

1    yesterday would have financially settled up in

2    the day ahead marketplace.  If they consumed as

3    much as they did and generated as much as they

4    did, they'd be all set in today's market.  To the

5    extent that you bought more or less or sold more

6    or less, you'd have to settle at the real time

7    prices.

8         The largest component maybe not in

9    terms of dollars but in terms of significance

10   would be the locational marginal price or the

11   price of power that a generator receives so that

12   load would be at a given location on the system.

13   And that locational marginal price in the day

14   ahead market has got three components to it, one

15   of which is a day ahead energy component, one of

16   which is a day ahead congestion component, one of

17   which is the day ahead loss component.  The

18   energy component is simply the marginal cost of

19   generation in the unconstrained system out there;

20   and that component is identical in all locations

21   on the system.  The congestion component reflects

22   congestion costs in constrained zones.  It's

23   really the marginal price at your location

24   compared to the marginal price of the

1    unconstrained system. So that congestion

2    component can either be a positive cost that you

3    pay in addition to the energy piece or a negative

4    cost that you get as a credit back in the energy

5    component. And the loss piece is a calculation

6    of large marginal costs of losses on the system

7    that have to be collected from all loads. So the

8    ISO determines what the marginal cost of

9    generation is to provide losses on the system,

10   allocates that out to the load. So we have an

11   LMP system in the day ahead market. Likewise, in

12   the real time market there are real time location

13   marginal prices with similar components.

14         MS. RACINE: How is that audited, Mr.

15   Hager? How do you know in actuality what you're

16   being billed is correct? How do you run a tally

17   next to what the ISO's doing?

18         MR. HAGER: I have no way of knowing

19   whether the ISO is properly calculating

20   locational price at any location. They do go

21   through operational audits over periods of time

22   to make sure that they are dispatching units in

23   accordance with the rules properly. But if I'm

24   looking at my settlement responsibilities, I

1    certainly know what my load is on any given hour

2    at any location, and I can compare that to the

3    locational price and I can compare that to the

4    bill that I get from the ISO.  Likewise, if I'm a

5    generator, I read my meter every hour, I know how

6    much I generated every hour at a location and I

7    can look at my settlement with the ISO to make

8    sure that I got credit for the proper amount of

9    generation.

10        MS. RACINE:  And that's going well in

11   your opinion?

12        MR. HAGER:  I have not heard that there

13   are any problems in that area.

14        MS. RACINE:  Thank you.

15        MR. HAGER:  Before I move on to some

16   other elements there, the whole issue with SMD

17   was prior to SMD you could deliver to any

18   location in the system, you all pay the same

19   price.  With SMD we deliver and we meet the power

20   for your load, could be at different locations

21   and, thus, you're exposed to different prices.

22   So we run into the situation if, hypothetically

23   if a supplier decided that they had a seller's

24   choice contract and they could deliver at any

51

location they chose and you had load at a
different location, you'd be exposed to real time
price differences in any of those components
compared to where to got your power delivered
versus where you needed the load.  Narragansett
expects all of its power to be delivered at its
load location here in Rhode Island.  So we don't
have any differences in cost.  But if I were to
get power delivered in Maine in the day ahead
market, I'd receive credit from the ISO for
having excess power in Maine day ahead at
whatever that price is, and so I'd pay the real
time price for my load here in Rhode Island.  As
I said, we expect all of our load delivered in
Rhode Island and for there to be no differences.

There are several other miscellaneous
charges that come about in the marketplace.  I'll
do these in no order.  There is a charge for
external inadvertent costs.  New England is
connected to New York and other control areas
from suppliers.  The ISO and other entities
typically schedule power flows into the other
marketplaces for market purposes and liability
purposes.  You're suppose to schedule these in

1   advance and have the power flow identical to your

2   schedule.  In actuality sometimes a little bit

3   more, a little bit less power flows across the

4   system.  And those little minor differences are

5   inadvertent costs that need to be credited back

6   or charged back to market participants within the

7   marketplace.

8        There are things called regulation

9   charges in that we've dispatched some units that

10   are capable of increasing or decreasing load to

11   account for fluctuations on the system and we

12   have to pay them for the ability to have that

13   regulation.  And there's a bidding system where

14   they bid how much they need to be compensated in

15   order to be regulated, and they receive

16   compensation.  And that's spread out to market

17   participants.

18        There are operating reserves of the

19   markets out there where we need generators that

20   are needed to respond within ten minutes or 30

21   minutes of an event of increasing load, loss of

22   generation, and so forth.  So generators bid in,

23   will receive compensation to provide these

24   operating reserves or the ability to be called

1    upon on short notice. Those charges are

2    allocated back out.

3        Suppliers have the ability to hedge

4    their risks between locational prices. They want

5    to deliver or procure power at one location, they

6    have an obligation to sell power at another. If

7    they don't want to take the risk of any price

8    differentials between them, they can bid into the

9    FDR market. If the bid is accepted, they pay a

10   price and they are entitled to compensation. To

11   the extent that there's a price difference

12   between the two locations, the money that they

13   kick in is to, as part of their bid is allocated

14   back out to market participants through the

15   settlement process.

16       I mentioned there was a loss component

17   which calculates and collects costs for losses on

18   the system. The way that is set up is it is

19   based on the marginal cost of the unit; but

20   there's really an average loss that's incurred on

21   the system. So the ISO in essence overcollects

22   money for losses and after it takes that money

23   and pays out the units that provided the energy

24   for the losses, it takes the excess and

54

1    redistributes it back into the marketplace. So

2    that's a component that they call real time

3    marginal loss revenue allocation.

4         We have ISO charges under its Tariff

5    Schedule 2, which is the energy -- operation of

6    the energy market, and Schedule 3 is the

7    operation of the reliability market. Those are

8    costs that we've included in our transmission

9    charges over time, costs to operate the ISO for

10   those various markets.

11        There are real time demand response

12   charges. There's a real time demand response

13   marketplace where customers who are able to

14   reduce load or respond to price signals receive

15   compensation under a set of market rules, and the

16   money that's paid out to those customers are

17   directed back from market participants who

18   theoretically receive some value from the demand

19   response of being in the marketplace.

20        There is a charge collected, transition

21   cost for repay, which is a means of collecting

22   from current market participants the transitional

23   cost of setting up the marketplace in the ISO.

24        And the last charge I'm aware of is

1    ICAP load.  Shifting the ICAP market has evolved

2    from a supplier who has load capacity

3    responsibility has to settle up prior to the

4    month their ICAP obligation is due.  So if you're

5    serving a load in the month of December, you

6    would have settled up in the month of November

7    what the ISO thought your ICAP responsibility

8    was.  And compared to after market prices, the

9    customers move during the month, and so at the

10   end of the month the meter readers figure out

11   which customer moved from Supplier A to Supplier

12   B.  And if you were a supplier who had a customer

13   move during the month, you'd get a credit back

14   from the ISO; if you were a supplier who picked

15   up a customer mid month, you had to pay a portion

16   of the month in ICAP charges.

17        MS. WILSON:  I have just a few more

18   questions; but the steno has requested a break.

19        MR. HOLBROOK:  It's 11 o'clock.  Why

20   don't we take a break until about ten after 11,

21   11 or 12 minutes.

22             (RECESS)

23        MR. HOLBROOK:  It's 11:15, why don't we

24   come back and begin the meeting again.  Ms.

# Tab 44-1

 

**TransCanada**

TransCanada Energy Ltd.

3400, 237 - 4th Avenue S.W.
Calgary, Alberta, Canada T2P 5A4
Telephone: (403) 213-3100
Fax: (403) 213-3111



March 24, 1998

"Via Fax: (508)559-6125"

Eastern Utilities Associates
750 West Centre Street
West Bridgewater, MA
USA 02379

Attention:    Mr. Michael Hirsh
             Vice President

Dear Michael:

Re:    Acquisition by TransCanada Power Marketing Ltd. ("TransCanada") of
       Montaup Electric Company's ("Montaup's") Power Purchase Agreement ("PPA")
       with Ocean State Power ("OSP")

I have attached a marked-up version of the most recent set of sale documents which were
recently provided to us. For the most part the comments are relatively minor. I would like to
direct your attention to the following material comments:

Asset Purchase Agreement:

1.    Page 4, Section 1.1(19) –         In the definition of "Permitted Encumbrances", the
                                       first phrase "any Encumbrances not created by the
                                       Seller" should be deleted.  TransCanada is not
                                       willing to accept the risk of Encumbrances of this
                                       nature.  I believe that this was agreed to in our
                                       original discussions.

2.    Page 9, Section 5.6 –            The litigation representation and warranty needs to
                                       be expanded to include the Purchased Assets.  At
                                       this time, the representation only refers to the Seller
                                       and there could be a suit with respect to the
                                       Purchased Assets that is not against the Seller.

Backstop Agreement:

1.    Article 5, Page 6 –              We have added Rider 1 which provides that any
                                       increase in the Price which arises as a result of a
                                       regulatory decision will be passed on to
                                       TransCanada. Although this concept has not been
                                       discussed previously, I believe it is similar to the

TCPM007194

- 2 -

"Favored Nations" clause we have discussed previously. In the event that Eastern Utilities Associates ("EUA") receives approval from the regulators for increased Standard Offer Service prices, I believe it is appropriate that any such increment be passed on to TransCanada.

Rider 1 is as follows:

"In the event that the Price increases as a result of the decision of any regulatory body having jurisdiction over Standard Offer Service, such increase shall be paid to Supplier by the Companies."

2.    Article 7, Page 7 –    I have deleted the reference to the one cent per kWh penalty in the "Failure to Deliver" provision. TransCanada will reimburse EUA for its actual costs of supplying replacement power.

3.    Article 8, Page 8 -    TransCanada PipeLines Limited's ("TCPL's") counsel are currently reviewing the Guarantee. We have also made a couple of changes to Article 8 to provide TransCanada with the time required to rectify default as well as to delete references to indirect consequential and incidental damages in order to make the provision reciprocal to TransCanada's obligations.

4.    Appendix A -    I have deleted the Option to Reduce Suppliers Share, as I believe this was agreed to previously.

**PPA Transfer Agreement:**

1.    Section 7(b) -    I found there was potential confusion between the provisions of Section 7(b) and 8(d). We have made some proposed amendments which I hope have the effect of cleaning up any potential confusion.

2.    Section 8(d) -    I have suggested certain amendments in this paragraph as the original language could have been construed to mean that a lump sum would have to be "equitable" amount rather than the discounted present value of the agreed upon monthly support payment. I believe that the only issue we should leave open for discussion is the actual discount rate attributable to the support payments.

TCPM007195

- 3 -

Finally in respect to your letter of March 9, 1998, we agree with the changes in your Paragraph 2 of the draft letter. I have attached a revised copy of the equity letter for your review. When you have had an opportunity to review the foregoing, please give me a call so that we can discuss the proposed amendments.

Yours truly,

TRANSCANADA ENERGY LTD.

Alexander J. Pourbaix
Vice President, Power and Projects

Enclosures

AJP/tc/ajp051

cc:    Mr. Sean McMaster

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## MONTAUP ELECTRIC COMPANY

## AND

## TRANSCANADA POWER MARKETING LTD.

_____, 1997

_____

TCPM007197

## ASSET PURCHASE AGREEMENT

*8*

ASSET PURCHASE AGREEMENT, dated as of ___, 1997, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the *"Seller"*), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the *"Buyer"*).

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell, the Purchased Assets upon the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1 *Definitions*. (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

(1)    *"Affiliate"* has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(2)    *"Ancillary Agreements"* mean the Backstop Agreement, the Instrument of Assignment and Assumption and the PPA Transfer Agreement.

(3)    *"Back Stop Agreement"* means the Backstop Agreement between the Retail Companies and the Buyer, substantially in the form of Exhibit A hereto, relating to Standard Offer Service.

(4)    *"Business Day"* means any day other than Saturday, Sunday and any day which is a legal holiday or a day on which banking institutions in Boston, Massachusetts are authorized by law or other governmental action to close.

(5)    *"Buyer Representatives"* means the Buyer's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

(6)    *"Code"* means the Internal Revenue Code of 1986, as amended.

TCPM007198

(7)    *"Confidentiality Agreement"* means the Confidentiality Agreement, among the Seller, Blackstone Valley Electric Company, Newport Electric Corporation, Eastern Utilities Associates and·TransCanada Energy Ltd.

(8)    *"Encumbrances"* means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

(9)    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

(10)    *"Federal Power Act"* means the Federal Power Act of 1935, as amended.

(11)    *"FERC"* means the Federal Energy Regulatory Commission.

(12)    *"Holding Company Act"* means the Public Utility Holding Company Act of 1935, as amended.

(13)    *"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(14)    *"Indenture"* means the Brockton Edison Company Indenture of First Mortgage and Deed of Trust dated as of September 1, 1948, as supplemented and modified.

(15)    *"Instrument of Assignment and Assumption"* means the Instrument of Assignment and Assumption substantially in the form of Exhibit B hereto relating to the assignment by the Seller and the assumption by the Buyer of all of the rights, title, interests, liabilities and obligations of the Seller, in, to and under the PPA.

(16)    *"Material Adverse Effect"* means any change in or effect on the Purchased Assets after the date of this Agreement that is materially adverse to the Purchased Assets, taken as a whole, other than (i) any change or effect resulting from changes in the international, national, regional or local wholesale or retail markets for electric power, (ii) any change or effect resulting from changes in the international, national, regional or local markets for any fuel utilized in connection with the Purchased Assets, (iii) any change or effect resulting from changes in the North American, national, regional or local electric transmission systems and (iv) any materially adverse change in or effect on the Purchased Assets which is cured (including by the payment of money) by the Seller before the Termination Date.

(17)    *"MDPU"* means the Massachusetts Department of Public Utilities.

(18)    *"NHPUC"* means the New Hampshire Public Utility Commission.

TCPM007199

(i)

(19)    *"Permitted Encumbrances"* means ~~(i) any Encumbrances not created by the Seller;~~ (ii) all exceptions, restrictions, easements, charges, rights of way and monetary and non-monetary encumbrances which are matters of record or are set forth in an applicable FERC project license, except for such encumbrances which secure indebtedness; (iii) with respect to any date before the Closing Date, Encumbrances created by the Indenture; (iv) statutory liens for current taxes or assessments not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (v) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Seller or the validity of which are being contested in good faith by appropriate proceedings; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations by governmental authorities; and (vii) such other liens, imperfections in or failure of title, charges, easements, restrictions and encumbrances which do not, in any material respect, affect the Buyer's rights under the Purchased Assets.

(20)    *"Person"* means any individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization and a governmental entity or any department or agency thereof.

(21)    *"PPA"* means the agreement, or, if more than one agreement, means collectively, the agreements listed on Schedule 1.1(a) hereto.

(22)    *"PPA Transfer Agreement"* means the PPA Transfer Agreement, between the Seller and the Buyer, substantially in the form of Exhibit C hereto.

(23)    *"Purchased Assets"* means all right, title and interests of the Seller in and to and all liabilities and obligations of the Seller under the PPA.

(24)    *"Retail Companies"* means, as applicable, each, any or all of Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation.

(25)    *"RIPUC"* means the Rhode Island Public Utilities Commission.

(26)    *"SEC"* means the Securities and Exchange Commission.

(27)    *"Securities Act"* means the Securities Act of 1933, as amended.

(28)    *"Standard Offer Service"* means the electric service, if any, required to be provided by one or more of the Retail Companies to its retail customers who do not elect to purchase electricity from an alternative supplier in the market.

(29)    *"Taxes"* means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll,

TCPM007200

withholding, social security or other taxes, including any interest, penalties or additions attributable thereto.

       (30)    *"VTPSB"* means the Vermont Public Service Board.

       (b)    Each of the following terms has the meaning specified in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Buyer | Recitals |
| Buyer Required Regulatory Approvals | 6.3(b) |
| Closing | 4.1 |
| Closing Conditions | 4.1 |
| Closing Date | 4.1 |
| Direct Claim | 9.2(c) |
| Final Order | 8.1(c) |
| Indemnifiable Loss | 9.1(a) |
| Indemnifying Party | 9.1(d) |
| Indemnitee | 9.1(c) |
| Permits | 5.18 |
| Purchase Price | 3.1 |
| Seller | Recitals |
| Seller Required Regulatory Approvals | 5.3(b) |
| Termination Date | 10.1(b) |
| Third Party Claim | 9.2(a) |

TCPM007201

## ARTICLE II

### PURCHASE AND SALE

2.1 *The Sale*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), the Purchased Assets.

## ARTICLE III

### PURCHASE PRICE

3.1 *Purchase Price*. The purchase price for the Purchased Assets shall be one dollar and other good and valuable consideration (the "Purchase Price").

## ARTICLE IV

### THE CLOSING

4.1 *Time and Place of Closing*. Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement (the *"Closing Conditions"*), the closing of the sale of the Purchased Assets contemplated by this Agreement (the *"Closing"*) will take place at the offices of McDermott, Will & Emery, 75 State Street, Suite 1700, Boston, MA 02109-1807 at 10:00 A.M. (local time) on such date as the parties may agree, which date is as soon as practicable, but no later than fifteen (15) Business Days, following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the parties may agree. The date and time at which the Closing actually occurs is hereinafter referred to as the *"Closing Date."*

4.2 *Payment of Purchase Price*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Purchased Assets, the Buyer will pay or cause to be paid to the Seller at the Closing the Purchase Price.

4.3 *Deliveries by Seller*. At the Closing, the Seller will deliver to the Buyer the following items:

TCPM007202

(a)    The Instrument of Assignment and Assumption, duly executed by the Seller;

(b)    All consents, waivers or approvals obtained by the Seller with respect to the Purchased Assets or the consummation of the transactions connected to the sale of the Purchased Assets, as the case may be, contemplated by this Agreement, to the extent specifically required hereunder;

(c)    Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Seller;

(d)    An opinion of counsel and certificates (as contemplated by Section 8.2) with respect to the Purchased Assets; and

(e)    Such other agreements, documents, instruments and writings as are required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Buyer and its counsel, in connection herewith.

4.4    *Deliveries by the Buyer*.  At the Closing, the Buyer will deliver to the Seller the following items:

(a)    The Purchase Price by wire transfer of immediately available funds or such other means as are agreed upon by the Seller and the Buyer;

(b)    Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Buyer;

(c)    An opinion of counsel and certificates (as contemplated by Section 8.3) with respect to the Purchased Assets;

(d)    The Instrument of Assignment and Assumption, duly executed by the Buyer; and

(e)    Such other agreements, documents, instruments and writings as are required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Seller and its counsel, in connection herewith.

4.5    *Backstop Agreement*.  In the event Unsubscribed Standard Offer Service (as defined in the Backstop Agreement) shall be zero on the Closing Date, neither the Seller nor the Buyer shall be required to execute and deliver the Backstop Agreement at the Closing.

TCPM007203

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows:

5.1. *Organization; Qualification*. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller is duly qualified or licensed to do business as foreign corporation and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The Seller has heretofore delivered to the Buyer complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents as currently in effect).

5.2. *Authority Relative to this Agreement*. The Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby. This Agreement and the Ancillary Agreements have been duly and validly executed and delivered by the Seller, and assuming that this Agreement and the Ancillary Agreements constitute valid and binding agreements of the Buyer, subject to the receipt of the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, constitute valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

5.3. *Consents and Approvals; No Violation*. (a) Except for such notices or approvals set forth on Schedule 5.3(a), and other than obtaining the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, neither the execution and delivery of this Agreement and the Ancillary Agreements by the Seller nor the sale by the Seller of the Purchased Assets pursuant to this Agreement and the Ancillary Agreements will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Seller, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except (x) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not in any material respect affect the Buyer's rights under the Purchased

TCPM007204

Assets or (y) for those requirements which become applicable to the Seller as a result of the specific regulatory status of the Buyer (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which the Buyer (or any of its Affiliates) is or proposes to be engaged; (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller, or any of the Purchased Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which, in the aggregate, would in any ~~material~~ respect affect the Buyer's rights under the Purchased Assets, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation would in any ~~material~~ respect affect the Buyer's rights under the Purchased Assets. *material*

    (b)  Except for such notices or approvals set forth on Schedule 5.3(b) (the *"Seller Required Regulatory Approvals"*), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Seller of the transactions contemplated hereby, other than such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, will not, in the aggregate, in any ~~material~~ respect affect the Buyer's rights under the Purchased Assets. *material*

    5.4.  *Title and Related Matters*.  Except as set forth in Schedule 5.4 and except for Permitted Encumbrances, the Seller has good and valid title to the Purchased Assets, free and clear of all Encumbrances.

    5.5.  *The PPA*.  (a) Except as disclosed in Schedule 5.5(a), the PPA (i) constitutes a valid and binding obligation of the Seller and to the best knowledge of the Seller constitutes a valid and binding obligation of the other parties thereto, (ii) is in full force and effect, and (iii) may be transferred to the Buyer pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder.

    (b)  Except as set forth in Schedule 5.5(b), there is not, under the PPA, any default or event which, with notice or lapse of time or both, would constitute a default on the part of the Seller.

    5.6.  *Litigation*.  There are no claims, actions, *or* proceedings pending against the Seller, or to the knowledge of Seller, threatened, against the Seller. *or with respect to the Purchased Assets.*

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF THE BUYER

TCPM007205

The Buyer represents and warrants to the Seller as follows:

6.1. *Organization*. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted. The Buyer has heretofore delivered to the Seller complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents), as currently in effect.

6.2. *Authority Relative to this Agreement*. The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Seller, subject to the receipt of the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

6.3. *Consents and Approvals; No Violation*. (a) Except as set forth in Schedule 6.3(a), and other than obtaining the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets pursuant to this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except for the failure of which to obtain or make would not materially affect the Buyer's ability to perform its obligations under this Agreement, or (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer or any of its subsidiaries is a party or by which any of their respective assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not materially affect the Buyer's ability to perform its obligations under this Agreement.

(b) Except as set forth in Schedule 6.3(b) (the filings and approvals referred to in Schedule 6.3(b) are collectively referred to as the "*Buyer Required Regulatory Approvals*"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any

TCPM007206

governmental or regulatory body or authority is necessary for the consummation by the Buyer of the transactions contemplated hereby.

6.4. *Regulation as a Utility*. The Buyer is a public utility holding company, exempt from registration, under the Holding Company Act.

## ARTICLE VII

### COVENANTS OF THE PARTIES

7.1. ***Conduct of Business of the Company***. During the period from the date of this Agreement to the Closing Date, the Seller will conduct its business with respect to the Purchased Assets according to its ordinary and usual course of business consistent with good industry practice and will not amend (or waive any rights under) the PPA without the Buyer's prior written consent or take any action or fail to take any action that would result in a material break of the Seller's obligations under the PPA.

*breach*

7.2. *Access to Information*. (a) Between the date of this Agreement and the Closing Date, the Seller will, during ordinary business hours and upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books and records of the Seller relating to the Purchased Assets; (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request; and (iii) furnish the Buyer, at the Buyer's expense, with such financial and operating data and other information with respect to the Purchased Assets in the Seller's possession as the Buyer may from time to time reasonably request; provided, however, that (A) the Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (B) the Seller need not supply the Buyer with any information which the Seller is under a legal obligation not to supply.

(b) All information furnished to or obtained by the Buyer and the Buyer Representatives pursuant to this Section 7.2 shall be subject to the provisions of the Confidentiality Agreement.

7.3. *Expenses*. Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

7.4. *Further Assurances*. (a) Subject to the terms and conditions of this Agreement, each of the parties hereto will use its reasonable commercial efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets pursuant to this Agreement.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          11

(b) Subject to the PPA Transfer Agreement, to the extent that the Seller's rights, title, interests, liabilities and obligations under the PPA may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Seller, at its expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. The Seller and the Buyer agree that if any consent to an assignment of the PPA shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights and obligations under the PPA so that the Buyer would not in effect acquire the benefit of all such rights and obligations, the Seller, to the maximum extent permitted by law and the PPA, shall at the Closing and pursuant to the PPA Transfer Agreement, appoint the Buyer to be the Seller's agent with respect to the PPA, and the Seller shall, to the maximum extent permitted by law and the PPA, enter into such reasonable arrangements with the Buyer as are necessary to provide the Buyer with the benefits and obligations of the PPA. The Seller and the Buyer shall cooperate and shall each use their commercially reasonable efforts after the Closing to obtain an assignment of the PPA to the Buyer.

7.5. *Public Statements*. The parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law and except that the parties may make public announcements, statements or other disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of "Proprietary Information" (as defined in the Confidentiality Agreement).

7.6. *Consents and Approvals*. (a) The Seller and the Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice the notifications, if any, required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The parties shall consult with each other as to the appropriate time of filing such notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by either of such agencies, and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after each date of filing.

(b) The Seller and the Buyer shall cooperate with each other and (I) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, necessary or advisable to consummate the transactions contemplated by this Agreement (including, without limitation, the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which the Seller

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          12

TCPM007208

or the Buyer is a party or by which any of them is bound. The Seller shall have the right to review and approve (in its reasonable discretion) in advance all characterizations of the information relating to Purchased Assets, and each of the Seller and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with the transactions contemplated hereby.

7.7. *Fees and Commissions*.  The Seller and the Buyer each represent and warrant to the other on its own behalf that no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transaction contemplated hereby by reason of any action taken by the party making such representation.  The Seller and the Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees (including the fees described above) incurred by reason of any action taken by such party.

7.8. *Tax Matters*.  All transfer and sales taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Buyer, and the Buyer, at its own expense, will file, to the extent required by applicable law, all necessary tax returns and other documentation with respect to all such transfer or sales taxes, and, if required by applicable law, the Seller will join in the execution of any such tax returns or other documentation.  Prior to the Closing Date, the Buyer will provide to the Seller, to the extent possible, an appropriate certificate of no tax due from any applicable taxing authorities.

## ARTICLE VIII

## PURCHASED ASSETS CLOSING CONDITIONS

8.1. *Conditions to Each Party's Obligations to Effect the Purchase Transactions*.  The respective obligations of each party to effect the sale of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) If applicable, the waiting period under the HSR Act applicable to the consummation of the sale of the Purchased Assets contemplated hereby shall have expired or been terminated;

(b) No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of the Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable best efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any state or federal government or governmental agency in the United States which prohibits the consummation of the sale of the Purchased Assets;

TCPM007209

(c) All material federal, state and local government consents and approvals required for the consummation of the sale of the Purchased Assets, including, without limitation, the Seller Required Regulatory Approvals applicable to the sale of the Purchased Assets and the Buyer Required Regulatory Approvals applicable to the sale of the Purchased Assets, shall have been obtained or become Final Orders (a "*Final Order*" means a final order after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending)) with such terms and conditions as shall have been imposed by the governmental entity issuing such Final Order; and

(d) All consents and approvals for the consummation of the sale of the Purchased Assets contemplated hereby required under the terms of any note, bond, mortgage, indenture, contract or other agreement to which the Seller or the Buyer, or any of their subsidiaries, are a party shall have been obtained, other than those (i) which if not obtained, would not, in the aggregate, have a Material Adverse Effect, or (ii) which are governed by the PPA Transfer Agreement.

8.2. *Conditions to Obligations of the Buyer.* The obligation of the Buyer to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) There shall not have occurred and be continuing a Material Adverse Effect;

(b) The Seller shall have performed and complied with in all material respects the covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed and complied with by the Seller on or prior to the Closing Date, and the representations and warranties of the Seller which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) There shall be no Encumbrances on the Purchased Assets by virtue of the Indenture or otherwise, except for Permitted Encumbrances;

(d) The Buyer shall have received certificates from authorized officers of the Seller, dated the Closing Date, to the effect that, to the best of such officers' knowledge, the conditions set forth in Sections 8.2(a), (b) and (c) have been satisfied;

(e)     The Buyer shall have received an opinion from McDermott, Will & Emery, counsel for the Seller, dated the Closing Date and satisfactory in form and substance to the Buyer and its counsel, substantially to the effect that:

(1) the Seller is a corporation organized, existing and in good standing under the laws of its state of incorporation and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased

J:\DATA\CLI\84\31584\064\ASSPURCH.OS        14

TCPM007210

Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Seller;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Seller and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals are obtained) are valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller will not constitute a violation of the Certificates of Incorporation or Bylaws (or similar governing documents), as in effect on the Closing Date, of the Seller;

(4) the Bill of Sale and other documents described in Section 4.3 are in proper form to transfer to the Buyer title to the Purchased Assets; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Seller of the Closing other than (i) the Seller Required Regulatory Approvals, all of such Seller Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority, and (ii) such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, would not, in the aggregate have a Material Adverse Effect.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States or the laws of Massachusetts, such counsel may rely upon opinions of counsel admitted in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of fact upon certificates furnished by the Seller and appropriate officers and directors of the Seller and by public officials.

8.3. *Conditions to Obligations of the Seller*. The obligation of the Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) The Buyer shall have performed in all material respects its covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed on or prior to the Closing Date;

J:\DATA\CLI\84\31584\064\ASSPURCH.OS        15

TCPM007211

(b) The representations and warranties of the Buyer which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) The Seller shall have received a certificate from an authorized officer of the Buyer, dated the Closing Date, to the effect that, to the best of such officer's knowledge, the conditions set forth in Sections 8.3(a) and (b) have been satisfied;

(d) The FERC shall have approved the Stipulations and Agreements filed in FERC Docket No. ER97-3127-000 by and between the Office of the Attorney General of Massachusetts, the Division of Energy Resources, Edison Electric Company and the Seller, dated October 29, 1997; Docket No. ER97-2800-000 by and between the RIPUC, the Rhode Island Division of Public Utilities and Carriers, Blackstone Electric Company, the Seller and Newport Electric Corporation; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Pascoag Fire District of Rhode Island; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Gas and Electric Department of the Town of Middleborough; and Docket No. ER97-2338-000 between the Seller and the Taunton Municipal Lighting Plant, Pascoag Fire District of Rhode Island and the Gas and Electric Department of the Town of Middleborough; and said Stipulations and Agreements shall be and shall continue to be in full force and effect; Stipulations and Agreements shall be and shall continue to be in full force and effect; and

(e) The Seller shall have received an opinion from Shearman & Sterling, counsel for the Buyer (or other counsel reasonably satisfactory to Seller), dated the Closing Date and satisfactory in form and substance to the Seller and its counsel, substantially to the effect that:

(1) the Buyer is a corporation organized, existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Buyer;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Buyer and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approval are obtained) are valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

J:\DATA\CLN84\31584\064\ASSPURCH.OS         16

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Buyer will not constitute a violation of the Certificate of Incorporation or Bylaws on the Closing Date (or other similar governing documents), as in effect, of the Buyer;

(4) the Instrument of Assignment and Assumption and other instruments described in Section 4.4 are in proper form for the Buyer to assume the Assumed Liabilities; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Buyer of the Closing other than the Buyer Required Regulatory Approvals, all of such Buyer Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States and the laws of New York, such counsel may rely upon opinions of counsel admitted to practices in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of facts upon certificates furnished by appropriate officers and directors of the Buyer and its subsidiaries and by public officials.

## ARTICLE IX

### INDEMNIFICATION

9.1. *Indemnification*. (a) The Seller will indemnify, defend and hold harmless the Buyer from and against any and all claims, demands or suits (by any Person), losses, liabilities, damages (including consequential or special damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance that is actually recovered (each, an *"Indemnifiable Loss"*), asserted against or suffered by the Buyer relating to, resulting from or arising out of (i) any breach by the Seller of any representation, warranty, covenant or agreement of the Seller contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(b) The Buyer will indemnify, defend and hold harmless the Seller from and against any and all Indemnifiable Losses asserted against or suffered by the Seller relating to, resulting from or arising out of (i) any breach by the Buyer of any representation, warranty, covenant or agreement of the Buyer contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

TCPM007213

(c) Any Person entitled to receive indemnification under this Agreement (an "*Indemnitee*") having a claim under these indemnification provisions shall make a good faith effort to recover all losses, damages, costs and expenses from insurers of such Indemnitee under applicable insurance policies so as to reduce the amount of any Indemnifiable Loss hereunder. The amount of any Indemnifiable Loss shall be reduced (i) to the extent that Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss (after taking into account the costs incurred in collecting such insurance and any reasonable likely increase in premiums resulting from such claim) and (ii) to take into account any net Tax benefit actually recognized by the Indemnitee arising from the recognition of the Indemnifiable Loss and any payment actually received with respect to an Indemnifiable Loss.

(d) The expiration, termination or extinguishment of any covenant or agreement shall not affect the parties' obligations under this Section 9.1 if the Indemnitee provided the Person required to provide indemnification under this Agreement (the "*Indemnifying Party*") with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

(e) Except in the case of fraud and intentional breaches of this Agreement, the rights and remedies of the Seller and the Buyer under this Article IX are exclusive and in lieu of any and all other rights and remedies which the Seller and the Buyer may have under this Agreement or otherwise for monetary relief with respect to (i) any breach or failure to perform any covenant or agreement set forth in this Agreement or (ii) any relationship resulting from the PPA Transfer Agreement.

9.2. *Defense of Claims*. (a) If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any Person who is not a party to this Agreement or any Affiliate of a party to this Agreement (a "*Third Party Claim*") with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than twenty (20) calendar days after the Indemnitee's receipt of notice of such Third Party Claim. Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, and the Indemnitee will cooperate in good faith in such defense at such Indemnitee's own expense.

(b) If within ten (10) calendar days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claim the Indemnitee receives written notice from the Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in the last sentence of Section 9.2(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; provided, however, that if the Indemnifying Party fails to take reasonable steps

TCPM007214

necessary to defend diligently such Third Party Claim within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable expenses thereof. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) calendar days after its receipt of such notice, the Indemnitee may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will be the amount of such settlement offer, plus reasonable costs and expenses paid or incurred by the Indemnitee up to the date of such notice.

(c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a *Direct Claim*) will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event not later than twenty (20) calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party will have a period of thirty (30) calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such thirty (30) calendar day period, the Indemnifying Party will be deemed to have accepted such claim. If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its rights to indemnification under this Agreement.

(d) If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the prime rate then in effect of the [Bank of Boston, N.A.]), will promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any indemnity payment, the Indemnifying Party will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided, however, that (i) the Indemnifying Party will then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said indemnity payment is hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party. Without limiting the generality or effect of any other provision hereof, each such Indemnitee and Indemnifying Party will duly execute upon request all instruments reasonably necessary to

TCPM007215

evidence and perfect the above-described subrogation and subordination rights. Nothing in this Section 9.2(d) shall be construed to require any party hereto to obtain or maintain any insurance coverage.

(e) A failure to give timely notice as provided in this Section 9.2 will not affect the rights or obligations of any party hereunder except if, and only to the extent that, as a result of such failure, the party which was entitled to receive such notice was actually prejudiced as a result of such failure.

## ARTICLE X

## TERMINATION AND ABANDONMENT

10.1. *Termination.* (a) This Agreement may be terminated at any time prior to the Closing Date by mutual written consent of the Seller and the Buyer.

(b) This Agreement may be terminated by the Seller or the Buyer if the Closing has not occurred on or before the first anniversary of the date of this Agreement (the "*Termination Date*"); provided that the right to terminate this Agreement under this Section 10.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date; and provided, further, that if on the first anniversary of the date of this Agreement the conditions to the Closing set forth in Section 8.1(c) shall not have been fulfilled but all other conditions to the Closing shall be fulfilled or shall be capable of being fulfilled, then the Termination Date shall be the day which is twenty-four (24) months from the date of this Agreement.

(c) This Agreement may be terminated by either the Seller or the Buyer if (i) any governmental or regulatory body, the consent of which is a condition to the obligations of the Seller or the Buyer to consummate the Closing shall have determined not to grant its or their consent and all appeals of such determination shall have been taken and have been unsuccessful, (ii) one or more courts of competent jurisdiction in the United States or any State shall have issued an order, judgment or decree permanently restraining, enjoining or otherwise prohibiting the Closing, and such order, judgment or decree shall have become final and nonappealable or (iii) any statute, rule or regulation shall have been enacted by any State or federal government or governmental agency in the United States which prohibits the consummation of the Closing.

(d) This Agreement may be terminated by the Buyer, if there has been a material violation or breach by the Seller of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Buyer to effect the Closing impossible and such violation or breach has not been waived by the Buyer.

TCPM007216

(e)  This Agreement may be terminated by the Seller, if there has been a material violation or breach by the Buyer of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Seller to effect the Closing impossible and such violation or breach has not been waived by the Seller.

10.2.  *Procedure and Effect of Termination*.  In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 10.1, written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein:

(a)  said termination shall be the sole remedy of the parties hereto with respect to breaches of any agreement, representation or warranty contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except in each case as stated in this Section 10.2 and in Sections 7.2(b), 7.3 and 7.7; provided, however, nothing in this Section 10.2 shall relieve any party for willful breaches of any representations, warranties, covenants or agreements contained herein; and

(b)  all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made.

# ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1.  *Amendment and Modification*.  Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of the Seller and the Buyer.

11.2.  *Waiver of Compliance; Consents*.  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

11.3.  *No Survival*.  Subject to the provisions of Section 10.2, each and every representation, warranty and covenant contained in this Agreement (other than the covenants

TCPM007217

contained in Sections 7.2(b), 7.3, 7.4, 7.7, 7.8 and in Articles IX and X (which covenants shall expire in accordance with their terms), and the provisions of Article IX with respect to any relationship resulting from the PPA Transfer Agreement and this Article XI which shall survive indefinitely) shall expire with, and be terminated and extinguished by the consummation of the sale of the Purchased Assets, provided, however, that representations and warranties contained herein shall survive for a period of twenty-four (24) months following closing, and none of the Seller, the Buyer or any officer, director, trustee or Affiliate of any of them shall be under any liability whatsoever with respect to any such representation, warranty or covenant. *to after such period expire*

11.4. _Notices_. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, telexed or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

(a) If to the Seller, to:

c/o EUA Service Corporation
750 West Center Street
West Bridgewater, MA 02379
Facsimile: (508) 559-8932
Attention:     Donald C. Ryan
Manager-Power Resources

with a copy to:

McDermott, Will & Emery
75 State Street
Suite 1700
Boston, MA  62109-1807
Facsimile: (617) 345-5077
Attention:     Arthur I. Anderson, P.C.

(b) if to the Buyer, to:

c/o TransCanada Energy Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta, Canada
T2P 5A4
Facsimile: (403) 213-3550
Attention:     Sean D. McMaster

with a copy to:

TCPM007218

Sherman & Sterling
555 California Street
San Francisco, CA 94104
Facsimile: (415) 616-1199
Attention:    Christopher D. Dillon

11.5. *Assignment*. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, other than to an affiliate, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.6. *Governing Law*. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

11.7. *Counterparts*. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.8. *Interpretation*. The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

11.9. *Schedules and Exhibits*. All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

11.10. *Entire Agreement*. This Agreement, the Confidentiality Agreement and the Ancillary Agreements including the Exhibits, Schedules documents, certificates and instruments referred to herein or therein, embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein. It is expressly acknowledged and agreed that there are no restrictions, promises, representations, warranties, covenants or undertakings contained in any material made available to the Buyer pursuant to the terms of the Confidentiality Agreement (including the Information Memorandum, dated July, 1997). This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions other than the Confidentiality Agreement.

TCPM007219

IN WITNESS WHEREOF, the Seller and the Buyer have caused this agreement to be signed by their respective duly authorized officers as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____
Name:
Title:

TRANSCANADA POWER MARKETING LTD.

By: _____
Name:
Title:

By: _____
Name:
Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          24

<u>EXHIBIT A</u>

Backstop Agreement

DRAFT

Backstop Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

Draft 2/3/98

TCPM007221

TABLE OF CONTENTS

Page

ARTICLE 1.    Definitions ................................    2

ARTICLE 2.    Term ...........................................    4

ARTICLE 3.    Supplier Responsibilities .....................    4

ARTICLE 4.    Estimation of Hourly Loads and Reporting to
              the ISO .......................................    5

ARTICLE 5.    Price .........................................    5

ARTICLE 6.    Billing and Payments ..........................    6

ARTICLE 7.    Failure to Deliver ............................    7

ARTICLE 8.    Events of Default, Liability, Relationship of
              the Companies .................................    7

ARTICLE 9.    Termination ...................................    8

ARTICLE 10.   Force Majeure .................................    9

ARTICLE 11.   Assignment .....................................   10

ARTICLE 12.   Successors and Assigns ........................   10

ARTICLE 13.   Resolution of Disputes ........................   10

ARTICLE 14.   Interpretation ................................   12

ARTICLE 15.   Severability of Provisions ....................   12

ARTICLE 16.   Accounts and Records ..........................   12

ARTICLE 17.   Limitations on Liability and Indemnification ..   12

ARTICLE 18.   Regulation ....................................   13

ARTICLE 19.   Notices .......................................   13

ARTICLE 20.   Miscellaneous .................................   14


Appendix A Schedule of Supplier's Share of Offer Service and
Standard Offer Wholesale Price

Appendix B Parent Guarantee

TCPM007222

## BACKSTOP AGREEMENT

This Backstop Agreement ("Agreement"), is made and entered into this _____ day of _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation, ("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Corporation, under an asset purchase agreement, (the "Asset Purchase Agreement") dated _____; and as condition of such purchase and sale Supplier is required to assume a share of any unsubscribed Standard Offer Service under this Backstop Agreement; and

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.P.U. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' unsubscribed portion of the aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

TCPM007223

# Tab 44-2

ARTICLE 1.    Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Closing Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.P.U." shall mean the Massachusetts Department of Public Utilities.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B.  The Companies or their Standard Offer customers shall not be obligated under

this Agreement for any payments in addition to the payments made
pursuant to Article 5.

"PTF" shall mean the facilities categorized as Pool
Transmission Facilities as defined in the Restated NEPOOL
Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities
Commission.

"Restated NEPOOL Agreement" shall mean the New England Power
Pool Agreement dated December 31, 1996, as amended from time to
time, as it is in force at the time the action in question is
taken.

"Standard Offer Service" shall mean firm all-requirements
electric service (minute by minute, hour by hour, day by day)
including, but not limited to: energy, installed capability,
operable capability, reserves, and associated losses necessary to
fulfill all NEPOOL and ISO obligations as they may change from
time to time associated with providing firm all requirements
power to the Companies' retail customers taking service under
Eastern's Standard Offer Service Tariff No. M.D.P.U. 340,
Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. _____,
or Newport's Standard Offer Service Tariff No. R.I.P.U.C. _____,
as amended from time to time. Supplier is responsible for
changes in customer demand for any reason, including, but not
limited to, seasonal factors, daily load fluctuations, increased
or decreased usage, demand side management activities, extremes
in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated
stream of prices, in cents per kilowatt-hour, that forms the cap
on the price that will be paid to suppliers of Standard Offer
Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the
Blackstone Valley Electric Company and Newport Electric
Corporation Terms and Conditions for Electric Power Suppliers
dated May 29, 1997 as approved by the P.U.C., or the Eastern
Edison Company Terms and Conditions for Competitive Suppliers as
approved by the D.P.U., as applicable. These Terms and
Conditions may be revised, amended, supplemented, or supplanted
in whole or in part from time to time by the P.U.C. or D.P.U. or
as otherwise provided by law.

"Unsubscribed Standard Offer Service" shall mean the amount
of Standard Offer Service, if any, that the Companies did not
award to an alternate supplier under the Companies' Standard
Offer Service auction. Prior to retail access, Unsubscribed
Standard Offer Service shall mean one hundred (100%) percent of
Montaup Electric Company's wholesale power requirements.

ARTICLE 2.    Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 11:59 p.m. on December 31, 2004, unless terminated sooner in accordance with Article 8 or 9.


ARTICLE 3.    Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies.  Supplier shall be responsible for all transmission

and distribution costs associated with the use of transmission
systems outside of NEPOOL and any local point-to-point
transmission charges and distribution charges incurred to deliver
the power to the NEPOOL PTF.

ARTICLE 4.    Estimation of Hourly Loads and Reporting to the
              ISO:

     To meet their NEPOOL obligations, the Companies shall report
to the ISO Supplier's share of hourly Standard Offer Service
load, including distribution and non-PTF losses. In making such
reports, the Companies will estimate Supplier's share of Standard
Offer Service load based on the methods and procedures approved
in Terms and Conditions for Suppliers on file with the P.U.C. and
D.P.U., as amended from time to time, as applicable.

     As required by NEPOOL, the Companies will make all
reasonable efforts to report to the ISO Supplier's hourly share
of Standard Offer Service load by 12:00 noon of the second
following business day.

     As described in the Terms and Conditions for Suppliers, at
the end of each month, the Companies shall aggregate Supplier's
hourly Standard Offer Service loads for the month as reported to
the ISO. The Supplier's aggregate share of Standard Offer
Service, not including losses will be deemed to be the quantity
of Delivered Energy that Supplier provided for that month and is
the unadjusted kWh amount to be used for Billing and Payment as
described in Article 6.

     The Companies will periodically reconcile the Delivered
Energy to actual meter readings of those customers taking
Standard Offer Service, as described in the Terms and Conditions
for Suppliers.  The Companies will apply any resulting billing
adjustment (debit or credit) to Supplier's account no later than
the last day of the third month following the billing month.


ARTICLE 5.    Price:

     For each kilowatt hour of Delivered Energy that Supplier
provides in each month, as determined in accordance with Article
4 and the Terms and Conditions for Suppliers, the Companies shall
pay Supplier the applicable Price for the month in cents per
kilowatt hour calculated as follows:

            Price = Standard Offer Wholesale Price
                  + Fuel Adjustment Factor

     where:    Standard Offer Wholesale Price in cents per
               kilowatt hour is as defined in Article 1 and shown
               in Appendix A, and

               Fuel Adjustment Factor is a cents per kilowatt-
               hour adder based on the incremental revenues
               collected, if any, attributed to the operation of
               the retail Rate Fuel Adjustment mechanism in the

Companies' Standard Offer Service tariffs. The
incremental revenues attributed to the retail Fuel
Adjustment will be fully allocated to
Suppliers in proportion to the Standard Offer
Service energy provided by each Supplier for the
applicable billing month through the Fuel
Adjustment Factor. The retail Fuel Adjustment, and
the resulting Fuel Adjustment Factor to be paid to
Supplier, will be made subject to regulatory
approval and only to the extent that the Companies
are allowed to collect such revenues from their
retail customers taking Standard Offer Service.

> Insert Rider 1

With the exception of any sales or gross receipts taxes
which are required by law to be paid by Standard Offer Service
customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments
applicable as of the date hereof or which may be assessed or
imposed in the future by any governmental authority with
jurisdiction governing the sale of electricity covered by this
Agreement.

ARTICLE 6.    Billing and Payments:

Until reconciled with actual metered data pursuant to the
Terms and Conditions of Suppliers, computations by the Companies
of the charges for the purposes of billings hereunder shall be
based on estimates of Supplier's Delivered Energy in accordance
with Article 4 and the Price as determined in accordance with
Article 5.  The Companies shall calculate the amount payable to
Supplier for a given month on or before the twentieth (20th) day
of the following month. The calculation shall be provided to
Supplier and shall show the total amount due and payable for the
previous month. Each bill shall be subject to adjustment for any
errors in arithmetic computation, estimating, reconciliation
pursuant to the Terms and Conditions of Suppliers or otherwise
only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay
Supplier any amounts due and payable for the Delivered Energy
provided by Supplier in the previous month ("Due Date"). Any
amount remaining unpaid after the Due Date shall bear interest at
the Prime Rate then in effect at the main office of BankBoston,
or such other lending institution as agreed to by Companies and
Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment,
Supplier shall itemize the basis for its dispute in a written
notice to Companies within fifteen days after the Due Date.
Billing and payment disputes shall be handled in accordance with
the provisions of Article 13 of this Agreement.  Upon final
resolution of the dispute, payment of any amount due to a Party
under the terms of the resolution shall be made within thirty
(30) days of the date thereof, together with interest from and
after the original Due Date at the rate specified in this
Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7.    Failure to Deliver:

If the Supplier fails to deliver its share of the Standard Offer Service as identified in Appendix A, the Supplier shall pay the Companies, on the date payment would otherwise be due to Supplier, an amount for each kWh of such deficiency equal to ~~one cent per kWh ($.01/kWh) plus~~ the positive difference, if any, obtained by subtracting the per unit Price established in Article 6, from the per unit Replacement Price.

"Replacement Price" shall mean the price at which the Companies, acting in a commercially reasonable manner, purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and/or NEPOOL charges incurred by the Companies. Absent any such purchase by the Companies, the Replacement Price shall be the market price as determined by the sum of the NEPOOL clearing price charges for energy, capacity, operable capacity, and reserves, as the case maybe, applicable for the amount and period in which Supplier failed to deliver its share of Standard Offer Service.

As a condition of this Agreement and upon execution hereof, the Supplier shall deliver to the Companies a Parent Guarantee, substantially in the form as provided in Appendix B, to secure Supplier's performance under this Article 7 and this Agreement.

ARTICLE 8.    Events of Default, Liability, Relationship of the Companies:

(1)  Unless excused by a Force Majeure as described in Article 10, each of the following events shall be deemed to be an Event of Default hereunder:

> (a)  Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

> (b)  Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(c)  Failure of Supplier to maintain any of the provisions of Parent Guarantee as outlined in Appendix B, and such failure is not cured or rectified within ~~five (5)~~ days after notice thereof from the Companies.

*ten — 10*

(2)  Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default.  In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint.  Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3)  Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for the amounts calculated pursuant to Article 7, regardless of the procedures set forth in Article 13 for the resolution of disputes, the Companies may exercise their rights under the Parent Guarantee. The Parties expressly agree that the amounts set forth in Article 7 do not constitute liquidated damages.  In addition to the amounts established in Article 7, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, and the Companies may pursue any remedies or other damages provided for under law, ~~including indirect, consequential, reliance and incidental~~ damages, and may unconditionally terminate this Agreement by giving at least ~~twenty-five (25)~~ days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice. *( sixty*  *60 )*

ARTICLE 9.    Termination:

In addition to the termination rights provided for an Event of Default as provided in Article 8, the Companies may terminate this Agreement, if:

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; and

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

TCPM007230

In the event that the Companies exercise their rights under this Article 9, Supplier's obligations to provide a Parent Guarantee to the Companies pursuant to Article 7 shall be terminated.

ARTICLE 10.    Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)    The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)    The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)    The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)    The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 11.    Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

ARTICLE 12.    Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 13.    Resolution of Disputes:

Subject to Section 3 of Article 8, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 13 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (c) of Article 8, notice of failure to comply with, observe or perform this Agreement or to maintain the Parent Guarantee under Article 7 to Supplier, and upon failure to cure or rectify by Supplier, exercise their rights under the Parent Guarantee. Supplier,

however, may dispute the exercise by the Companies of their rights under the Parent Guarantee, under this Article 13, after such exercise.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall be provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or

the decision itself, violated the standards required under the
Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The
Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c.
251, § 1 et seq.).


ARTICLE 14.    Interpretation:

     The interpretation and performance of this Agreement shall
be in accordance with and shall be controlled by the laws of the
Commonwealth of Massachusetts, without regard to Massachusetts
conflict of law principles.


ARTICLE 15.    Severability of Provisions:

     Subject to the provisions of Article 14 above, a holding by
any court having jurisdiction that any provision of this
Agreement is invalid or unenforceable shall not result in
invalidation or unenforceability of the entire Agreement but all
remaining terms shall remain in full force and effect.


ARTICLE 16.    Accounts and Records:

     The Companies and Supplier shall keep complete and accurate
records of their operations hereunder and shall maintain such
data for a period of at least two (2) years after final billing.
The Companies and Supplier shall have the right, during normal
business hours, to examine and inspect all such records insofar
as may be necessary for the purpose of ascertaining the
reasonableness and accuracy of all relevant data, estimates or
statement of charges associated with service hereunder.

ARTICLE 17.    Limitations on Liability and Indemnification:

     Each Party agrees to indemnify, defend, and hold the other
Party (including the other Party's affiliated companies,
trustees, directors, board members, officers, employees, and
agents) harmless from and against any and all damages, costs,
claims, liabilities, actions or proceedings arising from or
claimed to have arisen from the acts or omissions of the
indemnifying Party's employees or agents, unless caused by an act
of negligence or willful misconduct by the Party (including the
Party's affiliated companies, trustees, directors, board members,
officers, employees or agents).

     The Parties hereby waive and release the other Party as well
as the other Party's affiliated companies, trustees, directors,
officers, employees, and agents from any liability, claim, or
action arising from damage to its property due to the performance
of this Agreement.

ARTICLE 18.    <u>Regulation</u>:

(a)  This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, <u>provided</u>, <u>however</u>, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)  This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 19.    <u>Notices</u>:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

<u>To Companies</u>:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

<u>To Supplier</u>:
TransCanada Power Marketing Ltd.
3400, 237 - 4th Avenue S.W.
Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.

**TCPM007235**

ARTICLE 20.    <u>Miscellaneous</u>:

(a)  Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)  Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)  Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)  This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)  Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)  Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)  Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

TCPM007236

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:    TransCanada Power Marketing Ltd.

By:_____

By: _____

On Behalf of the Companies:

Blackstone:    BLACKSTONE VALLEY ELECTRIC COMPANY

By:_____

Eastern:    EASTERN EDISON COMPANY

By:_____

Newport:    NEWPORT ELECTRIC CORPORATION

By:_____

TCPM007237

APPENDIX A

SCHEDULE OF SUPPLIER'S SHARE of STANDARD OFFER SERVICE
AND
STANDARD OFFER WHOLESALE PRICE

TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent (PSTD) | Standard Offer Wholesale Price |
|---|---|---|
| 1998 | | 3.2 cents/kWh |
| 1999 | | 3.5 cents/kWh |
| 2000 | | 3.8 cents/kWh |
| 2001 | | 3.8 cents/kWh |
| 2002 | | 4.2 cents/kWh |
| 2003 | | 4.7 cents/kWh |
| 2004 | | 5.1 cents/kWh |

Option To Reduce Suppliers Share

With 30 days written notice, the Companies may reduce Supplier's percentage share of Standard Offer Service shown above; provided however, that once the Companies have elected to reduce Supplier's share of Standard Offer Service, such percentage share cannot be increased. The Companies may exercise this option to reduce Supplier's percentage share of Standard Offer Service as frequently as it deems necessary.

TCPM007238

<u>EXHIBIT B</u>

<u>TO ASSET PURCHASE AGREEMENT</u>

FORM OF INSTRUMENT OF
ASSIGNMENT AND ASSUMPTION

Instrument of Assignment and Assumption (this "Agreement") made, executed and delivered on this day of _____, by and between TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "Buyer") and MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "Seller").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of _____, 1997 (as amended, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), by and between the Seller and the Buyer, the Seller is concurrently herewith selling, assigning, conveying, transferring and delivering to the Buyer the Purchased Assets (as defined in the Asset Purchase Agreement); and

WHEREAS, the Asset Purchase Agreement requires that the Seller assign all of its right, title and interest in, and that the Buyer assume all liabilities and obligations of the Seller under, the PPA (as defined in the Asset Purchase Agreement);

NOW THEREFORE, in good consideration of these premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Seller and the Buyer agree as follows:

1.       Capitalized terms which are used in this Agreement but are not defined in this Agreement shall have the meaning ascribed to such terms in the Asset Purchase Agreement.

2.       The Seller hereby assigns, transfers and sets over to the Buyer all of the Seller's rights, title and interest in and to the PPA . The assignment effected pursuant to this Section 2 shall be without recourse to and without representation or warranty by the Seller except as specifically provided in the Asset Purchase Agreement.

3.       The Buyer hereby assumes and agrees to pay, perform or discharge in accordance with their terms, to the extent not heretofore paid, performed or discharged, all liabilities and obligations of the Seller under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

4.    It is understood and agreed that nothing in this Agreement shall constitute a waiver or release of any claims arising out of the contractual relationships between the Seller and the Buyer.

5.    This Agreement shall inure to the benefit and be enforceable against the respective successors and assigns of the Seller and the Buyer.

6.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws).

7.    This Agreement is delivered pursuant to and is subject to the Asset Purchase Agreement. In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall prevail.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the respective duly authorized officers of the Seller and the Buyer as of the date first above written.

TRANSCANADA POWER MARKETING LTD.


By_____
    Name:
    Title:


By_____
    Name:
    Title:


MONTAUP ELECTRIC COMPANY


By_____
    Name:
    Title:


J:\DATA\CLI\84\31584\064\ASSPURCH.OS

EXHIBIT C
TO ASSET PURCHASE AGREEMENT

PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of _____, 1997 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller") to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of _____, 1997 (the "APA"), by and between Seller and Asset Purchaser.

1.  The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:

    | Date    | Power Supplier                    |
    |---------|-----------------------------------|
    | 5/14/86 | Ocean State Power  (Montaup)       |
    | 9/28/88 | Ocean State Power II (Montaup)     |
    | 5/14/86 | Ocean State Power  (Montaup)       |
    | 7/12/88 | Ocean State Power II (Montaup)     |

1.  A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.  This Agreement shall become effective on the date of its execution and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List, and Seller has made payment to Asset Purchaser of amounts owned pursuant to Section 8 below, for the last month in which such a payment is due.

3.  Commencing as of the effective date of this Agreement, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

4.  (a) Commencing as of the month following the effective date of this Agreement, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below. In turn, each month, Seller shall timely pay each Power Seller an amount equal to all amounts properly due to a Power Seller for the preceding month under each Commitment. For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month. Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

(b) Upon the effective date of this Agreement, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or at the termination of this Agreement pay to Asset Purchaser any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the effective date which relate to billing errors or reconciliations of pre-effective date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the effective date that are attributable to a period prior to the effective date.

5.  (a) Effective as of the effective date of this Agreement, Seller hereby irrevocably and unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment. Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments. Seller shall not unreasonably without such consent.

(b) Seller shall not agree to any amendment to or waiver of rights under a Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of the Section 5.

( this

J:\DATA\CLI\84\31584\064\ASSPURCH.OS              2

TCPM007242

6.    Each party shall be entitled to indemnification under this Agreement to the extent and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.    (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation. _any Novation_

(b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, _will_ as a condition of assignment, the Asset Purchaser may require either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or (ii) security interest to the Asset Purchaser in a portion to the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is reasonably acceptable to the Asset Purchaser. _entirely reasonably_

8.    a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed of this Agreement, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

(b) Commencing as of the month following the effective date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth in Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c)) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b)) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month.

*( a Novation is executed with respect to a Commitment )*

(d)  To the extent that ~~an amendment and assignment is executed,~~ pursuant to Section 7, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller ~~to settle such difference and~~ to reduce the amount of Seller's retained obligation set forth in Section 8(b). *and Asset Purchaser elects to receive a lump sum payment* Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by ~~such parties. If a Commitment is amended~~ ~~and assigned pursuant to Section 7 above and as part of such amendment and assignment~~ ~~Seller agrees to make a lump-sum payment to Asset Purchaser or the Power Seller, Seller and~~ ~~Asset Purchaser agree to amend this agreement to equitably reduce the amount of Seller's~~ ~~retained obligation set forth in Section 8(b) by an amount to be negotiated in good faith by~~ ~~such parties.~~ *Asset Purchaser and Seller.* *This is the same as the first sentence.*

9.    This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10.    This Agreement, the APA and any other agreement entered into by the parties pursuant to the APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only by a written agreement signed by the parties. Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing, (i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned subsidiary (direct or indirect) of TransCanada PipeLines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to Asset Purchaser shall thereafter be deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the

*It is the intention of the parties that the lump sum payment shall be based on the amounts set out in Schedule "A" attached hereto, and in any event shall be no less than ...*

Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refinancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof; provided, however, that no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyance, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11.     All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such payment.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____
    Name:
    Title:

TRANSCANADA POWER MARKETING LTD.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

TCPM007245

SCHEDULE "A"

MONTHLY SUPPORT PAYMENTS

For each month, beginning with the Effective Day (prorated in accordance with Section 8(a) of
the PPTA), if applicable, the Monthly Support Payment shall be as set out below:

| Calendar Year | Monthly Support Payment |
|---|---|
| 1999 | $ 1,650,000 |
| 2000 | $1,650,000 |
| 2001 | $1,542,000 |
| 2002 | $1,542,000 |
| 2003 | $  870,000 |
| 2004 | $  870,000 |
| 2005 | $  870,000 |
| 2006 | $  870,000 |
| 2007 | $  870,000 |

*See letter*

J:\DATA\CLN84\31584\064\ASSPURCH.OS

TCPM007246

SCHEDULE 1.1(a)

PPA Description

"PPA" means, collectively, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated May 14, 1986, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated September 28, 1988, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement for the Sale of Unit Capacity and Energy From Ocean State Power Project to Newport Electric Corporation, dated May 14, 1986, by and between Ocean State Power and Newport Electric Corporation and the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power Project to Newport Electric Corporation, dated July 12, 1988, by and between Ocean State Power and Newport Electric Corporation, in each case as amended, modified or supplemented.

J:\DATA\CLN84\31584\064\ASSPURCH.OS

## SCHEDULE 5.3(a)

### Seller Notices and Approvals

Indenture

    Approvals as may be required under the Indenture.

PPA

    Approvals as may be required under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM007248

SCHEDULE 5.3(b)

Seller Required Regulatory Approvals

(i) Any required approvals under the Federal Power Act, (ii) (A) notice by the Seller to, and an order by, the MDPU approving the transactions contemplated by this Agreement, (B) the approval by the RIPUC of the market valuation "implementation methodology" filed in RIPUC Docket 25-92, pursuant to section 39-1-27.4(g) of the Rhode Island General Laws, (C) the approval by the RIPUC of the "Transfer Plan" filed in RIPUC Docket 25-14, pursuant to section 39-1-27(a) of the Rhode Island General Laws, (D) the approval, if required, of the Rhode Island Division of Public Utilities and Carriers, (E) the approval, if required, of the Rhode Island Energy Facilities Sitting Board, (F) if required, notice by the Seller to, and an order by, each of the NHPUC, the VTPSB, the Maine Public Utilities Commission and the Connecticut Department of Public Utility Control approving the sale of the Purchased Assets, (iii) the approval, if required, of the SEC pursuant to the Holding Company Act, (iv) the filings, if required by the Seller and the Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act, and (v) the approval, if required, of the Nuclear Regulatory Commission (the "NRC").

TCPM007249

## SCHEDULE 5.4

<u>Exceptions to Seller's Title to the PPA</u>

None.

TCPM007250

## SCHEDULE 5.5(a)

### Exceptions to the Full Force and Effect of and the Transferability of the PPA

Transferability may be subject to the approval of the counterparties to the PPA and lenders thereto.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

**SCHEDULE 5.5(b)**

<u>Defaults under the PPA</u>

None.

J:\DATA\CLN84\31584\064\ASSPURCH.OS

TCPM007252

## SCHEDULE 6.3(a)

### Buyer Notices and Approvals

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM007253

**SCHEDULE 6.3(b)**

<u>Buyer Required Regulatory Approvals</u>

Any approvals required under the Federal Power Act.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

SCHEDULE 6.4

Buyer Regulation as a Utility

The Buyer is a public utility holding company exempt
from registration under the Holding Company Act.

J:\DATA\CLN\84\31584\064\ASSPURCH.OS

TCPM007255