UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
                                                )
TRANSCANADA POWER  MARKETING LTD.,              )
                                                )
                        Plaintiff,              )
                                                )
            v.                                  )        C.A. No. 05-40076FDS
                                                )
                                                )
NARRAGANSETT ELECTRIC COMPANY,                  )
                                                )
                        Defendant.              )
_____)

**SUPPLEMENTAL DOCUMENT APPENDIX**
**Part III**

# Tab 45

03/30/98   13:28   FAX 403 213 3550          TCEM LAW DEPT                          ☒001

```
*****************************
***   ACTIVITY REPORT   ***
*****************************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO. | 4934 |
| TTI | TCEM LAW DEPT |
| CONNECTION TEL | 915085596125 |
| CONNECTION ID | |
| START TIME | 03/30 13:27 |
| USAGE TIME | 00'44 |
| PAGES | 2 |
| RESULT | OK |

EXHIBIT
59
PENGAD 800-631-6989

# TRANSCANADA ENERGY LTD.

3400, 237 - 4th AVENUE S.W.
CALGARY, ALBERTA  T2P 5A4
TEL: (403) 213-3100
FAX: (403) 213-3550
TELEX: 03-825531

Received from telecopier no.:
(403) 213-3550
If problems occur with transmission,
please call (403) 213-3632

Date:   March 30, 1998

## TO:

COMPANY NAME: _____

ATTENTION:        Mike Hirsch_____

TELECOPIER NUMBER:    508-559-6125_____

NUMBER OF PAGES
INCLUSIVE OF THIS PAGE:    Two (2)_____

RE:    Rider 1_____

As Requested.

TCPM 000624

Rider1

In the event that the Price increases as a result of the decision of any regulatory body having jurisdiction over Standard Offer Service, such increase shall be paid to Supplier by the Companies.

**Tab 46-1**

APR. -01' 98 (WED) 17:19



EXHIBIT
56

PERIOD 800-631-6989

P. 001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02370
508-559-2000
FAX: 508 559-6125

Sean Memaster

To: Alexander Pourbaix    Date: 4/1/98

Fax #: _____    Pages: 46
(including cover page)

From: M. Hirsh

Subject: Closing Documents

COMMENTS:

Backstop Agreement (renamed Wholesale Standard Offer Agreement) to follow. mph

ANY PROBLEMS OR QUESTIONS, PLEASE CALL M. Hirsh

AT (508) 559-2000, ext. 3101

Part II

TCPM007257

APR. -01' 98 (WED) 17:33                                                    P. 001

# FAX TRANSMISSION

**EUA SERVICE CORPORATION**
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-580-8125

Sean McMaster

To: Alexander Pourbaix          Date: 4/1/98

Fax #: _____          Pages: 46
                                (Including cover page)

From: M. Hirsh

Subject: Closing Documents

COMMENTS:

Backstop Agreement (renewed
Wholesale Standard Offer Agreement)
to follow.

ANY PROBLEMS OR QUESTIONS, PLEASE CALL: M. Hirsh

AT (508) 559-2000, ext. 3101

Part II

TCPM007258

APR. -01' 98(WED) 17:19     P. 002

ASSET PURCHASE AGREEMENT

BY AND AMONG

MONTAUP ELECTRIC COMPANY

AND

TRANSCANADA POWER MARKETING LTD.

_____, 1998

H:\DATA\CLN84\015\84\064\ASSPURCH.05

TCPM007259

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of _____, 1998?, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "*Seller*"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "*Buyer*").

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell, the Purchased Assets upon the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

**REDACTED**

## ARTICLE I

## DEFINITIONS

1.1 *Definitions*. (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

(1)    "*Affiliate*" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(2)    "*Ancillary Agreements*" mean the Backstop Wholesale Standard Offer Agreement, the Instrument of Assignment and Assumption and the PPA Transfer Agreement.

(3)    "*Back-Stop Wholesale Standard Offer Agreement*" means the Backstop Wholesale Standard Offer Agreement between the Retail Companies and the Buyer, substantially in the form of Exhibit A hereto, relating to Standard Offer Service.

(4)    "*Business Day*" means any day other than Saturday, Sunday and any day which is a legal holiday or a day on which banking institutions in Boston, Massachusetts are authorized by law or other governmental action to close.

(5)    "*Buyer Representatives*" means the Buyer's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

(6)    "*Code*" means the Internal Revenue Code of 1986, as amended.

I:\DATA\CLI\84\31584\064\ASSPURCH.0S          2

(7)    *"Confidentiality Agreement"* means the Confidentiality Agreement, among the Seller, Blackstone Valley Electric Company, Newport Electric Corporation, Eastern Utilities Associates and TransCanada Energy Ltd.

(8)    *"Encumbrances"* means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

(9)    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

(10)    *"Federal Power Act"* means the Federal Power Act of 1935, as amended.

(11)    *"FERC"* means the Federal Energy Regulatory Commission.

(12)    *"Holding Company Act"* means the Public Utility Holding Company Act of 1935, as amended.

(13)    *"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(14)    *"Indenture"* means the Brockton Edison Company Indenture of First Mortgage and Deed of Trust dated as of September 1, 1948, as supplemented and modified.    **REDACTED**

(15)    *"Instrument of Assignment and Assumption"* means the Instrument of Assignment and Assumption substantially in the form attached as of Exhibit B hereto relating to the assignment by the Seller and the assumption by the Buyer of all of the rights, title, interests, liabilities and obligations of the Seller, in, to and under the PPA.

(16)    *"Material Adverse Effect"* means any change in or effect on the Purchased Assets after the date of this Agreement that is materially adverse to the Purchased Assets, taken as a whole, other than (i) any change or effect resulting from changes in the international, national, regional or local wholesale or retail markets for electric power, (ii) any change or effect resulting from changes in the international, national, regional or local markets for any fuel utilized in connection with the Purchased Assets, (iii) any change or effect resulting from changes in the North American, national, regional or local electric transmission systems and (iv) any materially adverse change in or effect on the Purchased Assets which is cured (including by the payment of money) by the Seller before the Termination Date.

(17)    *"MDTE"* *"MDPU"* means the Massachusetts Department of Telecommunications and Energy (formerly the Department of Public Utilities.)

(18)    *"NHPUC"* means the New Hampshire Public Utility Commission.

(19)   *Permitted Encumbrances* means (i) any Encumbrances not created by the Seller or resulting from actions by or against the Seller; (ii) all exceptions, restrictions, easements, charges, rights of way and monetary and non-monetary encumbrances which are matters of record or are set forth in an applicable FERC project license, except for such encumbrances which secure indebtedness; (iii) with respect to any date before the Closing Date, Encumbrances created by the Indenture; (iv) statutory liens for current taxes or assessments not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (v) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Seller or the validity of which are being contested in good faith by appropriate proceedings; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations by governmental authorities; and (vii) such other liens, imperfections in or failure of title, charges, easements, restrictions and encumbrances which do not, in any material respect, affect the Buyer's rights under the Purchased Assets.

(20)   *Person* means any individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization and a governmental entity or any department or agency thereof.

**REDACTED**

(21)   *PPA* means the agreement, or, if more than one agreement, means collectively, the agreements listed on Schedule 1.1(a) hereto.

(22)   *PPA Transfer Agreement* means the PPA Transfer Agreement, between the Seller and the Buyer, substantially in the form of attached as Exhibit C hereto.

(23)   *Purchased Assets* means all right, title and interests of the Seller in and to and all liabilities and obligations of the Seller under the PPA.

(24)   *Retail Companies* means, as applicable, each, any or all of Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation.

(25)   *RIPUC* means the Rhode Island Public Utilities Commission.

(26)   *SEC* means the Securities and Exchange Commission.

(27)   *Securities Act* means the Securities Act of 1933, as amended.

(28)   *Standard Offer Service* means the electric service, if any, required to be provided by one or more of the Retail Companies to its retail customers who do not elect to purchase electricity from an alternative supplier in the market.

(29)   *Taxes* means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority,

I:\DATA\CLIX4\3315B4\064\ASSPURCH.OS              4

TCPM007262

including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions attributable thereto.

(30)    *"VTPSB"* means the Vermont Public Service Board.

(b)    Each of the following terms has the meaning specified in the Section set forth opposite such term:

| Term | Section | |
|---|---|---|
| Buyer | Recitals | |
| Buyer Required Regulatory Approvals | 6.3(b) | REDACTED |
| Closing | 4.1 | |
| Closing Conditions | 4.1 | |
| Closing Date | 4.1 | |
| Direct Claim | 9.2(c) | |
| Effective Date | 4.1 | |
| Final Order | 8.1(c) | |
| Indemnifiable Loss | 9.1(a) | |
| Indemnifying Party | 9.1(d) | |
| Indemnitee | 9.1(c) | |
| Permits | 5.18 | |
| Purchase Price | 3.1 | |
| Seller | Recitals | |
| Seller Required Regulatory Approvals | 5.3(b) | |
| Termination Date | 10.1(b) | |
| Third Party Claim | 9.2(a) | |

TCPM007263

## ARTICLE II

### PURCHASE AND SALE

2.1 *The Sale*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), the Purchased Assets.

## ARTICLE III

### PURCHASE PRICE

3.1 *Purchase Price*. The purchase price for the Purchased Assets shall be one dollar and other good and valuable consideration (the "Purchase Price").

## ARTICLE IV

### THE CLOSING

4.1 *Time and Place of Closing*. Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement (the *"Closing Conditions"*), the closing of the sale of the Purchased Assets contemplated by this Agreement (the *"Closing"*) will take place at the offices of McDermott, Will & Emery, 75 State Street, Suite 1700, Boston, MA 02109-1807 at 10:00 A.M. (local time) on such date as the parties may agree, which date is as soon as practicable, but no later than fifteen (15) Business Days, following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the parties may agree. The date and time at which the Closing actually occurs is hereinafter referred to as the *"Closing Date."* The Ancillary Agreements will become effective at midnight on the last day of the month following the closing date (the *"Effective Date"*), but in no event earlier than midnight on December 31, 1998.

**REDACTED**

4.2 *Payment of Purchase Price*. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Purchased Assets, the Buyer will pay or cause to be paid to the Seller at the Closing the Purchase Price.

4.3 *Deliveries by Seller*. At the Closing, the Seller will deliver to the Buyer the following items:

J:\DATA\CLI\84315\4060\ASSPURCH.OS                6

TCPM007264

(a) The Instrument of Assignment and Assumption, duly executed by the Seller;

(b) All consents, waivers or approvals obtained by the Seller with respect to the Purchased Assets or the consummation of the transactions connected to the sale of the Purchased Assets, as the case may be, contemplated by this Agreement, to the extent specifically required hereunder;

(c) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Seller;

(d) An opinion of counsel and certificates (as contemplated by Section 8.2) with respect to the Purchased Assets; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Buyer and its counsel, in connection herewith.

4.4 *Deliveries by the Buyer*.  At the Closing, the Buyer will deliver to the Seller the following items:

(a) The Purchase Price by wire transfer of immediately available funds or such other means as are agreed upon by the Seller and the Buyer;

(b) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Buyer;

(c) An opinion of counsel and certificates (as contemplated by Section 8.3) with respect to the Purchased Assets;

(d) The Instrument of Assignment and Assumption, duly executed by the Buyer; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Seller and its counsel, in connection herewith.

4.5 *Backstop Wholesale Standard Offer Agreement*.  In the event Unsubscribed Standard Offer Service (as defined in the Backstop Wholesale Standard Offer Agreement) shall be zero on the Closing Date, neither the Seller nor the Buyer shall be required to execute and deliver the Backstop Wholesale Standard Offer Agreement at the Closing.

H:\DATA\CLI\84315841064\ASSPURCH.OS                7

REDACTED

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows:

5.1. *Organization; Qualification.* The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller is duly qualified or licensed to do business as foreign corporation and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The Seller has heretofore delivered to the Buyer complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents as currently in effect).

5.2. *Authority Relative to this Agreement.* The Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby. This Agreement and the Ancillary Agreements have been duly and validly executed and delivered by the Seller, and assuming that this Agreement and the Ancillary Agreements constitute valid and binding agreements of the Buyer, subject to the receipt of the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, constitute valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

5.3. *Consents and Approvals; No Violation.* (a) Except for such notices or approvals set forth on Schedule 5.3(a), and other than obtaining the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, neither the execution and delivery of this Agreement and the Ancillary Agreements by the Seller nor the sale by the Seller of the Purchased Assets pursuant to this Agreement and the Ancillary Agreements will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Seller, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except (x) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not in any material respect affect the Buyer's rights under the Purchased Assets or (y) for those requirements which become applicable to the Seller as a result of the

H:\DATA\CLI\8403158\064\ASSPURCH.OS            8

specific regulatory status of the Buyer (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which the Buyer (or any of its Affiliates) is or proposes to be engaged; (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller, or any of the Purchased Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which, in the aggregate, would in any material real respect affect the Buyer's rights under the Purchased Assets, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation would in any material material respect affect the Buyer's rights under the Purchased Assets.

(b) Except for such notices or approvals set forth on Schedule 5.3(b) (the "Seller Required Regulatory Approvals"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Seller of the transactions contemplated hereby, other than such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, will not, in the aggregate, in any material material respect affect the Buyer's rights under the Purchased Assets.

**REDACTED**

5.4. *Title and Related Matters*. Except as set forth in Schedule 5.4 and except for Permitted Encumbrances, the Seller has good and valid title to the Purchased Assets, free and clear of all Encumbrances.

5.5. *The PPA*. (a) Except as disclosed in Schedule 5.5(a), the PPA (i) constitutes a valid and binding obligation of the Seller and to the best knowledge of the Seller constitutes a valid and binding obligation of the other parties thereto, (ii) is in full force and effect, and (iii) may be transferred to the Buyer pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder.

(b) Except as set forth in Schedule 5.5(b), there is not, under the PPA, any default or event which, with notice or lapse of time or both, would constitute a default on the part of the Seller.

5.6. *Litigation*. There are no claims, actions, proceedings pending against the Seller, or to the knowledge of Seller, threatened, against the Seller or its Affiliates relating to the Purchased Assets or any such claims, actions or proceedings, the subject matter of which is the Purchased Assets.

**REDACTED**

I:\DATA\CLN84\31584\060\ASSPURCH.05                9

TCPM007267

## ARTICLE VI

### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

6.1. *Organization.* The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted. The Buyer has heretofore delivered to the Seller complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents), as currently in effect.

6.2. *Authority Relative to this Agreement.* The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Seller, subject to the receipt of the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

6.3. *Consents and Approvals; No Violation.* (a) Except as set forth in Schedule 6.3(a), and other than obtaining the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets pursuant to this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except for the failure of which to obtain or make would not materially affect the Buyer's ability to perform its obligations under this Agreement, or (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer or any of its subsidiaries is a party or by which any of their respective assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not materially affect the Buyer's ability to perform its obligations under this Agreement.

H:\DATA\CT.RR4\315BAD6A\ASSPURCH.O8    10

TCPM007268

(b) Except as set forth in Schedule 6.3(b) (the filings and approvals referred to in Schedule 6.3(b) are collectively referred to as the *"Buyer Required Regulatory Approvals"*), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Buyer of the transactions contemplated hereby.

6.4. *Regulation as a Utility.* The Buyer is a public utility holding company, exempt from registration, under the Holding Company Act.

## ARTICLE VII

## COVENANTS OF THE PARTIES

7.1. *Conduct of Business of the Company.* During the period from the date of this Agreement to the Closing Date, the Seller will conduct its business with respect to the Purchased Assets according to its ordinary and usual course of business consistent with good industry practice and will not amend (or waive any rights under) the PPA without the Buyer's prior written consent or take any action or fail to take any action that would result in a material break breach of the Seller's obligations under the PPA.

| REDACTED

7.2. *Access to Information.* (a) Between the date of this Agreement and the Closing Date, the Seller will, during ordinary business hours and upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books and records of the Seller relating to the Purchased Assets; (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request; and (iii) furnish the Buyer, at the Buyer's expense, with such financial and operating data and other information with respect to the Purchased Assets in the Seller's possession as the Buyer may from time to time reasonably request; *provided, however,* that (A) the Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (B) the Seller need not supply the Buyer with any information which the Seller is under a legal obligation not to supply.

(b) All information furnished to or obtained by the Buyer and the Buyer Representatives pursuant to this Section 7.2 shall be subject to the provisions of the Confidentiality Agreement.

7.3. *Expenses.* Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

7.4. *Further Assurances.* (a) Subject to the terms and conditions of this Agreement, each of the parties hereto will use its reasonable commercial efforts to take, or cause

J:\DATA\CLI\843\15844066\ASSPURCH.OS        11

to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets pursuant to this Agreement.

(b) Subject to the PPA Transfer Agreement, to the extent that the Seller's rights, title, interests, liabilities and obligations under the PPA may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Seller, at its expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. The Seller and the Buyer agree that if any consent to an assignment of the PPA shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights and obligations under the PPA so that the Buyer would not in effect acquire the benefit of all such rights and obligations, the Seller, to the maximum extent permitted by law and the PPA, shall at the Closing and pursuant to the PPA Transfer Agreement, appoint the Buyer to be the Seller's agent with respect to the PPA, and the Seller shall, to the maximum extent permitted by law and the PPA, enter into such reasonable arrangements with the Buyer as are necessary to provide the Buyer with the benefits and obligations of the PPA. The Seller and the Buyer shall cooperate and shall each use their commercially reasonable efforts after the Closing to obtain an assignment of the PPA to the Buyer.

7.5. _Public Statements._ The parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law and except that the parties may make public announcements, statements or other disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of "Proprietary Information" (as defined in the Confidentiality Agreement).

7.6. _Consents and Approvals._ (a) The Seller and the Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice the notifications, if any, required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The parties shall consult with each other as to the appropriate time of filing such notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by either of such agencies, and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after each date of filing.

(b) The Seller and the Buyer shall cooperate with each other and (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, necessary or advisable to consummate the transactions contemplated by this Agreement

J:\DATA\CLR\84\3158\064\ASSPURCH.OS                12

(including, without limitation, the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which the Seller or the Buyer is a party or by which any of them is bound. The Seller shall have the right to review and approve (in its reasonable discretion) in advance all characterizations of the information relating to Purchased Assets, and each of the Seller and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with the transactions contemplated hereby.

7.7. *Fees and Commissions*. The Seller and the Buyer each represent and warrant to the other on its own behalf that no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transaction contemplated hereby by reason of any action taken by the party making such representation. The Seller and the Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees (including the fees described above) incurred by reason of any action taken by such party.

7.8. *Tax Matters*. All transfer and sales taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Buyer, and the Buyer, at its own expense, will file, to the extent required by applicable law, all necessary tax returns and other documentation with respect to all such transfer or sales taxes, and, if required by applicable law, the Seller will join in the execution of any such tax returns or other documentation. Prior to the Closing Date, the Buyer will provide to the Seller, to the extent possible, an appropriate certificate of no tax due from any applicable taxing authorities.

## ARTICLE VIII

## PURCHASED ASSETS CLOSING CONDITIONS

8.1. *Conditions to Each Party's Obligations to Effect the Purchase Transactions*. The respective obligations of each party to effect the sale of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a) If applicable, the waiting period under the HSR Act applicable to the consummation of the sale of the Purchased Assets contemplated hereby shall have expired or been terminated;

(b) No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of the Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable best efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall

J:\DATA\CLR\8431\586\060\ASSPURCH.DS    13

TCPM007271

have been enacted by any state or federal government or governmental agency in the United States which prohibits the consummation of the sale of the Purchased Assets;

(c) All material federal, state and local government consents and approvals required for the consummation of the sale of the Purchased Assets, including, without limitation, the Seller Required Regulatory Approvals applicable to the sale of the Purchased Assets and the Buyer Required Regulatory Approvals applicable to the sale of the Purchased Assets, shall have been obtained or and become Final Orders (a *Final Order* means a final order after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending)) with such terms and conditions as shall have been imposed by the governmental entity issuing such Final Order; and

**REDACTED**

(d) All consents and approvals for the consummation of the sale of the Purchased Assets contemplated hereby required under the terms of any note, bond, mortgage, indenture, contract or other agreement to which the Seller or the Buyer, or any of their subsidiaries, are a party shall have been obtained, other than those (i) which if not obtained, would not, in the aggregate, have a Material Adverse Effect, or (ii) which are governed by the PPA Transfer Agreement.

8.2. _Conditions to Obligations of the Buyer_. The obligation of the Buyer to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions.

(a) There shall not have occurred and be continuing a Material Adverse Effect;

(b) The Seller shall have performed and complied with in all material respects the covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed and complied with by the Seller on or prior to the Closing Date, and the representations and warranties of the Seller which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) There shall be no Encumbrances on the Purchased Assets by virtue of the Indenture or otherwise, except for Permitted Encumbrances;

(d) The Buyer shall have received certificates from authorized officers of the Seller, dated the Closing Date, to the effect that, to the best of such officers' knowledge, the conditions set forth in Sections 8.2(a), (b) and (c) have been satisfied;

(e) The Buyer shall have received an opinion from McDermott, Will & Emery, counsel for the Seller, dated the Closing Date and satisfactory in form and substance to the Buyer and its counsel, substantially to the effect that:

H:\DATA\CLIM\1584\066\ASSPURCH.05            14

TCPM007272

(1) the Seller is a corporation organized, existing and in good standing under the laws of its state of incorporation and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Seller;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Seller and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals are obtained) are valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller will not constitute a violation of the Certificates of Incorporation or Bylaws (or similar governing documents), as in effect on the Closing Date, of the Seller;

(4) the Bill of Sale and other documents described in Section 4.3 are in proper form to transfer to the Buyer title to the Purchased Assets; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Seller of the Closing other than (i) the Seller Required Regulatory Approvals, all of such Seller Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority. and (ii) such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, would not, in the aggregate have a Material Adverse Effect.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States or the laws of Massachusetts, such counsel may rely upon opinions of counsel admitted in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of fact upon certificates furnished by the Seller and appropriate officers and directors of the Seller and by public officials.

**8.3.  _Conditions to Obligations of the Seller_**  The obligation of the Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

J:\DATA\CLR04\315R4\06\ASSPURCH.05                    15

TCPM007273

(a) The Buyer shall have performed in all material respects its covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed on or prior to the Closing Date;

(b) The representations and warranties of the Buyer which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) The Seller shall have received a certificate from an authorized officer of the Buyer, dated the Closing Date, to the effect that, to the best of such officer's knowledge, the conditions set forth in Sections 8.3(a) and (b) have been satisfied;

(d) The FERC shall have approved the Stipulations and Agreements filed in FERC Docket No. ER97-3127-000 by and between the Office of the Attorney General of Massachusetts, the Division of Energy Resources, Edison Electric Company and the Seller, dated October 29, 1997; Docket No. ER97-2800-000 by and between the RIPUC, the Rhode Island Division of Public Utilities and Carriers, Blackstone Electric Company, the Seller and Newport Electric Corporation; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Pascoag Fire District of Rhode Island; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Gas and Electric Department of the Town of Middleborough; and Docket No. ER97-2338-000 between the Seller and the Taunton Municipal Lighting Plant, Pascoag Fire District of Rhode Island and the Gas and Electric Department of the Town of Middleborough; and said Stipulations and Agreements shall be and shall continue to be in full force and effect; Stipulations and Agreements shall be and shall continue to be in full force and effect; and

(e) The Seller shall have received an opinion from Shearman & Sterling, counsel for the Buyer (or other counsel reasonably satisfactory to Seller), dated the Closing Date and satisfactory in form and substance to the Seller and its counsel, substantially to the effect that:

(1) the Buyer is a corporation organized, existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Buyer;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Buyer and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approval are obtained) are valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their terms,

H:\DATA\CLI\84\31584\064\ASSPURCH.OS    16

TCPM007274

except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Buyer will not constitute a violation of the Certificate of Incorporation or Bylaws on the Closing Date (or other similar governing documents), as in effect, of the Buyer;

(4) the Instrument of Assignment and Assumption and other instruments described in Section 4.4 are in proper form for the Buyer to assume the Assumed Liabilities; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Buyer at the Closing other than the Buyer Required Regulatory Approvals, all of such Buyer Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States and the laws of New York, such counsel may rely upon opinions of counsel admitted to practices in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of facts upon certificates furnished by appropriate officers and directors of the Buyer and its subsidiaries and by public officials.

## ARTICLE IX

### INDEMNIFICATION

9.1. *Indemnification.* (a) The Seller will indemnify, defend and hold harmless the Buyer from and against any and all claims, demands or suits (by any Person), losses, liabilities, damages (including consequential or special damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance that is actually recovered (each, an *"Indemnifiable Loss"*), asserted against or suffered by the Buyer relating to, resulting from or arising out of (i) any breach by the Seller of any representation, warranty, covenant or agreement of the Seller contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(b) The Buyer will indemnify, defend and hold harmless the Seller from and against any and all Indemnifiable Losses asserted against or suffered by the Seller relating to,

K:\DATA\CLR\04315R4\0G0\ASSPURCH.OS    17

TCPM007275

resulting from or arising out of (i) any breach by the Buyer of any representation, warranty, covenant or agreement of the Buyer contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(c) Any Person entitled to receive indemnification under this Agreement (an "*Indemnitee*") having a claim under these indemnification provisions shall make a good faith effort to recover all losses, damages, costs and expenses from insurers of such Indemnitee under applicable insurance policies so as to reduce the amount of any Indemnifiable Loss hereunder. The amount of any Indemnifiable Loss shall be reduced (i) to the extent that Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss (after taking into account the costs incurred in collecting such insurance and any reasonable likely increase in premiums resulting from such claim) and (ii) to take into account any net Tax benefit actually recognized by the Indemnitee arising from the recognition of the Indemnifiable Loss and any payment actually received with respect to an Indemnifiable Loss.

(d) The expiration, termination or extinguishment of any covenant or agreement shall not affect the parties' obligations under this Section 9.1 if the Indemnitee provided the Person required to provide indemnification under this Agreement (the "*Indemnifying Party*") with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

(e) Except in the case of fraud and intentional breaches of this Agreement, the rights and remedies of the Seller and the Buyer under this Article IX are exclusive and in lieu of any and all other rights and remedies which the Seller and the Buyer may have under this Agreement or otherwise for monetary relief with respect to (i) any breach or failure to perform any covenant or agreement set forth in this Agreement or (ii) any relationship resulting from the PPA Transfer Agreement.

9.2. *Defense of Claims.* (a) If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any Person who is not a party to this Agreement or any Affiliate of a party to this Agreement (a "*Third Party Claim*") with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than twenty (20) calendar days after the Indemnitee's receipt of notice of such Third Party Claim. Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, and the Indemnitee will cooperate in good faith in such defense at such Indemnitee's own expense.

(b) If within ten (10) calendar days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claim the Indemnitee receives written notice from the

J:\DATA\CLI\84\371584\004\ASSPURCH.OS    18

TCPM007276

Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in the last sentence of Section 9.2(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof, provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable expenses thereof. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) calendar days after its receipt of such notice, the Indemnitee may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will be the amount of such settlement offer, plus reasonable costs and expenses paid or incurred by the Indemnitee up to the date of such notice.

(c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a *"Direct Claim"*) will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event not later than twenty (20) calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party will have a period of thirty (30) calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such thirty (30) calendar day period, the Indemnifying Party will be deemed to have accepted such claim. If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its rights to indemnification under this Agreement.

(d) If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the prime rate then in effect of the [Bank of Boston, N.A.]), will promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any indemnity payment, the Indemnifying Party will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; provided, however, that (i) the Indemnifying Party will then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying

**REDACTED**

J:\DATA\CLN\84\31584\064\ASSPURCH.OS                19

Party against any such third party on account of said indemnity payment is hereby made expressly subordinated and subjected in right of payment to the Indemnitee's rights against such third party. Without limiting the generality or effect of any other provision hereof, each such Indemnitee and Indemnifying Party will duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subordination rights. Nothing in this Section 9.2(d) shall be construed to require any party hereto to obtain or maintain any insurance coverage.

(e) A failure to give timely notice as provided in this Section 9.2 will not affect the rights or obligations of any party hereunder except if, and only to the extent that, as a result of such failure, the party which was entitled to receive such notice was actually prejudiced as a result of such failure.

## ARTICLE X

## TERMINATION AND ABANDONMENT

10.1. *Termination*. (a) This Agreement may be terminated at any time prior to the Closing Date by mutual written consent of the Seller and the Buyer.

(b) This Agreement may be terminated by the Seller or the Buyer if the Closing has not occurred on or before the first anniversary of the date of this Agreement (the "*Termination Date*"); provided that the right to terminate this Agreement under this Section 10.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date; and provided, further, that if on the first anniversary of the date of this Agreement the conditions to the Closing set forth in Section 8.1(c) shall not have been fulfilled but all other conditions to the Closing shall be fulfilled or shall be capable of being fulfilled, then the Termination Date shall be the day which is twenty-four (24) months from the date of this Agreement.

(c) This Agreement may be terminated by either the Seller or the Buyer if (i) any governmental or regulatory body, the consent of which is a condition to the obligations of the Seller or the Buyer to consummate the Closing shall have determined not to grant its or their consent and all appeals of such determination shall have been taken and have been unsuccessful, (ii) one or more courts of competent jurisdiction in the United States or any State shall have issued an order, judgment or decree permanently restraining, enjoining or otherwise prohibiting the Closing, and such order, judgment or decree shall have become final and nonappealable or (iii) any statute, rule or regulation shall have been enacted by any State or federal government or governmental agency in the United States which prohibits the consummation of the Closing.

TCPM007278

(d) This Agreement may be terminated by the Buyer, if there has been a material violation or breach by the Seller of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Buyer to effect the Closing impossible and such violation or breach has not been waived by the Buyer.

(e) This Agreement may be terminated by the Seller, if there has been a material violation or breach by the Buyer of any agreement, representation or warranty contained in this Agreement which has rendered the satisfaction of any condition to the obligations of the Seller to effect the Closing impossible and such violation or breach has not been waived by the Seller.

10.2. *Procedure and Effect of Termination.* In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 10.1, written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein:

(a) said termination shall be the sole remedy of the parties hereto with respect to breaches of any agreement, representation or warranty contained in this Agreement and none of the parties hereto nor any of their respective trustees, directors, officers or Affiliates, as the case may be, shall have any liability or further obligation to the other party or any of their respective trustees, directors, officers or Affiliates, as the case may be, pursuant to this Agreement, except in each case as stated in this Section 10.2 and in Sections 7.2(b), 7.3 and 7.7; provided, however, nothing in this Section 10.2 shall relieve any party for willful breaches of any representations, warranties, covenants or agreements contained herein; and

(b) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1. *Amendment and Modification.* Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of the Seller and the Buyer.

11.2. *Waiver of Compliance; Consents.* Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon

J:\DATA\CLR\8431584064\ASSPURCH.OS                    21

P.002

strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

11.3. *No Survival*. Subject to the provisions of Section 10.2, each and every representation, warranty and covenant contained in this Agreement (other than the covenants contained in Sections 7.2(b), 7.3, 7.4, 7.7, 7.8 and in Articles IX and X (which covenants shall expire in accordance with their terms), and the provisions of Article IX with respect to any relationship resulting from the PPA Transfer Agreement and this Article XI which shall survive indefinitely) shall expire with, and be terminated and extinguished by, the consummation of the sale of the Purchased Assets, provided, however, that representations and warranties contained herein shall survive for a period of twenty-four (24) months following closing.; and aNone of the Seller, the Buyer or any officer, director, trustee or Affiliate of any of them shall be under any liability whatsoever with respect to any such representation, warranty or covenant after such period expires.

REDACTED

11.4. *Notices*. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, telexed or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

(a) If to the Seller, to:

    c/o EUA Service Corporation
    750 West Center Street
    West Bridgewater, MA 02379
    Facsimile: (508) 559-8932
    Attention:        Donald C. Ryan
                  Manager-Power Resources

with a copy to:

    McDermott, Will & Emery
    75 State Street
    Suite 1700
    Boston, MA 62109-1807
    Facsimile: (617) 345-5077
    Attention:        Arthur L. Anderson, P.C.

TCPM007280

(b) if to the Buyer, to:

c/o TransCanada Energy Ltd.
3400, 237 4th Avenue S.W.
Calgary, Alberta, Canada
T2P 5A4
Facsimile: (403) 213-3550
Attention:          Sean D. McMaster

with a copy to:

Sherman & Sterling
555 California Street
San Francisco, CA 94104
Facsimile: (415) 616-1199
Attention:          Christopher D. Dillon

11.5. *Assignment*. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, other than to an aAffiliate, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder.

REDACTED

11.6. *Governing Law*. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

11.7. *Counterparts*. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.8. *Interpretation*. The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

11.9. *Schedules and Exhibits*. All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

I:\DATA\CLI\84\31584064\ASSPURCH.CK          23

11.10. *Entire Agreement*. This Agreement, the Confidentiality Agreement and the Ancillary Agreements including the Exhibits, Schedules documents, certificates and instruments referred to herein or therein, embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein. It is expressly acknowledged and agreed that there are no restrictions, promises, representations, warranties, covenants or undertakings contained in any material made available to the Buyer pursuant to the terms of the Confidentiality Agreement (including the Information Memorandum, dated July, 1997). This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions other than the Confidentiality Agreement.

IN WITNESS WHEREOF, the Seller and the Buyer have caused this agreement to be signed by their respective duly authorized officers as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____
    Name:
    Title:

TRANSCANADA POWER MARKETING LTD.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

TCPM007282

### SCHEDULE 1.1(a)

#### PPA Description

"PPA" means, collectively, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated May 14, 1986, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated September 28, 1988, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Newport Electric Corporation, dated May 14, 1986, by and between Ocean State Power and Newport Electric Corporation and the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power Project to Newport Electric Corporation, dated July 12, 1988, by and between Ocean State Power and Newport Electric Corporation, in each case as amended, modified or supplemented.

**REDACTED**

I:\DATA\CLI\84\032\84\064\ASSPURCH.OS

TCPM007283

## SCHEDULE 5.3(a)

#### Seller Notices and Approvals

__Indenture__

Approvals as may be required under the Indenture.

**REDACTED**

__PPA__

**REDACTED**

Approvals as may be required under the PPA.

I:\DATA\CLIB40315584\064\ASSPURCH.OS

TCPM007284

## SCHEDULE 5.3(b)

### Seller Required Regulatory Approvals

(i) Any required approvals under the Federal Power Act, (ii) (A) notice by the Seller to, and an order by, the MDPU MDTE approving the transactions contemplated by this Agreement, (B) the approval by the RIPUC of the market valuation "implementation methodology" filed in RIPUC Docket 25-92, pursuant to section 39-1-27.4(g) of the Rhode Island General Laws, (C) the approval by the RIPUC of the "Transfer Plan" filed in RIPUC Docket 25-14, pursuant to section 39-1-27(s) of the Rhode Island General Laws, (D) the approval, if required, of the Rhode Island Division of Public Utilities and Carriers, (E) the approval, if required, of the Rhode Island Energy Facilities Siting Board, (F) if required, notice by the Seller to, and an order by, each of the NHPUC, the VTPSB, the Maine Public Utilities Commission and the Connecticut Department of Public Utility Control approving the sale of the Purchased Assets, (iii) the approval, if required, of the SEC pursuant to the Holding Company Act, (iv) the filings, if required by the Seller and the Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act, and (v) the approval, if required, of the Nuclear Regulatory Commission (the "NRC").

REDACTED

F:\DATA\CLI\8431584\064\ASSPURCH.OS

APR -01' 98(WED) 17:35                                          P. 098

## SCHEDULE 5.4

Exceptions to Seller's Title to the PPA

None.

TCPM007286

## SCHEDULE 5.5(a)

### Exceptions to the Full Force and Effect of and the Transferability of the PPA

Transferability may be subject to the approval of the counterparties to the PPA and lenders thereto.

J:\DATA\CLA\8431584\064\ASSPURCH.OS

TCPM007287

## SCHEDULE 5.5(b)

### Defaults under the PPA

None.

J:\DATA\CLN84\31584\064\ASSPURCH.OS

TCPM007288

# Tab 46-2

APR -01' 98 (WED) 17:36                                    P. 011

## SCHEDULE 6.3(a)

### Buyer Notices and Approvals

None.

I.\DATA\CLN84\31584\066\ASSPURCH.0s

TCPM007289

## SCHEDULE 6.3(b)

### Buyer Required Regulatory Approvals

Any approvals required under the Federal Power Act.

J:\DATA\CLT\84\31584\064\ASSPURCH.OS

TCPM007290

APR. -01' 98 (WED) 17:36

P. 013

## SCHEDULE 6.4

### Buyer Regulation as a Utility

The Buyer is a public utility holding company exempt from registration under the Holding Company Act.

TCPM007291

P. 614

EXHIBIT B

TO ASSET PURCHASE AGREEMENT

FORM OF INSTRUMENT OF
ASSIGNMENT AND ASSUMPTION

Instrument of Assignment and Assumption (this "Agreement") made, executed and delivered on this day of _____, by and between TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "Buyer") and MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "Seller").

WITNESSETH:

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of _____, 1997 8 (as amended, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), by and between the Seller and the Buyer, the Seller is concurrently herewith selling, assigning, conveying, transferring and delivering to the Buyer the Purchased Assets (as defined in the Asset Purchase Agreement); and    **REDACTED**

WHEREAS, the Asset Purchase Agreement requires that the Seller assign all of its right, title and interest in, and that the Buyer assume all liabilities and obligations of the Seller under, the PPA (as defined in the Asset Purchase Agreement);

NOW THEREFORE, in good consideration of these premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Seller and the Buyer agree as follows:

1.    Capitalized terms which are used in this Agreement but are not defined in this Agreement shall have the meaning ascribed to such terms in the Asset Purchase Agreement

2.    The Seller hereby assigns, transfers and sets over to the Buyer all of the Seller's rights, title and interest in and to the PPA. The assignment effected pursuant to this Section 2 shall be without recourse to and without representation or warranty by the Seller except as specifically provided in the Asset Purchase Agreement.

3.    The Buyer hereby assumes and agrees to pay, perform or discharge in accordance with their terms, to the extent not heretofore paid, performed or discharged, all liabilities and obligations of the Seller under the PPA.

J:\DATA\CLI\8431358\0064\ASSPURCH 0S

TCPM007292

4.    It is understood and agreed that nothing in this Agreement shall constitute a waiver or release of any claims arising out of the contractual relationships between the Seller and the Buyer.

5.    This Agreement shall inure to the benefit and be enforceable against the respective successors and assigns of the Seller and the Buyer.

6.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws).

7.    This Agreement is delivered pursuant to and is subject to the Asset Purchase Agreement. In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall prevail.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the respective duly authorized officers of the Seller and the Buyer as of the date first above written.

TRANSCANADA POWER MARKETING LTD.


By_____
   Name:
   Title:


By_____
   Name:
   Title:


MONTAUP ELECTRIC COMPANY


By_____
   Name:
   Title:


J:\DATA\CLN84315840064\ASSPURCH.0S

TCPM007293

EXHIBIT C
TO ASSET PURCHASE AGREEMENT

PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of _____, 1997‑8 and is made
by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and
TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This
Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the
economic benefits and performance obligations, subject to Seller's continuing obligations to make
certain payments, associated with the power purchase agreements herein after described ("the Power
Purchase Agreement") between Seller and third party power supplier (the "Power Seller"), to Asset
Purchaser pursuant to the Asset Purchase Agreement. dated as of _____, 1997‑8 (the "APA"), by
and between Seller and Asset Purchaser.

**REDACTED**

1.     The following Power Purchase Agreement (as amended or supplemented, a "Commitment")
       is attached as an exhibit hereto and is incorporated into this Agreement by reference:

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power   (Montaup) |
| 9/2K/KK | Ocean State Power II (Montaup) |
| 5/14/86 | Ocean State Power   (Montaup) |
| 7/12/88 | Ocean State Power II (Montaup) |

1.     A Commitment shall be automatically deleted from the above Commitment list (the
       "Commitment List") without further action by the parties: (i) on the effective date of any
       amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the
       expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such
       Commitment pursuant to the written agreement of the parties thereto.

2.     This Agreement shall become effective on the date (as defined in Section 12) of its execution
       and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed
       pursuant to Section 4, below, for the last month in which a Commitment is listed on the
       Commitment List, and Seller has made payment to Asset Purchaser of amounts owed
       pursuant to Section 8 below, for the last month in which such a payment is due.

       **REDACTED**

3.     Commencing as of the effective date of this Agreement, each month Seller agrees to provide
       to Asset Purchaser all capacity, energy and any other benefits it receives under each
       Commitment as of the first day of the month. All electric energy shall be delivered to Asset
       Purchaser at the point at which the Power Seller makes delivery to Seller as established under
       such Commitment. Asset Purchaser shall be responsible for making all arrangements
       necessary for the further transmission of such energy.

J:\DATA\CLN4\31584\D6\ASSPURCH.OS

P.017

REDACTED

4.      (a)  Commencing as of the month following the effective date of this Agreement, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below. In turn, each month, Seller shall timely pay each the Power Seller an amount equal to all amounts properly due to, a the Power Seller for the preceding month under each eCommitment.  For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month.  Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

REDACTED

(b) Upon the effective date of this Agreement, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or, at the termination of this Agreement pay to Asset Purchaser, any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the effective date which relate to billing errors or reconciliations of pre-effective date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the effective date that are attributable to a period prior to the effective date.

REDACTED

5.      (a)  Effective as of the effective date of this Agreement, Seller hereby irrevocably and unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment.  Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments.  Seller shall not unreasonably without such consent.

(b)  Seller shall not agree to any amendment to or waiver of rights under a Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of the this Section 5.

TCPM007295

REDACTED

6.    Each party shall be entitled to indemnification under this Agreement to the extend and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.        (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation.

        (b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, as a condition of any Novation assignment, the Asset Purchaser will may require Seller to provide either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or, if Seller and Buyer do not mutually agree to payment of a lump sum, (ii) a security interest to the Asset Purchaser in a portion to the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is reasonably acceptable to the Asset Purchaser acting reasonably.    REDACTE

8.        (a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

        (b) Commencing as of the month following the effective date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment,

TCPM007296

and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth in Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month

(d) To the extent that a Novation is executed with respect to a Commitment an amendment and assignment is executed, pursuant to Section 7 and Asset Purchaser and Seller agree to a lump-sum payment, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller to settle such difference and to reduce the amount of Seller's retained obligation set forth in Section 8(b). Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by Asset Purchaser and Seller such parties. If a Commitment is amended and assigned pursuant to Section 7 above and as part of such amendment and assignment Seller agrees to make a lump-sum payment to Asset Purchaser or the Power Seller, Seller and Asset Purchaser agree to amend this agreement to equitably reduce the amount of Seller's retained obligation set forth in Section 8(b) by an amount to be negotiated in good faith by such parties. It is the intention of the parties that the lump-sum payment shall be based on the net present value amounts set out in Schedule "A" at a discount rate agreeable to Asset Purchaser and Seller.

**REDACTED**

9.    This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10.   This Agreement, the APA and any other agreement entered into by the parties pursuant to the APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only a written agreement signed by the parties. Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing, (i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned subsidiary (direct or indirect) of TransCanada Pipelines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such

liabilities and obligations, and all references herein to Asset Purchaser shall thereafter by deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refinancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof, provided, however, the no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyances, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby otherwise altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11. All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such such payment.

12. This Agreement shall be of no force and effect until the Effective Date. If the APA shall have been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA. As used in this Agreement, "Effective Date" shall mean the Effective Date (as defined in the APA).

REDACTED

TCPM007298

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By:_____
    Name:
    Title:

TRANSCANADA POWER MARKETING LTD.

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.C'S      6

## TABLE OF CONTENTS

ARTICLE I       DEFINITIONS .................................................. 1
        1.1.    Definitions ........................................................ 1

ARTICLE II      PURCHASE AND SALE ........................................ 5
        2.1.    The Sale............................................................ 5

ARTICLE III     PURCHASE PRICE ............................................ 5
        3.1.    Purchase Price.................................................... 5

ARTICLE IV      THE CLOSING.................................................. 5
        4.1.    Time and Place of Closing...................................... 5
        4.2.    Payment of Purchase Price...................................... 5
        4.3.    Deliveries by Seller............................................. 5
        4.4.    Deliveries by the Buyer......................................... 6
        4.5.    Backstop Wholesale Standard Offer Agreement ............... 6    |REDACTE

ARTICLE V       REPRESENTATIONS AND WARRANTIES OF THE SELLER............... 7
        5.1.    Organization; Qualification.................................... 7
        5.2.    Authority Relative to this Agreement .......................... 7
        5.3.    Consents and Approvals; No Violation.......................... 7
        5.4.    Title and Related Matters ..................................... 8
        5.5.    The PPA ......................................................... 8

ARTICLE VI      REPRESENTATIONS AND WARRANTIES OF THE BUYER................. 9
        6.1.    Organization ................................................... 9
        6.2.    Authority Relative to this Agreement .......................... 9
        6.3.    Consents and Approvals; No Violation.......................... 9
        6.4.    Regulation as a Utility........................................ 10

ARTICLE VII     COVENANTS OF THE PARTIES................................... 10
        7.1.    Conduct of Business of the Company ........................... 10
        7.2.    Access to Information.......................................... 10
        7.3.    Expenses....................................................... 11
        7.4.    Further Assurances............................................. 11
        7.5.    Public Statements.............................................. 11
        7.6.    Consents and Approvals......................................... 11
        7.7.    Fees and Commissions .......................................... 12
        7.8.    Tax Matters ................................................... 12

J:\DATA\CLI\84\31584\06\ASSPURCH.05

ARTICLE VIII   PURCHASED ASSETS CLOSING CONDITIONS ...................................... 13
    8.1.   Conditions to Each Party's Obligations to Effect the Purchase
        Transactions....................................................................................... 13
    8.2.   Conditions to Obligations of the Buyer ............................. 13
    8.3.   Conditions to Obligations of the Seller............................. 15

ARTICLE IX     INDEMNIFICATION................................................................................. 17
    9.1.   Indemnification ..................................................................................... 17
    9.2.   Defense of Claims ................................................................................. 18

ARTICLE X      TERMINATION AND ABANDONMENT ...................................... 19
    10.1.   Termination .......................................................................................... 19
    10.2.   Procedure and Effect of Termination................................................ 20

ARTICLE XI     MISCELLANEOUS PROVISIONS ...................................................... 21
    11.1.   Amendment and Modification ............................................................ 21
    11.2.   Waiver of Compliance; Consents ...................................................... 21
    11.3.   No Survival............................................................................................ 21
    11.4.   Notices ................................................................................................... 21
    11.5.   Assignment ........................................................................................... 22
    11.6.   Governing Law ..................................................................................... 23
    11.7.   Counterparts ......................................................................................... 23
    11.8.   Interpretation ....................................................................................... 23
    11.9.   Schedules and Exhibits....................................................................... 23
    11.10.  Entire Agreement................................................................................. 23

J:\DATA\CL\\84\31584\064\ASSPURCH.OS

TCPM007301

P.024

EASTERN UTILITIES ASSOCIATES
GENERATION BUSINESS DIVESTITURE

|  |  | Tab |
|---|---|---|
| Asset Purchase Agreement |  | 1 |
| Exhibits to Asset Purchase Agreement |  |  |
| A | Form of Backstop Wholesale Standard Offer Agreement | 2 |
| B | Form of Instrument of Assignment and Assumption | 3 |
| C | Form of Interconnection Agreement | 4 |
| D | Form of PPA Transfer Agreement | 5 |
| Guaranty |  | 6* |
| Schedules to the Asset Purchase Agreement |  | 7 |

---

\* To be provided at a later date, as an addition to this volume.

J:\DATA\CL\B4\31584\064\ASSPURCH.OS

Wholesale Standard
Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 1, 1998

TCPM007303

TABLE OF CONTENTS

Page

ARTICLE 1.    Definitions ............................................ 2

ARTICLE 2.    Term .................................................. 3

ARTICLE 3.    Supplier Responsibilities ....................... 3

ARTICLE 4.    Estimation of Hourly Loads and Reporting to
              the ISO ............................................... 5

ARTICLE 5.    Price ................................................. 5

ARTICLE 6.    Billing and Payments ............................. 6

ARTICLE 7.    Events of Default, Liability, Relationship of
              the Companies ....................................... 7

ARTICLE 8.    Termination ......................................... 8

ARTICLE 9.    Force Majeure ...................................... 8

ARTICLE 10.   Assignment .......................................... 9

ARTICLE 11.   Successors and Assigns ........................... 9

ARTICLE 12.   Resolution of Disputes ........................... 10

ARTICLE 13.   Interpretation ..................................... 11

ARTICLE 14.   Severability of Provisions ...................... 11

ARTICLE 15.   Accounts and Records ............................. 11

ARTICLE 16.   Limitations on Liability and Indemnification ... 12

ARTICLE 17.   Regulation .......................................... 12

ARTICLE 18.   Notices ............................................. 12

ARTICLE 19.   Miscellaneous ...................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and
Standard Offer Wholesale Price

TCPM007304

## STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this _____ day of _____ _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation, ("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Corporation, under an asset purchase agreement, (the "Asset Purchase Agreement") dated _____; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Standard Offer Service Agreement; and

WHEREAS, the Companies are required to provide firm all-requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.T.B. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' of the aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

TCPM007305

ARTICLE 1.    <u>Definitions</u>:

Whenever used in this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"<u>Agreement</u>" shall mean this Agreement, including its Appendices as amended from time to time.

"<u>Commencement Date of Service</u>" shall mean the ~~Closing~~ Date as defined in the Asset Purchase Agreement.    **REDACTED**

"<u>Contract Year</u>" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"<u>Companies' System</u>" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"<u>Delivered Energy</u>" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"<u>Delivery Point</u>" shall be any location on the NEPOOL PTF system or Companies' System.

"<u>D.T.E.</u>" shall mean the Massachusetts Department of Telecommunications and Energy.

"<u>ISO</u>" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"<u>NEPOOL</u>" shall mean the New England Power Pool or its successor.

"<u>Party</u>" or "<u>Parties</u>" shall mean the Supplier and the Companies and their respective successors and assigns.

"<u>Price</u>" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5 and Appendix B. The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments in addition to the payments made pursuant to Article 5.

**REDACTED**

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 340, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended from time to time. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that forms the cap on the price that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.     Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 11:59 p.m. on December 31, 2004, unless terminated sooner in accordance with Article 7 or 8.

REDACTED

ARTICLE 3.     Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this

TCPM007307

agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

Supplier is responsible for providing firm all-requirements service necessary to serve its share of the Companies' aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

REDACTED

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. <u>Estimation of Hourly Loads and Reporting to the ISO</u>:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

**REDACTED**

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.    <u>Price</u>:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

$$\text{Price} = \text{Standard Offer Wholesale Price} + \text{Fuel Adjustment Factor}$$

Where:      Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the

applicable billing month through the Fuel
Adjustment Factor. The retail Fuel Adjustment, and
the resulting Fuel Adjustment Factor to be paid to
Supplier, will be made subject to regulatory
approval and only to the extent that the Companies
are allowed to collect such revenues from their
retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes
which are required by law to be paid by Standard Offer Service
customers, the Price for Delivered Energy as set forth herein
includes all local, state and federal taxes, fees and assessments
applicable as of the date hereof or which may be assessed or
imposed in the future by any governmental authority with
jurisdiction governing the sale of electricity covered by this
Agreement.

REDACTED

ARTICLE 6.    Billing and Payments:

Until reconciled with actual metered data pursuant to the
Terms and Conditions of Suppliers, computations by the Companies
of the charges for the purposes of billings hereunder shall be
based on estimates of Supplier's Delivered Energy in accordance
with Article 4 and the Price as determined in accordance with
Article 5. The Companies shall calculate the amount payable to
Supplier for a given month on or before the twentieth (20th) day
of the following month. The calculation shall be provided to
Supplier and shall show the total amount due and payable for the
previous month. Each bill shall be subject to adjustment for any
errors in arithmetic computation, estimating, reconciliation
pursuant to the Terms and Conditions of Suppliers or otherwise
only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay
Supplier any amounts due and payable for the Delivered Energy
provided by Supplier in the previous month ("Due Date"). Any
amount remaining unpaid after the Due Date shall bear interest at
the Prime Rate then in effect at the main office of BankBoston,
or such other lending institution as agreed to by Companies and
Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment,
Supplier shall itemize the basis for its dispute in a written
notice to Companies within fifteen days after the Due Date.
Billing and payment disputes shall be handled in accordance with
the provisions of Article 12 of this Agreement. Upon final
resolution of the dispute, payment of any amount due to a Party
under the terms of the resolution shall be made within thirty
(30) days of the date thereof, together with interest from and
after the original Due Date at the rate specified in this
Article.

REDACTED

The Companies may make retroactive adjustments to any
billing for a period of up to one year from the date of the
original billing in order to reflect differences in charges
resulting from receipt of more accurate data. Supplier may

dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7.    Events of Default, Liability, Relationship of the Companies:

(1) Unless excused by a Force Majeure as described in Article 9, each of the following events shall be deemed to be an Event of Default hereunder:

(a)  Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)  Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)  Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default.  In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice.  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint.  Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represents as a percentage of the Companies' total Standard Offer Service requirements.                **REDACTED**

(3)  Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

                                                          **REDACTED**

"Replacement Price" shall mean the price at which the Companies purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages.  In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an

REDACTED    P. 011

Event of Default, including, but not limited to, additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least twenty-five (25) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.    REDACTED

ARTICLE 8.    Termination:

In addition to the termination rights provided for an Event of Default as provided in Article 7, the Companies may terminate this Agreement, if:

1. Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

2. The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; and    REDACTED

3. Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment Standard Offer Service.    REDACTED

ARTICLE 9.    Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from

whatever performance is affected by the Force Majeure, to the
extent so affected, provided that:

   (a)  The non-performing Party promptly, but in no case
   longer than five (5) working days after the occurrence of
   the Force Majeure, gives the other Party written notice
   describing the particulars of the occurrence;

   (b)  The suspension of performance shall be of no greater
   scope and of no longer duration than is reasonably required
   by the Force Majeure;

   (c)  The non-performing Party uses reasonable efforts to
   remedy its inability to perform and expeditiously takes
   reasonable action to correct or cure the event or condition;
   and

   (d)  The non-performing Party exercises all reasonable
   efforts to mitigate or limit damages to the other Party.
   With respect to the Supplier, this shall mean that Supplier
   must purchase, at its own expense, electricity from the
   NEPOOL market to meet its obligations under this Agreement,
   to the extent such electricity is available.

ARTICLE 10.    Assignment:

   Unless mutually agreed to by the Parties, no assignment,
pledge, or transfer of this Agreement shall be made by either
Party without the prior written consent of the other Party, which
shall not be unreasonably withheld, except no prior written
consent shall be required for (i) the assignment, pledge or other
transfer to another company or Affiliate in the same holding
company system as the assignor, pledgor or transferor, provided,
the assignee, pledgee or transferee expressly assumes and
demonstrates, to the reasonable satisfaction of the non-assigning
Party, that it can meet the obligations of the assignor, pledgor
or transferor under this Agreement, or (ii) the transfer,
incident to a merger or consolidation with, or transfer of all
(or substantially all) of the assets of the transferor, to
another person or business entity, provided, such transferee
expressly assumes and demonstrates, to the reasonable
satisfaction of the non-assigning party, that it can meet all the
obligations of the assignor, pledgor or transferor under this
Agreement.

ARTICLE 11.    Successors and Assigns:

   This Agreement shall be binding upon and shall inure to the
benefit of the Parties and their successors and assignees.

ARTICLE 12.    Resolution of Disputes:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable.  The Parties agree that such informal discussion shall be conducted in good faith.  The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided; however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks.  In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration.  Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties.  If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel.  The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates.  A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate.  This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted.  If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

TCPM007314

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13.    Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14.    Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15.    Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the

reasonableness and accuracy of all relevant data, estimates or
statement of charges associated with service hereunder.

ARTICLE 16.    Limitations on Liability and Indemnification:

Each Party agrees to indemnify, defend, and hold the other
Party (including the other Party's affiliated companies,
trustees, directors, board members, officers, employees, and
agents) harmless from and against any and all damages, costs,       **REDACTED**
claims, liabilities, actions or proceedings arising from or
claimed to have arisen from the acts or omissions of the
indemnifying Party's employees or agents, unless caused by an act
of negligence or willful misconduct by the Party (including the
Party's affiliated companies, trustees, directors, board members,
officers, employees or agents).

The Parties hereby waive and release the other Party as well
as the other Party's affiliated companies, trustees, directors,
officers, employees, and agents from any liability, claim, or      **REDACTED**
action arising from damage to its property due to the performance
of this Agreement.

ARTICLE 17.    Regulation:

(a) This Agreement and all rights, obligations, and
performances of the Parties hereunder, are subject to all
applicable state and federal laws, and to all duly promulgated
orders and other duly authorized actions of governmental
authority having jurisdiction, provided, however, that this
Agreement shall not be subject to change through unilateral
application under Sections 205 and 206 of the Federal Power Act.

(b) This Agreement must comply with all NEPOOL Criteria,
Rules, and Standards ("Rules"). If, during the term of this
Agreement, the Restated NEPOOL Agreement is terminated or amended
in a manner that would eliminate or materially alter a Rule
affecting a right or obligation of a Party hereunder, or if such
a Rule is eliminated or materially altered by NEPOOL or the ISO,
the Parties agree to negotiate in good faith in an attempt to
amend this Agreement to incorporate such changes as they deem
necessary to reflect the elimination or alteration of such Rule.
The intent of the Parties is that any such amendment reflect, as
closely as possible, the intent and substance of the Rule being
replaced as was in effect prior to such termination or amendment
of the Restated NEPOOL Agreement or elimination or alteration of
the Rule. If the Parties are unable to reach agreement on such
an amendment, the Parties agree to submit the matter to
arbitration under the terms of Article 12, and to seek a
resolution of the matter consistent with the above stated intent.

ARTICLE 18.    Notices:

Any notice, demand, or request permitted or required under
this Agreement shall be delivered in person or mailed by

certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

> To Companies:
> Director, Power Supply
> EUA Service Corporation
> P. O. Box 543
> 750 West Center Street
> West Bridgewater, MA 02379
>
> To Supplier:
> TransCanada Power Marketing Ltd.
> 3400, 237 - 4th Avenue S.W.
> Calgary, Alberta T2P 5A4

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19.    Miscellaneous:

(a) Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b) Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c) Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d) This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e) Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f) Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g) Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)  Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

TCPM007318

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:    TransCanada Power Marketing Ltd.

By:_____

REDACTED

On Behalf of the Companies:

Blackstone:    BLACKSTONE VALLEY ELECTRIC COMPANY

By:_____

Eastern:    EASTERN EDISON COMPANY

By:_____

Newport:    NEWPORT ELECTRIC CORPORATION

By:_____

TCPM007319

APR. -01' 98(WED) 17:53                                          P.019

# APPENDIX A

## SCHEDULE OF SUPPLIER'S SHARE of STANDARD OFFER SERVICE

### AND

### STANDARD OFFER WHOLESALE PRICE

### TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| *2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

\*   Standard Offer Service for Eastern Edison terminates
    December 31, 2004.

**REDACTED**

TCPM007320

## SCHEDULE "A"

### MONTHLY SUPPORT PAYMENTS

For each month, beginning with the Effective Day (prorated in accordance with Section 8(a) of the PPTA), if applicable, the Monthly Support Payment shall be as set out below:

| Calendar Year | Monthly Support Payment | |
|---|---|---|
| 1999 | $1,650,000 | REDACTED |
| 2000 | $1,650,000 | |
| 2001 | $1,542,000 | |
| 2002 | $1,542,000 | |
| 2003 | $ 870,000 | |
| 2004 | $ 870,000 | |
| 2005 | $ 870,000 | |
| 2006 | $ 870,000 | |
| 2007 | $ 870,000 | |

REDACTED

J:\DATA\CLI\84\315840064\ASSPURCH.OS

TCPM007321

2

6.    Each of the parties hereto agree that no public statements will be made with respect to the Transaction unless the other party has consented to such disclosure, which consent shall not be unreasonably withheld.

7.    This letter agreement shall be governed by the laws of the Commonwealth of Massachusetts in accordance with its terms.

If this letter agreement correctly sets forth our understanding, please confirm by signing and returning the enclosed copy to the undersigned.

Yours truly,

TRANSCANADA ENERGY LTD.


Alexander J. Pourbaix
Vice President, Power and Projects


Accepted and agreed to this ___ day of April, 1998.

EASTERN UTILITIES ASSOCIATES


By:    _____

Name:  _____

Title: _____


g:\user\1998\letters\EUA01\dfb\kmh

TCPM007322

# Tab 47

```
*****************************
***   ACTIVITY REPORT   ***
*****************************

TRANSMISSION OK

TX/RX NO.              5010
TTI                   TCEM LAW DEPT
CONNECTION TEL            916173577320
CONNECTION ID
START TIME            04/02 13:06
USAGE TIME           00'46
PAGES                 2
RESULT                OK
```

EXHIBIT
58


TransCanada

**TransCanada Energy Ltd.**

3400, 237 - 4th Avenue S.W.
Calgary, Alberta, Canada  T2P 5A4
Telephone: (403) 213-3100
Fax: (403) 213-3111

**FAX COVER SHEET**

TOTAL NUMBER OF PAGES INCLUDING COVER.......2

IF ANY PROBLEMS OCCUR CALL (403) ...........

TO : *Mike Hirsh*

COMPANY *EUA*

FAX NO. *(617) 357-7320*

DATE *April 2.*

FROM *Sean McMaster*

DEPARTMENT *TCE Legal*

FAX NO. (403) *213 3550*

RE    *Wholesale Standard Offer Service Agreement*

*Attached is the provision regarding "changes"
to Standard Offer service which Alex
has discussed with you. Alex
has not yet seen this. It can
be inserted as paragraph ... in Article 8*

TCPM007323



**TransCanada**

**TransCanada Energy Ltd.**

3400, 237 - 4th Avenue S.W.
Calgary, Alberta, Canada  T2P 5A4
Telephone: (403) 213-3100
Fax: (403) 213-3111

**FAX COVER SHEET**                    DATE  *April 2.*

TOTAL NUMBER OF PAGES <u>INCLUDING</u> COVER...... *2*

IF ANY PROBLEMS OCCUR CALL (403) ............

TO  *Mike Hirsch*                    FROM  *Sean McCarter*

COMPANY  *ELM*                    DEPARTMENT  *TCE Legal*

FAX NO.  *(617) 357-7320*          FAX NO. (403)  *213 3550*

RE    *Wholesale Standard Offer Service Agreement*

*Attached is the provision regarding "charges"
to Standard Offer Service which Alex
has discussed with you. Alex
has not yet seen this. It can
be inserted as paragraph 4 in Article E
which can be given a new heading
"Termination/Reimbursement", with
the existing paragraph being paragraph 1.*

*This facsimile is directed in confidence solely to the person named above, and may not otherwise
be distributed, copied or disclosed.  If you have received this facsimile in error, please notify us
immediately by telephone, and return the original transmission to us by mail, or destroy the same,
without making a copy.  Thank you for your assistance.*

TCPM007324

(2) In the event that Standard Offer Service or the Terms and Conditions for Supplier are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service, in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations. If Supplier determines, acting reasonably, that its costs or obligations have materially increased, the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

TCPM007325



**TransCanada Energy Ltd.**

3400, 237 - 4th Avenue S.W.
Calgary, Alberta, Canada T2P 5A4
Telephone: (403) 213-3100
Fax: (403) 213-3111

## FAX COVER SHEET

DATE _April 2._

TOTAL NUMBER OF PAGES INCLUDING COVER...... _2_

IF ANY PROBLEMS OCCUR CALL (403) ......................

TO _Mike Hirsh_

COMPANY _EUA_

FAX NO. _(617) 357-7320_

FROM _Sean McMaster_

DEPARTMENT _TCE Legal_

FAX NO. (403) _213 3550_

RE _Wholesale Standard Offer Service Agreement_

Attached is the provision regarding "changes"
to Standard Offer service which Alex
has discussed with you. Alex
has not yet seen. This. It can
be inserted as paragraph to in Article 8
which can be given a new heading
"Termination / Reimbursement", with
the existing paragraph being paragraph 1

*This facsimile is directed in confidence solely to the person named above, and may not otherwise be distributed, copied or disclosed. If you have received this facsimile in error, please notify us immediately by telephone, and return the original transmission to us by mail, or destroy the same, without making a copy. Thank you for your assistance.*

TCPM 000356

# Tab 48-1

APR. -03'98(FRI) 17:43   EASTERN UTILITIES                 TEL:508-559-6125                  P. 001

# FAX TRANSMISSION



### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-559-6125

To: S. McMaster                          Date: 4/3

Fax #: _____                    Pages: 22
                                         (including cover page)

From: M. Hirsh

Subject: Redline Agreements

COMMENTS:
Incorporates our discussions yesterday. We are
OK with all ~~the~~ in concept — may want to tweak
the words a bit. We have placed right of TCPL
to terminate in Article 8 of Standard Offer
Agreement. We agree to accept this but seek a
comparable right to terminate our obligation

ANY PROBLEMS OR QUESTIONS, PLEASE CALL_____

AT (508) 559-2000, ext._____

to sell equity if TCPL is in default
of either PPA Transfer ot Standard offer
prior to equity closing.

This document is coming to you in
three parts. Please make sure that
Alex finds a copy.

TCPM 000476

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## MONTAUP ELECTRIC COMPANY

### AND

## TRANSCANADA POWER MARKETING LTD.

_____, 1998

J:\DATA\CLI\84\31584\064\ASSPURCH.OS               1

TCPM 000477

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of ____, 1998, by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "*Seller*"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "*Buyer*").

WHEREAS, the Buyer desires to purchase, and the Seller desires to sell, the Purchased Assets upon the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1 *Definitions*. (a) As used in this Agreement, the following terms have the meanings specified in this Section 1.1(a).

(1)     "*Affiliate*" has the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

(2)     "*Ancillary Agreements*" mean the Wholesale Standard OfferAgreement, the Instrument of Assignment and Assumption and the PPA Transfer Agreement.

(3)     " *Wholesale Standard Offer Agreement*" means the Wholesale Standard Offer Agreement between the Retail Companies and the Buyer, substantially in the form of Exhibit A hereto, relating to Standard Offer Service.

(4)     "*Business Day*" means any day other than Saturday, Sunday and any day which is a legal holiday or a day on which banking institutions in Boston, Massachusetts are authorized by law or other governmental action to close.

(5)     "*Buyer Representatives*" means the Buyer's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

(6)     "*Code*" means the Internal Revenue Code of 1986, as amended.

TCPM 000478

(7)    *"Confidentiality Agreement"* means the Confidentiality Agreement, among the Seller, Blackstone Valley Electric Company, Newport Electric Corporation, Eastern Utilities Associates and TransCanada Energy Ltd.

(8)    *"Encumbrances"* means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

(9)    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

(10)    *"Federal Power Act"* means the Federal Power Act of 1935, as amended.

(11)    *"FERC"* means the Federal Energy Regulatory Commission.

(12)    *"Holding Company Act"* means the Public Utility Holding Company Act of 1935, as amended.

(13)    *"HSR Act"* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(14)    *"Indenture"* means the Brockton Edison Company Indenture of First Mortgage and Deed of Trust dated as of September 1, 1948, as supplemented and modified.

(15)    *"Instrument of Assignment and Assumption"* means the Instrument of Assignment and Assumption attached as ~~of~~ Exhibit B hereto relating to the assignment by the Seller and the assumption by the Buyer of all of the rights, title, interests, liabilities and obligations of the Seller, in, to and under the PPA.

(16)    *"Material Adverse Effect"* means any change in or effect on the Purchased Assets after the date of this Agreement that is materially adverse to the Purchased Assets, taken as a whole, other than (i) any change or effect resulting from changes in the international, national, regional or local wholesale or retail markets for electric power, (ii) any change or effect resulting from changes in the international, national, regional or local markets for any fuel utilized in connection with the Purchased Assets, (iii) any change or effect resulting from changes in the North American, national, regional or local electric transmission systems and (iv) any materially adverse change in or effect on the Purchased Assets which is cured (including by the payment of money) by the Seller before the Termination Date.

(17)    *"MDTE"* means the Massachusetts Department of Telecommunications and Energy (formerly the Department of Public Utilities.)

(18)    *"NHPUC"* means the New Hampshire Public Utility Commission.

TCPM 000479

(19)    *"Permitted Encumbrances"* means  (i) any Encumbrances not created by the Seller or resulting from actions by or against the Seller; (ii) all exceptions, restrictions, easements, charges, rights of way and monetary and non-monetary encumbrances which are matters of record or are set forth in an applicable FERC project license, except for such encumbrances which secure indebtedness; (iii) with respect to any date before the Closing Date, Encumbrances created by the Indenture; (iv) statutory liens for current taxes or assessments not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings; (v) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of the Seller or the validity of which are being contested in good faith by appropriate proceedings; (vi) zoning, entitlement, conservation restriction and other land use and environmental regulations by governmental authorities; and (vii) such other liens, imperfections in or failure of title, charges, easements, restrictions and encumbrances which do not, in any material respect, affect the Buyer's rights under the Purchased Assets.

(20)    *"Person"* means any individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization and a governmental entity or any department or agency thereof.

(21)    *"PPA"* means the agreement, or, if more than one agreement, means collectively, the agreements listed on Schedule 1.1(a) hereto.

(22)    *"PPA Transfer Agreement"* means the PPA Transfer Agreement, between the Seller and the Buyer,  attached as Exhibit C hereto.

(23)    *"Purchased Assets"* means all right, title and interests of the Seller in and to and all liabilities and obligations of the Seller under the PPA.

(24)    *"Retail Companies"* means, as applicable, each, any or all of Blackstone Valley Electric Company, Eastern Edison Company and Newport Electric Corporation.

(25)    *"RIPUC"* means the Rhode Island Public Utilities Commission.

(26)    *"SEC"* means the Securities and Exchange Commission.

(27)    *"Securities Act"* means the Securities Act of 1933, as amended.

(28)    *"Standard Offer Service"* means the electric service, if any, required to be provided by one or more of the Retail Companies to its retail customers who do not elect to purchase electricity from an alternative supplier in the market.

(29)    *"Taxes"* means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority,

J:\DATA\CLI\84\31584\064\ASSPURCH OS          4

TCPM 000480

including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions attributable thereto.

   (30) *"VTPSB"* means the Vermont Public Service Board.

   (b) Each of the following terms has the meaning specified in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Buyer | Recitals |
| Buyer Required Regulatory Approvals | 6.3(b) |
| Closing | 4.1 |
| Closing Conditions | 4.1 |
| Closing Date | 4.1 |
| Direct Claim | 9.2(c) |
| Effective Date | 4.1 |
| Final Order | 8.1(c) |
| Indemnifiable Loss | 9.1(a) |
| Indemnifying Party | 9.1(d) |
| Indemnitee | 9.1(c) |
| Permits | 5.18 |
| Purchase Price | 3.1 |
| Seller | Recitals |
| Seller Required Regulatory Approvals | 5.3(b) |
| Termination Date | 10.1(b) |
| Third Party Claim | 9.2(a) |

TCPM 000481

## ARTICLE II

### PURCHASE AND SALE

2.1 ***The Sale***. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing the Seller will sell, assign, convey, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances), the Purchased Assets.

## ARTICLE III

### PURCHASE PRICE

3.1 ***Purchase Price***. The purchase price for the Purchased Assets shall be one dollar and other good and valuable consideration (the "Purchase Price").

## ARTICLE IV

### THE CLOSING

4.1 ***Time and Place of Closing***. Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement (the "***Closing Conditions***"), the closing of the sale of the Purchased Assets contemplated by this Agreement (the "***Closing***") will take place at the offices of McDermott, Will & Emery, 75 State Street, Suite 1700, Boston, MA 02109-1807 at 10:00 A.M. (local time) on such date as the parties may agree, which date is as soon as practicable, but no later than fifteen (15) Business Days, following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the parties may agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "***Closing Date.***." The Ancillary Agreements will become effective at midnight on the last day of the month following the eClosing dDate (the "Effective Date"), but in no event earlier than midnight on December 31, 1998.

4.2 ***Payment of Purchase Price***. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, conveyance, transfer and delivery of the Purchased Assets, the Buyer will pay or cause to be paid to the Seller at the Closing the Purchase Price.

4.3 ***Deliveries by Seller***. At the Closing, the Seller will deliver to the Buyer the following items:

TCPM 000482

(a) The Instrument of Assignment and Assumption, duly executed by the Seller;

(b) All consents, waivers or approvals obtained by the Seller with respect to the Purchased Assets or the consummation of the transactions connected to the sale of the Purchased Assets, as the case may be, contemplated by this Agreement, to the extent specifically required hereunder;

(c) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Seller;

(d) An opinion of counsel and certificates (as contemplated by Section 8.2) with respect to the Purchased Assets; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Buyer and its counsel, in connection herewith.

4.4 *Deliveries by the Buyer*. At the Closing, the Buyer will deliver to the Seller the following items:

(a) The Purchase Price by wire transfer of immediately available funds or such other means as are agreed upon by the Seller and the Buyer;

(b) Each Ancillary Agreement associated with the sale of the Purchased Assets, duly executed by the Buyer;

(c) An opinion of counsel and certificates (as contemplated by Section 8.3) with respect to the Purchased Assets;

(d) The Instrument of Assignment and Assumption, duly executed by the Buyer; and

(e) Such other agreements, documents, instruments and writings as are required to be delivered by the Buyer at or prior to the Closing Date pursuant to this Agreement or otherwise required, in the reasonable opinion of the Seller and its counsel, in connection herewith.

4.5 *Wholesale Standard Offer Agreement*. In the event Unsubscribed Standard Offer Service (as defined in the Wholesale Standard OfferAgreement) shall be zero on the Closing Date, neither the Seller nor the Buyer shall be required to execute and deliver the Wholesale Standard Offer Agreement at the Closing.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          7

TCPM 000483

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer as follows:

5.1. *Organization; Qualification*. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Massachusetts and has all requisite corporate power and authority to own, lease, and operate its properties and to carry on its business as is now being conducted. The Seller is duly qualified or licensed to do business as foreign corporation and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a Material Adverse Effect. The Seller has heretofore delivered to the Buyer complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents as currently in effect).

5.2. *Authority Relative to this Agreement*. The Seller has full corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Seller and no other corporate proceedings on the part of the Seller are necessary to authorize this Agreement and the Ancillary Agreements or to consummate the transactions contemplated hereby. This Agreement and the Ancillary Agreements have been duly and validly executed and delivered by the Seller, and assuming that this Agreement and the Ancillary Agreements constitute valid and binding agreements of the Buyer, subject to the receipt of the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, constitute valid and binding agreements of the Seller, enforceable against the Seller in accordance with their terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

5.3. *Consents and Approvals; No Violation*. (a) Except for such notices or approvals set forth on Schedule 5.3(a), and other than obtaining the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals, neither the execution and delivery of this Agreement and the Ancillary Agreements by the Seller nor the sale by the Seller of the Purchased Assets pursuant to this Agreement and the Ancillary Agreements will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Seller, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except (x) where the failure to obtain such consent, approval, authorization or permit, or to make such filing or notification, would not in any material respect affect the Buyer's rights under the Purchased Assets or (y) for those requirements which become applicable to the Seller as a result of the

TCPM 000484

specific regulatory status of the Buyer (or any of its Affiliates) or as a result of any other facts that specifically relate to the business or activities in which the Buyer (or any of its Affiliates) is or proposes to be engaged; (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which the Seller is a party or by which the Seller, or any of the Purchased Assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which, in the aggregate, would in any material respect affect the Buyer's rights under the Purchased Assets, or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Seller, or any of its assets, which violation would in any material respect affect the Buyer's rights under the Purchased Assets.

(b) Except for such notices or approvals set forth on Schedule 5.3(b) the *"Seller Required Regulatory Approvals"*), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Seller of the transactions contemplated hereby, other than such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, will not, in the aggregate, in any material respect affect the Buyer's rights under the Purchased Assets.

5.4. *Title and Related Matters*. Except as set forth in Schedule 5.4 and except for Permitted Encumbrances, the Seller has good and valid title to the Purchased Assets, free and clear of all Encumbrances.

5.5. *The PPA*. (a) Except as disclosed in Schedule 5.5(a), the PPA (i) constitutes a valid and binding obligation of the Seller and to the best knowledge of the Seller constitutes a valid and binding obligation of the other parties thereto, (ii) is in full force and effect, and (iii) may be transferred to the Buyer pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder.

(b) Except as set forth in Schedule 5.5(b), there is not, under the PPA, any default or event which, with notice or lapse of time or both, would constitute a default on the part of the Seller.

5.6. *Litigation*. There are no claims, actions, or proceedings pending or to the knowledge of Seller, threatened, against the Seller or its Affiliates relating to the Purchased Assets or any such claims, actions or proceedings, the subject matter of which is the Purchased Assets.

TCPM 000485

## ARTICLE VI

### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

6.1. *Organization*. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as is now being conducted. The Buyer has heretofore delivered to the Seller complete and correct copies of its Certificate of Incorporation and Bylaws (or other similar governing documents), as currently in effect.

6.2. *Authority Relative to this Agreement*. The Buyer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of the Buyer and no other corporate proceedings on the part of the Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Buyer, and assuming that this Agreement constitutes a valid and binding agreement of the Seller, subject to the receipt of the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, constitutes a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

6.3. *Consents and Approvals; No Violation*. (a) Except as set forth in Schedule 6.3(a), and other than obtaining the Buyer Required Regulatory Approvals and the Seller Required Regulatory Approvals, neither the execution and delivery of this Agreement by the Buyer nor the purchase by the Buyer of the Purchased Assets pursuant to this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or Bylaws (or other similar governing documents) of the Buyer, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, except for the failure of which to obtain or make would not materially affect the Buyer's ability to perform its obligations under this Agreement, or (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer or any of its subsidiaries is a party or by which any of their respective assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained or which would not materially affect the Buyer's ability to perform its obligations under this Agreement.

TCPM 000486

(b)  Except as set forth in Schedule 6.3(b) (the filings and approvals referred to in Schedule 6.3(b) are collectively referred to as the "*Buyer Required Regulatory Approvals*"), no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental or regulatory body or authority is necessary for the consummation by the Buyer of the transactions contemplated hereby.

6.4.  *Regulation as a Utility*.  The Buyer is a public utility holding company, exempt from registration, under the Holding Company Act.

## ARTICLE VII

## COVENANTS OF THE PARTIES

7.1.  *Conduct of Business of the Company*.  During the period from the date of this Agreement to the Closing Date, the Seller will conduct its business with respect to the Purchased Assets according to its ordinary and usual course of business consistent with good industry practice and will not amend (or waive any rights under) the PPA without the Buyer's prior written consent or take any action or fail to take any action that would result in a material breach of the Seller's obligations under the PPA.

7.2.  *Access to Information*.  (a)  Between the date of this Agreement and the Closing Date, the Seller will, during ordinary business hours and upon reasonable notice (i) give the Buyer and the Buyer Representatives reasonable access to all books and records of the Seller relating to the Purchased Assets; (ii) permit the Buyer to make such reasonable inspections thereof as the Buyer may reasonably request; and (iii) furnish the Buyer, at the Buyer's expense, with such financial and operating data and other information with respect to the Purchased Assets in the Seller's possession as the Buyer may from time to time reasonably request; provided, however, that (A) the Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege and (B) the Seller need not supply the Buyer with any information which the Seller is under a legal obligation not to supply.

(b)  All information furnished to or obtained by the Buyer and the Buyer Representatives pursuant to this Section 7.2 shall be subject to the provisions of the Confidentiality Agreement.

7.3.  *Expenses*.  Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

7.4.  *Further Assurances*  (a)  Subject to the terms and conditions of this Agreement, each of the parties hereto will use its reasonable commercial efforts to take, or cause

TCPM 000487

to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Purchased Assets pursuant to this Agreement.

(b) Subject to the PPA Transfer Agreement, to the extent that the Seller's rights, title, interests, liabilities and obligations under the PPA may not be assigned without the consent of another Person which consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Seller, at its expense, shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. The Seller and the Buyer agree that if consent to an assignment of the PPA shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights and obligations under the PPA so that the Buyer would not in effect acquire the benefit of all such rights and obligations, the Seller, to the maximum extent permitted by law and the PPA, shall at the Closing and pursuant to the PPA Transfer Agreement, appoint the Buyer to be the Seller's agent with respect to the PPA, and the Seller shall, to the maximum extent permitted by law and the PPA, enter into such reasonable arrangements with the Buyer as are necessary to provide the Buyer with the benefits and obligations of the PPA. The Seller and the Buyer shall cooperate and shall each use their commercially reasonable efforts after the Closing to obtain an assignment of the PPA to the Buyer.

7.5 *Public Statements*. The parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law and except that the parties may make public announcements, statements or other disclosures with respect to this Agreement and the transactions contemplated hereby to the extent and under the circumstances in which the parties are expressly permitted by the Confidentiality Agreement to make disclosures of "Proprietary Information" (as defined in the Confidentiality Agreement).

7.6. *Consents and Approvals*. (a) The Seller and the Buyer shall each file or cause to be filed with the Federal Trade Commission and the United States Department of Justice the notifications, if any, required to be filed under the HSR Act and the rules and regulations promulgated thereunder with respect to the transactions contemplated hereby. The parties shall consult with each other as to the appropriate time of filing such notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by either of such agencies, and to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after each date of filing.

(b) The Seller and the Buyer shall cooperate with each other and (i) promptly prepare and file all necessary documentation, (ii) effect all necessary applications, notices, petitions and filings and execute all agreements and documents, (iii) use all commercially reasonable efforts to obtain all necessary consents, approvals and authorizations of all other parties, necessary or advisable to consummate the transactions contemplated by this Agreement

TCPM 000488

(including, without limitation, the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals) or required by the terms of any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, concession, contract, lease or other instrument to which the Seller or the Buyer is a party or by which any of them is bound. The Seller shall have the right to review and approve (in its reasonable discretion) in advance all characterizations of the information relating to Purchased Assets, and each of the Seller and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with the transactions contemplated hereby.

       7.7. *Fees and Commissions*. The Seller and the Buyer each represent and warrant to the other on its own behalf that no broker, finder or other Person is entitled to any brokerage fees, commissions or finder's fees in connection with the transaction contemplated hereby by reason of any action taken by the party making such representation. The Seller and the Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finder's fees (including the fees described above) incurred by reason of any action taken by such party.

       7.8. *Tax Matters*. All transfer and sales taxes incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Buyer, and the Buyer, at its own expense, will file, to the extent required by applicable law, all necessary tax returns and other documentation with respect to all such transfer or sales taxes, and, if required by applicable law, the Seller will join in the execution of any such tax returns or other documentation. Prior to the Closing Date, the Buyer will provide to the Seller, to the extent possible, an appropriate certificate of no tax due from any applicable taxing authorities.

ARTICLE VIII

PURCHASED ASSETS CLOSING CONDITIONS

      8.1. *Conditions to Each Party's Obligations to Effect the Purchase Transactions*. The respective obligations of each party to effect the sale of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

      (a) If applicable, the waiting period under the HSR Act applicable to the consummation of the sale of the Purchased Assets contemplated hereby shall have expired or been terminated;

      (b) No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of the Purchased Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its reasonable best efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall

TCPM 000489

APR. -03'98 (FRI) 17:50    EASTERN UTILITIES              TEL:508-559-6125              P. 015

have been enacted by any state or federal government or governmental agency in the United States which prohibits the consummation of the sale of the Purchased Assets;

(c) All material federal, state and local government consents and approvals required for the consummation of the sale of the Purchased Assets, including, without limitation, the Seller Required Regulatory Approvals applicable to the sale of the Purchased Assets and the Buyer Required Regulatory Approvals applicable to the sale of the Purchased Assets, shall have been obtained and become Final Orders (a *"Final Order"* means a final order after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending)) with such terms and conditions as shall have been imposed by the governmental entity issuing such Final Order; and

(d) All consents and approvals for the consummation of the sale of the Purchased Assets contemplated hereby required under the terms of any note, bond, mortgage, indenture, contract or other agreement to which the Seller or the Buyer, or any of their subsidiaries, are a party shall have been obtained, other than those (i) which if not obtained, would not, in the aggregate, have a Material Adverse Effect, or (ii) which are governed by the PPA Transfer Agreement.

8.2. *Conditions to Obligations of the Buyer*. The obligation of the Buyer to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) There shall not have occurred and be continuing a Material Adverse Effect;

(b) The Seller shall have performed and complied with in all material respects the covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed and complied with by the Seller on or prior to the Closing Date, and the representations and warranties of the Seller which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) There shall be no Encumbrances on the Purchased Assets by virtue of the Indenture or otherwise, except for Permitted Encumbrances;

(d) The Buyer shall have received certificates from authorized officers of the Seller, dated the Closing Date, to the effect that, to the best of such officers' knowledge, the conditions set forth in Sections 8.2(a), (b) and (c) have been satisfied;

(e) The Buyer shall have received an opinion from McDermott, Will & Emery, counsel for the Seller, dated the Closing Date and satisfactory in form and substance to the Buyer and its counsel, substantially to the effect that:

TCPM 000490

(1) the Seller is a corporation organized, existing and in good standing under the laws of its state of incorporation and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Seller;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Seller and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approvals are obtained) are valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller will not constitute a violation of the Certificates of Incorporation or Bylaws (or similar governing documents), as in effect on the Closing Date, of the Seller;

(4) the Bill of Sale and other documents described in Section 4.3 are in proper form to transfer to the Buyer title to the Purchased Assets; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Seller of the Closing other than (i) the Seller Required Regulatory Approvals, all of such Seller Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority, and (ii) such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not obtained or made, would not, in the aggregate have a Material Adverse Effect.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States or the laws of Massachusetts, such counsel may rely upon opinions of counsel admitted in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of fact upon certificates furnished by the Seller and appropriate officers and directors of the Seller and by public officials.

8.3. *Conditions to Obligations of the Seller*. The obligation of the Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

TCPM 000491

(a) The Buyer shall have performed in all material respects its covenants and agreements contained in this Agreement which relate to the Purchased Assets and are required to be performed on or prior to the Closing Date;

(b) The representations and warranties of the Buyer which relate to the Purchased Assets and are set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c) The Seller shall have received a certificate from an authorized officer of the Buyer, dated the Closing Date, to the effect that, to the best of such officer's knowledge, the conditions set forth in Sections 8.3(a) and (b) have been satisfied;

(d) The FERC shall have approved the Stipulations and Agreements filed in FERC Docket No. ER97-3127-000 by and between the Office of the Attorney General of Massachusetts, the Division of Energy Resources, Eastern Edison Electric Company and the Seller, dated October 29, 1997; Docket No. ER97-2800-000 by and between the RIPUC, the Rhode Island Division of Public Utilities and Carriers, Blackstone Electric Company, the Seller and Newport Electric Corporation; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Pascoag Fire District of Rhode Island; Docket No. ER97-3127-000 and ER97-2800-000 between the Seller and the Gas and Electric Department of the Town of Middleborough; and Docket No. ER97-2338-000 between the Seller and the Taunton Municipal Lighting Plant, Pascoag Fire District of Rhode Island and the Gas and Electric Department of the Town of Middleborough; and said Stipulations and Agreements shall be and shall continue to be in full force and effect; Stipulations and Agreements shall be and shall continue to be in full force and effect; and

(e) The Seller shall have received an opinion from Shearman & Sterling, counsel for the Buyer (or other counsel reasonably satisfactory to Seller), dated the Closing Date and satisfactory in form and substance to the Seller and its counsel, substantially to the effect that:

(1) the Buyer is a corporation organized, existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver this Agreement and those Ancillary Agreements which relate to the Purchased Assets and to consummate the transactions contemplated hereby; and the execution and delivery of this Agreement and such Ancillary Agreements and the consummation of the sale of the Purchased Assets contemplated hereby have been duly authorized by all requisite corporate action taken on the part of the Buyer;

(2) this Agreement and those Ancillary Agreements which relate to the Purchased Assets have been executed and delivered by the Buyer and (assuming that the Seller Required Regulatory Approvals and the Buyer Required Regulatory Approval are obtained) are valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their terms,

TCPM 000492

except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefore may be brought;

(3) the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Buyer will not constitute a violation of the Certificate of Incorporation or Bylaws on the Closing Date (or other similar governing documents), as in effect, of the Buyer;

(4) the Instrument of Assignment and Assumption and other instruments described in Section 4.4 are in proper form for the Buyer to assume the Assumed Liabilities; and

(5) no declaration, filing or registration with, or notice to, or authorization, consent or approval of any governmental authority is necessary for the consummation by the Buyer of the Closing other than the Buyer Required Regulatory Approvals, all of such Buyer Required Regulatory Approvals which are applicable to the sale of the Purchased Assets hereunder having been obtained and being in full force and effect with such terms and conditions as shall have been imposed by any applicable governmental authority.

As to any matter contained in such opinion which involves the laws of any jurisdiction other than the federal laws of the United States and the laws of New York, such counsel may rely upon opinions of counsel admitted to practices in such other jurisdictions. Any opinions relied upon by such counsel as aforesaid shall be delivered together with the opinion of such counsel. Such opinion may expressly rely as to matters of facts upon certificates furnished by appropriate officers and directors of the Buyer and its subsidiaries and by public officials.

## ARTICLE IX

## INDEMNIFICATION

9.1. *Indemnification*. (a) The Seller will indemnify, defend and hold harmless the Buyer from and against any and all claims, demands or suits (by any Person), losses, liabilities, damages (including consequential or special damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance that is actually recovered (each, an *"Indemnifiable Loss"*), asserted against or suffered by the Buyer relating to, resulting from or arising out of (i) any breach by the Seller of any representation, warranty, covenant or agreement of the Seller contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(b) The Buyer will indemnify, defend and hold harmless the Seller from and against any and all Indemnifiable Losses asserted against or suffered by the Seller relating to,

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          17

resulting from or arising out of (i) any breach by the Buyer of any representation, warranty, covenant or agreement of the Buyer contained in this Agreement, or (ii) any relationship resulting from the PPA Transfer Agreement.

(c) Any Person entitled to receive indemnification under this Agreement (an *"Indemnitee"*) having a claim under these indemnification provisions shall make a good faith effort to recover all losses, damages, costs and expenses from insurers of such Indemnitee under applicable insurance policies so as to reduce the amount of any Indemnifiable Loss hereunder. The amount of any Indemnifiable Loss shall be reduced (i) to the extent that Indemnitee receives any insurance proceeds with respect to an Indemnifiable Loss (after taking into account the costs incurred in collecting such insurance and any reasonable likely increase in premiums resulting from such claim) and (ii) to take into account any net Tax benefit actually recognized by the Indemnitee arising from the recognition of the Indemnifiable Loss and any payment actually received with respect to an Indemnifiable Loss.

(d) The expiration, termination or extinguishment of any covenant or agreement shall not affect the parties' obligations under this Section 9.1 if the Indemnitee provided the Person required to provide indemnification under this Agreement (the *"Indemnifying Party"*) with proper notice of the claim or event for which indemnification is sought prior to such expiration, termination or extinguishment.

(e) Except in the case of fraud and intentional breaches of this Agreement, the rights and remedies of the Seller and the Buyer under this Article IX are exclusive and in lieu of any and all other rights and remedies which the Seller and the Buyer may have under this Agreement or otherwise for monetary relief with respect to (i) any breach or failure to perform any covenant or agreement set forth in this Agreement or (ii) any relationship resulting from the PPA Transfer Agreement.

9.2. *Defense of Claims*. (a) If any Indemnitee receives notice of the assertion of any claim or of the commencement of any claim, action, or proceeding made or brought by any Person who is not a party to this Agreement or any Affiliate of a party to this Agreement (a *"Third Party Claim"*) with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnitee will give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than twenty (20) calendar days after the Indemnitee's receipt of notice of such Third Party Claim. Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The Indemnifying Party will have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, and the Indemnitee will cooperate in good faith in such defense at such Indemnitee's own expense.

(b) If within ten (10) calendar days after an Indemnitee provides written notice to the Indemnifying Party of any Third Party Claim the Indemnitee receives written notice from the

J:\DATA\CLI\84\31584\064\ASSPURCH.OS    18

Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim as provided in the last sentence of Section 9.2(a), the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense thereof; *provided*, *however*, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable expenses thereof. Without the prior written consent of the Indemnitee, the Indemnifying Party will not enter into any settlement of any Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to indemnification hereunder and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give written notice to the Indemnitee to that effect. If the Indemnitee fails to consent to such firm offer within ten (10) calendar days after its receipt of such notice, the Indemnitee may continue to contest or defend such Third Party Claim and, in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim will be the amount of such settlement offer, plus reasonable costs and expenses paid or incurred by the Indemnitee up to the date of such notice.

(c) Any claim by an Indemnitee on account of an Indemnifiable Loss which does not result from a Third Party Claim (a *"Direct Claim"*) will be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, stating the nature of such claim in reasonable detail and indicating the estimated amount, if practicable, but in any event not later than twenty (20) calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party will have a period of thirty (30) calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such thirty (30) calendar day period, the Indemnifying Party will be deemed to have accepted such claim. If the Indemnifying Party rejects such claim, the Indemnitee will be free to seek enforcement of its rights to indemnification under this Agreement.

(d) If the amount of any Indemnifiable Loss, at any time subsequent to the making of an indemnity payment in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the prime rate then in effect of the [Bank of Boston, N.A.]), will promptly be repaid by the Indemnitee to the Indemnifying Party. Upon making any indemnity payment, the Indemnifying Party will, to the extent of such indemnity payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the indemnity payment relates; *provided*, *however*, that (i) the Indemnifying Party will then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying

J:\DATA\CLI\84\31584\064\ASSPURCH.OS          19

TCPM 000495

04/03/98  16:56  FAX 403 213 3550        TCEM LAW DEPT                    ☒001

```
*****************************
***    ACTIVITY REPORT    ***
*****************************

TRANSMISSION OK

TX/RX NO.              5029
TTI                   TCEM LAW DEPT
CONNECTION TEL                    3538
CONNECTION ID         EXECUTIVE POWER
START TIME            04/03 16:44
USAGE TIME           12'03
PAGES                   43
RESULT               OK
```

APR. -03' 98(FRI) 17:56    EASTERN UTILITIES          TEL:508-559-6125              P. 001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
#### 750 WEST CENTER STREET
#### W. BRIDGEWATER, MA 02379
#### 508-559-2000
#### FAX: 508-559-6125

ALEX
Poubeaix

To: S. McMaster               Date: 4/3

                              P + 11 - 25 p'ss

Fax #: _____        Pages: _____
                              (including cover page)

From: M. Irish

Subject: Redline Agreements

COMMENTS:
Incorporates our discussions yesterday. We are
OK with all of in concept — May want to tweak
the words a bit. We have placed right of TCPL
to terminate in Article 8 of Standard Offer
Agreement. We agree to accept this but seek a
comparable right to terminate our obligation

TCPM 000432

APR -03'98(FRI) 17:56    EASTERN UTILITIES              TEL:508-559-6125           P. 001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-559-6125

**To:** S. McMaster                     **Date:** 4/3

                                        Pt 11 - 25 p.g.s

**Fax #:** _____          **Pages:** ~~XXX~~
                                        (including cover page)

**From:** M. (tish

**Subject:** Redline Agreements

**COMMENTS:**
Incorporates our discussions yesterday. We are
OK with all ~~etc~~ in concept — may want to tweak
the words a bit. We have placed right of TCPL
to terminate in Article 8 of Standard Offer
Agreement. We agree to accept this but seek a
comparable right to terminate our obligation

ANY PROBLEMS OR QUESTIONS, PLEASE CALL _____

AT (508) 559-2000, ext. _____

to sell equity if TCPL is in default
of either PPA Transfer of Standard offer.
prior to equity closing.

This document is coming to you in
three parts. Please make sure that
alex finds a copy.

**TCPM 000433**

strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

11.3. _No Survival_.  Subject to the provisions of Section 10.2, each and every representation, warranty and covenant contained in this Agreement (other than the covenants contained in Sections 7.2(b), 7.3, 7.4, 7.7, 7.8 and in Articles IX and X (which covenants shall expire in accordance with their terms), and the provisions of Article IX with respect to any relationship resulting from the PPA Transfer Agreement and this Article XI which shall survive indefinitely) shall expire with, and be terminated and extinguished by, the consummation of the sale of the Purchased Assets, provided, however, that representations and warranties contained herein shall survive for a period of twenty-four (24) months following closing. None of the Seller, the Buyer or Affiliate of any of them shall be under any liability whatsoever with respect to any such representation, warranty or covenant after such period expires.

11.4. _Notices_.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, telexed or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

    (a)  If to the Seller, to:

        c/o EUA Service Corporation
        750 West Center Street
        West Bridgewater, MA 02379
        Facsimile: (508) 559-8932
        Attention:        Donald C. Ryan
                    Manager-Power Resources

        with a copy to:

        McDermott, Will & Emery
        75 State Street
        Suite 1700
        Boston, MA  62109-1807
        Facsimile: (617) 345-5077
        Attention:        Arthur I. Anderson, P.C.

TCPM 000434

(b)  if to the Buyer, to:

> c/o TransCanada Energy Ltd,
> 3400, 237 - 4th Avenue S.W.
> Calgary, Alberta, Canada
> T2P 5A4
> Facsimile: (403) 213-3550
> Attention.              Sean D. McMaster

with a copy to:

> Sherman & Sterling
> 555 California Street
> San Francisco, CA 94104
> Facsimile: (415) 616-1199
> Attention:            Christopher D. Dillon

11.5.  *Assignment*.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, other than to an Affiliate, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other Person except the parties hereto any rights or remedies hereunder.

11.6.  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

11.7.  *Counterparts*.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.8.  *Interpretation*.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

11.9.  *Schedules and Exhibits*.  All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement.

J:\DATA\CLN\84\31584\064\ASSPURCH.OS          23

TCPM 000435

11.10. *Entire Agreement*. This Agreement, the Confidentiality Agreement and the Ancillary Agreements including the Exhibits, Schedules documents, certificates and instruments referred to herein or therein, embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein. It is expressly acknowledged and agreed that there are no restrictions, promises, representations, warranties, covenants or undertakings contained in any material made available to the Buyer pursuant to the terms of the Confidentiality Agreement (including the Information Memorandum, dated July, 1997). This Agreement supersedes all prior agreements and understandings between the parties with respect to such transactions other than the Confidentiality Agreement.

IN WITNESS WHEREOF, the Seller and the Buyer have caused this agreement to be signed by their respective duly authorized officers as of the date first above written.

MONTAUP ELECTRIC COMPANY

By: _____

     Name:
     Title:

TRANSCANADA POWER MARKETING LTD.

By: _____

     Name:
     Title:

By: _____

     Name:
     Title:

TCPM 000436

## SCHEDULE 1.1(a)

### PPA Description

"PPA" means, collectively, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated May 14, 1986, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Second Unit Capacity and Energy From Ocean State Power Project to Montaup Electric Company, dated September 28, 1988, by and between Ocean State Power and Montaup Electric Company, the Unit Power Agreement For the Sale of Unit Capacity and Energy From Ocean State Power Project to Newport Electric Corporation, dated May 14, 1986, by and between Ocean State Power and Newport Electric Corporation and the Unit Power Agreement For the Sale of Second Unit Capacity and Energy from Ocean State Power Project to Newport Electric Corporation, dated July 12, 1988, by and between Ocean State Power and Newport Electric Corporation, in each case as amended, modified or supplemented.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

## SCHEDULE 5.3(a)

### Seller Notices and Approvals

~~Indenture~~

~~Approvals as may be required under the Indenture.~~

### PPA

Approvals as may be required under the PPA.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000438

## SCHEDULE 5.3(b)

### Seller Required Regulatory Approvals

(i) Any required approvals under the Federal Power Act, (ii) (A) notice by the Seller to, and an order by, the  MDTE approving the transactions contemplated by this Agreement, (B) the approval by the RIPUC of the market valuation "implementation methodology" filed in RIPUC Docket 25-92, pursuant to section 39-1-27.4(g) of the Rhode Island General Laws, (C) the approval by the RIPUC of the "Transfer Plan" filed in RIPUC Docket 25-14, pursuant to section 39-1-27(a) of the Rhode Island General Laws, (D) the approval, if required, of the Rhode Island Division of Public Utilities and Carriers, (E) the approval, if required, of the Rhode Island Energy Facilities Sitting Board, ~~(F) if required, notice by the Seller to, and an order by, each of the NHPUC, the VTPSB, the Maine Public Utilities Commission and the Connecticut Department of Public Utility Control approving the sale of the Purchased Assets,~~ (iii) the approval, if required, of the SEC pursuant to the Holding Company Act, (iv) the filings, if required by the Seller and the Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act, and (v) the approval, if required, of the Nuclear Regulatory Commission (the *"NRC"*).

J:\DATA\CLN\84\31584\064\ASSPURCH.OS

TCPM 000439

## SCHEDULE 5.4

### Exceptions to Seller's Title to the PPA

None.

TCPM 000440

## SCHEDULE 5.5(a)

### Exceptions to the Full Force and Effect of and the Transferability of the PPA

        Transferability may be subject to the approval of the counterparties to the PPA and lenders thereto.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000441

## SCHEDULE 5.5(b)

### Defaults under the PPA

None.

TCPM 000442

# Tab 48-2

APR. -03' 98 (FRI) 17:59    EASTERN UTILITIES                TEL:508-559-6125                P. 011

## SCHEDULE 6.3(a)

### Buyer Notices and Approvals

None.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

**TCPM 000443**

**SCHEDULE 6.3(b)**

<u>Buyer Required Regulatory Approvals</u>

Any approvals required under the Federal Power Act.

## SCHEDULE 6.4

### Buyer Regulation as a Utility

The Buyer is a public utility holding company exempt from registration under the Holding Company Act.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000445

<u>EXHIBIT B</u>

<u>TO ASSET PURCHASE AGREEMENT</u>

FORM OF INSTRUMENT OF
ASSIGNMENT AND ASSUMPTION

     Instrument of Assignment and Assumption (this "Agreement") made, executed and delivered on this day of _____, by and between TRANSCANADA POWER MARKETING LTD., a Delaware corporation (the "Buyer") and MONTAUP ELECTRIC COMPANY, a Massachusetts corporation (the "Seller").

W I T N E S S E T H:

     WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of _____, 199 8 (as amended, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), by and between the Seller and the Buyer, the Seller is concurrently herewith selling, assigning, conveying, transferring and delivering to the Buyer the Purchased Assets (as defined in the Asset Purchase Agreement); and

     WHEREAS, the Asset Purchase Agreement requires that the Seller assign all of its right, title and interest in, and that the Buyer assume all liabilities and obligations of the Seller under, the PPA (as defined in the Asset Purchase Agreement);

     NOW THEREFORE, in good consideration of these premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Seller and the Buyer agree as follows:

     1.    Capitalized terms which are used in this Agreement but are not defined in this Agreement shall have the meaning ascribed to such terms in the Asset Purchase Agreement.

     2.    The Seller hereby assigns, transfers and sets over to the Buyer all of the Seller's rights, title and interest in and to the PPA. The assignment effected pursuant to this Section 2 shall be without recourse to and without representation or warranty by the Seller except as specifically provided in the Asset Purchase Agreement.

     3.    The Buyer hereby assumes and agrees to pay, perform or discharge in accordance with their terms, to the extent not heretofore paid, performed or discharged, all liabilities and obligations of the Seller under the PPA.

J:\DATA\CLN\84\31584\064\ASSPURCH.OS

TCPM 000446

4.    It is understood and agreed that nothing in this Agreement shall constitute a waiver or release of any claims arising out of the contractual relationships between the Seller and the Buyer.

5.    This Agreement shall inure to the benefit and be enforceable against the respective successors and assigns of the Seller and the Buyer.

6.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws).

7.    This Agreement is delivered pursuant to and is subject to the Asset Purchase Agreement. In the event of any conflict between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement shall prevail.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the respective duly authorized officers of the Seller and the Buyer as of the date first above written.

TRANSCANADA POWER MARKETING LTD.

By_____
   Name:
   Title:

By_____
   Name:
   Title:

MONTAUP ELECTRIC COMPANY

By_____
   Name:
   Title:

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000447

EXHIBIT C
TO ASSET PURCHASE AGREEMENT

. PPA TRANSFER AGREEMENT

This PPA TRANSFER AGREEMENT ("Agreement") is dated as of _____, 1998 and is made by and between MONTAUP ELECTRIC COMPANY, a Massachusetts corporation ("Seller"), and TRANSCANADA POWER MARKETING LTD., a Delaware corporation ("Asset Purchaser"). This Agreement sets forth the terms and conditions under which Seller transfers to Asset Purchaser the economic benefits and performance obligations, subject to Seller's continuing obligations to make certain payments, associated with the power purchase agreements herein after described ("the Power Purchase Agreement") between Seller and third party power supplier (the "Power Seller"), to Asset Purchaser pursuant to the Asset Purchase Agreement, dated as of _____, 1998 (the "APA"), by and between Seller and Asset Purchaser.

1.    The following Power Purchase Agreement (as amended or supplemented, a "Commitment") is attached as an exhibit hereto and is incorporated into this Agreement by reference:.

| Date | Power Supplier |
|------|----------------|
| 5/14/86 | Ocean State Power    (Montaup) |
| 9/28/88 | Ocean State Power II (Montaup) |
| 5/14/86 | Ocean State Power    (Montaup) |
| 7/12/88 | Ocean State Power II (Montaup) |

1.    A Commitment shall be automatically deleted from the above Commitment list (the "Commitment List") without further action by the parties: (i) on the effective date of any amendment and assignment of the Commitment pursuant to Section 7, below, (ii) upon the expiration of such Commitment pursuant to its terms, or (iii) upon the termination of such Commitment pursuant to the written agreement of the parties thereto.

2.    This Agreement shall become effective on the Effective dDate (as defined in Section 12) and shall remain in effect until Asset Purchaser has made payment to Seller of amounts owed pursuant to Section 4, below, for the last month in which a Commitment is listed on the Commitment List, and Seller has made payment to Asset Purchaser of amounts owned pursuant to Section 8 below, for the last month in which such a payment is due.

3.    Commencing as of the eEffective dDate-of-this-Agreement, each month Seller agrees to provide to Asset Purchaser all capacity, energy and any other benefits it receives under each Commitment as of the first day of the month. All electric energy shall be delivered to Asset Purchaser at the point at which the Power Seller makes delivery to Seller as established under such Commitment. Asset Purchaser shall be responsible for making all arrangements necessary for the further transmission of such energy

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000448

4.　　　　　(a)　Commencing as of the month following the eEffective dDate of this Agreement, Asset Purchaser agrees to pay to Seller each month all amounts properly due from Seller to the Power Seller for the preceding month associated with capacity, energy and any other benefits made available to it by Seller from each Commitment on the preceding month's Commitment List, less the amount of Seller's payment obligation specified in Section 8 below. In turn, each month, Seller shall timely pay the Power Seller an amount equal to all amounts properly due to the Power Seller for the preceding month under each Commitment. For purposes of the first monthly payment due from Asset Purchaser to Seller under this Agreement in connection with each Commitment, energy payments shall be based on meter readings taken on the first day for which Asset Purchaser has a payment obligation under this Agreement and capacity payments shall be based on the ratio of the number of days in the month for which Asset Purchaser has a payment obligation under this Agreement to the total number of days in the month. Asset Purchaser shall make such payment sufficiently in advance of the time that such payment is due by Seller to the Power Seller as to allow Seller to make timely payment under such Commitment, which includes the amount Seller receives from Asset Purchaser in connection with such Commitment and the amount of Seller's payment obligation specified in Section 8 below.

　　　　　(b) Upon the eEffective dDate of this Agreement, Seller shall irrevocably and unconditionally assign and thereafter hold for the benefit of and/or credit to Asset Purchaser against payments due from it to Seller under Section 4(a) hereof or, at the termination of this Agreement pay to Asset Purchaser, any and all amounts which are then or thereafter received by Seller from the Power Sellers under the Commitments, including, without limitation, any aggregate differential balances under any Commitment and the benefit of and proceeds from any security deposits, letters of credit or other similar instruments or accounts established for the benefit of Seller by the Power Seller, but excluding any credits or refunds received by Seller after the effective date which relate to billing errors or reconciliations of pre-effective date bills, and any amounts paid by the Power Sellers to Seller with respect to disputes arising before the eEffective dDate that are attributable to a period prior to the eEffective dDate.

5.　　　　　(a)　Effective as of the eEffective dDate of this Agreement, Seller hereby irrevocably and unconditionally appoints Asset Purchaser as its agent for all purposes under each Commitment. Asset Purchaser is authorized to take all actions that Seller may lawfully take under such Commitment without further approval by Seller, except that Seller's prior written consent shall be required for (i) actions that materially increase the costs to be incurred or the quantity of power to be purchased by Seller under such Commitment (such as the approval of facility expansions or fuel supply arrangements) and (ii) Commitment option exercises, term extensions or amendments. Seller shall not unreasonably witholdout such consent.

　　　　　(b) Seller shall not agree to any amendment to or waiver of rights under a Commitment without Asset Purchaser's consent, which Asset Purchaser may grant or withhold in its sole discretion, and will not take any actions inconsistent with the provisions of this Section 5.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS　　　　2

TCPM 000449

6.    Each party shall be entitled to indemnification under this Agreement to the extent and in the manner set forth in Article 9 of the APA which is hereby incorporated herein by reference.

7.    (a) Seller and Asset Purchaser agree to work cooperatively and use all reasonable efforts to amend each Commitment and assign the amended Commitment to Asset Purchaser so that Seller will be released of all further liabilities and obligations under each Commitment and Asset Purchaser will be directly in contract with the Power Seller (a "Novation"). Any such amendment shall include all modifications necessary to reflect the substitution of Asset Purchaser for Seller as the purchasing party under such Commitment (including modifications to Commitment price indices, where appropriate) and to properly describe interconnection, delivery point and transmission system references in such Commitment. It is intended by the parties that such Commitment amendment and assignment preserve the economic benefit of a Commitment to the Asset Purchaser while continuing to afford to Seller the protections for its or its Affiliates transmission system embodied in the Commitment, provided that nothing in this Agreement is intended to limit the ability of Asset Purchaser to direct the dispatch, availability, quantity of timing of capacity or electrical output of a facility that is the subject of a Commitment in accordance with the terms of such Commitment. Seller and Asset Purchaser agree to execute all agreements and documents reasonably requested by the other in connection with a Novation. The provisions of Section 8(d) shall apply in respect of a Novation.

(b) Notwithstanding the provisions of 7(a) the Seller and Asset Purchaser agree that, as a condition of any Novation , the Asset Purchaser will require Seller to provide,either (i) payment of a lump sum pursuant to the provisions of Section 8(d) which reduces the Seller's continuing obligation to zero ($0); or, if Seller and Buyer do not mutually agree to payment of a lump sum,(ii) a security interest to the Asset Purchaser in a portion to the Seller's Contract Termination Charge revenues and related service agreements with Eastern Edison Company, Blackstone Valley Electric Company and Newport Electric Corporation which is equal to the continuing obligation of the Seller under 8(b) and is acceptable to the Asset Purchaser acting reasonably.

8.    (a) In the month during which this Agreement is executed, Seller shall pay the Power Seller an aggregate amount equal to the amount as set out in Schedule "A" attached hereto (the "Monthly Support Payment"), multiplied by a fraction, the numerator of which is the total number of days in the month in which this Agreement is executed, less the number of days in such month up to and including the date of the execution of this Agreement, and the denominator of which is the total number of days in the month in which this Agreement is executed of this Agreement, and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above for such month.

(b) Commencing as of the month following the effective date of this Agreement and continuing for each succeeding month through and including January 2008, Seller shall pay to the Power Seller each month an aggregate amount equal to the Monthly Support Payment,

TCPM 000450

and such amount shall be deducted by Asset Purchaser from the amount due Seller under Section 4 above.

(c) In the event that the amount of the Monthly Support Payment set forth is Section 8(b) (as adjusted to reflect any increase pursuant to this Section 8(c) shall in any month exceed the amount due Seller from Asset Purchaser under Section 4, Seller shall increase the amount of its Monthly Support Payment in the next month (in addition to its obligation set forth in Section 8(b) by the amount of such excess and Asset Purchaser shall also be allowed to deduct such excess from the amount due Seller under Section 4 for such month

(d) To the extent that a Novation is executed with respect to a Commitment , pursuant to Section 7 and Asset Purchaser and Seller agree to a lump-sum payment, Seller and Asset Purchaser agree to amend this Agreement to equitability provide for a lump-sum payment to either Asset Purchaser or the Power Seller to reduce the amount of Seller's retained obligation set forth in Section 8(b). Such lump-sum payment and such reduction in the amount of Seller's retained obligation shall be in amounts to be negotiated in good faith by Asset Purchaser and Seller. It is the intention of the parties that the lump-sum payment shall be based on the net present value of the amounts set out in Schedule "A" at a discount rate agreeable to Asset Purchaser and Seller calculated using a discount rate acceptable to Asset Purchaser and Seller acting reasonably and which is reasonable given the remaining term of the amounts payable by the Seller to the Asset Purchaser as set out in Schedule "A", prevailing interest rates for similar financings done at the time of payment of the lump sum and the creditworthiness of Seller at the time of payment of the lump sum.

9.   This Agreement and all rights, obligations, and performances of the parties hereunder, are subject to all applicable Federal and state laws, and to all promulgated orders and other duly authorized action of governmental authority having jurisdiction.

10.  This Agreement, the APA and any other agreement entered into by the parties pursuant to the APA constitute the entire agreement between the parties, and supersede all previous offers, negotiations, discussions, communications and correspondence. This Agreement may be amended only a written agreement signed by the parties. Except as otherwise set forth in Section 5 hereof, this Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto, including by operation of law without the prior written consent of the other party, nor is this Agreement intended to confer upon any other person except the parties hereto any rights or remedies hereunder. Notwithstanding the foregoing, (i) the Asset Purchaser may assign all of its rights and obligations hereunder to any wholly owned subsidiary (direct or indirect) of TransCanada Pipelines Limited ("TransCanada") and upon Seller's receipt of notice from Asset Purchaser of any such assignment, the Asset Purchaser will be released from all liabilities and obligations hereunder, accrued and unaccrued, such assignee will be deemed to have assumed, ratified, agreed to be bound by and perform all such liabilities and obligations, and all references herein to Asset Purchaser shall thereafter by

TCPM 000451

deemed references to such assignee, in each case without the necessity for further act or evidence by the parties hereto or such assignee; provided, however, that no such assignment and assumption shall release the Asset Purchaser from its liabilities and obligations hereunder unless the assignee shall have acquired all or substantially all of the Asset Purchaser's assets; provided, further, however, that no such assignment and assumption shall relieve or in any way discharge TransCanada from the performance of its duties and obligations under the Guaranty dated as of the date of this Agreement executed by TransCanada; and (ii) the Asset Purchaser or its permitted assignee may assign, transfer, pledge or otherwise dispose of its rights and interests hereunder to a trustee or lending institution(s) for the purpose of financing or refiancing the Commitment including upon or pursuant to the exercise of remedies under a financing or refinancing, or by way of assignments, transfers, conveyances or dispositions in lieu thereof, provided, however, the no such assignment or disposition shall relieve or in any way discharge the Asset Purchaser or such assignee from the performance of its duties and obligations under this Agreement. Seller agrees to execute and deliver such documents as may be reasonably necessary to accomplish any such assignment, transfer, conveyances, pledge or disposition of rights hereunder so long as Sellers rights under this Agreement are not thereby otherwise altered, amended, diminished or otherwise impaired. The interpretation and performance of this Agreement shall be according to and controlled by the laws of The Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of laws). This Agreement may be executed in one or more counterparts and each such counterpart shall constitute one and the same instrument.

11. All payments required under this Agreement shall be paid in cash by federal or other wire transfer of immediately available funds to an account designated by the party to receive such such payment.

12. This Agreement shall be of no force and effect until the Effective Date. If the APA shall have been terminated before the occurrence of the Closing Date (as defined in the APA), this Agreement shall, without any action of the parties hereto, terminate as of the time of the termination of the APA. As used in this Agreement, "Effective Date" shall mean the Effective Date (as defined in the APA).

TCPM 000452

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Agreement on their behalf as of the date first above written.

MONTAUP ELECTRIC COMPANY

By:_____
   Name:
   Title:

TRANSCANADA POWER MARKETING LTD.

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

TCPM 000453

# TABLE OF CONTENTS

ARTICLE I      DEFINITIONS ................................ ............................ ...  1
   1.1.    Definitions .........................................................................  1

ARTICLE II     PURCHASE AND SALE ................. ........................... 5
   2.1.    The Sale..........................................................................  5

ARTICLE III    PURCHASE PRICE ........... ...................................... 5
   3.1.    Purchase Price....................................................................  5

ARTICLE IV     THE CLOSING..............................................................  5
   4.1.    Time and Place of Closing.....................................................  5
   4.2.    Payment of Purchase Price .....................................................  5
   4.3.    Deliveries by Seller.............................................................  5
   4.4.    Deliveries by the Buyer ........................................................  6
   4.5.    Wholesale Standard Offer Agreement.......................................  6

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF THE SELLER..................  7
   5.1.    Organization; Qualification.....................................................  7
   5.2.    Authority Relative to this Agreement .......................................  7
   5.3.    Consents and Approvals; No Violation......................................  7
   5.4.    Title and Related Matters ..... ................... ........................  8
   5.5.    The PPA ..........................................................................  8

ARTICLE VI     REPRESENTATIONS AND WARRANTIES OF THE BUYER...................  9
   6.1.    Organization .....................................................................  9
   6.2.    Authority Relative to this Agreement ........................................  9
   6.3.    Consents and Approvals; No Violation......................................  9
   6.4.    Regulation as a Utility......................................................... 10

ARTICLE VII    COVENANTS OF THE PARTIES........................................ 10
   7.1.    Conduct of Business of the Company......................................... 10
   7.2.    Access to Information .......................................................... 10
   7.3.    Expenses......................................................................... 11
   7.4.    Further Assurances............................................................. 11
   7.5.    Public Statements .............................................................. 11
   7.6.    Consents and Approvals....................................................... 11
   7.7.    Fees and Commissions ........................................................ 12
   7.8.    Tax Matters . ... ............................................................... 12

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000454

ARTICLE VIII   PURCHASED ASSETS CLOSING CONDITIONS ..................................... 13
 8.1. Conditions to Each Party's Obligations to Effect the Purchase
   Transactions.......................................................................................... 13
 8.2. Conditions to Obligations of the Buyer ........................... 13
 8.3. Conditions to Obligations of the Seller............................ 15

ARTICLE IX   INDEMNIFICATION........................................................... 17
 9.1. Indemnification ....................................................................... 17
 9.2. Defense of Claims .................................................................. 18

ARTICLE X   TERMINATION AND ABANDONMENT ............................................... 19
 10.1. Termination ........................................................................... 19
 10.2. Procedure and Effect of Termination ............................................ 20

ARTICLE XI   MISCELLANEOUS PROVISIONS .......................................... 21
 11.1. Amendment and Modification ........................................... 21
 11.2. Waiver of Compliance, Consents.......................................... 21
 11.3. No Survival.......................................................................... 21
 11.4. Notices ................................................................................ 21
 11.5. Assignment ......................................................................... 22
 11.6. Governing Law .................................................................... 23
 11.7. Counterparts ....................................................................... 23
 11.8. Interpretation ..................................................................... 23
 11.9. Schedules and Exhibits......................................................... 23
 11.10. Entire Agreement................................................................. 23

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000455

## EASTERN UTILITIES ASSOCIATES
### GENERATION BUSINESS DIVESTITURE

|                                                                   | Tab |
|-------------------------------------------------------------------|-----|
| Asset Purchase Agreement                                          | 1   |
| Exhibits to Asset Purchase Agreement                             |     |
| A   Form of Wholesale Standard Offer Agreement                  | 2   |
| B   Form of Instrument of Assignment and Assumption             | 3   |
| C   Form of Interconnection Agreement                           | 4   |
| D   Form of PPA Transfer Agreement                              | 5   |
| Guaranty                                                          | 6*  |
| Schedules to the Asset Purchase Agreement                       | 7   |

---

\* To be provided at a later date, as an addition to this volume.

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000456

## SCHEDULE "A"

### MONTHLY SUPPORT PAYMENTS

For each month, beginning with the Effective Day (prorated in accordance with Section 8(a) of the PPTA), if applicable, the Monthly Support Payment shall be as set out below:

| Calendar Year | Monthly Support Payment |
|---------------|-------------------------|
| 1999 | $ 1,6650,000 |
| 2000 | $1,6650,000 |
| 2001 | $1,542,000 |
| 2002 | $1,542,000 |
| 2003 | $ 870,000 |
| 2004 | $ 870,000 |
| 2005 | $ 870,000 |
| 2006 | $ 870,000 |
| 2007 | $ 870,000 |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM 000457

APR. -03' 98(FRI) 18:22    EASTERN UTILITIES          TEL:508-559-6125          P. 001

# FAX TRANSMISSION

### EUA SERVICE CORPORATION
750 WEST CENTER STREET
W. BRIDGEWATER, MA 02379
508-559-2000
FAX: 508-559-6125

To: S. McMaster          Date: 4/3

                                    Pt II - 36 pgs
Fax #: _____        Pages:  2x28  Pt III - 17 pgs
                                  (including cover page)

From: M. Hish

Subject: Redline Agreements

COMMENTS:
Incorporates our discussions yesterday. We are
OK with all are in concept — may want to tweak
the words a bit. We have placed right of TCPL
to terminate in Article 8 of Standard Offer
Agreement. We agree to accept this but seek a
comparable right to terminate our obligation

ANY PROBLEMS OR QUESTIONS, PLEASE CALL _____

AT (508) 559-2000, ext. _____

to sell equity if TCPL is in default
of either PPA Transfer of Standard offer,
prior to equity closing.

This document is coming to you in
three parts. Please make sure that
alex finds a copy.

TCPM 000458

Wholesale Standard
Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.

April 3, 1998

TCPM 000459

## TABLE OF CONTENTS

Page

ARTICLE 1.  Definitions............................................................................................. 2

ARTICLE 2.  Term ......................................................................................................3

ARTICLE 3.  Supplier Responsibilities ....................................................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO ..........................4

ARTICLE 5.  Price ......................................................................................................5

ARTICLE 6.  Billing and Payments ............................................................................. 6

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies ................. 6

ARTICLE 8.  Termination............................................................................................ 8

ARTICLE 9.  Force Majeure ........................................................................................ 8

ARTICLE 10. Assignment ........................................................................................... 9

ARTICLE 11. Successors and Assigns........................................................................ 10

ARTICLE 12. Resolution of Disputes......................................................................... 10

ARTICLE 13. Interpretation ....................................................................................... 11

ARTICLE 14. Severability of Provisions .................................................................... 11

ARTICLE 15. Accounts and Records.......................................................................... 11

ARTICLE 16. Limitations on Liability and Indemnification ....................................... 11

ARTICLE 17. Regulation ........................................................................................... 12

ARTICLE 18. Notices ................................................................................................ 12

ARTICLE 19. Miscellaneous ...................................................................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

TCPM 000460

## STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this ____ day of _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated /1_____; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Standard Offer Service Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 364, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' of the aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

TCPM 000461

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5.  The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

TCPM 000462

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken.

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 364, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended from time to time. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E. or as otherwise provided by law.

ARTICLE 2.    Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.

ARTICLE 3.    Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

TCPM 000463

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

TCPM 000464

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.


ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

Price = Standard Offer Wholesale Price<br>+ Fuel Adjustment Factor

Where:      Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein

TCPM 000465

includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6.   Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 12 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7.   Events of Default, Liability, Relationship of the Companies:

(1)    Unless excused by a Force Majeure as described in Article 9, each of the following events shall be deemed to be an Event of Default hereunder:

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such

TCPM 000466

failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2). Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3) Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the company resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable. Any contract entered into by the Companies will be deemed commercially reasonable unless Supplier can demonstrate that the Companies paid materially more than the market price for contracts for comparable services and lengths entered into during the same time period.

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to reasonable, additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4) As a condition of this agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this agreement. The Companies accept the Guarantee attached hereto as reasonable financial surety.

TCPM 000467

**ARTICLE 8.  Termination/Reimbursement:**

(1)    In addition to the termination rights provided for an Event of Default as provided in Article 7, the Companies may terminate this Agreement, if:

    a.  Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

    b.  The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; and

    c.  Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup Electric Company under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Supplier are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service, in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief to the Supplier. If Supplier determines, acting reasonably, that its costs or obligations have materially increased, and so demonstrates to the Companies, acting reasonably, then the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materiality of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

**ARTICLE 9.  Force Majeure:**

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

TCPM 000468

ıacilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)    The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)    The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)    The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)    The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

TCPM 000469

**ARTICLE 11.** Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.


ARTICLE 12. Resolution of Disputes:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

TCPM 000470

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c. 251, § 1 et seq.).

ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

ARTICLE 16. Limitations on Liability and Indemnification:

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful

TCPM 000471

misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

ARTICLE 17. Regulation:

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

ARTICLE 18. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4ᵗʰ Avenue S.W.
Calgary, Alberta T2P 5A4

TCPM 000472

Such addresses may be changed from time to time by written notice by either Party to the other Party.

ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

TCPM 000473

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:          TransCanada Power Marketing Ltd.

By:_____

On Behalf of the Companies:

Blackstone:        BLACKSTONE VALLEY ELECTRIC COMPANY

By:_____

Eastern:           EASTERN EDISON COMPANY

By:_____

Newport:           NEWPORT ELECTRIC CORPORATION

By:_____

TCPM 000474

# APPENDIX A

## SCHEDULE OF SUPPLIER S SHARE of STANDARD OFFER SERVICE
## AND
## STANDARD OFFER WHOLESALE PRICE

### TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

\* Standard Offer Service for Eastern Edison terminates
at 12:00 midnight on December 31, 2004.

Option To Reduce Suppliers Share

With 30 days written notice, the Companies may reduce Supplier's percentage share of Standard Offer Service shown above; provided however, that once the Companies have elected to reduce Supplier's share of Standard Offer Service, such percentage share cannot be increased. The Companies may exercise this option to reduce Supplier's percentage share of Standard Offer Service as frequently as it deems necessary.

TCPM 000475

# Tab 49

APR. -03' 98 (FRI) 18:22    EASTERN    ,LITIES                TEL:508-5   6125                    P. 002

Wholesale Standard
Offer Service Agreement

between

Blackstone Valley Electric Company

Eastern Edison Company

Newport Electric Corporation

and

TransCanada Power Marketing Ltd.



April 3, 1998

TCPM007506

APR. -03' 98(FRI) 18:23    EASTERN    'LITIES    TEL:508-5⁻⁻6125    P. 003

# TABLE OF CONTENTS

                                                                    Page

ARTICLE 1.  Definitions ........................................................ 2

ARTICLE 2.  Term ............................................................... 3

ARTICLE 3.  Supplier Responsibilities .......................................... 3

ARTICLE 4.  Estimation of Hourly Loads and Reporting to the ISO ................ 4

ARTICLE 5.  Price .............................................................. 5

ARTICLE 6.  Billing and Payments ............................................... 6

ARTICLE 7.  Events of Default, Liability, Relationship of the Companies ........ 6

ARTICLE 8.  Termination ........................................................ 8

ARTICLE 9.  Force Majeure ...................................................... 8

ARTICLE 10. Assignment ......................................................... 9

ARTICLE 11. Successors and Assigns ............................................ 10

ARTICLE 12. Resolution of Disputes ............................................ 10

ARTICLE 13. Interpretation .................................................... 11

ARTICLE 14. Severability of Provisions ........................................ 11

ARTICLE 15. Accounts and Records .............................................. 11

ARTICLE 16. Limitations on Liability and Indemnification ...................... 11

ARTICLE 17. Regulation ........................................................ 12

ARTICLE 18. Notices ........................................................... 12

ARTICLE 19. Miscellaneous ..................................................... 13

Appendix A Schedule of Supplier's Share of Offer Service and Standard Offer Wholesale Price

TCPM007507

APR. -03'98(FRI) 18:23    EASTERN   ILITIES              TEL:508-5  6125                    P. 004

## STANDARD OFFER SERVICE AGREEMENT

This Standard Offer Service Agreement ("Agreement"), is made and entered into this ____ day of _____, between Eastern Edison Company, ("Eastern") a Massachusetts Corporation; Blackstone Valley Electric Company ("Blackstone"), a Rhode Island Corporation; and Newport Electric Corporation ("Newport"), a Rhode Island Corporation (referred to collectively as the "Companies"), on the one hand, and TransCanada Power Marketing Ltd., a Delaware Corporation,("Supplier"), on the other hand.

WHEREAS, the Supplier will purchase certain electric resources from Montaup Electric Company, under an asset purchase agreement, (the "Asset Purchase Agreement") dated _____; and as condition of such purchase and sale Supplier is required to assume a share of the Companies' Standard Offer Service under this Standard Offer Service Agreement; and

WHEREAS, the Companies are required to provide firm all- requirements service to any retail customer that is eligible for and is taking electric service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 364, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended from time to time or such other similar tariff established by the Companies for those Customers that have not elected to choose an alternate supplier of electricity; and

WHEREAS, this Agreement provides for the transfer, from the Companies to Supplier, of the responsibility for providing firm all-requirements electric service including capacity, energy, reserves, losses and other related services necessary to serve a specified share of the Companies' of the aggregate load of retail customers taking Standard Offer Service; and

WHEREAS, by entering into this Agreement, Supplier agrees to provide and the Companies agree to receive and pay for electricity provided in accordance with the terms and conditions of this Agreement and the applicable Appendices, subject to any actions by any governmental bodies having regulatory jurisdiction over services rendered hereunder.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements contained herein, Supplier and Companies agree to the terms and conditions as set forth below:

TCPM007508

ARTICLE 1.  Definitions:

Whenever used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean any other entity (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity. For purposes of the foregoing the definition of "control" means the direct or indirect ownership of more than seventy percent of the outstanding capital stock or other equity interest having ordinary voting power.

"Agreement" shall mean this Agreement, including its Appendices as amended from time to time.

"Commencement Date of Service" shall mean the Effective Date as defined in the Asset Purchase Agreement.

"Contract Year" shall mean any calendar year, or in the case of 1998 part of a calendar year, after the Commencement Date of Service in which Supplier is scheduled to provide electricity to the Companies for Standard Offer Service.

"Companies' System" shall mean the electrical distribution systems of Blackstone, Newport, Eastern, and/or the electrical transmission system of Montaup Electric Company, as applicable.

"Delivered Energy" shall mean the kilowatt-hours delivered to the meters of those retail customers taking Standard Offer Service.

"Delivery Point" shall be any location on the NEPOOL PTF system or Companies' System.

"D.T.E." shall mean the Massachusetts Department of Telecommunications and Energy.

"ISO" shall mean ISO New England, Inc., the independent system operator established in accordance with the Restated NEPOOL Agreement, or its successor.

"NEPOOL" shall mean the New England Power Pool or its successor.

"Party" or "Parties" shall mean the Supplier and the Companies and their respective successors and assigns.

"Price" shall mean the annual amount per kilowatt-hour to be paid for Delivered Energy set forth in Article 5 with no variation for time-of-use, seasonality, or any other factor except as specified in Article 5. The Companies or their Standard Offer customers shall not be obligated under this Agreement for any payments for Delivered Energy in addition to the payments made pursuant to Article 5.

TCPM007509

"PTF" shall mean the facilities categorized as Pool Transmission Facilities as defined in the Restated NEPOOL Agreement.

"P.U.C." shall mean the Rhode Island Public Utilities Commission.

"Restated NEPOOL Agreement" shall mean the New England Power Pool Agreement dated December 31, 1996, as amended from time to time, as it is in force at the time the action in question is taken. *Settlement Agreements mean ... Bob to provide*

"Standard Offer Service" shall mean firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking service under Eastern's Standard Offer Service Tariff No. M.D.T.E. 364, Blackstone's Standard Offer Service Tariff No. R.I.P.U.C. 1154, or Newport's Standard Offer Service Tariff No. R.I.P.U.C. 1379, as amended ~~from time to time~~. Supplier is responsible for changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events. *all in accordance with the Settlement Agreements*

"Standard Offer Wholesale Price" shall mean the stipulated stream of prices, in cents per kilowatt-hour, that will be paid to suppliers of Standard Offer Service for Delivered Energy, as shown in Appendix A.

"Terms and Conditions for Suppliers" shall mean the Blackstone Valley Electric Company and Newport Electric Corporation Terms and Conditions for Electric Power Suppliers dated May 29, 1997 as approved by the P.U.C., or the Eastern Edison Company Terms and Conditions for Competitive Suppliers as approved by the D.T.E., as applicable. These Terms and Conditions may be revised, amended, supplemented, or supplanted in whole or in part from time to time by the P.U.C. or D.T.E., or as otherwise provided by law.

## ARTICLE 2.    Term:

The term of this Agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner in accordance with Article 7 or 8.

## ARTICLE 3.    Supplier Responsibilities

Supplier shall be a member, in good standing, of NEPOOL or its successor entity and maintain an own-load dispatch or settlement account established in accordance with the rules and criteria established by the ISO throughout the term of this agreement. In addition, Supplier must satisfy registration and certification requirements, as the case may be, as a Non-Regulated Power Producer in Massachusetts and Rhode Island.

TCPM007510

Supplier is responsible for providing firm all-requirements service necessary to serve its share, as shown in Appendix A attached hereto, of the Companies aggregate load attributed to those customers taking Standard Offer Service.

√ Service

As a provider of Standard Offer Service, Supplier is solely responsible for satisfying all requirements and paying all cost incurred or to be incurred to provide those services including, without limitation, all costs or other requirements to furnish installed capability, operable capability, energy, operating reserves, automatic generation control and reactive power support, receipt of, and payment for, tie benefits, line losses and other ancillary services associated with the provision of its share of Standard Offer Service. Supplier is also solely responsible for meeting any other requirements and paying any other cost now or hereafter imposed by the ISO from time to time which are attributable to the provision of Standard Offer, as they may arise. If the ISO or any successor entity or the NEPOOL Administrator allocates any NEPOOL expenses or uplift costs to the Standard Offer Service provided by the Supplier (on a load or peak load basis or otherwise), the expenses or cost so allocated will be borne by the Supplier alone without recourse to the Companies.

Supplier shall be responsible for all transmission and distribution losses associated with the delivery of electricity supplied under this Agreement from the sources of its supply to the meters of those customers taking Standard Offer Service.

The Companies, in their regulated charges, will bill Standard Offer Service customers for NEPOOL Regional Network Transmission Service ("RNS"), any Local Area Network Transmission Service ("LNS") which is the transmission, if any, between the NEPOOL PTF and the Companies' distribution system, and for the Companies' distribution costs. Supplier is responsible for any transmission wheeling costs to the Delivery Point and any distribution wheeling costs associated with supply sources not included in Companies' approved distribution rates. If the NEPOOL control area experiences congestion, Supplier will be responsible for any congestion costs incurred in delivering power across the PTF system to the Companies. Supplier shall be responsible for all transmission and distribution costs associated with the use of transmission systems outside of NEPOOL and any local point-to-point transmission charges and distribution charges incurred to deliver the power to the NEPOOL PTF.

In the event that either the D.T.E. or the P.U.C. issue orders requiring the Companies to implement uniform disclosure requirements that pertain to the reporting of information regarding power plant emissions, fuel types, or labor information for the sources of electricity used to supply Standard Offer Service, the Supplier will provide such information in a timely manner in an appropriate form to enable the Companies to comply with such requirements.

ARTICLE 4. Estimation of Hourly Loads and Reporting to the ISO:

To meet their NEPOOL obligations, the Companies shall report to the ISO Supplier's share of hourly Standard Offer Service load, including distribution and non-PTF losses. In making such reports, the Companies will estimate Supplier's share of Standard Offer Service load based on the methods and procedures approved in Terms and Conditions for Suppliers on file with the P.U.C. and D.T.E., as amended from time to time, as applicable.

As required by NEPOOL, the Companies will make all reasonable efforts to report to the ISO Supplier's hourly share of Standard Offer Service load by 12:00 noon of the second following business day.

As described in the Terms and Conditions for Suppliers, at the end of each month, the Companies shall aggregate Supplier's hourly Standard Offer Service loads for the month as reported to the ISO. The Supplier's aggregate share of Standard Offer Service, not including losses will be deemed to be the quantity of Delivered Energy that Supplier provided for that month and is the unadjusted kWh amount to be used for Billing and Payment as described in Article 6.

The Companies will periodically reconcile the Delivered Energy to actual meter readings of those customers taking Standard Offer Service, as described in the Terms and Conditions for Suppliers. The Companies will apply any resulting billing adjustment (debit or credit) to Supplier's account no later than the last day of the third month following the billing month.

ARTICLE 5.  Price:

For each kilowatt-hour of Delivered Energy that Supplier provides in each month, as determined in accordance with Article 4 and the Terms and Conditions for Suppliers, the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:

Price = Standard Offer Wholesale Price
         + Fuel Adjustment Factor

Where:        Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and

Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the retail Rate Fuel Adjustment mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

TCPM007512

With the exception of any sales or gross receipts taxes which are required by law to be paid by Standard Offer Service customers, the Price for Delivered Energy as set forth herein

includes all local, state and federal taxes, fees and assessments applicable as of the date hereof or which may be assessed or imposed in the future by any governmental authority with jurisdiction governing the sale of electricity covered by this Agreement.

ARTICLE 6.    Billing and Payments:

Until reconciled with actual metered data pursuant to the Terms and Conditions of Suppliers, computations by the Companies of the charges for the purposes of billings hereunder shall be based on estimates of Supplier's Delivered Energy in accordance with Article 4 and the Price as determined in accordance with Article 5. The Companies shall calculate the amount payable to Supplier for a given month on or before the twentieth (20th) day of the following month. The calculation shall be provided to Supplier and shall show the total amount due and payable for the previous month. Each bill shall be subject to adjustment for any errors in arithmetic computation, estimating, reconciliation pursuant to the Terms and Conditions of Suppliers or otherwise only to the extent allowed by the terms of this Article 6.

On or before the last day of each month, Companies shall pay Supplier any amounts due and payable for the Delivered Energy provided by Supplier in the previous month ("Due Date"). Any amount remaining unpaid after the Due Date shall bear interest at the Prime Rate then in effect at the main office of BankBoston, or such other lending institution as agreed to by Companies and Supplier, from the Due Date to the date of payment by Companies.

If Supplier disputes the amount of any bill or payment, Supplier shall itemize the basis for its dispute in a written notice to Companies within fifteen days after the Due Date. Billing and payment disputes shall be handled in accordance with the provisions of Article 12 of this Agreement. Upon final resolution of the dispute, payment of any amount due to a Party under the terms of the resolution shall be made within thirty (30) days of the date thereof, together with interest from and after the original Due Date at the rate specified in this Article.

The Companies may make retroactive adjustments to any billing for a period of up to one year from the date of the original billing in order to reflect differences in charges resulting from receipt of more accurate data. Supplier may dispute such adjustment in writing within thirty (30) days of receipt of the proposed adjustment.

ARTICLE 7.    Events of Default, Liability, Relationship of the Companies:

TCPM007513

(1)    Unless excused by a Force Majeure as described in Article 9, each of the following events shall be deemed to be an Event of Default hereunder:

(a)    Failure of Supplier, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days after notice thereof from the Companies.

(b)    Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such

APR. -03' 98(FRI) 18:27    EASTERN    LITIES            TEL:508-5⁻ 6125            P. 010

failure is not cured or rectified within thirty (30) days after notice thereof from the Supplier.

(2)    Upon the occurrence of an Event of Default by the Companies, the Companies shall be liable to the Supplier for any direct damages resulting from the Event of Default. In addition, the Supplier may pursue any remedies or other damages provided for under law, and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Companies, such termination to be effective as of the date specified in such notice. Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies, herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion that its monthly Standard Offer Service requirements represents as a percentage of the Companies' total Standard Offer Service requirements.

(3)    Upon the occurrence of an Event of Default by the Supplier, the Supplier shall be liable to the Companies for all costs reasonably incurred by the company resulting from Supplier's failure to deliver its share of the Standard Offer Service. Such amount shall be calculated as the positive difference, if any, obtained by subtracting the per unit Price established in Article 5, from the per unit Replacement Price. The positive difference shall be applied to each kilowatthour that Supplier fails to deliver.

"Replacement Price" shall mean the price at which the Companies acting in a commercially reasonable manner purchase substitute Standard Offer Service not delivered by Supplier, plus any additional transmission and NEPOOL charges, incurred by the Companies. The parties hereby stipulate that purchases at the applicable NEPOOL spot market prices will be deemed commercially reasonable. ~~Any contract entered into by the Companies will be deemed commercially reasonable unless Supplier can demonstrate that the Companies paid materially mo   than the market price for contracts for comparable services and lengths entered into during th⁻   ᵗʰᵉ time period.~~

The Parties expressly agree that the amounts set forth in this Article 7 subparagraph (3) do not constitute liquidated damages. In addition to the amounts established in this Article 7 subparagraph (3) above, the Supplier shall be liable to the Companies for any additional direct damages resulting from an Event of Default, including, but not limited to reasonable, additional administrative and legal expenses incurred as a result of Supplier's failure to deliver, and the Companies may pursue any remedies or other damages provided for under law and may unconditionally terminate this Agreement by giving at least sixty (60) days advance written notice to the Supplier, such termination to be effective as of the date specified in such notice.

(4)    As a condition of this agreement, the Supplier shall deliver to the Companies, prior to the Commencement Date of Service, financial surety reasonably acceptable to the Companies to secure Supplier's performance under this agreement. The Companies accept the Guarantee attached hereto as reasonable financial surety.

ARTICLE 8.    Termination/Reimbursement:

(1)    In addition to the termination rights provided for an Event of Default as provided in Article 7, the Companies may terminate this Agreement, if:

a.    Supplier's share of Standard Offer Service load is less than one (1) megawatt for two consecutive months;

b.    The Companies are prevented by any government agency of competent jurisdiction from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier; and

c.    Any governmental or regulatory agency with jurisdiction over the Companies orders, implements, requires, or causes what the Companies determine, in their sole discretion, to be a material modification or amendment of Standard Offer Service.

(2)    In the event of a material default by Montaup Electric Company under the PPA Transfer Agreement between Supplier and Montaup, Supplier may unconditionally terminate the Agreement by giving at least sixty (60) days written notice to the Companies, such termination to be effective as of the date specified in such notice.

(3)    In the event that the Standard Offer Service or the Terms and Conditions for Supplier are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service, in a manner which materially increases Supplier's costs or obligations to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief to the Supplier. If Supplier determines, acting reasonably, that its costs or obligations have materially increased and so demonstrates to the Companies, acting reasonably, then the Companies and Supplier shall meet to determine the amount to be reimbursed to Supplier. In the event that the Parties are not able to agree on the materiality of the increased costs or obligations or the amount to be reimbursed, the Parties shall attempt to resolve the matter in accordance with Article 12 and failing resolution in accordance with Article 12, either Party may terminate this Agreement on sixty (60) days written notice to the other Party, such termination to be effective as of the date specified in such notice.

ARTICLE 9.    Force Majeure:

As used in this Agreement, "Force Majeure" means any cause beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure. A Force Majeure shall include, without limitation, sabotage, strikes, riots or civil disturbance, acts of God, acts of a public enemy, drought, earthquake, flood, explosion, fire, lightning, landslide, or any similar cataclysmic occurrence, or appropriation or diversion of electricity by sale or order of any governmental authority having jurisdiction thereof, but only if and to the extent that the event adversely affects the availability of the transmission or distribution facilities of NEPOOL and/or its participants, the Companies or an affiliate of the Companies, and such affected

TCPM007515

facilities are necessary to deliver Standard Offer Service electricity to the Standard Offer Service customers.

An event that affects the availability or cost of operating any transmission or distribution facilities outside the NEPOOL control area, affects the availability or cost of operating a generating facility, or any event that merely causes an economic hardship to either Party shall not be deemed a Force Majeure.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure as defined above, that Party shall be excused from whatever performance is affected by the Force Majeure, to the extent so affected, provided that:

(a)    The non-performing Party promptly, but in no case longer than five (5) working days after the occurrence of the Force Majeure, gives the other Party written notice describing the particulars of the occurrence;

(b)    The suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure;

(c)    The non-performing Party uses reasonable efforts to remedy its inability to perform and expeditiously takes reasonable action to correct or cure the event or condition; and

(d)    The non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party. With respect to the Supplier, this shall mean that Supplier must purchase, at its own expense, electricity from the NEPOOL market to meet its obligations under this Agreement, to the extent such electricity is available.

ARTICLE 10. Assignment:

Unless mutually agreed to by the Parties, no assignment, pledge, or transfer of this Agreement shall be made by either Party without the prior written consent of the other Party, which shall not be unreasonably withheld, except no prior written consent shall be required for (i) the assignment, pledge or other transfer to another company or Affiliate in the same holding company system as the assignor, pledgor or transferor, provided, the assignee, pledgee or transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning Party, that it can meet the obligations of the assignor, pledgor or transferor under this Agreement, or (ii) the transfer, incident to a merger or consolidation with, or transfer of all (or substantially all) of the assets of the transferor, to another person or business entity, provided, such transferee expressly assumes and demonstrates, to the reasonable satisfaction of the non-assigning party, that it can meet all the obligations of the assignor, pledgor or transferor under this Agreement.

TCPM007516

ARTICLE 11. Successors and Assigns:

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and assignees.

ARTICLE 12. Resolution of Disputes:

Subject to Section 3 of Article 7, all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. The discussions between such representatives shall be considered "settlement talks" under Rule 403 of the Federal Rules of Evidence or analogous Massachusetts rules or practices and such discussions shall have no evidentiary value provided, however, that either Party may introduce evidence of matters discussed in such settlement talks, if the facts and documents reflecting such matters are discovered or otherwise come into a Party's possession independent of such settlement talks. In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and the Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. Nothing in this Article 12 shall prevent the Companies from issuing, pursuant to Sections 1(a) and (3) of Article 7, notice of failure to comply with, observe or perform this Agreement.

The arbitration shall be conducted before a single neutral arbitrator or arbitrator panel appointed by the Parties. If the Parties agree upon a single arbitrator within ten (10) days of the referral of the dispute to arbitration, that arbitrator shall serve, otherwise the Companies and Supplier shall each choose one arbitrator, who shall serve on a three-member arbitration panel. The two arbitrators so chosen shall within twenty (20) days select a third arbitrator to act as chairman of the arbitration panel. If the two arbitrators are unable to select a third arbitrator, each arbitrator shall select three candidates. A list of the six candidates, along with their resumes, shall provided in alphabetical order, with no indication of the arbitrator who selected such candidate or the Party who selected the arbitrator who selected such candidate, to the American Arbitration Association ("AAA"), who will select one candidate. If that candidate is unable or unwilling to serve, AAA shall select another candidate. This process will be repeated until a third arbitrator is selected or the list of candidates is exhausted. If the list of candidates is exhausted, the arbitrators shall submit a new list of candidates and the process set forth above shall be repeated a second time. In all cases, the arbitrator(s) shall be knowledgeable in electric utility matters, including electricity transmission and bulk power issues, and shall not have any current or past substantial business or financial relationships with any Party to the arbitration or any affiliate of such Party.

TCPM007517

Except as otherwise provided herein, the arbitrator(s), shall generally conduct the arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. There shall be no formal discovery conducted in connection with the arbitration, except as specifically authorized by a vote of the panel. The Parties shall exchange witness lists

and copies of any exhibits that they intend to utilize in their direct presentations at any hearing before the arbitrator(s) at least ten (10) days prior to such hearing, along with any other information or documents specifically requested by the arbitrator(s) prior to the hearing. Unless otherwise agreed, the arbitrator(s) shall render a decision within ninety (90) days of his, her, or their appointment and shall notify the Parties in writing of such decision and the reasons therefor, and shall make an award apportioning the payment of the costs and expenses of arbitration, including panel costs, among the Parties, provided, however, that each Party shall bear the costs and expenses of its own attorneys, expert witnesses and consultants. The arbitrator(s) shall be authorized only to interpret and apply the provisions of this Agreement and shall have no power to amend or modify this Agreement in any manner. The decision of the arbitrator(s) shall be final and binding upon the Parties, and judgment on the award may be entered in any court having jurisdiction. The decision of the arbitrator(s) may be appealed solely on the grounds that the conduct of the arbitrator(s), or the decision itself, violated the standards required under the Federal Arbitration Act (9 U.S.C.A. § 1 et. al.) and/or The Uniform Arbitration Act, as adopted in Massachusetts (M.G.L. c, 251, § 1 et seq.).

## ARTICLE 13. Interpretation:

The interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles.

## ARTICLE 14. Severability of Provisions:

Subject to the provisions of Article 13, a holding by any court having jurisdiction that any provision of this Agreement is invalid or unenforceable shall not result in invalidation or unenforceability of the entire Agreement but all remaining terms shall remain in full force and effect.

## ARTICLE 15. Accounts and Records:

The Companies and Supplier shall keep complete and accurate records of their operations hereunder and shall maintain such data for a period of at least two (2) years after final billing. The Companies and Supplier shall have the right, during normal business hours, to examine and inspect all such records insofar as may be necessary for the purpose of ascertaining the reasonableness and accuracy of all relevant data, estimates or statement of charges associated with service hereunder.

## ARTICLE 16. Limitations on Liability and Indemnification:

TCPM007518

Each Party agrees to indemnify, defend, and hold the other Party (including the other Party's affiliated companies, trustees, directors, board members, officers, employees, and agents) harmless from and against any and all damages, costs, claims, liabilities, actions or proceedings arising from or claimed to have arisen from the wrongful acts or omissions of the indemnifying Party's employees or agents, unless caused by an act of negligence or willful



misconduct by the indemnified Party (including the Party's affiliated companies, trustees, directors, board members, officers, employees or agents).

The Parties hereby waive and release the other Party as well as the other Party's affiliated companies, trustees, directors, officers, employees, and agents from any liability, claim, or action arising from damage to its property due to the performance of this Agreement.

## ARTICLE 17. Regulation:

(a)    This Agreement and all rights, obligations, and performances of the Parties hereunder, are subject to all applicable state and federal laws, and to all duly promulgated orders and other duly authorized actions of governmental authority having jurisdiction, provided, however, that this Agreement shall not be subject to change through unilateral application under Sections 205 and 206 of the Federal Power Act.

(b)    This Agreement must comply with all NEPOOL Criteria, Rules, and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL or the ISO, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate such changes as they deem necessary to reflect the elimination or alteration of such Rule. The intent of the Parties is that any such amendment reflect, as closely as possible, the intent and substance of the Rule being replaced as was in effect prior to such termination or amendment of the Restated NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Article 12, and to seek a resolution of the matter consistent with the above stated intent.

## ARTICLE 18. Notices:

Any notice, demand, or request permitted or required under this Agreement shall be delivered in person or mailed by certified mail, postage prepaid, return receipt requested, or otherwise confirmed receipt, to a Party at the applicable address set forth below:

To Companies:
Director, Power Supply
EUA Service Corporation
P. O. Box 543
750 West Center Street
West Bridgewater, MA 02379

To Supplier:
TransCanada Power Marketing Ltd.
3400, 237 - 4ᵗʰ Avenue S.W.
Calgary, Alberta T2P 5A4

TCPM007519

Such addresses may be changed from time to time by written notice by either Party to the other Party.

## ARTICLE 19. Miscellaneous:

(a)    Each Party shall prepare, execute and deliver to the other Party any documents reasonably required to implement any provision hereof.

(b)    Each Party represents to the other that this Agreement and such Party's performance thereof are within the corporate powers of such Party and have been duly authorized by proper corporate action on the part of such Party.

(c)    Any number of counterparts to this Agreement may be executed and each shall have the same force and effect as the original.

(d)    This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject matter of this Agreement.

(e)    Failure of either Party to enforce any provision of this Agreement or to require performance by the other Party of any of the provisions hereof, shall not be construed as a waiver of such provisions or affect the validity of this Agreement, any part hereof, or the right of either Party to thereafter enforce each and every provision.

(f)    Article and Section headings used throughout this Agreement are for the convenience of the Parties only and are not to be construed as part of this Agreement.

(g)    Nothing in this Agreement shall be construed as creating any relationship between the Parties other than that of independent contractor for the sale and purchase of electricity.

(h)    Notwithstanding any other provision of this Agreement to the contrary, the rights and obligations of the Companies herein are several and not joint. Each of the Companies share of such rights and obligations shall be determined by the portion of its monthly Standard Offer Service energy requirements represented as a percentage of the Companies' total Standard Offer Service requirement.

TCPM007520

IN WITNESS WHEREOF, Supplier and the Companies have caused this Agreement to be signed by their respective duly authorized representatives as of the date first above written.

Supplier:              TransCanada Power Marketing Ltd.

By:_____

On Behalf of the Companies:

Blackstone:            BLACKSTONE VALLEY ELECTRIC COMPANY

By:_____

Eastern:               EASTERN EDISON COMPANY

By:_____

Newport:               NEWPORT ELECTRIC CORPORATION

By:_____

TCPM007521

# APPENDIX A

## SCHEDULE OF SUPPLIER'S SHARE of STANDARD OFFER SERVICE
## AND
## STANDARD OFFER WHOLESALE PRICE

### TABLE 1

| Calendar Year | Supplier's Share of Standard Offer Service In Percent | Standard Offer Wholesale Price |
|---|---|---|
| 1999 | 14.4550% | 3.5 cents/kWh |
| 2000 | 14.4550% | 3.8 cents/kWh |
| 2001 | 14.4550% | 3.8 cents/kWh |
| 2002 | 14.4550% | 4.2 cents/kWh |
| 2003 | 14.4550% | 4.7 cents/kWh |
| 2004 | 14.4550% | 5.1 cents/kWh |
| * 2005 | 14.4550% | 5.5 cents/kWh |
| 2006 | 14.4550% | 5.9 cents/kWh |
| 2007 | 14.4550% | 6.3 cents/kWh |
| 2008 | 14.4550% | 6.7 cents/kWh |
| 2009 | 14.4550% | 7.1 cents/kWh |

\* Standard Offer Service for Eastern Edison terminates at 12:00 midnight on December 31, 2004.

## Option To Reduce Suppliers Share

With 30 days written notice, the Companies may reduce Supplier's percentage share of Standard Offer Service shown above; provided however, that once the Companies have elected to reduce Supplier's share of Standard Offer Service, such percentage share cannot be increased. The Companies may exercise this option to reduce Supplier's percentage share of Standard Offer Service as frequently as it deems necessary.

TCPM007522

APR. -03'98(FRI) 18:05    EASTERN    ILITIES              TEL:508-    :6125                    P. 025

## SCHEDULE "A"

### MONTHLY SUPPORT PAYMENTS

For each month, beginning with the Effective Day (prorated in accordance with Section 8(a) of the PPTA), if applicable, the Monthly Support Payment shall be as set out below:

| Calendar Year | Monthly Support Payment |
|---------------|-------------------------|
| 1999 | $1,659,000 |
| 2000 | $1,659,000 |
| 2001 | $1,542,000 |
| 2002 | $1,542,000 |
| 2003 | $ 870,000 |
| 2004 | $ 870,000 |
| 2005 | $ 870,000 |
| 2006 | $ 870,000 |
| 2007 | $ 870,000 |

J:\DATA\CLI\84\31584\064\ASSPURCH.OS

TCPM007523

# Tab 50

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 05-234 |
| v. | ) ) | |
| TRANSCANADA POWER MARKETING LTD., | ) ) ) | |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF WILLIAM TAYLOR

I, William Taylor, herby depose and state as follows:

1.    I am Vice President of TransCanada Power Marketing Ltd. ("TransCanada"), located at 110 Turnpike Road, Westborough, Worcester County, Massachusetts. I have held that position since early 1998. I currently reside in Westborough, Massachusetts. I have reviewed Narragansett's Complaint in this action (the "RI Complaint"), and am also familiar with TransCanada's earlier Complaint filed in the District Court of Massachusetts (the "MA Complaint").

2.    TransCanada is a power marketing company with a principal place of business in Westborough, Worcester County, Massachusetts. TransCanada purchases electricity from generation sources, such as power plants, and resells the electricity to retail electric distribution companies and other customers.

3.    TransCanada's primary office is in Westborough, Worcester County, Massachusetts. Several TransCanada officers are also located in Calgary, Alberta. TransCanada

has no offices or employees in Rhode Island, although certain of TransCanada's accounting

functions are performed at an administrative facility at the Ocean State Power (OSP) generation

site in Burrillville, Rhode Island. The administrative facility and OSP site are owned by, and

perform functions for, a number of TransCanada's affiliates.

4.    Although Narragansett's principal office is in Providence, Rhode Island, its

customer service office is in Northborough, Worcester County, Massachusetts. Narragansett's

customer service office in Northborough, Massachusetts is indicated on Narragansett's website at

http://www.nationalgridus.com/narragansett/contact_mail.asp, under "contact by mail." (See Ex.

1 hereto).

5.    Narragansett's service agent (which Narragansett calls its "power supply

manager" or "representative" in paragraphs 16-17 of its RI Complaint) is the National Grid USA

Service Company ("National Grid SC"), which is also located in Northborough, Massachusetts.

It is my understanding that Narragansett is owned by National Grid USA, a Massachusetts-based

public utility holding company with primary offices in Westborough, Massachusetts.

6.    On April 7, 1998, TransCanada entered into a Wholesale Standard Offer Services

Agreement (the "WSOS Agreement") with Blackstone Valley Electric Company ("Blackstone"),

Newport Electric Company ("Newport") and Eastern Edison Company ("Eastern"). Upon

information and belief, Blackstone, Newport and Eastern (collectively, the "EUA Companies")

were at the time all wholly-owned subsidiaries of EUA Utilities Associates ("EUA"), a

Massachusetts-based public utility holding company.

7.    The WSOS Agreement was part of a larger Asset Purchase Agreement between

TransCanada and Montaup Electric Company ("Montaup"), another EUA affiliate located in

Massachusetts.

-2-

3939579v2

Case 1:05-cv-00234-S    Document 6    Filed 06/16/2005    Page 3 of 3

drive from both Northborough and Westborough, Massachusetts.

Signed under the pains and penalties of perjury this 15th day of June, 2005.



William Taylor

6/15/05

RICHARD P. SCHULER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 7, 2006

-5-

3939579v2