UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

_____
)
TRANSCANADA POWER MARKETING LTD.,           )
)
Plaintiff,           )
)
v.           )          C.A. No. 05-40076FDS
)
NARRAGANSETT ELECTRIC COMPANY,           )
)
Defendant.           )
)
_____)

### TRANSCANADA'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**(Leave to File Excess Pages Granted on September 20, 2007)**

Plaintiff TransCanada Power Marketing Ltd. ("TransCanada") hereby submits its reply in support of its Motion for Summary Judgment and in response to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (the "Opposition").

What is most notable about Narragansett's Opposition is what is missing from it, not what is included. Narragansett admits by omission that the central facts necessary for summary judgment are undisputed. Narragansett similarly fails to respond to TransCanada's central legal arguments. Based on the undisputed facts as summarized below, and under the applicable law, this Court should find for TransCanada on its Motion for Summary Judgment.

### RESPONSE TO NARRAGANSETT'S FACTUAL OPPOSITION

Narragansett admits or fails adequately to contest the following undisputed facts:[1]

1. Narragansett does not contest any of the facts in Section A (pages 2-6) of TransCanada's Statement of Facts (*see* Opp. at 3 n. 3), including:

---

[1] These undisputed facts are set forth more fully in TransCanada's Statement of Facts in its Memorandum in Support of Summary Judgment ("TransCanada Mem.").

(a) The URA required EUA/Narragansett to file Standard Offer Service retail tariffs through 2009, with a pricing scheme including (i) a rising stipulated price plus (ii) an adjustment for factors out of the utilities' control including extraordinary fuel costs, through 2009 (TransCanada Mem. at 4-5).[2]

(b) The EUA Settlement Agreement attached a solicitation for Standard Offer Service contracts only through 2004, and allows the filing of a fuel adjustment through 2009 consistent with the URA (*Id.* at 6). Related EUA solicitation filings filed contemporaneously stated that EUA would address the 2005-09 time period at a later date (*Id.* at 5-6).

2. All of the documents EUA shared with TransCanada before signing the Agreement indicated a fuel adjustment extending through the end of its term. (*Id.* at 9, 17, 27).

3. EUA proposed extending the Agreement from 2004 to 2009, days before execution. (*Id.* at 9).

4. No retail tariff was on file or approved at the time the Agreement was executed, and EUA never gave TransCanada any draft or other retail tariff that indicated the fuel adjustment would not extend through 2009 as stated in the URA. (*Id.* at 8, 10, 19).

5. EUA did not propose to alter the Agreement's two-part pricing scheme for the added term, nor did it indicate in any way (verbally or in writing) that it was proposing that TransCanada supply power for the added five years for only one-half the pay structure, or that it intended to depart from the URA's tariff pricing scheme for extraordinary fuel costs through 2009.[3] (*Id.* at 9-10, 17-18, 27). In contrast, EUA affirmatively altered the Agreement to indicate that Standard Offer Service pricing in Massachusetts would end in 2004. (*Id.* at 9).

6. The extended Agreement's pricing matched the NEES (and NECO Agreement) pricing already approved for the rest of Rhode Island exactly, in all other respects. (*Id.* at 8, 17).[4]

7. To obtain approval for their merger, Narragansett and EUA made a rate consolidation filing in 1999 indicating that their SOS rates were the same and disclosing no differences between their fuel adjustment terms through 2009. (*Id.* at 12, 23).

8. Narragansett filed with RIPUC in 2001, and sent to TransCanada, tariff filings stating the fuel adjustments in the EUA and Narragansett contracts both extended and contained the exact same fuel trigger numbers through 2009. (*Id.* at 14, 24).

---

[2] Narragansett's legal arguments regarding the interpretation of the URA are without merit, and are addressed below. (*See* p. 6-8).

[3] For the reasons set forth in TransCanada's Memorandum, Narragansett has not adequately contested the undisputed fact that EUA never informed TransCanada of any intent to end the fuel adjustment despite Mr. Boisvert's speculative testimony. (*See* TransCanada Mem. at 10 n. 12).

[4] It also remains undisputed for summary judgment, despite Narragansett's protestations, that EUA told TransCanada at the time of the extension that the "pricing" for the added term was identical to the NECO Agreement pricing, although admittedly without specifically referencing the fuel adjustment as opposed to "pricing" in general. (TransCanada Mem. at 6 n. 9, 9, 18). This absence of a specific reference does not defeat TransCanada's Motion, since what is important is that EUA made no statement to the contrary regarding the fuel adjustment.

9.  There is no regulatory filing or anything else preventing EUA/Narragansett from filing for a fuel adjustment in the years 2005-2009.  (*Id*. at 10).[5]

10. Narragansett unilaterally amended its tariff filings to cut off TransCanada's fuel adjustment after 2004, and affirmatively advocated thereafter that the RIPUC approve a tariff for 2005 that (although it contained a fuel adjustment) omitted that fuel adjustment for TransCanada.  (*Id*. at 14-15, 24).

11. Narragansett did not pay a fuel adjustment to TransCanada in early 2005, but has thereafter made "protest" payments (approved by the PUC) to TransCanada based upon the NEES triggers applicable for the rest of Rhode Island.  (*Id*. at 14, 15-16).

## **LEGAL ARGUMENT**

Narragansett's Opposition fails to set forth any legal arguments that defeat summary judgment on these undisputed facts.

### A.  **TRANSCANADA IS ENTITLED TO SUMMARY JUDGMENT ON ITS CONTRACT AND DECLARATORY JUDGMENT CLAIMS**

### 1.  **The Plain Language of the Agreement Supports TransCanada's Claims**

---

[5] For this reason, which was admitted by every witness including Narragansett's Rule 30(b)(6) witness (TransCanada Mem., at 10), Narragansett's reliance on outdated filings (which addressed a time period in which EUA was soliciting Standard Offer Service contracts only through 2004) is baseless and mischaracterizes the record. For example, Narragansett represents that the proposed tariff EUA filed in November 1997 contained prices through 2009 but fuel adjustment triggers only through 2004.  (Opp. at 4).  What Narragansett fails to mention is that this November 1997 tariff (which EUA never gave to TransCanada or even suggested would be applicable to its 2009 Agreement, and which was rejected by RIPUC) was submitted to the RIPUC in concert with an earlier EUA solicitation for Standard Offer Service contracts only through 2004.  This tariff filing stated that the proposed tariff was preliminary and that EUA would address the 2005-09 time period later.  (*See* Supp. App. Tab 38, at NARR 42489-90, 42505-09, 42528, and Response of TransCanada Power Marketing Ltd. to Narragansett's Statement of Undisputed Material Fact ("TransCanada Fact Resp.") at ¶5) (Unless otherwise noted, Tab numbers referenced herein correspond to the tabs of the Appendix and Supplemental Appendix filed within TransCanada's Motion for Summary Judgment).  Similarly, Narragansett notes that the NEES Settlement Agreement contained language indicating it would file fuel triggers for the years 2005-2009 at a later date.  (Opp. at 4 n. 4).  This makes perfect sense, since the NEES Settlement Agreement described the fuel adjustment as part of a proposed bid document seeking supply contracts for Standard Offer Service *through 2009*, while the EUA Settlement Agreement described the fuel adjustment as part of a proposed bid document seeking supply of Standard Offer Service *through 2004* (and hence included *no* pricing information after 2004).  (TransCanada Mem. at 5-6 n. 7).  And EUA internal documents containing question marks for the fuel triggers for 2005-09 are irrelevant  since, as indicated in the NEES Settlement Agreement, the precise Rhode Island 2005-09 triggers had not yet been determined.  In fact, these internal documents cited by Narragansett – which appear to address an earlier plan by EUA to bid SOS contracts through 2009, show that EUA expressly anticipated including triggers for that 2005-09 period when offering contracts extending through 2009.  (Opp. Ex., J, Ex. K).  The same is true of the other outdated (and in some cases rejected) filings cited by Narragansett (Opp. at 4-5, 12-15), as more fully explained in TransCanada's Fact Response (in Opposition to Narragansett's Motion for Partial Summary Judgment), at ¶¶4-6.  Finally, Narragansett's reliance on a later bid solicitation that post-dated the Agreement and never formed the basis for any contract with TransCanada (Opp. at 5, 14) is baseless.

The basic undisputed fact remains that the Agreement states that TransCanada is to be paid two price components for delivery of power, without any end-date: a stipulated price, plus a fuel adjustment. The Agreement references a retail tariff which, according to the incorporated URA statutory provision, was to include an adjustment for extraordinary fuel costs through 2009. EUA provided no draft tariff or any other indication that it intended to depart from the URA or to omit one-half the pay structure for the latter half of the Agreement. There certainly is no contention that TransCanada affirmatively agreed that EUA could omit a fuel adjustment from its tariffs after 2004. Thus EUA was obligated under the plain language and incorporated statutory law to include it. In short, the absence of discussion on this point mandates that the plain language, and the default requirements of the URA and applicable Massachusetts law, dictate EUA's obligations.

It is notable that Narragansett does not respond at all to TransCanada's arguments concerning: (1) the plain language of the Agreement; (2) the last-minute extension to 2009; or (3) the Massachusetts case law establishing a duty to file for regulatory approval of the referenced fuel adjustment. (TransCanada Mem., at 19). Thus, it is undisputed that EUA and TransCanada negotiated a contract for several months, and that all of the documents provided to TransCanada indicated a fuel adjustment to the end of its term. Several days before the contract was executed, EUA asked that the term of the contract be extended to 2009. No retail tariff was on file or approved at the time and EUA presented no draft tariff or any other indication that it would not include a fuel adjustment through 2009 as stated in the URA. In contrast, EUA affirmatively altered the proposed extended Agreement to indicate that Standard Offer Service pricing in Massachusetts would end in 2004, implying if not essentially stating, that all other pricing terms would continue through 2009. As indicated in the URA, TransCanada could fairly

expect that, if EUA had intended to ask TransCanada to supply five more years of power for only one-half the Agreement's two-part price structure, it would have (and indeed had an obligation) to say so. EUA's silence, combined with the surrounding facts and EUA's express notation that other aspects of the pricing ended in 2004, amount to confirmation that EUA would include a fuel adjustment through 2009.

Narragansett also does not even acknowledge, much less respond to, the clear Massachusetts case law (even leaving aside the URA) establishing that when a payment in a contract is dependent on one party gaining government approval or funding (and absent any affirmative agreement to the contrary, which did not exist here), the party must make an effort to obtain the requisite approval. (TransCanada Mem. at 19). There is no evidence or even contention that the parties agreed that Narragansett would be absolved of its duty to file tariffs with a fuel adjustment through the full term, and thus this Massachusetts law is read into the Agreement and requires that Narragansett make the filings. (*Id.*).

To the extent there is ambiguity on this point, the ambiguity must be resolved in favor of TransCanada. As Narragansett itself argues (correctly) in its Motion for Partial Summary Judgment: (i) language in a particular contract provision should be construed against its drafter; and (ii) contract language should be read in light of similar provisions in the contract. (Narragansett Electric Company's Motion for Partial Summary Judgment, "Narr. Mem." at 7-9). These principles have particular applicability with respect to Article 5 of the Agreement, since Article 5 was a form pricing provision drafted solely by EUA and with no input from TransCanada. (TransCanada Mem. at 6-8, 27; Tab 7; Tab 12). Similarly, the disputed Standard Offer Service tariffs referenced in Article 5 were drafted exclusively by EUA. The EUA Settlement Agreement was also entirely drafted by EUA, with no chance for input by

5

TransCanada.  For these types of regulatory contract documents entirely within the control of EUA, the doctrine that ambiguities are construed against the drafter applies even among sophisticated business parties  (Narr. Mem. at 7-9; TransCanada Mem. at 18 n. 18).  Thus, any and all ambiguities in Article 5 of the Agreement, in the retail Standard Offer Service tariffs, and in the EUA Settlement Agreement must be construed against EUA/Narragansett.  (*See Id.*).

       **2.**      **URA**

Narragansett concedes that the URA is incorporated into the Agreement, and that the word "shall" in the URA is mandatory language.  Nonetheless, Narragansett argues that the URA still does not require Narragansett to seek an adjustment for extraordinary fuel costs for its suppliers after 2004, or at all.  This is an incorrect reading of the incorporated statute, and misses the point regarding the URA's impact upon the understanding of the parties.

First, Narragansett argues that the fuel adjustment language in the URA applies only to the retail companies' "former wholesale supplier" – which in EUA's case would be Montaup Electric Company ("Montaup").  (Opp. at 20).  This literal reading of the statute makes no sense, since the statute *required* a public bid to obtain suppliers for Standard Offer Service before Standard Offer Service and its pricing was implemented.  (TransCanada Mem. at 6).   Therefore, it was expected under the URA that Montaup (and any other former wholesale supplier) would not actually be supplying Standard Offer Service.  These same costs are obviously also outside the control of all suppliers.  Under these circumstances, the only reasonable interpretation of Section 39-1-27.3(d) is that extraordinary fuel costs would be included in the distribution companies' retail tariffs.  If this clause only applied to the "former wholesale supplier" of the utilities, there would have been no reason to include this language in the statute, or to have

included a fuel adjustment provision of any kind in the Agreement, the NECO Agreement or the EUA/Narragansett wholesale solicitations. Narragansett's argument is thus nonsensical.

Second, Narragansett argues that the standard offer is to be a price cap that can be less than the maximum allowed; therefore, the argument goes, Narragansett is permitted to include any price in its tariff that is below the maximum (and hence, apparently, to entirely exclude a fuel adjustment or any other adherence to the pricing structure or components stated in the URA). (Opp. at 21). Yet the RIPUC and Narragansett cannot be arbitrary and capricious in applying the URA to retail tariffs and must at least attempt to follow the prescribed pricing structure set forth in the URA. (TransCanada Mem. at 22 n. 19). The complete elimination of a fuel adjustment, even in the circumstance of extraordinary fuel costs, would without very good reason be an arbitrary and capricious action. (*Id.*). In any event, TransCanada is entitled to rely, for purposes of the Agreement, on the presumption that the basic components and principles of the Standard Offer Service tariff and pricing scheme, as described in the incorporated URA, would be followed by EUA. (TransCanada Mem. at 20).

Third, Narragansett states that the URA only concerns retail "consumer" tariffs and has nothing to do with competitive suppliers such as TransCanada. (Opp. at 21). This argument completely misses the mark, *since the language of Article 5 of the Agreement expressly ties the fuel adjustment in the Agreement to EUA's retail consumer tariffs.* Therefore, it is *precisely* the retail "consumer" tariff in the URA (the *only* Standard Offer Service tariff referenced in the URA) which EUA and TransCanada expressly made applicable to the Agreement.

Finally, Narragansett argues that the RIPUC, in denying a fuel adjustment to TransCanada, has held that the URA does not require a fuel adjustment and should be granted deference. (Opp. at 21). To the contrary, the RIPUC has made no ruling that the URA does not

require Narragansett to include a fuel adjustment in its retail tariff.  The RIPUC could not have possibly made this ruling because, from 2000 to the present, Narragansett has always had a fuel adjustment in its retail tariff.  (*See, e.g.*, Tab 31;  RIPUC Report and Order dated February 17, 2005, Reply App. Tab 51).  Narragansett proposed and asked the RIPUC to approve a 2005 tariff *with* a fuel adjustment, but simply to omit from that adjustment the funds needed to pay TransCanada.  (Tab 51).  Moreover, compliance with the URA – much less the version of the URA that was in effect at the time of the Agreement and incorporated into the Agreement – was not raised in opposition to Narragansett's proposed 2005 tariff or actually addressed by the RIPUC.  (*See, e.g.*, Tab 19; Tab 24; Tab 25; Tab 31; Tab 33).  And in any event, the RIPUC has acknowledged that TransCanada's position may be correct, by approving the protest payments.  Finally, contrary to Narragansett's case cites, even if the RIPUC did rule that the URA did not require a fuel adjustment, this Court's review of the RIPUC would be *de novo.  See, e.g.*, *In re Petition for Review Pursuant to § 39-1-30 of Ordinance Adopted by the City of Providence*, 745 A.2d 769, 773 (R.I. 2000) (noting with respect to the standard of review for RIPUC decisions that "[i]t is axiomatic that this Court is the final arbiter on questions of statutory construction, and that we undertake a *de novo* review of questions of statutory interpretation.") (internal citation omitted); *Narragansett Electric Company v. Public Utilities Commission*, 773 A.2d 237, 240 (R.I. 2001) (noting that courts review statutory interpretations by the RIPUC *de novo*).[6]

---

[6] The cases cited by Narragansett for the position that an agency's decision should be afforded great deference are inapplicable to this situation.  Those cases deal with the application of facts to particular regulatory or statutory construction, such as whether a particular fuel trigger level is reasonable.  That is not the situation here, where the issue of whether the URA requires a fuel adjustment is a straight issue of statutory construction.  As stated above, however, it is clear that the RIPUC did not decide this issue and therefore this Court is not reviewing an agency decision anyway.

8

### 3.    Intent

Narragansett argues that TransCanada's Motion relies on matters of intent, and thus is not appropriate for summary judgment.  (Opp. at 10).  To the contrary, as set forth above, TransCanada is entitled to summary judgment based on the language of the contract, the incorporated URA, and the actual negotiations between the parties.  Courts regularly grant summary judgment in contract cases based upon such facts, even though contractual "intent" is obviously involved.  Narragansett cites irrelevant cases in which a party's intent is an essential *element* of the claim, such as "actual malice."  *See, e.g., Evans v. Certified Eng'g & Testing Co.*, 834 F. Supp. 488, 499 (D. Mass. 1993) (intentional interference requires showing of actual malice); *Flesner v. Technical Comm. Corp.*, 410 Mass. 805, 809 (1991) (wrongful discharge case); *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 86 (1984).  *See also Wallis v. City of Worcester*, 2007 WL 690050, *5 (D. Mass., March 1 2007) (Saylor, J.) (nevertheless granting summary judgment in civil rights action).  In the present case, however, the parties' intent is not an essential element of TransCanada's contract claim.  Here, all three of TransCanada's claims rest on the language of the Agreement, the relevant actions of the parties, or undisputed admissions of intent by Narragansett.  Under these circumstances, summary judgment is appropriate.[7]

### B.    TRANSCANADA IS ENTITLED TO SUMMARY JUDGMENT ON ITS IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM.

---

[7] In its Introduction (but not fully developed anywhere in its Opposition) Narragansett also suggests that TransCanada has not suffered any damages in this litigation because "Narragansett has made *contingent* payments of all FAF amounts to which TransCanada claims entitlement."  (Opp. at 1 (emphasis added)).  Narragansett asserts that TransCanada holds these funds "in trust" and must return these payments unless it affirmatively prevails in this litigation.  (*Id.; see also* Tab 30.)  Thus, TransCanada has been damaged not only by the contingency of the payments, but by the great amount of resources and expense in bringing and litigating this lawsuit in order to receive the payments it is entitled to under the Agreement.  *See TPS Freight Distr. v. Texas Commerce Bank*, 788 S.W.2d 456, 460-61 (Tex. App. 1990) (a conditional payment is not a payment); *Cantu v. St. Paul Cos.*, 401 Mass. 53, 56-58 (1987) (filing suit is damage sufficient for a claim to accrue).

Narragansett argues that TransCanada's good faith and fair dealing claim does not succeed because TransCanada has failed to prove that Narragansett engaged in a "sophisticated, multi-year conspiracy" to fail to file for a fuel adjustment for the years 2005-2009. Once again, Narragansett ignores the central basis for TransCanada's claim – the misuse of discretion. Instead, Narragansett attempts to distract the Court by contesting the extent of its motives with regard to the fuel adjustment. What establishes TransCanada's claim for a breach of the duty of good faith and fair dealing, however, is Narragansett's affirmative use of any discretion regarding its tariff filings to TransCanada's detriment, and its affirmative, deliberate efforts to deny TransCanada benefits under the Agreement. Narragansett fails adequately to contest those undisputed affirmative actions.

The duty of good faith and fair dealing requires that the parties do nothing that will "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005). A breach of the duty of good faith and fair dealing turns on Narragansett's *actions*, and whether it exercised discretion in a way to deny TransCanada the benefit of its bargain. It is undisputed that: (1) Narragansett at least had discretion to file retail tariffs with a fuel adjustment through 2009, for the benefit of TransCanada; and (2) Narragansett affirmatively advocated to deny TransCanada that fuel adjustment. Based upon a plain reading of the RIPUC testimony, Narragansett unilaterally proposed and repeatedly testified that TransCanada was not entitled to a fuel adjustment from 2005 – 2009. In fact, the testimony shows that Narragansett went out of its way to *convince* the RIPUC that TransCanada was not entitled to a fuel adjustment after 2005, even in the face of actual skepticism from the regulators. (TransCanada Mem. at 15 (and cited PUC testimony)). Further, although Narragansett and TransCanada communicated on a regular

basis from 2000 through 2005 on matters related to the Agreement, *not once* did Narragansett raise the issue of the fuel adjustment with TransCanada.  (*See* Tab 25 at 20-27, 30-35, 53-55, 59-70; Tab 24 at 87-88, 117-118).  This failure to discuss the matter with TransCanada at a date prior to 2005 not only denied TransCanada (who, unlike Narragansett, actually participated in the negotiation of the Agreement) the opportunity to try to convince Narragansett that its position was wrong, but also denied TransCanada the opportunity to mitigate the effect of the lack of a fuel adjustment when it had the chance.[8]  Narragansett's failure to notify TransCanada is further highlighted by its obligations under Article 8(3) of the Agreement to negotiate with TransCanada changes to Standard Offer Service.

Thus, it is frankly laughable based on the factual record for Narragansett to argue that TransCanada itself breached the duty of good faith and fair dealing by "lying in the weeds" and "springing" its breach of contract claims upon Narragansett.  Narragansett acknowledged in RIPUC testimony that it was likely TransCanada would not agree with its position.  (*See* Tab 19 at 32-34).  Further, Narragansett sent to TransCanada a rate filing document that clearly indicated the NEES and EUA fuel adjustments were the same and went through 2009.  These undisputed facts clearly show that Narragansett took "unilateral, voluntary action that advanced its own self-interest and prevented or hindered [TransCanada] from reaping substantial benefits of the contract."  *Speakman*, 367 F. Supp.2d at 134; *Tufankjian v. Rockland Trust Co.*, 57 Mass. App. Ct. 173, 177-78 (2003).

---

[8] Narragansett also makes much of the fact that TransCanada does not suggest any motive for Narragansett's actions, but the motive is obvious and Narragansett misstates the record.  Narragansett itself, through its expert witness, Cliff W. Hamal, testified that Narragansett has a financial interest in lowering its rates, and that it is better for Narragansett to keep rates down by lowering its wholesale standard offer service rates rather than by lowering its own distribution rates.  (Deposition of Cliff W. Hamal "Hamal Dep." at 39-42).  Mr. Hamal also testified that, like other utilities, Narragansett has an incentive to keep rates down for political reasons.  (*Id*. at 42).

## C.    TRANSCANADA IS ENTITLED TO SUMMARY JUDGMENT OF RESCISSION/REFORMATION BASED ON UNILATERAL MISTAKE.

Narragansett does not meaningfully respond to TransCanada's mistake claim, or to the numerous undisputed facts supporting that claim.[9]  Turning to the undisputed facts ignored by Narragansett, it is undisputed:  (1) that EUA and TransCanada negotiated a contract with a term through 2004; and (2) that all of the documents that EUA provided to TransCanada indicated a fuel adjustment to the end of its term.  Several days before the contract was executed, EUA asked that the term of the contract be extended to 2009.  No retail tariff was on file or approved at the time the Agreement was executed and EUA never gave TransCanada any draft or other retail tariff that indicated that the fuel adjustment would not extend through 2009 as stated in the URA.  EUA did not propose to alter the Agreement's two-part pricing scheme for the added term.  Nor did EUA indicate in any way (verbally or in writing) that it was asking TransCanada to supply power for the added five years for only one-half of the pay structure, or that it intended to depart from the URA's tariff and pricing scheme for extraordinary fuel costs through 2009.  In contrast, EUA altered the proposed revised Agreement to indicate that Standard Offer Service pricing in Massachusetts would end in 2004.  Both parties were aware that the pricing and fuel adjustment triggers in the NEES and EUA Standard Offer contracts were identical in all disclosed respects, and that it would be reasonable for TransCanada to assume the NEES and EUA fuel adjustment triggers would remain identical so that Rhode Island, as mandated by the URA, would have a *"Standard Offer"* Service.  EUA never provided TransCanada with any contract language or even a document (such as the unapproved tariffs Narragansett relies so heavily on in its Opposition) that stated that the fuel adjustment ended in 2004.  TransCanada

---

[9] Narragansett also misstates the proper standard that applies to TransCanada's claim of unilateral mistake. Narragansett argues that TransCanada must show that "both parties must share the erroneous state of mind as to the

justifiably could expect that, if EUA had intended to ask TransCanada to supply five more years of power for only one-half the Agreement's two-part price structure, it would have said so. EUA's misleading silence, combined with the surrounding facts (including its failure to note any purported end to the fuel adjustment as it did for Massachusetts Standard Offer Service) directly caused any misunderstanding by TransCanada.

Based on these undisputed facts (and to the extent that TransCanada does not prevail on its contract claim) it has clearly met the standard to warrant rescission or reformation based on unilateral mistake. TransCanada has shown: (1) it made a mistake as to the "basic assumption of the contract;" (2) the mistake had material effect on the agreed exchange of performances; and (3) the mistake is such that enforcement of the contract would be unconscionable or the other party had reason to know of the mistake or his fault caused the mistake. *See Restatement (Second) of Contracts, §153* (2006). EUA's actions during the negotiation of the Agreement, combined with TransCanada's understanding of the URA (which it had to rely on since EUA would not provide TransCanada with draft tariffs prior to execution), led TransCanada justifiably to conclude that when the term of the Agreement was extended through 2009 the two-part pricing structure described in Article 5 would continue to apply to the end of the Agreement's term. Furthermore, any and all ambiguities in Article 5 of the Agreement, in the retail Standard Offer Service tariffs, and in the EUA Settlement Agreement must be construed in TransCanada's favor and against EUA/Narragansett. (*See*, *e.g.*, *Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 724 (1977); *Massachusetts Turnpike Auth. v. Perini Corp.*, 349 Mass. 448, 454 (1965)).

---

basic assumption on which the contract was made." (Opp. at 29). Narragansett mistakenly cites cases applying to *mutual* not *unilateral* mistake.

Finally, and contrary to Narragansett's assertion, TransCanada did not cause its mistake by its own actions. Instead, EUA's actions in requesting a last minute extension without stating any limitation to the fuel adjustment (while, for example, stating a limitation as to the Massachusetts pricing) caused TransCanada to reach this conclusion and EUA failed to correct TransCanada's mistake. It also is not correct that TransCanada did not care about Narragansett's future filings. Indeed, the parties added Article 8(3) to the Agreement, which requires Narragansett, the party regulated relative to the provision of Standard Offer Service, to negotiate and indemnify TransCanada for changes to Standard Offer Service.

In sum, EUA's last minute extension of the Agreement, and its misleading conduct, caused any mistaken understanding by TransCanada concerning the fuel adjustment. TransCanada is entitled to a reformation or rescission of the contract as a result. *See e.g. Zero Stage Capital, Inc. v. Harvard Clinical Technology, Inc.*, 2002 WL 148945 (Mass. Super. Ct. May 16, 2002) (court reforms contract to encompass sophisticated business entity plaintiff's understanding of the term "detachable warrant," even though this meaning was not the same as basic business definition of the term because defendant's actions caused plaintiff's mistaken understanding).

## Conclusion

For the reasons set forth above, TransCanada's Motion to for Summary Judgment should be granted.

4251767v3

Respectfully submitted,

TRANSCANADA POWER MARKETING LTD.,

By its attorneys,


/s/ Wendy S. Plotkin
Daniel C. Winston (BBO#562209)
Wendy S. Plotkin (BBO#647716)
Dara Z. Kesselheim (BBO #660256)
CHOATE, HALL & STEWART LLP
2 International Place
Boston, MA  02110
Telephone No.:  (617) 248-5000
Fax No.:  (617) 248-4000


Dated: September 21, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document (and other associated documents) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 21, 2007.

/s/ Wendy S. Plotkin
Wendy S. Plotkin


4243688v2

4251767v3

**APPENDIX AND SUPPLEMENTAL APPENDIX**
**TABLE OF CONTENTS**

## Deposition Testimony Excerpts

Lawrence R. Boisvert - March 1, 2007

James J. Bonner - March, 7, 2007

Robert Clarke March - 15, 2007

Michael Hachey - March 13, 2007

Michael J. Hager
        Day 1 - March 23, 2007
        Day 2 - April 3, 2007
        Day 3 - April 4, 2007

Cliff W. Hamal - July 10, 2007

Michael J. Hirsh - January 27, 2007

Kevin Kirby - March 20, 2007

Alex Pourbaix - April 17, 2007

Robert G. Powderly - February 14, 2007

Dennis St. Pierre - January 30, 2007

William C. Taylor - March 12, 2007


## Supplemental Deposition Testimony Excerpts

Alex Pourbaix - April 17, 2007

William C. Taylor - March 12, 2007


## Reply Deposition Testimony Excerpts

Cliff W. Hamal – July 10, 2007

4253237v1

## Appendix

Tab 1 Testimony of Michael J. Hager, November 5, 2002 Arbitration Hearing

Tab 2 1993 Blackstone Fuel Adjustment Clause, May 28, 1993

Tab 3 R.I. Gen. Laws § 39-1-27.3(d) (1997)

Tab 4 EUA Settlement Agreement , October 29, 1997

Tab 5 NEES Settlement Agreement, May 30, 1997

Tab 6 EUA Request for Qualifications, October 3, 1997

Tab 7 Memorandum re: EUA Divestiture, November 12, 1997

Tab 8  NECO Agreement, October 29, 1997

Tab 9 TransCanada/NEP Consent Agreement, October 29, 1997

Tab 10 Letter from Ryan to Pourbaix, January 19, 1998

Tab 11 TC Offer to Acquire Assets, January 19, 1998

Tab 12 EUA March 1998 RFP

Tab 13 April 3, 1998 Draft of Agreement

Tab 14 Wholesale Standard Offer Service Agreement entered into on April 7, 1998

Tab 15 Report and Order Dockets 2651, 2657, 2514, December 17, 1997

Tab 16 April 18, 2000 Letter from Hager to McMaster re: EUA Merger with National Grid

Tab 17 Rate Plan Filing in Support of Merger, June, 1999

Tab 18 Fax from Hager to Hachey re Merger w/EUA, February 8, 2000

Tab  19 June 20, 2000 Hearing Transcript

Tab 20 Narragansett Rate Change October 1, 2001

Tab 21 Narragansett Rate Change January 1, 2002

Tab 22 November 2001 Pre-Filed Testimony

4253237v1

Tab 23 Narragansett January 2003 Retail Rate Filing

Tab 24 Dec. 13, 2004 Transcript

Tab 25 July 26, 2004 Transcript

Tab 26 TransCanada's Arbitration Discovery Requests, August 12, 2002

Tab 27 National Grid's Responses to TransCanada's Arbitration Discovery Requests, August 30, 2002

Tab 28 February 10, 2005 Email from Pickett to Schuler  regarding fuel adjustment

Tab 29 March 1, 2005 Fax from Hachey to Hager regarding Notice of Default

Tab 30 April 29, 2005 Letter from Hager to Hachey Regarding Protest Payments

Tab. 31 RIPUC Report and Order September 29, 2005

Tab 32 Standard Offer Service Presentation, October 24, 1997

Tab 33 May 28, 2003 Transcript

Tab 34 January 2000 Blackstone Standard Offer of Service Tariff

Tab 35 RIPUC Report and Order regarding Docket 3379 October 2, 2001

**Supplemental Appendix**

Tab 36 RIPUC Report and Order dated Feb. 17, 2005, 2005 WL 1536259

Tab 37 RIPUC Report and Order dated October 23, 2003

Tab 38 November 1997 Tariff Advice

Tab 39 Responses to Enron Data Requests, December 1, 1997

Tab 40 May 15, 1998 Filing

Tab 41 July 17, 1998 Filing

Tab 42 October 30, 1998 Filing

Tab 43 December 9, 2003 Testimony

Tab 44 Draft APA Between Montaup and TCPM March 24, 1998

Tab 45 Rider 1, March 30, 1998

Tab 46 Draft APA April 1, 1998

Tab 47 April 2, 1998 Fax from McMaster to Hirsh with Provisions regarding Changes to
    Standard Offer Service

Tab 48 Draft APA April 3, 1998

Tab 49 WSOSA April 3, 1998

Tab 50 Affidavit of William Taylor, June 15, 2005

## **Reply Appendix**

Tab 51 RIPUC Report and Order February 17, 2005

4253237v1

Hamal

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Central Division)

- - - - - - - - - - - - - - -

TRANSCANADA POWER MARKETING    :

LTD,                           :

        Plaintiff,             :    CASE NO.

VS.                            :    05-40076 FDS

NARRAGANSETT ELECTRIC CO.,     :

        Defendant.             :

- - - - - - - - - - - - - - -


   DEPOSITION OF CLIFF W. HAMAL, a witness
called by and on behalf of the Plaintiff, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Sandra L. Bray, Registered Diplomate Reporter,
CSR Number 103593, and Notary Public in and for
Commonwealth of Massachusetts, at the offices of
Choate Hall & Stewart LLP, Two International
Place, Boston, Massachusetts, on Tuesday,
July 10, 2007, commencing at 9:11 a.m.

789a536e-b965-402f-98cc-aff662c7009a

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | Representing the Plaintiff: |
| 3 | CHOATE HALL & STEWART LLP |
| 4 | Two International Place |
| 5 | Boston, Massachusetts 02110 |
| 6 | BY: DANIEL C. WINSTON, ESQUIRE |
| 7 | -and- |
| 8 | TRANSCANADA PIPELINES LIMITED |
| 9 | 450 - 1st Street S.W. |
| 10 | Calgary, Alberta, Canada T2P 5H1 |
| 11 | BY: JODY D. M. JOHNSON, ESQUIRE |
| 12 | DOUGLAS I.D. McLEAN, ESQUIRE |
| 13 | |
| 14 | Representing Narragansett Electric Co.: |
| 15 | NATIONAL GRID |
| 16 | 25 Research Drive |
| 17 | Westborough, Massachusetts 01582 |
| 18 | BY: DAVID C. LODEMORE, ESQUIRE |
| 19 | |
| 20 | ALSO PRESENT: |
| 21 | Mike Hachey |
| 22 | Brenda Carr, National Grid |
| 23 | |
| 24 | |

| | Page 3 |
|---|---|
| | INDEX |
| 1 | WITNESS:                     PAGE NO. |
| 2 | CLIFF W. HAMAL |
| 3 | BY MR. WINSTON          4 |
| 4 | |
| 5 | EXHIBITS |
| 6 | NO.    DESCRIPTION          PAGE NO. |
| 7 | D    Expert Report of Cliff W. |
| 8 |      Hamal                         4 |
| 9 | E    Rebuttal Expert Report of |
|   |      Cliff W. Hamal                4 |
| 10 | |
|   | F    Taylor Deposition Testimony |
| 11 |      Excerpts                    77 |
| 12 | G    Work Paper 3.1, Electricity |
|   |      Price Forecast Data (1998-2009) 101 |
| 13 | |
|   | H    Wholesale Standard Offer |
| 14 |      Service Agreement         175 |
| 15 | I    Power Supply Agreement     183 |
| 16 | J    Service Agreement Filing   200 |
| 17 | |
| 18 | |
|   | (EXHIBITS RETAINED BY COUNSEL.) |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 4 |
|---|---|
| 1 | PROCEEDINGS |
| 2 | (The Virginia driver's license number as |
| 3 | identification of the deponent was noted |
| 4 | for the record.) |
| 5 | (Expert Report of Cliff W. Hamal was |
| 6 | marked Exhibit D for identification.) |
| 7 | (Rebuttal Expert Report of Cliff W. |
| 8 | Hamal was marked Exhibit E for |
| 9 | identification.) |
| 10 | CLIFF W. HAMAL, having duly sworn or |
| 11 | affirmed that his testimony would be the truth, |
| 12 | the whole truth, and nothing but the truth, |
| 13 | testified as follows: |
| 14 | * * * |
| 15 | MR. WINSTON: You want to go with the |
| 16 | stipulations we've put on the record in the |
| 17 | other depositions? |
| 18 | MR. LODEMORE: Absolutely. |
| 19 | EXAMINATION BY MR. WINSTON: |
| 20 | Q. Could you please state your name for the record? |
| 21 | A. My name is Cliff William Hamal. |
| 22 | MR. WINSTON: You have the spelling of |
| 23 | his name? |
| 24 | THE STENOGRAPHER: Yes. |

| | Page 5 |
|---|---|
| 1 | Q. Have you been deposed before? |
| 2 | A. Yes, I have. |
| 3 | Q. So you understand your counsel will be objecting |
| 4 | to certain questions. Except to the extent I'm |
| 5 | asking for privilege, you should go ahead and |
| 6 | answer. |
| 7 | I'm showing you what's been marked as |
| 8 | Exhibits D and E. Are those your report and |
| 9 | rebuttal report issued in this proceeding? |
| 10 | A. Yes, they appear to be. |
| 11 | Q. Okay. What is your expertise? |
| 12 | A. I'm an expert in economic issues related to the |
| 13 | electric power industry and business practices |
| 14 | in the electric power industry generally, and I |
| 15 | detail my expertise based on my experience and |
| 16 | education in my C.V. |
| 17 | Q. What is your education relevant to your |
| 18 | expertise? |
| 19 | A. My undergraduate degree is a bachelor of science |
| 20 | degree in marine engineering and marine |
| 21 | transportation. Marine engineering is very much |
| 22 | a power systems degree. So my education at the |
| 23 | bachelor's level is very focused on, |
| 24 | essentially, power generation, power plants and |

2 (Pages 2 to 5)

789a536e-b965-402f-98cc-aff662c7009a

| Page 6 | Page 8 |
|---|---|

**Page 6**

1  how they work.
2      My education after that included a
3  nondegree program working with General Electric
4  and Westinghouse at different points, taking
5  extensive full-time training programs in
6  operations of other power generation facilities
7  which relates to my understanding of the
8  industry.  In addition to that, I have a
9  master's of science in industrial administration
10 from Carnegie Mellon.  This degree is similar to
11 a master's in business administration, and, in
12 fact, the program has been renamed to match an
13 M.B.A. program; and that education experience
14 emphasized economics and business issues
15 generally.
16 Q.  Okay.  Your undergraduate degree was a bachelor
17     of science?
18 A.  That's right.
19 Q.  Okay.  Is that primarily a technical degree?
20 A.  Yes.
21 Q.  Do you have any degrees in economics?
22 A.  I do not have degrees with economics in their
23     title.  I do not.  I hope that was clear.
24 Q.  In what job capacities have you negotiated power

**Page 7**

1      contracts?
2          THE WITNESS:  Could you repeat the
3      question?
4          (Reporter read back the last question.)
5  A.  My work related to negotiation of power
6      contracts has been as a consultant.
7  Q.  Is it fair to say you've never negotiated an
8      electricity power contract?
9  A.  No.
10 Q.  What are the contexts in which you've negotiated
11     a power contract?
12 A.  I've worked with a utility looking to
13     restructure its power contracts and was engaged
14     in negotiations in that process.
15 Q.  Is that one occasion?
16 A.  I'm thinking of one occasion.
17 Q.  Are there others?
18 A.  Yes.
19 Q.  What are those?
20 A.  I have worked on restructuring a power system,
21     which involved an agreement that related to the
22     delivery of power during the transition period
23     on the way to competition from a generator --
24     power that would be delivered from a generator.

**Page 8**

1  Q.  How many other than those two times have you
2      consulted on the negotiation of power contracts?
3  A.  I don't know.
4  Q.  Can you think of any as you sit here today?
5  A.  I worked talking to companies looking to acquire
6      power generation facilities, and that involves
7      in some cases power purchase agreements on how
8      that energy might be sold back to the utility
9      that sold the power plant.
10 Q.  You've never been the actual negotiator on a
11     power contract; is that correct?
12         MR. LODEMORE:  Objection.
13 A.  No.
14 Q.  You've consulted on two occasions concerning the
15     negotiation of power contracts, correct?
16 A.  Yes, I have consulted.
17 Q.  On two occasions?
18 A.  Not to be limited to two, but yes, on two
19     occasions, I have consulted.
20 Q.  On some other occasions, you've done consulting
21     work which has involved the evaluation of power
22     purchase agreements, correct?
23 A.  Yes.
24 Q.  Okay.  Other than that, any other experience

**Page 9**

1      with negotiating power purchase contracts?
2  A.  I'm not sure what you mean by "other than that."
3  Q.  Other than what you've just named.
4  A.  I first want to include the work I did on behalf
5      of purchasing power generation facilities and
6      negotiations leading to the sale of energy back
7      to the original owners of those facilities,
8      which I talked about earlier but I wasn't sure
9      whether that was included by your "that" or not.
10     I have worked in occasions attempting to sell
11     power purchase agreements and dealing with the
12     marketplace and the sale of those agreements.  I
13     have consulted on -- let me pause here.
14         Can you repeat the question again?
15         (Reporter read back the record as
16         requested.)
17 A.  I've been involved with transactions looking to
18     purchase power plant ownership interests that
19     involve power purchase agreements.
20 Q.  Let me rephrase the question.  Other than as an
21     outside consultant, have you ever been involved
22     in the negotiation of power contracts?
23 A.  I'm not sure what you mean by an outside
24     consultant.

3  (Pages 6 to 9)

789a536e-b965-402f-98cc-aff662c7009a

Page 10

1  Q. Have you ever worked for a company that was
2     actually negotiating a power purchase contract?
3         MR. LODEMORE: Directly employed?
4         MR. WINSTON: Yes.
5  A. I'm thinking of an occasion. It becomes a
6     semantic issue whether it's included in what
7     you're talking about. I have worked as a
8     consultant, as I've said, in this activity. On
9     some occasions, work I have done would have
10    involved taking an interest in the output of the
11    power plant and taking an interest in the
12    proceeds from the power sale agreement. So it
13    becomes a semantic issue whether we're dealing
14    with that on behalf of the company I'm with.
15    Other than that, I have not -- well, I haven't
16    under that circumstance.
17 Q. Have you ever worked for a utility?
18        MR. LODEMORE: Again, directly?
19        MR. WINSTON: As an employee.
20 A. No.
21 Q. Have you worked --
22 A. Excuse me. As a regulated, vertically
23    integrated utility?
24 Q. Yes.

Page 11

1  A. No.
2  Q. Have you ever worked for an independent power
3     generator as an employee?
4  A. No.
5  Q. Have you ever worked for any agency or
6     governmental body in charge of electricity
7     rates?
8  A. As an employee?
9  Q. Yes.
10 A. No.
11 Q. Where geographically have you done your work?
12 A. What do you mean by where?
13 Q. New England region, California?
14 A. Where was I located or what markets was I
15    dealing with?
16 Q. What markets were you dealing with.
17 A. I've done work in South Africa, Eastern Europe,
18    Peru, some work in China, a tiny amount in New
19    Zealand and Australia. I've done work in the
20    U.S., the NERC regions in the U.S. I'd have to
21    think about it further.
22 Q. Would you describe your United States practice
23    as general or focused on any particular regions?
24 A. I would define it as focused on all the regions.

Page 12

1  Q. Okay. Have you done previous work as a
2     consultant in any capacity with National Grid or
3     its predecessors?
4  A. Yes.
5  Q. Can you describe that work?
6  A. Yes. I've done work with them on antitrust
7     issues, prudency hearings, and issues related to
8     power purchase agreements and issues related to
9     market roles and market design.
10 Q. Okay. On how many -- how many different
11    engagements would you say you've had with
12    National Grid or its predecessors over the
13    years?
14 A. I'm not sure.
15 Q. More than ten?
16 A. No, I don't -- I don't think so, no.
17 Q. Five to ten?
18 A. Probably.
19 Q. Have you done past work with TransCanada?
20 A. Yes.
21 Q. On what occasion?
22 A. I worked with TransCanada in the regulatory
23    approval process for their acquisition of
24    interest in Ocean State Power dealing with

Page 13

1     antitrust issues.
2  Q. Who did you work with at TransCanada?
3  A. I worked with outside law firms in general.
4  Q. Looking at what's been marked as Exhibit D, you
5     have an attachment which includes Speeches and
6     Papers?
7  A. Yes.
8  Q. On Page 8 of that, there's an article entitled
9     Risk and Risk Management in Electricity Markets?
10 A. Yes.
11 Q. Do you still have that paper?
12 A. No -- yes, in my office.
13 Q. Yes, you do have that paper?
14 A. Yes. I don't have it with me at the moment, but
15    I have it in my office.
16 Q. Are you aware of its content?
17 A. Generally.
18 Q. Okay. When's the last time you looked at it?
19 A. I looked at it last week, I believe.
20 Q. Does it discuss fuel adjustments?
21 A. What do you mean by fuel adjustments?
22 Q. I mean adjustment mechanisms by which power
23    contracts or tariffs include some adjustment for
24    the price of fuel.

4 (Pages 10 to 13)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

789a536e-b965-402f-98cc-aff662c7009a

**Page 34**

1    because of interest to lower rates to rate
2    payers?
3  A.  Well, I'm not planning on opining on anything.
4    My opinion is what's set forth in my reports.
5    I'm just answering your questions.
6  Q.  Do you know for a fact what EUA was thinking as
7    to what it intended with respect to a fuel
8    adjustment with respect to 2005 to '9?
9        MR. LODEMORE:  Objection.
10 A.  When?
11 Q.  In 1998.
12 A.  Well, in 1998, it agreed to the Rhode Island
13   settlement, which is an agreement which does not
14   include fuel triggers for that five-year period.
15   So it seems to me its intentions are not to
16   accept those.  And it also filed tariffs --
17   filed that material with the FERC and filed
18   tariffs in Rhode Island, which also reflected no
19   fuel adjustment in those time periods.
20 Q.  Okay.  So your -- are you inferring from the
21   documentation what EUA's intent was?
22 A.  No, and if I did that or gave that impression of
23   that, that was not my intention.  I do not have
24   an opinion, I'm not an expert on EUA's

**Page 35**

1    intentions.
2  Q.  You state at the top of Page 3 that EUA is
3    financially indifferent.  What does that mean?
4  A.  This sentence comes out of a paragraph which
5    talks about the wholesale standard offer service
6    agreement with TransCanada, and as that sentence
7    goes on to say, "EUA does not retain any extra
8    revenues nor does it have any incremental
9    benefits" -- "incremental payments," I'm sorry,
10   "that are not matched by this revenue."  So that
11   sentence fragment is meant to narrowly define
12   the money we're talking about here which is
13   dealing with potential adjustments under the
14   fuel adjustment factor in '05 through '09.  That
15   payment or cash flow stream doesn't end up at
16   EUA.  It flows from the customers through to
17   TransCanada if it were to occur or not occur.
18 Q.  So you are saying, for example, that Montaup
19   is financially indifferent as to whether it has
20   a fuel adjustment from 2005 to '9 on a backstop
21   obligation?
22       MR. LODEMORE:  Objection.
23 A.  EUA has this agreement.  If there were to be an
24   adjustment for fuel factor, the pass-through to

**Page 36**

1    TransCanada, it would leave Montaup and EUA
2    financially independent as narrowly defined
3    here.  And if there wasn't one such that there
4    was none of this extra money being passed from
5    customers to TransCanada, that would leave EUA,
6    Montaup in the same position, narrowly defined
7    here.
8  Q.  I understand.  In other words, when you are
9    talking about financial indifference here, you
10   are only speaking as to under the wholesale
11   standard offer service agreement as signed and
12   executed?
13 A.  Well, it's the relationship between that and the
14   retail or -- the backstop obligation and the
15   retail rates.
16 Q.  Well, once the agreement is executed, Montaup
17   doesn't have a backstop obligation with respect
18   to that load served by the WSOS agreement,
19   correct?
20 A.  It was being served by that other agreement.
21 Q.  Correct.
22 A.  And so it's -- yeah.
23 Q.  Okay.  You would agree with me that to the
24   extent Montaup -- prior to this agreement,

**Page 37**

1    Montaup had a backstop obligation for the load
2    that TransCanada agreed to take on, correct?
3  A.  That's right.
4  Q.  And you would agree with me that Montaup did
5    have a financial interest at that point as to
6    whether or not a fuel adjustment applied from
7    2005 to '9, correct?
8  A.  That's right.
9  Q.  I take it then that your statement here that EUA
10   is financially indifferent would also -- is it
11   your opinion that -- okay.  In 2000, there was a
12   merger, correct, in which EUA's obligations
13   under the WSOS agreement were taken on by
14   Narragansett, correct?  Not your legal
15   interpretation.  Is that your understanding?
16 A.  There was a merger between the parties.
17 Q.  Is it your understanding that in or around 2000
18   Narragansett stepped into the EUA distribution
19   company's shoes under the WSOS agreement?
20 A.  Generally, yes.
21 Q.  Okay.  Is it your opinion that Narragansett
22   likewise is financially indifferent under the
23   WSOS agreement as to whether a fuel adjustment
24   is paid in 2005 to '9?

10  (Pages 34 to 37)

789a536e-b965-402f-98cc-aff662c7009a

Page 38

1  A.  Again, Narragansett has, as you said, stepped
2      into the shoes of EUA, and this sentence
3      narrowly defined talking about prices paid by
4      customers and whether any of that money stops
5      at, in this case, Narragansett or whether it
6      passes on to TransCanada. Yes, in this narrow
7      sense, they are indifferent in the sense that if
8      that money were to be paid by customers and goes
9      to TransCanada or is not paid by customers and,
10     therefore, does not go to TransCanada, it leaves
11     Narragansett, narrowly defined, financially
12     indifferent.
13 Q.  I mean when Narragansett -- and I'm not speaking
14     Narragansett in the post-2000 world in which
15     it's under the WSOSA agreement. Are you saying
16     that Narragansett has no incentives or interests
17     one way or another as to whether or not the
18     rates include a fuel adjustment for TransCanada
19     or other wholesale standard offer service
20     suppliers?
21 A.  No.
22 Q.  What interest does Narragansett have?
23 A.  It's my understanding that Narragansett as a
24     regulated utility is looked to by the regulator

Page 39

1      to aid in providing electricity at the lowest
2      cost to the customers in the region, and this is
3      consistent with other utilities and traditions
4      of this industry; and in that context, the
5      regulators look for that utility to act in those
6      customers' best interests. And that's what I'm
7      referring to earlier when I'm talking about
8      narrowly defined because broadly speaking, I
9      think that Narragansett has an interest in not
10     charge customers rates and prices that it
11     doesn't have to charge.
12 Q.  So you'd agree that Narragansett has an
13     incentive to keep rates down to the extent it
14     can?
15 A.  Yes.
16 Q.  Does Narragansett have a financial incentive to
17     keep wholesale standard offer service rates
18     down?
19 A.  You mean that broadly speaking? We've been
20     talking about narrowly and broadly speaking
21     about financial incentives. Any financial
22     incentives?
23 Q.  Yes.
24 A.  For the reasons we just talked about, I believe

Page 40

1      that Narragansett has an incentive, has looked
2      at it to take actions to keep rates down to
3      customers and also to keep -- you mentioned
4      wholesale costs. To the effect that the
5      wholesale costs could affect stockholders -- it
6      has a fiduciary responsibility to its
7      stockholders as well.
8  Q.  Okay. What are some of the ways in which
9      wholesale standard offer service rates affect
10     Narragansett in an economic or financial sense?
11 A.  If rates were higher for energy that it was
12     purchasing that it could not pass those costs on
13     to customers, then that cost would be borne by
14     stockholders, which would be a financial
15     interest to it. If costs were higher that could
16     be passed on to customers, then there is still
17     the, broadly speaking, financial incentives in
18     terms of maintaining its responsibilities before
19     the regulators to keep those costs down.
20 Q.  Okay. Narragansett is also charging customers
21     for distribution rates, correct?
22 A.  That's right.
23 Q.  Is that how Narragansett essentially makes its
24     money?

Page 41

1  A.  Generally speaking, yes.
2  Q.  Okay. And it's a fair statement that the rates
3      charged to customers include Narragansett's
4      distribution rates as well as wholesale standard
5      offer service rates paid to third-party
6      suppliers?
7  A.  That's right.
8  Q.  You'd agree with me that from a financial
9      standpoint, it's better for Narragansett to keep
10     rates down by lowering wholesale standard offer
11     service rates than its own distribution rates,
12     correct?
13         MR. LODEMORE: Objection.
14         THE WITNESS: Could you read just the
15     last part of that question?
16         (Reporter read back the record as
17         requested.)
18 A.  I've set that up as a choice that is not
19     directly weighed one against the other in terms
20     of how this company is regulated, but given a
21     choice between lowering rates by not taking the
22     money itself or lowering rates by -- let me
23     start over.
24         Narragansett has an interest in

11  (Pages 38 to 41)

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

789a536e-b965-402f-98cc-aff662c7009a

Page 42

1    lowering rates. Narragansett does not want to
2    pass up an opportunity to earn appropriately on
3    and of its investments in the distribution
4    system. So it has no incentive to try to take
5    less money that it's entitled to in distribution
6    rates. If it can lower wholesale rates
7    independent of that, it has an incentive to do
8    that, and that's part of its responsibility as a
9    regulated utility.
10   Q.  Would you say that it's a fair statement that
11       there's a good deal of political pressure on
12       Narragansett to keep rates down?
13   A.  I don't know the details of Narragansett's
14       specific situation with respect to political
15       pressures at the moment.
16   Q.  Is there regulatory pressure on Narragansett to
17       keep rates down?
18   A.  In addition to what we've already talked about?
19   Q.  Well, is the answer yes?
20   A.  It's general -- as we've talked about already,
21       there is a general interest in keeping rates
22       down for regulatory reasons, and it spreads
23       beyond just the regulator. There are political
24       interests in general for utilities to keep rates

Page 43

1    down. I haven't studied the details of Rhode
2    Island's situation.
3    Q.  Turning to Page 4 of your report, in the middle
4        of the first full paragraph, you say, "At all
5        relevant times, TransCanada was a large,
6        sophisticated energy company," and then you go
7        on to describe it. And then in the second
8        sentence, you say, "It had specific capabilities
9        to assess and manage price risks in fuel and
10       electricity markets." What is that based on?
11   A.  That's based on TransCanada's annual report.
12       There's a companion document that is -- that
13       accompanies the annual report. I noticed in
14       pulling it off the Web site, which I forget the
15       name of it, but it's something different but
16       it's related to an annual report. I think it
17       has to deal with the fact it's a Canadian
18       company and may file things slightly
19       differently.
20           In addition, it's related to
21       representations in documents that went to the
22       board of directors in evaluating the specific
23       transaction, and there may be other company
24       documents.

Page 44

1    Q.  Other than your review of TransCanada documents,
2        are your statements of description about
3        TransCanada based on anything else?
4    A.  Well, TransCanada is a company I know of. It's
5        based on my experience in general. I'm aware of
6        them in the industry as a major transporter of
7        gas across Canada. I'm aware that they've
8        marketed electricity, and I've done this review
9        of their annual reports and looked at company
10       documents.
11   Q.  You then say in the next sentence, "It was
12       actively engaged in a strategy, of which the
13       WSOS agreement was a small part, to expand its
14       operations in the competitive segments of these
15       industries."
16           Are you intending to opine on
17       TransCanada's intent?
18   A.  No.
19   Q.  So the statements in your report that discuss
20       TransCanada's intent, those are not opinions
21       that you are intending to express in this case?
22   A.  Which statements are you referring to?
23   Q.  Well, there's an example. "It was actively
24       engaged in a strategy to expand its operations."

Page 45

1    A.  Right. I mean there are documents that talk
2        about its strategies and talk about its
3        statements and actions it was taking with
4        respect to those strategies. I don't view that
5        as a statement about its intentions. It's a
6        statement about its strategies, which I am
7        prepared to testify about, and it's a statement
8        about its actions, which I can talk about.
9    Q.  Well, the jury can read documents. The judge
10       can read documents. So my question to you is,
11       are you intending to draw conclusions about
12       TransCanada's intent --
13           MR. LODEMORE: Objection.
14   Q.  -- from your review of documents?
15           MR. LODEMORE: Same objection.
16   A.  My conclusions are put forth in my reports and
17       on this particular issue in this paragraph,
18       which I'll be prepared, if asked, to present at
19       trial.
20   Q.  Okay. And when you say it was actively engaged
21       in a strategy to expand its operations, I assume
22       that's based on a review of documents?
23   A.  It's based on documents, to be sure, as well as
24       my understanding of the industry, my

12  (Pages 42 to 45)

789a536e-b965-402f-98cc-aff662c7009a

# Tab 51

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
**PUBLIC UTILITIES COMMISSION**

IN RE: NARRAGANSETT ELECTRIC COMPANY :
PROPOSED RATE CHANGES TO STANDARD :  DOCKET NO. 3648
OFFER RATE, TRANSITION CHARGE AND :
TRANSMISSTION ADJUSTMENT FACTOR  :

<u>REPORT AND ORDER</u>

### I. <u>BACKGROUND</u>

The Utility Restructuring Act of 1996 ("URA") requires each electric distribution

company to arrange with wholesale power suppliers for a standard power supply offer to

sell electricity to all customers at a stipulated rate. Pursuant to the URA, Narragansett

Electric Company ("Narragansett" or "Company") entered into wholesale Standard Offer

supply contracts with the following prices:

| <u>Calendar Year</u> | <u>Price per kWh</u>[1] |
|---|---|
| 2005 | 5.5 cents |
| 2006 | 5.9 cents |
| 2007 | 6.3 cents |
| 2008 | 6.7 cents |
| 2009 | 7.1 cents |

The wholesale Standard Offer supply contracts also provide for increases in the

price per kilowatt-hour ("kWh") of wholesale power supplied to Narragansett in the event

fuel prices increase above certain levels. To the extent that the total cost of the wholesale

power supply to Narragansett, including fuel charges, exceeds retail Standard Offer

Service ("SOS") and Last Resort Service ("LRS") revenues, the under-collection is

recoverable from Narragansett's customers through the annual reconciliation provisions

of Narragansett's Standard Offer Adjustment Provision. Likewise, to the extent

Narragansett collects more than its total cost of providing SOS, the ratepayers are entitled

to recoup the benefit, with interest. Furthermore, Narragansett's transmission and transition charges are fully reconciling on an annual basis, the transition charges through an adjustment based on the annual reconciliation of wholesale power contract termination charges ("CTC") filed by National Grid and the transmission charges through a change in Narragansett's transmission adjustment factor ("TAF").

## II.    NARRAGANSETT

On November 10, 2004, Narragansett filed with the Rhode Island Public Utilities Commission ("Commission") its annual reconciliation filing with respect to SOS, transition and transmission rates. The filing included: a proposed 11.94% increase in the retail SOS rate from the present rate of 6.7 cents per kWh to 7.5 cents per kWh; a proposed 1.17% decrease in the transition rate from the present rate of .855 cents per kWh to .845 cents per kWh; and a proposed 469% increase in the transmission service adjustment factor from the present rate of .042 cents per kWh to .239 cents per kWh.[2]

On December 9, 2004, in response to Commission data requests, Narragansett filed a revised proposed SOS charge of 6.7 cents per kWh, resulting in no change to the rate then in effect.[3] The result for a typical residential customer using 500 kWh of service would be an increase of 1.6% equal to $0.97 per month. Therefore, the average monthly residential bill would increase from $61.80 to $62.77.[4] In support of the proposed rates, Narragansett presented the pre-filed testimony of Jeanne A. Lloyd, Principal Financial Analyst for National Grid USA Service Company, Michael J. Hager,

---

[1] The contractual increase over the five year period will be 29.09% before fuel index adjustments.
[2] Narragansett Ex. 1A, Pre-filed testimony of Jeanne A. Lloyd, pp. 3-4, Exhibit JAL-10, p. 1.
[3] PUC Ex. 1, Response to Commission Data Request 1-3.
[4] Narragansett Ex.  , Exhibit JAL-12 Update, p. 1.

Vice President, Energy Supply - NE for National Grid USA Service Company, and Carol A. Currier, Senior Analyst in Transmission Rates for New England Power Company.

A.    Standard Offer Service

In his pre-filed testimony, Michael Hager explained that Narragansett has wholesale power supply contracts with three suppliers to serve the retail SOS load within its pre-merger ("Narragansett zone") and post-merger (both "Narragansett zone" and "EUA zone") service territories. All of these wholesale SOS supply contracts run through December 31, 2009 and contain a fixed price component.[5] Mr. Hager explained that the Narragansett zone SOS supply contracts contain two price components – a base price and a fuel index adjustment provision. According to Mr. Hager, the fuel index adjustment provides for additional payments ("fuel index payments") to be made to the SOS suppliers in the event of substantial increases in the market price of No. 6 residual fuel and natural gas. The price is based on a comparison of the twelve-month ("Narragansett zone") rolling average of oil and gas prices to a current trigger price. The base price for SOS contracts in both zones in calendar year 2005 is 5.5 cents per kWh.[6]

In order to determine the extent of any fuel index payments for the period January 2005 through December 2005, Mr. Hager based the fuel index adjustment calculations on future gas and crude oil projections. In performing his calculations, he used the average gas and crude oil prices as reported in the Wall Street Journal on November 22, 23, and 24, 2004. Based on the numbers examined, Mr. Hager determined that Narragansett will have to make fuel index payments of 1.158 cents per kWh in the pre-merger Narragansett zone. There are no payments in the former EUA zone, due to the expiration of the fuel

---

[5] Narragansett Ex. 1B, (Pre-filed testimony of Michael Hager), p. 3.
[6] Id. at 4.

index in the EUA SOS contracts, for the period January 2005 through December 2005. This equates to a total weighted average SOS cost of 6.653 cents per kWh, slightly below the current level.[7]  Mr. Hager noted that recent procurements in Massachusetts had resulted in energy charges ranging from 6.646 cents per kWh for certain industrial customers to 7.093 for residential customers for the periods beginning in November 2004 and extending into 2005.[8]

In her pre-filed testimony, Jeanne Lloyd noted that Narragansett's current SOS rate is 6.7 cents per kWh.  The charge was designed in a manner where Narragansett would neither over-collect nor under-collect its total wholesale SOS expenses through December 2004.[9]  According to Ms. Lloyd's Updated Exhibit JAL-7, Narragansett projected an under collection of approximately $1,522,134 as of December 31, 2004.

Ms. Lloyd stated that Narragansett is proposing to maintain its SOS rate of 6.7 cents per kWh in order to meet anticipated fuel index payments.[10]  According to Ms. Lloyd, maintaining the current level of 6.7 cents per kWh will cause Narragansett's SOS expenses to be approximately $882,184 more than the Company's revenues.[11]  Because the over recovery of $72,938 in the Last Resort Service ("LRS") reconciliation is

---

[7] Id. at 5.

[8] Id. at 6.

[9] Narr. Ex. 1A (Pre-filed testimony of Jeanne A. Lloyd), p. 18.  Narragansett incurred fuel index payments of approximately $66.8 million for the period October 2002 through September 2003, with approximately $21.4 million offset by a supplier credit to Narragansett during a prior period.  Id. at 21.  In Docket No. 3508, the Commission directed Narragansett to monitor its SOS reconciliation on a monthly basis and file with the Commission for an adjustment to the rate if the projected balance as of December 2003 were to exceed $16 million, either positive or negative.  The balance as of December 2003 is estimated to be an over recovery of $8.1 million, which Ms. Lloyd uses to mitigate the proposed rate increase.  Id. at 18-19, JAL-7, p. 2.

[10] Id. at Exhibit JAL-1-Update.  The base SOS charge for 2005 is 5.5 cents per kWh.  The remainder of the proposed charge is related to anticipated fuel index payments.

[11] Id. at Exhibit JAL-7-Update.

minimal, rather than applying it to the SOS balance as in the past, Narragansett proposes to carry it forward to the next reconciling period.[12]

### B. Transition Charge

In her pre-filed testimony, Ms. Lloyd explained that the transition charge is intended to recover the CTC that was billed to Narragansett by its affiliated supplier, New England Power ("NEP"), when NEP released Narragansett from the all-requirements contract whereby Narragansett had contracted to buy all of the power required to serve Narragansett's customer load.[13]

Narragansett reconciles transition revenues on an annual basis in accordance with the requirements of the Non-Bypassable Transition Charge Adjustment Provision, which requires an annual reconciliation of Narragansett's total CTC expense against Narragansett's total revenue from the Transition Charge. Any over or under-collection is to be refunded to or collected from customers, with interest. Ms. Lloyd indicated that the current transition rate produced an over-recovery of approximately $437,110 for the period October 1, 2003 through September 30, 2004.[14] Narragansett proposed reducing the weighted average transition charge by a transition charge adjustment factor credit to return the over recovery to customers.[15]

Therefore, the Company's proposed transition charge of 0.845 cents per kWh represents the weighted average base transition charge of 0.850 cents per kWh and a

---

[12] Narr. Exhibit 1A, p. 18. The non-residential over recovery is $74,704 and the residential under recovery is $1,767 for the period October 2003 through September 2004. The balance will earn interest on behalf of ratepayers.

[13] Id. at 4.

[14] Id. at 5-6.

[15] Id. at 6. The weighted average transition charge is based on a formula comparing the transition charges of the Narragansett zone and the EUA zone. Id. at 5.

transition charge adjustment factor credit of 0.005 cents per kWh designed to refund the transition over recovery for the period October 2003 through September 2004.[16]

C. Transmission Rate

In her pre-filed testimony, Ms. Lloyd outlined the three components of Narragansett's proposed increase in the Transmission Adjustment Factor: (1) an increase of 0.061 cents per kWh to represent an increase in forecasted transmission costs for 2005; (2) an increase of 0.048 cents per kWh to collect a $3.8 million under recovery from the period October 2003 through September 2004; (3) an increase of .064 cents per kWh, due to the elimination of the 2004 transmission reconciliation factor and (4) an increase of 0.024 cents per kWh designed to recover approximately $5.6 million over three years for the deferred ISO Tariff Expenses.[17]    The net result was a proposed increase of 0.197 cents per kWh, increasing the Transmission Adjustment Factor from 0.042 cents per kWh to 0.239 cents per kWh.[18]

Narragansett forecasted total transmission costs for 2005 of approximately $44.2 million, resulting in a unit cost of 0.564 cents per kWh for 2005, or .061 cents more than the 2004 average transmission expense of .503 cents per kWh.[19]    Narragansett reported a $3.8 million transmission revenue under recovery as of September 30, 2004, which will be collected in 2005. Ms. Lloyd noted that in accordance with the Commission's Order in Docket No. 3617, Narragansett will begin collecting $5.6 million of the total $7.45 million of previously disputed transmission costs over a three-year period.[20]

---

[16] Id. at 4-5.
[17] Id. at 6-7.  Approval of the three year recovery was provided by the Commission in Docket No. 3617, Order No. 18037 (issued November 9, 2004).
[18] Id. at 6-7, Exhibit JAL-1-Update.
[19] Id. at 7-8.
[20] Id. at 8-11.

6

In her pre-filed testimony, Ms. Carol Currier explained that since January 1, 1998, Narragansett has been taking transmission services on behalf of its entire customer base under two open tariffs, New England Power Company's NEP Federal Energy Regulatory Commission ("FERC") Electric Tariff No. 9 and New England Power Pool's ("NEPOOL") FERC Electric Tariff No. 1.[21] FERC Tariff No. 9 provides service over NEP's local, non-PTF facilities. NEP also provides metering, transformation and certain ancillary services to Narragansett to the extent such services are required by Narragansett and not otherwise provided under the NEPOOL Tariff.[22] NEPOOL's FERC Tariff No. 1 covers regional transmission service over Pool Transmission Facilities ("PTF"), calculated pursuant to a FERC-approved formula. The NEPOOL Tariff also provides for Black Start, Reactive Power, and Scheduling, System Control and Dispatch Services.[23] Additionally, since January 1, 1999, Narragansett takes service pursuant to the New England Independent System Operator's ("ISO-NE") FERC Electric Tariff No. 1, under which ISO-NE provides Scheduling System Control and Dispatch, Energy Administration Service, and Reliability Administration Service.[24]

Ms. Currier estimated Narragansett's total transmission and ISO-NE Tariff expenses for 2005 to be approximately $44.2 million, representing a net increase of $5.49

---

[21] Narragansett Ex. 1C, Pre-filed testimony of Carol A. Currier, p. 3.

[22] Id. at 9-10.

[23] Id. at 4. Pool Transmission Facilities are defined as "the transmission facilities owned by Participating Transmission Owners (PTO) over which the ISO shall exercise Operating Authority in the terms set forth in the Transmission Owners Agreement (TOA), rated 69kV or above required to allow energy from significant power sources to move freely on the New England transmission system as defined in the Open Access Transmission Tariff, and include: 1. All transmission lines and associated facilities owned by PTOs rated 69 kV and above, except for lines and associated facilities that contribute little or no parallel capability to the PTF . The following do not constitute PTF: (a) Those lines and associated facilities which are required to serve local load only. (b) Generator leads, which are defined as radial transmission from a generation bus to the nearest point on the NEPOOL Transmission System. (c) Lines that are normally operated open. The remainder of the definition as contained in FERC Electric Tariff 3 (Open Access Tariff) has not been included in this footnote.

[24] Id. at 3.

million, or 14.2% from the 2004 forecast, primarily due to the combination of eliminating border charges with New York, increased PTF transmission investments and the updated RNS Rate, and increased NEPOOL Reactive Power costs.[25]    She explained that her estimate included NEP Tariff 9 charges, NEPOOL Regional Network Service ("RNS") transmission charges, Black Start, Reactive Power and Load Dispatch charges.[26]

In estimating the 2005 NEPOOL RNS charges, Ms. Currier indicated that she used the currently effective rates and adjusted them to reflect an estimated rate increase that becomes effective on June 1st each year. The estimated cost for Black Start Service is based on the January 1, 2005 rate. She calculated the Reactive Power cost by using the actual costs for the period September 2003 through August 2004. She also based the costs associated with Scheduling and Dispatch Service on the currently effective rate. All rates are further based on Narragansett's network load. Ms. Currier explained that no Reliability Must Run ("RMR") contract charges have been estimated because Rhode Island does not appear to be an affected reliability region.[27]

Ms. Currier calculated NEP Tariff No. 9 charges based on NEP's actual Non-PTF expenses for the 12 months ending August 2004 increased to reflect additional costs associated with forecasted capital additions anticipated for the rate period. Likewise, she based metering, transformation and ancillary service charges on current rates.[28]    Ms. Currier estimated the ISO-NE charges based on the ISO-NE revenue requirement filed with FERC. To estimate Narragansett's 2005 ISO-NE charges, Ms. Currier adjusted ISO-NE's actual costs for the period September 2003 through August 2004 by an

---

[25] Id. at 14.
[26] Id. at 11-14.
[27] Id. at 11-13.
[28] Id. at

inflationary factor which is intended to recognize the increase or decrease in the ISO-NE

revenue requirement from the budget as filed for the periods ending December 2004

versus December 2005.[29]

Finally, Ms. Currier provided an explanation of the primary changes from the

2004 forecasted expenses. She indicated that in response to a FERC Order regarding

elimination of market "seams" between New England and New York, the two control

areas reached an agreement which became effective on December 1, 2004. She

explained that elimination of this charge will decrease NEP's credit to its transmission

revenue requirement by the amount it currently receives from New York for the border

charge. This increases the Non-PTF costs allocated to Narragansett. Ms. Currier

indicated that the increase in the PTF forecast for 2005 is primarily due to an increased

PTF rate in 2005. The increase in Reactive Power costs is primarily due to the costs

associated with system changes in the Boston area which are allocated to the entire New

England region.[30]

### III.    DATA REQUESTS

The Energy Council of Rhode Island ("TEC-RI"), a full party intervenor, and the

Commission issued data requests to which Narragansett responded. TEC-RI asked

several questions regarding transmission costs and allocations from NEP. TEC-RI also

requested information regarding the current rules related to the procurement of last resort

service. Both TEC-RI and the Commission requested updated fuel information and cost

projections from Narragansett. The Commission requested information regarding the

---

[29] Id. at 14. The inflationary factor varies based on the category of expense, but when the cost of all categories is combined, the average inflationary factor is 5.24%
[30] Id. at 15-16.

impact of Standard Market Design ("SMD") on RMR costs.[31]   Under the pre-SMD model, Rhode Island would have been required to pay $11,497,893 for RMR costs in 2004.

Finally, the Commission requested an analysis from the Company as to whether or not SMD has resulted in an overall savings to customers in Rhode Island.  In response, Narragansett provided information from ISO-NE's website and 2003 Annual Markets Report which indicates that if energy costs are excluded, SMD has resulted in more efficiency in the New England wholesale electricity market.  Including energy costs does not decrease efficiency, but shows increased overall costs to customers.

IV.   HEARING

A public hearing was held at the Commission's offices, 89 Jefferson Boulevard, Warwick, Rhode Island, on December 13, 2004.   The following appearances were entered:[32]

| | |
|---|---|
| FOR NARRAGANSETT: | Laura S. Olton, Esq. |
| FOR DIVISON: | Paul J. Roberti, Esq.<br>Assistant Attorney General |
| FOR COMMISSION: | Cynthia G. Wilson, Esq.<br>Senior Legal Counsel |

A.  Public Comment

Nine members of the public provided comment regarding the proposed rate change.

B.  Narragansett's Testimony

---

[31] Reliability Must Run costs are those associated with electric generating units in congested areas that ISO-NE must run regardless of price in order to ensure system reliability.

[32] Mr. John Farley, Executive Director of TEC-RI, an intervenor, was allowed to make a statement for the record without counsel present during the hearing after no objection was made by the parties.

10

At the hearing, Mr. Hager, Ms. Lloyd and Ms. Currier testified on behalf of Narragansett. Ms. Lloyd testified regarding the effect of the revised calculations, indicating that there would be an increase of $0.97 on the typical residential monthly bill, or approximately 1.6%, for a total bill of $62.77 per month. The effect on the average low income residential customer without a water heater credit would be an increase of $0.97 or approximately 1.9%, for a total bill of $51.29 per month.[33]

The witnesses summarized their pre-filed testimony and were presented for cross examination. Ms. Currier and Ms. Lloyd responded to questions regarding transmission calculations. Ms. Lloyd acknowledged that the TAF is increasing by a significant amount, approximately 69%. Ms. Currier noted that approximately $3.5 million of the PTF charges are due to increased NEPOOL charges. She agreed that the non-PTF charges increased by approximately 13.8%. She indicated that $2.6 million is associated with transmission plant and other infrastructure improvements. She noted that $3.6 million is associated with payments to affiliate companies that own transmission facilities which NEP may use in the provision of transmission services pursuant to an integrated facilities agreement. She acknowledged that the largest component of the increase is $6 million associated with Administrative and General expenses resulting from NEP's costs pursuant to the formula set forth in FERC Tariff 9. She indicated that any transmission customer, such as Narragansett can ask for an audit to determine if the charges agree with the costs. She was not aware if Narragansett has ever sought such an audit. She was also not aware of the administrative procedure for approving the costs or for triggering the audit provision. Finally, she was unsure of whether any reasonableness review is

---

[33] Id. at 56.

11

undertaken by any jurisdictional entity such as FERC.[34]   With regard to the costs
associated with Reactive Power, Ms. Currier explained that the reactive power allocation
per the NEPOOL Tariff is allocated to all of New England as it is necessary to maintain
reliability of the New England transmission system, rather than something which is
identifiable to a subset of customers.[35]

Mr. Hager clarified that the National Grid USA costs are allocated to the various
distribution companies, including Narragansett, either based on actual costs for a
Narragansett-specific project or based on a  formula for a project that benefits all of the
distribution companies.  He indicated that an employee's daily wages are allocated based
on the hours he has incurred for his various functions throughout the day to ensure no
double billing.[36]

With regard to SOS issues, Mr. Hager indicated that the EUA fuel adjustment
provision expired in accordance with the contracts between EUA and Narragansett on
December 31, 2004.  Two of the three suppliers had acknowledged the expiration and one
had remained silent.  In the event the remaining supplier disagreed with Narragansett's
interpretation of the contract, the supplier could request arbitration.  However, Mr.
Roberti noted that this issue has been raised by the Commission in the last several SOS
proceedings and should come as no surprise to the remaining supplier.  He expressed

---

[34] Id. at 55-71.  In response to Record Requests, Ms. Currier indicated that the Integrated Facilities
Agreements were filed with FERC and that the recovery of the costs are provided for in the Agreements
and Tariff 9.  The Integrated Facilities Agreements were approved by FERC in 1975 (Blackstone Valley
Electric), 1990 (Blackstone Valley Electric), 1996 (Narragansett), and 1999 (Newport Electric
Corporation).  She indicated further that Narragansett has never sought an audit of NEP's accounts and
records as allowed under Tariff 9.  She explained that the revenue requirements under NEP's FERC Tariff
9 are calculated pursuant to a formula rate filed with and approved by FERC.  The approved formula rate
permits NEP to recover its actual costs for cost components approved as part of the cost of service formula.
Thus, she explained, FERC approves the formula but does not specifically review the Tariff 9 costs.
However, FERC may audit the application of NEP's formula or the transmission customers may conduct an
audit.  See Responses to Record Requests, 2, 3, and 4.

12

concern that if there were arbitration, a ratepayer advocate should have a right to be involved.

With regard to the treatment of the LRS over collection, Ms. Lloyd acknowledged that the Company is not recommending rolling it into the SOS balance in 2005 and explained that because the balance is so small, the Company believed it would be more appropriate to carry it forward in an interest bearing account through to the next reconciliation. She noted that most of the over collection was due to a timing issue between the monthly usage and the billing cycles, specifically regarding prorating of usage on bills.

Addressing public comment that restructuring was supposed to provide lower electric prices for customers, Mr. Hager explained that there is competition in the wholesale market, although not in the retail market for residential customers in Rhode Island. He reiterated a point from a prior SOS proceeding, noting that gas prices at the end of November 2004 for calendar year 2005 purchases were averaging $7.15 per MMBtu. He reminded the Commission that when the restructuring concept was being developed in 1996, 1997 and 1998, the natural gas market prices would fluctuate between $2.00 and $3.00 per MMBtu. At that time, $3.00 per MMBtu put people into crisis mode. He indicated that economists are advising market participants to "forget the old prices [and that] $5.00 or $5.50 should be the normal price." Both Mr. Hager and Dr. Stutz, the Division's witness agreed that some of the reason for the increased energy

---

[35] Id. at 78-79. See Response to Record Request 7.
[36] Id. at 72-75.

13

prices is due to increased generating capacity, built after the commencement of restructuring, which is dependent on natural gas.[37]

Mr. Hager noted that ISO-NE had issued a report which indicated that if one backs out the increased fuel costs, and normalizes them back to the oil and gas prices of the prior year, the actual wholesale market prices were lower in 2003 than in the year prior. According to ISO-NE, this shows the efficiencies created by the restructured market. Therefore, while customers were experiencing actual increases in their bills, it was due to increases in energy costs rather than inefficiencies in the system.[38]

C. Division's Testimony

The Division presented Dr. John Stutz of the Tellus Institute in support of its position. Dr. Stutz indicated that while the transmission costs and erratic behavior of the SOS costs concern the Division, the Division supports the amended proposal that Narragansett filed with the Commission.[39]  In response to a question from the Bench inquiring as to whether or not the SOS rate should be increased, Dr. Stutz agreed with a comment made by Mr. Hager that the current SOS rate should provide some cushion in the midst of volatility. Dr. Stutz also pointed out that with a volatile market such as the historical natural gas market, a valid projection of a trend is very difficult. He noted that the natural gas market, shown on a graph, tends to have peaks and valleys. Therefore, while there has been an overall upward trend in the energy market over time, it is very difficult to project what the market will do in the next twelve-month period for the purposes of setting rates. He also indicated that 6.7 cents per kWh is a reasonable level

---

[37] Id. at 94-102.
[38] Id. at 96-98.
[39] Id. at 83-84.

14

for the SOS rate and that it provides a cushion.[40]  He stated that "I do have to admit that the cushion isn't anywhere near as big as these swings we've seen, but I hope these swings are more indicative of spikes than trends."[41]  He maintained that in light of the volatility, where a clear trend is not discernable, this was not the time to be building up large surpluses.[42]  With regard to the Commission's previous Orders which contained provisions to encourage the Company to file for a rate change when the over- or under-collection in the SOS account reaches $16 million, Dr. Stutz noted that in light of the volatility, such a benchmark should not be an absolute mandate, but rather a trigger that a rate change may be necessary.[43]

### D.    TEC-RI's Testimony

Mr. John Farley, Executive Director of TEC-RI, stated that the organization has some concerns with the transmission rate.  Furthermore, with regard to the SOS rate, he noted that TEC-RI has two competing positions within the organization.  Some customers are receiving energy through competitive supply while others are taking SOS. Addressing the SOS concerns, he acknowledged that there is still no clear answer as to what the base line price will be.  He maintained that it is important for Rhode Island to seek the best strategy for mitigating risk when it comes to the prices.  He believed that the procurement of SOS is not flexible enough to mitigate risk.  He opined that the State is at a point where it should either move forward in encouraging the competitive market or

---

[40] Id. at 123-26, 128.
[41] Id. at 127-28.
[42] Id. at 128-129.
[43] Id. at 126-27.

15

that Narragansett will continue to procure most of the power, in which case there needs o

be a review of the Company's ability to procure it in the best way possible.[44]

## V.    COMMISSION FINDINGS

After considering the evidence presented, the Commission approved Narragansett's amended rate proposal as filed. Specifically, the Commission approved Narragansett's proposals with regard to the SOS rate, TAF, transition rate, and the LRS over-recovery, as just and reasonable and in the best interests of the ratepayers.

The Commission determined that Narragansett's proposal to continue reporting monthly on the projected balance of the SOS account as of December 31, 2004 is reasonable. Furthermore, Narragansett Electric should consider filing for a SOS rate adjustment if monthly projections indicate that the SOS account will accrue an over- or under-collection in excess of $16 million as of December 31, 2005. The Commission agrees with Dr. Stutz that the filing should not be required based solely on the projected number, but should consider the time of year and projections of oil and gas prices. In other words, if there appears to be a large over- or under-collection after only a couple of months of the year, time may smooth out the result. Likewise, if the over- or under-collection does not appear until after September, when Narragansett will be filing shortly for its annual reconciliation, it may not be appropriate to file. In other words, the Company has discretion utilizing various factors to determine when a rate adjustment is necessary beyond simply the figure of $16 million. It is encouraged to seek Division input prior to filing for a rate change if one is not clearly necessary.

The Commission notes that Narragansett does not earn any profit on the SOS, transmission or transition charges. These rates are the result of charges that Narragansett

---

[44] Id. at 129-131.

16

must pay in order to distribute the electricity to homes and businesses. With regard to the SOS rate, the Commission regulates Narragansett, but does not regulate the wholesale oil and natural gas prices. The Commission must appropriately address those costs and allocate those costs to the different groups of customers as those costs are incurred.

While the Commission is hopeful that a market will develop under restructuring, it will continue to diligently ensure that rates remain as stable as possible given the wholesale market volatility. The Commission reiterates that the General Assembly has voted in favor of electric restructuring twice based on the theory that competition will ensure lower energy prices. What the Commission has seen, however, is that the wholesale market prices have increased dramatically since 2000. Testimony at Commission hearings has consistently indicated that no one contemplated wholesale natural gas prices would settle out at $5, $6 and $7 per MMBtu, when they hovered around $2 and $3 in 1996. The Commission reminds ratepayers that it does not control or regulate these commodity prices.

While the Commission has heard the concerns of TEC-RI with regard to the procurement of SOS supply, the Commission notes that the SOS contracts that are currently in place are all requirements load following contracts with fixed prices, some that have fuel adjustment clauses, which extend through 2009. These contracts were approved by FERC after its administrative process back in 1998. If large commercial and industrial ("C&I") customers are truly concerned with what they perceive as above-market SOS prices, we encourage them to seek pricing in the market. It may be that while there may be less long-term price certainty, actual costs could be lessened in the market.

17

However, in response to a generalized concern that the SOS pricing may be in excess of the market, the Commission notes that after a review of Mr. Hager's pre-filed testimony, recent procurements in Massachusetts resulted in energy charges ranging from 6.646 cents per kWh for certain industrial customers to 7.093 cents per kWh for residential customers for the periods beginning in November 2004 and extending into 2005. Although filed after determination in this docket and not a part of the Commission's deliberations, the Commission notes that the average LRS pricing for non-residential customers for the eight month period January 1, 2005 through August 31, 2005 is 6.987.

Accordingly, it is hereby

(18151) ORDERED:

1.  Narragansett Electric Company's proposed retail Standard Offer Service Rate of 6.7 cents per kWh is approved for service on and after January 1, 2005.

2.  Narragansett Electric Company's proposed Transition Rate of 0.845 cents per kWh is approved to become effective for service on and after January 1, 2005.

3.  Narragansett Electric Company shall file a monthly reconciliation of the projected SOS balance for December 31, 2005.

4.  Narragansett Electric Company shall comply with all other findings and instructions as contained in this Report and Order.

EFFECTIVE AT WARWICK, RHODE ISLAND PURSUANT TO A BENCH DECISION ON DECEMBER 13, 2004.  WRITTEN ORDER ISSUED FEBRUARY 17, 2005.

PUBLIC UTILITIES COMMISSION

_____
Elia Germani, Chairman


_____
Robert B. Holbrook, Commissioner